## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| REVIER TECHNOLOGIES, INC.; <br><br> YOUNG AMERICA'S FOUNDATION, <br><br>     *Plaintiffs,* <br><br> v. <br><br> KELLY LOEFFLER, in her official capacity as Administrator of the U.S. Small Business Administration; <br><br> U.S. SMALL BUSINESS ADMINISTRATION; <br><br> PAMELA BONDI, in her official capacity as Attorney General of the United States and head of the U.S. Department of Justice; and <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br>     *Defendants.* | Civil Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. The federal government, across a variety of public programs, presumes individuals are "socially disadvantaged" based solely on their race. This policy is unconstitutional, and the rule implementing it should be vacated under the Administrative Procedure Act.

2. Section 8(a) of the Small Business Act is "an affirmative action contracting program," *United States v. Harris*, 821 F.3d 589, 591 (5th Cir. 2016), that directs the Small Business Administration to fulfill government contracts using small

businesses owned and controlled by "socially and economically disadvantaged individuals," 15 U.S.C. § 637(a).

3.     To implement this statute, the SBA issued a rule creating a *presumption* that members of certain races are "socially disadvantaged."[1] For example, the SBA Regulation presumes that *all* "Asian Pacific Americans," "Subcontinent Asian Americans," "Hispanic Americans," and "Black Americans," among other categories, are socially disadvantaged, merely because of their race or ethnicity. 13 C.F.R. § 124.103(b).

4.     Qualifying as "socially disadvantaged" is big business. At least hundreds of billions in federal tax dollars have flowed through the SBA's Section 8(a) program to select businesses, based on the unconstitutional presumption that someone's race, and only their race, makes them socially disadvantaged.

5.     But it is even worse than that. The SBA Regulation has been incorporated into programs administered by *other* federal agencies, imposing racial discrimination on small business owners, college students, and, indeed, countless Americans, in their dealings with an array of federally administered programs.

6.     For example, Plaintiff Revier Technologies, a Louisiana start-up technology company, is developing an artificial intelligence application for the construction industry, but it was denied small business investment capital, offered through the U.S. Department of the Treasury's State Small Business Credit

---

[1]  *See 8(a) Business Development/Small Disadvantaged Business Status Determinations*, 63 Fed. Reg. 35726 (June 30, 1998) (codified at 13 C.F.R. parts 121, 124, and 134) ("SBA Regulation").

Initiative, because funding is limited to "business enterprise[s] owned and controlled by socially and economically disadvantaged individuals," as defined by the SBA Regulation. Revier Technologies' owner, Matthew Schultheis, is white and therefore cannot benefit from the presumption of social disadvantage.

7.    Plaintiff Young America's Foundation is a nationwide conservative student organization with members at more than 1,000 colleges. A number of those students are eligible for a competitive cybersecurity fellowship offered by the Department of Homeland Security, but because their race is not presumed "socially disadvantaged," as defined by the SBA Regulation, they cannot apply for the fellowship on an equal footing.

8.    This lawsuit presents two examples of the SBA Regulation's reach, but that reach extends even further. For example, NASA sets a goal to provide eight percent of all contracting dollars to businesses owned and controlled by socially and economically disadvantaged individuals, as defined by the SBA Regulation. 51 U.S.C. § 30304. The Environmental Protection Agency does the same, with ten percent of certain research dollars relating to the Clean Air Act. 42 U.S.C. § 7601 note; 40 C.F.R. § 33.203(b). And there are more.

9.    The federal government's pervasive use of race as a proxy for determining who is "socially disadvantaged"—and therefore who receives contracts, grants, loans, investment capital, opportunities, and other benefits—is unconstitutional, and it must be stopped.

10.    The Constitution promises "equal protection of the laws." U.S. Const. amend. XIV, § 1. And, as the Supreme Court recently reaffirmed, that protection is "universal in its application." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (citation modified). "[It] cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id.* (citation modified). This means "doing away with all governmentally imposed discrimination based on race." *Id.* (citation modified).

11.    The Constitution's guarantee of equal protection applies, not just against the states through the Fourteenth Amendment's Equal Protection Clause, but against the federal government as well, through the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). As a result, "[f]ederal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest," *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 235 (1995)—a familiar legal test called "strict scrutiny."

12.    The SBA Regulation fails this test. The government has no compelling interest in discriminating against specific people in an attempt to remedy society-wide discrimination. To justify race-based action, the government must show specific, identified instances of past discrimination by the agency seeking to discriminate based on race. The SBA Regulation is not grounded in any such evidence.

13.    The SBA Regulation also lacks the required narrow tailoring. Indeed, the SBA Regulation is hardly tailored at all. There is no standard for assessing

whether the racial presumption is succeeding or has succeeded; there is no end date to the use of categorical racial presumptions; there is no process for removing a group from the list; and, in any event, the racial categories lack any meaningful connection to any alleged goal. As just some examples, Uyghur heritage from Kyrgyzstan is not presumed "socially disadvantaged," but Han Chinese heritage is. Pakistanis are in; Afghans are out. And because "Hispanic American" includes anyone of Spanish origin, the lineal descendants of the conquistadors are presumed socially disadvantaged.

14.    One court has already held that the application of the SBA's Regulation—by the SBA itself—violates the equal protection guarantee of the Fifth Amendment. *See Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023).

15.    Other courts have held that materially identical race-based presumptions of social disadvantage—drafted in other statutes or regulations, not merely incorporating the SBA Regulation—are also unconstitutional. *See Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 497–98 (N.D. Tex. 2024) (addressing the race-based presumption in 15 U.S.C. § 9501); *Mid-Am. Milling Co., LLC v. U.S. Dep't of Transp.*, No. 3:23-CV-00072-GFVT, 2024 WL 4267183, at *1 (E.D. Ky. Sept. 23, 2024), *opinion clarified*, No. 3:23-CV-00072-GFVT, 2024 WL 4635430 (E.D. Ky. Oct. 31, 2024) (addressing the race-based presumption in 49 C.F.R. § 26.67).

16.    The U.S. Solicitor General has taken the extraordinary step of formally notifying Congress that the Justice Department "will no longer defend the

constitutionality of" the Department of Transportation's substantially identical disadvantaged business enterprise (DBE) program regulation creating "race- and sex-based presumptions" of disadvantage because it "has determined that the USDOT DBE program is unconstitutional to the extent that it creates a presumption of social or economic disadvantage based on race or sex." D. John Sauer, Solicitor General, Race- and Sex-Based Presumptions in USDOT Disadvantaged Business Enterprise Program, 530D Letter 1–2 (June 25, 2025). DOT's program mimics the SBA's and even refers to the latter in its own implementing regulation. *See* 49 C.F.R. § 26.67(a)(1).

17.     Yet the SBA's racially discriminatory regulation remains in force, embedded in programs throughout the federal government.

18.     Plaintiff Revier Technologies and members of Young America's Foundation have been denied a fair chance to access federal opportunities because the SBA Regulation discriminates against them based on their race. And once again, those subjected to discriminatory treatment must rely on the Courts to fulfill the Constitution's guarantee of equal protection.

19.     This Court should "hold unlawful and set aside" the SBA Regulation. *See* 5 U.S.C. § 706(2).

20.     This Court should also issue any appropriate declaratory or injunctive relief to effectuate its judgment. *See* 5 U.S.C. §§ 702, 705.

## PARTIES

21.     Plaintiff Revier Technologies, Inc., is a Louisiana corporation, with all operations, including its principal place of business, in Thibodaux, Louisiana.

22.    Plaintiff Young America's Foundation (YAF) is a leading nationwide organization for young conservatives, founded in 1969, with thousands of student members on more than 1,000 college campuses across the country. For six decades, YAF has diligently fought for, protected, and handed on the ideas of individual freedom, a strong national defense, free enterprise, and traditional values. YAF's headquarters are in Reston, Virginia.

23.    Defendant Kelly Loeffler is the Administrator of the U.S. Small Business Administration (SBA) and is sued in her official capacity as the head of the agency.

24.    Defendant SBA is an independent agency of the United States whose purpose is to aid, counsel, assist and protect the interests of small business concerns, preserve free competitive enterprise, and maintain and strengthen the overall economy of our nation. SBA issued the regulation challenged in this action, *8(a) Business Development/Small Disadvantaged Business Status Determinations*, 63 Fed. Reg. 35726 (June 30, 1998) (codified at 13 C.F.R. parts 121, 124, and 134).

25.    Defendant Pamela Bondi is the Attorney General of the United States and is sued in her official capacity as the chief law enforcement officer of the United States and the head of the U.S. Department of Justice.

26.    Defendant U.S. Department of Justice is a cabinet-level agency of the United States that oversees the enforcement of many federal laws, in addition to performing a number of other functions. As described below, the SBA Regulation was issued, in part, in response to a Department of Justice proposal regarding federal-

procurement affirmative-action programs that defended maintaining the racial presumption at issue here. *See Proposed Reforms to Affirmative Action in Federal Procurement*, 61 Fed. Reg. 26042 (May 23, 1996).

## JURISDICTION AND VENUE

27.    This Court has jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

28.    This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706(2).

29.    Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1), because one of Defendants resides in this district, one of Plaintiffs resides in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

### I.    The SBA Regulation Presumes Individuals Are Disadvantaged Based Solely On Their Race.

30.    Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), directs the SBA to provide federal contracting opportunities to "small business concern[s] owned and controlled by socially and economically disadvantaged individuals." *Id.* at § 637(a)(1)(C).

31.    "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of

a group without regard to their individual qualities." *Id.* at § 637(a)(5).[2]

32.    "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* at § 637(a)(6)(A).

33.    In other words, to be "economically disadvantaged," the statute requires individuals must also be "socially disadvantaged."

34.    Regarding social disadvantage, the statute delegates to the SBA the power to determine which groups have been subjected to racial or ethnic prejudice or cultural bias. *See id.* at § 637(a)(8).

35.    But the SBA went further than that. Instead of merely identifying racial and ethnic groups that have been subject to prejudice or bias, the SBA created a presumption that *all* members of certain groups *are* socially disadvantaged.

36.    In 1983, the SBA first proposed creating a presumption of disadvantage for all members of certain racial groups, so that "in all but the rarest of cases, persons who are members of the designated minority groups would be deemed socially disadvantaged." *Minority Small Business and Capital Ownership Development Assistance*, 48 Fed. Reg. 56686, 56686 (proposed Dec. 22, 1983).

---

[2] The statute refers to race and ethnicity, and the SBA Regulation includes both racial categories and ethnic categories. For simplicity, this Complaint refers to both of these as "racial" categories and the presumption within the SBA Regulation as a "racial" presumption.

37.    And certain designated racial groups appeared in that final rule. *See Minority Small Business and Capital Ownership Development Assistance*, 51 Fed. Reg. 36132, 36144 (Oct. 8, 1986).

38.    In 1995, the Supreme Court decided *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995), holding that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny," *id.* at 227.

39.    In response, the Justice Department issued a proposal for federal acquisition programs that, it asserted, would "ensure compliance with the constitutional standards established by the Supreme Court in *Adarand* …." *Proposed Reforms to Affirmative Action in Federal Procurement*, 61 Fed. Reg. 26042, 26042 (May 23, 1996).

40.    The Justice Department's proposal did not, however, eliminate the racial presumption in the SBA's Section 8(a) regulations but, instead, argued for maintaining it.

41.    Partly in response to the Justice Department's proposal, the SBA then proposed amendments to the Section 8(a) program. *8(a) Business Development / Small Disadvantaged Business Status Determinations*, 62 Fed. Reg. 43584, 43584 (proposed Aug. 14, 1997).

42.    The SBA's proposed rule did not eliminate the racial presumption. Instead, the final version of the rule included the racial presumption in substantially the same form in which it appears today. *See* SBA Regulation, 63 Fed. Reg. at 35741.

10

43.    The present version of that presumption states:

> There is a rebuttable **presumption that the following individuals are socially disadvantaged**: Black Americans; Hispanic Americans; Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA ….

13 C.F.R. § 124.103(b)(1) (emphasis added).[3]

44.    Put differently, the SBA Regulation presumes that every individual belonging to any one of the listed racial categories is socially disadvantaged, merely because of their race.

45.    The SBA has never removed a group from this list.

---

[3] The original version of the presumption in the SBA Regulation included the text "Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians)." *See* SBA Regulation, 63 Fed. Reg. at 35741. In 2011, that text was amended to state: "Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe)." *8(a) Small Business Development / Small Disadvantaged Business Status Determinations*, 76 Fed. Reg. 8222, 8254 (Feb. 11, 2011). Since then, the text of 13 C.F.R. 124.103(b)(1) has remained the same.

46.    In fact, the SBA does not have criteria to evaluate whether a group should be removed from this list because it is no longer suffering the present effects of past discrimination.

47.    Although, in theory, a third party can challenge whether the "rebuttable presumption" should apply to an individual belonging to these specific groups, the SBA does not have a process for doing so.

48.    The SBA has not considered any race-neutral alternatives to the use of the rebuttable presumption since 1986, almost 40 years ago, when a rebuttable presumption was first created.

49.    An individual who is not a member of these identified groups does not receive the benefit of the presumption.

50.    That individual can qualify as socially disadvantaged, but in contrast to members of certain groups, who are presumed disadvantaged, the SBA Regulation requires a member of the out-group to *demonstrate* social disadvantage by a preponderance of the evidence through an onerous four-part review process. 13 C.F.R. § 124.103(c).

51.    The individual must demonstrate that he or she possesses "[a]t least one distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, identifiable disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." *Id.* at § 124.103(c)(2)(i).

52.    The individual must prove that his or her "social disadvantage [is] rooted in treatment which he or she has experienced in American society, not in other countries." *Id.* at § 124.103(c)(2)(ii).

53.    Additionally, the individual must demonstrate a social disadvantage that is "chronic and substantial." *Id.* at § 124.103(c)(2)(iii).

54.    And that social disadvantage "must have negatively impacted on [the individual's] entry into or advancement in the business world." *Id.* at §§ 124.103(c)(2)(iv), (c)(3).

55.    If there is a legitimate alternative ground to explain an adverse action, and the person has not demonstrated that bias is a more likely explanation, the SBA may reject the claim of social disadvantage. *Id.* at § 124.103(c)(3)(ii).

56.    As a particular example, the regulations state, if a woman claims social disadvantage because she was paid less than male counterparts, that claim would be insufficient because "[w]ithout additional facts, it is no more likely that the individual claiming disadvantage was paid less than her male counterpart because he had superior qualifications or because he had greater responsibilities." Example 1 to 13 C.F.R. § 124.103(c)(3)(ii).

57.    Similarly, even if the applicant demonstrates discriminatory conduct, the applicant must connect it to some difficulty to succeed in the business world. If, therefore, a woman's clients make derogatory statements about her because she is a woman, but nonetheless continue to do business with her, she has not demonstrated social disadvantage. Example to 13 C.F.R. § 124.103(c)(3)(iii).

58.     Therefore, for individuals of non-preferred races, the process set out in the SBA Regulation is more costly, onerous, and time-consuming, compared to the process for those who automatically qualify through the racial presumption. Many people are likely dissuaded from even applying, and of those who have applied through this process, only approximately fifty percent were accepted.

## II.     The SBA Regulation Was Used Against Plaintiffs.

### A.     The Racial Presumption Denies Revier Technologies an Equal Opportunity to Compete for Small Business Investment Capital.

59.     The Small Business Jobs Act of 2010, Pub. L. No. 111-240, authorizes the State Small Business Credit Initiative (SSBCI), 12 U.S.C. § 5701–10, which administers billions of federal dollars through state and private intermediaries. Pub. L. No. 111-240, §§ 3001–11, 124 Stat. 2504, 2568–2582.

60.     The program was re-authorized with the American Rescue Plan Act of 2021, which added the portions of the law at issue. Pub. L. No. 117-2, § 3301(b), (f); 135 Stat. 4, 69–72 (amendments codified, in relevant part, at 12 U.S.C. § 5701–02).

61.     Those relevant portions set aside certain SSBCI funding to "support business enterprises owned and controlled by socially and economically disadvantaged individuals." Pub. L. No. 117-2, § 3301(b); 12 U.S.C. § 5702(d)–(e).

62.     The 2021 Act allocated $1.5 billion of those funds to be expended for "business enterprises owned and controlled by socially and economically disadvantaged individuals … based on [their] needs … in each State …." 12 U.S.C. § 5702(d).

63.    The 2021 Act also directed $1.0 billion "for an incentive program under which the Secretary shall increase the second 1/3 and last 1/3 allocations for States that demonstrate robust support, as determined by the Secretary, for business concerns owned and controlled by socially and economically disadvantaged individuals in the deployment of prior allocation amounts." 12 U.S.C. § 5702(e).

64.    The term "business enterprise owned and controlled by socially and economically disadvantaged individuals" means a business that is 51 percent owned by "one or more socially and economically disadvantaged individuals." 12 U.S.C. § 5701(15)(A).

65.    The Act provided that "socially and economically disadvantaged individual" means "an individual who is a socially disadvantaged individual or an economically disadvantaged individual, as such terms are defined, respectively, under section 637 of title 15 [Section 8 of the Small Business Act] *and the regulations thereunder*." 12 U.S.C. § 5701(18) (emphasis added).

66.    Matthew Schultheis owns a small software company, Revier Technologies, Inc., located in Thibodaux, Louisiana. He is currently developing an AI application for the construction industry.

67.    Revier Technologies was incorporated in May 2018 but had no activities until 2024. To date, Revier Technologies has had no substantial operations and has minimal assets.

68.    At all relevant times, Schultheis has been a majority owner and sole operator of Revier Technologies.

69.     In 2024, at the relevant times of each application, Schultheis was an economically and socially disadvantaged individual.

70.     And Revier Technologies was therefore owned or operated by an economically and socially disadvantaged individual and was otherwise eligible for SSBCI funds.

71.     Revier Technologies could not benefit from the presumption of social disadvantage, however, because Schultheis is white and therefore is not a member of the designated racial categories established in the SBA Regulation.

72.     Tulane Ventures started in 2023 and resides under the Tulane Innovation Institute. Tulane Ventures invests in Tulane University professors, students, alumni, and Louisiana-based entrepreneurs. Tulane Ventures Seed Fund (the Fund) administers federal funds it receives from the state under the SSBCI to small businesses located in Louisiana.

73.     On June 18, 2024, Schultheis applied to the Fund on behalf of Revier Technologies, using the application on the web site, which, among other things, asked, "Are you 51% owned and controlled by minority individual (defined as a natural person who identifies as American Indian or Alaska Native; Asian American; Black or African American; Native Hawaiian or Other Pacific Islander; Hispanic or Latino/a, or one or more)?" Schultheis checked "no" to this question.

74.     On July 3, Schultheis received an email from Marco Malero, "Venture Capital Analyst," stating:

> Thank you for submitting your intake form to Tulane Venture
> Fund. Unfortunately, your startup does not align with our current

investment criteria and strategy. Your business does not qualify as a SEDI-owned [socially and economically disadvantaged individual], business and is therefore not eligible for SSBCI funding.

75.    Schultheis did not receive an investment from the Fund.

76.    Schultheis also applied to three other funds that administer money from the State Small Business Credit Initiative on behalf of Revier Technologies in June or July of 2024.

77.    For each application, Revier Technologies could not benefit from the presumption of social disadvantage provided to members of certain races.

78.    Each fund denied Revier Technologies' application.

**B.    YAF Members Cannot Apply for a Government Fellowship on an Equal Footing Because of the Racial Presumption.**

79.    Even seemingly small federal programs, such as the Intelligence and Cybersecurity Diversity Fellowship (ICDF) program at the Department of Homeland Security (DHS) rely on the SBA Regulation. *See* 6 U.S.C. § 665a. The fellowship provides "tuition assistance," a paid internship at DHS, and, upon successful completion of the internship, "an offer of employment to work in an intelligence or cybersecurity position of the Department," for college students meeting certain criteria. *See* 6 U.S.C. § 665a(b).

80.    But the ICDF program requires applicants to be "socially disadvantaged," as defined by the SBA Regulation.

81.    The relevant statute states:

To be eligible to participate in the Program, an individual shall—

(1) be a citizen of the United States; and

(2) as of the date of submitting the application to participate in the Program—

    (A)have a cumulative grade point average of at least 3.2 on a 4.0 scale;

    (B) ***be a socially disadvantaged individual (as that term i[s] defined in section 124.103 of title 13***, Code of Federal Regulations, or successor regulation); and

    (C) be a sophomore, junior, or senior at an institution of higher education.

*Id*. at § 665a(c) (emphasis added).

82.    Unlike the Section 8(a) program, there is no need also to demonstrate economic disadvantage; social disadvantage alone matters. *See id.*

83.    Congress appropriated funds for the program, and DHS has issued a contract announcement for performance of this program, with performance periods beginning in 2022 and lasting through September 29, 2027.[4]

84.    According to archives of DHS's website from 2024, "The Intelligence and Cybersecurity Diversity Fellowship Program is designed to help DHS recruit, retain, and reward the best and brightest in the fields of intelligence or cybersecurity. The program provides qualified students opportunities to work alongside highly skilled intelligence or cybersecurity professionals at DHS, gain hands-on technical experience, interact with experts and peers at professional development events and

---

[4] U.S. Dep't of Homeland Security, *Statement of Work*, https://bit.ly/4pkhJS2.

expand their professional network at national conferences." *See* U.S. Dep't of Homeland Security, Careers, ICDF, https://bit.ly/4oxrwDJ.

85.    DHS accepted applications for the program during the "late summer to early fall" every year since its inception through the USAJOBS website. *Id.* ("How to Apply").

86.    DHS accepted applications in 2024 for positions beginning in May of 2025. *See id.*

87.    Young America's Foundation is a nationwide student organization with members located at more than 1,000 campuses across the country.

88.    Some YAF student members were otherwise eligible for the program during past years of administration, but in those years "as of the date of submitting the application to participate in the Program," 6 U.S.C. § 665a(c), they could not apply for the program on an equal footing because of their race.

89.    Moreover, some YAF members want to apply in the future to the ICDF program, but because they are not members of certain favored races, they cannot apply on an equal footing for the program.

## III.    Plaintiffs' Challenge To The SBA Regulation Is Timely.

90.    The Administrative Procedure Act creates a federal mechanism for challenging "final agency action," 5 U.S.C. § 704, to ensure that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," *id.* at § 702.

91.    A reviewing court must "hold unlawful and set aside agency action … found to be … arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law … contrary to constitutional right, power, privilege, or immunity … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A)–(C).

92.    An APA challenge is timely filed when "the complaint [is] filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a).

93.    But this does not mean that "the limitations period for facial challenges to regulations begins when the rule becomes final even if the plaintiff does not yet have a complete and present cause of action." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 816 (2024).

94.    Instead, a "right of action accrues when the plaintiff has a complete and present cause of action—*i.e.*, when she has the right to file suit and obtain relief." *Id.* at 809 (citation modified). "An APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is injured." *Id.*

95.    "[B]ecause litigants can bring civil actions against the government challenging a regulation only after they are injured, their claims cannot accrue before that date." *Soc'y of the Divine Word v. United States Citizenship & Immigr. Servs.*, 129 F.4th 437, 448 (7th Cir. 2025). "And the fact that a plaintiff's challenge might be facial as opposed to as-applied makes no difference." *Id.* "In either case, we look to *when the plaintiff was injured* by a final agency action." *Id.* (emphasis added).

96.     "[I]n the context of a challenge to a set-aside program," as with the facial claims here, "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Northeastern Fla. Assoc. Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993). This is because a plaintiff suffers a concrete injury at the moment he or she faces "discriminatory treatment." *Inclusive La. v. St. James Par.*, 134 F.4th 297, 311 (5th Cir. 2025).

97.     Revier Technologies first applied for SSCBI funding during the summer of 2024.

98.     Its claim therefore accrued well within six years of the filing of this complaint.

99.     YAF members were eligible for the ICDF programs in the past several school years—well within the six-year limitations period—but could not qualify as "socially disadvantaged."

100.    Additionally, YAF members remain eligible for the ICDF program and would like to apply in the future, but because they cannot qualify as "socially disadvantaged," applying to the program will be futile.

101.    YAF members' claims accrued "as of the date of … the application" to the ICDF program for which they were otherwise eligible. *See* 6 U.S.C. § 665a(c)(2)(B).

102.    YAF members' claims therefore also accrued well within six years of the filing of this complaint.

## COUNT I
### Administrative Procedure Act Violation
### Contrary to Constitutional Right, U.S. Const. Amend. V and XIV
### (5 U.S.C. § 706(2)(A), (B))

103.    Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully set forth herein.

104.    The Administrative Procedure Act directs a court to "hold unlawful and set aside" any agency rule that is "not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B).

105.    The SBA Regulation, issued after notice and comment rulemaking, marks the consummation of SBA's decision-making process.

106.    The SBA Regulation also determines rights and legal obligations, as it creates presumptive advantages and disadvantages based on race for applicants in a variety of federal programs, including those affecting Plaintiffs.

107.    The SBA Regulation is therefore "final agency action," which is reviewable under the APA. *See* 5 U.S.C. § 704.

108.    The SBA Regulation assigns benefits—specifically, government contracts—to those who can qualify as "socially and economically disadvantaged."

109.    That regulation *presumes* that all individuals in certain designated racial groups qualify as socially disadvantaged. 13 C.F.R. § 124.103(b).

110.    By contrast, individuals who are not members of specific groups do not receive the benefit of the presumption.

111.    Instead, the SBA Regulation requires those out-group individuals to navigate a complex and difficult process to prove by a preponderance of the evidence that they are socially disadvantaged. 13 C.F.R. § 124.103(c).

112.    Many are likely deterred from undertaking this process.

113.    And for those who have undertaken this process, approximately half were rejected, which is a stark contrast to those in preferred racial groups who are automatically and unquestionably accepted.

114.    The SBA Regulation therefore treats individuals differently based on race, assigning benefits to members of racial groups merely because of their race.

115.    The Constitution forbids "discrimination by the general government ... against any citizen because of his race." *Gibson v. Mississippi*, 162 U.S. 565, 591 (1896).

116.    "The Equal Protection Clause of the Fourteenth Amendment provides that 'no State shall deny to *any person* within its jurisdiction the equal protection of the laws.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948)) (citation modified; emphasis in original). Applying the Fourteenth Amendment, the Supreme Court has "consistently denied the constitutionality of measures which restrict the rights of citizens on account of race." *Students for Fair Admissions*, 600 U.S. at 205 (quoting *Loving v. Virginia*, 388 U.S. 1, 11–12 (1967)).

117.   "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013).

118.   "*All* racial classifications imposed by the government must be analyzed by a reviewing court under strict scrutiny." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation modified; emphasis in original). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Id.* (citation modified).

119.   Race-conscious programs must also meet an additional test. According to the Supreme Court, race-based programs must "comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype." *Students for Fair Admissions*, 600 U.S. at 218.

120.   And all race-based programs must have a "logical end point." *Id.* at 221–22 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003)).

121.   The SBA Regulation's racial presumption therefore violates the Equal Protection Clause of the Fourteenth Amendment and Plaintiffs' Fifth Amendment Due Process rights to equal treatment because (i) Defendants lack a compelling government interest for the SBA Regulation's racial presumption, (ii) the racial presumption is not narrowly tailored to serve a compelling governmental interest, (iii) race is used as a negative, (iv) race is used as a stereotype, and (v) the SBA Regulation does not contain a logical end point.

122.   *First*, to establish a compelling government interest, Defendants must have a "strong basis in evidence," *Croson*, 488 U.S. at 500, that the purpose of the program is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," *Students for Fair Admission*, 600 U.S. at 207.

123.   Defendants have not, and cannot, provide a strong basis in evidence that the SBA Regulation remediates specific, identified instances of past discrimination that violated the Constitution or a statute.

124.   *Second*, Defendants have not, and cannot, show that the SBA Regulation is narrowly tailored to meet any compelling government interest.

125.   To be narrowly tailored, race-conscious government action "must be specifically and narrowly framed to accomplish [the government's] purpose." *Grutter*, 539 U.S. at 333.

126.   But the SBA Regulation lacks any "meaningful connection between the means [it] employ[s] and the goals [it] pursues." *See Students for Fair Admissions*, 600 U.S. at 216.

127.   The racial categories in the SBA Regulation are "plainly overbroad" and "arbitrary or undefined." *See id.*; *see also* David Bernstein, *Classified: The Untold Story of Racial Classification in America* xiv-xvi (2022).

128.   For example, Americans with ancestors from Spain are presumed socially disadvantaged, but not Americans with other European ancestry. Americans with their ancestry in Pakistan and India qualify, but those with ancestry in Afghanistan, Iran, and Iraq do not. Americans with Chinese and Japanese ancestry

qualify, but those with ancestry from Central Asian countries such as Kyrgyzstan, Tajikistan, Uzbekistan, and Turkmenistan do not. Nor do Americans with Arab or Berber ancestry.

129. *Third*, race is used as a "negative" because programs relying on the regulation, do not consider applicants or potential applicants, such as Revier Technologies and YAF's student members, on equal footing based on race. "A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Students for Fair Admission*, 600 U.S. at 218–19.

130. *Fourth*, the SBA Regulation uses race as a stereotype because Defendants presume that all individual bidders or applicants who are members of certain racial categories are similarly "disadvantaged" and thus meet this qualification.

131. *Finally*, the SBA Regulation "lack[s] a logical end point." *Id.* at 221.

132. Neither the racial presumption, nor the categories within the presumption, expire or "sunset" at any point.

133. Moreover, the SBA Regulation does not contain a process for removing a racial category from the presumption.

134. SSBCI funding incorporates the SBA Regulation, together with its racial presumption of social disadvantage.

135. Revier Technologies was otherwise eligible for SSBCI funding and was owned by one or more socially and economically disadvantaged individuals at the

time it applied to four different funds distributing SSBCI funding in the summer of 2024.

136.    Revier Technologies' owner, Matthew Schultheis, is white.

137.    Revier Technologies therefore could not benefit from a presumption of social disadvantage when it applied in the summer of 2024 to these funds, and thus could not apply on an equal footing, because it is not majority owned and controlled by one or more member of the racial groups set out in the SBA Regulation.

138.    Additionally, the ICDF program incorporates the SBA Regulation and its presumption of social disadvantage for all members of certain racial groups.

139.    YAF members could not benefit from the presumption of social disadvantage when they were eligible to apply for the ICDF because, even if socially disadvantaged, they were not members of the racial groups set out in the SBA Regulation.

140.    Additionally, YAF members that are still eligible to apply to the ICDF will not be able to apply on an equal footing in the future.

141.    Therefore, the SBA Regulation is not in accordance with law and contrary to constitutional right, specifically the Fifth and Fourteenth Amendments, because it discriminates against applicants on the basis of race, without satisfying strict scrutiny.

142.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction ordering vacatur of the SBA Regulation,

attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT II
### Administrative Procedure Act Violation — Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

143.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 102 as if fully set forth herein.

144.    The APA directs a court to "hold unlawful and set aside" any agency rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

145.    Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

146.    The SBA Regulation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

147.    Section 2(f) of the Small Business Act, initially passed in 1978 and amended several times in the 1980s, states that Congress has found "many persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control," 15 U.S.C. § 631(f)(1)(B), and "that

such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities," *id.* at 631(f)(1)(C).

148.   But these findings do not include any factual findings of "specific, identified instances of past discrimination that violated the Constitution or a statute," *see Students for Fair Admission*, 600 U.S. at 207, let alone sufficient findings to support the SBA Regulation.

149.   Nor do these findings state that *all* members of these identified groups are, or should be presumed to be, socially disadvantaged.

150.   The SBA Regulation does not discuss *any* findings regarding specific, identified instances of past discrimination that violated the Constitution or a statute.

151.   Indeed, the SBA Regulation does not discuss or cite any factual findings regarding racial discrimination at all.

152.   The SBA Regulation, instead, leaps to the conclusion, unsupported by sufficient evidence, that all members of certain racial groups are "socially disadvantaged."

153.   The SBA's decision to create a presumption that all members of certain races are socially disadvantaged is, accordingly, unsupported by the record and is therefore arbitrary and capricious.

154.   Moreover, the racial categories used are arbitrary. For example, Americans with ancestors from Spain are presumed socially disadvantaged, but not Americans with other European ancestry. Americans with their ancestry in Pakistan

and India qualify, but those with ancestry in Afghanistan, Iran, and Iraq do not. Americans with Chinese and Japanese ancestry qualify, but those with ancestry from Central Asian countries such as Kyrgyzstan, Tajikistan, Uzbekistan, and Turkmenistan do not. Nor do Americans with Arab or Berber heritage.

155.    As alleged above in paragraphs 134 through 140, Plaintiff Revier Technologies and members of Plaintiff YAF are harmed by the SBA Regulation.

156.    Accordingly, the SBA Regulation should be set aside and held unlawful as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that the Court:

A.    Issue declaratory and injunctive relief, pursuant to 5 U.S.C. §§ 702, 705, 706(2) and 28 U.S.C. §§ 2201–02, that holds unlawful and sets aside the SBA Regulation, U.S. Small Business Administration, *8(a) Business Development/Small Disadvantaged Business Status Determinations*, 63 Fed. Reg. 35726 (June 30, 1998) (codified at 13 C.F.R. parts 121, 124, and 134);

B.    Award Plaintiffs their reasonable costs, including of attorneys' fees, for bringing the action, per 28 U.S.C. § 2412; and

C.    Grant other legal and equitable relief as the Court deems just and proper.

DATED: November 17, 2025

Respectfully submitted,

_/s/ F. Evans Schmidt_

Michael A. Petrino*
Caleb Kruckenberg*
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW
Suite 625
Washington, DC 20036
(202) 833-8400
kruckenberg@cir-usa.org
petrino@cir-usa.org

Daniel P. Lennington*
Lucas Vebber*
WISCONSIN INSTITUTE FOR LAW
    & LIBERTY, INC.
330 East Kilbourn Avenue
Suite 725
Milwaukee, WI 53202
(414) 727-9455
dan@will-law.org
lucas@will-law.org

F. Evans Schmidt, La. Bar #21863
KOCH & SCHMIDT LLC
650 Poydras Street
Suite 2660
New Orleans, LA 70130
(504) 208-9040
feschmidt@kochschmidt.com

_Attorneys for Plaintiffs_

*Motion for admission _pro hac vice_
forthcoming