**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

<table>
<tr><td>

REVIER TECHNOLOGIES, INC., *et al.*,

*Plaintiffs*,

v.

LOEFFLER, *et al.*,

*Defendants.*

</td><td>

CASE NO. 2:25-cv-02328

JUDGE ST. JOHN
MAG. NORTH

</td></tr>
</table>

<u>**DECLARATION OF SONYA HOPSON**</u>

I, Sonya Hopson, declare as follows:

1.    My name is Sonya Hopson. I am a resident of Bowie, Maryland. I am over eighteen years old. This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my career and duties. If called as a witness, I could and would testify competently to the matters set forth below. I provide this declaration in support of the Proposed Intervenors' Motion to Intervene.

**Sage Services Group LLC**

2.    In 2010, while sitting at my kitchen table, I founded Sage Services Group LLC—a professional services company that provides innovative solutions to clients across the engineering, aerospace, education, consulting and human capital industries.

3.    Over the last 16 years, Sage Services Group has grown into a multi-state professional services firm. We specialize in system engineering expertise with a client-focused approach to help our clients make operational adjustments.

4.    As founder and CEO of Sage Services Group, I partner with federal agencies, prime contractors, and growing firms to strengthen their engineering, workforce, and operational

systems. We help build, scale and navigate complex government or regulated environments by providing long-term sustainable solutions for organizational, processing and systematic challenges.

5.    Sage Services Group supports complex, high-stakes environments across the federal government. We have worked work with NASA, the U.S. Department of Defense, the U.S. Department of Labor ("DOL"), the U.S. Department of State ("State"), the U.S. Department of Commerce ("Commerce"), the U.S. Department of Health and Human Services ("HHS"), other civilian agencies, and state organizations.

6.    At NASA, for example, we provide expert system engineering services to ensure that programs and software supplied by non-government vendors are working properly and comply with NASA's safety and engineering requirements.

7.    At the National Oceanic and Atmospheric Administration (NOAA) we trained staff in project management tools that improved the agency's ability to make procurement decisions efficiently and quickly—a skillset that staff took with them beyond their work at NOAA.

**Past Discrimination in Employment and Business Development**

8.    My professional success has not been without difficulties. There is still a significant amount of racial discrimination in business that I, as a Black woman, have experienced firsthand.

9.    For example, before I founded Sage Services Group, I worked as an engineering analyst at a nuclear power plant in Maryland. For several years, I sought to be promoted from an engineering analyst to an engineer. Being classified as an engineer would have opened the door to salary increases and other meaningful opportunities. But for several years I was consistently denied promotions and told that I needed to have a degree in engineering to be considered for advancement. Because I had a Bachelor of Science in physics and was already one year into a

master's program for industrial engineering and operations research, I asked if a master's in engineering would suffice for a promotion. That proposal was rejected. I was told instead that I needed a bachelor's degree in engineering (civil, mechanical or electrical) because the company did not recognize master's degrees in those areas. This response did not make sense: my white supervisor had the same bachelor's degree in physics as I did, and other white coworkers throughout the plant, without engineering degrees, were classified as engineers based solely on their military experience. As a result, I knew that I was being held to a different standard as a Black woman as compared to my white counterparts.

10.    Determined to qualify for promotional opportunities, I earned a bachelor's degree in engineering while working and raising my three children. There were no virtual course options available in the early 2000s, which meant I had to attend classes, in person, during normal work hours. Three days a week, for a year and a half, I traveled 120 miles round trip to attend daytime-only undergraduate classes. At work, I was not accommodated for this time and was reduced to working part time instead. The expense of my commute compounded with the reduction of income significantly impacted my ability to provide for my family, invest for retirement, and maintain a healthy credit limit. This all set me behind the curve for starting and growing my business. And during it all, my white male counterparts continued to receive promotions and bonuses. It was still another two years *after* I obtained by master's degree before I received a title change and was classified as an engineer.

11.    Between 1991 and 2005, when I left the nuclear power plant, I was denied six promotions and lateral opportunities that would have led to other promotions—in each case a white, male coworker got the promotion or lateral opportunities instead. Although I had led major projects

and received accolades from the Nuclear Regulatory Commission for my work, my white coworkers were promoted to supervisors and managers based on my projects' successes.

12.    In September 2000, I joined a group of African American employees in a class action lawsuit against the nuclear power plant company, alleging that the company engaged in systemic discrimination and harassment against Black workers in violation of the Civil Rights Act of 1964. Specifically, the class contended that the nuclear power plant used racially motivated discriminatory practices in its selection, transfer, testing, performance evaluation, compensation, and discipline policies, practices, and procedures, and maintained a hostile work environment. The court agreed and found that the plant's employment actions were racially motivated. *See Miller v. Baltimore Gas & Elec. Co.*, No.1:00-cv-02808 (D. Md. 2000).

13.    During litigation, I also learned that I was paid more than $40,000 less than my white counterparts per year, despite having three degrees (a B.S. in physics, a B.S. in mechanical engineering, and a master's in education) as compared to my white male counterparts with lesser qualifications. From 1991 to 2005, this wage gap represents more than half a million dollars in lost income; with a 7 percent standard rate of return, that amount equates to roughly $1.4 million dollars.

14.    That missing income could have supported investments in my business and retirement. But because of the gap, I has less capital to start my business and lacked sufficient collateral to be approved for financing from the banks. Also, because my business's initial rates for services were based on my historical salary, this income disparity impacted my earning potential beyond the nuclear plant, further delaying my business's growth and increasing my earnings' gap.

15. Having heard my parents tell stories of the racial discrimination they faced growing up, I had hoped that I would have had a different experience to share with my children. It has been disappointing to realize that not much has changed in the last 50 years.

**Sage Services' Participation in SBA's 8(a) Program**

16. Sage Services Group is an 8(a) certified small business. I applied for the 8(a) program on behalf Sage Services Group in May 2023 and gained certification in August 2024.

17. My decision to apply for the 8(a) program was a strategic one. I knew that I wanted to grow Sage Services Group to manage larger contracts, stay competitive, and strengthen the overall business. Based on advice I received from contacts at SBA and others, I understood that the 8(a) program would build Sage Services Group's reputation and help it grow in scale.

18. Before the 8(a) program, Sage Services Group had many federal agency "pipeline" clients. We worked with Commerce and NASA as a subcontractor and as a prime contractor. And we had new contracts with State, Labor, and HHS that I hoped to grow and expand into larger contracts.

19. The contracts that we were able to manage prior to the 8(a) program demonstrated that Sage Services Group could win and maintain federal contracting work—a necessary showing for 8(a) program eligibility. But 8(a) certification would give Sage Services Group access to more substantial federal contracts—larger in size than what Sage Services Group might be able to win without the certification.

20. 8(a) certification would also open the door to more prime, rather than sub, contracts for Sage Services Group. Being a prime contractor is a significant opportunity for small businesses. Prime contractors work directly with federal agency contacts across the government, building

relationships and learning the nuances of federal contracting regulations and practices. That kind of experience is invaluable for business development.

21.    The 8(a) application and certification process is challenging and time consuming in part because of the large amount of data required in the initial application process, and numerous additional requests for data after applying.

22.    SBA does not use the rebuttable presumption challenged in *Revier v. SBA* to establish social disadvantage anymore, so I provided a narrative describing how I was socially disadvantaged such that I qualify for the 8(a) program. It was emotionally burdensome to recount the racial discrimination I have faced as Black woman, but it was necessary to demonstrate why my business was eligible to participate in the 8(a) program.

23.    I also provided all the data needed to demonstrate economic disadvantage, including complying with new (and somewhat onerous) requests for information that SBA issued earlier this year to 8(a) firms.

24.    As of today, Sage Services Group has not won any contracts through the 8(a) program because SBA is not issuing any new 8(a) contracts. But, as a participant in the 8(a) program, I have already been able to reap the benefits of the program's business development components.

25.    For example the 8(a) program assigns certified firms to a business opportunities specialist who helps them navigate federal contracting issues, like the complexities of the Federal Acquisition Regulation (FAR). When Sage Services Group needs to respond to certain requests for documents or understand a particular regulation, I reach out to our business opportunities specialist for advice and guidance. Our specialist also sends periodic newsletters with information about agency programs and outreach opportunities that I otherwise would not have known were being offered.

26. I also hope to participate in the SBA mentor-protégé program, where small businesses that are new to the 8(a) program are mentored by larger, more experienced government contractors. As a business owner, I have learned that "you don't know what you don't know" so building relationships with larger and more experienced firms would be an incredible chance to learn, gain capacity, and eventually win more government contracts. But because of recent challenges to the diversity programs, large corporations have faced backlash when partnering with or otherwise supporting diverse businesses. If plaintiffs' litigation is successful, I fear that this chilling effect on mentorship and participating in the mentor-protégé program will only get worse, to determent of the growth of my business.

**Importance of the 8(a) Program**

27. The 8(a) program is not, and was never meant to be, a "handout" to minority owned businesses. Rather, I think of it as a risk mitigation tool for the federal government, that benefits both the government and small business owners.

28. When 8(a) certified firms win contracts through the 8(a) program, SBA acts as the prime contractor on paper, with the small business as a subcontractor to SBA. Though the 8(a) firm manages the contract and deals directly with the contracting agency as if it were the prime, SBA acts as a guarantor of sorts. This structure provides an additional level of backing and assurance for the contracting agency, and a built-in support system for the small business.

29. The business opportunities specialists and the mentor-protégé program offer incomparable support mechanisms for small business development. And the connections that 8(a) participants make across agencies, subcontractors and other firms is good business development for everyone, not just the 8(a) firm.

30.     We need initiatives—like the 8(a) program—for people of color. Racism and racial discrimination are as prevalent in business and contracting as they have ever been. Minority business owners are heavily scrutinized and must fight against racist stereotyping to even get a foot in the door for certain opportunities, especially for prime contractor openings. People of color are often asked to prove that they are capable and competent (based on past performance) *before* being offered opportunities to grow. White business owners, however, are not subject to the same litmus test; they are presumed competent and then allowed to prove their capabilities as they go; not as prerequisite for access.

31.     The 8(a) program helps even the playing field. 8(a) certification signals to federal agencies that a business is well-vetted, supported, and ready to handle substantial contracting opportunities. That stamp of approval cuts against the presumption of incompetence that many minority business owners would otherwise have to fight by themselves.

32.     All of these benefits would be lost if the 8(a) program is not defended, and the plaintiffs are successful in their efforts to cripple the program.

33.     Losing the 8(a) program would be a devasting blow, not just to Sage Services Group, but to the growth and development of minority-owned small businesses across the country.


Dated this _7_ day of May, 2026


_____
Sonya Hopson
Founder & CEO of Sage Services Group LLC
Bowie, Maryland


8