**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| REVIER TECHNOLOGIES, INC., *et al.,* | |
| *Plaintiffs*, | CASE NO. 2:25-cv-02328 |
| v. | JUDGE ST. JOHN |
| LOEFFLER, *et al.*, | MAG. NORTH |
| *Defendants.* | Submission Date: June 10, 2026[1] |

**MEMORANDUM OF LAW IN SUPPORT OF
PROPOSED INTERVENOR-DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

---

[1] Proposed Intervenors moved to intervene on May 12, 2026, and noticed the motion to intervene for submission on May 27, 2026. ECF No. 21. That original filing was found deficient because Proposed Intervenors' proposed motion to dismiss were not accompanied by a separate, supporting memorandum and notice of submission. On May 14, 2026, Proposed Intervenors cured said deficiency and refiled their motion to intervene per the Court's instructions, including a proposed motion to dismiss, this supporting memorandum and a notice of submission.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.  Congress Created the 8(a) Business Development Program to Support Historically Disadvantaged Business Owners. ................................................................................ 2

    A. Treasury's SSBCI Program and the Tulane Ventures Seed Fund ......................................5

    B. The Department of Homeland Security's Intelligence and Cybersecurity Diversity Fellowship Program ........................................................................................................7

II.  Plaintiffs Challenge the 8(a) Regulation's Presumption of Social Disadvantage. ............... 8

ARGUMENT ...................................................................................................................... 9

I.  The Complaint Must Be Dismissed Because Plaintiffs Lack Article III Standing. ............ 9

    A. The Complaint Does Not Allege Facts Demonstrating that YAF Members Suffer a Concrete, Imminent Injury. ..............................................................................................10

    B. The Complaint Does Not Allege Facts Demonstrating that Revier Suffers a Concrete, Particularized, or Imminent Injury. ...................................................................................14

II.  The Complaint Should Be Dismissed Because the Court Cannot Grant Plaintiffs Relief. 16

    A. Plaintiffs Cannot Obtain the Broad Relief They Request Based on their Alleged Injuries …..........................................................................................................................17

    B. In the Absence of Treasury and DHS, the Court Could Not Grant More Limited Relief Even if Plaintiffs Requested It. ........................................................................................20

III.  Plaintiffs Fail to State a Plausible Claim That The 8(a) Regulation Is Unconstitutional in All Its Applications. ...................................................................................................... 20

CONCLUSION.................................................................................................................. 25

**TABLE OF AUTHORITIES**

**CASES**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) .................................... 14, 20, 22, 23, 25

*Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) .................................. 19, 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 13, 20, 21

*Attala Cnty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038 (5th Cir. 2022) ................. 9, 10, 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................... 21

*Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022) ................................... 18

*Carney v. Adams*, 592 U.S. 53 (2020)...................................... 10, 11, 12, 13, 14, 15, 16

*Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) ........................................ 17

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)......................................................... 9, 10

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................... 9, 10, 14, 15

*Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406 (1977)...................................................... 18

*Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226 (5th Cir. 2025) ................................ 16

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).......................................................... 15, 16

*Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108*, 873 F.3d 540
    (6th Cir. 2017)........................................................................................... 17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)...................................... 18

*Gregory v. Stetson*, 133 U.S. 579 (1890) ................................................................ 20

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996) .................................. 17

*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................................... 17, 18, 19, 20

*Littlejohn v. New Orleans*, 493 F. Supp. 3d 509 (E.D. La. 2020) ................................................ 13

*Lowery v. Tex. A&M Univ.*, 696 F. Supp. 3d 273 (S.D. Tex. 2023)............................................... 12

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................... 9

*Majeske v. City of Chicago.*, 218 F.3d 816 (7th Cir. 2000)...................................................... 19, 24

*Midwest Fence Corp. v. DOT*, 840 F.3d 932 (7th Cir. 2016)........................................................ 23

*Miguel v. Abbott*, 2023 WL 5032480 (5th Cir. Aug. 8, 2023)................................................ 21, 22

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ........................................................ 21, 22, 23, 25

*Muskrat v. United States*, 219 U.S. 346 (1911).............................................................................. 17

*N. Contracting, Inc. v. Illinois*, 2004 WL 422704 (N.D. Ill. Mar. 3, 2004) .................................. 23

*Ne. Fla. Assoc. Gen. Contractors of Am. v. City of Jack.*, 508 U.S. 656 (1993)..................... 10, 15

*Polk v. Tex. Dep't of Ins.*, 2025 WL 846586 (S.D. Tex. Mar. 18, 2025)........................................ 12

*Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir. 1973) ..................................... 12

*Rothe Dev., Inc. v. DoD*, 836 F.3d 57 (D.C. Cir. 2016)................................................................. 23

*Shaw v. Hunt*, 517 U.S. 899 (1996)............................................................................................... 19

*Sherbrooke Turf, Inc. v. Minn. DOT*, 345 F.3d 964 (8th Cir. 2003).............................................. 23

*Shirley v. Sheriff, Henderson Cnty. Jail*, 2010 WL 3660087 (E.D. Tex. Sept. 7, 2010) ............... 17

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................................................ 10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)................................................................................................................. 19

*Teamsters v. United States*, 431 U.S. 324 (1977)..................................................................... 13, 14

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)........................................................................ 16

*Ultima Servs. Corp. v. Dep't of Agric.*, 683 F. Supp. 3d 745 (E.D. Tenn. 2023) ........................... 4

*United States v. Corbin*, 620 F. Supp. 2d 400 (E.D.N.Y. 2009)..................................................... 17

*United States v. Jubert*, 139 F.4th 484 (5th Cir. 2025)................................................................... 22

*W. States Paving Co. v. Wash. State DOT*, 407 F.3d 983 (9th Cir. 2005) ..................................... 23

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)........................... 21, 24

iii

## STATUTES & REGULATIONS

American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4............................................................ 5

Title 6 U.S.C. § 665a.............................................................................................................. 7, 20

Title 12 U.S.C. § 5701–10 ............................................................................................................ 5

Title 12 U.S.C. § 5702(d)............................................................................................................. 5

Title 13 C.F.R. § 124....................................................................................................... 3, 4, 5, 13

Title 13 C.F.R. § 124.101 ............................................................................................................. 3

Title 13 C.F.R. § 124.501(a) ........................................................................................................ 3

Title 15 U.S.C. § 631 ......................................................................................................... 2, 3, 25

Title 15 U.S.C. § 637 ........................................................................................................... 2, 3, 5

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(1) .................................................................................................... 9, 16, 25

Fed. R. Civ. P. 19(a)(1)(A).......................................................................................................... 20

## OTHER AUTHORITIES

Dep't of Treasury, *State Small Business Credit Initiative*,
    https://perma.cc/V38D-MR49 ...................................................................................... 5

DHS, *Intelligence and Cybersecurity Diversity Fellowship Program* (Jan. 22, 2025),
    https://web.archive.org/web/20250127013952/https://www.dhs.gov/archive/ho
    meland-security-careers/intelligence-and-cybersecurity-diversity-fellowship-
    program ................................................................................................................... 8, 13

DHS, Intelligence and Cybersecurity Diversity Fellowship, *Statement of Work*,
    https://perma.cc/7NDL-FV2X ...................................................................................... 7

*Due Diligence*, Tulane Ventures, https://perma.cc/WH36-S4EP ........................................... 5, 6, 7

*Eligibility to Pitch*, Tulane Ventures, https://perma.cc/L5PS-Y9ZQ ............................................ 6

*Eligibility to Pitch*, Tulane Ventures, https://perma.cc/QZC8-7JBE ....................................... 6, 14

Memorandum on Impact of Recent Court Decision *(Ultima Servs. Corp. v. Dep't of Agric. (E.D. Tenn.))* on 8(a) Program, SBA (Aug. 18, 2023), https://perma.cc/P3HE-ELDY ........................................................................... 4

SBA Guidance on 8(a) Program Mandate, SBA (Jan. 22, 2026) https://perma.cc/C8HW-6HLP........................................................................... 4

Tulane Innovation Inst., *Due Diligence Materials*, https://perma.cc/68UW-ECZK ...................... 7

*Who We Are*, Tulane Ventures, https://perma.cc/UBB5-27NL (last visited May 5, 2026) ................................................................................. 5

v

**INTRODUCTION**

Plaintiffs are a single-person start-up in Louisiana, Revier Technologies, Inc., and an advocacy group, Young Americas Foundation ("YAF"). They take issue with the fact that, for purposes of a grant program run by the U.S. Department of Treasury ("Treasury") and a student internship program run by the U.S. Department of Homeland Security ("DHS"), Congress adopted a Small Business Administration ("SBA") regulation (the "8(a) Regulation") that incorporates a rebuttable presumption that certain racial and ethnic groups are "socially disadvantaged." Although Revier has no operations, and no YAF member has ever applied to the program it challenges, Plaintiffs claim the rebuttable presumption violates their equal protection rights and is arbitrary and capricious because they cannot take advantage of it in applying to the Treasury and DHS programs. On that basis, they seek—not relief tailored to their alleged harms or the Treasury and DHS programs—but vacatur of the entire 8(a) Regulation, which Plaintiffs allege multiple agencies use to administer particular programs to support small businesses run by socially and economically disadvantaged individuals ("SEDIs").

The mismatch between the harms Plaintiffs allege, the defendants they sued, and the remedy they seek is apparent, and this Court should dismiss their claims for several reasons. For starters, the Complaint does not allege facts sufficient to demonstrate an injury-in-fact for either plaintiff. Revier relies entirely on prior funding denials and does not allege *any* future injury. YAF does not allege that any of its members have ever applied to the program it challenges, nor that they intend to do so. And even if they had, the materials cited in the Complaint indicate that neither the Treasury nor the DHS program is using the rebuttable presumption Plaintiffs challenge. Where Plaintiffs seek forward-looking relief, their failure to allege any impending injury, much less plausible facts showing an injury is certainly impending, forecloses standing.

Even if Plaintiffs could establish standing (they cannot), they still could not establish

1

Article III jurisdiction because the Court cannot grant Plaintiffs effective relief. The Court could not grant any relief Plaintiffs could conceivably be entitled to because the targets of Plaintiffs' allegations—Treasury and DHS—are not parties to this case. And the Court does not have the authority to grant the broader relief Plaintiffs request—vacatur of the entire 8(a) Regulation across any government program that uses it—based on Plaintiffs' (nonexistent) injuries attributed to only two distinct government programs run by Treasury and DHS.

Plaintiffs' facial challenge to the 8(a) Regulation on equal protection grounds also fails because Plaintiffs fail to allege—as they must—that there are *no* circumstances under which the rebuttable presumption would be constitutional. And even if they had, they cannot possibly *show* that the presumption is unconstitutional in all its applications because the Supreme Court, upon reviewing the very presumption at issue, specifically held that the presumption, and others like it, may be constitutional, and numerous courts over the years have confirmed as much.

Plaintiffs may dislike the 8(a) Regulation and related programs, but that dislike does not entitle them to challenge programs they claim no intent to apply to and obtain relief far beyond any purported defect in the 8(a) Regulation. The Court should dismiss the Complaint.

## **BACKGROUND**

### I. **Congress Created the 8(a) Business Development Program to Support Historically Disadvantaged Business Owners.**

Congress enacted the Small Business Act of 1953 (the "Act"), 15 U.S.C. § 631 *et seq.*, to "aid, counsel, assist, and protect … the interests of small-business concerns" and ensure a "fair proportion" of government contracts go to small businesses, *id.* § 631(a). Congress has since amended the Act to include several programs for small businesses that satisfy certain criteria, including those located in historically underutilized business zones ("HUBZones"), *id.* § 657a; owned and controlled by service-disabled veterans, *id.* § 657f; owned and controlled by women, *id.* § 637(m); and, as pertinent here, owned primarily by "socially and economically

2

disadvantaged" individuals, *id.* § 637(a) (herein, the "8(a) program"). Through the 8(a) program, SBA provides contract, financial, technical, and management assistance to help eligible small businesses develop and compete in the American economy. *See id.* § 631(f)(2); 13 C.F.R. § 124.1. SBA also contracts with other federal agencies and provides access to these contracts to 8(a) program participants. *See id.* § 637(a)(1); 13 C.F.R. § 124.501(a).

In establishing the 8(a) program, Congress found that individuals from certain racial and ethnic groups "are socially disadvantaged because of their identification as members of [those] groups[,] [which] have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." 15 U.S.C. § 631(f)(1)(B)-(C) ("includ[ing], but . . . not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities…."); *see also id.* § 637(a)(5) (defining socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities"). It also found that the "full participation [of SEDIs] in our free enterprise system . . . is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy." *Id.* § 631(f)(1)(A); *see also id.* § 631(f)(1)(D)–(G) (8(a) program in the "national interest"). Congress thus established the 8(a) program to support small businesses that are, among other things, at least 51% SEDI-owned and show potential for success in the private sector. *Id.* § 637(a)(4)(A), (7)(A); 13 C.F.R. § 124.101.

Under SBA's implementing regulation, 13 C.F.R. part 124, subpart A, (herein, "8(a) Regulation"), anyone may qualify as an SEDI, regardless of race or ethnicity, *see id.* § 124.103(b)(3), (c)(1). Consistent with congressional intent, the Regulation presumes Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent

3

Asian Americans, are socially disadvantaged for purposes of the program, *see id.* § 124.103(b)(1), but the presumption does not entitle such individuals to SEDI status and may be rebutted with "credible evidence to the contrary," *id.* § 124.103(b)(3). And individuals who do not fall within one of the listed groups may establish social disadvantage by showing that their entry or advancement in the business world has been limited due to "race, ethnic origin, gender, identifiable disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." *Id.* § 124.103(c)(1)–(2), (c)(2)(i).

In *Ultima Services Corp. v. Department of Agriculture*, a district court enjoined SBA "from using the rebuttable presumption of social disadvantage in administering … [the] 8(a) program." 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023). Given that decision, SBA announced in August 2023 that, in the case of program participants who had previously relied on the presumption to support their eligibility, SBA would make an affirmative determination, without using the presumption, that the individual has established social disadvantage. *See* Memorandum on Impact of Recent Court Decision *(Ultima Servs. Corp. v. Dep't of Agric. (E.D. Tenn*.)) on the Use of the 8(a) Program, SBA (Aug. 18, 2023), https://perma.cc/P3HE-ELDY. In January 2026, SBA reiterated that it is not using the presumption to establish social disadvantage and that it is "finalizing regulations to eliminate" the presumption. *See* SBA Guidance on 8(a) Program Mandate, SBA (Jan. 22, 2026), https://perma.cc/C8HW-6HLP.[2]

Regardless of how social disadvantage is established, all 8(a) applicants must also show economic disadvantage, *i.e.*, that their "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same

---

[2] Herein, all permalink websites were last visited May 5, 2026.

business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). To evaluate economic disadvantage, SBA considers the applicant's financial condition, including income, net worth, and the fair market value of assets. *See id.* § 637(a)(6)(E); *see also* 13 C.F.R. § 124.104(c).

### A.  Treasury's SSBCI Program and the Tulane Ventures Seed Fund

The State Small Business Credit Initiative ("SSBCI") is another program to support small businesses. 12 U.S.C. § 5701–10. Authorized in 2010, and expanded in 2021, *see* American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, 69 (2021), Congress allocated $10 billion to "provide support to small businesses responding to and recovering from the economic effects of the COVID–19 pandemic," §5702, 135 Stat. 69. Treasury administers the SSBCI, which provides "capital and technical assistance to promote small business stability, growth, and success." Dep't of Treasury, *State Small Business Credit Initiative*, https://perma.cc/V38D-MR49. As relevant here, Congress adopted the Small Business Act's SEDI definition for the SSBCI program, along with the 8(a) Regulation's rebuttable presumption, and allocated $1.5 billion of SSBCI funds for SEDI-owned businesses, 12 U.S.C. § 5702(d), and $1 billion to States that "demonstrate robust support" for such businesses, *id.* § 5702(e).

The Tulane University Innovation Institute received $5 million in SSBCI funding, which it matched to create the Tulane Ventures Seed Fund. *See Who We Are*, Tulane Ventures, https://perma.cc/UBB5-27NL. The fund provides investments between $50,000-$250,000 to "support[] . . . start-up businesses and early-stage small businesses and . . . ventures in Louisiana." *Id.*; *see also* Compl. ¶ 72, ECF No. 1.

To receive funding, applicants must successfully complete a five-step process. *See Due Diligence*, Tulane Ventures, https://perma.cc/WH36-S4EP. First, the applicant must fill out a detailed application, showing "eligibility to pitch." *Eligibility to Pitch*, Tulane Ventures,

https://perma.cc/L5PS-Y9ZQ. This includes, *inter alia:* (1) company information, including company vision and date founded; (2) detailed funding information, including stage of funding, preferred form of funding; funding raised to-date, current valuation, funding to be raised in its "next round", and "[i]f applicable," the closing date of that round of funding; (3) a "pitch deck"; and (4) whether the company is SEDI-owned, female-owned, in an underserved investment area, a Tulane affiliate, or none of the above. *Id.* For purposes of the Tulane program, a SEDI-owned business is not limited to individuals in certain racial and ethnic categories, and the definition of a SEDI-owned business does not presume that certain groups are socially disadvantaged. *See Eligibility to Pitch*, Tulane Ventures, https://perma.cc/QZC8-7JBE (link to La. Admin. Code's definition of "[SEDI]-Owned Business"). Instead, businesses may qualify as SEDI-owned based on various race-neutral criteria including, but not limited to, gender, veteran status, limited English proficiency, physical handicap, or residence in a rural community. *See id.*

Second, if Tulane determines the applicant meets the eligibility criteria, then the applicant will be given 30 minutes to present information about the company and its growth opportunity. *See Due Diligence*, Tulane Ventures, https://perma.cc/WH36-S4EP. Third, Tulane reviews the applicant's materials and gathers relevant third-party information. *Id.*

Fourth, if Tulane decides to move forward, the applicant enters due diligence, *id.*, during which the applicant must provide its latest pitch deck, as well as: (i) market size and landscape; (ii) team information, including board and advisors; (iii) product description; (iv) market position, competitive advantage, and competitor differentiation; (v) customer information and contracts; (vi) sales and marketing strategy; (vii) financial statements and projections; (viii) capital raised and current fundraising plan; (ix) risks and priorities; (x) potential exit opportunities; and (xi) patents and trademarks. *See* Tulane Innovation Inst., *Due Diligence Materials*,

https://perma.cc/68UW-ECZK. At the final step, Tulane schedules another meeting with the company to focus on its "Financial Statements (Historical & Projected); Sales, Marketing, and Distribution; Market Size (With Supporting Market Research); Competition; and Capital Structure." *See Due Diligence*, Tulane Ventures, https://perma.cc/WH36-S4EP.

    **B.  The Department of Homeland Security's Intelligence and Cybersecurity Diversity Fellowship Program**

As directed by Congress, in 2022, DHS created the Intelligence and Cybersecurity Diversity Fellowship Program ("ICDF") to "recruit, retain, and reward the next generation of future talent for a career at [DHS]." 6 U.S.C. § 665a; *see* DHS, Intelligence and Cybersecurity Diversity Fellowship, *Statement of Work*, https://perma.cc/7NDL-FV2X. The program is "designed to target socially disadvantaged students currently attending a Historically Black College or University (HBCU) or Minority Serving Institution (MSI) who will benefit from expanded career and growth opportunities through a tailored development program." *Id.* Fellows (1) participate in a DHS internship program related to intelligence or cybersecurity; (2) receive tuition assistance; and (3) upon successfully completing the program and graduation, may receive employment "in an intelligence or cybersecurity position" at DHS. 6 U.S.C. § 665a(b)(1)–(3).

For purposes of the program, Congress required, among other things, that a participant be a "socially disadvantaged individual," as defined in the 8(a) Regulation. *Id.* § 665a(c)(2)(B). An archived DHS webpage lists the eligibility requirements as: (1) "[b]e a U.S. Citizen"; (2) "[b]e currently enrolled as a freshman, sophomore, or junior at an institution of higher learning, with a particular focus on [MSIs] – specifically, [HBCUs];" (3) "[h]ave a cumulative grade point average (GPA) of at least 3.2 on a 4.0 scale . . . throughout the duration of the fellowship program"; (4) "[h]ave a declared major in a Science, Technology, Engineering, and Math (STEM), Information Technology (IT), cybersecurity, or intelligence-related field"; and (5) "[b]e a sophomore, junior,

7

or senior by the start of appointment, and maintain enrollment on a full-time basis."[3]

## II.  Plaintiffs Challenge the 8(a) Regulation's Presumption of Social Disadvantage.

Plaintiff Revier is owned by Matthew Schultheis and "located in Thibodaux, Louisiana." Compl. ¶ 66.[4] The Complaint alleges that Revier "is developing an artificial intelligence application for the construction industry." *Id.* ¶ 6. Schultheis applied to the Tulane Ventures Seed Fund on June 18, 2024, at which time, he was "an economically and socially disadvantaged individual." *Id.* ¶¶ 69–70. On July 3, Schultheis received an email stating: "Thank you for submitting your intake form to Tulane Venture Fund. Unfortunately, your startup does not align with our current investment criteria and strategy. Your business does not qualify as a SEDI-owned . . . business and is therefore not eligible for SSBCI funding." *Id.* ¶ 74. In June or July 2024, Schultheis, on behalf of Revier, applied to three other SSBCI funds, but each fund denied Revier's application. *Id.* ¶¶ 76, 78.

Plaintiffs allege that, in applying to the SSBCI programs, Revier "could not benefit from the presumption of social disadvantage" because he is white. *Id.* ¶¶ 77, 136–37. The Complaint notes that Revier "was incorporated in May 2018 but had no activities until 2024," and "[t]o date . . . has had no substantial operations and has minimal assets." *Id.* ¶ 67. The Complaint nevertheless alleges that Revier "was otherwise eligible for SSBCI funds [in 2024]." *Id.* ¶ 70.

Plaintiff YAF is "a nationwide conservative student organization with members at more than 1,000 colleges." *Id.* ¶ 7. In 2024, when DHS was accepting applications for the ICDF program, *see id.* ¶ 86, the Complaint alleges that "[s]ome YAF student members were otherwise eligible for the program," *id.* ¶ 88. The Complaint also alleges that "some YAF members want to apply in the

---

[3] DHS, *Intelligence and Cybersecurity Diversity Fellowship Program* (Jan. 22, 2025), https://web.archive.org/web/20250127013952/https://www.dhs.gov/archive/homeland-security-careers/intelligence-and-cybersecurity-diversity-fellowship-program.

[4] For purposes of this motion, Proposed Intervenors assume the truth of the Complaint allegations.

future to the ICDF Program," *id.* ¶ 89, but at no time could they apply "to the program on an equal footing because of their race," *id.* ¶ 88.

On November 17, 2025, Plaintiffs brought two claims against SBA and the U.S. Department of Justice. First, they claim that the 8(a) Regulation's rebuttable presumption violates Revier's and YAF members' equal protection rights. *See id.* ¶ 121. Second, they claim that SBA's decision to create the presumption, and the categories therein, are "arbitrary and capricious" under the Administrative Procedure Act ("APA"). *Id.* ¶ 153. Based on Plaintiffs' purported inability to compete on an equal footing in two distinct government programs run by Treasury and DHS, they seek vacatur of the 8(a) Regulation altogether and across "an array of federal[] . . . programs" allocating "hundreds of billions in federal tax dollars." *Id.* ¶¶ 4–5, 8, 142.

<u>**ARGUMENT**</u>

**I.    The Complaint Must Be Dismissed Because Plaintiffs Lack Article III Standing.**

The Court should dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs' allegations do not demonstrate Article III standing. "It is axiomatic that a plaintiff seeking redress in federal court must meet the initial 'requirement imposed by Article III of the Constitution by alleging an actual case or controversy.'" *Attala Cnty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).[5] Establishing standing is "an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To do so, each plaintiff must demonstrate three requirements: "[1] an injury [that is] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

---

[5] Hereinafter, internal alterations, citations, omissions, and quotations are omitted unless otherwise indicated.

"The type of relief sought also bears on whether the plaintiff has standing." *Attala Cnty.*, 37 F.4th at 1042 (citing *Lyons*, 461 U.S. at 103). To establish standing for prospective equitable relief, "[a]llegations of *possible* future injury are not sufficient"; instead, a plaintiff must demonstrate that the threatened injury is "*certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409(citation omitted). The plaintiff bears the burden of establishing these elements, *see Lujan*, 504 U.S. at 561, and at the pleading stage, "must clearly . . . allege facts demonstrating each" one, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

For purposes of their equal protection claim, Plaintiffs allege their "'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." Compl. ¶ 96 (quoting *Ne. Fla. Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). To establish a cognizable harm on that basis, however, Plaintiffs still need a concrete, particularized, and imminent injury, *Attala Cnty.*, 37 F.4th at 1044, which they can establish only by showing they are "'able and ready' to apply" to the challenged programs, *Carney v. Adams*, 592 U.S. 53, 60 (2020); *Assoc. Gen. Contractors*, 508 U.S. at 666. YAF falls far short of that standard, as no YAF member has *ever* applied to the ICDF program and disclaims an intent to do so. And the Complaint does not allege *any* future harm on Revier's part, failing to allege even that it intends to apply to SSBCI programs, much less that it is able and ready to do so. Thus, Plaintiffs have not carried their burden to plausibly allege an injury-in-fact.

### A. The Complaint Does Not Allege Facts Demonstrating that YAF Members Suffer a Concrete, Imminent Injury.

In support of standing, YAF alleges only that some unidentified student members "are still eligible to apply to the ICDF" program, Compl. ¶ 140, and "want to apply in the future" but cannot do so "on an equal footing" "because they are not members of certain favored races," *id.* ¶ 89; *see also id.* ¶ 100 (alleging similar). Such threadbare allegations that some unidentified YAF members

10

are "eligible" and "want to" apply to the ICDF program sometime "in the future"—with no allegation that they have ever applied in the past, truly intend to apply in the future, or stand able and ready to do so—is patently insufficient to demonstrate an imminent injury.

Indeed, the Supreme Court rejected allegations nearly identical to YAF's as insufficient to establish an injury-in-fact in *Carney v. Adams*, 592 U.S. 53 (2020). There, a "newly registered political independent" challenged Delaware constitutional provisions requiring state courts to reflect a partisan balance between the two major political parties, claiming that the provisions "violated his First Amendment right to freedom of association" because they "prevent[ed] him . . . from having his judicial application considered for three of Delaware's courts." *Id.* at 56, 60. To establish injury on that basis, the Court explained that Adams had to show that he was "'able and ready' to apply" for a judgeship, *id.*, and that his only evidence—"two statements . . . that he wants to be, and would apply to be, a judge on any of Delaware's five courts"—was insufficient to do so, *id.* at 60–61. This was especially so, the Court noted, where "Adams' words 'I would apply ...' stand alone without any actual past injury, without reference to an anticipated timeframe, without prior judgeship applications . . . [and] without other preparations or investigations" showing an ability and readiness to apply. *Id.* at 63.

As in *Carney*, YAF does not even allege that any of its members intend to apply to the ICDF program, much less facts sufficient to show they are able and ready to do so. YAF does not allege that any of its members have prepared to apply to the program. YAF offers no concrete plans or anticipated timeframe, alleging only that its members "would like to apply" sometime "in the future." Compl. ¶ 100. And YAF provides no evidence of past injury because none of its members have ever applied to, much less been rejected by, the program. *See id.* ¶¶ 99–100; *see also Attala Cnty.*, 37 F.4th at 1042 (past wrongs are typically insufficient alone to establish standing for

prospective relief but "are relevant to whether there is a real and immediate threat of repeated injury"). On these facts, *Carney* forecloses YAF's ability to show a concrete, imminent injury.

Moreover, the Fifth Circuit has repeatedly held that a plaintiff cannot challenge an allegedly discriminatory program if he never even applies to the program. *See Lowery v. Tex. A&M Univ.*, 696 F. Supp. 3d 273, 278 (S.D. Tex. 2023), *aff'd*, 2024 WL 4614714 (5th Cir. Oct. 30, 2024) (holding that a professor lacked standing where the "lone injury" he alleged was "a lost opportunity to 'compete with other applicants' for professorships at TAMU [Texas A&M University] 'on an equal basis,'" and he had "never applied and, in fact, 'disavow[ed] any present intention to apply'"); *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 710 (5th Cir. 1973) ("[P]laintiffs . . . have no standing to litigate the issue of racial discrimination in the administration of the section 8(a) program because they did not even apply for participation in the program."); *see also Carney*, 592 U.S. at 63–64 (explaining that "Adams' failure to apply previously when he was eligible," among other things, demonstrated "an abstract, generalized grievance, not an actual desire to become a judge"). "That [YAF] would prefer to file a lawsuit rather than file an application doesn't allow [it] simply to assume that an adverse outcome would meet any such application." *Polk v. Tex. Dep't of Ins.*, 2025 WL 846586, at *2 (S.D. Tex. Mar. 18, 2025). "Otherwise, any putative plaintiff could sue a potential employer without ever applying, simply upon allegation the posited discriminatory practices deterred application." *Lowery*, 696 F. Supp. 3d at 278. "That's not enough," *id.* (citing *Carney*, 592 U.S. at 53), and would eviscerate the requirement that plaintiffs plausibly allege facts showing they are "able and ready" to apply to establish imminent harm. *Carney*, 592 U.S. at 60.

Plaintiffs attempt to avoid this conclusion by alleging that applying would be "futile" because YAF members "cannot qualify as 'socially disadvantaged.'" Compl. ¶ 100. But YAF's

12

conclusory allegation that none of its "thousands of student members on more than 1,000 college campuses across the country," *id.* ¶ 22, could qualify as socially disadvantaged is "not entitled to a presumption of truth," *Littlejohn v. New Orleans*, 493 F. Supp. 3d 509, 519 (E.D. La. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And the facts here show why the Fifth Circuit has rightly required plaintiffs to at least apply to a program before challenging it in court as discriminatory. In their Complaint, Plaintiffs cite a DHS website listing the eligibility requirements for the ICDF program, *see* Compl. ¶ 84, and notably, the website does *not* indicate that an applicant needs to be a SEDI, *see* DHS, *Intelligence and Cybersecurity Diversity Fellowship Program* (Jan. 22, 2025), https://web.archive.org/web/20250127013952/https:/www.dhs.gov/archive/homeland-security-careers/intelligence-and-cybersecurity-diversity-fellowship-program; *supra* Background, § III. And even if DHS were requiring applicants to be SEDIs, Plaintiffs' contention that none of its members would qualify appears to rely on the premise that social disadvantage can be established *only* by falling into one of several racial and ethnic categories. *See* Compl. ¶ 100. That is incorrect. Under the 8(a) Regulation, individuals who do not fall into one of the listed groups may demonstrate social disadvantage by showing that their entry or advancement in the business world has been limited by other factors, including "gender, identifiable disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." § 124.103(c)(2)(i). YAF has not plausibly alleged that none of its members could make that showing, such that applying would be "futile."[6] As such, YAF cannot challenge as discriminatory a program its members have

---

[6] If there were any doubt, the Supreme Court expressly distinguished cases like this one from those egregious cases where it has found that a formal application "would be merely a 'futile gesture.'" *Carney*, 592 U.S. at 66 (quoting *Teamsters v. United States*, 431 U.S. 324, 365–366 (1977)). In *Teamsters*, the Government had already shown that the company had engaged in a systemwide pattern and practice of employment discrimination against minorities in violation of Title VII. *See*

never even applied to.

**B. The Complaint Does Not Allege Facts Demonstrating that Revier Suffers a Concrete, Particularized, or Imminent Injury.**

For Revier's part, the Complaint fails to allege facts sufficient to demonstrate an injury-in-fact for three reasons. First, the Complaint contains zero allegations of *future* harm that could support standing for prospective relief. *See Clapper*, 568 U.S. at 409. The Complaint alleges that in 2024, Revier was denied funding from four SSBCI programs, including Tulane Ventures, which specifically pointed to the fact that Revier "does not qualify as a SEDI-owned . . . business." Compl. ¶ 74; *see also id.* ¶ 72–78. But the SEDI definition used for purposes of the Tulane program does not include the rebuttable presumption that individuals in certain racial and ethnic groups are socially disadvantaged; instead, an applicant may demonstrate SEDI status based on various race-neutral criteria. *See Eligibility to Pitch*, Tulane Ventures, https://perma.cc/QZC8-7JBE. Thus, Plaintiffs do not plausibly allege that Revier was ever denied funding due to the rebuttable presumption, or Schultheis's race, much less a sufficient likelihood that he faces such an injury in the imminent future.[7] And in any event, the Complaint is bereft of any allegation that Revier intends to apply to an SSBCI program in the future.[8] Nor does the Complaint allege that, since 2024, Revier has regularly sought this kind of funding. *See Carney*, 592 U.S. at 64–65 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 212 (1995) (distinguishing *Carney* from *Adarand* where contractor established standing by showing that the defendant "'is likely to let

---

431 U.S. at 331. The Court determined that, at the remedial stage, non-applicants, who, because of the rampant discrimination were deterred from applying, could attempt to show that they were also victims of unlawful discrimination and thus, obtain the relief available to the class. *See id.* at 367–68. It was not a standing decision, and, as the Court recognized in *Carney*, it is easily distinguishable from the instant case. *See* 592 U.S. at 66.

[7] Likewise, although Plaintiffs allege that three other SSBCI programs denied Revier funding, they do not indicate why or provide any details about the programs. *See* Compl. ¶¶ 76–78.

[8] Revier does not even allege that it would apply to such programs if Plaintiffs obtained the relief they seek in this case. As set forth below, Revier would not be able and ready to do so.

contracts involving guardrail work . . . at least once per year in Colorado,' and that the plaintiff 'is very likely to bid on each such contract'" because "it 'bids on every guardrail project in Colorado'"); *Assoc. Gen. Contractors*, 508 U.S. at 666, 668 (distinguishing *Carney* from *Assoc. Gen. Contractors* where "it was undisputed that the[] [contractors] had 'regularly bid on construction contracts in Jacksonville, and . . . would have bid on contracts set aside pursuant to the city's ordinance were they so able'"."). Thus, far from demonstrating a "certainly impending" injury, *Clapper*, 568 U.S. at 409, Revier has not alleged an impending injury at all. That alone forecloses its ability to establish standing to obtain the injunctive relief it seeks. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury.").

Second, even if Revier were to allege that it intended to apply for funding from an SSBCI program in the future, the Complaint does not allege that Revier is "able and ready" to do so, *Carney*, 592 U.S. at 60, and indeed, the allegations show Revier is not. As set forth above, the five-part process to receive funding from Tulane is onerous. *See supra* Background § II. Just to pitch, an applicant must describe and provide a vision for the company, provide detailed funding information, and submit an investment pitch deck. *See id.* If the applicant clears the next two steps and enters due diligence, he must provide eleven categories of information, including a product description, multiple categories of market information, and historical financials and projections. *See id.* And to ultimately obtain funding, an applicant must present financial statements; sales, marketing, and distribution information; market research supporting market size; competitive information; and capital structure. *See id.* There is no allegation that Revier has (or had) such information at the ready. Far from it, Revier "had no activities" between 2018 and 2024, Compl. ¶ 67, is still in the process of "developing an artificial intelligence application for the construction

15

industry," *id.* ¶ 6, and to date, "has had no substantial operations and has minimal assets," *id.* ¶ 67. As such, Revier cannot show the preparations necessary to demonstrate that it is "able and ready" to apply to Tulane Ventures or other such SSBCI programs "in the imminent future," foreclosing its ability to establish an injury-in-fact. *Carney*, 592 U.S. at 66.

Third, a central flaw in Revier's assertion of standing is that it does not allege that Revier is currently SEDI-owned or otherwise eligible for SSBCI funding. The Complaint alleges only that Revier "was" SEDI-owned and "was otherwise eligible for SSBCI funds" in 2024. Compl. ¶ 70. To obtain prospective relief, however, Revier must demonstrate a sufficient likelihood of *future* harm. And that harm cannot be a grievance shared by the general population. *All. for Hippocratic Med.*, 602 U.S. at 379 ("For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, [he] cannot be a mere bystander, but instead must have a 'personal stake' in the dispute.") (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Because Revier has not alleged that it otherwise satisfies the SSBCI's eligibility requirements, it has no "personal stake" in this dispute and for that reason too, lacks standing. *See id.* at 381 ("[A] citizen does not have standing to challenge a government regulation simply because [he] believes that the government is acting illegally.").

## II.    The Complaint Should Be Dismissed Because the Court Cannot Grant Plaintiffs Relief.

Because standing is a "jurisdictional prerequisite," *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 235 (5th Cir. 2025), the Court should (indeed must) address that threshold issue and dismiss the Complaint under Rule 12(b)(1) where Plaintiffs have not sufficiently pled facts demonstrating an injury-in-fact. Should the Court determine otherwise, however, it should dismiss the Complaint for another reason: it cannot grant Plaintiffs effective relief.

"Article III prohibits federal courts from issuing opinions that do not resolve 'actual

controversies' or bring about change for the parties." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108*, 873 F.3d 540, 546 (6th Cir. 2017) (citing *Muskrat v. United States*, 219 U.S. 346, 361 (1911); *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113–14 (1948)). "Such opinions may arise where the parties are not adverse, the issue is moot, or the court cannot grant relief." *Id.*; *see also Shirley v. Sheriff, Henderson Cnty. Jail*, 2010 WL 3660087, at *2 (E.D. Tex. Sept. 7, 2010) ("Because this Court cannot grant the relief Shirley requests, any opinion this Court could issue would necessarily be only advisory."), *report and rec. adopted*, 2010 WL 3659589 (E.D. Tex. Sept. 14, 2010). Here, the Court can grant neither the broad relief Plaintiffs request, nor more limited relief, even if Plaintiffs were requesting it. As such, the Complaint must be dismissed. *See, e.g.*, *United States v. Corbin*, 620 F. Supp. 2d 400, 406 (E.D.N.Y. 2009) ("[I]f the Court cannot grant any effectual relief to a prevailing party, it must dismiss the case, rather than issue an advisory opinion."); *see also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) ("If . . . federal courts cannot grant any of the relief sought . . . a decision . . . would be an advisory opinion barred by Article III . . . .").

### A. Plaintiffs Cannot Obtain the Broad Relief They Request Based on their Alleged Injuries.

The Court does not have the authority to grant the broad relief Plaintiffs request based on the limited harms they allege. *See Lewis v. Casey*, 518 U.S. 343, 360 n.7 (1996) ("Courts have no power to presume and remediate harm that has not been established."). As Justice Scalia explained in *Lewis*, "[t]he actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches . . . if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Id.* at 357. Instead, "[t]he remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* Based on

17

these principles, the Court held that where the lower court had identified only two instances of actual injury, it did not have the authority to issue an injunction mandating systemwide changes in prisons across the Arizona Department of Corrections. *Id.* at 359.

These principles apply with equal force here. Plaintiffs allege that they cannot apply to the SSBCI program or the ICDF program on an equal footing *because of the rebuttable presumption in the 8(a) Regulation. See* Compl. ¶ 7. In addition to the fact that neither the SSBCI nor the ICDF program appears to be using the rebuttable presumption, Plaintiffs also do not allege any infirmities with the 8(a) Regulation outside of the presumption, nor do they contend that the presumption is not severable from the remainder of the Regulation. They thus cannot obtain the relief they seek—vacatur of the 8(a) Regulation *in its entirety. See Lewis*, 518 U.S. at 357; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact."); *Belmont Mun. Light Dep't v. Federal Energy Regulatory Commission*, 38 F.4th 173, 188 (D.C. Cir. 2022) (same with respect to agency regulation).

Likewise, where Plaintiffs' alleged harm is their inability to compete on an equal footing in two distinct government programs—the SSBCI and the ICDF programs—even if they could establish an injury-in-fact based on those alleged harms (they cannot), they would not be entitled to the broader relief they seek—invalidation of the 8(a) Regulation in any government program using it. *See* Compl. ¶¶ 1, 5–9; *Lewis*, 518 U.S. at 359 ("two instances" of inadequate legal research facilities "were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief") (citing *Dayton Bd. of Ed. v. Brinkman,* 433 U.S. 406, 417 (1977) ("[I]nstead of tailoring a remedy commensurate with the three specific violations, the [c]ourt . . .

18

imposed a systemwide remedy going beyond their scope.").

The mismatch between Plaintiffs' alleged harms and their requested relief is evident when one considers the analysis this Court would need to engage in, and the determinations it would need to make, to address Plaintiffs' claims. For instance, the Supreme Court has recognized that "remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023) (confirming that "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" may be a "compelling interest" permitting "race-based government action"). To do so, however, the government must, among other things, "identify that discrimination, public or private, with some specificity" and cannot rely on "[a] generalized assertion of past discrimination." *Shaw*, 517 U.S. at 909. An analysis of Plaintiffs' equal protection claim would thus require a fact-intensive examination of whether specific past or present discrimination justifies a race-conscious measure to remedy that discrimination or its lingering effects (and a fact-intensive inquiry, and competing evidence, as to whether effects persist). *See, e.g.*, *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000). But whether SBA could meet that threshold has no bearing on whether Treasury or DHS, or any other agency that may use the 8(a) Regulation's rebuttable presumption, could do so. And thus, a finding as to DHS or Treasury would not justify the invalidation of the 8(a) Regulation as to any other agencies or 8(a) programs. *See Lewis*, 518 U.S. at 360 (where "the constitutional violation ha[d] not been shown . . . systemwide . . . granting

19

a remedy beyond what was necessary to provide relief to [those harmed] was . . . improper").[9]

## B. In the Absence of Treasury and DHS, the Court Could Not Grant More Limited Relief Even if Plaintiffs Requested It.

Nor could the Court grant more limited relief, even if Plaintiffs were requesting it. Rule 19 requires persons to be joined if, "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). In light of the above, any relief Plaintiffs could obtain would need to be limited to addressing their purported inability to compete on an equal footing in the Treasury and DHS programs. As explained, however, analysis of Plaintiffs' constitutional claim would require a fact-intensive analysis of the need for, and tailoring of, those programs.[10] Such determinations could not be made without giving Treasury and DHS the opportunity to defend themselves. *Gregory v. Stetson*, 133 U.S. 579, 586 (1890) ("It is an elementary principle that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it."). Thus, unless and until Plaintiffs join those agencies, the Court could not grant relief with respect to them.

## III. Plaintiffs Fail to State a Plausible Claim That The 8(a) Regulation Is Unconstitutional in All Its Applications.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

---

[9] Similarly, any analysis of Plaintiffs' equal protection claim would require the Court to decide whether the government program at issue was "narrowly tailored" to further a compelling interest. *Adarand*, 515 U.S. at 227. But as Plaintiffs note, "[t]he SBA Regulation has been incorporated into programs administered by *other* federal agencies." Compl. ¶ 5; *see also id.* ¶¶ 8–9. And, as the SSBCI and ICDF programs illustrate, the administration of, and requirements for, various programs differ considerably, even with respect to whether a showing of social and economic disadvantage is required, *see id.* ¶ 82 (alleging that "[u]nlike the Section 8(a) program," for the ICDF program, "social disadvantage alone matters") (citing 6 U.S.C. § 665a(b)). Thus, again, any analysis of the 8(a) program would have no bearing on whether other government programs are narrowly tailored and thus, could not justify the blanket relief Plaintiffs request. *See Lewis*, 518 U.S. at 357.

[10] Plaintiffs' APA claim would require another agency-specific inquiry based on the record at issue.

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Here, Plaintiffs' equal protection claim should be dismissed because Plaintiffs have not alleged—and cannot plausibly allege—that there is no set of circumstances under which the 8(a) Regulation's rebuttable presumption would be constitutional, as they must to sustain a facial challenge to the regulation.

Plaintiffs' choice to bring their equal protection claim as a facial challenge, *see* Compl. ¶ 96, "comes at a cost," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Id.* "'Claims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement." *Id.* "Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–451 (2008). "And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723.

The Court has thus long "disfavored" facial challenges, *Wash. State Grange*, 552 U.S. at 450, and has made them "hard to win," *Moody*, 603 U.S. at 723. "[A] plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Id.*; *see also Miguel v. Abbott*, 2023 WL 5032480, at *2 (5th Cir. Aug. 8, 2023) (applying "no set of circumstances"

21

standard); *see also United States v. Jubert*, 139 F.4th 484, 489 (5th Cir. 2025) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.").[11]

Plaintiffs do not allege that there is no set of circumstances under which the 8(a) Regulation's rebuttable presumption would be valid,[12] and in fact, the Complaint recognizes that there are instances in which a race-conscious remedy may be constitutional. *See* Compl. ¶¶ 11–12. That alone warrants dismissal. *See Miguel*, 2023 WL 5032480, at *2 (where plaintiff "ha[d] not properly alleged that there is *no* set of circumstances in which the SVPA would be valid . . . he fail[ed] adequately to allege a facial challenge to the SVPA.").

Even if Plaintiffs had sufficiently alleged that there is no set of circumstances under which the rebuttable presumption would be valid, they cannot meet that standard because Supreme Court precedent holds that there *are* circumstances in which the 8(a) Regulation's rebuttable presumption of social disadvantage may be constitutional. In *Adarand Constructors, Inc. v. Pena*, for purposes of a program granting subcontracting preferences to SEDI-owned businesses, the U.S. Department of Transportation ("DOT") had "adopt[ed] the Small Business Act's definition of 'socially and economically disadvantaged individual,' including the applicable race-based presumptions," 515 U.S. at 208. Another contractor sued DOT, arguing that its use of "race-based presumptions" violated his equal protection rights. *Id.* at 204. The Court held that "all racial classifications . . . must be analyzed . . . under strict scrutiny." *Id.* at 227. But, importantly, it also recognized that there are circumstances when race-conscious action is both necessary and constitutional. It

---

[11] Plaintiffs do not bring a First Amendment overbreadth challenge and thus, the "very high bar" for facial challenges is not "lowered" as it is in that context. *Moody*, 603 U.S. at 723.

[12] Although Plaintiffs seek vacatur of the 8(a) Regulation in its entirety, their equal protection claim is directed at the rebuttable presumption therein. Proposed Intervenors thus focus on Plaintiffs' allegations regarding the presumption, but for the same reasons Plaintiffs cannot maintain a facial challenge to the presumption, they also cannot maintain such a challenge to the 8(a) Regulation.

explained:

> [W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.' The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it . . . . When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test this Court has set out in previous cases.

*Id.* at 237. On that basis, the Court remanded for a determination as to whether the presumption at issue was narrowly tailored to serve a compelling government interest. *Id.* at 239. The Tenth Circuit ultimately held that the revised statutory and regulatory scheme, including a presumption like that here, survived strict scrutiny. *See Slater*, 228 F.3d at 1155. And numerous other courts have upheld the constitutionality of the 8(a) Regulation's rebuttable presumption and others like it. *See Midwest Fence Corp. v. DOT*, 840 F.3d 932 (7th Cir. 2016); *Rothe Dev., Inc. v. DoD*, 836 F.3d 57, 61 (D.C. Cir. 2016) (rational basis review); *W. States Paving Co. v. Wash. State DOT*, 407 F.3d 983 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. DOT*, 345 F.3d 964, 967–68 (8th Cir. 2003); *N. Contracting, Inc. v. Illinois*, 2004 WL 422704, at *24 (N.D. Ill. Mar. 3, 2004). Given the Supreme Court's clear message that race-conscious presumptions, including that in the 8(a) Regulation, can pass constitutional muster, and numerous decisions finding that such presumptions do, Plaintiffs cannot plausibly claim that the presumption is unconstitutional in all its applications.

Moreover, this case provides a textbook example of the "host of good reasons" that facial challenges are disfavored. *Moody*, 603 U.S. at 723. Plaintiffs' equal protection claim cries out for "speculation about the law's coverage and its future enforcement." *Id.* Plaintiffs claim the rebuttable presumption precludes them from applying on an equal footing to the SSBCI and ICDF programs because of their race, but neither program appears to be using the presumption. Plaintiffs request vacatur of the 8(a) Regulation due to the rebuttable presumption, but SBA is affirmatively *not* using the presumption and has not been using it since 2023. *See supra* Background § I. And

23

YAF's challenge to the ICDF program rests on the speculation that none of YAF's thousands of student members could qualify as socially disadvantaged, *see* Compl. ¶¶ 139–40, but no YAF member has ever even applied to the program; it is far from clear that DHS is even using the presumption in administering the program; and even if it is, YAF members could still qualify as socially disadvantaged regardless of race or ethnicity. *See supra* Arg. § I.A.

The rank speculation underlying Plaintiffs' facial challenge to the presumption across any government program that *might* be using it is even more egregious. As explained, *see supra* Arg. § II.A, resolution of Plaintiffs' facial claim would require the Court to evaluate the history or presence of discrimination in each of the government agencies and programs that use the presumption; the presence of discrimination or its lingering effects; and the tailoring of each program, all typically based on anecdotal and statistical evidence presented via expert testimony. *See, e.g.*, *Majeske*, 218 F.3d at 820 (evaluating anecdotal and statistical evidence of discrimination by the Chicago Police Department in hiring and promotion of African–American and Hispanic police officers and to assess tailoring and necessity of the affirmative action program and its minimal impact on white officers). Given Plaintiffs' allegation that multiple government agencies use the rebuttable presumption, *see* Compl. ¶¶ 1, 3–4, 6–8, ferreting out whether and what agencies are using it, then analyzing the constitutionality of that use in light of each programs' particular history and requirements would be well-nigh impossible, such that any conclusion that use of the presumption is unconstitutional *in all its applications* would require precisely the type of speculation the Court warned against in *Washington State Grange* and its progeny.

Plaintiffs' facial claim also runs contrary to principles of "judicial restraint." *Wash. State Grange*, 552 U.S. at 450. Plaintiffs ask this Court to find the 8(a) Regulation's presumption of social disadvantage unconstitutional in all its applications both "in advance of the necessity of

24

deciding" that question and by "formulat[ing] a rule of constitutional law [far] broader than is required" by this case. *Id.* The Court should not (and, as explained, for practical purposes, hardly could) decide whether the presumption is unconstitutional in all its applications where Plaintiffs have not plausibly alleged that they are even able and ready to apply to the programs at issue. That deciding such a broad question is unnecessary is further evidenced by the fact that the programs Plaintiffs challenge do not appear to be using the presumption. And the relief Plaintiffs seek— vacatur of the 8(a) Regulation in its entirety (or even just use of the presumption in every program that may be using it)—is plainly far broader than necessary to resolve Plaintiffs' claimed harm.

And finally, Plaintiffs' facial challenge "threaten[s] to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723. Congress found that individuals from certain racial and ethnic groups are socially disadvantaged, 15 U.S.C. § 631(f)(1)(B)–(C), and it established the 8(a) program for SEDI-owned small businesses because it found that their "full participation in our free enterprise system . . . is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy." *Id.* § 631(f)(1)(A). Over the years, it has repeatedly expressed its support for SEDIs and the 8(a) Regulation's rebuttable presumption by establishing programs—like the SSBCI funding and ICDF program here—for the benefit of SEDIs and using the presumption. The Supreme Court has expressly said that the presumption *can* be implemented in constitutional ways, *Adarand*, 515 U.S. at 237, and multiple courts over the years have held that it has been. *See supra* at 22-23. Given that, Plaintiffs cannot meet their burden to sustain a facial challenge to the rebuttable presumption, and their equal protection claim should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Proposed Intervenors' Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) and (6).

25

Dated: May 14, 2026

Respectfully submitted,

/s/ *William Most*_____

William Most (La. Bar No. 36914)
Most & Associates
201 St. Charles Ave., Ste. 2500, # 9685
New Orleans, LA 70170
Tel: 985-441-9355
williammost@gmail.com

Cortney Robinson Henderson*
Emily Sue Newton*+
Steven Y. Bressler*
Robin F. Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Main: 202-448-9090
crhenderson@democracyforward.org

Sarah von der Lippe*
(D.C. Bar No. 454585)
Minority Business Enterprise Legal Defense and
Education Fund, Inc.
1104 East Capitol St. NE
(202) 744-5415
Outsidecounsel1@mbeldefwatchdog.org

*Counsel for Proposed Intervenors*

*\*Pro Hac Vice Forthcoming*
*+ Of Counsel; located in California; and*
*admitted only in Virginia*

26