[8025-01-M]

## SMALL BUSINESS ADMINISTRATION

[13 CFR Part 124]

### SMALL BUSINESS AND CAPITAL OWNERSHIP DEVELOPMENT PROGRAM

#### Procurement and Technical Assistance

AGENCY: Small Business Administration.

ACTION: Proposed rules.

SUMMARY: These proposed rules describe the type of assistance available, the requirements for obtaining assistance, and the methods of providing assistance to certain eligible small businesses under SBA's new Small Business and Capital Ownership Development Program as mandated by Pub. L. 95-507. In addition, they provide criteria for determining when the participation of a business in the program should be terminated or determined to be completed, and specify a procedure by which such a determination can be made.

DATES: Comments must be received on or before March 26, 1979.

ADDRESS: Comments, submitted in duplicate, are to be submitted to the Associate Administrator for Minority Small Business and Capital Ownership Development, Small Business Administration, 1441 L Street, NW., Washington, D.C. 20416.

FOR FURTHER INFORMATION CONTACT:

Martin D. Teckler, Office of General Counsel, Small Business Administration, 1441 L Street, NW., Washington, D.C. 20416, 202-653-6797.

SUPPLEMENTARY INFORMATION: Pub. L. 95-507 requires the revision of Part 124 of Title 13 of the Code of Federal Regulations because that Public Law substantially amends parts of the Small Business Act which Part 124 implements. As a result of Pub. L. 95-507, it is necessary to replace the following presently effective sections: 124.8, 124.8-1 and 124.8-2. The following proposed rules are proposed as replacements for these sections.

These proposed rules are to provide for the implementation of the Pub. L. 95-507, which amends among other provisions, sections 8(a) and 7(j) of the Small Business Act, as amended, (hereinafter the "Act"). The purpose of Section 8(a) of the Act is to foster busines ownership by individuals who are both socially and economically disadvantaged, to promote the competitive viability of such firms by providing such available contract, financial, technical, and management assistance as may be necessary, and to clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, materials and construction work from small business concerns owned and managed by socially and economically disadvantaged individuals.

The Act sets forth a business development program whereby the Administration is authorized to provide to eligible business concerns procurement contracts, financial, management and technical assistance.

The Congress has found that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential in order to attain social equality and economic parity for such persons. The Congress found further that Black Americans, Hispanic Americans, Native Americans, and other minorities have suffered the effects of discriminatory practices and other invidious circumstances over which they have no control.

The business development program of the Administration is designed to ameliorate the condition of socially and economically disadvantaged groups by providing the maximum practical opportunity for the development of businesses owned and managed by such persons. Such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, and construction work from such businesses and the provision of management and technical assistance to develop managerial self-sufficiency. The Congress intends that the primary beneficiaries of this program shall be minorities and that the authorities granted the Administration in this program will be used for appropriate business development.

The Act requires that the Administration of the section 8(a) program—the principal procurement assistance vehicle—and the section 7(j) management assistance program shall be under the direction of the Associate Administrator for Minority Small Business and Capital Ownership Development. The interface of these programs should result in the delivery to the business owned by the socially and economically disadvantaged individual an increased opportunity to produce and sell goods and services efficiently and profitably.

These regulations provide for significant changes in regard to the following areas:

(a) Program eligibility—The Act allows program participation for a "socially and economically disadvantaged small business concern." This means a small business concern which is at least 51 percent owned by one or more socially disadvantaged individuals, and whose management and daily business operations are controlled by one or more of such individuals. Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities.

Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities, the Administration shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual.

This represents a significant change of eligibility criteria from the standard of social or economic disadvantage heretofore utilized by the Administration.

(b) Contracting—This section provides for the relationship between the Administration and other federal agencies in regard to the provision of procurement contracts for the 8(a) program.

(c) Termination—Detailed termination procedures and standards are provided which will govern the circumstances under which a business concern can be denied assistance under the program. Simultaneously, with the publication of the within regulations, final regulations governing substantive and procedural rights for 8(a) concerns in regard to termination and the dental of assistance under the program shall be published. Comments regarding these matters are welcome.

(d) Small Business and Capital Ownership Development Program—This section grants significant new authority for the Administration to aid 8(a) concerns in regard to procurement, financial, management and technical assistance matters.

(e) Advance Payments and Business Development Expense—These sections set forth the criteria and standards for the award and use of advance payments and business development expense.

(f) Surety Bond Waiver—This section provides for the criteria and conditions for the Administration to grant waivers to requirements for the use of surety bonds in appropriate circumstances.

This 22d day of January 1979.

A. VERNON WEAVER,
*Administrator.*

It is proposed to amend 13 CFR Part 124 by deleting the present §§ 124.8, 124.8-1, and 124.8-2 and adding the following new §§ 124.1-1—124.1-5, 124.2-1, 124.3-1 and 124.4-1 to read as follows:

Sec.
124.1-1 The Section 8(a) Program.
124.1-2 Contracting.
124.1-3 Advance payments.
124.1-4 Letter of credit.
124.1-5 Business development expense.
124.2-1 Consultant services program.
124.3-1 Small business and capital ownership development program.
124.4-1 Surety bond waivers.

**§ 124.1-1 The Section 8(a) Program.**

(a) *General.* These regulations implement Section 8(a) of the Small Business Act (15 U.S.C. 637(a)) which authorizes SBA to enter into all types of contracts (including, but not limited to, supply, services, construction, research and development) with other Government departments and agencies and negotiate subcontracts for the performance thereof.

(b) *Purpose.* It is the objective of SBA to use such authority to assist small business concerns owned and controlled by socially and economically disadvantaged persons to achieve a competitive position in the market place.

(c) *Eligibility.* In order to be eligible to participate in the section 8(a) program, an individual or an applicant concern as the case may be must meet all of the pertinent eligibility criteria set forth hereafter in paragraphs (c)(1) through (5) of this section. All determinations pursuant to paragraphs (c)(1) through (5) of this section shall be made by the Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD) whose decision shall be final; provided however, than an applicant may request reconsideration of such final decision based upon information discovered subsequent to such decision or upon information which was unavailable at the time of such final decision. The granting of such reconsideration shall be within the absolute discretion of the AA/MSB&COD.

(1) *Small Business Concern.* In order to be eligible to participate in the section 8(a) program, an applicant concern must qualify as a small business concern as defined for purposes of Government procurement in § 121.3-8 of the SBA Rules and Regulations; the size standard to be applied shall be based on the principal activity of the applicant concern.

(2) *Ownership and Control.* In order to be eligible to participate in the section 8(a) program, an applicant concern must be one:

(i) Which is at least 51 percent owned by an individual or individuals who are citizens of the United States, (specifically excluding resident aliens) and who are determined to be socially and economically disadvantaged.

(A) In case of an applicant concern which is a corporation, 51 percent of all classes of voting stock of such corporation must be owned by an individual(s) determined to be socially and economically disadvantaged.

(B) In the case of an applicant concern which is a partnership, 51 percent of the partnership interest must be owned by an individual or individuals determined to be socially and economically disadvantaged.

(ii) Whose management and daily business operations are controlled by an individual(s) determined to be socially and economically disadvantaged. Such individual(s) must be engaged full time in the daily management and operation of the business concern.

(3) *Social Disadvantage.* (i) Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identification as members of certain groups, without regard to their individual qualities. Such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans and other minorities.

(ii) Social disadvantage of individuals within such groups shall be determined on a case-by-case basis. Membership alone in any group is not conclusive that an individual is socially disadvantaged.

(4) *Economic Disadvantage.* (i) Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit oportunities, as compared to others in the same line of business and competitive market area who are not socially disadvantaged.

(ii) In determining the degree of diminished credit and capital opportunities, consideration shall be given:

(A) With respect to both the disadvantaged individual and the applicant concern, to the following factors, including but not limited to:

(*1*) Personal and business assets;

(*2*) Personal and business net worth; and

(*3*) Personal and business income and profits.

(B) With respect to the applicant concern, the following factors, including but not limited to:

(*1*) Availability of financing;

(*2*) Bonding Capability;

(*3*) Availability of outside equity capital; and

(*4*) Available markets.

(5) *Potential for Success.* In order to be eligible to participate in the section 8(a) program, an applicant concern must be a concern:

(i) Which with contract, financial, technical and management support will be able to successfully perform contracts awarded under the section 8(a) program, and with such assistance shall have reasonable prospects for success in competing in the private sector.

(ii) In addition to meeting the criteria set forth in § 124.1-1(c)(5)(1) above, the AA/MSB&COD must determine that the financial, technical and management support necessary to enable the applicant concern to successfully complete the section 8(a) procurement contract shall be available to such concern from SBA or other identified and acceptable sources.

(d) *Program Completion.* (1) When a section 8(a) business concern has substantially achieved the objectives of the 8(a) program, including but not limited to, the achievement of the goals set forth in its business plan as approved an modified, and the attainment of demonstrated ability to compete in the market place without assistance from 8(a), its participation within the program shall be determined by SBA to be completed.

(2) In determining whether a concern has substantially achieved the goals of its business plan or has attained the ability to compete in the market place without 8(a) assistance, the following factors, among others, shall be considered by SBA. The factors cited above shall be determined with regard to the remedial purposes of the statute.

(i) Positive overall financial trends, including but not limited to:

(A) Profitability.

(B) Sales, including improved ratio of non-8(a) sales.

(C) Net Worth, financial ratios, working capital, capitalization, access to credit and capital.

(D) Ability to obtain bonding.

(ii) A comparison of the 8(a) business concern's business and financial profile with profiles of non-8(a) small businesses in the same area or similar business category.

(iii) Management capactity.

(3) Upon determination by the SBA that a section 8(a) business concern's particiaption within the program has been completed pursuant to § 124.1-1(d)(1), above, the section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the SBA's Rules of Practice for Adjudicative Proceedings set forth at Part 101.10 et. seq. of SBA rules and regulations.

(4) Subsequent to the completion of such hearing, based upon the record established therein, and after consideration of the recommended decision of the examiner who has conducted the hearing, the AA/MSB&COD shall render a final decision regarding the completion of the section 8(a) business concern's participation in the pro-

gram. Prior to a final decision, the subject 8(a) business concern may have full rights of participation in the 8(a) program.

(e) *Program termination.* (1) Participation of a section 8(a) business concern in the program may be terminated by the SBA prior to the completion of the concern's business plan for good cause. Examples of good cause include, but are not limited to, the following:

(i) Failure of the 8(a) business concern to continue to meet the standards of eligibility set forth in these regulations.

(ii) Failure of the 8(a) business concern to maintain its status as a small business concern within the applicable regulations.

(iii) The failure of the section 8(a) business concern to exert reasonable efforts to attain commerical business.

(iv) Failure to maintain ownership and control by the person(s) who has been determined to be socially and economically disadvantaged.

(v) Inadequate management performance by the section 8(a) business concern; and

(vi) Repeated inadequate performance of awarded section 8(a) procurement contracts by the section 8(a) business concern.

(vii) The concern has ceased its business operations. This constitutes automatic and immediate grounds for terminating a concern's participation in the program.

(viii) Failure to submit updated business plans within a reasonable time after its due date without approval by SBA.

(ix) Withholding notice from, or failure to provide notice to SBA within 30 days of changes in ownership and mangement control.

(x) Noncompliance with substantial requirements of divestiture or management agreements as approved by the AA/MSB&COD.

(xi) Failure to comply with the reporting provisions required in management agreements. Compensating those providing management assistance in excess of that specified in the SBA approved management agreement. Having a management agreement either written or oral that has not been approved by the AA/MSB&COD. Willful violation of any of the requirements of the management agreement.

(xii) Failure or refusal to provide SBA with required quarterly and annual financial statements and reports within a reasonable time after the close of the quarter.

(xiii) Failure to achieve goals cited in the business plan, as modified, as a result of repeated refusal to accept or utilize SBA assistance.

(xiv) Failure to reasonably pursue commerical and competitive business in accordance with the business plan projection, or failure to otherwise make reasonable efforts to achieve competitive status.

(xv) Inability to make satisfactory progress, within a reasonable time, after receiving SBA's management and technical assistance, financial and technical assistance in achieving its business development objectives.

(xvi) Failure to request prior approval from SBA before subcontracting under an 8(a) contract.

(xvii) Failure to disclose to SBA the extent to which nondisadvantaged persons or firms will participate in the management of the 8(a) business concern.

(xviii) Failure to disclose to SBA fees paid or to be paid, costs incurred or committed to third parties, directly or indirectly, in the process of obtaining 8(a) contracts.

(xix) Willful failure to comply with applicable labor standards obligations.

(xx) Knowingly submitting false information to SBA.

(xxi) Whenever the concern is debarred by the Comptroller General, the Secretary of Labor or the Director of the Office of Federal Contract Compliance.

(xxii) Whenever the concern is debarred or suspended for cause by any contracting agency pursuant to FPR subpart 1-1.6 "Debarred Suspended and Ineligible Bidders" or DAR (ASPR) section I. Part 6, "Debarment, Ineligibility and Suspension".

(xxiii) Conviction for commission of a criminal offense as an incident to obtaining or attempting to obtain a public or private contract, or subcontract thereunder, or in the performance of such contract or subcontract.

(xxiv) Conviction under the Organized Crime Control Act of 1970, or conviction of embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business integrity or business honesty which seriously and directly affects the question of present responsibility as a Government contractor.

(xxv) Conviction under the Federal Antitrust Statutes arising out of the submission of bids or proposals.

(xxvi) Violation of the subcontract provision against contingent fees and gratuities.

(2) Upon determination by the SBA that a section 8(a) business concern's participation in the program should be terminated for good cause, the section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the SBA's Rules of Practice for Adjudicative Proceedings set forth at Part 101.10 et seq. of the SBA rules and regulations.

(3) Subsequent to the completion of such hearing, upon the record established therein, and after consideration of the recommended decision of the examiner who has conducted the hearing, the AA/MSB & COD shall render a final decision regarding the termination, for good cause, of the 8(a) business concern's participation in the program.

(4) After the effective date of a program termination as provided for herein, the 8(a) business concern is no longer eligible to receive 8(a) subcontracts and other 8(a) assistance. However, such concern is obligated to complete previously awarded 8(a) subcontracts.

**§ 124.1-2 Contracting.**

(a) *General policy.* (1) Whenever SBA determines that it is necessary or appropriate, it shall enter into contracts with the United States Government or any department, agency, or officer thereof having procurement powers obligating SBA to furnish articles, equipment, supplies, services or materials to the Government, or to perform construction work for the Government.

(2) In any case in which SBA certifies to any procurement officer that SBA is competent and responsible to perform any specific Government procurement contract to be let by such officer, such officer shall be authorized in his discretion to let such procurement contract to SBA upon such terms and conditions as may be agreed upon between SBA and the procurement officer.

(3) In any case in which SBA and such procurement officer fail to agree on a procurement and/or the terms and conditions of a specific procurement contract, such disagreement shall be submitted to the head of the department or agency for final determination.

(4) SBA shall arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to section 8(a) small business concerns to provide whatever goods, construction work, or services may be necessary to enable SBA to perform such contracts.

(b) *Procedures*—(1) *Submission of business plans.* Applicants must submit a business plan, including complete information regarding the concern's qualifications, which will demonstrate that section 8(a) assistance will foster its participation in the economy as a self-sustaining, profit-oriented small business.

(2) *Requirements.* Procuring agencies will offer prospective contracts to SBA for the 8(a). A procuring agency

shall submit to SBA an offer which contains the following information:

(i) Current and complete specifications and drawings as necessary;

(ii) A procuring agency estimate of the current fair market value of the contract documented with supporting calculations;

(iii) Identification of any incumbent small business contractor which is presently performing the same or similar contract requirements with all available information on that business' gross receipts and the volume of Federal contracts previously awarded to and performed by such contractor, when such information is readily available and does not unduly delay the offering of a contract.

(3) *Certification.* SBA's execution of a procurement contract with a procuring agency, will operate as a certification of SBA's competency and responsibility to perform the contract as required by section 8(a)(1) of the Small Business Act.

(4) *Failure to Agree on Terms and Conditions.* In the event that SBA and the procuring agency's contacting officer fail to agree upon the selection of the procurement or the terms and conditions of any prospective contract being negotiated between SBA and the procuring agency, SBA and the procuring agency shall submit information sufficient to facilitate a final decision to the head of the procuring agency, who shall have the responsibility to resolve any such disagreement.

(i) Before submission of any disagreement to the head of the procuring agency, the appropriate SBA Regional Director shall seek resolution of any such disagreement by the contracting officer's supervisor.

(ii) Failure of the appropriate Regional Director and the contracting office's supervisor to agree will cause the matter to be submitted to the AAMSB-COD, who on behalf of the Administrator of the SBA, shall present the disagreement to the head of the procuring agency for resolution.

(iii) Subsequent to the resolution of any disagreement over the terms and conditions of any proposed contract by the head of the procuring agency, SBA and the procuring agency may reach agreement upon the proposed contract, or SBA may decide that the contract is unsuited to performance by a section 8(a) business concern, and may then return the proposed contract to the procuring agency for other procurement action.

(c) *Negotiation by 8(a) Business Concern.* Whenever practicable, any section 8(a) business concern which has been selected by SBA to perform a section 8(a) subcontract shall participate in the negotiations of the terms and conditions of such contract.

(d) *Impact on Small Business.* The AAMSB-COD and the AA/PA shall make a determination for each section 8(a) subcontract before award that:

(1) No public solicitation has been made on the specific purchase in question; and

(2) No small business, having relied upon Federal purchasing of the item for a significant part of its business during the preceding year, will suffer hardship because of the removal of the procurement from competition.

**§ 124.1-3 Advance Payments.**

(a) *Definitions.* Advance payments are disbursements of money made by SBA to a section 8(a) business concern prior to the completion of perfromance of a specific section 8(a) subcontract for the purpose of assisting the said 8(a) business concern in meeting financial requirements pertinent to the performance of said subcontract. Advance payments must be liquidated from proceeds derived from the performance of the specific section 8(a) subcontract. However, this does not preclude repayment of such advance payments from other revenues of the business except from other advance payments. The proceeds derived from the performance of the specific 8(a) contract must be deposited in a bank account established exclusively for the purpose of administering the advance payments.

(b) *General Policy.* Advance payments shall not be made in any case in which the section 8(a) business concern has assigned its rights to receive any payment under the specific section 8(a) subcontract to any person or entity, unless such assignment shall be made to SBA or to a Federal agency in regard to the receipt by the 8(a) business concern of a progress payment for any specific 8(a) subcontract. In no event shall the total amount of advance payments for a Section 8(a) business concern exceed the amount of the 8(a) subcontract to which it relates; nor shall any such advance payment exceed the amount which is to be earned from the anticipated completion of performance of the remainder of the subject 8(a) subcontract. The SBA shall not charge interest on advance payments disbursed pursuant to these regulations.

(c) *Requirements.* (1) Advance payments may be approved for a Section 8(a) business concern when the following conditions are found by SBA to exist:

(i) A Section 8(a) business concern does not have adequate working capital to perform a specific Section 8(a) subcontract; and

(ii) Either adequate and timely financing is not available on reasonable terms to provide the necessary capital, or financing is available but the terms of such financing are not conducive to the effective performance of the Section 8(a) subcontract and/or the business development purposes of the Section 8(a) program.

(iii) The Section 8(a) business concern has established or agrees to establish and maintain financial records and controls which provide for complete accountability and required reporting of program funds. These records must be made available upon request for review by SBA and the General Accounting Office.

(d) *Procedure.* To be eligible to receive Advance Payments a Section 8(a) business concern must meet the conditions set forth in § 124.1-3(c) above and must comply with the following procedure.

(1) A Section 8(a) business concern desiring to receive an advance payment in connection with any Section 8(a) subcontract shall:

(i) Submit a written request for advance payment to the appropriate SBA regional director or his designee. Such request must include detailed documentation supporting the need for such funds and evidence that working capital financing cannot be found upon terms acceptable under § 124.1-3(c)(ii) above from financial institutions.

(ii) The Section 8(a) business concern msut select a commercial bank which is a member of the Federal Reserve System in which it must establish a Special Bank Account for the deposit of advance payment funds from SBA and for the deposit of payments earned pursuant to the performance of the subcontract(s). This special account shall be a demand deposit account.

(A) Disbursements from the account shall require the countersignature of such SBA employee as shall be designated by the appropriate regional director.

(B) Under no circumstances shall the requirement for an SBA employee countersignature be waived.

(C) SBA shall obtain a lien upon the Special Bank Account, any property contracted for, and supplies, material and other property acquired with the proceeds of such advance payment funds.

(2) Upon a review of all the circumstances and evidence, the Regional Director shall have the obligation to decide whether to approve or deny a request for advance payment. This right of approval by the Regional Director shall not be delegated to any other person or entity. The 8(a) business concern, the bank selected pursuant to § 124.1-3(d)(ii) above, and SBA shall execute an Advance Payment agreement which shall set forth the terms and conditions governing advance payments.

(e) *Use of Advance Payment Funds.* (1) Except for repayment to SBA in appropriate circumstances, advance payment funds may be withdrawn from the special bank account by a Section 8(a) business concern exclusively for the purpose of purchasing materials and labor and paying for administrative and overhead expenses required to perform the specific Section 8(a) subcontract.

(2) Under no circumstances may advance payment funds be deposited in interest-bearing accounts.

(3) Advance payment funds shall be disbursed for deposit into the special account only in such amounts necessary to pay for the immediate needs of a Section 8(a) subcontract. Such disbursements shall be made as expeditiously as possible. Such immediate needs shall be documented by the small business concern and verified by SBA prior to disbursement.

(4) Payments to the 8(a) business concern for work performed or services rendered pursuant to the subject 8(a) contract shall be paid into the Special Bank Account.

(f) *Cancellation.* (1) SBA may determine that the advance payments be cancelled for any of the following reasons:

(i) The terms and conditions of the advance payment agreement have not been adhered to by a section 8(a) small business concern.

(ii) The subcontracting relationship between SBA and subcontractor is completed or terminated.

(2) In the event of cancellation, all previous advance payments shall become immediately due and payable to SBA.

**§ 124.1-4 Letter of Credit.**

(a) *General Policy.* The letter of credit method of payment will be utilized under certain circumstances to disburse advance payments to section 8(a) business concerns performing subcontracts under the section 8(a) program when SBA has made a decision approving the use of advance payments pursuant to the requirements and conditions provided for in these regulations.

(b) *Eligibility Requirements.* SBA may disburse advance payments through the letter of credit method of payment through the Federal Reserve Bank System to a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(1) SBA determines that the section 8(a) business concern may be awarded more than one section 8(a) subcontract during a period of at least one year.

(2) The aggregate amount of letter of credit advance payment funds will exceed $120,000 annually.

(3) The section 8(a) business concern has submitted a schedule of its projected monthly advance requirements for 8(a) subcontract disbursements, SBA has reviewed it, and SBA has found it to be reasonable.

(4) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of program funds. These records must be made available upon request for review and audit by SBA and the General Accounting Office.

(c) *Procedures.* The procedures for the utilization of the letter of credit method of payment shall be in accord with 41 CFR 1-30.408-1.

**§ 124.1-5 Business Development Expense.**

(a) *Definition.* Business Development Expense (BDE) funds are available for the purpose of assisting section 8(a) business concerns in connection with specific 8(a) subcontracts in their efforts to become competitive by overcoming deficiencies which would otherwise impede the firms from producing a service or product at a fair market price.

(b) *Purpose.* In the discretion of SBA, BDE funds may be used for the following purposes:

(1) To make up the difference between the current fair market price and the reasonable price required by the 8(a) contractor to provide the product or service in connection with a specific section 8(a) subcontract.

(2) For the purchase of capital equipment which has been determined by SBA to be essential to the section 8(a) business concern's performance of specific section 8(a) subcontracts and for which acquisition cannot be made by other financing means without adversely affecting the concern's financial condition.

(c) BDE may be used to defray other costs necessary to the performance of a specific 8(a) contract, including but not limited to:

(1) Facility and production engineering.

(2) Development, testing, and implementation of quality control procedures.

(3) Training costs to counteract low labor productivity due to the inexperience of the business concern or its labor force.

(4) Differential due to low order purchasing power and/or material usage in comparison to its competitors.

**§ 124.2-1 Consultant Services Program.**

(a) *General.* The Small Business Act, as amended, authorizes the SBA to provide assistance as set forth in section 7(j) of the Act. Section 7(j) of the Small Business Act, provides for financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or enterprises eligible for assistance under section 7(i), 7(j)(10), and 8(a) of the Small Business Act. Section 7(j)(10) of the Small Business Act establishes a Small Business and Capital Ownership Development program which shall provide additional assistance exclusively for small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. The management of the Capital Ownership Development program is vested in the Associate Administrator for Minority Small Business and Capital Ownership Development who is responsible for the oversight of the program and activities set forth in this part of these regulations. The Associate Administrator for Minority Small Business and Capital Ownership Development is responsible for coordinating and formulating policies relating to Federal assistance to small business concerns eligible for assistance under section 7(i) and 8(a) of the Small Business Act.

(b) *Services.* (1) Section 7(j)(1-2) of the Small Business Act empowers the SBA to provide through public and private organizations the management and technical assistance enumerated below to those individuals or concerns who meet the eligibility criteria contained in sections 7(i) and 8(a) of the Small Business Act.

(2) The SBA shall give preference to projects which promote the ownership, participation in ownership, or management of small businesses owned by low-income individuals and small businesses eligible to participate in the section 8(a) program.

(3) This assistance may include any or all of the following:

(i) Planning and research, including feasibility studies and market research;

(ii) The identification and development of new business opportunities;

(iii) The furnishing of centeralized services with regard to public services and Federal Government programs including programs authorized under sections 7(i), 7(j)(10), and 8(a) of the Small Business Act;

(iv) The establishment and strengthening of business service agencies, including trade associations and cooperatives;

(v) The furnishing of business counseling, management training, and legal and other related services, with special emphasis on the development of management training programs using the resources of the business community, including the development of management training opportunities in existing business, and with emphasis in all cases upon providing management training of sufficient scope and dura-

tion to develop entrepreneurial and managerial self-sufficiency on the part of the individuals served.

(4) Sections 7(j)(3) and 7(j)(9) of the Small Business Act authorize SBA to:

(i) Encourage the placement of subcontracts by businesses with small business concerns located in areas of high concentration of unemployed or low-income individuals, with small businesses owned by low-income individuals, and with small businesses eligible to receive contracts pursuant to section 8(a) of this Act. SBA may provide incentives and assistance to such businesses that will aid in the training and upgrading of potential subcontractors or other small business concerns eligible for assistance under sections 7(i), 7(j), and 8(a) of the Small Business Act, and

(ii) Coordinate and cooperate with the heads of other Federal departments and agencies, to insure that contracts, subcontracts, and deposits made by the Federal Government or with programs aided with Federal funds are placed in such way as to further the purposes of sections 7(i), 7(j), and 8(a) of the Small Business Act.

(c) *Eligibility.* (1) Eligibility for the assistance enumerated under § 124.2-1(b) above shall include, but not limited to:

(i) Businesses which qualify as small within the meaning of size standards prescribed in Part 121 of 13 CFR and which are located in urban or rural areas with a high proportion of unemployed or low income individuals; and

(ii) Businesses eligible to receive contracts pursuant to section 8(a) of the Small Business Act.

(d) *Delivery of Services.* (1) The financial assistance authorized for project under § 124.2-1(b) above includes assistance advanced by grant, agreement, or contract.

(2) To the extent feasible, services under § 124.2-1(b) above shall be provided in a location which is easily accessible to the individuals and small business concerns served.

(e) *Coordination and Cooperation With Other Government Agencies.* (1) The Associate Administrator for Minority Small Business and Capital Ownership Development may utilize the resources of other agenies and departments whenever practicable which can directly or indirectly support or augment the purposes of sections 7(j) and 8(a) of the Small Business Act.

(2) The Associate Administrator for Minority Small Business and Capital Ownership Development shall enter into agreements with Federal agencies and departments to further effectuate sections 7(i), 7(j) and 8(a) of the Small Business Act.

(3) The Associate Administrator for Minority Small Business and Capital Ownership Development shall encourage the placement of deposits made by the Federal funds, in such a way as to further the purposes of sections 7(i), 7(j) and 8(a) of the Small Business Act.

**§ 124.3-1 Small Business and Capital Ownership Development Program.**

(a) *General.* The development assistance described below shall be provided exclusively to those small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. Such small business concerns shall be participants in the Small Business Capital Ownership and Development program. This program shall:

(1) Assist small business concerns participating in the program to develop comprehensive business plans with specific business targets, objectives, and goals;

(2) Provide for such other nonfinancial services as deemed necessary for the establishment, preservation, and growth of small business concerns participating in the program, including but not limited to (i) loan packaging, (ii) financial counseling, (iii) accounting and bookkeeping assistance, (iv) marketing assistance, and (v) management assistance;

(3) Assist small business concerns participating in the program to obtain equity and debt financing;

(4) Establish regular performance monitoring and reporting systems for small business concerns participating in the program to assure compliance with their business plans;

(5) Analyze and report the causes of success and failure of small business concerns participating in the program; and

(6) Provide assistance necessary to help small business concerns participating in the program to procure surety bonds. Such assistance shall include, but not be limited to, (i) the preparation of surety bond application forms; (ii) special management and technical assistance designed to meet the specific needs of small business concerns participating in the program and which have received or are applying to receive a surety bond, and (iii) preparation of all forms necessary to receive a surety bond guarantee from the SBA pursuant to Title IV, part B of the Small Business Investment Act of 1958.

**§ 124.4-1 Surety Bond Waivers.**

(a) *Policy.* Notwithstanding subsections (a) and (c) of the first section of the Miller Act (40 U.S.C. 270(a) and (c), 49 Stat. 793) no small business concern shall be required to provide any amount of any bond as a condition of receiving any subcontract under section 8(a) of the Small Business Act if such business concern is determined by SBA to be a start-up concern which, as defined below, has not been participating in any program conducted under the authority of section 8(a) of the Small Business Act for a period exceeding one year, and SBA determines that such amount of bond is inappropriate for the concern in performing the subcontract.

(b) *Definitions.* (1) Start-up concern means a section 8(a) small business concern which is:

(i) both eligible for participation in SBA's section 8(a) program and has had its business plan approved by SBA, and

(ii) which has not been participating in any program conducted under the authority of section 8(a) of the Small Business Act for a period exceeding one year, and

(iii) which has been in its line of work, as its principal business activity, for no more than 2 years. If a principal of the concern has been a principal of another such firm or firms in the same line o: work, and the cumulative time span of his service in such capacity(s) is more than two years, the concern is not a start-up concern.

(2) Surety means a corporation with a Certificate of Authority from the Secretary of the Treasury under sections 6 to 13 of Title 6 of the United States Code, or as otherwise qualified under the Small Business Administration's Surety Bond Guarantee Regulations.

(c) *Eligibility.* To be eligible to receive a waiver of surety bond requirements by SBA, a business concern must:

(1) Be determined to be a start-up concern as defined in above; and

(2) Be under consideration by the AA/MSB-COD for award of a section 8(a) subcontract.

(d) *Procedures for Granting A Surety Bond Water.* SBA shall grant a surety bond waiver to an eligible start up concern with respect to the award of a section 8(a) subcontract after SBA has made the following determinations:

(1) SBA determines that the eligible start up concern is unable to obtain the requisite bond or bonds from a surety, and that no surety is willing to issue such bond or bonds subject to the surety bond guarantee provisions of Title IV of the Small Business Investment Act of 1958; and

(2) SBA determines that it can and shall assist, insofar as practicable, the eligible start up concern to develop within a reasonable period of time, such financial and other capability as may be needed to obtain such bonds as SBA may subsequently require for the successful completion of any such contract awarded to the eligible small business concern pursuant to section 8(a) of the Small Business Act; and

(3) SBA determines that it can and shall take such measures as it deems appropriate for the protection of persons furnishing materials and labor to the eligible small business construction concern to which a surety bond waiver is granted; and

(4) The start up concern agrees to remit to SBA a surety bond waiver fee in the amount of 2 percent of the 8(a) contract's face value within ninety (90) days of the time the contract is awarded.

[FR Doc. 79-2703 Filed 1-24-79; 8:45 am]

which it was made. If the AAMSB–COD determines that any such communication should, in fairness, be brought to the attention of all parties to the proceeding, the relevant written material pertaining thereto shall be made a part of the record of the proceeding to which it applies and the AAMSB–COD shall send copies thereto to all parties respondent.

(d) In any case where the AAMSB–COD determines that the dictates of fairness so require, any party requesting an opportunity to do so may rebut, on the record, any facts or contentions contained in any such ex parte communication.

(e) The Administrator of the SBA may, in accordance with the procedures contained in Part 104 of this chapter, suspend or revoke the privilege of any person who makes or solicits the making of an unauthorized ex parte communication, to practice or appear before SBA.

**§ 124.10-25 Reopening of proceedings.**

(a) In any case where an order has been issued by SBA it may, upon notice to the parties, modify or set aside, in whole or in part, its report of findings as to the facts or order in such manner as it may deem proper at any time prior to expiration of the time allowed for filing a petition for review.

(b) In any case in which an order issued by SBA has become final, SBA may at any time after reasonable notice and opportunity for hearing as to whether changed conditions of fact or of law or the public interest so require, reopen and alter, modify or set aside, in whole or in part, its report of findings as to the facts or order therein whenever in the opinion of the AAMSB–COD such action is required by the changed conditions or by the public interest.

(c) After an order dismissing an order to show cause has been issued, SBA may, upon reasonable notice to the parties and opportunity for a hearing as to whether the proceeding should be reopened, issue an order reopening such proceeding whenever, in the opinion of the AAMSB–COD, changed conditions of fact or of law or the public interest so require.

[FR Doc. 79-16784 Filed 5-25-79; 8:45 am]

BILLING CODE 8025-01-M

---

**13 CFR Part 124**

**[Amendment 8]**

## The Small Business and Capital Ownership Development Program

**AGENCY:** Small Business Administration.

**ACTION:** Final Rules.

**SUMMARY:** These final rules describe the type of assistance available, the requirements for obtaining assistance, and the methods of providing assistance to certain eligible small businesses under SBA's new Small Business and Capital Ownership Development Program as mandated by Pub. L. 95–507. In addition, they provide criteria for determining when the participation of a business in the program should be terminated or determined to be completed, and specify a procedure by which such a determination can be made.

**DATES:** Effective date: May 29, 1979. While these rules are being published in final form, and are effective upon publication, the public is welcome to comment upon them, and from time to time they will be revised as appropriate.

**ADDRESS:** Comments, submitted in duplicate, are to be submitted to the Associate Administrator for Minority Small Business and Capital Ownership Development, Small Business Administration, 1441 L Street, N.W., Washington, DC 20416.

**FOR FURTHER INFORMATION CONTACT:** Charles Gaston, Office of Minority Small Business and Capital Ownership Development, Small Business Administration, 1441 L Street, N.W., Washington, DC. 20416, 202-653-6851.

**SUPPLEMENTARY INFORMATION:** Pub. L. 95–507 requires the revision of Part 124 of Title 13 of the Code of Federal Regulations because that Public Law substantially amends parts of the Small Business Act which Part 124 implements. As a result of Pub. L. 95–507, it is necessary to replace the following presently effective sections: 124.8, 124.8-1 and 1243.8-2. The final rules are replacements for these sections.

On January 25, 1979, SBA published for comment its proposed rules to provide for the implementation of certain provisions of Pub. L. 95–507. A public comment period of sixty days was provided. During the comment period, approximately forty comments were received by SBA from the general public, and after due consideration of such comments, certain changes have been made which it is believed will result in the better administration of the program.

Several comments were received favoring eligibility of individuals for the section 8(a) program who are not members of minority groups designated by the statute. These comments were reviewed by SBA, and as a result a change in the final regulations was made to permit individuals to establish their social disadvantage for the purposes of the section 8(a) program by demonstrating to SBA that they have individually been subjected to chronic racial or ethnic prejudice or cultural bias. They must additionally establish their economic disadvantage as provided for in the statute in order to be eligible for participation in the program.

In addition, a procedure has been provided which allows minority groups not designated in the statute as socially disadvantaged to establish the group's status as socially disadvantaged for the purposes of the section 8(a) program. This procedure will also be utilized to allow minority groups to establish their status as socially and economically disadvantaged within the meaning of section 211 of Pub. L. 95–507 for participation in the subcontracting program. For clarity this procedure will be separately announced and published simultaneously with the publication of these rules and regulations for use in group designation in the subcontracting program. When a group is designated under this procedure as socially disadvantaged for section 8(a) purposes, it shall simultaneously be determined to be socially and economically disadvantaged for the purposes of the subcontracting program provided for in section 211 of Pub. L. 95–507.

Comments were also received regarding the need for clarification of certain regulations in order to facilitate the financing of section 8(a) businesses by members of the SBIC and MESBIC industries, and by development companies. These changes were made in order to encourage and stimulate financing of section 8(a) businesses.

The section of the proposed regulations regarding the contracting process between SBA and other Federal agencies was deleted in its entirety to facilitate the orderly administration of the program.

The section of the proposed regulations regarding the surety bond waiver provisions of Pub. L. 95–507 has been deleted to allow for a comprehensive review of the administration of this provision of the Act.

It is believed that all of the above changes will result in better administration of the provisions of Pub. L. 95–507.

These final rules are designed to provide for the implementation of the Pub. L. 95–507, which amends among other provisions, sections 8(a) and 7(j) of the Small Business Act, as amended (hereinafter the "Act"). The purpose of

section 8(a) of the Act is to foster business ownership by individuals who are both socially and economically disadvantaged to promote the competitive viability of such firms by providing such available contract, financial, technical, and management assistance as may be necessary, and to clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, materials and construction work from small business concerns owned and managed by socially and economically disadvantaged individuals.

The Act sets forth a business development program whereby the Administration is authorized to provide to eligible business concerns procurement contracts, financial management and technical assistance.

The Congress has found that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential in order to attain social equality and economic parity for such persons. The Congress found further that Black Americans, Hispanic Americans, Native Americans, and other minorities have suffered the effect of discriminatory practices and other invidious circumstances over which they have no control.

The business development program of the Administration is designed to ameliorate the condition of socially and economically disadvantaged groups by providing the maximum practical opportunity for the development of businesses owned and managed by such persons. Such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, and construction work from such businesses and the provision of management and technical assistance to develop managerial self-sufficiency. The Congress intends that the primary beneficiaries of this program shall be minorities and that the authorities granted the Administration in this program will be used for appropriate business development.

The Act requires that the Administration of the section 8(a) program—the principal procurement assistance vehicle—and the section 7(j) management assistance program shall be under the direction of the Associate Administrator for Minority Small Business and Capital Ownership Development. The interface of these programs should result in the delivery to the business owned by the socially and economically disadvantaged individual an increased opportunity to produce and sell goods and services efficiently and profitably.

These regulations provide for significant changes in regard to the following areas:

(a) Program eligibility—The Act allows program participation for a "socially and economically disadvantaged small business concern." This means a small business concern which is at least 51 percent owned by one or more socially disadvantaged individuals, and whose management and daily business operations are controlled by one or more of such individuals. Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities, and individuals who are able to demonstrate to SBA that they have been subjected to racial or ethnic prejudice or cultural bias.

Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities. The Administration shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual.

This represents a significant change of eligibility criteria from the standard of social or economic disadvantage heretofore utilized by the Administration.

(b) Termination—Detailed termination procedures and standards are provided which will govern the circumstances under which a business concern can be denied assistance under the program.

(c) Small Business and Capital Ownership Development Program—This section grants significant new authority for the Administration to aid section 8(a) concerns in regard to procurement, financial, management and technical assistance matters.

(d) Advance Payments and Business Development Expense—These sections set forth the criteria and standards for the award and use of advance payments and business development expense.

Dated this 24th day of May 1979.

**A. Vernon Weaver,**

*Administrator.*

13 CFR Part 124 is amended by deleting § 124.8, § 124.8-1 and § 124.8-2 and by adding the following new sections:

## PART 124—PROCUREMENT AND TECHNICAL ASSISTANCE

Sec.
124.1-1 The Section 8(a) Program.
124.1-2 Advance Payments.
124.1-3 Letter of Credit.
124.1-4 Business Development Expense.
124.2-1 Development Assistance Program.
124.3-1 Small Business and Capital Ownership Development Program.

* * * * *

### § 124.1-1 The section 8(a) program.

(a) *General.* These regulations implement section 8(a) of the Small Business Act (15 U.S.C. 637(a)) which authorizes SBA to enter into all types of contracts (including, but not limited to, supply, services, construction, research and development) with other Government departments and agencies and negotiate subcontracts for the performance thereof.

(b) *Purpose.* It is the purpose of section 8(a) to:

(1) foster business ownership by individuals who are both socially and economically disadvantaged;

(2) promote the competitive viability of such firms by providing such available contract, financial, technical, and management assistance as may be necessary; and

(3) clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals.

(c) *Eligibility.* In order to be eligible to participate in the section 8(a) program, an individual or an applicant concern, as the case may be, must meet all of the pertinent eligibility criteria set forth hereafter in paragraphs (1) through (5) below. All determinations pursuant to paragraphs (1) through (5) below shall be made by the Associate Administrator for Minority Small Business and Capital Ownership Development (AAMSB-COD) whose decision shall be final; provided, however, that an applicant may request reconsideration of such final decision based upon information discovered subsequent to such decision or upon information which was unavailable at the time of such final decision. The granting of such reconsideration shall be within the absolute discretion of the AAMSB-COD.

(1) *Small Business Concern.* In order to be eligible to participate in the section 8(a) program, an applicant concern must qualify as a small

business concern as defined for purposes of Government procurement in section 121.3–8 of the SBA Rules and Regulations. The particular size standard to be applied shall be based on the principal activity of the applicant concern.

(2) *Ownership and Control.* In order to be eligible to participate in the section 8(a) program, an applicant concern must be one:

(i) Which is at least 51 percent owned by an individual or individuals who are citizens of the United States, (specifically excluding resident aliens) and who are determined to be socially and economically disadvantaged by SBA.

(A) In the case of an applicant concern which is a corporation, 51 percent of all classes of voting stock of such corporation must be owned by an individual(s) determined to be socially and economically disadvantaged.

(B) In the case of an applicant concern which is a partnership, 51 percent of the partnership interest must be owned by an individual or individuals determined to be socially and economically disadvantaged, and

(ii) Whose management and daily business operations are controlled by an individual(s) determined to be socially and economically disadvantaged. Such individual(s) must be engaged in the daily management and operation of the business concern.

(iii) State, local and Community Development Corporations, MESBIC's and SBIC's, profit or nonprofit, may own up to 49 percent interest or voting stock in an applicant concern. State, local and Community Development Corporations, MESBIC's and SBIC's, profit or nonprofit, may own more than 49 percent interest or voting stock in an applicant 8(a) concern pursuant to a written divestiture agreement approved by the AAMSB–COD.

The divestiture agreement shall provide that such concern will divest within a specified period of time at least 51 percent of the business interest or voting stock, as the case may be, of the section 8(a) business concern to an individual(s) who is socially and economically disadvantaged within the meaning of these regulations.

In determining the "ownership and control" of a business within the meaning of these regulations, the potential ownership interests of state, local and Community Development Corporations, SBIC's and MESBIC's such as warrants, voting trust interests and other arrangements, shall not be counted until and unless exercised by the subject entity.

(3) *Social Disadvantage.*

(i) Socially disadvantaged individuals are (A) those individuals who have been subjected to racial or ethnic prejudice or cultural bias because of their identification as members of certain groups, without regard to their individual qualities; such groups including, but not limited to, Black Americans, Hispanic Americans, Native Americans, (including American Indians, Eskimos, Aleuts and Native Hawaiians) and other minorities, to be designated from time to time by SBA according to the procedures set forth at § 124.1–1(3)(iii) below; and (B) those individuals who are able to demontrate to SBA that they have individually been subjected to chronic racial or ethnic prejudice, or cultural bias.

(ii) The social disadvantage of individuals, including those within the above-named groups, shall be determined by SBA on a case-by-case basis. Membership alone in any group is not conclusive that an individual is socially disadvantaged.

(iii) *Minority Group Inclusion.* (A) *General.* Upon an adequate showing to SBA by representatives of a minority group that the group has suffered chronic racial or ethnic prejudice or cultural bias, and upon the request of the representatives of the group that SBA do so, SBA shall publish in the **Federal Register** a notice of its receipt of a request that it consider a minority group not specifically named in section 201 of Pub. L. 95–507 to have members which are socially disadvantaged because of their identification as members of the group for the purpose of eligibility for the section 8(a) program. The notice shall adequately identify the minority group making the request, and if a hearing is requested on the matter, the time, date and location at which such hearing is to be held. All information submitted to support a request should be addressed to the AAMSB–COD.

(B) *Standards to be applied.* In determining whether a minority group has made an adequate showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this regulation, SBA shall determine (1) if the group has suffered the effects of discriminatory practices or similar invidious circumstances over which its members have no control, (2) if the group has generally suffered from prejudice or bias, (3) if such conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in Pub. L. 95–507, and (4) if such conditions have produced impediments in the business world for members of the group over which they have no control which are not common to all small business people. If it is demonstrated to SBA by a particular group that it satisifies the above criteria, SBA will publish a notice under this regulation.

(C) *Procedure.* Once a notice is published under this regulation, SBA shall adduce further information on the record of the proceeding which tends to support or refute the group's request. Such information may be submitted by any member of the public, including Government representatives and any member of the private sector. Information may be submitted in written form, or orally at such hearings as SBA may hold on the matter.

(D) *Decision.* Once SBA has published a notice under this regulation it shall afford a reasonable comment period of not more than thirty (30) days for public comment upon a request. It shall complete the reception of comments, including the holding of hearings, within such comment period. Thereafter, SBA shall consider the comments received as expeditiously as possible, and shall render its final decision within 30 days of the close of receipt of information on the matter. Such decision shall take the form of a notice in the **Federal Register**, and SBA shall also inform the subject group representatives who have appeared in the proceeding of such decision in writing at the time it is made.

(4) *Economic Disadvantage.*

(i) Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area who are not socially disadvantaged.

(ii) In determining the degree of diminished credit and capital opportunities of a socially disadvantaged individual, consideration shall be given:

(A) with respect to both the disadvantaged individual and the applicant concern with which he or she is affiliated, to the following factors, including but not limited to:

(1) Personal and business assets;

(2) Personal and business net worth; and

(3) Personal and business income and profits.

(B) with respect to the applicant concern, the following factors, including but not limited to:

(1) Availability of financing;

(2) Bonding capability;

(3) Availability of outside equity capital; and

(4) Available markets.

(5) *Potential for Success.* In order to be eligible to participate in the section 8(a) program, an applicant concern must be a concern:

(i) Which with contract, financial, technical and management support will be able to successfully perform subcontracts awarded under the section 8(a) program, and with such assistance shall have reasonable prospects for success in competing in the private sector.

(ii) In addition to meeting the criteria set forth in § 124.1-1(c)(5)(1) above, the AAMSB-COD must determine that the procurement, financial, technical and management support necessary to enable the applicant concern to successfully complete the section 8(a) program shall be available to such concern from SBA or other identified and acceptable sources.

(d) *Program Completion.* (1) When a section 8(a) business concern has substantially achieved the objectives of the section 8(a) program, including but not limited to, the achievement of the goals set forth in its business plan as approved and modified, and the attainment of demonstrated ability to compete in the market place without assistance under the section 8(a) program, its participation within the program shall be determined by SBA to be completed.

(2) In determining whether a concern has substantially achieved the goals of its business plan and has attained the ability to compete in the market place without section 8(a) program assistance, the following factors, among others, shall be considered by SBA. The factors cited below shall be considered and applied by SBA with due regard to the remedial purposes of Pub. L. 95-507.

(i) Positive overall financial trends, including but not limited to:

(A) Profitability

(B) Sales, including improved ratio of non-section 8(a) sales

(C) Net worth, financial ratios, working capital, capitalization, access to credit and capital

(D) Ability to obtain bonding

(E) A positive comparison of the section 8(A) business concern's business and financial profile with profiles of non-section 8(a) small businesses in the same area or similar business category

(F) Good management capacity and capability.

(3) Upon determination by SBA that a section 8(a) business concern's participation within the section 8(a) program has been completed pursuant to paragraph 124.1-1(d)(1) above, the section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the SBA's Rules of Practice for Adjudicative Proceedings set forth at Part 124.10, et seq., of SBA Rules and Regulations.

(4) Subsequent to the completion of such hearing, based upon the record established therein, and after consideration of the initial decision of the Administrative Law Judge who has conducted the hearing, the AAMSB-COD shall render a final decision regarding the completion of the section 8(a) business concern's participation in the program. Prior to a final decision, the subject section 8(a) business concern may have full rights of participation in the section 8(a) program.

(e) *Program Termination.* (1) Participation of a section 8(a) business concern in the section 8(a) program may be terminated by the SBA prior to the completion of the concern's business plan for good cause. Examples of good cause include, but are not limited to, the following:

(i) Failure of a section 8(a) business concern to continue to meet the standards of eligibility set forth in these regulations.

(ii) Failure of a section 8(a) business concern to maintain ownership and control by the person(s) who has (have) been determined to be socially and economically disadvantaged pursuant to these regulations.

(iii) Inadequate management performance by a section 8(a) business concern.

(iv) Repeated inadequate performance of awarded section 8(a) procurement subcontracts by a section 8(a) business concern.

(v) A section 8(a) business concern has ceased its business operations.

(vi) Failure of a section 8(a) business concern to submit an updated business plan within a reasonable time after its due date, without approval by SBA.

(vii) Withholding notice from, or failure to obtain SBA approval prior to changes in ownership and management control by a section 8(a) business concern.

(viii) Unauthorized use of business development expense funds and/or advance payment funds by a section 8(a) business concern. Violation by a section 8(a) business concern of a substantial requirement or provision of an advance payment agreement.

(ix) Violation by a section 8(a) business concern of any of SBA's Rules and Regulations.

(x) Failure of a section 8(a) business concern to comply with the reporting provisions required in an SBA approved management agreement. Compensating those providing management assistance in excess of that specified in an SBA approved management agreement. Having a management agreement, either written or oral, that has not been approved by SBA. Willful violation of any of the other requirements of a management agreement approved by SBA.

(xi) Noncompliance by a section 8(a) business concern with substantial requirements of any divestiture or management agreement as approved by SBA.

(xii) Failure or refusal by a section 8(a) business concern to provide SBA with required quarterly and annual financial statements, reports, and other requested data within a reasonable time after the close of the reporting period.

(xiii) Failure by a section 8(a) business concern to achieve goals cited in its business plan, as modified, as a result of repeated refusal to accept or utilize SBA assistance.

(xiv) Failure by a section 8(a) business concern to reasonably pursue competitive and commercial business in accordance with its business plan, or failure to otherwise make reasonable efforts to achieve competitive status.

(xv) Inability of a section 8(a) business concern to make satisfactory progress in achieving its business development objectives within a reasonable time after receiving SBA management and technical assistance, financial and technical assistance.

(xvi) Failure by a section 8(a) business concern to request and obtain prior approval from SBA before subcontracting under a section 8(a) subcontract.

(xvii) Failure by a section 8(a) business concern to disclose to SBA the extent to which nondisadvantaged persons or firms will participate in the management of the section 8(a) business concern.

(xviii) Failure by a section 8(a) business concern to disclose to SBA fees paid or to be paid, costs incurred or committed to third parties, directly or indirectly, in the process of obtaining section 8(a) contracts or subcontracts.

(xix) Willful failure by a section 8(a) business concern to comply with applicable labor standards obligations.

(xx) Knowing submission of false information to SBA on behalf of a

section 8(a) business concern by its principals, officers, agents or employees.

(xxi) Debarment by the Comptroller General, the Secretary of Labor or Director of the Office of Federal Contract Compliance of a section 8(a) business concern.

(xxii) Debarment or suspension of a section 8(a) business concern for cause by any contracting agency pursuant to FPR subpart 1-1.6 "Debarred, Suspended and Ineligible Bidders" or DAR (ASPR) section I. Part 6, "Debarment, Ineligibility and Suspension."

(xxiii) Conviction of a section 8(a) business concern or a principal of a section 8(a) business concern for commission of a criminal offense as an incident to obtaining or attempting to obtain a public or private contract, or subcontract thereunder, or in the performance of such contract or subcontract.

(xxiv) Conviction of a section 8(a) business concern or a principal of a section 8(a) business concern under the Organized Crime Control Act of 1970; or conviction of such a principal of a section 8(a) business concern of embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business integrity or business honesty which seriously and directly affects the question of present responsibility as a Government contractor.

(xxv) Conviction of a section 8(a) business concern or a principal of a section 8(a) business concern under the Federal Antitrust Statutes arising out of the submission of bids or proposals.

(xxvi) Violation by a section 8(a) business concern of a section 8(a) subcontract provision against contingent fees and gratuities.

(2) Upon determination by the SBA that a section 8(a) business concern's participation in the section 8(a) program should be terminated for good cause, the section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the SBA's Rules of Practice for Adjudicative Proceedings set forth at Part 124.10 et seq., of the SBA Rules and Regulations.

(3) Subsequent to the completion of such hearing, upon the record established therein, and after consideration of the initial decision of the Administrative Law Judge who has conducted the hearing, the AAMSB-COD shall render a final decision regarding the termination, for good cause, of the 8(a) business concern's participation in the program.

(4) After the effective date of a program termination as provided for herein, a section 8(a) business concern is no longer eligible to receive any section 8(a) program assistance. Such concern is obligated to complete previously awarded section 8(a) contracts.

### 124.1-2 Advance payments.

(a) *General.* (1) Advance payments are disbursements of money made by SBA to a section 8(a) business concern prior to the completion of performance of a specific section 8(a) subcontract. Advance payments are made for the purpose of assisting the section 8(a) business concern in meeting financial requirements pertinent to the performance of the subcontract. Advance payments must be liquidated from proceeds derived from the performance of the specific section 8(a) subcontract. However, this does not preclude repayment of such advance payments from other revenues of the business, except from other advance payments and business development expenses (as defined hereinafter in these regulations). The proceeds derived from the performance of the specific section 8(a) subcontract must be deposited by the procuring agency in a special bank account established exclusively for the purpose of administering the advance payments. These proceeds will be used to liquidate the advance payments. No withdrawals of such subcontract proceeds from the special bank account may be made by the section 8(a) business concern before the full amount of the advance payments is liquidated.

(2) Advance payments shall not be made to a section 8(a) business concern in any case in which the section 8(a) business concern has assigned its rights to receive any payment under the specific section 8(a) subcontract to any person or entity, unless such assignment shall be made to SBA or to a Federal agency in regard to the receipt by the section 8(a) business concern of a progress payment for any specific section 8(a) subcontract.

(3) In no event shall the total amount of advance payments for a section 8(a) business concern exceed 90 percent of the amount of the section 8(a) subcontract to which the above payments relate. The amount of advance payments made to a section 8(a) business concern shall not exceed the amount which is to be paid to the section 8(a) concern upon completion of performance of the specific section 8(a) subcontract by the procuring agency.

(4) The SBA shall not charge interest on advance payments disbursed pursuant to these regulations.

(b) *Requirements.* (1) Advance payments may be approved for a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(i) A section 8(a) business concern does not have adequate working capital to perform a specific section 8(a) subcontract.

(ii) Either adequate and timely financing is not available on reasonable terms to provide necessary capital, or financing is available but the terms of such financing are not conducive to the effective and/or the business development purposes of the section 8(a) program.

(iii) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of advance payment funds. These records must be made available upon request for review by SBA and the General Accounting Office.

(c) *Procedure.* To be eligible to receive Advance Payments, a section 8(a) business concern must meet the conditions set forth in § 124.1-2(b) above and must comply with the following procedure.

(1) A section 8(a) business concern desiring to receive an advance payment in connection with any section 8(a) subcontract shall:

(i) Submit a written request for advance payment to the appropriate SBA Regional Director or his designee. Such request must include detailed documentation supporting the need for such funds and evidence that working capital financing cannot be found upon terms acceptable pursuant to § 124.1-2(b)(ii) above from financing institutions.

(ii) The section 8(a) business concern must select a commerical bank which is a member of the Federal Reserve System in which it must establish a special bank account for the deposit of payments paid to it by the procuring agency pursuant to the performance of the subcontract(s). This special account shall be a demand deposit account.

(A) Disbursements from the account shall require the countersignature of such SBA employee as shall be designated by the appropriate SBA Regional Director.

(B) Under no circumstances shall the requirement for an SBA employee countersignature be waived.

(C) At the time that SBA disburses advance payment funds into the special bank account, SBA shall obtain a lien upon the special bank account, any property contracted for, and supplies, material and other property acquired with the advance payment funds.

(2) Upon a review of all the circumstances and evidence, the appropriate SBA Regional Director shall have the obligation to decide whether to approve or deny a request for advance payment. This right of approval by the Regional Director shall not be delegated to any other person or entity. The section 8(a) business concern, the bank selected pursuant to § 124.1-2(c)(ii) above, and SBA shall execute an Advance Payment Agreement which shall set forth the terms and conditions governing advance payments.

(d) *Use of Advance Payment Funds.* (1) Except for repayment to SBA in appropriate circumstances, advance payment funds may be withdrawn from the special bank account by a section 8(a) business concern exclusively for the purpose of purchasing materials and labor and paying for administrative and overhead expenses required to perform the specific section 8(a) subcontract.

(2) Under no circumstances may advance payment funds be deposited in interest-bearing accounts.

(3) Advance payment funds shall be dispersed by SBA for deposit into the special account only in such amounts necessary to pay for the immediate needs of a section 8(a) subcontract. Such disbursements shall be made as expeditiously as possible. Such immediate needs shall be documented by the small business concern and verified by SBA prior to disbursement.

(4) All payments to the section 8(a) business concern for work performed or services rendered pursuant to the subject section 8(a) subcontract shall be paid into the special bank account by the procuring agency, and shall be applied by SBA against the balance of advance payments until the total amount of advance payments made by SBA to the section 8(a) business concern is liquidated.

(e) *Cancellation.* (1) SBA may determine that advance payments should be cancelled under the following circumstances:

(i) The terms and conditions of the advance payment agreement have not been adhered to by a section 8(a) small business concern.

(ii) The section 8(a) business concern's participation in the section 8(a) program is completed or has been terminated.

(2) In the event of cancellation of advance payments to a section 8(a) business concern, all previous advance payments made to that section 8(a) business concern shall become immediately due and payable to SBA.

**§ 124.1-3 Letter of credit.**

(a) *General Policy.* The letter of credit method of payment will be utilized under certain circumstances to disburse advance payments to section 8(a) business concerns performing subcontracts under the section 8(a) program when SBA has made a decision approving the use of advance payments pursuant to the requirements and conditions provided for in these regulations.

(b) *Eligibility Requirements.* SBA may disburse advance payments through the letter of credit method of payment through the Federal Reserve Bank System to a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(1) SBA determines that the section 8(a) business concern may be awarded more than one section 8(a) subcontract during a period of at least one year.

(2) The aggregate amount of letter of credit advance payment funds made to one section 8(a) business concern will exceed $120,000 annually.

(3) The section 8(a) business concern has submitted a schedule of its projected monthly advance requirements for section 8(a) subcontract disbursements, SBA has reviewed it, and SBA has found it to be reasonable.

(4) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of program funds. These records must be made available upon request for review and audit by SBA and the General Accounting Office.

(c) *Procedures.* The procedures for the utilization of the letter of credit method of payment shall be in accord with 41 CFR 1-30.408-1.

**§ 124.1-4 Business development expense.**

(a) *Purpose.* Business Development Expense (BDE) funds are funds made available by SBA for the purpose of assisting a section 8(a) business concern in connection with the performance of a specific section 8(a) subcontract.

In the discretion of SBA, BDE funds may be used for the following purposes:

(1) To make up the difference between the current fair market subcontract price and the reasonable price required by the section 8(a) contractor to provide the product or service in connection with a specific section 8(a) subcontract.

(2) For the purchase of capital equipment which has been determined by SBA to be essential to the section 8(a) business concern's performance of a specific section 8(a) subcontract and for which acquisition cannot be made by other financing means without adversely affecting the concern's financial condition.

(b) BDE may be used to defray other costs of a section 8(a) business concern for the performance of a specific section 8(a) subcontract, including but not limited to:

(1) Facility and production engineering.

(2) Development, testing, and implementation of quality control procedures.

(3) Training costs to counteract low labor productivity due to the inexperience of the business concern or its labor force.

(4) Differential due to low order purchasing power and/or material usage in comparison to its competitors.

**§ 124.2-1 Development assistance program.**

(a) *General.* The Small Business Act, as amended by Pub. L. 95-507, authorizes the SBA to provide assistance as set forth in section 7(j) of the Act. Section 7(j) of the Small Business Act provides for financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or enterprises eligible for assistance under sections 7(i), 7(j)(10), and 8(a) of the Small Business Act. The Associate Administrator for Minority Small Business and Capital Ownership Development is responsible for coordinating and formulating policies relating to the dissemination of this assistance to small business concerns eligible for assistance under sections 7(i), 7(i)(10) and 8(a) of the Small Business Act.

(b) *Services.* (1) Section 7(j)(1-2) of the Small Business Act empowers the SBA to provide through public and private organizations the management and technical assistance enumerated below to those individuals or concerns who meet the eligibility criteria contained in sections 7(i) and 8(a) of the Small Business Act.

(2) The SBA shall give preference to projects which promote the ownership, participation in ownership, or management of small businesses owned by low-income individuals and small

businesses eligible to participate in the section 8(a) program.

(3) This assistance may include any or all of the following:

(i) Planning and research, including feasibility studies and market research;

(ii) The identification and development of new business opportunities;

(iii) The furnishing of centralized services with regard to public services and Federal Government programs including programs authorized under sections 7(i), 7(j)(10), and 8(a) of the Small Business Act;

(iv) The establishment and strengthening of business service agencies, including trade associations and cooperatives;

(v) The furnishing of business counseling, management training, and legal and other related services, with special emphasis on the development of management training programs using the resources of the business community, including the development of management training opportunities in existing business, and with emphasis in all cases upon providing management training of sufficient scope and duration to develop entrepreneurial and managerial self-sufficiency on the part of the individuals served.

(4) Sections 7(j)(3) and 7(j)(9) of the Small Business Act authorize SBA to:

(i) Encourage the placement of subcontracts by businesses with small business concerns located in areas of high concentration of unemployed or low-income individuals, with small businesses owned by low-income individuals, and with small businesses eligible to receive contracts pursuant to section 8(a) of this Act. SBA may provide incentives and assistance to such businesses that will aid in the training and upgrading of potential subcontractors or other small business concerns eligible for assistance under sections 7(i), 7(j), and 8(a) of the Small Business Act, and

(ii) Coordinate and cooperate with the heads of other Federal departments and agencies, to insure that contracts, subcontracts, and deposits made by the Federal Government or with programs aided with Federal funds are placed in such way as to further the purposes of sections 7(i), 7(j), and 8(a) of the Small Business Act.

(c) *Eligibility.* (1) Eligibility for the assistance enumerated under section 124.2–1(b) above shall include, but not be limited to:

(i) Businesses which qualify as small within the meaning of size standards prescribed in 13 CFR Part 121, or which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, and which are owned by such unemployed or low-income individuals; and

(ii) Businesses eligible to receive contracts pursuant to section 8(a) of the Small Business Act.

(d) *Delivery of Services.* (1) The financial assistance authorized for projects under § 124.2–1(b) above includes assistance advanced by grant, agreement, or contract.

(2) To the extent feasible, services available under § 124.2–1(b) above shall be provided in a location which is easily accessible to the individuals and small business concerns served.

(e) *Coordination and Cooperation With Other Government Agencies.* (1) The Associate Administrator for Minority Small Business and Capital Ownership Development may utilize the resources of other agencies and departments whenever practicable which can directly or indirectly support or augment the purposes of sections 7(i), 7(j) and 8(a) of the Small Business Act.

(2) The Associate Administrator for Minority Small Business and Capital Ownership Development shall enter into agreements with Federal agencies and departments to further effectuate sections 7(i), 7(j) and 8(a) of the Small Business Act.

(3) The Associate Administrator for Minority Small Business and Capital Ownership Development shall encourage the placement of deposits made by the Federal Government, or by programs aided with Federal funds, in such a way as to further the purposes of sections 7(i), 7(j) and 8(a) of the Small Business Act.

**§ 124.3–1 Small business and capital ownership development program.**

(a) *General.* Section 7(j)(10) of the Small Business Act establishes a Small Business and Capital Ownership Development program which shall provide additional assistance exclusively for small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. The management of the Capital Ownership Development program is vested in the Associate Administrator for Minority Small Business and Capital Ownership Development who is responsible for the oversight of the program and activities set forth in this part of these regulations.

The development assistance described below shall be provided exclusively to those small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. Such small business concerns shall be participants in the Small Business Capital Ownership Development program. This program shall:

(1) Assist small business concerns participating in the program to develop comprehensive business plans with specific business targets, objectives, and goals;

(2) Provide for such other nonfinancial services as deemed necessary for the establishment, preservation, and growth of small business concerns participating in the program, including but not limited to (i) loan packaging, (ii) financial counseling, (iii) accounting and bookkeeping assistance, (iv) marketing assistance, and (v) management assistance;

(3) Assist small business concerns participating in the program to obtain equity and debt financing;

(4) Establish regular performance monitoring and reporting systems for small business concerns participating in the program to assure compliance with their business plans;

(5) Analyze and report the causes of success and failure of small business concerns participating in the program; and

(6) Provide assistance necessary to help small business concerns participating in the program to procure surety bonds. Such assistance shall include, but not be limited to, (i) the preparation of surety bond application forms; (ii) special management and technical assistance designed to meet the specific needs of small business concerns participating in the program and which have received or are applying to receive a surety bond, and (iii) preparation of all forms necessary to receive a surety bond guarantee from the SBA pursuant to Title IV, part B of the Small Business Investment Act of 1958.

(Secs. 5, 8, 72 Stat. 385, 389, as amended; 15 U.S.C. 634, 637.)

[FR Doc. 79-16783 Filed 5-25-79; 8:45 am]
BILLING CODE 8025-01-M

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 4 CFR Part 39

**[Docket No. 78-EA-99; Amdt. 39-3477]**

### Airworthiness Directives; Pratt & Whitney of Canada, Ltd.

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Part 124**

## Minority Small Business and Capital Ownership Development Assistance

**AGENCY:** Small Business Administration.

**ACTION:** Proposed rule.

**SUMMARY:** The Small Business Administration (SBA) is hereby proposing to amend and revise its regulations covering the section 8(a) and 7(j) programs. These programs were established by virtue of section 8(a) and 7(j) of the Small Business Act, 15 U.S.C. 637(a) and 636(j). Taken as a whole, these regulations implement the Minority Small Business and Capital Ownership Development Program of SBA, a program which is intended to provide contractual and management assistance to concerns owned and controlled by socially and economically disadvantaged persons. In some instances, these proposed regulations would, if adopted in final form, alter existing regulations covering the section 8(a) program. In other instances, these proposed regulations add additional provisions to the existing regulations. Finally, in certain other instances the existent regulations would not be either altered or added to by these regulations. It should be noted that the proposed regulations follow a numbering scheme different than that of the existent regulations. SBA believes that this scheme is easier to follow than that presently existent in its regulations. The renumbering of the regulations has not resulted in the elimination of any of the significant provision of the existent regulations.

**DATE:** Comments must be received February 21, 1984.

**ADDRESS:** Written comments should be addressed to Mr. Henry T. Wilfong, Jr., Associate Administrator for Minority Small Business And Capital Ownership Development, U.S. Small Business Administration, 1441 L Street, NW., Washington, D.C. 20416.

**FOR FURTHER INFORMATION CONTACT:** Same as above (202) 653–6407.

**SUPPLEMENTARY INFORMATION:** The Small Business Administration (SBA) is hereby proposing to amend and revise its regulations covering the section 8(a) and 7(j) programs. These programs were established by virture of sections 8(a) and 7(j) of the Small Business Act, 15 U.S.C. 637(a) and 636(j). Taken as a whole, these regulations implement the Minority Small Business and Capital Ownership Development Program of SBA. In some instances, these proposed regulations would, if adopted in final form, alter existing regulations covering the section 8(a) program. In other instances, these proposed regulations add additional provisions to the existing regulations. Finally, in certain other instances the existent regulations would not be either altered or added to by these regulations. This explanatory information will highlight instances where significant changes are proposed or where the present regulatory scheme is unaltered. It should be noted that the proposed regulations follow a numbering scheme different than that of the existent regulations. SBA believes that this scheme is easier to follow than that presently existent in its regulations. The renumbering of the regulations has not resulted in the elimination of any of the significant provisions of the existent regulations.

Sections 124.1 through 124.3 of the proposed regulations set forth gerneral statements as to the purpose and administration of the two programs. These statements do not vary from the present regulations except insofar as § 124.2 makes clear that the Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB–COD) is responsible for management of the program under the supervision of and responsible to the Administrator of the SBA. Clarification of this relationship is necessitated by statutory amendments which occurred subsequent to the last publication of regulations governing these programs.

Sections 124.101 through 124.109 of this proposal set forth the eligibility criteria for the section 8(a) program. Section 124.102 prescribes the applicable size standard to be used in determining the eligibility of each participant in the program. This section provides a partial departure from the existent regulations. In this regard an applicant for admission to the section 8(a) program must establish that it is small for the purposes of government procurement as set forth in 13 CFR 121.3–8. At the time of admission, the size standard to be applied will be that of the primary industry classification of the concern as expressed in its business plan. As the concern continues to participate in the section 8(a) program, however, it will be required to certify to SBA that it is small for the purpose of performing each section 8(a) subcontract which it is awarded. This is a new requirement. A firm will only be permitted to perform contracts which are classified according to the standard industrial classification code numbers which appear in its business plan as established pursuant to 124.207 of this proposal.

Section 124.103 describes ownership criteria to be applied to applicants for the program. In this regard, subsections 124.103 (c), (d), and (e) set forth criteria involving part ownership of an applicant for the 8(a) program by nondisadvantaged individuals, concerns in the same or similar lines of business, and participation in the program by a section 8(a) business concern following a change of ownership, which have not heretofore been included in SBA's regulations. The intent of these provisions is to make more clear SBA's concern that program participation be focused directly upon socially and economically disadvantaged individuals as the statute intends.

Section 124.103 also makes it clear that concerns owned and controlled by Indian Tribes and Native Alaskan Corporations are eligible for participation in the section 8(a) program under prescribed conditions.

Section 124.104 of the proposal sets forth the statutory requirement that participants in the section 8(a) program must be controlled and managed by individuals who are socially and economically disadvantaged. The proposal makes clear for the first time that individuals who are not socially and economically disadvantaged may not exercise actual control or have the power to control the operations of an applicant or participant in the program. SBA welcomes comments upon the addition of this provision to the regulations.

Section 124.105 sets forth definitional standards for the concept of social disadvantage. Subparagraph (a) of this proposed rule (124.105(a)) states that members of the statutorily designated minority groups are presumed to be socially disadvantaged, unless they have not maintained identification with the group to the extent of being commonly recognized as group members. Thus, in all but the rarest of cases, persons who are members of the designated minority groups would be deemed socially disadvantaged. SBA believes that this is consistent with the Congressional mandate that the primary beneficiaries of the 8(a) program be members of the statutorily designated minority groups.

The rule also makes it possible, however, for firms owned and controlled by persons who are not members of those groups to qualify for the section 8(a) program. Subparagraph (b) (§ 124.105(b)) outlines standards by which such individuals can, on a case-by-case basis, establish their social disadvantage. Subparagraph (c) (§ 124.105(c)) establishes a procedure by

which a minority group which has not been statutorily designated as socially disadvantaged can be administratively so designated—in which case its members will be afforded the presumption of social disadvantaged contained in subsection (b).

Subsections (b) and (c) require that social disadvantage be established on the basis of clear and convincing evidence. Given the ultimate imprecision of the concept of social disadvantage, this strict test is necessary to ensure that only the truly disadvantaged receive the benefits of the 8(a) program. Moreover, a weaker standard would have the effect of flooding the 8(a) program with firms having less claim to, or need for, its remedial benefits than those firms which Congress clearly intended as the program's primary beneficiaries. SBA believes that applying the clear and convincing test of social disadvantage to persons who are not members of statutorily designated groups fulfills the Congressional mandate that the primary beneficiaries of the 8(a) program be members of those groups.

Section 124.106 of the proposal sets forth the statutory requirement that economically disadvantaged individuals be socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged. The proposal then sets forth factors to be considered in determining whether an individuals is economically disadvantaged. These factors differ somewhat from those presently expressed in SBA's regulations. They represent an effort on SBA's part to more fully spell out the meaning of economic disadvantage as it is expressed in the statutory provisions and the legislative history thereof. SBA welcomes comments on these efforts.

Proposed § 124.107 sets forth two other statutorily required conditions for eligibility in the program, i.e., that SBA make a determination that participants will with the assistance of the program be able to successfully compete in the private sector, and that sufficient assistance is available from SBA and other sources to see to it that the concern's participation is useful.

Section 124.108 of the proposal sets forth a number of eligibility requirements which have heretofore not been expressed in SBA's regulations, but which have previously been utilized as a matter of standard procedure in evaluating applications for participation in the program. These criteria are selfexplanatory and SBA solicits public comment on the inclusion of these provisions in its regulations.

Section 124.109 sets forth several types of businesses which are ineligible for participation in the section 8(a) program.

Section 124.110 of the proposal sets forth the standards by which a fixed program participation term and an extension thereof will be established for each participant in the section 8(a) program. In this regard, the public's attention is directed to 46 FR 57266 (Nov. 23, 1981), at which citation the fixed program participation regulations were first published in final form. The proposal does not deviate markedly from those regulations. Since fixed program participation terms have been established for all concerns presently in the program, this portion of the proposal speaks only in terms of firms which will enter the program and extensions of terms for those firms already in the program. Otherwise, criteria by which the terms are to be established are for the most part the same as those already existent in SBA's regulations.

Section 124.111 of the proposal sets forth the mechanics for obtaining extension of a fixed program participation term. These mechanics have existed in SBA's standard operating procedures prior to this time, and it is felt that by now including them in the regulations participants in the program will have a better understanding of how the extension process functions.

It should be noted that the proposed regulations delete the provisions of the present regulations dealing with program completion. In this regard, prior to the enactment of Pub. L. 96-481 in October 1980, firms approved for participation in the 8(a) program remained program participants until such time as they were terminated for cause of "substantially achieved the goals of [their] business plan(s) and attained the ability to compete in the marketplace without section 8(a) program assistance * * *" In essence, unless a firm was found to be in violation of one or more of SBA's regulations, and was terminated for such violation(s), it remained a program participant until it overcome its disadvantage.

Pub. L. 96-481, however, required that a term of program participation be fixed for each firm at the time it is approved for participation in the section 8(a) program. At the conclusion of that Fixed Program Participation Term (FPPT), or extension, if any, the firm ceases to be a program participant "regardless of whether competitiveness is reached * * *" It is thus unnecessary to retain the concept of program completion in the regulations since a concern's participation in the section 8(a) program is concluded at the end of the FPPT, or any extension thereof.

Section 124.112 of the proposed regulations sets forth the grounds upon which a participant may be terminated from the section 8(a) program and the procedural mechanism by which such termination will take place. The proposed regulations vary only slightly from the existent regulatory scheme. In this regard, several of the criteria upon which termination may be based have been clarified. These clarifications have been proposed as a result of our experience in implementing and proceeding under the present standards. Public comment is invited as to the clarity and legal sufficiency of the standards as they are expressed in the proposal.

Proposed § 124.113 sets forth a procedural framework upon which SBA may suspend contractual and other forms of assistance to section 8(a) business concerns upon an issuance of an order to show cause why such a concern should not be terminated from the program. Such suspension would continue from the time of notification of the firm, which would be simultaneous with the issue of the order to show cause, until such time as SBA deems it appropriate to lift the suspension. In most cases, this period would encompass the period of time necessary to reach a formal conclusion of the termination proceeding. However, in some instances a suspension could last for a shorter period of time. In no circumstances would the suspension exceed the time necessary to conclude a termination proceeding in which the 8(a) business concern prevailed.

SBA is including these new provisions in the proposal based upon its desire to utilize limited program resources in the most efficient and economical manner. Furthermore, based upon certain recent adjudications SBA has no doubt that such a manner of proceeding is legally correct, if not mandated. The suspension procedures provided for in the proposal are similar to those utilized by other contracting agencies of the Government. SBA solicits public comment on the inclusion of these procedures in the regulations govering the 8(a) and 7(j) programs.

Sections 124.201 through 124.207 of the proposal set forth the basis upon which applications for admission to the section 8(a) program will be received and processed by SBA. These sections

would be new to the regulations, but they express procedures which have been part of SBA standard operating procedures governing the 8(a) program for some time. They are proposed for inclusion in the regulations to make more clear to the public SBA's procedures for admitting concerns to the program.

Section 124.301 is a new provision which describes the mechanisms by which requirements (contractual) support is made available to participants in the section 8(a) program. This section contains material which has heretofore been part of the standard operating procedure of the program, but which we feel is of sufficient value to the public to be included in the regulations. Of note are the provisions which describe the selection of specific contracts for the program and the conditions under which they are made available to participants.

Section 124.302 of the proposal sets forth provisions regarding the administration of contracts and subcontracts under the section 8(a) program. This part of the proposal would add a new section to the regulations which would incorporate provisions of SBA standard operating procedures into the regulations for the first time. The important provisions in this section are subsection (b) which sets forth percentages of work required to be performed directly by 8(a) business concerns on various types of contracts and subsection (c) which describes the Certification of Competency aspect of the 8(a) program. These provisions are self-explanatory and SBA solicits public comment on them. Otherwise, as mentioned above, the remainder of this section describes procedures which have long been standard in SBA's administration of the 8(a) program but have not been specifically included in SBA's regulations.

Sections 124.401 and 124.402 set forth the purposes for, and terms and conditions upon which, advance payments and business development expense will be made available to participants in the section 8(a) program. These sections are basically unchanged from the present regulations governing these topics. Section 124.403 sets forth the criteria upon which the line of credit method of making advance payments available to a section 8(a) concern will be used. This section is the same as the present provision, with the exception that it is renumbered.

Sections 124.501 and 124.502 are the renumbered sections concerning the Development Assistance Program (the "7(j) program") and the Small Business Capital Ownership Development Program (the "7(j)(10) program"). With the exception of the renumbering, no changes have been made in the present regulations governing these two programs.

Finally, §§ 124.1000 through 124.1024 contains the rules of practice governing adjudicatory proceedings governing termination of section 8(a) program participants from the program. These procedural rules remain the same as those presently in existence, with the exception of the renumbering for administrative consistency with the substantive program rules referred to above.

**Compliance with Executive Order 12291 and the Regulatory Flexibility Act**

SBA considers that this revision of regulations taken as a whole constitutes both a major rule for the purposes of Executive Order 12291 and a rule which will have a significant economic impact on a substantial number of small entities for the purposes of the Regulatory Flexibility Act. Therefore, we offer the following Regulatory Impact Analysis/Regulatory Flexibility Analysis for the purpose of compliance with the pertinent requirements of those two measures.

Since this revision is made up of a number of different individual rules, these measures in some instances will require analysis of the individual rules and in some instances the entire revision. In instances in which the Executive Order or the Act require explanation of specific sections, this analysis will so state. Otherwise, for the purposes of this analysis, the revision will be treated as if it were one rule.

1. *Description of potential benefits of the rule.* This revision taken as a whole will provide both SBA and participants in its Minority Small Business Capital Ownership Development Program with clearer guidance as to the process by which participation in the program is achieved, and once that participation is achieved, how the participants and SBA are to conduct their mutual roles in the administration of the program. It is our belief that SBA will benefit by the revision since its purpose is to clarify the regulatory framework governing the program and thus provide for more efficient administration. In addition, program applicants and participants should benefit from the revision because it should clarify for them the procedure by which entry into the program is attained and participation in the program is governed.

2. *Description of potential costs of the rule.* There should be no costs inherent in the revision which are not presently involved in the administration of the Minority Small Business Capital Ownership Development Program. This revision merely establishes the regulatory framework upon which the program is administerd, it does not by itself impose monetary or other types of costs upon SBA or program participants.

3. *Description of the net benefits of the rule.* This revision, taken as a whole, should provide for more efficient program management.

4. *Description of reasons why this action is being considered.* This action is being considered as part of normal periodic Agency revisions of its regulations. As such, the revision is based upon general experience with administration of the regulations as they presently exist. In addition, certain aspects of the revision, specifically the provisions dealing with size of program participants (§ 124.102), ownership of program participants by Indian Tribes (§ 124.109(b)), Advance Payments and Business Development Expense (§§ 124.401, 402, 403) result from specific instances of adverse experience with the present regulations covering those topics. Other aspects of the revision such as the provisions governing Fixed Program Participation (§ 124.110, 111), the relationship of SBA's Administrator to the Associate Administrator for Minority Small Business and Capital Ownership Development (§ 124.2), the definitions of social and economic disadvantage (§§ 124.105 and 106), and the inclusion of Asian Americans and Asian Pacific Americans among the "designated minority groups" (§ 124.105(a)) reflect regulatory changes mandated by statutory changes and receipt and evaluation of information by the Agency from outside sources, all occurring since the initial publication of regulations to govern the program. It was determined by the Agency to incorporate these provisions into one all encompassing revision rather than a series of piecemeal changes for administrative convenience and for easier public consumption.

5. *Statement of objectives and legal basis for the proposed rule.* The purpose of the proposal is to provide a general revision of the regulations governing the Minority Small Business and Capital Ownership Development Program which reflects statutory changes occurring since the initial program regulations were promulgated and administrative applications of those regulations. The legal basis for the proposed rule are sections 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a).

6. *Description of entities to which the proposed rule will apply.* This revision

will apply to all small business which wish to apply for admission to, and upon which admission do avail themselves of the benefits of participation in the Minority Small Business and Capital Ownership Development Program.

7. *Description of the reporting, recordkeeping and compliance requirements of the proposed rule.* The following provisions of the proposal impose significant reporting requirements:

a. Sections 124.105 and 124.106 require submission of information to SBA by applicants for admission to the program in order to prove social and economic disadvantage. These are statutory requirements.

b. Section 124.110 requires submission of information to SBA by applicants for program participation in order to establish a fixed program participation term. The type of data to be submitted is clearly indicated in the proposal.

c. Sections 124.401, 124.402 and 124.403 dealing with Advance Payments, Business Development Expense and Letter of Credit all impose reporting requirements upon participants in the program who receive these forms of benefits. The reporting involves maintenance of appropriate accounting mechanisms for the receipt and use of the benefits.

d. Section 124.501 dealing with the development assistance program involves the imposition of reporting requirements upon those concerns which receive assistance under that provision.

The same provisions as indicated above with respect to reporting requirements require concomittant recordkeeping requirements in order to accomplish the required reports. All program participants which avail themselves of the various forms of assistance indicated in the identified provisions are subject to the reporting and recordkeeping requirements indicated. The skills necessary for preparation of the reports and records are those general business recordkeeping and form preparation which normally confront applicants for government benefits. In some instances the small businesses may utilize professional accounting or legal services in order to prepare the required submissions.

In addition to the requirements indicated above, it should be noted that SBA requires applicants for admission to the Section 8(a) program to submit audited financial statements as part of the application process, and quarterly financial statements which must be prepared by professional accountants are required of program participants.

8. There are no relevant Federal rules which duplicate or overlap the revision.

SBA submits that there are no significant alternatives to the revision which would minimize any significant economic impact of the proposed rule upon small entities. In this regard, we have sought to closely adhere to the statutory framework in establishing the eligibility and participation requirements for the Minority Small Business and Capital Ownership Development Program. While suggestions may be made as to alternative approaches to the accomplishment of this objective in the case of individual sections of the revision, we feel that no such alternatives which might in some way minimize economic impact on applicants or participants accomplish the stated objectives of the applicable statutes in a manner more consistent than that stated in the revision. Of course we welcome public comment in this regard, and we anticipate that comment on the revision will be extensive.

*Compliance with the Paperwork Reduction Act of 1980.* In compliance with the Paperwork Reduction Act of 1980 (Title 44, U.S.C., Chapter 35) and its implementing regulations, the recordkeeping or reporting requirements and forms appearing in the following sections of this proposed rule have been approved by the Office of Management and Budget (OMB) under number 3245–0015: Sections 124.105(b)(3), 124.106(b)(2), 124.106(b)(3), 124.202, 124.204, 124.205, 124.502(a)(1) and 124.502(a)(6).

In addition, OMB is reviewing the recordkeeping or reporting requirements and forms appearing in the following sections for compliance with the Paperwork Reduction Act: Sections 124.103(e), 124.105(c)(2), 124.106(b)(1), 124.111(c), 124.112(a)(7), 124.112(a)(8), 124.112(a)(19), 124.205, 124.206, 124.401(c)(1)(i), 124.401(c)(1)(iii), 124.402(d), 124.403(b)(3), 124.403(b)(4), 124.501(b)(3)(vi), and 124.502(a)(4). It is anticipated that such requirements and forms will receive the approval of the Office of Management and Budget prior to SBA's publication of this proposed rule in final form.

**List of Subjects in 13 CFR Part 124**

Administrative practice and procedure, Government procedure, Reporting and recordkeeping requirements, Minority businesses, Surety bonds, Technical assistance.

Accordingly, pursuant to the authority set forth in sections 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a), SBA proposes to revise Part 124 of Title 13 of the Code of Federal Regulations to read as follows:

## PART 124—MINORITY SMALL BUSINESS AND CAPITAL OWNERSHIP DEVELOPMENT

Sec.
124.1 The section 8(a) and 7(j) Programs.
124.2 Program management.
124.3 Violations.
124.101 The Section 8(a) Program: General eligibility.
124.102 Small Business concern.
124.103 Ownership.
124.104 Control and management.
124.105 Social disadvantage.
124.106 Economic disadvantage.
124.107 Potential for success.
124.108 Additional eligibility requirements.
124.109 Ineligible businesses.
124.110 Fixed Program Participation Term.
124.111 Mechanics for extension of a fixed program participation term.
124.112 Program termination.
124.113 Suspension of program assistance.
124.201 Processing applications.
124.202 Place of filing.
124.203 Applicant representatives.
124.204 Requirement support determination.
124.205 Forms and documents required.
124.206 Approval and declination of applications for eligibility.
124.207 Business activity.
124.301 The provisions of requirements support for 8(a) firms.
124.302 8(a) Contracts and subcontracts.
124.401 Advance payments.
124.402 Business development expense.
124.403 Letter of credit.
124.501 Development Assistance Program.
124.502 Small Business and Capital Ownership Development Program.
124.601–999 [Reserved]
124.1000 Rules of practice for adjudicative proceedings to be used in effecting the termination of participation of a section 8(a) business concern from the section 8(a) program.
124.1001 Scope of the rules in §§ 124.1000 through 124.1024.
124.1002 Definitions.
124.1003 Appearances.
124.1004 Order to show cause, notice of suspension, where applicable, and notice of hearing of termination proceeding.
124.1005 Answer.
124.1006 Motions.
124.1007 Amendments and supplemental proceedings.
124.1008 Prehearing conferences.
124.1009 Voluntary intervention.
124.1010 Admissions as to facts and documents.
124.1011 Evidence.
124.1012 Presiding official.
124.1013 Hearings; transcripts.
124.1014 Witnesses and fees.
124.1015 Proposed findings, conclusions, and order.
124.1016 Interlocutory appeals.
124.1017 Initial decision.
124.1018 Petition for review.
124.1019 AAMSB–COD review.
124.1020 Decision on review.

Sec.
124.1021 Requirements as to form and filing of documents other than correspondence.
124.1022 Time.
124.1023 Service.
124.1024 Ex parte communication.

**Authority:** Secs. 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a).

**§ 124.1 The Section 8(a) and 7(j) Programs.**

(a) *General.* (1) These regulations implement sections 8(a) and 7(j) of the Small Business Act (15 U.S.C. 637(a) and 636(j)) which establish the Minority Small Business and Capital Ownership Development Program (program).

(2) Section 8(a) authorizes SBA to enter into all types of contracts (including, but not limited to, supply, services, construction, research and development) with other Government departments and agencies and to negotiate subcontracts for the performance thereof with small business concerns owned and controlled by socially and economically disadvantaged individual(s).

(3) Section 7(j) authorizes SBA to provide financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or small business concerns eligible for assistance under Sections 7(a)(11), 7(j)(10), and 8(a) of the Small Business Act.

(b) *Purposes.* (1) It is the purpose of the Section 8(a) program to:

(i) Foster business ownership by individuals who are both socially and economically disadvantaged; (ii) promote the competitive viability of such firms by providing such available contract, financial, technical, and management assistance as may be necessary; and (iii) clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from small business concern owned by socially and economically disadvantaged individuals.

(2) It is the purpose of the Section 7(j) program to: (i) Foster business ownership by individuals in groups that own and control little productive capital; and (ii) promote the competitive viability of such firms by creating a small business and capital ownership development program to provide such available financial, technical, and management assistance as may be necessary.

**§ 124.2 Program management.**

The Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSBCOD) is responsible for the formulation and execution of the policies and programs under sections 7(j) and 8(a) of the Small Business Act under the supervision of, and responsible to the Administrator of SBA.

**§ 124.3 Violations.**

Violation by an applicant for admission to the program of any of SBA's regulations may result in the applicant's denial of admission to the program.

**§ 124.101 The section 8(a) program: General eligibility.**

In order to be eligible to participate in the section 8(a) program, an individual or an applicant concern must meet all of the eligibility criteria set forth hereafter in §§ 124.102 through 124.110 of these regulations. All determinations made pursuant to §§ 124.102, 124.103, 124.104, 124.105(a), 124.105(b), 124.106, and 124.107 shall be made by the AA/MSB-COD whose decision shall be final.

**§ 124.102 Small business concern.**

(a) In order to be eligible to participate in the section 8(a) program, an applicant concern must qualify as a small business concern as defined for purposes of Government procurement in § 121.3–8 of the SBA Rule and Regulations. The particular size standard to be applied will be based on the primary industry classification of the applicant concern.

(b) In order to continue to participate in the section 8(a) program once a concern is admitted to the program, the concern must certify to SBA that it is a small business pursuant to the provisions of § 121.3–8 for the purpose of performing each individual contract which it is awarded. SBA, in turn, will verify such certifications.

(c) Once admitted to the section 8(a) program, a concern will only be permitted to perform contracts which are classified according to the standard industrial classification code number which appear in its business plan as established pursuant to § 124.207 of these regulations.

**§ 124.103 Ownership.**

In order to be eligible to participate in the section 8(a) program, an applicant concern must be one which is at least 51 percent owned by an individuals(s) who is a citizen of the United States (specifically excluding resident alien(s)) and who is determined to be socially and economically disadvantaged by SBA.

(a) In the case of an applicant concern which is a partnership, 51 percent of the partnership interest must be owned by an individual(s) determined to be socially and economically disadvantaged.

(b) In the case of an applicant concern which is a corporation, 51 percent of all classes of voting stock must be owned by an individual(s) determined to be socially and economically disadvantaged.

(c) Part ownership in an applicant concern by nondisadvantaged individual(s) is permitted and may be necessary to insure adequate capital and management of the concern's development. However, any property, equipment, supplies, services and/or financial assistance other than personal services which are sold, rented or donated to the 8(a) concern by such nondisadvantaged individual(s) must be reported to SBA on an annual basis. Such nondisadvantaged individual(s), their spouses or immediate family members may not:

(1) Be former employers of the disadvantaged owner(s) of the applicant concern;

(2) Be affiliated with another business in the same or similar type of business as the applicant concern;

(3) Hold ownership interest in any other 8(a) concern in an amount deemed excessive by SBA;

(4) Exercise negative control over the applicant concern as defined in 13 CFR 121.3–2(a)(i); or

(5) Receive compensation for personal services from the applicant concern as directors or employees which is deemed to be excessive by SBA.

(d) Non-section 8(a) concerns in the same or similar line of business are prohibited from having an ownership interest in an applicant concern which is deemed by SBA to cause negative control over the applicant concern, as defined in 13 CFR 121.3–2(a)(i).

(e) A section 8(a) business concern may continue participation in the program subsequent to the change in its ownership. However, any change of ownership of an 8(a) business concern requires the prior written approval of SBA (OMB Approval No. 3245–0145). Continued participation of the 8(a) concern under new ownership requires compliance with all individual and business eligibility requirements of these regulations by the concern and the new owners. Failure of either an individual owner or the concern to maintain compliance constitutes a ground for program termination.

(f) Applicant concerns owned and controlled by an Indian Tribe or a Native Alaskan Corporation are eligible for participation in the section 8(a) program if the individuals who manage and control the concern are found to be

socially and economically disadvantaged by SBA, and the Tribe or Alaskan Native Corporation is found to be economically disadvantaged by SBA.

**§ 124.104 Control and management.**

Except in the case of applicant concerns owned and controlled by an Indian tribe or Native Alaskan Corporation, an applicant concern's management and daily business operations must be controlled by an owner(s) of the applicant concern who has been (have been) determined to be socially and economically disadvantaged, and such owner(s) must own a greater percentage of the business entity than any other owner, or in the case of a corporation, more voting stock than any other stockholder.

(a) Individuals who are not socially and economically disadvantaged and who are stockholders, officers, directors, or employees of an applicant for admission to the program or a section 8(a) business concern shall not exercise actual control or have the power to control the operations of the applicant or section 8(a) business concern. The existence of control or the power to control shall be determined by the facts of each case.

(b) An applicant concern must be managed on a full-time basis by a person who has been found by SBA to be socially and economically disadvantaged, and such person must possess requisite management capabilities as determined by SBA. This precludes outside employment or other business interests by the individual which conflict with the management of the firm or prevent it from achieving the objectives of its business development plan. Any disadvantaged person upon whom section 8(a) eligibility is based, who is engaged in the management and daily business operations of the section 8(a) concern and who wishes to engage in regular outside employment must notify SBA of the nature and anticipated duration of the outside employment prior to engaging in such employment. This requirement does not preclude employment of persons who are not socially or economically disadvantaged in the management of the applicant concern.

**§ 124.105 Social disadvantage.**

Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage of individuals must stem from circumstances beyond their control.

(a) *Members of Designated Groups.* The following individuals are considered socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians, Alaskan Native, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, U.S. Trust Territory of the Pacific Islands, Northern Mariana Islands, Laos, Cambodia, or Taiwan); Asian Americans (persons wtih origins from India, Pakistan and Bangladesh); and members of other groups designated from time to time by SBA according to the procedures set forth at § 124.105(c). Membership in any of the above groups is not conclusive that an individual is socially disadvantaged if it does not appear that the individual has maintained identification with the group to the extent that he or she is commonly recognized as a group member. In such a case, SBA shall require the individual to demonstrate that he or she has maintained identification with the group to the extent that he or she is commonly recognized as a group member. If that showing is not made, the individual will be required to demonstrate his or her social disadvantage according to the standards set forth at § 124.105(b).

(b) *Individuals Not Members of Designated Groups*—(1) *Standard.* Individuals who are not members of the above-named groups must establish their social disadvantage on the basis of clear and convincing evidence.

(2) *Elements of Social Disadvantage.* A clear and convincing case of social disadvantage must include the following elements:

(i) The individual's social disadvantage must stem from his or her color; national origin; gender; physical handicap; long-term residence in an environment isolated from the mainstream of American society; or other similar cause beyond the individual's control. The individual cannot establish social disadvantage on the basis of factors which are common to small business persons who are not socially disadvantaged. For example, because of their marginal financial status, many small businesses have difficulty obtaining credit through normal banking channels. An individual predicating a social disadvantage claim on denial of bank credit to his or her firm would have to establish that the denial was based on one or more of the listed causes, or similar causes—not simply on the individual's or the firm's marginal financial status.

(ii) The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged. This can be achieved, for example, by describing specific instances of discrimination which the individual has experienced, or by recounting in some detail how his or her development in the business world has been thwarted by one or more of the listed causes or similar causes. As a general rule, the more specific an explanation of how one has personnally suffered social disadvantage, the more persuasive it will be. In assessing such facts, SBA will place substantial weight on prior administrative or judicial findings of discrimination experienced by the individual. Such findings, however, are not necessarily conclusive evidence of an individual's social disadvantage; nor are they a prerequisite for establishing social disadvantage.

(iii) The individual's social disadvantage must be rooted in treatment which he or she has experienced in American society, not in other countries.

(iv) The individual's social disadvantage must be chronic, longstanding, and substantial, not fleeting or insignificant. Without prejudging any particular case, as a general rule it would be difficult for an individual to present clear and convincing evidence of social disadvantage based on only one or two incidents in which the individual's status held him or her back in the business world. Typically, a number of incidents illustrating a person's social disadvantage, occurring over a substantial period of time, would be necessary to make a successful claim. Usually, only by demonstrating a series of obstacles which have impeded one's progress in the business world can an individual demonstrate chronic, longstanding, and substantial social disadvantage.

(v) The individual's social disadvantage must have negatively impacted on his or her entry into, and/or advancement in, the business world. The closer the individual can link social disadvantage to impairment of business opportunities, the stronger the case. For example, SBA will place little weight on annoying incidents experienced by an individual which have had little or no impact on the person's career or business development. On the other hand, SBA will place greater weight on concrete occurrences which have tangibly disadvantaged an individual in the business world.

(3) *Evidence of Social Disadvantage.* SBA will entertain any relevant evidence in support of an individual's claim of social disadvantage. In addition to a personal statement from the individual claiming to be socially disadvantaged, such evidence may include, but not be limited to, third party statements' copies of administrative or judicial findings of discrimination; and other documentation in support of matters discussed in the personal statement (OMB Approval No. 3245-0015). SBA will particularly consider and place emphasis on the following experiences of the individual, where relevant: Education, employment, and business history. However, the individual may present evidence relating to other matters as well. Moreover, the attainment of a quality education or job will not absolutely disqualify the individual from being found socially disadvantaged if sufficient other evidence of social disadvantage is presented to SBA.

(i) *Education.* SBA shall consider, as evidence of an individual's social disadvantage, denial of equal access to business or professional schools; denial of equal access to curricula; denial of equal access to social and professional association with students and teachers; denial of equal access to educational honors; social patterns or pressures which have discouraged the individual from pursuing a professional or business education; and other similar factors.

(ii) *Employment.* SBA shall consider, as evidence of an individual's social disadvantage, discrimination in hiring; discrimination in promotions and other aspects of professional advancement; discrimination in pay and fringe benefits; discrimination in other terms and conditions of employment; discriminatory retaliation by an employer; social patterns or pressures which have channelled the individual into non-professional or non-business fields; and other similar factors.

(iii) *Business History.* SBA shall consider, as evidence of an individual's social disadvantage, unequal access to credit or capital; acquisition of credit or capital under unfavorable circumstances; discrimination in receipt (award and/or bid) of government contracts; discrimination by potential clients; exclusion from business or professional organizations; and other similar factors which have retarded the individual's business development.

(c) *Minority Group Inclusion.* The purpose of this paragraph (c) is to establish a procedure by which a representative of a minority group can prove that the group has suffered chronic racial or ethnic prejudice or cultural bias. If the group is determined to have suffered chronic racial or ethnic prejudice or cultural bias, it shall be deemed a minority group for purposes of section 8(a) of the Small Business Act, and its members shall be accorded the same status as members of those minority groups specifically named in section 2(e)(1)(C) of the Small Business Act.

(1) *Standards.* In determining whether a group has suffered chronic racial or ethnic prejudice or cultural bias, the Administrator, after consultation with the AA/MSB-COD, shall determine: (i) if the representative of the minority group will adequately advocate the group's interest; (ii) whether the number of potential 8(a) applicants from the group is so substantial as to administratively warrant a determination of minority group status; (iii) whether the group is sufficiently discrete, and the traits of its members sufficiently common, as to warrant a determination of minority group status; (iv) whether an overwhelming majority of group members have suffered long-term prejudice and discrimination in American society; (v) whether an overwhelming majority of group members have suffered, and continue to suffer, the effects of discriminatory practices or similar invidious circumstances over which they have no control; (vi) whether such conditions have resulted, and continue to result, in substantial economic deprivation for an overwhelming majority of group members; and (vii) whether such conditions have produced, and continue to produce, substantial impediments in the business world for an overwhelming majority of group members, which impediments are beyond their control and not common to all small business persons not socially disadvantaged.

(2) *Application.* An application for minority group status shall be submitted in writing to the Administrator, shall adequately describe the minority group on whose behalf the application is made, and shall be adequately documented.

(3) *Public Notice, Comment, and Hearing.* If the application makes a prima facie showing as to each of the seven standards described above, the Administrator, after consultation with the AA/MSB-COD, shall, within thirty days of receipt of the application, direct that a notice be published in the Federal Register soliciting public comment on the application. The notice may also announce an informal public hearing on the application, to be held during the latter half of the comment period at a time and place determined by the Administrator.

(4) *Decision.* The Administrator, after consultation with the AA/MSB-COD, shall render a written decision on the application for minority group status within sixty days of the close of the comment period. Only if the Administrator determines, on the basis of clear and convincing evidence and after consultation with the AA/MSB-COD, that the applicant group has satisfied each of the seven standards described above, will the group be deemed a minority group for purposes of section 8(a) of the Small Business Act. Notice of the decision shall be published in the Federal Register.

(5) *Extensions of Time.* The Administrator may, in his descretion and after consultation with the AA/MSB-COD, extend any time period referenced in this paragraph (c) for no more than thirty days, except that the effective date specified in paragraph (c)(4) may not be changed.

**§ 124.106 Economic disadvantage**

(a) *General.* Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged.

(b) *Factors to be Considered.* In determining the degree of diminished credit and capital opportunities of a socially disadvantaged individual, consideration will be given to both the disadvantaged individual and the applicant concern with which he or she is affiliated. Factors to be analyzed include, but are not limited to the following:

(1) *Personal financial Condition of the Disadvantaged Individual.* This criterion is designed to assess the relative degree of econimic disadvantage of the individual in comparison to other individuals, as well as the potential to capitalize or otherwise provide financial support to the business. The specific factors considered are: Personal income for at least the past two years; total fair market value of all assets including the market value of the individual's primary residence; and the net worth of all holdings of the individual.

(2) *Business Financial Condition.* This criterion is designed to evaluate liquidity, leverage, operating efficiency and profitability of the applicant concern using commonly accepted financial ratios and percentages. This

evaluation will be used to provide a financial picture of a firm at a specific point in time in comparison to similar sized companies in the same industry. These factors are considered as indicators of a firm's economic disadvantage relative to businesses owned by non-socially disadvantaged individuals. Factors to be considered (OMB Approval No. 3245-0015) are business assets, net worth, income and profit. Also, factors to be compared include, but are not limited to: Current ratios, quick ratios, inventory turnover; number of days receivable; sales to working capital; returns on assets; debt to net worth ratio; percentage return on investment; percentage gross profit margin; and percentage return on sales.

(3) *Access to Credit and Capital.* This criterion will be used to evaluate the ability of the applicant concern to obtain the external support necessary to operate a competitive business enterprise. The factors to be considered (OMB Approval No. 3245-0015) are: Access to long-term financing; access to working capital financing; equipment trade credit; access to raw materials and/or supplier trade credit; bonding capability.

(4) *Additional Considerations.* A comparison will be made of the applicant concern's business and financial profile with profiles of businesses in the same or similar line of business and competitive market area. It is not the intent of the 8(a) program to allow program participation to concerns owned and controlled by socially disadvantaged individuals who have accumulated substantial wealth, have unlimited growth potential and have not experienced or have overcome impediments to obtaining access to financing, markets and resources.

**§ 124.107 Potential for success.**

To be eligible to participate in the section 8(a) program, an otherwise eligible applicant concern must be determined to be one that with contract, financial, technical and management support will be able to successfully perform subcontracts awarded under the Section 8(a) program, and further, with such support, will have a reasonable prospect for success in competition in the privated sector. In addition, the AA/MSB-COD must make a determination that the procurement, financial, technical and management support necessary to enable the applicant concern to successfully complete the Section 8(a) program is available from SBA or other identified and acceptable sources before the applicant concern may be admitted to the Section 8(a) program.

**§ 124.108 Additional eligibility requirements.**

(a) *Good Character.* Good character is an eligibility requirement. If serious adverse information is obtained from any source regarding an individual applicant's character during the processing of an application, no further action will be taken on the application until the adverse information has been forwarded through appropriate channels to the SBA's Inspector General for evaluation. The Inspector General will advise the AA/MSB-COD of his or her findings.

(b) *Standard of Conduct.* The SBA Standards of Conduct regulations, 13 CFR Part 105, et seq., apply to eligibility questions involving SBA employees and their relatives.

(c) *Individual Eligibility Limitations.* An individual applicant's eligibility may be used only once in qualifying an applicant concern for section 8(a) program participation. The AA/MSB-COD may accept a new application for section 8(a) program re-entry when a former section 8(a) concern which voluntarily withdrew from the section 8(a) program because of the health of the disadvantaged owner makes a subsequent reapplication for program admission.

(d) *Manufacturers and regular Dealers.* Each applicant concern which intends to manufacturer or furnish materials, supplies, articles and equipment in the performance of section 8(a) subcontracts must be determined to be a manufacturer or regular dealer or exempted therefrom as determined by SBA. SBA bases its definitions on the Walsh-Healey Public Contracts Act Regulations found at 41 CFR 50-201.101, 50-201.603, 50-201.604, 50-206.51, 50-206.52, 50-206.53.

**§ 124.109 Ineligible businesses.**

(a) *Brokers and Packagers.* These types of businesses do not meet the requirements of a manufacturer or regular dealer under the provisions of the Walsh-Healey Public Contracts Act and are ineligible to participate.

(b) *Debarred or Suspended Person or Concern.* Individuals or concerns who are debarred, suspended, or are found to be an ineligible bidder by any contracting agency of the Federal Government pursuant to 41 CFR Subpart 1-1.6 or DAR section I, Part 6, are ineligible for admission into the section 8(a) program during the period of debarment, suspension, or status as an ineligible bidder. Prior to approval of any applicant concern, it will be determined by SBA that the applicant concern or the disadvantaged individual(s) upon whom eligibility is based is not at that time debarred, suspended or otherwise an ineligible bidder.

**§ 124.110 Fixed program participation term.**

(a) Every section 8(a) program participant is subject to a Fixed Program Participation Term. A Fixed Program Participation Term establishes the ultimate time period during which a concern may remain in the section 8(a) program and the conditions of participation, regardless of whether competitiveness is reached by the concern.

(b) The Fixed Program Participation Term must be negotiated between SBA and each small concern which has applied for participation in the program and must be established prior to the concern's admission to the program.

(c) The provisions of the Fixed Program Participation Term, including the time limitation thereof, will be set forth in the SBA approved business plan of the Section 8(a) concern which must be established prior to the applicant concern's admission to the program.

(d) For concerns applying for entry into the program the Fixed Program Participation Term will begin on the date of award of the concern's first section 8(a) subcontract.

(e) The maximum Fixed Program Participation Term for all concerns is five years.

(f) Not less than one year prior to the expiration of the Fixed Program Participation Term, a concern may request SBA to review and extend its Fixed Program Participation Term for a period not to exceed the difference between the Fixed Program Participation Term established in the business plan and the maximum Fixed Program Participation Term of five years, plus two years. For business concerns which have a Fixed Program Participating Term of one year, a request for extension shall be deemed to be timely if postmarked no later than 10 days subsequent to the receipt by the concern of notification of Section 8(a) certification. There may be no further extensions.

(g) The criteria which SBA will use in negotiating a Fixed Program Participation Term or an extension thereof are as follows:

(1) The factors referenced in § 124.106 of these regulations for determining economic disadvantage.

(2)(i) The number and dollar amount, and the progressively decreasing importance, of section 8(a) contract support that it is anticipated will be necessary to achieve competitiveness. In

order to maximize limited program resources, SBA will emphasize business plans anticipating lesser amounts of section 8(a) contract support to reach competitiveness.

(ii) In considering a Fixed Program Participation Term extension the section 8(a) contract support previously received by the concern will be a factor. An SBA determination that such previous contract support has failed to appreciably contribute toward a timely achievement of competitiveness will be a significant factor in consideration of the request for extension.

(3)(i) The number and dollar amount and the progressively increasing importance of contract support, other than section 8(a) contract support, that it is anticipated will be necessary to achieve competitiveness. SBA will emphasize business plans having greater reliance on this non-section 8(a) contract support to reach competitiveness.

(ii) In considering a Fixed Program Participation Term extension request the non-section 8(a) contract support previously received by the firm will be a factor. An SBA determination that the concern has failed to progressively increase the importance of such non-section 8(a) contract support during its previous participation in the program will be a significant factor in SBA's consideration of the request for extension.

(4)(i) The length of time that it is anticipated will be necessary to achieve competitiveness. In order to maximize limited program resources, SBA will emphasize program participation for those concerns closer to achieving competitiveness.

(ii) In considering requests for Fixed Program Participation Term extensions for concerns currently in the program, the length of time during which the concern has previously participated in the program will be a factor.

(5)(i) The degree to which it is anticipated that Advance Payments and Business Development Expense will be necessary to enable a concern to successfully complete section 8(a) contracts and the extent to which reliance upon such proceeds will progressively decrease in importance. In order to maximize limited SBA resources and to increase exposure to regular competitive procedures, SBA will emphasize maximum use of conventional governmental and private resources in performing such contracts.

(ii) In considering requests for a Fixed Program Participation Term extension for a concern currently in the program, the previous Advance Payments and Business Development Expense already received by the concern will be a factor. An SBA determination that such Advance Payments and Business Development Expense support has failed to progressively decrease in importance during the concern's previous participation in the program will be a factor toward limiting the Fixed Program Participation term and the conditions thereof.

(6)(i) The rate at which it is anticipated that a concern will decrease its reliance upon all forms of program support, especially section 8(a) contracts support, in reaching competitiveness at the end of the Fixed Program Participation Term.

(ii) In considering Fixed Program Participation Term extensions for concerns currently in the program, a factor will be the previous rate at which the concern has decreased its reliance upon program support and correspondingly increased its reliance upon conventional governmental and private contract business. An SBA determination that the concern has failed to appreciably improve its rate of business reliance in this manner will be a factor toward limiting the Fixed Program Participation Term and the conditions thereof.

(h) No section 8(a) contracts may be awarded to any section 8(a) concern unless it has received and is operating under an SBA approved Fixed Program Participation Term.

(i) Nothing in this section shall be construed to limit SBA from initiating termination or suspension actions, pursuant to § 124.112 or § 124.113, respectively, during any Fixed Program Participation Term granted hereunder.

(j) Upon the conclusion of its Fixed Program Participation Term, including any extension thereof, a concern will cease to be a program participant. This cessation of program participation will occur without the necessity of any additional action by SBA. It will not give rise to any rights, claims or prerogatives on behalf of the concern. Cessation of program participation at the conclusion of the Fixed Program Participation Term is not subject to the requirements of section 8(a)(9) of the Small Business Act (15 U.S.C. 637(a)(9)), or any of SBA's implementing rules or regulations.

**§ 124.111 Mechanics for extension of a fixed program participation term.**

As stated in § 124.110(f), a section 8(a) concern's Fixed Program Participation Term (FPPT) may be extended only once, and only if the application for such an extension is made not less than one year prior to the expiration of the firm's original Fixed Program Participation Term.

(a) *The Request.* The section 8(a) concern must make a request for extension in writing by certified mail, return receipt requested, or by registered mail, to the SBA field office servicing its account, not less than one year prior to the expiration of the FPPT, specifically requesting an extension of its FPPT.

(b) *SBA Response.* Upon receipt of a timely request, the appropriate SBA field office will forward to the section 8(a) concern all forms needed to process the request. All required forms must be completed and returned to SBA within 45 days of receipt along with a persuasive narrative rationale to establish the basis for justifying the requested extension.

(c) *Narrative Rationale.* The narrative rationale submitted by the section 8(a) concern must detail the following (OMB Approval No. 3245–0147): (1) The firm's progress since admission into the 8(a) program; (2) Areas where the firm has failed to make progress anticipated when the original FPPT was set; (3) Reasons for lack of progress; (4) Benefits to be derived from an extension, other than increase in contract support; (5) any extenuating circumstances unique to the firm which cause an extension to be necessary and appropriate; (6) Any other facts which the firm believes supports its request.

(d) *Non Waiver of Time Limits.* Neither the requirement of § 124.110(f) to make a request for an extension of a concern's FPPT not less than one year prior to the expiration of a concern's original FPPT, nor the requirement of § 124.111(b) to return all forms and documentation completed along with the supporting narrative within 45 days may be waived. Failure to meet either time limit will result in denial of an extension of an FPPT.

(e) *Approval Authority.* The AA/MSB–COD has final authority to approve the concern's request for an extension, and may in his discretion approve an extension less than that requested, set terms and conditions for any extension granted, or deny any extension. The concern will be advised by the AA/MSB–COD of the Agency's final decision.

**§ 124.112 Program termination.**

(a) Participation of a section 8(a) business concern in the section 8(a) program may be terminated by SBA prior to the expiration of the concern's fixed program participation term or extension thereof, if any, for good cause. Examples of good cause include, but are not limited to, the following:

(1) Failure to continue to meet any one of the standards of program eligibility set forth in these regulations.

(2) Failure by the concern to maintain status as a small business under the Small Business Act, as amended, and the regulations promulgated thereunder.

(3) Failure by the concern for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership and control by the person(s) who has (have) been determined to be socially and economically disadvantaged pursuant to these regulations.

(4) Failure by the concern to obtain written approval from SBA prior to any changes in ownership and management control.

(5) Failure by the concern to disclose to SBA the extent to which nondisadvantaged persons or firms will participate in the management of the section 8(a) business concern.

(6) SBA's inability to provide the concern with contract support.

(7) Failure by the concern to provide SBA with required quarterly and annual financial statements (OMB Approval No. 3245-0151) within ninety days of the close of the reporting period. Failure to provide SBA with requested tax returns, reports, or other data within 30 days of the date of request.

(8) Failure by the concern to submit an updated business plan within 30 days of receipt of request, without an extension of time which has been approved by SBA.

(9) Failure by the concern to provide documents or otherwise respond to requests for information relating to the section 8(a) program from SBA or other authorized government officials.

(10) Cessation of business operations by the concern.

(11) Failure by the concern to achieve the goals cited in the original or modified business plan as a result of repeated refusal to accept ot utilize SBA assistance or failure to achieve the goals within a reasonable time after receiving procurement, management, and/or financial assistance from or through SBA.

(12) Failure by the concern to pursue competitive and commercial business in accordance with the business plan, or failure to make reasonable efforts to achieve competitive status.

(13) Inadequate management performance by the concern's management.

(14) Inadequate performance of awarded section 8(a) procurement subcontracts by the concern.

(15) Failure by the concern to pay or repay financial obligations owed to any government entity.

(16) Failure by the concern to obtain and keep current any and all required permits, licenses, and charters.

(17) Diversion of funds from the section 8(a) business concern to any other individual, subsidiary, firm, or enterprise which is detrimental to the achievement of the section 8(a) business concern's business plan.

(18) Unauthorized use of business development expense funds and/or advance payment funds. Violation of *any* provision of an advance payment or business development expense agreement including terms for repayment.

(19) Failure by the concern to obtain prior SBA approval of any management or joint venture agreement (OMB Approval No. 3245-0146). Violation of any requirements of a management or joint venture agreement approved by SBA by the concern or the joint venturers.

(20) Failure by the concern to obtain approval from SBA before subcontracting under a section 8(a) subcontract, or failure by the concern to abide by any conditions imposed by SBA upon such approval.

(21) Violation by the concern or a section 8(a) subcontract provision which prohibits contingent fees and gratuities; or failure to disclose to SBA fees paid or to be paid, or costs incurred or committed to third parties, directly or indirectly, in the process of obtaining section 8(a) contracts or subcontracts.

(22) Knowing submission of false information to SBA on behalf of a section 8(a) business concern by its principals, officers, agents, or employees.

(23) Debarment or repeated suspensions of the concern by the Comptroller General, the Secretary of Labor, Director of the Office of Federal Contract Compliance, or any contracting agency pursuant to FPR subpart 1-1.6, 41 CFR 1-1.600, *et seq.*, "Debarred, Suspended and Ineligible Bidders," or DAR (ASPR) Section I, Part 6, 32 CFR 1-600, *et seq.*, "Debarment, Ineligibility and Suspension."

(24) Conviction of a section 8(a) business concern or a principal of a section 8(a) business concern for any of the following:

(i) Commission of a criminal offense as an incident to obtaining or attempting to obtain a public or private contract, or subcontract thereunder, or in the performance of such contract or subcontract;

(ii) Violation of the Organized Crime Control Act of 1970;

(iii) Embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business integrity or business honesty which seriously and directly effects the question of present responsibility as a government contractor;

(iv) Violation of any Federal Antitrust Statute; or

(v) Commission of any felony not specifically listed above by the concern or any of its principals.

(25) Willful failure on behalf of the concern to comply with applicable labor standards obligations.

(26) Violation of any terms and conditions of the 8(a) program Participation Agreement.

(27) Violation by the concern or any of its principles of any of SBA's rules and regulations.

(b) Upon determination by the SBA that a section 8(a) business concern's participation in the section 8(a) program should be terminated for good cause, the section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the SBA's Rules of Practice for Adjudicative Proceedings set forth at § 124.1000 *et seq.*, of the SBA Rules and Regulations.

(c) Subsequent to the completion of such hearing, upon the record established therein, and after consideration of the initial decision of the Administrative Law Judge who has conducted the hearing, the AA/MSB-COD shall render a final decision regarding the termination, for good cause, of the 8(a) business concern's participation in the program.

(d) After the effective date of a program termination as provided for herein, a section 8(a) business concern is no longer eligible to receive any section 8(a) program assistance. Such concern is obligated to complete previously awarded section 8(a) subcontracts.

**§ 124.113 Suspension of program assistance.**

(a) Upon the issuance of an order to show cause why a section 8(a) business concern should not be terminated from the program, SBA may suspend contract support and other forms of assistance to that concern for a period of time not to exceed the time necessary to resolve the issue of the concern's termination from the program under the procedures set forth in § 124.1000 *et seq.* of these regulations.

(b) Immediately upon SBA's determination to suspend a section 8(a) concern, SBA will furnish that concern

with a notice of the suspension by certified mail, return receipt requested, to the last known address of the concern. If no receipt is returned within ten calendar days from the mailing of the notice, notice will be presumed to have occurred as of that time. The notice of suspension will provide the following information:

(1) The reason for the suspension which in most instances will be the grounds upon which the order to show cause has been issued;

(2) That the suspension will continue pending the completion of further investigation or the termination proceeding or some other specified period of time;

(3) That awards of section 8(a) subcontracts, including those which have been "self-marketed" by an 8(a) concern, will not be made during the pendency of the suspension unless it is determined by the head of the procuring agency or his or her authorized representative to be in the best interest of the government to do so and the AA/MSB-COD adopts that determination;

(4) That the conern is obligated to complete previously awarded section 8(a) subcontracts;

(5) That the suspension is effective nationally throughout the SBA;

(6) That a request for a hearing on the suspension will be considered by the Administrative Law Judge hearing the termination proceeding and granted or denied as a matter of his or her discretion that probable cause for the termination of the participation of the concern from the section 8(a) program exists. No such hearing may be granted if the suspension is based upon advice from either the Department of Justice or the Department of Labor that such a hearing would prejudice substantial interests of the government. The hearing on the suspension will be held within 30 calendar days of the Administrative Law Judge's ruling if the request is granted. At the close of such hearing, the Administrative Law Judge will make a recommended decision on the matter to the AA/MSB-COD who will then issue a final decision upholding or lifting the suspension.

(c) Any suspension which occurs in accord with these regulations will continue in effect until such time as SBA lifts it or the section 8(a) business concern's participation in the program is fully terminated. If all program assistance to a section 8(a) business concern has been suspended under these regulations, and that concern's participation in the program is not terminated, an amount of time equal to the duration of the suspension will be added to the concern's fixed program participation term.

### § 124.201 Processing applications.

It is SBA's policy that any individual or business has the right to apply for section 8(a) assistance, whether or not there is an appearance of eligibility.

### § 124.202 Place of filing.

An application for admission (OMB Approval No. 3245-0015) is to be filed, and approved cases are to be serviced in the SBA field office serving the territory in which the principal place of business of the applicant concern is located. Principal placed of business means the location at which the business records of the applicant concern are maintained.

### § 124.203 Applicant representatives.

An applicant concern may employ at its option outside representatives in connection with an application for 8(a) program participation. If the applicant chooses to employ outside representation such as an attorney, accountant, or others, the requirements of 13 CFR Part 103 dealing with the appearance and compensation of persons appearing before SBA are applicable to the conduct of the representative.

### § 124.204 Requirement support determination.

SBA shall first make a determination that there is a reasonable likelihood of section 8(a) requirements available to support the applicant concern. If the necessary requirement support is not available, the applicant concern shall be informed in writing that no further action can be taken on its application for participation in the 8(a) program. If the necessary requirements support is determined to be available, the applicant concern may submit the required application forms (OMB Approval No. 3245-0015).

### § 124.205 Forms and documents required.

Each 8(a) applicant concern must submit the forms and attachments thereto required by SBA when making application for admission to the section 8(a) program (OMB Approval No. 3245-0015), including but not limited to financial statements (OMB Approved No. 3245-0151).

### § 124.206 Approval and declination of applications for eligiblity

The AA/MSB-COD has final authority over approval or declination of applications for admission to the section 8(a) program. If the AA/MSB-COD declines an application, he will notify the applicant in writing giving detailed reasons for the decline and informing the applicant of the right to request a reconsideration within 30 days of receipt of the decline letter (OMB Approval No. 3245-0143). The AA/MSB-COD will also inform the applicant to submit in writing to the field office any subsequent information and documentation pertinent to rebutting the reason(s) for decline. If the application is declined by the AA/MSB-COD on reconsideration, no new application will be accepted within one year of the reconsideration decision.

### § 124.207 Business activity.

Eligible concerns will be approved for 8(a) program participation according to their principal business activity, i.e., non-professional service, professional service, manufacturing, construction, etc. The principal business activity and related Standard Industrial Code designations will be stated in a participating concern's business plan upon the concern's entry into the section 8(a) program and will not be subject to change thereafter. Pursuant to the section 8(a) program, a participating section 8(a) business concern will be eligible to receive only Government contracts which are classified under the Standard Industrial Classifications states in its business plan. (*See* definition of "business plan," § 124.301(b)(5).) A participating section 8(a) business concern may, however, receive Government contracts classified in other Standard Industrial Classifications through other Government procurement procedures.

### § 124.301 The provision of requirements support for 8(a) firms.

(a) These regulations govern the mechanics of the provision of requirements (contract) support to section 8(a) business concerns. They are to be read in conjunction with § 124.302 of this part

(b) *Definitions:*

(1) "Requirements support" means contract opportunities from Federal procuring agencies to acquire articles, equipment, supplies, services, materials or construction work which a section 8(a) business concern could perform.

(2) "National buy item" means an item or service purchased to meet the needs of a system where supply control, inventory management, and procurement responsibility have been assigned to a central procuring activity to support the needs of two or more users of the item. Examples include military clothing purchased by the Defense Personnel Support Center of the Department of Defense, paint or hand

tools purchased by the Federal Supply Service of the General Services Administration, medical supplies purchased by the Veterans Administration, or studies, evaluations, consulting services or similar services purchased by the headquarters office of a department or agency.

(3) "Local buy item" means a supply or service purchased to meet the specific needs of one user. Examples include the purchase of nonprofessional services, such as custodial or trash hauling, and construction work

(4) "Certification of SBA's competency" means a written statement by SBA that it is competent to perform the requirement as stated in the contract, and is based upon an assessment of a section 8(a) concern's competency to perform. The assessment does not require a special investigation or the issuance of a Certificate of Competency (COC) as provided for elsewhere in these regulations under the authority of section 8(b)(7) (A), (B), (C) of the Small Business Act.

(5) "Business plan" means the business plan documents as approved by SBA which include the objectives, goals and business projections of a section 8(a) concern, and all written amendments or modifications which have also been approved by SBA.

(6) "Commitment" means the commitment made by a procuring activity to SBA that the procuring activity will negotiate to place a contract with SBA for subcontract with a section 8(a) concern, provided there is no material change in requirements, availability of funds, or other pertinent factors. A commitment does not mean that an award of a particular contract to SBA and a section 8(a) concern will or must be made.

(7) "Open requirement" means a requirement submitted to SBA by a procuring activity for possible 8(a) award but without a particular 8(a) concern identified as a candidate for the award. Open requirements can be for local buy items or national buy items.

(c) *Basic principles of requirements support.* (1) An 8(a) subcontract will be provided to a section 8(a) concern only when consistent with that concern's business development needs.

(2) An 8(a) contract will be provided an 8(a) concern only when the procurement is consistent with the concern's capabilities as identified in its business plan by means of Standard Industrial Classification (SIC) codes, Product Service Classification (PSC) codes, or comparable specific descriptions.

(3) The aggregate dollar amount of 8(a) contracts to an 8(a) concern for any Federal fiscal year may not exceed by more than 25 percent the applicable annual approved 8(a) contract support level contained in the concern's business plan. This shall not preclude an 8(a) concern from requesting an increase in its approved 8(a) contract support level on other than an annual basis. Such request must be supported by a revised business plan and evidence that the firm has the capability to perform at the increased level. (OMB Approval No. 3245–0144)

(4) SBA does not guarantee any particular level of contract support to a section 8(a) business concern by the approval of its business plan.

(5) SBA is not required to make an award of any particular contract, and should it make an award, SBA is not required to award a contract to a particular 8(a) concern. Nonetheless, SBA will usually reserve a procurement for possible 8(a) award in favor of an 8(a) concern which initially self-marketed the procurement, provided the firm needs the requirement to satisfy its business plan projections without exceeding them.

(6) In cases in which SBA must select an 8(a) concern for possible award from among more than one concern which appear to be qualified to perform the contract, the selection will be based upon consideration of relevant factors, including the following:

(i) Technical capability including the ability to perform the contract, the concern's organizational structure, the experience and technical knowledge of its key employees, and technical equipment and facilities.

(ii) Financial capacity, including the availability of adequate financial resources or the ability to obtain such resources as required.

(iii) Ability to comply with the required delivery or performance schedules.

(iv) Ability to obtain any necessary bonding.

(v) Any applicable geographic limitations.

(vi) The concern's need for the specific contract to further the development objectives of the concern's business plan, in light of any other potential contracts under consideration.

(vii) The overall likelihood of successful performance of the proposed requirement.

(viii) Past amount of 8(a) contract support received by the concern and the performance record on past 8(a) contracts.

(ix) Current contracts in process, and progress toward timely delivery of those contracts.

(x) Length of time in the 8(a) program and the proximity of the FPPT date.

(xi) Amount of BDE and advance payment support received since entering the 8(a) program and required to perform the present requirement.

(xii) Which 8(a) concern initially identified the procurement, if any.

(7) In cases in which SBA must select an 8(a) concern for possible award of a professional service contract (except CPA audit services) SBA may, in its discretion, arrange for the evaluation of technical capabilities of several concerns, which appear to be most qualified, by the procuring agency itself. In such cases, SBA will request a written report of the evaluation including the criteria used, the results found, and an overall evaluation of each concern as technically or not technically acceptable for their particular procurement. SBA will make the final selection.

(8) SBA will not accept proposed procurements for 8(a) award if any of the following circumstances exist:

(i) Public solicitation has already issued for the procurement as a small business set-aside in the form of an Invitation for Bid (IFB), Request for Proposal (RFP) or a Request for Quotation (RFQ). Evidence of a general intent to set aside, such as Procurement Information Notices (PIN's), annual procurement forecasts or past procurements by set aside, is insufficient reason to preclude the procurement from 8(a) consideration.

(ii) The procuring agency can award the contract by noncompetitive means to a small disadvantaged concern whether or not it is presently in the 8(a) program.

(iii) There is a reasonable probability that a small disadvantaged concern, whether or not a section 8(a) concern, can successfully compete for the contract under conventional competitive procedures.

(iv) SBA has made a written determination that acceptance of the procurement for an 8(a) award would have an adverse impact on a small business. SBA presumes adverse impact to exist when,

(A) the small business concern has been the recipient of two or more consecutive awards of the item or service within the last 24 months, and the estimated dollar value of the award would be 20 percent or more of its most recent annual gross sales, or

(B) the small business concern has been the recipient of three or more consecutive awards of the item or service within the last 36 months, and the estimated dollar value of the award

would be 30 percent or more of its most recent annual gross sales.

(d) *Procedures for Obtaining Requirements Support.* (1) SBA procurement center representatives (PCR's) will screen proposed procurements for possible 8(a) contracts, in accordance with 13 CFR 125.6. PCR's may rely on information found in the business plans of portfolio section 8(a) concerns in performing this function.

(2) A requirement for possible award may be identified by SBA, a particular 8(a) concern, or the procuring activity itself. Once identified by whatever means, SBA shall select and nominate to the procuring agency an 8(a) concern for possible award. The selection will be made pursuant to these regulations and will be based on the business plan and such supplemental materials as SBA may request. If the 8(a) concern fails to provide SBA with the supplemental materials requested within any particular time specified by SBA, SBA will make its selection based solely on information contained in the concern's business plan.

(3) SBA's nomination of a section 8(a) concern to perform an identified procurement shall be communicated to the procuring activity in writing with notice to the 8(a) concern.

(4) If the procuring activity responds to SBA's nomination, or request for commitment, by making a commitment to SBA, SBA will then match the specific needs of the procurement with the specific capabilities of the selected 8(a) concern, relying upon the business plan and such supplemental or updated material as SBA in its discretion shall require. To facilitate matching, and to the extent reasonably available, SBA will obtain from the procuring activity the complete procurement package, which contains plans, specifications, delivery schedules, labor rates and so forth, along with the following:

(i) The title or name of work to be performed or items to be delivered.

(ii) The estimated period of performance.

(iii) The SIC code of the item or service.

(iv) The PSC number used by the Federal Procurement Data Center.

(v) The procuring agency dollar estimate of the requirement (current government estimate).

(vi) Any special requirement restrictions or geographical limitations.

(vii) Any special capabilities or disciplines needed for contract performance.

(viii) The type of contract to be awarded, such as firm fixed price, cost reimbursement, or time and materials.

(ix) A list of contractors who have performed on this specific procurement during the previous 36 months.

(x) A statement that public solicitation for the specific procurement has not been issued for small business set aside.

(xi) A statement that the procurement cannot reasonably be expected to be won by a disadvantaged concern under normal competition.

(xii) The nomination of any particular 8(a) concern designated for consideration, including a brief justification, such as one of the following:

(A) The requirement is a result of an unsolicited proposal and the buying activity is unable to justify a sole-source award.

(B) The 8(a) concern, through its own efforts, marketed the requirement and caused it to be reserved for the 8(a) program.

(C) The procuring agency has determined that the recommended concern has unusual technical qualifications to perform.

(5) Within ten working days of a commitment from a procuring activity identifying a particular 8(a) concern, SBA will determine whether a proper match exists, and will contact the procuring activity to arrange for initiation of contract negotiations. A letter accepting the commitment should normally be sent to the procuring activity at this time. Should contract negotiations be successful and result in an award to the 8(a) concern, SBA will then provide a Certification of SBA's Competency as a contract provision pursuant to § 124.302(c) of these regulations. Should SBA determine that a proper match does not exist, it will so advise the affected 8(a) concern, and may then select and nominate an alternative 8(a) concern to the procuring activity which, in the opinion of SBA, does match with the procurement, if any such concern exists.

(6) Should a procuring activity offer a contract to SBA as an open requirement, SBA will select and nominate in accordance with these regulations an 8(a) concern which appears to be qualified, subject to the following additional procedures:

(i) If the contract is a local buy item, the portfolio of 8(a) concerns maintained by the SBA district office where all or most of the work is to be performed or the items delivered will be examined initially for selection of a qualified 8(a) concern. If none are found to be qualified, the requirement may be considered for other 8(a) concerns located within the appropriate SBA region, or the requirement may be considered for 8(a) concerns located in immediate adjacent regions.

(ii) If the procurement is a national buy item, it shall be referred to SBA's Central Office. Central Office will allocate national buy requirements to the regional offices on an equitable basis, and regional offices will allocate national buy requirements to the districts on an equitable basis.

**§ 124.302 8(a) Contracts and subcontracts.**

(a) *General.* It is the policy of SBA to enter into contracts with other government agencies and subcontract the performance of such contracts to concerns admitted to the section 8(a) program pursuant to section 8(a)(1)(C) of the Small Business Act, at prices which will enable a company to perform the contract and earn a reasonable profit.

(b) *Performance of work by the 8(a) subcontractor.* To assure the accomplishment of the purposes of the program, each 8(a) subcontractor shall be required to perform work equivalent to the following percentages of the total dollar amount of each subcontract, exclusive of material costs, with its own labor force:

| | Percent |
|---|---|
| (1) Manufacturing | 50 |
| (2) Construction: | |
| (i) General construction | 15 |
| (ii) Special trades, such as electrical, plumbing, mechanical, etc | 25 |
| (3) Professional services | 55 |
| (4) Nonprofessional services | 75 |

The 8(a) concern is required to include in its proposal to perform a given contract a statement that it agrees to perform the required percentage of the work with its own labor force. Refusal of the concern to provide such a statement will result in the contract not being awarded.

(c) *Certification of SBA's Competency.* (1) SBA will not certify as to its competency, as provided by section 8(a)(1)(A) of the Small Business Act, without first determining that the section 8(a) concern it intends to subcontract to is responsible to perform the contract in question. If SBA determines that the concern lacks the capability, competency, capacity, credit, integrity, perseverance, and tenacity to perform on a specific 8(a) subcontract, the contract will not be awarded. In addition, SBA will also ensure that an 8(a) concern is eligible under the Walsh-Healey Public Contracts Act, 41 U.S.C. 35(a) for each individual 8(a) subcontract. An 8(a) concern which has not submitted current financial

statements to SBA will be deemed not responsible to receive 8(a) subcontracts.

(2) SBA's determination not to award an 8(a) subcontractor a specific 8(a) subcontract because the concern lacks an element of responsibility, or is ineligible under the Walsh-Healey Public Contracts Act, does not constitute a denial of total section 8(a) program participation for the purposes of section 8(a)(9) of the Small Business Act.

(d) *Contract Administration.* SBA may delegate its authority to administer section 8(a) subcontracts to the procuring agency or any Federal agency designated by it. This is done through the use of special clauses in the contract between SBA and the procuring agency, or by letter, as appropriate.

(e) *Contract termination.* (1) A decision to terminate a specific section 8(a) subcontract for default is made by the procuring activity contracting officer in cooperation with SBA. The contracting officer will advise SBA in advance of his/her intent to terminate for default the 8(a) subcontract. SBA may provide whatever program benefits as are reasonably available to the 8(a) concern in order to prevent termination for default of the contract. The contracting officer will be made aware of this effort. If, despite the efforts of SBA, in the opinion of the procuring activity contracting office grounds for termination continue to exist, he/she may terminate the 8(a) subcontract for default.

(2) In cooperation with SBA, the procuring activity contracting officer may terminate a section 8(a) subcontract for convenience at any time it is determined in the best interest of the government to do so.

(f) *Disputes and appeals.* (1) SBA is not subject to the Disputes Clause of a specific contract, and SBA is not a party to and does not appear at or participate in appeals brought under such a clause in its own behalf or on behalf of an 8(a) concern.

(2) If a dispute between an 8(a) subcontractor and the procuring activity contracting officer arises under the subcontract, it will be decided unilaterally by the procuring activity contracting officer. The 8(a) subcontractor has the right to appeal the decision of the procuring activity contracting officer under the Contract Disputes Act of 1978.

**§ 124.401 Advance payments.**

(a) *General.* (1) Advance payments are disbursements of money made by SBA to a section 8(a) business concern prior to the completion of performance of a specific section 8(a) subcontract. Advance payments are made for the purpose of assisting the section 8(a) business concern in meeting financial requirements pertinent to the performance of the subcontract. The gross amount of advance payments must be determined by SBA prior to commencement of performance of the contract. Any subsequent change in the gross amount of advance payments must be justified in writing by SBA as to amount and purpose. Advance payments are to be awarded only after all other forms of financing have been considered by SBA and rejected as unacceptable to support performance of the subcontract. Advance payments must be liquidated from proceeds derived from the performance of the specific section 8(a) subcontract to which they pertain. However, this does not preclude repayment of such advance payments from other revenues of the business, except from other advance payments and business development expenses (as defined hereinafter in these regulations); provided such repayment must occur according to the liquidation schedule established by the subcontract under which the advance payments were made. The proceeds derived from the performance of the specific section 8(a) subcontract must be deposited by the procuring agency in a special bank account established exclusively for the purpose of administering the advance payments. These proceeds will be used to liquidate the advance payments. No withdrawals of such subcontract proceeds from the special bank account may be made by the section 8(a) business concern which are inconsistent with the disbursement schedule established by the subcontract under which the advance payments were made.

(2) Advance payments shall not be made to a section 8(a) business concern in any case in which the section 8(a) business concern has assigned its rights to receive any payment under the specific section 8(a) subcontract to any person or entity, unless such assignment shall be made to SBA or to a Federal agency in regard to the receipt by the section 8(a) business concern of a progress payment for any specific section 8(a) subcontract.

(3) In no even shall the total amount of advance payments for a section 8(a) business concern exceed 90 percent of the outstanding proceeds of the section 8(a) subcontract to which the advance payments relate which remain to be paid to the section 8(a) concern.

(4) SBA shall not charge interest on advance payments disbused pursuant to these regulations.

(b) *Requirements.* (1) Advance payments may be approved for a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(i) A section 8(a) business concern does not have adequate working capital to perform a specific section 8(a) subcontract.

(ii) Adequate and timely financing is not available on reasonable terms to provide necessary capital. Where available terms for financing are at the current market rate, they shall be deemed reasonable for the purpose of this subsection.

(iii) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of advance payment funds. These records must be made available upon request for review by SBA and other appropriate Federal officials.

(iv) A company may receive an advance payment on a section 8(a) subcontract only in instances in which that company has no unliquidated advance payments outstanding on another section 8(a) subcontract which is completed, terminated or in default.

(c) *Procedure.* To be eligible to receive advance payments, a section 8(a) business concern must meet the conditions set forth above and must comply with the following procedure.

(1) A section 8(a) business concern desiring to receive an advance payment in connection with any section 8(a) subcontract shall:

(i) Submit a written request for advance payment to the appropriate SBA Regional Administrator or his designee. Under OMB Approval No. 3245-0148, such request must include detailed documentation requested by SBA as evidence to support the need for such funds and proof that working capital financing cannot be found upon terms acceptable pursuant to paragraph (b)(ii) of this section, from financing institutions.

(ii) The section 8(a) business concern must select a commercial bank which is a member of the Federal Reserve System in which it must establish a special non-interest bearing bank account for the deposit of payments made to it by the procuring agency pursuant to the performance of the subcontract(s). This special account must be a demand deposit account. The appropriate SBA Regional Administrator shall designate at least two SBA employees to serve as countersignatories on the special bank account.

(A) Disbursements from the account will be made only upon the signatures of

the section 8(a) concern and one of the designated SBA employees.

(B) Under no circumstance shall the requirement for an SBA employee countersignature be waived.

(C) At the time that SBA disburses advance payment funds into the special bank account, SBA shall obtain the most superior lien possible upon the special bank account, any property contracted for, supplies, material and other property acquired with the advance payment funds.

(iii) The section 8(a) subcontractor must support each request for disbursement of advance payments by submitting to SBA the following (OMB Approval No. 3245-0148):

(A) The original vendor invoice or original payroll record;

(B) A certified statement, dated and signed by the concern's Chief Financial Officer, attesting to the truth and accuracy of the vendor invoice, and/or the payroll records for the requested advance payment including records of direct payroll expenditures, and payroll expenditures for general and administrative expenses and overhead;

(C) Certification by the concern that all Federal taxes and FICA payments are current, or a copy of any agreement with the IRS providing for payment of delinquent taxes;

(D) Documentation of overhead and general and administrative rates using projected indirect costs applied to a valid base, which have been properly allocated to direct material, labor, or other direct costs.

(iv) The section 8(a) concern must, as required by IRS regulations, select a Federal Depository into which the Federal withholding and FICA payment will be made. There shall be no change of Federal Depository without obtaining the prior written consent of the SBA. A check shall be prepared for Federal taxes, concurrent with the SBA advance, based on the submitted payroll, in the name of the tax collecting agency or the Federal Depository and signed by SBA and the contractor. If the amount of a check payable to IRS is less than 25 percent of the gross payroll for that period, the concern's Chief Financial Officer shall prepare a statement certifying that the amount designated as payable to IRS or the Federal Depository is true and correct.

(2) Upon a review of all the circumstances, the Administrator of SBA shall have the obligation to decide whether to approve or deny a request for advance payment and the amount thereof. This right of approval may be delegated to appropriate SBA officials within the discretion of the Administrator. The section 8(a) business concern, the bank selected pursuant to above and SBA must execute an Advance Payment Agreement prior to the disbursement of any advance payment which shall provide for advance payments, set forth a liquidation schedule for the advance payments as well as other terms and conditions governing advance payments. Under no circumstances may a liquidation schedule by waived. However, appropriate SBA officials designated by the Administrator are authorized to modify liquidation schedules. The section 8(a) concern must execute a demand note evidencing the full amount of the advance payment and security agreement and/or personal guarantee by one or more of the principals of the concern as collateral for the advance payment.

(d) *Use of Advance Payment Funds.* (1) Except for repayment to SBA in appropriate circumstances, advance payment funds may only be withdrawn from the special bank account by a section 8(a) business concern exclusively for the purpose of purchasing materials, labor, general and administrative expenses and overhead, and paying advance payments to the subcontractors of the section 8(a) concern for the performance of a specific section of the section 8(a) subcontract at issue.

(2) Under no circumstances may advance payment funds be deposited in interest-bearing accounts, certificates of deposit or other securities.

(3) Advance payment funds shall be disbursed by SBA for deposit into the special account only in such amounts necessary to pay for the immediate needs of a section 8(a) subcontract. Such disbursements shall be made as expeditiously as possible. Such immediate needs shall be documented by the small business concern and verified by SBA prior to disbursement.

(4) All payments to the section 8(a) business concern for work performed or services rendered pursuant to the subject section 8(a) subcontract shall be paid into the special bank account by the procuring agency, and shall be applied by SBA against the balance of advance payments according to the subcontract liquidation schedule.

(e) *Cancellation.* (1) SBA may determine that advance payments should be cancelled under the following circumstances:

(i) The terms and conditions of the advance payment agreement have not been adhered to by a section 8(a) small business concern.

(ii) The section 8(a) business concern's participation in the section 8(a) program has ended by expiration of the Fixed Program Participation Term and any extension, or has been terminated by administrative action under section 8(a)(9) of the Small Business Act, 15 U.S.C. 637(a)(9).

(2) In the event of cancellation of advance payments to a section 8(a) business concern, all previous advance payments made to that section 8(a) business concern shall become immediately due and payable to SBA.

**§ 124.402 Business development expense.**

(a) *Purpose.* Business Development Expense (BDE) funds are funds made available by SBA prior to or at the time of the execution of a specific section 8(a) subcontract for the purpose of assisting a section 8(a) business concern in connection with the performance of that subcontract. The authority to approve the uses and amounts of BDE rests with the Administrator. The Administrator has the power to delegate that authority in his discretion.

(1) An award of BDE is justified only after SBA conducts a complete analysis of the request of a section 8(a) subcontractor which is submitted to the appropriate SBA official.

(b) In the discretion of SBA, BDE funds may be used for the following purposes:

(1) To make up the difference between the procuring activity's subcontract price and the price required by the section 8(a) contractor to provide the product or service in connection with a specific section 8(a) subcontract.

(2) For the purchase of capital equipment which has been determined by SBA to be essential to the section 8(a) business concern's performance of a specific section 8(a) subcontract and for which acquisition cannot reasonably be made by other financing means.

(c) BDE shall not be provided to satisfy:

(1) Price differentials for professionals and nonprofessional service firms.

(2) Any contingency arising subsequent to negotiation and execution of the section 8(a) subcontract for which the BDE is proposed.

(3) Cost overruns.

(4) Entertainment expense.

(5) The cost of capital equipment when the following conditions exist:

(i) funds are available from outside sources to the concern, including SBA financing and the personal resources of the principal(s);

(ii) adequate and timely financing from outside sources is available at the current market rate.

(6) Costs of interest expenses to be borne by the section 8(a) concern.

(d) *Requirements.* To be eligible for business development expense funds, a section 8(a) business concern must submit a written request to the appropriate SBA Regional Administrator or his designee. Such request (OMB approval No. 3245–0149) must include detailed documentation requested by SBA as evidence to support the need for such funds, proof adequate financing is not available at current market rates, and such additional information as required by SBA to adequately consider the request.

(e) When BDE will be used to purchase capital equipment, the section 8(a) concern shall:

(1) execute and record a lien on the equipment in favor of SBA; and

(2) execute a BDE agreement with SBA which among other things covenants that:

(i) The concern will use the funds exclusively for the purposes stated in the BDE approval;

(ii) The concern shall maintain records to substantiate the uses for which BDE funds have been expended; and

(iii) In the event of default on the contract to which the BDE relates, the section 8(a) concern shall be liable for repayment of the full amount of the BDE.

**§ 124.403 Letter of credit.**

(a) *General Policy.* The letter of credit method of payment will be utilized under certain circumstances to disburse advance payments to section 8(a) business concerns performing subcontracts under the section 8(a) program when SBA has made a decision approving the use of advance payments pursuant to the requirements and conditions provided for in these regulations.

(b) *Eligibility Requirements.* SBA may disburse advance payments through the letter of credit method of payment through the Federal Reserve Bank System to a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(1) SBA determines that the section 8(a) business concern may be awarded more than one section 8(a) subcontract during a period of at least one year.

(2) The aggregate amount of letter of credit advance payment funds made to one section 8(a) business concern will exceed $120,000 annually.

(3) The section 8(a) business concern has submitted a schedule of its projected monthly advance requirements for section 8(a) subcontract disbursements (OMB approval No. 3245–0148). SBA has reviewed it, and SBA has found it to be reasonable.

(4) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of program funds (OMB Approval No. 3245–0015). These records must be made available upon request for review and audit by SBA and the General Accounting Office.

(c) *Procedures.* The procedures for the utilization of the letter of credit method of payment shall be in accord with 41 CFR 1–30.408–1.

**§ 124.501 Development assistance program.**

(a) *General.* Section 7(j)(1) of the Small Business Act provides for financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or enterprises eligible for assistance under sections 7(a)(11), 7(j)(10), and 8(a) of the Small Business Act. The AA/MSB–COD is responsible for coordinating and formulating policies relating to the dissemination of this assistance to small business concerns eligible for assistance under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act.

(b) *Services.* (1) Section 7(j)(1–2) of the Small Business Act empowers the SBA to provide through public and private organizations the management and technical assistance enumerated below to those individuals or concerns who meet the eligibility criteria contained in sections 7(a)(11) and 8(a) of the Small Business Act.

(2) The SBA shall give preference to projects which promote the ownership, participation in ownership, or management of small businesses owned by low-income individuals and small businesses eligible to participate in the section 8(a) program.

(3) This assistance may include any or all of the following:

(i) Planning and research, including feasibility studies and market research;

(ii) The identification and development of new business opportunities;

(iii) The furnishing of centralized services with regard to public services and Federal Government programs including programs authorized under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act;

(iv) The establishment and strengthening of business service agencies, including trade associations and cooperatives;

(v) The furnishing of business counseling, management training, and legal and other related services, with special emphasis on the development of management training programs using the resources of the business community, including the development of management training opportunities in existing business, and with emphasis in all cases upon providing management training of sufficient scope and duration to develop entrepreneurial and managerial self-sufficiency on the part of the individuals served.

(4) Sections 7(j)(3) and 7(j)(9) of the Small Business Act authorize SBA to:

(i) Encourage the placement of subscontracts by businesses with small business concerns located in areas of high concentration of unemployed or low-income individuals, with small businesses owned by low-income individuals, and with small businesses eligible to receive contracts, pursuant to section 8(a) of this Act. SBA may provide incentives and assistance to such businesses that will aid in the training and upgrading of potential subcontractors or other small business concerns eligible for assistance under sections 7(a)(11), 7(j), and 8(a) of the Small Business Act, and

(ii) Coordinate and cooperate with the heads of other Federal departments and agencies, to insure that contracts, subcontracts, and deposits made by the Federal Government or with programs aided with Federal funds are placed in such a way as to further the purposes of sections 7(a)(11), 7(j), and 8(a) of the Small Business Act.

(c) *Eligibility.* (1) Eligibility for the assistance enumerated under paragraph (b) of this section shall include, but not be limited to:

(i) Businesses which qualify as small within the meaning of size standards prescribed in 13 CFR Part 121, and which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, or which are owned by such unemployed or low-income individuals; and

(ii) Businesses eligible to receive contracts pursuant to section 8(a) of the Small Business Act.

(d) *Delivery of Services.* (1) The financial assistance authorized for projects under paragraph (b) of this section includes assistance advanced by grant, agreement, or contract.

(2) To the extent feasible, services available under paragraph (b) of this section shall be provided in a location which is easily accessible to the individuals and small business concerns served.

(e) *Coordination and Cooperation with Other Government Agencies.* (1) The AA/MSB–COD may utilize the

resources of other agencies and departments whenever practicable which can directly or indirectly support or augment the purposes of section 7(a)(11), 7(j), and 8(a) of the Small Business Act.

(2) The AA/MSB-COD shall enter into agreements with Federal agencies and departments to further effectuate sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(3) The AA/MSB-COD shall encourage the placement of deposits made by the Federal Government, or by programs aided with Federal funds, in such a way as to further the purposes of sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

**§ 124.502 Small business and capital ownership development program.**

(a) *General.* Section 7(j)(10) of the Small Business Act establishes a Small Business and Capital Ownership Development program which shall provide additional assistance exclusively for small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. The management of the Capital Ownership Development program is vested in the AA/MSB-COD who is responsible for the oversight of the program and activities set forth in this part of these regulations. The development assistance described below shall be provided exclusively to those small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. Such small business concerns shall be participants in the Small Business Capital Ownership Development program. This program shall:

(1) Assist small business concerns participating in the program to develop comprehensive business plans (OMB Approval No. 3245-0015) with specific business targets, objectives, and goals;

(2) Provide for such other nonfinancial services as deemed necessary for the establishment, preservation, and growth of small business concerns participating in the program, including but not limited to (i) loan packaging, (ii) financial counseling, (iii) accounting and bookkeeping assistance, (iv) marketing assistance, and (v) management assistance;

(3) Assist small business concerns participating in the program to obtain equity and debt financing;

(4) Establish regular performance monitoring and reporting systems for small business concerns participating in the program to assure compliance with their business plans;

(5) Analyze and report the causes of success and failure of small business concerns participating in the program; and

(6) Provide assistance necessary to help small business concerns participating in the program to procure surety bonds. Such assistance shall include, but not be limited to, (i) the preparation of surety bond application forms; (ii) special management and technical assistance designed to meet the specific needs of small business concerns participating in the program and which have received or are applying to receive a surety bond, and (iii) preparation of all forms (OMB Approval No. 3245-0015) necessary to receive a surety bond guarantee from the SBA Pursuant to Title IV, part B of the Small Business Investment Act of 1958.

**§ 124.1000 Rules of practice for adjudicative proceedings to be used in effecting the termination of participation of a section 8(a) business concern in the section 8(a) program.**

**§ 124.1001 Scope of the rules in §§ 124.1000 through 1024.**

The rules in §§ 124.1000 through 124.1024 govern the procedure to be utilized in adjudicative proceedings conducted pursuant to the provisions of section 8(a)(9) of the Small Business Act, as amended (15 U.S.C. 637(a)(9)). They do not apply to adjudicative or rulemaking proceedings under the Small Business Investment Act of 1958, as amended (15 U.S.C. 661 *et seq.*) nor do they apply to investigations conducted under the Small Business Act (15 U.S.C. 631 *et seq.*), or the Inspector General Act of 1978 (5 U.S.C. App. I).

**§ 124.1002 Definitions.**

*AAMSB-COD.* "AAMSB-COD" means the Associate Administrator for Minority Small Business and Capital Ownership Development of the SBA.

*Act.* "Act" means the Small Business Act, as amended.

*Administration.* "Administration" means Small Business Administration (SBA).

*Administrative Law Judge.* "Administrative Law Judge" (ALJ) means the official who presides over the conduct of hearings held pursuant to the rules of practice in this part.

*Order to show cause.* "Order to show cause" means the formal statement and notice of hearing issued by SBA under § 124.1004 for the purpose of initiating adjudicative proceedings under these rules.

*Party.* "Party" refers to SBA and each respondent.

*Respondent.* "Respondent" means a section 8(a) business concern against which proceedings are instituted pursuant to section 8(a)(9) of the Small Business Act.

*Suspension.* "Suspension" means the period of time during which a section 8(a) business concern which has not been terminated from the 8(a) program pursuant to this subpart shall not receive 8(a) contract support, pursuant to § 124.113.

*Termination.* "Termination" means the complete removal from the 8(a) program, pursuant to this subpart, of a section 8(a) concern, with no rights of reinstatement.

**§ 124.1003 Appearances.**

(a) *By non-lawyers.* An individual may appear in his own behalf or may represent a sole proprietorship; a member of a partnership may represent the partnership upon a showing of adequate authorization from the other partner(s); a bona fide officer of a corporation, trust or association may represent the corporation, trust or association upon a showing of adequate authorization.

(b) *By lawyers.* An individual, sole proprietorship, partnership, corporation, trust or association may be represented by an attorney at law who is a member in good standing of a bar of any Federal court or of the highest court of any State, Commonwealth, Territory of the United States, or the District of Columbia.

(c) *Restrictions as to former employees.* The restrictions as set forth in Part 105 of the SBA Rules and Regulations (13 CFR Part 105, *et seq.*) shall apply to former employees of SBA with respect to their appearances as attorney or agent for anyone other than the United States in any proceeding conducted under the rules of practice in this part.

(d) *Notice of appearance.* Any attorney desiring to appear before SBA on behalf of a respondent shall file with SBA a written notice of such appearance which shall contain a statement of such attorney's eligibility as provided in this section.

(e) *Standards of conduct.* All counsel practicing before SBA shall conform to the standards of ethical conduct required of practitioners in the courts of the United States and by the bars of which they are members.

(f) *Suspension or disbarment of attorneys.* (1) The ALJ shall have the authority, for good cause stated on the record, to bar from participation in a particular proceeding any attorney who shall refuse to comply with his directions, or who shall be guilty of disorderly conduct, dilatory tactics, or contemptuous language in the course of such proceedings. Any attorney so

barred shall have the right to appeal to the AAMSB–COD from such action of the ALJ and the AAMSB–COD may take such action as he deems warranted by the circumstances.

(2) The Administrator of the SBA for good cause shown may, in accordance with the procedures set forth in Part 104 of the SBA Rules and Regulations (13 CFR 104 *et seq.*), suspend or disbar any alleged offender from practice before the Administration.

**§ 124.1004 Order to show cause, notice of suspension, where applicable, and notice of hearing of termination proceeding.**

(a) *Commencement of proceeding.* Adjudicative proceedings are commenced by the issuance of an order to show cause. A copy of the order to show cause will be served upon each respondent by certified mail, return receipt requested, to the last known address of the concern. If no receipt is returned within ten calendar days from the mailing of the notice or order to show cause, notice shall be presumed as of that time.

(b) *Form and notice of hearing.* The order to show cause shall be issued by SBA and shall contain a statement of the matters of fact and law asserted by SBA to be the grounds upon which proceedings have been instituted, and the legal authority and jurisdiction under which a hearing is to be held.

(c) *Hearing date.* The hearing shall be held on a date fixed by the ALJ.

(d) *Motion for more definite statement.* If the statement in the order to show cause as to matters of fact and law or legal authority and jurisdiction asserted by SBA is so vague and ambiguous that a respondent cannot reasonably frame a responsive answer, a respondent may move for a more definite statement before filing an answer. Such motion shall be filed within 15 days after service of the order to show cause and shall point out the defects complained of and the details desired.

**§ 124.1005 Answer.**

(a) *Time for filing.* A respondent shall have 30 days after service of the order to show cause within which to file an answer thereto: *Provided, however,* That the filing of a motion for a more definite statement alters this period of time as follows, unless a different time is fixed by the ALJ:

(1) If the motion is denied, the answer shall be filed within ten days after notice of such action;

(2) If the motion is granted in whole or in part, the answer shall be filed within ten days after service of the more definite statement: *Provided further, however,* That in no event need an answer be filed in less than thirty days after service of the order to show cause.

(b) *Content of answer.* An answer shall conform to the following:

(1) Answer contesting allegations of order to show cause. Such answer shall contain:

(i) A concise statement of the facts constituting the ground(s) of defense;

(ii) Specific admission, denial, or explanation of each fact alleged in the order to show cause or, if the respondent is without knowledge thereof, a statement to that effect.

(2) Answer admitting allegations of order to show cause. If the respondent elects not to contest the allegations of fact set forth in the order to show cause, the answer shall consist of a statement that respondent admits all material allegations to be true. Such an answer shall constitute a waiver of hearings as to facts so alleged, and an initial decision containing appropriate findings and conclusions and an appropriate order disposing of the proceeding shall be issued by the ALJ.

(c) *Default.* Failure of a respondent to file an answer within the time provided shall be deemed to constitute a waiver of its right to appear and to authorize the ALJ, without further notice to the respondent, to find the facts to be as alleged in the order to show cause and to enter an initial decision containing such findings, appropriate conclusions, and an order.

(d) *Signature on answer.* Every answer filed pursuant to this section shall be signed by (1) the proprietor of a sole proprietorship named as respondent, or (2) an officer of a corporate respondent, or (3) a partner of a partnership, or (4) a trustee of the trust, or (5) the attorney who represents a respondent, and verified before a person qualified to administer oaths in the State in which the answer is prepared.

**§ 124.1006 Motions.**

(a) *Presentation and disposition.* During the time a proceeding is before an ALJ, all motions, except as provided in § 124.1012(e)(2), shall be addressed to and ruled upon by the ALJ, and, if in writing, shall be filed with the ALJ. All motions addressed to the SBA shall be in writing and filed with SBA. It is the responsibility of the moving party to serve copies of any pleadings upon the opposing party or its counsel where the opposing party is represented by counsel. Respondent or respondent's counsel, where applicable, must serve all such pleadings on the attorney appearing on behalf of the agency. A certificate of service must accompany all such filings.

(b) *Content.* All written motions shall state the particular order, ruling, or action desired and the grounds therefor.

(c) *Replies.* Within ten days after service of any written motion, or within such longer or shorter time as may be designated by the ALJ or SBA, the opposing party shall reply or be taken to have consented to the granting of the relief asked for in the motion. The moving party shall have no right to reply, except as permitted by the ALJ or SBA.

(d) *Motions for extensions.* As a matter of discretion, the ALJ or SBA may waive the requirements of this section as to motions for extensions of time and may rule upon such requests ex parte.

(e) *Rulings on motions for dismissal.* When a motion to dismiss an order to show cause or for other relief is granted with the result that the proceeding before the ALJ is terminated, the ALJ shall make and file an initial decision in accordance with the provisions of § 124.1017. When a motion to dismiss is made at the close of the evidence offered in support of the order to show cause based upon the alleged failure to establish a prima facie case, the ALJ may, if he so elects, defer ruling thereon until the close of the case in order to permit the reception of evidence.

**§ 124.1007 Amendments and supplemental proceedings.**

(a)(1) *Amendments By Leave.* If and whenever determination of a controversy on the merits will be faciliated thereby, the ALJ may, upon such conditions as are necessary to avoid prejudicing the public interest and the rights of the parties, allow appropriate amendments to pleadings: *Provided, however,* That an application for amendment of an order to show cause may be allowed only if the amendment is reasonably within the scope of the proceeding initiated by the original order to show cause.

(2) *Conformance to evidence.* When issues not raised by the pleadings, but reasonably within the scope of the proceeding initiated by the original order to show cause, are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings; and such amendments of the pleadings as may be necessary to make them conform to the evidence and to raise such issues shall be allowed at any time.

(b) *Supplemental pleadings.* The ALJ may, upon reasonable notice and such

terms as are just, permit service of a supplemental pleading setting forth transactions, occurrences, or events which have happened since the date of the pleading sought to be supplemented and which are relevant to any of the issues involved.

**§ 124.1008 Prehearing conferences.**

(a) The ALJ upon motion of any party or upon its own motion may direct counsel for all parties to meet with him for a conference to consider:

(1) Simplification and clarification of the issues;

(2) Necessity or desirability of amendments to pleadings, subject, however, to the provisions of § 124.1007(a)(1);

(3) Stipulations, admissions of fact and of the contents, and authenticity of documents.

(4) Expedition in the presentation of evidence, including, but not limited to, restriction of the number of expert, economic, or technical witnesses; and

(5) Such other matters as may aid in the orderly disposition of the proceeding, including disclosure of the names of witnesses or furnishing for inspection or copying of nonprivileged documents, papers, books, or other physical exhibits, which constitute or contain evidence relevant to the subject matter involved and which are in the possession, custody, or control of any party to the proceeding.

(b) Prehearing conferences, at the discretion of the ALJ, may be stenographically reported as provided in § 101.10–14(f) but shall not be public unless all parties so agree.

(c) The ALJ shall enter in the record an order which recites the action taken, the amendments allowed, and the agreements made at the conference; and such order shall control the subsequent course of the proceeding, unless modified at the hearing to prevent manifest injustice. If counsel for any party after proper direction fails or refuses to disclose the names of witnesses or to make available for inspection or copying nonprivileged documents, papers, books, or other physical exhibits, the ALJ at his discretion, may also enter in the record an order providing, as appropriate:

(1) That the testimony of the witnesses who names are not disclosed or the documents, papers, books, or physical exhibits which are not made available for inspection or copying in accordance with the direction shall not be introduced in evidence; or

(2) That counsel who fails or refuses to comply with the ALJS's direction in respect to any of the foregoing shall be barred from participation in the proceeding in accordance with the provisions of § 124.1003(f)(1).

**§ 124.1009 Voluntary intervention.**

(a) Any individual, partnership, unincorporated association, or corporation desiring to intervene in a proceeding conducted under these rules shall make a written application in the form of a petition setting forth the basis therefor. Such application shall have attached to it a certificate showing service thereof upon each party to the proceeding in accordance with the provisions of § 124.1023(b). A similar certificate shall be attached to the answer filed by any party showing the service of such answer upon the applicant.

(b) The ALJ may by order permit the intervention to such extent and upon such terms as may be deemed proper. The ALJ shall consider, among other matters, whether the intervention will unduly delay or prejudice the adjudication of the rights of the parties.

**§ 124.1010 Admission as to facts and documents.**

(a) At any time after an answer has been filed, any party may serve upon any other party a written request for the admission of the genuineness of any relevant documents described in the request or the admission of the truth of any relevant matters of fact set forth in such documents. Copies of the documents shall be delivered with the request unless copies have already been furnished.

(b) Each requested admission shall be deemed made unless, within a period designated by the ALJ, but not less than ten days after service thereof, or within such further time as the ALJ may allow, the party so serves upon the party making the request either (1) a statement denying specifically the relevant matters of which an admission is requested or setting forth in detail the reasons why he can neither truthfully admit nor deny them, or (2) written objections on the grounds that some or all of the matters involved are privileged or irrelevant or that the request is otherwise improper in whole or in part, together with a copy of a request to the ALJ for a hearing on the objections at the earliest practicable time. Answers on matters to which such objections are made may be deferred until the objections are determined but, if written objections are made to only part of a request, the remainder of the request shall be answered within the period designated.

(c) Admissions obtained pursuant to this procedure may be used in evidence to the same extent and subject to the same objections as other admissions.

**§ 124.1011 Evidence.**

(a) *Burden of proof.* Counsel supporting the order to show cause shall have the burden of proof, but the proponent of any factual proposition shall be required to sustain the burden of proof with reference thereto.

(b) *Admissibility.* Relevant, material, and reliable evidence shall be admitted. Irrelevant, immaterial, unreliable, and unduly repetitious evidence shall be excluded. Immaterial or irrelevant parts of an admissible document shall be segregated and excluded so far as practicable.

(c) *Official notice of facts.* When any decision or an ALJ or of an official of SBA rests, in whole or in part, upon the taking of official notice of a material fact not appearing in evidence of record, opportunity to disprove such noticed fact shall be granted any party making timely motion therefor.

(d) *Objection.* Objections to evidence shall be timely and shall briefly state the grounds relied upon. The transcript of any proceeding governed by the rules shall include argument thereon except as ordered by the ALJ. Rulings on all objections shall appear in the record.

(e) *Exceptions.* Formal exceptions to an adverse ruling by the ALJ are not required.

(f) *Record of excluded evidence.* When an objection to a question propounded to a witness is sustained, the examining attorney may make a specific offer of what he expects to provide by the answer of the witness, or the ALJ upon request shall receive and report the evidence in full, unless it clearly appears that the evidence is not admissible on any ground. Similarly, rejected exhibits, adequately marked for identification, shall be retained in the record so as to be available for consideration by any reviewing authority.

**§ 124.1012 Presiding official.**

(a) *Who presides.* All hearings in adjudicative proceedings except those regarding suspension shall be presided over by an ALJ.

(b) *Powers and duties.* ALJ's shall have the duty to conduct fair and impartial hearings, to take all necessary action to avoid delay in the disposition of proceedings, and to maintain order. They shall have all powers necessary to that end, including the following:

(1) To administer oaths and affirmations;

(2) To rule upon offers of proof and receive evidence;

(3) To regulate the course of the hearings and the conduct of the parties and their counsel therein;

(4) To hold conferences for simplification of the issues or any other proper purpose;

(5) To consider and rule upon all procedural and other motions appropriate in an adversary proceeding;

(6) To make and file initial decisions;

(7) To take or cause depositions to be taken and to determine their scope; and

(8) to take action authorized by the rules in this part or in conformance with the provisions of Chapter 5, Administrative Procedure of title 5 of the United States Code (5 U.S.C. 551–559).

(c) *Substitution of ALJ.* In the event of substitution of a new ALJ for the one originally designated, any motion predicated upon such substitution shall be made within five days thereafter.

(d) *Interference.* In the performance of their adjudicative functions, ALJ's shall not be responsible to, nor subject to, the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecutive functions for the SBA, and all directions by SBA to ALJ's concerning any adjudicative proceeding shall appear in and be made a part of the record.

(e) *Disqualification of ALJ.* (1) When an ALJ deems himself disqualified to preside in a particular proceeding, he shall withdraw therefrom by notice on the record and shall notify the SBA of such withdrawal.

(2) Whenever any party shall deem the ALJ for any reason to be disqualified to preside, or to continue to preside, in a particular proceeding, that party shall file with SBA a motion to disqualify and remove such ALJ, such motion to be supported by affidavits setting forth the alleged grounds for disqualification. A copy of such motion shall be served by SBA on the ALJ whose removal is therein sought, who shall have ten days from such service within which to reply thereto. If the ALJ does not disqualify himself within ten days, then SBA shall promptly determine the validity of the grounds alleged, either directly or on the report of another ALJ appointed to conduct a hearing for that purpose.

### § 124.1013 Hearings; transcripts.

(a) *Public hearings.* All hearings conducted pursuant to these rules shall be public unless otherwise specified in the order to show cause or ordered by the ALJ for good cause shown.

(b) *Rights of parties.* Every party shall have the right to due notice, cross-examination, presentation of evidence, objection, motion, argument, and all other rights essential to a fair hearing.

(c) *Adverse witnesses.* An adverse party, or an officer, agent, or employee thereof, and any witness who appears to be hostile, unwilling, or evasive, may be interrogated by leading questions and may also be contradicted and impeached by the party calling him.

(d) *Expedition.* Hearings shall proceed with all reasonable expedition. Unless SBA otherwise orders upon a certificate of necessity therefor by the ALJ, all hearings will be held at one place and will continue without suspension until concluded. (This shall not bar overnight, weekend, or holiday recesses or other brief intervals of the sort normally involved in judicial proceedings.)

(e) *Notice.* Not less than ten days notice of the time and place of any hearing shall be given, and in setting such hearing due regard shall be had for the public interest and the convenience and necessity of all parties, witnesses, and counsel.

(f) *Transcripts.* Hearings shall be stenographically reported and transcribed by the official reporter under the supervision of the ALJ, and the original transcript shall be a part of the record and the sole official transcript. Copies of transcripts shall be available to respondents and to the public from the reporter at rates established by the reporter.

(g) *Corrections of the transcript.* Corrections of the official transcript may be made only when they involve errors affecting substance and then only in the manner herein provided: Corrections ordered by the ALJ or agreed to in written stipulation signed by all counsel and approved by the ALJ shall be included in the record, and such stipulations, except to the extent they are capricious or without substance, shall be approved by the ALJ. Corrections shall not be ordered by the ALJ except upon notice and opportunity for the hearing of objections. Corrections so ordered or approved shall be incorporated in the record as an appendix, and when so incorporated the ALJ shall make or cause to be made the necessary physical corrections in the official transcript so that it will incorporate the changes agreed upon or ordered. In making such physical corrections, there shall be no substitution of pages, but, to the extent practicable, such corrections shall be made by running a line through the matter to be changed, but without obliteration, and writing the matter as changed immediately above. Where the correction consists of an insertion, it shall be added, by rider or interlineation, as near as may be to the text which is intended to precede and follow it.

### § 124.1014 Witnesses and fees.

(a) Witnesses at hearings and depositions shall be examined orally under oath. Such witnesses shall be paid the same fees and mileage as are paid witnesses in the courts of the United States.

(b) Witness fees and mileage shall be paid by the party at whose instance witnesses appear.

### § 124.1015 Proposed findings, conclusions, and order.

At the close of the reception of evidence in an adjudicative proceeding, or within a reasonable time thereafter fixed by the ALJ, any party may file with the ALJ for his consideration proposed findings of fact, conclusions of law, and an order, together with reasons therefor and briefs in support thereof. Such proposals shall be in writing, shall be served upon all parties, and shall contain adequate references to the record and authorities relied on. The record shall show the ALJ's ruling on each proposed finding and conclusion except when his order disposing of the proceeding otherwise informs the parties of the action taken by him thereon.

### § 124.1016 Interlocutory appeals.

Except as provided in § 124.1003(f), interlocutory appeals from rulings of an ALJ may be filed only after permission is first obtained from the SBA. Any request for such permission (including supporting memoranda of fact and/or law) shall be in writing, not to exceed ten pages in length, and shall be filed within five days after notice of the ruling complained of. No such permission shall be granted by SBA unless it is found that such ruling involves substantial rights and will materially affect a final decision and that determination of its correctness before the conclusion of the proceeding would better serve the interest of justice. Interlocutory appeals shall be in the form of a brief, not to exceed ten pages in length, and shall be filed within five days after notice of the ruling complained of, in the case of appeals under § 124.1003(f), or within five days after notice of permission to file in the case of appeals under this section. Answer thereto may be filed within [five] days after service of the appeal brief. The appeal shall not operate to suspend the hearing unless otherwise ordered by the ALJ or SBA.

### § 124.1017 Initial decision.

(a) *When filed and when effective as agency decision.* Within 60 days after

completion of the reception of evidence in any proceeding, or within such further time as the SBA may allow on the ALJ's written request, the ALJ shall file an initial decision which shall become the decision of the AA/MSB–COD (i.e., the findings of fact, conclusions of law, and order contained in such initial decision shall become the final agency decision) 30 days after service thereof upon each of the parties; unless (1) within 15 days after service of the initial decision a petition for review thereof shall be filed pursuant to § 124.1018, or (2) within such 30 day period the AAMSB–COD issues an order directing the case to be placed on his docket for review. In that event, a copy of such order in addition to a copy of the initial decision shall be served on each party and each counsel or other representative who has appeared in the proceeding pursuant to § 124.1003.

(b) *Content.* An initial decision shall include a statement of (1) findings and conclusions, with the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record, and (2) an appropriate order specifying the effective date thereof. Initial decisions shall be based upon a consideration of the whole record and supported by reliable, probative, and substantial evidence.

(c) *By whom made.* The initial decision in an adjudicative proceeding shall be made and filed by the ALJ who presided therein, except when he or she shall have become unavailable to the Administration, in which event a substitute ALJ shall be designated.

(d) *Reopening; termination of ALJ's jurisdiction.* (1) At any time prior to the filing of his initial decision, an ALJ may reopen the proceeding for the reception of further evidence.

(2) Except for the correction of clerical errors, the jurisdiction of the ALJ is terminated upon the filing of his initial decision, unless and until the proceeding is remanded to him by the AA/MSB–COD.

**§ 124.1018 Petition for review.**

(a) *Who may file.* Any party to a proceeding may file a petition for review within the time prescribed by § 124.1017.

(b) *Content.* The petition for review shall concisely and plainly state (1) the questions presented for review, (2) the facts in abbreviated form, and (3) the reasons why review by the AAMSB–COD is deemed to be in the public interest. Such petition shall not exceed 15 pages in length.

(c) *Answer.* Within ten days after service upon the opposing party of a petition for review, such party may file in opposition thereto an answer not exceeding 15 pages.

(d) *Disposition.* A petition for review will be granted where, on examination of the record, the petition for review, and the answer, the AAMSB–COD finds that the questions presented are substantial and that determination thereof by the AAMSB–COD is necessary or appropriate under the law to insure a just and proper disposition of the proceeding and to protect the rights of all parties. If the petition for review is denied, the initial decision of the ALJ shall thereupon become the final decision of the AAMSB–COD. The AAMSB–COD will grant or deny the petition for review within 60 days from the date of the filing of the answer or such other final pleading.

**§ 124.1019 AAMSB–COD review.**

(1) Within 30 days after service of the AAMSB–COD's order granting the petition for review, the petitioner may file exceptions to the initial decision and a brief in support thereof.

(b) *Exceptions.* Each exception (1) shall relate only to substantive or procedural matters presented on the record, limited to the questions stated in the petition for review; (2) shall identify the part of the initial decision to which objection is made; (3) shall specify the portions of the record relied upon; and (4) shall state the grounds for the exception, including the citation of authorities in support thereof. Any objection to a ruling, finding, or conclusion which is not made a part of the exceptions shall be deemed to have been waived. Any exception which fails to present with accuracy, brevity, and clearness whatever is essential to a ready and adequate understanding of the points requiring consideration may be disregarded.

(c) *Brief.* The brief in support of the exceptions shall contain, in the order indicated, the following:

(1) A subject index of the matter in the brief, with page references, and a table of cases, textbooks, statutes, and other material cited, with page references thereto;

(2) A concise statement of the case containing all that is material to the consideration of the questions presented;

(3) A specification of the assigned errors; and

(4) The argument presenting clearly the points of fact and law relied upon in support of the position taken on each question, with specific page references to the transcript and the legal or other material relied upon.

Material not included in the exceptions or brief may not be presented to the AAMSB–COD in oral argument or otherwise.

(d) *Answering brief.* Within 30 days after service of the brief upon the opposing party, such party may file an answering brief which shall also contain a subject index, with page references, and a table of cases, textbooks, statutes, and other material cited, with page references thereto. It shall be limited to the questions raised in the brief in support of the exceptions and shall present clearly the points of fact and law relied upon in support of the position taken on each question with specific page references to the transcript and legal or other material relied upon.

(e) *Reply brief.* Reply briefs, not in excess of ten pages and limited to rebuttal of matters in an answering brief, will be received if filed and served within seven days after receipt of the answering brief or the day preceding the oral argument, whichever comes first. No answer to a reply brief will be permitted.

(f) *Length of briefs.* No brief in excess of 60 pages, including any appendices, shall be filed without leave of the AAMSB–COD.

(g) *Disallowance of Briefs.* Briefs not conforming to the requirements of this subpart will be returned to the filing party without being filed before SBA and will not be considered by the AAMSB–COD. The AAMSB–COD may, at his discretion, grant to the moving party an extension of time of ten days in which to amend its brief to conform to the procedural rules.

(h) *Oral argument.* Within 45 days of the filing of all briefs the AAMSB–COD may hold an oral argument in connection with agency review of any initial decision (1) upon request made by any party at the time of filing its briefs and for good cause shown or (2) on the AAMSB–COD's own motion. Oral argument before the AAMSB–COD shall be reported stenographically unless otherwise ordered by the AAMSB–COD.

**§ 124.1020 Decision on review.**

(a) Upon review of an initial decision, the AAMSB–COD will consider such parts of the record as are cited or as may be necessary to resolve the issues presented; and in addition will, to the extent necessary or desirable, exercise all the powers which he could have exercised if he had made the initial decision.

(b) In rendering his decision, the AAMSB–COD will adopt, modify, or set aside the findings, conclusions, and order contained in the initial decision and will include in the decision a

statement of the reasons or basis for his action.

(c) The final decision issued by the AAMSB–COD shall be rendered within 15 days of the close of the oral argument and shall be served upon each party and each counsel or other representative who has appeared in the proceeding pursuant to § 124.1003.

**§ 124.1021 Requirements as to form and filing of documents other than correspondence.**

(a) *Filing.* All documents filed in proceedings hereunder before the AAMSB–COD shall be addressed to and filed with the Associate Administrator for Minority Small Business and Capital Ownership Development, Small Business Administration, Washington, D.C. 20416. All documents filed in proceeding hereunder before an ALJ shall be addressed and filed with the Office of Hearings and Appeals, Small Business Administration, 1441, L Street, N.W. Washington, D.C. 20416, or to such other address as required by the ALJ assigned to the case.

(b) *Title.* All document shall clearly show the docket number and title of the proceeding.

(c) *Copies.* Five copies of all documents shall be filed with the exception of notices of appearances under § 124.1003, in which case only one copy need be filed.

(d) *Form.* All documents and pleadings, including briefs, filed in proceedings hereunder shall be printed, typewritten, or otherwise processed in permanent form and on good unglazed paper.

(e) *Signature.* (1) One copy of each document shall be signed by an attorney of record for the party or, in the case of respondents not represented by counsel, by an officer of respondent.

(2) Signing a document constitutes a representation by the signer that he has read it, that to the best of his knowledge, information, and belief, the statements made in it are true, and that is not interposed for delay. If a document is not signed or is signed with intent to defeat the purpose of this section, it may be stricken as sham and false, and the proceeding may go forward as though the document had not been filed.

**§ 124.1022 Time.**

(a) *Computation.* Computation of any period of time prescribed or allowed by these rules, by order of the AAMSB–COD, or an ALJ, or by any applicable statute, shall begin with the first business day following that on which the act, event, or development initiating such period of time shall have occurred. When the last day of the period so computed is a Saturday, Sunday, national holiday, or other day on which the office of SBA is closed, the period shall run until the end of the following business day. When such period of time, with the intervening Saturdays, Sundays, and national holidays counted, is less than seven days, each of the Saturdays, Sundays, and such holidays shall be excluded from the computation. When such period of time, with the intervening Saturdays, Sundays, and national holidays counted, exceeds seven days, each of the Saturdays, Sundays, and such holidays shall be included in the computation.

(b) *Extensions.* For good cause shown, the ALJ may, in any proceeding before him, extend any time limit prescribed or allowed by these rules or by order of the AAMSB-COD or the ALJ.

**§ 124.1023 Service.**

(a) *By SBA.* (1) Service of orders to show cause, orders, and other processes of SBA may be effected as follows:

(i) *By registered mail.* A copy of the documents shall be addressed to the person, partnership, corporation, or unincorporated association to be served at his or its residence or principal office or place of business, registered, and mailed; or

(ii) *By delivery to any individual.* A copy thereof may be delivered to the person to be served, or to a member of the partnership to be served, or to the president, secretary, or other executive officer or a director of the corporation or unincorporated association to be served; or

(iii) *By delivery of an address.* A copy thereof may be left at the principal office or place of business of the person, partnership, corporation or unincorporated association, or it may be left at the residence of the person or of a member of the partnership or of an officer or director of the corporation or unincorporated association to be served.

(2) Documents other than orders to show cause, orders, and other processes of SBA, the service of which starts the running of prescribed periods of time provided or allowed by any of the rules in this part or by any order of SBA or an ALJ for the performance of some act or the occurrence of some event or development, shall be served in the same manner as orders to show cause, orders, and other processes of SBA or by certified mail.

(3) All other documents may be similarly served, or they may be served by ordinary first-classed mail.

(b) *By other parties.* Service of documents by parties other than SBA shall be by delivering copies thereof as follows: Upon SBA by personal delivery or delivery by first-class mail to the Office of Hearings and Appeals or the Office of AAMSB-COD as appropriate; upon any other party, by delivery to the party; and upon SBA counsel by delivery to that counsel. If the party is an individual or partnership, delivery shall be to such individual or a member of the partnership; if a corporation or unincorporated association, to an officer or agent authorized to accept service of process therefor. Delivery to a party other than SBA means handing to the individual, partner, officer, or agent; leaving at his office with a person in charge thereof, or, if there is no one in charge or if the office is closed or if he has no office, leaving at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein; or sending by first-class mail.

(c) *Proof of service.* (1) When service is by mail, registered or ordinary first-class, it is complete upon delivery of the document by the post office.

(2) When a party has appeared in a proceeding by a partner, officer, or attorney, service upon such partner, officer, or attorney of any document other than an order to show cause, order, or other process of SBA shall be deemed service upon the party.

(3) The return post office receipt for a document registered and mailed, or the verified return or certificate by the person serving the document by personal delivery or ordinary mail, setting forth the manner of said service, shall be proof of the service of the document.

**§ 124.1024 Ex Parte Communication.**

(a) In any proceeding conducted under these rules, no employee or agent of SBA who performs any investigative or prosecutive function in connection with the proceeding and no respondent in the proceeding, or agent, or counsel, or anyone acting on behalf of a respondent, shall communicate ex parte, directly or indirectly, with the AAMSB–COD, or the ALJ, or any employee involved in the decisional process in such proceeding, with respect to the merits of the matter.

(b) In any proceeding conducted under these rules, the AAMSB–COD, ALJ, or employee involved in the decisional process of such proceeding shall not communicate ex parte, directly or indirectly, with any employee or agent of SBA who performs any investigative or prosecuting function in connection with the proceeding, or with any party respondent in the proceeding, or agent, or counsel, or anyone acting on behalf of a perty respondent, with respect to the merits of the matter.

(c) In any proceeding conducted under these rules, if any oral or written ex parte communication is made to or by the ALJ or employee involved in the decisional process, in violation of paragraph (a) or (b) of this section, such ALJ or employee, as the case may be shall promptly deliver to the AAMSB–COD any such written communication or, in the case of an oral communication, a report giving the substance thereof in writing, together with a written statement of the circumstances under which it was made. The relevant written material pertaining to the *ex parte* communication shall be made a part of the record of the proceeding to which it applies and, if the AAMSB–COD determines that such communications should, in fairness, be brought to the attention of all parties to the proceeding, the AAMSB–COD shall send copies thereof to all such parties.

(d) In any case where the AAMSB–COD determines that the dictates of fairness so require, any party requesting an opportunity to do so may rebut, on the record, any facts or contentions contained in any such ex parte communication.

(e) The Administrator of the SBA may, in accordance with the procedures contained in Part 104 of this chapter, suspend or revoke the privilege of any person who makes or solicits the making of an unauthorized ex parte communication to practice or appear before SBA.

Dated: March 8, 1983.

**James C. Sanders,**

*Administrator.*

[FR Doc. 83–33856 Filed 12–21–83; 8:45 am]

BILLING CODE 8025–01–M

# Proposed Rules

Federal Register
Vol. 49, No. 34
Friday, February 17, 1984

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF AGRICULTURE

### Federal Grain Inspection Service

### 7 CFR Part 810

### Proposed Revision of the U.S. Standards for Rye

*Corrections*

In FR Doc 84–2503 beginning on page 3663, in the issue of Monday, January 30, 1984, make the following corrections.

1. On page 3665, second column, § 810.402, paragraph (e), last line, "same" should read "sample".

2. On page 3666, in the table § 810.406, in the fourth entry under "Grade No." the footnote reference after "U.S. No. 4" should be removed.

3. On the same page under § 810.407 paragraph (a), line 6, the word "plumb" should read "plump".

4. Under § 810.408, paragraph (a), first line the word "no" should read "not".

BILLING CODE 1505-01-M

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 124

### Minority Small Business and Capital Ownership Development Assistance

**AGENCY:** Small Business Administration.

**ACTION:** Notice of extension of comment period on proposed rule.

**SUMMARY:** On December 22, 1983, SBA published in the **Federal Register** a proposed rule regarding its Minority Small Business and Capital Ownership Development Program (see 48 FR 56686). That publication provided that comments on the proposed rule would be received for a period of 60 days from date of publication. This notice extends the comment pertaining to the proposed rule for an additional 30 days in order to provide more time for public comment.

**DATE:** Comments on the above-referenced proposed rule must be receive by March 21, 1984..

**ADDRESS:** Written comments should be submitted to Mr. Henry T. Wilfong, Jr., Associate Administrator for Minority Small Business and Caiptal Ownership Development, U.S. Small Business Administration, 1441 L Street NW., Washington, D.C. 20416, Room 602.

**FOR FURTHER INFORMATION CONTACT:** Henry T. Wilfong, Jr., telephone (202) 653–6407.

**SUPPLEMENTARY INFORMATION:** In order to provide more time for public comment on the above-referenced proposed rule, SBA is hereby extending the comment period relative to the proposal for an additional 30 days. The public is encouraged to supply comments in writing to the address indicated above so that a complete record on this important proposed rule can be established.

Dated: February 10, 1984.

**James C. Sanders,**
*Administrator.*

[FR Doc. 84-4369 Filed 2-16-84; 8:45 am]
BILLING CODE 8025-01-M

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 71

### [Airspace Docket No. 83-AWA-22]

### Proposed Alteration of the Dallas-Fort Worth Terminal Control Area

*Correction*

In FR Doc. 84–3390, beginning on page 4765, in the issue of Wednesday, February 8, 1984, the maps on pages 4770 through 4777 are republished in there entirely.

BILLING CODE 1505-01-M

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Part 124**

## Minority Small Business and Capital Ownership Development Assistance

**AGENCY:** Small Business Administration.

**ACTION:** Final rule.

**SUMMARY:** The Small Business Administration (SBA) is hereby amending its regulations covering the section 8(a) and 7(j) programs. These programs were established by virtue of sections 8(a) and 7(j) of the Small Business Act, 15 U.S.C. 637(a) and 636(j). Taken as a whole, these regulations implement the Minority Small Business and Capital Ownership Development Program of SBA, a program which is intended to provide contractual and management assistance to concerns owned and controlled by socially and economically disadvantaged persons. In some instances, these regulations alter existing regulations covering the section 8(a) program. In other instances, these regulations add additional provisions to the existing regulations. Finally, in certain other instances the existing regulations would not be either altered or added to by these regulations. It should be noted that the regulations follow a numbering scheme different than that of the existing regulations. SBA believes that this scheme is easier to follow than in the existing regulations. The renumbering of the regulations has not resulted in the elimination of any significant provisions of the existing regulations.

**DATES:** These regulations are effective November 24, 1986.

**ADDRESS:** Written comments should be addressed to Docket Clerk, Office of General Counsel, Room 700, U.S. Small Business Administration, 1441 L Street, NW., Washington, DC 20416.

**FOR FURTHER INFORMATION CONTACT:** Edward C. Neal, (202) 653–6524.

**SUPPLEMENTARY INFORMATION:**

### General Overview

The Small Business Administration (SBA) is hereby amending its regulations covering the section 8(a) and 7(j) programs. These programs were established by virtue of sections 8(a) and 7(j) of the Small Business Act, 15 U.S.C. 637(a) and 636(j). Taken as a whole, these regulations implement the Minority Small Business and Capital Ownership Development Program of SBA. On December 22, 1983, at 48 FR 56686, SBA published proposed regulations governing the Minority Small Business and Capital Ownership Development Program. The public was afforded 60 days to comment on that proposal, and SBA extended that comment period by an additional 30 days thereafter (see 49 FR 6103). SBA received 322 public comments in response to that publication. In addition, SBA consulted with members and staff persons of the Senate and House of Representatives Small Business Committees regarding that proposal, and conducted numerous discussions with representatives of the minority business community relative to that proposal. A detailed analysis of the nature and substance of this public participation has been made a part of this Supplementary Material.

SBA has now evaluated all of the public participation, and these regulations represent the results of that evaluation. In some instances, these regulations alter existing regulations covering the section 8(a) program. In other instances these regulations add additional provisions to the existing regulations. Finally, in certain other instances the previously existent regulations are not either altered or added to by these regulations. This section of explanatory information will highlight instances where significant changes are made or where the present regulatory scheme is unaltered. In addition, it will explain how SBA has chosen to deal with sections of the proposed regulations on which significant public comment was received. It should be noted that these regulations follow a numbering scheme different than that of the preexistent regulations. SBA believes that this scheme is easier to follow than that presently existent in its regulations. The renumbering of the regulations has not resulted in the elimination of any of the significant provisions of the existent regulations.

Secions 124.1 through 124.3 of these regulations set forth general statements as to the purpose and administration of the two programs. These statements do not vary significantly from the present regulations. However, it should be noted that § 124.1 makes clear that these regulations are effective as to all concerns participating in the section 8(a) program and all applicants for admission upon their effective date, i.e., 45 days after publication in the **Federal Register**. (See § 124.100 of a special provision regarding conforming business plans of current program participants.) Further, § 124.2 makes clear that the Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB/COD) is responsible for management of the programs under the supervision of and responsible to the Administrator of the SBA. Clarification of this relationship is necessitated by statutory admendments which occurred subsequent to the last publication of regulations governing these programs. Section 124.3 of these regulations makes clear that previous willful violation of any of SBA's regulations may result in the denial of admission to the section 8(a) or 7(j) program. This clarification has been made as a result of the public comment SBA received in the proposal. In the proposal, it should be noted, the term *willful* did not appear.

Section 124.100 establishes a series of administrative definitions relevant to the section 8(a) progam of terms which are used throughout these regulations. These definitions appeared in the proposed regulations at § 124.301(b). The substance of the provisions which appeared in the proposal has not been altered from the manner in which it was presented at that time. However, several new definitions have been added. These include terms relative to eligibility of applicants for admission to the programs which are used to define types of eligible businesses. In addition, the concept of selfmarketing is also defined in this section. All of these new terms had previously been alluded to in the preexistent regulations, but heretofore had not been defined.

Section 124.100(m), a new provision, makes clear that present participants in the section 8(a) program will be notified by SBA of the approved Standard Industrial Classification (SIC) Code desingations contained in their business plans. In order to avoid any inequitable effect of the application of §§ 124.102 and 124.207, each present participant will be allowed to make a written request that SBA make one or more changes in its approved SIC Code designations to conform its business plan to these regulations.

Sections 124.101 through 124.109 set forth the eligibility criteria for the section 8(a) program. Section 124.101(a) provides that applicants for participation in the section 8(a) program must meet all eligibility criteria set forth in these regulations, and that determinations of eligibility shall be made in writing by the AA/MSB–COD, whose decision shall be final. Section 124.101(b) sets forth a procedure for reviewing eligibility determinations where members of the public submit evidence that a determination was based on fraudulent information, or that SBA did not follow the requirements of these regulations in rendering the determination. SBA will consider

comments regarding this new requirement for an additional thirty day period.

Section 124.102 prescribes the applicable size standard to be used in determining the eligibility of each participant in the program. This section provides a partial departure from the existent regulations. In this regard an applicant for admission to the section 8(a) program must establish that it is small as set forth in 13 CFR 121.4 At the time of admission, the size standard to be applied will be that of the primary industry classification of the concern as expressed in its business plan. As the concern continues to participate in the section 8(a) program, however, it will be required to certify to SBA that it is small for the purpose of performing each section 8(a) subcontract which it is awarded. This is a new requirement. In addition, a firm will only be permitted to perform contracts under section 8(a) which are classified according to the Standard Industrial Classification Code numbers which appear in its business plan as established pursuant to § 124.207 of these regulations.

Section 124.103 describes ownership criteria to be applied to applicants for the program. In this regard, subsections 124.103 (c), (d), and (e) set forth criteria involving part ownership of an applicant for the section 8(a) program by nondisadvantaged individuals, concerns in the same similar lines of business, and participation in the program by a section 8(a) business concern following a change of ownership, which have not heretofore been included in SBA's regulations. The intent of these provisions is to make more clear SBA's concern that program participation be focused directly upon socially and economically disadvantaged individuals as the statute intends.

Sections 124.103(f) and 124.103(g) make it clear that concerns owned and controlled by Indian Tribes and Native Alaska Regional and Village Corporations are eligible for participation in the section 8(a) program under prescribed conditions.

Section 124.104 sets forth the statutory requirement that participants in the section 8(a) program must be controlled and managed by individuals who are socially and economically disadvantaged. The regulation makes clear for the first time that individuals who are not socially and economically disadvantaged may not exercise actual control or have the power to control the operations of an applicant or participant in the program, and the socially and economically disadvantaged ownership interest in a participant must be in excess of the ownership interest of individuals or entities which are not socially and economically disadvantaged.

Section 124.105 sets forth definitional standards for the concept of social disadvantage and remains unchanged from the rule existing prior to the publication of the proposed rule. These standards remain under review and changes to this section, if any, will be undertaken at a later date.

Section 124.106 sets forth the statutory requirement that economically disadvantaged individuals be socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business and competitive markets area who are not socially disadvantaged. It then sets forth factors to be considered in determining whether an individual is economically disadvantaged. These factors differ somewhat from those previously expressed in SBA's regulations. They represent an effort on SBA's part to more fully spell out the meaning of economic disadvantage as it is expressed in the statutory provisions and the legislative history thereof.

Section 124.107 sets forth two other statutorily required conditions for eligibility in the program, i.e., that SBA make a determination that participants will, with the assistance of the program, have reasonable prospects for success in competing in the private sector, and that sufficient assistance is available from SBA and other sources to see to it that the concern's participation in the program is useful.

Section 124.108 sets forth a number of eligibility requirements which have heretofore not been expressed in SBA's regulations, but which have previously been utilized as a matter of standard procedure in evaluating applications for participation in the program. These criteria are self-explanatory.

Section 124.109 sets forth several types of businesses which are ineligible for participation in the section 8(a) program.

Section 124.110 sets forth the standards by which a fixed program participation term and an extension thereof will be established for each participant in the section 8(a) program. In this regard, the public's attention is directed to 46 FR 57266 (November 23, 1981), at which citation the fixed program participation regulations were first published in final form. These regulations do not deviate markedly from those regulations. Since fixed program participation terms have been established for all concerns presently in the program, this section speaks only in terms of firms which will enter the program and extensions of terms for those firms already in the program. Otherwise, criteria by which the terms are to be established are for the most part the same as those already existent in SBA's regulations.

In addition, a firm may be deemed to have completed participation in the section 8(a) program prior to expiration of its FPPT pursuant to the provisions of §124.110(k). This subsection provides the criteria upon which completion will be determined, and the mechanism by which SBA will implement such a determination. It should be noted that section 8(a)(9) of the Small Business Act requires that such a determination is subject to full Administrative Procedure Act hearings, and these regulations provide for such due process as that statutory provision requires before a concern may be determined to have completed its participation in the section 8(a) program prior to expiration of its FPPT.

Section 124.111 sets forth the mechanics for obtaining extension of a fixed program participation term. These mechanics have existed in SBA's standard operating procedures prior to this time, and it is felt that by now including them in the regulations participants in the program will have a better understanding of how the extension process functions.

Section 124.112 sets forth the grounds upon which a participant may be terminated from the section 8(a) program and the procedural mechanism by which such termination will take place. These regulations vary only slightly from the preexistent regulatory scheme. In this regard, several of the criteria upon which termination may be based have been clarified. These clarifications have been adopted as a result of our experience in implementing and proceeding under the present standards, and as a result of the public comment received on the proposed regulations.

Section 124.113 sets forth a procedural framework upon which SBA may suspend contractual and other forms of assistance to section 8(a) business concerns upon an issuance of an order to show cause why such a concern should not be terminated from the program. Such suspension would continue from the time of notification of the firm, which would be simultaneous with the issue of the order to show cause, until such time as SBA deems it appropriate to lift the suspension. In most cases, this period would encompass the period of time necessary

to reach a formal conclusion of the termination proceeding. However, in some instances a suspension could last for a shorter period of time. In no circumstances would the suspension exceed the time necessary to conclude a termination proceeding in which the 8(a) business concern prevailed.

SBA has adopted these regulations based upon its desire to utilize limited program resources in the most efficient and economical manner and to protect the Government's interests. Furthermore, based upon certain recent adjudications SBA has no doubt that such a manner of proceeding is legally correct, if not mandated. The suspension procedures provided for are similar to those utilized by other contracting agencies of the Government, and are designed to afford maximum due process of law to program participants.

Sections 124.201 through 124.206 set forth the basis upon which applications for admission to the section 8(a) program will be received and processed by SBA. These sections are new to the regulations, but they express procedures which have been part of SBA standard operating procedures governing the 8(A) program for some time. They are included in the regulations to make clearer to the public SBA's procedures for admitting concerns to the program.

Section 124.207 describes the process by which the business activity of a concern admitted to the section 8(a) program is established in its business plan. A concern's primary business industry classification and related Standard Industrial Classification Code designations will be stated in its business plan upon entry into the program. Thereafter, a concern will only be eligible to receive subcontracts in the section 8(a) program which are consistent with those Standard Industrial Classification Code designations. However, under certain prescribed circumstances a participating concern will be able to amend the Standard Industrial Classification Code designation with prior SBA approval. Those circumstances are delineated in the regulation.

Section 124.301 is a new provision which describes the mechanisms by which requirements (contractual) support is made available to participants in the section 8(a) program. This section contains material which has heretofore been part of the standard operating procedure of the program, but which we feel is of sufficient value to the public to be included in the regulations. Of note are the provisions which describe the selection of specific contracts for the program and the conditions under which they are made available to participants. Section 124.301(c)(2) has been amended to state that SBA will verify the appropriateness of the SIC Code designation assigned to each requirement offered for the section 8(a) program by the procuring agency. SBA's assumption of this responsibility precludes challenges of SIC Code designations to SBA's Office of Hearings and Appeals by section 8(a) program participants or other business concerns.

Section 124.302 sets forth provisions regarding the administration of contracts and subcontracts under the section 8(a) program. This part of the regulation would add a new section to the regulations which would incorporate provisions of SBA standard operating procedures into the regulations for the first time. The important provisions in this section are subsection (b) which sets forth percentages of work required to be performed directly by 8(a) business concerns on various types of contracts and subsection (c) which describes the Certification of Competency aspect of the 8(a) program. These provisions are self-explanatory. Otherwise, as mentioned above, the remainder of this section describes procedures which have long been standard in SBA's administration of the 8(a) program but have not been specifically included in SBA's regulations.

Section 124.401 and 124.402 set forth the purposes for, and terms and conditions upon which, advance payments and business development expense will be made available to participants in the section 8(a) program. These sections are basically unchanged from the preexistent regulations governing these topics. However, the discussion of the review of public comments below does indicate the changes which were made in these two sections. Section 124.403 sets forth the criteria upon which the line of credit method of making advance payments available to a section 8(a) concern will be used. This section is the same as the preexistent provision, with the exception that it is renumbered.

Sections 124.501 and 124.502 are the renumbered sections concerning the Development Assistance Program (the "7(j) program") and the Small Business Capital Ownership Development Program (the "7(j)(10) program"). With the exception of the renumbering, no changes have been made in the present regulations governing these two programs.

Finally, § 124.1000 which contained the rules of practice governing adjudicatory proceedings governing termination of section 8(a) program participants from the program, has been deleted. These procedural rules have been replaced by Part 134 of this Title which provides for procedural rules governing all adjudicatory proceedings conducted in SBA. These procedures will be administered by SBA's Office of Hearings and Appeals under the direction of SBA's Chief Administrative Law Judge.

**Review of Public Comments**

During the 90 days which SBA afforded the public to comment on the proposed section 8(a) regulations, 322 written comments were received. SBA has carefully reviewed all of these comments. Where appropriate, SBA has made changes to the regulations to take into account the comments received. Where SBA has not agreed with the comments regarding a particular provision of the regulations, an explanation for such disagreement is given.

There were no substantive comments concerning §§ 124.1 and 124.2. As such, they remain basically the same as in the proposed regulations. However, § 124.1(a)(i) was amended to make clear that these regulations apply to firms which are currently participating in the section 8(a) program.

Many commenters felt that § 124.3 was vague as written in the proposal. Consequently, SBA has rewritten the section to clarify that an applicant for admission to the section 8(a) program will not automatically be denied admission to the program for violating any of SBA's regulations. Such violation must be willful. In addition, the nature and severity of any such violation will be taken into account in making a determination on the admission of an applicant to the program.

A new § 124.100 has been added to the final version of the regulations. It is a definitional section, and it has been added to clarify several terms which many commenters indicated needed explanation. In addition, the definitions which appeared in § 124.301(b) of the proposed regulations have been incorporated into § 124.100 of these final regulations. The definitions of the terms "business plan," "certification of SBA's competency," "commitment," "local buy item," "manufacturer," "national buy item," "negative control," "open requirement," "primary industry classification," "regular dealer," "requirement support," and "self-marketing" are contained in § 124.100. Many comments were received on the proposed definition of "business plan," which was found at § 124.301(b)(5) of the proposed rule. Commenters suggested that the term "business plan"

should mean documents as submitted by a firm which will be presumed to be approved unless disapproved within 30 days. Such language would be in lieu of the language limiting "business plan" to those documents submitted by an 8(a) firm and approved by SBA. SBA rejects this recommendation. In order to effectively administer the operation of the 8(a) program, SBA must be able to approve or disapprove certain provisions of an applicant's proposed business plan. By restricting SBA to a 30-day review process, a firm's proposed business plan may not be afforded the proper consideration that it deserves. This could well lead to firms having business plans which are unworkable within the confines of the 8(a) program. Moreover, inadequate business plans would hinder a section 8(a) firm's development, contrary to the goals of the 8(a) program.

In addition, § 124.100(m) explains the applicability of these final rules to firms which are currently participating in the section 8(a) program. This subsection was added in response to concerns and confusion raised by current 8(a) firms' comments. SBA will review the business plan of each participating section 8(a) concern and will send a notice to each concern, within 120 days of the publication of this final rule, informing such concern of the SIC Code designations for which it has been approved to receive 8(a) contract awards. A currently participating section 8(a) firm will have 30 days from the mailing of such notice to request changes in SIC Code designations so that the firm's approved business plan conforms with these regulations (i.e., so that its primary industry classification and related SIC Code designations are stated in its business plan). A requested correction will be effective only after SBA gives its written approval.

Many commenters believed that the term "primary industry classification," in proposed § 124.102(a), should be clarified. Commenters stated that the term was confusing since no size standard is based on such a classification. The definition of this term was added in the final rules at § 124.100(i).

Numerous commenters objected to the proposed requirement for certification and verification of each contract, as required by § 124.102(b), and believed that such a requirement would cause delays in processing 8(a) contracts. SBA has not changed the certification and verification requirements of § 124.102(b) in these final regulations. Verification of the size of an 8(a) firm by SBA for each contract will serve a necessary purpose. It will eliminate challenges to the size certification by other section 8(a) concerns in connection with a particular 8(a) contract and will assure SBA that small businesses are receiving the benefit of the section 8(a) program. The verification will be conducted by the SBA contracting officer or designee by using the Business Development Specialist Review form, the business plan of the certifying concern, financial statements and other pertinent information.

Section 124.102(c) was heavily commented on. The commenters strenuously opposed the language which appeared to limit a firm to having only one SIC Code designation in its business plan. There was a typographical error in this proposed subsection which appeared to so limit an 8(a) firm. This error has been corrected to reflect that a section 8(a) concern can have more than one SIC Code designation in its business plan. There is no maximum number of SIC Codes which may appear in a firm's business plan. However, the business plan itself is a limiting factor. All SIC Codes in the business plan must reasonably relate to the development of the 8(a) concern in accordance with the business plan (see § 124.207).

Commenters were also concerned that a section 8(a) concern was limited, by § 124.102(c), to performing only 8(a) contracts. Such a notion is directly in conflict with the purpose of the section 8(a) program. SBA encourages 8(a) firms to pursue commercial and competitive Government contracts. Consequently, the language of this subsection has been changed to clarify that an 8(a) firm can perform any non-8(a) contract, and is limited only when performing 8(a) contracts to the SIC Codes specified in its business plan.

A number of commenters objected to the provision of proposed § 124.103 prohibiting part ownership in an 8(a) applicant concern by nondisadvantaged individuals, their spouses or immediate family members, who were former employers of the disadvantaged owner(s) of the applicant concern. A need for such nondisadvantaged individuals as a source of capital was stressed by many commenters. SBA's concern regarding this paragraph is a concern for the possibility of 8(a) firms acting as fronts for nondisadvantaged individuals. The 8(a) program has had a history of many abuses in this area where the real owner/manager was a nondisadvantaged individual and the disadvantaged "owner(s)" was (were) simply acting out the will of the nondisadvantaged individual. Because of this concern, SBA feels that this paragraph cannot be entirely eliminated. However, SBA agrees that in some instances such nondisadvantaged former employers of the disadvantaged owner(s) should be permitted to be part owners of an 8(a) concern and will allow such part-ownership where the applicant concern obtains prior approval from SBA.

Commenters also suggested that the term "negative control" in this section be defined. Such term is adequately defined in SBA's size regulations. The only change with respect to such term in these final rules is an updating of the definitional citation.

Section 124.104 sets forth the statutory requirement that participants in the section 8(a) program must be controlled and managed by individuals who are socially and economically disadvantaged. It clarifies, for the first time, that individuals who are not socially and economically disadvantaged may not exercise actual control or have the power to control the operations of an applicant or participant in the program.

Several commenters felt that the lead-in paragraph of § 124.104 was confusing and that it could be read to preclude equal minority owners. SBA does not agree that this language can be so read. Equal minority (disadvantaged) owners are permitted so long as the ownership portion of the disadvantaged managers is a greater percentage of the business entity than any other owners (i.e., the total percentage of ownership of all the disadvantaged managers combined must be at least 51 percent). Therefore, three disadvantaged individuals each owning 17 percent of the business entity and who are involved in the applicant concern's management and daily business would meet the requirements of § 124.104. However, if only two of the disadvantaged owners are involved in the management and daily business operations of the firm, such concern would not qualify under § 124.104 for the 8(a) program. The 8(a) program is designed to aid disadvantaged entrepreneurs, not investors who happen to be disadvantaged. The language of § 124.104(b) has been slightly amended to clarify that multiple disadvantaged managers is permissible.

Section 124.105 sets forth definitional standards for the concept of social disadvantage. In its proposed form, this section would have provided that members of certain designated groups "are considered socially disadvantaged," but that this presumption of social disadvantage would be subject to rebuttal if it did not

appear that the individual has maintained identification with the group to the extent that he or she was "commonly recognized" as a group member. If that showing were not made, the individual would have been required to demonstrate his or her social disadvantage according to the standards set forth for nonmembers of designated groups. The vast majority of comments received opposed this requirement because it would be impractical or inappropriate for the SBA to judge the extent of an individual's public "identification" with a group.

Many comments also opposed the language of proposed § 124.105(b)(3) which stated that "the attainment of a qualify education or job will not absolutely disqualify the individual from being found socially disadvantaged if sufficient other evidence of social disadvantage is presented to SBA." The commenters felt that the use of the word "absolutely" implied that circumstances existed where a qualify education or job could disqualify one from being termed socially disadvantaged. In order to avoid ambiguity, the final regulation (§ 124.105(c)(2)) make it clear that one's education or occupation, while of relevance, is not along dispositive of one's status as being socially disadvantaged or not.

As mentioned earlier, this section is therefore unchanged from its pre-notice of proposed rulemaking content. Changes to § 124.105 remain under review and may occur pursuant to appropriate rulemaking procedures.

Those commenting on proposed § 124.106 felt that different economic factors, relative to industry, should be considered in determining whether or not an individual is economically disadvantaged. It is, and has been, SBA's intention to consider different factors for different types of businesses in any such determination, and the regulations have been changed to reflect that view. Commenters also objected to the language of § 124.106(b)(1) concerning an individual's primary residence. It was felt that either a private residence is an irrelevant criterion in determining economic disadvantage, or that the value of the primary residence should be reduced by liens, mortgage obligations and other encumbrances in any such determination. The final rules have been changed so that only the equity value of an individual's primary residence is considered in determining economic disadvantage. In addition, commenters believed that whether an applicant firm is economically disadvantaged should be determined by comparison between the applicant concern and other concerns in the same business area who are not socially disadvantaged. The final regulations have been changed to reflect this comment.

Section 124.107 sets forth two other statutorily required conditions for eligibility in the program, i.e., that SBA make a determination that participants will, with the assistance of the program, have reasonable prospects for success in competing in the private sector, and that sufficient assistance is available from SBA and other sources to see to it that the concern's participation is useful.

Many commenters thought that the time period during which a firm must have a reasonable prospect for success in order to be eligible for the 8(a) program should be specified. The final rules have been clarified so that an applicant concern must have a reasonable potential for success within the maximum amount of time that a concern may be in the 8(a) program (up to seven years). Several commenters also requested that the term "reasonable prospect for success" be defined. Such a term is not subject to simple definition. The factors to be examined vary with each particular type of business concern. In addition, the circumstances that any one firm finds itself in are, for the most part, unique. These factors and circumstances must be analyzed together to make any determination concerning reasonable prospect for success. Consequently, any attempted definition may not take into account a unique factor or circumstance that would otherwise give an individual applicant concern a reasonable potential for success. SBA does not define such term so that a particular firm can show unique circumstances that should qualify it for the 8(a) program. If there is a doubt about a reasonable propsect for success, it will be resolved in favor of the applicant concern.

Section 124.108 sets forth a number of eligibility requirements which have heretofore not been expressed in SBA's regulations, but which have previously been utilized as a matter of standard procedure in evaluating applications for participation in the program. Two of the four proposed additional eligibility requirements of § 124.108 have been changed, in response to comments received, from their version in the proposed rules. The first was entitled "Good Character" in the proposed rules. Commenters recommended either deletion of the term "good character" or definition of such term to avoid subjective interpretation and arbitrary abuse. SBA has rewritten this subsection, calling it "Individual Character Review," and has more clearly described what will be considered under this eligibility requirement. Basically, if SBA receives information from a credible source or from the section 8(a) program application itself that an individual applicant has engaged in criminal conduct within the preceding five years, the application process will stop until SBA's Inspector General has reviewed and evaluated such charge(s).

The eligibility requirement entitled "Individual Eligibility Limitations" has also been amended from its proposed form. The comments suggested a second exemption allowing re-entry, where a firm is terminated due to SBA's failure to provide contract support. This entire subsection has been rewritten. A former 8(a) concern may now be reinstated into the 8(a) program for that amount of time which remained in its Fixed Program Participation Term at the time it withdrew from the program. A new FPPT will not be established upon reinstatement. However, there are now three situations, instead of one as in the proposed rules, in which such a firm may be reinstated, including where there are circumstances beyond the control of the 8(a) concern which inequitably interrupted the continued participation of the concern in the 8(a) program. The situation that the commenters recommended be a second exception to re-entry will now fall within this third category allowing reinstatment. However, in order for there to be reinstatement under any one of the three provisions, the 8(a) concern must have voluntarily withdrawn from the 8(a) program and the concern must have totally ceased its business operations.

Section 124.109 sets forth several types of businesses which are ineligible for participation in the section 8(a) program. This section was very lightly commented on. Those commenting believed that a definition should be provided for the terms "Brokers" and "Packagers." Both of these terms are used in connection with the implementation of the Walsh-Healey Public Contracts Act. "Packagers" are distinguished from "assemblers" in determining whether or not a firm is a manufacturer [see 48 CFR 22.606–1(d)]. "Brokers" are intermediaries who bid low to obtain a contract and then subcontract it out to another business concern. Brokers are distinguished from "agents," who are permitted under the Walsh-Healey Public Contracts Act, since the agency relationship is one that is disclosed up front [see 48 CFR 22.607].

These terms are better defined by the Walsh-Healey Public Contracts Act. As such, they are not defined in these final regulations.

Section 124.110 of the proposed regulations set forth the standards by which a fixed program participation term (FPPT) and, where appropriate, an extension thereof, will be established for each participant in the section 8(a) program. Section 124.111 delineates the mechanics of applying for an extension of one's FPPT. Some commenters questioned the advisability of fixed progam participation terms and voiced a preference for program completion only upon a firm's achievement of competitiveness.

In response to these comments, SBA refers the public to 46 FR 57266 (November 23, 1981), at which citation the final regulations governing fixed program participation terms were published. SBA introduced fixed program participation terms into the section 8(a) program in its implementation of Pub. L. 96-481. As stated in the preamble to that final regulation, Pub. L. 95-507, 92 Stat. 1760 (October 24, 1978), clearly states that the purposes of the section 7(j) and 8(a) programs are to foster business ownership, to promote competitive viability, and to clarify and expand the SBA's minority enterprise program. The implication of the terms "foster" and "promote" is that the SBA is direted to take actions to improve and advance the economic well-being of firms participating in the section 8(a) program. It is, however, beyond the intent of the statute and the ability of the SBA to guarantee or attempt to insure the success of participating firms. Neither Pub. L. 96-481, its implementing regulations or these revised regulations change the philosophy established by Pub. L. 95-507. Furthermore, Pub. L. 96-481 requires that the terms of program participation be fixed for each firm at the time it is approved for participation in the section 8(a) program.

Some commenters were concerned that the criteria which SBA uses as guidelines in deciding an appropriate FPPT for a given firm are not specified in the regulations. It is SBA's intention that, in addition to the criteria stated in the regulations, actual notice of any additional criteria will be providing each firm upon its application to the program. SBA's District Offices will make such information available in conjunction with the application forms.

Some commenters questioned the effect of the expiration of a firm's FPPT on its ability to execute options or modifications related to a contract received under the section 8(a) program. It has always been SBA's position that no new section 8(a) contract can be entered after a firm's FPPT has expired, but that options or modifications, related to contracts awarded during the FPPT, are permissible provided that, in the case of modifications, they are not so extensive that under ordinary circumstances a new contract would be executed.

The comments reflected an uncertainty as to the meaning of "the progressively increasing importance of contract support, other than section 8(a) contract support," as used in § 124.110 (g)(3). In negotiating an FPPT or an extension of an FPPT, SBA will look favorably on a firm which anticipates an increasingly greater percentage of its total contract dollars to be made up of non-8(a) contracts for each year over the course of its FPPT. Since one of the purposes of the section 8(a) program is to develop self-sufficient businesses, an applicant with little or no prospect of receiving non-8(a) contracts or of increasing its reliance on such contracts would not be an appropriate participant in the section 8(a) program.

Similarly, SBA looks to a firm's decreasing dependence on Advance Payments and Business Development Expense funds as indicators of a firm's business development in deciding whether to grant it an extension of its FPPT.

Some commenters stated that SBA should permit administrative appeals of determinations concerning the length of an FPPT. Since by statute such terms are mutually agreed upon by the applicant and SBA, such an appeal is unnecessary. Section 7(j)(10) of the Small Business Act, 15 U.S.C. 636(j)(10), also provides 8(a) concerns with an opportunity to request an extension of their FPPT's and, without mention of further input from the section 8(a) concern, authorizes SBA to grant or deny a firm's request. Therefore, appeals concerning requests for extensions of FPPT's are not in keeping with the authorizing legislation.

Some commenters objected to the deletion of a regulatory subsection covering program completion which would occur after a hearing confirming that a firm has satisfied its business development goals as stated in its business plan. While SBA believes that well-developed business plans and appropriate FPPT's will obviate the need for such a subsection in the vast majority of cases, SBA recognizes the appropriateness or retaining such a section. Therefore, SBA has included a subsection governing program completion which appears as subsection 124.110(k) in this final regulation. The language of this new subsection is substantially the same as that previously included in Part 124 of these regulations at § 124.1-1(d).

Section 124.112 of the proposed rule, Program Termination, set forth the grounds for which SBA could institute termination proceedings against an 8(a) program participant. Generally, the public comments voiced concern that some of the grounds were too vaguely worded and subject to contradictory interpretation. As a result of these comments, SBA has made the following changes to this section.

SBA has clarified that a firm's failure to maintain its status as a small business under the Small Business Act and its implementing regulations for *each* of the Standard Industrial Classification Code designations contained in its business plan is a separate ground for termination from the program [see § 124.112(a)(2)]. If, however, a firm becomes large for one or more, but not all, of its SIC Codes, it can continue to participate in the 8(a) program under the SIC Code designation(s) for which it has maintained its status as a small business.

In the interest of fairness, SBA's inability to provide contract support (previous ground number 6) has been deleted, upon consideration of the comments received, as a ground for termination.

The time limit for the return of requested audited financial statements (current number 6, previous number 7) has been extended to 180 days in recognition of the lengthy delays sometimes associated with obtaining audited financial statements.

Former ground number 11 (current number 10) has been amended to delete a time restriction on a firm's achieving its business goals as one reason for which termination proceedings could be instituted.

Former ground number 13 which would have authorized termination for inadequate management performance by the concern's management has been deleted. Generally, this ground is very difficult to demonstrate unless it occurs in conjunction with one or more other grounds for termination. Therefore, SBA views this ground to be duplicative and unnecessary to proper program administration.

In response to public concern that insignificant financial debts to any Government entity could be construed to be a ground for termination under former number 15 (current number 13), SBA has added the words "significant" and "Federal" to that provision.

SBA has also clarified that any joint venture agreement referred to in previous number 19 (current number 17) must relate to the performance of the section 8(a) subcontract.

Several commenters were concerned that former number 22 (current number 20) could result in an unfair termination of an 8(a) concern from the program for false submissions made by an employee of the firm without the principal(s) of the firm having knowledge of such submission. Therefore, SBA has amended this reason for termination to include the requirement that the principal(s) of the firm have or should have knowledge of the false submission(s).

Many public comments indicated a concern that a firm's violation of even the most unimportant SBA regulation could result in its termination from the program. SBA has clarified that, in order to be a ground for program termination, the violation must be of a significant SBA rule or regulation.

Subsection 124.112(b) has been amended to correct the reference to the hearing procedures which appear in Part 134 of this title.

Several commenters objected to the inclusion of § 124.113, which deals with suspension of program assistance, in situations where termination proceedings would be instituted and where SBA has determined that the Government's interests would be jeopardized by SBA's continuing to make assistance available to the suspended firm. SBA has clarified that *only* upon issuance of an order to show cause why such an 8(a) concern should not be terminated from the program may the Administrator or the AA/MSB-COD suspend contract support to the section 8(a) participant. SBA has also amended the regulation to make clear that a suspension would only occur in those situations where immediate action is necessary to protect the Government's interest. It is contemplated that in such a situation involving an indicated section 8(a) concern or its principal(s) where conviction for the indicted offense would be grounds for termination from the program SBA may suspend the indicted firm pending the resolution of the indictment. The final regulation also states that, where requested, a hearing on the suspension will commence as soon as possible, but in no case more than 20 calendar days from the Administrative Law Judge's ruling, if the request is granted.

No comments were received concerning §§ 124.201, 124.202, 124.203 and 124.205. As such, these procedural sections remain the same in these final regulations as they were in their proposed form.

Several commenters suggested that § 124.204 be revised to establish a definite and objective order or priority for award of contracts to responsible 8(a) concerns. SBA believes that such a provision would be inappropriate in this section. Pursuant to this section, SBA must make a determination that there is a reasonable likelihood that 8(a) requirements are available to support the applicant concern. Such a determination must be based upon the circumstances and needs, at the time of application, of the area and industry in which the applicant concern wishes to conduct its business. Any order of priority in these regulations would be inflexible to the unique situation of a particular 8(a) applicant.

Section 124.207 was heavily commented on. However, the comments were all basically the same. The primary objection raised was to the provision prohibiting change in SIC Codes in a firm's business plan after entry into the 8(a) program. In response to these comments, § 124.207(b) has been added in the final regulations. This subsection authorizes three instances where a firm's business plan may be amended. These three situations are designed to be limited in their application. A participating 8(a) concern will not be able to change or amend its business plan simply because it has gotten too large to qualify for contracts under a particular SIC Code designation and now wishes to add another SIC Code designation with a different size standard. In order to be deemed "unable to achieve reasonable section 8(a) development," under § 124.207(b)(2), an 8(a) concern's previously assigned SIC Code designations must be inadequate to enable the section 8(a) firm to achieve at least 40 percent of its approved section 8(a) contract support level. In addition, it is intended that, pursuant to § 124.207(b)(2), a firm not be permitted to add an SIC Code designation in a Division Classification, as expressed in the SIC Code manual, which was not already in its approved business plan. For example, if an 8(a) firm had several SIC Code designations in its business plan under the Division Classification of Manufacturing and is determined to be unable to achieve reasonable 8(a) development, it could add another SIC Code under the Manufacturing Division Classification, but could not add an SIC Code under the Division Classification of Retail Trade or of Construction, etc.

Commenters also objected to the use of the term "principal business activity" in the proposed rules. This term has been replaced by the term "primary industry classification," which is defined in § 124.100(i), in these final regulations.

Section 124.301 of the proposed rule was also heavily commented on. In these final regulations, the definitional provisions which appeared in § 124.301(b) in the proposed rule are located in a new § 124.100. Sections 124.301(c) and 124.301(d) of the proposed rule have been redesignated §§ 124.301(b) and 124.301(c) accordingly.

Many commenters objected to the definition of "business plan" in proposed § 124.301(b)(5). Such definition appears in § 124.100 of these final regulations. The comments regarding such definition and SBA's response thereto are found in the explanatory material of § 124.100.

Many commenters also objected to proposed § 124.301(c)(8) [now § 124.301(b)(8)]. These comments centered around the adverse impact language of proposed § 124.301(c)(8)(iv) [now § 124.301(b)(8)(iv)]. In response to these comments, this subparagraph has been rewritten to clarify that all relevant factors will be considered in determining whether another small business would be adversely affected by SBA's acceptance of a proposed procurement for section 8(a) award. Two factors which will be considered, if applicable, are listed in § 124.301(b)(8)(iv)(A). The situation in which adverse impact will be presumed has also been clarified.

Section 124.301(c)(5) [formerly § 124.301(d)(5)] has also been clarified in response to comments received. It specifies that SBA will provide a Certification of SBA's Competency after it has determined the capability of its 8(a) subcontractor, bu prior to the award of the actual contract. Such certification occurs after successful contract negotiations result in a proposed award to the 8(a) concern.

Several commenters objected to the proposed percentages of work required to be performed directly by 8(a) concerns in § 124.302(b). However, no persuasive reasons were set forth for changing these percentages. Therefore, they remain as they were in the proposed rule.

The comments concerning § 124.401, Advance Payments, centered on two main points. First, many commenters were concerned that § 124.401(b) was too restrictive in its prohibition of advance payments where financing is available on reasonable terms, where "reasonable terms" includes financing at the current market rate. SBA agrees with this concern and has deleted that portion of the subsection which made

reasonable terms synonymous with current market rate.

Second, some commenters misinterpreted § 124.401(b) to allow only one advance payment at a time. SBA wishes to clarify that an 8(a) concern may have several advance payments outstanding on on-going contracts. This subsection merely precludes an 8(a) concern from receiving additional advance payments if it has not repaid its obligation from a prior contract which it has completed, on which it has defaulted or which the Government has terminated. Other commenters advocated allowing an exception to this requirement where an 8(a) concern has successfully completed its contract and has an outstanding payment due on its advance payment merely because the contracting agency has delayed in making final payment on the contract. SBA believes that in this situation strict application of this subsection would unfairly penalize the concern. Therefore, SBA has included this suggested exception in this subsection.

SBA received a comment which objected to the requirement of a demand note for the amount of the advance payment. SBA believes that a note would be helpful additional evidence of the obligation in a situation where expedited collection of the advance payment is necessary. However, SBA agrees that it need not be a demand note, and has amended this subsection accordingly.

SBA has already added a sentence to § 124.401(d)(4) which clarifies that amounts remaining in the special bank account over and above those funds needed to meet the advance payment liquidation schedule may be disbursed to the section 8(a) concern provided that the unpaid balance on the section 8(a) subcontract is sufficient to meet the remainder of the liquidation schedule.

Some commenters expressed concern that § 124.401(e)(2) was too restrictive in its requirement that all previous advance payments become immediately due and payable upon the cancellation of one advance payment. SBA has considered these comments and has amended this subsection to allow the concern until its receipt of the final contract payment on the subcontract to which the cancelled advance payment relates to repay all outstanding advance payments.

Some commenters of § 124.402, Business Development Expense (BDE), were opposed to SBA's proposal of more restrictive rules governing this business development tool. Some believed that allowing BDE only where financing was not available at the current market rate was too restrictive. SBA has considered these comments and agrees that if financing is not available at a reasonable rate for a particular firm, then BDE may be made available.

Several commenters suggested that BDE be made available for purchasing capital equipment whenever such acquisition could not be made by other financial means without adversely affecting the concern's financial condition. SBA believes that this suggestion would result in no standard at all because, for any purchase of capital equipment, the argument could be made that the financial condition of the company is adversely affected.

Some commenters objected to SBA's imposition of protections for the agency's investment in the 8(a) concern through BDE awards. SBA believes that these protections are necessary during the course of the subcontract, but upon successful completion of the subcontract to which the BDE relates, the protections would no longer apply.

In response to public comment, SBA has revised § 124.402 to clarify that BDE will be awarded only after SBA conducts a complete analysis of the firm's written request and determines that an award of BDE will promote the long-term business development objectives of the section 8(a) concern. Further, SBA has amended this section to list the potential uses of BDE awards in order of priority. It is the policy of SBA that BDE will be used for capital equipment first, then for other capital improvements and finally for price differential. SBA will only grant BDE for price differential once for any one type of contract requirement and only if SBA's analysis of the BDE request demonstrates that the concern will be able to produce the item or service competitively in the future. These requirements for the award of BDE for price differential are included in order to carry out SBA's policy that BDE be used in connection with a given subcontract to promote the long-term business development objectives of the section 8(a) concern.

SBA has added a new subsection (d) to this section which relates to participatory BDE. SBA believes that in order to most efficiently use the BDE funds it has available, firms should be encouraged to cost share on capital equipment or capital improvements purchased with BDE funds. Former subsections (d) and (e) have been renumbered as subsection (e) and (f), respectively.

**Further Opportunity to Comment**

SBA is issuing these regulations as a coherent whole but, in order to accommodate those who wish to comment on this publication, SBA will continue to receive comments on the record and evaluate any such comments as part of its ongoing review of these regulations. Written comments should be addressed to Docket Clerk, Office of General Counsel, 1441 L Street, NW., Room 700, Washington, DC 20416.

**Compliance with Executive Order 12291 and the Regulatory Flexibility Act**

SBA considers that this revision of regulations taken as a whole constitutes both a major rule for the purposes of Executive Order 12291 and a rule which will have a significant economic impact on a substantial number of small entities for the purposes of the Regulatory Flexibility Act. Therefore, we offer the following Regulatory Impact Analysis/ Regulatory Flexibility Analysis for the purpose of compliance with the pertinent requirements of those two measures.

Since this revision is made up of a number of different individual rules, these measures in some instances will require analysis of the individual rules and in some instances the entire revision. In instances in which the Executive Order or the Act require explanation of specific sections, this analysis will so state. Otherwise, for the purposes of this analysis, the revision will be treated as if it were one rule.

1. *Description of potential benefits of the rule:* This revision taken as a whole will provide both SBA and participants in its Minority Small Business Capital Ownership Development Program with clearer guidance as to the process by which participation in the program is achieved, and once that participation is achieved, how the participants and SBA are to conduct their mutual roles in the administration of the program. It is our belief that SBA will benefit by the revision since its purpose is to clarify the regulatory framework governing the program and thus provide for more efficient administration. In addition, program applicant and participants should benefit from the revision because it should clarify for them the procedure by which entry into the program is attained and participation in the program is governed.

2. *Description of potential costs of the rule:* There should be no costs inherent in the revision which are not presently involved in the administration of the Minority Small Business Capital Ownership Development Program. This revision merely establishes the regulatory framework upon which the program is administered, it does not by itself impose monetary or other types of costs upon SBA or program participants.

3. *Description of the net benefits of the rule:* This revision, taken as a whole, should provide for more efficient program management.

4. *Description of reasons why this action is being considered:* This action is being considered as part of normal periodic Agency revisions of its regulations. As such, the revision is based upon general experience with administration of the regulations as they presently exist. In addition, certain aspects of the revision, specifically the provisions dealing with size of program participants (§ 124.102), ownership of program participants by Indian Tribes (§ 124.103(f)), Advance Payments and Business Development Expense (§§ 124.401, 402, 403) result from specific instances of adverse experience with the present regulations covering those topics. Other aspects of the revision such as the provisions governing Fixed Program Participation (§ 124.100, 111), the relationship of SBA's Administrator to the Associate Administrator for Minority Small Business and Capital Ownership Development (§ 124.2), the definition of economic disadvantage (§§ 124.105 and 106), and the inclusion of Asian Americans and Asian Pacific Americans among the "designated minority groups" (§ 124.105(a)) reflect regulatory changes mandated by statutory changes and receipt and evaluation of information by the Agency from outside sources, all occurring since the initial publication of regulations to govern the program. It was determined by the Agency to incorporate these provisions into one all encompassing revision rather than a series of piecemeal changes for administrative convenience and for easier public consumption.

5. *Statement of objectives and legal basis for the final rule:* The purpose of this regulation is to provide a general revision of the regulations governing the Minority Small Business and Capital Ownership Development Program which reflects statutory changes occurring since the initial program regulations were promulgated and administrative applications of those regulations. The legal bases for the final rule are sections 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a).

6. *Description of entities to which the final rule will apply:* This revision will apply to all small business which wish to apply for admission to, and upon which admission do avail themselves of the benefits of participation in the Minority Small Business and Capital Ownership Development Program.

7. *Description of the reporting, recordkeeping and compliance requirements of the proposed rule:* The following provisions of the final rule impose significant reporting requirements:

a. Sections 124.105 and 124.106 require submission of information to SBA by applicants for admission to the program in order to prove social and economic disadvantage. These are statutory requirements.

b. Section 124.110 requires submission of information to SBA by applicants for program participation in order to establish a fixed program participation term. The type of data to be submitted is clearly indicated in the proposal.

c. Sections 124.401, 124.402 and 124.403 dealing with Advance Payments, Business Development Expense and Letter of Credit all impose reporting requirements upon participants in the program who receive these forms of benefits. The reporting involves maintenance of appropriate accounting mechanisms for the receipt and use of the benefits.

d. Section 124.501 dealing with the development assistance program involves the imposition of reporting requirements upon those concerns which receive assistance under that provision.

The same provisions as indicated above with respect to reporting requirements require concomitant recordkeeping requirements in order to accomplish the required reports. All program participants which avail themselves of the various forms of assistance indicated in the identified provisions are subject to the reporting and recordkeeping requirements indicated. The skills necessary for preparation of the reports and records are those general business recordkeeping and form preparation which normally confront applicants for government benefits. In some instances the small business may utilize professional accounting or legal services in order to prepare the required submissions.

In addition to the requirements indicated above, it should be noted that SBA requires applicants for admission to the section 8(a) program to submit audited financial statements as part of the application process, and quarterly financial statements which must be prepared by professional accountants are required of program participants.

8. *Federal Rules:* There are no relevant Federal rules which duplicate or overlap the revision.

9. *Analysis of Public Participation:* A detailed analysis of the public comments received in response to the proposal and SBA's efforts to conform this final rule to that commentary has been provided above. Obviously, in a program as detailed and complex as that covered by these rules, the participants will have different views of the rules by which their participation is to be regulated than will the regulations.

SBA submits that it has rejected no significant alternative to this revision which would minimize any significant economic impact of the proposed rule upon small entities. In this regard, the vast majority of comments on the proposal related to regulatory provisions which do not in and of themselves impose economic impact. In preparing these rules, we have sought to adhere closely to the statutory framework in establishing the eligibility and participation requirements for the Minority Small Business and Capital Ownership Development Program. While many suggestions have been made as to alternative approaches to the accomplishment of this objective in the case of individual sections of the revision, we feel that no alternatives which might in some way minimize economic impact on applicants or participants accomplish the stated objectives of the applicable statutes in a manner more consistent than that provided in the revision.

**Compliance With the Paperwork Reduction Act of 1980**

In compliance with the Paperwork Reduction Act of 1980 (Title 44, U.S.C., Chapter 35) and its implementing regulations, the recordkeeping or reporting requirements and forms appearing in the following sections of this final rule have been approved by the Office of Management and Budget (OMB) under number 3245–0015: §§ 124.105(b), 124.106(b)(1), 124.106(b)(2), 124.106(b)(3), 124.202, 124.204, 124.205, 124.403(b)(4), 124.502(a)(1), and 124.502(a)(6).

The recordkeeping or reporting requirements and forms appearing in the following sections of this final rule have also been approved by OMB:

§ 124.103(c) [OMB Approval No. 3245–0145]; § 124.103(e) [OMB Approval No. 3245–0145]; § 124.111(c) [OMB Approval No. 3245–0147]; § 124.112(a)(7) [OMB Approval No. 3245–0205]; § 124.112(a)(17) [OMB Approval No. 3245–0146]; § 124.205 [OMB Approval No. 3245–0015]; § 124.206 [OMB Approval No. 3245–0143]; §§ 124.401(c)(1)(i), 124.401(c)(1)(iii) and 124.403(b)(3) [OMB Approval No. 3245–0148]; § 124.402(e) [OMB Approval No. 3245–0149]; and §§ 124.112(a)(6) 124.205 and 124.502(a)(4) [OMB Approval No. 3245–0151].

Section 124.104(b) contains a reporting requirement that is not subject to the

Paperwork Reduction Act because it will affect fewer than ten individuals annually.

**List of Subjects in 13 CFR Part 124**

Government procurement, Minority business, Reporting and recordkeeping requirements, Technical assistance.

Accordingly, pursuant to the authority set forth in sections 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a), SBA hereby revises Part 124 of Title 13 of the Code of Federal Regulations to read as follows:

## PART 124—MINORITY SMALL BUSINESS AND CAPITAL OWNERSHIP DEVELOPMENT

Sec.
124.1 The section 8(a) and 7(j) programs.
124.2 Program management.
124.3 Violations.
124.100 Definitions and applicability of these regulations.
124.101 The section 8(a) program: General eligibility.
124.102 Small business concern.
124.103 Ownership.
124.104 Control and management.
124.105 Social disadvantage.
124.106 Economic disadvantage.
124.107 Potential for success.
124.108 Additional eligibility requirements.
124.109 Ineligible businesses.
124.110 Fixed program participation term.
124.111 Mechanics for extension of a fixed program participation term.
124.112 Program termination.
124.113 Suspension of program assistance.
124.201 Processing applications.
124.202 Place of filing.
124.203 Applicant representatives.
124.204 Requirement support determination.
124.205 Forms and documents required.
124.206 Applicant and declination of applications for eligibility.
124.207 Business activity.
124.301 The provision of requirements support for 8(a) firms.
124.302 8(a) Contracts and subcontracts.
124.401 Advance payments.
124.402 Business development expense.
124.403 Letter of credit.
124.501 Development assistance program.
124.502 Small Business and Capital Ownership Development Program.
124.503 Compliance with the Paperwork Reduction Act of 1980.

Authority: 15 U.S.C. 637(a).

### § 124.1 The Section 8(a) and 7(j) Programs.

(a) *General.* (1) These regulations implement sections 8(a) and 7(j) of the Small Business Act (15 U.S.C. 637(a) and 636 (j)) which establish the Minority Small Business and Capital Ownership Development Program (program). These regulations apply to all section 8(a) concerns participating in the program as of the effective date of these regulations and all concerns applying for admission to the program subsequent to that date.

(2) Section 8(a) authorizes SBA to enter into all types of contracts (including, but not limited to, supply, services, construction, research and development) with other Government departments and agencies, and to negotiate subcontracts for the performance thereof with small business concerns owned and controlled by socially and economically disadvantaged individual(s).

(3) Section 7(j) authorizes SBA to provide financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or small business concerns eligible for assistance under sections 7(a)(11), 7(j)(10), and 8(a) of the Small Business Act.

(b) *Purposes.* (1) It is the purpose of the Section 8(a) program to:

(i) Foster business ownership by individuals who are both socially and economically disadvantaged; (ii) promote the competitive viability of such firms by providing such available contract, financial, technical, and management assistance as may be necessary; and (iii) clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals.

(2) It is the purpose of the Section 7(j) program to: (i) Foster business ownership by individuals in groups that own and control little productive capital; and (ii) promote the competitive viability of such firms by creating a small business and capital ownership development program to provide such available financial, technical, and management assistance as may be necessary.

### § 124.2 Program Management.

The Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB–COD) is responsible for the formulation and execution of the policies and programs under sections 7(j) and 8(a) of the Small Business Act under the supervision of, and responsible to the Administrator of SBA.

### § 124.3 Violations.

Willful violation by an applicant for admission to the section 8(a) program or an applicant for participation in the section 7(j) program of any of SBA's regulations governing its other programs may result in the applicant's denial of admission to the program. Any such violation will be considered by the AA/MSB–COD in making a determination on the admission of an applicant to the program, and such consideration will include the nature and severity of any such violation.

### § 124.100 Definitions and applicability of these regulations.

(a) "Business plan" means the business plan documents as submitted by the applicant section 8(a) concern and approved by SBA which include the objectives, goals, and business projections of a section 8(a) concern, and all written amendments or modifications which have also been approved by SBA.

(b) "Certification of SBA's competency" means a certification by SBA that it is competent to perform the requirement as stated in the contract, and is based upon an assessment of a section 8(a) concern's competency to perform. The assessment does not require a special investigation or the issuance of a Certificate of Competency (COC) as provided for elsewhere in these regulations under the authority of section 8(b)(7) (A), (B), and (C) of the Small Business Act.

(c) "Commitment" means the commitment made by a procuring activity to SBA that the procuring activity will negotiate to place a contract with SBA or subcontract with a section 8(a) concern, provided there is no material change in requirements, availability of funds, or other pertinent factors. A commitment does not mean that an award of a particular contract to SBA and a section 8(a) concern will or must be made.

(d) "Local buy item" means a supply or service purchased to meet the specific needs of one user. Examples include the purchase of nonprofessional services, such as custodial or trash hauling, and construction work.

(e) "Manufacturer" means a concern which owns, operates, or maintains a factory or establishment that produces on the premises the materials, supplies, articles, or equipment described by the business plan. In order to qualify as a manufacturer, a concern must be able to show (1) that it is an established manufacturer of particular goods or goods of general character which may be sought by the Government, or (2) if it is newly entering into such manufacturing activity, that it has made all necessary prior arrangements for space, equipment, and personnel to perform manufacturing operations. A new firm which has made such definite commitments in order to enter a manufacturing business which will later qualify it, shall not be barred from 8(a)

approval because it has not yet done any manufacturing; however, this interpretation is not intended to qualify a firm whose arrangements to use space, equipment, or personnel are contingent upon 8(a) approval. This definition is based upon the Walsh-Healy Public Contracts Act, 41 U.S.C. 35–45.

(f) "National buy item" means an item or service purchased to meet the needs of a system where supply control, inventory management, and procurement responsibility have been assigned to a central procuring activity to support the needs of two or more users of the item. Examples include military clothing purchased by the Defense Personnel Support Center of the Department of Defense, paint or hand tools purchased by the Federal Supply Service of the General Services Administration, medical supplies purchased by the Veterans Administration, or studies, evaluations, consulting services or similar services purchased by the headquarters office of a department or agency.

(g) "Negative control," as used in this part is defined in § 121.3(a)(i), formerly § 121.3–2(a)(i), of these regulations which is entitled "Nature of Control."

(h) "Open requirement" means a requirement submitted to SBA by a procuring activity for possible 8(a) award without a particular 8(a) concern identified as a candidate for the award. Open requirements can be for local buy items or national buy items.

(i) "Primary industry classification" means the four digit Standard Industrial Classification (SIC) Code designation which, for an on-going applicant concern, best describes the industry representing the largest proportion of its business revenues for the previous year or, in the case of a start-up applicant concern, that SIC Code designation which best describes the industry in which it intends to do the most business.

(j) "Regular dealer" means a person who owns, operates, or maintains a store, warehouse, or other establishment in which materials, supplies, articles, or equipment of the general character described in the business plan are bought for the account of such person, kept in stock and sold to the public in the usual course of business. In order to qualify as a regular dealer, the concern must be able to show:

(1) That he has an establishment or leased or assigned space in which he regularly maintains a stock of goods in which he claims to be a dealer; if the space is in a public warehouse, it must be maintained on a continuing, and not on a demand basis;

(2) That the stock maintained is a true inventory from which sales are made; the requirement is not satisfied by a stock of sample or display goods, or by a stock consisting of surplus goods remaining from prior orders, or by a stock unrelated to the supplies which are the subject of the business plan, or by a stock maintained primarily for the purpose of token compliance with the Act from which few, if any, sales are made;

(3) That the goods stocked are of the same general character as the goods in which he claimed to be a dealer; to be of the same general character the items to be supplied must be either identical with those in stock or be goods for which dealers in the same line of business would be an obvious source;

(4) That sales are made regularly from stock on a recurring basis; they cannot be only occasional and constitute an exception to the usual operations of the business; the proportion of sales from stock that will satisfy the requirements will depend upon the character of the business;

(5) That sales are made regularly in the usual course of business to the public, i.e., to purchasers other than Federal, State, or local government agencies; this requirement is not satisfied if the applicant concern merely seeks to sell to the public but has not yet made such sales; if government agencies are the sole purchasers, the applicant concern will not qualify as a regular dealer; the number and amount of sales which must be made to the public will necessarily vary with the amount of total sales and the nature of the business; and

(6) That his business is an established and going concern; it is not sufficient to show that arrangements have been made to set up such a business.

This definition is based upon the Walsh-Healy Public Contracts Act.

(k) "Requirement support" means contract opportunities from Federal procuring agencies to acquire articles, equipment, supplies, services, materials or construction work which a section 8(a) business concern could perform.

(l) "Self-marketing" of an item occurs when a section 8(a) marketing firm identifies a requirement that has not been committed to the section 8(a) program and through its marketing efforts causes the procuring activity to offer that specific requirement to the 8(a) program on its behalf.

(m) *Applicability to participating section 8(a) concerns.* Business plans for all participating section 8(a) concerns shall reflect Standard Industrial Classification Code designations consistent with the requirements of § 124.207 of these regulations. Within 120 calendar days of publication of this final rule, the appropriate SBA field office will review the business plan and related documents of each participating section 8(a) concern and within the same 120-day period will notify each concern by certified mail to its address of record of the SIC Code designations for which it has been approved to receive section 8(a) program contract awards. Within 30 calendar days from the date on which the notice is mailed, a participating concern may request in writing that SBA make a correction in the approved SIC Code designations in its presently approved business plan in order to conform the approved business plan to these regulations. Written approval or disapproval of any such request will be provided by SBA within 60 calendar days of the receipt of the request. Any correction of one or more SIC Code designations will be effective only when SBA gives written approval of such request. After the process is completed as to all concerns participating in the section 8(a) program on the effective date of these regulations, any subsequent changes in SIC Code designations appearing in their business plans must be accomplished pursuant to § 124.207(b).

**§ 124.101 The section 8(a) program: General eligibility.**

(a) In order to be eligible to participate in the section 8(a) program, an individual or an applicant concern must meet all of the eligibility criteria set forth in § 124.102 through § 124.110 hereunder. All determinations made pursuant to §§ 124.102, 124.103, 124.104, 124.105, 124.106, and 124.107 shall be in writing, setting forth the grounds and relevant facts upon which the determination is based, by the AA/MSB–COD, whose decision shall be final.

(b) It is the intent of the Small Business Administration to limit participation in the section 8(a) program to eligible individuals and concerns, and to process applications for participation in a fair and consistent manner. Toward that end, the Small Business Administration invites the participation of the public in preventing fraud and assuring the integrity of the section 8(a) program. The AA/MSB–COD shall review any determination that an individual or applicant concern is eligible to participate in the section 8(a) program whenever a member of the public submits credible evidence that such determination was based on fraudulent information, or that SBA did not follow the requirements of these regulations in rendering the determination. The AA/MSB–COD shall

determine whether the facts developed during any such review warrant further action; provided that any review of potential misconduct by SBA shall be concluded with a detailed report of the findings to the member of the public whose information gave rise to the review.

§ 124.102 Small business concern.

(a) In order to be eligible to participate in the section 8(a) program, an applicant concern must qualify as a small business concern as defined in § 124.4 of the SBA Rules and Regulations (13 CFR 121.4). The particular size standard to be applied will be based on the primary industry classification of the applicant concern.

(b) In order to continue to participate in the section 8(a) program once a concern is admitted to the program, the concern must certify to SBA that it is a small business pursuant to the provisions of § 121.4 for the purpose of performing each individual contract which it is awarded. SBA, in turn , will verify such certifications.

(c) Once admitted to the section 8(a) program, a concern will only be permitted to perform 8(a) contracts which are classified according to the standard industrial classification code numbers which appear in its business plan as established pursuant to § 124.207 of these regulations. A participating section 8(a) business concern is free to pursue *any non-section 8(a) contract* regardless of its Standard Industrial Classification Code number which it is capable and competent to perform.

§ 124.103 Ownership.

In order to be eligible to participate in the section 8(a) program, an applicant concern must be one which is at least 51 percent owned by an individual(s) who is a citizen of the United States (specifically excluding resident alien(s)) and who is determined to be socially and economically disadvantaged by SBA.

(a) In the case of an applicant concern which is a partnership, 51 percent of the partnership interest must be owned by an individual(s) determined to be socially and economically disadvantaged.

(b) In the case of an applicant concern which is a corporation, 51 percent of all classes of voting stock must be owned by an individual(s) determined to be socially and economically disadvantaged.

(c) Part ownership in an applicant concern by nondisadvantaged individual(s) is permitted and may be necessary to insure adequate capital and management for the concern's development. However, any property, equipment, supplies, services and/or financial assistance other than personal services which are sold, rented or donated to the 8(a) concern by such nondisadvantaged individual(s) must be reported to SBA on an annual basis. Such nondisadvantaged individual(s), their spouses or immediate family members may not:

(1) Be former employers of the disadvantaged owner(s) of the applicant concern without prior approval of SBA;

(2) Be affiliated with another business in the same or similar type of business as the applicant concern;

(3) Hold ownership interest in any other 8(a) concern in an amount deemed excessive by SBA;

(4) Exercise negative control over the applicant concern as defined in 13 CFR 121.3(a)(i) (formerly 13 CFR 121.3–2(a)(i)); or

(5) Receive compensation for personal services from the applicant concern as directors or employees which is deemed to be excessive by SBA

(d) Non-section 8(a) concerns in the same or similar line of business are prohibited from having an ownership interest in an applicant concern which is deemed by SBA to cause negative control over the applicant concern, as defined in 13 CFR 121.3(a)(i) (formerly 13 CFR 121.3–2(a)(i)).

(e) A section 8(a) business concern may continue participation in the program subsequent to a change in its ownership. However, any change of ownership of an 8(a) business concern requires the prior written approval of SBA. Continued participation of the 8(a) concern under new ownership requires compliance with all individual and business eligibility requirements of these regulations by the concern and the new owners. Failure of either an individual owner or the concern to maintain compliance constitutes a ground for program termination.

(f) Applicant concerns owned and controlled by an Indian Tribe are eligible for participation in the section 8(a) program if the individuals who manage and control the concern are found to be socially and economically disadvantaged by SBA, and the Tribe is found to be economically disadvantaged by SBA.

(g) Applicant concerns owned and controlled by a Regional Corporation or a Village Corporation as defined in 43 U.S.C. 1602 (Alaska Native Claims Settlement Act, Pub. L. 92–203, December 18, 1971) are eligible for participation in the section 8(a) program if the individuals who manage and control the concern are found to be socially and economically disadvantaged by SBA, and the Regional or Village Corporation is found to be economically disadvantaged by SBA.

§ 124.104 Control and management.

Except in the case of applicant concerns owned and controlled by an Indian tribe or a Regional Corporation or Village Corporation (*see* § 124.103(g)), an applicant concern's management and daily business operations must be controlled by an owner(s) of the applicant concern who has been (have been) determined to be socially and economically disadvantaged, and such owner(s) must own a greater percentage of the business entity than any nondisadvantaged owner, or in the case of a corporation, more voting stock than any nondisadvantaged stockholder.

(a) Individuals who are not socially and economically disadvantaged may be involved in the management of an applicant concern, and may be stockholders, officers, directors, or employees of such concern. However, such individuals shall not exercise actual control or have the power to control the operations of the applicant or section 8(a) business concern. The existence of control or the power to control shall be determined by the facts of each case.

(b) An applicant concern must be managed on a full-time basis by one or more persons who have been found by SBA to be socially and economically disadvantaged, and such person(s) must possess requisite management capabilities as determined by SBA. This precludes outside employment or other business interests by the individual which conflict with the management of the firm or prevent it from achieving the objectives of its business development plan. Any disadvantaged person upon whom section 8(a) eligibility is based, who is engaged in the management and daily business operations of the section 8(a) concern and who wishes to engage in regular outside employment must notify SBA of the nature and anticipated duration of the outside employment prior to engaging in such employment. SBA will review such notification for compliance with the requirement of day-to-day management and control of the 8(a) concern.

§ 124.105 Social disadvantage.

(a) General. Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because their identity as a member of a group without regard to their individual qualities. The social disadvantage of individuals must stem

from circumstances beyond their control.

(b) *Members of designated groups.* In the absence of evidence to the contrary, the following individuals are considered socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, U.S. Trust Territory of the Pacific Islands, Northern Mariana Islands, Laos, Cambodia, or Taiwan); Subcontinent Asian Americans; and members of other groups designated from time to time by SBA according to procedures set forth at § 124.105(d) of this part.

(c) *Individuals not members of designated groups.*

(1) Individuals who are not members of the above-named groups must establish their social disadvantage on the basis of clear and convincing evidence. A clear and convincing case of social disadvantage must include the following elements:

(i) The individual's social disadvantage must stem from his or her color; national origin; gender; physical handicap; long-term residence in an environment isolated from the mainstream of American society; or other similar cause not common to small business persons who are not socially disadvantaged.

(ii) The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged.

(iii) The individual's social disadvantage must be rooted in treatment which he or she has experienced in American society, not in other countries.

(iv) The individual's social disadvantage must be chronic, longstanding, and substantial, not fleeting or insignificant.

(v) The individual's social disadvantage must have negatively impacted on his or her entry into, and/or advancement in, the business world. SBA will entertain any relevant evidence in assessing this element of an applicant's case. SBA will particularly consider and place emphasis on the following experiences of the individual, where relevant: education, employment, and business history.

(A) *Education.* SBA shall consider, as evidence of an individual's social disadvantage, denial of equal access to business or professional schools; denial of equal access to curricula; exclusion from social and professional association with students and teachers; denial of educational honors; social patterns or pressures which have discouraged the individual from pursuing a professional or business education; and other similar factors.

(B) *Employment.* SBA shall consider, as evidence of an individual's social disadvantage, discrimination in hiring; discrimination in promotions and other aspects of professional advancement; discrimination in pay and fringe benefits; discrimination in other terms and conditions of employment; retaliatory behavior by a employer; social patterns or pressures which have channelled the individual into non-professional or non-business fields; and other similar factors.

(C) *Business history.* SBA shall consider, as evidence of an individual's social disadvantage, unequal access to credit or capital; acquisition of credit or capital under unfavorable circumstances; discrimination in receipt (award and/or bid) of government contracts; discrimination by potential clients; exclusion from business or professional organizations; and other similar factors which have retarded the individual's business development.

(d) *Minority group inclusion*—(1) *General.* Upon an adequate showing to SBA by representatives of a minority group that the group has suffered chronic racial or ethnic prejudice or cultural bias, and upon the request of the representatives of the group that SBA do so, SBA shall publish in the **Federal Register** a notice of its receipt of a request that it consider a minority group not specifically named in section 201 of Pub. L. 95–507 to have members which are socially disadvantaged because of their identification as members of the group for the purpose of eligibility for the section 8(a) program. The notice shall adequately identify the minority group making the request, and if a hearing is requested on the matter, the time, date and location at which such hearing is to be held. All information submitted to support a request should be addressed to the AAMSB–COD.

(2) *Standards to be applied.* In determining whether a minority group has made an adequate showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this regulation, SBA shall determine: (i) If the group has suffered the effects of discriminatory practices or similar invidious circumstances over which its members have no control, (ii) if the group has generally suffered from prejudice or bias, (iii) if such conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in Pub. L. 95–507, and (iv) if such conditions have produced impediments in the business world for members of the group over which they have no control which are not common to all small business people. If it is demonstrated to SBA by a particular group that it satisfies the above criteria, SBA will publish a notice under this regulation.

(3) *Procedure.* Once a notice is published under this regulation, SBA shall adduce further information on the record of the proceeding which tends to support or refute the group's request. Such information may be submitted by any member of the public, including Government representatives and any member of the private sector. Information may be submitted in written form, or orally at such hearings as SBA may hold on the matter.

(4) *Decision.* Once SBA has published a notice under this regulation, it shall afford a reasonable comment period of not more than thirty (30) days for public comment upon a request. It shall complete the reception of comments, including the holding of hearings within such comment period. Thereafter, SBA shall consider the comments received as expeditiously as possible, and shall render its final decision within 30 days of the close of receipt of information on the matter. Such decision shall take the form of a notice in the **Federal Register**, and SBA shall also inform the subject group representatives who have appeared in the proceeding of such decision in writing at the time it is made.

**§ 124.106 Economic disadvantage.**

(a) *General.* For purposes of the section 8(a) program, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged.

(b) *Factors to be considered.* In determining the degree of diminished credit and capital opportunities of a socially disadvantaged individual, consideration will be given to both the disadvantaged individual and the applicant concern with which he or she is affiliated. Factors to be analyzed depend upon the particular industry in which the applicant concern is involved. Such factors may include, but are not limited to, the following:

(1) *Personal financial condition of the disadvantaged individual.* This criterion is designed to assess the relative degree

of economic disadvantage of the individual in comparison to other individuals, as well as the potential to capitalize or otherwise provide financial support to the business. The specific factors considered are: personal income for at least the past two years; total fair market value of all assets (except that the *equity* value of the individual's primary residence will be considered); and the net worth of all holdings of the individual.

(2) *Business financial condition.* This criterion is designed to evaluate liquidity, leverage, operating efficiency and profitability of the applicant concern using commonly accepted financial ratios and percentages. This evaluation will be used to provide a financial picture of a firm at a specific point in time in comparision to other concerns in the same business area who are not socially disadvantaged. These factors are considered as indicators of a firm's economic disadvantage relative to businesses owned by non-socially disadvantaged individuals. Factors to be considered are business assets, net worth, income and profit. Also, factors to be compared include, but are not limited to: Current ratios, quick ratios, inventory turnover; accounts receivable turnover; sales to working capital; returns on assets; debt to net worth ratio; percentage return on investment; percentage gross profit margin; and percentage return on sales.

(3) *Access to credit and capital.* This criterion will be used to evaluate the ability of the applicant concern to obtain the external support necessary to operate a competitive business enterprise. The factors to be considered are: Access to long-term financing; access to working capital financing; equipment trade credit; access to raw materials and/or supplier trade credit; bonding capability.

(4) *Additional considerations.* A comparison will be made of the applicant concern's business and financial profile with profiles of businesses in the same or similar line of business and competitive market area. It is not the intent of the section 8(a) program to allow program participation to concerns owned and controlled by socially disadvantaged individuals who have accumulated substantial wealth, have unlimited growth potential and have not experienced or have overcome impediments to obtaining access to financing, markets and resources.

**§ 124.107 Potential for success.**

To be eligible to participate in the section 8(a) program, an otherwise eligible applicant concern must be determined to be one that with contract, financial, technical and management support will be able to successfully perform subcontracts awarded under the section 8(a) program, and further, with such support, will have a reasonable prospect for success in competition in the private sector within the maximum amount of time that a concern may be in the section 8(a) program (up to seven years). In addition, the AA/MSB–COD must make a determination that the procurement, financial, technical and management support necessary to enable the applicant concern to successfully complete the section 8(a) program is available from SBA or other identified and acceptable sources before the applicant concern may be admitted to the section 8(a) program.

**§ 124.108 Additional eligibility requirements.**

(a) *Individual character review.* If, during the processing of an application, adverse information is obtained from the section 8(a) program application or a credible source regarding criminal conduct by an individual applicant, no further action will be taken on the application until the adverse information has been forwarded through appropriate channels to the SBA's Inspector General for evaluation and that evaluation has been completed. The Inspector General will advise the AA/MSB–COD of his or her findings and the AA/MSB–COD will consider those findings as part of the process of evaluation of a particular application.

(b) *Standard of conduct.* The SBA Standards of Conduct regulations, 13 CFR 105, *et seq.*, apply to eligibility questions involving SBA employees and their relatives.

(c) *Individual eligibility limitations.* An individual's or business concern's eligibility may be used only once in qualifying for section 8(a) program participation.

(1) The AA/MSB–COD may reinstate a former section 8(a) program participant if:

(i) The section 8(a) concern has totally ceased its business operations; and

(ii) The section 8(a) concern voluntarily withdrew from the section 8(a) program due to—

(A) The health of a disadvantaged owner;

(B) Acts of God which destroyed or severely disrupted the operation of such concern; or

(C) Such other circumstances beyond the control of the section 8(a) concern which inequitably interrupted the continued participation of the concern in the section 8(a) program.

(2) Where a section 8(a) concern is reinstated pursuant to paragraph (c)(1) of this section, it will continue in the section 8(a) program for that amount of time which remained in its Fixed Program Participation Term at the time it withdrew from the program. A new Fixed Program Participation Term shall not be established for such concern.

(d) *Manufacturers and regular dealers.* Each applicant concern which intends to manufacture or furnish materials, supplies, articles and equipment in the performance of section 8(a) subcontracts must be determined to be a manufacturer or regular dealer as defined in the Walsh-Healey Public Contracts Act Regulations found at 48 CFR Subpart 22.6.

**§ 124.109 Ineligible businesses.**

(a) *Brokers and Packagers.* Brokers and packagers are ineligible to participate in the section 8(a) program. These types of businesses do not satisfy the definition of a manufacturer or regular dealer, as stated in § 124.100 of this part.

(b) *Debarred or Suspended Person or Concern.* Individuals or concerns who are debarred, suspended, or are found to be an ineligible bidder by any contracting agency of the Federal Government pursuant to 48 CFR Chapter I, Subpart 9.4 are ineligible for admission into the section 8(a) program during the period of debarrment, suspension, or status as an ineligible bidder. Prior to approval of any applicant concern, the applicant concern will certify that the applicant concern and the disadvantaged individual(s) upon whom eligibility is based is not at that time debarred, suspended or otherwise an ineligible bidder.

**§ 124.110 Fixed program participation term.**

(a) Every section 8(a) program participant is subject to a Fixed Program Participation Term. A Fixed Program Participation Term and any extension thereof establishes the ultimate time period during which a concern may remain in the section 8(a) program and the conditions of participation, regardless of whether competitiveness is reached by the concern.

(b) The Fixed Program Participation Term must be negotiated between SBA and each small concern which has applied for participation in the program and must be established by mutual agreement prior to the concern's admission to the program.

(c) The provisions of the Fixed Program Participation Term, including the time limitation thereof, will be set

forth in the SBA approved business plan of the section 8(a) concern which must be established prior to the applicant concern's admission to the program.

(d) For concerns applying for entry into the program, the Fixed Program Participation Term will begin on the date of award of the concern's first section 8(a) subcontract.

(e) The maximum Fixed Program Participation Term for any concern is five years.

(f) Not less than one year prior to the expiration of the Fixed Program Participation Term, a concern may request SBA to review and extend its Fixed Program Participation Term for a period not to exceed the difference between the Fixed Program Participation Term established in the business plan and the maximum Fixed Program Participation Term of five years, plus two years. For business concerns which have a Fixed Program Participating Term of one year, a request for extension shall be deemed to be timely if postmarked no later than 10 days subsequent to the receipt by the concern of notification of award of the concern's first section 8(a) subcontract. There may be no further extensions.

(g) The criteria which SBA will use in negotiating a Fixed Program Participation Term or in considering a request for an extension thereof are as follows:

(1) The factors referenced in § 124.106 of these regulations for determining economic disadvantage.

(2)(i) The number and dollar amount, and the progressively decreasing importance, of section 8(a) contract support that it is anticipated will be necessary to achieve competitiveness. In order to maximize limited program resources, SBA will emphasize business plans anticipating lesser amounts of section 8(a) contract support to reach competitiveness.

(ii) In considering whether to grant an extension of a Fixed Program Participation Term, the section 8(a) contract support previously received by the concern will be a factor. An SBA determination that such previous contract support has failed to appreciably contribute toward a timely achievement of competitiveness will be a significant factor in consideration of the request for extension.

(3) (i) The number and dollar amount and the progressively increasing importance of contract support, other than section 8(a) contract support, that it is anticipated will be necessary to achieve competitiveness. SBA will emphasize business plans having greater reliance on this non-section 8(a) contract support to reach competitiveness.

(ii) In considering a Fixed Program Participation Term extension request, the non-section 8(a) contract support previously received by the firm will be a factor. An SBA determination that the concern has failed to progressively increase the importance of such non-section 8(a) contract support during its previous participation in the program will be a significant factor in SBA's consideration of the request for extension.

(4) (i) The length of time that it is anticipated will be necessary to achieve competitiveness. In order to maximize limited program resources, SBA will emphasize program participation for those concerns closer to achieving competitiveness.

(ii) In considering requests for Fixed Program Participation Term extensions, the length of time during which the concern has previously participated in the program will be a factor.

(5) (i) The degree to which it is anticipated that Advance Payments and Business Development Expense will be necessary to enable a concern to successfully complete section 8(a) contracts and the extent to which reliance upon such proceeds will progressively decrease in importance. In order to maximize limited SBA resources and to increase exposure to regular competitive procedures, SBA will emphasize maximum use of conventional governmental and private resources in performing such contracts.

(ii) In considering requests for a Fixed Program Participation Term extension, the previous Advance Payments and Business Development Expense already received by the concern will be a factor. An SBA determination that such Advance Payments and Business Development Expense support has failed to progressively decrease in importance during the concern's previous participation in the program will be a factor toward limiting or denying extension of the Fixed Program Participation Term and the conditions thereof.

(6) (i) The rate at which it is anticipated that a concern will decrease its reliance upon all forms of program support, especially section 8(a) contracts support, in reaching competitiveness at the end of the Fixed Program Participation Term.

(ii) In considering Fixed Program Participation Term extensions, a factor will be the previous rate at which the concern has decreased its reliance upon program support and correspondingly increased its reliance upon conventional governmental and private contract business. An SBA determination that the concern has failed to appreciably improve its rate of business reliance in this manner will be a factor toward limiting or denying the Fixed Program Participation Term extension and the conditions thereof.

(h) No section 8(a) contracts may be awarded to any section 8(a) concern unless it has received and is operating under an SBA approved Fixed Program Participation Term.

(i) Nothing in this section shall be construed to limit SBA from initiating termination, completion or suspension actions, pursuant to §§ 124.112, 124.110(k), or 124.113, respectively, during any Fixed Program Participation Term granted hereunder.

(j) Upon the conclusion of its Fixed Program Participation Term, including any extension thereof, a concern will cease to be a program participant. This cessation of program participation will occur without the necessity of any additional action by SBA. It will not give rise to any rights, claims or prerogatives on behalf of the concern. Cessation of program participation at the conclusion of the Fixed Program Participation Term is not subject to the requirements of section 8(a)(9) of the Small Business Act (15 U.S.C. 637(a)(9)), or any of SBA's implementing rules and regulations.

(k) *Program completion.* (1) When a section 8(a) business concern has substantially achieved the goals and objectives set forth in its business plan prior to the expiration of its Fixed Program Participation Term, and has demonstrated the ability to compete in the marketplace without assistance under the section 8(a) program, its participation within the program shall be determined by SBA to be completed.

(2) In determining whether a concern has substantially achieved the goals and objectives of its business plan and has attained the ability to compete in the marketplace without section 8(a) program assistance, the following factors, among others, shall be considered by SBA.

(i) Positive overall financial trends, including but not limited to:

(A) Profitability;

(B) Sales, including improved ratio of non-section 8(a) sales;

(C) Net worth, financial ratios, working capital, capitalization, access to credit and capital;

(D) Ability to obtain bonding;

(E) A positive comparison of the section 8(a) business concern's business and financial profile with profiles of non-section 8(a) businesses in the same area or similar business category; and

(F) Good management capacity and capability.

(3) Upon determination by SBA that a section 8(a) business concern's participation in the section 8(a) program has been completed pursuant to paragraph (k)(1) of this section, SBA shall so advise the firm and shall issue it an order to show cause why its participation in the section 8(a) program should not be deemed to be completed. The section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the procedures of SBA's Office of Hearings and Appeals set forth at Part 134 of these regulations.

(4) Subsequent to the completion of such hearing, based upon the record established therein, and after consideration of the initial decision of the Administrative Law Judge who has conducted the hearing, the AA/MSB–COD shall render a final decision regarding the completion of the section 8(a) business concern's participation in the program. Prior to a final decision, the subject section 8(a) business concern may have full rights of participation in the section 8(a) program.

**§ 124.111 Mechanics for extension of a fixed program participation term.**

As stated in § 124.110(f), a section 8(a) concern's Fixed Program Participation Term (FPPT) may be extended only once, and only if the application for such an extension is made not less than one year prior to the expiration of the firm's original Fixed Program Participation Term.

(a) *The request.* The section 8(a) concern must make a request for extension in writing by certified mail, return receipt requested, or by registered mail, to the SBA field office servicing its account, not less than one year prior to the expiration of the FPPT, specifically requesting an extension of its FPPT.

(b) *SBA response.* Upon receipt of a timely request, the appropriate SBA field office will forward to the section 8(a) concern all forms needed to process the request. All required forms must be completed and returned to SBA within 45 days of receipt along with a persuasive narrative rationale to establish the basis for justifying the requested extension.

(C) *Narrative rationale.* The narrative rationale submitted by the section 8(a) concern must detail the following:

(1) The firm's progress since admission into the 8(a) program;

(2) Areas where the firm has failed to make progress anticipated when the original FPPT was set;

(3) Reasons for lack of progress;

(4) Benefits to be derived from an extension, other than increase in contract support;

(5) Any extenuating circumstances unique to the firm which cause an extension to be necessary and appropriate;

(6) Any other facts which the firm believes support its request.

(d) *Non waiver of time limits.* Neither the requirement of § 124.110(f) to make a request for an extension of a concern's FPPT not less than one year prior to the expiration of a concern's original FPPT, nor the requirement of § 124.111(b) to return all forms and documentation completed along with the supporting narrative within 45 days may be waived. Failure to meet either time limit will result in denial of an extension of an FPPT.

(e) *Approval authority.* Unless otherwise delegated by the Administrator, the AA/MSB–COD has final authority to approve the concern's request for an extension, and may in his discretion approve an extension less than that requested, set terms and conditions for any extension granted, or deny any extension. The concern will be advised in writing of the Agency's final decision.

**§ 124.112 Program termination.**

(a) Participation of a section 8(a) business concern in the section 8(a) program may be terminated by SBA prior to the expiration of the concern's fixed program participation term or extension thereof, if any, for good cause. The term good cause as used in the regulation means conduct violative of applicable State and Federal law or regulations or the pursuit of business practices detrimental to business development of an 8(a) concern. Examples of good cause include, but are not limited to, the following:

(1) Failure to continue to meet any one of the standards of program eligibility set forth in these regulations.

(2) Failure by the concern to maintain status as a small business under the Small Business Act, as amended, and the regulations promulgated thereunder for each of the Standard Industrial Code designations contained in the participating concern's business plan.

(3) Failure by the concern for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership and control by the persons(s) who has (have) been determined to be socially and economically disadvantaged pursuant to these regulations.

(4) Failure by the concern to obtain written approval from SBA prior to any changes in ownership and management control.

(5) Failure by the concern to disclose to SBA the extent to which nondisadvantaged persons or firms participate in the management of the section 8(a) business concern.

(6) Failure by the concern to provide SBA with required quarterly or annual financial statements within ninety days of the close of the reporting period, or required audited financial statements within 180 days of the close of the reporting period. Failure to provide SBA with requested tax returns, reports, or other available data within 30 days of the date of request.

(7) Failure by the concern to submit an updated business plan within 30 days of receipt of request, without an extension of time which has been approved by SBA.

(8) Failure by the concern to provide documents or otherwise respond to requests for information relating to the section 8(a) program from SBA or other authorized government officials.

(9) Cessation of business operations by the concern.

(10) Failure by the concern to achieve the goals cited in its original or modified business plan as a result of repeated refusals to accept or utilize SBA assistance.

(11) Failure by the concern to pursue competitive and commercial business in accordance with the business plan, or failure to make reasonable efforts to achieve competitive status.

(12) Inadequate performance of awarded section 8(a) procurement subscontracts by the concern.

(13) Failure by the concern to pay or repay significant financial obligations owed to the Federal Government.

(14) Failure by the concern to obtain and keep current any and all required permits, licenses, and charters.

(15) Diversion of funds from the section 8(a) business concern to any other individual, subsidiary, firm, or enterprise which is detrimental to the achievement of the section 8(a) business concern's business plan.

(16) Unauthorized use of business development expense funds and/or advance payment funds. Violation of an advance payment or business development expense agreement.

(17) Failure by the concern to obtain prior SBA approval of any management agreement or joint venture agreement relative to the performance of a section 8(a) subcontract. Violation of any

requirements of a management or joint venture agreement approved by SBA by either the section 8(a) concern or one of the joint venturers.

(18) Failure by the concern to obtain approval from SBA before subcontracting under a section 8(a) subcontract, or failure by the concern to abide by any conditions imposed by SBA upon such approval.

(19) Violation by the concern of a section 8(a) subcontract provision which prohibits contingent fees and gratuities; or failure to disclose to SBA fees paid or to be paid, or costs incurred or committed to third parties, directly or indirectly, in the process of obtaining section 8(a) contracts or subcontracts.

(20) Knowing submission of false information to SBA on behalf of a section 8(a) business concern by its principals, officers, or agents, or by its employees, where the principal(s) of the section 8(a) concern knows or should have known such submission to be false.

(21) Debarment or suspension of the concern by the Comptroller General, the Secretary of Labor, Director of the Office of Federal Contract Compliance, or any contracting agency pursuant to FAR subpart 9.4, 48 CFR Ch. 1.

(22) Conviction of a section 8(a) business concern or a principal of a section 8(a) business concern for any of the following:

(i) Commission of a criminal offense as an incident to obtaining or attempting to obtain a public or private contract, or subcontract thereunder, or in the performance of such contract or subcontract;

(ii) Violation of the Organized Crime Control Act of 1970;

(iii) Embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business integrity or business honesty which seriously and directly affects the question of present responsibility as a government contractor;

(iv) Violation of any Federal Antitrust Statute; or

(v) Commission of any felony not specifically listed above by the concern or any of its principals.

(23) Willful failure on behalf of a section 8(a) business concern to comply with applicable labor standards obligations.

(24) Violation of any terms and conditions of the 8(a) program Participation Agreement.

(25) Violation by a section 8(a) business concern, or any of its principals, of any of SBA's significant rules and regulations.

(b) Upon determination by the SBA that a section 8(a) business concern's participation in the section 8(a) program should be terminated for good cause, the section 8(a) business concern shall be afforded an opportunity for a hearing on the record in accordance with chapter 5 of Title 5 of the United States Code, at which hearing it may contest such determination. Such a hearing will be held pursuant to the procedures established for SBA's Office of Hearings and Appeals set forth at Part 134 of this title.

(c) Subsequent to the completion of such hearing, upon the record established therein, and after consideration of the initial decision of the Administrative Law Judge who has conducted the hearing, pursuant to §§ 134.32 and 134.34 of these regulations, the AA/MSB–COD shall render a final decision regarding the termination, for good cause, of the 8(a) business concern's participation in the program.

(d) After the effective date of a program termination as provided for herein, a section 8(a) business concern is no longer eligible to receive any section 8(a) program assistance. Such concern is obligated to complete previously awarded section 8(a) subcontracts.

**§ 124.113 Suspension of program assistance.**

(a) Only upon the issuance of an order to show cause why a section 8(a) business concern should not be terminated from the program, the Administrator of SBA or the AA/MSB–COD may suspend contract support and other forms of 8(a) program assistance to that concern for a period of time not to exceed the time necessary to resolve the issue of the concern's termination from the program under the procedures set forth in Part 134 of these regulations. The institution of such a suspension will not occur in conjunction with each proposed termination, but will only occur when the SBA Administrator or AA/MSB–COD determines that the Government's interests are jeopardized by continuing to make assistance available to a section 8(a) business concern and immediate action to protect those interests is necessary.

(b) Immediately upon SBA's determination to suspend a section 8(a) concern, SBA will furnish that concern with a notice of the supension by certified mail, return receipt requested, to the last known address of the concern. If no receipt is returned within ten calendar days from the mailing of the notice, notice will be presumed to have occurred as of that time. The notice of suspension will provide the following information:

(1) The reason for the suspension which will be the grounds upon which the order to show cause has been issued;

(2) That the suspension will continue pending the completion of further investigation or the termination proceeding or some other specified period of time;

(3) That awards of section 8(a) subcontracts, including those which have been "self-marketed" by an 8(a) concern, will not be made during the pendency of the suspension unless it is determined by the head of the relevant procuring agency or his or her authorized representative to be in the best interest of the Government to do so, and the SBA Administrator or the AA/MSB–COD adopts that determination;

(4) That the concern is obligated to complete previously awarded section 8(a) subcontracts;

(5) That the suspension is effective nationally throughout the SBA;

(6) That a request for a hearing on the suspension will be considered by the Administrative Law Judge hearing the termination proceeding and granted or denied as a matter of his or her discretion. It is contemplated that in most cases a hearing on the issue of the suspension will be afforded if the participant requests one. However, no such hearing may be granted if the suspension is based upon advice from either the Department of Justice or the Department of Labor that such a hearing would prejudice substantial interests of the Government. A hearing on the suspension will commence as soon as possible following the decision of the Administrative Law Judge to grant a request; but in no case more than 20 calendar days after the Administrative Law Judge's ruling if the request is granted. At the close of such suspension hearing, the Administrative Law Judge will make a recommended decision on the matter to the AA/MSB-COD who will then issue a final decision upholding or lifting the suspension.

(c) Any suspension which occurs in accord with these regulations will continue in effect until such time as the SBA lifts it or the section 8(a) business concern's participation in the program is fully terminated. If all program assistance to a section 8(a) business concern has been suspended under these regulations, and that concern's participation in the program is not terminated, an amount of time equal to the duration of the suspension will be added to the concern's fixed program participation term.

**§ 124.201 Processing applications.**

It is SBA's policy that an individual or business has the right to apply for section 8(a) assistance, whether or not there is an appearance of eligibility.

**§ 124.202 Place of filing.**

An application for admission is to be filed, and approved cases are to be serviced in the SBA field office serving the territory in which the principal place of business of the applicant concern is located. Principal place of business means the location at which the business records of the applicant concern are maintained.

**§ 124.203 Applicant representatives.**

An applicant concern may employ at its option outside representatives in connection with an application for section 8(a) program participation. If the applicant chooses to employ outside representation such as an attorney, accountant, or others, the requirements of 13 CFR 103 dealing with the appearance and compensation of persons appearing before SBA are applicable to the conduct of the representative.

**§ 124.204 Requirement support determination.**

SBA shall first make a determination that there is a reasonable likelihood of section 8(a) requirements available to support the applicant concern. If the necessary requirement support is not available, the applicant concern shall be informed in writing that no further action can be taken on its application for participation in the section 8(a) program. If the necessary requirements support is determined to be available, the applicant concern may continue to submit the required application forms.

**§ 124.205 Forms and documents required.**

Each 8(a) applicant concern must submit the forms and attachments thereto required by SBA when making application for admission to the section 8(a) program including but not limited to financial statements and Federal personal and business tax returns.

**§ 124.206 Approval and declination of applications for eligibility.**

The AA/MSB–COD has final authority over approval or declination of applications for admission to the section 8(a) program. If the AA/MSB–COD declines an application, he or she will notify the applicant in writing giving detailed reasons for the decline and informing the applicant of the right to request a reconsideration within 30 days of receipt of the decline letter. The AA/MSB–COD will also inform the applicant to submit in writing to the field office any subsequent information and documentation pertinent to rebutting the reason(s) for decline. If the application is declined by the AA/MSB–COD on reconsideration, no new application will be accepted within one year of the reconsideration decision.

**§ 124.207 Business activity.**

(a) Eligible concerns will be approved for section 8(a) program participation according to their primary industry classification, as defined in § 124.100 of this part. The primary industry classification relevant to a given concern and related Standard Industrial Classification Code designations will be stated in a participating concern's business plan upon the concern's entry into the section 8(a) program and will be subject to change thereafter only if a condition of subsection (b) is met. A participating section 8(a) business concern will be eligible to receive only Government contracts pursuant to the section 8(a) program which are classified under the Standard Industrial Classification Codes stated in its business plan. (*See* definition of "business plan," § 124.100(a).) A participating section 8(a) business concern may, however, receive Government contracts classified in other Standard Industrial Classification Codes through other Government procurement procedures. As 8(a) concerns develop, it is essential that they pursue commercial and competitive Government contracts to supplement section 8(a) sales and to achieve logical business progression or diversification.

(b) Requests for changes in Standard Industrial Classification Code designations stated in a business plan will be considered by the relevant SBA Regional Administrator only under the circumstances indicated below.

(1) Such Regional Administrator may approve an amendment to the Standard Industrial Classification Code designations in a section 8(a) concern's business plan if:

(i) The new Standard Industrial Classification Code designation relates to a unique procedure or product that the section 8(a) concern has developed; or

(ii) SBA determines that an additional Standard Industrial Classification Code designation is needed to correct significant limitations in section 8(a) contract support which result from administrative or regulatory actions by a contracting agency, which are beyond the control of the section 8(a) concern, and which were not contemplated by the original business plan.

(2) The Administrator or his designee may approve an amendment to the Standard Industrial Classification Code designations in a section 8(a) concern's business plan if the Administrator or his designee determines that absent a Standard Industrial Classification Code designation change, the section 8(a) concern would be unable to achieve reasonable section 8(a) development.

**§ 124.301 The provision of requirements support for 8(a) firms.**

(a) These regulations govern the mechanics of the provision of requirements (contract) support to section 8(a) business concerns. They are to be read in conjunction with § 124.302 below.

(b) Basic Principles of Requirements Support.

(1) An 8(a) subcontract will be provided to a section 8(a) concern only when consistent with that concern's business development needs.

(2) An 8(a) concern will be provided a section 8(a) contract only when the procurement is consistent with the concern's capabilities as identified in its business plan by means of Standard Industrial Classification (SIC) codes.

(3) The aggregate dollar amount of 8(a) contracts to an 8(a) concern for any Federal fiscal year may not exceed by more than 25 percent the applicable annual 8(a) contract support level approved by SBA as reflected in the concern's business plan. This shall not preclude an 8(a) concern from requesting an increase in its approved 8(a) contract support level on other than an annual basis. Such request must be supported by a revised business plan and evidence that the firm has the capability to perform at the increased level.

(4) SBA does not guarantee any particular level of contract support to a section 8(a) business concern by the approval of its business plan.

(5) SBA is not required to make an award of any particular contract, and should it make an award, SBA is not required to award a contract to a particular 8(a) concern. Nonetheless, SBA will usually reserve a procurement for possible 8(a) award in favor of an 8(a) concern which initially self-marketed the procurement, provided the firm needs the requirement to satisfy its business plan projections without exceeding them.

(6) In cases in which SBA must select an 8(a) concern for possible award from among more than one concern which appear to be qualified to perform the contract, the selection will be based upon consideration of relevant factors, including the following:

(i) Technical capability, including the ability to perform the contract, the concern's organizational structure, the experience and technical knowledge of its key employees, and technical equipment and facilities.

(ii) Financial capacity, including the availability of adequate financial resources or the ability to obtain such resources as required.

(iii) Ability to comply with the required delivery or performance schedules.

(iv) Ability to obtain any necessary bonding.

(v) Any applicable geographic limitations.

(vi) The concern's need for the specific contract to further the development objectives of the concern's business plan, in light of any other potential contracts under consideration.

(vii) The overall likelihood of successful performance of the proposed requirement.

(viii) Past amount of 8(a) contract support received by the concern and the performance record on past 8(a) contracts.

(ix) Current contracts in process, and progress toward timely delivery of those contracts.

(x) Length of time inthe 8(a) program and the proximity of the FPPT date. (xi) Amount of BDE and advance payment support received since entering the 8(a) program and required to perform the present requirement. (xii) Which 8(a) concern initially indentified the procurement, if any.

(7) In cases in which SBA must select an 8(a) concern for possible award of a professional service contract (except CPA audit services) SBA may, in its discretion, arrange for the evalution of technical capabilities of several concerns, which appear to be most qualified, by the procuring agency itself. In such cases, SBA will request a written report of the evaluation including the criteria used, the results found, and an overall evaluation of each concern as technically or not technically acceptable for their particular procurement. SBA will make the final selection.

(8) SBA will not accept for 8(a) award proposed procurements not previously in the section 8(a) program if any of the following circumstances exist:

(i) Public solicitation has already been issued for the procurement as a small business set-aside in the form of an Invitation for Bid (IFB), Request for Proposal (RFP) or a Request for Quotation (RFQ). Providence of a general intent to set aside, such as Procurement Information Notices (PIN's), annual procurement forecasts or past procurements by set aside, is insufficient reasons to preclude the procurement from 8(a) consideration.

(ii) The procuring agency will award the contract by noncompetitive means to a small disadvantaged concern whether or not it is presently in the 8(a) program.

(iii) There is a reasonable probability that a small disadvantaged concern, whether or not a section 8(a) concern, can successfully compete for the contract under conventional competitive procedures.

(iv) SAB has made a written determination that acceptance of the procurement for an 8(a) award would have an adverse impact on other small business programs or individual small business, whether or not the affected small business, is in the section 8(a) program.

(A) In determining whether or not adverse impact exists, SBA will consider relevant factors, including but not limited to:

(*1*) Whether or not SBA's acceptance of a proposed *National* buy requirement is likely to result in SBA's taking an inordinate portion of total procurements in subject industry to the detriment of the small business set-aside program, or

(*2*) Whether or not SBA's acceptance of a proposed *local* buy requirement is likely to result in SBA taking an inordinate portion of total procurements, in subject industry within a given SBA region to the detriment of the small business set-aside program.

(B) SBA presumes adverse impact to exist when a small business concern has been the recipient of two or more consecutive awards of the item or service within the last 24 months, and the estimated dollar value of the award would be 25 percent or more of its most recent annual gross sales (including those of its affiliates).

(c) Procedures for Obtaining Requirements Support

(1) SBA procurement center representatives (PCR's) will screen proposed procurements for possible 8(a) contracts, in accordance with 13 CFR Part 125.6.

(2) A requirement for possible award may be identified by SBA, a particular 8(a) concern, or the procuring activity itself. Once identified by whatever means, SBA shall verify the appropriateness of the SIC Code designation assigned to the requirement and shall select and nominate to the procuring agency an 8(a) concern for possible award. The selection will be made pursuant to these regulations and will be based on the business plan and such supplemental materials as SBA may request. If the 8(a) concern fails to provide SBA with the supplemental materials requested within any particular time specified by SBA, SBA will make its selection based solely on information contained in the concern's business plan.

(3) SBA's nomination of a section 8(a) concern to perform an indentified procurement shall be communicated to the procuring activity in writing with notice to the 8(a) concern.

(4) If the procuring activity responds to SBA's nomination, or request for commitment, by making a commitment to SBA, SBA will then match the specific needs of the procurement with the specific capabilities of the selected 8(a) concern, relying upon the business plan and such supplemental or updated material as SBA in its discretion shall require. To facilitate matching, and to the extent reasonably available, SBA will obtain from the procuring activity the complete procurement package, which contains plants, specifications, delivery schedules, labor rates and so forth, along with the following:

(i) The title or name or work to be performed or items to be delivered.

(ii) The estimated period of performance.

(iii) The SIC code of the item or service.

(iv) The PSC number used by the Federal Procurement Data Center.

(v) The procuring agency dollar estimate of the requirement (current government estimate).

(vi) Any special requirement restrictions or geographical limitations.

(vii) Any special capabilities or disciplines needed for contract performance.

(viii) The type of contract to be awarded, such as firm fixed price, cost reimbursement, or time and materials.

(ix) A list of contractors who have performed on this specific procurement during the previous 36 months.

(x) A statement that public solicitation for the specific procurement has not been issued for small business set aside.

(xi) A statement that the procurement cannot reasonably be expected to be won by a disadvantaged concern under normal competition.

(xii) The nomination of any particular 8(a) concern designated for consideration, including a brief justification, such as one of the following:

(A) The requirement is a result of an unsolicited proposal and the buying activity is unable to justify a sole-source award.

(B) The 8(a) concern through its own efforts, marketed the requirement and

caused it to be reserved for the 8(a) program.

(C) The procuring agency has determined that the recommended concern has unusual technical qualifications to perform.

(5) Within ten working days of a commitment from a procuring activity identifying a particular 8(a) concern, SBA will determine whether a proper match exists, and will contract the procuring activity to arrange for initiation of contact negotiations. A letter accepting the commitment should normally be sent to the procuring activity at this time. Should contract negotiations be successful and result in a proposed award to the 8(a) concern, SBA will provide a Certification of SBA's Competency as a contract provision pursuant to § 124.302(c) of these regulations. Should SBA determine that a proper match does not exist, it will so advise the affected 8(a) concern, and may then select and nominate an alternative 8(a) concern to the procuring activity which, in the opinion of SBA, does match with the procurement, if any such concern exists.

(6) Should a procuring activity offer a contract to SBA as an open requirement, SBA will select and nominate in accordance with these regulations an 8(a) concern which appears to be qualified, subject to the following additional procedures:

(i) If the contract is a local buy item, the portfolio of 8(a) concerns maintained by the SBA district office where all or most of the work is to be performed or the items delivered will be examined initially for selection of a qualified 8(a) concern. If none are found to be qualified, the requirement may be considered for other 8(a) concerns located within the appropriate SBA region, or the requirement may be considered for 8(a) concerns located in immediately adjacent regions.

(ii) If the procurement is a national buy item, it shall be referred to SBA's Central Office. Central Office will allocate national buy requirements to the regional offices on an equitable basis, and regional offices will allocate national buy requirements to the districts on an equitable basis.

**§ 124.302 8(a) Contracts and subcontracts.**

(a) *General.* It is the policy of SBA to enter into contracts with other government agencies and subcontract the performance of such contract to concerns admitted to the section 8(a) program pursuant to section 8(a)(1)(C) of the Small Business Act, at prices which will enable a company to perform the contract and earn a reasonable profit.

(b) *Performance of work by the 8(a) subcontractor.* To assure the accomplishment of the purposes of the program, each 8(a) subcontractor shall be required to perform work equivalent to the following percentages of the total dollar amount of each subcontract, exclusive of material costs, with its own labor force:

(1) Manufacturing—50 percent.

(2) Construction:

(i) General Construction—15 percent.

(ii) Special Trades, Such as Electrical, Plumbing, Mechanical, etc.—25 percent.

(3) Professional Services—55 percent.

(4) Nonprofessional Services—75 percent.

The 8(a) concern is required to include in its proposal to perform a given contract a statement that it agrees to perform the required percentage of the work with its own labor force. Refusal of the concern to provide such a statement will result in the contract not being awarded.

(c) *Certification of SBA's competency.* (1) SBA will not certify as to its competency, as provided by section 8(a)(1)(A) of the Small Business Act, without first determining that the section 8(a) concern it intends to subcontract to is responsible to perform the contract in question. If SBA determines that the concern lacks the capability, competency, capacity, credit, integrity, perseverance, and tenacity to perform on a specific 8(a) subcontract, the contract will not be awarded. In addition, SBA will also certify that an 8(a) concern is eligible under the Walsh-Healey Public Contracts Act, 41 U.S.C. 35(a) for each individual 8(a) subcontract. An 8(a) concern which has not submitted required financial statements to SBA will be deemed not responsible to receive 8(a) subcontracts.

(2) SBA's determination not to award an 8(a) subcontractor a specific 8(a) subcontract because the concern lacks an element of responsibility, or is ineligible under the Walsh-Healey Public Contracts Act, does not constitute a denial of total section 8(a) program participation for the purposes of section 8(a)(9) of the Small Business Act.

(d) *Contract administration.* SBA may delegate its authority to administer section 8(a) subcontracts to the procuring agency or any Federal agency designated by it. This is done through the use of special clauses in the contract between SBA and the procuring agency, or by letter, as appropriate.

(e) *Contract termination.* (1) A decision to terminate a specific section 8(a) subcontract for default is made by the procuring activity contracting officer in cooperation with SBA. The contracting officer will advise SBA in advance of his/her intent to terminate for default the 8(a) subcontract. SBA may provide whatever program benefits as are reasonably available to the 8(a) concern in order to prevent termination for default of the contract. The contracting officer will be made aware of this effort. If, despite the efforts of SBA, in the opinion of the procuring activity contracting officer grounds for termination continue to exist, he/she may terminate the 8(a) subcontract for default.

(2) In cooperation with SBA, the procuring activity contracting officer may terminate a section 8(a) subcontract for convenience at any time it is determined in the best interest of the government to do so.

(f) *Disputes and appeals.* (1) SBA is not subject to the Disputes Clause of a specific contract, and SBA is not a party to and does not appear at or participate in appeals brought under such a clause in its own behalf or on behalf of an 8(a) concern.

(2) If a dispute between an 8(a) subcontractor and the procuring activity contracting officer arises under the subcontract, it will be decided unilaterally by the procuring activity contracting officer. The 8(a) subcontractor has the right to appeal the decision of the procuring activity contracting officer under the Contract Disputes Act of 1978.

**§ 124.401 Advance payments.**

(a) *General.* (1) Advance payments are disbursements of money made by SBA to a section 8(a) business concern prior to the completion of performance of a specific section 8(a) subcontract. Advance payments are made for the purposes of assisting the section 8(a) business concern in meeting financial requirements pertinent to the performance of the subcontract. The gross amount of advance payments must be determined by SBA prior to commencement of performance of the contract. Any subsequent change in the gross amount of advance payments must be justified in writing by SBA as to amount and purpose. Advance payments are to be awarded only after all other forms of financing have been considered by SBA and rejected as unacceptable to support performance of the subcontract. Advance payments must be liquidated from proceeds derived from the performance of the specific section 8(a) subcontract to which they pertain. However, this does not preclude repayment of such advance payments from other revenues of the business, except from other advance

payments and business development expenses (as defined hereinafter in these regulations); provided such repayment must occur according to the liquidation schedule established by the subcontract under which the advance payments were made. The proceeds derived from the performance of the specific section 8(a) subcontract must be deposited by the procuring agency in a special bank account established exclusively for the purpose of administering the advance payments. These proceeds will be used to liquidate the advance payments. No withdrawals of such subcontract proceeds from the special bank account may be made by the section 8(a) business concern which are inconsistent with the disbursement schedule established by the subcontract under which the advance payments were made.

(2) Advance payments shall not be made to a section 8(a) business concern in any case in which the section 8(a) business concern has assigned its rights to receive any payment under the specific section 8(a) subcontract to any person or entity, unless such assignment shall be made to SBA or to a Federal agency in regard to the receipt by the section 8(a) business concern of a progress payment for any specific section 8(a) subcontract.

(3) In no event shall the total amount of advance payments for a section 8(a) business concern exceed 90 percent of the outstanding unpaid proceeds of the section 8(a) subcontract to which the advance payments relate.

(4) SBA shall not charge interest on advance payments disbursed pursuant to these regulations.

(b) *Requirements.* (1) Advance payments may be approved for a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(i) A section 8(a) business concern does not have adequate working capital to perform a specific section 8(a) contract.

(ii) Adequate and timely financing is not available on reasonable terms to provide necessary capital.

(iii) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of advance payment funds. These records must be made available upon request for review and copying by SBA and other appropriate Federal officials.

(iv) A company may receive an advance payment on a section 8(a) subcontract only in instances in which that company has no unliquidated advance payments outstanding on another section 8(a) subcontract which is completed, terminated or in default, unless such unliquidated advance payment is due *only* to the contracting agency's delay in making final payment to the section 8(a) concern which has successfully completed the subcontract.

(c) *Procedure.* To be eligible to receive advance payments, a section 8(a) business concern must meet the conditions set forth above and must comply with the following procedure.

(1) A section 8(a) business concern desiring to receive an advance payment in connection with any section 8(a) subcontract shall:

(i) Submit a written request for advance payment to the appropriate SBA Regional Administrator or his designee. Such request must include detailed documentation requested by SBA as evidence to support the need for such funds and proof that working capital financing cannot be found upon terms acceptable pursuant to § 124.401(b)(ii) above, from financing institutions.

(ii) The section 8(a) business concern must select a commercial bank which is a member of the Federal Reserve System in which it must establish a special non-interest bearing bank account for the deposit of payments made to it by the procuring agency pursuant to the performance of the subcontract(s). This special account must be a demand deposit account. The appropriate SBA Regional Administrator shall designate at least two SBA employees to serve as countersignatories on the special bank account.

(A) Disbursements from the account will be made only upon the authorized signatures of the section 8(a) concern and one of the designated SBA employees.

(B) Under no circumstances shall the requirement for an SBA employee countersignature be waived.

(C) At the time that SBA disburses advance payment funds into the special bank account, SBA shall obtain the most superior lien possible upon the special bank account, any property contracted for, supplies material and other property acquired with the advance payment funds.

(iii) The section 8(a) subcontractor must support each request for disbursement of advance payments by submitting to SBA the following:

(A) The original vendor invoice or original payroll record;

(B) A certified statement, dated and signed by the concern's Chief Financial Officer, attesting to the truth and accuracy of the vendor invoice, and/or the payroll records for the requested advance payment including records of direct payroll expenditures, and payroll expenditures for general and adminstrative expenses and overhead;

(C) Certification by the concern that all Federal taxes and FICA payments are current, or a copy of any agreement with the IRS providing for payment of delinquent taxes;

(D) Documentation of overhead and general and administrative rates using projected indirect costs applied to a valid base, which have been properly allocated to direct material, labor, or other direct costs.

(iv) The section 8(a) concern must, as required by IRS regulations, select a Federal Depository into which the Federal withholding and FICA payment will be made. There shall be no change of Federal Depository without obtaining the prior written consent of the SBA. A check shall be prepared for Federal taxes, concurrent with the SBA advance, based on the submitted payroll, in the name of the tax collecting agency or the Federal Depository and signed by SBA and the contractor. If the amount of a check payable to IRS is less than 25 percent of the gross payroll for that period, the concern's Chief Financial Officer shall prepare a statement certifying that the amount designated as payable to IRS or the Federal Depository is true and correct.

(2) Upon a review of all the circumstances, the Regional Administrator of SBA shall have the obligation to decide whether to approve or deny a request for advance payment and the amount thereof. This right of approval may be delegated to appropriate SBA officials within the discretion of the Administrator. The section 8(a) business concern, the bank selected pursuant to above and SBA must execute and Advance Payment Agreement prior to the disbursement of any advance payment which shall provide for advance payments, set forth a liquidation schedule for the advance payments as well as other terms and conditions governing advance payments. Under no circumstances may a liquidation schedule be waived. However, the appropriate Regional Administrator is authorized to modify liquidation schedules. The section 8(a) concern must execute a note evidencing the full amount of the advance payment and a security agreement and/or personal guarantee by one or more of the principals of the concern as collateral for the advance payment.

(d) *Use of advance payment funds.* (1) Except for repayment to SBA in appropriate circumstances, advance payment funds many only be withdrawn

from the special bank account by a section 8(a) business concern exclusively for the purpose of purchasing materials, labor, general and administrative expenses and overhead, and paying progress payments to the subcontractors of the section 8(c) concern for the performance of a specific section of the section 8(a) subcontract at issue.

(2) Under no circumstances may advance payment funds be deposited in interest-bearing accounts, certificates of deposit or other securities.

(3) Advance payment funds shall be disbursed by SBA for deposit into the special account only in such amounts necessary to pay for the immediate needs of a section 8(a) subcontract. Such disbursements shall be made as expeditiously as possible. Such immediate needs shall be documented by the small business concern and verified by SBA prior to disbursement.

(4) All payments to the section 8(a) business concern for work performed or services rendered pursuant to the subject section 8(a) subcontract shall be paid into the special bank account by the procuring agency, and shall be applied by SBA first against the balance of advance payments according to the liquidation schedule. Any amounts remaining in the special bank account may be disbursed to the section 8(a) concern, *provided, however*, that the unpaid balance on the section 8(a) subcontract is sufficient to allow the 8(a) concern to comply with its advance payment liquidation schedule.

(e) *Cancellation.* (1) SBA may determine that advance payments should be cancelled under the following circumstances:

(i) The terms and conditions of the advance payment agreement have not been adhered to by a section 8(a) small business concern.

(ii) The section 8(a) business concern's participation in the section 8(a) program has ended by expiration of the Fixed Program Participation Term and any extension, or has been suspended pursuant to § 124.113 of these regulations or has been terminated by administrative action under section 8(a)(9) of the Small Business Act, 15 U.S.C. 637(a)(9).

(2) In the event of cancellation of advance payments to a section 8(a) business concern, all previous advance payments made to that section 8(a) business concern shall become due and payable to SBA prior to the receipt of final contract payment.

**§ 124.402 Business development expense.**

(a) *Purpose.* Business Development Expense (BDE) funds are made available by SBA at the time of the execution of a specific section 8(a) subcontract for the purpose of assisting a section 8(a) business concern with the performance of that subcontract. The authority to approve the uses and amount of BDE rests with the Adminstrator who has the power to delegate the authority. An award of BDE is justified only if, prior to the execution of the related section 8(a) subcontract, SBA conducts a complete analysis of the written request and determines that the proposed BDE will promote the long term development objectives of the section 8(a) concern as described in the business plan.

(b) At the discretion of SBA, BDE funds may be added to the section 8(a) subcontract price and may be used for the following purposes and in the following order of priority.

(1) *Capital equipment.* For the purchase of capital equipment which has been determined by SBA to be essential to the section 8(a) business concern's performance of a specific section 8(a) subcontract at a fair market price and for which acquisition cannot reasonably be made by other financing means.

(2) *Other capital improvements.* To assist in the acquisition of other necessary production/technical assets or to subsidize the cost of other capital improvements directly related to reduction of production costs, or to increase productivity and/or production capacity in connection with a specific section 8(a) subcontract. This category includes, but is not limited to, such items as quality control systems, inventory control systems, and other business systems.

(3) *Price differential.* To make up the difference between Government's established fair market price and the price required by the section 8(a) contractor to provide the product or service in connection with a specific section 8(a) subcontract. This type of BDE should be granted to a firm only one time for any specific type of requirement and only if the analysis demonstrates that the firm will be able to produce the item/service competitively in the future.

(c) BDE shall not be provided to satisfy:

(1) Price differentials for professional and nonprofessional service firms;

(2) Any contingency arising subsequent to execution of the section 8(a) subcontract for which the BDE is proposed;

(3) Cost overruns;

(4) Entertainment expenses;

(5) The cost of capital equipment and other capital improvements when one of the following conditions exists:

(i) Funds are available from outside sources to the concern, including SBA financing and the personal resources of the principal(s); or

(ii) Adequate and timely financing from outside sources is available at a reasonable rate.

(6) Costs of interest expenses to be borne by the section 8(a) concern.

(d) *Participatory BDE.* Where appropriate and feasible, section 8(a) concerns will participate to the fullest extent possible in funding the acquisition of assets acquired with BDE funds.

(e) *Requirements.* To be eligible for business development expense funds, a section 8(a) business concern must submit a written request to the appropriate SBA Regional Administrator or his designee. The request must include detailed documentation to support the need for funds, proof that adequate financing is not available at current market rates, and such additional information as required by SBA to adequately consider the request.

(f) When BDE, including participating BDE, will be used to purchase capital equipment, the section 8(a) concern shall comply with the following requirements. The section 8(a) concern shall:

(1) Execute and record a lien on the equipment in favor of SBA. SBA will remove the lien on the assets acquired with BDE funds upon successful completion of the section 8(a) subcontract, except in the case of the firm which has outstanding obligations owed to SBA. Upon full repayment of such outstanding obligations, SBA shall release the lien.

(2) Execute a BDE agreement with SBA which among other things convenants that:

(i) The concern will use the funds exclusively for the purposes stated in the BDE approval;

(ii) The concern shall maintain records to substantiate the uses for which BDE funds have been expended; and

(iii) In the event of default on the contract to which the BDE relates, the section 8(a) concern shall be liable for repayment of the full amount of the BDE.

**§ 124.403 Letter of credit.**

(a) *General policy.* The letter of credit method of payment will be utilized under certain circumstances to disburse advance payments to section 8(a) business concerns performing subcontracts under the section 8(a) program when SBA has made a decision approving the use of advance payments pursuant to the requirements and

conditions provided for in these regulations.

(b) *Eligibility requirements.* SBA may disburse advance payments through the letter of credit method of payment through the Federal Reserve Bank System to a section 8(a) business concern when all of the following conditions are found by SBA to exist:

(1) SBA determines that the section 8(a) business concern may be awarded more than one section 8(a) subcontract during a period of at least one year.

(2) The aggregate amount of letter of credit advance payment funds made to one section 8(a) business concern will exceed $120,000 annually.

(3) The section 8(a) business concern has submitted a schedule of its projected monthly advance requirements for section 8(a) subcontract disbursements, SBA has reviewed it, and SBA has found it to be reasonable.

(4) The section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of program funds. These records must be made available upon request for review and audit by SBA and the General Accounting Office.

(c) *Procedures.* The procedures for the utilization of the letter of credit method of payment shall be in accord with 48 CFR § 32.406.

**§ 124.501 Development assistance program.**

(a) *General.* Section 7(j)(1) of the Small Business Act provides for financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or enterprises eligible for assistance under sections 7(a)(11), 7(j)(10), and 8(a) of the Small Business Act. The AA/MSB–COD is responsible for coordinating and formulating policies relating to the dissemination of this assistance to small business concerns eligible for assistance under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act.

(b) *Services.* (1) Section 7(j)(1–2) of the Small Business Act empowers the SBA to provide through public and private organizations the management and technical assistance enumerated below to those individuals or concerns who meet the eligibility criteria contained in section 7(a)(1) and 8(a) of the Small Business Act.

(2) The SBA shall give preference to projects which promote the ownership, participation in ownership, or management of small businesses owned by low-income individuals and small businesses eligible to participate in the section 8(a) program.

(3) This assistance may include any or all of the following:

(i) Planning and research, including feasibility studies and market research;

(ii) The identification and development of new business opportunities;

(iii) The furnishing of centralized services with regard to public services and Federal Government programs including programs authorized under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act;

(iv) The establishment and strengthening of business service agencies, including trade associations and cooperatives;

(v) The furnishing of business counseling, management training, and legal and other related services, with special emphasis on the development of management training programs using the resources of the business community, including the development of management training opportunities in existing business, and with emphasis in all cases upon providing management training of sufficient scope and duration to develop entrepreneurial and managerial self-sufficiency on the part of the individuals served.

(4) Sections 7(j)(3) and 7(j)(9) of the Small Business Act authorize SBA to:

(i) Encourage the placement of subcontracts by businesses with small business concerns located in areas of high concentration of unemployed or low-income individuals, with small businesses owned by low-income individuals, and with small businesses eligible to receive contracts pursuant to section 8(a) of this Act. SBA may provide incentives and assistance to such businesses that will aid in the training and upgrading of potential subcontractors or other small business concerns eligible for assistance under sections 7(a)(11), 7(j), and 8(a) of the Small Business Act, and

(ii) Coordinate and cooperate with the heads of other Federal departments and agencies, to insure that contracts, subcontracts, and deposits made by the Federal Government or with programs aided with Federal funds are placed in such a way as to further the purposes of sections 7(a)(11), 7(j), and 8(a) of the Small Business Act.

(c) *Eligibility.* (1) Eligibility for the assistance enumerated under § 124.501(b) above shall include, but not be limited to:

(i) Businesses which qualify as small within the meaning of size standards prescribed in 13 CFR Part 121, and which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, or which are owned by such low-income individuals; and

(ii) Businesses eligible to receive contracts pursuant to section 8(a) of the Small Business Act.

(d) *Delivery of services.* (1) The financial assistance authorized for projects under paragraph (b) of this section includes assistance advanced by grant, cooperative agreement, or contract.

(2) To the extent feasible, services available under paragraph (b) of this section shall be provided in a location which is easily accessible to the individuals and small business concerns served.

(e) *Coordination and cooperation with other government agencies.* (1) The AA/MSB–COD may utilize the resources of other agencies and departments whenever practicable which can directly or indirectly support or augment the purposes of sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(2) The AA/MSB–COD shall enter into agreements with Federal agencies and departments to further effective sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(3) The AA/MSB–COD shall encourage the placement of deposits made by the Federal Government, or by programs aided with Federal funds, in such a way as to further the purposes of section 7(a)(11), 7(j) and 8(a) of the Small Business Act.

**§ 124.502 Small Business and Capital Ownership Development program.**

(a) *General.* Section 7(j)(10) of the Small Business Act establishes a Small Business and Capital Ownership Development program which shall provide additional assistance exclusively for small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. The management of the Capital Ownership Development program is vested in the AA/MSB–COD who is responsible for the oversight of the program and activities set forth in this part of these regulations. The development assistance described below shall be provided exclusively to those small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. Such small business concerns shall be participants in the Small Business Capital Ownership Development program. This program shall:

(1) Assist shall business concerns participating in the program to develop comprehensive business plans with

specific business targets, objects, and goals;

(2) Provide for such other nonfinancial services as deemed necessary for the establishment, preservation, and growth of small business concerns participating in the program, including but not limited to (i) loan packaging, (ii) financial counseling, (iii) accounting and bookkeeping assistance, (iv) marketing assistance, and (v) management asssistance;

(3) Assist small business concerns participating in the program to obtain equity and debt financing;

(4) Establish regular performance monitoring and reporting systems for small business concerns participating in the program to assure compliance with their business plans;

(5) Analyze and report the causes of success and failure of small business concerns participating in the program; and

(6) Provide assistance necessary to help small business concerns participating in the program to procure surety bonds. Such assistance shall include, but not be limited to, (i) the preparation of surety bond participation forms; (ii) special management and technical assistance designed to meet the specific needs of small business concerns participating in the program and which have received or are applying to receive a surety bond, and (iii) preparation of all forms necessary to receive a surety bond guarantee form the SBA pursuant to Title IV, Part B of the Small Business Investment Act of 1958.

**§ 124.503 Compliance with the Paperwork Reduction Act of 1980.**

(a) In compliance with the Paperwork Reduction Act of 1980 (Title 44, U.S.C., Chapter 35) and its implementing regulations, the recordkeeping or reporting requirements and forms appearing in the following sections of this part have been approved by the Office of Management and Budget (OMB) under number 3245–0015: §§ 124.105(b), 124.106(b), 124.106(b)(1) 124.106(b)(2), 124.106(b)(3), 124.202, 124.204, 124.205, 124.403(b)(4), 124.502(a)(1) and 124.502(a)(6).

(b) The recordkeeping or reporting requirements and forms appearing in the following sections of this final rule have also been approved by OMB:

§ 124.103(c) [OMB Approval No. 3245–0145]; § 124.103(e) [OMB Approval No. 3245–0145]; § 124.111(c) [OMB Approval No. 3245–0147]; § 124.112(a)(7) [OMB Approval No. 3245–0205]; § 124.112(a)(17) [OMB Approval No. 3245–0146]; § 124.205 [OMB Approval No. 3245–0015]; § 124.206 [OMB Approval No. 3245–0143]; §§ 124.401(c)(1)(i), 124.401(c)(1)(iii) and 124.403(b)(3) [OMB Approval No. 3245–0148]; § 124.402(e) [OMB Approval No. 3245–0149]; and §§ 124.112(a)(6) 124.205 (financial statements) and 124.502(a)(4) [OMB Approval No. 3245–0151]

Dated: September 15, 1986.

**Charles L. Heatherly,**

*Acting Administrator.*

[FR Doc. 86–22659 Filed 10–7–86; 8:45 am]

BILLING CODE 8025-01-M

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Part 124**

## Minority Small Business and Capital Ownership Development Program

**AGENCY:** Small Business Administration.

**ACTION:** Proposed rule.

**SUMMARY:** The Small Business Administration (SBA) Proposes to amend its regulations governing the Minority Small Business and Capital Ownership Development Program authorized by sections 7 (j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10), 637(a)). In most instances the Proposed revisions would implement changes required by the Business Opportunity Development Reform Act of 1988 (Pub. L. 100-656), enacted November 15, 1988. Some Provisions, however, would incorporate into the regulations existing Agency Policy while others would implement proposed policy changes.

**DATE:** Comments will be accepted until April 24, 1989.

**ADDRESS:** Written comments should be addressed to Joseph O. Montes, Associate Administrator for Minority Small Business and Capital Ownership Development, 1441 L Street NW., Room 602, Washington, DC 20416.

**FOR FURTHER INFORMATION CONTACT:** Patricia R. Forbes at (202) 653-6573, or John W. Klein at (202) 653-6377.

**SUPPLEMENTARY INFORMATION:** On November 15, 1988, the enactment of the Business Opportunity Development Reform Act of 1988 (Reform Act) required SBA to substantially revise the Minority Small Business and Capital Ownership Development Program (MSB&COD Program or 8(a) Program), as authorized by sections 7 (j)(10) and 8(a) of the Small Business Act (Act) (15 U.S.C. 636(j)(10) and 637(a)). The 8(a) program was established in the late 1960's under the general authority of the Small Business Act, and was established by statute (Pub. L. 95-507) in 1978. Under Pub. L. 95-507, the stated purposes of the MSB&COD program are "* * * to (A) foster business ownership by individuals who are both socially and economically disadvantaged; (B) promote the competitiveness of such firms by providing such available contract, financial, technical and management assistance as may be necessary; and, (C) clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, material, and construction work from small business concerns owned by socially and economically disadvantaged individuals." By subsequent statutory amendments, the assistance provided to these individuals was extended to concerns owned and controlled by economically disadvantaged Indian tribes, Alaska Native Corporations and Native Hawaiian Organizations. Although in the Reform Act Congress found that the program remains a primary tool for improving the opportunities of such concerns in the Federal procurement process and for bringing such concerns into the nation's economic mainstream, Congress also found that the program must be substantially reformed in order to promote the statutorily required business development objectives and purposes.

It is SBA's intent to implement these congressional mandates through the revisions to its regulations as proposed here as well as through changes to the Agency's forms and standard operating procedures.

In preparing this proposed rule, SBA held two public meetings in December 1988 to receive public comment on the nature and extent of the regulations needed to implement the Reform Act. The first was held in San Francisco, California on December 9, 1988, and was attended by approximately 75 members of the public. The second was held in Washington, DC on December 19, 1988, and was attended by approximately 325 members of the public. All comments received have been considered in the preparation of this proposed rule.

SBA welcomes public comment on these proposed rules. However, since the Reform Act requires SBA to publish final implementing regulations by June 15, 1989, SBA is able to provide only a 30-day comment period on these regulations. In order to facilitate public comment as soon as possible after publication, SBA will have copies of the proposed rule available at its regional, district and branch offices.

SBA invites public comments on certain proposed sections in particular. In § 124.105 SBA proposes to define Asian Pacific Americans and Subcontinent Asian Americans. Public comment on the appropriateness of such definitions is invited.

Section 124.106 would require individuals claiming disadvantaged status who are married to submit their own and their spouses' financial statements. The purpose of this proposed section would be to prevent such individual from creating an unwarranted appearance of economic disadvantage by placing his/her assets in his/her spouse's name.

In addition, SBA invites comments on the effect of community property laws on such requirements.

Section 124.102 would impose new restrictions on disadvantaged and nondisadvantaged ownership. Section 124.109 would deem Franchises ineligible for 8(a) participation. SBA requests comments on these provisions in particular.

SBA invites public comment on proposed § 124.311 especially from procuring agencies. SBA is interested in news on whether 8(a) competition can be practically implemented by procuring agencies.

It should be noted that, although the numbering scheme is similar to that used in SBA's MSB&COD program regulations, published October 8, 1986 (51 FR 36132, *et seq.*), some sections have been renumbered or combined with other sections to accommodate new provisions required by the Reform Act. Proposed §§ 124.1 through 124.7 address issues which pertain to the program in general. Proposed § 124.100 sets forth definitions of key terms used in the regulations. Some of these definitions are identical to those now included in SBA's existing regulations. A list of new and amended definitions will be provided in the section-by-section review portion of this explanatory information. Some of these definitions will be highlighted.

Proposed §§ 124.101 through 124.113 address matters relating to program eligibility requirements both for admission to the program and for continued participation in the program. Proposed §§ 124.201 through 124.205 set forth information concerning the application process. Proposed §§ 124.206 through 124.211 set forth procedures relating to the Agency review of applications, program graduations, program terminations and suspensions as well as procedures relating to administrative appeal rights the Reform Act affords Program applicants and participants.

Proposed §§ 124.300 through 124.320 address requirements relating to business development and contracting. Proposed §§ 124.401 through 124.403 relate to special methods of contract financing: advance payments and business development expense. At this time, SBA proposes to make no changes to existing §§ 124.501 and 124.502, concerning the Development Assistance Program authorized by the Small Business and Capital Ownership Development Program. Proposed § 124.601 would be a new section setting forth miscellaneous reporting

requirements for current and former 8(a) Program Participants.

The Reform Act also contains provisions imposing new requirements relating to standards of conduct for certain SBA employees who have 8(a) program responsibilities and authorizing a loan program for 8(a) Program Participants. SBA intends to publish separate proposed rules amending Parts 105 and 120 of this Title, respectively, to implement these Reform Act requirements. In addition to §§ 124.206 through 124.211, SBA intends to implement the administrative hearing requirements of the Reform Act by proposing conforming amendments to its administrative hearing procedures found in Part 134 of this Title.

**Section-by-Section Review**

Section 124.1 proposes to describe the scope of these regulations. If adopted in final form, these rules would apply to participants in the MSB&COD program, as authorized by sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10) and 637(a)). Certain sections of these rules relating to social and economic disadvantaged status would apply to other Federal programs for which social and economic disadvantaged status is a requirement of program eligibility. Such programs include, among others, the Small Disadvantaged Business (SDB) Set-aside and Bid Preference programs authorized by section 1207(a) of Pub. L. 99–661, and the section 8(d) Subcontracting Program, authorized by section 8(d) of the Small Business Act (15 U.S.C. 637(d)).

Sections 124.2 and 124.3 describe statutorily mandated changes to 8(a) program administration. The position of the Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD) is required to be a career civil service position as opposed to a non-career appointee. The Reform Act requires SBA to establish a Division of Program Certification and Eligibility, which is to be headed by a Director. Once established, the Division would be responsible for handling matters relating to 8(a) program eligibility, termination and graduation, and certifications of disadvantaged status for purposes of any program or activity conducted under the authority of section 8(d) of the Small Business Act or any Federal law that references such section.

Section 124.4 describes the Commission on Minority Business Development which was authorized by section 505 of the Reform Act. The purpose of the Commission is to review all Federal programs designed to promote the development of minority owned businesses in order to ascertain whether the congressionally described goals and purposes of such programs are being realized.

Proposed § 124.5 would repeat existing § 124.3 which describes the effect of an 8(a) program applicant's willful violation of any of SBA's regulations governing its other programs.

Proposed § 124.6 would give notice to 8(a) program applicants and participants of the range and severity of penalties which could result from making misrepresentations or false statements in relation to the 8(a) program.

Section 124.7 would set forth restrictions on fees for applicant and 8(a) participant representatives. This proposed section would prohibit the applicant concerned or Program Participant from paying any fee to such representatives which would be contingent on program certification or on specific 8(a) contract award(s).

SBA is proposing to amend § 124.100 to include a number of new and changed definitions for terms used throughout this Title. In addition, SBA is proposing to eliminate those definitions which are no longer relevant or which are defined in the body of the regulations.

SBA would include. the following new definition paragraphs: (a), "Alaska Native;" (b), "Alaska Native Corporation;" (c), "Application" or "8(a) Application;" (d), "Business Opportunity Specialist;" (g), "Concern;" (h), "Descendant of an Alaska Native;" (j), "Fixed Program Participation Term" or "FPPT," (k), "Graduation;" (1), "Immediate family member;" (m), "Indian Tribe;" (n), "Joint venture agreement;" (r), "Native Hawaiian;" (s), "Native Hawaiian Organization;" (u), "Nondisadvantaged individual;" (v), "Non-8(a) business activity target;" (x), "Operational control;" (y), "Personal net worth;" (aa), "Principal place of business;" (bb), "Program Participant" or "Participant;" (cc), "Program Suspension;" (dd), "Program year;" (ff), "Requirement;" (gg), "Same or similar line of business;" (ii), "Termination;" (jj), "Tribally-owned concern;" and (kk), "Unconditional ownership."

In addition, SBA is proposing to amend these current definition paragraphs: (f), "Certification of SBA's competency;" (o), "Local buy item;" (dd), "Regular dealer;" and, (hh), "Self-marketing."

Proposed paragraphs (a), (b) and (h) would provide definitions for "Alaska Native," "Alaska Native Corporation" and "Descendant of an Alaska Native," respectively. Proposed paragraphs (m) and (jj) would provide definitions for "Indian tribe" and "Tribally owned concern." These definitions are necessary in conjunction with new proposed § 124.112 which would set forth the eligibility criteria for concerns owned by Indian tribes and Alaska Native Corporations.

Section 8(a) of the Small Business Act, as amended by Pub. L. 100–656, makes business concerns owned by Native Hawaiian Organizations eligible for 8(a) program participation. In accordance with this program change, SBA would adopt the definition for "Native Hawaiian" as contained in the Carl D. Perkins Vocational Act (20 U.S.C. 2313(a)(1)(B)) at paragraph (r). At paragraph (s), SBA would define "Native Hawaiian Organization."

SBA is also proposing to include as paragraph (j) a definition for "Fixed Program Participation Term (FPPT)." This definition would be provided in conjunction with § 124.110 which deals with the "grandfathering" of firms which were program participants as of September 1, 1988, and which had been subject to terms established in accordance with the provisions of the Small Business Act, as amended by Pub. L. 96–481.

In proposed paragraph (u) SBA would define "Nondisadvantaged individual." This definition would make clear that an individual will be regarded as nondisadvantaged if he/she does not claim disadvantaged status, is not found by SBA to be disadvantaged, or whose disadvantaged status is not relied upon by SBA in qualifyinq a concern for program participation. This definition would also clarify that once an individual has used his/her disadvantaged status to qualify a concern for program participation, that individual would be considered as nondisadvantaged for all other 8(a) program purposes.

SBA is proposing to include a definition for "Non-8(a) business activity target" at paragraph (w). This definition would be used in conjunction with the requirement of the section 8(a) of the Small Business Act, as amended by Pub. L. 100–656, that a concern in the transitional stage of the 8(a) program must meet appropriate targets for the mix of 8(a) and non-8(a) revenues.

SBA is proposing to amend its definition of "Principal place of business" at paragraph (aa). The new definition would require SBA to determine a concern's principal place of business based on two factors: the location of the concern's books and records, and the location at which the individual who manages the concern s day-to-day operations spends the majority of his/her working hours.

Proposed paragraph (kk) would define "Unconditional ownership." This definition would make clear that any arrangement which would serve to allow the benefits of program participation to accrue to nondisadvantaged individuals would not be considered to be unconditional for purposes of these regulations. Unconditional ownership of a business concern by a disadvantaged individual is required as a condition of program eligibility in accordance with § 124.103.

Proposed § 124.101 would describe the process for determining 8(a) program eligibility. Except for concerns owned by Indian tribes, Alaska Native Corporations and Native Hawaiian Organizations, addressed by §§ 124.112 and 124.113, respectively, each applicant concern must meet the requirements set forth in §§ 124.102 through 124.110. Under the proposed procedure, the AA/MSB&COD would approve or decline each application in writing setting forth the basis of his or her determination. If an application were denied based on a negative finding of social disadvantage, economic disadvantage, ownership or control, the applicant would be entitled to appeal to SBA's Office of Hearings and Appeals (OHA) under § 124.210 and Part 134 of this Title. The written decision of OHA would be the final agency action on the matter.

Under these regulations, Program Participants would be required to continue to meet the eligibility criteria of §§ 124.102 through 124.110. Failure to do so would be grounds for termination from the 8(a) program.

Proposed paragraph (c) of § 124.101 would describe SBA's intent to continue to ensure that the benefits of the 8(a) program accrue only to eligible individuals and concerns. It is also SBA's intent to prevent fraud and abuse in the 8(a) program. Towards these ends, paragraph (c) proposes to detail grounds for which SBA would review the eligibility of any applicant concern or Program Participant.

Proposed § 124.102 discusses the requirement that 8(a) applicant concerns and Program Participants qualify as small businesses under § 121.4 of Title 13, Code of Federal Regulations. Proposed paragraphs (a), (c), and (d) restate the requirements of existing paragraphs (a) and (b) of § 124.102 and have been reorganized as proposed paragraphs (a), (c) and (d) for greater clarity. Proposed paragraph (d) would also reference an exemption from the size requirement authorized by Pub. L. 100-656 and set forth in proposed § 124.321 for contracts awarded to joint ventures controlled by eligible Indian tribes. Contrary to past program policy, any such Program Participant would not be required to certify its small business size status under the applicable size standard for each 8(a) contract which it is awarded.

Proposed paragraph (b) of § 124.102 would permit the Division of Program Certification and Eligibility to deny a concern's application for program admission or to request a formal size determination from the appropriate regional office in instances where the Division is unable to determine that an applicant concern qualifies as a small business. The provision would also permit an applicant concern whose application has been so denied to seek a formal size determination from the appropriate SBA regional office and to appeal a negative regional size determination to SBA's Office of Hearings and Appeals, pursuant to SBA's size regulations (§§ 121.8 and 121.11 of this Title).

Proposed § 124.103 describes the ownership requirements of the 8(a) program for applicant and participating concerns, other than those owned by Indian tribes, Alaska Native Corporations and Native Hawaiian Organizations. Ownership requirements for applicant and participating concerns owned by Indian tribes and Alaska Native Corporations are set forth in proposed § 124.112 and for such concerns owned by Native Hawaiian Organizations in § 124.113.

The proposed ownership provisions generally reflect the requirements of existing 8(a) program regulations, the Reform Act or Agency policy as it has developed since the last revision of 8(a) program regulations, which was published in 1986. This proposed section implements a provision of the legislative history of the Reform Act that would require disadvantaged owners to hold unconditional interests in their 8(a) concerns of at least 51 percent. SBA proposes to define unconditional ownership in § 124.100(kk).

This proposed section would also require that, for two years prior to program entry, 51 percent of each applicant concern must be owned by the disadvantaged individuals upon whom 8(a) program eligibility is sought to be based. In unusual cases, SBA is proposing to permit an exception to this rule if it can be demonstrated that the recent transfer of ownership to the disadvantaged individual(s) upon whom eligibility is to be based was an arms length transaction.

Proposed paragraph (a) of § 124.103 would require an applicant concern which is a partnership to reflect the ownership interest of the disadvantaged owner in the concern's partnership agreement. In the case of any applicant concern which is a corporation, proposed paragraph (b) would require that 51 percent of each class of voting stock be owned by the disadvantaged owner(s) and that 51 percent of the aggregate of all classes of stock be owned by the disadvantaged owner(s). Existing paragraph (c) imposes the 51 percent ownership requirement only on voting stock. SBA is proposing to change this requirement to reflect existing program procedures and to ensure that the statutorily required ownership interests are not diluted by issuances of other classes of stock.

SBA also proposes to include in § 124.103 some additional requirements relating to stock and stock options which are intended to prevent circumvention of the statutory requirements regarding 51 percent ownership by one or more disadvantaged individuals. Proposed paragraph (d) would state Agency policy that, in evaluating the ownership interest held by the disadvantaged individual(s), SBA would treat as exercised options to purchase stock or to convert non-voting stock or debentures held by nondisadvantaged individuals or entities not in the same or similar line of business. Proposed paragraph (e) would require that the disadvantaged individual(s) receive at least 51 percent of any dividends of a corporate applicant concern, including distributions upon liquidation. The provision would also require that the disadvantaged individuals upon whom program eligibility is based be entitled to receive 100 percent of the value of each share of stock if sold.

Paragraphs (f) and (g) would restrict disadvantaged and nondisadvantaged owners of one 8(a) concern from simultaneously owning another 8(a) concern. Paragraph (h) would preclude a non-8(a) concern from having an ownership interest in an 8(a) concern. Paragraph (j) would exempt from the ownership limitations of paragraphs (g), (h), and (i) of this section and § 124.104(a)(5) individual ownership interests of less than 5 percent.

Proposed § 124.104 would restate the existing requirements for control and management of an 8(a) concern and would add examples to the requirements for clarity.

Paragraph (a) would impose restrictions on nondisadvantaged individuals who are involved in the management of an applicant or participating concern. This paragraph would prohibit management participation by any such individual or any immediate family member who

resides in his/her household who is a former employer of the disadvantaged owner(s) of the applicant or 8(a) concern, or who was an owner, stockholder, partner, officer, director or manager of another concern in the same or similar line of business as the applicant or 8(a) concern. In addition, such individuals would be prohibited from exercising actual control or having the power to control the applicant or 8(a) concern, from receiving excessive compensation for personal services as directors or employees of the applicant or 8(a) concern, or from having an ownership interest in another 8(a) concern. As noted in the previous section, this ownership restriction would not apply to ownership interests of less than 5 percent. This section would permit written exceptions by the AA/MSB&COD to the former employer prohibition, the excessive compensation prohibition and the prohibition of ownership of 5 percent or more of another 8(a) concern.

Paragraph (e) of § 124.104 would adopt a current procedural requirement that the socially and economically disadvantaged individual(s) upon whom 8(a) eligibility is based control the concern's Board of Directors.

Proposed § 124.105 would set forth regulatory requirements relating to social disadvantage. Much of this proposed section would be identical to existing regulations. The word "considered" has been changed to "presumed" to more precisely state the agency's policy and practice in administering the program. SBA also proposes to expand the definition of Asian Pacific Americans to include individuals with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China, Taiwan, Kampuchea, Vietnam, Korea, the Philippines, Trust Territory of the Pacific Islands (Republic of Palau, Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, and Samoa). In addition, SBA proposes to include in regulation for the first time a definition of Subcontinent Asian Americans. This definition would reflect current program policy and would include individuals with origins from India, Pakistan, Bangladesh, Sri Lanka. SBA also proposes to add to the definition of Subcontinent Asians, individuals with origins from Bhutan and Nepal. SBA considers that individuals with origins in these countries share similar culture, heritage and physical characteristics. SBA invites public comment on these definitions.

SBA is proposing to amend § 124.106 to reflect the mandates of the Small Business Act as amended by Public Law 100–656, to incorporate current program policy regarding economic disadvantage, and to provide more definitive criteria for determining economic disadvantage. In paragraph (a) of this section, SBA is proposing to set forth the criteria to be used in determining economic disadvantage for purposes of 8(a) program eligibility. In paragraph (b) of this section, SBA is proposing to set forth the criteria to be used in determining economic disadvantage for the subcontracting program authorized under section 8(d) of the Small Business Act, the Small Disadvantaged Business Set-Aside and Evaluation Preference Programs of the Department of Defense authorized by section 1207 of Public Law 99–661, and for any other Federal procurement programs which require SBA to determine disadvantaged status as a condition of eligibility.

For purposes of 8(a) program eligibility for applicant and Participant concerns, SBA is proposing to determine economic disadvantage by analyzing factors in three general categories: the personal financial condition of the individual(s) claiming disadvantaged status, including the individual's access to credit and capital; the financial condition of the applicant concern; and the applicant concern's access to credit and capital. In accordance with current program policy, SBA is proposing to include in its consideration the personal net worth of an individual and his/her spouse, if married. The requirement of a joint financial statement would not apply if the individual is separated from his/her spouse, and there has been a separation of the assets of the spouses recognized by a court of competent jurisdiction.

In accordance with section 8(a)(6) of the Small Business Act as amended by Pub. L. 100–656, SBA is proposing to exclude from its calculations of personal net worth the individual's ownership interest in the applicant or participating 8(a) concern, and the equity in his/her primary personal residence. However, SBA would include any portion of such equity in the primary residence which is attributable to excessive withdrawals from the business concern. SBA is also proposing to list in this section those assets which it will exclude from consideration when calculating the personal net worth of an individual claiming to be an Alaska Native.

In analyzing the business financial condition of an applicant or Participant concern, SBA is proposing to compare the concern to other firms in the same or similar line of business utilizing standard industry averages. In making this comparison SBA will consider a number of factors, including, among others: business assets, revenues, pre-tax profit, business net worth, return on assets, return on investments, return on sales, current ratio, ratio of sales to officers' compensation, and debt to net worth.

Finally, SBA is proposing to continue to measure a concern's access to credit and capital by considering the concern's access to long-term financing, working capital financing, equipment trade credit, raw materials and/or supplier trade credit, and its bonding capability, if required.

For purposes of the section 8(d) Subcontracting Program and other programs requiring SBA to determine disadvantaged status as a condition of eligibility, SBA is proposing to consider the same factors set forth in § 124.106(a) for determining economic disadvantage. SBA would, however, apply these standards to take into account the intent of Congress that partial or complete achievement of a concern's 8(a) program business development goals would not necessarily preclude the concern from participation in other Federal programs designated for socially and economically disadvantaged concerns.

SBA is proposing to amend § 124.107 to incorporate existing program policy, to provide clarification of existing regulation, and to implement section 7(j)(11) of the Small Business Act as amended by Pub. L. 100–656. SBA is proposing to include in this section current policy which requires that SBA look at a number of factors when determining an applicant concern's potential for success. These factors include the technical and managerial experience and competency of the individual(s) upon whom eligibility is based, the financial capacity of the applicant concern and the concern's record for performance on previous Federal and private sector contracts in the primary industry classification in which the concern is seeking 8(a) certification.

Further, in accordance with SBA's current policy, it would generally find that potential for success exists if the applicant concern has been in business in the primary industry classification in which it seeks 8(a) certification for two full years, has a proven performance record and is financially sound. If adopted, this section would also set forth the limited circumstances under which a concern which has not been in

business for two years would be found to possess potential for success.

SBA is proposing to include the new requirement of the Reform Act that with two exceptions, SBA cannot deny an applicant concern program admission due solely to a determination that specific contract opportunities are not available for it. SBA would be authorized to deny program admission if the Government does not procure the types of products or services offered by the concern, or the Government's purchase of such products or services is not in sufficient quantities to support the applicant concern's 8(a) program participation in addition to that of current program participants providing similar products or services.

SBA is proposing to leave paragraph (a) of § 124.108 regarding individual character reviews for 8(a) eligibility purposes essentially the same. SBA is proposing to amend paragraph (b) of this section to include specific reference to the prohibition imposed by section 8(a) of the Small Business Act as amended by Pub. L. 100–656 against SBA employees and former employees holding an ownership interest in an 8(a) concern.

In accordance with the provisions of section 7(j)(11) of the Small Business Act, as amended by Pub. L. 100–656, SBA is also proposing to amend paragraph (c) of this section to provide that an individual or a business concern may only use his/her or its eligibility one time to qualify a concern for 8(a) program participation. The existing exceptions under which a concern could be reinstated for program participation would be eliminated. SBA is also proposing that an individual or concern would be deemed to have used his/her or its eligibility effective upon the date of the concern's approval for program participation. In this section SBA would state that an individual who has used his/her eligibility to qualify a concern for program participation which has exited the 8(a) program is not precluded from holding an ownership interest in another 8(a) concern, but that he/she will be regarded as a nondisadvantaged owner of the second concern.

In this section, SBA is proposing to implement section 7(j)(11) of the Small Business Act, as amended by Pub. L. 100–656 which provides that the transfer of ownership and control of an 8(a) concern to a new individual(s) does not necessarily terminate a concern's 8(a) eligibility. However, in order for the firm to be found eligible for continued participation, SBA would have to find the new individual(s) to be socially and economically disadvantaged. If continued eligibility were found, the Program Term of the firm would continue without change.

SBA is proposing to amend paragraph (d) of § 124.108 to require that at the time of program application, a program applicant whose primary industry classification is in the fields of manufacturing or supply must meet the Walsh-Healey definition for a manufacturer or supplier, and to state that this requirement is in no way affected by the Walsh-Healey exemptions allowed by section 301(b)(C) of Pub. L. 100–656 to a Program Participant in the development stage.

Finally, SBA is proposing to add a new paragraph (e) to § 124.108 which would amend existing SBA policy to allow immediate family members of a disadvantaged owner who reside in the same household to qualify more than one 8(a) concern at the same time so long as the concerns are in separate lines of business, and are separately owned, managed and controlled.

SBA is not proposing to change existing paragraph (a) of § 124.109 which states that brokers and packagers are ineligible for 8(a) participation. Existing paragraph (b) which states that debarred or suspended persons or concerns are ineligible for 8(a) participation would also remain essentially unchanged, but would be proposed as new paragraph (d).

SBA is also proposing to make ineligible for 8(a) program participation new applicant concerns which are franchises. SBA is proposing to exclude franchises from program eligibility because the franchisor-franchisee arrangement, by its nature, gives the franchisor some degree of control over the management, daily business operations and business development of the franchisee. SBA specifically invites public comment on this proposed change from current policy.

SBA is also proposing to specify that non-profit organizations, because they do not meet SBA's definition of small business, do not qualify for 8(a) program participation. Finally, SBA is proposing to revise the regulations to include current program policy which provides that a concern which is owned in whole or in part by another business concern and which relies on such ownership to qualify it as disadvantaged, is ineligible for program participation. Such applicant concern is ineligible because it does not meet SBA's requirement that a concern be at least 51 percent owned by a disadvantaged person(s).

SBA is proposing to amend § 124.110 to reflect the Program Term mandated by section 7(j) of the Small Business Act, as amended by Pub. L. 100–656. SBA is proposing to delete in their entireties existing §§ 124.110(a)–(j) and 124.111, "Fixed program participation term," and "Mechanics for extension of a fixed program participation term," respectively, and to substitute a new § 124.110 titled "Program Term," to reflect the legislated changes. This new Program Term would replace the concept of Fixed Program Participation Term (FPPT) which was established in section 7(j) of the Small Business Act as amended by Pub. L. 96–481. Under the FPPT system, all firms participating in the 8(a) program as of April 21, 1982, and all firms approved for the program subsequent to that date were eligible to negotiate an original FPPT of up to five years. These firms were also eligible to receive one extension not to exceed the difference between the original term and seven years.

In accordance with the new provisions of section 7(j) of the Small Business Act, as amended by Pub. L. 100–656, any concern which was in the program as of September 1, 1988, and did not withdraw or was not terminated or graduated between that date and November 15, 1988, received a new Program Term which was the greater of nine years less the number of years since the award of the concern's first 8(a) contract, or the concern's original Fixed Program Participation Term (FPPT), plus extension, if any, plus eighteen months. It is SBA's interpretation that concerns which had been approved for program participation prior to November 15, 1988, but which had received no 8(a) contract awards as of that date, should be treated as if they were approved on November 15, 1988, and receive a nine year Program Term beginning on that date.

SBA is proposing to add a new § 124.111 to implement section 8(a) of the Small Business Act, as amended by Pub. L. 100–656, which requires each Program Participant to make certain annual submissions to SBA. SBA would be required to examine each Program Participant based on its annual submissions, or on information received by other sources, to determine whether the Participant and its disadvantaged owners continue to meet all eligibility standards, including the standards established for determining economic disadvantage. In accordance with the provisions of the statute, SBA is proposing to provide in § 124.110 that a concern's continued program participation is contingent upon its continuing compliance with the eligibility criteria set forth in §§ 124.101 through 124.109. Failure to continue to meet the standards of eligibility would result in SBA's initiation of termination

or graduation proceedings against the firm.

In this section, SBA is also proposing to implement the statutory provision that SBA examine information provided annually by each Program Participant, and from other sources, to determine whether an excessive amount of funds or other assets has been withdrawn from the Participant for the personal benefit of the disadvantaged owner(s) or that of any person or entity affiliated with such owner(s) to the detriment of the achievement of the targets, objectives, and goals of the concern's business plan. In accordance with the statute, if SBA found such excessive withdrawals, the Agency would initiate termination proceedings against the concern, or require an appropriate reinvestment of funds or other assets and such other actions as the Agency may deem necessary to counteract the detrimental withdrawals.

Proposed § 124.112 would address 8(a) program eligibility requirements for concerns owned by Indian tribes. The term Indian tribe includes Alaska Native corporations organized pursuant to the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, *et seq.*) (see § 124.100(m)). Because tribal ownership is significantly different from ownership by disadvantaged individuals, SBA proposes to establish some separate application requirements for tribally-owned entities. Although tribally-owned entities have been eligible for the 8(a) program for a number of years and most of the separate requirements have been required as a matter of Agency policy and procedure, this is the first time SBA has included such requirements in its regulations.

In addition, where the requirements for concerns owned by Alaska Native Corporations differ from those applicable to tribally-owned entities in general, this section would set them forth separately. These separate requirements are dictated by the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, *et seq.*).

This regulation would require that an Indian tribe meet the following criteria in order to qualify a concern for 8(a) program participation. Once an Indian tribe has established its disadvantaged status, it would not normally be required to reestablish such status in order to have other businesses that it owns certified for 8(a) program participation. However, the AA/MSB&COD is authorized to require such demonstration of disadvantaged status at any time.

Absent evidence to the contrary, an Indian tribe meeting the definition found in § 124.100(m) would be deemed to be socially disadvantaged. The Indian tribe would also be required to demonstrate that the tribe itself is economically disadvantaged by complying with § 124.105 and by submitting for SBA's consideration the following information: the number of tribal members, the present tribal unemployment rate, the per capita income of tribal members (excluding judgment awards), the percentage of the local Indian population below the poverty level, the tribe's access to capital markets, a list of all enterprises which are wholly or partially owned by the tribe and the primary industry classification of each, a list of members of the tribe which manage or control tribally-owned enterprises or serve as their officers or directors, and the tribal assets as disclosed in a current tribal financial statement. Such financial statement should include all assets, even those which are encumbered or held in trust, and should specifically note which assets are so encumbered or held in trust.

In addition, an Indian tribe must submit as part of its application a copy of its governing document(s) such as its constitution or business charter, evidence of its recognition as a tribe eligible for special programs and services provided by the United States or its state of residence, and copies of its articles of incorporation and by-laws or similar documents as filed with the organizing or chartering authority.

In order to qualify for 8(a) program certification, a concern owned by an eligible Indian tribe must be organized for profit and must waive any sovereign immunity which may attach by reason of tribal ownership. Such concern must also qualify as a small business concern in its primary industry classification as defined for purposes of Government procurement in Part 121 of this Title. Tribal ownership will not, in and of itself, cause the concern to be considered to be affiliated with the tribe or with other entities owned by the tribe. However, two tribally-owned firms may be affiliated on other grounds described in Part 121 of this Title.

Proposed paragraph (c)(2)(iii) would implement the Reform Act provision which permits a tribally-owned participant to be a party to a joint venture which exceeds the applicable size standard on up to two 8(a) contracts. In order to qualify for such exception to the normal size requirements, the joint venture would be required to be 51 percent or more owned and controlled by the tribally-owned Participant, located on the tribe's reservation or tribally-owned land, must perform most of its activities on such reservation or tribally-owned land, and must employ members of the tribe for at least 50 percent of its total workforce. This exception is limited to two 8(a) contracts.

The ownership requirements for tribally-owned entities would be generally the same as those set forth in § 124.103; however, the tribe would be permitted to own more than one 8(a) Participant provided that the Participants are not in the same or similar line of business.

While many of the management and control requirements for tribally-owned concerns are the same as those imposed on other 8(a) Participants by § 124.104, provisions of the Reform Act impose some different control and management requirements for tribally-owned concerns. Tribally-owned concerns must be managed by members of the tribe who possess the same degree of technical experience and expertise as is required of other 8(a) managers under § 124.104(d). The Reform Act authorizes managers of tribally-owned concerns to manage a maximum of two such concerns. In contrast, other 8(a) managers are required to devote full-time to management of the Participant. Under this proposed section, after an individual tribal member has managed two tribally-owned concerns, he/she would be considered to have used his/her 8(a) eligibility and would be precluded from using such eligibility to qualify any other concerns for 8(a) program participation.

Under this proposed section, members of the tribal council would be prohibited from participating in the daily management of a tribally-owned Participant or from serving on its Board of Directors without first receiving written approval from SBA.

This section would require that the primary economic benefits from the Participant accrue to the tribe. Such receipt of economic benefit would be presumed if the concern is located on the tribe's reservation or on other land which was tribally-owned prior to the existence of the concern. A tribally-owned concern would also be required to meet the eligibility criteria set forth in §§ 124.107 through 124.109.

The special provisions relating to Alaska Native Corporations are proposed at paragraph (a)(3) of § 124.112. While most of the requirements are the same as for other Indian tribes, SBA has attempted in this proposed section to reconcile requirements of the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1606) (Native Claims Act) with those of the Small Business Act, as

amended by the Reform Act. Therefore, for purposes of evaluating economic disadvantage, SBA proposes to prohibit any consideration of assets or income derived from distributions of the Alaska Native Fund, established by the Native Claims Act, although Alaska Native Corporations would be required to include such assets on their financial statements and specifically identify them as distributions of the Alaska Native Fund.

This proposed section would describe the relationship between Alaska Natives, descendants of Alaska Natives, and an Alaska Native Corporation. In addition, this proposed section would make clear that the non-profit status of an Alaska Native Corporation in no way would affect the requirement that an 8(a) applicant be a for-profit concern. Where the majority of the concern's stock or other ownership interest is owned by the Alaska Native Corporation and holders of its Settlement Stock, this proposed section would deem such concern owned and controlled by the Alaska Native Corporation.

Finally, this proposed section would make clear that an Alaska Native who holds Settlement Common Stock would be treated as a tribal member for purposes of the control and management requirements of this section and § 124.104 and that officers or directors of the Alaska Native Corporation would be treated as members of a tribal council for purposes of the restriction on their daily management and control of the 8(a) Participant without prior written SBA approval.

SBA is proposing to add a new § 124.113 to implement section 8(a)(15) of the Small Business Act as amended by Pub. L. 100–656. In this section SBA would state that concerns owned by Native Hawaiian Organizations are eligible for participation in the 8(a) program and other Federal programs which require SBA to determine social and economic disadvantage as a condition of eligibility.

Proposed § 124.201(a) is designed to allow the SBA to meet the provisions of the law requiring a 90-day time frame for the processing of applications for entry into the 8(a) program and the provision of comprehensive management and technical assistance. Congress suggested using established ratios of business opportunity specialists to serve the 8(a) portfolio, and § 124.201(a) is intended to permit the AA/MSB&COD to maintain appropriate resources to meet these requirements. Section 124.201(b) would state SBA's policy that, except as noted in § 124.201(a), concerns have the right to apply for 8(a) assistance, whether or not there is an appearance of eligibility.

Proposed sections 202 through 205 would provide technical information regarding the application process, the use of representatives in connection with filing 8(a) applications, and the location of the servicing office for a concern approved for 8(a) program participation. SBA is proposing only minor clarifying changes to these sections.

SBA proposes to implement section 8(a)(9) of the Small Business Act, as amended by section 409 of the Reform Act by adding new §§ 124.206 through 124.210. These proposed new sections would describe the rights of an applicant concern or Program Participant, with regard to certain initial Agency decisions, to seek further Agency review including an administrative appeal to an Administrative Law Judge. The Reform Act would authorize an appeal of an initial Agency decision if such decision relates to program graduation, program termination, a denial of a request for a waiver of the restriction against the sale of an 8(a) concern pursuant to § 124.317, or denial of program admission based on social disadvantage, economic disadvantage, ownership, or control.

Section 409 of the Reform Act authorizes a hearing on the record under the Administrative Procedure Act (5 U.S.C. 551, *et seq.*), but at the same time requires that the Agency's proposed action "be sustained unless it is found to be arbitrary, capricious, or contrary to law." Section 409 further amends the usual scheme of APA hearings by requiring that the ALJ's decision be "the final decision of the Administration." Generally, APA hearings call for an ALJ to conduct a factfinding hearing and to make a recommended decision to the Agency program official. That official would then be responsible for making the final Agency decision on the matter.

In order to reconcile the apparent internal inconsistency of section 409 of the Reform Act and to give meaning to the arbitrary and capricious standard, SBA has proposed procedures which require, except in limited circumstances, that the ALJ review the record as it existed when the Agency made its initial decision to determine whether or not the Agency decisionmakers had been arbitrary or capricious. The Administrative Law Judge (ALJ) would be required to remand the case to the AA/MSB&COD where the administrative record does not set forth the reason upon which the Agency's initial decision is based. In limited cases, where the applicant concern or Participant first makes a showing that the decision was made with bad faith or improper behavior on the part of SBA, the ALJ may permit the introduction of new or additional evidence, including testimony, and appropriate discovery on the issue. In order to make the required showing, the applicant concern or Participant would be required to present credible evidence not mere allegations to the ALJ. The Agency would be afforded an opportunity to respond to the showing prior to a decision on the introduction of new or additional evidence.

The proposed regulation would make clear that the burden of proof remains with the applicant concern or Participant regardless of the result of the showing presented by the applicant concern or Participant.

In order to afford the program applicants and Program Participants due process consistent with the Reform Act provisions, these proposed procedures would permit applicant or participating concerns to submit new evidence to the 8(a) program officials either through a reconsideration procedure for declined program applicants (Denial of Program Admission, § 124.206) or through a procedure affording Participants two separate opportunities to demonstrate why program termination or graduation should not occur (Program graduation, § 124.208 or Program termination, § 124.209).

Section 124.206 sets forth the procedures relating to approval and decline of applications for 8(a) program admission. An application would be considered first by the Division of Program Certification and Eligibility which would make a recommendation on program certification to the AA/MSB&COD. The AA/MSB&COD is authorized to approve or decline such applications and, unless appealed to the Office of Hearings and Appeals under § 124.210, the AA/MSB&COD's decision would be the final agency determination.

An applicant which has been denied program admission would be afforded an opportunity to seek reconsideration. As part of the reconsideration process, the applicant concern could change or correct the circumstances which caused the initial decline and could also submit new evidence to supplement the written record. The Division of Program Certification and Eligibility (Division) would review any additional information along with the existing record and would make a recommendation to the AA/MSB&COD. The AA/MSB&COD would consider the complete record and would render a decision. Such decision would become

the final Agency decision within 30 days if not appealed to the Office of Hearings and Appeals under § 124.210.

SBA is proposing to establish a new § 124.207 which, in accordance with the provisions of section 7(j)(10) of the Small Business Act as amended by Pub. L. 100-656, will enumerate the means by which a participant concern may leave the 8(a) program. These means are: voluntary withdrawal, expiration of the concern's Program Term, graduation, and termination.

Proposed § 124.208 sets forth SBA's procedures by which a Program Participant could be graduated from the 8(a) program. SBA would initiate such procedures when it determines that a Program Participant has substantially achieved the targets, objectives and goals described in its business plan.

Under the proposed procedures, SBA would notify the Participant of its intent to initiate program graduation in a letter of notification, which would set forth findings for every material issue relating to the basis for program graduation and the reasons for each finding. The Participant would be afforded 45 days to respond to the letter with written information explaining why the proposed basis for graduation is unwarranted.

Following the response period, the Division of Program Certification and Eligibility would review the written record of the proposed graduation, including any information submitted by the Participant. The Division would notify the Participant of its proposed actions, either to recommend program graduation to the AA/MSB&COD or not. In instances where the basis for program graduation continues to exist following the first response period, the Participant would be afforded an additional 45 day period to submit any further written information which would rebut the proposed graduation.

In those cases, following the second response period, the Division would consider the entire record relating to the proposed program graduation. If the Division Director determines that program graduation is not warranted, he/she would so inform the Participant. If the Division Director determines that graduation is appropriate, he/she would recommend in writing to the AA/MSB&COD that the Participant be graduated.

Upon recommendation of the Division Director, the AA/MSB&COD would consider the proposed graduation and the record relating to it. If the AA/MSB&COD determines that program graduation is not appropriate, he/she would so notify the Participant. If he/she determines that graduation is warranted, he/she would issue a Notice of Program Graduation to the Participant, which sets forth findings for every material issue relating to the basis of the program graduation along with specific reasons for each finding. The Notice would also advise the Participant of its right to appeal the decision to the Office of Hearings and Appeals under § 124.210 and Part 134 of this Title. This decision would become the final Agency decision within 45 days from the date that the Notice was mailed if the Participant chooses not to appeal to the Office of Hearings and Appeals within that period.

After the effective date of program graduation, a concern which has been graduated from the 8(a) program would no longer be eligible to receive any 8(a) program assistance. Program graduation does not, however, affect the concern's obligations to complete contracts previously awarded under section 8(a) of the Small Business Act.

Proposed § 124.209 would address program termination prior to the expiration of a Participant's Program Term. SBA would be authorized to seek program termination if good cause exists. The listing of examples of good cause would be illustrative and not all inclusive. Generally, it would restate those examples of good cause included in the existing regulations (*see,* § 124.112 of existing regulations).

Proposed program termination procedures would be similar to those proposed in § 124.208 for program graduation. For program termination, the letters of notification and the Notice of Termination would set forth SBA's intent to terminate, and findings for every material issue relating to the grounds upon which such termination would be based and the reasons for such findings. Otherwise the procedures would be identical to those proposed for program graduation.

Proposed § 124.210, in conjunction with Part 134 of this Title, as proposed to be amended by conforming amendments, would describe the appeal rights of an applicant concern or Program Participant relating to certain Agency determinations, as required by section 8(a)(9) of the Small Business Act, as amended by section 409 of the Reform Act. These determinations would be program graduation, program termination, denial of a request for a waiver from the prohibition against the sale of an 8(a) Participant pursuant to § 124.317, and denial of program admission based solely on a negative finding of social disadvantage, economic disadvantage, ownership or control.

Within 45 days from the date that a Notice of such Agency determination is mailed, an applicant or Participant concern could initiate an appeal by filing a petition in accordance with Part 134 with SBA's Office of Hearings and Appeals and concurrently serving the AA/MSB&COD with a copy of the petition and all its attachments. In addition to meeting the requirements of § 134.11(a), a petition would be required to contain reasons why the Agency's determination is alleged to be arbitrary, capricious or contrary to law with specific reference to the determination and the record supporting such determination.

Appeal proceedings would be conducted by an Administrative Law Judge in accordance with this section and with Part 134 of this Title. An ALJ selected to preside over an appeal would be precluded by statute from accepting jurisdiction over any of the following: (1) An appeal, which does not on its face allege facts that if proven to be true would warrant reversal or modification of the Agency determination; (2) an appeal which is untimely filed or otherwise not filed in accordance with this section or Part 134 of this Title; or (3) an appeal, the subject of which has been decided or is the subject of an adjudication before a court of competent jurisdiction over such matters.

The determination of the Agency would be sustained unless found to be arbitrary, capricious or contrary to law. The decision of the ALJ would be the final Agency decision. In instances where the ALJ, in his/her discretion, determines that the record of the determination is insufficiently complete to decide whether the determination was arbitrary, capricious or contrary to law, the ALJ would be permitted to remand the case for further consideration by the program officials. Unless the convenience and necessity of the parties would require otherwise, any hearing relating to an appeal pursuant to paragraph (a) of this section would be conducted in the Washington, DC area.

SBA is proposing a new § 124.211 dealing with the suspension of program assistance to 8(a) Participant concerns. This section would replace current § 124.113. The proposed section would be essentially the same as the current section except that changes are proposed which would reflect the proposed changes in procedures for the handling of termination actions. SBA is also proposing to make the decision of the Administrative Law Judge the final Agency decision in any hearing held regarding a program suspension action. Finally, in paragraph (k), SBA is proposing to provide regulatory notice of

current Agency policy that SBA does not recognize the concept of de facto suspension. In accordance with this policy, unless a concern has been formally suspended from the 8(a) program by SBA it will not be eligible for reinstatement of any portion of its program term.

Proposed § 124.301 addresses business plans. Proposed paragraph (a) would set forth the general requirement that each 8(a) Program Participant develop and submit to SBA a comprehensive business plan, setting forth the Participant's business targets, objectives, and goals. SBA must approve the business plan before the Participant is eligible to receive 8(a) contracts.

Proposed paragraph (b) would require the business plan to contain the primary industry classification relevant to the 8(a) concern and related secondary Standard Industrial Classification (SIC) code designations and would permit the Participant to receive only those 8(a) contracts which are classified under SIC codes approved in its business plan. However, a Participant would be free to pursue contracts classified under SIC codes not contained in its business plan through Federal procurement procedures other than 8(a).

Proposed paragraph (c) of § 124.301 would set forth the required contents of the business plan. The plan would include analyses of market potential, competitive environment, the concern's prospects for success, the concern's strengths and weaknesses, business development goals, estimates of contract awards needed to meet those goals (both 8(a) and non-8(a)), and such other information as SBA may require. These requirements are based on section 7(j)(10) of the Small Business Act, as amended by section 205 of the Reform Act.

Proposed § 124.302 addresses the procedures and requirements for annual review and modification of the business plan. The Participant's business plan would be required to be reviewed annually with the Business Opportunity Specialist. The annual review of a participant's business Plan would generally occur within 15 working days before or after the anniversary of the firm's certification of 8(a) eligibility. During the annual review, the Participant would be required to forecast its needs for 8(a) and non-8(a) contract awards during the next program year and succeeding program year.

This section would also set forth the circumstances under which changes in the SIC code designations stated in a Participant's business plan would be approved. SBA's current regulations permit SIC code changes only under narrow circumstances where (1) an additional SIC code designation is needed to correct significant limitations in 8(a) contract support due to procuring agency actions beyond the control of the 8(a) concern, and (2) the Administrator determines that, absent a SIC code change, the 8(a) concern would be unable to achieve reasonable 8(a) development. Congress was concerned that SBA's existing regulation could limit a Participant's business development by restricting natural lines of business progression. The proposed rule would expand the circumstances under which an 8(a) concern could request a SIC code change in accordance with section 8(a)(7)(B), as added by section 303(g) of the Reform Act and as a result of SBA policy determinations. The 8(a) concern could request such a change if the requested SIC code is related to the primary industry of the concern and represents a logical business progression for the concern; the 8(a) concern has demonstrated capacity and capability to perform in the requested SIC code; and other applicable eligibility criteria are met. The proposed regulation also provides for SIC code additions or changes when SBA makes an error.

Finally, § 124.302 would require each Program Participant in the transitional stage of program participation (fifth to ninth years of program participation) to annually submit a transition management plan outlining the specific steps it will take to promote profitable business operations after graduation. This section would implement section 7(j)(10), as amended by section 205 of the Reform Act and section 8(a)(7)(B), as added by section 303(g) of the Reform Act.

Section 124.303 would describe the stages of a Participant's program participation and the assistance available in each of the stages, provided that qualifying criteria are met. The Program Term would be divided into two stages—a developmental stage of four years and a transitional stage of five years. Program Participants in the developmental stage would be eligible for sole source and competitive 8(a) awards, financial assistance under a new loan program established in lieu of Business Development Expense (BDE), a maximum of two exemptions from the requirements of the Walsh-Healey Act, a maximum of five exemptions from the Miller Act's bonding requirements, financial assistance for skills training or upgrading of employees of 8(a) concerns, the transfer of technology or surplus property owned by the United States to Participants, and training sessions to enhance the ability of 8(a) concerns to compete in the open marketplace.

Participants in the transitional stage of program participation would be eligible for the same assistance available to firms in the developmental stage with the exception of the Walsh-Healey and Miller Act exemptions and the financial assistance for employees of 8(a) concerns. In addition, such Participants would be eligible to receive from procuring agencies, assistance in forming joint ventures, leader-follower arrangements and teaming agreements, as well as training and technical assistance in transitional business planning. This section would implement paragraphs (12), (13) and (14) of section 7(j) of the Small Business Act, as added by section 301 of the Reform Act.

Proposed § 124.304 would set forth the requirements and procedures for obtaining an exemption from the requirements of the Walsh-Healey Act. The exemption would enable a Participant to enter into a contingent agreement to acquire machinery, equipment, facilities or labor needed to perform an 8(a) contract with an anticipated contract value under $10,000,000. An exemption would be granted only where the contract to which the exemption would apply is consistent with the business development goals set forth in the Participant's business plan and where SBA determines that the Participant is fully capable of performing the contract. Participants would be eligible to receive a maximum of two such exemptions. SBA's authority to grant these exemptions expires on October 1, 1992. This section would implement section 7(j)(13)(C) of the Small Business Act, as added by section 301 of the Reform Act.

Proposed § 124.305 would set forth the requirements and procedures for obtaining exemptions from the requirements of the Miller Act that bid and performance bonds be obtained on Federal construction contracts. Paragraph (a) would set forth the general policy for granting such exemptions. An exemption would be granted only where SBA determined that an 8(a) concern was unable to obtain the requisite bonds from a surety. For purposes of this proposed section, the term surety means an entity that is in the business of issuing bonds, not an entity that would be willing to give a bond on a single contract only. Proposed paragraph (b) would set forth the eligibility requirements and conditions which would have to be met before a Participant could receive such an exemption. Proposed paragraph (c) would set forth the limitations on the

exemptions, including the limits to SBA's liability, maximum dollar amount of the contract ($3,000,000), and maximum number of exemptions a Participant may receive during its Program Term (5). Proposed paragraph (d) would set forth the measures to be taken to protect the interests of third parties such as persons providing material and labor to the Participant, including the establishment of a special bank account into which the procuring agency would deposit all payments relating to the performance of the contract. In addition, the Participant would be required to notify all persons supplying it with materials or labor, including its own employees, that it has received an exemption from the Miller Act's bonding requirements pursuant to this section and would have to receive written acknowledgment of the receipt of such notification. Proposed paragraph (e) would set forth the procedures for obtaining the exemptions, including attainment of approval by the procuring agency. The Miller Act exemptions are authorized only until October 1, 1992. This section would implement section 7(j)(13)(D) of the Small Business Act, as added by section 301 of the Reform Act.

Proposed § 124.306 would set forth the requirements and procedures for obtaining financial assistance for skills training or upgrading of employees or potential employees of Program Participants in the developmental stage of program participation. In order to receive such assistance, the Program Participant would be required to document that other cost-free or subsidized training programs are not available or suitable. This section would also limit the types of training providers which could be utilized and would impose certain dollar and time limitations on the training. Finally, this section would require the Participant to give adequate assurance that it would employ the trainee or upgraded employee for at least six months after training or upgrading has been completed and would require the trainee or upgraded employee to give a similar assurance. If the employee does not remain with the Participant for that period, the violating party would be required to reimburse SBA for the training costs and would be ineligible for further assistance under this section, subject to a limited exception when such penalties would be inequitable, such as when the spouse of the employee being trained is transferred. This section would implement section 7(j)(13)(E) of the Small Business Act, as added by section 301 of the Reform Act.

Proposed § 124.307 would address contractual assistance to Program Participants generally. SBA's statutory authority to contract with procuring agencies and subcontract the performance to 8(a) concerns is set forth in this proposed section. Such subcontracts may either be sole source awards or awards attained through competition reserved for eligible 8(a) concerns. Prior to enactment of the Reform Act, 8(a) contracts were awarded only on a sole source basis. Pursuant to section 303 of the Reform Act, 8(a) contracts valued at over certain dollar amounts must be competed as of October 1, 1989. *See* proposed § 124.311. This section would also clarify that admission into the 8(a) program does not bestow a right to receive 8(a) contracts and that SBA does not guarantee any particular level of contract support to a Participant by approval of its business plan.

Proposed § 124.308 would set forth the procedures for obtaining and accepting procurements for the 8(a) program. Proposed paragraph (a) would provide that, in agencies where they are resident or have liaison responsibilities, Procurement Center Representatives (PCRs) will screen proposed procurements for potential 8(a) contracts.

Paragraph (b) would set forth the mechanisms for identifying a requirement for possible 8(a) award and the procedures to be followed once a requirement is identified. If SBA determined a requirement to be suitable for the 8(a) program, it would verify the SIC code designated for the requirement and request that the requirement be offered to the 8(a) program. If the anticipated value of the requirement is above the statutory thresholds set forth in proposed § 124.311, the SBA would request that it be offered as a competitive contract. If the requirement was below such thresholds, SBA would request that it be offered either as an open requirement or on behalf of a particular Participant.

Paragraph (c) of § 124.308 would set forth the required contents of the offering letter, the vehicle used to offer a requirement formally to the 8(a) program. The information which must be contained in the offering letter would include a description of the work to be performed or items to be delivered, the estimated time period for performance, the type of contract to be awarded, such as firm fixed price or cost reimbursement, and information showing that acceptance of the requirement for the 8(a) program would not adversely affect another small business. In cases where the procuring agency identifies a particular 8(a) concern for consideration, the agency would have to provide justification for its choice, such as that the particular concern self-marketed the requirement. This information is necessary so that SBA can make an informed decision as to whether the requirement is suitable for the 8(a) program, whether it must be competed under the requirements of the Reform Act, and, if it is to be a sole source contract, the appropriate 8(a) concern to perform the contract.

Proposed paragraph (d) of § 124.308 would set forth the procedures for accepting a requirement for the 8(a) program. Upon receipt of a procuring agency's offer, SBA would determine whether to accept the requirement for the 8(a) program and would transmit that decision to the procuring agency within 15 working days of receipt of the offer, unless granted an extension by the procuring agency. In the case of a local buy requirement to be accepted on a sole source basis, SBA would accept the offer both on behalf of the program and on behalf of a specific Participant. In the case of a national buy requirement, SBA would accept the offer for the program generally and advise the procuring agency that the appropriate field office will designate a Participant for performance. In the case of a competitive requirement, it would accept the requirement for the program generally to be competed among eligible 8(a) Participants.

Proposed paragraph (e) of § 124.308 would address sole source awards where the procuring agency nominates a specific Program Participant. Proposed paragraph (e)(1) would provide that, once a procurement is deemed suitable for acceptance as a sole source contract, it will normally be accepted on behalf of the Participant recommended by the procuring agency as long as certain specified conditions are met. The SBA must determine that the procurement is consistent with the Participant's business plan, that the Participant is responsible, and that award of the contract would not result in the Participant exceeding its approved 8(a) business support level or the business mix requirements established under § 124.312. Paragraph (e)(1) would implement section 8(a)(1)(A) of the Small Business Act, as added by section 303 of the Reform Act.

Proposed paragraphs (e)(2) and (e)(3) would describe the procedures SBA would follow after it determines whether or not an appropriate match exists with the nominated concern. If SBA determines an appropriate match

does exist, it would send an acceptance letter, advising the procuring agency whether or not SBA will participate in contract negotiations or whether it will authorize the procuring agency to negotiate directly with the identified Program Participant. If SBA determines that an appropriate match does not exist (based on the factors set forth in paragraph (e)(1)), it would select an alternate 8(a) concern and so advise the procuring agency.

Proposed paragraph (f) of § 124.308 would address the procedures to be used in circumstances where a requirement is offered for the 8(a) program but no particular Program Participant is nominated for award—so-called "open requirements." In such a case, if the requirement is a local buy item, the contract would be referred to the SBA district office in the district where the work is to be performed or items delivered. If no 8(a) concern in that district is deemed qualified to perform the contract, it would be considered for other 8(a) concerns located in that SBA region or, if appropriate, other regions. It is also possible that a specific contract could be offered to an adjacent district office in another SBA Region before being considered for the rest of the Region if deemed appropriate by SBA. If the contract is a national buy item, it would be referred to SBA s Central Office for allocation.

This section would also address the circumstances where SBA must select a Participant for possible award from among two or more eligible and qualified Participants. In such a case, the selection would be based on consideration of relevant factors such as the business developments needs, financial condition, and management and technical ability of the eligible concerns.

Proposed paragraph (f) would also require SBA to promote the equitable geographic distribution of 8(a) sole source contracts to the maximum extent practicable. This paragraph would implement section 8(a)(16)(B) of the Small Business Act, as added by section 303 of the Reform Act.

Proposed paragraph (g) of § 124.308 would provide that SBA would not authorize formal technical evaluations for sole source contracts. This is consistent with Congressional intent. The legislative history of the Reform Act contemplates competition among eligible 8(a) Participants for requirements that do not meet the dollar threshold amounts set forth in proposed § 124.311 where the procuring agency desires a technical evaluation of several firms.

In addition, SBA recognizes that formal technical evaluations may be costly for 8(a) concerns. If formal technical evaluations are limited to competitive 8(a) awards, 8(a) concerns could elect whether to participate and would have a chance of receiving the award. If a procuring agency wishes to conduct technical evaluations among more than one 8(a) concern, it would be required to request that the requirement be a competitive 8(a) award. The agency could request a formal two-step sealed bid procurement under the Federal Acquisition Regulations (FAR), or a standard negotiated competitive procurement.

Proposed § 124.309 would address the circumstances under which the SBA would decline to accept for award a requirement not previously in the 8(a) program. This section would implement SBA's policy that the Agency will not accept a requirement for the 8(a) program if such acceptance would have an adverse impact on other small business programs or on an individual small business.

Proposed paragraph (a) of § 124.309 would provide that SBA will not accept a requirement where a solicitation has previously been issued. SBA could, however, accept a requirement under extraordinary circumstances; for example where a solicitation was issued but withdrawn because of inadequate response or in an emergency, where the agency would not have time to complete the requirement and could justify a sole source award under the FAR.

Proposed paragraph (b) of § 124.309 would provide that SBA would not accept a requirement where the procuring agency has expressed publicly a clear intention to reserve the procurement as a small business or small disadvantaged business set-aside; for example, a notice of intent to set aside a procurement published in the Commerce Business Daily and inviting a response from interested small businesses. The AA/MSB&COD could, however, permit the acceptance of the requirement under extraordinary circumstances. For instance, acceptance would be permitted where the procuring agency had made the decision to set aside a requirement for the 8(a) program and a notice was subsequently mistakenly sent out. Even in such a case, SBA would only accept the procurement if the procuring agency acknowledged and documented that the notice was a mistake.

Proposed paragraph (c) would set forth the general rule that SBA will not accept a requirement for the 8(a) program where such acceptance would have an adverse impact on other small business programs or an individual small business, whether or not the affected small business is in the 8(a) program. This policy continues SBA's current policy but expands the present regulation to clarify that the adverse impact policy does not apply to "new" requirements; *i.e.*, ones that have not been previously procured by the relevant procuring agency. In order for a concern to be adversely impacted by a requirement's acceptance for the 8(a) program, that concern must have previously performed the requirement. In the case of new requirements, there is no small business which will lose the requirement.

Section 124.109(c) would also provide that SBA will presume adverse impact to exist when a small business concern performed a specific requirement for at least 24 months, is currently performing the requirement or finished such performance within thirty days of the procuring agency's offer of the requirement to the 8(a) program, and the estimated dollar value of the award is 25 percent or more of its most recent annual gross sales (including those of its affiliates). Under this presumption, SBA would consider a small business concern that meets the presumption's requirements as being adversely impacted absent evidence to the contrary. SBA could also determine that adverse impact exists apart from the above presumption. Such determinations would be made on a case by case basis.

Proposed paragraph (d) would set forth the circumstances under which SBA would release a requirement from the 8(a) program for award through competition outside the 8(a) program. It would do so only in limited circumstances where an 8(a) sole source contract is being performed by a Program Participant whose Program Term would expire prior to contract completion or by a former Program Participant whose Program Term expired less than one year before the date of the proposed contract release. In making a determination whether to release the requirement, SBA would weigh the importance of the contract for the current or former Participant's stability and business development needs against the needs of other current 8(a) Program Participants. In addition, SBA would not release a requirement where it would deplete or seriously reduce the pool of similar types of contracts to be awarded through the 8(a) program. Finally, SBA would release a requirement only upon written request by a particular affected current or former Program Participant.

Proposed § 124.310 would set forth the requirements for approval of lower tier subcontractors on 8(a) contracts. Such requirements would include advance approval, compliance with the performance of work requirements required by section 921 of Pub. L. 99–661, maintenance of an arms length relationship with the subcontractor, and control of the performance of the contract by the 8(a) concern. SBA would also have to determine that the proposed subcontracting arrangement is not an attempt to circumvent SBA's size regulations. These requirements are to prevent fronts and to insure that the benefits of 8(a) contracts inure primarily to 8(a) concerns.

Proposed § 124.311 would set forth the procedures to be used in conducting any competition among eligible 8(a) concerns authorized by Pub. L. 100–656. The Small Business Act, as amended, mandates that any contract offered to the 8(a) program be awarded on the basis of competition among eligible 8(a) concerns if: (1) There is a reasonable likelihood that at least two eligible 8(a) concerns will submit offers, and (2) the anticipated award price of the contract, including options, will exceed $5,000,000 for contracts assigned manufacturing SIC Codes and $3,000,000 for all other contracts. This section of the proposed regulations would authorize competition below the threshold dollar figures in limited instances, including where technical competitions are appropriate. Competition in these instances would require the approval of the AA/MSB&COD. The AA/MSB&COD would deny a request by a procuring agency to compete an 8(a) requirement having a dollar figure below the applicable threshold if the requirement was previously offered to the 8(a) program as a sole source award, and the AA/MSB&COD concludes that the reason for such request is the procuring agency's failure to reach agreement on price during negotiations with the selected 8(a) concern. A sole source 8(a) award would be authorized above the threshold dollar figure where (1) SBA determines that there is not a reasonable expectation that two eligible Program Participants will submit offers at a fair price, but it is known that there is an eligible Participant in the portfolio which can perform the requirement at a fair price, or (2) the requirement would be awarded to an 8(a) concern owned and controlled by an economically disadvantaged Indian tribe. A procuring agency may request SBA to award a sole source contract that is above the applicable threshold figure. SBA will determine, after consulting with the procuring agency, whether the statutory rule of two can be met for the specific requirement. If SBA believes that it can be met, it will not accept a requirement above the applicable threshold figure for award as a sole source 8(a) contract. Where a tribally-owned concern is seeking a requirement which exceeds the applicable threshold figure, either the concern or the procuring agency could request SBA to award a sole source 8(a) contract above the threshold figures. In making a determination as to whether to award such a contract on a sole source basis, SBA would weigh the developmental needs of the tribally-owned concern against the needs of other eligible concerns in the portfolio for the contract.

Proposed § 124.311(h) would authorize SBA to restrict the award of competitive 8(a) contracts to certain types of 8(a) concerns. Only those Participants that have the SIC Code of the requirement in their approved business plan would be eligible to receive a competitive 8(a) award. SBA would also be authorized to restrict 8(a) competitions among Participants in specified stages of the program and, for local buy requirements, geographically. For example, SBA could require that only those Participants in the developmental stage of program participation would be eligible for award of a specific requirement.

Proposed § 124.311(f) would identify the procedures under which an 8(a) competition would be conducted. SBA specifically requests comments from Federal agencies as to the practical application of this section. The competition would be conducted by the procuring activity. However, SBA's approval of the competition criteria to be used would be required. In a sealed bid procurement, the procuring agency would identify the low bidder to SBA. In a negotiated procurement, the procuring agency would identify all offerors. It is contemplated that SBA would then determine which Participants are eligible for award. In making such a determination, SBA would look at the following: (1) Whether the firm had the SIC Code identified in the solicitation in its approved business plan; (2) if the procurement is to be restricted within a particular stage of program participation or a particular geographical area, whether the firm is within the required stage of development or location; (3) whether it appears that the firm is small for the applicable SIC Code; (4) whether the firm's non-8(a) business activity targets are being met; and (5) whether the firm has exceeded its approved level of 8(a) support. SBA would identify all offerors which are eligible for award. In a sealed bid procurement, if the initially identified concern is determined to be ineligible for award, the procuring agency would identify the next low bidder, and so on until an eligible Participant is identified. In a negotiated procurement, the proposals of all firms identified as eligible for award by SBA would be evaluated by the procuring agency. Negotiations and/or discussions would be authorized with any of these firms. The procuring agency would then identify the selected firm to SBA. SBA would generally award an 8(a) subcontract to the firm selected by the procuring agency. It would be the rare instance when SBA would not do so. The contracting arrangement for a competitive 8(a) award would be the same as that for a sole source 8(a) award (i.e., the procuring agency and SBA would enter a prime contract and would subcontract the performance of the requirement to the selected 8(a) concern).

Proposed § 124.311(g) would prohibit any party from challenging the eligibility of a Participant for an 8(a) award. A challenge could not be made either to SBA or to any other administrative forum as part of a bid or other contract protest. Anyone with information concerning the eligibility of a Participant to continue participation in the 8(a) program could submit such information to SBA and SBA would review it in accordance with proposed § 124.111(c). Determinations as to a firm's eligibility to participate in the 8(a) program is statutorily vested in SBA and should not be undertaken by another administrative body. Therefore, SBA does not believe that bid or other contract protests at GAO, GSBCA, ASBCA, etc. should be able to attack a Participant's 8(a) eligibility status.

Proposed § 121.312 would require a firm to establish targets of non-8(a) business activity during its participation in the 8(a) program. During the developmental stage of program participation (program years 1–4), a firm would be required to make substantial and sustained efforts to meet the targeted dollar levels of non-8(a) revenue set forth in its business plan. A fixed percentage of a Participant's total revenue during each program year in the transitional stage of program participation (program years 5–9), would be required to be derived from non-8(a) business. This proposed section would specify varying ranges of non-8(a) business that a Participant would be required to achieve, depending upon its year in the program.

As previously discussed, an applicant must have the potential to succeed in

business in order to be certified for 8(a) participation. One way an applicant can demonstrate its prospect for success is to have a track record of being in business for at least two years. It is contemplated that most firms entering the program would have such a two year track record. Proposed § 124.312(b)(2) would require a newly certified Participant to make maximum efforts to maintain its existing non-8(a) business base after certification. SBA understands that a firm may lose certain business due to no fault of its own. However, SBA seeks to discourage total reliance on the 8(a) program and could commence termination proceedings if a Participant made no attempts to maintain current or obtain new non-8(a) business.

A firm in the developmental stage of program participation could not receive 8(a) contract support (whether it is awarded as a sole source contract or through competition) in excess of 125 percent of the 8(a) support level established in its approved business plan. The Participant's support level could be increased, but not solely to enable the firm to receive an additional 8(a) contract that it has identified. In the past, SBA has at times approved requests for increases in 8(a) support levels in order to award additional 8(a) contracts to the concern. A request for such an increase may have been approved whether or not the firm could increase its non-8(a) business simultaneously.

This practice brought about two results. First, it gave little meaning to a firm's approved 8(a) support level. A firm could seek 8(a) contracts in excess of its approved 8(a) support level, knowing that SBA might increase the support level if requested. Second, it encouraged a reliance on the 8(a) program. It was possible that a concern could request, and receive, an increase in its 8(a) support level that resulted in the entire capacity of the business being devoted to the performance of 8(a) contracts. This would have made it difficult for a firm to make the transition into the competitive marketplace upon leaving the program.

The proposed regulation would permit a Participant to request, and receive, an increase in its approved 8(a) support level, but only if it can demonstrate that it has increased its capacity and capability to the point that its currently approved 8(a) support level is inappropriate. In addition, the increased capacity and capability must be to the point that any approved increase in 8(a) support would not take up the entire increased capacity of the concern (i.e., after increasing its 8(a) support level, the Participant would still be able to perform additional non-8(a) contracts). A request for an increase in a Participant's approved 8(a) support level could occur only once during a program year other than at the date of its annual review. The proposed regulation would require such a request to be made at the mid-year point of a Participant's program year. Specifically, such a request would be required to be made within 15 calendar days (either before or after) of the six month date of the Participant's preceding annual review. This requirement is intended to alleviate SBA's concern that in the past requests for increases in contract support could be made, and granted, at will throughout a program year.

In measuring whether a Participant has reached its approved 8(a) support level during any program year, the proposed regulations (proposed § 124.312(b)(6) for firms in the developmental stage and proposed § 124.312(c)(9) for firms in the transitional stage) would add the dollar value of the base year of all contracts awarded during that program year (excluding options on such contracts which would be exercisable in one or more subsequent program years) to the dollar value of all options and other modifications affecting price that are exercised during that program year. Options and modifications would be counted in the program year that they are exercised. If an option or modification were exercised in the same program year in which the base year of an 8(a) contract was awarded, then both the base year and option/modification would be counted in that program year. If, however, an option or modification is exercised in a subsequent program year, then only the base year of the 8(a) contract would be counted in determining 8(a) support received. In such a case, the dollar value of the option or modification would be counted in the program year in which the option/modification was exercised.

In order to determine a Participant's reliance on the 8(a) program and whether its non-8(a) business activity targets are being met, proposed § 124.312(b)(7), for firms in the developmental stage, and proposed § 124.312(c)(10), for firms in the transitional stage, would require Participants to submit quarterly financial statements separating 8(a) and non-8(a) revenues.

Proposed § 124.312(c) would set forth the non-8(a) business activity targets that Participants would be required to meet during the transitional stage of program participation. Participants approved for participation on or after November 15, 1988 and Participants with more than five years remaining in the program as of August 15, 1989 would be subject to the non-8(a) business activity targets set forth in proposed § 124.312(c)(4). Participants with five years or less remaining in the program as of August 15, 1989 would be subject to modified non-8(a) business activity targets set forth in proposed § 124.312(c)(5).

Proposed § 124.312(c)(2) would require that during the transitional stage a Participant's approved 8(a) support level would be set with the firm's history of 8(a) and non-8(a) business and these business activity targets in mind. Once established, a firm's support level could be increased only if the firm demonstrates that the receipt of such increased support would not conflict with the business activity targets. Similar to the requirement for firms in the developmental stage, a request for an increase in 8(a) support by a Participant in the transitional stage could be made only once during a program year other than at the annual review (i.e., at the mid-year point of the program year).

The Business Opportunity Development Reform Act of 1988 required SBA to establish non-8(a) business activity targets for Participants in the transitional stage of program participation. It did not, however, provide definitive guidelines for SBA to use in establishing these targets. Similarly, the conference report to the Reform Act, H.R. Rep. No. 1070, 100th Cong., 2d Sess. 62–63 (1988), provides general guidance, but is not explicit as to how SBA should implement this provision. The conference report states that the targets established "*should generally* require firms in the fifth and sixth years to show 25% of revenues from sources other than 8(a) contracts, while in the seventh and eighth years such business revenues should *move toward* 50%," and, in the final year of program participation, "firms should *strive to achieve* at least three-fourths of their business revenues from sources other than 8(a) contracts." SBA has taken these general parameters and has refined them in order to have targets which firms are more likely to meet.

Instead of grouping years 5 and 6 and years 7 and 8 together (i.e., having the same business activity targets), the proposed rule would set different business activity targets for each year in the transitional stage of program participation. SBA felt that a requirement of approximately 25 percent

non-8(a) business in year 6 followed by a requirement of approximately 50 percent non-8(a) business in year 7 would be unworkable. A Participant that barely meets the target in year 6, and is thus not subject to remedial measures, could have difficulty in reaching the target in year 7. SBA believes that a more gradual progression away from 8(a) reliance is preferable. In addition, the proposed rule would set ranges of acceptable non-8(a) business revenues instead of requiring a specific minimum level of non-8(a) business. SBA believes that the attainment of non-8(a) business by Program Participants within a specified range is more realistic than minimum level requirements.

For firms entering the program on or after November 15, 1988 and Participants with more than five years remaining in the program as of August 15, 1989, the proposed rule would set the following non-8(a) business activity targets: 15–25 percent non 8(a) business in the first year in the transitional stage; 25–35 percent non-8(a) business in the second year in the transitional stage; 40–45 percent non-8(a) business in the third year in the transitional stage; 50–55 percent non-8(a) business in the fourth year in the transitional stage; and 65–75 percent non-8(a) business in the fifth year in the transitional stage (the final year of program participation).

The Proposed rule would establish modified non-8(a) business activity targets for Participants with less than five years remaining in the program as of August 15, 1989. There would be no fixed percentage of non-8(a) business required for firms having two years or less remaining in the program as of August 15, 1989. Such firms would be required only to make substantial and sustained efforts to meet the non-8(a) business activity targets set forth in their business plans. Many of these firms are heavily 8(a) reliant and SBA believes that establishing required percentages for non-8(a) business would have little practical effect. For Participants with more than two but less than five years remaining in the program, the proposed rule would set the following modified non-8(a) business activity targets: 10–20 percent non-8(a) business in the first year in the transitional stage, if applicable; 20–30 percent non-8(a) business in the second year in the transitional stage, if applicable; 35–40 percent non-8(a) business in the third year in the transitional stage; 45–50 percent non-8(a) business in the fourth year in the transitional stage; and 60–65 percent non-8(a) business in the fifth year in the transitional stage (the final year of program participation). These targets would require less non-8(a) business than those for newly certified firms and firms with more than five years remaining in the program. SBA does not want to unduly burden firms that are already participating in the program, but at the same time does want to impose this business mix requirement to ensure that firms are able to survive in the competitive arena after exiting the program.

Proposed § 124.312(c)(11) would require a Participant in the transitional stage to certify that it is in compliance with the non-8(a) business activity targets or that it is in compliance with such remedial measures ordered by SBA before it could receive any additional 8(a) awards.

Proposed § 124.312(c)(12) would authorize SBA to take remedial actions for Participants that fail to achieve the minimum percentage of the applicable non-8(a) business activity target. The severity of the remedial measure used would depend on the extent to which the Participant failed to obtain non-8(a) business. The potential remedies could range from requiring a Participant to obtain management and/or technical assistance where the Participant's non-8(a) business activity is very close to the required target, to reducing a Participant's 8(a) support level or reducing/eliminating sole source 8(a) awards for Participants which have had less success in meeting the required targets, to termination where a Participant makes no effort to obtain non-8(a) business and is content to rely solely on the 8(a) program.

Proposed § 124.313 would repeat the provision of SBA's current regulations that SBA will certify its own competence to perform the 8(a) requirement. This certification, required by law for entering into any 8(a) contract (sole source and competitive), should not be confused with the entirely distinct Certificate of Competency (COC) available under the Small Business Act and Part 125 of this Title. That COC program for individual firms is not available with respect to 8(a) contracts. The certification is based on SBA's determination that the selected 8(a) concern is responsible to perform the contract. An 8(a) contract will not be awarded to any 8(a) concern that SBA believes does not have the capability, competency, capacity, credit, integrity, or tenacity and perseverance to perform the requirement.

Proposed § 124.314 would require the selected 8(a) concern in either a sole source or competitive 8(a) award to perform a certain percentage of the requirement with its own work force. The percentages for service and supply contracts are taken directly from section 8(a)(14)(A) of the Small Business Act, 15 U.S.C. 637(a)(14)(A), as amended by Pub. L. 99–661. In addition, section 8(a)(14)(C) of the Small Business Act requires SBA to establish performance of work requirements for general and specialty construction. This proposed rule would require an 8(a) contractor to perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees for a general construction contract, and at least 25% of the cost of the contract, not including the cost of materials, with its own employees for a specialty construction contract. These are the same percentage of work requirements that the 8(a) regulations have historically required for general and specialty trade construction contracts. This proposed rule would not change those requirements. The proposed rule would clarify that when the regulation requires the 8(a) concern to perform a certain percentage of the contract, work done by an 8(a) concern's subsidiary, even if wholly owned, does not count in determining whether the applicable performance of requirement is being fulfilled.

Proposed § 124.314(d) would specify how this performance of work requirements would apply to indefinite quantity contracts. This proposed section would require the Program Participant, at any point in time, to have performed the required percentage of the total value of the contract to that date. A Participant would not be required to perform the mandated percentage of each task order with its own employees or work force, but would have to perform the required percentage of the combined total of all task orders to date. SBA would be able to waive this requirement where subcontracting is essential up front before the 8(a) contractor can begin performance (i.e., the subcontractor performs work in preparation of the 8(a) subcontractor's performance).

Proposed § 124.315 would define what constitutes "fair market price" for 8(a) contract purposes. This section is taken almost verbatim from section 303(e) of the Business Opportunity Development Reform Act of 1988.

Proposed § 124.316 would authorize SBA to delegate, by the use of special clauses in the prime and subcontract, the responsibility for administering an 8(a) subcontract to the procuring agency. This proposed section would authorize SBA to delegate all subcontract administration functions *except* with

respect to the following: the exercise of options; novation agreements; any modification issued pursuant to the "Changes," "Differing Site Conditions," "Price Reduction," "Default-Damages for Delay-Time Extensions" and "Suspension of Work" clauses; payments to contractors; termination of the subcontract; and consent to placement of subcontracts; and all matters related to the approval, disbursement and repayment of Advance Payments granted by SBA. This new section was needed because the delegation of authority clause contained in § 52.219–11 of the FAR, Title 48 of the Code of Federal Regulations, which is inserted in all 8(a) contracts between the procuring agency and SBA, could be read broadly so that all administration of the subcontract, including the exercise of options and modifications and novations, could be achieved without SBA's concurrence. SBA believes that it cannot delegate away its privity of contract and, thus, must be part of any option, modification or novation agreement.

Proposed § 124.317 would provide for termination of a contract for convenience if the disadvantaged owner(s) of the 8(a) concern performing the contract transfer(s) ownership of the concern. This section is taken directly from section 407 of the Business Opportunity Development Reform Act of 1988 and is designed to encourage performance by the 8(a) firm that initially received the contract. The 8(a) Participant which was awarded the 8(a) contract would be required to notify SBA immediately upon entering an agreement to transfer all or part of its ownership to any other party.

Proposed § 124.318 would incorporate into the regulations opinions of the SBA's General Counsel concerning the exercise of options and modifications. Specifically, proposed § 124.318(a) would require that the exercise of an unpriced option be considered a new contracting action. As such, if a concern has exited the 8(a) program or is other than small under the size standard corresponding to the SIC Code for the requirement, negotiations to price the option could not be entered into and the option could not be exercised. If, however, the concern were still a Program Participant and still a small business under the size standard corresponding to the SIC Code for the requirement, negotiations to price the option could be entered into and, if a fair and reasonable price is negotiated, the option could be exercised. Similarly, a modification beyond the scope of the initial 8(a) contract award would constitute a new contracting action and the same rules that apply to unpriced options would apply. Alternatively, a priced option or a modification within the scope of the initial 8(a) contract award could be exercised whether or not the concern that received the award has exited the 8(a) program and whether the concern has grown large under the size standard corresponding to the SIC Code for the requirement.

Proposed § 124.319 would set forth the procedures for both terminations of 8(a) contracts for default and for convenience. These provisions, with one exception, are identical to those currently contained in 13 CFR 124.302(d). The only exception is that, as noted above in proposed § 124.317, a termination for convenience would be instigated whenever the disadvantaged owner(s) of an 8(a) concern transfer(s) ownership of the concern to any other party and the SBA Administrator does not grant a waiver pursuant to the exceptions set forth in proposed § 124.317.

Proposed § 124.320 would address disputes and appeals. Proposed paragraph (a) would address contract disputes generally. Disputes arising between an 8(a) subcontactor and a procuring agency contracting officer would generally be decided unilaterally by the procuring agency contracting officer. For disputes arising out of advance payments or business development expense funds, the contracting officer would be that of SBA. For disputes arising out of construction contracts where SBA has waived bonding pursuant to proposed § 124.305, the contracting officer deciding the dispute would be that as agreed between SBA and the procuring agency. It is anticipated that where a dispute arises out of the performance of the contract, the procuring agency contracting officer would decide the dispute, and where the dispute arises out of the disbursement of funds from the special bank account, the SBA contracting officer would decide it. Participants have the right to appeal contracting officer decisions under the Contract Disputes Act of 1978.

Proposed paragraph (b) would describe the conditions and procedures for appeal by SBA to the head of a procuring agency. This paragraph would clarify that SBA is authorized to appeal both the decision not to set aside a requirement for the 8(a) program and the terms and conditions of a contract already set aside for the program. This paragraph would also provide time limitations for notification of appeal and for a decision on the appeal. The procuring agency, upon receipt of the appeal, would be required to suspend all further action regarding the procurement until a written decision is made, unless the procuring agency could show urgent and compelling circumstances. This paragraph also would require the head of the procuring agency to notify the SBA of the reasons for his or her determination. This paragraph would implement section 8(a)(1)(A) of the Small Business Act, as amended by section 303(d).

Proposed § 124.321 would set forth the requirements for entering joint venture agreements to perform 8(a) contracts. Proposed paragraph (a) would set forth the prerequisites for entering into a joint venture agreement. The joint venture would be required to be solely for the performance of an 8(a) contract and could be entered into only when the 8(a) concern lacks the necessary capacity to perform the contract on its own. Any joint venture entered into by a Participant would be required to be of substantial benefit to the Participant. A joint venture agreement would be found to be of substantial benefit to the 8(a) concern when it would further the goals and targets set forth in its business plan, strengthen the concern's financial position, or contribute to the concern's business development.

Proposed paragraph (b) would set forth the requirement that, except for tribally owned concerns, the combined annual receipts or employees of the concerns entering into the joint venture must meet the size standard for the SIC code industry designated for the contract. SBA generally considers joint venture partners to be affiliates for purposes of determining size. *See* § 121.3(vii)(C).

Proposed paragraph (c) would address the required contents of joint venture agreements. Such required contents would include designation of the parties to the venture as co-managers; a distribution of 51 percent of the revenues earned by the joint venture to the 8(a) concern; the establishment of a special bank account requiring the signature of all participants in the joint venture for withdrawal; an itemized description of all major equipment, facilities and other resources; and a provision in the agreement specifying the responsibilities of the parties with regard to contract performance and negotiation of subcontracts. These requirements are intended to prevent the use of joint ventures as fronts for non-8(a) concerns and to insure that the primary benefits of 8(a) contracts go to Program Participants.

Proposed paragraph (d) would set forth additional requirements for joint venture agreements including approval by the AA/MSB&COD or his or her designee; designation of an employee of the 8(a) concern as a designated project manager responsible for contract performance; housing of records in the offices of the 8(a) concern; the submission of quarterly financial statements; the submission of a project-end profit and loss statement; and performance of work requirements. These requirements would enable the SBA to adequately monitor the joint venture to prevent fraud and circumvention of the regulations and to ensure that the joint venture is operating in accordance with the terms and conditions set forth in the joint venture agreement.

Proposed paragraph (e) would give SBA the authority to inspect the records of the joint venture at any time.

Proposed paragraph (f) would set forth the statutory exemption from SBA's size limitations for joint ventures with concerns owned by Indian tribes. Section 602 of the Reform Act grants joint ventures entered into by tribally owned concerns exemptions from SBA's size limitations for up to two contracts provided that certain requirements are met. The tribally owned concern must own 51 percent or more of the joint venture; the joint venture must be located on the tribe's reservation or on land owned by the tribe; the joint venture must perform most of its activities on such reservation or tribally owned land; and members of the tribe must be employed for at least 50 percent of the joint venture's workforce. This proposed paragraph would also require that a requirement suitable for a joint venture must be identified by either SBA or a tribally owned concern and may not be identified by a large business concern. SBA is authorized to provide these exemptions only until September 30, 1991.

Proposed § 124.401 would address Advance Payments. The requirements set forth in this proposed section would be substantively the same as those currently used by SBA in authorizing and administering advance payments. The current regulation has been reworded where necessary for clarity. In addition, several provisions which currently appear only in SBA's Standard Operating Procedures or policy guidelines have been added to this section of the proposed regulations. This proposed section would be, as is the SBA's existing regulation concerning advance payments, patterned after the requirements of the Federal Acquisition Regulations (FAR). This proposed section would also incorporate the provisions currently appearing in § 124.403 concerning letters of credit. Again, the substance of the proposed regulation dealing with letters of credit has not been changed, but it has been incorporated into the advance payment section for ease of use, understanding and clarity.

Proposed § 124.402 would address Business Development Expense (BDE). This proposed section would govern those Program Participants that are performing contracts for which BDE was given prior to October 1, 1989. As previously stated, the newly authorized loan program set forth in § 122.57 of this Title is intended to replace BDE. The granting of BDE is no longer authorized after October 1, 1989, the effective date of the statutory provision authorizing the loan program. This section would provide that any BDE funds received by a Program Participant prior to October 1, 1989 must be used exclusively for the purposes stated in the BDE approval and that use of such funds for other purposes would be grounds for termination from the 8(a) program pursuant to § 124.209. Program Participants which received BDE funds prior to October 1, 1989 would be required to maintain records to substantiate the uses for which the BDE funds have been expended. This section would also provide that a Participant would be liable for repayment of the full amount of the BDE granted the Participant in the event of default on the 8(a) contract to which the BDE funds relate.

Proposed § 124.501, *Development assistance program*, is identical to § 124.501 of the current regulations.

Proposed § 124.502, *Small Business and Capital Ownership Development Program*, is identical to § 124.502 of the current regulations.

Proposed § 124.601 would set forth those reporting requirements not set forth in other sections. Proposed paragraph (a) would require 8(a) concerns to submit a capability statement to SBA annually. Such statement would briefly describe the 8(a) concern's various contract performance capabilities. The capability statements would be submitted to the appropriate procuring agencies for the purpose of matching requirements with appropriate 8(a) concerns. This paragraph would implement section 8(a)(12) of the Small Business Act, as amended by section 501 of the Reform Act.

Proposed paragraph (b) would require each Program Participant to submit a written report to SBA semi-annually concerning the accountants, consultants, attorneys, and other such parties receiving compensation to assist the Participant to obtain Federal contracts. Participants would be required to include in such report the amount of compensation received by such persons during the relevant reporting period along with a description of the activities performed. Reports raising suspicion would be immediately forwarded to SBA's Inspector General. The failure to submit a report would be considered good cause for the initiation of a termination proceeding pursuant to § 124.209. This paragraph would implement section 8(a)(20) of the Small Business Act, as added by section 404 of the Reform Act.

Proposed paragraph (c) would address the reports required of former 8(a) Program Participants. Former Participants would be required to provide such information as SBA may request concerning such former Participants' continued business operations, contract portfolio and financial condition for a period of three years following the date on which the concern exited the program. Failure to provide such information could result in SBA's refusal to approve options on contracts awarded through the 8(a) program. This section would assist SBA in fulfilling its statutory data collection and reporting requirements under section 7(j)(16) of the Small Business Act, as added by section 408 of the Reform Act. That section requires SBA to periodically evaluate those concerns which have exited the 8(a) program during the immediately preceding three fiscal years.

**Compliance With Executive Orders 12291 the Regulatory Flexibility Act (5 U.S.C. 601, et seq.) and 12612 the Paperwork Reduction Act (44 U.S.C. Ch. 35)**

The Small Business Administration considers these regulations to be a major rule pursuant to Executive Order 12291 and one which will have significant economic impact on a substantial number of small entities for purposes of the Regulatory Flexibility Act. Therefore, SBA offers the following Regulatory Impact Analysis/Regulatory Flexibility Analysis:

*a. Descriptions of Reasons Why This Action Is Being Considered*

These proposed rules are being considered to implement sections 8(a) and 7(j) of the Small Business Act, as amended by the Business Opportunity Development Reform Act of 1988. (15

U.S.C. 637(a) and 636(j), as amended by Pub. L. 100–656). These proposed rules would also provide clarification of the intention that the benefits of the 8(a) program be used exclusively for business development purposes to help small businesses owned and controlled by socially and economically disadvantaged individuals to compete on an equal basis in the mainstream of the American economy.

*b. Statement of Objectives and Legal Basis for the Proposed Rules*

The Small Business Administration (SBA) proposes to amend its regulations governing the Minority Small Business and Capital Ownership Development Program authorized by sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10) and 637(a)). In most instances the proposed revisions would implement changes required by the Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656), enacted November 15, 1988. Some provisions, however, would incorporate into the regulations existing Agency policy while others would implement proposed policy changes.

The legal basis for the proposed rules are sections 5(b)(6), 7(j) and 8(a) of the Small Business Act as amended by Pub. L. 100–656 (15 U.S.C. 634(b)(6), 636(j) and 637(a)).

*c. Description of and Estimate of the Number of Small Entities to Which These Proposed Rules Will Apply*

If adopted in final form, these proposed rules would apply to all business concerns applying for or participating in the 8(a) program. They would also apply to certain businesses requiring social and economic disadvantaged status for eligibility to participate in such programs as the Small Disadvantaged Business (SDB) Set-Aside Program authorized by section 1207(a) of Pub. L. 99–661 and the section 8(d) Subcontracting Program authorized by Section 8(d) of the Small Business Act (15 U.S.C. 637(d)).

There are approximately 2,800 firms certified and eligible for participation in the 8(a) program. It is anticipated that within four years the number of firms in the 8(a) program will reach 5,000. Prior to the enactment of the Business Development Reform Act, approximately 2,000 applications were received each year. Of this number, 1,000 firms on average advanced to the second stage and completed the application process. Experience shows that approximately 35 percent of the firms completing the application process were accepted for participation in the 8(a) program annually.

SBA anticipates that the number of applications under the Business Development Reform Act will increase due to more expeditious application and processing procedures. Therefore, we anticipate that an average of 2,500 to 3,000 applications can be expected annually. Experience demonstrates an average decline rate of 80 percent. New firms coming into the program under the proposed rules could reach 600 annually.

Over the next 18- to 24-month period, we expect very few firms to leave the program as a result of provisions of the "grandfathering clause" permitting a firm up to an additional eighteen months' participation in the program.

*d. Preliminary Regulatory Impact Analysis*

If adopted in final form, these regulations would have a major economic impact on the national economy. Currently, purchases through the 8(a) program approximate $3.2 billion annually and are projected to reach $4 billion when the Business Development Opportunity Reform Act is implemented by regulation.

There would be certain economic benefits received by 8(a) Program Participants in that they would be provided increased access to developmental resources previously unavailable to socially and economically disadvantaged individuals. For example, it is expected that as a result of clarification of lines of responsibility for implementing the 8(a) program and expedition of the application process for 8(a) program certification, additional firms could be accepted for participation. These firms are expected to be stronger as a result of increased monitoring, availability of counseling and assistance for development. Firms remaining in the program would be required to achieve a reasonable mix of competitive as well as 8(a) contracts and establish business practices designed to enhance their ability to survive once they have completed their participation in the program.

In complying with increased monitoring and reporting requirements, program participants would experience some additional costs. However, these costs should be significantly less than the potential benefits which could be realized by the program participants through their greater access to and ownership of productive capital as a result of 8(a) Program Participation.

While the initial costs to Federal agencies for administering the program could be higher, the long range overall costs should be significantly reduced due to stronger firms and the increased numerical base of firms capable of competing for Federal procurement. This would also result in decreased acquisition costs of goods and services by the Federal Government.

In addition, these proposed rules would also apply to business concerns seeking to participate in other programs requiring social and economic disadvantaged status, where such status has been challenged. Examples of such programs are the Small Disadvantaged Business Set-aside program authorized by section 1207(a) of Pub. L. 99–661 and the section 8(d) Subcontracting Program authorized by section 8(d) of the Small Business Act. Since potential Participants in those programs could be affected by these proposed rules if their disadvantaged status is challenged to SBA, these proposed rules are likely to have an additional impact.

Currently, the Department of Defense's procurements represent a significant portion of total government purchases at $135.3 billion (1988.). In that year Small Disadvantaged Businesses received $3.6 billion (2.8 percent) of this amount. (Source: Office of Small and Disadvantaged Business Utilization and Office of Secretary of Defense). However, anticipated impact would be tangential because the DOD Program exists independently and does not rely on implementation of these rules for its existence. The proposed rules would only pertain to the distribution of contracts between eligible firms. While there could be some difference to individual firms seeking to do business with the Federal Government under such programs, there would be little or no impact on the number of contracts set-aside pursuant to such programs. Therefore, the economic impact on the national economy resulting from the effect of these rules on such programs is expected to be minimal.

The Small Business Administration is expected to experience the majority of additional costs related to implementing the provisions of these proposed rules. It is anticipated that these increased costs will not exceed $11 million. They are likely to be largely in the areas of increased administration for new guidelines and procedures and added personnel and equipment costs.

*e. Description of Projected Reporting, Recordkeeping and Other Compliance Requirements of These Proposed Rules*

The following provisions of these proposed rules would require significant reporting, recordkeeping and compliance requirements.

1. Business Plan

Section 124.301 would require that within 30 days of receipt of certification, Program Participants develop comprehensive business plans establishing business activity targets, objectives and goals.

2. Annual Review

Section 124.302 would require annual review of a Participant's business plan with modification, where appropriate, and development of forecasting for required contracting support. Starting in the year of transition (fifth year), Participants would be required to submit a transition management plan establishing plans for their competitive business mix and the firm's survival after expiration of its program term.

Section 124.111 would reflect other requirements for contracting eligibility review such as certification of continued 8(a) eligibility, personal financial statements for each disadvantaged owner, record of payments made by Participants to disadvantaged owners.

3. Reporting and Verification of Business Activity

Section 124.312 would require Program Participants to provide SBA with quarterly and annual financial statements within 90 calendar days (180 calendar days for audited statements) from the end of each period. Within 30 days of the end of the program year, the Participant would provide SBA with the annual report of all non 8(a) contracts, options and modifications affecting prices executed during the program year.

4. Miscellaneous Reporting Requirements

Section 124.601 would require each Program Participant to annually submit a capability statement to SBA that describes the firm's contract performance capabilities and the name of the Participant's Business Opportunity Specialist. These capability statements would be used for contract matching requirements with various procuring agencies.

Section 124.601 semi-annually would also require the Program Participant to provide the Participant's Business Opportunity Specialist with a listing and amounts paid to agents, representatives, attorneys, accountants, consultants and other parties (excluding employees) to assist in obtaining Federal contracts.

Finally, Section 124.601 would require former 8(a). Program Participants to provide SBA with requested information concerning business operations, contract portfolio and financial conditions for a three year period following exit from the program.

*f. Federal Rules Which May Duplicate This Proposed Rule*

Although there are Federal rules contained in sections of the Federal Acquisition Regulations (FAR) which may duplicate or overlap with these proposed rules, it is SBA's understanding that any inconsistency between those rules and these proposed rules will be corrected upon SBA's publication of final rules affecting this Subpart.

*g. Significant Alternatives to Proposed Rules Which Would Accomplish Stated Objectives*

SBA submits that there are no significant alternatives which would minimize any significant economic impact upon small entities.

**List of Subjects in 13 CFR Part 124**

Government procurement, Minority business, Reporting and recordkeeping requirements, Technical assistance.

Accordingly, pursuant to the authority set forth in sections 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a), SBA hereby amends Part 124 of Title 13 of the Code of Federal Regulations as follows:

**PART 124—[AMENDED]**

1. The authority citation for Part 124 is revised to read as follows:

**Authority:** 15 U.S.C. 634(b)(6), 636(j), 637(a), 637(d) and Pub. L. 99–661 (sec. 1207), and Pub. L. 100–656.

2. Subpart A of Part 124 is revised to read as follows:

**Subpart A—Minority Small Business and Capital Ownership Development**


Sec.
124.1 Scope of regulations.
124.2 Associate Administrator for Minority Small Business and Capital Ownership Development.
124.3 Division of Program Certification and Eligibility.
124.4 Commission on Minority Business Development.
124.5 Violations.
124.6 Penalties for misrepresentation and false statements.
124.7 Restrictions on fees for applicant and participant representatives.
124.100 Definitions.
124.101 The 8(a) program: General eligibility.
124.102 Small business concern.
124.103 Ownership requirements.
124.104 Control and management.
124.105 Social disadvantage.
124.106 Economic disadvantage.
124.107 Potential for success.
124.108 Additional 8(a) program eligibility requirements.
124.109 Ineligible businesses.
124.110 Program term.
124.111 Continued 8(a) program eligibility.
124.112 Concerns owned by Indian tribes.
124.113 Concerns owned by Native Hawaiian Organizations.
124.201 Processing applications.
124.202 Place of filing.
124.203 Servicing office.
124.204 Applicant representatives.
124.205 Forms and documents required.
124.206 Approval and decline of applications for 8(a) program admission.
124.207 Program exit.
124.208 Program graduation.
124.209 Program termination.
124.210 Appeals to SBA's Office of Hearing and Appeals.
124.211 Suspension of program assistance.
124.300 Business development.
124.301 Development of business plan.
124.302 Review and modification of business plan.
124.303 Stages of 8(a) program participation.
124.304 Statutory exemption from the Walsh-Healey Act.
124.305 Statutory exemption from Miller act bonds.
124.306 Financial assistance for skills training.
124.307 Contractual assistance.
124.308 Procedures for obtaining and accepting procurements for the 8(a) program.
124.309 Barriers to acceptance.
124.310 Approval of lower tier subcontractors.
124.311 8(a) competition.
124.312 Competitive business mix.
124.313 Certification of SBA's competency.
124.314 Performance of work by the 8(a) concern.
124.315 Fair market price.
124.316 Contract administration.
124.317 Performance of contracts by original concern.
124.318 Exercise of options and modifications.
124.319 Contract termination.
124.320 Disputes and appeals.
124.321 Joint venture agreements.
124.401 Advance payments.
124.402 Business development expense.
124.501 Development assistance program.
124.502 Small Business and Capital Ownership Development Program.
124.601 Miscellaneous reporting requirements.


**Subpart A—Minority Small Business and Capital Ownership Development**

**§ 124.1 Scope of regulations.**

(a) *General.* (1) These regulations implement sections 8(a) and 7(j) of the Small Business Act, as amended by the Business Opportunity Development Reform Act of 1988, (15 U.S.C. 637(a) and 636(j), as amended by Pub. L. 100–656). Sections 8(a) and 7(j) of the Small Business Act establish the Minority

Small Business and Capital Ownership Development Program or 8(a) Program. The 8(a) Program is intended to be used exclusively for business development purposes to help small businesses owned and controlled by socially and economically disadvantaged individuals to compete on an equal basis in the mainstream of the American economy.

(2) These regulations apply to all business concerns applying for or participating in the 8(a) program as of the effective date of these regulations. As noted, portions of these regulations also apply to other Federal programs for which social and economic disadvantaged status is a requirement of program eligibility. Such programs include, among others, the Small Disadvantaged Business (SDB) Set-aside and Bid Preference Programs authorized by section 1207(a) of Pub. L. 99–661, and the Minority Small Business Subcontracting Program authorized by section 8(d) of the Small Business Act (15 U.S.C. 637(d)).

(b) *The 8(a) and 7(j) programs.* (1) Section 8(a) authorizes SBA to enter into all types of contracts, including, but not limited to, contracts for supplies, services, construction, research and development with other Government departments and agencies and to subcontract the performance of these contracts to small business concerns owned and controlled by socially and economically disadvantaged individuals, Indian tribes or Hawaiian Native Organizations.

(2) Section 7(j) authorizes SBA to provide financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or small business concerns eligible for assistance under sections 7(i), 7(j)(10), and 8(a) of the Small Business Act.

**§ 124.2 Associate Administrator for Minority Small Business and Capital Ownership Development.**

The Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD), who shall be an employee in the competitive service or in the Senior Executive Service, and a career appointee, is responsible for the formulation and execution of the policies and programs under sections 7(j) and 8(a) of the Small Business Act. The AA/MSB&COD operates under the supervision of, and is responsible to, the Administrator of SBA.

**§ 124.3 Division of Program Certification and Eligibility.**

The Division of Program Certification and Eligibility (Division) within the Office of Minority Small Business and Capital Ownership Development (MSB&COD) shall be responsible for handling all matters relating to 8(a) program eligibility, termination and graduation from 8(a) program participation, and certifications of disadvantaged status for purposes of any program or activity conducted under the authority of section 8(d) of the Small Business Act or any Federal law that references such section. The Division, headed by a Director who shall report directly to the AA/MSB&COD, shall have field offices within some or all of the Agency's regional offices.

**§ 124.4 Commission on Minority Business Development.**

A Commission on Minority Business Development (Commission) shall be established pursuant to section 505 of the Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656). This Commission is authorized to review all Federal programs designed to promote the development of minority owned businesses in order to ascertain whether the congressionally described goals and purposes of such programs are being realized.

**§ 124.5 Violations.**

Willful violation by an applicant for admission to the section 8(a) program or an applicant for participation in the section 7(j) program of any of SBA's regulations governing its other programs may result in the applicant's denial of admission to the program. The nature and severity of any such violation will be considered by the AA/MSB&COD in making a determination on the admission of an applicant to the program.

**§ 124.6 Penalties for misrepresentations and false statements.**

(a) *General.* Section 16 of the Small Business Act (15 U.S.C. 645) sets forth penalties for false statements and misrepresentations.

(b) *Misrepresentation of small business or small disadvantaged business status.* The Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656) increased the penalties for misrepresentation of small business status or small disadvantaged business status. Generally, section 16(d) of the Small Business Act provides that any person or entity that misrepresents the status of any concern or person as a "small business concern" or "small business concern owned and controlled by socially and economically disadvantaged individuals" in order to obtain for oneself or another any of the contracting opportunities set forth in paragraph (b)(1) of this section will be subject to the penalties set forth in paragraph (b)(2) of this section.

(1)(i) A prime contract to be awarded pursuant to section 9 (Small Business Innovation Research Authorities Program) or section 15 (various small business set-aside authorities) of the Small Business Act;

(ii) A subcontract to be awarded pursuant to section 8(a) of the Small Business Act;

(iii) Subcontract that is to be included as part or all of a goal contained in a subcontracting plan required pursuant to section 8(d) of the Small Business Act; or

(iv) A prime or subcontract to be awarded as a result, or in furtherance, of any other provision of Federal law that specifically references section 8(d) of the Small Business Act for a definition of program eligibility.

(2)(i) A fine of not more than $500,000 or by imprisonment for not more than 10 years, or both;

(ii) The administrative remedies prescribed by the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. 3801–3812) and implementing regulations (54 FR 6271, February 9, 1989);

(iii) Suspension and debarment as specified in 13 CFR Part 145 or Subpart 9.4 of the Federal Acquisition Regulation (FAR) (48 CFR Subpart 9.4), or any successor regulation, on the basis that such misrepresentation indicates a lack of business integrity that seriously and directly affects the present responsibility of a person or entity to transact business with the Federal government; and

(iv) Be ineligible for participation in any program or activity conducted under the authority of the Small Business Act or the Small Business Investment Act of 1958 (15 U.S.C. 661, *et seq.*) for a period not to exceed 3 years.

(c) *Misrepresentation concerning compliance with competitive mix targets.* Section 16(f) of the Small Business Act, as amended by Pub. L. 100–656, imposes the penalties set forth in paragraph (b)(2) of this section on any person or entity that falsely certifies past compliance with the requirements of section 7(j)(10)(I) of the Small Business Act which deals with competitive business mix and attainment of business activity targets (see § 124.312).

**§ 124.7 Restrictions on fees for applicant and Participant representatives.**

(a) *General.* The compensation received by any agent or representative of an 8(a) applicant or Program Participant for assisting the applicant in obtaining 8(a) certification or for assisting the Program Participant in obtaining 8(a) contracts must be reasonable in light of the service(s) performed by the agent or representative.

(b) *Contingent fees.* The fee charged by any agent or representative of an 8(a) applicant or Program Participant for assisting the applicant in obtaining 8(a) certification or for assisting the Program Participant in obtaining 8(a) contracts cannot be contingent upon the applicant/Participant receiving either 8(a) certification or specific 8(a) contract awards.

(c) *Fees as a percentage of contract award.* A Program Participant is prohibited from agreeing to pay or paying a fee to any agent or representative for assistance in obtaining a specific 8(a) contract award, if such fee is based on a percentage of the contract award, either in terms of total value of the award, profit, or otherwise.

**§ 124.100 Definitions.**

(a) "Alaska Native" means a citizen of the United States who is a person of one-fourth degree or more Alaskan Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or a combination thereof. The term includes, in the absence of proof of a minimum blood quantum, any citizen who is regarded as an Alaska Native by a Native village or Native group and whose father or mother is regarded as an Alaska Native.

(b) "Alaska Native Corporation" means any Regional Corporation, Village Corporation, Urban Corporation, or Group Corporation organized under the laws of the State of Alaska in accordance with the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, *et seq.*).

(c) "Application" or "8(a) application" means all forms and attachments required by SBA to be completed by an applicant for the 8(a) program for the purpose of establishing program eligibility.

(d) "Business Opportunity Specialist" (BOS) means the SBA field office employee responsible for providing business development assistance to Program Participants pursuant to section 7(j) and 8(a) of the Small Business Act (15 U.S.C. 636(j), 637(a)).

(e) "Business plan" means the business plan documents as submitted by the 8(a) concern and approved by SBA which include the objectives, goals, and business projections of an 8(a) concern, and all written amendments or modifications which have also been approved by SBA.

(f) "Certification of SBA's competency" means a certification by SBA, based on its assessment of an 8(a) concern's competency to perform, that SBA is competent to perform the requirements as stated in the contract. The assessment does not require a special investigation or the issuance of a Certificate of Competency (COC) as provided for elsewhere in these regulations under the authority of section 8(b)(7) (A), (B) and (C) of the Small Business Act.

(g) "Concern" means any business entity organized for profit which has a place of business located in the United States and which makes a significant contribution to the U.S. economy through payment of taxes and/or use of American products, materials and/or labor. For definition of "Small Business Concern," and regulations relating to small business size standards, *see* § 124.102 and Part 121 of this title.

(h) "Descendant of an Alaska Native" means a lineal descendant of an Alaska Native or of an individual who would have been an Alaska Native if such individual were alive on December 18, 1971, or an adoptee of an Alaska Native or of a descendant of an Alaska Native whose adoption occurred prior to his or her majority (age 18 in the State of Alaska) and is recognized at law or in equity.

(i) "Disadvantaged owner" means an individual who SBA has determined to be socially and economically disadvantaged in connection with a concern's application for or participation in the 8(a) program.

(j) "Fixed Program Participation Term" means that ultimate time period during which a concern may have participated in the 8(a) program prior to the effective date of the Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656) (November 15, 1988).

(k) "Graduation" means completion of 8(a) program participation prior to expiration of the Program Term because of substantial achievement of the targets, objectives and goals contained in the Participant's business plan.

(l) "Immediate family member" means father, mother, husband, wife, son, daughter, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, step-father, step-mother, step-son, step-daughter, step-brother, step-sister, half-brother and half-sister.

(m) "Indian tribe" means any Indian tribe, band, nation, or other organized group or community of Indians, including any Alaska Native Corporation as defined in paragraph (b) of this section which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians, or is recognized as such by the State in which such tribe, band, nation, group, or community resides. See paragraph (jj) of this section for definition of "tribally-owned concern."

(n) "Joint venture agreement" means an agreement between an eligible 8(a) concern and another small business concern, whether or not an 8(a) participant, solely for the purpose of performing a specific 8(a) contract.

(o) "Local buy item" means a supply, service (nonprofessional/professional) or product purchased to meet the specific needs of one user in one location. Examples include the purchase of services, such as custodial, trash hauling, ADP support, auditing and training as well as construction work to be performed in one location and single user manufactured items.

(p) "Manufacturer" means a concern which owns, operates, or maintains a factory or establishment that produces on the premises the materials, supplies, articles, or equipment described in the business plan. In order to qualify as a manufacturer, a concern must be able to show

(1) That it is an established manufacturer of particular goods or goods of general character which may be sought by the Government, or

(2) If it is newly entering into such manufacturing activity, that it has made all necessary prior arrangements for space, equipment, and personnel to perform manufacturing operations.

A new firm which has made such definite commitments in order to enter a manufacturing business which will later qualify it for the 8(a) program, shall not be barred from 8(a) approval because it has not yet done any manufacturing; however, this interpretation is not intended to qualify a firm whose arrangements to use space, equipment, or personnel are contingent upon 8(a) approval. This definition is based upon the Walsh-Healey Public Contracts Act, 41 U.S.C. 35–45.

(q) "National buy item" means an item or service purchased to meet the needs of a system where supply control, inventory management, and procurement responsibility have been

assigned to a central procuring activity to support the needs of one or more users of the item in two or more locations. Examples include military clothing purchased by the Defense Personnel Support Center of the Department of Defense, paint or hand tools purchased by the Federal Supply Service of the General Services Administration, medical supplies purchased by the Veterans Administration, or studies, evaluations, consulting services or similar services purchased by the headquarters office of a Department or agency for use in two or more commands or field offices.

(r) "Native Hawaiian" means any individual any of whose ancestors were natives prior to 1778, of the area which now comprises the State of Hawaii.

(s) "Native Hawaiian Organization" means any community service organization serving Native Hawaiians in the State of Hawaii which:

(1) Is a not-for-profit organization chartered by the State of Hawaii,

(2) Is controlled by Native Hawaiians, and

(3) Whose business activities will principally benefit such Native Hawaiians.

(t) "Negative control," as used in this part is defined in § 121.3(a)(i); and § 124.104(c).

(u) "Nondisadvantaged individual" means any individual who does not claim disadvantaged status, does not qualify as disadvantaged, or upon whose disadvantaged status SBA does not rely in qualifying the concern for 8(a) program participation. Except as provided in § 124.116(c)(4), an individual who has used his/her disadvantaged status in previously qualifying a concern for 8(a) program participation is considered a nondisadvantaged individual for all other 8(a) program purposes.

(v) "Non-8(a) business activity target" means the amount of non-8(a) revenue forecasted in a Participant's approved business plan during each year of its participation in the 8(a) program. During the developmental stage of program participation, these targets are goals of non-8(a) business that a Participant must strive to achieve and may be either a percentage of total revenues or a specified dollar figure. During the transitional stage of program participation these targets must be expressed as a percentage of total revenues, as set forth in § 124.312(c), that a Participant is required to achieve in each year in the transitional stage.

(w) "Open requirement" means a requirement submitted to SBA by a procuring agency for possible 8(a) award without a particular 8(a) concern being identified as a candidate for the award. Open requirements can be for local buy items or national buy items.

(x) "Operational control" means actual or constructive authority to establish long and short term goals for the concern, and manage the concern's day to day operations.

(y) "Personal net worth" means the net value of the assets of an individual remaining after total liabilities are deducted. See § 124.106.

(z) "Primary industry classification" means the four digit Standard Industrial Classification (SIC) Code designation which, for an on-going applicant concern, best describes the industry representing the largest proportion of its business revenues for the previous year or, in the case of a start-up applicant concern, that SIC Code designation which best describes the industry in which it intends to do the most business.

(aa) "Principal place of business" means the location at which the business records of the applicant concern are maintained and the location at which the individual who manages the concern's day-to-day operations spends the majority of his/her working hours.

(bb) "Program Participant" ("Participant" or "8(a) Participant") means a small business concern participating in the Small Business and Capital Ownership Development Program established by section 7(j) and 8(a) of the Small Business Act (15 U.S.C. 636(j) and 637(a)).

(cc) "Program suspension" means the temporary cessation of all 8(a) program assistance pursuant to § 124.115 of these regulations.

(dd) "Program year" means a 12-month period of an 8(a) Participant's program participation. The first program year begins on the date that the concern is certified to participate in the 8(a) program and ends one year later. Each subsequent program year begins on the Participant's anniversary of program certification and runs for one 12-month period.

(ee) "Regular dealer" means regular dealer as defined by the Walsh-Healey Public Contracts Act, 41 U.S.C. 35–45, and Department of Labor regulations found at 41 CFR 50–201.101, 50–206.53, and 50–206.54.

(ff) "Requirement" means a contract opportunity from a Federal procuring agency to acquire articles, equipment, supplies, services, materials or construction work.

(gg) "Same or similar line of business" means all business activities within the same two-digit "Major Group" of the Standard Industrial Classification (SIC) System (set forth in the SIC Manual), as the primary industry classification of the applicant concern.

(hh) "Self-marketing" of a requirement occurs when an 8(a) firm identifies a requirement that has not been committed to the 8(a) program and through its marketing efforts causes the procuring agency to offer that specific requirement to the 8(a) program on its behalf. A firm which identifies and markets a requirement which is subsequently offered to the 8(a) program as an open requirement or on behalf of another 8(a) Participant has not "self-marketed" the requirement within the meaning of these regulations.

(ii) "Termination" means the permanent cessation of 8(a) program participation prior to the expiration of the concern's Program Term for good cause pursuant to § 124.114.

(jj) "Tribally-owned concern" means any concern at least 51 percent owned by an Indian tribe as defined in paragraph (h) of this section.

(kk) "Unconditional ownership" means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, shareholder agreements or other similar arrangements which serve to allow the benefits of program participation to accrue to nondisadvantaged individuals.

**§ 124.101 The 8(a) program: General eligibility.**

(a) In order to be eligible to participate in the 8(a) program, an applicant concern or an individual upon whom 8(a) eligibility is based must meet all of the eligibility criteria set forth in § 124.102 through § 124.110 hereunder. An applicant concern owned and controlled by an Indian tribe must meet the requirements set forth in § 124.116 and in §§ 124.102 through 124.110, as applicable. An applicant concern owned and controlled by a Native Hawaiian Organization must meet the requirements set forth in § 124.117 and in §§ 124.102 through 124.110, as applicable. All determinations by the AA/MSB&COD made pursuant to §§ 124.102, 124.103, 124.104, 124.105, 124.106, and 124.107 shall be in writing, setting forth the findings based on relevant facts and in accordance with law and regulations, upon which the determination is based. An applicant concern which is declined 8(a) program admission may request a reconsideration of such decline, as set forth in § 124.206. If the application is denied on reconsideration based on a negative finding of social disadvantage, economic disadvantage, ownership or control, such decline may be appealed

by an unsuccessful applicant to the Office of Hearings and Appeals. If no reconsideration is sought or if after reconsideration the application is declined based in whole or in part on a ground other than a negative finding of social disadvantage, economic disadvantage, ownership or control, the written decline of the AA/MSB&COD is final and not subject to appeal. Appeal procedures for a decline of program admission by the AA/MSB&COD and grounds for which such an appeal may be brought are set forth in § 124.206 and Part 134 of this title. The written decision of the Office of Hearings and Appeals shall be the final Agency decision. A concern which has been declined for 8(a) program admission may reapply for the program 12 months after the date of the final Agency decision to decline.

(b) In order to continue its participation in the 8(a) program, a concern certified for program participation on or after the effective date of these regulations must continue to meet all eligibility requirements described in paragraph (a) of this section. In order to continue its participation in the 8(a) program, a concern certified for program participation prior to the effective date of these regulations must comply with the requirements of paragraph (a) of this section which have been previously required by regulation, policy or procedure. Within 12 months of the effective date of these regulations, such concerns must also come into compliance with the requirements of paragraph (a) of this section which have not been previously required by regulation, policy or procedure. Failure to do so may lead to termination or graduation pursuant to §§ 124.113 and 124.114.

(c)(1) It is SBA's intent to process applications for participation in a fair and consistent manner and to ensure that 8(a) program participation is limited to eligible individuals and concerns. Toward that end, SBA invites the participation of the public in preventing fraud and assuring the integrity of the 8(a) program.

(2) The AA/MSB&COD shall review any determination that an individual, applicant concern or Participant is eligible to participate in the 8(a) program whenever a member of the public submits credible evidence that:

(i) Such determination was based on fraudulent information;

(ii) SBA did not follow the requirements of these regulations in rendering the determination; or

(iii) The individual or concern has undergone one or more changes which have rendered it ineligible for 8(a) program particiption.

(3) The AA/MSB&COD shall determine whether the facts developed during any such review warrant further action. The member of the public whose information gave rise to the review shall be advised of SBA's findings, consistent with laws protecting confidentiality.

**§ 124.102 Small business concern.**

(a) In order to be approved for participation in the 8(a) program, an applicant concern must qualify as a small business concern as defined in § 121.4 of title 13, Code of Federal Regulations or § 124.116. The particular size standard to be applied will be based on the primary industry classification of the applicant concern. A concern owned by a Native Hawaiian Organization must also qualify as a small business concern, but the circumstance of ownership by the Native Hawaiian Organization shall not, by itself, cause affiliation with the Native Hawaiian Organization.

(b) If the Division of Program Certification and Eligibility (Division) is unable to determine that an applicant concern qualifies as a small business, the Division may deny the concern's application for 8(a) program admission or may request a formal size determination from the appropriate regional office. If the application is so denied, the small business concern may request a formal size determination from the appropriate regional office pursuant to § 121.8 of this title. Negative size determinations by an SBA regional office may be appealed to SBA's Office of Hearings and Appeals pursuant to § 121.11 of this title.

(c) In order to continue to participate in the 8(a) program, a Program Participant must qualify pursuant to the provisions of Part 121 of this title as a small business under one or more of the SIC Codes contained in the concern's approved business plan.

(d) Except for contracts awarded to joint ventures controlled by eligible Indian tribes, under § 124.320, a Program Participant must certify that it is a small business pursuant to § 121.4(g) of this title for the purpose of performing each contract awarded under the authority of section 8(a). SBA, in turn, will verify such certifications. In the event that the SBA does not accept a certification, the Program Participant may file an appeal with SBA's Office of Hearings and Appeals pursuant to §§ 121.4(g)(2)(ii)(D)(4) and 121.11 of this title.

**§ 124.103 Ownership requirements.**

Except for concerns owned by Indian tribes, Alaska Native Corporations or Native Hawaiian Organizations, in order to be eligible to participate in the 8(a) program, an applicant concern must be one which is at least 51 percent unconditionally owned by an individual(s) who is a citizen of the United States (specifically excluding permanent resident alien(s)) and who is determined by SBA to be socially and economically disadvantaged. See § 124.100 for definition of unconditional ownership. Generally, such individuals are required to have had a minimum of 51 percent ownership in the applicant concern for at least two years prior to the date of application for 8(a) program participation. In extraordinary circumstances, the AA/MSB&COD may waive this requirement where the disadvantaged owner(s) can demonstrate the concern's potential for success in accordance with paragraphs (b)(1) through (b)(4) of § 124.107. Special ownership requirements for concerns owned by Indian tribes and Alaskan Native Corporations are set forth in § 124.116. Ownership requirements for Native Hawaiian Organizations are set forth in § 124.117.

(a) In the case of an applicant concern which is a partnership, 51 percent of the partnership interest must be owned by an individual(s) determined by SBA to be socially and economically disadvantaged. Such ownership must be reflected in the concern's partnership agreement.

(b) In the case of an applicant concern which is a corporation, 51 percent of each class of voting stock and 51 percent of the combined total of all outstanding stock must be owned by an individual(s) determined by SBA to be socially and economically disadvantaged.

(c) A socially and economically disadvantaged individual(s) must hold unconditional ownership in the applicant concern. Such individual(s) cannot assert ownership of a concern on the basis of unexercised stock options or other arrangements.

(d) When determining ownership for purposes of 8(a) program eligibility, SBA will consider options to purchase stock by nondisadvantaged individuals or to convert non-voting stock or debentures held by nondisadvantaged individuals or entities to voting stock, to have been exercised.

(e) The individual(s) upon whom eligibility is based must receive at least 51 percent of the annual distribution of dividends of a corporate applicant concern and must be entitled to receive

100 percent of the value of each share of stock in his/her possession in the event that the stock is sold; and must be entitled to receive at least 51 percent of the distribution proceeds in the event of a dissolution of the corporation.

(f) An individual who is determined by SBA to be socially and economically disadvantaged for purposes of qualifying a concern for 8(a) program participation may not have an ownership interest in any other 8(a) concern. One 8(a) concern may not hold an ownership interest in any other 8(a) concern.

(g) A nondisadvantaged individual who is a partner, stockholder, officer and/or director in an 8(a) concern is prohibited from holding a simultaneous ownership interest in another 8(a) concern.

(h) A non 8(a) concern in the same or similar line of business is prohibited from having an ownership interest in an 8(a) concern.

(i) An 8(a) business concern may continue participation in the program subsequent to a change in its 8(a) ownership, provided that SBA gave prior written approval to such change. Where the change in 8(a) ownership results from the death or incapacity of a disadvantaged principal, prior approval is not required; however, the concern shall notify SBA as soon as possible. Continued participation of the 8(a) concern under new disadvantaged ownership requires compliance with all individual and business eligibility requirements of these regulations by the concern and the new owners or the grant of a waiver to § 124.317.

(j) The ownership limitations set forth in paragraphs (g), (h) and (i) of this section and paragraph (a)(5) of § 124.104 do not apply to individuals or concerns with ownership interests of less than 5 percent of a concern which is a Program Participant or applicant. A Program Participant's request for SBA's approval for the issuance of a public offering will be treated as a request for a change of ownership in accordance with the provisions of § 124.317. Such request will also cause SBA to examine the concern's continued need for access to the business development resources of the 8(a) program.

**§ 124.104 Control and management.**

Except for concerns owned by Indian tribes and Native Hawaiian Organizations as defined in § 124.100 (m) and (r), an applicant concern's management and daily business operations must be controlled by an owner(s) of the applicant concern who has (have) been determined to be socially and economically disadvantaged. (See § 124.112 for the requirements for tribally-owned entities and § 124.113 for requirements for concerns owned by Native Hawaiian Organizations.) In order for a disadvantaged individual to be found to control the concern, that individual must have managerial and technical experience and competency directly related to the primary industry in which the applicant concern is seeking 8(a) certification. In addition, for those industries requiring professional training and/or licensing (i.e., public accountancy, law, professional engineering, asbestos removal, etc.), SBA must determine that the individual(s) upon whom eligibility is based has (have) the necessary training and/or hold the requisite license(s).

(a) Individuals who are not socially and economically disadvantaged may be involved in the management of an applicant concern, and may be stockholders, partners, officers, and/or directors of such concern. Such individual(s), their spouses or immediate family members who reside in the individual's household may not, however:

(1) Be former employers of the disadvantaged owner(s) of the applicant or 8(a) concern.

(2) Be an owner, stockholder, partner, officer, director or manager of another firm in the same or similar line of business as the applicant or 8(a) concern.

(3) Exercise actual control or have the power to control the applicant or 8(a) concern.

(4) Receive excessive compensation for personal services from the applicant or 8(a) concern as directors or employees. Compensation for the personal services of a nondisadvantaged owner, his/her spouse or immediate family member residing in the same household will be deemed excessive if it exceeds the compensation to be received by any of the individuals upon whom eligibility is based; provided that with the written approval of the AA/MSB&COD or designee, an individual upon whom eligibility is based may elect to take a lower salary than such a nondisadvantaged individual if it is demonstrated to be in the best interests of the applicant or 8(a) concern.

(5) Have an ownership interest in another 8(a) concern subject to the exception set forth in paragraph (j) of § 124.103.

(b) The AA/MSB&COD may allow exceptions to the prohibitions set forth in paragraphs (a) (1), (4) and (5) of this section if requested to do so in writing and if it is established that the contemplated relationship between the nondisadvantaged individual and the disadvantaged individual or applicant concern does not give the former actual control or the potential to control the applicant or 8(a) concern and such relationship is in the best interest of the applicant or 8(a) concern.

(c) With respect to the situation described in paragraph (a)(3) of this section, nondisadvantaged individuals may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive:

(1) Nondisadvantaged individuals control the board of directors of the 8(a) concern either directly through majority membership, or indirectly, if the by-laws allow nondisadvantaged individuals to block any action proposed by the disadvantaged individuals through negative control. For example, an equal number of disadvantaged and nondisadvantaged directors could create negative control.

(2) A nondisadvantaged individual, as an officer or member of the Board of Directors of the 8(a) concern, or through stock ownership, has the power to control day-to-day direction of the business affairs of the concern.

(3) The nondisadvantaged individual provides critical financial or bonding support or licenses to the 8(a) concern which directly or indirectly allows the nondisadvantaged individual to gain control or direction of the 8(a) concern.

(4) A nondisadvantaged individual exercises voting control of the Participant through a nominee(s).

(5) A nondisadvantaged individual controls the corporation or the individual disadvantaged owners through loan arrangements.

(6) Other contractual relationships exist with nondisadvantaged individuals, the terms of which would create control over the disadvantaged concern.

(d) An applicant concern must be managed on a full-time basis by one or more persons who have been found by SBA to be socially and economically disadvantaged, and such person(s) must possess requisite management and technical capabilities as determined by SBA. Such individual must hold the position of President or Chief Executive Officer. This precludes outside employment or other business interests by the individual which conflict with the management of the firm or hinder it in achieving the objectives of its business development plan. Any disadvantaged person upon whom 8(a) eligibility is based, who is engaged in the management and daily business

operations of the 8(a) concern and who wishes to engage in outside employment must notify SBA of the nature and anticipated duration of the outside employment prior to engaging in such employment. SBA will review such notification for compliance with the requirement of day-to-day management and control of the 8(a) concern.

(e) The socially and economically disadvantaged individual(s) upon whom eligibility is based shall control the Board of Directors of an applicant or 8(a) concern, either in actual numbers (*e.g.*, in a concern having a three-person Board of Directors where each Director has one vote, there must be at least two disadvantaged individuals on the Board) or through voting rights (*e.g.*, in a concern having a two-person Board of Directors where one individual on the Board is disadvantaged and one is not, the disadvantaged vote must be weighted—worth more than one vote—in order for the concern to be eligible for 8(a) participation). All arrangements regarding the structure and voting rights of the Board and its members must comply with applicable state laws.

**§ 124.105 Social disadvantage.**

(a) *General.* Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identities as members of groups without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control.

(b) *Members of designated groups.* (1) In the absence of evidence to the contrary, the following individuals are presumed socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China, Taiwan, Laos, Kampuchea, Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam or Samoa; Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at paragraph (d) of this section.

(2) An individual seeking socially disadvantaged status as a member of a designated group may be required to demonstrate that he/she holds himself/herself out and is identified as a member of a designated group if SBA has reason to question such individual's status as a group member.

(c) *Individuals not members of designated groups.* (1) An individual who is not a member of one of the above-named groups must establish his/her individual social disadvantage on the basis of clear and convincing evidence. A clear and convincing case of social disadvantage must include the following elements:

(i) The individual's social disadvantage must stem from his or her color, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar cause not common to small business persons who are not socially disadvantaged.

(ii) The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged.

(iii) The individual's social disadvantage must be rooted in treatment which he or she has experienced in American society, not in other countries.

(iv) The individual's social disadvantage must be chronic and substantial, not fleeting or insignificant.

(v) The individual's social disadvantage must have negatively impacted on his or her entry into and/or advancement in the business world. SBA will entertain any relevant evidence in assessing this element of an applicant's case. SBA will particularly consider and place emphasis on the following experiences of the individual, where relevant:

(A) *Education.* SBA shall consider, as evidence of an individual's social disadvantage, denial of equal access to institutions of higher education; exclusion from social and professional association with students and teachers; denial of educational honors; social patterns or pressures which have discouraged the individual from pursuing a professional or business education; and other similar factors.

(B) *Employment.* SBA shall consider, as evidence of an individual's social disadvantage, discrimination in hiring; discrimination in promotions and other aspects of professional advancement; discrimination in pay and fringe benefits; discrimination in other terms and conditions of employment; retaliatory behavior by an employer; social patterns or pressures which have channelled the individual into nonprofessional or non-business fields; and other similar factors.

(C) *Business history.* SBA shall consider, as evidence of an individual's social disadvantage, unequal access to credit or capital; acquisition of credit or capital under unfavorable circumstances; discrimination in receipt (award and/or bid) of government contracts; discrimination by potential clients; exclusion from business or professional organizations; and other similar factors which have impeded the individual's business development.

(d) *Socially disadvantaged group inclusion*—(1) *General.* Upon an adequate showing to SBA by representatives of an identifiable group that the group has suffered chronic racial or ethnic prejudice or cultural bias, and upon the request of the representatives of the group that SBA do so, SBA shall publish in the **Federal Register** a notice of its receipt of a request that it consider a group not specifically named in section 201 of Pub. L. 95–507 to have members which are socially disadvantaged because of their identification as members of the group for the purpose of eligibility for the 8(a) program. The notice shall adequately identify the group making the request, and if a hearing is requested on the matter and such request is granted, the time, date and location at which such hearing is to be held. All information submitted to support a request should be addressed to the AA/MSB&COD.

(2) *Standards to be applied.* In determining whether a group has made an adequate showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this regulation, SBA shall determine:

(i) Whether the group has suffered the effects of prejudice, bias, or discriminatory practices;

(ii) Whether such conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in Pub. L. 95–507; and

(iii) Whether such conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to all small business owners. If it is demonstrated to SBA by a particular group that it satisfies the above criteria, SBA will publish a notice under paragraph (d)(1) of this section.

(3) *Procedure.* Once a notice is published under paragraph (d)(1) of this section, SBA shall adduce further information on the record of the proceeding which tends to support or refute the group's request. Such information may be submitted by any member of the public, including Government representatives and any

member of the private sector. Information may be submitted in written form, or orally at such hearings as SBA may hold on the matter.

(4) *Decision.* Once SBA has published a notice under paragraph (d)(1) of this section, it shall afford a period of not more than thirty (30) days for public comment concerning the petition for socially disadvantaged group status. It shall complete the reception of comments, including the holding of hearings within such comment period. Thereafter, SBA shall consider all information received and shall render its final decision within 60 days of the close of the comment period. Such decision shall be published as a notice in the **Federal Register**. Concurrent with the notice, SBA shall provide the petitioners of its final decision in writing.

**§ 124.106 Economic disadvantage.**

(a) *Economic disadvantage for the 8(a) program.* (1)(i) For purposes of the 8(a) program, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business who are not socially disadvantaged and such diminished opportunities have precluded or are likely to preclude such individuals from successfully competing in the open market. In determining economic disadvantage for purposes of 8(a) program eligibility, SBA shall compare the applicant concern's business and financial profile with profiles of businesses in the same or similar line of business which are not owned and controlled by socially and economically disadvantaged individuals.

(ii) This program is not intended to assist concerns owned and controlled by socially disadvantaged individuals who have accumulated substantial wealth, who have unlimited growth potential or who have not experienced or have overcome impediments to obtaining access to financing, markets and resources.

(2) *Factors to be considered.* In determining the degree of diminished credit and capital opportunities of a socially disadvantaged individual, SBA will consider factors relating both to the applicant concern and to the individual(s) claiming disadvantaged status. Factors to be analyzed depend upon the particular primary industry in which the applicant concern is involved and fall into three general categories: the personal financial condition of the individual(s) claiming disadvantaged status, including that individual's access to credit and capital; the financial condition of the applicant concern; and the applicant concern's access to credit, capital and markets.

(i) *Personal financial condition of the individuals claiming disadvantaged status.* This criterion is designed to assess the relative degree of economic disadvantage of the individual, as well as the individual's potential to capitalize or otherwise provide financial support for the business. The specific factors to be considered include, but are not limited to: the individual's personal income for at least the past two years; total fair market value of all assets; and, the personal net worth of the individual and his/her spouse, if married, subject to the exclusions set forth in paragraph (b)(1)(i) of this section.

(A) When married, an individual upon whom eligibility is based shall submit a joint financial statement. However, a joint financial statement is not required if the individual and his/her spouse are subject to a legal separation.

(B) Whenever SBA calculates the personal net worth of an individual claiming disadvantaged status for purposes of the 8(a) program, SBA shall exclude the individual's ownership interest in the applicant or participating 8(a) concern and the equity in his/her primary personal residence, (including the equity of both spouses, if married) but shall not exclude any portion of such equity in his/her primary residence which is attributable to excessive withdrawals from the applicant or participating 8(a) concern.

(C) Whenever SBA calculates the personal net worth of an individual claiming to be an Alaska Native, as defined in § 124.100(a), SBA shall include assets and income from sources other than an Alaska Native Corporation, as defined in § 124.100(b), and shall exclude from such calculation any of the following which the individual receives from any Alaska Native Corporation:

(*1*) Cash (including cash dividends on stock received from a Native Corporation) to the extent that it does not, in the aggregate, exceed $2,000 per individual per annum;

(*2*) Stock (including stock issued or distributed by a Native Corporation as a dividend or distribution on stock);

(*3*) A partnership interest;

(*4*) Land or an interest in land (including land or an interest in land received from a Native Corporation as a dividend or distribution on stock); and

(*5*) An interest in a settlement trust.

(ii) *Business financial condition.* This criterion will be used to provide a financial picture of a firm at a specific point in time in comparison to other concerns in the same or similar line of business which are not owned and controlled by socially and economically disadvantaged individuals. In evaluating a concern's financial condition, SBA's consideration will include, but not be limited to, the following factors: Business assets, revenues, pre-tax profit, net worth of the concern, including the value of the investments in the concern held by the individual claiming disadvantaged status, the return on assets, the return on investments, return on sales, ratio of current assets to current liability (current ratio), the ratio of the concern's sales to the compensation of its officers, the ratio of the concern's sales to its working capital, the ratio of the concern's debt to its net worth.

(iii) *Access to credit and capital.* This criterion will be used to evaluate the ability of the applicant concern to obtain the external support necessary to operate a competitive business enterprise. In making the evaluation, SBA shall consider the concern's access to credit and capital, including, but not limited to, the following factors: Access to long-term financing; access to working capital financing; equipment trade credit; access to raw materials and/or supplier trade credit; and bonding capability.

(b) *Economic disadvantage for the 8(d) Subcontracting Program, Small Disadvantaged Business Set-Asides, Small Disadvantaged Business Evaluation Preferences and for any other Federal procurement programs requiring SBA's determination of disadvantaged status.* For purposes of the section 8(d) subcontracting program and other programs requiring SBA's determination of disadvantaged status, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and whose diminished opportunities have precluded or are likely to preclude such individuals from successfully competing in the open market. In determining economic disadvantage for the 8(d) subcontracting program, small disadvantaged business set-asides and small disadvantaged business evaluation preferences, SBA will consider the factors set forth in paragraph (a) of this section but will apply standards to each factor that are less restrictive than those applied when determining economic disadvantage for purposes of the 8(a) program. This

approach corresponds to the Congressional intent that partial or complete achievement of a concern's 8(a) program business development goals should not necessarily preclude its participation in other Federal procurement programs for concerns owned and controlled by socially and economically disadvantaged individuals.

**§ 124.107 Potential for success.**

(a) SBA will approve a concern for program participation only when it finds that the applicant concern possesses the potential for success. In determining whether a concern has potential for success, SBA will look at a number of factors including, but not limited to, the technical and managerial experience and competency of the individual(s) upon whom eligibility is based, the financial capacity of the applicant concern and the concern's record of performance on previous Federal and private sector contracts in the primary industry in which the concern is seeking 8(a) certification. SBA will examine each of these factors to determine whether the otherwise eligible applicant concern has the potential to successfully perform subcontracts awarded under the 8(a) program and meet the business development objectives and goals of the program.

(b) Generally, if an applicant concern has been in business in the primary industry classification in which it seeks 8(a) certification for two full years as evidenced by income tax returns showing revenues for each of the years, and if the concern has a proven performance record and is financially sound, SBA will find it to possess the requisite potential for success. In extraordinary circumstances, an applicant concern which has not been in business in its primary industry classification for two full years may be found to possess the potential for success if all of the following conditions are met:

(1) The disadvantaged person(s) upon whom eligibility is based has (have) outstanding business experience, technical expertise, and educational background directly related to the applicant concern's primary industry classification.

(2) The applicant concern is adequately capitalized.

(3) The disadvantaged person(s) upon whom eligibility is based has (have) demonstrated strong management skills.

(4) The applicant concern's existence as a functional business entity is not contingent upon acceptance into the 8(a) program.

(c) An applicant concern shall not be denied admission into the program due solely to a determination that specific contract opportunities are unavailable to assist in the development of the concern unless:

(1) The Government has not previously procured and is unlikely to procure the types of products or services offered by the concern; or

(2) The purchase of such products or services by the Federal Government will not be in quantities sufficient to support the developmental needs of the applicant and other Program Participants providing the same or similar items or services.

(d) Even though an applicant concern meets all of the eligibility criteria established in these regulations, the AA/MSB&COD has the authority to decline an otherwise eligible concern based on the lack of SBA resources to serve the applicant concern. A determination to decline the application based on the lack of SBA resources must be accompanied by a written statement that SBA resources, particularly personnel, are inadequate or unavailable to serve the applicant concern.

**§ 124.108 Additional 8(a) program eligibility requirements.**

(a) *Individual character review.* If, during the processing of an application, adverse information is obtained from the section 8(a) program applicant or a credible source regarding possible criminal conduct by an applicant concern or any of its principals, no further action will be taken on the application until SBA's Inspector General has evaluated that information and has advised the AA/MSB&COD of his or her findings. The AA/MSB&COD will consider those findings when evaluating the application.

(b) *Standards of conduct.* The SBA Standards of Conduct regulations, 13 CFR Part 105, *et seq.*, apply to eligibility questions involving SBA employees and their relatives. In particular, see §§ 105.404 and 105.506 of this title prohibiting certain SBA employees and former employees from, among other things, holding an ownership interest in an 8(a) concern.

(c) *Eligibility limitations.* (1) Except for Indian tribes, once a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) program and the concern has exited the program by termination, graduation, voluntary withdrawal or expiration of its program term, neither the concern nor any of the individuals upon whom program eligibility was based shall be eligible to reapply for program participation. *See* § 124.112 of this part regarding eligibility limitations for Indian tribes.

(2) An individual will be found to have used his or her eligibility for the 8(a) program if he or she has claimed disadvantaged status by completing the appropriate SBA forms and SBA has approved the applicant concern's entry into the 8(a) program.

(3) Use of eligibility will take effect on the date of the concern's approval into the program.

(4) After an 8(a) concern exits the program, a disadvantaged owner of that concern may hold an ownership interest in another 8(a) concern provided that the concern is not in the same or similar line of business. In these instances, for purposes of 8(a) participation only, such an individual will be deemed to be a non-disadvantaged owner of that concern and criteria restricting non-disadvantaged individual participation shall apply. *See* §§ 124.103 and 124.104 of this part.

(5) Transfer of the ownership and control of an 8(a) participant to one or more other individuals does not terminate such concern's eligibility for the program provided that SBA determines the transferee(s) to be socially and economically disadvantaged or grants a waiver pursuant to § 124.317. However, the 8(a) concern's Program Term as described in § 124.110 is in no way affected by such transfer.

(d) *Manufacturers and regular dealers.* (1) For purposes of program entry, each applicant concern whose primary industry classification is as a manufacturer or supplier of materials, supplies, articles and equipment must be determined to be a manufacturer or regular dealer as defined in the Walsh-Healey Public Contracts Act Regulations found at 48 CFR Subpart 22.6.

(2) Participants in the developmental stage of 8(a) program participation may be eligible for two exemptions from the contingent agreement requirements of the Walsh-Healey Public Contracts Act, *see*, § 124.304(d). However, the availability of such exemptions during the Program Term in no way affects the requirement that an applicant concern comply with the provisions of paragraph (d)(1) of this section.

(e) Immediate family members living in the same household may not each use their individual disadvantaged status to qualify more than one business concern for section 8(a) program participation if the concerns are in the same or similar line of business. When the concerns are in separate lines of business, each applicant must establish that the

concerns are separately owned, managed and controlled. (For size limitations *see* § 121.3(a)(ii) of this title.)

**§ 124.109 Ineligible businesses.**

(a) *Brokers and packagers.* Brokers and packagers are ineligible to participate in the 8(a) program. These types of businesses do not satisfy the definition of a manufacturer or regular dealer, as stated in § 124.100.

(b) *Franchises.* Except for those admitted to the 8(a) program prior to the effective date of these regulations, franchises are ineligible to participate in the section 8(a) program.

(c) *Debarred or suspended person or concern.* Pursuant to 48 CFR Chapter I, Subpart 9.4, or 13 CFR Part 145, individuals or concerns who are debarred, suspended, voluntarily excluded or are found to be an ineligible bidder by any contracting agency of the Federal Government are ineligible for admission into the 8(a) program during the period of debarment, suspension, voluntary exclusion or status as ineligible. Prior to approval for admission to the 8(a) program, the applicant must certify that both the applicant concern and the disadvantaged individual(s) upon whom eligibility is based are not at that time debarred, suspended, voluntarily excluded or otherwise an ineligible bidder.

(d) *Non-profit organizations.* A non-profit organization does not meet the general definition of a concern as set forth in §§ 121.3(b) and 124.100(d) of these regulations and is, therefore, ineligible for 8(a) program participation (*see* § 124.100(g)). Nothing in this paragraph affects the eligibility of a for-profit concern owned and controlled by a Hawaiian Native Organization, Indian tribe or Alaska Native Corporation (*see* §§ 124.112 and 124.113 of this part).

(e) *Concerns owned by other disadvantaged concerns.* A concern which is owned in whole or in part by another business concern and relies on the disadvantaged status of that concern to claim disadvantaged status is ineligible for 8(a) program participation. These types of businesses do not meet the individual disadvantaged ownership requirements of the Small Business Act and the regulations as set forth in § 124.103.

**§ 124.110 Program term.**

(a) Each concern certified for program participation on or after November 15, 1988, is subject to a Program Term of nine years from the date of such certification. The term will consist of two stages: the developmental stage and the transitional stage, which are described in § 124.303 of this part. Nothing in this subsection shall be construed to limit SBA from initiating graduation, termination or suspension actions pursuant to §§ 124.208, 124.209 and 124.211 or to prohibit a participant from voluntarily withdrawing from the program.

(b) A concern is subject to a revised program term if the following conditions are met:

(1) The concern was a Program Participant as of September 1, 1988 or approved for 8(a) program participation between September 1, 1988 and November 15, 1988; and

(2) The concern did not voluntarily withdraw from the 8(a) program and was not graduated or terminated pursuant to §§ 124.208 and 124.209 between September 1, 1988 and November 15, 1988.

The revised Program Term shall be the greater of nine years from the date of the Participant's first contract pursuant to section 8(a) or the Participant's Fixed Program Participation Term (FPPT) expiration date, including any extension thereof, plus 18 months, whichever is greater.

(c) Once a Program Term has been established or revised in accordance with paragraphs (a) and (b) of this section, SBA is statutorily prohibited from extending such term beyond the specified expiration date.

**§ 124.111 Continued 8(a) program eligibility.**

(a) *Standards.* In order for a concern to remain eligible for program participation, it must continue to meet all eligibility criteria contained in §§ 124.101 through 124.109. Failure to do so will cause SBA to initiate a graduation or termination proceeding in accordance with §§ 124.208 and 124.209.

(b) *Submissions supporting continued eligibility.* As part of its annual review, each Program Participant shall annually submit to the Division of Program Certification and Eligibility and to the servicing field office the following:

(1) A certification that it meets the 8(a) program eligibility requirements as set forth in §§ 124.101 through 124.109;

(2) Personal financial statement for each disadvantaged owner;

(3) A record of all payments (including loans and advances) made by the Participant to each of its owners or to any person or entity affiliated with such owners; and

(4) Such other information as SBA may deem necessary. For other required annual submissions, *see* § 124.601.

(c) *Economic disadvantage eligibility reviews.* (1) Upon receipt of specific and credible information alleging that a Program Participant no longer meets the requirements of economic disadvantage for continued program eligibility, SBA shall conduct a review of the concern's eligibility for continued participation in the Program.

(2) (i) If, based on information received from the Participant or elsewhere, SBA has reason to believe that the Participant no longer meets the standards of economic disadvantage as set forth in § 124.106, SBA shall conduct a review to determine whether the Participant and its disadvantaged owners continue to meet such standards.

(ii) Sufficient reasons for SBA to conclude that an 8(a) Participant is no longer economically disadvantaged may include, but are not limited to: demonstrated access of the concern and/or its owners to a substantial new source of capital or loans, an unusually large amount of funds withdrawn from the concern by its owners, or an unusually high personal net worth of the disadvantaged owner(s), not including the owner's equity in the 8(a) concern and in his/her primary personal residence.

(3) If SBA determines, pursuant to paragraphs (c)(1) or (c)(2) of this section, that a Program Participant and/or its disadvantaged owner(s) are no longer economically disadvantaged, SBA shall initiate a graduation proceeding under § 124.208.

(4) If, based on information received from the Participant or elsewhere, SBA has reason to believe that an excessive amount of funds or other assets has been withdrawn from the Participant for the personal benefit of the disadvantaged owner(s) or that of any person or entity affiliated with such owner(s), SBA shall conduct a review to determine whether such withdrawal was detrimental to the achievement of the targets, objectives and goals of the Participant's business plan.

(5) If SBA determines pursuant to paragraph (c)(4) of this section, that funds or other assets have been withdrawn to the detriment of the achievement of the targets, objectives and goals of the Participant's business plan, SBA shall initiate a termination proceeding under § 124.209 or shall require an appropriate reinvestment of funds or other assets and such other actions as SBA may deem necessary to counteract the detrimental withdrawals.

(d) *Eligibility reviews.* If on the basis of information submitted pursuant to paragraph (b) or upon information received from any source, SBA has reason to believe the Program Participant no longer meets the

eligibility criteria (other than economic disadvantage), SBA shall conduct a review of the Participant's 8(a) program eligibility. If as a result of such review, SBA determines such Participant may no longer be eligible for program participation, SBA shall initiate termination proceedings under § 124.209.

**§ 124.112 Concerns owned by Indian tribes.**

(a) *General.* (1) Small business concerns owned by Indian tribes are eligible for participation in the section 8(a) program, provided that certain conditions are met as described below. The term Indian Tribe is defined in § 124.100(m) of this part.

(2) Small business concerns owned and controlled by Indian tribes are generally considered socially and economically disadvantaged for purposes of participation in programs authorized by section 8(d) of the Small Business Act, section 1207(a) of the Defense Authorization Act of 1987 and any other program, except the 8(a) program, which requires social and economic disadvantaged status as a condition of eligibility. If such disadvantaged status is challenged under Subpart B of this part, SBA will evaluate the disadvantaged status of the tribally owned concern using the criteria set forth in this section and § 125.106 of this part, as appropriate.

(3) Small business concerns owned and controlled by Alaska Native corporations (ANC) are eligible for participation in the section 8(a) program, subject to the same conditions as apply to tribally-owned concerns and are described at paragraphs (b) through (e) of this section with the following exceptions which apply solely to ANC-owned concerns:

(i) In evaluating the economic disadvantage of the ANC, no consideration shall be given to assets or income derived from distributions of the Alaska Native Fund established by the Alaska Native Claims Settlement Act, Pub. L. 92-203, (1971). Such assets and income should be included but specifically identified on the ANC's financial statements.

(ii) Alaska Natives and descendants of Natives must own a majority of both the total equity of the ANC and the total voting powers to elect directors of the ANC through their holdings of settlement common stock. Settlement common stock means stock of an ANC issued pursuant to 43 U.S.C. 1606(g)(1) and which is subject to the rights and restrictions listed in 43 U.S.C. 1606(h)(1).

(iii) Even though an ANC can be either for profit or non-profit, a small business concern owned and controlled by ANC must be for profit to be eligible for the 8(a) program. The concern will be deemed owned and controlled by the ANC for purposes of program eligibility so as to satisfy paragraph (a)(3) of this section where the majority of stock or other ownership interest is held by the ANC and holders of its settlement common stock. Both a majority of the total equity and total voting power must be so held.

(iv) An Alaska Native who holds Settlement Common Stock will be treated as a tribal member for purposes of the control and management requirements of paragraph (c)(4)(i) of this section. Officers or directors of an ANC will be treated as members of tribal council for purposes of paragraph (c)(4)(ii) of this section.

(b) *Tribal eligibility.* In order to qualify a concern which it owns and controls for participation in the 8(a) program, an Indian Tribe itself must meet the conditions set forth in paragraphs (b) (1) through (2) of this section. Once an Indian tribe has so established its disadvantaged status, it need not reestablish such status in order to have other businesses that it owns certified for 8(a) program participation, unless specifically required to do so by the AA/MSB-COD or his/her designee. The AA/MSB-COD, or designee, may require proof of tribal eligibility during the program participation of any tribally-owned business or at any time during the processing of an 8(a) program application by a tribally-owned concern. However, nothing in this paragraph affects the requirement that each tribally-owned concern seeking to be certified for 8(a) Program participation comply with the provisions of paragraph (c) of this section.

(1) *Social disadvantage.* An Indian tribe meeting the definition set forth in § 124.100(m) of this part shall be deemed socially disadvantaged. Individual tribal members responsible for control and management upon whom eligibility is based, pursuant to paragraph (c)(4) of this section, are considered socially disadvantaged Native Americans absent evidence to the contrary as provided at § 124.105(b).

(2) *Economic disadvantage.* In order to be eligible to participate in the 8(a) program the Indian tribe must demonstrate to SBA, that the tribe itself is economically disadvantaged. This shall involve the consideration of available data showing the tribe's economic condition, including but not limited to, the following information:

(i) The number of tribal members.

(ii) The present tribal unemployment rate.

(iii) The per capita income of tribal members excluding judgment awards.

(iv) The percentage of the local Indian population below the poverty level.

(v) The tribe's access to capital markets.

(vi) The tribal assets as disclosed in a current tribal financial statement. The statement should list all assets including those which are encumbered or held in trust, but the status of those encumbered or trust assets should be clearly delineated.

(vii) A list of all wholly or partially owned tribal enterprises or affiliates and the primary industry classification of each, as defined in § 124.100(z). The list must also specify the members of the tribe who manage or control such enterprises or serve as officers or directors.

(viii) Other information usually evaluated by SBA in order to determine economic disadvantage as described in § 124.106.

(3) *Application process—forms and documents required.* In order to establish tribal eligibility to qualify for the 8(a) program, the Indian tribe must submit the forms and documents required of 8(a) applicants generally as well as the following material:

(i) A copy of the tribe's governing document(s) such as its constitution or business charter.

(ii) Evidence of its recognition as a tribe eligible for the special programs and services provided by the United States or by its state of residence.

(iii) Copies of its articles of incorporation and bylaws as filed with the organizing or chartering authority, or similar documents needed to establish and govern a non-corporate legal entity.

(iv) Documents or materials needed to show the tribe's economically disadvantaged status as described in paragraph (b)(2) of this section.

(c) *Business eligibility.* In order to be eligible to participate in the 8(a) program, a concern which is owned by an eligible Indian tribe must meet the conditions set forth in paragraphs (c) (1) through (6) of this section.

(1) *Legal business entity organized for profit and susceptible to suit.* The applicant or participating concern must be a separate and distinct legal entity organized or chartered by the tribe, or Federal or state authorities. The concern must waive any sovereign immunity which may attach by reason of ownership by the tribe. Its articles of incorporation must contain express sovereign immunity waiver language, or a "sue and be sued" clause which designates United States Federal Courts to be among the courts of competent

jurisdiction. Also, the concern must be organized for profit, and the tribe must possess economic development powers in the tribe's governing documents.

(2) *Size.* (i) A tribally-owned applicant concern must qualify as a small business concern as defined for purposes of Government procurement in Part 121 of this title. The particular size standard to be applied shall be based on the primary industry classification of the applicant concern. Ownership by the tribe will not, in and of itself, cause affiliation with the tribe or with other entities owned by the tribe. However, affiliation with other tribally-owned entities may be caused by circumstances other than tribal ownership. (*See* § 121.3(a) of this title regarding affiliation.)

(ii) Except as provided in paragraph (c)(2)(iii) of this section, a tribally-owned Program Participant must certify to SBA that it is a small business pursuant to the provisions of § 121.4(g)(2) of this title for the purpose of performing each individual contract which it is awarded.

(iii) During its Program Term, a tribally-owned Program Participant may, for up to two 8(a) contracts, be a party to a joint venture which exceeds the applicable size standard, if the joint venture is:

(A) 51 Percent or more owned and controlled by the tribally-owned Participant;

(B) Is located on the tribe's reservation or land owned by such tribe;

(C) Performs most of its activities on such reservation or tribally-owned land; and

(D) Employs members of the tribe for at least 50 percent of its total workforce.

(3) *Ownership.* For corporate entities, a tribe must own at least 50 percent of the voting stock and at least 51 percent of the aggregate of all classes of stock. For new corporate entities, a tribe must own at least a 51 percent interest. No Indian tribe shall own more than one current or former 8(a) Program Participant having the same primary industry classification. Tribally-owned Program Participants are subject to the provisions of §§ 124.103 (c) and (d) relating to ownership by nondisadvantaged individuals and non-8(a) concerns.

(4) *Control and management.* (i) The management and daily business operations of a tribally-owned concern must be controlled by individual members of the tribe, who have not previously used any disadvantaged status individually which they may have to qualify a non-tribally-owned concern for 8(a) program participation, and who do not or have not manage(d) and control(led) more than one other tribally-owned 8(a) Program Participant. In addition, such managers must be found to possess the technical experience and expertise required in § 124.104(d). This paragraph does not preclude management of a tribally-owned concern by committees, teams, or Boards controlled by such individuals.

(ii) Members of the tribal council shall not participate in the daily management or on the board of directors of any tribally-owned 8(a) concern without obtaining prior written approval for such participation from SBA.

(iii) Except as permitted by paragraph (c)(4)(i) of this section, members of the management team, business committee members, officers, and directors are precluded from engaging in any outside employment or other business interests which conflict with the management of the concern or prevent the concern from achieving the objectives set forth in its business development plan. This is not intended to preclude participation in tribal or other activities which do not interfere with such individual's responsibilities in the operation of the applicant concern.

(5) *Location and economic benefit.* The primary economic benefits from the concern must accrue to the tribe. A concern located on a designated Indian reservation or on tribally-owned land will be presumed to provide an economic benefit, such as employment, to the tribal community. SBA may approve a location not on tribally owned land, if the applicant concern can demonstrate that similar economic benefits will accrue to the tribal community.

(6) *Other eligibility criteria.* A tribally-owned concern must also meet the eligibility criteria set forth in §§ 124.107 through 124.109.

(d) *Individual eligibility limitation.* Once a tribally-owned concern completes its 8(a) program participation, those individuals upon whom eligibility was based pursuant to paragraph (c)(4) of this section shall be deemed to have used their eligibility to qualify a concern for the 8(a) program. They may use their eligibility again only to qualify up to a total of two tribally-owned concerns.

(e) *Existing section 8(a) firms.* Tribally-owned concerns presently in the section 8(a) program must comply with the requirements of this section within 12 months from the effective date of these regulations. Failure to do so may result in the commencement of section 8(a) program termination proceedings.

**§ 124.113 Concerns owned by Native Hawaiian organizations.**

Concerns owned by Native Hawaiian Organizations as defined in § 124.100(s) are eligible for participation in the 8(a) program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility. Such concerns must meet all eligibility criteria set forth in §§ 124.102 through 124.109 of this part.

**§ 124.201 Processing applications.**

(a) The AA/MSB&COD may take appropriate administrative actions to meet legislative requirements, including limiting the size of the portfolio to be served.

(b) Except as noted in paragraph (a) of this section, it is SBA's policy that an established or start-up business or an individual on behalf of such business has the right to apply for 8(a) assistance, whether or not there is an appearance of eligibility.

**§ 124.202 Place of filing.**

An application for admission is to be filed in the regional office of the Division of Program Certification and Eligibility serving the territory in which the principal place of business, as defined in § 124.100(aa), is located.

**§ 124.203 Servicing office.**

Once approved, a Program Participant will be serviced in the field office serving the territory in which the concern's principal place of business, as defined in § 124.100(aa), is located.

**§ 124.204 Applicant representatives.**

An applicant concern may employ at its option outside representatives in connection with an application for section 8(a) program participation. If the applicant chooses to employ outside representation such as an attorney, accountant, or others, the requirements of Part 103 of this title dealing with the appearance and compensation of persons appearing before SBA are applicable to the conduct of the representative. In addition, representation in proceedings before the Office of Hearings and Appeals shall be limited as provided in § 134.16 of this title.

**§ 124.205 Forms and documents required.**

Each 8(a) applicant concern must submit the forms and attachments thereto required by the SBA when making application for admission to the section 8(a) program. Such forms and attachments will include, but are not limited to, financial statements and Federal personal and business tax returns.

**§ 124.206 Approval and decline of applications for 8(a) program admission.**

(a) *General.* The AA/MSB&COD is authorized to approve or decline applications for admission to the 8(a) program. However, denials of program admission based on his/her finding that the individual(s) claiming social and economic disadvantage are not socially and/or economically disadvantaged and/or that such individual(s) does (do) not own and/or does (do) not control the applicant concern, may be appealed to SBA's Office of Hearings and Appeals (OHA). The Division of Program Certification and Eligibility (the Division) will receive, review and evaluate all 8(a) applications. The Division will advise each program applicant within 15 days after the receipt of an application whether such application is complete and suitable for evaluation and, if not, what additional information or clarification is required to complete the application. SBA will process an application for 8(a) program participation within 90 days of receipt by the Division of a complete application package. Incomplete application packages will not be processed.

(b) *Approval.* If the AA/MSB&COD finds that the applicant concern meets all eligibility criteria, he/she shall issue an approval letter to the concern. The date of the approval letter shall be the date of program certification for purposes of determining the concern's Program Term pursuant to § 124.110. A concern is not approved for participation in the 8(a) program until an approval letter is sent by the AA/MSB&COD to the ccncern. Up until that event occurs, any new information which could have an adverse affect on the application may be considered by the AA/MSB&COD. An applicant is not admitted to the 8(a) program, however, until the participation agreement is signed.

(c) *Decline.* If the AA/MSB&COD finds that an applicant concern does not meet all eligibility criteria, he/she will provide written notification of this finding to the applicant in a letter of decline. The letter of decline shall set forth findings based on the facts and in accordance with law and regulations for every material issue relating to each eligibility factor with specific reasons for each finding. The letter of decline shall inform the applicant of its rights to request reconsideration of the AA/MSB&COD's decision and/or to appeal such decision.

(1) *Reconsideration.* Every applicant has the right to request that the AA/MSB&COD reconsider his/her decline decision. Such request must be made in writing by certified mail, return receipt requested within 45 days of the date of service of the decline letter. In support of the reconsideration request, the applicant may submit in writing to the appropriate Regional Office of the Division any additional information and documentation pertinent to overcoming the reason(s) for the initial decline. If the concern requests reconsideration, the AA/MSB&COD will issue a written determination on the reconsideration within 45 days of receipt of the request by the Regional Office of the Division which processed the original application. The Agency's eligibility analysis on reconsideration will consider all eligibility factors in light of all information then available to the Agency, and may approve the application, decline it for any of the same reasons cited in the initial decline or decline it for reasons not previously identified. If, on reconsideration, the AA/MSB&COD finds that the applicant concern meets all eligibility criteria, he/she shall issue an approval letter to the concern. The date of the approval letter shall be the date of program certification for purposes of determining the concern's Program Term pursuant to § 124.110. If, on reconsideration, the AA/MSB&COD determines that the concern does not meet all eligibility criteria, he/she will notify the applicant of this decision by letter. Such letter shall set forth findings based on the facts and in accordance with law and regulations for every material issue relating to each eligibility factor with specific reasons for each finding. If the concern is being declined solely for reasons not identified in the initial decline, the concern will be advised that SBA will treat the decline as an initial decline, and that the concern will be afforded all rights which were available to it on its initial decline.

(2) *Appeal.* An unsuccessful applicant will have the right to appeal its decline to OHA if the application is denied based solely on a negative finding of one or more of the following criteria: social disadvantage, economic disadvantage, ownership or control. The applicant, at its option, may bring such appeal either after the initial decline or after a decline on reconsideration. Petitions of appeal must conform to the requirements of § 124.210 and will be handled in accordance with the procedures contained in § 124.210 and Part 134.

(3) *Final agency decision.* If a declined applicant does not request reconsideration of the decline or, if eligible under paragraph (c)(2) of this section, a declined applicant does not file an appeal with OHA within 45 days of the date of service of the decline letter, the determination of the AA/MSB&COD will become the final Agency decision. If the application is denied on reconsideration and the applicant does not have the right to appeal the denial under paragraph (c)(2) of this section, the decision of the AA/MSB&COD is the final Agency decision. If the applicant is entitled under paragraph (c)(2) of this section to an appeal, and exercises that right, the decision of the Administrative Law Judge shall be the final Agency decision.

(4) *Reapplication for program participation.* A concern which has been declined for 8(a) program admission may reapply for admission to the program 12 months after the date of the final Agency decision to decline.

**§ 124.207 Program exit.**

A concern participating in the 8(a) program may leave the program by any of the following means:

(a) Voluntary withdrawal.

(b) Expiration of the Program Term allowed by § 124.110;

(c) Graduation pursuant to the provisions of § 124.208;

(d) Termination pursuant to the provisions of § 124.209.

**§ 124.208 Program graduation.**

(a) *General.* When an 8(a) concern is recognized as successfully completing the 8(a) program by substantially achieving the targets, objectives and goals set forth in its business plan prior to the expiration of its program term, and has demonstrated the ability to compete in the marketplace without assistance under the 8(a) program, its participation within the program shall be determined by SBA to be completed and the firm shall be graduated from the program.

(b) *Graduation criteria.* In determining whether a concern has substantially achieved the goals and objectives of its business plan and has attained the ability to compete in the marketplace without 8(a) program assistance, the following factors, among others, shall be considered by SBA.

(1) Positive overall financial trends, including but not limited to:

(i) Profitability;

(ii) Sales, including improved ratio of non-8(a) sales to 8(a) sales;

(iii) Net worth, financial ratios, working capital, capitalization, access to credit and capital;

(iv) Ability to obtain bonding;

(v) A positive comparison of the 8(a) concern's business and financial profile with profiles of non-8(a) businesses in

the same area or similar business category; and

(vi) Good management capacity and capability.

(c) *Graduation procedures*—(1) *Letter of notification.* Upon determination by the SBA pursuant to paragraph (b) of this section that an 8(a) concern should be graduated from the 8(a) program, SBA shall notify the Participant in writing of its intent to graduate in a letter of notification. The letter of notification shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the basis of the program graduation with specific reasons for each finding. The letter of notification shall also provide the Participant 45 days from the date of service of the letter to submit in writing information which would explain why the proposed basis of graduation is not warranted.

(2) *Second letter of notification.* After the 45 day response period has elapsed, the Division shall consider the proposed graduation, including information submitted by the Participant, if any. As appropriate, the Division shall notify the Participant that it will not recommend program graduation or that, despite the information that may have been provided, the basis for graduation continues to exist and that he/she intends to recommend to the AA/MSB&COD that the Participant be graduated. In instances where graduation will be recommended, the Division Director shall further notify the Participant that it will have a 45 day period from the date of service of the second letter of notification to submit to SBA such further information which would explain why the proposed graduation is not justified.

(3) *Recommendation of the Division.* Following the 45 day response period, the Division Director will consider the facts of the proposed graduation, including all information submitted by the Participant. If the Division Director determines that graduation is not appropriate, he/she will so notify the Participant within 15 days of the close of the response period. If the Division Director determines that graduation is appropriate, he/she will recommend in writing to the AA/MSB&COD, within 15 days of the close of the response period, that the Participant be graduated.

(4) *Decision of the AA/MSB&COD.* Upon the recommendation of the Division Director, the AA/MSB&COD will consider the proposed graduation and the written record supporting it. If the AA/MSB&COD determines that program graduation is warranted, he/she will issue a Notice of Program Graduation to the Participant. If not, he/she will so notify the Participant.

(5) *Notice requirements.* A Notice of Program Graduation shall conform to the form, filing and service requirements of Part 134 of this Title, under which the appeal proceeding shall be conducted. The Notice of Program Graduation shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the basis of the program graduation with specific reasons for each finding. The Notice of Program Graduation shall also advise the Program Participant that it may avail itself of an opportunity for an appeal by filing a petition in accordance with the provisions of § 124.210 and Part 134 of this title.

(6) *Appeal to Office of Hearings and Appeals.* Procedures governing appeals of program graduation to the Office of Hearings and Appeals are set forth in § 124.210 and Part 134.

(d) *Post graduation.* After the effective date of a program graduation as provided for herein, an 8(a) concern is no longer eligible to receive any 8(a) program assistance. Such concern is obligated to complete previously awarded 8(a) subcontracts, however.

**§ 124.209 Program termination.**

(a) *General.* Participation of a section 8(a) business concern in the section 8(a) program may be terminated by SBA prior to the expiration of the concern's Program Term for good cause. Examples of good cause include, but are not limited to, the following:

(1) Failure by the concern to continue to maintain its eligibility for program participation.

(2) Failure by the concern to maintain its status as a small business under the Small Business Act, as amended, and the regulations promulgated thereunder. *See* § 124.102.

(3) Failure by the concern for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership, full-time day-to-day management, and control by the person(s) who has (have) been determined to be socially and economically disadvantaged pursuant to these regulations.

(4) Failure by the concern to obtain written approval from SBA any changes in ownership, management or control pursuant to §§ 124.103 and 124.104.

(5) Failure by the concern to disclose to SBA the extent to which nondisadvantaged persons or firms participate in the management of the section 8(a) business concern.

(6) A demonstrated pattern of failing to make required submissions or responses to the Administration in a timely manner, including:

(i) Failure by the concern to provide SBA with required quarterly or annual financial statements within 90 days of the close of the reporting period, or required audited financial statements within 180 days of the close of the reporting period. Failure to provide SBA with requested tax returns, reports, or other available data within 30 days of the date of request.

(ii) Failure by the concern to submit an updated business plan within 30 days of receipt of request, without an extension of time which has been approved by SBA.

(iii) Failure by the concern to provide documents or certifications of continuing eligibility or otherwise respond to requests for information relating to the section 8(a) program from SBA or other authorized government officials within the time frames provided for in the requests.

(7) Cessation of business operations by the concern.

(8) Failure by the concern to achieve the goals cited in its original or modified business plan as a result of repeated refusals to accept or utilize SBA assistance.

(9) Failure by the concern to pursue competitive and commercial business in accordance with the business plan, or failure to make reasonable efforts to achieve competitive status.

(10) Failure by the concern to engage in business practices that will promote its competitiveness within a reasonable period of time as evidenced by, among other indicators, a pattern of inadequate performance or unjustified delinquent performance or terminations for default with respect to contracts awarded under the authority of section 8(a).

(11) A pattern of inadequate performance of awarded section 8(a) procurement subcontracts by the concern.

(12) Failure by the concern to pay or repay significant financial obligations owed to the Federal Government.

(13) Failure by the concern to obtain and keep current any and all required permits, licenses, and charters.

(14) Diversion of funds or other assets from the section 8(a) business concern for the personal benefit of its disadvantaged owners or any person or entity affiliated with such owners which is detrimental to the achievement of the targets, objectives, and goals contained in such Program Participant's business plan.

(15) Unauthorized use of business development expense funds and/or advance payment funds and/or SBA

direct, guaranty or immediate participation loan proceeds; or violation of an advance payment, business development expense agreement, or loan agreement.

(16) Failure by the concern to obtain prior SBA approval of any management agreement, joint venture agreement or other agreement relative to the performance of a section 8(a) subcontract. Violation of any requirement of a management, joint venture, or other agreement approved by SBA by either the section 8(a) concern or one of the joint venturers.

(17) Failure by the concern to obtain approval from SBA before subcontracting under a section 8(a) subcontract, or failure by the concern to abide by any conditions imposed by SBA upon such approval.

(18) Violation by the concern of a section 8(a) subcontract provision which prohibits contingent fees and gratuities; or failure to disclose to SBA fees paid or to be paid, or costs incurred or committed to third parties, directly or indirectly, in the process of obtaining section 8(a) contracts or subcontracts.

(19) Knowing submission of false information to SBA on behalf of a section 8(a) business concern by its principals, officers, or agents, or by its employees, where the principal(s) of the section 8(a) concern knows or should have known such submission to be false.

(20) Debarment, suspension, voluntary exclusion, or ineligibility of the concern or its principals pursuant to 13 CFR Part 145, FAR Subpart 9.4, 48 CFR Ch. 1, and 48 CFR Ch. 22, or any successor regulation.

(21) Conviction of the concern or the individual(s) upon whom 8(a) program eligibility is based for any offense indicating a lack of business integrity including but not limited to:

(i) Commission of a criminal offense as an incident to obtaining or attempting to obtain a public or private contract, or subcontract thereunder, or in the performance of such contract or subcontract;

(ii) Violation of the Organized Crime Control Act of 1970 (Pub. L. 91–452; 84 Stat. 922);

(iii) Embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business integrity or business honesty which seriously and directly affects the question of present responsibility as a government contractor;

(iv) Violation of any Federal antitrust statute; or

(v) Commission of any felony not specifically listed above.

(vi) Violation of section 16 of the Small Business Act, (15 U.S.C. 645).

(22) Conviction of a nondisadvantaged owner or officer of the concern for any offense described in paragraph (a)(21) of this section, provided that one or more disadvantaged owners or officers of the concern abetted, conspired with or otherwise acquiesced in the owner's or officer's commission of the offense.

(23) Willful failure on behalf of an 8(a) business concern to comply with applicable labor standards and obligations.

(24) Violation of any terms and conditions of the 8(a) Program Participation Agreement.

(25) Willful violation by an 8(a) business concern, or any of its principals, of any rule or regulation of the Administration pertaining to material issues.

(b) *Termination procedures*—(1) *Letter of notification.* When SBA determines that grounds exist to terminate a concern's participation in the 8(a) program pursuant to this section, SBA shall notify the Participant in writing of its intent to terminate in a letter of notification. The letter of notification shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the grounds upon which such termination would be based with specific reasons for each finding. The letter of notification shall provide the Participant 45 days from the date of service of the letter to submit in writing information which would eliminate the ground(s) for termination or would explain why the proposed ground(s) should not justify termination.

(2) *Second letter of notification.* After the 45-day response period has elapsed, the Division shall consider the proposed termination, including information submitted by the Participant, if any. The Division shall notify the Participant that the grounds for proposed termination have been eliminated or that, despite the information that may have been provided, some or all of the grounds for termination continue to exist. Where appropriate, the Division Director shall further notify the Participant that he/she intends to recommend to the AA/MSB&COD that the Participant be terminated from the program, and that, within 45 days of the date of service of the second letter of notification, the Participant may submit to SBA such further information as would eliminate the ground(s) for termination or would explain why the proposed ground(s) should not justify termination.

(3) *Recommendation of the Division.* Following the 45 day response period, the Division Director will have 15 days to consider the facts of the proposed termination, including all information submitted by the Participant and to notify the Participant of his/her recommendation to the AA/MSB&COD. If the grounds for proposed termination continue to exist, the Division Director will recommend in writing to the AA/MSB&COD that the Participant be terminated.

(4) *Decision of the AA/MSB&COD.* Upon the recommendation of the Division Director, the AA/MSB&COD will consider the proposed termination and the written record supporting it. If the AA/MSB&COD determines that a termination is warranted, he/ she will issue a Notice of Termination to the Participant. If not, he/she will so notify the Participant.

(5) *Notice requirements.* A Notice of Termination shall conform to the form, filing and service requirements of Part 134 of this title, under which the appeal proceeding shall be conducted. The Notice of Termination shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the grounds upon which the termination is based. The Notice of Termination shall also advise the Program Participant that it may avail itself of an opportunity for an appeal by filing a petition in accordance with the provisions of § 124.210 and Part 134 of this title.

(6) *Appeal to Office of Hearings and Appeal.* Procedures governing appeals of program termination to the Office of Hearings and Appeals are set forth in § 124.210 and Part 134 of this title.

(c) *Post termination.* After the effective date of a program termination, a section 8(a) business concern is no longer eligible to receive any section 8(a) program assistance. Such concern is obligated to complete previously awarded section 8(a) subcontracts (see § 124.211 for Program Suspension).

**§ 124.210 Appeals to SBA's Office of Hearings and Appeals.**

(a) Except as provided in paragraph (c) of this section, an applicant concern or Program Participant shall be afforded the opportunity to appeal any of the following Agency determinations:

(1) Denial of program admission based solely on a negative finding(s) of social disadvantage, economic disadvantage, ownership or control pursuant to § 124.206;

(2) Graduation pursuant to § 124.208;

(3) Termination pursuant to § 124.209; or,

(4) Denial of a request to issue a waiver pursuant to § 124.317.

(b) The applicant or Participant concern may initiate such appeal by filing a petition in accordance with Part 134 of this title with SBA's Office of Hearings and Appeals (OHA) within 45 days of the date of service of the final Agency determination pursuant to paragraph (a) of this section. In addition to the requirements of § 134.11(a), the petition shall state, with specific reference to the determination and the record supporting such determination, the reasons why the determination is alleged to be arbitrary, capricious or contrary to law. Concurrent with its filing with OHA, the concern shall also serve the AA/MSB&COD with a copy of the petition, including all attachments.

(c) Appeal proceedings brought under the authority of this section shall be conducted by an Administrative Law Judge.

(d) The Administrative Law Judge selected to preside over an appeal shall decline to accept jurisdiction over any matter if:

(1) The appeal does not, on its face, allege facts that, if proven to be true, would warrant reversal or modification of the determination, including appeals of proposed denials of 8(a) program admission which have been based in whole or in part on grounds other than a negative finding of social disadvantage, economic disadvantage, ownership or control;

(2) The appeal is untimely filed under § 134.12 or is not otherwise filed in accordance with the requirements of this section and the rules of procedure set forth in Part 134 of this title; or

(3) The matter has been decided or is the subject of an adjudication before a court of competent jurisdiction over such matters.

(e) Once the Administrative Law Judge accepts jurisdiction over an appeal, subsequent initiation of an adjudication of the matter by a court of competent jurisdiction will not preclude the Administrative Law Judge from rendering a final decision on the matter.

(f) Proceedings conducted under the authority of this section shall be conducted in accordance with the provisions of this section and Part 134 of this title.

(g) Unless it is established that the convenience and necessity of the parties requires otherwise, in the sole discretion of the Administrative Law Judge, any oral hearing conducted with respect to an appeal pursuant to paragraph (a) of this section shall be held in the Washington, DC area.

(h) (1) Except as provided in paragraph (h)(3) of this section, any proceeding conducted under the authority of paragraph (a) of this section shall be decided solely on a review of the written administrative record. The determination by the AA/MSB&COD or a designee for matters related to paragraphs (a)(1), (a)(2), and (a)(3) of this section, and the determination by the Administrator for matters related to paragraph (a)(4) of this section, shall be sustained unless such determination is found to be arbitrary, capricious, or contrary to law.

(2) If the Administrative Law Judge determines that, due to the absence in the written administrative record of the reasons upon which the determination in question was based, such administrative record is insufficiently complete to decide whether the determination is arbitrary and capricious or contrary to law, the case shall be remanded by the Administrative Law Judge to the AA/MSB&COD for further consideration in accordance with the terms of such remand. Such remand shall be for a period of no more than 10 working days. The ALJ shall retain jurisdiction of the matter during such period as the matter is on remand.

(3) (i) Neither the admission of evidence beyond the written administrative record, nor any form of discovery, will be permitted in proceedings under this section unless it is first determined by the Administrative Law Judge that the applicant concern or Participant, upon written submission, has made a substantial showing, based upon credible evidence, and not mere allegation, that the Agency determination in question may have resulted from bad faith or improper behavior. Prior to any such determination, the Agency shall be afforded an opportunity to respond in writing to the submission of the applicant concern or Participant. Upon a determination by the Administrative Law Judge that the applicant concern or Participant has made such a substantial showing, the Administrative Law Judge may permit appropriate discovery, and accept relevant evidence beyond the written administrative record, which is specifically limited to the alleged bad faith or improper behavior asserted by the applicant concern or Participant.

(ii) A determination by the Administrative Law Judge that the required showing set forth in paragraph (h)(3)(i) of this section has been made does not shift the burden of proof, which continues to rest with the applicant concern or the Participant.

(i) A decision rendered by the Administrative Law Judge under the authority of this section shall be the final decision of the Administration and shall be binding upon the parties and those within the employ of the Administration.

(j) Such decision shall be rendered, insofar as practicable, within ninety days after a petition for appeal is filed, and, in the event such 90-day time limit has not been met, the Administrative Law Judge shall indicate the reason therefor in the decision, when issued.

**§ 124.211 Suspension of program assistance.**

(a) Upon the issuance of a Notice of Termination, SBA may suspend contract support and all other forms of 8(a) program assistance to that concern for a period of time not to exceed the time necessary to resolve the issue of the concern's termination from the program under the procedures set forth in § 124.209 and in Part 134 of this title. The institution of such a suspension will not occur in conjunction with each proposed termination, but will only occur when SBA determines that suspension of the concern's program participation is in the best interests of the Government. For example, SBA will generally find that it is in the best interests of the Government to suspend a Participant where the proposed termination is based on fraud or the submission of false statements or program ineligibility.

(b) Immediately upon SBA's determination to suspend a section 8(a) concern, SBA will furnish that concern with a Notice of Suspension by certified mail, return receipt requested, to the last known address of the concern. If no receipt is returned within ten calendar days from the mailing of the notice, notice will be presumed to have occurred as of that time. The Notice of Suspension will provide the following information:

(1) The reason(s) for the suspension, which will be the grounds upon which the Notice of Termination has been issued;

(2) A statement that the suspension will continue pending the completion of further investigation or the termination proceeding or some other specified period of time;

(3) Notice that awards of competitive and non-competitive section 8(a) subcontracts, including those which have been "self-marketed" by an 8(a) concern, will not be made during the pendency of the suspension unless it is determined by the head of the relevant procuring agency or his/her authorized representative to be in the best interest of the Government to do so, *and* SBA adopts that determination;

(4) Notice that the concern is obligated to complete previously awarded section 8(a) subcontracts;

(5) Notice that the suspension is effective nationally throughout the SBA;

(6) A statement that a request for a hearing on the suspension will be considered by an Administrative Law Judge in SBA's Office of Hearings and Appeals (OHA), and granted or denied as a matter of his/her discretion.

(7) A statement that the firm's program term is suspended effective the date of the suspension and that it will resume only if the concern's participation in the program is not terminated.

(c) It is contemplated that in most cases a hearing on the issue of the suspension will be afforded if the Participant requests one. However, no hearing shall be granted if the suspension is based upon advice from either the Department of Justice or the Department of Labor that such a hearing would prejudice substantial interests of the Government.

(d) The applicant concern may appeal a Notice of Suspension by filing a petition in accordance with Part 134 of this title with OHA within 30 days of the date of service of a Notice of Suspension to paragraph (b) of this section. Concurrent with its filing with OHA, the concern shall also serve the AA/MSB&COD with a copy of the petition including all attachments.

(e) A request for a hearing on the suspension will be considered by an Administrative Law Judge in OHA, and granted as a matter of his/her discretion.

(f) Proceedings conducted under the authority of this section shall be conducted in accordance with the provisions of this section and Part 134 of this title.

(g) For any oral hearing convened pursuant to § 134.19 of this title resulting from a request filed in accordance with this section, the Administrative Law Judge shall give due regard to the convenience and necessity of the parties or their authorized representatives in designating the place of the oral hearing.

(h) A hearing on the suspension will commence as soon as possible following the decision of the Administrative Law Judge to grant a request, but in no case more than 20 calendar days after the Administrative Law Judge's ruling if the request is granted.

(i) At the close of such suspension hearing, the Administrative Law Judge shall issue a decision upholding or lifting the suspension. The decision of the Administrative Law Judge shall be the final Agency decision.

(j) Any program suspension which occurs in accordance with these regulations will continue in effect until such time as the SBA lifts the suspension or the section 8(a) business concern's participation in the program is fully terminated. If all program assistance to a section 8(a) business concern has been suspended under these regulations and the concern's participation in the program is not terminated, the suspension will be lifted and the Program Term remaining as of the effective date of Program Suspension will be restored to the concern. However, nothing in this paragraph precludes SBA from initiating termination, graduation or suspension proceedings at any time during the concern's Program Term.

(k) SBA does not recognize the concept of de facto suspension. Reinstatement of the remaining portion of a Program Term will occur only where a concern's program participation has been formally suspended by SBA in accordance with the procedures set forth in this section.

**§ 124.300 Business development.**

The regulations at § 124.301 through § 124.320 address the provision of various forms of assistance to 8(a) Program Participants to promote the business development of such concerns. Such assistance includes financial, management and technical assistance, and contract support.

**§ 124.301 Development of business plan.**

(a) *General.* In order to assist the SBA in determining the business development needs of each 8(a) Program Participant, each such Participant shall develop a comprehensive business plan, setting forth the Participant's business targets, objectives, and goals. The business plan shall be submitted to the SBA servicing field office in final form within 30 days after the Participant's receipt of notice of certification to participate in the 8(a) program. The Participant will not be eligible for 8(a) contracts until the SBA approves its business plan. The approved business plan will constitute the Participant's short and long term goals and the strategy for developmental growth to the point of economic survival independent of the 8(a) program.

(b) *Standard Industrial Classification (SIC) code designations.* The concern's primary industry classification as defined in § 124.100 and all related secondary Standard Industrial Classification (SIC) code designations will be stated in an 8(a) concern's original business plan and will be subject to change thereafter only if the conditions of § 124.302(c) are met. Once admitted to the 8(a) program, a concern will only be permitted to perform 8(a) contracts which are classified under approved SIC codes which appear in its business plan. An 8(a) concern may receive Federal contracts classified under SIC codes not contained in its business plan, provided it is qualified, under authority other than section 8(a) of the Small Business Act.

(c) *Contents of business plan.* The initial business plan shall contain at least the following:

(1) An analysis of market potential, competitive environment, and other business analyses estimating the Program Participant's prospects for profitable operations during the term of program participation and after graduation;

(2) An analysis of the Program Participant's strengths and weaknesses, with particular attention paid to the means of correcting any financial, managerial, technical, or labor conditions which could impede the Participant from receiving contracts other than those awarded through the 8(a) program;

(3) Specific targets, objectives, and goals for the business development of the Participant during the next two years, utilizing the results of the analyses conducted pursuant to paragraphs (c)(1) and (c)(2) of this section;

(4) Estimates of contract awards pursuant to section 8(a) and from other sources which would be needed by the Participant to meet the specific targets, objectives and goals for the years covered by the business plan; and

(5) Such other information as SBA may require.

**§ 124.302 Review and modification of business plan.**

(a) *Annual review.* Each Participant shall annually review its currently approved business plan with the Business Opportunity Specialist (BOS) and shall modify such plan as may be appropriate. Any modified plan shall be submitted to the BOS for approval. A currently approved plan shall be considered the applicable plan for all program purposes until the SBA approves in writing a modified plan. SBA shall establish an anniversary date for review of the Participant's business plan and contract support forecasts. The annual review of a Participant's business plan will generally occur within 15 working days before or after the anniversary of the firm's certification of 8(a) eligibility.

(b) *Contract support forecast.* Each Participant shall annually forecast in writing its needs for contract awards for the next program year and the succeeding program year during the

review of its business plan conducted under paragraph (a) of this section. Such forecast shall be included in the Participant's business plan. The forecast shall include:

(1) The aggregate dollar value of contract support to be sought under section 8(a) (sole source and competitive), reflecting compliance with the business mix requirements of § 124.312;

(2) The aggregate dollar value of non-8(a) contracts to be sought;

(3) The types of contract opportunities being sought, identified by the appropriate Standard Industrial Classification (SIC) code; and

(4) Such other information as may be requested by the SBA to aid in providing effective business development assistance to the Participant.

(c) *Changes in SIC code designations.* Requests for changes in SIC code designations stated in a business plan may be approved only by the appropriate Regional Administrator or his/her designee, and only if:

(1)(i) The requested SIC code is related to the primary industry of the 8(a) concern and represents a logical business progression for the concern;

(ii) The 8(a) concern has demonstrated capacity and capability to perform in the requested SIC code; and

(iii) Other applicable eligibility criteria (Walsh-Healey Act, the non-manufacturer rule, size rules, etc.) appear to be met; or

(2) SBA erred in omitting a previously requested SIC code, improperly classifying a business industry or making a typographical or other error in its letter of approval to the 8(a) concern.

(d) *Transition management plan.* Beginning in the first year of the transitional stage of program participation under § 124.303, each Participant shall annually submit for inclusion in its business plan a transition management plan outlining specific steps to promote profitable business operations after graduation. The transition management plan should be submitted to the BOS at the same time other modifications are submitted pursuant to the annual review under paragraph (a) of this section. Such plan shall set forth the same information as required under paragraph (b) of this section for the initial plan, incorporate the competitive mix requirements of § 124.312, and provide specific transition steps the Participant will take to continue its business development after the expiration of its Program Term.

**§ 124.303 Stages of 8(a) program participation.**

(a) *General.* General program participation is divided into two stages—a developmental stage and a transitional stage. The developmental stage shall be 4 years and the transitional stage shall be 5 years unless the Participant has exited the program by one of the means set forth in § 124.112. The developmental stage is designed to assist Participants to overcome economic disadvantage by providing such assistance as may be necessary and appropriate to enable them to access relevant markets and strengthen their financial and managerial skills. The transitional stage of program participation is designed to assist Participants to overcome, insofar as practicable, the remaining elements of economic disadvantage and to prepare Participants for leaving the 8(a) program.

(b) *Developmental stage of program participation.* A Program Participant, if otherwise eligible, shall be qualified to receive the following assistance during the developmental stage of program participation:

(1) Sole source and competitive 8(a) contract support;

(2) Financial assistance pursuant to § 122.57 of this title;

(3) Pursuant to § 124.304, a maximum of two exemptions from the requirements of section 1(a) of the Walsh-Healey Act, 41 U.S.C. 35(a);

(4) Pursuant to § 124.305, a maximum of five exemptions from the requirements of the Miller Act, 40 U.S.C. 270a to 270d, that performance bonds be issued for the protection of the United States and payment bonds be issued for the protection of persons furnishing material and labor for the construction, alteration, or repair of public buildings or public works;

(5) Pursuant to § 124.306, financial assistance from SBA for skills training or upgrading for employees or potential employees of Program Participants;

(6) The transfer of technology or surplus property owned by the United States to Program Participants by grant, license, or sale. Technology or property transferred pursuant to this paragraph must be used by the Participant during the normal conduct of its business operation and cannot be sold or transferred to any other party (other than the Government) during such concern's Program Term and for one year thereafter. A Participant must agree to these conditions prior to any transfer of technology or property; and

(7) Training sessions to assist individuals and enterprises eligible to receive 8(a) contracts in the development of business principles and strategies to enhance their ability to compete successfully for contracts in the marketplace.

(c) *Transitional stage of program participation.* A Program Participant, if otherwise eligible, shall be qualified to receive the following assistance during the transitional stage of program participation:

(1) The same assistance as that provided to Participants in the developmental stage under paragraphs (b)(1), (b)(2), (b)(6) and (b)(7) of this section;

(2) Training and technical assistance in transitional business planning.

(3) Assistance from procuring agencies (in cooperation with SBA) in forming joint ventures, leader-follower arrangements, and teaming agreements between the Participant and other Program Participants or other business concerns, in accordance with all applicable statutes and regulations, with respect to contracting opportunities for research, development, fullscale engineering or production of major systems. In the case of a requirement to be procured as a small business set-aside, a small disadvantaged business set-aside, or through the 8(a) program, applicable size regulations will apply in determining whether the cooperative venture between a Participant and another business entity qualifies as a small business concern; and

**§ 124.304 Statutory exemption from the Walsh-Healey Act.**

(a) SBA is authorized to grant Program Participants in the developmental stage of participation a maximum of two exemptions from the requirements of section 1(a) of the Walsh-Healey Act, 41 U.S.C. 35(a). These exemptions apply only to specific 8(a) contracts with anticipated contract values under $10,000,000 (including options) and shall be used only to allow for contingent agreements by a Participant to acquire the machinery, equipment, facilities, or labor needed to perform such contracts. An exemption may be granted only where such exemption is needed to permit the firm to perform a contract which is consistent with the business development goals set forth in its approved business plan and SBA determines that the Participant is fully capable of performing the contract. SBA must be provided with a copy of the intended contingent agreement for its review prior to granting an exemption.

(b) The exemptions described in this section are authorized only until October 1, 1992.

**§ 124.305 Statutory exemption from Miller Act bonds.**

(a) *Policy.* Subject to the conditions contained in this section, SBA may exempt an 8(a) Participant in the developmental stage of program participation from any payment and performance bonds required by the Miller Act, 40 U.S.C. 270a–270d, for, and in connection with, any 8(a) construction contract whenever it is determined by SBA that the 8(a) concern is unable to obtain the requisite bond(s) from a surety for the performance of the 8(a) contract. The exercise of this authority by SBA is subject to the conditions set forth below.

(b) *Conditions for SBA exemption of bonding requirements.* In order to be eligible to obtain an exemption from the bonds required by the Miller Act, the following requirements must be met:

(1) The Program Participant must have been engaged in construction activities for a period of at least two years;

(2) SBA must find that the concern is otherwise eligible to receive a specific 8(a) construction contract, but is unable to obtain the requisite bond(s) required by the Miller Act for the performance of the contract;

(3) SBA must find, based on information supplied by the Participant, that the Participant cannot secure, either with or without an SBA surety bond guarantee, the bonds required for the contract from a corporate surety; and

(4) SBA must determine that the firm has the potential to become bondable if assisted by the bond waiver.

(c) *Limitations.* (1) The maximum dollar value of an 8(a) contract on which a bond requirement can be exempted is $3,000,000 (including options).

(2) In no event shall the above exemption be construed to make SBA liable to the procuring agency, 8(a) concern or any supplier, subcontractor, laborer or others for contractual obligations entered into by the 8(a) concern under the 8(a) contract to which the exemption applies.

(3) No Participant may receive more than one exemption to the Miller Act at any point in time, unless approved in writing by the Regional Administrator or his/her designee.

(4) No Participant may receive more than a total of five exemptions under this section. Where a Participant receives an exemption for a procurement having a base year and one or more option years, the exercise of an option does not count as an additional exemption (i.e., an exemption on such a contract counts as one exemption, not one for the base year and one for each of the option years exercised).

(5) A bond exemption shall not be granted where a contract for which a Participant has previously received such an exemption has been terminated for default.

(6) In order to be eligible for a bond exemption, a Participant must demonstrate that it has been denied a bond for the performance of the requirement by at least three sureties, at least one of which is a corporate surety.

(d) *Protection of third parties.* (1) The 8(a) contract must contain special clauses indicating that:

(i) The 8(a) contractor will make timely payment to all persons furnishing materials or labor to the 8(a) concern in the performance of the contract;

(ii) There must be established a special bank account in an institution insured by the Federal Deposit Insurance Corporation (FDIC), into which the procuring agency will deposit all payments relating to the performance of the contract; and

(iii) All disbursements from the special bank account shall be subject to the approval and counter signature by SBA or a third party approved by SBA. (This requirement for a controlled account will be satisfied if SBA makes an advance payment to the Participant pursuant to § 124.401 of these regulations and a special bank account is established in connection therewith.)

(2) The 8(a) contractor must notify persons supplying it with materials or labor that the contract is exempt from the Miller Act's bonding requirement and must also notify such suppliers that SBA will not be liable for payment for materials or labor. The 8(a) contractor must obtain a written acknowledgment of such notification from each supplier of materials or labor, and such acknowledgment(s) must, where practicable, be in SBA's possession prior to award of the contract and payment of invoices.

(e) *Procedure for obtaining a bond exemption.* (1) A Program Participant which seeks a bond exemption under this section may submit a written request to the applicable SBA servicing field office.

(2) Upon receipt of the request, SBA shall notify the Participant of supporting documentation that must be submitted in order to process the exemption request.

(3) If SBA preliminarily determines that a bond waiver is appropriate, SBA shall contact the procuring agency, prior to acceptance of the offer, and obtain its written views with respect to the bond exemption.

(4) The views and concerns of the procuring agency will be heavily weighed in determining whether to grant a bond exemption.

(5) If the procuring agency does not concur with the bond exemption and SBA accedes to the procuring agency's concerns, SBA may accept the offer for another 8(a) concern.

(f) *Expiration date.* The exemptions described in this section are authorized only until October 1, 1992.

**§ 124.306 Financial assistance for skills training.**

(a) SBA may pay in whole or in part the costs of training or upgrading of employees or potential employees of 8(a) concerns. An owner participating in the day-to-day management of a Participant may be considered as an employee for purposes of this section. Payments will be made to training providers pursuant to appropriate agreements.

(b) SBA assistance under this section is subject to the following conditions and requirements:

(1) The concern must be in the developmental stage of program participation.

(2) The 8(a) concern must document that it has explored the use of existing cost-free or cost-subsidized training programs offered by public and private sector agencies working with programs of employment and training and economic development and that no such programs are available or are capable of meeting the training needs of the Participant.

(3) The concern must be current with any reporting requirements established by SBA for ongoing program participation.

(4) The employee receiving the training or upgrading may not be a beneficiary of any other publicly or privately funded training program which benefits the trainee or upgraded employee for the same activity SBA is compensating under this section.

(5) The training provider must be an institution of higher education, a community or vocational college, or an institution eligible to provide skills training under the Job Training Partnership Act (29 U.S.C. 1501 *et seq.*).

(6) The training provider may not be debarred or suspended from any Federal programs.

(7) The training of employees or potential employees of a concern must be consistent with the concern's approved business plan.

(8) SBA must approve the training in writing prior to its commencement.

(9) No more than five employees or potential employees of a single 8(a)

Case 2:25-cv-02328-ASJ-MBN Document 53-1 Filed 09/04/26 Page 99 of 252



concern may be recipients of benefits under this section at one time.

(10) The length of training or skills upgrading financed under this section may be no less than one month nor more than six months.

(11) The training or skills upgrading assistance must be of a type which will offer genuine capacity development for the employing firm.

(12) No more than $2,500 shall be made available for any one employee or potential employee.

(c) SBA's allocation of resources appropriated for the purposes of this section shall generally be based on the identification of needs of developmental stage concerns. SBA shall evaluate training needs in the annual business plan review process, and may conduct other surveys as appropriate.

(d) Projects to be funded under this section shall be initiated by a proposal prepared by the 8(a) concern and submitted to SBA.

(e) Assistance under this section will be made only when the agreements entered into by SBA to fund training or upgrading contain acceptable training and upgrading standards and acceptable monitoring standards and requirements to insure the integrity and effectiveness of the training or upgrading.

(f) The Participant must give adequate assurance that it will employ the trainee or upgraded employee for at least six months after the training or upgrading financed pursuant to this section has been completed. Trainees and upgraded employees must provide a similar assurance that they will remain in the employ of the 8(a) firm for such six-month period. Such assurance will consist of an appropriate written employment agreement. If a trainee or upgraded employee does not remain in the employ of the Participant for at least six months after receiving such SBA-financed training or upgrading, the violating party must reimburse SBA for the amount expended together with any reasonable interest and costs incurred for collection. In addition, the violating party, whether it is the Participant, individual trainee or upgraded employee, shall be barred from receiving any further assistance under this section. The appropriate SBA Regional Administrator, or his/her designee, may waive the reimbursement provisions of this paragraph in limited circumstances where an employee's leaving is due to an unforeseen event (e.g., the employee's spouse is relocated by his/her business and the employee must move).

**§ 124.307 Contractual assistance.**

(a) It is the policy of SBA to enter into contracts with other Government agencies and to subcontract the performance of such contracts, pursuant to section 8(a)(1)(C) of the Small Business Act, to 8(a) Program Participants at prices which will enable such concerns to perform the contracts and earn a reasonable profit.

(b) Such subcontracts may either be sole source awards or awards attained through competition reserved for eligible Participants.

(c) Admission into the 8(a) program does not bestow a right to receive 8(a) contracts. SBA's approval of a Participant's business plan pursuant to § 124.301 does not guarantee the Participant any particular level of contract support.

(d) An 8(a) contract will be provided to a Participant only when such contract is consistent with the Participant's capabilities and business development needs, as determined by SBA.

**§ 124.308 Procedures for obtaining and accepting procurements for the 8(a) program.**

(a) *PCR-serviced agencies.* If an SBA Procurement Center Representative (PCR) is resident or has liaison responsibilities in a procuring agency, he/she will be responsible for screening proposed procurements for possible 8(a) contracts, in accordance with 13 CFR 125.6.

(b) *Requirement identification.* A requirement for possible award may be identified by SBA, a particular Program Participant or the procuring agency itself. Once a requirement that appears suitable for the 8(a) program has been identified, SBA shall verify the appropriateness of the SIC code designation assigned to the requirement and request the procuring agency to offer the requirement to the 8(a) program. If SBA disagrees with the SIC code designation assigned to a particular requirement, SBA may request that the procuring agency assign a different SIC code to the requirement. If the requirement exceeds the thresholds established by § 124.311, the SBA will request that the requirement be offered to the 8(a) program to be competed among eligible Program Participants, unless SBA determines that there is not a reasonable expectation that at least two eligible 8(a) concerns will submit offers. If the requirement is below the thresholds established by § 124.311, the SBA may request that it be offered to the 8(a) program for possible sole source award as an open requirement or in support of the approved business plan of a specific Program Participant.

(c) *Offering letter.* When a requirement is offered to the 8(a) program, the offering letter from the procuring activity shall contain the following information:

(1) A description of the work to be performed or items to be delivered and a copy of the statement of work, if available;

(2) The estimated period of performance;

(3) The SIC code that applies to the principal nature of the procurement;

(4) The procuring agency's current dollar estimate of the requirement, including options, if any;

(5) Any special restrictions or geographical limitations on the requirement;

(6) The location of the work to be performed for construction and service procurements;

(7) Any special capabilities or disciplines needed for contract performance;

(8) The type of contract to be awarded, such as firm fixed price, cost reimbursement, or time and materials;

(9) The procurement history, if any, of the requirement;

(10) The names and addresses of any small business contractors which have performed on this specific procurement during the previous 24 months;

(11) A statement that no solicitation for the specific procurement has been issued for small business set-aside or small disadvantaged business set-aside and that no other public communication (such as a notice in the Commerce Business Daily) has been made evidencing the procuring agency's clear intention to set aside the procurement for small business or small disadvantaged business (*see* § 124.309(a));

(12) Identification of any particular 8(a) concern designated for consideration, including a brief justification, such as one of the following:

(i) The 8(a) concern, through its own efforts, marketed the requirement and caused it to be reserved for the 8(a) program, or

(ii) The procurement is a follow-on or renewal contract and the nominated concern is the incumbent;

(13) Bonding requirements, if applicable; and

(14) Any other information that the procuring agency deems relevant or SBA requests.

(d) *Acceptance of the requirement.* Upon receipt of the procuring agency's offer, SBA will determine whether it will

accept the requirement for the 8(a) program. SBA's decision whether to accept the requirement will be transmitted to the procuring agency in writing within 15 working days of receipt of the offer, unless SBA requests, and the procuring agency grants, an extension. If SBA decides to accept a sole source requirement for the 8(a) program, it will advise the procuring agency in writing. In the case of a local buy requirement, as defined in § 124.100(o) of these regulations, SBA will accept the offer both on behalf of the program and in support of the business plan of a specific Participant. In the case of a National buy requirement, as defined in § 124.100(q) of these regulations, SBA will accept the offer for the 8(a) program generally and will advise the procuring activity that SBA's appropriate field office will designate a specific Participant for contract performance. If SBA decides to accept a competitive requirement for the 8(a) program, it will send a letter to the procuring agency accepting the offer for the benefit of the 8(a) program generally. SBA is not required to accept any particular procurement for the 8(a) program.

(e) *Sole source award where procuring agency nominates a specific program participant.* If the procuring agency identifies a particular 8(a) concern for a sole source award, SBA will determine whether an appropriate match exists.

(1) Once a procurement is deemed suitable for acceptance as an 8(a) sole source contract, it will normally be accepted on behalf of the Participant recommended by the procuring agency, provided that:

(i) The procurement is consistent with the Participant's business plan;

(ii) The Participant is determined by SBA to be a responsible contractor with respect to performance of the contract; and

(iii) The award of the contract would not result in the Participant exceeding its approved 8(a) business support level or the business mix requirements established under § 124.312.

(2) If an appropriate match exists, SBA will send a letter accepting the offer in support of the business plan of the identified Participant to the procuring agency. This letter will advise the procuring agency whether SBA will participate in contract negotiations or whether SBA will authorize the procuring agency to negotiate directly with the identified Program Participant. A Program Participant selected by SBA to perform a noncompetitive 8(a) contract shall, when practicable, participate in any negotiation of the terms and conditions of such contract.

(3) If SBA determines that an appropriate match with the nominated 8(a) concern does not exist based on the factors set forth in paragraph (e)(1) of this section, it will notify the affected 8(a) concern and may then select an alternate 8(a) concern, in accordance with paragraph (f)(3) of this section. It will so advise the procuring agency of its actions.

(f) *Open requirements.* When a procuring agency does not nominate a particular concern for performance of a sole source 8(a) contract (open requirement), the following additional procedures will apply:

(1) If the contract is a local buy item, SBA will examine the portfolio of 8(a) concerns for the SBA district office where the work is to be performed or the items delivered for selection of a qualified 8(a) concern. If none is found to be qualified or a match for a concern in that district is determined to be impossible or inappropriate, the requirement may be considered for other 8(a) concerns located within the region or, if appropriate, other regions.

(2) If the procurement is a national buy item, it shall be referred to SBA's Central Office in Washington, DC. The Central Office will allocate national buy requirements on an equitable basis.

(3) In cases in which SBA must select a Participant for possible award from among two or more eligible and qualified Participants, the selection will be based upon consideration of relevant factors, including the business development needs, compliance with competitive business mix requirements (if applicable), financial condition, management ability, and technical capability of each Participant. SBA shall make its selection based upon an examination of the business plan and procurement history of the concern as well as any supplemental materials requested and received.

(4) To the maximum extent practicable, the SBA shall promote the equitable geographic distribution of 8(a) sole source contracts.

(g) *Formal technical evaluations.* SBA will not authorize formal technical evaluations for sole source 8(a) contracts. If a procuring agency requires the performance of a formal technical evaluation among more than one 8(a) concern, the procuring agency must request that the requirement be a competitive 8(a) award. The procuring agency may request a formal two-step procurement process pursuant to § 14.5 of the FAR, 48 CFR 14.5, or a standard negotiated competitive procurement. Agencies may, however, conduct informal assessments of several 8(a) firms' capabilities to perform a specific requirement, provided that the statement of work for the requirement is not released to any of the participating 8(a) firms.

**§ 124.309 Barriers to acceptance.**

SBA will not accept for 8(a) award proposed procurements not previously in the 8(a) program if any of the circumstances identified in paragraph (a), (b), or (c) of this section exist.

(a) *Solicitation previously issued.* A solicitation has already been issued for the procurement as a small business set-aside, such as an Invitation for Bid (IFB) or Request for Proposal (RFP). The AA/MSB&COD may permit the acceptance of the requirement, however, under extraordinary circumstances, such as where a procuring agency had made a decision to offer the requirement to the 8(a) program before the solicitation was sent out and the procuring agency acknowledges and documents that the solicitation was in error.

(b) *Reservation as small business or SDB set-aside.* The procuring agency has expressed publicly a clear intention to reserve the procurement as a small business or small disadvantaged business (SDB) set-aside (*e.g.*, a notice of intent to set aside a procurement published in the Commerce Business Daily which invites a response from interested small businesses). The AA/MSB&COD may permit the acceptance of the requirement, however, under extraordinary circumstances, such as where a procuring agency had made a decision to offer the requirement to the 8(a) program before the notice was sent out and the procuring agency acknowledges and documents that the notice was in error. An annual procurement forecast or solicitation of information for possible small business set aside will generally not be considered as a clear exhibition of intention to set aside a procurement for small businesses.

(c) *Adverse impact.* SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on other small business programs or on an individual small business, whether or not the affected small business is in the 8(a) program. The adverse impact concept is designed to protect small business concerns which are performing Government contracts awarded outside the 8(a) program. Adverse impact does not apply to "new" requirements. A new requirement is a requirement which has not been previously procured by the relevant procuring agency. Where a

requirement is new, no small business could have performed the requirement and, thus, an impact determination need not be performed. The expansion or alteration of an existing requirement shall be considered a new requirement where the requirement is materially expanded or modified so that the ensuing requirement is not substantially similar to the prior requirement due to the magnitude of the expansion or alteration.

(1) SBA presumes adverse impact to exist when a small business concern has performed a specific requirement for at least 24 months, it is currently performing the requirement or finished such performance within 30 days of the procuring agency's offer of the requirement for the 8(a) program, and the estimated dollar value of the offered 8(a) award is 25 percent or more of its most recent annual gross sales (including those of its affiliates).

(2) SBA may determine adverse impact to exist upon an adequate showing based on circumstances other than those set forth in the presumption of paragraph (c)(1) of this section.

(d) *Release for non-8(a) competition.* In limited instances, SBA may determine that a sole source 8(a) contract being performed by a Program Participant whose Program Term will expire prior to contract completion or by a former Program Participant whose Program Term has expired within one year may be released to the procuring agency to be completed outside the 8(a) program. If such a determination is made, SBA will reject the procuring agency's offer of the requirement for award through the 8(a) program. In such a case, SBA would recommend that the requirement be procured as a small business set aside or, where appropriate, through a small disadvantaged business competition authorized by Pub. L. 99–661.

(1) In making such a determination, SBA will balance the importance of the contract for the (former) Participant's stability and business development needs against the needs of other Program Participants qualified to perform the requirement in order to develop in accord with their business plan. Such a determination will include consideration of whether the release of the requirement to competition would seriously reduce the pool of similar types of contracts to be fulfilled through the 8(a) program.

(2) A written request for the release of a contract must be made to SBA by the applicable (former) Participant prior to SBA's acceptance of the requirement for the 8(a) program. SBA will not release a requirement absent such a request.

**§ 124.310 Approval of lower tier subcontractors.**

(a) SBA's approval must be obtained prior to a Participant's subcontracting of the performance of an 8(a) contract to another concern.

(b) SBA will not approve any subcontracting arrangement where:

(1) The performance of work requirements set forth in § 124.314 would not be met;

(2) The proposed subcontractor has been suspended, debarred, or determined to be ineligible by any Federal agency;

(3) SBA determines that the proposed subcontractor would control the performance of the requirement;

(4) SBA determines that the proposed subcontracting relationship is not an arms length agreement; or

(5) SBA determines that the proposed subcontracting arrangement is an attempt to circumvent SBA's size regulations.

**§ 124.311 8(a) competition.**

(a) *Competitive thresholds.* A contract opportunity offered to the 8(a) program for award shall be awarded on the basis of competition restricted to eligible program participants if:

(1) There is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and

(2) The anticipated award price of the contract, including options, will exceed $5,000,000 for contracts assigned manufacturing standard industrial classification (SIC) codes and $3,000,000 for all other contracts.

**Example.** If the anticipated award price for a professional services requirement is determined to be $2.7 million and it is accepted as a sole source 8(a) requirement on that basis, a sole source award will be valid even if the contract price arrived at after negotiation is $3.1 million.

(b) *Effective date of thresholds.* The thresholds specified in paragraph (a) of this section shall not apply to any 8(a) requirement that has been accepted for the 8(a) program prior to October 1, 1989, where a proposal containing price has been submitted to the procuring agency.

(c) *Exemption from competitive thresholds for 8(a) concerns owned by Indian tribes.* SBA may award an 8(a) subcontract on a non-competitive basis to an 8(a) concern owned and controlled by an economically disadvantaged Indian tribe, as defined in § 124.100(m), even if such contract exceeds the competitive thresholds set forth in paragraph (a) of this section. *See* generally, § 124.112.

(d) *Competition below thresholds.* The AA/MSB&COD may, on a nondelegable basis, approve a request from an agency for a competitive 8(a) award even if the anticipated award price is not expected to exceed the dollar amounts specified in paragraph (a) of this section. Such approvals will be granted on a limited basis.

(1) This authority will be used primarily in areas where technical competitions are appropriate or when a large number of responsible 8(a) contractors exists.

(2) In determining whether to approve a request to compete an 8(a) contract below the applicable threshold amount, the AA/MSB&COD shall consider whether the requesting agency has made and will continue to make available a significant number of its contracts to the 8(a) program on a noncompetitive basis.

(3) The AA/MSB&COD shall deny a request to compete a contract having a dollar figure below the applicable threshold amount where the requirement was previously offered to the 8(a) program on a noncompetitive basis if he/she concludes that the request is based on the inability of the contracting agency and the Participant selected to perform the contract to reach an agreement on price or some other material term or condition.

(e) *Sole source above thresholds.* Where a contract opportunity exceeds the applicable threshold dollar figure and there is not a reasonable expectation that at least two eligible Program Participants will submit offers at a fair price, SBA may accept the requirement for a sole source 8(a) award if SBA determines that an eligible Participant in the 8(a) portfolio is capable of performing the requirement at a fair price.

(f) *Procedures for competition.* (1) Competitions among eligible 8(a) Participants shall be conducted by the procuring agencies in accordance with the Federal Acquisition Regulation (FAR). Such competitions shall be representative of competitions which are the normal practice in the relevant industries. Competitions need not stress price as the dominant factor, but may be based primarily on technical evaluations or other non-price related factors. Competition criteria, whether price or otherwise, must receive prior SBA approval. In any event, selection of a particular Program Participant by the procuring agency shall be based on specific evaluation criteria set forth in the solicitation.

(2) All solicitations for competitive 8(a) requirements shall include the

appropriate SIC code for the requirement.

(3) The procuring agency shall evaluate offers pursuant to the evaluation criteria in the solicitation and the applicable FAR provisions.

(4) In a sealed bid procurement, the procuring agency shall identify the low bidder to SBA. In a negotiated procurement, the procuring agency shall identify all offerors.

(5) The SBA will determine whether any firm identified is eligible for award of the contract, including whether it has the SIC code for the requirement in its approved business plan, whether it is small under the SIC code for the requirement, and whether it has exceeded its approved business support level by more than 25 percent if the firm is in the developmental stage (or will exceed such level if it is awarded the contract at issue) or whether it has achieved its competitive business mix targets under § 124.312 if the firm is in the transitional stage.

(6) If the low bidder in a sealed bid procurement is determined to be ineligible by SBA, the procuring agency shall identify the next low bidder. This process may need to be repeated until SBA determines that an identified Participant is eligible for award.

(7) In a negotiated procurement, the procuring agency will evaluate the offers of those firms determined by SBA to be eligible for award pursuant to paragraph (f)(5) of this section and will conduct discussions and/or negotiations with those firms deemed appropriate.

(8) After negotiations and/or discussions occur in a negotiated procurement, award will be made to the Participant selected by the procuring agency.

(9) Award shall be made through the normal 8(a) award procedures (i.e., a prime contract between the procuring agency and SBA and a subcontract between SBA and the selected 8(a) concern).

(g) *Protest restrictions.* The eligibility of a Participant for a competitive 8(a) award may not be challenged by another Participant or any other party to SBA or to any other administrative forum as part of a bid or other contract protest. Anyone with information concerning the eligibility of a Participant to continue participation in the 8(a) program may submit such information to SBA for in accordance with § 124.111(c).

(h) *Restricted competition.* (1) *Competition within stages of program participation.* SBA may accept a requirement to be awarded through a competition limited to 8(a) concerns in the developmental stage of program participation or limited to concerns in the transitional stage of program participation, or may accept a requirement to be competed among firms both in the developmental and transitional stages of program participation.

(2) *SIC code requirements.* Only those Participants that have in their approved business plan the SIC Code identified in the solicitation may submit offers for the requirement. A Participant will be deemed ineligible for award by SBA if it submits an offer for a requirement for which it does not have an approved SIC Code.

(3) *Local buy competitions.* Where a competitive 8(a) contract opportunity is a local buy requirement, the appropriate Assistant Regional Administrator for Minority Small Business and Capital Ownership Development (ARA/MSB&COD) will determine, based on his/her knowledge of the 8(a) portfolio, whether the competition should be limited only to those program Participants located within the geographical boundaries of one or more district offices or the entire region. Only those Participants located within the appropriate geographical boundaries are eligible to submit offers. If SBA determines, however, that there is not a reasonable expectation that at least two Participants within such region will submit offers, SBA may authorize the procuring agency to accept offers from eligible Program Participants in one or more other specified regions. Without such authorization, Participants located outside the relevant SBA regional boundaries which submit offers shall be considered ineligible. In appropriate instances, a competition may be limited to eligible Program Participants in adjacent SBA district offices which are in different SBA regional offices where the ARA/MSB&COD in the two relevant regions so agree.

(4) *National buy competitions.* Where a competitive 8(a) contract opportunity is a national buy requirement, all eligible Program Participants may submit offers.

**§ 124.312 Competitive business mix.**

(a) *General.* To ensure that 8(a) firms do not develop an unreasonable reliance on 8(a) contracts and to ease the transition of such firms into the competitive marketplace after exiting the 8(a) program, Program Participants must make maximum efforts to obtain business outside the 8(a) program.

(b) *Non-8(a) business activity targets and support levels during developmental stage*—(1) *Attainment of targeted levels.* During the developmental stage of Program Participation, an 8(a) concern must make substantial and sustained efforts to attain the targeted dollar levels of non-8(a) revenue established in its business plan.

(2) *Maintenance of existing business base.* An on-going business concern which enters the 8(a) program must make maximum efforts to maintain its existing business base and use the 8(a) program as a resource to strengthen the firm after its 8(a) certification.

(3) *Marketing strategy to attain targeted levels.* Every Program Participant must engage in a reasonable marketing strategy that will maximize its potential to achieve the targeted levels of non-8(a) revenue established in its business plan.

(4) *Establishing support levels.* SBA shall establish 8(a) and non-8(a) support levels by considering the firm's sales forecast and supporting data in its business plan, the firm's demonstrated capacity and capability level, current level of non-8(a) contracts on hand and the availability of 8(a) support. The aggregate dollar amount of 8(a) support provided to a Program Participant for any year of program participation during the developmental stage may not exceed the applicable 8(a) support level approved by SBA as reflected in the concern's business plan by more than 25 percent.

(5) *Increasing support levels.* An 8(a) concern in the developmental stage of program participation may request an increase in its approved 8(a) support level once during a program year other than at the date of its annual review. Such request must be made in writing and must be made within 15 calendar days (either before or after) of the six month date of its preceding annual review (e.g., if a firm's annual review occurs on June 23, the firm may request an increase in its approved 8(a) support level between December 8 and January 7—15 calendar days before and after December 23). A revision to a Participant's business plan may not, however, be based solely on the identification of an 8(a) contract in excess of the Program Participant's approved 8(a) support level. A Participant must demonstrate that it has increased its capacity and capability to the point that its currently approved 8(a) support level is inappropriate. The Participant's increased capacity and capability must be greater than the increased level of 8(a) support requested so that the Participant is still able to increase its non-8(a) revenue if the request is approved. Any increase in a Participant's approved 8(a) support level other than as part of the annual review process must be approved in writing by

the appropriate Regional Administrator or his/her designee.

(6) *Measuring 8(a) support.* In determining whether a Participant has reached its 8(a) support level during the program year, the base year value of all contracts awarded during the year shall be added to the value of all options and other modifications which changed the dollar value of the contract executed during that year.

**Example:** During a specific program year, Program Participant X receives three 8(a) contracts as follows: (1) $1,000,000 contract—$400,000 base year, and two $300,000 options; (2) $500,000 contract—$250,000 base year, and one $250,000 option; and (3) $100,000 contract with no options. In addition, two options on 8(a) contracts awarded in a previous program year, each worth $200,000, are exercised in the program year under consideration. The 8(a) contract support received during that program year is $1,150,000.

(7) *Reporting and verification of business activity.* Once admitted to the 8(a) program, the Program Participant must provide SBA with quarterly and annual financial statements within 90 calendar days (180 calendar days for audited statements) from the end of each quarter. The statements shall report revenue as non-8(a) and 8(a) revenue as appropriate. Also, within 30 calendar days from the end of the program year, the Program Participant shall provide SBA with an annual report of all non-8(a) contracts, options and modifications affecting price executed during the program year.

(c) *Required non-8(a) business activity targets during transitional stage*—(1) *General.* During the transitional stage of the program, the Program Participant shall be required to achieve certain targets of non-8(a) contract revenue. Such targets shall be referred to as non-8(a) business activity targets and shall be expressed as a percentage of total revenue. The targets shall reflect a reasonably consistent increase in non-8(a) revenue. Participants approved for participation on or after November 15, 1988 and Participants with more than five years remaining in the program as of August 15, 1989 shall be subject to the non-8(a) business activity targets set forth in paragraph (c)(4) of this section. Participants with five years or less remaining in the program as of August 15, 1989 shall be subject to the modified non-8(a) business activity targets set forth in paragraph (c)(5) of this section.

(2) *Establishing support levels.* During the transitional stage of the program, SBA shall establish 8(a) and non-8(a) support levels for each Program Participant. The aggregate dollar amount of 8(a) support provided to a Program Participant during the transitional stage may not exceed the established 8(a) support level for the applicable program year. The 8(a) support level shall be established so as to ensure that the 8(a) firm meets the non-8(a) business activity targets or the modified non-8(a) business activity targets set forth in paragraphs (c)(4) and (c)(5) of this section. In establishing the 8(a) support level, SBA will consider the following:

(i) The 8(a) and non-8(a) sales forecast and support data contained in the Program Participant's business plan;

(ii) Current 8(a) and non-8(a) contracts on hand;

(iii) Historical 8(a) and non-8(a) revenue and the current level of 8(a) and non-8(a) revenue;

(iv) The Program Participant's demonstrated capacity and capability level which may include current levels of 8(a) and non-8(a) revenue, current 8(a) and non-8(a) contracts on hand, working capital, access to credit, production capacity, projected increase in non-8(a) revenue, and management and technical capability;

(v) The applicable non-8(a) business activity target for the applicable transitional year.

(3) *Increasing support levels.* An 8(a) concern in the transitional stage of program participation may request an increase in its approved 8(a) support level once during a program year other than at the date of its annual review. Such request must be in writing and must be made within 15 calendar day before or after the six month date of its preceding annual review (e.g., if a firm's annual review occurs on June 23, the firm may request an increase in its approved 8(a) support level between December 8 and January 7—15 calendar days before and after December 23). A revision to a Participant's business plan may not, however, be based solely on the identification of an 8(a) contract in excess of the Program Participant's approved 8(a) support level. A Participant must demonstrate that it has increased its capacity and capability to the point that its currently approved 8(a) support level is inappropriate and that an increase in its approved support level will not conflict with the applicable non-8(a) business activity targets set forth in paragraphs (c)(4) and (c)(5) of this section.

(4) *Non-8(a) business activity targets.* During the transitional stage of program participation, firms approved for program participation on or after the enactment of Pub. L. 100-656 (November 15, 1988) and current Program Participants that have more than five years remaining in the program as of August 15, 1989 shall be subject to the following non-8(a) business activity targets during each year of program participation in the transitional stage:

| Program participant's year in the transitional stage | Non-8(a) business activity targets (non-8(a) revenue as a percentage of total revenue) |
|---|---|
| 1 | 15-25 |
| 2 | 25-35 |
| 3 | 40-45 |
| 4 | 50-55 |
| 5 | 65-75 |

(5) *Modified non-8(a) business activity targets.* During the transitional stage of program participation, firms that have five years or less remaining in the program as of August 15, 1989 shall be subject to modified non-8(a) business activity targets.

(i) A firm with three to five years remaining in the program as of August 15, 1989 shall be subject to the following non-8(a) business activity targets:

| Program participant's year in the transitional stage | Modified non-8(a) business activity targets (non-8(a) revenue as a percentage of total revenue) |
|---|---|
| 1 | 10-20 |
| 2 | 20-30 |
| 3 | 35-40 |
| 4 | 45-50 |
| 5 | 60-65 |

(ii) A firm with two years or less remaining in the program as of August 15, 1989 shall make substantial and sustained efforts to attain the targeted dollar levels of non-8(a) sales approved in its business plan.

(6) *Failure to meet required non-8(a) business activity target.* Firms that fail to achieve the minimum percentage non-8(a) business activity target in any year of the transitional stage will be subject to the remedial measures, as set forth in paragraph (c)(12) of this section.

(7) *Attainment of targeted levels.* The Program Participant must make maximum efforts to maintain and increase its targeted level of non 8(a) revenue during the transitional stage.

(8) *Marketing strategy to attain targeted levels.* The Program Participant must engage in a reasonable marketing strategy that will maximize its potential to achieve the targeted levels of non-8(a)

revenue established in the business plan.

(9) *Measuring 8(a) support.* In determining whether a Participant has reached its 8(a) support level during the program year, the base year value of all contracts awarded during the year shall be added to the value of all options and other modifications executed during that year. (*See* Example in paragraph (b)(6) of this section).

(10) *Reporting and verification of business activity.* Program Participants during the transitional stage shall provide SBA with quarterly and annual financial statements with a breakdown of 8(a) and non-8(a) revenue within 90 calendar days (180 calendar days for audited statements) from the close of the reporting period. The Program Participant shall also provide SBA with quarterly and annual reports of all non-8(a) contracts, options and modifications affecting price executed during the program year (and any other information as required by SBA) within thirty days from the end of the reporting period. At the end of each year of participation in the transitional stage, the BOS assigned to work with the Participant shall review the Participant's total revenues to determine whether the Participant's non-8(a) revenues have met the targets established pursuant to paragraphs (c)(4) and (c)(5) of this section.

(11) *Certification of compliance.* Before the receipt of any 8(a) contract during the transitional stage of the program, a Program Participant must certify that it is in compliance with the non-8(a) business activity targets established in its business plan as approved by SBA or that it is in compliance with such remedial measures ordered by SBA if such remedial measures allow the continued award of 8(a) contracts.

(12) *Remedial measures for failure to achieve competitive business activity targets.* SBA is authorized to take appropriate remedial measures with respect to a Program Participant which has failed to attain the minimum required business activity targets as established in paragraphs (c)(4) and (c)(5) of this section. If appropriate, remedial measures will be ordered when a Program Participant fails to achieve the minimum percentage of the non-8(a) business activity target at the end of any transitional year. These remedial actions include, but are not limited to:

(i) Reducing a Participant's approved level of 8(a) support;

(ii) Reducing, or eliminating, sole source 8(a) contracts;

(iii) Restricting the award of any new competitive and/or sole source 8(a) contracts;

(iv) Conditioning the award of future sole source 8(a) contracts on the Participant's taking affirmative steps to expand the dollar volume of its competitive business activity, such as changes in marketing or financing strategies;

(v) Requiring the Program Participant to obtain management and technical assistance or to obtain counseling and/or attend seminars relating to management assistance, business development, financing, marketing, or proposal preparation.

**§ 124.313 Certification of SBA's competency.**

(a) SBA will certify that it is competent to perform the requirement, as provided by section 8(a)(1)(A) of the Small Business Act, based on its determination that the 8(a) concern with which it intends to subcontract is responsible to perform the requirement. If SBA determines that the concern lacks the capability, competency, capacity, credit, integrity, or tenacity and perseverance to perform on a specific 8(a) subcontract, the subcontract will not be awarded to such concern. A Program Participant which has not submitted required financial statements to SBA will be deemed not responsible to receive 8(a) subcontracts. In addition, SBA will also certify that an 8(a) concern is eligible under the Walsh-Healey Public Contracts Act, 41 U.S.C. 35(a), for each individual 8(a) subcontract.

(b) SBA's determination not to award a Program Participant a specific 8(a) subcontract because the concern lacks an element of responsibility, or is ineligible under the Walsh-Healey Public Contracts Act, does not constitute a denial of total 8(a) program participation for the purposes of section 8(a)(9) of the Small Business Act.

(c) A Participant that is determined by SBA not to be responsible to perform a sole source or competitive 8(a) contract may not seek the issuance of a Certificate of Competency pursuant to § 125.5 of this title.

**§ 124.314 Performance of work by the 8(a) concern.**

(a) To assure the accomplishment of the purposes of the 8(a) program, each 8(a) subcontractor must perform work equivalent to the following percentages:

(1) *Services (except construction).* In the case of an 8(a) contract for professional and/or non-professional services (except construction), at least 50 percent of the cost of contract performance incurred for labor shall be expended for employees of the 8(a) concern.

(2) *Supplies (other than procurement from a regular dealer in such supplies).* In the case of an 8(a) contract for supplies, an 8(a) concern that seeks to perform the requirement as a manufacturer shall perform work for at least 50 percent of the cost of manufacturing the supplies, not including the cost of materials. This requirement does not apply to 8(a) concerns that seek to perform 8(a) supply contracts as regular dealers in such supplies.

(3) *General construction.* The concern shall perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

(4) *Construction by special trade contractors.* The concern shall perform at least 25 percent of the cost of the contract, not including the cost of materials, with its own employees.

(b) The Program Participant must certify in its bid or proposal that it will perform the required percentage of work with its own employees. Failure of the concern to provide such a statement will result in the firm being considered ineligible for award.

(c) For purposes of determining whether a Program Participant will perform the required percentage of the contract, the work to be performed by a subsidiary(ies) of the Participant or a concern(s) otherwise affiliated with the Participant is not counted as being performed by the Participant.

(d) *Indefinite quantity contracts.* (1) In order to ensure that the required percentage of an indefinite quantity 8(a) award is performed by the Program Participant, at any point in time the Program Participant must have performed the required percentage of the total value of the contract to that date. For a service or supply contract, this does not mean that the Program Participant must perform 50 percent of each task order with its own work force. But, rather, the Participant is required to perform 50 percent of the combined total of all task orders to date. The Regional Administrator or his/her delegatee may waive this requirement where a large amount of subcontracting is essential in the early stages of performance before the work to be done by the Participant can be performed, provided that there are written assurances from the Participant and the procuring agency that the contract will ultimately comply with the requirements of this section.

**Example:** If a Program Participant performed 90 percent of a $100,000 task order

on an indefinite quantity service contract with its own work force, it would only have to perform 10 percent of a second task order for $100,000 because the concern would still have performed 50 percent of the combined total value of the contract to date ($100,000 out of $200,000).

(2) Where there is a guaranteed minimum condition in an indefinite quantity 8(a) award, the required performance of work percentage need not be met on the first task order. In such a case, however, the percentage of work to be subcontracted to other concerns by the Program Participant on the first task order may not exceed 50 percent of the total guaranteed minimum dollar value to be provided by the contract. If the first task order exceeds 50 percent of the guaranteed minimum amount, the Participant may subcontract no more than 50 percent of the guaranteed amount. Once the guaranteed minimum amount is met, the general rule for indefinite quantity contracts set forth in paragraph (1) of this section applies.

**Example:** Where a contract guarantees a minimum of $100,000 in professional services and the first task order is for $60,000 in such services, it would be acceptable for the Program Participant to perform less than $30,000 (i.e., 50 percent of $60,000). The Program Participant could be permitted to perform only $10,000 of that first task order. In such a case, the entire remainder of the guaranteed minimum ($40,000), however, would have to be performed by the Program Participant so that the Participant would have ultimately performed $50,000 (i.e., 50 percent of the guaranteed minimum, i.e. ($100,000).

**§ 124.315 Fair market price for 8(a) awards.**

(a) A "fair market price" for an 8(a) contract shall be determined by the agency offering the procurement requirement to SBA in accordance with paragraphs (a)(1) and (a)(2) of this section.

(1) The estimate of a current fair market price for a new procurement requirement, or a requirement that does not have a satisfactory procurement history, shall be derived from a price or cost analysis. Such analysis may take into account prevailing market conditions, commercial prices for similar products or services, or data obtained from any other agency. Such analysis must also consider any cost or pricing data that is timely submitted by the SBA.

(2) The estimate of a current fair market price for a procurement requirement that has a satisfactory procurement history shall be based on recent award prices adjusted to insure comparability. Such adjustments shall take into account differences in quantities, performance times, plans, specifications, transportation costs, packaging and packing costs, labor and material costs, overhead costs, and any other additional costs which may be deemed appropriate.

(b) Upon the request of SBA, an agency offering a procurement requirement for potential award through the 8(a) program shall submit to SBA a written statement detailing the method used by the agency to estimate the current fair market price for such contract. Such statement shall be submitted within 10 business days. The procuring agency must identify the information, studies, analyses, and other data it used in making its estimate. The procuring agency's estimate of fair market price and any supporting data may not be disclosed to any potential contractor or subcontractor, other than SBA.

(c) The concern selected to perform the 8(a) contract may request SBA to protest the procuring agency's estimate of current fair market price to the Secretary of the Department or head of the agency in accordance with § 124.320(b).

**§ 124.316 Contract administration.**

(a) SBA may delegate, by the use of special clauses in the prime contract and subcontract, certain responsibilities for administering an 8(a) subcontract to the procuring agency.

(b) SBA may delegate to the procuring agency all subcontract administration functions except the following: the exercise of options; the exercise of novation agreements (48 CFR 42.302(a)(25)); the exercise of any modification issued pursuant to the "Changes," "Differing Site Conditions," "Price Reduction," "Default-Damages for Delay-Time Extensions" and "Suspension of Work" clauses (48 CFR Part 43); payments to contractors (48 CFR Part 32); termination of the subcontract (48 CFR Part 49 and § 124.319 of this part); and consent to the placement of subcontracts (48 CFR 42.302(51)).

**§ 124.317 Performance of contracts by original concern.**

(a) Subject to the provisions of paragraph (b) of this section, a contract (including options) awarded pursuant to section 8(a) of the Small Business Act shall be performed by the concern that initially received such contract. If the owner or owners upon whom eligibility was based relinquishes ownership or control of such concern, or enters into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government, except that no repurchase costs or other damages shall be assessed against such concern due solely to the provisions of this paragraph. This provision applies whether the concern that initially received 8(a) certification remains a separate legal entity after a transfer of ownership or whether it merges into/with another business concern.

(b) The Administrator may, as a matter of discretion and on a nondelegable basis, waive the requirements of paragraph (a) of this section if requested to do so prior to the actual relinquishment of ownership and control if any of the following conditions exist:

(1) When it is necessary for the owner(s) of the concern to surrender partial control of such concern on a temporary basis in order to obtain equity financing;

(2) The head of the procuring agency for which the contract is being performed certifies that termination of the contract would severely impair attainment of the agency's program objectives or missions;

(3) Ownership and control of the concern that is performing the contract will pass to another Program Participant, but only if the acquiring firm would otherwise be eligible to receive the award directly as an 8(a) contract;

(4) The individuals upon whom eligibility was based are no longer able to exercise control of the concern due to incapacity or death; and

(5) When, in order to raise equity capital, it is necessary for the disadvantaged owner(s) of the concern to relinquish ownership of a majority of the voting stock of such concern, but only if—

(i) Such concern has exited the 8(a) program;

(ii) The disadvantaged owner(s) will maintain ownership of the largest single outstanding block of voting stock (including stock held by affiliated parties); and

(iii) The disadvantaged owner(s) will maintain control of the daily business operations of the concern.

(c) A concern performing an 8(a) contract must notify the SBA in writing immediately upon entering an agreement (either oral or written) to transfer all or part of its stock or other ownership interest to any other party. Such an agreement could include an oral agreement to enter into a transaction to transfer interests in the future.

(d) Denial of a waiver request may be appealed to SBA's Office of Hearings

and Appeals in accordance with § 124.210 and Part 134 of the Title.

(e) For the purposes of determining ownership and control of a concern under these regulations, any potential ownership interests (such as options or warrants) held by investment companies licensed under the Small Business Investment Act of 1958 shall not be treated as ownership interests until exercised.

(f) An 8(a) concern may not transfer the performance of an 8(a) contract to another concern. Such a transfer may be grounds for termination of the concern from the 8(a) program.

**§ 124.318 Exercise of options and modifications.**

(a) *Unpriced options.* The exercise of an unpriced option is considered to be a new contracting action. As such, if a concern has exited the 8(a) program or is no longer small under the size standard corresponding to the SIC Code for the requirement, negotiations to price the option cannot be entered into and the option cannot be exercised. If, however, the concern is still a Program Participant and is still a small business under the size standard corresponding to the SIC Code for the requirement, negotiations to price the option may be entered into and, if a fair and reasonable price is negotiated, the option may be exercised. SBA's concurrence in the exercise of options is required pursuant to § 124.316.

(b) *Priced options.* A priced option to an 8(a) contract award may be exercised whether the concern that received the award has exited the 8(a) program and whether the concern is no longer small under the size standard corresponding to the SIC Code for the requirement.

(c) *Modifications beyond the scope.* A modification beyond the scope of the initial 8(a) contract award is considered to be a new contracting action. As such, if a concern has exited the 8(a) program or is no longer small under the size standard corresponding to the SIC Code for the requirement, the modification cannot be exercised. If, however, the concern is still a Program Participant and is still a small business under the size standard corresponding to the SIC Code for the requirement, the modification may be made since the authority exists to enter into a new 8(a) contract to fulfill the requirement. SBA's concurrence in the exercise of modifications is required pursuant to § 124.316.

(d) *Modifications within the scope.* A modification within the scope of the initial 8(a) contract award may be exercised whether the concern that received the award has exited the 8(a) program and whether the concern is no longer small under the size standard corresponding to the SIC Code for the requirement.

**§ 124.319 Contract termination.**

(a) *Termination for default.* A decision to terminate a specific 8(a) contract for default is made by the procuring agency contracting officer in cooperation with SBA. The contracting officer will advise SBA in writing in advance of his/her intent to terminate the 8(a) contract for default. SBA may provide to the 8(a) concern any program benefits reasonably available in order to assist in preventing termination for default of the contract. SBA will advise the contracting officer of this effort. If, despite the efforts of the SBA, the procuring agency contracting officer believes grounds for termination continue to exist, he/she may terminate the 8(a) contract for default, after consulting with SBA. Such terminations shall be processed in accordance with the FAR, 48 CFR. SBA will have no liability for termination costs or reprocurement costs.

(b) *Termination for Convenience.* (1) In cooperation with SBA, the procuring agency contracting officer may terminate an 8(a) contract for convenience any time it is determined to be in the best interest of the government to do so.

(2) Pursuant to § 124.317(a) a contract shall be terminated for convenience if the owner or owners upon whom eligibility was based relinquish ownership or control of such concern, or enter into any agreement to relinquish such ownership or control, unless a waiver is granted pursuant to § 124.317. Such terminations shall be processed in accordance with the FAR, 48 CFR.

**§ 124.320 Disputes and appeals.**

(a) *Contract disputes generally.* (1) Except as provided in paragraphs (a)(2) and (a)(3) of this section, for purposes of the Disputes Clause of a specific 8(a) contract, the contracting officer is that of the procuring agency. A dispute arising between an 8(a) subcontractor and the procuring agency contracting officer will be decided unilaterally by the procuring agency contracting officer. The 8(a) subcontractor has the right to appeal the decision of the procuring agency contracting officer under the Contract Disputes Act of 1978.

(2) For disputes arising out of advance payments or business development expense funds, the contracting officer is that of SBA.

(3) For disputes arising out of construction contracts where SBA has waived bonding pursuant to § 124.305, the contracting officer is that as agreed between SBA and the procuring agency.

(4) Decisions by contracting officers (either of SBA or a procuring agency) may be appealed under the Contract Disputes Act of 1978.

(b) *SBA appeals of nonselection or terms and conditions.* (1) The Administrator of SBA may appeal the following matters to the head of the procuring agency:

(i) The decision not to make a particular procurement requirement available for award under the 8(a) program; or

(ii) The terms and conditions of a particular contract to be awarded under the 8(a) program.

(2) The SBA must notify the contracting officer of the Administrator's intent to appeal an adverse determination within 5 business days of the SBA's receipt of such determination. The SBA Administrator must file a written request to reconsider the adverse decision with the head of the procuring agency (appeal) within 15 business days of the SBA's notification of intent to appeal.

(3) Upon receipt of the notice of intent to appeal, the procuring agency shall suspend further action regarding the procurement until the head of the procuring agency issues a written decision on the appeal, unless the head of the procuring agency makes a written determination that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for a reconsideration of the adverse decision.

(4) If the Administrator's appeal is denied, the procuring agency head shall so notify the SBA, specifying the reasons for the denial. This information shall be made a part of the contract file for the requirement.

(c) An 8(a) Participant selected by the SBA to perform or negotiate an 8(a) contract may request the SBA to protest the procuring agency's estimate of the fair market price for such contract pursuant to paragraph (b) of this section.

**§ 124.321 Joint venture agreements.**

(a) *Prerequisites for joint venture agreement.* An 8(a) concern may enter into a joint venture agreement, as defined in § 124.100(n), with another small business concern, whether or not an 8(a) Participant, for the purpose of performing a specific 8(a) contract. A joint venture agreement is permissible only when the 8(a) concern lacks the necessary capacity to perform the contract on its own, and when the

agreement is fair and equitable and will be of substantial benefit to the 8(a) concern.

(b) *Size limitations.* Except for certain Program Participants owned and controlled by Indian tribes, an 8(a) concern entering into a joint venture agreement with another concern is considered to be affiliated for size purposes with the other concern with respect to performance of the 8(a) subcontract. As such, the annual receipts or employees of the other concern are included in determining the size of the selected 8(a) concern. The combined annual receipts or employees of the concerns entering into the joint venture must meet the size standard for the SIC code industry designated for the contract. *See* paragraph (f)(1) of this section for joint ventures controlled by tribally-owned concerns.

(c) *Contents of joint venture agreements.* The following provisions shall be included in all joint venture agreements:

(1) A provision setting forth the purpose of the joint venture.

(2) A provision designating the parties to the joint venture as co-managers.

(3) A provision stating that not less than 51 percent of the revenues earned by the joint venture shall be distributed to the 8(a) concern.

(4) A provision providing for the establishment and administration of a special bank account in the name of the joint venture. This account shall require the signature of all Participants or designees for withdrawal purposes. All payments due the joint venture for performance on an 8(a) subcontract shall be deposited in the special account from which all expenses incurred under the subcontract shall be paid.

(5) An itemized description of all major equipment, facilities, and other resources to be furnished by each Participant to the joint venture, with a detailed schedule of cost or value of each.

(6) A provision specifying the responsibilities of the parties with regard to contract performance and negotiation of any subcontracts.

(d) *Other requirements.* Joint venture agreements are subject to the following additional requirements:

(1) The joint venture agreement must be approved in advance of contract award by the AA/MSB&COD or his/her designee.

(2) An employee of the 8(a) concern must be the designated project manager responsible for contract performance.

(3) Accounting and other administrative records relating to the joint venture shall be kept in the office of the 8(a) concern, unless approval to keep them elsewhere is granted by the Regional Administrator or his/her designee upon written request.

(4) Quarterly financial statements showing cumulative contract receipts and expenditures (including salaries of the joint venture's principals) shall be submitted to SBA not later than 45 days after each operating quarter.

(5) A project-end profit and loss statement shall be submitted no later than 90 days after completion of the contract including a statement of final profit distribution.

(6) The 8(a) concern shall perform with its own labor force the percentage of the total value of the 8(a) contract set forth in § 124.315.

(e) *Inspection of records.* The SBA shall have the authority to inspect the records of the joint venture without notice at any time deemed necessary.

(f) *Joint ventures with concerns owned by Indian tribes.*—(1) *Exemption from size limitations.* The size limitations set forth in paragraph (b) of this section will not be applied to joint ventures entered into by an 8(a) concern owned and controlled by an economically disadvantaged Indian tribe, as defined in § 124.100(h), if the concern:

(i) Owns and controls 51 percent or more of the joint venture;

(ii) Is located on the reservation of or land owned by the tribe;

(iii) Performs most of its activities on such reservation or tribally owned land; and

(iv) Employs members of such tribe for at least 50 percent of its total workforce.

(2) *Identification of requirements.* Requirements suitable for joint ventures with tribally owned concerns must be identified by SBA and/or the tribally owned concern. Large business concerns may not be involved in identifying such requirements.

(3) *Limitations.* An 8(a) concern as a party to a joint venture may receive the exception set forth in paragraph (f)(1) of this section on no more than two contracts.

(4) *Sunset.* This paragraph shall cease to be effective after September 30, 1991.

**§ 124.401 Advance payments.**

(a) *General.* (1) Advance payments are disbursements of cash made by SBA to an 8(a) concern prior to the completion of performance of a specific 8(a) subcontract and are based on anticipated performance on the part of the 8(a) concern under a particular 8(a) subcontract. Advance payments are made for the purpose of assisting the 8(a) concern to meet financial requirements pertinent to the performance of an 8(a) subcontract. Advance payments will be considered only after all other forms of financing have been considered by SBA and are determined to be either unavailable or unacceptable to support performance of the 8(a) subcontract.

(2) The gross amount of advance payments will be determined by SBA at the time the request for such payments is approved. In no event shall the total amount of advance payments exceed 90 percent of the outstanding unpaid proceeds of the 8(a) subcontract to which the advance payments relate. In the case of requirements and indefinite quantity type contracts, advance payments will be authorized only when a guaranteed minimum value is established in the 8(a) subcontract, and the advance payments shall not exceed 90 percent of that guaranteed minimum. SBA must approve in writing any subsequent change in the gross amount of advance payments.

(3) All advance payments, whether disbursed by letter of credit or otherwise, and all 8(a) subcontract proceeds shall be deposited into a Special Bank Account established exclusively for that purpose pursuant to the Advance Payment clause of the 8(a) subcontract. Under no circumstances may advance payment funds be deposited in certificates of deposit or other securities. The procuring agency shall pay all 8(a) subcontract proceeds directly into the Special Bank Account until notified by SBA in writing that the advance payments have been fully liquidated. SBA will not authorize any withdrawals from the Special Bank Account that are inconsistent with the liquidation schedule established by the 8(a) subcontract under which the advance payments were made.

(4) Advance payments shall be liquidated from proceeds derived from the performance of the specific 8(a) subcontract to which they pertain or from other revenues of the business (except other advance payments). 8(a) subcontract proceeds shall be applied first to liquidate outstanding advance payments. Repayment must occur according to the liquidation schedule established by the 8(a) subcontract under which the advance payments were made.

(5) The special bank account may not be used as a revolving line of credit. The cumulative total amount of advance payments disbursed may not exceed the amount authorized by the Regional Administrator or his/her designee.

(b) *Requirements and conditions.* (1) Advance payments may be approved for an 8(a) concern only when all of the

following conditions are found by SBA to exist:

(i) An 8(a) concern does not have adequate working capital to perform a specific 8(a) subcontract.

(ii) Adequate and timely private financing is not available on reasonable terms to provide necessary capital.

(iii) Progress payments based on costs at customary rates will not satisfy the working capital requirements of the 8(a) concern to perform the 8(a) subcontract.

(iv) When applicable, loan guarantees for defense production are not available.

(v) Progress payments based on costs with unusual terms will not satisfy the working capital requirements of the 8(a) concern to perform the 8(a) subcontract.

(vi) The 8(a) concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of advance payment funds. These records must be made available upon request for review and copying by SBA and other appropriate Federal officials.

(vii) The 8(a) concern has no unliquidated advance payments outstanding on another 8(a) subcontract which is completed, terminated or in default, unless such unliquidated advance payments are due only to the contracting agency's delay in making final payment to the 8(a) concern after it has successfully completed the 8(a) subcontract.

(2) Advance payments shall not be made to an 8(a) concern in any case in which the concern has assigned its right to receive any payment under the specific 8(a) subcontract to any person or entity.

(3) SBA shall not charge interest on advance payments disbursed pursuant to these regulations, except that SBA may charge interest if the 8(a) concern is declared to be in default either with respect to performance or liquidation of the advance payments. In such event, interest will accrue from the date of default and shall be assessed at such rate as established by the Secretary of the Treasury pursuant to Pub. L. 92-41.

(4) Under no circumstances may a liquidation schedule be waived; however, the cognizant Regional Administrator or his/her designee may extend a liquidation schedule in appropriate cases.

(c) *Application and approval procedure.* The following procedures apply to the approval of advance payments:

(1) The 8(a) concern must submit a written request for advance payments to the cognizant SBA Regional Administrator or his/her designee. Such request must include such detailed documentation as SBA may specify to support the 8(a) concern's need for such funds and proof that working capital financing cannot be found from financing institutions at reasonable terms.

(2) The 8(a) concern must identify a commercial bank which is a member of the Federal Reserve System in which it will establish a Special Bank Account for the deposit of advance payments and all progress payments made to it by the procuring agency for its performance of the 8(a) subcontract. This special account shall be a non-interest bearing demand deposit account.

(3) The 8(a) concern must, as required by IRS regulations, select a Federal Depository into which the Federal withholding and FICA payment will be made.

(4) Upon review of all of the circumstances, the Regional Administrator or his/her designee shall decide whether to approve or deny a request for advance payments, and, if approval is granted, shall designate the amount thereof and the terms and conditions upon which such advance payments may be made. The Regional Administrator's or his/her designee's Finding, Determination and Authorization for Advance Payments shall be in writing, and shall, at a minimum, state that the 8(a) concern has given adequate security, that the advance payments will not exceed the unpaid contract price, and, based on written findings, that making the advance payments either is in the public interest or facilitates the national defense. The Finding, Determination and Authorization for Advance Payments shall identify what security shall be required, including but not limited to a lien against the property contracted for, the balance of the Special Bank Account, and any property acquired for the performance of the 8(a) subcontract.

(d) *Post-approval procedures.* The Contracting Officer shall be responsible for assuring that advance payments are implemented consistent with the Finding, Determination and Authorization for Advance Payments issued by the Regional Administrator or his/her designee. Before any advance payments are disbursed, the following actions must occur:

(1) The 8(a) concern must execute a note evidencing the full amount of the advance payments and a security agreement and personal guarantee by one or more of the principals of the 8(a) concern as collateral for the advance payments.

(2)(i) The 8(a) concern and the SBA shall execute a modification to the 8(a) subcontract adding an Advance Payment clause prior to the disbursement of any advance payments. The clause shall state the amount of the advance payments, a liquidation schedule and all other terms and conditions to govern the advance payments, consistent with the Finding, Determination and Authorization for Advance Payments issued by the Regional Administrator or his/her designee.

(ii) The Contracting Officer, when other contract terms reducing the quantity, price or term of performance of the 8(a) prime contract and subcontract are modified by the procuring agency, shall initiate action to modify the Advance Payment clause and, if appropriate, the letter of credit as necessary, including, but not limited to, reduction of the total amount of advance payments authorized or the amount of the letter of credit and/or restructuring the liquidation schedule, to ensure that at no time during the performance of the 8(a) subcontract does the unliquidated advance payments balance exceed 90 percent of the unpaid value of the 8(a) subcontract.

(3) The 8(a) concern, SBA and the bank in which the Special Bank Account has been established will enter into a Special Bank Account Agreement prior to disbursement of any funds, which agreement shall specify the respective rights and responsibilities of the parties. The Agreement shall grant to SBA the unilateral right to withdraw any funds in the Special Bank Account to the extent necessary to liquidate any unliquidated advance payments.

(i) The cognizant SBA Regional Administrator shall designate at least two SBA employees to serve as countersignatories on the Special Bank Account. Withdrawals from the account will be made only upon the authorized signatures of a representative of the 8(a) concern and one of the designated SBA employees, as identified on the signature card for the Special Bank Account. Under no circumstances shall the requirement for an SBA employee countersignature be waived.

(ii) At the time that SBA disburses advance payment funds into the Special Bank Account, SBA shall obtain the most superior lien possible upon the Special Bank Account, any property contracted for, supplies, material and other property acquired with the advance payment funds, and upon any other security required by the Finding, Determination and Authorization for Advance Payments.

(4) Prior to the disbursement of an advance payment, SBA shall modify the

prime contract with the procuring agency in the following respects:

(i) Reassign contract administration authority to the extent necessary to administer the Advance Payment clause of the 8(a) subcontract to SBA's Contracting Officer.

(ii) Direct payment of all contract proceeds into the Special Bank Account until SBA issues written notice that the advance payments have been fully liquidated.

(iii) Require prompt notice of any adverse developments in contract performance, changes in the Government requirement, or of any other condition that may affect progress payments.

(iv) Require that copies of all payment vouchers issued by the procuring agency's disbursing office be sent to the Contracting Officer.

(e) *Procedures for use of advance payment funds.* (1) Except for repayment to SBA in appropriate circumstances, advance payment funds may be used by an 8(a) concern only for the purchase of materials, payment of labor, payment for equipment expenses, general and administrative expenses and overhead, and payment of progress payments to the subcontractors of the 8(a) concern necessary for the performance of the specific 8(a) subcontract for which the advance payments were authorized. 8(a) concerns shall follow a two-step process to gain access to advance payment funds. The first step is the disbursement of the advance payment funds from SBA, either directly or by way of letter of credit into the Special Bank Account. The second step is the withdrawal of funds from the Special Bank Account by check to pay particular contract expenses.

(2) *Disbursement of advance payment funds by SBA.* (i) SBA shall disburse advance payments by way of a letter of credit where the Agency anticipates that all of the following conditions exist:

(A) Its relationship with the particular 8(a) concern will last for a year or more.

(B) The cumulative disbursements to that 8(a) concern will total at least $120,000 annually.

(C) The 8(a) concern has submitted a schedule of its projected monthly advance requirements for 8(a) subcontract disbursements and SBA has reviewed it and found it to be reasonable.

(D) The 8(a) concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of program funds. These records must be made available upon request for review and audit by SBA and the General Accounting Office.

(ii) *Procedures for disbursements by letter of credit.* The procedures for the utilization of the letter of credit method of payment shall be in accordance with 48 CFR 32.406. Where disbursement is by the letter of credit method, an 8(a) concern shall draw down funds against its letter of credit for deposit into the Special Bank Account only as needed and in such amounts necessary for its immediate cash needs under the 8(a) subcontract for which the advance payments were authorized. Such immediate cash needs shall be documented by the 8(a) concern and verified by SBA prior to drawdown. The amount of each drawdown against the letter of credit shall be for the minimum amount needed to satisfy immediate cash needs, taking into account other financial resources available to the 8(a) concern, including progress payments not required for the liquidation of disbursed advance payments.

(iii) In all instances not covered by paragraph (e)(2)(i) of this section, SBA shall disburse advance payments by Treasury check or electronic funds transfer. In such cases, the Contracting Officer shall request SBA's Office of Financial Operations, Denver, Colorado, to disburse the authorized amount of the advance payments into the Special Bank Account.

(3) *Procedures for withdrawal of funds from the Special Bank Account.* All payments to the 8(a) concern under the 8(a) subcontract for which advance payments were authorized, together with all disbursements of such advance payments, shall be paid into the Special Bank Account.

(i) *Liquidation of disbursed advance payments.* The funds in the Special Bank Account shall be applied by SBA first to liquidate the balance of disbursed advance payments, in accordance with the liquidation schedule in the Advance Payment clause of the 8(a) subcontract. Withdrawals for liquidation of disbursed advance payments shall be made in accordance with the procedures contained in the Advance Payment clause of the 8(a) subcontract.

(ii) *Payment of 8(a) subcontract expenses.* Any amounts in the Special Bank Account not required to liquidate disbursed advance payments shall next be applied to pay allowable and allocable costs incurred in the performance of the 8(a) subcontract for which the advance payments were authorized. To obtain withdrawals from the Special Bank Account for the payment of such costs, the 8(a) concern shall request issuance of checks for the payment of expenses to the Contracting Officer, supported by the documentation described below. Such requests shall be made sufficiently in advance of the due date for such obligations to permit the review of the request by SBA and countersignature by the designated SBA countersignatories. The Contracting Officer or his/her designee will review the documentation presented and either recommend approval or disapproval to the Assistant Regional Administrator for Minority Small Business and Capital Ownership Development (ARA/MSB&COD). If the ARA/MSB&COD authorizes payment, the designated SBA countersigning agent(s) will countersign the check withdrawing funds from the Special Bank Account. The 8(a) concern shall support each request for a withdrawal from the Special Bank Account by submitting to the Contracting Officer or his/her designee, to the extent applicable, the following:

(A) The original vendor invoice or original payroll record;

(B) A certified statement, dated and signed by the concern's authorized certifying official, attesting to the truth and accuracy of the vendor invoice, and/or the payroll records for the requested withdrawal, including records of direct payroll expenditures as well as labor overhead;

(C) A certification by the 8(a) concern that all Federal taxes and FICA payments are current, or a copy of any agreement with the Internal Revenue Service (IRS) providing for payment of delinquent taxes; and

(D) Documentation of overhead and general and administrative rates, using projected indirect costs applied to a valid base, which have been properly allocated to direct material, labor, or other direct costs.

(E) Where the requested withdrawal is for payroll expenses, the 8(a) concern must prepare a check for Federal taxes in the name of the tax collecting agency, or the Federal Depository selected by the 8(a) concern into which its Federal withholding and FICA payments are made, to be signed by SBA and the 8(a) concern concurrent with the check for the submitted payroll. If the amount of a check payable to IRS or to the Federal Depository is less than 25 percent of the gross payroll for the Period, the 8(a) concern's authorized certifying official shall prepare a statement certifying that the amount designated as payable to IRS or to the Federal Depository is true and correct. There shall be no change of Federal Depository without obtaining the prior written consent of SBA.

(iii) *Release of residual funds after liquidation of the advance payments and payment of 8(a) subcontract expenses.* Any funds remaining in the Special Bank Account after the 8(a)

subcontract has been successfully completed or terminated and after the advance payments have been fully liquidated and all allowable and allocable 8(a) subcontract performance costs have been paid shall be disbursed to the 8(a) concern. Upon receipt of the final progress payment, the Contracting Officer shall expeditiously close the Special Bank Account, executing a check withdrawing the remaining balance of the Account payable to the 8(a) concern.

(f) *Cancellation.* (1) SBA may determine that advance payments should be cancelled under appropriate circumstances, including but not limited to the following:

(i) The terms and conditions of the Advance Payment clause have not been adhered to by an 8(a) concern.

(ii) The 8(a) concern is not in compliance with its 8(a) Participation Agreement.

(iii) The 8(a) concern has been suspended pursuant to § 124.115 or has been terminated by administrative action under section 8(a)(9) of the Small Business Act, 15 U.S.C. 637(a)(9).

(2) In the event of cancellation of advance payments to an 8(a) concern, all previous advance payments made to that 8(a) concern shall become due and payable to SBA prior to the receipt of final contract payment.

**§ 124.402 Business development expense.**

(a) Any Business Development Expense (BDE) funds received by a Program Participant prior to October 1, 1989 must. be used exclusively for the purposes stated in the BDE approval. Use of such funds for any other purpose may be good cause for termination from the 8(a) program pursuant to § 124.209.

(b) Any Program Participant which received BDE funds prior to October 1, 1989 shall maintain records to substantiate the uses for which the BDE funds have been expended.

(c) In the event of default on an 8(a) contract to which BDE funds relate, the Participant shall be liable for repayment of the full amount of the BDE to SBA.

**§ 124.501 Development assistance program.**

(a) *General.* Section 7(j)(1) of the Small Business Act provides for financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or enterprises eligible for assistance under sections 7(a)(11), 7(j)(10), and 8(a) of the Small Business Act. The AA/MSB–COD is responsible for coordinating and formulating policies relating to the dissemination of this assistance to small business concerns eligible for assistance under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act.

(b) *Services.* (1) Section 7(j)(1–2) of the Small Business Act empowers the SBA to provide through public and private organizations the management and technical assistance enumerated below to those individuals or concerns who meet the eligibility criteria contained in sections 7(a)(1) and 8(a) of the Small Business Act.

(2) The SBA shall give preference to projects which promote the ownership, participation in ownership, or management of small businesses owned by low-income individuals and small businesses eligible to participate in the section 8(a) program.

(3) This assistance may include any or all of the following:

(i) Planning and research, including feasibility studies and market research;

(ii) The identification and development of new business opportunities;

(iii) The furnishing of centralized services with regard to public services and Federal Government programs including programs authorized under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act;

(iv) The establishment and strengthening of business service agencies, including trade associations and cooperatives;

(v) The furnishing of business counseling, management training, and legal and other related services, with special emphasis on the development of management training programs using the resources of the business community, including the development of management training opportunities in existing business, and with emphasis in all cases upon providing management training of sufficient scope and duration to develop entrepreneurial and managerial self-sufficiency on the part of the individuals served.

(4) Sections 7(j)(3) and 7(j)(9) of the Small Business Act authorize SBA to:

(i) Encourage the placement of subcontracts by businesses with small business concerns located in areas of high concentration of unemployed or low-income individuals, with small businesses owned by low-income individuals, and with small businesses eligible to receive contracts pursuant to section 8(a) of this Act. SBA may provide incentives and assistance to such businesses that will aid in the training and upgrading of potential subcontractors or other small business concerns eligible for assistance under sections 7(a)(11), 7)(j), and 8(a) of the Small Business Act, and

(ii) Coordinate and cooperate with the heads of other Federal departments and agencies, to insure that contracts, subcontracts, and deposits made by the Federal Government or with programs aided with Federal funds are placed in such a way as to further the purposes of sections 7(a)(11), 7(j), and 8(a) of the Small Business Act.

(c) *Eligibility.* (1) Eligibility for the assistance enumerated under § 124.501(b) above shall include, but not be limited to:

(i) Businesses which qualify as small within the meaning of size standards prescribed in 13 CFR Part 121, and which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, or which are owned by such low-income individuals; and

(ii) Businesses eligible to receive contracts pursuant to section 8(a) of the Small Business Act.

(d) *Delivery of services.* (1) The financial assistance authorized for projects under paragraph (b) of this section includes assistance advanced by grant, cooperative agreement, or contract.

(2) To the extent feasible, services available under paragraph (b) of this section shall be provided in a location which is easily accessible to the individuals and small business concerns served.

(e) *Coordination and cooperation with other government agencies.* (1) The AA/MSB–COD may utilize the resources of other agencies and departments whenever practicable which can directly or indirectly support or augment the purposes of sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(2) The AA/MSB–COD shall enter into agreements with Federal agencies and departments to further effective sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(3) The AA/MSB–COD shall encourage the placement of deposits made by the Federal Government, or by programs aided with Federal funds, in such a way as to further the purposes of section 7(a)(11), 7(j) and 8(a) of the Small Business Act.

**§ 124.502 Small Business and Capital Ownership Development program.**

(a) *General.* Section 7(j)(10) of the Small Business Act establishes a Small Business and Capital Ownership Development program which shall provide additional assistance exclusively for small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. The management of the Capital

Case 2:25-cv-02328-ASJ-MBN Document 53-1 Filed 09/04/26 Page 111 of 252



Ownership Development program is vested in the AA/MSB–COD who is responsible for the oversight of the program and activities set forth in this part of these regulations. The development assistance described below shall be provided exclusively to those small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. Such small business concerns shall be participants in the Small Business Capital Ownership Development program. This program shall:

(1) Assist small business concerns participating in the program to develop comprehensive business plans with specific business targets, objects, and goals;

(2) Provide for such other nonfinancial services as deemed necessary for the establishment, preservation, and growth of small business concerns participating in the program, including but not limited to:

(i) Loan packaging,

(ii) Financial counseling,

(iii) Accounting and bookkeeping assistance,

(iv) Marketing assistance, and

(v) Management assistance;

(3) Assist small business concerns participating in the program to obtain equity and debt financing;

(4) Establish regular performance monitoring and reporting systems for small business concerns participating in the program to assure compliance with their business plans;

(5) Analyze and report the causes of success and failure of small business concerns participating in the program; and

(6) Provide assistance necessary to help small business concerns participating in the program to procure surety bonds. Such assistance shall include, but not be limited to:

(i) The preparation of surety bond participation forms;

(ii) Special management and technical assistance designed to meet the specific needs of small business concerns participating in the program and which have received or are applying to receive a surety bond, and

(iii) Preparation of all forms necessary to receive a surety bond guarantee from the SBA pursuant to Title IV, Part B of the Small Business Investment Act of 1958.

**§ 124.601 Miscellaneous reporting requirements.**

(a) *Capability statements.* Each 8(a) concern shall annually prepare and submit to the SBA a capability statement. Such statement shall briefly describe the concerns various contract performance capabilities and shall contain the name and telephone number of the BOS assigned the concern. SBA will submit the capability statements to the appropriate procuring agencies for the purpose of matching requirements with appropriate 8(a) concerns.

(b) *Participant reports on parties assisting it and fees.* (1) Each 8(a) Program Participant shall submit semi-annually a written report to its assigned BOS to include the following information:

(i) A listing of any agents, representatives, attorneys, accountants, consultants and other parties (other than employees) receiving fees, commissions, or compensation of any kind to assist such Participant in obtaining a Federal contract;

(ii) The amount of compensation received by any person listed under paragraph (b)(1)(i) of this section during the relevant reporting period along with a description of the activities performed for such compensation.

(2) The BOS will review the report and forward it to the AA/MSB&COD. Any report that raises a suspicion of improper activity shall be referred immediately to the SBA Inspector General.

(3) The failure to submit a report pursuant to the requirements of this section shall be considered good cause for the initiation of a termination proceeding pursuant to § 124.209.

(c) *Reporting requirements after exiting the 8(a) program.* Former 8(a) Program Participants shall provide such information as SBA may request concerning such former Participant's continued business operations, contract portfolio and financial condition for a period of three years following the date on which the concern exits the program. Failure to provide such information when requested may result in the nonexercise of options on contracts awarded through the 8(a) program.

Date: March 19, 1989.

James Abdnor,

*Administrator.*

[FR Doc. 89-6500 Filed 3-22-89; 8:45 am]

BILLING CODE 8025-01-M

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Part 124**

## Minority Small Business and Capital Ownership Development Program

**AGENCY:** Small Business Administration.

**ACTION:** Final rule.

**SUMMARY:** The Small Business Administration (SBA) hereby amends its regulations governing the Minority Small Business and Capital Ownership Development Program authorized by sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10), 637(a)). In most instances the revisions implement changes required by the Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656), enacted November 15, 1988 and the Business Opportunity Development Reform Act Technical Corrections Act (Pub. L. 101–37), enacted June 15, 1989. Some provisions, however, incorporate into the regulations existing Agency policy while others implement policy changes.

**EFFECTIVE DATES:** Except for §§ 124.311 and 124.312, this regulation is effective on August 21, 1989. Sections 124.311 and 124.312 are effective on October 1, 1989.

**FOR FURTHER INFORMATION CONTACT:** Associate Administrator for Minority Small Business and Capital Ownership Development, (202) 653–6407, Jane P. Butler, (202) 653–6813, or Rodney A. Lewis, (202) 653–6549.

**SUPPLEMENTARY INFORMATION:** On March 23, 1989, SBA published a proposed rule in the **Federal Register** (54 FR 12054) which revised the Minority Small Business and Capital Ownership Development Program (8(a) Program) and implemented the Business Opportunity Development Reform Act of 1988 (Reform Act) (Pub. L. 100–656, enacted November 15, 1988). In preparing the proposed rule, SBA held two public meetings in December 1988 to receive public comment on the nature and extent of the regulations needed to implement the Reform Act. The first was held in San Francisco, California on December 9, 1988 and was attended by approximately 75 members of the public. The second was held in Washington, DC, on December 19, 1988, and was attended by approximately 325 members of the public. All comments received at the hearings were considered in the preparation of the proposed rule.

Since, at the time of publication of the proposed rule, the Reform Act required SBA to publish final implementing regulations by June 15, 1989, SBA was able to provide a 30 day public comment period on the proposed regulations. The required implementation date for the final rule was subsequently extended to August 15, 1989 by Public Law 101–37, which was enacted June 15, 1989. During the public comment period, SBA received approximately 330 comment letters. SBA has analyzed these comments and has made changes to the rules where appropriate. A summary of the key issues raised by the public comments and the action SBA took with respect to the comment follows the general overview portion of this preamble.

### General Overview

The numbering scheme of these regulations is generally similar to that used in SBA's previous 8(a) program regulations, published October 8, 1986 (51 FR 36132, *et seq.*). Some sections, however, have been renumbered or combined with other sections to accommodate new provisions required by the Reform Act. Sections 124.1 through 124.7 address issues which pertain to the program in general. Section 124.100 sets forth definitions of key terms used in the regulations. Some of these definitions are identicial to those previously included in SBA's existing regulations. Others have been added or amended in this final rule in response to public comment.

Sections 124.101 through 124.113 address matters relating to program eligibility requirements both for admission to the 8(a) program and for continued participation in the 8(a) program. Sections 124.201 through 124.205 set forth information concerning the application process. Sections 124.206 through 124.211 set forth procedures relating to the Agency review of applications, program graduations, program terminations and suspensions as well as procedures relating to administrative appeal rights which the Reform Act affords program applicants and participants.

Sections 124.300 through 124.320 address requirements relating to business development and contracting. Sections 124.401 through 124.403 relate to special methods of contract financing: advance payments and business development expense. In this final rule, SBA has renumbered, but has not amended, former §§ 124.501 and 124.502, concerning the Development Assistance Program authorized by the Minority Small Business and Capital Ownership Development Program as §§ 124.404 and 124.405. Section 124.501, proposed as § 124.601, sets forth miscellaneous reporting requirements for current and former 8(a) Program Participants. It has been renumbered in this final rule to correct an inadvertent overlap with regulations published in subpart B of part 124, relating to protest and appeal procedures for small disadvantaged businesses.

The Reform Act also contains provisions imposing new requirements relating to standards of conduct for certain SBA employees who have 8(a) program responsibilities and authorizing a loan program for 8(a) Program Participants. SBA is publishing separate rules amending parts 105 and 122 of this title, respectively, to implement these Reform Act requirements. In addition, in order to implement the adminsitrative hearing requirements of the Reform Act, SBA is promulgating separate conforming amendments to its administrative hearing procedures found in part 134 of this title which complement §§ 124.206 through 124.211 of this rule.

### Summary of Issues Raised by Public Comment

Many commenters objected to the brevity of the 30 day comment period and requested that SBA extend it. As noted previously, the statutorily mandated publication timetable for implementing rules made it impossible for SBA to do so.

Some commenters objected to SBA's inclusion of certain provisions of the proposed regulation which were not required by the Reform Act. The commenters believed that SBA violated the Administrative Procedure Act (APA, 5 U.S.C. 551, *et seq.*) by proposing regulatory provisions which were not specifically authorized or required by statute.

This view, however, is not consistent with the requirements of the APA. In promulgating rules, the APA does not limit an agency to provisions specifically required by statute. Under section 5(b)(6) of the Small Business Act (15 U.S.C. 632(b)(6)), the Administrator of SBA has general rulemaking authority to "make such rules and regulations as he/she deems necessary to carry out the authority vested in him/her by or pursuant to this Act." This authority permits SBA to fashion rules to operate its programs effectively and efficiently. It is for this purpose as well as to implement the specific requirements of the Reform Act that SBA is promulgating these revisions to the 8(a) program regulations.

Section 124.1 describes the scope of these regulations. The rules apply to participants in the 8(a) program, as authorized by sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10) and 637(a)). Certain sections of these rules relating to social and

economic disadvantaged status apply to other Federal programs for which social and economic disadvantaged status is a requirement of program eligibility. Such programs include, among others, the Defense Department's (DoD's) Small Disadvantaged Business (SDB) Set-aside and Bid Preference programs authorized by section 1207(a) of Pub. L. 99-661, and the section 8(d) Subcontracting Program, authorized by section 8(d) of the Small Business Act (15 U.S.C. 637(d)). SBA received no public comments on this section.

Concerns with applications in process on the effective date of § 124.107 will be subject to Agency policy requirements regarding potential for success which were in effect on the date of application. They will not be required to meet the new provisions of § 124.107(a) regarding length of time in business. In addition, concerns with applications in process on the effective date of § 124.109 will not be subject to the provisions of section 109(b) which excludes franchises from 8(a) program participation.

The regulations also provide that actions to graduate, terminate or suspend which were commenced by the issuance of an Order to Show Cause prior to the effective date of §§ 124.206 through 124.211 will be governed by the procedures in effect on the date the Order to Show Cause was issued.

Sections 124.2 and 124.3 describe statutorily mandated changes to 8(a) program administration. Section 124.2 provides that the position of the Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD) is required to be a career civil service position as opposed to a non-career appointive position. SBA received one public comment on this section which supported the idea of a career civil service position for the AA/MSB&COD and addressed selection criteria, which are not appropriately addressed in these regulations. Section 124.3 provides information regarding the Division of Program Certification and Eligibility. No comments were received on this section.

Section 124.4 describes the Commission on Minority Business Development which was authorized by section 505 of the Reform Act. The purpose of the Commission is to review all Federal programs designed to promote the development of minority owned businesses in order to ascertain whether the congressionally described goals and purposes of such programs are being realized. SBA received a few comments on the Commission which expressed the view that the conclusions of the Commission may be biased if SBA is a member and is responsible for selecting staff for the Commission. SBA believes that Agency participation is essential and that it can maintain its objectivity. In any case, the final rule makes no change to the provisions concerning the Commission because the composition of the Commission is statutorily mandated and cannot be altered by regulation.

Section 124.5 repeats previous § 124.3 which describes the effect of an 8(a) program applicant's willful violation of any SBA's regulations governing its other programs. SBA received no comments on this provision.

Section 124.6 notifies 8(a) program applicants and participants of the range and severity of penalties which could result from making misrepresentations or false statements in relation to the 8(a) program. A number of commenters objected to the imposition of such penalties when representations are made based on a good faith interpretation of the requirements, but are found to be misrepresentation. Although SBA cannot alter the penalties which are imposed by statute, in response to public comments, SBA has revised the proposed rule relating to social and economic disadvantage to make the criteria to which a certification would relate more specific. SBA has also added the word "intentional" to § 124.6 to clarify that such penalties will only attach when a misrepresentation is intentional.

One commenter asked if the penalties described in § 124.6 apply to misrepresentations of small disadvantaged business status made for purposes of DoD's Small Disadvantaged Business (SDB) Program or for other programs for which social and economic disadvantage are requirements of eligibility. Section 124.6 implements section 405 of the Reform Act which, in an amendment to section 16(d)(1)(D), specifically applies the penalties to situations where the misrepresentations have been made to obtain "any prime or subcontract to be awarded as a result, or in furtherance, of any other provision of Federal law that specifically references section 8(d) [of the Small Business Act] for a definition of program eligibility * * *" Since DoD's SDB program relies on section 8(d) of the Small Business Act for its definition of social and economic disadvantage, the penalties set forth in § 124.6 apply misrepresentations of that Small Disadvantaged Business status.

Section 124.7 sets forth restrictions on fees for applicant and 8(a) participant representatives. As proposed, this section prohibited any applicant concern or Program Participant from, among other things, paying any fee to such representatives which is contingent on program certification or on specific 8(a) contract award(s). A number of commenters objected to the restrictions as they relate to contingent fees for assistance in obtaining a contract. The commenters cited section 3.4 of the Federal Acquisition Regulations (48 CFR 3.4) (FAR) which permits some contingent fees for such assistance in limited circumstances. SBA has amended paragraph (b) of § 124.7 to adopt the FAR provisions. SBA has retained without change the remainder of the section, which contains prohibitions against contingent fees for assistance in program admission and against fees which are based on a percentage of any contract awarded.

SBA has amended § 124.100 to include a number of new and changed definitions for terms used throughout this title and has eliminated definitions which are no longer relevant or which are defined in the body of the regulations. For ease of amendment, the lettered paragraphs have been deleted from the section and the terms appear alphabetically.

The definition of "Fixed Program Participation Term" ("FPPT") has been changed to clarify that an FPPT is the specific term of Program Participation negotiated with a concern under the authority of the Small Business Act, as amended by Public Law 96-481, effective April 21, 1982.

The definition of "primary industry classification" has been changed to conform to the definition of "primary industry" provided in SBA's Size Regulations (part 121 of this title).

SBA has also amended its definition of "principal place of business." This definition requires SBA to determine a concern's principal place of business based on two factors: The location of the concern's books and records, and the location at which the individual who manages the concern's day-to-day operations spends the majority of his/her working hours. In commenting on this definition, one commenter urged SBA to include a grandfathering provision in the definition. The commenter's view was that a concern which had participated in the 8(a) program for 3 years or more should not have to change either its SBA Servicing Office or its principal place of business to comply with the new definition. The commenter believed that to do so would disrupt the working relationship of the concern in the SBA district or region in which it is currently operating. SBA considered this comment and, in light of the 12 month grandfathering provision contained in § 124.101(b), SBA decided

not to adopt the comment. The grandfathering provision contained in § 124.101(b) applies to all requirements of this final rule which have not been previously imposed by regulation. SBA believes that a compliance period of one year from the effective date of these regulations allows firms a reasonable amount of time to adjust to the new requirements.

Another commenter urged that the definition of "disadvantaged owner" be amended to include a reference to Indian tribes, since tribally-owned concerns are eligible to participate in the 8(a) program and the proposed definition was phrased only in terms of individuals, not tribal entities. SBA has adopted this comment and has amended the term "disadvantaged owner" accordingly.

Section 124.101 describes the process for determining 8(a) program eligibility. Except for concerns owned by Indian tribes, including Alaska Native Corporations, and Native Hawaiian Organizations, addressed by §§ 124.112 and 124.113, respectively, each applicant concern must meet the requirements set forth in §§ 124.102 through 124.109. Under 8(a) eligibility procedures, the AA/MSB&COD will approve or decline each application in writing setting forth the basis of his or her determination. An applicant is entitled to appeal to SBA's Office of Hearings and Appeals (OHA) if its application is declined based solely on a negative finding of one or more of the following eligibility criteria: Social disadvantage, economic disadvantage, ownership or control. Appeal procedures are set forth in § 124.210 and part 134 of this title. The written decision of OHA is the final agency action on the matter.

Under these regulations, Program Participants are required to continue to meet the eligibility criteria of §§ 124.102 through 124.109, except as provided in § 124.111(a). Failure to maintain 8(a) program eligibility is grounds for termination from the 8(a) program.

Paragraph (c) of § 124.101 describes grounds for which SBA would review the eligibility of any applicant concern or Program Participant. One commenter expressed the view that due process rights, including a hearing before OHA, should be afforded an individual or concern about whom information has been submitted which leads SBA to reexamine the concern's program eligibility. SBA considered the comment but did not adopt it. Due process rights, including hearings, are already provided for terminations, graduations and suspensions. (*See* §§ 124.206 through 124.211.) If SBA takes no action, there is no need to afford the concern a hearing.

Section 124.102 discusses the requirement that 8(a) applicant concerns and Program Participants qualify as small businesses under § 121.4 of title 13, Code of Federal Regulations. Paragraphs (a), (c), and (d) restate the requirements of existing paragraphs (a) and (b) of § 124.102 and have been reorganized as proposed paragraphs (a), (c), and (d) for greater clarity. Paragraph (d) also references an exemption from the size requirement authorized by Public Law 100–656 and set forth in proposed § 124.321 for contracts awarded to joint ventures controlled by eligible Indian tribes.

Paragraph (b) of § 124.102, as proposed, authorized the Division of Program Certification and Eligibility (Division) to deny an application or to request a formal size determination when it is unable to determine that an applicant qualifies as a small business. In response to a public comment, this paragraph has been amended to replace all references to the Division with references to the AA/MSB&COD. The commenter correctly noted that only the AA/MSB&COD has the authority to deny an application even if the denial is for failure to meet size requirements.

In response to a public comment, paragraph (a) has been amended to clarify that concerns owned by Indian tribes, which are not joint ventures, are required to certify as small businesses in compliance with § 124.112.

Paragraph (d) has also been reworded slightly to make clear that in the event that SBA does not accept a concern's size certification, the concern may pursue review of its size status through the formal size determination process. As worded in the proposed rule, the language could have been interpreted to permit only an appeal to OHA and not an initial review at SBA's regional office. In addition, another commenter asked SBA to define the time at which a Participant would be required to certify size. SBA made no changes to this rule as a result of the comment because part 121 of this title already addresses this question. In accordance with SBA's size rules, a Participant is required to certify to its small business status at the time of submission of its initial offer which includes price. Changes in size subsequent to that certification will not affect the Participant's eligibility for that contract, unless the change is caused by acquisition of the firm.

Section 124.103 addresses ownership requirements for 8(a) program entry and for continued 8(a) program eligibility. Any ownership interest in an 8(a) concern which is held by a disadvantaged individual upon whom eligibility is based must be unconditionally held. This requirement was mandated by the Reform Act Technical Amendments, Public Law 101–37, which was enacted on June 15, 1989 subsequent to the publication date of the proposed rule. In order to conform the regulations to the new statutory requirement, SBA has amended paragraphs (a), (b) and (c) to specify that unconditional ownership is required.

A number of commenters objected to a proposed provision requiring an owner(s) upon whom 8(a) eligibility is based to have been a 51 percent owner(s) for at least two years prior to applying for 8(a) certification. This restriction was viewed as overly burdensome. SBA has adopted this comment and has deleted the two year ownership rule from the prefatory language of § 124.103.

A few commenters objected to proposed paragraph (b) which required disadvantaged individuals to hold 51 percent of the combined total of all classes of stock. The commenters expressed the view that this would overly restrict the 8(a) concern's access to capital through preferred stock offerings, etc. The commenters recommended that SBA return to its former regulation which only required that such individuals hold 51 percent of voting stock. The proposed requirement resulted from a General Counsel's opinion which found that such ownership was necessary to meet the 51 percent ownership requirement of section 8(a) of the Small Business Act (15 U.S.C. 637(a)). While disadvantaged ownership of 51 percent of the voting stock would satisfy the control requirement, it would not satisfy the separate requirement of 51 percent disadvantaged ownership. Therefore, the requirement of 51 percent ownership of the aggregate of all classes of stock remains unchanged in this final rule.

One commenter noted that SBA's treatment of options held by Small Business Investment Companies (SBICs) and Minority Enterprise Small Business Investment Companies (MESBICs) should be included in § 124.103, which addresses ownership of 8(a) concerns, and not, as proposed in § 124.317, which relates to performance of contracts by the original 8(a) concern awardee. SBA has adopted this comment and added the paragraph to § 124.103(d).

A number of commenters found the restrictions on ownership to be too severe and expressed the view that they would overly limit the ability of a small and disadvantaged firm to secure necessary long-term financing. SBA considered this comment and has

amended paragraphs (f), (g), (h), and (i) of § 124.103 so that the restrictions do not apply to ownership interests of less than 10 percent. In addition, equity interests held by SBICs, including MESBICs, or other financial institutions which are licensed by Federal, State or local government are not restricted under paragraph (g). SBA has also added the word "equity" before ownership interest in paragraphs (f), (g), and (h) to clarify that the restrictions apply to stock ownership or equity in a concern, but do not prohibit other concerns or individuals, whether or not disadvantaged, from making loans to 8(a) concerns. While such loans are generally encouraged, there may be instances where they would not be permitted during a concern's 8(a) program participation. For example, for purposes of size eligibility, SBA may still find affiliation between the lender and the 8(a) concern. In addition, certain loan arrangements could result in negative control of an 8(a) concern and would be prohibited for that reason under § 124.104(d)(5).

Paragraph (i) of § 124.103 addresses changes in 8(a) ownership. Where such changes result from the death or incapacity of an individual upon whom eligibility is based, SBA will not require prior approval of the change of ownership. For changes of ownership resulting from such circumstances, SBA will allow the concern reasonable period of time to replace the disadvantaged individual. However, any changes of ownership must be approved by SBA.

Proposed paragraph (j) contained exceptions to the restrictions contained in paragraphs (g), (h), and (i) for ownership interests of less than 5 percent. It also set forth procedures for obtaining approval of a public offering. To the extent that exceptions will be permitted to the ownership restrictions, they are set forth separately in individual paragraphs. Therefore, they have been deleted from paragraph (j). The remainder of proposed paragraph (j) is adopted without change.

Section 124.104 addresses requirements of, and restrictions on, the control and management of 8(a) Program applicants and participants. SBA has reordered the paragraphs to state first, in paragraphs (a) and (b) (proposed paragraph (c) and (d)), the control and management requirements. Paragraphs (c) and (d) (proposed paragraphs (a) and (b)) set forth the restrictions on control and management of an 8(a) concern by nondisadvantaged individuals, their spouses or immediate family members. This final rule permits any such individual to be an officer, director, or up to a 10 percent owner, stockholder, or partner of another concern in the same or similar line of business and may hold individually up to a 10 percent interest in one or more other 8(a) concerns. This represents a change from the proposed rule which exempted from the restrictions nondisadvantaged owners, stockholders and partners with up to 5 percent ownership interests.

In addition, this final rule does not restrict MESBICs, SBICs and other financial institutions which are licensed by Federal, state or local government to holding 10 percent interests. However, by statute, no nondisadvantaged individual or entity is permitted to hold more than 49 percent of any 8(a) concern.

One commenter urged SBA to permit MESBICs to acquire temporary control in instances where it is necessary to protect the MESBICs' investments. SBA rejected this suggestion because it conflicts with the statutory requirement that the disadvantaged individual(s) control the 8(a) concern.

A number of commenters objected to the prefatory language of § 124.104 which required the disadvantaged individual(s) who control the 8(a) applicant or participant to have managerial and technical experience and competency directly related to the primary industry of the concern. The commenters expressed the view that good managers do not need to personally possess all the technical experience and competency to operate a successful business. SBA has considered this comment and has amended the rule to require that the disadvantaged individual(s) possess either managerial or technical experience and competency.

Several commenters opposed SBA's proposed paragraph (e) which required disadvantaged individuals to control the Board of Directors either in actual numbers or through weighted voting. The commenters' believed that such restriction would prevent an 8(a) concern from assembling a varied and experienced Board of Directors. This requirement was included to comply with the statutory requirement of control by disadvantaged individuals. However, SBA has amended paragraph (e) to make clear that non-voting or honorary Board members are permitted.

Paragraph (c)(3) of § 124.104 has been amended to clarify that excessive compensation of any nondisadvantaged individual, spouse or immediate family member in any form, including stock dividends, is prohibited. In addition, compensation will be deemed excessive if it exceeds the compensation to be received by any of the individuals who control and manage the day-to-day operations of the 8(a) concern. As proposed, § 124.104 prohibited nondisadvantaged former employers of the disadvantaged owner(s) from participating in an 8(a) concern as partners, stockholders, officers or directors. Several commenters objected to this restriction as overly broad. The final rule has been amended in paragraph (c)(4) to permit such participation by former employers if the relationship is in the best interests of the concern and if the former employer does not have actual control of, or the power to, control the 8(a) applicant or participant.

Finally, § 124.104(a) has been amended to require, for those industries which require professional licensing (i.e., public accountancy, professional engineering, etc.), that either the applicant concern or one or more individuals employed by the applicant concern hold the requisite license. This represents a relaxation from the proposed rule which required the individual upon whom 8(a) eligibility is based to hold the requisite license. SBA proposed the more restrictive requirement as a means to guard against nondisadvantaged individuals controlling an 8(a) concern. Upon reconsideration, SBA concluded that the other requirements of § 124.104 relating to control of an 8(a) concern are adequate to guard against a nondisadvantaged individual controlling the firm by virtue of holding a professional license. SBA has amended the rule accordingly.

Section 124.105 addresses the regulatory requirements of social disadvantage. In the proposed regulation SBA made only three substantive amendments to the existing § 124.105. First, it proposed to specifically state that social disadvantage would be "presumed" for members of certain named groups. In addition, it proposed to include in the regulations a definition of "Subcontinent Asian Americans." Finally, it proposed to amend the existing regulatory definition of "Asian Pacific Americans" and the existing policy definition of "Subcontinent Asian Americans" to include individuals with origins in countries which has not previously been included. SBA specifically requested comments on the proposed definitional charges.

SBA received approximately ten comments on the proposed changes to this section. Of these, approximately seven commented that the proposed changes should not be adopted because

the SBA had failed to provide any justification for the changes, and because adding additional groups would serve to dilute the program. Three commenters concurred with the broadening of the definitions, and one of these also provided a detailed explanation of the geographical boundaries of the Subcontinent Asian and Asian Pacific areas. This commenter noted that SBA had omitted from its definition of "Asian Pacific American," individuals with origins from Hong Kong, and Macao; and from its definition of "Subcontinent Asian Americans," individuals from Sikkim and the Maldives Islands. SBA has adopted the additional locations suggested with the exception fo Sikkim. Sikkim has not been included since it is a state within India, and individuals with origins from India are already included among those presumed to be socially disadvantaged. In addition, SBA has also noted that it inadvertently omitted Fiji, Kiribati, Tuvalu, Nauru, Indonesia and Tonga from its listing of countries whose people are regarded as Asian Pacific American.

SBA has concluded that since it was the agency that had previously defined the two groups, either in regulations or policy documents, it is appropriate that these definitions be amended to include other countries of origin whose people share similar culture, heritage and physical characteristics with people from those countries that were previously included. The final rules will therefore adopt the definitions of "Asian Pacific American" and "Subcontinent Asian American" as proposed with the inclusion of the additional listed locations.

One commenter noted that SBA had failed to clearly indicate that tribal entities are regarded as socially disadvantaged. The final regulations have also been amended to reflect that comment.

In § 124.106 SBA proposed to establish criteria for determining economic disadvantage for purposes of 8(a) program entry and for participation in other programs which require SBA to determine social and economic disadvantage as a condition of eligibility.

SBA received many comments on this section. A number of the commenters recommended that objective criteria be established for measuring economic disadvantage. In addition, some commenters recommended that separate criteria be established for 8(a) program entry, continuing 8(a) program participation and participation in other Federal programs which require SBA to determine social and economic disadvantage as a condition of program eligibility. Comments on both this section and § 124.6 indicated that it would be unfair to enforce civil and criminal penalties for misrepresentations of economic disadvantage without clearly defining the criteria for determining such disadvantage.

In response to these comments, SBA has significantly revised § 124.106. Section 124.106(a) now provides that an individual with a net worth of less than $250,000 will be regarded as economically disadvantaged for purposes of 8(a) program entry. Section 102.106(b) now provides that an individual with a net worth of less than $750,000 will be regarded as economically disadvantaged for purposes of participation in programs, other than 8(a), which require SBA to determine social and economic disadvantage as a condition of eligibility.

After discussions with the Congressional Small Business Committees, the $250,000 threshold figure was selected as an appropriate ceiling for determinations of economic disadvantage for purposes of 8(a) program entry. The $750,000 threshold for determining economic disadvantage for purposes of participation in other Federal programs was selected to provide for a concern's business development. In both cases, the individual's net worth will be computed excluding the equity in his or her personal residence and his or her ownership interest in the applicant or Participant business concern. SBA has also amended § 124.111 to provide threshold figures for determining continuing economic disadvantage for 8(a) Program Participants.

SBA received a number of comments objecting to the proposed requirement that the net worth of an individual claiming economic disadvantage include the assets and liabilities of the individual and his or her spouse, if married. In response to these comments, SBA has amended the section to include new paragraphs (a)(2)(i)(A)(*1*) and (a)(2)(i)(A)(*2*).

The cited paragraphs now provide that, for purposes of program entry only, SBA will require separate financial statements from an individual claiming disadvantaged status and from his or her spouse, if any. However, the financial condition of the spouse will not be considered except to the extent that a non-applicant spouse has received assets from the applicant spouse within two years of the date of program application. Any assets transferred within two years will be presumed to be the property of the applicant spouse for purposes of determining that individual's personal net worth unless the couple is subject to a legal separation. In addition, SBA will not require financial statements from the non-applicant spouse if the couple is subject to a legal separation. SBA has also amended this section to indicate the special requirements governing the disclosure of assets and liabilities in community property states.

These provisions are not applicable to concerns where both spouses are individuals upon whom eligibility is based. In those cases, SBA will consider the net worth of each spouse individually for purposes of both program entry and for continued participation in the 8(a) program.

SBA has also amended paragraph (a)(2)(ii) to simplify the business financial condition criterion. SBA will continue to evaluate a concern's financial condition based on a comparison of its condition to other concerns in the same industry. However, SBA has amended the list of factors which it will generally consider in determining a concern's financial condition to add "working capital," and to delete "return on assets," "return on sales," "ratio of current assets to current liability (current ratio)," "ratio of the concern's sales to the compensation of its officers," "ratio of the concern's sales to its working capital," and "ratio of the concern's debt to its net worth."

Finally, SBA has amended paragraph (a)(2)(i)(C) to reflect that SBA will only evaluate the personal economic disadvantage of an Alaska Native who is claiming disadvantaged status for the purpose of qualifying an individually owned concern. In accordance with the provisions of the Alaska Native Claims Settlement Act, as amended, concerns which are majority owned by Alaska Native Corporations are also determined to be controlled by disadvantaged Alaska Natives. Therefore, SBA will not examine the economic disadvantage of an individual manager, officer or director of such a concern.

Section 124.107 sets forth criteria for determining whether an applicant concern has potential for success in the 8(a) program. SBA has amended § 124.107 to incorporate existing progam policy regarding determinations of potential for success, and has included an absolute requirement that an applicant concern demonstrate that it has been in business for two years prior to the date of its 8(a) program application. In addition, SBA has provided language to implement section

7(j)(11) of the Small Business Act, as amended by Public Law 100–656, which authorized SBA to deny program admission on the basis of lack of contract support only if the Government does not procure the types of products or if the purchase of such products or services is not in sufficient quantities to support the applicant concern's 8(a) program business development.

A number of comments objected to the "two year rule," and a few found the exemptions to the rule to be too narrow. Another commenter noted that the former 8(a) Program rules permitted too many exceptions to 8(a) program eligibility requirements, and recommended that the requirements of the program be less discretionary. It is SBA's conclusion that the business development goals of the program necessitate a determination of reasonable potential for success as one criterion of 8(a) program eligibility. SBA's experience has led it to conclude that a concern's potential for success can generally be assumed if the concern has been in business for two years, has a demonstrated track record and is financially sound. Therefore, SBA has deleted the provisions permitting exceptions to the two year in business requirement. This change is further supported by the fact that a concern's Program Term now begins on the date of its Program certification rather than on the date of award of the concern's first 8(a) contract. Therefore, firms which have been in business for at at least two years will have maximum opportunity for business development.

SBA has also deleted paragraph (d) from this section. Proposed paragraph (d) would have permitted SBA to decline to process applications if the agency lacked the resources in a particular district or region to serve the 8(a) concern. While this would have only been invoked in extraordinary circumstances, SBA has decided, that should the need arise, it will rely on the increase in, or realignment of, Agency resources to correct for any lack of resources in a particular district or regional office rather than suspend processing of applications.

Section 124.108 sets forth additional 8(a) program eligibility requirements. Paragraph (c) of this section implements the provisions of section 7(j)(11) of the Small Business Act, as amended by Public Law 100–656, by permitting an individual or a business concern to use his/her or its eligibility only one time to qualify a concern for 8(a) program participation. An individual or concern is deemed to have used his/her or its eligibility effective upon the date of the concern's approval for program participation. In this final rule SBA has clarified this restriction does not apply to concerns owned by Indian tribes or Alaska Native Corporations. The provisions relating to such concerns and their managers are set forth in § 124.112. This separate rule for tribally-owned concerns conforms to section 8(a)(4)(B) of the Small Business Act (15 U.S.C. 636(a)(4)(B)) which requires that such managers be members of the tribe, but does not require that they be socially and economically disadvantaged. Similarly, the rule regarding concerns owned by Alsaka Native Corporations (ANCs) conforms to the Alaska Native Claims Settlement Act, as amended. That Act mandates that for purposes of participation in federal programs, a concern which is majority owned by an ANC shall be deemed and controlled by the ANC.

In addition, SBA received a comment relating to this paragraph which objected to the imposition of a limitation on reapplication of a disadvantaged individual who had previously used his or her eligibility to qualify an 8(a) Participant. The commenter stated that very good reasons may exist for an individual to leave participant concern, for example, to assume an appointed position. SBA has made no change to the rule as a result of this comment because the limitation is statutorily mandated.

Section 124.109 describes types of businesses which are ineligible for the 8(a) program. SBA received a comment opposing paragraph (a) which makes packagers ineligible for 8(a) program participation. The commenter expressed that a packager would normally have more invested in its business than a dealer, which is permitted 8(a) participation. Therefore, a packager should also be eligible. SBA considered this comment but has not altered the regulation because packagers do not meet Walsh-Healey standards and are therefore ineligible to receive Federal contracts. Since the firms cannot receive Federal contracts, they have no prospects for business development through the 8(a) program.

SBA also received a few comments opposing paragraph (b) of § 124.109 which makes franchises ineligible for 8(a) program participation. The commenters expressed the view that all businesses are subject to some degree of control by external forces and that franchise agreements are not predicated on abusive control. SBA considered this comment but has decided to retain the prohibition because of concern that the franchisor-franchisee arrangement, by its nature, gives the franchisor more control over the management, daily business operations and business development of the franchisee than is appropriate in light of the business development goals of the 8(a) program and the statutory requirement of control by disadvantaged individuals.

Section 124.109(e) prohibits an 8(a) applicant or Program Participant from establishing its disadvantaged status by virtue of ownership by another disadvantaged concern. One commenter questioned whether this restriction applies to DoD's Small Disadvantaged Business (SDB) program or SBA's 8(d) Subcontracting program. Because the provision is rooted in the Small Business Act requirement of 51 percent ownership by disadvantaged individuals, and both the SDB program and 8(d) program use the 8(a) program definitions of social and economic disadvantage, this requirement applies also to the SDB program and the 8(d) program. The regulation has been amended accordingly. In contrast to some other ownership requirements set forth in § 124.103, becasue this requirement is required by statute, SBA has provided no exceptions.

Section 124.110 reflects the Program Term mandated by section 7(j) of the Small Business Act, as amended by Public Law 100–656. SBA received some comments which supported the fixed nine year term and one which opposed it. Since the term is set by statute, SBA has no authority to change it in these regulations.

SBA proposed to add to the regulations a new § 124.111 to implement section 8(a) of the Small Business Act, as amended by Public Law 100–656, which requires each Program Participant to make certain annual submissions to SBA. The statute also requires SBA to examine each Participant on the basis of these annual submissions, or on information received from other sources, to determine whether the Participant and its disadvantaged owners continue to meet all 8(a) program eligibility standards, including the standards established for determining economic disadvantage.

SBA received many comments pertaining to § 124.111. Most commenters objected to the vagueness of the standards for continued program eligibility and urged SBA to make them more specific. In the commenters' view, it would be unfair to require an individual to certify to his or her economic disadvantage without defining clearly the term. It would be particularly unfair in light of the penalties to be

imposed for false representation as set forth in § 124.6.

In response to these comments, SBA has added two new threshold personal net worth figures for determining continuing economic disadvantage for individuals claiming disadvantaged status for 8(a) program participation. For firms in the developmental stage (years 1–4) of program participation, an individual whose personal net worth exceeds $500,000 will not be considered economically disadvantaged. For firms in the transitional stage (years 5–9) of program participation, an individual whose personal net worth exceeds $750,000 will not be considered economically disadvantaged. To allow for the Participant's business development SBA has established three progressively higher thresholds for determining economic disadvantage throughout its Program Term: $250,000 for program entry and $500,000 and $750,000 as noted above for continuing eligibility. For determining continuing economic disadvantage, personal net worth will be calculated in accordance with the provisions of § 124.106(a)(2).

Some comments objected to SBA's requirement that it examine a concern's continued eligibility for 8(a) Program Participation both on an annual basis and whenever it receives information from any source that causes SBA to believe the Program Participant is no longer economically disadvantaged or no longer meets any of the other eligibility criteria for 8(a) program participation. These commenters recommended that SBA conduct reviews of continued eligibility only once annually, and that the findings of such reviews be conclusive evidence of eligibility for the next year. The Small Business Act, as amended by Public Law 100–656, states that SBA "shall conduct an evaluation of a Program Participant's eligibility for continued participation in the Program whenever it received specific and credible information alleging that such Program Participant no longer meets the requirements of Program eligibility." Because of this mandate, SBA has not adopted the suggested change.

In § 124.112, SBA proposed to address 8(a) program eligibility requirements for concerns owned by Indian Tribes, including Alaska Native Corporations (ANCs). SBA received a number of substantive comments on this proposed section from representatives of Indian Tribes and Alaska Native Corporations. In response to these comments SBA has made several amendments to § 124.112.

Paragraph (a)(3)(iv) has been amended to reflect the special status accorded to ANCs by the Alaska Native Claims Settlement Act, as amended. In accordance with that statute, ANCs are not required to provide the documentation required of other tribally-owned entities by paragraphs (b)(3) (i) and (ii). Neither are ANCs subject to the provisions of paragraph (c)(1).

SBA received several comments suggesting that the Agency presume economic disadvantage for tribally owned concerns. SBA could not adopt these comments because the Small Business Act, as amended by Public Law 99–272, expressly requires SBA to examine the economic disadvantage of a tribal owner of an 8(a) applicant concern. In the proposed regulations, SBA did provide that once a tribe has established its economic disadvantage for purposes of qualifying a concern for 8(a) program participation, it would not need to reestablish such status to qualify other concerns, unless specifically asked to do so. SBA has retained this provision in its final regulations.

SBA has deleted paragraph (b)(2)(viii) of this section since directors, managers, and officers of tribally-owned concerns, including those owned by ANCs are not required to establish individual economic disadvantage. (*See* § 124.112 (c) and (d).)

SBA also received several comments on paragraph (c)(1) which requires that a tribally-owned concern be a legal business entity organized for profit and susceptible to suit. In response to these comments, SBA has amended this paragraph to more clearly indicate that SBA's requirement is that the Articles of Incorporation of a tribally-owned concern contain language that expressly waives sovereign immunity, or allows suit only for those matters related to SBA's programs, including, but not limited to 8(a) program participation, SBA direct or guaranty loans, advance payments and contract performance.

Section 124.112(c)(3) has been amended to correct a typographical error. The corrected language now reads: "For corporate entities, a tribe must own at least 51 percent of the voting stock * * *" This provision mirrors the intent of Congress that disadvantaged concerns be 51% owned by disadvantaged individuals or tribes, or for those owned by Alaska Native Corporations, majority owned by the ANC. For the sake of administrative ease, SBA has interpreted "majority" ownership to mean 51%.

SBA received several comments regarding its proposed requirement that a tribal member who is a manager, officer or director of a tribally-owned concern use his or her personal status as disadvantaged in order to qualify the concern for Program Participation. In response to these comments SBA re-examined both the Small Business Act, as amended by Public Law 99–272, and the Alaska Native Claims Settlement Act, as amended. SBA has concluded that the statutory requirements of disadvantaged management and control are met for a tribally-owned concern if such concern is controlled by one or more members of an economically disadvantaged Indian Tribe. SBA has also concluded that the disadvantaged management and control requirements are met for concerns owned by Alaska Native Corporations if the majority of such concern is owned by an ANC. Therefore, for both tribally-owned and ANC-owned concerns, the individual managers, directors and officers are not required to establish individual social and economic disadvantage in order to qualify the concerns for 8(a) Program Participation. They are not, therefore, precluded from subsequently qualifying an individually owned concern for 8(a) Program Participation. Sections 124.112(c)(4)(i) and 124.112(d) have been amended to reflect these changes.

One commenter suggested that SBA allow tribally-owned concerns to be managed by individuals who are not members of the tribe which owns the 8(a) applicant or participant concern. Other commenters have recommended that SBA allow management of a tribally-owned concern to come from a mix of tribal members, Indians who are members of other tribes, and non-Indians. SBA has not adopted these comments because they are contrary to SBA's interpretation of the requirements of the Small Business Act, as amended by Public Law 99–272, which requires that tribally owned concerns, except those owned by ANCs, be managed by members of the economically disadvantaged Indian Tribe which owns the company.

Several comments indicated that ANC's should not be required to form separate corporate entities. SBA has considered these comments, but has not adopted them. It is SBA's conclusion that the administrative requirements of 8(a) program participation require that each ANC-owned concern be a separate entity.

SBA did not adopt comments indicating that the Agency should not require a tribally-owned Participant to receive prior approval in order to include Tribal Council members on its Board of Directors. This was not adopted because SBA has determined that it needs to be aware of any interrelationships between the tribe and

the concern(s) which it owns. However, it is not anticipated that SBA will generally refuse to allow Tribal Council members to serve as directors of tribally-owned 8(a) concerns, unless such dual roles will cause findings of affiliation due to common management, or will otherwise detract from the business development goals of the 8(a) program.

Comments were also received on § 124.112(c)(2) (ii) and (iii) which proposed that, except for joint ventures expressly authorized by the Small Business Act, as amended by Public Law 100–656, a tribally-owned Program Participant must qualify as a small business pursuant to § 121.4(g)(2) of this Title for each individual 8(a) contract award. It was suggested that SBA amend this section to allow 8(a) program eligibility for a joint venture of which a tribally-owned concern is a partner.

SBA has not adopted this recommendation. The Small Business Act, as amended by Public Law 100–656, provided for only two exemptions to SBA's size requirements specifically for award of section 8(a) contracts to tribally-owned concerns. Nothing in either the Act or the Conference Report allows SBA to exempt from its size regulations joint ventures of which a tribally-owned concern is a party for purposes of program entry.

In new § 124.113, SBA proposed to implement section 8(a)(15) of the Small Business Act, as amended by Public Law 100–656. In this section, SBA proposed that concerns owned by disadvantaged Native Hawaiian Organizations would be eligible for participation in the 8(a) program and other Federal programs which require SBA to determine social and economic disadvantage as a condition of eligibility. No comments were received on this section. However, SBA has amended § 124.113 to comport with the language of the statute by adding the words "economically disadvantaged" to provide that concerns owned by economically disadvantaged Native Hawaiian Organizations are eligible for participation in the 8(a) program and other cited programs.

In § 124.201, SBA proposed to provide general information regarding the processing of 8(a) applications. Paragraph (a) of this section provided authority to the AA/MSB&COD to decline to process an 8(a) application if SBA lacked appropriate resources to serve an additional Program Participant. Although SBA received no comments on this section, it did receive a number of comments on § 124.107(d) which contained a similar provision. In response to those comments SBA has deleted paragraph (a) in its entirety, and has deleted the paragraph designation for paragraph (b) of this section.

To conform with changes which have been made to § 124.107(a) and § 124.107(b) of this part regarding determinations of potential for success, SBA has amended proposed paragraph (b) of this section to state that it is the Agency's policy that any concern or individual on behalf of such concern has the right to apply for 8(a) program participation whether or not there is an appearance of eligibility. It should be noted, however, that concerns which have not been in business of two full years as defined by SBA will not be approved for 8(a) program participation.

Proposed § 124.202 provided information regarding the place of filing an 8(a) application. SBA received no comments on this section. However, to accommodate changes which have been made in SBA's organizational structure, the section has been amended to indicate the applications for 8(a) program participation will be filed in the field office serving the territory where the concern's principal place of business is located. These offices, generally district offices, except in SBA's Boston region, will also provide potential applicants with information regarding the program and with the required application forms. The section also states that applications for Program Participation will be processed by the appropriate regional office of the Division of Program Certification and Eligibility.

Section 124.203 states that concerns approved for Program Participation will be serviced in the field office serving the territory in which the concern's principal place of business is located. No comments were received in this section, and no changes have been made to it.

In § 124.204, SBA proposed to provide information regarding the use of representatives in connection with the 8(a) program application process. No comments were received on this section. However, SBA has amended § 124.204 to more clearly indicate that applicant representatives are subject to the prohibitions against contingency fees set forth in § 124.7 of this part.

Proposed § 124.205 provided general information regarding the forms and attachments required for making application to the 8(a) program. No comments were received on this section, and no changes have been made to it.

Sections 124.206 through 124.211 implement section 8(a)(9) of the Small Business Act, as amended by section 409 of the Reform Act. These sections describe the rights of an applicant concern or Program Participant to seek further Agency review of certain initial Agency decisions. The agency review may include an administrative appeal to an Administrative Law Judge. The Reform Act authorizes an appeal of an initial Agency decision if such decision relates to program graduation, program termination, a denial of a request for a waiver of the restriction against the sale of an 8(a) concern pursuant to § 124.317 or denial of program admission based solely on one or more of the following eligibility criteria: social disadvantage, economic disadvantage, ownership or control.

SBA received very few comments on these sections. One commenter requested that SBA allow the Participant 180 days to respond to SBA's Notice of Intent to Graduate or Terminate (§§ 124.208 and 124.209). SBA considered the comment but made no change to these sections, which, as written, allow two 45 day periods to respond to SBA's Notice of Intent to Graduate or Terminate. The Small Business Act requires SBA to provide 8(a) program benefits only to such firms which meet the continuing program eligibility requirements. If a firm has met the objectives of its business plan or ceases to meet the continued program eligibility requirements, it should be promptly graduated or terminated from the program. SBA believes that the 45 day response periods are adequate to protect the rights of the concern while also adhering to the statutory mandate that 8(a) Participants meet all Program eligibility requirements.

One commenter requested SBA to clarify that a graduated 8(a) concern is obligated to complete previously awarded 8(a) subcontracts, including price options. SBA has included a reference to priced options in § 124.108(d). One commenter urged SBA not to consider legitimate temporary absences of the disadvantaged owner(s) as grounds for termination of the program. In § 124.209, SBA is granted discretion to terminate a concern's Program Participation for any of the listed causes. SBA is not required to do so. It is unlikely that SBA would base program termination on temporary incapacity of a disadvantaged principal due to illness or accident. Among other reasons, this is unlikely to occur because the time involved in terminating a concern from the program is likely to exceed the period of illness. Therefore, SBA has made no change to § 124.209.

Another Federal agency also commented on § 124.209 and asked that SBA notify the contracting agencies when termination or suspension

procedures have been initiated. SBA does not notify contracting agencies of proposed suspensions or proposed terminations because to do so would deny the 8(a) concern the due process rights which the Small Business Act accords them.

One commenter recommended that § 124.210 relating to the appeals process permit the Agency to submit an affidavit to explain documentary evidence. This would be used to supplement the written record. SBA has considered this recommendation, but has not adopted it. The Reform Act mandated an arbitrary and capricious standard of review for 8(a) appeals, which in turn limits the evidence reviewed to that in the written record, unless a showing is made of bad faith or improper behavior on the part of the initial decisionmaker.

One commenter suggested that SBA clarify § 124.210(h)(3)(ii), which states that the burden of proof remains with the concern following the concern's preliminary showing of the initial decisionmaker's bad faith or improper behavior. SBA has made no change to the regulations, but offers the following explanation to clarify the intent of this provision. Under normal circumstances, neither SBA nor the 8(a) concern may introduce evidence beyond the written record in an 8(a) appeal. If, after the concern makes a preliminary showing of bad faith or improper behavior and the Agency has had an opportunity to rebut such showing, the Administrative Law Judge hearing the case will determine whether a substantial showing has been made. If so, the concern may engage in discovery and may introduce other evidence to show that the Agency arrived at the initial decision improperly. The Agency may engage in discovery and may introduce evidence to rebut such additional evidence offered by the concern. However, the burden of proof remains with the 8(a) concern to demonstrate that the decision was made in bad faith or as a result of improper behavior and was, therefore, arbitrary and capricious.

SBA received one comment on § 124.211 which addresses the suspension of program assistance to 8(a) Participant concerns. The commenter was not clear why the decision whether to permit a hearing relating to a suspension may be based on advice from the Department of Labor or the Department of Justice, since a hearing would not necessarily be prejudicial to the other agency's case. While this is true, it is government procedure to rely on advice from those named Departments so that their cases are not inadvertently prejudiced by an SBA hearing on a suspension.

SBA has revised § 124.211 to provide that actions to suspend a concern's program participation can be commenced at any time after the issuance of an Initial Letter of Termination. This change has been made to continue SBA's authority to protect the Government's interest by suspending a concern's Program Participation prior to its termination from the 8(a) Program.

Sections 124.301 through 124.320 address the provision of various forms of assistance to 8(a) Program Participants, such as financial, technical, managerial assistance and contract support, to promote the business development of such concerns.

Section 124.301 addresses the submission of business plans and the required contents of such plans. Section 301(a) sets forth general submission requirements. A number of commenters expressed the view that the 30-day time limit set forth in the proposed rule for the development and submission of a business plan was too short. SBA agrees with this comment and has amended the rule to provide that business plans must be submitted to SBA promptly after certification. The new language conforms to section 205 of the Reform Act. Another commenter recommended that a deadline be placed in the regulations for SBA review of the business plan. SBA has carefully considered this comment and has decided not to adopt it because of the differences in length and complexity of the various business plans requiring review. General time limitations will be placed in SBA's Standard Operating Procedures (SOP), however. In addition, SBA will consider requests to perform expedited reviews of business plans where receipt of an 8(a) contract is contingent upon approval of the business plan.

SBA has also amended this paragraph to provide that a Participant will not be eligible for program benefits until the SBA approves its business plan. The proposed regulation provided that the Participant would not be eligible for 8(a) contracts until approval of its business plan and did not address other program benefits. This amendment was made in response to the comment that SBA cannot determine appropriate program benefits for a Participant without an approved business plan.

Section 301(b) sets forth the requirement that Standard Industrial Classification (SIC) codes for the nine year Program Term be set forth in the business plan. Numerous commenters were opposed to this requirement, reasoning that it would be too difficult to project necessary SIC codes nine years in advance. The SIC code designation requirement is intended to be an estimate or projection of the industry areas in which the concern intends to concentrate. 8(a) concerns are not expected to make absolute determinations concerning the SIC codes under which they will operate for the next nine years. In fact, specific provision is made in § 124.302(c) for amendments and additions to the SIC codes set forth in the business plan. In addition, annual reviews of business plans are intended to permit 8(a) concerns to amend their business plans in accordance with the changing structure and needs of the concern. As part of the annual review process, 8(a) concerns have the opportunity to change the SIC codes in their business plans. The language of this section has been modified to clarify SBA's intent and to correct the misimpression that the SIC code requirement is inflexible.

Section 124.301(c) sets forth the required contents of the business plan. A few commenters objected to these requirements as too onerous. These requirements are mandated by section 205 of the Reform Act and, therefore, may not be altered.

Section 124.302 sets forth the procedures for review and modification of the business plan. The majority of comments on this section focused on paragraph (c) which provides the conditions under which SBA will permit an 8(a) concern to change the SIC codes in its business plan or to add new SIC codes. Most concerns expressed the view that SBA would apply this section strictly to preclude concerns from expanding their businesses and venturing into new areas. This is not SBA's intent. If a concern is able to demonstrate that it is able to perform under a new or different SIC code, that the new SIC code represents a logical business progression, and other applicable criteria (i.e., Walsh-Healey Act, non-manufacturer rule * * * ) are met, the concern will be permitted to amend its business plan to change or add a new SIC code. *See* preamble concerning § 124.301(b).

One commenter expressed concern regarding the requirement in the proposed rule that the requested SIC code be related to the primary SIC code of the concern. The commenter felt this requirement would be interpreted to prohibit concerns from adding SIC codes in two-digit SIC code industries other than the two-digit SIC code industry for the concern's primary industry. This was

not SBA's intent. To avoid this misimpression, SBA has deleted this requirement. The requirement that the new SIC code represent a logical business progression for the firm adequately addresses SBA's concern that the business limit its expansion to areas related to its primary area of endeavor.

This paragraph has also been amended to delete the designation of the Regional Administrator or his/her designee as the deciding official on SIC code requests. The final regulation provides that SBA will approve SIC code changes/additions. The reason for this change is that the SBA official authorized to approve these requests will vary from region to region depending on how the 8(a) program is managed in a particular region. In most regions 8(a) contracting is handled by the district office, and the appropriate District Director shall be responsible for approving SIC code changes. In those regions were 8(a) contracting is handled by the regional office, the appropriate ARA/MSB&COD shall approve such requests. Finally, paragraph (c) of § 124.302 has been amended as a result of the comments to add a requirement that SBA make a decision on a request for a SIC code change within 45 days from the date the request is received. The time limitation is designed to minimize delay in processing requests so as to maximize the business development potential of 8(a) concerns.

Paragraph (d) of § 123.302 requires a transition management plan to be submitted in the first year of a Participant's participation in the transitional stage of the Program Term. A few commenters asked when current Program Participants are expected to submit transition management plans if they are in the transitional stage on the effective date of these regulations. Such participants should submit these plans as soon as possible after the effective date of these regulations.

Section 303 sets forth the stages of Program Participation. General Program Participation is divided into two stages—a developmental stage and a transitional stage. For concerns entering the 8(a) program after November 15, 1988, the developmental stage is four years and the transitional stage is five years. One commenter asked for clarification concerning the length of time in each stage for concerns already in the program. The regulation has been amended to clarify the method of calculation for these Program Participants. For those concerns with five or fewer years in the program as of August 15, 1989, the program year they are in on August 15, 1989 shall be considered the first year in the transitional stage. These concerns are subject to the modified business activity targets established in § 124.312(c)(5).

For concerns with more than five years remaining in the program as of August 15, 1989, the stages of Program Participation shall be determined so that the Participant will have five years in the transitional stage. The remaining time in the program shall be considered to be time in the developmental stage. For instance, if a concern had six and one half years remaining in the program as of August 15, 1989, the concern would have one and one half years remaining in the developmental stage and five years in the transitional stage. The time in the developmental stage will naturally precede the time in the transitional stage. These concerns are subject to the full business activity targets set forth in § 124.312(c)(4).

Section 124.303 also set forth the various forms of assistance available to concerns in the developmental and transitional stages. One commenter expressed the view that teaming arrangements should be permitted at the developmental as well as transitional stage of program participation. SBA is unable to adopt this comment because section 301 of the Reform Act provides for teaming arrangements only during the transitional stage.

Another commenter requested clarification concerning whether SBA would be responsible for providing the training assistance available in the transitional stage. SBA will be responsible for arranging for such training assistance, either through the BOS or through its 7(j), Small Business Development Center (SBDC), or Service Corps of Retired Executives (SCORE) programs, or through referrals to other programs.

Section 124.304 sets forth the statutory exemption from the Walsh-Healey Act. One commenter suggested that the final rule clarify that these exemptions shall apply only to requirements received on or after the effective date of these regulations. SBA agrees with this comment and has adopted it. Section 124.305(f) of the final rule concerning Miller Act exemptions has also been amended to include this clarification.

Section 124.305 sets forth the statutory exemption from the requirement in the Miller Act that payment and performance bonds be obtained on construction contracts. SBA has made four substantive amendments to this section based on public comment. First, paragraph (c)(6) of the proposed rule (paragraph (b)(3) of the final rule) required Program Participants requesting exemptions to demonstrate that they had been denied bonds from three sureties, one of which was required to be a corporate surety. There were two major comments pertaining to this requirement. The first requested clarification concerning how a concern would "demonstrate" denial. The second expressed the view that obtaining three denials was overly burdensome for Program Participants. As a result of these comments, SBA has amended this paragraph to provide that a concern must obtain two denials from sureties, one of which must be from a corporate surety and one of which must be from an individual surety, and that the concern is to demonstrate such denial by submitting written denials from the sureties to SBA.

The second change made to this section as a result of comments concerns § 124.305(d), which provides for the protection of third parties. The commenters pointed out that the statute provides for direct disbursement of contract proceeds to subcontractors as an option for protecting suppliers, but that SBA's regulations did not contain this option. SBA agrees with this comment and has added to the regulation a provision listing direct disbursement as an option procuring agencies can utilize to protect suppliers.

The third change to this section also is to paragraph (d)(4). This paragraph provides, among other things, that suppliers must be notified in writing of the existence of a Miller Act exemption and that the 8(a) concern must obtain written acknowledgement of such notification from its suppliers. This paragraph has been amended to provide that in all instances SBA must have in its possession all required acknowledgments prior to the payment of invoices. The proposed rule required that SBA should possess such acknowledgments before invoices are paid "where practicable." The effect of this change is to provide further protection to suppliers of materials and labor.

The fourth substantive change is the addition of the requirements of paragraph (d)(4) concerning notifications to and acknowledgments from suppliers to the list of requirements which must be contained in special contract clauses.

SBA has also added proposed paragraph (c)(6) of § 124.305 to § 124.305 as paragraph (b)(3) because it believes that the requirement that a firm prove that it cannot obtain a bond is more appropriately placed in the paragraph concerning conditions for obtaining a

waiver than in the paragraph on limitations to the waiver.

Another commenter expressed the view that there should be a blanket exemption from the Miller Act for all 8(a) concerns involved in the construction industry. SBA is unable to adopt this comment because the Reform Act provides for an exemption from the Miller Act only where an 8(a) concern is unable to obtain a bond. Moreover, the purpose of the exemption is to enable responsible 8(a) concerns to perform contracts where they cannot persuade a surety to provide them a bond. The purpose is not to enable the concern to avoid paying for "high risk" bonding as the comment suggests.

One commenter suggested that bonds should not be waived below the $1.25 million surety bond guarantee ceiling. Under SBA's Surety Bond Guarantee program, SBA agrees to guarantee sureties where a surety company is unwilling to provide a surety bond to a small business without such guarantee. SBA has not adopted this comment because, under certain circumstances, a surety may not be willing to provide a bond to an 8(a) concern even if SBA agrees to guarantee the bond. In such case SBA may want to provide an exemption to the bonding requirement of the Miller Act if it determines that the 8(a) concern is capable of performing the requirement.

A number of other commenters were opposed to SBA's unwillingness to assume responsibility for payment of subcontractors when an 8(a) contractor fails to reimburse them. Congress has not appropriated funds for this purpose and, therefore, SBA is unable to assume this responsibility. Moreover, the Reform Act provides that SBA and the procuring agency should take steps to protect subcontractors by establishing a special bank account or by direct disbursement procedures.

A few commenters requested that the $3,000,000 ceiling for the exemptions be lowered. Inasmuch as the $3,000,000 ceiling is statutory, SBA cannot adopt this comment. It is the intent of Congress that SBA consider all requests under the ceiling.

One commenter suggested that SBA automatically reject a request for a bond waiver where the 8(a) concern requesting the waiver has defaulted on a prior contract; or, at a minimum, that SBA require such concern to meet a higher standard before it may obtain a waiver. SBA has considered this comment, but has not adopted it. There are many reasons why a concern might default on a contract. If such concern corrects the problem which caused the default or if the cause of the default would not pertain to the contract for which the waiver is requested, such concern should not be penalized for the default. However, SBA will carefully consider a prior default and the circumstances which caused the default in determining whether a concern is capable of performing a subsequent contract for purposes of determining whether a waiver is appropriate. Moreover, the regulation does provide that SBA will not grant an exemption where a concern has defaulted on a prior contract for which it received an exemption. *See* § 124.305(c)(5).

A few commenters opposed the provision in § 124.305(d)(1)(iii) which authorizes SBA to delegate to a third party its authority to approve disbursements from the special bank account established to protect third parties. SBA has considered and rejected this comment. The authority to delegate this authority is necessary due to SBA's limited personnel resources. SBA will exercise great care in approving qualified and responsible persons to approve disbursements from the special bank account.

For clarification, SBA has specified in § 124.305(d)(2) that the 8(a) concern receiving the bond waiver notify suppliers of material and labor in writing of the exemption.

A number of commenters asked whether SBA would grant a bond waiver over the objection of the procuring agency offering the requirement. If a procuring agency objects to a decision by SBA to grant a waiver, the agency can withdraw the requirement, in which case SBA may appeal the withdrawal, or the procuring agency may agree to offer the requirement to another 8(a) concern.

Section 124.306 sets forth both the standards and procedures for obtaining financial assistance from SBA for skills training. Paragraph (a) of § 124.306 in the proposed rule provided that payment would be made to the training providers pursuant to appropriate agreement. That paragraph has been amended as a result of amendments to the Reform Act by the Technical Corrections Act, Public Law 101–37. Section 8 of the Technical Corrections Act amended the Reform Act to permit SBA to make payments either to the training providers or as reimbursement to the 8(a) concern or the employee of the 8(a) concern receiving the training. The final rule has been amended to reflect this amendment to the Reform Act.

One commenter objected to the limitations in paragraph (b)(5) of § 124.306 on the types of institutions eligible to provide training under this section. SBA is unable to relax such limitations as they are required by section 301 of the Reform Act.

Paragraph (b) has been amended to include as paragraph (b)(12) the requirement that appropriate written employment contracts must be executed and submitted to SBA in accordance with paragraph (f) of § 124.306.

Paragraph (d) of § 124.306 has been amended to substitute the word "request" for the word "proposal" to avoid any confusion that the word "proposal" might cause, and to add a sentence clarifying that SBA may request additional information before the request is processed.

Section 124.307 sets forth the general standards for acceptance of contracts for the 8(a) program. One commenter requested that paragraph (d) of this section be amended to provide that approval of an 8(a) contract will be contingent upon a determination by the procuring agency as well as by SBA that the concern is capable of performing the contract. SBA has rejected this comment inasmuch as it is SBA's responsibility to certify its own capability to perform the contract as the prime contractor. Such certification is based on a determination by SBA that the 8(a) concern to which it will subcontract the requirement is capable of performing the requirement. This certification requirement remains unchanged from SBA's former regulations. If the procuring agency questions an 8(a) concern's capacity or capability to perform a particular requirement, it may express its concerns to SBA. However, the final authority to determine the capability of the 8(a) concern remains with SBA.

One commenter requested that SBA add a provision to this section prohibiting SBA from accepting for the 8(a) program any previously competed contract that is now an umbrella contract. SBA has not adopted this comment because under many circumstances, it would be appropriate to accept such an umbrella contract for the 8(a) program. The circumstances under which SBA will refuse to accept a procurement for the 8(a) program are set forth in § 124.309 of the rule. SBA will generally make such a refusal where acceptance would have an adverse impact on other small business programs or on an individual small business. If acceptance of the umbrella contract would result in any of the consequences listed in § 124.309, SBA would refuse to accept it. For instance, SBA would refuse to accept the requirement if the umbrella contract was substantially the same as the prior contract with minimal added requirements and a small business

concern would be adversely affected by acceptance of the contract for the 8(a) program.

Section 124.308 sets forth the procedures for obtaining and accepting procurements for the 8(a) program. Paragraph (b) of this section provides, among other things, that if SBA disagrees with the SIC code assigned to the requirement by the procuring agency, SBA may request that the procuring Agency assign a different SIC code to the requirement. A few of the procuring agencies commented that a sentence should be added to this provision to clarify that the procuring agency shall make the final decision with regard to the SIC code assigned to the requirement. SBA has not adopted this comment because SBA retains the right to refuse the requirement if the procuring agency chooses an incorrect SIC code for the requirement. SBA has therefore, amended this paragraph to provide that if SBA is unable to accept the procuring agency's SIC code designation for the requirement, the AA/MSB&COD may file a SIC code appeal to the Office of Hearings and Appeals of the SBA or may refuse to accept the requirement for the 8(a) program. SBA will only take such actions when a SIC code is clearly incorrect, however. So long as the SIC code assigned to the requirement by the procuring agency contracting officer is reasonable, it will be accepted by SBA.

Paragraph (b) has been further amended to provide that SBA may accept a requirement for competition even if it is below the applicable competitive threshold if it receives a request to do so from the procuring agency. One commenter correctly pointed out that SBA had inadvertently omitted this option from the proposed rule.

Paragraph (b) has also been subdivided for clarity.

Paragraph (c) of § 124.308 has been amended to reflect the proposed amendment to the Federal Acquisition Regulation (FAR) on competitive 8(a) procurements. That proposed rule was published in the **Federal Register** on June 28, 1989, 54 FR 27310. SBA has made minor language changes so that the language in this paragraph is virtually identical to that used in § 19.804–2(a) of the proposed FAR amendment. In addition, SBA has redesignated paragraph (c)(14) of the proposed rule as paragraph (c)(17) and has added new paragraphs (a)(14), (a)(15) and (a)(16) to comport with the proposed FAR amendment. Paragraph (a)(14) provides that the procuring agency will identify in the offering letter all 8(a) concerns which have expressed an interest in being considered for the acquisition. Paragraph (a)(15) provides that, if the requirement is a national buy, the procuring agency will identify all SBA district or regional offices which have asked for the acquisition for the 8(a) program. Paragraph (a)(16) provides that the offering letter shall contain a request that the acquisition be competitive, if appropriate, and the estimated contract value is under the applicable threshold. These additions represent either current policy which was not clear in SBA's proposed rule, or items contained in the Reform Act.

SBA has also added a new paragraph (h) to the final rule to clarify current policy and to comport with § 19.804–4 of the proposed FAR amendment. New Paragraph (h) provides that in order for repetitive acquisitions to be awarded through the 8(a) program, there must be separate offers and acceptances. This clarifies the general rule that every new contract must be separately accepted for the 8(a) program, even if such contract is for a repeat requirement.

Paragraph (d) of § 124.308 provides procedures for SBA acceptance of a requirement for the 8(a) program. A few commenters requested that time frames be established so that procuring agencies and contractors will know when to expect decisions with regard to SBA's acceptance of national buys and designations of specific participants to perform. SBA has rejected this comment because generally procuring agencies provide time frames in which they need decisions made for particular procurements. Moreover, general time frames will be placed in SBA's Standard Operating Procedures (SOP). Another commenter suggested that SBA make a detailed analysis of its portfolio within the 15-day time frame for acceptance, to include analyses of the business plans of all eligible Participants. Unfortunately, SBA does not have the resources to perform such extensive research within such a short time frame.

Paragraph (e) of § 124.308 sets forth the requirements and procedures for acceptance of sole source requirements when the procuring agency nominates a particular Program Participant for award. One commenter requested that an exception be made to the requirement that an 8(a) concern not be awarded a sole source contract if the concern has exceeded its support level when award of that contract would assist the concern in meeting its 8(a) program objectives. It is SBA's policy that 8(a) concerns must stay within their support levels. There are a number of reasons for setting support levels, including the encouragement of logical and well-planned development of the concern, reduced reliance on 8(a) contracts, and fair distribution of sole source contracts. If an 8(a) concern believes that its support level is too low, it may request that its support level be raised. If SBA granted exceptions to support level requirements to permit 8(a) concerns to be awarded additional sole source contracts, it would render such support levels meaningless.

Another commenter requested that the regulation permit the procuring agency to withdraw the requirement or appeal if SBA refuses to award the contract to the nominated concern. The procuring agency always has the option of withdrawing the requirement. Therefore, it is unnecessary to include that option in this regulation. There is no appeal process for issues of Participant selection.

Paragraph (g) of § 124.308 provides that procuring agencies may not request formal technical evaluations for sole source contracts. One commenter objected to formal technical evaluations in all cases, reasoning that these evaluations discriminate against smaller concerns which cannot afford costly proposal efforts. One of the purposes of the introduction of competition into the 8(a) program is to educate 8(a) concerns in the competitive process and to provide them with experience in following the procedures they will have to follow once they leave the 8(a) program. Formal technical evaluations are an integral part of unrestricted procurements of certain services. Therefore, to prohibit their use in 8(a) competitive procurements would artificially ease competitions for these procurements. The Conference Report to the Reform Act, H.R. Rep. No. 1070, 100th Cong., 2d Sess. 64 (1988) specifically provides that competitions should be representative of competition which is the normal practice in the relevant industries. In order to protect the smaller or newer Participants in the program, SBA has prohibited formal technical evaluations for sole source awards.

Section 124.309 sets forth the conditions under which SBA will refuse to accept a requirement for the 8(a) program where to do so would adversely affect the Small Business or Small Disadvantaged Business (SDB) set-aside programs or a particular small business. One commenter requested that this section be deleted as discriminatory to 8(a) concerns. This policy is well established and is set forth in SBA's former regulations. Congress intended that the various programs developed for assistance to small firms and small disadvantaged firms function

cooperatively and harmoniously. It is therefore necessary to have regulations in place which permit such cooperative functioning and prevent unnecessary and counter-productive competition between programs. The intent of this section is merely to preclude 8(a) awards where a procurement has already been committed to another small business program.

SBA has amended the language in paragraph (c) to clarify that in determining whether adverse impact exists, SBA will consider all relevant factors. In light of this clarification, paragraph (c)(2) of the proposed rule has been deleted as unnecessary.

A few commenters opposed paragraph (d) of § 124.309, which provides that under certain specified circumstances, SBA will release a requirement from the 8(a) program so that it can be competed. One commenter requested that the word "released" be changed to "rejected" since every new contract (even if it is a repeat requirement) must be separately accepted for the 8(a) program. SBA agrees with this comment and has substituted the word "rejected" for "released" everywhere it appears.

Another commenter requested that specific criteria be provided for rejection of a requirement. SBA has decided not to include specific criteria in the regulation because of the differences in the types of requirements offered to the 8(a) program, differing circumstances, and lack of experience in this area. After ABA develops clear policy guidelines for implementation of this paragraph, it will consider promulgating such guidelines and criteria as regulations.

Finally, one commenter suggested that the procuring agency have input into the decision to reject a requirement so that it can be competed. SBA agrees with this comment and has adopted it.

Section 124.310 provides that SBA must approve subcontracting arrangements under 8(a) contracts. One commenter asked whether this requirement is retroactive to contracts awarded prior to the effective date of the regulations. This requirement is not new and therefore retroactivity is not an issue. The requirement reflects long-standing SBA policy and is included in the FAR regulations under the section on required special clauses. (48 CFR 52.219–12(b)(3).)

A number of the commenters opposed the requirement generally, arguing that it needlessly injects SBA into the legitimate decisions of 8(a) concerns. Because the 8(a) program is a business development program, SBA has a legitimate interest in being informed of and involved in Participants' decisions. Moreover, this approval process is necessary in order to prevent fronts and to prohibit excessive control and/or benefits to non-8(a) concerns. Finally, SBA must examine the subcontracting arrangements of 8(a) concerns to insure that the legislatively mandated subcontracting percentage limitations are met. *See* section 921 of Public Law 99–661 and § 124.314 of these regulations.

It should also be noted that SBA is not required to affirmatively approve each subcontract and will generally accept the 8(a) concern's subcontracting arrangements if the requirements of § 124.314 are met. However, SBA must be informed of such arrangements and reserves the right to disapprove subcontractors or subcontracting arrangements.

Section 124.311 sets forth the statutory thresholds for competition within the 8(a) program and describes the procedures for conducting competitions. The introduction of competition into the 8(a) program over the threshold amounts was mandated by section 303(b) of the Reform Act. A number of commenters expressed the general view that competition cannot be effectively integrated into the 8(a) program. The primary concern was that the delay involved in conducting competitions would take away the primary motivations for procuring agencies to set aside contracts for the 8(a) program—ease and speed. SBA and the various procuring agencies which utilize the 8(a) program are aware of the danger that requirements could be lost to the 8(a) program as a result of the competitive requirements. In order to ensure that 8(a) activity is maintained at current levels or increased, SBA will use all due diligence to expedite the competitive 8(a) process and will encourage contracting agencies to do the same. Moreover, in revising the Federal Acquisition Regulation (FAR) to include standards and procedures for conducting competitions within the 8(a) program, Federal procuring agencies have taken into consideration the danger of increased delay and have provided, where possible, for streamlined procedures for conducting 8(a) competitions.

A number of commenters requested that the threshold amounts set forth in § 124.311(a)(2) be raised and many presented precise formulas for determining when competition should be required. SBA is unable to adopt these comments because the threshold amounts are mandated by statute. *See* section 303(b) of the Reform Act. The statute also mandates that option years be included in calculating the threshold amounts and that the calculation be based on "anticipated award price." Therefore, comments opposing these requirements could not be adopted.

One commenter suggested that paragraph (a) be amended to provide that for purposes of indefinite quantity/delivery contracts, the threshold amounts should apply to the guaranteed minimum value of the contract. SBA agrees with this comment and has amended the regulation accordingly.

Section 124.311(b) sets forth the effective date of the threshold requirements. A number of commenters objected to the requirement that a proposal containing price must be submitted to the procuring agency before October 1, 1989 in order for a requirement to avoid the requirement that contracts over the threshold requirements be competed. The commenters pointed out that 8(a) concerns expend valuable resources both in terms of personnel time and money to self-market and negotiate contracts with procuring agencies. The commenters requested SBA to revise the regulation to permit a requirement to be awarded as a sole source contract if it is accepted for the 8(a) program before October 1, 1989. SBA agrees with this comment and has amended paragraph (b) to provide that the threshold requirements shall not apply to any 8(a) requirement that has been accepted for the 8(a) program prior to October 1, 1989.

Paragraph (c) of § 124.311 provides that SBA may award an 8(a) contract on a non-competitive basis to an 8(a) concern owned and controlled by an economically disadvantaged Indian tribe even if such contract exceeds the competitive thresholds. A number of commenters recommended that SBA add a provision to this paragraph specifying that it will not consider a request to award a contract above the threshold amounts to an Indian tribe where the requirement has already been accepted for competition. The commenters reasoned that removal of a requirement from competition would prejudice prospective bidders who have expended valuable resources in preparing bids or proposals. SBA agrees with this view and has amended this paragraph to preclude SBA from awarding a requirement above the threshold amounts on a sole source basis to a tribally-owned 8(a) concern once it has been accepted for competition and prospective offerors have been notified. However, if a requirement is offered to the 8(a) program again (after the concern which was awarded such contract pursuant to

competition has completed performance), the requirement must then be separately accepted for the 8(a) program and could be offered to a tribally-owned concern.

Paragraph (d) of § 124.311 sets forth the circumstances under which SBA will consider a request from a procuring agency that a requirement under the applicable threshold amount be competed. A number of commenters expressed the view that contracts under the threshold amounts should never be competed. SBA has not adopted this comment for the following reasons. First, section 303(b) of the Reform Act expressly authorizes SBA to permit competition under the threshold amounts. Second, the regulation authorizes SBA to permit competition under the threshold amounts only under limited circumstances, and examples of the circumstances where SBA will consider granting such permission are clearly specified in the regulations. SBA intends to utilize this authority infrequently. Finally, it is SBA's policy to prohibit technical evaluations on sole source contracts. Therefore, SBA must have the authority to approve sole source contracts under the threshold amounts in order to permit agencies to perform technical evaluations on contracts under the threshold amounts.

Another commenter suggested that paragraph (d) be amended to provide that the head of the procuring agency must make the request to SBA to compete a contract under the applicable threshold. The statute does not specify that the request must come from the head of the procuring agency and SBA sees no need to require such high-level involvement. SBA will defer to the various procuring agencies with regard to the appropriate official to make the request.

Paragraph (e) of § 124.311 provides that SBA may accept a requirement above the applicable threshold on a sole source basis if there are not two eligible bidders in cases where SBA determines that there is one eligible Program Participant capable of performing the requirement at a fair price. One commenter suggested that this paragraph be amended to provide that the procuring agency rather than SBA will determine whether an 8(a) concern exists capable of performing the contract. SBA has always determined the competency of 8(a) concerns to perform sole source contracts and is in the best position to do so. Therefore, SBA has not adopted this comment.

Another commenter asked whether SBA would accept a requirement above the applicable threshold on a sole source basis if it was a local buy and there was only one eligible 8(a) concern in the district in which the procurement would be performed. Under these circumstances, SBA would look first to other districts in the applicable region and then to adjacent regions in order to determine whether two eligible offerors exist which are capable of performing the requirement at a fair price. SBA has amended paragraph (d) to clarify this policy.

SBA has amended paragraph (e) to clarify how it will determine the absence of two eligible bidders for local buys where the geographic boundaries for competition are flexible. The added language provides that, for national buys, SBA will determine that there are not two eligible bidders if there are not two eligible bidders anywhere in the United States. For local buys, SBA will determine that there are not two eligible bidders if there are not two eligible bidders located in the applicable region or adjacent regions. This clear threshold will preclude arbitrary decisions and requests to manipulate the thresholds to benefit particular 8(a) concerns.

Paragraph (f) of § 124.311 sets forth the procedures for conducting competitions. Numerous commenters objected to the requirement in paragraph (f)(1) that SBA approve the competitive criteria utilized by a procuring agency to select a concern for award. The commenters reasoned that SBA does not have the technical expertise to evaluate competitive criteria effectively and that, in exercising approval authority over the procuring agency, SBA would be usurping such agency's legitimate role in the procurement process. SBA agrees with this comment and has removed the clause in paragraph (f)(1) providing that SBA must approve the competitive criteria.

Many of the comments on this paragraph concerned issues that will be addressed in the amendments to the Federal Acquisition Regulation (FAR) implementing the Reform Act. As previously noted, those regulations were published in proposed form on June 28, 1989 in the **Federal Register** for comment. (54 FR 27310.) The proposed rule contains detailed procedures for conducting 8(a) competitions, including solicitation procedures and procedures for identifying potential offerors. Many of the comments also addressed issues which should more appropriately be made as comments on the proposed amendments to the FAR. For instance, a number of comments were received concerning when sealed bidding should be used and when competitions should be conducted based solely on technical capability without regard to price. These determinations are the responsibility of the procuring agencies rather than SBA.

A number of commenters requested that SBA provide a list of eligible offerors to procuring agencies for each competitive procurement. This would be impracticable for purposes of national buys in view of the number of concerns in the national portfolio. However, SBA is willing to provide procuring agencies with such a list where the requirement is a local buy, provided that the procuring agency returns the list with a copy of the solicitation when it is made public. This will permit SBA to update or correct the list of potential bidders if necessary.

Paragraph (f)(4) of § 124.311 of the proposed rule provided that, in a negotiated procurement, the procuring agency would identify all offerors to SBA for purposes of obtaining from SBA a determination of the eligibility of each offeror. This paragraph has been amended in the final rule to conform to the proposed FAR rule. That rule provides that in a sealed bid procurement, the procuring agency would provide SBA with a list of ranked offerors and that SBA would examine the eligibility of each concern on the list starting with the lowest bidder until it finds an eligible concern. This procedure is slightly different from the procedure set forth in SBA's proposed rule. The FAR proposed rule also provides that, in a negotiated procurement, the procuring agency would identify all offerors in the competitive range. SBA's proposed rule provided that the procuring agency would provide SBA a list of all offerors. SBA's final rule has been amended to conform to these provisions of the proposed FAR rule. Other technical changes have also been made to the language in the final rule to replicate the proposed FAR rule.

Paragraph (f)(5) of § 124.311 provides that SBA will determine whether any firm identified by the procuring agency is eligible for award and specifies the factors SBA will examine in making such determination. One of the factors SBA will examine is whether the 8(a) concern has achieved its competitive business mix targets. A number of commenters expressed the view that inability to achieve the competitive business targets should not preclude the 8(a) concern from competing for contracts inasmuch as denial of 8(a) contracts is only one possible remedy for failure to achieve the targets. SBA agrees with this view and has amended this paragraph to provide that SBA will determine whether the 8(a) concern has achieved or has made substantial and sustained efforts to achieve the competitive business mix targets set

forth in its business plan. A final sentence has been added to provide that failure to achieve the competitive business activity targets will not affect a concern's eligibility for an 8(a) competitive award if SBA and the concern have agreed upon a remedial plan and such plan does not include denial of future 8(a) awards.

Another commenter expressed the view that SBA should not consider support levels or achievement of business activity targets at all in determining whether an 8(a) concern is eligible for a competitive 8(a) award. SBA must consider these factors in order to insure that 8(a) contracts are equitably distributed among Program Participants, and in order to insure that concerns do not become unduly dependent on 8(a) contracts.

One commenter suggested that concerns be approved for competition before the bidding process; i.e., that SBA perform eligibility reviews on all the concerns in the 8(a) portfolio and submit to the procuring agency a list of all potential offerors eligible for an 8(a) competitive procurement. This comment was rejected as it would be an inappropriate use of SBA's time and resources to determine the eligibility of every concern in the portfolio for the appropriate geographical boundaries where only a small fraction of those concerns would ultimately bid on a particular procurement.

A number of commenters asked whether SBA or the procuring agency would be responsible for notifying 8(a) concerns that they are ineligible for award. SBA will notify those firms determined to be ineligible.

Another factor which SBA will examine in determining the eligibility of an 8(a) concern for a competitive 8(a) award is whether the concern has the SIC code for the procurement in its business plan. A few commenters suggested that the regulation be amended to provide that firms may compete for a procurement if they have the "same or similar" SIC code in their business plan as the SIC code for the procurement. SBA has rejected this comment because to permit a concern to compete for a contract where it does not have the SIC code for the contract in its business plan would defeat the purpose of requiring concerns to include all SIC codes under which they will operate in their business plans.

A few commenters recommended that concerns certify as to eligibility to a particular competitive 8(a) award with penalties for false certifications. SBA has considered this comment but has not adopted it. If a concern self-certifies and is awarded the contract and it is determined after performance has begun that the concern was ineligible for such contract, either the procuring agency would be harmed by having to terminate the contract and reaward it or, if the contract is not terminated, offerors which are eligible for the contract would be harmed.

In order to comport with § 19.805-2(d) of the FAR proposed rule, SBA has amended paragraph (f)(5) to provide that SBA will make eligibility determinations on competitive procurements within five working days of receipt of the list of offerors.

Section 124.312 requires a firm to establish targets of non-8(a) business activity during its participation in the 8(a) program. During the developmental stage of program participation (program years 1–4), a firm is required to make substantial and sustained efforts to meet the targeted dollar levels of non-8(a) revenue set forth in its business plan. These targets may be set as a percentage of revenues or as a specified dollar level. During each program year in the transitional stage of program participation (program years 5–9), a fixed percentage of a Participant's total revenue is required to be derived from non-8(a) business. The section sets forth varying ranges of non-8(a) business revenues that a Participant is required to achieve, depending upon its year in the program.

Section 124.312(c) identifies the non-8(a) business activity targets that Participants are required to meet during the transitional stage of Program Participation. Participants approved for participation on or after November 15, 1988, and Participants with more than five years remaining in the program as of August 15, 1989, are subject to the non-8(a) business activity targets set forth in § 124.312(c)(4). Participants with five years or less remaining in the program as of August 15, 1989, are subject to modified non-8(a) business activity targets set forth in § 124.312(c)(5).

SBA received many comments concerning its proposed implementation of the non-8(a) business activity targets. Generally, commenters felt that the proposed targets were too difficult to meet, particularly for current Participants in the program, although several commenters did believe that the targets should be more "challenging." SBA concurs that the proposed modified targets could have been difficult to meet for some current Participants and that more flexibility was needed in the final rule to avoid unduly burdening current Program Participants. In response to the comments, SBA has reduced the percentages of required non-8(a) revenue applicable for firms subject to the modified targets. As a result, a firm subject to the modified targets will be required to attain less non-8(a) revenue during each year in the transitional stage of program participation.

Several commenters urged SBA to make the modified targets applicable to current Participants with six years or less remaining in the program instead of five years or less as set forth in the proposed rule. SBA considered this recommendation, but believes it to be contrary to section 303(a) of the Business Opportunity Development Reform Act of 1988 which authorizes SBA to "establish modified targets for Program Participants that have participated in the Program for a period of *longer than four years* on the effective date of this subparagraph." (August 15, 1989) [Emphasis added]. If the modified targets were made applicable to firms with six years or less remaining in the program (instead of five years), they could apply to firms which have been in the program for only three years. This would be contrary to the statutory authority.

Several commenters also expressed confusion concerning the application of the modified targets. They wondered, for example, whether they were required to meet the target for year one or year two if they had four years remaining in the program on the effective date of this section (i.e., on October 1, 1989). The targets correspond to a firm's year in the transitional stage, not its year in the program or the number of years remaining in the program. As such, every firm subject to the modified targets must attain between 10–15% non-8(a) revenue (the target corresponding to year one in the transitional stage) during its first program year after the effective date of this provision. The following example of the application of this provision is offered to further illustrate the Agency's intent.

Example: Program Participant XYZ has 4 years remaining in the program as of August 15, 1989 (i.e., it graduates from the program on August 14, 1993). Because this firm has between 3 and 5 years remaining in the program, the modified non-8(a) business activity targets are applicable. During its first full program year after the effective date of this provision (i.e., August 15, 1989–August 14, 1990), the applicable non-8(a) business target is 10–15%—the target corresponding to year one in the transitional stage. During the program year of August 15, 1990–August 14, 1991, the applicable non-8(a) business target is 15–20%—the target corresponding to year two in the transitional stage. The

applicable non-8(a) business activity targets for the third and fourth program years would be 20–30% and 30–40% respectively. XYX would exit the program having a target of between 30–40% non-8(a) revenues. The modified target corresponding to the fifth year in the transitional stage would never be applicable in this instance.

SBA has not changed the non-8(a) business activity targets applicable to newly admitted firms and firms with more than five years remaining in the program as of August 15, 1989. It is SBA's view that the targets established in the proposed rule are entirely consistent with the intent of the Business Opportunity Development Reform Act of 1988 and are not unrealistic to achieve. The 8(a) program is a program designed to aid in the development of business concerns owned and controlled by disadvantaged individuals. It is not intended to be the sole support of such concerns. Firms are encouraged to develop a business base outside the 8(a) program so that they can survive after existing the program. While several commenters felt that the proposed non-8(a) business activity targets were too high, these targets must be set at levels that will encourage a firm to prosper in the open marketplace after leaving the 8(a) program.

The Conference Report to the Business Opportunity Development Reform Act of 1988, H.R. Rep. No. 1070, 100th Cong., 2d Sess. 62–63 (1988), provides guidance to SBA for establishing non-8(a) business activity targets. The conference report states that the targets established "*should generally* require firms in the fifth and sixth years to show 25% of revenues from sources other than 8(a) contracts, while in the seventh and eighth years such business revenues should *move toward* 50%," and, in the final year of program participation, "firms should *strive to achieve* at least three-fourths of their business revenues from sources other than 8(a) contracts." [Emphasis added]. SBA has taken these general parameters and has refined them in order to have realistic, attainable targets which firms are more likely to meet.

Instead of grouping years 5 and 6 and years 7 and 8 together (i.e., having the same business activity targets), the final rule sets different business activity targets for each year in the transitional stage of program participation. SBA believes that a requirement of approximately 25 percent non-8(a) business in year 6 followed by a requirement of approximately 50 percent non-8(a) business in year 7 would be unreasonable. A Participant that barely meets the target in year 6, and is thus not subject to remedial measures, could have difficulty in reaching the target in year 7. SBA believes that a more gradual progression away from 8(a) reliance is preferable. In addition, the final rule sets ranges of acceptable non-8(a) business revenues instead of requiring a specific minimum level of non-8(a) business. SBA believes that the attainment of non-8(a) business by Program Participants within a specified range is more realistic than minimum level requirements.

A few commenters also suggested that the non-8(a) business activity targets be industry specific (i.e., that they vary based on the primary SIC Code of the concern). SBA believes that such a system would be unworkable and subject to charges of prejudicial treatment. In addition, there is no support for such a concept in the Business Development Opportunity Reform Act of 1988 or its legislative history.

Comment was also made that compliance with the non-8(a) business activity targets should be based solely on new sales during the applicable program year, rather than on total revenues. SBA disagrees. In determining support levels, options and modifications are counted in the program year in which they are exercised. SBA believes that they should be similarly counted in determining compliance to business mix targets. To disregard 8(a) options and modifications in determining business mix compliance would be to skew a firm's true reliance on the 8(a) program. The intent of the new legislation was to require firms to become less dependent on the 8(a) program. The only way to do that is to count all revenues derived during the applicable program year in determining business mix compliance.

Several commenters felt that competitive 8(a) awards should count positively for a firm in determining business mix compliance, and not negatively (i.e., that sole source 8(a) awards should be measured against all other revenues instead of adding competitive 8(a) awards to sole source awards and measuring that figure against all other revenues). Another commenter believed that the regulations should not permit the Department of Defense Small Disadvantaged Business and other preference program contracts to count toward non-8(a) revenues. SBA believes that the statute and legislative history are clear concerning both of these points. Section 303(a) of the Business Development Opportunity Reform Act of 1988 requires SBA to set business activity targets which reflect a reasonably consistent increase in "contracts awarded other than pursuant to section 8(a)" of the Small Business Act. In addition, the conference report states that "the targets established by SBA shall be for business outside of the program that firms must attain and does not include those awards that firms receive after competitions restricted to the 8(a) program." H.R. Rep. No. 1070, 100th Cong., 2d Sess. 62 (1988). The statutory distinction is clear. All 8(a) revenue, whether awarded through competition or as a sole source contract, is measured against all revenue obtained outside the 8(a) program, including SDB and other preference program contracts.

SBA also received many comments concerning the imposition of remedial measures for failure to meet the required non-8(a) business activity targets (§ 124.312(c)(12)). Several commenters believed that the proposed remedial measures were penalties and recommended that SBA provide constructive assistance such as advice on marketing and financial strategies instead of imposing such penalties. Commenters also recommended that 8(a) contract support should not be reduced where good faith efforts were made by an 8(a) concern to obtain non-8(a) contracts, but where the concern did not meet its required non-8(a) business activity target (e.g., a firm submitted 8 offers for non-8(a) competitive contracts, but failed to receive an award). The proposed remedial measures were not intended to be penalties unless no efforts were made to obtain non-8(a) revenues or a firm repeatedly failed to come close to the applicable non-8(a) business activity target.

SBA has clarified the regulation to provide that the type of remedial measure to be used depends on the extent to which the Participant failed to obtain, and the effort expended in seeking, non-8(a) business. If a firm is close to its targets, or demonstrates that it has made good faith efforts to obtain non-8(a) business, the remedial measures to be taken by SBA will generally be the provision of technical and/or managerial assistance—not a reduction in 8(a) support levels. For example, if a firm has submitted offers for a variety of non-8(a) contracts, but fails to obtain any awards, the firm undoubtedly needs and should be required to obtain managerial and technical assistance. Reducing 8(a) support, however, might cripple the firm's ability to continue to operate. It should be noted, however, that good faith efforts alone will not insulate a

firm from reduced 8(a) support levels and/or termination from the program where the firm repeatedly makes no improvement in obtaining non-8(a) revenues.

The potential remedies can range from requiring a Participant to obtain management and/or technical assistance where the Participant's non-8(a) business activity is very close to the required target, to reducing a Participant's 8(a) support level or reducing or eliminating sole source 8(a) awards for Participants which have had less success in meeting the required targets, to termination where a Participant makes no effort to obtain non-8(a) business and is content to rely solely on the 8(a) program. The management and/or technical assistance called for in the regulations may be provided by SBA sponsored entities (e.g., through the 7(j) program, the Small Business Development Center program, or SCORE and ACE counselors), local chambers of commerce, private and public sector consultants, educational institutions, and other entities as specified by SBA as part of the annual review process. A provision has also been added to the final rule that notifies Program Participants that termination proceedings will be commenced where no efforts are made to obtain non-8(a) revenues.

Comment was also made that SBA should not include the denial or restriction of competitive 8(a) contracts as a remedial measure since this kind of competition will strengthen the firm's chances of obtaining non-8(a) competitive contracts. SBA has removed from the final rule the subparagraph that permitted restricting the award of new competitive 8(a) contracts (proposed § 124.312(c)(12)(iii)). This proposed subparagraph also authorized restricting the award of new sole source 8(a) contracts. Although that subparagraph has been eliminated from the final rule, restricting the award of new sole source 8(a) contracts may be imposed under § 124.312(c)(12)(iv) (proposed § 124.312(c)(12)(ii)).

Several commenters objected to the provision of proposed § 124.312(b)(4) which prohibited a firm in the developmental stage of Program Participation from receiving 8(a) contract support (whether it is awarded as a sole source contract or through competition) in excess of 125 percent of the 8(a) support level established in its approved business plan. The commenters argued that this provision ignored the nature of business cycles. SBA disagrees with the commenters concerning this provision. SBA encourages firms to plan for business cycles and authorizes changes (increases) in approved support levels throughout a firm's life in the program to account for such cycles. Specifically, the regulations authorize increases in approved support levels twice a year if such increases can be justified (i.e., once, at the time of the annual review, and again at the halfway mark of the specific program year). The Participant's support level can be increased at the mid-year point of a Participant's program year, but not solely to enable the firm to receive an additional 8(a) contract that it has identified. In the past, SBA may have approved requests for increases in 8(a) support levels without regard for whether or not the firm could increase its non-8(a) business simultaneously.

This brought about two results. First, it gave little meaning to a firm's approved 8(a) support level. A firm could seek 8(a) contracts in excess of its approved 8(a) support level, knowing that SBA might increase the support level if requested. Second, it encouraged a reliance on the 8(a) program. It was possible that a concern could request, and receive, an increase in its 8(a) support level that resulted in the entire capacity of the business being devoted to the performance of 8(a) contracts. This would have made it difficult for a firm to make the transition into the competitive marketplace upon leaving the program.

The final rule permits a Participant to request, and receive, an increase in its approved 8(a) support level, but only if it can demonstrate that it has increased its capacity and capability to the point that its currently approved 8(a) support level is inappropriate. In addition, the increased capacity and capability must be to the point that any approved increase in 8(a) support would not commit the entire increased capacity of the concern (i.e., after increasing its 8(a) support level, the Participant would still be able to perform additional non-8(a) contracts).

In measuring whether a Participant has reached its approved 8(a) support level during any program year, the regulations (§ 124.312(b)(6) for firms in the developmental stage and § 124.312(c)(9) for firms in the transitional stage) state that the dollar value of the base year of all contracts awarded during that program year (excluding options on such contracts which would be exercisable in one or more subsequent program years) will be added to the dollar value of all options and other modifications affecting price that are exercised during that program year. Options and modifications are counted in the program year during which they are exercised. If an option or modification were exercised in the same program year in which the base year of an 8(a) contract was awarded, then both the base year and option/modification would be counted in that program year. If, however, an option or modification is exercised in a subsequent program year, only the base year of the 8(a) contract would be counted in determining 8(a) support received. In such a case, the dollar value of the option or modification would be counted in the program year in which the option/modification was exercised.

Several commenters felt that the measurement of support levels should be based on revenues instead of on the value of contracts awarded during the year. They reasoned that this change was particularly needed in the case of indefinite quantity contracts where a ceiling dollar amount might never by reached. In such a case, if a ceiling dollar figure is counted toward a firm's support level and the procuring agency's needs under the contract do not come close to that figure, the 8(a) firm could be penalized (i.e., it might not have been eligible for other 8(a) contracts because it had reached its approved support level). SBA agrees that the application of this provision in the indefinite quantity contract context should be clarified. In this regard, the final rule now specifies that in the case of an indefinite quantity contract having a guaranteed minimum, only the guaranteed minimum dollar amount is counted against a concern's approved 8(a) support level. SBA does not, however, believe that the support level measurement should be changed from contract value to revenues. If such a change were made, adherence to a firm's approved support level could not be determined until after the program year ended. In which case, it would be too late to restrict 8(a) awards because the firm would have exceeded its approved support level. Restrictions in the subsequent program year would not be supportable because the firm would have a newly established approved support level for each year.

Section 124.313 repeats the provision of SBA's previously existing regulations that SBA will certify its own competence to perform the 8(a) requirement. This certification, required by law as a condition of 8(a) contract award for both sole source and competitive 8(a) contracts, should not be confused with the entirely distinct Certificate of Competency (COC)

available under the Small Business Act and part 125 of this Title. The COC program does not apply to 8(a) contracts. One commenter questioned whether an 8(a) firm could appeal SBA's refusal to certify its competency on behalf of a specific concern. The regulations call for no such appeal process. Practically, however, the firm's views concerning this issue will be heard. In a sole source 8(a) contract, the firm will generally be involved in negotiations with the procuring agency. If the procuring agency is not satisfied that the concern has the capacity or capability to perform the requirement, it will so notify SBA. SBA will discuss the matter with the firm and the procuring agency to determine whether the firm can perform the contract. The firm's, as well as the agency's, views will be considered in this regard. If SBA concurs with the procuring agency, the procuring agency will be authorized to negotiate with another 8(a) firm. If SBA determines that the firm can perform, but the procuring agency still disagrees, SBA can appeal that decision to the head of the procuring agency.

Section 124.314 requires the selected 8(a) concern in either a sole source or competitive 8(a) award to perform a certain percentage of the requirement with its own work force. The percentages for service and supply contracts are taken directly from section 8(a)(14)(A) of the Small Business Act, 15 U.S.C. 637(a)(14)(A), as amended by Public Law 99-661. In addition, section 8(a)(14)(C) of the Small Business Act requires SBA to establish performance of work requirements for general and specialty construction. This rule requires an 8(a) contractor to perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees for a general construction contract, and at least 25% of the cost of the contract, not including the cost of materials, with its own employees for a specialty construction contract. These are the same percentage of work requirements that the 8(a) regulations have historically required for general and specialty trade construction contracts. The rule clarifies that work done by an 8(a) concern's subsidiary, even if wholly owned, does not count in determining whether the applicable performance of requirement is being fulfilled. While a few commenters objected to the inclusion of this clarification in the regulations, SBA did not adopt these comments in as much as this provision is based on an opinion of SBA's Office of General Counsel and represents the Agency's past practice regarding subsidiaries.

One commenter also suggested that there be a separate lower performance of work requirement for architect and engineering services. Such a requirement would be contrary to section 8(a)(14)(A) of the Small Business Act, as amended by Public Law 99-661. That section applies to all services, excluding construction. Architect and engineering services are not excluded from that requirement.

Section 124.315 defines what constitutes "fair market price" for 8(a) contract purposes. This section is taken almost verbatim from section 303(e) of the Business Opportunity Development Reform Act of 1988. SBA received little comment on this section and it is unchanged from the proposed regulations.

Section 124.316 authorizes SBA to delegate, by the use of special clauses in the price and subcontract, the responsibility for administering an 8(a) subcontract to the procuring agency. The proposed rule excluded certain actions from those that could be delegated to the procuring agency by SBA. Procuring agencies felt that they should have administration functions with respect to the exercise of options and modifications. SBA agrees with respect to options and has deleted the reference to options within the provisions of actions that SBA will not delegate to procuring agencies. SBA also agrees that the exercise of modifications within the scope of the contract is within the authority of the procuring agency contracting officer. However, modifications outside the scope of the contract are, in effect, new contracts which need SBA's concurrence. SBA has seen many instances where a modification clearly outside the scope of the original contract has been exercised by the procuring agency (without any SBA involvement and many times without notice to SBA) to permit an 8(a) firm which has exited the program to perform work it would otherwise not have been eligible to perform.

SBA has deleted modifications from the list of actions which SBA will not delegate to procuring agencies. SBA believes that § 124.318, dealing with the exercise of modifications beyond the scope of the original 8(a) contract, is sufficient to ensure SBA's involvement and concurrence in such actions. SBA also believes that its second concern with regard to modifications, that many times SBA does not receive copies of modifications of 8(a) contracts, will be remedied by an addition requiring such notice in the FAR.

Although decisions to terminate a contract are to be made by the procuring agency contracting officer, SBA should be involved in the process because it can often prevent a default from occurring by providing technical and/or managerial assistance to the performing 8(a) concern. SBA believes that such involvement is ensured by the provisions of § 124.319 and, thus, has deleted terminations from this section. Comments were made that SBA's concurrence should be required before novations can be entered and with regard to all matters pertaining to advance payments. SBA concurs, and has left these two actions as actions that cannot be delegated to procuring agencies.

Section 124.317 provides for termination of a contract for convenience if the disadvantaged owner(s) of the 8(a) concern performing the contract transfer(s) ownership of the concern. This section is taken directly from section 407 of the Business Opportunity Development Reform Act of 1988 and implements the requirement that a contract be performed by the 8(a) firm that initially received the contract award. The SBA Administrator is authorized to waive this requirement under certain specified conditions. Several commenters questioned who could request a waiver to be granted by the SBA Administrator. The final rule clarifies that either the 8(a) Participant which was awarded the 8(a) contract or the procuring agency may request a waiver. Generally, this request must be made prior to the relinquishment of ownership and control by the original 8(a) awardee unless, pursuant to § 124.317(d), the head of the procuring agency certifies that termination of the contract would severely impair the attainment of the agency's program objectives or missions. In such case, a request for a waiver by the procuring agency may be considered subsequent to the change in ownership and control. The decision to grant a waiver is still statutorily vested solely in the SBA Administrator. In addition, where the change in ownership and control is due to the death or incapacity of an individual(s) upon whom eligibility is based, the request for a waiver may be made as soon as possible after the occurrence of such event pursuant to § 124.317(c).

SBA also wishes to clarify that waivers may be requested and granted, for "changes in ownership and control" or for "performance" of specific contracts. A waiver for a change of ownership, if granted, applies to all 8(a) contracts being performed by the concern (i.e., such a waiver authorizes an 8(a) concern to continue performance

on all of its 8(a) contracts.) A waiver relating to the performance of a speciic contract is just that. The Participant is authorized to continue performance on the 8(a) contract for which the waiver was granted. If a waiver for a change in ownership is not granted, the 8(a) concern must obtain a waiver of performance for each 8(a) contract it seeks to perform after the change of ownership and control occurs.

Several commenters noted that this provision was not limited in its application to contracts entered into on or after October 1, 1989 as set forth in the Business Opportunity Development Reform Act of 1988. SBA has clarified the final rule to so limit the application of this provision. As such, this provision does not apply to previously awarded 8(a) contracts or to contracts which may yet be awarded prior to October 1, 1989. A few commenters also believed that there should be discretion in whether to terminate an 8(a) contract for convenience where there is a change in ownership and control. The statute does not give such flexibility, and, therefore, SBA has not adopted this comment. Conversely, several commenters felt that the termination should be for default instead of convenience (so that reprocurement costs, etc., would not be borne by the Government) where the concern was no longer owned and controlled by disadvantaged individuals. In such instances, termination for convenience is statutorily required and cannot be changed by SBA in these regulations.

Section 124.318 incorporates into the regulations opinions of the SBA's General Counsel concerning the exercise of options and modifications. Specifically, this section treats the exercise of an unpriced option or a modification beyond the scope of the initial 8(a) as a new contracting action. As such, if a concern has exited the 8(a) program or is other than small under the size standard corresponding to the SIC code for the requirement, the option or modification cannot be exercised. If, however, the concern were still a Program Participant and still a small business under the size standard corresponding to the SIC code for the requirement, negotiations concerning the modification or pricing the option could be entered into and, if a fair and reasonable price is negotiated, the option or modification could be exercised. Alternatively, a priced option or a modification within the scope of the initial 8(a) contract award could be exercised whether or not the concern that received the award has exited the 8(a) program and whether the concern has grown large under the size standard corresponding to the SIC code for the requirement. One commenter noted that a modification beyond the scope of the initial 8(a) award should not be exercised even if the concern were still a Program Participant and still a small business under the size standard corresponding to the SIC code for the requirement where the value of the modification exceeds the applicable threshold amount set forth in § 124.311. SBA concurs. As long as such a modification is considered a new contracting action, if it exceeds the applicable threshold amount, it can only be accepted by SBA for competition among eligible 8(a) concerns. Although not commented on, the same rationale applies to unpriced options. Consequently, the final rule has been amended to specify that an unpriced option or modification beyond the scope of the contract cannot be exercised in any case where the anticipated value of the option or modification exceeds the threshold amount for the concern wishing to exercise it. SBA may only accept such requirement for competition among eligible 8(a) concerns.

Section 124.319 sets forth the procedures for terminations of 8(a) contracts for both default and convenience. These provisions, with one exception, are identical to those previously contained in § 124.302(d). The only exception is that, as noted above in § 124.317, a termination for convenience must be initiated whenever the disadvantaged owner(s) of an 8(a) concern transfer(s) ownership of the concern to any other party and the SBA Administrator does not grant a waiver pursuant to the exceptions set forth in § 124.317. Aside from a few comments relating to the provision relating to contract transfers, this section was not commented on.

Section 124.320 addresses disputes and appeals. Paragraph (a) speaks to contract disputes generally. Disputes arising between an 8(a) subcontractor and a procuring agency contracting officer will generally be decided unilaterally by the procuring agency contracting officer. Disputes arising out of matters relating to advance payments or business development expense funds will be decided unilaterally by SBA's contracting offices. For disputes arising out of construction contracts where SBA has waived bonding pursuant to § 124.305, the proposed rule specified that the contracting officer deciding the dispute will be that as agreed between SBA and the procuring agency. Comment was received objecting to this provision. Commenters felt that the procuring agency contracting officer should always be the official deciding disputes concerning performance. SBA agrees with that comment. The proposed rule intended that the procuring agency contracting officer decide such disputes. The proposal was also intended to permit the SBA contracting officer to decide disputes concerning the disbursement of funds from the special bank account established to protect suppliers of the 8(a) concern. That clarification has been made in this final rule. Participants have the right to appeal contracting officer decisions under the Contract Disputes Act of 1978.

Paragraph (b) describes the conditions and procedures for appeal by SBA to the head of a procuring agency. This paragraph clarifies that SBA is authorized to appeal both the decision not to set aside a requirement for the 8(a) program and the terms and conditions of a contract already set aside for the program. No specific comments were received concerning this paragraph and it remains unchanged in the final rule.

Section 124.321 sets forth the requirements by which a Program Participant may enter joint venture agreements to perform 8(a) contracts. Several commenters objected to the requirement that SBA's size regulations apply to the joint venture entity. While the 8(a) program is designed to develop small businesses owned and controlled by disadvantaged individuals, it must be remembered that 8(a) subcontracts must be awarded to small business entities. If an 8(a) concern is not small, either in its own right or because of affiliation, it cannot receive an 8(a) award. If an 8(a) concern wishes to be involved with a large concern in an 8(a) contracting matter, to gain experience in a certain area or for another reason, it can subcontract a portion of the performance of the 8(a) contract (in accordance with the percentages set forth in § 124.413) to the large concern. It cannot, however, joint venture with that concern. Failure to comply with the requirements of this section with respect to performance and/or control of the joint venture project may subject the firm to Program termination proceedings.

In response to comments, SBA has also added a new paragraph in the final rule concerning required performance of work percentages by the 8(a) party to the joint venture. Section 124.321(f) requires the 8(a) partner(s) to an eligible 8(a) joint venture to perform the applicable percentages of work required by § 124.314. For example, in a professional services contract, at least

50% of the cost of contract performance incurred for labor must be expended for employees of the 8(a) partner(s) to the joint venture. Performance by the other joint venturer(s) does not satisfy this requirement. To permit performance by other joint venturers to count toward the performance of work requirements imposed by § 124.314 would be to permit circumvention of the subcontracting limitations through the joint venture mechanism.

Section 124.401 addresses advance payments. The requirements set forth in this section are substantively the same as those formerly used by SBA in authorizing and administering advance payments. The former regulation has been reworded where necessary for clarity. In addition, several provisions which previously appeared only in SBA's Standard Operating Procedures or policy guidelines have been added to the regulations. This section also incorporates the provisions formerly appearing in § 124.403 concerning letters of credit. Again, the substance of the regulation dealing with letters of credit has not been changed, but it has been incorporated into the advance payment section for ease of use, understanding and clarity.

Several commenters recommended that advance payments be authorized only in connection with sole source 8(a) awards and not for competitive 8(a) awards, noting that firms lacking financial capacity would otherwise submit offers in response to a competitive 8(a) solicitation with an expectation of obtaining financing through advance payments. The commenters believed that such a practice would lead to unfair advantages in an 8(a) competition. SBA agrees and has inserted a new § 124.401(a)(3) which limits advance payments to sole source 8(a) contracts.

SBA has also clarified that options are not included when determining the amount of advance payments that may be authorized (see § 124.401(a)(4)). While SBA has never directly authorized advance payments in excess of the value of the base contract, we are aware that a few such advance payments have been made. There have been several cases where advance payments have been given in excess of the base contract, in anticipation of options to the contract, only to have the procuring agency not exercise the options. In such a situation, SBA is left in the precarious position of seeking repayment in excess of the value of the entire contract. The rule has been amended to prevent this situation from arising.

Section 124.402 addresses Business Development Expense (BDE). This section governs those Program Participants that are performing contracts for which BDE was given prior to the expiration of the BDE program. As previously noted, the newly authorized loan program set forth in § 122.57 of this title is intended to replace BDE. The granting of BDE is no longer authorized after June 1, 1989, the effective date of the statutory provision authorizing the loan program. No comments were received concerning the substance of these provisions.

Section 124.403 (proposed § 124.501), Development assistance program, and § 124.404 (proposed § 124.502), Small Business and Capital Ownership Development Program are identical to §§ 124.501 and 124.502 of the former regulations, respectively. No comments were received concerning these sections and, except for typographical corrections, they have not been changed in this final rule.

Section 124.501 (proposed § 124.601) sets forth those reporting requirements not set forth in other sections. This section states requirements which are mandated by the reform legislation. Only a few comments were received from the public concerning this section. These comments recommended changes which were contrary to the statutory mandates and, thus, have not been adopted.

**Compliance With Executive Orders 12291 and 12612, the Regulatory Flexibility Act (5 U.S.C. 601, et seq.), and the Paperwork Reduction Act (44 U.S.C. Ch 35)**

For purposes of Executive Order 12291 and the Regulatory Flexibility Act, this rule is a major rule which is likely to have a significant economic effect on a substantial number of small entities. As discussed in the initial regulatory flexibility analysis contained in the proposed rule (54 FR 12071), this rule is necessary to implement the Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656) and to implement changes in Agency policy relating to the 8(a) program. A summary of the public comments on the proposed rule and SBA's actions as a result of such comments is set forth in the preceding section of this preamble. SBA submits that there are no alternatives, which were not highlighted in the summary of the public comments, which could implement the policies and legal requirements addressed by this rule in a more cost effective manner or in a manner which would have less economic effect on small businesses.

The potential costs and benefits of the rule as well as the net benefit of the rule are unchanged from those set forth in the preamble to the proposed rule (54 FR 12070–12071). Projected annual purchases through the 8(a) Program as revised by implementation of the Reform Act are estimated at approximately $4 billion. The cost of implementing this rule is estimated to be approximately $11 million, to be used primarily to establish and implement new rules and guidelines and to purchase new equipment and to hire and/or train personnel. The net benefits of the rule realized by program participants through their greater access to and ownership of productive capital as a result of 8(a) program participation. In addition, the national defense production base will be strengthened by assisting 8(a) participants which perform defense contracts to develop into stronger, better established and more competitive businesses.

In the preamble to the proposed rule, SBA noted 5 sections of the proposed rule which contained new or changed paperwork requirements. The paperwork requirements have been made a part of this final rule and relate to the following: business plan (§ 124.301), annual reviews and continuing program eligibility (§§ 124.111 and 124.302), reporting and verification of 8(a) and non-8(a) business activity (§ 124.312) and capability statements (§ 124.501, proposed as § 124.601). Prior to use in the 8(a) Program, these requirements will be submitted to the Office of Management and Budget for approval under the Paperwork Reduction Act.

Finally, SBA certifies that this rule does not require a Federalism Assessment under Executive Order 12612.

**List of Subjects in 13 CFR Part 124**

Government procurement, Minority business, Reporting and recordkeeping requirements, Technical assistance.

Accordingly, pursuant to the authority set forth in sections 7(j) and 8(a) of the Small Business Act, 15 U.S.C. 636(j) and 637(a), SBA hereby revises subpart A, part 124 of title 13 of the Code of Federal Regulations to read as follows:

**PART 124—[AMENDED]**

1. The authority citation for part 124 is revised to read as follows:

**Authority:** 15 U.S.C. 634(b)(6), 636(j), 637(a), 637(d) and Pub. L. 99–661, sec. 1207, Pub. L. 100–656, and Pub. L. 101–37.

2. Subpart A of part 124 is revised to read as follows:

## Subpart A—Minority Small Business and Capital Ownership Development


Sec.
124.1 Scope of regulations.
124.2 Associate Administrator for Minority Small Business and Capital Ownership Development.
124.3 Division of Program Certification and Eligibility.
124.4 Commission on Minority Business Development.
124.5 Violations.
124.6 Penalties for misrepresentations and false statements.
124.7 Restrictions on fees for applicant and Participant representatives.
124.100 Definitions.
124.101 The 8(a) program: General eligibility.
124.102 Small business concern.
124.103 Ownership requirements.
124.104 Control and management.
124.105 Social disadvantage.
124.106 Economic disadvantage.
124.107 Potential for success.
124.108 Additional 8(a) program eligibility requirements.
124.109 Ineligible businesses.
124.110 Program term.
124.111 Continued 8(a) program eligibility.
124.112 Concerns owned by Indian tribes, including Alaska Native Corporations.
124.113 Concerns owned by Native Hawaiian Organizations.
124.201 8(a) Program application.
124.202 Place of filing.
124.203 Servicing office.
124.204 Applicant representatives.
124.205 Forms and documents required.
124.206 Approval and decline of applications for 8(a) program admission.
124.207 8(a) Program exist.
124.208 Program graduation.
124.209 Program termination.
124.210 Appeals to SBA's Office of Hearings and Appeals.
124.211 Suspension of program assistance.
124.300 Business development.
124.301 Development of business plan.
124.302 Review and modification of business plan.
124.303 Stages of 8(a) program participation.
124.304 Statutory exemption from the Walsh-Healey Act.
124.305 Statutory exemption from Miller Act bonds.
124.306 Financial assistance for skills training.
124.307 Contractual assistance.
124.308 Procedures for obtaining and accepting procurements for the 8(a) program.
124.309 Barriers to acceptance.
124.310 Approval of lower tier subcontractors.
124.311 8(a) competition.
124.312 Competitive business mix.
124.313 Certification of SBA's competency.
124.314 Performance of work by the 8(a) concern.
124.315 Fair market price for 8(a) awards.
124.316 Contract administration.
124.317 Performance of contracts by original 8(a) concern.
Sec.
124.318 Exercise of options and modifications.
124.319 Contract termination.
124.320 Disputes and appeals.
124.321 Joint venture agreements.
124.401 Advance payments.
124.402 Business development expense.
124.403 Development Assistance Program.
124.404 Small Business and Capital Ownership Development Program.
124.501 Miscellaneous reporting requirements.


### § 124.1 Scope of regulations.

(a) *General.* (1) These regulations implement sections 8(a) and 7(j) of the Small Business Act, as amended by the Business Opportunity Development Reform Act of 1988, and Business Opportunity Development Reform Act Technical Corrections Act, (15 U.S.C. 637(a) and 636(j), as amended by Pub. L. 100–656 and Pub. L. 101–37.). Sections 8(a) and 7(j) of the Small Business Act establish the Minority Small Business and Capital Ownership Development Program or 8(a) Program. The 8(a) Program is intended to be used exclusively for business development purposes to help small businesses owned and controlled by socially and economically disadvantaged individuals, economically disadvantaged Indian tribes, including Alaska Native Corporations, and economically Native Hawaiian Organizations to compete on an equal basis in the mainstream of the American economy.

(2)(i) Except as set forth in paragraphs (a)(2) (ii) and (iii) of this section and § 124.311(b) of this title, these regulations apply to all business concerns applying for or participating in the 8(a) program as of the effective date of the regulations. As noted, portions of these regulations also apply to other Federal programs for which social and economic disadvantaged status is a requirement of program eligibility. Such programs include, among others, the Small Disadvantaged Business (SDB) Set-aside and Bid Preference Programs authorized by section 1207(a) of Public Law 99–661, and the Minority Small Business Subcontracting Program authorized by section 8(d) of the Small Business Act (15 U.S.C. 637(d)).

(ii) Applications in process as of the effective date of these regulations, including applications that have been declined but have not received final determinations on requests for reconsideration, will not be subject to the new provisions of § 124.107(a) regarding length of time in business or the new provisions of § 124.109(b) which make franchises ineligible for 8(a) program participation. Such applicants will be subject to Agency policy requirements regarding potential for success and ineligible businesses which were in effect on the date of application.

(iii) Procedures described in § 124.210 relating to appeal of SBA's decline of an application are effective as to applications which are declined, after reconsideration, by the Associate Administrator for Minority Small Business and Capital Ownership Development on or after the effective date of these regulations. Procedures described in §§ 124.208, 124.209, 124.211, relating to Program graduation, Program termination and Program suspension shall apply to concerns which SBA seeks to graduate, terminate or suspend but to which, as of the effective date of these regulations, an Order to Show Cause has not been issued pursuant to 13 CFR 124.110(k), 124.112 and 124.113 of SBA's rules which were in effect on July 31, 1989. Proceedings relating to any concern to which SBA has issued an Order to Show Cause prior to the effective date of these regulations shall be governed by 13 CFR part 124 and part 134 as it existed on the date of the issuance of the Order to Show Cause.

(b) *The 8(a) and 7(j) programs.* (1) Section 8(a) authorizes SBA to enter into all types of contracts, including, but not limited to, contracts for supplies, services, construction, research and development with other Government departments and agencies and to subcontract the performance of these contracts to small business concerns owned and controlled by socially and economically disadvantaged individuals, Indian tribes or Hawaiian Native Organizations.

(2) Section 7(j) authorizes SBA to provide financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or small business concerns eligible for assistance under sections 7(i), 7(j)(10), and 8(a) of the Small Business Act.

### § 124.2 Associate Administrator for Minority Small Business and Capital Ownership Development.

The Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD), who shall be an employee in the competitive service or in the Senior Executive Service, and a career appointee, is responsible for the formulation and execution of the policies and programs under sections 7(j) and 8(a) of the Small Business Act. The AA/MSB&COD operates under the ultimate supervision of, and is generally

responsible to, the Administrator of SBA.

**§ 124.3 Division of Program Certification and Eligibility.**

The Division of Program Certification and Eligibility (Division) within the Office of Minority Small Business and Capital Ownership Development (MSB&COD) shall be responsible for handling all matters relating to 8(a) program eligibility, termination and graduation from 8(a) program participation, and certifications of disadvantaged status for purposes of any program or activity conducted under the authority of section 8(d) of the Small Business Act or any Federal law that references such section. The Division, headed by a Director who shall report directly to the AA/MSB&COD, shall have field offices within some or all of the Agency's regional offices.

**§ 124.4 Commission on Minority Business Development.**

A Commission on Minority Business Development (Commission) shall be established pursuant to section 505 of the Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656). This Commission is authorized to review all Federal programs designed to promote the development of minority-owned businesses in order to ascertain whether the congressionally described goals and purposes of such programs are being realized.

**§ 124.5 Violations.**

Willful violation by an applicant for admission to the section 8(a) program or an applicant for participation in the section 7(j) program or any of SBA's regulations governing these or its other programs may result in the applicant's denial of admission to the program. The nature and severity of any such violation will be considered by the AA/MSB&COD in making a determination on the admission of an applicant to the program.

**§ 124.6 Penalties for misrepresentations and false statements.**

(a) *General.* Section 16 of the Small Business Act (15 U.S.C. 645) sets forth penalties for false statements and misrepresentations.

(b) *Misrepresentation of small business or small disadvantaged business status.* The Business Opportunity Development Reform Act of 1988 (Pub. L. 100–656) increased the penalties for intentional misrepresentation of small business status or small disadvantaged business status. Generally, section 16(d) of the Small Business Act provides that any person or entity that intentionally misrepresents the status of any concern or person as a "small business concern" or "small business concern owned and controlled by socially and economically disadvantaged individuals" in order to obtain for him/herself or another any of the contracting opportunities set forth in paragraph (b)(1) of this section will be subject to the penalties set forth in paragraph (b)(2) of this section. The following contracting opportunities are subject to penalties for misrepresentation described in this section:

(1)(i) A prime contract to be awarded pursuant to section 9 (Small Business Innovation Research Program authority) or section 15 (various small business set-aside authorities) of the Small Business Act;

(ii) A subcontract to be awarded pursuant to section 8(a) of the Small Business Act;

(iii) A subcontract that is to be included as part or all of a goal contained in a subcontracting plan required pursuant to section 8(d) of the Small Business Act; or

(iv) A prime or subcontract to be awarded as a result, or in furtherance, of any other provision of Federal law that specifically references section 8(d) of the Small Business Act for a definition of program eligibility.

(2) The following penalties apply for violations of this section:

(i) A fine of not more than $500,000 or by imprisonment for not more than 10 years, or both;

(ii) The administrative remedies prescribed by the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. 3801–3812) and implementing regulations in part 142 of this chapter;

(iii) Suspension and debarment as specified in 13 CFR part 145 of subpart 9.4 of the Federal Acquisition Regulation (FAR) (48 CFR subpart 9.4), or any successor regulation, on the basis that such misrepresentation indicates a lack of business integrity that seriously and directly affects the present responsibility of a person or entity to transact business wtih the Federal government; and

(iv) Ineligibility for participation in any program or activity conducted under the authority of the Small Business Act or the Small Business Investment Act of 1958 (15 U.S.C. 661, *et seq.*) for a period not to exceed 3 years.

(c) *Misrepresentation concerning compliance with competitive mix targets.* Section 16(f) of the Small Business Act, as amended by Public Law 100–656, imposes the penalties set forth in paragraph (b)(2) of this section on any person or entity that falsely certifies past compliance with the requirements of section 7(j)(10)(I) of the Small Business Act which deals with competitive business mix and attainment of business activity targets (*see* section 124.312).

**§ 124.7 Restrictions on fees for applicant and Participant representatives.**

(a) *General.* The compensation received by any agent or representative of an 8(a) applicant or Program Participant for assisting the applicant in obtaining 8(a) certification or for assisting the Program Participant in obtaining 8(a) contracts must be reasonable in light of the service(s) performed by the agent or representative.

(b) *Contingent fees.* (1) The fee charged by any agent or representative of an 8(a) applicant for assisting the applicant in obtaining 8(a) certification cannot be contingent upon the applicant/Participant receiving 8(a) certification.

(2) Payment of a contingent fee for assisting a Program Participant in obtaining any 8(a) contract is generally prohibited as contrary to public policy, but is permitted if the payment is made by a Program Participant to a "bona fide employee" or a "bona fide agency," as defined by the FAR, 48 CFR subpart 3.4, and section 124.100.

(c) *Fees as a percentage of contract award.* A Program Participant is prohibited from agreeing to pay or paying a fee to any agent or representative for assistance in obtaining a specific 8(a) contract award, if such fee is based on a percentage of the contract award, either in terms of total value of the award, profit, or otherwise.

**§ 124.100 Definitions.**

*Alaska Native* means a citizen of the United States who is a person of one-fourth degree or more Alaskan Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or a combination thereof. The term includes, in the absence of proof of a minimum blood quantum, any citizen who is regarded as an Alaska Native by a Native village or Native group and whose father or mother is regarded as an Alaska Native.

*Alaska Native Corporation* means any Regional Corporation, Village Corporation, Urban Corporation, or Group Corporation organized under the laws of the State of Alaska in accordance with the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, *et seq.*)

*Application* or *8(a) application* means all forms and attachments required by SBA to be completed by an applicant for the 8(a) program for the purpose of establishing program eligibility.

*Bona fide agency* means an established commercial or selling agency, maintained by a contractor (or subcontractor where SBA is the contractor) for the purpose of securing business that neither exerts nor proposes to exert improper influence to solicit or obtain government contracts nor holds itself out as being able to obtain any government contract or contracts through improper influence.

*Bona fide employee,* means a person, who is employed by a contractor (or subcontractor where SBA is the contractor) and subject to the contractor's, (or where SBA is the contractor, the subcontractor's) supervision; control as to time, place, and manner of performance; and who neither exerts nor proposes to exert improper influence to solicit or obtain government contracts nor holds himself/herself out as being able to obtain any government contract or contracts through improper influence.

*Business Opportunity Specialist (BOS)* means the SBA field office employee responsible for providing business development assistance to Program Participants pursuant to sections 7(j) and 8(a) of the Small Business Act (15 U.S.C. 636(j) 637(a)).

*Business plan* means the business plan documents as submitted by the 8(a) concern and approved in writing by SBA which include the objectives, goals, and business projections of an 8(a) concern, and all written amendments or modifications which have also been approved in writing by SBA.

*Certification of SBA's competency* means a certification by SBA, based on its assessment of an 8(a) concern's competency to perform, that SBA is competent to perform the requirements as stated in the contract. The assessment does not require a special investigation or the issuance of a Certificate of Competency (COC) as provided for elsewhere in these regulations under the authority of section 8(b)(7) (A), (B) and (C) of the Small Business Act.

*Concern* is defined in part 121 of this title.

*Days* means calendar days unless otherwise specified.

*Descendant of an Alaska Native* means a lineal descendant of an Alaska Native, or of an individual who would have been an Alaska Native if such individual were alive on December 18, 1971, or an adoptee of an Alaska Native, or of a descendant of an Alaska Native whose adoption occurred prior to his or her majority (age 18 in the State of Alaska), and is recognized at law or in equity.

*Disadvantaged individual* means an individual who SBA has determined to be socially and economically disadvantaged in connection with a concern's application for or participation in the 8(a) program.

*Fixed Program Participation Term* means that ultimate time period during which a concern may have participated in the 8(a) program under Public Law 96–481, (April 21, 1982).

*Graduation* means completion of 8(a) Program Participation pursuant to § 124.208 prior to expiration of the Program Term because of substantial achievement of the targets, objectives and goals contained in the Participant's business plan.

*Immediate family member* means father, mother, husband, wife, son, daughter, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, step-father, step-mother, step-son, step-daughter, step-brother, step-sister, half-brother and half-sister.

*Indian tribe* means any Indian tribe, band, nation, or other organized group or community of Indians, including any Alaska Native Corporation, as defined in this section, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians, or is recognized as such by the State in which such tribe, band, nation, group, or community resides. *See,* definition of "tribally-owned concern."

*Joint venture agreement* means an agreement between an eligible 8(a) concern and another small business concern, whether or not an 8(a) participant, solely for the purpose of performing a specific 8(a) contract. *See* § 124.321(h) for joint venture agreements with tribally-owned 8(a) concerns.

*Local buy item* means a supply, service (nonprofessional/professional) or product purchased to meet the specific needs of one user in one location. Examples include the purchase of services, such as custodial, trash hauling, ADP support, auditing and training as well as construction work to be performed in one location and single user manufactured items.

*Manufacturer* means a concern which owns, operates, or maintains a factory or establishment that produces on the premises the materials, supplies, articles, or equipment described in the business plan. In order to qualify as a manufacturer, a concern must be able to show that it is an established manufacturer of particular goods or goods of general character which may be sought by the Government, or, if it is newly entering into such manufacturing activity, that it has made all necessary prior arrangements for space, equipment, and personnel to perform manufacturing operations. A new firm which has made such definite commitments in order to enter a manufacturing business which will later qualify it for the 8(a) program, shall not be barred from 8(a) approval because it has not yet done any manufacturing; however, this interpretation is not intended to qualify a firm whose arrangements to use space, equipment, or personnel are contingent upon 8(a) approval. This definition is based upon the Walsh-Healey Public Contracts Act, 41 U.S.C. 35–45.

*National buy item* means an item or service purchased to meet the needs of a system where supply control, inventory management, and procurement responsibility have been assigned to a central procuring activity to support the needs of one or more users of the item in two or more locations. Examples include military clothing purchased by the Defense Personnel Support Center of the Department of Defense, paint or hand tools purchased by the Federal Supply Service of the General Services Administration, medical supplies purchased by the Veterans Administration, or studies, evaluations, consulting services or similar services purchased by the headquarters office of a Department or agency for use in two or more commands or field offices.

*Native Hawaiian* means any individual whose ancestors were natives prior to 1778, of the area which now comprises the State of Hawaii.

*Native Hawaiian Organization* means any community service organization serving Native Hawaiians in the State of Hawaii which

(1) Is a not-for-profit organization chartered by the State of Hawaii,

(2) Is controlled by Native Hawaiians, and

(3) Whose business activities will principally benefit such Native Hawaiians.

*Negative control* is defined in part 121 of this title.

*Nondisadvantaged individual* means any individual who does not claim disadvantaged status, does not qualify as disadvantaged, or upon whose disadvantaged status applicant concern does not rely in qualifying for 8(a) program participation. An individual who has used his/her disadvantaged status in previously qualifying a concern for 8(a) program participation is considered a nondisadvantaged

individual for all other 8(a) program purposes.

*Non-8(a) business activity target* means the amount of non-8(a) revenue forecasted in a Participant's approved business plan during each year of its participation in the 8(a) program. During the developmental stage of program participation, these targets are goals of non-8(a) business that a Participant must strive to achieve and may be either a percentage of total revenues or a specified dollar figure. During the transitional stage of program participation these targets must be expressed as a percentage of total revenues, as set forth in § 124.312(c), that a Participant is required to achieve in each year in the transitional stage.

*Open requirement* means a requirement submitted to SBA by a procuring agency for possible 8(a) award without a particular 8(a) concern being identified as a candidate for the award. Open requirements can be for local buy items or national buy items.

*Operational control* means actual or constructive authority to establish long and short term goals for the concern, and to manage the concern's day-to-day operations.

*Personal net worth* means the net value of the assets of an individual remaining after total liabilities are deducted. *See* § 124.106.

*Primary industry classification* means the four digit Standard Industrial Classification (SIC) code designation which best describes the primary of industry the 8(a) applicant or Participant as defined in part 121 of this title.

*Principal place of business* means the location at which the business records of the applicant concern are maintained and the location at which the individual who manages the concern's day-to-day operations spends the majority of his/her working hours.

*Program Participant (Participant* or *8(a) Participant)* means a small business concern participating in the Small Business and Capital Ownership Development Program established by sections 7(j) and 8(a) of the Small Business Act (15 U.S.C. 636(j) and 637(a)).

*Program suspension* means the temporary cessation of all 8(a) program assistance pursuant to § 124.211 of these regulations.

*Program year* means a 12-month period of an 8(a) Participant's Program Participation. The first program year begins on the date that the concern is certified to participate in the 8(a) program and ends one year later. Each subsequent program year begins on the Participant's anniversary of program certification and runs for one 12-month period.

*Regular dealer* means regular dealer as defined by the Walsh-Healey Public Contracts Act, 41 U.S.C. 35–45, and Department of Labor regulations found at 41 CFR 50–201.101, 50–206.53, and 50–206.54.

*Requirement* means a contract opportunity from a Federal procuring agency to acquire articles, equipment, supplies, services, materials or construction work.

*Same or similar line of business* means all business activities within the same two-digit "Major Group" of the Standard Industrial Classification (SIC) System (set forth in the SIC Manual), as the primary industry classification of the applicant concern.

*Self-marketing* of a requirement occurs when an 8(a) firm identifies a requirement that has not been committed to the 8(a) program and, through its marketing efforts causes the procuring agency to offer that specific requirement to the 8(a) program on its behalf. A firm which identifies and markets a requirement which is subsequently offered to the 8(a) program as an open requirement or on behalf of another 8(a) Participant has not "self-marketed" the requirement within the meaning of these regulations.

*Termination* means the permanent cessation of 8(a) Program Participation prior to the expiration of the concern's Program Term for good cause pursuant to § 124.209.

*Tribally-owned concern* means any concern at least 51 percent owned by an Indian tribe as defined in this section.

*Unconditional ownership* means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, shareholder agreements or other similar arrangements which serve to allow the primary benefits of Program Participation to accrue to entities or individuals other than upon whom 8(a) program eligibility is based.

**§ 124.101 The 8(a) program: General eligibility.**

(a) In order to be eligible to participate in the 8(a) program, an applicant concern and an individual upon whom 8(a) eligibility is based must meet all of the eligibility criteria set forth in § 124.102 through § 124.109 hereunder. An applicant concern owned and controlled by an Indian tribe must meet the requirements set forth in § 124.112 and in §§ 124.102 through 124.109 as applicable. An applicant concern owned and controlled by a Native Hawaiian Organization must meet the requirements set forth in § 124.113 and in §§ 124.102 through 124.109, as applicable. All determinations by the AA/MSB&COD made pursuant to §§ 124.102, 124.103, 124.104, 124.105, 124.106, and 124.107 shall be in writing, setting forth the findings based on relevant facts and in accordance with law and regulations, upon which the determination is based. An applicant concern which is declined 8(a) program admission may request a reconsideration of such decline, as set forth in § 124.206. If the application is declined on reconsideration based solely on a negative finding of social disadvantage, economic disadvantage, ownership or control, such decline may be appealed by an unsuccessful applicant to the Office of Hearings and Appeals. If no reconsideration is sought, or if after reconsideration, the application is declined based in whole or in part on a ground other than a negative finding of social disadvantage, economic disadvantage, ownership or control, the written decline of the AA/MSB&COD is final and not subject to appeal. Appeal procedures for a decline of program admission by the AA/MSB&COD and grounds for which such an appeal may be brought are set forth in § 124.210 and Part 134 of this Title. The written decision of the Office of Hearings and Appeals shall be the final Agency decision. A concern which has been declined for 8(a) program admission may reapply for program admission 12 months after the date of the final Agency decision to decline.

(b) In order to continue its participation in the 8(a) program, a concern certified for Program Participation on or after the effective date of these regulations must continue to meet all eligibility requirements described in § 124.102 through § 124.109, § 124.111(a), and § 124.112 or § 124.113, if applicable. In order to continue its participation in the 8(a) program, a concern certified for program participation prior to the effective date of these regulations must comply with the requirements of §§ 124.102 through 124.109, 124.11(a) and 124.112, if applicable, which have been previously required by regulation, policy or procedure. Within 12 months of the effective date of these regulations, such concerns must also come into compliance with the requirements of paragraph (a) of this section which have not been previously required by regulation, policy or procedure. Failure to do so may lead to termination or graduation pursuant to §§ 124.208 and 124.209.

(c)(1) It is SBA's intent to process applications for participation in a fair

and consistent manner and to ensure that 8(a) program participation is limited to eligible individuals and concerns. Toward that end, SBA invites the participation of the public in preventing fraud and assuring the integrity of the 8(a) program.

(2) The AA/MSB&COD shall cause to be reviewed any determination that an individual, applicant concern or Participant is eligible to participate in the 8(a) program whenever a member of the public submits credible evidence that

(i) Such determination was based on fraudulent information;

(ii) SBA did not follow the requirements of these regulations in rendering the determination; or

(iii) The individual or concern has undergone one or more changes which have rendered it ineligible for 8(a) Program Participation.

(3) The AA/MSB&COD shall determine whether the facts developed during any such review warrant further action. The member of the public whose information gave rise to the review shall be advised of SBA's findings, consistent with laws protecting confidentiality.

### § 124.102 Small business concern.

(a) In order to be approved for participation in the 8(a) program, an applicant concern must qualify as a small business concern as defined in part 121 of this title, and, if a tribally-owned concern, as additionally defined in § 124.112. The particular size standard to be applied will be based on the primary industry classification of the applicant concern. A concern owned by a Native Hawaiian Organization must also qualify as a small business concern, but the circumstance of ownership by the Native Hawaiian Organization shall not, by itself, cause affiliation with the Native Hawaiian Organization.

(b) If the AA/MSB&COD is unable to determine that an applicant concern qualifies as a small business, the AA/MSB&COD may deny the concern's application for 8(a) program admission or may request a formal size determination from the appropriate regional office. If the application is so denied, the small business concern may request a formal size determination from the appropriate regional office pursuant to part 121 of this title. Size determinations by an SBA regional office may be appealed to SBA's Office of Hearings and Appeals pursuant to part 121 of this title.

(c) In order to continue to participate in the 8(a) program, a Program Participant must qualify pursuant to the provisions of part 121 of this title as a small business under one or more of the SIC Codes contained in the concern's approved business plan.

(d) Except for contracts awarded to joint ventures controlled by eligible Indian tribes, under § 124.321, a Program Participant must certify that it is a small business pursuant to part 121 of this title for the purpose of performing each contract awarded under the authority of section 8(a). SBA, in turn, will undertake to verify such certifications. In the event that the SBA does not verify a certification, the Program Participant may request a formal size determination from the appropriate SBA regional office. Formal size determinations will be conducted in accordance with part 121 of this title.

### § 124.103 Ownership requirements.

Except for concerns owned by Indian tribes, Alaska Native Corporations or Native Hawaiian Organizations, in order to be eligible to participate in the 8(a) program, an applicant concern must be one which is at least 51 percent unconditionally owned by an individual(s) who is a citizen of the United States (specifically excluding permanent resident alien(s)) and who is determined by SBA to be socially and economically disadvantaged. *See* § 124.100 for definition of unconditional ownership. Special ownership requirements for concerns owned by Indian tribes and Alaska Native Corporations are set forth in § 124.112. Ownership requirements for Native Hawaiian Organizations are set forth in § 124.113.

(a) In the case of an applicant concern which is a partnership, 51 percent of the partnership interest must be unconditionally owned by an individual(s) determined by SBA to be socially and economically disadvantaged. Such unconditional ownership must be reflected in the concern's partnership agreement.

(b) In the case of an applicant concern which is a corporation, 51 percent of each class of voting stock and 51 percent of the aggregate of all outstanding shares of stock must be unconditionally owned by an individual(s) determined by SBA to be socially and economically disadvantaged.

(c) SBA will not find unconditional ownership if socially and economically disadvantaged individual(s) asserts ownership of a concern on the basis of unexercised stock options or other arrangements.

(d) When determining ownership for purposes of 8(a) program eligibility, SBA will consider options to purchase stock held by nondisadvantaged individuals or entities, or to rights to convert non-voting stock or debentures held by nondisadvantaged individuals or entities into voting stock, to have been exercised. However, any potential ownership interests (such as options or warrants) held by investment companies licensed under the Small Business Investment Act of 1958 shall not be treated as ownership interests until exercised.

(e)(1) The individual(s) upon whom eligibility is based must receive at least 51 percent of the annual distribution of dividends paid on the voting stock of a corporate applicant concern;

(2) In the event that the stock is sold, the individual(s) upon whom eligibility is based must be entitled to receive 100 percent of the value of each share of stock in his/her possession; and

(3) In the event of dissolution of the corporation, the individual(s) upon whom eligibility is based must be entitled to receive at least 51 percent of the retained earnings of the concern and 100 percent of the value of each share of stock in his/her possession.

(f) One 8(a) concern may not hold more than a 10 percent equity ownership interest in any other 8(a) concern.

(g) Except for partners or shareholders which are financial institutions licensed or chartered by Federal, state or local government, including investment companies which are licensed under the Small Business Investment Act of 1958, an individual, whether or not disadvantaged, or entity, who/which is a partner, stockholder, officer and/or director in an 8(a) concern is prohibited from simultaneously holding an equity ownership interest exceeding 10 percent in another 8(a) concern. In no case shall an ownership interest in an 8(a) concern held by any such financial institution exceed 49 percent.

(h) a non-8(a) concern in the same or similar line of business is prohibited from having an equity ownership interest in an 8(a) concern which exceeds 10 percent.

(i) An 8(a) business concern may continue participation in the program subsequent to a change in its 8(a) ownership, provided that SBA gave prior written approval to such change. Where the change in 8(a) ownership represents less than a 10 percent interest in the concern or results from the death or incapacity due to serious, long-term illness or injury of a disadvantaged principal, prior approval is not required; however, the concern shall notify SBA as soon as possible. Continued participation of the 8(a) concern under new disadvantaged ownership requires SBA's determination that all individual and business eligibility requirements of

these regulations are met by the concern and the new owners.

(j) A Program Participant's request for SBA's approval for the issuance of a public offering will be treated as a request for a change of ownership. Such request will cause SBA to examine the concern's continued need for access to the business development resources of the 8(a) program.

§ 124.104 Control and management.

Except for concerns owned by Indian tribes, Alaska Native Corporations (ANCs) and Native Hawaiian Organizations as defined in § 124.100, an applicant concern's management and daily business operations must be controlled by an owner(s) of the applicant concern who has (have) been determined to be socially and economically disadvantaged. (*See* § 124.112 for the requirements for tribally-owned entities and those owned by ANCs and § 124.113 for requirements for concerns owned by Native Hawaiian Organizations.) In order for a disadvantaged individual to be found to control the concern, that individual must have managerial or technical experience and competency directly related to the primary industry in which the applicant concern is seeking 8(a) certification.

(a)(1) An applicant concern must be managed on a full-time basis by one or more individuals who have been found by SBA to be socially and economically disadvantaged, and such person(s) must possess requisite management or technical capabilities as determined by SBA. In addition, for those industries requiring professional licensing (i.e., public accountancy, law, professional engineering, etc.), SBA must determine that the applicant concern or individuals employed by the applicant concern hold(s) the requisite license(s).

(2) At least one socially and economically disadvantaged full-time manger must hold the position of President or Chief Executive Officer. This precludes outside employment or any other business interest by the individual which conflicts with the management of the firm or hinders it in achieving the objectives of its business development plan. Any disadvantaged person upon whom 8(a) eligibility is based, who is engaged in the management and daily business operations of the 8(a) concern and who wishes to engage in outside employment must notify SBA of the nature and anticipated duration of the outside employment and obtain the written approval of SBA, prior to engaging in such employment. SBA will review such notification for compliance with the requirement of day-to-day management and control of the 8(a) concern.

(b) The socially and economically disadvantaged individual(s) upon whom eligibility is based shall control the Board of Directors of an applicant or 8(a) concern, either in actual numbers of voting directors or through weighted voting (e.g., in a concern having a two-person Board of Directors where one individual on the Board is disadvantaged and one is not, the disadvantaged vote must be weighted—worth more than one vote—in order for the concern to be eligible for 8(a) participation.) This does not preclude the appointment of non-voting or honorary Directors so as to allow the firm to have a varied and experienced Board of Directors. All arrangements regarding the structure and voting rights of the Board must comply with applicable state law.

(c) Individuals who are not socially and economically disadvantaged may be involved in the management of an applicant concern, and may be stockholders, partners, officers, and/or directors of such concern. Such individual(s), their spouses or immediate family members who reside in the individual's household may not however:

(1) Exercise actual control or have the power to control the applicant or 8(a) concern.

(2) Be an officer or director or more than a 10% owner, stockholder, or partner of another firm in the same or similar line of business as the applicant or 8(a) concern.

(3) Receive excessive compensation from the applicant or 8(a) concern as directors, officers or employees. Individual compensation from the concern in any form, including dividends, which is paid to a nondisadvantaged owner, his/her spouse or immediate family member residing in the same household will be deemed excessive if it exceeds the compensation to be received by the Chief Executive Officer or, if no Chief Executive Officer, the President; provided that, with the written consent of the AA/MSB&COD or designee, the Chief Executive Officer or President may elect to take a lower salary than such a nondisadvantaged individual if it is demonstrated to be in the best interest of the applicant or 8(a) concern.

(4) Be former employers of the disadvantaged owner(s) of the applicant or 8(a) concern, unless it is determined by the AA/MSB&COD that the contemplated relationship between the former employer and the disadvantaged individual or applicant concern does not give the former actual control or the potential to control the applicant or 8(a) concern and such relationship is in the best interests of the 8(a) firm.

(5) Have an equity ownership interest of more than 10 percent in another 8(a) concern.

(d) Nondisadvantaged individuals or entities may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive:

(1) Nondisadvantaged individuals control the voting Board of Directors of the 8(a) concern, either directly through majority voting membership, or indirectly, if the by-laws allow nondisadvantaged individuals to block any action proposed by the disadvantaged individuals through negative control. For example, an equal number of disadvantaged and nondisadvantaged voting directors could create negative control.

(2) A nondisadvantaged individual, as an officer or member of the Board of Directors of the 8(a) concern, or through stock ownership, has the power to control day-to-day direction of the business affairs of the concern.

(3) The nondisadvantaged individual or entity provides critical financial or bonding support or licenses to the 8(a) concern which directly or indirectly allows the nondisadvantaged individual to gain control or direction of the 8(a) concern.

(4) A nondisadvantaged individual or entity exercises voting control of the Participant through a nominee(s).

(5) A nondisadvantaged individual or entity controls the corporation or the individual disadvantaged owners through loan arrangements.

(6) Other contractual relationships exist with nondisadvantaged individuals or entities, the terms of which would create control over the disadvantaged concern.

§ 124.105 Social disadvantage.

(a) *General.* Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identities as members of groups without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. For social disadvantage relating to Indian tribes and Alaska Native Corporations, *see* § 124.112(a).

(b) *Members of designated groups.* (1) In the absence of evidence to the contrary, the following individuals are presumed to be socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians,

Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China, Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Hong Kong, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at paragraph (d) of this section.

(2) An individual seeking socially disadvantaged status as a member of a designated group may be required to demonstrate that he/she holds himself/herself out and is identified as a member of a designated group if SBA has reason to question such individual's status as a group member.

(c) *Individuals not members of designated groups.* (1) An individual who is not a member of one of the above-named groups must establish his/her individual social disadvantage on the basis of clear and convincing evidence. A clear and convincing case of social disadvantage must include the following elements:

(i) The individual's social disadvantage must stem from his or her color, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar cause not common to small business persons who are not socially disadvantaged.

(ii) The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged.

(iii) The individual's social disadvantage must be rooted in treatment which he or she has experienced in American society, not in other countries.

(iv) The individual's social disadvantage must be chronic and substantial, not fleeting or insignificant.

(v) The individual's social disadvantage must have negatively impacted on his or her entry into and/or advancement in the business world. SBA will entertain any relevant evidence in assessing this element of an applicant's case. SBA will particularly consider and place emphasis on the following experiences of the individual, where relevant:

(A) *Education.* SBA shall consider, as evidence of an individual's social disadvantage, denial of equal access to institutions of higher education; exclusion from social and professional association with students and teachers; denial of educational honors; social patterns or pressures which have discouraged the individual from pursuing a professional or business education; and other similar factors.

(B) *Employment.* SBA shall consider, as evidence of an individual's social disadvantage, discrimination in hiring; discrimination in promotions and other aspects of professional advancement; discrimination in pay and fringe benefits; discrimination in other terms and conditions of employment; retaliatory behavior by an employer; social patterns or pressures which have channelled the individual into nonprofessional or non-business fields; and other similar factors.

(C) *Business history.* SBA shall consider, as evidence of an individual's social disadvantage, unequal access to credit or capital; acquisition of credit or capital under unfavorable circumstances; discrimination in receipt (award and/or bid) of government contracts; discrimination by potential clients; exclusion from business or professional organizations; and other similar factors which have impeded the individual's business development.

(d) *Socially disadvantaged group inclusion*—(1) *General.* Upon an adequate preliminary showing to SBA by representatives of an identifiable group that the group has suffered chronic racial or ethnic prejudice or cultural bias, and upon the request of the representatives of the group that SBA do so, SBA shall publish in the **Federal Register** a notice of its receipt of a request that it consider a group not specifically named in paragraph (b)(1) of this section to have members which are socially disadvantaged because of their identification as members of the group for the purpose of eligibility for the 8(a) program. The notice shall adequately identify the group making the request, and if a hearing is requested on the matter and such request is granted, the time, date and location at which such hearing is to be held. All information submitted to support a request should be addressed to the AA/MSB&COD.

(2) *Standards to be applied.* In determining whether a group has made an adequate preliminary showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this regulation, SBA shall determine:

(i) Whether the group has suffered the effects of prejudice, bias, or discriminatory practices;

(ii) Whether such conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in the Small Business Act; and

(iii) Whether such conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to all small business owners. If it is demonstrated to SBA by a particular group that it satisfies the above criteria, SBA will publish the notice described in paragraph (d)(1) of this section.

(3) *Procedure.* Once a notice is published under paragraph (d)(1) of this section, SBA shall adduce further information on the record of the proceeding which tends to support or refute the group's request. Such information may be submitted by any member of the public, including Government representatives and any member of the private sector. Information may be submitted in written form, or orally at such hearings as SBA may hold on the matter.

(4) *Decision.* Once SBA has published a notice under paragraph (d)(1) of this section, it shall afford a period of not more than thirty (30) days for public comment concerning the petition for socially disadvantaged group status. If appropriate, SBA may hold hearings within such comment period. Thereafter, SBA shall consider all information received and shall render its final decision within 60 days of the close of the comment period. Such decisions shall be published as a notice in the **Federal Register**. Concurrent with the notice, SBA shall advise the petitioners of its final decision in writing. If appropriate, SBA shall amend this regulation accordingly.

**§ 124.106 Economic disadvantage.**

(a) *Economic disadvantage for the 8(a) program.* (1)(i) For purposes of the 8(a) program, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged, and such diminished opportunities have precluded or are likely to preclude such individuals from successfully competing in the open market. In determining economic disadvantage for purposes of 8(a) program eligibility, SBA shall

compare the applicant concern's business and financial profile with profiles of businesses in the same or similar line of business which are not owned and controlled by socially and economically disadvantaged individuals.

(ii) This program is not intended to assist concerns owned and controlled by socially disadvantaged individuals who have accumulated substantial wealth, who have unlimited growth potential or who have not experienced or have overcome impediments to obtaining access to financing, markets and resources.

(iii) For economic disadvantage as it relates to tribally-owned concerns, *see* § 124.112(b)(2).

(2) *Factors to be considered.* In determining the degree of diminished credit and capital opportunities of a socially disadvantaged individual, SBA will consider factors relating both to the applicant concern and to the individual(s) claiming disadvantaged status. Factors fall into three general categories: The personal financial condition of the individual(s) claiming disadvantaged status, including that individual's access to credit and capital; the financial condition of the applicant concern; and the applicant concern's access to credit, capital and markets.

(i) *Personal financial condition of the individuals claiming disadvantaged status.* This criterion is designed to assess the relative degree of economic disadvantage of the individual, as well as the individual's potential to capitalize or otherwise provide financial support for the business. The specific factors to be considered include, but are not limited to: the individual's personal income for at least the past two years; total fair market value of all assets; and the individual's personal net worth. Subject to the exclusions set forth in paragraph (a)(2)(i)(B) of this section, an individual whose personal net worth exceeds $250,000 will not be considered economically disadvantaged for purposes of 8(a) program entry. For personal net worth thresholds relating to continued 8(a) program eligibility, *see* § 124.111(a).

(A)(*1*) Except as provided in paragraph (a)(2)(i)(A)(*2*) of this section, when married, an individual upon whom eligibility is based shall submit a financial statement relating to his/her personal finances and a separate financial statement relating to his/her spouse's personal finances. A married applicant individual residing in any of the community property states or territories of the United States (e.g., Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico Texas, Washington and Wisconsin) must clearly identify on his or her financial statement those assets which are his or her separate property and those which are community property. The spouse of such married applicant must similarly identify on his or her financial statement those assets which are his or her separate property and those which are community property. A one-half interest in the assets identified as community property (and income derived from such assets) will be attributed to the applicant individual for purposes of determining economic disadvantage. Assets or a community property interest in assets, which applicant spouse has transferred to a non-applicant spouse within 2 years of the date of application to the 8(a) program will be presumed to be the property of the applicant spouse for purposes of determining his/her personal net worth. However, such presumption shall not apply to any applicant spouse who is subject to a legal separation recognized by a court of competent jurisdiction. A financial statement of a spouse of an applicant is not required if the individual and his/her spouse are subject to a legal separation recognized by a court of competent jurisdiction. However, an applicant individual must include on his or her statement all community property in which he or she has an interest.

(*2*) Except for concerns where both spouses are individuals upon whom eligibility is based, the requirement of paragraph (a)(2)(i)(A)(*1*) of this section, relating to the separate financial statements, applies only to determinations of economic disadvantage for purposes of 8(a) program entry. For a concern where both spouses are individuals upon whom program eligibility is based, the personal net worth of each spouse individually will be considered for program certification and for continued program eligibility.

(B) Whenever SBA calculates the personal net worth of an individual claiming disadvantaged status for purposes of the 8(a) program, SBA shall exclude the individual's ownership interest in the applicant or participating 8(a) concern and the equity in his/her primary personal residence (including, for 8(a) Program certification, the equity of both spouses, if married), but shall not exclude any portion of such equity in his/her primary residence which is attributable to excessive withdrawals from the applicant or participating 8(a) concern.

(C) Whenever SBA calculates the personal net worth of an individual claiming to be an Alaska Native, as defined in § 124.100, for purposes of qualifying an individually owned 8(a) applicant concern, SBA shall include assets and income from sources other than an Alaska Native Corporation, as defined in § 124.100, and shall exclude from such calculation any of the following which the individual receives from any Alaska Native Corporation:

(*1*) Cash (including cash dividends on stock received from a Native Corporation) to the extent that it does not, in the aggregate, exceed $2,000 per individual per annum;

(*2*) Stock (including stock issued or distributed by a Native Corporation as a dividend or distribution on stock);

(*3*) A partnership interest;

(*4*) Land or an interest in land (including land or an interest in land received from a Native Corporation as a dividend or distribution on stock); and

(*5*) An interest in a settlement trust.

(ii) *Business financial condition.* This criterion will be used to provide a financial picture of a firm at a specific point in time in comparison to other concerns in the same or similar line of business which are not owned and controlled by socially and economically disadvantaged individuals. In evaluating a concern's financial condition, SBA's consideration will include, but not be limited to, the following factors: business assets, revenues, pre-tax profit, working capital and net worth of the concern, including the value of the investments in the concern held by the individual claiming disadvantaged status.

(iii) *Access to credit and capital.* This criterion will be used to evalute the ability of the applicant concern to obtain the external support necessary to operate a competitive business enterprise. In making the evaluation, SBA shall consider the concern's access to credit and capital, including, but not limited to, the following factors: Access to long-term financing; access to working capital financing; equipment trade credit; access to raw materials and/or supplier trade credit; and bonding capability.

(b) *Economic disadvantage for the 8(d) Subcontracting Program, Small Disadvantaged Business Set-Asides, Small Disadvantaged Business Evaluation Preferences and for any other Federal procurement programs requiring SBA's determination of disadvantaged status.* (1) For purposes of the section 8(d) Subcontracting Program and other programs requiring SBA's determination of disadvantaged status, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in

the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and whose diminished opportunities have precluded or are likely to preclude such individuals from successfully competing in the open market. In determining economic disadvantage for the section 8(d) Subcontracting program, Small Disadvantaged Business set-asides and Small Disadvantaged Business Evaluation preferences, SBA will consider the factors set forth in paragraph (a) of this section but will apply standards to each factor that are less restrictive than those applied when determining economic disadvantage for purposes of the 8(a) program. This approach corresponds to the Congressional intent that partial or complete achievement of a concern's 8(a) program business development goals should not necessarily preclude its participation in other Federal procurement programs for concerns owned and controlled by socially and economically disadvantaged individuals.

(2) An individual whose personal net worth exceeds $750,000 as calculated pursuant to paragraph (a)(2)(i) of this section, will not be considered economically disadvantaged for purposes of section 8(d) of the Small Business Act (15 U.S.C. 637(d)) or any Federal procurement program which uses section 8(d) for its definition of economic disadvantage.

**§ 124.107 Potential for success.**

SBA will approve a concern for Program Participation only when it finds that the applicant concern has been in business in its primary industry classification for two full years, and possesses the potential for success.

(a) An applicant concern must demonstrate that it has been in business in the primary industry classification in which it seeks 8(a) certification for two full years prior to the date of its 8(a) application by submitting income tax returns showing revenues for each of the two previous years.

(b) In determining whether a concern has the potential for success, SBA will look at a number of factors including, but not limited to, the technical and managerial experience and competency of the individual(s) upon whom eligibility is based, the financial capacity of the applicant concern and the concern's record of performance on previous Federal and private sector contracts in the primary industry in which the concern is seeking 8(a) certification. SBA will examine each of these factors to determine whether the otherwise eligibile applicant concern has the potential to successfully perform subcontracts awarded under the 8(a) program and to meet the business development objectives and goals of the program.

(c) An applicant concern shall not be denied admission into the program due solely to a determination that specific contract opportunities are unavailable to assist in the development of the concern unless:

(1) The Government has not previously procured and is unlikely to procure the types of products or services offered by the concern; or

(2) The purchase of such products or services by the Federal Government will not be in quantities sufficient to support the developmental needs of the applicant and other Program Participants providing the same or similar items or services.

**§ 124.108 Additional 8(a) program eligibility requirements.**

(a) *Individual character review.* If, during the processing of an application, adverse information is obtained from the 8(a) program applicant or a credible source regarding possible criminal conduct by an applicant concern or any of its principals, no further action will be taken on the application until SBA's Inspector General has evaluated that information and has advised the AA/MSB&COD of his or her findings. The AA/MSB&COD will consider those findings when evaluating the application.

(b) *Standards of conduct.* The SBA Standards of Conduct regulations, 13 CFR part 105, *et seq.*, apply to eligibility questions involving SBA employees and their relatives. In particular, *see* §§ 105.404 and 105.506 of this title prohibiting certain SBA employees and former employees from, among other things, holding an ownership interest in an 8(a) concern.

(c) *Eligibility limitations.* (1) Except for concerns owned by Indian tribes or Alaska Native Corporations, once a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) program and the concern has exited the program by termination, graduation, voluntary withdrawal or expiration of its program term, neither the concern nor any individual whose personal disadvantaged status was required to qualify the concern for 8(a) Program Participation shall be eligible to reapply for Program Participation. *See* § 124.112 regarding eligibility limitations for Indian tribes, including Alaska Native Corporations.

(2) An individual will be found to have used his or her eligibility for the 8(a) Program if he or she has claimed disadvantaged status by completing the appropriate SBA forms and SBA has approved the applicant concern's entry into the 8(a) program.

(3) Use of eligibility will take effect on the date of the concern's approval into the program.

(4) After an 8(a) concern exits the program, a disadvantaged owner of that concern may hold an ownership interest in or be involved in the management of another 8(a) concern, subject to the provisions of § 124.104(c). In these instances, for purposes of 8(a) participation only, such an individual will be deemed to be a non-disadvantaged owner of that concern and criteria restricting non-disadvantaged individual participation shall apply. *See* §§ 124.103 and 124.104.

(5) Transfer of the ownership and control of an 8(a) Participant to one or more other individuals does not terminate such concern's eligibility for the program provided that SBA determines the transferee(s) to be socially and economically disadvantaged. However, the 8(a) concern's Program Term as described in § 124.110 is in no way affected by such transfer.

(d) *Manufacturers and regular dealers.* (1) For purposes of program entry, each applicant concern whose primary industry classification is as a manufacturer or supplier of materials, supplies, articles and equipment must be determined to be a manufacturer or regular dealer as defined in the Walsh-Healey Public Contracts Act Regulations found at 48 CFR part 22, subpart 22.6.

(2) Participants in the developmental stage of 8(a) Program Participation may be eligible for two exemptions from the contingent agreement requirements of the Walsh-Healey Public Contracts Act, *see*, § 124.304(d). However, the availability of such exemptions during the Program Term in no way affects the requirement that an applicant concern comply with the provisions of paragraph (d)(1) of this section for purposes of program entry.

(e) Multiple concerns in same household. Immediate family members living in the same household may not each use their individual disadvantaged status to qualify more than one business concern for 8(a) Program Participation if the concerns are in the same or similar line of business. When the concerns are in separate lines of business, each applicant must establish that the concerns are separately owned,

managed and controlled. (For size limitations *see* part 121 of this title.)

**§ 124.109 Ineligible businesses.**

(a) *Brokers and packagers.* Brokers and packagers are ineligible to participate in the 8(a) program. These types of businesses do not satisfy the definition of a manufacturer or regular dealer, as stated in § 124.100.

(b) *Franchises.* Except for those admitted to the 8(a) program prior to the effective date of these regulations, franchisees are ineligible to participate in the section 8(a) program.

(c) *Debarred or suspended person or concern.* Pursuant to 48 CFR part 9, subpart 9.4, or 13 CFR part 145, individuals or concerns who are debarred, suspended, voluntarily excluded from Federal programs, including the 8(a) program, or are found to be ineligible for Federal programs, including the 8(a) Program, by any agency of the Federal Government are ineligible for admission into the 8(a) program during the period of debarment, suspension, voluntary exclusion or status as ineligible. Prior to approval for admission to the 8(a) program, the applicant must certify that both the applicant concern and the disadvantaged individual(s) upon whom eligibility is based are not at that time debarred, suspended, voluntarily excluded or otherwise ineligible.

(d) *Non-profit organizations.* A non-profit organization does not meet the general definition of a concern as set forth in part 121 and § 124.100 of these regulations and is, therefore, ineligible for 8(a) Program Participation. Nothing in this paragraph affects the eligibility of a for-profit concern owned and controlled by a Hawaiian Native Organization, Indian tribe, including an Alaska Native Corporation (*see* §§ 124.112 and 124.113.)

(e) *Concerns owned by other disadvantaged concerns.* A concern which is owned in whole or in part by another business concern and relies on the disadvantaged status of that concern to claim disadvantaged status is ineligible for 8(a) Program Participation and for participation in the Defense Department's Small Disadvantaged Business program (Pub. L. 99-661, section 1207(a)) and the section 8(d) Subcontracting Program, (15 U.S.C. 637(d)). These types of businesses do not meet the individual disadvantaged ownership requirements of the Small Business Act and these regulations as set forth in § 124.103.

**§ 124.110 Program term.**

(a) Each concern certified for program participation on or after November 15, 1988, is subject to a Program Term of nine years from the date of such certification. The term will consist of two stages: the developmental stage and the transitional stage, which are described in § 124.303. Nothing in this subsection shall be construed to limit SBA from initiating graduation, termination or suspension actions pursuant to §§ 124.208, 124.209 and 124.211 or to prohibit a Participant from voluntarily withdrawing from the program.

(b) A concern is subject to a revised Program Term if the following conditions are met:

(1) The concern was a Program Participant as of September 1, 1988 or was approved for 8(a) Program Participation between September 1, 1988 and November 15, 1988; and

(2) The concern did not voluntarily withdraw from the 8(a) program and was not graduated or terminated pursuant to §§ 124.208 and 124.209 between September 1, 1988 and November 15, 1988.

(c) The revised Program Term shall be the greater of nine years from the date of the Participant's first contract pursuant to section 8(a) or the Participant's Fixed Program Participation Term (FPPT) expiration date, including any extension thereof, plus 18 months, whichever is greater.

(d) Once a Program Term has been established or revised in accordance with this section, SBA is statutorily prohibited from extending such term beyond the specified expiration date.

**§ 124.111 Continued 8(a) program eligibility.**

(a) *Standards.* (1) Except as set forth in paragraph (a)(2) of this section, in order for a concern to remain eligible for 8(a) program participation, it must continue to meet all eligibility criteria contained in § 124.101 through § 124.109. Failure to do so may cause SBA to initiate a graduation or termination proceeding in accordance with §§ 124.208 and 124.209.

(2)(i) For purposes of maintaining continued 8(a) program eligibility of a Program Participant in the developmental stage of the 8(a) program, an individual whose personal net worth exceeds $500,000 as calculated pursuant to § 124.106(a)(2)(i), will not be considered economically disadvantaged. (*See,* § 124.303 for discussion of the developmental stage of 8(a) Program Participation).

(ii) For purposes of maintaining such eligibility of a Program Participant in the transitional stage of the 8(a) program, an individual whose personal net worth exceeds $750,000, as calculated pursuant to § 124.106(a)(2)(i), will not be considered economically disadvantaged (*See,* § 124.303 for discussion of the developmental stage of 8(a) program participation).

(b) *Submissions supporting continued eligibility.* As part of an annual review, each Program Participant shall annually submit to the Division of Program Certification and Eligibility and to the servicing field office the following:

(1) A certification that it meets the 8(a) program eligibility requirements as set forth in § 124.101 through § 124.109 and paragraph (a) of this section;

(2) A personal financial statement for each disadvantaged owner;

(3) A record of all payments, compensation, and distribution (including loans, advances, salaries and dividends) made by the Participant to each of its owners or to any person or entity affiliated with such owners; and

(4) Such other information as SBA may deem necessary. For other required annual submissions, *see* § 124.501.

(c) *Economic disadvantage eligibility reviews.* (1) Upon receipt of specific and credible information alleging that a Program Participant no longer meets the requirements of economic disadvantage for continued program eligibility, SBA shall conduct a review of the concern's eligibility for continued participation in the Program.

(2)(i) If, based on information received from the Participant or elsewhere, SBA has reason to believe that the Participant no longer meets the standards of economic disadvantage as set forth in § 124.106 or paragraph (a) of this section, SBA shall conduct a review to determine whether the Participant and its disadvantaged owners continue to meet such standards.

(ii) Sufficient reasons for SBA to conclude that an 8(a) Participant is no longer economically disadvantaged may include, but are not limited to: demonstrated access of the concern and/or its owners to a substantial new source of capital or loans, an unusually large amount of funds withdrawn from the concern by its owners, or personal net worth of the disadvantaged owner(s) which exceeds the threshold described in paragraph (a) of this section, not including the owner's equity in the 8(a) concern and in his/her primary personal residence.

(3) If SBA determines, pursuant to paragraphs (c)(1) or (c)(2) of this section, that a Program Participant and/or its disadvantaged owner(s) are no longer economically disadvantaged, SBA shall initiate a graduation or a termination proceeding under §§ 124.208 and 124.209.

(4) If, based on information received from the Participant or elsewhere, SBA has reason to believe that an excessive amount of funds or other assets has been withdrawn from the Participant for the personal benefit of the disadvantaged owner(s) or that of any person or entity affiliated with such owner(s), SBA shall conduct a review to determine whether such withdrawal was detrimental to the achievement of the targets, objectives and goals of the Participant's business plan.

(5) If SBA determines, pursuant to paragraph (c)(4) of this section, that funds or other assets have been withdrawn to the detriment of the achievement of the targets, objectives and goals of the Participant's business plan, SBA shall initiate a termination proceeding under § 124.209 or shall require an appropriate reinvestment of funds or other assets and such other actions as SBA may deem necessary to counteract the detrimental withdrawals as a condition of maintaining program eligibility.

(d) *Eligibility Reviews.* If, on the basis of information submitted pursuant to paragraph (b) of this section or upon information received from any source, SBA has reason to believe the Program Participant no longer meets the eligibility criteria (other than economic disadvantage), SBA shall conduct a review of the Participant's 8(a) program eligibility. If as a result of such review, SBA determines such Participant may no longer be eligible for program participation, SBA shall initiate termination proceedings under § 124.209.

**§ 124.112 Concerns owned by Indian tribes, including Alaska Native Corporations.**

(a) *General.* (1) Small business concerns owned by Indian tribes are eligible for participation in the section 8(a) program, provided that certain conditions are met as described below. The term "Indian tribe" is defined in § 124.100.

(2) Small business concerns owned and controlled by Indian tribes are generally considered socially and economically disadvantaged for purposes of participation in programs authorized by section 8(d) of the Small Business Act, section 1207(a) of the Defense Authorization Act of 1987 and any other program, except the 8(a) program, which requires social and economic disadvantaged status as a condition of eligibility. If the disadvantaged status of a tribally-owned concern is challenged under subpart B of this part, SBA will evaluate the concern's disadvantaged status using the criteria set forth in this section.

(3) Small business concerns owned and controlled by Alaska Native Corporations (ANCs) are eligible for participation in the 8(a) program, subject to the same conditions as apply to tribally-owned concerns which are described at paragraphs (b) through (e) of this section, with the following exceptions which apply solely to ANC-owned concerns:

(i) In evaluating the economic disadvantage of the ANC, no consideration shall be given to assets or income derived from distributions of the Alaska Native Fund established by the Alaska Native Claims Settlement Act, 43 U.S.C. 1601, *et seq.* Such assets and income should be included and specifically identified on the ANC's financial statements.

(ii) Alaska Natives and descendants of Natives must own a majority of both the total equity of the ANC and the total voting powers to elect directors of the ANC through their holdings of settlement common stock. Settlement common stock means stock of an ANC issued pursuant to 43 U.S.C. 1606(g)(1), which is subject to the rights and restrictions listed in 43 U.S.C. 1606(h)(1).

(iii) Even though an ANC can be either for profit or non-profit, a small business concern owned and controlled by ANC must be for profit to be eligible for the 8(a) program. The concern will be deemed owned and controlled by the ANC for purposes of program eligibility so as to satisfy paragraph (c)(3) of this section where the majority of stock or other ownership interest is held by the ANC and holders of its settlement common stock. Both a majority of the total equity and total voting power must be so held.

(iv) Paragraphs (b)(3) (i) and (ii) of this section are not generally applicable to an ANC, provided its status as an ANC is clearly shown in its articles of incorporation and by-laws. Additionally, paragraph (c)(1) of this section is not applicable to the ANC-owned concern to the extent it requires an express waiver of sovereign immunity or a "sue and be sued" clause.

(v) The Alaska Native Claims Settlement Act provides that a concern minority-owned by an ANC shall be deemed to be both owned and controlled by such ANC. Therefore, an individual responsible for control and management of an ANC-owned 8(a) applicant or Participant need not establish personal social and economic disadvantage.

(b) *Tribal eligibility.* In order to qualify a concern which it owns and controls for participation in the 8(a) program, an Indian tribe itself must meet the conditions set forth in paragraphs (b)(1) and (b)(2) of this section. Once an Indian tribe has so established its disadvantaged status, it need not reestablish such status in order to have other businesses that it owns certified for 8(a) Program Participation, unless specifically required to do so by the AA/MSB&COD or his/her designee. The AA/MSB&COD, or designee, may require proof of tribal eligibility during the Program Participation of any tribally-owned business or at any time during the processing of an 8(a) program application from a tribally-owned concern. However, nothing in this paragraph affects the requirement that each tribally-owned concern seeking to be certified for 8(a) Program Participation comply with the provisions of paragraph (c) of this section.

(1) *Social disadvantage.* An Indian tribe meeting the definition set forth in § 124.100 shall be deemed socially disadvantaged.

(2) *Economic disadvantage.* In order to be eligible to participate in the 8(a) Program the Indian tribe must demonstrate to SBA that the tribe itself is economically disadvantaged. This shall involve the consideration of available data showing the tribe's economic condition, including but not limited to, the following information:

(i) The number of tribal members.

(ii) The present tribal unemployment rate.

(iii) The per capita income of tribal members, excluding judgment awards.

(iv) The percentage of the local Indian population below the poverty level.

(v) The tribe's access to capital markets.

(vi) The tribal assets as disclosed in a current tribal financial statement. The statement should list all assets including those which are encumbered or held in trust, but the status of those encumbered or trust assets should be clearly delineated.

(vii) A list of all wholly or partially owned tribal enterprises or affiliates and the primary industry classification of each, as defined in § 124.100. The list must also specify the members of the tribe who manage or control such enterprises or serve as officers or directors.

(3) *Application process—forms and documents required.* Except as provided in paragraph (a)(3)(iv) of this section, in order to establish tribal eligibility to qualify for the 8(a) program, the Indian tribe must submit the forms and documents required of 8(a) applicants generally as well as the following material:

(i) A copy of the tribe's governing document(s) such as its constitution or business charter.

(ii) Evidence of its recognition as a tribe eligible for the special programs and services provided by the United States or by its state of residence.

(iii) Copies of its articles of incorporation and bylaws as filed with the organizing or chartering authority, or similar documents needed to establish and govern a non-corporate legal entity.

(iv) Documents or materials needed to show the tribe's economically disadvantaged status as described in paragraph (b)(2) of this section.

(c) *Business eligibility.* In order to be eligible to participate in the 8(a) program, a concern which is owned by an eligible Indian tribe must meet the conditions set forth in paragraphs (c)(1) through (c)(6) of this section.

(1) *Legal business entity organized for profit and susceptible to suit.* The applicant or participating concern must be a separate and distinct legal entity organized or chartered by the tribe, or Federal or state authorities. Except as provided in paragraph (a)(3)(iv) of this section, the concern's articles of incorporation must contain express sovereign immunity waiver language, or a "sue and be sued" clause which designates United States Federal Courts to be among the courts of competent jurisdiction for all matters relating to SBA's programs including, but not limited to, 8(a) Program Participation, loans, advance payments and contract performance. Also, the concern must be organized for profit, and the tribe must possess economic development powers in the tribe's governing documents.

(2) *Size.* (i) A tribally-owned applicant concern must qualify as a small business concern as defined for purposes of Government procurement in part 121 of this title. The particular size standard to be applied shall be based on the primary industry classification of the applicant concern. Ownership by the tribe will not, in and of itself, cause affiliation with the tribe or with other entities owned by the tribe. However, affiliation with other tribally-owned entities may be caused by circumstances other than common tribal ownership. (*See* part 121 of this title regarding affiliation.)

(ii) Except as provided in paragraph (c)(2)(iii) of this section, a tribally-owned Program Participant must certify to SBA that it is a small business pursuant to the provisions of part 121 of this title for the purpose of performing each individual contract which it is awarded.

(iii) During its Program Term, a tribally-owned Program Participant may, for up to two 8(a) contracts, be a party to a joint venture which exceeds the applicable size standard, if the joint venture is:

(A) 51 percent or more owned and controlled by the tribally-owned Participant;

(B) Is located on the tribe's reservation or land owned by such tribe;

(C) Performs most of its activities on such reservation or tribally-owned land; and

(D) Employs members of the tribe for at least 50 percent of its total workforce.

(3) *Ownership.* For corporate entities, a tribe must own at least 51 percent of the voting stock and at least 51 percent of the aggregate of all classes of stock. For non-corporate entities, a tribe must own at least a 51 percent interest. No Indian tribe shall own more than one current or former 8(a) Program Participant having the same primary industry classification. Tribally-owned Program Participants are subject to the provisions of paragraphs (g) and (h) of § 124.103 relating to ownership by nondisadvantaged individuals and non-8(a) concerns.

(4) *Control and management.* (i) Except for concerns owned by ANCs, the management and daily business operations of a tribally-owned concern must be controlled by an individual member(s) of the tribe, who does not manage and control more than one other tribally-owned 8(a) Program Participant. In addition, such manager(s) must be found to possess the requisite management of technical capabilities as determined by SBA. This paragraph does not preclude management of a tribally-owned concern by committees, teams, or Boards controlled by such individuals.

(ii) Members of the tribal council shall not participate in the daily management or on the board of directors of any tribally-owned 8(a) concern without obtaining prior written approval for such participation from SBA.

(iii) Except as permitted by paragraph (c)(4)(i) of this section, members of the management team, business committee members, officers, and directors are precluded from engaging in any outside employment or other business interests which conflict with the management of the concern or prevent the concern from achieving the objectives set forth in its business development plan. This is not intended to preclude participation in tribal or other activities which do not interfere with such individual's responsibilities in the operation of the applicant concern.

(5) *Location and economic benefit.* The primary economic benefits from the concern must accrue to the tribe. A concern located on a designated Indian reservation or on tribally-owned land will be presumed to provide an economic benefit, such as employment, to the tribal community. SBA may approve a location not on tribally-owned land, if the applicant concern can demonstrate that similar economic benefits will accrue to the tribal community.

(6) *Other eligibility criteria.* A tribally-owned concern must also meet the eligibility criteria set forth in § 124.107 through 124.109.

(d) *Individual eligibility limitation.*—(1) *Concerns owned by Indian tribes except those owned by Alaska Native Corporations.* The Small Business Act, as amended, provides that the 8(a) requirements regarding management and daily business operations are met if a tribally-owned concern is controlled by one or more members of the economically disadvantaged Indian tribe. The statute does not require that such individual be found by SBA to be personally socially and economically disadvantaged. Therefore, SBA does not deem an individual involved in the management or daily business operations of the tribally-owned concern to have used his or her individual eligibility within the meaning of § 124.108(c).

(2) *Concerns owned by Alaska Native Corporations.* The Alaska Native Claims Settlement Act, as amended, provides that a concern which is majority owned by an Alaska Native Corporation shall be deemed to be controlled and managed by minority individuals for purpose of participation in Federal programs. Therefore, SBA will not examine the disadvantaged status of an individual involved in the management of daily business operations of an Alaska Native Corporation-owned concern, and such individual will not be deemed to have used his or her individual eligibility within the meaning of § 124.108(c).

(e) *Existing Section 8(a) Firms.* Tribally-owned concerns presently in the section 8(a) program must comply with the requirements of this section within 12 months from the effective date of these regulations. Failure to do so may result in the commencement of section 8(a) program termination proceedings.

**§ 124.113 Concerns owned by Native Hawaiian Organizations.**

Concerns owned by economically disadvantaged Native Hawaiian Organizations as defined in § 124.100 are eligible for participation in the 8(a) program and other federal programs

requiring SBA to determine social and economic disadvantage as a condition of eligibility. Such concerns must meet all eligibility criteria set forth in §§ 124.102 through 124.109 and § 124.111(a) of this part.

**§ 124.201 8(a) Program application.**

It is SBA's policy that any concern or any individual on behalf of such business has the right to apply for 8(a) Program Participation whether or not there is an appearance of eligibility. However, concerns which have not been in business for two full years as described § 124.107 will not be approved for 8(a) Program Participation.

**§ 124.202 Place of filing.**

An application for 8(a) program admission is to be filed in the SBA field office serving the territory in which the principal place of business, as defined in § 124.100, is located. The field office will provide an applicant concern with information regarding the 8(a) program, and with all required application forms. An 8(a) application will be processed by the appropriate SBA regional office of the Division of Program Certification and Eligibility.

**§ 124.203 Servicing office.**

Once approved, a Program Participant will be serviced in the field office serving the territory in which the concern's principal place of business, as defined in § 124.100, is located.

**§ 124.204 Applicant representatives.**

Subject to the limitations of § 124.7, an applicant concern may employ at its option outside representatives in connection with an application for 8(a) Program Participation. If the applicant chooses to employ outside representation such as an attorney, accountant, or others, the requirements of part 103 of this title dealing with the appearance and compensation of persons appearing before SBA are applicable to the conduct of the representative. In addition, representation in proceedings before the Office of Hearings and Appeals shall be limited as provided in § 134.16 of this title.

**§ 124.205 Forms and documents required.**

Each 8(a) applicant concern must submit the forms and attachments thereto required by SBA when making application for admission to the 8(a) program. Such forms and attachments will include, but are not limited to, financial statements and Federal personal and business tax returns.

**§ 124.206 Approval and decline of applications for 8(a) program admission.**

(a) *General.* The AA/MSB&COD is authorized to approve or decline applications for admission to the 8(a) program. However, denials of program admission based on his/her finding that the individual(s) claiming social and economic disadvantage are not socially and/or economically disadvantaged and/or that such individual(s) does (do) not own and/or does (do) not control the applicant concern, may be appealed to SBA's Office of Hearings and Appeals (OHA). The Division of Program Certification and Eligibility (the Division) will receive, review and evaluate all 8(a) applications. The Division will advise each program applicant within 15 days after the receipt of an application whether such application is complete and suitable for evaluation and, if not, what additional information or clarification is required to complete the application. SBA will process an application for 8(a) Program Participation within 90 days of receipt by the Division of a complete application package. Incomplete application packages will not be processed.

(b) *Approval.* If the AA/MSB&COD finds that the applicant concern meets all eligibility criteria, he/she shall issue an approval letter to the concern. The date of the approval letter shall be the date of program certification for purposes of determining the concern's Program Term pursuant to § 124.110. A concern is not approved for participation in the 8(a) program until an approval letter is sent by the AA/MSB&COD to the concern. Up until that event occurs, any new information which could have an adverse affect on the application may be considered by the AA/MSB&COD. An applicant is not entitled to receive program benefits of any kind until a participation agreement is signed and SBA has approved the concern's business plan pursuant § 124.301.

(c) *Decline.* If the AA/MSB&COD finds that an applicant concern does not meet all eligibility criteria, he/she will provide written notification of this finding to the applicant in a letter of decline. The letter of decline shall set forth findings based on the facts and in accordance with law and regulations for every material issue relating to each eligibility factor with specific reasons for each finding. The letter of decline shall inform the applicant of its rights to request reconsideration of the AA/MSB&COD's decision and/or to appeal such decision.

(1) *Reconsideration.* Every applicant has the right to request that the AA/MSB&COD reconsider his/her decline decision. Such request must be made in writing to the appropriate regional office of the Division by certified mail, return receipt requested, within 45 days of the date of service of the decline letter. As part of the reconsideration request, the applicant should include any additional information and documentation pertinent to overcoming the reason(s) for the initial decline. If the concern requests reconsideration, the AA/MSB&COD will issue a written determination on the reconsideration within 45 days of receipt of the request by the Regional Office of the Division which processed the original application. The Agency's eligibility analysis on reconsideration will consider all eligibility factors in light of all information then available to the Agency, and may approve the application, decline it for any of the same reasons cited in the initial decline or decline it for reasons not previously identified. If, on reconsideration, the AA/MSB&COD finds that the applicant concern meets all eligibility criteria, he/she shall issue an approval letter to the concern. The date of the approval letter shall be the date of program certification for purposes of determining the concern's Program Term pursuant to § 124.110. If, on reconsideration, the AA/MSB&COD determines that the concern does not meet all eligibility criteria, he/she will notify the applicant of this decision by letter. Such letter shall set forth findings based on the facts and in accordance with law and regulations for every material issue relating to each eligibility factor with specific reasons for each finding. If the concern is being declined solely for reasons not identified in the initial decline, the concern will be advised that SBA will treat the decline as an initial decline, and that the concern will be afforded all rights which were available to it on its initial decline.

(2) *Appeal.* An unsuccessful applicant will have the right to appeal its decline to OHA if the application is denied based solely on a negative finding of one or more of the following criteria: social disadvantage, economic disadvantage, ownership or control. The applicant, at its option, may bring such appeal either after the initial decline or after a decline on reconsideration. Petitions of appeal must conform to the requirements of § 124.210 and will be handled in accordance with the procedures contained in § 124.210 and part 134 of this title.

(3) *Final Agency Decision.* If a declined applicant does not request reconsideration of the decline or, if

eligible under paragraph (c)(2) of this section, a declined applicant does not file an appeal with OHA within 45 days of the date of service of the decline letter, the determination of the AA/MSB&COD will become the final Agency division. If the application is denied on reconsideration and the applicant does not appeal or have the right to appeal the denial under paragraph (c)(2) of this section, the decision of the AA/MSB&COD is the final Agency decision. If the applicant is entitled under paragraph (c)(2) of this section to an appeal, and exercises that right, the decision of the Administrative Law Judge shall be the final Agency decision.

(4) *Reapplication for Program Participation.* A concern which has been declined for 8(a) program admission may reapply for admission to the program 12 months after the date of the final Agency decision to decline.

**§ 124.207 8(a) Program exit.**

A concern participating in the 8(a) program may leave the program by any of the following means:

(a) Voluntary withdrawal.

(b) Expiration of the Program Term established pursuant to § 124.110;

(c) Graduation pursuant to the provisions of § 124.208;

(d) Termination pursuant to the provisions of § 124.209.

**§ 124.208 Program graduation.**

(a) *General.* When an 8(a) concern is recognized as successfully completing the 8(a) program by substantially achieving the targets, objectives and goals set forth in its business plan prior to the expiration of its Program Term, and has demonstrated the ability to compete in the marketplace without assistance under the 8(a) program, its participation within the program may be determined by SBA to be completed and the firm may be graduated from the program.

(b) *Graduation criteria.* In determining whether a concern has substantially achieved the goals and objectives of its business plan and has attained the ability to compete in the marketplace without 8(a) program assistance, the following factors, among others, shall be considered by SBA. Positive overall financial trends, including but not limited to:

(1) Profitability;

(2) Sales, including improved ratio of non-8(a) sales to 8(a) sales;

(3) Net worth, financial ratios, working capital, capitalization, access to credit and capital;

(4) Ability to obtain bonding;

(5) A positive comparison of the 8(a) concern's business and financial profile with profiles of non-8(a) businesses in the same area or similar business category; and

(6) Good management capacity and capability.

(c) *Graduation procedures*—(1) *Letter of notification.* Upon determination by the SBA pursuant to paragraph (b) of this section that an 8(a) concern should be graduated from the 8(a) program, SBA shall notify the Participant in writing of its intent to graduate in a letter of notification. The letter of notification shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the basis of the program graduation with specific reasons for each finding. The letter of notification shall also provide the Participant 45 days from the date of service of the letter to submit in writing information which would explain why the proposed basis of graduation is not warranted.

(2) *Second letter of notification.* After the 45 day response period has elapsed, the Division shall consider the proposed graduation, including information submitted by the Participant, if any. As appropriate, the Division shall notify the Participant that it will not recommend program graduation or that, despite the information that may have been provided, the basis for graduation continues to exist. Where appropriate, the Division Director shall further notify that he/she intends to recommend to the AA/MSB&COD that the Participant be graduated. In instances where graduation will be recommended, the Division Director shall further notify the Participant that it will have a further 45 day period from the date of service of the second letter of notification to submit to SBA such further information which would explain why the proposed graduation is not justified.

(3) *Recommendation of the Division.* Following the second day response period, the Division Director will consider the facts of the proposed graduation, including all information submitted by the Participant. If the Division Director determines that graduation is not appropriate, he/she will so notify the Participant within 15 days of the close of the response period. If the Division Director determines that graduation is appropriate, he/she will recommend in writing to the AA/MSB&COD, within 15 days of the close of the response period, that the Participant be graduated.

(4) *Decision of the AA/MSB&COD.* Upon the recommendation of the Division Director, the AA/MSB&COD will consider the proposed graduation and the written record supporting it. If the AA/MSB&COD determines that program graduation is warranted, he/she will issue a Notice of Program Graduation to the Participant. If not, he/she will so notify the Participant.

(5) *Notice requirements.* A Notice of Program Graduation shall conform to the form, filing and service requirements of part 134 of this title, under which the appeal proceeding shall be conducted. The Notice of Program Graduation shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the basis of the program graduation with specific reasons for each finding. The Notice of Program Graduation shall also advise the Program Participant that it may avail itself of an opportunity for an appeal by filing a petition in accordance with the provisions of § 124.210 and part 134 of this title.

(6) *Appeal to Office of Hearings and Appeals.* Procedures governing appeals of program graduation to the Office of Hearings and Appeals are set forth in § 124.210 and part 134.

(d) *Post-graduation.* After the effective date of a program graduation as provided for herein, an 8(a) concern is no longer eligible to receive any 8(a) program assistance. However, such concern is obligated to complete previously awarded 8(a) subcontracts, including any priced options which may be exercised.

**§ 124.209 Program termination.**

(a) *General.* Participation of a 8(a) business concern in the 8(a) program may be terminated by SBA prior to the expiration of the concern's Program Term for good cause. Examples of good cause include, but are not limited to, the following:

(1) Failure by the concern to continue to maintain its eligibility for program participation.

(2) Failure by the concern to maintain its status as a small business under the Small Business Act, as amended, and the regulations promulgated thereunder. *See* § 124.102.

(3) Failure by the concern for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership, full-time day-to-day management, and control by the person(s) who has (have) been determined to be socially and economically disadvantaged pursuant to these regulations.

(4) Failure by the concern to obtain written approval from SBA for any changes in ownership, management or

control pursuant to §§ 124.103 and 124.104.

(5) Failure by the concern to disclose to SBA the extent to which nondisadvantaged persons or firms participate in the management of the section 8(a) business concern.

(6) A demonstrated pattern of failing to make required submissions or responses to the Administration in a timely manner, including:

(i) Failure by the concern to provide SBA with required quarterly or annual financial statements within 90 days of the close of the reporting period, or required audited financial statements within 180 days of the close of the reporting period. Failure to provide SBA with requested tax returns, reports, or other available data within 30 days of the date of request.

(ii) Failure by the concern to submit an updated business plan within 30 days of receipt of request, without an extension of time which has been approved by SBA.

(iii) Failure by the concern to provide documents or certifications of continued eligibility or otherwise respond to requests for information relating to the section 8(a) program from SBA or other authorized government officials within the time frames provided for in the requests.

(7) Cessation of business operations by the concern.

(8) Failure by the concern to achieve the goals cited in its original or modified business plan as a result of repeated refusals to accept or utilize SBA assistance.

(9) Failure by the concern to pursue competitive and commercial business in accordance with the business plan, or failure to make reasonable efforts to achieve competitive status.

(10) Failure by the concern to engage in business practices that will promote its competitiveness within a reasonable period of time as evidenced by, among other indicators, a pattern of inadequate performance or unjustified delinquent performance or terminations for default with respect to contracts awarded under the authority of section 8(a).

(11) A pattern of inadequate performance of awarded section 8(a) procurement subcontracts by the concern.

(12) Failure by the concern to pay or repay significant financial obligations owed to the Federal Government.

(13) Failure by the concern to obtain and keep current any and all required permits, licenses, and charters.

(14) Diversion of funds or other assets from the section 8(a) business concern or excessive withdrawals from such concern for the personal benefit of its disadvantaged owners or any person or entity affiliated with such owners which is detrimental to the achievement of the targets, objectives, and goals contained in such Program Participant's business plan.

(15) Unauthorized use of business development expense funds and/or advance payment funds and/or SBA direct, guaranty or immediate participation loan proceeds; or violation of an advance payment, business development expense agreement, or loan agreement.

(16) Failure by the concern to obtain prior SBA approval of any management agreement, joint venture agreement or other agreement relative to the performance of a section 8(a) subcontract. Violation of any requirement of a management, joint venture, or other agreement approved by SBA by either the section 8(a) concern or one of the joint venturers.

(17) Failure by the concern to obtain approval from SBA before subcontracting under a section 8(a) subcontract, or failure by the concern to abide by any conditions imposed by SBA upon such approval.

(18) Violation by the concern of a section 8(a) subcontract provision which prohibits contingent fees and gratuities; or failure to disclose to SBA fees paid or to be paid, or costs incurred or committed to third parties, directly or indirectly, in the process of obtaining section 8(a) contracts or subcontracts, or violation of § 124.7.

(19) Knowing submission of false information to SBA, including false certification of compliance with non-8(a) business activity targets under § 124.312(c)(11), on behalf of a section 8(a) business concern by its principals, officers, or agents, or by its employees, where the principal(s) of the section 8(a) concern knows or should have known such submission to be false.

(20) Debarment, suspension, voluntary exclusion, or ineligibility of the concern or its principals pursuant to 13 CFR part 145, FAR subpart 9.4, 48 CFR Ch.1, and 48 CFR Ch. 22, or any successor regulation.

(21) Conviction of the concern the individual(s) upon whom 8(a) program eligibility, or the director, officer or manager of tribally-owned concern, including one owned by an Alaska Native Corporation, or concern owned by a Hawaiian organization is based for any offense indicating a lack of business integrity including, but not limited to:

(i) Commission of a criminal offense as an incident to obtaining or attempting to obtain a public or private contract, or subcontract thereunder, or in the performance of such contract or subcontract;

(ii) Violation of the Organized Crime Control Act of 1970 (Pub. L. 91–452; 84 Stat. 922);

(iii) Embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business integrity or business honesty which seriously and directly affects the question of present responsibility as a government contractor;

(iv) Violation of any Federal antitrust statute;

(v) Commission of any felony not specifically listed above; or

(vi) Violation of section 16 of the Small Business Act, (15 U.S.C. 645).

(22) Conviction of a nondisadvantaged owner, officer, or director the concern for any offense described in paragraph (a)(21) of this section, provided that one or more disadvantaged owners or officers of the concern abetted, conspired with or otherwise acquiesced in the owner's or officer's commission of the offense.

(23) Willful failure on behalf of an 8(a) business concern to comply with applicable labor standards and obligations.

(24) Violation of any terms and conditions of the 8(a) Program Participation Agreement.

(25) Willful violation by an 8(a) business concern, or any of its principals, of any rule or regulation of the Administration pertaining to material issues.

(b) *Termination procedures*—(1) *Letter of notification.* When SBA determines that grounds exist to terminate a concern's participation in the 8(a) program pursuant to this section, SBA shall notify the Participant in writing of its intent to terminate in a letter of notification. The letter of notification shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the grounds upon which such termination would be based with specific reasons for each finding. The letter of notification shall provide the Participant 45 days from the date of service of the letter to submit in writing information which would eliminate the ground(s) for termination or would explain why the proposed ground(s) should not justify termination.

(2) *Second letter of notification.* After the 45 day response period has elapsed, the Division shall consider the proposed termination, including information submitted by the Participant, if any. The Division shall notify the Participant that the grounds for proposed termination

have been eliminated or that, despite the information that may have been provided, some or all of the grounds for termination continue to exist. Where appropriate, the Division Director shall further notify the Participant that he/she intends to recommend to the AA/MSB&COD that the Participant be terminated from the program, and that, within 45 days of the date of service of the second letter of notification, the Participant may submit to SBA such further information as would eliminate the ground(s) for termination or would explain why the proposed ground(s) should not justify termination.

(3) *Recommendation of the Division.* Following the second 45 day response period, the Division Director will have 15 days to consider the facts of the proposed termination, including all information submitted by the Participant and to notify the Participant of his/her recommendation to the AA/MSB&COD. If the grounds for proposed termination continue to exist, the Division Director will recommend in writing to the AA/MSB&COD that the Participant be terminated.

(4) *Decision of the AA/MSB&COD.* Upon the recommendation of the Division Director, the AA/MSB&COD will consider the proposed termination and the written record supporting it. If the AA/MSB&COD determines that a termination is warranted, he/she will issue a Notice of Termination to the Participant. If not, he/she will so notify the Participant.

(5) *Notice requirements.* A Notice of Termination shall conform to the form, filing and service requirements of Part 134 of this Title, under which the appeal proceeding shall be conducted. The Notice of Termination shall set forth findings, based on the facts and in accordance with law and regulations, for every material issue relating to the grounds upon which the termination is based. The Notice of Termination shall also advise the Program Participant that it may avail itself of an opportunity for an appeal by filing a petition in accordance with the provisions of § 124.210 and part 134 of this title.

(6) *Appeal to Office of Hearings and Appeals.* Procedures governing appeals of program termination to the Office of Hearings and Appeals are set forth in § 124.210 and part 134 of this title.

(c) *Post-termination.* After the effective date of a program termination, an 8(a) business concern is no longer eligible to receive any section 8(a) program assistance. However, such concern is obligated to complete previously awarded 8(a) subcontracts, including any priced options which may be exercised. (*See* § 124.211 for Program Suspension).

**§ 124.210 Appeals to SBA's Office of Hearings and Appeals.**

(a) Except as provided in paragraph (d) of this section, an applicant concern or Program Participant shall be afforded the opportunity to appeal any of the following Agency determinations:

(1) Denial of program admission based solely on a negative finding(s) of social disadvantage, economic disadvantage, ownership or control pursuant to § 124.206;

(2) Graduation pursuant to § 124.208;

(3) Termination pursuant to § 124.209; or,

(4) Denial of a request to issue a waiver pursuant to § 124.317.

(b) The applicant or Participant concern may initiate such appeal by filing a petition in accordance with part 134 of this title with SBA's Office of Hearings and Appeals (OHA) within 45 days of the date of service of the final Agency determination pursuant to paragraph (a) of this section. In addition to the requirements of § 134.11(a), the petition shall state, with specific reference to the determination and the record supporting such determination, the reasons why the determination is alleged to be arbitrary, capricious or contrary to law. Concurrent with its filing with OHA, the concern shall also serve the AA/MSB&COD with a copy of the petition, including all attachments.

(c) Appeal proceedings brought under the authority of this section shall be conducted by an Administrative Law Judge.

(d) The Administrative Law Judge selected to preside over an appeal shall decline to accept jurisdiction over any matter if:

(1) The appeal does not, on its face, allege facts that, if proven to be true, would warrant reversal or modification of the determination, including appeals of proposed denials of 8(a) program admission which have been based in whole or in part on grounds other than a negative finding of social disadvantage, economic disadvantage, ownership or control;

(2) The appeal is untimely filed under § 134.12 or is not otherwise filed in accordance with the requirements of this section and the rules of procedure set forth in part 134 of this title; or

(3) The matter has been decided or is the subject of an adjudication before a court of competent jurisdiction over such matters.

(e) Once the Administrative Law Judge accepts jurisdiction over an appeal, subsequent initiation of an adjudication of the matter by a court of competent jurisdiction will not preclude the Administrative Law Judge from rendering a final decision on the matter.

(f) Proceedings conducted under the authority of this section shall be conducted in accordance with the provisions of this section and part 134 of this title.

(g) Unless it is established that the convenience and necessity of the parties requires otherwise, in the sole discretion of the Administrative Law Judge, any oral hearing conducted with respect to an appeal pursuant to paragraph (a) of this section shall be held in the Washington, DC area.

(h)(1) Except as provided in paragraph (h)(3) of this section, any proceeding conducted under the authority of paragraph (a) of this section shall be decided solely on a review of the written administrative record. The determination by the AA/MSB&COD or a designee for matters related to paragraphs (a)(1), (a)(2), and (a)(3) of this section, and the determination by the Administrator for matters related to paragraph (a)(4) of this section, shall be sustained unless such determination is found to be arbitrary, capricious, or contrary to law.

(2) If the Administrative Law Judge determines that, due to the absence in the written administrative record of the reasons upon which the determination in question was based, such administrative record is insufficiently complete to decide whether the determination is arbitrary and capricious or contrary to law, the case shall be remanded by the Administrative Law Judge to the AA/MSB&COD for further consideration in accordance with the terms of such remand. Such remand shall be for a period of no more than 10 working days. The ALJ shall retain jurisdiction of the matter during such period as the matter is on remand.

(3)(i) Neither the admission of evidence beyond the written administrative record, nor any form of discovery, will be permitted in proceedings under this section unless it is first determined by the Administrative Law Judge that the applicant concern or Participant, upon written submission, has made a substantial showing, based upon credible evidence, and not mere allegation, that the Agency determination in question may have resulted from bad faith or improper behavior. Prior to any such determination, the Agency shall be afforded an opportunity to respond in writing to the submission of the applicant concern or Participant. Upon a determination by the Administrative

Law Judge that the applicant concern or Participant has made such a substantial showing, the Administrative Law Judge may permit appropriate discovery, and accept relevant evidence beyond the written administrative record, which is specifically limited to the alleged bad faith or improper behavior asserted by the applicant concern or Participant.

(ii) A determination by the Administrative Law Judge that the required showing set forth in paragraph (h)(3)(i) of this section has been made does not shift the burden of proof, which continues to rest with the applicant concern or the Participant.

(i) A decision rendered by the Administrative Law Judge under the authority of this section shall be the final decision of the Administration and shall be binding upon the parties and those within the employ of the Administration.

(j) Such decision shall be rendered, insofar as practicable, within ninety days after a petition for appeal is filed, and, in the event such 90-day time limit has not been met, the Administrative Law Judge shall indicate the reason therefor in the decision, when issued.

**§ 124.211. Suspension of program assistance.**

(a) At any time after the issuance of an initial letter of notification of termination pursuant to § 124.209(b)(1), the AA/MSB and COD may suspend contract support and all other forms of 8(a) program assistance to that concern for a period of time not to exceed the time necessary to resolve the issue of the concern's termination from the program under the procedures set forth in § 124.209 and in part 134 of this title. The institution of such a suspension will not occur in conjunction with each proposed termination, but will only occur when SBA determines that suspension of the concern's program participation is needed to protect the interests of the Government. For example, SBA will generally find that it is in the best interests of the Government to suspend a Participant where the proposed termination is based on fraud or the submission of false statements or program ineligibility.

(b) Immediately upon SBA's determination to suspend an 8(a) concern, SBA will furnish that concern with a Notice of Suspension by certified mail, return receipt requested, to the last known address of the concern. If no receipt is returned within ten calendar days from the mailing of the notice, notice will be presumed to have occurred as of that time. The Notice of Suspension will provide the following information:

(1) The reason(s) for the suspension;

(2) A statement that the suspension will continue pending the completion of further investigation or final program termination proceeding or some other specified period of time;

(3) Notice that awards of competitive and non-competitive section 8(a) subcontracts, including those which have been "self-marketed" by an 8(a) concern, will not be made during the pendency of the suspension unless it is determined by the head of the relevant procuring agency or his/her authorized representative to be in the best interest of the Government to do so, and SBA adopts that determination;

(4) Notice that the concern is obligated to complete previously awarded section 8(a) subcontracts;

(5) Notice that the suspension is effective nationally throughout the SBA;

(6) A statement that a request for a hearing on the suspension will be considered by an Administrative Law Judge in SBA's Office of Hearings and Appeals (OHA), and granted or denied as a matter of his/her discretion.

(7) A statement that the firm's Program Term is suspended effective the date of the suspension and that it will resume only if the concern's participation in the program is not terminated.

(c) It is contemplated that in most cases a hearing on the issue of the suspension will be afforded if the Participant requests one. However, no hearing shall be granted if the suspension is based upon advice from either the Department of Justice or the Department of Labor that such a hearing would prejudice substantial interests of the Government.

(d) The applicant concern may appeal a Notice of Suspension by filing a petition in accordance with part 134 of this title with OHA within 30 days of the date of service of a Notice of Suspension pursuant to paragraph (b) of this section. Concurrent with its filing with OHA, the concern shall also serve the AA/MSB&COD with a copy of the petition including all attachments.

(e) A request for a hearing on the suspension will be considered by an Administrative Law Judge in OHA, and granted as a matter of his/her discretion.

(f) Proceedings conducted under the authority of this section shall be conducted in accordance with the provisions of this section and part 134 of this title.

(g) For any oral hearing convened pursuant to § 134.19 of this Title resulting from a request filed in accordance with this section, the Administrative Law Judge shall give due regard to the convenience and necessity of the parties or their authorized representatives in designating the place of the oral hearing.

(h) A hearing on the suspension will commence as soon as possible following the decision of the Administrative Law Judge to grant a request, but in no case more than 20 calendar days after the Administrative Law Judge's ruling if the request is granted.

(i) At the close of such suspension hearing, the Administrative Law Judge shall issue a decision upholding or lifting the suspension.The decision of the Administrative Law Judge shall be the final Agency decision.

(j) Any program suspension which occurs in accordance with these regulations will continue in effect until such time as the SBA lifts the suspension or the 8(a) concern's participation in the program is fully terminated. If all program assistance to an 8(a) concern has been suspended under these regulations and the concern's participation in the program is not terminated, the suspension will be lifted and the Program Term remaining as of the effective date of Program Suspension will be restored to the concern. However, nothing in this paragraph precludes SBA from initiating termination, graduation or suspension proceedings at any time during the concern's Program Term.

(k) SBA does not recognize the concept of *de facto* suspension. Reinstatement of the remaining portion of a Program Term will occur only where a concern's program participation has been formally suspended by SBA in accordance with the procedures set forth in this section.

**§ 124.300 Business development.**

The regulations at § 124.301 through § 124.321 address the provision of various forms of assistance to 8(a) Program Participants to promote the business development of such concerns. Such assistance includes financial, management and technical assistance, and contract support.

**§ 124.301 Development of business plan.**

(a) *General.* In order to assist the SBA in determining the business development needs of each 8(a) Program Participant, each such Participant shall develop a comprehensive business plan, setting forth the Participant's business targets, objectives, and goals. The business plan shall be submitted to the SBA servicing field office in final form promptly after the Participant's receipt of notice of certification to participate in the 8(a) program. The Participant will

not be eligible for 8(a) Program benefits until the SBA approves its business plan. The approved business plan will constitute the Participant's short and long term goals and the strategy for developmental growth to the point of economic viability independent of the 8(a) program.

(b) *Standard Industrial Classification (SIC) code designations.* The concern's primary industry classification as defined in § 124.100 and all related secondary Standard Industrial Classification (SIC) code designations shall be stated in an 8(a) concern's original business plan. Such SIC codes may be changed, and new SIC codes may be added to the business plan, however, where the conditions of § 124.302(c) are met. Once admitted to the 8(a) program, a concern will only be permitted to perform 8(a) contracts which are classified under approved SIC codes which appear in its business plan. An 8(a) concern may receive a Federal contract classified under a SIC code not contained in its business plan where the contract is not awarded through the section 8(a) program.

(c) *Contents of business plan.* The initial business plan shall contain at least the following:

(1) An analysis of market potential, competitive environment, and other business analyses estimating the Program Participant's prospects for profitable operations during the term of program participation and after graduation;

(2) An analysis of the Program Participant's strengths and weaknesses, with particular attention paid to the means of correcting any financial, managerial, technical, or labor conditions which could impede the Participant from receiving contracts other than those awarded through the 8(a) Program;

(3) Specific targets, objectives, and goals for the business development of the Participant during the next two years, utilizing the results of the analyses conducted pursuant to paragraphs (c)(1) and (c)(2) of this section;

(4) Estimates of contract awards pursuant to section 8(a) and from other sources which would be needed by the Participant to meet the specific targets, objectives and goals for the years covered by the business plan; and

(5) Such other information as SBA may require.

### § 124.302 Review and modification of business plan.

(a) *Annual review.* Each Participant shall annually review its currently approved business plan with the Business Opportunity Specialist (BOS) and shall modify such plan as may be appropriate. Any modified plan shall be submitted to the BOS for approval. A currently approved plan shall be considered the applicable plan for all program purposes until the SBA approves in writing a modified plan. SBA shall establish an anniversary date for review of the Participant's business plan and contract support forecasts. The annual review of a Participant's business plan will generally occur within 15 working days before or after the anniversary of the firm's certification of 8(a) eligibility.

(b) *Contract support forecast.* Each Participant shall annually forecast in writing its needs for contract awards for the next program year and the succeeding program year during the review of its business plan conducted under paragraph (a) of this section. Such forecast shall be included in the Participant's business plan. The forecast shall include:

(1) The aggregate dollar value of contract support to be sought under section 8(a) (sole source and competitive), reflecting compliance with the business mix requirements of § 124.312;

(2) The aggregate dollar value of non-8(a) contracts to be sought;

(3) The types of contract opportunities being sought, identified by the appropriate Standard Industrial Classification (SIC) code; and

(4) Such other information as may be requested by the SBA to aid in providing effective business development assistance to the Participant.

(c) *Changes in SIC code designations.* (1) Requests for changes in SIC code designations stated in a business plan shall be approved by SBA if it is determined that:

(i)(A) The requested SIC code represents a logical business progression for the concern;

(B) The 8(a) concern has demonstrated capacity and capability to perform in the requested SIC code; and

(C) Other applicable eligibility criteria (Walsh-Healey Act, the non-manufacturer rule, size rules, etc.) appear to be met; or

(ii) SBA erred in omitting a previously requested and supported SIC code, improperly classifying a business industry or making a typographical or other error in its letter of approval to the 8(a) concern.

(2) SBA will make a decision on such request within 45 days from the date it receives the request.

(d) *Transition management plan.* Beginning in the first year of the transitional stage of program participation under § 124.303, each Participant shall annually submit for inclusion in its business plan a transition management plan outlining specific steps to promote profitable business operations after graduation. The transition management plan should be submitted to the BOS at the same time other modifications are submitted pursuant to the annual review under paragraph (a) of this section. Such plan shall set forth the same information as required under paragraph (b) of this section for the initial plan, incorporate the competitive mix requirements of § 124.312, and provide specific transition steps the Participant will take to continue its business development after the expiration of its Program Term.

### § 124.303 Stages of 8(a) program participation.

(a) *General.* Program participation is divided into two stages—a developmental stage and a transitional stage. For firms approved for 8(a) program participation after November 15, 1988, the developmental stage shall be 4 years and the transitional stage shall be 5 years unless the Participant has exited the program by one of the means set forth in § 124.110. The developmental stage is designed to assist participants to overcome their economic disadvantage by providing such assistance as may be necessary and appropriate to enable them to access relevant markets and strengthen their financial and managerial skills. The transitional stage of program participation follows the developmental stage and is designed to assist Participants to overcome, insofar as practicable, the remaining elements of economic disadvantage and to prepare Participants for leaving the 8(a) program.

(b) *Stages for grandfathered Program Participants.* (1) For Program Participants with five or fewer years remaining in the 8(a) program as of August 15, 1989, the program year they are in on August 15, 1989 shall be considered the first year of the transitional stage. Such Participants shall be subject to the modified business targets set forth in § 124.312.

(2) For concerns with more than five years remaining in the 8(a) program as of August 15, 1989, the stages of program participation shall be determined so that the Participant will have five years in the transitional stage. The remaining time in the program shall be considered time in the developmental stage. For example, if a Participant has seven years remaining in the program as of August 15, 1989, it will be considered to

have 2 years remaining in the developmental stage and five years in the transitional stage.

(c) *Developmental stage of program participation.* A Program Participant, if otherwise eligible, shall be qualified to receive the following assistance during the developmental stage of program participation:

(1) Sole source and competitive 8(a) contract support;

(2) Financial assistance pursuant to § 122.57 of this title;

(3) Pursuant to § 124.304, a maximum of two exemptions from the requirements of section 1(a) of the Walsh-Healey Act, 41 U.S.C. 35(a);

(4) Pursuant to § 124.305, a maximum of five exemptions from the requirements of the Miller Act (40 U.S.C. 270a through 270d) that performance bonds be issued for the protection of the United States and payment bonds be issued for the protection of persons furnishing material and labor for the construction, alteration, or repair of public buildings or public works;

(5) Pursuant to § 124.306, financial assistance from SBA for skills training or upgrading for employees or potential employees of Program Participants;

(6) The transfer of technology or surplus property owned by the United States to Program Participants by grant, license, or sale. Technology or property transferred pursuant to this paragraph must be used by the Participant during the normal conduct of its business operation and cannot be sold or transferred to any other party (other than the Government) during such concern's Program Term and for one year thereafter. A Participant must agree to these conditions prior to any transfer of technology or property; and

(7) Training sessions to assist individuals and enterprises eligible to receive 8(a) contracts in the development of business principles and strategies to enhance their ability to compete successfully for contracts in the marketplace.

(d) *Transitional stage of program participation.* A Program Participant, if otherwise eligible, shall be qualified to receive the following assistance during the transitional stage of program participation:

(1) The same assistance as that provided to Participants in the developmental stage under paragraphs (c)(1), (c)(2), (c)(6) and (c)(7) of this section;

(2) Assistance from procuring agencies (in cooperation with SBA) in forming joint ventures, leader-follower arrangements, and teaming agreements between the Participant and other Program Participants or other business concerns, in accordance with all applicable statutes and regulations, with respect to contracting opportunities for research, development, fullscale engineering or production of major systems. In the case of a requirement to be procured as a Small Business Set-aside, a Small Disadvantaged Business Set-aside, or through the 8(a) program, applicable size regulationis will apply in determining whether the cooperative venture between a Participant and another business entity qualifies as a small business concern; and

(3) Training and technical assistance in transitional business planning.

**§ 124.304 Statutory exemption from the Walsh-Healey Act.**

(a) SBA is authorized to grant Program Participants in the developmental stage of participation a maximum of two exemptions from the requirements of section 1(a) of the Walsh-Healey Act, 41 U.S.C. 35(a). These exemptions apply only to specific 8(a) contracts with anticipated contract values under $10,000,000 (including options) and shall be used only to allow for contingent agreements by a Participant to acquire the machinery, equipment, facilities, or labor needed to perform such contracts. An exemption may be granted only where such exemption is needed to permit the firm to perform a contract which is consistent with the business development goals set forth in its approved business plan and SBA determines that the Participant is fully capable of performing the contract. SBA must be provided with a copy of the intended contingent agreement for its review prior to granting an exemption.

(b) The exemptions described in this section are authorized only until October 1, 1992 and apply only to those contracts awarded on or after August 21, 1989, the effective date fo these regulations.

**§ 124.305 Statutory exemption from Miller Act bonds.**

(a) *Policy.* Subject to the conditions contained in this section, SBA may exempt an 8(a) Participant in the developmental stage of program participation from any payment and performance bonds required by the Miller Act (40 U.S.C. 270a through 270d) for, and in connection with, any 8(a) construction contract whenever it is determined by SBA that the 8(a) concern is unable to obtain the requisite bond(s) from a surety for the performance of the 8(a) contract. The exercise of this authority by SBA is subject to the conditions set forth in paragraph (b) of this section.

(b) *Conditions for SBA exemption of bonding requirements.* In order to be eligible to obtain an exemption from the bonds required by the Miller Act, the following requirements must be met:

(1) The Program Participant must have been engaged in construction activities for a period of at least two years;

(2) SBA must find that the concern is otherwise eligible to receive a specific 8(a) construction contract, but is unable to obtain the requisite bond(s) required by the Miller Act for the performance of the contract;

(3) The Participant must demonstrate that it cannot obtain a bond for the performance of the requirement by submitting to SBA written denials from at least two sureties, one of which is a corporate surety and one of which is an individual surety.

(4) SBA must determine that the firm has the potential to become bondable for future contracts if assisted by the bond exemption.

(c) *Limitations.* (1) The maximum dollar value of an 8(a) contract on which a bond requirement can be exempted is $3,000,000 (including options).

(2) Exemptions from Miller Act bond requirements are available only on sole source 8(a) contracts. Exemptions will not be granted on competitive 8(a) contracts.

(3) In no event shall the exemption described in paragraph (a) of this section be construed to make SBA liable to the procuring agency, 8(a) concern or any supplier, subcontractor, laborer or others for contractual obligations entered into by the 8(a) concern under the 8(a) contract to which the exemption applies.

(4) Unless approved in writing by the Regional Administrator or his/her designee, Participant may receive an exemption for a 8(a) contract under this section. If it is performing a contract for which an exemption under this section has been granted.

(5) No Participant may receive more than a total of five exemptions under this section. Where a Participant receives an exemption for a procurement having a base year and one or more option years, a continuation of the exemption, an option which is exercised does not count as an additional exemption (i.e., an exemption on such a contract counts as one exemption, not one for the base year and one for each of the option years exercised).

(6) No further bond exemptions shall be granted where a contract for which a Participant has previously received an exemption has been terminated for default.

(d) *Protection of third parties.* The following requirements must be met before a contract will be awarded under this section. These requirements are intended to protect third parties to the contract.

(1) The 8(a) contractor must make timely payment to all persons furnishing materials or labor to the 8(a) concern in the performance of the contract.

(2) There must be established a special bank account in an institution insured by the Federal Deposit Insurance Corporation (FDIC), into which the procuring agency will deposit all payments relating to the performance of the contract, or, in the alternative, the procuring agency, at its option, shall provide for direct disbursement of contract proceeds to suppliers, subcontractors, laborers and others.

(3) All disbursements from any special bank account established shall be subject to the approval and counter signature by SBA or a third party approved in writing by the AA/MSB & COD. (This requirement for a controlled account will be satisfied if SBA makes an advance payment to the Participant pursuant to § 124.401 of these regulations and a special bank account is established in connection therewith.)

(4) The 8(a) contractor must notify persons supplying it with materials or labor in writing that the contract is exempt from the Miller Act's bonding requirement and must also notify such suppliers in writing that SBA will not be liable for payment for materials or labor. The 8(a) contractor must obtain a written acknowledgment of such notification from each supplier of materials or labor, and such acknowledgment(s) must be in SBA's possession prior to award of the contract where practicable, and, in all instances prior to payment of invoices.

(5) The requirements set forth in paragraphs (d)(1), (d)(2), (d)(3), and (d)(4) of this section must be contained in the special 8(a) contract clauses, as appropriate.

(e) *Procedure for obtaining a bond exemption.* (1) A Program Participant which seeks a bond exemption under this section may submit a written request to the applicable SBA servicing field office.

(2) Upon receipt of the request, SBA shall notify the Participant of supporting documentation that must be submitted in order to process the exemption request.

(3) If SBA preliminarily determines that a bond exemption is appropriate, SBA shall contact the procuring agency and obtain its written views with respect to the bond exemption.

(4) The views and concerns of the procuring agency will be heavily weighed in determining whether to grant a bond exemption.

(5) If the procuring agency does not concur with the bond exemption and SBA determines that an exemption should not be granted, SBA may accept the offer for another 8(a) concern.

(f) *Expiration date.* The exemptions described in this section are authorized only until October 1, 1992 and apply only to those contracts awarded on or after August 21, 1989, the effective date of these regulations.

**§ 124.306 Financial assistance for skills training.**

(a) SBA may pay in whole or in part the costs of training or upgrading of employees or potential employees of 8(a) concerns. An owner participating in the day-to-day management of a Participant may be considered to be an employee for purposes of this section. Payments may be made directly to the training provider or by reimbursing the Program Participant or the Participant's employee, if such reimbursement is found to be reasonable and appropriate.

(b) SBA assistance under this section is subject to the following conditions and requirements:

(1) The concern must be in the developmental stage of program participation.

(2) The 8(a) concern must document that it has explored the use of existing cost-free or cost-subsidized training programs offered by public and private sector agencies working with programs of employment and training and economic development and that no such programs are available or are capable of meeting the training needs of the participant.

(3) The concern must be current with any reporting requirements established by SBA for ongoing program participation.

(4) The employee receiving the training or upgrading may not be a beneficiary of any other publicly or privately funded training program which benefits the trainee or upgraded employee for the same activity SBA is compensating under this section.

(5) The training provider must be an institution of higher education, a community or vocational college, or an institution eligible to provide skills training under the Job Training Partnership Act (29 U.S.C. 1501, *et seq.*).

(6) The training provider may not be debarred or suspended from any Federal programs.

(7) The training of employees or potential employees of a concern must be consistent with the concern's approved business plan.

(8) SBA must approve the training in writing prior to its commencement.

(9) No more than five employees or potential employees of a single 8(a) concern may be recipients of benefits under this section at one time.

(10) The length of training or skills upgrading financed under this section may be no less than one month nor more than six months.

(11) The training of skills upgrading assistance must be of a type which will offer genuine capacity development for the employing firm.

(12) No more than $2,500 shall be made available for any one employee or potential employee.

(13) The Participant must execute and submit to SBA any appropriate written employment agreements in accordance with paragraph (f) of this section.

(c) SBA's allocation of resources appropriated for the purposes of this section shall generally be based on the identification of needs of developmental stage concerns. SBA shall evaluate training needs in the annual business plan review process, and may conduct other surveys as appropriate.

(d) Projects to be funded under this section shall be initiated by a request prepared by the 8(a) concern and submitted to SBA. SBA may request additional information before the request is processed.

(e) Assistance under this section will be made only when the agreements entered into by SBA to fund training or upgrading contain acceptable training and upgrading standards and acceptable monitoring standards and requirements to insure the integrity and effectiveness of the training or upgrading.

(f) The Participant must give adequate assurance that it will employ the trainee or upgraded employee for at least six months after the training or upgrading financed pursuant to this section has been completed. Trainees and upgraded employees must provide a similar assurance that they will remain in the employ of the 8(a) firm for such six-month period. Such assurance will consist of an appropriate written employment agreement. If a trainee or upgraded employee does not remain in the employ of the participant for at least six months after receiving such SBA-financed training or upgrading, the violating party must reimburse SBA for the amount expended together with any reasonable interest and costs incurred for collection. In addition, the violating party, whether it is the Participant, individual trainee or upgraded employee, shall be barred from receiving

any further assistance under this section. The appropriate SBA Regional Administrator, or his/her designee, may waive the reimbursement provisions of this paragraph in limited circumstances where an employee's leaving is due to an unforseen event (e.g., the employee's spouse is relocated by his/her business and the employee must move).

**§ 124.307 Contractual assistance.**

(a) It is the policy of SBA to enter into contracts with other Government agencies and to subcontract the performance of such contracts, pursuant to section 8(a)(1)(C) of the Small Business Act, to 8(a) Program Participants at prices which will enable such concerns to perform the contracts and earn a reasonable profit.

(b) Such subcontracts may either be sole source awards or awards attained through competition reserved for eligible Participants.

(c) Admission into the 8(a) program does not bestow a right to receive 8(a) contracts. SBA's approval of a Participant's business plan pursuant to § 124.301 does not guarantee the Participant any particular level of contract support.

(d) An 8(a) contract will be provided to a Participant only when such contract is consistent with the Participant's capabilities and business development needs, as determined by SBA.

**§ 124.308 Procedures for obtaining and accepting procurements for the 8(a) program.**

(a) *PCR-serviced agencies.* If an SBA Procurement Center Representative (PCR) is resident or has liaison responsibilities in a procuring agency, he/she will be responsible for screening proposed procurements for possible 8(a) contracts, in accordance with 13 CFR 125.6.

(b) *Requirement identification.* (1) A requirement for possible award may be identified by SBA, a particular Program Participant or the procuring agency itself. Once a requirement that appears suitable for the 8(a) program has been identified, SBA shall verify the appropriateness of the SIC code designation assigned to the requirement and request the procuring agency to offer the requirement to the 8(a) program.

So long as the SIC code assigned to the requirement by the procuring agency contracting officer is reasonable, the SIC Code will be accepted by SBA.

(2) If SBA and the procuring agency are unable to agree as to the proper SIC code designation for the requirement, SBA may refuse to accept the requirement for the 8(a) program, or appeal the contracting officer's determination to the head of the agency pursuant to § 124.320, or the AA/MSB & COD file a SIC code appeal to SBA's Office of Hearings and Appeals.

(3) If the requirement exceeds the thresholds established by § 124.311, the SBA will request that the requirement be offered to the 8(a) program to be competed among eligible Program Participants, unless SBA determines that there is not a reasonable expectation that at least two eligible 8(a) concerns will submit offers.

(4) If the requirement is below the thresholds established by § 124.311, the SBA may request that it be offered to the 8(a) program for possible sole source award as an open requirement or in support of the approved business plan of a specific Program Participant, or it may accept the requirement for competition upon the procuring agency's request.

(c) *Offering letter.* When a requirement is offered to the 8(a) program, the offering letter or notification from the procuring activity shall contain the following information.

(1) A description of the work to be performed or items to be delivered and a copy of the statement of work, if available;

(2) The estimated period of performance;

(3) The SIC code that applies to the principal nature of the acquisition;

(4) The anticipated dollar value of the requirement, including options, if any;

(5) Any special restrictions or geographical limitations on the requirement;

(6) The location of the work to be performed for construction and service procurements;

(7) Any special capabilities or disciplines needed for contract performance;

(8) The type of contract to be awarded, such as firm fixed price, cost reimbursement, or time and materials;

(9) The acquisition history, if any, of the requirement;

(10) The names and addresses of any small business contractors which have performed on this requirement during the previous 24 months;

(11) A statement that no solicitation for the specific acquisition has been issued as a small business set-aside or small disadvantaged business set-aside and that no other public communication (such as a notice in the Commerce Business Daily) has been made evidencing the procuring agency's clear intention to set aside the acquisition for small business or small disadvantaged business (*see* § 124.309(a));

(12) Identification of any particular 8(a) concern designated for consideration, including a brief justification, such as one of the following:

(i) The 8(a) concern, through its own efforts, marketed the requirement and caused it to be reserved for the 8(a) program; or

(ii) The acquisition is a follow-on or renewal contract and the nominated concern is the incumbent;

(13) Bonding requirements, if applicable;

(14) Identification of all 8(a) concerns which have expressed an interest in being considered for the acquisition;

(15) If the requirement is a national buy, identification of all SBA district or regional offices which have asked for the acquisition for the 8(a) program;

(16) A request that the acquisition be competitive, if appropriate, and the estimated contract value is under the applicable threshold; and

(17) Any other information that the procuring agency deems relevant or SBA requests.

(d) *Acceptance of the requirement.* Upon receipt of the procuring agency's offer, SBA will determine whether it will accept the requirement for the 8(a) program. SBA's decision whether to accept the requirement will be transmitted to the procuring agency in writing within 15 working days of receipt of the offer, unless SBA requests, and the procuring agency grants, an extension. If SBA decides to accept a sole source requirement for the 8(a) program, it will advise the procuring agency in writing. In the case of a local buy requirement, as defined in § 124.100, SBA will accept the offer both on behalf of the program and in support of the business plan of a specific Participant. In the case of a national buy requirement, as defined in § 124.100 SBA will accept the offer for the 8(a) program generally and will advise the procuring activity that SBA's appropriate field office will designate a specific Participant for contract performance. If SBA decides to accept a competitive requirement for the 8(a) program, it will send a letter to the procuring agency accepting the offer for the benefit of the 8(a) program generally. SBA is not required to accept any particular procurement for the 8(a) program.

(e) *Sole source award where procuring agency nominates a specific program participant.* If the procuring agency identifies a particular 8(a) concern for a sole source award, SBA will determine whether an appropriate match exists.

(1) Once a procurement is deemed suitable for acceptance as an 8(a) sole source contract, it will normally be

accepted on behalf of the participant recommended by the procuring agency, provided that:

(i) The procurement is consistent with the Participant's business plan;

(ii) The Participant is determined by SBA to be a responsible contractor with respect to performance of the contract; and

(iii) The award of the contract would not result in the Participant exceeding its approved 8(a) business support level or the business mix requirements established under § 124.312.

(2) If an appropriate match exists, SBA will send a letter accepting the offer in support of the business plan of the identified Participant to the procuring agency. This letter will advise the procuring agency whether SBA will participate in contract negotiations or whether SBA will authorize the procuring agency to negotiate directly with the identified Program Participant. A Program Participant selected by SBA to perform a noncompetitive 8(a) contract shall, when practicable, participate in any negotiation of the terms and conditions of such contract.

(3) If SBA determines that an appropriate match with the nominated 8(a) concern does not exist based on the factors set forth in paragraph (e)(1) of this section, it will notify the affected 8(a) concern and may then select an alternate 8(a) concern, in accordance with paragraph (f)(3) of this section. It will so advise the procuring agency of its actions.

(f) *Open requirements.* When a procuring agency does not nominate a particular concern for performance of a sole source 8(a) contract (open requirement), the following additional procedures will apply:

(1) If the contract is a local buy item, SBA will examine the portfolio of 8(a) concerns for the SBA district office where the work is to be performed or the items delivered for selection of a qualified 8(a) concern. If none is found to be qualified or a match for a concern in that district is determined to be impossible or inappropriate, the requirement may be considered for other 8(a) concerns located within the region or, if appropriate, other regions.

(2) If the procurement is a national buy item, it shall be referred to SBA's Central Office in Washington, DC. The Central Office will allocate national buy requirements on an equitable basis.

(3) In cases in which SBA must select a participant for possible award from among two or more eligible and qualified participants, the selection will be based upon consideration of relevant factors, including the business development needs, compliance with competitive business mix requirements (if applicable), financial condition, management ability, and technical capability of each participant. SBA shall make its selection based upon an examination of the business plan and procurement history of the concern as well as any supplemental materials requested and received.

(4) To the maximum extent practicable, the SBA shall promote the equitable geographic distribution of 8(a) sole source contracts.

(g) *Formal technical evaluations.* SBA will not authorize formal technical evaluations for sole source 8(a) contracts. If a procuring agency requires the performance of a formal technical evaluation among more than one 8(a) concern, the procuring agency must request that the requirement be a competitive 8(a) award. The procuring agency may request a formal two-step procurement process pursuant to section 14.5 of the FAR, 48 CFR subpart 14.5, or a standard negotiated competitive procurement. Agencies may, however, conduct informal assessments of several 8(a) firms' capabilities to perform a specific requirement, provided that the statement of work for the requirement is not released to any of the participating 8(a) firms.

(h) *Repetitive acquisitions.* In order for repetitive acquisitions to be awarded through the 8(a) program, there must be separate offers and acceptances. This enables the SBA to reassess a firm's eligibility, to evaluate the suitability of each acquisition for competitive 8(a) award, and to determine whether the requirement should continue under the 8(a) program.

**§ 124.309 Barriers to acceptance.**

SBA will not accept for 8(a) award proposed procurements not previously in the 8(a) program if any of the circumstances identified in paragraphs (a), (b), or (c) of this section exist.

(a) *Solicitation previously issued.* A solicitation has already been issued for the procurement as a small business set-aside, such as an Invitation for Bid (IFB) or Request for Proposal (RFP). The AA/MSB&COD may permit the acceptance of the requirement, however, under extraordinary circumstances, such as where a procuring agency had made a decision to offer the requirement to the 8(a) program before the solicitation was sent out and the procuring agency acknowledges and documents that the solicitation was in error.

(b) *Reservation as small business or SDB set-aside.* The procuring agency has expressed publicly a clear intention to reserve the procurement as a small business or small disadvantaged business (SDB) set-aside (*e.g.*, a notice of intent to set aside a procurement published in the Commerce Business Daily which invites a response from interested small businesses). The AA/MSB&COD may permit the acceptance of the requirement, however, under extraordinary circumstances, such as where a procuring agency had made a decision to offer the requirement to the 8(a) program before the notice was sent out and the procuring agency acknowledges and documents that the notice was in error. An annual procurement forecast or solicitation of information for possible small business set aside will generally not be considered as a clear exhibition of intention to set aside a procurement for small businesses.

(c) *Adverse Impact.* SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on other small business programs or on an individual small business, whether or not the affected small business is in the 8(a) program. The adverse impact concept is designed to protect small business concerns which are performing Government contracts awarded outside the 8(a) program. Adverse impact does not apply to "new" requirements. A new requirement is a requirement which has not been previously procured by the relevant procuring agency. Where a requirement is new, no small business could have performed the requirement and, thus, an impact determination need not be performed. The expansion or alteration of an existing requirement shall be considered a new requirement where the requirement is materially expanded or modified so that the ensuing requirement is not substantially similar to the prior requirement due to the magnitude of the expansion or alteration.

(1) In determining whether or not adverse impact exist, all relevant factors will be considered.

(2) SBA presumes adverse impact to exist when a small business concern has performed a specific requirement for at least 24 months, it is currently performing the requirement or finished such performance within 30 days of the procuring agency's offer of the requirement for the 8(a) program, and the estimated dollar value of the offered 8(a) award is 25 percent or more of its most recent annual gross sales (including those of its affiliates).

(d) *Release for non-8(a) competition.* In limited instances, SBA may determine that a sole source 8(a) contract being performed by either a Program Participant whose Program Term will

expire prior to contract completion, or, by a former Program Participant whose Program Term has expired within one year of the requirement may be rejected so that it may be competed outside the 8(a) program. If such a determination is made, SBA will reject the procuring agency's offer of the requirement for award through the 8(a) program. In such a case, SBA will recommend that the requirement be procured as a small business set-aside or, where appropriate, through a small disadvantaged business competition authorized by Public Law 99–661.

(1) In making such a determination, SBA will balance the importance of the contract for the (former) Participant's stability and business development needs against the needs of other Program Participants qualified to perform the requirement in order to develop in accord with their business plan. Such a determination will include consideration of whether the rejection of the requirement would seriously reduce the pool of similar types of contracts to be fulfilled through the 8(a) program. In making such determination, SBA will also seek the views of the procuring agency.

(2) A written request for the rejection of a contract must be made to SBA by the applicable (former) Participant prior to SBA's acceptance of the requirement for the 8(a) program. SBA will not reject a requirement absent such a request.

**§ 124.310 Approval of lower tier subcontractors.**

(a) SBA's approval must be obtained prior to a Particpant's subcontracting of the performance of an 8(a) contract to another concern.

(b) SBA will not approve any subcontracting arrangement where:

(1) The performance of work requirements set forth in § 124.314 would not be met;

(2) The proposed subcontractor has been suspended, debarred, or determined to be ineligible by any Federal agency;

(3) SBA determines that the proposed subcontractor would control the performance of the requirement;

(4) SBA determines that the proposed subcontracting relationship is not an arms length agreement; or

(5) SBA determines that the proposed subcontracting arrangement is an attempt to circumvent SBA's size regulations.

**§ 124.311 8(a) competition.**

(a) *Competitive thresholds.* A contract opportunity offered to the 8(a) program for award shall be awarded on the basis of a competition restricted to eligible Program Participants if:

(1) There is a reasonable expectation that at least two eligible program participants will submit offers and that award can be made at a fair market price; and

(2) The anticipated award price of the contract, including options, will exceed $5,000,000 for contracts assigned manufacturing Standard Industrial Classification (SIC) codes and $3,000,000 for all other contracts. For purposes of indefinite quantity/delivery contracts, the thresholds will be applied to the guaranteed minimum value of the contract.

**Example.** If the anticipated award price for a professional services requirement is determined to be $2.7 million and it is accepted as a sole source 8(a) requirement on that basis, a sole source award will be valid even if the contract price arrived at after negotiation is $3.1 million.

(b) *Effective date of thresholds.* The thresholds specified in paragraph (a) of this section shall not apply to any 8(a) requirement that has been accepted for the 8(a) program prior to October 1, 1989.

(c) *Exemption from competitive thresholds for 8(a) concerns owned by Indian tribes.* SBA may award an 8(a) subcontract on a non-competitive basis to an 8(a) concern owned and controlled by an economically disadvantaged Indian tribe, as defined in § 124.100, even if such contract exceeds the competitive thresholds set forth in paragraph (a) of this section. *See* generally, § 124.112. However, once a requirement is accepted into the 8(a) program for competition and prospective offerors have been notified of such acceptance, SBA may not remove the requirement from competition and award it to a disadvantaged Indian tribe as a sole source contract.

(d) *Competition below thresholds.* The AA/MSB&COD may, on a nondelegable basis, approve a request from a procuring agency that an 8(a) contract be competed even if the anticipated award price is not expected to exceed the dollar amounts specified in paragraph (a) of this section. Such approvals will be granted on a limited basis.

(1) This authority will be used primarily in areas where technical competitions are appropriate or when a large number of responsible 8(a) contractors exists.

(2) In determining whether to approve a request to compete an 8(a) contract below the applicable threshold amount, the AA/MSB&COD shall consider whether the requesting agency has made and will continue to make available a significant number of its contracts to the 8(a) program on a noncompetitive basis.

(3) The AA/MSB&COD shall deny a request to compete a contract having a dollar figure below the applicable threshold amount where the requirement was previously offered to the 8(a) program on a noncompetitive basis if he/she concludes that the request is based on the inability of the contracting agency and the Participant selected to perform the contract to reach an agreement on price or some other material term or condition.

(e) *Sole source above thresholds.* Where a contract opportunity exceeds the applicable threshold dollar figure and there is not a reasonable expectation that at least two eligible Program Participants will submit offers at a fair price, SBA may accept the requirement for a sole source 8(a) award if SBA determines that an eligible participant in the 8(a) portfolio is capable of performing the requirement at a fair price.

(1) For purposes of national buy procurements, SBA will accept a contract opportunity above the applicable threshold as a sole source contract only if there are not two eligible offerors in the United States capable of performing the requirement at a fair price.

(2) For purposes of local buy procurements, SBA will accept a contract opportunity above the applicable threshold as a sole source contract only if there are not two eligible offerors located in the applicable region or adjacent regions which are capable of performing the requirement at a fair price.

(f) *Procedures for competition.* (1) Competitions among eligible 8(a) participants shall be conducted by the procuring agencies in accordance with the Federal Acquisition Regulation (FAR). Such competitions shall be representative of competitions which are the normal practice in the relevant industries. Competitions need not stress price as the dominant factor, but may be based primarily on technical evaluations or other non-price related factors. Selection of a particular Program Participant by the procuring agency shall be based on specific evaluation criteria set forth in the solicitation.

(2) All solicitations for competitive 8(a) requirements shall include the appropriate SIC code for the requirement.

(3) The procuring agency shall evaluate offers pursuant to the evaluation criteria in the solicitation and the applicable FAR provisions.

(4) In a sealed bid procurement, the procuring agency shall submit to SBA a list of offerors ranked in the order of their standing for award; i.e., first low, second low, etc., with the total evaluated price for each offer, differentiating between basic and any options. In a negotiated procurement, the procuring agency shall submit to SBA an unranked list of offerors within the competitive range. Actual offered prices in a negotiated acquisition will not be submitted or revealed to SBA. SBA will make business support level and competitive business activity determinations based on the estimated fair market price of the contract.

(5) Within 5 working days after receipt of the list of offerors, the SBA will determine whether any firm identified is eligible for award of the contract, including:

(i) Whether it has the SIC code for the requirement in its approved business plan;

(ii) Whether it is small under the SIC code for the requirement;

(iii) If the firm is in the developmental stage, whether it has exceeded its approved business support level by more than 25 percent (or will exceed such level if it is awarded the contract at issue); and,

(iv) If the firm is in the transitional stage, whether it has achieved its competitive business mix targets under § 124.312. Failure to achieve the competitive business activity targets will not affect a concern's eligibility for 8(a) competitive awards if SBA and the concern have agreed upon a remedial plan and such plan does not include denial of future 8(a) awards.

(6) If the low bidder in a sealed bid procurement is determined to be ineligible by SBA, SBA shall determine the eligibility of the next low bidder. This process shall be repeated until SBA determines that an identified participant is eligible for award, or until the list is exhausted.

(7) In a negotiated procurement, the procuring agency will evaluate the offers of those firms determined by SBA to be eligible for award pursuant to paragraph (f)(5) of this section and will conduct discussions and/or negotiations with those firms deemed appropriate.

(8) After negotiaitons and/or discussions occur in a negotiated procurement, the potential awardee will be selected by the procuring agency.

(9) Award shall be made through the normal 8(a) award procedures (i.e., a prime contract between the procuring agency and SBA and a subcontract between SBA and the selected 8(a) concern).

(g) *Protest restrictions.* The eligibility of a Program Participant for a competitive 8(a) award may not be challenged by another Program Participant or any other party to SBA or to any other administrative forum as part of a bid or other contract protest. Anyone with information concerning the eligibility of a Program Participant to continue participation in the 8(a) program may submit such information to SBA in accordance with § 124.111(c).

(h) *Restricted competition.*—(1) *Competition within stages of program participation.* SBA may accept a requirement to be awarded through a competition limited to 8(a) concerns in the developmental stage of program participation or limited to concerns in the transitional stage of program participation, or may accept a requirement to be competed among firms both in the developmental and transitional stages of program participation.

(2) *SIC code requirements.* Only those Participants that have in their approved business plan the SIC code identified in the solicitation may submit offers for the requirement. A participant will be deemed ineligible for award by SBA if it submits an offer for a requirement for which it does not have an approved SIC code.

(3) *Local buy competitions.* Where a competitive 8(a) contract opportunity is a local buy requirement, the appropriate Assistant Regional Administrator for Minority Small Business and Capital Ownership Development (ARA/MSB&COD) will determine, based on his/her knowledge of the 8(a) portfolio, whether the competition should be limited only to those Program Participants located within the geographical boundaries of one or more district offices or the entire region. Only those participants located within the appropriate geographical boundaries are eligible to submit offers. If SBA determines, however, that there is not a reasonable expectation that at least two participants within such region will submit offers, SBA may authorize the procuring agency to accept offers from eligible Program Participants in one or more other adjacent regions. Without such authorization, Program Participants located outside the relevant SBA regional boundaries which submit offers shall be considered ineligible. In appropriate instances, a competition may be limited to eligible Program Participants in adjacent SBA district offices which are in different SBA regional offices where the ARA/MSB&CODs in the two relevant regions so agree.

(4) *National buy competitions.* Where a competitive 8(a) contract opportunity is a national buy requirement, all eligible Program Participants may submit offers.

**§ 124.312 Competitive business mix.**

(a) *General.* To ensure that 8(a) firms do not develop an unreasonable reliance on 8(a) contracts and to ease the transition of such firms into the competitive marketplace after exiting the 8(a) program, Program Participants must make maximum efforts to obtain business outside the 8(a) program.

(b) *Non-8(a) business activity targets and support levels during developmental stage.*—(1) *Attainment of targeted levels.* During the developmental stage of Program Participation, an 8(a) concern must make substantial and sustained efforts to attain the targeted dollar levels of non-8(a) revenue established in its business plan.

(2) *Maintenance of existing business base.* A business concern which enters the 8(a) program must make maximum efforts to maintain its existing business base and use the 8(a) program as a resource to strengthen the firm after its 8(a) certification.

(3) *Marketing strategy to attain targeted levels.* Every Program Participant must engage in a reasonable marketing strategy that will maximize its potential to achieve the targeted levels of non-8(a) revenue established in its business plan.

(4) *Establishing support levels.* SBA shall establish 8(a) and non-8(a) support levels by considering the firm's salesforecast and supporting data in its business plan, the firm's demonstrated capacity and capability level, current level of non-8(a) contracts on hand and the availability of 8(a) support. The aggregate dollar amount of 8(a) support provided to a Program Participant for any year of program participation during the developmental stage may not exceed the applicable 8(a) support level approved by SBA as reflected in the concern's business plan by more than 25 percent.

(5) *Increasing support levels.* An 8(a) concern in the developmental stage of program participation may request an increase in its approved 8(a) support level no more than once during a program year other than at the date of its annual review. Such request must be made in writing and must be made within 15 days (either before or after) of the six month date of its preceding annual review (e.g., if a firm's annual review occurs on June 23, the firm may request an increase in its approved 8(a)

support level between December 8 and January 7—15 days before and after December 23). A revision to a Participant's business plan may not, however, be based solely on the identification of an 8(a) contract in excess of the Program Participant's approved 8(a) support level. A Participant must demonstrate that it has increased its capacity and capability to the point that its currently approved 8(a) support level is inappropriate. The Participant's increased capacity and capability must be greater than the increased level of 8(a) support requested so that the Participant is still able to increase its non-8(a) revenue if the request is approved. Any increase in a Participant's approved 8(a) support level other than as part of the annual review process must be approved in writing by the appropriate Regional Administrator or his/her designee.

(6) *Measuring 8(a) support.* In determining whether a Program Participant has reached its approved 8(a) support level during any program year, the base year value of all 8(a) contracts awarded during that program year shall be added to the value of all options and other modifications executed during that year. In the case of an indefinite quantity contract having a guaranteed minimum condition, only the guaranteed minimum dollar amount and task orders above that amount actually issued are counted against a concern's approved 8(a) support level.

Example: During a specific program year, Program Participant X receives three 8(a) contracts as follows: (1) $1,000,000 contract—$400,000 base year, and two $300,000 options; (2) $500,000 contract—$250,000 base year, and one $250,000 option; and (3) $100,000 contract with no options. In addition, two options on 8(a) contracts awarded in a previous program year, each worth $200,000, are exercised in the program year under consideration. The 8(a) contract support received during that program year is $1,150,000.

(7) *Reporting and verification of business activity.* Once admitted to the 8(a) program, the program participant must provide SBA with quarterly and annual financial statements within 90 calendar days (180 days for audited statements) from the end of each quarter. The statements shall segregate revenues as non-8(a) and 8(a) revenue as appropriate. Also, within 30 days from the end of the program year, the Program Participant shall provide SBA with an annual report of all non-8(a) contracts, options and modifications affecting price executed during the program year.

(c) *Required Non-8(a) Business Activity Targets During Transitional Stage.*—(1) *General.* During the transitional stage of the program, the Program Participant shall be required to achieve certain targets of non-8(a) contract revenue. Such targets shall be referred to as non-8(a) business activity targets and shall be expressed as a percentage of total revenue. The targets shall reflect a reasonably consistent increase in non-8(a) revenue. Participants approved for participation on or after November 15, 1988 and Participants with more than five years remaining in the program as of August 15, 1989 shall be subject to the non-8(a) business activity targets set forth in paragraph (c)(4) of this section. Participants with five years or less remaining in the program as of August 15, 1989 shall be subject to the modified non-8(a) business activity targets set forth in paragraph (c)(5) of this section.

(2) *Establishing support levels.* During the transitional stage of the program, SBA shall establish 8(a) and non-8(a) support levels for each Program Participant. The aggregate dollar amount of 8(a) support provided to a program participant during the transitional stage may not exceed the established 8(a) support level for the applicable program year. The 8(a) support level shall be established so as to ensure that the 8(a) firm meets the non-8(a) business activity targets or the modified non-8(a) firm meets the non-8(a) business activity targets or the modified non-8(a) business activity targets set forth in paragraphs (c)(4) and (c)(5) of this section. In establishing the 8(a) support level, SBA will consider the following:

(i) The 8(a) and non-8(a) sales forecast and support data contained in the Program Participant's business plan;

(ii) Current 8(a) and non-8(a) contracts on hand;

(iii) Historical 8(a) and non-8(a) revenue and the current level of 8(a) and non-8(a) revenue;

(iv) The Program Participant's demonstrated capacity and capability level which may include current levels of 8(a) and non-8(a) revenue, current 8(a) and non-8(a) contracts on hand, working capital, access to credit, production capacity, projected increase in 8(a) revenue, and management and technical capability;

(v) The applicable 8(a) business activity target for the applicable transitional year.

(3) *Increasing support levels.* An 8(a) concern in the transitional stage of program participation may request an increase in its approved 8(a) support level once during a program year other than at the date of its annual review. Such request must be in writing and must be made within 15 days before or after of the six month date of its preceding annual review (e.g., if a firm's annual review occurs on June 23, the firm may request an increase in its approved 8(a) support level between December 8 and January 7–15 calendar days before and after December 23). A revision to a Participant's business plan may not, however, be based solely on the identification of an 8(a) contract in excess of the Program Participant's approved 8(a) support level. A Participant must demonstrate that it has increased its capacity and capability to the point that its currently approved 8(a) support level is inappropriate and that an increase in its approved support level will not conflict with the applicable non-8(a) business activity targets set forth in paragraphs (c)(4) and (c)(5) of this section.

(4) *Non-8(a) business activity targets.* Firms approved for program participation on or after the enactment of Public Law 100–656 (November 15, 1988) and current Program Participants that have more than five years remaining in the program as of August 15, 1989 shall be subject to the following non-8(a) business activity targets during each year of program participation in the transitional stage:

| Program participant's year in the transitional stage | Non-8(a) business activity targets (non-8(a) revenue as a percentage of total revenue) |
|---|---|
| 1 | 15–25 |
| 2 | 25–35 |
| 3 | 40–45 |
| 4 | 50–55 |
| 5 | 65–75 |

(5) *Modified non-8(a) business activity targets.* Firms that have five years or less remaining in the program as of August 15, 1989 shall be subject to modified non-8(a) business activity targets during the transitional stage of program participation.

(i) A firm with three to five years remaining in the program as of August 15, 1989 shall be subject to the following non-8(a) business activity targets:

| Program participant's year in the transitional stage | Modified non-8(a) business activity targets (non-8(a) revenue as a percentage of total revenue) |
|---|---|
| 1 | 10–15 |
| 2 | 15–20 |
| 3 | 20–30 |
| 4 | 30–40 |
| 5 | 40–50 |

(ii) A firm with less than three years remaining in the program as of August

15, 1989 shall make substantial and sustained efforts to attain the targeted dollar levels of non-8(a) sales approved in its business plan.

(6) *Failure to meet required non-8(a) business activity target.* Firms that fail to achieve the minimum percentage non-8(a) business activity target in any year of the transitional stage will be subject to the remedial measures set forth in paragraph (c)(12) of this section. Compliance with the applicable business activity target is measured at the end of any program year in the transitional stage of program participation (e.g., at the end of the first year in the transitional stage of program participation, non-8(a) revenue is compared to total revenue). Remedial measures, if appropriate, will be imposed during the subsequent program year (e.g., non-complaince with the required business activity target in year one of the transitional stage of program participation would cause remedial measures to be imposed in year two in the transitional stage).

(7) *Attainment of targeted levels.* The program participant must make maximum efforts to maintain and increase its targeted level of non-8(a) revenue during the transitional stage.

(8) *Marketing strategy to attain targeted levels.* The program participant must engage in a reasonable marekting strategy that will maximize its potential to achieve the targeted levels of non-8(a) revenue established in the business plan.

(9) *Measuring 8(a) support.* In determining whether a Program Participant has reached its approved 8(a) support level during any program year, the base year value of all 8(a) contracts awarded during that program year shall be added to the value of all options and other modifications executed during that year. In the case of an indefinite quantity contract having a guaranteed minimum condition, only the guaranteed minimum dollar amount and tasks orders above that amount actually issued are counted against a concern's approved 8(a) support level. (*See* example in paragraph (b)(6) of this section).

(10) *Reporting and vertification of business activity.* Program Participants during the transitional stage shall provide SBA with quarterly and annual financial statements with a breakdown of 8(a) and non-8(a) revenue within 90 days (180 days for audited statements) from the close of the reporting period. The Program Participant shall also provide SBA with quarterly and annual reports of all non-8(a) contracts, options and modifications affecting price executed during teh program year (and any other information as required by SBA) within thirty days from the end of the reporting period. At the end of each year of participation In the transitional stage, the BOS assigned to work with the participant shall review the participant's total revenues to determine whether the participant's non-8(a) revenues have met the targets estabished pursuant to paragraphs (c)(4) and (c)(5) of this section.

(11) *Certification of compliance.* Before the receipt of any 8(a) contract during the transitional stage of the program, a Program Participant must certify that it is in compliance with the non-8(a) business activity targets estabished in its business plan as approved by SBA or that it is in compliance with any remedial measures imposed by SBA pursuant to paragraph (c)(12) of this section, if such remedial measures allow the continued award of 8(a) contracts.

(12) *Remedial measures for failure to achieve non-8(a) business activity targets.* SBA is authorized to take appropriate remedial measures with respect to a Program Participant which has failed to attain the minimum required business activity targets as established in paragraphs (c)(4) and (c)(5) of this section. The type of remedial measure used depends in part on the extent to which the Participant failed to obtain and the effort expended in seeking non-8(a) business. These remedial actions include, but are not limited to:

(i) Requiring the Program Participant to obtain management and technical assistance or to obtain counseling and/or attend seminars relating to management assistance, business development, financing, marketing, or proposal preparation.

(ii) Conditioning the award of future sole source 8(a) contracts on the Participant's taking affirmative steps to expand the dollar volume of its competitive business activity, such as changes in marketing of financing strategies;

(iii) Reducing a Participant's approved level of 8(a) support;

(iv) Reducing, or eliminating, sole source 8(a) contracts;

(v) Program termination pursuant to § 124.209—program termination proceedings will be commenced where a firm makes no efforts to obtain non-8(a) revenues.

**§ 124.313 Certification of SBA's competency.**

(a) SBA will certify that it is competent to perform the requirement, as provided by section 8(a)(1)(A) of the Small Business Act, based on its determination that the 8(a) concern with which it intends to subcontract is responsible to perform the requirement. If SBA determines that the concern lacks the capability, competency, capacity, credit, integrity, or tenacity and perseverance to perform on a specific 8(a) subcontract, the subcontract will not be awarded to such concern. A Program Participant which has not submitted required financial statements to SBA will be deemed not responsible to receive 8(a) subcontracts. In addition, SBA will also certify whether an 8(a) concern is eligible under the Walsh-Healey Public Contracts Act, 41 U.S.C. 35(a), for each individual 8(a) subcontract.

(b) SBA's determination not to award a Program Participant a specific 8(a) subcontract because the concern lacks an element of responsibility, or is ineligible under the Walsh-Healey Public Contracts Act, does not constitute a denial of total 8(a) program participation for the purposes of section 8(a)(9) of the Small Business Act.

(c) A Participant that is determined by SBA not to be responsible to perform a sole source or competitive 8(a) contract may not seek the issuance of a Certificate of Competency pursuant to § 125.5 of this title.

**§ 124.314 Performance of work by the 8(a) concern.**

(a) To assure the accomplishment of the purposes of the 8(a) program, each 8(a) subcontractor must perform work equivalent to the following percentages:

(1) *Services (except construction).* In the case of an 8(a) contract for professional and/or non-professional services (except construction), at least 50 percent of the cost of contract performance incurred for labor must be expended for employees of the 8(a) concern.

(2) *Supplies (other than procurement from a regular dealer in such supplies).* In the case of an 8(a) contract for supplies, an 8(a) concern that seeks to perform the requirement as a manufacturer must perform work for at least 50 percent of the cost of manufacturing the supplies, not including the cost of materials. This requirement does not apply to 8(a) concerns that seek to perform 8(a) supply contracts as regular dealers in such supplies.

(3) *General construction.* In the case of an 8(a) general construction contract, the 8(a) concern must perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

(4) *Construction by special trade contractors.* In the case of an 8(a) contract for special trade construction (e.g., electrical, plumbing, mechanical), the 8(a) concern must perform at least 25 percent of the cost of the contract, not including the cost of materials, with its own employees.

(b) The Program Participant must certify in its bid or proposal that it will perform the required percentage of work with its own employees. Failure of the concern to provide such a statement will result in the firm being considered ineligible for award.

(c) For purposes of determining whether a Program Participant will perform the required percentage of the contract, the work to be performed by a subsidiary(ies) of the Participant or a concern(s) otherwise affiliated with the Participant is not counted as being performed by the Participant.

(d) *Indefinite quantity contracts.* (1) In order to ensure that the required percentage of an indefinite quantity 8(a) award is performed by the Program Participant, at any point in time the Program Participant must have performed the required percentage of the total value of the contract to that date. For a service or supply contract, this does not mean that the Program Participant must perform 50% of each task order with its own force. But, rather, the Participant is required to perform 50% of the combined total of all task orders to date. The Regional Administrator or his/her designee may waive this requirement where a large amount of subcontracting is essential in the early stages of performance before the work to be done by the Participant can be performed, provided that there are written assurances from both the Participant and the procuring agency that the contract will ultimately comply with the requirements of this section.

Example. If a Program Participant performed 90 percent of a $100,000 task order on an indefinite quantity service contract with its own work force, it would only have to perform 10 percent of a second task order for $100,000 because the concern would still have performed 50 percent of the combined total value of the contract to date ($100,000 out of $200,000).

(2) Where there is a guaranteed minimum condition in an indefinite quantity 8(a) award, the required performance of work percentage need not be met on the first task order. In such a case, however, the percentage of work to be subcontracted to other concerns by the Program Participant on the first task order may not exceed 50 percent of the total guaranteed minimum dollar value to be provided by the contract. If the first task order exceeds 50 percent of the guaranteed minimum amount, the Participant may subcontract no more than 50 percent of the guaranteed amount. Once the guaranteed minimum amount is met, the general rule for indefinite quantity contracts set forth in paragraph (d)(1) of this section applies.

Example. Where a contract guarantees a minimum of $100,000 in professional services and the first task order is for $60,000 in such services, it would be acceptable for the Program Participant to perform less than $30,000 (i.e., 50 percent of $60,000). The Program Participant could be permitted to perform only $10,000 of that first task order. In such a case, the entire remainder of the guaranteed minimum ($40,000), however, would have to be performed by the Program Participant so that the Participant would have ultimately performed $50,000 (i.e., 50% of the $100,000 guaranteed minimum).

**§ 124.315 Fair market price for 8(a) awards.**

(a) A "fair market price" for an 8(a) contract shall be determined by the agency offering the procurement requirement to SBA in accordance with paragraphs (a)(1) and (a)(2) of this section.

(1) The estimate of a current fair market price for a new procurement requirement, or a requirement that does not have a satisfactory procurement history, shall be derived from a price or cost analysis. Such analysis may take into account prevailing market conditions, commercial prices for similar products or services, or data obtained from any other agency. Such analysis must also consider any cost or pricing data that is timely submitted by the SBA.

(2) The estimate of a current fair market price for a procurement requirement that has a satisfactory procurement history shall be based on recent award prices adjusted to insure comparability. Such adjustments shall take into account differences in quantities, performance, times, plans, specifications, transportation costs, packaging and packing costs, labor and material costs, overhead costs, and any other additional costs which may be deemed appropriate.

(b) Upon the request of SBA, an agency offering a procurement requirement for potential award through the 8(a) program shall submit to SBA a written statement detailing the method used by the agency to estimate the current fair market price for such contract. Such statement shall be submitted within 10 working days. The procuring agency must identify the information, studies, analyses, and other data it used in making its estimate. The procuring agency's estimate of fair market price and any supporting data may not be disclosed to any potential contractor or subcontractor, other than SBA.

(c) The concern selected to perform the 8(a) contract may request SBA to protest the procuring agency's estimate of current fair market price to the Secretary of the Department or head of the agency in accordance with § 124.320(b).

**§ 124.316 Contract administration.**

(a) SBA may delegate, by the use of special clauses in the prime contract and subcontract, certain responsibilities for administering an 8(a) subcontract to the procuring agency.

(b) SBA may delegate to the procuring agency all subcontract administration functions except the following: the approval of novation agreements (48 CFR 42.302(a)(25)); and pertaining advance payments approved by SBA.

**§ 124.317 Performance of contracts by original 8(a) concern.**

(a) Subject to the provisions of paragraph (b) of this section, a contract (including options) awarded pursuant to section 8(a) of the Small Business Act on or after October 1, 1989 shall be performed by the concern that initially received such contract. If the owner or owners upon whom eligibility was based relinquishes ownership or control of such concern, or enters into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government. In such a case, repurchase costs or other damages cannot be assessed against the concern due solely to the provisions of this paragraph. This provision applies whether the concern that initially received 8(a) certification remains a separate legal entity after a transfer of ownership or whether the concern merges into or is acquired by another business concern.

(b) The Administrator may, as a matter of discretion and on a nondelegable basis, waive the requirements of paragraph (a) of this section if requested to do so by the original 8(a) awardee if any of the following conditions exist:

(1) When it is necessary for the owner(s) of the concern to surrender partial control of such concern on a temporary basis in order to obtain equity financing;

(2) The head of the procuring agency for which the contract is being performed certifies that termination of the contract would severely impair attainment of the agency's program objectives or missions.

(3) Ownership and control of the concern that is performing the contract will pass to another Program Participant, but only if the acquiring firm would otherwise be eligible to receive the award directly as an 8(a) contract;

(4) The individuals upon whom eligibility was based are no longer able to exercise control of the concern due to incapacity of death; and

(5) When, in order to raise equity capital, it is necessary for the disadvantaged owner(s) of the concern to relinquish ownership of a majority of the voting stock of such concern, but only if—

(i) Such concern has exited the 8(a) program;

(ii) The disadvantaged owner(s) will maintain ownership of the largest single outstanding block of voting stock (including stock held by affiliated parties); and

(iii) The disadvantaged owner(s) will maintain control of the daily business operations of the concern.

(c) Requests pursuant to paragraph (b) of this section must be made prior to the relinquishment of ownership and control except in the case of death or incapacity. A request for a waiver under paragraph (b)(4) of this section must be made as soon as possible after the incapacity or death occurs.

(d) A procuring agency may request a waiver of the requirements of paragraph (a) of this section if the head of the procuring agency certifies that termination of the contract would severely impair attainment of the agency's program objectives or missions.

(e) A concern performing an 8(a) contract must notify the SBA in writing immediately upon entering into an agreement or agreement in principle (either oral or written) to transfer all or part of its stock or other ownership interest or assets to any other party. Such an agreement could include an oral agreement to enter into a transaction to transfer interests in the future.

(f) Denial of a waiver request may be appealed to SBA's Office of Hearings and Appeals in accordance with § 124.210 and part 134 of the title.

(g) For the purposes of determining ownership and control of a concern under these regulations, any potential ownership interests (such as options or warrants) held by investment companies licensed under the Small Business Investment Act of 1958 shall not be treated as ownership interests until exercised.

(h) An 8(a) concern may not transfer the performance of an 8(a) contract to another concern, absent a waiver or authorized by this section. Such a transfer may be grounds for termination of the concern from the 8(a) program.

### § 124.318 Exercise of options and modifications.

(a) *Unpriced Options.* The exercise of an unpriced option is considered to be a new contracting action. As such, if a concern has exited the 8(a) program or is no longer small under the size standard corresponding to the SIC code for the requirement, negotiations to price the option cannot be entered into and the option cannot be exercised. If, however, the concern is still a Program Participant and is still a small business under the size standard corresponding to the SIC code for the requirement, negotiations to price the option may be entered into provided the estimated fair market price falls below the applicable threshold amount set forth in § 124.311 and, if a fair and reasonable price is negotiated, and it is otherwise consistent with program requirements, the option may be exercised. If the estimated fair market price exceeds the applicable threshold amount set forth in § 124.311, the requirement must be competed among eligible 8(a) concerns. Because this equates to a new contracting action, SBA's concurrence in the exercise of such options is required.

(b) *Priced Options.* A priced option to an 8(a) contract award may be exercised whether the concern that received the award has existed the 8(a) program and whether the concern is no longer small under the size standard corresponding to the SIC Code for the requirement, if to do so is in the best interests of the Government considering the purposes of the 8(a) program.

(c) *Modifications Beyond the Scope.* A modification beyond the scope of the initial 8(a) contract award is considered to be a new contracting action. As such, if a concern has exited the 8(a) program or is no longer small under the size standard corresponding to the SIC Code for the requirement, the modification cannot be exercised. If, however, the concern is still a Program Participant and is still a small business under the size standard corresponding to the SIC Code for the requirement, the modification may be made provided the estimated fair market price falls below the applicable threshold amount set forth in § 124.311 and other program requirements are met, since the authority exists to enter into a new 8(a) contract to fulfill the requirement. If the estimated fair market price exceeds the applicable threshold amount set forth in § 124.311, the requirement must be competed among eligible 8(a) concerns. Because this equates to a new contracting action, SBA's concurrence in the exercise of such modifications is required.

(d) *Modifications Within the Scope.* A modification within the scope of the initial 8(a) contract award may be exercised whether the concern that received the award has exited the 8(a) program and whether the concern is no longer small under the size standard corresponding to the SIC Code for the requirement.

### § 124.319 Contract termination.

(a) *Termination for default.* A decision to terminate a specific 8(a) contract for default is made by the procuring agency contracting officer in cooperation with SBA. The contracting officer will advise SBA in writing in advance of his/her intent to terminate the 8(a) contract for default. SBA may provide to the 8(a) concern any program benefits reasonably available in order to assist in preventing termination for default of the contract. SBA will advise the contracting officer of this effort. If, despite the efforts of the SBA, the procuring agency contracting officer believes grounds for termination continue to exist, he/she may terminate the 8(a) contract for default, after consulting with SBA. Such terminations shall be processed in accordance with the FAR, 48 CFR. SBA will have no liability for termination costs or reprocurement costs.

(b) *Termination for convenience.* (1) In cooperation with SBA, the procuring agency contracting officer may terminate an 8(a) contract for convenience any time it is determined to be in the best interest of the government to do so.

(2) Pursuant to § 124.317, a contract shall be terminated for convenience if the owner or owners upon whom eligibility was based relinquish ownership or control of such concern, or enter into any agreement to relinquish such ownership or control, unless a waiver is granted pursuant to § 124.317. Such terminations shall be processed in accordance with the FAR, 48 CFR.

### § 124.320 Disputes and appeals.

(a) *Contract disputes generally.* (1) Except as provided in paragraphs (a)(2) and (a)(3) of this section, for purposes of the Disputes Clause of a specific 8(a) contract, the contracting officer is that of the procuring agency. A dispute arising between an 8(a) subcontractor and the procuring agency contracting officer will be decided unilaterally by the procuring agency contracting officer.

(2) For disputes arising out of advance payments or business development

expense funds, the contracting officer is that of SBA.

(3) For disputes arising out of construction contracts where SBA has waived bonding pursuant to § 124.305, the appropriate contracting officer depends upon the dispute. Where the dispute arises out of the disbursement of funds from the special bank account established to protect persons furnishing materials or labor to the 8(a) concern, the SBA contracting officer shall decide the dispute. In all other disputes, including disputes arising out of the performance of the contract, the procuring agency contracting officer shall decide the dispute.

(4) Decisions by contracting officers (either of SBA or a procuring agency) may be appealed as provided by the Contract Disputes Act of 1978.

(b) *SBA appeals of nonselection or terms and conditions.* (1) The Administrator of SBA may appeal the following matters to the head of the procuring agency:

(i) The decision not to make a particular procurement requirement available for award under the 8(a) program; or

(ii) The terms and conditions of a particular contract to be awarded under the 8(a) program, including selection of an appropriate SIC code.

(2) The SBA must notify the contracting officer of the Administrator's intent to appeal an adverse determination within 5 working days of the SBA's receipt of such determination. The SBA Administrator must file a written request to reconsider the adverse decision with the head of the procuring agency (appeal) within 15 working days of the SBA's notification of intent to appeal.

(3) Upon receipt of the notice of intent to appeal, the procuring agency shall suspend further action regarding the procurement until the head of the procuring agency issues a written decision on the appeal, unless the head of the procuring agency makes a written determination that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for a reconsideration of the adverse decision.

(4) If the Administrator's appeal is denied, the procuring agency head shall so notify the SBA, specifying the reasons for the denial. This information shall be made a part of the contract file for the requirement.

(c) An 8(a) Participant selected by the SBA to perform or negotiate an 8(a) contract may request the SBA to protest the procuring agency's estimate of the fair market price for such contract pursuant to paragraph (b) of this section.

**§ 124.321 Joint venture agreements.**

(a) *Prerequisites for joint venture agreement.* If approved by the AA/MCB&COD or his/her designee, an 8(a) concern may enter into a joint venture agreement, as defined in § 124.100, with another small business concern, whether or not an 8(a) participant, for the purpose of performing a specific 8(a) contract. A joint venture agreement is permissible only when the 8(a) concern lacks the necessary capacity to perform the contract on its own, and when the agreement is fair and equitable and will be of substantial benefit to the 8(a) concern.

(b) *Size limitations.* Except for certain Program Participants owned and controlled by Indian tribes, an 8(a) concern entering into a joint venture agreement with another concern is considered to be affiliated for size purposes with the other concern with respect to performance of the 8(a) subcontract. As such, the annual receipts or employees of the other concern are included in determining the size of the selected 8(a) concern. The combined annual receipts or employees of the concerns entering into the joint venture must meet the size standard for the SIC code industry designated for the contract. *See* paragraph (h) of this section for joint ventures controlled by tribally-owned concerns.

(c) *Contents of joint venture agreements.* The following provisions shall be included in all joint venture agreements:

(1) A provision setting forth the purpose of the joint venture.

(2) A provision designating the parties to the joint venture as co-managers.

(3) A provision stating that not less than 51 percent of the net profits earned by the joint venture shall be distributed to the 8(a) concern.

(4) A provision providing for the establishment and administration of a special bank account in the name of the joint venture. This account shall require the signature of all participants to the joint venture or designees for withdrawal purposes. All payments due the joint venture for performance on an 8(a) subcontract shall be deposited in the special account from which all expenses incurred under the subcontract shall be paid.

(5) An itemized description of all major equipment, facilities, and other resources to be furnished by each participant to the joint venture, with a detailed schedule of cost or value of each.

(6) A provision specifying the responsibilities of the parties with regard to contract performance, source of labor and negotiation of the 8(a) contract and any subcontracts to the joint venture.

(d) *Other requirements.* Joint venture agreements are subject to the following additional requirements:

(1) The joint venture agreement must be approved in advance of contract award by AA/MSB&COD or his/her designee.

(2) An employee of the 8(a) concern must be the designated project manager responsible for contract performance.

(3) Accounting and other administrative records relating to the joint venture shall be kept in the office of the 8(a) concern, unless approval to keep them elsewhere is granted by the Regional Administrator or his/her designee upon written request. Upon completion of the contract performed by the joint venture, the final original records shall be retained by the 8(a) concern.

(4) Quarterly financial statements showing cumulative contract receipts and expenditures (including salaries of the joint venture's principals) shall be submitted to SBA not later than 45 days after each operating quarter of the joint venture.

(5) A project-end profit and loss statement shall be submitted no later than 90 days after completion of the contract including a statement of final profit distribution.

(e) *Obligation of performance.* All parties to the joint venture must sign such documents as are necessary to obligate themselves to ensure performance of the 8(a) contract.

(f) *Performance of work by 8(a) concern(s).* The 8(a) partner(s) to an eligible joint venture, and not the aggregate of all parties to the joint venture, must perform the applicable percentages of work required by § 124.314.

(g) *Inspection of records.* The SBA shall have the right to inspect the records of the joint venture without notice at any time deemed necessary.

(h) *Joint ventures with concerns owned by Indian tribes*—(1) *Exemption from size limitations.* The size limitations set forth in paragraph (b) of this section will not be applied to joint ventures entered into by an 8(a) concern owned and controlled by an economically disadvantaged Indian tribe, as defined in § 124.100, if the concern:

(i) Owns and controls 51 percent or more of the joint venture;

(ii) Is located on the reservation of or land owned by the tribe;

(iii) Performs most of its activities on such reservation or tribally owned land; and

(iv) Employs members of such tribe for at least 50 percent of its total workforce.

(2) *Identification of requirements.* Requirements suitable for joint ventures with tribally owned concerns must be identified by SBA and/or the tribally owned concern. Large business concerns may not be involved in identifying such requirements.

(3) *Limitations.* A tribally owned 8(a) concern as a party to a joint venture may receive the exemption set forth in paragraph (h) of this section on no more than two contracts.

(4) *Sunset.* This paragraph shall cease to be effective after September 30, 1991.

**§ 124.401 Advance payments.**

(a) *General.* (1) Advance payments are disbursements of cash made by SBA to an 8(a) concern prior to the completion of performance of a specific 8(a) subcontract and are based on anticipated performance on the part of the 8(a) concern under a particular 8(a) subcontract. Advance payments are made for the purpose of assisting the 8(a) concern to meet financial requirements pertinent to the performance of an 8(a) subcontract. Advance payments will be considered only after all other forms of financing have been considered by SBA and are determined to be either unavailable or unacceptable to support performance of the 8(a) subcontract.

(2) Advance payments may be authorized only for concerns which are current Program Participants at the time of the approval of the advance payment. A firm which has graduated from or otherwise exited the 8(a) program prior to approval is ineligible for advance payments. Where the concern will graduate from the 8(a) program during the initial performance period (base year), advance payments may be authorized only for that year, and may not be authorized for option years.

(3) The gross amount of advance payments will be determined by SBA at the time the request for such payments is approved. The gross amount of advance payments must be determined by SBA prior to commencement of performance of the contract. In no event shall the total amount of advance payments disbursed and not repaid exceed 90 percent of the outstanding unpaid proceeds of the 8(a) subcontract to which the advance payments relate. The value of unexercised options is not considered in determining the outstanding unpaid proceeds of the 8(a) subcontract. In the case of requirements and indefinite quantity type contracts, advance payments will be authorized only when a guaranteed minimum value is established in the 8(a) subcontract, and the amount of advance payments approved shall not exceed 90 percent of that guaranteed minimum. SBA must approve in writing any subsequent change in the gross amount of advance payments.

(4) All advance payments, whether disbursed by letter of credit or otherwise, and all 8(a) subcontract proceeds shall be deposited into a Special Bank Account established exclusively for that purpose pursuant to the Advance Payment clause of the 8(a) subcontract. Under no circumstances may advance payment funds be deposited in certificates of deposit or other securities. The procuring agency shall pay all 8(a) subcontract proceeds directly into the Special Bank Account until notified by SBA in writing that the advance payments have been fully liquidated. SBA will not authorize any withdrawals from the Special Bank Account that are inconsistent with the disbursement schedule established by the 8(a) subcontract under which the advance payments were made.

(5) Advance payments shall be liquidated from proceeds derived from the performance of the specific 8(a) subcontract to which they pertain or from other revenues of the business (except other advance payments). 8(a) subcontract proceeds shall be applied first to liquidate outstanding advance payments. Repayment must occur according to the liquidation schedule established by the 8(a) subcontract under which the advance payments were made.

(6) The special bank account may not be used as a revolving line of credit. The cumulative total amount of advance payments disbursed may not exceed the amount authorized by the Regional Administrator or his/her designee.

(b) *Requirements and conditions.* (1) Advance payments may be approved for an 8(a) concern only when all of the following conditions are found by SBA to exist:

(i) An 8(a) concern does not have adequate working capital to perform a specific 8(a) subcontract.

(ii) Adequate and timely private financing is not available on reasonable terms to provide necessary capital.

(iii) Progress payments based on costs at customary rates will not satisfy the working capital requirements of the 8(a) concern to perform the 8(a) subcontract.

(iv) When applicable, loan guarantees for defense production are not available.

(v) Progress payments based on costs with unusual terms will not satisfy the working capital requirements of the 8(a) concern to perform the 8(a) subcontract.

(vi) The 8(a) concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of advance payment funds. These records must be made available upon request for review and copying by SBA and other appropriate Federal officials.

(vii) The 8(a) concern has no unliquidated advance payments outstanding on another 8(a) subcontract which is completed, terminated or in default, unless such unliquidated advance payments are due only to the contracting agency's delay in making final payment to the 8(a) concern after it has successfully completed the 8(a) subcontract.

(2) Advance payments shall not be made to an 8(a) concern in any case in which the concern has assigned its right to receive any payment under the specific 8(a) subcontract to any person or entity.

(3) SBA shall not charge interest on advance payments disbursed pursuant to these regulations, except upon an event of default, as defined in the subcontract. When charged, interest shall be assessed at such rate as established by the Secretary of the Treasury pursuant to Public Law 92–41.

(4) Under no circumstances may a liquidation schedule be waived. However, the cognizant Regional Administrator or ARA/MSB&COD may authorize a modified liquidation schedule in appropriate cases. Such modified schedule becomes effective when contained in an appropriate modification to the subcontract.

(c) *Application and approval procedure.* The following procedures apply to the approval of advance payments:

(1) The 8(a) concern must submit a written request for advance payments to the cognizant SBA Regional Administrator or his/her designee. Such request must include such detailed documentation as SBA may specify to support 8(a) concern's need for such funds and proof that working capital financing cannot be found from financing institutions at reasonable terms.

(2) The 8(a) concern must identify a commercial bank which is a member of the Federal Reserve System in which it will establish a Special Bank Account for the deposit of advance payments and all payments made to it by the procuring agency for its performance of the 8(a)

subcontract. This special account shall be a non-interest bearing demand deposit account.

(3) The 8(a) concern must, as required by IRS regulations, select a Federal Depository into which the Federal withholding and FICA payment will be made.

(4) Upon review of all of the circumstances, the Regional Administrator or the ARA/MSB&COD shall decide whether to approve or deny a request for advance payments, and, if approval is granted, shall designate the amount thereof and the terms and conditions upon which such advance payments may be made.

(d) *Post-approval procedures.* The Contracting Officer shall be responsible for assuring that advance payments are implemented consistent with the Finding, Determination and Authorization for Advance Payments issued by the Regional Administrator or his/her designee. Before any advance payments are disbursed, the following actions must occur:

(1) The 8(a) concern must execute a note evidencing the full amount of the advance payments and any other documents needed to create and perfect such other sources of security as SBA shall require, including, but not limited to the following:

(i) Real estate, deeds of trust and mortgages;

(ii) Security agreements and financing statements; and

(iii) Personal guarantees.

(2)(i) The 8(a) concern and SBA shall execute a modification to the 8(a) subcontract adding an Advance Payment clause prior to the disbursement of any advance payments. The clause shall state the amount of the advance payments, a liquidation schedule and all other terms and conditions to govern the advance payments, consistent with the Finding, Determination and Authorization for Advance Payments issued by the Regional Administrator or ARA/MSB&COD.

(ii) The Contracting Officer, when other contract terms reducing the quantity, price or term of performance of the 8(a) prime and subcontract are modified by the procuring agency, shall initiate action to modify the Advance Payment clause and, if appropriate, the letter of credit as necessary, including but not limited to reduction of the total amount of advance payments authorized or the amount of the letter of credit and/or restructuring the liquidation schedule, to ensure that at no time during the performance of the 8(a) subcontract does the unliquidated advance payments exceed 90 percent of the unpaid value of the 8(a) subcontract.

(3) The 8(a) concern, SBA and the bank in which the Special Bank Account has been established will enter into a Special Bank Account Agreement prior to disbursement of any funds. The agreement shall specify the respective rights and responsibilities of the parties. The Agreement shall grant to SBA the unilateral right to withdraw any funds in the Special Bank Account to the extent necessary to liquidate any unliquidated advance payments.

(i) The cognizant SBA Regional Administrator shall designate at least two SBA employees to serve as countersignatories on the Special Bank Account. Withdrawals from the account will be made only upon the authorized signatures of a representative of the 8(a) concern and one of the designated SBA employees, as identified on the signature card for the Special Bank Account. Under no circumstances shall the requirement for an SBA employee countersignature be waived.

(ii) At the time that SBA disburses advance payment funds into the Special Bank Account, SBA shall obtain a paramount lien upon the Special Bank Account, any property contracted for, supplies, material and other property acquired with the advance payment funds, and the most superior lien possible upon any other security required by the Finding, Determination and Authorization for Advance Payments.

(4) Prior to disbursement of an advance payment, SBA shall modify the prime contract with the procuring agency in the following respects:

(i) Reassign contract administration authority to the extent necessary to administer the Advance Payment clause of the 8(a) subcontract to SBA's Contracting Officer.

(ii) Direct payment of all contract proceeds into the Special Bank Account until SBA issues written notice that the advance payments have been fully liquidated.

(iii) Require prompt notice of any adverse developments in contract performance, changes in the Government requirement, or of any other condition that may affect contract payments.

(iv) Require that copies of all payment vouchers issued by the procuring agency's disbursing office be sent to the Contracting Officer.

(e) *Procedures for use of Advance Payment funds.* (1) Except for repayment to SBA in appropriate circumstances, advance payment funds may be used by an 8(a) concern only for the purchase of materials, payment of labor, payment for equipment expenses, general and administrative expenses and overhead, and payments to the subcontractors of the 8(a) concern necessary for the performance of the specific 8(a) subcontract for which the advance payments were authorized. Program Participants shall follow a two-step process to gain access to advance payment funds. The first step is the disbursement of the advance payment funds from SBA, either directly or by way of letter of credit into the Special Bank Account. The second step is the withdrawal of funds from the Special Bank Account by check to pay particular contract expenses.

(2) *Disbursement of advance payment funds by SBA.* (i) SBA shall disburse advance payments through a letter of credit where the Agency anticipates that all of the following conditions exist:

(A) Its relationship with the particular 8(a) concern will last for a year or more.

(B) The cumulative disbursements to that 8(a) concern will total at least $120,000 annually.

(C) The 8(a) concern has submitted a schedule of its projected monthly advance requirements for 8(a) subcontract disbursements and SBA has reviewed it and found it to be reasonable.

(D) The 8(a) concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of program funds. These records must be made available upon request for review and audit by SBA and the General Accounting Office.

(ii) *Procedures for disbursements by letter of credit.* The procedures for the utilization of the letter of credit method of payment shall be in accord with 48 CFR 32.406. Where disbursement is by the letter of credit method, 8(a) concerns shall draw down funds against their letters of credit for deposit into the Special Bank Account only as needed and in such amounts necessary for its immediate cash needs under the 8(a) subcontract for which the advance payments were authorized. Such immediate cash needs shall be documented by the 8(a) concern and verified by SBA prior to draw down. The amount of each draw down against the letter of credit shall be for the minimum amount needed to satisfy immediate cash needs, taking into account other financial resources available to the 8(a) concern, including progress payments not required for the liquidation of disbursed advance payments.

(iii) In all instances not covered by paragraph (e)(2)(i) of this section, SBA

shall disburse advance payments by Treasury check or electronic funds transfer. In such cases, the Contracting Officer shall request SBA's Office of Financial Operations, Denver, Colorado, to disburse the authorized amount of the advance payments into the Special Bank Account.

(3) *Procedures for withdrawal of funds from the Special Bank Account.* All payments to the 8(a) concern under the 8(a) subcontract for which advance payments were authorized, together with all disbursements of such advance payments, shall be paid into the Special Bank Account.

(i) *Liquidation of disbursed advance payments.* The funds in the Special Bank Account shall be applied by SBA first to liquidate the balance of disbursed advance payments, in accordance with the liquidation schedule in the Advance Payment clause of the 8(a) subcontract. Withdrawals for liquidation of disbursed advance payments shall be made in accordance with the procedures contained in the Advance Payment clause of the 8(a) subcontract.

(ii) *Payment of 8(a) subcontract expenses.* Any amounts in the Special Bank Account not required to liquidate disbursed advance payments shall next be applied to pay allowable and allocable costs incurred in the performance of the 8(a) subcontract for which the advance payments were authorized. To obtain withdrawals from the Special Bank Account for the payment of such costs, the 8(a) concern shall request issuance of checks for the payment of expenses to the Contracting Officer, supported by the documentation described below. Such requests shall be made sufficiently in advance of the due date for such obligations to permit the review of the request by SBA and countersignature by the designated SBA countersignatories. The 8(a) concern shall support each request for a withdrawal from the Special Bank Account by submitting to the Contracting Officer or his/her designee, to the extent applicable, the following:

(A) The original vendor invoice or original payroll record;

(B) A certified statement, dated and signed by the concern's authorized certifying official, attesting to the truth and accuracy of the vendor invoice, and/or the payroll records for the requested withdrawal, including records of direct payroll expenditures as well as labor overhead;

(C) A certification by the 8(a) concern that all Federal taxes and FICA payments are current, or a copy of any agreement with the Internal Revenue Service (IRS) providing for payment of delinquent taxes; and

(D) Documentation of overhead and general and administrative rates, using projected indirect costs applied to a valid base, which have been properly allocated to direct material, labor, or other direct costs.

(E) Where the requested withdrawal is for payroll expenses, the 8(a) concern must prepare a check for Federal taxes in the name of the tax collecting agency, or the Federal Depository selected by the 8(a) concern into which its Federal withholding and FICA payments are made, to be signed by SBA and the 8(a) concern concurrent with the check for the submitted payroll. If the amount of a check payable to IRS or to the Federal Depository is less than 25 percent of the gross payroll for the period, the 8(a) concern's authorized certifying official shall prepare a statement certifying that the amount designated as payable to IRS or to the Federal Depository is true and correct. There shall be no change of Federal Depository without obtaining the prior written consent of SBA.

(iii) *Release of residual funds after liquidation of the advance payments and payment of 8(a) subcontract expenses.* Any funds remaining in the Special Bank Account after the 8(a) subcontract has been successfully completed or terminated and after the advance payments have been fully liquidated and all allowable and allocable 8(a) subcontract performance costs have been paid shall be disbursed to the 8(a) concern. Upon receipt of the final progress payment, the Contracting Officer shall expeditiously close the Special Bank Account, executing a check withdrawing the remaining balance of the Account payable to the 8(a) concern.

(f) *Cancellation.* (1) SBA may determine that advance payments should be cancelled under appropriate circumstances, including but not limited to the following:

(i) The terms and conditions of the Advance Payment clause have not been adhered to by an 8(a) concern.

(ii) The 8(a) concern is not in compliance with its 8(a) Participation Agreement.

(iii) The 8(a) concern has been suspended pursuant to § 124.115 or has been terminated by administrative action under section 8(a)(9) of the Small Business Act, 15 U.S.C. 637(a)(9).

(2) In the event of cancellation of advance payments to an 8(a) concern, all previous advance payments made to that 8(a) concern shall become due and payable to SBA prior to the receipt of final contract payment.

**§ 124.402 Business development expense.**

(a) Any Business Development Expense (BDE) funds received by a Program Participant prior to the expiration of the BDE program must be used exclusively for the purposes stated in the BDE approval. Use of such funds for any other purpose may be good cause for termination from the 8(a) program pursuant to § 124.209.

(b) Any Program Participant which received BDE funds prior to the expiration of the BDE program shall maintain records to substantiate the uses for which the BDE funds have been expended.

(c) In the event of default on an 8(a) contract to which BDE funds relate, the Participant shall be liable for repayment of the full amount of the BDE to SBA.

**§ 124.403 Development Assistance Program.**

(a) *General.* Section 7(j)(1) of the Small Business Act provides for financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individual or enterprises eligible for assistance under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act. The AA/MSB&COD is responsible for coordinating and formulating policies relating to the dissemination of this assistance to small business concerns eligible for assistance under sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act.

(b) *Services.* (1) Section 7(j)(1–2) of the Small Business Act empowers the SBA to provide through public and private organizations the management and technical assistance enumerated in paragraph (b)(3) of this section to those individuals or concerns who meet the eligibility criteria contained in sections 7(a)(1) and 8(a) of the Small Business Act.

(2) The SBA shall give preference to projects which promote the ownership, participation in ownership, or management of small businesses owned by low-income individuals and small businesses eligible to participate in the section 8(a) program.

(3) This assistance may include any or all of the following:

(i) Planning and research, including feasibility studies and market research;

(ii) The identification and development of new business opportunities;

(iii) The furnishing of centralized services with regard to public services and Federal Government programs including programs authorized under

sections 7(a)(11), 7(j)(10) and 8(a) of the Small Business Act.

(iv) The establishment and strengthening of business service agencies, including trade associations and cooperatives;

(v) The furnishing of business counseling, management training, with special emphasis on the development of management training programs using the resources of the business community, including the development of management training opportunities in existing business, and with emphasis in all cases upon providing management training of sufficient scope and duration to develop entrepreneurial and managerial self-sufficiency on the part of the individuals served.

(4) Sections 7(j)(3) and 7(j)(9) of the Small Business Act authorize SBA to:

(i) Encourage the placement of subcontracts with small business concerns located in areas of high concentration of unemployed or low-income individuals, with small businesses owned by low-income individuals, and with small businesses eligible to receive contracts pursuant to section 8(a) of the Act. SBA may provide incentives and assistance to such business that will aid in the training and upgrading of potential subcontractors or other small business concerns eligible for assistance under sections 7(a)(11), 7(j), and 8(a) of the Small Business Act.

(ii) Coordinate and cooperate with the heads of other Federal departments and agencies, to insure that contracts, subcontracts, and deposits made by the Federal Government or with programs aided with Federal funds are placed in such a way as to further the purposes of sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(c) *Eligibility.* (1) Eligibility for the assistance enumerated under paragraph (b) of this section above shall include, but not limited to:

(i) Businesses which qualify as small within the meaning of size standards prescribed in 13 CFR part 121, and which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, or which are owned by such low-income individuals; and

(ii) Businesses eligible to receive contracts pursuant to section 8(a) of the Small Business Act.

(d) *Delivery of services.* (1) The financial assistance authorized for projects under paragraph (b) of this section includes assistance advanced by grant, cooperative agreement, or contract.

(2) To the extent feasible, services available under paragraph (b) of this section shall be provided in a location which is easily accessible to the individuals and small business concerns served.

(e) *Coordination and cooperation with other government agencies.* (1) The AA/MSB&COD may utilize the resources of other agencies and departments whenever practicable which can directly or indirectly support or augment the purposes of sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(2) The AA/MSB&COD shall enter into agreements with Federal agencies and departments to further the objectives of sections 7(a)(11), 7(j) and 8(a) of the Small Business Act.

(3) The AA/MSB&COD shall encourage the placement of deposits made by the Federal Government, or by programs aided with Federal Funds, in such a way as to further the purposes of section 7(a)(11), 7(j) and 8(a) of the Small Business Act.

**§ 124.404 Small Business and Capital Ownership Development Program.**

Section 7(j)(10) of the Small Business Act establishes a Small Business and Capital Ownership Development program which shall provide additional assistance exclusively for small business concerns eligible to receive contracts pursuant to section 8(a) of Small Business Act. The management of the Capital Ownership Development program is vested in the AA/MSB&COD who is responsible for the oversight of the program and activities set forth in this part of these regulations. The development assistance described below shall be provided exclusively to those small business concerns eligible to receive contracts pursuant to section 8(a) of the Small Business Act. Such small business concerns shall be participants in the Small Business Capital Ownership Development program. This program shall:

(a) Assist small business concerns participating in the program to develop comprehensive business plans with specific business targets, objectives, and goals;

(b) Provide for such other nonfinancial services as deemed necessary for the establishment, preservation, and growth of small business concerns participating in the program, including but not limted to:

(1) Loan packaging,

(2) Financial counseling,

(3) Accounting and Bookkeeping assistance,

(4) Marketing assistance, and

(5) Management assistance.

(c) Assist small business concerns participating in the program to obtain equity and debt financing;

(d) Establish regular performance monitoring and reporting systems for small business concerns participating in the program to assure compliance with their business plans;

(e) Analyze and report the causes of success and failure of small business concerns participating in the program; and

(f) Provide assistance necessary to help small business concerns participating in the program to procure surety bonds. Such assistance shall include, but not be limited to:

(1) The preparation of surety bond participating forms;

(2) Special management and technical assistance designed to meet the specific needs of small business concerns participating in the program and which have received or are applying to receive a surety bond, and

(3) Preparation of all forms necessary to receive a surety bond guarantee from the SBA pursuant to Title IV, part B of the Small Business Investment Act of 1958.

**§ 124.501 Miscellaneous reporting requirements.**

(a) *Capability statements.* Each 8(a) concern shall annually prepare and submit to the SBA a capability statement. Such statement shall briefly describe the concern's various contract performance capabilities and shall contain the name and telephone number of the BOS assigned to the concern. SBA will submit the capability statements to appropriate procuring agencies for the purpose of matching requirements with 8(a) concerns.

(b) *Participant reports on parties assisting it and fees.* (1) Each 8(a) Program Participant shall submit semi-annually a written report to its assigned BOS to include the following information:

(i) A listing of any agents, representatives, attorneys, accountants, consultants and other parties (other than employees) receiving fees, commissions, or compensation of any kind to assist such participant in obtaining a Federal contract;

(ii) The amount of compensation received by any person listed under paragraph (b)(1)(i) of this section during the relevant reporting period along with a description of the activities performed for such compensation.

(2) The BOS will review the report and forward it to the AA/MSB&COD. Any report that raises a suspicion of improper activity shall be referred immediately to the SBA Inspector General.

(3) The failure to submit a report pursuant to the requirements of this section shall be considered good cause for the initiation of a termination proceeding pursuant to § 124.209.

(c) *Reporting requirements after exiting the 8(a) program.* Former 8(a) Program Participants shall provide such information as SBA may request concerning such former Participant's continued business operations, contract portfolio and financial condition for a period of three years following the date on which the concern exits the program. Failure to provide such information when requested may result in the nonexercise of options on contracts awarded through the 8(a) program.

Dated: August 14, 1989.

Susan S. Engeleiter,

*Administrator.*

[FR Doc. 89-19500 Filed 8-16-89; 1:26 pm]

BILLING CODE 8025-01-M

---

## 13 CFR Part 105

## Standards of Conduct

**AGENCY:** Small Business Administration.

**ACTION:** Final rule.

**SUMMARY:** The Small Business Administration is hereby implementing sections 402 and 403 of the Business Opportunity Development Reform Act of 1988 (Pub. L. 100-656, effective June 1, 1989). This legislation provided for certain prohibitions, reporting requirements and penalties in connection with actions by SBA employees with regard to the administration of SBA's Minority Small Business and Capital Ownership Development Program. These regulations are required to implement the requirements of the legislation.

**EFFECTIVE DATE:** These regulations are effective September 20, 1989.

**ADDRESS:** Written comments may be submitted to Martin D. Teckler, Deputy General Counsel, 1441 L Street, NW., Room 700, Washington, DC 20416.

**FOR FURTHER INFORMATION CONTACT:** Martin D. Teckler, Deputy General Counsel, (202) 653-6642.

**SUPPLEMENTARY INFORMATION:** As indicated above, sections 402 and 403 of Pub. L. 100-656 imposed certain requirements upon SBA and its employees in administering the Agency's Minority Small Business and Capital Ownership Development (MSB&COD) program, more commonly known as the section 8(a) program. In this regard, section 402 prohibits SBA employees who participated personally either directly or indirectly in decisionmaking responsibilities or the administration of assistance relating to a program participant from certain relationships with that participant. (§ 105.521(a)). Further, certain enumerated employees are required to submit to the Administration annual written certifications of compliance with the provisions of the statute (§ 105.521(b)). There are specified civil penalties for noncompliance along with sanctions for false certification. (§ 105.521 (c) and (d)). In this regard, certifications required under (§ 105.521(b)) will be made to SBA's Office of General Counsel by each of the enumerated individuals on a yearly basis under instructions from SBA's General Counsel.

Section 403 of the legislation is implemented by (§ 105.522. Section 105.522(a) forbids any employee to exercise or threaten to exercise authority in taking actions with respect to the section 8(a) program on the basis of political activity or affiliation. Section 105.522(b) provides penalties for violation of § 105.522(a).

This rule involves a matter of Agency management and therefore notice and comment rulemaking is not required pursuant to 5 U.S.C. 553(a)(2). Thus, this rule is being published as final. SBA does, however, solicit comment from any interested party.

For purposes of the Regulatory Flexibility Act (5 U.S.C. 605(b), SBA certifies that this rule will not have a significant impact on a substantial number of small entities. For purposes of Executive Order 12291, SBA certifies that this rule is not a major rule. This rule will not impose additional reporting or recordkeeping requirements which would be subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35, nor will it have federalism implications warranting preparation of a Federal Assessment in accordance with Executive Order 12612.

### List of Subjects in 13 CFR Part 105

Standards of conduct.

Pursuant to the authority contained in section 5(b)(6) of the Small Business Act (15 U.S.C. 634(b)(6)), SBA hereby amends 13 CFR part 105 as follows:

## PART 105—[AMENDED]

1. The authority citation is revised to read:

Authority: 15 U.S.C. 684, Sec. 5, 72 Stat. 385; 15 U.S.C. 63(a)(18) and (19) as amended by Pub. L. 100-656; E.O. 11222; 3 CFR 1964-65 Comp.; 5 CFR 735-104.

2. Sections 105.521 and 105.522 are added to read as follows:

### § 105.521 Prohibited actions with respect to the Minority Small Business Program.

(a) (1) No person within the employ of the Administration shall, during the term of such employment and for a period of two years after such employment has been terminated, engage in any activity or transaction specified below with respect to any participant in the section 8(a) program which has been certified during such person's term of employment, if such person participated personally (either directly or indirectly) in decisionmaking responsibilities relating to such program participant or with respect to the administration of any assistance provided to program participants generally under section 8(a), section 7(j)(10), or section 7(a)(20) of the Small Business Act (15 U.S.C. 637(a), 636(j)(10) or 636(g)(20)).

(2) The activities and transactions prohibited by this section include:

(i) The buying, selling, or receiving (except by inheritance) of any legal or other beneficial ownership of stock or any other ownership interest in a section 8(a) program participant or the right to acquire any such interest;

(ii) The entering into or execution of any written or oral agreement (whether or not legally enforceable) to purchase or otherwise obtain any right or interest described in paragraph (a)(2)(i) of this section; or

(iii) The receipt of any other benefit or right that may be an incident of ownership of a section 8(a) program participant.

(b) The employees designated below shall annually submit a written certification to the Administration regarding compliance with the requirements of this section:

(1) Regional Administrators;

(2) District Directors;

(3) the Associate Administrator for Minority Small Business and Capital Ownership Development;

(4) employees whose principal duties relate to the award of contracts or the provision of other assistance pursuant to this subsection or section 7(j)(10); and

(5) such other employees as the Administrator may deem appropriate.

(c) Any present or former employee of the Administration who violates this section shall be subject to a civil penalty, assessed by the Attorney General, that shall not exceed 300 per centum of the maximum amount of gain such employee realized or could have realized as a result of engaging in those activities and transactions proscribed by this section.

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Parts 121, 124, and 134

### Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations; Rules of Procedure Governing Cases Before the Office of Hearings and Appeals

**AGENCY:** Small Business Administration.

**ACTION:** Proposed rule.

**SUMMARY:** In response to President Clinton's government-wide regulatory reform initiative and the Department of Justice's review of Federal procurement affirmative action programs, the Small Business Administration (SBA) proposes to amend both the eligibility requirements for, and contractual assistance provisions within, the SBA's 8(a) Business Development (8(a) BD) program. The proposed rule would change the name of the program from the Minority Small Business and Capital Ownership Development program to the 8(a) BD program to better reflect the purpose of the program. This rule is designed to streamline the operation of the 8(a) BD program, to ease certain restrictions perceived to be burdensome on Program Participants, to clarify certain eligibility requirements, and to delete obsolete regulations.

**DATES:** Comments must be submitted on or before October 14, 1997.

**ADDRESSES:** Written comments should be addressed to William Fisher, Acting Associate Administrator for Minority Enterprise Development, U.S. Small Business Administration, 409 3rd Street, SW., Suite 13, Washington, DC 20416.

**FOR FURTHER INFORMATION CONTACT:** Arthur E. Collins, Jr., Assistant Administrator for Program Development, Office of Minority Enterprise Development, at (202) 205–6410.

**SUPPLEMENTARY INFORMATION:** On March 4, 1995, President Clinton issued a Memorandum to federal agencies, directing them to simplify their regulations. In response to this directive, SBA completed a page-by-page, line-by-line review of all of its then existing regulations to determine which might be revised or eliminated. Revisions to 13 CFR Part 124 awaited a review of all Federal procurement affirmative action programs by the Department of Justice (DOJ). On May 23, 1996, DOJ published in the **Federal Register** a comprehensive proposal for tailoring affirmative action programs in the Federal procurement arena (*see* 61 FR 26042), and on May 9, 1997 the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration proposed amendments to the federal Acquisition Regulation (FAR) concerning programs for small disadvantaged business (SDB) concerns. In response to and in conjunction with the DOJ and FAR reform proposals, SBA proposes specific amendments to 13 CFR Part 124, its regulations governing the 8(a) Business Development (8(a) BD) program which is authorized by sections 7(j)(10) and 8(a) of the Small Business Act, 15 U.S.C. 636(j)(10), 637(a) (contained in subpart A of part 124), and those relating to the certification and protest of small disadvantaged businesses (subpart B of part 124). For the most part, SBA's proposed changes in response to the DOJ and FAR proposals are contained in subpart B of part 124. At the same time, SBA also proposes to streamline the entire Part 124, and to make several substantive changes in part A of the 8(a) BD regulations where needed. SBA also proposes to make changes to SBA's size regulations (part 121) to permit size protests and appeals of Standard Industrial Classification (SIC) code designations in connection with 8(a) competitive procurements, and to exclude certain joint venture arrangements from SBA's affiliation rules. These latter changes should increase the potential pool of small businesses available to compete for particular procurements. SBA believes that this change should encourage contracting officers to consider small business contractors more closely before determining a procurement strategy. Finally, this proposed rule would transfer the procedures relating to certain statutorily authorized appeals in the 8(a) program from part 124 to part 134 of 13 CFR.

In response to the DOJ review of Federal affirmative action procurement programs, this rule would develop standards and procedures by which a firm can apply to be recognized as a small disadvantaged business (SDB). Under the proposal, private sector organizations or business concerns (called Private Certifiers when approved by SBA) would determine whether a firm is owned and controlled by specified individuals claiming to be disadvantaged. Use of the term "Private Certifier" is not meant to exclude state agencies from applying for and receiving Private Certifier status. Once a firm receives a determination that it is owned and controlled by the individual(s) claiming to be disadvantaged from a Private Certifier (or from SBA if a Private Certifier is not reasonably available), it would be required to submit evidence of that determination to the appropriate procuring agency, or to SBA if the agency has an agreement with SBA, for a disadvantaged status determination and SDB certification. Individuals that are members of designated groups would be presumed to be socially and economically disadvantaged. Other individuals would be required to submit a narrative statement identifying personally how their entry into or advancement in the business world has been impaired because of their individual social disadvantage, and how their ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities. These standards and procedures would be completely separate from the 8(a) BD requirements and contained in an entirely rewritten subpart B to part 124. The rule would develop procedures for placing firms on and removing them from an SBA-maintained on-line register of certified SDBs. It would also provide regulatory authority for SBA, in its discretion, to limit 8(a) BD program entry, accelerate program graduation, and limit the numbers of 8(a) contracts available as a means of responding to benchmark achievements in particular industries.

The proposed rule is also designed to streamline the operation of the 8(a) BD program, to ease certain restrictions perceived to be burdensome on Participants, to amend certain eligibility procedures, and to delete obsolete regulations. SBA considered the need for each section of its current regulations in developing this proposal. Any regulatory provisions that SBA deemed duplicative are proposed to be removed, while those that appeared wordy or unclearly written have been rewritten in this proposed rule. The proposed rule also reorganizes the regulations into identifiable substantive areas for ease of use and clarity. The proposed unnumbered substantive category headings within subpart A of part 124 would be: Provisions of General Applicability; Eligibility Requirements for Participation in the Minority Enterprise Development Program; Applying to the 8(a) BD Program; Exiting the 8(a) BD Program; Business Development; Contractual Assistance; Miscellaneous Reporting Requirements; and Management and Technical Assistance Program. The proposed rule would also change all references to SBA's Office of Minority Small Business and Capital Ownership Development (MSB&COD) to the Office of 8(a) Business Development to

emphasize that individuals participating in the program need not be members of minority groups and the stress the importance of assisting participating firms in their overall business development.

SBA has attempted to rewrite the regulations in plain English wherever possible. To this end, SBA has written proposed section headings in question format for ease of use, and has tried to eliminate all unnecessary verbiage from the regulations.

This proposed rule would amend eligibility procedures for admission to the 8(a) BD program and also amend contractual assistance provisions within the 8(a) BD program. Of particular note, this rule would liberalize the standard of review for non-group members seeking disadvantaged status from a clear and convincing evidence test to a preponderance of the evidence standard, eliminate the requirement that a Participant must have specified SIC codes approved by SBA in its business plan in order to be eligible for 8(a) contracts, establish consistent remedial measures for firms that do not meet their competitive business mix targets, ease certain joint venture restrictions, and establish a mentor/protege program for developing 8(a) Participants.

This rule would clarify that 8(a) BD eligibility decisions are based on the facts before the Associate Administrator for 8(a) Business Development (AA/8(a)BD) at the time of his/her eligibility decision. The rule would specify that actual control of the applicant concern must be in the hands of one or more socially and economically disadvantaged individuals at the time the appropriate field office of the Division of Program Certification and Eligibility (DPCE) determines that an application for the 8(a) BD program is complete. Potential control or the power of disadvantaged individuals to change the applicant concern's Board of Directors or other aspects of control so that the applicant concern could be controlled by disadvantaged individuals, no matter how easily exercised, would not satisfy the requirement that the applicant be actually controlled by disadvantaged individuals at the time the DPCE field office determines an application to be complete. SBA believes that potential abuses would be greatly lessened by the clarifications made in this rule.

This proposed rule would also make changes, as needed, in various other eligibility and 8(a) contracting requirements. These changes are identified below in the section by section analysis of this proposed rule. Further, several typographical errors or inadvertent omissions would be corrected by this proposed rule. Finally, several obsolete references would be eliminated.

SBA invites comments on the proposed rule, and on any additional ways to improve the 8(a) BD program.

**Section By Section Analysis**

The following is a section by section analysis of each provision of SBA's regulations that would be affected by this proposed rule:

Section 121.103 would be amended so that certain joint venture arrangements would be excluded from the normal affiliation rules. The purpose of the proposal is to encourage contracting officers to use small business contractors to a greater extent. With the consolidation of procurements becoming an increasing reality, some contracting officers may feel that requirements are too big for small business to perform successfully. The proposed rule would permit two or more small business concerns to joint venture for a particular procurement and be considered a small business concern so long as each concern individually was small. In other words, the joint venture would receive an exclusion from the normal affiliation rules. SBA would not apply the exclusion to all procurements, but, rather, only to higher dollar value procurements where the likelihood that individual small business concerns can successfully offer on and perform the requirement is reduced. A large business could not, however, split into two smaller business entities under the same control in order to joint venture for a particular procurement reserved for small business.

Specifically, under the proposal, a joint venture of two or more business concerns could submit an offer as a small business for a non-8(a) federal procurement without regard to affiliation based on the joint venture arrangement so long as each concern is small under the size standard corresponding to the SIC code assigned to the contract where the procurement exceeded a specified dollar amount. For a procurement having a revenue-based size standard, the affiliation exclusion would apply if the procurement exceeds half the size standard corresponding to the SIC code assigned to the contract. For a procurement having an employee-based size standard, the affiliation exclusion would apply if the procurement exceeds $10 million. This same rule would apply to competitive 8(a) procurements, with two additional requirements. Pursuant to proposed § 124.512(b), in order to receive the exclusion from affiliation, there must be at least one 8(a) concern to the joint venture which is smaller than one half the size standard corresponding to the SIC code assigned to the procurement, and at least 51% of the work under the joint venture must be done by one or more of these smaller 8(a) firms.

The proposed rule also would amend the size regulations to permit firms approved by SBA under § 124.519 to be a mentor and protege to submit an offer as a joint venture and be considered a small business, provided the protege qualifies as small for the size standard corresponding to the procurement.

Sections 121.1001(a) and 121.1103(a) would be amended to permit size protests and appeals of Standard Industrial Classification code designations, respectively, in connection with competitive 8(a) procurements. SBA believes that competitive 8(a) procurements should as closely parallel normal Government contracting procedures as possible. Size protests and SIC appeals would still not be available for sole source 8(a) contracts.

Section 124.1 would be amended to delete unnecessary and duplicative language.

Section 124.1(b) would be deleted as a separate subsection. The substance of paragraph (b)(1) would be transferred to § 124.501.

Present § 124.2 would be deleted as unnecessary, administrative material.

Present § 124.3 would be deleted as unnecessary, administrative material.

Present § 124.4 would be deleted as obsolete since the Commission on Minority Business Development completed its task and no longer exists.

Section 124.5 would be deleted as unnecessary since proposed § 124.108(a) would provide for a review of an individual's character.

Section 124.6 would be deleted and the substance of paragraph (b) transferred to part 121 of this title for misrepresentations relating to size status, and § 124.501(i) for those relating to disadvantaged status.

Section 124.7 would be eliminated as duplicative of Part 103 of this title and Subpart 3.4 of the Federal Acquisition Regulation (FAR), Title 48 of the Code of Federal Regulations.

Section 124.100 would be redesignated as § 124.3. Those definitions that SBA deemed to be unnecessary or obsolete due to other changes in the proposed rule would be eliminated from this section. Also, the definition of ''Unconditional ownership'' in present § 124.100 would be amended. The revised definition would explain that a disadvantaged

owner may use his or her ownership interest (e.g., stock) in an applicant or Participant concern as collateral for financing during the normal course of business without affecting his or her ''unconditional'' ownership in such concern, provided that complete control of the ownership interest remains with the disadvantaged owner absent any default in fulfilling the terms of the financing. However, events of default must be defined in commercially reasonable ways. Events of default beyond those that are deemed commercially reasonable could lead to a conclusion that unconditional ownership is not in the hands of the disadvantaged owner. This clarification is not intended to require a concern to obtain financing through a financial institution or to preclude, for example, seller-financed transactions. It is intended only to permit financing terms that are reasonable within the marketplace. This change is essential to ensure that applicants and Participant concerns have the flexibility they need to raise necessary capital. The requirement that disadvantaged owners ''unconditionally'' own and control an applicant or Participant concern would thus be clarified so as to not restrict a firm's ability to raise capital under normal commercial terms and conditions to assist it in becoming viable.

Present § 124.100 would be amended further to correct a typographical error in the definition of ''Primary industry classification.''

Section 124.101 would be amended by rewording it for clarity, by transferring the requirement for written eligibility decisions to new § 124.204(d), and by deleting paragraph (c), which is generally contained in redesignated § 124.112(c). The provisions relating to reconsiderations would be written more plainly. An applicant denied 8(a) BD admission based solely on reasons of social disadvantage, economic disadvantage, ownership or control would still have the right to appeal to SBA's Office of Hearings and Appeals (OHA), and all applicants would continue to have the right to reapply in 12 months from the Agency's final decision denying program admission.

The portion of § 124.101(a) concerning reconsideration and that concerning appeal rights is duplicative of language currently contained in §§ 124.206(c) (1) and (2), respectively. SBA believes that it is not needed in both places. In this rule, reconsiderations would appear only in proposed § 124.205, while appeal rights would appear only in proposed § 124.206. The first sentence of current § 124.101(b) would be transferred to proposed § 124.112, and the remainder of this paragraph would be deleted as obsolete.

Sections 124.102 (a) and (b) would be amended by eliminating obsolete references. The proposed rule would further amend § 124.102 by transferring the substance of paragraph (c) to proposed § 124.112 and by transferring the substance of paragraph (d) to proposed § 124.501(h).

Section 124.103 would be amended by redesignating it as § 124.105 and by adding a new paragraph (a) that would require direct ownership of 8(a) BD applicants or Participants by disadvantaged *individuals.* This statutory requirement is currently set forth in § 124.109, but SBA believes that it should be added to this section for clarification purposes. SBA, however, recognizes the existence of current trust and estate planning techniques, such as living trusts, and invites comments on whether and, if so, how its ownership rules can be liberalized to permit trust-owned concerns in the 8(a) BD program in limited instances without violating the statutory requirement that 8(a) BD concerns be owned by individuals, and also without permitting abuses in the program.

Present §§ 124.103 (a) and (b) would be redesignated to become §§ 124.105 (b) and (d). A new paragraph (c) would be added for limited liability companies. Present §§ 124.103 (c) and (d) would be consolidated into proposed § 124.105(e).

Pursuant to proposed §§ 124.105 (g) and (h), SBA would aggregate the ownership interests of a business concern and its principal(s) in determining whether a non-disadvantaged individual or business concern exceeds the 10 percent equity ownership limitations (or, in the case of a former Participant, the 20 percent equity ownership limitations) established by present §§ 124.103 and 124.104.

Proposed § 124.105(i) would make clear that a 8(a) BD concern may substitute one disadvantaged individual for another without invoking the termination for convenience/waiver provision of present § 124.317 (redesignated as § 124.514 in the proposed rule) with respect to any 8(a) contracts that it has been awarded. Provided program eligibility is maintained and SBA approves a substitution of one disadvantaged individual for another, performance of 8(a) contracts already received could continue without seeking a waiver under present § 124.317. SBA believes that the statutory termination for convenience/waiver provision did not intend to prohibit the performance of an 8(a) contract by the Participant concern that initially received it simply where there has been one or more approved changes of particular individuals upon whom eligibility of the concern was based. This change is necessary to apprise procuring agencies and Participant concerns that termination of 8(a) contracts is not required in such instances.

This proposed rule would also add a new § 124.105(k), requiring that SBA consider applicable state community property laws on the respective ownership interests in an applicant concern or a Participant. This revision would not be a change in current SBA policy.

Section 124.104 would become proposed § 124.106 and its introductory text would be amended to clarify that the applicant concern must be actually controlled and managed by a disadvantaged individual. The unexercised right of the disadvantaged individual to bring about a change in the control or management of the applicant concern is not adequate to satisfy this requirement.

Proposed § 124.106(a) would be reorganized for greater clarity and easier use. Of particular note, § 124.106(a) would be amended to specify that one or more disadvantaged individuals who are determined to manage the applicant or Participant concern must devote full-time to the business during normal business hours. This means that a disadvantaged individual must be physically located at the offices of the applicant or Participant concern during most normal business hours, or devoting his or her full time efforts to the business away from its offices through marketing and outreach. The term ''normal business hours'' is intended to mean that the applicant or Participant concern be open during the normal 40 hour work week of most business concerns. Thus, an applicant would not meet this requirement if its disadvantaged owner was present at the applicant's offices only at night or on the weekends and worked outside the applicant during its normal business hours. This rule does not imply that business activities of the applicant or Participant concern could not be conducted by such individual(s) outside the offices of the applicant or Participant concern, nor does it prohibit a disadvantaged individual from establishing a Participant concern at his/her home. Although this proposed revision does not mean that the disadvantaged individual who manages the applicant or Participant concern

cannot leave the concern's premises to conduct business, it does mean that one or more disadvantaged owners must devote full-time to the business of the applicant or Participant concern. Under this proposed amendment, SBA would not permit an individual to be physically located at a job which is separate and distinct from the applicant or Participant concern during normal business hours and claim that he or she is managing the applicant or Participant concern from that location.

In addition, proposed § 124.106 would eliminate the requirement that the disadvantaged owner(s) have, in every instance, the technical expertise in the primary business classification of the applicant or Participant. The rule would simply require that disadvantaged managers must demonstrate that they have managerial experience to an extent and complexity necessary to run the applicant or Participant. SBA believes that sufficient management experience may be enough to overcome certain technical deficiencies in a manager.

The proposed rule would add a new paragraph (b) clarifying the control requirements for a partnership. The rule would require that one or more disadvantaged individuals must serve as general partners, with control over all partnership decisions. A partnership in which no disadvantaged individual is a general partner would be ineligible for 8(a) BD participation. The proposed rule would add a new paragraph (c) for limited liability companies.

Redesignated § 124.106(d) would be amended along the lines set forth above for proposed § 124.101. This amended paragraph would specify that the Board of Directors must actually be controlled by disadvantaged individuals. The ability of a disadvantaged individual to control the Board of Directors indirectly through his or her right to vote his or her stock (i.e., the power to remove and replace directors) would not be sufficient to establish control of the Board of Directors if non-disadvantaged individuals on the Board of Directors could control, or assert negative control on, the Board as currently structured at the time of the application for admission to the 8(a) BD program. Further, a quorum would require the presence of disadvantaged individual(s) upon whom eligibility is based, and could not be established to permit non-disadvantaged Directors to control the Board of Directors. This paragraph would also provide that non-voting, advisory or honorary Directors as well as Executive Committees may be appointed so long as they do not possess negative control over the Board or have the power to independently exercise the authority of the Board between Board meetings. Similarly, a separate board of advisors, particularly in the context of tribally-owned applicants and Participant concerns, could be established provided such board of advisors could not actually run the day-to-day operations of, or possess negative control over, the applicant or Participant business concern.

The proposed rule would revise redesignated § 124.106(e) (present § 124.104(c)) to clarify that principals of corporations or partners in a partnership are encompassed within the term ''former employer.'' Although a corporation or a partnership may technically be the former employer of a disadvantaged individual, a principal or partner (general or limited) with greater than a 20% interest would be treated as though he or she were the actual employer given their potential to exert considerable influence over the individual upon whom 8(a) BD eligibility is based.

The requirements pertaining to social disadvantage would be moved from present § 124.105 to proposed § 124.103. Paragraph (b) would be amended to clarify that the presumption of social disadvantage for members of designated groups is a rebuttable presumption. In addition, redesignated § 124.103(c) (present § 124.105(c)) would be amended to require an individual who is not a member of a designated socially disadvantaged group to establish his or her social disadvantage by a preponderance of evidence presented in the 8(a) BD application. This is a change from the current regulation which requires that an individual who is not a member of a designated group establish his or her social disadvantage on the basis of clear and convincing evidence.

SBA asks for comments on how better to define specific designated groups other than by requiring ''origins from'' specific countries. The rule makes clear that ancestral country of birth alone is not sufficient to make that country an individual's country of origin for membership in a designated group, but SBA believes a heritage or cultural requirement may be preferable to the ''origins'' requirement. SBA also specifically seeks comments regarding how an individual who is a member of a designated group can overcome his or her social disadvantage. The proposed rule states that the presumption of social disadvantage may be overcome with significant, credible evidence to the contrary, and SBA seeks comments on its application.

Proposed § 124.103(c)(2)(ii) would require that the social disadvantage experienced by a non-group member be ''longstanding.'' This clarification would not change the substance of SBA's practice in this area.

Proposed § 124.103(c)(2)(iii) (present § 124.105(c)(1)(v)) would be amended to clarify that, in evaluating whether an individual's social disadvantage has had a negative impact on his or her entry into and/or advancement in the business world, SBA will entertain any relevant evidence, but would always consider the experiences of the individual, where applicable, in education, employment and business history. The failure to establish such disadvantage in any one or even two areas (i.e., education, employment, or business history) would not prevent an individual from meeting this requirement of negative impact as long as the totality of the circumstances experienced by the individual demonstrate such disadvantage.

The proposed rule would move the economic disadvantage requirements from § 124.106 to proposed § 124.104. Under the proposed rule, in evaluating whether an individual is economically disadvantaged, SBA would focus solely on the personal financial condition of the individual. Factors in the current regulation pertaining to the financial condition of the applicant concern and the applicant concern's access to credit and capital would be eliminated as separate requirements. The financial condition of the applicant concern would be considered, but only in evaluating the individual's access to credit and capital. The authorizing legislation for the 8(a) BD program specifies that Participants must be owned and controlled by socially and economically disadvantaged individuals. It requires SBA to consider how the ability of socially disadvantaged individuals to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, but directs SBA to consider factors such as total assets and net worth in assessing the degree of diminished capital and credit opportunities. *See* 15 U.S.C. 637(a)(6)(A). The proposed rule would clarify that these factors would continue to be the focus of SBA's analysis of economic disadvantage.

The proposed rule would retain the current net worth limitations of $250,000 for initial 8(a) BD eligibility, $750,000 for continued 8(a) BD eligibility, and $750,000 for SDB eligibility. The proposed regulation would further clarify that a contingent

liability does not reduce an individual's net worth.

The proposed rule would provide that assets transferred by an individual claiming disadvantaged status to any immediate family member within two years prior to the date of application to the 8(a) BD program would be presumed to be the property of the individual claiming disadvantaged status. Currently, property or assets transferred by an individual claiming disadvantaged status to a spouse within two years of the date of 8(a) BD application is presumed to be the property of the transferor, but current regulations are silent as to property or assets transferred to children or other close family members. Several applicants may have circumvented eligibility requirements by such transfers. SBA believes that it should restrict this practice, lest it allow firms into the 8(a) BD program that should be considered ineligible.

The proposed rule would require an individual claiming disadvantaged status to disclose to SBA all transfers of funds or other assets to any immediate family member and to a trust the beneficiary of which is one or more immediate family members for purposes of continued program eligibility. At the time of the Participant's annual review, each individual claiming disadvantage status would have to certify that he or she made no transfers of assets to immediate family members within two years, or that he or she made no transfers to immediate family members within two years except as described on an attached sheet. Any transfers within two years would be attributed to the transferor in determining his or her continued economic disadvantage. SBA is considering extending this requirement beyond immediate family members so that any transfers for less than fair market value (e.g., gifts to charities) would be attributable to the transferor.

Proposed § 124.107 would clarify the potential for success requirements, without changing them substantively. Discussion of an applicant concern's access to credit and capital, currently handled under economic disadvantage in § 124.106(a)(2)(iii), would be moved to proposed § 124.107(c), and several other paragraphs would be revised for clarity and ease of use.

Section 124.108 would be amended for clarity. Proposed § 124.108(a)(4) would make an applicant to the 8(a) BD program ineligible for program participation if the proprietor, a partner, a director, officer or a holder of at least 10 percent of the stock, or a key employee, is currently incarcerated, on parole or on probation pursuant to a pre-trial diversion or following conviction for a felony or any crime involving business integrity. This provision parallels a similar provision in Part 120 of SBA's regulations, dealing with ineligibility for SBA financial assistance. It would also now include a new paragraph (c) that states that any wholesaler that applies for 8(a) BD participation need not demonstrate that it can supply the product of a small business manufacturer. Although SBA's nonmanufacturer rule generally requires a regular dealer or wholesaler to supply the product of a small business in order to be considered small for a specific 8(a) or small business set aside procurement), the 8(a) BD program should not be viewed solely as a contracting program. There is other business development assistance available to Participants which should not be foreclosed because of the nonmanufacturer rule. Moreover, the availability of small business manufactured products can change significantly over a Participant's program term. Wholesaler applicants to the 8(a) BD program should be aware, however, that they must meet the requirements of the nonmanufacturer rule in order to be awarded specific 8(a) contracts.

In addition, a new § 124.108(d) would be added that would authorize SBA, in its discretion, to reject an application if the applicant's primary industry classification falls within an industry where actual participation by disadvantaged businesses in Government contracting in a particular industry exceeds the benchmark limitations established under the DOJ proposal by the Department of Commerce for that industry. SBA would consider the developmental needs of the firm, as well as contracting opportunities outside its primary SIC code. A firm whose application was rejected on this basis could resubmit its application earlier than the normal 12 month waiting period whenever the benchmark was adjusted or a determination made that the benchmark was no longer exceeded. Similar language regarding the achievement of benchmarks in a particular industry would also be added to new §§ 124.302(c) and 124.403(c) to permit SBA to accelerate graduation, and would be added to § 124.504(d) to permit SBA not to accept an 8(a) offering in an industry in which the benchmark is achieved.

The proposed rule would delete current § 124.109. Some of these provisions are duplicative of other sections of part 124, or part 121, or the Federal Acquisition Regulation. A few have been incorporated elsewhere in this proposed rule. The rule also proposes to delete franchisees as businesses that are ineligible (i.e., making them eligible) for 8(a) BD participation.

Current section 124.110 would be clarified, streamlined, and redesignated as proposed § 124.2.

Proposed § 124.112(c) repeats the current provision (current § 124.111(d)) that SBA will review a Participant's eligibility upon receipt of information that the Participant no longer meets continued 8(a) eligibility requirements. The proposed rule requires that the information received be ''specific'' and ''credible.'' Under the proposed rule, sufficient reasons for SBA to conclude that a Participant is no longer economically disadvantaged include, but are not limited to, demonstrated access to a significant new source of capital or loans, an unusually large amount of funds or other assets withdrawn from the concern by its owners, or substantial personal assets, income or net worth of any disadvantaged owner. The term ''excessive withdrawals'' is defined elsewhere in the proposed regulation at § 124.303(a)(13). SBA asks for comments on how better to clarify a ''demonstrated access to a significant new source of capital or loans.''

Proposed § 124.112 would also add needed enforcement mechanisms to the existing regulation discouraging excessive withdrawals from Participants by their owners or managers. Certain Participants have suggested that, if net worth continues to increase, large withdrawals should be allowed as not detrimental to attainment of their business objectives. SBA disagrees, and believes this restriction is necessary to safeguard the development of Participant concerns toward economic viability. Participants will increase their net worth more and will achieve greater success if they avoid excessive withdrawals by their owners and managers.

Section 124.112, redesignated as proposed § 124.109, eliminates the present paragraph (c)(2)(iv) which previously allowed a Participant owned by an Indian tribe to joint venture with a large concern to perform an 8(a) contract. The statutory authority for this provision has expired. Proposed § 124.109 also would delete other obsolete and duplicative provisions. Additionally, it would eliminate the requirement that a tribally-owned or ANC-owned concern demonstrate that the primary economic benefits of the concern accrue to the tribe or ANC by

being located on tribally-owned or ANC-owned land or otherwise. SBA has previously interpreted the requirement as not applying to ANC-owned concerns, but believes that it should also not apply to tribally-owned concerns. In other ways the proposed rule would treat tribes and ANCs and their 8(a) entities more similar. Tribes and ANCs would be restricted from qualifying a new 8(a) concern possessing the same primary SIC as another 8(a) concern only if the other concern has been operating in the 8(a) program within the previous two years. Finally, it would more narrowly focus management restrictions on tribally-owned concerns to enhance development opportunities.

Section 124.113, redesignated as § 124.110, would add an exclusion from affiliation for concerns owned by a Native Hawaiian Organization, prohibit a Native Hawaiian Organization from owning more than one current or former Participant having the same primary industry classification, and exclude from the one-time individual eligibility requirement any individual who merely manages a concern owned by a Native Hawaiian Organization. These changes would achieve consistency with restrictions on other non-individual owners.

The proposed rule would redesignate § 124.114 as § 124.111. Equating CDCs with Indian tribes, the proposed rule would permit concerns that are at least 51% owned by a wholly owned business entity of a CDC to be eligible for 8(a) BD participation.

It would amend § 124.201 by deleting the last sentence of this section which became obsolete when waivers to the two year in business rule were statutorily required, and amend section 124.202 to revise obsolete language and clarify its meaning. It would transfer § 124.203 to the sections pertaining to business development, redesignating it as proposed § 124.401.

It would delete § 124.204 as duplicative of language in other sections of part 124, and redesignate § 124.205 as § 124.203.

Section 124.206, redesignated as proposed § 124.204, would delete duplicative language from paragraph (a), which is contained in proposed § 124.206, and add new proposed §§ 124.204 (b) and (c). For further clarity, this section would delete obsolete and duplicative language in current §§ 124.206 (b) and (c), and redesignate current § 124.206(c)(4) as a separate proposed § 124.207.

Proposed § 124.204(b) would further clarify that the AA/8(a)BD's decision to approve or decline an application for 8(a) BD program participation would be based on whether the applicant concern complied with each of SBA's eligibility criteria at the time the concern's application for admission to the 8(a) BD program is deemed to be complete by the DPCE field office. A change in circumstances submitted by an applicant concern subsequent to the date that an application is deemed to be complete by the DPCE field office would not be considered, unless it causes a loss of eligibility. The structure of the concern, including all necessary corporate or other organizational formalities, would have to be in place prior to the DPCE field office's processing of an application. A disadvantaged individual's ability to immediately change the applicant's structure or cause a change in its control so that actual control of the concern is in the hands of disadvantaged individuals and/or other eligibility criteria are met would not satisfy the requirement that they be met at the time of the completed application. The rule would specify, however, that SBA, in its sole discretion, could request clarification of information contained in the application at any stage in the application process. SBA would obviously consider any information submitted in response to a request by SBA.

The decision of the AA/8(a)BD to approve or decline an application for 8(a) BD program admission would then be based on whether the application, as clarified by any information submitted in response to a request by SBA, demonstrates that the applicant concern complies with each of SBA's eligibility criteria. While SBA would be able to request and consider additional information in processing an 8(a) BD application, SBA would not consider information volunteered by an applicant concern after it submits its application. This clarification is needed to streamline the application process and ensure that SBA meets its statutorily imposed time limitation for processing applications.

The proposed rule would redesignate § 124.207 as § 124.301, amend redesignated § 124.302 by revising obsolete references, and specifically authorize a Participant to voluntarily ''graduate'' prior to the expiration of its program term.

The examples of what constitutes ''good cause'' for terminating a Participant from the 8(a) BD program would be amended from current § 124.209(a) in proposed § 124.303. Several examples of good cause previously listed for terminating a Participant would be dropped in the proposed rule and a few new examples would be added. As before, the examples of ''good cause'' are illustrative only. SBA's decision to drop several examples of good cause should in no way be read to infer that SBA no longer considers those situations as valid reasons for termination. That is not SBA's intent. The proposed rule would also define what constitutes an ''excessive'' withdrawal for purposes of determining whether termination is warranted.

The procedures for graduation and termination currently contained in §§ 124.208 and 124.209 would be combined into proposed § 124.304 to eliminate unnecessary duplication and clarify confusing language. The term graduation previously used in the regulations would be changed to ''early graduation.'' Through the years, many people have used the terms ''graduation,'' ''graduation date,'' and ''graduated 8(a) firm'' to describe the situation where a Participant has exited the 8(a) BD program through nothing more than the expiration of its program term. This proposed rule would recognize the use of the term *graduation* in this context, and would refer to graduation prior to the expiration of a firm's program term under proposed §§ 124.302 and 124.304 as ''early graduation.''

Where an SBA district office initiates early graduation or termination by sending a Notification of Early Graduation or Termination to the concern, the allowable response time would be reduced from 45 days to 30 days after service of the Notification (the date that it is mailed, FAXed or hand delivered to the concern). SBA would then review any information submitted by the concern. If the Assistant Administrator of the DPCE decides that early graduation or termination is not appropriate, he or she will notify the concern. If it appears appropriate, the Assistant Administrator will forward that recommendation to the AA/8(a)BD for a final decision. SBA will not take early graduation lightly, but will initiate it in appropriate circumstances. As part of the early graduation process, SBA will also attempt to reduce any adverse impact on the Participant's business development.

Current section 124.210 would be eliminated as a separate section setting forth all appeal rights to SBA's Office of Hearings and Appeals for the 8(a) BD program. Appeal rights for denials of 8(a) BD eligibility would be contained in proposed § 124.206, while the appeal rights for early graduation, termination, suspension, or denial of a request for waiver under current § 124.317 would

be contained in the proposed sections dealing with those substantive areas. A minor revision would be made to the first sentence of paragraph (b), and a new second sentence added to clarify that an OHA decision is the final Agency decision. The remainder of paragraph (b) and paragraphs (c), (d), (e), (f), (g), (h), (i), and (j) would be moved from part 124 to a new subpart C of part 134 of this chapter.

Current section 124.211 would be redesignated as proposed § 124.305. Redesignated § 124.305 would be amended to revise obsolete references, and reorganized to transfer procedural rights for OHA appeals to part 134 of this title. The period to file an appeal would be extended from 30 to 45 days to be consistent with part 134. SBA is also considering ''suspension'' as a tool where ownership or control changes and a Participant seeks approval of its changed ownership or control. Where ownership or control of a Participant changed prior to SBA's approval, and the Participant seeks SBA's approval after the fact, SBA would suspend the Participant pending SBA's resolution of the request to change its ownership or control.

The proposed rule would separate general business development provisions and those dealing with contractual assistance into two distinct substantive categories. Thus, the provisions currently contained in §§ 124.300–124.321 would be separated into Business Development (proposed §§ 124.401–124.405) and Contractual Assistance (proposed §§ 124.501–124.519). Most of these provisions would be reorganized and/or clarified under the proposed rule.

Section 124.300 would be deleted from the final rule as unnecessary.

Section 124.301 (proposed § 124.402) would be divided into more subheadings for ease of use. It would eliminate the requirement that a Participant must have specified SIC codes in its approved business plan (other than the entry requirement that an applicant must identify its primary SIC code for initial size eligibility), and no longer treat a concern as ineligible for any 8(a) contracting opportunity for which a contracting officer has assigned a SIC code not in its approved business plan. SBA believes that a Participant should not be denied the opportunity to receive and perform an 8(a) contract where a procuring agency determines the firm to be capable to perform the requirement, simply because the firm does not have a particular SIC code in its approved 8(a) business plan. This also eliminates the need for a Participant to go through a sometimes lengthy and burdensome process seeking to add additional SIC codes to its business plan after being admitted to the 8(a) BD program. While an applicant would still be required to give a detailed description of the products it produces and services it performs, SBA would not prohibit the award of an 8(a) contract solely because a product or service is not so identified. In such a case, the Participant would still have to demonstrate its capability and other aspects of responsibility to perform the contract in question. As long as that burden is met, the Participant could be awarded the subcontract. Identifying SIC codes, however, may be beneficial to a concern because it will help SBA in providing business development assistance.

An applicant must still identify its primary industry classification. This identification is needed in order to permit SBA to determine initial size eligibility. The requirement to submit an annual capability statement would be moved from the miscellaneous reporting requirements provision of current § 124.501 to be included within the requirement defining how a business plan is updated (proposed § 124.403). That part of current § 124.501(a) addressing what SBA does with capability statements would be moved to proposed § 124.501(e) of this proposed rule.

Section 124.303 (proposed section 124.404) would be revised by eliminating obsolete references to the dates certain Participants were admitted to the program or received their first 8(a) contract. Those provisions were relevant to the length of 8(a) BD participation at the time Public Law 100–656 was enacted, but are not relevant today. The section would also be rewritten for clarity.

The reserved sections 124.304 and 124.305 would be eliminated in this proposed rule.

Section 124.306, financial assistance for skills training, would be eliminated from the regulations in the proposed rule because SBA has not received funding from Congress for this program.

The proposed rule would add a new section 124.405, detailing how a Participant may obtain Federal Government surplus property. The authority for Participants to receive Federal surplus property was created in Public Law 100–656. Section 301(b) of the Business Opportunity Development Act of 1988, Pub. L. 100–656, 102 Stat. 3853, amended the Small Business Act by adding a new section 7(j)(13)(F), 15 U.S.C. 636(j)(13)(F), which authorizes the transfer of surplus property owned by the Federal Government to Participants under certain conditions. This proposed rule would implement that authority in regulation form for the first time.

The proposed rule would detail the procedures for, and conditions upon which, the transfer of Federal Government surplus property could be made to Participants. Such transfers would be made from the U.S. General Services Administration (GSA) through State Agencies for Surplus Property (SASPs) to eligible Participants. Transfers to SASPs from GSA would be made in accordance with the procedures set forth in 41 CFR Part 101–44. Although the statutory language of section 7(j)(13)(F) of the Small Business Act, 15 U.S.C. 636(j)(13)(F), authorizes that ''such property * * * be transferred to program participants on a priority basis,'' the proposed rule would permit Participants to participate in the surplus property distribution program administered by the SASPs to the same extent as, but with no special priority over, other authorized donees. See 41 CFR Subpart 101–44.2. The Participant would have to certify in writing that it is eligible to receive the property and that it will use the property only for normal business activities. The Participant would have to agree to a fair market value assigned to the acquired property, and if the firm were to sell the property before one year after exiting the program, it would have to repay to the Federal Government the agreed upon fair market value of the property, or the sales price, whichever was greater.

The proposed rule would detail the eligibility requirements a Participant must meet to obtain Federal surplus property. Generally, a Participant would be able to receive surplus property if it is in good standing with the 8(a) BD Program as of the date it is to receive the property. The firm would have to be in compliance with all reporting requirements imposed by program management, and must not have been debarred or suspended from receiving contracts. The firm also could not be the subject of any termination or early graduation proceedings. Finally, the firm would have to qualify as a small business for at least one product or service identified in its business plan that it produces or performs.

Proposed §§ 124.501–124.517 would contain most of the substance currently in §§ 124.307–124.321, but in a revised organizational structure for easier use. Proposed §§ 124.518 and 124.519 would be new provisions.

Section 124.307 (proposed section 124.501) would be redrafted for clarity and revised by adding a provision

encouraging Participants to self-market their capabilities to increase their chances of receiving 8(a) sole source contracts. SBA believes that it is vital that Participants realize the importance of self-marketing to their development in the 8(a) BD program. This revised section would also recognize that SBA may delegate its 8(a) contract execution function to procuring agency contracting officers where appropriate. It is SBA's intent to enter into a Memorandum of Understanding (MOU) with each procuring agency or activity that wishes to receive a delegation of SBA's 8(a) contract execution and review functions. SBA has a model MOU that would be modified according to the particular circumstances of each agency or activity. It would only be the rare case where SBA would not approve an MOU signed by an agency or activity. SBA would, however, have the authority to rescind the delegation where it saw fit. This would include cases where an agency or activity failed to report all 8(a) contract awards, modifications, and options to SBA in a timely manner.

The proposed rule would clarify the requirements relating to offers and acceptances of procurements for the 8(a) BD program. Currently, both the offer and acceptance processes are contained in § 124.308. The proposed rule would separate the offering provisions from the procedures relating to SBA's acceptance of a procurement into proposed §§ 124.502 and 124.503, respectively.

Section 124.308(c) (proposed § 124.502(b)) would specify the SBA locations to which contracting officers must offer requirements to the 8(a) BD program. This clarification is needed in light of other recent changes made by SBA in eliminating local and national buy requirements. Under the proposed rule, all requirements that are offered to the 8(a) BD program as competitive procurements and those sole source requirements that are offered to the program without nominating a specific Participant (i.e., open requirements) would be offered to the SBA district office serving the geographical area in which the offering procuring agency is located. The only exception to this provision would be in the case of a construction requirement where the work to be performed is in a different location than that of the procuring agency. In such a case, an offering must be made to the SBA district office serving the geographical area in which the work is to be performed. Sole source requirements that are offered to the 8(a) BD program on behalf of a specific Participant would be offered to the SBA district office serving the geographical area in which the principal place of business of the Participant is located.

SBA's verification of the SIC code assigned to a particular 8(a) contract would be moved from § 124.308(b)(1)–(2) (where it was part of the ''requirement identification'' process) to proposed § 124.503(b) (where it is clearly identified as a step in SBA's acceptance of a procurement for the 8(a) BD program).

The proposed rule would amend the provision dealing with formal technical evaluations (proposed § 124.503(e)). Specifically, SBA would exclude Brooks Act procedures applying to architect-engineer services (as set forth in FAR subpart 36.6) from the general requirement that SBA will not authorize formal technical evaluations for sole source 8(a) requirements. In practice SBA has recognized the Brooks Act procedures, but believes that a specific provision in the regulations would clarify its policy in this regard.

The proposed rule would add a new provision pertaining to Basic Ordering Agreements (BOAs) as a method of contracting under the 8(a) program (proposed § 124.503(g)). Under SBA's current regulations, SBA believes that BOAs could be used to circumvent the statutory requirement that 8(a) procurements with an anticipated award value in excess of $3 million or $5 million be competed among eligible Participants. Each order issued under a BOA, and not the BOA itself, is a contracting action. A procuring agency could issue a series of $2–3 million task orders under a BOA without ever competing the basic procurement requirement. SBA believes that this is contrary to Congressional intent. As such, under the proposed rule, SBA would not accept any task order for award as an 8(a) contract if that task order added to the total task orders issued to date would exceed the applicable competitive threshold amount, unless the BOA itself was awarded on the basis of competition among eligible Participants. SBA would also determine eligibility for an order under a BOA at the time of the issuance of the order. This would require a concern to remain a small business at the time the order is to be issued and would prohibit orders from being issued to concerns whose program terms have expired or who have otherwise exited the 8(a) BD program.

Proposed § 124.504 would clarify the circumstances limiting SBA's ability to accept a procurement for award as an 8(a) contract. Existing §§ 124.309 (a) and (b) would be combined into one paragraph (proposed § 124.504(a)). The proposed rule would add a new provision (proposed § 124.504(b)) that would prohibit a procuring agency from initiating the competitive process for an 8(a) requirement prior to obtaining SBA's acceptance of the requirement for the 8(a) BD program. Any competition so held would not be considered an 8(a) competition. If a procuring agency still wanted to fulfill its requirement through the 8(a) BD program, the requirement would have to be offered to and accepted by SBA for the 8(a) BD program, and the procuring agency would have to use applicable 8(a) competitive procedures after the acceptance. A new solicitation would have to be issued, and new offers submitted and evaluated.

The proposed rule would broaden the concept of adverse impact (current § 124.309(c); proposed § 124.504(c)), finding that ''adverse impact'' could be found to exist where several requirements currently being performed by different small business concerns are consolidated into one larger requirement which could be considered ''new'' under SBA's regulations due to the magnitude of the consolidated requirement. This rule would permit SBA to find adverse impact whenever at least one of the small business concerns losing work that is to be consolidated meets the presumption of adverse impact. The proposed rule would also add objective criteria for determining whether a requirement is new. Under the proposal, the expansion or modification of an existing requirement would be considered a ''new'' requirement where the price (adjusted for inflation) increases by more than 25% or where significant additional capabilities are added to the requirement.

Proposed § 124.504(e) would clarify the limited instances where SBA may reject the offer of a repetitive 8(a) acquisition to give a Participant that is leaving or has left the 8(a) BD program the opportunity to compete for the requirement outside the 8(a) BD program. The proposal would require the applicable (former) Participant to qualify as a small business concern for the requirement now offered to the 8(a) BD program before SBA considers releasing the requirement from the 8(a) BD program.

The proposed rule would eliminate section 124.310 as unnecessary or duplicative. Debarment and suspension is adequately covered in the FAR. Current § 124.314 (proposed § 124.509), deals with the required percentages of work that a Participant must perform on any 8(a) contract and need not be duplicated in this section.

Current section 124.311 would be separated into two sections: proposed § 124.506, regarding the dollar thresholds above which procurements accepted for 8(a) award must be competed among eligible Participants, and proposed § 124.507, describing the procedures that apply to competitive 8(a) procurements. Proposed § 124.506 would eliminate unnecessary language, but leave most of the substance of current §§ 124.311 (a)–(e) unchanged. It would clarify that there is no order of precedence between accepting requirements for competition and accepting requirements for sole source award above the applicable threshold amounts for a tribally-owned or ANC-owned concern. Current § 124.311(d) permits SBA to accept a contract opportunity above the applicable competitive threshold amount for a sole source 8(a) award where SBA determines that only one eligible Participant in the 8(a) BD portfolio is capable of performing the requirement at a fair price. The proposed rule would eliminate this authority. SBA believes that such a requirement should either be awarded under the sole source authority of the FAR, if applicable, or competed as a small business set aside requirement or as an SDB set-aside contract, where appropriate.

Proposed § 124.507 would set forth the procedures applicable to competitive 8(a) procurements. This proposed section would clarify how SBA determines whether an apparent successful offeror in an 8(a) competition is eligible to receive the award. SBA believes that the eligibility process will be much easier to follow and understand under this proposal. The proposal would also clarify which Participants engaged in construction may submit offers in response to competitive 8(a) construction requirements. The proposed rule would limit eligibility to those Participants located within the geographical boundaries of one or more SBA district offices (looking first to the district office serving the area in which the work is to be performed). Any concern with a bona fide place of business in the applicable geographic area would be eligible for the procurement. In order to be considered a *bona fide* place of business, the Participant would have to regularly maintain an office which employs at least one full-time individual within that geographical boundary. Construction trailers or other temporary construction sites would not qualify as *bona fide* places of business under the regulation, nor would merely occupying a government-furnished office to oversee the performance of a specific contract qualify as having a bona fide place of business within that geographic location. The term is meant to extend beyond one or more individual contracts. SBA specifically requests comments on how best to define ‘‘bona fide place of business,’’ and how eligibility for 8(a) construction procurements should be limited.

Proposed § 124.507(b)(5) would add the Certificate of Competency (COC) procedures to competitive 8(a) procurements. Where a procuring agency contracting officer finds the apparent successful offeror for a competitive 8(a) procurement not to be responsible to perform the contract, he or she would be required to refer the Participant to SBA for a possible COC under the procedures set forth in § 125.5 of this chapter. SBA seeks to make competitive 8(a) procurements as similar as possible to non-8(a) Government contracting procedures. COC procedures would not, however, be available for sole source 8(a) procurements. In most cases, the procuring agency would have selected the Participant for the sole source contract by assessing the firm’s capabilities prior to offering the procurement to SBA. It is unlikely that the procuring agency would select a Participant, go through negotiations with the firm, and then find the firm not to be responsible. If that does happen, or if the procuring agency determines that a firm nominated by SBA for an open requirement cannot perform the contract, SBA would review the situation to determine whether it agrees with the procuring agency. If SBA agrees, it can nominate another Participant to perform the contract, if one exists that is found to be eligible and responsible for the requirement, or it can permit the agency to withdraw the requirement from the 8(a) program if an eligible and responsible Participant is not found. If SBA does not agree, it can appeal the procuring agency’s decision to the head of the procuring agency pursuant to § 124.505.

Proposed § 124.507(d) (current § 124.311(i)) would clarify SBA’s implementation of § 8(a)(1)(C) of the Small Business Act, 15 U.S.C. § 637(a)(1)(C), which authorizes competitive 8(a) awards in limited circumstances to firms which have completed their terms of participation in the 8(a) BD program. Of particular note, eligibility would be determined as of the initial date specified for the receipt of offers set forth in the solicitation without regard to extensions of time through amendments to the solicitation. The only legislative history to the statutory provision authorizing competitive 8(a) awards to firms which have completed their terms of participation in the 8(a) BD program indicates that Congress did not want Participants to go through the expense of submitting offers for competitive 8(a) procurement requirements only to be told that they were ineligible for such requirements months later at the time of award. *See* 136 Cong. Rec. S17645, S17648 (daily ed. October 27, 1990) (statement of Sen. Bumpers). In addition, Congress was concerned that competition among firms in the later stages of program participation would be discouraged if firms felt that they could be deemed ineligible after going through the expense of preparing an offer for a competitive 8(a) procurement requirement. *Id.*

The proposed amendment would be consistent with these Congressional purposes. The date for determining eligibility is firmly established and cannot change during the procurement process. With such a date certain, firms know up front if their program term will expire prior to that specified date. Offers cannot be prepared amid uncertainty that the date for determining eligibility could be changed. As such, firms are not dissuaded from participating in 8(a) competitive procurements during the later stages of their participation terms.

Proposed § 124.508 would contain the requirements relating to competitive business mix targets. The proposed rule would eliminate obsolete language contained in current § 124.312 regarding modified business activity targets. It would also tighten the language throughout the section, eliminating unnecessary wording where appropriate.

Proposed § 124.508(d) would revise SBA’s policy on imposing remedial measures on Participants that fail to meet their applicable competitive business mix targets. Recent audits and reports have revealed that SBA needs to do a better job of encouraging firms to develop in ways that will ensure their success in the competitive marketplace after program completion. Too many firms are not meeting competitive business mix targets during the transitional stage of program participation.

If a Participant fails to meet its competitive business mix target during any year in the transitional stage, it would be ineligible for sole source 8(a) contracts during the succeeding program year unless the Participant corrects the situation. A Participant that fails to meet its applicable competitive business mix target during the transitional stage of program

participation may attempt to meet the competitive business mix target as part of the normal annual review process, or it may elect to submit quarterly information regarding its non-8(a) revenue and contract awards in an attempt to comply with the competitive business mix requirements prior to its annual review. Where the Participant elects to submit information to SBA, SBA would monitor the Participant's revenues quarterly to determine whether the Participant has come into compliance. At its 3-month or 6-month review, a Participant would be required to demonstrate that it has received non-8(a) revenue and/or new non-8(a) contract awards that are equal to or greater than the dollar amount by which it failed to meet its competitive business mix target for the just completed program year in order to again be eligible to receive 8(a) sole source contracts for the remainder of the program year. Compliance with the competitive business mix target for that program year would again be determined at the end of the program year. If the firm did not meet that target, it would again be ineligible for 8(a) sole source contracts in the succeeding program year unless and until it came into compliance during the succeeding program year. In order for a Participant to come into compliance with the competitive business mix target during the last six months of the current program year (i.e., at either the nine-month or one year review), it would be required to demonstrate that it has achieved its competitive business mix target as of that point in the current program year. At the 9-month or one-year review, SBA would look at all revenues received during that program year (including options and modifications) to determine whether the firm has achieved the competitive business mix target for that year. If it has, it would again be eligible for 8(a) sole source contracts; if it has not, it would remain ineligible for 8(a) sole source contracts. Additional remedial measures would continue to be authorized where appropriate, including program termination where the Participant makes no good faith efforts to obtain non-8(a) revenues.

Current section 124.313 would be eliminated as unnecessary.

Proposed § 124.509 would incorporate the substantive provisions currently contained in § 124.314, but would cross reference the performance of work requirements contained in § 125.6 of this chapter. Proposed § 124.510 would do the same for those requirements currently contained in § 124.315. Again, clarification would be made wherever appropriate.

Proposed § 124.511 would authorize SBA to delegate all responsibilities for administering an 8(a) contract to the appropriate procuring agency contracting officer except for the approval of novation agreements. It would eliminate the reference to advance payments contained in current § 124.316. It clarifies that a procuring agency may execute an in-scope 8(a) modification without SBA's signature.

Proposed § 124.512 would set forth the requirements for entering into a joint venture agreement to perform an 8(a) contract. SBA proposes several changes to this section from the provisions currently contained in § 124.321. Proposed § 124.512(a)(2) would require that a Participant seeking to joint venture with another firm bring something of value to the joint venture arrangement other than its status as an 8(a) concern. While the regulation would continue to state that a joint venture agreement is permissible only where an 8(a) concern lacks the necessary capacity to perform the contract on its own, it would specify for the first time that where SBA concludes that the 8(a) concern brings very little to the joint venture relationship except its 8(a) status, SBA will not approve the joint venture relationship. An 8(a) concern may lack the necessary management, technical and financial capacity to perform a contract the size of the joint venture contract on its own, but it cannot be totally reliant on its proposed joint venture partner. The purpose of permitting joint ventures is to enable an 8(a) firm to gain experience and know-how so that it can become self-reliant in the future. If the 8(a) concern will not be developing its own capabilities in any meaningful way, the joint venture will not be approved. It is also SBA's intent to delegate the approval of joint venture relationships from the AA/8(a) to the local SBA district offices.

As described above for amendments to the size regulations, the proposed rule would permit joint ventures for competitive 8(a) procurements between two or more small businesses (at least one of which is an 8(a) Participant whose size is smaller than one half the size standard corresponding to the SIC code assigned to the procurement—an eligible 8(a) Participant) so long as each small business is individually small. One of the eligible 8(a) Participants must be the lead entity in the joint venture, and the eligible 8(a) Participants combined must perform the applicable percentage of work required by proposed § 124.509.

Joint ventures for sole source 8(a) procurements and competitive 8(a) procurements that do not exceed one half the size standard corresponding to the SIC code assigned to the procurement would continue to be authorized under current requirements, unless a mentor/protege relationship exists, as discussed below. The joint venture partners would be considered affiliates, and their revenues or employees aggregated in determining whether the joint venture qualifies as small.

The rule would also move certain requirements contained in ''Other requirements'' of current § 124.321(d) to provisions that must be contained in the joint venture agreement itself.

The proposed rule would transfer current § 124.321(i) concerning joint ventures for Small Disadvantaged Business (SDB) set-asides and evaluation preferences to proposed § 124.1002(f) of subpart B of these regulations. SBA believes that moving SDB joint ventures into the subpart dealing with SDB protests and appeals makes more sense organizationally.

Proposed § 124.513 would contain the provisions currently contained in § 124.318, but eliminate duplicative language.

The provisions of § 124.317 requiring an 8(a) contract to be performed by the Participant that was initially awarded it, and requiring the contract to be terminated for convenience if there is a change in the ownership or control of the concern, would be incorporated into proposed § 124.514, with minor clarifications. The proposed rule would specify that only physical or mental incapacity (and not factors like criminal incarceration or bankruptcy) could justify a waiver of the termination for convenience requirement imposed by this section. In addition, this section would make clear that the concern requesting a waiver must demonstrate that it has met the grounds upon which the waiver is being sought. The Agency need not consider and dismiss every possible basis for waiver. Finally, with respect to determining whether a Participant seeking to acquire ownership or control in another Participant is ''otherwise eligible'' to receive the award directly, the proposed rule would require SBA to consider whether prior to the transaction the acquiring Participant is eligible for and responsible with respect to each contract to be transferred. For example, were a concern with ten employees seeking to acquire a concern with 150 employees, responsibility would be considered prior to the transaction (i.e., could the ten-employee concern

perform the transferring contracts without the resources of the 150-employee concern).

The proposed rule would add a new paragraph 124.517(c), clarifying that SBA may substitute one Participant for another (with the consent of the procuring agency) where the first concern cannot complete performance of an 8(a) contract, without seeking the approval of the Administrator under § 124.317. The original 8(a) concern would be liable for any reprocurement costs, as is now the case.

The proposed rule would separate current § 124.320 into two sections: One dealing with SBA appeals of the terms and conditions of a particular 8(a) contract or of a procuring agency decision not to reserve a requirement for the 8(a) BD program (proposed § 124.505); and one concerning contract disputes arising between a Participant and a procuring agency after the award of an 8(a) contract (proposed § 124.515). Both are clarified for easier use.

Proposed § 124.505 would specify that SBA may appeal to the head of the procuring agency a contracting officer's decision to reject a specific Participant for award of an 8(a) contract after SBA's acceptance of the requirement for the 8(a) BD program. This basis for appeal has been used many times in practice. SBA believes that it should be added to the regulation to apprise all contracting officers of its existence.

Proposed § 124.515 would improve the language of current § 124.320(a), eliminating unnecessary references to advance payments, business development expense, and surety bond waivers (all three of which the proposed rule would also eliminate).

The proposed rule would add a third appeal-related section, pertaining to the ability of another party to question the eligibility of a Participant for award of an 8(a) contract (proposed § 124.516). No party may challenge the eligibility of a Participant for a specific sole source or competitive 8(a) requirement at SBA or any other administrative forum. The authority to determine eligibility for an 8(a) contract is exclusively SBA's. Much of this provision is currently contained in § 124.311(g) for competitive 8(a) requirements, but no such specific language was set forth for sole source 8(a) requirements. Prior to the enactment of Public Law 100–656, there were no 8(a) competitive requirements, and it was clear that a determination concerning a Participant's eligibility for specific 8(a) contract awards was exclusively within the jurisdiction of SBA's Office of 8(a)BD. After the enactment of Public Law 100–656, SBA's regulations were amended to specify that eligibility protests would not be authorized for competitive 8(a) procurements. This notified interested parties that SBA intended to make eligibility for competitive 8(a) procurements consistent with SBA's longstanding practice with regard to sole source 8(a) procurements (that is, that the Office of 8(a)BD (Minority Small Business and Capital Ownership Development (MSB&COD) at that time) would retain exclusive authority for determining eligibility for any 8(a) contract). The current regulations contain specific language regarding protest restrictions for competitive 8(a) procurements, but not for sole source procurements. This proposed rule would clarify that these restrictions were always meant to apply to both sole source and competitive 8(a) procurements. The regulatory language appearing in § 124.311(g) would be moved into this new provision and would be expanded to apply to sole source 8(a) procurements as well. Paragraph 124.311(g) would be deleted as unnecessary.

SBA has historically included a Participant's size as part of a concern's eligibility that cannot be protested. This proposed rule would amend that policy with respect to competitive 8(a) contracts. Another offeror for a competitive 8(a) contract would be able to protest the size status of the apparent successful offeror in accord with part 121 of this chapter. In addition, the proposed rule would authorize appeals of SIC code designations in connection with 8(a) competitive requirements. The policy for size protests and SIC appeals would, however, remain unchanged for sole source 8(a) contracts (i.e., size protests would not be authorized for sole source 8(a) contracts; SIC appeals would not be permitted for sole source contracts, except by the AA/8(a)BD). In connection with a sole source 8(a) contract, any party may submit evidence to SBA to explain why it believes another SIC code should be assigned to the procurement. SBA will consider such information and will seek a SIC code change if it believes that the SIC code assigned by the procuring agency is unreasonable.

SBA is currently examining ways to further address the perceived problem of concentration of 8(a) contracts. Concerns about contract concentration have been cited by several SBA oversight entities, including the General Accounting Office, SBA's Office of Inspector General, and the U.S. Senate and House of Representatives Committees on Small Business. SBA believes that it has addressed this issue, in part, by removing the indefinite delivery, indefinite quantity exception to competition (*see* 60 FR 29969, 29971–72 and 29976), and by limiting sole source 8(a) awards as described below in proposed § 124.518. Although not part of this rulemaking, SBA wishes to solicit comments on how best to achieve a broader distribution of 8(a) contracts beyond these proposals.

Proposed section 124.518 would authorize most Participants (other than firms owned by an Indian tribe or an ANC) to receive any combination of 8(a) sole source and 8(a) competitive contracts up to a specified dollar amount. Once that dollar amount of 8(a) contracts is reached, the firm would not be eligible to receive any more 8(a) sole source contracts, but could remain eligible for competitive 8(a) awards. For a firm having a revenue-based primary SIC code at time of program entry, the limit above which it could no longer receive sole source 8(a) contracts would be set at five times the size standard corresponding to that SIC code or $100,000,000, whichever is less. For a firm having an employee-based primary SIC code at time of program entry, the limit above which it could no longer receive sole source 8(a) contracts would be set at $100,000,000. Under the proposed rule, SBA would not consider 8(a) contracts awarded under $100,000 in determining whether a Participant has reached its limit.

This change is designed to promote the equitable distribution of 8(a) contracts to an increased number of 8(a) Participants and to foster 8(a) business development on a wider scale. Smaller developing 8(a) Participants should have an increased opportunity of receiving sole source 8(a) contracts. SBA does not view this change as a penalty for those firms reaching the dollar limit. They will still be eligible for competitive 8(a) awards. SBA's mission is to advance the development of Participants so that they can be viable businesses after graduation from the 8(a) BD program. After a certain amount of contract support within the 8(a) sheltered market, sole source 8(a) awards may be counterproductive to a firm's development because they do not prepare a firm for the competitive marketplace after graduation. A firm that has received five times its applicable size standard or $100,000,000 in 8(a) contracts, whichever is applicable, should not need the business development tool of additional sole source contracts, and should spend more resources refining its competitive skills. SBA asks for comments on whether the restriction should apply to competitive as well as sole source 8(a) contracts once the

specified level of 8(a) contract dollars has been reached.

Proposed section 124.519 would establish a mentor/protege program. As proposed, firms that have graduated from the 8(a) BD program and those that are in the transitional stage of program participation may be approved as mentors for particular developing 8(a) Participants. This could include businesses that have grown to be other than small. The idea is to link firms that have gone through the 8(a) program with developing 8(a) firms so that the more mature firms can impart their knowledge and practical experience from their own program participation to the developing firms. Although the proposed rule limits mentors to current or former 8(a) Participants, SBA seeks comments on whether other firms should be mentors. If mentors are limited to current and former 8(a) Participants, SBA desires comments as to whether former Participants should be permitted where their ownership or control has changed since they were in the 8(a) program. SBA also seeks comments regarding whether a mentor should be able to be a large business, or whether mentors should be limited to firms that are small in their primary industry category (whether or not they would qualify as small under the protégé's primary SIC code, or under a particular contract for which the mentor and protégé seek to perform as a joint venture). Finally, SBA requests comments on appropriate safeguards SBA should impose on mentors to ensure that mentors do not unjustly benefit from the 8(a) BD program. SBA recognizes that some commenters may oppose any mentor/protege program as a method of extending 8(a) participation for firms that have graduated from the program, or of providing program benefits to non-disadvantaged firms (if SBA were to allow mentors to be other than current and former 8(a) Participants). SBA believes, however, that such a program will provide substantial benefits for developing 8(a) Participants, and that the assistance received through the program will enhance their ability to be viable businesses after they leave the 8(a) BD program.

The advantages to a protege firm in terms of management and technical assistance, knowledge of the procurement process, and personal relationships can be substantial. In order to encourage mentors to participate, the proposed rule would permit a mentor and protege to joint venture as a small business for various government procurement opportunities, including procurements less than half the size standard corresponding to the assigned SIC code and 8(a) sole source contracts, provided the protege qualifies as small for the procurement (and has not reached the limit described above in proposed § 124.518). The mentor/protege relationship would extend beyond the 8(a) BD program, and would encourage mentors and proteges to submit offers as joint ventures for non-8(a) competitive contracts as well. Because SBA would waive the affiliation requirements for a mentor/protege joint venture, more contracts may become available for small businesses that are 8(a) Participants. The regulation would also permit a mentor firm to own up to 33% in the protege firm to assist the protege firm raise needed capital. A protege firm could also qualify for other assistance as a small business, including SBA financial assistance, notwithstanding the mentor/protege relationship.

A mentor would have to possess good character and be operating profitably. A mentor could have no more than one protege at a time. SBA does not believe that proteges would be adequately served were one firm able to mentor more than one Participant at a time. In addition, were a mentor able to have more than one protege at a time, the perception could exist that the mentor is ''chasing'' many different 8(a) contracts through its various proteges. For a mentor that has left the 8(a) program or has grown large, there would be a concern that such a mentor was unjustly benefitting from the 8(a) program. In order to be recognized as mentors/proteges, the AA/8(a)BD would have to approve a written agreement between the mentor and protege firms under which the mentor commits to provide management and/or technical assistance to the protege firm for at least one year.

The proposed rule would eliminate current § 124.401 dealing with advance payments. Funding for advance payments does not exist.

The proposed rule would also eliminate current § 124.402, concerning business development expense (BDE). References to it are obsolete.

Proposed §§ 124.601–124.603 would set forth reporting requirements not contained elsewhere in the regulations. These requirements are largely unchanged from the current regulations. However, in keeping with President Clinton's request that Federal agencies reduce reporting requirements wherever feasible, proposed § 124.601 would reduce from twice a year to once a year the number of times a Participant must submit a report to SBA regarding its agents and other representatives.

Sections 124.701–124.704 of the proposed rule would reduce and clarify the provisions for its 7(j) management and technical assistance program (currently contained in §§ 124.403 and 124.404).

Subpart B, Eligibility, Certification, and Protests relating to Federal Small Disadvantaged Business Programs, is an entirely new subpart and is proposed in response to the DOJ's review on Federal affirmative action procurement programs. Current subpart B, dealing with SDB protests would be incorporated into the revised subpart. The subpart would be expanded to include procedures by which Private Certifiers will determine whether a firm is owned and controlled by one or more individuals claiming disadvantaged status, procedures by which a procuring agency or SBA (if the procuring agency has an agreement with SBA) will certify businesses as SDBs for purposes of all Federal procurement programs, and provisions defining how firms will be added to and deleted from an SBA-maintained on line register of SDBs.

The proposed rule would add a clarifying provision that potential for success would not be considered in determining the disadvantaged status of a concern for purposes other than the 8(a) BD program. Potential for success goes to the developmental purposes of the 8(a) BD program, and should not be a criterion in determining disadvantaged status for other programs. The proposed rule would add a provision to the section regarding who can protest the disadvantaged status in an SDB set-aside or evaluation procurement. It would not permit a firm that had previously been found not to be disadvantaged for a specific SDB set-aside to then protest the disadvantaged status of an apparent successful offeror.

Proposed § 124.1008(c)(2) would provide that the burden is on the firm seeking an SDB certification to demonstrate that those individuals claiming disadvantaged status own and control the concern. Similarly, proposed § 124.1020(c) would provide that the burden is on the protested concern to demonstrate its disadvantaged status. The protested concern must submit all information it deems relevant to such a determination. A protested concern cannot challenge a disadvantaged status determination by claiming that it did not submit a specific piece of information because SBA did not request it.

Proposed new subpart D of part 134 would contain the rules of procedure applying to appeals of denials of 8(a) BD program admission based solely on a negative finding(s) of social

disadvantage, economic disadvantage, ownership or control pursuant to § 124.206; early graduation pursuant to §§ 124.302 and 124.304; termination pursuant to §§ 124.303 and 124.304; and denials of requests to issue a waiver of the performance of work/termination for convenience requirements pursuant to § 124.514. The substance of these provisions was previously contained in § 124.210. This proposed rule transfers them to part 134 so that all procedures relating to appeals before OHA are contained in one part of SBA's regulations. Proposed § 134.406(d) clarifies that where SBA files its answer to the appeal petition after the date specified in § 134.206, the Administrative Law Judge may ignore the answer and base his or her decision solely on a review of the administrative record. All the Administrative Law Judge has the authority to do is to determine whether the Agency's decision is arbitrary or capricious. In order to do so, he or she must review the administrative record.

**Compliance With Executive Orders 12612, 12778, and 12866, the Regulatory Flexibility Act (5 U.S.C. 601, et seq.), and the Paperwork Reduction Act (44 U.S.C. Ch. 35)**

SBA certifies that this proposed rule would not be considered a significant rule within the meaning of Executive Order 12866, but may have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*

*Regulatory Flexibility Analysis*

We do not know the extent to which this proposed rule would have a significant economic impact on a substantial number of small businesses but are interested in receiving comments from the public on what they believe the impact of this regulation will be.

*Summary of the Proposed Rule*

The SBA's proposed rule would improve and strengthen the 8(a) program. The rule changes would also respond to the challenges posed by the findings in the *Adarand* v. *Pena* court case and improve the success rates for firms after participation in the 8(a) program. We believe this to be the appropriate regulatory alternative to meet the judicial requirements applicable to the agency.

The proposed 8(a) rule changes fall under four major categories. They are: (1) Equitable distribution of 8(a) contracts; (2) small business affiliation rule revisions; (3) a new 8(a) mentor-protege program; and (4) SBA's responsibilities for implementing the Small Disadvantaged Business (SDB) contracting program authorized by the Federal Acquisition Streamlining Act and developed during the U.S. Department of Justice's post-Adarand affirmative action review and recommendations.

The proposed 8(a) regulations would make changes to the existing regulations designed to distribute 8(a) contracts more equitably and encourage participating 8(a) firms to compete more effectively for contracts. The regulation would enhance the ability of 8(a) firms and other small businesses to obtain larger prime contracts that would be normally out of the reach of individual small businesses. Also, by establishing an 8(a) mentor-protege program, SBA would allow participants in the 8(a) program to tap into the expertise and capital of 8(a) graduates or more advanced participating firms. Lastly, the proposed 8(a) regulations would provide the guidelines needed to conform SBA's rules and procedures to the Department of Justice's post-Adarand guidelines, including SBA's responsibility to certify participating SDB firms and maintain and provide oversight for a national network of private sector SDB certifiers.

This proposal applies to all current and eligible participants in the SBA 8(a) program and all eligible small disadvantaged businesses (SDBs) that seek to do business with the federal government as contractors.

*Current Program Participants*

At present, there are approximately 5,800 SBA certified 8(a) firms. Based on information from the SBA PASS system, there are approximately 34,000 minority or SDB firms seeking contracts with the federal government. All 8(a) firms meet the eligibility requirements of an SDB firm and are included in the 34,000 number. Pursuant to PASS, there are an additional 37,000 non-minority women-owned firms and 3,000 non-minority disabled veteran-owned firms seeking contracts with the federal government. Any or all of these additional 40,000 firms could also seek SDB certification through SBA under SBA's new subpart B of part 124.

In FY '96, 8(a) firms received $6.3 billion in federal contracts and SDBs about $10.3 billion. The $10.3 billion in contracts to SDBs represents about 5 percent of all federal contract dollars spent in FY '96. In addition, the federal contract dollars that went to SDBs is about 25 percent of all federal receipts that went to small businesses for the same period.

It is believed that this rule will benefit eligible 8(a) and SDB firms because it simplifies and clearly defines eligibility requirements, especially for SDBs; streamlines the operation of the 8(a) program; increases partnering opportunities by easing affiliation rules; and, improves business assistance provided by the SBA. It is estimated that, under this proposal, the number of certified 8(a) programs will increase by 10 percent and the number of SDBs seeking federal contracts will increase by 20 to 30 percent.

*Universe of Potential Program Applicants*

The last official U.S. Census Statistics on women and minority-owned firms are for 1992; these data were released in 1996. In 1992, there were 2.0 million total minority-owned firms. Of these, 312 thousand (15.6 percent) had employees. If the growth in minority firms between 1992 and 1997 is the same as it was between 1987 and 1992 —a conservative assumption—then an estimate of total minority firms would be 3.3 million in 1997 and perhaps half a million with employees. For the most part, only firms with employees would be affected by this proposal. The latter, of course, are only educated assumptions based upon extrapolations.

An estimate of the racial composition of minority owned firms with employees would be: Black (32 percent), Hispanic (38 percent), and the cluster of Asian-American/Pacific Islanders/ Native Americans, and Alaska Natives (30 percent).

By gender, 63 percent of minority owned firms in 1992 were likely to be owned by men; 37 percent were owned by women. For minority firms with employees, about 71 percent of the minority owned firms were likely to be owned by men; 29 percent were likely to be owned by women.

Including regular C corporations, women owned 6,407 million firms in 1992. Of these 1,25 million firms (19.4 percent) had employees. Based on estimates by the National Association of Women Business Owners, there are nearly 8.0 million women-owned firms in 1996, we can extrapolate that there were about 1.55 million women-owned firms with employees in 1996.

With this large pool of businesses which may at some point apply to the SBA's programs, we can anticipate that the number of 8(a) participants and SDBs will increase, but cannot estimate the magnitude of the increase or its effect on firms that have or may obtain contracts in the future. We believe that the impact of these regulatory changes will be beneficial to small business and,

again, would be interested in receiving any information that would shed additional light on the specific impact of these proposed regulations.

The rule is not, however, likely to have an annual economic effect of $100 million or more, result in a major increase in costs or prices, or have a significant adverse effect on competition or the United States economy.

For purposes of the Paperwork Reduction Act of 1995 (Pub. L. 104–13), SBA certifies that this proposed rule, if adopted in final form, would contain no new reporting or recordkeeping requirements. Although the proposed rule would require small disadvantaged business concerns to submit evidence that they are owned and controlled by one or more disadvantaged individuals to private certifiers, and representations of group membership or evidence of disadvantaged status to SBA, in order to become certified as an SDB, the information sought is the same as that currently required for participation in SBA's 8(a) program. In addition, once certified, this rule would not require SDB concerns to report any other information to SBA or to maintain additional records.

For purposes of Executive Order 12612, SBA certifies that this rule would not have any federalism implications warranting the preparation of a Federalism Assessment.

For purposes of Executive Order 12778, SBA certifies that this rule is drafted, to the extent practicable, in accordance with the standards set forth in Section 2 of that Order.

**List of Subjects in 13 CFR**

*Part 121*

Government procurement, Government property, Grant programs-business, Individuals with disabilities, Loan programs-business, Small businesses.

*Part 124*

Government procurement; Minority businesses; Tribally-owned concerns; Hawaiian natives; Reporting and record keeping requirements; Technical Assistance.

*Part 134*

Administrative practice and procedure, Organization and functions (Government agencies).

Accordingly, for the reasons set forth above, SBA hereby proposes to amend Title 13, Code of Federal Regulations (CFR), as follows:

## PART 121—[AMENDED]

1. The authority citation for 13 CFR part 121 would continue to read as follows:

**Authority:** 15 U.S.C. 632(a), 634(b)(6), 637(a) and 644(c); and Pub. L. 102–486, 106 Stat. 2776, 3133.

2. Section 121.103 is amended by redesignating paragraphs (f)(3) and (f)(4) as paragraphs (f)(4) and (f)(5), respectively, by revising paragraph (f)(2) and by adding a new paragraph (f)(3) to read as follows:

### § 121.103 What is affiliation?

* * * * *

(f) *Affiliation based on joint venture arrangements.* * * *

(2) Except as provided in paragraph (f)(3) of this section, concerns submitting offers on a particular procurement or property sale as joint venturers are affiliated with each other with regard to the performance of that contract.

(3) *Joint venture exclusion from affiliation.* (i) A joint venture of two or more business concerns may submit an offer as a small business for a non-8(a) federal procurement without regard to affiliation based on the joint venture arrangement so long as each concern is small under the size standard corresponding to the SIC code assigned to the contract, provided:

(A) For a procurement having a revenue-based size standard, the procurement exceeds half the size standard corresponding to the SIC code assigned to the contract; or

(B) For a procurement having an employee-based size standard, the procurement exceeds $10 million.

(ii) A joint venture of at least one 8(a) Participant and one or more other business concerns may submit an offer for a competitive 8(a) procurement without regard to affiliation based on the joint venture arrangement so long as the requirements of § 124.512(b)(1) of this chapter are met.

(iii) Two firms approved by SBA to be a mentor and protege under § 124.519 of this chapter may joint venture as a small business for any government procurement, provided the protege qualifies as small for the size standard corresponding to the SIC code assigned to the procurement and, for purposes of 8(a) sole source requirements, has not reached the dollar limit set forth in § 124.518 of this chapter.

* * * * *

2a. Section 121.1001 is amended by redesignating paragraphs (a)(2) through (a)(5) as paragraphs (a)(3) through (a)(6), by adding the following new paragraph (a)(2), and by revising paragraph (b)(2) to read as follows:

### § 121.1001 Who may initiate a size protest or request a formal size determination?

(a) *Size Status Protests.* * * *

(2) For competitive 8(a) contracts, the following entities may protest:

(i) Any offeror;

(ii) The contracting officer; or

(iii) The SBA District Director, or designee, in either the district office serving the geographical area in which the procuring agency is located or the district office that services the apparent successful offeror, or the Associate Administrator for Minority Enterprise Development.

* * * * *

(b) *Request for Size Determinations.* * * *

(2) For SBA's 8(a) BD program:

(i) Concerning initial or continued 8(a) BD eligibility, the following entities may request a formal size determination:

(A) The 8(a) BD applicant concern or Participant; or

(B) The Assistant Administrator of the Division of Program Certification and Eligibility or the Associate Administrator for 8(a)BD.

(ii) Concerning individual sole source 8(a) contract awards, the following entities may request a formal size determination:

(A) The Participant nominated for award of the particular sole source contract;

(B) The SBA program official with authority to execute the 8(a) contract; or

(C) The SBA District Director in the district office that services the Participant, or the Associate Administrator for 8(a)BD.

* * * * *

3. Section 121.1103 is amended by revising paragraph (a) to read as follows:

### § 121.1103 What are the procedures for appealing a SIC code designation?

(a) Generally, any interested party who has been adversely affected by a SIC code designation may appeal the designation to OHA. However, with respect to a particular sole source 8(a) contract, only the Associate Administrator for 8(a)BD may appeal.

* * * * *

## PART 124—[AMENDED]

4. Part 124 is revised to read as follows:

## PART 124—8(A) BUSINESS DEVELOPMENT/SMALL DISADVANTAGED BUSINESS STATUS DETERMINATIONS

### Subpart A—8(a) Business Development

**Provisions of General Applicability**


Sec.
124.1 What is the purpose of the 8(a) Business Development program?
124.2 What length of time may a business participate in the 8(a) BD program?
124.3 What definitions are important in the 8(a) BD program?

**Eligibility Requirements for Participation in the 8(a) Business Development Program**

124.101 What are the basic requirements a concern must meet for the 8(a) BD program?
124.102 What size business is eligible to participate in the 8(a) BD program?
124.103 Who is socially disadvantaged?
124.104 Who is economically disadvantaged?
124.105 What does it mean to be unconditionally owned by one or more disadvantaged individuals?
124.106 When do disadvantaged individuals control an applicant or Participant?
124.107 What is potential for success?
124.108 What other eligibility requirements apply for individuals or businesses?
124.109 Do Indian tribes and Alaska Native Corporations have any special rules for applying to the 8(a) BD program?
124.110 Do Native Hawaiian Organizations have any special rules for applying to the 8(a) BD program?
124.111 Do Community Development Corporations (CDCs) have any special rules for applying to the 8(a) program?
124.112 What criteria must a business meet to remain eligible to participate in the 8(a) BD program?

**Applying to the 8(a) BD Program**

124.201 May any business submit an application?
124.202 Where must an application be filed?
124.203 What must a concern submit to apply to the 8(a) BD program?
124.204 How does SBA process applications for 8(a) BD program admission?
124.205 Can an applicant ask SBA to reconsider SBA's initial decision to decline its application?
124.206 What appeal rights are available to an applicant that has been denied admission?
124.207 Can an applicant reapply for admission to the 8(a) BD program?

**Exiting the 8(a) BD Program**

124.301 What are the ways a business may leave the 8(a) BD program?
124.302 What is early graduation?
124.303 What is termination?
124.304 What are the procedures for early graduation and termination?
124.305 What is suspension and how is a Participant suspended from the 8(a) BD program?

**Business Development**

124.401 Which SBA field office services a Participant?
124.402 How does a Participant develop a business plan?
124.403 How is a business plan updated and modified?
124.404 What business development assistance is available to Participants during the two stages of participation in the 8(a) BD program?
124.405 How does a Participant obtain Federal Government surplus property?

**Contractual Assistance**

124.501 What general provisions apply to the award of 8(a) contracts?
124.502 How does an agency offer a procurement to SBA for award through the 8(a) BD program?
124.503 How does SBA accept a procurement for award through the 8(a) BD program?
124.504 What circumstances limit SBA's ability to accept a procurement for award as an 8(a) contract?
124.505 When will SBA appeal the terms and conditions of a particular 8(a) contract or a procuring agency decision not to reserve a procurement for the 8(a) BD program?
124.506 At what dollar threshold must an 8(a) procurement be competed among eligible Participants?
124.507 What procedures apply to competitive 8(a) procurements?
124.508 What are competitive business mix targets?
124.509 What percentage of work must a Participant perform on an 8(a) contract?
124.510 How is fair market price determined for an 8(a) contract?
124.511 Delegation of contract administration to procuring agencies.
124.512 Under what circumstances can a joint venture be awarded an 8(a) contract?
124.513 Exercise of 8(a) options and modifications.
124.514 Can a Participant change its ownership or control and continue to perform an 8(a) contract, and can it transfer performance to another firm?
124.515 Who decides contract disputes arising between a Participant and a procuring agency after the award of an 8(a) contract?
124.516 Can the eligibility or size of a Participant for award of an 8(a) contract be questioned?
124.517 How can an 8(a) contract be terminated before performance is completed?
124.518 Are there any dollar limits on the amount of 8(a) contracts that a Participant may receive?
124.519 Mentor/Protege program.

**Miscellaneous Reporting Requirements**

124.601 What reports does SBA require on parties assisting Participants in obtaining federal contracts?
124.602 What kind of annual financial statement must a Participant submit to SBA?
124.603 What reports regarding the continued business operations of former Participants does SBA require?

**Management and Technical Assistance Program**

124.701 What is the purpose of the 7(j) management and technical assistance program?
124.702 What types of assistance are available through the 7(j) program?
124.703 Who is eligible to receive 7(j) assistance?
124.704 What additional management and technical assistance is reserved exclusively for concerns eligible to receive 8(a) contracts?

### Subpart B—Eligibility, Certification, and Protests Relating to Federal Small Disadvantaged Business Programs

124.1001 General applicability.
124.1002 What is a Small Disadvantaged Business (SDB)?
124.1003 What is a Private Certifier?
124.1004 How does an organization or business concern become a Private Certifier?
124.1005 Can a Private Certifier charge a fee?
124.1006 Is there a list of Private Certifiers?
124.1007 How long may an organization or business concern be Private Certifier?
124.1008 How does a firm become certified as a SDB?
124.1009 How does a firm appeal a decision of a Private Certifier?
124.1010 Can a firm represent itself to be an SDB if it is not on the list of qualified SDBs?
124.1011 What is a misrepresentation of disadvantaged status?
124.1012 Can a firm reapply for SDB certification?
124.1013 Is there a list of certified SDBs?
124.1014 What is the effect of receiving an SDB certification?
124.1015 Who may protest the disadvantaged status of a concern?
124.1016 When will SBA not decide an SDB protest?
124.1017 Who decides disadvantaged status protests?
124.1018 What submission procedures apply to disadvantaged status protests?
124.1019 What format or degree of specificity does SBA require to consider an SDB protest?
124.1020 What will SBA do when it receives an SDB protest?
124.1021 How does SBA make disadvantaged status determinations?
124.1022 Appeals of disadvantaged status determinations.


**Authority:** 15 U.S.C. 634(b)(6), 636(j), 637(a), 637(d) and Pub. L. 99–661, Pub. L. 100–656, sec. 1207, Pub. L. 101–37, Pub. L. 101–574, and 42 U.S.C. 9815.

**Federal Register** / Vol. 62, No. 157 / Thursday, August 14, 1997 / Proposed Rules **43599**

## Subpart A—8(a) Business Development

### Provisions of General Applicability

#### § 124.1 What is the purpose of the 8(a) Business Development program?

Sections 8(a) and 7(j) of the Small Business Act authorize a Minority Small Business and Capital Ownership Development program (designated the 8(a) Business Development or ''8(a) BD'' program for purposes of the regulations in this part). The purpose of the 8(a) BD program is to assist eligible small disadvantaged business concerns compete in the American economy through business development.

#### § 124.2 What length of time may a business participate in the 8(a) BD program?

A Participant receives a program term of nine years from the date of SBA's approval letter certifying the concern's admission to the program. A firm that completes its nine year term of participation in the 8(a) BD program is deemed to graduate from the program. The nine year program term may be shortened only by termination, early graduation or voluntary withdrawal as provided for in this part.

#### § 124.3 What definitions are important in the 8(a) BD Program?

*Alaska Native* means a citizen of the United States who is a person of one-fourth degree or more Alaskan Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or a combination of those bloodlines. The term includes, in the absence of proof of a minimum blood quantum, any citizen who a Native village or Native group regards as an Alaska Native if their father or mother is regarded as an Alaska Native.

*Alaska Native Corporation or ANC* means any Regional Corporation, Village Corporation, Urban Corporation, or Group Corporation organized under the laws of the State of Alaska in accordance with the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, et seq.)

*Bona fide place of business,* for purposes of 8(a) construction procurements, means that a Participant regularly maintains an office which employs at least one full-time individual within the appropriate geographical boundary. The term does not include construction trailers or other temporary construction sites.

*Community Development Corporation or CDC* means a nonprofit organization responsible to residents of the area it serves which has received financial assistance under 42 U.S.C. 9805 *et seq.*

*Concern* is defined in part 121 of this title.

*Days* means calendar days unless otherwise specified.

*Immediate family member* means father, mother, husband, wife, son, daughter, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, step-father, step-mother, step-son, step-daughter, step-brother, step-sister, half-brother, and half-sister.

*Indian tribe* means any Indian tribe, band, nation, or other organized group or community of Indians, including any ANC, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians, or is recognized as such by the State in which the tribe, band, nation, group, or community resides. See definition of ''tribally-owned concern.''

*Native Hawaiian* means any individual whose ancestors were natives prior to 1778, of the area which now comprises the State of Hawaii.

*Native Hawaiian Organization* means any community service organization serving Native Hawaiians in the State of Hawaii which is a not-for-profit organization chartered by the State of Hawaii, is controlled by Native Hawaiians, and whose business activities will principally benefit such Native Hawaiians.

*Negative control* is defined in part 121 of this title.

*Nondisadvantaged individual* means any individual who does not claim disadvantaged status, does not qualify as disadvantaged, or upon whose disadvantaged status an applicant or Participant does not rely in qualifying for 8(a) BD program participation.

*Participant* means a small business concern admitted to participate in the 8(a) BD program.

*Primary industry classification* means the four digit Standard Industrial Classification (SIC) code designation which best describes the primary business activity of the 8(a) BD applicant or Participant. The SIC code designations are described in the Standard Industrial Classification Manual published by the U.S. Office of Management and Budget.

*Principal place of business* means the business location at which the individuals who manage the concern's day-to-day operations spend most working hours and where top management's business records are kept. If different, SBA may determine the principal place of business for program purposes.

*Program year* means a 12-month period of an 8(a) BD Participant's program participation. The first program year begins on the date that the concern is certified to participate in the 8(a) BD program and ends one year later. Each subsequent program year begins on the Participant's anniversary of program certification and runs for one 12-month period.

*Same or similar line of business* means business activities within the same two-digit ''Major Group'' of the SIC Manual as the primary industry classification of the applicant or Participant. The phrase ''same business area'' is synonymous with this definition.

*Self-marketing* of a requirement occurs when a Participant identifies a requirement that has not been committed to the 8(a) BD program and, through its marketing efforts, causes the procuring agency to offer that specific requirement to the 8(a) BD program on the Participant's behalf. A firm which identifies and markets a requirement which is subsequently offered to the 8(a) BD program as an open requirement or on behalf of another Participant has not ''self-marketed'' the requirement within the meaning of this part.

*Tribally-owned concern* means any concern at least 51 percent owned by an Indian tribe as defined in this section.

*Unconditional ownership* means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

### Eligibility Requirements for Participation in the 8(a) Business Development Program

#### § 124.101 What are the basic requirements a concern must meet for the 8(a) BD program?

Generally, a concern meets the basic requirements for admission to the 8(a) BD program if it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States, and which demonstrates potential for success.

**§ 124.102 What size business is eligible to participate in the 8(a) BD program?**

(a) An applicant concern must qualify as a small business concern as defined in part 121 of this title. The applicable size standard is the one for its primary industry classification. The rules for calculating the size of a tribally-owned concern, a concern owned by an Alaska Native Corporation, a concern owned by a Native Hawaiian Organization, or a concern owned by a Community Development Corporation are additionally affected by §§ 124.109, 124.110, and 124.111, respectively.

(b) If 8(a) BD program officials determine that a concern may not qualify as small, they may deny an application for 8(a) BD program admission or may request a formal size determination under part 121 of this title.

(c) A concern whose application is denied due to size by 8(a) BD program officials may request a formal size determination under part 121 of this title. A favorable determination will enable the firm to submit a new 8(a) BD application without waiting one year.

**§ 124.103 Who is socially disadvantaged?**

(a) *General.* Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control.

(b) *Members of designated groups.* (1) There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at paragraph (d) of this section. Being born in a country does not, by itself, suffice to make the birth country an individual's country of origin for purposes of being included within a designated group.

(2) An individual must demonstrate identification by others as a member of a designated group if SBA requires it.

(3) The presumption of social disadvantage may be overcome with significant, credible evidence to the contrary. Individuals possessing or knowing of such evidence should submit the information in writing to the Associate Administrator for 8(a) BD (AA/8(a)BD) for consideration.

(c) *Individuals not members of designated groups.* (1) An individual who is not a member of one of the groups presumed to be socially disadvantaged in paragraph (b)(1) of this section must establish individual social disadvantage by a preponderance of the evidence.

(2) Evidence of individual social disadvantage must include the following elements:

(i) At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged;

(ii) Personal experiences of social disadvantage, not merely membership in a non-designated group which might be socially disadvantaged, but has not been so designated by SBA. The experiences must have been in American society, not in other countries, and must have been substantial, chronic, and longstanding; and

(iii) Negative impact on entry into or advancement in the business world because of the disadvantage. SBA will consider any relevant evidence in assessing this element. In every case, however, SBA will consider education, employment and business history to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world.

(A) *Education.* SBA considers such factors as denial of equal access to institutions of higher education, exclusion from social and professional association with students or teachers, denial of educational honors rightfully earned, and social patterns or pressures which discouraged the individual from pursuing a professional or business education.

(B) *Employment.* SBA considers such factors as unequal treatment in hiring, promotions and other aspects of professional advancement, pay and fringe benefits, and other terms and conditions of employment; retaliatory or discriminatory behavior by an employer; and social patterns or pressures which have channelled the individual into nonprofessional or non-business fields.

(C) *Business history.* SBA considers such factors as unequal access to credit or capital, acquisition of credit or capital under commercially unfavorable circumstances, unequal treatment in opportunities for government contracts or other work, unequal treatment by potential customers and business associates, and exclusion from business or professional organizations.

(d) *Socially disadvantaged group inclusion.* (1) *General.* Representatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition SBA to be included as a presumptively socially disadvantaged group under paragraph (b)(1) of this section. Upon an adequate preliminary showing that the group has suffered such prejudice or bias, SBA will publish a notice in the **Federal Register** that it has received and is considering such a request, and that it will consider public comments.

(2) *Standards to be applied.* In determining whether a group has made an adequate preliminary showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this regulation, SBA must determine:

(i) Whether the group has suffered prejudice, bias, or discriminatory practices;

(ii) Whether those conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in the Small Business Act; and

(iii) Whether those conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to small business owners generally.

(3) *Procedure.* The notice published under paragraph (d)(1) of this section will authorize a specified period for the receipt of public comments supporting or opposing the petition for socially disadvantaged group status. If appropriate, SBA may hold hearings. SBA may also conduct its own research relative to the group's petition.

(4) *Decision.* SBA will advise the petitioners of its final decision in writing, and publish its conclusion as a notice in the **Federal Register**. If appropriate, SBA will amend paragraph (b)(1) of this section to include a new group.

**§ 124.104 Who is economically disadvantaged?**

(a) *General.* Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged.

(b) *Submission of narrative and financial information.* (1) Each individual claiming economic disadvantage must describe it in a narrative statement, and must submit personal financial information.

(2) When married, an individual claiming economic disadvantage also must submit separate financial information for his or her spouse, unless the individual and the spouse are legally separated.

(c) *Factors to be considered.* In considering diminished capital and credit opportunities, SBA will examine factors relating to the personal financial condition of any individual claiming disadvantaged status, including personal income for the past two years (including bonuses and the value of company stock given in lieu of cash), personal net worth, and the fair market value of all assets, whether encumbered or not. SBA will also consider the financial condition of the applicant compared to the financial profiles of small businesses in the same primary industry classification, or, if not available, in similar lines of business, which are not owned and controlled by socially and economically disadvantaged individuals in evaluating the individual's access to credit and capital. The financial profiles that SBA compares include total assets, net sales, pre tax profit, sales/working capital ratio, and net worth.

(1) *Assets.* Assets which an individual claiming disadvantaged status has transferred within two years of the application to an immediate family member, or to a trust the beneficiary of which is an immediate family member, for less than fair market value will be attributed to the individual claiming disadvantaged status.

(2) *Net worth.* For initial 8(a) BD eligibility, the net worth of an individual claiming disadvantage must be less than $250,000. For continued 8(a) BD eligibility after admission to the program, net worth must be less than $750,000. In determining such net worth, SBA will exclude the ownership interest in the applicant or Participant and the equity in the primary personal residence (except any portion of such equity which is attributable to excessive withdrawals from the applicant or Participant). Exclusions for net worth purposes are not exclusions for asset valuation or access to capital and credit purposes.

(i) A contingent liability does not reduce an individual's net worth.

(ii) The personal net worth of an individual claiming to be an Alaska Native will include assets and income from sources other than an Alaska Native Corporation and exclude any of the following which the individual receives from any Alaska Native Corporation: cash (including cash dividends on stock received from a Native Corporation) to the extent that it does not, in the aggregate, exceed $2,000 per individual per annum; stock (including stock issued or distributed by a Native Corporation as a dividend or distribution on stock); a partnership interest; land or an interest in land (including land or an interest in land received from a Native Corporation as a dividend or distribution on stock); and an interest in a settlement trust.

**§ 124.105 What does it mean to be unconditionally owned by one or more disadvantaged individuals?**

An applicant or Participant must be at least 51 percent unconditionally and directly owned by one or more socially and economically disadvantaged individuals who are citizens of the United States, except for concerns owned by Indian tribes, Alaska Native Corporations, Native Hawaiian Organizations, or Community Development Corporations (CDCs). See § 124.3 for definition of unconditional ownership; and §§ 124.109, 124.110, and 124.111, respectively, for special ownership requirements for concerns owned by Indian tribes, ANCs, Native Hawaiian Organizations, and CDCs.

(a) *Ownership must be direct.* Ownership by one or more disadvantaged individuals must be direct ownership. An applicant or Participant owned principally by another business entity or by a trust (including employee stock ownership trusts) that is in turn owned and controlled by one or more disadvantaged individuals does not meet this requirement.

(b) *Ownership of a partnership.* In the case of a concern which is a partnership, at least 51 percent of every class of partnership interest must be unconditionally owned by one or more individuals determined by SBA to be socially and economically disadvantaged. The ownership must be reflected in the concern's partnership agreement.

(c) *Ownership of a limited liability company.* In the case of a concern which is a limited liability company, at least 51 percent of each class of member interest must be unconditionally owned by one or more individuals determined by SBA to be socially and economically disadvantaged.

(d) *Ownership of a corporation.* In the case of a concern which is a corporation, at least 51 percent of each class of voting stock outstanding and 51 percent of the aggregate of all stock outstanding must be unconditionally owned by one or more individuals determined by SBA to be socially and economically disadvantaged.

(e) *Stock options' effect on ownership.* In determining unconditional ownership, SBA will disregard any unexercised stock options or similar agreements held by disadvantaged individuals. However, any unexercised stock options or similar agreements (including rights to convert non-voting stock or debentures into voting stock) held by non-disadvantaged individuals will be treated as exercised, except for any ownership interests which are held by investment companies licensed under the Small Business Investment Act of 1958.

(f) *Dividends and distributions.* One or more disadvantaged individuals must be entitled to receive:

(1) At least 51 percent of the annual distribution of dividends paid on the stock of a corporate applicant concern;

(2) 100 percent of the unencumbered value of each share of stock owned in the event that the stock is sold; and

(3) At least 51 percent of the retained earnings of the concern and 100 percent of the unencumbered value of each share of stock owned in the event of dissolution of the corporation.

(g) *Ownership of another Participant.* The individuals determined to be disadvantaged for purposes of one Participant, their immediate family members, and the Participant itself, may not hold, in the aggregate, more than a 10 percent equity ownership interest in any other single Participant.

(h) *Ownership restrictions for non-disadvantaged individuals and concerns.* (1) A non-disadvantaged individual (in the aggregate with all immediate family members) or a non-Participant concern that is a general partner or stockholder of at least 10 percent in one Participant may not own more than 10 percent in another Participant. This restriction does not apply to financial institutions licensed or chartered by Federal, state or local government, including investment companies which are licensed under the Small Business Investment Act of 1958.

(2) A non-Participant concern in the same or similar line of business may not own more than 10 percent in a Participant, except that a former Participant or a principal of a former Participant (except those that have been terminated from 8(a) BD program participation pursuant to §§ 124.303 and 124.304) may have an equity ownership interest of up to 20 percent in a current Participant in the same or similar line of business.

(i) *Change of ownership.* A Participant may change its ownership so long as one or more disadvantaged individuals would own and control it after the change and it obtains the prior written approval of SBA.

(1) The Participant that was awarded one or more 8(a) contracts may substitute one disadvantaged individual for another disadvantaged individual without requiring the termination of those contracts or a request for waiver under § 124.514, as long as it receives SBA's approval prior to the change.

(2) Where the previous owner held less than a 10 percent interest in the concern, or the transfer results from the death or incapacity due to a serious, long-term illness or injury of a disadvantaged principal, prior approval is not required, but the concern must notify SBA within 60 days.

(3) Continued participation of the Participant with new ownership and the award of any new 8(a) contracts requires SBA's determination that all eligibility requirements are met by the concern and the new owners.

(4) The Participant's program term is in no way extended by the change in ownership.

(j) *Public offering.* A Participant's request for SBA's approval for the issuance of a public offering will be treated as a request for a change of ownership. Such request will cause SBA to examine the concern's continued need for access to the business development resources of the 8(a) BD program.

(k) *Community property laws given effect.* In determining ownership interests when an owner resides in any of the community property states or territories of the United States (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin), SBA considers applicable state community property laws. If only one spouse claims disadvantaged status, that spouse's ownership interest will be considered unconditionally held only to the extent it is vested by the community property laws. A transfer or relinquishment of interest by the non-disadvantaged spouse may be necessary in some cases to establish eligibility.

### § 124.106 When do disadvantaged individuals control an applicant or Participant?

SBA regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations. An applicant or Participant's management and daily business operations must be conducted by one or more disadvantaged individuals, except for concerns owned by Indian tribes, ANCs, Native Hawaiian Organizations, or Community Development Corporations (CDCs). (See §§ 124.109, 124.110, and 124.111, respectively, for the requirements for concerns owned by Indian tribes or ANCs, for concerns owned by Native Hawaiian Organizations, and for CDC-owned concerns). Disadvantaged individuals managing the concern must have managerial experience of the extent and complexity needed to run the concern. Control is not the same as ownership, although both may reside in the same person. A disadvantaged owner's unexercised right to cause a change in the control or management of the applicant concern does not constitute disadvantaged control and management, regardless of how quickly or easily the right could be exercised.

(a)(1) An applicant or Participant must be managed on a full-time basis by one or more disadvantaged individuals who possess requisite management capabilities.

(2) A disadvantaged full-time manager must hold the highest officer position (usually President or Chief Executive Officer) in the applicant or Participant.

(3) One or more disadvantaged individuals who manage the applicant or Participant must devote full-time to the business during normal working hours.

(4) Any disadvantaged manager who wishes to engage in outside employment must notify SBA of the nature and anticipated duration of the outside employment and obtain the prior written approval of SBA. SBA will deny a request for outside employment which could conflict with the management of the firm or could hinder it in achieving the objectives of its business development plan.

(b) In the case of a partnership, one or more disadvantaged individuals must serve as general partners, with control over all partnership decisions. A partnership in which no disadvantaged individual is a general partner will be ineligible for participation.

(c) In the case of a limited liability company, one or more disadvantaged individuals must serve as management members, with control over all decisions of the limited liability company.

(d) Disadvantaged individuals must control the Board of Directors of a corporate applicant or Participant, either through a majority of voting directors or through weighted voting.

(1) The powers to appoint, remove and replace directors (e.g., through ownership of voting stock) is not sufficient to satisfy the requirement that one or more disadvantaged individuals actually control the Board of Directors.

(2) Non-voting, advisory, or honorary Directors may be appointed.

(3) Any Executive Committee of Directors must be controlled by disadvantaged directors unless the Executive Committee can only make recommendations to and cannot independently exercise the authority of the Board of Directors.

(4) Arrangements regarding the structure and voting rights of the Board of Directors must comply with applicable state law.

(5) Provisions for the establishment of a quorum cannot permit non-disadvantaged Directors to control the Board of Directors.

(e) Non-disadvantaged individuals may be involved in the management of an applicant or Participant, and may be stockholders, partners, limited liability members, officers, and/or directors of the applicant or Participant. No such non-disadvantaged individual or immediate family member may:

(1) Exercise actual control or have the power to control the applicant or Participant;

(2) Be a former employer or a principal of a former employer of any disadvantaged owner of the applicant or Participant, unless it is determined by the AA/8(a)BD that the relationship between the former employer or principal and the disadvantaged individual or applicant concern does not give the former employer actual control or the potential to control the applicant or Participant and such relationship is in the best interests of the 8(a) BD firm; or

(3) Receive compensation from the applicant or Participant in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest officer (usually CEO or President). The highest ranking officer may elect to take a lower salary than a non-disadvantaged individual only upon demonstrating that it helps the concern and upon obtaining the prior

written consent of the AA/8(a)BD or designee).

(f) Non-disadvantaged individuals or entities may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive:

(1) Non-disadvantaged individuals control the Board of Directors of the applicant or Participant, either directly through majority voting membership, or indirectly, where the by-laws allow non-disadvantaged individuals to effectively block actions proposed by the disadvantaged individuals.

(2) A non-disadvantaged individual or entity provides critical financial or bonding support to the applicant or Participant which directly or indirectly allows the non-disadvantaged individual to significantly influence business decisions of the Participant.

(3) A non-disadvantaged individual or entity controls the applicant or Participant or an individual disadvantaged owner through loan arrangements. Providing a loan guaranty on commercially reasonable terms does not, by itself, give a nondisadvantaged individual or entity the power to control a firm.

(4) Business relationships exist with non-disadvantaged individuals or entities which cause such dependence that the applicant or Participant cannot exercise independent business judgment without great economic risk.

### § 124.107 What is potential for success?

The applicant concern must possess reasonable prospects for success in competing in the private sector. To do so, it must be in business in its primary industry classification for at least two full years immediately prior to the date of its 8(a) BD application, unless a waiver for this requirement is granted pursuant to paragraph (b) of this section.

(a) Income tax returns for each of the two previous tax years must show operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification.

(b)(1) SBA may waive the two years in business requirement if each of the following five conditions are met:

(i) The individual or individuals upon whom eligibility is based have substantial business management experience;

(ii) The applicant has demonstrated technical experience to carry out its business plan with a substantial likelihood for success.

(iii) The applicant has adequate capital to sustain its operations and carry out its business plan;

(iv) The applicant has a record of successful performance on contracts from governmental or nongovernmental sources in its primary industry category; and

(v) The applicant has, or can demonstrate its ability to timely obtain, the personnel, facilities, equipment, and any other requirements needed to perform contracts.

(2) The concern seeking a waiver under this paragraph (b) must provide information on governmental and nongovernmental contracts in progress and completed (including letters of reference) in order to establish successful contract performance, and must demonstrate how it otherwise meets the five conditions for waiver. SBA considers an applicant's performance on both government and private sector contracts in determining whether the firm has an overall successful performance record. If, however, the applicant has performed only government contracts or only private sector contracts, SBA will review its performance on those contracts alone to determine whether the applicant possesses a record of successful performance.

(c) In assessing potential for success for all concerns, SBA considers the concern's access to credit and capital, including, but not limited to, access to long-term financing, access to working capital financing, equipment trade credit, access to raw materials and supplier trade credit, and bonding capability.

(d) In assessing potential for success, SBA will also consider the technical and managerial experience of the applicant concern's managers, the operating history of the concern, the concern's record of performance on previous Federal and private sector contracts in the primary industry in which the concern is seeking 8(a) BD certification, and its financial capacity. The applicant concern as a whole must demonstrate both technical knowledge in its primary industry category and management experience sufficient to run its day-to-day operations.

(e) The Participant or individuals employed by the Participant must hold all requisite licenses if the concern is engaged in an industry requiring professional licensing (e.g., public accountancy, law, professional engineering).

(f) An applicant will not be denied admission into the 8(a) BD program due solely to a determination that potential 8(a) contract opportunities are unavailable to assist in the development of the concern unless:

(1) The Government has not previously procured and is unlikely to procure the types of products or services offered by the concern; or

(2) The purchase of such products or services by the Federal Government will not be in quantities sufficient to support the developmental needs of the applicant and other Participants providing the same or similar items or services.

### § 124.108 What other eligibility requirements apply for individuals or businesses?

(a) *Good character.* The applicant or Participant and all its principals must have good character.

(1) If, during the processing of an application, adverse information is obtained from the applicant or a credible source regarding possible criminal conduct by the applicant or any of its principals, no further action will be taken on the application until SBA's Inspector General has collected relevant information and has advised the AA/8(a)BD of his or her findings. The AA/8(a)BD will consider those findings when evaluating the application.

(2) Violations of any of SBA's regulations may result in denial of participation in the 8(a) BD program. The AA/8(a)BD will consider the nature and severity of the violation in making an eligibility determination.

(3) Debarred or suspended concerns or concerns owned by debarred or suspended persons are ineligible for admission to the 8(a) BD program.

(4) An applicant is ineligible for admission to the 8(a) BD program if a proprietor, partner, limited liability member, director, officer, or holder of at least 10 percent of the stock, or another person (including a key manager) with significant authority over the concern is currently incarcerated, or on parole or probation pursuant to a pre-trial diversion or following conviction for a felony or any crime involving business integrity.

(5) If, during the processing of an application, SBA determines that an applicant has submitted false information, regardless of whether correct information would cause SBA to deny the application, and regardless of whether correct information was given to SBA in accompanying documents, SBA will deny the application. If SBA determines that such false information has been submitted after a firm is admitted to the 8(a) BD program, SBA will initiate termination proceedings and suspend the firm under §§ 124.304 and 124.305. Whenever SBA determines that the applicant submitted false information, the matter will be referred

to SBA's Office of Inspector General for review.

(b) *One-time eligibility.* Once a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) BD program, neither the concern nor that individual will be eligible again.

(1) An individual who claims disadvantage and completes the appropriate SBA forms to qualify an applicant has participated in the 8(a) BD program if SBA approves the application.

(2) Use of eligibility will take effect on the date of the concern's approval into the program.

(3) An individual who uses his/her one-time eligibility to qualify a concern for the 8(a) BD program will be considered a non-disadvantaged individual for ownership or control purposes of another applicant or Participant. The criteria restricting participation by non-disadvantaged individuals will apply to such an individual. See §§ 124.105 and 124.106.

(4) When at least 50% of the assets or liabilities of a concern are the same as those of one or more former Participants, it will not be eligible for participation.

(5) Participants which change their form of business organization and transfer their assets and liabilities to the new organization may do so without affecting the eligibility of the new organization provided the previous business is dissolved and all other eligibility criteria are met. In such a case, the new organization may complete the remaining program term of the previous organization. A request for a change in business form will be treated as a change of ownership under § 124.105(i).

(c) *Wholesalers.* An applicant concern seeking admission to the 8(a) BD program as a wholesaler need not demonstrate that it is capable of meeting the requirements of the nonmanufacturer rule for its primary industry classification.

(d) *Achievement of benchmarks.* Where actual participation by disadvantaged businesses in a particular industry exceeds the benchmark limitations established by the Department of Commerce, in consultation with the General Services Administration and the SBA, for that industry, SBA, in its discretion, may decide not to accept an application for 8(a) BD participation from a concern whose primary industry classification falls within that industry.

(e) *Multiple concerns for immediate family members.* Immediate family members may not each use their individual disadvantaged status to qualify more than one business concern for 8(a) BD program participation if the concerns are in the same or similar line of business. When the concerns are in separate lines of business, each concern must establish that it is separately owned, managed and controlled.

(f) *Brokers.* Brokers are ineligible to participate in the 8(a) BD program. A broker is a concern that adds no value to an item being supplied to a procuring activity.

**§ 124.109 Do Indian tribes and Alaska Native Corporations have any special rules for applying to the 8(a) BD program?**

(a) *Special rules for ANCs.* Small business concerns owned and controlled by ANCs are eligible for participation in the 8(a) program, subject to the same conditions that apply to tribally-owned concerns, as described in paragraphs (b) and (c) of this section, except that the following provisions and exceptions apply only to ANC-owned concerns:

(1) Alaska Natives and descendants of Natives must own a majority of both the total equity of the ANC and the total voting powers to elect directors of the ANC through their holdings of settlement common stock. Settlement common stock means stock of an ANC issued pursuant to 43 U.S.C. 1606(g)(1), which is subject to the rights and restrictions listed in 43 U.S.C. 1606(h)(1).

(2) An ANC that meets the requirements set forth in paragraph (a)(1) of this section is deemed economically disadvantaged under 43 U.S.C. 1626(e), and need not establish economic disadvantage as required by paragraph (b)(2) of this section.

(3) Even though an ANC can be either for profit or non-profit, a small business concern owned and controlled by an ANC must be for profit to be eligible for the 8(a) program. The concern will be deemed owned and controlled by the ANC where both the majority of stock or other ownership interest and total voting power are held by the ANC and holders of its settlement common stock.

(4) The Alaska Native Claims Settlement Act provides that a concern which is majority owned by an ANC shall be deemed to be both owned and controlled by Alaska Natives and an economically disadvantaged business. Therefore, an individual responsible for control and management of an ANC-owned applicant or Participant need not establish personal social and economic disadvantage.

(5) Paragraphs (b)(3) (i), (ii) and (iv) of this section are not generally applicable to an ANC, provided its status as an ANC is clearly shown in its articles of incorporation.

(6) Paragraph (c)(1) of this section is not applicable to an ANC-owned concern to the extent it requires an express waiver of sovereign immunity or a ''sue and be sued'' clause.

(b) *Tribal eligibility.* In order to qualify a concern which it owns and controls for participation in the 8(a) BD program, an Indian tribe must establish its own economic disadvantaged status under paragraph (b)(2) of this section. Thereafter, it need not reestablish such status in order to have other businesses that it owns certified for 8(a) BD program participation, unless specifically required to do so by the AA/8(a)BD or designee. Each tribally-owned concern seeking to be certified for 8(a) BD participation must comply with the provisions of paragraph (c) of this section.

(1) *Social disadvantage.* An Indian tribe as defined in § 124.3 is considered to be socially disadvantaged.

(2) *Economic disadvantage.* In order to be eligible to participate in the 8(a) BD program, the Indian tribe must demonstrate to SBA that the tribe itself is economically disadvantaged. This must involve the consideration of available data showing the tribe's economic condition, including but not limited to, the following information:

(i) The number of tribal members.

(ii) The present tribal unemployment rate.

(iii) The per capita income of tribal members, excluding judgment awards.

(iv) The percentage of the local Indian population below the poverty level.

(v) The tribe's access to capital.

(vi) The tribal assets as disclosed in a current tribal financial statement. The statement must list all assets including those which are encumbered or held in trust, but the status of those encumbered or in trust must be clearly delineated.

(vii) A list of all wholly or partially owned tribal enterprises or affiliates and the primary industry classification of each. The list must also specify the members of the tribe who manage or control such enterprises by serving as officers or directors.

(3) *Forms and documents required to be submitted.* Except as otherwise provided in this section, the Indian tribe generally must submit the forms and documents required of 8(a) BD applicants as well as the following material:

(i) A copy of all governing documents such as the tribe's constitution or business charter.

(ii) Evidence of its recognition as a tribe eligible for the special programs

and services provided by the United States or by its state of residence.

(iii) Copies of its articles of incorporation and bylaws as filed with the organizing or chartering authority, or similar documents needed to establish and govern a non-corporate legal entity.

(iv) Documents or materials needed to show the tribe's economically disadvantaged status as described in paragraph (b)(2) of this section.

(c) *Business eligibility.* In order to be eligible to participate in the 8(a) BD program, a concern which is owned by an eligible Indian tribe (or wholly owned business entities of such tribe) must meet the conditions set forth in paragraphs (c)(1) through (c)(7) of this section.

(1) *Legal business entity organized for profit and susceptible to suit.* The applicant or participating concern must be a separate and distinct legal entity organized or chartered by the tribe, or Federal or state authorities. The concern's articles of incorporation, partnership agreement or limited liability company articles of organization must contain express sovereign immunity waiver language, or a ''sue and be sued'' clause which designates United States Federal Courts to be among the courts of competent jurisdiction for all matters relating to SBA's programs including, but not limited to, 8(a) BD program participation, loans, and contract performance. Also, the concern must be organized for profit, and the tribe must possess economic development powers in the tribe's governing documents.

(2) *Size.* (i) A tribally-owned applicant concern must qualify as a small business concern as defined for purposes of Government procurement in part 121 of this title. The particular size standard to be applied shall be based on the primary industry classification of the applicant concern.

(ii) A tribally-owned Participant must certify to SBA that it is a small business pursuant to the provisions of part 121 of this title for the purpose of performing each individual contract which it is awarded.

(iii) In determining the size of a small business concern owned by a socially and economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe) for either 8(a) BD program entry or contract award, the firm's size shall be determined independently without regard to its affiliation with the tribe, any entity of the tribal government, or any other business enterprise owned by the tribe, unless the Administrator determines that one or more such tribally-owned business concerns have obtained, or are likely to obtain, a substantial unfair competitive advantage within an industry category.

(3) *Ownership.* For corporate entities, a tribe must own at least 51 percent of the voting stock and at least 51 percent of the aggregate of all classes of stock. For non-corporate entities, a tribe must own at least a 51 percent interest. A tribe cannot own 51% or more of another firm which, either at the time of application or within the previous two years, has been operating in the 8(a) program under the same primary Standard Industry Classification code as the applicant. The restrictions of § 124.105(h) do not apply to tribes; they do, however, apply to non-disadvantaged individuals or other business concerns that are partial owners of a tribally-owned concern.

(4) *Control and management.* (i) The management and daily business operations of a tribally-owned concern must be controlled by the tribe, through one or more disadvantaged individual members who possess sufficient management experience of an extent and complexity needed to run the concern, or through management as follows:

(A) Management may be provided by committees, teams, or Boards of Directors which are controlled by one or more members of an economically disadvantaged tribe, or

(B) Management may be provided by non-tribal members if SBA determines that such management is required to assist the concern's development, that the tribe will retain control of all management decisions common to boards of directors, including strategic planning, budget approval, and the employment and compensation of officers, and that a written management development plan exists which shows how disadvantaged tribal members will develop managerial skills sufficient to manage the concern or similar tribally-owned concerns in the future.

(ii) Members of the management team, business committee members, officers, and directors are precluded from engaging in any outside employment or other business interests which conflict with the management of the concern or prevent the concern from achieving the objectives set forth in its business development plan. This is not intended to preclude participation in tribal or other activities which do not interfere with such individual's responsibilities in the operation of the applicant concern.

(5) *Individual eligibility limitation.* SBA does not deem an individual involved in the management or daily business operations of a tribally-owned concern to have used his or her individual eligibility within the meaning of § 124.108(b).

(6) *Potential for success.* (i) A tribally-owned applicant concern must be in business for at least two years, as evidenced by income tax returns for each of the two previous tax years showing operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification, or demonstrate potential for success as set forth in paragraph (c)(6)(ii) of this section.

(ii) In determining whether a tribally-owned concern has the potential for success, SBA will look at a number of factors including, but not limited to:

(A) The technical and managerial experience and competency of the individual(s) who will manage and control the daily operation of the concern;

(B) The financial capacity of the concern; and

(C) The concern's record of performance on any previous Federal or private sector contracts in the primary industry in which the concern is seeking 8(a) certification.

(7) *Other eligibility criteria.* (i) As with other 8(a) applicants, a tribally-owned applicant concern shall not be denied admission into the 8(a) program due solely to a determination that specific contract opportunities are unavailable to assist the development of the concern unless:

(A) The Government has not previously procured and is unlikely to procure the types of products or services offered by the concern; or

(B) The purchase of such products or services by the Federal Government will not be in quantities sufficient to support the developmental needs of the applicant and other program participants providing the same or similar items or services.

(ii) Except for the tribe itself, the concern's officers, directors, and 20% or more shareholders must demonstrate good character. See § 124.108(a).

**§ 124.110 Do Native Hawaiian Organizations have any special rules for applying to the 8(a) BD program?**

(a) Concerns owned by economically disadvantaged Native Hawaiian Organizations as defined in § 124.3 are eligible for participation in the 8(a) program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility. Such concerns must meet all eligibility criteria set forth in §§ 124.101 through 124.108 and § 124.112(a) to the extent that they are not inconsistent with this section.

(b) A concern owned by a Native Hawaiian Organization must qualify as a small business concern as defined in part 121 of this title. The size standard corresponding to the primary industry classification of the applicant concern applies for determining size. Ownership by the Native Hawaiian Organization will not, by itself, cause affiliation with the Native Hawaiian Organization or with other entities owned by the Native Hawaiian Organization. However, affiliation with the Native Hawaiian Organization or with other entities owned by the Native Hawaiian Organization may be caused by circumstances other than common ownership.

(c) A Native Hawaiian Organization cannot own more than one current or former Participant having the same primary industry classification.

(d) SBA does not deem an individual involved in the management or daily business operations of a Participant owned by a Native Hawaiian Organization to have used his or her individual eligibility within the meaning of § 124.108(b).

(e)(1) An applicant concern owned by a Native Hawaiian Organization must be in business for at least two years, as evidenced by income tax returns for each of the two previous tax years showing operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification, or demonstrate potential for success as set forth in paragraph (e)(2) of this section.

(2) In determining whether a concern owned by a Native Hawaiian Organization has the potential for success, SBA will look at a number of factors including, but not limited to:

(i) The technical and managerial experience and competency of the individual(s) who will manage and control the daily operation of the concern;

(ii) The financial capacity of the concern; and

(iii) The concern's record of performance on any previous Federal or private sector contracts in the primary industry in which the concern is seeking 8(a) certification.

**§ 124.111 Do Community Development Corporations (CDCs) have any special rules for applying to the 8(a) BD program?**

(a) Concerns owned at least 51 percent by CDCs (or a wholly owned business entity of a CDC) are eligible for participation in the 8(a) BD program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility. These concerns must meet all eligibility criteria set forth in § 124.101 through § 124.108 and § 124.112(a) to the extent that they are not inconsistent with this section.

(b) A concern that is at least 51 percent owned by a CDC (or a wholly owned business entity of a CDC) is considered to be controlled by such CDC and eligible for participation in the 8(a) BD program, provided it meets all eligibility criteria set forth or referred to in this section and its management and daily business operations are conducted by one or more individuals determined to have managerial experience of an extent and complexity needed to run the concern.

(c) A concern that is at least 51 percent owned by a CDC (or a wholly owned business entity of a CDC) must qualify as a small business concern as defined in part 121 of this title. The size standard corresponding to the primary industry classification of the applicant concern applies for determining size. Ownership by the CDC will not, by itself, cause affiliation with the CDC or with other CDC-owned entities. However, affiliation with the CDC or other CDC-owned entities may arise due to circumstances other than common CDC ownership.

(d) A CDC cannot own more than one current or former Participant having the same primary industry classification.

(e) SBA does not deem an individual involved in the management or daily business operations of a CDC-owned concern to have used his or her individual eligibility within the meaning of § 124.108(b).

(f)(1) A CDC-owned applicant concern must be in business for at least two years, as evidenced by income tax returns for each of the two previous tax years showing operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification, or demonstrate potential for success as set forth in paragraph (e)(2) of this section.

(2) In determining whether a CDC-owned concern has the potential for success, SBA will look at a number of factors including, but not limited to:

(i) The technical and managerial experience and competency of the individual(s) who will manage and control the daily operation of the concern;

(ii) The financial capacity of the concern; and

(iii) The concern's record of performance on any previous Federal or private sector contracts in the primary industry in which the concern is seeking 8(a) certification.

(g) A CDC-owned applicant and all of its principals must have good character as set forth in § 124.108(a).

**§ 124.112 What criteria must a business meet to remain eligible to participate in the 8(a) BD program?**

(a) *Standards.* In order for a concern to remain eligible for 8(a) BD program participation, it must continue to meet all eligibility criteria contained in § 124.101 through § 124.108. For continued economic disadvantage, transfers of assets by an individual claiming disadvantaged status to an immediate family member, or to a trust the beneficiary of which is an immediate family member, for less than fair market value will be attributed to the individual claiming disadvantaged status for a period of two years after the transfer. Any concern that fails to meet the eligibility requirements after being admitted to the program will be subject to termination or early graduation under §§ 124.302 through 124.304, as appropriate.

(b) *Submissions supporting continued eligibility.* As part of an annual review, each Participant must annually submit to the servicing district office the following:

(1) A certification that it meets the 8(a) BD program eligibility requirements as set forth in § 124.101 through § 124.108 and paragraph (a) of this section;

(2) Personal financial information for each disadvantaged owner;

(3) A certification from each individual claiming disadvantaged status regarding the transfer of assets to any immediate family member, or to a trust the beneficiary of which is an immediate family member, within two years of the date of the annual review. The individual must certify that he or she has not transferred assets or that he or she has not transferred assets except to the extent described in an attachment to the certification.

(4) A record of all payments, compensation, and distributions (including loans, advances, salaries and dividends) made by the Participant to each of its owners, officers or directors, or to any person or entity affiliated with such individuals; and

(5) Such other information as SBA may deem necessary. For other required annual submissions, *see* § 124.601 through § 124.603.

(c) *Eligibility reviews.* (1) Upon receipt of specific and credible information alleging that a Participant no longer meets the eligibility requirements for continued program eligibility, SBA will review the concern's eligibility for continued participation in the program.

(2) Sufficient reasons for SBA to conclude that a 8(a) BD Participant is no longer economically disadvantaged include, but are not limited to,

demonstrated access to a significant new source of capital or loans, an unusually large amount of funds or other assets withdrawn from the concern by its owners, or substantial personal assets, income or net worth of any disadvantaged owner.

(3) If SBA determines that funds or other assets have been withdrawn to the detriment of the achievement of the targets, objectives and goals of the Participant's business plan, or to the detriment of its overall business development, SBA may initiate a termination proceeding under §§ 124.303 and 124.304, or require an appropriate reinvestment of funds or other assets, as well as any other actions SBA deems necessary to counteract the detrimental effects of the withdrawals, as a condition of the Participant maintaining program eligibility. The fact that a concern's net worth has increased despite withdrawals that are deemed excessive will not preclude SBA from determining that such withdrawals were detrimental to the attainment of the concern's business objectives or to its overall business development.

## Applying to the 8(a) BD Program

### § 124.201 May any business submit an application?

Any concern or any individual on behalf of a business has the right to apply for 8(a) BD program participation whether or not there is an appearance of eligibility.

### § 124.202 Where must an application be filed?

An application for 8(a) BD program admission must be filed in the SBA Division of Program Certification and Eligibility (DPCE) field office serving the territory in which the principal place of business is located. The SBA district office will provide an applicant concern with information regarding the 8(a) BD program and with all required application forms.

### § 124.203 What must a concern submit to apply to the 8(a) BD program?

Each 8(a) BD applicant concern must submit those forms and attachments required by SBA when applying for admission to the 8(a) BD program. These forms and attachments will include, but not be limited to, financial statements, Federal personal and business tax returns, and personal history statements. The application package may be in the form of an electronic application.

### § 124.204 How does SBA process applications for 8(a) BD program admission?

(a) The AA/8(a)BD is authorized to approve or decline applications for admission to the 8(a) BD program. The DPCE will receive, review and evaluate all 8(a) BD applications except those from ANC-owned applicants. The SBA's Anchorage District Office will receive those applications and review them for completeness before sending them to the AA/8(a)BD for further processing. The field DPCE office will advise each program applicant within 15 days after the receipt of an application whether the application is complete and suitable for evaluation and, if not, what additional information or clarification is required to complete the application. SBA will process an application for 8(a) BD program participation within 90 days of receipt of a complete application package by the field DPCE office. Incomplete application packages will not be processed.

(b) An applicant concern's eligibility will be based on circumstances existing on the date of application except as provided in paragraph (c) of this section. SBA, in its sole discretion, may request clarification of information contained in the application at any time in the application process.

(c) Changed circumstances for an applicant concern occurring subsequent to its application and which adversely affect eligibility will be considered and may constitute grounds for decline. The applicant must inform SBA of any changed circumstances during its application review.

(d) The decision of the AA/8(a)BD to approve or deny an application will be in writing. A decision to deny admission will state the specific reasons for denial, and will inform the applicant of any appeal rights.

(e) If the AA/8(a)BD approves the application, the date of the approval letter is the date of program certification for purposes of determining the concern's program term. However, an applicant is not entitled to receive program benefits until SBA has approved the concern's business plan.

### § 124.205 Can an applicant ask SBA to reconsider SBA's initial decision to decline its application?

(a) An applicant may request the AA/8(a)BD to reconsider his or her initial decline decision. To do so, the applicant must ask for reconsideration by sending a certified letter, return receipt requested, to the regional office of the DPCE that originally processed its application. The applicant must submit its request for reconsideration within 45 days of receiving notice that its application was declined. The applicant must provide any additional information and documentation pertinent to overcoming the reason(s) for the initial decline.

(b) The AA/8(a)BD will issue a written decision within 45 days of the regional DPCE's receipt of the applicant's request. The AA/8(a)BD may either approve the application, deny it on the same grounds as the original decision, or deny it on other grounds. If denied, the AA/8(a)BD will explain why the applicant is not eligible for admission to the 8(a) BD program and give specific reasons for the decline.

(c) If the AA/8(a)BD declines the application solely on issues not raised in the initial decline, the applicant can ask for reconsideration as if it were an initial decline.

### § 124.206 What appeal rights are available to an applicant that has been denied admission?

(a) An applicant may appeal a denial of program admission if it is based solely on a negative finding of social disadvantage, economic disadvantage, ownership, control, or any combination of these four criteria. A denial decision that is based at least in part on the failure to meet any other eligibility criterion is not appealable and is the final Agency decision.

(b) The applicant may appeal an initial decision of the AA/8(a)BD without requesting reconsideration, or may appeal the decision of the AA/8(a)BD on reconsideration.

(c) The applicant may initiate an appeal by filing a petition in accordance with part 134 of this title with SBA's Office of Hearings and Appeals (OHA) within 45 days of the date of service (as defined in § 134.204) of the Agency decision.

(d) If an appeal is filed with OHA, the written decision of the Administrative Law Judge is the final Agency decision. If an appealable decision is not appealed, the decision of the AA/8(a)BD is the final Agency decision.

### § 124.207 Can an applicant reapply for admission to the 8(a) BD program?

A concern which has been declined for 8(a) BD program admission may submit a new application for admission to the program 12 months after the date of the final Agency decision to decline.

## Exiting the 8(a) BD Program

### § 124.301 What are the ways a business may leave the 8(a) BD program?

A concern participating in the 8(a) BD program may leave the program by any of the following means:

(a) Voluntary early graduation or withdrawal;

(b) Expiration of the program term established pursuant to § 124.2;

(c) Early graduation pursuant to the provisions of §§ 124.302 and 124.304; or

(d) Termination pursuant to the provisions of §§ 124.303 and 124.304.

**§ 124.302 What is early graduation?**

(a) *General.* The Small Business Act authorizes SBA to graduate a firm from the 8(a) BD program prior to the expiration of its Program Term for two reasons:

(1) When a Participant is recognized as successfully completing the 8(a) BD program by substantially achieving the targets, objectives and goals set forth in its business plan prior to the expiration of its program term, and has demonstrated the ability to compete in the marketplace without assistance under the 8(a) BD program; or

(2) When SBA determines that one or more of the disadvantaged owners upon whom the Participant's eligibility is based are no longer economically disadvantaged.

(b) *Early graduation criteria.* In determining whether a Participant has substantially achieved the targets, objectives and goals of its business plan and in assessing the overall competitive strength and viability of a Participant, SBA considers the totality of circumstances, including the following factors:

(1) Degree of sustained profitability;

(2) Sales trends, including improved ratio of non-8(a) sales to 8(a) sales since program entry;

(3) Business net worth, financial ratios, working capital, capitalization, and access to credit and capital;

(4) Current ability to obtain bonding;

(5) A comparison of the Participant's business and financial profiles with profiles of non-8(a) BD businesses having the same primary four-digit SIC code as the Participant;

(6) Strength of management experience, capability, and expertise; and

(7) Ability to operate successfully without 8(a) contracts.

(c) *Benchmark achievement.* SBA may graduate a Participant prior to the expiration of its program term where the Participant has substantially achieved the targets, objectives and goals of its business plan as adjusted under § 124.403(c) because of benchmark achievement.

**§ 124.303 What is termination?**

(a) SBA may terminate the participation of a concern in the 8(a) BD program prior to the expiration of the concern's Program Term for good cause. Examples of good cause include, but are not limited to, the following:

(1) Submission of false information in the concern's 8(a) BD application, regardless of whether correct information would have caused the concern to be denied admission to the program, and regardless of whether correct information was given to SBA in accompanying documents or by other means.

(2) Failure by the concern to maintain its eligibility for program participation.

(3) Failure by the concern for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership, full-time day-to-day management, and control by disadvantaged individuals.

(4) Failure by the concern to obtain written approval from SBA for any changes in ownership, management or control pursuant to §§ 124.105 and 124.106.

(5) Failure by the concern to disclose to SBA the extent to which non-disadvantaged persons or firms participate in the management of the Participant business concern.

(6) Failure by one or more of the concern's principals to maintain good character.

(7) A pattern of failure to make required submissions or responses to SBA in a timely manner, including a failure to provide required financial statements, requested tax returns, reports, updated business plans, information requested by SBA's Office of Inspector General, or other requested information or data within 30 days of the date of request.

(8) Cessation of business operations by the concern.

(9) Failure by the concern to pursue competitive and commercial business in accordance with its business plan, or failure in other ways to make reasonable efforts to develop and achieve competitive viability.

(10) A pattern of inadequate performance by the concern of awarded section 8(a) contracts.

(11) Failure by the concern to pay or repay significant financial obligations owed to the Federal Government.

(12) Failure by the concern to obtain and keep current any and all required permits, licenses, and charters.

(13) Excessive transfers of funds or other business assets hindering development of the concern, or excessive withdrawals from the concern for the personal benefit of any of its owners or any person or entity affiliated with the owners. Withdrawals are excessive if they exceed:

(i) $150,000 for firms with sales up to $1,000,000;

(ii) $200,000 for firms with sales between $1,000,000 and $2,000,000; and

(iii) $300,000 for firms with sales over $2,000,000.

(14) Unauthorized use of SBA direct or guaranty loan proceeds or violation of an SBA loan agreement.

(15) Submission on behalf of a Participant of false information to SBA, including false certification of compliance with non-8(a) business activity targets under § 124.508, where responsible officials of the 8(a) BD concern knew or should have known the submission to be false.

(16) Debarment, suspension, voluntary exclusion, or ineligibility of the concern or its principals pursuant to 13 CFR part 145 or FAR subpart 9.4 (48 CFR part 9, subpart 9.4).

(17) Conduct by the concern, or any of its principals, indicating a lack of business integrity. Such conduct may be demonstrated by information in a criminal indictment, a criminal conviction, or a civil judgment.

(18) Suspension or revocation of any professional license required to run the business.

(19) Willful failure by the Participant business concern to comply with applicable labor standards and obligations.

(20) Material breach of any terms and conditions of the 8(a) BD Program Participation Agreement.

(21) Willful violation by a concern, or any of its principals, of any SBA regulation.

(b) The examples of good cause listed in paragraph (a) of this section are intended to be illustrative only. Other grounds for terminating a Participant from the 8(a) BD program for cause may exist and may be used by SBA.

**§ 124.304 What are the procedures for early graduation and termination?**

(a) *General.* The same procedures apply to both early graduation and termination of Participants from the 8(a) BD program.

(b) *Letter of Intent to Terminate or Early Graduate.* When SBA believes that a Participant should be terminated or graduated prior to the expiration of its program term, SBA will notify the concern in writing. The Letter of Intent to Terminate or Early Graduate will set forth the specific facts and reasons for SBA's findings, and will notify the concern that it has 30 days from the date of service of the letter to submit a written response to SBA. Service is defined in § 134.204.

(c) *Recommendation and decision.* Following the 30-day response period,

the Assistant Administrator, DPCE, will consider the proposed early graduation or termination and any information submitted in response by the concern. Upon determining that early graduation or termination is not warranted, the Assistant Administrator will notify the Participant in writing. If early graduation or termination appears warranted, the Assistant Administrator will make such a recommendation to the AA/8(a)BD, who will then make a decision whether to early graduate or terminate the concern.

(d) *Notice requirements.* Upon deciding that early graduation or termination is warranted, the AA/8(a)BD will issue a Notice of Early Graduation or Termination. The Notice will set forth the specific facts and reasons for the decision, and will advise the concern that it may appeal the decision in accordance with the provisions of part 134 of this title.

(e) *Appeal to Office of Hearings and Appeals.* Procedures governing appeals of early graduation or termination to SBA's OHA are set forth in part 134. If a Participant does not appeal a Notification of Early Graduation or Termination within 45 days of the date of service (as defined in § 134.204), the decision of the AA/8(a)BD is the final agency decision effective on the date the appeal right expired.

(f) *Effect of early graduation or termination.* After the effective date of early graduation or termination, a Participant is no longer eligible to receive any 8(a) BD program assistance. However, such concern is obligated to complete previously awarded 8(a) contracts, including any priced options which may be exercised.

#### § 124.305 What is suspension and how is a Participant suspended from the 8(a) BD program?

(a) At any time after SBA issues a Letter of Intent to Terminate pursuant to § 124.304, the AA/8(a)BD may suspend 8(a) contract support and all other forms of 8(a) BD program assistance to that concern until the issue of the concern's termination from the program is finally decided. The AA/8(a)BD may suspend a Participant when he or she determines that suspension is needed to protect the interests of the Government, such as where information showing a clear lack of program eligibility or conduct indicating a lack of business integrity exists, including where the concern or one of its principals submitted false statements to the Government. SBA will suspend a Participant where SBA determines that the Participant submitted false information in its 8(a) BD application.

(b) SBA will issue a Notice of Suspension to the Participant's last known address by certified mail, return receipt requested. Suspension is effective as of the date of the issuance of the Notice. The Notice will provide the following information:

(1) The basis for the suspension;

(2) A statement that the suspension will continue pending the completion of further investigation, a final program termination determination, or some other specified period of time;

(3) A statement that awards of competitive and non-competitive 8(a) contracts, including those which have been ''self-marketed'' by a Participant, will not be made during the pendency of the suspension unless it is determined by the head of the relevant procuring agency or an authorized representative to be in the best interest of the Government to do so, and SBA adopts that determination;

(4) A statement that the concern is obligated to complete previously awarded section 8(a) contracts;

(5) A statement that the suspension is effective nationally throughout the SBA;

(6) A statement that a request for a hearing on the suspension will be considered by an Administrative Law Judge at OHA, and granted or denied as a matter of discretion.

(7) A statement that the firm's participation in the program is suspended effective on the date the Notice is issued, and that the program term will resume only if the suspension is lifted or the firm is not terminated.

(c) The applicant concern may appeal a Notice of Suspension by filing a petition in accordance with part 134 of this title with OHA within 45 days of the date of service (as defined in § 134.204) of a Notice of Suspension pursuant to paragraph (b) of this section. It is contemplated that in most cases a hearing on the issue of the suspension will be afforded if the Participant requests one, but authority to grant a hearing is within the discretion of the Administrative Law Judge in OHA. A suspension remains in effect pending the result of its appeal.

(d) SBA has the burden of showing that substantial evidence exists in support of at least one of the grounds for termination cited in the Letter of Intent to Terminate, and that protection of the Government's interest requires suspension before OHA makes a final determination regarding the termination.

(e) If there is a timely appeal, the decision of the Administrative Law Judge is the final Agency decision. If there is not a timely appeal, the decision of the AA/8(a)BD is the final Agency decision.

(f) Upon the request of SBA, OHA may consolidate suspension and termination proceedings when the issues presented are identical.

(g) Any program suspension which occurs in accordance with this part will continue in effect until such time as the SBA lifts the suspension or the Participant's participation in the program is fully terminated. If the concern is ultimately not terminated from the 8(a) BD program, the suspension will be lifted and the length of the suspension will be added to the concern's program term.

(h) SBA does not recognize the concept of de facto suspension. Adding time to the end of a Participant's program term equal to the length of a suspension will occur only where a concern's program participation has been formally suspended in accordance with the procedures set forth in this section.

(i) A suspension from 8(a) BD participation under this section has no effect on a concern's eligibility for non-8(a) Government contracts. However, a debarment or suspension under the Federal Acquisition Regulation (48 CFR chapter 1) will disqualify a concern from receiving all Government contracts, including 8(a) contracts.

### Business Development

#### § 124.401 Which SBA field office services a Participant?

The SBA district office which serves the geographical territory where a Participant's principal place of business is located normally will service the concern during its participation in the 8(a) BD program.

#### § 124.402 How does a Participant develop a business plan?

(a) *General.* In order to assist the SBA servicing office in determining the business development needs of its portfolio Participants, each Participant must develop a comprehensive business plan setting forth its business targets, objectives, and goals.

(b) *Submission of initial business plan.* Each Participant must submit a business plan to its SBA servicing office as soon as possible after program admission. The Participant will not be eligible for 8(a) BD program benefits, including 8(a) contracts, until SBA approves its business plan.

(c) *Contents of business plan.* The business plan must contain at least the following:

(1) A detailed description of any products currently being produced and any services currently being performed

by the concern, as well as any future plans to enter into one or more new markets;

(2) The applicant's designation of its primary industry classification, as defined in § 124.3;

(3) An analysis of market potential, competitive environment, and the concern's prospects for profitable operations during and after its participation in the 8(a) BD program;

(4) An analysis of the concern's strengths and weaknesses, with particular attention on ways to correct any financial, managerial, technical, or work force conditions which could impede the concern from receiving and performing non-8(a) contracts;

(5) Specific targets, objectives, and goals for the business development of the concern during the next two years;

(6) Estimates of both 8(a) and non-8(a) contract awards that will be needed to meet its targets, objectives and goals; and

(7) Such other information as SBA may require.

#### § 124.403 How is a business plan updated and modified?

(a) *Annual review.* Each Participant must annually review its business plan with its assigned Business Opportunity Specialist (BOS), and modify the plan as appropriate. The Participant must submit a modified plan and updated information to its BOS within thirty (30) days after the close of each program year. It also must submit a capability statement describing its current contract performance capabilities as part of its updated business plan.

(b) *Contract forecast.* As part of the annual review of its business plan, each Participant must annually forecast in writing its needs for contract awards for the next program year. The forecast must include:

(1) The aggregate dollar value of 8(a) contracts to be sought, broken down by sole source and competitive opportunities where possible;

(2) The aggregate dollar value of non-8(a) contracts to be sought;

(3) The types of contract opportunities to be sought, identified by product or service; and

(4) Such other information as SBA may request to aid in providing effective business development assistance to the Participant.

(c) *Benchmark achievement.* Where actual participation by disadvantaged businesses in a particular industry exceeds the benchmark limitations established by the Department of Commerce, in consultation with the General Services Administration and the SBA, for that industry, SBA may adjust the targets, objectives and goals contained in the business plans of Participants whose primary industry classification falls within that industry. Any adjustment will take into account projected decreases in 8(a) and SDB contracting opportunities.

(d) *Transition management strategy.* Beginning in the first year of the transitional stage of program participation, each Participant must annually submit a transition management strategy to be incorporated into its business plan. The transition management strategy must describe:

(1) How the Participant intends to meet the applicable non-8(a) business activity target imposed by § 124.508 during the transitional stage of participation; and

(2) The specific steps the Participant intends to take to continue its business growth and promote profitable business operations after the expiration of its program term.

#### § 124.404 What business development assistance is available to Participants during the two stages of participation in the 8(a) BD program?

(a) *General.* Participation in the 8(a) BD program is divided into two stages, a developmental stage and a transitional stage. The developmental stage will last four years, and the transitional stage will last five years, unless the concern has exited the program by one of the means set forth in § 124.301 prior to the expiration of its program term.

(b) *Developmental stage of program participation.* A Participant, if otherwise eligible, may receive the following assistance during the developmental stage of program participation:

(1) Sole source and competitive 8(a) contract support;

(2) Financial assistance pursuant to § 120.385 of this title;

(3) The transfer of technology or surplus property owned by the United States pursuant to § 124.405; and

(4) Training to aid in developing business principles and strategies to enhance their ability to compete successfully for both 8(a) and non-8(a) contracts.

(c) *Transitional stage of program participation.* A Participant, if otherwise eligible, may receive the following assistance during the transitional stage of program participation:

(1) The same assistance as that provided to Participants in the developmental stage;

(2) Assistance from procuring agencies (in cooperation with SBA) in forming joint ventures, leader-follower arrangements, and teaming agreements between the concern and other Participants or other business concerns with respect to contracting opportunities outside the 8(a) BD program for research, development, or full scale engineering or production of major systems (these arrangements must comply with all relevant statutes and regulations, including applicable size standard requirements); and

(3) Training and technical assistance in transitional business planning.

#### § 124.405 How does a Participant obtain Federal Government surplus property?

(a) *General.* (1) Surplus Federal Government property may be transferred to eligible Participants from State Agencies for Surplus Property (SASPs) in accordance with the procedures set forth in 41 CFR Part 101–44 and this section.

(2) The property which may be transferred to SASPs for further transfer to eligible Participants includes all personal property which has been determined to be ''donable'' as defined in 41 CFR 101–44.001–3.

(b) *Eligibility to receive Federal surplus property.* To be eligible to receive Federal surplus property, on the date of transfer a concern must:

(1) Be in the 8(a) BD program;

(2) Be in compliance with all program requirements, including any reporting requirements;

(3) Not be debarred, suspended or declared ineligible under part 9, subpart 9.4 of the Federal Acquisition Regulations, Title 48 of the Code of Federal Regulations;

(4) Not be under a pending 8(a) BD program suspension, termination or early graduation proceeding; and

(5) Be engaged or expect to be engaged in business activities making the item useful to it.

(c) *Use of acquired surplus property.* (1) Eligible Participants may acquire surplus Federal property from any SASP located in any State, provided the concern represents and agrees in writing:

(i) As to what the intended use of the surplus property is to be and that this use is consistent with the objectives of the concern's 8(a) business plan;

(ii) That it will use the property to be acquired in the normal conduct of its business activities or be liable for the fair rental value from the date of its receipt;

(iii) That it will not sell or transfer the property to be acquired to any party other than the Federal Government during its term of participation in the 8(a) program and for one year after it leaves the program;

(iv) That, at its own expense, it will return the property to a SASP or transfer

it to another Participant if directed to do so by the SBA because it has not used the property as intended within one year of receipt;

(v) That, should it breach its agreement not to sell or transfer the property, it will be liable to the Government for the established fair market value or the sale price, whichever is greater, of the property sold or transferred; and

(vi) That it will give SBA access to inspect the property and all records pertaining to it.

(2) A firm receiving surplus property pursuant to this section assumes all liability associated with or stemming from the use of the property.

(3) If the property is not placed in use for the purposes for which it was intended within one year of its receipt, SBA may direct the concern to deliver the property to another Participant or to the SASP from which it was acquired.

(4) Failure to comply with any of the commitments made under paragraph (c)(1) of this section constitutes a basis for termination from the 8(a) program.

(d) *Procedures for acquiring Federal Government surplus property.* (1) Participants may participate in the surplus property distribution program administered by the SASPs to the same extent, but with no special priority over, other authorized transferees. *See* 41 CFR subpart 101–44.2.

(2) Each Participant seeking to acquire Federal Government surplus property from a SASP must:

(i) Certify in writing to the SASP that it is eligible to receive the property pursuant to paragraph (b) of this section;

(ii) Make the written representations and agreement required by paragraph (c)(1) of this section; and

(iii) Identify to the SASP its servicing SBA field office.

(3) Upon receipt of the required certification, representations, agreement, and information set forth in paragraph (d)(2) of this section, the SASP must contact the appropriate SBA field office and obtain the SBA's verification that the concern seeking to acquire the surplus property is eligible, and that the identified use of the property is consistent with the concern's business activities. SASPs may not release property to a Participant without this verification.

(4) The SASP and the Participant must agree on and record the fair market value of the surplus property at the time of the transfer to the Participant. The SASP must provide to SBA a written record, including the agreed upon fair market value, of each transaction to a Participant when any property has been transferred.

(e) *Costs.* Participants acquiring surplus property from a SASP must pay a service fee to the SASP which is equal to the SASP's direct costs of locating, inspecting, and transporting the surplus property. If a Participant elects to incur the responsibility and the expense for transporting the acquired property, the concern may do so and no transportation costs will be charged by the SASP. In addition, the SASP may charge a reasonable fee to cover its costs of administering the program. In no instance will any SASP charge a Participant more for any service than their established fees charged to other transferees.

(f) *Title.* The title to surplus property acquired from a SASP will pass to the Participant when the Participant executes the applicable SASP distribution documents and takes possession of the property.

(g) *Compliance.* (1) SBA will periodically review whether Participants that have received surplus property have used and maintained the property as agreed. This review may include site visits to visually inspect the property to ensure that it is being used in a manner consistent with the terms of its transfer.

(2) Participants must provide SBA with access to all relevant records upon request.

(3) Where SBA receives credible information that transferred surplus property may have been disposed of or otherwise used in a manner that is not consistent with the terms of the transfer, SBA may investigate such claim to determine its validity.

(4) SBA may, either by itself or through a SASP, take any action to correct any noncompliance involving the use of transferred property still in possession of the Participant or to enforce any terms, conditions, reservations, or restrictions imposed on the property by the distribution document. Actions to enforce compliance, or which may be taken as a result of noncompliance, include the following:

(i) Requiring that the property be placed in proper use within a specified time;

(ii) Requiring that the property be transferred to another Participant having a need and use for the property, returned to the SASP serving the area where the property is located for distribution to another eligible transferee or to another SASP, or transferred through GSA to another Federal agency;

(iii) Recovery of the fair rental value of the property from the date of its receipt by the Participant; and

(iv) Initiation of proceedings to terminate the Participant from the 8(a) BD program.

(5) Where SBA finds that a recipient has sold or otherwise disposed of the acquired surplus property in violation of the agreement covering sale and disposal, the Participant is liable for the agreed upon fair market value of the property at the time of the transfer, or the sale price, whichever is greater. However, a Participant need not repay any amount where it can demonstrate to the SBA's satisfaction that the property is no longer useful for the purpose for which it was transferred and receives the SBA's prior written consent to transfer the property. For example, if a piece of equipment breaks down beyond repair, it may be disposed of without being subject to the repayment provision, so long as the concern receives the SBA's prior consent.

(6) Any funds received by the SBA in enforcement of this section will be remitted promptly to the Treasury of the United States as miscellaneous receipts.

## Contractual Assistance

### § 124.501 What general provisions apply to the award of 8(a) contracts?

(a) Pursuant to section 8(a) of the Small Business Act, SBA is authorized to enter into all types of contracts with other Federal Government agencies, including contracts to furnish equipment, supplies, services, leased real property, or materials to the Government or to perform construction work for the Government, and to contract the performance of these contracts to qualified Participants. Where appropriate, SBA may delegate the contract execution function to procuring activities. In order to receive and retain a delegation of SBA's contract execution and review functions, a procuring activity must report all 8(a) contract awards, modifications, and options to SBA.

(b) 8(a) contracts may either be sole source awards or awards won through competition with other Participants.

(c) Admission into the 8(a) BD program does not guarantee that a Participant will receive 8(a) contracts.

(d) While a Participant's projected level of 8(a) contract support is required as part of its business plan as a planning and development tool, the proposed level contained in the business plan will not prevent contract awards above that level so long as:

(1) The Participant is competent and responsible to perform a particular 8(a) contract; and

(2) The Participant is in compliance with any applicable competitive

business mix target or remedial measure imposed by § 124.508.

(e) A requirement for possible award may be identified by SBA, a particular Participant or the procuring agency itself. SBA will submit the capability statements provided to SBA annually under § 124.403 to appropriate procuring agencies for the purpose of matching requirements with Participants.

(f) Participants should market their capabilities to appropriate procuring agencies to increase their prospects of receiving sole source 8(a) contracts.

(g) A concern must be a current Participant in the 8(a) BD program at the time of award, except as provided in § 124.507(d).

(h) A Participant must certify that it is a small business under the size standard corresponding to the SIC code assigned to each 8(a) contract. 8(a) BD program personnel will verify size prior to award of an 8(a) contract. If the Participant is not verified as small, it may request a formal size determination from the appropriate General Contracting Area Office under part 121 of this title.

(i) Any person or entity that misrepresents its status as a ''small business concern owned and controlled by socially and economically disadvantaged individuals'' in order to obtain any 8(a) contracting opportunity will be subject to possible criminal, civil and administrative penalties, including those imposed by section 16(d) of the Small Business Act, 15 U.S.C. 645(d).

**§ 124.502 How does an agency offer a procurement to SBA for award through the 8(a) BD program?**

(a) A procuring agency contracting officer indicates his or her formal intent to award a procurement requirement as an 8(a) contract by submitting an offering letter to SBA.

(b) Contracting officers must submit offering letters to the following locations:

(1) For competitive 8(a) requirements and those sole source requirements for which no specific Participant is nominated (i.e., open requirements) other than construction requirements, to the SBA district office serving the geographical area in which the procuring agency is located;

(2) For competitive and open construction requirements, to the SBA district office serving the geographical area in which the work is to be performed;

(3) For sole source requirements offered on behalf of a specific Participant, to the SBA district office servicing that concern.

(c) An offering letter must contain the following information:

(1) A description of the work to be performed or items to be delivered and a copy of the statement of work, if available;

(2) The estimated period of performance;

(3) The SIC code that applies to the principal nature of the acquisition;

(4) The anticipated dollar value of the requirement, including options, if any;

(5) Any special restrictions or geographical limitations on the requirement;

(6) The location of the work to be performed for construction procurements;

(7) Any special capabilities or disciplines needed for contract performance;

(8) The type of contract to be awarded, such as firm fixed price, cost reimbursement, or time and materials;

(9) The acquisition history, if any, of the requirement;

(10) The names and addresses of any small business contractors which have performed on this requirement during the previous 24 months;

(11) A statement that prior to the offering no solicitation for the specific acquisition has been issued as a small business set-aside, as a small disadvantaged business set-aside, or as a competitive 8(a) procurement, and that no other public communication (such as a notice in the Commerce Business Daily) has been made showing the procuring agency's clear intent to use any of these means of procurement;

(12) Identification of any specific Participant that the procuring agency contracting officer nominates for award of a sole source 8(a) contract, if appropriate, including a brief justification for the nomination, such as one of the following:

(i) The Participant, through its own efforts, marketed the requirement and caused it to be reserved for the 8(a) BD program; or

(ii) The acquisition is a follow-on or renewal contract and the nominated concern is the incumbent;

(13) Bonding requirements, if applicable;

(14) Identification of all Participants which have expressed an interest in being considered for the acquisition;

(15) Identification of all SBA field offices which have requested that the requirement be awarded through the 8(a) BD program;

(16) A request, if appropriate, that a requirement whose estimated contract value is under the applicable competitive threshold be awarded as an 8(a) competitive contract; and

(17) Any other information that the procuring agency deems relevant or which SBA requests.

**§ 124.503 How does SBA accept a procurement for award through the 8(a) BD program?**

(a) *Acceptance of the requirement.* Upon receipt of the procuring agency's offer of a procurement requirement, SBA will determine whether it will accept the requirement for the 8(a) BD program. SBA's decision whether to accept the requirement will be sent to the procuring agency in writing within 10 working days of receipt of the written offering letter, unless SBA requests, and the procuring agency grants, an extension. SBA is not required to accept any particular procurement offered to the 8(a) BD program.

(1) Where SBA decides to accept an offering of a sole source 8(a) procurement, SBA will accept the offer both on behalf of the 8(a) BD program and in support of a specific Participant.

(2) Where SBA decides to accept an offering of a competitive 8(a) procurement, SBA will accept the offer on behalf of the 8(a) BD program.

(b) *Verification of SIC code.* As part of the acceptance process, SBA will verify the appropriateness of the SIC code designation assigned to the requirement by the procuring agency contracting officer.

(1) SBA will accept the SIC code assigned to the requirement by the procuring agency contracting officer as long as it is reasonable, even though other SIC codes may also be reasonable.

(2) If SBA and the procuring agency are unable to agree as to the proper SIC code designation for the requirement, SBA may either refuse to accept the requirement for the 8(a) BD program, appeal the contracting officer's determination to the head of the agency pursuant to § 124.505, or appeal the SIC code designation to OHA under part 134 of this title.

(c) *Sole source award where procuring agency nominates a specific Participant.* SBA will determine whether an appropriate match exists where the procuring agency identifies a particular Participant for a sole source award.

(1) Once SBA determines that a procurement is suitable to be accepted as an 8(a) sole source contract, SBA will normally accept it on behalf of the Participant recommended by the procuring agency, provided that:

(i) The procurement is consistent with the Participant's business plan;

(ii) The Participant complies with its applicable competitive business mix target or any remedial measures imposed by § 124.508(e);

(iii) The Participant is small for the size standard corresponding to the SIC code assigned to the requirement by the procuring agency contracting officer; and

(iv) The Participant has submitted required financial statements to SBA.

(2) If an appropriate match exists, SBA will advise the procuring agency whether SBA will participate in contract negotiations and execution of award documents or whether SBA will authorize the procuring agency to negotiate and execute award directly with the identified Participant.

(3) If an appropriate match does not exist, SBA will notify the Participant and the procuring agency, and may then nominate an alternate Participant.

(d) *Open requirements.* When a procuring agency does not nominate a particular concern for performance of a sole source 8(a) contract (open requirement), the following additional procedures will apply:

(1) If the procurement is a construction requirement, SBA will examine the portfolio of Participants that have a bona fide place of business within the geographical boundaries served by the SBA district office where the work is to be performed to select a qualified Participant. If none is found to be qualified or a match for a concern in that district is determined to be impossible or inappropriate, SBA may nominate a Participant with a bona fide place of business within the geographical boundaries served by another district office within the same state, or may nominate a Participant having a bona fide place of business out of state but within a reasonable proximity to the work site. SBA's decision will ensure that the nominated Participant is close enough to the work site to keep costs of performance reasonable.

(2) If the procurement is not a construction requirement, SBA may select any eligible, responsible Participant nationally to perform the contract.

(3) In cases in which SBA selects a Participant for possible award from among two or more eligible and qualified Participants, the selection will be based upon relevant factors, including business development needs, compliance with competitive business mix requirements (if applicable), financial condition, management ability, and technical capability.

(4) To the maximum extent practicable, SBA will promote the equitable geographic distribution of 8(a) sole source contracts.

(e) *Formal technical evaluations.* Except for the procedures set forth in subpart 36.6 of the Federal Acquisition Regulation (FAR) (48 CFR part 36, subpart 36.6) for architect-engineer services, SBA will not authorize formal technical evaluations for sole source 8(a) requirements. A procuring agency:

(1) Must request that a procurement be a competitive 8(a) award if it requires formal technical evaluations of more than one Participant for a requirement below the applicable competitive threshold amount; and

(2) May conduct informal assessments of several Participants' capabilities to perform a specific requirement, so long as the statement of work for the requirement is not released to any of the Participants being assessed.

(f) *Repetitive acquisitions.* A procuring agency contracting officer must submit a new offering letter to SBA where he or she intends to award a follow-on or repetitive contract as an 8(a) award. This enables the SBA to:

(1) Evaluate whether the requirement should be a competitive 8(a) award;

(2) Assess a nominated firm's eligibility, whether or not it is the same firm that performed the previous contract; and

(3) Determine whether the requirement should continue under the 8(a) BD program.

(g) *Basic Ordering Agreements (BOAs).* A Basic Ordering Agreement (BOA) is not a contract under the FAR. *See* 48 CFR 16.703(a). Each order to be issued under the BOA is an individual contract. As such, the procuring agency must offer, and SBA must accept, each task order under a BOA in addition to offering and accepting the BOA itself.

(1) SBA will not accept for award on a sole source basis any task order under a BOA that would cause the total dollar amount of task orders issued to exceed the applicable competitive threshold amount set forth in § 124.506(a).

(2) Where a procuring agency believes that task orders to be issued under a proposed BOA will exceed the applicable competitive threshold amount set forth in § 124.506(a), the procuring agency must offer the requirement to the program to be competed among eligible Participants.

(3) Once a concern's program term expires, the concern otherwise exits the 8(a) BD program, or becomes other than small for the SIC code assigned under the BOA, new orders will not be accepted for the concern.

**§ 124.504 What circumstances limit SBA's ability to accept a procurement for award as an 8(a) contract?**

SBA will not accept a procurement for award as an 8(a) contract if the circumstances identified in paragraphs (a) through (e) of this section exist.

(a) *Reservation as small business or SDB set-aside.* The procuring agency issued a solicitation for or otherwise expressed publicly a clear intent to reserve the procurement as a small business or small disadvantaged business (SDB) set-aside prior to offering the requirement to SBA for award as an 8(a) contract. The AA/8(a)BD may permit the acceptance of the requirement, however, under extraordinary circumstances. *Example.* SBA may accept a requirement where a procuring agency made a decision to offer the requirement to the 8(a) BD program before the solicitation was sent out and the procuring agency acknowledges and documents that the solicitation was in error.

(b) *Competition prior to offer and acceptance.* The procuring agency competed a requirement among Participants prior to offering the requirement to SBA and receiving SBA's formal acceptance of the requirement.

(1) Any competition conducted without first obtaining SBA's formal acceptance of the procurement for the 8(a) BD program will not be considered an 8(a) competitive requirement.

(2) SBA may accept the requirement for the 8(a) BD program as a competitive 8(a) requirement, but only if the procuring agency agrees to resolicit the requirement using appropriate competitive 8(a) procedures.

(c) *Adverse impact.* SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs. The adverse impact concept is designed to protect small business concerns which are performing Government contracts awarded outside the 8(a) BD program, and does not apply to follow-on or renewal 8(a) acquisitions.

(1) In determining whether the acceptance of a requirement would have an adverse impact on an individual small business, SBA will consider all relevant factors.

(i) In connection with a specific small business, SBA presumes adverse impact to exist where:

(A) The small business concern has performed the specific requirement for at least 24 months;

(B) The small business is performing the requirement at the time it is offered to the 8(a) BD program, or its performance of the requirement ended within 30 days of the procuring agency's offer of the requirement to the 8(a) BD program; and

(C) The dollar value of the requirement that the small business is or was performing is 25 percent or more of its most recent annual gross sales (including those of its affiliates). For a multi-year requirement, the dollar value of the last 12 months of the requirement will be used to determine whether a small business would be adversely affected by SBA's acceptance.

(ii) Except as provided in paragraph (c)(2) of this section, adverse impact does not apply to ''new'' requirements. A new requirement is one which has not been previously procured by the relevant procuring agency.

(A) Where a requirement is new, no small business could have previously performed the requirement and, thus, SBA's acceptance of the requirement for the 8(a) BD program will not adversely impact any small business.

(B) Construction contracts by their very nature (e.g., the one-time building of a specific structure) are new requirements.

(C) The expansion or modification of an existing requirement will be considered a new requirement where the magnitude of change is significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional types of capabilities.

(D) SBA need not perform an impact determination where a new requirement is offered to the 8(a) BD program.

(2) In determining whether the acceptance of a requirement would have an adverse impact on a group of small businesses, SBA will consider the effects of combining or consolidating various requirements being performed by two or more small business concerns into a single contract which would be considered a ''new'' requirement as compared to any of the previous smaller requirements. SBA may find adverse impact to exist if one of the existing small business contractors meets the presumption set forth in paragraph (c)(1)(i) of this section.

(3) In determining whether the acceptance of a requirement would have an adverse impact on other small business programs, SBA will consider all relevant factors, including but not limited to, the number and value of contracts in the subject industry reserved for the 8(a) BD program as compared with other small business programs.

(d) *Benchmark achievement.* Where actual participation by disadvantaged businesses in a particular industry exceeds the benchmark limitations established by the Department of Commerce, in consultation with the General Services Administration and the SBA, for that industry, SBA may elect not to accept a requirement offered to SBA for award as an 8(a) contract in that industry, considering the developmental needs of Participants and other anticipated contracting opportunities.

(e) *Release for non-8(a) competition.* In limited instances, SBA may decline to accept the offer of a follow-on or renewal 8(a) acquisition to give a concern previously awarded the contract that is leaving or has left the 8(a) BD program the opportunity to compete for the requirement outside the 8(a) BD program.

(1) SBA will consider release only where:

(i) The procurement awarded through the 8(a) BD program is being performed by either a Participant whose program term will expire prior to contract completion, or, by a former Participant whose program term expired within one year of the date of the offering letter;

(ii) The concern requests in writing that SBA decline to accept the offer prior to SBA's acceptance of the requirement for award as an 8(a) contract; and

(iii) The concern qualifies as a small business for the requirement now offered to the 8(a) BD program.

(2) In considering release, SBA will balance the importance of the requirement to the concern's business development needs against the business development needs of other Participants that are qualified to perform the requirement. This determination will include consideration of whether rejection of the requirement would seriously reduce the pool of similar types of contracts available for award as 8(a) contracts. SBA will seek the views of the procuring agency.

(3) If SBA declines to accept the offer and releases the requirement, it will recommend to the procuring agency that the requirement be procured as a small business or SDB set-aside.

**§ 124.505 When will SBA appeal the terms or conditions of a particular 8(a) contract or a procuring agency decision not to reserve a requirement for the 8(a) BD program?**

(a) *What SBA may appeal.* The Administrator of SBA may appeal the following matters to the head of the procuring agency:

(1) A contracting officer's decision not to make a particular procurement available for award as an 8(a) contract;

(2) A contracting officer's decision to reject a specific Participant for award of an 8(a) contract after SBA's acceptance of the requirement for the 8(a) BD program; and

(3) The terms and conditions of a proposed 8(a) contract, including the procuring agency's SIC code designation and estimate of the fair market price.

(b) *Procedures for appeal.* (1) SBA must notify the contracting officer of the SBA Administrator's intent to appeal an adverse decision within 5 working days of SBA's receipt of the decision.

(2) Upon receipt of the notice of intent to appeal, the procuring agency must suspend further action regarding the procurement until the head of the procuring agency issues a written decision on the appeal, unless the head of the procuring agency makes a written determination that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for a consideration of the appeal.

(3) The SBA Administrator must send a written appeal of the adverse decision to the head of the procuring agency within 15 working days of SBA's notification of intent to appeal or the appeal may be considered withdrawn.

(4) The procuring agency head must specify in writing the reasons for a denial of an appeal brought by the Administrator under this section.

**§ 124.506 At what dollar threshold must an 8(a) procurement be competed among eligible Participants?**

(a) *Competitive thresholds.* A procurement offered and accepted for the 8(a) BD program must be competed among eligible Participants if:

(1) There is a reasonable expectation that at least two eligible Participants will submit offers at a fair market price;

(2) The anticipated award price of the contract, including options, will exceed $5,000,000 for contracts assigned manufacturing Standard Industrial Classification (SIC) codes and $3,000,000 for all other contracts; and

(3) The requirement has not been accepted by SBA for award as a sole source 8(a) procurement on behalf of a tribally-owned or ANC-owned concern.

(i) For all types of contracts, the applicable competitive threshold amounts will be applied to the procuring agency estimate of the total value of the contract, including all options.

(ii) Where the estimate of the total value of a proposed 8(a) contract is less than the applicable competitive threshold amount and the requirement is accepted as a sole source requirement on that basis, award may be made even though the contract price arrived at through negotiations exceeds the competitive threshold, provided that the contract price is not more than ten percent greater than the competitive threshold amount. *Example.* If the anticipated award price for a

professional services requirement is determined to be $2.7 million and it is accepted as a sole source 8(a) requirement on that basis, a sole source award will be valid even if the contract price arrived at after negotiation is $3.1 million.

(iii) A proposed 8(a) requirement with an estimated value exceeding the applicable competitive threshold amount may not be divided into several separate procurement actions for lesser amounts in order to use 8(a) sole source procedures to award to a single contractor.

(b) *Exemption from competitive thresholds for Participants owned by Indian tribes.* SBA may award a sole source 8(a) contract to a Participant concern owned and controlled by an Indian tribe or an ANC where the anticipated value of the procurement exceeds the applicable competitive threshold if SBA has not accepted the requirement into the 8(a) BD program as a competitive procurement. There is no requirement that a procurement must be competed whenever possible before it can be accepted on a sole source basis for a tribally-owned or ANC-owned concern, but a procurement may not be removed from competition to award it to a tribally-owned or ANC-owned concern on a sole source basis.

(c) *Competition below thresholds.* The AA/8(a)BD, on a nondelegable basis, may approve a request from a procuring agency to compete a requirement that is below the applicable competitive threshold amount among eligible Participants.

(1) This authority will be used primarily when technical competitions are appropriate or when a large number of potential awardees exist.

(2) The AA/8(a)BD will consider whether the procuring agency has made and will continue to make available a significant number of its contracts to the 8(a) BD program on a noncompetitive basis.

(3) The AA/8(a)BD will deny a request if the procuring agency previously offered the requirement to the 8(a) BD program on a noncompetitive basis and the request is made following the inability of the procuring agency and the potential sole source awardee to reach an agreement on price or some other material term or condition.

(d) *Requirements above thresholds.* Except as set forth in paragraph (b) of this section, SBA will not accept a contract opportunity above the applicable competitive threshold amount as a sole source 8(a) requirement.

**§ 124.507 What procedures apply to competitive 8(a) procurements?**

(a) *FAR procedures.* Procuring agencies will conduct competitions among and evaluate offers received from Participants in accordance with the Federal Acquisition Regulation (48 CFR chapter 1).

(b) *Eligibility determination by SBA.* In either a negotiated or sealed bid competitive 8(a) acquisition, the procuring agency will request that the SBA district office servicing the apparent successful offeror determine that firm's eligibility for award.

(1) Within 5 working days after receipt of a procuring agency's request for an eligibility determination, SBA will determine whether the firm identified by the procuring agency is eligible for award.

(2) Eligibility is based on 8(a) BD program criteria, including whether the Participant is:

(i) A small business under the SIC code assigned to the requirement;

(ii) In compliance with any applicable competitive business mix target established or remedial measure imposed by § 124.508 that does not include the denial of future 8(a) contracts;

(iii) In the developmental stage of program participation if the solicitation restricts offerors to the developmental stage of participation; and

(iv) A concern with a bona fide place of business in the applicable geographic area if the procurement is for construction.

(3) If SBA determines that the apparent successful offeror is ineligible, SBA will notify the procuring agency. The procuring agency will then send to SBA the identity of the next highest evaluated firm for an eligibility determination. The process is repeated until SBA determines that an identified offeror is eligible for award.

(4) Except to the extent set forth in paragraph (d) of this section, SBA determines whether a Participant is eligible for a specific 8(a) competitive requirement as of the date that the Participant submitted its initial offer which includes price.

(5) If the procuring agency contracting officer believes that the apparent successful offeror is not responsible to perform the contract, he or she must refer the concern to SBA for a possible Certificate of Competency in accord with § 125.5 of this chapter.

(6) A competitive 8(a) contract will be executed using normal 8(a) award procedures (i.e., a prime contract between the procuring agency and SBA and a contract between SBA and the selected Participant).

(7) Paragraphs (b)(5) and (b)(6) of this section do not apply if SBA has delegated contract execution authority to the procuring agency.

(c) *Restricted competition.* (1) *Competition within stages of program participation.* SBA may accept a competitive 8(a) requirement that is limited to Participants in the developmental stage of program participation or limited to concerns in the transitional stage of program participation, or may accept a requirement to be competed among firms both in the developmental and transitional stages of program participation.

(2) *Construction competitions.* Based on its knowledge of the 8(a) BD portfolio, SBA will determine whether a competitive 8(a) construction requirement should be competed among only those Participants having a bona fide place of business within the geographical boundaries of one or more SBA district offices, within a state, or within the state and nearby areas. Only those Participants with their principal places of business within the appropriate geographical boundaries are eligible to submit offers.

(3) *Competition for all non-construction requirements.* Except for construction requirements, all eligible Participants regardless of location may submit offers in response to competitive 8(a) solicitations. The only geographic restrictions pertaining to 8(a) competitive requirements, other than those for construction requirements, are any imposed by the solicitations themselves.

(d) *Award to firms whose program terms have expired.* A concern that has completed its term of participation in the 8(a) BD program may be awarded a competitive 8(a) contract if it was a Participant eligible for award of the contract on the initial date specified for receipt of offers contained in the contract solicitation, and if it continues to meet all other applicable eligibility criteria.

(1) Amendments to the solicitation extending the date for submissions of offers will be disregarded.

(2) For a negotiated procurement, a Participant may submit revised offers, including a best and final offer, and be awarded a competitive 8(a) contract if it was eligible as of the initial date specified for the receipt of offers in the solicitation, even though its program term may expire after that date.

(3) An 8(a) requirement for architect-engineer services with a value less than the competitive threshold amount and which uses the evaluation procedures prescribed by part 36, subpart 36.6 of

the Federal Acquisition Regulation (48 CFR chapter 1) will not be considered a competitive 8(a) requirement under this section for which a firm whose program term has expired may be eligible.

**§ 124.508 What are competitive business mix targets?**

(a) *General.* (1) To ensure that Participants do not develop an unreasonable reliance on 8(a) awards, and to ease their transition into the competitive marketplace after exiting the 8(a) BD program, Participants must make maximum efforts to obtain business outside the 8(a) BD program.

(2) During both the developmental and transitional stages of the 8(a) BD program, a Participant must make substantial and sustained efforts, including following a reasonable marketing strategy, to attain the targeted dollar levels of non-8(a) revenue established in its business plan. It must attempt to use the 8(a) BD program as a resource to strengthen the firm for economic viability when program benefits are no longer available.

(b) *Required non-8(a) business activity targets during transitional stage.* (1) *General.* During the transitional stage of the 8(a) BD program, a Participant must achieve certain targets of non-8(a) contract revenue. These targets are called non-8(a) business activity targets and are expressed as a percentage of total revenue. The targets reflect an increase in non-8(a) revenue over time.

(2) *Non-8(a) business activity targets.* Firms in the transitional stage of program participation must meet the following non-8(a) business activity targets during each year of program participation in the transitional stage:

| Participant's year in the transitional stage: | Percent [1] |
|---|---|
| 1 | 15 |
| 2 | 25 |
| 3 | 35 |
| 4 | 45 |
| 5 | 55 |

[1] Competitive business mix targets (required minimum non-8(a) revenue as a percentage of total revenue)

(3) *Compliance with competitive business mix targets.* Compliance with the applicable competitive business mix target is measured at the end of any program year in the transitional stage of program participation based on the Participant's latest fiscal year-end total revenue (e.g., at the end of the first year in the transitional stage of program participation, non-8(a) revenue is compared to total revenue). Remedial measures, if appropriate, will be imposed during the subsequent program year (e.g., non-compliance with the required business activity target in year one of the transitional stage of program participation would cause SBA to initiate remedial measures under paragraph (d) of this section for year two in the transitional stage).

(4) *Certification of compliance.* A Participant must certify that it complies with the applicable competitive business mix target or with the measures imposed by SBA under paragraph (d) of this section before it receives any 8(a) contract during the transitional stage of the 8(a) BD program.

(c) *Reporting and verification of business activity.* (1) Once admitted to the 8(a) BD program, a Participant must provide to SBA as part of its annual review:

(i) Annual financial statements with a breakdown of 8(a) and non-8(a) revenue in accord with § 124.602; and

(ii) An annual report within 30 days from the end of the program year of all non-8(a) contracts, options, and modifications affecting price executed during the program year.

(2) At the end of each year of participation in the transitional stage, the BOS assigned to work with the Participant will review the Participant's total revenues to determine whether the non-8(a) revenues have met the applicable target.

(d) *Consequences of not meeting competitive business mix targets.* (1) Beginning at the end of the first year in the transitional stage (the fifth year of participation in the 8(a) BD program), any firm that does not meet its applicable competitive business mix target for the just completed program year will be ineligible for sole source 8(a) contracts in the current program year, unless and until the Participant corrects the situation as described in paragraph (d)(2) of this section.

(2) If SBA determines that an 8(a) Participant has failed to meet its applicable competitive business mix target during any program year in the transitional stage of program participation, SBA may increase its monitoring of the Participant's contracting activity during the ensuing program year. SBA will also notify the Participant in writing that the Participant will not be eligible for further 8(a) sole source contract awards until it has demonstrated to SBA that it has complied with its competitive business mix requirements as described in paragraphs (d)(2) (i) and (ii) of this section. In order for a Participant to come into compliance with the competitive business mix target and be eligible for further 8(a) sole source contracts, it may:

(i) Wait until the end of the current program year and demonstrate to SBA as part of the normal annual review process that it has met the revised competitive business mix target; or

(ii) At its option, submit information regarding its non-8(a) revenue to SBA quarterly throughout the current program year in an attempt to come into compliance before the end of the current program year. If the Participant satisfies the requirements of paragraphs (d)(2)(ii)(A) or (d)(2)(ii)(B) of this section, SBA will reinstate its ability to get sole source 8(a) contracts prior to its annual review.

(A) During the first six months of the current program year (i.e., at either the first or second quarterly review), the Participant must demonstrate that it has received non-8(a) revenue and new non-8(a) contract awards that are equal to or greater than the dollar amount by which it failed to meet its competitive business mix target for the just completed program year. For this purpose, SBA does not count options on existing non-8(a) contracts in determining whether a Participant has received new non-8(a) contract awards; or

(B) During the last six months of the current program year (i.e., at either the nine-month or one year review), it has achieved its competitive business mix target as of that point in the current program year.

*Example 1 to paragraph (d)(2).* Firm A had $10 million in total revenue during year 2 in the transitional stage (year 6 in the program), but failed to meet the minimum competitive business mix target of 25 percent. It had 8(a) revenues of $8.5 million and non-8(a) revenues of $1.5 million. Based on total revenues of $10 million, Firm A should have had at least $2.5 million in non-8(a) revenues. Thus, Firm A missed its target by $1 million (its target ($2.5 million) minus its actual non-8(a) revenues ($1.5 million)). Because Firm A did not achieve its competitive business mix target, it cannot receive 8(a) sole source awards until correcting that situation. The firm may wait until the next annual review to establish that it has met the revised target, or it can choose to report contract awards and other non-8(a) revenue to SBA quarterly. Firm A elects to submit information to SBA quarterly in year 3 of the transitional stage (year 7 in the program). In order to be eligible for sole source 8(a) contracts after either its 3 month or 6 month review, Firm A must show that it has received non-8(a) revenue and/or been awarded new non-8(a) contracts totaling $1 million (the amount by which it missed its target in year 2 of the transitional stage).

*Example 2 to paragraph (d)(2).* Firm B had $10 million in total revenue during year 2 in the transitional stage (year 6 in the program), of which $8.5 million were 8(a) revenues and $1.5 million were non-8(a) revenues. At its first two quarterly reviews during year 3 of the transitional stage (year 7 in the program),

Firm B could not demonstrate that it had received at least $1 million in non-8(a) revenue and new non-8(a) awards. In order to be eligible for sole source 8(a) contracts after its 9 month or 1 year review, Firm B must show that at least 35% (the competitive business mix target for year 3 in the transitional stage) of all revenues received during year 3 in the transitional stage as of that point are from non-8(a) sources.

(3) In determining whether a Participant achieved its required competitive business mix target at the end of any program year in the transitional stage, or whether a Participant that failed to meet the target for the previous program year has achieved the required level of non-8(a) business at its nine-month review, SBA measures 8(a) support by adding the base year value of all 8(a) contracts awarded during the applicable program year to the value of all options and modifications executed during that year.

(4) As a condition of eligibility for new 8(a) contracts, SBA may also impose other requirements on a Participant that fails to achieve the competitive business mix targets. These include requiring the Participant to obtain management assistance, technical assistance, and/or counseling, and/or attend seminars relating to management assistance, business development, financing, marketing, accounting, or proposal preparation.

(5) SBA will initiate proceedings to terminate a Participant from the 8(a) BD program where the firm makes no good faith efforts to obtain non-8(a) revenues.

**§ 124.509 What percentage of work must a Participant perform on an 8(a) contract?**

(a) To assist the business development of Participants in the 8(a) BD program, an 8(a) contractor must perform certain percentages of work with its own employees. These percentages and the requirements relating to them are the same as those established for small business set-aside prime contractors, and are set forth in § 125.6 of this title.

(b) A Participant must certify in its offer that it will meet the applicable percentage of work requirement. SBA will determine compliance as of the date of best and final offers for a negotiated procurement, and as of the date of bid opening for sealed bid procurements.

(c) *Indefinite quantity contracts.* (1) In order to ensure that the required percentage of an indefinite quantity 8(a) award is performed by the Program Participant, at any point in time the Participant must have performed the required percentage of the total value of the contract to that date. For a service or supply contract, this does not mean that the Participant must perform 50 percent of each task order with its own force. But, rather, the Participant is required to perform 50 percent of the combined total of all task orders to date. The applicable SBA District Director or his/her designee may waive this requirement in writing where a large amount of contracting is essential in the early stages of performance before the work to be done by the Participant can be performed, provided that there are written assurances from both the Participant and the procuring agency that the contract will ultimately comply with the requirements of this section. *Example.* If a Program Participant performed 90% of a $100,000 task order on an indefinite quantity service contract with its own work force, it would have to perform only 10 percent of a second task order for $100,000 because the concern would still have performed 50% of the combined total value of the contract to date ($100,000 out of $200,000).

(2) Where there is a guaranteed minimum condition in an indefinite quantity 8(a) award, the required performance of work percentage need not be met on the first task order. In such a case, however, the percentage of work that a Program Participant may further contract to other concerns on the first task order may not exceed 50 percent of the total guaranteed minimum dollar value to be provided by the contract. If the first task order exceeds 50 percent of the guaranteed minimum amount, the Participant may contract no more than 50 percent of the guaranteed amount. Once the guaranteed minimum amount is met, the general rule for indefinite quantity contracts set forth in paragraph (c)(1) of this section applies. *Example.* Where a contract guarantees a minimum of $100,000 in professional services and the first task order is for $60,000 in such services, the Program Participant may perform as little as $10,000 of that order. In such a case, however, the Participant must perform all of the next task order(s) up to $40,000 to ensure that it performs 50% of the $100,000 guaranteed minimum ($10,000 + $40,000 = $50,000, or 50% of $100,000).

**§ 124.510 How is fair market price determined for an 8(a) contract?**

(a) The procuring agency determines what constitutes a ''fair market price'' for an 8(a) contract.

(1) The procuring agency must derive the estimate of a current fair market price for a new requirement, or a requirement that does not have a satisfactory procurement history, from a price or cost analysis. This analysis may take into account prevailing market conditions, commercial prices for similar products or services, or data obtained from any other agency. The analysis must also consider any cost or pricing data that is timely submitted by the SBA.

(2) The procuring agency must base the estimate of a current fair market price for a requirement that has a satisfactory procurement history on recent award prices adjusted to ensure comparability. Adjustments will take into account differences in quantities, performance, times, plans, specifications, transportation costs, packaging and packing costs, labor and material costs, overhead costs, and any other additional costs which may be appropriate.

(b) Upon the request of SBA, a procuring agency will provide to SBA a written statement detailing the method used by the agency to estimate the current fair market price for the 8(a) requirement. This statement must be submitted within 10 working days of SBA's request. The procuring agency must identify the information, studies, analyses, and other data it used in making its estimate.

(c) The procuring agency's estimate of fair market price and any supporting data may not be disclosed by SBA to any Participant or potential contractor.

(d) The concern selected to perform an 8(a) contract may request SBA to protest the procuring agency's estimate of current fair market price to the Secretary of the Department or head of the agency in accordance with § 124.505.

**§ 124.511 Delegation of contract administration to procuring agencies.**

(a) SBA may delegate, by the use of special clauses in the 8(a) contract documents or by a separate agreement with the procuring agency, all responsibilities for administering an 8(a) contract to the procuring agency except the approval of novation agreements under 48 CFR 42.302(a)(25).

(b) Because of this delegation of contract administration, a contracting officer may execute any priced option or in scope modification without SBA's concurrence. The contracting officer must, however, notify SBA of all modifications and options exercised.

**§ 124.512 Under what circumstances can a joint venture be awarded an 8(a) contract?**

(a) *General.* (1) If approved by SBA, a Participant may enter into a joint venture agreement with another small business concern, whether or not an 8(a) Participant, for the purpose of performing a specific 8(a) contract.

(2) A joint venture agreement is permissible only where an 8(a) concern

lacks the necessary capacity to perform the contract on its own, and the agreement is fair and equitable and will be of substantial benefit to the 8(a) concern. However, where SBA concludes that an 8(a) concern brings very little to the joint venture relationship except its 8(a) status, SBA will not approve the joint venture arrangement.

(b) *Size of concerns to an 8(a) joint venture.* (1) A joint venture of at least one 8(a) Participant and one or more other business concerns may submit an offer as a small business for a competitive 8(a) procurement so long as each concern is small under the size standard corresponding to the SIC code assigned to the contract, provided:

(i) For a procurement having a revenue-based size standard, the procurement exceeds half the size standard corresponding to the SIC code assigned to the contract;

(ii) For a procurement having an employee-based size standard, the procurement exceeds $10 million;

(iii) The size of at least one 8(a) Participant to the joint venture is less than one half the size standard corresponding to the SIC code assigned to the contract; and

(iv) The 8(a) Participant(s) identified in paragraph (b)(1)(iii) of this section must perform the applicable percentage of work required by § 124.509.

(2) Except as provided in § 124.519, for sole source and competitive 8(a) procurements that do not exceed the dollar levels identified in paragraph (b)(1) of this section, an 8(a) Participant entering into a joint venture agreement with another concern is considered to be affiliated for size purposes with the other concern with respect to performance of the 8(a) contract. The combined annual receipts or employees of the concerns entering into the joint venture must meet the size standard for the SIC code assigned to the 8(a) contract.

(c) *Contents of joint venture agreement.* Every joint venture agreement to perform an 8(a) contract, including those between mentors and proteges authorized by § 124.519, must contain a provision:

(1) Setting forth the purpose of the joint venture;

(2) Designating an 8(a) Participant as the lead entity of the joint venture, and an employee of the lead entity as the project manager responsible for performance of the 8(a) subcontract;

(3) Stating that not less than 51 percent of the net profits earned by the joint venture be distributed to the 8(a) Participant(s);

(4) Providing for the establishment and administration of a special bank account in the name of the joint venture. This account must require the signature of all parties to the joint venture or designees for withdrawal purposes. All payments due the joint venture for performance on an 8(a) contract will be deposited in the special account from which all expenses incurred under the contract will be paid;

(5) Itemizing all major equipment, facilities, and other resources to be furnished by each party to the joint venture, with a detailed schedule of cost or value of each;

(6) Specifying the responsibilities of the parties with regard to contract performance, source of labor and negotiation of the 8(a) contract;

(7) Designating that accounting and other administrative records relating to the joint venture be kept in the office of the lead 8(a) concern, unless approval to keep them elsewhere is granted by the District Director or his/her designee upon written request;

(8) Requiring the final original records be retained by the lead 8(a) concern upon completion of the 8(a) contract performed by the joint venture;

(9) Stating that quarterly financial statements showing cumulative contract receipts and expenditures (including salaries of the joint venture's principals) must be submitted to SBA not later than 45 days after each operating quarter of the joint venture; and

(10) Stating that a project-end profit and loss statement, including a statement of final profit distribution, must be submitted to SBA no later than 90 days after completion of the contract.

(d) *Prior approval by SBA.* SBA must approve a joint venture agreement prior to the award of an 8(a) contract on behalf of the joint venture.

(e) *Contract execution.* Where SBA has approved a joint venture, the procuring agency will execute an 8(a) contract in the name of the 8(a) Participant(s), not the joint venture entity.

(f) *Obligation of performance.* All parties to the joint venture must sign such documents as are necessary to obligate themselves to ensure performance of the 8(a) contract.

(g) *Performance of work by 8(a) concern(s).* The 8(a) partner(s) to an eligible joint venture, and not the aggregate of all parties to the joint venture, must perform the percentages of work required by § 124.510. Employees furnished by the 8(a) Participant(s) or hired through normal employment channels by the joint venture are considered to be employees of the 8(a) Participant(s) for this purpose.

(h) *Amendments to joint venture agreement.* All amendments to the joint venture agreement must be approved by SBA.

(i) *Inspection of records.* SBA may inspect the records of the joint venture without notice at any time deemed necessary.

**§ 124.513 Exercise of 8(a) options and modifications.**

(a) *Unpriced options.* The exercise of an unpriced option is considered to be a new contracting action.

(1) If a concern has exited the 8(a) BD program or is no longer small under the size standard corresponding to the SIC code for the requirement, negotiations to price the option cannot be entered into and the option cannot be exercised.

(2) If the concern is still a Participant and otherwise eligible for the requirement on a sole source basis, the procuring agency contracting officer may negotiate price and exercise the option provided the option, considered a new contracting action, meets all regulatory requirements, including SBA's acceptance of the requirement for the 8(a) BD program.

(3) If the estimated fair market price of the option exceeds the applicable threshold amount set forth in § 124.506, the requirement must be competed as a new contract among eligible Participants.

(b) *Priced options.* The procuring agency contracting officer may exercise a priced option to an 8(a) contract whether the concern that received the award has exited the 8(a) BD program or is no longer eligible if to do so is in the best interests of the Government.

(c) *Modifications beyond the scope.* A modification beyond the scope of the initial 8(a) contract award is considered to be a new contracting action. It will be treated the same as an unpriced option as described in paragraph (a) of this section.

(d) *Modifications within the scope.* The procuring agency contracting officer may exercise a modification within the scope of the initial 8(a) contract whether the concern that received the award has exited the 8(a) BD program or is no longer eligible if to do so is in the best interests of the Government.

**§ 124.514 Can a Participant change its ownership or control and continue to perform an 8(a) contract, and can it transfer performance to another firm?**

(a) An 8(a) contract must be performed by the Participant that initially received it unless a waiver is granted under paragraph (b) of this section.

(1) An 8(a) contract, whether in the base or an option year, must be terminated for the convenience of the Government if one or more of the individuals upon whom eligibility for the 8(a) BD program was based relinquishes or enters into any agreement to relinquish ownership or control of the Participant such that the Participant would no longer be controlled or at least 51% owned by disadvantaged individuals.

(2) An 8(a) contract, whether in the base or an option year, must be terminated for the convenience of the Government if the contract is transferred or novated for any reason to another firm.

(3) The procuring agency may not assess repurchase costs or other damages against the Participant due solely to the provisions of this section.

(b) The SBA Administrator may waive the requirements of paragraphs (a)(1) and (a)(2) of this section if requested to do so by the 8(a) contractor when:

(1) It is necessary for the owners of the concern to surrender partial control of such concern on a temporary basis in order to obtain equity financing;

(2) Ownership and control of the concern that is performing the 8(a) contract will pass to another Participant, but only if the acquiring firm would otherwise be eligible to receive the award directly as an 8(a) contract;

(3) Any individual upon whom eligibility was based is no longer able to exercise control of the concern due to physical or mental incapacity or death;

(4) The head of the procuring agency, or an official with delegated authority from the agency head, certifies that termination of the contract would severely impair attainment of the agency's program objectives or missions; and

(5) It is necessary for the disadvantaged owners of the initial 8(a) awardee to relinquish ownership of a majority of the voting stock of the concern in order to raise equity capital, but only if —

(i) The concern has exited the 8(a) BD program;

(ii) The disadvantaged owners will maintain ownership of the largest single outstanding block of voting stock (including stock held by affiliated parties); and

(iii) The disadvantaged owners will maintain control of the daily business operations of the concern.

(c) The 8(a) contractor must request a waiver in writing prior to the relinquishment of ownership and control except in the case of death or incapacity. A request for waiver due to incapacity or death must be submitted within 60 days after such occurrence. The Participant seeking to relinquish ownership or control must specify the grounds upon which it requests a waiver, and must demonstrate that the proposed transaction would meet such grounds.

(d) SBA determines the eligibility of an acquiring Participant under paragraph (b)(2) of this section by referring to the items identified in § 124.507(b)(2) and deciding whether prior to the transaction the acquiring Participant is a responsible and eligible concern with respect to each contract to be transferred.

(e) Anyone other than a procuring agency head who submits a certification regarding the impairment of the agency's objectives under paragraph (b)(4) of this section, must also certify delegated authority to make the certification.

(f) A concern performing an 8(a) contract must notify the SBA in writing immediately upon entering into an agreement or agreement in principle (either oral or written) to transfer all or part of its stock or other ownership interest or assets to any other party. Such an agreement could include an oral agreement to enter into a transaction to transfer interests in the future.

(g) The Administrator has discretion to decline a request for waiver even though legal authority exists to grant the waiver.

(h) The 8(a) contractor may appeal SBA's denial of a waiver request by filing a petition with OHA pursuant to part 134 of this title within 45 days of the date of service (as defined in § 134.204) of the Agency decision.

### § 124.515 Who decides contract disputes arising between a Participant and a procuring agency after the award of an 8(a) contract?

For purposes of the Disputes Clause of a specific 8(a) contract, the contracting officer is that of the procuring agency. A dispute arising between an 8(a) contractor and the procuring agency contracting officer will be decided by the procuring agency, and appeals may be taken by the 8(a) contractor without SBA involvement.

### § 124.516 Can the eligibility or size of a Participant for award of an 8(a) contract be questioned?

(a) The eligibility of a Participant for a sole source or competitive 8(a) requirement may not be challenged by another Participant or any other party, either to SBA or any administrative forum as part of a bid or other contract protest.

(b) The size status of the apparent successful offeror for a competitive 8(a) procurement may be protested pursuant to § 121.1001(a)(2) of this chapter. The size status of a nominated Participant for a sole source 8(a) procurement may not be protested by another Participant or any other party.

(c) A Participant cannot appeal SBA's determination not to award it a specific 8(a) contract because the concern lacks an element of responsibility or is ineligible for the contract, other than the right set forth in § 124.501(h) to request a formal size determination where SBA cannot verify it to be small.

(d)(1) The SIC code assigned to a sole source 8(a) requirement may not be challenged by another Participant or any other party either to SBA or any administrative forum as part of a bid or contract protest. Only the AA/8(a)BD may appeal a SIC code designation with respect to a sole source 8(a) requirement.

(2) In connection with a competitive 8(a) procurement, any interested party who has been adversely affected by a SIC code designation may appeal the designation to SBA's OHA pursuant to § 121.1103 of this chapter.

(e) Anyone with information questioning the eligibility of a Participant to continue participation in the 8(a) BD program or for purposes of a specific 8(a) contract may submit such information to SBA under § 124.112(c).

### § 124.517 How can an 8(a) contract be terminated before performance is completed?

(a) *Termination for default.* A decision to terminate a specific 8(a) contract for default can be made by the procuring agency contracting officer after consulting with SBA. The contracting officer must advise SBA of any intent to terminate an 8(a) contract for default in writing before doing so. SBA may provide to the Participant any program benefits reasonably available in order to assist it in avoiding termination for default. SBA will advise the contracting officer of this effort. Any procuring agency contracting officer who believes grounds for termination continue to exist may terminate the 8(a) contract for default, in accordance with the FAR (48 CFR chapter 1). SBA will have no liability for termination costs or reprocurement costs.

(b) *Termination for convenience.* After consulting with SBA, the procuring agency contracting officer may terminate an 8(a) contract for convenience when it is in the best interests of the Government to do so. A termination for convenience is appropriate if any disadvantaged owner

of the Participant performing the contract relinquishes ownership or control of such concern, or enters into any agreement to relinquish such ownership or control, unless a waiver is granted pursuant to § 124.514.

(c) *Substitution of one 8(a) contractor for another.* Where a procuring agency contracting officer demonstrates to SBA that an 8(a) contract will otherwise be terminated for default, SBA may authorize another Participant to complete performance and, in conjunction with the procuring agency, permit novation of the contract without invoking the termination for convenience or waiver provisions of § 124.514.

**§ 124.518 Are there any dollar limits on the amount of 8(a) contracts that a Participant may receive?**

(a) A Participant (other than one owned by an Indian tribe or an ANC) may not receive sole source 8(a) contract awards where it has received 8(a) contracts in excess of the dollar amount set forth in this section during its participation in the 8(a) BD program.

(1) For a firm having a revenue-based primary SIC code at time of program entry, the limit above which it can no longer receive sole source 8(a) contracts is five times the size standard corresponding to that SIC code or $100,000,000, whichever is less.

(2) For a firm having an employee-based primary SIC code at time of program entry, the limit above which it can no longer receive sole source 8(a) contracts is $100,000,000.

(3) SBA will not consider 8(a) contracts awarded under $100,000 in determining whether a Participant has reached the limit identified in paragraphs (a)(1) and (a)(2) of this section.

(b) Once the limit is reached, a firm could not receive any more 8(a) sole source contracts, but could remain eligible for competitive 8(a) awards.

(c) The limitation set forth in paragraph (a) of this section will not apply for firms that are current Participants in the 8(a) BD program as of December 31, 1996.

(d) SBA includes the dollar value of 8(a) options and modifications in determining whether a Participant has reached the limit identified in paragraph (a) of this section. If an option is not exercised or the contract value is reduced by modification, SBA will deduct those values.

(e) A Participant's eligibility for a sole source award is measured as of the date of award without taking into account whether the value of that award will cause the limit to be exceeded.

**§ 124.519 Mentor/protege program.**

(a) *Who can be a mentor?* Concerns that have graduated from the 8(a) BD program and those that are in the transitional stage of program participation may mentor developing 8(a) Participants and receive benefits as set forth in this section. This could include businesses that have become large.

(1) In order to qualify as a mentor, a concern must demonstrate that it:

(i) Possesses favorable financial health, including profitability for at least the last two years;

(ii) Possesses good character; and

(iii) Can impart value to a protege firm due to lessons learned and practical experience gained because of the 8(a) BD program.

(2) A mentor could have no more than one protege at a time.

(3) In order to demonstrate its favorable financial health, a firm seeking to be a mentor must submit its federal tax returns for the last two years to SBA for review.

(4) Once approved, a mentor must annually certify that it continues to possess good character and a favorable financial position.

(b) *Proteges.* (1) In order to be a protege firm, a Participant must:

(i) Be in the developmental stage of program participation;

(ii) Have never received an 8(a) contract; or

(ii) Have a size that is less than half the size standard corresponding to its primary SIC code.

(2) Only firms that are in good standing in the 8(a) BD program (e.g., firms that do not have termination proceedings against them, and are up to date with all reporting requirements) may qualify as a protege.

(3) A protege firm can have only one mentor at a time.

(c) *Benefits.* (1) A mentor and protege can joint venture as a small business for any government procurement, including procurements less than half the size standard corresponding to the assigned SIC code and 8(a) sole source contracts, provided the protege qualifies as small for the procurement and, for purposes of 8(a) sole source requirements, has not reached the dollar limit set forth in § 124.518.

(2) Notwithstanding the requirements set forth in §§ 124.105(g) and (h), in order to raise capital for the protege firm, the mentor may own an equity interest of up to 33% in the protege firm.

(3) Notwithstanding the mentor/protege relationship, a protege firm may qualify for other assistance as a small business, including SBA financial assistance.

(d) *Written agreement.* (1) The mentor and protege firms must enter a written agreement whereby the mentor commits to provide management and/or technical assistance to the protege firm for at least one year.

(2) The written agreement must be approved by the AA/8(a) BD.

(3) The protege firm must have the right to terminate the agreement with 30 days advance notice to the mentor and to SBA.

(4) Once approved, the protege must annually certify to SBA that there has been no change in the terms of the agreement.

## Miscellaneous Reporting Requirements

**§ 124.601 What reports does SBA require on parties assisting Participants in obtaining federal contracts?**

(a) Each Participant must submit annually a written report to its assigned BOS that includes a listing of any agents, representatives, attorneys, accountants, consultants and other parties (other than employees) receiving fees, commissions, or compensation of any kind to assist such participant in obtaining a Federal contract. The listing must indicate the amount of compensation paid and a description of the activities performed for such compensation.

(b) Failure to submit the report is good cause for the initiation of a termination proceeding pursuant to §§ 124.303 and 124.304.

**§ 124.602 What kind of annual financial statement must a Participant submit to SBA?**

(a) Participants with gross annual receipts of more than $5,000,000 must submit to SBA audited annual financial statements prepared by a licensed independent public accountant within 120 days after the close of the concern's fiscal year.

(1) The servicing SBA District Director may waive the requirement for audited financial statements for good cause shown by the Participant.

(2) Circumstances where waivers of audited financial statements may be granted include, but are not limited to, the following:

(i) The concern has an unexpected increase in sales towards the end of its fiscal year that creates an unforeseen requirement for audited statements;

(ii) The concern unexpectedly experiences severe financial difficulties which would make the cost of audited financial statements a particular burden; and

(iii) The concern has been a Participant less than 12 months.

(b) Participants with gross annual receipts between $1,000,000 and $5,000,000 must submit to SBA reviewed annual financial statements prepared by a licensed independent public accountant within 90 days after the close of the concern's fiscal year.

(c) Participants with gross annual receipts of less than $1,000,000 must submit to SBA an annual statement prepared in-house or a compilation statement prepared by a licensed independent public accountant, verified as to accuracy by an authorized officer, partner, limited liability member, or sole proprietor of the Participant, including signature and date, within 90 days after the close of the concern's fiscal year.

(d) Any audited or reviewed financial statements submitted to SBA pursuant to paragraphs (a) or (b) of this section must be prepared in accordance with Generally Accepted Accounting Principles.

(e) While financial statements need not be submitted until 90 or 120 days after the close of a Participant's fiscal year, depending on the receipts of the concern, a Participant seeking to be awarded an 8(a) contract between the close of its fiscal year and such 90 or 120-day time period must submit a final sales report signed by the CEO or President to SBA in order for SBA to determine the concern's eligibility for the 8(a) contract. This report must show a breakdown of 8(a) and non-8(a) sales.

(f) Notwithstanding the amount of a concern's gross annual receipts, SBA may require audited or reviewed statements whenever they are needed to obtain more complete information as to a concern's assets, liabilities, income or expenses, such as when the concern's capacity to perform a specific 8(a) contract must be determined, or when they are needed to determine continued program eligibility.

### § 124.603 What reports regarding the continued business operations of former Participants does SBA require?

Former Participants shall provide such information as SBA may request concerning such former Participant's continued business operations, contracts and financial condition for a period of three years following the date on which the concern exits the program. Failure to provide such information when requested will constitute a violation of this part, and may result in the nonexercise of options on or termination of contracts awarded through the 8(a) BD program, debarment, or other legal recourse.

## Management and Technical Assistance Program

### § 124.701 What is the purpose of the 7(j) management and technical assistance program?

Section 7(j)(1) of the Small Business Act, 15 U.S.C. 636(j)(1), authorizes SBA to enter into grants, cooperative agreements, or contracts with public or private organizations to pay all or part of the cost of technical or management assistance for individuals or concerns eligible for assistance under sections 7(a)(11), 7(j)(10), or 8(a) of the Small Business Act.

### § 124.702 What types of assistance are available through the 7(j) program?

Through its private sector service providers, SBA may provide a wide variety of management and technical assistance to eligible individuals or concerns to meet their specific needs, including:

(a) Counseling and training in the areas of financing, management, accounting, bookkeeping, marketing, and operation of small business concerns; and

(b) The identification and development of new business opportunities.

### § 124.703 Who is eligible to receive 7(j) assistance?

The following businesses are eligible to receive assistance from SBA through its service providers:

(a) Businesses which qualify as small within the meaning of size standards prescribed in 13 CFR part 121, and which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, or which are owned by such low-income individuals; and

(b) Businesses eligible to receive 8(a) contracts.

### § 124.704 What additional management and technical assistance is reserved exclusively for concerns eligible to receive 8(a) contracts?

In addition to the management and technical assistance available under § 124.702, Section 7(j)(10) of the Small Business Act authorizes SBA to provide additional management and technical assistance through its service providers exclusively to small business concerns eligible to receive 8(a) contracts, including:

(a) Assistance to develop comprehensive business plans with specific business targets, objectives, and goals;

(b) Other nonfinancial services necessary for a Participant's growth and development, including loan packaging; and

(c) Assistance in obtaining equity and debt financing.

## Subpart B—Eligibility, Certification, and Protests Relating to Federal Small Disadvantaged Business Programs

### § 124.1001 General applicability.

(a) This subpart defines a Small Disadvantaged Business (SDB). It also sets forth procedures by which a firm can apply to be recognized as an SDB, including procedures to be used by private sector entities approved by SBA for determining whether a particular concern is owned and controlled by one or more disadvantaged individuals. Finally, this subpart establishes procedures by which SBA determines whether a particular concern qualifies as an SDB in response to a protest challenging the firm's status as disadvantaged.

(b) Only small firms that have been found to be owned and controlled by disadvantaged individuals and appear on the SBA-maintained list of qualified SDBs are eligible to participate in Federal SDB set-aside, price evaluation adjustment, evaluation factor or subfactor, or monetary subcontracting incentive programs, or SBA's section 8(d) subcontracting program.

### § 124.1002 What is a Small Disadvantaged Business (SDB)?

(a) *Reliance on 8(a) criteria.* In determining whether a firm qualifies as an SDB, use the definitions of social and economic disadvantage and other eligibility requirements established in subpart A of this part, including the requirements placed on ownership and control and disadvantaged status, unless otherwise provided in this subpart. Qualified private certifiers must use those requirements applicable to ownership and control in determining whether a particular firm is actually owned and controlled by individuals claiming disadvantaged status.

(b) *SDB eligibility criteria.* A small disadvantaged business (SDB) is a concern:

(1) Which qualifies as small under part 121 of this title for the size standard corresponding to the applicable four digit Standard Industrial Classification (SIC) code.

(i) For purposes of SDB certification, the applicable SIC code is that which relates to the primary business activity of the concern;

(ii) For purposes of an SDB protest, the applicable SIC code is that assigned by the contracting officer to the procurement at issue;

(2) Which is at least 51 percent unconditionally owned by one or more

socially and economically disadvantaged individuals, as defined by §§ 124.103 and 124.104 and paragraph (c) of this section, an Indian tribe, an Alaska Native Corporation (ANC), a Native Hawaiian Organization, or a Community Development Corporation (CDC) (See ownership requirements set forth in § 124.105, and those in §§ 124.109, 124.110, and 124.111 pertaining to concerns owned by tribes and ANCs, Native Hawaiian Organizations, or CDCs, respectively);

(3) Whose management and daily business operations are controlled by one or more socially and economically disadvantaged individuals (See control requirements set forth in § 124.106; but see § 124.109(c)(4) for firms owned by Indian tribes or ANCs, and § 124.111(b) for firms owned by CDCs); and

(4) Which, for purposes of SDB set-asides and SDB evaluation adjustments relating to the Department of Defense, NASA and the Coast Guard only, has the majority of its earnings accruing directly to the socially and economically disadvantaged individuals.

(c) *Disadvantaged status.* In assessing the personal financial condition of an individual claiming economic disadvantage, the net worth must be less than $750,000 after taking into account the applicable exclusions set forth in § 124.104(c)(2).

(d) *Additional eligibility criteria.* Each individual claiming disadvantaged status must be a citizen of the United States and possess good character. See § 124.108(a).

(e) *Potential for success not required.* The potential for success requirement set forth in § 124.107 does not apply.

(f) *Joint ventures.* Joint ventures are permitted for Small Disadvantaged Business (SDB) set-asides and SDB evaluation adjustments, provided that the requirements set forth in this paragraph are met.

(1) The disadvantaged participant to the joint venture must be a certified SDB and appear on the list of qualified SDBs;

(2) For purposes of this paragraph, the term joint venture means two or more concerns forming an association to engage in and carry out a single, specific business venture for joint profit. Two or more concerns that form an ongoing relationship to conduct business would not be considered ''joint venturers'' within the meaning of this paragraph, and would also not be eligible as an entity owned and controlled by one or more socially and economically disadvantaged individuals.

(3) A concern that is owned and controlled by one or more socially and economically disadvantaged individuals entering into a joint venture agreement with one or more other business concerns is considered to be affiliated for size purposes with such other concern(s). The combined annual receipts or employees of the concerns entering into the joint venture must meet the applicable size standard corresponding to the SIC code designated for the contract.

(4) The majority of the venture's earnings must accrue directly to the socially and economically disadvantaged individuals in the SDB concern(s) in the joint venture.

(5) The percentage ownership involvement in a joint venture by disadvantaged individuals must be at least 51 percent.

*Example 1 to paragraph (b)(5).* Small business concern A is 100% owned by disadvantaged individuals. Small business concern B is 100% owned by nondisadvantaged individuals. The percentage involvement by concern A in a joint venture between A and B must be at least 51%.

*Example 2 to paragraph (b)(5).* Small business concern C is 51% owned by disadvantaged individuals. Small business concern D is 100% owned by nondisadvantaged individuals. Any joint venture between C and D would be ineligible because the amount of ownership involvement in such a joint venture by disadvantaged individuals would be less than 51%. Even a 90% involvement by concern C in a joint venture with D would mean an overall ownership involvement by disadvantaged individuals of only 45.9% (51% of 90), and an overall ownership involvement by nondisadvantaged individuals of 54.1% (10 + (49% of 90)).

(g) *Performance of work.* In order to be awarded a Federal contract reserved for SDB participation or through an SDB evaluation adjustment, a certified SDB must agree to perform certain percentages of work with its own employees. These percentages and the requirements relating to them are set forth in § 125.6 of this title.

### § 124.1003 What is a Private Certifier?

A Private Certifier is an organization or business concern approved by SBA to determine whether firms are owned and controlled by one or more individuals claiming disadvantaged status.

### § 124.1004 How does an organization or business concern become a Private Certifier?

(a) SBA may execute no-cost contracts with organizations or business concerns seeking to become Private Certifiers. Any such contract will include provisions for the oversight, monitoring, and evaluation of all certification activities by SBA.

(b) The organization or business concern must demonstrate a knowledge of SBA's regulations regarding ownership and control, as well as business organizations and the legal principles affecting their ownership and control generally, including stock issuances, voting rights, convertability of debt to equity, options, and powers and responsibilities of officers and directors, general and limited partners, and limited liability members.

(c) The organization or concern must also, along with its principals, demonstrate good character. Good character does not exist for these purposes if the organization or concern or any of its principals:

(1) Are debarred or suspended under any Federal procurement or non-procurement debarment and suspension regulations; or

(2) Have been indicted or convicted for any criminal offense or suffered a civil judgment indicating a lack of business integrity.

(d) As a condition of approval, SBA may require that the principals of the concern attend and pass a training session on SBA's rules and requirements.

(e) A Private Certifier must provide access to SBA of its books and records when requested, including records pertaining to its certification activities. SBA may review this information, as well as the decisions of a Private Certifier, in determining whether SBA will renew or extend the term of the Private Certifier, or terminate the Private Certifier for cause.

(f) Private Certifiers may not certify any company with which they have other business dealings.

### § 124.1005 Can a Private Certifier charge a fee?

A Private Certifier may charge a reasonable fee a firm in order to process the firm's determination of ownership and control.

### § 124.1006 Is there a list of Private Certifiers?

SBA maintains a list of approved Private Certifiers on the SBA's Home Page on the Internet. Any interested person may also obtain a copy of the list from the local SBA district office.

### § 124.1007 How long may an organization or concern be a Private Certifier?

(a) SBA's approval document will specify how long the organization or concern may act as a Private Certifier. If the approval is through a no cost contract, the contract will generally be for one year, with possible renewal or option years.

(b) SBA may terminate a contract with an organization or business concern to be a Private Certifier for the convenience of the Government at any time, and may terminate the contract for default where appropriate.

### § 124.1008 How does a firm become certified as an SDB?

Any firm may apply for certification as a federally recognized SDB. SBA's various district offices provide further information and required application forms to any firm interested in SDB certification. In order to become certified as an SDB, a firm must obtain a determination that it is owned and controlled by one or more individuals claiming to be disadvantaged from a Private Certifier (or from SBA if a Private Certifier is not reasonably available), and must submit evidence of that determination to SBA along with certifications or narratives regarding the disadvantaged status of those individuals as set forth in paragraph (e) of this section.

(a) *Determination regarding ownership and control.* A firm must first submit a completed application for a determination of ownership and control to an approved Private Certifier, or to SBA if a Private Certifier is not reasonably available.

(1) The firm must identify one or more individuals claiming disadvantaged status to the Private Certifier, which then will determine whether those individuals own and control the firm.

(2) Where no Private Certifier is reasonably available, the firm may submit its application for a determination of ownership and control to the Assistant Administrator, Division of Program Certification and Eligibility (DPCE), Office of Minority Enterprise Development, Small Business Administration, 409 3rd Street, SW, Washington, DC 20416.

(b) *Required forms.* A firm seeking a determination of its ownership and control must submit the following forms and documents to the Private Certifier (or to SBA where no Private Certifier is reasonably available): SBA Form 1010B, ''Statement of Business Eligibility;'' stock certificates; stock register; articles of incorporation, with amendments; current by-laws; resolutions affecting rights and responsibilities of officers and directors; voting agreements; partnership agreements; limited liability articles of organization; and any other relevant information regarding the concern's ownership and control.

(c) *Application processing.* (1) A Private Certifier must advise each applicant within 15 days after the receipt of an application for an ownership and control determination whether the application is complete and suitable for evaluation and, if not, what additional information or clarification is required. The Private Certifier will process an application for an ownership and control determination within 30 days of receipt of a complete application package.

(2) The burden is on the applicant to demonstrate that those individuals claiming disadvantaged status own and control the concern.

(d) *Ownership and control decision.* The Private Certifier will issue a written decision as to whether the applicant is owned and controlled by the individuals identified as claiming disadvantaged status. If the Private Certifier finds that the applicant is not owned and controlled by the individuals claiming disadvantaged status, the decision will state the specific reasons for the finding, and inform the applicant of its right to appeal the decision to SBA pursuant to § 124.1009.

(e) *SDB certification.* Once a concern receives a decision finding that it is owned and controlled by those individuals claiming disadvantaged status (either through an initial determination or on appeal), the concern must apply to the appropriate office of the relevant procuring agency, or to SBA if the agency has entered into an agreement with SBA to have SBA make disadvantaged status determinations, for inclusion on the SBA-maintained list of qualified SDBs. A firm seeking inclusion on the list of qualified SDBs must represent that it is small for the size standard corresponding to the SIC code for its primary business activity.

(1) *Members of designated groups.* (i) Those individuals claiming disadvantaged status that are members of the same designated groups that are presumed to be socially disadvantaged for purposes of SBA's 8(a) BD program (see § 124.103(b)) are presumed to be socially and economically disadvantaged for purposes of SDB certification. These individuals must represent that they are members of one of the designated groups, that they are identified as a member of one of the designated groups, that they are socially and economically disadvantaged, and that they are citizens of the United States.

(ii) Provided that the ownership and control determination of the Private Certifier is not based to any extent on ownership and/or control by non-group members, the relevant procuring agency or SBA may accept these representations as true and certify the firm as an SDB.

(2) *Individuals not members of designated groups.* (i) Each individual claiming disadvantaged status that is not a member of one of the designated groups must submit to SBA a statement identifying personally how his or her entry into or advancement in the business world has been impaired because of personally specific factors (see § 124.103(c)), and how his or her ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities (see § 124.104).

(ii) If the relevant procuring agency or SBA determines that the individual(s) claiming disadvantage are disadvantaged, it will certify the firm as an SDB. If the relevant procuring agency or SBA determines that one or more of the individuals upon whose status the Private Certifier relied in making its ownership and control decision is not disadvantaged, it will reject the firm's application for SDB certification. The procuring agency or SBA will issue a written decision setting forth its reasons for decline.

(iii) A firm may appeal SBA's decision that one or more of the individuals claiming disadvantaged status is not disadvantaged to SBA's Office of Hearings and Appeals (OHA). OHA will determine whether SBA's decision was arbitrary, capricious, or contrary to law. OHA will issue a determination on appeal within 10 days, if possible.

(f) *Current 8(a) BD program participants.* Any firm that is currently a participant in SBA's 8(a) BD program need not apply to an Private Certifier for an ownership and control determination or to a procuring agency or SBA for a separate certification as an SDB. SBA will automatically include it on the list of qualified SDBs.

### § 124.1009 How does a firm appeal a decision of a Private Certifier?

(a) If a Private Certifier finds that a firm is not owned and controlled by the individual(s) claiming disadvantaged status, the firm may appeal that decision to OHA.

(b) Where an appeal is filed, the Private Certifier must submit the full record upon which its decision was based to OHA.

(c) OHA will perform a new ownership and control determination on the firm, without regard to the decision of the Private Certifier. OHA will issue a determination within 10 days, if possible.

(d) If OHA finds that the firm is owned and controlled by the

individual(s) claiming disadvantaged status, the firm may apply to SBA for inclusion on the list of qualified SDBs. If OHA finds that the firm is not owned and controlled by such individual(s), the administrative judge will state the reasons for that decision, which will be the final decision of the Agency.

**§ 124.1010 Can a firm represent itself to be an SDB if it is not on the list of qualified SDBs?**

A firm cannot represent itself to be an SDB concern in order to receive a preference as an SDB for any Federal procurement program if it is not on the SBA-maintained list of qualified SDBs. A firm may, however, represent itself to be an SDB concern for general statistical purposes without regard to its inclusion on the SBA-maintained list of qualified SDBs.

**§ 124.1011 What is a misrepresentation of disadvantaged status?**

(a) A representation of disadvantaged status by any firm that SBA has found not to be owned and controlled by one or more disadvantaged individuals (either in connection with an SDB application or protest) will be deemed a misrepresentation of disadvantaged status, unless and until the firm reapplies for and obtains SDB certification.

(b) Any person or entity that misrepresents its status as a ‘‘small business concern owned and controlled by socially and economically disadvantaged individuals’’ in order to obtain an 8(d) or SDB contracting opportunity for anyone will be subject to the penalties imposed by section 16(d) of the Small Business Act, 15 U.S.C. 645(d), as well as any other penalty authorized by law.

**§ 124.1012 Can a firm reapply for SDB certification?**

(a) A concern which has been denied SDB certification may reapply for certification 12 months after the date of the final Agency decision to decline the application (either on appeal of an ownership and control determination, or a negative finding of disadvantaged status).

(b) A concern which received a decision that it was not owned and controlled by the individual(s) claiming disadvantaged status from an Private Certifier and does not appeal that decision to SBA may apply for a new ownership and control determination at any time.

**§ 124.1013 Is there a list of certified SDBs?**

(a) If a procuring agency certifies a firm to be an SDB, it must notify SBA of its certification. If SBA certifies a firm to be an SDB or receives notification of a procuring agency certification, SBA will enter the name of the firm into an SBA-maintained central on-line register.

(b) The register of SDBs will contain the names of all firms that are currently certified to be SDBs, including the names of all firms currently participating in SBA’s 8(a) BD program.

(c) On a continuing basis, SBA will delete from the on-line register those firms that have:

(1) Exited SBA’s 8(a) BD program for any reason and have not otherwise received SDB certification;

(2) Been determined not to be disadvantaged in response to an SDB protest brought under § 124.1015; or

(3) Not received a renewed SDB certification after being on the register for three years (*see* § 124.1014(a)).

**§ 124.1014 What is the effect of receiving an SDB certification?**

(a) Once SBA certifies a firm to be an SDB by placing it on the list of qualified SDBs, the firm generally will be considered to be a disadvantaged business for a period of three years from the date of the certification.

(b) Once SBA certifies a firm to be an SDB by placing it on the list of qualified SDBs, the firm may represent itself as an SDB for purposes of Federal SDB set-aside, price evaluation adjustment, evaluation factor or subfactor, monetary subcontracting incentive programs, or section 8(d) subcontract, subject to the following provisions:

(1) In order to participate as an SDB, the firm must be listed on the SBA-maintained SDB register on the date of its representation.

(2) For purposes of a particular procurement, the firm must represent that it is both disadvantaged and small at the time it submits its initial offer including price (*see* part 121 of this title). At the same time, the firm must also represent that no material change has occurred in the disadvantaged ownership and control of the firm since its SDB certification, and specifically that the net worth of the disadvantaged individuals upon whom the SDB certification was based does not exceed $750,000.

(c) A firm’s status as ‘‘disadvantaged’’ or ‘‘small’’ may be protested pursuant to §§ 124.1015 through 124.1019 and §§ 121.1001 through 121.1005, respectively, despite the presence of the firm on the SDB register.

(d) A firm must submit a new application and receive a new certification in order to be recognized as an SDB after three years. If a firm does not submit a new application and receive a new certification, SBA will remove its name from the SDB register three years after the date of the certification.

**§ 124.1015 Who may protest the disadvantaged status of a concern?**

(a)(1) In connection with a specific SDB set-aside or a requirement for which the apparent successful offeror has invoked an SDB evaluation adjustment, the following entities may protest the disadvantaged status of the apparent successful offeror:

(i) Any other concern which submitted an offer for that requirement, unless the contracting officer has found the concern to be non-responsive or outside the competitive range, or SBA has previously found the concern to be ineligible for the SDB set-aside requirement at issue;

(ii) The procuring agency contracting officer; or

(iii) The SBA.

(2) A protest may challenge whether the apparent successful offeror is owned and controlled by one or more disadvantaged individuals, including whether one or more of the individuals claiming disadvantaged status are in fact socially or economically disadvantaged.

(b) In connection with an 8(d) subcontract, or a requirement for which the apparent successful offeror received an evaluation adjustment for proposing one or more SDB subcontractors, the procuring agency contracting officer or SBA may protest the disadvantaged status of a proposed subcontractor. Other interested parties may submit information to the contracting officer or SBA in an effort to persuade the contracting officer or SBA to initiate a protest.

**§ 124.1016 When will SBA not decide an SDB protest?**

(a) SBA will not evaluate the disadvantaged status of any concern other than the apparent successful offeror.

(b) SBA will not normally consider a post award protest. SBA may consider a post award protest in its discretion where it determines that an SDB determination after award is meaningful (e.g., where the contracting officer agrees to terminate the contract if the protest is sustained).

(c) The protest must be timely (*see* § 124.1018(c)).

(d) The protest must have specificity (*see* § 124.1019).

**§ 124.1017 Who decides disadvantaged status protests?**

In response to a protest challenging the disadvantaged status of a concern, the SBA’s Assistant Administrator of DPCE in the Office of 8(a)BD, or

designee, will determine whether the concern is disadvantaged.

**§ 124.1018 What submission procedures apply to disadvantaged status protests?**

(a) *General.* The protest procedures described in this section are separate and distinct from those governing size protests and appeals. All protests relating to whether a concern is a ''small'' business for purposes of any Federal program, including SDB set-asides and SDB evaluation adjustments, must be filed and processed pursuant to part 121 of this title.

(b) *Filing.* (1) All protests challenging the disadvantaged status of a concern with respect to a particular Federal procurement requirement must be submitted in writing to the procuring agency contracting officer, except in cases where the contracting officer or SBA initiates a protest.

(2) Any contracting officer who initiates a protest must submit the protest in writing to SBA in accord with paragraph (c) of this section.

(3) In cases where SBA initiates a protest, the protest must be submitted in writing to the Assistant Administrator of DPCE and notification provided in accord with § 124.1020.

(c) *Timeliness of protest.* (1) *SDB Set-Aside and SDB Evaluation Adjustment protests.* (i) *General.* In order for a protest to be timely, it must be received by the contracting officer prior to the close of business on the fifth day, exclusive of Saturdays, Sundays and legal holidays, after the bid opening date for sealed bids, or after the receipt from the contracting officer of notification of the identity of the prospective awardee in negotiated acquisitions.

(ii) *Oral protests.* An oral protest relating to an SDB set-aside or SDB evaluation adjustment made to the contracting officer within the allotted 5-day period will be considered a timely protest only if the contracting officer receives a confirming letter postmarked, FAXed, or delivered no later than one calendar day after the date of such oral protest.

(iii) *Protests of contracting officers or SBA.* The time limitations in paragraph (c)(1)(i) of this section do not apply to contracting officers or SBA, and they may file protests before or after awards, except to the extent set forth in paragraph (c)(3) of this section.

(iv) *Untimely protests.* A protest received after the time limits set forth in this paragraph (c)(1) will be dismissed by SBA.

(2) *Section 8(d) protests.* In connection with an 8(d) subcontract, the contracting officer or SBA must submit a protest to the Assistant Administrator of DPCE prior to the completion of performance by the intended 8(d) subcontractor.

(3) *Premature protests.* Protests in connection with any procurement which are submitted by any person, including the contracting officer, before bid opening or notification of intended award, whichever applies, will be considered premature, and will be returned to the protestor without action. A contracting officer that receives a premature protest must return it to the protestor without submitting it to the SBA.

(d) *Referral to SBA.* (1) Any contracting officer who receives a protest that is not premature must promptly forward it to the SBA's Assistant Administrator of DPCE, 409 3rd Street, SW, Washington, DC 20416.

(2) A contracting officer's referral of a protest to SBA must contain the following:

(i) The written protest and any accompanying materials;

(ii) The date on which the protest was received by the contracting officer;

(iii) A copy of the protested concern's self-certification as an SDB, and the date of such self-certification; and

(iv) The date of bid opening or the date on which notification of the apparent successful offeror was sent to all unsuccessful offerors, as applicable.

**§ 124.1019 What format or degree of specificity does SBA require to consider an SDB protest?**

(a) An SDB protest need not be in any specific format in order for SBA to consider it.

(b) A protest must be sufficiently specific to provide reasonable notice as to all grounds upon which the protested concern's disadvantaged status is challenged.

(1) A protest merely asserting that the protested concern is not disadvantaged, without setting forth specific facts or allegations is insufficient and will be dismissed.

(2) The contracting officer must forward to SBA any non-premature protest received, notwithstanding whether he or she believes it is sufficiently specific or timely.

(c) A dismissal of a protest by the Assistant Administrator of DPCE for lack of specificity or lack of timeliness may be appealed to SBA's AA/8(a)BD pursuant to § 124.1022.

**§ 124.1020 What will SBA do when it receives an SDB protest?**

(a) Upon receipt of a protest challenging the disadvantaged status of a concern, the Assistant Administrator of DPCE will immediately notify the protestor and the contracting officer of the date the protest was received and whether it will be processed or dismissed for lack of timeliness or specificity.

(b) In cases where the protest is timely and sufficiently specific, the Assistant Administrator of DPCE will also immediately advise the protested concern of the protest and forward a copy of it to the protested concern.

(1) The Assistant Administrator of DPCE is authorized to ask the protested concern to provide any or all of the following information and documentation, completed so as to show the circumstances existing on the date of self-certification: SBA Form 1010A, ''Statement of Personal Eligibility'' for each individual claiming disadvantaged status; SBA Form 1010B, ''Statement of Business Eligibility;'' SBA Form 413, ''Personal Financial Statement,'' for each individual claiming disadvantaged status; information as to whether the protested concern, or any of its owners, officers or directors, have applied for admission to or participated in the SBA's 8(a) BD program and if so, the name of the company which applied or participated and the date of the application or entry into the program; business tax returns for the last two completed fiscal years prior to the date of self-certification; personal tax returns for the last two years prior to the date of self-certification for all individuals claiming disadvantaged status, all officers, all directors and for any individual owning at least 10% of the business entity; annual business financial statements for the last two completed fiscal years prior to the date of self-certification; a current monthly or quarterly business financial statement no older than 90 days; articles of incorporation; corporate by-laws; partnership agreements; limited liability company articles of organization; and any other relevant information as to whether the protested concern is disadvantaged.

(2) SBA's disadvantaged status determination is not limited to consideration only of the issues raised in the protest. All applicable criteria may be considered.

(3) Unless the protest presents specific credible information which calls into question the veracity of application or other documents previously submitted to SBA by a current Participant in SBA's 8(a) BD program, SBA will allow the Participant to submit, in lieu of the information specified in paragraph (b)(1) of this section, a sworn affidavit or declaration that circumstances concerning the

43626 **Federal Register** / Vol. 62, No. 157 / Thursday, August 14, 1997 / Proposed Rules

ownership and control of the business and the disadvantaged status of its principals have not changed since its application or entry into the program or its most recent annual review, and a copy of its most recently completed annual review.

(i) If the ownership or control of the business or the disadvantaged status of any principals have changed, the protested concern must comply with paragraph (b)(1) of this section.

(ii) An affidavit or declaration may be allowed only if SBA admitted the protested concern to the 8(a) BD program, or conducted an annual review of the protested concern, during the 12-month period preceding the date on which SBA receives the protest, and if proceedings to suspend, terminate or early graduate the concern from the 8(a) BD program are not pending.

(c) Within 10 working days of the date that notification of the protest was received from the Assistant Administrator of DPCE, the protested concern must submit to the Assistant Administrator of DPCE, by personal delivery, FAX, or mail, the information and documentation requested pursuant to paragraph (b)(1) of this section or the affidavit permitted by paragraph (b)(2) of this section. Materials submitted must be received by the close of business on the 10th working day.

(1) SBA will consider only materials submitted timely, and the late or non-submission of materials needed to make a disadvantaged status determination may result in sustaining the protest.

(2) The burden is on the protested concern to demonstrate its disadvantaged status, whether or not it is currently shown on the list of qualified SDBs.

(3) The protested concern must timely submit to SBA any information it deems relevant to a determination of its disadvantaged status.

### § 124.1021 How does SBA make disadvantaged status determinations?

(a) *General.* The Assistant Administrator of DPCE will determine a protested concern's disadvantaged status within 15 working days after receipt of a protest. If the procuring agency contracting officer does not receive an SBA determination within 15 working days after the SBA's receipt of the protest, the contracting officer may presume that the challenged offeror is disadvantaged, unless the SBA requests and the contracting officer grants an extension to the 15-day response period.

(b) *Award after protest.* (1) After receiving a protest involving an offeror being considered for award, the contracting officer shall not award the contract until:

(i) The SBA has made an SDB determination, or

(ii) 15 working days have expired since SBA's receipt of a protest and the contracting officer has not agreed to an extension of the 15-day response period.

(2) Notwithstanding paragraph (b)(1) of this section, the contracting officer may award a contract after the receipt of an SDB protest where he or she determines in writing that an award must be made to protect the public interest.

(c) *Withdrawal of protest.* If a protest is withdrawn, SBA will not complete a new disadvantaged status determination, and its previous SDB certification will stand.

(d) *Basis for determination.* (1) Except with respect to a concern which is a current Participant in SBA's 8(a) BD program and is authorized under § 124.1020(b)(3) to submit an affidavit concerning its disadvantaged status, the disadvantaged status determination will be based on the protest record, including reasonable inferences therefrom, as supplied by the protestor, protested concern, SBA or others.

(2) SBA may in its discretion make a part of the protest record information already in its files, and information submitted by the protestor, the protested concern, the contracting officer, or other persons contacted for additional specific information.

(e) *Disadvantaged status.* In evaluating the social and economic disadvantage of individuals claiming disadvantaged status, SBA will consider the same information and factors set forth in §§ 124.103 and 124.104.

(f) *Disadvantaged status determination.* SBA will render a written determination including the basis for its findings and conclusions.

(g) *Notification of determination.* After making its disadvantaged status determination, the SBA will immediately notify the contracting officer, the protestor, and the protested concern of its determination. SBA will promptly provide by certified mail, return receipt requested, a copy of its written determination to the same entities, consistent with law.

(h) *Results of an SBA disadvantaged status determination.* A disadvantaged status determination becomes effective immediately.

(1) If the concern is found not to be disadvantaged, the determination remains in full force and effect unless reversed upon appeal by SBA's AA/8(a)BD pursuant to § 124.1022, or the concern is certified to be an SDB under § 124.1008. The concern is precluded from applying for SDB certification for 12 months from the date of the final agency decision (whether by the Assistant Administrator of DPCE without an appeal, or by the AA/8(a)BD on appeal).

(2) If the concern is found to be disadvantaged, the determination remains in full force and effect unless and until reversed upon appeal by SBA's AA/8(a)BD pursuant to § 124.1022. A final agency decision (whether by the Assistant Administrator of DPCE without an appeal, or by the AA/8(a)BD on appeal) finding the protested concern to be an SDB remains in effect generally for three years from the date of the decision under the same conditions as if the concern had been granted SDB certification under § 124.1008.

### § 124.1022 Appeals of disadvantaged status determinations.

(a) *Who may appeal.* Appeals of protest determinations may be filed with the SBA's AA/8(a)BD by the protested concern, the protestor, or the contracting officer.

(b) *Timeliness of appeal.* An appeal must be in writing and must be received by the AA/8(a)BD no later than 5 working days after the date of receipt of the protest determination. SBA will dismiss any appeal received after the five-day time period.

(c) *Notice of appeal.* Notice of the appeal must be provided by the party bringing an appeal to the procuring agency contracting officer and either the protested concern or original protestor, as appropriate.

(d) *Grounds for appeal.* SBA will re-examine a protest determination only if there was a clear and significant error in the processing of the protest, or if the Assistant Administrator of DPCE failed completely to consider a significant fact contained within the information supplied by the protestor or the protested concern. SBA will not consider protest determination appeals based on additional information or changed circumstances which were not disclosed at the time of the decision of the Assistant Administrator of DPCE, or which are based on disagreement with the findings and conclusions contained in the determination.

(e) *Contents of appeal.* No specific format is required for the appeal. However, the appeal must identify the protest determination which is appealed, and set forth a full and specific statement as to why the determination is erroneous under paragraph (c) of this section.

(f) *Completion of appeal after award.* An appeal may proceed to completion

even though an award of the SDB acquisition or other procurement requirement which prompted the protest has been made, if so desired by the protested concern, or where SBA determines that a decision on appeal is meaningful, such as where the contracting officer agrees:

(1) In the case where an award is made to a concern other than the protested concern, to terminate the contract and award to the protested concern if the appeal finds that the protested concern is disadvantaged; or

(2) In the case where an award is made to the protested concern, to terminate the contract if the appeal finds that the protested concern is not disadvantaged.

(g) The appeal will be decided by the AA/8(a)BD within 5 working days of its receipt, if practicable.

(h) The appeal decision will be based only on the information and documentation in the protest record as supplemented by the appeal. SBA will provide a copy of the decision to the contracting officer, the protestor, and the protested concern, consistent with law.

(i) The decision of the AA/8(a)BD is the final decision of the SBA.

## PART 134—[AMENDED]

5. The authority citation for 13 CFR part 134 would continue to read as follows:

**Authority:** 5 U.S.C. 504; 15 U.S.C. 632, 634(b)(6) and 637(a).

6. Section 134.201 is amended by revising the second and third sentences to read as follows:

### § 134.201 Scope of the rules in this subpart B.

* * * Specific procedural rules pertaining to 8(a) program appeals and to proceedings under the Program Fraud Civil Remedies Act are set forth, respectively in subpart D of this part and part 142 of this chapter. In the case of a conflict between a particular rule in this subpart and a rule of procedure pertaining to OHA appearing in another subpart of this part or another part of this chapter, the latter rule shall govern.

7. Section 134.202 is amended in paragraph (c) by removing the reference to ''subpart D of this part'' and inserting in its place the phrase ''subpart E of this part,'' and in paragraph (d) by removing the phrase ''§ 124.211'' and inserting in its place the phrase ''§ 124.305.''

8. Section 134.206(a) is amended by removing the words ''the service of'' and inserting in their place the words ''the filing of.''

9. Section 134.211 is amended by adding the following new paragraph (d) at the end thereof.

### § 134.211 Motions.

* * * * *

(d) *Stay.* A motion to dismiss stays the time to answer. The Judge will establish the time for serving and filing an answer in the order determining the motion to dismiss.

### § 134.213 [Amended]

10. Section 134.213(a) is amended by removing the second sentence.

### § 134.222 [Amended]

11. Section 134.222 is amended by removing the '';'' and the word ''or'' at the end of paragraph (a)(2), by inserting a ''.'' at the end of paragraph (a)(2), and by removing paragraph (a)(3).

12. Subpart D is redesignated as Subpart E, sections 134.401 through 134.418 are redesignated as sections 134.501 through 134.518, and the following new Subpart D is inserted:

## Subpart D—Rules of Practice for Appeals Under the 8(a) Program

### § 134.401 Scope of the rules in this subpart D.

The rules of practice in this subpart D apply to all appeals to OHA from:

(a) Denials of 8(a) BD program admission based solely on a negative finding(s) of social disadvantage, economic disadvantage, ownership or control pursuant to § 124.206;

(b) Early graduation pursuant to §§ 124.302 and 124.304;

(c) Termination pursuant to §§ 124.303 and 124.304; and

(d) Denials of requests to issue a waiver pursuant to § 124.514.

### § 134.402 Appeal petition.

In addition to the requirements of § 134.203, an appeal petition must state, with specific reference to the determination and the record supporting such determination, the reasons why the determination is alleged to be arbitrary, capricious or contrary to law.

### § 134.403 Service of appeal petition.

(a) Concurrent with its filing with OHA, a concern must also serve SBA's AA/8(a)BD and SBA's Office of General Counsel with a copy of the petition, including attachments.

(b) In the context of appeals relating to denials of program admission pursuant to § 124.206 or denials of requests for waivers pursuant to § 124.514, service on the Office of General Counsel must be made to the SBA's Associate General Counsel for General Law. For appeals relating to early graduation pursuant to §§ 124.302 and 124.304 or termination pursuant to §§ 124.303 and 124.304, service on the Office of General Counsel must be made to the Associate General Counsel for Litigation.

(c) Service should be addressed to the AA/8(a)BD and either Associate General Counsel at the Small Business Administration, 409 3rd Street, SW, Washington, DC 20416.

### § 134.404 Decision by Administrative Law Judge.

Appeal proceedings brought under this subpart will be conducted by an Administrative Law Judge.

### § 134.405 Jurisdiction.

(a) The Administrative Law Judge selected to preside over an appeal shall decline to accept jurisdiction over any matter if:

(1) The appeal does not, on its face, allege facts that, if proven to be true, would warrant reversal or modification of the determination, including appeals of denials of 8(a) BD program admission based in whole or in part on grounds other than a negative finding of social disadvantage, economic disadvantage, ownership or control;

(2) The appeal is untimely filed under § 134.202 or is not otherwise filed in accordance with the requirements of this subpart or the requirements in subparts A and B of this part; or

(3) The matter has been decided or is the subject of an adjudication before a court of competent jurisdiction over such matters.

(b) Once the Administrative Law Judge accepts jurisdiction over an appeal, subsequent initiation of an adjudication of the matter by a court of competent jurisdiction will not preclude the Administrative Law Judge from rendering a final decision on the matter.

### § 134.406 Review of the administrative record.

(a) Except as provided in § 134.407, any proceeding conducted under this subpart shall be decided solely on a review of the written administrative record.

(b) The Administrative Law Judge's review is limited to determining whether the Agency's determination is arbitrary, capricious, or contrary to law. As long as the Agency's determination is reasonable, the Administrative Law Judge must uphold it on appeal.

(c) The administrative record must contain all documents that are relevant to the determination on appeal before the Administrative Law Judge. The administrative record, however, need not contain all documents pertaining to the appellant. For example, the administrative record in a termination proceeding need not include the

Participant's entire business plan file or documents pertaining to specific 8(a) contracts that are unrelated to the termination action.

(d) Where the Agency files its answer to the appeal petition after the date specified in § 134.206, the Administrative Law Judge may decline to consider the answer and base his or her decision solely on a review of the administrative record.

(e) The Administrative Law Judge may remand a case to the AA/8(a)BD (or, in the case of a denial of a request for waiver under § 124.514, to the Administrator) for further consideration if he or she determines that, due to the absence in the written administrative record of the reasons upon which the determination was based, the administrative record is insufficiently complete to decide whether the determination is arbitrary, capricious or contrary to law. Such a remand will be for a period of 10 working days.

**§ 124.407 Evidence beyond the record and discovery.**

(a) The Administrative Law Judge may not admit evidence beyond the written administrative record nor permit any form of discovery unless he or she first determines that the appellant, upon written submission, has made a substantial showing, based on credible evidence and not mere allegation, that the Agency determination in question may have resulted from bad faith or improper behavior.

(1) Prior to any such determination, the Administrative Law Judge must permit the Agency to respond in writing to any allegations of bad faith or improper behavior.

(2) Upon a determination by the Administrative Law Judge that the appellant has made such a substantial showing, the Administrative Law Judge may permit appropriate discovery, and accept relevant evidence beyond the written administrative record, which is specifically limited to the alleged bad faith or improper behavior.

(b) A determination by the Administrative Law Judge that the required showing set forth in paragraph (a) of this section has been made does not shift the burden of proof, which continues to rest with the appellant.

**§ 134.408 Decision on appeal.**

(a) A decision of the Administrative Law Judge under this subpart is the final agency decision, and is binding on the parties.

(b) The Administrative Law Judge shall issue a decision, insofar as practicable, within 90 days after an appeal petition is filed. If the Administrative Law Judge does not issue a decision within 90 days after an appeal petition is filed, he or she must indicate the reason that the 90-day time limit has not been met in the decision, when issued.

(c) The Administrative Law Judge may re-examine an appeal decision if there is a clear showing of an error of fact or law material to the decision.

Dated: July 23, 1997,

**Aida Alvarez,**

*Administrator.*

[FR Doc. 97–21514 Filed 8–13–97; 8:45 am]

BILLING CODE 8025–01–P

*the contracting officer*] percent to the price of all offers, except—

(i) Offers from small disadvantaged business concerns that have not waived the adjustment;

(ii) For DOD, NASA, and Coast Guard acquisitions, otherwise successful offers from historically black colleges or universities or minority institutions;

(iii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is equaled or exceeded (see section 25.402 of the Federal Acquisition Regulation (FAR));

(iv) Otherwise successful offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government; and

(v) For DOD acquisitions, otherwise successful offers of qualifying country end products (see sections 225.000–70 and 252.225–7001 of the Defense FAR Supplement).

(2) The factor shall be applied on a line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation shall be applied before application of the factor. The factor may not be applied if using the adjustment would cause the contract award to be made at a price that exceeds the fair market price by more than the factor in paragraph (b)(1) of this clause.

(c) *Waiver of evaluation adjustment.* A small disadvantaged business concern may elect to waive the adjustment, in which case the factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) of this clause do not apply to offers that waive the adjustment.

____Offeror elects to waive the adjustment.

(d) *Agreements.* (1) A small disadvantaged business concern, that did not waive the adjustment, agrees that in performance of the contract, in the case of a contract for—

(i) Services, except construction, at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern;

(ii) Supplies (other than procurement from a nonmanufacturer of such supplies), at least 50 percent of the cost of manufacturing, excluding the cost of materials, will be performed by the concern;

(iii) General construction, at least 15 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern; or

(iv) Construction by special trade contractors, at least 25 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.

(2) A small disadvantaged business concern submitting an offer in its own name agrees to furnish in performing this contract only end items manufactured or produced by small disadvantaged business concerns in the United States. This paragraph does not apply in connection with construction or service contracts.

(End of clause)

*Alternate I (Oct 1998).* As prescribed in 19.1104, substitute the following paragraph (d)(2) for paragraph (d)(2) of the basic clause:

(2) A small disadvantaged business concern submitting an offer in its own name agrees to furnish in performing this contract only end items manufactured or produced by small business concerns in the United States. This paragraph does not apply in connection with construction or service contracts.

[FR Doc. 98–17197 Filed 6–26–98; 8:45 am]

BILLING CODE 6820–EP–P

---

**DEPARTMENT OF DEFENSE**

**GENERAL SERVICES ADMINISTRATION**

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**

**48 CFR Chapter 1**

## Federal Acquisition Regulation; Small Entity Compliance Guide

**AGENCIES:** Department of Defense (DOD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Small Entity Compliance Guide.

**SUMMARY:** This document is issued under the joint authority of the Secretary of Defense, the Administrator of General Services, and the Administrator for the National Aeronautics and Space Administration as the Federal Acquisition Regulatory Council. This *Small Entity Compliance Guide* has been prepared in accordance with Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 (Public Law 104–121). It consists of a summary of the rule appearing in Federal Acquisition Circular (FAC) 97–06 which amends the Federal Acquisition Regulation (FAR). Further information regarding this rule may be obtained by referring to FAC 97–06 which precedes this document. This document may be obtained from the Internet at http://www.arnet.gov/far.

**FOR FURTHER INFORMATION CONTACT:** The FAR Secretariat, (202) 501–4755.

### Reform of Affirmative Action in Federal Procurement

*FAC 97–06/FAR Case 97–004A.* The interim rule amends FAR Parts 1, 12, 14, 15, 19, 33, and 52 to establish a mechanism to benefit small disadvantaged business concerns at the prime contract level. This mechanism is a price evaluation adjustment of up to ten percent in certain Standard Industrial Classification (SIC) Major Groups as determined by the Department of Commerce. This price evaluation adjustment conforms to the Department of Justice proposal to reform affirmative action in Federal procurement and to regulations issued by the Small Business Administration regarding small disadvantaged business programs. This price evaluation adjustment is mandatory for those competitive procurements to which it applies. It does not, however, apply to several major categories of acquisition, including, for example, acquisitions within the simplified acquisition threshold, acquisitions set aside for small business, and acquisitions conducted pursuant to the 8(a) program.

Dated: June 23, 1998.

**Edward C. Loeb,**

*Director, Federal Acquisition Policy Division.*

[FR Doc. 98–17198 Filed 6–26–98; 8:45 am]

BILLING CODE 6820–EP–P

---

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Parts 121, 124, and 134**

## Small Business Size Regulations; 8(a) Business Development/Small Disadvantaged Business Status Determinations; Rules of Procedure Governing Cases Before the Office of Hearings and Appeals

**AGENCY:** Small Business Administration.

**ACTION:** Final rule.

**SUMMARY:** In response to President Clinton's government-wide regulatory reform initiative, the Small Business Administration (SBA) amends both the eligibility requirements for, and contractual assistance provisions within, the SBA's 8(a) Business Development (8(a) BD) program. This final rule changes the name of the program from the Minority Small Business and Capital Ownership Development program to the 8(a) BD program to better reflect the purpose of the program. This rule streamlines the operation of the 8(a) BD program, eases certain restrictions perceived to be burdensome on Program Participants, clarifies certain eligibility requirements, and deletes obsolete regulations.

**DATES:** *Effective Date:* This rule is effective on July 30, 1998.

*Compliance Dates:* Subpart A applies to all applications for the 8(a) Business Development program pending as of July 30, 1998 and all 8(a) procurement requirements accepted by SBA on or after July 30, 1998. These rules do not apply to any appeals pending before SBA's Office of Hearings and Appeals. The revisions to 13 CFR part 121 apply with respect to all solicitations issued on or after June 30, 1998. Except for 13 CFR 134.408(c), the procedural revisions to 13 CFR part 134 apply to all appeals served or filed on or after June

30, 1998. 13 CFR 134.408(c) applies as of the publication to all pending appeals before SBA's Office of Hearings and Appeals.

**FOR FURTHER INFORMATION CONTACT:** William A. Fisher, Acting Associate Administrator for Minority Enterprise Development, at (202) 205–6412.

**SUPPLEMENTARY INFORMATION:** On March 4, 1995, President Clinton issued a Memorandum to federal agencies, directing them to simplify their regulations. In response to this directive, SBA completed a page-by-page, line-by-line review of all of its then existing regulations to determine which might be revised or eliminated. Revisions to 13 CFR Part 124 awaited a review by the Department of Justice (DOJ) of all Federal procurement affirmative action programs. On May 23, 1996, DOJ published in the **Federal Register** a comprehensive proposal for tailoring affirmative action programs in the Federal procurement arena (*see* 61 FR 26042), and on May 9, 1997 the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration proposed amendments to the Federal Acquisition Regulation (FAR) concerning programs for small disadvantaged business (SDB) concerns. In response to and in conjunction with the DOJ and FAR reform proposals, on August 14, 1997, SBA published in the **Federal Register**, 62 FR 43584, a proposed rule to amend 13 CFR part 124. Subpart A of the proposed part 124 dealt with changes pertaining to the 8(a) Business Development (8(a) BD) program which is authorized by sections 7(j)(10) and 8(a) of the Small Business Act, 15 U.S.C. 636(j)(10), 637(a). Subpart B of proposed part 124 dealt with SBA's role in the certification and protest of small disadvantaged businesses, as contemplated by the DOJ and FAR proposals. During the proposed rule's 60-day comment period, SBA received 95 timely comments, the majority of which favored the proposed changes. This rule finalizes subpart A of 13 CFR part 124 (its regulations relating to the SBA's 8(a) Business Development Program. SBA continues to consider issues relating to subpart B of 13 CFR part 124, and will finalize those regulations at a later time. This rule does not address any comments made regarding subpart B of part 124 or SBA's response thereto.

A substantial number of commenters applauded SBA's effort to remove duplicative provisions, and rewrite those that appeared wordy or unclearly written. For the most part, the comments also supported the substantive changes proposed by SBA. SBA received comments on many aspects of the proposed rule. With the exception of comments which did not set forth any rationale or make suggestions, SBA discusses and responds fully to all the comments below.

In addition to the changes to 13 CFR part 124, the final rule also makes changes to SBA's size regulations (part 121) to permit size protests and appeals of Standard Industrial Classification (SIC) code designations in connection with 8(a) competitive procurements, and to exclude certain joint venture arrangements from SBA's affiliation rules. These changes should increase the potential pool of small businesses available to compete for particular procurements and should encourage contracting officers to consider small business contractors more closely before determining a procurement strategy. The final rule also transfers the procedures relating to certain statutorily authorized appeals in the 8(a) program from part 124 to part 134 of 13 CFR.

This final rule streamlines the operation of the 8(a) BD program, eases certain restrictions perceived to be burdensome on Participants, amends certain eligibility procedures, and deletes obsolete regulations. It reorganizes the regulations into identifiable substantive areas for ease of use and clarity. It also changes all references to SBA's Office of Minority Small Business and Capital Ownership Development to the Office of 8(a) Business Development to emphasize that individuals participating in the program need not be members of minority groups and to stress the importance of assisting participating firms in their overall business development.

SBA has attempted to rewrite the regulations in plain English wherever possible. To this end, SBA has written section headings in question format for ease of use, and has eliminated unnecessary verbiage from the regulations.

This rule amends eligibility procedures for admission to the 8(a) BD program and also amends contractual assistance provisions within the 8(a) BD program. It eliminates the requirement that a Participant must have specified SIC codes approved by SBA in its business plan in order to be eligible for 8(a) contracts, establishes consistent remedial measures for firms that do not meet their non-8(a) business activity targets, eases certain joint venture restrictions, and establishes a mentor/protege program for developing 8(a) Participants. This rule also liberalizes the standard of review for non-group members seeking disadvantaged status from a clear and convincing evidence test to a preponderance of the evidence standard.

## Summary of Comments and SBA's Response

*Part 121:* SBA received a substantial number of comments agreeing with SBA's proposal to exclude certain joint venture arrangements from the normal affiliation rules. This provision will encourage contracting officers to use small business contractors to a greater extent. With the consolidation of procurements becoming an increasing reality, some contracting officers may feel that requirements are too big for a small business to perform successfully. The proposed rule would have permitted two or more small business concerns to joint venture for a particular procurement and be considered a small business concern so long as each concern individually was small. Several commenters recommended that this provision be broadened to exclude affiliation rules where there are "teaming" agreements as well. SBA concurs with this recommendation, and has changed the rule accordingly.

*Part 124, subpart A:* Most of the comments received by SBA focused on subpart A of part 124. The following analysis discusses each of the significant comments received.

The proposed rule contained no provision for reporting changes that would adversely affect a firm's eligibility, either during the application stage or during a Participant's tenure in the program. As a result of a number of comments, several new provisions have been included in the regulation. Section 124.2 requires, in part, that a Participant must maintain its program eligibility throughout its tenure in the program and is obligated to inform SBA of any changes that would adversely affect its program eligibility. To continue a firm's participation in the program, § 124.112 specifically reasserts this obligation and § 124.112(b)(2) requires program Participants as part of their annual review to represent that no adverse change occurred or, in the alternative, to describe any adverse changes that have occurred. During the application stage, the 8(a) applicant is obligated to inform SBA of any adverse changes that may have occurred since the actual application.

Section 124.103(c) of the proposed rule stated that individuals who are not members of designated socially disadvantaged groups must establish individual social disadvantage by a "preponderance of the evidence."

Previously, individuals not members of a designated group needed to prove individual social disadvantage by ''clear and convincing'' evidence. SBA received many comments regarding the proposed change in the evidentiary standard. The majority of commenters did not favor changing the standard. SBA believes that all individuals who can show that they have personally suffered social disadvantage, including women and handicapped individuals, should be admitted to the 8(a) BD program, and that the change in the evidentiary standard is necessary for constitutional reasons. In response to the Supreme Court's decision in *Adarand Constructors, Inc.* v. *Pena,* 115 Sup. Ct. 2097 (1995), which requires programs to provide a race-based remedy to be ''narrowly tailored,'' the Department of Justice recommended the ''preponderance of the evidence'' standard for government-wide disadvantaged business programs. SBA based the ''preponderance of the evidence'' standard on the Department of Justice proposal, and continues to believe that the use of this standard strengthens the defense of the 8(a) BD program. Therefore, SBA retains the ''preponderance of the evidence'' standard in the final rule. While the criteria for a case of individual social disadvantage remains basically the same, the final rule changes the evidentiary standard that must be shown to demonstrate an individual case of social disadvantage. In assessing a claim of individual social disadvantage, SBA will consider all relevant information submitted by an applicant. Evidence which tends to show generalized patterns of discrimination against a non-designated group or statistical data showing that businesses owned by a specific non-designated group are disproportionately underrepresented in a particular industry may be used to augment an individual's case. Statistics and generalized patterns are not sufficient by themselves to establish a case of individual social disadvantage. However, an individual's statement of personal experiences in combination with the generalized evidence may be sufficient to demonstrate social disadvantage.

Proposed § 124.103(d) stated that representatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition SBA to be included as a group presumed to be socially disadvantaged. One commenter asked what the evidentiary standard should be for approval of a designated group. As a result of this comment, § 124.103(d)(1) of the final rule provides that a preliminary showing must be made that substantial evidence exists that a group meets the criteria to be determined presumptively socially disadvantaged. Once this showing is made, SBA will publish a notice for comment and, where deemed appropriate, hold hearings and/or conduct its own research. After completion of the process, SBA will determine whether a preponderance of the evidence shows that the group meets the necessary criteria to be considered presumptively disadvantaged.

Proposed § 124.104, which set forth the factors to be reviewed to determine the economic status of socially disadvantaged individuals, clarified that a contingent liability does not reduce an individual's net worth. A commenter remarked that contingent liabilities reduce capital and credit opportunities and should be considered as reducing net worth. SBA understands this possibility, but does not adopt the comment. There are wide varieties of contingencies and their impacts on credit opportunities. Moreover, individuals should not be permitted to satisfy the net worth criterion by offering guarantees and indemnities with remote possibilities of becoming actual liabilities.

Another commenter felt that § 124.104 needed to set forth in greater detail the criteria SBA uses to determine whether an individual is economically disadvantaged. SBA will study this issue for possible later revision.

Another commenter suggested that under § 124.104, review of the financial status of individuals claiming economic disadvantage should be performed going back two years prior to application. This is already addressed in two subsections of this section and no further provisions are needed. Proposed § 124.104(c) provides that SBA will take into account the individual's personal income for the previous two years. Proposed § 124.104(c)(1) provides that SBA will attribute to an individual claiming disadvantaged status any assets which that individual has transferred to an immediate family member, or to a trust a or beneficiary of which is an immediate family member, for less than fair market value, within two years prior to a concern's application for participation in the 8(a) BD program or within two years of a Participant's annual program review, unless the individual claiming disadvantaged status can demonstrate that the transfer is to or on behalf of an immediate family member for that individual's education, medical expenses, or some other form of essential support.

One commenter expressed concern that transfers of assets to family members within two years prior to application should be objectionable even if the transfer was ''for fair market value.'' The commenter felt that sham transfers would be made to enable individuals to qualify as economically disadvantaged under the thresholds. SBA has not adopted this comment since, if a transferee received fair market value for an asset, the transfer would be a sale, not a sham. As such, the transfer would not distort a calculation of the transferor's net worth.

SBA had specifically requested comments on proposed § 124.105, seeking input on whether and under what circumstances trust arrangements might be considered permissible without violating the statutory requirement that an applicant or Participant must be at least 51 percent unconditionally owned by one or more socially and economically disadvantaged individuals. SBA received several comments on this issue. Upon further reflection, SBA has determined that ownership of an 8(a) applicant or Participant by trusts that are the functional equivalent of individuals, like living trusts, are tantamount to individual ownership and should be permitted in the program. One commenter noted that the IRS treats living trusts as individuals for the purposes of income tax calculation, and urged SBA to do the same. The SBA recognizes that an increasing number of entrepreneurs are using such vehicles for tax and estate planning purposes. Therefore, a provision making certain trusts eligible for 8(a) participation has been included in § 124.105(a). The new provision states that an 8(a) BD concern owned by a trust is considered to be directly owned by a disadvantaged individual if the trust is revocable and the disadvantaged individual is also the grantor, a trustee and the sole current beneficiary of the trust.

Section 124.105(h) of the proposed rule set forth certain ownership restrictions for non-disadvantaged individuals and concerns. Proposed § 124.105(h)(1) stated that a non-disadvantaged individual or a non-Participant concern that owns a 10 percent or greater interest in a Participant as a general partner or stockholder may not own more than a 10 percent interest in another Participant. Proposed § 124.105(h)(2) stated that a non-Participant concern in the same or similar line of business may not own more than 10 percent in a current Participant, and a former

Participant in the same or similar line of business may not own more than 20 percent in a current Participant. Five commenters disagreed with these restrictions. They felt they were unnecessary and would place extra burdens on 8(a) firms that non-8(a) firms do not have. Most felt that if SBA determines that the firm is 51 percent owned, managed and controlled by a disadvantaged individual, no other ownership restrictions should apply. Two commenters pointed out that the regulation as proposed would hinder the firm's access to capital. The commenters pointed out that access to money is necessary to make the transition into the competitive market place. In response to these comments, the SBA has revised its regulations to raise the percentages that non-disadvantaged individuals, non-disadvantaged firms and former 8(a) firms may own in an 8(a) Participant in the transitional stage of program participation. With respect to a firm in the transitional stage of 8(a) program participation, the final rule states that (1) a non-disadvantaged individual or a non-Participant concern with at least a 10 percent ownership interest in another Participant may own up to a 20 percent interest; (2) a non-disadvantaged individual or concern in the same or similar line of business may own up to a 20 percent interest; and (3) a former 8(a) Participant may own up to a 30 percent interest. Percentages of ownership for firms in the developmental stage of program participation are not changed in this rule. SBA's decision to ease the current restrictions on ownership of an 8(a) BD concern should improve access to sources of capital. SBA decided not to raise the percentages higher than 20 and 30 percent at this time due to its continued concern over program abuse through the possible establishment of fronts. SBA will continue to monitor this section of the rule and may adjust the percentages further in the future if it deems it appropriate to do so.

Section 124.105(i) contains standards for obtaining SBA approval of a change in a Participant's ownership. Several commenters expressed concern that a time limit should be imposed on SBA to approve or decline change of ownership requests. The final rule provides that the AA/8(a)BD will issue a decision within 60 days of receipt by the Agency of a request containing all necessary documentation, and that the decision of the AA/8(a)BD will be the final Agency decision. The final rule further provides that the denial of a request for a change of ownership may be grounds for program termination if the change is nonetheless completed.

The preamble to the proposed rule solicited comments on a proposal to use suspension as a tool to allow time for an SBA inquiry into a Participant's change of ownership or control. No negative comments were received relating to this issue. Commenters who did address the matter approved of such use, providing that SBA would restore the length of the suspension to the firm's program term if the change is ultimately approved. As a result of the comments, SBA has revised § 124.105(i). As revised, § 124.105(i) provides that, where a Participant requests a change of ownership or business sture, and the che change has already occurred, SBA will suspend the Participant pending a decision on the request. If the change is approved, the SBA will restore the length of the suspension to the Participant's program term where the change in ownership results from the death or incapacity of a disadvantaged individual, or where the firm requested prior approval and waited 60 days for SBA approval before making the change. SBA will not restore the length of a suspension for any firm that did not request a change in ownership prior to making the change (except, as noted, for a change due to death or incapacity). This provision has also been added to § 124.305 governing suspensions.

The proposed regulation regarding suspension (§ 124.305) has been modified to clarify the jurisdiction of the Office of Hearings and Appeals and the standard of evidence necessary for SBA to sustain its suspension action. The proposed rule stated that SBA has the burden of showing that ''substantial'' evidence exists in support of at least one of the grounds for termination cited in the Letter of Intent to Terminate. SBA has decided not to adopt this new standard in the final rule. The final rule provides that SBA is required to show only that ''adequate'' evidence exists in support of a least one of the grounds for termination. The final rule defines the term ''adequate evidence'' as information sufficient to support the reasonable belief that a particular act or omission has occurred. This definition is adopted from § 9.403 of Title 48 of the Code of Federal Regulations.

Section 124.305 has also been amended to provide that, unless the Administrative Law Judge consolidates the suspension and termination proceedings, the review must be limited to determining whether the government's interest needs protection. SBA's Office of Hearings and Appeals (OHA) may not review the grounds for termination under a suspension action.

A commenter questioned whether proposed § 124.105(i) conflicts with the requirement in § 124.515 that a change in ownership of an 8(a) BD concern requires a waiver from SBA for the Participant to continue performing on an 8(a) contract. Section 124.105(i) allows continued performance of a contract without a waiver if a disadvantaged individual is substituted for another, with SBA approval before the change is implemented. SBA requires waivers under § 124.515 only where ownership of an 8(a) Participant would be changed to an extent that the 8(a) BD concern would be no longer at least 51 percent owned by one or more disadvantaged individuals. If SBA does not approve a change in ownership because it determines that the acquiring individual is not disadvantaged or that the firm as structured after the change is no longer owned and controlled by disadvantaged individuals, then the firm must seek a waiver under § 124.515 in order to continue to perform any of its 8(a) contracts.

Proposed § 124.106 explained the concept of control and the factors which SBA looks at to determine who controls an 8(a) BD concern. Several commenters raised issues of control where a non-disadvantaged individual held a critical license. SBA does not believe that the mere fact that a non-disadvantaged employee who is not also an equity owner of the firm holds a critical license would cause the disadvantaged principal(s) to lose control. In such a case, the disadvantaged principal(s) must demonstrate their management expertise and the right to replace the non-disadvantaged employee at any time with another technical employee. However, SBA agrees that the situation is much more complicated where the non-disadvantaged individual who holds a critical license is also an equity owner of the firm. The final rule permits SBA to find negative control where a non-disadvantaged owner holds a critical license. The burden is on the applicant or Participant to demonstrate that control is in the hands of one or more disadvantaged individuals. The final rule provides that an individual need not have the technical expertise or possess a required license to be found to control an applicant or Participant if he or she can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise. SBA recognizes that failure to possess technical expertise or a required license are factors that may be considered in evaluating the disadvantaged

individual's control of the concern, but that such circumstances are not dispositive.

One commenter suggested that 8(a) concerns be allowed to own subsidiary concerns without being in violation of the requirement under proposed § 124.106(a)(3) that an owner of an 8(a) concern devote full time to management of the concern. SBA's policy is to allow such ownership since working with the subsidiary indirectly advances the interests of the 8(a) concern. Therefore, a provision expressly allowing such ownership has been added to § 124.106(a)(3). However, this exception does not change the general requirement that an owner of an 8(a) concern devote full time to manage the concern.

A few commenters requested that some flexibility be given to the requirement under § 124.106(a)(3) that a disadvantaged individual who manages the Participant concern must devote full-time to the business during normal working hours. As stated in the preamble to the proposed regulations, this requirement is not intended to prevent such individual from spending normal business hours away from the premises in such areas as marketing and outreach that benefit the concern. The rule does not imply that business activities could not be conducted by such individual outside the office. It does, however, prohibit such individual from being physically located at a site on a continuing basis which is separate and distinct from the Participant concern during normal business hours, despite any claim that he or she is managing the concern from that location. SBA believes it is important for the growth and development of the 8(a) BD concern that the disadvantaged individual who manages the concern devote full time to such management. Therefore, SBA makes no change to the final rule.

The proposed regulations continued SBA's current approach and required that disadvantaged individuals have majority control of the board of directors. Some commenters felt that this requirement did not reflect business practice in the corporate world. One commenter felt that, particularly in smaller corporations, the sole shareholder or the majority shareholder virtually always controls the board of directors. This control stems from his or her ability to replace directors at will. The commenter recognized, however, that in rare situations the sole or majority owner might not control the board, such as where directors have fixed terms and cannot be removed before the end of such terms. In addition, SBA notes that cumulative voting practices and super majority requirements (i.e., any provisions requiring more than a simple majority vote) may make it difficult for a shareholder owning only 51% of a corporate concern to control the board of directors of that concern. Likewise, where more than one disadvantaged owner is involved, voting rights and control of the board of directors is harder to pinpoint. As such, SBA accepts this comment to a point. The final rule gives several alternatives for finding control by disadvantaged individuals of the board of directors. Where a single disadvantaged individual owns 100% of an applicant or Participant, SBA deems that individual to control the board of directors, and no further analysis is needed. Where a single disadvantaged individual owning less than 100% seeks to qualify a concern, SBA deems that individual to control the board of directors where he or she owns at least 51% of the concern or, where the concern has super majority voting requirements, that percentage of ownership needed to overcome any such super majority ownership requirements, and he or she is on the board of directors. The applicant will be required to inform SBA of any super majority voting requirements provided for in its articles of incorporation, its by-laws, or by state law. Thus, the disadvantaged owner is able to convene a shareholder's meeting, change corporate by-laws and articles of incorporation, and change directors on the board at will. In such a case, SBA will not look at the makeup of the board of directors for determining control of the firm (although SBA will continue to examine the character of directors). Where more than one disadvantaged owner seeks to qualify an applicant or Participant (i.e., no one individual owns 51%) and each such individual is on the board of directors, SBA deems those individuals to control the board of directors where together they own at least 51% of the concern or, where the concern has super majority voting requirements, that percentage of ownership needed to overcome any such super majority ownership requirements, and they can demonstrate that they have made arrangements to overcome any potential stalemates and that they have the comparable ability of a single majority owner to act quickly. For example, where a concern has three disadvantaged individuals each owning 17%, SBA will deem the individuals to control the board of directors without looking at the board's make-up if two of the three individuals have given their voting rights to the third individual. Where an applicant or Participant cannot demonstrate the ability for a disadvantaged individual to act quickly to replace members of the board of directors, SBA will look at the composition of the board of directors and will apply the current board of directors control requirements to the concern. The concern must meet the current requirement that one or more disadvantaged individuals must control the board of directors through numbers of individuals on the board or, where permitted by state law, through weighted voting.

Numerous commenters expressed concern that, with the lowering of the evidentiary standard for eligibility in cases of individual social disadvantage, there would be a greater need to police fraud in the program application process. Many warned of potential front situations involving the transfer of ownership and/or control of the applicant firm from one family member to another. This final rule addresses these issues at several points. Section 124.106(f) provides that if a non-disadvantaged individual transfers majority ownership or control of the applicant firm to a family member within two years of the date of application while remaining an owner, officer, director or key employee of the company, the non-disadvantaged individual will be presumed to control the company. As noted above, the final rule also requires program applicants (§ 124.204(d)) and Participants (§ 124.112(b)) to inform SBA of any changes that would adversely affect their eligibility. Failure to inform SBA of these adverse changes, or falsely certifying that no adverse changes exist, are grounds for denial of entry into the program or, if concern is a already a program Participant, grounds for termination from the program.

Proposed § 124.107 set forth the requirement that an 8(a) BD applicant must possess potential for success in competing in the private sector. One commenter questioned whether an 8(a) applicant that can meet the requirements under § 124.107(b)(iii) and (iv), needs 8(a) BD assistance. These subsections provide that if an applicant to the 8(a) BD program does not meet the requirement that it has been in business in its primary industry classification for at least two full years prior to applying, this requirement may be waived if certain conditions are met. In 1990, Congress passed legislation that would allow concerns to waive the two year rule after satisfying five conditions. *See* The Small Business Administration Reauthorization and Amendments Act

of 1990, Pub. L. No. 101–574 § 203(b)(1), 104 Stat. 2814, 2818–2819 (1990). SBA adopted the same five conditions for waiver in the 8(a) regulations, but has clarified that applicants will be assessed in the context of their proposed participation in the program.

As indicated above, several commenters expressed a need for greater oversight by SBA during the application process to prevent fraud. SBA notes that provisions included in the proposed regulations at § 124.108(a)(5) provide that SBA may decline an application due to the submission of false information. SBA may also terminate a firm from the program under § 124.303(a)(1)(15) if it discovers later that the Participant falsified information in its application. SBA retains these provisions in the final rule.

Proposed § 124.108(a) provided that SBA could exclude firms from program participation for lack of good character in circumstances where there was credible evidence of criminal activity. Upon further internal deliberation, the final rule significantly expands and clarifies § 124.108(a). SBA will also find a firm ineligible for the 8(a) BD program if it or one of its principals (1) lacks integrity as demonstrated by information related to an indictment, guilty plea, conviction, civil judgment or settlement; (2) is currently incarcerated, or on parole or probation pursuant to a pre-trial diversion or following conviction for a felony or any crime involving business integrity; or (3) has knowingly submitted false information as part of the application for program admission. This clarification and expansion of the definition of good character reinforces the concept of business character as a requirement for program eligibility. It also promotes greater consistency between the eligibility requirements in this section and the grounds for termination in § 124.303(a).

Several commenters believed that payment of obligations to the Federal government should be included as an element of good business character under § 124.108(a). Failure to pay significant obligations owed to the Federal Government is already a basis for program termination under § 124.303(a)(11). Additionally, the existence of defaults resulting in a loss on a federal loan or federally assisted financing has long been a reason for denying financial assistance in other SBA programs. *See* 13 CFR § 120.110. For these reasons, SBA has added a new paragraph (e) to § 124.108, providing that any firm or principal that fails to pay significant financial obligations owed to the Federal Government is not eligible for admission to the 8(a) BD program.

Section 124.108(f) of the proposed rule defined a ‘‘broker’’ as a concern that adds no value to an item being supplied to a procuring activity. One commenter suggested that the definition of broker be expanded to provide that a company would not be considered a broker if it purchased and shipped an item, despite the fact that purchasing and shipping do not technically ‘‘add value’’ to an item. SBA concurs that the proposed language did not adequately capture the meaning of the term ‘‘broker.’’ SBA has, therefore, added language to § 124.108 to refine the definition of a broker. The final rule (§ 124.108(d)) provides that a broker is a concern that adds no material value to an item being supplied to a procuring activity or which does not take ownership or possession of or handle the item being procured with its own equipment or facilities. This definition of ‘‘broker’’ is specific to this rule. Some firms which refer to themselves as brokers in their line of business may not be ineligible for 8(a) participation as ‘‘brokers’’ under this rule.

The final rule also clarifies the provision restricting a tribe’s (or an ANC’s) ability to own more than one firm in the 8(a) program doing the same work. Section 124.109(c)(3)(ii) specifies that a tribe may own a Participant or an applicant that conducts or will conduct secondary business in the 8(a) BD program under the same SIC code that a current Participant owned by the tribe operates in the 8(a) BD program as its primary SIC code. In other words, SBA will not deny an application from a tribally-owned concern where the application plans to do some work (but not its primary work) in the same SIC as another 8(a) firm owned by the tribe. The final rule makes this same clarification for CDCs and Native Hawaiian Organizations as well. *See* §§ 124.110(c) and 124.111(d), respectively.

Proposed § 124.112 listed the criteria Participants must meet in order to remain eligible for the 8(a) BD program. One commenter suggested that if SBA determines that a Participant is no longer eligible for the 8(a) BD program under § 124.112, that the Participant be allowed to respond to the factors supporting ineligibility even before SBA initiates early graduation or termination proceedings under § 124.302 and § 124.303, respectively. If SBA initiates such proceedings, the Participant now has 30 days to respond to SBA under § 124.304(b). SBA believes these procedures give the Participant an adequate opportunity to respond on the issue of continued eligibility.

Another commenter recommended that a Participant which obtains an SBA loan should not thereby be considered to have ‘‘access to credit’’ under § 124.112 such that the socially disadvantaged individuals are no longer considered economically disadvantaged. Since this is already SBA’s policy, no change to the regulation is necessary.

One commenter felt that requiring certification of the transfer of assets to family members under § 124.112(b)(4) would penalize individuals for making gifts to their families and would serve no legitimate purpose. SBA does not intend that each disadvantaged owner report every gift made to his or her family members. SBA is merely trying to determine if an individual has transferred significant assets to his or her family members in order to remain eligible for the program (i.e., in order to remain ‘‘economically disadvantaged’’). Where the individual retains some use or enjoyment of the asset transferred (e.g., real estate is ‘‘transferred’’ to a spouse and the individual continues to have access to it; a piece of art is ‘‘transferred’’ to a family member, but continues to be displayed in the individual’s residence), SBA will attribute the asset back to the disadvantaged individual for purposes of determining his or her continued economic disadvantage status. Where the individual demonstrates that the transfer is an irrevocable transfer as to which the disadvantaged individual retains no use or enjoyment (e.g., the one-time transfer of funds to an adult child to assist the child’s purchase of a residence), the asset will not be attributed back to the disadvantaged individual. In addition, § 124.104(c)(1)(ii) of the final rule specifies that SBA will not attribute to an individual claiming disadvantaged status any assets transferred by that individual to an immediate family member that are consistent with the customary recognition of special occasions, such as birthdays, graduations, anniversaries, and retirements. This does not mean that an individual claiming disadvantaged status may transfer unreasonably large funds or other assets to an immediate family member and claim that it should not be attributed back to him or her because the transfer was, for example, a birthday present. The funds or assets transferred must be reasonable and within customary limits for the occasion.

Another commenter suggested that SBA also attribute back to the disadvantaged transferor all transfers to

non-family members for less than fair market value. SBA does not adopt this suggestion. Such a rule could discourage, for example, an irrevocable charitable transfer of assets. SBA notes that if an asset is transferred subject to a retained interest or a remainder, then the present value of the retained interest will continue to be counted as an asset in determining the donor's net worth. As such, there is no need to impose further restrictions or requirements on these transfers.

A few commenters noted that language in proposed § 124.112, concerning the continuing eligibility of businesses in the 8(a) BD program, inadvertently requires concerns owned by Alaska Native Corporations (ANCs) to comply with §§ 124.101 through 124.108. SBA has revised § 124.112 to correct this error. In addition, this section has been revised to address the continuing eligibility of concerns owned by Indian tribes, Native Hawaiian Organizations and Community Development Corporations (CDCs).

With respect to the new mentor/protege program, one commenter suggested that SBA should measure the performance of the mentor and benefits of the program. SBA has adopted this suggestion by revising § 124.112(b) to require from protege firms a narrative report on the program as part of their annual report. SBA has also revised § 124.520 to provide specific standards for SBA reviews of mentor/protege relationships.

Proposed § 124.112(c) set forth examples under which SBA may determine that a socially disadvantaged individual is no longer economically disadvantaged. One commenter noted that the proposed rule referred to the economic status of the 8(a) BD Participant, rather than the disadvantaged individual. This error has been corrected in the final regulations, and language has been added to clarify that the economic status of the Participant may be considered in analyzing the status of the individual.

Proposed § 124.204 set forth the process of applying to the 8(a) BD program. Proposed § 124.204(b) stated that eligibility for the program is based on the circumstances existing on the date of application, but that SBA may request clarification of information in the application. Several commenters felt that this was too harsh and that concerns which might easily be eligible for the program would not be allowed the chance to make simple changes in order to be eligible. While SBA understands the desire an applicant would have to be able to change its application at any point in time in order to come into compliance with SBA's requirements during the application process, SBA believes that it is more important for reviewers not to have an application that is an ever-changing moving target. In addition, SBA notes that the applicant still has its right to request reconsideration of an initial decline letter and it is free to make any changes in its application at that time.

Proposed § 124.302 of the regulations set forth the criteria for early graduation. A Participant could be graduated early if it either successfully completes the program prior to the end of its program term or if one or more of the disadvantaged owners are no longer economically disadvantaged. Some commenters felt that successful firms would be penalized for their success if they were graduated before the expiration of their 9 year term. Although SBA is authorized to graduate firms that meet their business objectives early, this process is at the discretion of the Administrator. Early graduation is not an automatic process. Only Participants that show sufficient competitive strength and viability to compete successfully outside the program will be subject to early graduation. Once they show such strength and viability, their need for continued participation in the program has ended. Accordingly, SBA has retained these provisions in the final rule.

One commenter suggested that SBA should graduate Participants early when the Participants have demonstrated the ability to compete in the marketplace without assistance under the 8(a) BD program, whether or not they have achieved the targets, goals and objectives set forth in their business plans. SBA believes that this recommendation is contrary to the Small Business Act. The Small Business Act authorizes SBA to graduate Participants early only under limited circumstances, among them where a Participant has successfully completed the program by substantially achieving its targets, goals and objectives. SBA understands the concerns of the commenter, and will take efforts to ensure that the targets, goals and objectives in the business plans are realistic and appropriate.

Section 124.303(a) of the proposed rule provides for early termination from the 8(a) program prior to the expiration of a concern's Program Term for good cause. Section 124.303(a)(13) lists, as an example of good cause, excessive transfers of funds or other business assets hindering development of the concern, and excessive withdrawals from the concern for the personal benefit of any of its owners or any entity affiliated with the owners. Several commenters were concerned with SBA labeling withdrawals ''excessive'' without reviewing the totality of the circumstances. Section 124.112(d)(3) defines as excessive those withdrawals during any one fiscal year of a Participant that exceed $150,000 for firms with sales up to $1,000,000; $200,000 for firms with sales between $1,000,000 and $2,000,000; and $300,000 for firms with sales over $2,000,000. The regulation permits SBA to terminate the concern for good cause for such withdrawals. However, it does not state that SBA will automatically terminate the concern. SBA realizes that some withdrawals above the ''excessive'' guidelines are not excessive in light of the totality of the circumstances. SBA decides terminations on a case-by-case basis and always considers the totality of the circumstances beforehand. Nonetheless, the final rule clarifies that SBA will presume to be excessive all withdrawals exceeding the specified amounts.

The final rule changes § 124.303 to add clarity and to eliminate redundancy. Proposed § 124.303(a)(18) stated that a suspension or revocation of any license required to run the business is good cause for termination. SBA has deleted this paragraph and transferred its substance to § 124.303(a)(12). Section 124.303(a)(12) of the final rule now lists as a ground for termination the failure to keep licenses, charters and permits current.

SBA received several comments concerning the application of benchmarks to the 8(a) BD program. This application is based on the DOJ review of Federal procurement affirmative action programs and the Government-wide SDB program. Because this rule is not finalizing SBA's implementation of the SDB program at this time, it eliminates all references to benchmarks from the 8(a) regulations (i.e, subpart A).

SBA has changed many of the 8(a) contracting sections as a result of the comments. It has amended the general provisions in proposed § 124.501 in several respects. The final rule eliminates proposed paragraph (d) of § 124.501 as unnecessary, and renumbers proposed paragraphs (e) and (f) as paragraphs (d) and (e) respectively. That paragraph had clarified that a concern's success in meeting its support level would not preclude future 8(a) BD contract awards. Although SBA thought this clarification necessary at the time the regulations were originally amended to permit 8(a) concerns to exceed their support levels, SBA believes that that need no longer exists.

One commenter requested clarification concerning the purpose of delegating contract execution authority. The primary purpose behind such delegation is improved efficiency. Procuring activities can award contracts much more quickly and efficiently with such authority and may, therefore, see more opportunities for making use of the 8(a) BD program.

A sentence was added to proposed § 124.501 to provide that, where practicable, simplified acquisition procedures should be used for 8(a) contracts at or below the simplified acquisition threshold. This change conforms SBA's regulations to the Federal Acquisition Regulation (FAR) governing simplified acquisition procedures (48 CFR Part 13) and promotes efficiency and economy. SBA has also amended its rule, including § 124.501(e), to change the term ''procuring agency'' to ''procuring activity,'' thus identifying correctly the Government contracting entity referenced. Since Federal contracting is frequently performed at the sub-Agency level, using the term ''procuring agency'' did not cover every entity that may enter into an 8(a) contract.

As a result of the comments, SBA added a new paragraph (f) to provide that an 8(a) Participant that identifies a requirement should request SBA to contact the procuring activity to request that the requirement be offered to the 8(a) program.

Proposed § 124.502 addressed offers of procurements to the 8(a) BD Program. SBA has amended its proposed § 124.502(a) to provide that a procuring activity may transmit an offering letter to SBA by electronic mail, if available, or by facsimile transmission, mail or commercial delivery service. This conforms the rule to the simplified acquisition procedures contained in the FAR and helps ensure that procuring activities can award small contracts expeditiously. SBA has amended its proposed § 124.502(b) to provide that, in cases where performance of a construction contract is to take place overseas, the contract should be offered to the Office of 8(a) BD located in SBA Headquarters.

One commenter asked why SBA verified the size of an 8(a) concern prior to accepting a sole source contract on its behalf since self-certification is accepted in every other case. SBA performs this function for sole source awards since there is no mechanism in place for protesting a concern's size in reference to a sole source award. Thus, there is no other check to ensure that concerns in line for award of sole source contracts are in fact small for such contracts. Moreover, since sole source awards are significant benefits, enabling firms to receive contracts without having to compete with other firms, it is particularly important that eligibility, including size, is verified.

Proposed § 124.503 set forth the procedures for accepting a requirement for the 8(a) BD Program. This rule amends § 124.503(a) to provide that, where a contract is valued at or below the simplified acquisition threshold, SBA will accept or reject the requirement within two days of receipt of the offer. In cases where the offer is made on behalf of a particular Program Participant, if SBA does not accept or reject the requirement or request an extension within two days, the procuring activity may assume that the offer has been approved and go forward with the award. SBA intends this change to conform to the simplified acquisition procedures contained in Part 13 of the FAR and to promote efficiency. This final rule also makes a significant change to promote efficiency where SBA has delegated its 8(a) contract execution functions to an agency and a procuring activity within that agency has a procurement requirement whose value is less than the Simplified Acquisition Procedures (SAP) threshold amount. In such case, this rule authorizes SBA, in its discretion, to permit the procuring activity to award an 8(a) contract under the SAP threshold amount without sending an offering letter to SBA and without receiving SBA's official acceptance of the requirement for the 8(a) program.

A number of comments requested clarification of the treatment of multiple award and federal supply schedule contracts. SBA has added a paragraph to § 124.503 setting forth the standards to be applied to these types of contracts. Since, unlike Basic Ordering Agreements (BOA's), multiple award schedule contracts and federal supply schedule contracts are contracts, a new task order under such a contract will not require a new offer and acceptance. Likewise, if a concern qualifies for award of a multiple award schedule or federal supply schedule contract in terms of eligibility and size, it will not be denied future task orders on that contract if it subsequently grows large. Finally, if a multiple award schedule or federal supply schedule contract was competed when awarded, subsequent task orders under such contract will not require further competition under § 124.506.

As a result of the comments, SBA has added a new paragraph (i) to clarify that where SBA has delegated its 8(a) contract execution authority to a procuring activity, the procuring activity must still offer and SBA must accept all requirements intended to be awarded as 8(a) contracts. The only exception to the normal offer and acceptance process is that identified above where a procurement requirement is less than the SAP threshold amount and SBA has specifically authorized (through the Memorandum of Understanding delegating its contract execution functions or otherwise) a procuring activity to dispense with offer and acceptance.

Proposed § 124.504 set forth the circumstances limiting SBA's ability to accept a procurement for award as an 8(a) contract. In response to comments identified below, this final rule specifically authorizes the use of SAP in connection with 8(a) contract awards, and requires SBA to review offering letters for requirements under SAP in an expedited two-day time frame. In order to meet this quick acceptance turn around, SBA has decided not to consider adverse impact in connection with a requirement offered under SAP. It is not feasible for SBA to obtain current financial statements from affected small businesses and to make adverse impact determinations within two days. However, because the SAP threshold is $100,000, SBA believes that adverse impact should not be a real factor with these smaller contracts, and that this change should not have a harmful effect.

Proposed § 124.504(e) (§ 124.504(d) in the final rule) concerned the release of a procurement for non-8(a) competition. One commenter pointed out that the language in proposed § 124.504(e)(3) was misleading. That language provided that if SBA declines to accept an offer and releases the requirement, it will recommend to the procuring agency that the requirement be procured as a small business or SDB set-aside. The commenter correctly pointed out that SDB set-asides are not authorized at this time. SBA has, therefore, amended this paragraph to provide that if SBA declines to accept an offer for the 8(a) program, it will recommend that the requirement be procured as a small business or, if authorized, SDB set-aside.

One commenter suggested that industries for which SBA has elected not to accept requirements should be listed on SBA's website. SBA is considering adopting this idea; however, it need not revise its regulations to adopt this policy. Another commenter recommended that firms that have graduated be permitted to compete for follow-on contracts where the firm had been awarded the original

contract. Applicable law precludes SBA from making this change.

A number of commenters requested additional procedures to protect the rights of small firms which could be adversely impacted by a decision to accept an award for the 8(a) BD program. SBA carefully considered these comments and weighed them against the need of procuring activities for prompt award of contracts. SBA determined that the current procedures were sufficient to ensure that small businesses performing contracts are not unduly harmed by the acceptance of an award for the 8(a) program.

Proposed § 124.506 provided that 8(a) procurements above certain dollar thresholds must be competed among eligible Participants. A number of commenters requested that the competitive thresholds be lowered. These thresholds were set by statute and, therefore, may not be lowered by SBA.

One commenter requested clarification concerning how the thresholds are applied to indefinite delivery/indefinite quantity (ID/IQ) contracts. The commenter asked whether the total value of such contracts would be the value of what the procuring activity actually expects to order or the maximum ordering amount it may order. SBA considers the maximum ordering amount to be the total value of the contract for purposes of determining whether a particular ID/IQ contract must be competed. As a result of this comment, § 124.506(a)(2) has been amended to provide that for indefinite delivery or indefinite quantity type contracts, the thresholds are applied to the maximum order amount authorized.

Language was mistakenly included in proposed § 124.507(c) which referred to limiting competitions to the transitional stage of program participation. SBA has eliminated this language in the final rule, since it does not restrict competitions to the transitional stage.

One commenter objected to the language in proposed § 124.506(c)(3) requiring SBA to deny a request to compete a requirement under the competitive thresholds where the request is made following the inability of the procuring activity and the potential sole source awardee to reach an agreement on price or some other material term or condition. The commenter pointed out that this provision unnecessarily restricts the flexibility of the Federal Government. SBA agrees with this comment and has amended this paragraph to provide only that SBA may deny a request under such circumstances.

A number of commenters objected to SBA's proposal to eliminate its authority to award an 8(a) contract above the competitive threshold on a sole-source basis where there is only one eligible firm capable of performing the requirement. As a result of the comments, SBA has added this provision back to the regulations at § 124.506(d).

Proposed § 124.507 set forth the procedures applicable to competitive 8(a) contracts. One commenter objected to the elimination of the requirement that a firm must obtain SBA approval to do business under a particular SIC code. SBA has considered this comment, but has rejected it. After several years of experience, SBA believes that the burden on an 8(a) Participant to obtain SBA approval for every SIC code under which the Participant might want to perform contracts hinders more than helps the Participant's business development. Moreover, the procuring activity's determination that a particular 8(a) Participant is responsible to perform a given contract should suffice to prevent firms from brokering contracts or from competing for contracts for which they are not qualified.

One commenter correctly pointed out that Certificate of Competency (COC) procedures should not be inapplicable in cases where SBA has delegated contract execution authority to the procuring activity as provided in proposed § 124.507(b)(7). SBA agrees. SBA did not intend to make the COC procedures inapplicable where contract execution authority has been delegated. In addition, the final rule transfers the substance of proposed § 124.507(b)(6) (dealing with the execution of competitive 8(a) contracts) to a new § 124.508. The correction regarding the availability of COCs where SBA has delegated its 8(a) contract execution functions to a procuring activity and the transfer of proposed § 124.507(b)(6) to a new section make proposed § 124.507(b)(7) unnecessary. Thus, SBA has eliminated that provision in this final rule.

A number of commenters objected to the special geographic requirements for construction contracts in proposed § 124.507(c)(2). These requirements are mandated by the Small Business Act and, therefore, may not be eliminated. One commenter correctly pointed out that the reference to principal places of business in proposed § 124.507(c)(2) is incorrect and should be bona fide places of business. SBA agrees with this comment and has made this correction.

This final rule adds a new § 124.508 governing execution of 8(a) contracts. This new section clarifies that SBA, the procuring activity and the 8(a) firm may sign a tripartite agreement or, where SBA has delegated contract execution authority, the procuring activity and the Participant alone may sign an 8(a) contract. This section also provides that, where SBA receives a contract for signature valued at or below the simplified acquisition threshold, it will sign the contract and return it to the procuring activity within three (3) days of receipt. This addition was made to conform to the simplified acquisition procedures in the FAR and to promote expeditious award of smaller contracts.

Pursuant to proposed § 124.508 (§ 124.509 in the final rule), a Participant could not receive sole source 8(a) contracts where it was not in compliance with its non-8(a) business activity targets. A commenter recommended that SBA allow more flexibility to permit sole source awards where the firm can demonstrate good faith efforts to obtain non-8(a) revenue. SBA agrees that a waiver to the requirement prohibiting further sole source contracts when a Participant does not meet its non-8(a) business activity target may be appropriate in limited, extraordinary circumstances. The final rule permits the AA/8(a)BD, or his or her designee, to allow one or more sole source contracts to a Participant that is not in compliance with its non-8(a) business activity target where a denial of a sole source contract would cause severe economic hardship to the Participant so that the Participant's survival may be jeopardized, or where extenuating circumstances beyond the Participant's control caused the Participant not to meet its non-8(a) business activity target. For example, a Participant might demonstrate that it was the apparent successful offeror for a non-8(a) contract that was cancelled by the procuring activity, and that a loss of that projected revenue caused the Participant not to meet its non-8(a) business activity target. However, loss of additional profit or other normal business consequences will not be grounds for granting a waiver. SBA believes that a more extensive waiver is not needed because the rule permits sufficient flexibility by allowing a firm to come into compliance during authorized quarterly reviews. The rule authorizes no appeal right for decisions not to grant a waiver, and such a waiver is totally at SBA's discretion. The final rule also adds a provision authorizing the SBA Administrator to waive the requirement that a Participant cannot receive an 8(a) sole source award when it is not in

compliance with its non-8(a) business activity targets where the head of the procuring activity requests that award be made for the best interests of the Government.

Proposed § 124.509 (§ 124.510 in the final rule) set forth the requirement that certain percentages of work be performed by the 8(a) BD concern on an 8(a) BD contract. One commenter pointed out that compliance with the percentage of work requirements is an element of responsibility and, therefore, should be determined as of the date of award. SBA agrees with this comment and has amended this section to provide that SBA will determine whether the firm will be capable of complying with the percentage of work requirements by the time of award of the contract for both sealed bid and negotiated procurements.

Another commenter correctly pointed out that the example in the regulation conflicts with the requirements set forth in 13 CFR § 125.6, which refer to the work required as a percentage of total labor rather than as a percentage of the total value of the contract. SBA agrees with this comment and has changed example 1 as well as some of the language in § 124.510(c) of the final rule to conform to the language in § 125.6. (The legislation on which the performance of work requirements are based states the percentage of work required as a percentage of total labor and not total value.) Example 2 was not changed because the example does not conflict with either § 125.6 or the legislation. Example 2 merely clarifies application of the rule in the early stages of performance of an ID/IQ contract.

One commenter pointed out that application of the subcontracting limitations at all times during performance of an ID/IQ contract would keep many contractors from proposing on task orders. SBA agrees that the regulation is not flexible enough in this regard and has amended the language in paragraph (c) to provide that SBA may approve in writing an 8(a) BD firm's request to subcontract out more than the required percentage where it receives assurances from both the contractor and the procuring activity that the percentages will be met by the time performance is completed. SBA believes that this addition will provide firms with the necessary flexibility without undermining the purposes of the rule. Where a firm has received permission to subcontract out more than the required percentage and does not comply with the percentage requirements by the end of the contract, SBA will not grant future waivers.

There were a number of comments on proposed § 124.512 governing joint ventures. Several commenters objected to the requirement in proposed § 124.512(e) that a contract be awarded in the name of the 8(a) BD participant or participants, even though the contract is to be performed by the joint venture. The commenters argued that the contract should be in the name of the joint venture to assure that all parties to the joint venture are obligated to perform. SBA agrees with this view and has amended this section to provide that the procuring activity will execute an 8(a) contract in the name of the joint venture entity. With respect to the statutory requirement that all 8(a) contracts be performed by participant concerns, SBA interprets the AA/8(a)BD's acceptance of Participants into the program to extend to approved joint ventures in which the Participant is the lead joint venture partner. In other words, for purposes of contracting, admission into the program includes both a concern in its own capacity and any approved joint venture in which the concern is the lead entity. For contracting purposes, SBA will consider the joint venture to be the Participant where the joint venture meets all applicable requirements and is approved by SBA.

Paragraph (f) requiring all parties to the joint venture to sign such documents as are necessary to obligate themselves to ensure performance of the contract was deleted as unnecessary where the contract is entered into in the joint venture's name. However, a provision was added requiring the joint venture agreement to obligate each party to the venture to complete performance of the contract even if one of the members withdraws. (*See* § 124.513(c)(7))

A number of commenters felt that the provision requiring the 8(a) members of the joint venture to perform the applicable percentages of work under the performance of work requirements (§ 124.510) would undermine the benefits derived from the joint venture arrangement. SBA considered this comment and agrees that many of the advantages of performing a particular contract as a joint venture would be lost if the 8(a) BD concern is required to perform as much of the contract as it would have had to perform had it been awarded the contract directly. Therefore SBA has amended paragraph (b)(1)(iv) of this section to provide that the joint venture must perform the applicable percentage of work. Paragraph (g) was also eliminated in light of this change.

SBA made a number of other technical changes to the joint venture provisions (§ 124.513 in the final rule) as a result of the comments. The term ''lead entity'' was changed to ''managing venturer'' to comport with current terminology. One commenter requested clarification of the term ''very little'' in proposed § 124.512(a) which states that SBA will not approve a joint venture arrangement where the 8(a) concern brings ''very little'' to the relationship. That provision has been clarified to provide that SBA will not approve the joint venture if the 8(a) concern brings very little in terms of resources and expertise to the relationship. A more precise definition would not leave SBA sufficient discretion to judge each case on its own merits.

Proposed § 124.514 (§ 124.515 in the final rule) set forth the provisions requiring an 8(a) contract to be performed by the Participant that was initially awarded it, and requiring the contract to be terminated for convenience if there is a change in the ownership or control of the concern. SBA received several comments regarding the authority for a waiver where one Participant transfers ownership and control to another eligible Participant. The commenters believed that a bulk transfer of all or substantially all of one 8(a) concern's assets to another 8(a) concern should satisfy the requirement this requirement. SBA carefully considered the legal requirements of the Small Business Act as it pertains to this provision. Upon further deliberation, SBA agrees that a transfer of all a Participant's operating assets to another Participant should be treated the same as a transfer of stock or another ownership interest, provided the Participant that transfers its assets to another eligible Participant withdraws from the 8(a) BD program, and it ceases its business operations, or presents a plan to SBA for its orderly dissolution. The requirement that all ''operating assets'' be transferred excludes accounts receivable and cash. SBA will require dissolution or a plan to dissolve as a condition for the waiver because SBA does not believe that it is appropriate for the transferor to remain a separate legal entity that could restart operations and seek to obtain 8(a) contracts after the transfer of all of its operating assets.

SBA received three comments on proposed § 124.516 (§ 124.517 in the final rule) concerning protests of 8(a) contract awards. All three commenters recommended extending this provision to permit protests of the size of a concern in line for a sole source award. SBA rejected this comment since it is difficult for other firms to find out about sole source awards and only a few, if

any, firms would have standing to protest the award of a sole-source contract under SBA's size regulations. SBA has historically verified the size of each potential awardee of a sole-source contract since the benefits of receiving a contract without having to compete are so significant. Moreover, if any concern or individual believes a firm in line for a sole-source award does not meet the size standard for the SIC code for the contract, such firm may contact SBA and explain why it believes that the firm is not small. SBA will consider such information in verifying the size of that concern for the award provided the information is specific and credible. While SBA makes no changes to allow size protests and SIC code appeals in connection with sole source 8(a) contracts at this time, SBA will continue to examine this issue and may make additional changes at a later date.

Proposed § 124.518 (§ 124.519 in the final rule), authorized Participants (other than firms owned by an Indian tribe or an ANC) to receive any combination of 8(a) sole source and 8(a) competitive contracts up to a specified dollar amount (excluding contracts of $100,000 or less). Once that dollar amount of 8(a) contracts is reached, the firm will not be eligible to receive any more 8(a) sole source contracts, but will remain eligible for competitive 8(a) awards. The proposed rule set the dollar limit above which a firm could not receive sole source 8(a) awards at five times the size standard for the firm's primary SIC code or $100,000,000, whichever was less. SBA received comments on both sides of this issue. Several thought the cap was set at too high a level, while others thought that it should be set even higher. No commenters presented persuasive reasons for setting the cap at a level other than that set forth in the proposed rule. As such, the final rule continues the five times the size standard or $100,000,000 language. If the size standard for a particular SIC code increases over time, the corresponding cap amount will also increase. One comment suggested that after a firm reaches the specified dollar threshold amount, SBA should require it to use other 8(a) concerns that have not received contracts as subcontractors in order to receive additional sole source awards. SBA considered this comment, but decided not to adopt it. It is important to remember that SBA will not restrict all 8(a) contract support after a Participant receives total 8(a) contract support equaling at least five times the size standard for its primary SIC code or $100,000,000. A firm will be unable to receive only sole source 8(a) contracts after reaching the cap amount. The alternative suggested by the commenter seeks to have a Participant that has exceeded the cap subcontract 8(a) sole source contracts to other Participants that have not received an 8(a) contract. SBA believes that enforcing the cap should enable more of those same firms (i.e., the Participants that have not received an 8(a) contract) to receive 8(a) contracts directly. While both would aid in distributing the performance of 8(a) contracts to more Participants, from the perspective of a Participant that has not received an 8(a) contract, receiving a sole source contract directly is preferable to getting a piece of an 8(a) contract as another Participant's subcontractor. In addition, SBA believes that the alternative cap amounts are sufficiently high so that a Participant that reaches the cap amount should be able to compete effectively for 8(a) competitive contracts. That, in turn, should assist such firms in reaching viability after leaving the 8(a) program.

Upon further reflection, SBA also amended the date at which a Participant's eligibility for a sole source contract is measured. The proposed rule stated that such eligibility would be measured as of the date of contract award, without taking into account whether the value of that award would cause the limit to be exceeded. SBA believes that such a requirement could cause an undue hardship for both 8(a) Participants and procuring activities. As proposed, SBA could accept a sole source requirement on behalf of a particular Participant (because the Participant had not yet received contracts in excess of the cap amount), the Participant and the procuring activity could enter into protracted negotiations, and SBA could be required later to deny the award of the contract because eligibility would be determined as of the date of award and the Participant may have received one or more competitive 8(a) contracts between the acceptance and award dates. Thus, this final rule changes the date that a firm's eligibility for a sole source award, in terms of whether the firm has exceeded the dollar limit for 8(a) contracts, from the date of award to the date that the requirement is accepted by SBA. This does not in any way imply that all eligibility for an 8(a) sole source contract will now be measured at the acceptance date. In other words, this final rule will continue to require that a firm be a current Participant in the 8(a) program on the date of contract award in order to receive an 8(a) sole source award. See § 124.508(c).

Finally, similar to the provision identified above when a Participant fails to achieve its non-8(a) business activity targets, the final rule adds a provision authorizing the SBA Administrator to waive the requirement that a Participant cannot receive an 8(a) sole source award in excess of the cap amount where the head of the procuring activity requests that award be made for the best interests of the Government.

Proposed § 124.519 (§ 124.520 in the final rule) set forth the standards for the mentor/protege program. Most of the commenters were in favor of this new program, although several warned that the potential existed for abuse. Numerous commenters requested greater detail in this section. Some of the commenters felt that a section explaining the purpose of the program would be helpful. In response to those comments, SBA has amended paragraph (a) of this section to clarify that the program is designed to encourage approved mentors to provide various forms of assistance to eligible Participants, with examples of the assistance contemplated.

SBA received varying views regarding the type of business that should be able to act as a mentor. The comments ranged from recommendations that any business, large or small, disadvantaged-owned or not, should be able to be a mentor, to only small businesses, to support for the proposed rule which limited mentors to former 8(a) Participants and current 8(a) Participants in the transitional stage of the program. Upon further deliberation, SBA believes that the focus should not be on who the mentor is, but what the concern acting as a mentor will provide to the protege. For that reason, the final rule permits any business, large or small, to be a mentor if it can demonstrate the commitment and ability to assist small, developing 8(a) Participants. Under the final rule, a mentor generally will have no more than one protege at a time. The AA/8(a)BD may, however, authorize a concern to mentor more than one protege at a time where the concern can demonstrate that the additional mentor/protege relationship will not adversely affect the development of either protege firm. SBA does not believe that it would be appropriate to authorize a concern to be a mentor in a second mentor/protege relationship if that relationship would harm or compete with the protege of the first mentor/protege relationship approved by SBA.

Some of the commenters felt that the amount of a contract the protege could perform should be limited. After considering this comment, SBA has

decided not to adopt it at this time. SBA does not want to impose additional requirements on mentor/protege joint ventures that do not apply to joint ventures between 8(a) BD concerns and other entities.

Many of the commenters requested guidelines so that the mentor does not take control of the contracts or the company. SBA will monitor the mentor/protege arrangement on a regular basis to help ensure that this does not occur.

Some commenters requested that the program be expanded to enable companies which have never been in the 8(a) BD program to become proteges. SBA has not adopted this recommendation. It must be remembered that SBA's mentor/protege program is designed to be an additional developmental tool for Participants in the 8(a) BD program. Only firms that SBA has certified to participate in the 8(a) BD program are statutorily eligible to receive any of the benefits of the program.

One commenter suggested that a provision be added clarifying that a mentor and protege will not be determined to be affiliated based on the mentor/protege agreement or assistance provided pursuant to the agreement. SBA agrees with this comment and has amended paragraph (d) of this section to add a new subparagraph (4) to this effect.

Several commenters suggested standards for SBA monitoring of the relationship and the adoption of objective standards by which to measure the success of a mentor/protege relationship. In response to these comments, SBA has added a new paragraph (f) to impose specific reporting requirements on the protege and to provide standards under which SBA will review the mentor/protege relationship. The final rule also amends paragraph (e) of this section (§ 124.519(d) in the proposed rule) to provide that SBA will review the mentor/protege relationship annually to determine whether to approve its continuation for another year. As set forth in the rule, the mentor/protege program is designed to assist the development of Participants in the developmental stage of the program, Participants that have not received an 8(a) contract, and Participants having a size that is less than half the size standard corresponding to its primary SIC code. Where a Participant leaves the developmental stage of the program, receives several significant 8(a) contracts, or has a size that exceeds half the size standard corresponding to its primary SIC code, the firm may no longer need the assistance provided by the mentor/protege relationship, and the AA/8(a)BD may decide not to authorize its continuation.

SBA received no comments to proposed §§ 124.601 through 124.603 and §§ 124.701 through 124.704. As such, this rule makes no changes to those sections from the proposed rule.

*Part 124, subpart B:* Subpart B of the proposed rule defined a Small Disadvantaged Business (SDB) and set forth the procedures by which a firm can be recognized as an SDB. As noted above, SBA will discuss the comments to subpart B and finalize its provisions in a later rulemaking action.

*Part 134:* The proposed new Subpart D of Part 134 contained the rules of procedure applying to appeals of denials of 8(a) BD program admission based solely on the negative finding(s) of social disadvantage, economic disadvantage, ownership or control pursuant to § 124.206; early graduation pursuant to § 124.302 and 124.304; termination pursuant to § 124.303 and 124.304; and denials of requests to issue a waiver of the performance of work/termination for convenience requirements pursuant to § 124.513.

The proposed rules transferred the rules of procedure governing the 8(a) program from § 124.210 to Part 134 so that all procedures related to appeals before OHA are contained in one part of SBA's regulations.

SBA received one comment regarding the proposed revisions to Part 134. The majority of these comments dealt with streamlining the regulations governing the appeals of denials of 8(a) BD program admission and protecting appellant rights.

The proposed rule did not change § 134.202 and § 134.203 of the former regulations. The commenter requested that SBA amend § 134.202 to require that the appeal petition include the SBA determination. SBA agrees that the appeal petition should include the SBA determination and modified § 134.203, which specifies the requirements of a petition, to include the submission of the SBA determination. This provision will allow the Administrative Law Judge to determine, without further delay, whether the appeal was timely filed.

This rule does not finalize the proposed amendment to § 134.206(a) that would have changed the date on which the SBA's 45-day period to file an answer would run. The proposed rule would have changed that date from the date that an appeal is served on SBA to the date that an appeal is filed at OHA. Upon further consideration, SBA does not believe that this change is appropriate. The proposed rule was concerned about SBA not having the allotted time to answer an appeal where the appeal was incorrectly served on SBA's Office of General Counsel. SBA has addressed this concern by clarifying the service requirements for 8(a)-related appeals set forth in § 134.403.

Proposed § 134.401, which outlined the scope of the rules in Subpart D, had no provision for appeals to OHA from suspensions pursuant to § 124.305. A commenter stated that the inclusion of appeals related to suspension was necessary pursuant to § 124.305(b) which provides that notice of suspension includes a statement that a request for hearing on the suspension will be considered by an Administrative Law Judge at OHA and granted or denied as a matter of discretion. SBA agreed with the comment and added § 134.401(e) in response to it.

A commenter noted that proposed § 134.405, which deals with jurisdiction, failed to include a provision for the jurisdiction of suspension cases pursuant to § 124.305. SBA added subsection (c) to proposed § 134.405 in response to this comment. Subsection (c) provides that the jurisdiction of OHA in suspension cases is limited to determining whether the protection of the Government's interest requires suspension pending resolution of the termination action, unless the Administrative Law Judge has consolidated the suspension appeal with the corresponding termination appeal.

Proposed § 134.406 dealt with review of the administrative record and replaced § 124.210. A commenter requested that an appellant be permitted to object to the absence of a document in the administrative record. Since § 134.406(c) provides that the administrative record need not contain all documents pertaining to the appellant, SBA decided that § 134.406(c) should be amended in response to this request. Revised § 134.406(c) allows an appellant to object to the absence of a document he or she believes was erroneously omitted from the administrative record, thereby helping to ensure that the Administrative Law Judge has all of the information needed to decide the case.

Proposed § 134.406(e) limited remand to situations where ''due to the absence in the written administrative record of the reasons upon which the determination was based, the administrative record is insufficiently complete to decide'' the case. A commenter requested that remand be extended to include cases in which SBA made an erroneous analysis of facts. SBA determined that SBA error is properly handled on appeal under

proposed § 134.408 and, therefore, did not adopt this comment.

Proposed § 134.408, which dealt with decisions on appeal, replaced § 124.210. A commenter requested that the term ''re-examine'' be changed to ''reconsider,'' and that a time limit be placed on when the decision is final. SBA determined that for clarity purposes the term ''re-examine'' should be changed to ''reconsider.'' SBA further determined that, in response to the commenter's request for a reasonable time period after which the decision is final, a period of 20 days should be inserted into the proposed regulation after which time the decision is final.

**Compliance With Executive Orders 12612, 12778, and 12866, the Regulatory Flexibility Act (5 U.S.C. 601, et seq.), and the Paperwork Reduction Act (44 U.S.C. Ch. 35)**

SBA certifies that this rule is not a major rule within the meaning of Executive Order 12866 and will not have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*

The rule addresses changes in the SBA's 8(a) BD program. The overall impact of the changes to the 8(a) BD program will be beneficial to small businesses. The rule also makes several changes to SBA's size regulations that will have an impact beyond that program, and should result in more procurement opportunities for small business generally. No definitive data exist that would allow SBA to conclude that the proposed rule will have a substantial impact on a significant number of small businesses.

Specifically, the rule improves and strengthens the 8(a) BD program. It responds to the challenges posed by the findings in the *Adarand Constructors, Inc.* v. *Pena*, 115 Sup. Ct. 2097 (1995) (Adarand), and are designed to improve the success rates for firms after their terms of participation in the 8(a) BD program end. The rule changes fall within three major categories. They are: (1) measures designed to more equitably distribute 8(a) contracts; (2) small business affiliation rule revisions; and (3) a new mentor/protege program.

The changes that exclude certain joint venture and teaming arrangements from SBA's affiliation rules and the 8(a) mentor/protege program are designed to enable small businesses to effectively compete for contracts that were previously too large for a single small business to perform as a prime contractor. By allowing small businesses to form joint venture and teaming relationships without regard to affiliation, they can be considered responsible contractors for ''bundled'' and other large contracts which exceed the capability of any of the individual small businesses to perform as prime contractors. Likewise, 8(a) Participants will be able to submit offers for and be considered responsible businesses for larger contracts than they would be able to obtain individually without the newly established mentor/protege program. Expanding the number and dollar amount of contracts available for award through the 8(a) BD program may result in a shift of dollars to small business.

In fiscal year (FY) 1996, the federal government spent $197.6 billion on the procurement of goods and services. Small businesses were awarded $41.1 billion in prime contracts, representing about a 21 percent share of the total contract dollars. There are approximately 180,000 small firms registered on PRO-Net, SBA's database of small businesses actively seeking federal government contracts. By comparison, there are approximately 5,800 small firms certified as eligible 8(a) Participants. In FY 1996, $6.4 billion or 3.2 percent of the total government prime contracts were awarded to less than 2,000 8(a) certified small businesses. SBA believes that the changes set forth in this rule will benefit small firms, but not increase the net number of current 8(a) Participants by more than 500 to 800 businesses, or less than 1 percent of the total universe of small firms seeking federal government contracts.

Similarly, the changes regarding affiliation eligibility and the mentor/protege program will benefit small business contractors, but impact a relatively small number of businesses and dollars, when compared to total government spending and the universe of small firms seeking federal government contracts. Because of consolidation, contracts are becoming larger and fewer in number. It has become increasingly more difficult for small business to possess the wherewithal to individually perform these larger contracts. The changes in small business affiliation rules are designed to counter the growing trend of contract consolidation and allow small firms to compete for larger contracts.

For purposes of the Paperwork Reduction Act of 1995 (Public Law 104–13), SBA certifies that this final rule contains no new reporting or recordkeeping requirements.

For purposes of Executive Order 12612, SBA certifies that this rule has no federalism implications warranting the preparation of a Federalism Assessment.

For purposes of Executive Order 12778, SBA certifies that this rule is drafted, to the extent practicable, in accordance with the standards set forth in Section 2 of that Order.

**List of Subjects**

*13 CFR Part 121*

Government procurement, Government property, Grant programs—business, Individuals with disabilities, Loan programs—business, Small businesses.

*13 CFR Part 124*

Government procurement, Hawaiian Natives, Minority businesses, Reporting and recordkeeping requirements, Technical assistance, Tribally-owned concerns.

*13 CFR Part 134*

Administrative practice and procedure, Organization and functions (Government agencies).

Accordingly, for the reasons set forth above, SBA amends Title 13, Code of Federal Regulations (CFR), as follows:

## PART 121—[AMENDED]

1. The authority citation for 13 CFR part 121 continues to read as follows:

**Authority:** Pub. L. 105–135 sec. 601 *et seq.*, 111 Stat. 2592; 15 U.S.C. 632(a), 634(b)(6), 637(a) and 644(c); and Pub. L. 102–486, 106 Stat. 2776, 3133.

2. Section 121.103 is amended by redesignating paragraphs (f)(3) and (f)(4) as paragraphs (f)(4) and (f)(5), respectively, by revising paragraph (f)(2) and by adding a new paragraph (f)(3) to read as follows:

### § 121.103 What is affiliation?

* * * * *

(f) * * *

(2) Except as provided in paragraph (f)(3) of this section, concerns submitting offers on a particular procurement or property sale as joint venturers are affiliated with each other with regard to the performance of that contract.

(3) *Exclusion from affiliation.* (i) A joint venture or teaming arrangement of two or more business concerns may submit an offer as a small business for a non-8(a) Federal procurement without regard to affiliation under paragraph (f) of this section so long as each concern is small under the size standard corresponding to the SIC code assigned to the contract, provided:

(A) For a procurement having a revenue-based size standard, the procurement exceeds half the size standard corresponding to the SIC code assigned to the contract; or

(B) For a procurement having an employee-based size standard, the procurement exceeds $10 million.

(ii) A joint venture or teaming arrangement of at least one 8(a) Participant and one or more other business concerns may submit an offer for a competitive 8(a) procurement without regard to affiliation under paragraph (f) of this section so long as the requirements of 13 CFR 124.513(b)(1) are met.

(iii) Two firms approved by SBA to be a mentor and protege under 13 CFR 124.520 may joint venture as a small business for any Federal Government procurement, provided the protege qualifies as small for the size standard corresponding to the SIC code assigned to the procurement and, for purposes of 8(a) sole source requirements, has not reached the dollar limit set forth in 13 CFR 124.519.

* * * * *

3. Section 121.1001 is amended by redesignating paragraphs (a)(2) through (a)(6) as paragraphs (a)(3) through (a)(7), by adding the following new paragraph (a)(2), and by revising paragraph (b)(2) to read as follows:

### § 121.1001 Who may initiate a size protest or request a formal size determination?

(a) * * *

(2) For competitive 8(a) contracts, the following entities may protest:

(i) Any offeror;

(ii) The contracting officer; or

(iii) The SBA District Director, or designee, in either the district office serving the geographical area in which the procuring activity is located or the district office that services the apparent successful offeror, or the Associate Administrator for 8(a) Business Development.

* * * * *

(b) * * *

(2) For SBA's 8(a) BD program:

(i) Concerning initial or continued 8(a) BD eligibility, the following entities may request a formal size determination:

(A) The 8(a) BD applicant concern or Participant; or

(B) The Assistant Administrator of the Division of Program Certification and Eligibility or the Associate Administrator for 8(a)BD.

(ii) Concerning individual sole source 8(a) contract awards, the following entities may request a formal size determination:

(A) The Participant nominated for award of the particular sole source contract;

(B) The SBA program official with authority to execute the 8(a) contract; or

(C) The SBA District Director in the district office that services the Participant, or the Associate Administrator for 8(a)BD.

* * * * *

4. Section 121.1103 is amended by revising paragraph (a) to read as follows:

### § 121.1103 What are the procedures for appealing a SIC code designation?

(a) Generally, any interested party who has been adversely affected by a SIC code designation may appeal the designation to OHA. However, with respect to a particular sole source 8(a) contract, only the Associate Administrator for 8(a)BD may appeal.

* * * * *

## PART 124—[AMENDED]

5. The authority citation for part 124 continues to read as follows:

**Authority:** 15 U.S.C. 634(b)(6), 636(j), 637(a), 637(d) and Pub. L. 99–661, Pub. L. 100–656, sec. 1207, Pub. L. 101–37, Pub. L. 101–574, and 42 U.S.C. 9815.

6. In part 124, subpart B consisting of §§ 124.601 through 124.610 is redesignated as subpart B, §§ 124.1001 through 124.1010, and subpart A is revised to read as follows:

## PART 124—8(A) BUSINESS DEVELOPMENT/SMALL DISADVANTAGED BUSINESS STATUS DETERMINATIONS

### Subpart A—8(a) Business Development

Provisions of General Applicability

124.1 What is the purpose of the 8(a) Business Development program?
124.2 What length of time may a business participate in the 8(a) BD program?
124.3 What definitions are important in the 8(a) BD program?

Eligibility Requirements for Participation in the 8(a) Business Development Program

124.101 What are the basic requirements a concern must meet for the 8(a) BD program?
124.102 What size business is eligible to participate in the 8(a) BD program?
124.103 Who is socially disadvantaged?
124.104 Who is economically disadvantaged?
124.105 What does it mean to be unconditionally owned by one or more disadvantaged individuals?
124.106 When do disadvantaged individuals control an applicant or Participant?
124.107 What is potential for success?
124.108 What other eligibility requirements apply for individuals or businesses?
124.109 Do Indian tribes and Alaska Native Corporations have any special rules for applying to the 8(a) BD program?
124.110 Do Native Hawaiian Organizations have any special rules for applying to the 8(a) BD program?
124.111 Do Community Development Corporations (CDCs) have any special rules for applying to the 8(a) BD program?
124.112 What criteria must a business meet to remain eligible to participate in the 8(a) BD program?

Applying to the 8(a) BD Program

124.201 May any business submit an application?
124.202 Where must an application be filed?
124.203 What must a concern submit to apply to the 8(a) BD program?
124.204 How does SBA process applications for 8(a) BD program admission?
124.205 Can an applicant ask SBA to reconsider SBA's initial decision to decline its application?
124.206 What appeal rights are available to an applicant that has been denied admission?
124.207 Can an applicant reapply for admission to the 8(a) BD program?

Exiting the 8(a) BD Program

124.301 What are the ways a business may leave the 8(a) BD program?
124.302 What is early graduation?
124.303 What is termination?
124.304 What are the procedures for early graduation and termination?
124.305 What is suspension and how is a Participant suspended from the 8(a) BD program?

Business Development

124.401 Which SBA field office services a Participant?
124.402 How does a Participant develop a business plan?
124.403 How is a business plan updated and modified?
124.404 What business development assistance is available to Participants during the two stages of participation in the 8(a) BD program?
124.405 How does a Participant obtain Federal Government surplus property?

Contractual Assistance

124.501 What general provisions apply to the award of 8(a) contracts?
124.502 How does an agency offer a procurement to SBA for award through the 8(a) BD program?
124.503 How does SBA accept a procurement for award through the 8(a) BD program?
124.504 What circumstances limit SBA's ability to accept a procurement for award as an 8(a) contract?
124.505 When will SBA appeal the terms and conditions of a particular 8(a) contract or a procuring activity decision not to reserve a procurement for the 8(a) BD program?
124.506 At what dollar threshold must an 8(a) procurement be competed among eligible Participants?
124.507 What procedures apply to competitive 8(a) procurements?
124.508 How is an 8(a) contract executed?
124.509 What are non-8(a) business activity targets?

124.510 What percentage of work must a Participant perform on an 8(a) contract?
124.511 How is fair market price determined for an 8(a) contract?
124.512 Delegation of contract administration to procuring agencies.
124.513 Under what circumstances can a joint venture be awarded an 8(a) contract?
124.514 Exercise of 8(a) options and modifications.
124.515 Can a Participant change its ownership or control and continue to perform an 8(a) contract, and can it transfer performance to another firm?
124.516 Who decides contract disputes arising between a Participant and a procuring activity after the award of an 8(a) contract?
124.517 Can the eligibility or size of a Participant for award of an 8(a) contract be questioned?
124.518 How can an 8(a) contract be terminated before performance is completed?
124.519 Are there any dollar limits on the amount of 8(a) contracts that a Participant may receive?
124.520 Mentor/Protege program.

Miscellaneous Reporting Requirements

124.601 What reports does SBA require concerning parties who assist Participants in obtaining federal contracts?
124.602 What kind of annual financial statement must a Participant submit to SBA?
124.603 What reports regarding the continued business operations of former Participants does SBA require?

Management and Technical Assistance Program

124.701 What is the purpose of the 7(j) management and technical assistance program?
124.702 What types of assistance are available through the 7(j) program?
124.703 Who is eligible to receive 7(j) assistance?
124.704 What additional management and technical assistance is reserved exclusively for concerns eligible to receive 8(a) contracts?

## Subpart A—8(a) Business Development

### Provisions of General Applicability

#### § 124.1 What is the purpose of the 8(a) Business Development program?

Sections 8(a) and 7(j) of the Small Business Act authorize a Minority Small Business and Capital Ownership Development program (designated the 8(a) Business Development or ''8(a) BD'' program for purposes of the regulations in this part). The purpose of the 8(a) BD program is to assist eligible small disadvantaged business concerns compete in the American economy through business development.

#### § 124.2 What length of time may a business participate in the 8(a) BD program?

A Participant receives a program term of nine years from the date of SBA's approval letter certifying the concern's admission to the program. The Participant must maintain its program eligibility during its tenure in the program and must inform SBA of any changes that would adversely affect its program eligibility. A firm that completes its nine year term of participation in the 8(a) BD program is deemed to graduate from the program. The nine year program term may be shortened only by termination, early graduation or voluntary graduation as provided for in this subpart.

#### § 124.3 What definitions are important in the 8(a) BD Program?

*Alaska Native* means a citizen of the United States who is a person of one-fourth degree or more Alaskan Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community), Eskimo, or Aleut blood, or a combination of those bloodlines. The term includes, in the absence of proof of a minimum blood quantum, any citizen whom a Native village or Native group regards as an Alaska Native if their father or mother is regarded as an Alaska Native.

*Alaska Native Corporation or ANC* means any Regional Corporation, Village Corporation, Urban Corporation, or Group Corporation organized under the laws of the State of Alaska in accordance with the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, *et seq.*)

*Bona fide place of business*, for purposes of 8(a) construction procurements, means a location where a Participant regularly maintains an office which employs at least one full-time individual within the appropriate geographical boundary. The term does not include construction trailers or other temporary construction sites.

*Community Development Corporation or CDC* means a nonprofit organization responsible to residents of the area it serves which has received financial assistance under 42 U.S.C. 9805, *et seq.*

*Concern* is defined in part 121 of this title.

*Days* means calendar days unless otherwise specified.

*Day-to-day operations* of a firm means the marketing, production, sales, and administrative functions of the firm.

*Immediate family member* means father, mother, husband, wife, son, daughter, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, and mother-in-law.

*Indian tribe* means any Indian tribe, band, nation, or other organized group or community of Indians, including any ANC, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians, or is recognized as such by the State in which the tribe, band, nation, group, or community resides. *See* definition of ''tribally-owned concern.''

*Native Hawaiian* means any individual whose ancestors were natives, prior to 1778, of the area which now comprises the State of Hawaii.

*Native Hawaiian Organization* means any community service organization serving Native Hawaiians in the State of Hawaii which is a not-for-profit organization chartered by the State of Hawaii, is controlled by Native Hawaiians, and whose business activities will principally benefit such Native Hawaiians.

*Negative control* is defined in part 121 of this title.

*Non-disadvantaged individual* means any individual who does not claim disadvantaged status, does not qualify as disadvantaged, or upon whose disadvantaged status an applicant or Participant does not rely in qualifying for 8(a) BD program participation.

*Participant* means a small business concern admitted to participate in the 8(a) BD program.

*Primary industry classification* means the four digit Standard Industrial Classification (SIC) code designation which best describes the primary business activity of the 8(a) BD applicant or Participant. The SIC code designations are described in the Standard Industrial Classification Manual published by the U.S. Office of Management and Budget.

*Principal place of business* means the business location where the individuals who manage the concern's day-to-day operations spend most working hours and where top management's business records are kept. If the offices from which management is directed and where the business records are kept are in different locations, SBA will determine the principal place of business for program purposes.

*Program year* means a 12-month period of an 8(a) BD Participant's program participation. The first program year begins on the date that the concern is certified to participate in the 8(a) BD program and ends one year later. Each subsequent program year begins on the Participant's anniversary of program certification and runs for one 12-month period.

*Same or similar line of business* means business activities within the

same two-digit ''Major Group'' of the SIC Manual as the primary industry classification of the applicant or Participant. The phrase ''same business area'' is synonymous with this definition.

*Self-marketing* of a requirement occurs when a Participant identifies a requirement that has not been committed to the 8(a) BD program and, through its marketing efforts, causes the procuring activity to offer that specific requirement to the 8(a) BD program on the Participant's behalf. A firm which identifies and markets a requirement which is subsequently offered to the 8(a) BD program as an open requirement or on behalf of another Participant has not ''self-marketed'' the requirement within the meaning of this part.

*Tribally-owned concern* means any concern at least 51 percent owned by an Indian tribe as defined in this section.

*Unconditional ownership* means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

**Eligibility Requirements for Participation in the 8(a) Business Development Program**

### § 124.101 What are the basic requirements a concern must meet for the 8(a) BD program?

Generally, a concern meets the basic requirements for admission to the 8(a) BD program if it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States, and which demonstrates potential for success.

### § 124.102 What size business is eligible to participate in the 8(a) BD program?

(a) An applicant concern must qualify as a small business concern as defined in part 121 of this title. The applicable size standard is the one for its primary industry classification. The rules for calculating the size of a tribally-owned concern, a concern owned by an Alaska Native Corporation, a concern owned by a Native Hawaiian Organization, or a concern owned by a Community Development Corporation are additionally affected by §§ 124.109, 124.110, and 124.111, respectively.

(b) If 8(a) BD program officials determine that a concern may not qualify as small, they may deny an application for 8(a) BD program admission or may request a formal size determination under part 121 of this title.

(c) A concern whose application is denied due to size by 8(a) BD program officials may request a formal size determination under part 121 of this title. A favorable determination will enable the firm to immediately submit a new 8(a) BD application without waiting one year.

### § 124.103 Who is socially disadvantaged?

(a) *General.* Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control.

(b) *Members of designated groups.* (1) There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at paragraph (d) of this section. Being born in a country does not, by itself, suffice to make the birth country an individual's country of origin for purposes of being included within a designated group.

(2) An individual must demonstrate that he or she has held himself or herself out, and is currently identified by others, as a member of a designated group if SBA requires it.

(3) The presumption of social disadvantage may be overcome with credible evidence to the contrary. Individuals possessing or knowing of such evidence should submit the information in writing to the Associate Administrator for 8(a) BD (AA/8(a)BD) for consideration.

(c) *Individuals not members of designated groups.* (1) An individual who is not a member of one of the groups presumed to be socially disadvantaged in paragraph (b)(1) of this section must establish individual social disadvantage by a preponderance of the evidence.

(2) Evidence of individual social disadvantage must include the following elements:

(i) At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged;

(ii) Personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and

(iii) Negative impact on entry into or advancement in the business world because of the disadvantage. SBA will consider any relevant evidence in assessing this element. In every case, however, SBA will consider education, employment and business history, where applicable, to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world.

(A) *Education.* SBA considers such factors as denial of equal access to institutions of higher education, exclusion from social and professional association with students or teachers, denial of educational honors rightfully earned, and social patterns or pressures which discouraged the individual from pursuing a professional or business education.

(B) *Employment.* SBA considers such factors as unequal treatment in hiring, promotions and other aspects of professional advancement, pay and fringe benefits, and other terms and conditions of employment; retaliatory or discriminatory behavior by an employer; and social patterns or pressures which have channelled the individual into nonprofessional or non-business fields.

(C) *Business history.* SBA considers such factors as unequal access to credit or capital, acquisition of credit or capital under commercially unfavorable circumstances, unequal treatment in opportunities for government contracts or other work, unequal treatment by potential customers and business

associates, and exclusion from business or professional organizations.

(d) *Socially disadvantaged group inclusion.* (1) *General.* Representatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition SBA to be included as a presumptively socially disadvantaged group under paragraph (b)(1) of this section. Upon presentation of substantial evidence that members of the group have been subjected to racial or ethnic prejudice or cultural bias because of their identity as group members and without regard to their individual qualities, SBA will publish a notice in the **Federal Register** that it has received and is considering such a request, and that it will consider public comments.

(2) *Standards to be applied.* In determining whether a group has made an adequate showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this section, SBA must determine that:

(i) The group has suffered prejudice, bias, or discriminatory practices;

(ii) Those conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in the Small Business Act; and

(iii) Those conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to small business owners generally.

(3) *Procedure.* The notice published under paragraph (d)(1) of this section will authorize a specified period for the receipt of public comments supporting or opposing the petition for socially disadvantaged group status. If appropriate, SBA may hold hearings. SBA may also conduct its own research relative to the group's petition.

(4) *Decision.* In making a final decision that a group should be considered presumptively disadvantaged, SBA must find that a preponderance of the evidence demonstrates that the group has met the standards set forth in paragraph (d)(2) of this section based on SBA's consideration of the group petition, the comments from the public, and any independent research it performs. SBA will advise the petitioners of its final decision in writing, and publish its conclusion as a notice in the **Federal Register**. If appropriate, SBA will amend paragraph (b)(1) of this section to include a new group.

### § 124.104 Who is economically disadvantaged?

(a) *General.* Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged.

(b) *Submission of narrative and financial information.* (1) Each individual claiming economic disadvantage must describe it in a narrative statement, and must submit personal financial information.

(2) When married, an individual claiming economic disadvantage also must submit separate financial information for his or her spouse, unless the individual and the spouse are legally separated.

(c) *Factors to be considered.* In considering diminished capital and credit opportunities, SBA will examine factors relating to the personal financial condition of any individual claiming disadvantaged status, including personal income for the past two years (including bonuses and the value of company stock given in lieu of cash), personal net worth, and the fair market value of all assets, whether encumbered or not. SBA will also consider the financial condition of the applicant compared to the financial profiles of small businesses in the same primary industry classification, or, if not available, in similar lines of business, which are not owned and controlled by socially and economically disadvantaged individuals in evaluating the individual's access to credit and capital. The financial profiles that SBA compares include total assets, net sales, pre tax profit, sales/working capital ratio, and net worth.

(1) *Transfers within two years.* (i) Except as set forth in paragraph (c)(1)(ii) of this section, SBA will attribute to an individual claiming disadvantaged status any assets which that individual has transferred to an immediate family member, or to a trust a beneficiary of which is an immediate family member, for less than fair market value, within two years prior to a concern's application for participation in the 8(a) BD program or within two years of a Participant's annual program review, unless the individual claiming disadvantaged status can demonstrate that the transfer is to or on behalf of an immediate family member for that individual's education, medical expenses, or some other form of essential support.

(ii) SBA will not attribute to an individual claiming disadvantaged status any assets transferred by that individual to an immediate family member that are consistent with the customary recognition of special occasions, such as birthdays, graduations, anniversaries, and retirements.

(iii) In determining an individual's access to capital and credit, SBA may consider any assets that the individual transferred within such two-year period described by paragraph (c)(1)(i) of this section that SBA does not consider in evaluating the individual's assets and net worth (e.g., transfers to charities).

(2) *Net worth.* For initial 8(a) BD eligibility, the net worth of an individual claiming disadvantage must be less than $250,000. For continued 8(a) BD eligibility after admission to the program, net worth must be less than $750,000. In determining such net worth, SBA will exclude the ownership interest in the applicant or Participant and the equity in the primary personal residence (except any portion of such equity which is attributable to excessive withdrawals from the applicant or Participant). Exclusions for net worth purposes are not exclusions for asset valuation or access to capital and credit purposes.

(i) A contingent liability does not reduce an individual's net worth.

(ii) The personal net worth of an individual claiming to be an Alaska Native will include assets and income from sources other than an Alaska Native Corporation and exclude any of the following which the individual receives from any Alaska Native Corporation: cash (including cash dividends on stock received from an ANC) to the extent that it does not, in the aggregate, exceed $2,000 per individual per annum; stock (including stock issued or distributed by an ANC as a dividend or distribution on stock); a partnership interest; land or an interest in land (including land or an interest in land received from an ANC as a dividend or distribution on stock); and an interest in a settlement trust.

### § 124.105 What does it mean to be unconditionally owned by one or more disadvantaged individuals?

An applicant or Participant must be at least 51 percent unconditionally and directly owned by one or more socially and economically disadvantaged individuals who are citizens of the United States, except for concerns owned by Indian tribes, Alaska Native Corporations, Native Hawaiian Organizations, or Community Development Corporations (CDCs). *See*

§ 124.3 for definition of unconditional ownership; and §§ 124.109, 124.110, and 124.111, respectively, for special ownership requirements for concerns owned by Indian tribes, ANCs, Native Hawaiian Organizations, and CDCs.

(a) *Ownership must be direct.* Ownership by one or more disadvantaged individuals must be direct ownership. An applicant or Participant owned principally by another business entity or by a trust (including employee stock ownership trusts) that is in turn owned and controlled by one or more disadvantaged individuals does not meet this requirement. However, ownership by a trust, such as a living trust, may be treated as the functional equivalent of ownership by a disadvantaged individual where the trust is revocable, and the disadvantaged individual is the grantor, a trustee, and the sole current beneficiary of the trust.

(b) *Ownership of a partnership.* In the case of a concern which is a partnership, at least 51 percent of every class of partnership interest must be unconditionally owned by one or more individuals determined by SBA to be socially and economically disadvantaged. The ownership must be reflected in the concern's partnership agreement.

(c) *Ownership of a limited liability company.* In the case of a concern which is a limited liability company, at least 51 percent of each class of member interest must be unconditionally owned by one or more individuals determined by SBA to be socially and economically disadvantaged.

(d) *Ownership of a corporation.* In the case of a concern which is a corporation, at least 51 percent of each class of voting stock outstanding and 51 percent of the aggregate of all stock outstanding must be unconditionally owned by one or more individuals determined by SBA to be socially and economically disadvantaged.

(e) *Stock options' effect on ownership.* In determining unconditional ownership, SBA will disregard any unexercised stock options or similar agreements held by disadvantaged individuals. However, any unexercised stock options or similar agreements (including rights to convert non-voting stock or debentures into voting stock) held by non-disadvantaged individuals will be treated as exercised, except for any ownership interests which are held by investment companies licensed under the Small Business Investment Act of 1958.

(f) *Dividends and distributions.* One or more disadvantaged individuals must be entitled to receive:

(1) At least 51 percent of the annual distribution of dividends paid on the stock of a corporate applicant concern;

(2) 100 percent of the value of each share of stock owned by them in the event that the stock is sold; and

(3) At least 51 percent of the retained earnings of the concern and 100 percent of the unencumbered value of each share of stock owned in the event of dissolution of the corporation.

(g) *Ownership of another Participant.* The individuals determined to be disadvantaged for purposes of one Participant, their immediate family members, and the Participant itself, may not hold, in the aggregate, more than a 20 percent equity ownership interest in any other single Participant.

(h) *Ownership restrictions for non-disadvantaged individuals and concerns.* (1) A non-disadvantaged individual (in the aggregate with all immediate family members) or a non-Participant concern that is a general partner or stockholder with at least a 10 percent ownership interest in one Participant may not own more than a 10 percent interest in another Participant that is in the developmental stage or more than a 20 percent interest in another Participant in the transitional stage of the program. This restriction does not apply to financial institutions licensed or chartered by Federal, state or local government, including investment companies which are licensed under the Small Business Investment Act of 1958.

(2) A non-Participant concern in the same or similar line of business may not own more than a 10 percent interest in a Participant that is in the developmental stage or more than a 20 percent interest in a Participant in a transitional stage of the program, except that a former Participant or a principal of a former Participant (except those that have been terminated from 8(a) BD program participation pursuant to §§ 124.303 and 124.304) may have an equity ownership interest of up to 20 percent in a current Participant in the developmental stage of the program or up to 30 percent in a transitional stage Participant, in the same or similar line of business.

(i) *Change of ownership.* A Participant may change its ownership or business structure so long as one or more disadvantaged individuals own and control it after the change and SBA approves the transaction in writing prior to the change. The decision to approve or deny a Participant's request for a change in ownership or business structure will be made and communicated to the firm by the AA/8(a)BD. The decision of the AA/8(a)BD is the final decision of the Agency. The AA/8(a)BD will issue a decision within 60 days from receipt of a request containing all necessary documentation, or as soon thereafter as possible. If 60 days lapse without a decision from SBA, the Participant cannot presume that it can complete the change without written approval from SBA. A decision to deny a request for change of ownership or business structure may be grounds for program termination where the change is made nevertheless.

(1) Any Participant that was awarded one or more 8(a) contracts may substitute one disadvantaged individual for another disadvantaged individual without requiring the termination of those contracts or a request for waiver under § 124.515, as long as it receives SBA's approval prior to the change.

(2) Where the previous owner held less than a 10 percent interest in the concern, or the transfer results from the death or incapacity due to a serious, long-term illness or injury of a disadvantaged principal, prior approval is not required, but the concern must notify SBA within 60 days.

(3) Continued participation of the Participant with new ownership and the award of any new 8(a) contracts requires SBA's determination that all eligibility requirements are met by the concern and the new owners.

(4) Where a Participant requests a change of ownership or business structure, and proceeds with the change prior to receiving SBA approval (or where a change of ownership results from the death or incapacity of a disadvantaged individual for which a request prior to the change in ownership could not occur), SBA will suspend the Participant from program benefits pending resolution of the request. If the change is approved, the length of the suspension will be restored to the Participant's program term in the case of death or incapacity, or if the firm requested prior approval and waited 60 days for SBA approval.

(5) A change in ownership does not provide the new owner(s) with a new 8(a) BD program term. For example, if a concern has been in the 8(a) BD program for five years when a change in ownership occurs, the new owner will have four years remaining until program graduation.

(j) *Public offering.* A Participant's request for SBA's approval for the issuance of a public offering will be treated as a request for a change of ownership. Such request will cause SBA to examine the concern's continued need for access to the business

development resources of the 8(a) BD program.

(k) *Community property laws given effect.* In determining ownership interests when an owner resides in any of the community property states or territories of the United States (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin), SBA considers applicable state community property laws. If only one spouse claims disadvantaged status, that spouse's ownership interest will be considered unconditionally held only to the extent it is vested by the community property laws. A transfer or relinquishment of interest by the non-disadvantaged spouse may be necessary in some cases to establish eligibility.

### § 124.106 When do disadvantaged individuals control an applicant or Participant?

Control is not the same as ownership, although both may reside in the same person. SBA regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations. An applicant or Participant's management and daily business operations must be conducted by one or more disadvantaged individuals, except for concerns owned by Indian tribes, ANCs, Native Hawaiian Organizations, or Community Development Corporations (CDCs). (*See* §§ 124.109, 124.110, and 124.111, respectively, for the requirements for concerns owned by Indian tribes or ANCs, for concerns owned by Native Hawaiian Organizations, and for CDC-owned concerns.) Disadvantaged individuals managing the concern must have managerial experience of the extent and complexity needed to run the concern. A disadvantaged individual need not have the technical expertise or possess a required license to be found to control an applicant or Participant if he or she can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise. However, where a critical license is held by a non-disadvantaged individual having an equity interest in the applicant or Participant firm, the non-disadvantaged individual may be found to control the firm.

(a)(1) An applicant or Participant must be managed on a full-time basis by one or more disadvantaged individuals who possess requisite management capabilities.

(2) A disadvantaged full-time manager must hold the highest officer position (usually President or Chief Executive Officer) in the applicant or Participant.

(3) One or more disadvantaged individuals who manage the applicant or Participant must devote full-time to the business during the normal working hours of firms in the same or similar line of business. Work in a wholly-owned subsidiary of the applicant or participant may be considered to meet the requirement of full-time devotion. This applies only to a subsidiary owned by the 8(a) firm, and not to firms in which the disadvantaged individual has an ownership interest.

(4) Any disadvantaged manager who wishes to engage in outside employment must notify SBA of the nature and anticipated duration of the outside employment and obtain the prior written approval of SBA. SBA will deny a request for outside employment which could conflict with the management of the firm or could hinder it in achieving the objectives of its business development plan.

(5) Except as provided in paragraph (d)(1) of this section, a disadvantaged owner's unexercised right to cause a change in the control or management of the applicant concern does not in itself constitute disadvantaged control and management, regardless of how quickly or easily the right could be exercised.

(b) In the case of a partnership, one or more disadvantaged individuals must serve as general partners, with control over all partnership decisions. A partnership in which no disadvantaged individual is a general partner will be ineligible for participation.

(c) In the case of a limited liability company, one or more disadvantaged individuals must serve as management members, with control over all decisions of the limited liability company.

(d) One or more disadvantaged individuals must control the Board of Directors of a corporate applicant or Participant.

(1) SBA will deem disadvantaged individuals to control the Board of Directors where:

(i) A single disadvantaged individual owns 100% of all voting stock of an applicant or Participant concern;

(ii) A single disadvantaged individual owns at least 51% of all voting stock of an applicant or Participant concern, the individual is on the Board of Directors and no super majority voting requirements exist for shareholders to approve corporation actions. Where super majority voting requirements are provided for in the concern's articles of incorporation, its by-laws, or by state law, the disadvantaged individual must own at least the percent of the voting stock needed to overcome any such super majority voting requirements; or

(iii) More than one disadvantaged shareholder seeks to qualify the concern (i.e., no one individual owns 51%), each such individual is on the Board of Directors, together they own at least 51% of all voting stock of the concern, no super majority voting requirements exist, and the disadvantaged shareholders can demonstrate that they have made enforceable arrangements to permit one of them to vote the stock of all as a block without a shareholder meeting. Where the concern has super majority voting requirements, the disadvantaged shareholders must own at least that percentage of voting stock needed to overcome any such super majority ownership requirements.

(2) Where an applicant or Participant does not meet the requirements set forth in paragraph (d)(1) of this section, the disadvantaged individual(s) upon whom eligibility is based must control the Board of Directors through actual numbers of voting directors or, where permitted by state law, through weighted voting (e.g., in a concern having a two-person Board of Directors where one individual on the Board is disadvantaged and one is not, the disadvantaged vote must be weighted—worth more than one vote—in order for the concern to be eligible for 8(a) participation). Where a concern seeks to comply with this paragraph:

(i) Provisions for the establishment of a quorum cannot permit non-disadvantaged Directors to control the Board of Directors, directly or indirectly;

(ii) Any Executive Committee of Directors must be controlled by disadvantaged directors unless the Executive Committee can only make recommendations to and cannot independently exercise the authority of the Board of Directors.

(3) An applicant must inform SBA of any super majority voting requirements provided for in its articles of incorporation, its by-laws, by state law, or otherwise. Similarly, after being admitted to the program, a Participant must inform SBA of changes regarding super majority voting requirements.

(4) Non-voting, advisory, or honorary Directors may be appointed without affecting disadvantaged individuals' control of the Board of Directors.

(5) Arrangements regarding the structure and voting rights of the Board of Directors must comply with applicable state law.

(e) Non-disadvantaged individuals may be involved in the management of an applicant or Participant, and may be stockholders, partners, limited liability

members, officers, and/or directors of the applicant or Participant. However, no such non-disadvantaged individual or immediate family member may:

(1) Exercise actual control or have the power to control the applicant or Participant;

(2) Be a former employer or a principal of a former employer of any disadvantaged owner of the applicant or Participant, unless it is determined by the AA/8(a)BD that the relationship between the former employer or principal and the disadvantaged individual or applicant concern does not give the former employer actual control or the potential to control the applicant or Participant and such relationship is in the best interests of the 8(a) BD firm; or

(3) Receive compensation from the applicant or Participant in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest officer (usually CEO or President). The highest ranking officer may elect to take a lower salary than a non-disadvantaged individual only upon demonstrating that it helps the applicant or Participant. In the case of a Participant, the Participant must also obtain the prior written consent of the AA/8(a)BD or designee before changing the compensation paid to the highest ranking officer to be below that paid to a non-disadvantaged individual.

(f) Non-disadvantaged individuals who transfer majority stock ownership or control of the firm to an immediate family member within two years prior to the application and remain involved in the firm as a stockholder, officer, director, or key employee of the firm are presumed to control the firm. The presumption may be rebutted by showing that the transferee has independent management experience necessary to control the operation of the firm.

(g) Non-disadvantaged individuals or entities may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive:

(1) In circumstances where an applicant or Participant seeks to establish disadvantaged control of the Board of Directors through paragraph (d)(2) of this section, non-disadvantaged individuals control the Board of Directors of the applicant or Participant, either directly through majority voting membership, or indirectly, where the by-laws allow non-disadvantaged individuals effectively to prevent a quorum or block actions proposed by the disadvantaged individuals.

(2) A non-disadvantaged individual or entity, having an equity interest in the applicant or participant, provides critical financial or bonding support or a critical license to the applicant or Participant which directly or indirectly allows the non-disadvantaged individual significantly to influence business decisions of the Participant.

(3) A non-disadvantaged individual or entity controls the applicant or Participant or an individual disadvantaged owner through loan arrangements. Providing a loan guaranty on commercially reasonable terms does not, by itself, give a non-disadvantaged individual or entity the power to control a firm.

(4) Business relationships exist with non-disadvantaged individuals or entities which cause such dependence that the applicant or Participant cannot exercise independent business judgment without great economic risk.

### § 124.107 What is potential for success?

The applicant concern must possess reasonable prospects for success in competing in the private sector if admitted to the 8(a) BD program. To do so, it must be in business in its primary industry classification for at least two full years immediately prior to the date of its 8(a) BD application, unless a waiver for this requirement is granted pursuant to paragraph (b) of this section.

(a) Income tax returns for each of the two previous tax years must show operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification.

(b)(1) SBA may waive the two years in business requirement if each of the following five conditions are met:

(i) The individual or individuals upon whom eligibility is based have substantial business management experience;

(ii) The applicant has demonstrated technical experience to carry out its business plan with a substantial likelihood for success if admitted to the 8(a) BD program;

(iii) The applicant has adequate capital to sustain its operations and carry out its business plan as a Participant;

(iv) The applicant has a record of successful performance on contracts from governmental or nongovernmental sources in its primary industry category; and

(v) The applicant has, or can demonstrate its ability to timely obtain, the personnel, facilities, equipment, and any other requirements needed to perform contracts as a Participant.

(2) The concern seeking a waiver under paragraph (b) must provide information on governmental and nongovernmental contracts in progress and completed (including letters of reference) in order to establish successful contract performance, and must demonstrate how it otherwise meets the five conditions for waiver. SBA considers an applicant's performance on both government and private sector contracts in determining whether the firm has an overall successful performance record. If, however, the applicant has performed only government contracts or only private sector contracts, SBA will review its performance on those contracts alone to determine whether the applicant possesses a record of successful performance.

(c) In assessing potential for success, SBA considers the concern's access to credit and capital, including, but not limited to, access to long-term financing, access to working capital financing, equipment trade credit, access to raw materials and supplier trade credit, and bonding capability.

(d) In assessing potential for success, SBA will also consider the technical and managerial experience of the applicant concern's managers, the operating history of the concern, the concern's record of performance on previous Federal and private sector contracts in the primary industry in which the concern is seeking 8(a) BD certification, and its financial capacity. The applicant concern as a whole must demonstrate both technical knowledge in its primary industry category and management experience sufficient to run its day-to-day operations.

(e) The Participant or individuals employed by the Participant must hold all requisite licenses if the concern is engaged in an industry requiring professional licensing (e.g., public accountancy, law, professional engineering).

(f) An applicant will not be denied admission into the 8(a) BD program due solely to a determination that potential 8(a) contract opportunities are unavailable to assist in the development of the concern unless:

(1) The Government has not previously procured and is unlikely to procure the types of products or services offered by the concern; or

(2) The purchase of such products or services by the Federal Government will not be in quantities sufficient to support the developmental needs of the applicant and other Participants providing the same or similar items or services.

**§ 124.108 What other eligibility requirements apply for individuals or businesses?**

(a) *Good character.* The applicant or Participant and all its principals must have good character.

(1) If, during the processing of an application, adverse information is obtained from the applicant or a credible source regarding possible criminal conduct by the applicant or any of its principals, no further action will be taken on the application until SBA's Inspector General has collected relevant information and has advised the AA/8(a)BD of his or her findings. The AA/8(a)BD will consider those findings when evaluating the application.

(2) Violations of any of SBA's regulations may result in denial of participation in the 8(a) BD program. The AA/8(a)BD will consider the nature and severity of the violation in making an eligibility determination.

(3) Debarred or suspended concerns or concerns owned by debarred or suspended persons are ineligible for admission to the 8(a) BD program.

(4) An applicant is ineligible for admission to the 8(a) BD program if the applicant concern or a proprietor, partner, limited liability member, director, officer, or holder of at least 10 percent of its stock, or another person (including key employees) with significant authority over the concern:

(i) Lacks business integrity as demonstrated by information related to an indictment or guilty plea, conviction, civil judgment, or settlement; or

(ii) Is currently incarcerated, or on parole or probation pursuant to a pre-trial diversion or following conviction for a felony or any crime involving business integrity.

(5) If, during the processing of an application, SBA determines that an applicant has knowingly submitted false information, regardless of whether correct information would cause SBA to deny the application, and regardless of whether correct information was given to SBA in accompanying documents, SBA will deny the application. If, after admission to the program, SBA discovers that false information has been knowingly submitted by a firm, SBA will initiate termination proceedings and suspend the firm under §§ 124.304 and 124.305. Whenever SBA determines that the applicant submitted false information, the matter will be referred to SBA's Office of Inspector General for review.

(b) *One-time eligibility.* Once a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) BD program, neither the concern nor that individual will be eligible again.

(1) An individual who claims disadvantage and completes the appropriate SBA forms to qualify an applicant has participated in the 8(a) BD program if SBA approves the application.

(2) Use of eligibility will take effect on the date of the concern's approval for admission into the program.

(3) An individual who uses his or her one-time eligibility to qualify a concern for the 8(a) BD program will be considered a non-disadvantaged individual for ownership or control purposes of another applicant or Participant. The criteria restricting participation by non-disadvantaged individuals will apply to such an individual. *See* §§ 124.105 and 124.106.

(4) When at least 50% of the assets of a concern are the same as those of a former Participant, the concern will not be eligible for entry into the program.

(5) Participants which change their form of business organization and transfer their assets and liabilities to the new organization may do so without affecting the eligibility of the new organization provided the previous business is dissolved and all other eligibility criteria are met. In such a case, the new organization may complete the remaining program term of the previous organization. A request for a change in business form will be treated as a change of ownership under § 124.105(i).

(c) *Wholesalers.* An applicant concern seeking admission to the 8(a) BD program as a wholesaler need not demonstrate that it is capable of meeting the requirements of the nonmanufacturer rule for its primary industry classification.

(d) *Brokers.* Brokers are ineligible to participate in the 8(a) BD program. A broker is a concern that adds no material value to an item being supplied to a procuring activity or which does not take ownership or possession of or handle the item being procured with its own equipment or facilities.

(e) *Federal financial obligations.* Neither a firm nor any of its principals that fails to pay significant financial obligations owed to the Federal Government, including unresolved tax liens and defaults on Federal loans or other Federally assisted financing, is eligible for admission to or participation in the 8(a) BD program.

**§ 124.109 Do Indian tribes and Alaska Native Corporations have any special rules for applying to the 8(a) BD program?**

(a) *Special rules for ANCs.* Small business concerns owned and controlled by ANCs are eligible for participation in the 8(a) program and must meet the eligibility criteria set forth in § 124.112 to the extent the criteria are not inconsistent with this section. ANC-owned concerns are subject to the same conditions that apply to tribally-owned concerns, as described in paragraphs (b) and (c) of this section, except that the following provisions and exceptions apply only to ANC-owned concerns:

(1) Alaska Natives and descendants of Natives must own a majority of both the total equity of the ANC and the total voting powers to elect directors of the ANC through their holdings of settlement common stock. Settlement common stock means stock of an ANC issued pursuant to 43 U.S.C. 1606(g)(1), which is subject to the rights and restrictions listed in 43 U.S.C. 1606(h)(1).

(2) An ANC that meets the requirements set forth in paragraph (a)(1) of this section is deemed economically disadvantaged under 43 U.S.C. 1626(e), and need not establish economic disadvantage as required by paragraph (b)(2) of this section.

(3) Even though an ANC can be either for profit or non-profit, a small business concern owned and controlled by an ANC must be for profit to be eligible for the 8(a) program. The concern will be deemed owned and controlled by the ANC where both the majority of stock or other ownership interest and total voting power are held by the ANC and holders of its settlement common stock.

(4) The Alaska Native Claims Settlement Act provides that a concern which is majority owned by an ANC shall be deemed to be both owned and controlled by Alaska Natives and an economically disadvantaged business. Therefore, an individual responsible for control and management of an ANC-owned applicant or Participant need not establish personal social and economic disadvantage.

(5) Paragraphs (b)(3)(i), (ii) and (iv) of this section are not applicable to an ANC, provided its status as an ANC is clearly shown in its articles of incorporation.

(6) Paragraph (c)(1) of this section is not applicable to an ANC-owned concern to the extent it requires an express waiver of sovereign immunity or a ''sue and be sued'' clause.

(b) *Tribal eligibility.* In order to qualify a concern which it owns and controls for participation in the 8(a) BD program, an Indian tribe must establish its own economic disadvantaged status under paragraph (b)(2) of this section. Thereafter, it need not reestablish such status in order to have other businesses

**Federal Register** / Vol. 63, No. 125 / Tuesday, June 30, 1998 / Rules and Regulations 35747

that it owns certified for 8(a) BD program participation, unless specifically required to do so by the AA/8(a)BD or designee. Each tribally-owned concern seeking to be certified for 8(a) BD participation must comply with the provisions of paragraph (c) of this section.

(1) *Social disadvantage.* An Indian tribe as defined in § 124.3 is considered to be socially disadvantaged.

(2) *Economic disadvantage.* In order to be eligible to participate in the 8(a) BD program, the Indian tribe must demonstrate to SBA that the tribe itself is economically disadvantaged. This must involve the consideration of available data showing the tribe's economic condition, including but not limited to, the following information:

(i) The number of tribal members.

(ii) The present tribal unemployment rate.

(iii) The per capita income of tribal members, excluding judgment awards.

(iv) The percentage of the local Indian population below the poverty level.

(v) The tribe's access to capital.

(vi) The tribal assets as disclosed in a current tribal financial statement. The statement must list all assets including those which are encumbered or held in trust, but the status of those encumbered or in trust must be clearly delineated.

(vii) A list of all wholly or partially owned tribal enterprises or affiliates and the primary industry classification of each. The list must also specify the members of the tribe who manage or control such enterprises by serving as officers or directors.

(3) *Forms and documents required to be submitted.* Except as otherwise provided in this section, the Indian tribe generally must submit the forms and documents required of 8(a) BD applicants as well as the following material:

(i) A copy of all governing documents such as the tribe's constitution or business charter.

(ii) Evidence of its recognition as a tribe eligible for the special programs and services provided by the United States or by its state of residence.

(iii) Copies of its articles of incorporation and bylaws as filed with the organizing or chartering authority, or similar documents needed to establish and govern a non-corporate legal entity.

(iv) Documents or materials needed to show the tribe's economically disadvantaged status as described in paragraph (b)(2) of this section.

(c) *Business eligibility.* In order to be eligible to participate in the 8(a) BD program, a concern which is owned by an eligible Indian tribe (or wholly owned business entities of such tribe) must meet the conditions set forth in paragraphs (c)(1) through (c)(7) of this section.

(1) *Legal business entity organized for profit and susceptible to suit.* The applicant or participating concern must be a separate and distinct legal entity organized or chartered by the tribe, or Federal or state authorities. The concern's articles of incorporation, partnership agreement or limited liability company articles of organization must contain express sovereign immunity waiver language, or a ''sue and be sued'' clause which designates United States Federal Courts to be among the courts of competent jurisdiction for all matters relating to SBA's programs including, but not limited to, 8(a) BD program participation, loans, and contract performance. Also, the concern must be organized for profit, and the tribe must possess economic development powers in the tribe's governing documents.

(2) *Size.* (i) A tribally-owned applicant concern must qualify as a small business concern as defined for purposes of Federal Government procurement in part 121 of this title. The particular size standard to be applied is based on the primary industry classification of the applicant concern.

(ii) A tribally-owned Participant must certify to SBA that it is a small business pursuant to the provisions of part 121 of this title for the purpose of performing each individual contract which it is awarded.

(iii) In determining the size of a small business concern owned by a socially and economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe) for either 8(a) BD program entry or contract award, the firm's size shall be determined independently without regard to its affiliation with the tribe, any entity of the tribal government, or any other business enterprise owned by the tribe, unless the Administrator determines that one or more such tribally-owned business concerns have obtained, or are likely to obtain, a substantial unfair competitive advantage within an industry category.

(3) *Ownership.* (i) For corporate entities, a tribe must own at least 51 percent of the voting stock and at least 51 percent of the aggregate of all classes of stock. For non-corporate entities, a tribe must own at least a 51 percent interest.

(ii) A tribe cannot own 51% or more of another firm which, either at the time of application or within the previous two years, has been operating in the 8(a) program under the same primary SIC code as the applicant. A tribe may, however, own a Participant or an applicant that conducts or will conduct secondary business in the 8(a) BD program under the same SIC code that a current Participant owned by the tribe operates in the 8(a) BD program as its primary SIC code.

(iii) The restrictions of § 124.105(h) do not apply to tribes; they do, however, apply to non disadvantaged individuals or other business concerns that are partial owners of a tribally-owned concern.

(4) *Control and management.* (i) The management and daily business operations of a tribally-owned concern must be controlled by the tribe, through one or more disadvantaged individual members who possess sufficient management experience of an extent and complexity needed to run the concern, or through management as follows:

(A) Management may be provided by committees, teams, or Boards of Directors which are controlled by one or more members of an economically disadvantaged tribe, or

(B) Management may be provided by non-tribal members if SBA determines that such management is required to assist the concern's development, that the tribe will retain control of all management decisions common to boards of directors, including strategic planning, budget approval, and the employment and compensation of officers, and that a written management development plan exists which shows how disadvantaged tribal members will develop managerial skills sufficient to manage the concern or similar tribally-owned concerns in the future.

(ii) Members of the management team, business committee members, officers, and directors are precluded from engaging in any outside employment or other business interests which conflict with the management of the concern or prevent the concern from achieving the objectives set forth in its business development plan. This is not intended to preclude participation in tribal or other activities which do not interfere with such individual's responsibilities in the operation of the applicant concern.

(5) *Individual eligibility limitation.* SBA does not deem an individual involved in the management or daily business operations of a tribally-owned concern to have used his or her individual eligibility within the meaning of § 124.108(b).

(6) *Potential for success.* (i) A tribally-owned applicant concern must be in business for at least two years, as evidenced by income tax returns for

each of the two previous tax years showing operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification, or demonstrate potential for success as set forth in paragraph (c)(6)(ii) of this section.

(ii) In determining whether a tribally-owned concern has the potential for success, SBA will look at a number of factors including, but not limited to:

(A) The technical and managerial experience and competency of the individual(s) who will manage and control the daily operation of the concern;

(B) The financial capacity of the concern; and

(C) The concern's record of performance on any previous Federal or private sector contracts in the primary industry in which the concern is seeking 8(a) certification.

(7) *Other eligibility criteria.* (i) As with other 8(a) applicants, a tribally-owned applicant concern shall not be denied admission into the 8(a) program due solely to a determination that specific contract opportunities are unavailable to assist the development of the concern unless:

(A) The Government has not previously procured and is unlikely to procure the types of products or services offered by the concern; or

(B) The purchase of such products or services by the Federal Government will not be in quantities sufficient to support the developmental needs of the applicant and other program participants providing the same or similar items or services.

(ii) Except for the tribe itself, the concern's officers, directors, and all shareholders owning an interest of 20% or more must demonstrate good character. *See* § 124.108(a).

### § 124.110 Do Native Hawaiian Organizations have any special rules for applying to the 8(a) BD program?

(a) Concerns owned by economically disadvantaged Native Hawaiian Organizations, as defined in § 124.3, are eligible for participation in the 8(a) program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility. Such concerns must meet all eligibility criteria set forth in §§ 124.101 through 124.108 and § 124.112 to the extent that they are not inconsistent with this section.

(b) A concern owned by a Native Hawaiian Organization must qualify as a small business concern as defined in part 121 of this title. The size standard corresponding to the primary industry classification of the applicant concern applies for determining size. SBA will determine the concern's size independently, without regard to its affiliation with the Native Hawaiian Organization or any other business enterprise owned by the Native Hawaiian Organization, unless the Administrator determines that one or more such concerns owned by the Native Hawaiian Organization have obtained, or are likely to obtain, a substantial unfair competitive advantage within an industry category.

(c) A Native Hawaiian Organization cannot own 51% or more of another firm which, either at the time of application or within the previous two years, has been operating in the 8(a) program under the same primary SIC code as the applicant. A Native Hawaiian Organization may, however, own a Participant or an applicant that conducts or will conduct secondary business in the 8(a) BD program under the same SIC code that a current Participant owned by the Native Hawaiian Organization operates in the 8(a) BD program as its primary SIC code.

(d) SBA does not deem an individual involved in the management or daily business operations of a Participant owned by a Native Hawaiian Organization to have used his or her individual eligibility within the meaning of § 124.108(b).

(e)(1) An applicant concern owned by a Native Hawaiian Organization must be in business for at least two years, as evidenced by income tax returns for each of the two previous tax years showing operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification, or demonstrate potential for success as set forth in paragraph (e)(2) of this section.

(2) In determining whether a concern owned by a Native Hawaiian Organization has the potential for success, SBA will look at a number of factors including, but not limited to:

(i) The technical and managerial experience and competence of the individual(s) who will manage and control the daily operation of the concern.

(ii) The financial capacity of the concern; and

(iii) The concern's record of performance on any previous Federal or private sector contracts in the primary industry in which the concern is seeking 8(a) certification.

### § 124.111 Do Community Development Corporations (CDCs) have any special rules for applying to the 8(a) BD program?

(a) Concerns owned at least 51 percent by CDCs (or a wholly owned business entity of a CDC) are eligible for participation in the 8(a) BD program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility. These concerns must meet all eligibility criteria set forth in § 124.101 through § 124.108 and § 124.112 to the extent that they are not inconsistent with this section.

(b) A concern that is at least 51 percent owned by a CDC (or a wholly owned business entity of a CDC) is considered to be controlled by such CDC and eligible for participation in the 8(a) BD program, provided it meets all eligibility criteria set forth or referred to in this section and its management and daily business operations are conducted by one or more individuals determined to have managerial experience of an extent and complexity needed to run the concern.

(c) A concern that is at least 51 percent owned by a CDC (or a wholly owned business entity of a CDC) must qualify as a small business concern as defined in part 121 of this title. The size standard corresponding to the primary industry classification of the applicant concern applies for determining size. SBA will determine the concern's size independently, without regard to its affiliation with the CDC or any other business enterprise owned by the CDC, unless the Administrator determines that one or more such concerns owned by the CDC have obtained, or are likely to obtain, a substantial unfair competitive advantage within an industry category.

(d) A CDC cannot own 51% or more of another firm which, either at the time of application or within the previous two years, has been operating in the 8(a) program under the same primary SIC code as the applicant. A CDC may, however, own a Participant or an applicant that conducts or will conduct secondary business in the 8(a) BD program under the same SIC code that a current Participant owned by the CDC operates in the 8(a) BD program as its primary SIC code.

(e) SBA does not deem an individual involved in the management or daily business operations of a CDC-owned concern to have used his or her individual eligibility within the meaning of § 124.108(b).

(f)(1) A CDC-owned applicant concern must be in business for at least two years, as evidenced by income tax returns for each of the two previous tax years showing operating revenues in the primary industry in which the applicant is seeking 8(a) BD certification, or demonstrate potential for success as set forth in paragraph (e)(2) of this section.

**Federal Register** / Vol. 63, No. 125 / Tuesday, June 30, 1998 / Rules and Regulations 35749

(2) In determining whether a CDC-owned concern has the potential for success, SBA will look at a number of factors including, but not limited to:

(i) The technical and managerial experience and competence of the individual(s) who will manage and control the daily operation of the concern;

(ii) The financial capacity of the concern; and

(iii) The concern's record of performance on any previous Federal or private sector contracts in the primary industry in which the concern is seeking 8(a) certification.

(g) A CDC-owned applicant and all of its principals must have good character as set forth in § 124.108(a).

**§ 124.112 What criteria must a business meet to remain eligible to participate in the 8(a) BD program?**

(a) *Standards.* In order for a concern (except those owned by Indian tribes, ANCs, Native Hawaiian Organizations or CDCs) to remain eligible for 8(a) BD program participation, it must continue to meet all eligibility criteria contained in § 124.101 through § 124.108. For concerns owned by Indian tribes, ANCs, Native Hawaiian Organizations or CDCs to remain eligible, they must meet the criteria set forth in this § 124.112 to the extent that they are not inconsistent with § 124.109, § 124.110 and § 124.111, respectively. The concern must inform SBA in writing of any changes in circumstances which would adversely affect its program eligibility, especially economic disadvantage and ownership and control. Any concern that fails to meet the eligibility requirements after being admitted to the program will be subject to termination or early graduation under §§ 124.302 through 124.304, as appropriate.

(b) *Submissions supporting continued eligibility.* As part of an annual review, each Participant must annually submit to the servicing district office the following:

(1) A certification that it meets the 8(a) BD program eligibility requirements as set forth in § 124.101 through § 124.108 and paragraph (a) of this section;

(2) A certification that there have been no changed circumstances which could adversely affect the Participant's program eligibility. If the Participant is unable to provide such certification, the Participant must inform SBA of any changes and provide relevant supporting documentation.

(3) Personal financial information for each disadvantaged owner;

(4) A record from each individual claiming disadvantaged status regarding the transfer of assets for less than fair market value to any immediate family member, or to a trust any beneficiary of which is an immediate family member, within two years of the date of the annual review. The record must provide the name of the recipient(s) and family relationship, and the difference between the fair market value of the asset transferred and the value received by the disadvantaged individual.

(5) A record of all payments, compensation, and distributions (including loans, advances, salaries and dividends) made by the Participant to each of its owners, officers or directors, or to any person or entity affiliated with such individuals;

(6) If it is an approved protege, a narrative report detailing the contacts it has had with its mentor and benefits it has received from the mentor/protege relationship. See § 124.520(b)(4) for additional annual requirements;

(7) IRS Form 4506, Request for Copy or Transcript of Tax Form; and

(8) Such other information as SBA may deem necessary. For other required annual submissions, *see* §§ 124.601 through 124.603.

(c) *Eligibility reviews.* (1) Upon receipt of specific and credible information alleging that a Participant no longer meets the eligibility requirements for continued program eligibility, SBA will review the concern's eligibility for continued participation in the program.

(2) Sufficient reasons for SBA to conclude that a socially disadvantaged individual is no longer economically disadvantaged include, but are not limited to, excessive withdrawals of funds or other assets withdrawn from the concern by its owners, or substantial personal assets, income or net worth of any disadvantaged owner. SBA may also consider access by the Participant firm to a significant new source of capital or loans since the financial condition of the Participant is considered in evaluating the disadvantaged individual's economic status.

(d) *Excessive withdrawals.* (1) The term withdrawal includes, but is not limited to, the following: officer's salary; cash dividends; distributions in excess of amounts needed to pay S Corporation taxes; cash and property withdrawals; bonuses; loans; advances; payments to immediate family members; investments on behalf of an owner, officer, or key employee; acquisition of a business not merged with the 8(a) Participant; charitable contributions; and speculative ventures.

(2) If SBA determines that excessive funds or other assets have been withdrawn from the Participant, SBA may:

(i) Initiate termination proceedings under §§ 124.303 and 124.304 where the withdrawals detrimentally affect the achievement of the Participant's targets, objectives and goals set forth in its business plan, or its overall business development;

(ii) Initiate early graduation proceedings under §§ 124.302 and 124.303 where the withdrawals do not adversely affect the Participant's business development; or

(iii) Require an appropriate reinvestment of funds or other assets, as well as any other actions SBA deems necessary to counteract the detrimental effects of the withdrawals, as a condition of the Participant maintaining program eligibility.

(3) Withdrawals are excessive if during any fiscal year of the Participant they exceed (i) $150,000 for firms with sales up to $1,000,000; (ii) $200,000 for firms with sales between $1,000,000 and $2,000,000; and (iii) $300,000 for firms with sales over $2,000,000.

(4) The fact that a concern's net worth has increased despite withdrawals that are deemed excessive will not preclude SBA from determining that such withdrawals were detrimental to the attainment of the concern's business objectives or to its overall business development.

## Applying to the 8(a) BD Program

**§ 124.201 May any business submit an application?**

Any concern or any individual on behalf of a business has the right to apply for 8(a) BD program participation whether or not there is an appearance of eligibility.

**§ 124.202 Where must an application be filed?**

An application for 8(a) BD program admission must be filed in the SBA Division of Program Certification and Eligibility (DPCE) field office serving the territory in which the principal place of business is located. The SBA district office will provide an applicant concern with information regarding the 8(a) BD program and with all required application forms.

**§ 124.203 What must a concern submit to apply to the 8(a) BD program?**

Each 8(a) BD applicant concern must submit those forms and attachments required by SBA when applying for admission to the 8(a) BD program. These forms and attachments will include, but not be limited to, financial statements, Federal personal and business tax returns, and personal history statements. An applicant must also submit IRS Form 4506, Request for Copy

or Transcript of Tax Form, to SBA. The application package may be in the form of an electronic application.

**§ 124.204 How does SBA process applications for 8(a) BD program admission?**

(a) The AA/8(a)BD is authorized to approve or decline applications for admission to the 8(a) BD program. The appropriate DPCE field office will receive, review and evaluate all 8(a) BD applications except those from ANC-owned applicants. SBA's Anchorage District Office will receive all applications from ANC-owned applicants and review them for completeness before sending them to the AA/8(a)BD for further processing. The appropriate field office will advise each program applicant within 15 days after the receipt of an application whether the application is complete and suitable for evaluation and, if not, what additional information or clarification is required to complete the application. SBA will process an application for 8(a) BD program participation within 90 days of receipt of a complete application package by the DPCE field office. Incomplete application packages will not be processed.

(b) SBA, in its sole discretion, may request clarification of information contained in the application at any time in the application process. SBA will take into account any clarifications made by an applicant in response to a request for such by SBA.

(c) An applicant concern's eligibility will be based on circumstances existing on the date of application, except where clarification is made pursuant to paragraph (b) of this section or as provided in paragraph (d) of this section.

(d) Changed circumstances for an applicant concern occurring subsequent to its application and which adversely affect eligibility will be considered and may constitute grounds for decline. The applicant must inform SBA of any changed circumstances that could adversely affect its eligibility for the program (particularly economic disadvantage and ownership and control) during its application review. Failure to inform SBA of any such changed circumstances constitutes good cause for which SBA may terminate the Participant if non-compliance is discovered after admittance.

(e) The decision of the AA/8(a)BD to approve or deny an application will be in writing. A decision to deny admission will state the specific reasons for denial, and will inform the applicant of any appeal rights.

(f) If the AA/8(a)BD approves the application, the date of the approval letter is the date of program certification for purposes of determining the concern's program term.

**§ 124.205 Can an applicant ask SBA to reconsider SBA's initial decision to decline its application?**

(a) An applicant may request the AA/8(a)BD to reconsider his or her initial decline decision by filing a request for reconsideration with the SBA field office that originally processed its application. Filing means submission by personal delivery, first-class mail, express mail, fascimile transmission followed by first-class mail, or commercial delivery service. The applicant must submit its request for reconsideration within 45 days of receiving notice that its application was declined. The applicant must provide any additional information and documentation pertinent to overcoming the reason(s) for the initial decline.

(b) The AA/8(a)BD will issue a written decision within 45 days of the regional DPCE's receipt of the applicant's request. The AA/8(a)BD may either approve the application, deny it on the same grounds as the original decision, or deny it on other grounds. If denied, the AA/8(a)BD will explain why the applicant is not eligible for admission to the 8(a) BD program and give specific reasons for the decline.

(c) If the AA/8(a)BD declines the application solely on issues not raised in the initial decline, the applicant can ask for reconsideration as if it were an initial decline.

**§ 124.206 What appeal rights are available to an applicant that has been denied admission?**

(a) An applicant may appeal a denial of program admission to SBA's Office of Hearings and Appeals (OHA), if it is based solely on a negative finding of social disadvantage, economic disadvantage, ownership, control, or any combination of these four criteria. A denial decision that is based at least in part on the failure to meet any other eligibility criterion is not appealable and is the final decision of SBA.

(b) The applicant may appeal an initial decision of the AA/8(a)BD without requesting reconsideration, or may appeal the decision of the AA/8(a)BD on reconsideration.

(c) The applicant may initiate an appeal by filing a petition in accordance with part 134 of this title with OHA within 45 days of the date of service (as defined in § 134.204) of the Agency decision.

(d) If an appeal is filed with OHA, the written decision of the Administrative Law Judge is the final Agency decision. If an appealable decision is not appealed, the decision of the AA/8(a)BD is the final Agency decision.

**§ 124.207 Can an applicant reapply for admission to the 8(a) BD program?**

A concern which has been declined for 8(a) BD program admission may submit a new application for admission to the program 12 months after the date of the final Agency decision to decline.

**Exiting the 8(a) BD Program**

**§ 124.301 What are the ways a business may leave the 8(a) BD program?**

A concern participating in the 8(a) BD program may leave the program by any of the following means:

(a) Graduation upon the expiration of the program term established pursuant to § 124.2;

(b) Voluntary early graduation;

(c) Early graduation pursuant to the provisions of §§ 124.302 and 124.304; or

(d) Termination pursuant to the provisions of §§ 124.303 and 124.304.

**§ 124.302 What is early graduation?**

(a) *General.* SBA may graduate a firm from the 8(a) BD program prior to the expiration of its Program Term where SBA determines that:

(1) The concern has successfully completed the 8(a) BD program by substantially achieving the targets, objectives, and goals set forth in its business plan prior to the expiration of its program term, and has demonstrated the ability to compete in the marketplace without assistance under the 8(a) BD program; or

(2) One or more of the disadvantaged owners upon whom the Participant's eligibility is based are no longer economically disadvantaged.

(b) *Criteria for determining whether a Participant has met its goals and objectives.* In determining whether a Participant has substantially achieved the targets, objectives and goals of its business plan and in assessing the overall competitive strength and viability of a Participant, SBA considers the totality of circumstances, including the following factors:

(1) Degree of sustained profitability;

(2) Sales trends, including improved ratio of non-8(a) sales to 8(a) sales since program entry;

(3) Business net worth, financial ratios, working capital, capitalization, and access to credit and capital;

(4) Current ability to obtain bonding;

(5) A comparison of the Participant's business and financial profiles with profiles of non-8(a) BD businesses having the same primary four-digit SIC code as the Participant;

(6) Strength of management experience, capability, and expertise; and

(7) Ability to operate successfully without 8(a) contracts.

(c) *Excessive withdrawals.* SBA may graduate a Participant prior to the expiration of its program term where excessive funds or other assets have been withdrawn from the Participant (see § 124.112(d)(3)), causing SBA to determine that the Participant has demonstrated the ability to compete in the marketplace without assistance under the 8(a) BD program.

**§ 124.303 What is termination?**

(a) SBA may terminate the participation of a concern in the 8(a) BD program prior to the expiration of the concern's Program Term for good cause. Examples of good cause include, but are not limited to, the following:

(1) Submission of false information in the concern's 8(a) BD application, regardless of whether correct information would have caused the concern to be denied admission to the program, and regardless of whether correct information was given to SBA in accompanying documents or by other means.

(2) Failure by the concern to maintain its eligibility for program participation.

(3) Failure by the concern for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership, full-time day-to-day management, and control by disadvantaged individuals.

(4) Failure by the concern to obtain prior written approval from SBA for any changes in ownership or business structure, management or control pursuant to §§ 124.105 and 124.106.

(5) Failure by the concern to disclose to SBA the extent to which non-disadvantaged persons or firms participate in the management of the Participant business concern.

(6) Failure by the concern or one or more of the concern's principals to maintain good character.

(7) A pattern of failure to make required submissions or responses to SBA in a timely manner, including a failure to provide required financial statements, requested tax returns, reports, updated business plans, information requested by SBA's Office of Inspector General, or other requested information or data within 30 days of the date of request.

(8) Cessation of business operations by the concern.

(9) Failure by the concern to pursue competitive and commercial business in accordance with its business plan, or failure in other ways to make reasonable efforts to develop and achieve competitive viability.

(10) A pattern of inadequate performance by the concern of awarded section 8(a) contracts.

(11) Failure by the concern to pay or repay significant financial obligations owed to the Federal Government.

(12) Failure by the concern to obtain and keep current any and all required permits, licenses, and charters, including suspension or revocation of any professional license required to operate the business.

(13) Excessive withdrawals, including transfers of funds or other business assets, from the concern for the personal benefit of any of its owners or any person or entity affiliated with the owners that hinder the development of the concern (*see* § 124.112(d).

(14) Unauthorized use of SBA direct or guaranteed loan proceeds or violation of an SBA loan agreement.

(15) Submission by or on behalf of a Participant of false information to SBA, including false certification of compliance with non-8(a) business activity targets under § 124.507 or failure to report changes that adversely affect the program eligibility of an applicant or program participant under § 124.204 and § 124.112, where responsible officials of the 8(a) BD Participant knew or should have known the submission to be false.

(16) Debarment, suspension, voluntary exclusion, or ineligibility of the concern or its principals pursuant to part 145 of this title or FAR subpart 9.4 (48 CFR part 9, subpart 9.4).

(17) Conduct by the concern, or any of its principals, indicating a lack of business integrity. Such conduct may be demonstrated by information related to a criminal indictment or guilty plea, a criminal conviction, or a judgment or settlement in a civil case.

(18) Willful failure by the Participant business concern to comply with applicable labor standards and obligations.

(19) Material breach of any terms and conditions of the 8(a) BD Program Participation Agreement.

(20) Willful violation by a concern, or any of its principals, of any SBA regulation pertaining to material issues.

(b) The examples of good cause listed in paragraph (a) of this section are intended to be illustrative only. Other grounds for terminating a Participant from the 8(a) BD program for cause may exist and may be used by SBA.

**§ 124.304 What are the procedures for early graduation and termination?**

(a) *General.* The same procedures apply to both early graduation and termination of Participants from the 8(a) BD program.

(b) *Letter of Intent to Terminate or Graduate Early.* When SBA believes that a Participant should be terminated or graduated prior to the expiration of its program term, SBA will notify the concern in writing. The Letter of Intent to Terminate or Graduate Early will set forth the specific facts and reasons for SBA's findings, and will notify the concern that it has 30 days from the date of service (as defined in § 134.204 of this title) of the letter to submit a written response to SBA explaining why the proposed ground(s) should not justify termination or early graduation. Service is defined in § 134.204.

(c) *Recommendation and decision.* Following the 30-day response period, the Assistant Administrator for DPCE (AA/DPCE) or designee will consider the proposed early graduation or termination and any information submitted in response by the concern. Upon determining that early graduation or termination is not warranted, the AA/DPCE or designee will notify the Participant in writing. If early graduation or termination appears warranted, the AA/DPCE will make such a recommendation to the AA/8(a)BD, who will then make a decision whether to early graduate or terminate the concern. SBA will act in a timely manner in processing early graduation and termination actions.

(d) *Notice requirements.* Upon deciding that early graduation or termination is warranted, the AA/8(a)BD will issue a Notice of Early Graduation or Termination. The Notice will set forth the specific facts and reasons for the decision, and will advise the concern that it may appeal the decision in accordance with the provisions of part 134 of this title.

(e) *Appeal to OHA.* Procedures governing appeals of early graduation or termination to SBA's OHA are set forth in part 134. If a Participant does not appeal a Notification of Early Graduation or Termination within 45 days of the date of service (as defined in § 134.204), the decision of the AA/8(a)BD is the final agency decision effective on the date the appeal right expired.

(f) *Effect of early graduation or termination.* After the effective date of early graduation or termination, a Participant is no longer eligible to receive any 8(a) BD program assistance. However, such concern is obligated to complete previously awarded 8(a) contracts, including any priced options which may be exercised.

### § 124.305 What is suspension and how is a Participant suspended from the 8(a) BD program?

(a) At any time after SBA issues a Letter of Intent to Terminate pursuant to § 124.304, the AA/8(a)BD may suspend 8(a) contract support and all other forms of 8(a) BD program assistance to that concern until the issue of the concern's termination from the program is finally decided. The AA/8(a)BD may suspend a Participant when he or she determines that suspension is needed to protect the interests of the Federal Government, such as where information showing a clear lack of program eligibility or conduct indicating a lack of business integrity exists, including where the concern or one of its principals submitted false statements to the Federal Government. SBA will suspend a Participant where SBA determines that the Participant submitted false information in its 8(a) BD application.

(b) SBA will issue a Notice of Suspension to the Participant's last known address by certified mail, return receipt requested. Suspension is effective as of the date of the issuance of the Notice. The Notice will provide the following information:

(1) The basis for the suspension;

(2) A statement that the suspension will continue pending the completion of further investigation, a final program termination determination, or some other specified period of time;

(3) A statement that awards of competitive and non-competitive 8(a) contracts, including those which have been ''self-marketed'' by a Participant, will not be made during the pendency of the suspension unless it is determined by the head of the relevant procuring agency or an authorized representative to be in the best interest of the Government to do so, and SBA adopts that determination;

(4) A statement that the concern is obligated to complete previously awarded section 8(a) contracts;

(5) A statement that the suspension is effective nationally throughout SBA;

(6) A statement that a request for a hearing on the suspension will be considered by an Administrative Law Judge at OHA, and granted or denied as a matter of discretion.

(7) A statement that the firm's participation in the program is suspended effective on the date the Notice is served, and that the program term will resume only if the suspension is lifted or the firm is not terminated.

(c) The applicant concern may appeal a Notice of Suspension by filing a petition in accordance with part 134 of this title with OHA within 45 days of the date of service (as defined in § 134.204) of a Notice of Suspension pursuant to paragraph (b) of this section. It is contemplated that in most cases a hearing on the issue of the suspension will be afforded if the Participant requests one, but authority to grant a hearing is within the discretion of the Administrative Law Judge in OHA. A suspension remains in effect pending the result of its appeal.

(d) SBA has the burden of showing that adequate evidence exists that protection of the Federal Government's interest requires suspension before OHA or the AA/8(a)BD makes a final determination regarding the termination action.

(1) The term ''adequate evidence'' means information contained in the record before the AA/8(a)BD at the time of his or her suspension decision that is sufficient to support the reasonable belief that the Government's interests need to be protected.

(2) SBA need not demonstrate that an act or omission actually occurred in order for OHA to uphold a suspension. SBA's burden in a suspension proceeding is limited to demonstrating that it had a reasonable belief that a particular act or omission occurred, and that that act or omission requires suspension to protect the interests of the Government.

(3) Unless the Administrative Law Judge consolidates the suspension and termination proceedings, OHA's review is limited to determining whether the Government's interests need to be protected, and will not consider the merits of the termination action.

(e) If there is a timely appeal, the decision of the Administrative Law Judge is the final SBA decision. If there is not a timely appeal, the decision of the AA/8(a)BD is the final Agency decision.

(f) Upon the request of SBA, OHA may consolidate suspension and termination proceedings when the issues presented are identical.

(g) Any program suspension which occurs under this section is effective until such time as SBA lifts the suspension or the Participant's participation in the program is fully terminated. If the concern is ultimately not terminated from the 8(a) BD program, the suspension will be lifted and the length of the suspension will be added to the concern's program term.

(h) SBA may suspend a Participant from program benefits where a change of ownership or business structure has been requested if ownership or control of the participant changed prior to SBA's approval pending resolution of the request to change its ownership or control. If the change of ownership is approved, the length of the suspension will be added to the firm's program term where the change in ownership results from the death or incapacity of a disadvantaged individual or where the firm requested prior approval and waited 60 days for SBA approval before making the change. The suspension will be commenced by the issuance of a notice similar to that required for termination-related suspensions under paragraph (b) of this section, except that a change of ownership suspension is not appealable.

(i) SBA does not recognize the concept of de facto suspension. Adding time to the end of a Participant's program term equal to the length of a suspension will occur only where a concern's program participation has been formally suspended in accordance with the procedures set forth in this section.

(j) A suspension from 8(a) BD participation under this section has no effect on a concern's eligibility for non-8(a) Federal Government contracts. However, a debarment or suspension under the Federal Acquisition Regulation (48 CFR, chapter 1) will disqualify a concern from receiving all Federal Government contracts, including 8(a) contracts.

## Business Development

### § 124.401 Which SBA field office services a Participant?

The SBA district office which serves the geographical territory where a Participant's principal place of business is located normally will service the concern during its participation in the 8(a) BD program.

### § 124.402 How does a Participant develop a business plan?

(a) *General.* In order to assist the SBA servicing office in determining the business development needs of its portfolio Participants, each Participant must develop a comprehensive business plan setting forth its business targets, objectives, and goals.

(b) *Submission of initial business plan.* Each Participant must submit a business plan to its SBA servicing office as soon as possible after program admission. The Participant will not be eligible for 8(a) BD program benefits, including 8(a) contracts, until SBA approves its business plan.

(c) *Contents of business plan.* The business plan must contain at least the following:

(1) A detailed description of any products currently being produced and any services currently being performed by the concern, as well as any future

plans to enter into one or more new markets;

(2) The applicant's designation of its primary industry classification, as defined in § 124.3;

(3) An analysis of market potential, competitive environment, and the concern's prospects for profitable operations during and after its participation in the 8(a) BD program;

(4) An analysis of the concern's strengths and weaknesses, with particular attention on ways to correct any financial, managerial, technical, or work force conditions which could impede the concern from receiving and performing non-8(a) contracts;

(5) Specific targets, objectives, and goals for the business development of the concern during the next two years;

(6) Estimates of both 8(a) and non-8(a) contract awards that will be needed to meet its targets, objectives and goals; and

(7) Such other information as SBA may require.

### § 124.403 How is a business plan updated and modified?

(a) *Annual review.* Each Participant must annually review its business plan with its assigned Business Opportunity Specialist (BOS), and modify the plan as appropriate. The Participant must submit a modified plan and updated information to its BOS within thirty (30) days after the close of each program year. It also must submit a capability statement describing its current contract performance capabilities as part of its updated business plan.

(b) *Contract forecast.* As part of the annual review of its business plan, each Participant must annually forecast in writing its needs for contract awards for the next program year. The forecast must include:

(1) The aggregate dollar value of 8(a) contracts to be sought, broken down by sole source and competitive opportunities where possible;

(2) The aggregate dollar value of non-8(a) contracts to be sought;

(3) The types of contract opportunities to be sought, identified by product or service; and

(4) Such other information as SBA may request to aid in providing effective business development assistance to the Participant.

(c) *Transition management strategy.* Beginning in the first year of the transitional stage of program participation, each Participant must annually submit a transition management strategy to be incorporated into its business plan. The transition management strategy must describe:

(1) How the Participant intends to meet the applicable non-8(a) business activity target imposed by § 124.507 during the transitional stage of participation; and

(2) The specific steps the Participant intends to take to continue its business growth and promote profitable business operations after the expiration of its program term.

### § 124.404 What business development assistance is available to Participants during the two stages of participation in the 8(a) BD program?

(a) *General.* Participation in the 8(a) BD program is divided into two stages, a developmental stage and a transitional stage. The developmental stage will last four years, and the transitional stage will last five years, unless the concern has exited the program by one of the means set forth in § 124.301 prior to the expiration of its program term.

(b) *Developmental stage of program participation.* A Participant, if otherwise eligible, may receive the following assistance during the developmental stage of program participation:

(1) Sole source and competitive 8(a) contract support;

(2) Financial assistance pursuant to § 120.375 of this title;

(3) The transfer of technology or surplus property owned by the United States pursuant to § 124.405; and

(4) Training to aid in developing business principles and strategies to enhance their ability to compete successfully for both 8(a) and non-8(a) contracts.

(c) *Transitional stage of program participation.* A Participant, if otherwise eligible, may receive the following assistance during the transitional stage of program participation:

(1) The same assistance as that provided to Participants in the developmental stage;

(2) Assistance from procuring agencies (in cooperation with SBA) in forming joint ventures, leader-follower arrangements, and teaming agreements between the concern and other Participants or other business concerns with respect to contracting opportunities outside the 8(a) BD program for research, development, or full scale engineering or production of major systems (these arrangements must comply with all relevant statutes and regulations, including applicable size standard requirements); and

(3) Training and technical assistance in transitional business planning.

### § 124.405 How does a Participant obtain Federal Government surplus property?

(a) *General.* (1) Pursuant to 15 U.S.C. 636(j)(13)(F), eligible Participants may receive surplus Federal Government property from State Agencies for Surplus Property (SASPs). The procedures set forth in 41 CFR Part 101–44 and this section will be used to transfer surplus property to eligible Participants.

(2) The property which may be transferred to SASPs for further transfer to eligible Participants includes all personal property which has been determined to be ''donable'' as defined in 41 CFR 101–44.001–3.

(b) *Eligibility to receive Federal surplus property.* To be eligible to receive Federal surplus property, on the date of transfer a concern must:

(1) Be in the 8(a) BD program;

(2) Be in compliance with all program requirements, including any reporting requirements;

(3) Not be debarred, suspended, or declared ineligible under part 9, subpart 9.4 of the Federal Acquisition Regulations, Title 48 of the Code of Federal Regulations;

(4) Not be under a pending 8(a) BD program suspension, termination or early graduation proceeding; and

(5) Be engaged or expect to be engaged in business activities making the item useful to it.

(c) *Use of acquired surplus property.* (1) Eligible Participants may acquire surplus Federal property from any SASP located in any state, provided the concern represents and agrees in writing:

(i) As to what the intended use of the surplus property is to be and that this use is consistent with the objectives of the concern's 8(a) business plan;

(ii) That it will use the property to be acquired in the normal conduct of its business activities or be liable for the fair rental value from the date of its receipt;

(iii) That it will not sell or transfer the property to be acquired to any party other than the Federal Government during its term of participation in the 8(a) program and for one year after it leaves the program;

(iv) That, at its own expense, it will return the property to a SASP or transfer it to another Participant if directed to do so by SBA because it has not used the property as intended within one year of receipt;

(v) That, should it breach its agreement not to sell or transfer the property, it will be liable to the Government for the established fair market value or the sale price, whichever is greater, of the property sold or transferred; and

(vi) That it will give SBA access to inspect the property and all records pertaining to it.

(2) A firm receiving surplus property pursuant to this section assumes all liability associated with or stemming from the use of the property.

(3) If the property is not placed in use for the purposes for which it was intended within one year of its receipt, SBA may direct the concern to deliver the property to another Participant or to the SASP from which it was acquired.

(4) Failure to comply with any of the commitments made under paragraph (c)(1) of this section constitutes a basis for termination from the 8(a) program.

(d) *Procedures for acquiring Federal Government surplus property.* (1) Participants may participate in the surplus property distribution program administered by the SASPs to the same extent, but with no special priority over, other authorized transferees. *See* 41 CFR subpart 101–44.2.

(2) Each Participant seeking to acquire Federal Government surplus property from a SASP must:

(i) Certify in writing to the SASP that it is eligible to receive the property pursuant to paragraph (b) of this section;

(ii) Make the written representations and agreement required by paragraph (c)(1) of this section; and

(iii) Identify to the SASP its servicing SBA field office.

(3) Upon receipt of the required certification, representations, agreement, and information set forth in paragraph (d)(2) of this section, the SASP must contact the appropriate SBA field office and obtain SBA's verification that the concern seeking to acquire the surplus property is eligible, and that the identified use of the property is consistent with the concern's business activities. SASPs may not release property to a Participant without this verification.

(4) The SASP and the Participant must agree on and record the fair market value of the surplus property at the time of the transfer to the Participant. The SASP must provide to SBA a written record, including the agreed upon fair market value, of each transaction to a Participant when any property has been transferred.

(e) *Costs.* Participants acquiring surplus property from a SASP must pay a service fee to the SASP which is equal to the SASP's direct costs of locating, inspecting, and transporting the surplus property. If a Participant elects to incur the responsibility and the expense for transporting the acquired property, the concern may do so and no transportation costs will be charged by the SASP. In addition, the SASP may charge a reasonable fee to cover its costs of administering the program. In no instance will any SASP charge a Participant more for any service than their established fees charged to other transferees.

(f) *Title.* The title to surplus property acquired from a SASP will pass to the Participant when the Participant executes the applicable SASP distribution documents and takes possession of the property.

(g) *Compliance.* (1) SBA will periodically review whether Participants that have received surplus property have used and maintained the property as agreed. This review may include site visits to visually inspect the property to ensure that it is being used in a manner consistent with the terms of its transfer.

(2) Participants must provide SBA with access to all relevant records upon request.

(3) Where SBA receives credible information that transferred surplus property may have been disposed of or otherwise used in a manner that is not consistent with the terms of the transfer, SBA may investigate such claim to determine its validity.

(4) SBA may take any action to correct any noncompliance involving the use of transferred property still in possession of the Participant or to enforce any terms, conditions, reservations, or restrictions imposed on the property by the distribution document. Actions to enforce compliance, or which may be taken as a result of noncompliance, include the following:

(i) Requiring that the property be placed in proper use within a specified time;

(ii) Requiring that the property be transferred to another Participant having a need and use for the property, returned to the SASP serving the area where the property is located for distribution to another eligible transferee or to another SASP, or transferred through GSA to another Federal agency;

(iii) Recovery of the fair rental value of the property from the date of its receipt by the Participant; and

(iv) Initiation of proceedings to terminate the Participant from the 8(a) BD program.

(5) Where SBA finds that a recipient has sold or otherwise disposed of the acquired surplus property in violation of the agreement covering sale and disposal, the Participant is liable for the agreed upon fair market value of the property at the time of the transfer, or the sale price, whichever is greater. However, a Participant need not repay any amount where it can demonstrate to SBA's satisfaction that the property is no longer useful for the purpose for which it was transferred and receives SBA's prior written consent to transfer the property. For example, if a piece of equipment breaks down beyond repair, it may be disposed of without being subject to the repayment provision, so long as the concern receives SBA's prior consent.

(6) Any funds received by SBA in enforcement of this section will be remitted promptly to the Treasury of the United States as miscellaneous receipts.

**Contractual Assistance**

**§ 124.501 What general provisions apply to the award of 8(a) contracts?**

(a) Pursuant to section 8(a) of the Small Business Act, SBA is authorized to enter into all types of contracts with other Federal agencies, including contracts to furnish equipment, supplies, services, leased real property, or materials to them or to perform construction work for them, and to contract the performance of these contracts to qualified Participants. Where practicable, simplified acquisition procedures should be used for 8(a) contracts at or below the simplified acquisition threshold. Where appropriate, SBA will delegate the contract execution function to procuring activities. In order to receive and retain a delegation of SBA's contract execution and review functions, a procuring activity must report all 8(a) contract awards, modifications, and options to SBA.

(b) 8(a) contracts may either be sole source awards or awards won through competition with other Participants.

(c) Admission into the 8(a) BD program does not guarantee that a Participant will receive 8(a) contracts.

(d) A requirement for possible award may be identified by SBA, a particular Participant or the procuring activity itself. SBA will submit the capability statements provided to SBA annually under § 124.403 to appropriate procuring activities for the purpose of matching requirements with Participants.

(e) Participants should market their capabilities to appropriate procuring activities to increase their prospects of receiving sole source 8(a) contracts.

(f) An 8(a) participant that identifies a requirement that appears suitable for award through the 8(a) BD program may request SBA to contact the procuring activity to request that the requirement be offered to the 8(a) BD program.

(g) A concern must be a current Participant in the 8(a) BD program at the time of award, except as provided in § 124.507(d).

(h) A Participant must certify that it is a small business under the size

standard corresponding to the SIC code assigned to each 8(a) contract. 8(a) BD program personnel will verify size prior to award of an 8(a) contract. If the Participant is not verified as small, it may request a formal size determination from the appropriate General Contracting Area Office under part 121 of this title.

(i) Any person or entity that misrepresents its status as a ''small business concern owned and controlled by socially and economically disadvantaged individuals'' in order to obtain any 8(a) contracting opportunity will be subject to possible criminal, civil and administrative penalties, including those imposed by section 16(d) of the Small Business Act, 15 U.S.C. 645(d).

**§ 124.502 How does an agency offer a procurement to SBA for award through the 8(a) BD program?**

(a) A procuring activity contracting officer indicates his or her formal intent to award a procurement requirement as an 8(a) contract by submitting a written offering letter to SBA. The procuring activity may transmit the offering letter to SBA by electronic mail, if available, or by facsimile transmission, as well as by mail or commercial delivery service.

(b) Contracting officers must submit offering letters to the following locations:

(1) For competitive 8(a) requirements and those sole source requirements for which no specific Participant is nominated (i.e., open requirements) other than construction requirements, to the SBA district office serving the geographical area in which the procuring activity is located;

(2) For competitive and open construction requirements, to the SBA district office serving the geographical area in which the work is to be performed or, in the case of such contracts to be performed overseas, to the Office of 8(a) BD located in SBA Headquarters;

(3) For sole source requirements offered on behalf of a specific Participant, to the SBA district office servicing that concern.

(c) An offering letter must contain the following information:

(1) A description of the work to be performed;

(2) The estimated period of performance;

(3) The SIC code that applies to the principal nature of the acquisition;

(4) The anticipated dollar value of the requirement, including options, if any;

(5) Any special restrictions or geographical limitations on the requirement;

(6) The location of the work to be performed for construction procurements;

(7) Any special capabilities or disciplines needed for contract performance;

(8) The type of contract to be awarded, such as firm fixed price, cost reimbursement, or time and materials;

(9) The acquisition history, if any, of the requirement;

(10) The names and addresses of any small business contractors which have performed on this requirement during the previous 24 months;

(11) A statement that prior to the offering no solicitation for the specific acquisition has been issued as a small business set-aside, or as a small disadvantaged business set-aside if applicable, and that no other public communication (such as a notice in the Commerce Business Daily) has been made showing the procuring activity's clear intent to use any of these means of procurement;

(12) Identification of any specific Participant that the procuring activity contracting officer nominates for award of a sole source 8(a) contract, if appropriate, including a brief justification for the nomination, such as one of the following:

(i) The Participant, through its own efforts, marketed the requirement and caused it to be reserved for the 8(a) BD program; or

(ii) The acquisition is a follow-on or renewal contract and the nominated concern is the incumbent;

(13) Bonding requirements, if applicable;

(14) Identification of all Participants which have expressed an interest in being considered for the acquisition;

(15) Identification of all SBA field offices which have requested that the requirement be awarded through the 8(a) BD program;

(16) A request, if appropriate, that a requirement whose estimated contract value is under the applicable competitive threshold be awarded as an 8(a) competitive contract; and

(17) Any other information that the procuring activity deems relevant or which SBA requests.

**§ 124.503 How does SBA accept a procurement for award through the 8(a) BD program?**

(a) *Acceptance of the requirement.* Upon receipt of the procuring activity's offer of a procurement requirement, SBA will determine whether it will accept the requirement for the 8(a) BD program. SBA's decision whether to accept the requirement will be sent to the procuring activity in writing within 10 working days of receipt of the written offering letter if the contract is valued at more than the simplified acquisition threshold, and within two days of receipt of the offering letter if the contract is valued at or below the simplified acquisition threshold, unless SBA requests, and the procuring activity grants, an extension. SBA is not required to accept any particular procurement offered to the 8(a) BD program.

(1) Where SBA decides to accept an offering of a sole source 8(a) procurement, SBA will accept the offer both on behalf of the 8(a) BD program and in support of a specific Participant.

(2) Where SBA decides to accept an offering of a competitive 8(a) procurement, SBA will accept the offer on behalf of the 8(a) BD program.

(3) Where SBA has delegated its contract execution functions to a procuring activity, the procuring activity may assume that SBA accepts its offer for the 8(a) program if the procuring activity does not receive a reply to its offer within five days.

(4) In the case of procurement requirements valued at or below the Simplified Acquisition Procedures threshold:

(i) Where a procuring activity makes an offer to the 8(a) program on behalf of a specific Program Participant and does not receive a reply to its offer within two days, the procuring activity may assume the offer is accepted and proceed with award of an 8(a) contract;

(ii) Where SBA has delegated its 8(a) contract execution functions to an agency, SBA may authorize the procuring activity to award an 8(a) contract without requiring an offer and acceptance of the requirement for the 8(a) program. In such a case, the procuring activity must notify SBA of all 8(a) awards made under this authority.

(5) Where SBA does not respond to an offering letter within the normal 10-day time period, the procuring activity may seek SBA's acceptance through the AA/8(a)BD. The procuring activity may assume that SBA accepts its offer for the 8(a) program if it does not receive a reply from the AA/8(a)BD within 5 days of his or her receipt of the procuring activity request.

(b) *Verification of SIC code.* As part of the acceptance process, SBA will verify the appropriateness of the SIC code designation assigned to the requirement by the procuring activity contracting officer.

(1) SBA will accept the SIC code assigned to the requirement by the procuring activity contracting officer as

long as it is reasonable, even though other SIC codes may also be reasonable.

(2) If SBA and the procuring activity are unable to agree as to the proper SIC code designation for the requirement, SBA may either refuse to accept the requirement for the 8(a) BD program, appeal the contracting officer's determination to the head of the agency pursuant to § 124.505, or appeal the SIC code designation to OHA under part 134 of this title.

(c) *Sole source award where procuring activity nominates a specific Participant.* SBA will determine whether an appropriate match exists where the procuring activity identifies a particular Participant for a sole source award.

(1) Once SBA determines that a procurement is suitable to be accepted as an 8(a) sole source contract, SBA will normally accept it on behalf of the Participant recommended by the procuring activity, provided that:

(i) The procurement is consistent with the Participant's business plan;

(ii) The Participant complies with its applicable non-8(a) business activity target imposed by § 124.509(d);

(iii) The Participant is small for the size standard corresponding to the SIC code assigned to the requirement by the procuring activity contracting officer; and

(iv) The Participant has submitted required financial statements to SBA.

(2) If an appropriate match exists, SBA will advise the procuring activity whether SBA will participate in contract negotiations or whether SBA will authorize the procuring activity to negotiate directly with the identified Participant. Where SBA has delegated its contract execution functions to a procuring activity, SBA will also identify that delegation in its acceptance letter.

(3) If an appropriate match does not exist, SBA will notify the Participant and the procuring activity, and may then nominate an alternate Participant.

(d) *Open requirements.* When a procuring activity does not nominate a particular concern for performance of a sole source 8(a) contract (open requirement), the following additional procedures will apply:

(1) If the procurement is a construction requirement, SBA will examine the portfolio of Participants that have a bona fide place of business within the geographical boundaries served by the SBA district office where the work is to be performed to select a qualified Participant. If none is found to be qualified or a match for a concern in that district is determined to be impossible or inappropriate, SBA may nominate a Participant with a bona fide place of business within the geographical boundaries served by another district office within the same state, or may nominate a Participant having a bona fide place of business out of state but within a reasonable proximity to the work site. SBA's decision will ensure that the nominated Participant is close enough to the work site to keep costs of performance reasonable.

(2) If the procurement is not a construction requirement, SBA may select any eligible, responsible Participant nationally to perform the contract.

(3) In cases in which SBA selects a Participant for possible award from among two or more eligible and qualified Participants, the selection will be based upon relevant factors, including business development needs, compliance with competitive business mix requirements (if applicable), financial condition, management ability, technical capability, and whether award will promote the equitable distribution of 8(a) contracts.

(e) *Formal technical evaluations.* Except for requirements for architectural and engineering services, SBA will not authorize formal technical evaluations for sole source 8(a) requirements. A procuring activity:

(1) Must request that a procurement be a competitive 8(a) award if it requires formal technical evaluations of more than one Participant for a requirement below the applicable competitive threshold amount; and

(2) May conduct informal assessments of several Participants' capabilities to perform a specific requirement, so long as the statement of work for the requirement is not released to any of the Participants being assessed.

(f) *Repetitive acquisitions.* A procuring activity contracting officer must submit a new offering letter to SBA where he or she intends to award a follow-on or repetitive contract as an 8(a) award. This enables SBA to determine:

(1) Whether the requirement should be a competitive 8(a) award;

(2) A nominated firm's eligibility, whether or not it is the same firm that performed the previous contract;

(3) The affect that contract award would have on the equitable distribution of 8(a) contracts; and

(4) Whether the requirement should continue under the 8(a) BD program.

(g) *Basic Ordering Agreements (BOAs).* A Basic Ordering Agreement (BOA) is not a contract under the FAR. See 48 CFR 16.703(a). Each order to be issued under the BOA is an individual contract. As such, the procuring activity must offer, and SBA must accept, each task order under a BOA in addition to offering and accepting the BOA itself.

(1) SBA will not accept for award on a sole source basis any task order under a BOA that would cause the total dollar amount of task orders issued to exceed the applicable competitive threshold amount set forth in § 124.506(a).

(2) Where a procuring activity believes that task orders to be issued under a proposed BOA will exceed the applicable competitive threshold amount set forth in § 124.506(a), the procuring activity must offer the requirement to the program to be competed among eligible Participants.

(3) Once a concern's program term expires, the concern otherwise exits the 8(a) BD program, or becomes other than small for the SIC code assigned under the BOA, new orders will not be accepted for the concern.

(h) *Multiple Award and Federal Supply Schedule Contracts.* Unlike Basic Ordering Agreements, Multiple Award and Federal Supply Schedule contracts are contracts. Orders issued under these contracts are not considered separate contracts. As such, SBA's acceptance of the original Multiple Award or Federal Supply Schedule contract is valid for the duration of the contract. Separate offers and acceptances will not be made for individual task orders under these contracts.

(1) Task orders are not required to be competed where the value of the task order will exceed the competitive threshold as long as the original contract was competed.

(2) A concern may continue to accept new orders under a Multiple Award or Federal Supply Schedule contract even where a concern's program term expires, the concern otherwise exits the 8(a) BD program, or the concern becomes other than small for the SIC code assigned under the contract subsequent to award of the contract.

(i) Requirements where SBA has delegated contract execution authority. Except as provided in paragraph (a)(4)(i) of this section, where SBA has delegated its 8(a) contract execution authority to the procuring activity, the procuring activity must still offer and SBA must still accept all requirements intended to be awarded as 8(a) contracts.

**§ 124.504 What circumstances limit SBA's ability to accept a procurement for award as an 8(a) contract?**

SBA will not accept a procurement for award as an 8(a) contract if the circumstances identified in paragraphs (a) through (d) of this section exist.

(a) *Reservation as small business or SDB set-aside.* The procuring activity issued a solicitation for or otherwise expressed publicly a clear intent to reserve the procurement as a small business or small disadvantaged business (SDB) set-aside prior to offering the requirement to SBA for award as an 8(a) contract. The AA/8(a)BD may permit the acceptance of the requirement, however, under extraordinary circumstances.

**Example to paragraph (a).** SBA may accept a requirement where a procuring activity made a decision to offer the requirement to the 8(a) BD program before the solicitation was sent out and the procuring activity acknowledges and documents that the solicitation was in error.

(b) *Competition prior to offer and acceptance.* The procuring activity competed a requirement among Participants prior to offering the requirement to SBA and receiving SBA's formal acceptance of the requirement.

(1) Any competition conducted without first obtaining SBA's formal acceptance of the procurement for the 8(a) BD program will not be considered an 8(a) competitive requirement.

(2) SBA may accept the requirement for the 8(a) BD program as a competitive 8(a) requirement, but only if the procuring activity agrees to resolicit the requirement using appropriate competitive 8(a) procedures.

(c) *Adverse impact.* SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs. The adverse impact concept is designed to protect small business concerns which are performing Government contracts awarded outside the 8(a) BD program, and does not apply to follow-on or renewal 8(a) acquisitions. SBA will not consider adverse impact with respect to any requirement offered to the 8(a) program under Simplified Acquisition Procedures.

(1) In determining whether the acceptance of a requirement would have an adverse impact on an individual small business, SBA will consider all relevant factors.

(i) In connection with a specific small business, SBA presumes adverse impact to exist where:

(A) The small business concern has performed the specific requirement for at least 24 months;

(B) The small business is performing the requirement at the time it is offered to the 8(a) BD program, or its performance of the requirement ended within 30 days of the procuring activity's offer of the requirement to the 8(a) BD program; and

(C) The dollar value of the requirement that the small business is or was performing is 25 percent or more of its most recent annual gross sales (including those of its affiliates). For a multi-year requirement, the dollar value of the last 12 months of the requirement will be used to determine whether a small business would be adversely affected by SBA's acceptance.

(ii) Except as provided in paragraph (c)(2) of this section, adverse impact does not apply to ''new'' requirements. A new requirement is one which has not been previously procured by the relevant procuring activity.

(A) Where a requirement is new, no small business could have previously performed the requirement and, thus, SBA's acceptance of the requirement for the 8(a) BD program will not adversely impact any small business.

(B) Construction contracts, by their very nature (e.g., the building of a specific structure), are deemed new requirements.

(C) The expansion or modification of an existing requirement will be considered a new requirement where the magnitude of change is significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional or different types of capabilities or work.

(D) SBA need not perform an impact determination where a new requirement is offered to the 8(a) BD program.

(2) In determining whether the acceptance of a requirement would have an adverse impact on a group of small businesses, SBA will consider the effects of combining or consolidating various requirements being performed by two or more small business concerns into a single contract which would be considered a ''new'' requirement as compared to any of the previous smaller requirements. SBA may find adverse impact to exist if one of the existing small business contractors meets the presumption set forth in paragraph (c)(1)(i) of this section.

(3) In determining whether the acceptance of a requirement would have an adverse impact on other small business programs, SBA will consider all relevant factors, including but not limited to, the number and value of contracts in the subject industry reserved for the 8(a) BD program as compared with other small business programs.

(d) *Release for non-8(a) competition.* In limited instances, SBA may decline to accept the offer of a follow-on or renewal 8(a) acquisition to give a concern previously awarded the contract that is leaving or has left the 8(a) BD program the opportunity to compete for the requirement outside the 8(a) BD program.

(1) SBA will consider release only where:

(i) The procurement awarded through the 8(a) BD program is being or was performed by either a Participant whose program term will expire prior to contract completion, or, by a former Participant whose program term expired within one year of the date of the offering letter;

(ii) The concern requests in writing that SBA decline to accept the offer prior to SBA's acceptance of the requirement for award as an 8(a) contract; and

(iii) The concern qualifies as a small business for the requirement now offered to the 8(a) BD program.

(2) In considering release, SBA will balance the importance of the requirement to the concern's business development needs against the business development needs of other Participants that are qualified to perform the requirement. This determination will include consideration of whether rejection of the requirement would seriously reduce the pool of similar types of contracts available for award as 8(a) contracts. SBA will seek the views of the procuring activity.

(3) If SBA declines to accept the offer and releases the requirement, it will recommend to the procuring activity that the requirement be procured as a small business or, if authorized, an SDB set-aside.

### § 124.505 When will SBA appeal the terms or conditions of a particular 8(a) contract or a procuring activity decision not to reserve a requirement for the 8(a) BD program?

(a) *What SBA may appeal.* The Administrator of SBA may appeal the following matters to the head of the procuring agency:

(1) A contracting officer's decision not to make a particular procurement available for award as an 8(a) contract;

(2) A contracting officer's decision to reject a specific Participant for award of an 8(a) contract after SBA's acceptance of the requirement for the 8(a) BD program; and

(3) The terms and conditions of a proposed 8(a) contract, including the procuring activity's SIC code designation and estimate of the fair market price.

(b) *Procedures for appeal.* (1) SBA must notify the contracting officer of the SBA Administrator's intent to appeal an adverse decision within 5 working days of SBA's receipt of the decision.

(2) Upon receipt of the notice of intent to appeal, the procuring activity must suspend further action regarding the procurement until the head of the procuring agency issues a written decision on the appeal, unless the head of the procuring agency makes a written determination that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for a consideration of the appeal.

(3) The SBA Administrator must send a written appeal of the adverse decision to the head of the procuring agency within 15 working days of SBA's notification of intent to appeal or the appeal may be considered withdrawn.

(4) By statute (15 U.S.C. 637(a)(1)(A)), the procuring agency head must specify in writing the reasons for a denial of an appeal brought by the Administrator under this section.

### § 124.506 At what dollar threshold must an 8(a) procurement be competed among eligible Participants?

(a) *Competitive thresholds.* (1) A procurement offered and accepted for the 8(a) BD program must be competed among eligible Participants if:

(i) There is a reasonable expectation that at least two eligible Participants will submit offers at a fair market price;

(ii) The anticipated award price of the contract, including options, will exceed $5,000,000 for contracts assigned manufacturing SIC codes and $3,000,000 for all other contracts; and

(iii) The requirement has not been accepted by SBA for award as a sole source 8(a) procurement on behalf of a tribally-owned or ANC-owned concern.

(2) For all types of contracts, the applicable competitive threshold amounts will be applied to the procuring activity estimate of the total value of the contract, including all options. For indefinite delivery or indefinite quantity type contracts, the thresholds are applied to the maximum order amount authorized.

(3) Where the estimate of the total value of a proposed 8(a) contract is less than the applicable competitive threshold amount and the requirement is accepted as a sole source requirement on that basis, award may be made even though the contract price arrived at through negotiations exceeds the competitive threshold, provided that the contract price is not more than ten percent greater than the competitive threshold amount.

**Example to paragraph (a)(3).** If the anticipated award price for a professional services requirement is determined to be $2.7 million and it is accepted as a sole source 8(a) requirement on that basis, a sole source award will be valid even if the contract price arrived at after negotiation is $3.1 million.

(4) A proposed 8(a) requirement with an estimated value exceeding the applicable competitive threshold amount may not be divided into several separate procurement actions for lesser amounts in order to use 8(a) sole source procedures to award to a single contractor.

(b) *Exemption from competitive thresholds for Participants owned by Indian tribes.* SBA may award a sole source 8(a) contract to a Participant concern owned and controlled by an Indian tribe or an ANC where the anticipated value of the procurement exceeds the applicable competitive threshold if SBA has not accepted the requirement into the 8(a) BD program as a competitive procurement. There is no requirement that a procurement must be competed whenever possible before it can be accepted on a sole source basis for a tribally-owned or ANC-owned concern, but a procurement may not be removed from competition to award it to a tribally-owned or ANC-owned concern on a sole source basis.

(c) *Competition below thresholds.* The AA/8(a)BD, on a nondelegable basis, may approve a request from a procuring activity to compete a requirement that is below the applicable competitive threshold amount among eligible Participants.

(1) This authority will be used primarily when technical competitions are appropriate or when a large number of potential awardees exist.

(2) The AA/8(a)BD may consider whether the procuring activity has made and will continue to make available a significant number of its contracts to the 8(a) BD program on a noncompetitive basis.

(3) The AA/8(a)BD may deny a request if the procuring activity previously offered the requirement to the 8(a) BD program on a noncompetitive basis and the request is made following the inability of the procuring activity and the potential sole source awardee to reach an agreement on price or some other material term or condition.

(d) *Sole source above thresholds.* Where a contract opportunity exceeds the applicable threshold amount and there is not a reasonable expectation that at least two eligible 8(a) Participants will submit offers at a fair price, the AA/8(a)BD may accept the requirement for a sole source 8(a) award if he or she determines that an eligible Participant in the 8(a) portfolio is capable of performing the requirement at a fair price.

### § 124.507 What procedures apply to competitive 8(a) procurements?

(a) *FAR procedures.* Procuring activities will conduct competitions among and evaluate offers received from Participants in accordance with the Federal Acquisition Regulation (48 CFR, chapter 1).

(b) *Eligibility determination by SBA.* In either a negotiated or sealed bid competitive 8(a) acquisition, the procuring activity will request that the SBA district office servicing the apparent successful offeror determine that firm's eligibility for award.

(1) Within 5 working days after receipt of a procuring activity's request for an eligibility determination, SBA will determine whether the firm identified by the procuring activity is eligible for award.

(2) Eligibility is based on 8(a) BD program criteria, including whether the Participant is:

(i) A small business under the SIC code assigned to the requirement;

(ii) In compliance with any applicable competitive business mix target established or remedial measure imposed by § 124.509 that does not include the denial of future 8(a) contracts;

(iii) In the developmental stage of program participation if the solicitation restricts offerors to the developmental stage of participation; and

(iv) A concern with a bona fide place of business in the applicable geographic area if the procurement is for construction.

(3) If SBA determines that the apparent successful offeror is ineligible, SBA will notify the procuring activity. The procuring activity will then send to SBA the identity of the next highest evaluated firm for an eligibility determination. The process is repeated until SBA determines that an identified offeror is eligible for award.

(4) Except to the extent set forth in paragraph (d) of this section, SBA determines whether a Participant is eligible for a specific 8(a) competitive requirement as of the date that the Participant submitted its initial offer which includes price.

(5) If the procuring activity contracting officer believes that the apparent successful offeror is not responsible to perform the contract, he or she must refer the concern to SBA for a possible Certificate of Competency in accord with § 125.5 of this title.

(c) *Restricted competition.* (1) *Competition within stages of program participation.* SBA may accept a competitive 8(a) requirement that is limited to Participants in the developmental stage of program

participation, or may accept a requirement to be competed among firms both in the developmental and transitional stages of program participation.

(2) *Construction competitions.* Based on its knowledge of the 8(a) BD portfolio, SBA will determine whether a competitive 8(a) construction requirement should be competed among only those Participants having a bona fide place of business within the geographical boundaries of one or more SBA district offices, within a state, or within the state and nearby areas. Only those Participants with bona fide places of business within the appropriate geographical boundaries are eligible to submit offers.

(3) *Competition for all non-construction requirements.* Except for construction requirements, all eligible Participants regardless of location may submit offers in response to competitive 8(a) solicitations. The only geographic restrictions pertaining to 8(a) competitive requirements, other than those for construction requirements, are any imposed by the solicitations themselves.

(d) *Award to firms whose program terms have expired.* A concern that has completed its term of participation in the 8(a) BD program may be awarded a competitive 8(a) contract if it was a Participant eligible for award of the contract on the initial date specified for receipt of offers contained in the contract solicitation, and if it continues to meet all other applicable eligibility criteria.

(1) Amendments to the solicitation extending the date for submissions of offers will be disregarded.

(2) For a negotiated procurement, a Participant may submit revised offers, including a best and final offer, and be awarded a competitive 8(a) contract if it was eligible as of the initial date specified for the receipt of offers in the solicitation, even though its program term may expire after that date.

### § 124.508 How is an 8(a) contract executed?

(a) An 8(a) contract can be awarded in the following ways:

(1) As a tripartite agreement in which the procuring activity, SBA and the Participant all sign the appropriate contract documents. There may be separate prime and subcontract documents (i.e., a prime contract between the procuring activity and SBA and a subcontract between SBA and the selected 8(a) concern) or a combined contract document representing both the prime and subcontract relationships; or

(2) Where SBA has delegated contract execution authority to the procuring activity, directly by the procuring activity through a contract between the procuring activity and the Participant.

(b) Where SBA receives a contract for signature valued at or below the simplified acquisition threshold, it will sign the contract and return it to the procuring activity within three (3) days of receipt.

(c) In order to be eligible to receive a sole source 8(a) contract, a firm must be a current Participant on the date of award. (*See* § 124.507(d) for competitive 8(a) awards.)

### § 124.509 What are non-8(a) business activity targets?

(a) *General.* (1) To ensure that Participants do not develop an unreasonable reliance on 8(a) awards, and to ease their transition into the competitive marketplace after graduating from the 8(a) BD program, Participants must make maximum efforts to obtain business outside the 8(a) BD program.

(2) During both the developmental and transitional stages of the 8(a) BD program, a Participant must make substantial and sustained efforts, including following a reasonable marketing strategy, to attain the targeted dollar levels of non-8(a) revenue established in its business plan. It must attempt to use the 8(a) BD program as a resource to strengthen the firm for economic viability when program benefits are no longer available.

(b) *Required non-8(a) business activity targets during transitional stage.* (1) *General.* During the transitional stage of the 8(a) BD program, a Participant must achieve certain targets of non-8(a) contract revenue (i.e., revenue from other than sole source or competitive 8(a) contracts). These targets are called non-8(a) business activity targets and are expressed as a percentage of total revenue. The targets call for an increase in non-8(a) revenue over time.

(2) *Non-8(a) business activity targets.* During their transitional stage of program participation, Participants must meet the following non-8(a) business activity targets each year:

| Participant's year in the transitional stage | Non-8(a) business activity targets (required minimum non-8(a) revenue as a percentage of total revenue) |
|---|---|
| 1 | 15 |
| 2 | 25 |
| 3 | 35 |
| 4 | 45 |
| 5 | 55 |

(3) *Compliance with non-8(a) business activity targets.* SBA will measure the Participant's compliance with the applicable non-8(a) business activity target at the end of each program year in the transitional stage based on the Participant's latest fiscal year-end total revenue. Thus, at the end of the first year in the transitional stage of program participation, SBA will compare the Participant's non-8(a) revenue to its total revenue during that first year. If appropriate, SBA will require remedial measures during the subsequent program year. Thus, for example, non-compliance with the required non-8(a) business activity target in year one of the transitional stage would cause SBA to initiate remedial measures under paragraph (d) of this section for year two in the transitional stage.

(4) *Certification of compliance.* A Participant must certify as part of its offer that it complies with the applicable non-8(a) business activity target or with the measures imposed by SBA under paragraph (d) of this section before it can receive any 8(a) contract during the transitional stage of the 8(a) BD program.

(c) *Reporting and verification of business activity.* (1) Once admitted to the 8(a) BD program, a Participant must provide to SBA as part of its annual review:

(i) Annual financial statements with a breakdown of 8(a) and non-8(a) revenue in accord with § 124.602; and

(ii) An annual report within 30 days from the end of the program year of all non-8(a) contracts, options, and modifications affecting price executed during the program year.

(2) At the end of each year of participation in the transitional stage, the BOS assigned to work with the Participant will review the Participant's total revenues to determine whether the non-8(a) revenues have met the applicable target. In determining compliance, SBA will compare all 8(a) revenues received during the year, including those from options and modifications, to all non-8(a) revenues received during the year.

(d) *Consequences of not meeting competitive business mix targets.* (1) Except as set forth in paragraph (e) of this section, beginning at the end of the first year in the transitional stage (the fifth year of participation in the 8(a) BD program), any firm that does not meet its applicable competitive business mix target for the just completed program year will be ineligible for sole source 8(a) contracts in the current program year, unless and until the Participant corrects the situation as described in paragraph (d)(2) of this section.

(2) If SBA determines that an 8(a) Participant has failed to meet its applicable competitive business mix target during any program year in the transitional stage of program participation, SBA may increase its monitoring of the Participant's contracting activity during the ensuing program year. SBA will also notify the Participant in writing that the Participant will not be eligible for further 8(a) sole source contract awards until it has demonstrated to SBA that it has complied with its non-8(a) business activity requirements as described in paragraphs (d)(2)(i) and (d)(2)(ii) of this section. In order for a Participant to come into compliance with the non-8(a) business activity target and be eligible for further 8(a) sole source contracts, it may:

(i) Wait until the end of the current program year and demonstrate to SBA as part of the normal annual review process that it has met the revised non-8(a) business activity target; or

(ii) At its option, submit information regarding its non-8(a) revenue to SBA quarterly throughout the current program year in an attempt to come into compliance before the end of the current program year. If the Participant satisfies the requirements of paragraphs (d)(2)(ii)(A) or (d)(2)(ii)(B) of this section, SBA will reinstate the Participant's ability to get sole source 8(a) contracts prior to its annual review.

(A) To qualify for reinstatement during the first six months of the current program year (i.e., at either the first or second quarterly review), the Participant must demonstrate that it has received non-8(a) revenue and new non-8(a) contract awards that are equal to or greater than the dollar amount by which it failed to meet its non-8(a) business activity target for the just completed program year. For this purpose, SBA will not count options on existing non-8(a) contracts in determining whether a Participant has received new non-8(a) contract awards.

(B) To qualify for reinstatement during the last six months of the current program year (i.e., at either the nine-month or one year review), the Participant must demonstrate that it has achieved its non-8(a) business activity target as of that point in the current program year.

**Example 1 to paragraph (d)(2).** Firm A had $10 million in total revenue during year 2 in the transitional stage (year 6 in the program), but failed to meet the minimum non-8(a) business activity target of 25 percent. It had 8(a) revenues of $8.5 million and non-8(a) revenues of $1.5 million (15 percent). Based on total revenues of $10 million, Firm A should have had at least $2.5 million in non-8(a) revenues. Thus, Firm A missed its target by $1 million (its target ($2.5 million) minus its actual non-8(a) revenues ($1.5 million)). Because Firm A did not achieve its non-8(a) business activity target, it cannot receive 8(a) sole source awards until correcting that situation. The firm may wait until the next annual review to establish that it has met the revised target, or it can choose to report contract awards and other non-8(a) revenue to SBA quarterly. Firm A elects to submit information to SBA quarterly in year 3 of the transitional stage (year 7 in the program). In order to be eligible for sole source 8(a) contracts after either its 3 month or 6 month review, Firm A must show that it has received non-8(a) revenue and/or been awarded new non-8(a) contracts totaling $1 million (the amount by which it missed its target in year 2 of the transitional stage).

**Example 2 to paragraph (d)(2).** Firm B had $10 million in total revenue during year 2 in the transitional stage (year 6 in the program), of which $8.5 million were 8(a) revenues and $1.5 million were non-8(a) revenues. At its first two quarterly reviews during year 3 of the transitional stage (year 7 in the program), Firm B could not demonstrate that it had received at least $1 million in non-8(a) revenue and new non-8(a) awards. In order to be eligible for sole source 8(a) contracts after its 9 month or 1 year review, Firm B must show that at least 35% (the non-8(a) business activity target for year 3 in the transitional stage) of all revenues received during year 3 in the transitional stage as of that point are from non-8(a) sources.

(3) In determining whether a Participant has achieved its required non-8(a) business activity target at the end of any program year in the transitional stage, or whether a Participant that failed to meet the target for the previous program year has achieved the required level of non-8(a) business at its nine-month review, SBA will measure 8(a) support by adding the base year value of all 8(a) contracts awarded during the applicable program year to the value of all options and modifications executed during that year.

(4) As a condition of eligibility for new 8(a) contracts, SBA may also impose other requirements on a Participant that fails to achieve the non-8(a) business activity targets. These include requiring the Participant to obtain management assistance, technical assistance, and/or counseling, and/or attend seminars relating to management assistance, business development, financing, marketing, accounting, or proposal preparation.

(5) SBA may initiate proceedings to terminate a Participant from the 8(a) BD program where the firm makes no good faith efforts to obtain non-8(a) revenues.

(e) *Waiver of sole source prohibition.* (1) The AA/8(a)BD, or his or her designee, may waive the requirement prohibiting a Participant from receiving further sole source 8(a) contracts when a Participant does not meet its non-8(a) business activity target where a denial of a sole source contract would cause severe economic hardship on the Participant so that the Participant's survival may be jeopardized, or where extenuating circumstances beyond the Participant's control caused the Participant not to meet its non-8(a) business activity target. The decision to grant or deny a request for a waiver is at SBA's discretion, and no appeal may be taken with respect to that decision.

(2) The SBA Administrator on a non-delegable basis may waive the requirement prohibiting a Participant from receiving further sole source 8(a) contracts when the Participant does not meet its non-8(a) business activity target where the head of a procuring activity represents to the SBA Administrator that award of a sole source 8(a) contract to the Participant is needed to achieve significant interests of the Government.

### § 124.510 What percentage of work must a Participant perform on an 8(a) contract?

(a) To assist the business development of Participants in the 8(a) BD program, an 8(a) contractor must perform certain percentages of work with its own employees. These percentages and the requirements relating to them are the same as those established for small business set-aside prime contractors, and are set forth in § 125.6 of this title.

(b) A Participant must certify in its offer that it will meet the applicable percentage of work requirement. SBA will determine whether the firm will be in compliance as of the date of award of the contract for both sealed bid and negotiated procurements.

(c) *Indefinite quantity contracts.* (1) In order to ensure that the required percentage of costs on an indefinite quantity 8(a) award is performed by the Participant, the Participant must demonstrate semiannually that it has performed the required percentage to that date. For a service or supply contract, this does not mean that the Participant must perform 50 percent of the applicable costs for each task order with its own force, or that a Participant must have performed 50 percent of the applicable costs at any point in time during the contract's life. Rather, the Participant must perform 50 percent of the applicable costs for the combined total of all task orders issued to date at six month intervals.

**Example to paragraph (c)(1).** Two task orders are issued under an 8(a) indefinite quantity service contract during the first six months of the contract. If $100,000 in personnel costs are incurred on the first task order, 90% of those costs ($90,000) are incurred for performance by the Participant's

own work force, and the second task order also requires $100,000 in personnel costs, the Participant would have to perform only 10 percent of the personnel costs on the second task order because it would still have performed 50% of the total personnel costs at the end of the six-month period ($100,000 out of $200,000).

(2) Where there is a guaranteed minimum condition in an indefinite quantity 8(a) award, the required performance of work percentage need not be met on task orders issued during the first six months of the contract. In such a case, however, the percentage of work that a Participant may further contract to other concerns during the first six months of the contract may not exceed 50 percent of the total guaranteed minimum dollar value to be provided by the contract. Once the guaranteed minimum amount is met, the general rule for indefinite quantity contracts set forth in paragraph (c)(1) of this section applies.

**Example to paragraph (c)(2).** Where a contract guarantees a minimum of $100,000 in professional services and the first task order is for $60,000 in such services, the Participant may perform as little as $10,000 of the personnel costs for that order. In such a case, however, the Participant must perform all of the next task order(s) up to $40,000 to ensure that it performs 50% of the $100,000 guaranteed minimum ($10,000 + $40,000 = $50,000 or 50% of the $100,000).

(3) The applicable SBA District Director may waive the provisions in paragraphs (c)(1) and (c)(2) of this section requiring a Participant to meet the applicable performance of work requirement at the end of any six-month period where he or she makes a written determination that larger amounts of subcontracting are essential during certain stages of performance, provided that there are written assurances from both the Participant and the procuring activity that the contract will ultimately comply with the requirements of this section. Where SBA authorizes a Participant to exceed the subcontracting limitations and the Participant does not ultimately comply with the performance of work requirements by the end of the contract, SBA will not grant future waivers for the Participant.

### § 124.511 How is fair market price determined for an 8(a) contract?

(a) The procuring activity determines what constitutes a ''fair market price'' for an 8(a) contract.

(1) The procuring activity must derive the estimate of a current fair market price for a new requirement, or a requirement that does not have a satisfactory procurement history, from a price or cost analysis. This analysis may take into account prevailing market conditions, commercial prices for similar products or services, or data obtained from any other agency. The analysis must also consider any cost or pricing data that is timely submitted by SBA.

(2) The procuring activity must base the estimate of a current fair market price for a requirement that has a satisfactory procurement history on recent award prices adjusted to ensure comparability. Adjustments will take into account differences in quantities, performance, times, plans, specifications, transportation costs, packaging and packing costs, labor and material costs, overhead costs, and any other additional costs which may be appropriate.

(b) Upon the request of SBA, a procuring activity will provide to SBA a written statement detailing the method it has used to estimate the current fair market price for the 8(a) requirement. This statement must be submitted within 10 working days of SBA's request. The procuring activity must identify the information, studies, analyses, and other data it used in making its estimate.

(c) The procuring activity's estimate of fair market price and any supporting data may not be disclosed by SBA to any Participant or potential contractor.

(d) The concern selected to perform an 8(a) contract may request SBA to protest the procuring activity's estimate of current fair market price to the Secretary of the Department or head of the agency in accordance with § 124.505.

### § 124.512 Delegation of contract administration to procuring agencies.

(a) SBA may delegate, by the use of special clauses in the 8(a) contract documents or by a separate agreement with the procuring activity, all responsibilities for administering an 8(a) contract to the procuring activity except the approval of novation agreements under 48 CFR 42.302(a)(25).

(b) This delegation of contract administration authorizes a contracting officer to execute any priced option or in scope modification without SBA's concurrence. The contracting officer must, however, notify SBA of all modifications and options exercised.

### § 124.513 Under what circumstances can a joint venture be awarded an 8(a) contract?

(a) *General.* (1) If approved by SBA, a Participant may enter into a joint venture agreement with one or more other small business concerns, whether or not 8(a) Participants, for the purpose of performing a specific 8(a) contract.

(2) A joint venture agreement is permissible only where an 8(a) concern lacks the necessary capacity to perform the contract on its own, and the agreement is fair and equitable and will be of substantial benefit to the 8(a) concern. However, where SBA concludes that an 8(a) concern brings very little to the joint venture relationship in terms of resources and expertise other than its 8(a) status, SBA will not approve the joint venture arrangement.

(b) *Size of concerns to an 8(a) joint venture.* (1) A joint venture of at least one 8(a) Participant and one or more other business concerns may submit an offer as a small business for a competitive 8(a) procurement so long as each concern is small under the size standard corresponding to the SIC code assigned to the contract, provided:

(i) The size of at least one 8(a) Participant to the joint venture is less than one half the size standard corresponding to the SIC code assigned to the contract; and

(ii)(A) For a procurement having a revenue-based size standard, the procurement exceeds half the size standard corresponding to the SIC code assigned to the contract; or

(B) For a procurement having an employee-based size standard, the procurement exceeds $10 million;

(2) For sole source and competitive 8(a) procurements that do not exceed the dollar levels identified in paragraph (b)(1) of this section, an 8(a) Participant entering into a joint venture agreement with another concern is considered to be affiliated for size purposes with the other concern with respect to performance of the 8(a) contract. The combined annual receipts or employees of the concerns entering into the joint venture must meet the size standard for the SIC code assigned to the 8(a) contract.

(3) Notwithstanding the provisions of paragraphs (b)(1) and (b)(2) of this section, a joint venture between a protege firm and its approved mentor (*see* § 124.520) will be deemed small provided the protege qualifies as small for the size standard corresponding to the SIC code assigned to the procurement and has not reached the dollar limit set forth in § 124.519.

(c) *Contents of joint venture agreement.* Every joint venture agreement to perform an 8(a) contract, including those between mentors and proteges authorized by § 124.520, must contain a provision:

(1) Setting forth the purpose of the joint venture;

(2) Designating an 8(a) Participant as the managing venturer of the joint venture, and an employee of the managing venturer as the project

manager responsible for performance of the 8(a) contract;

(3) Stating that not less than 51 percent of the net profits earned by the joint venture will be distributed to the 8(a) Participant(s);

(4) Providing for the establishment and administration of a special bank account in the name of the joint venture. This account must require the signature of all parties to the joint venture or designees for withdrawal purposes. All payments due the joint venture for performance on an 8(a) contract will be deposited in the special account; all expenses incurred under the contract will be paid from the account as well;

(5) Itemizing all major equipment, facilities, and other resources to be furnished by each party to the joint venture, with a detailed schedule of cost or value of each;

(6) Specifying the responsibilities of the parties with regard to contract performance, source of labor and negotiation of the 8(a) contract;

(7) Obligating all parties to the joint venture to ensure performance of the 8(a) contract and to complete performance despite the withdrawal of any member;

(8) Designating that accounting and other administrative records relating to the joint venture be kept in the office of the managing venturer, unless approval to keep them elsewhere is granted by the District Director or his/her designee upon written request;

(9) Requiring the final original records be retained by the managing venturer upon completion of the 8(a) contract performed by the joint venture;

(10) Stating that quarterly financial statements showing cumulative contract receipts and expenditures (including salaries of the joint venture's principals) must be submitted to SBA not later than 45 days after each operating quarter of the joint venture; and

(11) Stating that a project-end profit and loss statement, including a statement of final profit distribution, must be submitted to SBA no later than 90 days after completion of the contract.

(d) *Performance of work.* For any 8(a) contract, including those between mentors and proteges authorized by § 124.520, the joint venture must perform the applicable percentage of work required by § 124.510, and the 8(a) partner(s) to the joint venture must perform a significant portion of the contract.

(e) *Prior approval by SBA.* SBA must approve a joint venture agreement prior to the award of an 8(a) contract on behalf of the joint venture.

(f) *Contract execution.* Where SBA has approved a joint venture, the procuring activity will execute an 8(a) contract in the name of the joint venture entity.

(g) *Amendments to joint venture agreement.* All amendments to the joint venture agreement must be approved by SBA.

(h) *Inspection of records.* SBA may inspect the records of the joint venture without notice at any time deemed necessary.

**§ 124.514 Exercise of 8(a) options and modifications.**

(a) *Unpriced options.* The exercise of an unpriced option is considered to be a new contracting action.

(1) If a concern has graduated or been terminated from the 8(a) BD program or is no longer small under the size standard corresponding to the SIC code for the requirement, negotiations to price the option cannot be entered into and the option cannot be exercised.

(2) If the concern is still a Participant and otherwise eligible for the requirement on a sole source basis, the procuring activity contracting officer may negotiate price and exercise the option provided the option, considered a new contracting action, meets all regulatory requirements, including the procuring activity's offering and SBA's acceptance of the requirement for the 8(a) BD program.

(3) If the estimated fair market price of the option exceeds the applicable threshold amount set forth in § 124.506, the requirement must be competed as a new contract among eligible Participants.

(b) *Priced options.* The procuring activity contracting officer may exercise a priced option to an 8(a) contract whether the concern that received the award has graduated or been terminated from the 8(a) BD program or is no longer eligible if to do so is in the best interests of the Government.

(c) *Modifications beyond the scope.* A modification beyond the scope of the initial 8(a) contract award is considered to be a new contracting action. It will be treated the same as an unpriced option as described in paragraph (a) of this section.

(d) *Modifications within the scope.* The procuring activity contracting officer may exercise a modification within the scope of the initial 8(a) contract whether the concern that received the award has graduated or been terminated from the 8(a) BD program or is no longer eligible if to do so is in the best interests of the Government.

**§ 124.515 Can a Participant change its ownership or control and continue to perform an 8(a) contract, and can it transfer performance to another firm?**

(a) An 8(a) contract must be performed by the Participant that initially received it unless a waiver is granted under paragraph (b) of this section.

(1) An 8(a) contract, whether in the base or an option year, must be terminated for the convenience of the Government if:

(i) One or more of the individuals upon whom eligibility for the 8(a) BD program was based relinquishes or enters into any agreement to relinquish ownership or control of the Participant such that the Participant would no longer be controlled or at least 51% owned by disadvantaged individuals; or

(ii) The contract is transferred or novated for any reason to another firm.

(2) The procuring activity may not assess repurchase costs or other damages against the Participant due solely to the provisions of this section.

(b) The SBA Administrator may waive the requirements of paragraph (a)(1) of this section if requested to do so by the 8(a) contractor when:

(1) It is necessary for the owners of the concern to surrender partial control of such concern on a temporary basis in order to obtain equity financing;

(2) Ownership and control of the concern that is performing the 8(a) contract will pass to another Participant, but only if the acquiring firm would otherwise be eligible to receive the award directly as an 8(a) contract;

(3) Any individual upon whom eligibility was based is no longer able to exercise control of the concern due to physical or mental incapacity or death;

(4) The head of the procuring agency, or an official with delegated authority from the agency head, certifies that termination of the contract would severely impair attainment of the agency's program objectives or missions; or

(5) It is necessary for the disadvantaged owners of the initial 8(a) awardee to relinquish ownership of a majority of the voting stock of the concern in order to raise equity capital, but only if—

(i) The concern has graduated from the 8(a) BD program;

(ii) The disadvantaged owners will maintain ownership of the largest single outstanding block of voting stock (including stock held by affiliated parties); and

(iii) The disadvantaged owners will maintain control of the daily business operations of the concern.

(c) The 8(a) contractor must request a waiver in writing prior to the change of

ownership and control except in the case of death or incapacity. A request for waiver due to incapacity or death must be submitted within 60 days after such occurrence. The Participant seeking to change ownership or control must specify the grounds upon which it requests a waiver, and must demonstrate that the proposed transaction would meet such grounds.

(d) SBA determines the eligibility of an acquiring Participant under paragraph (b)(2) of this section by referring to the items identified in § 124.507(b)(2) and deciding whether at the time of the request for waiver (and prior to the transaction) the acquiring Participant is a responsible and eligible concern with respect to each contract for which a waiver is sought. As part of the waiver request, the acquiring firm must certify that it is a small business for the size standard corresponding to the SIC code assigned to each contract for which a waiver is sought.

(e) Anyone other than a procuring agency head who submits a certification regarding the impairment of the agency's objectives under paragraph (b)(4) of this section, must also certify delegated authority to make the certification.

(f) In processing a request for a waiver under paragraph (b)(2) of this section, SBA will treat a transfer of all a Participant's operating assets to another Participant the same as the transfer of an ownership interest, provided the Participant that transfers its assets to another eligible Participant:

(1) Voluntarily graduates from the 8(a) BD program; and

(2) Ceases its business operations, or presents a plan to SBA for its orderly dissolution.

(g) A concern performing an 8(a) contract must notify SBA in writing immediately upon entering into an agreement or agreement in principle (either oral or written) to transfer all or part of its stock or other ownership interest or assets to any other party. Such an agreement could include an oral agreement to enter into a transaction to transfer interests in the future.

(h) The Administrator has discretion to decline a request for waiver even though legal authority exists to grant the waiver.

(i) The 8(a) contractor may appeal SBA's denial of a waiver request by filing a petition with OHA pursuant to part 134 of this title within 45 days of the date of service (as defined in § 134.204) of the Administrator's decision.

### § 124.516 Who decides contract disputes arising between a Participant and a procuring activity after the award of an 8(a) contract?

For purposes of the Disputes Clause of a specific 8(a) contract, the contracting officer is that of the procuring activity. A dispute arising between an 8(a) contractor and the procuring activity contracting officer will be decided by the procuring activity, and appeals may be taken by the 8(a) contractor without SBA involvement.

### § 124.517 Can the eligibility or size of a Participant for award of an 8(a) contract be questioned?

(a) The eligibility of a Participant for a sole source or competitive 8(a) requirement may not be challenged by another Participant or any other party, either to SBA or any administrative forum as part of a bid or other contract protest.

(b) The size status of the apparent successful offeror for a competitive 8(a) procurement may be protested pursuant to § 121.1001(a)(2) of this chapter. The size status of a nominated Participant for a sole source 8(a) procurement may not be protested by another Participant or any other party.

(c) A Participant cannot appeal SBA's determination not to award it a specific 8(a) contract because the concern lacks an element of responsibility or is ineligible for the contract, other than the right set forth in § 124.501(h) to request a formal size determination where SBA cannot verify it to be small.

(d)(1) The SIC code assigned to a sole source 8(a) requirement may not be challenged by another Participant or any other party either to SBA or any administrative forum as part of a bid or contract protest. Only the AA/8(a)BD may appeal a SIC code designation with respect to a sole source 8(a) requirement.

(2) In connection with a competitive 8(a) procurement, any interested party who has been adversely affected by a SIC code designation may appeal the designation to SBA's OHA pursuant to § 121.1103 of this title.

(e) Anyone with information questioning the eligibility of a Participant to continue participation in the 8(a) BD program or for purposes of a specific 8(a) contract may submit such information to SBA under § 124.112(c).

### § 124.518 How can an 8(a) contract be terminated before performance is completed?

(a) *Termination for default.* A decision to terminate a specific 8(a) contract for default can be made by the procuring activity contracting officer after consulting with SBA. The contracting officer must advise SBA of any intent to terminate an 8(a) contract for default in writing before doing so. SBA may provide to the Participant any program benefits reasonably available in order to assist it in avoiding termination for default. SBA will advise the contracting officer of this effort. Any procuring activity contracting officer who believes grounds for termination continue to exist may terminate the 8(a) contract for default, in accordance with the Federal Acquisition Regulations (48 CFR chapter 1). SBA will have no liability for termination costs or reprocurement costs.

(b) *Termination for convenience.* After consulting with SBA, the procuring activity contracting officer may terminate an 8(a) contract for convenience when it is in the best interests of the Government to do so. A termination for convenience is appropriate if any disadvantaged owner of the Participant performing the contract relinquishes ownership or control of such concern, or enters into any agreement to relinquish such ownership or control, unless a waiver is granted pursuant to § 124.515.

(c) *Substitution of one 8(a) contractor for another.* Where a procuring activity contracting officer demonstrates to SBA that an 8(a) contract will otherwise be terminated for default, SBA may authorize another Participant to complete performance and, in conjunction with the procuring activity, permit novation of the contract without invoking the termination for convenience or waiver provisions of § 124.515.

### § 124.519 Are there any dollar limits on the amount of 8(a) contracts that a Participant may receive?

(a) A Participant (other than one owned by an Indian tribe or an ANC) may not receive sole source 8(a) contract awards where it has received a combined total of competitive and sole source 8(a) contracts in excess of the dollar amount set forth in this section during its participation in the 8(a) BD program.

(1) For a firm having a revenue-based primary SIC code at time of program entry, the limit above which it can no longer receive sole source 8(a) contracts is five times the size standard corresponding to that SIC code as of the date of SBA's acceptance of the requirement for the 8(a) BD program or $100,000,000, whichever is less.

(2) For a firm having an employee-based primary SIC code at time of program entry, the limit above which it can no longer receive sole source 8(a) contracts is $100,000,000.

(3) SBA will not consider 8(a) contracts awarded under $100,000 in determining whether a Participant has reached the limit identified in paragraphs (a)(1) and (a)(2) of this section.

(b) Once the limit is reached, a firm may not receive any more 8(a) sole source contracts, but may remain eligible for competitive 8(a) awards.

(c) The limitation set forth in paragraph (a) of this section will not apply for firms that are current Participants in the 8(a) BD program as of December 31, 1997.

(d) SBA includes the dollar value of 8(a) options and modifications in determining whether a Participant has reached the limit identified in paragraph (a) of this section. If an option is not exercised or the contract value is reduced by modification, SBA will deduct those values.

(e) A Participant's eligibility for a sole source award in terms of whether it has exceeded the dollar limit for 8(a) contracts is measured as of the date that the requirement is accepted for the 8(a) program without taking into account whether the value of that award will cause the limit to be exceeded.

(f) The SBA Administrator on a non-delegable basis may waive the requirement prohibiting a Participant from receiving sole source 8(a) contracts in excess of the dollar amount set forth in this section where the head of a procuring activity represents to the SBA Administrator that award of a sole source 8(a) contract to the Participant is needed to achieve significant interests of the Government.

**§ 124.520 Mentor/protege program.**

(a) *General.* The mentor/protege program is designed to encourage approved mentors to provide various forms of assistance to eligible Participants. This assistance may include technical and/or management assistance; financial assistance in the form of equity investments and/or loans; subcontracts; and/or assistance in performing prime contracts with the Government in the form of joint venture arrangements. The purpose of the mentor/protege relationship is to enhance the capabilities of the protege and to improve its ability to successfully compete for contracts.

(b) *Mentors.* Any concern that demonstrates a commitment and the ability to assist developing 8(a) Participants may act as a mentor and receive benefits as set forth in this section. This includes businesses that have graduated from the 8(a) BD program, firms that are in the transitional stage of program participation, other small businesses, and large businesses.

(1) In order to qualify as a mentor, a concern must demonstrate that it:

(i) Possesses favorable financial health, including profitability for at least the last two years;

(ii) Possesses good character;

(iii) Does not appear on the federal list of debarred or suspended contractors; and

(iv) Can impart value to a protege firm due to lessons learned and practical experience gained because of the 8(a) BD program, or through its general knowledge of government contracting.

(2) Generally, a mentor will have no more than one protege at a time. However, the AA/8(a)BD may authorize a concern to mentor more than one protege at a time where the concern can demonstrate that the additional mentor/protege relationship will not adversely affect the development of either protege firm (e.g., the second firm cannot be a competitor of the first firm).

(3) In order to demonstrate its favorable financial health, a firm seeking to be a mentor must submit its federal tax returns for the last two years to SBA for review.

(4) Once approved, a mentor must annually certify that it continues to possess good character and a favorable financial position.

(c) *Proteges.* (1) In order to initially qualify as a protege firm, a Participant must:

(i) Be in the developmental stage of program participation;

(ii) Have never received an 8(a) contract; or

(ii) Have a size that is less than half the size standard corresponding to its primary SIC code.

(2) Only firms that are in good standing in the 8(a) BD program (e.g., firms that do not have termination or suspension proceedings against them, and are up to date with all reporting requirements) may qualify as a protege.

(3) A protege firm may have only one mentor at a time.

(d) *Benefits.* (1) A mentor and protege may joint venture as a small business for any government procurement, including procurements less than half the size standard corresponding to the assigned SIC code and 8(a) sole source contracts, provided both the mentor and the protege qualify as small for the procurement and, for purposes of 8(a) sole source requirements, the protege has not reached the dollar limit set forth in § 124.519.

(2) Notwithstanding the requirements set forth in §§ 124.105(g) and (h), in order to raise capital for the protege firm, the mentor may own an equity interest of up to 40% in the protege firm.

(3) Notwithstanding the mentor/protege relationship, a protege firm may qualify for other assistance as a small business, including SBA financial assistance.

(4) No determination of affiliation or control may be found between a protege firm and its mentor based on the mentor/protege agreement or any assistance provided pursuant to the agreement.

(e) *Written agreement.* (1) The mentor and protege firms must enter a written agreement setting forth an assessment of the protege's needs and describing the assistance the mentor commits to provide to address those needs (e.g., management and/or technical assistance, loans and/or equity investments, cooperation on joint venture projects, or subcontracts under prime contracts being performed by the mentor). The agreement must also provide that the mentor will provide such assistance to the protege firm for at least one year.

(2) The written agreement must be approved by the AA/8(a)BD. The agreement will not be approved if SBA determines that the assistance to be provided is not sufficient to promote any real developmental gains to the protege, or if SBA determines that the agreement is merely a vehicle to enable a non-8(a) participant to receive 8(a) contracts.

(3) The agreement must provide that either the protege or the mentor may terminate the agreement with 30 days advance notice to the other party to the mentor/protege relationship and to SBA.

(4) SBA will review the mentor/protege relationship annually to determine whether to approve its continuation for another year.

(5) SBA must approve all changes to a mentor/protege agreement in advance.

(f) *Evaluating the mentor/protege relationship.* (1) In its annual business plan update required by § 124.403(a,) the protege must report to SBA for the protege's preceding program year:

(i) All technical and/or management assistance provided by the mentor to the protege;

(ii) All loans to and/or equity investments made by the mentor in the protege;

(iii) All subcontracts awarded to the protege by the mentor, and the value of each subcontract;

(iv) All federal contracts awarded to the mentor/protege relationship as a joint venture (designating each as an 8(a), small business set aside, or unrestricted procurement), the value of each contract, and the percentage of the

contract performed and the percentage of revenue accruing to each party to the joint venture; and

(v) A narrative describing the success such assistance has had in addressing the developmental needs of the protege and addressing any problems encountered.

(2) The protege must annually certify to SBA whether there has been any change in the terms of the agreement.

(3) SBA will review the protege's report on the mentor/protege relationship as part of its annual review of the firm's business plan pursuant to § 124.403. SBA may decide not to approve continuation of the agreement if it finds that the mentor has not provided the assistance set forth in the mentor/protege agreement or that the assistance has not resulted in any material benefits or developmental gains to the protege.

## Miscellaneous Reporting Requirements

### § 124.601 What reports does SBA require concerning parties who assist Participants in obtaining federal contracts?

(a) Each Participant must submit annually a written report to its assigned BOS that includes a listing of any agents, representatives, attorneys, accountants, consultants and other parties (other than employees) receiving fees, commissions, or compensation of any kind to assist such participant in obtaining a Federal contract. The listing must indicate the amount of compensation paid and a description of the activities performed for such compensation.

(b) Failure to submit the report is good cause for the initiation of a termination proceeding pursuant to §§ 124.303 and 124.304.

### § 124.602 What kind of annual financial statement must a Participant submit to SBA?

(a) Participants with gross annual receipts of more than $5,000,000 must submit to SBA audited annual financial statements prepared by a licensed independent public accountant within 120 days after the close of the concern's fiscal year.

(1) The servicing SBA District Director may waive the requirement for audited financial statements for good cause shown by the Participant.

(2) Circumstances where waivers of audited financial statements may be granted include, but are not limited to, the following:

(i) The concern has an unexpected increase in sales towards the end of its fiscal year that creates an unforeseen requirement for audited statements;

(ii) The concern unexpectedly experiences severe financial difficulties which would make the cost of audited financial statements a particular burden; and

(iii) The concern has been a Participant less than 12 months.

(b) Participants with gross annual receipts between $1,000,000 and $5,000,000 must submit to SBA reviewed annual financial statements prepared by a licensed independent public accountant within 90 days after the close of the concern's fiscal year.

(c) Participants with gross annual receipts of less than $1,000,000 must submit to SBA an annual statement prepared in-house or a compilation statement prepared by a licensed independent public accountant, verified as to accuracy by an authorized officer, partner, limited liability member, or sole proprietor of the Participant, including signature and date, within 90 days after the close of the concern's fiscal year.

(d) Any audited or reviewed financial statements submitted to SBA pursuant to paragraphs (a) or (b) of this section must be prepared in accordance with Generally Accepted Accounting Principles.

(e) While financial statements need not be submitted until 90 or 120 days after the close of a Participant's fiscal year, depending on the receipts of the concern, a Participant seeking to be awarded an 8(a) contract between the close of its fiscal year and such 90 or 120-day time period must submit a final sales report signed by the CEO or President to SBA in order for SBA to determine the concern's eligibility for the 8(a) contract. This report must show a breakdown of 8(a) and non-8(a) sales.

(f) Notwithstanding the amount of a Participant's gross annual receipts, SBA may require audited or reviewed statements whenever they are needed to obtain more complete information as to a concern's assets, liabilities, income or expenses, such as when the concern's capacity to perform a specific 8(a) contract must be determined, or when they are needed to determine continued program eligibility.

### § 124.603 What reports regarding the continued business operations of former Participants does SBA require?

Former Participants must provide such information as SBA may request concerning the former Participant's continued business operations, contracts, and financial condition for a period of three years following the date on which the concern graduates or is terminated from the program. Failure to provide such information when requested will constitute a violation of the regulations set forth in this part, and may result in the nonexercise of options on or termination of contracts awarded through the 8(a) BD program, debarment, or other legal recourse.

## Management and Technical Assistance Program

### § 124.701 What is the purpose of the 7(j) management and technical assistance program?

Section 7(j)(1) of the Small Business Act, 15 U.S.C. 636(j)(1), authorizes SBA to enter into grants, cooperative agreements, or contracts with public or private organizations to pay all or part of the cost of technical or management assistance for individuals or concerns eligible for assistance under sections 7(a)(11), 7(j)(10), or 8(a) of the Small Business Act.

### § 124.702 What types of assistance are available through the 7(j) program?

Through its private sector service providers, SBA may provide a wide variety of management and technical assistance to eligible individuals or concerns to meet their specific needs, including:

(a) Counseling and training in the areas of financing, management, accounting, bookkeeping, marketing, and operation of small business concerns; and

(b) The identification and development of new business opportunities.

### § 124.703 Who is eligible to receive 7(j) assistance?

The following businesses are eligible to receive assistance from SBA through its service providers:

(a) Businesses which qualify as small under part 121 of this title, and which are located in urban or rural areas with a high proportion of unemployed or low-income individuals, or which are owned by such low-income individuals; and

(b) Businesses eligible to receive 8(a) contracts.

### § 124.704 What additional management and technical assistance is reserved exclusively for concerns eligible to receive 8(a) contracts?

In addition to the management and technical assistance available under § 124.702, Section 7(j)(10) of the Small Business Act authorizes SBA to provide additional management and technical assistance through its service providers exclusively to small business concerns eligible to receive 8(a) contracts, including:

(a) Assistance to develop comprehensive business plans with

specific business targets, objectives, and goals;

(b) Other nonfinancial services necessary for a Participant's growth and development, including loan packaging; and

(c) Assistance in obtaining equity and debt financing.

## PART 134—[AMENDED]

7. The authority citation for 13 CFR part 134 continues to read as follows:

**Authority:** 5 U.S.C. 504; 15 U.S.C. 632, 634(b)(6) and 637(a).

7a. Section 134.201 is amended by revising the second and third sentences to read as follows:

### § 134.201 Scope of the rules in this subpart B.

* * * Specific procedural rules pertaining to 8(a) program appeals and to proceedings under the Program Fraud Civil Remedies Act are set forth, respectively in subpart D of this part and part 142 of this chapter. In the case of a conflict between a particular rule in this subpart and a rule of procedure pertaining to OHA appearing in another subpart of this part or another part of this chapter, the latter rule shall govern.

8. Section 134.202 is amended in paragraph (c) by removing the reference to ''subpart D of this part'' and inserting in its place the phrase ''subpart E of this part,'' and in paragraph (d) by removing the phrase ''§ 124.211'' and inserting in its place the phrase ''§ 134.305.''

9. Section 134.203 is amended by redesignating paragraphs (a)(2) through (4) as paragraphs (a)(3) through (5) and adding the following new paragraph (a)(2):

### § 134.203 The petition.

(a) * * *

(2) The SBA determination being appealed.

* * * * *

10. Section 134.211 is amended by adding the following new paragraph (d):

### § 134.211 Motions.

* * * * *

(d) *Stay*. A motion to dismiss stays the time to answer. The Judge will establish the time for serving and filing an answer in the order determining the motion to dismiss.

### § 134.213 [Amended]

11. Section 134.213(a) is amended by removing the second sentence.

### § 134.222 [Amended]

12. Section 134.222 is amended by removing the '';'' and the word ''or'' at the end of paragraph (a)(2), by inserting a ''.'' at the end of paragraph (a)(2), and by removing paragraph (a)(3).

13. Subpart D is redesignated as Subpart E, §§ 134.401 through 134.418 are redesignated as §§ 134.501 through 134.518, and the following new Subpart D is added:

**Subpart D—Rules of Practice for Appeals Under the 8(a) Program**

134.401 Scope of the rules in this subpart D.
134.402 Appeal petition.
134.403 Service of appeal petition.
134.404 Decision by Administrative Law Judge.
134.405 Jurisdiction.
134.406 Review of administrative record.
134.407 Evidence beyond the record and discovery.
134.408 Decision on appeal.

## Subpart D—Rules of Practice for Appeals Under the 8(a) Program

### § 134.401 Scope of the rules in this subpart D.

The rules of practice in this subpart D apply to all appeals to OHA from:

(a) Denials of 8(a) BD program admission based solely on a negative finding(s) of social disadvantage, economic disadvantage, ownership or control pursuant to § 124.206 of this title;

(b) Early graduation pursuant to §§ 124.302 and 124.304;

(c) Termination pursuant to §§ 124.303 and 124.304;

(d) Denials of requests to issue a waiver pursuant to § 124.515; and

(e) Suspensions pursuant to § 124.305(a).

### § 134.402 Appeal petition.

In addition to the requirements of § 134.203, an appeal petition must state, with specific reference to the determination and the record supporting such determination, the reasons why the determination is alleged to be arbitrary, capricious or contrary to law.

### § 134.403 Service of appeal petition.

(a) Concurrent with its filing with OHA, a concern must also serve SBA's AA/8(a)BD and the appropriate Associate General Counsel in SBA's Office of General Counsel with a copy of the petition, including attachments.

(1) For appeals relating to denials of program admission pursuant to § 124.206 of this title, suspensions of program assistance pursuant to § 124.305, or denials of requests for waivers pursuant to § 124.515, a petitioner must serve the SBA's Associate General Counsel for General Law.

(2) For appeals relating to early graduation pursuant to §§ 124.302 and 124.304 or termination pursuant to §§ 124.303 and 124.304, a petitioner must serve the SBA's Associate General Counsel for Litigation.

(3) Service on SBA's Office of General Counsel generally or the SBA General Counsel do not meet the service requirements of this section.

(b) Service should be addressed to the AA/8(a)BD and the applicable Associate General Counsel at the Small Business Administration, 409 3rd Street, SW, Washington, DC 20416.

### § 134.404 Decision by Administrative Law Judge.

Appeal proceedings brought under this subpart will be conducted by an Administrative Law Judge.

### § 134.405 Jurisdiction.

(a) The Administrative Law Judge selected to preside over an appeal shall decline to accept jurisdiction over any matter if:

(1) The appeal does not, on its face, allege facts that, if proven to be true, would warrant reversal or modification of the determination, including appeals of denials of 8(a) BD program admission based in whole or in part on grounds other than a negative finding of social disadvantage, economic disadvantage, ownership or control;

(2) The appeal is untimely filed under § 134.202 or is not otherwise filed in accordance with the requirements of this subpart or the requirements in subparts A and B of this part; or

(3) The matter has been decided or is the subject of an adjudication before a court of competent jurisdiction over such matters.

(b) Once the Administrative Law Judge accepts jurisdiction over an appeal, subsequent initiation of an adjudication of the matter by a court of competent jurisdiction will not preclude the Administrative Law Judge from rendering a final decision on the matter.

(c) Jurisdiction of the Administrative Law Judge in a suspension case is limited to the issue of whether the protection of the Government's interest requires suspension pending resolution of the termination action, unless the Administrative Law Judge has consolidated the suspension appeal with the corresponding termination appeal.

### § 134.406 Review of the administrative record.

(a) Except as provided in § 134.407, any proceeding conducted under this subpart shall be decided solely on a review of the written administrative record.

(b) The Administrative Law Judge's review is limited to determining

whether the Agency's determination is arbitrary, capricious, or contrary to law. As long as the Agency's determination is reasonable, the Administrative Law Judge must uphold it on appeal.

(c) The administrative record must contain all documents that are relevant to the determination on appeal before the Administrative Law Judge and upon which the SBA decision-maker relied. The administrative record, however, need not contain all documents pertaining to the petitioner. For example, the administrative record in a termination proceeding need not include the Participant's entire business plan file, documents pertaining to specific 8(a) contracts, or the firm's application for participation in the 8(a) BD program if they are unrelated to the termination action. The petitioner may object to the absence of a document, previously submitted to or sent by SBA, which the petitioner believes was erroneously omitted from the administrative record.

(d) Where the Agency files its answer to the appeal petition after the date specified in § 134.206, the Administrative Law Judge may decline to consider the answer and base his or her decision solely on a review of the administrative record.

(e) The Administrative Law Judge may remand a case to the AA/8(a)BD (or, in the case of a denial of a request for waiver under § 124.515 of this title, to the Administrator) for further consideration if he or she determines that, due to the absence in the written administrative record of the reasons upon which the determination was based, the administrative record is insufficiently complete to decide whether the determination is arbitrary, capricious or contrary to law, or where it is clearly apparent from the record that SBA made an erroneous factual finding (e.g., SBA double counted an asset of an individual claiming disadvantaged status) or a mistake of law (e.g., SBA applied the wrong regulatory provision in evaluating the case). Such a remand will be for a period of 10 working days.

**§ 134.407 Evidence beyond the record and discovery.**

(a) The Administrative Law Judge may not admit evidence beyond the written administrative record nor permit any form of discovery unless he or she first determines that the petitioner, upon written submission, has made a substantial showing, based on credible evidence and not mere allegation, that the Agency determination in question may have resulted from bad faith or improper behavior.

(1) Prior to any such determination, the Administrative Law Judge must permit SBA to respond in writing to any allegations of bad faith or improper behavior.

(2) Upon a determination by the Administrative Law Judge that the petitioner has made such a substantial showing, the Administrative Law Judge may permit appropriate discovery, and accept relevant evidence beyond the written administrative record, which is specifically limited to the alleged bad faith or improper behavior.

(b) A determination by the Administrative Law Judge that the required showing set forth in paragraph (a) of this section has been made does not shift the burden of proof, which continues to rest with the petitioner.

**§ 134.408 Decision on appeal.**

(a) A decision of the Administrative Law Judge under this subpart is the final agency decision, and is binding on the parties.

(b) The Administrative Law Judge shall issue a decision, insofar as practicable, within 90 days after an appeal petition is filed. If the Administrative Law Judge does not issue a decision within 90 days after an appeal petition is filed, he or she must indicate the reason that the 90-day time limit has not been met in the decision, when issued.

(c) The Administrative Law Judge may reconsider an appeal decision within 20 days of the decision if there is a clear showing of an error of fact or law material to the decision.

Dated: February 13, 1998.

**Aida Alvarez,**

*Administrator.*

[FR Doc. 98–17196 Filed 6–26–98; 8:45 am]

BILLING CODE 8025–01–P

---

## SMALL BUSINESS ADMINISTRATION

## 13 CFR Part 124

## 8(a) Business Development/Small Disadvantaged Business Status Determinations

**AGENCY:** Small Business Administration.

**ACTION:** Final rule.

**SUMMARY:** In response to the Department of Justice's review of Federal procurement affirmative action programs and amendments to the Federal Acquisition Regulation to implement a government-wide small disadvantaged business (SDB) program, the Small Business Administration (SBA) issues this final rule establishing the procedural framework for certifying firms as SDBs and for processing protests challenging the disadvantaged status of a firm claiming to be an SDB.

**DATES:** *Effectove Dates.* The amendments made by this rule to subpart A of 13 CFR part 124 are effective on June 30, 1998. Sections 124.1001 through 124.1016 of subpart B of 13 CFR part 124 are effective on August 24, 1998. With the exeptions of §§ 124.1017(b) and 124.1020(c)(2), §§ 124.1017 through 124.1024 of subpart B of 13 CFR part 124 are effective on October 1, 1998. Sections 124.1017(b) and 124.1020(c)(2) of subpart B of 13 CFR part 124 are effective on January 1, 1999.

*Compliance Dates.* SBA will begin to accept and process applications for SDB certifications as of August 24, 1998.

**FOR FURTHER INFORMATION CONTACT:** Calvin Jenkins, Deputy Associate Deputy Administrator for Government Contracting and Minority Enterprise Development, at (202) 205–6459.

**SUPPLEMENTARY INFORMATION:** On May 9, 1997, the Department of Defense (DOD), the General Services Administration (GSA), and the National Aeronautics and Space Administration (NASA) proposed amendments to the Federal Acquisition Regulation (FAR) concerning programs for small disadvantaged business concerns. 62 FR 25786. The amendments were intended to conform to a Department of Justice (DOJ) proposal to reform affirmative action in Federal procurement (*see* 61 FR 26042) and to comply with the constitutional standards established by the Supreme Court in *Adarand Constructors, Inc.* v. Pena, 115 S.Ct. 2097 (1995). The proposed amendments to the FAR included procedures by which a firm claiming to be owned and controlled by one or more disadvantaged individuals could certify its status as a small disadvantaged business (SDB) concern for purposes of receiving a benefit as an SDB in connection with a Federal procurement. The proposed FAR change also contained procedures by which an interested party may protest a small business concern's disadvantaged status to the Small Business Administration (SBA). In response to and in conjunction with the DOJ and FAR reform proposals, on August 14, 1997, SBA published in the **Federal Register**, 62 FR 43584, a proposed rule to amend 13 CFR part 124. Subpart A of the proposed part 124 dealt with changes pertaining to the 8(a) Business Development (8(a) BD) program which is authorized by sections 7(j)(10) and 8(a) of the Small Business Act, 15 U.S.C. 636(j)(10), 637(a). Subpart B of proposed