# EXHIBIT A-2
# (part 1)

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

S. HRG. 118–385

# PROMOTING OPPORTUNITY: THE NEED FOR TARGETED FEDERAL BUSINESS PROGRAMS TO ADDRESS ONGOING RACIAL DISCRIMINATION

## FIELD HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

OF THE

## UNITED STATES SENATE

ONE HUNDRED EIGHTEENTH CONGRESS

SECOND SESSION

MAY 6, 2024

Printed for the use of the Committee on Small Business and Entrepreneurship

Available via the World Wide Web: http://www.govinfo.gov

U.S. GOVERNMENT PUBLISHING OFFICE

56–458 WASHINGTON : 2024

COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

ONE HUNDRED EIGHTEENTH CONGRESS

---

JEANNE SHAHEEN, New Hampshire, *Chair*
JONI ERNST, Iowa, *Ranking Member*

MARIA CANTWELL, Washington
BENJAMIN L. CARDIN, Maryland
EDWARD J. MARKEY, Massachusetts
CORY A. BOOKER, New Jersey
CHRISTOPHER A. COONS, Delaware
MAZIE HIRONO, Hawaii
TAMMY DUCKWORTH, Illinois
JACKY ROSEN, Nevada
JOHN HICKENLOOPER, Colorado

MARCO RUBIO, Florida
JAMES E. RISCH, Idaho
RAND PAUL, Kentucky
TIM SCOTT, South Carolina
TODD YOUNG, Indiana
JOHN KENNEDY, Louisiana
JOSH HAWLEY, Missouri
TED BUDD, North Carolina

SEAN MOORE, *Democratic Staff Director*
MEREDITH WEST, *Republican Staff Director*

# CONTENTS

MAY 6, 2024

## OPENING STATEMENTS


| | Page |
|---|---|
| Benjamin L. Cardin, U.S. Senator from Maryland | 1 |
| Chris Van Hollen, U.S. Senator from Maryland | 6 |


## WITNESSES


| | |
|---|---|
| Ms. Natalia Luis, Co-Owner, M. Luis Construction and M. Luis Products, Silver Spring, MD | 11 |
| Prepared Statement | 13 |
| Ms. Tonya Lawson, President and CEO, Lawson Consulting, Fort Washington, MD | 19 |
| Prepared Statement | 21 |
| Ms. Ronnette R. Meyers, President and CEO, JLAN Solutions, Washington, DC | 30 |
| Prepared Statement | 32 |
| Mr. Gary Moore, Senior Business Consultant, Maryland MBDA Business Center, Baltimore, MD | 35 |
| Prepared Statement | 37 |
| Mr. Andres Bernal, Vice President, MGT Consulting, Cincinnati, OH | 40 |
| Prepared Statement | 42 |
| Mr. Gary Cunningham, Senior Advisor, The New School, New York, NY | 43 |
| Prepared Statement | 45 |


## ADDITIONAL LETTERS/STATEMENTS FOR THE RECORD


| | |
|---|---|
| Joni Ernst, U.S. Senator from Iowa | |
| Statement dated May 6, 2024 | 70 |
| Asian Americans Advancing Justice (AAJC) | |
| Statement dated May 6, 2024 | 73 |
| Association for Enterprise Opportunity (AEO) | |
| Statement dated May 6, 2024 | 92 |
| Capital Region Minority Supplier Development Council (CRMSDC) | |
| Statement dated May 8, 2024 | 96 |
| Doles, Brenda, Healthcare Resolution Services, Inc. | |
| Statement dated May 20, 2024 | 102 |
| Legal Defense Fund | |
| Statement dated May 6, 2024 | 104 |
| Minority Business Enterprise Legal Defense and Education Fund, Inc. (MBELDEF) | |
| Statement dated May 19, 2024 | 120 |
| Minority Business Enterprise Legal Defense and Education Fund (MBELDEF) | |
| Joint Statement With Eight Other Organizations | 130 |
| Missions Lenders Working Group | |
| Statement dated May 6, 2024 | 135 |
| National Association of Women Business Owners (NAWBO) | |
| Statement dated May 6, 2024 | 137 |
| National LGBT Chamber of Commerce (nglcc) | |
| Statement dated May 6, 2024 | 141 |
| National Minority Supplier Development Council (NMSDC) | |
| Statement dated May 6, 2024 | 143 |

Page

Small Business Majority
Statements dated May 6, 2024 ........ 145
Trans Pacific Communications
Statements dated May 6, 2024 ........ 152
U.S. Black Chambers, INC
Statement dated May 6, 2024 ........ 155
White, LaTanya, Concept Creative Group, LLC
Statement dated May 6, 2024 ........ 159
Women Impacting Public Policy (WIPP)
Statement dated May 6, 2024 ........ 166

# PROMOTING OPPORTUNITY: THE NEED FOR TARGETED FEDERAL BUSINESS PROGRAMS TO ADDRESS ONGOING RACIAL DISCRIMINATION

**MONDAY, MAY 6, 2024**

UNITED STATES SENATE,
COMMITTEE ON SMALL BUSINESS
AND ENTREPRENEURSHIP,
*Bowie, MD.*

The committee met, pursuant to notice, at 10:00 a.m., at Bowie State University, Student Center Ballroom, Student Center, 14000 Jericho Park Road, Bowie, MD, Hon. Ben Cardin presiding.

Present: Senators Cardin [presiding] and Van Hollen.

Also Present: Representative Ivey.

## OPENING STATEMENT OF SENATOR CARDIN

Senator CARDIN. Good morning, everyone. The Small Business and Entrepreneurship Committee will come to order. I first want to thank Senator Shaheen and Senator Ernst, the Chair and Ranking Member of the Small Business Committee for allowing us to hold this field hearing. Having previously chaired the Small Business Committee, it is a great honor for me to chair this event with Senator Van Hollen and Congressman Ivey and a distinguished group of witnesses.

It could not be at a better location to hold this hearing, "Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination," than here at Bowie State University. To me this is the perfect place. Under the leadership of Dr. Breaux, this campus has been a real magnet for opportunities for small businesses. We recently opened the Women's Business Center here at Bowie State University. This the oldest of our Historically Black Colleges and Universities. We have the Business Innovation Center located here. This has been a real active campus for opportunities for underserved communities and small business opportunities.

Before we get started I want to recognize Dr. Breaux for her extraordinary leadership. She is one of our major players in Washington. We bring her there frequently. She has testified before our committees, and she is really a superstar, and we have her right here at Bowie State University.

Dr. Breaux. [Applause.]

**STATEMENT OF AMINTA BREAUX, Ph.D., PRESIDENT, BOWIE STATE UNIVERSITY, BOWIE, MARYLAND**

Dr. BREAUX. Thank you, Senator, and good morning, everyone. [Chorus of good mornings.]

Alright, we have coffee on the outside there.

Good morning and welcome to Bowie State University. I am indeed Aminta Breaux, the very proud 10th President at BSU, and I am so honored and pleased to welcome you here today and to serve as the host site for the U.S. Senate Committee on Small Business and Entrepreneurship field hearing, and to welcome you, Senator Van Hollen, Representative Glenn Ivey, and, of course, welcoming back our esteemed Chair for today, Senator Ben Cardin. You are no stranger, as none of you are, to Bowie State University, and we truly appreciate all of your support of higher education and especially for our HBCUs.

I just want to say a few words before I let you go on with the program for today. We are preparing for commencement that will take place on May 24th, and I want to thank you all for your support throughout this year. For over 150 years, our HBCUs have opened our doors to all in our society and provided a pathway to upward social economic mobility for our graduates and for their families.

And as many of you know, while HBCUs comprise just 3 percent of the higher ed institutions in the nation, we produce 20 percent of African American baccalaureate degrees and 25 percent of African American graduates in STEM. Additionally, our HBCUs have been shown to produce about $14.8 billion annually in economic benefit to our country, and HBCUs generate about 134,000 jobs for local and regional economies, according to one study.

And then Bowie State University, as I hope you all know by now, we are growing, we are thriving, as we are raising to excellence, the name of our strategic plan. But it is also the mantra by which we live each and every day to serve our students.

As a result of the extraordinary efforts of our faculty, staff, and student leaders we have recognized great achievements, including a total growth in enrollment by 2.1 percent and a 25 percent increase in graduate enrollment in 1 year. At the opening of this academic year, in the fall of 2023, we welcomed 6,400 students from 30 states, 37 foreign countries, and a total number of applications reached just about 13,000 for just 1,000 seats. Does that get a round of applause? [Applause.]

U.S. News and World Report ranks Bowie State University as number 16 among the more than 100 HBCUs in the nation. It also recognizes BSU as among the most innovative universities and as a top performer for social mobility. And we are listed among the nation's top graduate school programs in nursing, computer science, education, and public affairs.

And in addition to creating a pipeline of talent for the workforce, as you just heard from the Senate, we here at Bowie State University champion the spirit of entrepreneurship, recognizing it as a driving force for economic growth, for strengthening our community. It is our vision here at BSU to ensure that every student graduates with an entrepreneurial mindset, and some of the ways we help to inspire that entrepreneurial mindset include integration

entrepreneurship into the curriculums across the disciplines and offering entrepreneurship as a topic to our freshman year students as they come in to the university.

We offer a concentration in entrepreneurship and small business management in the College of Business, and we provide two post-baccalaureate supplemental programs with stackable credentials. One is an entrepreneurship 12-credit micro-credential and an 18-credit hour entrepreneurship certificate. And as you came into the campus, I hope you noticed the Entrepreneurship Living Learning Community that bridges the learning environments from the classroom to the residence halls, inspiring students to understand that learning happens everywhere. That Entrepreneurship Living Learning Community is home to over 500 students, and on any given day they can get up and see ideation to creation in their products and businesses. But most importantly again, we are helping to inspire them to have an entrepreneurial mindset to navigate this rapidly changing world.

I want to again thank Senator Cardin and Senator Van Hollen for your support when you were here not too long ago for the congressionally directed spending that brought out that center of excellence, and allowing for Bowie State University to lead the way for other HBCUs to develop 8 (a) government contracting programs. So can you please give the Senators a round of applause. [Applause.]

There are many more items to highlight, and the Senators know this president can go on for a while. But I know you have an agenda. Let me welcome the Committee, welcome all of our elected officials. I would like to acknowledge the mayor of Bowie, Mayor Tim Adams. Would you give him a round of applause please. [Applause.]

And finally, I invite you to see what I see here every day as we are racing to excellence, the great excellence among our faculty, staff, and students here at BSU. I know the weather is not as we had hoped, but nonetheless I hope you get out across the campus. It is a 300-acre campus here in Prince George's County, and a gem in Prince George's County.

Once again, welcome. I am Aminta Breaux, the very proud 10th president of Bowie State University, the oldest HBCU in the state of Maryland. Thank you. [Applause.]

Senator CARDIN. I think you all can see why we are so proud of Dr. Breaux, and thank you for the arrangement for this field hearing. It could not be at a better location, and we thank you for your hospitality.

You acknowledged the mayor of Bowie, Mayor Tim Adams. Tim, would you like to say a word? We want to be welcomed by you, so it would be nice.

**STATEMENT OF TIM ADAMS, MAYOR OF BOWIE, MARYLAND**

Mr. ADAMS. Thank you. I would simply like to quickly say thank you to Dr. Breaux. It is always a pleasure to be here on the campus of Bowie State University, as she said a number of times, the oldest HBCU in the state of Maryland. I would like to thank Congressman Ivey, Senator Van Hollen, and Senator Cardin, who is the Chair today.

I would like to just say that I want to say thank you, because as a resident of the state of Maryland I have closely followed your work and have been consistently impressed by your commitment to public service. You know, your tireless efforts in advocating for our community, needs, and championing important causes such as small businesses have not gone unnoticed. Your leadership and unwavering dedication to the betterment of our society are truly inspiring.

I would like to particularly express my appreciation for your work on truly supporting small businesses and advocating for them. Your commitment to small businesses has made a significant difference in the lives of countless individuals, including myself. Your ability to effectively communicate with constituents and listen to their concerns is commendable. It is clear that you genuinely care about the issues that affect our community, and your responsiveness and accessibility as a public servant have been truly remarkable.

Once again, I want to extend my deepest gratitude for your service and for representing our community with honor and integrity. Your commitment to public service sets a shining example for the future leaders and inspires me to be more engaged in our democracy.

Thank you, Senator Cardin, for your outstanding service to our community. I wish you continued success in all your future endeavors.

Senator CARDIN. Thank you. I appreciate it. [Applause.]

I also wanted to acknowledge the real workhorses that are here, our staff that really put together this hearing and worked with us on these small business issues, Sean Moore, who is the Staff Director of the Small Business and Entrepreneurship Committee; Shivani Pampati, who is my key person for this particular hearing; and Steve Chang. We thank the entire staff of the Small Business Committee for what they have done.

We are also joined by Steve Umberger and Larry Webb, who are the two directors of the offices, the regions that include the state of Maryland, so we thank you both for being with us today. And I want to acknowledge Terrance is here, representing Congressman Hoyer, who has been a great champion of small businesses and of course represents parts of Prince George's County, as well.

**STATEMENT OF SENATOR CARDIN**

Senator CARDIN. This is the right venue for this hearing. I want to take a moment to recognize that the topic we are discussing today is not an easy one. Racial discrimination has plagued our country since its inception. Let me just tell my colleagues, last night I saw the world premier of "Ain't No Back to a Merry-Go-Round," which is the story of the integration of Glen Echo Park, which is, of course, in our community. I recommend the movie to all of you. It was a real testament to the strength of a community to fight for integration in 1960. Those struggles are still continuing today. So I think it just motivated me more for why we are holding this hearing today.

Racial discrimination has plagued our nation since its inception, and unfortunately we have not been able to truly reckon with our

past in a way that completely breaks down the historical barriers that racial discrimination has created.

I want to particularly thank our small business owners with us today. This is not an easy task, and I applaud your bravery and commitment to discussing the facts that racial discrimination exists today, and that it directly impacts your ability to operate and grow you business. Not all business owners were as brave as you. Fear in discussing this topic is unfortunately a common sentiment and why this hearing is so critical.

So thank you again to the business owners here today for your willingness to tell the story in an attempt to protect and highlight the importance of targeted Federal programs, like the Small Business Administration's 8(a) program and the Minority Business Development Agency.

Attacks on programs across the Federal Government that level the playing field for minority communities are affecting every facet of our society, from education to small business. In the small business space we are witnessing a widespread and coordinated legal attack against public and private programs that aim to uplift minority small business owners and remedy disparities caused by racial discrimination. These programs provide tailored support for communities of color, to address the impact of racial discrimination that they continue to face. To say that I am disappointed by these attacks and court decisions would be a grave understatement.

I am trained by Parren James Mitchell, the first Black congressman we had in the state of Maryland. He was the former Chair of the Small Business Committee and used that opportunity to expand opportunity, providing the first set-asides for minority small businesses. He was my congressman when he was first elected to Congress, and he helped me a great deal when I was elected to Congress in 1987.

The Small Business Administration's 8(a) business development program was codified in the 1970s. It is a 9-year program that provides socially and economically disadvantaged small businesses with training, technical assistance, and contracting opportunities. This program has helped contractors from minority and underserved communities grow successful and sustainable businesses. Given the most recent lawsuits against this program, 8(a) applicants must now submit to the Federal Government explicit instances of intentional discrimination on the basis of their race in order to qualify for the program. This is not only invasive, but incredibly time consuming and costly for these business owners.

As our witnesses will attest, countless studies and other research have proven time and time again that disparities exist in minority business formations and ownership. Research has also demonstrated that systemic discrimination is the primary factor behind those disparities. Small business owners should be focusing on building their businesses and getting the support they need. Instead, minority applicants to the 8(a) program must once again do something that is all too familiar to them—prove themselves above and beyond what is normally expected.

Additional obstacles like this are stark reminders of the historical barrier we have rightly done away with, such as poll taxes and literacy tests, redlining, and so much more. These policies were

once considered by some to be reasonable standards, but have profound intentional negative impacts on Black and brown communities.

As Congress, we must do more. We must ensure the 8(a) program is not further stripped down through these legal attacks and work to not only build it back to what it was once, but also to improve it.

Most recently, the Minority Business Development Agency's business centers were challenged in the court. After more than 50 years in existence through executive order, I was proud to codify, on a bipartisan basis, the only agency explicitly dedicated to minorities in the Federal Government. My partner in this effort was Congressman Mfume in the House. Opponents of the agency argued that they agency's use of race in defining socially and economically disadvantaged was somehow unfair or unjustified. To put an injunction on business services that uniquely tailor to the needs of minority individuals is unconscionable.

These legal attacks threaten to reverse decades of progressive policies created to help address the injustice and discrimination that persists in our society and within the Federal Government. Without targeted Federal programs, we leave a large swath of our society behind, only strengthening historical barriers. It is important that we, as a country, recognize that when we exclude parts of our society we are actively undermining the social, political, and economic potential of our country.

I am honored to be holding this hearing at Maryland's oldest HBCU, focusing on how targeted Federal programs address the impact of racial discrimination and promote opportunity for minority communities.

We have an incredible group of witnesses that will join us in this discussion, but first, if I might, I am going to allow my two colleagues to make opening comments. I am pleased that both are joining me. For those, I am sure you know, Senator Van Hollen is not only a champion for small businesses, he chairs the Appropriations Subcommittee of the Small Business Administration. I think that is why we have our two regional directors that are here today. Senator Van Hollen is here to challenge their budget.

Senator Van Hollen.

## STATEMENT OF SENATOR VAN HOLLEN

Senator VAN HOLLEN. Well thank you, Senator Cardin, and I want to start where Senator Cardin did, by thanking you, Dr. Breaux, and Bowie State University not only for hosting us today but for your amazing leadership. So it is great to be back on the campus of Maryland's oldest HBCU, and again, thank you.

Mayor Adams, thank you, as always, for the warm welcome to Bowie, and it was great that Senator Cardin and I were able to join you recently to provide some additional Federal funding to support the city of Bowie.

It is wonderful to be here with my colleague from the House, Glenn Ivey. We work very closely together on all issues, including small business issues and minority-owned business issues.

And I do just want to give a special word of thanks to my friend and colleague, Maryland's senior Senator, Ben Cardin. I think all

of you know that he has announced that he is not running for reelection. But as you can see what is happening today he has not slowed down one bit. And throughout his entire career in public service, he has always been a champion for small businesses and minority-owned businesses. That has been his record, that is who he is, and that is why today's hearing is so important. He has served for many years as the Chair of the Small Business Administration, the authorizing committee for small businesses, and he, of course, continues to serve on that committee. And like all of you here, we recognize that there is an ongoing threat and attack on the basic laws that provide for minority small businesses in response to historic discrimination. So thank you to Ben Cardin for being here. [Applause.]

Let me also join Senator Cardin in welcoming all of our witnesses today. Thank you for coming here to provide your insights on the unique challenges you have faced as small business owners. Thank you for coming here to share your expertise on the significance of programs like the Minority Business Development Agency and the SBA 8(a) program, and how they can help us, and continue to help us create a fairer, competitive environment for small business owners and for our economy.

Minority business owners continue to face long-standing systemic barriers in both the private and public sectors, even after decades of building programs to try to remedy this. Lack of access to capital, networks, and contracts remain ongoing barriers to success for many of these businesses. Yet small business owners, like all of you who have joined us today and so many across Maryland and the United States have pushed forward with resilience, fighting to establish yourselves in a whole variety of business sectors, and done so successfully. Entrepreneurs like yourselves have been swimming upstream to contribute to this economy through the work you do.

For centuries, governments at various levels have enacted policies and practices that systematically disadvantage minority entrepreneurs, from discriminatory landing programs. Like the redlining Senator Cardin mentioned, to zoning laws that stifled the growth of minority-owned businesses, the hand of government has often been used to reinforce existing inequalities rather than to dismantle them.

This discrimination has had a profound impact on the ability of minority small business owners to thrive. Denied access to capital, resources, and opportunities, many talented entrepreneurs have been unable to realize their full potential. They have faced higher hurdles in obtaining loans, accessing contracts, and navigating regulatory environments, all because of the color of their skin or their ethnic background.

Amidst this landscape there have been beacons of hope, programs like the Small Business Administration's 8 (a) program, and the Minority Business Development Agency. Thank you, Senator Cardin, for codifying that once and for all in law. Those programs, among others, have helped break down the barriers that we know exist. By providing access to capital, technical assistance, and contracting opportunities, these initiatives have empowered minority entrepreneurs to overcome the obstacles stacked against them.

The 8 (a) program, in particular, has been instrumental in leveling the playing field for minority-owned businesses. By offering set-aside contracts and subcontracting opportunities to small businesses owned by individuals who historically have been socially and economically disadvantaged, the program has opened doors of opportunity that were previously shut. It has helped minority entrepreneurs gain a foothold in the industries where they were once excluded, paving the way for greater economic inclusion and prosperity.

Similarly, the Minority Business Development Agency has been a life line for minority entrepreneurs seeking guidance and support. Through its network of business centers across the country, the agency provides technical assistance, access to markets, and strategic advice to help minority-owned businesses grow and thrive.

I look forward to continuing to work with Senator Cardin in this capacity on the Small Business Committee. As Senator Cardin mentioned, I chair the Subcommittee of the Appropriations Committee that funds the Small Business Administration, as well as the CDFI programs. They are such an important source of capital. I look forward to working with all of you as we confront the attacks that have been made and that are ongoing to these very, very important programs.

We have come a long way, but this is not the time to dismantle the programs that have been successful at breaking down those barriers and are needed today because those barriers remain in place.

Thank you all for being part of this discussion. Senator Cardin, again, thank you for convening this hearing.

Senator CARDIN. Thank you, Senator Van Hollen.

Our expert in the House of Representatives on the impacts of the court cases on the 8 (a) program and the Minority Business Development Agency is Glenn Ivey. He called me shortly after the court decision as to what we could do to try to remedy the situation. We are very fortunate to have his expertise in the House of Representatives as we look for ways to deal with the realities and impact of these court decisions, to make sure that we keep the tools available to help minority small businesses.

Congressman Ivey.

**STATEMENT OF CONGRESSMAN IVEY**

Mr. IVEY. Thank you, Senator. I appreciate that. And I do want to join in the chorus of, you know, I guess bemoaning a bit your forthcoming retirement.

Senator CARDIN. I am still here, guys. [Laughter.]

I know you all have seen a lot of ads on television, so you know there is an open spot.

Mr. IVEY. You know, when Michael Jordan retired they did a tour, essentially, so he would go play in different cities. I remember in one city they got him a rocking chair. So if you get a rocking chair, don't be surprised. We do want to make sure you are fully recognized for the outstanding work that you have done.

And Chris, it is great working with you on these issues, and so many others. You know, it is fantastic to come in. I have only been

in Congress for a year and change, but to join a team with this caliber of leadership and skill is a real honor.

And I do want to thank Bowie State. You know, you did a great job. The leadership you provided—I don't think you have been here so long, but you have really made a great impact already, and making sure that the university continues to move in the right direction.

And to Tim Adams, yes, he is the mayor of Bowie, but he is also a successful entrepreneur, in fact, maybe one of the most successful minority entrepreneurs in the country. And when Jolene Ivey, the chair of the County Council, and I did a joint hearing on this, Tim was one of the great witnesses on that proceeding that did a great job. So I am looking forward to hearing from the panel.

I just want to say a couple of things quickly, though. First of all, I see so many friends in the audience from the fights over the years. I first got into this in 1987, when I first came to the Hill. I think you had just gotten there. In fact, Jolene was working for you in 1987. And on the Small Business Committee, Congressman Conyers was on it. Congressman Mfume was on it, as well.

And so I remember that year. President Reagan had decided to attack the 8 (a) program, and he essentially tried to dismantle it. Wedtech was the case that they used as sort of the point of attack. And at the same time, they were trying to block effort, Congressman Mfume. Congressman Parren Mitchell had just left the Small Business Committee, but his leadership continued. In fact, I see the individuals from Minority Business Enterprise Legal Defense Fund, which he founded when he left. Talk about not missing a beat. He left Congress and he started MBELDEF like almost immediately.

But we fought those fights then, and we were relatively successful. We were able to preserve the 8 (a) program. In fact, there were some changes that I thought, some were beneficial, some were maybe less so. But it stayed, and it continued to move forward roughly in the form that it had.

And the MBDA bill, as Senator Cardin mentioned, well, that took a little while to get done, but it did get done. What was that, 2 years ago, I think it was, something like that? Huge achievement over a long term to make that happen. So a lot of that push came from Maryland. We have been the epicenter for these policy fights, in some respects, and I think that is going to continue, as you can see today.

But it is particularly heartbreaking then to look back on that history, and as soon as I get to Congress, and I hope it is not a causation or a correlation thing, but then we get the courts attacking these programs that we spent all these years building up and using. And it is especially problematic because it is not like these programs, like people were really getting over before they started attacking them. Yes, they were helpful. Yes, they were beneficial. But there were still challenges in the programs as they existed before these court cases, so we know we have got a long way to go, because we had a long way to go before these court cases even came down.

And then when *Ultima* came down last summer, I was heartbroken, really, because it really went to the heart of a lot of the

things we had been fighting so hard to get done. And it looked like, unfortunately, a sign of things to come because they are sort of gathering forces on the other side to continue these court attacks, and they are not stopping. We just had another one come through just the other day that is going to be kind of pushing this envelope along the wrong direction, in my view.

So, you know, I think it is critical for us to do a couple of things, and one is I am looking forward to hearing from you all. I know you can't learn when you are talking, so I am going to stop talking in a second.

But I do want to lay this out real quick, though, because I think it is important for us to think about recognizing the challenges that are there with respect to these court cases, recognizing some of the challenges that were growing for other reasons. For example, the concentration and consolidation of a lot of these contracts have made it harder for small businesses, in general, to get a chance to even compete for these, much less small minority businesses to compete, and have all the challenges that Ben and Chris laid out with respect to capital and credit and the like. So I think we have to figure out what to do with that.

Also, when we come back to this at the end, I think the question of where do we go from here I think is a big one. I think we have got some very good arguments we can make as far as why these programs should stay in place and why they need to continue to expand. On, in particular, from my perspective, the lessons we should have learned from the supply chain issues coming out of COVID, which is to the extent we can have businesses here in the United States that are doing these services as opposed to overseas, that is a great thing. If we can have minority businesses who are doing them here in the United States, and utilizing people who are not so much involved in the economic growth of the United States, that is even better piece.

And I think it is also critical for us to make sure that we expand the opportunities available so the American Dream, as we have known it—and we saw it flourishing before it got sort of cut off at the knees when some of these court cases came in.

So I do want to make sure that before we end the day we talk a little bit about things that we can do. The Congressional Black Caucus, you know, I appreciate Ben suggesting my role in that with respect to figuring out how to approach the White House, what to do with the courts, what to do with the Department of Justice, things that we can do to take on these challenges. And I think it is critical for us to make sure we do those things now rather than later.

Because the Biden administration has trillions of dollars coming out from a Federal contracting standpoint. This is the worst possible moment for us to get cut off from the ability to compete fully for those government contracts. It is generational wealth coming out. Some of these contracts, like some of the bridges and tunnels that you all have been hearing about on the news, those can turn businesses around and turn them into not only just small minority businesses but potentially primes and general contracts down the road.

So it is critical for us to fight this fight, keep it moving in the right direction, and I appreciate the leadership that you all have provided in this. And with that I will yield back, and I look forward to your testimony, and thank all of you all for coming today.

Senator CARDIN. Congressman Ivey, thank you for those comments. Your point is just so well taken. We need to engage all of the talent we have in our community for the full strength of America. There is no question about that. But it also provides a way of dealing with the gaps that we have in our community, the wealth gap. Small business entrepreneur opportunities for underserved communities allow us to be able to build some wealth equities in America. So I appreciate you mentioning both of those points.

I will now turn to our witnesses. Your full statements will be made part of the record without any objections, since there is no one here to object. [Laughter.]

I think we are safe on that. And you can proceed as you wish. In the committee room we have a 5-minute time. I don't see any timer here, so you are going to probably be relieved from that. But I would ask that you try to summarize in about 5 minutes to give us a chance to be able to have a discussion here.

I will introduce you as you speak, since there are six of you. It might just be easier to introduce you one at a time as you speak.

We will start with Ms. Natalia Luis, who is the CEO of M. Luis Construction and M. Luis Products. She has 30 years of experience operating her own businesses and guiding other businesses on their growth. Her story is a testament to perseverance and resilience. She is passionate about making an impact in her community, and we are proud to have her business in Maryland.

You may proceed.

**STATEMENT OF NATALIA LUIS, CO-OWNER, M. LUIS CONSTRUCTION AND M. LUIS PRODUCTS, SILVER SPRING, MD**

Ms. LUIS. Thank you, Senator. My name is Natalia Luis. Along with my sister, who is here with me today, I own and operate M. Luis Construction and M. Luis Products, companies based in Maryland that specialize in asphalt manufacturing, asphalt paving, concrete construction, and general contracting. I am here today because the programs that correct an even small amount of the discrimination that minorities and women face in business are essential to our survival and success.

My family has faced devastating discrimination from the beginning. Usually the discrimination is worse as we expand the business, challenging white male dominance in our construction industry. There have been all too many instances to recount, but I will give you a few examples.

Some of my competition has gone through the extreme of tapping my phones or posted big, tough guys outside of our business operations in an effort to intimidate us and our employees. We are proud that we have a workforce that looks like our community, but these bullies went to the extent of filming our employees and then posted a video on social media with the title, "Are these the type of people we want working in America?"

They even tried to get the Federal Government to put us out of business. Normally a business like ours will get one or two labor

audits every few years. We were hit with half a dozen in one year, all due to our competitors making false claims against us, that is that we were hiring illegal aliens. All the audits showed was that, on average, we were not only paying contractually required wages, but we were providing higher wages and better benefits to our multiracial, multiethnic, e-verified workforce.

Yet another instance was when we were seeking to work in one of our counties. We were in a large meeting with 15 to 20 high ranking officials when midway through the Director of Public Works and Transportation looked at us and said, referring to the other Portuguese-owned companies working in the county, “Why don’t you and your cousins get together and figure out your bid because it seems like you don’t know how to do math.” This casual racial belittlement in a public forum directly undermines our business solely based on our minority status.

We have brought on board members and numerous outstanding professionals, many of whom happen to be white males. After about 18 months with us, one of them confided in my sister and I that while he was initially skeptical, he was astonished by the racial and gender biases we faced. His experience with our minority-run business brought challenges he had never faced before in his career.

Senators and Representative, the bottom line is this: discrimination against minority and women business owners is as despicable as it is pervasive. As I have detailed in my testimony, discrimination and the barriers it imposes affect the ability of our business to operate and receive contracting opportunities. We can and we will do our part to create a prosperous economy for all of us, but we need you to protect the MBE, WBE, DBE programs for victims of systemic discrimination and institutional racism. That is minorities, women, veterans, people with disabilities. We are all counting on you. Thank you.

[The prepared statement of Ms. Luis follows:]

**The Testimony of Natalia Luis, Co-Owner of M. Luis Construction and M. Luis Products**
**Field Hearing of the U.S. Senate Committee on**
**Small Business and Entrepreneurship**
May 6, 2024

Introduction:

My name is Natalia Luis. Along with my sister who is here today, I own and operate M. Luis Construction and M. Luis Products, companies based in Maryland. Our companies specialize in asphalt manufacturing, asphalt paving, concrete construction, and general contracting. We have facilities in Silver Spring, Rockville, Glen Burnie, Baltimore, and Clinton.

Family Background:

My parents, Manuel and Albertina, are Portuguese. Dad was born in 1941 into poverty and hard work. As the eldest of five siblings, he was expected to help feed his family, and thus was indentured as a house servant at the age of seven. He was nine years old when he got his first pair of shoes second-hand, a prized possession despite being two sizes too large. Through the years and a lot of difficult work, he was able to elevate himself and went on to work in clay mines, collect resin, harvest olives, work in rice fields, shepherd sheep, and then move on to various construction apprenticeships, which led him to Lisbon at the age of sixteen.

In 1963, after completing 28 months of compulsory, unpaid, military service, my father left Portugal for France to escape political and economic oppression under the authoritarian dictator Antonio de Oliveira Salazar. He was only 22. During his first attempt to escape, he was captured, returned to Portugal, tortured, and imprisoned. Eventually, he made a successful escape to France, arriving on November 17, 1964. During his journey, he had to cross fascist Spain, which was embroiled in a civil war. In order to get to France, my father walked from Portugal and was harbored by various shepherds whilst climbing through the Pyrenes. At this time, France welcomed all refugees seeking asylum from dictatorships. If you could find your way into the country, you were given immediate legal status and welcomed to work legally in France. He began working on December 3, 1964.

Even though people from Portugal were considered second-class citizens in France and were relegated to jobs as laborers and farmworkers, it was much better than watching his brothers and sisters starve in Portugal. Moreover, his sacrifice helped to feed his family back home which was the only reason he left Portugal in the first place. A few years later, my father returned to Portugal, married my mother, and brought her back to France with him, where my sister and I were both born.

Both of my parents were amazing entrepreneurs and hard workers. My father was an excellent craftsman. His supervisors soon realized that he had extraordinary math skills and could make complex construction calculations despite never having set foot in a classroom. My father was never afforded the basic human right of education. However, his math and construction skills were so extraordinary that his bosses sent him to school to learn elementary reading and writing and how to read blueprints. To this day, my father's handwriting is rudimentary at best.

My parents moved back to Portugal in 1974, after the April 25th military coup d'etat in hopes of making a life for themselves in their birth country. They were immediately disheartened to find that, instead of freedom and opportunity, Portugal had been engulfed by anarchy and was led by a government that embraced communism. It was no place to pursue their long-held dream of seeing their two little girls have a real chance at a good education. They applied for green cards from several countries, and, to their

relief, the United States came through first. On March 17, 1979, five years after their initial application, they were granted permission and our family moved to Kensington, Maryland.

It is important to know that in the five years my parents waited for permission to live legally in the United States, they had built out multiple successful businesses in Portugal. My mother was a natural businesswoman, starting an aviary of 3000 chickens that provided all the eggs for the surrounding villages. She also had a dairy business that provided milk for our village. She developed many businesses in agriculture, including animal husbandry, and the introduction of soybean production in the region. She eventually also established a successful ceramics business. The only reason they wanted to immigrate to the United States was to ensure that my sister and I would get a college education and help to fulfill their dream of leaving the world better than they found it. They left everything they had built behind to ensure our future. They did not speak English, nor did they understand the measuring system of their new country, as they used the metric system. For my father, whose career was built on math, this was yet another huge impediment to a smooth and successful transition. But he overcame it.

Imagine the courage required to move to a country with two young children and a wife, not understanding its language, its customs, and traditions. Leaving everything you know and have built behind – all to ensure that your daughters could get the education that you were denied. My parents came to the United States with two suitcases, a few hundred dollars in their pockets, and roundtrip tickets back home in the event it did not work out. I remember one time, when I was 8 or 9, in the dead of winter, when my mother came home, carrying groceries. She had cleaned two houses that day and taken several buses and still stopped to buy groceries and lug them home. I was so happy to see her that I ran to hug her. When I did, I could feel her exhaustion and heard the ice crackling in her hair as I held her tight. I will never forget that moment because I promised myself then and there that I would do everything I could to help my family succeed.

Before I say anything else, let's get one thing out of the way: Yes, I am Hispanic, from Hispania on the Iberian Peninsula of Europe, known today as Portugal and Spain. To be clear, when your name is Natalia Maria Domingues Luis, no one stops to ask if you where you are from before they start to discriminate. I realize that some think that Portuguese and Spanish people should not be considered minorities, but the fact is that we experience the exact same types of discrimination that any Portuguese- or Spanish-speaking country does. It is ever-present in our daily lives. I am here to testify today because programs that seek to correct an even a small amount of the discrimination that women and minorities face in business are essential to our survival and success.

History of Company:

After moving to the United States, my parents earned money to support our family however they could. Because of his construction skills, Dad worked in street repair construction and my mother did the back breaking work of cleaning other peoples' homes. The yearning to start a company came as a direct result of how unfairly my father was treated by his employers. From not receiving paid overtime for the 70 to 80 hours a week that he worked, to his employers not paying into the unemployment fund but deducting it from his paychecks – leaving him unable to collect unemployment during the harsh winter months when construction workers were unable to work due to weather.

For approximately five years, my mom and dad worked to start their own company, and in 1985, M. Luis Construction was born. My mom went to school to learn English and accounting at night and became the chief executive on the business side, while my dad was responsible for the artisanal work and outside operations. Even though my dad did not read or write in English, his extraordinary skills in math and my mom's business skills made it possible for them to develop a street repair business here. Our company was first certified as a disadvantaged minority business enterprise by the Maryland Department

of Transportation in 1992. Yes, it took my parents seven years to even realize that these essential protections existed for minority- and woman-owned businesses.

My sister, Cidalia, and I were involved in the business as soon as we turned 14 years of age. We would work in the summers, before and after school, and on weekends. Obviously that schedule prevented us from being able to participate in any academic or extracurricular activities, including joining any sports teams or watching the games, for that matter. It is something we still think about to this day as we raise our own children. We had to become responsible adults all too early. We helped prepare quotes and worked at project sites performing tasks such as seeding and mulching, and cleaning construction tools. We translated for our parents and were the chief sales force for the company. At fourteen.

We were both raised with a commitment to hard work, excellence, and high ethical and moral values. Frankly, we never needed a contract because our word was our contract. We also were raised to honor our culture, improve, and stand up for our community, and to not be a statistic or a burden on our society. In 2008, Cidalia and I bought the company from my parents, having long since completed college and, in Cidalia's case, graduate school. We are proud alumni of the University of Maryland College Park where we both received an extraordinary education. We were the first and second people from our village in Portugal to go to college. Those two graduations fulfilled my parents' dreams and justified their sacrifices all those years ago.

In 2010, my sister and I purchased an asphalt plant in Rockville, Maryland. We began the process of making M. Luis Construction a multi-divisional enterprise. It took us six years to negotiate the purchase. We did it in complete secrecy, knowing that our large multigenerational or multinational competitors, led mostly or completely by white males, would not tolerate an immigrant, Hispanic, woman-owned company rising to the status of a manufacturer. And they did not take it well. In fact, they, as a group, tried to crush our growth by denying us access to asphalt. Five years later, we leased another asphalt plant in Glen Burnie to support our expansion in Baltimore.

History of Discrimination:

My family has faced devastating discrimination from the beginning. There have been too many instances to recount them all but let me give a few examples and this is in no way an exhaustive list. It is important to understand that, historically, Portuguese people have faced devastating discrimination in this country. We have consistently been relegated to low wage jobs as laborers and have contended with all the stereotypes that go with this sort of second-class status. There are even ugly slurs specifically for Portuguese people. I will not repeat them here, but believe me, I have heard them a lot – and my parents heard them even more.

I want to be clear that I have dealt with pervasive discrimination. I hate to admit this, but some of it I have just learned to ignore and forget – no matter how hurtful it is. We could not run and grow our company if we spent our time focusing on every instance of bigoted behavior – it has become an expected, albeit always challenging, part of our daily lives. Do not get me wrong – not all white males are racist, sexist, or predatory. My sister and I have been the recipients of much kindness, mentorship, and respect by some of the industry's most influential and reputed white men. The problem is that too many white, male business owners still harbor bias and prejudice.

We have hired many amazing, top professionals that happen to be white and male. After working with us for about 18 months, one of them lamented to Cidalia and me that when he first came to work at M. Luis, he had initially doubted our assertions of the types of discrimination we face daily in our industry. He told us he was shocked by the artificial barriers that were placed in front of us solely based on gender bias and racial prejudice. He himself encountered additional challenges just by working with

us, something he had never experienced in his long, professional career. Honestly, it took a lot of courage for him to accept our job offer because in doing so, he knew he would face backlash and some ridicule for working in an immigrant company led by women. Actually, all of the white men in our company have experienced that same reputational risk.

Usually, discrimination is the worst as we are expanding the business or moving into new areas. Every time we start to challenge the status quo – that is the status quo of white, male dominance – we get hit with a new round of outrageous behavior. For instance, in the early 2000s when we began to bid as a general contractor, a prime in Baltimore City, several large white, male-owned companies came after us with everything they had. They tapped our phones. They went through our trash so frequently that we had to shred every document that left our office. They posted big, tough guys outside of our business and our temporary construction yards in an effort to intimidate us and our employees. We are immensely proud of the fact that we have a workforce that looks like our community, but these bullies filmed our employees on our job sites and then posted the video on social media with the question, "Are these the types of people we want working in America?"

Once we started to really compete, these big companies did even more to try to crush us. In the press, they would accuse of us "taking advantage of illegal workers." They even tried to harness the power of the federal government to put us out of business. Normally, a business like ours will get one or two federal labor audits every few years. As we proved ourselves to be both responsive and responsible contractors and began to consistently win and execute contracts, we were hit with over half a dozen federal labor audits *in one year* all as a result of our competitors making false claims against us. These audits are no joke – the average penalty from such an audit is $100,000. Fortunately, we are fair and compliant employers, and we were never fined, not a cent. All the audits showed was that, on average, we were not only paying contractually required wages, but we were providing higher wages and better benefits to our multi-racial, multi-ethnic *e-verified* workforce.

Still, the attacks were vicious and explicitly racial: their message was that as Hispanic people, we were hiring illegals and therefore deserved to be run out of business. To repeat: all our employees were and continue to be e-verified, even when it was not obligatory. They were trying to bully and intimidate our workers. It did not matter that they were working legally, they were threatened, and, in some cases, they were rightfully afraid. These are not the sort of attacks that white male-owned companies have to contend with.

After we bought the asphalt plant in 2010, things got even worse. They continued with all the other harassment they had been doing, and then did more. For a period of years, they put out the word in the construction community that they would put us out of business. One of their methods was to consistently and pervasively state that M. Luis was up for a liquidation sale. This led to destabilizing our labor force and some employees even quit because they had been fooled into thinking that we were not an economically viable company. They posted fake "for sale" signs on our new equipment at our job sites saying things like, "For Sale, No Offer Refused." This was brand new equipment.

During this period, all asphalt producers in Maryland refused to sell M. Luis any asphalt products from their plants, knowing that this would drive up our costs and make it harder for us to compete for jobs in geographical zones further away from our Rockville plant. They did this even though we had established excellent credit in previous work with their firms. An example of the hardship that this created was that we had to haul asphalt from Rockville to Baltimore City, tripling the hauling costs and severely reducing productivity rates, preventing our company from having a profitable outcome. Despite this artificially created difficulty, M. Luis won an urban asphalt paving award for Falls Road with asphalt that came from our Rockville plant.

Unfortunately, the theme of physical intimidation has not been restricted solely to our employees. I myself have been the victim of physical attacks. A few years ago, I was in a meeting in Baltimore City at the Department of Transportation to resolve systemic misogyny and harassment. As way of background, M. Luis is both a prime and subcontractor on various jobs in Baltimore City. On this occasion, M. Luis was made to endure the wrath of a city inspector who had worked tirelessly to make our lives miserable. In this case, the animosity may have been based more on the fact that I am a woman, rather than the fact that I am Hispanic. This inspector was making life so difficult for us and had prevented us from being paid for so long on one project that we began to document all our interactions with him so that we could bring the problem to the attention of his superiors. Finally, we asked for a meeting with the inspector and his bosses. We calmly detailed the problems we had been facing and he became enraged. At one point he lunged across the table to grab me. After witnessing this, the Director had that inspector restrained and removed from the room by his colleagues. Thankfully, the incident was enough evidence to keep him off our job sites for a period of two years. Since then, he has returned to our job sites where he continues to actively prevent us from working without hinderance and intimidation.

Discrimination is not always physical intimidation, sometimes it is an effort to belittle and to degrade. In this instance we were seeking to work in Prince George's County. There was a Director of Public Works and his deputy there who discriminated against us based on both race and gender. I remember one meeting in which it became clear that he and his team were going to make our lives as difficult as possible. We were in a large meeting, with 15-20 high-ranking county officials in the room (when we had initially asked about the nature of the meeting, we were told it was without consequence and only a few people from our company should attend). At about the midpoint of this meeting, the director looked at us and said (referring to the other Portuguese-owned companies working in the county), "Why don't you and your cousins get together and figure out your bid because it seems like you don't know how to do math." These words came from the leader of the transportation department.

Discrimination results in real loss of work and livelihood. It is not just emotionally harmful; it takes jobs away from us and money out of our pockets. And that means it also takes money away from our extraordinarily hardworking employees – a workforce that reflects our community in its diversity. I remember one period in which we lost four bids in one year in the City of Baltimore. Please understand, I am not saying we were outbid, I am saying that we lost four bids on which *we were the lowest, responsive, responsible bidder!* In this case, even though we were the lowest, responsive, responsible bidder, the contracts were given to a large, multigenerational, white, male-owned company. At this stage in our careers, Cidalia and I were still shockable. Whilst still at City Hall, and immediately after that boards and commissions meeting, we ran after the Director of the Department of Transportation and asked how this could possibly have happened. He turned to Cidalia and I and said: "You'll be fine girls. It astonishes me that no matter how many times you get knocked to your knees, you still keep getting back up." His sexual connotation was not only disgusting, but he uttered those words directly under the City Hall's dome. If a woman is not safe there, where can she be safe at all?

In another case at Boards and Commissions in Baltimore City, a white male-owned, multigenerational company – the same one that vigorously protested most bids being considered for award to M. Luis – was protesting a project awarded to M. Luis. They contended that M. Luis was not a woman-owned business. Their accusation was that my father solely ran the business and that my mom was a front. The mayor at the time was so fed up with the discussion that she asked if the owner of M. Luis Construction was present and could please stand up. When my mom, Albertina, stood up, the mayor stated, "well, that looks like a woman to me."

In yet another case, we were targeted by an Associate Director of Public Works and Transit in Prince George's County who did everything he could to keep us from working in the county. In fact, he was responsible for the fact that it took six years for us to become prequalified. When a local manufacturer

provided us with asphalt that did not meet county specifications, despite the fact that we rectified the paving at our own full cost, he disqualified us from paving and prevented us from winning contracts based on a single mistake made by a manufacturer outside of our company and despite the immediate correction made by our company at our own expense. Unfortunately for us, he preferred to work with the other two asphalt manufacturing/large paving contractors in the county, one of which was a white, male-owned, multigenerational company, and the other was a multinational company. He was white as well.

We have also been the victims of discrimination when larger companies, who feared that we would grow and compete against them, would go to other small MBE/WBE subcontracting companies and pressure them not to work with us. As an example, prior to purchasing our own milling machinery, we experienced an especially damaging type of forced collusion. Larger white, male-owned companies went to our milling subcontractors and told them that, if they worked as subcontractors for M. Luis, they in turn would refuse to subcontract with them – this forced our subcontractors to refuse to bid and work for us because they could not risk losing all their other contract work with these large, non-minority firms. This type of discrimination is especially egregious. It hurt us, it hurt the smaller milling companies, and it put the larger companies in a position where they could reduce competition, charge the government more, and drive-up prices, which all of us end up paying for with our taxes.

My parents worked so hard and sacrificed so much so that my sister and I would have a chance to succeed and an opportunity for a better life. We are the embodiment of the American dream. We make a positive difference in our community every day. But do not just take it from us. Ten years ago, President Obama came to our Rockville asphalt plant where he held an international press conference. In his words, when speaking about M. Luis Construction, he said, "so this company right here is full of folks who do right by each other. They don't try to see if they can work every angle. They don't lie about each other. They don't try to undermine each other. They understand they're supposed to be on the same team. You pitch in, you look out for one another. When somebody gets knocked down, you help them back up. You don't ask what can you get out of this, because you know that success doesn't depend on one of you, it depends on all of you working together."

Senator Cardin, the bottom line is this: discrimination against minority and women business owners is as pervasive as it is despicable. We will continue to work tirelessly to succeed despite it. But we need you to protect programs that help people who face systemic discrimination and institutional racism – minorities, women, veterans, people with disabilities. We can and will continue to do our part to create a prosperous economy for ALL of us, but we need you to protect MBE, WBE, and DBE programs and other programs that are intended to address discrimination.

Senator CARDIN. Well, thank you very much for your testimony. [Applause.]

Our next witness is Ms. Tonya Lawson, who is the President and CEO of Lawson Consulting. Her company works on innovative workplace solutions through automation and AI. She has over 20 years of experience working for Federal contractors and operating her own small business.

Ms. Lawson.

**STATEMENT OF TONYA LAWSON, PRESIDENT AND CEO, LAWSON CONSULTING, FORT WASHINGTON, MD**

Ms. LAWSON. Senator Cardin, Senator Van Hollen, Representative Ivey, esteemed guests, thank you for inviting me to testify today. My name is Tonya Lawson, and I own Lawson Consulting. I am honored to be here to address race discrimination against minority-owned businesses as a matter of paramount importance to minority entrepreneurs. I bring a perspective rooted in over two decades of experience in the Federal Government and private sector contracting. I am also a representative of Black American small business community that has faced discriminatory challenges for centuries and continues to encounter discrimination that limits our ability to grow and prosper. I would like to provide just a few examples.

A few years ago, I entered a partnership with a large majority-owned government contractor to collaborate on Federal contract with a small business/MBE requirement. Our team successfully secured the contract. Unfortunately, after 2 years of collaboration it became evident to me that this partnership would not foster my company's success or align with my core values. There were indications of discriminatory practices inside the larger company. Employees spoke openly about instances of discrimination against Black employees, including disparities in promotion rates, mentorship opportunities, and customer-facing roles. There was a pervasive sense among Black employees that they needed to exceed expectations significantly to advance, while white colleagues were systematically favored.

This year, at a recent small business development event, where networking plays a crucial role in fostering opportunities, I encountered a troubling instance of discrimination that highlights ongoing challenges faced by Black-owned businesses. As I awaited in turn in line to speak with a lead IT procurement representative, he abruptly turned away when it was my turn to talk to me, opting instead to converse with two white women who were not even in line. Simultaneously, he held up his index finger at me, in a dismissive gesture, indicating that I should wait.

The procurement representative initially was dismissive, but after my persistence to engage him in conversation he eventually was very impressed with my company's capabilities and core competencies, which focuses on process automation and artificial intelligence.

I am not alone in experiencing situations like this. Discrimination is pervasive, and it is effect are long lasting. It is a reminder of the barriers that we Black Americans so very often face in our businesses. The SBA 8 (a) and MBDA programs have been a life-

line for countless minority small businesses like mine, providing training, technical assistance, and access to Federal contracting opportunities.

Racism, discrimination, and gender discrimination still exist, especially for Black American business owners. Despite centuries passing since era of slavery, the remnants of racial inequality remain in our society. Supporting Black American businesses is not just about economic empowerment. It is about fostering a more inclusive and just society where everyone has a fair chance at pursuing the American dream. Thank you. [Applause.]

[The prepared statement of Ms. Lawson follows:]

May 6, 2024
Written Testimony-Senate Committee on Small Business and Entrepreneurship
Tonya Lawson

## The Continued Struggle For Equality Of Black American Business Owners

Senator Cardin, Senator Van Hollen, and Representative Ivey, esteemed guests, and fellow advocates for small businesses and diversity in entrepreneurship.

My name is Tonya Lawson, and I am honored to appear before this esteemed committee to address a matter of paramount importance to small businesses and minority entrepreneurs across our nation. As the owner of a minority, woman-owned small business, and a passionate advocate for Small Businesses, I bring a perspective deeply rooted in over two decades of experience in federal government and private sector contracting.

Today, I stand before you not just as a business owner but as a representative of Black-American small business community that has faced historical challenges and continues to encounter barriers in accessing opportunities that are fundamental to economic growth and prosperity. The recent challenges to programs like the Small Business Administration's 8(a) Business Development program and the Minority Business Development Agency's (MBDA) Business Center programs are deeply concerning, as they threaten to dismantle crucial avenues of support for socially and economically disadvantaged entrepreneurs.

The SBA's 8(a) program has been a lifeline for countless small minority businesses, providing training, technical assistance, and access to federal contracting opportunities. While I am not in the 8(a) program myself, I've long considered joining the program, given the doors it could open for my business. Similarly, the MBDA's Business Center programs have played a vital role in empowering minority business enterprises (MBEs) with essential resources and guidance to navigate the complexities of business ownership and access capital for growth and expansion.

Considering recent court rulings and challenges to these programs, it is imperative that we recognize the enduring value they bring to our economy and communities. These programs are not just about leveling the playing field; they are about creating pathways to success, fostering innovation, and driving economic inclusion for all Americans.

In my testimony today, I will share insights from my own experiences as a Black American, woman business owner and highlight the critical importance of preserving and strengthening initiatives like the SBA 8(a) program and MBDA's Business Center programs. Racism, discrimination, and gender discrimination still exists, especially for Black American business owners. I urge this committee to consider the profound impact of these programs in addressing the barriers caused by discrimination and to work collaboratively to ensure that all entrepreneurs, regardless of background, continue to have the opportunity to have access and contribute to our nation's prosperity.

### Facing Hate Head-On: Confronting Racial Slurs and Discrimination in Corporate America

In my twenties, while working in the private sector for a large publicly traded electronics company, I encountered a deeply disturbing incident that highlighted the stark realities of discrimination. As part of the credit department, I diligently assisted customers with the credit application process, ensuring smooth transactions and excellent service. One evening shift, I adhered to my scheduled hours, making it clear to colleagues that I needed to leave promptly at 9 pm. Despite this, a mature-adult white woman sales

representative insisted that I stay longer to assist her customer, disregarding my commitments. When I firmly declined, citing my prior arrangements, she resorted to using an offensive racial slur, calling me a "Nigger." The shock and hurt I felt were immediate and profound. In a moment of intense emotion, I reacted instinctively and slapped her in response to this deeply offensive language.

This incident revealed not only the racial animosity that still pervades our society but also the unequal treatment and lack of accountability faced by minority individuals. Rather than the company addressing the root cause of the conflict and the offensive behavior displayed by the sales representative, I was suspended and ultimately employment terminated. The lack of consequences for her actions and the swift punishment imposed on me sent a clear message about the systemic biases and injustices that Black Americans face in the workplace. It was a stark reminder that despite my hard work, dedication, and professionalism, I could still be targeted and penalized based on my race, while the offender faced no repercussions.

Regarding this incident, it's crucial to highlight the context and emotional impact that led to my reaction. Her use of a racial slur, specifically calling me a derogatory term, was not only deeply offensive but also created an intensely hostile environment. The immediate emotional distress caused by such a derogatory and racially charged insult cannot be overstated. It's important to note that I did not instigate this situation; rather, I was responding to a direct attack on my dignity and humanity.

In a professional setting, racial slurs are completely unacceptable and have no place in civilized discourse. The use of such language not only undermines professionalism but also perpetuates harmful stereotypes and discrimination. In this case, the slur used against me was particularly egregious and hurtful, evoking a strong emotional response.

Some might argue I was wrong for slapping the woman. They may label me as the aggressor. That I was the violent one. But I ask you to consider this, what would you have done, in your twenties, if someone hurled a racial slur, a direct attack on your dignity and humanity, in a professional setting? In that moment, as a young person in my twenties, confronted with such blatant racism, my initial reaction was not premeditated, however, it rocked me to my core. I was shocked and hurt that someone could demean me with such venom.

Being called the offensive "N-word" was a painful reminder of the deep-rooted history of racism and oppression that Black Americans had endured for centuries. The "N-word" originated during the dark era of slavery, this derogatory term was used to dehumanize and belittle Black people, depicting them as inferior and unworthy. Through the harrowing periods of Jim Crow segregation and the Civil Rights Movement, the "N-word" continued to serve as a tool of hate, a means of asserting white supremacy and reinforcing racial hierarchies and perpetuating racial injustices and systemic discrimination.

The weight of the "N-word" encompasses the horrors of slavery, where our Black ancestors faced unimaginable atrocities—they were treated as mere property, husbands were separated from their wives and children, Black woman were raped, they were whooped with chains and whips, hung from trees, mutilated, worked cotton fields from morning to night, they were told they were dump, ignorant and couldn't learn. Our men were targeted for privatized prison. It symbolizes a deliberate attempt to strip away the dignity, autonomy, and humanity of Black people. Being subjected to such hate speech evokes the profound pain and trauma experienced by countless Black individuals who endured hate crimes, violence, and systemic oppression throughout history.

So, when I was called the "N-word", I felt this sting of centuries of injustice and discrimination. It was a stark reminder of the dehumanization that my ancestors faced, the struggles they endured, and the sacrifices they made for future generations. This word is not just an insult, it is a manifestation of centuries of racism and hatred. No one should ever use or tolerate such language, as it perpetuates the cycle of pain and division. I wouldn't wish this level of hurt on anyone, and it's crucial for us to understand the impact of such words and work towards creating a more inclusive and respectful society.

Imagine being in my shoes, a dedicated young, loyal employee doing their job diligently, only to be met with a racial slur that cuts deep into your sense of self-worth. It's about the emotional impact of being dehumanized and degraded in such a manner. In that moment, my instinctive reaction was to defend my dignity and push back against the blatant racism I was subjected to.

Reflecting on the incident, I'm struck by how effortlessly the sales representative used the "n-word." Her casual delivery of such an offensive slur was astonishing to me. At the time, I was a young worker in my twenties, dedicated and enthusiastic about my job. The age difference between us was around 10-15 years, yet the ease and comfort with using such a derogatory term highlighted to me the lack of consequences she faced. Yes, I acknowledge that resorting to physical retaliation (a facial slap) wasn't the proper reaction, but it's crucial to grasp the emotional toll inflicted on me by such a derogatory term. It's not merely about the physical act of a slap; it's about the profound pain, hurt, and anguish caused by being targeted with hate speech in what should be a professional and respectful setting. It's important to note that the woman didn't sustain any lasting physical injury. However, the impact on me went much deeper and was long-lasting, striking at the core of my identity and dignity.

I am not alone in experiencing situations like mine. Discrimination is pervasive and its effects are long-lasting. It's a reminder of the barriers that we, Black Americans, face in our daily lives. This event underscores the ongoing need for government advocacy programs like the SBA 8(a) Business Development program and MBDA programs, which play a vital role in supporting businesses owned by socially and economically disadvantaged individuals.

From this experience, I've learned several key lessons that highlight the importance of such programs in fostering a fair and inclusive business environment. Here are the lessons learned:

- **Advocacy for Minority-Owned Businesses:** Recognizing the ongoing challenges faced by minority-owned businesses in combating discrimination underscores the critical need for government advocacy programs like the 8(a) Business Development program. These programs are indispensable in providing a level playing field for businesses owned by socially and economically disadvantaged individuals, ensuring fair opportunities for growth and success
- **Strategic Navigation of Discrimination:** Navigating instances of discrimination requires a strategic approach and the utilization of available resources. Programs like the SBA 8(a) program offer support and opportunities for growth, essential for small businesses to thrive in competitive environments.
- **Upholding Professionalism and Resilience:** Upholding professionalism and resilience in the face of discriminatory behavior is crucial for maintaining business integrity and reputation. Initiatives like the SBA 8(a) program promote ethical business practices and fair treatment for all entrepreneurs.
- **Seeking Recourse and Support:** Seeking recourse and support from appropriate channels, such as HR departments or advocacy programs like the SBA 8(a) program is essential in addressing and rectifying instances of discrimination within business partnerships.

- **Continuous Advocacy for Equity, Equality and Fairness:** Advocating for equity, equality and fairness in business interactions is a continuous effort that requires active participation and engagement. Programs like SBA 8(a) program empower entrepreneurs to challenge discriminatory practices and advocate for inclusivity and diversity in the business landscape.
- **Promoting Awareness and Education:** Educating stakeholders and promoting awareness about the impact of discriminatory language and actions fosters a culture of respect and inclusivity. Initiatives like the SBA 8(a) program contribute to creating a more equitable and supportive business environment for all entrepreneurs.

**Navigating Racism: Experiencing Racial Discrimination in Business Partnerships**

A few years ago, I entered into a partnership with a large government contractor that is owned and operated by individuals of Caucasian descent, a company with which I had a relationship. They initially showed support and willingness to mentor my small business, inviting me to collaborate on a Department of Defense (DOD) contract that included a small business/MBE requirement. As part of the proposal process, I contributed extensively by providing information about my company, including past performances, capabilities, and expertise. Our team successfully secured the contract.

Post-award, I expected discussions to commence regarding the specifics of our partnership, such as the allocation of technical resources, roles, responsibilities, and the number of full-time equivalents (FTEs) my company would provide. However, despite my repeated inquiries over two years, I received no response or clarity on these critical matters. I remained proactive, maintaining regular communication, and expressing my readiness to contribute to the team's success.

Disheartened by the lack of progress and meaningful engagement, I reached out to my small business advocate at the Small Business Administration (SBA) to seek assistance. After the SBA's review, it became apparent that the large business was not fulfilling its obligations outlined in the small business subcontract plan submitted during the proposal stage. Despite SBA intervention and discussions with the large business, the situation did not improve. Instead, the company ceased all communication with me, signaling a clear lack of genuine commitment to partnering with a qualified small business like mine.

Why do I believe this experience amounted to discrimination? Firstly, there were indications within the company's culture of discriminatory practices. Employees, including some of my supporters within the company, spoke openly about instances of discrimination against Black employees. These included disparities in promotion rates, limited opportunities for customer-facing roles, and a pervasive sense among Black employees of needing to exceed expectations significantly to advance within the company. Moreover, Black employees observed disparities in mentorship opportunities and succession planning, where white colleagues were systematically favored.

Ultimately, I made the difficult decision to disengage from the partnership after investing two years of effort and hope into building a strategic relationship. The company's failure to uphold its commitments, coupled with a corporate culture that seemed indifferent to diversity, equality, and genuine partnership with small businesses, made it clear that this was not an environment conducive to my success or aligned with my values. This

experience not only drained significant time, money, and effort but also potentially cost me other valuable opportunities and partnerships that could have contributed to the growth and sustainability of my business.

The lessons learned from this situation are profound and have guided my approach to business partnerships and advocacy for fair practices:

- **Accountability and Oversight**: The SBA must play an active role in holding large businesses accountable for meeting their small business subcontracting plans as outlined in contract requirements. This includes monitoring the allocation of funds and resources designated for small businesses, ensuring that these opportunities are not overlooked or redirected to non-compliant practices.
- **Importance of Due Diligence:** Conduct thorough due diligence before entering into partnerships, ensuring alignment not only in goals but also in values and commitment to diversity and fairness.
- **Advocacy and Collaboration:** Actively engage with advocacy organizations like the SBA to address issues of non-compliance and discrimination, leveraging their expertise and support to advocate for fair treatment.
- **Transparency and Communication:** Maintain open and transparent communication channels with partners, setting clear expectations and seeking regular updates to ensure mutual understanding and accountability.
- **Resilience and Adaptability:** Remain resilient in the face of challenges, recognizing when to pivot or disengage from partnerships that do not uphold ethical standards or support diverse and inclusive practices.
- **Heightened Awareness and Discernment:** The experience highlights the persistence of racism in business interactions. As a small business owner, it's essential to maintain a heightened level of awareness and discernment to detect early signs of discrimination or bias. This includes being attentive to subtle cues, language, and behaviors that may indicate underlying prejudices. As a minority business owner, I must continuously think about this. Why?

**Systemic Bias Unveiled: Challenges Faced by Black American, Woman-Owned Business**

A few years ago, I encountered discrimination while working on a subcontract for a civilian agency, providing project management services. Initially, I reported directly to the interim CIO, a Black male professional, who recognized my competency and experience. I was brought onto the contract as a project manager to support a team of about 25 technical resources. As I began supporting the Interim CIO, the department and the team, everything seemed positive and productive.

However, when the permanent CIO, a white male professional, took over, the dynamics shifted. After a few months, the new CIO not only commended my work ethics and effort but also invited me to collaborate closely with him on special projects, recognizing my capabilities publicly. This recognition inadvertently triggered jealousy among some white male teammates, particularly a project manager who had a history of making disparaging comments about me to the CIO. I became aware of these conversations through other coworkers who shared the white teammates' complaints, revealing their jealousy and attempts to undermine my work ethics and reputation. Despite my unwavering dedication and hard work, these jealous colleagues started to influence the CIO's decisions, ultimately impacting my small business subcontract.

Over time, the team's disparagement escalated, leading to a decline in my interactions with the CIO and eventually, the early termination of my contract. The explanation given was budget concerns, but it became evident that this decision stemmed from the influence of jealous colleagues and a lack of leadership discernment from the CIO.

This experience left me feeling proud initially, to contribute meaningfully and collaborate effectively with the team. However, as the discrimination unfolded, I felt hurt, disappointed, and disillusioned. It was a clear case of racial and gender-based discrimination, where jealousy and undermining tactics prevailed over merit and professionalism.

The discrimination manifested in several ways. Let me explain:

- **Unequal Treatment:** Despite my qualifications and contributions, I faced unequal treatment compared to my white male counterparts. This included being overlooked for opportunities, receiving less recognition for my work, and facing undue scrutiny and criticism.
- **Undermining Tactics:** The jealous colleagues engaged in undermining tactics, such as spreading false rumors about my performance, questioning my abilities without merit, and attempting to discredit my reputation within the team and with the CIO.
- **Lack of Support:** Instead of addressing the discriminatory behavior and supporting a fair and inclusive work environment, the CIO and some colleagues chose to ignore or condone the discriminatory actions, further exacerbating the situation.
- **Emotional Impact:** The discrimination took a toll on my emotional well-being, leaving me feeling hurt, disappointed, and disillusioned. It created a hostile work environment where I constantly felt undervalued and undermined, impacting my morale and confidence.
- **Economic Impact:** The discriminatory actions ultimately led to the loss of the subcontract, resulting in a significant financial impact on my business and my family. This loss of revenue not only affected the sustainability of my business but also had direct implications for my ability to provide a stable income for myself and support my family, highlighting the real economic consequences of discrimination in business relationships.

The CIO's failure to address this discrimination and uphold equitable practices was disheartening. It not only affected my professional growth but also highlighted systemic challenges that black minority professionals often face in corporate environments.

The experience I just recounted highlights the pervasive challenges of racial and gender-based discrimination that persist in professional environments, even in agencies where diversity is valued. This incident underscores the importance of addressing systemic biases and promoting equity and fairness in the workplace. These lessons are particularly relevant to the Senate Committee on Small Business and Entrepreneurship as they consider policies and programs to support minority-owned businesses and combat discrimination in federal contracting. In reflecting on this incident, here are my take-aways:

- **Discrimination hinders productivity and Innovation:** When discriminatory behaviors go unchecked, it creates a toxic work environment that stifles collaboration, productivity, and innovation. Agencies and leaders must actively address discriminatory practices to foster inclusive and high-performing teams.

- **Accountability is essential for fairness:** Government agencies and contractors must be held accountable for promoting diversity, equity, and inclusion. This includes implementing clear policies and practices to prevent and address discrimination, ensuring fair treatment for all employees and subcontractors.
- **Support for minority-owned businesses is crucial:** Programs like the SBA 8(a) Business Development program play a vital role in providing opportunities for socially and economically disadvantaged entrepreneurs. Continued support and advocacy for such programs are imperative to level the playing field and promote diversity in federal contracting.
- **Heightened Awareness and Discernment:** The incident emphasizes the need for small business owners to maintain a heightened level of awareness and discernment in professional environments. Being attuned to subtle signs of discrimination, such as disparaging remarks or biased treatment, is crucial to address issues early and advocate for fair treatment. This experience underscores the importance of recognizing and confronting discrimination, even in seemingly progressive workplaces.
- **Connecting the Dots – The Ongoing Presence of Racism**: Reflecting on this incident brought back memories of a deeply upsetting experience from my twenties when I was subjected to a racial slur, being called the "N-word". Those words left me feeling deeply devalued and disrespected. Fast forward fifteen years, and I found myself in a similar situation where a white male professional made me feel undervalued, unappreciated, and inadequate. However, this time around, I approached the situation with increased resilience and determination, seeking justice and accountability for discriminatory behavior.
- **Today, Racism Persists:** Racism is no longer as overt as it was in the 1960s when it was openly displayed through symbols like hoods and messaging on walls and businesses. Instead, racism today exists in more subtle and insidious forms, ingrained into the very fabric of American society. It often lurks beneath layers of privilege and systemic biases, making it challenging to address directly. Despite these challenges, I maintain hope and pray for progress, believing that we must collectively work towards a society where discrimination has no place, fostering a more just and equitable environment for all.

## Impact of Discrimination on Business Opportunities

This year, at a recent small business development event, where networking plays a crucial role in fostering business connections and opportunities, I encountered a troubling instance of discrimination that highlighted ongoing challenges faced by Black-owned businesses. The event, bustling with exhibitors ranging from small to large corporations across various industries, offered a platform for networking and exploring potential business opportunities. As I eagerly awaited my turn to speak with the lead IT procurement representative, a white male professional, from a global pharmaceutical company, I observed a disheartening sequence of events. The representative, after engaging with three individuals ahead of me, abruptly turned away when it was my turn, opting instead to converse with two white woman who weren't in line. This blatant disregard left me feeling frustrated and overlooked. Despite attempting to draw his attention back to our conversation, I was met with a dismissive gesture (pointing his index finger at me signaling for me to wait) and a lack of acknowledgment.

The procurement representative initially was dismissive towards me, eventually was very impressed with my skills and knowledge area. He became very interested and engaged in the conversation as I shared my company's core competencies in automation and AI. I felt that he had dismissed me because I was black, for he spoke to the

male professionals and the white woman professionals with a sense of eagerness and joy. I had to get over an extra hurdle before he would talk to me and recognize my company's capabilities.

Despite these initial setbacks, I persisted in introducing my company's services and engaging the representative in a meaningful conversation about our automation and AI offerings. This demonstrated my determination and resilience in the face of adversity. Had I not pushed through and engaged the representative despite the dismissive behavior, it could have meant missed opportunities for my business. Networking events like these are critical for establishing partnerships, securing contracts, and expanding business reach. By actively participating and advocating for my company's services, I showcased our capabilities and expertise, potentially opening doors to new collaborations and projects. This incident highlighted the importance of perseverance and seizing opportunities, especially in environments where bias and discrimination may exist. It also reinforced the need for minority entrepreneurs to assertively pursue business opportunities and challenge discriminatory behaviors to create a more inclusive and equitable business landscape.

After reflection, the following take-aways underscore the urgent need for proactive measures to address bias and discrimination in business settings and promote inclusivity and fairness for all entrepreneurs.

- **Heightened Awareness and Discernment:** The experience underscores the need for heightened awareness and discernment among business leaders and representatives to detect and address early signs of discrimination or bias.
- **Accountability and Fair Treatment:** Government agencies and contractors must be held accountable for promoting diversity, equity, and inclusion in business interactions. Fair treatment for all entrepreneurs and subcontractors is imperative for fostering a level playing field.
- **Advocacy for Inclusive Policies:** Policies and programs supporting minority-owned businesses, such as the SBA 8(a) Business Development program, are essential for promoting diversity and combating discrimination in federal contracting.
- **Economic Implications:** Discriminatory practices can have significant economic impacts, affecting the sustainability of businesses and individuals' livelihoods. Addressing discrimination is not only a matter of fairness but also crucial for economic empowerment and growth.
- **Importance of Networking and Building Relationships:** Networking plays a crucial role in fostering business connections, uncovering opportunities, and building meaningful relationships. Creating an inclusive environment in networking settings is essential for promoting diversity and equal access to business opportunities.
- **Persistent Discrimination and Its Economic Toll:** Discrimination against minority-owned small businesses creates significant barriers, bias, and hurdles that hinder their growth and success. Beyond the immediate impact on individual opportunities, discrimination consumes valuable time and resources that could otherwise be invested in business development and innovation. The need to navigate discriminatory practices and overcome bias adds layers of complexity and challenges to everyday operations, diverting attention from core business objectives. This not only affects the morale and productivity of entrepreneurs but also has long-term economic repercussions, leading to missed opportunities, financial strain, and decreased competitiveness. Addressing discrimination is not just about fairness; it's about leveling the playing field and creating an environment where all businesses can thrive without unnecessary obstacles and setbacks.

## Conclusion

In conclusion, the incidents detailed here shed light on the persistent challenges faced by Black-owned businesses in today's landscape. Discriminatory practices remain prevalent, as evidenced by the experiences recounted. Black America continues to grapple with the enduring effects of systemic racism, hindering progress and opportunities for business growth.

These narratives underscore the critical need for affirmative initiatives and programs like the SBA 8(a) and MBDA. These programs are not just about leveling the playing field; they are about rectifying historical injustices and providing equitable access to opportunities. The lessons learned from these experiences highlight the complexities and realities that Black minority businesses must navigate—issues of racism, fairness, and the fundamental right to access the same opportunities as their Caucasian counterparts.

As we advocate for the preservation and enhancement of these vital affirmative programs, we must also recognize the broader societal implications. Supporting Black-owned businesses isn't just about economic empowerment; it's about fostering a more inclusive and just society where everyone has a fair chance at pursuing the American dream of entrepreneurship. It is imperative that we continue to address these issues comprehensively and proactively to create a more equitable future for all.

Senator CARDIN. Ms. Lawson, thank you for your comments also. These are testimonies that need to be heard and documented, so we appreciate it very, very much.

I will now go to Ms. Ronnette Meyers. Ms. Meyers is the President and CEO of JLAN Solutions. JLAN Solutions provides management and training services to Federal, state, and local government agencies, and is a certified 8 (a) company. She has been publicly recognized on multiple occasions, including receiving the Biden-Harris Lifetime Achievement Award. Ms. Meyers also previously had a distinguished career in the Federal Government.

We look forward to hearing from you.

**STATEMENT OF RONNETTE R. MEYERS, PRESIDENT AND CEO, JLAN SOLUTIONS, WASHINGTON, D.C.**

Ms. MEYERS. Good morning. Thank you so much. Thank you, Senator Van Hollen, Senator Cardin, and Representative Ivey. Thank you all. My name is Ronnette Meyers. I am the President and CEO of JLAN Solutions.

My journey as an entrepreneur in government contracting, particularly within the 8 (a) program, has been profoundly shaped by confronting and overcoming both overt and subtle discrimination and adversity. This narrative is not just about my professional growth but also about an expose of the persistent barrier that minorities and women entrepreneurs frequently encounter, as well as how these barriers directly affect my business operations.

Before launching my business, my journey as a technical specialist within the Federal Government was married by discrimination from the outset. Early on, I faced questions from my boss that challenged not just my professional presence but also my racial and gender identity. “Why are you here? Why did they send you?” he asked.

Throughout my tenure I was isolated and marginalized. That is how I felt. The toxic environment became unsustainable, prompting me to seek new opportunities and embark on a journey of self-employment and entrepreneurship.

Transitioning to a government contractor role in Washington, D.C., I found a workplace that valued my skills, where I felt like a genuine sense of belonging, which gave me the inspiration to start my own company, JLAN Solutions, in 2010, and eventually, joining the 8 (a) program in 2018, a move that was fueled by ambition and resilience.

Yet this new beginning was quickly tempered by the harsh realities of entrepreneurship in a space where resources were unevenly distributed, and support for minority-owned small businesses like mine was minimal. My early partnerships with the majority-owned businesses were promising but ultimately disappointing. These collaborations, which I hoped would bolster my business’ standing and visibility, instead left me feeling exploited and sidelined.

The first partnership I formed to secure an opportunity with a Federal agency disintegrated when the company’s leadership unexpectedly withdrew the partnership due to my company being a minority small business. A professional rejection that felt personal and left me devastated. It was not just a setback. It was a deeply

personal blow that left me questioning my worth and my place in this industry.

The subsequent challenge came when another majority-owned business protested our successful contract bid, jeopardizing JLAN's financial stability and future growth. An employee from this company explicitly warned me about significant racial bias in the company, leading all of the minority-owned businesses to unite and address the situation through a collective letter. This protest highlighted the systematic challenges minority businesses encounter, from financial and structure barriers to discriminatory practices that hinder their success.

Recently, at a networking event in Virginia, I was one of a few Black women among predominantly white male peers. During the networking session it was clear to me and the other Black women that we were being dismissed by our peers. Our treatment was not a reflection of capabilities but of systematic biases, prejudices that continue to pervade our society.

The lessons of this journey are clear. While these experiences have undoubtedly strengthened my resolve, I cannot overlook the tangible losses that have been inflicted upon me and my family. They have taken away real opportunities, both financial and emotional.

Racial discrimination and the barriers it has imposed has often hindered my business operations and ability to receive contracting opportunities. Throughout these experiences, the role of the 8 (a) program has been twofold. It has been a crucial lifeline, providing access to opportunity otherwise out of reach, and it has been a constant reminder of the disparities that persist in the business world. Thank you. [Applause.]

[The prepared statement of Ms. Meyers follows:]

**U.S. Senate Committee on Small Business and Entrepreneurship:**
*Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination*

**Written Testimony of Mrs. Ronnette Meyers**
**JLAN Solutions**
**Monday, May 6, 2024**

My name is Ronnette Meyers, and I am the President and CEO of JLAN Solutions. My journey as an entrepreneur in government contracting, particularly within the 8(a) program, has been profoundly shaped by confronting and overcoming both overt and subtle discrimination and adversity. This narrative is not just about my professional growth but also an exposé of the persistent barriers that minority and women entrepreneurs frequently encounter, as well as how these barriers directly affect my business operations.

Before launching my own business, my career with the Federal Government took a transformative turn from administrative to technical roles. This shift was catalyzed by the support of a center director who sponsored my college education in technical fields, validating my potential and fueling my determination. However, my journey as a technical specialist was marred by discrimination from the outset. On my first day in a new position, I faced unsettling questions from my boss that seemed to challenge not just my professional presence but also my racial and gender identity. "Why are you here?" Why did they send you?" he asked. Throughout my tenure, I endured a consistent undercurrent of bias, which left me feeling isolated and marginalized. Despite my dedication and achievements, the toxic environment became unsustainable, prompting me to seek new opportunities and embark on a journey of self-empowerment and entrepreneurship.

Transitioning to a government contractor role in Washington, D.C., I found a workplace that valued my skills and where I felt a genuine sense of belonging. This positive change was significant, but the scars from my previous experiences were indelible. They served as a stark reminder of the challenges that lay ahead as I ventured into establishing my own company, JLAN Solutions.

Founding JLAN Solutions in 2010 under the 8(a) program was a dream fueled by ambition and the legacy of resilience passed down by my mother, a retired Chief Master Sergeant of the U.S. Air Force. Yet, this new beginning was quickly tempered by the harsh realities of entrepreneurship in a space where resources were unevenly distributed, and support for minority-owned small businesses like mine was minimal.

My initial forays into partnerships with Majority-Owned businesses were promising but ultimately disappointing. These collaborations, which I had hoped would bolster my businesses standing and visibility, instead often left me feeling exploited and sidelined. The first

partnership I formed to secure an opportunity within a federal agency disintegrated when the company's leadership unexpectedly withdrew the partnership due to my company being a minority small business, a professional rejection that felt personal and left me devastated. It wasn't just a setback; it was a deeply personal blow that left me questioning my worth and place in the industry.

The subsequent challenge came when another Majority-Owned business protested our successful contract bid, a move that jeopardized not just a significant financial opportunity but also the stability and future growth of JLAN. An employee from this company explicitly warned me about racial issues he observed, prompting all minority-owned businesses to unite and address the situation through a collective letter. This protest underscored the systemic obstacles faced by minority businesses, including financial, structural, and discriminatory barriers that can hinder our progress. This protest was not just a professional setback; it was emblematic of the larger systemic obstacles that minority businesses often face—obstacles that include not only financial and structural barriers but also discriminatory practices that can derail even the most promising ventures.

During a recent meeting in Virginia, I found myself among a group predominantly comprised of White males, with only two other black women, including myself, and another woman of lighter complexion. As the networking session commenced, it became painfully evident that we were being overlooked and dismissed by our peers. The palpable sense of isolation and exclusion weighed heavily on me, stirring up feelings of frustration, anger, and disbelief. Glancing at the other black woman, we shared a knowing look, silently acknowledging the shared experience of being marginalized. With a mutual understanding, we gravitated towards each other, seeking solace and solidarity in our shared identity. As we exchanged glances, we conveyed the unspoken question: "Do you feel the same sense of disregard and discrimination that I do?" With a heavy heart, she confirmed my suspicions, affirming that the dismissive treatment was indeed rooted in our race and gender. In that moment, I couldn't help but question: "Is it me, or is it us?" Yet, the answer was painfully clear – it was not a reflection of our worth or capabilities, but rather a stark reminder of the systemic biases and prejudices that continue to pervade our society.

Throughout these experiences, the role of the 8(a) program has been twofold: it has been a crucial lifeline, providing access to opportunities otherwise out of reach; and it has also been a constant reminder of the disparities that still exist in the business world. This dual reality drives my commitment to not only navigate these challenges but also to advocate for and support other minority and women entrepreneurs facing similar battles.

As I reflect on my journey, the lessons are clear. Each instance of discrimination, while painful, has left an indelible mark on my resilience and determination. While these experiences have undoubtedly strengthened my resolve, I cannot overlook the tangible losses they have inflicted upon me and my family. They've taken away real opportunities, translating to dollars out of my pocket and food off my family's table. It's a harsh reality that when individuals engage in discriminatory practices, they directly impact the bottom line of my company, resulting in significant losses and setbacks.

They have also deepened my commitment to breaking down the barriers that minority and women entrepreneurs face, ensuring a more equitable and inclusive industry for the generations to come. Racial discrimination, and the barriers it has imposed, has at times hindered my business operations and ability to receive contracting opportunities. However, I believe that my story, marked by both setbacks and successes, is a testament to the enduring strength and potential of those who continue to fight for their rightful place in the business world.

Senator CARDIN. Thank you for your testimony.

Mr. Gary Moore is the Senior Business Consultant with the Maryland MBDA Business Center. He has a background in sales, construction, and government, and is an entrepreneur himself. He has provided guidance and consultation to countless Maryland-based businesses, helping connect them to opportunities in networking, capital access, and more.

Mr. Moore.

**STATEMENT OF GARY MOORE, SENIOR BUSINESS CONSULTANT, MARYLAND MBDA BUSINESS CENTER, BALTIMORE, MD**

Mr. MOORE. Thank you. Good morning, Senator Cardin, Senator Van Hollen, and Representative Ivey. Thank you for inviting me to testify today.

My name is Gary Moore. I am the Senior Business Development Specialist for the Maryland Minority Business Development Agency under the U.S. Department of Commerce. I have been with the Maryland MBDA Business Center for over 7 years. My primary responsibility is to keep in alignment with MBDA's mission, which is to foster growth and global competitiveness of minority business enterprises.

In my role as a Senior Business Development Specialist for the MBDA I help clients gain access to networks, information, and resources, including programs like the SBA's 8 (a) business development program. I work with government agencies, institutions, and privately held corporations on behalf of center clients, advocating for access to capital, procurement opportunities, and providing them with overall strategic business consulting. Our center has directly serviced over 1,000 minority businesses, where I have heard countless stories of disparities in minority participation in private, state, and local procurement opportunities.

One of my MBE clients bid on a non-MBE project and was the lowest and most capable bidder. On any large project—this project was for over $3 million—you must present your qualifications, financials for bonding, references, and your capacity to do the work before the bid so that all that is left to do while conducting a low-bid meeting is verification of each line item.

When the client arrived at the meeting he knew the minute he walked in, by the prime's startled looks and subsequent questions, they were not expecting a person of color. Instead of conducting a normal low-bid meeting the questions shifted from the bid requirements to him as an individual. Statements were made such as, "You are very articulate," and questions were asked such as, "How did you grow your business to have a company in double-digit millions of revenue?" These are not statements and questions posed to Caucasian business owners I speak with.

Though my client was highly qualified to perform the work, had full bonding capacity of $3 million, and was the lowest bidder, it was given to someone else who was of Caucasian descent.

Focusing on our client as an individual and not the company's success and ability to perform the work is blatant discrimination. If an MBE is the most capable and is the lowest bidder, the MBE is in a good position to win the award when MBE participation is required. This is not the case when MBE goals are not present or

when primes are not held accountable to the goals. Before becoming certified, our client had difficulty getting work with prime contractors. Becoming certified has helped open doors for him in cases where MBE utilization requirements are in place.

Our clients believe that the impact of *Nuziard* v. *MBDA* ruling will hurt the same programs that have helped their businesses grow, despite the ongoing discrimination faced in obtaining capital and procurement opportunities. Our clients have expressed they don't need to have more of an opportunity than anyone else, just the ability to compete on a level playing field.

These stories reflect the wider discrimination and barriers that minority business owners face daily as it relates to denying MBE's access to capital, procurement opportunities, networks and resources, as well as adverse treatment by Caucasian prime contractors, both in private and public sectors.

I want to say that one of my clients' sentiments was this, that this is not in the spirit of America, where if you work hard and are in compliance with laws you can accomplish anything that you want and succeed. Thank you. [Applause.]

[The prepared statement of Mr. Moore follows:]

May 6, 2024
Written Testimony-Senate Committee on Small Business and Entrepreneurship
Gary Moore

Good morning Senator Cardin, Senator Van Hollen, and Representative Ivey; thank you for inviting me to testify today.

My name is Gary Moore; I am the Senior Business Development Specialist for the Maryland Minority Business Development Agency (MBDA) under the U.S. Department of Commerce. I have been with the Maryland MBDA Business Center for over seven (7) years. My primary responsibility is to keep in alignment with MBDA's mission which is to foster growth and global competitiveness of Minority Business Enterprises (MBE's).

In my role I work with government agencies, institutions and privately held corporations on behalf of Center clients; advocating for access to capital, procurement opportunities and providing them with overall strategic business consulting. Our Center has directly serviced over one thousand (1,000) minority businesses where I have heard countless stories of disparities in minority participation in private, state and local procurement opportunities. Not long ago, a major east coast company's project manager, who was Caucasian, told me a story of why they have not used any MBE's. This privately held company had a need for subcontractors for a particular project and invited several Caucasian companies and one (1) MBE to bid on their project. The MBE was unable to make the initial scheduled pre-bid site-visit. The project manager told the MBE that he would meet him on site on the day of the MBE's choosing. The MBE met the project manager on a Friday and was told the bid was due on the following Monday. The MBE was unable to turn in his bid within the short window of time. The project manager told me that they "just don't have any *luck* with MBE's", as if this was something he did not experience with Caucasian owned companies. I would like you to know, as a former successful contractor for over fourteen (14) years, Caucasian contractors miss site visits and deadlines for bids very often. The impact of the MBE not attending the pre-bid site visit is the prime company may not offer an MBE an opportunity again; and will continue to only use Caucasian companies for their projects. After looking at the Board of Directors and their leadership online, I found that they were all Caucasian males and one Caucasian female. The conclusion is their leadership, like many companies, lacks the importance of diversity and inclusion.

There are several multi-billion-dollar companies that have indicated they don't have a need to use MBE's as they are simply *"given"* awards by the federal government before projects go out to bid. For example: I work with many minority-owned businesses who are highly capable and experienced in their trade, as MBDA has parameters set as to whom can become a client of the Business

Centers. One of the Center's minority-owned companies had difficulty procuring work, we became aware that he did not have any certifications, which had not limited him from performing and being awarded contracts in the past as his work spoke for itself. The Maryland MBDA Business Center assisted him with becoming certified on all levels; federal, state, and local. Once certified, his company's revenue of $300,000 - $400,000 per year grew to over $6 million annually. As he told me, "Those certifications allowed me to grow. Without them I would have been stuck at my prior revenue levels." After assisting with obtaining his certifications the Center directed him to various projects that we believed would give him an opportunity for growth. His business grew as he began winning contracts for projects that required MBE utilization and he is currently working on all levels, federal, state and private projects that have specific goals to meet MBE utilization. As a Senior Business Development Specialist with the Maryland MBDA Business Center, I help clients gain access to networks, information, and resources – including programs like the SBA's 8(a) Business Development program. Certifications are essential to our clients as our client indicated that before becoming certified, relying solely on capacity and experience, "no prime would give him the time of day!" Suppliers would not sell to him, as the specifications on projects were proprietary, allowing only the larger primes and Caucasian subcontractors to bid on projects. Without an MBE goal, our client would not even be able to request a price from the supplier, and most often, would be given a higher price than his Caucasian counterparts.

Another MBE client bid on a non-MBE project as the lowest bidder. On any large project (this project was for over $3,000,000) you must present your qualifications, financials for bonding, references and your capacity to do the work before the bid so that all that is left to do while conducting a low bid meeting is verification of each line item. When the client arrived at the meeting he knew the minute he walked in, by the prime's startled looks and subsequent questions, they were not expecting a person of color. Instead of conducting a normal low bid meeting, the questions shifted from the bid requirements to him as an individual. Statements were made such as **"you're very articulate,"** and questions were asked such as **"how did you grow to have a company in double-digit millions of revenues?"** These are not statements and questions posed to Caucasian business owners I speak with. Though my client was highly qualified to perform the work, had full bonding capacity ($3MM) and was the lowest bidder, it was given to someone else who was of Caucasian decent. Focusing on our client as an individual, and not the company's success and ability to perform the work is blatant discrimination. If an MBE is the most capable, and is the lowest bidder, the MBE is in a good position to win the award when MBE participation is required. This is not the case when MBE goals are not present, or when primes are not held accountable to the goals. Before becoming certified, our client had difficulty getting work with prime contractors; becoming certified has helped open doors for him in cases where MBE utilization requirements are in place.

Access to capital is also very difficult for minority businesses and affects their ability to participate in commercial and public contracting opportunities. For example: a Center client was unable to obtain a line of credit increase from a bank that holds the mortgage on his business property, which they appraised, and has worked with for many years. He has only used 50% of his line of credit and is looking to increase it as he has a very large backlog of over $12M. This means he has $12M dollars in signed contracts for the year. He spoke to two of his Caucasian counterparts who work with the same bank and was told by them that the bank increased both of their lines of credit. The minority customer requesting the increase was in better position as his Caucasian counterparts as their backlog was of much less value, they had more debt, and companies had less revenues than

our client. Our client has never missed a payment on any loans or mortgage and has excellent credit.

Our clients believe that the impact of the Nuziard v. MBDA ruling will hurt the same programs that have helped their businesses grow, despite the ongoing discrimination faced in obtaining capital and procurement opportunities. Our clients have expressed they "don't need to have more of an opportunity than anyone else, just the ability to compete on a level playing field." Specific clients believe the court ruling is not in the "spirit of America," nor in the spirit of the MBE programs created to advocate for equality. "Why must we perform above and beyond anyone else, before they will even look at us?"

These stories reflect the wider discrimination and barriers that minority business owners face daily as it relates to denying MBEs access to capital, procurement opportunities, networks and resources, as well as adverse treatment by Caucasian prime contractors both in private and public sectors. I would like to reiterate our client's sentiments that this is not in the "spirit of America," where if you work hard and are in compliance within the law you can accomplish anything you want and succeed. To not hold others accountable to that dream will lead to the inability to leave a legacy of wealth to their children and erase all the work we have done, in service, to advocate on behalf of minority businesses in alignment with MBDA's mission of prosperity and growth for all.

Thank you,

*Gary Moore*

Gary Moore
Senior Business Development Specialist
***U.S. Department of Commerce of Commerce, Minority Business Development Agency (MBDA) Maryland Business Center*** *owned & operated by L. S. Caldwell & Associates, Inc.*

Senator CARDIN. Thank you for your testimony.

Mr. Andres Bernal is the Vice President of MGT Consulting Group. He is a legal and quantitative researcher. His company is currently conducting a disparity study for Maryland. Mr. Bernal has extensive experience researching barriers and racial discrimination in Federal contracting space for minority-owned businesses.

**STATEMENT OF ANDRES BERNAL, VICE PRESIDENT, MGT CONSULTING, CINCINNATI, OH**

Mr. BERNAL. Thank you, sir. Good morning. Thank you Congressman Ivey, Senator Van Hollen, Senator Cardin for having me here today.

My name is Andres Bernal, and I am the Vice President of MGT. We are a nationally recognized public sector consulting firm. Since 1975, MGT has provided strategic, operational, and technological solutions to government and education agencies in all 50 states.

I have nearly 20 years of direct disparity, consulting, quantitative, and qualitative experience analyzing all aspects of public agency disparity research. In that time, I have authored or co-authored more than 100 reports of findings of whether or not race, ethnicity, and gender affects a person's ability to do business in a marketplace.

I have been asked to offer a few observations about historical trends that have emerged regarding how minority-owned businesses are utilized by public entities.

Findings from hundreds of disparity studies conducted by MGT and across the industry underscore a continuing opportunity for targeted supplier diversity programs to address underutilization of minority-owned businesses. Almost universally, the results from disparity research continue to show that MBEs are substantially underutilized, and that the markets where these MBEs are doing business are under-realizing their opportunity to expand their entrepreneurial sector of their economies and to broaden economic participation among MBEs.

When it comes to analyzing public contracting data, it is case law and industry standard to use what the law refers to as a "disparity index" to determine, statistically, if the race of business ownership influences a business's likelihood of availing itself of government contracting opportunities. This index calculates how much public entities utilize minority-owned businesses related to the availability of qualified MBEs in a given market area.

Looking at procurement data across the nation, what we see throughout many jurisdictions, historically, is that, despite some progress, MBEs are substantially underutilized across all goods and services categories, such as construction, professional services, and goods. In those rare instances in which there is parity in MBE utilization or even overutilization of MBEs, what we see is a concentration among several companies, rather than an indication that government agencies are consistently and broadly drawing upon the local pool of qualified MBEs.

Furthermore, when we look at the private sector business activity and dynamics, the following observations are typically seen. MBEs earn significantly less revenue than their majority-owned business counterparts, even when taking into account characteris-

tics such as level of experience, education, and number of employees.

The same dynamic we see when we are looking at the likelihood of MBEs to be self-employed compared to their majority counterparts. Studies after studies are showing the same thing that race, ethnicity, and gender impacts a person's ability to conduct business.

The culmination of my research including qualitative studies, disparity studies, regression analyses, continue to support the conclusion that public agencies across the nation have a significant opportunity to expand utilization of MBEs, thereby strengthening their local economies and their communities through broader utilization of qualified minority-owned businesses. Thank you. [Applause.]

[The prepared statement of Mr. Bernal follows:]

MGT

Good morning. My name is Andres Bernal, and I am the Vice President of Disparity Research for MGT, a nationally recognized public sector consulting firm. Since 1975, MGT has provided strategic, operational, and technology solutions to government and education agencies in all 50 States.

I have nearly 20 years of direct disparity study consulting, quantitative, and qualitative experience analyzing all aspects of public agency disparity research. In that time, I have authored or co-authored more than 100 reports of findings for clients regarding state and local governments' utilization of minority and women-owned businesses in public sector procurement of goods and services.

I have been asked to offer a few observations about historical trends that have emerged regarding how minority -owned businesses are utilized by public entities.

Findings from hundreds of disparity studies conducted by MGT and across the industry underscore a continuing opportunity for targeted supplier diversity programs to address underutilization of minority owned business enterprises (MBEs). Almost universally, the results from disparity research continue to show that MBEs are substantially underutilized, and that the markets where these MBEs are doing business are under-realizing their opportunity to expand the entrepreneurial sector of their economies and to broaden economic participation among MBEs.

When it comes to analyzing public contracting data, it is a case law and industry standard to use what the law refers to as a "disparity index" to determine, statistically, if the race of business ownership influences a business's likelihood of availing itself of government contracting opportunities. This index calculates how much public entities utilize minority owned businesses, relative to the availability of qualified MBEs in a given market area.

Looking at procurement data across the nation, what you see throughout many jurisdictions, historically, is that, despite some progress, MBEs are substantially underutilized across all goods and services categories-- such as construction, professional services, and goods. In those rare instances in which there is either parity in MBE utilization or overutilization of MBEs relative to majority-owned businesses, this is most often a phenomenon in which utilization of MBEs is concentrated among several companies, rather than an indication that government agencies are consistently and broadly drawing upon the total pool of qualified MBEs.

Furthermore, when we examine private sector business activity and dynamics, the following observations are typically seen:

- MBEs earn significantly less revenue than majority-owned businesses for similar business categories, even, when possible, influence from other characteristics is taken into account (e.g., level of education, business experience).
- MBEs are significantly less likely to be self-employed (i.e. owner-operated) compared to their majority-owned counterparts in nearly all market areas analyzed.
- Studies consistently find that race of firm ownership is statistically correlated to MBE vs. Majority-owned enterprise utilization.

The culmination of my research, including qualitative studies, disparity studies, regression analyses, continue to support the conclusion that public agencies across the nation have significant opportunity to expand utilization of MBEs, thereby strengthening their local economies and communities through broader utilization of qualified minority owned businesses.

Senator CARDIN. Thank you for your comments.

Gary Cunningham is the Senior Advisor with the Institute on Race, Power, and Political Economy at The New School. Mr. Cunningham works at the intersection of racial equity and entrepreneurship. He has vast experience providing business consultation to minority business owners as well as advocating for minority-owned businesses.

His former experience includes being the former President of Prosperity Now and the CEO of Minnesota MBDA Business Center.

Mr. Cunningham.

**STATEMENT OF GARY CUNNINGHAM, SENIOR ADVISOR, THE NEW SCHOOL, NEW YORK, NY**

Mr. CUNNINGHAM. Thank you, Mr. Chairman, Senator Van Hollen, and Congressman Ivey. I appreciate being here today.

One, I just want to thank you for holding this hearing at this critical juncture in our history as Americans.

I sit here today on the shoulders of many proud ancestors, including the Black Creek Freedmen from Muskogee, Oklahoma, that were in part responsible for creating Black Wall Street. Many of you might have heard of Black Wall Street. It sits as a pinnacle of what can be achieved by African Americans in this country, and it was destroyed in 1921, through a race riot that happened there many years ago. And I would argue that we still have similar conditions today, but may not be as vitriol as they were in 1921, but they exist.

We are at a critical juncture in our nation's history where many of our hard-fought gains to create a more perfect union, where everyone, no matter who they are, no matter what their background, can fully participate in the American Dream.

These issues are under assault and continuously, court case after court case, and we cannot turn back the hands of time in this country. The American promise or the American contract is built upon the idea that if you work hard, you apply yourself, you can move up on the economic ladder of success. I would argue that this is not the case, that all doors are not open for small businesses within this country, particularly those based on the color of someone's skin.

If we are to sustain our democracy it is important that we take action and continue to maintain what we have created, but also build upon what we created, so that all Americans, no matter what their skin color, no matter what their ethnic origins, can participate in our American democracy.

Despite the significant contributions of entrepreneurs of color to the U.S. economy, which includes the launching of over 50 percent of the new businesses that have been created in the last 10 years have been created by people of color, creating 4.7 million jobs, these entrepreneurs face systematic, systemic barriers to success. Access to capital, which has already been mentioned, creates a critical hurdle.

And there is study after study, both by the Federal Reserve and by private industry, that shows that entrepreneurs of color have been denied loans at nearly twice the rate of their white counter-

parts. The disparities in loan approval rates and higher interest rates charged to minority-owned businesses highlight the systematic challenges of access to financial systems that impede entrepreneurs of color from succeeding, in many cases.

Despite this, entrepreneurs of color have been a vital and critical lifeline for American industry and for our economies, particularly in local communities where they exist.

The government has a critical role in leveling the playing field. This historic discrimination in lending practices and unequal access to markets have curtailed the potential of minority entrepreneurs. Addressing these challenges head-on is not only a matter of equity but also economic necessity.

To dismantle these barriers, I propose not only to sustain but to expand the initiatives like the Minority Business Development Agency and the SBA's 8 (a) small business development program. Moreover, we must develop targeted financial products, such as grants and low-interest loans, especially designed to meet the unique challenges faced by minority entrepreneurs.

Finally, I would argue that the government bears a critical responsibility in not only breaking down systematic barriers but also opening up access to markets, to ensure the success not only of minority entrepreneurs but all entrepreneurs. We strive to build a more prosperous and inclusive economy. It is imperative that we leverage public and private sector solutions to empower these vital contributors to our nation's growth.

Let us pledge together to create a more inclusive and prosperous future for every entrepreneur in our nation, recognizing the indispensable role played by entrepreneurs of color.

Thank you very much, and I stand ready to answer any questions. [Applause.]

[The prepared statement of Mr. Cunningham follows:]

**May 6, 2024**

**Written Testimony - Senate Committee on Small Business and Entrepreneurship**

**Gary L. Cunningham, Senior Advisor, Institute on Race, Power and Political Economy at The New School**

## Introduction

Chairman and honorable Members of the Committee, thank you for the opportunity to present strategies to combat the racial wealth divide and to support minority-owned firms. I am honored to be asked to provide input into your consideration of policies to grow and accelerate the success of businesses of color.

My comments draw on my many years of work in this field, including leadership in the CDFI movement, as a founding member of the African-American Alliance of CDFIs CEOs, the BlackBusiness Credit Initiative, and the Black Vision Fund. Additionally, I served as president of the Metropolitan Economic Development Association (MEDA), one of the highest performing minority business development centers in the country according to The U.S. Department of Commerce's Minority Business Development Agency for 4 consecutive years. I also operated the Federal Procurement Center pilot for MBDA providing technical assistance and trusted guidance to businesses of color seeking federal contracts. More recently, I served as President and CEO of Prosperity Now, a national organization focusing on racial and economic inequalities.

I am board chair of Momentous Capital and board member of the Association for Enterprise Opportunity, the largest microenterprise membership organization in the country. I also am a member of the Treasury Advisory Committee on Racial Equity.

Currently I am senior advisor to the Institution on Race, Power and Political Economy at The New School. Where we advance research and understanding of structural inequalities to identify innovative ways to promote equity and create a world that works equally well for everyone.

Today, I stand here proudly on the shoulders of my ancestors – the Black Freedmen of the Muskogee Nation in Oklahoma. The Black Creek Freedman who were in part responsible for the creation of Black Wall Street in the Greenwood District of Tulsa. Their resilience and entrepreneurial spirit in the face of systemic racism and exclusion laid the groundwork for what would become a symbol of Black economic empowerment and excellence. Despite the tragic destruction of Black Wall Street in 1921, the legacy of the Freedmen and their descendants continues to inspire our efforts to uplift entrepreneurs of color. Their struggles and triumphs underscore the importance of our work to ensure that entrepreneurs of color have the support and resources they need to thrive. As we discuss strategies to empower minority firms, let us remember the

enduring spirit of the Creek Freedmen and the vital role that Black entrepreneurship has played in our nation's history.

We are at a critical juncture in our nation's history, where many hard-fought gains toward creating a more inclusive union, where everyone—regardless of their background—can pursue the American Dream, are under assault. The American Promise is founded on the idea that through hard work and dedication, anyone can climb the economic ladder of success. I would argue that this is not only an economic imperative for our country, but that opening up doors of opportunity through small business and entrepreneurship for communities of color is key to sustaining our American democracy.

Our journey through a complex legal and socio-economic landscape underscores the urgency of our commitment to fostering an equitable business environment, which is crucial for the prosperity of our nation.

## Historical Context of Minority Entrepreneurship

The history of minority entrepreneurship in the United States reflects a complex tapestry of resilience, innovation, and persistence against the backdrop of racial discrimination, segregation, and economic exclusion. Spanning diverse communities—African Americans, Asian Americans, Latinos, and Native Americans—each group's entrepreneurial journey has been uniquely shaped by its distinct challenges and contributions to the economic landscape.

This narrative of minority entrepreneurship is not just a chronicle of business development but also a profound testament to the enduring spirit of communities that have navigated systemic barriers. Whether facing overt policies of exclusion or subtler forms of bias, these entrepreneurs have consistently demonstrated remarkable ingenuity and determination. Their contributions enrich our understanding of the American economic story, highlighting the pivotal role of diversity in fostering a vibrant, inclusive marketplace.

## Post-Civil War Era and African American Entrepreneurship

African American entrepreneurship has its roots in the period following the Civil War. During Reconstruction, African Americans began to establish businesses. However, the end of Reconstruction marked the beginning of the Jim Crow era, which imposed severe restrictions on African American life through enforced racial segregation and discriminatory laws. Despite these barriers, African Americans created thriving business districts, famously known as "Black Wall Streets" in several cities, such as the Greenwood District in Tulsa, Oklahoma.

The Jim Crow laws not only segregated African Americans but also limited their economic opportunities, forcing them to start and patronize their own businesses due to

racial exclusion from white-owned establishments. This period saw the rise of Black-owned banks, insurance companies, and other institutions as a response to exclusion from white-dominated financial services.

Redlining, a practice that began in the 1930s, systematically denied mortgage and business loans to residents in predominantly minority neighborhoods. This practice, along with other forms of economic discrimination, significantly hindered the ability of Black entrepreneurs to acquire capital and grow their businesses. The effects of redlining are still evident today, as minority communities continue to face significant disparities in business ownership and access to business resources.

## Asian American Entrepreneurship and Immigration Challenges

Asian Americans have also faced significant hurdles due to discriminatory laws and practices. Early Asian immigrants, particularly the Chinese and Japanese, came to the United States in significant numbers during the 19th and early 20th centuries. They were met with hostility and legal barriers, such as the Chinese Exclusion Act of 1882, the first significant law restricting immigration based on nationality.

These restrictions curtailed their rights to own property and businesses. Nevertheless, Asian Americans managed to establish ethnic enclaves where they started businesses that catered primarily to their own communities. Over time, these enclaves became pivotal in nurturing the growth of Asian American businesses, which expanded beyond ethnic boundaries as legal and social hurdles were gradually dismantled.

## Latino Entrepreneurship and Sector Concentration

Latino entrepreneurship has been shaped by both immigration patterns and the socio-economic conditions of Latino communities in the U.S. Historically, Latino businesses have been concentrated in sectors like agriculture, retail, and service industries. These businesses often emerged within tightly-knit communities, providing goods and services not only to fellow Latinos but also to other minority groups. The challenges faced by Latino entrepreneurs include language barriers, access to capital, and navigating legal frameworks for business, which were often compounded by racial and ethnic discrimination.

## Native American Entrepreneurship and Economic Development Efforts

Native American entrepreneurship, often overlooked, has been hindered by systemic marginalization and land dispossession. Recent efforts have focused on tribal enterprises, including ventures like casinos that have become significant Native American business endeavors. Despite challenges, Native entrepreneurs engage in

various sectors such as agriculture, tourism, and crafts, contributing to the diverse landscape of entrepreneurship.

## Current State of Minority-Owned Businesses in the U.S.

In examining the current landscape of minority-owned businesses in the United States, it becomes evident that these enterprises play a vital role in driving economic growth and innovation across diverse sectors. According to the US census, there are approximately 8 million minority-owned businesses contributing over $1 trillion annually to the economy, their impact underscores the entrepreneurial spirit and resilience within minority communities. Despite significant contributions, disparities persist relative to demographic proportions, highlighting challenges that hinder the full potential of these businesses. For example, Black Americans comprise approximately 12.4% of the US population, but represent only about 2.4% of all employer firm owners.

## Growth Trends and Economic Contributions

Over the past decade, minority business enterprises have been at the forefront of new business creation, accounting for more than 50% of the two million new businesses started in the U.S. These ventures have created 4.7 million jobs, showcasing their substantial role in job creation and economic vitality. While there has been notable growth, disparities persist, especially concerning the representation of Black-owned businesses compared to their population share, indicating the need for targeted support and interventions to address underlying barriers.

Black owned businesses, in particular, have shown notable growth. Between 2017 and 2020, the number of Black owned businesses increase by 13.64% significantly more than the 0.53% increase in all businesses combined.

In addition, the revenue and employment figures for Black owned businesses have also seen significant increases from 2017 to 2021, Black firms' gross revenues soared by 43% and these businesses employed over 1.4 million people.

## Sector-Specific Challenges and Opportunities

A substantial portion of minority-owned businesses are concentrated in low growth sectors like health care and social assistance. However, these businesses face systemic financial barriers that hinder their expansion and competitiveness in the market. Addressing these challenges requires a nuanced understanding of the sector-specific dynamics and the unique hurdles minority entrepreneurs encounter in accessing capital and resources.

## Challenges Faced by Minority-Owned Businesses

The history of minority entrepreneurship in the U.S. is marked by resilience and innovation in the face of systemic racism and economic exclusion. Each group, while

facing unique challenges, has developed strategies to sustain and grow their businesses. The legacy of these entrepreneurial efforts is a testament to the crucial role that minority businesses play in the American economy, contributing not only to the economic diversity but also to the social and cultural richness of the nation.

Minority-owned businesses across various groups encounter persistent challenges in accessing capital, with disparities in loan approvals, funding amounts, and interest rates affecting their financial stability. Entrepreneurs of color face obstacles in securing adequate financing, limiting their capacity for investment and growth. Additionally, disparities in equity investments and venture capital further compound the financial challenges faced by minority-owned businesses, restricting their ability to scale and innovate within their industries.

**Access to capital**: Surveys, such as one conducted by Goldman Sachs, revealed that 37% of black small business owners report significant difficulties in accessing new capital – 14% higher than their non-Black peers, underscoring systematic bias.

**Loan denial rates**: reports from institutions like Intuit QuickBooks illustrate that 57% of Black business owners have been denied bank loans at least once during their start up phase. Rates are also significantly higher than experienced by their non-Black counterparts.

**Cost disparities and business startups**: on average, Black entrepreneurs face a higher initial financial burden, costing them approximately $5000 more to start a business compared to their non-Black peers.

Recent studies by the Federal Reserve have highlighted persistent disparities in financing approval and amounts between minority and non-minority-owned small businesses. According to the 2021 Report on Firms Owned by People of Color, based on the 2020 Small Business Credit Survey, Black- and Latino-owned firms applying for non-emergency financing were less than half as likely to receive full approval compared to their white counterparts, even when categorized as low credit risks. Specifically, while 48% of low-risk white-owned firms received all the financing they sought, only about 25% of similarly situated Latino-owned firms did.

Furthermore, a 2016 Federal Reserve study found that even among businesses approved for some level of financing, only 40% of minority-owned firms received the full amount they sought, compared to 68% of non-minority-owned firms. This data points to a broader trend where minority-owned businesses face not only higher hurdles in securing initial loan approvals but also receive lesser amounts than requested, underscoring the challenges these businesses encounter in accessing capital.

The Federal Reserve's findings suggest that these disparities are due in part to weaker banking relationships and structural barriers that disproportionately affect minority-owned firms.

## Market Access and Growth Limitations

In addition to financial barriers, minority-owned businesses encounter significant obstacles in accessing markets, expanding their customer base, and penetrating established networks. Limited networking opportunities, geographic constraints, and sector concentration pose challenges to market diversification and growth opportunities. Overcoming these obstacles requires targeted initiatives to enhance market access, address customer biases, and provide resources for effective marketing strategies, enabling minority-owned businesses to compete and thrive in a competitive business environment.

The current state of minority-owned businesses in the U.S. reflects a dynamic landscape of growth, innovation, and resilience, tempered by persistent disparities and challenges. By understanding the unique contributions and obstacles faced by these enterprises, policymakers can implement tailored solutions to foster an inclusive economic environment where minority entrepreneurs can flourish, drive economic progress, and contribute meaningfully to the nation's entrepreneurial ecosystem.

Business owners of color, despite facing systemic challenges and biases, are making a substantial impact. Various studies support the assertion that Black entrepreneurship can significantly impact the racial wealth gap. However, the effectiveness and extent of this impact remain subjects of ongoing research and debate.

## The Role of Entrepreneurship in Reducing the Racial Wealth Gap

The racial wealth gap in the United States is a significant and persistent issue, marked by substantial disparities in wealth between Black and white households. This gap has historical roots and has been exacerbated by systemic inequalities and discriminatory practices over centuries. Recent data shows that the median wealth for white households is significantly higher than for Black households, with the gap amounting to approximately $164,000. The median white household has about $189,000 in wealth, while the median Black household has around $24,000.

Addressing this racial wealth gap requires substantial economic investment. McKinsey & Company projects that closing the racial wealth gap, including supporting Black-owned businesses to achieve revenue parity with white-owned businesses, could potentially add between $1 trillion and $1.5 trillion annually to the U.S. economy by 2028. This projection accounts for the negative effect of the wealth gap on consumption and investment, suggesting that addressing it could significantly boost economic activity and growth.

Despite systemic challenges and biases, business owners of color are already making significant contributions. In his study "The 'Myth' That Black Entrepreneurs Can Reduce the Gap in Wealth between Black and White Families," William D. Bradford from Washington University argues that African American entrepreneurs can bridge the racial income gap. His research, published in "Economic Development Quarterly" in August 2014, analyzed family income data from 1999 to 2009 and showed that African American entrepreneurship significantly reduces income disparities between African

American and white families. Bradford found that African American entrepreneurs experience similar upward income mobility to their white counterparts. He also noted that self-employed entrepreneurs, regardless of race, tend to have higher income levels and upward mobility than those employed in the labor force.

Supporting this view, the Brookings Institution noted that the racial wealth gap in the United States widened during the COVID-19 pandemic, underscoring systemic challenges facing Black entrepreneurs and households. A study from Springer emphasized that entrepreneurial success is crucial for reducing the racial wealth gap. It highlights that improving the success rates of Black entrepreneurs by increasing access to capital, markets, and technical assistance is critical for the sustainability and growth of Black-owned businesses. The St. Louis Federal Reserve has highlighted that Black entrepreneurs face unique challenges that contribute to a racial entrepreneurship gap. Addressing these challenges could help Black entrepreneurs build wealth and strengthen their communities.

While entrepreneurship is not a panacea for closing the racial wealth gap, it can play a crucial role in addressing the issue. However, broader systemic challenges must also be addressed to fully unlock the potential of entrepreneurship in reducing racial wealth disparities.

## Broadening the Spectrum of Financial Support

To address these challenges, it is crucial to broaden the spectrum of financial support available to minority-owned businesses beyond traditional loans. This can include equity investments, grants, and innovative funding mechanisms that are more inclusive and accessible.

## Equity Investments

Minority entrepreneurs often face significant barriers in accessing venture capital and equity investments. Programs like Backstage Capital and Founders First Capital Partners are specifically designed to support underrepresented entrepreneurs by providing not just funding but also strategic advice and networking opportunities. These initiatives recognize the value of diversity in driving innovation and are committed to correcting the underrepresentation of minority-owned businesses in venture funding.

## Grants

Grants provide an essential source of funding for minority-owned businesses because they do not require repayment, which can alleviate financial pressure. Numerous grants are available specifically for minority entrepreneurs, such as those offered by the U.S. Small Business Administration and private entities like the Pepper Start Up Grant for Blackwomen business owners. These grants can support various business needs, from startup costs to expansion efforts, without the burden of debt.

## Community Development Financial Institutions (CDFIs)

CDFIs play a pivotal role in supporting minority-owned businesses by offering loans, investments, financial services, and technical assistance to underserved populations and communities. These institutions often provide more favorable terms compared to traditional banks and are more likely to understand and support the unique challenges faced by minority entrepreneurs.

## Digital and Fintech Solutions

The rise of fintech has introduced new avenues for accessing capital. Digital platforms can offer alternative lending options that bypass traditional banking barriers. For instance, the Opportunity Project's initiative to develop digital tools helps minority businesses understand and access alternative business capital options, enhancing their ability to secure necessary funding.

## Government and Nonprofit Programs

Several government and nonprofit programs are designed to facilitate access to capital for minority-owned businesses. For example, the Minority Business Development Agency (MBDA) offers various resources to help minority entrepreneurs secure capital and navigate the financial landscape. Additionally, programs like the SBA's 8(a) Business Development program provide business assistance, training, and support for government contracts, which can be a crucial growth area for these businesses.

Expanding the types of financial support available to minority-owned businesses is crucial for fostering an inclusive economic environment where diversity is seen as an asset rather than a barrier. By supporting a range of funding options—from equity investments and grants to innovative fintech solutions—stakeholders can help address the systemic barriers that have long hindered the financial success of minority entrepreneurs. This comprehensive approach not only aids in the immediate growth of minority-owned businesses but also contributes to the long-term vitality of the broader economy.

**Remedying Persistent Discrimination**

Diversity and inclusion business development programs transcends merely addressing historical injustices; it actively combats ongoing discrimination that still affects minority entrepreneurs today. Discriminatory practices in lending, barriers to networking, and unequal access to business opportunities continue to undermine minority business owners. These support programs provide essential support to these entrepreneurs, leveling the playing field and enabling true competition based on merit and innovation.

**Economic Benefits Extend Beyond Beneficiaries**

The economic justification for diversity and inclusion extends well beyond the immediate benefits to minority businesses. By fostering diversity in the business community, these

programs enhance innovation, stimulate competition, and drive economic growth. The success of minority-owned businesses leads to job creation and revitalizes economically underserved areas, yielding benefits for the economy at large.

**Ethical Imperatives and Social Integration**

From an ethical standpoint, diversity and inclusion is crucial for correcting deep-seated imbalances in a society that professes to value fairness and equal opportunity. Socially, these programs contribute to a more inclusive and diverse business landscape that mirrors our multicultural society. Diversity in business precipitates varied perspectives and solutions, essential for catering to a broad spectrum of consumer needs and addressing societal challenges.

**Enhancing National Cohesion and Stability**

Diversity and inclusion programs play a pivotal role in fostering national cohesion and social stability by mitigating economic disparities that can lead to social tension and conflict. By ensuring equitable economic opportunities, these programs promote inclusivity and fairness, foundational to societal harmony and long-term prosperity.

As legal interpretations and societal contexts evolve, the continued support and refinement of divers programs are imperative. These programs are vital not only for rectifying historical injustices but also for proactive equity in opportunity distribution. By steadfastly supporting and enhancing these initiatives, we ensure that minority-owned businesses flourish, thereby enriching our nation's economic landscape and forging a more just and equitable society.

In light of the challenges and opportunities outlined in the landscape of minority-owned businesses in the United States, it is imperative to ensure targeted policies that can effectively support and empower these enterprises. The following recommendations aim to enhance the growth, sustainability, and competitiveness of minority-owned businesses through strategic interventions and proactive initiatives:

## Expansion of Federal Programs

1. **Increased Funding for Minority Business Development**: Allocate additional resources to programs like the Minority Business Development Agency (MBDA) to expand outreach, provide comprehensive business consulting services, and facilitate market expansion opportunities for minority entrepreneurs.

2. **Enhanced Access to Federal Contracts**: Implement initiatives that streamline the procurement process for minority-owned businesses, ensuring fair and equitable participation in government projects. Strengthening programs like the 8(a) Business Development program can enhance contracting opportunities and promote the growth of minority enterprises in federal projects.

## Implementation of Lending Supports

1. **Targeted Financial Instruments**: Develop specialized financial products, including grants and low-interest loans tailored for minority entrepreneurs. These

financial instruments should address the specific needs and challenges faced by minority-owned businesses, providing crucial support for capital investments and business development.

2. **Increase Federal Partnerships with Minority Depository Institutions and Minority led CDFIs**: Foster collaborations between federal agencies and Minority Depository Institution and CDFIs to increase access to capital (not just debt capital) for minority businesses. Establishing lending partnerships can facilitate easier loan approvals, lower interest rates, and enhanced financial services tailored to the unique requirements of minority entrepreneurs.

## Increased Contracting Opportunities with the Government

1. **Diversification of Supplier Networks**: Encourage government agencies to diversify their supplier networks by actively seeking contracts with minority-owned businesses. Implementing inclusive procurement policies can create more opportunities for minority entrepreneurs to engage in government projects and access a broader market for their goods and services.

2. **Capacity Building for Minority Contractors**: Provide capacity-building programs and training initiatives to enhance the competitiveness of minority contractors in bidding for government contracts. Offering technical assistance, mentorship, and resources can empower minority-owned businesses to navigate the contracting process effectively and secure lucrative opportunities.

## Comprehensive Mentorship and Networking Programs

1. **Establish Mentorship Networks**: Create mentorship programs that connect established business leaders with aspiring minority entrepreneurs. These initiatives can provide valuable guidance, industry insights, and networking opportunities to support the growth and development of minority-owned businesses.

2. **Industry-Specific Networking Events**: Organize industry-specific networking events and conferences that facilitate connections between minority entrepreneurs, potential investors, and key stakeholders. Promoting collaboration and partnerships within sectors can catalyze innovation, growth, and market expansion for minority-owned businesses.

## Tailored Support Programs for High-Growth Sectors

1. **Sector-Specific Support Initiatives**: Develop sector-specific support programs that cater to high-growth industries where minority businesses are prevalent. These initiatives should offer targeted resources, training, and financial incentives to foster innovation, competitiveness, and sustainability within key sectors.

2. **Technology and Innovation Grants**: Introduce grant programs that encourage technological advancement and innovation in minority-owned businesses. Providing funding for research and development, digital transformation, and technology adoption can enhance the competitive edge of minority enterprises in the evolving business landscape.

By implementing these policy recommendations, policymakers can proactively address the systemic barriers, financial constraints, and market challenges that hinder the full potential of minority-owned businesses. Empowering these enterprises through targeted support, inclusive programs, and strategic partnerships will not only drive economic growth and job creation but also foster a more equitable and vibrant entrepreneurial ecosystem that benefits diverse communities and advances the collective prosperity of the nation.

## Conclusion

In reflecting on the rich tapestry of insights surrounding minority-owned businesses in the United States, it becomes evident that these enterprises embody resilience, innovation, and the enduring spirit of communities striving for economic empowerment. From the historical contexts of African American, Asian American, Latino, and Native American entrepreneurship to the challenges faced in accessing capital, navigating discriminatory laws, and expanding market reach, the journey of minority entrepreneurs is marked by both triumphs and obstacles.

As we navigate the current landscape of minority-owned businesses, marked by growth trends, sector-specific challenges, and financial disparities, it is imperative to recognize the substantial contributions and untapped potential of these enterprises. Policy recommendations aimed at enhancing support through targeted financial instruments, federal programs expansion, and comprehensive mentorship initiatives are crucial steps towards fostering an inclusive economic environment that empowers minority entrepreneurs.

The importance of continued support for agencies like the Minority Business Development Agency (MBDA) and programs such as the SBA 8(a) Business Development Program cannot be overstated. These entities play critical roles in leveling the playing field, providing minority business owners with access to much-needed resources including capital, contracts, and markets. The MBDA, for instance, serves as a dedicated advocate for minority entrepreneurs, offering technical assistance and fostering partnerships that amplify growth opportunities. Similarly, the SBA 8(a) program specifically helps small, disadvantaged businesses compete in the marketplace, enhancing their viability and capacity to grow.

In conclusion, the imperative of implementing effective policies to support minority-owned businesses aligns with national values of equity, justice, and economic sustainability. By embracing proactive interventions, advocating for equitable opportunities, and fostering an environment conducive to growth and innovation, we not only bridge the racial wealth gap but also catalyze overall prosperity and diversity within the American economic landscape. The journey of minority entrepreneurship is a

testament to the enduring spirit of entrepreneurship, the resilience of diverse communities, and the transformative power of inclusive economic policies. These efforts are essential not just for the success of minority entrepreneurs, but for the health and competitiveness of the entire U.S. economy

Senator CARDIN. Thank you. Let me thank all six of our participants in this hearing. I think, Mr. Bernal, your research conclusions are, you have got the exhibits here that gave you the specifics that show that we have challenges, and that rather than removing those challenges that sometimes there are more obstacles put in the way of opportunity.

So yes, we could talk about one of the issues on contracting. We find discriminatory practices of contracting authorities trying to bundle contracts to make it impossible for minority businesses to have a fair chance at a prime contract. They have to come in as subcontractors. We also have the problems of established relations of agencies, and they don't want to open it up to additional opportunities. These are some of the challenges we have to deal with on contracting.

And then we have the challenges on financing. Senator Van Hollen already mentioned CDFI program, which is one area that we try to deal with the systemic challenges we have in the banking community of established customers. It is hard to break that cycle. And if you are a small business, is you are not as attractive as larger small businesses, and you are more likely to have minorities starting as smaller small businesses.

So all of that adds to the challenges that we have in the system. But I want to concentrate at least my first question on the effectiveness of the 8 (a) programs and MBDA, because that is the area I think we have the experts here to talk about. We recognize what the courts have done. We do not know the full impact of that yet. We are still trying to figure that out. But could you give us some examples or your observations as to whether the 8 (a) program has been effective in removing some of these barriers, and can it be improved, and what damage have the courts done to the 8 (a) program by its interpretation? Whoever wants to start on that. Ms. Meyers.

Ms. MEYERS. Sure. No problem. Thank you so much for that question. I will just start a little bit about my history. So my grandmother built a hair salon on the front porch of her house in Youngstown, Ohio, where I am from. My grandfather worked in a steel mill, and she had five children she needed to take care of, one was with Down syndrome, so it afforded her the opportunity to be home. But what it showed me or instilled in me was entrepreneurship. I did not know it back then, but that is what it instilled within me.

And then my mother is a 24-year United States Air Force veteran. When she retired from the Air Force she started her business in the government contracting space, and hence the legacy is already starting. And one day my mother and I sat down and we started having a discussion about how do we build generational wealth. How do we create legacy businesses, because we were not born into this.

After that discussion, JLAN Solutions was born, and I named JLAN after my four children—Jamie, Lenae, Asia, and Nia, because I wanted to instill entrepreneurship in them. And my daughter, Nia, my baby girl who is a rising junior at Pennsylvania State University, is here with me today.

And so 2½ of them have businesses now, because of this conversation, this strategy that we have built around entrepreneurship. My son is 100 percent disabled, but he also played basketball in high school, so he is a shooting coach, and he coaches people around the DMV. And I have another daughter who is a graduate, and she has a virtual assistance business, so she is helping people around. And then my baby girl, during COVID, learned how to braid. So at Penn State she is braiding everybody's hair. So we are instilling it in them.

But because of the 8 (a) program it has afforded us the opportunity to start creating generational wealth. It has afforded us the opportunity to start these legacy businesses. My ultimate goal is to get the children in the business—a couple of them are in there now—and have them learn this business, be able to utilize the 8 (a) program as we go on, because now family members are able to participate into this program.

But what it has taught me was business development. The 8 (a) program has a lot of programs to help with business development. And it has also given me access to training, leadership programs, and executive coaches, things that we would normally not receive for free. The APEX Accelerator, NMSDC programs like this have just been phenomenal in helping us with access to capital, grants, and contracting opportunities.

And now I am proud to say because of the 8 (a) program that I am now the prime contractor on the majority of my Federal Government work. [Applause.]

Thank you. The challenges still exist in the access to capital, but we are working on it. But the 8 (a) program has been great for me, my business, my family, and my legacy.

Senator CARDIN. Thank you. [Applause.]

Ms. Luis and Ms. Lawson, do you have any prime contracts or are you all partnership or subcontracts? Have you been able to break through with prime contracts with government?

Ms. LUIS. So maybe I can start on that. The majority of our work is now prime contracting. We were very deliberate in that journey because, as a subcontractor, it is harder to grow. It is harder to grow.

I did want to also say that, Mr. Gary, that there was one single day where as a prime contractor I lost four bids. That was not because I was not the low bidder—I was. In fact, we were the lowest responsible bidder. That contract inevitably ended up being awarded to a multigenerational, majority contractor, which was incredibly disappointing.

When we contract, we do not just look at the minimum requirements for MBE and WBE subcontracting opportunities. We actually have a mandate in our organization that we endeavor to always exceed with as much opportunity to the MBE and the WBE community as possible. But it has taken decades to get there, and only because of the support of the MBE and WBE programs have we been able to break through.

Senator CARDIN. Ms. Lawson.

Ms. LAWSON. Yes. Thank you for that question. My journey is a little different in that I have been doing government contracting and I have never been into the 8 (a) program. So yes, as some may

say that minority businesses need to pull themselves up from the bootstraps and just work hard and through merit that they will be able to accomplish certain things, and my journey has been a struggle. I have always been able to get subcontracting roles, never a prime.

A lot of times when—well, yeah, on many occasions when I am sitting down at the table I am the only Black female, Black small business owner and female small business owner, sitting at that table. And that is a big challenge to overcome the hurdles that are put in front of me when there is potentially bias in the decision-making process.

I have often thought to pursue the 8 (a) program, but I really wanted to do it on my own. But you know what? I was not really able to get to the level that I wanted to get. So as a result I am now considering. I see the benefit, I am very familiar with the 8 (a) program, I am familiar with the benefits that could be achieved from the 8 (a) program, going through the process of applying to the 8 (a) program.

So if this program continues to get watered down or taken away, given the fact that discrimination still exists in America, if this program goes away it would even make it more difficult for small businesses, minority businesses, women-owned businesses to achieve any kind of success.

Senator CARDIN. Thank you. Senator Van Hollen.

Senator VAN HOLLEN. Thank you, Mr. Chairman, and thank all of you for your testimony here. I think you provide very strong and overwhelming evidence about the continuing need for the 8 (a) program and the MBDA programs and other programs, in order to level the playing field. Because as your testimony clearly points out we have ongoing discrimination, as you mentioned, Mr. Bernal, even with these programs in place. They are being underutilized, right. Minority-owned businesses are still underutilized compared to their potential, which means that we are not putting our full potential on the table. So I agree with you, Mr. Cunningham, about the need not only to preserve these programs but find ways to make them even more effective.

As I think many of you pointed out, not only is this important to have a fair shot and economic opportunity, but when there are more competitors that are out there, this is also good for the American taxpayer. We want more competition in order to ensure the taxpayers, as they go about choosing these businesses, have a fair chance, and to allow those businesses to get in the game, to get in the game.

So I do have a couple of questions with respect to the role that I hear some of your competitors are playing in trying to undermine your success. I think both Ms. Luis, I know Ms. Meyers, others have talked about some of the harassment, some of the false information put out there by competitors.

Can you talk a little bit more about how some of the primes that I guess are concerned that they are going to lose a contract to one of you, how they are undermining your efforts? Because as I listen to you, Ms. Luis, your testimony, it seems to me that if you have a pattern of a competitor making false allegations there we need to make sure there is some recourse there. And so I would be inter-

ested in comments from any of you about what patterns you see on that issue. Maybe we will start with you.

Ms. LUIS. Thank you, sir. So I will give you two examples today about patterns. We started as a subcontractor and slowly but surely, organically, grew, mostly because of majority contractor interference. When we started bidding on larger paving contractors, that is when the boxing gloves came out.

One of the ways that we were prevented from being successful, for instance, is, let's say I bid a mill and overlay program and I had smaller patching crew, and I depended on subcontractors to mill and overlay, and this happened. The larger contractors, the larger paving contractors would threaten the existing MBE and WBE subcontractors in that if those subcontractors bid to me or worked for me, they would remove all of their work, their contracted work, from them. So these smaller subcontractors refused to bid to us, and in the public sector where I bid most of the time you are outlining your MBE and your WBE participation. And it became very, very difficult to obtain that at the time, and also to complete our jobs. And we are under liquidated damages, so when there was any kind of delay in the schedule there was a very large financial hardship.

Another example is when we first purchased our asphalt plant in Rockville from Lafarge we had accounts with every major asphalt manufacturer in Maryland. We had good accounts. We purchased a lot of asphalt. It took us 6 years to negotiate that deal with Lafarge, under complete secrecy, but we got it. And when it was announced the response was extraordinary. It was almost unacceptable that an audacious female immigrant company would have the ability to purchase that plant.

Asphalt is temperature sensitive, so you want to work around plants that are nearby. When we purchased the plant, every single manufacturer refused to sell us asphalt. So we had to take asphalt from our Rockville plant, for instance to distances like City Center Baltimore. I would like to say that we won an award for Falls Road with our own asphalt from Rockville, but it was unnecessary because you can imagine it cost us three times, four times more in hauling. It obviously reduced the productivity rates. It increased overtime.

And so we are not economically viable for a number of years. And so we went ahead and leased our second plant in the Baltimore city area so we did not have that problem anymore.

Senator VAN HOLLEN. Well, thank you for shining a light on those, what I would have to believe are clearly abusive practices, and I guess the question is whether there is a way to make sure there is a penalty attached to unfair competition.

Does anybody else want to comment on this particular issue?

Ms. MEYERS. Absolutely. Thank you so much. I really would like to talk about the disparity or discrimination from large business to small, majority-owned to minority-owned small businesses.

Just a few years ago we were part of a team on a large bid for a government contracting opportunity in the IT space. The company won the bid. It was $650 million, and we had a workshare of $9 million. The contract was protested by another large business. The large business eventually acquired that company, and then it

took almost 2 years for us to even get work. Where, in my testimony, I talked about how all of the minority-owned businesses who were on that winning contract, we had to write a letter to the ombudsman in order to get work on the contract.

Because when large businesses, they do have a requirement to do, I believe, about 35 percent to small business, so they utilize us a lot to get work, but we do not necessarily see the work. It could come in year 2, 3, 4, or 5. We do not know. By then we may or may not still be in business. But they met their requirement. They checked the box at the beginning. But there is no real accountability, from my perspective, of what I have seen.

But when that other majority-owned company won the contract we got our subcontract agreement. Our agreement was for $4 million. And I questioned it. I said, "Wait. We have a $9 million workshare." And they stated, "Oh, you are a minority-owned firm. You are an 8 (a). You only qualify for $4 million, and that is all you get."

So you can imagine how I felt, because we are ready to staff up. You know, I have to talk to my staff, reduce our staff, because we were expecting to grow from this. This was our foot in the door. But like I said, we only had $4 million workshare.

And also, when I brought it to their attention, I talked to the vice president of the company because I was upset. And he said, "I apologize, but that is all we can do." So it makes me think that going forward I do not necessarily want to partner with this company anymore because of the way that they treat their small businesses.

And we like to show our customers who we are, what we do every month. We like to do program management reviews and highlight our employees and what they are doing. So we do this with this company. So buried into our contract states that they can hire our employees after 6 months. Early on I was young, naïve into the program, did not fully understand the contract, because at the time I could not afford an attorney at the very beginning. And so 6 months down the road they start hiring our employees, hired them on a Friday, did not tell us.

So on Monday, Tuesday I reached out to our employees and said, "Hey, you haven't input your timesheets." "Oh, well, they told us we work for them. We no longer had to input our timesheets." No notification to us. So, of course, me, I go back to the vice president and have a conversation and still, "Well, I'm sorry. It's in the contract."

So bottom line is we started with six people. We now have one. We were not a Tier 1 subcontractor, so we get what we get. It is really frustrating that we are still treated like this, and there is no real accountability.

I am sorry. I am a little emotional about that because it really hurts us as minority-owned businesses, and we are really trying to build something, to grow, and they are still hindering our growth.

Senator VAN HOLLEN. Do not be sorry. I would be emotional too. I would be mad as hell.

Ms. MEYERS. Yeah.

Senator VAN HOLLEN. This is one of the reasons we wanted to have this hearing. And again, thank you, Senator Cardin, for organizing it.

Senator CARDIN. Representative Ivey.

Mr. IVEY. I have more questions than I thought I was going to have so I apologize in advance.

The $4 million versus $9 million, I was just kind of curious. Did you approach the contracting officer about that? Did the government know about it, or were you concerned about approaching the CO, or how did that play out?

Ms. MEYERS. So we wrote a letter to the ombudsman, and the ombudsman got involved with the Office of Small Disadvantaged Business Utilization, the OSDBU, and then thereafter we started seeing work but our workshare did not change. No one has addressed the issue of the decrease in the dollar value.

Mr. IVEY. And what department was it?

Ms. MEYERS. Which department?

Mr. IVEY. Mm-hmm.

Ms. MEYERS. Transportation.

Mr. IVEY. Interesting. Okay. How long ago was that?

Ms. MEYERS. So we are in year 4.

Mr. IVEY. No. I mean, how long ago was it that this popped up? Was that 4 years ago?

Ms. MEYERS. Mm-hmm.

Mr. IVEY. Okay. Okay. I was going to ask about the new DOT rules that just came out, but I will set that to the side for the moment.

Prebid conference was one I had a question about, as well, and I guess this could be, well, not quite panel-wide. Mr. Bernal, I am going to come back to you in a minute.

Back before the *Ultima* decision and some of those, they would have the pre-bid conferences. Sometimes you ended up in a scenario where there were discussions that were had, maybe promises were made that were not kept down the road.

But I am kind of curious. To the extent there is a movement away from, by the government, minority-specific race classifications, what happens in the pre-bid conferences now on these issues? In other words, if you have a minority business, I guess back in the day there would be like 35 percent minority business utilization requirement. Is that still in place, or have they started moving away from those because of you are not supposed to be designated as a minority business anymore?

Ms. MEYERS. So I would probably have Ms. Luis answer that because for us the pre-bid conferences we go to are more on the IT side of the house, but construction is constantly pre-bid, and office movement opportunities are pre-bid. But for us they just kind of lay out what they are looking for, what the socioeconomic set-asides, if there is going to be a set-aside or if it is just for a large business. But they do tell us that before we get there of who is invited.

We can go in and we can as our questions, but once we come out, you know, you cannot speak to them anymore once the opportunity hits the streets. So then we actually go ahead and bid on the opportunity. But I think it is more prevalent in the construction realm.

Mr. IVEY. Ms. Luis.

Ms. LUIS. So from a Federal funding component I generally bid to the state, counties, municipalities, public/private sector, so I get the Federal spend indirectly. The number one reason that we started bidding as a prime and letting go of some of our subcontracting opportunities was because of those false promises. We would be written in, and then really not utilized, or if so, often they would come back after bid and try to renegotiate.

Over the years there has been a lot of clean-up of that, thanks to your efforts. There are jurisdictions that are much better at accountability than others. We try to stick to those. And as a prime contractor, you know, when we first opened up our plant, one of the difficult things for the minority- and women-owned business arena was that they were not granted credit at asphalt plants because the financial matrices that were used were similar to large banking. And so one of the things that we did is we removed all of that and our team had to come to Cidalia and I and tell us why they were not issuing credit to minorities and women-owned. And I think when we work as a community and we try to make sure that we are protectionists and we keep everyone at a fair play, then everything goes better. There has been improvement, for sure.

Mr. IVEY. Prompt pay. Again, this might be more of a subcontract question, but I had thought that, geez, the Prompt Payment Act was like in the '80s or sometime, but now that I am back in the middle of this stuff I am hearing complaints again about late payments that are being made, sometimes for, frankly—they appear to me to be for strategic reasons as opposed to some legitimate dispute about work that has been performed. I wanted to get a sense of if that is something that you are seeing, as well, if that is out there on the street too.

Ms. MEYERS. Definitely. You know, in the Federal Government, as a small business, the FAR states that they can pay us within 15 days, if we ask, and generally they do comply. But when you are a subcontractor there is a 45- to 60-day waiting period, where we have to be financially stable in order to support these efforts. The payments sometimes come in 45, sometimes in 60, sometimes in 70 days. We still have to reach out and say we haven't been paid, it is in our agreement that we are supposed to be paid on time, and we are still sometimes not paid on time.

It poses a challenge because they said, "Well, you know, our accounting system is set up this way," or "We haven't been paid from the government," when in actuality the government pays. But it is the primes that make us wait.

Mr. IVEY. Okay. Mr. Bernal, a couple of questions for you. I noticed in your testimony you talked about disparity indexes and sort of the scope of the studies that you do. It mentions in your testimony it looks like you focus primarily on state and local governments.

Mr. BERNAL. Mm-hmm.

Mr. IVEY. All right. Do you have any familiarity with studies that have been done that have targeted the Federal Government?

Mr. BERNAL. We do not do an overall Federal study, but there are DOT studies that are involved with the Federal Government. But one of the things that we always see in the studies, and it is

also because of case law, we need to be sure that when we are analyzing the issues, they are localized. What we see across all the studies is a corroboration of what everybody has said today, that race, ethnicity and gender impact a person's ability to do business in a certain jurisdiction.

And I think it is interesting to say, you know, when we look at these targeted programs, such as the 8 (a), we just finished a study for Baltimore that had an 8 (a) component, we do see progress. We see progress in the utilization of minority businesses, subcontractors and sometimes even prime contractors.

But one of the things I really want to lay on this, as well, is the economic impact that we see, as well. That is something that we have started really looking into, what is the economic impact of these programs. And all of what we see is that there is a true, quantifiable impact, a positive impact to communities, to overall communities, of having investments in these programs.

Mr. IVEY. One of the things that the judge in the *Ultima* case wrote was that—he did not necessarily base his finding on it ultimately, but he did question, or attack frankly, the studies that were underlying. Basically he said there is insufficient information from a records standpoint to justify the 8 (a) program continuing in the way that it was, in other words, race-based classification for admission into the program.

And you might not know what he had access to or not, but what kind of programs or studies are out there, and what would be your thought as to how the Federal Government could go about pulling together those sorts of records? And I guess he wanted specific to, they used to call them SI codes. What are they, NAICS codes now? Okay. I apologize for my oldness on that. But I think he wanted them specific to that too. So locality and also industry-specific would probably be important, and also they have to be relatively contemporary, I guess, based on what he said. He sort of argued that they were so old that they would not be applicable.

How should the Federal Government go about pulling that together, and to what extent is there information that is already out there along those lines?

Mr. BERNAL. And thank you, Congressman, for that question, and you are right. I cannot speak to what the judge had in that. But in my opinion I like to jokingly say, throw the kitchen sink at these court systems. And what I mean by that is we already have a lot of this data already, U.S. census data. That is a lot of the data that we use in our disparity studies to analyze the private sector. It looks at different levels of those NAICS codes throughout the entire nation. It looks at it by jurisdiction. It looks at it in different granularity. And we can use that to determine what is the impact of race, ethnicity, and gender on a person's ability to earn a certain level of business revenue, on the likelihood to be self-employed.

So the data is available. It just needs to be used, like you said, specifically to look at commodity code level, jurisdictional level, or even the entire nation.

Mr. IVEY. All right. Last set of questions, and I guess, Ms. Luis, these will be mainly for you. Bureau of Engraving is about to start construction a few miles from here, maybe five or six miles. It is a $1.5 billion project, roughly. And I am assuming here is going to

be a lot of asphalt, concrete, whatever, that is going to be needed there.

When we took a look, we called them up and asked them about what their goals were, and I think it was a 6 percent small business goal, which I thought was shocking. And we are doubling back to it, to make sure that I read that right, but a 6 looks like a 6. I am pretty sure.

Had you heard about that? Did you bid on it? And then the follow-up question is going to be—because we have got FBI coming, we have got, tragically, but, you know, it has to get done, Key Bridge is coming, the Baltimore Tunnel is coming. There is a lot of stuff that is coming in the very near future right here in Maryland. And I am sort of curious as to what you are seeing and what you think your chances are for participating in those.

What did they say, I think the bridge is going to be $1.7 billion, Engraving is $1.4, FBI is like $3.5 or something. So literally billions of dollars coming just within a few mile radius of here. What are you seeing? And if any of the others of you have any knowledge of that, you speak up too. But we will start with you, Ms. Luis.

Ms. LUIS. Sure. So on those larger projects I tend to be artificially bid out because we have two divisions to our company, two different companies. One is construction. The revenue cap is measured for retail road construction. For manufacturing it is based on number of employees. That is the test.

Mr. IVEY. Number of employees that have not been stolen away from your company, yeah.

Ms. LUIS. Yeah.

Mr. IVEY. I am sorry.

Ms. LUIS. No, it is okay. It is true.

When it comes to the DB factor, our business, even though I have fought this quite a bit, our business tends to be tested on revenue, and because it is a manufacturing plant, those revenues tend to put us out of the ability to compete within the DB market.

We like to obviously participate as much as possible, but we are typically subcontractors and utility organizations, such as WSSE or BGE or Washington Gas, DC Water, and whatnot. When it comes to the Federal spend I am relegated out.

Mr. IVEY. Anyone else?

Mr. MOORE. I would say that just about everything everyone said here this morning I hear on a daily basis, three or four times a day. And sometimes I feel like a little bit of a counselor, if you know what I mean, because you have to deal with especially the emotional part of it.

But with the infrastructure part we have had difficulty at the Maryland MBDA with even getting our foot in the door to talk to somebody. So if the Senator's office, or your office called, they would pick up the phone. And I would think that the MBDA and the U.S. Department of Commerce, they would pick up the phone for me too. But most of them know what the reason is why I am calling, and so I don't get any kind of communication back.

A lot of my client say—some of them do not even want to bid on it. They have already got that. You know, they know who the money is going to. Why should they even bother? And that is also

because that is things they see in their past and in their businesses.

So I have got to try and turn that around, and I am still knocking the door for those things. And hopefully with your help I will be able to get through and have somebody pick up the phone. That is all I want is a phone call and an opportunity to speak and introduce some of my clients, like M. Luis.

Ms. LUIS. If I could just add one small piece to that, I think one of the solutions is because these are such large contracts, I think one of the solutions is if the Federal space were willing to create reciprocity with local certifications, such as Prince George's County or MDOT, I think you would quickly get to that 35, 40-plus percent, because you have the businesses that are certified. It is getting through the DBE, that for those kinds of dollars typically the revenue cap inches everyone out.

Senator CARDIN. I can assure you that we heard you loud and clear, and we will very much be engaged. To Representative Ivey's point about the amount of public construction that will take place in the state of Maryland over the next few years, it is going to be dramatic. So we will absolutely be working with the MBDA, so we will do that.

I had one other point that I just wanted to raise and that is with the court challenges to the MBDA programs, your thoughts as to what Congress can do, what we can do, to make sure that the services that are provided there can continue. We know it is going to be a challenge, but we want to work with you in that regard.

It is not necessary for answering today, but we would appreciate your technical support in making that a reality. Mr. Cunningham, we also appreciate your help in that regard, with your experience in Minnesota. So any thoughts there, please let us know.

Mr. CUNNINGHAM. Mr. Chairman, thank you. I would say a couple of things. One is the MBDA is doing a fantastic job of working with the demand of contractors that are coming in to do work with the MBDA centers across the country. The issue is that there is just not enough staff. When I was in Minnesota at the MBDA center, one of the things we saw, we did a market analysis, and what we found was we were only serving about 19, 20 percent of the market that could have been served if we had enough staff. And we were already overloaded.

I think all of the MBDA centers are seeing this kind of demand, and that technical assistance and support that they are providing is critical for these folks to be successful in what they are doing.

So I would argue that the number one thing is that we have to increase the capacity of these organizations to do this work. This is not only just good for minority entrepreneurs; it is good for the country.

So I will stop there, Mr. Chairman.

Mr. MOORE. And I think the budget was cut $1.7 million.

Senator CARDIN. We are now in the appropriations cycle for fiscal year 2025, and that is one of our priorities is to try to help in regard to budget support. But as you know, the real challenge is in Representative Ivey's court as we try to get reasonable caps in the budget process, and this is one of the programs that are our priority. So we will be working with you in that regard.

I want to thank our witnesses. This has been extremely helpful. I want to acknowledge Carlton Atkinson, Roderick Lewis, and my staff for helping to put this all together today. I appreciate everyone's cooperation.

So let me just conclude by a quote from Parren Mitchell that my staff put in front of me, which I think is very appropriate to conclude this hearing. And this is quoting from Parren Mitchell. "If you believe in fighting racism you make a commitment for the rest of your life. There is no getting off that train. You can't say I'll put five years into fighting racism and now I'm finished. No. You are not finished. Our job is to fight it every day, to continue to shove it down, when it rises up, to shove it down even harder."

With that the hearing will stand adjourned, and we thank you all for the fight to make our country a better place. [Applause.]

[Whereupon, at 11:54 a.m., the hearing was adjourned.]

## APPENDIX MATERIAL SUBMITTED

**Statement for the Record**
**Ranking Member Joni K. Ernst**
**U.S. Senate Committee on Small Business & Entrepreneurship**
**"Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"**
**May 6, 2024**

Thank you, Senator Cardin for bringing small contractors into the national spotlight. The ability of an entrepreneur to transform a dream into a real, tangible business is a testament to the undying American spirit and proof that this is still, after all, the land of opportunity. However, all small businesses face the same difficult tasks: managing workforce constraints; complying with often-conflicting and constantly-changing rules and regulations; and dealing with arcane and complex tax policies, to name a few. Adding to these daily challenges, small contractors have the additional burden of navigating the complex maze of federal bureaucracy, rife with its own unique set of demands, risks, and rewards. These realities exist for any small business, regardless of race, gender, or creed.

The current environment in which small contractors operate is, in fact, untenable. Multiple reports and studies have confirmed that small businesses are leaving the federal marketplace at a rapid pace, threatening the security and stability of this nation.[1] Procurement and acquisition trends, such as an overemphasis on contract consolidation and bundling activities, are resulting in a loss of small business contract opportunities. This loss

[1] Department of Defense, *Small Business Strategy* (2023), https://media.defense.gov/2023/Jan/26/2003150429/-1/-1/0/SMALL-BUSINESS-STRATEGY.PDF; Department of Defense, *National Defense Industrial Strategy* (2023), https://www.businessdefense.gov/docs/ndis/2023-NDIS.pdf; Department of Defense Office of the Under Secretary of Defense for Acquisition and Sustainment, Defense Pricing and Contracting, *Contract Finance Study Report* (April 2023), https://www.acq.osd.mil/asda/dpc/pcf/docs/finance-study/FINAL%20-%20Defense%20Contract%20Finance%20Study%20Report%204.6.23.pdf; National Defense Industrial Association, *Vital Signs 2023* (February 2023), https://www.ndia.org/-/media/sites/ndia/policy/vital-signs/2023/ndia_vitalsigns2023_final_v3.pdf?download=1?download=1

of opportunity, coupled with new and increasing regulatory and compliance burdens, creates an acquisition environment so hostile to small businesses it comes as no surprise to learn that the small business federal base has shrunk by approximately 36% over the past decade.[2] Data from the U.S. Small Business Administration (SBA) shows that the greatest rate of loss is found among all small business vendors generally, while in contrast, the number of small and disadvantaged business vendors enjoyed the highest growth rate, increasing in number by approximately 71% over the past decade.[3]

Allowing more Americans to access the dream of small business ownership is a goal we all share. Congress has, on a bipartisan basis, enacted various pro-growth, pro-small business policies and programs, including the SBA's 8(a) Business Development Program. The 8(a) Program helps small businesses develop, grow, and create jobs in their communities by leveraging powerful contracting tools, while simultaneously cultivating a new class of capable small business government contractors. It is prudent for the SBA to leverage the success of the 8(a) program to achieve these aims, uplifting business ownership on the basis of **true** social and economic disadvantage.

However, in helping Americans succeed we must remember to equally protect all Americans, not favor some over others based purely on their race, gender, or creed.

In closing, I urge my colleagues across the aisle to recognize that a rising tide lifts all boats, and we must remain vigilant, hyper focused on the larger problem at hand, the decline in the small business vendor base. It is my sincere hope that the SBA and the Department of

---

[2] This percentage difference was calculated by comparing the latest complete vendor data, the FY22 Small Business Vendor count (62,670), with the FY2012 Small Business Vendor Count (104355): https://datahub.certify.sba.gov/

[3] This percentage increase was calculated by comparing the latest complete vendor data, the FY22 Small Business Vendor count for SDBs (23260), with the FY2012 Small Business Vendor Count (13596). *Id.*

Commerce embody this approach, and redouble their efforts to assist business owners of all shapes and stripes, without preference, priority, or discrimination. I look forward to continuing to work to make sure that there is a place in our federal contracting environment for all of America's entrepreneurs.

ASIAN AMERICANS ADVANCING JUSTICE AAJC

**Testimony of**
**John C. Yang**
**President and Executive Director**
**Asian Americans Advancing Justice | AAJC**

***for***

**Hearing on "Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination."**

**United States Senate**
**Small Business Committee**
**May 6, 2024**

## I. Introduction

Government programs like the Small Business Administration's 8(a) program, and those provided by the Minority Business Development Agency ("MBDA"), are essential for remedying past discrimination against racial and ethnic minorities, including Asian Americans, helping the American economy thrive, and reinforcing our democracy. These programs ensure that minority-owned small businesses are able to survive and thrive, benefitting not only the businesses themselves but the communities they serve and the nation as a whole. Only through the inclusion of all sectors of our economy and all segments of the populace can the American economy and democracy flourish.

Unfortunately, like many other racial minorities in the United States, Asian Americans have faced centuries of explicit, government-sponsored discrimination, including racist immigration policies, restrictions on land ownership, efforts to eradicate Asian American small businesses, incarceration of Japanese Americans, and exclusion from government programs. That discrimination has interfered with economic opportunity, excluding Asian Americans from both equal dignity and status in American democracy and from equal participation in the economic life of the nation, to the detriment of all.

The legacy of past discrimination remains with us today in a multitude of forms, including unequal opportunities in the creation of businesses and greater difficulty in maintaining those businesses. Moreover, Asian Americans continue to face explicit government-sponsored discrimination and unequal opportunities to participate in government programs.

The reality of racial discrimination and inequality cannot be remedied by ignoring it. Only by recognizing that reality and consciously addressing it can the federal government begin to repair the harm it has caused to Asian Americans and others, both in the past and the present.

## II. Organizational Information

**Asian American Advancing Justice | AAJC ("Advancing Justice | AAJC")** submits this written testimony to the Senate Small Business Committee in conjunction with its hearing, "**Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination**."

Advancing Justice | AAJC is a national 501(c)(3) non-profit organization founded in 1991 dedicated to advancing civil and human rights for Asian Americans, and to promoting a fair and equitable society for all. Advancing Justice | AAJC fights for our civil rights through education, litigation, and public policy advocacy and serves to empower our communities by bringing local and national constituencies together and ensuring that Asian Americans are able to participate fully in our democracy and the economic life of our nation.

We work closely with our Community Partners Network, a national collaboration of over 300 AAPI-serving community-based organizations (CBOs) across 37 states and the District of Columbia to increase regional and local capacity to elevate community voices nationwide.

As a founding member of the Asian Americans Advancing Justice (Advancing Justice) national affiliation, we partner with our affiliates — Advancing Justice | Asian Law Caucus, Advancing Justice | Atlanta, Advancing Justice | Chicago, and Advancing Justice | Southern California — to extend the reach of our programming and enhance the impact of our collective work. Advancing Justice | AAJC is a member of the National Council for Asian Pacific Americans, a coalition of Asian American & Pacific Islander national advocacy organizations. We are also a member of the Leadership Conference on Civil and Human Rights, comprised of over 200 national organizations working together to promote and protect the civil and human rights of all Americans.

## III. History of Discrimination Against Asian Americans in the United States

Present-day discrimination against Asian Americans must be understood within the context of the long history of anti-Asian discrimination in the United States. Discrimination against Asian Americans has historically been rooted in the false stereotype of Asian Americans as "outsiders," "aliens," and "perpetual foreigners."[1]

---

[1] *See, e.g.*, Beth Lew-Williams, THE CHINESE MUST GO: VIOLENCE, EXCLUSION, AND THE MAKING OF THE ALIEN IN AMERICA (2021); Claire Jean Kim, *"Exclusion Belonging"* in ASIAN AMERICANS IN AN ANTI-BLACK WORLD 17-122 (2023). Racial stereotyping of Asian Americans reinforces an image of Asian Americans as "different," "foreign," and the "enemy," leading to stigmatization of