# EXHIBIT A-2
# (part 2)

Based on this perception, Asian Americans were long denied the rights held by U.S. citizens and the ability to participate fully in American democracy and the economic life of the country.

As early as the mid-19th century, Asian Americans faced discrimination. Chinese workers initially migrated to the United States to work in the gold mines, the agricultural and garment industries, and as laborers building railroads on the west coast.[2] The latter half of the 19th century marked a rise in anti-Chinese sentiment as Chinese immigrants were scapegoated for the lack of economic opportunity.[3] Asian immigrants faced significant race-based violence, such as the 1871 massacre of around twenty Chinese residents of Los Angeles.[4] Yet they often had little recourse, as some states would not allow Asian witnesses to testify against white defendants.[5]

---

Asian Americans, heightened racial tension, and increased discrimination. Spencer K. Turnbull, Comment, *Wen Ho Lee and the Consequences of Enduring Asian American Stereotypes*, 7 UCLA ASIAN PAC. AM. L.J. 72, 75 (2001); Terri Yuh-lin Chen, Comment, *Hate Violence as Border Patrol: An Asian American Theory of Hate Violence*, 7 ASIAN L.J. 69, 72, 74-75 (2000); Cynthia Kwei Yung Lee, *Beyond Black and White: Racializing Asian Americans in a Society Obsessed with O.J.*, 6 HASTINGS WOMEN'S L.J. 165, 181 (1995); Note, *Racial Violence Against Asian Americans*, 106 HARV. L. REV. 1926, 1930-32 (1993); *see also* Thierry Devos & Mahzarin R. Banaji, *American = White?*, 88 J. PERSONALITY & SOC. PSYCHOL. 447 (2005) (documenting empirical evidence of implicit beliefs that Asian Americans are not "American").

[2] *See* Office of the Historian, *Chinese Immigration and the Chinese Exclusion Acts*, https://history.state.gov/milestones/1866-1898/chinese-immigration ("Office of the Historian").

[3] Chinese immigrants faced a number of discriminatory laws ranging from foreign miner taxes, directed at Chinese gold miners, to anti-Asian business regulations. *See* Sucheng Chan, *Asian Americans: An Interpretive History*, TWAYNE'S IMMIGRANT HERITAGE OF AMERICA SERIES 46–47 (1991); Gordon H. Chang, GHOSTS OF GOLD MOUNTAIN: THE EPIC STORY OF THE CHINESE WHO BUILT THE TRANSCONTINENTAL RAILROAD 38–54 (2019); George Anthony Peffer, *Forbidden Families: Emigration Experiences of Chinese Women Under the Page Law, 1875-1882*, AM. ETHNIC HIST. J. 28, 28–46 (1986), https://www.jstor.org/stable/27500484.

[4] John Johnson, Jr., *How Los Angeles Covered Up the Massacre of 17 Chinese*, LA WEEKLY (Mar. 10, 2011), *available at* https://www.laweekly.com/how-los-angeles-covered-up-the-massacre-of-17-chinese/. *See generally* Jean Pfaelzer, DRIVEN OUT: THE FORGOTTEN WAR AGAINST CHINESE AMERICANS (2008).

[5] *E.g.*, *People v. Hall*, 4 Cal. 399, 405 (Cal. 1854) (barring testimony from Asian witnesses on ground that they were "a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development").

Anti-Asian scapegoating and prejudice resulted in the 1875 Page Act, which barred immigrants deemed as "undesirable" and primarily targeted Asians.[6] Rooted in anti-Asian sentiment, the bill intended "to stop the flow of the 'yellow peril' to American shores."[7]

Congress then passed the Chinese Exclusion Act and its progeny to deter immigration not only of "undesirables," but of all new Chinese immigrants. The Chinese Exclusion Act—the first U.S. immigration law to bar a specific ethnic group—effectively prohibited Chinese immigrants from coming to the U.S. for nearly 60 years.[8] The Act also barred all Chinese immigrants from becoming naturalized citizens.[9]

The Geary Act of 1892 extended the Chinese Exclusion Act of 1882 for another ten years.[10] This bill singled out Chinese individuals, requiring them to obtain "certificates of residence," and denied them the right to be released on bail upon application for a writ of habeas corpus. Chinese immigrants also could not bear witness in court.[11] Instead, only a "credible white witness" could testify for them.[12] Although economic security was touted as a reason for the Chinese Exclusion Act, the Act fit within a larger anti-Chinese movement intended to advance a racist agenda for white purity threatened by Chinese immigration.[13] Only in 2011 did the Senate introduce and pass a resolution recognizing the discriminatory nature of the Chinese Exclusion Act and other laws against those of Chinese descent in America.[14]

The Chinese exclusionary laws paved the way for other laws rooted in anti-Asian sentiment, and the Supreme Court issued harmful precedents by repeatedly upholding challenges to discriminatory laws and its progeny against Asian

---

[6] 18 Stat. 477, 43 Cong. Ch. 141.
[7] *See* Peffer, *supra* n.3 at 29, 28–46.
[8] 22 Stat. 58, 47 Cong. Ch. 126.
[9] *Id.*
[10] Pub. L. No. 52-60, 27 Stat. 25.
[11] Maureen Fan, *An Immigrant's Story: Against a Wall of Exclusion*, S.F. CHRON. (Oct. 4, 2019), https://www.sfchronicle.com/opinion/article/An-immigrant-s-story-Against-awall-of-14494875.php.
[12] *Id.*
[13] Office of the Historian, *supra* n.2.
[14] S. Res. 201, 112th Cong. (2011) (enacted), *available at* https://www.congress.gov/bill/112th-congress/senate-resolution/201/text.

immigrants, establishing Congress' plenary power on immigration matters.[15] Later legislation such as the Naturalization Act of 1906,[16] which allowed only "free white persons" and "persons of African nativity or persons of African descent" to naturalize, also survived constitutional challenges from immigrants seeking to overturn discriminatory policies against Asian immigrants. Two key U.S. Supreme Court cases – *Ozawa v. U.S.* (1922) and *U.S. v. Thind* (1923) – held that Asian immigrants were not free white people and therefore, ineligible for naturalized citizenship.[17] The Immigration Act of 1924[18] expanded the reach of the Chinese Exclusion Act to prevent citizens from all Asian nations from immigrating to the United States, and these exclusionary laws remained in effect until they were repealed by the Magnuson Act in 1943.[19] Exclusionary laws changed the face of America. As a result, by 1960, only 877,934 Asian Americans lived in the United States.[20] That figure represented a mere half of one percent of the American population.[21]

Relying on these discriminatory federal citizenship laws, and invoking the same racist rationales, states began imposing severe restrictions on the ability of Asian Americans and Asian immigrants to purchase real property, often called "alien land laws." To clothe these laws with a patina of legitimacy, they did not mention Asian immigrants or residents specifically. Instead, they excluded persons "ineligible for citizenship"—as determined by federal law—from property ownership, which encompassed primarily Asian immigrants, who were excluded from citizenship under the discriminatory federal statutes discussed above.[22]

---

[15] *See, e.g.*, *Chae Chan Ping v. United States*, 130 U.S. 581 (1889).
[16] 4 Pub. L. 59-338, 34 Stat. 596.
[17] *See, e.g.*, *Ozawa v. United States*, 260 U.S. 178, 198 (1922) (Ozawa, a Japanese immigrant who had lived in the U.S. for over 20 years was "clearly ineligible for citizenship" because he "is clearly of a race which is not Caucasian"); *U.S. v. Thind*, 261 U.S. 204 (1923) (affirming cancellation of Indian national's U.S. citizenship due to fact he was not "free white person").
[18] Pub. L. 68-139, 43 Stat. 153.
[19] Pub. L. 78-199, 57 Stat. 600.
[20] Asian Americans Advancing Justice, Inside the Numbers: How Immigration Shapes Asian American and Pacific Islander communities 20 (2019), https://www.advancingjustice-aajc.org/sites/default/files/2019-06/1153_AAJC_Immigration_Final_Pages_LR-compressed.pdf.
[21] *Id.*
[22] *In re Admin. Order 2017-05-17*, 217 Cal. Rptr. 3d 730 (Cal. 2017).

California enacted the first such law in 1913, which restricted Asian immigrants from owning or leasing farmland. It then tightened these restrictions further in 1920 and 1923, prohibiting even American-born children of Asian immigrant parents or by corporations controlled by Asian immigrants.[23] As the California Supreme Court recognized in 1952, "the real purpose [of the alien land law] was the elimination of competition by alien Japanese [sic] in farming California land."[24]

Many other states followed suit, all of them motivated by anti-Asian animus, including Arizona (1917), Louisiana (1921), New Mexico (1922), Idaho (1923), Montana (1923), Oregon (1923), Kansas (1925), Utah (1943), Wyoming (1943), and Arkansas (1925 and 1943).[25] Though Arkansas' 1925 law restricted ineligible aliens, its 1943 law went even further, barring any "Japanese or a descendent of a Japanese [sic]"—including citizens—from "ever purchas[ing] or hold[ing] title to any lands" in the state.[26]

In 1925, Florida went so far as to amend its constitution to empower the legislature to exclude "ineligible aliens" from the right to "own[], inherit[], dispos[e] [of], possess[], [or] enjoy[] real estate." It was explicitly targeted at Asian—and specifically Japanese—immigrants,[27] though both legislators and state newspapers acknowledged there was no need for it.[28] The provision was "readopted during the 1968 revision of the Florida constitution,"[29] and not repealed until 2018, when the Florida Constitution Revision Commission proposed a successful referendum to remove the "discriminatory" language.[30]

---

[23] *Id.*
[24] *Fujii v. California*, 38 Cal.2d 718, 735 (1952).
[25] Dudley O. McGovney, *The Anti-Japanese Land Laws of California and Ten Other States*, 35 CAL. L. REV. 7, 7-8 (1947), *available at* https://www.jstor.org/stable/3477374?origin=crossref.
[26] *Id.* at 8-9; *see also Applegate v. Lum Jung Luke*, 173 Ark. 93, 95 (1927) (invalidating 1925 law as inconsistent with state constitution).
[27] *Florida to Vote on Alien Land Law*, THE NEW YORK TIMES 3 (Oct. 30, 1926) ("Its sponsors said the proposed amendment is aimed specifically at Japanese subjects."), *available at* https://timesmachine.nytimes.com/timesmachine/1926/10/30/104213831.html?pageNumber=3.
[28] Declaration of Rights Committee, Constitution Revision Commission, *Proposal Analysis* 4 (Dec. 20, 2017), *available at* https://library.law.fsu.edu/Digital-Collections/CRC/CRC-2018/Proposals/Commissioner/2017/0003/Analyses/2017p0003.dr.pdf.
[29] *Id.*
[30] *Detzner v. Anstead*, 256 So. 3d 820, 824 (Fla. 2018).

These alien land laws had a tangible economic impact on Asian immigrants in the United States. In California, for example, Japanese immigrants saw a 47% decrease in total acres farmed in 1922–1924 as compared to 1918–1920, and a 23% decrease in the total number of farms owned by Japanese immigrants living in California during that period.[31] Though these laws were eventually repealed, history now echoes in a slew of alien land laws sweeping through the country, recently enacted or considered in California, New York, Texas, Louisiana, South Carolina, Alabama, and Florida, among others.[32]

At the same time, states and municipalities targeted other Asian-owned businesses. For example, many states excluded "foreign-born persons from practicing law unless they were eligible for citizenship."[33] As was the case with alien land laws, this restriction disproportionately affected Asian immigrants because federal law barred them from naturalization.

Other efforts were more explicitly racialized. Officials in San Francisco used an 1880 ordinance to shut down Chinese-owned laundry businesses in the city by denying such businesses licenses while granting them to others.[34] Around the same time, state and local legislators sought to "eliminate Chinese restaurants from the United States."[35] This "war"—as its proponents described it[36]—was driven by racism and xenophobia, including moral panics over opium, interracial marriage, and various other "threats" to the morality of white women.[37] A variety of states and cities "considered legislation or decrees banning white women from patronizing

---

[31] Masao Suzuki, *Important or Impotent? Taking Another Look at the 1920 California Alien Land Law*, 64 J. OF ECONOMIC HISTORY 125, 130-131 (2004), *available at* https://www.jstor.org/stable/3874944.
[32] Edgar Chen, *With New "Alien Land Laws" Asian Immigrants Are Once Again Targeted by Real Estate Bans*, JUST SECURITY (May 26, 2023), https://www.justsecurity.org/86722/with-new-alien-land-laws-asian-immigrants-are-once-again-targeted-by-real-estate-bans/.
[33] *In re Admin. Order 2017-05-17*, 217 Cal. Rptr. 3d 730 (Cal. 2017) (citing *Raffaelli v. Committee of Bar Examiners*, 7 Cal.3d 288, 291 (1972)); *see also Large v. State Bar*, 218 Cal. 334, 335 (1933) (rejecting constitutional challenge to rule and collecting cases); *In re Hong Yen Chang*, 84 Cal. 163 (Cal. 1890) (rejecting admission of Asian immigrant to state bar).
[34] *Yick Wo v. Hopkins*, 118 U.S. 356, 359 (1886).
[35] Gabriel J. Chin & John Ormonde, *The War Against Chinese Restaurants*, 67 DUKE L. J. 681, 683 (2018), *available at* https://scholarship.law.duke.edu/dlj/vol67/iss4/1/.
[36] *Id.* at 683.
[37] *Id.* at 698-707.

Chinese restaurants or being employed there."[38] Police targeted Chinese restaurants for raids and in some jurisdictions issued decrees barring "young white girls" from entering such establishments.[39] And municipal government officials discriminated against Chinese restaurants in licensing, zoning, and other regulatory enforcement.[40] Not until the mid-20th century approached did the effort to stamp out Chinese restaurants conclude.[41]

Amidst rising anti-Japanese hysteria during World War II, President Franklin D. Roosevelt issued Executive Order 9066, which authorized the forcible removal of people of Japanese ancestry from their homes and communities in the interest of "national security." As a result, approximately 120,000 U.S. residents of Japanese ancestry, half of whom were children, were incarcerated in federal detention. This constituted nearly the entire Japanese populations of California (99%), Oregon (87%), and Washington (88%).[42] About 2,000 people died in incarceration from a series of causes, including infectious diseases, bad sanitation, or even shooting by guards.[43]

Though never accused of any offense, and incarcerated without due process, the Supreme Court nevertheless upheld the laws and curfews implementing Executive Order 9066 against U.S. citizens of Japanese descent in a shameful series of opinions. *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214 (1944); *Hirabayashi v. United States*, 320 U.S. 81 (1943); *Yasui v. United States*, 320 U.S. 115 (1943).

Even after incarceration ended, Japanese Americans struggled to recover due to the "very substantial economic losses" they suffered:

> Owners and operators of farms and businesses either sold their income-producing assets under distress-sale circumstances on very short notice

---

[38] *Id.* at 707-13.
[39] *Id.* at 713-16, 723-26.
[40] *Id.* at 716-23, 726-30.
[41] *Id.* at 682-83, 733.
[42] Aimee Chin, *Long-Run Labor Market Effects of Japanese American Internment during World War II on Working-Age Male Internees*, 23 J. OF LABOR ECONOMICS 491, 496 (2005), available at https://doi.org/10.1086/430285.
[43] Gisela Perez Kusakawa, *The Korematsu Legacy: "Stand up for what is right!"*, AAJC (Jan. 30, 2020), https://medium.com/advancing-justice-aajc/the-korematsu-legacy-stand-up-for-what-is-right-4a19c5af491d.

> or attempted, with or without government help, to place their property in the custody of people remaining on the Coast. . . . Homes had to be sold or left without the personal attention that owners would devote to them. Businesses lost their good will, their reputation, their customers. Professionals had their careers disrupted. Not only did many suffer major losses during evacuation, but their economic circumstances deteriorated further while they were in camp. The years of exclusion were frequently punctuated by financial troubles: trying to look after property without being on the scene when difficulties arose; lacking a source of income to meet tax, mortgage, and insurance payments. Goods were lost or stolen. Income and earning capacity were reduced to almost nothing during the long detention in the relocation centers, and after the war life had to be started anew on meager resources.[44]

Small businesses—one of the "major occupations" of those subject to incarceration—were especially affected. Facing incarceration, they were "forced by circumstances to accept low prices or abandon property or . . . to place the property in insecure storage."[45]

Subsequent research supports the conclusion that incarceration had substantial long-term adverse economic effects. One study concluded that Japanese incarceration "reduced the annual earnings of males by as much as 9%-13% 25 years afterwards."[46] Though the federal government eventually—in 1988—paid each survivor of incarceration a modest reparation, the amount provided fell "considerably short of compensating working-age male internees for lifetime earnings losses resulting from the labor market withdrawal induced by the internment [sic]."[47] Moreover, this did not take into account other financial losses

---

[44] Comm'n on Wartime Relocation & Internment of Civilians, PERSONAL JUSTICE DENIED 117-18 (1982), *available at* https://www.archives.gov/files/research/japanese-americans/justice-denied/chapter-4.pdf.
[45] *Id.* at 127-28.
[46] Aimee Chin, *Long-Run Labor Market Effects of Japanese American Internment during World War II on Working-Age Male Internees*, 23 J. of Labor Economics 491, 512-515 (2005), *available at* https://doi.org/10.1086/430285.
[47] *Id.*

incurred. Though the total value of economic losses is hard to quantify 80 years later, it is almost certainly staggering.

While the United States government incarcerated Japanese immigrants and Japanese Americans, it also excluded most Asians in the United States from the benefits of many New Deal programs. For example, most work-relief jobs under the New Deal required U.S. citizenship; yet at the time, Asian immigrants were unable to naturalize and as a result could not participate.[48] Likewise, the Home Owners' Loan Corporation ("HOLC")—a New Deal entity created to refinance home mortgages, promote home purchases, and limit foreclosures—subjected Asian Americans to the discriminatory practice of redlining, along with Black and Latinx Americans.[49] "Redlining" involved "grad[ing] neighborhoods based on their perceived mortgage-lending risk"[50]—if someone lived in a neighborhood designated as "high risk," they could not obtain a mortgage loan, even if they were otherwise qualified.[51] The risk assessments were driven in significant part by the racial composition of neighborhoods.[52] In California, for example, HOLC appraisers marked down neighborhoods with large numbers of Asian Americans, classifying them as "subversive racial elements."[53]

Asian Americans and Asian American-owned businesses continued to face overt, government-sponsored discrimination well into the late 20th century. For example, a 1970 study by the United States Commission on Civil Rights described the "negative and sometimes hostile attitudes" of government contracting specialists toward minority-owned businesses—including Asian-owned businesses: that they were "inefficient, sloppy, lacking in business acumen and knowledge of government

---

[48] Judy Yung, UNBOUND FEET: A SOCIAL HISTORY OF CHINESE WOMEN IN SAN FRANCISCO 185 (1995).
[49] *See generally* Richard Rothstein, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA (2017).
[50] Ryan Best & Elena Mejia, *The Lasting Legacy of Redlining*, FiveThirtyEight (Feb. 9, 2022), https://projects.fivethirtyeight.com/redlining/.
[51] *See* Candace Jackson, *What Is Redlining?*, THE NEW YORK TIMES (Aug. 17, 2021), https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.
[52] *Id.*
[53] Ryan Best & Elena Mejia, *The Lasting Legacy of Redlining*, FIVETHIRTYEIGHT (Feb. 9, 2022), https://projects.fivethirtyeight.com/redlining/.

processes, or [were] 'just a lot of extra bother.'"[54] One procurement officer even referred to "minority firms" as "leeches."[55]

### IV. Contemporary Anti-Asian Discrimination in Business and Economic Opportunity

Unfortunately, anti-Asian discrimination is still with us today, including specifically in the arena of business and economic opportunity. For example, Asian Americans are less able to obtain business loans, and, when they are able to obtain a loan, it tends to be on less favorable terms than firms owned by white business-owners.[56] As a result, Asian American business owners are substantially more likely than white business owners to rely on "personal funds as the primary funding source for their businesses."[57]

**Government Contracting**

As a 2022 Department of Justice report observed, "discrimination hinders the ability of minority- and women-owned businesses to compete equitably for government contracts," such as through "(1) discrimination by procurement agencies and prime contractors, (2) exclusion from business networks, and (3) discrimination by bonding companies and suppliers."[58]

This conclusion finds support not only in numerous studies and reports,[59] but in the lived experiences of Asian American small business owners. A Korean immigrant business owner, for example, reported that his business had difficulty obtaining government contracts because "[c]ompared to the majority of white Americans who have had relatives and friends in the government sector and professional fields, we

---

[54] U.S. Comm'n on Civil Rights, *Minorities and Women as Government Contractors* ("The Commission Report"), 20 (1975), *available at* https://books.google.com/books?id=c8V-h3gRrfkC&pg=RA1-PA111&source=gbs_toc_r&cad=2#v=onepage&q&f=false.
[55] *Id.* at 20-21.
[56] U.S. Dep't of Justice, The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence 30-34 (2022), *available at* https://www.justice.gov/crt/page/file/1463921/dl
[57] *Id.* at 33-34.
[58] *Id.* at 21.
[59] *Id.* at 21-26 (discussing quantitative research).

[Asian Americans] don't have those kinds of relationships."[60] He added "language barriers and cultural differences" also make fostering those kinds of relationships more difficult for him.[61] Others have encountered discrimination from prime contractors,[62] language and cultural discrimination,[63] and double standards.[64]

It is hardly a surprise, then, that Asian American-owned small businesses have long been underrepresented among recipients of government contracts. In 1997, an Urban Institute report concluded that Asian American-owned businesses, like other minority population groups, "receive a substantially lower proportion of government contracting dollars than would be expected, given their availability."[65] Little has changed since. A 2016 meta-analysis by the MBDA observed that minority business enterprises (MBEs) "typically secure a lower number and dollar amount of contracts in proportion to the number of available MBEs in a relevant market."[66] Other research, including reports by the Department of Justice, studies conducted by states and municipalities, and other subsequent findings, supports these conclusions.[67]

Another way that government-sponsored discrimination against Asian Americans manifests in contracting and grants is under the guise of "national security." For example, the Department of Justice's now-defunct "China Initiative" spurred federal authorities to profile Chinese American and immigrant scientists and researchers. In February 2020, FBI Director Christopher Wray called for a "whole-of-society" response to Chinese economic espionage and the threat of so-called "non-traditional collectors" (a euphemism for "spies") to encompass individuals of Chinese descent,

---

[60] Asian American Institute & Asian American Justice Center, OVERLOOKED: THE ASIAN AMERICAN CONTRACTOR EXPERIENCE 12 (2012).
[61] *Id.* at 13.
[62] *Id.* at 17-18.
[63] *Id.* at 3.
[64] *Id.* at 25.
[65] Maria E. Enchautegui et al., The Urban Institute, DO MINORITY-OWNED BUSINESSES GET A FAIR SHARE OF GOVERNMENT CONTRACTS? x, xi, 14 (1997), *available at* https://www.urban.org/sites/default/files/publication/67046/307416-Do-Minority-Owned-Businesses-Get-a-Fair-Share-of-Government-Contracts-.PDF.
[66] Minority Business Development Agency, CONTRACTING BARRIERS AND FACTORS AFFECTING MINORITY BUSINESS ENTERPRISES: A REVIEW OF EXISTING DISPARITY STUDIES iii (Dec. 2016).
[67] U.S. Dep't of Justice, *supra* n.56 at 16-19.

but more specifically, graduate students and researchers.[68] In a Senate Intelligence Committee hearing on world threats, Chinese students and academics, in particular, were painted as national security threats regardless of any wrongdoing.[69] This rhetoric, and the fixation on "non-traditional collectors" has the effect of focusing on people of Chinese descent, rather than on those actually committing state-sponsored acts of espionage.[70] Indeed, economic espionage or trade secret theft prosecutions have declined[71] and one in five people of Asian or Chinese descent charged are never convicted of any crime,[72] lending credence to concerns of "pretextual prosecutions" based on weak evidence and stereotypes that Asians are spies.[73]

According to a recent study of over a dozen former federal investigators, "distrust of people of Chinese heritage [too often] drives decision-making at the FBI and other U.S. security agencies."[74] In fact, the now-dissolved Investigations and Threat

---

[68] Dir. Christopher Wray, Federal Bureau of Investigation, *Responding Effectively to the Chinese Economic Espionage Threat, Remarks at the Department of Justice China Initiative Conference* (Feb. 6, 2020), https://www.fbi.gov/news/speeches/responding-effectively-to-the-chinese-economic-espionage-threat (testifying that "I would just say that the use of nontraditional collectors, especially in the academic setting, whether it's professors, scientists, students, we see in almost every field office that the FBI has around the country… So one of the things we're trying to do is view the China threat as not just a whole-of-government threat but a whole-of-society threat on their end.")

[69] Elizabeth Redden, *The Chinese Student Threat?*, INSIDE HIGHER ED (Feb. 15, 2019), https://www.insidehighered.com/news/2018/02/15/fbi-director-testifies-chinese-students-and-intelligence-threats.

[70] George Koo, *Fear of Chinese 'non-traditional collectors' strikes again*, ASIA TIMES (Feb. 15, 2019), https://asiatimes.com/2018/02/fear-chinese-non-traditional-collectors-strikes/.

[71] Eileen Guo, *In a further blow to the China Initiative, prosecutors move to dismiss a high-profile case*, MIT TECH. REV. (Jan. 15, 2022), https://www.technologyreview.com/2022/01/15/1043319/china-initative-gang-chen-mit/.

[72] *Id.*

[73] *See* Andrew Chongseh Kim, *Prosecuting Chinese "Spies": An Empirical Analysis of the Economic Espionage Act*, 40 CARDOZO L. REV. 749, 755 (2018); *see also Testimony of John C. Yang for Hearing on "Exposing the Dangers of the Influence of Foreign Adversaries on College Campuses,"* U.S. House of Representatives Committee on Education & the Workforce (July 13, 2023), *available at* https://edworkforce.house.gov/uploadedfiles/john_yang_testimony_for_house_subcommittee_on_higher_education_and_workforce_development.pdf.

[74] Kim, *supra* n.73 at 755.

Management Service of the Department of Commerce even engaged in investigations without proper authorization and with little oversight, disproportionately targeting Chinese or Southeast Asian individuals.[75] And Chinese scientists who work as federal employees and contractors appear to receive disproportionate scrutiny, and innocent familial or financial ties to China result in more denials of security clearances than is the case with respect to ties to any other country.[76]

These investigations have deprived scientists of Chinese descent of funding opportunities by casting a pall of suspicion over them. For example, Dr. Xiaoxing Xi, a Chinese American physics professor wrongfully accused of being a spy due to the FBI's failure to understand the technology on which he was working,[77] lost federal grants because he was under investigation. Prior to his improper arrest and prosecution, Dr. Xi had received nine federal grants—afterwards, in 2019, he had only two.[78] This is the reality for many Chinese scientists who are forced to tread carefully, wary of the government's broad scrutiny and easy conclusions of culpability.[79]

These policies demonstrate that anti-Asian racism still permeates government decision-making and result in ongoing discrimination in contracting decisions and awarding federal grants.

**Discrimination in Government Responses to COVID-19**

The federal government's response to the COVID-19 pandemic exacerbated matters for Asian American-owned small businesses. Asian American small business owners not only had to face the exigencies of the pandemic itself, but did so in the face of preexisting inequities, anti-Asian prejudice and disinformation, and barriers to

---

[75] Daniella Diaz, *Report Finds Little-Known Security Unit in Commerce Abused and Investigated Employees of Chinese or Southeast Asian Ancestry for Years,* CNN (July 17, 2021), https://www.cnn.com/2021/07/17/politics/commerce-department-senate-report/index.html.
[76] *Id.*
[77] Matt Apuzzo, *U.S. Drops Charges That Professor Shared Technology with China*, N.Y. Times (Sept. 11, 2015), https://www.nytimes.com/2015/09/12/us/politics/us-drops-charges-that-professor-shared-technology-with-china.html.
[78] Bloomberg Markets & Finance, *How the U.S. is Purging Chinese Americans from Cancer Research* (Jul. 12, 2019), https://www.youtube.com/watch?v=SBTroGMs-2w.
[79] *Id.*

accessing government assistance. These difficulties led to the failure of many Asian American-owned businesses: Within the first three months of the pandemic, the number of Asian American business owners dropped by 26%—higher than the national average of 22%.[80]

At the start of the pandemic, Asian American-owned small businesses were especially precarious, and therefore in particular need of government assistance.[81] As a Brookings Institution report in April 2020 observed, businesses owned by people of color—including by Asian Americans—were far more likely to face "immediate risk" from the pandemic, as opposed to "near term" or "long term" risk.[82]

Compounding these difficulties was the rise in anti-Asian hate, driven in substantial part by federal officials, including the President of the United States. These officials promoted the conspiracy theory that China intentionally released the virus and that Chinese Americans—and by extension Asian Americans more generally—were responsible for the pandemic. Over the course of months, then-President Donald Trump repeatedly referred to COVID-19—the World Health Organization's official designation—as the "Chinese virus," "China virus," or "Kung Flu," both on social media and at White House press conferences.[83] Other federal officials soon joined in. Senator John Cornyn, for example, assigned "blame" to China because it is home to a "culture where people eat bats and snakes and dogs and things like that."[84]

---

[80] U.S. Dep't of Justice, *supra* n.56 at 34-35 (citing Robert Fairlie, *The impact of COVID-19 on small business owners: Evidence from the first three months after widespread social-distancing restrictions*, 29 J. ECON. MANAG. STRATEGY 727 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7461311/).

[81] Sifan Liu & Joseph Parilla, *Businesses owned by women and minorities have grown. Will COVID-19 undo that?*, BROOKINGS INSTITUTION (Apr. 2020), https://www.brookings.edu/articles/businesses-owned-by-women-and-minorities-have-grown-will-covid-19-undo-that/; *see also* U.S. Dep't of Justice, *supra* n.56 at 26-27 (noting that "minority- and women-owned businesses are . . . less profitable" than "businesses owned by White men," and that "Asian-American owned firm[s]" specifically were generally less profitable than "a White-owned firm").

[82] Liu & Parilla, *supra* n.81.

[83] Angela R. Gover, et al., *Anti-Asian Hate Crime During the COVID-19 Pandemic: Exploring the Reproduction of Inequality*, 45 AM. J. OF CRIMINAL JUSTICE 647 (2020), *available at* https://link.springer.com/article/10.1007/s12103-020-09545-1.

[84] *Id.*

Statements like these created—according to one paper—"an atmosphere where it [was] socially acceptable to express and act on anti-Asian sentiment."[85]

As federal officials stoked anti-Asian attitudes, Asian Americans continued to face discrimination in virtually every area of life. A Pew Research Center report published in July 2020 revealed that a majority of Asian adults (58%) felt it was more common for people to express racist or racially insensitive views about people who are Asian than it had been before the COVID-19 outbreak.[86] And a June 2021 survey found that around 40% of Asian American and Pacific Islander[87] small business owners had been "blamed for the COVID-19 pandemic."[88]

Anti-Asian attitudes contributed to economic losses for Asian American-owned small businesses. According to a 2021 survey, 60% of Asian American small business owners expressed worry about "anti-Asian bias or hate crime happening to them, their business establishment or their staff."[89] Another study concluded that in 2020, "Asian restaurants experienced an 18.4% decrease in traffic (estimated US$7.42 billion lost revenue . . .) relative to comparable non-Asian restaurants[.]"[90]

Despite the urgent need for government assistance, access to it remained out of reach for many Asian American-owned small businesses.[91] One barrier, identified in a study of the greater New York City region, was the lack of available information

---

[85] Nathan Kar Ming Chan, et al., *COVID-19 and Asian Americans: How Elite Messaging and Social Exclusion Shape Partisan Attitudes*, 20 PERSPECTIVES ON POLITICS 618 (2022).

[86] Pew Research Center, *Many Black and Asian Americans Say They Have Experienced Discrimination Amid the COVID19 Outbreak* (July 1, 2020), https://www.pewresearch.org/social-trends/2020/07/01/many-black-and-asian-americans-say-they-have-experienced -discrimination-amid-the-covid-19-outbreak/.

[87] We refer to Asian Americans and Pacific Islanders collectively here in the context of data that do not disaggregate these communities, though recognize the myriad diversities among them.

[88] Asian/Pacific Islander American Chamber of Commerce and Entrepreneurship, BACK TO BUSINESS: ARE AAPI SMALL BUSINESSES REBOUNDING FROM COVID-19? (Jun. 2021), *available at* https://www.nationalace.org/2021survey.

[89] Ahyoung Kim, et al., Asian American Federation, SMALL BUSINESS, BIG LOSSES 17 (2021), *available at* https://www.aafederation.org/wp-content/uploads/2021/05/Small_Biz_Survey.pdf.

[90] Justin T. Huang et al., *The cost of anti-Asian racism during the COVID-19 pandemic*, 7 NATURE HUMAN BEHAVIOUR 682 (2023), *available at* https://www.nature.com/articles/s41562-022-01493-6.

[91] Kim et al., *supra* n.89 at 10.

about government programs in the business owner's primary language.[92] Even beyond the New York City region, in-language information is essential for Asian Americans, many of whom have limited English proficiency ("LEP"): as of 2019, over 30% of Asian American adults were LEP, compared to only 1.4% of white adults.[93] The same study of the greater New York City region found LEP is even more common among Asian American small business owners, such as those self-employed in "taxi and ridesharing, food services, laundry services, nail and beauty salons," among whom LEP rates range between 66% (taxi and ridesharing) and 79% (laundry services).[94] The result was that nearly two-thirds (64%) of Asian American small business owners reported that "they did not have enough information about COVID-19 in a language they could understand."[95]

Government outreach also fell short because its reliance on "traditional communication chains such as Business Improvement Districts or Chambers of Commerce" failed to reach many Asian American business owners. According to one survey, 93% of Asian American small business owners "were not members of either a BID or Chamber of Commerce."[96] For example, in Philadelphia, one Cambodian restaurant owner said that "[i]nformation that is needed for survival, or information that is needed for economic stability, comes to our community too late."[97]

As a result, Asian American small businesses were significantly underrepresented among those receiving federal assistance, including via the Paycheck Protection Program ("PPP"). One analysis of PPP data found that "businesses located in majority-Asian American neighborhoods were less likely to receive PPP loans": in

---

[92] *Id.* at 11.
[93] Jennifer M. Haley, et al., Urban Institute, MANY ASIAN AMERICANS AND NATIVE HAWAIIAN/PACIFIC ISLANDER ADULTS MAY FACE HEALTH CARE ACCESS CHALLENGES RELATED TO LIMITED ENGLISH PROFICIENCY 1 (Dec. 2022), *available at* https://www.urban.org/sites/default/files/2022-12/Many%20AANHPI%20Adults%20May%20Face%20Health%20Care%20Access%20Challenges%20Related%20to%20Limited%20English%20Proficiency.pdf.
[94] Kim et al., *supra* n.89.
[95] *Id.* at 11.
[96] *Id.*
[97] Jack Tomczuk, *How PPP loans missed the mark with Philly's Southeast Asian business owners*, METRO PHILADELPHIA (Oct. 27, 2022), https://metrophiladelphia.com/ppp-loans-philadelphia-southeast-asian-business-owners/

ZIP codes with "40 percent or more Asian American residents," around 57% of businesses received PPP loans; in ZIP codes with 40 percent or fewer Asian American residents, 68% of businesses received PPP loans.[98] Another analysis observed that in New York City, the ZIP codes where Asians constituted the largest share of the population received fewer PPP loans in 2020 than did other parts of the city; those same ZIP codes also saw relatively little assistance from the second round of PPP loans in 2021.[99] Moreover, "businesses in heavily-Asian zip codes—such as taxi services, restaurants, and beauty salons—tended to get less money" from PPP as compared to other areas.[100]

## V. Conclusion

American democracy and the American economy work best when all can participate, both legally and practically. Unfortunately, Asian Americans have faced two centuries of exclusion from these pillars of American life. The severity of that discrimination has ameliorated over time, but nevertheless continues to this day, as do the effects of the harm already done.

To properly remedy past harms and to ensure an end to present discrimination, there must be a full accounting of, and conscious effort to address, both. The Small Business Administration's 8(a) program and the services provided through the Minority Business Development Agency are important steps to that end, providing essential assistance to Asian American and other minority-owned businesses.

---

[98] Kim et al., *supra* n.89.
[99] Amy Yee et al., *New York's Once-Thriving Asian Businesses Struggle to Recover from 4,000% Unemployment Spike*, Bloomberg (Oct. 28, 2021), https://www.bloomberg.com/graphics/2021-nyc-asian-american-recovery/.
[100] *Id.*

AEO Association for Enterprise Opportunity

"Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"

U.S. Senate Committee on Small Business and Entrepreneurship
May 6, 2024

** Testimony by Natalie Madeira Cofield, President and CEO**

Chairman Cardin, Senator Van Hollen, Congressman Ivey, and esteemed Members of the Senate Committee on Small Business and Entrepreneurship:

As an entrepreneur, advocate, and former Assistant Administrator for the U.S. Small Business Administration (SBA), I have witnessed firsthand the transformative power of programs like the 8(a) Business Development program in shaping the landscape of small business ownership in America. Today, I offer my testimony on the positive and negative aspects of participating in the SBA's 8(a) program, drawing from my extensive experience in the field of economic development and entrepreneurship.

The history of the SBA's 8(a) Business Development program traces back to the 1950s when the Small Business Act was implemented, with the aim of promoting the growth and development of small businesses across the United States. Recognizing the systemic barriers faced by minority-owned businesses, particularly those owned by socially and economically disadvantaged individuals, the program was expanded in 1968 to include a specific provision for minority-owned firms. Since then, the 8(a) program has evolved to become a cornerstone of the federal government's efforts to promote diversity and inclusion in contracting. Over the decades, the program has undergone revisions and enhancements to better serve the needs of underserved communities, including updates to eligibility criteria, contracting preferences, and mentorship requirements. Today, the 8(a) program continues to play a vital role in leveling the playing field for minority entrepreneurs, providing them with access to government contracts, technical assistance, and mentorship opportunities that are critical for their success.

The importance of the SBA's 8(a) program to underserved communities across the United States cannot be overstated. For decades, minority-owned businesses have faced systemic barriers to accessing capital, contracts, and other resources needed to thrive in the marketplace. The 8(a) program addresses these barriers head-on by providing a pathway to government contracting opportunities, which can serve as a catalyst for growth and economic empowerment. By participating in the program, minority entrepreneurs gain access to a wide range of benefits, including sole-source contracts, set-aside opportunities, and mentorship from experienced professionals.

These resources not only help minority-owned businesses compete more effectively but also contribute to the broader goal of building wealth and opportunity in underserved communities. As we look to the future, it is essential to continue supporting and strengthening programs like the 8(a) program to ensure that all entrepreneurs, regardless of background or circumstance, have the opportunity to succeed and thrive in the American economy.

The 8(a) program serves as a vital resource for underserved entrepreneurs, particularly those from minority backgrounds, by providing access to crucial resources, contracts, and mentorship opportunities. Through my tenure at the SBA and my involvement with organizations like the Association for Enterprise Opportunity (AEO), I have seen countless success stories of businesses that have thrived because of their participation in the program.

One of the most significant positive effects of the 8(a) program is its role in fostering economic empowerment and upward mobility among historically marginalized communities. AEO's research on Small Business Outcomes by Ethnicity underscores the importance of programs like 8(a) in leveling the playing field for minority entrepreneurs, who often face systemic barriers to accessing capital and contracts. By providing a pathway to government contracts and procurement opportunities, the 8(a) program empowers minority-owned businesses to compete on a more equal footing and achieve sustainable growth.

Furthermore, the mentorship component of the 8(a) program is invaluable in nurturing the next generation of diverse entrepreneurs. As CEO of Walker's Legacy, a platform dedicated to empowering women through entrepreneurship, I have seen the profound impact that mentorship can have on aspiring business owners. Through the 8(a) program, participants learn from seasoned professionals, gain valuable insights, and navigate the complexities of government contracting, ultimately positioning them for long-term success.

Mentorship and collaboration with regional partners are essential components of the success of the 8(a) program. Mentorship provides participants with invaluable guidance, support, and access to networks that can help them navigate the complexities of government contracting and grow their businesses sustainably. By fostering relationships with experienced mentors, 8(a) participants can tap into a wealth of knowledge and expertise, accelerating their learning curve and positioning them for greater success. Additionally, working closely with regional partners, including community-based lenders, non-profit organizations, and local government agencies, can further enhance the impact of the 8(a) program. These partners play a critical role in providing access to capital, technical assistance, and market opportunities, ensuring that 8(a) participants have the resources they need to thrive. By building strong partnerships at the regional level, we can create a supportive ecosystem that empowers entrepreneurs to overcome challenges, seize opportunities, and contribute to the economic vitality of their communities. AEO's focus on regionalism, exemplified by its six dedicated regional councils, ensures that these collaborative efforts are coordinated

and strategic, maximizing the collective impact on local economies and fostering sustainable growth.

While the 8(a) program has undoubtedly had a positive impact on many businesses, it is not without its challenges and limitations. One of the primary concerns is the potential for over-reliance on government contracts, which can leave businesses vulnerable to fluctuations in federal spending and market demand. This issue is particularly relevant in light of recent budgetary constraints and uncertainties, which have underscored the importance of diversifying revenue streams and building resilience.

Additionally, there have been criticisms regarding the transparency and accountability of the 8(a) program, particularly in terms of contract allocation and oversight. As someone who has worked extensively in government and economic development, I recognize the importance of ensuring that taxpayer dollars are used effectively and equitably. Therefore, it is essential for policymakers and program administrators to implement robust monitoring mechanisms and accountability measures to prevent fraud, waste, and abuse within the program.

Moreover, while the 8(a) program has been instrumental in advancing minority entrepreneurship, it is not a panacea for addressing systemic inequalities in the business landscape. AEO's research on Small Business Revenue by Ethnicity highlights the persistent disparities in business revenue and profitability across different racial and ethnic groups, underscoring the need for broader structural reforms and investment in inclusive economic development initiatives.

Recommendations:

In conclusion, while the 8(a) program has played a significant role in promoting minority entrepreneurship and economic empowerment, there is still work to be done to maximize its effectiveness and address its shortcomings. As CEO of the Association for Enterprise Opportunity, I am committed to advocating for policies and programs that support the development of a more inclusive and equitable marketplace for underserved small businesses and entrepreneurs.

To that end, I offer the following recommendations:

1. Strengthen oversight and accountability measures to ensure transparency and integrity within the 8(a) program, including regular audits, evaluations, and reporting requirements.
2. Enhance access to capital and technical assistance for 8(a) participants to support their long-term sustainability and growth beyond government contracts.
3. Expand outreach and support initiatives to reach underserved communities and ensure equitable access to the benefits of the 8(a) program.

4. Foster collaboration and partnership between government agencies, non-profit organizations, and private sector stakeholders to maximize the impact of the 8(a) program and promote inclusive economic development.

I believe by implementing these recommendations and leveraging the lessons learned from the 8(a) program, we can continue to advance our collective mission of creating economic opportunity for all entrepreneurs, regardless of background or circumstance. Together, we can build a more vibrant, resilient, and inclusive economy that empowers individuals and communities to thrive.

Thank you for the opportunity to share my experience and testimony.

Nicole Madeira Cofield, President and CEO,
Association for Enterprise Opportunity

CRMSDC OUR MISSION ENDURES Capital Region Minority Supplier Development Council Certify. Develop. Connect. Advocate. BUSINESS CENTER CRP Capital Readiness Program

**Written Testimony of**
**Sharon R. Pinder**
**President of the Capital Region Minority Supplier Development Council**

**U.S. Senate**
**Committee on Small Business – Field Hearing**
**Bowie State University May 8, 2024**

**Dear Senator Benjamin Cardin and Esteemed Members of the Senate Committee on Small Business and Entrepreneurship:**

Thank you for this opportunity to provide testimony and share valuable information with you.

I am Sharon Roberson Pinder, President and CEO of the Capital Region Minority Supplier Development Council (CRMSDC). With a rich history dating back to 1972, CRMSDC is steadfast in its dedication to fostering the growth and success of minority-owned businesses in the Capital Region. We are deeply committed to advocating for policies that promote equity and inclusion in the business landscape.

Our organization also oversees two significant grants from the U.S. Department of Commerce and the Minority Business Development Agency (MBDA). These grants are instrumental in supporting the operation of the MBDA Business Center, Virginia, and the Capital Readiness Program. Both of these initiatives are pivotal in our mission to promote equity and inclusion in the business landscape.

The Capital Region Minority Supplier Development Council, one of twenty-three regional affiliates, stands out as a key player in the National Minority Supplier Development Council (NMSDC), the nation's sole minority business certifying body for the private sector. Our unique position allows us to connect our 1,700 major corporate members and 13,000 certified minority business owners, fostering diversification and innovation in their supply chains. This distinctive role underscores the relevance of our testimony today.

The establishment of the NMSDC is significant because it was founded on the principle of fostering economic development and wealth creation within minority communities. NMSDC's corporate founders envisioned that an employed and thriving minority business sector would generate income, which would, in turn, be spent by that community on products and services from corporate America. For an overview of CRMSDC's history, please watch this brief video: https://www.youtube.com/watch?v=7euJ7XSUz40.

CRMSDC OUR MISSION ENDURES Capital Region Minority Supplier Development Council Certify Develop Connect Advocate BUSINESS CENTER CRP Capital Readiness Program

The hearing's theme, "Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination," speaks directly to the heart of the challenges faced by minority entrepreneurs across our nation. Despite progress in some areas, racial discrimination continues to pose significant barriers to the advancement of minority-owned businesses, hindering their ability to compete on a level playing field.

Minority business programs are under attack in both the public and private sectors. Coinciding with recent actions to pass restrictive laws prohibiting DEI programs, there have also been specific attacks on supplier diversity programs and on programs aimed at helping improve the growth and performance of minority-owned businesses.

Various lawsuits have challenged programs such as the Minority Business Development Agency's Business Center and the 8(a) Business Development programs. These legal actions significantly impact the minority-owned contractors in our network, who depend on these initiatives to overcome unique barriers and survive in the marketplace.

These programs and initiatives are intended to address the economic disparity that is the result of past and existing discrimination. Programs like the 8(a), SDB, and DBE programs were created so the Federal and local governments, as well as private sector firms, could help small companies owned and operated by socially and economically disadvantaged persons develop their businesses, while also increasing the size and diversity of their supply chains.

In today's landscape, being certified as an MBE can unfortunately carry negative connotations, reminiscent of wearing a scarlet letter. Discrimination against minority businesses is magnified, casting a shadow of stigma upon them. However, without a level playing field, these businesses understand the uphill battle they face in competing with their counterparts.

In discussions with two African American female-owned businesses in Prince George's County, it became clear that their 2024 business plans included pursuing the 8a program. They saw it as an opportunity to diversify their client base and expand their horizons. However, recent events such as the Ultima lawsuit and the evolving requirements associated with the program narratives have prompted them to reconsider this strategy.

**Access to Capital:**
The minority businesses that we work with face prejudices and stereotypes when seeking finance or access to network/contracting opportunities. Specifically, as it relates to access to capital, a significant number of them report that they lack the foundational experience and are fearful when it comes to applying for loans. Because a great number of our businesses lack the finances that capture the attention of banks, they are unable to get the necessary coaching and assistance from already stretched banking professionals. This

was especially true during the COVID-19 Pandemic. Several of our minority-owned firms reached out to us to intervene on their behalf to get support from their local banks.

One of our minority businesses enrolled in our recently launched Capital Readiness Academy shared that he had just been turned down by a loan for operating capital. He believed that he was stereotyped, and no explanation was given for the denial. This Washington DC Cybersecurity Company has resorted to self-funding to grow its business.

A female minority-owned services company in Prince George's applied for a line of credit to provide operating capital as part of its business expansion. Although the company had been with its bank for years, it was also turned down without explanation.

**One of our Virginia-based 8 (a) firms reported the following challenges she faces on a daily basis:**

- Complex Procurement Processes: Government procurement processes are very resource-driving, complex, and can be unfair for small businesses. Navigating through proposal response requirements, meeting compliance requirements, and complex regulations are very daunting for small businesses. Mid-size and large businesses have proposal development departments with full-time staff to respond to proposals. "True" small businesses do not have the resources to do so.
- Unequal Competition: Small businesses often find themselves competing with larger, more established firms that may have greater resources and experience. For example, Joint Venture (JV) companies where large companies form a joint venture company with small businesses to capture small business set-asides opportunities. The Small Business Administration (SBA) used to have parameters for JVs limiting them to certain opportunities. Today, JVs can respond to any small business set-aside opportunities, including opportunities of $2M or less. This creates an uneven playing field and reduces the chances of "true" small enterprises securing government contracts. Another trend is contract consolidation.
- Financial Constraints: Small businesses may face challenges meeting the financial requirements for bidding on and executing government contracts, including bonding and insurance. Limited capital may also restrict their ability to participate in certain projects.
- Bureaucratic Hurdles: Bureaucratic red tape and lengthy decision-making processes within government agencies can delay contract awards. For small businesses, these delays can be financially burdensome and impact their overall operations or their ability to sustain their businesses.

- Subcontracting Barriers: Subcontracting can provide opportunities for small businesses; however, they often face barriers in establishing relationships with the Government customers. Building business relationships is crucial for accessing other subcontracting opportunities to expand capabilities and transition to becoming prime contractors.
- Cybersecurity Concerns: As government contracts increasingly involve digital components, small businesses may encounter challenges in meeting cybersecurity requirements. Ensuring compliance with evolving cybersecurity standards can be demanding for entities with limited IT and financial resources.

**Bonding Concerns**:
Lack of collateral is the main issue and understanding how bonds are structured. If businesses don't have assets that have equity or cash, they can't get the bond. If business owners don't have assets like housing to leverage, they can't get bonding. Some of our companies have even experienced bonding requirements on information technology contracts.

One of our minority-owned construction companies, located in Maryland, shared that bonding can be so incredibly expensive that they are relegated to always subcontract.

**Unfair Specs:**
Several of our firms located throughout the DMV have reported this as an experience. It is when proposals are written so closely aligned with the incumbent's skillset that it is cost-prohibitive to submit because of the high risks of not being successful. Requirements are written in such a way that the incumbent is the only one who can respond.

In lowest-bid type contracts, the cost of doing business is so high that it drastically cuts into their profit margins, but some will take the risk in desperation to survive.

**Bid-Shopping:**
One of our Baltimore-based IT firms has experienced this issue. This happens far too often when prime contractors ask for a bid for a proposal submission. Unfortunately, once the award is made, they never hear from the prime contractor. That prime contractor has possession of this information and numbers and shops them to other minority businesses to get a lower price. They also experienced it from a large healthcare firm. They were asked for their bid on several occasions. No communication or follow-up is conducted so you are left with the very real assumption that they only wanted to check the box.

In the private sector, these programs play a critical role in supporting minority-owned firms through mentorship and partnership, technical assistance, access to capital, and

contract access. They are essential to the continued growth of our business and our ability to drive economic growth in our local community.

In the Federal marketplace, these programs are the tools used to ensure the *"maximum practicable utilization"* of the available firms owned by socially and economically disadvantaged individuals, as required by law.

While the attack on federal programs to help minority businesses overcome bias in government contracting is an ongoing concern, we at CRMSDC also continue to pay very close attention to attacks on minority business programs in the corporate space.

Public policy and legal findings affect business behavior in the commercial marketplace. In addition to the formal court cases against private investment funds that aim to support diverse companies and cases against corporate supplier diversity and DEI programs, we are even hearing reports of activist shareholders objecting to any corporate spending on DEI programs (including supplier diversity) that "divert resources" to activities that "undermine the primary fiduciary responsibility of the corporate entity to maximize shareholder value." This coincides with 13 state attorneys general sending a letter to Fortune 100 companies – essentially threatening them against continuing their hiring, promotion, retention, and supplier diversity programs. This was then followed by 21 Attorneys General, led by the AG of Nevada, sending a letter making it clear that they did not stand with that position and did not support the baseless assertion that any attempts to address racial disparity are by their very nature unlawful.

There were already reports of a chilling effect; many corporations have already begun cutting back on DEI initiatives and funding based on concerns that they would make the company vulnerable to legal fights from other employees who believe the DEI programs discriminate against them and hurt their hiring, promotions, etc.

To put it bluntly, minority business programs are under sustained attack, which means that fair and open access to business opportunities for minority businesses is under attack. The Capital Region Minority Supplier Development Council has witnessed firsthand the resilience and ingenuity of minority entrepreneurs who strive to succeed despite facing systemic obstacles. However, these obstacles persist, limiting access to capital, contracts, and other critical resources necessary for business growth and sustainability.

Targeted federal business programs play a vital role in addressing these disparities and leveling the playing field for minority entrepreneurs. Initiatives such as the Minority Business Development Agency (MBDA) and its Business Center program, as well as the local and state MWOB programs, have demonstrated their effectiveness in providing technical assistance, access to capital, and procurement opportunities to minority-owned businesses.

However, more must be done to ensure that these programs are adequately funded, accessible, and responsive to the evolving needs of minority entrepreneurs. Additionally, there is a pressing need for greater enforcement of anti-discrimination laws and increased transparency and accountability in government contracting practices to combat ongoing racial disparities.

In conclusion, promoting opportunity and addressing ongoing racial discrimination in business requires a multifaceted approach that includes targeted federal business programs, robust enforcement of anti-discrimination laws, and proactive efforts to promote diversity and inclusion in government contracting. The Capital Region Minority Supplier Development Council stands ready to collaborate with policymakers, industry stakeholders, and community partners to advance these critical objectives and create a more equitable and prosperous future for all.

Thank you for the opportunity to share this testimony. I am happy to answer any questions you may have.

Sincerely,

Sharon R. Pinder
President & CEO

**WRITTEN STATEMENT FOR THE RECORD BEFORE THE U.S. SENATE COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP**

**PROMOTING OPPORTUNITY: THE NEED FOR TARGETED FEDERAL BUSINESS PROGRAMS TO ADDRESS ONGOING RACIAL DISCRIMINATION**

**Brenda Doles**
**Co-Founder, HealthCare Resolution Services, Inc**
**May 20, 2024**

Dear Senator Cardin and members of the U.S. Senate Committee on Small Business and Entrepreneurship:

Thank you for the opportunity to provide a statement for the record regarding the need to address ongoing racial discrimination in targeted federal business programs supporting minority-owned businesses. My name is Brenda Doles, and I'm the co-founder of HealthCare Resolution Services, Inc (HRCS), a consulting firm in the health information management industry with nearly 30 years of experience in federal and private contracting.

First, I would like to share how thankful I am that targeted federal programs such as the U.S. Small Business Administration's (SBA) 8(a) and the Minority Business Development Agency (MBDA) exist to provide the support, guidance, and assistance for small, minority-owned businesses like mine. These programs have served as a launching pad to better position my business to work with federal agencies and departments, but they have also enabled me to get in touch and build relationships with prime contractors. In fact, my small business graduated from the SBA's 8 (a) program in 2009, which better prepared me to compete for federal contracts, set my business up for success and secure opportunities with the federal government.

However, it is concerning to see how recent developments in both the federal and corporate industries are impacting programs and initiatives that support underserved and disadvantaged communities. They come at a time when even the best of efforts to reach gaps in resources and funding are falling short of levelling the playing field for minority-owned businesses like mine.

In the last few years, I've seen a steep increase in certifications and requirements to be eligible for federal contracts. Some of those requirements, although understandable, are cost-prohibitive and time-consuming, which creates barriers for my business and other small businesses, leaving us behind and taking us out of the competition. What's more, this rise in contractor requirements and certifications for minority-owned businesses is laying bare a problematic trend—only older, well-established, and well-funded businesses can meet those requirements. This, in turn, pushes smaller businesses out of the competition and makes it harder for any new small business to enter the federal contracting space.

Despite the recent increase in compliance requirements, my business has met most of them, albeit not without setbacks. One of our longest-standing contracts with the U.S. Department of Defense, awarded to us for more than 15 years, recently implemented a new requirement for small businesses to have a line of credit from a traditional financial institution. Unfortunately, due to financial challenges related to the COVID-19 pandemic, our business line of credit was terminated. And while we had sufficient funds to fulfill the contract, the lack of a line of credit disqualified us from this crucial source of funding, creating a cash flow strain on my business.

Similarly, a recent requirement from a prime contractor mandated a $5 million cybersecurity insurance policy for my business to fulfill a contract. This requirement seems excessive for a small business, especially when our annual revenue is only $2 million a year. These are only two examples of how increases in compliance requirements are creating barriers for small businesses like mine to participate in federal contracting but are certainly not the only harm coming our way.

What's more troubling these days is the persistent contract bundling that's plagued the industry. The federal government, in their efforts to ensure minority-owned businesses can participate in the space, are

requiring prime contractors to meet certain goals for Minority Business Enterprises, Women Business Enterprises, and more. To ensure contractors can meet all the qualifications and requirements, federal agencies bundle different suppliers, big and small, so they can get a piece of the pie by combining their qualifications. But once that contract is awarded and the project starts, I never hear again from the prime contractor, they're not held accountable to using the minority business enterprises that they had promised to utilize. I call, send emails, visit their offices, and try to set up appointments, but they choose not to follow up and respond. By this time, I've already hired and purchased the equipment for said contract, making an investment that I never get back. Ultimately, the prime contractor, which is often a bigger business with more resources and funding, moves ahead and fulfills the entirety of the contract without my business or the other small businesses that were originally bundled into that contract. The prime contractor gets paid, and the sub-contractors, which hold a portion of the certifications and requirements of the initial contract, never do. So not only are we being pushed out of the contract, but we are losing thousands of dollars in equipment and staff because we didn't get to participate. This is an ongoing practice that's been the norm for years, which is detrimental to minority owned enterprises and is running us out of business. I've heard from other minority owners about the similar difficulties they've experienced.

Therefore, it's imperative for the federal government to step in and monitor their targeted programs serving minority-owned businesses, while also mandating reasonable requirements for smaller businesses that are trying to compete in federal contracting. Despite federal agencies' efforts of creating set-aside contracts for small businesses, we still have work to do to remove and address biases and discriminatory practices in these programs.

If the federal government is truly serious about building equitable federal contracts, agencies need to pay close attention to contract bundling, and create checkpoints and guardrails to prevent bigger businesses from stealing, using, and leveraging minority-owned businesses to win contracts.

Thank you for your time.

Sincerely,

Brenda Doles
Co-Founder
HealthCare Resolution Services, Inc.

**Written Testimony of Jin Hee Lee**
**Director of Strategic Initiatives**
**NAACP Legal Defense and Educational Fund, Inc.**

**Submitted to the U.S. Senate Small Business Committee**
**In Connection with the May 6, 2024 Hearing Entitled**
**"Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"**

## I. Introduction

Thank you for holding this important hearing on discrimination against small business owners of color in federal contracting.

As the Supreme Court explained four decades ago, "[i]t is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."[1] Yet nearly forty years later, less than 2 percent of federal contracting dollars go to Black-owned businesses,[2] even though 9 percent of small businesses are owned by Black people.[3] As the witnesses at the hearing testified, these racial disparities in federal contracting do not result from a lack of qualified businesses. Rather, they are the product of pervasive discrimination against Black and other business owners of color.

For generations, the federal government both actively and passively participated in this discrimination by, among other things, encouraging racial discrimination in housing and lending; denying Black people equal access to government benefits; perpetuating racial wealth gaps through federal tax policy; and failing to remedy public and private discrimination through adequate civil rights enforcement. As a result, Black business owners face persistent barriers in access to financial and social capital that prevent them from starting and sustaining their businesses and hinder their ability to compete on a level playing field in their respective markets.

Racial discrimination that persists and is not fully remediated hurts the U.S. economy and threatens the stability of our multiracial and multiethnic democracy. To prosper as a nation, we must continue to invest in remedial initiatives like the U.S. Small Business Administration's 8(a) program to ensure that taxpayer dollars ameliorate, rather than exacerbate, racial inequality.

Founded in 1940 by Thurgood Marshall, LDF is the nation's oldest civil rights law organization.[4] LDF was launched at a time when the United States' aspirations for equality and due process of law were stifled by widespread, state-sponsored racial inequality. For over eight decades, LDF has been at the forefront of shaping the legal meaning of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, most notably through its watershed victory in *Brown v. Board of Education*. LDF has also always endeavored to ensure Black people's equal access to economic opportunity. To that end, LDF has litigated numerous economic justice cases[5] and filed *amicus* briefs supporting remedial federal contracting

---

[1] *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 492 (1989).
[2] Press Release 24-41, U.S. Small Business Admin., Biden-Harris Administration Awards Record-Breaking $178 Billion in Federal Procurement Opportunities to Small Businesses (Apr. 29, 2024), https://www.sba.gov/article/2024/04/29/biden-harris-administration-awards-record-breaking-178-billion-federal-procurement-opportunities.
[3] U.S. SMALL BUSINESS ADMIN. OFF. OF ADVOCACY, FREQUENTLY ASKED QUESTIONS (Mar. 2023), https://advocacy.sba.gov/wp-content/uploads/2023/03/Frequently-Asked-Questions-About-Small-Business-March-2023-508c.pdf.
[4] LDF has been fully separate from the National Association for the Advancement of Colored People (NAACP) since 1957.
[5] *See, e.g.*, *Lewis v. Chicago*, 560 U.S. 205 (2010); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); *Sniadach v. Fam. Fin. Corp.*, 395 U.S. 337 (1969); *Mandala v. NTT Data, Inc.*, 88 F.4th 353 (2d Cir. 2023); *Pickett v. City pf Cleveland*, No.: 1:19 CV 2911 (N.D. Ohio); *Taylor v. City of Detroit*, 368 F.Supp.2d 676 (E.D. Mich. 2005); *Hall v. Coburn Corp. of Am.*, 26 N.Y.2d 396 (N.Y. 1970); *Russell v. Coburn Corp. of Am.*, 298 N.Y.S.2d 893 (N.Y. App. Div. 1969); *Cline v. Credit Bureau of Santa Clara Valley*, 1 Cal.3d 908 (Cal. 1970).

programs.[6] LDF's mission has always been transformative: to achieve racial justice, equality, and an inclusive society.

## II. <u>The Federal Government Has Engaged, and Continues to Engage, in Active and Passive Discrimination Against Black People.</u>

For decades, the federal government has engaged in active and passive discrimination against Black people that continues to limit their ability to start and sustain their businesses. These actions, both past and present, include direct encouragement of housing and lending discrimination, denial of equal access to government benefits, tax policies that perpetuate the effects of these discriminatory policies, and inadequate civil rights enforcement that permits racial discrimination to continue. While the federal government may have ended some of its egregious conduct, it has never taken sufficient action to remedy the substantial harm that reverberates to this day and continues to limit the opportunities of Black people throughout the country.

### A. *Housing Discrimination*

Over the course of multiple decades, the federal government played a direct role in encouraging racial discrimination in housing and mortgage lending, intentionally devaluing Black-owned homes and discouraging lending in predominantly Black neighborhoods. At the same time, during the New Deal, federal programs dramatically expanded access to financial services, particularly through the rapid dissemination of low-cost credit to homeowners.[7]

The federal government's discriminatory housing policies, known as redlining, denied people of color—especially Black people—access to mortgage refinancing and federal underwriting opportunities.[8] In the 1930s, the Federal Home Owners Loan Corporation (HOLC) created maps to assess the risk of mortgage refinancing and set new standards for federal underwriting.[9] These maps assessed risk, in part, based on a neighborhood's racial composition, designating predominantly Black neighborhoods and other neighborhoods of color as hazardous.[10] The Federal Housing Administration, which covered the insurance of over one-third

---

[6] Br. of NAACP Legal Defense & Educational Fund, Inc., et al., as *Amicus Curiae, Rothe Development, Inc. v. U.S. Dep't of Defense & U.S. Small Business Admin.*, No. 15-5176 (Jan. 28, 2016 D.D.C.); Br. of NAACP Legal Defense & Educational Fund, Inc., as *Amicus Curiae, Dynalantic Corp. v. U.S. Dep't of Defense, et al.*, No. 95-2301 (Jan. 19, 2005 D.D.C.), 2005WL3803518;

[7] Written Testimony of Janai Nelson, President and Director-Counsel, NAACP Legal Defense and Educational Fund, Inc., *Fairness in Financial Services: Racism and Discrimination in Banking: Hr'g Before the Senate Banking Comm.*, Dec. 1, 2022; Mehrsa Baradaran, *Jim Crow Credit*, 9 UC IRVINE L. REV. 887, 888-89 (2019), *available at* https://scholarship.law.uci.edu/ucilr/vol9/iss4/4.

[8] *Id.*

[9] Danyelle Solomon, et al., *Systematic Inequality: Displacement, Exclusion, and Segregation How America's Housing System Undermines Wealth Building in Communities of Color*, CTR. FOR AM. PROGRESS (Aug. 2019), https://www.americanprogress.org/wp-content/uploads/sites/2/2019/08/StructuralRacismHousing.pdf; Testimony of Richard Rothstein, Distinguished Fellow of the Economic Policy Institute and Senior Fellow, Emeritus, NAACP Legal Defense and Educational Fund, Inc. on behalf of himself and Sherrilyn Ifill President and Director-Counsel NAACP Legal Defense and Educational Fund, Inc. Before the U.S. Senate Committee on Banking, Housing & Urb. Affairs, *Separate and Unequal: The Legacy of Racial Discrimination in Housing* 6 (Apr. 13, 2021), https://www.naacpldf.org/wp-content/uploads/LDF-Testimony-Senate-Banking-Racial-Discrimination-in-Housing_FINAL.pdf.

[10] BRUCE MITCHELL & JUAN FRANCO, NAT'L CMTY. REINVESTMENT COAL., HOLC "REDLINING" MAPS: THE PERSISTENT STRUCTURE OF SEGREGATION AND ECONOMIC INEQUALITY (Mar. 20, 2018), https://ncrc.org/holc/.

of the U.S. mortgage market by the middle of the century,[11] later developed similar maps.[12] In doing so, the federal government codified and perpetuated the racial stereotype that residents of color were financially risky and a threat to local property values. As a result, just two percent of the $120 billion in Federal Housing Administration (FHA) loans distributed between 1934 and 1962 went to nonwhite families.[13]

The federal government took additional steps to discourage lending to borrowers and communities of color.[14] For example, the FHA's 1939 Underwriting Manual explicitly prohibited lending in neighborhoods that were changing in racial composition.[15] The FHA also instructed appraisers to focus on the uniformity of neighborhoods, with the presumption that the highest value would be assigned to all-white neighborhoods,[16] and to investigate "areas surrounding a location . . . to determine whether incompatible racial and social groups are present, for the purpose of making a prediction regarding the probability of the locations being invaded by such groups."[17] In a 1941 memorandum concerning St. Louis, Missouri, the Federal Housing Administration similarly warned that "the rapidly rising Negro population ha[d] produced a problem in the maintenance of real estate values."[18] These racist views were then explicitly incorporated by the appraisal industry and reinforced in appraiser manuals through the mid-1970s.[19] Finally, the Federal Housing Administration refused to guarantee mortgages for developers who were building subdivisions unless the deeds included racially-restrictive covenants, effectively blocking development of integrated suburban communities.[20]

Institutionalized housing discrimination persisted for decades, compounding and legitimizing private bias and barring Black people from building inter-generational wealth through home ownership. In its 1961 report, the U.S. Commission on Civil Rights documented numerous discriminatory housing and lending practices, from requiring Black borrowers to make higher down payments and adopt faster repayment schedules, to refusing to approve loans on the basis of applicants' race.[21] Due to these discriminatory acts, many borrowers of color could only access credit in the form of a high-cost loans or contract sales[22] that imposed higher costs in

---

[11] KRISTEN BROADY, ET AL., BROOKING INST., AN ANALYSIS OF FINANCIAL INSTITUTIONS IN BLACK-MAJORITY COMMUNITIES: BLACK BORROWERS AND DEPOSITORS FACE CONSIDERABLE CHALLENGES IN ACCESSING BANK SERVICES (2021), https://www.brookings.edu/research/an-analysis-of-financial-institutions-in-black-majority-communities-black-borrowers-and-depositors-face-considerable-challenges-in-accessing-banking-services/.

[12] RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA (2017).

[13] *Id.* at 7.

[14] *Id.* at 8-10.

[15] *See* DALTON CONLEY, BEING BLACK, LIVING IN THE RED: RACE, WEALTH, AND SOCIAL POLICY IN AMERICA 37 (2010); *see also* DOUGLAS MASSEY & NANCY DENTON, AMERICAN APARTHEID: SEGREGATION AND THE MAKING OF THE UNDERCLASS 54 (1993).

[16] Scott N. Markey, Planning Spatial Obsolescence: Racial Capitalism, the Home Owner Loan Corporation, and the Production of Racialized Devaluation (University of Georgia, May 2023) https://s3.amazonaws.com/na-st01.ext.exlibrisgroup.com/01GALI_UGA/storage/alma/7F/B2/E8/80/6D/F3/3C/2B/80/CD/5C/60/02/22/E4/F5/MarkleyScottPHD.pdf?response-content-type=application%2Fpdf&X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Date=20230814T171800Z&X-Amz-SignedHeaders=host&X-Amz-Expires=119&X-Amz-Credential=AKIAJN6NPMNGJALPPWAQ%2F20230814%2Fus-east-1%2Fs3%2Faws4_request&X-Amz-Signature=10a706d255334ae3127bf1c0574e5a2e38d93beeb3820af15e4140bcf0e34031.

[17] NAT'L FAIR HOUS. ALLIANCE, ET AL., IDENTIFY BIAS AND BARRIERS, PROMOTING EQUITY: AN ANALYSIS OF THE USPAP STANDARDS AND APPRAISER QUALIFICATIONS CRITERIA (2022), https://nationalfairhousing.org/wp-content/uploads/2022/02/2022-01-28-NFHA-et-al_Analysis-of-Appraisal-Standards-and-Appraiser-Criteria_FINAL.pdf.

[18] Conley, *supra* note 15, at 37.

[19] *Id.*

[20] HEATHER MCGEE, THE SUM OF US 80 (2022).

[21] U.S. COMM'N ON CIV. RTS., BOOK 4: HOUSING (1961), https://www2.law.umaryland.edu/marshall/usccr/documents/cr11961bk4.pdf.

[22] Baradaran, *supra* note 7, at 893.

exchange for limited, if any, home equity—if they could access credit at all. Moreover, these acts devalued the equity that Black people accumulated in their homes.

Today, lenders continue to engage in redlining by refusing to provide credit services to individuals living in communities of color.[23] For example, a 2018 study of 61 metro areas across the country found that Black and Latinx homebuyers were more likely to be denied a conventional mortgage than their white counterparts, even when they: 1) made the same amount of money; 2) tried to borrow the same amount of money; and 3) wanted to buy in the same neighborhood.[24] A 2022 FDIC study likewise found that Black borrowers are more likely to be denied home loans and pay higher interest rates than white borrowers, even when controlling for other factors.[25] A report by the National Association of Real Estate Brokers published that same year found similar results.[26] In several cases, banks have allegedly redlined some of the same neighborhoods that were first redlined by HOLC maps in the 1930s.[27]

Racial bias and disparities in home valuations also remain a persistent problem. For example, a 2021 Federal Housing Finance Agency review of appraisals found that appraisers made many overt and indirect references to race, ethnicity, and other prohibited and irrelevant traits in their appraisal reports.[28] That same year, researchers at Freddie Mac analyzed millions of appraisals submitted for purchase transactions and found unexplained racial disparities in the percentage of properties that received an appraisal value lower than the contract price (the "appraisal gap").[29] This appraisal gap is more likely to occur in census tracts with predominantly Black or Latinx residents, and this racial gap increases as the concentration of Black or Latinx individuals increases, even when controlling for structural and neighborhood characteristics.[30] Noted fair housing researcher Dr. Junia Howell similarly found in her 2023 analysis of FHFA data that appraisers assess homes in predominantly white neighborhoods at double the value than similar homes located in neighborhoods of color with the same socioeconomic status and

---

[23] *E.g.*, Press Release, U.S. Dep't of Just., *Justice Department Secures Over $31 Million from City National Bank to Address Lending Discrimination Allegations* (Jan. 23, 2023), https://www.justice.gov/opa/pr/justice-department-secures-over-31-million-city-national-bank-address-lending-discrimination.

[24] *The Community Reinvestment Act: Assessing the Law's Impact on Discrimination and Redlining: Hearing Before the Subcomm. on Consumer Prot. and Fin. Insts. of the H. Comm. on Fin. Servs.*, 116th Cong. 14-15 (2019) (statement of Aaron Glantz, Senior Reporter, Reveal From the Center for Investigative Reporting), *available at* https://www.congress.gov/116/meeting/house/109303/witnesses/HHRG-116-BA15-Wstate-GlantzA-20190409.pdf.

[25] Stephen Popick, *Did Minority Applicants Experience Worse Lending Outcomes in the Mortgage Market? A Study Using 2020 Expanded HMDA Data*, FED. DEPOSIT INS. CO. (June 2022), https://www.fdic.gov/analysis/cfr/working-papers/2022/cfr-wp2022-05.pdf?source=govdelivery&utm_medium=email&utm_source=govdelivery.

[26] Debra Kamin, *Discrimination Seeps Into Every Aspect of Home Buying for Black Americans*, N.Y. TIMES (Nov. 29, 2022), https://www.nytimes.com/2022/11/29/realestate/black-homeowner-mortgage-racism.html?smid=tw-nytimes&smtyp=cur.

[27] Press Release, U.S. Dep't of Justice, Justice Department Reaches Significant Milestone in Combating Redlining Initiative After Securing Over $107 Million in Relief for Communities of Color Nationwide (Oct. 19, 2023), https://www.justice.gov/opa/pr/justice-department-reaches-significant-milestone-combating-redlining-initiative-after.

[28] Chandra Broadnax & James Wylie, Fed. Hous. Finance Agency, Reducing Valuation Bias by Addressing Appraiser and Property Valuation Commentary (Dec. 14, 2021), http://www.fhfa.gov/Media/Blog/Pages/Reducing-Valuation-Bias-by-Addressing-Appraiser-and-Property-Valuation-Commentary.aspx.

[29] Melissa Narragon, et al., *Racial and Ethnic Valuation Gaps in Home Purchase Appraisals*, FREDDIE MAC ECON. & HOUS. RES. NOTE (Sept. 2021), http://www.freddiemac.com/fmac-resources/research/pdf/202109-Note-Appraisal-Gap.pdf.

[30] *Id.*

comparable amenities.[31] Unfortunately, appraisal bias is increasing, rather than decreasing, with racial inequality in appraised values rising 75 percent over the last decade.[32]

B. *Discrimination in Government Benefits*

At the same time that it encouraged housing discrimination, the federal government also deliberately excluded Black people from other government benefits that offered economic security and a pathway to the middle class, including wage protections under the Fair Labor Standards Act, Social Security, and unemployment insurance.[33] These bills were structured to conform to the policy preferences of racist Southern members of Congress, who demanded that the bills uphold racial hierarchies by devolving authority to the states or excluding Black people entirely.[34]

The Servicemen's Readjustment Act—commonly referred to as the GI Bill—offers one of the starkest examples of state-sanctioned discrimination against Black people with respect to government benefits. After World War II, the federal government provided veterans with unemployment insurance, educational benefits, low-cost mortgages, and low-interest loans. However, 1.2 million Black veterans were denied equal access to many of these benefits despite serving their country during that conflict.[35] Like other New Deal legislation, the GI Bill "was deliberately designed to accommodate Jim Crow," shifting implementation to states and private entities and limiting federal oversight.[36]

Although the GI Bill made veterans eligible for low-interest home loans with no down payment, veterans first had to convince local banks to lend to them—yet banks denied the overwhelming majority of loans to Black veterans who were eligible for this government benefit.[37] According to historian Ira Katznelson, "In New York and the northern New Jersey suburbs, fewer than 100 of the 67,000 mortgages insured by the GI bill supported home purchases by non-whites."[38] In Mississippi, just two out of 3,229 U.S. Department of Veterans' Affairs-insured mortgages went to Black servicemembers seeking to finance a home, business, or farm in the first three years of the program.[39] Racially-restrictive covenants and redlining further limited where Black veterans could buy a home.[40]

Similarly, local Veteran Affairs officers, who had to approve GI bill benefits, made it difficult for Black veterans to access educational benefits or decreased the value of these benefits by steering them away from predominantly white, four-year colleges and toward vocational and

---

[31] JUNIA HOWELL & ELIZABETH KORVER-GLENN, APPRAISED: THE PERSISTENT EVALUATION OF WHITE NEIGHBORHOODS AS MORE VALUABLE THAN COMMUNITIES OF COLOR (2022), https://static1.squarespace.com/static/62e84d924d2d8e5dff96ae2f/t/6364707034ee737d19dc76da/1667526772835/Howell+and+Korver-Glenn+Appraised_11_03_22.pdf.
[32] Debra Kamin, *Widespread Racial Bias Found in Home Appraisals*, N.Y. Times (Nov. 2, 2022), https://www.nytimes.com/2022/11/02/realestate/racial-bias-home-appraisals.html.
[33] IRA KATZNELSON, WHEN AFFIRMATIVE ACTION WAS WHITE: AN UNTOLD HISTORY OF RACIAL INEQUALITY IN TWENTIETH-CENTURY AMERICA (2005).
[34] *Id.*
[35] Peter C. Baker, *The Tragic, Forgotten History of Black Military Veterans*, NEW YORKER (Nov. 27, 2016), https://www.newyorker.com/news/news-desk/the-tragic-forgotten-history-of-black-military-veterans.
[36] KATZNELSON, *supra* note 33, AT 113.
[37] EQUAL JUSTICE INITIATIVE, LYNCHING IN AMERICA: TARGETING BLACK VETERANS 38 (2017).
[38] Ira Katznelson, When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America 140 (2005).
[39] *Id.*
[40] *See* DEDRICK ASANTE-MUHAMMAD, ET AL., THE ROAD TO ZERO WEALTH: HOW THE RACIAL WEALTH DIVIDE IS HOLLOWING OUT AMERICA'S MIDDLE CLASS 15 (2017).

other non-degree programs.[41] Veterans who tried to use their benefits to study at segregated educational institutions were denied certain opportunities that were only available to white students.[42] Historically Black Colleges and Universities were underfunded and so overwhelmed by the influx of Black applicants that they had to turn tens of thousands of veterans away.[43] Ultimately, according to historian Hilary Herbold, "the segregationist principles of almost every institution of higher learning effectively disbarred a huge proportion of Black veterans from earning a college degree."[44]

In effect, the federal government provided a massive transfer of wealth and opportunity to white veterans while denying Black veterans similar wealth and opportunities. As a result, the cash equivalent of Black veterans' GI Bill benefits was only 40 percent of what white veterans received,[45] a difference in value of $170,000 per veteran in today's dollars.[46]

C. *Discrimination in the Federal Tax Code*

The federal government has perpetuated the racial wealth gaps created by its discriminatory policies through provisions in the federal tax code that allow white taxpayers to accumulate and retain capital at higher rates than their Black counterparts despite substantial evidence of these racially disparate impacts. For example, the federal tax code generally taxes income from investments (such as stocks, businesses, or real estate) at lower rates than income from salaries or wages.[47] These benefits are some of the largest federal tax expenditures, imposing a cost of nearly $150 billion per year on taxpayers in 2023.[48] Yet this policy disproportionately benefits wealthy white people,[49] who are more likely to own these kinds of investments.[50] According to a 2023 study by the U.S. Department of the Treasury, an estimated 92 percent of the tax value of the preferential treatment of these assets went to white families, even though white families represent only 67 percent of all families in the United States.[51] A 2022 study by a team of economists found that the racial disparities resulting from this preferential tax treatment of investment assets are driving the current racial wealth gap.[52]

---

[41] Aaron Morrison & Kat Stafford, *Veterans Day legislation targets GI Bill racial inequities*, AP NEWS (Nov. 11, 2021), https://apnews.com/article/lifestyle-business-veterans-affairs-world-war-ii-discrimination-b2d02e6030ef44e798d4e2d4165ae13e.
[42] Erin Blakemore, *How the GI Bill's Promise Was Denied to a Million Black WWII Veterans*, HISTORY (Apr. 20, 2021), https://www.history.com/news/gi-bill-black-wwii-veterans-benefits.
[43] *Id.*
[44] Hilary Herbold, *Never a Level Playing Field: Blacks and the GI Bill*, J. OF BLACKS IN HIGHER EDUC. 104, 107 (1994).
[45] Morrison & Stafford, *supra* note 41.
[46] *Id.*
[47] Tax Pol'y Ctr., Key Elements of the U.S. Tax System: How are capital gains taxed?, https://www.taxpolicycenter.org/briefing-book/how-are-capital-gains-taxed (last updated Jan. 2024).
[48] URBAN INST. & TAX POL'Y CTR., HOW THE FEDERAL INCOME TAX SYSTEM CAN WORSEN RACIAL DISPARITIES (Feb. 14, 2024), https://apps.urban.org/features/federal-income-tax-system-can-worsen-racial-disparities/.
[49] Assistant Secretary for Tax Policy Lily Batchelder & Deputy Assistant Secretary for Tax Analysis Greg Leiserson, U.S. Dep't of Treasury, Disparities in the Benefits of Tax Expenditures by Race and Ethnicity (Jan. 20, 2023), https://home.treasury.gov/news/featured-stories/disparities-in-the-benefits-of-tax-expenditures-by-race-and-ethnicity
[50] Urban Inst. & Tax Pol'y Ctr., *supra* note 48.
[51] Julie-Anne Cronin, et al., *U.S. Treasury Dep't, Tax Expenditures by Race and Hispanic Ethnicity: An Application of the U.S. Treasury Department's Race and Hispanic Ethnicity Imputation* (Jan. 4, 2023), https://home.treasury.gov/system/files/131/WP-122.pdf
[52] Ellora Derenoncourt, et al., *Wealth of Two Nations: The U.S. Racial Wealth Gap, 1860-2020*, NAT'L BUR. ECON. RES. (June 2022), https://www.nber.org/system/files/working_papers/w30101/w30101.pdf

D. *Inadequate Civil Rights Enforcement*

Finally, the federal government has failed to live up to its obligation to enforce federal civil rights laws, as the agencies charged with enforcement have never received sufficient funding or other necessary resources to do so.

While many civil rights laws permit enforcement by private parties, federal agencies have the broadest authority to enforce antidiscrimination laws in financial services, housing, employment, and other areas, as well as the unique ability to issue guidance and regulations to help covered entities comply with their legal obligations. Federal agencies also have additional investigative authority that is not available to private parties, such as subpoena power.

Yet these agencies are chronically underfunded and lack sufficient staff or other resources to investigate and respond to civil rights complaints, bring agency-initiated charges and systemic litigation, and issue affirmative civil rights policy guidance.[53] In its first comprehensive analysis of federal civil rights enforcement in 1970, the U.S. Commission on Civil Rights (the Commission) found "a number of [54][illegible]

While the federal government has made some progress in the decades since 1970, the failure to satisfy its enforcement obligations unfortunately continues to this day. In 2002, the Commission found that its "reviews of civil rights implementation, compliance, and enforcement at several agencies over the past decade revealed a system that was often unequal to the task."[55] Nearly 20 years later, in 2019, the Commission likewise found that federal "agencies generally lack adequate resources to investigate and resolve discrimination allegations within their jurisdiction, leaving allegations of civil rights violations unredressed."[56] In some cases, these resource constraints have worsened with time. Several agencies—including the Department of Justice's (DOJ) Civil Rights Division, which enforces fair lending laws in conjunction with other agencies, and the Department of Labor's Office of Contract Compliance Programs, which enforces federal contractors' affirmative action requirements— experienced a decrease in funding requests and allocations between FY 2016 and FY 2018, even as they fielded an increasing number of complaints.[57] In fact, five agencies were forced to cut staff during that time period.[58] Similar funding issues continue in federal agencies to this day: the number of staff at the U.S. Department of Education's Office of Civil Rights, for example, was cut in half between 1981 and 2022, even though that agency received more than six times as many complaints in 2022 as in 1981.[59]

Federal agencies' resource constraints have a significant impact on civil rights enforcement. Without sufficient resources, agencies generally do not meet their goals for timely investigation of complaints, including those filed by individuals who may have been significantly harmed from racial discrimination.[60] Some investigations can languish for years, ultimately

---

[53] U.S. COMM'N ON CIVIL RIGHTS, ARE RIGHTS A REALITY? EVALUATING FEDERAL CIVIL RIGHTS ENFORCEMENT (2019), https://www.usccr.gov/files/pubs/2019/11-21-Are-Rights-a-Reality.pdf [hereinafter ARE RIGHTS A REALITY?].

[54] Letter of Transmittal from Rev. Theodore M. Hesburgh, C.S.C. Chair, with fellow Commissioners and Staff Director, U.S. Comm'n on Civil Rights, to U.S. President and U.S. Congress in Federal Civil Rights Enforcement Effort: A Report, 1970, p. ii, http://www2.law.umaryland.edu/marshall/usccr/documents/cr12en2.pdf.

[55] U.S. COMM'N ON CIVIL RIGHTS, TEN-YEAR CHECK-UP: HAVE FEDERAL AGENCIES RESPONDED TO CIVIL RIGHTS RECOMMENDATIONS? VOLUME ONE: A BLUEPRINT FOR CIVIL RIGHTS ENFORCEMENT (2002), http://www2.law.umaryland.edu/marshall/usccr/documents/tenyrchekupvol1.pdf.

[56] ARE RIGHTS A REALITY?, *supra* note 53.

[57] *Id.*

[58] *Id.*

[59] U.S. DEP'T OF ED. OFF. OF CIV. RTS., FY 2022 ANNUAL REPORT TO THE PRESIDENT AND SEC. OF ED. (2023), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2022.pdf.

[60] ARE RIGHTS A REALITY?, *supra* note 53.

diminishing their effectiveness as witnesses, documents, and other evidence disappear with time. Indeed, the U.S. Equal Employment Opportunity Commission told the Commission that "it 'can only file lawsuits in a very small number of the charges where [EEOC] find[s] reasonable cause to believe that there was discrimination.'"[61] Similarly, the DOJ Civil Rights Division's enforcement actions decreased by 23.7 percent between FY 2016 and FY 2018 during the Trump Administration.[62] During this time, federal agencies also initiated fewer regulatory actions, rolled back civil rights rules, and repealed guidance, severely impacting civil rights enforcement that already had been severely deficient.[63] Despite the reversal of some of these harmful policies, federal agencies remain underfunded and under-resourced.[64]

As much as strong enforcement regimes promote deterrence, inadequate enforcement invites noncompliance. For example, weak enforcement of fair lending laws has likely contributed to the persistence of redlining that continues to disadvantage Black individuals' access to credit. In 1977, Congress passed the Community Reinvestment Act (CRA) to address America's systemic denial of credit services to Black and other communities of color. The CRA requires regulators to assess a financial institution's record of "meeting the credit needs of the entire community, including low- and moderate-income [LMI] neighborhoods."[65] Yet, as described above, banks continue to fail to meet the needs of Black borrowers and communities, even within LMI neighborhoods, and maintain their longstanding discriminatory practices.[66] Despite these lasting disparities in lending, 98 percent of banks nevertheless pass their CRA exams.[67]

Much of the disadvantages experienced by Black-owned businesses are directly attributable to the federal government, which has yet to fully remediate its past acts of explicit racial discrimination and continues to implement policies that perpetuate the harms from that discrimination. Thus, present-day barriers to opportunities for Black business owners are not products of chance in a free marketplace, but instead entrenched inequalities that are directly connected to the federal government's own complicity in acts of racial discrimination. The federal government should not allow these inequalities to persist.

## III. <u>Black Business Face Significant and Unfair Barriers Resulting from Government Discrimination.</u>

As a result of past and ongoing discrimination, unequal economic systems deprive Black people of the financial and social capital they need to create and sustain successful businesses. Barriers include lack of access to wealth, loans, and investments, causing Black-owned businesses to start with less funding and more debt, to encounter more obstacles to growth, and be more

---

[61] *Id.*
[62] *Id.*
[63] *Id.* at 58-60 (detailing testimony); Sherrilyn Ifill, *President Trump's First Year Was an Affront to Civil Rights*, TIME (Jan. 17, 2018 3:42 PM EST), https://time.com/5106648/donald-trump-civil-rights-race/; The Leadership Conference on Civil & Hum. Rts., Trump Administration Civil and Human Rights Rollbacks, https://civilrights.org/trump-rollbacks/ (last visited May 13, 2024).
[64] U.S. DEP'T OF ED. OFF. OF CIV. RTS., *supra* note 59.
[65] 12 U.S.C. § 2903(a)(1).
[66] LINNA ZHU, ET AL., SHOULD THE COMMUNITY REINVESTMENT ACT CONSIDER RACE? 10 (2022), https://www.urban.org/sites/default/files/2022-04/should-the-community-reinvestment-act-consider-race_1.pdf. *Id.* at 10..
[67] *Better Together: Examining the Unified Proposed Rule to Modernize the Community Reinvestment Act: Hearing Before the Subcomm. on Consumer Prot. and Fin. Insts. of the H. Comm. on Fin. Servs.*, 117th Cong. 2 (2022) (statement of Seema Agnani, Executive Director, National Coalition for Asian Pacific American Community Development), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba15-wstate-agnanis-20220713.pdf.

likely to fail than white-owned businesses. These barriers do not result from the fundamentals of the business or the acumen of the owner, but rather ongoing discrimination.

### A. *Lack of Access to Loans and Investments*

Access to capital—whether through bank loans or investments—is essential to small business creation and success. Yet Black small business owners are not able to obtain funding from banks and other investors at the same rates as white businesses, limiting their ability to start and succeed. These disparities exacerbate the harms of the racial wealth gap by limiting Black people's ability to utilize external financing opportunities outside of their own wealth.[68]

Black-owned businesses struggle to access bank loans. According to the Federal Reserve, creditworthy Black-owned firms were 7 percent less likely to get approved for business loans overall, and 20 percent and 17 percent less likely to obtain credit at large and small banks, respectively, than other businesses, even when controlling for business characteristics and performance.[69] Furthermore, when Black-owned businesses are approved for financing, it is often at substantially lower levels than white-owned businesses. For example, the Federal Reserve found that only approximately 14 percent of Black small business owners and 19 percent of Latinx small business owners received all the financing they sought from banks in 2021, compared to 34 percent of white small business owners.[70] Similarly, Black-owned businesses received loans through the Paycheck Protection Program that were approximately 50 percent smaller than white-owned businesses with similar characteristics.[71]

Banks often require Black business owners to take additional steps to secure a loan—actions that they do not ask white business owners to take. A 2019 study published in the Journal of Public Policy and Marketing found that 73 percent of Black loan applicants were asked to provide financial statements for their businesses, compared with only 50 percent of white applicants with comparable profiles.[72] The study also found that 31 percent of Black applicants were asked to provide their personal W-2 forms, while no white applicants received such a request.[73]

In addition, Black founders of businesses receive minimal funding from venture capital and other outside investors at every stage of growth. In 2022, for example, Black founders received only 1 percent of total venture capital funding; Black women founders received only 0.1

[68] KRISTEN BROADY, ET AL., BROOKING INST., AN ANALYSIS OF FINANCIAL INSTITUTIONS IN BLACK-MAJORITY COMMUNITIES: BLACK BORROWERS AND DEPOSITORS FACE CONSIDERABLE CHALLENGES IN ACCESSING BANK SERVICES (2021), https://www.brookings.edu/research/an-analysis-of-financial-institutions-in-black-majority-communities-black-borrowers-and-depositors-face-considerable-challenges-in-accessing-banking-services/; Mels de Zeeuw & Brett Barkley, *Mind the Gap: Minority-Owned Small Businesses' Financing Experiences in 2018*, CONSUMER & CMTY. CONTEXT, A FED. RESERVE SYST. PUB., Vol. 1, No. 2, p. 16 (Nov. 2019), https://www.federalreserve.gov/publications/2019-november-consumer-community-context.htm.

[69] DANA M. PETERSON & CATHERINE L. MANN, CITI GPS, CLOSING THE RACIAL INEQUALITY GAPS: THE ECONOMIC COST OF BLACK INEQUALITY IN THE U.S. 61 (2020), https://www.citigroup.com/global/insights/citigps/closing-the-racial-inequality-gaps-20200922.

[70] ANN MARIE WIERSCH, ET AL., U.S. FED. RESERVE SYS., THE SMALL BUSINESS CREDIT SURVEY 2022 REPORT ON EMPLOYER FIRMS 18 (2022).

[71] Rachel Atkins, et al., *Discrimination in lending? Evidence from the Paycheck Protection Program*, 58 SMALL BUS. ECON. 843 (2022).

[72] Sterling A. Bone, *Shaping Small Business Lending Policy Through Matched-Pair Mystery Shopping*, 38 J. of Publ. Pol'y & Marketing 391-399, https://doi.org/10.1177/0743915618820561.

[73] *Id.*

percent.[74] Black-owned businesses also receive less total funding, with white male founders receiving over $210 million compared to $91.1 million for businesses owned by Black, Latinx, and other underrepresented businesses owners combined.[75] In 2023, the amount of venture capital funding for Black-owned businesses declined precipitously, falling 71 percent nationally.[76] This decline was nearly double the overall decline in venture capital funding.[77]

As a result of this discrimination, Black business owners are less likely to rely on bank loans to launch their business than white entrepreneurs, and are more dependent on capital from friends, family, and their own personal resources[78]—even though these sources tend to yield less capital and are disproportionately less available due to the racial wealth gap.[79]

*B. Lack of Access to Wealth*

Due to government-sponsored discrimination and practices that limit wealth accumulation and devaluation of assets, Black people have less wealth than white people. These disparities limit the resources Black people have on hand to start their businesses and sustain them through hard times.

As a result of past and modern-day redlining and other unfair discriminatory practices, the gap in home ownership between Black and white individuals is wider now than it was in 1968, when Congress passed the Fair Housing Act (FHA).[80] In 2023, only 44 percent of Black people owned a home, compared to 72.7 percent of white people, and Black homeowners and renters are more cost-burdened than other racial groups.[81]

The racial wealth gap also continues to grow.[82] According to a 2023 analysis by the Federal Reserve's Survey of Consumer Finances, the median white household owns $240,120 more in wealth than the median Black household.[83] This persistent racial wealth gap held even as median

---

[74] MCKINSEY & CO., UNDERESTIMATED START-UP FOUNDERS: THE UNTAPPED OPPORTUNITY (Jun. 23, 2023), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/underestimated-start-up-founders-the-untapped-opportunity.

[75] *Id.*

[76] J. Scott Trubey, *Venture funding of Black startups in U.S., Atlanta withers, data show*, Atlanta J.-Const. (Feb. 20, 2024), https://www.ajc.com/news/business/huge-drop-in-vc-funding-of-black-owned-startups-in-us-and-atlanta-report-says/DGCP22KEMZBNDASTONGCCXA5XQ/.

[77] Chris Metinko & Gene Teare, *Drop In Venture Funding To Black-Founded Startups Greatly Outpaces Market Decline*, Crunchbase News (Feb. 27, 2024), https://news.crunchbase.com/diversity/venture-funding-black-founded-startups-2023-data/#:~:text=The%20decline%20in%20capital%20to,%25%2C%20according%20to%20Crunchbase%20data.

[78] PETERSON & MANN, *supra* note 69, at 59-60.

[79] *Id.* at 59.

[80] BRAD BLOWER ET AL., NAT'L CMTY. REINVESTMENT COAL., ADDING ROBUST CONSIDERATION OF RACE TO COMMUNITY REINVESTMENT ACT REGULATIONS: AN ESSENTIAL AND CONSTITUTIONAL PROPOSAL (2021), https://ncrc.org/adding-robust-consideration-of-race-to-community-reinvestment-act-regulations-an-essential-and-constitutional-proposal/#ftnref7.

[81] NAT'L ASSOC. OF REALTORS, 2024 SNAPSHOT OF RACE AND HOME BUYING IN AMERICA (2024), https://cdn.nar.realtor/sites/default/files/documents/2024-snapshot-of-race-and-home-buying-in-america-02-20-2024.pdf?_gl=1*1u2pfb2*_gcl_au*MjA2Njk1ODY1NS4xNzE1MTA4NzY1.

[82] *See* TOM SHAPIRO ET AL., LDF THURGOOD MARSHALL INST. & INST. ON ASSETS AND SOC. POL'Y AT BRANDEIS UNIV. THE BLACK-WHITE RACIAL WEALTH GAP 5 (2019), https://tminstituteldf.org/wp-content/uploads/2019/11/FINAL-RWG-Brief-v1.pdf; Andre Perry, et al., *Black wealth is increasing, but so is the racial wealth gap*, BROOKINGS INST. (Jan. 9, 2024), https://www.brookings.edu/articles/black-wealth-is-increasing-but-so-is-the-racial-wealth-gap/.

[83] Bd. of Gov. of the Fed. Reserve Syst., Greater Wealth, Greater Uncertainty: Changes in Racial Inequality in the Survey of Consumer Finances, Accessible Data, https://www.federalreserve.gov/econres/notes/feds-notes/greater-wealth-greater-uncertainty-changes-in-racial-inequality-in-the-survey-of-consumer-finances-accessible-20231018.htm#fig1 (last updated Oct. 23, 2023).

wealth increased overall by $51,800 from 2019 to 2022 because of the ongoing gaps in homeownership rates, as well as racial disparities in business and stock equity.[84] Gaps in stock equity are due, in part, to equally pervasive employment discrimination, which relegates Black people to lower wage jobs in less lucrative industries compared to white people with similar levels of education,[85] as well as industries that do not offer stock or pension benefits.[86]

C. *Consequences for Black Businesses*

As a result of persistent barriers to equal access and opportunities, Black-owned businesses face an uphill battle to survive. Many Black-owned businesses fail at early stages: While 20 percent of Black people start businesses, only 4 percent of these businesses survive the start-up stage[87]–the lowest survival rate of all new business[88] These negative outcomes are, in part, a consequence of undercapitalization. Black entrepreneurs start their businesses with approximately one-third the capital of white entrepreneurs, which amount to$35,000 compared to $107,000[89] According to a 2016 report by the Kauffman Foundation, "Black entrepreneurs . . . are almost three times as likely as whites to have profitability hurt by lack of access to capital and more than twice as likely as whites to have profits negatively impacted by the cost of capital.[90]

Black-owned businesses also struggle to grow and thrive. A disproportionate number of Black-owned businesses have no employees, and their growth is unfairly limited by inadequate access to wealth, loans, networks, and other resources. While the number of Black-owned businesses grew between 2017 to 2021, their overall share of employer businesses—i.e., businesses with at least one employee other than the owner-operator—remains low.[91] Although Black Americans made up 14.4 percent of the population in 2021, they represented only 2.7 percent of employers.[92] By contrast, white Americans made up 72.5 percent of the population but owned 82 percent of employer businesses.[93]

Black-owned businesses are also in more precarious financial positions. Even before the COVID-19 pandemic, "58 percent of Black-owned businesses were at risk of financial distress . . . compared with about 27 percent of white-owned businesses."[94] Black-owned businesses also earn

---

[84] Perry, et al., *supra* note 82.
[85] Ashley Jardina, et al., *The Limits of Educational Attainment in Mitigating Occupational Segregation Between Black and White Workers*, Nat'l Bureau of Econ. Research (Aug. 2023), https://doi.org/10.3386/w31641.
[86] PETERSON & MANN, *supra* note 69, at 48.
[87] David Baboolal, et al., *Building supportive ecosystems for Black-owned US businesses*, MCKINSEY INST. FOR BLACK ECONOMIC MOBILITY (Oct. 29, 2020), https://www.mckinsey.com/industries/public-sector/our-insights/building-supportive-ecosystems-for-black-owned-us-businesses.
[88] U.S. Small Business Admin. Frequently Asked Questions, *supra* note 3.
[89] *Id.*
[90] ALICIA ROBB & ARNOBIO MORELIX, EWING MARION KAUFMANN FOUNDATION, STARTUP FINANCING TRENDS BY RACE: HOW ACCESS TO CAPITAL IMPACTS PROFITABILITY: ANNUAL SURVEY OF ENTREPRENEURS DATA BRIEFING SERIES (2016), https://www.kauffman.org/wp-content/uploads/2019/12/ase_brief_startup_financing_by_race.pdf.
[91] Andre M. Perry, et. Al., *Closing the Black employer gap: Insights from the latest data on Black-owned businesses*, BROOKINGS INST., https://www.brookings.edu/articles/closing-the-black-employer-gap-insights-from-the-latest-data-on-black-owned-businesses/.
[92] *Id.*
[93] *Id.*
[94] CLAIRE KRAMER MILLS & JESSICA BATTISTO, FED. RESERVE BANK OF NEW YORK, DOUBLE JEOPARDY: COVID-19'S CONCENTRATED HEALTH AND WEALTH EFFECTS IN BLACK COMMUNITIES (2020), https://www.newyorkfed.org/medialibrary/media/smallbusiness/DoubleJeopardy_COVID19andBlackOwnedBusinesses.

lower revenues and are overrepresented in low-growth, low-revenue industries, such as food service and accommodations.[95]

Without sufficient business networks, Black-owned businesses are also underutilized. According to a 2016 study by the Minority Business Development Agency (MBDA), the median share of contract dollars awarded to Black-owned businesses across five key industries—architecture and engineering, construction, goods and supplies, professional services, and other services—was 4 to 44 percent of contractors' availability, compared with 49 to 61 percent for white-owned businesses.[96]

## IV. Racial Inequality Unduly Suppresses U.S. Economic Growth.

Racial inequality and discrimination in economic opportunities limit America's economic growth and competitiveness in the global economy. As Deputy Secretary of the Treasury Wally Adeyemo noted, "The exclusion of communities of color from the ladder of economic opportunity holds back economic growth for the entire country. Pursuing racial equity is a vital opportunity to drive innovation and boost growth across the U.S. economy."[97] Remediating the obstacles that artificially suppresses the success of Black small businesses would help the U.S. economy grow by trillions of dollars.

Racial segregation limited U.S. economic growth throughout American history, particularly in the Jim Crow South. Racial segregation in southern states drove educated Black and white people to leave the region and travel northward,[98] creating a drain of human capital and entrepreneurship. Southern lawmakers often rejected proposals that could have improved the regional economy, such as investments in education, in order to adhere to the racial hierarchy.[99] State-sanctioned racial violence undercut economic growth, destroying prosperous Black communities and causing severe economic losses.[100] This violence also decreased innovation and technological advancements in the region: Research by economist Lisa Cook found that riots and lynchings "depressed patent activity among blacks by more than 15 percent annually" across the country, and "conflict and hate-related violence, and the resulting uncertainty in property-rights enforcement . . . [,] may substantially affect the level, direction, and quality of inventive activity and economic growth."[101] As a result, the economy in the South became dependent on low labor costs, with limited incentives for innovation and development, leading to economic stagnation.[102] By contrast, reductions in racial occupational segregation and other forms of discrimination led to economic growth. Recent research by economists Chang-Tai

---

[95] David Baboolal, et al., *supra* note 87.
[96] MINORITY BUSINESS DEV. AGENCY, CONTRACTING BARRIERS AND FACTORS AFFECTING MINORITY BUSINESS ENTERPRISES: A REVIEW OF EXISTING DISPARITY STUDIES (2016), https://www.mbda.gov/sites/default/files/migrated/files-attachments/FINAL-MBDA-Disparity-Report-Summary.pdf.
[97] DEPUTY SECRETARY WALLY ADEYEMO, U.S. DEPARTMENT OF THE TREASURY THE AMERICAN RESCUE PLAN: CENTERING RACIAL EQUITY IN POLICYMAKING (2021), https://home.treasury.gov/system/files/136/American-Rescue-Plan-Centering-Equity-in-Policymaking.pdf.
[98] ROBERT A. MARGO, RACE AND SCHOOLING IN THE SOUTH, 1880-1950: AN ECONOMIC HISTORY (1990).
[99] Vanessa Williamson, *The Long Shadow of White Supremacist Fiscal Policy*, TAX POL'Y CTR. (Nov. 4, 2020), https://www.taxpolicycenter.org/publications/long-shadow-white-supremacist-fiscal-policy-0.
[100] Alex Albright, et al., *After the Burning: The Economic Effects of The 1921 Tulsa Race Massacre*, Nat'l Bureau of Econ. Res. (July 2021), https://www.nber.org/system/files/working_papers/w28985/w28985.pdf.
[101] Lisa D. Cook, *Violence and Economic Activity: Evidence from African American Patents, 1870 to 1940*, 19 J. OF ECON. GROWTH 221 (2014), https://lisadcook.net/wp-content/uploads/2014/02/pats_paper17_1013_final_web.pdf.
[102] Vanessa Williamson, *Democracy is good for the economy. Can business defend it?*, Brookings Inst. (Apr. 29, 2024), https://www.brookings.edu/articles/democracy-is-good-for-the-economy-can-business-defend-it/; Richard Hornbeck & Suresh Naidu, *When the Levee Breaks: Black Migration and Economic Development in the American South*, 104 AM. ECON. REV. 963 (2014), https://www.aeaweb.org/articles?id=10.1257/aer.104.3.963.

Hsieh, Erik Hurst, Charles I. Jones, and Peter J. Klenow shows that up to 40 percent of growth in the U.S. GDP per capita between 1960 and 2010 can be attributed to increases in the shares of women and Black men working in highly skilled occupations.[103]

Today, racial discrimination continues to hurt the U.S. economy. According to a 2020 study by Citi, the United States' aggregate economic output would have been $16 trillion higher since 2000 if we had closed racial gaps in wages, access to higher education, lending, and mortgage access.[104] Researchers at McKinsey estimated that the racial wealth gap alone will cost the U.S. economy between $1 trillion and $1.5 trillion between 2019 and 2028—4 to 6 percent of the projected GDP in 2028.[105] By contrast, financial institutions could earn approximately $2 billion annually in additional revenue if Black Americans had the same access to financial products as white Americans, and up to $60 billion annually in additional revenue if Black Americans reached full wealth parity.[106] Finally, equal parity in Black and Latinx business ownership compared to their share of the population, as well equalization of their business revenues with those of their peers, would generate an additional $1.6 trillion and $2.3 trillion respectively[107] and create millions of jobs per year.[108]

## V. <u>Our Multiracial and Multiethnic Democracy Depends on an Inclusive Economy that Gives Everyone the Opportunity to Thrive.</u>

Ultimately, racial inequality is not only bad for the economy; it is anathema to a functioning democracy. As President Biden recognized, "the ideal of equal opportunity is the bedrock of American democracy."[109] Systems that exclude people from economic opportunity and social mobility based on race are inherently unequal; exclusion, in turn, can impact how people experience and think about the validity and integrity of political institutions and processes.[110] While most research has focused on how economic inequality—which itself is driven by race in the United States—reduces support for democracy, exposure to systemic racial inequality has similar effects.

Extensive research has shown that economic inequality is associated with less support for democracy in principle and practice, reduced institutional trust, and lower levels of civic engagement—all of which threaten the stability of democratic institutions.[111] The United States has substantially higher income and wealth inequality than almost any other developed nation.

---

[103] Chang-Tai Hsieh, et al., *The Allocation of Talent and U.S. Growth*, 87 ECONOMETRICA 1439 (2019).
[104] PETERSON & MANN, *supra* note 69, at 7.
[105] Nick Noel, et al., *The economic impact of closing the racial wealth gap*, MCKINSEY & CO. (Aug. 13, 2019), https://www.mckinsey.com/industries/public-and-social-sector/our-insights/the-economic-impact-of-closing-the-racial-wealth-gap.
[106] Aria Florant, et al., *The case for accelerating financial inclusion in black communities*, McKinsey Inst. for Black Econ. Mobility Ex. 3 (Feb. 25, 2020), https://www.mckinsey.com/industries/public-and-social-sector/our-insights/the-case-for-accelerating-financial-inclusion-in-black-communities
[107] MCKINSEY & CO., *supra* note 74.
[108] PETERSON & MANN, *supra* note 69, at 4.
[109] The White House, Advancing Equity and Racial Justice Through the Federal Government, https://www.whitehouse.gov/equity/ (last visited May 14, 2024).
[110] BARBARA CRUIKSHANK, THE WILL TO EMPOWER: DEMOCRATIC CITIZENS AND OTHER SUBJECTS (1999).
[111] In the discussion below, we rely on research examining subjective as well as objective measures of economic inequality. Economic inequality can be captured by objective measures like the GINI coefficient, which reflects income distribution per capita or individual income. However, subjective measures of inequality, often captured by surveys, provide more insight into the relationship between economic inequality and democracy. Subjective measures elucidate how individual perceptions of inequality facilitate the relationship between economic inequality and political attitudes and behaviors.

and that inequality is growing at a faster rate than in many other democracies.[112] And, as discussed above, these income and wealth disparities disproportionately fall along racial lines.[113]

Economic inequality fosters feelings of distrust between groups, making it difficult for people to come together to identify and advance policies that benefit the whole community: people with more wealth want to keep what they have, while those at the lower end of the economic scale feel insecurity about what they do not have.[114]

Subjective experiences of economic inequality decrease democratic support and corrodes institutional trust, regardless of one's political ideology.[115] Perceived income inequality makes people with less wealth feel incapable of influencing policy and government, thus reducing trust in democratic institutions.[116] These perceptions are corroborated by research demonstrating that politicians are more responsive to wealthier constituents—which, given the connection between wealth and race in America, means constituents who are disproportionately white.[117] Research has further shown that rising perceptions of economic inequality coincide with more support for radical and autocratic forms of governance[118] and facilitates increasing desires for an authoritarian leader and the proliferation of conspiracy theories.[119]

Support for democracy similarly declines when people become aware of not only economic inequalities but systemic racial inequalities.[120] In a 2022 study, researchers conducted both quantitative and qualitative analyses using data from original and existing surveys to identify the impact of racial inequality on democratic legitimacy in the mass public.[121] They found that learning about the systemic inequalities confronting Black people undermined support for and

---

[112] Anshu Siripurapu, *The U.S. Inequality Debate*, Council on Foreign Relations (Apr. 20, 2022 5:14 pm EST), https://www.cfr.org/backgrounder/us-inequality-debate; CONGRESSIONAL BUDGET OFFICE, THE DISTRIBUTION OF HOUSEHOLD INCOME, 2018 (2021), https://www.cbo.gov/system/files/2021-08/57061-Distribution-Household-Income.pdf.

[113] In addition to gaps in wealth, Black people also earn less income than similarly-educated white people and are more likely to experience disruptions in employment. *See, e.g.*, Jardina, et al., *supra* note 85; Valerie Wilson & William Darity Jr., *Understanding black-white disparities in labor market outcomes requires models that account for persistent discrimination and unequal bargaining power*, ECON. POL'Y INST. (Mar. 25, 2022), https://www.epi.org/unequalpower/publications/understanding-black-white-disparities-in-labor-market-outcomes/.

[114] RICHARD WILKINSON & KATE PICKETT, THE SPIRIT LEVEL: WHY GREATER EQUALITY MAKES SOCIETIES STRONGEr (2010).

[115] Sarah Engler & David Weisstanner, *The threat of social decline: income inequality and radical right support*, 28 J. of European Pub. Pol'y 153 (2021), https://doi.org/10.1080/13501763.2020.1733636; Jolanda Jetten, et al., *Consequences of economic inequality for the social and political vitality of society: A social identity analysis*, 42 POLITICAL PSYCH. 241 (2021), https://onlinelibrary.wiley.com/doi/abs/10.1111/pops.12800; Jazmin L. Brown-Iannuzzi, et al., *Political Action in the Age of High-Economic Inequality: A Multilevel Approach*, 11 Soc. Issues & Pol'y Rev. 232 (2017), https://doi.org/10.1111/sipr.12032; Jonathan Krieckhaus, et al., *Economic inequality and democratic support*, 76 J. OF POLITICS 139 (2014), https://doi.org/10.1017/S0022381613001229.

[116] Simon Bienstman, et al., *Explaining the 'democratic malaise' in unequal societies: Inequality, external efficacy and political trust*, 63 European J. of Political Res. 172-191 (2024), https://doi.org/10.1111/1475-6765.12611.

[117] TASK FORCE ON INEQUALITY AND AMERICAN DEMOCRACY AMERICAN POLITICAL SCI. ASSOC., AMERICAN DEMOCRACY IN AN AGE OF RISING INEQUALITY (2004), https://www.apsanet.org/portals/54/Files/Task%20Force%20Reports/taskforcereport.pdf (summarizing research); ADAM LIOZ, DEMOS, STACKED DECK HOW THE RACIAL BIAS IN OUR BIG MONEY POLITICAL SYSTEM UNDERMINES OUR DEMOCRACY AND OUR ECONOMY (2014), https://www.demos.org/sites/default/files/publications/StackedDeck2_1.pdf.

[118] Engler & David Weisstanner, *supra* note 115; Jetten et al., *supra* note 115.

[119] Jetten et al., *supra* note 115.

[120] Jane Morgan, et al., *Racial Inequality and the Fragility of Democracy: How Unequal Citizenship Threatens Democratic Legitimacy* (Feb. 10, 2022), https://www.wpsanet.org/papers/docs/Morgan,%20Christiani,%20and%20Kelly_Racial%20Inequality%20and%20the%20Fragility%20of%20Democracy_2022_02_10.pdf.

[121] *Id.*

satisfaction with democratic governance, among both Black and white respondents regardless of partisan affiliation. The researchers also found that satisfaction with democracy is lower when there are deeper economic divides between Black and white residents; this dissatisfaction emerges among white as well as Black survey respondents. This research echoes earlier studies which found that racial inequality undermines trust in the institutions of government and provokes alienation from conventional democratic practices like voting, particularly for Black people and other underrepresented and under-resourced populations.[122]

## VI. Conclusion

Active and passive discrimination by the federal government continues to impede economic opportunity for Black-owned small businesses, preventing them from competing equally with their white counterparts. The federal government's decades-long failure to acknowledge and remediate systems of inequality, much of which can be directly attributed to the federal government's own actions, weakens our economy and undermines our democracy, given the illegitimacy of any political system that denies equal access to opportunity on the basis of race. We therefore urge Congress and the Administration to continue to invest in remedial measures that will help undo the harm caused by the federal government's complicity in creating present-day inequalities for Black-owned businesses and ensure that federal tax dollars do not perpetuate racial discrimination.

Thank you.

[122] *Id.* (citing studies).

The Statement of the

MBELDEF

**Minority Business Enterprise Legal Defense and Education Fund, Inc.**

Before the U.S. Senate Committee on
Small Business and Entrepreneurship
"Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"

May 19, 2024

Esteemed members of the Committee, thank you for holding this hearing. Before we begin, we want to recognize and thank Senator Cardin for his leadership on minority business issues over the years. We are especially grateful for the fact that he has been such a strong supporter of civil rights and ending discrimination throughout his time in public office. Senator Cardin was kind enough to *close* this hearing with a quote of MBELDEF's founder, Congressman Parren J. Mitchell. We want to *begin* our testimony with a quote from Senator Cardin from his opening statement at this very hearing:

> Racial discrimination has plagued our country since its inception. Unfortunately, we have not been able to truly reckon with our past in a way that completely breaks down the historical barriers of racial discrimination. Those struggles continue today and directly impact minority business owners' ability to operate and grow.

With these simple, eloquent sentences, Senator Cardin reveals that he understands something that too many others choose to ignore: businesses owned by people of color face more formidable challenges than businesses owned by white men because minority-owned businesses are the victims of race discrimination.

The reality is, however, that many people do not understand the myriad ways that this discrimination poses obstacles for minority entrepreneurs and minority business owners. Starting and growing a successful business is profoundly difficult. In order to fully understand the challenge for people who are Black, Hispanic or Latinx, Asian American, or Indigenous one must understand how racial discrimination enters the equation at every stage of the process.

MBELDEF has been fighting for the legal rights of minority business owners for over forty years. We have interviewed, counseled and represented minority business owners and entrepreneurs in court, in Congress, in regulatory contexts and in informal settings. Our work has spanned the public and private sectors at the federal, state and local levels. Over that time, we have learned a lot about how race discrimination impacts minority business owners and entrepreneurs. We have developed a deep expertise in a subject area that we devoutly wish did not exist.

The appalling truth is that the overwhelming majority of minority business owners can relate at least a few disturbing stories about the race discrimination they have endured. Still, many of them are unwilling to tell their stories due to fear of retaliation by customers and the risk of reputational damage by those who will accuse them of "playing the race card." Make no mistake, the reticence to speak out is not a simple matter of wanting to preserve existing relationships, contracts or market share. Business owners never have the luxury of thinking only of themselves and their own families; they have employees, investors and communities depending on them. Even when they are willing to absorb the personal pain of talking about some of their most debasing and humiliating experiences with race discrimination, sometimes they feel they simply cannot because too many lives and livelihoods are depending upon them.

Over the years, MBELDEF has sometimes stepped in to be the voice of these businesses. We know in detail the severity and the pervasiveness of the race discrimination they confront. The following provides a small portion of the various types of discrimination about which we have heard directly from minority business owners. Some business owners have experienced just a few of these types of bias. Most have experienced many of these different types of discrimination. It is the extremely rare minority business owner who reports never having to confront discrimination at all.

**Race Discrimination in Starting a Business:**

Successful business ownership requires education and training – in some cases many years of it. Over half of U.S. business owners are age 55 or older.[1] This means that the majority of today's business owners today attended elementary and secondary schools in the 1970s and 1980s (or earlier) that were still sharply segregated, often with the active participation of government actors at every level.[2] For people of color, that often meant severely under-resourced schools. Those same future business owners, if they chose to apply to college or professional school were less likely to be accepted than their white counterparts and less likely to be able to afford to attend. These problems in education, as well as difficulty in accessing credit and mortgages, were compounded by the legacy of racially discriminatory aspects of the federal government's G.I Bill even though it was enacted decades before today's cohort of business owners applies to attend institutions of higher education.[3]

For business ownership in many industries, the most common form of training comes from "working your way up" and gaining more and more advanced skills in a particular field or industry on the job. Here again, minority business owners report to us that they consistently confronted discrimination. In some contexts, this has meant employment discrimination based on race that has led to reduced salaries and opportunity for advancement and hostile and degrading working conditions and environments. In other contexts, aspiring minority entrepreneurs have historically been the victims of race discrimination by unions and apprenticeship programs that have prevented them from being able to obtain the same job experience and skills as their white competitors.

Another way in which discrimination based on race disadvantages minority business owners has to do with the unfairness in the way that public and private research and development (R&D) funding is distributed among institutions of higher learning. Minority Serving Institutions (including but not limited to Historically Black Colleges and Universities (HBCUs), High Hispanic Enrollment (HHE) institutions and Tribal Colleges and Universities (TCU)) receive a tiny fraction of public and private R&D investment.[4] This disparity, rooted in historical discrimination for which the federal government is directly responsible, reduces the opportunity for minority students (and future entrepreneurs) to participate in cutting-edge research, discovery

[1] https://www.census.gov/library/visualizations/2020/comm/business-owners-ages.html
[2] Business owners who are 75 years in 2024, started kindergarten the year that *Brown v. Board of Education* 347 U.S. 483 (1954) was handed down by the Supreme Court.
[3] Ira Katznelson, When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America 125-140 (2005).
[4] https://ncses.nsf.gov/pubs/nsb202326/patterns-of-academic-r-d-spending

and the development of intellectual property (patents, for example) in the rapidly growing and expanding fields of science and technology. It also reduces the funding available for minority graduate students and post-doctoral research fellows.[5]

The discrimination in education in training and R&D investment has a direct negative impact on the ability of aspiring minority business owners to earn the money needed to start a business. Of course, this only compounds an existing and egregious racial wealth gap rooted in historical discrimination by both public and private actors. That same racial wealth gap translates directly into the fact that people of color have fewer personal assets and are less likely to have family members who are available to invest in or support a start-up. Moreover, past and present discrimination in social networks and institutions (social clubs, business associations, civic organizations, etc.) has further isolated aspiring business owners and limited their access to potential private investment. We have repeatedly heard from minority businesses who told us that the country club or civic association in their community was both where a lot of business got done, and was either officially or unofficially closed to them based on the color of their skin.

Home equity is another source of capital that is dramatically reduced for minority business owners by race discrimination. Red-lining has sharply limited the value of the homes owned by many people of color[6] as compared to white homeowners and that has a direct impact on their ability to start a business. And these policies were also compounded by the racially discriminatory aspects of the federal G.I. Bill.[7] It is crucial to understand that red-lining and the racial discrimination in the G.I. Bill were both explicitly sanctioned by the federal government and many state and local governments. Many of the business owners we represent report to us that the only source of start-up capital initially available to them was the value of their home. In some cases, aspiring business owners sought to tap that value through home equity lines of credit and mortgages, and in other cases business owners were obliged to use their homes as collateral for business loans (often when such collateral was not required of white business owners). Again and again, we have heard from business owners that the artificially low value of their home made it impossible to obtain the loans that they needed. We have also heard stories of the stress, fear and sense of helplessness they felt at having to secure a needed business loan with the home their family depended on.

While access to capital through friends, family, personal assets and community members is limited by current discrimination and the present-day effects of past discrimination, so too is access to capital through banks and other financial institutions. There are thousands of pages of recent studies documenting the statistics that demonstrate discrimination in business lending based on race. But what we hear at MBELDEF are not the statistics, but the stories of frustration and humiliation that cause business owners to either give up or agree to outrageous interest rates that become one more threat to their business survival.

Over and over again, we meet minority business owners who don't apply for loans because they fear they will be rejected. And when they do apply, their fears are often proven correct and they

[5] https://ncses.nsf.gov/pubs/nsb202326
[6] https://research.stlouisfed.org/publications/page1-econ/2021/09/01/neighborhood-redlining-racial-segregation-and-homeownership
[7] Katznelson, at 163-164.

are rejected more often than their white counterparts with the same assets, balance sheet and credit risk. Even when their applications are accepted, they are forced to provide more documentation and more collateral than white business owners. Moreover, they receive less than the full amount they requested more often than white borrowers – and they pay higher interest rates than white borrowers. This type of discrimination is both infuriating and demoralizing, causing many business owners to give up before they ever get started. Every one of these discouraged business owners represents an engine of economic growth that never had the opportunity to bring jobs and wealth to their community and our nation.

**Race Discrimination in Owning a Business:**

In many ways, once a business owner has made it through the start-up phase, the discrimination only gets worse. In this context it is important to understand how hard-working, confident and self-reliant most business owners are. They go into business precisely because they want to build something special and productive that they can call their own. They are not people who want to take time out to file complaints or lawsuits alleging discrimination and mistreatment. Most of the time, they don't even want to talk about discrimination until it has become so overwhelming that they have no choice. The last place they want to be is in court – they want to be building their businesses. Still, the barrier posed by discrimination is sometimes too formidable to overcome. When that happens their families, their employees, their communities and our nation lose real opportunity and wealth.

As witnesses in this hearing testified, when minority business owners have the temerity to try to break through existing barriers, the reaction is usually swift and ferocious. Certainly, business involves competition, and new market entrants are rarely treated with kid gloves. But the reaction that greets new minority businesses is an order of magnitude less friendly. Business owners we work with tell us stories of prime contractors and customers in the public and private sectors who had previously been collegial and professional on the phone or through e-mail only to become markedly less so when they meet face-to-face for the first time. Sometimes the realization that a business owner is a person of color leads to a withdrawal of an opportunity on the spot. This type of overt racial discrimination is so common that some minority business owners tell us that they end up having to assign white employees specifically to handle client interface. Minority businesses have even related to us that some of their clients refuse to deal with the minority owner at all and will only work with the white subordinate. Frequently those same white employees tell us that they are often mistaken for the owner even when the minority owner is present. In fact, many white employees of minority-owned businesses recount that they never fully understood how pervasive racism against people of color is until they started working for a minority-owned firm.

The specifics of how race discrimination during business deals plays out differs from case to case, but there are a lot of recurring themes. For instance, most minority business owners relate stories of Old Boy Networks from which they are excluded but through which vital information and access flows. In both the public and private context, minority businesses have explained that "who you know" sometimes dictates whether you learn about contracts or other opportunities at all. Certainly, access to information about upcoming contracts or plans for the future that have not yet been advertised are frequently only available through these informal networks and

minority business owners report being intentionally excluded. Interestingly, as racial attitudes change (albeit slowly), some minority business owners report that one of the ways they learn about discrimination is from white competitors who have become friends. These relationships give minority business owners a window on what is being done to undermine them and confirms the intentionality of behavior that previously might have seemed ambiguous.

An additional area in which intentional racial discrimination plays an insidious role involves the prices minority business owners must pay for bonding, insurance and, just as in the start-up phase, credit. In all of these areas, minority-owned businesses report not only that they have trouble finding bonding and insurance agents who will take their business, but also that when they do, they are expected to pay higher rates than white-owned companies with equal or lessor balance sheets, books of business or credit ratings – solely based on their race. As has been documented in many studies, some of this discrimination in bonding and insurance has roots in the federal government condoned red-lining that also led to the undervaluing of homes in communities of color. But it is also rooted in stubborn discriminatory attitudes about the competence and capacity of minority-owned businesses. Business owners report to us that they often confront incredulity that they can perform well and complete jobs – even when they have done so many times in the past. These attitudes in turn lead to race discrimination in access to credit, insurance and bonding and the rates that they must pay for each.

**Race Discrimination in Contracting, Operation and Deals:**

Some of the ugliest racial discrimination happens during the process of actually doing business. Minority business owners report being intentionally excluded for discriminatory reasons from the formal and informal networks though which business opportunities are announced. Without timely notice of an opportunity to bid or pitch new business, minority businesses cannot succeed. Moreover, even when minority businesses learn in time of business opportunities, there are significant roadblocks thrown into their path through racially discriminatory and predatory business practices including, for instance, supply pricing discrimination. Minority business owners report to us that they know they are facing discrimination in pricing because they have actually tested their suspicions. Some report having a white employee or colleague call the same wholesaler or manufacturer and ask for prices on the same items – and get a lower price. When confronted, wholesalers and manufacturers often claim something about "preferred customer pricing" even when the white employee had never purchased from that company before.

Minority businesses also report being subject to racially discriminatory "bid shopping" where they do all the painstaking and often expensive work of preparing a bid, pitch or proposal only to have the customer turn around and reveal their work product to a competitor – often a majority male owned company. This practice is made all the more harmful where there is an anti-competitive understanding between the customer and their preferred supplier that the difference in price between the minority-owned company's lower bid and the majority owned company's higher bid will ultimately be made up in change orders, price adjustments or future contracts.

Bid shopping when used in this way is both racially discriminatory and an anti-competitive form of collusion. But very large majority-owned companies and other customers have been known to go much further in colluding to exclude – or drive out of business – minority contractors. During

this hearing we heard how very large construction companies tried to drive a company out of business by warning subcontractors with which they sometimes work not to work with the minority company. The explicitly threatened "or else" is that if the subcontractors work with an up-and-coming minority-owned business they will be cut out of all future work with the larger prime contractor. In some contexts, that is essentially the equivalent of threatening those subs with extinction. We have also heard of situations where there are more actors involved in the collusion including materials suppliers, bonding companies and even financial institutions. Very large companies have huge amounts of power to influence other actors in their industry just by threatening to withhold future work. All of this is sometimes known, or even reported, to government entities that rarely take action.

Do unfair restraints of trade like bid shopping and collusion between competitors happen to non-minority companies too? Of course they do. But the information we have been receiving for years from minority-owned companies (and sometimes their majority allies who are also affected) is that these anti-competitive practices are more frequently targeted at minority-owned firms for reasons of racial animus. It's crucial to understand that the results of this behavior are less competition and higher prices. These practices don't just hurt minority-owned companies, they hurt our entire economy. Moreover, when any type of restraint of trade occurs on public sector projects, they drive up prices to the public and are a waste of scarce taxpayer dollars.

Unlike collusion, some types of discriminatory practices aimed at minority-owned companies involve very public actions by public and private customers alike. Again, at this very hearing we heard reports of government entities denying prime contracts to a minority and woman-owned business despite the fact that her business was the lowest responsive and responsible bidder. Minority-owned businesses report that this is common. Sometimes they are simply denied the contract, despite being the low bidder, and the contract is given to a larger white-owned company. Sometimes, the government entity announces that the whole contract must be re-bid for murky and non-transparent reasons.

Something similar happens even more frequently in cases where the minority-owned company is a subcontractor. In these instances, in jurisdictions where there are remedial minority business programs in place to encourage primes to use minority sub-contractors, prime contractors will commit to the government agency and the minority-owned businesses at bid time that they plan to use a minority-owned company for some percentage of the work on the contract. When it comes to actually performing the contract, minority companies often report that they see far less work than was promised and sometimes none at all. Again, this very type of behavior was detailed by a witness at this hearing. When good remedial minority business programs are in place, this behavior is often explicitly prohibited – but still it occurs and recourse is usually limited. If the prime contractor is very large and works regularly with the government agency, that agency may look the other way or accept questionable explanations from the prime as justifications for reducing the work flowing to minority-owned businesses.

Another way that racially biased prime contractors, customers and government entities harm minority-owned companies is by slowing down payments. Minority-owned companies are disproportionately smaller than white-owned companies and, as we have discussed, they have fewer assets and less access to loans and credit. Under these circumstances a prime contractor or

malign government agency can do catastrophic damage to a minority-owned firm simply by paying very late. Sometimes these actions are accompanied by the discriminatory application of more exacting inspections on minority companies or the demands that work be re-done several times. Under these circumstances, the joy of winning an opportunity can quickly turn into the loss of a business, often with very few places to turn for recourse or help.

Similarly, larger competitors hoping to keep small minority firms "in their place" have often turned to weaponizing federal, state and local labor, licensing and tax audits as a way of injuring smaller minority-owned businesses. Again, one of the witnesses in this very hearing spoke about having been subject to several intrusive audits in one year at the same time as she was trying to break into a new geographic territory. Sadly, we often hear that government agencies used this way are either appallingly clueless about the fact that their compliance programs are being manipulated in racially discriminatory schemes – or they are actively complicit. Rarely have we heard of any large company being punished or even warned for filing, or causing the filing of, false and frivolous complaints targeting minority-owned businesses.

It's important to remember that often all of these racially discriminatory acts take place against the backdrop of racially stereotypical attitudes about the competence, capacity, and quality of work of minority businesses and their employees. These racially biased views often lead to double standards in the way that the work of minority-owned companies is evaluated. We have heard from both minority-owned businesses and even their non-minority allies, that racist inspectors and compliance officials are common in both the public and private sectors and that they repeatedly criticize and nit-pick when reviewing work by minority-owned businesses, demanding changes that they would never request from established white-owned companies. These reports come from every industry and area of the nation. In some cases, this has been reported to us as simple racial animus. In other cases, it appears to be part of more organized efforts to drive minority businesses off jobs or out of business. When any company is forced to redo work it adds cost to their project, in some industries that additional cost is enough to make a contract go from profitable to unprofitable.

In some areas and some industries, the conditions go well beyond stereotypical attitudes and involve overtly racist environments that include tolerance of racial slurs and racist symbols, intimidation, equipment sabotage and violence. These types of working conditions are both frightening and utterly exhausting for the minority-owned firms that are victimized. Minority business owners who try to compete in these environments exhibit enormous bravery, but the costs to both their psychic and physical well-being, and to their businesses, are enormous. We have heard reports of the aggressive use of racial slurs and taunts for Black and African American, Latinx and Hispanic, Asian Americans and Indigenous people. We have also heard accounts of the use of nooses, dead animals hung by nooses from equipment, racially offensive pictures and props, the sabotage or destruction of equipment and materials, and the threatening and intimidation of minority employees. And finally, in some cases we have had reports of threats of violence and actual violence against minority business owners and their employees.

Finally, we hear constantly from minority business owners that white-owned businesses that rave about their work on public contracts rarely or never solicit them to work on private contracts. This is a serious problem and essentially locks minority-owned businesses into public sector

work where they have at least some protections provided by minority contracting programs and prevents their expansion into the, often more lucrative, private sector. One very successful minority construction contractor memorably recounted a story to us in which he described a discussion with a white-owned prime contractor who had just finished praising his work and telling him how delighted they were to work with him. This minority subcontractor asked the prime: "Can I just ask one thing? If my work is so excellent, why do you never invite me to bid on any of your private work?" The white prime looked genuinely baffled and said: "But I don't *have to* use you on private contracts."

**Growing a Business to Scale**

With all of this as background, it is remarkable that any minority businesses succeed at all, but they do. Brilliant, hard-working and ambitious men and women of color across our nation have worked hard to build businesses and some of them have even been able to grow large enough to become leaders in their fields and communities. But it would be wrong to end our discussion about racial discrimination in business without making clear that all of the racial discrimination we have discussed is arguably worse for medium-sized and larger minority-owned businesses. First of all, these larger, more successful businesses are in a better position to actually compete with the larger majority-owned companies and so they are seen as more of a threat. Second, for the most part, larger companies usually do not have access to even the minimal protections provided by remedial minority business programs.

We have worked with many successful business owners who voice intense frustration about trying to continue to grow their business beyond a certain point. Once businesses approach the size and personal net-worth caps that most minority or disadvantaged business programs impose, they face a very stark choice: take their foot of the gas to keep their businesses small enough to continue to claim the small amount of protection that MBE-type programs provide, or keep growing and risk being annihilated by competition with businesses that are exponentially larger on top of all of the discrimination we have discussed above. Because business owners are generally hard-wired to continue to innovate and evolve, most choose to try to compete with businesses that are much larger and stronger – but the path is never easy.

It is ironic that against this background, not only do large white-owned and publicly traded companies have an enormous built-in advantage, but in some cases, they get special treatment that gives them additional unearned advantages. We have already mentioned the ambiguous and unevenly applied "preferred customer" programs and privileges that are common in the private sector. Moreover, advantages for larger, almost always white-owned or publicly traded, companies are ingrained in government and large private contracting at every level. The bundling of contracts into very, very large contracts for which only the largest companies can bid is one way this happens. Another way it happens is when governments let very long-term contracts or limit the bidding on "indefinite delivery/indefinite quantity" contracts only to very large companies or only to companies that are large enough to bid on every job under such a contract. Finally, the federal government itself has long had at least one policy – the Defense Industrial Base Policy[8] – that is literally designed mostly to keep huge defense contractors in

[8] https://crsreports.congress.gov/product/pdf/R/R47751

business and profitable in perpetuity in case our country has need of their services in times of war.

No one disputes the need for our nation to maintain its military readiness. Indeed, we believe our readiness would be enhanced if we included a more diverse group of contractors in the Defense Industrial Base. Our democracy must be ready to defend itself against those who would try to undermine our cherished freedoms and ideals. But one of our nation's most cherished ideals is that everyone in America deserves the equal protection of our laws. Indeed, most people in our nation agree that discrimination based on race is not just morally wrong, it is corrosive to our democracy. And yet, our nation has a long history of race discrimination against businesses owned by Black, Hispanic and Latinx, Asian American and Indigenous people. Surely some small fraction of the money spent to ensure that huge defense companies remain flush and ready could be allocated to remedy the discrimination that has plagued minority-owned companies throughout our nation's history.

Thank you.

The Joint Statement of the Minority Business Enterprise Legal Defense and Education Fund, Democracy Forward, Latino Justice PRLDEF, PolicyLink, Asian Americans Advancing Justice, the Southern Poverty Law Center, the Lawyers' Committee for Civil Rights Under Law, the National Urban League, and the Leadership Conference on Civil and Human Rights before the U.S. Senate Committee on Small Business and Entrepreneurship "Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"

May 20, 2024

MBELDEF
Minority Business Enterprise Legal Defense and Education Fund, Inc.

DEMOCRACY FORWARD

PolicyLink

latinoJustice PRLDEF

ASIAN AMERICANS ADVANCING JUSTICE AAJC

SPLC

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

National Urban League

The Leadership Conference

On behalf of the Minority Business Enterprise Legal Defense and Education Fund, Democracy Forward, Latino Justice PRLDEF, PolicyLink, Asian Americans Advancing Justice, the Southern Poverty Law Center, Lawyers' Committee for Civil Rights Under Law, the National Urban League, and the Leadership Conference on Civil and Human Rights we submit this testimony in connection with the Senate Committee on Small Business & Entrepreneurship's May 6, 2024 hearing "Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination," and ask that you enter it into the record.

Senator Cardin and members of the U.S. Senate Committee on Small Business and Entrepreneurship, thank you for holding this important hearing on the persistent and pervasive racial discrimination experienced by businesses and including our statement for the record. While remedial government programs like the Small Business Administration's 8(a) program have come under attack by extremist, anti-civil rights organizations, these programs remain a necessary and lawful means to address ongoing racial discrimination and one way to help ensure a more level playing field for minority business owners and entrepreneurs.

We cannot begin our testimony without expressing our gratitude for Senator Cardin's career-long efforts to help move our nation closer to its aspiration of racial justice and equality under the law. His steadfast commitment and unwavering kindness will be sorely missed.

There is currently a well-financed, highly-coordinated effort by the extremist anti-civil rights legal movement to reverse decades of progress towards greater racial equity. This effort seeks to undermine various programs that provide remedial assistance to people of color—assistance that was enacted in response to centuries of racial discrimination. These legal attacks include especially pointed efforts to dismantle federal programs intended to remedy discrimination against businesses based on the race and ethnicity of their owners. These same legal actors are also proposing legislation to silence all discussion about race and efforts to address racism in schools, workplaces and by government agencies at the state and local level across the nation.[1] Indeed, the two strategies are linked: they seek to erase knowledge about and discussion of race discrimination as a tactic in their mission to eliminate programs intended to remedy discrimination. Despite voluminous quantitative and qualitative evidence of intentional discrimination against minority-owned businesses, these groups have announced their plans to take down any program or policy that provides even a small amount of remedial assistance for minority business owners and entrepreneurs. As noted, minority business owners have faced and continue to face race-based discrimination.[2]

[1] Sarah Schwartz, *Who's Really Driving Critical Race Theory Legislation? An Investigation,* Ed Week (Jul 19, 2021), https://www.edweek.org/policy-politics/whos-really-driving-critical-race-theory-legislation-an-investigation/2021/07.
[2] *See e.g.,* Pacific Legal Foundation, Ending State-Based Racial Discrimination Model Policy, https://pacificlegal.org/wp-content/uploads/2022/04/6-PLF-Ending-State-Based-Racial-Discrimination-Model-Policy.pdf.

To be clear, none of the programs under attack, including the 8(a) and Minority Business Development Agency business development programs at the heart of today's hearings, have yet eradicated discrimination based on race or its effects. But these programs have made important progress toward leveling the playing field and provide crucial assistance to minority business owners and entrepreneurs who are severely disadvantaged by both current discrimination and the present-day effects of past discrimination. Without these programs, our nation cannot make progress toward ensuring that all people in our nation have a full and fair opportunity to establish and grow businesses and participate equally in our economy regardless of race or ethnicity.

As this hearing has demonstrated, there remains serious and pervasive intentional discrimination against minority-owned businesses. Indeed, numerous Congressional hearings over decades have revealed that people of color – specifically Black and African American, Latinx and Hispanic, Asian American, and Indigenous people – continue to face discrimination in every aspect of our society. Likewise, discrimination that specifically targets business owners of color and minority entrepreneurs has been painstakingly and repeatedly documented by Congress.[3]

The evidence of racial discrimination in the context of small business previously submitted to Congress has included quantitative evidence of statistically significant racial disparities in both public contracting and the private sector.[4] More recent studies likewise reveal that racial inequities remain pervasive. For instance, a recent report of the Federal Rail Administration found both qualitative and quantitative evidence of racial discrimination in both the public and private sectors across all major U.S. industries, with a special emphasis on industries related to rail.[5] Additionally, Congress has received hundreds of disparity studies documenting statistical inequities showing racial discrimination against businesses owned by people of color from states and localities from across the nation.[6]

As the testimony before this Committee at this hearing, and at hearings in the past, has evinced, the racial discrimination experienced by minority business owners goes beyond the cold,

[3] See, e.g., *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*, 61 Fed. Reg. 26,050 (May 23, 1996); *Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses* (2010) (*See Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Business: Hearing before Subcomm. on Gov't Mgmt., Org. and Procurement of the House Comm. on Oversight & Gov't Reform*, 111th Cong., 2d Sess. (2010) (testimony of David A. Hinson, National Director, Minority Business Development Agency, U.S. Dep't of Commerce)); Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022) (U.S. Dep't of Justice, *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (2022)).

[4] *See, e.g.*, Testimony of Dr. Jon Wainwright, *Driving Equity: The U.S Department of Transportation's Disadvantaged Business Enterprise Program*, a hearing before the Committee on Transportation and Infrastructure of the U.S. House of Representatives, H. Hrg 116-64, at 40; Expert report of Dr. Jon Wainwright in *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, (E.D. Tennessee 2:20-cv-0004) submitted to the record during this hearing.

[5] Federal Rail Admin., U.S. Dep't of Trans., Report to Congress Concerning Minority- and Women-Owned Small Businesses in Industries Related to the Rail Transportation Sector (2023), https://railroads.dot.gov/sites/fra.dot.gov/files/2023-01/Disparity%20Report%2020230111_0.pdf

[6] *See, e.g.*, Statement of Chairman Peter DeFazio, *Driving Equity: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program*, a hearing before the Committee on Transportation and Infrastructure of the U.S. House of Representatives, H. Hrg 116-64, Sept. 23, 2020 at 3.

impersonal statistics and overwhelmingly represents intentional discrimination. Again and again, business owners have come before this Committee and other committees of Congress and related their own experiences with race-based discrimination. These stories are hard to hear and reflect some of the most humiliating and degrading experiences these business owners have endured. The courage it takes to come forward and tell these stories should not be underestimated. At this hearing alone, witnesses have submitted testimony that they have been subject to racial slurs, denied contracts even when they were the lowest bidder, and bullied and intimidated by public officials and private corporate officials alike. These stories have echoes in many other hearings, both recent and from years past, and they also mirror the personal qualitative accounts included in the many disparity studies before Congress.

There is also significant evidence that the federal government itself has caused some of the discrimination that has prevented minority-owned businesses from succeeding. While this is true in a number of contexts, it has been especially harmful in the crucial area of business lending and credit where people of color have long suffered from unequal access to capital. One especially important example involves the federal government's historical role in red-lining, which has caused property owned by racial and ethnic minorities to be artificially undervalued and has worsened segregation and community disinvestment.[7] This is especially a problem for minority-owned businesses seeking to use their residence as collateral for business loans.

Given the undeniable evidence of rampant racial discrimination faced by minority business owners, the overwhelming majority of federal courts of appeals that have considered the constitutionality of federal programs to assist minority owned businesses and entrepreneurs of color have found those programs to be facially constitutional or have dismissed constitutional challenges on procedural grounds. For example, every federal circuit court that has considered the constitutionality of the U.S. Department of Transportation's Disadvantaged Business Enterprise program since it was revised in the aftermath of *Adarand Constructors, Inc. v. Pena*,[8] has found that program to be facially constitutional.[9]

Recently, a few district court judges, incorrectly importing precedent that applies to higher education into the minority contracting context, have begun to undermine federal remedial efforts that assist minority owned businesses. However, as multiple circuit courts have long made clear, the Supreme Court's opinions in *City of Richmond v. J.A. Croson Co.* and *Adarand*[10] remain good law. These *applicable* precedents firmly permit the continuation of federal, state, and local

---

[7] *See, e.g.*, RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA (2017); Testimony of Richard Rothstein, Distinguished Fellow of the Economic Policy Institute and Senior Fellow, Emeritus, NAACP Legal Defense and Educational Fund, Inc. on behalf of himself and Sherrilyn Ifill President and Director-Counsel NAACP Legal Defense and Educational Fund, Inc. Before the U.S. Senate Committee on Banking, Housing & Urb. Affairs, Separate and Unequal: The Legacy of Racial Discrimination in Housing 6 (Apr. 13, 2021), https://www.naacpldf.org/wp-content/uploads/LDF-Testimony-Senate-Banking-Racial-Discrimination-in-Housing_FINAL.pdf.

[8] 515 U.S. 200 (1995).

[9] *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000); *Sherbrooke Turf, Inc. v. Minnesota Dept. of Transp.*, 345 F.3d 964 (8th Cir. 2003); *W. States Paving Co. v. Wash. State DOT*, 407 F.3d 983 (9th Cir. 2005); *N Contracting, Inc. v. Illinois*, 473 F.3d 715 (7th Cir. 2007).

[10] *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).

programs, designed to remedy racial discrimination against minority business owners and entrepreneurs.

As a nation, we are facing a generationally defining moment in which what we do to uplift and safeguard the ability for all people to thrive will determine whether democracy will prevail. Indeed, democracy depends on a government that works for all people and seeks to remedy and remove barriers to opportunities for people and communities. Yet, progress in many communities, institutions, and halls of government to further racial and gender equity, and other forms of diversity and inclusion has been met with harmful and aggressive, anti-civil rights attacks, as evidenced by testimony we heard in this hearing. Efforts to remedy discrimination and ensure that America's vast resources are available to all are not just in the interest of minority business owners and minority entrepreneurs. Economic inequality, especially when based on race, undermines the stability, validity, and productivity of our nation. We must work collectively to make progress toward equality for all. There is no more compelling reason for our nation to recommit itself to ending racial discrimination and all forms of discrimination than the need to safeguard our democracy.

Thank you.

Mission Lenders Working Group
*Building Success in Underserved Communities*

Statement for the Record Submitted to the
Senate Small Business and Entrepreneurship Committee

For the hearing:
"Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"

Monday, May 6, 2024

Submitted on behalf of the Mission Lenders Working Group

Senator Cardin and members of the committee, on behalf of the Mission Lenders Working Group (MLWG), I write to thank you for convening a hearing focused on ensuring that all small businesses, particularly minority-owned businesses, can access the full range of resources they need to be successful. While the hearing was primarily focused on protecting and strengthening efforts to ensure that minority-owned businesses have access to federal contracting opportunities, witnesses also spoke to the barriers that too many minority and female entrepreneurs, especially those who are under-resourced and/or seeking to launch a new business, continue to encounter as they try to secure responsible and affordable financing for their venture. Our statement is focused on the SBA's Community Advantage (CA) program and how CA lenders (now CA SBLCs) have intentionally increased SBA-backed lending to under-resourced businesses and underserved communities - including increasing lending to under-resourced Black-owned and Hispanic-owned businesses.

The SBA initiated the CA pilot in 2011 using its authority to establish temporary pilot programs.[1] The CA pilot was explicitly created to increase lending to underserved businesses by granting select mission-driven, non-bank lenders the authority to offer an SBA guarantee on loans of up to $350,000 to small businesses unable to access a conventional bank loan even with the backing of a conventional 7(a) guarantee. CA lenders are required to deliver at least 60% of their CA loans to businesses in "underserved markets," currently defined by SBA to be a business entity that is a start-up, Veteran-owned, located in an Empowerment Zone or Enterprise Community, a HUBZone, a Low-to-Moderate Income (LMI) community, an Opportunity Zone, or a rural area.

In 2015, the MLWG network was organized as a way for CA lenders to share best practices as mission-focused lenders that are intentionally targeting under-resourced businesses. Members see their organizations as a coalition and stewards of the CA program with a shared commitment to financing, supporting, and sustaining underserved and underbanked small businesses. The lenders in the working group represent a diverse cross-section of the CDCs, CDFIs, and Microlenders participating as CA lenders including some of the largest CA lenders in terms of volume as well as smaller lenders, rural-focused lenders, and lenders targeting underserved urban centers, but all are seasoned lenders and all are purposefully financing, supporting and sustaining underbanked businesses.

CA lenders understand that access to capital is critical to the success of *any* small business. The 2022 Federal Reserve Small Business Credit Survey reported that applicant firms owned by people of color were about half as

---

[1] SBA, "Community Advantage Pilot Program," 76 Federal Register 9626, February 18, 2011. In identifying this authority, SBA referenced 15 U.S.C. §636(a)(25) and 13 C.F.R. §120.3.

likely as white-owned applicant firms to receive all the financing they sought.[2] In addition, businesses owned by people of color faced more financial and operational challenges than their white-owned counterparts and often were less successful at obtaining the funding needed to weather the effects of the pandemic.[3] The 2023 Federal Reserve Report on Employer Firms further highlighted that of the applicants seeking loans, lines of credit, and cash advances, Black-owned were among those least likely to be fully approved in 2022. For most firm categories, financing approval rates declined from pre-pandemic levels.[4]

The CA program has been successful in addressing the financing gap facing small businesses and emerging entrepreneurs that the SBA deemed to be in underserved markets for purposes of the CA pilot. While Black-owned or Hispanic-owned businesses are not considered to be "underserved" for purposes of meeting the 60% target for CA lenders, SBA-backed lending to these businesses has increased significantly with the introduction of the CA program. In FY 2023 alone, 800 CA loans, including 5 CA Lines of Credit were approved, for a total of $141 million with an average loan size of $177,000.[5] Of the 795 CA loans approved, Black-owned businesses received 157 loan approvals (19.7%), and were to Hispanic-owned businesses received 70 loan approvals (8.8%). In FY 2023, conventional SBA 7(a) lenders made 56,562 loans for $27.37 billion with 4,414 (7.8%) approvals for Blacked-owned businesses and 6,815 (12%) approvals for Hispanic-owned businesses.

The SBA recently certified 30 new lenders to participate in the CA program which brings the total number of CA SBLCs to 141. One of the new CA SBLCs is Baltimore Community Lending (BCL), a Maryland-based and focused Microlender and CDFI dedicated to delivering responsible, affordable lending products to help low-income, low-wealth, and other disadvantaged people and communities join the economic mainstream. In 2023, before becoming a CA SBLC, 87% of BCL's small business loan approvals were to minority-owned small businesses, 52% went to women-owned small businesses, and 52% went to start-up businesses. We focus on BCL's lending track record to highlight their work as a community-based lender intentionally developing and delivering products and services to address the needs of neighborhood businesses in their under-resourced markets.

The CA model works and is powerful for reaching under-resourced communities and underbanked small businesses and entrepreneurs - including Blacked-owned and Hispanic-owned businesses that are not - at least not yet- bankable. We appreciate Senator Cardin's leadership and support for promoting opportunity and recognizing the need for federal programs that seek to break down barriers and help create a level playing field where all aspiring entrepreneurs, including under-resourced minority-owned businesses, can access the tools they need to launch, grow and sustain a business. The MLWG looks forward to working with you and your colleagues to protect and strengthen federal programs - like CA - that do just that.

[2] Board of Governors of the Federal Reserve System (U.S). "Small Business Credit Survey (SBCS). 2022 Report on Firms Owned by People of Color." Fed Small Business. https://www.fedsmallbusiness.org/survey/2022/2022-report-on-firms-owned-by-people-of-color. Page 15

[3] "2022 Report on Firms Owned by People of Color: Based on the 2021 Small Business Credit Survey." 2022. *Small Business Credit Survey*. Federal Reserve Banks. https://doi.org/10.55350/sbcs-20220629

[4] "2023 Report on Employer Firms: Findings from the 2022 Small Business Credit Survey, page 18. " 2023. *Small Business Credit Survey*. Federal Reserve Banks. https://doi.org/10.55350/sbcs-20230308

[5] SBA 7(a) and 504 Summary Report Dashboard for FY23 https://careports.sba.gov/views/7a504Summary/Report?%3Aembed=yes&%3Atoolbar=no

NAWBO
National Association of Women Business Owners

**Statement for the Record**

**Lisa Brunet**
**CEO**
**DLZP Group, LLC**

***U.S. Senate Committee on Small Business and Entrepreneurship***

| | |
|---|---|
| **Date:** | May 6, 2024 |
| **Time:** | 10:00 AM |
| **Location:** | Bowie State University |
| **Topic:** | Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination |

NAWBO
National Association of Women Business Owners

Senator Cardin and other Members of the Committee thank you for the opportunity to share my story.

As a female Asian, I have faced discrimination all my life. Until you face discrimination or racism firsthand, it is hard to believe that it happens. In fact, according to the Harvard School of Public Health, 31% of all women say they have been discriminated against when applying for jobs due to their gender. The same research showed that more than a third (35%) of Asian Americans report personally experiencing people making insensitive or offensive comments or negative assumptions about their race or ethnicity. Despite the statistics, I never anticipated facing discrimination while trying to work with the federal government.

In 2019, I was certified by the U.S. Small Business Administration for 8(a). As you already know, Congress established the 8(a) program as a nine-year program created to help firms owned and controlled by socially and economically disadvantaged individuals. Businesses like mine receive training and technical assistance to bolster our ability to compete effectively in the American economy. In addition, the SBA works with federal agencies to promote using 8(a) businesses to ensure equitable access to federal procurement opportunities. I was excited to join this group of companies, and I understood it did not mean it would be a free ticket to federal contracts.

At first, everything was going great. In March 2020, right before the world shutdown, I was given a contract from an agency we spoke with for the past year. Then, the 8(a) world turned upside down. COVID changed the dynamics entirely. The federal government shifted to working from home without in-person meetings. Without in-person meetings, all our contacts disappeared, and the long-term relationships developed over countless meetings vanished. My contacts were no longer accepting meetings to talk, and overnight, I went from having regular touchpoints with select agencies to now being a number.

In 2021, I began attending events when everything started opening back up. Unfortunately, these events were not the same as just two years prior. Moreover, many of the agencies I met with in 2019 were not open to meeting at all. It did not take me long to realize that I needed to change my strategy. It was happening in my work world, and my personal world backed up my intuition. For example, I spoke with Representatives from Texas on behalf of a nonprofit about rare diseases. The Representatives were happy to meet and always responded to my letters. Then, on behalf of the 10,000 Goldman Sachs Small Business Program as a minority business owner, when I tried to engage with the Hill, the meetings were canceled with the representatives repeatedly, and I never received responses to my letters. All of this told me if I wanted to make any headway in the federal sector, I needed someone who had the connections and was part of that "network." I was actively looking for the right person, and after doing the research, I realized I needed a Caucasian male to be my point of contact to build out my work with the federal government.

Thus, in the fall of 2021, a seasoned male Caucasian Business Development Representative was looking to transition from his current position to a socio-economic firm. His position before joining

NAWBO
National Association of Women Business Owners

ours was with another small business he helped grow, but he had experience with large prime vendors before then. He was an older male with all the right connections, so I hired him to start at the beginning of 2022. Within a couple of months, he met with agencies through his contacts. We attended a Federal Contracting Conference together where many of the executives from various federal agencies go, and it was apparent that having a Caucasian male representing a female Asian 8(a) firm was the way to make traction at the federal level. He was the first hand everyone shook, and I waited in the wings for the introduction. While the contracts did not come flowing in, it was very apparent that I needed a Caucasian male to make headway again and develop contacts to lead to new contracts.

This was not just one instance. There are many events that I attend where people assume that I am an employee and not the owner of the company. Caucasian men constantly question me about my expertise in running a company and my background. It is worse with certain agencies that do not have a diverse leadership staff. I attended an industry day last June, of which 70% were Caucasian men from other vendors, large primes, and leadership. Even though I was invited to attend since we were SMEs in the area they spoke about, I felt highly unwelcome.

To date, I have had four contracts with the federal government, and currently, we are trying to be a subcontractor on another project. Still, our business relationship is turning into a bunch of broken promises. We worked on the proposal, and during the response phase, the documentation mentioned that we would receive four resources to start with, with the numbers to increase after the first six months of the contract. We mentioned we did not have a facility clearance, and not everyone on our team had it. The large prime said that was not a problem and they would work with us to ensure our team was on the project.

We are in the final phase before the contract award and have been asked to submit our resources. They have changed the requirements and are no longer willing to work with us to get team members' clearance. They have also changed the resources we can submit. They have given us an opportunity to submit additional resources, but they are extremely specialized. One of our resources who has worked for this agency and worked on their implementation was rejected without explaining why he was not a fit.

When we reached out to some of the people in the specialized field, a number of them said they heard directly from the large prime about the opportunity over a month ago. They felt that the large prime was pushing their weight around to get them to sign directly with the large prime vs going with a sub-contractor.

However, despite the constant hurdles and hoops we jump through, I believe that despite the chaos that ensued post-COVID, the 8(a) program was the only entry point for an Asian women business owner like me. The federal government must continue programs to keep our nation's economy vibrant. Moreover, they need to expand them and include more set-asides for these businesses to ensure we can continue playing a role in the procurement system.

NAWBO
National Association of Women Business Owners

I am just one story out of many I hear from fellow women business owners in the National Association of Women Business Owners. For decades, we have been working tirelessly to ensure that women, especially minority women, can reach a level playing field in the federal marketplace.

I appreciate you taking the time to listen to my story. I hope this knowledge helps move the women business owner economy forward because we are indeed the engines of our economy.

nglcc
National LGBT
Chamber of Commerce

**National LGBT Chamber of Commerce (NGLCC)**
**Statement for the Record**
**U.S. Small Business Committee on Small Business and Entrepreneurship**

**May 6, 2024**

The National LGBT Chamber of Commerce (NGLCC) respectfully submits the following statement for the record in response to the Senate Committee on Small Business and Entrepreneurship bearing held on Monday, May 6, 2024, regarding the 8(a) field hearing.

The 8(a) Business Development Program stands as a crucial cornerstone for diverse small businesses, including LGBTBEs, seeking to expand their operations by engaging with the federal government. Through the 8(a) program, LGBT+ small businesses have gained access to federal contracts, mentorship programs, networking opportunities, and business development assistance that they may not have pursued or accessed otherwise.

These aspects of the 8(a) program are vital for leveling the playing field for diverse-owned businesses that might otherwise encounter barriers when entering the federal marketplace.

The 8(a) program serves as a vital resource for LGBT-diverse owned businesses. 8(a) certified firms have access to a number of free and low cost resources from boot camp training, networking opportunities and educational webinars that can help them access capital and grow their businesses when they may otherwise struggle to do so. Access to capital remains a top concern for LGBT owned small businesses, as they are less likely to receive funding that they apply for compared to other demographics. This was especially true during the pandemic, when 1 in 6 LGBT owned firms reported that they had received none of the pandemic relief that they applied for, compared to 1 in 10 non-LGBT owned firms. That said, federal contracting can serve as an important revenue stream for LGBT owned firms amidst a challenging lending market.

In conversations with members of the NGLCC network, we heard from the owner of an 8(a) certified LGBTBE owned firm. She shared instances where she felt compelled to conceal aspects of her identity, particularly her sexual orientation, due to not feeling welcomed or supported in various contracting settings. These experiences were emotionally and mentally taxing for her, as living authentically is significant, as it is for most of us. For this member, having to conceal her sexuality felt personal and despite her professional credentials, it made her question her place in

the federal contracting arena. Even as discrimination can be subtle and challenging to identify, it has lasting impacts that translate into missed or lost opportunities, discouraging diverse-owned businesses from pursuing contracting opportunities.

Feedback from our members also indicated that despite the program's benefits, improvements are needed to better serve diverse-owned businesses. Some members expressed reluctance in disclosing their 8(a) certification to clients and prospective investors due to fears that it may negatively impact their businesses. Additionally, members shared that while the program offers valuable networking opportunities, graduates often leave with an insufficient professional network and limited opportunities to leverage their certification to grow their businesses.

Regarding the reluctance of 8(a) firms to disclose their certification, members specifically expressed concern that potential investors and clients would make unfair assumptions about the capacity of an 8(a) certified firm to execute on a project. That said, there are misconceptions regarding the 8(a) program that stem from systemic bias towards the businesses that utilize the program to help prepare their businesses to prepare themselves for contracts.

The 8(a) Business Development Program is a vital resource for diverse-owned businesses, preparing them for contracting opportunities in the public and private sectors while addressing challenges that stem from discrimination. It provides meaningful opportunities for firms to prepare for larger contracts despite certain limitations.

NGLCC appreciates the opportunity provided by the Senate Committee on Small Business and Entrepreneurship to offer feedback on this critical issue. We look forward to being a resource as the Committee continues to explore solutions that create more opportunities for LGBT+ owned businesses.

NMSDC
National Minority Supplier Development Council

**National Minority Supplier Development Council**
**Statement for the Record**
**Senate Committee on Small Business and Entrepreneurship**
**U.S. Small Business Administration, U.S. Small Business Administration 8(a) Field Hearing - May 6, 2024**
**Bowie, Maryland**

The National Minority Supplier Development Council (NMSDC) values the opportunity to provide insights on the U.S. Small Business Administration (SBA) 8(a) Business Development Program, underscoring the pivotal role it plays in combating racial discrimination within federal contracting.

The 8(a) Business Development Program is essential because it addresses the systemic racial discrimination and biases that minority-owned businesses frequently encounter in the federal contracting space. For instance, Ronnette Meyers, president and CEO of JLAN Solutions, faced both overt and subtle discrimination throughout her career, from unsettling questions about her presence in technical roles to being marginalized and dismissed during professional networking sessions. These discriminatory practices hindered her ability to secure contracts, build partnerships, and grow her business. Without the 8(a) Program, minority entrepreneurs like Meyers would struggle even more to overcome these barriers, as the it offers vital access to government contracts, enhances networking and mentorship opportunities, and provides targeted outreach and education. It not only helps level the playing field but also empowers minority-owned businesses to build credibility, gain economic stability, and achieve long-term success.

The 8(a) Program contributes to leveling the playing field for minority-owned businesses that often encounter systemic barriers in the competitive federal marketplace. By providing access to government contracts specifically reserved for program participants, the program offers these businesses a revenue stream and an opportunity to establish credibility and build a performance track record that is often out of reach due to racial and economic disparities.

While the 8(a) Program is not without its limitations in fully eradicating racial discrimination, it is a vital component of helping minority-owned enterprises overcome the unique barriers and challenges they face. Members of our community report experiences of isolation and subtle biases, often as a result of racial discrimination, which affects their ability to secure contracts and effectively network within the industry. These challenges are not exclusive to the 8(a) Program but are pervasive throughout the federal contracting space. As a result, many businesses face significant barriers to growth, including difficulties in accessing capital and other critical resources. Moreover, discrimination is not limited to race. Gender, age, and disability biases also play a role in limiting opportunities. Even participation in the 8(a) Program does not fully shield members from these systemic issues, highlighting the need for broader, more inclusive reforms to support minority-owned businesses in overcoming these obstacles.

These issues highlight the need for continual improvements to address and mitigate the impact of such discrimination. The 8(a) Program has been instrumental in promoting economic diversity and empowerment among minority-owned businesses, offering numerous benefits that help MBEs overcome

barriers:

- **Enhanced Monitoring and Accountability:** It ensures greater transparency in how contracts are awarded. Regular audits and mandatory reporting by federal agencies on their contracting practices with minority-owned businesses are essential to identify and address racial biases. This accountability helps create a fairer distribution of opportunities for MBEs, highlighting the importance of maintaining and strengthening these measures within the program.
- **Expanded Networking and Mentorship Opportunities:** It offers MBEs unique networking and contracting opportunities that might otherwise be inaccessible. By enhancing mentor-protégé programs, minority business owners gain access to and learn from successful entrepreneurs in their field. Structured and intentionally inclusive networking opportunities provided by the program are vital for the growth and success of MBEs, underscoring the positive contributions of the program.
- **Targeted Outreach and Education:** Many minority-owned businesses are not fully aware of the 8(a) Program or how to navigate its complexities. Its targeted outreach and educational workshops empower these businesses with the knowledge needed to leverage the program effectively. By increasing awareness and understanding, more MBEs can take advantage of the resources and opportunities available to them, demonstrating its critical role in supporting MBEs.

While the 8(a) Program offers significant support to MBEs, broader reforms in federal contracting are necessary to combat the impact of racial discrimination and support minority-owned businesses in overcoming systemic barriers. Its success exemplifies how targeted initiatives can foster economic inclusivity, emphasizing the need to protect and recognize the importance of it in the broader landscape of federal contracting.

This program remains critical for promoting economic diversity and empowerment among minority-owned businesses. However, to realize its full potential in combating racial discrimination, continued updates are essential. NMSDC is eager to collaborate with the Senate Small Business Committee, the SBA, and other stakeholders to refine and strengthen the program, ensuring it effectively addresses the barriers faced by minority business enterprises today. While more can be done, the 8(a) Program is a powerful catalyst for economic inclusivity and a model for overcoming systemic racial barriers in federal contracting. It is essential to protect and recognize its importance in supporting MBEs.

SMALL BUSINESS MAJORITY

**WRITTEN STATEMENT FOR THE RECORD BEFORE THE U.S. SENATE COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP**

**PROMOTING OPPORTUNITY: THE NEED FOR TARGETED FEDERAL BUSINESS PROGRAMS TO ADDRESS ONGOING RACIAL DISCRIMINATION**

May 6, 2024
John Arensmeyer
Founder & CEO, Small Business Majority

Dear Chair Shaheen, Ranking Member Ernst, and members of the Committee on Small Business and Entrepreneurship:

As a leading representative of America's 33 million small businesses, Small Business Majority is pleased to provide written testimony to the U.S. Senate Committee on Small Business and Entrepreneurship regarding efforts to preserve, protect, and expand programs targeting minority entrepreneurs.

Small Business Majority is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. From our nine offices across the country, we engage our network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth. Our work is bolstered by extensive research and deep connections with the small business community that enables us to educate stakeholders about keys issues impacting America's entrepreneurs, with a special focus on the smallest businesses and those facing systemic inequities.

Minority entrepreneurs face disproportionate barriers when it comes to achieving the American Dream, despite their presence and contributions to our economy. According to recent data from the U.S. Census Bureau, there are approximately 12 million minority-owned businesses in the U.S., both employer and non-employer firms, which contribute over $2 trillion to the economy annually.[1 2] However, the barriers these entrepreneurs face due to centuries of systemic challenges and racial discrimination have historically stood in the way of their success. Whether through efforts to obtain and utilize sustainable, responsible, and transparent capital products, or through efforts to win contracts with the federal government, minority business enterprises (MBEs) oftentimes are forced to rely on the help of programs curated to meet their unique needs to drive their business forward.

As an organization that represents a network consisting of over two-thirds of MBEs, Small Business Majority continues to see these challenges, driven by racially motivated discrimination, play out in real time. When it comes to accessing capital, according to a nationwide report from 2021, small business owners of color have encountered more setbacks when obtaining capital than their white counterparts.[3] While 1 in 5 (19%) of small business owners overall obtained less financing than they sought, this number was higher among Asian Americans and Pacific Islanders (AAPI) (36%), Black (31%), and Latino (26%)

[1] "Census Bureau releases new data on minority-owned, veteran-owned and women-owned businesses." U.S. Census Bureau. October 26, 2023. https://www.census.gov/newsroom/press-releases/2023/annual-business-survey-employer-business-characteristics.html.
[2] "Census Bureau releases nonemployer business data by demographic characteristics of owners." U.S. Census Bureau. February 8, 2024. https://www.census.gov/newsroom/press-releases/2024/nonemployer-business-data.html.
[3] "Small businesses struggling to access capital, harming their financial recovery." Small Business Majority. February 17, 2021. https://smallbusinessmajority.org/our-research/access-capital/small-businesses-struggling-access-capital-harming-their-financial-recovery.

small business owners.[4] Similarly, while 18% of small businesses, overall, were denied a loan, the rates of loan denials were higher among people of color: 32% of Black, 23% of Latino, and 22% of AAPI business owners were denied funding. This data points towards the larger-than-imaginable capital and opportunity gaps faced by so many members of our communities. Therefore, underscoring a need for targeted, meaningful investment to MBE communities will help bring them closer to parity with their counterparts in other demographic groups.

MBEs also face significant challenges when seeking to compete for federal contracts and opportunities. For example, the U.S. Small Business Administration's (SBA) FY22 data estimated that small, minority-owned firms only received 9.62% of all contract awards, compared to 16% of contracts that went to white-owned firms (larger firms received over 74% of all contract awards), compounding this disparity further. This is concerning as the U.S. government is the largest purchaser of goods and services in the world. In fact, the government is projected to spend over $750 billion in contracts this year alone.[5] The federal government is also increasing its spending thanks to the Bipartisan Infrastructure Law, which directs even more funding and creates opportunities for contractors to work with the government. However, this historic funding will not reach the smallest, most disadvantaged entrepreneurs without targeted support from federal agencies to break into the networks they need to achieve success in such a difficult sector. It is not surprising then that certain agencies whose mission it is to serve the interests of minority entrepreneurs cite a lack of access to networks critical to succeed. For example, a report conducted by the MBDA in 2016 found that 86% of minority-owned businesses cited a lack of networks as an exclusionary factor to obtaining federal contracts.[6] For these dollars to truly make an impact, it is critical that the government continues to invest in and strengthen its small business set-aside programs, setting up small and minority-owned contractors for future success.

The examples we share here, including barriers to capital and contract opportunities, are only two small instances that demonstrate the disparities MBEs continue to face, and in today's political climate, their challenges are worsening. In the wake of the 2023 Supreme Court's affirmative action ruling, programs across the country that have historically served marginalized communities continue to face setbacks. By way of legal or philosophical challenges, some of these programs are no longer able to support the communities that need them most. Some recent examples of action taken against these programs include attacks on private funds designed to support minority groups, such as the lawsuit filed against Fearless Fund, blocking the venture fund from supporting grants to Black women-owned businesses.[7] Another challenge against government sponsored programs include the SBA 8(a) business development program, a program geared at providing access to procurement opportunities for small and disadvantaged businesses.[8]

In another recent attack, the Minority Business Development Agency (MBDA) was challenged due to the definition of socially and economically disadvantaged used by the agency and a U.S. District Court Judge ruled against MBDA.[9] The MBDA is the only federal agency with minority in its name and is dedicated to supporting the development and expansion of MBEs which are essential to building a thriving and equitable economy. As business formation has surged over the past three years, the agency has been a proven lifeline for many entrepreneurs seeking to start and grow their businesses in our nation's most under-resourced communities. Their mission is critical to addressing the historic barriers that these

---

[4] Ibid.
[5] "Contract spending is set to grow across the board in 2024." Federal News Network. November 7, 2023. https://federalnewsnetwork.com/contracting/2023/11/contract-spending-is-set-to-grow-across-the-board-in-2024/.
[6] "The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence." https://www.justice.gov/crt/page/file/1463921/dl?inline
[7] "Grant program for Black women comes under tough questioning in key anti-DEI lawsuit." Associated Press. January 31, 2024. https://apnews.com/article/fearless-fund-dei-corporate-diversity-backlash-lawsuit-[illegible]
[8] In the 8(a) decision, a court ordered that SBA's presumption of social disadvantage was unfair for other businesses (largely, white-owned firms) trying to compete for the very limited set-aside dollars to support small, underserved firms. This ruling is representative of a broader attack on programs that are designed to lift marginalized communities from the depths of systemic racial barriers to success. https://www.sba.gov/document/policy-guidance--impact-recent-court-decision-ultima-servs-corp-v-dept-ag-ed-tenn-use-8a-program
[9] "MBDA ruling is a disappointing setback for underserved small businesses." Small Business Majority. March 6, 2024. https://smallbusinessmajority.org/press-release/mbda-ruling-disappointing-setback-underserved-small-businesses.

businesses face. The ruling was representative of yet another striking blow to the small business owners in our network from underserved and minority communities that these programs seek to provide targeted services to. If the MBDA is unable to continue serving the communities it was created to serve, the consequences of removing that support would be detrimental to the fabric of our economy.

In the corporate sector, attacks on Diversity, Equity, and Inclusion (DEI) initiatives continues to grow. Companies that once stood in support of racially targeted programs in the wake of the murder of George Floyd have walked back their commitments in double-time. For example, recent data by Revelio Labs shows that companies like Zoom, Meta, Tesla, DoorDash and others, made cuts to their DEI programs in the wake of affirmative action lawsuits.[10]

Even more concerning, the U.S. House of Representatives dissolved its Office of Diversity and Inclusion this year.[11] The provision to halt DEI initiatives rode quietly on legislation that provided last-minute, buzzer-beater funding to the government preventing a shutdown for the remainder of FY24. The clear trickle-down and chilling effect of the dismantling of systems that protect and serve minority communities across the country following last year's affirmative action case are only the beginning. Therefore, it's imperative for our federal government to act now and play a key role in reversing this damage. Now is the time to double-down on our efforts to protect, expand, and invest in programs serving minority-owned businesses and minority entrepreneurs. The attacks on DEI initiatives and programs specifically targeting minority-owned businesses and entrepreneurs have led to an overall apprehensiveness within the business community that we serve. From partners to our business owners, without action from the government to protect these programs, communities fear they will be left out of the opportunity to connect with the resources and assistance they need to grow.

As an advocate for America's small business community and a fervent supporter of programs designed to provide equitable opportunities for entrepreneurs, Small Business Majority stands in unwavering support of programs that specifically target minority-owned businesses and combat the impacts that racial discrimination has plagued our economy for centuries. Due to a continuing onslaught of historic and current injustices, minority communities need extra support, guidance, and access to resources to start and operate their businesses. As an advocate for what we call "real small businesses," solopreneurs, and minority-owned enterprises, we know too often that race has stood in the way of potential success. Equity initiatives are key to leveling the playing field for underserved and disadvantaged entrepreneurs, and we cannot afford to keep losing support infrastructures for these communities. To that end, our nation is made up of many different communities, cultures, and backgrounds, and we must meet entrepreneurs where they are rather than provide them with a one-size-fits-all approach when it comes to government support and programming.

Below, we detail some ways in which they government can uphold its commitment to equity by continuing to invest in programs that are critical to the success of all entrepreneurial ecosystems.

1. **Commit to provide the funding support and capacity needed for proven programs such as the MBDA and SBA so they can continue reaching entrepreneurs of all backgrounds.** While the MBDA and SBA programs are only two examples of government-led initiatives, we urge the government to do more by way of direct funding to agencies, and through the intentional act of protecting and bolstering programs that target underserved communities to ensure all may compete on a level playing field. As the data shows, disparities remain despite the available opportunities. To ensure that business owners who want to work with the government can do so or can gain the understanding and guidance needed to navigate federal opportunities, more must be done to strengthen and protect the MBDA (and its contracting programs) and the SBA's 8(a) program. We have worked with many business owners who have seen a great deal of success from utilizing programs designed to uplift underserved small businesses. For example, an

[10] "As DEI gets more divisive, companies are ditching their teams." The Washington Post. February 18, 2024. https://www.washingtonpost.com/business/2024/02/20/corporate-diversity-job-cuts/.
[11] "U.S. House Office of Diversity and Inclusion to be disbanded as part of government spending bill." U.S. House Office of Diversity and Inclusion. March 25, 2024. https://diversity.house.gov/2024/03/25/us-house-office-of-diversity-and-inclusion-to-be-disbanded-as-part-of-government-spending-bill/

8(a) graduate on our board of directors is an experienced government contractor – this business owner has the 8(a) program to point back towards that built the foundations of their procurement success many years ago. To ensure that success stories continue to underscore their importance to the minority business ecosystem, key programs must continue to be supported federally. It is the federal government's duty to provide the services and support needed for disadvantaged communities to thrive and this includes expanding and protecting the successful programs designed to reach communities that are all too often at a racial or systemic disadvantage.

2. **Ensure that federal procurement opportunities are available and accessible to all by expanding and evaluating set-aside programs for MBEs.** Each agency is tasked with the responsibility of serving disadvantaged and underutilized small businesses through their Offices of Small and Disadvantaged Business Utilization (OSDBU) or similar departments. These divisions are tasked with the goal of increasing the utilization of small contractors and assisting small and disadvantaged business enterprises in the pursuit of opportunity to work with the federal government. We believe these programs must be strengthened and held accountable on their equity initiatives to bridge opportunity gaps between communities. Similarly, we urge Congress to protect and strengthen set-aside programs by ensuring that all MBEs gain access to the same opportunities as their counterparts. To ensure MBEs have a fair shot at tapping into historic opportunities to work with the government through recent landmark legislative investments, we encourage Congress to hold agencies accountable to increasing the small business spend across all MBE groups through targeted outreach, technical assistance, and resources tailored to meet the needs of specific communities.
3. **Ensure accountability across federal programs that serve minority business communities.** Ensuring that programs that are designed to help our small business communities are held accountable on their goals will increase their effectiveness and dollar for dollar value. A good example of accountability in government programs can be seen in recent SBA efforts to disaggregate its contracting data by racial group. Shedding light on the disparities faced by certain communities is critical to developing public policy solutions that prevent these disparities from growing further. We urge Congress to ensure that agencies are taking a closer look at their spending and contracting habits, measuring the economic impact of the invested dollars in small, MBEs across the nation.
4. **Develop strong reporting requirements for programs to demonstrate impact and sustain public support.** Recognizing that each member of Congress represents the needs of their constituents, more must be done to show taxpayers the value of supporting minority programs, and this starts with strong data collection. We must ensure that programs supporting minority communities are measurable, impactful, and continue to shape a feedback dialogue between public and private entities to inform their success moving forward. Demonstrating a clear link between targeted investment and increasing success rates in MBE communities will be paramount to ensuring that these programs can continue to operate and provide services to those who need them.
5. **Push forward with efforts to shed light on racially motivated disparities and barriers across the small business ecosystem.** For the government to be a leader in this space, agencies and leaders in Congress should remain at the forefront of encouraging more transparency in our economy. Unfortunately, data collection efforts to help our nation's decisionmakers understand the current landscape are under attack, as demonstrated by legal pushback on the Consumer Financial Protection Bureau (CFPB)'s move to implement section 1071 of the Dodd-Frank act in its small business lending data collection initiative.[12] While this example is just one instance of how legal barriers are hindering a more transparent economy, it represents the tip of the iceberg concerning attacks on equity across the country and the world.

[12] "Court issues nationwide stay of CFPB's Section 1071 Small Business Lending Rule." Greenberg Traurig. October 30, 2023. https://www.gtlaw.com/en/insights/2023/10/court-issues-nationwide-stay-of-cfpbs-section-1071-small-business-lending-rule

> We believe that without access to comprehensive data on how MBEs fare in today's economy, attacks on key programs designed to address discrimination will persist, ultimately hindering the effectiveness of programs both public and private.

Small Business Majority recognizes that the federal government plays a critical role in understanding and addressing the disparities and inequities faced by minority communities. While we outline a few programs that work to bridge some of these inequities in this testimony, we know that there are many other programs–both public and private–that remain at risk of failing to achieve their full economic potential. When it comes to business ownership, a cornerstone of the American Dream, it is critical that the government continues to invest in communities that historically face barriers to success. We thank you for the opportunity to comment on these critical issues and welcome the Committee's efforts to ensure that our federal programs are meeting the needs of America's diverse small businesses. For any questions or additional information, please contact Government Affairs Director, Alexis D'Amato at adamato@smallbusinessmajority.org.

Sincerely,

John Arensmeyer
Founder & CEO
Small Business Majority

SMALL BUSINESS MAJORITY

**TESTIMONY OF HYACINTH TUCKER**

**FOUNDER & CEO, THE LAUNDRY BASKET LLC**

**Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination**

**May 6, 2024**

Dear Chair Shaheen, Ranking Member Ernst, and members of the Senate Committee on Small Business and Entrepreneurship, thank you for providing the opportunity to submit a written statement for the record regarding the discrimination faced by minority contractors. As the founder of The Laundry Basket LLC, I've experienced firsthand the challenges and barriers that minority-owned businesses encounter in the entrepreneurial landscape.

One notable incident of systemic discrimination occurred when seeking financing to expand my business operations. Despite having a solid business plan and a track record of success, I faced significant hurdles in securing loans from traditional financial institutions. After extensive research on typical lending practices and speaking with other small business owners in my network, I learned I was being subjected to higher interest rates and stricter lending criteria compared to my non-minority counterparts. Not only did lenders express skepticism about the viability of my business model, despite providing ample evidence of its potential success, but I also found the loan application process itself seemed more rigorous and burdensome compared to what my non-minority counterparts reported. This unequal treatment not only hindered my ability to grow my business but also highlights the economic disparities within the community.

Another example of bias occurred during the bidding process for a lucrative contract with a major corporate client. Despite submitting a competitive proposal that met all the requirements, I was ultimately passed over in favor of a larger, non-minority-owned firm. The questions I was asked when interviewed by a panel of decision makers implied a lack of confidence in my ability to deliver on the contract despite there being clear evidence I could. Throughout the evaluation process, I was subject to remarks and microaggressions from the client that led me to believe the decision was influenced by implicit biases and preconceived notions about the capabilities of minority-owned businesses. This experience highlighted the systemic barriers faced by minority contractors and shows the need for greater diversity and inclusivity in procurement practices.

The recent attacks against equity-based programs in both the public and private sectors only serve to make these challenges worse. Programs such as the 8(a) Program and the Minority Business Development Agency play a crucial role in leveling the playing field and providing opportunities for minority entrepreneurs to thrive. Any attempts to shut down or undermine these programs not only threaten the progress made towards equity and inclusion, but also hinder the economic growth and prosperity of our communities.

It is important policymakers and stakeholders recognize the importance of addressing discrimination and promoting diversity and inclusion in the business ecosystem. By encouraging an environment that supports and uplifts minority-owned businesses, we can encourage untapped potential, drive innovation and create a more equitable economy for all.

I hope my testimony can shed light on the experiences of minority contractors and serve as a catalyst for meaningful change. I am committed to working alongside policymakers, advocacy organizations and my fellow entrepreneurs to advance policies and initiatives that promote equity and opportunity for all.

Thank you once again for the opportunity to contribute to this important conversation. Please do not hesitate to reach out if you require any further information or assistance.

Sincerely,

Hyacinth Tucker
Founder & CEO
The Laundry Basket LLC

TRANSPACIFIC COMMUNICATIONS
BRIDGING CULTURES

**TransPacific Communications**
**Statement for the Record**
**Senate Committee on Small Business and Entrepreneurship**

**Field Hearing: Promoting Opportunity: *The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination***

On behalf of TransPacific Communications (TPC), I'm pleased to share the following statement for the record in response to the Senate Committee on Small Business and Entrepreneurship field hearing, Promoting Opportunity: *The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination* held on May 6, 2024.

TransPacific Communications is an 8(a) Certified Business and has more than 20 years of expertise in Cross-Cultural Communications, translation and interpretation, DEIA, coaching, consulting and media training. We are an Economically Disadvantaged Woman Owned Small Business (EDWOSB) and have worked in the public and private sectors. We have been 8(a) certified since September 25, 2018.

Throughout TPC's experience as an 8(a) firm, I have gained access to contracting opportunities that I may not have otherwise had access to as a woman-minority owned firm. I have also had the opportunity to build professional relationships through networking and industry events. However, I cannot overlook significant challenges I have endured within the federal contracting space as a result of my race that have cost me time, capital and deep emotional pain. The 8(a) Business Development Program, despite its flaws, is an important program, and it serves a crucial purpose, which is to help minority owned firms like mine access contracting opportunities.

In the 6 years since TPC received 8(a) certification, there have been several instances in which we've experienced discriminatory treatment at the hands of contracting officers who have not upheld the values of the SBA's 8(a) policy, causing me to lose contracting opportunities and to question my worth in this space. There are systemic barriers that minority-women owned firms face in federal contracting, and the 8(a) program is a much needed mechanism to reduce them. Even still, there are instances of discriminatory practices that persist and have a negative impact on minority-women owned firms.

For example, when we first became certified, TPC had spent considerable time and effort developing an 8(a) contract with a federal agency. It was disheartening to learn that after putting forth such effort, that the contract was nearly botched because the agency unexpectedly

canceled the contract. Then, I found out through different channels that we lost the contract because the contracting officer forgot about it and decided to cancel it. That experience was awful enough on its own, but does not compare to the treatment I received from the contracting officer after I discussed this incident with the Director of Contracting and Procurement for the agency, and eventually provided suggestions to improve the 8(a) program in a Congressional testimony. I used my Congressional testimony to let the agency know that I was worth it – and only then was our 8(a) contract revived. In response to my taking action, I received a phone call from the contracting officer who forgot about our contract to let me know that he was not pleased that I had met with the Director of Contracting and Procurement. He screamed and yelled at me, intimidating and threatening in early October of 2019. I was shaken after the call. I had never been abused by anyone in such a verbally violent manner, let alone a stranger, and a government official. When I told an SBA liaison about this call, they responded "that's just how he is." We have only 9 years in the 8(a) program and we lost an entire year due to this type of unprofessional and discriminatory behavior toward an Asian American small businesswoman.

In another instance, TPC was approached by an agency working group to create a Diversity, Equity, Inclusion and Accessibility (DEIA) report given our firm's expertise on DEIA. We were asked to prepare this report in advance of a new contracting official coming on board, and after spending several months conducting a careful review of the agency's practices and procedures, we presented a thorough report. Upon review by the agency working group that asked us to write the report, we were asked to redact much of the 'unfavorable' information we found in our review. The agency working group wanted to present a positive report and implied that if we didn't redact specific elements of the report, that we would suffer reputational risk. This experience left me feeling deeply conflicted, as I didn't want to have a 'black mark' on my firm, but I also wanted to ensure that discriminatory practices were identified and addressed.

When working with the same team, I could not help but notice that the entire working group was comprised of white women, with the exception of one Black woman. At one point, I was also warned to reassign the employee (who was a Black woman) whom I had assigned to work with this agency working group because in their words, "you need to look like the client". In this case, the "clients" were white women.

One more example I will share happened in October 2022. I met a programming officer at an agency summit and after I'd shared some background on my firm in addition to the importance of translation, she shared that she was getting ready to put on webinars and was looking for a translation. I built a strong connection with the program officer, and she came to trust and rely on TPC due to our translation capabilities. She sought help with a Scope of Work (SOW) for a translation project. Sensing a chance for TPC's 8(a) sole-source, I provided an SOW, which she accepted. However, another agency's CO, unaware of 8(a) advantages, engaged in extensive inquiries but ultimately dismissed our capabilities. Despite the program officers' endorsement, they chose a problematic vendor for their second webinar. Later, the program officer informed me that their agency decided to advertise the SOW solely on GSA, inaccessible to TPC. This outcome left us disheartened after months of effort, despite leveraging OSDBU support from another department. Following this setback, on the advice of an OSDBU officer, I sent a

compelling letter to the agency and to the agency asking them to reconsider and open up for fair competition and to include 8(a). To my surprise, the agency's response was both disrespectful and hurtful. To add insult to injury, I noticed agency staff saved the letter under the name "TransAtlantic" which is of course miles apart from TransPacific. It shows how much or how little care was taken in response to my concerns. Feeling saddened, defeated and demoralized, my faith in working in federal space took a severe beating. The adage "You can't fight the City Hall" came to remind me how broken the system can be, despite all the support and access TPC has and the proper channels we have followed.

TransPacific Communications experience in federal contracting stands as a testament to the complexities and challenges faced by women-minority owned businesses within the federal contracting landscape. While our journey as an 8(a) Certified Business has been marked by both successes and setbacks, it is clear that systemic barriers and discriminatory practices persist, hindering the full realization of equal opportunities. Our experiences underscore the vital role of thoughtful and intentional efforts, including the 8(a) program, to address racial disparities and discrimination in federal contracting.

US BLACK CHAMBERS, INC
THE NATIONAL VOICE OF BLACK BUSINESS

"Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination"

U.S. Senate Committee on Small Business and Entrepreneurship
May 6, 2024

Testimony of Ron Busby, Sr., President and CEO of U.S. Black Chambers, Inc.

Chairman Cardin, Senator Van Hollen, Congressman Ivey, and esteemed Members of the Senate Committee on Small Business and Entrepreneurship:

Thank you for the opportunity to address this critical concern today before you. My name is Ron Busby, Sr., and I proudly serve as the CEO of the United States Black Chambers, Inc. (USBC). It is an honor and humble duty to speak with you and shed light on the pervasive issue of discrimination within the Small Business Administration's 8(a) government contracting program.

It is my belief that the 8(a) program is designed to provide a pathway for disadvantaged small businesses to compete for federal contracts. The program holds tremendous promise as a catalyst for economic growth and community development. Despite its righteous intentions, this program has been peppered with systematic imbalance and barriers that have disproportionately impacted minority-owned businesses, more specifically Black entrepreneurs.

At its core, the SBA 8(a) program was established with the intention of empowering small businesses owned by socially and economically disadvantaged individuals. By offering specialized assistance, including business development support, access to capital, and contracting opportunities, the program aimed to enable these businesses to compete on a more equitable basis in the federal marketplace. For Black-owned businesses, which have historically faced systemic barriers to economic advancement, the 8(a) program represented a means of overcoming institutionalized discrimination and achieving greater financial independence and success.

The significance of the SBA 8(a) program for Black businesses cannot be overstated. It serves as a pathway for entrepreneurs seeking to navigate the complexities of government contracting, which can often be daunting and inaccessible without the program's support. By providing that pathway to federal contracts, the program offers Black-owned businesses a unique opportunity to grow and scale their operations, expand their customer base, and create jobs within their communities. Moreover, the program's emphasis on mentorship and networking enables participants to build

valuable relationships and learn from experienced industry professionals, further enhancing their long-term prospects for success.

As a cornerstone of the economic engine driving America forward, the SBA 8(a) program, in principle, embodies the potential construct of equity, opportunity, and inclusivity. By empowering Black-owned businesses to compete and thrive in the federal marketplace, the program not only strengthens the economic vitality of minority communities but also fosters innovation, diversity, and resilience within the broader business landscape. As we continue to strive for a more just and prosperous society, the SBA 8(a) program remains a critical tool for advancing economic empowerment and realizing the full potential of Black entrepreneurship in America.

In the 1980s, I embarked on my journey with the 8(a) program. Taking the reins of my family's janitorial business, I encountered a pivotal opportunity through a connection I made with a participant who was exiting the program in Oakland, California. The initial contract presented itself in an unlikely location—a neglected auxiliary building nestled in the toughest part of town; an assignment spurned by other companies. Despite the daunting task requiring a workforce of at least 40 individuals, my team fell short in numbers. However, we rose to the challenge, delivering exceptional results with precision and efficiency.

This endeavor marked the catalyst for remarkable growth in my business, catapulting revenues from $3M to $7M almost overnight. With newfound confidence and resources, I expanded my reach, pursuing contracts across the nation, including prestigious opportunities at Ft. Bragg military base and beyond. The transformative impact of the 8(a) program is evident in the success stories it has fostered, notably contributing to the success of numerous black businesses.

Throughout my tenure at the USBC, I have borne witness to the resilience and entrepreneurial spirit of Black business owners who strive to succeed against formidable odds. Yet, too often, their efforts are derailed by a system that fails to provide them with a level playing field. From arbitrary denial of certification to unequal access to contracting opportunities, the barriers faced by Black entrepreneurs in the 8(a) program are not merely obstacles to business growth—they are injustices that consistently perpetuate economic disparities and hinder our nation's progress.

In my role as President and CEO of U.S. Black Chambers, Inc., I regularly encounter the frustrations of well-prepared members encountering hurdles in securing government contracts. The process is bogged down by redundant inquiries, leading to unnecessary complexity and depriving many qualified businesses of opportunities.

Illustrating the severity of the issue, not a single black-owned firm has secured a contract in the multi-million-dollar CHIPS program, aimed at bolstering the nation's semiconductor capabilities and workforce. Despite our integral role in the American entrepreneurial landscape, equitable opportunities are elusive.

In addition, the transition of the 8(a) program from regional to national exacerbates matters, allowing companies from distant locales to vie for contracts across the country, irrespective of local ties or logistical feasibility. This shift fosters cutthroat competition, with the government prioritizing cost over quality and sustainability.

Furthermore, the government's sluggish payment process poses a significant challenge. The six-month delay between contract commencement and fund disbursement strains the financial resources of many businesses, jeopardizing their viability and potentially leading to closure.

Overall, the current landscape highlights systemic barriers hindering the participation and success of Black-owned businesses in government contracting, underscoring the urgent need for reform and a more equitable playing field.

The most recent data, as of 2020, highlights the necessity of programs like 8(a) in fostering economic empowerment. Black business owners, leveraging federal contracting opportunities, garnered a lowly 1.67% of the available funds. I wholeheartedly believe that black business owners can handle access to a larger percentage of the total spend.

I must also emphasize the critical role that the 8(a) program plays in closing the wealth gap that persists in our society. The ability to secure government contracts through this program not only generates revenue for participating businesses but also enables them to build capacity, invest in infrastructure, and position themselves for long-term success. This, in turn, translates into wealth creation for Black entrepreneurs, their families, and their communities—a crucial step towards economic equity and prosperity.

It is essential to underscore that the benefits of the 8(a) program extend far beyond individual businesses. When Black-owned businesses thrive, they create jobs, stimulate economic growth, and contribute to the vitality of our communities. This ripple effect is especially pronounced in underserved areas where entrepreneurship can serve as a significant catalyst for revitalization and opportunity.

As we look to the future, it is incumbent upon policymakers and stakeholders to preserve and strengthen the 8(a) program, ensuring that it remains a robust and effective tool for advancing economic empowerment and narrowing disparities. This includes measures to streamline the application process, enhance technical assistance and training, and increase access to capital and resources for program participants.

In conclusion, the 8(a) program at the SBA is not just important; it is indispensable to the Black-owned business community and the broader goal of closing the wealth gap. Efforts to weaken or undermine this program must be met with firm opposition, as they run counter to the principles of equity, opportunity, and economic justice. I urge this committee to stand with us in championing the 8(a) program and its mission of fostering a more inclusive and prosperous economy for all.

I always say that America is greatest when we can **ALL** participate.

Thank you for your attention to this critical concern, and I look forward to effective policy improvements and the sustainability of the SBA's 8(a) program as a part of the entrepreneurial and economic engine in America.

Ron Busby, Sr. CEO, U.S. Black Chambers, Inc

Written Testimony of

LaTanya White, Ph.D., M.B.A.
Founder & Principal Researcher
Concept Creative Group, LLC

United States Senate
Committee on Small Business and Entrepreneurship

Field Hearing

Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination

Senator Cardin, Senator Van Hollen, and Representative Ivey, and Members of the Senate Committee on Small Business and Entrepreneurship:

As a fellow advocate for inclusive opportunities for small businesses and entrepreneurship, it is again an honor to be of service by contributing to your efforts to amplify *The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination.*

I am Dr. LaTanya White, founder and principal researcher of Concept Creative Group, LLC. I have nearly 14 years of providing training and technical assistance to socially and economically disadvantaged individual (SEDI) entrepreneurs. My experience as includes serving as a Certified Business Analyst with the Florida Small Business Development Center Network at FAMU as well as working in different capacities with the Minority Business Development Agency Business Center and Capital Readiness Programs.

My experiences working directly with SEDI entrepreneurs have given me a unique perspective on their struggles and triumphs. For instance, during my tenure as an entrepreneurship educator at Florida A&M University, I encountered numerous students who, despite their aspirations, faced significant barriers due to their backgrounds. One student in particular, majoring in Allied Health Sciences, expressed disbelief at the possibility of owning a business, underscoring the need for exposure to entrepreneurship as a viable path for all disciplines and backgrounds.

This professional experience coupled with my highly-sought after keynote speaking and training workshops by inclusive entrepreneur support organizations has positioned me to create impact for more than 10,000 SEDI entrepreneurs over the course of my career. Even with this extensive background and deep insight, my expertise in the space of fostering economic mobility and closing the racial wealth gap was cemented through my doctoral research on the lived experience of first-generational wealth creation for SEDI entrepreneurs.

**I: Economic Injury: The Connection Between Discrimination and the Racial Wealth Gap**

In my research, I found that both quantitative and qualitative evidence suggests that this group faces uniquely complex barriers, often caused by structural and systemic discrimination. America's economic vitality and global competitiveness depend on harnessing all entrepreneurial talent. Access to financial and social capital have been shown to speed up the pathway to entrepreneurial success; however, for SEDI entrepreneurs, pervasive racial discrimination are significant obstacles. The timeline below provides a brief overview of some of the systemic barriers that have hindered the aspirations of Black entrepreneurs:

- **1874— Failure of the Freedman's Bank**: With the collapse of the Freedman's Bank, more than 72,000 Black Americans lost their entire life savings. Congress initially

refused to reimburse the depositors but eventually did reimburse about of them. Other depositors never received any restitution. The emotional damage that this created can be seen in the high levels of unbanked and underbanked Black communities. The mistrust of the American banking system as a result of this deepened the economic injury of Black entrepreneurs during the COVID-19 pandemic where it has been widely documented that, due in large part to Black founders not having banking relationships, PPP loans were not granted to Black business owners

- **1896– Ruling of Plessy v. Ferguson:** The vestiges of the landmark case that legalized racial segregration in 1896 can still be felt and can be seen in the lower levels of psychological safety among Black entrepreneurs in spaces that do not welcome, celebrate and center their contributions. The impact of this produces lower levels of social capital among Black and other socially disadvantaged founders, thus contributing to the lower levels of financial and venture capital they receive.

- **1935– Federal Housing Administration Redlining Activities:** The FHA's practice of only insuring homes that were in White-only neighborhoods—the practice of redlining—has significantly impeded the ability of socially and economically disadvantaged families to generate and transfer wealth. Research makes a direct connection between the economic mobility of homeowners and the economic paralysis of those who had historically been denied equitable housing opportunities[1]. Many SEDI entrepreneurs are unable to access venture financing because they have not had successful rounds of Friends and Family fundraising. This is due in large part to those families having experienced discrimination in their home buying journeys.

- **1940– Stuart's Theory of Economic Detours:** While recent data shows the gap between business revenue generated by SEDI business owners and their White American counterparts, research shows this to have been documented as early as the 1940s. When M.S. Stuart, a White male economist, studied the revenues of insurance firms owned by Black and White business owners, he determined that the Black-owned firms where generating significantly less revenue due to their race[2]. Stuart referred to this as Economic Detours, where based on the outcomes of Plessy v. Ferguson and redlining, the customer bases of the Black-owned firms were mainly comprised of Black customers. These same Black customers were experiencing discrimination in the labor market and, if they were employed, they were significantly underpaid. With lower levels of discretionary incomes, these customers could only afford to purchase insurance policies

---

[1] Rothstein, R. (2017). *The color of law: A forgotten history of how our government segregated America*. Liveright Publishing.

[2] Stuart, M. S. (1940). *An economic detour: A history of insurance in the lives of American Negroes*. Wendell Malliet & Co.

with the lowest premiums and the lowest values, thus generating lower levels of revenue for Black owners.

**II: How SEDI Entrepreneurs Experience the Racial Wealth Gap**

I considered what might be a significant underlying cause of the racial wealth gap: the absence of intergenerational wealth transfers in Black business families. The general concern of my research focused on the intersection of race, wealth, and entrepreneurship. The study was based on the phenomenal wealth gap between the 1% of the United States' population who hold nearly $2 trillion in wealth and the remaining 99%[3]. Staggering statistics show that White families have 22 and 41 times more wealth compared to the median Latinx and Black families, respectively[4]. Further, researchers estimated that it would take 242 years for Latinx and Black families to match the average wealth that White American families had in 2016[5]. Black and Latinx household wealth increased by triple-digit percentages between 2013 and 2016, by $1,700 and $4,300, respectively. Their White American counterparts benefited from a 17% uptick, which increased their wealth by more than $20,000 during the same time frame[6].

In an analysis of the Characteristics of Business Owners Survey, researchers found that Black entrepreneurs had lower social capital levels than other minority and non-minority entrepreneur groups[7]. They relied on data from the survey to assess the percentage of Black business owners that had entrepreneurial relatives, training and experience in family businesses, sources of debt and equity, minority customers and employees and marital status to determine as contributors to the levels of social capital held by Black entrepreneurs.

From my work with SEDI entrepreneurs in a wide range of industries, I know that these factors carry a heavy burden for them, especially for first-generation wealth creators. This group is less likely to have received training and experience in a family business which would provide them with the levels of entrepreneurial pre-exposure that have been proven to produce entrepreneurial persistence. Black entrepreneurs are less likely to have access to funding from their families, given the barriers to wealth building that Black families have faced, including those due to America's tax policies[8].

---

[3] Collins, C. (2012). *99 to 1: How wealth inequality is wrecking the world and what we can do about it.* Berrett-Koehler Publishers, Inc.

[4] Collins, C., Asante-Muhammad, D., Hoxie, J., & Terry, S. (2019). *Dreams deferred: How enriching the 1% widens the racial wealth divide.* Institute for Policy Studies.

[5] Nieves, E., & Asante-Muhammad, D. (2018). *Running in place: Why the racial wealth divide keeps Black and Latino families from achieving economic security.* Prosperity Now. https://prosperitynow.org/resources/running-in-place

[6] *ibid.*

[7] Fratoe, F. A. (1988). Social capital of Black business owners. *The Review of Black Political Economy,* 16(4), 33–50. https://doi.org/10.1007/BF02892164

[8] Brown, D. A. (2021). *The whiteness of wealth: How the tax system impoverishes Black Americans—and how we can fix it.* Crown.

As American wealth becomes concentrated into fewer and fewer hands, the data reveals that one third of the 400 wealthiest Americans inherited their wealth from the entrepreneurial endeavors of earlier generations in their family[9]. Historical data show that 75% of household wealth can be attributed to capital gains on intergenerational inheritances[10]. From the brief historical account of systemic oppression and racism faced by SEDIs builds a relatively short bridge to how the racial wealth gap began, how it is perpetuated, and why it continues to widen.

The recent attacks on diversity, equity, and inclusion (DEI) initiatives have exacerbated challenges for SEDI entrepreneurs. Uplifting SEDI entrepreneurs allows us to hear silenced voices and address power imbalances, as current research indicates. My doctoral research on intergenerational wealth transfer in Black business families underscores the transformative potential of a comprehensive, evidence-based approach to entrepreneurship education and policy.

**IV. Key Findings: The Transformative Power of Dynastic Wealth™**

Marginalized business families often lack exposure to succession planning strategies, also due to discrimination. Given the lack of representation of attorneys of color, especially in the tax and estate planning fields, these families rarely have access to legal professionals who do not exclude them based on their lower levels of wealth. Without understanding the value and importance of packaging, protecting, and passing down their assets, generation after generation find themslved in the cycle of starting from scratch each time. My research highlights the importance of integrating succession planning into entrepreneurship education and technical assistance. This generative approach ensures businesses thrive across generations, contributing to long-term economic stability.

Dynastic Wealth™, a framework that emerged from the research I conducted[11], offers a comprehensive approach to business development and entrepreneurship, nurturing both quantitative and qualitative forms of wealth through the lens of belonging, racial access, context and equity. In my doctoral research, I found evidence for the necessity of contextualizing entrepreneurial education and training within the lived experience of SEDI founders.

Entrepreneur support organizations that center inclusion in their programming have leveraged my research in their entrepreneurial outcomes for SEDI founders. A sample of those organizations include the American Association of Blacks in Higher Education; Capital

---

[9] Collins, C., & Hoxie, J. (2018). *Billionaire bonanza: Inherited wealth dynasties of the United States. Institute for Policy Studies*. https://ips-dc.org/wpcontent/uploads/2018/11/Billionaire-Bonanza-2018-Report-October-2018-1.pdf
[10] Wolff, E. N. (1992). Changing inequality of wealth. *American Economic Review*, 82(2), 552–558. https://www.jstor.org/stable/2117460?seq=1
[11] White, L. (2022). *Dynastic and Generative Intent for First-Generation Black Wealth Creators in a Modern Racial Enclave Economy*. https://aura.antioch.edu/etds/758

Readiness Program grantee M. Gill & Associates; Blackstone LaunchPad at Florida A&M University; Blackstone LaunchPad at the University of Buffalo; Fulbright Association; IGNITE! Central; Keller Center at Princeton University; Kukua Institute; Office of Strategic Partnerships at the National Museum of African American History and Culture; Pennsylvania State University; Prosperity Now; RL Engineering & Tech Solutions, Rotary Club of Washington, D.C.; Russell Innovation Center for Entrepreneurship; and the U.S. Department of State.

The framework for Dynastic Wealth™ accounts for this and emphasizes:

- **Economic Mobility:** By focusing on wealth transfer and succession planning, Dynastic Wealth™ addresses the root causes of the racial wealth gap, equipping entrepreneurs with knowledge and resources to build sustainable businesses for future generations.

- **Community Development:** Entrepreneurship should uplift communities. Dynastic Wealth™ fosters a community-centric approach, encouraging entrepreneurs to invest in and support their local economies.

- **Policy Advocacy:** Effective policy is crucial for creating an enabling environment for SEDI entrepreneurs. This includes advocating for policies that promote equitable access to capital, protect DEI initiatives, and support comprehensive entrepreneurship education.

**V. Policy Recommendations**

Based on my background as a TA provider and expert in SEDI entrepreneurship, I recommend the following to promote opportunity and address ongoing racial discrimination in targeted federal business programs:

- **Informed Technical Assistance:** Expand programs like the MBDA and 8(a) to provide technical assistance, mentorship, and training that has been informed by qualitative research on the lived experiences of SEDI entrepreneurs, as well as quantitative research. This will hep TA providers to better understand and address the unique challenges faced by these program participants.

- **Accountable Inclusion:** Strengthen and protect inclusion initiatives by at the federal level, ensuring that all federal contracting programs prioritize diversity and inclusion, and provide incentives for private sector companies to adopt similar practices.

- **Succession Planning Education:** Integrate succession planning into all federal entrepreneurship and business development programs, providing resources and training to

help SEDI entrepreneurs develop long-term strategies for business continuity and intergenerational wealth transfer.

- **Research and Data Collection:** Invest in qualitative research to continuously assess the impact of federal programs on SEDI entrepreneurs, using this data to inform policy decisions and ensure that programs remain responsive to the evolving needs of marginalized communities.

**V. Conclusion**

We are approaching both the largest shift in wealth and the largest demographic shift in history. It has been proven that entrepreneurship and the entrepreneurial exposure can create an accelerated pathway to wealth. Without federal programs such as the Minority Business Development Agency and the 8(a) Program, SEDI entrepreneurs will be locked out of opportunities to grow their businesses. This will produce economic injuries for their families and communities that will be felt for generations, further widening the racial wealth gap.

America's future prosperity relies on an inclusive entrepreneurial ecosystem. Addressing systemic barriers and maintaining targeted federal business programs will foster economic mobility, close the racial wealth gap, and enhance our global competitiveness. I urge you to consider this evidence-based account of the need to continue federal programs such as the MBDA and 8(a) as they have been proven to promote equity and opportunity for all entrepreneurs.

Thank you for the opportunity to contribute to this important discussion. I look forward to remaining an active participant in working together to create a more equitable economic future.

WOMEN IMPACTING
PUBLIC POLICY

**Women Impacting Public Policy**
**Statement for the Record**
**Senate Committee on Small Business and Entrepreneurship**

**8(a) Field Hearing - May 6, 2024**
**Bowie, Maryland**

Women Impacting Public Policy (WIPP) respectfully submits the following Statement for the Record in response to the Senate Small Business Committee hearing held on May 6, 2024, 8(a) Field Hearing.

The Small Business Administration's 8(a) Business Development Program is an important resource for socially and economically disadvantaged small businesses that have entered and sought to enter the federal contracting space. In many cases, these businesses, including those owned by Black, Hispanic, women, or LGBTBEs, may not have had the ability to otherwise secure federal contracting opportunities. While the program is not without its flaws, it still serves as a crucial resource for socially and economically disadvantaged individuals as a means for these individuals to increase access to capital, scale their businesses, and grow their professional networks.

The 8(a) program provides opportunities for women-minority owned firms to participate in contracts that would otherwise go to large, majority-owned firms and helps to prepare them to participate in unrestricted competition. Benefits include experience with contract negotiations, compliance, delivery, CPARs, and ratings, to name a few. In addition to the benefits that 8(a) provides, it serves as the standard for how minority-owned firms are treated, and by extension, how women-owned firms are treated in federal contracting. We recognize the importance of contracting set-aside programs like the 8(a) program for the broader community of small socially and economically disadvantaged business owners. There is still a great need for the 8(a) program given the barriers that women and minority-owned firms continue to face in accessing federal contracts.

**Network Building**

The barriers to entry for women-minority owned businesses are vast, especially as it relates to building a network in the federal contracting space. Women-minority owned firms are capable of building professional networks; however, the reality is, if a business owner has not had the opportunity to engage with the 'right' individuals in the contracting space, it becomes more challenging to cultivate those relationships. It's virtually impossible to get an audience at any Federal Agency without past performance and an existing relationship. In discussions with our membership, we've heard instances where women-minority owned firms are not taken seriously, which often translates to being ignored by program officers despite attempts to make a connection.

With that being said, women, including women of color who lack strong professional networks face an exceptionally uphill battle towards breaking into the contracting space. Given that the federal government is the world's largest buyer of goods and services, accessing this marketplace should not pose as much of a challenge for businesses seeking growth.

When women-minority owned businesses struggle to navigate the federal contracting space, they are often directed to the Office of Small and Disadvantaged Business Utilization (OSDBU) as a point of entry. While OSDBUs can provide support, they are limited in their capacity to assist women-minority owned businesses in competitive bidding for contracts. It becomes a vicious cycle of unsuccessful attempts to win business and the inability to get on vehicles that would help them win business without having the necessary relationships. The best entry point to federal contracting is subcontracting, and to do that, women and minority businesses need a network of small and large companies that will work with them.

The 8(a) program allows firms to begin developing their professional networks within the contracting space, in addition to building on experience that they can leverage in the future as they bid on contracts. 8(a) provides a wealth of resources for businesses, including courses, bootcamps and networking opportunities to help prepare them to take on contracts after graduating from the program.

**Lack of Accountability for Prime Contractors**

Small businesses, especially WOSB and 8(a) WOSB, can be disadvantaged by relationships with prime contractors. There is intense pressure to provide lower than market rates to join prestigious teams, and there is no guarantee that the promised work will be granted to the small business – especially on large IDIQs and BPAs. Collaboration with prime contractors is crucial for any business aiming for success in the contracting realm. Little to no accountability when primes are late on payments, pull work, or otherwise prevent small businesses from executing a contract can result in severe consequences for women-minority owned businesses, including reputational risk,

the inability to secure additional lines of credit, or lay off employees. Majority owned firms intentionally seek out some firms specifically because of their small disadvantaged status, and far too often they offer a contract to a woman-minority owned firm, only to turn around and give the contract to a majority-owned firm that they already have a relationship with.

While 8(a) does not solve this problem, it still represents a significant barrier to growth for WOSBs and 8(a) WOSBs. Participating and graduating from the 8(a) program can help women businesses build relationships with primes that they wish to work with, though there is no guarantee that they won't encounter primes that don't prioritize small business growth.

**Why the 8(a) Program is Necessary:**

The 8(a) program provides women-minority owned businesses, especially those owned by Black, Hispanic, AAPI women, a path to compete for government contracts despite the hurdles they face to enter the contracting space. For women-minority owned businesses that don't have the foundation in place to become a certified business, 8(a) provides the tools needed to leverage certification for their enterprises. It also helps to level the playing field for women and minority-owned firms to compete with larger firms. At the end of the day, women, especially Black women and women of color have to work twice as hard, whether it's furthering their education, building nearly perfect credit scores, or increasing their assets to secure lines of credit equal to what their white, male counterparts can qualify for without having to put forth the same efforts.

While we acknowledge that the 8(a) program was not created to exclusively support women-owned businesses, we recognize that the program is critical for the entire minority-owned business community, which intersects with the woman-owned community. Even in the wake of the Ultima decision, the 8(a) program continues to propel women-minority owned firms to success. WIPP will continue to support the program as a vehicle to bring more women-owned firms into the WOSB program, to reach and exceed the federal government's 5% contracting goal for WOSBs.

The following documents were submitted to the record for the field hearing held on May 6, 2024, entitled "Promoting Opportunity: The Need for Targeted Federal Business Programs to Address Ongoing Racial Discrimination." For any documents that do not currently include a link, please contact the Senate Committee on Small Business and Entrepreneurship to receive a copy of the report.


Barkley et al.; Federal Reserve Bank of Cleveland; November 2017; Report on Minority-Owned Firms; https://www.fedsmallbusiness.org/reports/survey/2017/2017-report-on-minority-owned-firms

Battisto, et al; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San Francisco; February 3, 2021; 2021 Report on Employer Firms: Based on the 2020 Small Business Credit Survey; https://www.fedsmallbusiness.org/reports/survey/2021/2021-report-on-employer-firms

Battisto, et al; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San Francisco; April 15, 2021; 2021 Report on Firms Owned by People of Color: Based on the 2020 Small Business Credit Survey; https://www.fedsmallbusiness.org/reports/survey/2021/2021-report-on-firms-owned-by-people-of-color

BBC Research & Consulting; California Department of Transportation; August 6, 2021; Availability and Disparity Study Report 2021; https://www.mbda.gov/california-availability-and-disparity-study-report-2021-0

BBC Research & Consulting; City of San Diego; July 2021; 2020 City of San Diego Disparity Study; https://www.sandiego.gov/sites/default/files/city_of_san_diego_disparity_study_report_-_final.pdf

BBC Research & Consulting; Commonwealth of Virginia; January 2021; 2020 Commonwealth of Virginia Disparity Study; https://www.mbda.gov/commonwealth-virginia-disparity-study

BBC Research & Consulting; Idaho Department of Transportation; July 2021; 2023 Idaho Transportation Department Disparity Study; https://itd.idaho.gov/wp-content/uploads/2023/07/CR_2023_Disparity_Study.pdf

BBC Research & Consulting; Montana Department of Transportation; October 2022; 2022 Montana Department of Transportation Disparity Study; https://www.mdt.mt.gov/other/webdata/external/CivilRights/DBE/2022_Disparity_Study.pdf

BBC Research & Consulting; State of Oregon; November 2023; 2023 State of Oregon Disparity Study: Final Report; https://www.oregon.gov/das/Docs/2023%20State%20of%20Oregon%20Disparity%20Study%20Final%20Report_November%2016%202023.pdf

Chow; Minority Business Development Agency, Office of Policy Analysis and Development; June 2022; The Probability of Winning Federal Contracts: An Analysis of Small Minority Owned Firms; https://www.mbda.gov/probability-winning-federal-contracts-analysis-small-minority-owned-firms#:~:text=MBDA's%20analysis%20finds%20that%20on,other%20small%20firms%20winning%20contracts.

Collette Holt & Associates; Harris County, Texas; June 2020; Harris County Disparity Study 2020; https://deeo.harriscountytx.gov/Portals/18/Documents/HarrisCountyDisparityStudyFinal2020.pdf

Corcoran, et al.; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San Francisco; March 8, 2023; 2023 Report on Employer Firms: Findings from the 2022 Small Business Credit Survey; https://www.fedsmallbusiness.org/reports/survey/2023/2023-report-on-employer-firms

de Zeeuw; Federal Reserve Bank of Atlanta; December 2019; Small Business Credit Survey Report on Minority-Owned Firms; https://www.atlantafed.org/community-development/publications/partners-update/2020/01/200108-report-on-minority-owned-small-businesses

Johnson, et al.; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San Francisco; March 7, 2024; 2024 Report on Employer Firms. Findings from the 2023 Small Business Credit Survey; https://www.fedsmallbusiness.org/reports/survey/2024/2024-report-on-employer-firms

Mason Tillman Associates, Ltd.; City of St. Petersburg; April, 2021; City of St. Petersburg Final Report: Disparity Study; https://cms5.revize.com/revize/stpete/Business/Economic%20Development/docs/City%20of%20St.%20Petersburg%20Disparity%20Study%20Report.pdf

MGT Consulting Group; Alaska Department of Transportation and Public Facilities; March, 2021; Disadvantaged Business Enterprise Disparity Study: Final Report; https://dot.alaska.gov/cvlrts/pdfs/Alaska-DOTPF-1-0-Final-Report-March-2021.pdf

MGT Consulting Group; City of Baltimore and Housing Authority of Baltimore City; August 26, 2022; City of Baltimore 2022 Disparity Study

MGT Consulting Group; City of Dallas; July 31, 2020; Availability and Disparity Study; https://dallascityhall.com/departments/sbcworkforcedev/PublishingImages/Pages/freshstart-employment-program/City%20of%20Dallas%20-%20Availability%20Disparity%20Study%20-%20July%2031,%202020.pdf

MGT Consulting Group; City of New York; May 2018; City of New York Disparity Study; https://www.nyc.gov/assets/mwbe/business/pdf/NYC-Disparity-Study-Report-final-published-May-2018.pdf

MGT Consulting Group; State of Delaware; March 29, 2022; 2022 Disparity Study: State of Delaware; https://mymarketplace.delaware.gov/results-de/documents/disparity-report-2022.pdf

MGT Consulting Group; Washington Suburban Sanitary Commission; 2022; 2022 Disparity Study; Washington Suburban Sanitary Commission; https://www.wsscwater.com/disparitystudy

Mills and Battisto; Federal Reserve Bank of New York; August 4, 2020; Double Jeopardy: Covid-19's Concentrated Health and Wealth Effects in Black Communities; https://www.fedsmallbusiness.org/reports/survey/2020/double-jeopardy

Misera and Perlmeter; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San Francisco; June 16, 2023; 2023 Report on Startup Firms Owned by People of Color: Findings from the 2022 Small Business Credit Survey; https://www.fedsmallbusiness.org/reports/survey/2023/2023-report-on-startup-firms-owned-by-people-of-color

Perry, Stephens and Donoghoe; The Brookings Institute; January 9, 2024; Black wealth is increasing, but so is the racial wealth gap; https://www.brookings.edu/articles/black-wealth-is-increasing-but-so-is-the-racial-wealth-gap/

Premier Quantitative Consulting, Inc.; Minority Business Development Agency; December, 2016; Contracting Barriers and Factors Affecting Minority Business Enterprises A Review of Existing Disparity Studies; https://archive.mbda.gov/news/news-and-announcements/2017/01/contracting-barriers-and-factors-affecting-minority-business.html

U.S. Department of Justice, Civil Rights Division; U.S. Department of Justice; January 20, 2022; The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence; https://www.justice.gov/crt/page/file/1463921/dl

Wainwright; U.S. Department of Agriculture, U.S. Small Business Administration; February 4, 2022; Report of Defendant's Expert

Wiersch and Misera; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San

4

Francisco; June 29, 2022; 2022 Report on Firms Owned by People of Color: Based on the 2021 Small Business Credit Survey; https://www.fedsmallbusiness.org/reports/survey/2022/2022-report-on-firms-owned-by-people-of-color

Wiersch, et al.; Federal Reserve Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis and San Francisco; February 22, 2022; 2022 Report on Employer Firms: Based on the 2021 Small Business Credit Survey, https://www.fedsmallbusiness.org/reports/survey/2022/2022-report-on-employer-firms

###