# EXHIBIT A-4

# The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence

## Table of Contents


Table of Contents ........ 1

Introduction ........ 2

I. Legal Landscape ........ 4

A. Overview ........ 4

B. Constitutional Challenges to Race- and Gender-Conscious Contracting Programs ........ 5

1. Challenges to the Small Business Act's Section 8(a) Business Development Program ........ 6

2. Challenges to States' Implementation of the United States Department of Transportation Disadvantaged Business Enterprise Program ........ 8

3. Challenges to Race- and Gender-Conscious COVID-related Relief Efforts ........ 13

4. Challenges to State and Local Disadvantaged Business Enterprise Programs ........ 15

II. There are Identified Disparities in Government Contracting between Minority- and Women-Owned Businesses and Their Non-Minority, Male-Owned Counterparts ........ 16

III. Discrimination Limits Access to Contracting Markets ........ 21

A. Discrimination By Procurement Agencies and Prime Contractors Creates Obstacles for Minority- and Women-Owned Businesses ........ 21

B. Exclusion From Business Networks Limits Opportunities ........ 24

C. Discrimination in Bonding and by Suppliers Burdens Disadvantaged Firms ........ 25

IV. There Are Significant Disparities in Business Formation and Success Between Minority- and Women-Owned Businesses Relative to Their Non-Minority, Male-Owned Counterparts 26

V. Discrimination Limiting Access to Capital Affects the Formation and Development of Businesses Owned by Women or People of Color ........ 27

A. The Wealth Gap Contributes to, and is Exacerbated By, Lack of Access to Capital ........ 28

B. Businesses Owned by Women and People of Color are Significantly More Likely to Be Denied Access to Capital ........ 30

C. When Minority and Female Business Owners Do Obtain Loans, They Are Smaller and on Less Favorable Terms and Conditions ........ 33

VI. COVID Has Had a Disproportionate Impact on Minority- and Women-Owned Businesses ........ 34

APPENDIX A ........ 37

APPENDIX B ........ 40

APPENDIX C ........ 56

## Introduction

This report summarizes recent evidence required to justify the use of race- and sex-conscious provisions in federal contracting programs. Federal programs that involve racial classifications must meet the strict scrutiny standard of review to withstand constitutional challenge.[1] This is the most exacting standard of review, and it requires, among other things, evidence supporting the conclusion that such measures are necessary to further the compelling governmental interest in remedying the effects of past and present discrimination. If a program contains affirmative measures based on sex, those measures are subject to the somewhat lower standard of intermediate scrutiny.[2] That standard demands that any gender-based preference be substantially related to an important governmental objective.[3]

In 2010, the Department of Justice submitted to Congress a report compiling and summarizing evidence of discriminatory barriers that racial minorities and women face that impede participation in government contracting.[4] The 2010 report has been cited in federal court as evidence that there is a compelling governmental interest in programs that support the ability of businesses owned by women or people of color to compete on an equal basis.[5] The 2010 report updated and expanded upon a 1996 Department of Justice report, which was published in the Federal Register.[6]

This report compiles and summarizes evidence accumulated and analyzed since 2010. A substantial body of evidence, both quantitative and qualitative, demonstrates the continued pervasiveness of discriminatory barriers that impede the full and fair participation of businesses owned by women or people of color in government contracting. The nature and breadth of the evidence discussed in this report supports the compelling interest in the continued use of federal programs that contain remedial measures to eliminate discriminatory barriers to contracting opportunities for businesses owned by women or people of color.

Section I of this report provides an overview of the legal landscape surrounding constitutional challenges to affirmative action in contracting programs that are subject to strict and intermediate scrutiny, including a discussion of some recent cases challenging various federal and state contracting programs. Section II reviews a

---

[1] *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

[2] *United States v. Virginia*, 518 U.S. 515, 533 (1996).

[3] *Id.*

[4] *Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses* (2010). This report summarized 47 studies and reports and 75 disparity studies between 2000 and 2010, and 39 congressional hearings between 2006 and 2010. The report and associated studies were provided to Congress as testimony. *See Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Business: Hearing before Subcomm. on Gov't Mgmt., Org. and Procurement of the House Comm. on Oversight & Gov't Reform*, 111th Cong., 2d Sess. (2010) (testimony of David A. Hinson, National Director, Minority Business Development Agency, U.S. Dep't of Commerce).

[5] *Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011).

[6] *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*, 61 Fed. Reg. 26,050 (May 23, 1996). This report summarized more than 50 documents and 30 congressional hearings between 1980 and 1996.

substantial body of statistical evidence published in the last decade, which demonstrates the existence of significant disparities in the amount of public contracting dollars going to businesses owned by women or people of color as compared to their availability for such contracts. Section III explores the various ways that discriminatory barriers can limit access to contracting markets, resulting in the statistical disparities identified in Section II. These include discrimination by procurement agencies and prime contractors, whether overt or subtle; exclusion from business networks crucial to making the connections necessary to learn about and compete effectively for contracting opportunities; and discrimination by bonding companies and suppliers. Section IV discusses stark disparities in the formation and success of businesses owned by women or people of color as compared to other businesses. Section V addresses discriminatory barriers that limit minority and female business owners' access to capital. These barriers impose a significant burden on minority- and women-owned businesses that affects both the ability to form and grow businesses in the first instance as well as the ability to compete effectively for contracts. Finally, Section VI addresses how the economic downturn that began in 2020 as a result of the COVID-19 pandemic has disproportionately affected businesses owned by women or minorities. Evidence discussed in this report, or related to the issues discussed herein, is listed in the appendices. Appendix A identifies congressional hearings from 2010-2021 that address challenges facing business enterprises owned by women or people of color. Appendix B identifies over 200 disparity studies published between 2010 and 2021. Appendix C identifies additional studies and reports pertaining to the issues discussed herein.

This report is particularly timely in light of the January 20, 2021, Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, which charges the federal government with "pursu[ing] a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[7] The Executive Order makes explicit that "[t]he Federal Government's goal in advancing equity is to provide everyone with the opportunity to reach their full potential" and that "[c]onsistent with these aims, each agency must assess whether, and to what extent, its programs and policies perpetuate systemic barriers to opportunities and benefits for people of color and other underserved groups" in order to "better equip agencies to develop policies and programs that deliver resources and benefits equitably to all."[8] Of particular relevance to this report, the Executive Order provides that "Government contracting and procurement opportunities should be available on an equal basis to all eligible providers of goods and services."[9] It is thus especially appropriate for the Department of Justice to take an updated look at the barriers and challenges that businesses owned by women or people of color face today.

The Executive Order also mandates that the federal government use every available tool to ensure the equitable distribution of federal funds, including by increasing access for, and promoting the diversity of, small businesses participating in

[7] Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021).
[8] *Id.*
[9] *Id.*

government contracting opportunities. To that end, federal agencies are empowered to implement a broad range of programs to expand equity and diversity without triggering a heightened standard of review. In the contracting realm, these programs include race- and gender-neutral measures like the Historically Underutilized Business Zone ("HUBZones") Program and the Service-Disabled Veteran-Owned Small Business ("SDVOSBs") Program.[10] Because these programs provide preferential access to government contracting opportunities based on non-suspect classifications, if challenged, they must only survive the lowest standard of scrutiny—rational basis.[11] That is to say, the programs will survive challenges so long as they bear a rational relation to some legitimate end.[12] Because they are not subject to heightened scrutiny, the HUBZone program, the program for SDVOSBs, and other government programs that do not include race- or gender-conscious classifications fall outside the scope of this report.

## I. Legal Landscape

### A. Overview

In *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995), the United States Supreme Court held that federal race-conscious classifications are subject to strict scrutiny, meaning they "are constitutional only if they are narrowly tailored measures that further compelling governmental interests." There is no doubt that remedying discrimination and its lingering effects is a compelling governmental interest.[13] That compelling government interest includes a public entity's attempt to remedy past discrimination by rectifying its own actions.[14] It also includes remedying a public entity's passive complicity in private sector discrimination, as the Supreme Court has noted that "[it] is beyond dispute that any public entity . . . has a compelling interest in assuring that public dollars drawn from the tax contributions of all citizens do not serve to finance the evil of private prejudice."[15] In either case, the government must demonstrate a "strong basis in evidence for its conclusion that remedial action was necessary" to further that interest.[16]

A "strong basis in evidence" is that which "approach[es] a prima facie case of a constitutional or statutory violation."[17] The Supreme Court held in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (plurality opinion), that "[w]here there is a

[10] Robert Jay Dilger, Cong. Rsch. Serv., R45576, *An Overview of Small Business Contracting* 17-18 (2021), https://fas.org/sgp/crs/misc/R45576.pdf.
[11] The "mere awareness" or consideration of race in efforts to remedy discrimination and its effects does not automatically equate to a racial classification. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015). Public entities can undertake efforts to eliminate racial disparities through a variety of race-neutral means without triggering strict scrutiny. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring).
[12] *Romer v. Evans*, 517 U.S. 620, 631 (1996).
[13] *Shaw v. Hunt*, 517 U.S. 899, 909 (1996).
[14] *Parents Involved in Cmty. Schs. v. Seattle Sch. District No. 1*, 551 U.S. 701, 741, (2007).
[15] *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion); *Associated Gen. Contractors of Ohio, Inc. v. Drabnik*, 214 F.3d 730, 735 (6th Cir. 2000).
[16] *Croson*, 488 U.S. at 500 (1989) (plurality opinion).
[17] *Id.*

significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." The evidence of discrimination must have a sufficient nexus with the proposed remedial action such that it involves more than general societal discrimination.[18] In recent decisions concerning race- and gender-conscious COVID-related relief efforts, courts have conveyed that the policy cannot rest on a "generalized assertion that there has been past discrimination in an entire industry."[19] Consequently, courts in these cases have expected statistical evidence of disparities presented in defense of race- or gender-conscious programs to describe the appropriate marketplace with specificity and to tie evidence of current disparities to discrimination in that marketplace. In cases where race- or gender-conscious government contracting programs have been successfully defended from constitutional challenges, courts have relied on disparity studies analyzing statistical and anecdotal evidence of public and private discrimination in the appropriate contracting arena. Disparity studies examine the utilization of minority-owned firms as compared to their availability in the relevant market area. These state and local disparity studies also include qualitative evidence describing discriminatory barriers that minority- and women-owned businesses face not only in participating in contracting markets, but also in forming and developing businesses in the first place.

In addition to being supported by a compelling interest, federal programs must be narrowly tailored to accomplish that interest. Courts consider several factors to determine whether a program is narrowly tailored, including: (1) the necessity for the race-conscious remedy; (2) the duration of the remedy; (3) the relationship of the numerical target of the program to the relevant labor market; (4) the flexibility of the program, including the availability of waiver provisions; (5) over-inclusiveness or under-inclusiveness of the program; and (6) the effect of the remedy on innocent third parties.[20]

### B. Constitutional Challenges to Race- and Gender-Conscious Contracting Programs

Over the past 10 years, courts have evaluated numerous constitutional challenges to federal, state, and local contracting programs that contain race- and gender-conscious provisions. Courts have rejected facial challenges that assert such programs are per se unconstitutional. Courts have, however, found that the administration of some programs did not meet strict scrutiny standards. This is typically because the available evidence did not support the application of the program to particular government contracting industries. In addition, several recent constitutional challenges

---

[18] *Parents Involved,* 551 U.S. 701 (holding that remedying racially identifiable housing patterns did not justify race-conscious criteria for school assignments).

[19] *Holman v. Vilsack*, No. 1:21-cv-1085 (W.D. Tenn. Jul, 8, 2021) (citing *Vitolo*, 2021 WL 2172181 at *2, *8-9). As of August 2021, these cases are still in litigation, and the Department of Justice is continuing to defend the constitutionality of the programs at issue.

[20] *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality and concurring opinions); *Croson*, 488 U.S. at 508 (plurality opinion).

outside of the contracting arena have been brought seeking to end the use of race- and gender-conscious measures in programs established in the American Rescue Plan Act of 2021 to provide pandemic-related relief to businesses in the restaurant and agricultural industries. While courts have granted temporary restraining orders and preliminary injunctions in these cases, litigation on the merits is ongoing as of the date of this report.

### 1. Challenges to the Small Business Act's Section 8(a) Business Development Program

The Small Business Act establishes certain contracting preferences to aid small businesses in competing for government contracts. Among these are several programs that create contracting opportunities for certain small disadvantaged businesses. One such program, known as the 8(a) program, allows the government to prioritize the issuance of certain contracting opportunities to businesses owned by "socially and economically disadvantaged" individuals.[21] The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."[22] The Small Business Administration (SBA), which administers the program, has promulgated a regulation that provides that applicants to the 8(a) program who are members of certain designated racial or ethnic groups are entitled to a rebuttable presumption of social disadvantage.[23] Because this regulation includes a race-conscious classification, it has been subjected to strict scrutiny when faced with constitutional challenge.

Unlike some federal programs that are limited to particular agencies, all federal departments and major independent agencies participate in the 8(a) program. In Fiscal Year 2019, the federal government awarded $30.4 billion to 8(a) firms, more funding than any of the SBA's other small disadvantaged business programs.[24] Since the Department of Justice's 2010 report, the 8(a) program has survived two constitutional challenges brought by businesses alleging that the program on its face violates the guarantee of equal protection found in the Due Process Clause of the Fifth Amendment to the Constitution, and it is currently facing a third.[25] The courts in the two decided cases found a strong basis in evidence that the program is necessary to further the compelling governmental interest in remedying racial discrimination in the government contracting arena. In addition, the courts found that the 8(a) program is narrowly tailored to further that interest.

---

[21] 15 U.S.C. § 637(a).
[22] *Id.* § 637(a)(5).
[23] 13 C.F.R. § 124.103(b)(1). This presumption may be rebutted with "credible evidence to the contrary." *Id.* § 124.103(b)(3).
[24] Robert Jay Dilger, Cong. Rsch. Serv., R45576, *An Overview of Small Business Contracting* 16 (2021), https://fas.org/sgp/crs/misc/R45576.pdf.
[25] *See Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 2:20-CV-00041-DCLC (E.D. Tenn. filed Mar. 4, 2020).

i. *DynaLantic Corporation v. United States Department of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012).

DynaLantic is a small business that manufactures aircrafts, submarines, ships, and training equipment. When the Navy awarded a contract to develop a flight simulator for the Huey helicopter through the 8(a) program, DynaLantic sued the Department of Defense (DOD), alleging that the 8(a) program was unconstitutional both on its face and as applied in the military simulation and training industry.

The court rejected the facial challenge, concluding that the government had articulated a compelling interest in the program and presented a strong basis in evidence to support its conclusion that race-conscious remedial action was necessary to further that interest. The court considered the evidence before Congress at the time the 8(a) program was enacted, as well as post-enactment evidence that supports the continued need for the program.[26] The evidence fell into "three broad categories: (1) evidence of barriers to the formation of qualified minority contractors due to discrimination, (2) evidence of discriminatory barriers to fair competition between minority and non-minority contractors, and (3) evidence of discrimination in state and local disparity studies."[27] In reviewing the evidence, the court noted that it was not necessary to examine "the vast amount of statistical evidence" presented by the government in detail because the burden was on DynaLantic to show "no set of circumstances exist under which the Act would be valid" in order to succeed in its facial challenge to the program's constitutionality.[28] In addition, in response to DynaLantic's arguments that there were flaws in some of the evidence, the court found that any flaws did not rise to the level of the "credible, particularized evidence" necessary to rebut the government's initial showing of a compelling interest.[29] The court explained that the government can establish a strong basis in evidence with evidence "approaching a *prima facie* case of a constitutional or statutory violation" and that it is not required to present "irrefutable or definitive proof of discrimination."[30]

In addition to finding that the government articulated a compelling interest, the court considered several factors in determining that the program is narrowly tailored, including that: (1) Congress attempted to use race-neutral measures to assist minority-owned businesses for at least 25 years before incorporating a race-conscious component into the 8(a) program; (2) the program is sufficiently flexible in that it contains only aspirational goals with no penalties for failing to meet them, the presumption of social disadvantage available to certain racial and ethnic groups is rebuttable and applicants who are not presumptively disadvantaged may still demonstrate social disadvantage, and all applicants must meet the same economic disadvantage requirements; (3) the program is not over-inclusive as the government presented sufficient evidence of discrimination to justify granting the rebuttable presumption to the five groups

---

[26] *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 253-58 (D.D.C. 2012).
[27] *Id.* at 258.
[28] *Id.* at 265 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).
[29] *Id.* at 271 (quoting *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1175 (10th Cir. 2000)).
[30] *Id.* at 276 (*quoting Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 971 (10th Cir. 2003) (internal quotation omitted)).

identified in the regulation; (4) there are time limits on participation in the program, and participants graduate from the program earlier if they meet certain business development goals; (5) the goal for participation in the program is reasonably tied to the pool of available minority-owned businesses, taking into account that the availability of minority-owned businesses reflects discrimination that has prevented minorities from forming and developing businesses; and (6) the program includes several provisions that minimize the burden on non-minority businesses, including a waiver provision to ensure that an award will not be accepted for the program if there would be an adverse impact on small businesses operating outside the 8(a) program.[31]

But in evaluating the as-applied challenge, the court determined that the government failed to demonstrate a compelling interest in utilizing the 8(a) program in DOD's award of contracts for military simulators, as the government conceded that it did not have evidence of discrimination in that industry.[32]

*ii. Rothe Development, Inc. v. United States Department of Defense*, 836 F.3d 57 (D.C. Cir. 2016).

Just a few years after the *DynaLantic* decision, the United States District Court for the District of Columbia again upheld the constitutionality of the 8(a) program, rejecting a facial challenge brought by Rothe Development, Inc., a small business that bids on DOD contracts.[33] The *Rothe* district court decision relied on much of the same reasoning as the court in the *DynaLantic* opinion. On appeal, the D.C. Circuit upheld the constitutionality of the 8(a) program, concluding that the statute itself does not contain a racial classification that would subject the program to strict scrutiny.[34] Because Rothe challenged only the statutory provisions and not the SBA regulation, the court applied rational basis review, which requires only that the statute "bear[] a rational relation to some legitimate end," and determined that the statute "readily survives" such review.[35]

**2. Challenges to States' Implementation of the United States Department of Transportation Disadvantaged Business Enterprise Program**

For more than 30 years, the United States Department of Transportation (USDOT) has implemented variations of a program wherein states that receive federal funds for highway planning and construction must implement a state-designed, federally-approved Disadvantaged Business Enterprise (DBE) program.[36] In the following cases, courts examined whether a state's implementation of the federal DOT DBE program withstands strict scrutiny.

---

[31] *Id.* at 283-91.
[32] *Id.* at 280.
[33] *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183 (D.D.C. 2015).
[34] *Rothe Dev., Inc. v. Dep't of Def.*, 836 F.3d 57, 68 (D.C. Cir. 2016).
[35] *Id.* at 63, 72-73.
[36] *See e.g.*, Safe, Accountable, Flexible, Efficient Transportation Equity Act, 49 C.F.R. § 26.1 (2005).

When reviewing the constitutionality of the program as applied by a particular state, courts do not require the state to demonstrate an independent compelling interest for its DBE program; instead, states may rely on the compelling nationwide interest identified by Congress in adopting the program.[37] Courts differ as to how they articulate the precise standard for evaluating the constitutionality of a state's DBE program, but ultimately, whether such a program can withstand heightened scrutiny depends primarily on whether there is sufficient evidence of discrimination in the relevant contracting market to support the specific race- or gender-conscious goals set by the program.

i. *Mountain West Holding Co. v. Montana*, 691 F. App'x 326 (9th Cir. 2017) (Memorandum opinion).

The plaintiff, a subcontractor who competes to win subcontracts from prime contractors who have contracted with the Montana DOT, was denied a contract despite offering the lowest bid on the project. As a result, the plaintiff raised an as-applied challenge to Montana's DBE program under the Equal Protection Clause and also under Title VI of the Civil Rights Act, alleging that it unlawfully required prime contractors to give preference to minority- or female-owned companies.[38] Relying on statistical and anecdotal evidence from a Montana disparity study, the district court concluded that the program was narrowly tailored to further the compelling government interest identified by Congress when it passed the DOT DBE legislation.[39] The district court accordingly granted summary judgment in favor of the defendants.

On appeal, because Montana had discontinued using race- and sex-conscious goals, the Ninth Circuit dismissed the plaintiff's claim for injunctive and declaratory relief as moot.[40] However, as to the plaintiff's claims for damages under Title VI, the Ninth Circuit reversed the district court's grant of summary judgment in favor of Montana. The court first noted that in an as-applied challenge to a state's DBE contracting program, Ninth Circuit precedent established in *Western States Paving Co. v. Washington State Department of Transportation*, 407 F.3d 983 (9th Cir. 2005), holds that "(1) the state must establish the presence of discrimination within its transportation contracting industry, and (2) the remedial program must be 'limited to those minority groups that have actually suffered discrimination.'"[41] The court then concluded that the district court erred in granting summary judgment, finding genuine issues of material fact based on issues that the plaintiff's expert raised as to the validity of the defendants' disparity study.[42] The court also concluded that without this statistical evidence, the state could not rely on anecdotal evidence of discrimination

---

[37] *See, e.g.*, *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 997 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 970 (8th Cir. 2003).
[38] *Mountain W. Holding Co. v. Montana*, 691 F. App'x 326, 328 (9th Cir. 2017).
[39] *Mountain W. Holding Co. v. Montana*, No. CV 13-49-BLG-DLC, 2014 WL 6686734 (D. Mont. Nov. 26, 2014), *aff'd in part, rev. in part, dismissed in part by Mountain W. Holding Co. v. Montana*, 691 F. App'x 326 (9th Cir. 2017).
[40] *Mountain W. Holding Co. v. Montana*, 691 F. App'x 326, 328 (9th Cir. 2017).
[41] *Id.* at 329-30 (quoting *W. States Paving*, 407 F.3d at 997-99).
[42] *Id.* at 330.

alone.[43] Finally, the court determined that it was improper for the district court to rely on the decrease in DBE participation after the state halted use of race- and gender-based preferences, concluding that such a decrease in participation is not necessarily evidence of discrimination against DBEs.[44]

ii. *Midwest Fence Corporation v. Department of Transportation*, 840 F.3d 932 (7th Cir. 2016).

Midwest Fence, a fencing and guardrail contractor, filed an 18-count complaint against the USDOT, the Illinois DOT (IDOT), and the Illinois State Tollway Highway Authority (Tollway) challenging the constitutionality of the federal DBE program, the application of the program by IDOT, and Tollway's analogous DBE program. The Seventh Circuit affirmed the district court's ruling upholding the constitutionality of the federal, IDOT, and Tollway programs.[45] The plaintiff did not challenge whether a compelling interest justified the federal program, and the Seventh Circuit joined the Eighth, Ninth, and Tenth Circuits in concluding that the federal program is narrowly tailored and thus constitutional on its face.[46] Because not all of IDOT's contracts are federally funded, and the Tollway's DBE program did not make use of federal funds, they could not rely on the federal compelling interest in establishing the programs; thus, the court considered whether IDOT and the Tollway established a strong basis in evidence to support their programs.[47] Based on a review of studies presenting statistical evidence of disparities between the availability and utilization of DBEs in the relevant market areas, the court found that both IDOT and the Tollway had a strong basis in evidence to adopt their programs.[48] The court also concluded that all three programs are narrowly tailored, including because they use race- and gender-neutral alternatives, and because they include waivers from provisions that require specific goals when a contractor has made good faith efforts to comply with a DBE goal.[49]

iii. *Dunnet Bay Construction Co. v. Borggren*, 799 F.3d 676 (7th Cir. 2015).

Dunnet Bay, a corporation specializing in general highway construction, was owned and operated by White males. After its bid proposal for the Eisenhower Highway construction project was rejected for failing to meet IDOT's DBE goal, despite being the lowest bid, it filed a claim challenging the constitutionality of IDOT's DBE program. The court held that Dunnet Bay lacked standing to raise an equal protection claim because it could not show that it was excluded from competing for contracts because of race-based measures.[50] Rather, IDOT did not award the contract on which Dunnet Bay bid to anyone and re-bid the project because Dunnet Bay's low bid substantially exceeded the

---

43 *Id.* at 331.
44 *Id.*
45 *Midwest Fence Corp. v. Dep't of Transp.*, 840 F.3d 932, 941, 935-36 (7th Cir. 2016).
46 *Id.* at 942.
47 *Id.* at 948.
48 *Id.* at 949-51.
49 *Id.* at 942-43, 954.
50 *Dunnet Bay Constr. Co v. Borggren*, 799 F.3d 676, 690 (7th Cir. 2015).

program's estimated budget.[51] When Dunnet Bay bid on one of the rebid projects, it was not awarded the contract because it was not the lowest bid.[52] In addition, the court found that even if Dunnet Bay could establish that it was disadvantaged in competing for contracts as compared to DBEs, the reason was not because of race, but was equally attributable to the fact that Dunnet Bay exceeded the business size standard established to qualify as a DBE.[53]

The court then determined that even if Dunnet Bay had standing, IDOT was still entitled to summary judgment. Relying on *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715, 720–21 (7th Cir. 2007), the court first noted that IDOT could rely on "the federal government's compelling interest in remedying the effects of past discrimination in the national construction market," and then stated that a "state is insulated from [a constitutional challenge as to whether its program is narrowly tailored to achieve this compelling interest], absent a showing that the state exceeded its federal authority."[54] The court held that IDOT did not exceed its authority in establishing its DBE program and accordingly affirmed the district court's grant of summary judgment in favor of IDOT.

*iv. Associated General Contractors of America, San Diego Chapter, Inc. v. California Department of Transportation*, 713 F.3d 1187 (9th Cir. 2013).

An association of general contractors challenged the California Department of Transportation's (Caltrans) DBE program on constitutional grounds because it provided race- and gender-based preferences on certain transportation contracts. After the United States District Court for the Eastern District of California upheld the constitutionality of the program, the association appealed. The Ninth Circuit dismissed the appeal for lack of jurisdiction on the grounds that the plaintiff association did not have standing to bring the suit because it did not identify a single member of its association who had suffered or would suffer harm under Caltrans's program.[55] The court also found that even if the plaintiff did have standing, the program survived strict scrutiny.[56] Relying on *Western States*, the Court first explained that Caltrans could rely on the compelling nationwide interest identified by Congress when passing the federal statute and did not need to demonstrate an independent compelling interest for the program.[57] The court then applied the two-prong narrow-tailoring test set forth in *Western States*.[58] First, the court found that a 2007 disparity study commissioned by Caltrans contained "substantial statistical and anecdotal evidence of discrimination in

[51] *Id.* at 692.
[52] *Id.* at 687.
[53] *Id.* at 692-93.
[54] *Id.* at 697 (quoting *N. Contracting*, 473 F.3d at 720, 721).
[55] *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194-95 (9th Cir. 2013).
[56] *Id.* at 1195.
[57] *Id.* at 1195-96 (citing *Western States*, 407 F.3d at 995-1002).
[58] *Id.* at 1196.

the California transportation contracting industry."[59] Second, the court found that Caltrans's program was limited only to those groups actually identified in the disparity study as having experienced discrimination: African Americans, Native Americans, Asian Pacific Americans, and women.[60] Accordingly, the court concluded that the program was narrowly tailored to benefit only those groups that had actually suffered discrimination in the relevant contracting market.

v. *Geyer Signal, Inc. v. Minnesota Department of Transportation*, No. 11-321 (JRT/LIB), 2014 WL 1309092 (D. Minn. Mar. 31, 2014).

Geyer Signal, a White male-owned signage contractor in Minnesota, filed a complaint challenging the constitutionality of the state's DBE program. The complaint also challenged the constitutionality of the USDOT regulations regarding DBE programs as Minnesota's DBE program follows those regulations.[61] The United States intervened in order to defend the USDOT regulations.[62] The court granted summary judgment in favor of both the United States and Minnesota. In June 2014, plaintiffs abandoned a pending appeal in the Seventh Circuit.

vi. *Geod Corporation v. New Jersey Transit Corporation*, 678 F. Supp. 2d 276 (D.N.J. 2009), and 746 F. Supp. 2d 642 (D.N.J. 2010).

GEOD, a White male-owned corporation that specializes in surveying, topographic mapping, and photogrammetry, challenged the New Jersey Transit Corporation's (NJT) DBE program on constitutional grounds. In ruling on the parties' cross-motions for summary judgment, the district court followed numerous other courts in determining that NJT did not need to independently establish a compelling interest because states inherit the federal government's compelling interest in enacting the legislation.[63] The parties disputed the appropriate standard for determining whether the program was narrowly tailored. Plaintiff relied on the Ninth Circuit's decision in *Western States* to assert that its as-applied challenge to the constitutionality of the DBE program required NJT to demonstrate that the program is narrowly tailored.[64] Defendants relied on the Seventh Circuit's decision in *Northern Contracting* to contend that the program was narrowly tailored as long as it complied with the requirements of the federal program.[65] While the parties presented these two approaches as a circuit split, the court seemingly disagreed, stating that each case involved "considerably the same analysis," because determining whether a state's DBE program complies with the federal program requirements involves much the same considerations as the narrow

[59] *Id.*
[60] *Id.* at 1198-99.
[61] *Geyer Signal, Inc. v. Minn. Dep't of Transp.*, No. 11-321 (JRT/LIB), 2014 WL 1309092 (D. Minn. Mar. 31, 2014).
[62] *Id.*
[63] *Geod Corp. v. N.J. Transit Corp.*, 678 F. Supp. 2d 276, 282 (D.N.J. 2009).
[64] *Id.*
[65] *Id.*

tailoring analysis.[66] Ultimately, the court found that a genuine issue of material fact remained concerning whether the method NJT used to determine its DBE goal was sufficiently narrowly tailored.[67]

Following a bench trial, the court upheld the constitutionality of the program. The court first clarified that it agreed with the Seventh Circuit's holding in *Northern Contracting* that "a challenge to a state's application of a federally mandated program must be limited to the question of whether the state exceeded its authority."[68] After reviewing the steps NJT undertook to set its DBE goals, the court ruled that NJT's DBE program was sufficiently narrowly tailored because it did not exceed the authority granted by the federal statute.[69] The court also found that even under the as-applied narrow tailoring test set forth in *Western States*, the program was still constitutional as it was narrowly tailored to further a compelling governmental interest.[70]

### 3. Challenges to Race- and Gender-Conscious COVID-related Relief Efforts

In early 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), which included several race- and gender-conscious relief plans to assist minority-, female-, and veteran-owned businesses in the restaurant and agricultural industries. Some of the programs prioritize socially and economically disadvantaged individuals for certain pandemic relief, in some cases adopting the SBA's definition of social and economic disadvantage.[71] A number of constitutional challenges to the race- and gender-conscious provisions in the ARPA followed. These lawsuits fall into two main groups: those challenging a debt relief program for socially disadvantaged farmers and ranchers,[72] and those challenging an emergency grant fund's 21-day prioritization of restaurants owned by socially and economically disadvantaged individuals.[73]

---

[66] *Id.* at 282-83.
[67] *Id.* at 284.
[68] *Geod Corp. v. N.J. Transit Corp.*, 746 F. Supp. 2d 642, 652 (D.N.J. 2010).
[69] *Id.* at 954-55.
[70] *Id.* at 656-57.
[71] American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 5003(c)(3)(A) (adopting the Small Business Act's definition of social and economic disadvantage for the purpose of prioritizing applications for restaurant relief grants); *see also*, ARPA § 1005(a) (providing debt relief for socially disadvantaged farmers and ranchers); § 1006(b)(1)-(2), (5) (establishing educational training and providing grants, loans, and financial assistance to socially disadvantaged farmers); § 3206(c)(2) (prioritizing a portion of a homeowner assistance fund for socially disadvantaged individuals); § 3301(b), (d), (f) (distributing funds to the states to help small businesses owned and controlled by socially and economically disadvantaged individuals).
[72] APRA § 1005(a). *See, e.g.*, *Miller v. Vilsack*, No. 4:21-cv-595 (N.D. Tex. filed Apr. 26, 2021); *Faust v. Vilsack,* No. 1:21-cv-548 (E.D. Wis. filed Apr. 29, 2021); *Wynn v. Vilsack*, No. 3:21-cv-514 (M.D. Fla. filed May 18, 2021); *Carpenter v. Vilsack*, No. 0:21-cv-103 (D. Wyo. filed May 24, 2021); *Holman v. Vilsack*, No. 1:21-cv-1085 (W.D. Tenn. filed June 2, 2021).
[73] ARPA § 5003(c)(3)(A). *See Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021); *Blessed Cajuns v. Guzman*, No. 21-cv-00677-O (N.D. Tex. filed May 23, 2021).

One challenge to the emergency relief fund for restaurants, *Vitolo v. Guzman,* 999 F.3d 353, 357 (6th Cir. 2021), was filed by a bar and grill equally co-owned by Antonio Vitolo, who is White, and his wife, who is Hispanic. Their restaurant struggled during the COVID-19 pandemic, and they applied for relief from the Restaurant Revitalization Fund ("RRF") the first day the SBA accepted applications.[74] Congress directed the SBA to process applications and distribute the funds on a first come, first served basis, with the exception of a 21-day priority applicant period for restaurants that are at least 51 percent owned and controlled by women, veterans, or the "socially and economically disadvantaged," as defined by the SBA.[75] Non-priority restaurants would not receive a grant until the 21-day period ended, if any funds remained.[76] Vitolo and his restaurant sued the SBA, claiming that the race- and sex-based preferences in the RRF's 21-day priority period violated his constitutional rights under the Equal Protection Clause, and requested a temporary restraining order and a preliminary injunction.[77]

While the United States District Court for the Eastern District of Tennessee denied the plaintiff's motion for a temporary restraining order and a preliminary injunction,[78] the Sixth Circuit granted an emergency motion for an injunction pending appeal, enjoining the SBA from relying on the regulatory presumption that certain racial and ethnic groups are socially disadvantaged and from using any race-based criteria to evaluate social disadvantage in the distribution of RRF grants.[79] It directed the SBA to "fund the plaintiffs' grant application, if approved, before all after-filed applications, without regard to processing time or the applicants' race or sex."[80] The court held that Vitolo had standing even though he might not otherwise qualify for priority consideration without the use of race-conscious preferences and that even though the 21-day period had expired, the claim was not moot because the SBA had not yet paid out any funds.[81]

The court held that the government likely failed to demonstrate a compelling interest in targeting restaurants owned by socially and economically disadvantaged individuals for relief assistance because: (1) the government pointed only to societal discrimination against business owners, not to any specific instances of discrimination; (2) the government's statistical evidence of past discrimination against the groups protected by the presumption was "not nearly enough" to support an inference of intentional discrimination; and (3) a congressional hearing identifying a "theme" that minority-owned businesses required targeted relief assistance because prior pandemic

---

[74] *Vitolo*, 999 F.3d at 357. The $28.6 billion RRF was created by the ARPA to help small, private restaurant owners meet payroll and other expenses. ARPA, Pub. L. No. 117-2, § 5003(b)(2)(A).
[75] ARPA §§ 5003(c)(1)-(3)(A).
[76] *Id. See Vitolo*, 999 F.3d at 357.
[77] *Vitolo*, 999 F.3d at 358.
[78] *Vitolo v. Guzman*, No. 3:21-cv-176, 2021 WL 2132106 (E.D. Tenn. May 25, 2021).
[79] *Vitolo*, 999 F.3d at 365.
[80] *Id.* at 366.
[81] *Id.* at 358-59.

programs failed to reach them was not enough to show that the government participated in the discrimination it sought to remedy.[82]

Even if the government had shown a compelling interest, the court held that the RRF likely was not narrowly tailored because: (1) there were a number of race-neutral alternatives relying on economic rather than racial indicators; (2) the vastly different evidentiary burdens on those who are eligible for the racial presumption and those who are not render the program underinclusive; and (3) the regulation's "racial gerrymandering"—presuming that some ethnicities are socially disadvantaged, and not others—makes the program overbroad.[83]

The court also held that the RRF's prioritization of women-owned businesses did not survive intermediate scrutiny because the government failed to show that (1) the sex-based classification serves an important governmental objective, and (2) the classification is substantially related to that objective.[84] The government's statistics were insufficient to show actual evidence of discrimination, and the RRF prioritized *all* women-owned restaurants, not just those who were economically disadvantaged.[85]

The USDA loan forgiveness program for socially and economically disadvantaged farmers has received a similar reception in a number of federal court cases. For example, a Wisconsin district court issued a temporary restraining order halting the program's implementation, finding that the program "purportedly intended to provide economic relief to disadvantaged individuals without actually considering the financial circumstances of the applicant."[86] Subsequently, a Florida district court issued a nationwide preliminary injunction, temporarily halting enforcement of the program.[87] These and other equal protection challenges to the race-conscious aspects of the USDA's loan forgiveness program remain pending as of the publication of this report, and the government is continuing to defend the program on the merits.

### 4. Challenges to State and Local Disadvantaged Business Enterprise Programs

Some states have implemented programs to promote the use of DBEs, minority business enterprises (MBEs), and/or women's business enterprises (WBEs) in state-funded contracts. Since these contracts are not federally funded, states are not required to adhere to the federal government's mandate requiring states to implement a DBE program. Thus, even though a state program may mirror the federal DBE program, the state does not inherit the federal government's compelling interest. Instead, the state must prove that it has its own compelling interest in remedying discrimination in contracting within the state.

[82] *Id.* at 361-62.
[83] *Id.* at 362-64.
[84] *Id.* at 364-65.
[85] *Id.* at 365. As of July 19, 2021, the case remains pending in district court.
[86] *Faust v. Vilsack*, 519 F. Supp. 3d 470, 476 (E.D. Wis. 2021).
[87] *Wynn v. Vilsack*, --- F. Supp. 2d ---, 2021 WL 2580678 (M.D. Fla June 23, 2021).

In a recent circuit court decision involving such a challenge, the plaintiff, a prime contractor in North Carolina who was denied a contract on a state-funded construction project for failing to demonstrate "good faith efforts" to satisfy participation goals for minority- and women-owned subcontractors, alleged that North Carolina's participation goals violated its equal protection rights.[88] After the district court found the program constitutional both on its face and as applied, the plaintiff appealed. Since North Carolina DOT's DBE program applied to state-funded, not federally funded, contracts, the state did not inherit the government's compelling interest.[89] North Carolina had commissioned a consulting firm to conduct a disparity study every few years regarding the state's transportation construction industry. Relying heavily on these studies, the Fourth Circuit concluded that there was a strong basis in evidence of discrimination in North Carolina against Black and Native American subcontractors, and finding the program narrowly tailored, it upheld it both on its face and as applied to these two groups.[90] However, the Court found that the evidence did not justify application of the program to female, Asian American, and Hispanic subcontractors, and thus held that the statute was unconstitutional as applied to those groups.[91]

## II. There are Identified Disparities in Government Contracting between Minority- and Women-Owned Businesses and Their Non-Minority, Male-Owned Counterparts

Following the *Croson* decision, in which the Supreme Court articulated the type of evidence necessary to support the use of race-conscious measures in contracting programs, state and local governments began commissioning disparity studies to determine whether evidence of racial and gender discrimination existed in their contracting markets sufficient to justify race- and gender-conscious remedial action. While disparity studies vary in approach, the central component of most disparity studies is a comparison between the availability of minority- and women-owned businesses as a percentage of businesses operating in distinct categories of a particular contracting market and the utilization of such businesses by the spending authority as defined by the percentage of dollars that goes to those firms. Simply put, dividing utilization percentage by availability percentage results in a disparity index. A disparity index of 100 indicates that the utilization of a particular category of businesses is equivalent to the availability of those businesses in the relevant market. For example, if 25% of the construction firms in a particular geographic area were women-owned, and 25% of the spending authority's construction contracting was spent with women-owned businesses, that would yield a disparity index of 100. As a general rule of thumb, a

---

[88] *H.B. Rowe Co. v. Tippett*, 615 F.3d 233 (4th Cir. 2010).
[89] *Id.*
[90] *Id.* at 257.
[91] *Id.* at 245, 258 (noting that the study found that female subcontractors were overutilized during the study period and that underutilization of Hispanic American and Asian American subcontractors was not statistically significant).

disparity index of less than .80, or 80 for those studies that multiply the disparity index by 100, indicates a substantial disparity.[92]

The Department of Justice's 2010 report reviewed approximately 70 disparity studies, which showed that "'minority-owned businesses and women-owned businesses throughout the nation continue to face large disparities in almost every aspect of business enterprise activity that can be quantified' in a pattern of discriminatory barriers that is repeated across the nation."[93] Since then, over 200 disparity studies have been published. A review of these studies shows that the "needle has not moved."[94] Disparity studies continue to identify substantial disparities between the availability of minority- and women-owned businesses and the utilization of such businesses in state and local government procurement. Overwhelmingly, the studies also present evidence linking such disparities to discriminatory factors. A list of 189 of these recent studies from state and local jurisdictions in 34 different states and the District of Columbia is attached as Appendix B.

In a 2016 report, the U.S. Department of Commerce's Minority Business Development Agency conducted a comprehensive review of 100 publicly available disparity studies, summaries, and reports, focusing on studies conducted in the prior ten years (hereinafter, "2016 MBDA Report").[95] The 2016 MBDA Report found that the studies "indicated significant contracting disparities for minority business enterprises (MBEs), pervasive across different ethnic and racial groups, industries, and geographies."[96] Over 78% of the observed disparity ratios fell below the 80% threshold signifying a "substantial" disparity. The median value for the observed disparities was just 19%, indicating that minority businesses were being utilized at less than one-fifth of their availability in a given marketplace. The report concluded that "these results indicate that contracting disparities for MBEs are pervasive."[97]

Disparity studies published since the 2016 MBDA Report continue to show substantial and pervasive disparities. For example, a 2019 disparity study commissioned by the City of Indianapolis and Marion County found that the participation of minority- and women-owned businesses in contracts the city awarded from 2014-2018 was substantially lower than what one would expect based on the availability of those businesses for that work, with a disparity index of 76.[98] This means that "minority- and woman-owned businesses received approximately $0.76 for every dollar that they might

---

[92] *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607.4 (D); *Connecticut v. Teal*, 457 U.S. 440, 443 n.4 (1982).
[93] *Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses* 10 (2010) (quoting *The Department of Transportation's Disadvantaged Business Enterprise Program: Hearing Before the H. Comm. on Transp. and Infrastructure*, 111th Cong. 326 (2009) (statement of Jon Wainwright, Vice President, NERA Economic Consulting)).
[94] U.S. Dep't of Com., Minority Bus. Dev. Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprises: A Review of Existing Disparity Studies* (2016) (hereinafter, "2016 MBDA Report").
[95] 2016 MBDA Report, at 70.
[96] *Id.* at 69.
[97] *Id.* at vi.
[98] BBC Rsch. & Consulting, *City of Indianapolis and Marion County Disparity Study* 15 (2019).

be expected to receive based on their availability for the relevant prime contracts and subcontracts that the City awarded during the study period."[99] A 2018 disparity study prepared for the City of New York found even greater disparities. Analysis of disparities across all procurement categories revealed a disparity index of 20.43% for minority- and women-owned businesses.[100] The study further found that this "quantitatively significant disparity" was corroborated by qualitative evidence of "barriers that M/WBEs face in participating in the City's procurement process."[101]

A 2021 disparity study report prepared for the California Department of Transportation ("Caltrans") found that women- and minority-owned businesses were substantially underutilized, receiving only 20.3 percent of Caltrans contracts despite being available to perform 27.6 percent of the construction and professional services contracts funded by USDOT.[102] This disparity persists despite the fact that all Caltrans construction and professional services contracts funded by USDOT are subject to race- and gender-conscious subcontracting programs. In contrast, Caltrans' state-funded projects do not use race- or gender-conscious measures. In those projects, women- and minority-owned business participation lags at a meager 10.8 percent despite an availability of 23.4 percent.[103] The resulting disparity index is 46, meaning that W/MBEs received $.46 of every dollar they should have expected to receive based on their availability to perform state-funded construction and professional services contracts.[104] The systemic barriers to the marketplace that cause these disparities are rooted in discriminatory systems. By way of example, the report cited that the average business loan approved for W/MBEs in the Pacific region was $289,131, whereas, for non-Hispanic White men it was $455,636.[105]

Similarly, the Commonwealth of Virginia's 2020 disparity study found that the overall availability of minority- and women-owned businesses in construction, professional services, and goods and other services was 32.8 percent.[106] However, minority- and women-owned businesses received only 13.4 percent of the relevant contract and procurement dollars that the Commonwealth awarded during the study period (2014-2019).[107] As a result, the disparity index was 41, representing a significant underutilization of minority- and women-owned businesses.[108]

These findings comport with other comprehensive reviews of disparity studies and related statistical materials. For example, in a 2013 expert report prepared for

---

99 *Id.*
100 MGT Consulting Grp., *City of New York Disparity Study* 4-12 (May 2018).
101 *Id.* at 6-3.
102 BBC Rsch. & Consulting, *California Department of Transportation Availability and Disparity Study Report*, ES 3 & 5 (2021).
103 *Ibid.*
104 *Id.* at ES-8
105 *Id.* at App'x C, Fig. C-16.
106 BBC Rsch & Consulting, *Commonwealth of Virginia 2020 Disparity Study*, ES-3 (2020).
107 *Id.* at ES-6.
108 *Id.* at ES-8.

litigation, Dr. Jon Wainwright, Senior Vice President of NERA Economic Consulting, reviewed 107 disparity studies conducted since 2000 covering 142 public contracting entities in 35 states encompassing 89% of the national population. Dr. Wainwright concluded that "these materials contain significant evidence of large and adverse disparities facing minority business enterprises."[109] Dr. Wainwright further concluded that the observed disparities "are consistent with the presence of discrimination and its lingering effects in the small business contracting environment."[110]

While the evidence indicates that the barriers that have impeded the growth and success of minority- and women-owned businesses continue to exist, the evidence also shows that government contracting preference programs ameliorate the effects of public and private discrimination. For example, a 2017 disparity study prepared for the Los Angeles County Metropolitan Transportation Authority compared the participation of minority- and women-owned business on contracts that contained goals to encourage utilization of minority- and women-owned businesses as opposed to contracts that did not contain such goals.[111] The results showed that on contracts without goals, minority- and women-owned firms earned only 53 cents on the dollar, but on contracts with goals, such firms earned 96 cents on the dollar—almost what would be expected given the availability of such firms in the marketplace.[112]

The presence of substantial disparities does not in itself indicate that discrimination is the cause of the observed disparities. Researchers use both quantitative and qualitative methods to examine the causes of disparities in public contracting. One method includes testing the results for statistical significance, which helps to determine whether the observed disparities could be due to random chance alone. The 2016 MBDA Report found that the majority of substantial disparities observed were "statistically significant at high levels, such that disparity study consultants could reject chance as a prime driver of contracting disparities."[113]

Another quantitative method used to identify the underlying causes of the observed disparities is regression analysis. Regression analysis is a statistical technique that allows for the "comparison between certain business outcomes, such as business formation, business earnings, or loan denials, and minority status, while holding other, potentially non-discriminatory factors, such as geographic location, industry affiliation,

---

[109] Jon Wainwright, Report of Defendant's Expert, submitted in *Rothe Dev., Inc. v. Dep't of Def.*, No. 12-CV-744 (D.D.C.) (2013), at 1 ("Wainwright Report").
[110] *Id.* at 21, 25-35 (Table 5), 36-54.
[111] BBC Rsch. & Consulting, *2017 LA Metro Disparity Study* 7-7 (2018).
[112] *See also* BBC Rsch. & Consulting, *Pennsylvania Department of Transportation Disparity Study*, ES-8-9 (2018) (noting that PennDOT's use of DBE contract goals during the study period applied most directly to MWBE participation in subcontracts rather than on prime contracts and found that MWBEs showed a substantial disparity for prime contracts (75) but not for subcontracts); BBC Rsch. & Consulting, *City of Charlotte Disparity Study*, ES-5 (2017) (MWBEs, considered together, showed higher participation in goals contracts—18.3%—than in no-goals contracts—11.3%); BBC Rsch.& Consulting, *Illinois Department of Transportation Disparity Study*, ES-8 (2017) (MWBEs considered together showed a substantial disparity of 34 for prime contracts, which do not include goals, but do not show a disparity for subcontracts, which do use goals).
[113] 2016 MBDA Report, at 69.

education, age, or balance sheets, constant."[114] This allows researchers to investigate various factors in private-sector marketplace discrimination, such as disparities in business formation, business earnings, and access to capital, and whether these contribute to observed contracting disparities.[115] The 2016 MBDA report determined through these regression analyses that "the majority of the studies in the set that utilized quantitative data on marketplace discrimination found that minorities and minority business enterprises: "[e]arned significantly lower wages than similarly situated non-minority male counterparts in relevant markets; [h]ad significantly lower business earnings than similarly situated non-MBEs in relevant markets; [h]ad lower rates of business formation than non-minority males; [w]ere more likely to be denied commercial or personal loans than similarly situated non-minority males or non-MBEs; and [h]ad lower revenues and market shares than similarly situated non-MBEs."[116] Analyses of such private-sector disparities is important because the Supreme Court has found that governments have a compelling interest in not being a passive participant in private discrimination.[117]

Disparity studies also analyze qualitative evidence to identify and explain what factors lead to the contracting disparities observed through statistical evidence. Certainly, there are some challenges that all businesses face regardless of the identity of the business owner. Yet the 2016 MBDA Report also identifies discriminatory factors that lead to the observed disparities, including overt prejudicial treatment and exclusion based on race and systemic discrimination in the public and private marketplace. Key discriminatory barriers identified include "[a]gency and prime contractors employing capability stereotypes, double or higher standards, and manipulating bid processes based on prejudicial factors unrelated to business performance; also systemic discrimination against MBEs related to key market-based issues including access to capital."[118] Each of these will be discussed in more detail below.

In addition to the substantial body of evidence showing disparities in state and local contracting, the evidence shows that substantial disparities are also present in federal contracting. In 2017, just 9.8% of federal spending on contracts went to minority-owned businesses.[119] The same year, woman-owned businesses received only 5% of federal prime contract awards.[120] In a 2012 expert report prepared for litigation, Dr. Robert N. Rubinovitz, the Deputy Chief Economist in the Economics and Statistics Administration at the Department of Commerce, conducted regression analyses comparing the likelihood of minority-owned businesses winning federal prime contracts

[114] Wainwright Report, at 64 n. 69.
[115] 2016 MBDA Report at vii.
[116] *Id.* at 44-45.
[117] *Croson*, 488 U.S. at 492.
[118] *Id.* at 69.
[119] Megan Janetsky, Ctr. for Responsive Politics, *Women- and minority-owned businesses receive only a small fraction of federal contracts*, Apr. 13, 2018, https://www.opensecrets.org/news/2018/04/women-owned-biz-receive-fraction-of-fed-contracts/.
[120] *Strengthening the Entrepreneurial Ecosystem for Women*: *Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 115th Cong. 29 (2017) (opening statement from Sen. Shaheen).

when compared to majority-owned businesses of similar size in the same industry.[121] Dr. Rubinovitz analyzed data on government contracts for small businesses for Fiscal Year 2012 and found consistent, statistically significant underutilization of small, minority-owned businesses in federal prime contracting. Dr. Rubinovitz conducted regression analyses to control for factors other than race that might contribute to differences in the success of minority-owned firms in winning contracts compared to non-minority-owned firms. Specifically, Dr. Rubinovitz's regression analyses controlled for the industry in which the firm did business, business age, business size (both in terms of average number of employees and annual receipts), business form, and security clearance, and compared the likelihood of minority-owned businesses receiving a federal contract versus similar businesses.[122] The analysis showed that in the vast majority of industries, minority-owned businesses remained less likely to win a federal contract, usually to a statistically significant degree.[123]

## III. Discrimination Limits Access to Contracting Markets

The statistical evidence discussed in the prior section is bolstered by qualitative evidence that shows the various ways discrimination hinders the ability of minority- and women-owned businesses to compete equitably for government contracts. While this discrimination can take many forms, three primary obstacles are: (1) discrimination by procurement agencies and prime contractors, (2) exclusion from business networks, and (3) discrimination by bonding companies and suppliers.

### A. Discrimination By Procurement Agencies and Prime Contractors Creates Obstacles for Minority- and Women-Owned Businesses

As the 2016 MBDA Report found, "[t]he most obvious barriers arising due to discrimination lie in actions by procurement agencies and non-MBE prime contractors (when considering MBE subcontractors) to purposely exclude or hinder MBE participation."[124] The report identified these barriers as including "outright prejudicial treatment, attitudes, stereotypes, implementing higher and double standards for MBEs, or manipulating the bid process."[125]

Unfortunately, recent studies and reports show that the prejudicial treatment and discriminatory attitudes discussed in the Department of Justice's 1996 and 2010 reports persist. The 2016 MBDA Report found that "instances of outright discrimination permeated" the reviewed disparity studies across industries, geographic areas, and all ethnic, racial, and gender groups.[126] Studies published since the 2016 MBDA Report show the same. In a 2018 disparity study commissioned by the City of New Orleans, a

---

[121] Robert N. Rubinovitz, Report of Defendants' Expert, submitted in *Rothe Dev., Inc. v. Dep't of Def.*, No. 12-cv-0744 (KBJ) (2012) ("Rubinovitz Report").
[122] *Id.* at 10-11.
[123] *Id.* at 11-12.
[124] 2016 MBDA Report, at 54.
[125] *Id.*
[126] *Id.* at 63-64.

business owner reported an instance of a federal agency revoking his contract once it was discovered he was a minority, directly saying to him that they did not want an "'n-word' to have the job."[127] The same study noted that "[o]ther interviewees reported hearing racial slurs and gender-based insults used against minority and female business owners."[128] In a 2015 study conducted in Arizona, a Black business owner explained: "I have seen everything from looks to gestures, hearing the 'n-word' and different things from Hispanics to whites. . . . Getting your truck sprayed, different things like tearing checks open [to] see what you make, or you are blocked off a job because you are the only woman or African American out there.'"[129] In Nevada, an Asian-American female representing a woman-focused organization said, "It is still very difficult for women business owners to get contracts, especially in construction. I don't want to say it is a man's world, but it is here [in Las Vegas]. When I go out and do site visits for our WBE's, they are still having difficulty accessing the contract that they need. Not so much with the smaller contracts like $25,000 or under, but beyond that, they still struggle." She shared an experience from a WBE who believes she lost the bid on an environmental project in her county to an out-of-state contractor because she was a woman-owned business."[130]

Some minority and female business owners report dealing with assumptions by prime contractors that they are a worker and not the business owner of a subcontracting firm. This evidence could demonstrate that the under-utilization of minority and women-owned subcontracting firms in a particular market place was due to discrimination. For example, "[t]he vice president of a DBE-certified Black American engineering firm said that he was on a job where they had to go inside a sewer and he saw a worker point at him and overheard him say, 'Send that boy down there.'"[131] In another study, the vice president, non-owner of a minority-owned contracting business stated that "it is often assumed that the business owner (a minority) works for him (a non-minority)."[132] A minority business owner even went so far as to change his company name and to hire a non-Hispanic White engineer to be his employee manager, and he noticed that "we started to get quite a few prime jobs in the rural areas. . . . So that tell[s] me something."[133]

---

[127] Keen Indep. Rsch. LLC, *City of New Orleans Disparity Study* Appendix J-37 (2018).
[128] *Id.*
[129] Keen Indep. Rsch. LLC, *Arizona Department of Transportation Disparity Study Report* Appendix J-66 (2015).
[130] BBC Rsch. & Consulting, *2017 Nevada Transportation Consortium Disparity Study* Appendix D-54 (2017).
[131] BBC Rsch. & Consulting, *2014 Imperial County, CA Transportation Disparity Study* Appendix D-54 Appendix J-69 (2014). In the same study, a Hispanic female who is part-owner of a towing company reports not only her own issues with proving she is a business owner, but also that her husband faces the same issues, explaining, "nobody believes him, that he's an owner. . . . They just say, 'You're just a driver [or] you're just a worker.'" *Id.*
[132] Keen Indep. Rsch., LLC, *Arizona Department of Transportation Disparity Study Report* Appendix J-65 (2015).
[133] BBC Rsch. & Consulting, *Caltrans 2016 Disparity Study* Appendix D-128 (2016).

The 2016 MBDA Report also found that the studies reviewed "support the presence of double or higher standards for minority-owned businesses."[134] In one study, a minority male business owner reported that "[s]ome City managers will require me as a minority-owned business to do work that was not required of others doing similar work. . . . I have seen other jobs where the work was not nearly as professional as mine but they did not have to redo it."[135] In a 2018 study conducted in Maryland, a business owner stated that "we've seen situations where a majority contractor or a White firm would do the same thing, and a lot of times what happens, it's an accident. With a minority firm . . . it happened because you didn't manage it properly, you didn't look far enough ahead, you didn't anticipate."[136]

Other barriers occur through manipulation of bid processes, such as bid shopping and held bids, or "bait and switch" practices. Some of these practices can affect all businesses to some extent, but the 2016 MBDA Report found a "strong discriminatory pattern" associated with certain process-related barriers.[137]

The Department of Justice's 2010 report described the practice known as "bait and switch," in which a prime contractor commits to using a minority- or woman-owned business to meet a race- or gender-conscious goal for subcontractors, but never gives the minority- or woman-owned business the promised work. Recent disparity studies have documented that this practice continues. For example, in a 2018 study conducted in Pennsylvania, a Black female owner of a professional services firm stated: "I have been approached and included on contracts and never gotten an order. . . . There have been several times when I have been put on the contract as a subcontractor and never heard another word."[138] Similarly, a 2019 study in Florida reported that an "African American professional services firm stated there is no accountability for primes utilizing MWBE firms. Primes get work and submit names of MWBE subs but do not use the subs named in their proposals."[139]

Bid shopping is another practice frequently cited in disparity studies as presenting barriers to minority- and woman-owned businesses. Bid shopping occurs when a prime contractor solicits a bid from a minority- or woman-owned business, but instead of selecting them as a subcontractor, the prime uses the bid to get lower bids from non-minority- and male-owned firms. For example, a minority business owner in

---

[134] 2016 MBDA Report, at 65.
[135] *Id.* at 66 (quoting Mason Tillman Assoc., Ltd., *City of Cincinnati Disparity Study* 10-6 (2015)).
[136] NERA Econ. Consulting, *Disadvantaged Business Enterprise Disparity Study: Volume I* (prepared for the Maryland Department of Transportation) 275 (2018).
[137] 2016 MBDA Report, at 60.
[138] BBC Rsch. & Consulting, *Commonwealth of Pennsylvania Department of General Services 2018 Disparity Study* Appendix D-100 (2018).
[139] MGT Consulting Group, *City of Tallahassee, Leon County, and Blueprint 2019 Disparity Study* 7-10 (2019); *see also* Keen Indep. Rsch. LLC, *Arizona Department of Transportation 2020 Disparity Study* J-59 (2020) (listing examples of minority-owned firms being used in "bait and switch" bidding and contracting processes).

Indiana noted that after faxing in his bids, the prime contractor would "use our bid with another contractor to get a lower bid."[140]

### B. Exclusion From Business Networks Limits Opportunities

Often referred to as the "good ol' boy" network, the lack of access to business networks is a barrier identified in almost all disparity studies. The 2016 MBDA Report identified networking barriers as the most frequently cited barrier, with 86% of minority- and women-owned businesses identifying exclusionary networks as a barrier to obtaining contracts. In one recent study, the Black owner of a construction firm reported that "general contractors would tell him that his subcontracting bid was too high but then he would later find out that the winning subcontracting bid was even higher than his bid, but was accepted because '[t]hey knew the guy. [The general contractor] had a working relationship with them.'"[141]

Exclusionary networks also can result in a lack of transparency, precluding some businesses from even hearing about opportunities. In a recent study conducted in North Carolina, the Black male owner of a minority-owned and veteran-certified professional services firm stated, "It is [a barrier]. No notification. If you're not a part of the good old boy network, you'll never know about it. It's not open and transparent."[142] Some treatment is more blatantly discriminatory. In a 2017 disparity study conducted for Palm Beach County, a female business owner noted: "My industry is the good old boys. I am called 'Girlie,' even though I'm over 60. The construction industry is a male-dominated White industry. If you are not in the club, you are ignored."[143]

To be sure, some exclusion of minorities and women from business networks may not be due to overt discrimination, but to the reality that people are comfortable working with people who they know or already have experience working with. But considering many of these longstanding business and social connections have developed in environments that have historically excluded minorities and women, it is difficult to ignore the discriminatory foundation for such networks. As a female owner of a disadvantaged business-certified engineering and consulting firm noted when asked if there is a good ol' boy network: "It is huge—it definitely exists," and she knows that she is not going to get jobs that are discussed "while golfing at the country club or in the locker room at the gym."[144] The Black co-owner of a professional services firm commented that he is from the generation that "sat at the back of the bus" and that some of his White peers are in charge now and still have that old mentality.[145] The

[140] Mason Tillman Assoc., Ltd., *City of St. Louis Disparity Study Volume 1* 8-6 (2015).
[141] Keen Indep. Rsch. LLC, *City of Baton Rouge, Parish of East Baton Rouge Disparity Study* 4-15 (2019).
[142] BBC Rsch. & Consulting, *2018 Disparity Study City of Asheville, North Carolina* Appendix D-70 (2018).
[143] Mason Tillman Assoc., Ltd., *Palm Beach County Disparity Study Final Report* 10-12 (2017).
[144] Keen Indep. Rsch. LLC, *2016 Availability and Disparity Study* (prepared for the Montana Department of Transportation) 5-18 (2016).
[145] Keen Indep. Rsch. LLC, *Missouri Department of Transportation 2019 DBE Availability Study Final Report* Appendix F-47 (2019).

existence of exclusionary networks supports the use of measures that encourage agencies and businesses to go outside of their usual networks to expand opportunities.

### C. Discrimination in Bonding and by Suppliers Burdens Disadvantaged Firms

Most public contracting projects require a contractor to obtain a surety bond, which financially guarantees the performance of the agreed upon work. Inability to meet bonding requirements can be a challenge for any small business trying to break into the marketplace, but numerous studies show that bonding requirements burden minority- and women-owned businesses to an even greater degree. Barriers to meeting bonding requirements not only inhibit the successful formation and growth of businesses, but also place such businesses at a disadvantage in competing for contracts.

Both quantitative and qualitative evidence shows that bonding requirements disproportionately affect businesses owned by women or people of color. The 2016 MBDA Report noted that 83% of minority- and women-owned businesses identified bonding requirements as a specific barrier to the ability to obtain contracts.[146] A number of recent studies show that minority-owned firms are significantly more likely to face difficulties in obtaining required bonds compared with majority-owned firms.[147] In some circumstances, minority- and women-owned businesses may even face double standards related to bonding requirements. A Black specialty contractor relayed a situation in which he was the low bidder for a contract and was required to provide bonding. While he was acquiring a bond, he learned that another contractor received the contract and was not required to have bonding on the project.[148]

Discriminatory barriers in the bonding market are closely related to the access to capital issues discussed below in Section V. Not only do the same factors affect both access to capital and access to bonding, but the inability to obtain adequate capital contributes to a business's ability to obtain bonding. In this way, even if contracts are

---

[146] 2016 MBDA Report, at 55.
[147] BBC Rsch. & Consulting, *City of Indianapolis and Marion County Disparity Study* 9-4 (2019) (concluding that minority- and women-owned businesses do not have the same access to certain business inputs, including bonding, as businesses owned by non-Hispanic White men); Keen Indep. Rsch. LLC, *City of Baton Rouge, Parish of East Baton Rouge Disparity Study* 4-10 (2019) (finding that among construction firms that had tried to obtain a bond for a project, 31% of minority-owned firms had difficulty obtaining the required bond compared with only 4% of majority-owned firms); Keen Indep. Rsch. LLC, *City of New Orleans Disparity Study* 9 (2018) (reporting that minority-owned businesses (42%) and women-owned businesses (21%) were much more likely than majority-owned firms (7%) to indicate they had experienced difficulties trying to obtain a bond); BBC Rsch. & Consulting, *Illinois Department of Transportation Disparity Study* 8-4 (2017) (finding that minority- and woman-owned businesses in Illinois do not have the same access to bonding and other business inputs as businesses owned by non-Hispanic White men); NERA Econ. Consulting, *Business Disparities in the DCAMM Construction and Design Market Area* (prepared for the Commonwealth of Massachusetts Division of Capital Asset Management and Maintenance) 15 (2017) (reporting that bonding requirements were statistically significantly more difficult for minority- and women-owned business even when holding constant factors such as business size and other characteristics related to business capacity).
[148] MGT of America, Inc., *Comprehensive Disparity Study for the City of Pensacola* 7-12 (2012).

otherwise awarded on a race-and gender-neutral basis, public entities may still become passive participants in private sector discrimination.

The Department of Justice's 2010 report concluded that discrimination by suppliers also limited minority- and women-owned businesses' ability to compete. That remains the case. For example, a recent disparity study commissioned by New Orleans found that one-third of minority- and women-owned businesses reported experiencing competitive disadvantages due to supplier pricing compared to only 15% of majority-owned firms.[149] In another study, a minority female owner of an architecture and engineering company reported that "it's very well-known that suppliers have two to three tiers of pricing structures based on relationships where certain contractors get preferred pricing with our supplier. We can't be competitive on bids if someone else can rent the same equipment for $50 a day and I get charged $75 a day."[150] Discriminatory pricing by suppliers creates a significant barrier for minority- and women-owned businesses because they have to include those prices in their bid, resulting in a less competitive bid.

## IV. There Are Significant Disparities in Business Formation and Success Between Minority- and Women-Owned Businesses Relative to Their Non-Minority, Male-Owned Counterparts

As was discussed in the Department of Justice's 2010 report, minority- and women-owned businesses make up a disproportionately small share of small businesses. Unfortunately, this remains true a decade later. Even though people of color constitute 40% of the U.S. population, they make up only 20% of the nation's business owners.[151] This disparity is even more stark for some racial and ethnic groups. The business ownership rate among non-Latino Whites is 11%, but for Black Americans it is only 3% and approximately 7% for Latinos.[152] While 12.7% of White men own businesses, the same is true of only 8.3% of Asian American women, 7.3% of White women, 6.9% of Hispanic women, and 3.5% of Black women.[153] Women-owned businesses represent about 38% of all firms.[154]

It is not merely that minority- and women-owned businesses are less common than businesses owned by White men; they are also less profitable. In 2012, the average

[149] Keen Indep. Rsch. LLC, *City of New Orleans Disparity Study* Appendix H, 42 (2018).
[150] Mason Tillman Assoc., Ltd., *City of St. Louis Disparity Study Volume 1* 8-4 (2015).
[151] *Promoting Inclusive Lending During the Pandemic: Community Development, Financial Institutions, and Minority Depository Institutions, Hearing Before the H. Comm. on Financial Services*, 116th Cong. (2020).
[152] Robert W. Fairlie, *Latino Business Ownership: Contributions and Barriers for U.S.-born and Immigrant Latino Entrepreneurs*, produced under contract with the SBA, Office of Advocacy 6, 27 (2018).
[153] *Strengthening the Entrepreneurial Ecosystem for Minority Women*: *Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 113th Cong. 105 (2013) (report by Robert W. Fairlie, *Wealth Inequality, Business Success, and Minority Women*).
[154] *Strengthening the Entrepreneurial Ecosystem for Women*: *Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 115th Cong. 16 (2017) (statement of Michelle Richards, Executive Director, Great Lakes Women's Business Council).

minority-owned firm generated gross receipts of $173,552, roughly one-third of the average non-minority-owned firm gross receipts of $550,472.[155] Certain minority groups fare even worse. A Black-owned firm averages about $58,000 in sales per firm, while a Hispanic-owned firm generates two and a half times this amount; an Asian American-owned firm, six times as much; and a White-owned firm, over nine times this amount.[156] Although African Americans own 9.5% of businesses, these businesses only account for 1.3% of sales.[157] Hispanic-owned firms are 12.2% of businesses but only 4.0% of sales.[158] Women-owned businesses earn less than male-owned firms, as they employ only 8% of the nation's private workforce and produce 4% of business revenues.[159]

The 2018 Small Business Credit Survey, an annual survey of over 6,000 businesses with fewer than 500 employees, found that:

- Smaller shares of Asian American- (51%) and Black-owned businesses (46%) were profitable at the end of 2017 compared to White-owned firms (55%).
- A larger share of White-owned firms reported revenue growth (58%) compared to Black-owned firms (49%).
- A larger share of White-owned firms reported growth in the number of employees (37%) compared to Black-owned firms (31%).
- Minority-owned firms more frequently reported financial challenges. Seventy-eight percent of Black-owned firms, and 69% of Asian American- and Hispanic-owned firms did so, compared to 62% of White-owned businesses.[160]

These disparities in sales, growth, and profitability make minority- and women-owned businesses less stable and less able to withstand challenges. This has been made even more apparent with the economic effects of the COVID-19 pandemic disproportionately affecting minority- and women-owned businesses, as discussed below in Section VI.

## V. Discrimination Limiting Access to Capital Affects the Formation and Development of Businesses Owned by Women or People of Color

Businesses owned by women or people of color have far less access to capital than White male business owners, and this significantly limits their ability to establish and grow their businesses and compete equally in the marketplace. Both statistical and

[155] U.S. Dep't of Com., Minority Bus. Dev. Agency, *The State of Minority Business Enterprises, An Overview of the 2012 Survey of Business Owners* 2 (2018).
[156] *Id.* at 10.
[157] *Id.* at 17.
[158] *Id.* at 18.
[159] *Strengthening the Entrepreneurial Ecosystem for Women*: *Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 115th Cong. 2 (2017) (opening statement of Sen. Shaheen).
[160] Fed. Rsrv. Bank of Atlanta, *Small Business Credit Survey: Report on Minority-Owned Firms* (Dec. 2019).

qualitative evidence show that minority and female business owners not only are denied loans at a higher rate than White males, but when they are successful in obtaining loans, they are for lower amounts and at less favorable terms and conditions. Because minority- and women-owned businesses cannot access capital at the same cost as firms owned by White males in the same marketplaces, they are at a competitive disadvantage when bidding on government contracts where they must include these higher costs in the price of their bid.[161]

### A. The Wealth Gap Contributes to, and is Exacerbated By, Lack of Access to Capital

One factor contributing to the lack of access to capital is the vast wealth gap between Whites and minorities. The average wealth of White families in 2016 was seven times the wealth of Black families and five times the wealth of Latino families (at the median, White families have 10 times the wealth of Black families and eight times the wealth of Latino families).[162] This disparity has grown over time. In 1963, White families had $121,000 more in wealth than Black families, on average; by 2016, they had over $700,000 more.[163] The disparity also grows with age. On average, White people in their 30s have $147,000 more in wealth than their Black counterparts. But by the time they are in their 60s, White people have $1.1 million more in wealth than Black people, on average.[164] This wealth gap has grown in the last few decades. A 2019 McKinsey study found that even adjusting for inflation the overall racial wealth gap between Black and White families widened from about $100,000 in 1992 to $154,000 in 2016.[165] Researchers at the Center for Global Policy Solutions suggested that in the recovery period after the 2008 housing crisis, African Americans (45%), Asian Americans (48%) and Latinos (58%) lost nearly half or more than half of their wealth compared to a 21% loss among Whites.[166] In 2017, Prosperity NOW and the Institute for Policy Studies reported that 51% of households of color live in liquid asset poverty compared to 28% of White households.[167] Similar to minorities, "'[w]omen start with less capital then men.'"[168] Minority women in particular have low levels of wealth relative to White men

---

[161] *See* Rubinovitz Report, *supra* at 11 (showing a consistent, statistically significant underutilization of small, minority-owned businesses in federal prime contracting); *see also* Robert Rubinovitz, *Utilization of Women-Owned Businesses in Federal Prime Contracting,* Department of Commerce (Dec. 31, 2015) (finding that the odds of winning a contract for Woman-Owned Businesses (WOBs) are estimated to be roughly 21 percent lower relative to the odds of winning contracts by otherwise similar firms that were not identified as WOBs).
[162] *Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Services*, 116th Cong. (2019) (testimony of Kilolo Kijakazi, PhD, Urban Institute).
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.* "Liquid asset poverty" is defined as a status of a four-person household that maintains less than three months' worth of savings at any given time.
[168] *Strengthening the Entrepreneurial Ecosystem for Minority Women*: *Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 113th Cong. 46 (2013) (quoting *Women-Owned Businesses in the 21st Century*, U.S. Department of Commerce Economics and Statistics Administration, for the White

and women.[169] White men have a median net worth of $137,775, but the median net worth is lower for all groups of women—$125,700 for White women, $106,084 for Asian American women, $8,902 for Hispanic women, and $7,645 for Black women.[170] While 32% of White men have startup capital of at least $10,000 when starting a business, the same is true of only 17% of White women, 15% of Hispanic women, and 11% of Black women.[171]

This wealth gap has a dramatic effect on the ability of minorities and women to start their own businesses. Underrepresentation of Black business owners can be attributed in large part to Black people having less of their own money to invest in firms and less collateral to put toward a loan due to job, housing, and financing discrimination. Black-owned businesses start with approximately a third less capital than their White peers and have difficulties raising private investments from mainstream investment systems.[172] The situation for minority women, particularly Black and Hispanic women, is especially dire, given that they have low levels of wealth relative to White women and men. This results in less access to startup capital, lower levels of business ownership, and smaller businesses when they are created.[173]

This wealth gap is the product, at least in part, of discrimination. Congress has received testimony that Black wealth accumulation has undergone a sustained process of asset underdevelopment "via an array of American programs and practices."[174] These include:

- federally sanctioned redlining, which reduced the credit available for Black households, in turn limiting their ability to buy homes;
- discriminatory access to homeownership subsidies in the New Deal legislation;
- denial of the benefits of the G.I. Bill to Black veterans, while White households were able to rely on the G.I. Bill to build wealth;
- racial zoning practices and tax policies; and

---

House Council on Women and Girls, October 2010); *see also Disparities in Access to Capital: What the Federal Government is Doing to Increase Support for Minority Owned Firms, Field Hearing Before the H. Comm. on Small Business*, 115th Cong. (2018); BBC Rsch. & Consulting, *Illinois Department of Transportation 2017 Disparity Study* 3-6 (2017) ("Women have also faced consistent wage and income gaps relative to men. Nationally, the median hourly wage of women is still only 84 percent the median hourly wage of men.").

[169] *Id.* at 101 (report by Robert W. Fairlie, *Wealth Inequality, Business Success, and Minority Women*).

[170] *Id.* at 102.

[171] *Id.* at 104.

[172] Andre Perry, Jonathan Rothwell, and David Harshbarger, *Five-star reviews, one-star profits: The devaluation of businesses in Black communities*, Metropolitan Policy Program at Brookings (Feb. 2020).

[173] *Strengthening the Entrepreneurial Ecosystem for Minority Women: Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 113th Cong. (2013).

[174] *How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color, Hearing before Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services*, 117th Cong. (2021) (testimony of William Darity Jr., Samuel DuBois Cook Professor of Public Policy, Duke University) (citations omitted).

- the long-term effects of Jim Crow era state tax policies.[175]

### B. Businesses Owned by Women and People of Color are Significantly More Likely to Be Denied Access to Capital

Given that women and people of color who own businesses have less of their own personal capital to contribute toward their small businesses, loans are especially critical for them. Unfortunately, these business owners are also less likely than White male business owners to be able to obtain loans. The wealth gap is a contributing factor to the challenges that minority and female business owners face in obtaining capital. The Director of Outreach at Goldman Sachs testified that women and minorities have lower credit, which inhibits their ability to obtain capital, not because they lack moral character or intend to default on loans, but rather for three other reasons: (1) customers are late to pay them, (2) they lack accumulated assets/wealth, and (3) they have debt.[176] The impact is significant: due to the historic barriers and private discrimination that has limited the ability of minority business owners to accumulate assets and wealth, minority-owned businesses are two to three times more likely to be denied credit, more likely to avoid applying for loans based on the belief they will be turned down, and more likely to receive smaller loans and pay higher interest rates on the loans they do receive.[177] Along the same lines, only 30% of businesses owned by women were able to get bank loans in the first part of 2016, and women founders get only 7% of the venture capital in this country.[178] Women receive only 16% of conventional small business loans, and only 4.4% of the total dollar value of loans from all sources.[179]

Disparity studies are replete with statistical evidence of disparities in access to capital.[180] For example, a 2017 disparity study conducted in Massachusetts concluded

---

[175] *Id.*
[176] *Strengthening Access to Capital for Minority-Owned Small Business: Field Hearing Before the S. Committee on Small Business and Entrepreneurship*, 115th Cong. 58 (2018) (statement of Will Holmes, Director of Outreach, Goldman Sachs).
[177] *Id.*
[178] *Strengthening the Entrepreneurial Ecosystem for Women*: *Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 115th Cong. 3-4 (2017) (statement of Elizabeth Gore).
[179] *Id.* at 15 (statement of Michelle Richards, Executive Director, Great Lakes Women's Business Council).
[180] Keen Indep. Rsch. LLC, *Arizona Department of Transportation Disparity Study Report* 407 (2015) ("There are statistically significant disparities in loan approval rates for African American-owned small businesses compared with similarly-situated non-Hispanic white-owned firms."); NERA Econ. Consulting, *Business Disparities in the San Antonio, Texas Market Area* 9 (2015) ("When minority-owned firms applied for a loan, their loan requests were substantially more likely to be denied than non-minorities, even after accounting for differences in firm size and credit history."); NERA Econ. Consulting, *Business Disparities in the Travis County, Texas Market Area* 119 (2016) ("When minority-owned firms applied for a loan, their loan requests were substantially more likely to be denied than non-minorities, even after accounting for differences in firm size and credit history."); *id.* at 135 ("African American-owned firms are 24 percentage points more likely than nonminority male-owned firms to have their loan application denied . . . ."); MGT of America, Inc., *City of Hampton and Hampton Schools Historical M/WBE Utilization Disparity Study* E-10 (2014) ("About 1.3 percent of non-M/WBE loan applicants reported being denied commercial bank loans, as compared to 36.3 percent of African American applicants and 4.5 percent of nonminority woman applicants."); MGT of America, Inc., *Comprehensive Disparity Study for the City of Pensacola* 8-5, 8-6 (2012) ("About 3.7 percent of non-

"that there is evidence of discrimination against M/WBEs in the DCAMM market area in the small business credit market" and that "[t]his discrimination is particularly acute for African American-owned small businesses where, even after adjusting for differences in assets, liabilities, and creditworthiness, the loan denial rates remain substantially higher than for nonminority male-owned small businesses."[181] Another study, conducted in Washington State, analyzed data in the National Survey of Small Business Finance (NSSBF) and found that "African American businesses were much more likely to be denied loans than comparable businesses owned by nonminority males."[182] In fact, only 2.7% of non-M/WBE loan applicants reported being denied commercial bank loans, as compared to 50% of African American loan applicants.[183] Another study found that "[m]inorities have a significantly lower probability of obtaining a business loan than Caucasian males in all industries."[184] Similarly, a 2011 Virginia study found that "[a]bout 20.5 percent of non-M/WBEs reported being denied commercial bank loans, as compared to 52.4 percent of African American-owned firms, 35.3 percent of Hispanic American-owned firms."[185] Of the minority-owned firms that did not apply for financing, 28% of the Hispanic-owned firms, 27% of the Black-owned firms, and 24% of the Asian American-owned firms explained that they did not apply because of a belief

---

M/WBE loan applicants reported being denied commercial bank loans, as compared to 52.6 percent of African American-owned firms and 22.2 percent of Nonminority Woman-owned firms."); NERA Econ. Consulting, *The State of Minority- and Women-Owned Business Enterprise: Evidence from Cleveland* 7 (2012) ("When minority-owned firms did apply for a loan, their loan requests were substantially more likely to be denied than non-minorities, even after accounting for differences like firm size and credit history."); *id.* at 8 ("[F]or African American-owned small businesses where, even after adjusting for differences in assets, liabilities, and creditworthiness, the loan denial rate ranges from 8 to 22 percentage points higher than for nonminority male-owned small businesses."); Colette Holt & Assoc., *Texas Department of Transportation Disparity Study* 156 (2019) ("Minority-owned firms are less likely to receive loans than non-minority-owned firms regardless of firm size."); *Native 8(a) Contracting: Emerging Issues, Hearing Before the H. Comm. on Small Business*, 116th Cong. (2019) ("Native Hawaiians have less access to capital because they have a higher loan denial rate for mortgages due to poor credit history."); Colette Holt & Assoc., *Washington State Airports Disparity Study* 121 (2019) ("[L]oan denial rates for minority firms were about three times higher, at 42 percent, compared to those of non-minority-owned firms, at 16 percent."); BBC Rsch. & Consulting, *2013 Sound Transit Disparity Study* 4-10 (2013) (32% of MBEs reported difficulties obtaining lines of credit or loans, compared with 14% of majority-owned businesses); BBC Rsch. & Consulting, *2017 Disparity Study: City of Charlotte* 3-9 (2017) ("Researchers have shown that Black American-owned businesses and Hispanic American-owned businesses are more likely to forego submitting business loan applications and are more likely to be denied business credit when they do seek loans, even after accounting for various race-neutral and gender-neutral factors."); BBC Rsch. & Consulting, *City of Indianapolis and Marion County Disparity Study* 9-4 (2019) ("Qualitative information collected through public meetings, telephone surveys, and in-depth interviews with local businesses also indicated that minority- and woman-owned businesses often have difficulties obtaining business loans and credit." ).

[181] NERA Econ. Consulting, *Business Disparities in the DCAMM Construction and Design Market Area* 9 (2017).

[182] MGT of America, Inc., *2015 Disparity Study for the Washington Suburban Sanitary Commission* ES-9 (2016).

[183] *Id.*

[184] Mason Tillman Assoc., LTD, *Shelby County (Tennessee) Disparity Study Final Report* 10-31 (2016).

[185] MGT of America, Inc., *A Disparity Study for the Commonwealth of Virginia* 7-16 (2011).

that they would not be approved, compared to only 13% of White-owned firms who reported the same.[186]

While these results were reported across the board, individual stories from minority and female business owners supported them. Consistent with the data on the challenges that minority business owners face in obtaining financing, several business owners of color reported how difficult it was to access the financing that their businesses needed.

- "The Hispanic male co-owner of a construction company reported that one major issue he faces is financing. He said that the Contractor's Licensing Board sets limits on the size of job a contractor can bid on. In order to meet these requirements, they borrowed some money and had friends help them put $20,000 in the business account. He said that his firm is licensed up to $200,000 per job, making it ineligible to do jobs over $200,000. He said that he would love to take on larger jobs but there's no one who will back them financially without wanting a part of their company."[187]

- "The African American director of a minority development agency reported that one of the biggest challenges a minority-owned business faces is access to capital and the banks are not making loans to minority businesses. He said that the lack of financing is impacting the ability to obtain bonding."[188]

- "An African American owner of a DBE-and MBE-certified specialty contracting firm, when asked about challenges starting the business, reported that money was a challenge, saying 'Finding people that would give you money to make your payroll without [abusing] you, that's the hardest part.'"[189]

Numerous minority business owners reported on the practical fallout for their businesses resulting from their difficulty in accessing capital. For example:

> A Black American male owner of a MBE-certified landscaping firm said that the biggest disadvantage or challenge he faces as a small or disadvantaged business is not being able to obtain capital to buy the equipment he feels the firm needs. He said, "What we would like to do is set up a line of credit and be able to get trucks and stuff, tractors, and Bobcats. We had a chance that one time this guy was going out of business. He was cutting grass, and he was [going to] set us up real good, but we didn't have the financing to get the equipment." He said that he believes

---

[186] Fed. Rsrv. Bank of Atlanta, *Small Business Credit Survey: Report on Minority-Owned Firms* 6 (Dec. 2019).
[187] Keen Indep. Rsch. LLC, *Nevada Department of Transportation Disparity Study Final Report* Appendix J-39 (2013).
[188] *Id.* at Appendix J-53.
[189] Keen Indep. Rsch. LLC, *Oregon Department of Transportation 2016 Availability and Disparity Study* Appendix J-18 (2016).

> the key to success in his industry is being able to get the financing to be able to grow. He added, "We don't have the financing to get the type of equipment that we would like to get to go out and expand."[190]

Similarly, "[a] minority male owner of a professional services company reported that he has been unable to receive any financial assistance for his small business: 'We had a very difficult time getting financing. It obviously has put a strain on my business. We had to make business decisions to not seek certain work. The banks perceived my minority company as a business risk even though we had a great business plan that indicated that we were a minimal risk.'"[191]

### C. When Minority and Female Business Owners Do Obtain Loans, They Are Smaller and on Less Favorable Terms and Conditions

Minority- and women-owned firms receive smaller loans at higher interest rates than firms owned by White males, and they also get smaller equity investments.[192] While 49% of White-owned business applicants were approved for all of the financing for which they applied, the same was true for only 31% of Black-owned firms, 35% of Hispanic-owned firms, and 39% of Asian American-owned firms.[193] Thirty-eight percent of Black-owned business applicants and 33% of Hispanic-owned business applicants receive none of the financing they applied for, compared to 20% of White-owned business applicants and 24% of Asian American-owned business applicants.[194] At a congressional hearing on disparities in access to capital, Rep. Al Lawson noted that "minority-firms, including women, are more likely than other businesses to be denied traditional financing compared to other businesses. In fact, the average African-American owner raises about $500 in equity in the first year, compared to $18,000 for the average White business start-up."[195]

Evidence from disparity studies also shows that the loans obtained by minority and female business owners were smaller than those obtained by White male business owners. A 2015 Arizona study found that "[t]he mean value of approved loans for minority- and female-owned businesses in the Mountain region was less than one-half that for non-Hispanic white male-owned firms."[196] Additionally, numerous studies found that minority and female business owners pay higher interest rates than White business owners.[197]

---

[190] BBC Rsch. & Consulting, *2015-16 Ohio Public Authorities Disparity Study* Appendix E-29 (2016).
[191] Mason Tillman Assoc., LTD, *Palm Beach County Disparity Study Final Report* 10-13 (2017).
[192] *Empowering America to Reach its Full Economic Potential: Closing the Wealth Gap, Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 113th Cong. (2013).
[193] Fed. Rsrv. Bank of Atlanta, *Small Business Credit Survey: Report on Minority-Owned Firms* 6 (Dec. 2019).
[194] *Id.*
[195] *Disparities in Access to Capital: What the Federal Government is Doing to Increase Support for Minority Owned Firms: Field Hearing Before the H. Comm. on Small Business*, 115th Cong. (2018).
[196] Keen Indep. Rsch. LLC, *Arizona Department of Transportation Disparity Study* 4-7 (2015).
[197] *See* Colette Holt & Assoc., *Texas Department of Transportation Disparity Study* 156 (2019) ("Minority-owned firms paid an average of 7.8 percent in interest rates for loans compared to 6.4 percent

The challenges of obtaining financing lead minority business owners to rely more heavily on their personal funds. Twenty-eight percent of Black and Asian American business owners and 29% of Hispanic owners relied on personal funds as the primary funding source for their businesses, compared to only 16% of White business owners.[198] But as already discussed, the wealth gap between White males and minorities and women limits the personal wealth that minority and women owners have at their disposal.[199]

The challenges that minority- and women-owned businesses face in accessing capital affect their ability to get established in the first place, compete in the market, and maintain thriving and successful businesses over time.

## VI. COVID Has Had a Disproportionate Impact on Minority- and Women-Owned Businesses

The 2020 economic downturn caused by the COVID-19 pandemic has had an extremely disproportionate effect upon minority- and women-owned businesses.[200] This disparity exists for two critical reasons: (1) minority- and women-owned businesses tend to face underlying challenges that make them harder to run and scale successfully, and (2) they are more likely to be concentrated in the industries most immediately affected by the pandemic, such as service industries.[201] Distressed companies were three times as likely to close because of a two-month revenue shock,[202] and in April 2020, the Federal Reserve Bank of New York reported that minority- and women-owned businesses were twice as likely to be classified as "at risk" or "distressed" as their non-

---

for non-minority-owned firms."); NERA Econ. Consulting, *Business Disparities in the San Antonio, Texas Market Area* at 9 (2015) ("When minority-owned firms did receive a loan they were obligated to pay higher interest rates on the loans than comparable nonminority-owned firms."); Keen Indep. Rsch. LLC, *Arizona Department of Transportation Disparity Study* 4-7 (2015) ("There is evidence that minority- and women-owned small businesses in the Mountain region paid higher interest rates on their business loans than non-minority male-owned small businesses."); NERA Econ. Consulting, *Business Disparities in the Travis County, Texas Market Area* 119 (2016) ("When minority-owned firms did receive a loan they were obligated to pay higher interest rates on the loans than comparable nonminority-owned firms."); NERA Econ. Consulting, *The State of Minority- and Women-Owned Business Enterprise: Evidence from Cleveland* 7 (2012) ("When minority-owned firms did receive a loan they were obligated to pay higher interest rates on the loans than comparable nonminority-owned firms.").

[198] Fed. Rsrv. Bank of Atlanta, *Small Business Credit Survey: Report on Minority-Owned Firms* 5 (Dec. 2019).

[199] A number of studies have demonstrated that lower start-up capital adversely affects prospects for those businesses. *See, e.g.*, Keen Indep. Rsch. LLC, *2017 Minnesota Joint Disparity Study* (2017).

[200] *Capital Access for Minority Small Businesses: COVID-19 Resources for an Equitable and Sustainable Recovery: Hearing Before S. Comm. on Small Business & Entrepreneurship*, 116th Cong. (2020).

[201] Andre Dua, Deepa Mahajan, Ingrid Millan, and Shelley Stewart, *COVID-19's effect on minority-owned small businesses in the United States*, McKinsey & Company (May 2020); *see also Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services, Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Services,* 116th Cong. (2020).

[202] *Id.*

minority male-owned counterparts.[203] The effects on minority- and women-owned businesses were thus predictable and pronounced. According to a recent survey of Latina and Black female business owners, 70% reported that COVID-19 has caused a decrease or loss of revenue, and 90% reported that they are currently unable to pay themselves a sustainable income.[204] The number of active small business owners in the United States dropped by 22% between February and April 2020, but this drop was even greater for minority and women business owners—Black business owners dropped by 41%, Latino business owners dropped by 32%, Asian American business owners dropped by 26%, and female-owned businesses dropped by 25%.[205]

Notwithstanding the federal government's efforts to assist small businesses in the wake of the economic crisis, this disparity persists. The Paycheck Protection Program (PPP), administered by the Small Business Administration, oversaw the disbursement of 4.4 million private loans totaling over $511 billion as of May 26, 2020, to help small businesses with employees stay afloat during the COVID-19 economic crisis. A PPP loan is based on the applicant's average monthly payroll costs and could be partially or fully forgiven if the business keeps its employee counts and employee wages stable. However, businesses owned by women and people of color were more likely than White-male-owned businesses to face challenges in taking advantage of the PPP program for several reasons. First, businesses owned by people of color are likely to have fewer employees and lower payroll and thus could not qualify for higher loan amounts. Second, pre-existing disparities in access to capital, discussed in detail above in Section V, made it less likely that business owners of color would have the commercial lending relationships necessary to access the PPP program and discouraged many from applying. Third, the SBA did not issue guidance to lenders about prioritizing borrowers in rural, minority-owned, or women-owned markets and did not collect data that would allow analysis of whether lenders served underserved and rural markets under the PPP program. Fourth, PPP excluded potential loan recipients based on many forms of criminal legal system involvement, including people who have been charged, but not tried or convicted of a crime.[206] Due to racial disparities in all aspects of the criminal justice system, there is evidence that this provision had a negative impact on business owners of color.[207] These factors and others may have contributed to the fact that 70% of Black firms affiliated with the U.S. Black Chambers, Inc. that applied for PPP loans were denied, and 96% of U.S. Black Chambers, Inc. members who applied did not receive the

---

[203] *Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services: Hearing Before Subcomm. On Diversity and Inclusion of the H. Comm. on Financial Services*, 116th Cong. (2020).
[204] *Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services: Hearing Before Subcomm. On Diversity and Inclusion of the H. Comm. on Financial Services*, 116th Cong. (2020).
[205] Robert W. Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey*, National Bureau of Economic Research 1 (June 2020).
[206] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).
[207] Ctr. for Responsible Lending, *The Paycheck Protection Program Continues to be Disadvantageous to Smaller Businesses, Especially Businesses Owned by People of Color and the Self-Employed* (Apr. 2020).

PPP loan amount that they requested.[208] Women of color similarly suffered. Since less than 7% of businesses owned by women of color have employees, few were in a position to benefit from the PPP despite facing revenue losses.[209]

The economic fallout of the COVID-19 pandemic is ongoing, and the long-term effects remain to be seen. It is already apparent, however, that this crisis has revealed and exacerbated the hardships that minority- and women-owned businesses continue to face.

[208] *Capital Access for Minority Small Businesses: COVID-19 Resources for an Equitable and Sustainable Recovery: Hearing Before S. Comm. on Small Business & Entrepreneurship*, 116th Cong. (2020).
[209] Closing the Women's Wealth Gap Initiative, *On the Margins: Economic Security for Women of Color Through the Coronavirus Crisis and Beyond*, Closing the Women's Wealth Gap 17 (Apr. 2020).

# APPENDIX A

## Congressional Hearings from 2010 to 2021 Addressing Public Procurement and Challenges Facing Minority- and Women-Owned Business Enterprises

- *How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color, Hearing before Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services,* 117th Cong. (2021).

- *Capital Access for Minority Small Businesses: COVID-19 Resources for an Equitable and Sustainable Recovery, Hearing Before S. Comm. on Small Business & Entrepreneurship,* 116th Cong. (2020).

- *Small Business in Crisis: The 2020 Paycheck Protection Program and its Future Before S. Comm. on Small Business and Entrepreneurship*, 116th Cong. (2020).

- *Oversight Hearing on "From Languages to Homelands: Advancing Tribal Self-Governance and Cultural Sovereignty for Future Generations," Hearing Before the S. Comm. on Indian Affairs*, 116th Cong. (2020).

- *Holding Financial Regulators Accountable for Diversity and Inclusion: Perspectives from the Office of Minority and Women Inclusion, Hearing Before Subcomm. On Diversity and Inclusion of the H. Comm. on Financial Services,* 116th Cong. (2020).

- *The Rent is Still Due: America's Renter, COVID-19, and an Unprecedented Eviction Crisis, Hearing Before the H. Comm. on Financial Services*, 116th Cong. (2020).

- *Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services, Hearing Before Subcomm. On Diversity and Inclusion of the H. Comm. on Financial Services,* 116th Cong. (2020).

- *Promoting Inclusive Lending During the Pandemic: Community Development, Financial Institutions, and Minority Depository Institutions, Hearing Before the H. Comm. on Financial Services,* 116th Cong. (2020).

- *Transparency in Small Business Lending, Hearing Before the H. Comm. on Small Business*, 116th Cong. (2020).

- *Transportation's Disadvantaged Business Enterprise Program, Hearing Before the H. Comm. on Transportation and Infrastructure*, 116th Cong. (2020).

- *Examining the Racial and Gender Wealth Gap in America, Hearing Before Subcomm. On Diversity and Inclusion of the H. Comm. on Financial Services,* 116th Cong. (2019).

- *Reauthorization of the SBA's Contracting Programs, Hearing Before the S. Comm. on Small Business and Entrepreneurshi*p, 116th Cong. (2019).

- *Embracing Corporate Social Responsibility: Small Business Best Practices, Hearing Before the H. Comm. on Small Business*, 116th Cong. (2019).

- *Fostering the American Dream: How SBA Can Empower Immigrant Small Business Owners, Field Hearing Before the H. Comm. on Small Business*, 116th Cong. (2019).

- *Native 8(a) Contracting: Emerging Issues, Hearing Before the H. Comm. on Small Business*, 116th Cong. (2019).

- *The Role of the SBA's 8(a) Program in Enhancing Economic Opportunities, Hearing Before the H. Comm. on Small Business*, 116th Cong. (2019).

- *Lost Opportunities? SBA's Engagement with Historically Black Colleges and Universities, Hearing Before the H. Comm. on Small Business*, 116th Cong. (2019).

- *Strengthening Access to Capital for Minority-Owned Small Business, Field Hearing Before the S. Committee on Small Business and Entrepreneurship,* 115th Cong. (2018).

- *Opportunities and Challenges with the Small Business Administration's Federal Contracting Programs, Hearing Before the S. Comm. on Small Business and Entrepreneurshi*p, 115th Cong. (2018).

- *Disparities in Access to Capital: What the Federal Government is Doing to Increase Support for Minority Owned Firms, Field Hearing Before the H. Comm. on Small Business*, 115th Cong. (2018).

- *Strengthening the Entrepreneurial Ecosystem for Women, Hearing Before the S. Comm. on Small Business and Entrepreneurshi*p, 115th Cong. (2017).

- *Minority Access to Capital, Field Hearing Before the S. Comm. on Small Business and Entrepreneurshi*p, 114th Cong. (2015).

- *Accessing Capital in Indian Country, Hearing Before the S. Committee on Indian Affairs*, 114th Cong. (2015).

- *Empowering America to Reach its Full Economic Potential: Closing the Wealth Gap, Hearing Before the S. Comm. on Small Business and Entrepreneurshi*p, 113th Cong. (2013).

- *Strengthening the Entrepreneurial Ecosystem for Minority Women, Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 113th Cong. (2013).

- *Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities, Hearing Before the S. Comm. on Small Business and Entrepreneurship*, 112th Cong. (2011).

- *Small Business Participation in the Federal Procurement Marketplace, Hearing Before the H. Comm. on Small Business*, 111th Cong. (2010).

- *Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses, Hearing Before the Subcommittee on Government Management, Organization, and Procurement of the H. Comm. on Oversight and Government Reform*, 111th Cong. (2010).

# APPENDIX B

## State and Local Disparity Studies from 2010-2021

**Alaska**

*Alaska Department of Transportation & Public Facilities Disadvantaged Business Enterprise Study, Final Report*, Prepared by the Alaska Department of Transportation & Public Facilities Civil Rights Office (2020).

*Alaska Department of Transportation & Public Facilities Disadvantaged Business Enterprise Study, Final Appendices*, Prepared by the Alaska Department of Transportation & Public Facilities Civil Rights Office (2020).

*Alaska Department of Transportation and Public Facilities Disparity Study*, Prepared by MGT of America, Inc. (2014).

**Arizona**

*Arizona Department of Transportation Disparity Study, Final Report*, Prepared by Keen Independent Research (2020).

*Arizona Department of Transportation Disparity Study Report*, Prepared by Keen Independent Research (2015).

**California**

*Availability and Disparity Study, California Department of Transportation, Final Report*, Prepared by BBC Research & Consulting (2012).

*BGPAA Disparity Study - Final Report, Burbank-Glendale-Pasadena Airport Authority (CA)*, Prepared by BBC Research & Consulting (2012).

*California Department of Transportation Availability and Disparity Study Report*, Prepared by BBC Research & Consulting (2021).

*California High-Speed Rail Authority Business Market Availability and Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2014).

*Caltrans 2014 Disparity Study for FTA Contracts, California DOT*, Prepared by BBC Research & Consulting (2014).

*Caltrans Disparity Study*, Prepared by BBC Research and Consulting for Caltrans Department of Transportation (2016).

*City of Oakland 2017 Race and Gender Disparity Study Draft,* Prepared by Mason Tillman Associates, Ltd. (2020).

*City of San Diego 2020 Disparity Study*, Prepared by BBC Research & Consulting (2021).

*Disadvantaged Business Enterprise (DBE) Program Disparity Study Update*, Prepared by Mason Tillman Associates, Ltd. for the Los Angeles County Metropolitan Transportation Authority Disparity Study (2013).

*2015 Disadvantaged Business Enterprise Disparity Study, John Wayne Airport, County of Orange, California Final Report*, Prepared by MGT of America, Inc. (2016).

*Imperial County Transportation Commission Disparity Study*, Prepared by BBC Research & Consulting (2014).

*LA Metro 2017 Disparity Study*, Prepared by BBC Research & Consulting for the Los Angeles County Metropolitan Transportation Authority (2018).

*Metro Disparity Study Final Report, Los Angeles County Metropolitan Transportation Authority*, Prepared by BBC Research & Consulting (2010).

*MTS Disparity Study Final Report*, Prepared by BBC Research & Consulting for the San Diego Metropolitan Transit System (2010).

*OCTA Disparity Study Final Report, Orange County Transportation Authority*, Prepared by BBC Research & Consulting (2010).

*SANDAG Disparity Study Final Report*, Prepared by BBC Research & Consulting for the San Diego Association of Governments (2010).

*San Diego Association of Governments Disparity Study*, Prepared by BBC Research & Consulting (2014).

*San Diego County Regional Airport Authority Disparity Study*, Prepared by BBC Research & Consulting (2010).

*San Francisco Bay Area Rapid Transit District Disparity Study Volume I*, Prepared by Miller³ Consulting, Inc. (2017).

*Disadvantaged Business Enterprise Availability, Utilization, and Disparity Study for the San Francisco Municipal Transportation Agency*, Prepared by Rosales Business Partners LLC (2015).

**<u>Colorado</u>**

*City and County of Denver Disparity Study*, Prepared by BBC Research & Consulting (2018).

*City and County of Denver Minority/Women Owned/Disadvantaged Business Enterprise Disparity Study*, Prepared by MGT of America, Inc. (2013).

*Colorado Disparity Study, Final Report,* Prepared by Keen Independent Research (2020).

*Disparity Study for Denver Public Schools*, Prepared by MGT of America, Inc. (2015).

**<u>Connecticut</u>**

*Connecticut Disparity Study: Phase 1*, Prepared by The Connecticut Academy of Science and Engineering for the Connecticut General Assembly and the Government Administration and Elections Commission (2013).

*Connecticut Disparity Study: Phase 2*, Prepared by The Connecticut Academy of Science and Engineering for the Connecticut General Assembly and the Government Administration and Elections Commission (2014).

*Connecticut Disparity Study: Phase 3*, Prepared by The Connecticut Academy of Science and Engineering for the Connecticut General Assembly and the Government Administration and Elections Commission (2016).

**<u>District of Columbia</u>**

*2015 Disparity Study for Washington Suburban Sanitary Commission*, Prepared by MGT of America, Inc. (2016).

*2010 Disparity Study for Washington Suburban Sanitary Commission*, Prepared by Mason Tillman Associates (2011).

**<u>Florida</u>**

*Broward County Public Schools Disparity Study-Final Report*, Prepared by Mason Tillman Associates (2015).

*Comprehensive Disparity Study for the City of Pensacola*, Prepared by MGT of America, Inc. (2012).

*Disparity Study for Miami-Dade County Public Schools Phase I Report*, Prepared by MGT of America, Inc. (2014).

*Hillsborough County Aviation Authority Disparity Study Update Final Report*, Prepared by MGT of America, Inc. (2015).

*Jacksonville Multi-Jurisdictional Disparity Study Volume 1*, Prepared by Mason Tillman Associates (2013).

*Miami-Dade County Comprehensive Disparity Study, Final Report*, Prepared by Mason Tillman Associates, Ltd. (2015).

*Minority, Women, and Small Business Enterprise Disparity Study for the City of Tallahassee, Leon County, Florida and Blueprint Intergovernmental Agency*, Prepared by MGT Consulting Group (2019).

*Palm Beach County Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2017).

*Solid Waste Authority of Palm Beach County, Florida Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2017).

*Solid Waste Authority of Palm Beach County, Florida Disparity Study Appendix A*, Prepared by Mason Tillman Associates, Ltd. (2017).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Broward County*, Prepared by NERA Economic Consulting for Broward County, Florida (2010).

**Georgia**

*Atlanta Housing Authority Disparity Study*, Prepared by Keen Independent Research (2017).

*Atlanta Public Schools Disparity Study*, Prepared by Keen Independent Research (2017).

*City of Atlanta Disparity Study Summary Report*, Prepared by Keen Independent Research LLC (2015).

*Comprehensive Disparity Study City of Savannah, Georgia*, Prepared by Griffin & Strong, P.C. (2016).

*Georgia Department of Transportation Disparity Study*, Prepared by Griffin & Strong, P.C. for the State of Georgia (2016).

*Georgia Department of Transportation Disparity Study*, Prepared by BBC Research & Consulting for the State of Georgia (2012).

**Hawaii**

*Hawaii Department of Transportation 2019 Availability and Disparity Study*, Prepared by Keen Independent Research (2020).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Hawai'i*, Prepared by NERA Economic Consulting for the Hawai'i Department of Transportation (2010).

**<u>Idaho</u>**

*Idaho Transportation Department Disparity Study*, Prepared by BBC Research & Consulting (2017).

**<u>Illinois</u>**

*Chicago Transit Authority Disparity Study*, Prepared by Colette Holt & Associates (2019).

*City of Chicago Disparity Study for Construction Contracts*, Prepared by Colette Holt & Associates (2021).

*Cook County, Illinois Disparity Study*, Prepared by Colette Holt & Associates (2015).

*Illinois Department of Transportation 2017 Disparity Study*, Prepared by BBC Research & Consulting (2018).

*Illinois Department of Transportation/Illinois Tollway Disadvantaged Business Enterprises Disparity Study, Volume 1: Illinois State Toll Highway Authority*, Prepared by Mason Tillman Associates, Ltd. (2011).

*Illinois Department of Transportation/Illinois Tollway Disadvantaged Business Enterprise Disparity Study, Volume 2: Illinois Department of Transportation*, Prepared by Mason Tillman Associates, Ltd. (2011).

*Illinois State Toll Highway Authority Disparity Study Construction and Construction Related Services*, Prepared by Colette Holt & Associates (2015).

*Metra Availability Study*, Prepared by Colette Holt & Associates for the Northeast Illinois Regional Commuter Railroad Corporation (2016).

*Pace Suburban Bus Disparity Study*, Prepared by Collette Holt & Associates (2015).

*RTA Availability Study*, Prepared by Colette Holt & Associates for the Regional Transportation Authority of Illinois (2016).

*The Metropolitan Water Reclamation District of Greater Chicago Disparity Study 2015*, Prepared by Collette Holt & Associates, (2015).

*The Status of Minority and Women Owned Business Enterprises Relevant to Construction Activity in and around Cook County, Illinois*, Prepared by Collette Holt & Associates and NERA, 2010.

*State of Illinois Department of Central Management Services Disparity Study*, Prepared by Colette Holt & Associates (2015).

**Indiana**

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Ball State University (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Indiana Department of Administration (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Indiana University (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Indiana State University (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Ivy Tech Community College (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Purdue University (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for University of Southern Indiana (2016).

*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting for Vincennes University (2016).

*City of Indianapolis and Marion County Disparity Study*, Prepared by BBC Research & Consulting (2019).

*Indiana Disparity Study Final Report*, Prepared by BBC Research & Consulting (2010).

*Indiana Disparity Study Final Report Appendices*, Prepared by BBC Research & Consulting (2010).

*State of Indiana 2020 Disparity Study*, Prepared by BBC Research & Consulting (2020).

**Kentucky**

*Louisville & Jefferson County Metropolitan Sewer District Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2018).

**Louisiana**

*City of Baton Rouge, Parish of East Baton Rouge Disparity Study*, Prepared by Keen Independent Research (2019).

*City of New Orleans Disparity Study*, Prepared by Keen Independent Research (2018).

*Recreation and Park Commission for the Parish of East Baton Rouge Disparity Study*, Prepared by Keen Independent Research (2019).

**Maryland**

*Business Disparities in the Maryland Market Area*, Prepared by NERA Economic Consulting for the State and Maryland and the Maryland Department of Transportation (2017).

*City of Frederick MD Disparity Study Report*, Prepared by Griffin & Strong (2021).

*Disadvantaged Business Enterprise Disparity Study: Volume I*, Prepared by NERA Economic Consulting for the Maryland Department of Transportation (2018).

*Disadvantaged Business Enterprise Disparity Study: Volume II*, Prepared by NERA Economic Consulting for the Maryland Department of Transportation (2018).

*Disadvantaged Business Enterprise Disparity Study: Volume III*, Prepared by NERA Economic Consulting for the Maryland Department of Transportation (2018).

*Disadvantaged Business Enterprise Disparity Study: Volume I*, Prepared for the Maryland Department of Transportation by NERA Economic Consulting (2013).

*Disparity Study Final Report, Baltimore County, MD*, Prepared by Mason Tillman Associates (2021).

*MBE/WBE Disparity Study for the Baltimore City Public Schools*, Prepared by NERA Economic Consulting (2014).

*Montgomery County Maryland Disparity Study Final Report*, Prepared by Griffin & Strong (2014).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Baltimore*, Prepared by NERA Economic Consulting (2014).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Maryland*, Prepared by NERA Economic Consulting for the Maryland Department of Transportation (2011).

**Massachusetts**

*Business Disparities in the DCAMM Construction and Design Market Area*, Prepared by NERA Economic Consulting for the Commonwealth of Massachusetts Division of Capital Asset Management and Maintenance (2017).

*City of Boston 2020 Disparity Study*, Prepared by BBC Research & Consulting (2021).

**Minnesota**

*2017 Minnesota Joint Disparity Study City of Minneapolis*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study City of Saint Paul*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Hennepin County*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Metropolitan Airports Commission*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Metropolitan Council*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Metropolitan Mosquito Control District*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Minnesota Department of Administration*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Minnesota Department of Transportation*, Prepared by Keen Independent Research (2018).

*2017 Minnesota Joint Disparity Study Minnesota State Colleges and Universities*, Prepared by Keen Independent Research (2018).

*State of Minnesota Joint Availability and Disparity Study, Final Report*, Prepared by MGT of America, Inc. for the Metropolitan Airports Commission (2010).

*State of Minnesota Joint Availability and Disparity Study, Final Report*, Prepared by MGT of America, Inc. for the Metropolitan Council (2010).

*State of Minnesota Joint Availability and Disparity Study, Final Report*, Prepared by MGT of America, Inc. for the Minnesota Department of Administration (2010).

*State of Minnesota Joint Availability and Disparity Study, Final Report*, Prepared by MGT of America, Inc. for the Minnesota Department of Transportation (2010).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Minneapolis*, Prepared by NERA Economic Consulting (2010).

**Mississippi**

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Mississippi*, Prepared by NERA Economic Consulting for the Jackson Municipal Airport Authority (2012).

**Missouri**

*City of Kansas City Construction Workforce Disparity Study*, Prepared by Keen Independent Research (2019).

*City of Kansas City, Missouri Disparity Study*, Prepared by Colette Holt & Associates (2016).

*City of Kansas City, Missouri Public School System*, Prepared by Colette Holt & Associates (2017).

*City of St. Louis Disparity Study Volume 1*, Prepared by Mason Tillman Associates (2015).

*Jackson County, Missouri Disparity Study,* Prepared by Colette Holt & Associates (2017).

*Kansas City Area Transportation Authority Disadvantaged Business Enterprise Availability Study*, Prepared by Colette Holt & Associates (2016).

*Metropolitan St. Louis Sewer District Disparity Study Draft Report*, Prepared by Mason Tillman Associates, Ltd. (2012).

*Missouri Department of Transportation DBE Availability Study*, Prepared by Keen Independent Research (2019).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Missouri*, Prepared by NERA Economic Consulting for the Missouri Department of Transportation (2012).

*Saint Louis County Disparity Study*, Prepared by Griffin & Strong P.C. (2017).

*State of Missouri Office of Administration Disparity Study*, Prepared by Colette Holt & Associates (2014).

**Montana**

*Availability and Disparity Study*, Prepared by Keen Independent Research LLC for the State of Montana Department of Transportation (2016).

**Nevada**

*Nevada Transportation Consortium Disparity Study*, Prepared by BBC Research & Consulting for the Regional Transportation Commission of Southern Nevada (2017).

*Nevada Department of Transportation Disparity Study Final Report*, Prepared by Keen Independent Research (2013).

**New Jersey**

*NJ Transit Disparity Study Final Report Executive Summary*, Prepared by The University of Minnesota (2016).

*NJ Transit Disparity Study Final Report Appendix*, Prepared by The University of Minnesota (2016).

*Newark Public Schools Disparity Study 2017*, Prepared by Collette Holt & Associates (2017).

*Purchasing Disparity Study (Draft)*, Prepared by MGT of America, Inc. for the City of Jersey City (2011).

**New York**

*City of New York Disparity Study*, Prepared by MGT Consulting Group (2018).

*State of New York 2016 MWBE Disparity Study Volume I*, Prepared by Mason Tillman Associates, Ltd. (2016).

*State of New York 2016 MWBE Disparity Study Policy Review Final Report Volume II*, Prepared by Mason Tillman Associates, Ltd. (2017).

**New Jersey and New York**

*The Port Authority of New York and New Jersey MWBE Disparity Analysis 2017 Volume I: Final Report*, Prepared by Mason Tillman Associates, Ltd. (2018).

**North Carolina**

*City of Asheville, North Carolina Disparity Study*, Prepared by BBC Research & Consulting (2018).

*City of Charlotte Disparity Study*, Prepared by BBC Research & Consulting (2017).

*City of Winston-Salem 2019 Disparity Study*, Prepared by MGT Consulting Group (2019).

*Disparity Study for Minority/Women Business Enterprise Program*, Prepared by MGT of America, Inc. for City of Greensboro, North Carolina (2012).

*Durham County/City of Durham, North Carolina Multi-jurisdictional Disparity Study*, Prepared by Griffin & Strong, P.C. (2015).

*Greensboro, North Carolina Disparity Study*, Prepared by Griffin & Strong (2018).

*Guilford County Schools 2015 Disparity Study*, Prepared by MGT of America, Inc. (2016).

*Mecklenburg County, North Carolina Disparity Study Report*, Prepared by Griffin & Strong (2020).

*North Carolina Department of Transportation*, Prepared by Colette Holt & Associates (2014).

*State of North Carolina Department of Administration, Disparity Study Report: Volume 1, State Agencies,* Prepared by Griffin & Strong, P.C. (2020).

*State of North Carolina Department of Administration, Disparity Study Report: Volume 2, Community Colleges and Universities*. Prepared by Griffin & Strong, P.C. (2021).

*The City of Charlotte Update Disparity Study, Final Report*, Prepared by MGT of America, Inc. (2011).

**<u>Ohio</u>**

*Cuyahoga County Disparity Study Report*, Prepared by Griffin & Strong P.C. (2020).

*Cuyahoga County Disparity Study*, Prepared by Griffin & Strong P.C. (2014).

*2015-16 Ohio Public Authorities Disparity Study*, Prepared by BBC Research & Consulting for the Ohio Department of Transportation (2016).

*City of Cincinnati Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2015).

*City of Columbus Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2019).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Cleveland*, Prepared by NERA Economic Consulting for the City of Cleveland (2012).

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Northeast Ohio*, Prepared by NERA Economic Consulting for the Northeast Ohio Regional Sewer District (2010).

*Third Generation Disparity Study, City of Dayton, Final Report*, Prepared by MGT Consulting Group (2019).

**<u>Oklahoma</u>**

*City of Tulsa, Oklahoma Business Disparity Study Final Report*, Prepared by MGT of America, Inc. (2010).

*A Study to Determine DBE Availability and Analyze Disparity in the Transportation Contracting Industry in Oklahoma*, Prepared by BBC Research & Consulting for the Oklahoma Department of Administration (2010).

**Oregon**

*City of Portland Disparity Study*, Prepared by BBC Research & Consulting (2011).

*Oregon Department of Aviation, Oregon Statewide Airport DBE Disparity Study*, Prepared by Keen Independent Research (2021).

*Oregon Department of Transportation Availability and Disparity Study*, Prepared by Keen Independent Research LLC (2016).

*Portland Development Commission Disparity Study*, Prepared by BBC Research & Consulting (2011).

*State of Oregon Disparity Study Update Final Report*, Prepared by MGT of America, Inc. for the Oregon Department of Transportation (2011).

*The Port of Portland Small Business Program Disparity Study*, Prepared by Colette Holt & Associates (2018).

**Pennsylvania**

*City of Philadelphia Fiscal Year 2019 Annual Disparity Study,* Prepared by the City of Philadelphia Department of Commerce and Miller3 Consulting (2020).

*City of Philadelphia Fiscal Year 2018 Annual Disparity Study*, Prepared by Econsult Solutions, Inc. and Milligan & Company, LLC (2019).

*City of Philadelphia Fiscal Year 2016 Annual Disparity Study*, Prepared by Econsult Solutions, Inc. for the City of Philadelphia Department of Commerce (2017).

*City of Philadelphia Fiscal Year 2015 Annual Disparity Study*, Prepared by Econsult Solutions, Inc. and Milligan & Company, LLC (2016).

*City of Philadelphia Fiscal Year 2014 Annual Disparity Study*, Prepared by Econsult Solutions, Inc. and Milligan & Company, LLC (2014).

*City of Philadelphia Fiscal Year 2013 Annual Disparity Study*, Prepared by Econsult Solutions, Inc. and Milligan & Company, LLC (2014).

*City of Philadelphia Fiscal Year 2012 Annual Disparity Study*, Prepared by Econsult Corp., Milligan & Company, and Winston Terrell (2013).

*City of Philadelphia Fiscal Year 2011 Annual Disparity Study*, Prepared by Econsult Corp., Milligan & Company, and Winston Terrell (2012).

*City of Philadelphia Fiscal Year 2010 Annual Disparity Study*, Prepared by Econsult Corp. and Milligan & Company (2011).

*City of Philadelphia Fiscal Year 2009 Annual Disparity Study*, Prepared by Econsult Corp. and Milligan & Company (2010).

*Commonwealth of Pennsylvania Department of General Services Disparity Study*, Prepared by BBC Research & Consulting (2018).

*Pennsylvania Department of Transportation Disparity Study*, Prepared by BBC Research & Consulting (2018).

**Rhode Island**

*State of Rhode Island Disparity Study Final Report*, Prepared by Mason Tillman Associates, Ltd. (2021).

**Tennessee**

*Business Market Availability and Disparity Study Shelby County Schools Board of Education*, Prepared by MGT Consulting Group (2017).

*City of Chattanooga, Tennessee Disparity Study Final Report*, Prepared by Griffin & Strong P.C. (2019).

*City of Memphis, Tennessee Disparity Study*, Prepared by Griffin & Strong P.C. (2016).

*City of Memphis, Tennessee Disparity Study*, Prepared by Griffin & Strong P.C. (2010).

*Memphis Light, Gas, and Water Division Comprehensive Disparity Study and Policy Formulation*, Prepared by MGT of America, Inc. (2012).

*Metro Nashville, Tennessee Disparity Study*, Prepared by Griffin & Strong P.C. (2018).

*Metropolitan Nashville Airport Authority Disparity Study*, Prepared by Colette Holt & Associates (2014).

*Shelby County Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2016).

*The State of Minority and Women-Owned Business Enterprise: Evidence from Memphis*, Prepared by NERA Economic Consulting for the Memphis-Shelby County Airport Authority (2013).

**Texas**

*Availability and Disparity Study, City of Dallas, Texas, Final Report,* Prepared by MGT Consulting Group (2020).

*Bexar County, Texas Disparity and Availability Study*, Prepared by Mason Tillman Associates, Ltd. (2011).

*Business Disparities in the Austin Independent School District Market Area*, Prepared by NERA Economic Consulting (2015).

*Business Disparities in the Austin, Texas Market Area*, Prepared by NERA Economic Consulting for the City of Austin, Texas (2015).

*Business Disparities in the San Antonio, Texas Market Area*, Prepared by NERA Economic Consulting for the City of San Antonio (2015).

*Business Disparities in the Travis County, Texas Market Area*, Prepared by NERA Economic Consulting for Travis County, Texas (2016).

*City of Fort Worth, Texas, Disparity Study*, Prepared by Colette Holt & Associates (2020).

*Dallas County Texas Disparity Study*, Prepared by Collette Holt & Associates (2015).

*Dallas Fort Worth International Airport Disparity Study*, Prepared by Collette Holt & Associates (2019).

*Disparity Study for Corpus Christi and CCRTA*, Prepared by Texas A&M University South Texas Economic Development Center (2016).

*Harris County Texas Disparity Study*, Prepared by Collette Holt & Associates (2020).

*Metropolitan Transit Authority of Harris County, Texas, Disparity Study, Final Report*, Prepared by Mason Tillman Associates, Ltd. (2021).

*Minority- and Women-owned Business Enterprise (M/WBE) Program Disparity Study for the San Antonio Water System*, Prepared by MGT of America (2015).

*North Central Texas Council of Governments Joint Availability and Disparity Volume 1: Legal, Anecdotal, Private Sector, & Capacity Analyses*, Prepared by Mason Tillman Associates (2010).

*North Central Texas Council of Governments Joint Availability and Disparity Volume 2: City of Arlington*, Prepared by Mason Tillman Associates (2010).

*North Central Texas Council of Governments Joint Availability and Disparity Study Volume 4: Dallas/Fort Worth International Airport Board*, Prepared by Mason Tillman Associates, Ltd. (2010).

*North Central Texas Council of Governments Joint Availability and Disparity Volume 4: Dallas Fort Worth International Airport Board Supplemental Study*, Prepared by Mason Tillman Associates (2010).

*Parkland Health and Hospital System Disparity Study*, Prepared by Colette Holt & Associates (2015).

*Texas Department of Transportation Disparity Study*, Prepared by Colette Holt & Associates (2019).

*The State of Minority- and Women-Owned Business Enterprise in Construction: Evidence from Houston*, Prepared by NERA Economic Consulting for the City of Houston (2012).

**Virginia**

*Commonwealth of Virginia Disparity Study*, Prepared by BBC Research & Consulting (2020).

*A Disparity Study for the Commonwealth of Virginia*, Prepared by MGT of America, Inc. (2011).

*City of Hampton and Hampton Schools Disparity Study*, Prepared by MGT of America, Inc. (2014).

*City of Virginia Beach Disparity Study*, Prepared by BBC Research & Consulting (2018).

*Portsmouth Public Schools Procurement Disparity Study Final Report*, Prepared by MGT of America, Inc. for Portsmouth, Virginia Public Schools (2011).

*Procurement Disparity Study, City of Portsmouth, Virginia*, Prepared by MGT of America, Inc. (2015).

**Washington**

*2012 DBE Program Disparity Study State of Washington Department of Transportation*, Prepared by BBC Research & Consulting (2013).

*City of Tacoma Disparity Study*, Prepared by Griffin & Strong P.C. (2018).

*Port of Seattle Disparity Study Executive Summary,* Prepared by Colette Holt & Associates (2019).

*Port of Seattle Disparity Study*, Prepared by BBC Research & Consulting for the Port of Seattle, Washington (2014).

*Sound Transit Disparity Study*, Prepared by BBC Research & Consulting for Sound Transit, Seattle, Washington (2013).

*State of Washington Disparity Study*, Prepared by Colette Holt & Associates (2019).

*Washington State Airports Disparity Study*, Prepared by Colette Holt & Associates (2019).

*Washington State Department of Transportation Disparity Study*, Prepared by Colette Holt & Associates (2017).

*Sound Transit 2020 Disadvantaged Business Enterprise Disparity Study,* Prepared by BBC Research and Consulting for Sound Transit, Seattle, Washington (2020).

**Wisconsin**

*Madison Public Works Disparity Study*, Prepared by Keen Independent Research for *City of Madison, Wisconsin* (2015).

# APPENDIX C

## Relevant Studies and Reports from 2010 to 2020


- Lawrence C. Manson, Jr., *Access to Capital: Accelerating the Growth of Diverse- and Women-Owned Businesses, The Trillion Dollar Opportunity*, NexTier Consulting Solutions, LLC (July 2020).

- Robert W. Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey*, National Bureau of Economic Research (June 2020).

- Andre Dua, Deepa Mahajan, Ingrid Millan, and Shelley Stewart, *COVID-19's effect on minority-owned small businesses in the United States*, McKinsey & Company (May 2020).

- Dominique Derbigny, *On the Margins: Economic Security for Women of Color Through the Coronavirus Crisis and Beyond*, Closing the Women's Wealth Gap (April 2020).

- *The Paycheck Protection Program Continues to be Disadvantageous to Smaller Businesses, Especially Businesses Owned by People of Color and the Self-Employed*, Center for Responsible Lending (April 2020).

- Claire Kramer Mills and Jessica Battisto, *Can Small Firms Weather the Economic Effects of COVID-19?*, Federal Reserve Bank of New York (April 2020).

- Andre Perry, Jonathan Rothwell, and David Harshbarger, *Five-star reviews, one-star profits: The devaluation of businesses in Black communities*, Metropolitan Policy Program at Brookings (February 2020).

- Anne Price, *Don't Fixate on the Racial Wealth Gap: Focus on Undoing Its Root Causes*, Insight and Roosevelt Institute (February 2020).

- Eric Rodriguez, *Why Latinos Will Lose under the OCC and FDIC's Proposal to Modernize the Community Reinvestment Act*, UnidosUS (January 2020).

- *Small Business Credit Survey: Report on Minority-Owned Firms*, Federal Reserve Bank of Atlanta (December 2019).

- Lisa D. Cook and Jan Gerson, *The implications of U.S. gender and racial disparities in income and wealth inequality at each stage of the innovation process*, Washington Center for Equitable Growth (July 2019).

- Robert Bartlett, Adair Morse, Richard Stanton, and Nancy Wallace, *Consumer-Lending Discrimination in the Fintech Era*, National Bureau of Economic Research (June 2019).

- Nora Esposito, *Small Business Facts: Spotlight on Minority-Owned Employer Businesses*, U.S. Small Business Administration, Office of Advocacy (May 2019).

- Anna Maria Ortiz, *Small Business Administration: Key Entrepreneurship Programs and Activities Do Not Specifically Target Historically Black Colleges and Universities, but Collaboration Exists with Some Schools*, U.S. Government Accountability Office (March 2019).

- Carolyn Schulman, *The Partnership for Lending in Underserved Markets: Increasing Minority Entrepreneurs' Access to Capital*, Milken Institute (November 2018).

- Carolyn Karo Schulman, *Partnership for Lending in Underserved Markets, Phase II Summary: Lessons Learned for Advancing Minority Small Business Capital Access*, Milken Institute (2018).

- Nora Esposito, *Data From The Census Bureau Shows Growth In Hispanic-Owned Businesses*, U.S. Small Business Administration, Office of Advocacy (October 2018).

- Edward N. Wolff, *The Decline of African-American and Hispanic Wealth Since the Great Recession*, National Bureau of Economic Research (October 2018).

- Alicia M. Robb, *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms*, Prepared for Office of Advocacy, U.S. Small Business Administration (2018).

- Robert W. Fairlie, *Latino Business Ownership: Contributions and Barriers for U.S.-born and Immigrant Latino Entrepreneurs*, Prepared for the Office of Advocacy, U.S. Small Business Administration (2018).

- U.S. Department of Commerce, Minority Business Development Agency, *The State of Minority Business Enterprises: An Overview of the 2012 Survey of Business Owners* (2018).

- *Small Business Credit Survey: Report on Minority-Owned Firms*, Federal Reserve Bank of Cleveland (November 2017).

- Carolyn Karo and Jackson Mueller, *Partnership for Lending in Underserved Markets, Phase I Summary: Developing Action-Oriented Solutions to the Financing Challenges Facing Minority-Owned Small Businesses*, Milken Institute (September 2017).

- Dedrick Asante-Muhammad, Chuck Collins, Josh Hoxie, and Emanuel Nieves, *The Road to Zero Wealth: How the Racial Wealth Divide Is Hollowing Out America's Middle Class*, Prosperity Now (September 2017).

- Benjamin Whetzel, *Home Equity Used to Start Seven Percent of U.S. Businesses*, Eye On Housing (August 2017).

- U.S. Department of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprises: A Review of Existing Disparity Studies* (December 2016).

- Alicia Robb and Arnobio Morelix, *Startup Financing Trends by Race: How Access to Capital Impacts Profitability, Annual Survey of Entrepreneurs Data Briefing Series*, Prepared for the Kauffman Foundation (October 2016).

- Michael McManus, *Minority Business Ownership: Data from the 2012 Survey of Business Owners*, U.S. Small Business Administration, Office of Advocacy (September 2016).

- U.S. Small Business Administration, Office of Advocacy, *Survey of Business Owners Facts: Minority-Owned Businesses in the United States* (May 2016).

- U.S. Small Business Administration, Office of Advocacy, *Survey of Business Owners Facts: Black- Or African American-Owned Businesses In The United States* (May 2016).

- U.S. Small Business Administration, Office of Advocacy, *Survey of Business Owners Facts: Asian-Owned Businesses In The United States* (May 2016).

- U.S. Small Business Administration, Office of Advocacy, *Survey of Business Owners Facts: American Indian- And Alaska Native-Owned Businesses In The United States* (May 2016).

- U.S. Small Business Administration, Office of Advocacy, *Survey of Business Owners Facts: Hispanic-Owned Businesses In The United States* (May 2016).

- U.S. Small Business Administration, Office of Advocacy, *Survey of Business Owners Facts: Native Hawaiian- and Pacific Islander-Owned Businesses In The United States* (May 2016).

- U.S. Small Business Administration, Office of Advocacy, *Minority STEM Entrepreneurs* (April 2016).

- Robert Fairlie, Alicia Robb, and David T. Robinson, *Black and White: Access to Capital among Minority-Owned Startups* (March 2016).

- U.S. Department of Commerce, Minority Business Development Agency, *Impact of Minority Businesses on the U.S. Economy* (December 2015).

- Robert Rubinovitz, *Utilization of Women-Owned Businesses in Federal Prime Contracting,* Department of Commerce (December 2015).

- Michael S. Barr, *Minority and Women Entrepreneurs: Building Capital, Networks, and Skills*, Prepared for The Hamilton Project, Brookings Institution (March 2015).

- Aaron K. Chatterji, Kenneth Y. Chay, and Robert W. Fairlie, *The Impact of City Contracting Set-Asides on Black Self-Employment and Employment*, Journal of Labor Economics (July 2014).

- Signe-Mary McKernan, Caroline Ratcliffe, Eugene Steuerle, and Sisi Zhang, *Disparities in Wealth Accumulation and Loss from the Great Recession and Beyond*, American Economic Review (2014).

- Alicia Robb, *Access to Capital among Young Firms, Minority-owned Firms, Women-owned Firms, and High-tech Firms*, Prepared for the Office of Advocacy, U.S. Small Business Administration (April 2013).

- Signe-Mary McKernan, Caroline Ratcliffe, Eugene Steuerle, and Sisi Zhang, *Less Than Equal: Racial Disparities in Wealth Accumulation*, Urban Institute (April 2013).

- Signe-Mary McKernan, Caroline Ratcliffe, Margaret Simms, and Sisi Zhang, *Do Financial Support and Inheritance Contribute to the Racial Wealth Gap?*, Urban Institute (September 2012).

- Robert Fairlie and Christopher M. Woodruff, *Mexican-American Entrepreneurship*, The B.E. Journal of Economic Analysis & Policy (2010).