# EXHIBIT A-5

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# THE 8(a) PROGRAM: OVERVIEW AND NEXT STEPS TO PROMOTE SMALL BUSINESS SUCCESS

## HEARING

BEFORE THE

## SUBCOMMITTEE ON CONTRACTING AND INFRASTRUCTURE

OF THE

## COMMITTEE ON SMALL BUSINESS
## UNITED STATES
## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

SECOND SESSION

HEARING HELD
MARCH 2, 2022

Small Business Committee Document Number 117–047
Available via the GPO Website: www.govinfo.gov

U.S. GOVERNMENT PUBLISHING OFFICE
46–931 WASHINGTON : 2022

HOUSE COMMITTEE ON SMALL BUSINESS

NYDIA VELÁZQUEZ, New York, *Chairwoman*
JARED GOLDEN, Maine
JASON CROW, Colorado
SHARICE DAVIDS, Kansas
KWEISI MFUME, Maryland
DEAN PHILLIPS, Minnesota
MARIE NEWMAN, Illinois
CAROLYN BOURDEAUX, Georgia
TROY CARTER, Louisiana
JUDY CHU, California
DWIGHT EVANS, Pennsylvania
ANTONIO DELGADO, New York
CHRISSY HOULAHAN, Pennsylvania
ANDY KIM, New Jersey
ANGIE CRAIG, Minnesota
BLAINE LUETKEMEYER, Missouri, *Ranking Member*
ROGER WILLIAMS, Texas
JIM HAGEDORN, Minnesota
PETE STAUBER, Minnesota
DAN MEUSER, Pennsylvania
CLAUDIA TENNEY, New York
ANDREW GARBARINO, New York
YOUNG KIM, California
BETH VAN DUYNE, Texas
BYRON DONALDS, Florida
MARIA SALAZAR, Florida
SCOTT FITZGERALD, Wisconsin

MELISSA JUNG, *Majority Staff Director*
ELLEN HARRINGTON, *Majority Deputy Staff Director*
DAVID PLANNING, *Staff Director*

# CONTENTS

## OPENING STATEMENTS


| | |
|---|---|
| Hon. Kweisi Mfume | 1 |
| Hon. Maria Salazar | 3 |


## WITNESSES


| | |
|---|---|
| Mr. Darryl K. Hairston, Retired, Small Business Advisor, Woodbridge, VA | 5 |
| Ms. Jackie Robinson-Burnette, Chief Executive Officer, Senior Executive Strategic Solutions, Woodbridge, VA | 7 |
| Mr. Arshdeep Khurana, President & Chief Executive Officer, Avosys Technology Inc., San Antonio, TX | 8 |
| Ms. Qin Li, President, Soliel, LLC, Vienna, VA | 10 |


## APPENDIX


| | |
|---|---|
| Prepared Statements: | |
| Mr. Darryl K. Hairston, Retired, Small Business Advisor, Woodbridge, VA | 23 |
| Ms. Jackie Robinson-Burnette, Chief Executive Officer, Senior Executive Strategic Solutions, Woodbridge, VA | 35 |
| Mr. Arshdeep Khurana, President & Chief Executive Officer, Avosys Technology Inc., San Antonio, TX | 50 |
| Ms. Qin Li, President, Soliel, LLC, Vienna, VA | 60 |
| Questions for the Record: | |
| None. | |
| Answers for the Record: | |
| None. | |
| Additional Material for the Record: | |
| Ho-Chunk Incorporated | 67 |

# THE 8(A) PROGRAM: OVERVIEW AND NEXT STEPS TO PROMOTE SMALL BUSINESS SUCCESS

---

**WEDNESDAY, MARCH 2, 2022**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON SMALL BUSINESS,
SUBCOMMITTEE ON CONTRACTING AND INFRASTRUCTURE,
*Washington, DC.*

The Subcommittee met, pursuant to call, at 11:00 a.m., in Room 2360 of the Rayburn House Office Building, and via Zoom, Hon. Kweisi Mfume [Chairman of the Subcommittee] presiding.

Present: Representatives Mfume, Carter, Salazar, Stauber, Meuser, and Fitzgerald.

Chairman MFUME. Good morning, everyone. I would like to officially call this hearing to order.

And without objection, the Chair is authorized to declare a recess at any time.

I would like to begin by noting some important requirements. Let me begin by saying the standing House and Committee rules and practice will continue to apply during this hybrid proceeding. All Members are reminded that they are expected to adhere to these rules, including decorum.

House regulations require Members to be visible through a video connection throughout the proceeding, so please, if you are on a video connection, keep your cameras on. Also, please remember to remain muted until you are recognized to minimize background noise.

In the event that a Member encounters technical issues that prevent them from being recognized for their questioning, I will then move to the next available Member of the same party and will recognize that Member at the next appropriate time slot provided that they have returned to the proceeding.

I want to again thank all of our witnesses who are here today. I appreciate your time and your effort to get here and I have a few comments.

Throughout our history, small businesses, especially those owned by socially and economically disadvantaged individuals, have faced real challenges when it comes to participating on equal footing in the American economy, and specifically in the federal procurement space. Disadvantaged businesses often navigate obstacles like discriminatory lending practices, and fewer mentorship and business opportunities as they seek to grow their businesses and, of course, to serve their customers.

Recognizing the struggles that disadvantaged businesses face, Congress created the Small Business and Capital Ownership Development Program known as 8(a) that was done in 1978. I take particular pride in the landmark program because my predecessor, Parren J. Mitchell was the author of that and we are reminded of him by his picture which hangs down at the far end of this hearing room.

The 8(a) program is, as we all know, a 9-year program that offers small businesses owned by "socially and economically disadvantaged individuals" training, technical assistance, and contracting opportunities. 8(a) participants are eligible, as we also know, for 7(j) training, which offers valuable counseling and training opportunities in financing, management, accounting, bookkeeping, marketing, and identifying new business opportunities.

The federal government has also established a statutory goal of awarding 5 percent of all eligible contracting and subcontracting dollars to small and disadvantaged business concerns, including those that are not currently participants in the 8(a) program where there is still more needed support. That is why I applaud President Biden's goal of increasing the share of contract awards to small and disadvantages from 5 percent to 15 percent by the year 2025.

For over 40 years, socially and economically disadvantaged businesses have relied on the 8(a) program to help them compete and innovate in the federal marketplace. When small businesses win federal contracts, they grow, create jobs, and they support our communities.

While the 8(a) program helps thousands of small businesses annually, participants have reported and are still reporting ongoing challenges. For example, many business owners have reported concerns with the duration of the 8(a) program. So, when a small firm, as we know, is admitted, it typically takes a couple of years to receive its first award, which hinders the development of program participants and really raises the question of whether or not those enterprises are ready for graduation when they are expected to exit the program.

8(a) businesses have also expressed concern with the program's technical assistance and training through the 7(j) program. And today, we will ask the question of whether the training provided to 8(a) participants is, in fact, adequately preparing small contractors for graduation, in addition to how to improve the 8(a) program to better support disadvantaged businesses.

And lastly, we will examine how trends within the contracting space impact small 8(a) firms particularly. For years, the size and scope of contracts have been on the rise. That has excluded, as we know, many 8(a) firms that may not have the capacity to take on larger contracts. At the same time, sole-source contract thresholds have remained unchanged over the years and over time, resulting in fewer 8(a) sole-source contracts. Before this Committee, the Full Committee, we have tackled the question of category management in the past and it is something to keep in mind as we look at reasons as to why there has not been growth in this sole source area.

Consolidation in procurement has limited the ability of 8(a) firms to compete for contracts, ensuring a level playing field for small contractors is one of the utmost importance to our economy.

So, I hope that today's hearing will allow us to explore actions our Committee can take to improve legislatively and to modernize the 8(a) program, a program that all of us support and many of us are still concerned with as it relates to the challenges that many of you as small business owners and many others who are viewing this hearing still find yourself confronted with.

With that said, I would like to yield to the distinguished Ranking Member, the gentlewoman from Florida for her opening statement, Ms. Salazar.

Ms. SALAZAR. Thank you, Mr. Chairman. Wonderful to be here for the first time in person right next to each other. And thank you to all the witnesses.

As you said, contracting with the federal government is the American dream. And today's hearing is a perfect example of this work this Committee must perform on behalf of America's small business contractors. We owe it to them.

Congress is at its best when we are making laws that protect the interests of all small businesses. And let me repeat that. We must help all small businesses. Congress made a point to give special recognition to socially and economically disadvantaged entrepreneurs through the Small Business Act as you mentioned, the Minority Small Business and Capital Ownership Development Program, also known as the 8(a) program. This program creates a space for entrepeneurs to grow, to compete, and to be productive contributors to our nation's workforce. The law mandates that 5 percent of the federal government spending on goods and services must go towards small, disadvantaged businesses.

But, according to the SBA, this goal was succeeded in fiscal year 2021 at approximately 10 percent or close to $60 billion. That is what the SBA is saying. But I have doubts about these numbers, and also, we cannot ignore issues that continue to plague the 8(a) program. For instance, unfortunately, we are seeing that fewer small businesses are winning bigger and bigger rewards and that is a very big problem. Let me translate this for you. This means less diversity, less competition, more costs for our taxpayers, and more importantly, less money in the pockets of small business owners.

We have to increase participation within all of SBA's contracting programs and enhance diversity of awards so that all small businesses can succeed and not just a few, the selected ones that know how to work the system. And the SBA's role is ensuring the success of its 8(a) participants is key. The SBA has the responsibility to make this program work.

Recently, and unfortunately, I need to report that the Inspector General found that the SBA is failing to accurately measure the effectiveness of this program. So that means that we are allocating money but we do not know if that money that is being allocated is doing what it needs to do. It is effectively going to enhance and to help those small business owners. The program is as effective as its ability to root out waste, fraud, and abuse. So, the agency must aggressively tackle potential fraud and abuse within all of its programs. Every dollar going to the wrong firm is an American taxpayer dollar that is wasted and abused.

So, what do we need to do? We need to ensure that the SBA is operating the program at optimal levels. That no level of fraud or abuse is acceptable. That the federal government awards the widest range of contracts to as many small firms as possible. That is the American way and that is why I am here and all of us to ensure that this occurs.

I thank you. I yield back, Mr. Chairman.

Chairman MFUME. The Ranking Member yields back. Thank you very much for your statement.

I would like to take an additional moment to explain how we will proceed with the hearing today. Each witness will have 5 minutes to provide a statement, and each Committee Member will have 5 minutes for questions. Please ensure if you are with us through the hybrid setup that your microphone is on when you begin speaking and that you return to mute when finished.

I would like to introduce our witnesses beginning with Mr. Darryl K. Hairston. Mr. Hairston serves as a small business advisor. He has assisted small businesses for more than 35 years as a dedicated employee of the Small Business Administration where he has held senior level positions, including acting administrator of the SBA and deputy associate administrator for the Office of Government Contracting and Business Development. Mr. Hairston, again, thank you very much for being with us.

Our next witness is Ms. Jackie Robinson-Burnette, the CEO of Senior Executive Strategic Solutions, a consulting firm. And she is also a former federal senior executive having served in multiple positions, most recently in the SBA as the deputy associate administrator of the Office of Government Contracting and Business Development in 2016. Prior to joining the SBA, Ms. Robinson-Burnette served more than 20 years in the Department of Defense, both as a contracting officer and leading small business programs. Ms. Robinson-Burnette, thank you again, and welcome.

Our third witness is Mr. Arshdeep Khurana, president and CEO of AVOSYS Technology, Inc., located in San Antonio, Texas. AVOSYS Technology is an 8(a) and HUBZone certified small business that offers information technology and management consulting services. Mr. Khurana founded AVOSYS in 1998 and that company will be graduating from the program this year. So, I want to thank you, sir, for your insight in advance because your graduation is a part of the issues that we are talking about. Not yours specifically, but the amount of time and the people who are, in fact, graduating.

I would like to yield to the Ranking Member, the gentlewoman from Florida, to introduce our final witness. Ms. Salazar?

Ms. SALAZAR. Our final witness is Ms. Qin Li. Welcome. She is the president of Soliel, a small business technology company providing innovative and cutting-edge technical engineering and development services to the United States Government. Ms. Li's work in government contracting began in 2010 out of a need for greater career flexibility. When an opportunity arose to subcontract to a large firm, Ms. Li took it. Good for her. And now the company is celebrating her 12th year and it is in the 7th year in the SBA 8(a) program. Under Ms. Li's leadership, Soliel has invested heavily in technology and quality operations, successfully holding many high

level cybersecurity and technological certifications necessary to compete for difficult and complex government contracts. A testament to her success, Soliel has successfully served many government customers such as the United States Navy, the United States Army, and the Defense Counterintelligence and Security Agency. Ms. Li, it is a pleasure having you to testify before this Committee, and I look forward to the valuable insights I know you will provide today. Welcome. I yield back.

Chairman MFUME. Thank you. I join with the Ranking Member, Ms. Li, in saying welcome to you also. Thank you for being here. We look forward to your testimony.

The Chair would now recognize Mr. Hairston, if you are prepared, and if so, you are recognized for 5 minutes. Go right ahead.

**STATEMENTS OF DARRYL K. HAIRSTON, RETIRED, SMALL BUSINESS ADVISOR; JACKIE ROBINSON-BURNETTE, CHIEF EXECUTIVE OFFICER, SENIOR EXECUTIVE STRATEGIC SOLUTIONS; ARSHDEEP KHURANA, PRESIDENT & CHIEF EXECUTIVE OFFICER, AVOSYS TECHNOLOGY INC.; QIN LI, PRESIDENT, SOLIEL, LLC**

## STATEMENT OF DARRYL K. HAIRSTON

Mr. HAIRSTON. Good morning, Chairman Mfume, Ranking Member Salazar, and other distinguished Members of this Committee. I am pleased to present testimony in support of your examination of how the SBA's 8(a) Business Development Program currently works, the resources it provides, and to identify ways to modernize and improve the program's effectiveness.

As noted, Congress enacted Public Law 95-507 in 1978 to provide statutory authority to an existing program that was previously created by Executive Order for socially or economically disadvantaged individuals. The law shifted the program's focus to Business Development and required program participants to be at least 51 percent owned and controlled by socially and economically disadvantaged individuals. Since 1978, there have been several additional amendments to the law aimed at achieving the unfulfilled goals of Public Law 95-507 by addressing abuses and improving its effectiveness. Additionally, the SBA's Office of the Inspector General and the General Accounting Office have also noted instances of fraud and the lack of quality and consistent SBA monitoring and oversight. Based on my experience, I believe the following recommendations for 8(a) business development program improvements will have a significant impact on the program's administration and effectiveness.

First, while the associate administrator for 8(a) business development is responsible for the oversight of all matters related to the 8(a) Business Development Program, the business opportunity specialists who are defined by statute are the primary face of the SBA to an 8(a) participant and are responsible for delivering the programs and services of the program to participants. They work in district offices under the supervision of district management who report to SBA's Office of Field Operations. It in my view that this overlapping organizational structure creates programmatic challenges. Without the cooperation and the leadership of the Office of

Field Operations, the associate administrator for business development has little to no control over the implementation of program, policies, and procedures, the hiring and selection process and no input into the performance review process.

Consequently, I recommend a written agreement should be developed between the Office of the Associate Administrator for Business Development and the Associate Administrator for the Office of Field Operations delineating the roles and responsibilities associated with the district offices and the delivery of the 8(a) program.

Additionally, the annual performance goals of the associate administrator for Business Development should be shared by the associate administrator for the Office of Field Operations and should be incorporated in his or her annual performance standards as well as those of the district directors and/or business opportunity specialists.

7(j) resources should be allocated to the development and delivery of specific programs and curriculums for new and transitioning program participants. For new program participants, training should focus on preparing them to compete in the federal acquisition environment as small businesses and 8(a) program participants. Similarly, for transitioning companies, this coursework might include focus on long-term planning and consideration for market expansion and diversification. Such training for new firms in their beginning stage may help alleviate the lag that many experience in receiving their first contract opportunity.

Public Law 100-656 amended Section 7(a) of the Small Business Act to include an 8(a) Loan Program. Specifically, the administration was empowered to make loans either directly or in cooperation with banks and other financial institutions. I have no recollection that it was ever implemented. The implementation of this program will provide a source of critical financing for 8(a) program participants.

Under Section 8a)(12) of the Act, participants are required to annually prepare and submit to SBA a capability statement. Those statements are to be disseminated to executive agencies and used during their annual contract forecasting to identify simple contracts to support the 8(a) program. I am not aware of adherence to this requirement. Adherence to this requirement would greatly improve the likelihood of a new 8(a) program participant receiving contract assistance earlier in its 8(a) program participation.

And finally, there should be a focus on preparing transitional stage firms to become mentors. The Mentor-Protégé program is an excellent opportunity for transitional 8(a) participants to continue their growth and development. To ensure the effectiveness of this program and validate that its objectives are being met, SBA must improve its oversight to be certain that both mentors and proteges are adhering to the Mentor-Protégé Agreement and that program regulations are being followed.

Thank you for the opportunity to testify in connection with this Committee's hearing on SBA's 8(a) program. I am happy to answer any questions you may have.

Chairman MFUME. Thank you, sir.

Ms. Burnette-Robinson, you are now recognized for 5 minutes. If I can ever get your first name in front of your second name and

do this correctly before the hearing is over I will have made a major accomplishment. Ms. Robinson-Burnette, go right ahead.

**STATEMENT OF JACKIE ROBINSON-BURNETTE**

Ms. ROBINSON-BURNETTE. Good morning, Chairman Mfume and Ranking Member Salazar and other distinguished Members of the Committee. Thank you for all that you do for citizens like me, giving us a voice and a chance to be heard. I am humbled and honored to be here before you.

My husband, this handsome man sitting behind me is a retired Army officer. We have two daughters serving as Army officers and one just signed her Army Cadet Command contract last week. We are a family committed to serving this nation.

The 8(a) program expands our ability to easily tap into all the smart people in different corners of our country to help tackle the nation's most pressing challenges as we engage in humanitarian efforts or defend our great country, within our borders and across the globe.

In the simplest terms, the 8(a) program offers a small, disadvantaged business a chance to learn how to win a federal government contract or subcontract, perform the work with their own money or an SBA loan, and if the work is deemed acceptable and timely, then expect payment. When I arrived at the SBA in December 2014, I found the pool of firms shrinking. As an inclusive leader, I brought my team around the table and asked for solutions. I wish I could say the excitement and the shift in operations that later led the team to win the highest-ranking award at the SBA was due to how smart I was. But it turns out, if you bring smart people around the table and support them, you have a win.

I would like to share my thoughts today. Unfortunately, a considerable amount of 8(a) firms graduate and they struggle to stay in business 5 years after graduation. I recommend giving 8(a) graduate mentors priority with the Mentor-Protégé program application process. It is a low-cost and effective way to help them quickly transfer their knowledge to a new 8(a). It would increase the competitiveness of a protege and build longevity for the graduate.

For months, the Office of Federal Procurement Policy and GSA and contracting executives from multiple federal agencies met to create and implement category management. However, there were no small business executives at the table with an equivalent seat. The SBA had a seat but no voice and SBA regulations lagged behind for years without inclusion in the federal acquisition regulation like the similarly situated rule. I would suggest that Congress require OFPPs for our counsel to consider its regulations in tandem with the SBA's rulemaking. I also recommend a full-time senior executive at the Office of OFPP who understands contracting and values the contributions of small businesses. They would have a seat at the table where the discussion is category management, priorities for updates to the FAR or the next acquisition reform.

I ran into a retired Army Lieutenant Colonel West Point graduate and he said he has tried unsuccessfully since 2016 to get 8(a) certification. He was a Special Forces officer. He trained Army and Foreign Services. He won a 5-year contract with the Special Operations Command. He shared with me his letter of rejection. One,

his Board of Directors meeting minutes where he elected himself as president, treasurer, and secretary had errors in it. The other, he had 93 percent of his revenues from Special Operations Command. These issues are irrelevant to eligibility. I am not advocating for dismissing eligibility rules, but there must be a shift in the SBA culture to ensure that the program is accessible for eligible firms.

I also recommend the SBA develop justification to significantly increase their 7(j) budget, and I know that Congress historically provides the funds based on it and I would ask you to support the increase.

The 8(a) program typically has vacant positions for the 8(a) BOS and the business development specialists. I know that the SBA is considering virtual support and I would recommend that the SBA also bring on an HR professional from another agency under detail to help assist objectively look at the allocations. I also think the 8(a) sole source threshold should be raised from $8 million for services and $10 million for manufacturing. I understand the simplified acquisition threshold is not within your jurisdiction but I would like it to be increased. I would recommend an increase from $250,000 to $1 million.

Finally, I know that the smart SBA employees in our federal agencies will raise the bar and support President Biden's goal of increasing contracts to small, disadvantaged businesses. His goal is bold but it is very achievable. I urge you to take my suggestions today to further strengthen the program. Thank you.

Chairman MFUME. Thank you, very much, Ms. Robinson-Burnette. And Mr. Burnette, welcome to you also.

Mr. Khurana, you are recognized for 5 minutes, sir.

**STATEMENT OF ARSHDEEP KHURANA**

Mr. KHURANA. Chair Mfume, Ranking Member Salazar, and Members of the Subcommittee, thank you for the opportunity to testify before you today. My name is Arshdeep Khurana, and?I am the president and CEO of AVOSYS Technology, headquartered in San Antonio, Texas. AVOSYS provides enterprise IT support, information assurance, software development, healthcare staffing, biomedical research and support services to the federal government's clients. Established in 1998, I have grown the company from a one-man operation, to currently servicing over 50 commercial and government contracts across 14 states.

When I immigrated to United States, I was in pursuit of higher education and had the American dream of becoming an entrepreneur. After naturalization, I started my business from my apartment with a single dial-up server connection with a server. For over a decade, I serviced several small and mid-sized businesses as a trusted chief information officer. My business was 100 percent commercial when I was accepted to the SBA's 8(a) program in 2011. Through the program, my company has been able to grow and become highly successful in the federal marketplace. I am particularly proud of the multimillion dollar competitive contract I was awarded to provide clinical healthcare support services to the Air Force base clinic to service our men and women in uniform. It is an incredible honor to provide these services, and my company

would not have been here today without the 8(a) program, tremendous support from my family, and the ever gracious, the Almighty Lord.

The past 2 years have been difficult for small businesses, and 8(a) firms are no exception. I was thrilled when this Committee added an extra year to the 8(a) program as part of the pandemic response. This lifeline helped companies like mine save jobs and stay afloat. While this extension was incredibly impactful, the pandemic has unfortunately impacted operations not just for 1, but for 2 years. Recovery did not truly begin until the current fiscal quarter, leaving many 8(a) companies approaching graduation without feeling like they had their full time in the program. For companies like mine to truly succeed, adding an additional year extension would make all the difference.

Given the increasingly complex and competitive procurement environment, I also recommend extending the 8(a) program to 10 years permanently. The decline in the number of 8(a) firms has caused concerns across the program.

According to the SBA, in August 2021, there were about 4,906 program participants, while in 2010, there were about roughly about 7,000. I believe this is happening for a number of reasons and I suggest the following changes to the 8(a) program in order to increase the number of successful participants and dollars flowing to small, disadvantaged businesses.

First, limiting the sole source awards to individually owned 8(a) firms and other socioeconomic set asides are too small. I suggest the Committee to increase the sole source threshold as you did in the 116th Congress by eliminating the option years and allowing the amount of $4.5 million and $7.5 million each year for services and manufacturing, respectively. Group-owned 8(a) firms have seen huge success with the raising of their sole source threshold five times to $100 million without justification. Therefore, individual firms would also welcome this important change with similar five times increase from the current threshold amount.

Second, multiple 8(a) procurements are being bundled and consolidated with scope additions making their follow-on contracts too large for the individual 8(a) companies' current direct award threshold level. Data on these awards remains too broad; therefore, I suggest SBA break down their annual scorecard spend into four subcategories. Mapping of the impact of these dollars would assist the administration in identifying contracts that could be set aside or directly awarded to individually owned 8(a) firms.

Third, changing the business activity target requirements is necessary to the developmental stage of the program. It should start with the award of the first contract instead of right away. Additionally, 8(a) competitive dollars should be considered as small business competitive dollars meaning the Business Activity Target (BAT) restrictions would only apply to sole source revenue. Similarly, other program continuity ratios including the audit requirement threshold should be at least adjusted two to three times.

I cannot express the appreciation I have for the 8(a) program and how it has dramatically changed my business after a tough survival in both the 2001 and 2008 recessions. I am sincerely thankful for the excellent support obtained from the San Antonio Small

Business Administration office and the many SBA specialists on officers who are working hard for the thousands of 8(a) business like myself. Not only does AVOSYS's success impact me but it also impacts more than 200 employees I have hired around the country as a result.

Thank you for holding this important hearing and I look forward to answering your questions.

Chairman MFUME. Thank you, sir.

We will get to questions in just a moment, but I want to make sure that we go to Ms. Li for her 5 minutes of testimony and to say welcome again. Thank you.

**STATEMENT OF QIN LI**

Ms. LI. Thank you, Chair Mfume, Ranking Member Salazar, and other Members of the Subcommittee. I am really thrilled to be here to testify today.

My name is Qin Li. I am the president of Soliel, LLC. Soliel is headquartered in the D.C. area in Vienna, Virginia, and we bring innovative technical solutions to our customers to help them develop and transform and modernize their IT systems and infrastructure.

So originally from China, I came here and got my Master of Science degree from George Washington University 25 years ago. And I have called the D.C. area home since then.

Soliel's adventure into the government contracting is also out of necessity. When I was seeking treatment for my middle child, who has a very rare chromosome abnormality. So, when the opportunity to subcontract arose, I took that risk and that is how Soliel started in government contracting. And 12 years later, today, we very proudly support a number of DoD agencies, including DISA, Army, Navy, and DCSA. And that success is really a testimony to our commitment and investment in innovation and technology, as well as the contributions from our team.

It is also remarkable if you think about only 9 percent of women-owned businesses are Asian American owned, and only 6 percent of the science and engineering employees in the United States are Asian. So, it is really a remarkable and very humbling experience for me. And again, I want to really thank this Committee to advance policies that will further advance the interests for this Committee, especially the 8(a) program.

So, Soliel started in 2010 as a second-tier subcontractor as I mentioned earlier. And then we became a first-tier subcontractor. Gradually, we started bidding for small business prime contracts. So, we received our 8(a) designation in June of 2015. That is 5 years after we started our government contracting business. So, the first 5 years we were subcontractors and really building up our performance and qualifications. The 8(a) program is really a game changer that provided Soliel a critical, if not the only contract to really prime and be successful. So, I am very passionate and I am sincerely grateful for the program.

While it has allowed me to find a successful way forward, I also just want to outline some thoughts on specific elements of the program that can be further improved.

So, one of the challenges as mentioned earlier is for the graduating and successful 8(a) companies to minimize the potential loss in revenue once they graduate from the program and they are no longer an 8(a). So, I believe greater assistance from the SBA is much needed in this transition period out of the program. For example, it would be very helpful for the SBA to consider allowing contracts performed by a graduated woman-owned or HUBZone company after they graduate for that contract to be solicited as either a HUBZone or woman-owned instead of just an 8(a) contract. This way, it aligns with the SBA's overall goal as the Ranking Member has mentioned to really advocate for the entire small business community, not just 8(a) or HUBZone or woman-owned. So, it is fully aligned with that if the graduating 8(a) is still a small business. But it also allows the graduating 8(a) companies to minimize the revenue loss and still retain their revenue.

The other thing that we could use a lot of help from the SBA is oversight of the Mentor-Protégé program. It is a very powerful program and Soliel has been in that since the second year we were admitted to the 8(a) program. While there is a lot of structured paperwork and very good oversight during the initial formation of the JV, there is not as much SBA supervision in the later stage, especially in the execution stage of the JV. So, there is also very limited recourse if the mentor is not fulfilling its commitment. And so, giving the SBA greater power with respect to the enforcement of the JV will really help 8(a) companies like ours, the Mentor-Protégé program greatly.

So again, I really appreciate the opportunity to be here today. It is very much an honor and I look forward to answering questions.

Chairman MFUME. Ms. Li, thank you very, very much. And my thanks to all of the witnesses who are with us this morning.

I would like to call your attention to the fact that we have been joined by the distinguished gentleman from Pennsylvania, Mr. Meuser, and welcome him, obviously, to this hearing as well.

We have got some questions. You have all had great comments and great suggestions. One of the things I know I can say on behalf of myself and the distinguished gentleman from Florida, our Ranking Member, is that we passionately want to make the 8(a) program much better. It is not something that divides us. It is something that unites us. And I think beyond this hearing, we have got to go directly to the administrator of the SBA to figure out what can be done in the time that we have. And I tell you, I speak out of a little bit of frustration.

I joined this Committee in 1987 when I first got elected to the Congress. Served for 10 years, Chaired the Subcommittee, went away for 24 years, came back, and many of the problems and the issues and the suggestions that we were listening to then have languished. They are still before us today. So, it is a passion and there is absolute unanimity between the Ranking Member and myself to try to find a way to get something done legislatively with every bit of strength that we have.

So let me recognize myself for 5 minutes and we will proceed with the Ranking Member and the order of Members as they appear.

Mr. Hairston, we all know the 8(a) program is a 9-year program divided into two phases—an initial 4-year development stage and a final 5-year transition stage. You have heard from some of our witnesses today with respect to changing that, restructuring it because 9 years is not enough. Can you speak to this 9-year timeframe? Give us from your own experience a sense as to whether or not you believe, like many do, that it is just not enough time for a small firm to develop the skills needed to adequately compete in this economy, and by the time they do they are out the door.

Mr. HAIRSTON. Thank you for that question. I listened to those comments with interest. Several years ago, we developed a proposal to redesign the 8(a) program along the lines that were mentioned by the witnesses. One of the things that we talked about was the fact that most firms coming into the program were truly eligible for the program, had little experience in the federal marketplace, and found it difficult to navigate the federal system early on and their ability to achieve contact assistance was hampered to an extent and sometimes they were 3 or 4 years in the program before they actually realized some success in achieving that. The question around whether or not 9 years is long enough, I think the timeframe is highly dependent upon how successful firms are coming into the program and how well they take off with the benefits that are available to them in the program. My thinking along those lines is that the program should be a 9-year program. I think the way it is structured though and how that term is implemented is what is important. I honestly believe that when a firm first comes into the program it should be provided targeted resources for learning how to do business in the federal environment. They should be given assistance in understanding acquisition trends, understanding how to respond to solicitations, understanding how to develop relationships and market themselves. And when I think of marketing, I do not speak of marketing generally. I speak of marketing and how that is actually done effectively in the federal system. I think a firm's term should be dedicated to receiving assistance under the 7(j) program targeted to developing its ability to do business in the federal government. If after that 1 year it does not receive a contract, its term may start. Or, if it receives a contract during that 1 year, maybe its term starts in that 1 year. I would look at structuring a program in phases that allow for business development to lead the way to success in the program.

Chairman MFUME. Okay. Thank you, Mr. Hairston.

Ms. Robinson-Burnette, I would like to just turn to you quickly before yielding.

As was previously mentioned, the president has a goal of increasing the share of federal contracting dollars to small and disadvantaged firms from 5 to 15 percent by 2025. In your experience, are there any specific steps that the SBA should be taking and that we should be holding them accountable for to ensure that the initiative results in agencies reserving more opportunities for the 8(a) program and not less?

Ms. ROBINSON-BURNETTE. Thank you, Chairman, for that question.

When I was a contracting officer years ago, in accordance with the Federal Acquisition Regulation and my contract training, my

first step was to conduct market research for any acquisition that came across my desk to determine if the rule of two could be met. Can two or more small businesses do the work? And if so, I would set the work aside for small businesses or I would find an indefinite delivery contract or GWAC, one of these multiple award contracts that would allow set-asides for small businesses. With the shrinking acquisition workforce and the new increase in use of GWACs and category management, contracting officers are picking a contract vehicle first, bypassing the small business staff, and saying that contract does not require them to set aside for small business. Even if an incumbent is the small business that would be devastated with the loss of this work, or if the program was in the 8(a) program, they pull it out and put it into these contracts, I think the SBA must get more depth and more depth engaged with the OSDIBU and the small business directors at these agencies to learn what is really happening at their level in terms of the challenges they have with getting contracting officials to abide by the rule of two.

The OFPP memo, the White House Memo M2203, Advancing Equity and Procurement, now requires OFPP and SBA and the OSDIBUs to work together on category management. I think it is important that they look across the government and engage in every level. Our contracting officials abiding by the rule of two. When small businesses can do the work, is the work going to small business? Thank you.

Chairman MFUME. Thank you, very much.

My time has expired. I want to yield to the Ranking Member, the gentlewoman from Florida, Ms. Salazar, and I want to call your attention to the fact that we have been joined by the gentleman from Wisconsin, Mr. Fitzgerald, who is also a Member of this Committee. Thank you, sir.

Ms. Salazar?

Ms. SALAZAR. Thank you, Mr. Chairman. And I agree with you that we have the bipartisan spirit in trying to find solutions for this program because we are all, at least I consider myself part of the American dream. And Ms. Li said it specifically and the other witnesses as well. And thank you, Ms. Robinson-Burnette, for your service. Not only yours but the handsome husband behind you and the children that are joining the Armed Forces of the United States. Very laudable. So, thank you.

I think I have a question for all of you but I am going to start with Ms. Li. In very simple terms, if there is something that you need to fix with the 8(a) program that you are saying that helped you so much and it put you where you are right now, what would it be? What would you do if you had the power to fix that 8(a) program?

Ms. LI. Number one, thank you for that question. Thank you. Number one would be to raise the threshold as echoed by my fellow witnesses. The current threshold of $4 million for services is way too small. Time has moved on. Contracting has moved on. Everything has moved on but that threshold stayed. And what that does is it really is an impairment to regular individual 8(a) companies. And Soliel, my company, had multiple times for our 8(a) contracts to be taken away because there is not enough threshold. Either

they were given to 8(a) companies that can attain or support $100 million threshold or they were being put on other contract vehicles due to the consolidation, category management, all those reason to be put on an IDIQ contract as a task order. So that is our number one.

Ms. SALAZAR. Number one. Okay. Okay. Let me give the opportunity to Mr. Khurana. One thing that you would do, that you would fix with this program?

Mr. KHURANA. Ma'am, I would echo Ms. Li's comments as well. The threshold is way too limiting. It deserves the same increase as the group-owned 8(a)s, up to at least $22 million for the individual 8(a) owned. This will make a significant impact on the competitiveness for the business as they get ready for the competitive non-8(a) small business awards as well.

The second would be to really enhance measures to the scorecard goals that is set for the agencies to recognize what really makes the bottom line difference to more than 99 percent of the companies like myself, which is identifying the trackability as you mentioned, ma'am, earlier, if the dollars being spent on the direct awards is indeed going to the individually-owned 8(a)s. And what the recent trend contrary has been unfortunately that the threshold has shifted predominantly to the group-owned 8(a)s in the recent years because of their unique capability to get awards at a much higher threshold value.

Ms. SALAZAR. All right. Ms. Robinson?

Ms. ROBINSON-BURNETTE. Thank you for that question.

Some federal agencies have started decreasing their contracts going to the 8(a) program because the pool was shrinking and they did not want their contracts tied into the 8(a) program and not have enough firms to perform the work. I would make sure that the SBA shift their focus to include every firm that is eligible. The SBA can provide statistics on their applications, but when I was at the SBA, I though the issue with the declining pool was we were not receiving enough applications. Then I found we were receiving 2,300 applications a year and certifying 300.

Ms. SALAZAR. You said something about shifting the SBA's culture.

Ms. ROBINSON-BURNETTE. Yes.

Ms. SALAZAR. What do you mean by that?

Ms. ROBINSON-BURNETTE. Right now the focus is making sure they mitigate the risk of firms getting into the program that should not be in the program. Focusing on the fraud and really, that is the 1 or 2 percent of firms that apply. And so, the other 90-plus percent of firms are struggling to get in, like this lieutenant colonel that I talked about, because the SBA is focused on the wrong thing.

Ms. SALAZAR. And I would like to hear your opinion. We have a problem where the SBA is allocating those funds but is not tracking if those funds are being successful. Meaning, like at a university. We are paying for the tuition but we do not know if the student receiving it is getting good grades, if it is attending classes, or if it is graduating. So, the money is not being, I believe that is just, we do not know if it is being well used. So, do you feel the same way? Do you think that is your impression? Ms. Li?

Ms. LI. Yes, I tend to agree. And one of the questions we always ask is how do you measure a program's success? Is it by how many new 8(a) companies are being admitted or how many 8(a) contracting dollars that went into individual firms like ours? Or is it by how many are graduating and how many are still in business 5 years after?

Ms. SALAZAR. Which one do you think should be the right answer?

Ms. LI. I think it should be number one, the dollars that actually go to individual 8(a) firms. And number two, are they still in business 5 years after graduation?

Ms. SALAZAR. What do you say, Mr. Khurana?

Mr. KHURANA. I would echo exactly the same, ma'am.

Ms. SALAZAR. Ms. Robinson?

Ms. ROBINSON-BURNETTE. Yes. The number of dollars——

Ms. SALAZAR. What should be the guidelines?

Ms. ROBINSON-BURNETTE. The number of dollars going to eligible, to firms. And not just the super 8(a)s but the individually-owned small businesses. The number of firms. And then how many firms graduate and can stay in business after 5 years. I would also like to add, how many firms graduate and can actually sell their company to a new 8(a) that comes in. It is important that we reduce the burdens on that. A woman-owned can sell to another woman-owned and their contracts stay. A veteran to a veteran. If an 8(a) sells to another 8(a), a graduate 8(a) sells to a new 8(a) and transitions, those contracts are slated to be terminated. And that is unique only to the 8(a) program.

Ms. SALAZAR. Mr. Hairston, I am going to give you the last word.

I think he is muted.

Chairman MFUME. Mr. Hairston, we cannot hear you.

Mr. HAIRSTON. I apologize. I agree with the issues around measuring success, but I think you also have to consider the motivation of the entrepreneur coming in and what constitutes success to that entrepreneur. I think measuring based on dollars received is a fair measure, but we cannot forget that this is a business development program and it has basically survived based on the notion that it is a business development program. So, anything measuring success also has to be attributed to the business development assistance that has been provided to the firm.

Chairman MFUME. Mr. Hairston, I am going to ask you to begin to conclude.

Mr. HAIRSTON. Okay. But I would agree with the comments of the other panelists.

Chairman MFUME. Thank you very much.

Ms. SALAZAR. I yield back.

Chairman MFUME. The gentlewoman yields back.

The Chair recognizes the gentleman from Pennsylvania, Mr. Meuser, for 5 minutes.

Mr. MEUSER. Thank you very much, Mr. Chairman. And thank you to our Ranking Member as well. Thank you to all of you. Very important subject. I can see it in your eyes. You are living this and it is very essential to your business livelihood.

So, the questioning that is taking place here is specific, and boy, that is what we need to do. And as the Chairman stated earlier, that he has been dealing with such bureaucracy and less than business efficiencies in these requirements for many, many years. And I am hearing all that.

So, my first question would be to Ms. Robinson-Burnette, and I think I already know the answer. But do you have a white paper outlining some strong suggestions of what would be in the interest of the contracting that we could have and we could work on to actually try to implement? Do you have such a plan already written?

Ms. ROBINSON-BURNETTE. Thank you, Congressman, for the question.

I do not have a white paper, but my written testimony is 15 pages long that goes in-depth about the recommendations that I have offered today.

Mr. MEUSER. Beautiful. I summarized it. I am sorry. I did not read the whole thing but that will suffice.

Okay. So next, the administrative burdens the government placed on small businesses that everybody is agreeing we want to reduce, the fraud end of it, you say that is 1 to 2 percent, and I agree with that. I think a little bit of a phone call and a little bit of data analysis in today's information age should not be all that difficult to determine whether it is a real company or a phony-baloney company.

Now, on the same note, we just came off of EIDL and we had some really rush initiatives which we are very familiar with that did have some significant fraud in them. So, it has got to be a concern.

Quickly, Ms. Li, let me go to you, if you would. What can be eliminated from that so as we can have integrity and efficiency?

Ms. LI. Thank you. From my own experience, the individual 8(a) program seems to be administered better than the 8(a) Mentor-Protégé Joint Venture program. Soliel has been in the JV program for 6 years now. There is a lot of opportunity for the SBA to really exert oversight and improve its oversight to stop the abuse from the mentors to its small business proteges. That is where my personal experience has been focused on.

Mr. MEUSER. Okay. So, you all must be aware of some companies, and you have experienced it yourself, engage in the contracting, 4-year eligibility for the contracted self and just run into barriers that do not make a lot of sense to you but you need to overcome anyway because it is a very important contract. Does that happen regularly? And do you know other companies that just give up because it seems too burdensome?

Ms. LI. Yes, I do.

Mr. MEUSER. Go ahead, Mr. Khurana. Go ahead.

Mr. KHURANA. Thank you for the question, sir. Absolutely. Through the 9-year journey, the first 3 years I almost gave up hope. This is after surviving two recessions, surviving in commercial for 14 years, and still facing the challenges. I mean, I thought 8(a) would be to the rescue but of course, in the third year I got blessed with the first U.S. Air Force contract. Then I started to foresee a few other challenges which are roadblocks, clearly distinguishing them as such on why they are there. What I started to

notice is the consolidation efforts, the bundling efforts, scope creeps on the existing requirements just to make them above the direct award threshold by the agencies so that they could make it competitive or be awarded to the super 8(a)s. And that was at a big loss of the development dollars which are much essentially needed for the development firms like myself.

Another common one seen is the category management, and once we are graduating, those 8(a) requirements are being removed from the 8(a) to small business or some other category; I believe requires strengthening the PCRs of the SBA which are procurement representatives. They are our guardians. Protecting the program and the requirements within the 8(a) program. They need to be empowered, should have the influence on the agencies and the additional scorecard mechanisms, as I have highlighted a few options in my 10-page testimony.

Mr. MEUSER. Lastly, and I have very limited time, do you find that ineligible companies are gaming the system and gaining the contracts more in an unfair manner?

Mr. KHURANA. Sir, within the 8(a) program, I believe it is very well vetted, at least the 8(a) part. The other socioeconomic I am not too privy about but there may be some.

Mr. MEUSER. Okay. And are there any reasons that businesses do not apply because the payment is not there, the requirements are too costly? And I know I am over my time, Chairman, but a quick answer to that. Do some small businesses not apply because it is simply not worth it?

Please, Ms. Robinson-Burnette.

Ms. ROBINSON-BURNETTE. As I said, over 2,300 firms apply every year. They are applying. Only 300 are being brought in. Firms are paying advisors $4,000 to $10,000 to do applications for them. So, they are interested. It is just very difficult to get through the cumbersome process at the SBA, not relative to eligibility but mistakes or in the application. It has nothing to do with are they eligible.

Mr. MEUSER. We will certainly work on this. And thank you. And thanks for your indulgence, Mr. Chairman, for being over.

Chairman MFUME. The gentleman yields back.

The Chair recognizes the gentleman from Wisconsin, Mr. Fitzgerald, for 5 minutes.

Mr. FITZGERALD. Thank you, Mr. Chair.

My colleague on this Committee, Mr. Evans and I introduced H.R. 5861, which is the Waiver Authorization Streamline Act. It seeks to reduce the regulatory burden on the 8(a) transferring its contract to another 8(a) company. So, I know that was kind of discussed here. And after acquisitions or simply just being gobbled up by the other company, instead of going through the multi-level review process, which could span months as was brought up earlier again, SBA administration, being the authority to waive the approval process so long as the 8(a) company is absorbing the contract can perform the work.

So, I am going to ask Ms. Robinson-Burnette. So before serving as the CEO of the consulting firm you served as senior exec to the SBA Office of Government Contracting, so I appreciate your experience. Based on your experience, do you believe streamlining the ap-

proval process for transferring the 8(a) contract after acquisition would help keep more small businesses in the program?

Ms. ROBINSON-BURNETTE. Thank you, Congressman, for that question.

The SBA administrator on a nondelegable authority is the approving authority for transferring the 8(a) contracts when an 8(a) graduate is acquired. And I believe that that authority should remain at that level. But the contract should not be automatically slated for termination without that. I believe that the only time those contracts should be terminated is if the company is going to a non-8(a), or if with the consolidation of the company that acquires it the company now becomes other than a small business. Because once you join those two companies, they could now exceed the size standards. But if they are still small, what a great way for a new 8(a) to start out with contracts, customers, and possibly the mentorship of the firm that released the company.

Mr. FITZGERALD. Yeah, I do not want to overgeneralize, but sometimes those mergers are either because there is a stress on one of the two, financially, or in some instances, I mean, it makes sense because both entities kind of say, you know, we are competitors now. We should kind of unite and be more competitive in the market; right?

Ms. ROBINSON-BURNETTE. Yes. Also, after a 9-year term, sometimes—one real example I had, and it was the first time I encountered this, I was actually the associate administrator of the 8(a) program, an 8(a) participant died. And now his contracts had to go to another company. And if the company was sold to another 8(a), then, of course, his family that helped him build this company could benefit but then transition the company and the employees to a new 8(a) so the company could continue to go instead of the company having to shut down, employees lose their jobs and all the contracts be terminated. So it could be because of illness, a desire to retire after 20 years in the business, or the company just wants to sell for other reasons.

Mr. FITZGERALD. Gotcha. Very good. Very good. Thank you.

Just real quick, Ms. Li, Wisconsin, my home state, our big three are tourism, agriculture, and manufacturing. And for the most part, light manufacturing. So, you have got kind of these smaller factories and then you have got the transportation component, and then you might have a tool and dye shop down the road. So, they are all integrated. In my experience, not only personal experience because of interacting with some of the small businesses and my father-in-law that was in manufacturing for years, but oftentimes, I mean, they would tell the story that the federal contracts would come, they would land on the desk, and they would put their best person on it. But by the time they got done bidding it and going through kind of what the standards and specs are, it just was not worth their time. So, they eventually would just give up on any of those types of contracts. The reason I bring it up is because I think there is a misnomer that, oh, my gosh, we cannot wait to get government contracts because it is just the best thing in the world and that is not always the case, I think, especially for medium to small businesspeople. And I am just wondering if you could comment on that and what your experience on that front is.

Ms. LI. I would agree. Especially if you think about it, a lot of the acquisitions, even though it is a direct award or a small business set-aside, they require a huge amount of certification, especially with the cyber risk and supply chain risk for the DoD community that we support. It is a legitimate requirement, but to what extent for a small business that you need to require the same level of certification as those billion dollar companies that have resources to go through, you know, years of certification and investing hundreds of thousands of dollars to acquire those. So that is a legitimate concern and I share that.

Mr. FITZGERALD. Very good.

Thank you, Mr. Chair, and I yield back.

Chairman MFUME. The gentleman yields back.

The Chair is happy to recognize and to welcome Mr. Stauber, the gentleman from Minnesota who has joined us.

Mr. STAUBER. Thank you very much, Mr. Chair.

While we can all agree that increasing contracting goals of the federal government, especially of the disadvantaged small businesses, it is a laudable goal, I think we need our agencies to be more transparent. It seems to me that agencies are picking a few of their favorite small businesses, dumping all their money into those very select few, and then reporting that they are far exceeding their contracting goals year after year. So, without competition, we are guaranteed to see an increase in prices for taxpayers in the long run.

Ms. Li, can you explain how contract consolidation practices has harmed more competition amongst 8(a) businesses?

Ms. LI. Thank you. I would be very happy to.

As mentioned by my fellow witnesses earlier, this category management——

Chairman MFUME. Ms. Li, would you speak into the microphone? Thank you.

Ms. LI. Oh, I am sorry.

Chairman MFUME. That is okay.

Ms. LI. I would be happy to. And that is what we live with as individual 8(a) companies on a daily basis because there is the group 8(a)s that have now a threshold of $100 million. So even when there is an 8(a) opportunity that is being solicited or directly awarded and Soliel was on the receiving side of that multiple times, the question for a contracting officer is very realistically, if you have a requirement that is $4 million a year but a 5-year requirement totaling $20 million or above, so what do you do? Would you give to an individual 8(a) company that you need to then subsequently, if you are even allowed to reissue that same contract five times or four more times? Or would you give it to another 8(a) company, group 8(a) company that has a much higher threshold?

So, it is really a challenge. And one of the contracts that Soliel performed, we lost that because of the real consideration, very practical considerations. It went to a group-owned 8(a) company but I cannot say the performance was up to the level, so it was subsequently recompeted. So, to your question, I am really saying one of the ways to address that is to raise the threshold so there is more a level playing field among 8(a) companies and also extending that to all small business. You have HUBZone, woman-owned, vet-

eran-owned, SDVOSB. So that would really help the small business. Thank you.

Mr. FITZGERALD. Thank you very much. That was the only questions I have. And I yield back, Mr. Chair.

Chairman MFUME. Thank you very much. The gentleman yields back.

The Chair recognizes the gentleman from Louisiana, Mr. Carter, for 5 minutes.

Mr. CARTER. Mr. Chairman, thank you very much. I greatly appreciate the opportunity to ask questions.

Let me ask a question very basically. When we talk about 8(a) contractors, we know that the issues that impacted those contractors during COVID have been somewhat adjusted by advancing an additional year. We know that many of those contractors suffered beyond that 1 calendar year. What are your thoughts on some additional time and/or assistance that can be given to those people that were graduating out of the 8(a) program but lost significant time because of the pandemic?

Mr. KHURANA. Thank you for the question, sir.

As a graduating 8(a), the recent addition has made a decent impact but it is not yet just enough. I will give an example. The last year, our own follow-on contract from the United States Air Force for the clinical healthcare services came up for Avosys to be able to recompete on and that was only made possible because of the 1-year extension given. However, there are many other large government vehicles which are delayed through the pandemic response in getting reprocured and I feel that I will be losing that once in an 8(a) lifetime chance to bid on them. So, I humbly request another year of extension which will make a real big difference to many graduating 8(a)s like myself.

Mr. CARTER. Anyone else want to add on that?

Ms. ROBINSON-BURNETTE. Thank you, Congressman.

I think an additional year would significantly benefit the 8(a)s that are in the program right now. Also, I think it is incumbent on the SBA to really push the Mentor-Protégé Program which allows a graduating 8(a) to joint venture with a new 8(a) and transition the contracts and continue to perform on 60 percent of the work. And this is a real legitimate way that an 8(a) that is graduating can maintain their work and their customer base.

Mr. CARTER. How much of that actually happens? I hear about the Mentor-Protégé Program. I hear varying thoughts on some that work, some that do not work as well. What is your general experience on the availability of willing mentors?

Ms. ROBINSON-BURNETTE. Thank you for that question. I think the SBA's Mentor-Protégé Program is one of the most successful programs that has come out of the SBA. The director of that program is Mr. Stanley Jones, Jr., I think one of the smartest leaders at the SBA. It is work exceptionally well and the SBA has a Mentor-Protégé Program conference every year. They had one before COVID-19. And this is a great place to do matchmaking between graduated 8(a)s and new 8(a)s and allowed them to meet and connect at that event.

Mr. CARTER. Can some body speak to the reverse of that, becoming and finding a protege? How successful has that been and are there seamless opportunities to create that linkage?

Mr. KHURANA. Sir, I would like to add there are elements which can be implemented to come in line with the mentor-protégé intention and the success which can be achieved through it. First, the sole source threshold, if it comes close to the four or five times the capacity it is, it will help directly give the empowerment to the prime contractor or the 8(a) contractor to compete for the real world awards which are generally on an average of $20 to $25 million.

Two, the SBA lending program could be empowered with working with the banks to provide the line of credit which is much needed on the financial support rather than reliance on just the mentors.

Three, empowering SBA with the additional PCRs for the support, they can then further help us in providing the contract legal HR negotiation support which is much needed. These are all elements which a mentor would typically provide to the proteges and SBA has been instrumental in giving many of those but more could be done. Thank you.

Mr. CARTER. Mr. Chairman, unless there is somebody else that wanted to weigh in? I am sorry; did I hear someone jump in?

Chairman MFUME. None of the witnesses unless it is Mr. Hairston, who is not here.

Mr. CARTER. Okay, in that case, Mr. Chairman, I would like to, first of all, thank you, and thank all of our witnesses.

Mr. Chairman, I ask at a later date if we can revisit the possibility of visiting with SBA to see what the likelihood and ability for us to advance discussion to consider an additional year of resources for those 8(a)s who were undoubtedly significantly harmed by the pandemic.

Chairman MFUME. Thank you very much. It is so noted and I appreciate your comments.

One of the things we really I think are committed to doing in this Committee is to find a way to start being able to mark some progress so that 5 years from now this is still not the discussion.

And I want to take a moment just to thank again all of our witnesses, Mr. Hairston, Ms. Li, Mr. Khurana, and Ms. Robinson-Burnette. I have to say I am a little troubled to hear though, and I was not aware of this and maybe it is my own fault, that if you are an 8(a) contractor and you die or you retire after 25 years or something else happens and your business is sold to me, that all of the contracts that are in place are considered null and void. I mean, that really, really disturbs me, particularly I think as you said, Ms. Robinson-Burnette, that that is not the case with any other category of business. There are a lot of good ideas and suggestions from all of you that I hope we will find our way to make into legislation. The Ranking Member and I as I have said before are committed to real change and change that is verifiable so that we are able to mark progress.

But again, I want to thank all of you. I want to thank Ms. Salazar. She was kidding earlier when she was not really kidding. This is the first time we have sat together on a Committee because we have been in a hybrid virtual situation. But here we are, the A

Team. My thanks to all of you and this hearing now stands adjourned. Thank you.

[Whereupon, at 12:14 p.m., the subcommittee was adjourned.]

# APPENDIX

"THE 8(a) PROGRAM: OVERVIEW AND NEXT STEPS TO PROMOTE

SMALL BUSINESS SUCCESS"

TESTIMONY

BY

DARRYL K. HAIRSTON

BEFORE THE

The COMMITTEE ON SMALL BUSINESS SUBCOMMITTEE ON CONTRACTING

AND INFRASTRUCTURE

HEARING - 11:00 A.M. - RAYBURN HOUSE OFFICE BUILDING

ROOM 2350

MARCH 2, 2022

Chairman Mfume and other distinguished Members of this Committee, I am pleased to present testimony in support of your examination of how the U. S. Small Business Administration's (SBA) 8(a) Business Development (BD) Program currently works and the resources it provides to small businesses. The purpose of this examination is to identify ways to modernize the program and improve its effectiveness.

**PROGRAM HISTORY AND PURPOSE**

The origin of the 8(a) program can be found in Public Law 77-603, June 11, 1942, which created the Smaller War Plants Corporation. This Corporation had broad authority to contract with the United States to furnish goods and services to the government and to arrange for the performance of these contracts by subcontracting to small businesses or others. The Defense Production Act amendments of 1951, Public Law 82-96, created the independent Small Defense Plants Administration, which was generally given the same authorities as the Smaller War Plants Corporation

The 8(a) authority under Public Laws 82-96 and 77-603 was not used but the concept survived when SBA was established. In this regard, the Small Business Act of 1953 authorized SBA to enter into contracts with federal agencies and to subcontract the

work to small businesses. However, for 15 years SBA did not use this authority which was Section 8(a) authority because it believed that the effort to start and operate such a program was not worthwhile in terms of developing small businesses.

The 8(a) program was started as a result of Executive Orders issued by President Johnson in response to the 1967 Report of the Commission on Civil Disorders, commonly called the Kerner Commission. The finding that triggered the 8(a) effort was that disadvantaged individuals did not play an integral role in America's free enterprise system, in that they enjoyed no appreciable ownership of small businesses and did not share in the community redevelopment process. The report recommended that steps be taken to increase the level of business ownership by minorities so that they would have a better opportunity to materially share in the competitive free enterprise system.

In 1967, President Johnson ordered that the section 8(a) authority be used to direct contracts to businesses locating plants in distressed urban areas in order to create jobs. After rioting in inner cities in 1967, section 8(a) authority was used for the first time in support of the Test Cities Program in 12 cities. Sole source federal contracts were provided to induce businesses to locate in areas of high unemployment. This effort was short lived. The effort to promote more employment in inner cities was turned over to the National Alliance for Business JOBS Program.

In 1969, SBA redesigned the program to provide federal contract support for small firms owned by socially **or** economically disadvantaged individuals. This use of the Section 8(a) authority was accomplished through SBA administrative regulations. The 8(a) program grew to include, in a 10-year period from 1970 to 1980, approximately 2000 firms. Throughout this period the program was subject to abuse and fraud, particularly due to the intrusion of "front" companies.

In an attempt to correct the abuses, Congress enacted Public Law 95-507 in 1978 to provide the program with statutory authority. The law provided a number of measures to shift the program's focus to business development and required program participants be at least 51% owned and controlled by socially **and** economically disadvantaged individuals. The legislation was designed to foster business ownership by socially and economically disadvantaged persons and to promote the viability of businesses run by such persons by providing contract, financial, technical and management assistance.

The law created the position of Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD) to administer the 8(a) and 7(j) management and technical assistance programs. As a result of the inequitable determinations of eligibility by the field offices, P. L. 95-507 provided specific eligibility criteria and required that the AA/MSB&COD, now referred to as the Associate Administrator for 8(a) Business Development, make final determinations of program eligibility.

The law clarified the intent that the primary beneficiaries of the program would be socially and economically disadvantaged individuals. Socially disadvantaged

individuals were defined as those who have been "subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The Law also included congressional findings that Black Americans, Hispanic Americans, Native Americans are presumed to be socially disadvantaged. Economically disadvantaged was defined for purposes of the 8(a) Program, as those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. Consequently, while the law provided a presumption of social disadvantage for members of certain minority groups, no one was presumptively economically disadvantaged. By regulation, SBA further defined an economically disadvantaged individual as one having an adjusted net worth of less than $250,000 at the time of entry into the 8(a) Program ($750,000 for continuing eligibility), unless SBA determined that such individual, despite not exceeding these thresholds, otherwise demonstrated that he/she had access to capital and credit.

Therefore, under the law, a minority or a non-minority could establish his/her eligibility to participate in the program if they could demonstrate that they met both of these requirements, along with all other conditions of eligibility. Additionally, SBA's Associate Administrator for Minority Small Business and Capital Ownership Development was granted the authority to make determinations regarding the recognition of other groups or individuals as presumptively socially disadvantaged based upon criteria promulgated in regulations.

Under Section 7(j) the law authorized SBA, among other things, to provide financial assistance to public or private organizations to pay all or part of the cost of projects designed to provide technical or management assistance to individuals or enterprises eligible for assistance under various SBA programs, noting that SBA shall give preference to projects which promote the ownership, participation in ownership, or the management of small business owned by low-income individuals and small businesses eligible to receive contracts pursuant to Section 8(a) of the Small Business Act. This authority was later further clarified by Public Law 100-656, to include the provision of financial assistance to individuals or entrepreneurs eligible for program assistance.

Unfortunately, even with P. L. 95-507 the program failed to develop viable competitive firms that graduated from the program. As a result of so few firms graduating from the program, Congress passed P. L. 96-481 in October 1980. This law required SBA to negotiate with all 8(a) firms a fixed period of time to participate and definite graduation dates.

Through regulations to implement P. L. 96-481, SBA established the fixed program participation term (FPPT) which limited a firm's participation in the program to an original term of up to 5 years with a possible extension of 2 years. Full implementation of these regulations took place on April 21,1982.

On November 15, 1988, President Reagan signed into law the "Business Opportunity Development Reform Act of 1988", P. L. 100-656. This law provided for, among other things, competition in the 8(a) program for contracts above certain dollar thresholds; a nine year participation term divided into a four (4) year developmental stage and a five (5) year transitional stage requiring attainment of non-8(a) revenue at certain levels during program years five (5) through nine (9); an 8(a) loan program; establishment of the Division of Program Certification and Eligibility that would process applications within 90 days and conduct annual continuing eligibility reviews; Miller Act surety bond exemptions; the transfer of technology or surplus property; Walsh-Healey Act exemptions; business plan approvals after certification but prior to award of any 8(a) contracts; a transition management plan during the first year of participation in the transitional stage; required SBA to submit an annual report on the program to the Congress; and, made the AA/MSB&COD position career reserved.

In passing P. L. 100-656, Congress found that the 8(a) program remained a primary tool for improving opportunities for small business concerns owned and controlled by socially and economically disadvantaged individuals in the Federal procurement process and bringing such concerns into the nation's economic mainstream. Congress also found that although some progress had resulted from the program, it had generally failed to meet its objectives, which remained as valid in 1988 as when the program was initiated.

Evidence before the Congress in 1988 showed that the disadvantaged business program had thus far made unsatisfactory progress in removing discriminatory barriers to minority business success. That is, "Only six percent of minorities owned businesses and the average receipts per minority firm was less than 10 percent of the average receipts for all businesses." Minority businesses still only accounted for less than 1 percent of the nation's gross business receipts and employment.

Although the 8(a) Program was originally established for the benefit of disadvantaged individuals, in the 1980s, Congress expanded the program to include small businesses owned by four "disadvantaged" groups. The first owner-group to be included was Community Development Corporations (CDCs). A CDC is: a nonprofit organization responsible to residents of the area it serves which is receiving financial assistance under part 1 [42 USCS §§9805 et seq.] and any organization more than 50 percent of which is owned by such an organization, or otherwise controlled by such an organization, or designated by such an organization for the purpose of this subchapter [42 USCS §§9801 et seq.]. Congress created CDCs with the Community Development Act of 198136 and instructed the SBA to issue regulations ensuring that CDCs could participate in the 8(a) Program. In 1986, two additional owner-groups, Indian tribes and Alaska Native Corporations, became eligible for the 8(a) Program when Congress passed legislation providing that firms owned by Indian tribes, which included Alaskan Native Corporations (ANCs), were to be deemed "socially disadvantaged" for purposes of the 8(a) Program. In 1992, ANCs were further deemed to be "economically disadvantaged." The final owner-group, that of Native Hawaiian Organizations (NHOs), was recognized in 1988. An NHO was defined as: any community service organization serving Native Hawaiians in the State of Hawaii which—(A) is a nonprofit corporation

that has filed articles of incorporation with the director (or the designee thereof) of the Hawaii Department of Commerce and Consumer Affairs, or any successor agency, (B) is controlled by Native Hawaiians, and (C) whose business activities will principally benefit such Native Hawaiians.

Additionally, the list of presumptively socially disadvantaged individuals was expanded to include Asian Pacific Americans and Subcontinent Asian Americans and recent changes updated the economic disadvantaged eligibility thresholds. In that regard to be considered economically disadvantaged an individual must have an adjusted personal net worth that does not exceed $750,000; an adjusted gross personal income averaged over the three preceding years that does not exceed $350,000; and, the fair market value of all his or her assets (including his or her primary residence and the value of the applicant/Participant firm) does not exceed $6 million.

**PROGRAM OVERVIEW AND BENEFITS**

The 8(a) program can be a valuable tool for socially and economically disadvantaged small business owners. The program offers unique and valuable business assistance. Certified firms in the 8(a) program can:

- Efficiently compete and receive competitive and sole-source contracts;
- Receive one-on-one business development assistance for their nine-year term from dedicated Business Opportunity Specialists focused on helping firms grow and accomplish their business objectives;
- Pursue opportunity for mentorship from experienced and technically capable firms through the SBA Mentor-Protégé program;
- Connect with procurement and compliance experts who understand regulations in the context of business growth, finance, and government contracting;
- Pursue joint ventures with established businesses to increase capacity;
- Qualify to receive federal surplus property on a priority basis; and
- Receive free training from SBA's 7(j) Management and Technical Assistance program.

*Competitive and Sole Source Contracts*

The 8(a) certification qualifies your business as eligible to compete for the program's sole-source and competitive set-aside contracts. The government authorizes sole-source contracts to 8(a) participants for up to $7.5 million for acquisitions assigned manufacturing North American Industry Classification System (NAICS) codes and $4.5 million for all other acquisitions. Entity-owned 8(a) program participants are eligible for sole-source contracts above these thresholds, but the Department of Defense requires approval of a formal justification if the 8(a) sole-source contract exceeds $100 million; all other federal agencies require approval for sole-source 8(a) contract actions that exceed $25 million.

*Business Opportunity Specialists*

BOSs assist both prospective and existing 8(a) firms with questions related to the

application process, required forms, and the program's various eligibility, reporting, and performance requirements. BOSs also provide general business development assistance, assist with the firm's planning and establishment of goals, work with the firm as it develops and submits its required business plan, and ensure that the firm is on track regarding anticipated business growth. BOSs "on-going responsibility is to assist the Participant in developing its business to the fullest extent possible so that it attains competitive viability during its program participation term, and maintains viability thereafter." As directed, BOSs accomplish this by (1) helping the firm identify its strengths and weaknesses; (2) providing advice, counsel, and guidance in the areas of marketing to the federal government, prime contracting, and contract administration; (3) referring the firm to appropriate internal and external resources for assistance in technical, management, and financial matters; and (4) monitoring the firm's progress in the program and its compliance with program requirements.

*Mentor-Protégé Program Participation*

8(a) participants can get valuable business development help from their mentors in several areas, including:

- Guidance on internal business management systems, accounting, marketing, manufacturing, and strategic planning
- Financial assistance in the form of equity investments, loans, and bonding
- Assistance navigating federal contract bidding, acquisition, and the federal procurement process
- Education about international trade, strategic planning, and finding markets
- Business development, including strategy and identifying contracting and partnership opportunities
- General and administrative assistance, like human resource sharing or security clearance support.

A mentor and its protégé can joint venture as a small business for any small business contract, provided the protégé individually qualifies as small. The joint venture may also pursue any type of set-aside contract for which the protégé qualifies, including contracts set aside for 8(a), service-disabled veteran-owned, women-owned, and HUBZone businesses. Visit the Joint Venture program page more information.

*JOINT VENTURES*

Joint venture benefits to participants include:

- Collective representation of past performance;
- Shared costs and resources; and,
- Leveraging the other partner's experience and market share.

A mentor and its protégé can joint venture as a small business for any small business contract, provided the protégé individually qualifies as small. The joint venture may also pursue any type of set-aside contract for which the protégé qualifies, including contracts set aside for 8(a), service-disabled veteran-owned, woman-owned,

and HUBZone businesses.

*SURPLUS PROPERTY*

Pursuant to 15 U.S.C. 636(j)(13)(F), eligible Participants may receive surplus Federal Government property from State Agencies for Surplus Property (SASPs). To be eligible to receive Federal surplus property, on the date of transfer a concern must:

- Be in the 8(a) BD program;
- Be in compliance with all program requirements, including any reporting requirements;
- Not be debarred, suspended, or declared ineligible under Title 2 or Title 48 of the Code of Federal Regulations;
- Not be under a pending 8(a) BD program suspension, termination or early graduation proceeding;
- Be engaged or expect to be engaged in business activities making the item useful to it; and,
- Not have received property an eligible Disaster Area business, during the applicable 2-year period described 13 CFR Part 129 Subpart B.

*7(j) MANAGEMENT AND TECHNICAL ASSISTANCE PROGRAM*

8(a) participants can receive free training, executive education, and one-on-one consulting in a wide range of activities, and the opportunity to participate in courses in the following areas:

- Accounting
- Marketing
- Strategic and operational planning
- Financial analysis
- Business development
- Contract management
- Compliance
- Various business-related software

## Program Improvement Recommendations

In support of the Passage of P.L. 95.507, the Law that statutorily authorized the Section 8(a) program, Congress concluded that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy and, that many such persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control. Congress further found that ownership and control of productive capital was concentrated in the economy of the United States and certain groups, therefore, own and control little productive capital; that certain groups in the United

States own and control little productive capital because they have limited opportunities for small business ownership; that the broadening of small business ownership among groups that presently own and control little productive capital is essential to provide for the well-being of this Nation by promoting their increased participation in the free enterprise system of the United States; and that such development of business ownership among groups that presently own and control little productive capital will be greatly facilitated through the creation of a small business ownership development program, which shall provide services, including, but not limited to, financial, management, and technical assistance.

While there have been improvements since 1978, there have been many reviews and studies, some recent, that have concluded that the goals of P.L. 95-507 have not been realized. Additionally, during this time there have been a number of reports prepared by the SBA's Office of the Inspector General Inspector and the General Accounting Office noting instances of fraud, and the lack of quality and consistent SBA monitoring and oversight. In this regard, it is my opinion that the following recommendations for 8(a) BD Program improvements will have a significant impact on its administration and effectiveness:

1) *SBA Infrastructure*

The SBA's Office of Business Development (BD), housed within the Office of Government Contracting and Business Development, oversees the 8(a) Program. Under the direction of the AA/8(a) BD, this Office is responsible for the oversight of all matters related to the 8(a) BD program. However, the Business Opportunity Specialist (BOSs) who are the primary face of the SBA to an 8(a) participant and who are the employees responsible for delivering the programs and services of the 8(a) BD Program to program participants work in district offices under the general supervision of the District Director who reports to SBA's Office of Field Operations (OFO). Although BOSs report to the SBA's OFO, they interact extensively with BD, which is located in the SBA's headquarters building in Washington, DC. In my view this overlapping organizational structure creates programmatic challenges.

First, while the AA/BD develops and/or modifies program policies, he or she has little to no control or the implementation of such initiatives and changes without the cooperation and commitment of the leadership of the Office of Field Operations and the District Offices.

Additionally, the BOS role is the most critical role in the assistance provide to 8(a) program participants. Therefore, it is imperative that the recruiting process for these positions places emphasis on the appropriate skill sets and that training to enhance the employee's ability to provide relevant assistance and support to program participants is provided on an ongoing basis. Again, because of the noted organization structure, the role of the AA/BD or his/her designee in this process is limited top the cooperation of the leadership of the Office of Field

Operations.

Finally, of great importance is the overall performance of the BOSs. Here, where it appears that a BOS may not be performing his/her duties as prescribed by the law and/or his/her performance plan or is utilized for purposes not associated with the 8(a) BD Program, the AA/BD has no input.

Absent a restructuring that would give the AA/BD more control and input into the management of these program issues, I recommend the following:

- *A written agreement should be developed between the Office of the AA/BD and the AA/OFO delineating the roles and responsibilities associated with the field office responsibilities of the Office of the AA/BD and the AA/OFO;*
- *The annual performance goals developed by the AA/BD should be communicated clearly to the AA/OFO and should be incorporated in his/her annual performance standards; and,*
- *The performance standards should also be included in the annual performance requirements of the District Directors and the BOSs.*

2) *7(j) Management and Technical Assistance*

The 7(j) Management and Technical Assistance program authorizes SBA to extend financial, management, technical, and other services to socially and economically disadvantaged small businesses. The SBA's current regulations indicate that the 7(j) Management and Technical Assistance Program will, "through its private sector service providers [deliver] a wide variety of management and technical assistance to eligible individuals or concerns to meet their specific needs, including: (a) counseling and training in the areas of financing, management, accounting, bookkeeping, marketing, and operation of small business concerns; and (b) the identification and development of new business opportunities."

While it is a widely used program to support 8(a) BD program participants, it is my view that there are opportunities to improve its effectiveness and the associated outcomes. SBA should consider allocating some 7(j) resources to the development and delivery of specific programs/ curriculums for new and transitioning program participants. For new program participants such courses might focus on the Federal acquisition process; understanding Federal contract solicitations; preparing successful proposals, building networks/relationships in the public and private sector, how to successfully market to the Federal government; effective business planning, etc. Such a curriculum could be most effectively developed with the input of prior program participants. Similarly, for transitioning companies, such coursework might include a focus on long-term planning; considerations for market expansion, i.e. mergers and acquisitions; diversification, etc.

For new participants, the availability of such training in their beginning stage may help alleviate the lag many experience in receiving their first contract opportunity.

3) *8(a) Loan Program*

As noted, P. L.100-656 amended Section 7(a) of the Small Business Act to include an 8(a) Loan Program. Specifically, the Administration was empowered to make loans either directly or in cooperation with banks or other financial institutions through agreements to participate on an immediate or deferred (guaranteed) basis to small business concerns eligible for assistance under subsection (j) (10) and section 8(a). Prior to the authorization of the 8(a) Loan two critical financing program associated with the 8(a) BD program had been eliminated, those being the Business Development Expense Program and the Advance Payments Program.

The Business Development Expense Program authorized SBA to assist an 8(a) Program participant by purchasing equipment that would enhance its ability to perform on instant and future contracts in its line of business. After successfully completing the contract for which the equipment was purchased the 8(a) participant retained title to the equipment. Advanced Payments was a revolving fund that allowed SBA to provide working capital to an 8(a) participant which was repaid out of the firm's progress payments on the job for which it was provided.

While it seemed that the 8(a) Loan Program was legislated as a financial tool to replace those that were eliminated, I have no recollection that it was ever implemented. The implementation of this program would provide a source of critical financing for 8(a) program participants

4) *Annual Forecast*

Under Section 8(a)12) (A) each concern eligible to receive subcontracts pursuant to this subsection is required to annually prepare and submit to the SBA a capability statement. The statement shall briefly describe the concern's various contract performance capabilities and shall contain the name and telephone number of the Business Opportunity Specialist assigned such concern. The SBA shall separate the statements by those primarily dependent upon local contract support and those primarily requiring a national marketing effort. Statements primarily dependent upon local contract support shall be disseminated to appropriate buying activities in the marketing area of the concern. The remaining statements shall be disseminated to the Directors of Small and Disadvantaged Business Utilization for the appropriate agencies who shall further distribute such statements to buying activities with such agencies that may purchase the types of items or services described on the capability statements.

Contracting activities receiving capability statements shall, within 60 days after

receipt, contact the relevant Business Opportunity Specialist to indicate the number, type and approximate dollar value of contract opportunities that such activities may be awarding over the succeeding 12-month period and which may be appropriate to consider for award to those concerns for which it has received capability statements.

Each executive agency reporting to the Federal Procurement Data System contract actions with an aggregate value in excess of $50,000,000 in fiscal year 1988, or in any succeeding fiscal year, shall prepare a forecast of expected contract opportunities or classes of contract opportunities for the next and succeeding fiscal years that small business concerns, including those owned and controlled by socially and economically disadvantaged individuals, are capable of performing.

Such forecast shall be periodically revised during such year. To the extent such information is available, the agency forecasts shall specify: (i) The approximate number of individual contract opportunities (and the number of opportunities within a class) (ii) The approximate dollar value, or range of dollar values, for each contract opportunity or class of contract opportunities. (iii) The anticipated time (by fiscal year quarter) for the issuance of a procurement request. (iv) The activity responsible for the award and administration of the contract.
The head of each executive agency shall within 10 days of completion furnish such forecasts to— (i) the Director of the Office of Small and Disadvantaged Business Utilization established pursuant to section 15(k) for such agency; and (ii) the Administrator.

While the majority of the current 8(a) portfolio provides an updated capability statement annually and, most Federal Agencies prepare an annual forecast, I am not aware of adherence to the processing requirements stipulated in this section of the Small Business Act. In my view, adherence to the provisions of this Section of the Act would greatly improve the likelihood of a new 8(a) program participant receiving contract assistance earlier in its 8(a) program participation. Further, it would most likely result more program participants realizing greater access to suitable contract opportunities during their program participation.

5) *Mentor-Protégé Program*

The small business mentor-protégé program is designed to enhance the capabilities of protégé firms by requiring approved mentors to provide business development assistance to protégé firms and to improve the protégé firms' ability to successfully compete for federal contracts. This assistance may include technical and/or management assistance; financial assistance in the form of equity investments and/or loans; sub contracts (either from the mentor to the protégé or from the protégé to the mentor); trade education; and/or assistance in performing prime contracts with the Government through joint venture arrangements. Mentors are encouraged to provide assistance relating to the

performance of contracts set aside or reserved for small business so that protégé firms may more fully develop their capabilities.

The Mentor-Protégé program is an excellent opportunity for transitional 8(a) participants to continue their growth and developmental while supporting the developmental needs of less season program participants. However, to ensure the effectiveness of this program and to make certain that its objectives are being met, SBA must improve its oversight to ensure that both Mentors and Proteges are adhering to the Mentor-Protégé Agreement and that program rules and regulations are being followed.

Chairman Mfume and other distinguished Members of this Committee, thank you for the opportunity to submit this written statement in connection with the Subcommittee's hearing on SBA's 8(a) Program. I am happy to answer any questions you may have.

Senior Executive Strategic Solutions

SES2
Senior Executive Strategic Solutions LLC

**Testimony of Jackie Robinson-Burnette**
**CEO**
**Senior Executive Strategic Solutions LLC**

**before the**

**House Committee on Small Business**
**Subcommittee on Contracting and Infrastructure**
**Hearing on "The 8(a) Program: Overview and Next Steps to Promote Small Business Success"**

**March 2, 2022**

**Rayburn Building, Washington DC**

https://www.linkedin.com/in/jackierobinsonburnette/

**Testimony of Jackie Robinson-Burnette**
**CEO**
**Senior Executive Strategic Solutions LLC**

Good morning, Chairman Kweisi Mfume, Ranking Member Maria Salazar, and distinguished Members of the Committee. Thank you for all that you do across this country for every day citizens like me while giving us a voice and a chance to be heard. I am humbled and honored to be before you today, and I am grateful for this once in a lifetime opportunity to discuss my thoughts on the 8(a) Business Development program and important next steps to promote small business success. I cannot express in words how excited I am about the President's goal of increasing the share of federal contracts awarded to small. disadvantaged businesses from 5 to 15 percent by 2025.

As background, I am a recent retired federal Senior Executive. I started my federal career while in High School as a GS-1 Clerk-Typist at the Naval Postgraduate School in Monterey CA. Fast forward, I served 34 years with the Dept of Defense contracting offices in Germany, Korea, and had temporary duties in war-torn places like Bosnia and Kosovo. My husband of 30+ years is a retired Army Lieutenant Colonel, and the sole survivor of his team after the attacks on the Pentagon on 9/11. We have three daughters, two are serving as Army 1st Lieutenants, and our youngest in college is an Army ROTC cadet. We are a family committed to this great Nation, and we have dedicated our lives to living with the highest levels of integrity and character. Most of my career was in contracting to include years as a Contracting Officer with an unlimited warrant. I shifted into Small Business Program Management later in my career. My mentor was the late Ms. Tracey Pinson. From 1982-1986, Tracey served as counsel to the House Committee on Small Business for Chair Parren J. Mitchell, and she served as the Army Small Business Executive for 19 years. My commitment to the 8(a) Program and career progression to the ranks of the Senior Executive Service is directly attributable to my faith and Tracey. Some of my Small Business

https://www.linkedin.com/in/jackierobinsonburnette/

Program assignments included leading the Army Corps of Engineers SB Program, and the Secretary of Army SB Program before realigning to the U.S. Small Business Administration (SBA) for my dream job of running the 8(a) Business Development program.

Since we are referencing socially and economically disadvantaged small business concerns in our discussion of the 8(a) Business Development program, it is important to know the definition. A socially and economically disadvantaged small business concern is at least 51% unconditionally owned by: (1) one or more socially and economically disadvantaged individuals, (2) an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or (3) an economically disadvantaged Native Hawaiian organization.

The 8(a) Business Development program is the key component of the SBA's strategy to foster the development of small businesses owned by socially and economically disadvantaged individuals to prepare them to access federal prime contracts and subcontracting opportunities. Congress established the program to help increase the full participation of small, disadvantaged businesses.

It expands our ability to easily tap into all the possible avenues of creativity, innovation, and problem solving from smart people in different corners of our country that have something to offer to help tackle some of the Nation's most pressing challenges. It increases our country's access to diverse strategies and solutions to enhance our performance as we engage in humanitarian efforts or defend U.S. citizens within our boarders and across the globe.

The program provides business development assistance, which consists of management and technical assistance as well as preferential contracting opportunities over a 9-year program term. Management and technical assistance could be anything from learning how to set up proper cost and accounting procedures to marketing to the government and preparing winning proposals. This assistance is provided by geographically dispersed SBA Business

Opportunity Specialists, the 7(j) management and technical assistance program, and SBA's resource partners. Contracting opportunities include competitive 8(a) set-aside contracts; and direct award sole-source contracts up to certain dollar thresholds if the firm has proven the capability and financial resources to perform.

I also want to paint a very simple picture of what the program offers. It simply offers a socially and economically disadvantaged entrepreneur an opportunity to learn how to lock in a contract job, to do the work with their own money, and in advance of payment from the government they cover bi-weekly payroll and offer benefits to their employees with their own money or line of credit. After completion of the job or at certain milestones like after 30 days of performance, the 8(a) participant can submit an invoice to the government. If the work is deemed timely and acceptable, the participant can expect payment within 15-30 days. For the individual entrepreneurs that succeed in the program, it supports their families in a way that offers their children an ability to go to college without student loans, it allows them a way to create stable jobs and offer health care for often overlooked but capable candidates, and it provides resources to give back to their underserved community.

When I arrived at the US Small Business Administration in December 2014 to my dream job at the highlight of my federal career, I found that we had about 3,500 certified 8(a) participants and the pool of firms was shrinking every year. We were almost losing more firms per year than we were bringing in, and I could count on my fingers when the program would cease to exist. Immediate action was needed to turn around the decline.

My responsibilities included streamlining the 8(a) application process, continuing eligibility reviews, 7(j) technical assistance, the 8(a) Mentor Protégé Program, and standing up the All-Small Mentor Protégé Program while addressing outstanding and dated OIG and GAO recommendations. I had to quickly assemble a team that could turn the office around. I am a huge

proponent of using the talents of people already on the bus, so I had a couple of town hall meetings with my team to get their ideas and buy-in. Some of the employees immediately developed white papers and shared ideas about how we could build continuous process improvement, increase operational efficiency, and improve customer satisfaction while inspiring and motivating the team. These employees became the team leads for the change initiatives. The excitement for change was contagious.

I wish I could say that all the ideas for improvement that later led the Office of Government Contracting and Business Development to win one of the highest-ranking awards within the SBA for turning around a division/team was due to how smart I was. However, the credit belongs to the smart civil servants that worked at the SBA for years. The dedicated employees were willing to work long hours to make things better. I learned long ago to be an inclusive leader. Turns out that if you bring the smart people to the table and just support them in making things better, you have a win.

- The team closed out more OIG and GAO recommendations in 1 year than the last 10 years combined.

- The team streamlined and digitized the 8(a) application and 8(a) Mentor Protégé Program processes. The 8(a) Program historically had one of the most difficult application processes for entry. Where the typical firm would sometimes have a 9-month review process and hundreds would just give up. The team led the agency to cut the red tape and during our streamlined pilot we learned that we had the ability to process applications more expeditiously, some within 7-10 days of receipt of application. This increased the number of firms entering the program that year from a historical average of 350 to over 900. We challenged employees to avoid decline recommendations for issues that were not relevant to eligibility. Shifting old mindsets was not without challenges, especially since some

employees had a history of recommending decline for 90% of the applications they processed.

- The team updated the standard operating procedures, a task that was 8 years overdue. There was inconsistency in how SBA employees implemented the program across the country at multiple levels; and this increased the frustration of business owners and minimized the success of the program.

- Some 8(a) participants struggled to manage all the compliance paperwork during the first two years in the program without success winning a contract and wanted to opt out of the program. We reduced the administrative paperwork burdens of the 8(a) Annual Review process for firms that had yet to succeed with winning an 8(a) contract. This also gave our 8(a) Business Opportunity Specialist (BOS) some additional bandwidth and capacity to provide technical assistance while the firm focused on winning work.

Several smart SBA employees came up with the ideas to improve customer service. There were also other win-win benefits as a result, because increasing the pool of 8(a) participants positively impacted our federal agency stakeholders. Federal agencies were reducing the number of new contracts for the 8(a) Business Development program, because the pool of capable and competitive 8(a) participants was shrinking, and they did not want their work locked up in a program that did not have enough firms to bid on the work. In a meeting with federal agency Small Business Directors, we committed to increasing our pool of 8(a) participants and relaxing our stance on once in the 8(a) always in the 8(a), if the agency could *(1)* clearly justify why the work was no longer suited for the 8(a) BD program; *(2)* provide market research that proved capable 8(a) firms did not respond; and *(3)* agreed to replace the dollars with new 8(a) projects. Re-

energized, federal agencies responded favorably and during our streamlining initiative, SDB awards grew by $4 billion between fiscal years 2015 and 2016.

President Biden's goal of increasing the share of federal contracts awarded to small, disadvantaged businesses from 5 to 15 percent by 2025 is significant, it is bold, and it is achievable. Since the federal regulations prohibit set-asides for Small Disadvantaged Businesses, strengthening and building the 8(a) Program and 7(j) Program are important next steps to ensure the success of small firms. I have seen smart SBA employees and our federal agencies raise the bar to support small firms.

I would like to share my recommendations and ask for your consideration.

**Priority Mentor Protégé Program (MPP) Processing for Small Disadvantaged Business Mentors**

Unfortunately, a considerable number of 8(a) graduates still struggle and many close their doors within 5 years of graduation. 8(a) graduates that retain the Small Disadvantaged Business (SDB) status are great mentors to new 8(a) participants. To retain SDB status, an 8(a) graduate firm must qualify as small under the NAICS size standards, and be owned and controlled by one or more socially and economically disadvantaged individuals.

CEOs of 8(a) graduate firms understand the ticking 9-year clock and directly engage CEO to CEO to help small businesses navigate the complex processes of winning contracts with a skeleton crew, managing a limited line of credit for payroll, wearing multiple hats, and building an infrastructure with tight margins. The knowledge transferred comes from lessons learned and firsthand experience growing an 8(a) firm. The relationship is mutually beneficial. If the two firms create a joint venture, it offers the graduate a chance to make introductions to their customers and continue to perform on a percentage of the work. It creates a path to transfer employees to the protégé and it gives the protégé the ability to

take the front seat with a customer that is open to awarding contracts to 8(a) participants. Having an 8(a) graduate mentor will shift some of the firm's dependence on their assigned 8(a) BOS and the 7(j) program.

I have learned that small firms mentored by large businesses are not afforded an opportunity to engage at the CEO level. They are typically assigned to a mid-level program manager or someone on the large business team that has never owned a small business.

Giving graduate 8(a) mentors priority with Mentor Protégé Program application processing is a low cost and effective way to help transfer the knowledge between these firms. It will increase the competitiveness of an 8(a) protégé and build longevity for the 8(a) graduate. The MPP office is understaffed and would likely require additional staffing to expedite the processing for SDBs.

**Full-Time Small Business Executive Support within OFPP**

The Office of Federal Procurement Policy (OFPP) aligned under the Office of Management and Budget (OMB) develops strategic solutions for promoting economy, efficiency, and effectiveness in the contracting & acquisition processes. For months, OFPP, GSA and federal Contracting executives from multiple agencies met to create and implement procedures for the strategic buying initiative known as Category Management. As a former contracting officer leading over 300 Contracting Officer Representatives, I understand the value and benefits of implementing category management. However, there were no Department of Defense or Civilian Agency Small Business executives with an equivalent seat at the table. The SBA had a seat at the table without a voice.

As a result, policies and processes were designed for contracting officers to give priority to Category Management full and open contracts without consideration of the rule of two as outlined in Federal Acquisition Regulation (FAR) 19.502-2

which requires contracting officers to set-aside procurements over the Simplified Acquisition Threshold (SAT), when there is a reasonable expectation that *(1)* offers will be obtained from at least two responsible small business concerns; and *(2)* award will be made at fair market prices.

Contracting officers have realigned contracts to unrestricted Category Management contracts, even when the incumbent is a small business and will be devastated financially without the ability to compete for the work. To achieve Category Management targets, some Contracting officers dismissed contract options of a small business to realign work to large firms on Category Management contracts. As this Committee heard from witnesses in a hearing October 2021, this practice continues to adversely affect small businesses.

Had a Small Business voice been at the table, the Category Management initiative could have been shaped to mitigate the negative impacts to the industrial base of small business federal contractors.

OFPP also provides leadership in maintaining the FAR. Often, new SBA regulatory guidance implemented in the Code of Federal Regulations does not make it into the FAR for years (like the similarly situated entity rule). I would suggest that Congress require the FAR Council to consider its regulations in tandem with SBA's rulemaking.

I also recommend a full time OFPP Senior Executive level Small Business Program Advisor with a solid background in contracting and acquisition (DAWIA or FAC-C Certified Level III). Acquisition reform at the OFPP level should include the input of a career executive who understands contracting and values the contribution of small business contractors. I am impressed with the clear language in the White House OMB memo M-22-03 which requires OMB and SBA to work with Chief Acquisition Officers and Senior Procurement Executives, agency Offices of Small Disadvantaged Business Utilization, and agency senior accountable officials for category management to monitor implementation.

https://www.linkedin.com/in/jackierobinsonburnette/

However, a full-time OFPP SB Advisor fully engaged on every new strategic solution for effectiveness in contracting and acquisition, would ensure that small businesses are considered whether the discussion is category management, priorities for updates to the FAR, or the next acquisition reform.

**Reduce Administrative Burdens for Entry in to 8(a) Program**

To be eligible for the 8(a) Business Development program, a small business must be unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States and demonstrates potential for success. The SBA must continue to reduce unnecessary administrative burdens that do not align with the regulations for program eligibility.

A couple of weeks ago, I was at dinner and ran into a retired Army Lieutenant Colonel (West Point graduate) who said he has unsuccessfully tried to secure 8(a) certification since 2015. He was a Special Forces Officer with significant combat and contingency experience from multiple deployments. He trained foreign and US Army Forces. After starting his business, he competitively won a 5-year contract with the U.S. Special Operations Command (USSOCOM) with obligations averaging $2.5M per year. DoD still needs his expertise to help train Special Forces Officers fighting in the defense of the United States. Government leaders advised him to seek 8(a) certification to make it easier to contract directly with him. He said that securing 8(a) certification has proven impossible, even though he hired and paid consultants to prepare and submit his application. I asked him to send me a copy of his rejection letter from the SBA which was prepared by a first level application processor (not at the HQ SBA decision level).

The first reason on the rejection letter was –

> *"(1) Board of Director and Shareholder meeting minutes are two separate documents. You may complete the meeting minutes on the same*

> *day at the same meeting or even combine what is occurring in the meeting minutes. You provide what you called board of director meeting minutes and elected the President, Treasurer, and Secretary (all being YOU) as the directors. This is not correct. Your shareholder meeting minutes elect the directors and then your board of director meeting minutes elect the officer positions required by your bylaws. Provide updated meeting minutes for board of directors and shareholders showing the election of officers and directors according to your bylaws."*

The fourth reason was -

> *"(4) Over the last three years you appear to receive 93% of your revenues from DoD. Your firm does not appear to have the operating history based on its lack of diversified client based and economic dependence on one contract. It appears you may not have the contract history to be eligible for the 8a program."*

There were other reasons, but neither of these two reasons should be cause for delay or rejection in the program. In this specific case, the 8(a) Program's business development support and 7(j) service providers could help this veteran improve his board meeting process within his first year in the program. Generating 93% of revenues from a DoD Special Forces Command contract for the last 3-years is irrelevant to this applicant's eligibility. It is actually a plus that this veteran was able to secure a $2.5M per year contract and perform successfully enough for DoD to exercise option years.

I absolutely am not advocating for dismissing eligibility requirements of the law or regulations or anything to reduce the integrity of the program. There must be a shift in the culture to achieve the right balance to ensure accessibility for eligible firms while weeding out and mitigating the risks of certifying ineligible firms.

Finally, it is incumbent on the Associate Administrator of 8(a) Business Development to lean forward exercising the final decision-making authority without fear of the Office of Inspector General or the retribution of lower-level employees that may offer a differing recommendation for reasons irrelevant to eligibility.

**Support Increase in 7(j) Funding for Business Development Efforts**

The last time I checked, the budget for 7(j) was about $2.8M (2-year budget cycle). The 7(j) program provides high-quality assistance to socially and economically disadvantaged small firms to help them successfully compete for federal, state, and local contracting opportunities as a prime or subcontractor. The SBA should develop a compelling justification to significantly increase the 7(j) budget. From my experience while serving at the SBA, Congress has historically provided funds based on the SBA request. The program is critical, as it serves firms that are --

- certified as an 8(a) participant, HUBZone small business, or economically-disadvantaged women-owned small business; or
- located in areas of high unemployment or low income; or
- owned by low-income individuals.

I am contacted on a consistent basis by CEOs who are asking if I know anyone trustworthy and capable of helping with business development, proposal writing, and contract pipeline development. Firms cannot grow without this type of support. Unfortunately, small firms are often taken advantage of by beltway bandit business development professionals that bounce around every year to a different firm asking for a salary that starts at $150,000 and a 1-year commitment without bringing value to the firm. Based on my experience, an increase in access to 7(j) business development support would be exceptionally valuable during the first 2-years for an 8(a) participant, and would help them maximize the full 9-years in the program.

Increasing the 7(j) budget would also take some of the load off the very understaffed 8(a) BOS team and will also give them time to maintain their skills, training, and acquisition workforce certification levels to be more effective for the firms supported.

**Backfilling Vacant 8(a) Business Opportunity Specialists and 8(a) Business Development Office Positions**

When I was serving at the SBA, it was a frequent practice to allow the 8(a) Business Opportunity Specialist (BOS) and HQs Office of Business Development (BD) positions to be vacant or realigned to another office. I do not know if this is because the SBA lacks funding to backfill for the positions, or there is a lack of understanding of how these vacancies negatively impact the team's ability to serve government contractors and decreases the morale of those left to carry enormous workloads as they take on the work of a departed co-worker.

The workload in BD is overwhelming, and includes processing 8(a) applications, continuing eligibility, changes of ownership, and managing the 7(j) and Mentor Protégé Program. The BD office is historically understaffed. At the SBA District Office level, some BOSs are supporting over 70 firms while others are supporting 5 to 20. There are several District Offices that do not have a BOS at all. This results in diminishing the effectiveness of the program and/or creates gaps in participation in parts of the country where there are zero to less than 10 certified 8(a) participants like Delaware, and Vermont, Arkansas, Maine, Rhode Island, New Hampshire, and North Dakota.

I understand that the SBA Office of Field Operations (OFO) is working hard to address the workload issues for District level BOS, and is considering virtual support for 8(a) firms. Providing virtual support is a brilliant idea, as all the work is managed virtually anyway. Firms should still be able to participate in nearby training and events held at the closest SBA office.

https://www.linkedin.com/in/jackierobinsonburnette/

I recommend that the SBA bring in a temporary detailed GS-15 level Human Resource (HR) professional from another agency under a professional development rotation to assist both OFO and BD look at the allocations of positions for an objective look at proper staffing. The HR professional's project should include establishing a process fully coordinated within the SBA to ensure timely job announcements and expeditious hiring to backfill these vacancies to maintain acceptable levels of customer service. Having a temporary rotation from an outside HR professional would be of no cost to the SBA and would assist a potential HR senior executive candidate secure the experience needed to progress in their career.

**Raise the Sole Source Threshold for 8(a) Firms Owned by Individuals**

As stated earlier in my testimony, since the government is buying its goods and services in larger contracting vehicles, sole source thresholds for individually owned 8(a) firms need to be revamped and increased. Consider at a minimum, raising the 8(a) sole source threshold for services to $8M for firms owned by individuals, and $10M for manufacturing.

To be clear, I see the small business community united in support for raising sole source limits for all socioeconomic subcategories of small businesses which includes 8(a) participants, service-disabled veteran owned small businesses, HUBZone certified firms, and woman owned small businesses (to include economically disadvantaged woman owned small businesses). It is a simple matter of being able to compete in a contracting environment that favors large, consolidated contracts.

**Increase the Simplified Acquisition Threshold**

Finally, I understand that the committee does not have jurisdiction over the Simplified Acquisition Threshold (SAT). However, I want to add to my statement

that the simplified acquisition threshold should be increased from $250K to $1M. FAR 13.003 Policy for Simplified Acquisition at (b) (1) requires acquisitions of supplies or services that have an anticipated dollar value above the micro-purchase threshold, but at or below the SAT, to be set aside for small business concerns.

Service contracts valued at about $1M spread over five years ($200K per year) would typically support payroll, equipment, benefits and overhead for 1-3 full-time employees depending on the type of work, education and expertise required by the contract. With the impacts of Category Management and contract consolidation, raising the SAT is a quick way to realign small business suitable projects back to small businesses. This would also maximize efficiency and economy and minimizes administrative costs for both the Government and industry, because it would expand the use of simplified acquisition procedures described in FAR 13.106 Soliciting competition, evaluation of quotations or offers, award and documentation.

In addition, this would expand the use of small firms for procurements valued under $1M, but would not tie the hands of contracting officers. Contracting Officers always retain the authority to solicit unrestricted and award to other than a small firm, when they determine that small firms are not capable.

*****

In closing, I am honored and grateful to be before you today. Thank you for giving me the opportunity to testify. The 8(a) Business Development program provides the pathway for small, disadvantaged companies to compete in a complex and competitive marketplace. The companies that participate in the program provide important goods and services to the federal government and create employment opportunities for their communities. I urge you to take the suggestions given today to further strengthen the program.

https://www.linkedin.com/in/jackierobinsonburnette/

Testimony of

Arshdeep Khurana

President & CEO
AVOSYS Technology

House Committee on Small Business
Subcommittee on Contracting and
Infrastructure

"The 8(a) Program: Overview and Next Steps to
Promote Small Business Success"

March 2, 2022

Chair Mfume, Ranking Member Salazar, and Members of the Subcommittee, thank you for the opportunity to testify before you today. My name is Arshdeep Khurana, and I am the President and CEO of AVOSYS Technology, headquartered in San Antonio, Texas.

AVOSYS provides Enterprise IT support, Information Assurance, Software and Data Engineering, Healthcare IT, Healthcare staffing and Biomedical R&D Support Services to federal government clients. Established in 1998, I have grown the company from a one-man operation, to currently servicing over 50 commercial and government contracts with employees in fourteen states. AVOSYS has achieved industry leading certifications such as CMMI Level 3, ISO 9001 and 27001 certifications, and Joint HealthCare Staffing Gold seal certification.

When I immigrated to United States, I was in pursuit of higher education and the American dream of becoming an entrepreneur. For over a decade, I serviced small and midsize businesses as a trusted Chief Information Office (CIO). After naturalization, I started my business from my apartment with a single dial-up internet connection and a server. Leveraging university computer labs, I was able to experiment with technologies to create AVOSYS' portfolio of product and service offerings.

My business was 100% commercial when I was accepted into the Small Business Administration's (SBA) 8(a) program in 2011. Through the program, my company has been able to grow and become highly successful in the federal marketplace. I am particularly proud of the $48 million competitive contract I was awarded to provide Clinical Healthcare Support Services to the Air Force base clinic to service our men and women in uniform. It is an incredible honor to provide these services, and my company wouldn't be where it is today without the 8(a) program.

The past two years have been difficult for small businesses, and 8(a) firms are no exception. Marketing to customers became exceedingly difficult, and many contracting officers became less approachable during the pandemic. I was thrilled when this Committee added an extra year to the 8(a) program as part of the pandemic response.

This lifeline helped companies like mine save jobs and stay afloat. Some of my contracts ended or were temporarily extended during the pandemic, and I was able to recompete on opportunities I otherwise would not have had access to. For example, we were able to bid on the recompete of our Clinical Healthcare Services contract. If awarded, this opportunity would be a win for my small business, the government, and our 70+ clinical healthcare employees, which was made possible by the 1 year 8(a) program extension granted in 2020. While this extension was incredibly impactful, the pandemic has unfortunately impacted operations for not just one, but two years. Recovery did not truly begin until the current fiscal quarter, leaving many 8(a) companies approaching graduation without feeling like they had their full time in the program. For companies like mine to truly succeed, adding an additional year extension would make all the difference. This would allow for graduating 8(a) firms to get their fair chance to bid on large government wide contract vehicles, including the Defense Health Agency's NextGen Q-Code Medical Services contract and the General Services Administration's (GSA) new Services Multi-Agency Contract (MAC). Many large contracts were impacted by the pandemic, pushing back timelines on opportunities that graduating 8(a)s will not be able to bid on unless the additional year is granted. I recommend the Committee allow for an additional one-year extension for 8(a) firms, if they were part of the 8(a) program (active or on temporary pandemic suspension) as of September 9, 2021, for a full year, regardless of the firm's graduation date. This levels the playing field for these graduating firms that happened to have a graduation date during the extension year, ensuring they can take advantage of a full year extension. Given the increasingly complex and competitive procurement environment, I suggest Congress extends the 8(a) program length to 10 years permanently instead of the current 9 years.

All small businesses, including 8(a) firms, have faced challenges in federal procurement with the greater implementation of category management governmentwide. I applaud the Administration's efforts to encourage agencies to balance this policy with meeting small business goals, especially for small, disadvantaged businesses (SDBs). As the government moves away from direct contracts with businesses, opportunities decrease

for smaller businesses. The large buying contracts used in category management require substantial resources to bid and substantial resources to win task orders. Contract requirements have been increasingly structured to keep small businesses out – including stringent past performance or other requirements that are impossible for a small business to meet, especially those who are new to the federal market. Agencies are also moving work out of the 8(a) program to larger non-8(a), agency specific vehicles that they are mandated to use, lessening the ability for 8(a) firms to compete for work. For example, instead of using existing GSA vehicles to award work to small businesses, the Air Force has been using Network-Centric Solutions (NetCents) and its follow-on vehicles. Of the 400 proposals submitted by small businesses on NetCents-2, only 20 were awarded slots on this vehicle. Therefore, a huge portion businesses that are willing and able to compete have been shut out of these opportunities. Over my past 9 years in the program, I have seen numerous 8(a) contract follow-ons moved out of the program to larger non-8(a) vehicles because of high-level agency policies. To remedy this decrease, I suggest that once an 8(a) requirement is set at an agency, it either remains an 8(a) requirement or the agency is required to put equal 8(a) dollars through work in the same or related NAICS code if it is taken out of the program. Further, SBA needs to have a way to measure how the requirements are moving, allowing the Business Opportunity Specialist (BOS) and Procurement Center Representative (PCR) to be engaged in the process.

The decline in number of 8(a) firms has caused concern across the program. According to SBA, as of August 19, 2021, there were 4,906 program participants. In 2010, there were roughly 7,000.[1] One of the consequences of this decline is that fewer firms are entering the 8(a) program, questioning its usefulness. I believe this is happening for a number of reasons and suggest the following changes to the 8(a) program in order to increase the number of successful participants and dollars flowing to SDBs.

[1]Office of Inspector General, Small Business Administration. "SBA'S 8(a) Business Development Program Eligibility." *Sba.gov*, 2016, https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf.

Limits on sole source awards to individually owned 8(a), Historically Underutilized Business Zones (HUBZone), service-disabled veteran-owned (SDVOSB) and women-owned small businesses (WOSB) have also contributed to this decline. Currently, sole source awards to these socio-economic groups can only be awarded a total of $4.5/$7.5 million (manufacturing) over the life of the contract. For a 5-year contract, that equates to less than $1 million a year. Given the size of a typical government contract which far exceeds this amount, the justification required to award a sole source through these programs requires more time and effort than contracting officers can devote to making these small awards. Thus, dollars are falling away from small businesses and are increasingly awarded through larger contract vehicles and vendors. According to the Government Accountability Office (GAO), the number of 8(a) sole source contracts over $20 million awarded by the Department of Defense (DoD) dropped more than 86% from 2011 to 2016.[2] There are countless examples of small businesses missing out on sole source awards because the contract awards exceed the current sole source thresholds. I suggest this Committee increase the sole source thresholds for individual 8(a), SDVOSB, HUBZone and WOSBs as you did in the 116th Congress through H.R. 190 – by eliminating option years and allowing the amount of $4.5/$7.5 million each year. Group-owned 8(a) firms[3] have seen huge success with the raising of their sole source threshold to $100 million without justification. While we are not seeking parity, increasing the 8(a) thresholds to allow for the $4.5/$7.5 million each year would bring the rules more into line with the government buying practices.

Multiple 8(a) procurements are being bundled and consolidated, with scope additions making their follow-on contracts too large for individual 8(a) companies to be awarded with the current sole source threshold limit. As a result, they often end up going to group-owned 8(a)s that have large sole source thresholds. Data on these awards remains too broad and both the SBA and small businesses could benefit from additional

[2] Government Accountability Office (GAO). "Gao-16-557, DOD Small Business Contracting: Use of Sole - Source 8(a) Contracts over $20 Million Continues to Decline." *Gao.gov*, 2016, https://www.gao.gov/pdf/product/677750.
[3] *See* Group-owned references 8(a)'s that are Community Development Corporations, Alaska Native Corporations, Native Hawaiian Corporations and Indian Tribes. *See* 13 CFR § 124.109.

insight on the government's buying in the 8(a) program. I suggest SBA break down their annual scorecard SDB spend into 4 sub-categories of awards: direct (sole source), competitive, individual 8(a) and group-owned 8(a). The FY2020 SBA scorecard[4] reported $59 billion in contracts to 8(a) firms, with $11.1 billion[5] in sole source awards. While these numbers seem high, a question that remains for a lot of individually-owned 8(a) companies is how many of these dollars are going to group-owned vs. individually-owned 8(a) companies. Mapping out the impact of these dollars would assist the Administration in identifying contracts that could be set aside or directly awarded to individually owned 8(a) firms.

In my past 9 years in the program, I've seen a reduction of 8(a) direct awards to individually-owned 8(a) firms, bundling and consolidation of contracts, and change of organization or contract scope to take opportunities away from the 8(a) program. Further, I have noticed a significant rise of large sole source contract awards to group-owned 8(a)s in the top ten services NAICS codes with virtually no opportunities left for individually-owned 8(a)s in a fiscal year. In my observation, it seems like the 8(a) program has become one that services the richest group-owned 8(a) franchises. This trend is unfortunately in direct conflict with the original intent of the entire 8(a) program itself. While our fellow group-owned firms deserve their fair share, unfortunately, due to their significantly greater lobbying power backed by billion-dollar firms, many of the regular middle-class citizens running individually-owned 8(a) firms are helpless and have lost hope in the program.

There is also some confusion in scorecard reporting with respect to which awards are truly set-aside for certain programs. Agencies are allowed to "double count" awards toward their goals[6] – meaning, if a company is both an 8(a) and HUBZone certified business, an award to this business counts toward meeting both socioeconomic set-aside goals. Unfortunately, this practice does not necessarily incentivize agencies to

---

[4] *See* SBA FY2020 Small Business Procurement Scorecard, available at https://www.sba.gov/sites/default/files/2021-07/GW-508.pdf (last visited Feb. 24, 2022).
[5] https://sgp.fas.org/crs/misc/R44844.pdf
[6] *See* 15 U.S.C. § 644(g) (Goals for participation of small business concerns in procurement contracts).

maximize the number of awards to small businesses. As the industrial base continues to shrink, as well as 8(a) participants, any enticement for agencies to award more contracts to small businesses is needed. It is my view that federal agencies should be required to have an 8(a) set-aside component as a follow on to all their large indefinite delivery/indefinite quantity (IDIQ) procurement contracting vehicles. This would immensely help transitional and graduating 8(a) firms, as they prepare themselves to compete for unrestricted solicitations.

Increasing the number of PCRs would make a significant impact on the success of 8(a) companies, both during and after the program. The Office of Government Contracting at SBA employs a team of Area Directors, PCRs, and Commercial Market Representatives (CMRs) that continually work with federal agencies to increase federal contracts awarded to small businesses. However, there are not enough, and Congress should increase the funding for these important positions.

PCRs increase the small business share of Federal procurement awards by initiating small business set-asides, reserving procurements for competition among small business firms; providing small business sources to Federal buying activities; and counseling small firms. In addition, PCRs, advocate for the breakout of items for full and open competition to affect savings to the Federal Government. There are thousands of buying activities across the country. However, there are currently only approximately 65 PCRs and CMRs advocating for small business prime and subcontracting opportunities. Additionally, more of these valuable personnel are needed to assist when work is pulled unjustly from an 8(a) firm. For example, in my 9 years in the 8(a) program, I have researched 100s of 8(a) contracts as business development opportunities. The majority of them were shifted to agency specific and GSA government wide contract vehicles in the general small business category rather than keeping them as an 8(a) set-aside. Agencies sometimes failed to involve SBA PCRs as they consolidated, bundled, and increased the scope of the contract above the 8(a) direct, sole source threshold.

A significant portion of small business eligible contract dollars are not tapped for small businesses due to the lack of contracting resources, such as PCR/CMR coverage. According to Bloomberg Government, although small businesses won $144 billion of $681 billion in contract awards in FY2020, their share of the remarket remained relatively flat at about 22%. By adding over 130 additional personnel to strategically cover buying activities with small business opportunity, the SBA would be able to significantly increase federal contracting opportunities for small businesses. In the hiring of additional PCRs and CMRs, SBA should also consider the benefits of hiring industrial, engineering, and technical specialists. Congress should appropriate $20 million for the SBA's General Salaries Fund,[7] with a directive to fund 18 CMRs and 180 PCRs.

One of the challenges I have heard from my fellow program participants is entering the program and failing to win any contract awards for the first few years. I can relate to this struggle – I was ready to give up on the program when in my 3rd year I still had not won any contracts. After being in the commercial sector for 14 years, while the federal space was new for me, I certainly had a strong list of capabilities. Every year in the 8(a) program is coveted by participants, so to "waste" the first few years without any success can feel frustrating. However, I was able to get my first contract with the Department of the Air Force to support records management for the Wilford Hall hospital. My federal business started taking off, but because I was already into the end of my 3rd year, I felt the pressure of the Business Activity Target (BAT) requirements in the 8(a) program regulations much sooner. BATs exist to ensure that participants are not developing a sole reliance on 8(a) awards and are making maximum efforts to obtain business outside the 8(a) program. While this makes sense, the structure should be changed since it currently unintentionally penalizes firms that do not get awards in the first few years in the program. The developmental stage of the program should start with the award of the first contract, instead of right away. Cutting some transitional years by

[7] Currently, funding for PCRs/CMRs comes out of the General Salaries Fund.

making this change would benefit companies, since past performance helps companies win non-8(a) business and meet the activity targets.

Another change to the activity targets that would help participants succeed is allowing the 8(a) competitive dollars to be considered as small business competitive awards. Therefore, the BAT restrictions would only apply to 8(a) sole source revenue. For example, we won a Clinical Support Services Healthcare contract as an 8(a) competitive award, which proved our ability to compete and win with tight margins. However, due to the BAT restrictions, it ended up hurting us – making us ineligible to compete for the follow-on to our own contracts and other multi-million dollar contracts. The restriction has been a challenge for most of the remaining years of the 8(a) program, even after delivering our services with government evaluated "very good" ratings year after year on most of our contracts. In the current highly competitive contract environment, demonstrating competitive winning capability on 8(a) contracts is on par with any other small business competitive procurements and thus in line with the intent of BAT policy. The number 8(a) graduates in 2009 and 2010 receiving federal prime contract obligations declined more than 60% by 2017, and the total value of their contracts by nearly the same amount.[8] In addition, the average size of contract obligations per DUNS number rose very little, from $6.05 million in graduation year to $6.25 million in FY2017. Adjusted for inflation, the value of such obligations actually declined.[9]

Further, in 2020 the total asset restriction was changed to allow a total of $750,000 in personal net worth when a participant enters the program.[10] However, an individual's

---

[8] Berteau, David J, and Amanda Swanson. "The Impact of 8(a) Small Business Graduation ." *Dair.nps.edu*, Acquisition Research Program, Graduate School of Business and Public Policy, Naval Postgraduate School, 2018, https://dair.nps.edu/bitstream/123456789/1602/1/SYM-AM-18-087.pdf.
[9] *Id.*
[10] On May 11, 2020, the SBA announced in the Federal Register that, as of July 15, 2020, personal net worth of less than $750,000, both at the time of entry into the 8(a) program and for continuing eligibility, will constitute economic disadvantage.41 The SBA indicated that it was eliminating the $250,000 personal net worth threshold at the time of entry into the 8(a) program to bring the 8(a) program into conformity with the personal net worth threshold used for determining the status of EDWOSBs in the SBA's WOSB federal contracting program. That program uses less than $750,000 in personal net worth for determining economic disadvantage.

total assets cannot exceed $750,000 throughout the 9 years.[11] As a business owner, this does not make sense – if one of the goals of the program is to grow small disadvantaged companies, the asset restriction should increase as well. I suggest setting a cap of three times the initial personal net worth restriction of $750,000, as previous regulations allowed for asset growth three times the amount from entrance into the program. Similarly, for continued eligibility, each threshold should be increased three times for a Total Assets restriction of $20 million; 3-year average Adjusted Gross Income of $1 million; and total annual income maximum of $1.2 million. I believe this is a much more realistic number for a growing business.

Finally, marketing to federal agencies remains a challenge for businesses in the program. I have found success when I am able to get in front of a customer multiple times, which has been increasingly difficult amidst the pandemic. With in-person events returning, I suggest SBA district offices hold local small business events once a quarter. This would help the 8(a) firms in that locale meet with potential customers and network with other companies in the program. I have found that talking to my fellow 8(a) participants has been the "secret sauce" for great success in the program.

I cannot express the appreciation I have for the 8(a) program and how it has dramatically changed my business after a tough survival from both the 2001 and 2008 recessions. I am sincerely thankful for the excellent support obtained from my local SBA San Antonio district office team, Ms. Sheena Little, PCR; Theresa Scoot and Eric Spencer (BoS), and recently retired District Director Mr. Anthony Ruiz. I would also like to thank prior Associate Administrator Ms. Jackie Robinson Burnette who is joining me here today, SBA Counsel John Klein, and the many SBA specialists and officers who are working hard for the thousands of small businesses and for the protection of the 8(a) program - a successful hallmark of the SBA. Not only does AVOSYS' success impact me, but it also impacts the more than two hundred employees I have hired around the country as a result. Thank you for holding this important hearing today and I look forward to answering your questions.

---

[11] 13 C.F.R. §124.104.

TESTIMONY OF

QIN LI

PRESIDENT, SOLIEL LLC

HOUSE COMMITTEE ON SMALL BUSINESS

SUBCOMMITTEE ON CONTRACTING AND INFRASTRUCTURE

“THE 8(A) PROGRAM: OVERVIEW AND NEXT STEPS TO PROMOTE SMALL BUSINESS SUCCESS”

MARCH 2, 2022

Chair Mfume, Ranking Member Salazar, and Members of the Subcommittee, thank you for the opportunity to testify before you today. My name is Qin Li, and I am the President of Soliel LLC, located in Vienna, VA. Soliel brings innovative solutions and capabilities to help its customers develop and transform its IT systems and infrastructure. We provide technical and functional engineering, development expertise in IT modernization, cloud migration, DevSecOps, software engineering, data analytics, and cybersecurity.

Bringing the same innovation and cutting-edge solutions that I worked with in the private sector to the government sector, I steered Soliel into government contracting in 2010. Soliel, a woman-owned, 8(a) company provides technical engineering and development services to the U.S. Government. We have built an impressive team of subject matter experts that have extensive expertise in computing, networking, data, and cloud. We serve many U.S. Government customers, which include the Defense Information Systems Agency (DISA), Army, Navy, and the Defense Counterintelligence and Security Agency (DCSA). Originally from China, I got my Master of Science degree from the George Washington University and have called the Washington D.C. metro area home ever since.

Soliel's adventure into government contracting was also out of a need for flexibility and taking advantage of opportunity. Seeking treatment for my middle child with a rare chromosome abnormality requires more flexibility than full time employment offers. When the opportunity to subcontract to a large firm presented itself, I took the risk. Soliel's success is remarkable given that only 9% of all women-owned companies are Asian American owned, and Asian women account for only 6% of science and engineering employees in the United States.[1] Navigating the complex acquisition process and competitive federal contracting industry is a daunting task for any company. We have invested heavily to build our own innovation lab to stay on the forefront of new ideas and technologies—before bringing them to our customers. I am always looking for opportunities to empower other women to pursue careers in technology or start a business, as well as participate in acquisition and small business policy discussions.

I would like to start by thanking the Committee for its commitment to small businesses and for advancing policies that support small businesses doing business with federal government. Soliel started in government contracting in 2010, as a 2nd tier subcontractor in support of DISA. We then became a 1st tier subcontractor, and gradually started bidding for small business prime contracts. Soliel received its 8(a) designation in June 2015, and it provided Soliel a critical contract vehicle to accelerate our growth. I would like to outline my thoughts on some specific elements of the 8(a) program.

[1] *The 2019 State of Women-Owned Businesses Report: Summary of Key Trends.* American Express, 2019. *https://s1.q4cdn.com/692158879/files/doc_library/file/2019-state-of-women-owned-businesses-report.pdf*

While the 8(a) program has allowed me to find a successful path forward, I know many companies have not had the same experience. For example, one of the downfalls for any company is relying on 8(a) awards as the majority of their business. So, when it is time to graduate, companies do not have exit strategies to transition out of the program. One of the ways the Small Business Administration (SBA) is trying to tackle this issue is through the 7(j) Management and Technical Assistance program. According to the SBA, the 7(j) program provides assistance in a wide range of business activities, including marketing, accounting, opportunity development and capture, contract management, compliance, and financial analysis. When I attended a 7(j) training, I found it was geared more towards businesses just starting out, instead of those who were newer 8(a) program participants but more developed contractors. Although training for companies new to contracting is necessary, it would be beneficial for the SBA to consider having two tracks—one for businesses who are in the beginning phases of the program and one that is more advanced. Utilizing this existing resource could be a way to tackle the issue of businesses struggling to succeed after graduation. SBA resource partners and 7(j) training would benefit from information shared from Business Opportunity Specialists (BOS) who counsel firms like mine, so that more relevant resources could be provided to 8(a) program participants.[2] Tracking success of 8(a) participants throughout their time in the program is important for all of these programs to best support small, disadvantaged businesses (SDBs).

It is also important to assess how participant firms are performing once they have left the program. I have heard many stories of fellow program participants struggling to continue after their 9 years have ended. A recent report from the SBA's Office of Inspector General (OIG) suggested tracking whether the program achieved business development objectives, including the number of graduated 8(a) firms.[3] I think it is important that the Committee examine ways to ensure better success of program graduates. Additionally, greater assistance from the SBA is needed in the transition out of the program. For example, it would be helpful for the SBA to consider allowing contracts performed by a graduating 8(a) women-owned small business (WOSB) to be solicited and awarded as a WOSB contract instead of 8(a). This approach fully aligns with the goal of promoting small business success and provides graduating 8(a) small businesses additional opportunities to perform their contracts, especially when requirements were introduced into the 8(a) program by the graduating small business. Currently, all graduating 8(a) small businesses will not be able to prime for their work once they are no longer an 8(a), losing a significant portion of their revenue.

There have been some issues with SBA oversight with respect to the joint venture (JV) program, which has directly impacted my company. While there is a lot of paperwork and scrutiny in the initial stages of a JV, there is not much SBA oversight beyond that

[2] *See* Finding 2: SBA Needs Improved Procedures for Providing Business Development Assistance. *https://www.oversight.gov/sites/default/files/oig-reports/SBA/SBA-OIG-Report-22-08.pdf*

[3] *Id.*

stage, and there is limited recourse if the mentor is not fulfilling its commitment. In many instances, small businesses are being taken advantage of by large companies in these arrangements. For example, Soliel's large business mentor used their "negative control" / "veto" to block the JV from responding to opportunities that they did not want to pursue, despite them being viable for the JV. This action, taken by the mentor solely out of self-interest, significantly impaired the JV's success and breaches its fiduciary responsibility as a mentor and shareholder of the JV. The issue was brought to the SBA district office, but it was not clear what recourse the SBA can give to enforce a correction of the mentor's behavior. Giving the SBA greater power with respect to enforcement of these agreements would help assist 8(a) companies, as well as all small businesses, when mentors take these type of actions.

Further, there are additional policies that impact not just 8(a) firms, but all small businesses doing business with the federal government. Small business contractors are currently facing unprecedented economic and workforce challenges due to the ongoing COVID-19 crisis. According to the survey by the National Defense Industrial Association, 60% of small business respondents expect to have long-term financial and cash-flow issues.[4] Additionally, the small business industrial base has been shrinking over the past 10 years. Analysis of agency data reported in the Federal Procurement Data System (FPDS) finds similar trends regarding the small business supplier base at large, including a loss of 49,000 small businesses (or 38% of small businesses) in the Federal supplier base since 2010.[5]

I. Bring sole source thresholds in line with current government buying

Since the 8(a) program has a time limit of 9 years, it is important to me that other socioeconomic set-aside programs at the SBA can be utilized after graduation, such as WOSB. One area that needs to be changed is the current sole source thresholds for individual 8(a), WOSB, service-disabled veteran-owned (SDVOSB) and Historically Underutilized Business Zones (HUBZone) certified firms. Both the House and Senate Small Business Committees have attempted to increase sole source thresholds and bring them more in line with government buying. The House passed H.R. 190 in the 116th Congress, which eliminated option years and would have allowed for the current threshold amounts per contract year. A draft of the Senate Small Business Committee SBA Reauthorization bill in the 116th Congress also made changes to the thresholds—raising them to $8/$10 million per year by eliminating option years. Included in the 2021 House passed version of the National Defense Authorization Act (NDAA) was H.R. 3065, *Expanding Contracting Opportunities for Small Businesses Act of 2021*. This bill raised the sole source thresholds to $8/$10 million per year but did

[4] NDIA COVID-19 Small-Business Impacts Survey Summary (2020). Available at: *https://www.ndia.org/-/media/sites/ndia/policy/documents/covid-19-small-business-impacts-survey-summary.ashx*.

[5] Memorandum from Executive Office of the President Office of Management and Budget M-22-03, Advancing Equity in Federal Procurement (December 2, 2021).

not eliminate option years. I would like to thank the Committee for their tireless work to achieve this increase over the past two Congresses, especially Ranking Member of this Subcommittee, Representative Salazar, as well as Ranking Member of the Committee, Representative Luetkemeyer and his staff.

Soliel has had multiple 8(a) direct awards where our team performed extremely well. However, because some of the requirements had a higher dollar amount than the $4 million threshold, the work was awarded other contract vehicles that have a higher ceiling threshold. In one case, Soliel's work was consolidated into another 8(a) sole source award to a community-owned 8(a) contractor because they can be awarded up to $100 million without justification. In another case, instead of making a direct award to Soliel, since the threshold was too low, our work was instead competed on a large existing indefinite delivery/indefinite quantity (IDIQ) and awarded as a task order.

Broad bipartisan support for increasing small business participation in the federal marketplace dictates changes are needed to bolster awards to these businesses. Increasing these thresholds is a necessary change to acquisition policy given the average size of contracts. By making these programs more accessible for federal agencies to use such as the 8(a) program, many more small businesses will benefit.

II. Strengthen subcontracting transparency and accountability

Since subcontracting was so integral to my long-term federal contracting success, I want to discuss how the Committee could improve this process. Subcontracting serves as an important avenue for small businesses to enter the federal marketplace and build past performance and often the only way to win work. With larger contract being utilized by the federal government, subcontracting is more important than ever. It is critical that prime contractors are rewarded for adhering to subcontracting plans and penalized if they do not. Presently, there is little to no recourse for prime contractors that fail to meet their small business subcontracting goals. Soliel started out its federal work as a 2nd tier subcontractor. We worked as a subcontractor in the first four years of our operation. Our first competitive contract win was in our 4th year as a contractor. However, it was protested, which delayed our ability to perform. Thankfully this protest was defined by the Government Accountability Office (GAO), and Soliel was able to resume support. Subcontracting was the critical to Soliel's survival and success as a contractor, as I know it is to many other small businesses.

The FY2021 NDAA included language to require large primes with subcontracting plan requirements to provide past performance evaluations when requested. However, many small businesses have faced issues when requesting this information. Creating a streamlined framework for large primes to provide this information to small businesses would greatly assist businesses trying to enter the prime contracting arena.

Although reports by federal agencies show that dollars are being awarded to small businesses at consistent levels in best in class

(BIC) contracting vehicles, the number of small business concerns being awarded prime contracts is shrinking drastically. Category management undoubtedly plays a role. Consequently, subcontracting is now incredibly important for small business concerns. Many small businesses are not prime awardees of BIC vehicles, and many may not have the qualifications to even bid on these large contract vehicles. Transparency should include whether prime contractors have aggressive small business goals in their subcontracting plans. It would be extremely beneficial to small businesses if data existed on three fronts: (1) the number of subcontractors on BICs broken down by small businesses and the socio-economic set-aside programs listed under the Small Business Act; (2) compliance of primes in achieving goals set forward in subcontracting plans; and (3) the percentage of subcontracting work performed by small business concerns on taskorders.

A 2020 GAO report on subcontracting compliance[6] found that agencies did not consistently follow all required procedures for oversight of small business subcontracting plans, both before and after contracts were awarded. GAO reviewed 26 contracts with a subcontracting plan at 4 agencies and found that of the reviewed contracts, about half of the agencies could not demonstrate that procedures for Procurement Center Representative (PCR) reviews were followed. PCRs are critical for ensuring small business success in federal agencies—they have been shown to increase the small business share of Federal procurement awards through their work. PCRs initiate small business set-asides, provide small business sources to identified opportunities and counsel small firms. However, there are currently a limited number of PCRs available to do this important work. Increasing the number of these positions would assist the success of 8(a) firms, both during their time in the program and after they graduate.

Further, category management shuts out any small or midsize companies from competing for the work—the requirements were structured for very large businesses. Subcontracting is becoming an increasingly important tool for small businesses to enter the federal market. I encourage the Committee to look at incentives that would spur subcontracting plan compliance, transparency, and accountability.

### III. Align rulemaking between SBA and the FAR Council

Each year, SBA issues a procurement scorecard, which indicates how agencies performed in meeting their small business goals.[7] The governmentwide goal of contracting with WOSBs is 5%. Despite this small number, the federal government has only met this goal twice. However, fewer contracts have likely gone to WOSBs due to inaccurate reporting. Agencies often count the same dollar value towards multiple socioeconomic program goals, even though the contract was not explicitly a set-aside for more than one program. For example, if a contract is set-aside for the WOSB pro-

[6] U.S. Gov't Accountability Off., GAO-20-464, *Small Business Subcontracting: Oversight of Contractor Compliance with Subcontracting Plans Needs Improvement* (2020).

[7] SBA FY2020 Small Business Procurement Scorecard, available at *https://www.sba.gov/sites/default/files/2021-07/GW-508.pdf* (last visited Feb. 24, 2022).

gram, and the winning company is also a certified HUBZone and SDVOSB, those contract dollars count toward the agency's goals in each of the 3 programs. This practice ultimately inflates the data reported on small business contracting awards. It would be beneficial to the small business contracting community if agencies reported progress toward small business based on how the contract was solicited. In other words, if an agency set a contract aside for the WOSB program, then the dollars should only count as a WOSB award. This change would hold agencies accountable for truly awarding 5%, for example, to WOSBs, and result in an increase in the number of awards to small businesses.

Further, pervading inconsistencies exist in government contracting due to discrepancies between final rules issued by the SBA and the Federal Acquisition Regulatory (FAR) Council. This causes confusion for both companies and federal agencies on which guidance they should ultimately follow. Many in the acquisition workforce do not follow changes in small business rules unless it is in the FAR, despite the fact that final rulemaking by SBA is sufficient. The time lapse between FAR Council action and final rules promulgated by the SBA can span many years. For example, in 2016, the SBA updated its regulations pertaining to limitations on subcontracting. It took until August 11, 2021, 5 years later, for the FAR Council to finally publish two final rules that largely mirrored the SBA's. To remedy this problem, I suggest requiring the FAR Council issue its rulemaking simultaneously with SBA.

As mentioned in the beginning of my testimony, I credit the 8(a) program to accelerating my company's success. I believe in the value of this program and thank the Committee for holding this hearing to ensure it is helping SDBs to the fullest extent possible. Thank you again for the opportunity to speak today about my experience, and I look forward to answering any questions.

HO-CHUNK INCORPORATED

**VIA EMAIL TO:** Lauren.Finks@mail.house.gov

March 14, 2022

The Honorable Kweisi Mfume, Chairman
Subcommittee on Contracting and Infrastructure
Committee on Small Business
2361 Rayburn House Office Building
Washington, DC 20515-6315

Dear Chairman Mfume:

On behalf of Ho-Chunk Inc. (Ho-Chunk), I am pleased to submit this response to the hearing held on March 2, 2022, by the Subcommittee entitled "The 8(a) Program: Overview and Next Steps to Promote Small Business Success." The hearing examined how the 8(a) Program currently works as well as the resources it provides to small businesses. Members heard from stakeholders about ways to modernize the program and improve its effectiveness. We would like to thank you and other members of the Subcommittee for carefully considering the impact the Small Business Administration's (SBA's) 8(a) Business Development Program has had on small business. We would also like to expand on the information provided by the witnesses during the hearing and detail the economic opportunities the Program has provided for entity-owned companies such as ours.

**Background:**

The designation of Indian tribes as socially disadvantaged for purposes of the 8(a) program arose due to the high levels of unemployment across Indian Country, often in excess of 60%. Like other governments, tribal governments are responsible for the health and welfare of their tribal citizens. But relocation to remote areas of the Country, along with failed federal policies, led to disparate treatment of tribal governments and their citizens in areas such as healthcare, education, and home ownership. Removal and relocation left few opportunities for economic development. Acknowledging the need to create entrepreneurship and economic development opportunities for tribal governments and their citizens, tribes were included in the 8(a) Program to spur economic opportunity.

Ho-Chunk believes the 8(a) Program has been one of the most successful and consistent federal programs aimed at creating economic opportunities and affecting generational change in Indian Country. We wish the Subcommittee to understand that the role of 8(a) corporations in Native Communities differs from other non-tribal small businesses. Our letter details some of the requirements for entity-owned firms in the 8(a) Program, and we make some recommendations for improvement.

In 1986, Indian tribes, as owner-groups, became eligible for the 8(a) program when Congress passed legislation providing that

firms owned by Indian tribes were to be deemed socially disadvantaged for 8(a) Program purposes. During the 1980s, other owner-groups became eligible for the Program, including Community Development Corporations (CDCs), Alaska Native Corporations (ANCs), and Native Hawaiian Organizations (NHOs).

There are several exceptions to the 8(a) program rules for entity-owned participants based on the acknowledged lack of economic resources and access to capital. These exceptions to federal regulations allow entity-owned companies to provide revenue to their tribes that is used for health care, infrastructure for very rural communities, education, housing, language and cultural retention and revitalization, and other important tribal initiatives.

The 8(a) Business Development Program certification and participation is governed by regulations contained in 13 CFR 124. These regulations are primarily the same for both individual and tribally-owned corporations, with some exceptions for "group" or entity-owned firms. All 8(a) companies, including tribally owned, must meet strict certification qualifications, are restricted to nine years in the Program, must be small, must report on their progress in the program annually, and must meet the limitations on subcontracting, among other CFR and FAR, contracting rules.

The primary exceptions for entity-owned firms are the ability for tribes to own multiple firms in the 8(a) program and the exemption from competitive thresholds for sole source awards. These few exceptions to the Program allow entity-owned firms to provide profits to benefit communities, sometimes numbering in the hundreds of thousands of tribal citizens, as opposed to individually-owned firms that provide benefits to only the owner.

Entity-owned firms, however, are the only 8(a) Participants that have a regulatory requirement that they must report on the benefits they provide to their communities during each required annual update. In addition to the requirements of an individual applicant, tribally owned firms must submit documentation with their applications that they are included on the official Bureau of Indian Affairs list of federally acknowledged Indian Tribes in the contiguous 48 states and Alaska. Tribes must also show that the applicant companies are owned and controlled by the tribe. If a non-tribal person is managing the 8(a) company, the tribe must retain control of the company and have a management plan in place that shows how the tribe is mentoring and developing tribal members to manage its companies in the future.

**Recommendations:**

*SBA Systems:* The SBA has modernized the 8(a) application and annual reporting process through the SBA.Certify system. The system was designed for an individual applicant and not entity-owned applicants. The Administration has tried to address the system deficiencies through training and some workarounds, however, the additional documentation required for entity-owned firms is difficult to fit into the system as it is currently designed. Ho-Chunk,

Inc.'s experience has shown that the SBA analysts also have a difficult time finding submitted documentation in the system. There is a lack of communication between the SBA and applicant companies regarding the submitted applications, and a lack of transparency in the system. We recommend that SBA improve the existing system to allow for entity-owned differences and require less personal information from the managers of the companies, or create a new system that tracks the regulatory requirements of tribally certification. We support SBA's efforts in trying to modernize the reporting process.

*SBA Hubzone Program:* We applaud SBA's efforts in recent years to improve the Hubzone Program such as allowing an employee that was living in a Hubzone at the time of certification to remain counted as living in a Hubzone if they subsequently moved outside a Hubzone, and allowing firms a one-year certification. However, Hubzone status is very difficult to maintain when performing service contracts for the federal government. Often the employees on a government contract can be in very disparate locations, most of which are not in Hubzone areas. We would like to recommend that the SBA consider a two-year certification period.

**Conclusion:**

The Native 8(a) program at the Small Business Administration has been one of the most successful economic opportunities for Tribes. In many cases, this program is the only economic opportunity available—especially for tribes who are in rural areas. Ho-Chunk Inc. through its government contracting businesses and other subsidiaries has been able to create jobs for tribal members and members of the local community, has raised the median household income of Reservation residents and has started to reverse hundreds of years of poverty on the Reservation.

The 8(a) program at the Small Administration is a model of self-determination, allowing tribal governments to determine what type of businesses best suit the needs of their citizens and how to enter a market that is local, national, and international. The program musts be protected and encouraged to grow to take into account the capacity and infrastructure that tribally-owned entities now have so the gains of the corporations can be returned to the tribal governments and citizens.

Please do not hesitate to contact us if you would like any further information.

Sincerely,

Annette Hamilton

COO - Ho-Chunk, Inc.

○