# EXHIBIT A-6

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# DOES DISCRIMINATION EXIST IN FEDERAL PASSENGER RAIL CONTRACTING?

**(117–33)**

## REMOTE HEARING

BEFORE THE

SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS

OF THE

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

NOVEMBER 9, 2021

Printed for the use of the
Committee on Transportation and Infrastructure

Available online at: https://www.govinfo.gov/committee/house-transportation?path=/browsecommittee/chamber/house/committee/transportation

U.S. GOVERNMENT PUBLISHING OFFICE
47–135 PDF WASHINGTON : 2022

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

PETER A. DEFAZIO, Oregon, *Chair*

ELEANOR HOLMES NORTON, District of Columbia
EDDIE BERNICE JOHNSON, Texas
RICK LARSEN, Washington
GRACE F. NAPOLITANO, California
STEVE COHEN, Tennessee
ALBIO SIRES, New Jersey
JOHN GARAMENDI, California
HENRY C. "HANK" JOHNSON, JR., Georgia
ANDRÉ CARSON, Indiana
DINA TITUS, Nevada
SEAN PATRICK MALONEY, New York
JARED HUFFMAN, California
JULIA BROWNLEY, California
FREDERICA S. WILSON, Florida
DONALD M. PAYNE, JR., New Jersey
ALAN S. LOWENTHAL, California
MARK DESAULNIER, California
STEPHEN F. LYNCH, Massachusetts
SALUD O. CARBAJAL, California
ANTHONY G. BROWN, Maryland
TOM MALINOWSKI, New Jersey
GREG STANTON, Arizona
COLIN Z. ALLRED, Texas
SHARICE DAVIDS, Kansas, *Vice Chair*
JESÚS G. "CHUY" GARCÍA, Illinois
ANTONIO DELGADO, New York
CHRIS PAPPAS, New Hampshire
CONOR LAMB, Pennsylvania
SETH MOULTON, Massachusetts
JAKE AUCHINCLOSS, Massachusetts
CAROLYN BOURDEAUX, Georgia
KAIALI'I KAHELE, Hawaii
MARILYN STRICKLAND, Washington
NIKEMA WILLIAMS, Georgia
MARIE NEWMAN, Illinois
TROY A. CARTER, Louisiana

SAM GRAVES, Missouri
DON YOUNG, Alaska
ERIC A. "RICK" CRAWFORD, Arkansas
BOB GIBBS, Ohio
DANIEL WEBSTER, Florida
THOMAS MASSIE, Kentucky
SCOTT PERRY, Pennsylvania
RODNEY DAVIS, Illinois
JOHN KATKO, New York
BRIAN BABIN, Texas
GARRET GRAVES, Louisiana
DAVID ROUZER, North Carolina
MIKE BOST, Illinois
RANDY K. WEBER, SR., Texas
DOUG LAMALFA, California
BRUCE WESTERMAN, Arkansas
BRIAN J. MAST, Florida
MIKE GALLAGHER, Wisconsin
BRIAN K. FITZPATRICK, Pennsylvania
JENNIFFER GONZÁLEZ-COLÓN, Puerto Rico
TROY BALDERSON, Ohio
PETE STAUBER, Minnesota
TIM BURCHETT, Tennessee
DUSTY JOHNSON, South Dakota
JEFFERSON VAN DREW, New Jersey
MICHAEL GUEST, Mississippi
TROY E. NEHLS, Texas
NANCY MACE, South Carolina
NICOLE MALLIOTAKIS, New York
BETH VAN DUYNE, Texas
CARLOS A. GIMENEZ, Florida
MICHELLE STEEL, California

SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS

DONALD M. PAYNE, JR., New Jersey, *Chair*

TOM MALINOWSKI, New Jersey
SETH MOULTON, Massachusetts
MARIE NEWMAN, Illinois
STEVE COHEN, Tennessee
ALBIO SIRES, New Jersey
ANDRÉ CARSON, Indiana
FREDERICA S. WILSON, Florida
JESÚS G. "CHUY" GARCÍA, Illinois
MARILYN STRICKLAND, Washington, *Vice Chair*
GRACE F. NAPOLITANO, California
HENRY C. "HANK" JOHNSON, JR., Georgia
DINA TITUS, Nevada
JARED HUFFMAN, California
STEPHEN F. LYNCH, Massachusetts
JAKE AUCHINCLOSS, Massachusetts
TROY A. CARTER, Louisiana
PETER A. DEFAZIO, Oregon *(Ex Officio)*

ERIC A. "RICK" CRAWFORD, Arkansas
SCOTT PERRY, Pennsylvania
RODNEY DAVIS, Illinois
MIKE BOST, Illinois
RANDY K. WEBER, SR., Texas
DOUG LAMALFA, California
BRUCE WESTERMAN, Arkansas
BRIAN K. FITZPATRICK, Pennsylvania
TROY BALDERSON, Ohio
PETE STAUBER, Minnesota
TIM BURCHETT, Tennessee
DUSTY JOHNSON, South Dakota
TROY E. NEHLS, Texas
MICHELLE STEEL, California
SAM GRAVES, Missouri *(Ex Officio)*

# CONTENTS

| | Page |
|---|---|
| Summary of Subject Matter | vi |

STATEMENTS OF MEMBERS OF THE COMMITTEE

| | |
|---|---|
| Hon. Donald M. Payne, Jr., a Representative in Congress from the State of New Jersey, and Chair, Subcommittee on Railroads, Pipelines, and Hazardous Materials, opening statement | 1 |
| Prepared statement | 3 |
| Hon. Eric A. "Rick" Crawford, a Representative in Congress from the State of Arkansas, and Ranking Member, Subcommittee on Railroads, Pipelines, and Hazardous Materials, opening statement | 4 |
| Prepared statement | 4 |
| Hon. Marilyn Strickland, a Representative in Congress from the State of Washington, and Vice Chair, Subcommittee on Railroads, Pipelines, and Hazardous Materials, prepared statement | 43 |
| Hon. Sam Graves, a Representative in Congress from the State of Missouri, and Ranking Member, Committee on Transportation and Infrastructure, prepared statement | 53 |

WITNESSES

| | |
|---|---|
| Kenneth B. Canty, P.E., President and Chief Executive Officer, Janus Materials, oral statement | 5 |
| Prepared statement | 7 |
| Melvin E. Clark, Jr., Esq., Owner, Chairman, and Chief Executive Officer, G.W. Peoples Contracting Company, Inc., oral statement | 10 |
| Prepared statement | 12 |
| Victoria Malaszecki, President and Chief Executive Officer, Envision Consultants, Ltd., oral statement | 15 |
| Prepared statement | 17 |
| Francisco Otero, Founder, President, and Chief Executive Officer, PACO Group, Inc., oral statement | 21 |
| Prepared statement | 22 |
| Gnanadesikan "Ram" Ramanujam, P.E., President and Chief Executive Officer, Somat Engineering, Inc., oral statement | 24 |
| Prepared statement | 25 |
| Evalynn A. "Eve" Williams, President and Chief Executive Officer, Dikita Enterprises, Inc., oral statement | 29 |
| Prepared statement | 31 |

SUBMISSIONS FOR THE RECORD

| | |
|---|---|
| Submissions for the Record by Hon. Donald M. Payne, Jr.: | |
| Statement of Ian Jefferies, President and Chief Executive Officer, Association of American Railroads | 35 |
| Letter of November 22, 2021, from Laura C. Dutton, Former Administrative Assistant, Atlantic Meridian Contracting Corp., Inc. | 53 |
| Letter from Richard J. Ellis, Jr., Controller, Atlantic Meridian Contracting Corp., Inc. | 54 |

APPENDIX

| | |
|---|---|
| Question from Hon. Donald M. Payne, Jr. to Gnanadesikan "Ram" Ramanujam, P.E., President and Chief Executive Officer, Somat Engineering, Inc. | 57 |

Committee on Transportation and Infrastructure
U.S. House of Representatives
Washington, DC 20515

Peter A. DeFazio
Chairman

Katherine W. Dedrick, Staff Director

Sam Graves
Ranking Member

Paul J. Sass, Republican Staff Director

NOVEMBER 4, 2021

**SUMMARY OF SUBJECT MATTER**

TO: Members, Subcommittee on Railroads, Pipelines, and Hazardous Materials
FROM: Staff, Subcommittee on Railroads, Pipelines, and Hazardous Materials
RE: Subcommittee Hearing on "Does Discrimination Exist in Federal Passenger Rail Contracting?"

---

PURPOSE

The Subcommittee on Railroads, Pipelines, and Hazardous Materials will meet on Tuesday, November 9, 2021, at 11:00 a.m. EDT in 2167 Rayburn House Office Building and via Zoom to hold a hearing titled "Does Discrimination Exist in Federal Passenger Rail Contracting?" The Subcommittee will hear testimony from witnesses from Janus Materials, G.W. Peoples Contracting Company, Envision Consultants, the PACO Group, Somat Engineering, and Dikita Engineering. The hearing will offer a chance to examine whether discrimination is present in federal passenger rail contracting.

BACKGROUND

The U.S. Department of Transportation (USDOT) Disadvantaged Business Enterprise (DBE) Program was established to address discrimination against minority and women-owned businesses.[1] The DBE program seeks to ensure those businesses are provided equal opportunities to compete for certain USDOT funded contracts administered by the Federal Highway Administration (FHWA), the Federal Aviation Administration (FAA), the Federal Transit Administration (FTA), and the National Highway Traffic Safety Administration (NHTSA).[2] Currently, no such program exists for funds administered by the Federal Railroad Administration (FRA).

First established by federal regulation in 1980 as a minority and women's business enterprise program, the DBE program was later statutorily authorized for highway and transit transportation programs in 1983 by the Surface Transportation Assistance Act of 1982 (P.L. 97–424) to aid small businesses owned and operated by minorities facing historic and continuing discriminatory barriers to participation in the highways and transit programs.[3]

DBE programs for women-owned businesses and the FAA's airport DBE program were primarily implemented by regulation until Congress enacted the Surface Transportation and Uniform Relocation Assistance Act of 1987 (P.L. 100–17) and the Airport and Airway Safety and Capacity Expansion Act of 1987 (P.L. 100–223). These laws expanded the statutory authorization for highway, transit, and airport construction DBE programs to include women-controlled small businesses and codified the airport DBE program, respectively. The Airport and Airway Safety and Capacity Expansion Act also established a separate Airport Concession Disadvantaged Business Enterprise (ACDBE) Program administered by the FAA for airport conces-

---

[1] USDOT Office of Civil Rights. *Disadvantaged Business Enterprise (DBE) Program*. U.S. Department of Transportation. Retrieved October 27, 2021, from https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise

[2] 49 CFR 26.3.

[3] USDOT Office of Civil Rights. *Disadvantaged Business Enterprise (DBE) Program*.

sions and related contracts.[4] The highway and transit DBE program, the airport concession DBE program, and the airport construction DBE program are implemented pursuant to regulations established under 49 CFR part 26.

Congress has regularly reauthorized the DBE program for highways and transit in successive surface transportation reauthorization bills, most recently with the enactment of the Fixing America's Surface Transportation (FAST) Act (P.L. 114–94). H.R. 3684, the Infrastructure Investment and Jobs Act, reauthorized the surface DBE program.[5]

*I. WHAT IS A DBE?*

For highways and transit and airport construction DBE program eligibility purposes, a DBE is defined as a small, for-profit business where socially and economically disadvantaged individuals (1) own at least 51 percent of the economic interests of the entity, and (2) control and manage the business operations of the firm.[6] A firm and its minority and/or women owners seeking certification as a DBE must meet: (1) an ownership and control test, (2) a personal net worth test, and (3) a size standard test, requirements for which are described in regulation.[7]

Under statute, "socially disadvantaged" refers to individuals or groups facing historic and ongoing discrimination, such as racial or ethnic prejudice or cultural bias due to membership in a particular group.[8] Consistent with USDOT implementing regulations, minorities and women are presumed to be socially disadvantaged.[9] Others may qualify as socially disadvantaged on a case-by-case basis.[10]

To be regarded as economically disadvantaged, an individual must, among other things, have a personal net worth that does not exceed $1.32 million, excluding the equity in the individual's primary residence and the value of their ownership interest in the firm seeking certification.[11]

To meet size standards for DBE eligibility and be regarded as a small business in the surface transportation sector, a business must meet the qualifications of a small business defined by the Small Business Administration (SBA) in accordance with the North American Industry Classification System (NAICS) codes relevant to the business and as defined by the annual gross receipts or employee number caps outlined for each industry code.[12] In addition, the small business must not have average annual gross receipts over the firm's previous three fiscal years in excess of $23.98 million, regardless of the relevant NAICS code qualification.[13]

*II. A DBE PROGRAM AT FRA*

Currently, FRA does not have specific statutory authority to administer a DBE program, unlike most other USDOT agencies. To authorize an FRA-administered DBE program, Congress must determine that there is need for such policy. Section 11310 of the 2015 FAST Act required FRA to conduct a disparity and availability study which will inform Congress of this need.

This Subcommittee hearing will allow for Members to hear from six minority business leaders, each testifying to their personal experiences of discrimination on the basis of race or sex when working within the federally-funded passenger rail space.

WITNESS LIST

- Mr. Ken Canty, President and CEO, Janus Materials
- Mr. Melvin Clark, Chairman and CEO, G.W. Peoples Contracting Company
- Ms. Victoria Malaszecki, President and CEO, Envision Consultants
- Mr. Francisco Otero, President and CEO, PACO Group
- Mr. Gnanadesikan "Ram" Ramanujam, President and CEO, Somat Engineering
- Ms. Evalynn Williams, President, Dikita Engineering

[4] Since the Airport and Airway Safety and Capacity Expansion Act P.L. 100–223 codified the airport construction DBE program and the ACBDE program, these programs do not require statutory reauthorization in the same manner as highway and transit DBE programs.
[5] In this memo, "surface" refers to highways and transit.
[6] 49 CFR 26.5.
[7] 49 CFR 26; 49 CFR 23.
[8] 13 CFR 124.103.
[9] 49 CFR 26.67(a) and (b).
[10] 49 CFR 26.67(d).
[11] 49 CFR 26.67(a).
[12] 49 CFR 26.65(a).
[13] 49 CFR 26.65(b).

# DOES DISCRIMINATION EXIST IN FEDERAL PASSENGER RAIL CONTRACTING?

**TUESDAY, NOVEMBER 9, 2021**

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON RAILROADS, PIPELINES, AND HAZARDOUS MATERIALS,
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE,
*Washington, DC.*

The subcommittee met, pursuant to call, at 11 a.m., in room 2167 Rayburn House Office Building and via Zoom, Hon. Donald M. Payne, Jr. (Chair of the subcommittee) presiding.

Members present in person: Mr. Payne, Jr.

Members present remotely: Mr. Carson, Mr. García of Illinois, Ms. Strickland, Mrs. Napolitano, Mr. Johnson of Georgia, Mr. Auchincloss, Mr. Carter of Louisiana, Ms. Norton, Mr. Crawford, Mr. Weber of Texas, Mr. LaMalfa, Mr. Fitzpatrick, Mr. Johnson of South Dakota, and Mrs. Steel.

Mr. PAYNE. The subcommittee will come to order.

I ask unanimous consent that the chair be authorized to declare a recess at any time during today's hearing.

Without objection, so ordered.

I also ask unanimous consent that Members not on the subcommittee be permitted to sit with the subcommittee at today's hearing and ask questions.

Without objection, so ordered.

As a reminder, please keep your microphones muted unless speaking. Should I hear any inadvertent background noise, I will request that the Member please mute their microphone.

To insert a document into the record, please have your staff email it to DocumentsT&I@mail.house.gov.

Good morning.

When I had the honor of being selected by my colleagues to become the chairman of this subcommittee, one of my first priorities was seeing how I could bring equity to the rail sector.

Unfortunately, I have since learned that much work still needs to be done to ensure that everyone has a fair shot at obtaining work on Federal passenger rail contracts.

The first question I asked when I got the gavel was how we could strengthen the Disadvantaged Business Enterprise program at the Federal Railroad Administration. Imagine my surprise when I found out that there was no DBE program at the FRA.

To be clear, today's hearing is not to debate the merits of creating a program. The purpose of today's hearing is to allow business owners to share their experiences of working in the rail sector.

We are going to hear uncomfortable stories of very real discrimination that our witnesses have suffered. Today, our responsibility is to listen and reflect on each person's experience.

I would be remiss if I didn't share my own experience. The question is often asked: How do you know when you are being discriminated against?

I know. As a Black man, I know that feeling when people treat you differently because of the color of your skin. I know that when companies conspire against a supplier to shut out the only minority firm manufacturing a particular product, you are being discriminated against.

I was fortunate. Because of Government intervention, that particular discrimination was stopped, although others have not been so lucky.

The experiences we are going to hear today from our panel will be different than mine. The point of holding this hearing is to try to understand someone else's experience.

I do not know what it is like to experience discrimination as a member of a different minority group, or what discrimination women face in an industry dominated by men. That is why we have invited a diverse panel of witnesses to share their unique experiences.

I commend our witnesses for being courageous enough to share extremely personal and often painful experiences that should not happen in any setting, and least of all in professional settings.

It is not easy to come forward and describe when discrimination has happened to you, but it is a necessary story to tell. I encourage all Members to listen closely to these experiences.

Some Members may have gone through similar things and others may have not. We can't change what happened to our witnesses, but we have the privilege and the responsibility of being able to correct these injustices to ensure that future generations will be playing on a level field.

What I want to prevent are instances where business owners decide that it isn't even worth trying to bid for work because they know that they will be judged by what they look like rather than the quality of their work.

I commend the Biden administration for taking bold steps to ensuring diversity and inclusion. Secretary Buttigieg has committed to working with me and this committee to identify ways to create a fair shot to compete for Federal rail contracts.

Information gathered from today's hearing will help inform Congress whether actions must be taken to address discrimination in the transportation sector. It is my sincere hope that today, Members can put themselves in other people's shoes, if just for a moment, to understand the damage a well-entrenched system of discrimination can cause to business owners simply trying to provide for their families and succeed in the rail industry.

Some uncomfortable conversations need to be had to bring about a positive result. These conversations are not easy, but they are necessary.

I again thank the witnesses for being here, and I look forward to their testimony.

I now call on the ranking member of the subcommittee, Mr. Crawford, for an opening statement.

[Mr. Payne's prepared statement follows:]

**Prepared Statement of Hon. Donald M. Payne, Jr., a Representative in Congress from the State of New Jersey, and Chair, Subcommittee on Railroads, Pipelines, and Hazardous Materials**

Good morning. When I had the honor of being selected by my colleagues to become Chair of this subcommittee, one of my first priorities was seeing how I could help bring equity to the rail sector.

Unfortunately, I have since learned that much work still needs to be done to ensure that everyone has a fair shot at obtaining work on federal passenger rail contracts.

The first question I asked when I got this gavel was how we could strengthen the Disadvantaged Business Enterprise program at the Federal Railroad Administration. Imagine my surprise when I found out that there was no DBE program at the FRA.

To be clear, today's hearing is not to debate the merits of creating a program. The purpose of today's hearing is to allow business-owners to share their experiences of working in the rail sector.

We are going to hear uncomfortable stories of the very real discrimination that our witnesses have suffered.

Today, our responsibility is to listen and reflect on each person's experience.

I would be remiss if I didn't share my own experience. The question is often asked: "How do you know you are being discriminated against?"

I know. As a black man, I know that feeling when people treat you differently because of the color of your skin.

I know that when companies conspire against a supplier to shut out the only minority firm manufacturing a particular product, you are being discriminated against.

I was fortunate. Because of government intervention, that particular discrimination was stopped. Others have not been so lucky.

The experiences we are going to hear today from our panel will be different than mine. The point of holding this hearing is to try to understand someone else's experience.

I do not know what it is like to experience discrimination as a member of a different minority group or what discrimination women face in an industry dominated by men.

That is why we have invited a diverse panel of witnesses to share their unique experiences.

I commend our witnesses for being courageous enough to share extremely personal and often painful experiences that should not happen in any setting, and least of all in a professional setting.

It is not easy to come forward and describe when discrimination has happened to you, but it is a necessary story to tell.

I encourage all members to listen closely to these experiences. Some members may have gone through similar things and others may not have.

We can't change what happened to our witnesses but we have the privilege and responsibility of being able to correct these injustices, to ensure that future generations will be playing on a level field.

What I want to prevent are instances where business owners decide that it isn't even worth trying to bid for work because they know they will be judged by what they look like rather than the quality of their work.

I commend the Biden administration for taking bold steps toward ensuring diversity and inclusion.

Secretary Buttigieg has committed to working with me and this committee to identify ways to create a fair shot to compete for federal rail contracts.

Information gathered from today's hearing will help inform Congress whether actions must be taken to address discrimination in the transportation sector.

It is my sincere hope that today, members can put themselves in other people's shoes, if just for a moment, to understand the damage a well-entrenched system of discrimination can cause to business owners simply trying to provide for their families and succeed in the rail industry.

Some uncomfortable conversations need to be had to bring about a positive result. These conversations are not easy, but they are necessary.

I again thank the witnesses for being here and I look forward to their testimony.

Mr. CRAWFORD. Thank you, Chairman Payne, for holding the hearing.

Thank you to our witnesses for participating today.

Today's hearing will examine the need for a Disadvantaged Business Enterprise, or DBE, program, within the Department of Transportation for passenger rail contractors to ensure equal and fair access to Government grant money for rail infrastructure projects.

The DBE program currently applies to airport construction, airport concessions, and surface transportation construction programs, but does not to passenger rail work.

This committee has demonstrated a bipartisan commitment to DBE programs and to promoting fair and full access to transportation contracting opportunities.

While the Federal Railroad Administration doesn't currently have statutory authority to administer a DBE program for passenger rail, the FRA has demonstrated its support of the DBE program objectives.

The 2015 FAST Act directed the FRA to conduct a nationwide disparity and availability study on participation by minority-, women-, and veteran-owned small businesses in federally funded intercity passenger rail transportation projects. The study will inform Congress on whether legislation is needed to create a DBE program for passenger rail contracting.

I commend the chair for holding the hearing today. And I yield back the balance of my time.

[Mr. Crawford's prepared statement follows:]

**Prepared Statement of Hon. Eric A. "Rick" Crawford, a Representative in Congress from the State of Arkansas, and Ranking Member, Subcommittee on Railroads, Pipelines, and Hazardous Materials**

Thank you, Chair Payne, for holding this hearing, and thank you to our witnesses for participating.

Today's hearing will examine the need for a Disadvantaged Business Enterprise (DBE) Program within the Department of Transportation for passenger rail contractors to ensure equal and fair access to government grant money for rail infrastructure projects. The DBE program currently applies to airport construction, airport concessions, and surface transportation construction programs, but not to passenger rail work.

This Committee has demonstrated a bipartisan commitment to the DBE program and to promoting fair and full access to transportation contracting opportunities.

While the Federal Railroad Administration doesn't currently have statutory authority to administer a DBE program for passenger rail, the FRA has demonstrated its support of the DBE program objectives.

The 2015 Fixing America's Surface Transportation Act, or FAST Act, directed the FRA to conduct a nationwide disparity and availability study on participation by minority, women, and veteran-owned small businesses in federally-funded intercity passenger rail transportation projects. The study will inform Congress on whether legislation is needed to create a DBE program for passenger rail contracting.

I commend the Chair for holding this hearing today.

Mr. PAYNE. The gentleman yields back.

And so, we will now turn to our witnesses. And we will be hearing from testimony from witnesses followed by questions from Members. I would now like to welcome our witnesses.

Mr. Ken Canty, president and CEO of Janus Materials. Mr. Melvin Clark, chairman and CEO of G.W. Peoples Contracting Company. Ms. Victoria Malaszecki, president and CEO of Envision Consultants. Mr. Francisco Otero, president and CEO of the PACO Group. Mr. Gnanadesikan Ramanujam, president and CEO of Somat Engineering. And last but not least, Ms. Evalynn Williams, president of Dikita Enterprises.

Thank you for joining us today, and I look forward to your testimony.

Without objection, our witnesses' full statements will be included in the record.

Since your written testimony has been made a part of the record, the subcommittee requests that you limit your oral testimony to 5 minutes.

Mr. Canty, you may proceed.

**TESTIMONY OF KENNETH B. CANTY, P.E., PRESIDENT AND CHIEF EXECUTIVE OFFICER, JANUS MATERIALS; MELVIN E. CLARK, JR., ESQ., OWNER, CHAIRMAN, AND CHIEF EXECUTIVE OFFICER, G.W. PEOPLES CONTRACTING COMPANY, INC.; VICTORIA MALASZECKI, PRESIDENT AND CHIEF EXECUTIVE OFFICER, ENVISION CONSULTANTS, LTD.; FRANCISCO OTERO, FOUNDER, PRESIDENT, AND CHIEF EXECUTIVE OFFICER, PACO GROUP, INC.; GNANADESIKAN "RAM" RAMANUJAM, P.E., PRESIDENT AND CHIEF EXECUTIVE OFFICER, SOMAT ENGINEERING, INC.; AND EVALYNN A. "EVE" WILLIAMS, PRESIDENT AND CHIEF EXECUTIVE OFFICER, DIKITA ENTERPRISES, INC.**

Mr. CANTY. Good morning, Mr. Chairman and members of the subcommittee.

Whether it be the actions of Frederick Douglass in 1855, Rosa Parks a century later, or John Fitzgerald Johnson today, our country has a vigorous tradition of standing up to protest and advocate for marginalized peoples.

This morning we find ourselves at a comparative inflection point in the rail and infrastructure industry.

My name is Kenneth B. Canty. I am the president of Janus Materials. Janus, by using a process we have coined, "sustainable structural demolition and repurposing," deploys material from demolished bridges to combat climate change through net-zero carbon solutions.

I am also the president of AMC Civil Corporation and Freeland Construction. I have been involved in this business and field since 1995 when I was hired as an engineering intern from UMass Amherst by Parsons Brinckerhoff to work on the design of what became known as the Big Dig.

From a very young age, my life's dream was to work on bridges, as you can see behind me. This moved from being a dream to a reality due to the experience I had with my father, a World War II Pacific combat veteran, as he we would take me with him as a 6-

year-old child on long drives from Boston to Baltimore to see his ailing mother. We would go over the George Washington Bridge down the New Jersey Turnpike to the Delaware Memorial Bridges.

It was these occurrences that inspired me to be a bridge engineer. I would beg my dad to take the routes that were out of the way, like the Bay Bridge in Annapolis, to check it off the list.

Through working on the Big Dig, I went down to Charleston to work on the Cooper River Bridges. And to make a long story short, I was able to use these experiences and qualifications to purchase my first business.

Using the SBA's 8(a) program, we grew the company from 4 people to over 50 in 4 years. We were working for the Departments of Defense, Agriculture, and Homeland Security, and the GSA, to name a few, for the express purpose of working with the railroad.

As the railroads have a very high barrier for entry, and rightfully so, due to the extremely dangerous work it is and the impact it has on the traveling public, we made sure we had enough past performance work and capital and qualified personnel to approach Amtrak.

We approached Amtrak in 2011, and after 3 years were awarded our first contract in 2014 to reconstruct railroad stations from Gainesville, Georgia; Prince, West Virginia; and throughout South Carolina and North Carolina. We also pursued work in North Dakota, Texas, Florida, and Washington, DC, as well as Connecticut.

I must point out to this committee my path was very different than others, as I was able to use an established program that provides a path for a protected class of citizens, the 8(a) program.

Furthermore, the work I was doing for Amtrak still existed in the framework of what we call "vertical work," which is a place many minority contractors can succeed.

However, my end goal remains "horizontal work," which is bridges and tunnels and larger assets of infrastructure that hardly any Black contractors get into.

I submit to this subcommittee that there is a concerted, coordinated effort of large prime contractors, and sometimes in conjunction with owners, to keep minority contractors, particularly Black contractors, out of the federally funded infrastructure industry, particularly rail.

While others testifying today have certainly documented these actions, I would like to focus on my unfortunate set of experiences in the heavy civil industry.

It is no coincidence there is a dearth of minority contractors who are in the rail industry. The majority of these minority contractors are usually taken out before they can even qualify for work for the railroads and usually under the auspices of the State DBE programs.

I fully realize and accept that prime contractors do not want this conversation to be had. I also understand that I am likely to suffer an extreme backlash from these prime contractors and maybe even owners for coming before this committee and subcommittee.

I accept this risk no matter what the cost. I stand before you knowing that this committee is the only body that can enact positive change for the minority business community and the United States as a whole. Too often these prime contractors are not pun-

ished for the behavior I will showcase below but are rewarded with hundreds of millions of dollars of more work.

My experiences range throughout South Carolina, but I am going to take my remaining time to talk to you about what happened in Florida.

We were contracted to demo a bridge in Florida by a firm many of you may be familiar with called Skanska. We started experiencing racial discrimination that went from simple acts of what might be called tomfoolery to erasing ignition codes off machines. That quickly accelerated to sinking of boats, sabotage of equipment, which we caught on video and has been submitted to this committee, and harassment by a tugboat that coincidentally was named after who was purported to be one of the high ranking members of the Ku Klux Klan and a Confederate war general, Albert Pike. We were demeaned on a regular basis, and I myself suffered this behavior.

Mr. Chairman, I am sure you are aware that Skanska—maybe inadvertently—is being rewarded for their behavior by receiving a contract from New Jersey Transit for $1.5 billion for the construction of the North Portal Bridge. Why would anybody think that this behavior that they displayed would go away?

Finally, I would like to just take 30 seconds and tell you that the financial implications have been huge. In addition to myself, companies in Louisiana, such as TK Towing, Cashman Equipment in Massachusetts, International Power Products in Maine, companies in Florida, and Urban Advisors in North Carolina have suffered greatly through this.

I am in the midst of losing my house. I cannot provide care for my autistic children. And my wife has had to go back to work as opposed to raising the children. I have not been able to make a payroll. And I am afraid that with the infrastructure act that was just passed, I am not going to be able to participate at all, despite all of the great, hard-won experience I have.

Thank you for this opportunity, and I sincerely pray that it spurs action by this body. Thank you.

[Mr. Canty's prepared statement follows:]

**Prepared Statement of Kenneth B. Canty, P.E., President and Chief Executive Officer, Janus Materials**

Good morning, Mr. Chairman and members of this subcommittee. My name is Kenneth B. Canty and I am President of JANUS MATERIALS. JANUS, by using a process we have coined "sustainable structural demolition and repurposing", deploys material to combat climate change through net zero carbon solutions. I am also President of AMC CIVIL CORPORATION and FREELAND CONSTRUCTION. I have been involved with the Heavy Civil Infrastructure Field since 1995, when I was hired as an engineering intern by Parsons Brinckerhoff to work on design of what became the Central Artery / Third Harbor Tunnel Project, also known as the "Big Dig". From a very young age, my life dream was to work on bridges. This moved from being a dream to a reality due to the experiences I had with my father, a World War 2 Veteran, as he would take me with him as a 6-year-old child on the long drives from Boston to Baltimore to see his then ailing mother. This trip would take us over the George Washington Bridge, and over the New Jersey Turnpike to the Delaware Memorial Bridges. It was these occurrences that inspired me to be a bridge engineer as I would beg my dad to take routes that were out of the way like the Bay Bridge in Annapolis, in order for me to check off my list long span bridges that I hadn't crossed yet.

I received a Civil Engineering Degree from the University of Massachusetts/Amherst in 1997 and was hired by a large General Contractor, Modern Continental Construction, in 1998 and continued to work on what would become the largest infrastructure project of the 20th century. From here I went on to Charleston, SC to assist in the construction of the United States' largest cable stayed bridge over the Cooper River in Charleston, SC, and then was hired on by the same team I worked for in Boston to dismantle the old existing truss bridges that crossed the same river.

I was able to use these unique sets of experiences and qualifications to purchase my first business, Freeland Construction. In short order, using the opening that the Small Business Administration's 8(a) Program provided, I was able to grow the company from 5 employees to over 50 employees in 4 years. We developed an acute vision and goal to utilize these Federal Contracts for facets of the Department of Defense, Agriculture, Homeland Security, and General Services Administration, to name a few, to gain experience so that we could qualify for work with the Railroads. As the railroads have very high barriers of entry, and rightfully so, due to the extremely dangerous work it is and the impact it has on the traveling public, we made sure we had more than enough past performance, working capital, and qualified personnel, to approach the National Railroad Passenger Corporation, also know as AMTRAK. We approached Amtrak in October of 2011 and were awarded our first contract in 2014 to reconstruct railroad stations in Gainesville, GA; Staunton, VA, Prince, WV; Camden, SC; and Charlotte, NC. Our success with Amtrak allowed us to travel the country pursuing work in North Dakota, Texas, Florida, Connecticut, and Washington, DC.

I must point out to the committee that my path was very different than others as I was able to use an established program that provides a path for a protected class of citizens. Furthermore, the work I was doing for Amtrak still existed in the framework of what we in the industry refer to as "vertical work", which is a place where many black contractors can succeed. However, my end goal remains "horizontal work" which consists of bridges, tunnels and other larger assets of infrastructure that hardly any black contractors can get into. These projects, while inherently more risky, provide much higher margins, less competition, and more market stability with Heavy Infrastructure being more adequately funded by Congress.

I submit to this subcommittee, that there is a concerted, coordinated effort by Large Prime Contractors, and sometimes in conjunction with Owners, to keep Minority Contractors, particularly Black Contractors, out of the Federally Funded infrastructure industry. While others testifying today have certainly documented these actions, I would like to focus on my unfortunate experiences as a Heavy Civil Contractor and examples of discrimination whose ultimate purpose is to keep us out of the infrastructure industry. It is no coincidence that there is a dearth of Minority Contractors who are players in the Rail Industry. The majority of these minority contractors are taken out before they can even qualify to work for the Railroads, and usually under the auspices of the USDOT DBE program that States and Commonwealths are responsible for overseeing and enacting. There are challenges with the current DBE program's implementation—and I will outline below my experience with a firm that touts its ability to include DBE's—but the barrier of entry without the DBE program is too great.

I fully realize, and accept, that certain Prime Contractors do not want this conversation to be had. I also understand that I am likely to suffer an extreme backlash from these Large Primes Contractors and maybe even Owners for coming before this Committee and Subcommittee. I accept this risk no matter what the cost. I stand before you knowing that this committee is the only body that can enact positive change for not only the Minority Business Community, but also for the United States as a whole. With the infrastructure issues in our country being past critical, it is going to take not just Large Businesses, but also small and minority businesses, to work together to enact these solutions that Congress and this Administration is funding through the historic Infrastructure Investment and Jobs Act Bill. The biggest issue from my viewpoint is not just passing the bill, but ensuring that there are enough companies to actually do the work. To this end, small and minority businesses are critical to achieve the needed work force.

Too often, not only are Prime Contractors not punished for the behavior I will showcase below, but they are rewarded with hundreds of Millions of dollars in more work with absolutely no regard for the Black Owned firms, and lives, that they have destroyed. I have experienced this behavior on no less than three separate contracts, ranging from working for the US Army Corps of Engineers Charleston District (Fort Jackson, SC), to PCL / South Carolina Department of Transportation (Pee Dee River Bridge, Georgetown, SC), to most recently Skanska USA and Florida Department of Transportation for the 3 Mile Bridge in Pensacola, Florida. Due to time constraints, I will present the treatment I had at the hands of Skanska, as I believe

they are one of the worst offenders in the business. Skanska is also one of the largest recipients of FRA funded work in the USA, and would correspondingly be one of the largest contractors to participate in a future Federal Railroad Disadvantaged Business Enterprise Program. In order to understand what very well would happen with this new potential program, one reasonably must look at past actions. Without accountability and corrective action, these bad actors will never change their behavior.

### SKANSKA—3 MILE BRIDGE CONSTRUCTION DISCRIMINATORY ACTIONS AGAINST AMC CIVIL, VENDORS AND SUPPLIERS

I am an African American and the principal owner and operator of AMC Corp, a small and disadvantaged business that employs predominantly minority employees conducting demolition on civil projects. My firm was subcontracted to Skanska USA Civil Southeast, Inc. on an FDOT-owned, FHWA-assisted project in Pensacola, Florida. Though I previously worked for other divisions of Skanska, this was my first subcontract with Skanska Southeast and in Florida. Beginning in early 2020, I began to suspect that I was being subjected to racial discrimination by Skanska. First, I was not provided with sufficient information to appropriately bid the work. As an African American engineer and owner of a business, I was ignored and disrespected by Skanska Management when I raised legitimate questions about site conditions affecting some of the work we were to perform and in meetings. Instead of addressing the concerns I raised, Skanska failed to timely submit the matter to FDOT and insisted that AMC expend far more time and financial resources than allocated in the contract for certain portions of work; refused to pay for the work completed; delayed, interfered with, refused to allow us to perform the more profitable work in our contract; and Skanska personnel vandalized AMC's equipment, rendering it inoperable, all of which destroyed AMC's planned cashflow under the contract. Skanska then claimed AMC was in default on the contract for the delays and financial condition that it had caused. I made a complaint of race discrimination to FDOT regarding this behavior by Skanska, but FDOT took no action to remedy Skanska's discrimination. After my complaint, Skanska refused to pursue AMC's claim regarding the site conditions and gave AMC a notice of default. The discrimination and retaliation by Skanska and FDOT culminated in and caused the termination of AMC's subcontract on or about April 27, 2020. Skanska requested FDOT's approval of the termination and FDOT failed to take any action to stop the termination.

I believe that my treatment on this project is the result of my race, black, and that my subsequent termination was due to both my race and in retaliation for having voiced complaints about Skanska. We were the only African American firm on site during the execution of our contract. As this is a federally-assisted project, these constitute violations by both Skanska and FDOT of Title VI of the Civil Rights Act of 1964.

*Examples of Intimidation and Discrimination*

1) After mobilization on November 19, 2019 our rented skid steer ignition code was erased out of the cab of the equipment. One of our tool boxes was locked without our knowledge and we had to drill the lock out of the toolbox. We originally thought these were pranks as we were the new guys on site.
2) Sinking of Crew Boat—We left site on 2/6/2020 due to bad weather. Our crew boat was brought in, and tied off per the report in Exhibit A. As there was forecasted to be bad weather that night, we secured the vessel properly. When we came in the next morning, we found our crew boat sunk. After further investigation it was discovered that an Underwater Mechanix vessel (contract divers to Skanska) had been tied to our boat in such a way that would cause our boat to sink. Please see Exhibit A for Photographs and Report.
3) Sabotage of our LaBounty UP–70 Muncher on March 17, 2020. Please see Exhibit B. We believe this was done in order to slow down our progress. As the video shows, the alleged suspect was already on the site and based on his familiarity of the site, appears to be a Skanska employee.
4) The Albert Pike Tugboat Interrupting our Work Flow—Please See Exhibit C. While we were working in the channel, every time a vessel would come by we would have to take our divers out of the water. There were more than a few instances that the Albert Pike would transit by with no cargo in tow, back and forth from one side of the bridge to another, so the only purpose of the move-

Editor's note: Exhibits A–D referenced in Mr. Canty's prepared statement are retained in committee files.

ment appeared to be to interfere with our work and slow us down in completing the work. The name of this Tug Boat (named for a Confederate general reputed to be a high-ranking member of the Ku Klux Klan) was painted over after we left in order to hide its identity during the most recent racial civil unrest.

5) Animosity by senior Skanska Staff towards myself and other employees. Please See Exhibit D. Several times I was demeaned and treated with hostility that I felt was based on my race by Senior Skanska Staff. Numerous witnesses can attest to that behavior.
6) Retaliation due to Reporting the above Incidents to FDOT—After we experienced the allegations as described above, Skanska on or about March 30, 2020, took action to not use our participation for DBE Credit in order to justify terminating our contract. Please see correspondence between Skanska and FDOT. We have also included police reports from our Connex being broken into after we were terminated as well as all correspondence detailing why we believe that Skanska was operating in this way. See Exhibit D.

Mr. Chairman, I am sure you are aware that Skanska, while maybe inadvertently, is being rewarded for their behavior by receiving an award from New Jersey Transit, for 1.5 Billion Dollars for the construction of the North Portal Bridge. Why would anyone think that the behavior they have displayed on other work involving Disadvantaged Contractors would not rear its ugly head on this extremely important piece of infrastructure?

I also would finally like to point out that the cost of these discriminatory actions are not only harmful to my firm, they have also been devastating to Majority Owned Firms as well. These firms not only include TK Towing (Morgan City, LA), but Also Cashman Equipment (Braintree, MA), International Power Products (Acton, ME), Cowin Equipment (Pensacola, Florida), Urban Advisers (Charlotte, NC) and a host of other small businesses throughout the Mid Atlantic Region and Gulf Coast. Because of the discriminatory behavior that my firm experienced, these firms who worked for AMC Civil on this project suffered greatly as well.

Lastly, the financial toll to myself because of this behavior has been beyond devastating. I am fighting to not lose my residence, am struggling with providing care for my two children who are on the Autism Spectrum, and in the midst of a pandemic my wife has had to go back to work being a grocer versus raise our children in order to keep food on the table. I have lost the majority of my employees, and have not been able to make a payroll in sometime. Additionally, the ability to procure work with the passage of the infrastructure bill is greatly at risk because of not being able to be on a firm personal and professional financial footing.

Thank you.

Mr. PAYNE. Thank you, sir, for that compelling testimony.

Next, we will hear from Mr. Melvin Clark.

Mr. CLARK. Good morning. I am the chairman, CEO, and owner of G.W. Peoples Contracting Company. We are the only African-American-owned rail contractor in the United States, specializing in heavy rail construction, maintenance, repair, rehabilitation, and track demolition, and we work all over the country.

I want to thank the chairman, Mr. Payne, for having this hearing. I have been working and advocating for a minority business program at FRA for over 30 years. I have been in this industry close to 40 years.

So, following the passage of the Reagan administration's Surface Transportation Act, I started a company called Metroplex. Metroplex was the first minority-owned railroad contractor in the United States, and we grew to be a nationally known and respected leader in this field.

From the time that we started the company, I was a very strong minority business advocate. We did a number of things with SBA and DOT.

However, our most significant success was starting the mentor-protege program at SBA. It was implemented during the Clinton

administration. And Metroplex mentored my current company now, G.W. Peoples.

I ended up selling Metroplex and coming back to G.W. Peoples in 2011, and we acquired full control there. It was a successful turnaround. We do over $22 million in annual sales. We have been the rail contractor for the Chicago Transit Authority, for example. We did the rehabilitation of the Dan Ryan Red Line. That was a very large project, $425 million to upgrade over 10 miles of the CTA system.

The transit people and companies there at that time did not want any kind of minority company to come in and get any of the work. However, we went through the chairman of CTA and others, who granted us this opportunity, and we completed that job with over 70 percent minorities and women. It was one of which everyone was so very proud of, and we had established a place in Chicago.

Despite the public support for our transit workforce, and the track work reflected the neighborhoods and the ridership of color, we were not successful in the heavy passenger rail market.

The private railroads usually reserve the high-profile, high-profit, and labor-intensive work for themselves.

For example, in Chicago, there was a project called the Englewood Flyover. It was a $93 million system with bridges to carry the Rock Island rail line over the Norfolk Southern/Amtrak line, and it went through the heart of the South Side of Chicago.

When the local public found out the size of the project, $93 million, when they found out also that the African-American firms only received $112,000, we argued and advocated that they should have somebody of color there. We were more than qualified to do the work. But they said they had no obligation to meet any kind of minority participation goals, and they paid no more than lip service to minority businesses in the community.

It ended up really being a mess. One of the congressional supporters that we have now in Chicago, Bobby Rush, was able to help make a change there in their policies. However, there really is still nothing happening for us.

So, anyway, as I said, I have been a minority business advocate for the time period I have been in business. I have served on all of the national organizations with regard to trade organizations with regard to rail.

For example, at one of the organizations I was on the legislative committee, and one of the goals of the committee was to lobby to eliminate the DBE programs altogether at DOT and at the Defense Department.

Mr. PAYNE. Excuse me, Mr. Clark. Could you wrap up? Your time has expired. So just give us a quick summation.

Mr. CLARK. Well, I am going to give you a quick summation of what I was going to say.

There were two major high-speed rail projects that you may know about in Florida and in Las Vegas. Both were going to use G.W. Peoples to do the track work until they found out they did not have any kind of minority participation goals. Thus, and therefore, we were shut out of this. And I can't think of a better example

of discrimination and the need for a policy here for minority business than that.

[Mr. Clark's prepared statement follows:]

**Prepared Statement of Melvin E. Clark, Jr., Esq., Owner, Chairman, and Chief Executive Officer, G.W. Peoples Contracting Company, Inc.**

My name is Melvin E. Clark, Jr. I am the Owner, Chairman and Chief Executive Officer of G. W. Peoples Contracting Co., Inc. (GWP). We are the only national contracting company that specializes in heavy rail construction, maintenance, repair, rehabilitation, and track demolition. I am also a long-time, active member of COMTO, the Conference of Minority Transportation Officials; however, the views I express in this testimony are my own and should not be construed as representing any official position of COMTO.

I want to thank Chairman Donald Payne, Jr. Chair of the Transportation and Infrastructure Subcommittee on Railroads, Pipelines and Hazardous Materials, Ranking Member Rick Crawford, and the other Members of the Subcommittee for the opportunity to discuss key concerns and experiences of minority-owned—and more specifically, Black-owned—businesses seeking to opportunities funded by programs funneled through the Federal Railroad Administration. I believe this to be a historic event and that it sets significant precedent since this is the first hearing of its kind dedicated to identifying the pervasive racial discrimination in FRA-funded infrastructure contracting and minority business participation.

Before I begin, I do want to recognize the efforts of Deputy Administrator Amit Bose who, since his appointment, has been very aggressive in facilitating meetings between the private sector and quasi-public railroad trade associations and representatives of minority businesses groups. I understand these have been productive and hopefully will lead to further conversations and teaming opportunities. Also, the FRA has successfully negotiated state agency agreements that provide opportunities for small and minority businesses. However, I understand that, unfortunately, those agreements are facing backlash from groups who oppose the negotiated goals, most notably in California.

As you may know, I have been in the heavy rail industry for going on forty years. I first began my legal career with a prominent Pittsburgh law firm, as a corporate and labor attorney, prior to joining the Tax Division of the U.S. Department of Justice. Following the passenger of the Reagan Administration's Surface Transportation Act, in 1983, with my father's support, I founded Metroplex Corporation, the nation's first minority-owned railroad construction company which I grew into a nationally-known and widely-respected leader in its field. The company won multi-million dollar contracts for prestigious transit projects across the country, including the Alameda LRT Corridor in Los Angeles ($65 million), the Bay Area Rapid Transit Project in San Francisco ($35 million) and the New Jersey Transit Project in Camden ($50 million). During this time, Metroplex signed the first SBA-sanctioned mentor-protégé agreement with the fledging company, G. W. Peoples Contracting.

In 2011, I was able to acquire full control of G. W. Peoples. GWP can now boast a successful turnaround, producing over $22 million in annual sales. GWP was the DBE rail contractor for the Chicago Transit Authority's (CTA) rehabilitation of the Dan Ryan Red Line, a $425 million project to upgrade 10.2 miles of the CTA system where GWP was able to ensure that over *70% of its workforce on the project was minority (men and women)*. (We hire from the chronically unemployed: people who look like us.) GWP also built the Atlanta Downtown Streetcar Line and the downtown rail line through the Central Business District of Dallas. Importantly, I must point out that these were all Federal Transit Administration (FTA) funded projects.

Therefore, I do want to begin by being perfectly and adamantly clear about my position: the Federal Railroad Administration, the only major USDOT agency exempted, must implement a program to set goals for participation of disadvantaged business enterprises, i.e., a robust, efficient, and effective DBE program.

Again, while we do appreciate that the FRA is facilitating face-to-face discussions in order to give the pseudo-private railroads and large contractors a chance to engage with DBE and MBEs, I understand that the agenda for the majority-owned firms is to try to avoid goals on contracts or projects funded through FRA. However, good faith and cordial chats have not been enough in the past and they will no longer fly for companies like mine and individuals like myself who have faced—and faced down—overt racial discrimination throughout my railroad career. To put it bluntly, if they don't have to, they won't.

The role of the Federal Railroad Administration is to focus is on *maintaining current rail services and infrastructure (maintenance and repair)*, strategically *expanding, and improving the rail network (new construction and upgrades)* to accommodate growing travel and freight demand and providing leadership in national and regional system planning and development *(transit-oriented development and workforce skills training)*.

I believe it is important to define what I mean when I refer to FRA funded projects. I have learned that the Federal Railroad Administration itself has been working aggressively to be inclusive of small, minority and women owned business within its own agency, including through Buy America rules, administrative and general management consulting, supplies and services, and information technology equipment, services, and software.

But the FRA's authority and responsibility, as noted above in the above paragraph, go beyond its own agency to the entire nation and all public funds dispersed through its budget. The agency needs to be cognizant of the systemic discriminatory practices and the racial and cultural implications attached to these funds.

I am referring to high-profile, labor-intensive projects, including building and construction. According to a 2016 report published by the Minority Business Development Agency (MBDA), a federal agency established during the Nixon Administration and requiring annual reauthorization, minority business owners have historically been systemically excluded from securing often lucrative federal contracts for *infrastructure work* (emphasis added), such as building bridges and highways. I would add railroads to that list, and I must point out that it's particularly telling that, having reviewed the MBDA website and its publications, rail infrastructure is so glaringly absent from MBDA studies on minority business.

I believe the reason may be that it has been an extraordinarily unwelcome space for minority-owned businesses and that racial inequities were so institutionalized that even the only federal agency whose mission is solely dedicated to the growth and competitiveness of minority business enterprises, seemed resigned to the inherent procurement disparities in the railroad construction industry.

However, we believe that the FRA procurement minority disparity study, mandated by the FAST Act and currently close to conclusion, will result in the predictable conclusion: to reiterate, *racial discrimination is real and minority business owners have historically and systematically been excluded from securing lucrative federal contracts for rail infrastructure work*.

I have spent decades meeting with and proselytizing to half a dozen Administrations, continually making the argument that USDOT needed to address the contracting playing field at FRA, skewed towards large and majority-owned firms, by implementing DBE goals for FRA funds. Although many beneficiaries of FRA's programs will argue that they are private entities and that DBE goals should not apply, we believe this to be disingenuous rationalization. Federal rail grants, guaranteed credit and loan programs, highway-rail crossing safety projects, mean that hundreds of millions of dollars are funneled into state and local rail agency coffers. FRA does not pull this money out of the air: these funds come from minority taxpayers and fees from minority transportation users. In fact, according to data from the National Minority Suppliers Development Council (NMSDC), minority-owned businesses contribute close to $49 billion in local, state, and federal tax revenues. It is only fair that recipients of those tax dollars should be accountable to the minority business community.

GWP has been—literally and figuratively—both breaking ground and laying the groundwork for future minority entrepreneurs to pursue transportation construction as a start-up option. But the opportunities have not been built and they have not come.

I point out again that GWP continues to be the only Black company in this particular construction niche, and we have found the position a hard row to hoe. It is an absurd set of circumstances considering the fact that the DBE program is nearly 40 years old, established during the Reagan Administration by the Surface Transportation Act of 1983, for transit and highways. Despite the revolutionary shifts in social, cultural, racial, and ethnic demographics in the U.S. between now and the last millennium, minority business has made so little progress making inroads into the railroad contracting arena. This is in the face of the impressive strides made in DBE participation percentages in the transit and highway sectors—both of which have implemented robust DBE programs. I believe this can only be attributed to the racial bias in infused in the procurement processes.

As I stated, I have been in the rail construction industry for four decades. Over that period. I have been an active member in the National Railroad Construction and Maintenance Association, Inc. (NRC) and the Association of General Contractors (AGC), the latter of which we were members of the Diversity and Inclusion

Task Force. We have attended networking events for the Railway Engineering–Maintenance Suppliers Association, Inc. (REMSA), the American Short Line and Regional Railroad Association (ASLRRA) and the National Railroad Passenger Corporation (AMTRAK). We have been part of many conversations with the Association of American Railroads (AAR); yet the only diversity in their vocabulary on the AAR website relates to diversification of services in the context of profit.

Most railroad and contracting trade organizations basically exist to protect the interests of majority-owned firms. Each has stated for the public record that they strongly oppose goals for FRA funds. This is particularly ironic since they all insist that they do not receive any public funds. If that were truly the case and they do not receive FRA money, why would it impact them if there was an FRA DBE program? At most, they should be indifferent.

At one of the organizations, I served on its legislative committee. One of the goals of that committee was to lobby for eliminating the DBE program altogether at USDOT. Thankfully, I was present during a strategy meeting, and I was aggressive enough to successfully thwart an overt effort to try to terminate the program. However, the organization's official position continues to be opposition to—if not termination of—minority business participation goals.

Forty years of effort and struggle against the monolithic, i.e., large, powerful, and intractable "private" railroads, for barely a mere sliver of the massive contracting pie: this has been my experience.

According to sources, Chicago is North America's largest rail hub, and remains unsurpassed in the total number of passenger and freight trains that converge on any city on the continent. Chicago is also a major hub for Amtrak, with dozens of different lines terminating at the city's Union Station. The city has the second largest Black population in the country. One would think this location would be ripe for heavy rail construction opportunities. Indeed, GWP established an office in the city, and achieved significant success working with the Chicago Transit Authority (CTA), the city's light rail system, where we received kudos for our work and our employment recruitment efforts. However, the heavy rail passenger side offered a completely different scenario.

While I credit the Chicago Region Environmental and Transportation Efficiency (CREATE) agency and its member heavy railroads who have worked hard and been successful in meeting and exceeding its D/MBE goals in Chicago, there have been few to no opportunities in passenger railroad track construction.

Despite public support for GWP in Chicago where our transit workforce on trackwork reflected the neighborhoods and the ridership of color, GWP has not been successful in the heavy passenger rail market. The private railroads reserve the high-profile, higher-profit and labor-intense work for themselves. While I do not intend to disparage micro-businesses, trucking firms, materials suppliers, IT services, consulting or even Caucasian-women owned (WBE) businesses, meeting goals in this manner may not produce the job creation nor the necessary fuel for economic growth for underserved communities intended by the program's crafters.

To be more specific, in Chicago, a project called the Englewood Flyover, a $93 million system of bridges to carry the METRA Rock Island rail line over the Norfolk Southern/Amtrak line, went through the heart of the South Side of Chicago. Local protests over the clear racial discrimination were held when the public learned that African-American-owned firms received $112,000 while white-owned firms received $90.5 million, the difference made up of Hispanic and Asian-owned firms. Ultimately, I understand the amount awarded to minority firms was $4 million, including Black, Hispanic, and Asian, a mere pittance; however, none went to minority track construction contractors. That $93 million was FRA funds, and although GWP worked hard to get CREATE, Norfolk Southern and Amtrak to see the racial inequity in this scenario, since NS and Amtrak had no obligation to meet a minority-participation goal, they paid little more than lip-service to minority businesses and to the minority community. This is not just bad business practices; it translates into outright racially discriminatory practices.

Some, but not all, "private" rail construction contracts are bid publicly and over the years, we have worked to stay on top of the pipeline of projects: we have tried to follow the money and to stay ahead of the game on rail construction jobs. As is typical in the industry, we have attended pre-bids and site visits in advance of submitting proposals. However, we found ourselves in that very unwelcoming space: once GWP identified itself as a DBE/MBE, we were advised in no uncertain terms to leave and that if we ever mentioned the phrase (DBE/MBE) again, our representatives would be escorted out.

As GWP became known in the industry and our national reputation grew, we were viewed as competitors, not partners, and shunned for this reason, which simply added insult to injury. GWP was left off solicitation lists even when we were

registered, pre-qualified vendors. On the few occasions when we have been able to submit a bid, the only feedback we receive is who the successful bidder is. We are unable to find out where we placed in the bid results in order to conduct post-mortem benchmarking. We would learn later, usually through our Caucasian employees with long careers in the industry and access to this information through the "old boys" network, what the true bid results were. Put simply, lowest bidder, best value and diversity/inclusion components are not always priority factors in making awards.

Again, mind you, this was in the heavy rail sector. Although we managed to perform small, heavy rail industrial jobs because of contacts our employees had nurtured throughout their careers, GWP found success and truly established its reputation in the transit, light-rail industry (FTA) where opportunities (DBE goals) were made available and where we could compete more equitably on the playing field.

As background, GWP was founded and incorporated in Western Pennsylvania and owned for forty years by individuals of Caucasian descent. It had established a strong reputation in that region until its owner passed away. At that point, GWP came under African-American ownership, continuing the firm's mission as a track construction contractor, and became an 8(a) and certified DBE two years later. The industry is a small community and Mr. George Peoples and later Dr. John Verna, the two previous owners, were readily recognized and warmly welcomed by their peers. However, that all reversed after the change in ownership. When GWP's Black owner began showing up at pre-bid meetings and site visits, the entire dynamics in the meeting room changed to palpable tension and it was as if a heavy curtain had fallen: GWP was blacked-out and blacklisted, so to speak. Indeed, it almost WAS "curtains" for GWP until we became certified 8(a) when we were able to find work as a prime contractor, including on federally-funded Defense Department and Corps of Engineers projects, set aside for 8(a) firms. Although majority firms continued to respond to the term "minority-owned" as though there was a bad smell, they held their noses and did attempt to team with us on these lucrative jobs: finally, they needed us. That program leveled the playing field, at least during our nine-year tenure as an 8(a).

Over the past decade, there have been several high-speed passenger rail projects in the works, including Brightline (Miami to Orlando, FL), and Brightline West (formerly known as Xpress West, Las Vegas to Victorville, CA). At one point, the two projects were candidates for federal rail grants and loans, and USDOT, as a condition of those funds, insisted on DBE/MBE participation. In fact, the owner of Xpress West approached me to assist in developing a minority-business program. GWP was actively courted as a subcontractor on both these multi-billion dollar projects. That was until a change in Administrations led to a removal of that condition. Once the owners of these project learned that goals would no longer be applied, i.e., once those goals went away, GWP was sent away. We had devoted an extraordinary amount of time and effort into putting our proposals together, but afterward, we were simply and unceremoniously ghosted: no one responded to our proposals, and no one returned our calls.

In closing, I do want to again say, unequivocally, *minority business owners have historically and systematically been discriminated against by being excluded from opportunities to secure lucrative federal contracts for rail infrastructure work*. I know you have heard this before, but a DBE program in the Federal Railroad Administration would mean millions of dollars for the minority business community and thousands of jobs for the minority community.

As Congress grows close to passing a comprehensive infrastructure bill, we have the opportunity at this point in history to right an egregious long-term wrong. We look forward to the Subcommittee and the FRA doing the right thing.

As Chairman/CEO of G. W. Peoples, I thank you for your hard work on this important issue. I appreciate your time and attention, and for providing me and other minority business owners the opportunity to share our experiences of discrimination in federal passenger rail contracting. I will make myself available for any follow up questions or additional information, as requested.

Mr. PAYNE. Thank you.

Now we will move on to Ms. Malaszecki.

Ms. MALASZECKI. Good morning, Mr. Chairman and members of the subcommittee. My name is Victoria Malaszecki, and I am the president and CEO of Envision Consultants.

My company is certified as a small woman-owned disadvantaged business enterprise in my home State of New Jersey and nine

other States. We are headquartered in Mullica Hill, New Jersey, and have an office in Philadelphia, Pennsylvania. We are now approaching 27 years in business, with 47 employees, and anticipate closing the year at $7.3 million in revenue.

We work in the architectural, engineering, and construction industry, providing program and construction management services. Our market sectors include aviation, bridges, general buildings, educational K through 12, higher education, highway, transit, water/wastewater, and technology.

I realize that I have become desensitized to the systemic discrimination that happens daily to me based on my gender. I thought that because I have worked hard, started from nothing, raised a family, and am running a successful business, that I am respected and equal to a man.

But I am not. Every day I must prove myself to owners, clients, and most disheartening, a few employees who have come and gone.

I was almost put out of business by a large prime and moved the operations into my home to meet payroll and cut costs. To this day, I don't know how I survived that year, but I did. I could have thrown in the towel were it not for my family supporting me.

I would not be here today if it were not for statutory requirements for women-owned businesses. Business is business, and the certifications do not guarantee work, but they level the playing field, allowing me to be in the game.

The discrimination that continues daily is so subtle that it is overlooked. The anger, hostility, and hate from men when confronted by me is, I believe, grounded in disrespect. Yet, this behavior is not all men.

What is concerning to me today is recognizing this hostility and disrespect to women on my management team and the young women entering the workforce. I must incorporate annual training in this area of discrimination that is not sexual. I would never have thought in 2021 that this is what is needed for workplace culture.

The industry continues to be male dominated at all levels. I must be well versed in all aspects of business operations when many of the men I am working with only need to be knowledgeable in one aspect.

A few of the daily experiences I encounter after all of these years are: What is your education? What is your background? What can you do for me? You are not allowed to speak to any division of the agency or owner. You are not allowed to attend the preproposal meetings.

Ninety-nine percent of the time I do not receive a copy of the submitted proposal. I hear that, "We negotiated your rates and fee. We request you to start work without an executed contract." And too many times the dollar values assigned to my firm in winning a proposal never result in any revenue.

In conclusion, my story reflected in the written testimony identifies that discrimination against women exists in this industry, and that there is a need for establishing goals in Federal passenger rail contracting.

Envision has only pursued two procurements in Federal passenger rail in 27 years of doing business. If this arena opens to include small woman- and minority-owned businesses, like other

agencies of the Government, such as the Federal Transit Administration and the Federal Highway Administration, I would pursue additional contracts.

If there is no incentive to utilize firms like mine, they will not be utilized. The large private national and global firms will continue to strengthen and dominate this market via mergers and acquisitions, performing 100 percent of the work on their own.

With only a few large players winning and performing the work, more and more conflicts of interest will arise. This is an opportunity only if the agency is ready to procure with a small woman- or minority-owned firm.

Thank you.

[Ms. Malaszecki's prepared statement follows:]

**Prepared Statement of Victoria Malaszecki, President and Chief Executive Officer, Envision Consultants, Ltd.**

My name is Victoria Malaszecki, and I am the President & CEO of Envision Consultants, Ltd. My company is certified as a small woman-owned disadvantaged business enterprise (DBE) in my home state of New Jersey and nine other states. We are headquartered in Mullica Hill, New Jersey and have an office in Philadelphia, Pennsylvania. On December 4, 1994, Envision was incorporated and is now approaching 27 years in business with forty-seven employees and anticipate closing the year at $7.3 M in revenue. We work in the Architectural, Engineering and Construction (AEC) Industry providing Program and Construction Management services specializing in Project Controls, Public Outreach and Technology Services. Our market sectors include Aviation, Bridges, General Buildings, Educational K–12, Higher Education, Highway, Rail, Transit, Water/Wastewater and Technology. I am honored to be here today to share my story as it relates to "Identifying Discrimination in Federal Passenger Rail Contracting".

As a young girl my mother told me I could be anything I wanted to be when I grew up. She was my world, my best friend, my mentor, my inspiration. My world was rocked when she died—I was 15 years old. The youngest of five children and the mistake coming 10 years later after the youngest of their four children. My father did not understand me, I always asked too many questions. I was always debating both him and my brother. During high school there was no girls' soccer team and my father would not allow me to play on the boys' team. He turned to alcohol after she died and did not know what to do with a teenage girl. He told me not to go to college as "You will just grow up and get married and have children like your sister." My father died one week after my high school graduation. At his funeral friends and family told me his was proud of me going to college. I was the first one in my family to attend college and obtain degree(s).

In preparing for today I realized that I have become desensitized to the systemic discrimination that happens daily to me based on my gender. I thought that because I have worked hard, started from nothing, raised a family and am running a successful business that I am respected. That was the message to young girls in the 1980's: you can have it all—marriage, motherhood and a career. But I am wrong. It is 2021 and I thought I was respected and equal to a man, but the cold hard reality is that I am not. I have to prove myself everyday to owners, clients and most disheartening a few employees who have come and gone. "Disadvantaged" is not the best term since I put myself through college, with no healthcare, no parents, $25,000 dollars to my name and a mortgage to pay on my parents' home after they died. I made it. Not really. I am constantly proving myself. So many times, when in a conversation with a few people and introductions are made I am asked what my background is, my education but a man is not.

Additionally, I have come a long way from the beginning to the firm's present success. Almost put out of business by a large prime (outstanding invoices for over one year) and moved the operations in my home to meet payroll and cut costs. To this day I don't know how I survived that year, but I did. I could have thrown in the towel were it not for my family supporting me.

Similarly, there is the analogy in the medical profession that the doctor needs to role play and be the patient for empathy and understanding. I would suggest that the same role playing should be incorporated into the orientation for all employees

in the AEC industry. Empathy and understanding at all levels that the women and minority firms being utilized on projects are real and are responsible for the livelihoods of their employees (payroll, medical benefits, PTO). "Just because you have to use them" doesn't mean that the business is not as real as yours.

For instance, a project manager for a Prime (firm who has the contractual relationship with the owner) should understand that the invoice sitting in his bin should be processed efficiently, the accounting department should understand why they are calling for payment. Since I am not allowed to call the Owner (at times that language is written in the contract) we are making collection calls to the Prime. Recently, I contacted the Owner since my CFO, also a woman, was getting nowhere with the collection calls. I was sent a high priority email from the male VP citing the contract terms. In a follow up conversation with the male VP, I highlighted that there was no such clause in his contract and that I simply inquired if payment was made since we were out 8 months. In the end and two months after my inquiry both firms were in fact paid for the outstanding invoices. This email was sent to my team and his team putting my firm in its place. You see I am not supposed to be a Prime. I am to stay in my lane as a subcontractor. As he was about to renew his contract for the fourth and final year, I suggested that the remaining budget in my contract be utilized for his other subcontractor and Envision will no longer be his subcontractor.

Most importantly, I have encountered countless lessons and obstacles that required me to have the patience, strength, and persistence to learn and grow. I would not be here today if it was not for the statutory requirements for woman owned businesses. Business is business and the certifications do not guarantee work, but they level the playing field allowing me to be in the game. Unfortunately, my 27 years of experience in the rail business has taught me that I am not welcomed or respected without proving myself in each and every opportunity.

Before I get into my examples, I would like to share with you the typical experiences I have experienced as a woman business owner. The discrimination that continues daily is systemic, ingrained and so subtle that it is overlooked. The anger, hostility and hate from men when confronted by me is, I believe, grounded in disrespect. Open hostility to me privately and in front of other women but not in front of other men. What is most concerning to me today is recognizing this hostility and disrespect to women on my management team. As I continue to grow, I am blending the skill sets amongst generations but have noticed that I must incorporate annual training in this area of discrimination that is not sexual. I never would have thought that this is what is needed for workplace culture and necessary for young women just entering the workforce.

Specifically, a man will question me on a decision but will not question another man even if it is the same decision. The AEC industry continues to be male dominated at all levels. I am constantly having to prove myself in all aspects of business operations, when many of the men I'm working with only need to be knowledgeable in one aspect. If I question a man or challenge a man, I've been told I'm confrontational, I don't know what I'm talking about, or flat out I'm wrong. When in fact most of the time I'm right and it is very hard for a man to come back and admit that he was incorrect, and I was right. Why are we on the battlefield? Why are we competing based on gender?

Yet this behavior is not all men. I have a male mentor who is a business owner, who shares his experiences and insights and we attempt to have lunch on an annual basis. At a Women in Transportation Seminar (WTS) event we were casually speaking about a situation I encountered and his response to me was "Vicki, you are teaching me things now that I have never encountered. I'm learning from you."

To illustrate the issue that women and minority firms experience with procurement is due to the privity of the prime contract, are not allowed to have access to procurement, accounting, engineering, or any division of the owner. There is the exception of the EEO office. This leaves us powerless and without intelligence of the solicitation on the street to streamline our teaming efforts. If there is a conflict or inequity, then we can file a complaint. If I ever filed a complaint, I would never get work again.

When I team on pursuits there is a conversation, an agreement on scope of services, a cost proposal and company information. 99% of the time I never receive a copy of the team proposal for our records. There is a general lack of communication to inform us of a win or loss. Many times, it is an afterthought on the Prime's part and we are asked to start work without an executed contract. I don't allow working without a contract or notice to proceed anymore. Too many times the dollar values assigned to my firm in a winning proposal never result in any revenue to my firm.

In 2006 I sat down with a Project Manager (PM) for a large new contract. We discussed staffing and between the time of bidding and winning, one of my employ-

ees was reassigned. He thought I was doing a 'bait and switch' which I was not. He told me what the rate should be, said find someone, and stated, "A mom could do it." Being a 'Mom', I did not sign the contract since if this man showed this level of disrespect to the female president of the company, how would he treat a female employee of mine working side by side in a trailer on a construction project site. When I reached out to another large firm who also was a subcontractor on this same contract, and spoke to that firm's vice president, his response was, "Calm down Norma Rae." In the end, this contract come up unexpectedly prior to COVID and after delays in any signed contract or Notice to Proceed, I rechecked the contract and it included an old overhead (OH) rate. The current PM is a woman and the contract manager wondered why I never had a subcontract—then I remembered the above. Prior to signing I explained to her that since I do not have a contract, I should not be held to an OH in 2006 when times and the firm were different. She in turn then submitted the latest OH for themselves and all subconsultants and we proceeded to meet our deliverables. I do not believe I would have had a similar experience if the PM had been a male.

I'm asked, 'What can you do for me?' If I cannot meet with the owners, agency representatives and I cannot speak with them what can I do for them. In the beginning, I could not even get owner references. As I grew in experience, I have asked, and we have a few now. The only way I have been able to strengthen my network has been by leading a variety of professional organizations. This has provided the opportunity to meet and get to know clients who would never get to know me because of my subcontractor status. This adds a burden to DBE's trying to establish themselves and growing their portfolio of services.

Sometimes, my company will pass on pursuing certain contracts. If I say 'pass' on a pursuit, the response comes back 'why?' Why do I need to explain my decision? This is not a question asked of male-owned firms.

I have many specific examples of discrimination that I've faced over my career that I can recall in detail.

I hired a senior manager from a firm who at the time was our biggest client. I was told to go meet with the President of the firm, a male, and make amends so that our firms can continue to work together. I knew within two months that this new hire was not going to last as he did not want to take direction from me, undermined my decisions, and created a toxic work environment. Why do I need to make amends when someone joins my firm, when the firm will hire an employee from another competitor and then the two will joint venture contracts together? Why the double standard?

Another time, I spoke with a male Prime contractor regarding a contract for my firm. He said to me, "During the negotiations, we negotiated your employees' rate with the Agency PM." I responded that I did not negotiate this rate nor am I going to take a 15 dollar an hour hit on his direct rate. The PM went to my lead (male) and discussed with him the situation to see if he could get around this. My employee sent him back to me.

In September 2014, I was awarded a Prime contract with the FTA as the managing partner of a JV. I teamed with another woman owned firm. Shortly after award the owner of the other firm wanted out of the contract. The FTA Contracting Officer, a woman, walked me through what I needed to do to dissolve the agreement. The FTA had the confidence in awarding the contract solely to Envision. I am extremely grateful to the FTA in having the confidence for us to be a Prime, it has been a large learning curve but I and my team now understand all aspects of being a Federal Contractor and were successful in receiving our second Prime Award with the FTA in 2019.

During the last quarter of 2012, a solicitation DTRT5714D30008 was placed on the street, and I teamed with three large Prime Contractors to bid on the work. Two of the three firms I had worked with in the past, one I had never worked with before. Two firms were successful and awarded the contract. The third firm, the one I had never worked with before never informed me of their success or failure in securing a contract. I spent time (and therefore money) with the firm upfront to put together components of their bid proposal and then never heard from them again despite numerous attempts to contact the firm.

On another occasion, a Prime firm was awarded a contract to do program management oversight. The cost proposal submission included information that Envision would participate in up to $1,043, 964 of contract work (Indefinite Delivery Indefinite Quantity). A letter from the agency to the Prime stated "In accordance with FAR Clause 52.244–2, entitled "Subcontracts" (OCT 2010), consent cannot be granted for any of your proposed subcontractors." The Prime responded, "In the case of Envision and any other subcontractors listed in this proposal, these firms have been subcontractors to [us] on other federal contracts. Typically, [we] have worked with

all the firms on a cost-reimbursement, time-and-materials, or labor-hour type basis." I never received a subcontract to execute.

At another time, a Prime firm was also awarded a contract to do Program Management Oversight. Project amount to Envision $507,475 (IDIQ contract) from cost proposal submission. The Prime received the same letter as stated above. I received an executed contract and one task for $6,873.00; however never received notice to proceed to perform work and never billed. I remember this solicitation well and even contacted agency procurement for guidance to no avail. I provided the necessary supporting documentation in both cases. Federal Acquisition Regulations and federal government and agency-specific contract clauses were being thrown around and I was unable to get clarity. Since the Primes are engineers, not auditors, they also did not understand what the Agency was requesting, and expected me to simply know the answer. The Agency procurement made this complicated, cumbersome, time consuming and intimidating without understanding the rationale. When reaching out for help why is a man in procurement not asked to provide an explanation? I was not a new business; I was mature and experienced with an audited overhead statement.

To further exemplify the treatment I've been faced with, in 2012, I teamed with a joint venture pursuit with two male-owned firms and completed all the necessary proposal documents, including a cost proposal for public outreach services. Envision's portion of the cost proposal was $1,164,240. At the time of contract review for execution, I was informed that Envision would only be performing services for one location as the contract was across multiple states, including New Jersey. Envision was not assigned New Jersey but Philadelphia as the joint venture spread the work to local firms. The JV did not share their plan to spread out the work with multiple additional vendors with me at the time of the proposal. We only received three task orders for a total of $99,072.18 over two years, and I was left out of the rest of the process.

2012 was the first solicitation we teamed on for the FRA and to date I have not been invited to join subsequent teams for solicitations from this agency for the same scope of work since that time.

If there is no incentive to utilize firms like mine, they will not be utilized. The large firms will pursue on their own and keep the work to themselves. As a business owner I made the decision not to search or pursue teaming opportunities in this arena after my experiences in 2012–2014. If the arena opens to include and incorporate small woman and minority owned businesses like other agencies of government, such as the Federal Transit Administration and the Federal Highways Administration, I would pursue additional contracts.

As Envision continues to grow, we will need to take on more Prime Contracts. If one agency of the government has confidence in my firm to be a Prime, then we should be able to compete for Prime Contracts with another agency. This would open another door to compete nationally for challenging projects that will have a social and economic impact.

I was told years ago by a male agency procurement official "You are not allowed to attend the pre-proposal meeting, only the Primes can attend." On the other hand, FTA reaches out to and includes DBEs intentionally for pre-proposal conferences, so DBEs can learn firsthand FTA's expectations and large firms can make contacts with potential sub-DBE's or joint venture opportunities.

I do not have the luxury of staff positions solely for business development as a large firm does. Large firms have professionals who are employed full time with access to procurement staff and face to face meetings. In all my years of being in business, I have had five face to face meetings with an agency representative, none of which were with procurement. Why? Agencies will not meet with the small businesses. I refer to the importance of these meetings as 'intelligence'. The large firm has the resources to mine the solicitation, meet and greet the agency, and establish a team. Firms like mine do not have this access unless they hire these types of professionals whose salaries can be higher than the owner, risking the woman and DBE certification.

In conclusion, my story told above identifies that discrimination against women exists in this industry and that there is a need for establishing small woman and minority goals in Federal Passenger Rail Contracting. Unless there are goals established during procurement small woman and minority firms will not be utilized. Envision has pursued only two procurements outlined above in Federal Passenger Rail Contracting in 27 years of doing business. The large private national and global firms will continue to strengthen and dominate this market via mergers and acquisitions. Thus, performing practically 100% of the work to maintain their business interests respectively. The small woman and minority owned businesses still struggle to exist. With only a few large players winning and performing the work, more

and more conflicts of interest will arise. This is an opportunity for small woman and minority owned firms to pursue, partner and team in other capacities with large firms only if the agency is ready to procure with a small woman or minority owned firm.

Mr. PAYNE. Thank you very much.

Now we will hear from Mr. Francisco Otero.

Mr. OTERO. Good morning to the committee. My name is Francisco Otero. I am the founder, president, and CEO of the PACO Group.

PACO is a minority-owned and certified disadvantaged business enterprise that provides program and construction management consulting services. I started my company in 1989. Our headquarters are in New York City, and we maintain a regional office in Miami, Florida.

My company specializes in providing project controls and related services nationally to Federal, State, local, and municipal government agencies that are involved in the design and construction of infrastructure and transportation projects.

My company functions typically as an extension of an agency's staff, helping to protect their interests during the planning, design, bid/award, and construction phases of a project. Our services are intended to provide independent oversight support to the agency by monitoring and tracking the project's cost, schedule, and quality performance.

My personal business experience is that it is almost impossible to compete with majority firms on federally funded projects due to their size, resources, and financial capabilities. I can honestly and emphatically attest to the fact that had it not been for the FTA's federally mandated DBE program, my company probably would not have been able to get started, much less survive for over 31 years.

If you require proof, just look at the private sector of the construction industry where no DBE goals exist, and you will find barely any meaningful minority firm's participation.

The DBE program provided my company the opportunity to subcontract with majority firms on federally funded FTA construction projects and has been the lifeline for contracting opportunities.

As a matter of fact, the FTA's DBE program has enabled my company to participate on numerous high-profile mega projects, including Puerto Rico's Tren Urbano, New Jersey Transit's Hudson-Bergen Light Rail System, New Jersey Transit's Southern New Jersey Light Rail System, New York's East Side Access program, New York's Second Avenue Subway, and many, many other projects.

One would think that the impressive resume of successful projects that my company has compiled over the years would be an adequate testimonial demonstrating the depth of our experience, capabilities, and qualifications.

Unfortunately, that has not been the case. DBEs are relegated to seeking subcontracting opportunities with majority firms, and our teaming success, to a large part, depends on the majority firm's willingness and corporate culture towards diversity and inclusion.

For the record, I do not expect any contract opportunity to be handed to me, and I don't feel any sense of entitlement. I freely

and willingly embrace competing for work. I just expect the competition to be fair and that it provide a level playing field.

I must admit that I do have a serious problem with and find completely unacceptable the way I am treated disrespectfully, rudely, and dismissively by many majority firms.

I have on several occasions had a majority firm come right out and tell me they wish the DBE program would go away so that they would not have to bother teaming with firms like myself, that they would prefer being able to subcontract with whoever they want and not be forced to subcontract with DBE firms.

They have gone so far as to say that DBEs are lazy, that the quality of their work is inferior, et cetera, et cetera, et cetera, all very stereotypical attitudes.

Due to time, I will only mention one example, but in my written testimony there are many other examples of the type of discrimination that we face.

So, in conclusion, recognizing that the small business sector is the economic engine driving the Nation's economy, it is important that DBEs can competitively participate on FRA federally funded railroad projects. The roles and opportunities that the FRA projects can provide will vary from track construction, to engineering, to design, to procurement of supplies, all that are intended to strengthen our rail systems nationally. This would mean millions of dollars for minority businesses and thousands of jobs within the minority community.

PACO is ready, willing, and able to participate in FRA projects once the DBE program is implemented. I strongly encourage the congressional subcommittee to establish an FRA DBE program so that minority-owned businesses, such as myself, will have the opportunity to participate on these Federal projects as well.

I thank you.

[Mr. Otero's prepared statement follows:]

**Prepared Statement of Francisco Otero, Founder, President, and Chief Executive Officer, PACO Group, Inc.**

My name is Francisco Otero, I am the founder, President & CEO of the PACO Group, Inc. (PACO). PACO is a minority owned and certified Disadvantaged Business Enterprise (DBE) that provides Program & Construction Management consulting services. I started my company in 1989 and our headquarters is located in New York City and we also maintain a regional office in Miami, Florida. My company specializes in providing Project Controls and related services nationally to Federal, State, local and municipal government agencies involved in the design and construction of infrastructure and transportation projects and programs. My company functions typically as an extension of the agencies' staff, helping to protect their interest during the planning, design, bid/award and construction phases of a project. Our services are intended to provide independent oversight support to the Agency by monitoring and tracking the project's costs, schedule, and quality performance. The specific services we offer include: Construction Schedule Management, Independent Cost Estimating, Project Cost Control, Document/Records Management, Claims Management, Risk Assessment, Value Engineering, Asset Management, Operational Analysis, Office Engineering, and Construction Inspection services.

I serve on several civic and industry boards and have received many awards during my career. For over 20 years I have been an active member and have also served on the Board of the American Public Transportation Association (APTA), an international trade organization whose mission is to advocate, strengthen and improve public transportation. I also served a six-year term on the Board of Directors of the National Transit Cooperative Research Board. Additionally, I have a leader-

ship role in numerous minority industry organizations including the Conference of Minority Transportation Officials (COMTO) and Latinos In Transit (LIT), where I advocate for leveling the playing field by providing meaningful procurement opportunities that enable capacity building for minority businesses. I am a Fellow at Rutgers University and Pontifical Javeriana University (Colombia, S.A.) where I am an invited guest lecturer teaching Configuration Management to the graduate and undergrad engineering students. I possess a Bachelor of Science degree, have written various "white papers" and made numerous presentations on Configuration Management.

I was born and raised in Spanish Harlem (aka El Barrio) which is in the upper east side of Manhattan in New York City. My parents were first generation immigrants from Puerto Rico. This was a predominantly Puerto Rican neighborhood and even though we were very poor my parents were always able to provide for us. My first experience with discrimination was when I started my career working at a Fortune 500 company. I observed after a while that all the supervisors, managers, and executives were white and mostly men. I did not at the time think anything of it until I had been working there long enough to inquire about promotional opportunities. I truly felt that I had paid my dues and I was qualified and merited a promotion based on my work performance. However, no promotional opportunity was ever afforded to me. I was shocked by this experience and learned a hard lesson about this so-called "glass ceiling" since I had grown up believing that one is judged by their abilities and not the color of one's skin. After working there for several years, I decided to leave and take a chance to be in control of my own destiny. I started my company with the hope of finding a niche in the highly competitive construction industry. However, I soon learned that as a minority owned business, I would continue to confront challenges and discrimination. This experience had a profound influence and committed me to wanting to build a diverse and inclusive organization. This philosophy is a principal part of my company's core values and is consistently practiced in our recruitment and talent acquisition policy. In fact, we currently employ 50 full-time employees and 80% of our company's leadership team and approximately 65% of the overall staff is comprised of minorities and women.

My personal business experience is that it is almost impossible to compete with majority prime firms on federally funded projects due to their size, resources and financial capabilities. I can honestly and emphatically attest to the fact that had it not been for the FTA federally mandated DBE program, my company probably would not have been able to get started, much less survive, for the past 31 plus years. If you require proof, just look at the private sector of the construction industry where no DBE goals exist and you will barely find any meaningful minority firms participation. The DBE program provided my company the opportunity to subcontract with majority firms on federally funded FTA construction projects and has been the lifeline for contracting opportunities. As a matter of fact, the FTA DBE program has enabled my company to participate on numerous high profile mega projects including: Puerto Rico's Tren Urbano Heavy Rail System; New Jersey Transit's Hudson/Bergen Light Rail System; New Jersey Transit's Southern NJ Light Rail System; New York City/Long Island Railroad's Eastside Access Program; New York City Transit's Second Avenue Subway System; New Jersey Transit's Sandy Recovery Program; New York City's Transit Sandy Recovery Program; Port Authority of NY&NJ's Sandy Recovery Program; Washington Metropolitan Area Transit Authority's Dulles Extension.

One would think that the impressive resume of successful projects that my company has compiled over the years would be adequate testimonial demonstrating the depth of our experience, capabilities and qualifications. Unfortunately, that has not been the case! DBE firms are relegated to seeking subcontracting with majority firms and our teaming success, in large part, depends on the majority firm's willingness and corporate culture toward diversity and inclusion. For the record, I do not expect any contract opportunity to be handed to me nor do I feel any sense of entitlement. I freely and willingly embrace competing for work, I just expect the competition to be fair and that it provides a level playing field. I must admit that I do have a serious problem with and find completely unacceptable when I am treated disrespectfully, rudely and dismissively by majority firms. I have on several occasions had a majority firm come right out and tell me that they wish the DBE program would go away so that they would not have to bother teaming with minority firms. That they would prefer being able to subcontract with whoever they want and not be forced to subcontract with a DBE firm. They have gone so far as to state that all DBEs are lazy, that the quality of our work is inferior, etc. All very stereotypical attitudes and beliefs held by some, not all, majority firms and their employees.

Another example of discrimination practice that I have personally experienced is at the Agencies' pre-bid conference. The pre-bid meeting is arranged by the Agency and is intended to provide an overview of the project and answer questions that prospective bidders may have regarding the Request for Proposal (RFP). These pre-bid meetings also serve as a networking opportunity for DBEs to meet with majority prime firms for potential teaming. The Agency also addresses the DBE goal requirements for the project. I have occasionally witnessed the majority firms strongly opposing and questioning the Agency's representative as to the need for DBE goals. The tone of their remarks are very racially charged and quite clearly expressing their disapproval of the DBE program and goals. I have heard them state "we can't guarantee the quality or schedule of the project if you force us to subcontract 25–35% to DBEs". They start making all kinds of excuses why the Agency should lower the DBE goal or eliminate it. So imagine approaching these majority firms to discuss subcontracting on this project after just witnessing their openly bigoted beliefs towards DBEs. Unfortunately, these procurements wind up being a "shotgun marriage" and I have found these teaming arrangements rarely turn out well for the DBE. The majority firm will do anything to make the relationship miserable to force the DBE to want to cancel their subcontract relationship. A common practice by some majority firms is holding back payments to DBEs to the point that we are in a serious cash flow situation. The majority firm will claim that they have not yet been paid by the client when in fact they have. They also refuse to adhere to the contract's terms and conditions regarding prompt payment. If the DBE complains to the Agency, this causes an even greater conflict in the relationship.

In my opinion ideally, the DBE program should not only provide subcontracting opportunities but should also foster capacity building for DBE firms by providing meaningful participation. Obviously for this to work it requires a true partnership between the majority prime firm and the DBE that includes a mentoring-type relationship. The goal being that over time the DBE will build the capacity and be able to grow sufficiently to eventually prime opportunities or become an attractive joint venture teaming partner to majority firms. Hopefully some day, majority firms will come to the conclusion that embracing diversity and inclusion benefits us all.

In conclusion, recognizing that the small business sector is the economic engine driving the nation's economy, it is important that DBEs can competitively participate on FRA federally funded railroad projects. The roles and opportunities that the FRA projects can provide will vary from track construction, to engineering/design, to procurement of supplies that are intended to strengthen our rail system nationally. This would mean millions of dollars for minority businesses and thousands of jobs for the minority communities. PACO is ready, willing, and able to participate in FRA projects once the DBE program is implemented. I strongly encourage the Congressional Committee to establish an FRA DBE program so that minority owned firms have the opportunity to participate on these federal projects as well.

Mr. PAYNE. Thank you very much.

Next we have Mr. Gnanadesikan Ramanujam.

Mr. RAMANUJAM. Thank you, sir.

1776, Philadelphia, Pennsylvania: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." This is from the Declaration of Independence.

Greetings, Chairman Payne and members of the committee. My name is Ram, and I am the president and CEO of Somat Engineering. We are a minority-owned consulting engineering business, headquartered in Detroit, Michigan, with offices in Cleveland, Ohio; Baltimore, Maryland; and Washington, DC.

I start by saying, in business, both parties, in fact all parties, must get some benefit. That is an absolute must. My written testimony regarding the bias against minority firms and our difficulty to get work in the railroad industry is with your committee. I have presented three specific instances where I explicitly experienced how it feels to be treated differently because of how I look or how I sound.

Number one, I was told to stay in my disadvantaged/minority lane and not aspire to grow in my profession and to compete with others.

Number two, I was saddled—and I am saddled even right now—with different and unfair terms from all kinds of business partners, such as my financial institution, that many of my other non-minority competitors do not have to face.

Number three, I found out about the racist and the sexist communication that goes on behind the veneer of civility. It is couched as humor, but it is there.

But I am not here to complain. I am here to answer questions and to help make the case that a DBE program is essential to level the playing field for minority firms in the railroad industry.

I am often asked how many times have I directly experienced discrimination, in writing or to my face verbally. My answer is: Not by a person in a position to give work out. No.

But that is not surprising, because someone—anyone—who is engaged in questionable behavior, is unlikely to do so explicitly. The discrimination is subtle. It is unspoken.

I just heard a new term recently, "unconscious bias," "subconscious bias," whatever it may be. However, it is present. It can be inferred. How? By the work that we get—or rather, I should say, the lack of work that we have gotten.

I am also asked to explain many times how a minority firm like Somat has been successful. We have offices in four cities, like I mentioned. If there is discrimination, how did this happen?

But please note, Chairman and Members, the cities that we work in—Detroit, Cleveland, Baltimore, and Washington, DC—it is not by accident that we work in four majority-minority cities. We focus our energies on where we feel welcome, not where we are looked down upon.

Our scriptures called us in my language [speaking foreign language]. We move away from that which is unpleasant and towards what is pleasant.

Despite 35 years of recognitions and awards and a track record of performing higher end engineering services, such as expert review, expert witness, value engineering, we have performed zero—zero—work for the railroad industry and on FRA-funded projects. To me, this speaks volumes.

Well, I end as I began, by saying that in business, all parties must benefit. This program is not an entitlement program, and those who do not perform, DBE or not, must be weeded out. The FRA and the industry will reap the benefit of competition and innovation with this inclusive action.

I welcome your questions. Thank you.

[Mr. Ramanujam's prepared statement follows:]

**Prepared Statement of Gnanadesikan "Ram" Ramanujam, P.E., President and Chief Executive Officer, Somat Engineering, Inc.**

Greetings, Honorable Chairman Payne and other committee members:

My name is Gnanadesikan Ramanujam. I go by one name "Ram" (like Prince and Madonna). I am the president and CEO of Somat Engineering, Inc. (Somat), a Detroit, Michigan, headquartered small, minority, disadvantaged engineering consulting business. I use the word "business" deliberately because in business both

parties must get some benefit, and because "business" depends on "relationships". Business does not, and cannot, co-exist with an attitude of entitlement.

We have been in business since 1986, and we currently provide geotechnical, environmental, civil and structural engineering, construction inspection, material testing and project/program management services. Our focus is on aging infrastructure in our older urban areas, and we have offices in Detroit, Michigan; Cleveland, Ohio; Baltimore, Maryland; and Washington, DC. Our staff level fluctuates between 60 and 100 individuals due to the seasonality of construction work.

Somat did NOT have the Disadvantaged Business Enterprise (DBE) certification for about the first ten years of our existence. We provided services primarily to local municipalities as a subconsultant to local, mainstream engineering consultants. Quality and delivery have been Somat's trademark, and we earned repeat business, as well as some new business via word-of-mouth referrals. We employed between 10 to 20 people up to that point, working on small local projects which had modest budgets.

In the mid 1990s, one of our clients told us about the Department of Transportation (DOT) DBE program and encouraged us to apply for it. We had not worked on any State DOT projects at that time, but our client pushed us to get certified explaining it would help them, as well as us, if Somat got DBE certified.

In 1995, we worked on our first DOT funded bridge project, the Baldwin Road Bridge over I–75 in Auburn Hills, Michigan. After that, our DOT work really took off thanks to a robust DBE program and our continued emphasis on quality and delivery. Within a few years, in 2004, Somat was nationally recognized by the Federal Highway Administration (FHWA) as the DBE Firm of the Year, and I received the award from then Transportation Secretary Norman Mineta in Washington, DC. In 2013, we also received the Historically Underutilized Business (HUB) Firm of the Year from the Conference of Minority Transportation Officials (COMTO) in Jacksonville, Florida. Today, our annual revenue from DOT work runs in six figure dollar amounts for highway and bridge related engineering and construction inspection & material testing work.

We have done similarly well in the aviation sector and have worked on multiple major and smaller airports in Michigan and Ohio, again, thanks to a robust DBE/SBE (small business enterprise) program advocated by the Federal Aviation Administration (FAA). I am pleased to say that the Wayne County Airport Authority (WCAA) in Romulus, Michigan is currently soliciting Request for Proposals (RFP's) for consulting engineering services at Detroit Metropolitan Wayne County Airport that includes a Mentor/Protege provision in the solicitations aimed at increasing DBE/MBE/SBE participation. I say this because in the 25+ years that Somat has provided professional services to the WCAA, this is the 1st time this provision has been included in the RFP's.

I take pride in saying our work has been the best testimonial for our technical competence:

- Somat works for multiple national consulting engineering firms in MI, OH, MD and DC on water/wastewater, highway, aviation, energy, and education projects, with all of them being for repeat customers.
- Somat has worked on several signature private sector projects like the new Detroit Lions football stadium; the new Detroit Tigers baseball stadium; the new Little Caesars Arena (LCA) Entertainment Complex for the Detroit Red Wings and Detroit Pistons; the new Henry Ford Hospital complex in West Bloomfield, Michigan; and multiple automotive suppliers. There is little to no tolerance for shoddy work in the private sector and pay is tied to delivery and quality of services provided.
- Somat has provided expert review services, as well as expert witness services, to national firms, private owners, and agencies in multiple states in the Midwest, and even in Russia for a General Motors plant in St. Petersburg.

Interestingly, and sadly, despite our success over the past 35 years, we find the playing field is still not level for DBE/MBE/SBE firms unless the owners and the agencies promote that concept.

In our own case, the prime consultant that strongly, and repeatedly, pushed Somat to get the DBE certification, waited until we were DBE certified before offering us the opportunity to be on their team. I understand they would have been unable to get the credit for DBE participation if we were not certified, but my point is that the quality of our work would not have been any different whether we were certified as a DBE or not. The fact that the Federal Highway Administration (FHWA) implemented a robust DBE program is the only reason that particular prime consultant gave Somat a chance on that first project in 1995. Without such a program, I have no doubt that Somat would not be doing highway and bridge work today.

Another concrete example of how DBE firms face the challenge of a non-level playing field comes to mind: in 2008, Somat lost our DBE certification because the size standards for small engineering businesses had not been adjusted for inflation. The reaction from our prime consultants was akin to a spigot being turned off. Even though there was not another DBE firm providing geotechnical engineering services (with our quality), the prime consultants removed Somat from their project teams, gave the work to other majority owned geotechnical companies, and tried to meet their DBE commitments by giving other disciplines of design work such as survey, maintenance of traffic, etc., to DBE firms. In some cases, the prime firms submitted good faith effort documentation to the agency to show they were unable to find a DBE to do the work.

This clearly indicated two facts to me: first, the prime firms were pleased with the quality of our work. They were not taking Somat on their team solely because of our lack of the DBE certification. Second, despite being satisfied with our work quality the prime firms gravitated to a non-minority firm when we lost our DBE certification. When a prime consultant chooses a non-DBE, non-minority firm instead of a non-DBE minority firm (despite a long working relationship, expert level work, national recognition etc.), that is a clear indicator the playing field is definitely uphill.

Moreover, when we temporarily lost our DBE certification, other prime consultants stopped taking Somat on their teams for DOT work. I spoke with the leaders of at least seven national and large regional firms about being shut-out. All of them were professional, honest and apologetic. They explained that the only reason they stopped teaming with Somat was our lack of the DBE certification, and they would resume doing business with us if we were to get the DBE certification back.

Our revenue dropped below the federal small business size standard (annual revenue of four and a half million dollars at that time), and we obtained our DBE certification, again. Thankfully, the small business administration adjusted the small business standard after that, and we continue to be DBE certified.

Having been in this business for over thirty years, I have personally experienced situations that definitely felt discriminatory to me. They are hurtful to recall, even now. The way I have handled such instances is to be practical, determine whether this is a client we want to continue to work for, swallow my pride and accept the bad with the good. Life will throw lemons at us, and we have learned how to make lemonade. The alternative is to forget the dream, close the business and work for somebody else. I will mention a few examples of my personal experience with discrimination:

1. We did a fair amount of business as a subconsultant to a large consulting engineering firm in Michigan for the Department of Transportation. As we gained experience, developed some relationships at the agency, and gained confidence, we started pursuing some smaller projects as a prime consultant. We were even successful in winning a prime contract and getting the best of this consultant in the process after declining to be their subconsultant on that pursuit. They were not pleased, and let us know very clearly that if we were to stray from the DBE lane and compete as a prime consultant, they would not work with us. Subsequently, they declined to be our subconsultant for a proposal we were well positioned to win and in fact, did win. It is the prerogative of a business to decide who they do business with. However, in this instance, I felt we were being schooled and put in our place as a minority owned firm for daring to dream that merit, quality and delivery of professional engineering services is what matters. One's socio-economic status or race should not determine one's dream nor the outcome for that matter.
2. Even the most basic of business functions can be, and is, a challenge. Banking is one example. We struggled to get a line of credit from a bank when we opened for business, and frequently used personal credit cards and short-term personal loans to make payroll. However, after 35 years in business, we find that banking is still a challenge. Despite *never* having missed payroll, paying payroll taxes in a timely manner, *never* filing for bankruptcy, having managed our line of credit responsibly, having the requisite insurance coverages, using our personal home equity line of credit, etc., I still have to provide a personal guarantee to the bank that allows them to take anything and everything in my name or in my wife's name should we default on a loan or the line of credit. In speaking to other non-minority companies of our size, I have not found a single firm that requires their major shareholders to give a personal guarantee to their bank. This puts tremendous pressure on me, and impacts every action and reaction of mine. Someone who is not in my shoes cannot understand my situation.

3. About twelve years ago, I received an email from a senior level management person with a company we do business with. The subject line was innocuous. When I opened the email, it consisted of several racist and sexist jokes. I was one of many recipients, and I was the only minority recipient. I felt that I was included by mistake. While I knew this person somewhat well through professional dealings, we did not have the relationship to share such jokes. Neither the sender nor I ever brought this email up, later. I would not have guessed that this person or many of the other recipients would be enjoying such dark, discriminatory, humor behind our backs. Thoughts lead to actions, and I wonder how much influence this attitude has on the teaming decisions of such leaders. Considering the difficulty of being selected for a prime consultant's team when there is no DBE goal, such an attitude clearly has a lot of bearing on who gets the call to be on the team.

Coming now to the Federal Railroad Administration (FRA), and to the railroad industry more particularly, this is our experience:

Zero! Zilch! Nada!

Yes, it is true, and it is troubling, that in 35 years of being in business successfully, Somat has not worked for the railroad industry, nor have we worked on any FRA funded project.

This begs the questions, "Is Somat interested in railroad work and did Somat pursue railroad opportunities?" I shall attempt to answer both these legitimate questions.

To the first question, yes, Somat is definitely interested in railroad related engineering and construction inspection, material testing and project/program management work. We are passionate about, and are in the business of, infrastructure consulting and engineering. Railroads are an integral part of infrastructure.

Moreover, having grown up in Africa and in India during my younger days, I have observed how passenger rail benefits the lower economic classes of society who do not have the means to own their own cars, or purchase their own plane tickets. After coming to the United States, I saw with my own eyes the even starker disparity here. Therefore, I have an interest in railroad work from a social, humanitarian and moral angle, as well. Equity in transportation is a civil right.

To be clear, it is not as though Somat has not done any work related to railroads in our thirty-five years in business. We have worked on multiple railroad grade crossing improvement projects, grade separation projects and some light rail projects. The key point to note is that all of Somat's work for these projects was performed for either State agency, County government or local municipality contracts, primarily as a part of their roadway/highway programs. Not a single railroad project Somat has worked on was performed for the railroad industry or for FRA funded contracts.

Coming to the second question, has Somat pursued railroad work? The short answer is, "Not vigorously." Let me explain.

As I stated in the beginning, business depends on relationships and relationships are developed over time if, and that is a big IF, there is an opportunity to make a personal connection. There is no question of relationship when there is no personal connection.

This really translates to the age-old question of the chicken or the egg—getting selected to be on a team versus having the necessary experience to be selected. Why would the railroad industry take a chance on an engineering firm that has never designed tracks, signals, or structures before? Having said that, how will Somat and other DBE firms ever gain the necessary experience to be selected?

Consider the following:

- Somat works for several national and international infrastructure engineering and consulting firms for other modes of transportation, and for other sectors of infrastructure such as water/wastewater, energy etc. These firms are involved with railroads, but they have never taken us on their teams for railroad work. There is no incentive, and so, they do not want to risk losing a contract because of having an inexperienced DBE subconsultant on their team.
- Somat has worked on railroad crossings, grade separations, bus stations, transit centers, major utilities, and multiple large and complex buildings. Our skills are pertinent, and transferable, to structures and infrastructure related to the railroad industry. However, we cannot show past experience working for the railroad industry or on FRA projects.
- Somat has experienced, first hand, the instantaneous change in the reception we get due to the loss of the DBE certification. When such is the case, even with a robust DBE program, it is not difficult to fathom the reception we see in the railroad industry in the absence of a DBE program.

- At Somat, we have asked the larger firms and looked at RFPs and RFQs from the railroad industry to try and branch out. However, running a small, disadvantaged business takes a lot of time and when you factor in—cash flow issues, line of credit issues, staffing issues, etc., that disproportionately impacts minority DBEs. Time is the one resource that cannot be replenished, and we do not have the luxury of wasting it on pie-in-the-sky pursuits which is what the railroad industry is for us, without a DBE program by the FRA.

There is a bias that is not favorable to minority DBE firms, able and looking to do quality work in the railroad industry. It may be unintentional (in some cases), but it is present, it is subtle, and it is systemic. The experience of this bias cannot be explained because it takes one to know one. The experience of enjoying a rare, fine, wine cannot be explained in a million words. One has to actually taste the wine. However, we can infer or conclude there is a bias against minorities in the railroad sector based on actual data. What percentage of railroad work goes to minority owned companies, compared to the percentage for highway, transit, aviation or maritime work that goes to minority owned firms? Anecdotally, the numbers are not even close and speak louder than I could ever shout.

At this juncture, I must state that Administrator Amit Bose is doing all that is possible to help minorities and DBEs, given that he inherited this situation. In 2015, Congress mandated that FRA perform a disparity study in the FAST Act Bill. This was put on hold indefinitely by the Trump administration. Administrator Bose has picked it back up and is currently executing the disparity study. In addition, the administrator has been responsive to organizations such as the Conference of Minority Transportation Officials (COMTO) that work hard to level the playing field. However, he cannot do this by himself. He needs help.

I strongly plead to you, Chairman Payne and to your committee, to set right this inequity. Other transportation modes within the US DOT all have robust DBE programs, and have given opportunities to DBE firms. It is imperative, and only fair, that the FRA also have a DBE program.

I end as I began—in business both parties must benefit. The DBE program is not an entitlement program. *The DBE firms must deliver the goods*. Firms that do not deliver will drop off or will be dropped off. Prime consultants and the industry will still have options such as Good Faith Efforts to ensure they are not saddled with non-performing DBE companies.

On behalf of the DBE community, I am requesting you to open the door. It is up to DBEs to earn our seat at the table, but absent the opportunity to even make the interview cut, we will be destined to languish forever outside the door.

I will be more than happy to answer any questions. Thank you for your time.

Mr. PAYNE. Thank you very much. I think that is a very important point you made. This is about leveling the playing field and everyone having the opportunity to compete in this great Nation.

Next, we will have Ms. Evalynn Williams.

Ms. WILLIAMS. Thank you, and good morning.

I am the president and CEO of Dikita Enterprises, a family-owned minority engineering firm located in Dallas, Texas. We will celebrate our 42nd year in business this month. In the transit and rail industry, we provide civil rail design, rail program and construction management, and transit market research.

My father, Lucious Williams, founded the firm in 1979 in Milwaukee, Wisconsin, and moved the firm to Dallas, where I was attending college, in 1983.

I am currently an executive board member of APTA, which is the American Public Transportation Association, and I am the first African-American female to chair APTA's Business Member Board of Governors.

When we started the business in 1979, minority programs, such as the Minority Business Enterprise program, was the only way we could get work. Sadly, today, that continues to be the main driver.

I remember my father applying for certification in 1983 and having to report on paper his recollections of how he was discriminated against. It was one of the many requirements of the long, arduous

certification process. I recall how painful it was for him then and how I learned about the awful experiences he had endured.

In the 1940s, when my father was younger, he played for the old Negro Baseball League and played for the Memphis Reds. He explained about being called racial slurs and having to go around the back to get leftovers from diners. When he was on the road, they weren't allowed to go into the White-owned establishments or sleep in regular motel beds. He and his team often slept on the bus or in cars.

I think this is where my children and I get our "can-do, don't stop, get it done" attitude. Being pioneers as the first Black firm to get Government contracts—or one of them—we were often targeted. We survived, however, despite the many hurdles we had to climb, hurdles that are extra because we are a Black engineering firm.

Unless you walk in my shoes, you have no idea how unconscious the typical nonminority is about understanding these microaggressions.

I remember, less than a decade ago, we competed for a project from a midsize transit system in another State. We did our homework, we understood the local politics, and we won the project.

During the negotiations, however, we ran into a problem. While our fees were acceptable and our references did check out, the procurement officer was not comfortable in awarding us the project. He asked me for my tax returns, my financials, my banking credentials.

This was not typical. And as I gathered this information, I became angry. I called his boss, who I knew through transit associations, and I complained. And when the officer called back, his tone had changed.

I asked him, "Why were you treating me so differently?" He told me and confessed that he had never awarded such a large project to a Black company and he was just trying to ensure that we were financially able.

The DBE program provides equity, which in turn helps to build financial capacity and workforce resources. However, being called "disadvantaged" is not a privilege, nor does it sound like a goal a company would strive to be. Quite frankly, it was embarrassing explaining this to my 22-year-old millennial why we were considered a disadvantaged business.

It was then that I had the opportunity to recall my experiences as my father recalled some 35 years earlier. Fast forward, it was only a matter of time that she has now begun to have her own stories.

Large corporations would self-perform 100 percent of the work if left unchecked, just as they do in the private sector.

Once I was a member of a panel discussing the merits of the DBE program. The panel was comprised of industry professionals. To my surprise, one of the panelists of a very large firm openly admitted that, if it was not for the DBE program, they would not subcontract to DBE firms.

He felt as though there should not be such a program and that the entire process was not warranted. He did not see this as discrimination but his right to contract as he pleased.

His remark, it was hurtful, but it was not surprising. These are just a few episodes regarding practices that either keep minority firms small or run them out of business, especially African-American firms.

Regarding work on an FRA, we have only had one project about 10 years ago. It was a customer satisfaction survey for Amtrak. But the fact that the FRA does not have a DBE program speaks volumes as to why we only had one single project in the last 42 years.

The services and skill sets we offer to FTA- and FAA-funded projects are much transferable to the FRA rail projects. And I hope that the FRA will adopt a race-conscious DBE program.

Thank you.

[Ms. Williams' prepared statement follows:]

**Prepared Statement of Evalynn A. "Eve" Williams, President and Chief Executive Officer, Dikita Enterprises, Inc.**

My name is Evalynn Williams. Most people call me Eve. I am the President and CEO of Dikita (pronounced Da Kee′ ta) Enterprises, Inc., a family-owned minority consulting engineering and architectural firm headquartered in Dallas, Texas. We will celebrate our 42nd year in business this month. In the transit and rail industry, we provide civil rail design, rail program and construction management, and transit market research. We employ 35–45 professionals from diverse nationalities, many whom are woman and/or of a minority classification. My father, Lucious Williams, founded the firm in 1979 in Milwaukee Wisconsin and moved the firm to Dallas, where I was attending college in 1983. I promised him 2 years as his CFO in exchange for paying off my $5,000 college loan. That was 38 years ago, and we've been partners ever since. Lucious owns 51% of the firm and I own 47%, while my oldest daughter owns 2%.

We offer our services to mainly the governmental sectors, that are federally, state or locally funded. We have two division. Our engineering division provides services to public transit, highways, aviation, public educational institutions, including K–12 and higher education, municipalities for roadway and infrastructure projects. Our transit planning division provides market research to the transit industry. We have worked on multi-billion-dollar projects as well as those under $100,000. We have worked across the nation providing a variety of services, typically transit market research. We are certified in 19 locations across the nation. Being certified in many areas allow us to participate with different transit and rail properties.

I have a BBA degree in information systems and an MBA in accounting. I serve on several civic boards and have won my share of awards. I am currently a member of COMTO and the American Public Transportation Association (APTA) board of directors. I am also the first African American female to chair APTA's distinguished Business Members Board of Governors. APTA membership includes at least 90% of all public transit organizations in North America and practically every large national commercial firm that does business with public transit authorities.

In 2010, I became President and CEO of Dikita, and my father has remained active as the Chairman of the Board and Director of Government Affairs. Being a female, an African American, and a small business in the construction industry has had many challenges. There are certain systemic stereotypes that are associated with all the classes of categories I've mentioned, but typically they all have one thing in common. There is the general mentality that women and/or African Americans produce inferior work products. These certainly aid to create barriers for successfully contracting and being relevant in the industry. Of all these labels, I think being African American, however, presents the biggest challenge when competing for work.

When we started the business in 1979, minority programs, such as the Minority Business Enterprise (MBE) program was the only way we could get work. Sadly, today that continues to be the main driver. I remember my father applying for certification in 1983 and having to report on paper his recollections of how he was discriminated against. It was one of the many requirements of the long arduous certification process.

I recall how painful it was for him then and how I learned about the awful experiences he had endured. It isn't a typical conversation a father or a man has with

his daughter. In the 40's, when my father was younger, he played for the Old Negro Baseball League and played for the Memphis Reds. He explained about being called racial slurs and having to go around to the back to get leftovers from diners. When they were on the road, they were not allowed to go into white-owned establishments or sleep in regular motel beds. He and the team often slept on the bus or in cars. Sometimes, there were Black families who agreed to let him and his teammates sleep at their houses. Having to explain instances of discrimination during the MBE certification process was an opportunity for me to learn history including the painful parts of racism. I think part of our success today comes from the strength and determination he endured growing up. This is where my children and I get our "can-do, don't stop, get it done" attitude.

I believe his courage and relentless posture are why we are still standing today. We were the first Black firm to get prime contracts in most of the local federally and state-funded government civil engineering projects in Dallas. Even after 40 years we still make history occasionally being the first African American firm to prime projects in our local Dallas/Fort Worth area. Many of the firms we began with in the early 80s no longer exist for various reasons, but mostly because of the lack of resources, opportunities, and determination to withstand. Today, we are the oldest African American professional engineering firm in North Texas.

I remember, less than a decade ago, we competed for a project from a mid-size transit system in another state. We did our homework, understood the local politics, developed a great team and submitted a winning proposal. The services we offered were part of a niche market and not many companies compete in the transit ridership survey market. We were shortlisted and granted an interview. The day before the interview we practiced with our team until we were perfect. The next day we walked away from the presentation knowing we had won. During negotiations, however, we ran into a problem. While our fee proposal of $400,000 was acceptable and our references had checked out, along with the previous experience, the procurement officer was not comfortable awarding the project. He asked me for tax returns, financials, and bank credentials. This was not typical. As I gathered this information, I became angry. This was unusual. So, I refused. I called the officer's boss and explained the situation and how offended I was. When the officer called back his tone had changed. I asked him why he was treating me differently. He told me that he had never awarded such a "large" project to a Black company and he was trying to ensure we were financially able to complete the work. He didn't realize that his admission was discriminatory. He actually felt that an African American company would not be able to complete the job. Did it bother me? Not really. It was just blatant discrimination. What bothered me most was the "normality" of it all. He was being truthful and ignorant. As an African American, I always know, it just rare that people admit it. The bigger picture was winning the contract and doing a great job.

Being a disadvantaged business has certainly helped level the playing field. As the CEO of a 2nd generation African American engineering and architectural firm, we would never have sustained had it not been for disparity programs such as the Federal DBE Program. Competition for prime contracts with the US Department of Transportation would be very difficult at best, and out of reach for most minority and women owned businesses (M/WBE) if it was not for the program. Being the proprietors of an African American consulting engineering firm is a rarity, relative to the majority of engineering firms in the US. It is also a rarity among African American owned businesses. We have been able to sustain mostly because of USDOT's FTA, FAA, and FWHA DBE programs, along with local SBE and MBE programs. I am certain without these initiatives and goals, we would not still be in business, at least not in this industry.

It is almost impossible for DBE firms to compete with large national and international firms. They have the capacity and depth within their workforce and can pull from global office locations. And over the last 15 years, they have gotten even larger, which makes the expansion of the DBE Program is so extremely critical to firms such ours. It provides us with opportunities to join a team as a subconsultant, a prime or joint venture partner, which in turn helps to build financial capacity and workforce resources. It's because of the DBE program, Dikita had an opportunity to have a leadership role in a joint-venture with a large majority firm to design and build the last 3 miles of Dallas Area Rapid Transit system (DART) light rail system. Sixty-one percent of contract dollars went to DBE firms. This experience is an example of an agency that is serious about DBE programs. When a system is serious about DBE participation, it encourages larger firms to form associations with smaller firms who ordinarily wouldn't have a chance to "sit at the table". The lessons and the viewpoint when you are a prime of a large rail construction project is much different than the view from the bottom up. It's not business as usual. In fact, it was

probably the first time in my life that I had the opportunity to be at the helm of such a large contract and award contracts to so many smaller firms. We had 15 subconsultants, all women or minority-owned. The pride and work ethic of this team was powerful. We saved the agency over $4 million and DART was able to open for revenue service 2 months ahead of schedule. We all had ownership and we all felt engaged.

This is a great example of how the DBE program can help to grow smaller firms. However, being called "disadvantaged" is not a privilege nor does it sound like a goal that a company would strive to be. The reality is, without the program we would not have a fair chance at competition. Quite frankly, it was embarrassing explaining to my then 22-year-old millennial, why we were considered a disadvantaged business. I can tell you that we had an engaging conversation and a history lesson spun from this exposure. My daughter had no idea of the struggle or the blatant discrimination my father and I experienced over the years. It was then I had the opportunity to recall my experiences, as my father had recalled and disclosed to me some 35 years earlier. Fast forward, it was only a matter of time that she had stories of her own. This is unfortunate because she has witnessed how easy it was for her college buddies to advance to higher positions with salaries that allowed them to live in much better apartments. As an African American, the possibility of advancement is much more of challenge. However, she has the generational tenacity to forge ahead, especially knowing what's ahead.

As I explained to her, had we not become certified, we would not still be in this business; no matter how well we performed. The positive effects of the DBE program are evident when you look at private vs. public work. We do not compete well in the private sector where the work is typically won by the "good ole boys". In the public sector, large firms contract with us only to the extent that it will help them win the project. If the goal is 25%, then they will typically subcontract only that minimum amount, even though we are a proven entity and have the experience and capacity to handle much larger tasks. And if the goal is 25%, there might be 3 firms sharing that percentage. I've actually had conversations with firms who have admitted that they would not subcontract any work had there not been for a requirement.

The truth is . . . if not for the DBE Program, large corporations would not share the work and would self-perform 100% of contract-work. This is very likely in the private sector. And sometimes, I think larger companies really regret having to share government-funded projects. Once, I was a member of a panel discussing the merits of the DBE program. The panel was comprised of industry companies and government agency staff. The audience included suppliers/manufacturers, engineers, consultants, large and small businesses, government staff and others. Each member of the panel discussed their experiences with the program. To my surprise, one panelist of a very large firm openly admitted that if it were not for the DBE program, he would not subcontract to DBE firms. He felt as though there should not be such a program and the entire process was not warranted. He did not see this as discrimination but as his right to contract as he pleased. His remark was hurtful, but not surprising to me. It just further justifies the need for equitable programs to lessen the consequences the past discriminatory practices.

The firms I do business with are typically not as obvious as the ones mentioned above. Case in point. We were going after a project in a small suburban community near Dallas. I found out about the request for proposal because I had very strong relationships in that community. Much of the project was within our wheelhouse and we felt certain we could successfully propose and win. Since there were parts of the work that others could do better, we reached out to a nationally known local firm that we had worked with in the past. They were not aware of the opportunity. What happened later was shocking but not surprising. In an email thread that was inadvertently sent to me, I read a discussion that went something like this (all names are fictitious and are here to make the conversation easier to understand):

- John informed his boss Ted of XYZ company that I had called about them subcontracting to us to provide service on an upcoming proposal.
- Ted asked about scope and John explained it and thought Dikita and XYZ could do well since they have worked together in the past.
- Ted asked about the minority participation goal.
- John told him that there was no minority goal.
- Ted asked John why they would sub to Dikita.
- John reminded Ted that Dikita was very good at providing these type of specialty services
- Ted told John that XYZ was bigger and to dig into the opportunity.
- When John asked about participating with Dikita, Ted told him that since there was no minority participation, they would just do the project themselves.

- When John questioned Ted again, Ted told him that XYZ was bigger and to reject our offer.
- This is when John sent us an email rejecting our offer and inadvertently included the entire thread.

This kind of conversation among large majority firms is not unusual and is a matter of practice. And often we only suspect or hear about why we were rejected from a third party. However, this was played out in an email and was so painful and disappointing.

These are just a few episodes regarding practices that either keep minority firms small or run them out of business, especially African American firms. It's common knowledge that minority businesses often live month to month unless we have been successful in backfilling our pipelines with future projects. One of the most disheartening feelings is to know that you are only as good as the current project. We have had many relationships with larger firms and have provided excellent service, but it's never quite the excellent services in which you are remembered. We are the token DBE checkbox that fulfilled the requirement. This I say because I have witnessed the less than genuine relationships we have forged. We can perform exceptionally well for many years on a 5-year large project. However, I notice that when that same large firm is going for the exact project-type in another state, they will not invite us to the team. When I've asked about being on the team, the reply is the same, "we needed you in Dallas, we have to use someone else in Houston". When I question why, the answer is always "because you are only useful in Dallas and taking you to other cities or states doesn't help us to win, it's political", even if we are the best in providing the services required. Well, that mentality keeps firms like mine small and confines us to our own neighborhoods. This is sometimes the unintended consequence of the program.

Regarding work on an FRA project, we have had only one. We did do one project with a majority firm about 10 years ago. It was a customer satisfaction survey for AMTRAK. But the fact that FRA does not have a DBE program speaks volumes as to why perhaps we have had only a single opportunity in all of our 42 years. If majority firms were required to fulfill a goal, we would have had the opportunity to participate on a lot more projects because those firms who always get the work would have to share the work. If the USDOT was interested in helping firms of color, it would be natural for the railroad administration to mimic what the aviation, highway, and transit systems are doing to grow firms. Afterall, we want to Buy America or Buy American, but if we do not grow American companies to the point of sustainability, this initiative will fail. More of America is becoming a melting pot of the races therefore it seems the logical and most direct way to ensure that we are the America for all Americans, we ought to consider ensuring that the playing field is level across all of the USDOT's departments. Not just the well-funded and convenient ones. High Speed rail is coming. America is ready to catch up with the rest of the world. But who's going to build it?

In conclusion, the disparity, and the inequities of our capitalistic society, coupled with the injustices from America's history of discriminatory practices against African Americans specifically, are reasons that DBE program must continue to exist and expand. This program is not a handout, it's a leg up. It forces the big companies and big government to play fairly, and quite frankly without it, we would be out of business at the expiration date of the last contracts in our pipeline. We'd love for the FRA to catch up with FTA, FAA, and FWHA. The services and skillsets we offer FTA funded projects are very much transferable to FRA rail projects.

Mr. PAYNE. Thank you very much.

We will now move on to Members' questions. Each Member will be recognized for 5 minutes, and I will start by recognizing myself.

I ask unanimous consent to include for the record the written statement of the Association of American Railroads.

Without objection, so ordered.

[The information follows:]

**Statement of Ian Jefferies, President and Chief Executive Officer, Association of American Railroads, Submitted for the Record by Hon. Donald M. Payne, Jr.**

On behalf of the members of the Association of American Railroads (AAR), thank you for the opportunity to submit this statement for the record. Freight railroads operating in the United States are the most productive and cost-effective in the world, connecting businesses with each other across the continent and with markets overseas through a private rail network spanning close to 140,000 miles. AAR members account for the vast majority of America's freight railroad mileage, employees, revenue, and traffic. Amtrak and several major commuter railroads are also AAR members.

In recent years, railroads have also invested an average of $25 billion per year—$740 billion since 1980—to maintain and modernize its private infrastructure and equipment, and to research and develop new technologies that will ultimately serve to improve safety and reduce greenhouse gas emissions. As a result of these efforts, the American Society of Civil Engineers has given the nation's rail network its highest grade as part of its Infrastructure Report Card. The net economic impact of these investments and rail operations generally is tangible. In 2017, Class I freight railroads supported 1.1 million jobs (approximately eight jobs for every railroad job), $219 billion in economic output, $71 billion in wages, and $26 billion in tax revenues. In addition, millions of people work at firms, including the tens of thousand of firms that are rail suppliers, that are more competitive because of freight railroads. Sustaining these critical investments will be essential for freight railroads to meet the anticipated 30 percent growth in freight transportation demand by 2040 and ensure that our nation's families and businesses receive the goods they need.

Maintaining a privately owned railroad network touching virtually every state in the nation requires a broad range of capital and maintenance spending on infrastructure, technology, equipment, and services. Examples of products and services often provided by diverse-owned suppliers include construction services, equipment rentals, environmental services, information technology services, leadership training, legal services, lodging, machining and tooling, railcar lubricants, relocation services, staff augmentation, signal materials, and video production services.

SUPPLIER DIVERSITY

For many decades, the nation's major freight railroads have been committed to fostering diversity in supplier networks, as diversity is an effective way to promote innovation, reduce costs, and improve service competition. This competition can also introduce new products, services, and solutions that might otherwise be unnoticed. In many cases, competition spurs further investment in the communities in which railroads operate, promoting job creation at the local level.

Today, inclusive procurement is a core value of the leadership of the freight railroad industry. The railroad industry recognizes that commitment at the highest level of management is key to a successful supplier diversity program. Railroads have appointed specific individuals and diversity supplier teams within their companies to provide accountability, measurable tracking, and reporting milestones for senior management.

To achieve results, the major Class I railroads have all initiated Supplier Diversity Programs aimed at disadvantaged, minority-owned, women-owned, and veteran-owned businesses. These programs operate in a variety of ways to generate annual improvements in the diversity of suppliers used by the railroad industry.

EXPANDING OPPORTUNITIES FOR DIVERSE-OWNED SUPPLIERS

Railroads use a variety of strategies to expand the diversity of their supplier base. Some of these efforts include:

- Maintaining web-based portals for potential suppliers to submit profiles of their companies. This allows for suppliers to make themselves known to the railroads and to remain visible on an ongoing basis. Based on the materials and services noted, profiles can then be routed to appropriate sourcing teams. Managers in charge of supplier diversity actively monitor these portals and serve as a liaison between the railroads and their suppliers;
- Partnering with certification councils and other supplier diversity professionals;
- Sponsoring and participating in national, regional, and local events, such as one-on-one matchmaker meetings, roundtable sessions, business fairs, developmental sessions, and new member orientations. For example, certain railroads work with the following organizations: the National Center for American Indian Enterprise Development; the National Minority Supplier Development Council

(NMSDC); the NMSDC Transportation Industry Group; the U.S. Hispanic Chamber of Commerce; the U.S. Pan Asian American Chamber of Commerce; the Women's Business Enterprise Council; the Woman Owned Small Business; various veteran support groups; the Agenda for Building Capacity; the Hispanic Contractors Association; the Hispanic American Construction Industry Association; and the Supplier Diversity Professional Work Group;

- Connecting current and potential disadvantaged businesses with buyers at other corporations to foster opportunities throughout the supply chain;
- Serving on boards of directors and on other committees, such as regional Women's Business Enterprise Councils and the National Minority Supplier Development Council's Transportation Industry Group;
- Advocating within the railroads for qualified suppliers through ongoing project status meetings, supplier review sessions, and buyer participation in events; and
- Guiding non-certified suppliers to become certified as a diverse-owned supplier.

### CREATE

By way of example, the Chicago Region Environmental and Transportation Efficiency Program (CREATE) is a public-private partnership underway to complete roughly 70 railroad-related infrastructure improvement projects in the Chicago region. These projects include building and repairing tracks and structures, upgrading signals and technology, and improving safety and delays at certain railroad crossings. CREATE partners, which include federal, state, city and county governments, major freight railroads, Amtrak, and local transit, have worked collaboratively to promote supplier diversity since its inception in 2003. A diverse supplier base has been actively recruited and encouraged to submit bids on projects, and data show that targets have often been met or exceeded. The most recent data, for example, show that 23 percent of the work performed on ten completed railroad projects, with $37 million in contracts awarded, went to disadvantaged business enterprises. This exceeded the target goal of 21 percent. The CREATE partners have hosted a series of disadvantaged business enterprise contractor diversity workshops in recent years to highlight upcoming bid opportunities within the CREATE Program. The most recent virtual workshop occurred in April 2021 that included participation with several local elected officials.

### Effective Vetting Processes

Freight railroads have established vetting processes to ensure that suppliers meet their requirements for a diverse-owned supplier. Part of that process is ensuring that a supplier qualifies as a disadvantaged business, including that the business must be at least 51 percent owned, operated, and controlled by a qualifying member of a diverse population (such as a veteran, minority, person with disabilities, female, or LGBT). This may also include reviews for qualification under certain governmental designations, such as HUBZone, Small Disadvantaged Business, Disadvantaged Business Enterprise, and 8(a) Business. Qualified owners must have control of the company and be active in day-to-day management and daily business operations.

### Labor Agreements and Outsourcing

Approximately 84 percent of Class I railroad employees are unionized. Through collective bargaining, management and labor agree on the parameters of pay, benefits, and working conditions, as well as the types of services that can or cannot be outsourced. Depending on the project at hand, opportunities for contracting for services outside of the railroad labor workforce may be limited or not permitted. When labor agreements do allow for outsourcing, the railroad industry actively seeks diversity in its supplier network.

### Conclusion

AAR member railroads are committed to proactively identifying, attracting, and developing long-term partnerships with diverse and disadvantaged businesses. Doing so makes good business sense; it enhances value, competition, and innovation; and it is reflective of railroads' customer bases and the communities they serve.

Mr. PAYNE. Ms. Williams, let me start by commending you for being here today and publicly sharing what is certainly an uncomfortable and unsettling experience. It is deeply troubling to hear that your company did not receive fair consideration for a project because there was no minority participation goal.

If these goals were in place for projects and you had the opportunity to fairly compete, in what ways do you think that would have changed your business?

Ms. WILLIAMS. One of the things that is troubling and is often a challenge for small and minority contractors is the ability for sustainability.

As you know, in our arena, we live by projects, projects after projects, and the only way that you can be truly sustainable and successful in this business is by having continuous work. By having continuous work, you are able to have the workforce to move from one project to the other.

Many times what happens to small businesses and African-American businesses is that when the project is over, many times you do not get that continuity between projects, so you end up losing your workforce.

And you know what is worse? What happens more than often is that your staff is now absorbed by your prime contractor, your prime consultant. You look around and your people are working for their people and advancing. And there you are left looking for more people.

So that is the major reason why I think it would change.

Mr. PAYNE. Thank you.

Mr. Canty, I found your testimony quite profound in that you knew from a young age that you wanted to work in the rail space and continue to do so, despite the racial discrimination you have suffered.

One of my priorities in examining racial discrimination in the Federal passenger rail contracting space is ensuring that minority men- and women-owned businesses have opportunities to build capacity and grow as large as multinational construction firms.

If minority contractors like yourselves were not systematically excluded from the same kind of starting opportunities that were given to large multinational construction firms, what impact would that have?

Mr. CANTY. In 2014–2015 where we reached our apex, particularly when we were doing work with Amtrak, we were trending at 38 employees, we were in 14 different States, 5 regional offices, and were working on an international office in Bulgaria.

If we had been allowed to continue to move forward without this discrimination, we would have been definitely probably into our fifth or sixth large bridge demolition contract. The first one we did was in Charleston, South Carolina, in 2016 to 2017. We would have been probably a force of 50 to 100 employees at least. Definitely would have been in the $20 to $30 million range. And we would have actually been knocking on the door of not qualifying for the DBE program anymore, which is the whole point of the program, is not to qualify for it.

Our goal was by 2018 to 2024 that we would have been exiting the DBE program. So we would have been playing a major role,

and a major employer, particularly in Black and Brown communities, because we did have a program of hiring folks from the— we had literally a prison-to-work pipeline that we had enacted where we were hiring folks coming out, because construction is one of the industries that you can start from the bottom and go right to the top no matter what your background is.

I have to tell you, the places we would have been would have been unlimited. The construction business, with all its issues, is still one of those businesses that you can do very well if you work hard, as long as you don't have to deal with the systemic discrimination.

Thank you.

Mr. PAYNE. Thank you very much.

Now I will go to the ranking member, Mr. Crawford, for 5 minutes.

Mr. CRAWFORD. Thank you, Mr. Chairman. I appreciate the opportunity.

I just want to, to any of the panel that want to comment, what would you identify as the single biggest barrier that minority- and women-owned contractors face in receiving contracts for passenger rail projects?

Mr. RAMANUJAM. Well, sir, it is a classic case of the chicken or the egg. It is extremely difficult to compete for business when we cannot show any experience, and we cannot show any experience because we have no opportunity to get it. So, a lot of times that is what I have been told, that, "We like you, but you do not have the experience." That has been a challenge for us.

Mr. CRAWFORD. Thank you.

Anybody else want to weigh in on that?

Mr. CANTY. I would also add the financial constraints, some of them particularly unique to the minority business community.

So, in order to get funding, including bonding, you have to have a certain net worth, or if you don't, then you basically hand over everything you own except a table and four chairs to the bonding company. But in order to be a DBE, you can't exceed a certain net worth.

So, what we are finding is you get in, even if you get the financial background, sometimes owners, but definitely these primes, are using the bonding company in a term from the 1980s called "bond 'em and break 'em." They will bond you, they will break you through the contract, you will lose everything you have, and you can't even start over at that point.

I think the financial constraints are one of the biggest barriers of entry. And the rail work requires significant insurance, and that shouldn't change, but there has got to be some look at how you can be financially viable and not have it used against you.

Mr. CRAWFORD. Ms. Williams, anything to add?

Ms. WILLIAMS. I wanted to ask you to repeat the question, please.

Mr. CRAWFORD. Sure. I am just trying to get a sense of what you find to be the single biggest barrier to being able to compete in receiving those contracts for passenger rail projects.

Ms. WILLIAMS. I don't know if you are speaking of within the DBE, that arena that has established a DBE program, or you mean the FRA nonestablished——

Mr. CRAWFORD. Well, we have established that the FRA doesn't have a DBE, and so I am just trying to gauge the degree of difficulty and what is the single biggest barrier in that space outside of the DBE, what you find the most challenging.

Ms. WILLIAMS. We probably can go back and look and see who is getting the projects, and they are probably the same guys that are getting the projects every time. And as long as they are getting them every time and then they don't have any kind of goal to bring anybody new, or bring in smaller or minority companies, they will continue doing what they are doing.

So, the barrier is that there is a barrier. Nobody is going to—if I have been getting the contract for years and years, why would I bring on a small minority company? So, the barrier is because there is no incentive to do anything different.

Mr. CRAWFORD. Mr. Clark, anything to add?

Mr. CLARK. First of all, I agree with all our panelists here. But I have to break it down to a matter of greed.

The prime contractors do not want to sub out any work that they do, because that is where they make the most money. So, they want to relegate you to smaller areas, such as trucking or maybe supplying materials.

We as a rail contractor want to do rail projects. And we perform well when we are given an opportunity. But if they don't have to, unless they have an incentive to give out work that they do, they will not, and we find that to be a barrier to moving forward.

There are some companies that have made it a habit of not giving out anything related to what they may do. And so, it is more difficult for us to break into the market. And if we do break into the market, then we become a hindrance to everybody there. Now everybody has to listen to us and listen to us trying to come in and do the work.

Mr. PAYNE. Thank you. The gentleman's time has expired.

We will now move on to Mr. Carson for 5 minutes.

Mr. CARSON. Thank you, Chairman.

I really appreciate the testimony today and the leadership of our Chairman Payne.

What do you all think would be the most impactful way to increase the number of Black and Brown professionals in the rail sector overall and the passenger rail sector in particular? Is this led by industry or is there more action needed from the FRA or DOT or even Amtrak to better implement programs that are already in place? And what new efforts might we consider? And what can the subcommittee do to advance diversity in aviation?

Ms. WILLIAMS. I would like to answer that.

One of the things that has to happen is what I see—and I have to commend the agency that has given me probably my biggest leg up and the most work, and that is Dallas Area Rapid Transit. And what they do is it starts at the top. It starts with the CEO. It starts at the board level. And it encouraged—everyone knows, who goes to work for DART, that you are going to start off with the

goal, but that is the minimum. That is the floor. You are not going to win if the goal is 30 percent and you come in with 30 percent.

And case in point, we had a project that we had—I ended up as a joint venture partner 50/50, and we brought on 15 different minority subs. We saved the agency $4 million, and we brought it in 2 months ahead of time. And the participation on that project was 61 percent. That doesn't happen unless it starts from the top down.

Mr. RAMANUJAM. Representative Carson, this is Ram. Trickle-down economics just does not seem to work when it comes to getting work with the railroad sector. So, to your question, would industry be the right people to take the charge? We have not seen that be effective. It has to be basically both a carrot and a stick approach from the Federal Government to ensure that there is some incentive for smaller minority firms to get some work. So that is what we feel.

Mr. CANTY. Kenneth Canty with Janus. You know, you have got a lot of these bad actors out there. They are typically large, large companies because they get away with this stuff. And I think the most effective thing you can do is make it part of the criteria for picking companies to do this work. If they have any of this in their background, it needs to be used in evaluating if you want to use them for work, because, correspondingly, there are some real good firms out there, medium size, $200 million, $300 million range, who started off as small guys, and they are not necessarily minority, but they started off as small guys, and they just don't tolerate this stuff. They just don't tolerate it. Because their bid, come in and work and we are going to give you a fair chance, and they haven't gotten so big where the racism is actually profitable to them.

That is the thing, is the racism is profitable and discriminatory acts are profitable to these people. That is why they continue doing it. They do it because it is profitable.

So, you have got—I think this committee—the agencies through the leadership of this committee have to make that—even if you hear about it, it needs to be answered because where there is smoke, there is fire.

Mr. CARSON. That is helpful.

Lastly, I am proud to represent the largest rail maintenance facility in Beech Grove, Indiana, one of the cities in my district, where they repair locomotives and passenger rail cars. They do great work there. We would like to see them do more, but there appears to be a closed process that is really hard to break if you don't know someone at the facility. And this challenge isn't unique to our district. It is a challenge for many facilities across the country, particularly as it relates to hiring Black and Brown applicants.

What can be done to open these doors wider so we can bring in more diverse workers?

This is an Amtrak maintenance facility, by the way.

Mr. CLARK. Well, I think it is incumbent upon us as minority contractors to reach out and try and train individuals who are interested in the work, for example, in the rail industry.

We did the maintenance on the WMATA contract when they had the work that they had to complete very quickly, the fast-track part work. And we went to a trade school in Brooklyn and brought down

over 50 students who had just graduated, and we gave them an opportunity to learn. We trained them. We gave them housing. And these graduates did a wonderful job for us as we completed the work successfully, and many of them now have careers in doing track work. So, we took it upon ourselves to do this.

And now we do have another maintenance contract we are just starting today with Shell, and we have several people that are coming down to work on this project that we gave the opportunity to work in Washington 2 years ago.

So, we have done this ourselves. I think there should be some kind of incentive to hire workers and train them, some kind of tax credits or something like that that would make a difference to the contractor and would make a difference in pricing that we would give to the prime contractors.

Mr. PAYNE. Thank you.

Mr. CARSON. Thank you, Chairman.

Mr. PAYNE. The Chair now recognizes Mr. LaMalfa for 5 minutes.

Mr. LAMALFA. Thank you, Mr. Chairman. I appreciate working with you, ever since we have known each other at the beginning of our times in Congress together.

So, I just would like to get Mr. Clark's attention for my questions on this here. Basically, what we are looking at here in California is the high-speed rail system that has been troubled from the very beginning. But, early on in the project, it was constantly accused of not getting minority companies involved. So, in 2010, a civil rights coalition claimed only 12 out of 134 prime contractors were minority-owned firms.

So, last week, the L.A. Times published a piece going into detail about the impacts it has been having on the communities themselves. We have disadvantaged communities that are seeing issues with the way the system is doing business.

So, for example, in agriculture, farmers are having their land taken through eminent domain, yet it has taken years and years for them to get paid for it. The projects that are going through a lot of low-income neighborhoods, Black neighborhoods, Latino neighborhoods, it took down, in some cases, some very important institutions. Like in Fresno, the rescue mission there, for example, which helps a lot of people as a homeless shelter in the Central Valley. And Bakersfield is going to lose a homeless shelter here soon. So, the impact on communities is really tough, too.

So, the project also at some point is supposed to go through San Jose, and it is going to go right straight through a Latino neighborhood there. So, these aren't obviously temporary. They will be forever as long as the rail is around.

And so, for folks to get compensated, for them to even be heard as to whether this is a good idea to go through their neighborhood or such, coming back to the Fresno rescue mission, it took 8 years in a lawsuit to get compensated for their being damaged the way they were, being basically eviscerated.

So, Mr. Clark, you are experienced in heavy rail. I would like to see what you think about some—has anything you have been involved with ever been asked to build tracks through these types of neighborhoods, through these types of shelters, and other things

that are pretty critical towards the communities we are talking about here? And have they been held accountable for doing that kind of damage?

Mr. CLARK. Well, absolutely. In my initial testimony, I talked about what we did in Chicago. We worked with the Urban League, we worked with the churches, we worked with the community organizations to recruit and vet minorities and women. And, again, we took them and trained them on the job. On-the-job training is what we gave them. And they ended up working so very well that our prime contractor, who was one of the largest in the world, sent us home for 2 weeks so they could catch up with us.

Now, we did that because we wanted to make sure the community was, one, benefiting with regard to the work and the opportunity that we could give them, but also to make sure that our reputation was such that we do more than just the work. We try to really make an impact in the community. We try to make sure our workforce looks like our ridership.

So, everywhere we have gone, not just Chicago, we have done the same in Atlanta, we have done the same with MARTA, the transit organization there. We have done the same at DART.

Ms. Williams testified about the 61-percent minority workforce that was with her joint venture. Well, we did those two the same. This is what we do. We look to make a difference.

And when Donald Trump came in and tried to take away local workforce hiring, well, they were—the major companies wanted to bring in their workers and not really do anything for the community.

Mr. LAMALFA. Right. That happens around here when we have these issues with the fires burning up the communities here in northern California, that is really difficult to overcome the barriers of small local companies, no matter their makeup, to overcome the big on that with getting contracts.

A relative of mine has a small company, and he can hardly break into doing jobs at his unique business in the bay area, for example, because it is either you are too small or you are not in the union, for example. So, we have got issues across the board on that.

As we have seen with high-speed rail, they pretty much have basically ignored local concerns and don't involve local private companies. Do you think that this will lead to even more problems on the California project or is that—you know, what do you think about that?

Mr. PAYNE. Excuse me, but the gentleman's time has expired.

Mr. LAMALFA. Wow, that was fast.

OK. Thank you, Mr. Chairman.

Mr. PAYNE. Thank you.

Next, we will hear from the vice chair of the subcommittee, Ms. Strickland, for 5 minutes.

Ms. STRICKLAND. Thank you, Chairman Payne and Ranking Member Crawford.

Mr. Chairman, I have an opening statement to enter into the record.

Mr. PAYNE. Without objection.

[The information follows:]

**Prepared Statement of Hon. Marilyn Strickland, a Representative in Congress from the State of Washington, and Vice Chair, Subcommittee on Railroads, Pipelines, and Hazardous Materials**

Railroad expansion in the United States has historically depended upon discriminatory practices—from the railroads' Western expansion federal land grants that violated federal treaties with Indian tribes to limiting Black, Asian-Pacific Islanders and Latino American employment opportunities. The American railway labor force has been sharply segmented along gender, ethnic, and racial lines since its beginning in the late 1820s and early 1830s. Minority men played a critical role in constructing the infrastructure necessary to develop the railroad industry. Immigrants from China, Japan, and Mexico and formerly enslaved African Americans comprised much of the workforce that graded roadbeds, laid track, and ensured upkeep over rail networks throughout the U.S. White men avoided this work as it was considered arduous and dangerous. High level and well-paying jobs in the railroad industry were reserved for white men.

In the Pre-Civil War era, southern railroad systems depended on the labor of enslaved individuals. Many railroads made up their entire train crews, except for conductors, with enslaved laborers. This meant enslaved individuals gained experience working as rail firemen, brakemen, and engineers. After the Civil War and Emancipation, southern railroads continued to rely on the labor of African Americans. The number of African American engineers dramatically decreased after the war; white workers were given preference after railroads were made to pay their African American workforce. In the south, African American rail operating employees were predominantly restricted to the roles of firemen and brakemen, or kept at the level of porter in name while performing the duties of firemen and brakemen. In the north, African Americans were entirely barred from the positions of fireman, brakemen, engineer, and conductor.

In 1910, statistics collected by the U.S. Department of Commerce's Bureau of the Census indicate that railroads promoted only three African Americans from fireman to engineer for every hundred whites in the southern United States. In addition to promoting white men to the role of engineer, railroads also paid white workers in fireman and brakeman roles higher wages than their African American counterparts. This limitation of opportunity was reflected in union membership, exacerbated by some unions barring African American engineers from joining their membership.

In 1957, a study conducted by the New York State Commission Against Discrimination and the New Jersey Division against Discrimination found that less than one percent of railroad operating jobs were held by African Americans. In 1962, Congress received testimony that southern railway labor forces had transformed from majority African American to overwhelmingly white. The witness, A. Philip Randolph, argued African Americans' rapid exit from railroad operating departments demonstrated the urgent need for fair employment legislation. Increased access of African Americans to good-paying railroad operating jobs was driven by the passage of the Civil Rights Act in 1964. However, discrimination has persisted.

In 1976, Congress passed the Railroad Revitalization and Regulatory Reform Act (4R Act), which stated that activities funded by the bill must not discriminate against any person. In 1979, the Government Accountability Office (GAO) found the FRA was not effectively enforcing this provision of the law. The GAO stated that discrimination would persist unless, "minority business enterprises and entrepreneurs were made aware of opportunities in which they could participate; and assistance was made available to them to overcome endemic problems of minority businesses in this country, i.e. lack of capital, lack of access to major markets and lack of sufficient supply of capable managers." GAO's principal findings noted marginal success in internal FRA efforts to prohibit discrimination on federal contracts and that progress was not substantial. Furthermore, in examining the industry climate for minority businesses, GAO quoted stakeholders describing the railroads receiving 4R Act funding as "'dragging their feet' and . . . doing only what they are forced to do."

Women were also denied advancement to high-level and good-paying jobs in the railroad industry. Since the inception of railroading, women worked a variety of jobs including coach and depot cleaners, restaurant servers, passenger train hostesses, telegraphers, and clerks. The role of coach cleaner was most commonly filled by African American women. During WWI and WWII, employment of women on railroads spiked to fill vacancies left by men assigned to the war effort. While the experience women built in these roles allowed some to stay in the industry after the wars, most

of their positions were returned to male workers. Women were firmly excluded from operating and skilled maintenance crafts until the 1970s.

Ms. STRICKLAND. And, Mr. Chairman, I want to thank you for your leadership in holding this important hearing today. And I especially want to thank all of the witnesses for your factual, compelling, and diverse stories of discrimination.

The topic of this hearing today is, does discrimination exist in Federal passenger rail contracting? And without having to even do a disparity study, I knew the answer was yes, and those who have testified have demonstrated that.

We also know that a lot of the racial and gender discrimination that exists through your stories and experiences, there are other people who have the same stories to tell, but they are just not here today. They have been denied contracts, opportunities, and fair consideration. And I sincerely thank all of our witnesses today.

Mr. Clark, I would like to start with a question for you. In your testimony, you noted that some of the success that GWP has had after you acquired control, including serving as the DBE rail contractor for Chicago Transit Authority, can you please tell us about the differences your firm has experienced in pursuing projects with DBE programs, like FTA's, versus agencies that don't have the programs?

Mr. CLARK. Well, the agencies that don't have the program just don't give us any opportunity to work. I have been saying for a long time as an advocate that if they don't have to, they won't. They will not share anything. There are so many prime contractors now, OK, that we have good relationships with, that only call us when they have a project that requires some kind of goal to be met.

So, other than that, we don't have that opportunity. Or if we do bid them—and sometimes we bid these contracts with private groups, OK, and agencies—they don't tell you where you stand in your bid. They just say who has won the job and they move on.

So, we don't win those types of jobs. Actually, we are very seldom solicited. However, this week, something new happened—last week, I am sorry—and we were actually sent a solicitation from Norfolk Southern, and we were knocked off our feet, OK, because we have been trying to get in to let them know what we do for the longest. And it was a minority business representative, and we were shocked because they never had anything like that before.

So, I felt like what was going on, what is going on here today, and what has been pushed by the Congressional Black Caucus, is starting to make a difference. People are recognizing that they are going to have to accept this. And we can make a difference. We feel that we have made a difference as a small contractor in several States.

Ms. STRICKLAND. Thank you.

I now want to turn to Mr. Canty. Sir, the examples of intimidation and blatant discrimination that you noted in your testimony is simply unconscionable. Could you talk more about the toll that takes on you as a contractor and business owner about what it takes to pursue action against these actions and how it affects your ability to compete?

Mr. CANTY. The toll it takes is—everybody on this Zoom, at the end of the day, we're not that different. We are all people. Right? We are all people. And the toll it takes on a person is indescribable. It is indescribable. It is the worst. I wouldn't wish this on anybody.

We don't have time to get into it in totality, but the toll is indescribable. I mean, the toll it has on your families, the toll it has then on your ability to provide for your family, your ability to provide for your employees, is huge.

So, there is a net ripple effect of bills that literally just can't get paid and net ripple effect of—and this is the reason I believe what was done to me was done was, as far as like [inaudible]—and I forgot to mention to you guys, I used to work for these guys as an employee for a joint venture. So, I knew them and they knew me. And I had the first mentor-protege in the history of the United States DOT having served there with them. I think the reason why they do this is to make sure nobody else stands up, because their racism, it is profitable. It is profitable, so——

Ms. STRICKLAND. Thank you.

And as we look at doing a DBE study, I also want to make sure that we are looking at both the carrot and stick. There must be enforcement and accountability.

I yield back.

Mr. PAYNE. The gentlewoman yields back, and she is absolutely correct.

Next, we will have Mrs. Steel for 5 minutes.

[Pause.]

Mr. PAYNE. You are on mute.

[Pause.]

Mr. PAYNE. OK. Next, we will go to Mr. Johnson for 5 minutes.

Mr. JOHNSON OF GEORGIA. Thank you, Mr. Chairman, for holding this very important hearing. And thank you to the witnesses for your time and your testimony.

I have been a longstanding advocate of the DOT's Disadvantaged Business Enterprise program, which facilitates the success of women- and minority-owned businesses throughout the transportation sector. Unfortunately, however, there is no DBE program for Federal funds administered under the Federal Railroad Administration, the FRA, despite systemic discrimination based on race and sex that severely limits the economic prosperity of minority-owned businesses.

Not only must Congress strengthen the existing DBE program under DOT, we must also establish a similar program under the FRA for the rail transportation industry. And this is crucial to mitigating inequality.

Mr. Canty, your testimony asserts that discriminatory and unprofessional behavior by prime contractors has gone unpunished by Florida DOT, FDOT. And what is more, the FDOT has demonstrated a willingness to ignore discriminatory complaints altogether, allowing bad actors to receive additional funding.

Your firm has engaged in work across the east coast and the South, including in my home State of Georgia. Based on your experience, how confident are you that the discriminatory experience you were subjected to is representative of that experienced by minority-owned firms across the country?

Mr. CANTY. I am very confident of it, because since my story has been told, I have had a plethora of folks send me information on it, including a picture of a noose on a job in LaGuardia by the same contractor, which I was blown away by, even with my experience of seeing what I have seen.

So, it is absolutely representative. I think maybe the difference with me a little bit is I came up under these folks, so I was able to document in the way they were able to document, and that way it didn't just get swept under the rug.

I am no tougher than any other man or woman or anybody here, but I mean—you know, you just can't give up. And no matter what, one day somebody will hear it. Some places in the country are worse than others.

A lot of the reason nothing changes is that chain of custody from the State for them to really control it doesn't exist. Like in Florida, they really don't have any control over the prime, so——

Mr. JOHNSON OF GEORGIA. OK. Gotcha. Thank you.

Mr. Ramanujam, your testimony indicates the challenges DBE businesses face due to current limitations in the program, such as how size standards for small businesses have not been adjusted for inflation. How does the lack of a uniform DBE size standard diminish a minority-owned prime contractor's ability to compete with non-DBE firms?

Mr. RAMANUJAM. Thank you, sir. My testimony referred to the time when we actually lost our DBE status earlier. And it has since been adjusted, but it needs to be adjusted some more.

To answer your question, the value of the dollar is not as much as it was before. We all know that, whether it is a gallon of milk or a gallon of gas. The projects that are coming out are much larger. And with the recent—and I thank all of you Members here for passing the infrastructure stimulus.

With the recent infrastructure stimulus, the projects are much, much larger. The size standards are not amenable or favorable for a small firm like ours to even get anything as a prime. We are constantly having to depend being a sub, and once you are dependent on being a sub, your destiny is not in your hands.

So, it is very real. It has a very limiting and a very negative impact on small businesses to not have the size standard pegged into inflation.

Mr. JOHNSON OF GEORGIA. All right. Thank you.

Mr. Otero, I commend your leadership as a minority business owner for more than 30 years.

How do you believe the existing DBE program can be strengthened to increase meaningful participation of businesses beyond subcontracting opportunities?

Mr. OTERO. Well, I think that what the program should also be focusing on is capacity building. All too often, we are given subcontracting an [inaudible] but it's just a point here, a point there, and that doesn't really help the small business in any way. There should be more of a mentoring relationship.

But the agency has to be the one who drives this kind of philosophy that says, OK, you are going to have 10 or 5 different subconsultants on this project, but what are their roles? That there is a meaningful role that that firm is going to provide that is going

to help that firm grow its own capacity. Because if all you are doing is some menial type of task that is going to be what you are relegated to, all it is doing is satisfying the goal but not achieving the true spirit of what the program is intended for, which is have meaningful participation so that these firms are growing and are able to eventually survive on their own.

Mr. JOHNSON OF GEORGIA. Thank you, sir.

And I yield back.

Mr. PAYNE. The gentleman's time has expired.

Next, we have Mr. Auchincloss for 5 minutes.

Mr. AUCHINCLOSS. Thank you, Chair.

This is a timely hearing to hold as, 3 days ago, the House passed, and the President signed into law, a historic investment in our Nation's infrastructure. The bipartisan infrastructure bill includes $66 billion for passenger and freight rail. Part of the bill's mission is to address the history of discrimination and how it has shaped our communities.

The Disadvantaged Business Enterprise program was established under President Reagan, and yet four decades later, Federal contracting awards are still struggling to include smaller businesses that strengthen local economies and create good jobs. Notably, this designation does not currently exist within the FRA, the Federal Railroad Administration.

As we make these news investments in rail made possible by BIF, especially the South Coast Rail in Massachusetts and potentially East-West Passenger Rail and North-South Rail Link as well, and further projects spurred by the passage of the infrastructure bill, we should not repeat the mistakes of the past.

For Mr. Otero, you offered an idea in your testimony that the Disadvantaged Business Enterprise program should not only provide subcontracting opportunities, but should also foster capacity building for DBE firms by providing meaningful participation.

Can you expand more on that idea? And would there be incentives to the mentoring entity or a post-mentorship evaluation for each participating company?

Mr. OTERO. In my experience, being in business for 32 years and being—I would say 80 percent of our work is as a subconsultant; 20 percent is prime. All too often, the prime thinks that by having 10, 15 subs on their proposal, that is the way to win. And they may win. But the problem is what work is being divvied out to those 15 subconsultants is menial. OK?

What I try to talk to primes when they are giving me the opportunity to provide some input to how they are going to frame the team, I say, look at what are the scopes of services that you are going to sub out and give it to one or two firms and approach it that way, so that, at the end of the day, I know I am responsible for the following work, should we win.

This way it is in my wheelhouse. I am using the staff and the capabilities that I have, and I am building that capacity and providing a meaningful service that I feel very capable of providing, so that it is a win-win situation all around.

But a lot of times, the primes don't want to look at it that way. They just want to have the 15 window dressing of firms on the team, and what they wind up giving to them and how meaningful

it is is not part of their philosophy in terms of diversity and inclusion.

Mr. AUCHINCLOSS. That is helpful. I appreciate that insight.

And then my final question for Ms. Malaszecki, you noted in your testimony that if the contracting arena becomes more tailored to support small women- and minority-owned businesses, like other agencies of Government, your business would certainly pursue additional contracts. What can the FTA and the FHWA do throughout these processes so that smaller businesses can equitably compete with the bigger entities?

Ms. MALASZECKI. Congressman, right now, I have been awarded two FTA contracts back to back 5 years as a prime contractor, nationwide contract for program management oversight. So, to answer that question as to the FTA, they are already doing it.

It was a big learning curve. It starts with the procurement at the agency to assist someone like me to answer the questions. We have to do all the other work, but there is a lot of administrative background to be a Federal contractor.

And the second time we went after the contract, it was competitive, and we are 1 of 5 small businesses out of 21 in the country that have this as a prime.

What occurs, though—and many of the people speaking today—is it changes the game because the large prime contractors don't want me to be in that prime arena. They want me to stay where I am. And that is the piece that, with the DBE financial requirements and the different things that all of you have going on presently right now, is we are capable to get to that next level, but we are strapped by other different pieces, such as the financial capacity and our——

Mr. AUCHINCLOSS. Thank you, ma'am. My time has expired I appreciate the answer.

And I yield back.

Mr. PAYNE. I thank the gentleman.

Next, we will go to Mr. García for 5 minutes.

Mr. GARCÍA OF ILLINOIS. Thank you, Chairman Payne and Chairman DeFazio, for holding this very important hearing on whether discrimination exists in Federal passenger rail contracting.

Congress recently passed historic infrastructure legislation that authorizes hundreds of billions of dollars in new infrastructure spending, including $66 billion for passenger and freight rail.

As the U.S. Department of Transportation and State and local governments award contracts over the next few years to spend this historic amount of money, we must make sure that they include disadvantaged business enterprises in those contracts, especially Black-, Brown-, and women-owned businesses.

I want to thank our brave witnesses here today for sharing their harrowing and painful stories of how they faced unjust discrimination as they sought to expand their contracting businesses. We must work in Congress to eliminate this insidious discrimination.

A question for Mr. Melvin Clark. In your testimony, you mentioned how you established an office in Chicago and have worked successfully with the Chicago Transit Authority, most notably with respect to the rehabilitation of the Dan Ryan portion of the Red Line.

Why have you had success in getting contracts from CTA? And what lessons can Congress take away from what CTA has implemented in terms of Disadvantaged Business Enterprise programs and goals?

Mr. CLARK. Well, one of the factors that I feel has made a difference for us is that we did something and were accepted by the minority community. When we came in to work on that project, as I told you, we went to the churches and the Urban League, and the city supported all of that. They saw people being hired and they saw a positive difference it made in the community.

And so, we ended up becoming their contractor of choice, OK, because we were supported by more than just the fact that we can do the work, but that we were doing positive things. Our motto is to do well by doing good and——

Mr. GARCÍA OF ILLINOIS. Local government made [inaudible].

Mr. CLARK. Hello? You are frozen.

Hello?

Mr. PAYNE. We are having a little bit of a technical difficulty here. We are going to see if we can get Mr. García back up.

Mr. CLARK. OK.

Mr. PAYNE. What we will do here is go to the gentleman from Louisiana, Mr. Carter, and we can come back to Mr. García.

[Pause.]

Mr. PAYNE. Mr. Carter?

[Pause.]

Mr. PAYNE. We are having technical difficulties with everyone. Be patient with us for a second, please.

[Pause.]

Mr. PAYNE. We just ask the witnesses to be patient with us.

[Pause.]

Mr. PAYNE. Mr. García? Mr. García, can you hear me?

Mr. GARCÍA OF ILLINOIS. Thank you so much, Mr. Chairman. I apologize, but I think we all had some technical issues. Yes, I can.

Mr. PAYNE. OK. You can continue. You have about 3 minutes left.

[Technical difficulties.]

Mr. PAYNE. And it is not working.

Mr. CLARK. Hello, can you hear me now?

Mr. PAYNE. Yes, we can hear you, sir, Mr. Clark.

Mr. CLARK. All right. Are we continuing or——

Mr. PAYNE. Yes.

Mr. CLARK. OK. Well, he was talking about how the community and local government had embraced us, and I said yes, they have. In fact, when I was working on the fast-track program in Washington, they allowed me to come and recruit workers in Chicago, and we announced it on the radio. Some of the people and the deputy mayor were fully supportive of us. Actually, we brought buses to bring down workers to give them opportunities again that we had, that they didn't necessarily have in Chicago at the time. And those are the things that have endeared us to the community.

And the prime contractors know now that G.W. Peoples makes a difference, and that CTA and the local government is very pleased with what we do and the way we do it, and so we are getting more opportunities.

And we felt like it is not just low price that wins something, but it should be what difference are you making in a community when you have these kinds of opportunities.

Mr. PAYNE. Thank you.

Mr. García?

Mr. GARCÍA OF ILLINOIS. Yes. Can you hear me, Chairman?

Mr. PAYNE. Yes, now we can.

Mr. GARCÍA OF ILLINOIS. Chairman, can you hear me?

Mr. PAYNE. Yes.

Mr. GARCÍA OF ILLINOIS. Mr. Chairman? OK.

Mr. Canty, you touched on the personal net wealth cap of $1.32 million and how the cap disadvantages DBEs. Can you expand on why the cap hurts the growth of DBEs and what you think Congress—if we should raise that cap?

Mr. CANTY. Yes, sir. Typically, when that cap comes into place where it is harmful is in the bonding program. And if you are living in an area, the majority of the area of the country, like the Northeast or Chicago or the west coast, your home is typically included in that equity, the value of your home—in the 8(a) program, it is not, but in the DOT programs, a lot of them they are and any retirement programs.

So, if you have already been established, you have got to be very careful of not exceeding the cap. But in order to get the bonding you need, typically they are going to look at, if you want a $10 million bonding program, you have got to have $1 million in the bank somewhere or you can't indemnify yourself; meaning, if it all goes wrong, you get to give up everything you have.

So, perhaps there is a need for legislation where, for DBEs, you can either do jobs that don't require the same level of bonding or some kind of tweak to the bonding program, that could be where it is for DBEs specifically, or some change on the jobs where the jobs are actually self-insured anyway, the majority of them, and the DBE's bonding is covered by the prime's bond.

Mr. PAYNE. Thank you very much.

Mr. GARCÍA OF ILLINOIS. Thank you very much.

Mr. Chairman, I yield back.

Mr. PAYNE. The gentleman's time is expired.

We are going to have Mr. Carter for 5 minutes.

Mr. CARTER OF LOUISIANA. Mr. Chairman, thank you very much. I greatly appreciate the opportunity to address this significant issue.

We know that DBEs historically have had a difficult time when cracking into the mainstream of doing business with majority firms and even with the Federal Government. We know that, currently, roughly 5 percent of Federal contracting dollars go to minority-owned businesses. So, that is something that we have to do a better job at. And I am very proud that this infrastructure bill establishes the Minority Business Development Agency within the Department of Commerce.

So, to the panelists, I would ask that you gather as many of your experiences as possible and share them with us in writing so that we can—as this development of the Minority Business Development Agency is armed, we can begin by giving them all of the horror stories of things that you have experienced.

I know that many times small businesses are choked when it comes to getting paid. The prime gets paid, and then the sub is choked for 90, 120 days and beyond, oftentimes making it next to impossible to run a business, because you need your resources; oftentimes to find that prime companies come in and then offer pennies on the dollar to close out a file where members of the minority community, minority businesses, women-owned business have already expended resources.

So, I would ask either of the panelists—or all of you, very briefly, because I have got a little bit of time, to share your experiences as it relates to the process of getting paid. Once a prime has been paid, oftentimes subs are left on the sideline waiting to be paid, oftentimes getting far less.

Can anyone speak to that?

Mr. RAMANUJAM. We have definitely—thank you, Congressman. We have definitely experienced that in terms of getting late payments. And as we speak right now, we have a really large national firm whose average AR days, that is the average number of days it takes them to pay us, is over 120 days.

That goes to my second point in my testimony about the relationship and the difficulty of having a fair relationship with the bank, because we have to borrow. We have to borrow. And I have had to write off, or take less money on occasions, to take care of this. But it is a lot of stress. There is no cash flow, and I have——

Mr. CARTER OF LOUISIANA. Absolutely. And I don't want to cut you off. I have got a little bit of time, but I agree. I appreciate that.

I would like to hear from a few other panelists as well.

Mr. OTERO. I would like to address that as well.

What we found is also sometimes the culprit is the agency itself. So, what we try to do is work with the agency to see if they can speed up the payment process internally, because that is what the prime is telling us, is that they haven't been paid, even though there is a prompt payment requirement in the contract. So, we talk to the agency also and make them aware of how much pain this causes us, and that sometimes sensitizes the agency to try to improve or monitor the invoicing cycle by the prime.

Mr. CARTER OF LOUISIANA. But the issue that I am bringing forward is ones that I have heard a million times before. And while I acknowledge that the agency oftentimes could be the culprit, many times the culprit is the prime is paid and then withholds payment from the sub when you can least afford that.

Mr. Clark, can you chime in for a brief second on that? And then I am going to ask—do it in 10 seconds because I have only got a little over a minute left.

Mr. CLARK. Yes, certainly. I think that there should be some legislation, regulations put in the DBE program where the minority business contractor, subcontractor, the small business normally, is paid within 30 days.

Mr. CARTER OF LOUISIANA. A payment of some kind with the prime, right? When a prime is paid, they can pay you commensurate.

Mr. CLARK. Well, sometimes the prime is not paid because of their issues, and we as the small business are sitting around waiting. We are in that situation right now. OK? We had nothing to

do with them not being paid. However, they are saying that we signed the same contract: "paid when paid." That is what we are supposed to do. Well, I think—go ahead.

Mr. CARTER OF LOUISIANA. Mr. Clark, I am sorry, I have got 24 seconds, and it looks like Kenneth wants to jump in there real fast. Can you do it in about 5 seconds?

Mr. CANTY. I think the best way is to have 14-day pay terms just like the Small Business Act is used with the 8(a) program. And the prime should be required to pay, even if they haven't been paid within those 14 days, and they can carry the cost of that in their contract to the owner.

Mr. CARTER OF LOUISIANA. In closing, what I would ask everyone to do is as I started: Cobble together as many of those experiences and give them to the committee in writing. Share with us your experiences. I mean, we have limited time to talk today. But as this development of the Minority Business Agency comes about, we want to be able to think about those problems that you had and address them in as thoughtful a way as possible.

Does us no good to have a $1.2 trillion infrastructure bill if the people that are in the community that have been negatively impacted the most never have an opportunity to participate, to share your professional knowledge or skills, your wares.

That is what we are here for, to make sure that we have equity in Federal Government contracting, but also to make sure that we create opportunities across the board.

So I know I am out of time, Mr. Chairman. Thank you very much. I yield back.

Mr. PAYNE. No, thank you. The gentleman's comments are well received.

Next, I will ask Mrs. Steel if she has any questions for the witnesses.

Mrs. STEEL. Thank you, Mr. Chairman.

Actually, I submitted written questions, so I think I am going to stay as-is, because they are almost the same as Congressman Doug LaMalfa, because I was quoting the L.A. Times and high-speed rail. So, I am just going to submit the written statements.

Thank you, Mr. Chairman.

Mr. PAYNE. OK. Thank you.

That concludes our hearing today.

And I would like to, again, thank each of the witnesses for their testimony today.

I ask unanimous consent that the record of today's hearing remain open until such time as our witnesses have provided answers to any questions that may have been submitted to them in writing.

I also ask unanimous consent that the record remain open for 15 days for any additional comments and information submitted by Members or witnesses to be included in the record of today's hearing.

Without objection, so ordered.

And the subcommittee stands adjourned.

[Whereupon, at 12:47 p.m., the subcommittee was adjourned.]

# Submissions for the Record

**Prepared Statement of Hon. Sam Graves, a Representative in Congress from the State of Missouri, and Ranking Member, Committee on Transportation and Infrastructure**

Thank you, Chair Payne, and thank you to our witnesses for being here today.

Thank you for calling today's hearing to examine the potential need for a Disadvantaged Business Enterprise, or DBE, program for passenger rail contracting.

It has been roughly 40 years since Congress first created the DBE program, which was intended to help small businesses owned and controlled by those facing barriers in the transportation construction and airport concession industries.

Congress has recognized the success of the DBE programs in the Department of Transportation by authorizing their continuation and making adjustments as needed.

The Federal Railroad Administration is currently working on a disparity study that will inform Congress on the need to create a DBE program for passenger rail. I look forward to receiving the results of that study when it is complete.

I look forward to hearing more from our witnesses on this subject.

Thank you, Chair Payne. I yield back.

**Letter of November 22, 2021, from Laura C. Dutton, Former Administrative Assistant, Atlantic Meridian Contracting Corp., Inc., Submitted for the Record by Hon. Donald M. Payne, Jr.**

November 22, 2021.

To Whom It May Concern:

I was employed by Atlantic Meridian Contracting Corp., Inc. (AMC), owned, by Mr. Kenneth Canty, from 10/14/2019 through 12/31/2020. I served as the Administrative and Accounting Assistant for the company and submitted billings on the company's behalf.

Our biggest client during this period of time was Skanska Corporation. The project on which we were employed by Skanska was the New Pensacola Bridge. AMC was hired as a subcontractor to complete the demolition of the old bridge. I arranged for housing for our crew in Pensacola, I submitted Certified Payrolls weekly, and I submitted progress billings on the project.

To the best of my recollection, Skanska rejected the majority of our billings, stating the billings were not accurate. Our company controller, Mr. Richard Ellis, made every effort to communicate with Skanska's accounts receivable department, the Skanska project managers, and other Skanska company representatives to try to get direction on how to correct the billings so that AMC could be paid. Each time we asked for clarification, Skanska would simply say we were not accomplishing the work for which we were billing.

Likewise, our Certified Payroll reports were being rejected and, we felt, nitpicked. As soon as we corrected one issue, another issue would be found. For one particular date, there was a report from the Skanska project manager that two members of AMC's crew were interviewed. However, both those members were on personal leave and were not on the worksite day. We received a negative report for our payroll for that particular date because we had not reported hours worked for those two employees. It took several phone calls and emails back and forth to convince Skanska that their project manager was in error about the date. It certainly felt like harassment.

I performed identical job duties previously for a white owned subcontractor, and my experience as a representative of that employer was quite different, virtually opposite as far as professional respect and open communication between contractor and subcontractor. My billings were almost never rejected and, if they were, the rea-

son was clearly communicated with an opportunity to correct the issue. My experience with submitting Certified Payrolls on federally funded projects for a white owned subcontractor was also starkly different than when I worked for AMC. The payrolls were almost always accepted, and if there was ever an issue, it was due to a legitimate error on my part that I was given the opportunity to correct without undue scolding or threats of discontinuing the project.

Mr. Canty was in constant contact with Skanska on every aspect of the Pensacola project, to include our progress billings. After several months of having our bills questioned and then rejected, Ken was told that Skanska had altered their Standard of Values (SOV). However, AMC was not allowed to alter our SOV to reflect what Skanska showed was the accurate picture of the costs of the project. An SOV is crucial to a contractor's being paid accurately for their work. It is the official itemized form on which billings are submitted. This was unacceptable and made it impossible for us to submit accurate billings. Not only was AMC's SOV different from Skanska's SOV; Mr. Canty also discovered that the specifics for the entire project were not presented to him accurately when he was awarded the job. This caused enormous cost overruns for an already expensive project for AMC. After months of rejected progress billings and no compensation from Skanska, AMC was no longer able to meet their financial obligations.

Looking back on these events, there was no reason whatsoever for Skanska officials to behave so unprofessionally unless they were doing so deliberately to try to frustrate AMC's efforts. I believe it was March/April 2020 that AMC was sued by Skanska for failing to fulfill their contract, and AMC was terminated from the project. As you know, AMC has counter-sued, and Mr. Canty has filed a discrimination lawsuit as well. As a minority business owner, he has been subjected to the most egregious and blatant disrespect and unprofessional treatment imaginable. His employees were subjected to open racism and hostility on the jobsite in Pensacola. There were no repercussions for the offenders. Both in person and on paper, the discrimination was rampant throughout the project.

Respectfully submitted,

LAURA C. DUTTON,
*Former Administrative Assistant, Atlantic Meridian Contracting Corp., Inc.*

Please allow my name above to serve as my signature.

**Letter from Richard J. Ellis, Jr., Controller, Atlantic Meridian Contracting Corp., Inc., Submitted for the Record by Hon. Donald M. Payne, Jr.**

HONORABLE DONALD M. PAYNE, JR.,

I am submitting this Letter Of Record on behalf of Mr. Kenneth Canty and his testimony of discrimination on the jobsite that Atlantic Meridian Contracting Corp was involved in.

My name is Richard Joseph Ellis, Jr. I am a 66-year-old, Caucasian male. I am the Controller for AMC. I have worked in accounting for 46 years for sole proprietors to corporations with multiple businesses and over 600 stores across the nation. My diversified experience over the 46 years has given me insight into the various ways across the board that companies do business in paying their bills and in their day to day relationships with subcontractors and other AP vendors.

What I have witnessed at AMC from SKANSKA I have never witnessed before. Their actions, which I will elaborate on further in the letter, show a distinct aggressiveness and intentional conflict to delay or avoid paying AMC at times when SKANSKA knew it was critical to get on time payment for labor and equipment which AMC had paid up front in order to provide the work that needed to get done.

Over and over there were intentional challenges and avoidance openly to the point that it could only be because of Mr. Canty's race. It was so openly done to the point that they were not only being prejudiced but to the point of not trying to hide it because they acted like they thought they were immune to any action AMC would take to challenge them. To put it simply, it was like they were saying "we are going to do this and there is nothing you can do about it". I can't stress how much my disbelief was that they worked like this and that it was not just with the accounting dept, but seemed to be ingrained in the whole company attitude from other areas. "We are the big boys on the block and we can do whatever we want."

I will start listing some examples of ways they intentionally hurt AMC which includes openly hiding site conditions they knew about that the Florida DOT provided them which they withheld from AMC, to delay tactics for payment and to actual onsite sabotage of working areas and conditions for our employees.

A common delay practice they would use is to be nick picky about our Pay App. Each time it would be something and they would ask us to do this or that. Once I did and would resubmit, they would then tell us that the whole approval process had to start over and that our payment would now fall into a different pay period and we would have to wait another month. The corrections they would ask for were usually issues of presentation about how they wanted the Pay App, but that would change every time. They would constantly delay and keep pushing our payments back.

On our final payment which was never paid, I talked to their Controller 3 or 4 times about when we would be paid. He would give me an actual date that the pay run would be made. Then when time came there was not payment. Time and again he told me the payment would be a certain date. Of course, we are budgeting our AP and Payroll based on that and when they did not pay then we would be in a worse position because we had already committed to making our payments based on receiving those funds. This occurred at least 3 times where they directly told me the date of payment. On my last contact with them about getting this payment, the Controller simply replied to me that there was no payment scheduled for AMC nor would there be. This after a month of emails promising us payment, telling us a payment date and then not paying.

These occurrences continually happened and I have NEVER seen such outright deception that they openly did almost like saying, we can do whatever we want, you are just some little DBE minority owned company and we will pay or not pay when we tell you. They blatantly and openly did this over and over to us and I am absolutely sure it was because of Mr. Canty's race and his knowledge of the work being much better than theirs to the point they wanted to show him, yes you might be smarter but we are bigger!!!

I humbly submit this as my opinion that there was outright racism from this company.

RICHARD J. ELLIS, JR.,
*Controller, Atlantic Meridian Contracting Corp., Inc.*

# APPENDIX

QUESTION FROM HON. DONALD M. PAYNE, JR. TO GNANADESIKAN "RAM" RAMANUJAM, P.E., PRESIDENT AND CHIEF EXECUTIVE OFFICER, SOMAT ENGINEERING, INC.

*Question 1.* No business should have the door closed on them before they can prove that they deserve a seat at the table.

If this behavior continues, what do you see as the long-term consequences to minority and women-owned businesses looking to make their way into the rail industry?

*ANSWER*. The consequences to minority and women-owned businesses are many, and impact different aspects of their existence, sustenance and growth.

Financial consequence: Minority business that invest money, time and resources in building their skill set to serve the rail industry will suffer two ways. First, they would have wasted their resources because there will be no work—kind of like getting a degree in basket weaving. Second, they would have spent time that could have otherwise been spent on other productive pursuits, and time is a resource that cannot be replenished. Some businesses will even have to close their doors. These business owners will never realize, or will lose, the fruits of investment of multiple years of hard work and sacrifice.

Educational consequence: It is an established fact that minority businesses are the ones that provide meaningful employment to minority populations, with opportunities to advance and evolve professionally. If the current behavior continues, minority students will not pursue education related to rail industry, further narrowing opportunities for minority and women businesses.

Innovation and business consequences: Transportation in the 21st century is no longer in silos. Multimodal projects are being planned and executed all over the United States, with rail, transit and road modes intersecting each other. The lack of rail industry opportunities will severely and adversely impact minority and women businesses compete effectively for such work, and develop innovative solutions. This will actually reduce their ability to compete even in their traditional markets of transit and road work, or be relegated to commodity aspects of such work.

Perception consequences: "Perception is Reality." The lack of opportunity, and experience, in rail work will leave minority/women businesses without the opportunity to acquire that skill set. This in turn will cause a perception that such businesses are unable, or uninterested, to acquire those skills and become a complete, full-service business. Once such a perception takes root, minority and women businesses will be considered even less for any opportunity. This is a highly impactful consequence.

Social consequences: Failure is crushing to a person's confidence. The failure of multiple efforts to penetrate the rail industry, or keep a business open and running, will send a strong message to younger, future minority and women entrepreneurs. That message is that they are not welcome, not considered capable and should not aspire. That is a disastrous consequence for multiple future generations.

In 1947, Jackie Robinson showed us that black folk can play major league baseball. Today, the FRA has the opportunity to show that minority folk can play ball in the rail industry.

○