# EXHIBIT A-7

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

# DRIVING EQUITY: THE U.S. DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

**(116–64)**

## REMOTE HEARING

BEFORE THE

## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

SECOND SESSION

SEPTEMBER 23, 2020

Printed for the use of the
Committee on Transportation and Infrastructure

Available online at: https://www.govinfo.gov/committee/house-transportation?path=/browsecommittee/chamber/house/committee/transportation

U.S. GOVERNMENT PUBLISHING OFFICE

43–413 PDF WASHINGTON : 2021

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

PETER A. DEFAZIO, Oregon, *Chair*

ELEANOR HOLMES NORTON, District of Columbia
EDDIE BERNICE JOHNSON, Texas
RICK LARSEN, Washington
GRACE F. NAPOLITANO, California
DANIEL LIPINSKI, Illinois
STEVE COHEN, Tennessee
ALBIO SIRES, New Jersey
JOHN GARAMENDI, California
HENRY C. "HANK" JOHNSON, JR., Georgia
ANDRÉ CARSON, Indiana
DINA TITUS, Nevada
SEAN PATRICK MALONEY, New York
JARED HUFFMAN, California
JULIA BROWNLEY, California
FREDERICA S. WILSON, Florida
DONALD M. PAYNE, JR., New Jersey
ALAN S. LOWENTHAL, California
MARK DESAULNIER, California
STACEY E. PLASKETT, Virgin Islands
STEPHEN F. LYNCH, Massachusetts
SALUD O. CARBAJAL, California, *Vice Chair*
ANTHONY G. BROWN, Maryland
ADRIANO ESPAILLAT, New York
TOM MALINOWSKI, New Jersey
GREG STANTON, Arizona
DEBBIE MUCARSEL-POWELL, Florida
LIZZIE FLETCHER, Texas
COLIN Z. ALLRED, Texas
SHARICE DAVIDS, Kansas
ABBY FINKENAUER, Iowa
JESÚS G. "CHUY" GARCÍA, Illinois
ANTONIO DELGADO, New York
CHRIS PAPPAS, New Hampshire
ANGIE CRAIG, Minnesota
HARLEY ROUDA, California
CONOR LAMB, Pennsylvania

SAM GRAVES, Missouri
DON YOUNG, Alaska
ERIC A. "RICK" CRAWFORD, Arkansas
BOB GIBBS, Ohio
DANIEL WEBSTER, Florida
THOMAS MASSIE, Kentucky
SCOTT PERRY, Pennsylvania
RODNEY DAVIS, Illinois
ROB WOODALL, Georgia
JOHN KATKO, New York
BRIAN BABIN, Texas
GARRET GRAVES, Louisiana
DAVID ROUZER, North Carolina
MIKE BOST, Illinois
RANDY K. WEBER, SR., Texas
DOUG LAMALFA, California
BRUCE WESTERMAN, Arkansas
LLOYD SMUCKER, Pennsylvania
PAUL MITCHELL, Michigan
BRIAN J. MAST, Florida
MIKE GALLAGHER, Wisconsin
GARY J. PALMER, Alabama
BRIAN K. FITZPATRICK, Pennsylvania
JENNIFFER GONZÁLEZ-COLÓN, Puerto Rico
TROY BALDERSON, Ohio
ROSS SPANO, Florida
PETE STAUBER, Minnesota
CAROL D. MILLER, West Virginia
GREG PENCE, Indiana
MIKE GARCIA, California

# CONTENTS

Page

Summary of Subject Matter .......... v

STATEMENTS OF MEMBERS OF THE COMMITTEE

Hon. Peter A. DeFazio, a Representative in Congress from the State of Oregon, and Chairman, Committee on Transportation and Infrastructure:
Opening statement .......... 1
Prepared statement .......... 4
Hon. Sam Graves, a Representative in Congress from the State of Missouri, and Ranking Member, Committee on Transportation and Infrastructure:
Opening statement .......... 4
Prepared statement .......... 5
Hon. Eleanor Holmes Norton, a Delegate in Congress from the District of Columbia, and Chairwoman, Subcommittee on Highways and Transit:
Opening statement .......... 5
Prepared statement .......... 6
Hon. Rodney Davis, a Representative in Congress from the State of Illinois, and Ranking Member, Subcommittee on Highways and Transit:
Opening statement .......... 7
Prepared statement .......... 8
Hon. Eddie Bernice Johnson, a Representative in Congress from the State of Texas, prepared statement .......... 133
Hon. Rick Larsen, a Representative in Congress from the State of Washington, and Chairman, Subcommittee on Aviation, prepared statement .......... 133

WITNESSES

Evalynn Williams, President and Chief Executive Officer, Dikita Enterprises, Inc., on behalf of the Conference of Minority Transportation Officials:
Oral statement .......... 10
Prepared statement .......... 11
Geri E. Boyer, P.E., President, Kaskaskia Engineering Group, LLC, on behalf of the American Council of Engineering Companies:
Oral statement .......... 14
Prepared statement .......... 16
Mary T. Lerdahl, President, Emerald Consulting Services, LLC:
Oral statement .......... 22
Prepared statement .......... 24
Farad Ali, Chairman, Government Affairs Committee, Airport Minority Advisory Council:
Oral statement .......... 27
Prepared statement .......... 29
Sandy-Michael E. McDonald, Director, Office of Economic and Small Business Development, Broward County, Florida:
Oral statement .......... 32
Prepared statement .......... 33
Sandra D. Norman, Division Administrator, Civil Rights, Virginia Department of Transportation:
Oral statement .......... 36
Prepared statement .......... 37
Jon S. Wainwright, Ph.D., Affiliated Consultant, NERA Economic Consulting:
Oral statement .......... 38
Prepared statement .......... 40

Page

SUBMISSIONS FOR THE RECORD

Submissions for the Record by Hon. Peter A. DeFazio:
Ten Disparity Studies ........ 3
Letter of June 25, 2020, from Geri E. Boyer, P.E., President, Kaskaskia Engineering Group, LLC ........ 95
Letter of July 13, 2020, from Lawrence T. Green, President, Divine Cement, Inc. ........ 134
Letter of July 15, 2020, from Linda Moen, P.E., LEED BD+C, President and Managing Member, EFK Moen ........ 136
Letter of July 1, 2020, from Carla M. Williams, DBELO, Director of Community and Business Engagement, Hillsborough Area Regional Transit Authority, and President, COMTO Central Florida Chapter ...... 137
Letter of September 19, 2020, from Colette Holt, Colette Holt & Associates ........ 138
Letter of June 16, 2020, from Katherine M. Cloonen, President, JK Steel Erectors, Inc. ........ 142
Letter of June 24, 2020, from Carol L. Kwan, Carol Kwan Consulting LLC ........ 143
Letter of May 26, 2020, from Sarah Imberman, S. Levy Foods ........ 144
Letter of June 17, 2020, from Constance Macolino, President, Puget Sound Steel Co., Inc. ........ 144
Letter of September 9, 2020, from Robert S. Bright, Founder and President, Talson Solutions, LLC ........ 145
Letter of September 8, 2020, from Lorenzo Thompson, Principal, Thompson Civil, LLC ........ 146
Letter of July 1, 2020, from Katey Doman, President, TyE Bar LLC ......... 147
Statement of Joann Payne, President, Women First National Legislative Committee ........ 147
Submissions for the Record by Hon. Sam Graves of Missouri:
Statement of the American Road & Transportation Builders Association .. 151
Letter of October 7, 2020, from James V. Christianson, Vice President, Government Relations, Associated General Contractors of America ........ 155
Statement of the Airport Restaurant and Retail Association, Submitted for the Record by Hon. Rick Larsen ........ 159

APPENDIX

Question from Hon. Troy Balderson to Sandy-Michael E. McDonald, Director, Office of Economic and Small Business Development, Broward County, Florida ........ 163
Questions from Hon. Peter A. DeFazio to Jon S. Wainwright, Ph.D., Affiliated Consultant, NERA Economic Consulting ........ 164

Committee on Transportation and Infrastructure
U.S. House of Representatives
Washington, DC 20515

Peter A. DeFazio
Chairman

**Katherine W. Dedrick**, Staff Director

Sam Graves
Ranking Member

**Paul J. Sass**, Republican Staff Director

SEPTEMBER 18, 2020

**SUMMARY OF SUBJECT MATTER**

| | |
|---|---|
| TO: | Members, Committee on Transportation and Infrastructure |
| FROM: | Staff, Committee on Transportation and Infrastructure |
| SUBJECT: | Hearing on “Driving Equity: The U.S. Department of Transportation’s Disadvantaged Business Enterprise Program” |

---

## PURPOSE OF HEARING

The Committee on Transportation and Infrastructure will meet on Wednesday, September 23, 2020, at 10:00 am, in room 2167 Rayburn House Office Building and remotely via Cisco WebEx, to receive testimony regarding “Driving Equity: The U.S. Department of Transportation’s Disadvantaged Business Enterprise Program.” The Committee will hear from representatives of the Virginia Department of Transportation; Broward County, Florida, Office of Small Business and Economic Development; the Airport Minority Advisory Council (AMAC); the Conference of Minority Transportation Officials (COMTO); Emerald Consulting Services; NERA Economic Consulting; and the American Council of Engineering Companies (ACEC).

## BACKGROUND

The U.S. Department of Transportation’s (DOT) Disadvantaged Business Enterprise (DBE) Program was established to remedy discrimination against minority and women-owned businesses.[1] The DBE program seeks to ensure those businesses are provided equal opportunities to compete for contracts assisted by certain DOT funds administered by the Federal Highway Administration (FHWA), the Federal Aviation Administration (FAA), the Federal Transit Administration (FTA), and the National Highway Traffic Safety Administration (NHTSA).[2]

First established by Federal regulation in 1980 as a minority and women’s business enterprise program, the DBE program was later statutorily authorized for surface transportation programs in 1983 by the Surface Transportation Assistance Act of 1982 (P.L. 97–424) to aid small businesses owned and controlled by minorities facing historic and continuing discriminatory barriers to participation in the highways and transit programs.[3]

DBE programs for women-owned businesses and the FAA’s airport DBE program were primarily implemented by regulation until Congress passed the Surface Transportation and Uniform Relocation Assistance Act of 1987 (P.L. 100–17) and the Airport and Airway Safety and Capacity Expansion Act of 1987 (P.L. 100–223), which expanded statutory authorization for surface and airport transportation construction

[1] DOT Office of Civil Rights. *Disadvantaged Business Enterprise (DBE) Program*. US Department of Transportation. Retrieved September 18, 2020, from https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise

[2] 49 CFR 26.3.

[3] DOT Office of Civil Rights. *Disadvantaged Business Enterprise (DBE) Program*.

DBE programs to include women-controlled small businesses and codified the airport DBE program, respectively. The Airport and Airway Safety and Capacity Expansion Act also established a separate Airport Concession Disadvantaged Business Enterprise (ACDBE) Program administered by the FAA for airport concessions and related contracts.[4] Since P.L. 100–223 codified the airport construction DBE program and the ACBDE program, these programs do not require statutory reauthorization in the same manner as surface transportation DBE programs.

Though not codified like the airport programs, Congress has regularly reauthorized the DBE program for highways and transit in successive surface transportation bills, most recently with the enactment of the Fixing America's Surface Transportation (FAST) Act (P.L. 114–94). In addition, the U.S. House of Representatives passed H.R. 2, the Moving Forward Act, which aims to reauthorize the surface DBE program with some amendments.

Both the surface DBE program and the aviation construction DBE program are implemented pursuant to regulations established under 49 CFR part 26. The ACDBE program is implemented pursuant to regulations established under 49 CFR part 23.

*I. What is a DBE?*

For eligibility purposes, a DBE is defined as a small, for-profit business where socially and economically disadvantaged individuals (1) own at least 51 percent of the economic interests of the entity, and (2) control and manage the business operations of the firm.[5] A firm and its minority and/or women owners seeking certification as a DBE must meet: (1) an ownership and control test, (2) a personal net worth test, and (3) a size standard test, requirements for which are described in regulation.[6]

To be regarded as socially disadvantaged means to face historic and ongoing discrimination, such as racial or ethnic prejudice or cultural bias due to membership in a particular group.[7] Consistent with DOT implementing regulations, minorities and women are presumed to be socially disadvantaged (although that presumption is rebuttable).[8] Others may qualify as socially disadvantaged on a case-by-case basis.[9]

To be regarded as economically disadvantaged, an individual must, among other things, have a personal net worth that does not exceed $1.32 million, excluding the equity in the individual's primary residence and the value of their ownership interest in the firm seeking certification.[10]

To meet size standards for DBE eligibility and be regarded as a small business in the surface transportation sector, a business must meet the qualifications of a small business defined by the Small Business Administration (SBA) in accordance with the North American Industry Classification System (NAICS) codes relevant to the business and as defined by the annual gross receipts or employee number caps outlined for each industry code.[11] In addition, the small business must not have average annual gross receipts over the firm's previous three fiscal years in excess of $23.98 million, regardless of the relevant NAICS code qualification.[12]

Until the FAA Reauthorization Act of 2018 (P.L. 115–254), size standards for DBE eligibility in the aviation construction sector reflected the same requirements as the surface DBE program. With that Act, however, Congress removed the separate $23.98 million gross receipts cap requirement for businesses in the aviation construction sector, tying eligibility requirements directly to the SBA's definitions of small businesses.[13]

In addition, H.R. 2, the Moving Forward Act, proposes to remove the $23.98 million gross receipts cap from the surface transportation DBE program as well, so the SBA would determine business size standards for DBEs. This proposed change would result in a uniform standard for determining small business size for both the surface and aviation construction DBE programs, set by the SBA.

To be certified under the FAA's ACDBE program, a business must meet different size standards reflective of the diversity of industries present in airport concessions.[14]

---

[4] *Id.*
[5] 49 CFR 26.5.
[6] 49 CFR 26; 49 CFR 23.
[7] 13 CFR 124.103.
[8] 49 CFR 26.67(a) and (b).
[9] 49 CFR 26.67(d).
[10] 49 CFR 26.67(a).
[11] 49 CFR 26.65(a).
[12] 49 CFR 26.65(b).
[13] 49 USC §47113(a)(1).
[14] 49 CFR 23.33.

### *II. HOW ARE FIRMS CERTIFIED?*

Recipients of DOT financial assistance (such as state departments of transportation, local governments, transit agencies, and port authorities) are required to establish a Unified Certification Program (UCP) in their state.[15] The purpose of a UCP is to ensure DBEs and applicants (including airport concessionaires) will have "one-stop shopping" on all certification matters with respect to these recipients. If a business wants to be certified as a DBE, it must submit an application to the state UCP for approval.[16] Determinations as to whether a firm meets the DBE criteria are made by the UCP using various means, including on-site visits, personal interviews, reviews of licenses, stock ownership, equipment, bonding capacity, work completed, résumé of principal owners, financial capacity, and type of work preferred.[17] Once a DBE is certified through the UCP, that certification must be honored by all recipients of DOT funds within the state.[18]

While some state UCPs maintain certification reciprocity agreements with other state UCPs, each state exercises its own discretion as to whether it will accept certification from other states.[19] DBEs wishing to do business in multiple states must generally recertify with all applicable UCPs.[20]

### *III. HOW DOES THE DBE PROGRAM WORK?*

Under the authorizing statues for the various DBE programs, Congress set a national 10 percent participation goal for firms certified as DBEs in surface transportation programs, in airport federally assisted contracting (i.e., procurement, construction, or professional services contracts), and in airport concessions.[21]

DOT regulations require recipients of federal financial assistance that anticipate awarding prime contracts of more than $250,000 to establish an annual aspirational DBE participation goal that reflects what DBE participation in federally-assisted projects would look like in the absence of discrimination.[22] Recipients must base their goals on how to achieve a level playing field in their individual programs, regardless of the 10 percent national goal.[23] These goals must be based on demonstrable evidence of the availability of ready, willing, and able DBEs relative to the DOT-assisted contracts that will be available that fiscal year (FY).[24]

The two-step process for goal-setting in accordance with this demonstrable evidence is laid out in 49 CFR 26.45. Demonstrable evidence may come from several sources, including, but not limited to: census data, established DBE directories, past bidder lists, determinations by other DOT recipients with substantially similar market areas, and statistical DBE availability and disparity studies covering recipients' market areas.[25] The recipient of DOT funds must establish its goal for a three-year period and submit that goal with the determining methodology to the FAA, FHWA, or FTA for review and approval.[26]

It is important to note that a recipient's goal is aspirational only; quotas and set-asides are generally not permitted. In addition, DOT does not assess penalties for not meeting DBE goals as long as good faith efforts are demonstrably made.[27] Furthermore, recipients are required to use race-neutral means to meet as much of their overall goal as possible (in this context, "race-neutral" refers to both race and gender, i.e., without application of any criteria favoring DBEs over non-DBEs).[28] Examples of "race-neutral means" include: providing assistance to small businesses in overcoming issues such as the inability to obtain bonding or financing; unbundling large contracts to make them more accessible to small businesses; informational and communication programs on contracting procedures and specific contract opportunities; and other business support services.[29]

---

[15] 49 CFR 26.81.
[16] *Id.*
[17] 49 CFR 26.83(c).
[18] 49 CFR 26.81(b).
[19] 49 CFR 26.81(e) and (f).
[20] 49 CFR 26.85.
[21] *See* P.L. 114–94 §1101(b)(3) for surface, and 49 USC §47113(b) for aviation.
[22] 49 CFR 26.21(a)(1) requires all FHWA "primary recipients" of Federal financial assistance to establish a DBE program, regardless of contract size. Subrecipients are governed by the prime recipient's DBE program.
[23] 49 CFR 26.45(b).
[24] 49 CFR 26.45.
[25] 49 CFR 26.45.
[26] *Id.*
[27] 49 CFR 26.47.
[28] *See* 49 CFR 26.5 and 49 CFR 26.51.
[29] 49 CFR 26.51(b).

If a recipient is unable to meet its overall DBE participation goal through race-neutral means, then a recipient must establish contract goals (which are deemed race-conscious) for DBE participation.[30] This means the recipient has determined that, without the use of race-conscious measures, a level playing field for DBE businesses could not be achieved. Contract goals require that prime contractors employed by DOT recipients make good-faith efforts to award a certain percentage of their total contract work to certified DBEs in order to meet the race-conscious portion of their overall DBE participation goal.[31] There are no Federally-mandated penalties for failing to meet these goals as long as good-faith efforts are made.

Importantly, as discussed further in section VI below, states under the jurisdiction of the Ninth Circuit Court of Appeals must use evidence from statistical disparity studies during their goal-setting process before DOT recipients in those states are allowed to set race-conscious goals for DBE participation.[32]

*V. WHAT MUST RECIPIENTS REPORT TO DOT MODAL ADMINISTRATIONS?*

Recipients of DOT funds must maintain accurate records of data related to the participation of DBEs on projects and report these records regularly to DOT modal administrations.[33] FHWA and FTA recipients must submit a uniform report of DBE contract awards, commitments, and payments twice per FY, and FAA recipients must submit such a report once per FY.[34]

These uniform reports break down awards, commitments, and payments of federal financial assistance in terms of, among other things: (1) number of contracts awarded to DBEs as a percentage of total contracts, (2) dollar amount of contracts awarded to DBEs as a percentage of total contract dollars, (3) a breakdown of number of contracts awarded to DBEs disaggregated by race, gender, or other applicable categories, and (4) a breakdown of contract dollar amounts awarded to DBEs disaggregated by race, gender, or other applicable categories.[35]

*VI. HOW HAS THE DBE PROGRAM BEEN REVIEWED BY THE COURTS?*

Numerous court cases dealing with the DOT's DBE program or questions of race or gender-based discrimination have affected the implementation of the program over time. Some have involved the program directly and others indirectly. Below is a brief overview of a few of the most relevant cases.

*a. City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989)*

In 1989, the United States Supreme Court held in *City of Richmond v. J.A. Croson Co. (Croson)* that a Richmond, Virginia, set-aside program giving preference to minority businesses in the awarding of municipal contracts was unconstitutional on the grounds that the city had failed to adequately demonstrate its compelling interest in establishing such a program on the basis of relevant, measurable evidence.[36] With this holding, the Court established an outline of what would constitute a permissible program for race-based awarding of public contracts by requiring that such programs be subject to a "strict scrutiny" standard (the most stringent standard) of judicial review.[37] Under the strict scrutiny standard, a public entity must prove: (1) that it has a "compelling interest" in remedying discrimination based on "a strong basis in evidence," and (2) that the measures employed to remedy such discrimination are "narrowly tailored" to the scope of the evidence presented.[38]

*b. Adarand v. Pena, 515 U.S. 200 (1995)*

In 1995, in *Adarand v. Pena (Adarand)*, a case dealing with DOT funds expended in the state of Colorado, the United States Supreme Court held that the strict scrutiny standard previously applied in *Croson* applies to the Federal government in the establishment of race-based programs.[39] While the Court did not specifically determine the constitutionality of DOT's DBE program in *Adarand*, the Administration undertook a review of Federal programs, including the DBE program, that used race or gender as a basis for decision-making to ensure compliance with the strict scru-

[30] 49 CFR 26.51(d).
[31] 49 CFR 26.51(e)(2).
[32] Case No. C00–5204 RBL (W.D. Wash. June 23, 2006)
[33] 49 CFR 26.11.
[34] *Id*.
[35] 49 CFR 26, Appendix B.
[36] 488 U.S. 469 (1989).
[37] *Id*.
[38] *Id*.
[39] 515 U.S. 200 (1995).

tiny standard.[40] In 1998, Congress reauthorized the surface DBE programs with the Transportation Equity Act for the 21st Century (TEA–21, P.L. 105–178). In 1999, the DOT finalized new rules for both the surface and aviation DBE programs to ensure compliance with *Adarand*, and new rules for the ACDBE program were issued in 2005.[41] Since the new rules were adopted, courts considering the constitutionality of the DBE program have consistently upheld the program against facial challenges.[42]

*c. Western States Paving Co, Inc. v. Washington State Department of Transportation, Case No. C00–5204 RBL (W.D. Wash. June 23, 2006)*

In 2005, the U.S. Court of Appeals for the Ninth Circuit decided in *Western States Paving Co, Inc. v. Washington State Department of Transportation (Western States)* that DOT's DBE program was facially constitutional, however was unconstitutional "as applied" by Washington State's DOT (WashDOT), because WashDOT had failed to meet the strict scrutiny requirement that the program be narrowly tailored.[43] The court held WashDOT had not established with sufficient statistical evidence that it needed race-conscious measures to meet WashDOT's DBE participation goals.[44] In response to this ruling, the DOT advised all states within the jurisdiction of the Ninth Circuit Court to implement only race-neutral program goals until statistical disparity studies could be completed to meet strict scrutiny standards for race-conscious contracting goals.[45]

*VII. WHAT ARE DISPARITY STUDIES AND HOW DO THEY IDENTIFY DISCRIMINATION IN MARKETS?*

Disparity studies are complex statistical analyses of relevant marketplaces for Federal contracts. Study methodology can vary, but studies generally aim to present policymakers with a "disparity ratio," the relative percentage of Federal contract dollars awarded to minority groups and women in comparison with the percentage such groups would be expected to receive in a marketplace where discrimination is not present.[46] Disparity studies conducted for DOT funding recipients may include, among other factors, analysis such as: (1) an empirical determination of the appropriate market area and appropriate product markets relevant to the recipients contracting activity; (2) an estimate of the fraction of DBEs compared with non-DBEs in the relevant market area and product markets (DBE availability); (3) an estimate of the percentage of the recipient's contract dollars earned by DBEs (DBE utilization); (4) a statistical comparison of DBE availability and utilization; (5) econometric analysis of the relative success of DBEs in the recipients public sector market as well as the corresponding private sector market; and (6) econometric analysis of DBE access to capital in the relevant marketplace.

As noted, recipients of DOT funds may use, and recipients under the jurisdiction of the Ninth Circuit Court generally must use pursuant to *Western States*, statistical disparity studies to aid in the establishment of goals for DBE participation on Federal-aid contracts. Since the *Croson* decision, many public agencies across the country, including DOT funding recipients, have relied upon disparity studies to establish accurate, empirically-based goals for minority participation in public contracting programs, including the DOT's DBE program.

---

[40] *See* Affirmative Action Review Report to the President. Retrieved September 18, 2020, from https://clintonwhitehouse2.archives.gov/WH/EOP/OP/html/aa/aa-index.html

[41] *See* 54 Fed. Reg. 5,096 (February 2, 1999), and 70 Fed. Reg. 14,496 (March 22, 2005)

[42] *See* Adarand Constructors, Inc. v. Slater, 228 F.3d 1147 (10th Cir. 2000), cert. granted, 532 U.S. 941, then dismissed as improvidently granted, 534 U.S. 103 (2001) (Adarand VII); Sherbrooke Turf, Inc. v. Minnesota Department of Transportation, and Gross Seed Co. v. Nebraska Department of Roads, 345 F.3d. 964 (8th Cir. 2003), cert. denied, 541 U.S. 1041 (2004); Western States Paving Co., Inc. v. Washington Department of Transportation, 407 F.3d 983 (9th Cir. 2005), cert. denied, 546 U.S. 1170 (2006); Northern Contracting, Inc. v. Illinois Department of Transportation, 473 F.3d 715 (7th Cir. 2007) (Northern Contracting III); Orion Insurance Group v. Washington OMWBE, U.S. DOT, 2018 WL 6695345 (9th Cir. 2018), cert. denied, June 24, 2019.

[43] Case No. C00–5204 RBL (W.D. Wash. June 23, 2006).

[44] *Id*.

[45] DOT Office of Civil Rights. *Western States Paving Company Case Q&A*. US Department of Transportation. Retrieved September 18, 2020 from https://www.transportation.gov/osdbu/disadvantaged-business-enterprise/western-states-paving-company-case-q-and-a

[46] National Academies of Sciences, Engineering, and Medicine, Transportation Research Board, & National Cooperative Highway Research Program. (2010). Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program. *The National Academies Press*. Retrieved September 18, 2020, from https://www.nap.edu/catalog/14346/guidelines-for-conducting-a-disparity-and-availability-study-for-the-federal-dbe-program

WITNESSES

- Mr. Farad Ali, Airport Minority Advisory Council
- Ms. Geri E. Boyer, P.E., American Council of Engineering Companies
- Ms. Mary Lerdahl, Emerald Consulting Services
- Mr. Sandy-Michael McDonald, Broward County, Florida, Office of Economic and Small Business Development
- Ms. Sandra Norman, Virginia Department of Transportation
- Mr. Jon Wainwright, Ph.D., NERA Economic Consulting
- Ms. Evalynn Williams, Conference of Minority Transportation Officials

# DRIVING EQUITY: THE U.S. DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

**WEDNESDAY, SEPTEMBER 23, 2020**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE,
WASHINGTON, DC.

The committee met, pursuant to call, at 10:01 a.m., in room 2167 Rayburn House Office Building and via Cisco Webex, Hon. Peter A. DeFazio (Chairman of the committee) presiding.

Mr. DEFAZIO. The committee will come to order.

I ask unanimous consent that the chair be authorized to declare recess at any time during today's hearing.

Without objection, so ordered.

Before proceeding further, I would first like to make a few comments about how we intend to proceed today. We had previously covered these issues, but I want to briefly remind Members for this hearing; it has been a while.

Today's hearing is being held in the committee's hearing room, as well as remotely by Cisco Webex. For Members and staff in the hearing room, I do have an announcement based on guidance from the Attending Physician, dated June 16, 2020. Members, staff, and all those physically present are informed that, in accordance with recent guidance from the Office of the Attending Physician, masks must be worn at all times during today's proceeding, except when a Member is speaking at a microphone.

The chair views this as a safety issue and, therefore, an important matter of order and decorum, and will assert his responsibility to preserve order and decorum with respect to the wearing of masks. The chair's authority to enforce the preservation of order and decorum during committee proceedings derives from the Speaker's enforcement authority under clause 2 of rule I. Pursuant to clause 1 of rule XI, the rules of the House are the rules of its committees and subcommittees, as far as applicable.

The committee chair has long been responsible for the enforcement of general decorum in their respective committees. The chair would greatly prefer that all present simply uphold the decorum of the committee by complying with reasonable safety standards that are recommended by the Attending Physician and are respectful of all the occupants in the room. However, failing that, enforcement would include denial of recognition toward Members who refuse to uphold standards of decorum.

As this is a hybrid hearing, I also want to remind Members of key regulations from the House Committee on Rules to ensure the

hearing goes smoothly. Members must be visible—hello—on screen for purposes of identification when joining this hearing. Members must also continue to use the video function software platform, Cisco Webex, as lame as it is, for the remainder of the time they are attending this hearing, unless experiencing connectivity issues or other technical problems.

If a Member is experiencing any connectivity issues or other technical problems, please inform committee staff as soon as possible so you can receive assistance. The chat function is available for Members on the Webex site platform for this purpose. Members can also call the committee's main phone line, 202–225–4472, for technical assistance by phone.

Members may not participate remotely in any other proceeding that may be occurring simultaneously.

It is the responsibility of each Member seeking recognition to unmute their microphone prior to speaking. To avoid any inadvertent background noise, I request every Member to keep their microphone muted when not seeking recognition to speak. Should I hear any inadvertent background noise, I will request the Member to please mute their microphone.

Finally, despite this being a hybrid hearing, I want to emphasize that all the standard rules of decorum apply.

As the chair of today's hearing, I will make a good faith effort to provide every Member experiencing connectivity issues an opportunity to participate fully.

Members will have the standard 5 minutes to ask questions.

To insert a document into the record, please have your staff email it to the committee's clerk, Mike Twinchek.

This hearing is also being livestreamed for the public to view.

And I would now recognize myself for my opening statement.

Today's hearing is focused on the United States Department of Transportation's Disadvantaged Business Enterprise program, DBE program, for short. It is an essential program that seeks to remedy discrimination and its effects on women- and minority-owned businesses as they compete for federally assisted transportation contracts. It seeks to ensure all businesses can compete for Federal transportation dollars on a level playing field.

I am proud to follow in the footsteps of my friend, the former chairman of this committee, Jim Oberstar—there is Jim, right there [indicating portrait]—who was the last chairman to convene a hearing on this subject, 11 years ago, in 2009.

I am also disturbed that, in the 11 years since that hearing, discrimination has continued to plague women and minorities in this country in the transportation sector. Discrimination is still terribly real in America. And if the events of 2020 have not proven that convincingly enough, I am confident the overwhelming evidence we have examined for this hearing will at least shut the door on the question, as it relates to federally assisted transportation projects.

Our committee planned to hold this hearing more than 5 months ago, but our plans were delayed by the rapid spread of the COVID–19 pandemic. Sadly, the continuing pandemic only underscores the need for this hearing and for the DBE program. It is increasingly clear minority communities and minority-owned businesses have been disproportionately devastated by the virus.

Almost 2 months ago, during debate before the passage of H.R. 2 on the House floor, I submitted 30 high-quality disparity studies into the Congressional Record, including many hundreds of pages of rigorous empirical evidence testifying to the reality of discrimination and its effects on the transportation sector.

Today I ask unanimous consent to insert into this committee's record an additional 10 studies, for a total of 40 studies, only a sampling of the mountain of evidence this committee has seen over the years testifying to the reality of discrimination in the transportation sector.

Without objection, so ordered.

[The information follows:]

**Ten Disparity Studies, Submitted for the Record by Hon. Peter A. DeFazio**

The full text of each report is held on file electronically with the Committee on Transportation and Infrastructure.

*Dallas Fort Worth International Airport Disparity Study 2019*, Colette Holt & Associates, 2019

*Washington State Airports Disparity Study 2019, Conducted for the Washington State Department of Transportation*, Colette Holt & Associates, 2019

*City of South Bend Disparity Study 2019*, Colette Holt & Associates, 2019

*2017 Minnesota Joint Disparity Study, Metropolitan Airports Commission, Draft Report*, Keen Independent Research, January 2018

*2015 Disadvantaged Business Enterprise Disparity Study, John Wayne Airport, County of Orange, California*, MGT of America, Inc., December 2016

*2015 Procurement Disparity Study, City of Portsmouth, Virginia*, MGT of America, Inc., 2015

*Tampa International Airport 2015 Disparity Study Update*, MGT of America, Inc., August 2015

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Memphis, Prepared for the Memphis-Shelby County Airport Authority*, NERA Economic Consulting, December 2013

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Mississippi, Prepared for the Jackson Municipal Airport Authority*, NERA Economic Consulting, December 2012

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Missouri, Prepared for the Missouri Department of Transportation*, NERA Economic Consulting, August 2012

Mr. DEFAZIO. I repeatedly pointed to these disparity studies to demonstrate the reality of discrimination and its effects. But it is equally important to note that our committee has received qualitative evidence of discrimination, as well. Letters from DBE-certified business owners and other stakeholders from across the country have come to this committee in the last few months, testifying to the importance of the program and to the reality of discrimination faced by women and minority business owners. Some of those business owners and stakeholders are before us, virtually, today to share their stories, and I thank them for their testimony.

The DBE program has been narrowly constructed to combat the discrimination laid out in the evidence from across this country. It is not a perfect program; I am sure we will hear more about that today. But I believe it is an essential program, if we want to ensure

a level playing field for all American businesses wishing to compete for Federal transportation dollars.

Once again, I want to thank all the witnesses for taking the time to be with us today, particularly in this rather awkward virtual format. This is a profoundly important topic, and I look forward to hearing your testimony.

[Mr. DeFazio's prepared statement follows:]

**Prepared Statement of Hon. Peter A. DeFazio, a Representative in Congress from the State of Oregon, and Chairman, Committee on Transportation and Infrastructure**

Today's hearing is focused on the U.S. Department of Transportation's Disadvantaged Business Enterprise, or DBE, Program. This essential program seeks to remedy discrimination and its effects on women- and minority-owned businesses as they compete for Federally-assisted transportation contracts. It seeks to ensure all businesses can compete for Federal transportation dollars on a level playing field.

I am very proud to follow in the footsteps of my friend, the former Chairman of this Committee, Jim Oberstar, who was the last Chairman to convene a hearing on this subject eleven years ago in 2009. But I am also disturbed that in the eleven years since that hearing discrimination has continued to plague women and minorities in this country and in the transportation sector.

Discrimination is still terribly real in America, and if the events of 2020 have not proven that convincingly enough, I'm confident the overwhelming evidence we have examined for this hearing will at least shut the door on the question as it relates to Federally-assisted transportation contracts.

Our Committee planned to hold this hearing over five months ago, but our plans were delayed by the rapid spread of the COVID–19 pandemic. Sadly, the continuing pandemic only underscores the need for this hearing and for the DBE program. It is increasingly clear minority communities and minority-owned businesses have been disproportionately devastated by the virus.

Almost two months ago, during debate before the passage of HR 2 on the House floor, I submitted thirty, high-quality disparity studies into the Congressional Record including many hundreds of pages of rigorous empirical evidence testifying to the reality of discrimination and its effects in the transportation sector. Today, I ask unanimous consent to insert into this Committee's Record an additional ten studies, for a total of forty studies—only a sampling of the mountain of evidence this Committee has seen over the years—testifying to the reality of discrimination in the transportation sector.

I have repeatedly pointed to these disparity studies to demonstrate the reality of discrimination and its effects, but it is equally important to note that our Committee has received qualitative evidence of discrimination as well. Letters from DBE-certified business owners and other stakeholders from across the country have come to this committee in the last few months testifying to the importance of the program, and to the reality of discrimination faced by women and minority business owners. Some of those business owners and stakeholders are before us today to share their stories, and I thank them for being here.

The DBE program has been narrowly constructed to combat the discrimination laid out in the evidence from across this country. It is not a perfect program, and I'm sure we will hear more about that today. But I believe it is an essential program if we want to ensure a level playing field for all American businesses wishing to compete for Federal transportation dollars.

Once again, I want to thank all the witnesses for taking the time to be with us today, particularly in this virtual format. This is a profoundly important topic, and I look forward to hearing your testimony.

Mr. DeFazio. With that, I would recognize the ranking member, Sam Graves, for an opening statement.

Mr. Graves of Missouri. Thank you, Chairman DeFazio, and I want to thank you for calling today's hearing to review the Department of Transportation's Disadvantaged Business Enterprise, or DBE, program.

We are all here today to examine the DBE program and determine what, if anything, can be done to improve the program, moving forward.

It has been 37 years since Congress first created the DBE program, which was intended to help small businesses owned and controlled by those facing discriminatory barriers in the transportation, construction, and airport concessions industry. Congress has recognized the success of the DBE program by continuing to keep it in place, and making adjustments as needed.

I look forward to hearing from today's witnesses as to the progress that we have made towards realizing the goals of the DBE program, and what recommendations they have.

And with that, I yield back.

[Mr. Graves of Missouri's prepared statement follows:]

**Prepared Statement of Hon. Sam Graves, a Representative in Congress from the State of Missouri, and Ranking Member, Committee on Transportation and Infrastructure**

We are here today to examine the DBE program and determine what, if anything, can be done to improve the program going forward.

It has been 37 years since Congress first created the DBE program, which was intended to help small businesses owned and controlled by those facing discriminatory barriers in the transportation construction and airport concession industries.

Congress has recognized the success of the DBE program by continuing it and making adjustments as needed.

I look forward to hearing from today's witnesses as to the progress that we have made toward realizing the goals of the DBE program, and what recommendations they have.

Mr. DeFazio. I thank the gentleman. I now recognize the chair of the Subcommittee on Highways and Transit, Congresswoman Norton, for a statement.

Ms. Norton. Thank you, Mr. Chairman. I very much appreciate your holding this important hearing, especially this year.

We are at a pivotal moment in our Nation's history, we are shining a long-overdue light on the lived realities of people of color in this country, despite our pledge of liberty and justice for all. Over the last few months, the vulnerability of African Americans, Latinos, Native American, and other Black and Brown people has been unmistakably demonstrated as we ride wave after wave of crisis, a global pandemic, a tanking economy, and systemic racism repeatedly manifesting itself.

The way in which our Nation has failed and marginalized large populations of our citizens, while unbearable to watch over and over again, comes as no surprise to those of us who feel the prevalence of racism in our experience.

I have spent my entire career—in Congress, and as chair of the U.S. Equal Opportunity Commission before that—fighting for equality and seeking to break down barriers so that all citizens have the same opportunities to participate and thrive in our economy and our society.

One of the most powerful tools in the field of transportation and construction to assist people who have been routinely left out is the Disadvantaged Business Enterprise program. This program, when properly administered and enforced, ensures that businesses owned

by women and minorities have a fair chance to compete for federally assisted transportation contracts. The need for this program is ongoing, and stronger than ever, as income inequality in this country, with a pandemic helping it to grow, continues.

Today's panel will provide mountains of statistical evidence that show discrimination in transportation and construction projects. Mr. Wainwright's testimony documents, through rigorous statistical analysis and survey data collected by various agencies, the continued need for the DBE program. We are also joined today by individual business owners who have participated in the DBE program to provide some context for why these surveys and statistical studies matter.

But let me point to a 2018 study conducted for the Maryland Department of Transportation, whose geographic market includes Washington, DC. The study looked at, among other things, whether prime contractors who work with minority- and women-owned firms as subcontractors on contracts with DBE-type goals ever solicit or hire those same firms to work on contracts without such goals.

The answers were stark and stunning: 69 percent of African-American-owned firms responded that they were seldom or never solicited to work on contracts without goals in place, and 74 percent of African-American-owned firms were seldom or never hired to work on contracts without goals. For Hispanic Americans, the results were 47 percent and 52 percent. For Asian Americans, the results were 56 percent and 61 percent. For Native Americans, the results were 82 percent and 70 percent. And for nonminority women, the results were 54 percent and 53 percent. This is just one regional example, but this pattern repeats itself across the country.

In closing, I remind my colleagues that this hearing presents a welcome opportunity to elevate the realities of minority- and women-owned business owners. By holding this hearing today, we ensure that the DBE program and the business owners it lifts up will receive thorough consideration by our committee.

We also have the opportunity to learn what policy changes Congress should consider for the continued success of the DBE program.

And I look forward to hearing from today's witnesses, as well as from my fellow members of this committee.

Thank you very much, Mr. Chairman.

[Ms. Norton's prepared statement follows:]

**Prepared Statement of Hon. Eleanor Holmes Norton, a Delegate in Congress from the District of Columbia, and Chairwoman, Subcommittee on Highways and Transit**

Thank you, Mr. Chairman. I cannot overstate the importance of this hearing on the U.S. Department of Transportation's Disadvantaged Business Enterprise program. I thank Chairman DeFazio, Ranking Member Graves, and all the Members participating today for your time and attention to this critical topic.

We are at a pivotal moment in our Nation's history. We are shining a long overdue light on the lived realities for people of color in this country, despite our pledge of "liberty and justice for all". Over the last few months, the vulnerability of African American, Latinx, Native American, and other black and brown people has been unmistakably demonstrated as we ride wave after wave of crisis—a global pandemic,

a tanking economy, and systemic racism repeatedly manifesting as physical violence.

The ways in which our Nation has failed and marginalized large populations of our citizens—while unbearable to watch over and over again—comes as no surprise to those of us who can feel the prevalence of racism in our bones. I have spent my entire career—in Congress, and as Chair of the U.S. Equal Opportunity Commission before that—fighting for equality and seeking to break down barriers so that truly all citizens have the same opportunities to participate and thrive in our economy and our society.

One of the most powerful tools in the field of transportation and construction to assist people who have routinely been left out or left behind is the U.S. Department of Transportation's Disadvantaged Business Enterprise (DBE) Program. This program, when properly administered and enforced, ensures that businesses owned by women and minorities have a fair chance to compete for federally assisted transportation contracts.

The need for this program is ongoing, and stronger than ever, as income inequality in this country with the pandemic helping it to grow. Today's panel will provide mountains of statistical evidence that shows discrimination on transportation construction projects is, unfortunately, alive and well.

Mr. Wainwright's testimony documents, through rigorous statistical analysis and survey data collected by various public agencies, the continued need for the DBE program.

We are also joined today by individual business owners who have participated in the DBE program and will share their personal stories of how this program affirmatively created opportunities that did not exist in its absence. I would like in particular to thank Ms. Lerdahl, Ms. Williams, and Ms. Boyer for sharing your experiences with the Committee.

To provide some context for why these surveys and statistical studies matter, let me point to a 2018 study conducted for the Maryland Department of Transportation, whose geographic market area includes Washington, D.C. The study looked at, among other things, whether prime contractors who work with minority- and women-owned firms as subcontractors on contracts with DBE-type goals ever solicit or hire those same firms to work on contracts without such goals. The answers were stark and stunning—69 percent of African American owned firms responded that they were seldom or never solicited to work on contracts without goals in place, and 74 percent of African American owned firms were seldom or never hired to work on contracts without goals. For Hispanic Americans the results were 47 percent and 52 percent; for Asian Americans the results were 56 percent and 61 percent; for Native Americans the results were 82 percent and 70 percent; and for non-minority women, the results were 54 percent and 53 percent. This is just one regional example but this pattern repeats itself across the country.

In closing, I remind my colleagues that this hearing presents a welcome opportunity to elevate the realities of minority and women-owned business owners. By holding this hearing today, we ensure that the DBE program and the business owners it lifts up receive thorough consideration by this Committee. We also have the opportunity to learn what policy changes Congress should consider for the continued success of the DBE program in the future.

I look forward to hearing from today's witnesses, as well as my fellow Members, on the DBE program.

Mr. DEFAZIO. Thank you, Ms. Norton. I now call on the ranking member of the Subcommittee on Highways and Transit, Mr. Davis.

Mr. DAVIS. Thank you, Chairman DeFazio. I want to thank the witnesses for participating in this important hearing. I want to give a special welcome to my friend, Ms. Geri Boyer, who is in southern Illinois right now.

I understand Congressman Bost is going to be providing us with your full introduction today, so I won't steal his thunder, unless he screws it up.

So I am watching you right now, Mike.

But it is great to see you. I appreciate the work you do for Illinois and across the Midwest.

The Disadvantaged Business Enterprise program, administered by the Department of Transportation, applies to airport construc-

tion, airport concessions, and surface transportation construction programs. The program addresses discrimination against minority- and women-owned businesses, and provides those businesses within the transportation industry an equal opportunity to participate in billions of dollars of DOT-assisted highway, transit, and airport contracts each year.

The DBE program has been successful, and this committee has demonstrated a bipartisan commitment to this program and to promoting full and fair access to transportation contracting opportunities.

I commend the chairman and the ranking member for holding this hearing today. This is an important discussion, important to all of us in the room, and those connecting remotely, and to the Nation, as a whole.

Mr. Chair, I yield back the balance of my time.

[Mr. Davis' prepared statement follows:]

**Prepared Statement of Hon. Rodney Davis, a Representative in Congress from the State of Illinois, and Ranking Member, Subcommittee on Highways and Transit**

I want to thank the witnesses for participating in this important hearing, and I want to give a special welcome to Ms. Geri Boyer. It is great to see you and I appreciate the work you do for Illinois and across the Midwest.

The Disadvantaged Business Enterprise program, administered by the Department of Transportation, applies to airport construction, airport concessions, and surface transportation construction programs. The program addresses discrimination against minority and women-owned businesses and provides those businesses within the transportation industry an equal opportunity to participate in billions of dollars of DOT-assisted highway, transit, and airport contracts each year.

The DBE program has been successful, and this Committee has demonstrated a bipartisan commitment to this program and to promoting fair and full access to transportation contracting opportunities.

I commend you for holding this hearing today. This is an important discussion—important to all of us in the room and those connecting remotely, and to the Nation as a whole.

Mr. DEFAZIO. I thank the gentleman.

I would now like to welcome the witnesses on our panel: Ms. Evalynn Williams, president, Dikita Enterprises, on behalf of the Conference of Minority Transportation Officials; Ms. Geri Boyer, president, Kaskaskia Engineering Group, on behalf of the American Council of Engineering Companies; Ms. Mary Lerdahl, owner, Emerald Consulting Services; Mr. Farad Ali, at-large board director, Airport Minority Advisory Council; Mr. Sandy-Michael McDonald, director, Office of Economic and Small Business Development, Broward County, Florida; and Ms. Sandra Norman, administrator, civil rights division, Virginia Department of Transportation; and Mr. Jon Wainwright, Ph.D., affiliated consultant, NERA Economic Consulting.

Thank you all for participating today. We are looking forward to your testimony.

Without objection, our witnesses' full statements will be included in the record.

Hearing none.

Since your written testimony has been made part of the record, the committee requests you limit your oral testimony to 5 minutes. Summarize as best as possible.

Before we hear from our panel of witnesses, I recognize Representative Johnson to introduce Ms. Evalynn Williams.

Representative Johnson?

Ms. JOHNSON OF TEXAS. Yes, thank you very much. And I want to thank all of the witnesses for being present.

I want to say that I am pleased to introduce Ms. Evalynn Williams, who is a constituent in Dallas, Texas. She has served as the chief financial officer for Dikita for 26 years, prior to transitioning to the president and CEO in 2010. Following and guided by her father, the company has grown to unprecedented heights. Under her leadership, the company has continued to thrive in new markets and obtain large and notable projects. Dikita's largest client is Dallas Area Rapid Transit, where the company has managed transit and NTD data for the last 28 consecutive years. Recently, Dikita completed a prime role as a 49-percent JV partner designing and managing the construction of DART's last 3 miles of light rail, and I look forward to her testimony.

And thank you very much for being here.

Mr. DEFAZIO. Thanks, Representative Johnson. I now recognize Representative Bost to introduce Ms. Geri Boyer, under threat by Rodney Davis.

Mr. BOST. Thank you, Mr. Chairman. You know, I am happy to have the opportunity to introduce our constituent, Geri Boyer from Belleville, Illinois, as a witness for today's hearing.

Ms. Boyer is a founder, owner, and president of Kaskaskia Engineering Group. Kaskaskia Engineering Group is a civil engineering and contracting firm that has been recognized on the list of St. Louis Business Journal's largest women-owned businesses over the past decade. Ms. Boyer has also won multiple awards for her leadership. She is an active member of the American Council of Engineering Companies, Associated General Contractors of Illinois, Illinois Association of County Engineers, and the Illinois Association of Highway Engineers. Ms. Boyer is also an active member within our community, working with the Belleville CEO Program and is the civil chairperson for the Belle-Scott Committee of the Greater Belleville Chamber of Commerce.

I am excited to have her give her testimony on the Department's Disadvantaged Business Enterprise program, and look forward to the insight that she can offer, given her years of success in business. She is one of the most qualified witnesses, I believe, that is on the panel today, and I appreciate her being here, and I appreciate the opportunity to introduce her.

And Rodney, I hope that was good enough for you, because I think Geri is going to do a great job.

And with that, I yield back.

Mr. DEFAZIO. Rodney stepped out, but I am sure he is in accordance. I think that was very well done. So thank you.

We will now move to witness testimonies.

Ms. Williams, you may proceed. You are recognized for 5 minutes.

**TESTIMONY OF EVALYNN WILLIAMS, PRESIDENT AND CHIEF EXECUTIVE OFFICER, DIKITA ENTERPRISES, INC., ON BEHALF OF THE CONFERENCE OF MINORITY TRANSPORTATION OFFICIALS; GERI E. BOYER, P.E., PRESIDENT, KASKASKIA ENGINEERING GROUP, LLC, ON BEHALF OF THE AMERICAN COUNCIL OF ENGINEERING COMPANIES; MARY T. LERDAHL, PRESIDENT, EMERALD CONSULTING SERVICES, LLC; FARAD ALI, CHAIRMAN, GOVERNMENT AFFAIRS COMMITTEE, AIRPORT MINORITY ADVISORY COUNCIL; SANDY-MICHAEL E. McDONALD, DIRECTOR, OFFICE OF ECONOMIC AND SMALL BUSINESS DEVELOPMENT, BROWARD COUNTY, FLORIDA; SANDRA D. NORMAN, DIVISION ADMINISTRATOR, CIVIL RIGHTS, VIRGINIA DEPARTMENT OF TRANSPORTATION; AND JON S. WAINWRIGHT, PH.D., AFFILIATED CONSULTANT, NERA ECONOMIC CONSULTING**

Ms. WILLIAMS. Good morning, and I want to thank you for allowing me the opportunity to testify in support of the DBE program. My name is Eve Williams, president of Dikita Enterprises, a 40-year-old African-American engineering firm located in Dallas, Texas. And today I speak on behalf of COMTO, as well as all the DBEs across the Nation.

I also sit on the APTA board of directors, where next month I will become the first African-American female to chair its distinguished Business Members Board of Governors.

My company has been a part of the DBE program since its beginning, and is the oldest black engineering firm in north Texas.

Being a female, Black, and a small business in the construction industry has many challenges. Programs such as the DBE program provide us a chance to participate in lead roles, which affords us the opportunity to create majority-minority teams. One success story I would like to share.

Dikita was a 49-percent partner in a team where we designed the last 3 miles of the rail system for Dallas Area Rapid Transit. We saved the agency over $4 million, and began revenue service 2 months ahead of schedule. The icing on the cake is that 60 percent of the project was designed by DBE firms.

Being called disadvantaged is not a privilege, nor does it sound like a company's goal. And quite frankly, it was embarrassing, explaining that to my 25-year-old millennial. What an engaging conversation that followed.

The public sector is where firms like Dikita has its greatest opportunity. But please note, if majority companies and public agencies are not incentivized to include firms like mine, they won't. Let me give you a case in point.

We were going after a project in a small suburban community near Dallas. I knew about the proposal because of my strong relationships in the community. The project was much in our wheelhouse, but since there were parts of the work that others could do better, we reached out to a nationally known, local firm that we had worked with in the past. They were not aware of the opportunity. What happened next was shocking, but not surprising.

In an email thread that was inadvertently sent to me, I read a discussion that went something like this. Of course, I changed the names here. So I called John to ask if they'd be interested in

teaming with us. John informed his boss, Ted. John explained the services, and thought Dikita and their company could do well, since we had a relationship.

Ted asked about the minority participation goal. John told him there was no minority goal. Ted asked John, "Then why would we sub to Dikita?" John reminded Ted that Dikita was the best at what they were doing.

Ted told him that, since there was no minority participation goal, "Dig into the opportunity, and we will just do it ourselves."

When John questioned Ted again, Ted told them, "Hey, we're bigger, just reject the offer."

This is when John sent me an email rejecting our offer, and inadvertently included the entire thread. The email was so painful and disappointing.

There are so many sad storybook episodes regarding blatant discriminatory practices, especially against Black firms. In fact, if you look closer at the minority goals being met today, you more than likely will find that African Americans who the DBE program was first written for will have the smallest percentages, while other groups have benefitted more. Black professional firms are starting to be an endangered species, like the bald eagle was.

I do want to bring one barrier that you have the power to change. That is the formula in determining personal net worth. It took 22 years before an inflationary adjustment was made to the personal net worth statement in 2011. It is now almost another 10 years and counting. The lack of regular inflationary adjustments could prematurely remove small businesses from the program.

One idea I have is to exclude retirement savings from the net worth calculation. Currently, it includes restricted funds such as 401(k), which disincentivizes a business owner to save for retirement. So here I am, respectfully asking for your consideration to remove retirement savings from the personal net worth calculation.

In conclusion, this program is not a handout. It is a leg up. It forces big companies and public agencies to play fair. And, quite frankly, without the DBE program, we would be out of business at the end date of the last contract in our pipeline. We should be protected like——

[Microphone unmuted.]

Mr. DeFazio. Somebody is transmitting. Just conclude, then, Ms. Williams. Thank you, sorry about that.

[No response.]

Mr. DeFazio. OK?

Ms. Williams. Yes, thank you.

[Ms. Williams' prepared statement follows:]

**Prepared Statement of Evalynn Williams, President and Chief Executive Officer, Dikita Enterprises, Inc., on behalf of the Conference of Minority Transportation Officials**

My name is Evalynn Williams. I am the President and CEO of Dikita Enterprises, Inc., a family-owned minority consulting engineering and architectural firm headquartered in Dallas, Texas. We celebrated our 40th year in business last November. We provide civil design, program and construction management, and transit market research as it relates to public transit planning. We have 40–50 people typically and employ all nationalities of which many are skilled professionals who are

either woman or are of a minority group. My father, Lucious Williams, founded the firm in 1979 in Milwaukee Wisconsin and branched to Dallas, where I was attending college in 1983. I promised him 2 years as his CFO in exchange for paying off my college loans, which was only $5,000 at the time. That was 36 years ago. We've been partners ever since. Over the years, especially in the 80 and 90's we have many times been the first African American firm to be awarded . . . and you can fill in the blank. Even today, I'm amazed that we continue to be the first African American engineering firm to prime a contract with public entities. Many of the firms we began with in the early 80s no longer exist for various reasons, but mostly because of the lack of opportunities and resources. We are the oldest African American professional engineering firm in North Texas.

We offer our services to mainly the governmental sectors, that are federally, state or locally funded. Our industries include public transit, highways, aviation, public educational institutions, including K–12 and higher education, municipalities for roadway and infrastructure projects. We have worked on multi-billion dollar projects as well as those under $100,000. We have worked across the nation providing a variety of services, typically transit planning. We are certified in 19 locations across the nation. Being certified in these many areas allow us to participate with transit properties and provide transit market research. We typically are precluded from offering engineering services as a DBE in other states because of certain state laws. Neither my father nor I have a professional engineering license. We excel in management, marketing and financial expertise.

I have a BBA degree in information systems and an MBA in accounting. I serve on several civic boards and have won my share of awards. I am currently a member of COMTO and the American Public Transportation Association (APTA), where, in October, I will become the first African American female to chair APTA's distinguished Business Members Board of Governors. APTA membership includes at least 90% of all public transit organizations in North America and practically every large national commercial firm that does business with public transit authorities. COMTO, which is the Conference of Minority Transportation Officials, is the leading national advocate for employment diversity, inclusion and contracting opportunities in the multi-modal, multi-billion-dollar transportation industry. Their mission is to eliminate barriers to maximum participation for minority individuals, veterans, people with disabilities and certified MWDBE businesses.

In 2010, I became President and CEO of Dikita and my father has remained active as the Chairman of the Board and Director of Government Affairs. He owns 51% of the firm and I own 47%, while my oldest daughter owns 2%. Being trained in accounting and finance, running an engineering firm has its challenges in of itself. Being a female, an African American, and a small business in the construction industry has had many challenges. There are certain systemic stereotypes that are associated with all the classes of categories I've mentioned, but typically they all have one thing in common. The idea that women, African Americans, small businesses, engineering companies ran by non-engineers—produce an inferior work product. These certainly create barriers for successfully contracting and being relevant in the industry. Of all these labels, I think being African American, however, presents the biggest challenge when competing for work.

Being a disadvantaged business has certainly helped level the playing field. As the CEO of a 2nd generation African American engineering and architectural firm, we would never have sustained had it not been for disparity programs such as the Federal DBE Program. Competition for prime contracts with the Department of Transportation, Federal Aviation and Federal Transit is difficult at best, and out of reach for most minority and women owned businesses (M/WBE).

It is almost impossible for DBE firms to compete with large national and international firms. They have the capacity and depth within their workforce and can pull from global office locations. And over the last 15 years, they have gotten even larger; which makes the reauthorization of the DBE Program is so extremely critical to firms such as *Dikita Enterprises, Inc*. It provides us with opportunities to join a team as a subcontractor, a prime or joint venture partner, which in turn helps to build financial capacity and workforce resources. It's because of this program, Dikita led a joint-venture team with a huge majority firm to design and build the last 3 miles of rail line for the Dallas Area Rapid Transit system (DART), saving the agency over $4 million. DART was able to open for revenue service 2 months ahead of schedule. Sixty-one percent of the team were DBE firms.

The truth is . . . if not for the DBE Program, large corporations would not share the work and would self-perform 100% of contract-work. Being called "disadvantaged" is not a privilege nor does it sound like a goal that a company would strive to be. The reality is, without the program we would not have a chance at fair competition. Quite frankly, it was embarrassing explaining to my 21-year-old millennial,

a few years ago, why we were considered a disadvantaged business. I can tell you that an engaging conversation and history lesson spun from this revelation. Nevertheless, the DBE program is necessary for the continuing survival of firms such as mine—to feed our families, educate our youth, and build our communities.

I know for a fact that if it wasn't for the federal and local equity programs, we would not be able to compete or obtain contracts. That is evident when you look at private vs. public work. In the public sector, the large firms that are considered primes, contract with us only to the extent that it will help them win the project. If the goal is 25%, then they will typically subcontract only that minimum amount, even though we are a proven entity. Case in point. We were going after a project in a small suburban community near Dallas. I found out about the request for proposal because I had very strong relationships in that community. Much of the project was within our wheelhouse and we felt certain we could successfully propose and win. Since there were parts of the work that others could do better, we reached out to a nationally known local firm that we had worked with in the past. They were not aware of the opportunity. What happened later was shocking but not surprising. In an email thread that was inadvertently sent to me, I read a discussion that went something like this (all names are fictitious and are here to make the conversation easier to understand):

- John informed his boss Ted that Dikita had inquired about XYZ company providing service on an upcoming proposal.
- Ted asked about the services to be performed and John explained the services and thought Dikita and XYZ could do well since they have worked together in the past.
- Ted asked about the minority participation goal.
- John told him that there was no minority goal.
- Ted asked John why they would sub to Dikita.
- John reminded Ted that Dikita was very good at providing these type of specialty services
- Ted told John that XYZ was bigger and to dig into the opportunity.
- When John asked about participating with Dikita, Ted told him that since there was no minority participation, they would just do the project themselves.
- When John questioned Ted again, Ted told him that XYZ was bigger and to reject our offer.
- This is when John sent us an email rejecting our offer and inadvertently included the entire thread.

This kind of conversation among large majority firms is not unusual and is a matter of practice. And often we only suspect or hear about why we were rejected from a third party. However, this was played out in an email and was so painful and disappointing.

There are many story-book episodes regarding blatant discriminatory practices that occur to either keep minority firms small or run them out of business, especially African American firms. Everyone knows that DBE businesses often live month to month unless we have been successful in backfilling our pipelines with future projects. One of the most disheartening feelings is to know that you are only as good as the current project. We have had many relationships with larger firms and have provided excellent service, but it's never quite the excellent services in which you are remembered. We are the token DBE checkbox that fulfilled the requirement. This I say because I have witnessed the less than genuine relationships we have forged. We can perform exceptionally well for many years on a 5-year large project. However, I notice that when that same large firm is going for the exact project-type in another state, they will not invite us to the team. When I've asked about being on the team, the reply is the same, "we needed you in Dallas, we will 'use' someone else in Houston". When I question why, the answer is always "because you are only useful in Dallas and taking you to other cities or states doesn't help us to win", even if we are the best in providing the services required. It's political. Well that mentality keeps firms like mine small and confines us to our own neighborhoods. For us to grow, we need not only to be able to work in other states, but to work in the private industry. Working for private developers is typically not an option, hence the need for DBE program for government projects.

I'd like to talk about another challenge I see with the DBE Program. While I appreciate the nature of the DBE program, there seems to be a lack of attention to some of the challenges we face. Still in existence are discriminatory and other related barriers that pose significant obstacles for minority and women-owned businesses competing for federally funded contracts. One such barrier is the lack of regular inflation-adjustments to the Personal Net Worth requirement for DBE certification. Unlike the Business Revenue Cap, (which is reviewed and adjusted periodically by the Secretary of Transportation) it was 22 years before an inflation-adjust-

ment was made to the Personal Net Worth, increasing the 1989 cap of $750K to $1.3M in 2011. It is important to note that much like the economy, the personal net worth of DBE owners and their companies are fluid. The lack of regular inflation-adjustments stops DBE businesses from growing and could prematurely remove businesses such as mine from the program. Some folks think that this $1.3M net worth is vast. If you are a successful business, you must accumulate a net worth that will allow banks to loan you money in order to continue upward growth and mobility. But more importantly, you must save money for retirement. While the formula for calculating personal net worth excludes our homestead, it *does include* your retirement savings. By including restricted retirement savings into the calculation, it acts to disincentivize a business owner from saving adequately for retirement. At the end of the day, we all should have a transition plan and be able to retire comfortably. However, if most of the dollars I save become retirement assets and those assets count against me in the certification process, then I'm likely not encouraged to save but to spend. So, I am asking that the program exclude retirement savings from the Personal Net Worth calculation.

In conclusion, the disparity and the inequities of our capitalistic society, coupled with the injustices from America's history of discriminatory practices against African Americans specifically, are reasons that DBE program must continue to exist and expand. My dad, my daughters and I depend on the program to stay in business. This program is not a handout, it's a leg up. It forces the big companies to play fair, and quite frankly, if we graduated from the program (and its sister M/WBE local programs) or the program is dissolved, we would be out of business at the expiration date of the last contracts in our pipeline.

Mr. DEFAZIO. OK, thank you for your testimony and your suggestion.

Ms. Boyer, you may proceed.

Ms. BOYER. Chairman DeFazio and Ranking Member Graves, thank you for the opportunity to testify before the committee today. It is an honor to represent my firm and my colleagues in the Nation's engineering industry.

And thank you, Representative Davis and Representative Bost, for that kind introduction.

As you heard, my name is Geri Boyer. I am president and sole owner of Kaskaskia Engineering Group, headquartered in Belleville, Illinois. We have DBE certifications in Illinois, Iowa, Indiana, Kentucky, Missouri, Minnesota, and Wisconsin.

I am testifying today on behalf of the American Council of Engineering Companies, the business association of the Nation's engineering industry. ACEC represents nearly 5,500 engineering companies, nationwide. Our members include very large firms with tens of thousands of employees as well as hundreds of small businesses like mine.

I want to communicate three main points to you today: first of all, DBE programs are essential for helping businesses like mine compete for work; second, securing certifications in different States and different jurisdictions can be burdensome; and three, for professional engineering and design-related services, it is important to balance DBE considerations with qualification-based selection procedures.

DBE programs have provided me the opportunity to diversify and grow my company within the engineering and construction industry throughout the Midwest. I still encounter discrimination and the historic effects of discrimination, and DBE certification gives me the opportunity to compete for contracts and expand my business opportunities.

If we are going to be able to sustain our profession and continue to support the transportation clients we serve, it is imperative that

we continue these efforts. Diversification makes our companies and our industry stronger, and it makes us more appealing to the next generation of professionals which we desperately need to recruit. Federal DBE programs are one tool to bring these goals forward.

However, one challenge for DBE firms like mine that work in multiple jurisdictions is the lack of a unified approach to DBE certification. The changes made in MAP–21 to implement a uniform certification application and reporting forms have been helpful. All the States I mentioned before use the uniform application, but they require the entire application again at different times of the year. The application must be current to equipment, purchases, loans, and anything else a business uses to run their day-to-day operation. This creates unnecessary work for the DBE firm and the public agency, who both have limited time and budget pressures.

I submitted for the hearing record a white paper I helped develop with the ACEC Illinois Business Practices Committee. It goes into greater detail on certification challenges and potential solutions to streamline and simplify the process.

Lastly, I want to note the intersection of DBE certification with Federal and State procurement requirements for contracting for engineering services. Current laws require agencies using Federal funds to follow QBS, qualification-based selection procedures, for procuring engineering and design-related services. Under QBS, agencies select firms based on their experience, expertise, and demonstrated competence. These rules apply to federal-aid highway, transit, and airport improvement programs through various pieces of legislation approved by this committee over many years, which ACEC strongly supported.

Current regulations strike an effective balance between the QBS framework and DBE program goals. Contracting agencies are required to give consideration to DBEs, but without set-aside contracts or quotas. State and local agencies set their own DBE program participation goals and the method for achieving them, subject to DOT approval, of course. Agencies may use an evaluation criterion for DBE participation limited to 10 percent of the overall qualifications-based selection criteria, or they can establish DBE participation goals, which can be satisfied through good-faith efforts.

ACEC supports this approach. It helps to achieve DBE program goals, while still emphasizing qualifications as the preeminent factor in selecting engineering firms. Increasing the weight of DBE as a selection criterion, or adding specific set-asides, quotas, or mandates will diminish QBS and the successful project delivery that it promotes.

Thank you again for the opportunity to testify today. I will be happy to answer any questions later.

[Ms. Boyer's prepared statement follows:]

**Prepared Statement of Geri E. Boyer, P.E., President, Kaskaskia Engineering Group, LLC, on behalf of the American Council of Engineering Companies**

Chairman DeFazio and Ranking Member Graves:

Thank you for the opportunity to testify before the committee today. It's an honor to represent my firm and my colleagues in the nation's engineering industry to you and the members of the committee.

My name is Geri Boyer. I am the President and sole owner of Kaskaskia Engineering Group, a civil engineering, environmental, and contracting firm headquartered in Belleville, Illinois.

I am testifying today on behalf of the American Council of Engineering Companies (ACEC)—the business association of the nation's engineering industry. ACEC member firms drive the design of America's infrastructure and built environment. Founded in 1906, ACEC is a national federation of 52 state and regional organizations representing nearly 5,500 engineering firms and 600,000+ engineers, surveyors, architects, and other specialists nationwide.

FIRM PROFILE

I founded Kaskaskia Engineering Group, LLC (KEG) in 2006 with the mission of making the world a better place through the practice of engineering. Through partnerships with our clients and regulatory agencies, we plan, design, and build projects that enhance communities, spur economic development, and respect the environment. From the beginning, we have recruited highly skilled employees from a variety of public and private sector backgrounds. Armed with good experience, a great reputation and the Disadvantaged Business Enterprise Program, I have built an impressive portfolio of federal, state, local, and private project experience. Since 2006, KEG has earned over $100 million in revenue and provides engineering services in Illinois, Iowa, Indiana, Kentucky, Michigan, Minnesota, Missouri, North Dakota, Ohio, Oklahoma, and Wisconsin.

KEG specializes in transportation engineering, traffic engineering, geotechnical engineering, structural engineering, environmental science, infrastructure analysis and planning, water resource management, right-of-way acquisition, and general highway construction.

DBE CERTIFICATIONS AND DOT EXPERIENCES

KEG is a certified DBE through the Illinois Unified Certification Program, Iowa Department of Transportation, Indiana Department of Transportation, Kentucky Transportation Cabinet, Missouri Regional Certification Committee, Minnesota Unified Certification Program, and Wisconsin Unified Certification Program.

KEG is a certified Women Business Enterprise (WBE) through the Illinois Central Management Services, Indiana Department of Administration, Minnesota Central CERT Certification Program, Missouri Office of Equal Opportunity, Metropolitan Water Reclamation District of Greater Chicago, and the Women Business Enterprise National Council.

KEG is a certified Small Business Enterprise (SBE) through the Kentucky Transportation Cabinet and Minnesota Central CERT Certification Program.

KEG is a self-certified Women Owned Small Business (WOSB) and Economically Disadvantaged Women Owned Small Business (EDWOSB) through the Small Business Administration.

In an ever changing and volatile business market, corporate growth and stability rely on diversification strategies, which often include providing services to multiple federal, state, and local agencies, as well as private corporations across regional, national, and international markets. Diversification has long been a successful strategy for large businesses, and it is just as important for the survival and development of small firms.

Using the opportunities that the DBE program has provided, I have diversified my company within the engineering and construction industry throughout the Midwest. It's this diversification that has helped me grow and weather economic storms. But it takes all these certification programs in multiple states in order for me to have the same opportunities as non-DBE firms.

One challenge for DBE firms like mine that work in multiple jurisdictions is the lack of a unified approach to DBE certification. The amended 49 CFR Part 26 which was included in MAP–21 implemented a revised uniform certification application and reporting forms. However, even though there is a uniform process, there is not

a uniform certification. All the agencies I mentioned before use the uniform application but require the entire application again at different times of the year. The application must be current to equipment purchases, loans, and anything else a business uses to run their day-to-day operation. This creates unnecessary work for the DBE firm and the public agency who both have limited time and budget pressures. And with the rising problem of identity theft, it's stressful to be sending all your personal information to multiple agencies in multiple states.

I encourage the committee to consider additional reforms to streamline and simplify the DBE certification process, creating a program that is more efficient and effective for women and minority firms working for multiple agencies across multiple states.

### Qualifications-Based Selection

It's important to note the intersection of DBE program goals with federal and state procurement requirements for the contracting of engineering and design-related services. Current laws require agencies using federal funds to follow Brooks Act qualifications-based selection (QBS) procedures for procuring engineering and design services. These rules apply to federal-aid highway, transit, and airport improvement programs through various pieces of legislation approved by this committee dating back to 1987. ACEC applauds this committee's consistent and historic leadership in protecting and expanding QBS requirements on federal infrastructure programs. Most states have a "Mini Brooks Act" that apply the same selection procedures to state programs.

Under QBS, agencies select firms based on their experience, expertise, and demonstrated competence for the types of professional services required. They first evaluate and rank submitting firms' statements of qualifications, performance data, and information regarding the proposed project or services. The contracting agency then selects and ranks firms based on those qualifications in accordance with the established/advertised criteria for the project and negotiates with the most highly qualified firm to arrive at a fair and reasonable price for the solicited services.

QBS is the gold standard for procurement of professional engineering and design services. It helps small and DBE firms compete for work by providing us a forum to demonstrate the advantages we often have, including niche market expertise, ability to be nimble to meet deadlines, local knowledge, and involvement of senior level management. Quantitative studies have shown that QBS lowers total project costs and results in more satisfactory outcomes for owners.

Current Federal Highway Administration (FHWA) regulations strike an effective balance between the QBS procurement framework and DBE program goals. Contracting agencies are required to give consideration to DBE consultants in the procurement of engineering and design related services contracts using federal-aid funds, but without set-aside contracts or quotas for DBE participation. State and local agencies set their own DBE program participation goals, as well as the method for achieving them, subject to FHWA approval. To the extent practical, a contracting agency must achieve DBE program participation goals through race and gender-neutral measures. DBE participation on all contracts funded with federal funds, whether for professional or construction services, may be counted toward overall DBE program participation goals.

FHWA regulations provide that when overall DBE program participation goals cannot be met through race-neutral measures, additional DBE participation on engineering and design-related services contracts may be achieved through either (1) the use of an evaluation criterion for DBE participation in the qualifications-based selection of firms, or (2) establishment of a contract DBE participation goal. Prime contractors can satisfy these measures through good-faith efforts to engage DBE participation.

In its policy guidance, FHWA states that in order to "harmonize" QBS rules and DBE program implementation, a contracting agency may establish the use/participation of certified and qualified DBE firms as an evaluation criterion of no more than ten (10) percent of the total evaluation criteria in assessing the qualifications of firms/teams to perform the solicited services.

ACEC supports this current approach. It helps to achieve DBE program goals while still respecting the importance of emphasizing qualifications as the preeminent factor in selecting engineering firms. Increasing the weight of DBE as a selection criterion or adding specific set-asides, quotas, or mandates will diminish QBS and the successful project delivery that it promotes.

## ACEC DIVERSITY AND INCLUSION INITIATIVES

Lastly, I want to draw the committee's attention to the new Strategic Plan that ACEC approved in October 2019. Embodying inclusion and diversity is one of the five pillars of the new plan. Our express goal is that the Council is recognized as a welcoming organization where all members are included, involved and can achieve their full potential. The objectives include improving the diversity of ACEC leadership, enhancing the diversity of our membership, and increasing engagement of diverse individuals from member firms.

If we're going to be able to sustain our profession and continue to support the transportation clients we serve, it's imperative that we deliver on these goals. Diversity makes our companies and our industry stronger, and it makes us more appealing to the next generation of professionals who we need to recruit. Federal DBE programs, as explored by this hearing today, are one tool to help firms like mine bring those goals forward.

I want to close by inserting here the statement that the Council made earlier this year, which encapsulates how I personally feel and what I strongly support about the engineering industry.

> "ACEC is committed to an inclusive and diverse engineering industry.
>
> The engineering profession has always been grounded in integrity, fairness, and service to community. Engineers build communities. We create space and by extension, we create social experience. We support equality and respect for all humankind. We believe in providing equitable opportunities within our profession to support untapped potential both within our workforce and within the communities we serve. And we have the power to foster progress by breaking down the physical barriers that can inhibit economic and social equity.
>
> Those are the principles that have guided our community through this difficult time. Through ACEC we will embrace inclusion and diversity and continue to focus our members on ways to lift people up to become their best selves and to make our companies models of the values we embrace."

Thank you again for the opportunity to testify.

### ATTACHMENT

## NATIONAL UNIFIED DBE CERTIFICATION PROGRAM

### A WHITE PAPER BY ACEC ILLINOIS

### BUSINESS PRACTICES—DBE/WBE/MBE COMMITTEE

*Authored by: Geri E. Boyer, P.E., Kaskaskia Engineering Group, LLC*
June 2016
Last update: 6/25/2020

### INTRODUCTION

In an ever changing and volatile business market, corporate growth and stability rely on diversification strategies, which often include providing services to multiple federal, state, and local agencies, as well as private corporations across regional, national, and international markets. Diversification has long been a successful strategy for large businesses, but it is just as important for the survival and development of small firms.

Firms owned by women and minority group members that want to employ diversification strategies are encumbered by the current DBE Certification process. Public agencies and small business owners have limited time and continued budget pressures. Time and budget constraints have significantly affected DBE certification in Illinois and its surrounding states. This white paper discusses how a national unified program could strengthen, streamline, and simplify the DBE certification program, creating a program that is more efficient and effective for women and minority firms working for multiple agencies across multiple states.

### BACKGROUND

*History of DBE Program*

A policy of helping small businesses owned and controlled by socially and economically disadvantaged individuals, including minorities and women, participating in contracting opportunities created by Department of Transportation (DOT) finan-

cial assistance programs, has been in effect for more than 20 years. The Department, through its Operating Administrations, distributes billions of dollars annually to help finance thousands of projects across the country. Approximately 85 percent of the assistance dollars is for construction. The major portion of construction funds are allocated to state highway and transportation agencies for highway construction. The balance is provided to local public transit and airport authorities for mass transit and airport facilities.

In 1983, Congress enacted the first Disadvantaged Business Enterprise (DBE) statutory provision, which applied primarily to small minority-owned firms. This provision required the Department to ensure that at least 10% of the funds authorized for the highway and transit Federal financial assistance programs be expended with DBE's. In 1987, Congress re-authorized and amended the statutory DBE program to, among other changes, add women to the groups presumed to be disadvantaged. Since 1987, the DOT has established a single DBE goal, encompassing both firms owned by women and minority group members.

Primarily three major DOT Operating Administrations (OA's) are involved in the DBE program. They are the Federal Highway Administration, the Federal Aviation Administration, and the Federal Transit Administration. The DOT DBE program is carried out by state and local transportation agencies under the rules and guidelines in the Code of Federal Regulations (Title 49, Part 26). The FAA also maintains a separate DBE program for concessions in airports (Title 49, Part 23).

Title 49, Part 26 of the Code of Federal Regulation (49 CRF part 26) required all agencies in each state receiving DOT funds to participate in a state Unified Certification Program (UCP). Within three years of March 4, 1999, recipients of DOT funding had to sign an agreement establishing the UCP for that state and submit the agreement to the Secretary for approval. The agreement provided for the establishment of a UCP, which met all the requirements. The agreement had to specify that the UCP would follow all certification procedures and standards; that the UCP would cooperate fully with oversight, review, and monitoring activities of DOT and its operating administrations; and that the UCP would implement DOT directives and guidance concerning certification matters. The agreement also committed recipients to ensuring that the UCP has sufficient resources and expertise to carry out the requirements.

*DBE Unified Certification Program (UCP)*

The purpose of the UCP is to provide "one-stop shopping" to applicants for certification. The program was designed so that if a firm was certified using a UCP agency in a state, they would only have to apply to one federally-funded agency within that state to work with all UCP member agencies. In Illinois, the UCP is made up of five US DOT-funded agencies, the Illinois Department of Transportation (IDOT), City of Chicago, Chicago Transit Authority (CTA), Metra, and Pace. The Regional Transportation Authority (RTA) is also part of the IL UCP, but is a non-certifying agency. Other states have very similar programs made up of all agencies that receive federal funds.

*Non-DOT-funded Certifying Agencies*

Within every state, there are also non-DOT-funded agencies. Some will accept the DOT's state implemented DBE Certification Program, and some have their own certification process. Several non-DOT-funded agencies have chosen to certify women business enterprises (WBE), minority business enterprises (MBE), and Business Enterprise owned by People with Disabilities (BEPD). In Illinois, the non-DOT-funded certifying agencies are Central Management Services (CMS), City of Chicago, and Cook County.

*Interstate Certification Rule*

While the DBE program was always a national program, state specific administrative requirements tended to impair a DBE firm's ability to fully compete for business opportunities in other states. In response to longstanding concerns from the DBE community, the USDOT issued a proposed rule aimed at breaking down these barriers. On January 1, 2012, the interstate certification provision (49 CRF 26.85) went into effect. Its intent was to clear up administrative obstacles to certification that were undermining important program objectives. The rule furthered the following fundamental objectives of the DBE program.

(1) Facilitated the ability of DBE firms to compete for DOT-assisted contracting.
(2) Reduced administrative burdens and costs on small businesses that sought to pursue contracting opportunities in other states.
(3) Fostered greater consistency and uniformity in the application of certification requirements, while maintaining program integrity.

The ultimate purpose of the interstate certification rule was to facilitate certification of currently certified firms in other jurisdictions. Interstate certification was not meant to be an automatic reciprocity in the sense that each state must honor the other states' certification decisions without review. Rather, the rule created a rebuttable presumption, such that a firm certified in its home state is eligible to be certified in other states to which it applies.

The Department once again amended 49 CFR Part 26, which went into effect on November 3, 2014. The final rule improved DBE program implementation in the following three major areas.

(1) Revised the uniform certification application and reporting forms and created a uniform personal net worth form for use by applicant owners, which collect the data required by the Department's Surface Transportation Reauthorization, Moving Ahead for Progress in the 21st Century Act (MAP–21).
(2) The rule strengthened the certification-related program provisions, which includes adding a new section authorizing summary suspensions under specified circumstances.
(3) The rule modified several other program provisions concerning such subjects as overall goal setting, good faith efforts, transit vehicle manufacturers, and counting for trucking companies.

## PROBLEMS

Over the last several years, the DOT has made a concerted effort to improve the DBE program. Many hurdles have already been overcome, but there are still problems to be solved to make this program even more useful to small businesses owned and controlled by socially and economically disadvantaged individuals. Problems that are burdensome and limit the success of a DBE company are 1) Confusion between DBE Certification and Prequalification, 2) Duplication of Applications for DBE Certification, and 3) Slow Responsiveness of Reviewing Agencies.

The following are a few examples to support the need for additional changes to the DBE program.

### *1) Confusion between DBE Certification and Prequalification*

The Bureau of Small Business Enterprises administers IDOT's DBE program. IDOT, like all other state DOT's, is tasked with the certification of DBE firms and the prequalification of firms wanting to bid on contracts and/or offer their services to the department. DBE *certification* and DOT *prequalification* are performed by two different units within IDOT. While there is some overlap in the certification and prequalification processes for DBE firms, the *certification* process is generally concerned with establishing if a business qualifies as "disadvantaged," and the *prequalification* process confirms if an applicant has resources and experience to self-perform each specific service. If you are a DBE engineering/architectural consultant, you are *certified* as a DBE through the Bureau of Small Business Enterprises and *prequalified* through the Bureau of Design and Environment. The Bureau of Design and Environment prequalifies firms in multiple categories of service.

If you are a DBE contractor, you are *certified* as a DBE through the Bureau of Small Business Enterprises and *prequalified* through the Bureau of Construction. The prequalification process of a contractor is governed by Title 44 Illinois Administrative Code Section 650. The prequalification process does not apply to subcontractors. However, DBE subcontractors are required to be *certified* through the Bureau of Small Business Enterprises but only need to be *registered* through the Bureau of Construction to perform work for IDOT.

Currently, the Bureau of Small Business Enterprises utilizes the uniform certification application and forms required in the final rule. These forms require the applicant to fill out a listing of NAICS codes for which they are able to self-perform. The NAICS codes are used on the UCP online directory and generally correlate with the prequalification categories. However, the Bureau of Small Business Enterprises has taken on the responsibility of prequalifying subcontractors through the certification process. Instead of verifying NAICS codes, they are verifying the resources and experience of a DBE subcontractor to complete an IDOT specific contract pay item. They are also certifying DBE subcontractors/contractors in work classifications that are not in alignment with the Bureau of Construction. These additional requirements are limiting the expansion of DBE subcontractors/contractors.

### *2) Duplication of Applications for DBE Certification*

The Illinois Department of Central Management Services (CMS) Business Enterprise Program (BEP) is now certifying businesses owned by women, minorities, and persons with disabilities. They claim that with their certification a company will have the opportunity to participate in the State's 20% minority, female, and persons

with disabilities goal. Also, a company would be listed in their BEP directory that is used by state agencies, universities, and other large firms when they are looking for businesses owned by females, minorities, and persons with disabilities. This program's eligibility is available to companies whose gross annual sales are less than $75 million, which far exceeds the limit of $23.98 million in gross annual receipts required by the new federal form and exceeds the Small Business Administration size standard for all transportation-related industries.

CMS states that if a firm is currently certified with the City of Chicago, Cook County, Chicago Transit Authority, METRA, PACE, IDOT, Women Business Development Council, or Chicago Minority Business Development Council, you can complete the *Recognition Certification Application* to qualify for the "limited" Business Enterprise Certification. CMS also offers the *BEP Full Certification Application*, which effectively requires the same information as the UCP, but with different forms. Both of these application processes certify businesses as MBE, FBE, Female and Minority Business Enterprise (FMB), and/or Persons with Disability Business Enterprise (PBE). Although a firm may choose to be certified by CMS using the recognition certification, this certification is not considered a valid certification by agencies in other states.

For example, the Indiana Department of Administration only recognizes CMS as the official M/WBE certifying agency for the State of Illinois. As part of their application, the Illinois firm must provide a copy of the Illinois certification conducted by CMS. If the firm was initially awarded certification by IDOT and the firm used the CMS Recognition Certification, the firm cannot apply for M/WBE certification with the State of Indiana through the Indiana Department of Administration. Also, the Indiana Minority & Women's Business Enterprise Division does not accept onsite reports from the City of Chicago, PACE, Metra, the Chicago Transit Authority, or the Chicago Minority Business Development Council, making the ability for an Illinois DBE firm to work in Indiana as an M/WBE firm very difficult.

The City of Chicago is a member of the IL UCP, which certifies DBE firms.

The City also has the following certifications:

- MBE
- WBE
- Business Enterprise owned by People with Disabilities (BEPD)
- Airport Concession Disadvantaged Business Enterprise (ACDBE)

The MBE/WBE/BEPD certification is needed to work on city-funded contracts and the DBE/ACDBE certification is needed to work on state and federally funded contracts. If a woman-owned DBE firm that is already certified through the IL UCP and CMS wants to work on a city-funded project, the firm must also apply to the City of Chicago's WBE program.

*3) Slow Responsiveness of Reviewing Agencies*

The goal of the DBE program is to give individuals who own disadvantaged businesses the opportunity to grow their business. DBE firms are taking advantage of the goals of the DBE program and looking for opportunities to expand their businesses outside of their home-based state. A single firm could apply to as many as 50 DBE offices, which places additional burden on certifying offices. Additionally, as state DOTs replace and/or reduce staff the burden increases.

State personnel are struggling to review the applications for home-based firms in a timely manner. Adding a maximum 60 day determination period for non-home-based firms set forth in 49 CRF 26.85 is creating an impossible situation for reviewing agencies. There have been cases in which it has taken over a year to issue a DBE certification.

SOLUTION

A proposed solution is to create a National Unified DBE Certification Program (National UCP) to serve as a "one-stop shopping" to applicants for certification. Any state agency using the unified certification application could be a coordinating member of the National UCP, and its certification would be recognized as a National UCP. Under a National UCP, the firm applies one time for certification as DBE with their participating cognizant agency or a national organization. If approved, that certification would be honored by all recipients of federally funded and non-federally funded projects in all states. The National UCP would only certify firms using the unified certification application. Prequalification, determination if an applicant has the requisite resources and experience to complete the service/category as required, would remain with the contracting agency.

The certification and record would be held by a national agency/organization, such as the Small Business Administration (SBA). The SBA already have systems in

place to review a standard application, evaluate its compliance with federal regulations, and certify its credibility. It currently is certifying Women Owned Small Business (WOSB), 8(A), and HUBZone. It has the capacity for the upload of documents necessary for annual renewal (Affidavit of Continued DBE Certification). This process would significantly reduce the time and effort necessary to become licensed in multiple states.

B2GNow, a cloud-based software system for real-time collection, tracking and analysis of compliance data, currently maintains compliance of DBE firms with federal, state, and local diversity programs. It is a tool that could serve as a DBE certification record holder for federal and state agencies to utilize.

Certifying agencies that do not use unified certification application or do not choose to be a coordinating member of the National UCP could continue to certify DBE. If a firm does not intend to work with multiple agencies in multiple states, it might not be advantageous to certify with a national organization. A certified firm that had been certified by a non-coordinating local certifying agency could still apply to have their record held by the national organization.

Although this White Paper is focused on DBE firms certified to do engineering and contracting, any type of DBE business could benefit from a National UCP.

SOURCES

"Disadvantaged Business Enterprise (DBE) Program." United States Department of Transportation, n.d. Web. 08 March 2015.

"Final Rule Changes Effective as of November 3, 2014." United States Department of Transportation—Departmental Office of Civil Rights, n.d. Web. 8 March 2015.

Indiana Department of Administration Division of Supplier Diversity, Application for Certification, n.d. Web. 1 March, 2015

"Small Business Size Standards" US Small Business Administration, n.d. Web. 1 March, 2015

Mr. DEFAZIO. Thank you, Ms. Boyer.

Ms. Lerdahl, you may proceed.

Ms. LERDAHL. Good morning, Chairman DeFazio and committee members. My name is Mary Lerdahl, currently the owner of Emerald Consulting Services in the Seattle area.

Prior to starting my firm to help DBEs navigate the challenges of the construction industry, I was an electrical contractor for 22 years. I started my firm, DBE Electric, in 2009 during the Great Recession, after losing my share of another company as the result of a marital dissolution. The firm DBE Electric performed 122 projects valued at over $80 million over the course of 9 years, until I was forced out of business as a result of WSDOT, Washington State Department of Transportation's, waiver to exclude White women from the DBE program.

The waiver was approved by U.S. DOT in 2016 after, in my opinion, a faulty disparity study that included projected revenue from the two largest mega-projects in Washington State history.

From the time the waiver was enacted in June 2017 to mid-2018, my firm's revenues went from $9 million a year to zero. Without the designation of a DBE, I couldn't win a single project, even with my successful track record. I was the only female contractor in the State that performed complex, heavy highway electrical projects, traffic signals, illumination, intelligent transportation, and tolling systems.

By September of 2017, a new disparity study showed that White women were not over-represented, and WSDOT asked U.S. DOT to rescind the waiver on September 11, 2017.

I personally made two trips to Washington, DC, to meet with U.S. DOT, the Federal Highway Admnistration, and Terence Cole-

man of the Department of Assistant General Counsel, all to no avail. When U.S. DOT finally denied WSDOT's request to rescind the waiver on December 13, 2019, it was far too late to save my business and the businesses of other White women in our State.

Because of the DBE program, I participated in building the SR 520 floating bridge, the longest floating bridge in the world, with Kiewit. The contract was a design-build project, and my contract value was $14 million. It was a great example of how a small DBE firm like mine could work together with a large prime contractor to grow, learn, and build a project that all contractors could be proud of.

At the same time as I was building the bridge project, I was also working on the SR 99 Bored Tunnel project, valued at $1.6 billion, with Seattle Tunnel Partners, the joint venture with Dragados and Tutor-Perini. I have experienced many incidents, overt and subtle, of discrimination in many years, but this one was the worst. Shortly after winning the tunnel project, Tutor-Perini purchased Fisk Electric, a large firm out of Houston.

At an initial DBE outreach meeting, a Fisk representative blatantly stated that they were only interested in receiving labor-only bids from DBE firms, thus exposing the DBE firms to more risk and less profit from the less risky material purchases portion of the work. A local subcontractor, JH Kelley, was brought in to sub out to the two electrical firms owned by the joint venture—Fisk being owned by Tutor-Perini, and SICE, being owned by Dragados in Spain—to minimize the appearance of self-dealing.

While my firm ultimately performed $977,246 of work on the project, public records show that SICE performed $34,315,556, and Fisk performed $106,057,656. STP solicited bids from DBE firms like mine in order to show good faith efforts, only to self-perform much of the work.

I experienced sexual advances while on the project site, while supervising my crews.

Getting paid was slow and difficult, and begging was necessary, as they always had some excuse. They needed two signers, who were rarely both there, for example.

Finally, while my firm was working on a change order to convert temporary generator power to permanent power feeding refrigerated shipping containers, I experienced discrimination at the hands of Mike Kerschner, a project manager for Tutor-Perini. He was pressuring me to proceed with ordering expensive Siemens electrical gear, but my change order hadn't yet been signed for that work, and STP owed me over $80,000. It was very past due.

I put in a call to the local electrical union for an electrician to do the power cutover, but the union wouldn't fill my call for labor. I met with Mike Kerschner face to face to discuss the ongoing failure of the union to respond to my call. And after looking me up and down in a sexually suggestive manner, he informed me that if I didn't have labor on the job the next day, he would take over my work.

The next day my crews were shut out of the job, and my equipment was taken over. I also received a letter from the union that day, pulling manpower from all of my jobs, including the bridge project. Fortunately, Kiewit intervened, and didn't allow that to

happen, so my company lived to see another day. I later learned that Fisk took over my work, and that Tutor-Perini had colluded with the union to make this happen.

My firm finally got paid the $80,000 owed by STP, only because of a Federal Highway Administration investigation into WSDOT's mishandling of the DBE program and the project.

Tutor-Perini has been found guilty of DBE fraud on several occasions across the country, and has paid millions of dollars in fines. In my opinion, the only reason Tutor-Perini hasn't been disbarred from Federal contracting is because of the powerful connection between this company and a certain U.S. Senator.

In closing, the DBE program is essential to allow small firms owned by women and minorities to compete for a few pennies of the highway dollar. However, it must be administered with strict compliance, starting with the Federal Highway Administration's enforcement of CFR part 26.

State and local programs' field compliance need to start from the bottom up, listening to the DBE firms and the field inspectors from each agency, instead of from the top down, so the issues can be resolved as soon as possible to avoid business failure due to nonpayment and discrimination during disputes.

Waivers should never again destroy a DBE firm, separating the DBE communities.

Unfortunately, due to human nature, discrimination will probably always be with us. But this program is effective, and the committee has an opportunity to strengthen it and make it more accountable and transparent to participating firms and taxpayers. Thank you for the opportunity to share my story, and I would be happy to share any other information you would like. Thank you.

[Ms. Lerdahl's prepared statement follows:]

**Prepared Statement of Mary T. Lerdahl, President, Emerald Consulting Services, LLC**

Good morning Chairman DeFazio and members of the Committee:

My name is Mary Lerdahl and I formerly owned an electrical contracting firm in the Seattle area named DBE Electric. I started the firm in November 2009 during the "Great Recession" after losing my share of a similar firm as a result of a marital dissolution. Altogether I had been an electrical contractor since 1996, for a total of 22 years before I was driven out of business as a result of WSDOT's (Washington State Department of Transportation) decision to waive white women out of the federal DBE program. My company focused exclusively on highway electrical projects; traffic signal systems, illumination, Intelligent Transportation Systems. From 2009 to 2018 (the year the company closed) my firm successfully completed 122 projects valued at nearly $80 million. My firm never failed to complete a project on time and finished all contracted projects with the exception of two, which were the result of blatant discrimination, which I will explain later in greater detail. The typical size of projects performed were $500,000–$2,000,000.

The highlight of my career was building the SR 520 Floating Bridge project, a design build project with Kiewit, the longest floating bridge in the world. The overall project was about five years long; about 2 years in design and 3 years in actual construction. The initial contract was $8.9 million with the final contract value being $14 million. This project had an 8% mandatory DBE goal, which is why my firm had a "place at the table", along with my company's proven track record of projects with Kiewit and other firms. I learned so much from that project, both technically as well as what it was like to "work with the big boys". As doors opened to me because of my certification as a DBE firm, I could see a bright future ahead for my company after the successful completion of the project.

Kiewit treated me fairly and with respect and was a good example of how a mega firm and a small, DBE firm could work together to build a great project that all parties could be proud of.

At the same time I was working on the design portion of the bridge project, I was working on the SR 99 Bored Tunnel project with Seattle Tunnel Partners, (STP) a joint venture between Tutor-Perini and Dragados.

The project had a value of $1.6 Billion and a 8% DBE Condition of Award goal.

Initially my firm worked as a second tier subcontractor to one of the larger local general contractors, and then directly for STP. The contrast between Kiewit and STP couldn't be more stark. My firm faced discrimination in many ways throughout my 2 year experience on the tunnel project, finally culminating in a meeting required by WSDOT as a result of the Conciliatory Change Order required by FHWA after an investigation by FHWA showed widespread discrimination by STP against DBE firms. Some of the specific instances of discrimination that I personally suffered and my firm experienced are as follows:

1. Initial DBE "outreach" meetings in which Fisk Electric, a large electrical contracting firm purchased by Tutor-Perini shortly after winning the project, stated outright that they were only interested in "labor only" bids from DBE firms, thereby denying DBE firms the opportunity for profit on the less risky material purchases portion of the project.
2. Sexual advances made directly to me by STP supervisors while I was in the field supervising operations.
3. Slow payment processing and a feeling of "begging" to get paid during the direct visits to STP's offices because of intentionally slow payment processing; for example, two check signers who were hard to track down, no option for ACH payments, delayed processing of change orders while being demanded to perform work by STP supervisors prior to the change orders being executed.
4. Invitations to bid electrical systems inside the tunnel that were virtually identical to the work I was performing on the bridge project just to provide "good faith efforts" and allow SICE, an electrical firm owned by Dragados, to self-perform the work. My firm wasted countless hours bidding this design-build work when STP knew all along that they would never use my firm to build the work.
5. The final incident occurred when my firm was working to convert electrical power from temporary diesel generators to provide power to the refrigerated containers being unloaded at the Seattle waterfront to permanent power. Since my crews primarily worked on signal systems, I put in a call to the local IBEW (electrical workers) union for a call for a journey level electrician with experience with such work; the union failed to fill my call for labor and after a week without getting my call for labor filled I had a meeting with the project superintendent, Mike Kerschner to discuss the situation. At this time there was a pending change order for $200,000 with specialized Siemens equipment that I wasn't going to order the equipment until the change order was approved. Mike Kerschner had been pressuring me to order it anyway without a change order but I refused. When I met with him regarding the power conversion issue due to the union's continued failure to supply the requested labor, he was openly hostile to me while at the same time giving me unwanted top to bottom looks that were sexual in nature. He informed me that if I didn't get the needed labor that he would take over my work. The next day I received a letter from the IBEW stating that they were pulling all manpower off ALL of my jobs because I had failed to make a trust payment, which was only two weeks late due to STP's failure to pay my company. The union was colluding with STP and Fisk Electric to drive my firm off the tunnel job, and there were other large electrical contractors who were hoping to take over my SR 520 Floating Bridge Project. Fortunately Kiewit didn't allow that to happen, so the outright destruction of my business didn't happen at that time. In retrospect I realize that my firm was a threat to the assertion that DBE firms didn't have the technical expertise to perform on such a large, technically challenging projects because I was doing just that across the water. By the time I was locked out of the job STP owed my firm over $80,000 and I am certain that the only reason I eventually got paid was because of the focus of FHWA's investigation into STP and WSDOT's administering of the DBE program. Public records show that SICE, Inc. did $34,315.556.53 on the project and Fisk Electric did $106,057,656.02, while my firm, DBE Electric did $977,246.59. Both SICE and Fisk were hired by a local company, JH Kelley, in order to minimize the appearance of the self-dealing by STP's ownership of Fisk and SICE. It is widely known that Tutor-Perini has been found guilty of DBE fraud in other areas of the country and has paid millions of dollars in fines; our state simply wasn't

prepared to handle the assortment of dirty tricks that Tutor-Perini pulled in order to line their own pockets while appearing to be employing "good faith efforts" among the DBE firms who were hoping for a piece of the pie.

While the SR 99 Bored Tunnel was one of the worst examples of discrimination I experienced, it certainly wasn't the only one. I could spend hours citing examples, but since my time for testimony before the committee is limited, I will share just one more in detail. My firm was working on a city project that had federal funds administered through WSDOT Local Programs. The contract value was approximately $1.2 million. The general contractor was falling behind the critical path schedule as originally submitted and approved by the city, and changed the schedule to place the blame for the delays on my firm. When I challenged the project manager and eventually the company president regarding the disputed schedule and delays, they didn't want to meet with me, only with my male project superintendent. The dispute few uglier by the day, and resulted in the general contractor failing to pay my firm nearly $300,000 at one point. The general contractor sought to have my contract terminated, and WSDOT became involved in their request in accordance with CFR Part 26 rules. In the interim, the general contractor contacted my main pole supplier and threatened not to pay for the $500,000 pole order if they placed it with my firm. Due to the on-going hostilities WSDOT allowed the contract to be terminated, but only for convenience, not for cause. I then brought suit again the contractor and eventually was awarded the $300,000 owed and attorney's fees after 3 years of legal battles. I know that the only reason this situation wasn't able to be resolved without litigation was because I am female and stood up for my company. I had done business with this company before when I was in business with my ex-husband, and when issues came up as they do in construction, they were able to be resolved, "man to man". Not so when I was the principal. The general contractor even stated in front of WSDOT attorney's during meetings to resolve the issues that "the only reason he hired me was because he had to make the goal". I'd also like to mention that this man himself was a minority and had been in the DBE program before graduating from the program. He was openly hostile to women in the construction industry, unless they worked in the office, not in the field and certainly not being an owner herself.

There are many other instances of outright and subtle discrimination that I could cite, but unfortunately the worst was when the agency that was supposed to help firms like mine actually caused the destruction of my business by enacting the waiver to exclude white women from the federal DBE program in Washington State. When the waiver was enacted in June 2017 after being approved by Secretary Foxx on December 16, 2016, my firm was doing approximately $8,000,000 in revenue. After June 2017 when my firm was no longer considered eligible for "Condition of Award" projects with DBE goals, I did not win one single bid, including several that I knew I was the low bidder for. This is when the full knowledge of the level of discrimination in the highway construction industry really sunk in. I had fought battle after battle for years, but surely I thought that my company's proven track record of successful projects would see me through this unfortunate and unfair period, but I was dead wrong. I did everything I could to get work, begging contractors to use me on their projects. I had been the only female electrical contractor doing major highway electrical projects, and now the "good ole boys" were making up for lost time getting on projects that I formerly might have won. When WSDOT excluded my firm from participation, those project dollars didn't go to another DBE firm; they went to larger firms in our region doing $50–600 million in annual revenues! In the space of 18 awful months, my company died a death of a thousand cuts as I watched my firm die, month after month. I had to lay off my daughter, whom I had hoped to pass the company on to, along with other family members and employees. Word spread at the IBEW union that my company was going to go under, so getting quality labor dispatches to finish my jobs was extremely difficult. I could have easily filed for bankruptcy but I wanted to finish my projects and cause as least amount of collateral damage as possible for my employees, general contractors with which I had project backlog with, and the public agencies who were counting on the projects to be finished. By the fall of 2018 it was finished and there was nothing left to show for my years of hard work except exposure to creditors due to the personal guarantees typically required by DBE firms due to credit discrimination. During the period of the demise of my business I made two trips to Washington DC to meet with FHWA and USDOT to plead for WSDOT's request to rescind the waiver dated September 13, 2017. I met with Terence Coleman of the Department of Assistant General Counsel to share how this delay in responding affirmatively to WSDOT's request to rescind the waiver was causing my business failure, along with many other women in the region, all to no avail.

Finally on December 13, 2019 USDOT denied WSDOT's request to rescind the waiver; while the reasons cited speak for themselves, there is no mention whatsoever of the skewing of the 2009–2011 data included in the flawed study, which included both the DBE awarded dollars of the two largest projects in Washington state history (SR 99 Bored Tunnel and SR 520 Floating Bridge) as well as documented DBE fraud purported by a white woman trucking firm that was eventually decertified as a DBE firm by WSDOT.

In summary, while I am a positive person, I am also a realist. I had hoped to see discrimination end during my lifetime, unfortunately it seems to be getting worse in our society. While one can only change oneself to be a fair and just person, we can't change human nature. This committee through the federal DBE program has an opportunity to make a big difference in small DBE firms. I don't think it's realistic to expect to "level the playing field", but it is realistic to make a significant impact and hold to account the large general contractors who complain about the DBE contracting community getting a few pennies of the federal contracting dollar. While it is too late for my firm to benefit from the return of white women as Condition of Award as of October 1, 2020, I am determined to do all that I can to coach and mentor DBE firms as they navigate the difficult construction industry and avoid being used and abused by some of the unethical prime contractors who seek to abuse "good faith efforts" for their own gain.

I had hoped to participate in building the Interstate Bridge Replacement program, replacing the aging bridge connecting Washington and Oregon after my successful completion of the SR 520 Floating Bridge. When I left Oregon as a young girl in 1968 to move to Washington with my mother and younger siblings she related that I said "Seattle is my town" when I saw the Space Needle. Now instead of helping to build a physical bridge, I hope that I can use my experience to build a bridge between DBE firms and the good general contractors like Kiewit that do believe in this program to help empower DBE firms to grow in the way that the DBE program was intended for.

Thank you for your time.

Mr. DEFAZIO. Thank you, Ms. Lerdahl.

Mr. Ali, you may proceed for 5 minutes.

[Pause.]

Mr. DEFAZIO. You have to unmute.

Mr. ALI. Oh, sorry. Oh, am I unmuted?

Mr. DEFAZIO. You are unmuted now.

Mr. ALI. I apologize for that, Chairman. I have my own feelings about Cisco.

Chairman DeFazio, thank you, and members of the committee. My name is Farad Ali, chairman of the advisory Government Affairs Committee for the Airport Minority Advisory Council. I am also the immediate past chairman of the Raleigh Durham International Airport Authority. Thank you for providing AMAC the opportunity to participate in the committee's hearing today.

AMAC was founded 36 years ago to combat discrimination in the airport industry. Since its founding, AMAC has been in the forefront of every national policy discussion concerning this ubiquitous nature of discrimination in the transportation industry, and in particular, concerning airport contracting opportunities for small and disadvantaged business enterprises.

AMAC's members include DBEs and airport concessionaire DBEs, non-DBEs, airports, and airport officials, and all others who are committed to promoting diversity and inclusion in the airport industry.

The DBE authorization by Congress is vitally needed to combat conscious and unconscious bias and institutional discrimination that, regrettably, minority and women entrepreneurs too often face. To be sure, steady progress has been made. However, our DBEs

and ACDBE members regularly attest that, without the DBE program, they would be locked out of contracting opportunities.

Having served in many capacities with AMAC, as board chair, and committee chair, and as an airport commissioner, I too have had my own direct observation about the additional work to be done.

In addition, anecdotal accounts, like academic papers and data from recent disparity studies, further document the continuing challenge of racial and/or gender bias barriers to full participation. They also point to the ongoing need for a DOT DBE program.

AMAC works consistently with Congress, the U.S. DOT, Federal Aviation Administration, aviation trade organizations, and others, as a resource to provide education and guidance concerning these public policies and best practices to redress discrimination and further diversity and inclusion issues.

Often we are unwilling to, really, have candid conversations and discussion about discrimination. But its ongoing present-day manifestations are real.

With regard to the Government's interest in battling discrimination, equality is a core value of our Constitution, and fairness also yields great societal benefits.

Although there has been growth in a number of minority- and women-owned firms in the United States, they continue to experience both direct and indirect discrimination. Examples of this is clear when you look at prime contractors and suppliers, unequal access to capital, bias in bonding decisions, how contracts are structured, and RFP experience requirements. The Government has a powerful fundamental interest in addressing these forms of discrimination.

The DBE program allows minority- and women-owned firms to participate in federally assisted contracts worth millions of dollars and, as you have heard earlier, these businesses are only receiving pennies. But we really do appreciate all the work that has been going on so far, and I would like to make a few comments on the disparity studies that have been presented for a fact of evidence.

While it was clear progress has been made, and many policy battles have been won, it is also clear there is a continuing and compelling need for the DBE program. There are far too many instances when women and minorities are denied equal access to opportunities in the transportation space. As noted, we continue to see extreme, compelling statistical evidence of discrimination, and its effect in disparity studies are really clear, and we will present other ideas.

For a number of years, this committee has worked in a bipartisan manner to shore up this program by monitoring current discrimination and present-day effects on the past discriminations, as well as legislation modifications for the current program. These efforts have been really important, and I want to let Members know that these policy gains have been great.

But the COVID–19 epidemic has really created even more problems for our diverse businesses. Although in response to the pandemic Congress has provided a lot of assistance to small business, they are hindered by these discrimination policies. As I said earlier, these businesses have unique challenges that can't be solved

by short-term programs like the Paycheck Protection Program, and other funding decisions.

ACDBEs will find themselves ill-equipped to participate in programs like the Main Street Lending Program, and the airport concessionaires, unlike passenger air carriers, air cargo carriers, and associated contractors, received no explicit assistance in phase 3 of the CARES Act. So I would like to ask you to look at issues surrounding the DBE program, that you look at what could be done in the short term to protect and sustain these businesses that are under this current economic crisis.

I thank you for the opportunity to testify before the House Committee on Transportation and Infrastructure, and on behalf of our group and the thousands of airport concessionaires, I would like to say thank you. And if there are any other questions, I will be happy to answer those at the appropriate time.

[Mr. Ali's prepared statement follows:]

**Prepared Statement of Farad Ali, Chairman, Government Affairs Committee, Airport Minority Advisory Council**

Chairman DeFazio, Ranking Member Graves, and members of the Committee, my name is Farad Ali, and I am the Chairman of the Government Affairs Committee for the Airport Minority Advisory Council (AMAC). I am also the immediate past Chairman of the Raleigh Durham International Airport Authority. Thank you for providing AMAC with the opportunity to participate in the Committee's hearing today.

AMAC was founded thirty-six (36) years ago to combat discrimination in the airport industry. Since its founding AMAC has been at the forefront of nearly every national policy discussion concerning the ubiquitous nature of discrimination in the transportation industry and, in particular, concerning airport contracting opportunities for small and disadvantaged businesses enterprises (DBEs). AMAC's members include DBEs—and airport concessions DBEs (ACDBEs), non-DBEs, airports and airport officials and others who are committed to promoting diversity and inclusion in the airport industry. As a result, AMAC occupies a unique vantage point concerning the purpose of this hearing.

The DBE program authorized by Congress is vitally needed to combat conscious and unconscious bias and institutional discrimination that regrettably minority and woman entrepreneurs too often experience. Too be sure, steady progress has been made; however, our DBE and ACDBE members regularly attest that without the DBE program they would be locked out of contracting opportunities. Having served in many capacities with AMAC (as a board chair and committee chair) and as an airport commissioner I too have my own direct observations about the additional work to be done. In addition, anecdotal accounts, academic papers, and data from recent disparity studies—many of them undertaken by AMAC members who are consultants and researchers—further document the continuing challenge of racial and/or gender based barriers to full participation. They also point to the ongoing need for the DOT DBE program.

AMAC works consistently with Congress, the US Department of Transportation, the Federal Aviation Administration, aviation trade associations, and others as a resource for information, education and guidance concerning public policies and best practices to redress discrimination and further diversity and inclusion. On a bi-partisan basis this Committee and the Congress has shown great leadership in affirming the government's continuing interest in remedying discrimination and its effects. As we are aware, Congressional efforts to monitor ongoing evidence of discrimination undergird the statutory and regulatory framework of the DBE program—and give airports a targeted, narrowly tailored, evidence based "tool" to promote equity, fairness, participation. Again, Mr. Chairman, AMAC thanks you and the Committee for your ongoing leadership and collaborative approach with industry stakeholders.

Often we are unwilling to have candid discussions about discrimination and its ongoing present day manifestations. With regard to the government's interest in combatting discrimination, equity is a core value of our Constitution and fairness also yields other important societal benefits. Although there has been growth in the

number of minority businesses in the United States, they continue to experience both direct and indirect discrimination. Examples of indirect discrimination include: direct discrimination by prime contractors or suppliers, unequal access to capital, bias in bonding decisions, how contracts are structured, RFP experience requirements in RFPs, and the like. The government has a powerful and fundamental interest in addressing these forms of discrimination and the DBE program is part of that effort.

Minority-owned businesses remain underrepresented as a share of the total U.S. business ownership. Moreover, these businesses when compared to their non-minority counterparts typically have fewer employees and lower revenues. This underrepresentation in large measure has its basis in racial discrimination and addressing it is a critical reason why Congress must continue to support initiatives like the DBE program.

The program allows women and minority-owned companies to participate in federally-assisted transportation contracts worth billions of dollars a year. The program is an essential entry point for many DBE firms into the transportation space and there is a large and growing body of evidence that shows that the DBE program enables women and minority owned firms the opportunity to play in a space that would otherwise be off limits to them. Simply put, this program works and as noted previously, it is narrowly tailored to meet the constitutional standard set out by the U.S. Supreme Court. A fact that has been affirmed by many federal District and Courts of Appeal.

I'd like to offer a few more comments on disparity studies and other fact based evidence that discrimination continues to a problem in the transportation sector. While it's clear that progress has been made and many policy battles have been won, it is also clear that there is still a continuing and compelling need for the DBE program. In far too many instances women and minorities are being denied equal access to opportunities in the transportation space. As noted previously, we continue to see extremely compelling statistical evidence of discrimination and its effects from a variety of disparity studies that are produced by state and local governments. These studies are backed up by countless accounts from women and minority owned firms that show that they continue to operate on an uneven playing field. AMAC continuously works with its members to monitor ongoing discrimination, and we will submit some examples to the Committee. AMAC believes that these accounts show that this problem is not specific to any one county, state, or group. Rather, it exists throughout the country and effects countless individual businesses.

In the aggregate, these studies show us that women and minority owned firms continue to face discrimination and that without initiatives like the DBE program, these firms would receive far fewer opportunities to successfully compete for contracts in the transportation sector. AMAC commends the work that the Committee has done in this area and I would personally like to thank all of the Committee Members and their staff for working to ensure that the DBE program continues to create a fairer marketplace in which women and minority owned businesses are able to find opportunities in transportation sector. For a number of years, this Committee has worked in a bipartisan manner to shore up and maintain this program by:

- *Monitoring Current Discrimination and the Present Day Effects of Past Discrimination*: Holding hearings like this one permit the Committee to hear directly from DBEs and ACDBEs and their representatives about the discrimination they experience as they attempt to establish and grow their businesses. It is critically important that Congress and the public have a full understanding of the types of discrimination that persist across the nation so that they can support and improve the programs intended to address such discrimination.. We are grateful to this Committee for the work it has done in this area.
- *Legislative Modifications to the Current Program that Foster a Fairer Marketplace*: Similarly, this Committee has also worked to incorporate needed statutory modifications into legislation that has moved through this committee. Again, for example, in the 2018 FAA Reauthorization, the Committee addressed a long-standing discriminatory small business "size standard" barrier to DBEs involved in FAA-assisted contracting. The legislation rectified this matter by conforming the DBE size standard for programs authorized by the FAA bill to those set by the U.S. Small Business Administration. The prior definition had not used size tests that are generally applicable under the Small Business Act, but instead imposed an arbitrary rule that reduced the size standard for DBEs by approximately 30% as compared to the size standard set in the Small Business Act. We note as well that H.R. 2, which recently passed the House of Representatives, would eliminate the discriminatory small business standard with respect to all DOT modes—highways, transit, and rail.

These efforts have been substantive and helpful in ensuring that the DBE program continues to be a success. However, while I and AMAC applaud the Committee for its efforts in assisting women and minority owned businesses, I want to take some time to let Members know that many of these policy gains (particularly in airport concessions space) will likely be lost as a result of the COVID–19 Pandemic—if Congress does not provide direct and immediate assistance to concessionaires.

The COVID crisis has absolutely decimated women and minority owned airport businesses. From the vantage point of the airport sector, I can say that this crisis and the resulting economic downturn has been absolutely devastating. Airport concessionaires including Disadvantaged Business Enterprises (ACDBEs) are the third major partner in an ecosystem that serves air travelers. Concessionaires take empty airport terminals and turn them into vibrant shopping and dining destinations that generate important revenues for themselves and fees that are paid to airports. These concessionaires are major sources of employment and taxes for surrounding communities and they help to grow the airports in which they are located by providing (in aggregate and pre-COVID times) approximately $2.5 billion in non-aeronautical revenue to airports. This revenue fuels new airport growth by underpinning airport bond financing, development, and growth.

However, as airport concessionaires, these businesses are uniquely dependent on the flow of passengers in and around airports. Our revenues rise and fall based on Airline passenger traffic. If there is no traffic, we cannot survive. With COVID–19, we have seen this traffic fall sharply in some cases up to 95% of pre-pandemic totals. This dramatic fall in potential customer traffic has already caused many ACDBEs to close their doors permanently. Those that are still open are barely surviving and have seen their revenues drop by 95 percent or more. Unlike the rest of the economy, industry experts don't expect this industry to bounce back quickly. Instead these experts expect passenger traffic (and subsequently business sales) to remain depressed for at least 18–36 months. Prior to this pandemic, ACDBE program had created several success stories of businesses that not only scaled within their home airport but were able to open new operations in airports across the country. This program saw businesses that had begun to setup joint ventures with larger businesses to grow their operations, and had also seen older ACDBEs act as mentors to other businesses that had just entered this space. COVID–19 could undo all of this progress. I don't want to sound alarmist, but the industry and ACDBEs in particular are at a crossroads.

Although in response to the pandemic Congress has enacted programs intended to assist small businesses, they are not well suited to the airport environment. As a result, concessionaires continue to struggle to secure adequate resources to survive the COVID crisis. ACDBEs, which are already hindered by discrimination in many aspects of their work, are even more vulnerable to the pandemic. As I said earlier, these businesses have unique challenges that can't be solved by short term programs like the Paycheck Protection Act and often need more funding than what is currently available under the Economic Injury Disaster Loan. ACDBEs also find themselves ill-equipped to participate in programs like the Main Street Lending Program and airport concessionaires unlike the passenger air carriers, air cargo carriers, or associated contractors received no explicit assistance in Phase III of the CARES Act.

Although DBEs and ACDBEs, in particular, are severely impacted by the pandemic, this economic devastation is not limited to the aviation sector. Minority businesses in general have been decimated by the pandemic. All across the country, minority businesses are shutting down permanently. Lacking pre-existing relationships with banks, many of these businesses were unable to access loans from the first round of the PPP. Many of these companies simply folded, taking jobs and potential revenues with them. This country can't afford to lose a generation of minority entrepreneurs. These businesses are sources of income, skills training, and development for many minority communities. I ask that as you look into the issues surrounding the DBE program that you also look at what can be done in the short-term to protect and sustain businesses under the current economic climate. This Committee and the DBE program has done an amazing job of helping to build a transportation marketplace that is more equitable and fairer than it would have been without your efforts. To protect and maintain these efforts, I ask that Members continue to not only support the DBE program, but to also work to support the ACDBEs and DBEs as they seek to get back on their feet.

Thank you for this opportunity to testify before the House Committee on Transportation and Infrastructure on behalf of AMAC. Our group and the thousands of Airport Concessionaires that we represent look forward to working with the Com-

mittee to advance policies that will continue to protect and enhance the DBE program.

Mr. DEFAZIO. Thank you for your testimony.

Ms. Norman, you may proceed.

Oh, wait, I am sorry, I skipped someone.

Mr. McDonald, you may proceed.

Mr. MCDONALD. Thank you, Chairman DeFazio, and good morning, committee members. My name is Sandy McDonald, and I am the director of the Office of Economic and Small Business Development in Broward County. I am also here on behalf of COMTO, the Conference of Minority Transportation Officials, this morning. And my office is also a member of the Airport Minority Advisory Council.

It was an excellent start in 1983, when the provision was made to authorize highway and Federal assistance programs to allocate at least 10 percent of the funds to be spent with DBEs. In 1987 the program progressed, and included women during the reauthorization.

The DBE program, as we know it today, is one of the most significant tools for guaranteeing the participation of minority-owned and women-owned businesses in the Federal procurement of goods and services in the arenas of highway, aviation, and transit. But we also know we can do more.

In Broward County alone, the DBE program accounts for 408 businesses, of which 210 are women-owned. Throughout the State of Florida, there are over 4,000 certified DBEs documented. The significance of the number of DBEs in my county and State is only one important factor to consider. Equally as important are the number of jobs these DBEs provide and account for throughout the State and the country. But yet we know we can do more.

Broward County believes the success of our DBEs comes from the additional assistance we are willing to offer in our program. All DBE program administrators are required to meet eight objectives of the DBE program under part 26. However, the following specific objective, "to assist the development of firms that can compete successfully in the marketplace outside the DBE program," is one we put extra emphasis on and apply to grow our minority and women participation and, yes, grow our overall economy.

The DBE program in Broward County develops and directly affords our minority- and women-owned businesses the chance to perfect their craft, realize their growth, build capacity, and nurture relationships that can carry them far beyond a single contract. Going through the process for a DBE is invaluable. Whether they win or lose a specific bid, it allows them to create relationships that lead to partnerships that have the potential to result in future contracting opportunities. And it is that potential with our firms we want to build on even more.

Providing this opportunity through Department of Transportation contracting for minority- and women-owned businesses goes far beyond the one single contract. It is imperative that a DBE program achieves the outlined objectives. It is these objectives that provide opportunities for DBEs, and are the standard that DBELOs—Disadvantaged Business Enterprise Liaison Officers—such as myself, govern our programs by. We recognize that there

is always room for improvement. We accept the challenges that arise as opportunities to expand on the original intent, and to continue the purpose of the program.

I have seen the professional growth of DBEs over time. I have witnessed the evolution of business owners with an idea who started operations in small residential markets, and then expanded to commercial markets, and prepared themselves for Government procurement. I have certified businesses who met all the eligibility criteria for DBE participation, but were not familiar with Government bidding or establishing professional relationships. I have worked with established DBE businesses who have used their talents and experiences to grow their business beyond my county, and beyond my State, and to provide their service in multiple States.

I have also, unfortunately, seen those businesses who were not given the opportunity this program should allow. We can actually do more.

The DBE program affords minority- and women-owned businesses the chance to start, develop, and master their abilities, and grow beyond their initial footprint and the program. For this reason and many more, the DBE program needs to continue for an additional 37 years and beyond.

While my office in Broward County continues to find more ways to increase our DBE participation while focusing on successful contracting awards to DBEs, we also pay attention to the areas where there are opportunities to grow, and embrace the challenges that could make this program even better. The success of our program and the impact it has on the local and State economy is an ideal example of the importance of the DBE program to drive equality in the field of transportation.

And yes, I will say without question, COVID has impacted our community in the worst way, and we believe the DBE program will be one of those starts that helps us to bring our community back and support the minority- and women-owned businesses.

Thank you for this opportunity.

[Mr. McDonald's prepared statement follows:]

**Prepared Statement of Sandy-Michael E. McDonald, Director, Office of Economic and Small Business Development, Broward County, Florida**

Greetings Chairman DeFazio and Committee Members:

My name is Sandy-Michael E. McDonald and I am the Director of the Office of Economic and Small Business Development for Broward County, Florida. I also serve as the Disadvantaged Business Enterprise Liaison Officer (DBELO) and Airport Concession Disadvantaged Business Enterprise Liaison Officer (ACDBELO) for the administering of the DBE and ACDBE programs under 49 CFR Parts 26 & 23. As the DBELO/ACDBELO, it is my responsibility, and that of my office, to ensure that the objectives of the Disadvantaged Business Enterprise (DBE) and the Airport Concessions Disadvantaged Business Enterprise (ACDBE) programs are adhered to. This includes certifying eligible applicants and confirming that program activities and projects are monitored and reported accurately. As this Committee on Transportation and Infrastructure convenes to hear testimony on the topic of "Driving Equality: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program", I would like to share some of my thoughts, professional experiences, and observations of my daily role in driving equality and using the DBE program to do so.

## Opening Statement

It was an excellent start in 1983 when the provision was made to authorize highway and federal financial assistance programs to allocate at least 10% of the funds to be spent with DBEs to ensure that minorities would have an opportunity to participate and compete. In 1987, as the program progressed, it included women during the reauthorization. The DBE program as we know it today, is one of the most significant tools for guaranteeing the participation of minority-owned and women-owned businesses in the federal procurement of goods and services in the arenas of Highway, Transit and Aviation. However, it also serves as a foundation for other federal procurement programs and contracting opportunities.

In Broward County alone, the DBE program accounts for 408 businesses; of which 210 are women-owned. Throughout the State of Florida there are over 4,043 certified DBEs documented. The significance of the number of DBEs in my county and state is only one important factor to consider. Equally as important, are the number of jobs these DBEs provide and account for throughout the state and country. The implications and impact on labor and economics of these combined factors are not singular, but exponential. As an office, we are excited about growing the number of DBEs in the county, and throughout the state. We are even more excited about developing DBEs to participate successfully in the process, and then, preparing them to win contracts. That is the true value of the program.

Broward County believes the success of our DBEs comes from the additional assistance we are willing to offer in our program. All DBE program administrators are required to meet the eight objectives of the DBE Program under 49 CFR Part 26.1. However, the following specific objective: "*To assist the development of firms that can compete successfully in the marketplace outside the DBE program*", is the one we apply to grow our minority and women participation, and to grow our overall economy. We support this by preparing minority and women owned businesses to contract and provide services in all areas of government, private industry, national and international markets, as well as to produce more entrepreneurs and startup businesses.

## Need of the Program—Then and Now

Broward County clearly understands the importance and the need for the DBE program since its inception to the present. Through the projects and procurement of our Aviation and Transit Departments, our DBEs are given the opportunity to not only participate as a subcontractor, but to also serve as Prime Contractors (Primes). Due to our unbundling and small business development, our DBEs can serve as Primes on contracts and offer additional opportunities to other DBEs as subcontractors. The DBE program in Broward County develops and directly affords our minority and women owned businesses the chance to perfect their craft, realize their growth, build capacity, and nurture relationships that carry them far beyond a single contract. Going through the process for our DBEs is invaluable. Whether they win or lose a specific bid, it still allows them to create relationships that lead to partnerships that have the potential to result in future contracting opportunities outside of the government. Providing this opportunity through DOT contracting for minority and women owned businesses goes far beyond the contract.

It is imperative that a DBE program achieves the following objectives:

a) To ensure nondiscrimination in the award and administration of DOT-assisted contracts in the Department's highway, transit, and airport financial assistance programs;
b) To create a level playing field on which DBEs can compete fairly for DOT-assisted contracts;
c) To ensure that the Department's DBE program is narrowly tailored in accordance with applicable law;
d) To ensure that only firms that fully meet this part's eligibility standards are permitted to participate as DBEs;
e) To help remove barriers to the participation of DBEs in DOT-assisted contracts;
f) To promote the use of DBEs in all types of Federally assisted contracts and procurement activities conducted by recipients.
g) To assist the development of firms that can compete successfully in the marketplace outside the DBE program; and
h) To provide appropriate flexibility to recipients of Federal financial assistance in establishing and providing opportunities for DBEs.

It is these objectives that provide opportunities for DBEs, and are the standard that DBELOs, such as myself, govern ourselves and the program. These along with

the principles of professionalism and personal compassion, commitment, interest in growing and sustaining minority and women owned businesses, and striving for a greater economy, is why my office and Broward County supports and takes seriously our role and responsibility.

We recognize that there is always room for improvement. We accept the challenges that arise as opportunities to expand on the original intent, and to continue the purpose of the program. Broward County uses the DBE program and county contracting funded by DOT to stabilize and grow our economy and workforce. Now, more than ever, due to the COVID–19 public health crisis, industries such as aviation and transit have been adversely impacted, and to a degree, completely shut down in some locations for 5 months or more. Broward is identifying opportunities through Master Plans and through previously dedicated funding sources, to continue projects that will put some of our DBEs back to work and assist in the rejuvenation of our economy. We also realize that for the DBEs we have certified over the years, a significant part of developing them is also making sure they have the necessary access to capital. DBEs must be able to not only win a contract, but also to execute the contract over time. They must be able to meet all their financial obligations as they await payment. Clearly, this is a priority for all small businesses, especially minority and women owned businesses. Broward County is committed to leveraging resources to assist our businesses in being prepared financially. Another key element of developing our DBEs is making sure they have examples of best practices and access to information sharing. We continue to grow in that area; this includes building Mentor-Protégé relationships, as well as business development workshops on topics and areas of need and demand.

### Closing Remarks

I have seen the professional growth of DBEs over time. I have witnessed the evolution of business owners with an idea who started operations in small residential markets and then expanded to commercial markets and prepared themselves for government procurement. I have certified businesses who met all the eligibility criteria for DBE participation but were not familiar with government bidding or establishing professional relationships. I have worked with established DBE businesses who have used their talents and experiences to grow their business beyond my county and beyond my state to provide their services in multiple states.

The DBE program affords minority and women owned businesses the chance to start, develop, master their abilities, and grow beyond their initial footprint and the program. For these reasons, and many more, the DBE program needs to continue for an additional 37 years and beyond. While my office and Broward County continues to find more ways to increase our DBE participation numbers, while focusing on the successful contracting awards to DBEs, we will also pay attention to the areas where there are opportunities to grow and embrace the challenges that could make this great program even better. We will continue to work to make sure that more than our county office and staff are aware of the success of the DBE program and its participants. The participants themselves and their businesses are the best way to tell the story, and to have a voice for recruitment of new DBEs. Existing DBEs are the best trainers to share what the best business practices are. Existing DBEs are the demonstrators of how to contribute to the economic vitality, success, and a growing economy. Broward County will continue to do its part to meet and exceed all the objectives of the 49 CFR to maintain a successful DBE program. The success of our program and the impact it has on the local and state economy is an ideal example of the importance of the DBE program to drive equality in the field of transportation. Broward County exemplifies what DBEs, in partnership with government, working within a federal program that is committed to utilizing a target group, can produce.

Thank you for this opportunity to share my knowledge and experience with the DBE program. The impact the program has historically had on the economy, and the effect it continues to have should not be minimized. I am in full support of the continuation of the program in the interest of driving equality.

Mr. DeFazio. Thank you, Mr. McDonald. While you are testifying, if you wonder why I am looking over there, somehow some people show up on that screen, and some people only show up over there. So I don't know—I would hope, if our tech person is listening, when someone is speaking, if we could pop them up on the main screen, so we can just look forward.

With that, Ms. Norman, you may proceed.

Ms. NORMAN. Thank you very much, Mr. Chairman and members of the Transportation and Infrastructure Committee. Thank you all so much for allowing me to be a part of this process, and I am very honored and pleased to appear before you today. My name is Sandra D. Norman. I am division administrator for civil rights with the Virginia Department of Transportation.

As director, I know firsthand of the DBE program's importance that is within your jurisdiction. I am very supportive of the DBE program that assists minority- and women-owned businesses who are ready, willing, and able to compete and perform contract work as either a prime contractor or subcontractor. I believe it is the right thing to do. It continues to drive equality and inclusiveness.

The DBE program for the United States meets constitutional tests. Every court has held that the DBE program regulations and 49 CFR 26 are constitutional.

Why is the DBE program important? Here are some of my thoughts for you to consider.

The DBE program has its roots in the Civil Rights Act of 1964. It has been regulated through a series of reauthorization legislative initiatives. The DBE program applies to airport and surface transportation, highway, transit, and aviation. The DBE program has been enacted by Congress to address historical discrimination against minority-owned firms in the transportation industry, and to ensure that minority- and women-owned businesses have a fair chance to participate in contracting opportunities made possible by Federal financial assistance.

The DBE program, with its rigid certification requirements, presents an excellent opportunity for a win-win for all parties.

It is a success for VDOT, and a success for the community. We want the residents of those communities to benefit from the public investment in that community. The majority of employment growth in the United States comes from small businesses. When small businesses are allowed to do contract work, it is an opportunity for people who might have been excluded from the relevant workforce to showcase their talents and skills, get training, and work within the transportation industry to have more employment opportunities in the future.

Advancing diversity and making money are not conflicting goals. It is good for business and good for society.

DOT's DBE program is as relevant today as ever to level the playing field in transportation for individuals, businesses, and communities of race, color, and gender. Our country suffers when talented people who have new ideas and who want to work hard are denied the opportunity to compete because of their ethnic background, race, or gender. And that is why there is a continuing need for the Disadvantaged Business Program, a need to ensure that small businesses can compete fairly for Federal-funded, transportation-related projects.

The DBE program, independent of the inherent challenges and the nature that comes with those challenges, has provided opportunities for minorities and women-owned small businesses and other contractors to participate in an arena that has historically not seen such participation. It has allowed people to create jobs, and give

their employees a quality of life which they would not have been able to do before the DBE program.

So, independent of all the challenges, the right part of the program is access, access to many construction projects that use governmental money that will have a requirement with a designated percentage of the total contract values awarded, making sure they are awarded to the DBEs. This allows access to DBE businesses that may not have been able to compete on price with larger operations to win contracts on projects.

In addition to the financial benefit, contacts are made with respective industries that may lead to additional work. It is about people.

It is about jobs. And too often we forget that our industry's golden nuggets are the people who participate in the DBE program, our small businesses and the thousands upon thousands of people they employ.

Oftentimes we forget that the faces behind the businesses also want to leave a legacy for their children, grandchildren, and for generations yet unborn.

In closing, the success of DOT's DBE program depends on the rich diversity, skills, and talents of our DBEs. VDOT, as an agency, will continue to serve as a model DBE program to ensure that minority- and women-owned businesses have a fair opportunity to participate in contracting opportunities at VDOT. Therefore, we are committed to championing and strengthening our DBE program.

It is the real-life stories of discrimination for minority and women business owners that are vital to assisting courts, policymakers such as yourselves, and the public to understand the need to preserve and improve the Government DBE program that helps to drive equality and inclusiveness within the U.S. DOT DBE program.

Again, I am honored, and thank you so much for your time and consideration.

[Ms. Norman's prepared statement follows:]

**Prepared Statement of Sandra D. Norman, Division Administrator, Civil Rights, Virginia Department of Transportation**

Thank you very much, Mr. Chairman, and members of the Transportation and Infrastructure Committee. Thank you all so much for allowing me to be a part of this process and I am very honored and pleased to appear before you today.

My name is Sandra D. Norman, Division Administrator for Civil Rights for the Virginia Department of Transportation (VDOT). As Director, I know firsthand of the DBE Program's meaning that is within your jurisdiction. I am very supportive of the DBE program that assists minority and women-owned businesses who are ready, willing, and able to compete and conduct contract work as either a Prime Contractor or Subcontractor. I believe it is the right thing to do.

The Disadvantaged Business Enterprise (DBE) program for the U.S. meets constitutional tests. Every court has held that the DBE program regulations at 49 CFR Part 26 are constitutional.

*Why is the DBE Program Important, great question Mr. Chairman? Here are my thoughts for Transportation and Infrastructure (T&I)*:

The Disadvantaged Business Enterprise Program (DBE) has its roots in the Civil Rights Act of 1964. It has been regulated through a series of reauthorization legislative initiatives. The DBE program applies to airports and surface transportation (Highway and Transit). The DBE Program has been enacted by Congress to address historical discrimination against minority-owned firms in the transportation industry and to ensure that minority and women-owned businesses have a fair oppor-

tunity to participate in contracting opportunities made possible by Federal financial assistance

The DBE program, with its rigid certification requirements, presents an excellent opportunity for a win-win for all parties. It is a success for VDOT and a success for the community. We want the residents of those communities to benefit from the public investment in that community. The majority of employment growth in the United States comes from small businesses. When small businesses are allowed to do contract work, it is also an opportunity for people who might have been excluded from the relevant workforce to showcase their talents and skills, get trained and work within the transportation industry to have more employment opportunities in the future. Advancing diversity and making money are not conflicting goals; it is good for business and good for society.

Our DBE Program is as relevant today as ever: to level the playing field in transportation for individuals, businesses, and communities of race, color, and gender. Our Country suffers when talented people, who have new ideas, and who want to work hard, are denied the opportunity to compete because of their ethnic background, race, or gender. And that is why there is a continued need for the Disadvantaged Business Program, a need to ensure that small disadvantaged business enterprises can compete fairly for federal funded transportation related projects.

The DBE program, independent of the inherent challenges and the nature that comes with those challenges, has provided opportunities for minorities and women-owned small businesses and other contractors to participate in an arena that had historically not seen such participation. It has allowed people to create jobs and give their employees a quality of life, which they would not have been able to do before the DBE program. So independent of all the challenges we have, the right part of the program is ACCESS. Access to many construction projects that use governmental money that will have a requirement with a designated percentage of the total contract values awarded are awarded to DBEs. This allows access to DBE businesses that may not be able to compete on price with larger operations to win contracts on projects that such businesses may not traditionally be able to win on price alone. In addition to the financial benefit, contacts are made with respective industries that may lead to additional work. It is about people, it is about jobs, and too often, we forget that our industry's golden nuggets are the people who participate in the DBE program and the thousands upon thousands of people they employ. Oftentimes we forget that the faces behind the businesses also want to leave a legacy for their children, grandchildren, and for generations yet unborn.

The success of VDOT's DBE Program depends on the rich diversity, skills and talents of our DBEs. VDOT will continue to serve as a model DBE Program to ensure that minority and women-owned businesses have a fair opportunity to participate in contracting opportunities at VDOT. Therefore, we are committed to championing and strengthening our DBE Program. It is the real life stories of discrimination from minority and women business owners that are vital to assisting courts, policymakers such as yourselves, and the public to understand the need to preserve and improve the government disadvantaged business programs that help to DRIVE EQUALITY.

Again, I am honored, and thank you very much for your time and consideration.

Mr. DEFAZIO. Thank you, Ms. Norman.

Dr. Wainwright, you may proceed for 5 minutes.

Mr. WAINWRIGHT. Thank you, Chairman DeFazio, Ranking Member Graves, members of the committee. Good morning. I appreciate the invitation to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Until my recent retirement after 24 years, I served as a managing director at NERA Economic Consulting. My primary career focus has been analyzing the effects of discrimination on minorities and women.

My written testimony contains 90 pages of analysis conducted and compiled for this hearing. I will attempt to summarize. I have performed extensive original research using 95 existing disparity studies, as well as data covering millions of firms from the Census Bureau Survey of Business Owners, the Annual Business Survey, and the American Community Survey. My testimony is a continu-

ation of similar research I have performed over the course of my career as an economist.

I conclude that there is strong evidence, both past and present, of large, adverse, and statistically significant disparities facing minority-owned and women-owned business enterprises in the United States. Moreover, these disparities cannot be explained solely or even primarily by differences in factors that are untainted by discrimination. In other words, these disparities are primarily due to discrimination and its destructive effects.

I reached this conclusion from three main sources of empirical evidence.

First, disparity studies overwhelmingly demonstrate adverse findings for minority- and women-owned businesses. The vast majority of the 95 disparity studies I reviewed in my testimony identified large, adverse disparities affecting minority- and women-owned businesses in both construction and professional services like architecture and engineering. In construction, 72 percent of disparities were adverse, and 81 percent of those were large and adverse. In construction-related professional services, 77 percent were adverse and 97 percent of those were large and adverse. I am confident that, if a similar analysis were conducted with additional studies such as the 40 that have been introduced into the record here today, it would reveal similar results.

Second, census data shows large, adverse, and statistically significant disparities. The most recent complete census showed that, for every dollar of sales and receipts earned by nonminority male-owned firms, African Americans earned just $.34, Hispanics just $.47, and Asians just $.47. American Indian and Alaska Native-owned firms earned just $.43. Native Hawaiian and other Pacific Islander owned firms earned just $.49, and women earned just $.41.

Third, statistical regression analysis shows that historical and current disparities are largely due to discrimination. The most recent American Community Survey shows that the rate of business formation for African Americans would be 120 percent higher in the absence of discrimination. For Hispanics, the figure is 41 percent; for Asians, 30 percent higher; for American Indians and Alaska Natives, 43 percent higher; for Native Hawaiians and other Pacific Islanders, 58 percent higher; for women, 44 percent higher, in the absence of discrimination.

In closing, there is still some good news. As my testimony shows, and as you have heard today from the other witnesses, although severe disparities persist, we are making progress, thanks primarily to public efforts like the DBE and ACDBE programs. Still, now is not the time to reduce our efforts to eliminate business discrimination and its effects. Indeed, the evidence is overwhelming that, if we eliminate or reduce these programs, much greater disparities will very quickly occur.

The best metaphor I can offer is to consider someone like myself, who takes blood pressure medication: if you take my blood pressure while I am on my meds, it will read close to normal. Obviously, that does not mean that any responsible doctor will say it is time to stop taking my medicine. This is precisely why I and other researchers in this area try to examine both public-sector contracting

markets, where affirmative measures like the DBE program are found, as well as private-sector contracting markets, where such programs are rare and, consequently, discrimination remains almost totally undermediated.

The bottom line is this: despite admirable progress, discrimination and its destructive effects are deeply rooted in the American economy. Such discrimination makes it immeasurably harder for women and minorities to form and grow their own firms. This reality has innumerable harmful consequences for our economy and for our Nation. For all these reasons, I strongly urge you to reauthorize the DBE program. Thank you very much.

[Mr. Wainwright's 55-page prepared statement follows. The transcript resumes on page 95.]

**Prepared Statement of Jon S. Wainwright, Ph.D., Affiliated Consultant, NERA Economic Consulting**

Chairman DeFazio, Ranking Member Graves, and Members of the Committee:

Thank you for the invitation to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Until my recent retirement after 24 years, I served as a Managing Director at NERA Economic Consulting in Austin, Texas and Chicago, Illinois. NERA is a national and international economic consulting firm dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. One of my primary areas of interest as a professional economist has been documenting and analyzing the effects of discrimination on minorities, women, and other disadvantaged groups.

I would like to ask the Committee's permission to include my entire testimony in the record as if read in full and to supplement my testimony with additional material if needed.

### A. Introduction

I have been asked to provide a statistical overview of the historical and current state of Minority-Owned and Women-Owned Business Enterprise (M/WBE) in the United States, for the economy as a whole and particularly in those industry sectors relevant to Federal surface and aviation transportation funding.

My findings are drawn from evidence in numerous studies of M/WBE participation in public sector contracting activity that have been performed in the wake of the U.S. Supreme Court's ruling in *City of Richmond v. J. A. Croson Company*,[1] many of which I conducted myself. These disparity studies examine statistical evidence of M/WBE participation in public sector and private sector business activity compared to M/WBE representation in the relevant business populations, and offer explanations for the disparities observed between these factors. They also include qualitative, or anecdotal, accounts from both M/WBEs and non-M/WBEs regarding these disparities.

Additionally, I have drawn findings from the few primary sources of statistical evidence that exist regarding M/WBEs, namely the Census Bureau's historical *Survey of Business Owners*, its new *Annual Business Survey*, and its ongoing *American Community Survey*. The *Survey of Business Owners* and its recent successor, the *Annual Business Survey*, provide information regarding the total number of M/WBEs in the country, their gross sales and receipts, and their employment and payroll, both in absolute terms as well as relative to their nonminority, male-owned counterparts. The *American Community Survey* is an annual version to the old decennial census long form and provides evidence regarding patterns of business formation by minority and female entrepreneurs and associated business earnings relative to their nonminority, male-owned counterparts.

In preparing this testimony, I conducted extensive original research using all of the above-mentioned sources of evidence. This research is a continuation of similar research I have performed over the course of my career as an economist. Based on the findings presented below, I conclude that there is strong evidence, both past and present, of large, adverse, and statistically significant disparities facing minority-

[1] 488 U.S. 469 (1989).

owned and women-owned business enterprises in the United States. Moreover, these disparities cannot be explained solely, or even primarily, by differences between the relevant populations in factors untainted by the effects of discrimination. These disparities are primarily due to discrimination and its effects, in the economy as a whole, as well as in the markets such as construction, architecture, and engineering that most relevant to Federal surface and aviation transportation funding.

*1. Qualifications*

I hold a Ph.D. in economics from the University of Texas at Austin. My graduate curriculum included advanced courses in statistics, econometrics and labor economics, among others. Prior to joining NERA in 1995, I served as a Research Associate Professor at the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin and also headed my own economic consulting firm. While at NERA, I conducted economic and statistical studies of discrimination for attorneys, corporations, governments and non-profit organizations. I also conducted research and advised clients on adverse impact and economic damage issues arising from contracting activities, hiring, termination, performance assessment, compensation, and promotion. I have extensive experience producing, processing, and analyzing large and complex statistical data bases, including public sector contracting and purchasing data, as well as with myriad socioeconomic and demographic datasets produced by the Census Bureau and other official statistical agencies.

Over the course of my career, I have conducted economic and statistical research and assisted in litigation concerning the minority and female participation in public contracting activities. From 2004 through 2018, I directed NERA's national discrimination consulting practice. In that capacity, I served as the project director and principal investigator for more than 40 studies of business discrimination, and prior to that time as principal or co-principal investigator on approximately a dozen additional business discrimination studies. I have authored two peer-reviewed monographs and several articles and white papers on this and related subjects, including *Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program*, published in 2010 by the *Transportation Research Board* of the *National Academy of Sciences*.

Between 2010 and 2013 I served as the principal economic and statistical expert on behalf of the U.S. Department of Justice, testifying in four cases challenging Federal policies to promote participation by minority-owned and/or women-owned businesses in Federal contracting activities. These were:

- *Kevcon, Inc. v. The United States* (United States Court of Federal Claims), concerning the Small Business Administration's 8(a) minority business set-aside program.[2]
- *Geyer Signal, Inc. and Kevin Kissell v. Minnesota Department of Transportation, et al*. (United States District Court for the District of Minnesota), concerning the USDOT Disadvantaged Business Enterprise Program.[3]
- *Midwest Fence Corporation v. United States Department of Transportation, et al*. (United States District Court for the Northern District of Illinois, Eastern Division), concerning the USDOT Disadvantaged Business Enterprise Program.[4]
- *Rothe Development, Inc. v. Department of Defense and Small Business Administration* (United States District Court for the District of Columbia), concerning the Small Business Administration 8(a) minority business set-aside program.[5]

I have been repeatedly qualified as an expert economic and statistical witness in both Federal and state courts and have testified in these and related matters on 20 occasions. I have also testified before the U.S. Congress on these matters on five previous occasions.

My current curriculum vitae is attached to this testimony. The source material relied on in reaching my findings and conclusions are noted below in the body of my testimony.

*2. Discrimination and its Effects, Historically and Currently, Consistently Disadvantages Minority- and Women-Owned Business Enterprises*

As other researchers have noted, and as demonstrated in many of the studies, reports, and other testimony submitted to Congress, minorities and women have been historically and consistently disadvantaged by the effects of discrimination in busi-

[2] Wainwright, Jon S. (2010).
[3] Wainwright, Jon S. (2012).
[4] Wainwright, Jon S. (2013b), (2013c).
[5] Wainwright, Jon S. (2013a).

ness enterprise.[6] Despite progress in some areas, these disadvantages are still present in business markets.[7] As my testimony demonstrates, although severe disparities persist between non-minority male owned firms and minority- and women-owned firms, we are making progress thanks to programs like the Disadvantaged Business Enterprise Program. Still, now is no time to reduce our efforts to eliminate business discrimination and its effects. Indeed, much of the progress that has been achieved is due to the effect that programs like the DBE program have had. The evidence is overwhelming that, were we to eliminate or reduce these programs, much greater disparities would very quickly occur. The best metaphor I can think of is the person who takes blood pressure medicine. If we take that person's blood pressure while they are taking their medicine, their blood pressure will appear normal but that does not mean that any responsible doctor would argue that the person should stop taking their blood pressure medicine. This is precisely why I and other researchers in this area try to examine both the public sector contracting markets where affirmative measures like the DBE program are found as well as the private sector contracting markets where such programs are much more rare. This is also why, although my testimony includes voluminous data from public sector sources like disparity studies, I also include a great deal of information from Census sources which examine markets that are largely unremediated by programs like the DBE program.

African Americans are 13.3 percent of the general population, 12.6 percent of the civilian labor force, and 12.2 percent of total employment. However, at last count, African Americans owned only 9.5 percent of the nation's businesses, and earned a mere 1.26 percent of all business sales and receipts.[8]

Hispanics are 18.2 percent of the general population, 17.1 percent of the civilian labor force, and 17.0 percent of total employment. However, at last count Hispanics owned only 12.2 percent of the nation's businesses, earned less than 4.0 percent of all business sales and receipts.

American Indians and Alaska Natives are 1.3 percent of the general population, but they are only 1.0 percent of the business population and earned just 0.32 percent of business sales and receipts.

Asians and Pacific Islanders represent 6.1 percent of the general population, 6.2 percent of the civilian labor force, and 6.2 percent of total employment. While Asians own 7.1 percent of the nation's businesses, they earned only 5.9 percent of business sales and receipts.

Women represent 50.9 percent of the general population, 46.9 percent of the civilian labor force, and 46.9 percent of total employment. However, they are only 36.4 percent of the business population and earn only 11.9 percent of business sales and receipts.

Even those minorities and women who manage against the odds to start their own businesses must compete in a business enterprise system that has long been dominated by non-minority male-owned firms.[9] The advantages enjoyed by non-minority males in this context are borne out in the statistics. In a groundbreaking pair of studies of employer business closure rates, Professor Ying Lowrey documented that existing African American-owned, Hispanic-owned, Asian and Pacific Islander-owned, and women-owned businesses across a wide variety of industry groups suffered substantially higher closure rates during the 2002–2006 period than did their nonminority male counterparts.[10] More recently, Professor Rob Fairlie has shown that African American, Hispanic Asian, American Indian and Alaska Native, and female small businesses closed at higher rates than their non-minority male counterparts during the first month of widespread COVID–19 induced shelter-in-place restrictions in April of this year.[11]

Even among larger firms, such as those with one or more paid employees, the disparities between minorities and women, on the one hand, and non-minority males, on the other, are stark. In 2017, for every dollar in sales and receipts earned by

[6] *See, e.g.*, U.S. Department of Commerce (2015); Lowrey (2010a); Lowrey (2010b); Marshall (2002); Wainwright (2000).

[7] *See*, generally, U.S. Small Business Administration (2010).

[8] General population statistics are from the U.S. Census Bureau (2017a); civilian labor force and total employment figures are from the Bureau of Labor Statistics (2018a, 2018b, 2018c); business enterprise statistics are from the *2012 Survey of Business Owners*, U.S. Census Bureau (2018b). Note: Publicly owned companies have been excluded from all calculations in this report that use *Survey of Business Owners* or *Annual Business Survey* statistics.

[9] *See, e.g.*, Wainwright (2000), pp. 17–22, and the studies cited therein.

[10] Lowrey, Ying (2010a), pp. 20–21; Lowrey, Ying (2010b), p. 16. The comparison was between non-publicly held establishments that were in business in 2002 but had closed by 2006 versus all non-publicly held establishments in business in 2002.

[11] Fairlie, Robert (2020). p. 16.

non-minority male-owned employers, African American-owned employers earned 45 cents, Hispanic-owned employers earned 57 cents, Asian and Pacific Islander-owned employers earned 63 cents, American Indians and Alaska Native-owned employers earned 67 cents, and women-owned employers earned 61 cents.[12]

The overwhelming majority of businesses have less than 10 employees, and only a small fraction have more than 500 employees. Minority- and women-owned firms are over-represented in the former category and under-represented in the latter. For the smallest firms in 2017 (the most recent data available), 78 percent of non-minority male-owned firms had less than 10 employees, compared to 82.1 percent of African American-owned firms, 82.3 percent of Hispanic-owned firms, 81.2 percent of Asian and Pacific Islander-owned firms, 82.2 percent of American Indian and Alaska Native-owned firms, and 82.2 percent of women-owned firms.[13] For the largest firms in 2017, 0.21 percent of nonminority-owned male firms had 500 or more employees, compared to 0.12 percent of African Americans, 0.1 percent of Hispanics, 0.07 percent of Asians and Pacific Islanders, 0.11 percent of Native Americans, and 0.1 percent of women.[14]

### B. Studies Conducted Since 2000 Provide Strong Evidence of Disparities Against Minority- and Women-Owned Businesses

As mentioned above, between 2010 and 2013 I served as an expert witness on behalf of the U.S. Department of Justice in its defense of two challenges to the SBA 8(a) Program and two challenges to the USDOT DBE Program. As part of this work, I collected and reviewed every known study of M/WBE disparities published since 2000.

*1. Data and Methods*

Table 1 identifies 95 studies of minority and female business enterprise completed between 2000 and 2012. These studies examined M/WBE participation in public contracting and procurement for 127 different public entities and/or funding sources. The studies span 32 different states that collectively account for over 80 percent of the general population of the United States.[15] Of the 95 studies, 21 were conducted under my direction. Over the course of these studies, I personally examined and analyzed tens of billions of dollars worth of public sector spending across tens of thousands of contracts and subcontracts. The remaining 74 studies covered an even larger number of public contracts and public dollars.

All of the disparity studies in Table 1 examined minority-owned business enterprises as well as non-minority women-owned business enterprises. Typically, M/WBEs include businesses owned by African Americans, Hispanics, Asians and Pacific Islanders, American Indians and Alaska Natives, and non-minority women.

A wide variety of government types are represented as well in these disparity studies. Some studies encompassed the entire state (*i.e.*, Indiana, Maryland, Minnesota, New York, Texas, and Virginia), others were performed for single state agencies (*i.e.*, Department of Transportation studies in Alaska, Arizona, California, Colorado, Georgia, Hawaii, Idaho, Illinois, Kansas, Maryland, Minnesota, Missouri, Montana, Nevada, North Carolina, Oklahoma, Oregon, Virginia, and Washington and the Division of Capital Asset Management and the Housing Finance Agency in Massachusetts), others were done for cities (*i.e.*, Atlanta, Augusta, Austin, Baltimore, Boston, Charlotte, Cincinnati, Columbia, Dayton, Denver, Durham, Fort Worth, Houston, Kansas City, Memphis, Milwaukee, Minneapolis, Nashville, Philadelphia, Phoenix, Portland, San Antonio, St. Louis, St. Paul, Tallahassee, Tucson, and Tulsa), others covered counties (*i.e.*, Pima, AZ; Broward, FL; Leon, FL; Richmond, GA; Wyandotte, KS; Durham, NC; Davidson, TN), and still more were for a variety of special districts including schools, public utilities, housing authorities, airports, and transit agencies.

All 95 studies identified included contracts and procurements for public works in construction, and a large majority also included contracts in the construction-related professional services ("CRS") sector, which includes architecture, engineering, and related services. Construction and CRS activities include the public works per-

[12] U.S. Census Bureau (2020a). For employer firms, the most recent data are from the 2017 Annual Business Survey, released in May 2020.
[13] U.S. Census Bureau (2018b, 2018c 2018d).
[14] *Ibid*.
[15] U.S. Census Bureau (2011e).

formed by highway departments, transit agencies, and airports under USDOT jurisdiction.[16]

Many of the disparity studies in Table 1 encompass public contracting and purchasing activities in other industry sectors as well. This reflects the fact that state and local governments, and their prime contractors and vendors, purchase goods and services from practically every major industry. In addition to construction and CRS, these include agriculture, mining, utilities, transportation, wholesale trade, retail trade, finance and insurance, real estate, professional and technical services, administrative and support services, waste management services, educational services, health care and social assistance services, food services, and others. NERA's most recent study for the State of Maryland, for example, encompassed 695 distinct industries.[17]

In addition to covering construction, CRS, and other industries, the 95 studies in Table 1 span the country geographically, representing all four Census Regions and all nine Census Divisions. In all, 32 states plus the District of Columbia are represented here, as well as 53 of this Committee's 67 members.

As part of my work on behalf of USDOJ, I reviewed all of 95 studies identified in Table 1. Typically, these studies include an Executive Summary, a review of case law pertaining to M/WBEs, a review of the government's purchasing and contracting policies as they pertain to M/WBEs, a chapter estimating the availability of M/WBEs, a chapter estimating the utilization of M/WBEs, a chapter comparing availability and utilization to assess disparities, and a chapter examining anecdotal evidence of discrimination. Often, these disparity studies also included one or more chapters examining evidence of disparities and discrimination in the wider market area, surrounding a particular government's jurisdiction. These are referred to as "private sector" or "economy-wide" analyses.

*2. Findings*

Each study is different. They were prepared by different consultants, for different governments, in different parts of the country, with differing levels of resources. They examined different periods of time and used a variety of methods for assessing utilization, availability, and disparity, and for gathering anecdotal information.[18]

Nevertheless, the striking similarities among these studies strongly outweigh the differences. Foremost among these is an almost universal finding that historical and contemporary discrimination adversely impacts all different types of M/WBEs throughout the United States, in the construction sector, the CRS sector, and in other industry segments as well.

To begin to see this, Table 2 presents specific statistical findings from the studies listed in Table 1. One primary function of a disparity study is to gather information on a government entity's prime contracting and subcontracting activity during the time period being studied. Since the Federal DBE Program applies to both prime contracting and subcontracting, I focused my review on the combined utilization of M/WBEs as both prime contractors and subcontractors.[19]

I reviewed each study's findings concerning:

- The percentage utilization of M/WBEs in construction spending,
- The percentage availability of M/WBEs for construction spending,
- The percentage utilization of M/WBEs in CRS spending, and
- The percentage availability of M/BEs for CRS spending.

Several appear more than once in Table 2 since they provided statistical evidence in more than one relevant category. Columns (1) and (2) in Table 2 identify the state and political subdivision for which each disparity study was performed. Columns (3) and (6) present the utilization statistics for construction and CRS, respectively. Col-

[16] Construction prime contractors and subcontractors also purchase a variety of supplies and materials (*e.g*., steel, concrete, asphalt), as well as trucking services.

[17] NERA Economic Consulting (2017), p. 45. However, public sector spending is not typically distributed evenly among industries. In the State of Maryland's case, 261 industries (38 percent) accounted for 99 percent of all spending over the study period.

[18] A detailed discussion of the differences in methods employed by different consultants is provided in Wainwright and Holt (2010), pp. 29–53.

[19] Depending on how any given study's statistics were presented, I had to carry out certain additional calculations in order to present the information in Table 2 in a consistent manner. For example, a study might show the total number of prime contract construction dollars accruing to M/WBEs in one table, the total number of subcontract construction dollars accruing to M/WBEs in another table, and the total number of construction dollars overall in yet another table. Calculating overall M/WBE prime contract and subcontract utilization thereby required adding the figure in the first table to the figure in the second table and dividing the sum by the figure in the third table. These figures, in turn, might then be combined with availability statistics from one or more tables in the study in question to form the relevant disparity index.

umns (4) and (7) present the availability statistics for construction and CRS, respectively. Columns (5) and (8) present the disparity indexes for construction and CRS, respectively. Column (9) indicates the years covered by each study. Column (10) provides the page citations for the statistical data presented.

The disparity indexes presented in column (5) for construction and column (8) for CRS are formed by dividing the M/WBE utilization percentage by the M/WBE availability percentage, and multiplying the result by 100. A disparity index of 100 or more indicates that M/WBEs are being utilized at or above their market availability level. A disparity index of less than 100 indicates that M/WBEs are being utilized at or below their market availability level. A disparity index of 80 or lower is commonly taken as an indicator that discrimination is adversely affecting M/WBEs.[20]

The substantial majority of the disparity studies reviewed and presented in Table 2 identified large adverse disparities affecting M/WBEs in both construction and CRS.[21] There are 206 disparity indexes altogether—127 for the construction sector and 79 for the CRS sector.

- In construction, 74 of 127 disparity indexes, or 58 percent, fall at or below 80; and 91 of 127, or 72 percent, are less than 100.
- In CRS, 59 of 79 disparity indexes, or 75 percent, fall at or below 80; and 61 of 79, or 77 percent, are less than 100.
- Combining the results from both industry sectors, 133 of 206 disparity indexes, or 65 percent, fall at or below 80; and 152 of 206, or 74 percent, are less than 100.

Notably, the general consistency of these results occurs despite these studies having been undertaken by different consultants, using differing methods, at different points in time, with different budgets, and for a wide variety of state and local government agencies in a wide variety of geographic locations. Perhaps most notably, these disparities exist *despite the fact that, in the overwhelming majority of studies there was a strong, mature MBE or DBE program in place aimed at eliminating disparities*. In other words, these disparities are so powerful and so severe that even strong efforts to level the playing field are simply not enough to eradicate them.

Eleven different consultants produced the studies in Table 2. However, just four firms produced 75 percent of these studies: MGT of America, NERA Economic Consulting, BBC Research & Consulting, and Mason Tillman Associates.

- Of the 34 construction disparity indexes from MGT of America, 20 (59 percent) are less than or equal to 80 and 26 (76 percent) are less than or equal to 100. Of the 15 CRS disparity indexes from MGT, 12 (80 percent) are less than or equal to 80 and 12 (80 percent) are less than or equal to 100.
- Of the 24 construction disparity indexes from NERA Economic Consulting, 16 (67 percent) are less than or equal to 80 and 17 (71 percent) are less than or equal to 100. Of the 20 CRS disparity indexes from NERA, 10 (50 percent) are less than or equal to 80 and 11 (55 percent) are less than or equal to 100.
- Of the 23 construction disparity indexes from BBC Research & Consulting, 13 (57 percent) are less than or equal to 80 and 17 (74 percent) are less than or equal to 100. Of the 20 CRS disparity indexes from BBC, 17 (85 percent) are less than or equal to 80 and 17 (85 percent) are less than or equal to 100.
- Of the 17 construction disparity indexes from Mason Tillman Associates, 13 (76 percent) are less than or equal to 80 and 16 (94 percent) are less than or equal to 100. Of the 12 CRS disparity indexes from Mason Tillman, 10 (83 percent) are less than or equal to 80 and 10 (83 percent) are less than or equal to 100.
- Of the 29 construction disparity indexes from the balance of consulting firms in Table 2, 12 (41 percent) are less than or equal to 80 and 15 (52 percent) are less than or equal to 100. Of the 12 CRS disparity indexes from the balance of consulting firms, 10 (83 percent) are less than or equal to 80 and 11 (92 percent) are less than or equal to 100.

Some specific results in Table 2 are highlighted below:

- Of the 33 state DOT construction disparity indexes, 26 (79 percent) are less than or equal to 80 and 29 (88 percent) are less than or equal to 100. These include Alaska, Arizona, California, Colorado, Georgia, Hawaii, Idaho, Illinois, Kansas, Minnesota, Missouri, Nevada, North Carolina, Oregon, Texas, Virginia, and Washington.

[20] Although not the same as statistical significance, the "four-fifths rule" says that a disparity index of less than or equal to 80 (on a scale of zero to 100, zero being perfect disparity and 100 being perfect parity), because it is large, or "substantively" significant, indicates the presence of discrimination. *See* 29 C.F.R. § 1607.4(d).

[21] In Table 2, disparity indexes of 80 or lower are highlighted in boldface type. Disparity indexes above 80 but still less than 100 (which would indicate parity with non-M/WBEs) are highlighted in boldface italicized type.

- Of the 24 state DOT CRS disparity indexes, 23 (96 percent) are less than or equal to 80 and 23 (96 percent) are less than or equal to 100. These include Arizona, California, Colorado, Georgia, Idaho, Illinois, Missouri, Montana, Nevada, North Carolina, Oklahoma, Oregon, Virginia, and Washington. Only Hawaii was found to have consistently utilized M/WBEs at or above their estimated availability in CRS.
- Of the 11 statewide (excluding DOTs) construction disparity indexes, 7 (64 percent) are less than or equal to 80 and 10 (91 percent) are less than or equal to 100. Of the 4 statewide (excluding DOTs) CRS disparity indexes, 3 (75 percent) are less than or equal to 80 and 4 (100 percent) are less than or equal to 100.
- Of the 41 city or county construction disparity indexes, 19 (46 percent) are less than or equal to 80 and 25 (61 percent) are less than or equal to 100. Of the 22 city or county CRS disparity indexes, 13 (59 percent) are less than or equal to 80 and 13 (59 percent) are less than or equal to 100.
- Of the 39 special district (*e.g.*, transit agencies, airports, housing authorities, school districts) construction disparity indexes, 23 (59 percent) are less than or equal to 80 and 27 (69 percent) are less than or equal to 100. Of the 28 special district CRS disparity indexes, 20 (71 percent) are less than or equal to 80 and 21 (75 percent) are less than or equal to 100.

Finally, in almost all of the studies presented, the statistical findings are accompanied by anecdotal evidence of discrimination against M/WBEs.[22] Many of these studies also include statistical evidence of disparities in the surrounding private sector—in minority and female business formation rates, business owner earnings, and access to commercial loans and capital. This type of statistical evidence is especially important since it helps explain why the large and adverse disparities observed for M/WBEs can be attributed to discrimination rather than to other, non-discriminatory factors.

*3. Conclusions from the Disparity Study Data*

According to my records, there are at least another 150 disparity studies that have been completed since I finished my work for USDOJ in 2013. There is no doubt in my mind that were I to conduct a comparable analysis on these latest studies, I would find similar results—large and adverse disparities that continue to face M/WBEs throughout the country. In the next two sections of my testimony, I examine the most recent Census Bureau data with respect to M/WBEs.

**Table 1. Selected Disparity and Availability Studies Performed in the United States Between 2000–2012**

| State | Subdivision | Author | Type of Study | Year Completed |
|---|---|---|---|---|
| AK | Department of Transportation and Public Facilities | D. Wilson Consulting Group, LLC | Disparity | 2007 |
| AZ | Arizona Department of Transportation | MGT of America, Inc. | Disparity | 2009 |
| AZ | City of Phoenix | MGT of America, Inc. | Disparity | 2005 |
| AZ | City of Tucson | D. Wilson Consulting Group, LLC | Disparity | 2008 |
| AZ | Pima County | D. Wilson Consulting Group, LLC | Disparity | 2008 |
| CA | Bay Area Rapid Transit (BART) | Mason Tillman Associates, Ltd. | Disparity | 2009 |
| CA | California Department of Transportation | BBC Research & Consulting | Disparity | 2007 |
| CA | Los Angeles County Metropolitan Transportation Authority. | BBC Research & Consulting | Disparity | 2010 |
| CA | Metrolink—Southern California Regional Rail Authority. | BBC Research & Consulting | Disparity | 2009 |
| CA | Orange County Transportation Authority | BBC Research & Consulting | Disparity | 2010 |
| CA | San Diego Association of Governments | BBC Research & Consulting | Disparity | 2010 |
| CA | San Diego Metropolitan Transit System | BBC Research & Consulting | Disparity | 2010 |
| CA | San Mateo County Transit District | CRA International | Disparity | 2008 |
| CA | Santa Clara Valley Transportation Authority | CRA International | Disparity | 2007 |
| CO | City and County of Denver, Denver International Airport. | NERA | Disparity | 2006 |
| CO | Colorado Department of Transportation | MGT of America, Inc. | Disparity | 2001 |
| CO | Colorado Department of Transportation | D. Wilson Consulting Group, LLC | Disparity | 2009 |
| CT | Metropolitan District Commission | M3C | Disparity | 2009 |

[22] *See also, e.g.*, U.S. Small Business Administration (2010), Aparicio (2009), Asian American Justice Center (2008), Lau (2009), Quon (2008), U.S. Congress (2007), (2008), (2009a), (2009b), and (2009c).

**Table 1. Selected Disparity and Availability Studies Performed in the United States Between 2000–2012**—Continued

| State | Subdivision | Author | Type of Study | Year Completed |
|---|---|---|---|---|
| DC | Washington Suburban Sanitary Commission | Mason Tillman Associates, Ltd. | Disparity | 2011 |
| FL | Broward County | MGT of America, Inc. | Disparity | 2001 |
| FL | Broward County | NERA | Disparity | 2010 |
| FL | City of Tallahassee | MGT of America, Inc. | Disparity | 2004 |
| FL | Leon County | MGT of America, Inc. | Disparity | 2009 |
| FL | School District of Hillsborough County | Mason Tillman Associates, Ltd. | Disparity | 2007 |
| GA | City of Atlanta | Griffin & Strong | Disparity | 2006 |
| GA | Consolidated Government of Augusta-Richmond County. | NERA | Disparity | 2009 |
| GA | Georgia Department of Transportation | Boston Research Group, Inc. | Disparity | 2005 |
| GA | Georgia Department of Transportation | BBC Research & Consulting | Disparity | 2012 |
| HI | Hawai'i Department of Transportation | NERA | Disparity | 2010 |
| ID | Idaho Transportation Department | BBC Research & Consulting | Disparity | 2007 |
| IL | Illinois Department of Transportation | Mason Tillman Associates, Ltd. | Disparity | 2011 |
| IL | Illinois State Toll Highway Authority | Mason Tillman Associates, Ltd. | Disparity | 2011 |
| IL | Illinois State Toll Highway Authority | NERA | Disparity | 2006 |
| IN | Indiana Department of Administration, Indiana DOT, Ball State Univ., Indiana State Univ., Indiana Univ., Ivy Tech Comm. College, Purdue Univ., Univ. of Southern Indiana, Vincennes Univ.. | BBC Research & Consulting | Disparity | 2010 |
| KS | Kansas Department of Transportation | MGT of America, Inc. | Availability | 2003 |
| KS; MO | City of Kansas City; Wyandotte County, KS; Kansas City Area Transit Authority; Kansas City School District, MO. | Mason Tillman Associates, Ltd. | Disparity | 2006 |
| MD | City of Baltimore | MGT of America, Inc. | Disparity | 2000 |
| MD | City of Baltimore | NERA | Disparity | 2007 |
| MD | State of Maryland | NERA | Disparity | 2006 |
| MD | State of Maryland | NERA | Disparity | 2011 |
| MA | City of Boston | Mason Tillman Associates, Ltd. | Disparity | 2003 |
| MA | Division of Capital Asset Management | NERA | Disparity | 2006 |
| MA | Massachusetts Housing Finance Agency | NERA | Disparity | 2006 |
| MN | City of Minneapolis | NERA | Disparity | 2010 |
| MN | City of St. Paul and the St. Paul Housing Authority | MGT of America, Inc. | Disparity | 2008 |
| MN | Metropolitan Airports Commission | MGT of America, Inc. | Disparity | 2009 |
| MN | Metropolitan Council | MGT of America, Inc. | Disparity | 2009 |
| MN | Minnesota Department of Administration | MGT of America, Inc. | Disparity | 2009 |
| MN | Minnesota Department of Transportation | NERA | Availability | 2005 |
| MN | Minnesota Department of Transportation | MGT of America, Inc. | Disparity | 2009 |
| MO | Bi-State Development Agency (St. Louis Metro) | NERA | Disparity | 2005 |
| MO | City of St. Louis, The St. Louis Housing Authority, The Metropolitan St. Louis Sewer District. | MGT of America, Inc. | Disparity | 2001 |
| MO | Missouri Department of Transportation | NERA | Disparity | 2012 |
| MT | Montana Department of Transportation | D. Wilson Consulting Group, LLC | Disparity | 2009 |
| NV | Nevada Department of Transportation | BBC Research & Consulting | Disparity | 2007 |
| NY | State of New York | NERA | Disparity | 2010 |
| NC | City of Charlotte | MGT of America, Inc. | Disparity | 2011 |
| NC | City of Durham and Durham County | Mason Tillman Associates, Ltd. | Disparity | 2000 |
| NC | Durham County | Griffin & Strong | Disparity | 2007 |
| NC | North Carolina Department of Transportation | MGT of America, Inc. | Disparity | 2004 |
| NC | North Carolina Department of Transportation | Euquant | Disparity | 2009 |
| OH | City of Cincinnati | Griffin & Strong | Disparity | 2002 |
| OH | City of Dayton | MGT of America, Inc. | Disparity | 2008 |
| OH | Northeast Ohio Regional Sewer District | NERA | Disparity | 2010 |
| OK | City of Tulsa | MGT of America, Inc. | Disparity | 2010 |
| OK | Oklahoma Department of Transportation | BBC Research & Consulting | Disparity | 2010 |
| OR | City of Portland | BBC Research & Consulting | Disparity | 2011 |
| OR | Oregon Department of Transportation | MGT of America, Inc. | Disparity | 2007 |
| OR | Port of Portland | MGT of America, Inc. | Disparity | 2009 |
| OR | Portland Development Commission | BBC Research & Consulting | Disparity | 2011 |
| PA | City of Philadelphia | Econsult Corporation | Disparity | 2007 |
| PA | City of Philadelphia | Econsult Corporation | Disparity | 2008 |
| PA | City of Philadelphia | Econsult Corporation | Disparity | 2009 |

**Table 1. Selected Disparity and Availability Studies Performed in the United States Between 2000–2012**—Continued

| State | Subdivision | Author | Type of Study | Year Completed |
|---|---|---|---|---|
| PA .... | City of Philadelphia | Econsult Corporation | Disparity ..... | 2010 |
| PA .... | City of Philadelphia | Econsult Corporation | Disparity ..... | 2011 |
| PA .... | City of Philadelphia | Econsult Corporation | Disparity ..... | 2012 |
| SC ... | City of Columbia | MGT of America, Inc. | Disparity ..... | 2006 |
| TN .... | City of Memphis | Griffin & Strong | Disparity ..... | 2010 |
| TN .... | Consolidated Government of Nashville and Davidson County. | Griffin & Strong | Disparity ..... | 2004 |
| TN .... | Memphis International Airport | NERA | Disparity ..... | 2008 |
| TN .... | Nashville International Airport | Griffin & Strong | Disparity ..... | 2007 |
| TX .... | City of Austin | NERA | Disparity ..... | 2008 |
| TX .... | City of Fort Worth; City of Arlington; DFW Airport; Fort Worth Independent School District; Fort Worth Transportation Authority; North Texas Tollway Authority [North Central Texas Council of Governments]. | Mason Tillman Associates, Ltd. | Disparity ..... | 2010 |
| TX .... | City of Houston | NERA | Disparity ..... | 2012 |
| TX .... | City of San Antonio, Alamo Regional Mobility Authority, Brooks Development Authority, CPS Energy, Edwards Aquifer Authority, Port Authority of San Antonio, San Antonio Housing Authority, San Antonio Water System, University Health System. | MGT of America, Inc. | Disparity ..... | 2009 |
| TX .... | Dallas Area Rapid Transit Authority (DART) | Mason Tillman Associates, Ltd. | Disparity ..... | 2003 |
| TX .... | State of Texas | Mason Tillman Associates, Ltd. | Disparity ..... | 2007 |
| TX .... | State of Texas | MGT of America, Inc. | Disparity ..... | 2010 |
| UT .... | Salt Lake City International Airport | NERA | Disparity ..... | 2009 |
| VA .... | Commonwealth of Virginia | MGT of America, Inc. | Disparity ..... | 2004 |
| VA .... | Commonwealth of Virginia | MGT of America, Inc. | Disparity ..... | 2010 |
| VA .... | Virginia DOT | MGT of America, Inc. | Disparity ..... | 2004 |
| WA ... | Washington Department of Transportation | NERA | Availability | 2005 |
| WI .... | City of Milwaukee | Mason Tillman Associates, Ltd. | Disparity ..... | 2007 |
| WI .... | City of Milwaukee | D. Wilson Consulting Group, LLC | Disparity ..... | 2010 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| AK ... | Department of Transportation and Public Facilities. | 10.52 | 14.26 | **73.73** | | | | 2002-2006 | 4-9, 4-11, 5-10, 5-13 |
| AZ ... | Arizona Department of Transportation. | 7.03 | 15.61 | **45.03** | 5.39 | 27.07 | **19.90** | 2002-2007 | 4-47 |
| AZ ... | City of Phoenix | 11.37 | 21.48 | **52.94** | | | | 2000-2004 | 4-29, 4-33 |
| AZ ... | City of Tucson | 24.55 | 5.76 | 426.21 | | | | 2002-2006 | 4-9, 4-10, 5-10, 5-19 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| AZ ... | Pima County ............................... | 19.51 | 9.43 | 206.83 | 19.25 | 25.10 | **76.71** | 2002-2006 | 4-9, 4-10, 5-13, 5-16, 5-28, 5-32 |
| CA ... | Bay Area Rapid Transit (BART) .. | 19.34 | 34.42 | **56.20** | | | | 2002-2007 | 4-8, 5-5, 7-20 |
| CA ... | California Department of Transportation (federal funds). | 14.34 | 17.00 | ***84.36*** | 18.90 | 25.50 | **74.11** | 2002-2006 | Figs. E-26, 29 |
| CA ... | California Department of Transportation (state funds). | 11.41 | 18.70 | **61.00** | 12.04 | 28.20 | **42.68** | 2002-2006 | Figs. E-69, 70 |
| CA ... | Los Angeles County Metropolitan Transportation Authority (federal funds). | 15.01 | 13.70 | 109.54 | 14.44 | 29.65 | **48.69** | 2003-2007 | E-42, E-20, E-21 |
| CA ... | Los Angeles County Metropolitan Transportation Authority (local funds). | 12.20 | 20.80 | **58.65** | 17.81 | 28.80 | **61.84** | 2003-2007 | E-13, E-22 |
| CA ... | Metrolink—Southern California Regional Rail Authority (federal funds). | 10.71 | 16.00 | **66.97** | 62.54 | 24.58 | 254.40 | 2003-2007 | E-42, E-20, E-21 |
| CA ... | Metrolink—Southern California Regional Rail Authority (local funds). | 8.60 | 30.00 | **28.65** | 24.73 | 40.40 | **61.22** | 2003-2007 | E-13, E-22 |
| CA ... | Orange County Transportation Authority (federal funds). | 36.77 | 26.70 | 137.70 | 13.42 | 23.77 | **56.47** | 2003-2007 | E-42, E-20, E-21 |
| CA ... | Orange County Transportation Authority (local funds). | 52.24 | 30.00 | 174.13 | 24.97 | 31.90 | **78.27** | 2003-2007 | E-13, E-22 |
| CA ... | San Diego Association of Governments (federal funds). | 8.49 | 23.60 | **35.97** | 27.59 | 23.54 | 117.22 | 2003-2007 | E-42, E-20, E-21 |
| CA ... | San Diego Association of Governments (local funds). | 0.45 | 22.50 | **1.99** | 18.20 | 27.70 | **65.69** | 2003-2007 | E-13, E-22 |
| CA ... | San Diego Metropolitan Transit System (federal funds). | 27.66 | 33.20 | ***83.30*** | 19.75 | 26.56 | **74.37** | 2003-2007 | E-42, E-20, E-21 |
| CA ... | San Diego Metropolitan Transit System (local funds). | 26.75 | 36.90 | **72.49** | 0.00 | 32.90 | **0.00** | 2003-2007 | E-13, E-22 |
| CA ... | San Mateo County Transit District. | 5.56 | 21.40 | **26.00** | | | | 2002 | 26, 104 |
| CA ... | Santa Clara Valley Transportation Authority. | 17.10 | 21.40 | **79.88** | | | | 2001-2006 | 28, 104, 112 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| CO .. | City and County of Denver, Denver International Airport. | 12.86 | 21.92 | **58.67** | 25.41 | 14.97 | 169.74 | 2000-2005 | 190 |
| CO .. | Colorado Department of Transportation. | 10.56 | 20.21 | **52.25** | 4.69 | 24.07 | **19.48** | 1996-2000 | 3-20 |
| CO .. | Colorado Department of Transportation. | 16.58 | 23.17 | **71.58** | 21.21 | 41.37 | **51.28** | 2002-2007 | 4-5, 4-6, 4-7, 5-8, 5-10, 6-6, 6-7 |
| CT ... | Metropolitan District Commission | 30.68 | 19.66 | 156.07 | 8.35 | 18.70 | **44.64** | 2005-2008 | V-112, V-114, V-116, V-117, V-119, V-121, V-123, V-125 |
| DC .. | Washington Suburban Sanitary Commission. | 29.57 | 68.38 | **43.24** | 31.49 | 61.12 | **51.52** | 2003-2009 | 1-15, 1-17, 2-5, 2-7, 4-21, 4-23, 4-36, 4-38 |
| FL ... | Broward County | 35.70 | 40.57 | ***87.99*** | 16.04 | 44.95 | **35.68** | 1991-1999 | 4-18, 4-21, 4-28, 4-31, 4-33, 4-37 |
| FL ... | Broward County | 28.62 | 24.10 | 118.76 | 26.86 | 25.87 | 103.83 | 2005-2009 | 284 |
| FL ... | City of Tallahassee | 28.50 | 34.03 | ***83.74*** | | | | 1996-2000 | 4-13, 4-17, 4-19 |
| FL ... | Leon County | 19.56 | 11.92 | 164.04 | | | | 2004-2008 | 4-10, 4-12, 4-13 |
| FL ... | School District of Hillsborough County. | 30.49 | 37.58 | ***81.12*** | 24.69 | 42.99 | **57.45** | 2001-2004 | 2-5, 2-7, 3-4, 3-6, 5-21, 5-23, 5-32, 5-34 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State (1) | Subdivision (2) | U-CON (3) | A-CON (4) | D-CON (5) | U-CRS (6) | A-CRS (7) | D-CRS (8) | Years (9) | Page Spec. (11) |
|---|---|---|---|---|---|---|---|---|---|
| GA ... | City of Atlanta ............................ | 34.02 | 57.63 | **59.04** | 35.03 | 56.30 | **62.21** | 2001-2005 | Vol. I, 19, 21, 22, 30, 46, 59, 62 |
| GA ... | City of Atlanta (Airport, local dollars). | 59.17 | 57.63 | 102.66 | | | | 2001-2005 | Vol. I, 19, 70, 73, 80 |
| GA ... | City of Atlanta (Airport, federal dollars). | 26.30 | 57.63 | **45.63** | | | | 2001-2005 | Vol. I, 19, 83, 86 |
| GA ... | City of Atlanta (Watershed Management). | 23.72 | 57.63 | **41.16** | | | | 2001-2005 | Vol. I, 19, 21, 22, 88, 91, 95 |
| GA ... | Consolidated Government of Augusta-Richmond County. | 5.91 | 32.37 | **18.26** | 28.65 | 44.93 | **63.77** | 2003-2007 | 225 |
| GA ... | Georgia Department of Transportation. | 8.46 | 11.03 | **76.67** | | | | 1999-2004 | 111, 119, 123, 130 |
| GA ... | Georgia Department of Transportation (federal dollars). | 13.23 | 21.50 | **61.52** | 9.31 | 24.40 | **38.17** | 2009-2011 | K-6, K-9 |
| GA ... | Georgia Department of Transportation (state dollars). | 4.81 | 25.50 | **18.87** | 12.26 | 26.50 | **46.27** | 2009-2011 | K-7, K-10 |
| HI .... | Hawai'i Department of Transportation. | 32.17 | 54.78 | **58.70** | 62.01 | 51.79 | 119.73 | 2003-2008 | 331 |
| ID .... | Idaho Transportation Department | 14.36 | 16.90 | ***84.95*** | 6.79 | 12.90 | **52.63** | 2002-2006 | Figs. E-11, 20 |
| IL .... | Illinois Department of Transportation. | 11.00 | 27.33 | **40.25** | 21.22 | 29.82 | **71.18** | 2006-2008 | 4-10, 4-11, 5-3, 5-4, 7-18, 7-19, 7-21, 7-22 |
| IL .... | Illinois State Toll Highway Authority. | 11.43 | 19.56 | **58.44** | 23.58 | 19.03 | 123.91 | 2000-2005 | 49, 50, 61, 63 |
| IL .... | Illinois State Toll Highway Authority. | 11.38 | 39.39 | **28.89** | 16.42 | 41.02 | **40.04** | 2006-2009 | 4-8, 4-10, 5-4, 5-6, 7-15, 7-17, 7-20, 7-22 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| IN .... | State of Indiana (INDOT and INDOA). | 10.03 | 10.90 | ***92.03*** | | | | 2006-2009 | O-2 |
| IN .... | State of Indiana (Higher Educ.) | 10.69 | 15.10 | **70.79** | | | | 2006-2009 | M-2 |
| KS; .. MO | City of Kansas City, KS .............. | 18.34 | 25.31 | **72.44** | 15.34 | 36.21 | **42.37** | 2002-2004 | 3-5, 3-7, 4-4, 4-6, 6-21, 6-23, 6-30, 6-32 |
| KS; .. MO | Kansas City School District, MO | 34.20 | 25.60 | 133.58 | | | | 2002-2004 | 3-5, 4-4, 6-21, 6-28 |
| KS ... | Kansas Department of Transportation. | 10.31 | 13.75 | **75.01** | | | | 2000-2001 | 2-10, 2-12, 3-2, 3-3 |
| MD .. | City of Baltimore ......................... | 23.02 | 36.63 | **62.84** | 30.14 | 21.60 | 139.51 | 1990-1998 | 4-20, 4-26, 4-29, 4-31, 4-33, 4-34 |
| MD .. | City of Baltimore ......................... | 25.85 | 22.88 | 112.98 | 31.88 | 27.32 | 116.69 | 2000-2005 | 217 |
| MD .. | State of Maryland ....................... | 15.81 | 24.00 | **65.88** | 24.52 | 28.46 | ***86.16*** | 2000-2004 | 206 |
| MD .. | State of Maryland ....................... | 23.45 | 30.26 | **77.51** | 22.31 | 41.34 | **53.97** | 2005-2009 | 328 |
| MA .. | City of Boston ............................. | 23.76 | 24.23 | ***98.08*** | 10.26 | 47.02 | **21.83** | 1999-2001 | 1-5, 1-7, 2-4, 2-6, 4-22, 4-24, 4-29, 4-31 |
| MA .. | Division of Capital Asset Management. | 19.44 | 10.39 | 187.10 | 33.79 | 17.86 | 189.19 | 1999-2004 | 199 |
| MA .. | Massachusetts Housing Finance Agency. | 25.80 | 10.86 | 237.57 | | | | 2000-2004 | 203 |
| MN .. | City of Minneapolis ..................... | 7.57 | 19.54 | **38.73** | 13.65 | 19.08 | **71.51** | 2003-2007 | 234 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State (1) | Subdivision (2) | U-CON (3) | A-CON (4) | D-CON (5) | U-CRS (6) | A-CRS (7) | D-CRS (8) | Years (9) | Page Spec. (11) |
|---|---|---|---|---|---|---|---|---|---|
| MN .. | City of St. Paul .......................... | 15.23 | 15.05 | 101.17 | | | | 2002-2006 | 4-21, 4-22, 4-28, 4-29 |
| MN .. | St. Paul Housing Authority .......... | 6.33 | 10.43 | **60.67** | | | | 2002-2006 | 6-6, 6-12, 6-18 |
| MN .. | Metropolitan Airports Commission. | 2.05 | 11.28 | **18.21** | | | | 2004-2007 | 3-8, 3-10, 3-12, 3-13 |
| MN .. | Metropolitan Council .................. | 0.16 | 3.63 | **4.41** | | | | 2003-2007 | 3-8, 3-10, 3-13 |
| MN .. | Minnesota Department of Administration. | 3.42 | 2.74 | 124.97 | | | | 2002-2007 | 3-8, 3-10, 3-14 |
| MN .. | Minnesota Department of Transportation (federal funds). | 5.55 | 15.18 | **36.56** | | | | 2000-2004 | 69, 72 |
| MN .. | Minnesota Department of Transportation (state funds). | 2.92 | 15.18 | **19.24** | | | | 2000-2004 | 69, 75 |
| MN .. | Minnesota Department of Transportation. | 2.40 | 3.52 | **68.06** | | | | 2002-2007 | 3-7, 3-9, 3-12 |
| MO .. | Bi-State Development Agency (St. Louis Metro). | 21.16 | 20.14 | 105.06 | 18.98 | 15.29 | 124.13 | 1997-2003 | 167 |
| MO .. | City of St. Louis ......................... | 19.06 | 15.89 | 119.97 | 17.44 | 27.46 | **63.52** | 1995-1999 | Ex. pp. 2, 4, 7, 9, 11, 12 |
| MO .. | The Metropolitan St. Louis Sewer District. | 13.91 | 15.89 | ***87.54*** | 15.42 | 27.46 | **56.16** | 1995-1999 | Ex. pp. 84, 86, 89, 91, 93, 94 |
| MO .. | Missouri Department of Transportation (federal funds). | 13.35 | 20.37 | **65.56** | 13.05 | 21.52 | **60.66** | 2005-2009 | 220 |
| MO .. | Missouri Department of Transportation (state funds). | 6.49 | 20.19 | **32.16** | 12.28 | 21.48 | **57.16** | 2005-2009 | 224 |
| MT .. | Montana Department of Transportation. | 11.32 | 2.01 | 563.36 | 11.68 | 16.09 | **72.58** | 2000-2006 | 4-6, 4-8, 5-18, 5-29, 5-53, 5-64 |
| NV ... | Nevada Department of Transportation (federal funds). | 8.70 | 15.60 | **55.79** | 3.03 | 7.80 | **38.89** | 2000-2006 | Figs. E-11, 20 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| NV ... | Nevada Department of Transportation (state funds). | 8.34 | 12.90 | **64.65** | 3.05 | 10.80 | **28.26** | 2000-2006 | Figs. E-38, 47 |
| NY ... | State of New York ....................... | 12.39 | 22.74 | **54.48** | 19.43 | 24.53 | **79.21** | 2004-2008 | 292 |
| NC .. | City of Charlotte .......................... | 19.28 | 35.74 | **53.95** | 13.66 | 18.55 | **73.66** | 2005-2010 | 3-11, 3-13, 3-15, 3-16, 3-19, 3-20, 3-23 |
| NC .. | City of Durham and Durham County. | 12.79 | 27.38 | **46.72** | | | | 1996-1999 | 3-4, 3-6, 5-9, 5-11 |
| NC .. | Durham County ........................... | 6.24 | 72.85 | **8.57** | 20.23 | 27.30 | **74.13** | 2001-2005 | 76, 78, 82, 85, 94, 118 |
| NC .. | North Carolina Department of Transportation (divisionally-let). | 13.41 | 12.70 | 105.59 | | | | 1999-2003 | 4-16, 4-26, 4-49, 4-72, 4-90 |
| NC .. | North Carolina Department of Transportation (centrally-let, state funds). | 9.83 | 29.92 | **32.87** | 14.41 | 20.00 | **72.06** | 1999-2003 | 4-52, 4-56, 4-70, 4-76, 4-80, 4-90 |
| NC .. | North Carolina Department of Transportation (centrally-let, federal funds). | 11.43 | 29.92 | **38.22** | 4.86 | 20.00 | **24.30** | 1999-2003 | 4-62, 4-66, 4-70, 4-84, 4-88, 4-90 |
| NC .. | North Carolina Department of Transportation. | 8.65 | 24.98 | **34.62** | | | | 2004-2008 | 89, 90, 138 |
| OH .. | City of Cincinnati ........................ | 16.41 | 18.33 | ***89.51*** | 12.20 | 22.48 | **54.28** | 1995-2001 | 44, 45, 49, 50 |
| OH .. | City of Dayton ............................. | 4.73 | 23.91 | **19.80** | | | | 2001-2006 | 4-11, 4-17, 4-19, 4-20, 4-24 |
| OH .. | Northeast Ohio Regional Sewer District. | 24.44 | 22.31 | 109.55 | 23.78 | 22.03 | 107.94 | 2004-2008 | 263 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State (1) | Subdivision (2) | U-CON (3) | A-CON (4) | D-CON (5) | U-CRS (6) | A-CRS (7) | D-CRS (8) | Years (9) | Page Spec. (11) |
|---|---|---|---|---|---|---|---|---|---|
| OK ... | City of Tulsa ............................... | 4.72 | 20.77 | **22.73** | 24.70 | 22.51 | 109.71 | 2002-2008 | 4-8, 4-13, 4-14, 4-15, 4-20, 4-22, 4-23 |
| OK ... | Oklahoma Department of Transportation (federal funds). | 19.47 | 12.40 | 156.99 | 3.96 | 19.10 | **20.73** | 2004-2009 | K-6, K-9 |
| OK ... | Oklahoma Department of Transportation (state funds). | 19.82 | 15.40 | 128.70 | 5.00 | 19.90 | **25.13** | 2004-2009 | K-7, K-10 |
| OR .. | City of Portland .......................... | 7.49 | 5.10 | 146.85 | 34.98 | 14.60 | 239.62 | 2004-2009 | L-5, M-2 |
| OR .. | Oregon Department of Transportation. | 19.07 | 27.55 | **69.20** | 3.84 | 46.31 | **8.30** | 2000-2007 | 4-12, 4-21, 4-25, 4-111, 4-120, 4-123, 4-124 |
| OR .. | Port of Portland .......................... | 18.59 | 15.16 | 122.66 | 9.94 | 27.97 | **35.53** | 2002-2007 | 4-11, 4-13, 4-15, 4-19 |
| OR .. | Portland Development Commission. | 9.29 | 12.37 | **75.06** | | | | 2004-2009 | L-2, L-5 |
| PA ... | City of Philadelphia .................... | 12.90 | 10.80 | 119.44 | | | | 2006 | 17, 21 |
| PA ... | City of Philadelphia .................... | 13.80 | 10.80 | 127.78 | | | | 2007 | 36, 51 |
| PA ... | City of Philadelphia .................... | 12.70 | 10.80 | 117.59 | | | | 2008 | vi, 45 |
| PA ... | City of Philadelphia .................... | 9.30 | 10.80 | 86.11 | | | | 2009 | viii, 41 |
| PA ... | City of Philadelphia .................... | 17.40 | 14.90 | 116.78 | | | | 2010 | vi, vii |
| PA ... | City of Philadelphia .................... | 13.30 | 11.40 | 116.67 | | | | 2011 | v, vii |
| SC ... | City of Columbia ......................... | 3.42 | 19.03 | **17.96** | 18.15 | 17.14 | 105.90 | 2002-2005 | 4-10, 4-15, 4-16, 4-17, 4-24, 4-26 |
| TN ... | City of Memphis .......................... | 18.77 | 18.84 | ***99.62*** | | | | 2002-2007 | 112, 116, 129 |
| TN ... | Consolidated Government of Nashville and Davidson County (Metro Purchasing). | 0.37 | 6.25 | **5.90** | 0.04 | 2.39 | **1.63** | 1999-2003 | 57, 65, 66, 68, 69 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| TN ... | Consolidated Government of Nashville and Davidson County (Nashville Public Schools). | 0.02 | 4.27 | **0.40** | 3.30 | 7.24 | **45.58** | 1999-2003 | 58, 98, 99, 100, 102 |
| TN ... | Consolidated Government of Nashville and Davidson County (Metro Nashville Airport). | 12.70 | 12.70 | ***100.00*** | 0.20 | 7.97 | **2.50** | 1999-2003 | 60, 76, 77, 79 |
| TN ... | Consolidated Government of Nashville and Davidson County (Metro Development and Housing Authority). | 20.70 | 16.56 | 125.03 | 29.33 | 10.41 | 281.71 | 1999-2003 | 61, 85, 86, 88, 89 |
| TN ... | Memphis International Airport .... | 18.69 | 27.99 | **66.77** | 13.88 | 34.32 | **40.44** | 1999-2005 | 229 |
| TN ... | Nashville International Airport .... | 9.81 | 9.68 | 101.37 | 7.53 | 8.87 | ***84.84*** | 2003-2006 | 36, 38, 39, 40, 47, 49 |
| TX ... | City of Austin .............................. | 29.83 | 27.54 | 108.32 | 39.39 | 31.79 | 123.91 | 2002-2006 | 206 |
| TX ... | City of Arlington .......................... | 10.94 | 66.58 | **16.43** | 13.11 | 54.03 | **24.27** | 2002-2007 | 2-9, 2-11, 3-5, 3-7, 3-9, 5-24, 5-26, 5-33, 5-35, 5-37 |
| TX ... | City of Fort Worth ........................ | 38.41 | 60.28 | **63.72** | 60.81 | 54.05 | 112.51 | 2002-2007 | 2-9, 2-11, 3-5, 3-7, 5-26, 5-28, 5-37, 5-39 |
| TX ... | DFW Airport ................................. | 50.72 | 62.82 | ***80.74*** | 57.53 | 53.80 | 106.93 | 2002-2007 | 2-9, 2-11, 3-5, 3-7, 5-26, 5-28, 5-37, 5-39 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| TX ... | Fort Worth Independent School District. | 27.75 | 66.06 | **42.01** | 28.91 | 53.89 | **53.64** | 2002-2007 | 2-9, 2-11, 3-4, 3-6, 5-26, 5-28, 5-37, 5-39 |
| TX ... | North Texas Tollway Authority ..... | 18.60 | 58.34 | **31.88** | 14.75 | 53.56 | **27.54** | 2003-2007 | 2-9, 2-11, 3-4, 3-6, 5-26, 5-28, 5-37, 5-39 |
| TX ... | City of Houston .......................... | 29.87 | 34.74 | ***85.97*** | | | | 2005-2010 | 191 |
| TX ... | City of San Antonio .................... | 35.19 | 28.14 | 125.09 | | | | 2004-2007 | 3-9, 3-15, 3-16, 3-17 |
| TX ... | Dallas Area Rapid Transit Authority (DART). | 31.44 | 68.38 | **45.98** | | | | 1996-2001 | 3-5, 4-5, 4-7, 6-22, 6-29, 6-31 |
| TX ... | State of Texas ............................ | 13.71 | 51.57 | **26.58** | 18.27 | 55.74 | **32.79** | 2002-2005 | 3-8, 3-10, 4-6, 4-12, 6-21, 6-23, 6-37, 6-39 |
| TX ... | State of Texas (TxDOT) ............... | 7.07 | 10.14 | **69.67** | | | | 2006-2008 | 4-10, 4-19, 5-11 |
| TX ... | State of Texas (State Agencies) | 24.04 | 22.10 | 108.78 | | | | 2006-2008 | 4-10, 4-20, 4-21, 5-11 |
| TX ... | State of Texas (Universities) ....... | 21.66 | 22.10 | ***98.01*** | | | | 2006-2008 | 4-10, 4-20, 4-21, 5-11 |

**Table 2. M/WBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Between 2000–2012**—Continued

| State | Subdivision | U-CON | A-CON | D-CON | U-CRS | A-CRS | D-CRS | Years | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (11) |
| TX ... | State of Texas (Medical Institutions). | 21.95 | 22.10 | ***99.29*** | | | | 2006-2008 | 4-10, 4-20, 4-21, 5-11 |
| UT ... | Salt Lake City International Airport. | 5.32 | 17.03 | **31.24** | 0.79 | 18.25 | **4.33** | 2001-2006 | 258 |
| VA ... | Commonwealth of Virginia .......... | 3.39 | 15.55 | **21.78** | | | | 2006-2009 | 4-10, 4-12, 4-20, 4-26 |
| VA ... | Commonwealth of Virginia .......... | 1.35 | 14.66 | **9.19** | | | | 1998-2002 | 4-16, 4-23, 4-27, 4-32 |
| VA ... | Virginia DOT (federal funds) ....... | 6.59 | 10.26 | **64.21** | 9.53 | 15.89 | **59.99** | 1998-2002 | 11, 15, 18, 22, 26, 29 |
| VA ... | Virginia DOT (state funds) .......... | 8.52 | 10.26 | ***82.99*** | 5.41 | 15.89 | **34.08** | 1998-2002 | 34, 38, 41, 45, 49, 52 |
| WA .. | Washington Department of Transportation (federal funds). | 14.32 | 19.59 | **73.10** | 10.44 | 14.88 | **70.16** | 1999-2003 | 63, 66, 72 |
| WA .. | Washington Department of Transportation (state funds). | 2.97 | 19.59 | **15.16** | 10.66 | 14.88 | **71.64** | 1999-2003 | 63, 69, 75 |
| WI ... | City of Milwaukee ........................ | 18.94 | 40.91 | **46.29** | | | | 2005 | 5-11, 6-5, 6-26 |
| WI ... | City of Milwaukee ........................ | 31.21 | 13.77 | 226.74 | | | | 2005-2008 | 4-7, 4-9, 5-2, 5-7 |

Note: Disparity indexes of 80 or lower are highlighted in **boldface** type. Disparity indexes above 80 but lower than 100 are highlighted in ***boldface italic*** type.

### C. There is Strong Evidence of Disparities Between Utilization and Availability in Aggregate U.S. Business Enterprise Activity

A key rationale for the advent of public sector policies such as the USDOT DBE Program was the Federal Government's desire to prevent its own passive participation in private sector discrimination in business enterprise activity.[23] Therefore, it is important to examine the best available evidence regarding how minorities and women fare in the economy as a whole with respect to business enterprise activity. In order to do this, I present evidence from the U.S. Census Bureau's past and present data collection efforts dedicated to M/WBEs.

The *Survey of Business Owners and Self-Employed Persons* (SBO) collected data on the number, sales, employment, and payrolls of businesses owned by minorities, women, and non-minority males. This survey was conducted every 5 years from

[23] *City of Richmond v. J. A. Croson Company*, 488 U.S. 469, at 492 ("Thus, if the city could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system.").

1972 to 2012 as part of the *Economic Census* program. Data from the 2012 SBO, the most recent available, were released in December 2015. In mid-2018, the Census Bureau announced that the SBO would be discontinued and only partially replaced with a new survey called the *Annual Business Survey* (ABS).[24] Unfortunately, the ABS is restricted to firms with paid employees only, as opposed to the SBO that also included nonemployer firms.[25] Data from the 2017 ABS, the most recent available, were released in May 2020.[26] The SBO and ABS cover women and five groups of minorities: (1) African Americans, (2) Hispanics, (3) Asians, (4) Native Hawaiians and Other Pacific Islanders, and (5) American Indians and Alaskan Natives. Comparative information for non-minority male-owned firms is also included.[27]

The SBO and ABS contain a wealth of information on the character of minority and female business enterprise in the U.S. as a whole as well as in individual states and sub-state divisions.[28] In the remainder of this section, I present national evidence from the 2012 SBO and the 2017 ABS for the economy as whole, as well as for the construction and architecture/engineering industries that are the main beneficiaries of Federal surface and aviation transportation funding.

*1. Results from the 2012 Survey of Business Owners*

*a. Economy-Wide Results*

I begin with the 2012 SBO—the most recent and last data from this important survey. Table 3 contains data for the U.S. as a whole and the economy-wide (*i.e.* all industries combined). Panel A in this table summarizes the SBO results for each race and/or sex grouping. For example, Panel A shows a total of 27.18 million firms in the U.S. in 2012 (column 1) with overall sales and receipts of $11.964 trillion (column 2). Of these 27.18 million firms, 5.14 million had one or more employees (column 3) and these 5.14 million firms had overall sales and receipts of $10.965 trillion (column 4). Column (5) shows a total of 56.059 million employees on the payroll of these 5.14 million firms and a total annual payroll expense of $2.096 trillion (column 6).

The remaining rows in Panel A provide comparable statistics for nonminority male-owned, women-owned, and minority-owned firms. For example, Table 3 shows that there were 2.6 million African American-owned firms counted in the SBO, and that these 2.6 million firms registered $150.2 billion in sales and receipts. It also shows that 109,137 of these African American-owned firms had one or more employees, and that they employed a total of 975,052 workers with an annual payroll total of $27.69 billion.

Panel B in Table 3 converts the figures in Panel A to percentage distributions within each column. For example, Column (1) in Panel B of Table 3 shows that African American-owned firms were 9.51 percent of all firms in the U.S. and women-owned firms were 36.35 percent. Additionally, 12.16 percent of firms were Hispanic-owned, 7.06 percent were Asian-owned, 1.0 percent were American Indian- and Alaska Native-owned, and 0.20 percent were Native Hawaiian- and Other Pacific Islander-owned.

Column (2) in Panel B provides the same percentage distribution for overall sales and receipts. Table 3, for example, shows that nonminority males owned 45.18 percent of all firms and earned 73.45 percent of all sales and receipts. In contrast:

- Although African Americans owned 9.51 percent of all firms in the U.S. in 2012, they earned only 1.26 percent of all sales and receipts.
- Although Hispanics owned 12.16 percent of all firms, they earned only 3.96 percent, of all sales and receipts.
- Although Asians owned 7.06 percent of all firms, they earned only 5.85 percent, of all sales and receipts.
- Although American Indians and Alaska Natives owned 1.0 percent of all firms, they earned only 0.32 percent of all sales and receipts.
- Although Native Hawaiians and Other Pacific Islanders owned 0.20 percent of all firms, they earned only 0.07 percent of all sales and receipts.

---

[24] U.S. Census Bureau (2018e).

[25] U.S. Census Bureau (2018f). In 2012, according to the SBO, there were about 5.1 million firms with paid employees and more than 22 million nonemployer firms.

[26] U.S. Census Bureau (2020c).

[27] In the American Community Survey Public Use Microdata Samples (ACS PUMS), discussed below, the unit of analysis is the business owner, or self-employed person. In the SBO and ABS data, the unit of analysis is the business itself rather than the business owner. Furthermore, unlike most other business statistics, including the other components of the *Economic Census*, the unit of analysis in the SBO and ABS is the firm, rather than the establishment.

[28] Appendix A, below, provides state-level data from the 2017 ABS. Appendices B, C and D, below, provide state-level data from the 2012, 2007 and 2002 SBO.

- Although women owned firms 36.35 percent of all firms, they earned only 11.87 percent of all sales and receipts.

These disparities between the availability and utilization of minority- and women-owned firms can be viewed directly from the disparity indexes in Panel C of Table 3. For example, Panel C shows that African American-owned firms in 2012 received just 13.2 percent of what would be expected based on their availability in the market. Panel C shows as well that women-owned firms received just 32.65 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 32.55 percent. For Asians, the figure was 82.85 percent. For American Indians and Alaska Natives, the figure was 32.33 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 33.76 percent. These disparities are all adverse, and statistically significant. The disparities are all large as well, with the exception of Asian-owned firms.

We can also compare sales and receipts per firm among all firms in 2012. In Table 3, for example, average per firm sales and receipts for non-minority male-owned firms was $715.6 thousand. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $58.1 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, African American-owned firms received just 8 cents.
- For Hispanic-owned firms, average per firm sales and receipts was $143.3 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Hispanic-owned firms received just 20 cents.
- For Asian-owned firms, average per firm sales and receipts was $364.7 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Asian-owned firms received just 51 cents.
- For American Indian- and Alaska Native-owned firms, average per firm sales and receipts was $142.3 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, American Indian- and Alaska Native-owned firms received just 20 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, average per firm sales and receipts was $148.6 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Native Hawaiian- and Other Pacific Islander-owned firms received just 21 cents.
- For women-owned firms, average per firm sales and receipts was $143.7 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, women-owned firms received just 20 cents.

Turning to employer firms, we see from column (3) in Table 3, that although non-minority male-owned firms were 57.11 percent of all employer firms, they accounted for 74.98 percent of all employer firm sales and receipts. In contrast:

- Although African Americans owned 2.12 percent of all employer firms in the U.S. in 2012, they earned only 0.94 percent of all sales and receipts.
- Although Hispanics firms 5.6 percent of all employer firms, they earned only 3.47 percent of all sales and receipts.
- Although Asians owned 9.37 percent of all employer firms, they earned only 5.72 percent of all sales and receipts.
- Although American Indians and Alaska Natives owned 0.51 percent of all employer firms, they earned only 0.29 percent of all sales and receipts.
- Although Native Hawaiians and Other Pacific Islanders owned 0.09 percent of all employer firms, they earned only 0.06 percent of all sales and receipts.
- Although women owned 20.16 percent of all employer firms, they earned only 10.86 percent of all sales and receipts.

The economy-wide employer firm disparity indexes for 2012 appear in Panel C of Table 3. Panel C shows that African American-owned firms in 2012 received just 44.4 percent of what would be expected based on their availability in the market. Women-owned firms received just 53.85 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 61.91 percent. For Asians, the figure was 61.11 percent. For American Indians and Alaska Natives, the figure was 56.64 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 64.40 percent. These disparities are all large, adverse, and statistically significant.

Considering sales and receipts among employer firms in 2012. Table 3 shows a figure of $2.8 million for non-minority male-owned employer firms. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $947.9 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, African American-owned firms received just 34 cents.

- For Hispanic-owned firms, average per firm sales and receipts was $1.32 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Hispanic-owned firms received just 47 cents.
- For Asian-owned firms, average per firm sales and receipts was $1.3 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Asian-owned firms received just 47 cents.
- For American Indian- and Alaska Native-owned firms, average per firm sales and receipts was $1.21 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, American Indian- and Alaska Native-owned firms received just 43 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, average per firm sales and receipts was $1.37 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Native Hawaiian- and Other Pacific Islander-owned firms received just 49 cents.
- For women-owned firms, average per firm sales and receipts was $1.15 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, women-owned firms received just 41 cents.

The problem of minority- and women-owned firms earning less has important consequences that ripple throughout the economy. Because these firms make less, they have to pay their employees less. This obviously compounds race and gender disparities to the extent that minority- and women-owned firms hire proportionately more minority and female employees. In addition, it reduces the wealth accruing to minorities and women and thus hinders any would-be minority and women entrepreneurs in their efforts to create and grow their own firms thus reinforcing the negative consequences of social and economic disadvantage. Table 3 shows that average payroll per employee at non-minority male-owned employer firms in 2012 was $40,573. In contrast:

- For African American-owned employers, average payroll per employee was just $28,398. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at African American-owned firms earned only 70 cents.
- For Hispanic-owned employers average payroll per employee was just $30,416. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Hispanic-owned firms earned only 75 cents.
- For Asian-owned employers average payroll per employee was just $30,942. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Asian-owned firms earned only 76 cents.
- For American Indian- and Alaska Native-owned employers average payroll per employee was just $33,599. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at American Indian- and Alaska Native-owned firms earned just 83 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employers, average payroll per employee was just $36,681. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Native Hawaiian- and Other Pacific Islander-owned firms earned just 90 cents.
- For women-owned employers average payroll per employee was just $31,278. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at women-owned firms earned only 77 cents.

**Table 3. Disparity Ratios from the 2012 Survey of Business Owners, United States, All Industries**

| | Number of Firms | Sales and Receipts ($000s) | Employer Firms | Sales and Receipts ($000s) | Employees | Payroll ($000s) |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Panel A. Levels** | | | | | | |
| All Firms | 27,179,380 | 11,964,077,871 | 5,136,203 | 10,964,584,749 | 56,058,563 | 2,096,442,212 |
| Non-minority male | 12,280,591 | 8,787,915,377 | 2,933,198 | 8,221,010,815 | 37,750,711 | 1,531,662,394 |
| African American | 2,584,403 | 150,203,163 | 109,137 | 103,451,510 | 975,052 | 27,689,957 |
| Hispanic | 3,305,873 | 473,635,944 | 287,501 | 379,994,999 | 2,329,553 | 70,855,704 |
| Asian | 1,917,902 | 699,492,422 | 481,026 | 627,532,399 | 3,572,577 | 110,543,615 |
| Native Hawaiian/Pac. Islander | 54,749 | 8,136,445 | 4,706 | 6,469,957 | 39,001 | 1,430,591 |
| Am. Indian & Alaska Native | 272,919 | 38,838,125 | 26,179 | 31,654,165 | 208,178 | 6,994,509 |
| Female | 9,878,397 | 1,419,834,295 | 1,035,655 | 1,190,586,438 | 8,431,614 | 263,720,252 |
| **Panel B. Column Percentages** | | | | | | |
| All Firms | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-minority male | 45.18% | 73.45% | 57.11% | 74.98% | 67.34% | 73.06% |
| African American | 9.51% | 1.26% | 2.12% | 0.94% | 1.74% | 1.32% |
| Hispanic | 12.16% | 3.96% | 5.60% | 3.47% | 4.16% | 3.38% |
| Asian | 7.06% | 5.85% | 9.37% | 5.72% | 6.37% | 5.27% |
| Native Hawaiian/Pac. Islander | 0.20% | 0.07% | 0.09% | 0.06% | 0.07% | 0.07% |
| Am. Indian & Alaska Native | 1.00% | 0.32% | 0.51% | 0.29% | 0.37% | 0.33% |
| Female | 36.35% | 11.87% | 20.16% | 10.86% | 15.04% | 12.58% |
| **Panel C. Disparity Ratios** | | **(2) vs. (1)** | | **(4) vs. (3)** | **(5) vs. (3)** | **(6) vs. (3)** |
| Non-minority male | | *162.56* | | *131.29* | *117.92* | *127.93* |
| African American | | *13.20* | | *44.40* | *81.86* | *62.16* |
| Hispanic | | *32.55* | | *61.91* | *74.24* | *60.38* |
| Asian | | *82.85* | | *61.11* | *68.05* | *56.30* |
| Native Hawaiian/Pac. Islander | | *33.76* | | *64.40* | *75.93* | *74.48* |
| Am. Indian & Alaska Native | | *32.33* | | *56.64* | *72.86* | *65.46* |
| Female | | *32.65* | | *53.85* | *74.59* | *62.39* |

Source: Author's calculations using 2012 SBO. Notes: (1) Figures are rounded. Rounding was performed subsequent to any mathematical calculations; (2) Excludes publicly owned, foreign-owned, and not-for-profit firms; (3) Totals for "All Firms" includes firms that were equally nonminority-minority owned; (4) Statistically significant disparity indexes are italicized; (5) "n/a" indicates that data were not disclosed due to confidentiality or other publication restrictions.

*b. Results for the Construction Sector*

Table 4 shows comparable 2012 SBO data for the construction sector in the U.S. as a whole.

Column (2) in Panel B of Table 4 shows that nonminority males owned 62.85 percent of all firms and earned 78.02 percent of all sales and receipts. In contrast:

- Although African Americans owned 4.67 percent of all firms in the U.S. in 2012, they earned only 0.93 percent of all sales and receipts.
- Although Hispanics owned 16.24 percent of all firms, they earned only 4.65 percent, of all sales and receipts.
- Although Asians owned 2.63 percent of all firms, they earned only 1.28 percent, of all sales and receipts.
- Although American Indians and Alaska Natives owned 1.23 percent of all firms, they earned only 0.62 percent of all sales and receipts.
- Although Native Hawaiians and Other Pacific Islanders owned 0.19 percent of all firms, they earned only 0.13 percent of all sales and receipts.
- Although women owned firms 9.08 percent of all firms, they earned only 7.75 percent of all sales and receipts.

The associated 2012 disparity indexes for firms in the construction sector can be viewed directly in Panel C of Table 4. Panel C shows that African American-owned firms in 2012 received just 19.88 percent of what would be expected based on their

availability in the market. Panel C shows as well that women-owned firms received 85.37 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 28.64 percent. For Asians, the figure was 48.74 percent. For American Indians and Alaska Natives, the figure was 50.19 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 66.26 percent. These disparities are all adverse, and statistically significant. The disparities are all large as well, with the exception of women-owned firms.

We can also compare sales and receipts per firm among all firms in construction in 2012. In Table 4 average per firm sales and receipts for non-minority male-owned firms was $508.9 thousand. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $81.5 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, African American-owned firms received just 16 cents.
- For Hispanic-owned firms, average per firm sales and receipts was $117.4 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Hispanic-owned firms received just 23 cents.
- For Asian-owned firms, average per firm sales and receipts was $199.8 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Asian-owned firms received just 39 cents.
- For American Indian- and Alaska Native-owned firms, average per firm sales and receipts was $205.8 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, American Indian- and Alaska Native-owned firms received just 40 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, average per firm sales and receipts was $271.7 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Native Hawaiian- and Other Pacific Islander-owned firms received just 53 cents.
- For women-owned firms, average per firm sales and receipts was $350 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, women-owned firms received just 69 cents.

Turning to employer firms, we see from column (3) in Table 4, that although non-minority male-owned firms were 69.87 percent of all employer firms, they accounted for 79.09 percent of all employer firm sales and receipts. In contrast:

- Although African Americans owned 1.19 percent of all employer firms in the U.S. in 2017, they earned only 0.77 percent of all sales and receipts.
- Although Hispanics firms 6.07 percent of all employer firms, they earned only 3.59 percent of all sales and receipts.
- Although Asians owned 1.66 percent of all employer firms, they earned only 1.19 percent of all sales and receipts.
- Although American Indians and Alaska Natives owned 0.76 percent of all employer firms, they earned only 0.57 percent of all sales and receipts.
- Native Hawaiians and Other Pacific Islanders owned 0.11 percent of all employer firms, and they earned 0.12 percent of all sales and receipts, essentially at parity.
- Although women owned 8.55 percent of all employer firms, they earned only 7.86 percent of all sales and receipts.

The employer firm disparity indexes for construction in 42012 appear in Panel C of Table 4. Panel C shows that African American-owned firms in 2012 received just 64.51 percent of what would be expected based on their availability in the market. Women-owned firms received just 91.88 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 59.14 percent. For Asians, the figure was 71.94 percent. For American Indians and Alaska Natives, the figure was 74.52 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 101.89 percent. The disparities for African Americans, Hispanics, Asians and American Indians and Alaska Natives are all large, adverse, and statistically significant. The disparity for women is adverse, and statistically significant. The disparity for Native Hawaiians and Other Pacific Islanders is not statistically significant.

Considering sales and receipts among employer firms in 2012, Table 4 shows a figure of $1.92 million for non-minority male-owned employer firms. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $1.1 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, African American-owned firms received just 57 cents.

- For Hispanic-owned firms, average per firm sales and receipts was $1.01 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Hispanic-owned firms received just 52 cents.
- For Asian-owned firms, average per firm sales and receipts was $1.22 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Asian-owned firms received just 64 cents.
- For American Indian- and Alaska Native-owned firms, average per firm sales and receipts was $1.27 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, American Indian- and Alaska Native-owned firms received just 66 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, average per firm sales and receipts was $1.73 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Native Hawaiian- and Other Pacific Islander-owned firms received just 90 cents.
- For women-owned firms, average per firm sales and receipts was $1.56 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, women-owned firms received just 81 cents.

As discussed above, these disparities extend to the employees of minority- and women-owned firms as well and thus cause a ripple effect that further damages women and minorities. Table 4 shows that average payroll per employee at non-minority male-owned employer firms in 2012 was $48,736. In contrast:

- For African American-owned employers, average payroll per employee was just $42,824. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at African American-owned firms earned only 88 cents.
- For Hispanic-owned employers average payroll per employee was just $37,977. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Hispanic-owned firms earned only 78 cents.
- For Asian-owned employers average payroll per employee was just $45,450. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Asian-owned firms earned only 93 cents.
- For American Indian- and Alaska Native-owned employers average payroll per employee was just $44,763. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at American Indian- and Alaska Native-owned firms earned just 92 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, on the other hand, was $49,870. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Native Hawaiian- and Other Pacific Islander-owned firms earned $1.02—essentially at par with non-minority male-owned firms.
- For women-owned employers average payroll per employee was just $46,509. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at women-owned firms earned only 95 cents.

**Table 4. Disparity Ratios from the 2012 Survey of Business Owners, United States, Construction**

| | Number of Firms | Sales and Receipts ($000s) | Employer Firms | Sales and Receipts ($000s) | Employees | Payroll ($000s) |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Panel A. Levels** | | | | | | |
| All Firms | 2,928,015 | 1,200,413,658 | 637,296 | 1,083,093,941 | 4,764,280 | 225,039,336 |
| Non-minority male | 1,840,218 | 936,510,929 | 445,288 | 856,603,507 | 3,581,982 | 174,571,576 |
| African American | 136,729 | 11,141,919 | 7,594 | 8,325,857 | 39,883 | 1,707,968 |
| Hispanic | 475,472 | 55,830,007 | 38,704 | 38,900,840 | 222,161 | 8,437,113 |
| Asian | 76,883 | 15,362,433 | 10,567 | 12,919,296 | 54,404 | 2,472,635 |
| Native Hawaiian/Pac. Islander | 5,551 | 1,507,949 | 724 | 1,253,656 | 4,803 | 239,527 |
| Am. Indian & Alaska Native | 35,969 | 7,401,462 | 4,836 | 6,124,399 | 29,700 | 1,329,464 |
| Female | 265,733 | 93,002,152 | 54,511 | 85,116,364 | 435,718 | 20,264,904 |
| **Panel B. Column Percentages** | | | | | | |
| All Firms | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-minority male | 62.85% | 78.02% | 69.87% | 79.09% | 75.18% | 77.57% |
| African American | 4.67% | 0.93% | 1.19% | 0.77% | 0.84% | 0.76% |
| Hispanic | 16.24% | 4.65% | 6.07% | 3.59% | 4.66% | 3.75% |
| Asian | 2.63% | 1.28% | 1.66% | 1.19% | 1.14% | 1.10% |
| Native Hawaiian/Pac. Islander | 0.19% | 0.13% | 0.11% | 0.12% | 0.10% | 0.11% |
| Am. Indian & Alaska Native | 1.23% | 0.62% | 0.76% | 0.57% | 0.62% | 0.59% |
| Female | 9.08% | 7.75% | 8.55% | 7.86% | 9.15% | 9.01% |
| **Panel C. Disparity Ratios** | | | | | | |
| Non-minority male | | *124.13* | | *113.19* | *107.60* | *111.02* |
| African American | | *19.88* | | *64.51* | *70.25* | *63.69* |
| Hispanic | | *28.64* | | *59.14* | *76.78* | *61.73* |
| Asian | | *48.74* | | *71.94* | *68.87* | *66.27* |
| Native Hawaiian/Pac. Islander | | *66.26* | | 101.89 | 88.74 | 93.69 |
| Am. Indian & Alaska Native | | *50.19* | | *74.52* | *82.15* | *77.85* |
| Female | | *85.37* | | *91.88* | *106.92* | *105.28* |

Source and Notes: *See* Table 6.

*c. Results for the Professional, Scientific, and Technical Services Sector*

Table 8 shows comparable 2012 SBO data for the professional, scientific, and technical services sector in the U.S. as a whole.

Column (2) in Panel B of Table 8 shows that nonminority males owned 47.45 percent of all firms and earned 66.95 percent of all sales and receipts. In contrast:

- Although African Americans owned 5.35 percent of all firms in the U.S. in 2012, they earned only 1.79 percent of all sales and receipts.
- Although Hispanics owned 7.19 percent of all firms, they earned only 3.82 percent of all sales and receipts.
- Although Asians owned 7.16 percent of all firms, they earned 7.72 percent of all sales and receipts.
- Although American Indians and Alaska Natives owned 0.8 percent of all firms, they earned only 0.36 percent of all sales and receipts.
- Although Native Hawaiians and Other Pacific Islanders owned 0.16 percent of all firms, they earned only 0.11 percent of all sales and receipts.
- Although women-owned firms were 34.5 percent of all firms, they earned only 15.81 percent of all sales and receipts.

The associated 2012 disparity indexes for firms in the construction sector can be viewed directly in Panel C of Table 8. Panel C shows that African American-owned firms in 2012 received just 33.42 percent of what would be expected based on their availability in the market. Panel C shows as well that women-owned firms received 45.82 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 53.17 percent. For Asians, the figure was 107.9 per-

cent. For American Indians and Alaska Natives, the figure was 45.12 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 65.32 percent. With the exception of Asians, these disparities are all large, adverse, and statistically significant.

We can also compare sales and receipts per firm among all firms in professional services in 2012. In Table 8, average per firm sales and receipts for non-minority male-owned firms was $319.9 thousand. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $75.8 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, African American-owned firms received just 24 cents.
- For Hispanic-owned firms, average per firm sales and receipts was $120.6 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Hispanic-owned firms received just 38 cents.
- For Asian-owned firms, average per firm sales and receipts was $244.78 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Asian-owned firms received just 76 cents.
- For American Indian- and Alaska Native-owned firms, average per firm sales and receipts was $102.3 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, American Indian- and Alaska Native-owned firms received just 32 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, average per firm sales and receipts was $148.1 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Native Hawaiian- and Other Pacific Islander-owned firms received just 46 cents.
- For women-owned firms, average per firm sales and receipts was $103.9 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, women-owned firms received just 32 cents.

Turning to employer firms, we see from column (3) in Table 8, that although non-minority male-owned firms were 59 percent of all employer firms, they accounted for 69.13 percent of all employer firm sales and receipts. In contrast:

- Although African Americans owned 1.85 percent of all employer firms in the U.S. in 2012, they earned only 1.52 percent of all sales and receipts.
- Although Hispanics firms 3.95 percent of all employer firms, they earned only 3.45 percent of all sales and receipts.
- Asians owned 6.79 percent of all employer firms, and they earned 7.9 percent of all sales and receipts.
- Although American Indians and Alaska Natives owned 0.48 percent of all employer firms, they earned only 0.3 percent of all sales and receipts.
- Native Hawaiians and Other Pacific Islanders owned 0.08 percent of all employer firms, and they earned 0.1 percent of all sales and receipts.
- Although women owned 22.1 percent of all employer firms, they earned only 13.81 percent of all sales and receipts.

The employer firm disparity indexes for construction in 42012 appear in Panel C of Table 8. Panel C shows that African American-owned firms in 2012 received just 82.26 percent of what would be expected based on their availability in the market. Women-owned firms received just 62.47 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 87.16 percent. For Asians, the figure was 116.31 percent. For American Indians and Alaska Natives, the figure was 60.94 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 116.31 percent. The disparities for women and American Indians and Alaska Natives are large, adverse, and statistically significant. The disparities for African Americans and Hispanics are adverse and statistically significant. The disparities for Asians is not adverse and is statistically significant. The disparity for Native Hawaiians and Other Pacific Islanders is not statistically significant.

Considering sales and receipts among employer firms in 2012, Table 8 shows a figure of $1.16 million for non-minority male-owned employer firms. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $816.2 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, African American-owned firms received just 70 cents.
- For Hispanic-owned firms, average per firm sales and receipts was $864.9 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Hispanic-owned firms received just 74 cents.
- For Asian-owned firms, average per firm sales and receipts was $1.15 million. In other words, for every dollar of sales and receipts earned by non-minority

male-owned firms, Asian-owned firms received just 99 cents, just slightly below parity.

- For American Indian- and Alaska Native-owned firms, average per firm sales and receipts was $604.7 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, American Indian- and Alaska Native-owned firms received just 52 cents.
- For Native Hawaiian- and Other Pacific Islander-owned firms, average per firm sales and receipts was $1.27 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, Native Hawaiian- and Other Pacific Islander-owned firms received just $1.10, slightly above parity.
- For women-owned firms, average per firm sales and receipts was $619.9 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned firms, women-owned firms received just 53 cents.

Considering the employees of minority- and women-owned employer firms in the professional services sector, Table 8 shows that average payroll per employee at non-minority male-owned employer firms in 2012 was $63,240. In contrast:

- For African American-owned employers, average payroll per employee was just $54,911. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at African American-owned firms earned only 88 cents.
- For Hispanic-owned employers average payroll per employee was just $51,813. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Hispanic-owned firms earned only 78 cents.
- For Asian-owned employers average payroll per employee was just $66,788. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Asian-owned firms earned only 93 cents.
- For American Indian- and Alaska Native-owned employers average payroll per employee was just $44,013. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at American Indian- and Alaska Native-owned firms earned just 92 cents.
- For women-owned employers average payroll per employee was just $49,128. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at women-owned firms earned only 95 cents.

Payroll per employee for Native Hawaiian- and Other Pacific Islander-owned firms, on the other hand, was $69,386. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Native Hawaiian- and Other Pacific Islander-owned firms earned $1.10—slightly above par with non-minority male-owned firms.

**Table 5. Disparity Ratios from the 2012 Survey of Business Owners, United States, Professional Services**

| | Number of Firms | Sales and Receipts ($000s) | Employer Firms | Sales and Receipts ($000s) | Employees | Payroll ($000s) |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Panel A. Levels** | | | | | | |
| All Firms | 3,868,657 | 877,237,881 | 748,444 | 742,626,210 | 4,652,991 | 277,172,802 |
| Non-minority male | 1,835,748 | 587,306,112 | 441,573 | 513,381,557 | 3,050,082 | 192,887,690 |
| African American | 206,942 | 15,682,967 | 13,822 | 11,281,769 | 81,170 | 4,457,109 |
| Hispanic | 278,066 | 33,525,181 | 29,582 | 25,584,292 | 170,953 | 8,857,606 |
| Asian | 276,960 | 67,766,453 | 50,834 | 58,666,210 | 345,376 | 23,067,037 |
| Native Hawaiian/Pac. Islander | 6,292 | 931,973 | 600 | 764,525 | 3,680 | 255,342 |
| Am. Indian & Alaska Native | 30,966 | 3,168,244 | 3,627 | 2,193,127 | 17,882 | 787,037 |
| Female | 1,334,561 | 138,669,937 | 165,437 | 102,552,393 | 774,717 | 38,060,358 |
| **Panel B. Column Percentages** | | | | | | |
| All Firms | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-minority male | 47.45% | 66.95% | 59.00% | 69.13% | 65.55% | 69.59% |
| African American | 5.35% | 1.79% | 1.85% | 1.52% | 1.74% | 1.61% |
| Hispanic | 7.19% | 3.82% | 3.95% | 3.45% | 3.67% | 3.20% |
| Asian | 7.16% | 7.72% | 6.79% | 7.90% | 7.42% | 8.32% |
| Native Hawaiian/Pac. Islander | 0.16% | 0.11% | 0.08% | 0.10% | 0.08% | 0.09% |
| Am. Indian & Alaska Native | 0.80% | 0.36% | 0.48% | 0.30% | 0.38% | 0.28% |
| Female | 34.50% | 15.81% | 22.10% | 13.81% | 16.65% | 13.73% |
| **Panel C. Disparity Ratios** | | | | | | |
| Non-minority male | | *141.09* | | *117.17* | *111.11* | *117.95* |
| African American | | *33.42* | | *82.26* | *94.46* | *87.07* |
| Hispanic | | *53.17* | | *87.16* | *92.96* | *80.85* |
| Asian | | *107.90* | | *116.31* | *109.29* | *122.53* |
| Native Hawaiian/Pac. Islander | | *65.32* | | 128.42 | 98.66 | 114.92 |
| Am. Indian & Alaska Native | | *45.12* | | *60.94* | *79.30* | *58.59* |
| Female | | *45.82* | | *62.47* | *75.32* | *62.12* |

Source and Notes: See Table 6.

*2. Results from the 2017 Annual Survey of Businesses*

*a. Economy-Wide Results*

Turning now to the 2017 ABS, Table 6, below, presents results for all industries combined (*i.e*. economy-wide) and for the United States as a whole. Panel A summarizes the ABS results for each race and/or sex group. For example, Panel A shows a total of 5.47 million employer firms in the U.S. in 2017 (column 1) with overall sales and receipts of $12.689 trillion (column 2). These 5.47 million firms had a total of 62.99 million employees (column 3) and a total annual payroll expense of $2.618 trillion (column 4).

The remaining rows in Panel A provide comparable statistics for non-minority male-owned, women-owned, and minority-owned firms. For example, Table 6 shows that there were 124,004 African American-owned employer firms counted in 2017, and that these 124,004 firms registered $127.851 billion in sales and receipts. It also shows that these African American-owned firms employed a total of 1.21 million workers with an annual payroll total of $36.105 billion.

Panel B in Table 6 converts the figures in Panel A to percentage distributions within each column. For example, Column (1) in Panel B of Table 6 shows that African Americans owned just 2.27 percent of all employer firms in the U.S. and women owned just 15.62 percent. Additionally, 5.88 percent of employer firms were Hispanic-owned, 10.15 percent were Asian-owned, 0.45 percent were American Indian- and Alaska Native-owned, and 0.13 percent were Native Hawaiian- and Other Pacific Islander-owned.

Column (2) in Panel B provides the same percentage distribution for overall sales and receipts for employer firms. Table 6, for example, shows that non-minority males owned 52.08 percent of all employer firms and earned 70.71 percent of all sales and receipts. In contrast:

- Although African Americans owned 2.27 percent of all employer firms in the U.S. in 2017, they earned only 1.01 percent of all sales and receipts.
- Although Hispanics firms 5.88 percent of all employer firms, they earned only 3.33 percent of all sales and receipts.
- Although Asians owned 10.15 percent of all employer firms, they earned only 6.42 percent of all sales and receipts.
- Although American Indians and Alaska Natives owned 0.45 percent of all employer firms, they earned only 0.3 percent of all sales and receipts.
- Although Native Hawaiians and Other Pacific Islanders owned 0.13 percent of all employer firms, they earned only 0.07 percent of all sales and receipts.
- Although women owned 15.62 percent of all employer firms, they earned only 9.6 percent of all sales and receipts.

These disparities between the availability and utilization of minority- and women-owned firms can be viewed directly from the disparity indexes in Panel C of Table 6. For example, Panel C shows that African American-owned employer firms in 2017 received just 44.48 percent of what would be expected based on their availability in the market.[29] Panel C shows as well that women-owned firms received just 61.44 percent of what would be expected based on their availability in the market. For Hispanics, the figure was 56.6 percent. For Asians, the figure was 63.27 percent. For American Indians and Alaska Natives, the figure was 66.89 percent, and for Native Hawaiians and Other Pacific Islanders, the figure was 53.09 percent. These disparities are all large, adverse, and statistically significant.

Another way to look at these disparities is by comparing sales and receipts per firm. In Table 6, for example, average per firm sales and receipts for non-minority male-owned employer firms was $3.15 million.[30] In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $1.03 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, African American-owned employer firms received just 33 cents.
- For Hispanic-owned employer firms, average per firm sales and receipts was $1.31 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Hispanic-owned employer firms received just 42 cents.
- For Asian-owned employer firms, average per firm sales and receipts was $1.47 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Asian-owned employer firms received just 47 cents.
- For American Indian- and Alaska Native-owned employer firms, average per firm sales and receipts was $1.55 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, American Indian- and Alaska Native-owned employer firms received just 49 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employer firms, average per firm sales and receipts was $1.23 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Native Hawaiian- and Other Pacific Islander-owned employer firms received just 39 cents.
- For women-owned employer firms, average per firm sales and receipts was $1.42 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, women-owned employer firms received just 45 cents.

As discussed above, these severe disparities in firm earnings have a direct negative and compounding effect on the employees of minority- and women-owned firms. Table 6, for example, shows that average payroll per employee at non-minority male-owned employer firms in 2017 was $45,555.[31] In contrast:

- For African American-owned employers, average payroll per employee was just $29,882. In other words, for every $1 in wages earned by employees at non-mi-

[29] The disparity index is derived by dividing the share of sales and receipts from Panel B column (2) by the share of firms in Panel B column (1) and multiplying the result by 100.

[30] Per firm sales and receipts is derived by dividing the sales and receipts amount in Panel A column (2) by the number of employer firms in Panel A column (1).

[31] Average payroll per employee is derived by dividing total payroll in Panel A column (4) by total number of employees in Panel A column (3).

nority male-owned firms, employees at African American-owned firms earned just 66 cents.

- For Hispanic-owned employers average payroll per employee was just $31,674. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Hispanic-owned firms earned just 70 cents.
- For Asian-owned employers average payroll per employee was just $34,137. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Asian-owned firms earned just 75 cents.
- For American Indian- and Alaska Native-owned employers average payroll per employee was just $39,756. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at American Indian- and Alaska Native-owned firms earned just 87 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employers it was just $35,386. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Native Hawaiian- and Other Pacific Islander-owned firms earned just 78 cents.
- For women-owned employers average payroll per employee was just $36,926. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at women-owned firms earned just 81 cents.

**Table 6. Disparity Ratios from the 2017 Annual Business Survey, United States, All Industries**

| | Employer Firms | Sales and Receipts ($000s) | Employees | Payroll ($000s) |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| **Panel A. Levels** | | | | |
| All Firms | 5,474,721 | 12,689,937,307 | 62,990,475 | 2,618,191,164 |
| Non-minority male | 2,851,098 | 8,972,454,223 | 38,973,541 | 1,775,434,267 |
| African American | 124,004 | 127,850,815 | 1,208,270 | 36,105,467 |
| Hispanic | 322,076 | 422,573,589 | 2,872,550 | 90,985,526 |
| Asian | 555,638 | 814,806,324 | 4,649,688 | 158,725,110 |
| Native Hawaiian/Pac. Islander | 6,847 | 8,426,209 | 55,413 | 1,960,819 |
| Am. Indian & Alaska Native | 24,503 | 37,992,217 | 221,193 | 8,793,842 |
| Female | 855,136 | 1,217,743,211 | 7,863,653 | 290,375,358 |
| **Panel B. Column Percentages** | | | | |
| All Firms | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-minority male | 52.08% | 70.71% | 61.87% | 67.81% |
| African American | 2.27% | 1.01% | 1.92% | 1.38% |
| Hispanic | 5.88% | 3.33% | 4.56% | 3.48% |
| Asian | 10.15% | 6.42% | 7.38% | 6.06% |
| Native Hawaiian/Pac. Islander | 0.13% | 0.07% | 0.09% | 0.07% |
| Am. Indian & Alaska Native | 0.45% | 0.30% | 0.35% | 0.34% |
| Female | 15.62% | 9.60% | 12.48% | 11.09% |
| **Panel C. Disparity Ratios** | | **(2) vs. (1)** | **(3) vs. (1)** | **(4) vs. (1)** |
| Non-minority male | | *135.77* | *118.81* | *130.21* |
| African American | | *44.48* | *84.69* | *60.88* |
| Hispanic | | *56.60* | *77.52* | *59.07* |
| Asian | | *63.27* | *72.73* | *59.73* |
| Native Hawaiian/Pac. Islander | | *53.09* | *70.34* | *59.88* |
| Am. Indian & Alaska Native | | *66.89* | *78.46* | *75.04* |
| Female | | *61.44* | *79.92* | *71.00* |

Source: Authors calculations from the 2017 ABS. Notes: (1) Figures are rounded. Rounding was performed subsequent to any mathematical calculations; (2) Excludes publicly owned, foreign-owned, and not-for-profit firms; (3) Totals for ‘‘All Firms’’ includes firms that were equally nonminority-minority owned; (4) Statistically significant; disparity indexes are italicized; (5) ‘‘n/a’’ indicates that data were not disclosed due to confidentiality or other publication restrictions.

*b. Results for the Construction Sector*

Table 7 provides comparable 2017 information for the construction sector, which, along with architecture, engineering, and related professional services, is a major recipient of Federal surface and aviation transportation funding.

Although non-minority males owned 68.52 percent of all employer firms in the construction sector, they earned 77.92 percent of all sales and receipts. In contrast:

- Although African Americans owned 1.17 percent of all employer firms in the U.S. in 2017, they earned only 0.72 percent of all sales and receipts. This yields a disparity index of 61.05.
- Although Hispanics owned 7.16 percent of all employer firms in the U.S. in 2017, they earned only 4.1 percent of all sales and receipts. This yields a disparity index of 57.26.
- Although Asians owned 2.02 percent of all employer firms in the U.S. in 2017, they earned only 1.37 percent of all sales and receipts. This yields a disparity index of 67.73.
- Although Native Hawaiians and Other Pacific Islanders owned 0.16 percent of all employer firms in the U.S. in 2017, they earned only 0.1 percent of all sales and receipts. This yields a disparity index of 62.97.
- Although American Indians and Alaska Natives owned 0.69 percent of all employer firms in the U.S. in 2017, they earned only 0.52 percent of all sales and receipts. This yields a disparity index of 76.15.

As a group, women fared much better in construction in 2017 compared to other disadvantaged groups. Women owned 7.15 percent of all employer firms in the U.S. in 2017, and they earned an equivalent share of sales and receipts—7.26 percent, yielding no adverse disparity index. But remember, this new ABS data does not include emerging firms that have yet grown sufficiently large to hire employees.

When we consider per firm sales and receipts for employer firms in 2017, we see that non-minority male-owned firms averaged $2.51 million. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was 1.35 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, African American-owned employer firms received just 54 cents.
- For Hispanic-owned employer firms, average per firm sales and receipts was 1.26 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Hispanic-owned employer firms received just 50 cents.
- For Asian-owned employer firms, average per firm sales and receipts was 1.49 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Asian-owned employer firms received just 60 cents.
- For American Indian- and Alaska Native-owned employer firms, average per firm sales and receipts was 1.68 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, American Indian- and Alaska Native-owned employer firms received just 67 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employer firms, average per firm sales and receipts was 1.39 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Native Hawaiian- and Other Pacific Islander-owned employer firms received just 55 cents.
- For women-owned employer firms, average per firm sales and receipts was 2.24 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, women-owned employer firms received just 89 cents.

Considering the employees of these minority- and women-owned firms, Table 7 shows that average payroll per employee at non-minority male-owned employer firms the construction sector in 2017 was $54,984. In contrast:

- For African American-owned employers, average payroll per employee was just $45,869. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at African American-owned firms earned just 83 cents.
- For Hispanic-owned employers average payroll per employee was just $41,881. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Hispanic-owned firms earned just 76 cents.
- For Asian-owned employers average payroll per employee was just $50,307. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Asian-owned firms earned 91 cents.
- For American Indian- and Alaska Native-owned employers average payroll per employee was just $51,723. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at American Indian- and Alaska Native-owned firms earned 94 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employers it was just $46,120 male-owned firms, employees at Native Hawaiian- and Other Pacific Islander-owned firms earned just 84 cents.

- For women-owned employers average payroll per employee was just $53,318. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at women-owned firms earned 97 cents.

**Table 7. Disparity Ratios from the 2017 Annual Business Survey, United States, Construction**

| | Employer Firms | Sales and Receipts ($000s) | Employees | Payroll ($000s) |
|---|---|---|---|---|
| | (3) | (4) | (5) | (6) |
| **Panel A. Levels** | | | | |
| All Firms | 700,453 | 1,544,490,456 | 6,120,046 | 324,999,296 |
| Non-minority male | 479,971 | 1,203,446,334 | 4,504,618 | 247,682,903 |
| African American | 8,218 | 11,062,034 | 54,093 | 2,481,191 |
| Hispanic | 50,187 | 63,362,420 | 327,799 | 13,728,565 |
| Asian | 14,169 | 21,160,223 | 82,746 | 4,162,689 |
| Native Hawaiian/Pac. Islander | 1,093 | 1,517,730 | 7,795 | 359,508 |
| Am. Indian & Alaska Native | 4,821 | 8,095,145 | 35,355 | 1,828,684 |
| Female | 50,075 | 112,156,157 | 508,141 | 27,092,808 |
| **Panel B. Column Percentages** | | | | |
| All Firms | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-minority male | 68.52% | 77.92% | 73.60% | 76.21% |
| African American | 1.17% | 0.72% | 0.88% | 0.76% |
| Hispanic | 7.16% | 4.10% | 5.36% | 4.22% |
| Asian | 2.02% | 1.37% | 1.35% | 1.28% |
| Native Hawaiian/Pac. Islander | 0.16% | 0.10% | 0.13% | 0.11% |
| Am. Indian & Alaska Native | 0.69% | 0.52% | 0.58% | 0.56% |
| Female | 7.15% | 7.26% | 8.30% | 8.34% |
| **Panel C. Disparity Ratios** | | **(2) vs. (1)** | **(3) vs. (1)** | **(4) vs. (1)** |
| Non-minority male | | *113.71* | *107.42* | *111.22* |
| African American | | *61.05* | *75.34* | *65.07* |
| Hispanic | | *57.26* | *74.76* | *58.96* |
| Asian | | *67.73* | *66.84* | *63.32* |
| Native Hawaiian/Pac. Islander | | *62.97* | *81.62* | *70.89* |
| Am. Indian & Alaska Native | | *76.15* | *83.93* | *81.75* |
| Female | | 101.58 | 116.14 | 116.61 |

Source and Notes: See Table 6.

*c. Results for the Professional, Scientific, and Technical Sector*

Table 8 provides comparable 2017 information for the professional, scientific, and technical sector (which includes architecture, engineering, and related professional services). This sector, along with construction, is a major recipient of Federal surface and aviation transportation funding.

Although non-minority males owned 56.31 percent of all employer firms in the construction sector, they earned 66.39 percent of all sales and receipts. In contrast:

- Although African Americans owned 2.06 percent of all employer firms in the U.S. in 2017, they earned only 1.6 percent of all sales and receipts. This yields a disparity index of 77.65.
- Although Hispanics owned 4.32 percent of all employer firms in the U.S. in 2017, they earned only 3.2 percent of all sales and receipts. This yields a disparity index of 74.09.
- Although Asians owned 7.67 percent of all employer firms in the U.S. in 2017, they earned only 8.84 percent of all sales and receipts. This yields a disparity index of 115.31.
- Although Native Hawaiians and Other Pacific Islanders owned 0.12 percent of all employer firms in the U.S. in 2017, they earned only 0.1 percent of all sales and receipts. This yields a disparity index of 84.87.
- Although American Indians and Alaska Natives owned 0.52 percent of all employer firms in the U.S. in 2017, they earned only 0.52 percent of all sales and receipts. This yields a disparity index of 99.76.

- Although women owned 19.1 percent of all employer firms in the U.S. in 2017, they earned only 12.4 percent of all sales and receipts. This yields a disparity index of 64.91.

When we consider per firm sales and receipts for employer firms, we see that non-minority male-owned firms averaged $1.37 million in 2017. In contrast:

- For African American-owned employer firms, average per firm sales and receipts was $902 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, African American-owned employer firms received just 66 cents.
- For Hispanic-owned employer firms, average per firm sales and receipts was $861 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Hispanic-owned employer firms received just 63 cents.
- For Asian-owned employer firms, average per firm sales and receipts was $1.34 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Asian-owned employer firms received just 98 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employer firms, average per firm sales and receipts was $986 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, Native Hawaiian- and Other Pacific Islander-owned employer firms received just 72 cents.
- For American Indian- and Alaska Native-owned employer firms, average per firm sales and receipts was $1.16 million. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, American Indian- and Alaska Native-owned employer firms received just 85 cents.
- For women-owned employer firms, average per firm sales and receipts was $754 thousand. In other words, for every dollar of sales and receipts earned by non-minority male-owned employer firms, women-owned employer firms received just 55 cents.

Considering the employees of these minority- and women-owned firms, Table 8 shows that average payroll per employee at non-minority male-owned employer firms the professional services sector in 2017 was $70,546. In contrast:

- For African American-owned employers, average payroll per employee was just $59,033. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at African American-owned firms earned just 84 cents.
- For Hispanic-owned employers average payroll per employee was just $56,567. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Hispanic-owned firms earned just 80 cents.
- For Asian-owned employers average payroll per employee was $75,179—somewhat higher than non-minority male-owned employers. Thus, for every $1 in wages earned by employees at non-minority male-owned firms, employees at Asian-owned firms earned $1.07 cents, slightly better than parity.
- For American Indian- and Alaska Native-owned employers average payroll per employee was just $60,884. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at American Indian- and Alaska Native-owned firms earned 86 cents.
- For Native Hawaiian- and Other Pacific Islander-owned employers it was just $63,009 male-owned firms, employees at Native Hawaiian- and Other Pacific Islander-owned firms earned just 89 cents.
- For women-owned employers average payroll per employee was just $55,606. In other words, for every $1 in wages earned by employees at non-minority male-owned firms, employees at women-owned firms earned 79 cents.

**Table 8. Disparity Ratios from the 2017 Annual Business Survey, United States, Professional, Scientific, and Technical Services**

| | Employer Firms | Sales and Receipts ($000s) | Employees | Payroll ($000s) |
|---|---|---|---|---|
| | (3) | (4) | (5) | (6) |
| **Panel A. Levels** | | | | |
| All Firms | 794,235 | 922,698,077 | 5,339,009 | 362,594,623 |
| Non-minority male | 447,254 | 612,610,502 | 3,281,827 | 231,520,629 |
| African American | 16,392 | 14,787,229 | 96,267 | 5,682,935 |
| Hispanic | 34,292 | 29,514,634 | 185,395 | 10,487,211 |
| Asian | 60,907 | 81,592,941 | 432,567 | 32,520,040 |
| Native Hawaiian/Pac. Islander | 971 | 957,403 | 6,118 | 385,489 |
| Am. Indian & Alaska Native | 4,142 | 4,800,227 | 29,953 | 1,823,661 |
| Female | 151,694 | 114,396,323 | 751,207 | 41,771,294 |
| **Panel B. Column Percentages** | | | | |
| All Firms | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-minority male | 56.31% | 66.39% | 61.47% | 63.85% |
| African American | 2.06% | 1.60% | 1.80% | 1.57% |
| Hispanic | 4.32% | 3.20% | 3.47% | 2.89% |
| Asian | 7.67% | 8.84% | 8.10% | 8.97% |
| Native Hawaiian/Pac. Islander | 0.12% | 0.10% | 0.11% | 0.11% |
| Am. Indian & Alaska Native | 0.52% | 0.52% | 0.56% | 0.50% |
| Female | 19.10% | 12.40% | 14.07% | 11.52% |
| **Panel C. Disparity Ratios** | | **(2) vs. (1)** | **(3) vs. (1)** | **(4) vs. (1)** |
| Non-minority male | | *117.90* | *109.16* | *113.39* |
| African American | | *77.65* | *87.36* | *75.94* |
| Hispanic | | *74.09* | *80.43* | *66.99* |
| Asian | | *115.31* | *105.65* | *116.95* |
| Native Hawaiian/Pac. Islander | | 84.87 | 93.73 | 86.96 |
| Am. Indian & Alaska Native | | 99.76 | 107.58 | 96.44 |
| Female | | *64.91* | *73.67* | *60.32* |

Source and Notes: See Table 6.

*3. State-Level Results from 2002–2017*

The state-level disparities observed in the 2017 ABS are documented below in Appendix A, Tables A.1 through A.18. Data from the 2012 SBO is presented in Appendix B, Tables B.1 through B.18. Data from the 2007 SBO is presented in Appendix C, Tables C.1 through C.18. Data from the 2002 SBO is presented in Appendix D, Tables D.1 through D.18.

The most noticeable aspect of the statistics presented in Tables A.1 through D.18 below is how many of the disparity indexes are large, adverse, and statistically significant.[32] This is true for African Americans, Hispanics, Asians and Pacific Islanders, American Indians and Alaska Natives, and non-minority women. It is true in the construction sector, it is true in the professional services sector, and it is true when considering all industries combined. It is true in all 50 states and the District of Columbia. While there is certainly variation by race, sex, industry, geography, and time, the similarities vastly outweigh the differences. Table 9 provides a high-level summary of the findings of disparity from the 2007 SBO in Tables A.1 through A.18.

[32] I have measured statistical significance here using the "two standard deviation" or "5%" level of significance typically used in disparate impact litigation in employment and related areas.

**Table 9. Prevalence of Disparities in the 2017 Annual Business Survey and the 2012, 2007 & 2002 Survey of Business Owners**

| Year | Industry | Number of Disparity Indexes in Table | Race/Sex Group | Fraction of Disparity Indexes Less than or Equal to 80 | Fraction of Disparity Indexes Less than or Equal to 100 | Fraction of Disparity Indexes that are Statistically Significant |
|---|---|---|---|---|---|---|
| 2017 | All Industries | 48 | AfrAmer | 98% | 100% | 88% |
| 2012 | All Industries | 96 | AfrAmer | 97% | 98% | 92% |
| 2007 | All Industries | 96 | AfrAmer | 93% | 97% | 90% |
| 2002 | All Industries | 100 | AfrAmer | 98% | 100% | 98% |
| 2017 | Construction | 39 | AfrAmer | 77% | 82% | 46% |
| 2012 | Construction | 84 | AfrAmer | 88% | 93% | 80% |
| 2007 | Construction | 84 | AfrAmer | 85% | 90% | 82% |
| 2002 | Construction | 69 | AfrAmer | 86% | 88% | 72% |
| 2017 | Professional Services | 41 | AfrAmer | 73% | 80% | 49% |
| 2012 | Professional Services | 92 | AfrAmer | 78% | 90% | 70% |
| 2007 | Professional Services | 92 | AfrAmer | 76% | 88% | 73% |
| 2002 | Professional Services | 86 | AfrAmer | 94% | 98% | 80% |
| 2017 | All Industries | 52 | Hispanic | 87% | 94% | 79% |
| 2012 | All Industries | 101 | Hispanic | 87% | 94% | 84% |
| 2007 | All Industries | 101 | Hispanic | 82% | 90% | 86% |
| 2002 | All Industries | 102 | Hispanic | 100% | 100% | 100% |
| 2017 | Construction | 49 | Hispanic | 86% | 92% | 61% |
| 2012 | Construction | 95 | Hispanic | 89% | 96% | 79% |
| 2007 | Construction | 95 | Hispanic | 87% | 93% | 78% |
| 2002 | Construction | 85 | Hispanic | 88% | 91% | 81% |
| 2017 | Professional Services | 48 | Hispanic | 42% | 65% | 29% |
| 2012 | Professional Services | 97 | Hispanic | 63% | 79% | 54% |
| 2007 | Professional Services | 97 | Hispanic | 65% | 75% | 57% |
| 2002 | Professional Services | 84 | Hispanic | 93% | 94% | 74% |
| 2017 | All Industries | 52 | Asian | 98% | 98% | 96% |
| 2012 | All Industries | 104 | Asian | 68% | 89% | 73% |
| 2007 | All Industries | 104 | Asian | 75% | 96% | 80% |
| 2002 | All Industries | 102 | Asian | 100% | 100% | 100% |
| 2017 | Construction | 40 | Asian | 72% | 75% | 38% |
| 2012 | Construction | 84 | Asian | 70% | 75% | 57% |
| 2007 | Construction | 84 | Asian | 71% | 77% | 54% |
| 2002 | Construction | 58 | Asian | 74% | 90% | 53% |
| 2017 | Professional Services | 49 | Asian | 14% | 29% | 16% |
| 2012 | Professional Services | 100 | Asian | 21% | 33% | 34% |
| 2007 | Professional Services | 100 | Asian | 15% | 28% | 32% |
| 2002 | Professional Services | 88 | Asian | 64% | 77% | 51% |
| 2017 | All Industries | 36 | NHPI | 81% | 86% | 58% |
| 2012 | All Industries | 71 | NHPI | 86% | 86% | 70% |
| 2007 | All Industries | 71 | NHPI | 86% | 93% | 72% |
| 2002 | All Industries | 48 | NHPI | 100% | 100% | 96% |
| 2017 | Construction | 11 | NHPI | 73% | 73% | 45% |
| 2012 | Construction | 33 | NHPI | 76% | 79% | 74% |
| 2007 | Construction | 33 | NHPI | 73% | 79% | 58% |
| 2002 | Construction | 10 | NHPI | 70% | 80% | 50% |
| 2017 | Professional Services | 13 | NHPI | 69% | 77% | 46% |
| 2012 | Professional Services | 31 | NHPI | 68% | 75% | 73% |
| 2007 | Professional Services | 31 | NHPI | 52% | 58% | 39% |
| 2002 | Professional Services | 13 | NHPI | 92% | 92% | 85% |

**Table 9. Prevalence of Disparities in the 2017 Annual Business Survey and the 2012, 2007 & 2002 Survey of Business Owners**—Continued

| Year | Industry | Number of Disparity Indexes in Table | Race/Sex Group | Fraction of Disparity Indexes Less than or Equal to 80 | Fraction of Disparity Indexes Less than or Equal to 100 | Fraction of Disparity Indexes that are Statistically Significant |
|---|---|---|---|---|---|---|
| 2017 | All Industries | 49 | AIAN | 76% | 88% | 55% |
| 2012 | All Industries | 94 | AIAN | 89% | 97% | 82% |
| 2007 | All Industries | 94 | AIAN | 91% | 98% | 82% |
| 2002 | All Industries | 96 | AIAN | 99% | 99% | 98% |
| 2017 | Construction | 39 | AIAN | 59% | 72% | 23% |
| 2012 | Construction | 74 | AIAN | 72% | 81% | 53% |
| 2007 | Construction | 74 | AIAN | 73% | 85% | 54% |
| 2002 | Construction | 74 | AIAN | 81% | 91% | 64% |
| 2017 | Professional Services | 33 | AIAN | 52% | 67% | 27% |
| 2012 | Professional Services | 79 | AIAN | 79% | 92% | 51% |
| 2007 | Professional Services | 79 | AIAN | 68% | 80% | 43% |
| 2002 | Professional Services | 71 | AIAN | 90% | 92% | 76% |
| 2017 | All Industries | 52 | NMF | 100% | 100% | 98% |
| 2012 | All Industries | 104 | NMF | 98% | 99% | 98% |
| 2007 | All Industries | 104 | NMF | 98% | 100% | 100% |
| 2002 | All Industries | 104 | NMF | 100% | 100% | 100% |
| 2017 | Construction | 52 | NMF | 21% | 54% | 2% |
| 2012 | Construction | 103 | NMF | 30% | 56% | 16% |
| 2007 | Construction | 103 | NMF | 36% | 67% | 23% |
| 2002 | Construction | 42 | NMF | 71% | 86% | 50% |
| 2017 | Professional Services | 52 | NMF | 92% | 100% | 83% |
| 2012 | Professional Services | 103 | NMF | 97% | 100% | 94% |
| 2007 | Professional Services | 103 | NMF | 99% | 99% | 94% |
| 2002 | Professional Services | 54 | NMF | 100% | 100% | 98% |

Source: Author's calculations from the 2017 ABS, and the 2012, 2007 and 2002 SBO. Note: "NHPI" stands for Native Hawaiians and Other Pacific Islanders, "AIAN" stands for American Indians and Alaska Natives, and "NMF" stands for non-minority female.

*a. Conclusions from the Survey of Business Owners/Annual Business Survey Data*

While the exact proportions vary, large and statistically significant disparities are observed in the U.S. as a whole, in all 50 states and the District of Columbia, for all minority groups—African Americans, Hispanics, Asians and Pacific Islanders, and American Indians and Alaska Natives—as well as for non-minority women. These disparities are found in the Construction sector, the Professional, Scientific and Technical Services Sector (which includes Architecture, Engineering and related industries), and in the economy as a whole.

D. There is Strong Evidence of Disparities and Discrimination in Minority and Female Business Formation Rates and Earnings

It is fair to ask whether the disparities documented in most disparity studies and in the SBO and ABS data result primarily from discrimination, or whether they result from other, potentially non-discriminatory, factors.

This question can be tested directly using the *American Community Survey 5-year Public Use Microdata Sample* (ACS PUMS), which allows us to examine business outcomes for different race, ethnic, and gender groups in great detail while holding constant a wide variety of other demographic and economic variables.

*1. Discrimination Impacting Business Formation*

*a. Methods*

To assess the extent of discrimination in business formation, I developed three different statistical regression models.[33] In "Model A", the only independent variables included in the analysis are indicators for race and sex and survey year. This model identifies the raw differences in business formation rates between minorities, women, and non-minority males, holding only time constant.

Next, "Model B" adds to the regression equation several independent variables that are indicators of qualifications and capacity, including schooling, state of residence, and age.[34] This allows us to compare individuals that are similarly situated in terms of their educational attainment, their geographic location, and their labor market experience.

Finally, "Model C" adds to the regression equation a large number of independent variables that have been shown to be related to the propensity to become a business owner. These include proxies for individual financial assets (interest and dividend income, home ownership status, and home property value), family structure (spouse present in the household, number of children in the household), mobility (lived in the same house last year), immigration status (foreign born, years in the U.S., English proficiency), military status (veteran), and local macroeconomic conditions by state (general population level, unemployment rate, number of full-time government employees, per capita personal income).[35]

Taken together, these three models allow us to test whether discrimination is the primary explanation for observed business disparities for minorities and women. If disparity indexes remain adverse, large, and statistically significant throughout Models A, B and C, then the answer is "Yes."

*b. Data*

The data used for the analyses in this section are the most recent *2014–2018 American Community Survey 5-year Public Use Microdata Sample* (ACS), which allows us to examine business outcomes for different race, ethnic, and gender groups in great detail while holding constant a wide variety of other demographic and economic variables.[36]

The analyses undertaken in this section require individual-level data (*i.e.*, "microdata") with relevant information on business ownership status and other key socioeconomic characteristics. The *American Community Survey* is an ongoing annual survey covering the same type of information that was formerly collected in the decennial census "long form." The ACS is sent to approximately 3.5 million addresses annually, including housing units in all counties in the 50 states and the District of Columbia.[37] The PUMS file from the ACS contains records for a subsample of the full ACS. The data used here are the multi-year estimates combining the 2014 through 2018 ACS PUMS records. The combined file contains over six million person-level records. The 2014–2018 ACS PUMS provides the full range of population and housing information collected in the annual ACS and in the decennial census. Business ownership status is identified in the ACS PUMS through the "class of worker" variable, which distinguishes the unincorporated and incorporated self-employed from others in the labor force. The presence of the class of worker variable allows us to construct a detailed cross-sectional sample of individual business owners and their associated earnings. The ACS PUMS universe for all of the analyses presented below includes all prime age (16–64) private sector labor force participants.

*c. Economy-Wide Findings*

I estimated Models A, B and C across four different industry groupings in the U.S.: (1) the entire economy, (2) the construction sector, and (3) the Architecture/Engineering sector. These results are reported below in Tables 10–12.

---

[33] Regression analysis is a type of statistical analysis that examines the correlation between two variables ("regression") or three or more variables ("multiple regression" or "multivariate regression") in a mathematical model by determining the line of best fit through a series of data points. In simpler terms, regression analysis is a statistical technique allowing the comparison between certain business outcomes, such as business formation, business earnings, or loan denials, and minority or female status, while holding other, potentially non-discriminatory factors, such as geographic location, industry affiliation, education, age, or balance sheets, constant.

[34] A person's age is a widely used proxy for their labor market experience and enters the regression equation quadratically.

[35] Interest and dividend income and per capita personal income are included in the model in their logarithmic forms.

[36] These ACS data were released in January 2020. See U.S. Census Bureau (2020d).

[37] U.S. Census Bureau (2013).

For the economy as a whole, the results are presented in Table 10. Model A identifies large, adverse, and statistically significant disparities in business formation rates in 2014–2018 for all minority groups and for women. The results for Model A show:

- For African Americans, the observed self-employment rate is 5.7 percent and the model predicts that it would be 6.7 percentage points higher—12.5 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 46.
- For Hispanics, the observed self-employment rate is 9.2 percent and the model predicts that it would be 3.8 percentage points higher—13 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 70.9.
- For Asian and Pacific Islanders, the observed self-employment rate is 10 percent and the model predicts that it would be 3 percentage points higher—13 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 76.8.
- For American Indians and Alaska Natives, the observed self-employment rate is 8.7 percent and the model predicts that it would be 3.7 percentage points higher—12.4 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 70.3.
- For minorities as a group, the observed self-employment rate is 8.3 percent and the model predicts that it would be 4.8 percentage points higher—13.1 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 63.2.
- For non-minority females, the observed self-employment rate is 9 percent and the model predicts that it would be 4 percentage points higher—13 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 69.1.

For minorities and women as a group, the observed self-employment rate is 8.6 percent and the model predicts that it would be 4.9 percentage points higher—13.4 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 63.7.Despite the addition of important qualifications and capacity variables, the results for Model B show that, for the economy as a whole, disparities in business formation rates remain large, adverse, and statistically significant even when we compare individuals that are similarly situated in terms of their educational attainment, their geographic location, and their labor market experience. Specifically, the results for Model B show:

- For African Americans, the observed self-employment rate is 5.7 percent and the model predicts that it would be 5.9 percentage points higher—11.6 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 49.5.
- For Hispanics, the observed self-employment rate is 9.2 percent and the model predicts that it would be 3.3 percentage points higher—12.5 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 73.9.
- For Asian and Pacific Islanders, the observed self-employment rate is 10 percent and the model predicts that it would be 3.2 percentage points higher—13.1 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 75.9.
- For American Indians and Alaska Natives, the observed self-employment rate is 8.7 percent and the model predicts that it would be 3.5 percentage points higher—12.2 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 71.4.
- For minorities as a group, the observed self-employment rate is 9 percent and the model predicts that it would be 3.6 percentage points higher—12.5 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 71.6.
- For non-minority females, the observed self-employment rate is 8.3 percent and the model predicts that it would be 4.3 percentage points higher—12.6 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 65.7.
- For minorities and women as a group, the observed self-employment rate is 8.6 percent and the model predicts that it would be 4.3 percentage points higher—12.9 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 66.5.

In Model C, numerous additional variables are included that measure individual financial assets, family structure, mobility, immigration status, military status, and

local macroeconomic conditions. Despite the inclusion of all these additional explanatory variables, the results still show that disparities in business formation rates remain large, adverse, and statistically significant when we compare individuals who are also similarly situated in terms of these additional measures. The specific results for Model C show:

- For African Americans, the observed self-employment rate is 5.7 percent and the model predicts that it would be 5.4 percentage points higher—11.2 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 51.5.
- For Hispanics, the observed self-employment rate is 9.2 percent and the model predicts that it would be 4.3 percentage points higher—13.5 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 68.4.
- For Asian and Pacific Islanders, the observed self-employment rate is 10 percent and the model predicts that it would be 5 percentage points higher—14.9 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 66.7.
- For American Indians and Alaska Natives, the observed self-employment rate is 8.7 percent and the model predicts that it would be 3.2 percentage points higher—11.9 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 73.3.
- For minorities as a group, the observed self-employment rate is 9 percent and the model predicts that it would be 3.5 percentage points higher—12.4 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 72.1.
- For non-minority females, the observed self-employment rate is 8.3 percent and the model predicts that it would be 5.1 percentage points higher—13.4 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 61.9.
- For minorities and women as a group, the observed self-employment rate is 8.6 percent and the model predicts that it would be 4.5 percentage points higher—13.1 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 65.6.

**Table 10. Actual and Potential Minority and Female Business Formation Rates, 2014–2018, All Industries**

| Race, Location | Current Business Formation Rate (%) (1) | Expected Business Formation Rate (%) (2) | Disparity Index (3) |
|---|---|---|---|
| **Regression Model A** | | | |
| African American | 5.74 | 12.48 | *45.99* |
| Hispanic | 9.21 | 12.99 | *70.90* |
| Asian and Pacific Islander | 9.96 | 12.97 | *76.79* |
| American Indian and Alaska Native | 8.70 | 12.38 | *70.27* |
| Two or More Races | 8.87 | 12.66 | *70.06* |
| Minority | 8.27 | 13.08 | *63.23* |
| Non-minority female | 8.95 | 12.96 | *69.06* |
| DBE | 8.56 | 13.44 | *63.69* |
| Non-minority male | 13.09 | | |
| **Regression Model B** | | | |
| African American | 5.74 | 11.60 | *49.48* |
| Hispanic | 9.21 | 12.46 | *73.92* |
| Asian and Pacific Islander | 9.96 | 13.12 | *75.91* |
| American Indian and Alaska Native | 8.70 | 12.18 | *71.43* |
| Two or More Races | 8.87 | 11.06 | *80.20* |
| Minority | 8.27 | 12.58 | *65.74* |
| Non-minority female | 8.95 | 12.50 | *71.60* |
| DBE | 8.56 | 12.87 | *66.51* |
| Non-minority male | 13.09 | | |

**Table 10. Actual and Potential Minority and Female Business Formation Rates, 2014–2018, All Industries**—Continued

| Race, Location | Current Business Formation Rate (%) (1) | Expected Business Formation Rate (%) (2) | Disparity Index (3) |
|---|---|---|---|
| **Regression Model C** | | | |
| African American | 5.74 | 11.15 | *51.48* |
| Hispanic | 9.21 | 13.46 | *68.42* |
| Asian and Pacific Islander | 9.96 | 14.93 | *66.71* |
| American Indian and Alaska Native | 8.70 | 11.87 | *73.29* |
| Two or More Races | 8.87 | 11.06 | *80.20* |
| Minority | 8.27 | 13.35 | *61.95* |
| Non-minority female | 8.95 | 12.41 | *72.12* |
| DBE | 8.56 | 13.05 | *65.59* |
| Non-minority male | 13.09 | | |

Source and Notes: Calculations by the author from the 2014–2018 ACS PUMS. Disparity Indexes in italics are statistically significant at a 95 percent probability level or better.

*d. Findings for Construction*

When the scope of the inquiry is limited to just the construction industries, the results appear in Table 11. When we examine just the construction industry, Model A identifies large, adverse, and statistically significant disparities in business formation rates in 2014–2018 for all minority groups and for women. The results for Model A show:

- For African Americans, the observed self-employment rate is 17.8 percent and the model predicts that it would be 8.9 percentage points higher—26.6 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 66.7.
- For Hispanics, the observed self-employment rate is 17.9 percent and the model predicts that it would be 8.7 percentage points higher—26.6 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 67.3.
- For Asian and Pacific Islanders, the observed self-employment rate is 23.6 percent and the model predicts that it would be 3.9 percentage points higher—27.5 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 85.9.
- For American Indians and Alaska Natives, the observed self-employment rate is 19.1 percent and the model predicts that it would be 9.1 percentage points higher—28.2 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 67.9.
- For minorities as a group, the observed self-employment rate is 18.3 percent and the model predicts that it would be 8.5 percentage points higher—26.8 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 68.2.
- For non-minority females, the observed self-employment rate is 17.9 percent and the model predicts that it would be 9 percentage points higher—26.9 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 66.5.
- For minorities and women as a group, the observed self-employment rate is 18.2 percent and the model predicts that it would be 8.9 percentage points higher—27.1 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 67.3.

Despite the addition of important qualifications and capacity variables, the results for Model B show that, for the economy as a whole, disparities in business formation rates remain large, adverse, and statistically significant even when we compare individuals that are similarly situated in terms of their educational attainment, their geographic location, and their labor market experience. Specifically, the results for Model B show:

- For African Americans, the observed self-employment rate is 17.8 percent and the model predicts that it would be 8.7 percentage points higher—26.5 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 67.2.

- For Hispanics, the observed self-employment rate is 17.9 percent and the model predicts that it would be 5.6 percentage points higher—23.5 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 76.1.
- For Asian and Pacific Islanders, the observed self-employment rate is 23.6 percent and the model predicts that it would be 2.9 percentage points higher—26.5 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 89.1.
- For American Indians and Alaska Natives, the observed self-employment rate is 19.1 percent and the model predicts that it would be 7.9 percentage points higher—27 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 70.9.
- For minorities as a group, the observed self-employment rate is 17.9 percent and the model predicts that it would be 10 percentage points higher—27.9 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 64.1.
- For non-minority females, the observed self-employment rate is 18.3 percent and the model predicts that it would be 6.1 percentage points higher—24.3 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 75.
- For minorities and women as a group, the observed self-employment rate is 18.2 percent and the model predicts that it would be 7.5 percentage points higher—25.7 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 71.

In Model C, numerous additional variables are included that measure individual financial assets, family structure, mobility, immigration status, military status, and local macroeconomic conditions. Despite the inclusion of all these additional explanatory variables, the results still show that disparities in business formation rates remain large, adverse, and statistically significant when we compare individuals who are also similarly situated in terms of these additional measures. The specific results for Model C show:

- For African Americans, the observed self-employment rate is 17.8 percent and the model predicts that it would be 7.5 percentage points higher—25.3 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 70.4.
- For Hispanics, the observed self-employment rate is 17.9 percent and the model predicts that it would be 9 percentage points higher—26.9 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 66.5.
- For Asian and Pacific Islanders, the observed self-employment rate is 23.6 percent and the model predicts that it would be 6.8 percentage points higher—30.5 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 77.6.
- For American Indians and Alaska Natives, the observed self-employment rate is 19.1 percent and the model predicts that it would be 7.9 percentage points higher—27.1 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 70.7.
- For minorities as a group, the observed self-employment rate is 17.9 percent and the model predicts that it would be 10.3 percentage points higher—28.2 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 63.4.
- For non-minority females, the observed self-employment rate is 18.3 percent and the model predicts that it would be 8.1 percentage points higher—26.4 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 69.2.
- For minorities and women as a group, the observed self-employment rate is 18.2 percent and the model predicts that it would be 9.5 percentage points higher—27.7 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 65.8.

**Table 11. Actual and Potential Minority Business and Female Formation Rates, 2014–2018, Construction**

| Race, Location | Current Business Formation Rate (%) (1) | Expected Business Formation Rate (%) (2) | Disparity Index (3) |
|---|---|---|---|
| **Regression Model A** | | | |
| African American | 17.78 | 26.64 | *66.74* |
| Hispanic | 17.90 | 26.58 | *67.34* |
| Asian and Pacific Islander | 23.64 | 27.52 | *85.90* |
| American Indian and Alaska Native | 19.13 | 28.19 | *67.86* |
| Two or More Races | 20.10 | 25.79 | *77.94* |
| Minority | 18.25 | 26.77 | *68.17* |
| Non-minority female | 17.91 | 26.92 | *66.53* |
| DBE | 18.20 | 27.06 | *67.26* |
| Non-minority male | 26.84 | | |
| **Regression Model B** | | | |
| African American | 17.78 | 26.47 | *67.17* |
| Hispanic | 17.90 | 23.52 | *76.11* |
| Asian and Pacific Islander | 23.64 | 26.53 | *89.11* |
| American Indian and Alaska Native | 19.13 | 27.00 | *70.85* |
| Two or More Races | 20.10 | 22.43 | *89.61* |
| Minority | 18.25 | 24.33 | *75.01* |
| Non-minority female | 17.91 | 27.92 | *64.15* |
| DBE | 18.20 | 25.65 | *70.96* |
| Non-minority male | 26.84 | | |
| **Regression Model C** | | | |
| African American | 17.78 | 25.27 | *70.36* |
| Hispanic | 17.90 | 26.90 | *66.54* |
| Asian and Pacific Islander | 23.64 | 30.45 | *77.64* |
| American Indian and Alaska Native | 19.13 | 27.06 | *70.69* |
| Two or More Races | 20.10 | 22.62 | *88.86* |
| Minority | 18.25 | 28.24 | *63.42* |
| Non-minority female | 17.91 | 26.38 | *69.18* |
| DBE | 18.20 | 27.65 | *65.82* |
| Non-minority male | 26.84 | | |

Source and Notes: See Table 10.

*e. Findings for Architecture/Engineering*

When the scope of the inquiry is limited to just the Architecture/Engineering industries, the results appear in Table 12. When we examine just the Architecture/Engineering industries, Model A identifies large, adverse, and statistically significant disparities in business formation rates in 2014–2018 for all minority groups and for women. The results for Model A show:

- For African Americans, the observed self-employment rate is 6.5 percent and the model predicts that it would be 5.2 percentage points higher—11.8 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 55.6.
- For Hispanics, the observed self-employment rate is 8.4 percent and the model predicts that it would be 3.4 percentage points higher—11.8 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 71.1.
- For Asian and Pacific Islanders, the observed self-employment rate is 6.5 percent and the model predicts that it would be 5.1 percentage points higher—11.5 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 55.9.
- For American Indians and Alaska Natives, the observed self-employment rate is 6.2 percent and the model predicts that it would be 5.3 percentage points

higher—11.5 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 53.7.

- For minorities as a group, the observed self-employment rate is 7.4 percent and the model predicts that it would be 4.5 percentage points higher—11.9 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 62.
- For non-minority females, the observed self-employment rate is 7.8 percent and the model predicts that it would be 4.2 percentage points higher—12 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 65.4.
- For minorities and women as a group, the observed self-employment rate is 7.6 percent and the model predicts that it would be 4.7 percentage points higher—12.3 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 62.

Despite the addition of important qualifications and capacity variables, the results for Model B show that, for the economy as a whole, disparities in business formation rates remain large, adverse, and statistically significant even when we compare individuals that are similarly situated in terms of their educational attainment, their geographic location, and their labor market experience. Specifically, the results for Model B show:

- For African Americans, the observed self-employment rate is 6.5 percent and the model predicts that it would be 3.6 percentage points higher—10.1 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 64.6.
- For Hispanics, the observed self-employment rate is 8.4 percent and the model predicts that it would be 1.6 percentage points higher—9.9 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 84.4.
- For Asian and Pacific Islanders, the observed self-employment rate is 6.5 percent and the model predicts that it would be 4.4 percentage points higher—10.9 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 59.2.
- For American Indians and Alaska Natives, the observed self-employment rate is 6.2 percent and the model predicts that it would be 4.4 percentage points higher—10.5 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 58.6.
- For minorities as a group, the observed self-employment rate is 7.8 percent and the model predicts that it would be 3.1 percentage points higher—11 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 71.4.
- For non-minority females, the observed self-employment rate is 7.4 percent and the model predicts that it would be 3.1 percentage points higher—10.5 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 70.5.
- For minorities and women as a group, the observed self-employment rate is 7.6 percent and the model predicts that it would be 3.3 percentage points higher—10.9 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 69.6.

In Model C, numerous additional variables are included that measure individual financial assets, family structure, mobility, immigration status, military status, and local macroeconomic conditions. Despite the inclusion of all these additional explanatory variables, the results still show that disparities in business formation rates remain large, adverse, and statistically significant when we compare individuals who are also similarly situated in terms of these additional measures. The specific results for Model C show:

- For African Americans, the observed self-employment rate is 6.5 percent and the model predicts that it would be 3 percentage points higher—9.6 percent—if African Americans faced the same market outcomes as non-minority males. This yields a disparity index of 68.3.
- For Hispanics, the observed self-employment rate is 8.4 percent and the model predicts that it would be 1.8 percentage points higher—10.2 percent—if Hispanics faced the same market outcomes as non-minority males. This yields a disparity index of 82.3.
- For Asian and Pacific Islanders, the observed self-employment rate is 6.5 percent and the model predicts that it would be 4.9 percentage points higher—11.4 percent—if Asian and Pacific Islanders faced the same market outcomes as non-minority males. This yields a disparity index of 56.7.

- For American Indians and Alaska Natives, the observed self-employment rate is 6.2 percent and the model predicts that it would be 4.1 percentage points higher—10.3 percent—if American Indians and Alaska Natives faced the same market outcomes as non-minority males. This yields a disparity index of 60.3.
- For minorities as a group, the observed self-employment rate is 7.8 percent and the model predicts that it would be 3.4 percentage points higher—11.2 percent—if minorities as a group faced the same market outcomes as non-minority males. This yields a disparity index of 69.9.
- For non-minority females, the observed self-employment rate is 7.4 percent and the model predicts that it would be 3.1 percentage points higher—10.5 percent—if non-minority females faced the same market outcomes as non-minority males. This yields a disparity index of 70.5.
- For minorities and women as a group, the observed self-employment rate is 7.6 percent and the model predicts that it would be 3.5 percentage points higher—11.1 percent—if minorities and women as a group faced the same market outcomes as non-minority males. This yields a disparity index of 68.5.

**Table 12. Actual and Potential Minority and Female Business Formation Rates, 2014–2018, Architecture/Engineering**

| Race, Location | Current Business Formation Rate (%) (1) | Expected Business Formation Rate (%) (2) | Disparity Index (3) |
|---|---|---|---|
| **Regression Model A** | | | |
| African American | 6.54 | 11.77 | *55.56* |
| Hispanic | 8.37 | 11.78 | *71.05* |
| Asian and Pacific Islander | 6.45 | 11.54 | *55.89* |
| American Indian and Alaska Native | 6.18 | 11.50 | *53.74* |
| Two or More Races | 8.68 | 11.92 | *72.82* |
| Minority | 7.40 | 11.94 | *61.98* |
| Non-minority female | 7.84 | 11.99 | *65.39* |
| DBE | 7.60 | 12.25 | *62.04* |
| Non-minority male | 12.15 | | |
| **Regression Model B** | | | |
| African American | 6.54 | 10.13 | *64.56* |
| Hispanic | 8.37 | 9.92 | *84.38* |
| Asian and Pacific Islander | 6.45 | 10.89 | *59.23* |
| American Indian and Alaska Native | 6.18 | 10.54 | *58.63* |
| Two or More Races | 8.68 | 9.83 | 88.30 |
| Minority | 7.40 | 10.50 | *70.48* |
| Non-minority female | 7.84 | 10.98 | *71.40* |
| DBE | 7.60 | 10.92 | *69.60* |
| Non-minority male | 12.15 | | |
| **Regression Model C** | | | |
| African American | 6.54 | 9.58 | *68.27* |
| Hispanic | 8.37 | 10.17 | *82.30* |
| Asian and Pacific Islander | 6.45 | 11.37 | *56.73* |
| American Indian and Alaska Native | 6.18 | 10.25 | *60.29* |
| Two or More Races | 8.68 | 9.85 | 88.12 |
| Minority | 7.40 | 10.49 | *70.54* |
| Non-minority female | 7.84 | 11.22 | *69.88* |
| DBE | 7.60 | 11.09 | *68.53* |
| Non-minority male | 12.15 | | |

Source and Notes: See Table 10.

*2. Discrimination Impacting Business Earnings*

Even for those disproportionately few minority and female entrepreneurs who manage against the odds—as we have just seen from the results in Tables 10–12—to form their own businesses, their earnings from those businesses tend to lag far

behind their non-minority male counterparts. These disparities, just as those observed with respect to business formation, tend to remain large, adverse, and statistically significant—even when other important non-discriminatory attributes are held constant.

*a. Methods and Data*

I examined deficits in business owner earnings between minorities, women, and their non-minority male counterparts using the same framework as above. Model A included only the race, sex, and time indicators, thus showing the raw disparities in earnings between the groups. Model B consisted of our set of qualifications and capacity controls, which include educational attainment, geographic location, and labor market experience. Finally, Model C included all the controls from Models A and B plus those for individual financial assets, family structure, mobility, immigration status, military status, and local macroeconomic conditions.

*b. Economy-Wide Findings*

As shown in Table 13, the baseline regression equation (Model A) includes only indicators for race, sex and time. This is the raw difference in earnings between minority and women business owners, one the one hand, and non-minority male business owners, on the other. The results for Model A show:

- African American business owners earned 46.2 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 54 cents.
- Hispanic business owners earned 26.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 73 cents.
- Asian and Pacific business owners earned 8.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 91 cents.
- Native business owners earned 44 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 56 cents.
- Minority business owners earned 29.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 70 cents.
- Non-minority female business owners earned 46.3 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 54 cents.
- Minority and Female business owners earned 39.2 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 61 cents.

In Model B, which accounts for some common qualifications and capacity controls, we observe small changes in both directions for all the groups except Asian and Pacific Islanders, for whom the business earnings gap increases significantly compared to Model A. Specifically, the results for Model B show:

- African American business owners earned 44.8 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 55 cents.
- Hispanic business owners earned 26.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 74 cents.
- Asian and Pacific business owners earned 18.2 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 82 cents.
- Native business owners earned 40.6 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 59 cents.
- Minority business owners earned 30.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 69 cents.
- Non-minority female business owners earned 45 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings ac-

cruing to non-minority males, non-minority female business owners made just 55 cents.

- Minority and Female business owners earned 39.6 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 60 cents.

In Model C, which accounts for a large set of additional explanatory variables related to business owner earnings, we again observe small changes in both directions for all the groups except Asian and Pacific Islanders, for whom the business earnings gap increases significantly compared to Model B. Specifically, the results for Model C show:

- African American business owners earned 38.2 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 62 cents.
- Hispanic business owners earned 29.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 71 cents.
- Asian and Pacific business owners earned 28.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 71 cents.
- Native business owners earned 36.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 63 cents.
- Minority business owners earned 44.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 56 cents.
- Non-minority female business owners earned 33.3 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 67 cents.
- Minority and Female business owners earned 41.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 59 cents.

All of these economy-wide findings are statistically significant at a 95 percent probability level or better.

**Table 13. Minority and Female Business Owner Earnings Disparities, All Industries**

| Race, Location | Business Earnings Deficit (%) (1) | Cents Earned Per Dollar of Non-Minority Male Earnings (2) |
|---|---|---|
| **Regression Model A** | | |
| African American | *–46.2* | *54¢* |
| Hispanic | *–26.9* | *73¢* |
| Asian and Pacific Islander | *–8.9* | *91¢* |
| American Indian and Alaska Native | *–44.0* | *56¢* |
| Two or More Races | *–45.3* | *55¢* |
| Minority | *–29.9* | *70¢* |
| Non-minority female | *–46.3* | *54¢* |
| DBE | *–39.2* | *61¢* |
| **Regression Model B** | | |
| African American | *–44.8* | *55¢* |
| Hispanic | *–26.1* | *74¢* |
| Asian and Pacific Islander | *–18.2* | *82¢* |
| American Indian and Alaska Native | *–40.6* | *59¢* |
| Two or More Races | *–40.1* | *60¢* |
| Minority | *–30.9* | *69¢* |
| Non-minority female | *–45.0* | *55¢* |
| DBE | *–39.6* | *60¢* |
| **Regression Model C** | | |
| African American | *–38.2* | *62¢* |
| Hispanic | *–29.4* | *71¢* |
| Asian and Pacific Islander | *–28.9* | *71¢* |
| American Indian and Alaska Native | *–36.9* | *63¢* |
| Two or More Races | *–37.9* | *62¢* |
| Minority | *–33.3* | *67¢* |
| Non-minority female | *–44.4* | *56¢* |
| DBE | *–41.1* | *59¢* |

Source and Notes: Calculations by the author from the 2014–2018 ACS PUMS. Figures in italics are statistically significant at a 95 percent probability level or better.

*c. Findings for Construction*

As shown in Table 14, the baseline regression equation (Model A) includes only indicators for race, sex and time. This is the raw difference in earnings between minority and women business owners, one the one hand, and non-minority male business owners, on the other. The results for Model A show:

- African American business owners earned 40.4 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 60 cents.
- Hispanic business owners earned 12.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 88 cents.
- Asian and Pacific business owners earned 1.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 99 cents.
- Native business owners earned 30.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 70 cents.
- Minority business owners earned 17.3 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 83 cents.
- Non-minority female business owners earned 45.6 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings

accruing to non-minority males, non-minority female business owners made just 54 cents.

- Minority and Female business owners earned 22.3 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 78 cents.

In Model B, which accounts for some common qualifications and capacity controls, we observe small changes in both directions for all the groups except Asian and Pacific Islanders, for whom the business earnings gap increases significantly compared to Model A. Specifically, the results for Model B show:

- African American business owners earned 39.9 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 60 cents.
- Hispanic business owners earned 11 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 89 cents.
- Asian and Pacific business owners earned 10.7 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 89 cents.
- Native business owners earned 26.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 73 cents.
- Minority business owners earned 18.5 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 82 cents.
- Non-minority female business owners earned 46.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 54 cents.
- Minority and Female business owners earned 25.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 75 cents.

In Model C, which accounts for a large set of additional explanatory variables related to business owner earnings, we again observe small changes in both directions for all the groups except Asian and Pacific Islanders, for whom the business earnings gap increases significantly compared to Model B. Specifically, the results for Model C show:

- African American business owners earned 32.8 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 67 cents.
- Hispanic business owners earned 16.7 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 83 cents.
- Asian and Pacific business owners earned 21.6 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 78 cents.
- Native business owners earned 22.2 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 78 cents.
- Minority business owners earned 47.5 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 52 cents.
- Non-minority female business owners earned 22.5 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 78 cents.
- Minority and Female business owners earned 30.7 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 69 cents.

With only one exception, once again, all of these findings for the construction regressions are statistically significant at a 95 percent probability level or better.[38]

**Table 14. Minority and Female Business Owner Earnings Disparities, Construction**

| Race, Location | Business Earnings Deficit (%) (1) | Cents Earned Per Dollar of Non-Minority Male Earnings (2) |
|---|---|---|
| **Regression Model A** | | |
| African American | *–40.4* | *60¢* |
| Hispanic | *–12.4* | *88¢* |
| Asian and Pacific Islander | –1.1 | 99¢ |
| American Indian and Alaska Native | *–30.4* | *70¢* |
| Two or More Races | *–29.0* | *71¢* |
| Minority | *–17.3* | *83¢* |
| Non-minority female | *–45.6* | *54¢* |
| DBE | *–22.3* | *78¢* |
| **Regression Model B** | | |
| African American | *–39.9* | *60¢* |
| Hispanic | *–11.0* | *89¢* |
| Asian and Pacific Islander | *–10.7* | *89¢* |
| American Indian and Alaska Native | *–26.9* | *73¢* |
| Two or More Races | *–28.3* | *72¢* |
| Minority | *–18.5* | *82¢* |
| Non-minority female | *–46.4* | *54¢* |
| DBE | *–25.1* | *75¢* |
| **Regression Model C** | | |
| African American | *–32.8* | *67¢* |
| Hispanic | *–16.7* | *83¢* |
| Asian and Pacific Islander | *–21.6* | *78¢* |
| American Indian and Alaska Native | *–22.2* | *78¢* |
| Two or More Races | *–25.8* | *74¢* |
| Minority | *–22.5* | *78¢* |
| Non-minority female | *–47.5* | *52¢* |
| DBE | *–30.7* | *69¢* |

Source and Notes: See Table 13.

*d. Findings for Architecture/Engineering*

As shown in Table 15, the baseline regression equation (Model A) includes only indicators for race, sex and time. This is the raw difference in earnings between minority and women business owners, one the one hand, and non-minority male business owners, on the other. The results for Model A show:

- African American business owners earned 59.2 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 41 cents.
- Hispanic business owners earned 16.3 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 84 cents.
- Asian and Pacific business owners earned 23.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 77 cents.
- Native business owners earned 60.8 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 39 cents.

[38] The sole exception is again the result in Model A for Asian and Pacific Islanders. However this result was not statistically significant.

- Minority business owners earned 30 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 70 cents.
- Non-minority female business owners earned 46 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 54 cents.
- Minority and Female business owners earned 39 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 61 cents.

In Model B, which accounts for some common qualifications and capacity controls, we observe once again just small changes in both directions for all the groups except Asian and Pacific Islanders, for whom the business earnings gap increases significantly compared to Model A. Specifically, the results for Model B show:

- African American business owners earned 55 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 45 cents.
- Hispanic business owners earned 6.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 93 cents.
- Asian and Pacific business owners earned 28.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 72 cents.
- Native business owners earned 70.5 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 30 cents.
- Minority business owners earned 27.2 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 73 cents.
- Non-minority female business owners earned 43.4 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 57 cents.
- Minority and Female business owners earned 36.7 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority and female business owners made just 63 cents.

In Model C, which accounts for a large set of additional explanatory variables related to business owner earnings, we again observe just small changes in both directions for all groups. Specifically, the results for Model C show:

- African American business owners earned 50.6 percent less than non-minority male business owners from 2014–2018. In other words, for each dollar of business earnings accruing to non-minority males, African American business owners made just 49 cents.
- Hispanic business owners earned 9.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Hispanic business owners made just 91 cents.
- Asian and Pacific business owners earned 30.7 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Asian and Pacific business owners made just 69 cents.
- Native business owners earned 71 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, Native business owners made just 29 cents.
- Minority business owners earned 45.1 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, minority business owners made just 55 cents.
- Non-minority female business owners earned 28.9 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings accruing to non-minority males, non-minority female business owners made just 71 cents.
- Minority and Female business owners earned 39.5 percent less than non-minority male business owners from 2014–2018. For each dollar of business earnings

accruing to non-minority males, minority and female business owners made just 60 cents.

With only two exceptions, all of these findings for the Architecture/Engineering regressions are statistically significant at a 95 percent probability level or better.[39]

**Table 15. Minority and Female Business Owner Earnings Disparities, Architecture/Engineering**

| Race, Location | Business Earnings Deficit (%) (1) | Cents Earned Per Dollar of Non-Minority Male Earnings (2) |
|---|---|---|
| **Regression Model A** | | |
| African American | *–59.2* | *41¢* |
| Hispanic | –16.3 | 84¢ |
| Asian and Pacific Islander | *–23.4* | *77¢* |
| American Indian and Alaska Native | –60.8 | 39¢ |
| Two or More Races | *–39.0* | *61¢* |
| Minority | *–30.0* | *70¢* |
| Non-minority female | *–46.0* | *54¢* |
| DBE | *–39.0* | *61¢* |
| **Regression Model B** | | |
| African American | *–55.0* | *45¢* |
| Hispanic | –6.9 | 93¢ |
| Asian and Pacific Islander | *–28.1* | *72¢* |
| American Indian and Alaska Native | *–70.5* | *30¢* |
| Two or More Races | *–32.3* | *68¢* |
| Minority | *–27.2* | *73¢* |
| Non-minority female | *–43.4* | *57¢* |
| DBE | *–36.7* | *63¢* |
| **Regression Model C** | | |
| African American | *–50.6* | *49¢* |
| Hispanic | –9.1 | 91¢ |
| Asian and Pacific Islander | *–30.7* | *69¢* |
| American Indian and Alaska Native | *–71.0* | *29¢* |
| Two or More Races | *–27.9* | *72¢* |
| Minority | *–28.9* | *71¢* |
| Non-minority female | *–45.1* | *55¢* |
| DBE | *–39.5* | *60¢* |

Source and Notes: See Table 13.

*e. Conclusions from American Community Survey Data*

This section has documented that when we examine the status of minorities and women compared to non-minority males in the industry segments relevant to Federal surface and aviation transportation funding, the results look very similar to what we observe elsewhere in the economy.

That is, even when other non-discriminatory factors are held constant using the statistical technique of regression analysis, the disparities in business formation rates between African Americans, Hispanics, Asians and Pacific Islanders, American Indians and Alaska Natives, and women, on the one hand, and their non-minority male counterparts, on the other, remain large, adverse, and statistically significant. I have documented such disparities in this testimony for the Nation as a whole and throughout the states, and in the economy as a whole as well as in Construction and Architecture/Engineering, which are key industries with respect to Federal surface and aviation transportation funding.

Furthermore, I have documented that even for those minority and female entrepreneurs who manage against the odds to form their own businesses, their earnings

[39] The exceptions are the results in Models B and C for Hispanics.

from those businesses lag far behind their non-minority male counterparts.[40] These disparities as well remain large, adverse, and statistically significant even when other non-discriminatory attributes are held constant.

These results are fully consistent with the conclusion that discrimination continues to adversely affect minorities and women operating in United States business markets, and in particular those markets that are relevant to Federal surface and aviation transportation funding.

### E. Overall Conclusions

In preparing this testimony, I conducted extensive original research using almost 100 previously produced disparity studies, and current and past data from the *Survey of Business Owners*, the *Annual Business Survey*, and the *American Community Survey*. This research is a continuation of similar research I have performed over the course of my career as an economist. Based on the findings presented above, I conclude that there is strong evidence, both past and present, of large, adverse, and statistically significant disparities facing minority-owned and women-owned business enterprises in the United States. Moreover, these disparities cannot be explained solely, or even primarily, by differences between the relevant populations in factors untainted by the effects of discrimination. These disparities are primarily due to discrimination, in the economy as a whole, as well as in the markets such as construction, architecture, and engineering that most relevant to Federal surface and aviation transportation funding.

### F. References


Aparicio, Ana. 2009. *Hispanic-Owned Business Enterprises in the Construction Industry of Greater Chicago: Responses and Personal Perspectives*. For the City of Chicago M/WBE Program.

Asian American Justice Center. 2008. *Equal Access: Unlocking Government Doors for Asian Americans: Public Contracting Laws and Policies*.

Fairlie, Robert (2020). "The Impact of COVID–19 on Small Business Owners: Continued Losses and the Partial Rebound in May 2020." Working Paper.

Lau, Yvonne M. 2009. *Profiles on Asian Americans in Construction—A Study for the City of Chicago M/WBE Sunset Project*. For the City of Chicago M/WBE Program.

Lowrey, Ying. 2010a. "Race/Ethnicity and Establishment Dynamics, 2002–2006," *SBA Office of Advocacy*. November.

Lowrey, Ying. 2010b. "Gender and Establishment Dynamics, 2002–2006," *SBA Office of Advocacy*. November.

Marshall, Ray. 2002. "The economics of discrimination as applied to business development," in Horowitz, Irving Louis, ed., *Eli Ginzberg: The Economist as a Public Intellectual*. New Brunswick, NJ: Transaction Publishers, 67–106.

NERA Economic Consulting. 2017. *Business Disparities in the Maryland Market Area*, prepared for the Maryland Department of Transportation. February.

Quon, Myron. 2008. "Discrimination Against Asian American Business Enterprises: The Continuing Need for Affirmative Action in Public Contracting," *Asian American Policy Review* 41.

U.S. Bureau of Labor Statistics. 2018a. Employment status of the civilian population by sex and age. <http://www.bls.gov/news.release/empsit.t01.htm> . Viewed October 30, 2018.

U.S. Bureau of Labor Statistics. 2018b. Employment status of the civilian population by race, sex, and age. <http://www.bls.gov/news.release/empsit.t02.htm> . Viewed October 30, 2018.

U.S. Bureau of Labor Statistics. 2018c. Employment status of the Hispanic population by sex and age. <http://www.bls.gov/news.release/empsit.t03.htm> . Viewed October 30, 2018.


[40] In addition to the analyses of business owner earnings, I also ran comparable analyses on the annual earnings of wage and salary workers—as opposed to business owners—in the industry segments relevant to Federal surface and aviation transportation funding as well as in the economy as a whole. Disparities facing wage and salary workers matter to the analysis of business enterprise discrimination because that is where much of the entrepreneurial talent pool starts—especially in industries such as construction, architecture, and engineering. Though not reported here, the results of the wage and salary regressions look very similar to those presented above—in the vast majority of instances, large, adverse, and statistically significant deficits were observed for African Americans, Hispanics, Asians and Pacific Islanders, American Indians and Alaska Natives, and non-minority women, as well as for minorities as a group and minorities and women as a group.

U.S. Bureau of Labor Statistics. 2020a. “Local Area Unemployment Statistics: Unemployment Rates for States, 2018 Annual Averages.” (Last Modified 4 March 2020). <https://www.bls.gov/lau/lastrk18.htm>. Accessed 31 August 2020.

U.S. Bureau of Labor Statistics. 2020b. “Local Area Unemployment Statistics: Unemployment Rates for States, 2017 Annual Averages.” (Last Modified 4 March 2020). <https://www.bls.gov/lau/lastrk18.htm>. Accessed 31 August 2020.

U.S. Bureau of Labor Statistics. 2020c. “Local Area Unemployment Statistics: Unemployment Rates for States, 2016 Annual Averages.” (Last Modified 4 March 2020). <https://www.bls.gov/lau/lastrk18.htm>. Accessed 31 August 2020.

U.S. Bureau of Labor Statistics. 2020d. “Local Area Unemployment Statistics: Unemployment Rates for States, 2015 Annual Averages.” (Last Modified 4 March 2020). <https://www.bls.gov/lau/lastrk18.htm>. Accessed 31 August 2020.

U.S. Bureau of Labor Statistics. 2020e. “Local Area Unemployment Statistics: Over-the-Year Change in Unemployment Rates for States, 2014–2015 Annual Averages.” (Last Modified 4 March 2020). < https://www.bls.gov/lau/lastch15.htm>. Accessed 31 August 2020.

U.S. Bureau of Labor Statistics. 2020f. “State and Area Employment, Hours, and Earnings: District of Columbia” (Series Id: SMS 11000009000000001). <https://data.bls.gov/timeseries/SMS11000009000000001?amp%253bdata__tool=XGtable&output__view=data&include__graphs=true>. Accessed 31 August 2020.

U.S. Census Bureau. 2017a. “Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2017 (NC–EST2017–ALLDATA).” <https://www2.census.gov/programs-surveys/popest/datasets/2010-2017/national/asrh/nc-est2017-alldata-c-file17.csv>. Accessed October 30, 2018.

U.S. Census Bureau. 2017b. “2016 Annual Survey of Public Employment & Payroll: State Government Employment & Payroll Data” <https://www2.census.gov/programs-surveys/apes/datasets/2014/annual-apes/2016__state.xls>. Accessed 31 August 2020.

U.S. Census Bureau. 2017c. “2015 Annual Survey of Public Employment & Payroll: State Government Employment & Payroll Data” <https://www2.census.gov/programs-surveys/apes/datasets/2014/annual-apes/2015__state.xls>. Accessed 31 August 2020.

U.S. Census Bureau. 2017d. “2014 Annual Survey of Public Employment & Payroll: State Government Employment & Payroll Data” <https://www2.census.gov/programs-surveys/apes/datasets/2014/annual-apes/2014__state.xls>. Accessed 31 August 2020.

U.S. Census Bureau. 2018a. 2012 Survey of Business Owners: Statistics for All U.S. Firms by Industry, Gender, Ethnicity, and Race for the U.S., States, Metro Areas, Counties, and Places (SB1200CSA01).” <https://factfinder.census.gov>. Accessed October 30, 2018.

U.S. Census Bureau. 2018b. 2012 Survey of Business Owners: Statistics for All U.S. Firms with Paid Employees by Industry, Race, and Employment Size of Firm for the U.S. and States (SB1200CSA11).” <https://factfinder.census.gov>. Accessed October 30, 2018.

U.S. Census Bureau. 2018c. 2012 Survey of Business Owners: Statistics for All U.S. Firms with Paid Employees by Industry, Ethnicity, and Employment Size of Firm for the U.S. and States (SB1200CSA10).” <https://factfinder.census.gov>. Accessed October 30, 2018.

U.S. Census Bureau. 2018d. 2012 Survey of Business Owners: Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States (SB1200CSA09).” <https://factfinder.census.gov>. Accessed October 30, 2018.

U.S. Census Bureau. 2018e. “Census Bureau Announces New 2017 Annual Business Survey.” Release number CB18–TPS. 32. <https://www.census.gov/newsroom/press-releases/2018/annual-business-survey.html>. June 19, 2018.

U.S. Census Bureau. 2018f. “About the Annual Business Survey.” <https://www.census.gov/programs-surveys/abs/about.html>. Accessed August 29, 2020.

U.S. Department of Commerce, Minority Business Development Agency. 2015. *The State of Minority Business Enterprises: An Overview of the 2007 Survey of Business Owners*. Washington, DC.: Minority Business Development Agency.

U.S. Census Bureau. 2019. “Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2019: April 1, 2010 to July 1, 2019 (NC–EST2019–01).” <https://www2.census.gov/programs-surveys/popest/datasets/2010-2019/national/totals/nst-est2019-alldata.csv>. Accessed 31 August, 2020.

U.S. Census Bureau. 2020a. Annual Business Survey: Statistics for Employer Firms by Industry, Sex, Ethnicity, Race, and Veteran Status for the U.S., States, Metro Areas, Counties, and Places: 2017 (AB1700CSA01).'' <https://www2.census.gov/programs-surveys/abs/data/2017/AB1700CSA01.zip>. Accessed August 13, 2020.

U.S. Census Bureau. 2020b. Annual Business Survey: Statistics for Employer Firms by Industry, Sex, Ethnicity, Race, Veteran Status, and Employment Size of Firm for the U.S., States, Metro Areas, Counties, and Places: 2017 (AB1700CSA04).'' <https://www2.census.gov/programs-surveys/abs/data/2017/AB1700CSA04.zip>. Accessed August 13, 2020.

U.S. Census Bureau. 2020c. ''Annual Business Survey Release Provides Data on Minority- and Women-Owned Businesses.'' Release number CB20–TPS. 24. <https://www.census.gov/newsroom/press-releases/2020/annual-business-survey-data.html>. May 19, 2020.

U.S. Census Bureau. 2020d. ''2018 Data Release New and Notable.''. <https://www.census.gov/programs-surveys/acs/news/data-releases/2018/release.html>. Viewed 31 August, 2020.

U.S. Census Bureau. 2020e. ''2018 Annual Survey of Public Employment & Payroll: State Government Employment & Payroll Data'' <https://www2.census.gov/programs-surveys/apes/datasets/2014/annual-apes/2018__state.xls>. Accessed 31 August 2020.

U.S. Census Bureau. 2020f. ''2017 Annual Survey of Public Employment & Payroll: State Government Employment & Payroll Data'' <https://www2.census.gov/programs-surveys/apes/datasets/2014/annual-apes/2017__state.xls>. Accessed 31 August 2020.

U.S. Congress. 2007. *Access to Federal Contracts: How to Level the Playing Field*, 110th Cong. (October 29), Serial No. 110–373.

U.S. Congress. 2008. *Business Start-Up Hurdles in Underserved Communities: Access to Venture Capital and Entrepreneurship Training*, Hearing Before the Committee on Small Business and Entrepreneurship (Sept. 11).

U.S. Congress. 2009a. *DOT's Disadvantaged Business Enterprises Programs Before the H. Comm. on Transportation and Infrastructure*, 111th Cong. (March 26), Serial No. 111–1.

U.S. Congress. 2009b. *The Federal Aviation Administration Reauthorization Act of 2009*: Hearing Before the H. Subcomm. on Aviation of the H. Comm. on Transportation and Infrastructure, 111th Cong. (February 11), Serial No. 111–8.

U.S. Congress. 2009c. *Infrastructure Investment: Ensuring an Effective Economic Recovery Program*: Hearing Before the H. Comm. on Transportation and Infrastructure, 111th Cong. (January 22), Serial No. 111–2.

U.S. Small Business Administration. 2010. ''Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses,'' supplementing the testimony of David Hinson, National Director, Minority Business Development Agency, U.S. Department of Commerce, before the U.S. House Committee on Oversight and Government Reform, Subcommittee on Government Management, Organization, and Procurement, September 22, 2010.

Wainwright, Jon S. 2000. *Racial Discrimination and Minority Business Enterprise, Evidence From the 1990 Census*, Studies in Entrepreneurship Series, S. Bruchey (ed.). New York: Garland Publishing.

Wainwright, Jon S. (2013a), Report of Defendant's Expert in *Rothe Development, Inc. v. Department of Defense and Small Business Administration*, United States District Court for the District of Columbia, Case No. 12–CV–744, March 8.

Wainwright, Jon S. (2013b), Report of Defendant's Expert in *Midwest Fence Corporation v. United States Department of Transportation, et al.*, United States District Court for the Northern District of Illinois, Case No. 10–CV–5627, May 20.

Wainwright, Jon S. (2013c), Reply to Report of Plaintiff's Expert in *Midwest Fence Corporation v. United States Department of Transportation, et al.*, United States District Court for the Northern District of Illinois, Case No. 10–CV–5627, July 19.

Wainwright, Jon S. (2012), Report of Defendant Intervenor's Expert in *Geyer Signal, Inc. and Kevin Kissell v. Minnesota Department of Transportation, et al.*, United States District Court for the District of Minnesota, Case No. 0:11-cv–00321–JRT, December 30.

Wainwright, Jon S. (2010), Report of Defendant's Expert in *Kevcon, Inc. v. The United States*, No. 09 625, United States Court of Federal Claims, April 29.

Wainwright, Jon S. (2008), ''Discrimination facing small minority-owned and women-owned businesses in commercial credit markets,'' Testimony before the U.S. Senate, Committee on Small Business and Entrepreneurship, Hearing on ''Business

Start-up Hurdles in Underserved Communities: Access to Venture Capital and Entrepreneurship Training," September 11.
Wainwright, Jon and Colette Holt. 2010. *Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program*. National Cooperative Highway Research Program Report 644. Washington, DC.: Transportation Research Board.

Mr. DEFAZIO. Thank you, Dr. Wainwright, a good summary of 90 pages of comprehensive research. So thanks very much. Your full research will be entered into the record.

So now we will proceed to questions. Each Member will have 5 minutes to question the witnesses. I will first begin by recognizing myself.

Ms. Boyer, in addition to your testimony today, you sent a compelling letter to the committee, when the committee reauthorized the DBE program in H.R. 2 earlier this year. I ask unanimous consent to put this letter in the record.

Without objection.

[The information follows:]

**Letter of June 25, 2020, from Geri E. Boyer, P.E., President, Kaskaskia Engineering Group, LLC, Submitted for the Record by Hon. Peter A. DeFazio**

JUNE 25, 2020.

Congressman PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

RE: Response to the request from the Committee on Transportation and Infrastructure for a letter or statement on the Disadvantaged Business Enterprise Program.

DEAR CONGRESSMAN DEFAZIO:

I am a licensed professional engineer and sole owner of Kaskaskia Engineering Group, a civil engineering design firm. My firm has had the opportunity to work on public infrastructure projects across the Midwest, and approximately 82% of the $10,000,000 of work done every year can be attributed to the Disadvantaged Business Enterprise Program (DBE). It is because of the DBE Program that my firm is in existence and continues to grow.

For the first twenty five years of my civil engineering career, I experienced discrimination on many levels including advancement and salary. I was told over and over by supervisors at a state agency that although I was an overachiever and did excellent work it would not be reflected in my yearly raise because I was not "the breadwinner" of my family. When I left that agency, the lowest paid managers were all women. In those years, I was also told that I needed to make a choice between being an engineer and being a mother. My inspiration for started my own firm was to take care of myself, to have the flexibility to work while being a mother, and to afford those same opportunities to other women and men.

The only reason I was able to start my own business was the DBE program. I worked with DBE firms while employed by a large "white-male led" company, and realized that with the help of the program, I could be a business owner. I survived the first year while working through the certification processed on small city projects I got because of my reputation. Those projects were small and it was only enough fee to keep a few people busy. Once I was BDE certified, many consulting firms used my firm to satisfy their DBE requirement. My firm grew fast once I had the certification.

Even though I have been in business for 14 years and won several statewide awards for my engineering, I still cannot compete with established engineering firms owned/managed by white-males. I have participated in many equity surveys and discussions, and the question always comes up about the need for this program to continue. I can testify that without this program, the work I get on federal and state infrastructure projects would cease. The only reason other firms team with me

is because I am a certified DBE firm first and then because I do excellent work. I am not their buddy. I do not look like them. Large firms do and will continue to keep all the work for themselves unless they are mandated to give a percentage away. Small firms do not have the capacity to propose on large projects by themselves, so without the DBE program, small firms would never have a chance to work on a portion of these large projects.

Instead of discussing if the program is needed, the discussion should center around expanding the program by increasing the limits and making the program more accessible. A policy of helping small businesses owned and controlled by socially and economically disadvantaged individuals, including minorities and women, participating in contracting opportunities created by Department of Transportation (DOT) financial assistance programs, has been in effect for more than 20 years. It has had several revisions which has made the program function more efficiently for business such as the Unified Certification Program (UCP) and the interstate certification provision. But there is still more that needs to be done to help this program be more successful.

In an ever changing and volatile business market, corporate growth and stability rely on diversification strategies, which often include providing services to multiple federal, state, and local agencies, as well as private corporations across regional, national, and international markets. Diversification has long been a successful strategy for large businesses, but it is just as important for the survival and development of small firms.

Firms owned by women and minority groups that want to employ diversification strategies are encumbered by the individual state agencies that do not want to accept the DBE's certification from their cognizant certifying agency. The amended 49 CFR Part 26, which went into effect on November 3, 2014, implemented a revised uniform certification application and reporting forms and created a uniform personal net worth form for use by applicant owners, which collects the data required by the Department's Surface Transportation Reauthorization, Moving Ahead for Progress in the 21st Century Act (MAP–21). Even though there is a uniform process, states do not trust the certification process of neighboring states and require the entire application again. This creates unnecessary work for the DBE firm and the public agency who both have limited time and budget pressures. And with the rising problem of identity theft, it's stressful to be sending all your personal information to multiple agencies in multiple states.

A national unified program could strengthen, streamline, and simplify the DBE certification program, creating a program that is more efficient and effective for women and minority firms working for multiple agencies across multiple states. A National UCP to serve as a "one-stop shopping" to applicants for certification is needed. Any state agency using the unified certification application could be a coordinating member of the National UCP, and its certification would be recognized as a National UCP. Under a National UCP, the firm applies one time for certification as DBE with their participating cognizant agency or a national organization. If approved, that certification would be honored by all recipients of federally funded and non-federally funded projects in all states. The National UCP would only certify firms using the unified certification application. Prequalification, determination if an applicant has the requisite resources and experience to complete the service/category as required, would remain with the contracting agency.

The certification and record would be held by a national agency/organization, such as the Federal Highway Administration (FHWA), National Council of Examiners for Engineering and Surveying (NCEES) or Women's Business Enterprise National Council (WBENC). The FHWA has offices in every state and would be locally available to firms that have questions or need to meet in person. NCEES and WBENC already have systems in place to review a standard application, evaluate its compliance with federal regulations, and certify its credibility. They both allow for the upload of documents necessary for annual renewal (Affidavit of Continued DBE Certification). WBENC's regional offices also have the capacity to conduct site visits for compliance with the 49 CFR Part 26. Members of the NCEES system can easily request their record be sent to other states for licensure. A similar system could be employed by NCEES for a National UCP. A national unified program could strengthen, streamline, and simplify the DBE certification program, creating a program that is more efficient and effective for women and minority firms working for multiple agencies across multiple states.

If you have any questions or need any additional information, please contact me.

Respectfully,

GERI E. BOYER, P.E.,
*President, Kaskaskia Engineering Group, LLC.*

Mr. DEFAZIO. You know, you detailed experiences there with discrimination throughout your career. And you said it was only because of the DBE program you were able to start your business, grow your business in the face of that discrimination. And one quote was, "Even though I have been in business for 14 years and won several statewide awards for my engineering, I still cannot compete with established engineering firms owned and managed by White males. I have participated in many equity surveys and discussions, and the question always comes up about the need for this program to continue. I can testify that without this program, the work I get on Federal and State infrastructure projects would cease. The only reason other firms team with me is because I am a certified DBE firm first and then because I do excellent work. I am not their buddy. I do not look like them."

That is pretty compelling, Ms. Boyer. You stand by that quote?

Ms. BOYER. Absolutely.

Mr. DEFAZIO. Yes, OK. That is pretty sad.

Ms. Williams, would you agree with Ms. Boyer's assessments in these matters?

Ms. WILLIAMS. Absolutely.

Mr. DEFAZIO. OK. Well, that really underlines why we are here today, why we are reauthorizing the program, and also looking at ways to make the program work better.

Dr. Wainwright, at the end of your testimony you mentioned the private-sector study versus the public sector with the DBE program. Can you give us a rough, quantified comparison in any way, in brief?

I know that you go into it in more depth in your study, but—Dr. Wainwright, are you still there?

[Pause.]

Mr. DEFAZIO. Yes, I see you over there. You need to unmute.

Mr. WAINWRIGHT. Yes, I am not sure I fully understand the question. Can you——

Mr. DEFAZIO. Well, you concluded, the private sector versus public sector, and you are doing these comparative studies. In aggregate, is there any way—can we say—it is a small percentage of the work, overall, in the public programs? What percent is it where the public programs with DBE aren't—how much smaller is that?

Mr. WAINWRIGHT. Oh, sure. I think I understand now, sorry.

Mr. DEFAZIO. Yes.

Mr. WAINWRIGHT. The public sector, as a share of the overall economy, is maybe 20 percent. The DBE program and programs like it throughout the country are, you know, to some degree, a finger in the dike. You don't see these programs very much at all in the private sector. So you have got the DBE program and programs like it, trying on their own, largely, to remedy discrimination and remediate discrimination, with only 20 percent of the economic activity to work with. The other 80 percent remains practically untouched.

Mr. DEFAZIO. Great. That is what I was looking for. I didn't know what the comparison was. So 20/80, and then we get a fraction of the 20. So——

Mr. WAINWRIGHT. That is correct.

Mr. DEFAZIO. Thanks.

To anybody else, I have got about 1 minute left. Anybody else want to expand on their remarks for about 1 minute?

[No response.]

Mr. DEFAZIO. OK, I am not hearing anybody.

Oh, go ahead.

Ms. LERDAHL. I would just like—this is Mary Lerdahl again—I would just like to reiterate the importance of waivers, and the effect that they have on hurting DBE firms that, while they may have enjoyed some success within the DBE group, they are still far from being ready to be kicked out or graduated from the program.

I think also that in Washington, the waiver that was enacted to exclude White women actually really separated the DBE community, and actually pit one group against the other, which, of course, you know, it is the last thing that we need. We want to bring DBE communities together. And they are—you know, just by the numbers of statistics, there will always be one group that is going to do better in any particular data segment than another. But overall, the DBE community still is just getting pennies of the Federal highway dollar.

So I would like to submit that the committee consider that waivers should never be enacted against one group or another. They are very destructive, and they are not necessary. In our State of Washington, because we were covered by the Ninth Circuit District for court decisions, I realize that the State of Washington had the opportunity to ask for a waiver, but it was not required that they seek a waiver. And that is an important distinction that I hope that the committee would perhaps consider writing into the reenactment, that never again that waivers would waiver out one group in the DBE community against the other. Thank you.

Mr. DEFAZIO. OK, thanks for that observation. Now I would turn to Ranking Member Graves for his questions.

Oh, no. He's not there. It would be Representative Weber who will ask.

Mr. WEBER. Thank you, Mr. Chairman. I have questions for Farad Ali, and I am not sure how we get him up on the screen. I guess we look to whoever the speaking part is.

Mr. Ali, does the DBE program assist minorities in attaining financing?

Mr. ALI. Thank you for your question. I have been also the executive director of the Small Business Transportation Resource Centers that is through your NCDOT funding. In that program, part of the milestones are to provide technical assistance and access to capital, or resources for them to get that access to capital. But the program doesn't actually provide the financing. You have to go out and find sources.

I will tell you in my work I have seen that we have had to go out and find specialized—or people of color or women to support this group, to help them, to show a duty of care, to make sure they can get the financing and the bonding necessary to participate on roadside projects, as well as the ACDBEs. So you also do see some institutional discrimination in that work, from allowing people to show duty of care and helping others.

Mr. WEBER. Are you able—when that happens, do you have a matrix? Are you able to track how—from each project or each com-

pany, how good it went, what the pitfalls were, and how to improve upon that?

Mr. ALI. Yes, thank you. Great question again, Congressman. In our program, what we would do is look at some of the ways that we—weaknesses in the DBEs, or that we may see that are important. We find ways to strengthen it, if it is on asset base, or if it is credit, or whatever it may be, to help them to get the financing.

Again, the financial system has not always treated ACDBEs or even DBEs fairly.

And it is hard to speak to this, because I know in the banking system or the financial system, there are rules of the way people operate. But it is also the ways that people have culture in allowing people to feel like they can have opportunity.

So we do measure, when people actually look for financing opportunities, figure out ways to help them to overcome any obstacles, and then success in getting them financing or bonding needed to meet the requirements of the project.

The answer is yes.

Mr. WEBER. OK, that is good to know. And then I am going to jump over to Ms. Sandra Norman, if I may.

Ms. Norman, what would you say, in your experience, is the biggest obstacle to increasing minority participation in transportation-related projects in your State?

Ms. NORMAN. I would say, as you just talked about, access to capital. The other part, too, is the—how we procure projects, making sure that our DBEs have the opportunity on the design side of the house, as well as the construction side of the house, so making sure that we do set aside some smaller bundle of projects so that the small business DBEs will have the opportunity to compete and win contracts. We just don't want them to compete for it, we want them to be awarded the contract, and be successful in carrying it out from beginning to end, making that project a win-win for both the DBE and for the DOT.

Mr. WEBER. So, as kind of a follow up, I guess, with my question with Mr. Ali, do you have a process, Ms. Norman, with the way you are doing it?

I mean, is there a hotline for help set up? Do you encourage participation? Do you reach out and get feedback from them, I guess?

Ms. NORMAN. Just like Mr. Ali, we do have what we call the BOWD Center, the Business Opportunity Workforce Development Center. It is through a supportive services program. We do provide technical assistance. And one of the things that I do, I do a lot of outreach, a lot of networking through different entities, through different partnerships with State, local programs, so that our DBEs will have that opportunity.

But sometimes the requirements for our DBEs are stricter and harder for them to have that level playing field with regards to access to capital.

But to your point, yes, we do provide technical support and assistance, make sure that we do have partnership opportunities for our DBEs.

Mr. WEBER. Well, thank you for that.

I have been kind of setting the stage for you, Ms. Lerdahl. You are the last one up. I am quickly getting close to my time, and I

appreciate the chairman's indulgence. Since you have run a company, Ms. Lerdahl—you have heard the panelists, especially the last two that I have had questions for—from your business experience, would you be able to give them suggestions—maybe you want to hire on as a consultant, I don't know, but would you be able to give them suggestions on how to better help these companies successfully compete on these jobs?

Ms. LERDAHL. Yes, thank you. Well, I do think they touched on the importance of access to capital. I will state that, in the 9 years I was in business, I was never able to obtain a line of credit, except for the one project that was provided through the Small Business Transportation Center. I was able to get a $250,000 line of credit to do one particular project. So that really did help. But the rest of my work, $80 million worth of work, was done without a line of credit. So I became a really good bill collector; otherwise, I couldn't pay.

I do think, too, there is definitely, not only in the banking segment, discrimination against small business, and particularly women- and minority-owned businesses, but also with creditors. I was not able to get the pricing on big loads of material—$500,000 pull orders, for example—that my larger contracting competitors could.

So—and there was a few times I tried to pursue collusion within the supplier network, and that was a very difficult thing to prove, because, of course, if they are not going to bid to you, how can you prove that they are stacking the deck against you?

I do think that there is also evidence of supplier fraud, where even, unfortunately, DBE firms that are a supplier up the pricing of a package of materials on bid day to a non-DBE electrical firm or other firm in order to win the bid, because they can count 60 percent of that billable material. So that, again, stacks against DBEs. It is almost the DBE supplier working against the DBE contractor.

And so there is a lot of games that get played in the supplier DBE industry, unfortunately, as well as access to credit in both the suppliers and the banking forums.

Mr. WEBER. Well, thank you for that. It sounds like you would be a good resource for the other folks on the panel on working on some of the pitfalls that a lot of these business owners see.

So I appreciate your indulgence, Madam Chairwoman. I yield back.

Ms. NORTON [presiding]. I thank my good friend, and I recognize myself for the next series of questions.

I think I want to start with Ms. Williams and Ms. Boyer, because I am interested in why this discrimination continues to occur.

Now, you would have the same ability, even more experience, if the DBE program went away. So I would like you to elaborate on why you think opportunities for small businesses like yours would dry up—you all seem to have testified to that effect—without the DBE program. I am trying to find whether there is a real remedy here that is lasting.

For example, do you think that these contracts are based on personal relationships that these companies have? Is it based on the size they prefer, larger companies? Is it based on the nature of the

competition? Indeed, are they competed? I am trying to get at the cause of what you have—virtually, all of you have—elaborated as continuing discrimination, notwithstanding the DBE program.

So I will start with Ms. Williams.

Ms. WILLIAMS. Thank you so much. I think that one of the unintentional consequences of the DBE program is that the program is set up to invite and encourage the checkbox. In other words, you have to check the box [inaudible] so in large majority firms, and the goal is 25 percent, I am looking for a DBE, and I check the box. If I am a large, majority firm, I am trying to get 40—50 to 60 percent of the project. And so, I have got to give out 25. I mean it is all in the numbers.

And so I think if you graduated or you weren't a DBE, they would not pick you as just a good engineering company. [Inaudible.] So it is an unintentional consequence that the DBE program has developed. But it is what it is.

Ms. NORTON. Ms. Boyer, do you have any views on this?

Ms. BOYER. Yes, of course. So thank you for the question.

Excluding the city that I live in and I am headquartered in, Belleville, Illinois, they give us work because we are right here in their community, serving their needs, going the extra mile all the time. And we do excellent work. And it doesn't matter if I am a DBE here, because this is where I work, and they know me. So I think a lot of it has to do with relationships, although it is also about the culture of our Nation.

And so, even though I work with large engineering firms, and we give work back and forth all the time, I think for us in Illinois it has more to do with—the Illinois Department of Transportation really emphasizes that they want DBEs to succeed, and they want prime firms to be giving DBEs chances to lead. And they know the only way that they are going to win the work is to work with DBEs, because that is what the State wants.

So it is all about winning. It is all about getting a leg up. And if a firm thinks that they are going to have a better chance to win with a DBE, then we are great. Even if we do fantastic work, they won't use us if they don't have to, because it is all about winning the most. It is all about this individual culture that we have in the U.S., that the more for me, the better. And the only way people are going to share is if they are made to share. I hate to say it.

Ms. NORTON. Interesting to note, and it says a lot about the importance of continuing this program, because you would think, automatically, these firms, women- and minority-owned firms, would work their way into the industry.

Ms. Lerdahl, I must say, your story was particularly chilling to me, about the problems of women business owners. And I am trying to find out the difference between waivers and graduation from the program. I am confused on that. What is your response for those who believe that the program should exclude automatically certain groups, once they have attained what is known as parity in the market?

Ms. LERDAHL. Well, thank you for that question. It is a great one.

First, a big difference between graduating and the waiver. The waiver sought to exclude White women as a result of a disparity

study. It, again, had some unusual data in it, with these two big mega-projects, where billions of dollars of contracts with multiple years of work were counted in that 2009 to 2011 study data period.

Other firms—ironically, the two biggest firms in our State—one is Valley Electric, one is Elcon Electric—both used to be DBE firms, but they were allowed the time and the length of the runway to grow, and to graduate from the program. Elcon is owned by an African-American gentleman, and Valley Electric was a women-owned majority business. But they had——

Ms. NORTON. They are not in the program any longer, those two firms?

Ms. LERDAHL. Yes, they graduated from the program.

Ms. NORTON. Yes, OK.

Ms. LERDAHL. But in the case of a waiver, we were essentially kicked out by our own agency because of the disparity study data that indicated that White women were getting more than our share of the DBE dollar, which is absolutely not true. So my company barely got [inaudible] and started to do great projects, like the 520 bridge, and then I was completely cut off at the knees.

And I would also share what the other ladies talked about, not getting work without there being a condition of award. I bid—from the time the waiver was enacted in June of 2017, I bid hundreds of projects. I pulled out every networking—I begged, I pleaded. I mean, I had never not finished a job on time or ahead of schedule. I had done multiple millions of dollars' worth of work, never with a problem. And I could not get a single job. But that is because discrimination is even more real than I thought.

Now, I have been in business for 22 years. I had a great reputation in the community, and not only as a DBE firm, but as an electrical contractor. I had been in business for 10 years prior to starting my own firm, in a non-DBE firm. I knew everybody. Everybody knew me. But I couldn't get one job to save my company, and that is why my company died a death of 1,000 cuts over 18 months, $9 million a year to [inaudible].

Ms. NORTON. Thank you. My time has expired. I do note that you cited two firms that had graduated from the program. I would hope that, if we have this hearing again, we will invite at least one firm that has graduated from the program, so that we can learn about what the program does for people to put them on their own. I think that would have added a great deal to this hearing.

I am pleased now to recognize Representative Davis.

Mr. DAVIS. Thank you, Madam Chair, and thanks again to all the witnesses.

Ms. Boyer, I heard that Mr. Bost did a fine job with your introduction while I was absent.

Ms. BOYER. Yes.

Mr. DAVIS. I do want to start my question with you. Based on your experience, do you believe that a mentorship program between prime contractors and your company, like your company, Kaskaskia Engineering Group, would have been helpful to you when you first became a business owner?

Ms. BOYER. Obviously, the mentor programs are so beneficial in getting started, and even just getting into different forms of work.

So I have actually participated with mentor programs in both engineering and on the contracting side.

The problem with mentor programs is it takes a lot of administration, both by the companies and by the agency. So often the followup and making sure that it is really happening falls through the cracks, because people are short-staffed and they are just too busy. But mentorships do work when there is enough staff to make it work.

Mr. DAVIS. Great. Great to hear that. Another question for you.

Has either the DBE program's personal net worth or the gross receipts limitation factored into your decisionmaking when considering new business opportunities?

Ms. BOYER. Absolutely. It is a strategy. I know right now that I could not survive if I graduated out of the DBE program right now. My foundation is not deep enough. And so, yes, it has everything to do with the decisions that I make. I need to stay in the program right now, because I have 45 mouths to feed here.

Mr. DAVIS. Would you be more interested in getting off, making more dollars available, if there was a better off-ramp to move toward self-sufficiency?

Ms. BOYER. Absolutely. I mean, one of the things that I actually looked at with a firm in Minnesota as they were graduating out of the program is to form a joint venture with them, a joint venture company, in a sense, that would go after Federal work there, and share the work, me being a DBE, but giving them, like, 40 percent of it to kind of pad them as they graduated out of the program, and built and sustained themselves.

In the end, we couldn't come up with an agreement. And I think that there are a lot of problems right now with staffing engineers. There is a huge shortage. And I think the close relationship scared them, that their people might like our firm better, and have some people move over. So they decided not to do it with us.

But I think that just the exercise of looking at how can you stabilize a firm as they jump out of the program, and teaming with another DBE to share work back and forth could lift both firms. So I think there are a lot of opportunities there.

Mr. DAVIS. You know, it is great to hear, and that the program has been so successful for companies like yours. But I think some of the things you just mentioned, Ms. Boyer, could make the program better. And we look forward to working with you on those issues.

I know that this program has meant a lot for you and your company. We heard about that in your opening statement. And I just wanted to give you another chance. Is there anything that you haven't yet said about this having an impact on you and your life that you would like to mention to us in the committee?

Ms. BOYER. Well, you certainly would never see a mother-daughter engineering firm. And this program has made that available.

Mr. DAVIS. Well, that is wonderful.

Ms. BOYER. I also do want to say that this idea of a unified certification is so important. And, you know, we have a lot of stuff going on in the United States right now. We have the DBE program, but we also have a lot of people trying things. Our utility

companies are trying to come up with their own DBE programs, and they have separated out women and minorities.

And so, you know, when I would work in 7 States, I have to get 17 different certifications. And it just seems that we are far enough along in our electronic world that we could have one place, one repository, and that we could certify DBEs in categories of women or minorities, so that everybody doesn't have to do the same thing over and over and over. It takes one full staff member of mine to just keep up with this.

So I think it can be simplified, but it takes our agencies to trust each other. And the Small Business Administration does a great job. They are the perfect candidate for something like that.

Mr. DAVIS. That is another great idea. Look, we know—and we see the emotion that you have shown us—how much of an impact this has had in your life. Thank you for being here. I look forward to seeing you in person again soon.

And I yield back the balance of my time.

Ms. NORTON. The gentleman has yielded. I must say I was very touched to hear the testimony about a mother-daughter engineering firm. I mean, typically, we see businesses like this passed on to sons. The notion that you had that effect within your family is telling about the importance of this program. I appreciated that, hearing that, very much.

We will next hear from Representative Larsen.

You are recognized for 5 minutes.

Mr. LARSEN. Thank you. I have a question for Mr. Ali.

It is clear the pandemic continues to have a significant impact on the U.S. aviation industry, particularly on airport concessionaires. Even more concerning is the fact that minority-owned small businesses are disproportionately impacted by the effects of the pandemic. Could you cover for us how the pandemic has affected AMAC members and airports, concessions, disadvantaged business enterprises?

Mr. ALI. Yes, thank you, Congressman. It is really important to understand the process of how these work. You look at an airport—I look at it, really, as a hotel—and big concessionaires, which are mainly foreign-owned, secure pieces of the airport to be able to provide services for their passengers.

And as you have heard earlier, a lot of the DBEs, the status of DBE allows for them to partner with other minority- and women-owned firms. And many of these concessionaires, these large concessionaires, look for women- and minority-owned firms to participate, and that is how they get a pathway into being concessionaires, either from streetside to airports, or even beginning new businesses.

A lot of the investment, the investment for these airports to, as you could see, the—improvements inside of the airport are shared cost by DBEs. So they are making investment in public assets based on a contract for 5, 7, or 10 years, and they have to pay those loans back, typically, to their master concessionaire.

So when you have the COVID crisis, which took down 90 percent of the travel, a lot of these ACDBEs are now having to still make payments which are not being received. And because they made them in public assets, they can't get traditional funding, which is

really hard, because then, if you can't get traditional funding from a bank, there is no way you could refinance or restructure your loan. And as a result, you find yourself in a cataclysm of debt, of not only business debt from the pandemic, but business debt from being able to pay back your loan.

So not being able to get access to the PPP, it didn't help these businesses, ACDBEs. And some of them weren't able to get the EIDL loan, because the EIDL loan, which was once at $2 million, went down to $150,000. But a lot of these businesses needed the EIDL loan so that they could continue to cooperate and manage inside of these airports.

So you find a lot of the concessionaires are in default, which means they are in a position where they could be eliminated from these contracts that they needed, and whatever assets they had tied up would be lost.

Mr. LARSEN. Yes. And what effect would large-scale closures of the concessionaires have on airport operations?

Mr. ALI. It would do a whole lot of things for airport operations, thanks for the question.

If you look at these ACDBEs or these DBEs that would be eliminated from contracts, they will lose these opportunities. You will have societal impacts to them where these communities that look to these DBEs for support or hiring, so they would lose all of these employees. These employees would lose houses.

I mean, the trickle-down effect of ACDBEs going out of business or DBEs going out of business, please note if you look at some of the statistical analysis, most DBEs hire people of color or women than any other constituency groups. So when they go out of business, it has a real trickle-down effect into either of the communities and the airport community.

Mr. LARSEN. Yes, thank you.

A question for Mr. McDonald. So, Mr. McDonald, I am the chair of the Aviation Subcommittee and certainly acutely aware of the lack of diversity in U.S. aviation and the need to attract new talent to ensure this industry remains competitive.

In the time I have remaining, which is about 1 minute, I think, can you discuss some of the successful initiatives that you have implemented within the DBE program that have attracted more participation from women- and minority-owned firms, particularly related to aviation?

Mr. MCDONALD. Yes, I would say that through our community partners—again, I am with the Office of Economic and Small Business Development, and because of that we have community partners. We have a group called the Greater Fort Lauderdale Alliance that works with the attraction and the retaining of businesses in our county.

And through that group, we also have a cohort of aviation type businesses, but from education and training and apprenticeship, we have been able to create a collaboration where we attract not only those businesses, but we engage those business opportunities, and we align that with our DBE program.

So our upside is by being an economic development office, also operating the Small Business Program, also by administering the Federal program, we leverage our resources and our partnerships.

And, again, that is one of our saving graces. The idea that we also have an aviation director who is supportive of the program. We have education and institutional organizations that are willing to commit their resources, and this becomes, as you can imagine, attractive to the business community who recognizes your growth and your opportunity.

Because, as you know, businesses always speak to do I have access to that employee, to that individual who has the skill set as well as the interest?

So it is through our collaboration and our partnerships that we have been able to have some success in growing the businesses, which also introduced opportunities for our DBEs to participate.

Mr. LARSEN. That is great. That is really helpful. I appreciate that.

And according to my personal timer, I am out of time, and I will yield back.

Thank you, Mr. McDonald.

Ms. NORTON. I note this term “trickle-down effect.” It seems to me that is very important to hear. We are talking about engineering, where minorities and women have not participated in nearly the numbers they do in other professions.

So the notion that this encourages minorities and women to even enter the profession, it seems to me, should be encouraging to this committee.

I am pleased to recognize Representative Woodall at this time.

Mr. WOODALL. Thank you very much, Madam Chair.

I wanted to start with Dr. Wainwright. I appreciated his likening our challenges to blood pressure medication, and we certainly do not want to end the blood pressure medication.

I wanted to find out, Dr. Wainwright, if you saw anything in your research that helped us on the pathway to a cure. I have heard lots of concerns about graduating from the program. I have heard lots of concerns about the impact of categorical exclusions.

At the end of the day, the DBE program was intended to be a step towards a cure. Do you see anything that could help us alter the program in ways that alleviate some of the fears of graduation and bring us closer to that societal cure?

Mr. WAINWRIGHT. Thank you, Representative.

A couple of things. One is I am not a policy guy as much as a statistical guy. So I am not sure I can speak about what detailed improvements in the DBE program might get to the cure, as you are mentioning.

But as Chairman DeFazio mentioned at the beginning, one of the touchstones for me would be to see greater spillover of efforts like the DBE program, like the State and local MWBE programs, into the private sector, which, as I mentioned, is about 80 percent of the economic activity.

So the DBE program at its best is affecting a fraction of 20 percent that the public sector controls and, you know, still more, we are talking today just about the transportation sector.

In the 37 years that the program has been in effect, we are starting to see some of that, but it is still a long, long way off. When I started working on this in 1989, you never heard of the term

"supplier diversity officer" at a public agency, let alone a private agency.

So there is a demonstration effect, I think, to see and then to witness the positive effects that this program has on many of the witnesses you have here today, business owners.

Hopefully, that has a demonstration effect into the private sector and will encourage more private companies to diversify their supply chains and their contracting and procurement chains.

And when that day comes, I may be getting off my blood pressure medicine at some point down the road from that. So that is a great question. Thank you.

Mr. WOODALL. I thank you for that, Dr. Wainwright.

I think it was Ms. Norman who mentioned that one of the side effects of that blood pressure medication could just be creating a check box program.

Ms. Norman, I kind of heard that from Ms. Lerdahl's testimony, that she had done amazing work, built amazing relationships, and as soon as she was excluded from the program, all of that hard work disappeared because those folks were not prioritizing her relationships or her quality work. They were focused on getting that check box done.

Could you speak a little bit more about your concern that it is turning into a check box program and maybe some ideas about how we can solve that so that these relationships and these good work ethics can be continued?

Ms. NORMAN. So while I do not want to just say it is a check box—in essence, it is—but without it, sir, they would not get these opportunities.

So it is very important to have that, to have these demonstrated goals requirements, not just an aspiration, but a requirement to make sure that part of the process that the DBEs and women-owned businesses get that fair opportunity to bid and compete and win those contracts.

The other part that can assist with that as Virginia, we have what they call the Virginia Small Business Enterprise Program, and that allows us to de-bundle some of these contracts on the construction side of the house and the professional services side of the house, $750,000 or less or up to $1 million, looking at those projects to see for a subcontractor to then step into the arena of being a prime.

So a lot of times these larger businesses forget that they started out as a small business as well.

However, we have been fortunate on the construction side of the house. We still have some work to do on the professional services side of the house of identifying those kinds of projects.

So while we say it is a check box, without that check box these small businesses and women-owned businesses would not have that opportunity.

Ms. NORTON. Well, thank you.

Mr. WOODALL. I certainly recognize to Chairwoman Norton's point. When we have our next hearing on this topic, it hurts to hear the fears of graduating from the program. Graduation should be something that we are aspiring to.

But I hope we will be able to make some changes and explore some ways to make them a more comfortable transition.

Chairwoman, thank you for your indulgence. I yield back.

Ms. NORTON. I thank the gentleman for his questions.

We hear next from Representative Sires.

Mr. SIRES. Thank you, Ms. Norton.

And thank you for the people that are giving testimony today. It is very important.

Mr. Ali, thank you very much. My question will be directed to you.

I represent a portion of the Newark Airport with my colleague, Don Payne. We both represent the airport. You have said that without the Disadvantaged Business Enterprise programs some of the contracting opportunities for minorities are gone.

Well, as you know, Newark Airport, the new terminal 1 is being built, and they are probably now going through the process of selecting bids. I am hopeful that minority women-owned businesses, minority-owned Black businesses, and minority Latino businesses get to participate in this process and are able to secure some of these bids.

Would you know what percentage of minority women and Latino-owned businesses currently represent airport concessions across the country?

Mr. ALI. No, sir, I do not have that answer. That is something the fiscal guy can tell you, the doctor. I do not have all of those stats.

Mr. SIRES. So you would not know anything about New Jersey either, right?

Mr. ALI. No, sir, I am sorry. Not about specific or, I mean, in general, no, sir.

Mr. SIRES. Well, I think it would help if there would be some data about how many minority businesses are participating in these airports because we do not know if there are enough or there are too many or there are not enough.

Mr. ALI. Yes, sir.

Mr. SIRES. So I do not know who would put those statistics together.

Mr. ALI. Yes, sir, Congressman. I believe that the FAA should be able to provide you with that information, sir, as well as the DOT Office of Civil Rights.

Mr. SIRES. So I am going to get my staff on that because I am very concerned that this new wing that we have in Newark, this terminal 1, that the minorities get their fair share of concessions in that new wing.

Mr. ALI. Yes, sir.

Mr. SIRES. What role do you think that the DBE program plays in the recovery of businesses like yours with this pandemic? How has that impacted?

Mr. ALI. Sir, the businesses that we represent I will tell you that COVID has adversely affected businesses in that they have been able to have to deal with it. Most of the contracts for ACDBEs have been secured against contracts with the airports, and those airports have used contracting to get rents, and those rents and those pay-

ments all go to pay for bonding and other things inside of the airport and aviation business.

So when you have a slowdown in traffic and those ACDBEs are no longer able to get passengers to pay the facility charges or the costs, it becomes a really critical role of making sure that we have the ACDBEs involved, but they also lose out when the airport industry is inhibited by the lack of passengers.

Mr. SIRES. And have you noticed where there is big investment in airports across the country where the minority businesses are able to take part after such investments in some of these airports, or do you feel that maybe they are cast out some places?

Mr. ALI. Yes, thank you. That is a really good question.

I do believe that you have offered, in your funding to these airports, you have offered the opportunity for them to share that with their concessionaires and the ACDBEs. It is my understanding that each airport has the authority to make a determination of how much they will share or if they will share.

I think each area would need to be audited for that particular concern. So if you are interested in New Jersey and New York, I think you should ask if the resources that you provide for them, how much of that were they able to share with the ACDBEs.

Mr. SIRES. Yes, I am concerned about New Jersey and New York, but quite frankly, I am concerned about the rest of the country also because there is big investment in some of these airports, and I would like to see minority-owned business not be cast out because, well, you know how it works.

Mr. ALI. We have heard from our members that there has not been shared prosperity with those resources. Those resources have not necessarily been shared.

So members have asked airport directors and airport authority members to share and find resources. I know of a particular case out West where an ACDBE constituency group was concerned that a major airport got a lot of resources, but those resources have not been shared.

As a result, there has been a multimillion-dollar business that may have to come back to the city council and ask for additional funding because the airport did not share in the resources to help them stay in business.

Mr. SIRES. Well, if I can ever be of service.

Ms. NORTON. Thank you very much.

Mr. SIRES. Thank you.

Ms. NORTON. The next question is from Representative Carol Miller.

Mrs. MILLER. Thank you, Acting Chairwoman Norton.

With some of your comments that you made earlier, the thought came into my mind about how grateful I am that over the last few years our educators are focusing more on STEAM and STEM education, which will give the opportunity to all our children, the little girls, the minority children, the opportunity to learn what they need in order to have some of these businesses, like mother-daughter engineering.

And thank you all, all of you, for being here today as witnesses. I am grateful for the opportunity to hear from the stakeholders

that do represent DBEs and ACDBEs. The initials are still kind of hard for me.

As these organizations attempt to cultivate their businesses, it is important that we continue to monitor discrimination so that we can continue to build and expand on this program to allow for fair and equal opportunities to have access.

Mr. Ali, could you please speak about the difference between direct and indirect discrimination and what your suggestions would be so that we could ensure that minority-owned businesses are properly represented?

Mr. ALI. Yes. Thank you, Congresswoman.

I think it is important that you strengthen the program in the way that you evaluate it and open up opportunities.

Direct discrimination is organizations making the determination that they really are not going to have inclusion. They say they will have inclusion.

I will tell you an example of the time I was in an airport directors' meeting, and someone indicated that they were going to do maybe 5 percent with minorities and try to do another 5 percent to get to the 10 percent.

And I indicated back with them at the meeting, well, then maybe we will try to sign your contract.

The attitudes change really quickly. Within 48 hours they were able to attain the other 5 percent to make sure they had the 10 percent.

So to really enforce the utilization of good faith effort at inclusion is going to be important.

Some of the other issues around institutional discrimination are really cultural, and a lot of that has to be really developed through organizations and sometimes through policy, where people are not really allowing ACDBEs or DBEs to come to the table, where they may put them inside of a contract, as you heard from earlier testimony, but not have them actually really participate and grow their business so that they cannot just be airport-side. They can grow their business to be on the private sector side that would help them make it to the 80-percent level.

So this is truly not just a groundbreaking way to get minorities and women into the transportation industry, but a lot of them use this and catalyze this and leverage this opportunity to be able to go to the private side, which allows them to really grow their business and, as you would say, graduate, but to really bifurcate their portfolio so they can diversify it long enough so that they can be able to build sustainable businesses.

Mrs. MILLER. Thank you so much.

Mr. McDonald, following the COVID–19 pandemic, Broward County has had to adjust and adapt their business practices to help the DBEs stay on their feet. Could you speak to how Broward County utilized current resources to prepare the DBEs for the pandemic?

Did the county use the funds to prepare the DBEs for the pandemic or to help them respond to the pandemic?

Mr. MCDONALD. Thank you for that question, a good question.

We actually did both. We were able, based on our programming and our activity, and specifically projects, because we had already

scheduled some projects with aviation, and we have some other county projects that also spoke to transit rather than to our DBE activity that we already had funds for.

So when we recognized the troubles of COVID, one of the things that the commission had moved forward was to make sure that projects that were aligned with dollars, we could still continue those projects.

But in the meantime, as we also look forward to rolling those projects out, we made sure in the economic development side of our office that we also involved the necessary handholding as our DBEs and other small businesses, minority and women, were looking to identify if they could qualify for PPP, EIDL, our regular State bridge loan program.

We also made sure that we worked closely with our Miami office of the Small Business Administration to take other additional resources that have always been available, but make sure that those virtual workshops were in front of all of our DBEs.

And where we are right now, we are beginning to roll out projects and activities that we, again, have the funding for, and since aviation traffic as one example is still slow, some of the projects that our airport director was looking to do, we can now start those projects. We can begin to align those goals, and we can have a way for our DBEs to participate.

So we were able to at least juggle some opportunities on the frontend, use projects the county had already committed as a way to stabilize some of our DBEs, as well as to rejuvenate our economy with those projects, but more importantly, it did take time to make sure that those were projects that may not be available, but were able to take advantage of those Federal funds and other financial resources that were available.

Ms. NORTON. Thank you very much.

The gentlelady's time has expired.

I want to call next on Representative Eddie Bernice Johnson.

Ms. JOHNSON OF TEXAS. Thank you very much, Madam Chair, and thanks to all the witnesses present.

Let me say that this is my 28th year on this committee, and this is the most prevailing concern that has been expressed to me around the country since I have been a member of this committee, most especially with my own area.

It was one of the first issues that I started working on when I came to this committee. Secretary LaHood, who came from this committee to become Secretary of Transportation, worked with us on language in order to make sure that when the language was put in the RFPs, there would be some sanctions if they were not followed.

What we have gotten since we put this in place is a lot of RFPs that included minorities, but never got them involved once they got the RFP.

I have been visited with women, minority women from all over this country complaining about that. He helped us come up with language, but we could not get Chairman Mica to support it at the time.

And I notice there that is still overwhelming evidence of discrimination, and really when we first started looking at this, there were

companies that were putting the name of the company into the spouse's name in order to get Anglo women qualified. And so all of that has been experienced.

And I really have a great interest in fairness and opportunity with it. So I have heard great testimony. I appreciate everyone being here, but I want to know from the witnesses when these RFPs are sent out and the minority participation is dictated, have you experienced any reason to believe that it is a serious effort to include minorities?

Let me start with Mr. McDonald.

Mr. MCDONALD. Thank you for the question.

I believe that to your point, and you have certainly been at it longer than I have, but you are 100 percent correct. The language that was put in, it is my job as a Disadvantaged Business Enterprise Liaison Officer to make sure and work with aviation and/or transit. When those RFPs cross our desk, I have to make sure that language is there that even supersedes that good faith effort.

I have to make sure that there is language that is not impediments or hurdles to the minority. So, yes, I do believe there have been situations, as the agency prepared the RFPs, that that language that supports DBEs is silent and those things that give opportunity to overwrite the program are present.

But it is the responsibility of individuals like myself, UCPs, as we are reviewing these, to catch that and to address that, and I can say at least in my 7 years here in Broward, especially the last 3 years, working with my aviation director and my transit director, they have worked with me to assure that their RFPs, and with their staff, we are addressing that.

But it is certainly has happened in the past, no question.

Ms. JOHNSON OF TEXAS. Thank you very much.

Mr. McDonald, I have had minority women visit me in Dallas, Texas, from Florida complaining that their names went into the RFPs, but they never got a call or even a word after the contract was let.

Have you heard any reports of that?

Mr. MCDONALD. Yes, I have, and one of the examples I can explain is that when the DBEs are a part of the process and we do the letters of interest and the prime has to identify which DBEs they are going to be working with, as you can imagine, most primes go out and find five or six to try to reach that 10, 15, or 20 percent goal.

When they submit their RFP, they have to identify specifically which of the DBEs they are going to use. It is that review that we do, and what we have started doing is asking our agency. But the primes notify the non-DBEs or the nonminorities that you are not going to use them.

But we require that they submit who they are actually going to use as a part of the bid, and as a part of that posting, we list that.

So it is true that a prime would have five or six to try to reach their goal, but they only need two or three, and it is the two or three they submit on the bid we hold them two, but yes, the other ones should be notified that they were not used.

But we definitely record minority and women and the participation.

Ms. JOHNSON OF TEXAS. Thank you very much.

I have heard from my own city, the DART, which is the Dallas Area Rapid Transit, that they have no power to insist that the RFP that was selected include what they have in a contract; that they cannot enforce the fact that they have named the minority firm, and then they do not hire them.

Do you have difficulty looking at the language to see whether or not there is enforcement language there? Because it is not being done in Dallas, Texas.

And I just wonder if any of you have any experience with saying that their hands are tied of the local authorities for not sticking with the contract once it is let.

Mr. Ali? Unmute.

Mr. ALI. Yes, ma'am. Congresswoman, I apologize.

I not aware of the situation. I have heard many stories like you have heard from Mr. McDonald of contracts like that, but I am not aware of any specific situation where that has occurred.

I have had members express this to me, but I have not been witness to any of the information on it.

Ms. NORTON. The gentlelady's time has expired.

Ms. JOHNSON OF TEXAS. Yes, ma'am.

Ms. NORTON. The gentlelady's time has expired.

Ms. JOHNSON OF TEXAS. Thank you.

Ms. NORTON. Representative Babin.

Dr. BABIN. Yes, ma'am. Thank you so much, Madam Chair.

I want to thank all of you for your giving your time to participate as witnesses today, and I appreciate the work that went into setting up today's hearing.

However, I think we can all agree that the Department of Transportation Disadvantaged Business Enterprise program is a very important program and one that is overwhelmingly and bipartisanly supported here in Congress.

And to suppose that anyone on this committee feels otherwise I think would be misleading and politically motivated.

Now, with that said, I will keep this short. Every single day that focuses on identity politics is a day that we are not focusing on finding solutions to very real problems, problems like a debilitating national debt; a poor southern border where our interstates and our highways are being used to transport millions of tons of deadly drugs into our country; a port system that today is being use to facilitate the real institution of modern day slavery, and that is human trafficking.

All of these issues and more deserve our full attention. But we are here using our time and resources celebrating a program that is already supported by the Trump administration, by congressional Democrats and Republicans.

I am not saying that this program is not worthy at all. It is certainly worthy of our attention, but much the opposite, as we heard from Ms. Boyer's testimony earlier today, and that as long as we emphasize identity politics, we can expect to see more division, more exclusion.

We are one America, folks, all sexes, all races, all creeds, and identity politics is dividing us and in many ways keeps vulnerable

communities oppressed through perceived grievances and resentment.

The American dream has produced prosperity and liberty, without a doubt, but some here maintain that it has increased inequality, and we are seeing the consequences of that right now all across this great land and Nation of ours.

My earnest prayer is that we could come together and effectively address the many issues within our committee's jurisdiction that are not getting the attention that they deserve.

I would like to thank you, Madam Chair, and I will yield back.

Ms. NORTON. The gentleman yields back.

This is an oversight hearing, and we have an obligation to do oversight, especially since we have just passed one of the few bills that has passed this time, which has been the transportation infrastructure bill.

I am pleased to recognize Representative Hank Johnson.

Mr. JOHNSON OF GEORGIA. Thank you, Madam Chair.

This country was born out of the soil of racism. Slavery is what built this country, free labor off the backs of Black people. For 250 years, Black people were enslaved in this country, and then for 100 years thereafter we had Jim Crow apartheid imposed upon us.

And then to say that in the 400-year history, 401-year history we should now consider Black businesses to compete on the same playing field, starting from the same starting point as White businesses, some of which have been in existence in this country, you know, for 200, 300 years; to say that those Black businesses must compete with those White businesses from a level playing field, it is impossible.

And that is why affirmative action has always been necessary, and as it was said earlier today, if you have got high blood pressure and you take medication for it, just because your medication has produced equilibrium, that does not mean that you stop taking the medication.

So that is where we are in this country with the DBE program.

And, Mr. Ali, in response to Congressman Larsen's question, you revealed some of the specific challenges that airport DBEs are grappling with to survive during the ongoing COVID–19 pandemic.

Are there any other challenges that minority airport concessionaires currently face that you want to bring to our attention?

And are there any foreseeable challenges that DBEs are likely to face as they seek to compete in a post-pandemic recovery?

Mr. ALI. Yes, I thank you, Congressman.

I think it is important that we either focus on the short-term issues of the underwriting requirements, and so the constraints of what is making the private sector investment in these public assets. I mean, you do not have the same type of collateral.

You cannot pledge the same kind of assets. You cannot give people the same sort of security interest in the underlying assets of your business when you are doing this work.

And so the crippling effect of there is a quote that when one community gets a cold, the other one gets pneumonia. I would say the other one may be getting COVID, and it is a slow kill.

So it becomes quintessential that in these public-private partnerships that we are able to find resources like with the SBA and the

EIDL loan program or the Main Street Lending Program, that there is some attention to not just providing resources for airports, but providing resources for the ACDBEs to be able to get maybe MAG abatement—minimal annual guarantee—fees abated.

Right now there is currently a $3.5 billion proposal in the Senate bill which will include relief for concessionaires, and we are hoping that that will be addressed and may be in the bill for the CR.

Mr. JOHNSON OF GEORGIA. Thank you.

Ms. Boyer, in your testimony you argued for a national DBE certification process as opposed to the current process which adheres to a State-by-State certification process. You contend that the 50-State certification process serves as an additional and unnecessary barrier to competition that women- and minority-owned businesses already face.

Do you have anything else to tell us about the difficulties that the 50-State DBE certification process poses to your company's ability to grow and compete?

And do you believe that the 50-State certification process was put into place as an intentional barrier?

Ms. BOYER. No, I certainly do not think it was an intentional barrier. Until something is lived, we have no idea to understand what the challenges are with it.

So I think the program that was put in place was a great start, but because of the challenges that we have had, it's just there to light that we do not have the same opportunities as large companies that are more nimble, that can cross State lines.

And when we develop a relationship with a large engineering firm, let's say, that uses our expertise, they want us to be their partners, and we both together have a better ability to win projects by moving from State to State.

It is just that they can just move State to State and get a business license. We have to get a business license and then start a certification process, and then on top of it we have to get a prequalification with the State that we are going to.

So just to have that nimbleness of a unified DBE certification in the 50 States, I think, again, it just takes a little bit of the challenge away, and any layer of challenge that we can eliminate just helps all of us.

Mr. JOHNSON OF GEORGIA. Thank you.

Ms. Williams, your company is certified in many areas, and one of your strengths has been that you are able to provide transit market research. In your company's work and research, have you uncovered disparities in transit availability and equity that perhaps larger private companies overlook?

And what factors enable DBEs to be uniquely positioned to provide transit data that most affects underrepresented communities or communities facing transit inequity?

And would a greater presence of DBEs on transit projects result in reducing transit inequity in underrepresentative communities?

Ms. WILLIAMS. Wow, that was a tall order. I am going to try and remember the question.

One of the things you mentioned, transit market research. So we know that transit agencies typically service 70 percent of their rid-

ers may come from low-income or disadvantaged or underrepresentative neighborhoods.

What has helped us in the transit market research business is the ability to go out and talk to these folks, to gather the information that is necessary for transit systems to make great decisions on routes and how they are serving the public.

Then a minority firm is doing the market research. Typically we hire people that look like so. So we are able to connect.

One of the things that was not mentioned here is on the IDIQ and task order type contracts, a lot of times what is happening these days is that you see a lot of these type contracts where you are included in the team, but your—and I hear the bell—your number is never pulled.

So you are with a big firm. You are on the team, but because it is a service order contract, they will just tell you your services were never required or never came up. And I have lost a lot of business on just that.

Ms. NORTON. The gentleman's time has expired.

I want to call next on Representative Garcia.

Mr. GARCIA OF CALIFORNIA. Thank you, Madam Chair.

I really appreciate the opportunity here. A very important discussion, obviously. As a business owner myself and my wife a small business owner, I do understand the value of this and support the cause.

Just going back to a statement that I believe Ms. Boyer made, it may have been Ms. Lerdahl made the statement as well. The frustrations with a formal mentorship program, I have been in several mentorship programs that are frustrating because they end up creating more work and more bureaucracy, and it sometimes slows us down while the intent is to help us speed up.

I would just encourage a more informal mentorship program or network of mentors and mentees to where you could connect folks within industry to help each other out and synergize as much as possible.

I know that is probably beyond the reach of any one of your charters or even the DBE's charter, but I think that will pay off huge dividends if we can figure out how to get these sort of informal mentorships in motion and make those connections happen for the various folks.

My question is somewhat along those lines. But do individual members, do individual business owners have access to a repository of some sort where there is a list of best practices or lessons learned from previous engagements or different agencies and equities that you can point someone in the right direction and just say, "Hey, when this type of RFP comes out with this sort of turnaround time, this is where we have seen the most success. Contact this agency first, this agency second"?

I do not know what those solutions would be. You guys would, but is there a database somewhere or some sort of a repository that is made available to folks that can tap into those lessons learned and not make some of the mistakes that we all have made in the past as we navigate these competitions, which is what they are?

Is there a place that has the right contact plans, the right capture plans, and sort of the lessons learned from several, probably hundreds of different captures?

And I guess, you know, that is directed to Mr. Wainwright, Ms. Boyer, and Ms. Williams as well.

Mr. WAINWRIGHT. Well, I will jump in. I am not sure I am the perfect person to answer that, but I would think that organizations like those that are represented here today, COMTO, AMAC, ACCA, that is where people go every year and multiple times a year to network with their colleagues, to share those ideas they have, certification levels for their own people as their trainers get better and better at what they know.

And I am sure Ms. Williams and Mr. Ali can speak more to that, but that would be probably the first place I would think where that kind of institutional knowledge is deposited.

Mr. GARCIA OF CALIFORNIA. And before you jump in, guys, I think my question is: is it memorialized somewhere? Is it a link or a database somewhere that folks can access and get sort of the uniformity of it, but also the consistency and making sure that everything is actually memorialized?

Mr. WAINWRIGHT. That I do not know. My guess is it comes and I know in my experience with those associations, every annual meeting I go to I come away with reams of good, solid information that I did not have before.

Whether it is easy to get to as a link, I doubt, but Ms. Williams and Mr. Ali may know better about that, Representative.

Thank you.

Ms. WILLIAMS. This is Eve Williams.

In regard to COMTO, as you said, Mr. Wainwright, there is a tremendous amount of outreach [inaudible].

A database of sorts that might [inaudible], with APTA, which is the American Public Transportation Association, is to develop such a database, and we have talked about it a number of times and to become more of a free source for small and disadvantaged businesses so they can reach us and get information on how to do certain things.

This is the type of work that comes for people to actually have. They are so difficult to [inaudible], and until somebody comes up with a question that is typically not an answer, but an app that we did not have, industry standards and [inaudible] have a lot of things that are available to our members, as well as COMTO.

Mr. GARCIA OF CALIFORNIA. OK. Thank you.

I see I am out of time. I yield back, Madam Chair.

Ms. NORTON. Thank you very much.

We will hear next from Representative Maloney.

Representative Maloney, are you muted?

[No response.]

Ms. NORTON. We will pass on then to Representative Brownley. Representative Brownley, are you muted?

[No response.]

Ms. NORTON. Then we will go to Representative Payne.

Mr. PAYNE. Thank you, Madam Chair.

Before I start, I cannot help but comment on one of my colleagues, two gentlemen prior to me on the other side of the aisle representing identity politics.

Well, on a topic such as this, and I appreciate the chairwoman pointing out our oversight duties, which is the bottom line, it just appears that one of the reasons that we are in the situation are statements and opinions such as that.

So the good ol' boys network is still in place.

Mr. Ali, what tools does the Airport Minority Advisory Council organization use [inaudible] from airports on the runway side and the horizontal-vertical side of civil builders? [Inaudible] airports?

Ms. NORTON. I am not sure that the question was received. Do you receive the question? Part of it was——

Mr. ALI. No, ma'am, I could not receive the question.

Ms. NORTON. Could I ask Representative Payne to repeat the question?

Representative Payne, part of the question was not heard by us or by the gentleman you asked to respond. So could you repeat your question again?

You may be muted. Could you unmute, Representative Payne?

Mr. PAYNE. Is that better?

Ms. NORTON. Yes.

Mr. PAYNE. Oh, I am sorry. I am so sorry.

Mr. Ali, what tools does the Airport Minority Advisory Council use to get more DBE contractors ready for work at airports on the air runway side and the horizontal and vertical side of civil builders?

Can the Federal Government play a stronger role in developing more industry contractors at airports?

Mr. ALI. I thank you, Congressman.

Before COVID, we had lots of training and development that we did face to face at our annual conference when we talked around service delivery as well on the construction side and the service side.

During the pandemic side, we have moved to webinars to be able to facilitate some of that training. As you can imagine, certain contracts in construction are for the DBE program, but a lot of that is your social networks.

And so social networks and business allow for people to participate more readily than others. So we recognize that. So we try to make sure we do matchmaking with the larger contractors with the people that we may have in our database so they can have some great opportunities.

We also have regional directors throughout the country so that it can align and find themselves to do more partnerships with that.

And then as you continue to move forward, I think if you were looking at ways for the Federal Government to create policies that would be important or impactful is how do we look at PFCs in the future.

As we know, a lot of the funding has moved from AIP funding to PFC funding, is to ensure that the DBE regulation as you go forward will have or also include PFC dollars. As many people can tell you here, the AIP dollars or airport improvement dollars have the

DBE program. The PFCs, which is the passenger facility charges, do not have the DBE grant assurances.

So as a result, I believe, you will start seeing a diminishing of utilization of DBEs.

Mr. PAYNE. OK. Thank you.

Mr. McDonald, we have heard positive things about Broward County's funded capital construction program. What type of success have you had with providing work to local DBE firms?

And can your program plan be implemented in other areas?

[Interruption to audio.]

Ms. NORTON. Thank you.

Continue please.

Mr. PAYNE. Thank you.

Mr. McDonald, should MWDBE participation in your program require third party determination and signoff before majority primes sign contracts with DBE inclusion?

Mr. MCDONALD. Thank you, Congressman, for that question.

Yes. Our program can be duplicated. Again, running an economic development and a small business office and administering the Federal program, we understand the importance from my local small businesses all the way to my DBEs where they need the additional assistance.

So one of the things we do, similar to what Mr. Ali just shared, we do as many meet and greets, whether purchasing does pre-bids or not.

During COVID and pre-COVID, we did pre-meetings or what we call meet and greets as possible, for sure, that from an agency perspective, we speak to the DBEs about all of the opportunities that are on the route.

From potential prime perspective, we call them in as potential primes and explain the program and the expectations of the office.

As mentioned earlier to one of the speakers, we actually do have a requirement as a part of that LOI, whoever you submit you are married to unless it goes through a process of my office and my final signature that there is a reason to substitute.

So it is the idea that the program tries to enforce exactly what 49 CFR requires us to do. It is the idea that I do have the support of the county commission, the county administrator, and my agency that support the bid all the way to the utilizations of the primes.

And we do believe that as a model—and nothing is perfect, I am not acting as if it is—there is an opportunity to empower primes to recognize that this requirement is one that we also want, as you have heard, to develop and nurture those relationships.

Mr. PAYNE. OK.

Mr. MCDONALD. We were given an [inaudible] a few years ago to not set a goal just to see. I refused. I knew that without the goal they would not do it.

So we are crystal clear. I just had a primes meeting last month—a virtual—to let them know that this is not only a requirement. It is also monitored and reported, and we will act on it.

So it really requires us to do what the law allows us to do.

Mr. PAYNE. Thank you very much.

And, Madam Chair, I yield back.

Ms. NORTON. The gentleman's time has expired. I thank you.

Representative Palmer.

Mr. PALMER. Thank you, Madam Chairman.

Ms. Boyer, in 2013, the Office of Inspector General issued a report saying that there were DBE firms that were deliberately limiting the amount of new contract dollars in order to stay eligible for the program.

Do you think that that is harmful to those programs?

And I will explain why I asked this in a moment.

Is she still there?

Ms. BOYER. Yes. Yes, I am.

I do think it is harmful to the program. I believe that the program is about empowering firms to get a leg up, get a start, get a lot of experience, and be able to step out and perform on a level playing field.

I think it is the fear that overcomes a small business to step out because it is that, you know, we hear so often that if there is not a DBE goal, then we are going to do it ourselves.

So I think it is a fear, and I just think there needs to be more of a ladder in between.

Mr. PALMER. Well, the reason I bring this up and the possibility that there needs to be some term limits for how long you can stay in the program is you made another point earlier about lacking the nimbleness that larger firms have.

And is that not largely a function of resources, your undercapitalized cash flow issues, that you do not have the nimbleness that the other firms have?

Ms. BOYER. Yes, certainly. I mean, it is nimbleness when it comes to being able to move to opportunities. I think within our company, we are actually were able to move fairly quickly, but we are mostly undercapitalized. It is very difficult to get capital, and it takes years and years.

So my company is only 16 years old. So it takes years and years to get to a point where you can sustain yourself.

Mr. PALMER. My point about this is that I am kind of odd in my reading choices. Where some people read novels, I tend to read reports.

But there was a report from the Federal Reserve Bank, I think one from St. Louis and one from Atlanta, that talked about how minority-owned and women-owned businesses are undercapitalized.

And one of the things that I think we need to do to address this situation is to follow on what President Trump has done with the Opportunity Zones and maybe do a broader version of that that incentivizes financial institutions to work with minority-owned and women-owned businesses to help them to get to a stronger position in terms of available capital, which will help address this nimbleness issue that you raised.

But I think it is also important in the DBE program that we not incentivize companies that are in that program to stay in that program because you will never grow. And I would just like your thoughts on that and maybe Mr. Wainwright weigh in on that as well.

Ms. BOYER. Sure. So I mean, it would help to have the financial institutions more onboard in helping minority- and women-owned

businesses. I mean, it is definitely something that holds most people back.

For me, our company always kids that we are in the basement of the bank. They always ask, “Is there a man that is involved in your decisionmaking?”

And, we have been building a successful business and doing well being run by women. So I think it would help.

Mr. PALMER. And your answer is you don’t need no stinking man?

Ms. BOYER [Laughter.] In collaboration and, yes, in support.

Mr. PALMER. You just need a good banker.

Ms. BOYER. And good bankers are hard to find for women and minorities. I mean, we know the banking industry. It is always a challenge. It really is.

Right now I am using a very small bank from my hometown, not even in the State that I am working in. Because of the personal relationships, they know my family. They know my brothers and sisters, and they trust me.

Mr. PALMER. Madam Chairman, I know we are in the midst of a highly partisan election, but I think what we need to at least give some credit to the Trump administration on the Opportunity Zones, and we need to think about how we expand this to make more capital available to minority-owned and women-owned businesses.

And I would recommend that our colleagues look at these reports from the Federal Reserve Banks and start thinking about how at some point we work together to address this.

And I yield back.

Ms. NORTON. I thank the gentleman for his suggestion, and as he notes, this is a very bipartisan committee, and this issue is very bipartisan. So I believe the chairman will take note of what you have asked astutely.

Representative Plaskett.

Are you muted, Representative Plaskett, who is next?

[No response.]

Ms. NORTON. Then we will move to Representative Carbajal.

Mr. CARBAJAL. Thank you, Madam Chair.

Dr. Wainwright, today we have heard business owners tell us they believe discrimination would prevent them from being successful in business in the absence of this program. Statistical analysis can shed further light on the question by comparing situations where a DBE program is in effect with situations in the same jurisdiction the program is not in effect.

Do you agree and do you believe doing that provides useful evidence?

And if so, what does the evidence you have reviewed demonstrate?

Mr. WAINWRIGHT. Thank you, Representative.

We have heard from Ms. Lerdahl about what has happened in Washington DOT. The overwhelming majority of examples of so-called parity that I am familiar with are quite recent, and as some DBE programs have matured and programs like them.

In my experience they are rarely statistically significant, which means they do not necessarily show parity at all, which is what we learned with the subsequent disparity study that was performed by

Washington DOT, despite U.S. DOT ignoring those results when the request to rescind the waiver came in.

But second, these results in the rare instances that they occur are statistically significant in the context in which availability figures have been artificially depressed due to discrimination.

You remember I testified that minority- and women-owned firms are forming at much lower rates than similarly situated majority firms because of discrimination. If such firms were forming at the same rate as majority male firms, there would be few, if any, findings of parity.

Third, you really should not consider a category of DBE to have achieved parity until you have seen the same result appear consistently in the private sector, that is, in the census data.

Again, this is like the blood pressure metaphor I have used previously.

Remember the only markets in which there has been any attempt to level the playing field are the public contracting markets, like the federally assisted transportation market.

And the far larger and more lucrative private sector DBE programs are rare to nonexistent, and majority male-owned firms generally get almost all of the business.

We also have to remember that majority male-owned firms have literally had centuries to grow and establish their firms with effectively zero competition from minorities and women.

Early on, the lack of competition was a direct result of laws that intentionally and explicitly disadvantaged women and minorities. Later it was the result of discriminatory practices that were permitted to continue despite civil rights laws.

Finally, we should consider the practical effects of suspending the operation of the program every time some subcategory of program participant achieves a modicum of success. This will not reduce discrimination. It will just tend to increase bankruptcies, as we have heard so poignantly from Ms. Lerdahl, and then those same entrepreneurs or others like them will need to be added right back into the program.

Thank you.

Mr. CARBAJAL. Thank you.

Dr. Wainwright, this committee has received reports that some State and local transportation agencies have excluded certain minority ethnic or gender groups from their programs because these groups have finally reached or exceeded, quote, unquote, “parity” according to a disparity study.

Do you believe excluding from the program certain groups who reach some measure of parity in the market is the right approach?

Mr. WAINWRIGHT. No, it is not, and I believe that was what I just addressed in my previous response. So maybe I misunderstood your initial question.

Mr. CARBAJAL. Thank you.

I have limited time. So, Ms. Lerdahl, you stated in your testimony that after being excluded from the DBE program, you bid on several contracts, but were unsuccessful.

To your knowledge, did those contracts go to other DBEs?

Ms. LERDAHL. Thank you, Representative, for the question.

No, absolutely not. They went to large electrical companies that were not DBE firms, and in fact, our experience in the State of Washington was when the waiver was enacted, prior to that, the DBE community had about 17 percent participation, and after the waiver was enacted, that fell to about 8 percent or 8½ percent participation, approximately.

So those DBE dollars did not go to other DBE firms. They actually went to the prime contractors who self-performed that work.

Mr. CARBAJAL. Thank you very much.

Madam Chair, I yield back.

Ms. NORTON. Thank you very much.

Representative Graves, and thank you, Representative Carbajal. We now go to Representative Graves.

Mr. GRAVES OF LOUISIANA. Thank you. Thank you, Madam Chair.

Witnesses, I want to thank you very much for your testimony and participation today.

My first question is for Mr. Ali.

Mr. Ali, in the 2018 FAA reauthorization bill, we changed the size standard for DBEs in the legislation in regard to FAA DBE participation. I am just curious if you have any reflection or reaction to that law change and how it might have caused an impact on DBE contracts within the aviation space.

Mr. ALI. Yes, I think it was good that we had, in regard to that position, when you start looking at it, we had to have the size to equal the SBA. I mean, that helped with DBEs because some of the size standards were not working. They were not equivalent.

So we really appreciate what the committee has done and argued for this inclusion of this kind in the Moving Forward Act we thought.

Mr. GRAVES OF LOUISIANA. Thank you.

I want to first ask Mr. McDonald and perhaps Ms. Norman. Our State department of transportation in Louisiana has indicated that some of their success in growing DBE participation has been the result of these community partnerships that they have helped to establish and sort of create a larger market within the DBE community for some of the contractors to be able to hit their DBE goals.

Have you all established any type of partnerships or any other strategies that have resulted in increasing DBE participation?

Mr. MCDONALD. I would say that we have, and as I mentioned earlier, the idea that we extend that same olive branch to our primes that I do with my DBEs. I actually hold virtual workshops now during COVID, but prior, meet and greets with the primes to make sure that they understand the county's program, that they understand the Federal program; they understand our expectations.

And certainly, we want to entertain any questions or concerns they may have historically had with our DBEs. We also then do the same with the primes and the DBEs.

The model I am trying to describe is that the more we know about the project price, the more we extend the information to the DBE community as well as the prime community before the bid

ever comes out helps to build the relationship so that they understand the county is serious about the Federal program.

We are going to adhere to the 49 CFR regulations, and that is not against the prime. That just makes sure that the prime understands that it's a commitment for our great economy to use our minorities and women and, yes, to allow our minorities and women as DBEs to get in front of our primes early for the pre-qualifiers.

So that's one of the things that we do on a regular basis to try to assure that who the primary themselves who have the DBE, they maintain them and also to let us know that we are having challenges with our DBE so that we can continue to try to develop them.

So we do the collaboration regularly.

Mr. GRAVES OF LOUISIANA. Thank you. Thank you. I appreciate that.

Ms. Norman, I don't know if there is anything you wanted to add.

Ms. NORMAN. Yes, same here. We do our collaboration opportunities with our primes.

We also have what we call the TDAC. It is the DBEs, our Transportation DBE Advisory Committee. It is where the DBEs come together along with the primes. They have their president, their vice president, secretary, and treasurer. We meet quarterly.

Out of that they build relationships. Every year we hold what we call a DBE symposium, where we bring in primes, where we bring in DBEs who have graduated from the program.

We also have, as you enter the workshop, we have what we call a matchmaking event so that we can match some of the DBEs with the primes, some of the scope of work opportunities, and so we do that often.

We also seek out, as someone talked about earlier, mentorship programs, partnering with large firms like within the tolling industry where there are not a lot of DBEs who have that skill set; partnering with those kinds of agencies to build the capacity for our DBE firms.

So it is about partnership, and it is about collaboration.

Mr. GRAVES OF LOUISIANA. Thank you, Ms. Norman. Thank you and Mr. McDonald.

The last question, I am going to kind of bring those two together. So years ago I ran a large infrastructure program, and often we would meet with DBEs that wanted more work.

The type of work that we did in some cases was a very specialized area, and so we would be sitting there with contracts of tens of millions or maybe even hundreds of millions of dollars, and as you can understand, somewhat cautious or concerned about giving a contract to a firm that maybe does not have that resume or that portfolio of expertise in the field.

You have both talked about partnerships and mentoring programs. So on the one hand, we have eliminated the gross receipts cap in the FAA, the H.R. 2. The highway bill that is moving through also eliminates that nearly $24 million gross receipts cap.

I am trying to figure out how do you strike that right balance of not giving contracts to folks that do not have the right expertise, but at the same time do not allow these huge contracts to slide in

under a DBE label whenever they are taking work from smaller businesses.

Ms. Boyer, do you want to comment on that at all?

Ms. BOYER. I think one of the things that we have done in Illinois for the Illinois Department of Transportation is we do a lot of teaming between small firms and large firms, and that seems to really work well. It gives the small firms the ability to lead the project, but it has the support of the larger firms that have the breadth of experience and really a workforce that can help us out when we need the extra manpower.

So I think joint mentoring and teaming opportunities between prime and DBE firms is really important, and I think it is a way to advance us all because what it also does is the prime firm learns or the bigger firm learns how to be a sub. They learn that information needs to flow up and down, and sometimes if they never have the opportunity to work as a subconsultant or a subcontractor, they never understand the importance of passing on information in a timely manner.

They do not even have any idea what it is like to be a DBE firm. So I think overall it strengthens the entire industry.

Mr. GRAVES OF LOUISIANA. Thank you very much. I appreciate it.

I yield back, Ms. Chair.

Ms. NORTON. I thank the gentleman for his question.

Representative Stanton.

Mr. STANTON. Thank you very much, Madam Chair. Thank you for holding this important hearing.

Thank you to the witnesses for being here.

As people on the committee know, I am a new Member to Congress. My former job was mayor of a large city, mayor of the city of Phoenix, and I am a huge fan of the DBE program.

I witnessed with my own eyes when we were lucky enough to do a large infrastructure program at our airport or advanced light rail in my city or build a water treatment plant the opportunity to get businesses, often small businesses led by women, led by people of color, an opportunity to get a portion of that work and see them build their companies, grow employment, build their own wealth.

It is really great for the city, and a benefit of this program also that I witnessed over and over again is that the DBE firm leadership often would become the leadership of the city. As those companies grew in size and importance in our community, I would tap the leadership of those companies for important boards and commissions or nonprofit board seats, et cetera.

They tend to be some of the most civically active business leaders in a community. The DBE program is critically important to opening the door for small businesses owned by socially and economically disadvantaged individuals to compete for important federally funded projects.

Today I want to highlight just one DBE success story in Arizona. Arizona Heat Contracting, a woman-owned DBE company, had only one contract with our State DOT prior to joining the South Mountain Freeway Team, the largest project to date in Arizona at almost $2 billion. The company was contracted to perform trucking activities on this new 22-mile freeway.

The original contract was for $25,000. That was just the start. The company did well and kept growing and growing, got in new contracts, ultimately got contracts valued up to $9 million, and then they were able to subcontract with over 81 DBE and non-DBE trucking firms to assist in delivering the main portion of the project's trucking needs.

That is a great success story. They were successful in maintaining ownership and control of the trucking operations on a project which had an aggressive schedule and many requirements.

Arizona Heat was able to quickly adapt to take the necessary steps in a very short period of time in order to sustain the needs of the project and increase its capacity.

I mean, that story has played out over and over and over again in communities throughout this country. It is just one example of many successful DBE programs in my State and has been in so many other States.

I have a question for Ms. Williams.

Ms. Williams, the committee recently enacted a provision which was included in H.R. 2, the Moving Forward Act, to remove the gross receipts cap under the DBE provisions applicable to the Surface Transportation Program.

If enacted, certified DBEs would be eligible to participate in federally funded highway and transit projects based upon their Small Business Administration size standard, as is the case in the aviation DBE program.

Ms. Williams, how would such a change benefit certified DBEs seeking to participate on highway and transit projects?

Ms. WILLIAMS. Thank you. That is a great question.

I think it will help if those caps were lifted. However, many times the problems for graduating or the problem existed that pushes people out of the program is not the cap on gross receipts. It is the cap on personal net worth.

If I do not have the personal net worth to go after a $24 million project, then it does not behoove me to go after it. I do not have the resources to fund it.

And so I think a greater emphasis should be put on looking at the personal net worth cap as well.

Mr. STANTON. All right. You have given this committee a lot of food for thought with that good advice. I appreciate that, Ms. Williams.

Mr. Ali, how has participation in the DBE and ACDBE programs made AMAC members more competitive outside of the DBE program?

Mr. ALI. Yes, thank you for the question.

What we found, as you heard earlier, the joint ventures that you heard from Ms. Boyer, those joint ventures and those teaming arrangements, that you have seen that happen more often, and as a result, they have been able to take some of those partnerships outside of the airport industry into other transportation industries as well as into the private industry, which allows them to build relationships.

We should never forget business is done with people in business with people you know, people you like, and people you trust. And that is really done in this space where you get people to engage.

So the DBE program kind of helps to align for some of that, particularly since there has been so much discrimination in the past, that this provides a way for people to partner and grow and learn to work and build together so they can do exactly what you said. People get to know who they are and be able to put them on board commissions together.

Mr. STANTON. Thank you, Mr. Ali.

Thank you, Madam Chair. It has been an excellent, excellent hearing. I yield back.

Ms. NORTON. I thank the gentleman.

Representative Fletcher. Representative Fletcher.

Mrs. FLETCHER. Yes. Thank you, Chairwoman, and thank you and also Ranking Member Graves and Chairman DeFazio for holding the hearing today.

Thank you so much to the witnesses for taking the time to testify. Your stories have been very powerful.

I also want to thank my colleagues for their thoughtful questions and their ongoing support of the important work we are doing here today, especially Mr. Johnson from Georgia, who reminded us all why this program exists and why it matters.

As we have heard, the DOT Disadvantaged Business Enterprise program is an important program created to ensure that minority- and women-owned businesses have a fair chance to compete for Federal DOT funds, a program that has historical roots that, as we have heard from our witnesses, is very much needed today.

For more than 40 years, the program has opened access to small businesses across the country who would otherwise not be able to compete for many of these projects, and we have seen the results in my hometown, for example.

Thanks to this program, more than 30 percent of both George Bush Intercontinental Airport and William P. Hobby Airport contracting and concessions goes to ACDBEs.

But as we have heard today, the committee has an important role in ensuring that the marketplace for DOT-assisted contracts is free from artificial and discriminatory barriers for women- and minority-owned businesses who wish to compete on a level playing field.

So I want to use my time here today to follow up on a few questions that some of my colleagues have already asked, and I actually want to start with Ms. Williams.

In your opening statement, I think the end of your opening statement was interrupted, and so I would like to give you the opportunity to just repeat the concluding sentence, the thing that you wanted to say in conclusion of your opening remarks.

Ms. WILLIAMS. Well, thank you so much.

I will repeat that. So in conclusion, I wanted to say that the program is not a handout. It is a leg up. It forces big companies and public transit agencies or public transportation authorities to do business with minority companies.

Without the DBE program, we would probably be out of business at the end of the life cycle of our contracts that are in the pipeline.

And my last statement there was that we need to be protected like we protected the bald eagle.

Mrs. FLETCHER. Well, thank you so much, Ms. Williams. I did want to hear you full statement, and I want to follow up with you on a particular question kind of following up on what Chairman DeFazio was asking in his questions to Dr. Wainwright about public versus private projects.

Can you share with us kind of the percentage of your work or your revenues that comes from public versus private projects?

And talk about kind of the effect of the DBE program, public versus private, and how that might help particularly in the bidding process in Dallas, but also more generally.

Ms. WILLIAMS. Private work is null. We have probably done a few private projects in the past. They tend not to come frequent enough to sustain us, and they also come with other issues that we do not face when we do public work, like getting paid. That is important.

As far as the contracts that we do have in the public sector, those have been our lifeline. I think that without those projects, we would not be in business. We just simply would not because we depend on the DBE program.

Would I like to graduate? I would, but as others have mentioned, it is frightening because I know what happens when you pull the covers back.

I think sustainability is really important, and sustainability happens when there is continuity between projects, when you are able to retain staff between projects, when the team you have worked with is continuing on to another project together.

And so there is a lack of continuity, and what happens is you are forced to lose your resources because you cannot sit them on a bench. And so this cycle just starts over and over and over again.

Thank you.

Mrs. FLETCHER. Thank you very much, Ms. Williams.

And I want to use the remaining time that I have, which is not a lot, to direct a question to Dr. Wainwright.

In your testimony, you stated that statistically significant disparities facing minority-owned and women-owned businesses persist to this day, according to research, and looking at the disparities, what gaps do you feel your research reveals where the DBE program could be used to further reduce the existing and currently present disparities?

Mr. WAINWRIGHT. I want to make sure I understand your question, Representative. Is it what more could the DBE program be doing?

Mrs. FLETCHER. Yes. I mean, does your research reveal gaps where the DBE program could be used to further reduce the continuing and existing disparities?

And very quickly. I think I have gone over my time here.

Mr. WAINWRIGHT. Yes. It is kind of a policy question, a little bit out of my wheelhouse. I guess I would say quickly, seeing these programs, there are still a lot of cities and counties and States around the country that do not run comparable programs, and it would be nice, and as one of them I would say also within the Federal Government outside U.S. DOT.

So it would be good to see a more consistent and widespread effort to promote contracting diversity in the public sector and, of course, to see that spill over into the private sector.

Ms. NORTON. I thank the gentleman.

Mrs. FLETCHER. Thank you very much, Dr. Wainwright, and Madam Chairwoman, I yield back.

Ms. NORTON. I thank the gentlelady for her question.

Representative Espaillat.

Representative Espaillat, are you muted?

Mr. ESPAILLAT. Yes, I am here.

Ms. NORTON. All right.

Mr. ESPAILLAT. How are you?

Ms. NORTON. Go ahead.

Mr. ESPAILLAT. Yes. Thank you, Madam Chair, and thank you to all the panelists for being here.

This is an incredibly important hearing. I am grateful to come from a State and a city like New York which has programs in the transportation and construction sector that go well beyond the requirements of disadvantaged business enterprises. But there are so many underlying issues that I believe we need to address.

Last year I held a meeting with my local Transportation Task Force to discuss better inclusion of DBEs. I have had our local contractors association provide us a thorough examination to a number of community groups and leaders so they could ensure small businesses in the city have a good sense of how the DBE program works.

One of the biggest take-aways from the meeting was that even though New York is full of diversity and has very aggressive diversity goals, there is still a pipeline issue in the construction sector.

That is why I am working closely with former congressman Charlie Rangel and City College of New York to develop a state-of-the-art infrastructure training program because we feel that there is just not enough young people particularly ready for the potential jobs that may be coming towards the future.

So I believe that as we invest in infrastructure, we also need to invest in training the diverse field of candidates for the jobs that will come along the way.

Another issue has been brought to my attention is the NAICS issue. The NAICS size standard negatively impacts the ability of DBEs to grow.

So I want to ask the panelists: have you faced similar issues?

Do you believe that changes need to be made to the INVEST in America Act to sufficiently resolve these issues?

And is there more that we can do to ensure that DBEs are not held back?

Any of the panelists.

Ms. WILLIAMS. This is Eve Williams.

I would like to address the NAICS standards on senior [inaudible] architectural services, and it puzzles me as to why engineering [inaudible] service. The engineering cap on gross revenue is somewhere near $14 million over an average 3-year period, but yet engineering architecture services are near $7 million.

I think in speaking for the architects, I think that they are severely held back because of the NAICS code standards or cap on just architectural services.

Mr. ALI. Yes, this is Farad Ali from AMAC.

I would say that there needs to be some real evaluation of what Ms. Williams was talking about earlier, which is personal net worth. I think it is unreasonable to believe. I think you create some kind of economic discrimination by keeping the number so low and then expect for businesses to, quote, unquote, "graduate" or to "perform better."

It is hard to continue to have a small net worth and expect that people can grow to $30 million or $40 million or $15 million. I mean, it is almost unreasonable.

That is the problem that we ran into in the car rental industry because you have got a $1.3 million net worth requirement, net standard, that means you cannot have over that, but yet you have the cars.

If you wanted to be a dealer for rental cars when you have got $50 million of rental cars, if you only have a net worth of $1.3 million, you could not even get a contract to do that work.

So I think there should be some real intensive studies on understanding the impact of keeping the net worth at its current level and how that has also created some economic discrimination until you start really raising that so people can have growth and share in the prosperity.

Mr. ESPAILLAT. Anything on the pipeline issue from anybody or do you find that there are not enough trained folks for the jobs that may be coming our way in the future?

And what can we do about it?

Mr. MCDONALD. No, the pipeline actually is an issue, and you are absolutely correct.

So we are working here within our State and with our county to expand our apprenticeship program in addition to what we are trying to do to prepare for DBEs.

As the county we, too, just decided that we are going to align our own county procurement with apprenticeship, requiring primes to use a percentage of their activity with the contracts they win from the county to be done with apprenticeship.

So we are believing that we are going to able to grow that in a similar manner over with the DBE, but the pipeline is an issue that we are trying to address right now because we do not have disciplines as we go forward and infrastructure begins to grow and bloom as opportunities for small businesses.

Mr. ESPAILLAT. Thank you, Madam Chair. I yield back.

Ms. NORTON. I thank the gentleman for his question.

Representative García? Representative García? Are you muted or are you present?

[No response.]

Ms. NORTON. Then I am going to move on to Representative Cohen.

Representative Cohen, are you muted?

[No response.]

Ms. NORTON. Then the last Member who has not been heard is Representative Carson.

Representative Carson, are you muted?

[No response.]

Ms. NORTON. I want to thank all of the witnesses for their testimony today. I think this hearing has been very telling and essential.

It was particularly essential this year when we are seeing demonstrations over racial discrimination. It is one thing to demonstrate to take down a Confederate statute that was erected decades ago and be successful at that.

It is quite another thing to make sure to raise up the ability of minorities and women to participate in Government programs.

That is an issue for today and in keeping with the kinds of reckoning that are happening in our country.

The comments of our witnesses today have been very helpful. They will be taken into consideration, especially your comments calling for changes in the statute itself.

I want to thank each of the witnesses for your testimony, your very informative and helpful testimony.

I ask unanimous consent that the record of today's hearing remain open until such time as our witnesses have provided answers to any questions that may be submitted to them in writing.

I also ask unanimous consent that the record remain open for 15 days for any additional comments and information submitted by Members or witnesses to be included in the record of the day's hearing.

Without objection, so ordered.

If no other Members have anything to add, the committee stands adjourned.

Thank you very much.

[Whereupon, at 1 p.m., the committee was adjourned.]

# SUBMISSIONS FOR THE RECORD

**Prepared Statement of Hon. Eddie Bernice Johnson, a Representative in Congress from the State of Texas**

Almost four decades ago, the Disadvantaged Business Enterprise program was enacted to address the stubborn and harmful institutionalized bias and systemic racism people of color were facing in the transportation industry. Since its enactment, the program has made progress, but that progress has been far too slow. This committee has collected enormous amounts of evidence that illustrates just how difficult it is for DBEs to succeed in today's environment. The bottom line is that DBEs must fight twice as hard and still usually end up getting far less money than goes to firms owned by non-minority males.

Discrimination greatly increases the difficulty for women and minority owned firms to succeed. A recently published disparity study conducted for the Texas Department of Transportation used Census data to examine this issue. The study found that the business formation rate for white males was 5.4 percent, but the rate for African Americans was less than a third of that—1.6 percent. For Hispanic Americans it was 2 percent, for Native Americans it was 2.9 percent, and for white women it was 3.1 percent. For Asian/Pacific Islanders it was better—5.2 percent but still lower than for white males.[1]

The disparities for firm formation in construction in Texas were even worse. White men formed construction firms at a rate of 10.3 percent, but for Asian/Pacific Islanders the rate was only 9.5 percent. For white women it was 8.9 percent. Shockingly the construction firm formation rates for Native Americans, Hispanic Americans and African Americans were 4.9 percent, 3.5 percent and 2.9 percent respectively.

Think about what this means—as bad as the economic disparities are for firms owned by minorities and women, the current data actually understates the problem, since it doesn't take into consideration all the firms that could never even get off the ground. How can minorities and women ever erase the gaps in business inequality if discrimination keeps them from even forming the businesses they need to compete?

This is exactly what makes the DBE program so important—while it doesn't fully level the playing field, it provides a demand for businesses owned by minorities and women and gives those businesses that do exist at least a fighting chance to compete.

It is my hope that this hearing today will help us better understand the importance of this program along with the areas where this program can be improved upon. I look forward to hearing from our witnesses. Thank you.

**Prepared Statement of Hon. Rick Larsen, a Representative in Congress from the State of Washington, and Chairman, Subcommittee on Aviation**

Thank you, Chair DeFazio and Subcommittee Chair Norton, for holding today's hearing on the importance of the U.S. Department of Transportation's Disadvantaged Business Enterprise (DBE) Program.

Women and minority-owned businesses are fundamental to economic growth in Northwest Washington and the success of U.S. transportation.

I saw this firsthand when I met with Marques Warren of Warren's News and Gifts at SeaTac Airport in Seattle.

[1] *Texas Department of Transportation Disparity Study 2019*, Colette Holt & Associates, 2019, at 133.

Marques' father, Ardie Warren, opened the family's first store, Northwest Encounter, at SeaTac in 1994. The news and gift store has now grown to 18 locations in the airport in partnership with the Hudson Group.

To launch their business, the Warrens depended on Airport Concessions Disadvantaged Business Enterprise (ACDBE) loans, which help level the playing field for airport concessionaires.

The needs of U.S. transportation industry are as diverse as the passengers it serves.

Congress must work to improve equity in the industry and increase economic opportunity for women and minority business owners.

One of the ways Congress can support these efforts is through preserving and improving the Disadvantaged Business Enterprise (DBE) Program.

According to the American Community Survey, women and minorities significantly establish fewer businesses and earn less from those businesses than their white male counterparts.

To address these disparities, the DBE program aims to increase the participation of women and minority-owned businesses in federally funded transportation and infrastructure projects.

The Port of Seattle is one example of the DBE program's positive impact.

According to the Port, DBE firms received more than $4.9 million for work performed on Federal Aviation Administration (FAA) funded projects, including taxiway improvements and residential noise insulation.

The Port's Diversity in Contracting program tripled the number of women and minority-owned businesses doing business with the Port. Last year, the program met its five-year goal of increasing the amount of spend on these contracts to 15 percent.

The DBE program is key to improving economic opportunity for small businesses in U.S. transportation, but Congress can do more to meet the needs of women and minority entrepreneurs.

Last year, the Washington State Department of Transportation (WSDOT) conducted a disparity study, which found:

- Smaller airports want more assistance from the FAA and WSDOT to increase DBE participation; and
- Without the program, DBEs would be effectively shut out of the market with devastating impacts to these businesses, among other conclusions.

I look forward to hearing from today's witnesses, including the Airport Minority Advisory Council (AMAC), regarding the critical need to continue the DBE program and ways to improve it for women and minority-owned businesses, particularly in aviation.

Diversity in hiring and contracting is essential to strengthening the nation's transportation and infrastructure, and to keep the country competitive in the global market.

Today's witnesses are important partners in these efforts.

**Letter of July 13, 2020, from Lawrence T. Green, President, Divine Cement, Inc., Submitted for the Record by Hon. Peter A. DeFazio**

JULY 13, 2020.

Mr. PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

Re: In Response to the Request from the Committee on Transportation and Infrastructure for a Letter or Statement on the Disadvantaged Business Enterprise Program

DEAR CHAIRMAN DEFAZIO,

Construction is an area that has historically excluded black workers. This includes the unionized portion of the industry. Giving minority workers access to good paying jobs has always been an important part of closing our large and persistent racial wage inequities. This is a critical issue that must be addressed and resolved. Trade unions have had a complicated and often ugly history with race. That history has helped shut blacks and Hispanics out of these highly coveted lines of work.

I have worked in the construction industry since the age of sixteen. I worked as a cement finisher another sixteen years before starting my own company, Divine Cement, Inc.

The construction trade has always been employment set aside for predominately Caucasian men. During high school, I remember vividly my white counterparts landing summer jobs in the trades while my black and hispanic counterparts worked in the fast food industry or retail such as clothing and shoe stores at the local mall.

In June 1971 the New York Times wrote, "The building of houses, offices and factories, of bridges and dams and highways is still largely white man's work in America."

Despite Government-imposed quotas and timetables, despite voluntary "hometown solutions" and "outreach" programs to train inner-city youths along with seemingly constant litigation, the number of black and other minority workers entering the construction industry remains a thin trickle.

There is some evidence that these efforts have forced open the door to employment in the construction trades at least a crack. The number of blacks now entering construction jobs is still insignificant in terms of their need for employment and higher income. The crack is so insignificant, light can't shine through.

According to a 2018 Crain's New York Business article, "In 2015, the Center for Union Facts, released data on the racial pay disparities in the construction unions. We noted that only 25% of unionized construction workers were black, compared with 53% and 43% in the health care and transportation sectors, respectively. Additionally, we found white workers were getting better-paid job assignments than minorities, who often had lower-paying apprenticeships. Fast forward to current research and those figures confirms there has been little to no change."

The reasons for Black invisibility at street construction sites are racist exclusion, cheap labor, and the refusal of city and county officials to enforce anti-discrimination labor laws. While the laws are in place, they are routinely circumvented allowing discrimination to continue. But most importantly, the reason is racist exclusion and it starts with the unions. The long history of racial closed doors toward African Americans in the trades is well-known and documented with construction at the top of the list. These are the plum paying and plum benefit jobs in the construction industry. They have long been jealously guarded as the sole preserve of blue-collar whites as cited in "The Hutchinson Report" by author and political analyst Earl Ofari Hutchinson.

Some of my personal experiences begin with unfair practice of how and when mobilization is paid out. When my company is selected as the subcontractor, we have a significant amount of work to perform and rely on mobilization monies to purchase equipment and materials to start the job. We are forced to wait until two weeks prior to the scope of work starting before being paid mobilization. Often times, we do not receive mobilization until after the scope of work has begun.

More importantly, we are forced to wait sometimes months after the general contractor is paid before we receive payment. More times than not, we are forced to call the general contractor numerous times requesting we be paid and this is after confirming they have been paid by the owner. It is extremely frustrating to complete a job on or ahead of schedule, with complete satisfaction of the general contractor only to be sent a perceived message of, "You'll get paid when I feel like paying you and not a day before!" It is extremely disheartening.

The DBE Program has enhanced Divine's opportunities in the highway, transit, and airport construction industries simply by existing. The consequences of not having the program would be our business would not exist. But for the Disadvantage Business Enterprise and the requirements to use minority owned businesses, Divine Cement, Inc. would not a reality because general contractors would self-perform.

Securing working capital is extremely difficult for minority owned businesses. Personally, I am repeatedly forced to secure loans with interest rates that mirror loans from merchant cash advances. While the interest rates are uncomfortably high, the loans are necessary to make payroll and purchase the equipment and materials needed to perform the job in the absence of mobilization.

Our saving grace has been that the consistent superior quality of work Divine Cement provides has afforded us the opportunity for additional work. Moreover, additional contracts are awarded after the realization that Divine Cement's performance surpasses expectation. One of the visions of Divine is to create a state-of-the-art training center to equip other minorities to provide a more diverse group of highly trained and qualified tradesmen thereby opening the door for my more successful minority owned companies like Divine Cement, Inc.

Sincerely,

LAWRENCE T. GREEN,
*President, Divine Cement, Inc.*

**Letter of July 15, 2020, from Linda Moen, P.E., LEED BD+C, President and Managing Member, EFK Moen, Submitted for the Record by Hon. Peter A. DeFazio**

JULY 15, 2020.

Hon. PETER DEFAZIO,
*Chair,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

Re: Request from the Committee on Transportation and Infrastructure on the Disadvantaged Business Enterprise (DBE) Program

DEAR MR. DEFAZIO,

My company, EFK Moen, is a woman-owned civil engineering design firm with offices in Missouri, Illinois, and Georgia. I own 57% of the company and I worked in the public sector as a highway design engineer, project leader and regional design & operations manager for 13 years before starting my company. I have a strong background in highway design and in management of public highway projects, but it was still difficult for me to get approval in the DBE program—the state Department of Transportation (DOT) I first applied for DBE certification with challenged me to prove that my father (a retired construction engineer with no design experience and no involvement with my company) or the other men who worked at my company were not the "brains" or "influencers" of my company. I stood firm, overcame those hurdles and have been in business for over 22 years (1998 to the present). I have grown my company from 4 to 54 engineers and surveyors; with 5 offices in Missouri-Illinois-Georgia; and EFK Moen has a respected position in the industry as an experienced design firm capable of leading large highway and bridge infrastructure projects and as a valued teaming partner with other national civil engineering design firms. Without the DBE program, I expect I would be dabbling on very small project assignments or I would be out of business.

The construction industry is built on managing risk and trusting that others will be able to do their job well and contribute to a project's profitability. For an agency or a prime contractor to take a chance on a new/unknown/small firm there needs to be an incentive. Women-owned and Minority-owned firms are "unknowns" because we are seen as strangers to this industry—still after over 30 years of DBE–MBE–WBE programs—because we do not fit the typical image of construction workers and project managers. There are individuals who are interested in giving firms a chance, but when they see it could impact their bottom line it is a very hard call to make without an incentive. The DBE program provides incentive and has been very successful in the markets I work in. The program gives me enough value-potential to have the initial discussions with a potential client—whether that is an agency or prime contractor/consultant. Then my company can prove that we are capable and have value on our own, beyond the DBE incentives. We can build relationships that break the pattern and help women and minorities become part of the "face of the industry". EFK Moen has successfully become one of the top engineering design firms in the Missouri public works market with MoDOT and with local counties and municipalities; we have successfully become a valued part of the very large engineering design industry in Illinois; and we are starting out strong in the Georgia engineering public highway and bridge design market. In each new market, our DBE certification has provided us opportunities to team with other engineering firms and prove our value.

The DBE programs run by the state DOT's we work with are very strong, inclusive and ethical. The DOTs provide training opportunities on how to do business with government agencies (which is quite a bit different than doing private work) and facilitate introductions to prime firms in the industry. Business owners in the program support each other and support the philosophy of bringing other disadvantaged people and firms into the industry. The FHWA and state DOT commitment to the program sets the tone for the industry to value the program also, and to strive to build up the industry's woman-owned and minority-owned firms to match/represent the communities where those tax dollars are spent. The state success in supporting capable DBE firms creates a pool of women-owned and minority-owned firms who are available to do work in their region on projects outside the program also.

The culture created by the DBE program is valuable to our industry and supports a healthy inclusive environment for firms and for diverse individuals who are under-represented in our industry. Engineers' and surveyors' potential is not based

on their skin tone, ethnicity, culture or gender—success in technical fields is based on a love of problem solving. Encouraging diversity in our industry pushes that reality forward and teaches us not to judge a person's capabilities based on the appearance of other capable engineers we have worked with in the past. As in any process, it is "easier" to continue the status quo, to continue doing business with the same type of people you have always worked with. But the reward for the community comes when we try a little harder and reach out with opportunities for everyone.

Thank you for accepting my letter of support for the DBE program. It has been very valuable to me, to my company, to the engineering/construction industry and to our community.

With warm regards,

LINDA MOEN, P.E., LEED BD+C,
*President and Managing Member, EFK Moen.*

**Letter of July 1, 2020, from Carla M. Williams, DBELO, Director of Community and Business Engagement, Hillsborough Area Regional Transit Authority, and President, COMTO Central Florida Chapter, Submitted for the Record by Hon. Peter A. DeFazio**

JULY 1, 2020.

Hon. PETER DEFAZIO,
*Chair,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

RE: The Hillsborough Transit Authority's (HART) Support for the Reauthorization of the DOT's DBE Program

The Hillsborough Transit Authority's (HART) is responding to the request from the Committee on Transportation and Infrastructure for a statement on the Disadvantaged Business Enterprise Program.

The DBE program has enhanced transit in the Tampa Bay area, in Florida. Over a ten-year period (2010–2019), awards, with federal dollars to primes averaged about $4.1 million, while about 11.1% of $4.1 million went to DBE's. The major construction projects during this period (2010–2013) included:

- CNG Fueling Facility
- TECO Streetcar Line Phase II

Contracts to DBE's spiked in 2011 to 108 DBE's. The final construction was completed by 2014 and overall federal funds levelled off after 2015 to average about 14.6 DBE contract awards.

CONSEQUENCES IF THE PROGRAM WERE NOT TO RECEIVE REAUTHORIZATION

It would be unimaginable to discontinue the DBE program during these tumultuous, economic strained times. The COVID–19 crisis hit with people of color struggling to stay healthy, provide for their families, and keep their small businesses going, while still striving to stay safe from enforcement brutality or worst. The death toll of this pandemic has been reported to hit Black and Brown skinned people in the United States at a higher proportion than others. Removal of continued support to Disadvantaged businesses would be like adding an accelerant to an already well burning fire.

If the country's goal is to maintain a level playing field, assistance is still needed for the minority disadvantaged business. Yes, there has been improvement since the 1982 inception of the DBE program. However, the scale of fairness and the Good Ole Boy Network still is vibrant and not willing to yield to inclusion.

Still most of the subcontracting opportunities on HART projects are only filled with a DBE when a goal is set because of federal funding (Race Conscious). HART has experienced a major, well-known and highly utilized company agreeing to hire DBE's but backed out and said that the DBE was not cooperating on their expected salary. When in truth the DBE Company was never contacted and the conversation about salary never took place. The prime contractor found a non-DBE with a similar name and attempted to pass the company off as the DBE. This deviousness only surfaced when the DBE firm called the HART DBE Coordinator to ask what was going on and when they could expect to start work.

PROCUREMENT ISSUES

*Issue 1: Open and Transparent Communication of Informing DBE's of Upcoming Opportunities*

Notifying DBE's on regular solicitation lists. Currently DBE's, registered in the HART Vendor System, are not notified automatically when opportunities arise. The solicitations are advertised on the HART website, however since the procurement solicitation is not linked to the vendor registration system it can't automatically search for vendors with the NAICS codes.

The vendor is required to download the bonfire software to their individual computer for automatic notifications and to get details of a solicitation.

Our DBE staff is collaborating with the Procurement Department to improve the process to ensure the information can be transmitted to qualified DBE's, who are registered in the HART Vendor System in a timely manner so that they are aware of the bid opportunities and have time to prepare the appropriate paperwork.

*Issue 2: Good Faith Efforts to Sub-Contract DBE's*

*DBE Goal Waived by the Director of Procurement*: HART experienced a prime contractor who came unbelievably close to the project's Independent Cost Estimation. The eligible, federally funded project allowed for a DBE goal. When the solicitation was examined none of the selected subcontractors were Unified Certification Program (UCP) DBE's. This procurement required the use of the Good Faith Efforts clause. After efforts were made to obtain UCP DBE's and the results were examined, the additional expense to the prime contractor would have been $66. HART DBE Compliance ruled the additional price was not sufficient enough to stop the use of UCP DBE's on the project. The Procurement Director had the last say. The Procurement Director ruled the prime contractor had completed all that was asked of them and because of that, the utilization of DBE's on the project was not required.

*Dropping DBE subcontractors from projects*: After collaborating with Hillsborough County DBE staff, they saw a pattern where the same Prime Contractors solicit bids naming the DBE on their contract and later on dropped the DBE from the project. While it may be a legitimate reason, there may be a need to be notified by procurement staff at the time of solicitation when the same Prime Contractor keeps repeating the pattern.

Continuing the DBE Program will assist HART in continuing to make transit a viable travel option for residents within the Tampa Bay Region and attaining the objective to support transit projects that promote economic development and job creation. HART strongly supports the continuation of the DBE Program.

Sincerely,

CARLA M. WILLIAMS, DBELO,
*Director of Community and Business Engagement, Hillsborough Area Regional Transit Authority.*
*President, COMTO Central Florida Chapter.*

**Letter of September 19, 2020, from Colette Holt, Colette Holt & Associates, Submitted for the Record by Hon. Peter A. DeFazio**

SEPTEMBER 19, 2020.

Hon. PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives Washington, DC.*

DEAR CHAIRMAN DEFAZIO:

I write in support of the continuation of the Disadvantaged Business Enterprise program for federally-assisted transportation projects. My law and consulting firm, Colette Holt & Associates, has been involved in the DBE program and other contracting supplier diversity programs for over 25 years. I have conducted or participated in over 75 high-quality disparity and availability studies in recent years. These research projects evaluated whether there was sufficient evidence of discrimination for relevant jurisdictions to continue or to enact remedial race- and gender-based programs for public sector contracts. The statistical and anecdotal evidence gathered in these studies is necessary to support the use of race- and gender-conscious goals to combat discrimination and to ensure that program elements meet applicable constitutional standards.

This discussion focuses on the salient evidentiary findings that emerge from the following 23 Colette Holt & Associates studies. My conclusions are also informed by my decades of work with federal agencies, including USDOT and state and local government agencies across the country. Over 30 years of research reveals a stark truth:

> DBE goals remain necessary to ensure that minority- and woman-owned businesses have full and fair opportunities to compete for USDOT-funded contracts. Without goals, DBEs receive little to no work. There is also no doubt that the availability and capabilities of these firms are depressed by the effects of past and current race and gender discrimination. The DBE program therefore remains essential to ensure that the federal government does not function as a passive participant in ongoing discrimination in the market for USDOT-funded contracts.

This finding is supported by two types of proof: 1. Quantitative or statistical evidence looks at the utilization and availability of minority and woman firms, and where necessary for agencies located in the Ninth Circuit Court of Appeals, disparities between the utilization and availability of DBEs. 2. Qualitative or anecdotal data that describes the experiences of business owners in their market areas with discriminatory barriers.

## QUANTITATIVE EVIDENCE FROM RECENT COLETTE HOLT & ASSOCIATES DISPARITY STUDIES

A high quality disparity or availability study provides detailed results of an analysis of the recipient's utilization of DBEs, measured in dollars paid as a percentage of all firms' receipt of dollars paid. Contract records must include prime contract dollars and all subcontractor dollars, not just those paid to DBE subcontractors. These records must be examined at the 6-digit North American Industry Classification System ("NAICS") code level to ensure the results are "narrowly tailored" to the recipient's own contracting activities.

Next, a study must estimate the availability of minority- and woman-owned businesses at the 6-digit level in the recipient's market area that provide the types of services and goods purchased by the recipient, as established by the utilization analysis.

Where there is a large gap between utilization and availability, the courts have held that such disparities can support an inference of discrimination. A ratio of 80 percent or lower supports a *prima facie* inference that the cause of the disparity might be discrimination. This "disparity testing" is not required for recipients outside the Ninth Circuit, since Congress, through the legislative process has previously determined that discrimination constitutes a failure in the market for USDOT-funded contracts. Even where statistical analyses is not required, the gulf between the minority- and woman-owned firms that could have received dollars and the actual dollars such businesses received presents strong evidence that remedial intervention through the use of narrowly tailored DBE contract goals is necessary and supportable.

It can also be illuminating to contrast the results of the DBE program, that uses contract goals to ensure equal opportunities, with programs in the same market area that do not take affirmative steps to remedy discrimination. Again, we found that without the use of goals, DBEs received little or no work.

We have provided our studies to the Committee. Please allow me to highlight a few results:

- Our 2017 Disparity Study for the Washington State Department of Transportation ("WSDOT") found that DBEs received dollars close to their availability on Federal Highway Administration funded contracts: DBE availability was 13.80 percent, and they were paid 12.90 percent of the dollars, yielding a disparity ratio of 93.30 percent. However, on state-funded highway construction projects on which WSDOT is prohibited from setting race- and gender-conscious goals by a state constitutional amendment, DBE availability was 19.0 percent [1], but they received only 6.40 percent of the dollars, yielding a disparity ratio of 33.50 percent. Clearly, the use of goals is what drove the FHWA results.
- Even when DBE contract goals are set, disadvantaged firms often received significantly less than would be expected in a discrimination-free market. For example, DBEs constituted 8.90 percent of the firms available to perform on FHWA-funded contracts awarded by the Texas Department of Transportation in

[1] The availability estimates vary by funding source because the types of contracts are somewhat different in scope and scale.

our 2019 Disparity Study, yet their availability was 28.10 percent, yielding a disparity ratio of 31.67 percent.

- Our 2019 State of Washington Disparity Study, which examined state-funded contracts other than for highway construction, found that minority and woman firms constituted 16.53 percent of the available firms but received only 9.00 percent of the dollars, for a disparity ratio of 54.43 percent.
- Even in the FHWA DBE program, DBEs, especially Black-owned businesses, often received few dollars in the recipient's core contracting activities. For example, in NAICS code 237310, Highway, Street and Bridge Construction, non-DBEs received 94 percent of contract dollars from NCDOT; Blacks received 0.3 percent. In the same subindustry in Washington State, non-DBEs received 88 percent of contract dollars; Blacks received zero dollars. Likewise, in code 237990, Other Heavy and Civil Engineering
- Construction, non-DBEs received 100 percent of contract dollars from NCDOT; DBEs received nothing. In the same subindustry in Washington State, non-DBEs received 94 percent of contract dollars; Blacks received zero dollars.

These and many more reports make it clear that discrimination continues to impede opportunities on the basis of race and gender, and that without the use of contract goals, the "playing field" for federal-aid contracts would remain tilted in favor of long established firms that enjoy the benefits of historic and ongoing structural exclusion that advantages White males.

### Qualitative Evidence from Recent Colette Holt & Associates Disparity Studies

Qualitative evidence gathered through surveys and personal interviews from these and other studies further supports the conclusion that racism and sexism continue to impede the entrepreneurial aspirations of DBEs seeking government contracts. Some representative comments follow.

*Discriminatory Attitudes and Negative Perceptions of Competency and Professionalism*

Many minority and women business owners reported that they continue to encounter discriminatory attitudes, stereotypes and negative perceptions of their qualifications and core competencies and capabilities by other firms and government officials. Explicit and implicit biases impact their attempts to obtain contracts and to be treated equally. Respondents reported that White men frequently display negative attitudes relative to their competency, skill, and professionalism.

> "When people meet me, [being an MBE] they assume certain things. As they get to know me and understand that I can speak construction, that I'm bilingual, that I speak engineering, then I get the comment, 'Oh you're different.' Or, 'You're educated.'" (2019 Dallas Fort Worth Int'l Airport Disparity Study).

> "The perception is just there that if you're Black or if you're a woman you probably don't know how to do X, Y, and Z type of work. So, they've already put [you] in that pigeonhole." (2014 State of Missouri Disparity Study).

> "[State personnel] look down on us as some kind of beggars for percentages." (2016 Illinois State Toll Highway Authority).

Minority- and woman-owned businesses reported that they were perceived to lack the capacity to do additional or more complex work.

> "There is significant evidence that the larger the goals are, the higher the capacity building . . . . People will take the opportunities. Because we're women or we're minorities doesn't mean that we're not entrepreneurs and we don't seize opportunity. It's just that the opportunity doesn't exist in the current market." (2015 State of Illinois Disparity Study).

Many women reported unfair treatment or sexual harassment in the workplace.

> "I still do find the initial contact with specifically, a general contractor, there is somewhat that attitude of you're a woman, let me tell you how to do this." (2019 Texas Dept. of Transportation Disparity Study).

> "I am the female, and they bring me like a tiny, little role in this large contract. They bring me to the interview to make the showing because I interview well and so they're going to put me in front of people . . . Then no work comes out of it." (2017 Washington State Department of Transportation Disparity Study).

"If you go into a construction zone, and you got wall-to-wall men construction in concrete, whether it's Mexican, it doesn't matter, but you feel like you're the only woman there. I got a gun with me all the time, all the time." (2019 State of Washington Disparity Study).

"Let's just be honest. I'm a woman who's in construction so that just equals bulls' eye . . . Other contractors who come in behind you and they call you [trade] chicks . . . Or, they tell you, what has the world come to because you're [trade] chicks . . . Men come out and they complain that a woman is running the crew . . . Even the men that I hire—I'm giving you a paycheck—struggle with taking orders from a woman . . . Someone comes to the job and they go to one of the guys [I employ] and they say, are you the lead there?" (2016 Illinois State Toll Highway Authority).

"'Here comes that big titted blonde'. That's what they'll say, right out loud, in front of everybody. And all the guys will just laugh. And I've got to suck it up and just do my job . . . [Even my employees often won't stand up for me.] If I react, that's just going to make me more belittled and [look] petty." (2019 State of Washington Disparity Study).

*Access to Industry and Professional Networks*

Relationships are pivotal to obtaining public transportation work as subcontractors and to opportunities to work as prime vendors. Both minority and women respondents reported difficulty in accessing networks and fostering relationships necessary for professional success and viability. Business owners frequently stated that there is a "good old boy" network. Barriers extended to agency staff; DBEs were unable to gain access to and communicate with key agency decisionmakers.

"The transportation industry as a whole is dominated by the civil engineers, which typically the folks graduating in civil engineering are White men. You have a very low proportion of women and minorities with those degrees. Inherently, then in the workplace, you're seeing very low amounts of diversity. Same thing in environmental services. You don't get a lot of women who are wildlife biologists. Someone with that type of experience typically has been hunting and fishing with his father and his grandpa their entire lives and they have a good old boys club. They go drinking, they go fishing, they go playing golf." (2019 Texas Department of Transportation Disparity Study).

"It's not being respected in the room, and it is body language. It's relationships, which I heard over and over again here, as a side word for experience. It's really, 'Do I have experience with you?' And somebody I'm more comfortable with, because they look like me, I'm going to choose the person I'm more comfortable with because they look like me." (2017 Washington State Department of Transportation Disparity Study).

"People have relationships with people that they feel that they can identify with. And that might be a problem because they're not willing to open the door for you and let you get in." (2014 Metropolitan Nashville Airport Authority Disparity Study).

*Obtaining Work on an Equal Basis*

DBEs were in almost unanimous agreement that contract goals remain necessary to level the playing field and equalize opportunities. Without contract goals, they would receive little or no work. Race- and gender-neutral approaches alone are viewed as inadequate and unlikely to ensure a level playing field.

"If those DBE goals had not been in there, we absolutely would not have been considered . . . . In fact, we were point blank told on a contract because they didn't have a DBE goal of some kind, they didn't even need to consider us." (2014 Metropolitan Nashville Airport Authority Disparity Study).

"I remember when the Tollway had no goals, and it was absolutely abysmal. There was never a minority or a female that worked on a Tollway job, ever. And we would tell them, DOT has goals. They find women and minorities to do work. It's the same kind of work that the Tollway does, and the DOT does. And it wasn't until the Tollway started to have some goals that we started to get work on Tollway projects." (2016 Illinois State Toll Highway Authority).

"If there is no goal-setting, you don't have any opportunity to perform as a subcontractor." (2016 Kansas City Consortium Disparity Study).

"[Prime contractors] use us because they have to." (2017 Washington State Department of Transportation Disparity Study).

"If you're not a DBE or HUB or SBE, you're not going to be considered for any work as a consultant for TxDOT because they're going to use these legacy firms for most of their work on the consulting side." (2019 Texas Dept. of Transportation Disparity Study).

CONCLUSION

The findings from our studies and other reports provide strong quantitative and qualitative evidence that Congress has a strong basis in evidence to continue to require recipients to implement the remedial DBE program. The studies provide proof of pervasive and systemic discrimination against women and minorities in the market for federal-aid contracts and support the need for appropriate race- and gender-conscious measures.

Thank you for the opportunity to submit this information.

Very truly yours,

COLETTE HOLT,
*Colette Holt & Associates.*

**Letter of June 16, 2020, from Katherine M. Cloonen, President, JK Steel Erectors, Inc., Submitted for the Record by Hon. Peter A. DeFazio**

JUNE 16, 2020.

Hon. PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

DEAR MR. DEFAZIO:

Regarding the DBE program and discrimination faced by female contractors, I am writing to provide a few examples of how, after owning my own business for nearly thirty years, I, the female owner, still face discrimination in the construction field. My company specializes in the installation of structural steel and rebar. The following examples punctuate the need to continue the DBE program in the 2020 highway bill:

- I asked a truck dealer for the bottom price on a pickup truck. A male employee called the same dealer for the bottom price on the same truck from the same sales rep, and he was able to get a lower price, even though my name was on the check written for the purchase.
- A prime contractor calls asking for the estimator of the company. When I say that I am the estimator, the person hangs up the phone.
- A salesperson calls and asks for the man in charge of buying the tools, and I say that I am the woman in charge of buying tools. The person hangs up the phone.
- When I am owed money by a contractor, and I call to ask about the funds, the accounts payable person 1) is not available, 2) has misplaced my check, 3) has misplaced my invoice or other required paperwork, or 4) simply does not return my call. When a male employee from my company calls, the money suddenly is on its way.
- The project manager of a prime contractor always called my foreperson, who was a male, for scheduling, he would not call me, even though I told him I was in charge of scheduling.
- A male project manager lied in a meeting as to what was said in a phone conversation with me. That particular lie cost me nearly $100,000 even though I stated he clearly lied.
- After a deadline for a bid, I found that I was not asked to bid a project because they "don't need no women on the job."
- A contractor called and asked me if I wanted to make more money. Instead of giving me an invitation to bid, he invited me to a meeting to sell health and beauty products for a multi-level marketing company. I told him that if I had to sell the beauty products in order to be a subcontractor for him, I would not do it. I have not done business with that company since then.

There are more examples over the years, but this is a sample of what still happens in the construction industry. Thank you for your consideration.

Sincerely.

KATHERINE M. CLOONEN,
*President, JK Steel Erectors, Inc.*

**Letter of June 24, 2020, from Carol L. Kwan, Carol Kwan Consulting LLC, Submitted for the Record by Hon. Peter A. DeFazio**

JUNE 24, 2020.

Hon. PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

Subject: Testimony Regarding the Disadvantaged Business Enterprise Program

DEAR MR. DEFAZIO:

I am responding to the request from the Committee on Transportation and Infrastructure for a letter or statement on the Disadvantaged Business Enterprise (DBE) Program.

My company began in 2003 after I was laid off from a large residential development corporation. My daughter was one-year old and had been very sickly, making it difficult for me to perform my duties reliably. It was a mutually agreed upon lay off. My former employer gave me a generous severance package and has been one of my clients occasionally since that time.

For the first several years, I focused on private clients until my daughter became healthier. Beginning in 2008, I returned to working in construction, mostly smaller projects. Because of the recession, by 2011 most of my work had dried up. My net income that year was $4,000 and I considered myself lucky that it was in the black. I had become aware of the DBE program several years earlier but was busy enough at the time not to bother with it. Desperate times call for desperate measures, and I set about having my company certified as a DBE. That came through in 2012, and I started getting more work. Two large general contractors subcontracted with me on DBE projects, one with EPA funding and one with DOT funding. The first company had contacted me for the EPA funded project. A year or so later, I was bidding on a non-DBE project and contacted the company about providing a bid. The man that I spoke with seemed reluctant, as though he doubted that I could do the work. I encounter that often as a woman working in construction. Fortunately, he checked with the project manager for the contract that I already had with the company, who vouched for me. I have had many contracts with both the first and second contractors since then, both DBE and non-DBE projects.

As a Certified Arborist, there are few of us who work in the construction industry here in Hawaii. My primary competitor has been doing this type of work for over five decades and was the first person that contractors thought of when they needed tree protection work. He is a nice man and highly qualified, but a formidable competitor for a company like mine that was trying to get established. The DBE program gave me a foot in the door in being able to compete against him. My net income (basically my salary as a 1-person company) has gone from around $40,000 a year to around $80,000–$120,000 a year, a much more livable income in the State of Hawaii, in large part because of the network of clients that I have built as a DBE company.

I still encounter contractors who refuse to hire a woman, either as a subcontractor or an employee. Some of these contractors are small, ethnic companies with cultural backgrounds that are strongly opposed to nontraditional roles for women. Occasionally one of them will hire me because they are desperate and are unable to find anyone else. It can make for an uncomfortable working situation, but I do it in part because I look at it as chipping away at their preconceived biases of what women can and cannot do. The DBE program helps to do that. By forcing contractors out of their comfort zone, it helps to chip away at societal biases and makes the playing field a little more level.

I hope that Congress will act to continue the DBE program. It is worthwhile and it does make a difference. Should you have any questions or would like additional information, I can be reached at [redacted].

Very truly yours,

CAROL L. KWAN,
*Carol Kwan Consulting LLC.*

**Letter of May 26, 2020, from Sarah Imberman, S. Levy Foods, Submitted for the Record by Hon. Peter A. DeFazio**

MAY 26, 2020.

To: Peter DeFazio—Chairman of the House Committee on Transportation and Infrastructure

Re: Statement on the Disadvantage Business Enterprise Program

DEAR MR. DEFAZIO,

I am writing to convey the importance of the Disadvantage Business Enterprise (DBE) Program. I started my company in 2004, making chocolate out of my mom's kitchen. After operating my bakery in Chicago for five years, I learned about the DBE program and first became certified as an Airport Concession Disadvantage Business Enterprise (ACDBE) in 2009.

I have often felt discriminated against and treated differently because of the fact that I am a woman in business. I will never forget when the owner of a local Chicago bank asked for a meeting and wanted to discuss my decision to close my street side operation in order to focus on growing my business bringing local restaurants to airports. I remember leaving the meeting feeling like I had been "called into the principal's office" as he said things to me like, "I think your decision was rash and immature." Do I think he would have said this to me if I was a businessman instead of businesswoman? No. It turns out that closing my street side location to focus on growing the airport business was the best business decision that I had made, albeit an extremely difficult one. I am so fortunate that the ACDBE program exists, as it has allowed me to grow my business beyond my mom's apartment and into seven airports across the country.

I have benefited greatly from the DBE program and cannot imagine what my business would become without it. Because of the ACDBE program, I have a seat at the table in the airport industry, even when others don't want me to.

Sincerely,

SARAH IMBERMAN,
*S. Levy Foods.*

**Letter of June 17, 2020, from Constance Macolino, President, Puget Sound Steel Co., Inc., Submitted for the Record by Hon. Peter A. DeFazio**

JUNE 17, 2020.

Mr. PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

RE: Disadvantaged Business Enterprise Program

DEAR CHAIRMAN DEFAZIO:

I am writing to you to request your support for the authorization of the DBE program in the upcoming 2020 highway bill. My firm is a reinforcing steel fabricator with over fifty years in business in the State of Washington and I can attest to the real need for this program for women-owned businesses in the transportation construction marketplace. The plain and simple fact is that disadvantaged businesses do not face a level playing field and continue to suffer discriminatory barriers to full and fair access to construction contracts.

By way of illustration, in June of 2017, majority women were waived out of the WSDOT DBE program due to the results of a disparity study. In the two years prior, Puget Sound Steel was awarded a total of 23 contracts with WSDOT totaling almost 3,000 tons of steel and over $4,000,000.00 in revenue. Since June 2017, we have bid in excess of 7,000 tons of WSDOT work and have been awarded 1 job, for a total of 185 tons and $259,000.00 in revenue. Most, if not all, of that work went to public companies listed on the NYSE.

Then there are the anecdotal examples of why this program is needed. Puget Sound Steel has supplied reinforcing steel to a number of prime contractors who do both commercial and civil work; when the primes don't know we are a women owned business (commercial arena) we are awarded jobs based on price and past performance. When we designate as a DBE (civil arena) and without set DBE goals on a given project, we are passed over for work. On multiple occasions I have had to ask

employees at the same company to please walk across the hall and tell their civil division that our firm is competent and able to perform the work on any given project.

I cannot over-state how important this program is to small businesses, such as mine. Prime contractors, most of whom are owned publicly or by white males, already receive almost ninety percent of federal contract dollars in construction. This program allows us the opportunity to participate, which is all we ask.

I would welcome the opportunity to give additional information to your committee, if you would find that helpful, and thank you in advance for your continued support of this necessary program.

Very truly yours,

CONSTANCE MACOLINO,
*President, Puget Sound Steel Co., Inc.*

**Letter of September 9, 2020, from Robert S. Bright, Founder and President, Talson Solutions, LLC, Submitted for the Record by Hon. Peter A. DeFazio**

SEPTEMBER 9, 2020.

Mr. MATT LEASURE,
*Special Assistant to the Chairman,*
*House Committee on Transportation and Infrastructure.*

Re: Disadvantaged Business Enterprise Program—Personal Net Worth

MR. LEASURE:

I am pleased to submit my comments and suggestion for change to the Disadvantaged Business Enterprise (DBE) Program. I am Robert S. Bright, Founder and President of Talson Solutions, LLC (Talson), a DBE, Minority Business Enterprise (MBE) and Small Business Enterprise (SBE). Founded in 2001 and headquartered in Philadelphia, Talson is a capital project consulting firm with domestic United States and international experience in the transportation and infrastructure industries. Our clients include Allegheny Port Authority, LA Metro, New Jersey Transit, Panama Canal Authority, Sound Transit, and Denver International Airport to name a few.

I wish to bring to your attention with the Personal Net Worth (PNW) requirement to establish and maintain the DBE status. In essence, *the PNW requirement of $1.32 million has not changed or been adjusted for inflation in approximately ten years*. However, the price of labor, goods and services (Consumer Price Index) have increased. DBE's PNW are typically based on the value of an owner's retirement account or other forms of investment that are not readily available without adverse tax consequences. As a result, the growth of these assets has significantly increased with advances in the United States stock market (i.e. S&P Index). As the value of the investment may increase, this potentially causes the PNW to increase without day-to-day management from the DBE owner. Although this may appear good, it is not for the DBE owner whom is worried about exceeding the initial PNW base and thereby losing the DBE status. The DBE owner is then forced to concentrate on the PNW value and not the business operation. In addition, the DBE owner may choose to take drastic steps or sell equities with tax disadvantages in order to maintain the required PNW. The loss of DBE status for many firms would cause irrevocable harm leading to business interruption and loss revenue preventing long-term firm growth for value generation.

The State of Maryland Department of Transportation and New York recognized the need for increases in the PNW. As a DBE firm grows, the Owner' s PNW typically increases due to retirement investments and asset purchases. This allows the DBE to increase their confidence to take on greater risks and larger value contracts. However, if the DBE exceeds its PNW, there is a substantial risk that DBE participation in future contracts will decrease due to the lack of the DBE certification. The following two examples reflect an adjustment by the Maryland Department of Transportation and a petition from New York on the need for changes in PNW:

(1) In December 2019, The Maryland Department of Transportation announced that the Personal Net Worth (PNW) cap applied to the Minority Business Enterprise (MBE) Program will increase from $1,749,347 to $1,771,564, effective January 1, 2020. As required by Maryland law, the State's MBE Program adjusts its PNW cap annually based on the *Consumer Price Index*.

(2) New York's Governor Cuomo rejected a petition to eliminate the $3.5 million personal net worth requirement especially for those in both the construction and financial sectors, in order to grow and participate in government con-

tracts. These sectors have minimum income requirements that need to be met in order to be eligible to bid, win mid-size projects, and gain access to capital. It will also enable prime contractors to fulfill their 30% MWBE sub-contracting goal.

Failure to adjust the PNW requirement prevents real growth for DBEs and the introduction of new DBEs. Additionally, without an annual PNW adjustment, the USDOT may fail to capture the importance of the overall DBE program by allowing DBEs to grow and build long-term investment in the business and communities in which we live.

Thank you for your consideration to review the maximum PNW requirement for DBEs. Consideration for annual adjustment (i.e., Consumer Price Index) is strongly recommended and can only reflect current economic trends.

Respectfully yours,

ROBERT S. BRIGHT,
*Founder and President, Talson Solutions, LLC.*

cc: Ms. Nicole Christus, American Public Transportation Association

**Letter of September 8, 2020, from Lorenzo Thompson, Principal, Thompson Civil, LLC, Submitted for the Record by Hon. Peter A. DeFazio**

SEPTEMBER 8, 2020.

Hon. PETER DEFAZIO,
*Chair,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

Re: Request from the Committee on Transportation and Infrastructure on the Disadvantaged Business Enterprise (DBE) Program

DEAR MR. DEFAZIO,

I am Lorenzo Thompson and Principal of Thompson Civil, LLC. The only way for my firm to enjoy the work we perform is to be a part of a program that provides project participation from diverse firms. We are located in St. Louis, Missouri, and Illinois. We have only been in the program for 3 years and it has highly contributed to our success.

The construction industry is built on managing risk and trusting that others will be able to do their job well and contribute to a project's profitability. For an agency or a prime contractor to take a chance on an unknown firm there needs to be an incentive. Women-owned and Minority-owned firms are "unknowns" because women and many minorities are seen as strangers to this industry—still after over 30 years of DBE–MBE–WBE programs—because we do not fit the typical image of the construction workers and project managers. The DBE program provides incentive and has been very successful in the state Department of Transportation (DOT) markets.

The Federal Highway Administration (FHWA) and state DOT commitment to the DBE program sets the tone for the industry to value the program and to strive to build up the industry's woman-owned and minority-owned firms to match/represent the communities where the tax dollars are spent. The state DOT success in supporting capable DBE firms creates a pool of women-owned and minority-owned firms who are available to do work in their region on projects outside the program also.

The culture created by the DBE program is valuable to our industry and supports a healthy inclusive environment for diverse firms and for diverse individuals who are under-represented in our industry. Engineers' and surveyors' potential is not based on their skin tone, ethnicity, culture, or gender—success in technical fields is based on a love of problem solving. Encouraging diversity in our industry pushes that reality forward and teaches us not to judge a person's capabilities based on the appearance of capable engineers we have worked with in the past. As in any process, it is "easier" to continue the status quo, to continue doing business with the same type of people you have always worked with. But the reward for the community comes when we try a little harder and reach out with opportunities for everyone.

Thank you for accepting this letter of support for the DBE program. It has been very valuable to my company, to the engineering/construction industry and to our community.

With warm regards,

LORENZO THOMPSON,
*Principal, Thompson Civil, LLC.*

**Letter of July 1, 2020, from Katey Doman, President, TyE Bar LLC, Submitted for the Record by Hon. Peter A. DeFazio**

JULY 1, 2020.

Mr. PETER DEFAZIO,
*Chairman,*
*House Committee on Transportation and Infrastructure, United States House of Representatives, Washington, DC.*

RE: Disadvantaged Business Enterprise Program

DEAR CHAIRMAN DEFAZIO:

With the upcoming 2020 Highway Transportation Bill being discussed, I felt compelled to reach out to you for your support of the DBE Program to be included in the proposed bill. As owner of TyE Bar LLC, a DBE reinforcement steel and concrete paving hardware manufacturer, I still consider myself a start-up company since we have only been in existence for just 5 years. Without having my DBE Certification, I firmly believe my company wouldn't have made it this far when competing against the conglomerate steel manufacturing companies across our nation's landscape.

In 2015 I felt compelled to start a manufacturing business in the heart of Pittsburgh, to bring manufacturing jobs back to an area that has been left abandoned over the last few decades. I knew that it wouldn't be possible to compete in the market unless I was able to receive my DBE certification. Prior to receiving my certification, I had only been awarded contracts that totalled $800,000, once my certification had been granted, I picked up an additional $1,800,000 of revenue in just 3 months—my revenue had more than doubled.

Being a start-up company with over a million dollars in loans, it is inevitable that I am not the low price to the DOT Contracting Communities. With no ties to steel mills I am receiving raw material from my very own competitors—I can never be low for that reason alone. Without DOT Agency's having DBE Programs in place there wouldn't be an arena that I could possibly compete in due to the disadvantages I face as a woman-owned, independent, start-up manufacturer.

What does the DBE Program do for the American People?

In 2015 I had employed 4 blue-collared employees and five years later I am proud to have 34 employees helping manufacture products that go into the roads and bridges that our American people travel every day. Last year our revenue has grown to $11,000,000 and if the DBE program remains in effect for the 2020 Transportation Bill I anticipate with my past growth rate that by 2022 we will employ more than 70 people and manufacture over $23 million dollars in heavy highway products.

The inclusion of the DBE Program is vital to helping small businesses such as TyE Bar. Without the DBE Program I would lose more than three quarters of my business, most likely TyE Bar would cease to exist. The DBE Program allows for us to participate, doesn't guarantee us work, but gives us the opportunity to be considered.

Mr. Chairman, I ask that you consider what the DBE Program brings to small businesses and the American People. If there is any additional information that you would find helpful, please don't hesitate to reach out to me.

Thank you kindly for your consideration,

KATEY DOMAN,
*President, TyE Bar LLC.*

**Statement of Joann Payne, President, Women First National Legislative Committee, Submitted for the Record by Hon. Peter A. DeFazio**

Chairman Peter DeFazio, Congressman Sam Graves and Chairwoman Eleanor Holmes Norton——

Thank you for the opportunity to submit a statement for the Congressional Record on behalf of Women First National Legislative Committee (Women First). Women First is a nonpartisan, national grassroots advocacy group that promotes and pro-

tects the interests of women owned businesses certified in the United States Department of Transportation Disadvantaged Business Enterprise (DBE) Program. Founded in 1985, Women First has been advocating for small women owned businesses in the highway construction industry for the past 35 years.

### INTRODUCTION

In 2001, Women First submitted an Amicus Brief to the Supreme Court in *Adarand Construction v. Mineta*. In the brief, it said, "they have experienced first-hand the detrimental effects of the discriminatory practices, which, to this day, continue to plague the construction industry. As a result of this discrimination, the ability of women owned businesses to compete for government contracts in the transportation related area has been severely hampered." [1]

And in 2020 those words are still true today.

From the day Eve took a bite out of the apple in the Garden of Eden, women have been submitted to systemic sex discrimination in every aspect of their social, economic, and political lives. They have been undervalued and remain underrepresented in position of power.

A study conducted by the Pew Research Center found that two-thirds of women in the United States believe we still have a way to go to achieving equality. Women executives, doctors, lawyers, and professional athletes earn less money than men. According to a 2019 study done by McKinsey & Company women earn more bachelor's degrees then men, but men obtain more entry-level positions in corporate America. The study also found that men outnumber women in management-level positions 62% to 38%. There are only 7% of Fortune 500 CEOs that are women. Congress in 2020 is 75% men.

When I testified in 1986 to the Senate Environment and Public Works Committee supporting the inclusion of women in the DBE program, I testified that women made 70 cents to a man's dollar. Today, a woman makes 79 cents to a man's dollar. The US Women's Soccer Team has won four World Cups, four Olympic gold medals, and eight Gold Cups, yet they are grossly underpaid, lack the necessary training facilities and poor travel conditions that are not equal to the US Men's Soccer Team, who has not been as successful as the women's team.

Like the men's soccer team, the women's soccer team is governed under the US Soccer Federation (USSF) with the same rules, regulations and international competition agenda. The US Women's Soccer Team filed a gender discrimination lawsuit against the USSF. USSF response to the lawsuit was Men were superior to women because they have greater physical strength and skills . . . need I say more?

### PROGRAM OVERVIEW

The DBE Program is a competitive small business program that has an innovative goal setting economic development program that produces results year after year. The program:

- Creates jobs—approximately 125,000 jobs are created by DBE companies annually
- Serves as an engine of growth for our nation's economy even in with the Pandemic
- Establishes a tax base from women and minority owned businesses;
- Promotes competition in an industry where there was very little for years;
- Levels the playing field by opening access
- Promotes diversity

The DBE Program has proven to be an equal opportunity program, which benefits all Americans by promoting the development and competitiveness of America's small businesses. In fact, the DBE Program is the most successful small business contracting program for women. For example, the DBE Program has significantly increased the percentage of women owned construction firms. Women DBE participation has increased from 1.6% in 1986 to over 7% in 2018.

### RESPONSES FROM DBES

Women First collected about 40 letters from DBEs across the country asking them to submit to the Committee on Transportation & Infrastructure their stories and why the DBE program should continue.

[1] Brief of Women First National Legislative Committee, et al., *Amici Curiae* in Support of Affirmance of the Tenth Circuit Court of Appeals.

Wisconsin: "I am writing to emphasize the importance of the reauthorization of the Federal DBE Program in the Highway Transportation Bill. We are a minority-owned business of color and we have been shut out of many opportunities to participate on projects. I would like to see more opportunity for disadvantaged business enterprises of Hispanic Americans".

Washington State: "Against many challenges, both from individuals and firms within the male-dominated construction industry, labor unions, lack of capital and bonding, my firm rose to become the only female-owned, union electrical contractor specializing in highway electrical work in the State of Washington. From 2010–2017 my firm successfully completed 122 projects valued at nearly $ 80 million. That is, until the agency that was supposed to support women and minority owned businesses, WSDOT Office of Equal Opportunity, removed white women from the federal DBE program in June of 2017. My firm went from doing nearly $ 9 million a year, preparing to graduate from the program, to being out of business in only 18 months".

Missouri: "The construction industry is built on managing risk and trusting that others will be able to do their job well and contribute to a project's profitability. For an agency or a prime contractor to take a chance on a new/unknown/small firm there needs to be an incentive. Women-owned and Minority-owned firms are "unknowns" because we are seen as strangers to this industry—still after over 30 years of DBE–MBE–WBE programs because we do not fit the typical image of construction workers and project managers. The DBE program provides incentive and has been very successful in the markets I work in. The program gives me enough value-potential to have the initial discussions with a potential client—whether that is an agency or prime contractor/consultant. Then my company can prove that we are capable and have value on our own, beyond the DBE incentive".

Illinois: "More importantly, we are forced to wait sometimes months after the general contractor is paid before we receive payment. More times than not, we are forced to call the general contractor numerous times requesting we be paid and this is after confirming they have been paid by the owner. It is extremely frustrating to complete a job on or ahead of schedule, with complete satisfaction of the general contractor only to be sent a perceived message of, 'You'll get paid when I feel like paying you and not a day before!' It is extremely disheartening. The DBE Program has enhanced our opportunities in the highway, transit, and airport construction industries simply by existing. The consequences of not having the program would be our business would not exist. But for the Disadvantage Business Enterprise and the requirements to use minority owned businesses, we would not in reality because general contractors would self-perform. Securing working capital is extremely difficult for minority owned businesses. Personally, I am repeatedly forced to secure loans with interest rates that mirror loans from merchant cash advances. While the interest rates are uncomfortably high, the loans are necessary to make payroll and purchase the equipment and materials needed to perform the job in the absence of mobilization."

Massachusetts: "Small businesses, especially women-owned firms, need to be given a chance to prove themselves. The DBE program does just that by highlighting firms that may otherwise have doors permanently closed. I have experienced discrimination in the construction industry through the years, and, have been pushed off projects that I was equally qualified to do. I am thankful for the DBE program. It serves a vital role by providing checks and balances to assure that all companies, large, small, women, and minorities are allowed the equal opportunity to participate."

### Changes to the DBE Program

The DBE program only applies to highway, transit, and airport construction and related industries. One purpose of the DBE program is to develop minority and women construction businesses so they can gain experience and expertise to compete for federal, local, and state contracts.

The perceived outcome is DBEs would achieve three consecutive years of gross receipts of $23.980 million and graduate out of the program and successfully compete equally with majority male firms for federal, state, and local contracts. Unfortunately, the beneficiaries of the statutory size cap of 23.980 million applies only to a small percentage of DBEs.

In reality, the DBE program is a subcontracting program where ninety-nine percent of DBEs are limited to the Small Business Size Standard and the cap governed by the North American Industry Classification System (NAICS) Code. Depending on the code classification, highway, transit, and airport construction, specialty trade sub contractors may have a cap that is between $3 million to $17 million. By con-

necting the subcontractors to the size standard in the NAICS Codes, it prohibits DBEs from developing into prime/ general contractors and puts them at a disadvantage with non-DBE companies.

Additionally, it creates an endless cycle of DBEs graduating out of the program to finding their company has lost fifty percent or more of its business and a need to reapply back into the program after one year. One of the main reasons this cycle continues to escalate is the rise in material cost in the construction industry especially in the last three years.

RECOMMENDATIONS:

*1. Gross Receipts*

There should be two statutory gross receipts levels. One for DBE companies that compete as prime contractors and one for the Specialty and sub-contractors. Once the DBE graduates out of the Small Business levels, Congress should create a new medium-size business program that would include all medium size companies (majority males included) with goals, certification, limited personal worth and gross receipts.

*2. DBE Procurement Disagreements with Prime Contractors and Recipients*

The Secretary should take additional steps and procedures to ensure that recipients report immediately to the Federal Administrator any procurement disputes that may develop between DBEs, general contractors and or recipients. There has been an increase in procurement disputes between DBEs general contractors and state DOTs. DBEs have contract agreements with general contractors. The states try to stay out of the mix but are asked to notify FHWA if conflict arises, however, they have been slow to report problems. This has resulted in millions of dollars lost by DBE firms. Let us not forget that firms that are certified in the program are there because they are at a disadvantaged over non-minority firms.

*3. Disparity Studies*

The Secretary should create a Disparity Study Committee to develop guidelines for firms and recipients conducting Disparity Studies. The Committee should include, but not limited to representatives from disparity study firms, DBEs, DBE advocates, Federal Highway's Office of Civil Rights, department lawyers, and state department of transportation. Presently, there are no guidelines in place for firms who conduct disparity studies or recipients who want the studies conducted. This situation has resulted in an unresolved issue in Washington State that has left one of the protected groups out of the "goal-counting" on federal projects.

*4. Unbundling*

Require the Secretary to create an incentive program for state department of transportation and other recipients to unbundle mega-contracts and create contracts that are $2 million dollars or less for DBEs to compete for as primes.

IF THE PROGRAM DOES NOT CONTINUE

In representing women-owned DBEs for thirty-five years, I have heard women discuss the problems they face in the construction industry with Members of Congress and the Administration. These women, everyday, have to face the assumption by others that they can not do the work and run their businesses. Women owned businesses still have problems obtaining loans and bonding and after years in business they still have to explain that they are the boss to men on the jobs who refuse to believe that a woman can be the boss.

If the DBE Program were not to continue, I believe not just women and minority owned companies will be severely affected, but small majority owned sub-contracting businesses will be affected as well. The only small business program in the highway, airport and transit industries will disappear. There would be no reason for sub-contract work even to majority firms thus competition would be eliminated and prices will climb.

The trend of the industry the last several years has been the prime contractors are doing more of the work in-house. A great example is what happen in Washington State when women were removed from the goal setting program. The group that benefited the most and increase in percentage was the large majority firms.

CONCLUSION

I had a member of the Women First Board of Trustees tell me when asked why she still felt the burn of discrimination after years in business. She said to me that when she attends meetings there are very few women, if any, around the table.

She thinks, "Well it will be ok because I am at the table, I know these people, I've worked with them and I make a pretty good living—so why do I still feel the subtle discrimination—and then I realized why." She continued, "It's because I am not like them, I will never be like them, I am different and they don't understand the importance of that."

I have thought about her statement a lot and I believe this awareness should empower her and other women owned businesses, because they contribute and make better an industry that is vital to our country's daily life. And it also why diversity is so important in the highway industry and in our nation. Our diversity is what strengthens and binds us together. We are a government for all the people and all of our people deserve a chance to compete and to contribute.

**Statement of the American Road & Transportation Builders Association, Submitted for the Record by Hon. Sam Graves of Missouri**

Chair DeFazio and Ranking Member Graves, thank you for allowing the American Road & Transportation Builders Association (ARTBA) to offer our views as part of today's hearing on the Disadvantaged Business Enterprise (DBE) Program.

Established in 1902, ARTBA is the oldest national transportation construction-related association. ARTBA's more than 8,000 members include public agencies and private firms and organizations that own, plan, design, supply and construct transportation projects throughout the country and world. The industry we represent generates more than $500 billion annually in U.S. economic activity and sustains more than 4 million American jobs.

In the midst of the current pandemic, ARTBA remains a steadfast advocate for increased federal transportation investment. Given additional resources, the transportation construction industry can help lead the nation's economic recovery. It is important to view the DBE program—and its potential opportunities—in this context.

Compliance with the DBE program, which has been in place for nearly 40 years, is a key task for transportation agencies and contractors on federal-aid transportation projects. The program's purposes include developing DBE firms and ensuring a level playing field in contracting for federal-aid projects. As with other regulatory requirements, the transportation construction industry seeks to comply with the DBE program rule while carrying out its core objective of delivering projects in an efficient, timely and safe manner. Moreover, the integrity of the DBE program is critical.

While Congress authorizes and establishes parameters for the DBE program, the U.S. Department of Transportation (USDOT), its modal administrations, and state and local transportation agencies are responsible for the program's implementation. This includes USDOT rulemaking and issuance of guidance, in which the industry always maintains great interest. Our submission today references a number of these administrative actions and policies. While we know the committee wants to stay abreast of these activities because of its oversight responsibilities, we also hope you consider our proposed improvements as potential future legislative provisions, such as in the next surface transportation reauthorization bill.

We seek to highlight ways in which the DBE program can be run more efficiently and effectively, including for the benefit of those emerging businesses for which the program was developed. Similarly, we point out specific aspects of the current DBE rule and guidance where the opposite often results. We are informed in our comments by examples of collaborative efforts to structure and implement state-level DBE programs around the country, in which various ARTBA members and affiliated chapters have participated.

In describing our proposed improvements, we cite (with page numbers) USDOT's DBE guidance entitled "Official Questions and Answers (Q&A's) Disadvantaged Business Enterprise Program Regulation (49 CFR 26)," dated April 25, 2018 (and referred to as the "guidance" or "Q&A"); and one of its addenda, the single-page "Procedures for Submitting Good Faith Efforts Information on Design-Bid-Build Contracts," dated June 20, 2018.

Our four primary themes are the following: 1.) identification of policies that diverge markedly from customary and efficient industry practices, which can add project costs and sometimes work to the detriment of DBE firms themselves, 2.) in-

consistencies in USDOT's adherence to its own DBE guidance document, which explicitly advises recipient-agencies to craft aspects of their DBE programs using "information about the real world of contracting in the recipient's contracting area," because "[r]ecipients know their own markets" [p. 61]; 3.) lack of meaningful consultation with the industry and other legitimate stakeholders about important policy changes; and 4.) failure to modernize the DBE guidance to reflect evolving business practices in the industry (especially those involving emerging technologies), with numerous Q&A sections dating back to the previous century. ARTBA hopes to see a collaborative effort to improve DBE program implementation in these respects.

GOOD FAITH EFFORT AND SUBMISSION OF DBE COMMITMENTS

USDOT conducted a significant DBE rulemaking in 2012–14, issuing its final rule on October 2, 2014 (79 CFR 59565). A key and contentious issue was the department's initial proposal to abolish the longstanding "responsibility" option, through which recipient-agencies had the option of accepting DBE utilization plans from bidders (or sometimes just the apparent low bidder) within a reasonable number of days after the bid on design-bid-build projects. Had the department stayed with its original position, as ARTBA and numerous other commenters noted, prime contractors and DBE subcontractors, among others, would have been overwhelmed with the mandate to gather or submit quotes for numerous projects at the same time, many/most/all of which would be for projects in which they would not eventually participate, which is the nature of the letting process. The potential for added administrative costs was obvious. For example, at the time of the rulemaking, Illinois had a state "no cure" law similar to USDOT's proposed provision. While Illinois' law was in effect, fewer projects met the DBE goal. Worse yet, some DBE subcontractors overcommitted themselves during the bidding process, leading to their demise.

Ultimately, to the great relief of industry and many recipients, the department settled on a maximum seven-day window (later to be shortened to five days) for the submission of DBE commitments under the responsibility option. To the best of our knowledge, in a series of written, audio and video communications rolling out the DBE rule changes in late 2014 and early 2015, no one from USDOT averred recipients would now need to require all bidders to submit their DBE commitments in all circumstances. The practice among the states would continue to vary permissibly, in that some states only required this information from the lowest apparent bidder, others the lowest two bidders, and so forth.

In fact, in the publication of its final rule in 2014, USDOT described the responsibility option as follows: "We think it reasonable ultimately to limit the time to a maximum of 5 calendar days to protect program beneficiaries and overall program integrity." In a related footnote, "Due to the definition of 'days' adopted in this final rule, bidders or offerors will have 5 calendar days (i.e., not business days) to submit the necessary information. Thus, if a bid is submitted on Thursday, the *apparent low bidder* would have until Tuesday to submit the information" [emphasis added].

It was therefore shocking and disappointing when the department issued a one-page guidance on June 20, 2018, ordering that on design-bid-build contracts, "*all bidders* . . . submit credible documentation of DBE commitments and/or good faith efforts either with their sealed bid, as a matter of responsiveness; or no later than five days after bid opening, as a matter of responsibility" [emphasis in original]. Department officials have since contended this revised guidance was not a change in policy, but a restated means of reviewing the performance of all bidders and their respective good faith efforts. Under that reasoning, the pronouncements made upon publication of the final rule were misleading and/or opaque—whether intentional or not. (On at least two occasions, a department official publicly stated or implied recipients could maintain current options for implementing the responsibility approach, if they abided by the newly-prescribed time limit.)

It is puzzling the department would let 1,357 days (or three years, eight months and 18 days) elapse between publication of its final rule and this supposed clarification of related, existing policy. (If it was part of longstanding policy, why not make that clear while rolling out the rule changes?) Had ARTBA and other stakeholders been given the opportunity to submit public comments, we would have made a compelling argument this change in policy will add costs to many projects, in direct contravention of the administration's regulatory reform principles.

To be certain, implementation of this good faith effort guidance provision will increase project costs in a number of states. In the past, we have seen this draconian approach result in fewer bidders among prime contractors, DBE contractors' quoting too few projects (for fear of overcommitment) or too many (sometimes leading to their dissolution) and decreased achievement of DBE project goals. In 2013, ARTBA facilitated a survey of nearly 300 transportation construction contractors, who over-

whelmingly anticipated the proposed new DBE regulations (such as one similar to the 2018 guidance) would increase the cost of projects because of added compliance burdens.

Moreover, proponents of the "all bidders" approach ignore—and have no coherent response for—the fact that most DBE firms (which are small businesses, and often start-ups) do not have the capacity to provide quotes for a large number of projects at the same time, as part of the same letting, especially given the likelihood they will participate in just a few of them, at best.

It is also troubling that USDOT has forced this "misguidance" provision on recipient-agencies and contracting communities in states with DBE programs considered successful and effective by all parties.

USDOT should reverse this back-door rulemaking and work with all parties—including DBE and non-DBE contractors—to address any concerns that led to its adoption in the first place. That is far preferable to the department's issuing mandates in conflict with its own rules.

### Good Faith Effort Parameters

After nearly four decades, the DBE rule and guidance still do not provide objective descriptions of good faith efforts to be undertaken by prime contractors. USDOT should compile examples of successful good faith effort practices nationwide, which would function similarly to case law in the legal realm. At the same time, while the department advises that prime contractors need not accept DBE subcontractors' prices which are "excessive or unreasonable," the guidance has never provided insight as to how to define those terms.

ARTBA members have noted examples of recipient-agencies in their respective markets that do not maintain current or accurate databases or lists of DBE firms actually ready, willing and able (as the rule states) to participate in a transportation project. These lists—if they exist at all—commonly include firms in disciplines unrelated to transportation or construction, not qualified or certified to work on a project for that agency, or out of business or unreachable. The related concept of "potential DBEs," as used in assessing good faith effort or setting overall DBE goals in a jurisdiction, strains the limits of credulity.

For all these reasons, USDOT should direct recipients to compile and maintain information for legitimate and relevant DBE firms. The current rule also suggests a prime contractor use the services of community organizations and business assistance offices as part of its good faith effort. That role is more properly assigned to the recipient, for the benefit of all prime contractors and DBE firms.

### Prompt Payment and Retainage

There have been ongoing concerns that the USDOT guidance on prompt payment and retainage (pp. 4–9) does not reflect the "real world of contracting." In the recent past, ARTBA members reported a development at the state level, in which prime contractors were prohibited from withholding funds for a DBE subcontractor's prorated bond, as well as their state/local association dues. This prevents a common industry practice and puts affected DBE subcontractors at a disadvantage, in that their non-DBE counterparts are able to address surety protection and association membership as part of the contractual relationship with their prime contractor. To address this and related prompt payment issues, we suggest a collaborative effort with recipients and industry to better understand everyone's respective views of the payment process.

### Prime Contractor/DBE Subcontractor Relationship

In some notable cases, the department's Q&A prohibits DBE credit for that firm's carrying out customary and efficient industry practices. Generally, the cost of equipment purchased or leased by a DBE subcontractor from a prime contractor does not count for DBE credit (p. 12). (Similarly, materials purchased from a prime contractor do not count either.) Given that it is common for "primes and subs" to undertake these types of transactions, the rule and guidance actually put DBE firms at a disadvantage in this regard. Industry has long made the point that materials suppliers may be limited in a given geographic area, and as a result it may be necessary for a prime contractor, who is also the sole/dominant supplier there, to sell material to the DBE subcontractor. The DBE rule should stop ignoring the realities of that circumstance, and instead allow counting of the material for DBE credit when appropriate.

USDOT's Q&A also directs prime contractors to consult with their recipient-agency about the appropriateness of their relationship with a DBE subcontractor. Unfor-

tunately, the recipient's assessment can count for little or nothing should law enforcement question the relationship at a future time. A future legislative revision to the DBE program should designate these agency assessments as a safe harbor for the contracting parties should they follow the agency's parameters.

### REGULAR DEALERS

In another issue addressed in the 2012–14 rulemaking, the department initially explored abolishing the regular dealer designation for DBE firms. The final rule mandated those firms' status would be determined on a project-by-project basis.

The Q&A betrays a strong presumption that drop shipment of supplies or materials to a project site downgrades a DBE supplier's status from regular dealer to that of expediter or broker. In that case, the prime contractor may not count any of the materials cost (other than the DBE firm's commission) for DBE credit, and the practice also calls into question the subcontractor's commercially useful function.

This viewpoint is outdated and shows unawareness of current business practices in the industry, in which emerging technologies and efficiencies continue to develop. The "case-by-case" approach is also excessively subjective and puts this determination in the hands of perhaps one agency official.

In recent years, USDOT has conducted at least one "listening session" on the regular dealer issue, but limited the number of participants and did not include a representative cross-section of the industry. The department should commit to improving this 2014 provision to reflect the decade (and century) we are in, while collaborating with all interested stakeholders in doing so.

### COMMERCIALLY USEFUL FUNCTION

This section of the USDOT Q&A (pp. 40–42) addresses the requirement for DBE firms to meaningfully participate in a project, rather than assuming a role contrived so DBE goals can be achieved. Again, however, the guidance does not capture current industry practices and potential roles on a transportation improvement project. The material in this section dates back to 1999 and 2012. Technology and other developments have created new opportunities and potential responsibilities for subcontractors, DBE and otherwise. (One example of many is a social media coordinator for a major project, where public communications are vital.) The department should initiate a dialogue with industry to bring this section up to date.

### JOINT CHECKS

It is common industry practice for a prime contractor to issue a check jointly to its first-tier subcontractor and that subcontractor's material supplier. Joint checks are used regardless of a subcontractor or supplier's status as a DBE. Many such firms prefer this method of payment. Yet USDOT's DBE Q&A deems the use of joint checks as a "'red flag' calling for further scrutiny." Again, the department should make an effort to better understand typical industry transactions and not approach this practice with a presumption of guilt.

### MENTOR-PROTÉGÉ PROGRAMS

More than 20 years ago, the department's Q&A recognized the use of mentor-protégé programs in DBE development. Many members of the industry—including emerging DBE firms—believe in their value as well. However, USDOT's guidance provides virtually no direction as to the permissible structure of such a program, instead giving responsibility to the private sector. Prime contractors may have little incentive to participate, especially considering the legal risk they may incur if law enforcement later accuses the parties of an improper relationship that undercuts the DBE firm's commercially useful function.

A better approach would be directing recipients to initiate mentor-protégé programs in consultation with the industry in their market. Again, the department should compile permissible practices for all to see, and stand behind them as a legal safe harbor for program participants.

### ALTERNATIVE CONTRACTING & PROCUREMENT METHODS

In 2018, the Federal Highway Administration's Office of Civil Rights published the "Disadvantaged Business Enterprise Program Administration and Oversight on Projects with Alternative Contracting & Procurement Methods Handbook." A major premise of the document is that planning and implementing DBE compliance on design-build and similar projects, where the scope and specifics of subcontracting opportunities evolve over its life, require a more collaborative and flexible approach

than for "design-bid-build" projects. However, ARTBA believes some of the same methods outlined in the handbook would also be appropriate for use in many such "traditional" projects. We hope to explore wider use of these innovations with the agency when possible.

### GOVERNMENT ACCOUNTABILITY OFFICE (GAO) STUDY

ARTBA, various members of this committee, and others involved in today's hearing have pointed out shortcomings of and potential improvements for the DBE program. This is an opportune time for the Government Accountability Office (GAO) to conduct a study of the DBE program's first four decades, focused on assessing the program's fulfillment of its stated purposes and recommendations for program improvements to achieve its desired outcomes. In carrying out the study, the GAO should seek a full range of stakeholder views.

ARTBA suggests that this committee include direction for this GAO study in its next draft of surface transportation reauthorization legislation. It will serve as a catalyst for all interested stakeholders—including the U.S. Department of Transportation, state agencies, contractors and the minority- and women-owned business communities—to collaborate on improving the DBE program's efficiency and effectiveness.

### CONCLUSION

By exploring and incorporating the improvements described above, the DBE program can be a more productive component of federal-aid transportation programs that maximize business opportunities and put Americans to work, while operating with efficiency and integrity. We appreciate this committee's consideration of ARTBA's views and hope to engage in a continuing dialogue as the surface transportation reauthorization process moves forward.

## Letter of October 7, 2020, from James V. Christianson, Vice President, Government Relations, Associated General Contractors of America, Submitted for the Record by Hon. Sam Graves of Missouri

OCTOBER 7, 2020.

Hon. PETER DEFAZIO,
*Chairman,*
*Committee on Transportation, United States House of Representatives, Washington, DC.*

Hon. SAM GRAVES,
*Ranking Member,*
*Committee on Transportation, United States House of Representatives, Washington, DC.*

RE: Hearing entitled, "Driving Equity: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program"

DEAR CHAIRMAN DEFAZIO AND RANKING MEMBER GRAVES:

On behalf of the Associated General Contractors of America (AGC or Association)—the leading association in the construction industry representing more than 27,000 firms, including America's leading general contractors and specialty-contracting firms—thank you holding the important hearing entitled: "Driving Equity: The U.S. Department of Transportation's Disadvantaged Business Enterprise Program." AGC respectfully puts forward the following comments on fostering diversity and inclusion in the construction industry and recommendations for the U.S. Department of Transportation's (U.S. DOT) Disadvantaged Business Enterprise (DBE) program.

### THE CONSTRUCTION INDUSTRY

The construction industry is large, diverse, and fragmented. In 2018, the construction industry had 733,689 firms and 6,814,979 million paid employees. In that same year, ninety-one percent (666,697) of construction firms had fewer than 20 employ-

ees; one percent (8,666) of construction firms had 100 or more employees; the average construction firm had fewer than 9 employees.[1]

As with other industries, construction is not free of discrimination. However, construction is an intensely competitive industry and that competition penalizes any company that resorts to discrimination. The unique nature of the construction bidding process can also help prevent discrimination from occurring. Most public owners are subject to legal requirements for open competitive bidding, which typically include a publicly announced deadline for the submission of sealed bids, the public opening of the bids, and contract award to the lowest responsive and responsible bidder, eliminating the ability for public owners to engage in unlawful discrimination. The resulting pressure on prime contractors makes it necessary to select subcontractors based on experience, price, and quality.

### Diversity and Inclusion

Nevertheless, AGC is committed to fostering a business climate that enhances opportunities for all companies and employees in the construction industry. AGC fully embraces diversity among its employees and within its membership. People of diverse backgrounds, opinions, perspectives, experiences, and ideas bring creativity and vitality that maximizes member engagement at all levels of the Association. Fostering an environment that is welcoming and inclusive to all individuals is essential to achieving the Association's mission and places members in a position to contribute to the construction industry's future success. In furtherance of this commitment, AGC undertook several efforts over the years, many of which are ongoing. Some of these efforts are described in further detail below.

- Established a Diversity and Inclusion Council (Council) within AGC in 2017. The goal of the Council is to foster an environment both in the Association and in the industry that is welcoming and inclusive to all individuals regardless of one's background, opinions, perspectives, experiences, or ideas. A key strategy of the Council's is to identify barriers that prevent individuals from underrepresented groups from pursuing a career in construction and developing resources to eliminate those roadblocks.
- Authored and released a report, titled "The Business Case for Diversity & Inclusion in the Construction Industry," that outlines six reasons why diversity and inclusion are strategically valuable in generating corporate/industry innovation, increasing profitability, and ensuring a positive and sustaining legacy of progress for a company.
- Partnered with AGC of Washington to create an initiative called the Culture of CARE. Launched nationwide in March 2020, the Culture of CARE seeks to advance the construction industry as the industry of choice for diverse and talented workers by building inclusive work environments in construction firms nationwide. The Culture of CARE is built on four principles[2]. There are two ways to participate in the Culture of CARE. The first is that a company can commit to a Culture of CARE by signing the company pledge. The second is that an employee can sign an individual pledge. To date, approximately 375 companies and 950 individuals took the pledge. Upon taking the pledge, there are resources available to a company such as tools to communicate a company's pledge, a model human resources policy and best practices, and kits for toolbox talks, with additional resources continuing to be developed.
- Created the annual Diversity and Inclusion Excellence Awards in 2018 to honor AGC members that are champions in advancing diversity and fostering a culture of inclusion within their workforce, supply chain, and in the communities they serve. By showcasing and recognizing best practices from companies that are developing and delivering diversity and inclusion initiatives with demonstrable success, award winners have the opportunity to share their track record of achievement and commitment, which will help spur other companies to establish or improve their own initiatives.

---

[1] All Sectors: County Business Patterns by Legal Form of Organization and Employment Size Class for U.S., States, and Selected Geographies: 2018. U.S. Census Bureau. https://rb.gy/xtybhe (link shortened). Accessed: October 1, 2020.

[2] Culture of CARE's four principles: (1) commit to hire and pay based on skill and experience regardless of age, ethnicity, gender identity, nationality, race, religion, sex, or sexual orientation; (2) attract prospective employees by creating inclusive workplaces that are free from harassment, hazing and bullying; (3) retain high-performing employees by identifying and removing barriers to advancement; and (4) empower every employee to promote a culture of diversity and inclusion.

DBE PROGRAM

The DBE program (or program) plays a pivotal role in fostering diversity and inclusion in the construction industry by ensuring that certified small businesses owned and controlled by socially and economically disadvantaged individuals can compete for federally funded highway, public transit, and airport projects. The program was originally established by regulation in 1980. In the years since, Congress included provisions in certain transportation laws that established goals for a certain amount of federal funding to be expended through DBEs.

Most recently, Congress continued the goal that not less than 10 percent of certain federal funding, including funding for highways and public transit projects, be expended through DBEs in the Fixing America's Surface Transportation Act (FAST Act; P.L. 114–94). In addition, the FAST Act authorized up to $10 million of the total amount authorized for the administrative expenses of the Federal Highway Administration each fiscal year to be used for the Disadvantaged Business Enterprises–Supportive Services (DBE–SS) program. The Federal Aviation Administration Reauthorization Act of 2018 (FAA Reauthorization Act of 2018; P.L. 115–254) continued the goal that at least 10 percent of certain federal funding for airports be expended through DBEs or qualified HUBZone small business. Notably, it also amended the definition of a "small business concern" for the construction industry, tying it to the "size standard for the North American Industry Classification System Code 237310, as adjusted by the Small Business Administration" for the purposes of the DBE program. The DBE program and associated goals are administered by the Departmental Office of Civil Rights, the relevant modal administrations within U.S. DOT, and recipients of certain federal funding.

THE CHALLENGES AND RECOMMENDATIONS:

First and foremost, AGC supports the continuation of the DBE program. As with any federal program, there are important improvements to the DBE program that should be made to ensure its continued success. AGC is having ongoing conversations with its members to develop both legislative and regulatory recommendations to help improve the DBE program. In the near-term, AGC respectfully urges the Committee to consider the following recommendations.

*Definition of a "Small Business Concern"*

*Challenge*: To meet the definition of a "small business concern" for the purpose of the DBE program for federal highway and public transit funding a company's average annual gross receipts during the preceding three fiscal years must not exceed $23,980,000, under the FAST Act. The amount is adjusted annually for inflation by the Secretary of Transportation. The amount was previously $22,410,000, adjusted annually for inflation, under the Moving Ahead for Progress in the 21st Century Act (P.L. 112–141). This definition limits the ability of DBEs to grow their companies into sustainable, long-term businesses. Instead, the definition can force DBEs out of the program prematurely or require a DBE to sell off a part of their business. When this occurs, the capacity of certified DBEs in a state dwindles, making it difficult to achieve DBE goals, which undermines the very intent of the DBE program.

> *Recommendation*: Congress should amend the definition of a "small business concern" for the purposes of the DBE program. Specifically, the definition should provide for a significant increase in the annual gross revenue receipts during the preceding three fiscal years. This new amount should continue to be adjusted for inflation. The increase will help ensure that DBEs that exceed the amount are more likely to succeed outside of the DBE program and it will help address capacity issues.

*Reciprocity of DBE Certifications*

*Challenge*: Prior to being eligible to participate in a state's DBE program, a company must go through a rigorous certification process. The company bears the "burden of demonstrating to you, by a preponderance of evidence, that it meets the requirements of this subpart concerning group membership or individual disadvantage, business size, ownership, and control" (49 CFR 26.61). Federal regulations (49 CFR 26 Subparts D and E) set forth the standards and procedures for making a certification decision for an applicant company by a state certification agency.

Once a company is certified as a DBE, it remains certified until or unless a state certification agency removes its certification in whole or in part through a separate process outlined in federal regulations. A state certification agency cannot require a certified DBE to reapply for certification or undergo a re-certification process. However, a state certification agency may conduct a certification review of a DBE if appropriate. A certified DBE is required to inform a state certification agency of

any changes to its circumstances (i.e., disadvantaged or economic status) that affect its ability to meet federal requirements or its application and it must provide a state certification agency with a sworn affidavit on an annual basis that affirms that there have not been any changes to the company's circumstances.

While the federal regulations allow for a state certification agency to accept another state's certification of a DBE, there is discretion given to a state certification agency in terms of accepting that certification (49 CFR 26.85) and the process for doing so is also rigorous. The lack of direct reciprocity for states' DBE certifications artificially limits the ability of DBEs to expand their businesses. In addition, it hinders the ability for a prime contractor to address any capacity constraints in a state that impacts its ability to meet DBE goals.

> *Recommendation*: Congress should facilitate increased reciprocity of DBE certifications between states by establishing in law a streamlined process through which a state certification agency must accept another state's certification, which is in keeping with the Uniform Certification Program that allows for a DBE certification to be honored by all recipients in a state. The process should provide for an exception in the event that the state certification agency can demonstrate good cause for rejecting another state's certification.

*Business Development and Supportive Services*

*Challenge*: The DBE–SS program (23 USC 140 (c)) provides training, assistance, and services to DBEs with the objective of furthering the development of their companies. As previously noted, Congress authorized up to $10 million each fiscal year for the DBE–SS program. While federal regulations provide guidance regarding the types of training, assistance, and services that should be provided (23 CFR 230 Subpart B) and allow a recipient to establish their own business development program (49 CFR 26.35), these well-intentioned efforts can fall short of effectively supporting DBEs. AGC members are concerned that emphasis on certain services is misplaced and that the consultants hired by recipients to offer services can miss the mark.

> *Recommendation*: Congress should reinvigorate the DBE–SS program to ensure that it focuses on providing the education, training, technical assistance, and services that bolster the success of DBEs. Specifically, Congress should place an emphasis on securing financial and bonding services, certification assistance, bidding and estimating, increasing awareness of and compliance with federal requirements for projects, and procuring new equipment and technologies. In addition, Congress should ensure that consultants hired to provide any of these resources are have appropriate technical and industry expertise. Finally, Congress should continue to provide funding for the DBE–SS program.

*Administration of the DBE Program*

*Challenge*: The DBE program evolved over the years through various legislative and regulatory changes. AGC members remain concerned with the interpretation of the requirements of the DBE program. In addition, there is not always uniformity in the way the recipients administer the requirements through their respective programs. The construction industry wants to ensure the success of the DBE program. However, the uncertainty and confusion associated with the DBE program's requirements, which is in part due to issues with the program's regulations and guidance, poses a real concern for all contractors. Contractors found to be in violation of the DBE program's requirements can face suspension, debarment, or civil and/or criminal prosecution—any of these can put a company out of business and a business owner in prison.

> *Recommendation*: Congress should initiate a thorough and balanced review of the DBE program. The review should focus on the administration of the program, rely on quantitative and qualitative analyses, and provide ample opportunities for input from all affected or interested parties. The review should also include recommendations for Congress and U.S. DOT's consideration that will ensure the continued success of DBE program in the future.

## CONCLUSION

Again, AGC thanks the Committee for holding this important hearing and looks forward to working with the Committee as works to ensure the continued success of the DBE program.

Sincerely,

JAMES V. CHRISTIANSON,
*Vice President, Government Relations, Associated General Contractors of America.*

**Statement of the Airport Restaurant and Retail Association, Submitted for the Record by Hon. Rick Larsen**

Mr. Chairman and Members of the Committee:

Thank you for holding this hearing today. The Airport Restaurant & Retail Association (ARRA), representing the businesses, including many small, minority and women owned Airport Concession Disadvantaged Business Enterprises (ACDBEs), that operate the retail stores and restaurants serving airports and air travelers nationwide, is seeking your support to ensure the Disadvantaged Business Enterprise (DBE) Program and the ACDBE Program continue and that the ACDBE companies survive this unprecedented air-traffic downturn due to the COVID–19 pandemic. This hearing, focusing on the DBE Program at the Department of Transportation (DOT), is well timed. While we are writing to emphasize that there is a *continuing need and compelling government interest* in the federal DBE and ACDBE programs and register our strong support thereof, our message today is that unless Congress acts quickly, many of these companies and these programs may not have a future. Without immediate aid, many DBEs and ACDBEs and the important benefits these programs provide our nation's airports, highway and public infrastructure will be lost. It is that simple.

*The DBE program is essential to remedy discrimination and its effects on women- and minority-owned businesses while ensuring all businesses can compete for Federal transportation dollars on a level playing field.*

DOT's DBE program, since its inception, has been devoted to combatting discrimination, and the continuing effects of past discrimination, in federally assisted highway, transit and airport programs and projects. ARRA fully supports the core goals and objectives of the DBE program, which are to level the playing field by providing small businesses, like the airport concessionaires within our membership, that are owned and controlled by socially and economically disadvantaged individuals, with fair and significant opportunities to compete for federally funded transportation contracts and compete in contracting and business opportunities.

The ACDBE program has been instrumental in providing opportunities for small minority and women owned disadvantaged companies to participate in the aviation industry and the airport concessions business. Airports are very challenging environments in which to start up and operate a business. These companies face large upfront capital expenditures, high construction costs, limited access to capital, high rents and minimum annual guarantees (MAGs} that are required to operate in airport spaces, and higher operating costs due to the federally regulated safety and security requirements at airports.

Even with the DBE/ACDBE programs the barriers to entry are many and substantial. The challenge of survival has never been greater than it is now during the COVID–19 pandemic. While ACDBEs have grown under the Department of Transportation and Federal Aviation Administration's guidance and oversight, and opportunities expanded during the period of continuous growth of air travel, we now face a real threat to the ACDBE program and many small companies and individual owners/operators.

Operating within the heavily restricted airport environment, airport concessionaires are highly dependent on passenger traffic for their customers and sales. After a period of record passenger growth, within only a few months the pandemic cost airports and their concessionaires about 95% of their passengers and business. Concessionaires were forced to furlough 80–95% of their employees, close the vast majority of their stores and drastically reduce operations for those few that were able to continue operating. Unlike other restaurants and retail operators, airport concessionaires cannot conduct business with the general public outside the airport environment, and thus have not been able to sustain any business through drive-thru, delivery or carry-out sales. They are totally captive to the number of air travelers at the airport.

*Unless Congress acts quickly to provide immediate aid, many of the DBE/ACDBE companies, the program itself and the important benefits these programs provide our nation's airports, highway and public infrastructure will be lost.*

In talking to our members around the country and in every airport, the story is the same. Business has effectively come to a standstill and passengers won't return until people feel comfortable and safe traveling again.

Airline travel has been devastated by the COVID–19 pandemic, and the restaurant and retail airport industry has been particularly impacted. We have experienced, and continue to experience, mounting losses in jobs and revenues. Beyond air carriers and airport operators, our members, airport concessionaires, are the third major partner in the aviation ecosystem that serve air travelers. Airport concessionaires completely transform empty airport terminals into vibrant shopping and dining destinations that enhance the travel experience, generate $10B in sales annually and employ more than 125,000 workers in steady jobs that provide good pay and benefits and opportunities for advancement. Moreover, airport concessionaires contribute $2.5B in non-aeronautical revenue to airports (approximately 10% of all airport operating revenues) under contracts and agreements that deliver services that travelers and airports need and fuel airport operations, development, bond financing, and growth.

For our members to survive, and continue to make the DOT DBE/ACDBE program vibrant and effective, we need at minimum:

- $3.5B in relief for airport concessionaires; and
- $10B for airports in the next COVID–19 package.

It is vital that these funds be added to any final negotiated legislation on COVID–19 relief. ARRA, together with the Airport Minority Advisory Council (AMAC), the International Association of Airport Duty Free Stores (IAADFS), the American Car Rental Association (ACRA) and the National Parking Association (NPA), along with the airport trade associations—the Airports Council International-North America (ACI–NA) and the American Association of Airport Executives (AAAE)—are united in requesting at least $13.5B in grants to airports, with $3.5B dedicated to support Minimum Annual Guarantee (MAG) and rent abatement for airport concessionaires at airports across the country.

In our reports (attached for the hearing record) *Facing Facts: The Survival and Revival of Shopping and Retail Concessions at Airports*, ARRA demonstrates that concessionaires cannot survive at current traffic levels and have little chance until passenger traffic returns to near pre-pandemic levels. Airport restaurant and retail concessionaires will lose an estimated $3.4B between now and the end of 2021. In the next 18 months, they will lose 3 years of profit.

Most airline, FAA and industry projections show that it will be at least 18–36 months, and possibly five years, before the aviation industry returns to normal. Without immediate federal relief, many DBE/ACDBEs and other concessionaires will not survive. Since these companies operate in a highly restricted and federally regulated airport environment, they will live or die based on government policies, travel restrictions, airline schedules, public confidence in the health safety of air travel and other factors over which they have no control—including whether the Congress appropriates targeted relief funding.

Airport concessionaires include more than 3,500 small minority and women-owned businesses who operate under the Congressionally authorized ACDBE program, which is administered by DOT/FAA. These businesses' survival is threatened by the pandemic's disproportionate negative impact on them. Our fear is that many airport concessionaires will fail to weather this storm without significant financial assistance from the federal government and relief from airport rents and MAG payments. Air travel demand must increase substantially beyond what it is now for airport concessionaires to generate sufficient revenue, meet airport rent obligations, pay debt service and rebound as the key component of the aviation system that they were prior to the pandemic.

The CARES Act (Phase III) provided passenger air carriers with $50B and air cargo carriers with $8B. Airports received $10B and air carrier associated contractors received $3B in immediate financial aid and for future recovery. Airport concessionaires received $0.

The $3.5B and the additional $10B airports and concessionaires are requesting are vital to the airport community, and we urge you to ensure that it is included in any legislation aiding the industry. These funds will help sustain airports and speed their recovery by helping them offset the drastic loss of operating revenue, meet debt service obligations and provide MAG and rent abatement to airport concessionaires. The requested $3.5B for airport concessionaires MAG and rent abatement is the first step in assuring companies survive in the short term but like the airlines and airports, many ACDBEs and airport restaurant and retail concessionaires will also need additional financial assistance for continuing operating expenses, debt payments, and reopening and rehiring employees to be part of the airport and aviation industry's recovery. ARRA is supportive of programs such as the

Payroll Protection Program (PPP) and Main Street Lending Program (MSLP), however these programs are not designed and do not meet the needs of airport concessionaires given their unique circumstances and operating characteristics. We support improvements to these programs that are designed to enable ACDBEs and concessionaires to benefit, and other legislative and administrative initiatives to give airport concessionaires, and ACDBEs in particular, better access to federal grants and no- or low-interest loan programs, such as SBA and MSLP lending programs and other forms of financial assistance.

The requested $13.5B for airport and airport concessions relief—necessary to help airports and concessionaires survive the months ahead—in combination with additional grants and loan programs targeted for airport concessionaires, will help ensure the continued vitality and survival of DOT's ACDBE program. ACDBE firms and concessionaires at airports across the country desperately need the support of Congress in order to assure the survival and speedy recovery of our industry and the nation's economy.

We are submitting this statement both to voice our strong support for the DBE and ACDBE programs and to urge Congress to pass financial relief and assistance specifically for airport restaurateurs and retailers and ACDBEs given the unprecedented and disastrous long-term business impact caused by the pandemic. We are also attaching for the record the statements and testimonials of individual ACDBE companies in strong support of the DBE/ACDBE program. If airport concessionaires do not receive this immediate critical relief, many will cease to exist and this critical program will disappear.

For these reasons, ARRA urges Congress to SAVE OUR INDUSTRY and include financial relief and direct assistance to airport concessionaires as it works to mitigate the severe economic and public health impacts of this unprecedented pandemic.

Thank you.

## About ARRA

ARRA represents the companies who operate restaurant and retail stores and shops at airports across the U.S. More than 80% of ARRA Members are ACDBEs—small minority and women-owned businesses. ARRA's mission is to work collaboratively with the airport community and the aviation industry on matters of policy decision-making, with a collective impact on restaurant and retail operators, and also to empower small, minority, women-owned, and disadvantaged businesses to participate in and contribute to the aviation industry.

## ATTACHMENTS

Letters and testimonial statements from ACDBE companies
[The letters and testimonials are retained in committee files.]

ARRA Reports: "Facing Facts 2: The Survival and Revival of Airport Shopping and Dining—July 2020"
[This report is available online at https://www.arra-airports.com/uploads/1/3/2/1/132108975/arra__facing__facts__2__the__survival__and__revival__of__airport__shopping__and__dining.pdf and is retained in committee files.]

"Facing Facts: The Survival of Airport Shopping and Dining—June 2020"
[This report is available online at https://www.arra-airports.com/uploads/1/3/2/1/132108975/microsoft__word__-__final__arra__10__facts__.pdf and is retained in committee files.]

# APPENDIX

QUESTION FROM HON. TROY BALDERSON TO SANDY-MICHAEL E. MCDONALD, DIRECTOR, OFFICE OF ECONOMIC AND SMALL BUSINESS DEVELOPMENT, BROWARD COUNTY, FLORIDA

*Question 1.* Federal and state Miller Acts help protect subcontractors against loss by requiring payment and performance bonds for infrastructure projects. However, some delivery methods, including public-private partnerships do not require the same levels of protection. To help ensure these protections are in place, Rep. Lynch and I introduced H.R. 6359, the Promoting Infrastructure by Protecting Our Subcontractor and Taxpayers Act, which would ensure that these protections are applied to TIFIA finance projects. A recent Op-ed from in the Daily Kos, "Protecting the Builders Rebuilding America," from Wendell Stemley, the Emeritus Director of the National Association of Minority Contractors, spoke in support of H.R.6359, specifically the benefits of ensuring proper payment and performance security is in place on infrastructure projects to protect subcontractors, including Disadvantaged Business Enterprise program participants.

We believe these requirements are needed now more than ever as states are cancelling transportation projects due to the reduced funding. This puts additional risk on contractors' financial solvency, and therefore adds risk to subcontractors that are part of those projects.

Can you speak to the importance of having these protections in place for DBE's that are subcontracted on large scale multimillion-dollar infrastructure projects if the lead contractor falls into insolvency or experiences financial difficulty, and is unable to complete the project?

*ANSWER.* Thank you for the question you provided and the opportunity to respond to what I believe is another substantive opportunity to support our DBE's.

One of the main reasons small businesses fail is due to a lack of access to capital. According to Forbes[1], it is the number two reason small businesses or entrepreneurs go out of business—Access to Capital. Unfortunately, many entrepreneurs and small businesses with good plans, innovative ideas and genuine intentions, fall short due to running out of cash and not being able to access capital. This also holds true when you take into consideration the obligations and risk that is taken on every day by the Minority and Woman Owned Businesses who serve as our Disadvantaged Business Enterprises (DBEs) under Department of Transportation (DOT) contracts. If they are successful in navigating the typical roadblocks of starting a business, they must then be able to maintain and continue to get over the hurdles associated with slow payments and address the risks of not being covered. This is stated in your H.R. 6359 as, "appropriate payment and performance security".

Representative Balderson, as you have indicated, now more than ever, and certainly as an impact of COVID–19, DBEs need support. With the reduction in funding projects, they need security and financial assistance as soon as possible. The daily risks that are taken on projects are greater for our smaller businesses and subcontractors then the risks experienced by the prime contractors. What should be an incentive for taking a contract must not also be a deterrent in fear of "what could happen" if I am not protected or covered.

The nature of subcontracting places small businesses in the position to be second and third tier performers on a project. It is the consequence of being the second or third tier performer that also dictates the payments and possible profit margins to be made by these companies. They are typically here due to their size and financial capacity. To consider a scenario where a multimillion-dollar project does not continue and the prime contractor, that is a multimillion-dollar company, would have

[1] Burns, Stephanie. (April 30, 2019). *Why Entrepreneurs Fail: Top 10 Causes of Small Business Failure*. Forbes.

recourse and resources if they fell into insolvency is the challenge subcontractors are faced with. Without necessary support and guarantees, our DBE's are at more risk. With this risk, contracts that should be favorable and inviting from DOT, unfortunately, appear far more intimidating and extremely risky.

H.R. 6359, established from the principles of the Miller Act is progress in the right direction. More importantly, it is the necessary incentive, security, and protection the subcontractors need. Whether the responsible party is local or state government, payments and performance securities for the subcontractor are the right protection. DOT taking the responsibility to ensure that these protections are in place, would speak to several of the objectives of the DBE program; e.g.:

1) To create a level playing field on which DBE's can compete fairly for DOT assisted contracts;
2) To help remove barriers to the participation of DBE's in DOT assisted contracts;
3) To assist the development of firms that can compete successfully in the marketplace outside of the DBE program.

In conclusion, the opportunity to share my feedback and perspective is greatly appreciated. To allow our DBE's to grow their businesses, account for their company's fiscal growth, and to compete in competitive markets where competition is the true concern; rather than losing their revenue or their business because of insolvency due to the financial difficulty of the prime contractor is essential. H.R. 6359 is the road now and in the future for our DBE's to travel with the support of DOT.

QUESTIONS FROM HON. PETER A. DEFAZIO TO JON S. WAINWRIGHT, PH.D., AFFILIATED CONSULTANT, NERA ECONOMIC CONSULTING

*Question 1.* Some critics say disparity studies should not be given any credibility because they do not adjust for the capacity of DBEs. Is that true?

*ANSWER*. No. That is not true.

First, most disparity studies address capacity in many meaningful ways. They consider, for example, qualities like education level, labor market experience, geographic and industry location, and dollar weighting to account for specific industry spending patterns by government agencies.

Second, many studies also conduct statistical regression analysis, which demonstrates that disparities remain even when holding capacity-related factors constant between groups.

Third, we must recognize that some aspects of what people think of as "capacity" are themselves negatively impacted by current and historical discrimination. There is a long list of examples here, with credit and capital discrimination being the most obvious, differences in firm size and access to formal and informal business networks both running a close second. Such differences in "capacity" are not evidence of a lack of discrimination. On the contrary, they point to the existence of pervasive discrimination.

It's critical, from a good social science perspective, that in trying to measure discrimination, we do not treat factors that are themselves the result of discrimination as endogenous variables.

*Question 2.* Some state and local transportation agencies have excluded certain minority, ethnic or gender groups from their programs because these groups have reached or exceeded "parity" according to a disparity study. Is this the right approach in your opinion?

*ANSWER*. No. It is not the right approach.

First, the overwhelming majority of examples of "parity" are quite recent, as some DBE programs have matured, and in my experience they are very rarely statistically significant, which mean they don't actually show "parity" at all.

Second, these results, in the rare instances they occur and are also statistically significant, appear in a context in which availability figures have been artificially depressed due to discrimination. As I testified, minority- and women-owned firms are forming at much lower rates than similarly-situated majority male firms because of discrimination. If such firms were forming at the same rate as majority male firms there would be few, if any, findings of "parity".

Third, it's inappropriate to consider a category of DBE to have achieved parity until you see the same result occurring consistently in the private sector—that is, in the Census data. Again, this is like checking the blood pressure of a patient with high blood pressure who is on medication—seeing it's 120 over 80 and concluding—wrongly—that the patient is cured and can stop their medication.

Remember: The only markets in which there has been any attempt to level the playing field are the public contracting markets—like the federally-assisted trans-

portation markets. In the far larger and more lucrative private sector markets, DBE programs are rare to non-existent and majority male-owned firms generally get almost *all* of the business.

We also have to remember that majority male-owned firms have literally had centuries to grow and establish their firms with effectively no competition from minorities and women. Early on the lack of competition was a direct result of laws that intentionally and explicitly disadvantaged minorities and women. Later it was the result of discriminatory practices that were permitted to continue despite civil rights laws.

Finally, we should consider the practical effects of suspending the operation of the program every time some subcategory of program participant achieves a modicum of success. This won't reduce discrimination, it will just tend to increase bankruptcies and then those same entrepreneurs, or others like them, will need to be added right back into the program.

*Question 3.* Does it provide useful evidence, in your professional opinion, to compare situations where a DBE program is in effect with situations in the same jurisdiction where such a program is not in effect?

*ANSWER*. Yes. This evidence can be very powerful when it is available and it tends to highlight the profound importance of the DBE program. Three examples come immediately to mind:

First, in the immediate aftermath of the *Croson* and *Adarand* decisions we saw programs shut down from fear of litigation or enjoined as the result of litigation and we can compare the data from before and after these events.

Second, we often see agencies that use goals for their federal DBE program but not for exactly similar spending with their state or local funds.

Third in some of the disparity studies I have authored, I've had the opportunity to compare DBE participation on contracts with goals to contracts without.

In almost every one of the aforementioned cases, when DBE goals are absent minority- and women-owned firms' participation plummets. This type of evidence shows the profound importance of the DBE program.

I would add this one caveat, however. Just because this evidence is powerful does not mean we always want to have it or create it. You have heard testimony during your September 23rd hearing from business owners who explained that without the DBE program they would not get any work at all. We should not undertake experiments that end up resulting in harm to disadvantaged firms.

*Question 4.* Are you concerned about so called "overconcentration" of DBEs in specific markets? Why or why not?

*ANSWER*. I see several potential problems that might fall under the category of "overconcentration".

First, one of the problems is that "overconcentration" has been, defined differently by different people, and this has the potential to lead to hasty and ill-advised policy decisions. For instance, it is demonstrably incorrect to say that simply increasing the number and percentage of DBEs participating in subcontracting on federally assisted contracts constitutes "overconcentration". That's not overconcentration—it's evidence of the first steps of addressing centuries of discrimination.

Second, my experience has been that most examples of so-called overconcentration are recent, temporary, and rarely statistically significant, meaning they don't really show "overconcentration" at all. We should not permit anomalous improvements in DBE participation to lead to the suspension of DBE programs for some or all DBEs. As I stated above, we should not consider improvements in DBE participation to constitute overconcentration unless they are sustained, statistically significant and reflected in the broader private contracting market.

Third, I am concerned about the history of shunting minority- and women-owned firms into those industry areas that tend to have the lowest profit margins and the highest risk. That's wrong and sadly, that is where we are most likely to see "overconcentration" first. Instead, we should be helping DBEs expand beyond such low margin industries where they have often been concentrated due to discrimination such as lack of access to capital and business networks.

Finally, I must add, and as my written testimony demonstrates, that for every single instance in which DBEs have made progress in a particular industry, I can provide dozens of examples of industries in which minority- and women-owned firms are largely, or even completely, excluded.

*Question 5.* How do you know that the DBE program is working? How do you know that any reduction in disparities is due to the program?

*ANSWER.* I think there are two ways to answer this. First, with reference to the quantitative and qualitative evidence I have seen, and second, with respect to my own first-hand observations of these programs over the years.

With respect to evidence, two important data points come to mind. First, in almost every case where DBE type goals are removed, DBE participation rates subsequently plummet. That suggests a pretty close relationship between the program and participation rates. Second, in my own studies, I also conducted surveys and interviews to capture what firms actually experience in their day-to-day operation. Minority- and women-owned firms almost universally report that the DBE program is invaluable to them in helping them win contracts and grow their firms. A number of majority male-owned firms also report that they think the program is a positive thing.

Second, I have my first-hand observations. The DBE program has made real changes on the ground. Previously there was not staff assigned to monitor contracting diversity and provide training and information to DBEs and ACDBEs. To the extent any staff were dedicated to the issue at all, they were fairly low level. Now the rules require that senior DBE staff have direct access to the agency CEO. Previously the federal government did not require prompt pay provisions in every contract funded with federal dollars—now they do. That makes a huge difference—and by the way, those prompt pay provisions help all firms, not just DBEs. There are a lot of changes caused by the DBE Program that I think are genuinely important in beginning to chip away at the ingrained effects of discrimination. Moreover, as the DBE program has grown and matured, it has improved in its effectiveness. For instance, in recent years recipients of federally assisted transportation funding have dramatically improved the accuracy of goals due to DOT regulations requiring that goal-setting be data-driven. In addition, the program has improved the detection of fraud, abuse and unfair business practices that have long injured DBEs and other small businesses.

With all of that said, however, I cannot emphasize enough that we still have a long way to go. The statistics I presented in my testimony are devastating. Moreover, I am deeply concerned about the effect this pandemic will have. Remember, all of the data I presented pre-dates the pandemic and it still shows incredibly bad results for firms owned by minorities and women. My colleague Professor Bob Fairlie has already raised the alarm that minority- and women-owned firms are disappearing during the pandemic at a much higher rate than majority male-owned firms.[1]

If you really want to say that the program has been such a success that it is no longer needed, you would of course need to see the elimination of disparities in the public sector where goals are utilized *and* you would want to see that those gains are matched by similar gains in the private sector where goals are generally not used. As my testimony demonstrates, we are definitely not there yet.

*Question 6.* Your research utilizes an impressive amount of federally collected data. Do you have the data you need to conduct these studies and are their other types of data you might need?

*ANSWER.* This is a timely question. As the country rightfully grapples with our national history of racism, Congress is well-positioned to expand the collection of data for researchers like myself who are interested in studying the effects of racial and gender discrimination. This is especially important in the context of the Supreme Court's increasingly stringent requirements on legislators who seek to remedy discrimination. I would be happy to work with the Committee to discuss this issue at length as it is terribly important. In this context, however, I would raise two actions that the Congress could take immediately:

First, reinstate the collection of data that was previously compiled by the *Survey of Small Business Finances* (SSBF) so that we can monitor discrimination in credit for small businesses owned by women and minorities. The SSBF, previously conducted under the auspices of the Federal Reserve Board, in conjunction with the Small Business Administration, was a very detailed survey that oversampled minorities and women and therefore allowed us to assess discrimination in access to business credit for small businesses while controlling for many common balance sheet factors. The fact that the government stopped conducting this survey in 2008 means that we lost an important source of data that might have helped us better understand the special vulnerability of minority and women owned firms to both the

[1] Fairlie, Robert (2020). "The Impact of COVID–19 on Small Business Owners: Continued Losses and the Partial Rebound in May 2020." Working Paper.

Great Recession and the more recent, and ongoing, pandemic-related economic recession and dislocations. It is often said that credit is the life blood of business. If that is true, we must work harder to eliminate discrimination in business lending. That process begins with understanding the problem, not ignoring it by ceasing to collect the data required to understand it.[2]

Second, reverse the elimination of the collection and reporting of information on non-employer firms that recently occurred when the Census Bureau's *Survey of Business Owners* (SBO) was eliminated and absorbed into a new survey called the *Annual Business Survey* (ABS). While there are certain improvements in the ABS compared to the SBO, such as reporting data annually rather than twice per decade, these are dwarfed in importance by the elimination of data on non-employer firms, *which constitute more than 80 percent of all businesses in the United States*. Non-employer firms are, obviously, a hugely important component of the small business market, and ignoring them in the only federal survey dedicated to collecting information on minority- and women-owned businesses and business owners is a huge mistake.

○

[2] Robb, A. (2010). "Beyond the late, lamented Survey of Small Business Finances," *Newsletter of the Association of Public Data Users*, 33, no. 2, March/April.