# EXHIBIT A-8

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO


# THE ROLE OF THE SBA's 8(a) PROGRAM IN ENHANCING ECONOMIC OPPORTUNITIES

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS UNITED STATES HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

HEARING HELD
SEPTEMBER 18, 2019

Small Business Committee Document Number 116–044
Available via the GPO Website: www.govinfo.gov

U.S. GOVERNMENT PUBLISHING OFFICE
37–638 WASHINGTON : 2020

HOUSE COMMITTEE ON SMALL BUSINESS

NYDIA VELÁZQUEZ, New York, *Chairwoman*
ABBY FINKENAUER, Iowa
JARED GOLDEN, Maine
ANDY KIM, New Jersey
JASON CROW, Colorado
SHARICE DAVIDS, Kansas
JUDY CHU, California
MARC VEASEY, Texas
DWIGHT EVANS, Pennsylvania
BRAD SCHNEIDER, Illinois
ADRIANO ESPAILLAT, New York
ANTONIO DELGADO, New York
CHRISSY HOULAHAN, Pennsylvania
ANGIE CRAIG, Minnesota
STEVE CHABOT, Ohio, *Ranking Member*
AUMUA AMATA COLEMAN RADEWAGEN, American Samoa, *Vice Ranking Member*
TRENT KELLY, Mississippi
TROY BALDERSON, Ohio
KEVIN HERN, Oklahoma
JIM HAGEDORN, Minnesota
PETE STAUBER, Minnesota
TIM BURCHETT, Tennessee
ROSS SPANO, Florida
JOHN JOYCE, Pennsylvania

ADAM MINEHARDT, *Majority Staff Director*
MELISSA JUNG, *Majority Deputy Staff Director and Chief Counsel*
KEVIN FITZPATRICK, *Staff Director*

# CONTENTS

## OPENING STATEMENTS


| | Page |
|---|---|
| Hon. Nydia Velázquez | 1 |
| Hon. Steve Chabot | 2 |


## WITNESSES


| | |
|---|---|
| Mr. Ralph C. Thomas III, Executive Director Emeritus & Representative of the National Association of Minority Contractors (NAMC), Lawyer, Law Offices of Ralph C. Thomas III PLLC, Washington, DC | 5 |
| Ms. Dottie Li, Founder and CEO, TransPacific Communications, Cheverly, MD | 6 |
| Mr. Clarence McAllister, CEO, Fortis Networks, Phoenix, AZ | 7 |
| Ms. Rebecca Askew, CEO & General Counsel, Circuit Media LLC, Denver, CO | 9 |


## APPENDIX


| | |
|---|---|
| Prepared Statements: | |
| Mr. Ralph C. Thomas III, Executive Director Emeritus & Representative of the National Association of Minority Contractors (NAMC), Lawyer, Law Offices of Ralph C. Thomas III PLLC, Washington, DC | 25 |
| Ms. Dottie Li, Founder and CEO, TransPacific Communications, Cheverly, MD | 41 |
| Mr. Clarence McAllister, CEO, Fortis Networks, Phoenix, AZ | 49 |
| Ms. Rebecca Askew, CEO & General Counsel, Circuit Media LLC, Denver, CO | 52 |
| Questions and Answers for the Record: | |
| Questions from Hon. Nydia Velázquez to Mr. Ralph C. Thomas III and Answers from Mr. Ralph C. Thomas III | 57 |
| Questions from Hon. Nydia Velázquez to Ms. Dottie Li and Answers from Ms. Dottie Li | 60 |
| Questions from Hon. Nydia Velázquez to Ms. Rebecca Askew and Answers from Ms. Rebecca Askew | 63 |
| Additional Material for the Record: | |
| IEEE-USA | 65 |

# THE ROLE OF THE SBA'S 8(A) PROGRAM IN ENHANCING ECONOMIC OPPORTUNITIES

**WEDNESDAY, SEPTEMBER 18, 2019**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON SMALL BUSINESS,
*Washington, DC.*

The committee met, pursuant to call, at 11:31 a.m., in Room 2360, Rayburn House Office Building. Hon. Nydia Velázquez [chairwoman of the Committee] presiding.

Present: Representatives Velázquez, Finkenauer, Golden, Kim, Davids, Chu, Evans, Delgado, Houlahan, Craig, Chabot, Balderson, Hern, Stauber, Spano, and Joyce.

Chairwoman VELÁZQUEZ. Good morning. The committee will come to order.

I want to thank everyone for joining us this morning, and I want to especially thank the witnesses for being here. Today we are here because of the enormous role the federal government plays as a customer. In fact, it purchased over $550 billion of goods and services last year.

Whether it is rebuilding roads, outfitting offices with 21st century technology, or creating cutting-edge equipment for our medical laboratories or armed services, small firms are producing the innovative and quality products the federal government is looking to buy.

Which brings me to why we are here today. Those who have been following the committee closely know that it is a top priority for both the Ranking Member and myself to ensure that the federal government is receiving contract bids from small businesses and that those firms have the resources they need to understand the federal contracting process.

That is why Congress created government-wide contracting goals which require federal agencies to award a percentage of contracts to historically underserved populations. Our committee has already held hearings on how to strengthen SBA initiatives to increase access to the federal marketplace for women and veteran-owned businesses.

Today we will be taking an overdue examination of the Small Business and Capital Ownership Development Program, more commonly known as the "8(a)" program. The 8(a) program provides small firms owned by socially and economically disadvantaged individuals with increased access to the federal marketplace, procurement training, technical assistance, and the ability to be paired with a mentor. The government also has a goal to award 5 percent

of all prime and subcontracting dollars to small disadvantaged businesses, including 8(a) certified firms.

Its purpose is simple: to promote the development and competitiveness of small businesses looking to contract with the federal Government. Make no mistake, minority-owned businesses continue to be a driving force in our economy. According to the SBA 2018 Small Business Profile, there are 8 million minority-owned small businesses in the United States. These small businesses accounted for almost 30 percent of all firms, contributed $1.38 trillion in revenue, and make up over 7.2 million jobs in the United States.

However, this progress has not been accomplished without hardships along the way. While some may want to minimize the barriers created by discrimination, that does not make it any less real. Throughout our nation's history, minorities have suffered the effects of discriminatory practices in access to affordable credit, housing, criminal justice, and education. Consequently, the path to starting and running a business for minority entrepreneurs has been difficult. The 8(a) program was designed to make it just a little easier, while also encouraging minority entrepreneurship and further improving the federal marketplace as a whole.

Over 40 years ago, Congress determined that the opportunity for full participation in the federal marketplace is essential if we are to obtain social and economic equality and have an economy that works for everyone. This premise, which remains as true today as it was more than 40 years ago, is the reason why I am committed to making sure that the 8(a) program works as intended.

Given how critical this program is to our nation's wellbeing, I am troubled by ongoing problems.

Over the past few years, the SBA's Office of Inspector General identified issues that we will discuss today. For example, despite a rise in contract dollars to 8(a) participants, the number of 8(a) firms remains in decline. We need more 8(a) firms, not fewer. To reverse this trend, we need to understand why fewer owners are utilizing this program so this committee can ensure eligible firms have the necessary resources and tools to become certified and win contracts.

Getting certified is just the beginning and is not a guarantee for winning an award. We need to make sure the SBA will aid, monitor, and support the business development needs of 8(a) firms for the duration of their time in the program.

Finally, it is time we look closely at ways to modernize the program to bring it into the 21st century. It is my hope today's hearing will help us determine if things like the standard for net worth, which has not changed in over 30 years, adequately reflects the reality of our times.

Today's hearing will give this committee an opportunity to discuss what can be done to best serve the 8(a) community.

I thank all of our witnesses for their attendance and insights into this important topic. I now yield to the Ranking Member, Mr. Chabot, for his opening statement.

Mr. CHABOT. Thank you, Madam Chairwoman, for holding this important hearing on a program that means so much to so many disadvantaged entrepreneurs across the country.

The 8(a) program is a crucial component of the SBA's arsenal of small business programs. Given that it is the longest running and most well established business development program maintained by the SBA, taking the time to revisit this program today is certainly a worthwhile undertaking.

The Federal Government has long recognized the policy that the government should aid, counsel, assist, and protect the interests of small business concerns. However, special recognition has been given to the socially and economically disadvantaged. The Federal Government, through the Small Business Act, recognizes the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential to obtaining equality and improving the function of our national economy.

The 8(a) program was developed with this policy goal in mind, creating a prospective space for these types of firms to grow and succeed so they may later rise to become fully, capable, competent, competitive, and productive members of our Nation's workforce.

To further spur economic growth among this group of businesses, the Federal Government imposes a statutory goal of awarding at least 5 percent of all prime and subcontracting dollars to a socially and economically disadvantaged firm. According to the SBA, this goal was exceeded in fiscal year 2018 with nearly $46.5 billion dollars being awarded to small, disadvantaged businesses.

While these numbers seem to indicate a measure of success, it is important for us to take the time today to really grasp the human aspect of this Federal program. Applying to become an 8(a) eligible program is not an easy task. These entrepreneurs must face that they have faced substantial hardship in their lives and careers in order to qualify for the program. In addition, they must continue to show demonstrated success year after year in order to remain in good standing. The success of these businesses also translates directly to broader benefits, whether in the form of increasing the number of jobs in the local area or amplifying economic activity within their communities.

Given that these businesses only have 9 years to participate in this program, it is incumbent on us as members of this Committee to ensure that the program is effectively acting as a launch pad for sustained success.

That is why again today's hearing is so important. Not only do we need to devote time to hear from our witnesses, the successes that this program can bring for socially and economically disadvantaged entrepreneurs, we also need to understand where improvements can be made to ensure that the program is operating optimally and fairly. It is in the best interest of our Nation's economy and the very fabric of our communities to ensure that this program yields high quality, productive, and successful small disadvantaged businesses and entrepreneurs.

I want to thank you, Madam Chairwoman, for holding this hearing, and I yield back.

Chairwoman VELÁZQUEZ. Thank you, Mr. Chabot. The gentleman yields back.

If committee members have an opening statement prepared, we ask that they be submitted for the record.

I would like to just take a minute to explain the timing rules. Each witness gets 5 minutes to testify and each member gets 5 minutes for questioning. There is a lighting system to assist you. The green light will be on when you begin, and the yellow light will come on when you have 1 minute remaining. The red light will come on when you are out of time, and we ask that you stay within the timeframe to the best of your ability.

I would now like to introduce our witnesses.

Our first witness is Mr. Ralph C. Thomas, III, Executive Director Emeritus and Representative of the National Association of Minority Contractors. He is also a government contracts litigator, who focuses his practice on legal issues affecting small businesses in the federal contracting arena, including the SBA's 8(a) Business Development Program. From 1992 to 2005, Mr. Thomas was the Associate Administrator for Small and Disadvantaged Business Utilization at NASA in Washington, D.C., where he reported directly to the head of NASA. He received his Juris Doctor degree from Harvard Law School and his Bachelor of Arts degree with honors from the University of California at Berkeley. Welcome, Mr. Thomas.

Our second witness is Ms. Dottie Li, the founder and CEO of TransPacific Communications, an SBA 8(a) company. Prior to becoming CEO, Ms. Li moved from broadcast and print journalism to work as a corporate spokesperson and public relations executive. She then served at the White House handling media advance assignments for presidential trips and later as a communication chief for several large national and international nonprofit organizations. Just last year, Ms. Li was recognized as one of "Maryland's Top 100 Women" in 2015 by the Daily Record. Welcome, Ms. Li.

Our next witness today is Mr. Clarence McAllister. Mr. McAllister is the cofounder and CEO of Fortis Networks, a former 8(a) company that provides general construction services. He started the company in 2000 after an engineering career and today has 120 employees across seven states. Mr. McAllister has more than 30 years of experience in all facets of the construction industry. He holds a Master of Business Administration from Nova Southeastern University and both a Bachelor and a Master of Science in electrical engineering from Arizona State University. Welcome, sir.

I yield to the Ranking Member to introduce our final witness.

Mr. CHABOT. Thank you, Madam Chair.

Our final witness today will be Ms. Rebecca Askew, founder and CEO of Circuit Media, LLC. Circuit Media was established in 2002 and is dually based in both Denver and Washington, D.C. It is a certified 8(a) small disadvantaged business and an economically disadvantaged woman-owned small business, and the company supplies goods and services at the state and Federal level. Before founding Circuit Media, Ms. Askew served as corporate counsel for an international media technology company, started her own litigation law firm, and served as a government prosecutor. She earned her B.A. from the University of Iowa and J.D. from the University of Denver, Sturm College of Law. In addition, Ms. Askew received training in change management and design thinking from Harvard University. We thank you for your participation today, Ms. Askew.

We look forward to hearing from all the witnesses here this morning, and I yield back.

Chairwoman VELÁZQUEZ. Thank you, Mr. Chabot.
Mr. Thomas, you are recognized for 5 minutes.

**STATEMENTS OF RALPH C. THOMAS III, EXECUTIVE DIRECTOR EMERITUS & REPRESENTATIVE OF THE NATIONAL ASSOCIATION OF MINORITY CONTRACTORS (NAMC), LAWYER, LAW OFFICES OF RALPH C. THOMAS III PLLC; DOTTIE LI, FOUNDER AND CEO, TRANSPACIFIC COMMUNICATIONS; CLARENCE MCALLISTER, CEO, FORTIS NETWORKS; REBECCA ASKEW, CEO & GENERAL COUNSEL, CIRCUIT MEDIA LLC**

## STATEMENT OF RALPH C. THOMAS, III

Mr. THOMAS. Good morning, Madam Chairman, and other members of this distinguished Committee.

My name, as was stated, is Ralph Thomas, and I am here on behalf of the National Association of Minority Contractors. We are celebrating our 50th anniversary this year and we are the oldest minority construction trade association in the U.S. Our organization advocates on behalf of the near 100,000 minority construction contractors across the U.S. As was mentioned, I am also an attorney, who represents minority contractors in government contracting issues. And as was stated, I was the AA for the NASA Small and Disadvantaged Business Office from 1992 to 2005. Now, our written testimony, and I will just summarize because you have it in front of you, but it is based, it is broken into five parts. One in which we express our strong support for the 8(a) program. Though it is sometimes flawed, it nevertheless provides the best vehicle for minority contractors to break into government contracting. And for the reasons that I haye laid out in the written testimony, we feel that the Mentor-Protege Program, particularly the part that allows minority contractors or 8(a) contractors to obtain joint ventures with large contractors, it allows them to evolve to a higher level of government contracting.

The second part of our testimony I have provided a short history of the 8(a) program for the newer members of this Committee.

Third, I have given an illustration of 8(a)'s contractors' best successes. When I began as executive director of NAMC in 1985, 8(a) firms were primarily used by Federal agencies to perform small contracts and construction, administrative contract support, and janitorial maintenance contracts. However, when I served as the head of NASA's Small Business Program from 1992 to 2005, I watched 8(a) contractors perform such a mission, critical activities as developing subsystems for complex spacecraft, assisting in building nonrocket-powered vehicles to fly at hypersonic speed, and manufacturing hardware or the international space station. So they were also more involved in more complex service-oriented contracts, such as space shuttle related software development, safety and mission assurance, systems engineering. So I proudly observed the continued success of some of these companies that have graduated from the 8(a) program and are still performing at a high level.

The fourth part of my statement of my written testimony, we have commented to a limited degree on the last OIG report regard-

ing the 8(a) program. And you can see that for yourself. And if you want me to elaborate I will.

Finally, we have listed some of our concerns and suggestions for improvements to the program. For example, we are concerned about those contractors that are left behind. Most 8(a) contractors do not, in fact, receive contracts, you know, during their tenure. And we are very concerned about that.

We also request that this Committee follow up on a study of graduated 8(a) firms. The last one done was in 1988 by the Senate Committee on Small Business. We are concerned that the contracts are getting so large that smaller 8(a) firms are being left out.

This does not concern this Committee, but we are hearing about disparate treatment of African American and Latino women-owned businesses and the DOT Program. We have a few concerns about the Protégé Program, and we would also like to nail down the non-procurement assistance to 8(a) contracts, financial, technical, and management support from the agency.

That ends my oral testimony. And once again, thank you for allowing me to testify today. And I am now ready for any questions you might have.

Mr. EVANS. [Presiding] Thank you, Mr. Thomas.

Ms. Li, you are now recognized for 5 minutes.

**STATEMENT OF DOTTIE LI**

Ms. LI. Thank you.

Good morning, Chairwoman Velázquez, Vice Chair Evans, Ranking Member Chabot, and each member of this Committee. It is an honor to speak with you. I am also pleased to appear before Representative Chu, Chair of CAPAC, and along with Representative Kim, who I have also met.

It is almost a full year since my company, TransPacific Communications, became an 8(a). It also has been almost one full year since TransPacific Communications has yet to receive an 8(a) contract. Why the delay? I believe there is a critical gap between the SBA 8(a) policy which is great and the operations. Operational movement at agency level would greatly enhance a new 8(a) firm, like TransPacific Communications, in obtaining 8(a) contracts.

I am here today to present my perspective as a new 8(a) company and the challenges we face in the system. More importantly, I am here to offer some suggestions I believe will make the 8(a) program better to reduce and eliminate the gap between policy and operation.

I was born and raised in China, a little girl who dreamed of going to America and becoming a Voice of America broadcaster. I struggled when I got here. The culture shock of finding myself in Mobile, Alabama, my accent, a combination of British-taught English overlaying my Chinese intonation and now marinated in a southern drawl.

After finishing my graduation, I landed my very first job as a broadcaster at Voice of America two blocks from here. When I later became a corporate spokesperson, I worked hard with a professional coach to clear up my speech. I found my speaking voice, the one allowing me to sound natural and credible. This did not wash away my Asian identity; it added a layer of my new American iden-

tity to it. It was a life-changing experience. It also helped me discover my calling.

Many in the Asian-American and other immigrant communities have the same experience that we excel academically, get good jobs, perform well, but many fail to achieve our full potential, and are unable to fully contribute in the workplace and in society.

Many of the employers and managers are also frustrated. They see talent and drive that is hindered by poor communication skills and cultural barriers on both sides. I became certified to train others so they could transform their lives and careers as I did, and TransPacific Communications was born.

We serve several different industries, corporations, and higher education, and many Federal agencies. You have a long list of those. But even with the support of satisfied agency managers, I had to find a way to grow and scale so that we could help more Federal workers, and 8(a) appeared to be the solution.

I started looking into the 8(a) application process in late 2017. The process is daunting and lengthy. After submitting the complex application, it was wait and wait and wait. Finally, an SBA official intervened and introduced me directly to the person who handled my file. It took too many more months, but then on September 25, 2018, we finally got the 8(a) certificate. I was elated and ready to go.

An 8(a) sole source BPA contract with an agency was supposedly ready for me. I began planning, allocating resources and staff, but nothing happened. No movement.

I would like to offer some suggestions in the hope of improving the process for others.

One is to put a check-in mechanism in place that allows 8(a) firms to move in a timely fashion. It will also hold agencies accountable while SBA provides oversight to avoid 8(a) firms being left in limbo. It is critical that operations be empowered in order for 8(a) firms to successfully obtain contracts. Coordination, collaboration, and team work among SBA contracting agencies and 8(a) participants must be improved. Strengthening the mentoring of 8(a) participants is needed during the contracting process between contractor and subcontractor and outside of any contract relationship.

I am grateful to be in the 8(a) program. It has given us a good platform as we wait to experience its full potential as we contribute to our economy and fulfill the mission to serve others. I offer my full statement for the record, and I am happy to answer any questions.

Thank you, Chairwoman, thank you Vice Chair, thank you Ranking Member and the entire Committee.

Mr. EVANS. Thank you, Ms. Li.

Mr. McAllister, you are now recognized for 5 minutes.

## STATEMENT OF CLARENCE MCALLISTER

Mr. MCALLISTER. Good morning, Committee Chair, Vice Chair, Ranking Member. Thank you for the invitation to be here.

My name is Clarence McAllister. We are a successful graduate of the 8(a) program. I am also an immigrant. I came to this country 30 years ago and obtained a great education, started a company.

We did become MB certified, DB certified, and found that those programs were not able to allow us to grow the company. So the next step was Federal contracting.

I started the business in 2000. In 2008, we applied for the 8(a) program. It took us a year to get our application approved to the program. And once we got started in the program we realized that we did not have the expertise to do Federal contracting, so we had to join several networking groups, like the Society of American Military Engineers to become familiar with Federal contracting.

Phoenix is not a large city for Federal contracting so we had to travel to states like California. Neighboring states, California and New Mexico, Texas, and visit military bases off the beaten path and we were very successful at it. We grew the company substantially, fourfold. We had two Mentor-Protégé Programs. They have helped us substantially in growing the company, increasing our bonding capacity as a construction company, and obtained contracts that on our own we would not be able to qualify successfully. So the MPA program I believe definitely should be expanded and the SBA should perhaps serve as a matchmaker between 8(a) companies and potential mentors as well.

We transitioned out of the 8(a) program 2 years ago when we graduated, and I have heard figures that 90 percent of 8(a) companies are out of business 2 years after graduation. So we are 2 years past graduation. And we started that transition process early on, and some of the tools, the paths that we utilized are, one, we applied for several IDIQs, Multiple Award Task Order Contracts that were 5 years in length. So by the time we graduated we still had 3, 4, 5 years to compete. We were very successful at that. So after year 9 we are still competing for some of those 8(a) contracts that we got awarded when we were 8(a).

We are moving to the HUBZone. We believe the HUBZone is a great program. If you are not 8(a), I believe the HUBZone is the second best program. And we are moving to a neighborhood that needed some help. We hired employees from that neighborhood and we are successfully pursuing HUBZone contracts right now.

The first strategy was to mentor newly 8(a)s and we have been successful at that. Our first contract as an 8(a) took us about 2 years to get. We mentored an 8(a) company and they have gotten their 8(a) contracts in the first year. So there is definitely some benefit to that.

I submit that even though minorities have indeed entered the economic mainstream, the net worth or average minority household is only a fraction of that of white households. According to Forbes Magazine, the median white household owns 86 times more wealth than its black counterpart and 68 times more than its Hispanic counterpart.

Even though the 8(a) program is not a solution to America's inequality, I believe it is a tool to assist minorities be successful, hire more minorities, and upgrade our communities. Thus, the 8(a) program should not be eliminated. It should be strengthened. And I do have some recommendations for that.

One, extend the 8(a) program beyond 9 years because it usually takes 5 years for an 8(a) contractor, at least in my field in construc-

tion, to obtain the bonding capacity experience to be able to qualify and compete for larger contracts. So 9 years is not enough.

Federal construction contracts over $100,000 require bonding. Most 8(a) contractors are not able to build that equity in the business to be able to bond larger contracts unless they are into Mentor Protégé, for example.

Expedite the application process. I believe that just recently in the last couple years it is now online and takes less time but I am still hearing about 6 months, 8 months for approval.

Provide legal assistance to 8(a) contractors. If you are an 8(a) contractor and you do not know the FAR, you can get in trouble very easily. And it is something that most attorneys are not even qualified for.

And access to capital is very important as well.

Thank you very much for your time.

Mr. EVANS. Thank you, Mr. McAllister.

Ms. Askew, you are recognized for 5 minutes.

**STATEMENT OF REBECCA ASKEW**

Ms. ASKEW. Thank you.

Vice Chair Evans, Ranking Member Chabot, Chair Velázquez, and members of the Committee, I would like to thank you for the opportunity to testify before you today.

My name is Rebecca Askew and I am CEO and general counsel of Circuit Media located in Denver, Colorado. We provide competitive intelligence to business and legal professionals through print and online media. I am also on the Leadership Advisory Counsel for Women Impacting Public Policy (WIPP). WIPP is a national, nonpartisan policy organization advocating on behalf of women entrepreneurs.

I started Circuit Media, like most entrepreneurs, in my basement. Now my company has grown to 60 employees with offices in Denver and D.C. I am testifying today about a program that has contributed to my success, the Small Business Administration 8(a)'s Business Development Program.

The 8(a) program has given my company access to Federal contracts that would not otherwise have occurred. However, I think it is important to make something clear: this program is a hand up, not a handout. As the SBA states, the mission of the program is to help provide a level playing field for small businesses owned by socially and economically disadvantaged people or entities. Now in my seventh year of the program, I have been strategic in ensuring that I balance contracts both in and out of the program. Having this balance has resulted in my success in the 8(a) program and creating a sustainable company.

While the 8(a) program has allowed me to find a successful path forward, I know many companies have not had the same experience. One of the downfalls for any company is over relying on 8(a) contracts while in the program. This results in difficulties when it is time to transition out of the program. Many companies go out of business, sell, or reinvest themselves to stay small.

One of the ways the Small Business Administration is trying to tackle this issue is through the 7(j) Management and Technical Assistance Program. Although this type of training is valuable, it

would be beneficial for the SBA to consider having two tracks: one for businesses who are in the beginning phases of the program and one that is more advanced for businesses nearing graduation.

Since the 8(a) business development program is only 9 years, a solution is to make sure that other SBA socioeconomic set-aside programs are available for companies post-graduation.

Proposals such as H.R. 190, which passed out of the Committee earlier this year, would allow other socioeconomic programs—women-owned, service-disabled, veteran-owned, and HUBZone to take advantage of increased access to sole source contracts.

By making these set-aside programs similarly accessible to Federal agencies, graduated 8(a) companies could continue to effectively utilize this set-aside strategy after transition out of the program.

Another challenge for 8(a) businesses is to take full advantage of the program during the first years of the program, otherwise known as the developmental stage. Government contracting requires a company to have significant business development and financial acumen. Young companies may not have the internal infrastructure to compete for and perform on government contracts. Given the length of time it takes for an agency to become familiar with a contractor, changing the criteria for acceptance into the program could help attract companies that can fully utilize the program at the time of entry.

I have greatly appreciate the opportunities afforded to me through my participation in the 8(a) program and have made a concerted effort to extend these awards to my employees and my community. As a certified green company, Circuit Media has developed and funded campaigns educating businesses and schools across the country on the benefits of recycling and reduction in paper towel usage. In addition, we donate time, money, and services to the Trust for Public Lands, Leave No Trace, and Denver's Highline Conservancy.

We have established an internship program for at-risk youth who attend Denver Public Schools and offer our employees tuition reimbursement and paid time off to volunteer in the community.

In conclusion, the 8(a) program has been beneficial to my growth, and as this Committee examines the program, I would urge you to consider my recommendations.

Thank you for inviting me to testify at this important hearing and I look forward to answering any questions. And I will yield my time.

Mr. EVANS. I thank you, and we appreciate you for all the information you have shared with us.

The Chairwoman has done a fantastic job in putting this together so I want to not mess up for her, so I want to be clear.

So what I would like to do is begin by yielding myself 5 minutes. I would like to start off with Mr. Thomas.

Mr. Thomas, the government has the goal of awarding 5 percent of all eligible prime contractors of socially and economic disadvantaged small businesses. Agencies get credit for 8(a) small disadvantaged businesses and non 8(a) small disadvantaged businesses like 8(a) guarantee.

While this information is available through the Federal procurement data system from a review of the annual scorecard, it cannot be determined what percentage of Federal spending dollars 8(a) firms are receiving. Would it make sense to require SBA, Small Business Administration to report 8(a) specific data in the scorecard? If so, how would such data help make a better understanding of the 8(a) program?

Mr. THOMAS. Let me say yes. The 8(a) information should definitely be included and added to the scorecard. First of all, you have to know as much as you can about what is happening in the 8(a) program in order to assess it, in order to assess its needs. I had a boss, one of the NASA administrators used to say if you cannot measure it, you cannot manage it. And so if we can gather as much information that we can on the 8(a) contractors and what contracting dollars they are getting we can have something to improve on.

Secondly, yes, I think it should be made part of the SBA score because when you keep a record of anything in terms of numbers they tend to improve each year.

Mr. EVANS. Thank you.

I would like to go to Ms. Li. As an 8(a) participant, have you been able to receive training in areas such as marketing through the 7(j) program? If so, what has your experience been with the training? And then I am going to add a follow up so you can think about that. What should improvements be made in the training program?

Ms. LI. Thank you, Mr. Vice Chair Evans. Pardon me. My bad.

Thank you, Mr. Vice Chair Evans. Yes, I have received some training through the 7(j) program thanks to the SBA official who made me aware of those programs. And I took part in some training. They were helpful, yet I believe they would be better off if they were offered in person, as a group, or one-on-one. I believe those programs would be much better beneficial if they could conduct that for a group of entrepreneurs like us and coming to our facilities to provide those training.

Mr. EVANS. Mr. McAllister, currently, individual-owned 8(a) small businesses can receive sole source wards of less than $4 million for goods and services. The current Administrative Office of Government Contracting said in 2017 that increasing the 8(a) sole threshold is one way SBA would make a special gain. Do you have any thoughts on this statement whether Congress should, in fact, increase the 8(a) sole source threshold?

Mr. MCALLISTER. Yes, I do agree that the sole source threshold of $4 million should be increased. If you look at, for example, the small business size, I believe in the last year all of them or the majority of them were increased. In my, for example, my NAICS code, 236220 for construction, it used to be capped at $33.5 million and it is now at $36 million for a small business size. So we have an increase in cost of living and other expenses going up and these small business 8(a) sole source remains at $4 million where you have the ANC companies, Alaska Native Corporations with $20 million sole source limits as well. So I do believe that for 8(a) companies, the sole source limits should be increased beyond $4 million.

Mr. EVANS. Thank you. My time is now expired, and the Ranking Member, Mr. Chabot, is now recognized for 5 minutes.

Mr. CHABOT. Thank you, Mr. Chairman. And Ms. Askew, I will begin with you.

Given the short timeframe for participation in the program, 9 years, what can the SBA do to ensure that these 9 years are the most beneficial to 8(a) participants?

Ms. ASKEW. Thank you, Ranking Member Chabot.

So I am in Denver and we have an amazing SBA program. They have really been on the ground and working with me from day one. I do not believe that that is the same experience that other 8(a) organizations have within this United States. I know one of my colleagues who do not even have a business opportunity specialist attached to them. They just call the phone and hopefully someone will respond and help them. So I think that uniformity in assistance and training right from the bat is very valuable, and I also believe that getting to understand how the SBA works, how they support you throughout the program I think is vitally important. You know, it took me months to really understand how the whole * there is quit a bureaucracy for lack of better words in trying to understand who helps you with what and how does that pan out. And I really believe that that would be valuable as well. Thank you.

Mr. CHABOT. Thank you. It is great to hear that the program in Denver is so good. And we would hope, and I think this Committee, we would want to aspire to have the programs all across the country so everybody can benefit. And if their program does not meet the standards that you found, we ought to try to work towards that. And that is something that we can do in a bipartisan way I would hope.

Mr. McAllister, I will move to you next. How long did the entire application process take from the first application submission to receiving the 8(a) certification notification?

Mr. MCALLISTER. Well, the first notification probably took about 6 months. I was told that you always are going to get some comments. So it took me about 6 months. And then the final approval took about a year. And now this is 11 years ago.

Mr. CHABOT. Okay. Thank you.

Could you describe the application process so we can kind of, some of the folks who may not be familiar with it can hear what it is like, and are there any improvements that you would recommend so that others might maybe have an easier process than others?

Mr. MCALLISTER. Yeah, well, again, it was all paper-based back then. One of the requirements was to have 2 years in business, which I thought is a great idea. You do not want to have a new startup getting into the program where they are not able to take full advantage of it. So 2 years was the minimum requirement. Beyond that, things like net worth, there were some minimum which I believe that they should be increased as well. Same with the sole source requirements. And the process involved basically filling out lots of paperwork and what you have done in the last 2 years, your experience. Where you got funding from. Make sure that basically you bootstrap the company because as an 8(a)

company you are not allowed to have investors, outside investors. So in some instances, I know companies who have struggled for 2 years and really minimal revenues just to qualify to an 8(a) program. We applied 7 years in business. We were in business for 7 years, so we had a good track record. We had a bonding capacity. We had customers already in place. So by the time we got approved for the program we were ready to grow. But it was definitely very extensive. I have been told that now the program is online and it is taking less time. But I have not had experience with that in the last couple years.

Mr. CHABOT. Excellent. Thank you very much.

Ms. Li, do you feel the 8(a) program adequately prepared you to compete against larger, more established firms?

Ms. LI. The short answer is no. I think by the time we received the 8(a) certificate I was not ready for a lot of bureaucratic items and things that are within the system. I believe, again, refing to my testimony, things are in the system that are just preventing people from moving forward. And so that is another reason for my recommendation to eliminate and reduce some of the gap between the policy and operation.

Mr. CHABOT. Excellent. Well, we should definitely strive to improve the program, so all can benefit from it.

Mr. Thomas, unfortunately, I ran out of time before I got my question to you. You would have been next and it would have been a great question.

Mr. THOMAS. The story of my life.

Mr. CHABOT. I yield back, Mr. Chairman.

Mr. EVANS. I would like to thank the Ranking Member, and go to someone who I have watched, and she has done a fantastic job and she is Representative Davids from Kansas. You have 5 minutes.

Ms. DAVIDS. Thank you.

Well, first, I am excited to be able to participate in this hearing today because the 8(a) program presents a unique and valuable opportunity for small businesses to compete for valuable Federal contracts.

The recent decrease in participation in the program has been discouraging and I hope we can address some of those issues here today.

The Small Business Administration did try to increase participation through streamlining the application process. I do worry though that that streamlining may have eroded some of the safeguards that ensure that we have proper certification and eligibility for the program.

Recently, I have been more concerned about the issues that have come to light about eligibility requirements for Native American contractors participating in the 8(a) program, and hopefully in the future our Committee will be able to examine some of those issues more in-depth.

The first thing I would like to do actually is follow up on the previous question that the Ranking Member was bringing up which is, Ms. Li, I would love to hear a little bit. You know, I am often concerned about the barriers to participation but then also once you have participation we want it to be a successful program. So I

would love to hear a little bit more about when you say, no, the program did not necessarily help compete against the bigger firms, can you give us a couple of concrete examples of that? I think that those are often the best ways for us to be able to make good policy arguments.

Ms. LI. I believe when a big firm, a well-known firm, I am not going to give any names, when they walk into an agency, agencies tend to respond to them better. And we may be an unknown entity even though we have been performing excellent work within the same agency, yet they tend to gravitate toward this big name firm. And yet, we are left behind. Left on the sideline. We are not being considered just for the mere fact that we do not have the capacity as these large firms do or seem to have, yet we perform such a niche service that addresses these agencies' problems. We solve a problem and these large firms cannot really compete with us. However, we are missing the opportunities to get into the game.

Ms. DAVIDS. Thank you.

And that actually I think helps with even understanding sometimes some of the barriers speaking of folks understanding and knowing about the 8(a) program. I wonder if Mr. McAllister, I will start with you. If you could speak to some of the barriers of the program. You already brought up a couple of the things which were, I mean, the question that brought out the threshold increase was insightful and then you mentioned bonding and also an increase in the number of years for the program. I would love to hear a little bit more from you about either barriers to the program or also once you are in the program what some of the improvements we could see are.

Mr. MCALLISTER. Well, certainly, like I said, the Mentor-Protégé Program is a good program. If you cannot compete with the big boys you may as well join them; right? And that is what we have done. We never go after, I guess, a large company. It is a losing battle. And most large companies are looking for smaller companies to team up to do Mentor-Protégés with as well. So that is one of the things that could be done to be more competitive.

I believe that a purpose of the 8(a) program is to allow companies when they graduate to be successful outside of the program, and we found that outside of the Federal programs we have not been given the opportunity. When we started the company it was difficult to compete in the commercial sector. We went to the Federal market to build that capacity and after we exited that we found that it is still challenging because we do not have those networks, those connections on the private sector to compete, so we are still challenged in that regard. We still continue to do that but what we have done is stay in the Federal market, do the HUBZone program, some of the other programs, but I believe that the SBA should perhaps help 8(a) companies do that transitioning part better so they can be successful and we do not have this high level of failure by 8(a) companies after graduation.

Ms. DAVIDS. Thank you.

Mr. Thomas, probably I talked too long, but just I am curious really quickly, do you feel like the SBA supports organizations like yours? I mean, I am more familiar with the Native American Contractors Association, but do you feel like the SBA is supportive of

these organizations so that we can start to branch out, so we can see them branching out once the 8(a) program has expired?

Mr. THOMAS. Not as much as used to. I remember years ago when the SBA used to give grants to organizations like ours and the ones you just mentioned for marketing purposes, for bringing people to training and things like that, but over the years it has decreased. And maybe in our next—oh, we still have time. I wanted to address——

Ms. DAVIDS. We are 30 seconds over. Can I ask that you submit for the record a little bit more and then I can look at it?

Mr. THOMAS. Yes. I wanted to address your question about Native American contractors and certifying with the 8(a) program, the barriers to them getting in. I have represented them before.

Mr. EVANS. The time. Thank you.

Ms. DAVIDS. Thank you. I yield back.

Mr. EVANS. What I would like to do now is recognize the gentleman who is the Ranking Member of the Subcommittee on Contracting and Infrastructure, Representative Pete Stauber from Minnesota.

Mr. STAUBER. Thank you, Mr. Chair.

I just have a few questions. Ms. Askew, you know, I am particularly impressed with one of the lines in your testimony today, that the 8(a) is a hand up, not a handout. As a small business owner myself, I know how important the SBA programs are in helping our small businesses grow and thrive, but you are so right. The government is, or at least should be here to assist in times of need, not hold your hand cradle to grave but rather give every American small business owner the opportunity to be independently successful.

An item that was highlighted in the 2016 OIG report was declining participation in the 8(a) program. Two questions. How do you feel we best keep the program thriving without encouraging people to be reliant on the government? And then what can we do better to market the 8(a) program as a stepping stone to independence?

Ms. ASKEW. Thank you for your questions.

I think that my colleagues here at the table have talked a little bit about some of the issues and the barriers in regard to why organizations might not choose to become part of the 8(a) program. It is not an easy task to get into the program. And once you do, there is that period of time that you need to navigate through the information in order to get to those nuggets. We really consider * I consider the 8(a) program as just basically a fishing license. I got a fishing license and now I need to go out and figure out how to fish and which waters I should fish.

Mr. STAUBER. And you can fish any of the 10,000 lakes in Minnesota.

Ms. ASKEW. That is right. And I have, actually. So that is definitely, you know, a very positive thing. And I think that part of the things that we have seen in regards to how do you get to be—it is a huge morass of businesses and agencies and how do you get in front of those and make that impactful impression when you have many companies that have full-time business development folks in the D.C. area constantly knocking on everyone's doors.

So it does, I think, to Ms. Li's point of making sure you differentiate yourself is definitely a way in which you can not only be seen by agencies but also be sustainable. And that is certainly the impact that you are wanting.

Mr. STAUBER. During the application process, give us a sense of how you went through it and was it difficult? What areas can we improve on or you know, shorten that process up?

Ms. ASKEW. Sure. So Mr. McAllister did mention that it used to be a paper process and it is currently more of an electronic process. And I think that that has improved, certainly improved the capabilities. It is now in plain English. So instead of, you know, many of the times when I was filling out my initial paperwork I was not even clear myself and, you know, I have an advanced degree what was being asked for. And I think that the process now has become more simplified and able. I just did my renewal and, you know, I could understand the questions. And it was linear in process so I could fill out the paperwork and manage those hurdles a lot easier than when I was first filling out the paperwork.

Mr. STAUBER. One of the comments that we seem to get in the Small Business Committee is some of these applications can be tedious and cumbersome and really hard to navigate so it is nice to see that it is starting to become less intrusive on the small business owner so they can fill it out themselves rather than hire outside help which obviously can be difficult.

Ms. Li, you talked about, I think you mentioned the handout, the contracts to the bigger contractors or what have you. So what should we be looking at in order to allow that small business owner to be on that same footing when the decisions are made?

Ms. LI. Thank you. That is a great question.

There should be some kind of systematic training, a long-term training for all people who are involved. And not just the contracting officers but programming and project management. Everyone who touches contacts, those people have to be trained so they understand their roles and responsibilities as well as the functions they need to play when it comes to awarding a contract to a large or small. So 8(a)s should be in the picture, should be part of the process.

Mr. STAUBER. Well, thank you very much.

And Mr. Thomas, I was going to ask you a question. It was going to be better than the Ranking Member's but I am out of time. Thank you.

Chairwoman VELÁZQUEZ. The gentleman yields back.

Now we recognize the Chairwoman of the Subcommittee on Investigations, Oversight, and Regulations, Ms. Chu from California, for 5 minutes.

Ms. CHU. Thank you so much.

I am so pleased that all of the panelists are here, but in particular, Dottie Li. I have known her for over 2 decades and she is such a great leader in the community. So thank you for being here.

And I would like to applaud the work that your company does in helping non-Native English-speaking speakers become more effective communicators. I believe it is so critical that we educate our business and Federal agencies in cultural competency, especially as

more and more of our economy relies on a workforce from diverse backgrounds.

So I would like to follow up on your story, first on the frustrations you had on certification and then the hurdles that you faced as you tried to secure a government contract through the 8(a) program. It is important to recognize that your business had already contracted with a long list of Federal agencies. So we know that your services have been in demand. But now one year into your 8(a) certification your business has not secured a Federal contract through the program. These circumstances, however, are not unique. In fact, Mr. Thomas noted in his testimony that many participants never receive an 8(a) contract during their entire tenure in the program. But with one-time eligibility and a 9-year window to participate, it is important that firms can take full advantage of their time in the program.

So Ms. Li, can you talk about the certification process and what things you would do to improve it, but also talk about how you would improve the process of getting a contract? You refer to some things about improvement such as the need for a check-in mechanism and a need to improve the vendor outreach sessions and a need to strengthen the mentorship program. So first, the certification.

Ms. LI. Thank you. Thank you, Representative Chu. It is wonderful to see you today.

The certification process for us was long and lengthy as I alluded to. I was blessed to have many people who provided their support and expertise, and my counselor, Mr. Richard Peyton is here from P-TECH, Maryland P-TECH, and director Denise Warner is also here. She runs the P-TECH program. And Mr. Peyton has helped me tremendously through that process. I did not have to pay someone to provide the service. And as well as other entities, SDBC and some folks who are former SBA officials who provided tremendous support in that process.

And during the waiting game I spotted Mr. Rob Wong.

Ms. CHU. But what would you do to improve it?

Ms. LI. What do I have to do? I would say that the online process right now, even though it is improved by a lot from the paperwork days, however, it is just too cumbersome for anyone to go through. There are times where the language is not clear. There are times that the steps are not clear. How would you interpret something when you do not even understand the language? That was the process and it was frustrating. I was able to eventually get through to folks who intervened to get to the person who needed to help us.

Ms. CHU. and then you said in terms of getting the contract there are certain things that needed to be improved, like the vendor outreach sessions. Could you say something about that?

Ms. LI. Absolutely. I love going to these vendor outreach sessions. I always have the best time meeting with different agencies and they have those matchmaking sessions. It is sort of like speed dating, not that I would know anything about it. And you go from agency to agency. I pitched my story. I have the full passion to tell them what we do and they promise you the world. They say come to us and we are going to work with you. And you send emails and just crickets, nothing afterwards.

Ms. CHU. So how could that be improved?

Ms. LI. I think vendor outreach sessions should be staffed by contracting people, programming people, not just OSDBU folks. I think they are great yet we need to talk to program people directly in order to make a difference, so they can hear the kind of services we offer.

Ms. CHU. And then you talk about strengthening the mentorship program. Do you have a mentor?

Ms. LI. I do not really have a mentor. I tried to reach out to another 8(a) firm for quite some time now at the suggestion of a wonderful OSDBU person. I do my outreach. I check in with them. I see them at different functions, yet, again, it is like a relationship. It may not be jelling yet I am still hoping to find a mentor who will show us the ropes.

Ms. CHU. So getting that mentorship program going so you could actually have a mentor is really important.

Ms. LI. That would be critical. That would be critical.

Ms. CHU. Yes. Thank you.

Ms. LI. Could I just add one more? As of yesterday afternoon we got word from this particular group that our first 8(a) BPA contract is moving forward. So I think it is very interesting. Timing is everything. The day before I came to testify.

Chairwoman VELÁZQUEZ. Time has expired.

Now we recognize Mr. Balderson, Ranking Member of the Subcommittee on Innovation and Workforce Development from Ohio for 5 minutes.

Mr. BALDERSON. Thank you, Madam Chair. And thank you for the panelists for being here today.

I want to kind of jump around because I have been paying attention. And Mr. McAllister, this was going to be directed at you but you talked a little bit about it with the Ranking Member, so the rest of the panel, if you would kind of jump in with this question I have. You know, Mr. McAllister talked about it. He did not apply for this until he was 7 years in business I believe was the number that you used. How about the rest of you? Did you jump in immediately or did you wait some time before you were a little bit more established?

Ms. Askew?

Ms. ASKEW. Yes. Thank you.

We were several years established before we started our 8(a) program.

Mr. BALDERSON. Okay. How were the first couple years? You wanted to wait a couple years, but what did you do that you thought was some of the good processes that you went through to wait for that?

Ms. ASKEW. Sure. We recognize that even if we had gotten a contract we would not have known what to do with it. We did not have the infrastructure necessary, the bookkeeping, all of the things that are required. And so we started on the commercial side like Mr. McAllister did and started looking for work that way. And that is actually how we ended up getting the chops to be able to support a contract once we received it.

Mr. BALDERSON. Okay.

And Ms. Li? Ms. Li, would you like to add anything to that?

Ms. LI. I think the fact that we were able to make an imprint with Federal agencies, and at least they are aware. And it is just a matter of doing more work. And that seems to be getting really old. So I was hoping that the 8(a) program would give us a tremendous boost right away off the bat but again, it has taken a whole year, almost a full year. But I am looking forward to taking full advantage of the program moving forward.

Mr. BALDERSON. Okay. Thank you.

And how long were you in business before you made the decision to go with the program?

Ms. LI. Ten years.

Mr. BALDERSON. Ten years. Okay.

Ms. LI. Actually, nine.

Mr. BALDERSON. Nine? Okay.

Ms. LI. Right now it is 10.

Mr. BALDERSON. All right. Thank you.

My follow up to all of you, and again, you can all just jump in and speak up. Beyond extending the program window which you all talked about, do you believe there is something else the SBA could do to help foster those early critical years? I mean, obviously, those are the most important years to get going, but is there something else out there the SBA could do to accommodate that?

And Mr. Thomas?

Mr. THOMAS. If I could answer.

Mr. BALDERSON. I would love to have you answer. You were going to be the first one I was going to say.

Mr. THOMAS. Yes. Yes. I think the most critical is the marketing. To be in the 8(a) program, it takes a firm to fiercely market the agencies to get contracts. They have to figure out where they land. You know, where they stand. What their status is in terms of what they have to offer. And then they have to see if the agency is buying that. And then they have to almost show the agency how they can do it, how the agency would benefit from using them, from using their niche. And this is how. And first of all, they have to show the agency how the agency already buys it and how it would be beneficial, less costly for them to use them as an 8(a) contractor. And I have seen many contractors market to agencies and get them to set aside an 8(a) contract merely from marketing.

But you need training to do that. You need really a good trained, personalized training because it is not easy. Everybody does not know how to do it. The businesses that thrive in the 8(a) program have something very special and that is the marketing edge and then the performance after that. Agencies stick with 8(a) companies that they are satisfied with.

Mr. BALDERSON. Okay.

Ms. Li? Ma'am? Ms. Li?

Ms. LI. Yes?

Mr. BALDERSON. Did you want to follow up with anything with that? Or Mr. McAllister, or Ms. Askew, would you like to?

Ms. ASKEW. Yes, absolutely.

One of the things that have not been mentioned today are that the SBA has a program called the Emerging Leaders Program. And I think it would be wise if it was coupled with the 8(a) program. It was an amazing program for me. It was like a mini MBA. Great

opportunity. I learned so much about the government arena, and I think coupling that with the 8(a) program requiring 8(a) companies would assist them in the long run.

Mr. BALDERSON. Emerging Leaders? Is that from the SBA?

Ms. ASKEW. It is the Emerging Leaders Program.

Mr. BALDERSON. All right. Thank you.

And Madam Chair, I yield back. Thank you all very much.

Chairwoman VELÁZQUEZ. The gentleman yields back.

Now I recognize the gentleman from Florida, Mr. Spano, for 5 minutes.

Mr. SPANO. Thank you, Madam Chair. I apologize. I got to the meeting late.

I want to direct a couple questions to Mr. McAllister. If the questions were asked already I apologize in advance. One of the things that we did back at our Chamber of Commerce back home was to develop a mentorship program for young people, right, because we understood, especially for economically disadvantaged young people to try and teach them what it is like to hang around a small business, you know, and give them an idea of whether or not they want to do that someday, right, start their own business.

So the challenge that we had though was that it was tough for us to find mentors. And I think a question just a moment ago, I believe it was Ms. Li about, you know, whether or not you have been able to find a mentor so far. So I guess my question is, what do you think that the SBA could do better if you have any suggested solutions, to encouraging mentors, more mentors to participate?

Mr. MCALLISTER. Well, I think it is easier to find mentors in the community to mentor youth. From the SBA-MPA program, a Mentor-Protégé is like a marriage. Or like dating. And then we establish a joint venture under the MPA. That is marriage. So there is financial risk from both sides, from the mentor and from the protégé.

So like Ms. Li said, it is, you know, let's go out, let's have dinner, let's have lunch, let's get to know each other. Do we match with each other? Our cultures? Because, you know, oftentimes with the Mentor-Protégé, the mentors provide training to the protégé staff. So it is not just sign a document and let's move on. There is a lot to it. So, but what the SBA can do is perhaps just build that speed dating environment or dates or sessions with large businesses, or the agencies can do it as well where large agencies come in with 8(a) companies and just get to know each other. Because in our case it took us perhaps a year or two to find that right mentor. And we actually had one, the first one did not work out at all. They were all for getting one contract that they had that they were incumbent and they wanted to recompete and they seeked us just for that. And when that fell through, the Mentor-Protégé went away. So it took us about a year to find another mentor, and we have had three mentors. Two, one at the 8(a) and one at the HUBZone program. We take start to get to know each other and find the right match.

Mr. SPANO. And if I may just ask a follow up. So relating to the Mentor-Protégé Program, if you could say one thing that from your experience as a mentor and as a protégé, one thing that you can

think of that comes immediately to mind that really works well and one thing that you say probably needs work?

Mr. MCALLISTER. Well, the training works well. You can find the right match, the right mentor and you have needs, say in accounting, marketing, payroll. They can help you with that. What does not work well is perhaps the red tape that is involved with it because you apply for the 8(a) program and then you have your annual 8(a) recertifications and you have to apply for a Mentor-Protégé which oftentimes can take months as well. And then every year you have to recertify that Mentor-Protégé. So I think generally it is the red tape that is involved with both the 8(a) and the Mentor-Protégé Program that just needs to be streamlined.

Mr. SPANO. And you mentioned in your testimony that most 8(a) contractors do not gain momentum in the program until around their fifth year. Is that a result in your opinion of some of the red tape that is associated with the program?

Mr. MCALLISTER. I think it more than anything is find the right match in terms of customers. Here in the D.C. area, all the Federal agencies are here. Out West we do not have that plethora of agencies, so I think it is finding that right customer, that right agency that can give you a shot. You know, that first opportunity, and then be able to grow with them. In our case, we had to go out of our comfort zone, out of Arizona to go into Colorado, Texas, New Mexico, and oftentimes into areas where nobody else wanted to go because it was in the middle of nowhere. But there was a Marine base there or an Army base there that needed our services. And that is what it takes perhaps for the 8(a) companies to have that. First of all, somebody to tell them where to go because the phone is not going to ring wanting to become 8(a). Their phone is not going to ring. It is a fishing license and you have to go out and fish.

Mr. SPANO. Thank you, sir.

Madam Chair, I yield.

Chairwoman VELÁZQUEZ. The gentleman yields back.

Now I recognize myself for 5 minutes.

I would like to follow up on Mr. Spano's question.

Mr. Thomas and Mr. McAllister, is there anything more SBA should be doing to facilitate or incentivize the use of the Mentor-Protégé aspect so that more small businesses are able to participate and benefit from it?

Mr. THOMAS. One thing that I could suggest is a few years ago the SBA used to do these matchmaking events to match contracts with the contractors. Taking that to another level, perhaps they could have conferences where they have only the prime contractors who want to be mentors and protégés who are looking for mentors. You have them in the same room and at least you are not fishing for goldfish where there is only seabass. So I think that is something that would give it a push.

Chairwoman VELÁZQUEZ. Mr. McAllister, anything that will incentivize?

Mr. MCALLISTER. Yeah. I think definitely setting that venue for that matchmaking to occur. But also the financial support that a protégé can get. The Mentor-Protégé allows a mentor to invest up to 40 percent into an 8(a), into its protégé, and I believe that is a great vehicle. There is a lot of red tape involved in that. We

try to do that and got the runaround and we just gave up because we have known 8(a) companies, we know one in particular right now where the owner is taking a second job because he needs to support himself. And he is being threatened with getting certified for the program.

Chairwoman VELÁZQUEZ. Thank you.

Mr. MCALLISTER. So even if he gets into the Mentor-Protégé Program, he is not able to succeed unless there is some financial investment from the mentor to the protégé.

Chairwoman VELÁZQUEZ. Thank you.

Mr. Thomas, the government has the goal of awarding 5 percent of all eligible prime contracts to socially and economically disadvantaged small businesses. Under this goal, agencies get credit for all awards given to small disadvantaged businesses, whether they are 8(a) participants or not. Should Congress enact legislation to create a goal for the 8(a) program?

Mr. THOMAS. Yes. I think I have answered this in part before. But yes, it should. It should.

In case you did not hear that.

Chairwoman VELÁZQUEZ. Yes.

Mr. THOMAS. Yes. The answer is yes. Because to determine the success of a program you want to get as much information about how the program is working as possible. And it only stands to reason to know how much business that 8(a)s are getting. It is not hard to gather information because they can get it easily.

Chairwoman VELÁZQUEZ. Do you think that this will incentivize agencies to contract with 8(a) firms if we increase the firms?

Mr. THOMAS. Well, yes. Even if you make a goal, regardless of what you put in the goal, when you are measuring someone on a certain basis, the numbers go up because nobody likes not to meet a goal. So whatever that goal is, I think you will see the numbers go up.

Chairwoman VELÁZQUEZ. Do any other members of the panel want to comment on that? Ms. Li?

Ms. LI. Before we became an 8(a), I always heard people would say if you were an 8(a) we would give you the contract. And now we are an 8(a) and they say, if you were a HUBZone, we would give you the contract. So you just end up chasing the endless loop. And so where do you actually get yourself being recognized as a formidable force so that people could really work with you?

Chairwoman VELÁZQUEZ. Okay.

Mr. MCALLISTER. Yeah, I believe that that goal should be specific for 8(a) programs. That way the 8(a)s are not just lost in wait.

Chairwoman VELÁZQUEZ. Thank you.

Ms. Askew?

Ms. ASKEW. Yes, thank you.

I would agree with Mr. McAllister. I do think that there is value in that and back to what Ms. Li said about educating cores and contracting officers so that they understand how to utilize the program well, I think there is a problem in that area as well.

Chairwoman VELÁZQUEZ. Thank you.

There is another issue that I want to discuss with you, and that is that the SBA 8(a) program has a personal net worth limitation

of less than $250,000 for initial eligibility and $750,000 for continued eligibility. This limitation has been in place since the late 1980s. The DOT also has a Disadvantaged Business Enterprise Program, and in 2011, increased the personal net worth threshold for eligibility to account for inflation.

What are your thoughts on increasing the 8(a) net worth limitation and adjusting it for inflation?

Mr. Thomas?

Mr. THOMAS. Well, yes, of course. It needs to be adjusted. I mean, for any other program it would be adjusted. And we are keeping good people out because they do not want to come down. They do not want to adjust their business lives to come down, to come under $250,000 because it would not be worth it. And it just makes natural business sense to raise it, at least for inflation if not beyond that.

Chairwoman VELÁZQUEZ. Thank you.

Any others who want to comment?

Ms. LI. I tend to agree in principle that adjustment should be made for inflation. I do not have a problem with increasing it. However, I am a participant. I am a cross-cultural communication specialist. I am not an economist. So I think in an economic survey of some sort has to be conducted to determine how much to increase and when to increase.

Chairwoman VELÁZQUEZ. Thank you.

Mr. MCALLISTER. Those limits should be increased like everything has increased in the last 30 years. Agreed.

Chairwoman VELÁZQUEZ. Thank you.

Ms. Askew?

Ms. ASKEW. Yes, thank you.

I would say that the corresponding NAICS codes, the amount that awards can be have increased, so it would make sense that this would also be increased.

Chairwoman VELÁZQUEZ. Thank you.

Ms. Li, the 8(a) program has a 9-year lifespan which is divided into two phases, an initial 4 year developmental stage and a final 5 year transition stage. Is this enough time for a small firm to fully realize their potential and win contracts with the government?

Ms. LI. Thank you. Thank you, Chairwoman. That is such a great question. The short answer is no. Clearly, from my fellow panelists and our own experiences have shown that the first 4 years are critical for you to understand, to grow, to be trained, to be mentored in order to fully understand the process. So by the time you actually understand a little bit more that we are in this process, 4 years are already gone.

Chairwoman VELÁZQUEZ. Thank you.

Ms. LI. And then you have to graduate or transition out of the program.

Chairwoman VELÁZQUEZ. Any of the members of the panel can comment on this question. Do you have any suggestions on how to improve either the 4-year developmental stage or the 5-year transition stage?

Mr. MCALLISTER. Well, I think that it probably should be increased over 9 years for starts because 9 years is not enough. So perhaps 10 years and make it 5 years developmental and 5 years

transition or something along those lines. Just a little bit more time to get traction before they start that transitional stage.

Chairwoman VELÁZQUEZ. Thank you. Any other comments? Ms. Askew?

Ms. ASKEW. Yes, thank you. I do know that we are in the transition stage currently and they require us to make sure that we have a certain blend of 8(a) and non 8(a) work at this point. And so it makes it hard because once you just start wrapping up it is time to ramp down in terms of the amount of 8(a) work. So you have to be cognizant of your balance and that makes it difficult.

Chairwoman VELÁZQUEZ. Thank you.

Let me take this opportunity to thank all of you for taking time out of your busy schedule to be with us today.

The 8(a) program is the hallmark of all contracting programs managed by the Small Business Administration. Not only is it the oldest but it is the one in which the agency has the most expertise. Now, just as 40 years ago, the program remains equally important because of the impact it has on enhancing minority entrepreneurship and strengthening the federal marketplace.

I want to thank our witnesses for offering their valuable insights today and I look forward to working with my colleagues on both sides of the aisle on ways to improve the 8(a) program.

With that, I will ask unanimous consent that members have 5 legislative days to submit statements and supporting materials for the record.

Without objection, so ordered.

And if there is no further business to come before the committee, we are adjourned. Thank you.

[Whereupon, at 12:51 p.m., the committee was adjourned.]

[Mr. Clarence McAllister did not submit his responses in a timely manner.]

# APPENDIX

**"THE ROLE OF THE SBA'S 8(A) PROGRAM IN ENHANCING ECONOMIC OPPORTUNITIES."**

**TESTIMONY OF THE**

**NATIONAL ASSOCIATION OF MINORITY CONTRACTORS**

**WASHINGTON, D.C.**

**BY**

**RALPH C. THOMAS III, ESQUIRE**

**EXECUTIVE DIRECTOR EMERITUS**

**BEFORE THE**

**HOUSE COMMITTEE ON SMALL BUSINESS**

**HEARING - 11:30 A.M. - RAYBURN HOUSE OFFICE BUILDING**

**ROOM 2350**

**SEPTEMBER 18, 2019**

Good morning, Madame Chair and ladies and gentlemen of this most important Congressional Committee. The House Committee on Small Business usually represents the first stop in developing legislation that reflects the hopes and aspirations of thousands of small businesses in America -- not only those that are owned and controlled by socially and economically disadvantaged individuals in the 8(a) Program, but all categories of small businesses across the country. Because of that, you are to be commended on focusing your attention on the 8(a) Business Development Program of the Small Business Administration (SBA) at this particular time.

My name is Ralph C. Thomas III, and I am testifying today on behalf of the National Association of Minority Contractors (NAMC). Our headquarters is here in Washington, D.C., and we have chapters and affiliates all over the country. NAMC was founded in 1969, to advocate primarily on behalf of minority –owned construction firms, so we are proudly celebrating our 50th anniversary this year. That makes us the oldest minority construction trade association in the United States.

We advocate not just for our members but also for the approximate 100,000 minority contractors across America and for the construction industry as a whole. The inclusion of minority contractors in the overall competitive base of vendors from which the government regularly purchases goods and services ensures that America is operating at the full productive capacity of its citizenry.

I served as Executive Director of NAMC from 1985 to 1992. After that, I was Associate Administrator of NASA's Office of Small and Disadvantaged Business Utilization (OSDBU) from 1992 – 2005. Since 2005, I have represented and advocated on behalf of minority contractors and all other categories of small business as a government contracts attorney. Many of my legal clients have included 8(a) contractors and I have interrelated with the US. Small Business Administration (SBA) on numerous occasions in my various roles as an advocate for minority contractors.

I have been familiar with the 8(a) Program almost since it was codified into law more than 40 years ago. So I am happy to be here today representing NAMC and having the benefit of including and sharing some of my personal experiences regarding the 8(a) Program. My testimony will include why NAMC supports the 8(a) Program, a brief history of the Program, successes and challenges of the Program, the SBA Office of Inspector General's (OIG) most recent report regarding the 8(a) Program, and, finally, a few issues that we would like to see this Committee focus on within the Program.

## I. NAMC SUPPORTS THE 8(A) PROGRAM

Let me say from the outset that NAMC fully and enthusiastically supports the 8(a) Program. While the Program is not without flaws, it is no doubt one of the best government vehicles that minority contractors can use to enhance their economic opportunities in the federal marketplace. First of all, to be eligible for the Program, one of the requirements is that the business owner has to have already run a successful business in his/her field for at least two years. So there has to be a basis for success from the outset.

As an 8(a) contractor, the minority business has the unique opportunity to build a track record of successfully completed contracts by competing against fellow 8(a) contractors in its field. Even though the entrepreneur is in the Program, it will get no breaks from Federal agencies on demanding the highest quality and the most reasonable cost and prices for an 8(a) contractor's products or services. The 8(a) contractor must deliver its product on time and within budget, even if the contract is a sole source award. Moreover, the 8(a) contractor has a Business Opportunity Specialist (BOS) to assess its progress and to assist the business in obtaining government contracts. A construction 8(a) contractor should have better access to bonding and financing through the SBA's guaranteed programs. Although these SBA services may be available to non-8(a) small businesses as well, a firm might be more familiar with them in the course of being an 8(a) contractor.

If the 8(a) contractor wants to move to the next level and is fortunate enough to find a good mentor company, it can apply to be accepted into SBA's Mentor-Protégé Program where it will receive special training and assistance from a large contractor. Being a part of the Mentor-Protégé Program also means that the 8(a) contractor can joint venture with its large business mentor and still be classified as an 8(a) firm. A contractor can then bid for larger government contracts.

Simply put, a small business could not have this kind of access to government contracts and other contract-related opportunities without the existence of the 8(a) Business Development Program. Nevertheless, the Program is not always administered or implemented as well as it should be. To put the 8(a) Program in its proper context, a brief review of how the 8(a) Program came into existence might be appropriate at this time.

## II. THE 8(A) PROGRAM – HISTORY AND PURPOSE

The original authority for SBA assistance to small and disadvantaged businesses has its roots in Section 8(a) of the Small Business Act of 1953. (Pub. L. No. 83-163, 67 Stat. 232 (1953), as amended by Pub. L. N. 85-536, 72 Stat. 384 (1953), and at various times thereafter; currently codified as 15 U.S.C. § 631 et. seq.) At that time Section 8(a) authorized the SBA itself to enter into contracts with government agencies and to arrange for the performance of such contracts by awarding "subcontracts," by negotiation or otherwise to small business firms or others.

In 1958 the SBA issued its first regulations implementing Section 8(a). (Pub. L. No. 85-536 § 2(8), 72 Stat. 389 (1958)). These regulations indicated that the Section 8(a) power was to be exercised in the event of emergency for the benefit of small businesses as a class and on a publicized, competitive basis. So, the concept of channeling contracts to small businesses through an intermediate federal agency was an emergency measure to insure that small businesses were not bypassed in wartime. However, the SBA never used the Section 8(a) authority for that purpose, and section 8(a) was dormant for the next 10 years or so.

Following the urban riots, President Johnson appointed the Kerner Commission, named after its Chairman, to investigate civil disorders in the American ghettos. (REPORT ON THE NATIONAL ADVISORY COMMISSION ON CIVIL DISORDERS 236 (March 1, 1968). The investigation revealed that in the area of governmental assistance to small businesses, in general, there were truly two societies: one Black and one White . . . separate and unequal.

Consequently, the Commission recommended that the government encourage business ownership by minorities.

In 1970 the SBA regulations were changed to state that a firm must be owned r be destined to be owned by socially or economically disadvantaged persons in order to be eligible for an 8(a) contract. (Act of Aug. 12, 1970, Pub. L. No. 91-375, §6(g), 84 Stat. 776 (current version at 15 U.S.C. 637 (1970)). The regulations were also amended to authorize the award of 8(a) subcontracts on a non-publicized, non-competitive basis. *Id.*

During the 1970's the government sought to encourage the development of minority-owned businesses primarily through expanding government contract procurement opportunities. The administrative program for minority business set-asides developed by the SBA under the general set-side authority of Section 8(a) of the Small Business Act was the primary vehicle used to accomplish that goal.

In 1978 Congress empowered the Small Business Administration (SBA) to "provide small business concerns owned and controlled by socially and economically disadvantaged individuals such management, technical, financial and contract assistance as may be necessary to promote competitive viability within a reasonable amount of time." (Act of October 24, 1978, Pub. L. No. 95-507, 92 Stat. 1757-73 (1978)). In this law Congress left no doubt as to its intent. The legislation sets forth both congressional findings and purposes. The statute in effect contains a congressional finding that there exists in this country a correlation between ethnicity and social and economic disadvantage. The Congress also found that it was in the national interest to expeditiously ameliorate this situation in order to both obtain social and economic equality and to improve the functioning of the national economy. The promotion of minority

business ownership through the use of federal resources, i.e., contract awards, was one of the means chosen by Congress to effect these goals.

Before the passage of Public Law 95-507, less than one percent of all federal procurement dollars went to minority-owned firms. *Fullilove v. Klutznick*, 488 U.S. 448, 459 (1980). According to the U.S. Supreme Court in *Fullilove* the causes of this disparity were perceived by Congress to be the longstanding existence and maintenance of barriers which impaired access by minority enterprises to public contracting opportunities. Congress found such barriers were attributable to direct discrimination, and not to a lack of capable and qualified minority contractors that were ready and willing to work. *Id.* at 463.

In 1980 Congress passed Pub. L. No. 96-482, which required the SBA to negotiate a fixed period of time for participation and a definite graduation date for all 8(a) firms. Prior to that time, there was no time limit on participation in the Program. In 1982 the SBA implemented regulations which established the fixed program participation term (FPPT) which limited a firm's participation in the Program to an original term of up to five years with a possible extension of two years. (13 C.F.R. § 124.100 (1982)).

In 1988 Congress passed the Business Development Opportunity Reform Act, Pub. L. No. 100-656. Among other things, this law provided for: competition in the 8(a) program; a nine-year participation term; attainment of non-8(a) revenue at certain levels of the program; an 8(a) loan program; transfer of surplus property; employee skills training; and a transition management plan during the first year of the transition stage.

Also, in 1988, a Government-wide study was conducted by the U.S. Senate Committee on Small Business to determine what happens to 8(a) firms after they graduate from the Program.

That Study, which is included in a GAO Report on the subject, showed in part that 21-30 percent of the graduated 8(a) firms had gone out of business, and that 44 percent were either not doing well, or doing just well enough to get by. Fifty-eight percent (58%) of the respondents said that "graduation" had a devastating effect on their businesses. The report concluded that the 8(a) Program was not preparing firms for the post-graduate competitive market. ("Small Business Administration: Status, Operations, and Views on the 8(a) Procurement Program," General Accounting Office, GAO/RCED0-88-148BR, May, 1988, p. 18).

At the same time the Report indicated that, in general, most 8(a) firms performed satisfactorily. Contracting officers reported that all or most of the delivery dates were met on over 78 percent of the contracts, and for over 88 percent of the contracts, the products or services delivered met or exceeded quality specifications. The study also looked at the performance of 8(a) firms on contracts in comparison with the performance of non-8(a) firms on contracts in the same or similar industries. The contracting officers on over half of the contracts in the surveys had experience with both types of companies and in comparing them reported that the 8(a) firms' performance in meeting delivery dates for about 75 percent of the contracts was equal to or better than non-a(a) firms'. For about 85 percent of the contracts, the 8(a) firms performed the same or better than the non-8(a) firms in terms of the quality of goods or services they delivered.

Since that time, the SBA has issued regulations updating the 8(a) Program as necessary. The above history is not meant to be exhaustive, but only to highlight the most important historical points associated with the Program.

## III. 8(A) PROGRAM SUCCESSES

When I began as Executive Director of NAMC in 1985 8(a) firms were primarily used by federal agencies to perform small contracts in construction, administrative contract support and janitorial/maintenance contracts. However, when I served as head of NASA's Small Business Program from 1992 to 2005, I watched 8(a) contractors perform such mission critical activities as developing subsystems for complex spacecraft; assisting in building non-rocket-powered vehicles to fly at hypersonic speed; and, manufacturing hardware for the International Space Station; One 8(a) contract, for example, was valued at $264 million, and it is my understanding that the contract is still in 8(a) Program, 26 years later.

They were also involved in more complex service-oriented contracts, such as space shuttle-related software development, safety and mission assurance, systems engineering, construction of mission control facilities, and the design of inter-planetary spacecraft.

I also proudly observed the continued success of some of these companies that have graduated from the 8(a) Program, and which are still performing in an outstanding manner. Some of them I knew at NAMC and others at NASA. At NAMC we have a Hall of Fame consisting of about 50 individuals, most of whom were or are construction firm owners. Most of them participated in the 8(a) Program at one time or another. They overcame hardships and became amazingly successful entrepreneurs even after their graduation from the 8(a) Program.

In 1999, at the direction of the NASA Administrator, the OSDBU, in association with NASA's Minority Business Resource Advisory Committee, conducted a study to determine whether high tech firms that were in the 8(a) program when they contracted with NASA were still viable after their graduation from the Program.

Although NASA's Study was limited to high tech contractors, the report closely followed the schematic approach of that of the U.S. Senate Committee on Small Business Report and had much better results. (*See* "A REPORT TO THE NASA ADMINISTRATOR ON THE STATUS OF NASA HIGH TECH 8(A) GRADUATE CONTRACTORS," submitted by NASA's Minority Business Resource Advisory Committee (July 14, 2000)). The Study showed, for example, that 62 percent of the firms that had completed their first 8(a) contract with NASA were now doing business with other parts of the government, indicating that their experience with the space program made them competitive and able to win contracts from other Federal agencies.

Sixty-eight percent (68%) of the graduates surveyed were currently doing work in the commercial market, while thirty percent (30%) reported that they had contracts in the international market. Indeed seventy percent of the 8(a) graduates surveyed *directly* attributed their success and development to their NASA experience. Another seventeen percent (17%) *indirectly* attributed their current success to NASA.

Sixty-eight percent (68%) of the graduates surveyed were currently doing work in the commercial market, while thirty percent (30%) reported that they had contracts in the international market. Indeed seventy percent of the 8(a) graduates surveyed *directly* attributed their success and development to their NASA experience. Another seventeen percent (17%) *indirectly* attributed their current success to NASA.

Thus, the successes of the 8(a) Program demonstrates the positive potential and promise of the Program to both the Federal government and the nation – if it is properly administered and implemented.

## IV. THE SBA OIG REPORT

NAMC has also reviewed the SBA OIG's Audit Report, dated September 7, 2018, and entitled "Improvements Needed in SBA's Oversight of 8(a) Continuing Eligibility Processes" as well as its "Report on the Most Serious Management and Performance Challenges Facing the Small Business Administration," dated October 11, 2018. While we appreciate the OIG's objective here to make sure that only those 8(a) contractors who are eligible for the Program are in fact in the Program, we do have some concerns.

The OIG is essentially stating that from its independent review of certain documents and records, certain 8(a) contractors, from its viewpoint, are ineligible for the 8(a) Program. As an attorney who has represented 8(a) contractors who have been wrongly marked for termination by the SBA, however, I feel that much caution should be taken in this area. Moreover, I perfectly understand the SBA's partial concurrence to some of the OIG recommendations.

First of all, the SBA is the only entity by law that can determine the true eligibility or ineligibility of an 8(a) contractor. Because of that, only the SBA hears *both* sides to any given claim to an 8(a) contractor's continued eligibility in the Program. In fact, in all of the cases where I represented an 8(a) contractor marked for termination, the SBA had wisely contacted the firm and brought to its attention the charges that were being leveled against it. This was done before the SBA sent a formal Notice of Intent to Terminate to the 8(a) contractor to determine if there was a logical explanation from the 8(a) contractor. If the 8(a) contractor was not successful in informally persuading the SBA that the charges were unwarranted, he/she gets an opportunity to establish a formal record of its position by responding to the SBA's written Notice of Intent to Terminate. Even if the SBA still decides to terminate the firm from the 8(a) Program, the

individual may appeal to the SBA Office of Hearings and Appeals. If the contractor loses there, it can take the case to federal court. As an attorney, I have prevailed in both appeal avenues when the case could not be informally resolved.

The point here is that the SBA is not at liberty to simply terminate firms from the 8(a) Program simply based upon the viewpoints of individuals or even other governmental entities. To wrongly terminate a contractor from the 8(a) Program will adversely affect that contractor for life. Therefore, all of the facts must be heard and considered by the SBA, and then the regulatory process due the 8(a) contractor must be followed. As in other venues of law, factual scenarios are not always what they appear to be at first glance.

Finally, the OIG's Report on the SBA's Most Serious Management and Performance Challenges, indicates that the participants in the 8(a) Program has decreased in recent years. It has gone down from more than 7000 participants in the Program to less than 5000 today. In today's super competitive government contractor environment that dilemma makes no sense.

There are still many (most) participants in the 8(a) Program that never get an 8(a) contract. Hopefully, potential 8(a) Participants are not assuming that because of this fact, it is not worth the time and effort to apply for entry into the Program. This is a topic that causes NAMC great concern, and we hope that the OIG would make the subject of why 8(a) participation is decreasing a future oversight topic. We ask that of this Committee prioritize this issue.

Finally, we would like to see the OIG focus more on whether 8(a) contractors are receiving the training and other resources that they need to succeed in the Program.

## V. RECOMMENDATIONS FOR IMPROVEMENTS TO THE PROGRAM

### A. Left Behind 8(a) Contractors

Many of our members have complained about having been in the 8(a) Program for years and never getting an 8(a) contract. Some have reported never being awarded an 8(a) contract during their entire nine year tenure. Each 8(a) Participant is assigned a Business Opportunity Specialist (BOS) who is supposed to, in part, assist them in obtaining contracts with the various Federal agencies. While some BOS's are very good at doing that, obviously many are not. NAMC recommends that the SBA develop a process to these BOS's accountable as to how many 8(a) contractors in their client base actually have 8(a) contracts.

Perhaps the fact that most 8(a) contractors in the Program do not have 8(a) contracts may be the reason why participation in the Program is down. Upon hearing from 8(a) contractors currently in the Program that do not have contracts, other eligible small businesses may not see the Program as worth applying to get into

### B. Status of Graduated 8(a) Firms

NAMC recommends that the House Committee on Small Business conduct a follow up survey to the 1988 Report by the Senate Committee on Small Business on the current status of graduated 8(a) firms. It is imperative that we understand the current state of affairs with regard to what happens to 8(a) firms after they graduate from the Program. Having this information will serve as guidance to the Members of this Committee as to specific improvements that need to be made to the Program.

**C. Smaller 8(a) Contractors**

The SBA recently announced that size standards would be increased in the various industry codes for small businesses. NAMC feels that as contracts get larger, smaller 8(a) firms are getting less contract awards. However, we believe that there are still smaller contracts that can be made 8(a) by Federal agencies. The SBA currently negotiates goals with agencies that measure the amount of dollars that are awarded to 8(a) firms. Sometimes these goals can be met with a few super large awards. NAMC recommends that such goal reporting be supplemented to measure the *number* of contracts that are made to 8(a) firms. Such action may increase the number of 8(a) contracts going to smaller firms. Another method to increase the number of contracts going to smaller firms is to require Federal agencies to report contracts awarded to 8(a) contractors by revenue tiers. For example, requesting 8(a) contract dollars that were awarded to firms with less than $1 million in annual revenues, $1 million to $5 million in revenues, and so forth.

**D. Disparate Treatment of African American and Latino Women Owned Businesses in the 8(a) Program**

The 2017 U.S. Department of Transportation (DOT) Uniform Report on DBE Commitments/Awards and Payments demonstrated a marked disparity of contract awards to African American and Hispanic American Women-Owned Businesses as opposed to other minority firms and non-minority owned women firms. In Tennessee, for example, the Report showed that no awards were made to African-American women owned firms. Yet $200 million in total contract awards were made.

Although this Report does not involve the 8(a) Program, it would be very informative if the SBA could determine if there was any correlation with the lack of contract awards made to

African American and Hispanic owned women businesses in geographic areas of the DOT Disadvantaged Business Program and awards made to such businesses in these same geographic areas in the 8(a) Program. If further action is warranted, such action should be taken.

**E. SBA's Mentor-Protégé Programs/Joint Ventures**

Our members who are or have been in SBA's Mentor Protégé Program are very concerned about the fact that under the 8(a) banner, the large business obtains an 8(a) contract with its 8(a) protégé and then during the performance of the contract, the large firm determines that the 8(a) firm cannot perform its part of the contract and essentially drops the 8(a) firm from the contract.

Because of its commitment to complete the contract if the 8(a) contractor is unable to finish performance of the contract, the large company then gets paid for completing what was supposed to be an 8(a) contract. Our members tell us that this is beginning to happen more and more. We ask this Committee to look further into this issue.

**F. Non-Procurement Assistance to 8(a) Contractors**

One of the requirements for a small business to be eligible for the 8(a) Program is its "potential for success." the statue, 15 U.S.C. § 637(a)(7)(A), requires a determination by the SBA as to whether an applicant for the SBA's 8(a) BD Program would have reasonable prospects for success with contract, financial, technical, and management support from the Agency. However, it is not clear what contract, financial, technical and management support that the SBA actually provides the 8(a) Participant. NAMC recommends that this Committee require the SBA to address this issue.

That ends my testimony, distinguished Members of the Committee. Once again, thank you for allowing me to testify today. I am now ready for any questions that you might have.

DUNS # 961918658
EIN # 94-3485191
CCR Cage Code 3U9V8
SBA 8(a) case C006Oe

TRANSPACIFIC
COMMUNICATIONS
BRIDGING CULTURES
华美公共关系公司

**House Small Business Committee Hearing**

The Role of the SBA's 8(a) Program in Enhancing Economic Opportunities
11:30 A.M., Wednesday, September 18, 2019
Room 2360 of the Rayburn House Office Building

Testimony prepared by
Dottie Li, Founder and CEO
TransPacific Communications

Good morning Chairwoman Velázquez, Ranking Member Chabot and committee members of this distinguished committee. It is such an enormous honor to speak before you, it is an extra honor to appear before Congresswoman Judy Chu, chair of CAPAC, a leader in the Asian American community, along with Congresswoman Radewagen and Congressman Kim.

Almost one year into being an 8(a), TransPacific Communications, the company I founded and lead, has yet to receive an 8(a) contract. What is the reason? It's not due to lack of trying or hard work, but due to what I believe is a critical gap between the SBA 8(a) policy which is great and the operation in practice. Operational movement at agency level would greatly speed up the process for and enhance the flow for a new 8(a) firm like TransPacific Communications to obtaining 8(a) contracts.

In my testimony today in front of the committee, I will explain why I started my business, what the 8(a) experience has been (including the application process) and the expectations I have. And as a new participant, perhaps I may make a few suggestions to make the 8(a) program run better by reducing the gap between policy Congress intended and on-the-ground operations.

(301) 322-5675 trapac.net Dottie@trapac.net

I started my business TransPacific Communications because of a desire to help non-native English speakers improve their communication skills, increase their confidence and raise the profile of talented, educated and highly motived members of the Asian American community and other immigrants in both the workplace and in society. This is not some grand intellectual exercise. This desire comes straight from my heart resulting from my own experience as an immigrant – a non-native English speaker who had her fair share of communication challenges in my early days in America.

I was born and raised in a small city of 5 million people in China. My hometown Hefei is the capital of Anhui province.

I was nine when I listened in secret to the Voice of America broadcasts, which helped to ignite a dream: going to America to be a broadcaster at VOA. Instead, I became a newspaper reporter in China first. When I eventually made my way to the United States, and after finishing my education, my very first job in my new country was as a VOA broadcaster.

I was struggling when I first came to the United States, initially it was the cultural shock and then it was the accent, my accent. Chinese is my first language. Later I was taught British English by Chinese teachers, so I spoke with a distinct English articulation over the remnants of Asian intonation. Then another layer of pure Southern molasses was poured on during the two-and-a-half years I lived in Mobile, Alabama. The word "pen" was coming out of my mouth sounding like "pay-un" by the time I moved north to Washington.

From VOA I went on to C-SPAN to produce coverage of many public affairs events, including Congressional hearings just like this one. I later made a transition to the other side of the media fence, first as a corporate spokesperson. This is when my life and career changed.

When I made my first professional transition, from broadcast journalism into the corporate world, I was lucky enough to be employed by a large company which valued me enough to pay for lessons to smooth out my speech. It was good for them, as I was their spokesperson. I was understandable, but that is not good enough for a high-level communications professional. I had to

sound better than that. I worked hard with a professional coach, and found "my" speaking voice, the one allowing me to sound naturally credible, and authoritative.

The extra effort was great for me. Not only did it help with my immediate work, it also opened my eyes to many of the things which are useful and even necessary for personal and professional success. It helped me take stock of my talents and attributes, and also the areas where I needed to sharpen up.

Because of that, I have to say that smoothing out my accent is the single best thing I ever did for my career, especially for someone in communications. I wrote a column about that in the *Path to Excellence* magazine, entitled *Accent-uate the Positive.* I am making the column available for the record.

It is one of the conundrums amongst some in the Asian American and other immigrant community, especially for those who are more recent immigrants, like myself. We excel academically, get good jobs, and perform well but fail to advance like many of our counterparts. A lot of this has to do with communication, perceptions and misperceptions, and lack of confidence in our ability to communicate.

This was when I saw a business opportunity. I had the entrepreneur spirit even back then.

I decided to be certified to train others so their careers could be transformed like mine was. And that was how I started TransPacific Communications. I had to become a quick study of being a businesswoman, learning on the job.

From there, TransPacific Communications has expanded beyond speech into breaking down wider cultural barriers. Barriers that exist on both sides of the cultural divide. Workers who don't understand their bosses. And bosses who don't get their workers. We have moved into serving several different industries, corporations and higher education, and some high-level personal client coaching in addition to serving federal agencies.

And that brings us to today, as I am here testifying about what I have been doing, supporting federal and private workforce as an 8(a) firm, with training that helps transform people's careers and lives.

I have met so many federal employees who saw the value in our training and the passion and dedication I brought to the work. They have given TransPacific Communications the opportunity to support its workforce to improve communication and to break down barriers. They understand what the benefits our service brings. They are champions to diversity and heroes in our corner. Ms. Carol Moulton, Director of Food and Drug Administration's Equal Employment Opportunity is one of them.

But even with their support, I had to find a way to grow and scale so we could help more federal workers and 8(a) appeared to be the solution for accomplishing this.

I started looking into the application process in late 2017 at the encouragement of my counselor, Mr. Richard Paden of Maryland Procurement Technical Assistance Center (PTAC). Mr. Paden had offered advice for several years, suggesting on a few occasions that we need to get our 8(a) certification to scale our business. Several of our clients also asked us to become an 8(a). So I went for it.

At that time, TransPacific Communications had been successfully awarded by federal agencies and other entities. They include the U.S. Department of Treasury, National Institute of Standards and Technology (NIST), Office of the Comptroller of the Currency (OCC), National Oceanic and Atmospheric Administration (NOAA), U.S. Department of Agriculture, many centers at the U.S. Food and Drug Administration (FDA), U.S. Department of Housing and Urban Development (HUD), the Army, the Navy, U.S. Consumer Product Safety Commission (CPSC), U.S. Coast Guard, U.S. Department of Commerce, Voice of America (VOA), Nuclear Regulatory Commission (NRC), National Aeronautics and Space Administration (NASA), U.S. International Trade Commission, the Federal Reserve Board, several institutes of the National Institutes of Health (NIH), Centers for Disease Control and Prevention (CDC), National Science Foundation (NSF), Fort Manmouth, Fort Belvoir, Defense Logistics Agency (DLA), Defense Threat Reduction Agency (DTRA), Defense Security Service (DSS), National Transportation and Safety Board (NTSB), U.S. Patent and

Trademark Office (USPTO), Federal Housing Finance Agency (FHFA), Fannie Mae, The United Way Worldwide, Aeroteck, United States Pharmacopeia Convention, Sodexo, The World Bank, RegenxBio, the George Washington University, John Hopkins University and the University of Maryland at College Park, etc.

These mostly are through simplified acquisition and direct orders because we didn't have any vehicle other than the fact we're a woman-owned small business. We provided training services to help their employees improve communication, build better teams, stellar brand and become more culturally competent in a multicultural and multiethnic workforce.

I strongly support the purpose and promise of the 8(a) program to remove barriers for small minority or women entrepreneurs to compete for and win federal contracts. The success of my company's participation can be measured by the enhanced ability of federal employees to improve their communications skills and provide better service to the public and be able to be considered for promotion and advancement. We all know that accent discrimination is illegal under Title VII of the Civil Rights Act. But it remains. Some accents, like Dr. Henry Kissinger's, may be valued over others. The 8(a) program provides the level playing field for me and other small women-owned or minority-owned entrepreneurs to provide our services to strengthen the federal government's capacity to serve all Americans.

Our service provides a solution to agency's challenges and problems in bridging cultural differences and supporting their diverse workforce's career development. ADM T.W. Allen of the United States Coast Guard commended our work: "Your excellent work emphasized the powerful message on the importance of diversity, multiculturalism and inclusion in the total workforce community. Your efforts will help the U.S. Coast Guard become a leader in diversity management within the federal government and the model for the nation."

Now back the 8(a) application. The process was daunting and too long. I was blessed to have the support of many people and their expertise. A former SBA official gave me some insightful guidance, a friend who introduced me to officials overseeing the 8(a) certification, other 8(a) firms provided testimonies. And there is a wonderful federal client who wrote in to support us. I have

another friend who is a federal agency's contracting director who also provided invaluable help. The list goes on and on. We sent in the application.

Despite all that support and my own work with the application, the waiting game eventually got old. Not knowing where your application was and what to do was not fun. I eventually cornered a high-level SBA official who texted the staff to track down where my file was. Another SBA official, a friend's friend intervened and introduced me directly to the person who handled my file.

Ms. Andrea Choy was truly heaven-sent. She was professional, courteous and helpful. It made me feel so proud knowing my tax dollars were at work through her and others at SBA. As a matter of fact, I always make a point to tell each and every SBA person I come across at many vendor outreach sessions how impressed I am with their professionalism. They all give me the same answer: we are just doing our job!

After going back and forth with Ms. Choy on additional documents for a couple of times, on September 25, 2018, we finally received the notice that TransPacific Communications became an 8(a) certified firm. I was elated. Another reason for my happiness was I had worked behind the scenes with a federal agency to line up an 8(a) sole source BPA contract. I thought once we have the 8(a) certification, our first 8(a) BPA contract would be ready to go. I began planning, allocating resources and staff. But nothing happened. And the period of nothing stretched on even longer with the government shutdown last year, which further delayed that contract.

So far I'm not all that favorably impressed with my experience of getting our first 8(a) contract. Almost 12 months later, we have yet to receive one, despite our best efforts.

Because of the hard lesson I learned, I thought I'd offer some suggestions in hopes that this process would be improved incrementally to make it better and easier for other new 8(a) companies.

One suggestion is to put a check-in mechanism in place that allows the 8(a) firm to move in a timely fashion. It would also hold agencies accountable while SBA provides oversight to avoid 8(a) firms being left dangling.

Another suggestion is to bridge the gap between policy and operation by empowering operations. Operational movement is critical in order for 8(a) firms to successfully obtain contracts.

Agencies conduct many Vendor Outreach Sessions where most representatives of Office of Small and Disadvantaged Business Utilization (OSDBUs) attend. However, vendors including TransPacific Communications need to talk to program officials directly. There is a missing link between OSDBUs and the program. These VOSs take a lot of time and efforts and we want to maximize our resources to make these events beneficial and successful for both agencies and vendors.

Promoting the success and ameliorating the potential for discouragement of 8(a) contractors requires a high degree of coordination, collaboration and teamwork among SBA, contracting agencies and the 8(a) participants. After my own experience of almost a year of being certified but not gaining any contracts as a result of certification, I know how daunting it is for women and minority entrepreneurs to persist with federal contracting.

Specifically, I would recommend strengthening the mentoring of 8(a) participants both during the contracting process between contractor and subcontractor and outside of any contract relationship. Majority-owned firms should be given recognition for mentoring 8(a) participants irrespective of whether the 8(a) participant is included in a particular contract. Of course, subcontracting with 8(a)s should be given even greater weight in awarding contracts.

The 8(a) program is a race of time, for only 9 years. Our 8(a) race started on September 25 last year. I'm wiser, but still excited and have hope for the program. It has given us a good platform as we wait to see the full potential it will bring to us. It's a sobering experience. My expectation and understanding is that the 8(a) certification would truly give small and disadvantaged businesses like TransPacific Communications a boost and help level the playing field so we can scale and grow; more importantly to contribute to our economy, and to fulfill the mission to serve others. I'm not naïve thinking contracts will be landing in our laps. There are always roadblocks and barriers, and we're ready to take on the challenges.

I'm truly grateful to be in the SBA 8(a) program. I have spoken to enough 8(a) firms and contracting officers to know there is hope. We need a first 8(a) contract to break through. I still trust and believe the core of the program is to give small businesses the access we need. On the operation side there are areas for improvement, to be more fine-tuned, redesigned and reworked to make it run better and more efficient.

The clock is ticking on this 8(a) race. We lost some very precious time. Our goal is to win more contracts through this vehicle because we have a mission to support more of America's workforce, both the employees who wish to reach their professional and personal potential, the managers who are demanding the best work from the best teams.

I'm more determined today than that nine-year-old girl in China. More fierce, more focused, more driven, with more power, wisdom, savvy, success, know-how, skills, expertise and an 8(a) certification to boot, not to mention a village of supporters, to pursue my mission in life.

Speaking of supporters, I'd like to acknowledge the President and CEO of National ACE, Chiling Tong who recommended us, and VP of Development Daniel Oliver. Executive Director of the White House Initiative on Asian Americans and Pacific Islanders, Holly Ham and Senior Advisor Dr. Debra Suarez. National Director of the Minority Business Development Agency Henry Childs. Administrative Director of the Maryland Governor's Office of Community Initiative, Christina Poy. Director of Maryland PTAC, Denise Warner and Counselor Richard Paden. Director of Training at Maryland SBDC's Russell Teter and Counselor Mark Wells. Some of our federal clients are here. Many individuals also helped me get ready for today are online watching. Finally, my family members, my loyal Asian American community and many other individuals who have supported me on this journey.

Chairwoman Velázquez, Ranking member Chabot and distinguished committee members, thank you again for giving me the opportunity to share TransPacific Communications' 8(a) experience. I hope my perspective as a new 8(a) company owner and suggestions will be helpful to the committee in addressing the gap between policy and operation. It is a great privilege to testify today. Thank you for listening.

Phoenix, AZ September 16th, 2019

My name is Clarence McAllister. I was born and raised in Panama and immigrated to the US as a college student. I obtained degrees in Electrical Engineering and after several years in the industry, established Fortis Networks with my wife Reyna in 2000 in Phoenix, AZ. We became Minority Business Enterprise and USDOT Disadvantaged Business Enterprise certified. These programs did not help us grow because neither the State of Arizona nor the City of Phoenix have minority business set-asides. DBE opportunities were far in between. It was difficult to compete in the commercial market because we lacked local relationships. Our only path to grow was federal contracting.

The entrepreneurial path has not been easy for us. We started Fortis using personal credit cards. After 7 years in business, we applied to the 8a program, which allowed us to grow the company fourfold through federal contracting. At the time we were new to Federal contracting. We had a huge learning curve to become familiar with the rules, the lingo and the requirements. Through much networking and joining trade groups such as the Society of American Military Engineers, we were able to obtain our first 8a federal contract 2 years into the program. Phoenix does not have a large number of federal customers. Therefore, I had to travel extensively to neighboring states of California, New Mexico and Texas to visit military bases and other agencies off the beaten path. Our marketing strategy was not to wait for the release of the RFPs on www.fbo.gov but rather to meet with the contracting officers to present our experience and capabilities. Our visits would start at the beginning of the fiscal year and over multiple meetings, we would line up sole source negotiated contracts to be awarded by the end of the fiscal year. Our first contract was for $10,000. As we became more experienced in working with the agencies, the size and complexity of the contracts increased. After a failed experience through a Mentor Protégé Program, we landed a second Mentor that allowed us to pursue contracts that exceeded our bonding capacity. We were able to use our mentor's past performance and financial backing to land a 5-year multimillion dollar Multiple Award Task Order Contract along with a task order with the US Army corps of Engineers Savannah District. A third mentor allowed us to expand our capabilities and geographical footprint.

Today, 19 years later we are a General Contractor with projects nationwide. My wife and I have hired hundreds of employees over this time span.

Building a successful federal contracting business is a long and arduous process that requires skills that we did not have. Most of our peers were either former service men or women, or were previously employed by other government contractors, where they learned how to write proposals and negotiate contracts. We lacked these skills, and thus had to hire the right people with this expertise. Despite all the obstacle, we found the 8a program to be the best program to grow the company, because government agencies were eager to do business with us due to our good track record and ease of doing business with. This was the case with the smaller contracts and sole source contracts. As the contracts became larger and we pursued competitive contracts, we had to retain legal counsel and build a larger infrastructure. We were lucky to retain the services of attorney David Rose who has represented us for over 10 years.

Transition:

Transitioning out of the 8a program was very challenging.

Our first strategy was to compete for 8a 5-year Multiple Award Order Contracts (MATOC) prior to our graduation which would allow us to continue to compete for these task orders after year 9. We were very successful at this.

Our second strategy was to relocate to the HUBZone and obtain the HUBZone certification. Even though the HUBZone program does not allow sole source negotiated contracts, it allows us to compete among a smaller pool of qualified contractors. Most of our current contracts are HUBZone set asides.

Our third strategy was to mentor a new 8a to teach them the dos and don'ts of federal contracting, help them with our bonding capacity and through Joint Ventures, continue to compete for 8a set-asides. We are currently mentoring an 8a contractor and have helped them obtain their first federal contractor early in the program.

Our last strategy was to pursue commercial contracts. This has been the most tedious and so far the least successful strategy. Even though we have marketed to large and small commercial customers over the years, we have not been able to increase our commercial business as planned. It is heartbreaking to see other white owned competitors start in business, obtain funding and have substantial growth while after 19 years we are still struggling to get our foot in the door with those same customers.

Let's be honest, the 8a program was established as a result of the 1966 urban riots and executive orders by presidents Lyndon Johnson and Richard Nixon to encourage African Americans to enter economic mainstream. But it was not until the 1978 amendments to the Small Business Act when social disadvantage was defined and the program got structured.

I submit that even though minorities have indeed entered economic mainstream, the net worth of the average minority household is only a fraction of that of a white household. According to Forbes magazine, the median white household owns 86 times more wealth than its black counterpart, and 68 times more than its Hispanic counterpart.

Even though the 8a program is not a solution to American's inequality, it is a tool to assist minorities start and grow businesses. Minority businessowners are more likely to hire other minorities and help their communities. Minority businessowners set the example of what is possible when the media only highlights sports and entertainment as the path out of poverty for most minority youths.

The 8a program should not be terminated. Moreover, it should be improved and updated since it has not been reviewed in the last 30 years.

Recommendations:

I offer the following recommendations.

1. Extend the 8a program beyond 9 years. Most 8a contractors start getting traction on the program at year 5.

2. Federal construction contracts over $100K are required to be bonded. Most 8a contractors are not able to bond because they have not built enough equity in their business. Therefore, provide more bonding assistance.
3. Expedite the application process to obtain 8a certification.
4. Provide more legal assistance to 8a contractors. The Federal Acquisition Regulations (FAR) is very complicated and has many landmines that if unknown could be costly to 8a contractors.
5. Provide more access to capital. Due to the stringent rules, an investor can only purchase 15% of an 8a company. New 8a companies without a history of credit are unable to obtain lines of credits to finance their operations. Non-profits such as Dream Spring serve as a conduit between the banks and small business to provide lending. But without collateral, lending is next to impossible.

Written Testimony of

Rebecca Askew

CEO and General Counsel

Circuit Media LLC

Before the House Committee on Small Business

"The Role of the SBA's 8(a) Program in Enhancing Economic Opportunities"

September 18, 2019

Chair Velazquez, Ranking Member Chabot and Members of the Committee, I would like to thank you for the opportunity to testify before you today. My name is Rebecca Askew and I am CEO and General Counsel of Circuit Media, which provides competitive intelligence to business and legal professionals through print and online media. I am also on the Leadership Advisory Council for Women Impacting Public Policy (WIPP). WIPP is a national nonpartisan policy organization advocating on behalf of women entrepreneurs—strengthening their impact on our nation's public policy, creating economic opportunities and forging alliances with other business organizations.

I started Circuit media 13 years ago in my basement, and now my company has grown to 60 employees with offices in Denver and Washington, D.C. I am testifying today about a program that has contributed to my success – the Small Business Administration's 8(a) Business Development program.

The 8(a) program has given my company access to contracts with the federal government that I would not have otherwise had. For example, Circuit Media was chosen to assist The Department of Labor (DOL), Job Corps National Office with the redesign of all 125 Job Corps Centers throughout the United States. The DOL Office of Job Corps (OJC) wanted to refocus this prestigious program to make it more relevant for the future and the youth it serves. Our team implemented change management through the use of customer-centered design, utilizing tools and techniques to understand the students' and other stakeholders' needs, wants, and limitations to identify changes that needed to occur to make the program relevant to today's youth.

I want to make something clear – this program is a hand up, not a handout. As the SBA states, the mission of the program is to help provide a level playing field for small businesses owned by socially and economically disadvantaged people or entities.[1] Now in my 7th year of the program, I have been strategic in ensuring that I balance opportunities both in and out of the program. This includes leveraging my WOSB, WBE, and DBE status; competing on local, state, and regional contracting opportunities; and responding to Multi-Award Schedules or MAS through the General Services Administration (GSA). Circuit Media also has a thriving commercial portfolio and we continue to strive to make our commercial work a significant portion of our revenues. I have had immense success in the 8(a) program because I have been cognizant of how to balance 8(a) and non-8(a) work to create a sustainable company – diversifying early was key for Circuit Media.

While the 8(a) program has allowed me to find a successful path forward, I know many companies have not had the same experience. For example, one of the downfalls for any company is relying on 8(a) awards as the majority of their business. So, when it is time to graduate, companies do not have exit strategies to transition out of the program.

One of the ways the Small Business Administration (SBA) is trying to tackle this issue is through the 7(j) management and technical assistance program. According to the SBA, the 7(j) program provides assistance in a wide range of business activities, including marketing, accounting, opportunity development and capture, contract management, compliance and

[1] 8(a) Business Development Program, SBA GOV, https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program (last visited September 13, 2019)

financial analysis.[2] When I attended a 7(j) training, I found it was geared more towards businesses at the beginning of their lifecycle, instead of those nearing graduation of the 8(a) program. Although this type of training is valuable, it would be beneficial for the SBA to consider having two tracks – one for businesses who are in the beginning phases of the program and one that is more advanced. Utilizing this existing resource could be a way to tackle the issue of businesses struggling to succeed after graduation.

Since the 8(a) program has a time limit of 9 years, one solution is to make sure that other socioeconomic set-aside programs at SBA can be utilized after graduation. Proposals such as H.R. 190, which passed out of this Committee earlier this year, would allow other socioeconomic programs – WOSB, SDVOSB and HUBZone – to take advantage of the sole source requirements currently afforded to individually-owned 8(a) companies. Currently, many of the rules and regulations around these set-aside programs create barriers for the acquisition workforce, who often say they are too complicated or are unaware of how to use them. By making these programs more accessible for federal agencies to use like the 8(a) program, many more small businesses will benefit.

Another challenge for 8(a) businesses is taking full advantage of the program during the first few years. The world of government contracting requires a company to have significant business development and financial acumen. Young companies may not have the internal infrastructure to compete for and perform on government contracts. As the 8(a) program is only nine years in length, I have known companies that felt they wasted valuable time in the

---

[2] *Id.*

program just learning how to navigate through the process. There is a sweet spot in the program, where a company is sophisticated enough to take advantage and benefit from the program before they graduate. Additionally, given the length of time it takes for an agency to become familiar with a contractor, changing the criteria for acceptance into the program could help attract companies that can fully utilize the program at the time of entry.

I have greatly appreciated the opportunities afforded to me through my participation in the 8(a) program and have made a concerted effort to extend these rewards to my employees and my community. As a certified green company, Circuit Media has developed and funded campaigns educating businesses and schools across the country on the benefits of recycling and reduction in paper towel usage. In addition, we donate time, money and services to the Trust for Public Lands, Leave No Trace and Denver's Highline Canal Conservancy. We have established an internship program for at-risk youth who attend Denver Public Schools and offer our employees tuition reimbursement and paid time off to volunteer in the community. These are a few examples that demonstrate the extension of 8(a) program benefits beyond the business itself.

In conclusion, the 8(a) program has been beneficial to my growth. As this Committee examines the program, I would urge you to consider changing the criteria for entry into the program to ensure companies can take full advantage of their 8(a) status. Additionally, as stated in my testimony, changes to enhance training offered by the SBA would assist companies as they near graduation. Thank you for inviting me to testify at this important hearing and I look forward to answering any questions.

**Question to Mr. Thomas**

- Mr. Thomas, we understand that during your time as an associate administrator of the NASA OSDBU, NASA provided training in addition to that provided through the 8(a) program. What were the areas where NASA focused to complement what the SBA was doing and how do you make those determinations?

**Mr. Thomas Response: I can't say that we were consciously complementing what the SBA was doing. Rather, we developed a course independent of what the SBA was doing with significant input from 8(a)/small disadvantaged businesses. One thing we knew was that there was no training program in the government that was specific to NASA. Our purpose was to have a training program that would increase the chances of small businesses, particularly small disadvantaged businesses (including 8(a) contractors) to win contracts with NASA and/or subcontracts with NASA's large contractors. The courses we offered were those we felt were most necessary to fulfill that goal.**

**We had a 3-day Basic Training Course and later on a 2-day Advanced Training Course. In the Basic Course we had the following four (4) modules with courses taught under each module in non-bold: Module 1, "Understanding the Culture of NASA"** (Overview of NASA; NASA Initiatives; NASA's Procurement Process; Role of NASA's OSDBU and its Center Small Business Specialists); **Module 2, "Business Management and Marketing Development,"** (Marketing Methodologies and Development Unique to NASA; Strategic Planning; Source Directed Procurements; Bid vs. No Bid Decisions; Write Winning Proposals) ; **Module 3, "Accounting, Finance and Contract Administration,"** (Adequacy of Financial Systems for Research and Development Contracts; Contract and Task Management; Business Systems Support Staff; Preparation for Audit) **Module 4, "Project/Task Management,"** (Project Tracking and Task Management; Technical Performance Measurement; Quality Evaluation/TQM; Business Re-Engineering).

**We offered the Basic Training Course four (4) times a year, mostly on or near the 10 NASA Centers. We also went to geographic areas where there were no NASA Centers. We offered the Advanced Course twice a year. The instructors were NASA Technical Managers, NASA Procurement Personnel, NASA OSDBU Staffers and Small Business Specialists. Special contractor personnel were also brought in, including representatives from major corporate prime contractors. More than 1500 individuals and about 1300 companies received the training when it was offered during FY 1994 – FY 2004. Many trainees attributed the Training Program to winning their first NASA contracts. The Training Program was a major factor in NASA increasing its contract and subcontract dollars to small disadvantaged businesses (including 8(a) contractors) from 5.4% in FY1991 to 19.4% in FY2004.**

*************************************************************

**Questions to the Panel**

- The certification process can be daunting for firms even after the SBA's attempt to streamline it. Based on your experience with the certification process, what were the most difficult steps in applying and being admitted to the 8(a) program?

- How do we balance easing certification with the need to ensure ineligible firms do not become 8(a) certified?

- We've heard for some time that the certification process can use some improvements. Have you used certify.gov during your time in the 8(a) program and what has been your experience with it?

- Since the number of 8(a) participants keeps decreasing, what needs to be done to get information about the 8(a) Program to more minority businesses owners so that they may enter into the federal marketplace?

**Mr. Thomas' Response: The SBA must go around the country holding conferences or workshops at conferences that encourage eligible small businesses to apply for the 8(a) Program. However, SBA personnel may not be the best entity to perform that task. Therefore, SBA should contract out that task to several private entities and measure their success by their ability to attract more 8(a) applicants. The entities that perform best should be renewed while the ones that underperform should not be renewed.**

- Would it be beneficial for 8(a) companies if the SBA were to provide vendor outreach sessions to ensure that contracting officers are aware of the products and services small businesses can provide? If so, why?

**Mr. Thomas' Response: NASA was very successful in holding limited vendor outreach sessions with not only contracting officers but also with technical program managers. NASA used to match the future needs of the Agency with small disadvantaged businesses that possessed the technical capabilities and proven experience to provide the products and services that the Agency would soon be soliciting. It was done several times a year under different technical program. A call notice would be sent out to the small business community as to what the Agency would be soliciting for it future needs and companies were required to send in a vitae which showed its ability to meet those requirements. Selected ones would be offered an opportunity to present to technical program managers and procurement staff to present its capabilities to such personnel in person. Many small disadvantaged businesses, including 8(a) firms, eventually received millions of dollars in NASA contracts after participating in these programs.**

- How did you find out about the program and what resources did you use to learn the ins and outs of becoming certified, training, and the benefits of the program?

- Has your designated 8(a) Business Opportunity Specialists or BOS been able to refer you to the right resources to improve the competitive viability of your company? Have they performed a comprehensive assessment as to the needs of your company? What should be done to ensure that BOSs are able to serve that role?

- It shouldn't be completely up to small business individuals to find contracts with the federal government. What more can be done so that 8(a) firms can win prime contracts and also be used as subcontractors?

**Mr. Thomas' Response: The BOS should be evaluated on his/her ability to find contracts for 8(a) firms in the federal governments. There should be incentives such as monetary awards and other recognition for those that do a better job than others in this regard.**

**Question to Ms. Li**

- Ms. Li, we know getting certified as an 8(a) firm is no guarantee to receiving a federal contract. You mention in your testimony that we need to bridge the gap between policy and operations. Can you explain in more detail how empowering operations will better serve 8(a) firms and lead to more 8(a) firms obtaining contracts?

  Operations need to go through a systematic training. Anyone who touches contract should. There should be a long-term training for all people who are involved. And not just the contracting officers but programming and project management. Everyone who touches contacts – people have to be trained so they understand their roles and responsibilities as well as the functions they need to play when it comes to awarding a contract to a large or small company. So 8(a)s should be in the picture, should be part of the process.

  In addition, local offices should accept projects into the SBA program. Federal agencies contact the district offices to obtain a letter of acceptance. When IT infrastructure doesn't allow the local District BOS to generate those letters, contracts to 8(a) firms are delayed and sometimes never awarded. That is because the agency with the funding and project can't obtain the letter for them to proceed with work for the 8(a) firm. Operations need to be able to better assist their participants.

**Questions to the Panel**

- The certification process can be daunting for firms even after the SBA's attempt to streamline it. Based on your experience with the certification process, what were the most difficult steps in applying and being admitted to the 8(a) program?

  The process is designed to make it challenging and difficult to weed out the one who are not serious or qualified. However, it is too daunting and cumbersome – the sheer amount of paperwork alone is going to scare people off. In addition the language in the application is often times not user friendly, making it even more impossible to get through the process. Furthermore, the waiting game is not productive for both the applicants and the reviewers.

  The process which the SBA uses to process paperwork is inefficient. When they review your papers, they find one item to question, stop, and then and return your application. It would be more efficient to review the complete package, then request additional information. It's not just the certification process. All the processes are done this way.

  Another difficulty is with the IT systems. Some firms submit their information into the Web based system and obtain a confirmation. But the district office calls with an outstanding requirement because the system tells them the firm hasn't submitted. It's really a problem.

- How do we balance easing certification with the need to ensure ineligible firms do not become 8(a) certified?

  Spelling out the conditions and requirements at the beginning so the ones who are not eligible should be self-eliminated quickly.

- We've heard for some time that the certification process can use some improvements. Have you used certify.gov during your time in the 8(a) program and what has been your experience with it?

  I used certify.gov website too many times during my application process. It was a frustrating process to say the least.

- Since the number of 8(a) participants keeps decreasing, what needs to be done to get information about the 8(a) Program to more minority businesses owners so that they may enter into the federal marketplace?

  There is a stigma that the 8(a) program is going away. Maybe SBA can do a campaign to get rid of that stigma. Department of Education has a successful campaign – No Child Left Behind. SBA can emulate that.

- Would it be beneficial for 8(a) companies if the SBA were to provide vendor outreach sessions to ensure that contracting officers are aware of the products and services small businesses can provide? If so, why?

  Yes, absolutely. I believe we will definitely welcome that with open arms. This will give a chance to directly talk and sell to people about our services.

- How did you find out about the program and what resources did you use to learn the ins and outs of becoming certified, training, and the benefits of the program?

  I found out about 8(a) from other contractors and my counselor Richard Paden at the Maryland PTAC. He along with many others helped with the application process.

- Has your designated 8(a) Business Opportunity Specialists or BOS been able to refer you to the right resources to improve the competitive viability of your company? Have they performed a comprehensive assessment as to the needs of your company? What should be done to ensure that BOSs are able to serve that role?

  BOSs first need to be accessible and must be held accountable.

- It shouldn't be completely up to small business individuals to find contracts with the federal government. What more can be done so that 8(a) firms can win prime contracts and also be used as subcontractors?

Promoting the success and ameliorating the potential for discouragement of 8(a) contractors requires a high degree of coordination, collaboration and teamwork among SBA, contracting agencies and the 8(a) participants. After my own experience of almost a year of being certified but not gaining any contracts as a result of certification, I know how daunting it is for women and minority entrepreneurs to persist with federal contracting.

Specifically, I would recommend strengthening the mentoring of 8(a) participants both during the contracting process between contractor and subcontractor and outside of any contract relationship. Majority-owned firms should be given recognition for mentoring 8(a) participants irrespective of whether the 8(a) participant is included in a particular contract. Of course, subcontracting with 8(a)s should be given even greater weight in awarding contracts.

**Questions to the Panel – Rebecca Askew**

- The certification process can be daunting for firms even after the SBA's attempt to streamline it. Based on your experience with the certification process, what were the most difficult steps in applying and being admitted to the 8(a) program?

  With any application process, it is vital to keep track of timelines and be responsive to both questions and requests for clarifications. Balancing responding to requests for more information with running a company still in startup mode was the most difficult part of the certification process. Any action that the SBA could take to streamline this process would be welcome by 8(a) companies.

- Since the number of 8(a) participants keeps decreasing, what needs to be done to get information about the 8(a) Program to more minority businesses owners so that they may enter into the federal marketplace?

  SBA should utilize its district offices and resource partners in order to disseminate information about small business programs. These partners are able to reach potential companies around the country and share valuable resources from the SBA headquarters.

- Would it be beneficial for 8(a) companies if the SBA were to provide vendor outreach sessions to ensure that contracting officers are aware of the products and services small businesses can provide? If so, why?

  Yes, it would be very beneficial. Educating the acquisition workforce on how to use SBA's small business programs is always needed, as well as opportunities for small businesses to share their capabilities with contracting officers. These sessions would be mutually beneficial for both the government and 8(a) contractors.

- How did you find out about the program and what resources did you use to learn the ins and outs of becoming certified, training, and the benefits of the program?

  I learned about the 8(a) program when I was selected for the SBA's Emerging Leaders Program through the SBA. As part of our training, there was discussion about all the different government vehicles (small business set-asides, GSA Schedules, GWACs) and I began to research those programs on my own. This spurred my interest in these various programs, which is how I ended up finding the programs/vehicles that worked best for my company. Through the SBA's Emerging Leaders program, the friendships and connections I made were invaluable in learning about the certification process and once certified, understanding the process. In addition, my SBA Business Opportunity Specialist and local PTAC kept me up-to-date on further training and additional opportunities to leverage my certification.

- It shouldn't be completely up to small business individuals to find contracts with the federal government. What more can be done so that 8(a) firms can win prime contracts and also be used as subcontractors?

  Subcontracting is of great importance to small businesses, especially as a point of entry into the federal marketplace. Although government data is not easily accessible on this issue, many small businesses have voiced that subcontractors listed on a prime's subcontracting plan end up with no work, or less than they anticipated. While there are many reasons why prime contractors need to deviate from their subcontracting plan, increased transparency and accountability would help solve this problem. Additionally, a suggestion to increase accountability is to designate someone in an agency to be responsible for monitoring compliance and raise questions if the prime contractor's utilization of subcontractors falls significantly below the subcontracting plan. Small business advocates in the federal agencies should be empowered by Congress to take on this role.

- Has your designated 8(a) Business Opportunity Specialists or BOS been able to refer you to the right resources to improve the competitive viability of your company? Have they performed a comprehensive assessment as to the needs of your company? What should be done to ensure that BOSs are able to serve that role?

- We've heard for some time that the certification process can use some improvements. Have you used certify.gov during your time in the 8(a) program and what has been your experience with it?

IEEE★USA IEEE

September 17, 2019

The Honorable Nydia M. Velázquez
Chairwoman
Committee on Small Business
U.S. House of Representatives
2069 Rayburn House Office Building
Washington, DC 20515

Dear Chairwoman Velázquez,

On behalf of IEEE-USA, the largest organization of technology professionals in America, we appreciate that the House Small Business Committee will be holding an upcoming hearing on, "The Role of the SBA's 8(a) Program in Enhancing Economic Opportunities."

A priority of IEEE-USA's Entrepreneurship Policy and Innovation Committee (EPIC) is to support expanding small tech business entrepreneurship among underrepresented groups and regions. The SBA's 8(a) program, which facilitates contracts between federal government and small disadvantaged businesses, is certainly helpful in this regard. As you know, the latest SBA report available (FY2014) indicated that 8(a) firms contributed over 158,000 jobs to the American economy and revenue of almost $5.5 billion for the fiscal year.

We strongly support increased opportunities for small tech business with the federal government, and applaud your leadership in examining the benefits of SBA's 8(a) program to entrepreneurs and communities, as well as steps Congress can take to improve the effectiveness and oversight of the program.

IEEE-USA advances the public good and promotes the careers and public policy interests of the nearly 180,000 engineering, computing and allied professionals who are U.S. members of the IEEE.

Sincerely,

Thomas M. Coughlin

Thomas M. Coughlin
2019 IEEE-USA President

**IEEE-USA** | 2001 L Street, N.W., Suite 700, Washington, D.C. 20036-4928 USA
Office: +1 202 785 0017 | Fax: +1 202 785 0835 | E-mail: ieeeusa@ieee.org | Web: http://www.ieeeusa.org