# EXHIBIT A-9

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# MINORITY CONTRACTING: OPPORTUNITIES AND CHALLENGES FOR CURRENT AND FUTURE MINORITY-OWNED BUSINESSES

## HEARING

BEFORE THE

SUBCOMMITTEE ON GOVERNMENT MANAGEMENT, ORGANIZATION, AND PROCUREMENT

OF THE

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

SEPTEMBER 22, 2010

**Serial No. 111–148**

Printed for the use of the Committee on Oversight and Government Reform

Available via the World Wide Web: http://www.fdsys.gov
http://www.house.gov/reform

U.S. GOVERNMENT PRINTING OFFICE

65–561 PDF WASHINGTON : 2011

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

EDOLPHUS TOWNS, New York, *Chairman*

PAUL E. KANJORSKI, Pennsylvania
CAROLYN B. MALONEY, New York
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
JOHN F. TIERNEY, Massachusetts
WM. LACY CLAY, Missouri
DIANE E. WATSON, California
STEPHEN F. LYNCH, Massachusetts
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
MIKE QUIGLEY, Illinois
MARCY KAPTUR, Ohio
ELEANOR HOLMES NORTON, District of Columbia
PATRICK J. KENNEDY, Rhode Island
DANNY K. DAVIS, Illinois
CHRIS VAN HOLLEN, Maryland
HENRY CUELLAR, Texas
PAUL W. HODES, New Hampshire
CHRISTOPHER S. MURPHY, Connecticut
PETER WELCH, Vermont
BILL FOSTER, Illinois
JACKIE SPEIER, California
STEVE DRIEHAUS, Ohio
JUDY CHU, California

DARRELL E. ISSA, California
DAN BURTON, Indiana
JOHN L. MICA, Florida
JOHN J. DUNCAN, JR., Tennessee
MICHAEL R. TURNER, Ohio
LYNN A. WESTMORELAND, Georgia
PATRICK T. MCHENRY, North Carolina
BRIAN P. BILBRAY, California
JIM JORDAN, Ohio
JEFF FLAKE, Arizona
JEFF FORTENBERRY, Nebraska
JASON CHAFFETZ, Utah
AARON SCHOCK, Illinois
BLAINE LUETKEMEYER, Missouri
ANH "JOSEPH" CAO, Louisiana
BILL SHUSTER, Pennsylvania

RON STROMAN, *Staff Director*
MICHAEL MCCARTHY, *Deputy Staff Director*
CARLA HULTBERG, *Chief Clerk*
LARRY BRADY, *Minority Staff Director*

SUBCOMMITTEE ON GOVERNMENT MANAGEMENT, ORGANIZATION, AND PROCUREMENT

DIANE E. WATSON, California, *Chairman*

PAUL E. KANJORSKI, Pennsylvania
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
HENRY CUELLAR, Texas
JACKIE SPEIER, California
PAUL W. HODES, New Hampshire
CHRISTOPHER S. MURPHY, Connecticut
MIKE QUIGLEY, Illinois

BRIAN P. BILBRAY, California
AARON SCHOCK, Illinois
JOHN J. DUNCAN, JR., Tennessee
JEFF FLAKE, Arizona
BLAINE LUETKEMEYER, Missouri

BERT HAMMOND, *Staff Director*

# CONTENTS


| | Page |
|---|---|
| Hearing held on September 22, 2010 | 1 |
| Statement of: | |
| Hinson, David, Director, Minority Business Development Agency, U.S. Department of Commerce; Marie C. Johns, Deputy Administrator, U.S. Small Business Administration; Jiyoung Park, Associate Administrator for Small Business Utilization, General Services Administration; Linda Oliver, Acting Director, Office of Small Business Programs, U.S. Department of Defense; and Brandon Neal, Director, Office of Small and Disadvantaged Business Utilization, U.S. Department of Transportation | 15 |
| Hinson, David | 15 |
| Johns, Marie C. | 27 |
| Neal, Brandon | 73 |
| Oliver, Linda | 62 |
| Park, Jiyoung | 56 |
| Robinson, Anthony W., president, Minority Business Enterprise Legal Defense and Education Fund; Fernando V. Galaviz, president, the Centech Group, on behalf of the Mid-Tier Advocacy; Don O'Bannon, chairman, Airport Minority Advisory Council; Joel Zingeser, FAIA, director of corporate development, Grunley Construction Co., Inc.; and Michael Sumner, Discrimination Research Center, Thelton E. Henderson Center for Social Justice, UC Berkeley School of Law | 93 |
| Galaviz, Fernando V. | 105 |
| O'Bannon, Don | 124 |
| Robinson, Anthony W. | 93 |
| Sumner, Michael | 148 |
| Zingeser, Joel | 142 |
| Rush, Hon. Bobby L., a Representative in Congress from the State of Illinois | 5 |
| Letters, statements, etc., submitted for the record by: | |
| Bilbray, Hon. Brian P., a Representative in Congress from the State of California, prepared statement of | 3 |
| Connolly, Hon. Gerald E., a Representative in Congress from the State of Virginia, prepared statement of | 166 |
| Galaviz, Fernando V., president, the Centech Group, on behalf of the Mid-Tier Advocacy, prepared statement of | 107 |
| Hinson, David, Director, Minority Business Development Agency, U.S. Department of Commerce, prepared statement of | 18 |
| Johns, Marie C., Deputy Administrator, U.S. Small Business Administration, prepared statement of | 29 |
| Neal, Brandon, Director, Office of Small and Disadvantaged Business Utilization, U.S. Department of Transportation, prepared statement of | 75 |
| O'Bannon, Don, chairman, Airport Minority Advisory Council, prepared statement of | 126 |
| Oliver, Linda, Acting Director, Office of Small Business Programs, U.S. Department of Defense, prepared statement of | 64 |
| Park, Jiyoung, Associate Administrator for Small Business Utilization, General Services Administration, prepared statement of | 58 |
| Robinson, Anthony W., president, Minority Business Enterprise Legal Defense and Education Fund, prepared statement of | 96 |
| Rush, Hon. Bobby L., a Representative in Congress from the State of Illinois, prepared statement of | 8 |

Page

Letters, statements, etc., submitted for the record by—Continued
Sumner, Michael, Discrimination Research Center, Thelton E. Henderson Center for Social Justice, UC Berkeley School of Law, prepared statement of ... 150
Zingeser, Joel, FAIA, director of corporate development, Grunley Construction Co., Inc., prepared statement of ... 144

# MINORITY CONTRACTING: OPPORTUNITIES AND CHALLENGES FOR CURRENT AND FUTURE MINORITY-OWNED BUSINESSES

**WEDNESDAY, SEPTEMBER 22, 2010**

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON GOVERNMENT MANAGEMENT,
ORGANIZATION, AND PROCUREMENT,
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:07 a.m., in room 2203, Rayburn House Office Building, Hon. Diane E. Watson (chairwoman of the subcommittee) presiding.

Present: Representatives Watson, Connolly, and Bilbray.

Also present: Representative Chu.

Staff present: Bert Hammond, staff director; Valerie Van Buren, clerk; and Adam Bordes and Deborah Mack, professional staff members.

Ms. WATSON. Good morning. The Subcommittee on Government Management, Organization, and Procurement of the Committee on Oversight and Government Reform will now come to order.

Without objection, the Chair and ranking minority member will have 5 minutes to make opening statements, followed by opening statements not to exceed 3 minutes by any other Member who seeks recognition.

Without objection, Members and witnesses may have 5 legislative days to submit a written statement or extraneous materials for the record.

Let me just read an opening statement, and then I will yield to you, Congressman Rush.

I want to welcome all of you today to the hearing that examines the status of Government-wide minority contracting programs and the efforts made to date by Federal agencies to comply with requirements for minority-owned business programs. In addition, the subcommittee will hear testimony from Congressman Bobby Rush regarding his legislation, which is H.R. 4343, the Minority Business Development Improvement Act of 2009.

Programs to assist minority-owned businesses represent one of the several types of programs in place to promote the growth of small business entrepreneurs. Such programs, administered under Section 8(a) of the Small Business Act, provide agencies the authority to set aside contracts for small disadvantaged business [SDBs], and to make sole source awards to such firms.

The Federal Government offers assistance to small businesses to make sure they get a fair proportion of Federal contracts and subcontract dollars. In fiscal year 2009, $29.3 billion, or 6.7 percent of all Federal contracts, were awarded to minority-owned businesses out of a total of $537 billion in goods and services purchased by Federal agencies. A portion of this funding was allocated as part of the American Recovery and Reinvestment Act [ARRA]. And as of July 16, 2010, the Federal Procurement Data System reported that about $3.6 billion, or 12.6 percent of the ARRA funds, had been awarded to small disadvantaged businesses.

While minority contracting programs have proven rewarding to both contractors and the U.S. Government, I am aware that significant obstacles and barriers still confront minority contracts in their attempt to bid for and obtain Government contracts. Evidence of ongoing and persistent discrimination against minority contractors has been documented over the years. Structural barriers, including access to financing, bonding, and trade union resistence, continue to impede the performance and successful participation in minority contractors. Moreover, recent court decisions, such as Rossi, have impacted the scope and the purpose of minority contracting programs on a going forward basis.

I am very interested in hearing more specifics from our private sector panelists on how documented instances of discrimination have prevented minority firms from advancing in the marketplace, particularly because I do understand that it is often difficult for minority contractors to speak openly about these issues out of their fear that they will be ostracized. If Congress is to address the shortcomings in our minority contract program, it must have a comprehensive understanding of the problems at hand in order to develop appropriate legislative remedies.

It is my hope that this hearing today will make a significant contribution to the development of a meaningful legislative record on this important issue, and I welcome all the witnesses that are here today and we all look forward to your testimony.

OK, now I will turn the mic over to our ranking minority member, Congressman Bilbray.

Mr. BILBRAY. Madam Chair, you will be pleased to hear that I have a written statement for the record and ask for unanimous consent it be included in the record.

Ms. WATSON. Without objection.

Mr. BILBRAY. I yield back to the Chair.

[The prepared statement of Hon. Brian P. Bilbray follows:]

**Opening statement: Brian Bilbray, Ranking Member, Subcommittee on Government Management, Organization, and Procurement**

Madame Chairwoman, thank you for holding this hearing today. Thank you also to the witnesses testifying on the issue of minority contracting.

I welcome your testimony on this important matter. Small businesses, many of which are minority owned are the backbone of our economy. When they receive federal government contracts, they are able to increase their payroll.

In recent years, the government has made improvements in the area of meeting and exceeding goals of awarding federal contracts to small businesses. The Department of Education, for example, exceeded its goal of 12.8% of contract allocation to small businesses by awarding them 16.4% of its contracts.

24 federal agencies were evaluated by the Small Business Administration. They were graded on a scale of A-F. Two thirds received grades of A or B- meaning they exceeded or came very close to meeting their goals for awarding contracts to small firms. However, the remaining one third have not come close to meeting their goals.
And one sixth of all federal agencies evaluated received a score of a D or F.

The minority witness, Mr. Zingeser has some suggestions for changing how contractors report small, disadvantaged subcontractors. His suggestions would provide policy-makers with a more accurate picture of the federal dollars flowing to small, disadvantaged businesses.

I look forward to hearing the testimony from the witnesses regarding barriers to small, minority business contractors, how agencies are determining which firms get these funds, and how we can grow the percentage of small, minority businesses contracting with the federal government.

Thank you again, Madame Chairwoman, for holding this hearing.

Ms. WATSON. Thank you.

Now we are honored to have our guest panelist and my good friend, Congressman Bobby L. Rush. Congressman Rush was first selected to the U.S. House of Representatives in 1992 and is presently in his ninth term serving the people of Illinois' First Congressional District, and he is a senior member of the Energy and Commerce Committee, where he chairs the Subcommittee on Commerce, Trade, and Consumer Protection.

Congressman Rush is a sponsor of H.R. 4343, the Minority Business Development Improvement Act of 2009. The legislation would establish a program providing technical assistance, loan guarantees, and contract assistance to qualifying minority businesses. Also, the program would broadly resemble existing Small Business Administration [SBA], programs for small businesses owned and controlled by socially and economically disadvantaged individuals, among others.

But it would differ in its eligibility criteria in the loan guarantees and contract assistance provided. Specific eligibility criteria differences include, first, the size of firms allowed to participate; inclusion of certain groups presumed to be disadvantaged; three, higher economic and network thresholds for individuals seeking to participate; and, four, limited eligibility for group owners to participate.

Congressman Rush, you may proceed with your statement.

**STATEMENT OF HON. BOBBY L. RUSH, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ILLINOIS**

Mr. RUSH. I want to thank you, Madam Chairperson, Madam Chairwoman, for your leadership on this committee and, I also say, in 1992.

Congressman Bilbray, it is so good to be with you and before you this morning. I would also extend my note of you being one of the most successful Members of the House of Representatives. But it is good to see you, my friend.

To all the members of the subcommittee, I am so delighted to be here. I want to thank you for inviting me to testify before your subcommittee on this important hearing on Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses.

During the first half of 2009, Congress took extraordinary steps to turn the Nation's economy around and create jobs that would fuel our economic recovery.

Many States have already begun to distribute contracts. However, across the country, minority-owned firms are being shut out of the process because of what I call artificial barriers that I believe that this Congress must simply break down.

Also, on the outside of the Federal marketplace, minority-owned firms are struggling, literally, trying to stay afloat and finding the needed financial and technical assistance to continue their operations. In business, the metaphor of the level playing field comes to mind. But that metaphor doesn't quite describe the circumstances for minority-owned businesses.

Far from being on the playing field, many minority businesses and business owners find themselves standing outside the stadium

doors where the business games in America are being conducted, standing on the outside of the stadium, in a crowd, trying to raise their voices over the din and over the noise and over the clamber that is going on of business R&D inside the stadium and playing the American game of business. They are signaling with one voice as loud as they can, they are saying, we are here. Look at us. Recognize us. Acknowledge us. We are here and we want to participate in the American economy.

Madam Chair, that is why I am here, because so many of these business persons in my community, in my district, in your district and districts like ours, they can't be here. Their voices won't be heard today, so I am here to speak for them in my own way. The question remains to be answered, and so many others that I represent here: Why are these companies continually shut out of a process that these men and women, who are also taxpayers, citizens of this Nation, veterans of wars of this Nation, why are they out of the process and how can we help fund and support them?

Quite frankly, Madam Chair, I find that this situation is totally unacceptable, and I believe that all of you join me in this.

Historically, minority-owned firms have long faced an uphill battle in gaining a foothold on the national economic scene. In 1997, a study by the Urban Institute identified several obstacles faced by minority-owned businesses. At the top of that list was the lack of access to financial capital, limited access to informal business networks, lesser skilled human capital, and limited access to non-minority markets.

I am here today unequivocally saying that by building up minority firms we can begin to truly drive the economic recovery that Congress and the Obama administration has been so diligently working toward. I have spent some time looking for ways to assist minority-owned firms of all sizes, including all business sectors, in their efforts to succeed and prosper in their efforts to create jobs in our Nation. Minority businesses and business owners employ nearly 5 million Americans.

I looked at the Minority Business Development Agency [MBDA] in my research. This agency is under the auspices of the Department of Commerce and it is the only Federal agency, the only one, the only Federal agency in the last 40 years that was created specifically to help minority-owned firms. This agency was created during the years of Richard Nixon and it has language in the Department of Commerce fighting to stay alive, really struggling against tremendous odds, trying to help minority businesses prosper, to gain a foothold in the American economy, with little to no help from the U.S. Congress; an ignored agency for the most part.

Unfortunately, even today, it still currently lacks the resources it truly needs to bring about significant change, particularly in today's tough economic climate. If there ever was a time when this agency, given its mission of 40 years ago, needs to be strengthened, I say the time is now. There is no better time than now. Now is the time.

To that end, I introduced my bill, H.R. 4343, the Minority Business Development Improvement Act of 2009. If adopted, this bill will establish a Minority Business Development Program to assist qualified minority businesses by providing technical assistance,

loan guarantees, and contracting procurement assistance. The bill authorizes the director of the MBDA to certify any entity as a qualified minority business that satisfies each of the eight criteria outlined in the bill. The bill authorizes $200 million to the director to carry out the technical assistance program and $500 million for loan guarantees. The bill would also allow firms participating in the program to bid on select set-aside contracts for goods and services.

Ladies and gentlemen, brothers and sisters of this committee, I believe that it is time to bring the Minority Business Development Agency to the forefront of our Nation's economic recovery, and I am sure that other witnesses at today's hearing will concur with me. I am also sure that each one of you have felt, in your own way, the desire to turn things around and to regain our economic footing for the people in our local communities and throughout the Nation.

Madam Chair, I urge the members of this subcommittee to join me in an effort to create a viable platform for minority-owned business development. Again, I thank you for giving me this opportunity to address this auspicious and this very important committee of the U.S. House of Representatives, and I thank you again. I am available for any questions that you may have.

[The prepared statement of Hon. Bobby L. Rush follows:]

**Testimony by the Honorable Bobby L. Rush**
**at the**
**Government Management, Organization, and Procurement Subcommittee Hearing**
**on**
**"Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses"**

Wednesday, September 22, 2010 – 10:00 a.m.

Good morning, Chairwoman Watson, Ranking Member Bilbray and members of the subcommittee.

Thank you for inviting me to testify before your subcommittee on this important hearing on "Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses."

I want to also thank you, Madam Chair, for this subcommittee's consideration this morning of my legislation, H.R. 4343.

During the first half of 2009, Congress took extraordinary steps to turn the nation's economy around and create jobs that would fuel our economic recovery.

Many states have already begun to distribute contracts using funds provided by the American Recovery and Reinvestment Act of 2009. However, across the country, minority-owned firms are being shut out of the process because of artificial barriers that I believe this Congress *simply must break down.*

Outside of the federal marketplace, minority-owned firms are struggling to stay afloat and find the needed financial and technical assistance to continue their operations. In business, the metaphor of the 'level playing field' comes to mind.

But that metaphor doesn't quite describe the circumstances for minority-owned businesses.

Far from being on the playing field, many of them find themselves standing outside the stadium door of that playing field and raising their voices, as loud as they can, saying "we're here and we want to participate!"

That's why I'm here, today, because so many of them can't be. Historically, minority-owned firms have long faced an uphill battle in gaining a foothold on the national economic scene. In 1997, a study by the Urban Institute identified several obstacles faced by minority-owned firms. At the top of that list was the lack of access to financial capital; limited access to informal business networks; lesser skilled human capital; and limited access to non-minority markets. Today, minority businesses make up almost 20 percent of all firms yet continue to be largely forgotten by the federal government.

For example, a 2007 Government Accountability Office report found that *four federal departments* and *only one agency* paid more than $4 billion for advertising from fiscal year 2001 to 2005. Needless to say, the report found that these federal agencies did a poor job of directing much of that money to these minority-owned firms. The question remains, to me and so many

others I represent, why are these companies continually shut out of a process that these men and women, *who are also taxpayers*, also help fund and support?

Quite frankly, I find this unacceptable and so should all of you.

I am stating, unequivocally today, that by *building up* minority-owned firms we can begin to truly drive the economic recovery that Congress, and the Obama Administration, has been so diligently working towards.

Before I came here, today, I spent some time looking for ways to assist minority-owned firms, of all sizes and business sectors, in their efforts to succeed and prosper in their efforts to create jobs in America. Minority businesses employ nearly five million Americans.

I looked at the Minority Business Development Agency (MBDA), under the Department of Commerce, as it's *the only federal agency* created *specifically* to help minority-owned firms.

Unfortunately it currently lacks the resources it truly needs to bring about significant change, especially in today's tough economic climate. If there was ever a time when this agency—*given its mission*—needs to be strengthened, I say that time is now! To that end, I introduced **H.R. 4343, the Minority Business Development Improvement Act of 2009**.

If adopted, this bill would:

- Establish the Minority Business Development Program to assist qualified minority businesses by providing technical assistance, loan guarantees and contracting procurement assistance.
- The bill authorizes the Director of MBDA to certify any entity as a qualified minority business that satisfies each of eight criteria outlined in the bill
- The bill authorized $200 million to the Director to carry out the technical assistance program and $500 million for loan guarantees.
- The bill would also allow firms participating in the program to bid on select, set-aside contracts for goods and services.

Ladies and gentlemen, I believe it is time to bring the Minority Business Development Agency to the forefront of our nation's economic recovery discussion and, indeed, to give it the critically needed resources that will allow this agency to work in tandem with other federal agencies that are, likewise, engaged in and committed to growing businesses and creating jobs.

I am sure that other witnesses at today's hearing will concur that it is important to foster and enhance the creation of wealth in minority communities all across our nation.

As we continue to climb out of the economic ditch we find ourselves in, I'm sure that each of you have felt, in your own way, the desire to turn things around and to regain our economic footing for the people in our local communities and throughout the nation.

I urge members of this subcommittee to join me in a united effort to create a viable platform for minority-owned business development.

I thank you, again, for your support and the opportunity to speak this morning and I look forward to our shared future.

Ms. WATSON. We want to thank you too for bringing this issue, being persistent on this issue over a period of time, to our attention. It is right for us to have a hearing and bring all the facts as we know them to the table so that we can start discussing how we can do remedies, as I said before.

Based on the information from your constituents, and I know that you have a history of always being tuned in to the people in your constituency, and even out of your constituency, or whatever sources you might have been talking with, how has the recent recession affected the minority-owned firms seeking to obtain Government financing or Federal contracts?

Mr. RUSH. Madam Chair, thank you for that great question. As I expressed before, there are still great disparities.

Ms. WATSON. Do you have kind of a percentage? Let's just stick within your district. What would you say the percentages would be in terms of those receiving contracts?

Mr. RUSH. Well, it is very paltry. I say that during this era, the Recovery Act, less than 3 percent of the minority-owned businesses in my district have been affected, although we took initial steps. We had a number of seminars and forums; we brought Government officials out early on, when this was first proposed. We tried to get ahead of the tide, ahead of the program. We wanted to be associated with the mostest.

However, as we see how these programs and these dollars are being spent, they have very little effect on my district. And one of the reasons why they have very little effect on my district is that there is not a singular entity that really can help address and deal with some of the difficulties that minority businesses have historically affected, and that is why I focus on, again, the President Nixon created program, Minority Business Development Agency.

I looked at and said, well, this is what is sorely needed at this time. If we want to increase from 3 percent to 10 percent to 25 percent to 30 percent, then we have to have an advocate, a well armed, well financed, well intentioned focused advocate that will help minority businesses in my district and provide assistance.

Madam Chair, I am astounded and I am ashamed to say this, but MBDA right now is the smallest Federal agency within the Federal Government. It has been flatlined in terms of its budget for over 40 years. Flatlined. Everything else has taken off, has soared. But the one agency that can make a significant difference in my community, other minority communities, the one agency whose mission it is to help engage my constituents, your constituents, in a robust manner in this Congress, that agency is moribund almost because of the lack of funding and resources that it has.

Ms. WATSON. Let me just say this. We are all, in this Congress, focusing on jobs, jobs, jobs.

Mr. RUSH. Yes.

Ms. WATSON. And when we cannot focus or train our awards to these companies, there are a great number of people without jobs, laid off. That is correct. What is the jobless rate, percentage-wise, in your constituency?

Mr. RUSH. Madam Chair, I thank you for that question. Let me just say the published rate is about 16 percent. That is the published rate. Now, the real rates are more like about 30, 35 percent.

And that is just the ones who are considered unemployed and the ones who might be eligible for unemployment benefits. Those who have dropped out of the job market, I mean totally dropped out, then you would probably say it is somewhere around about 45 percent. If you want to include young people, then it is over 50 percent.

So, I mean, if you are talking about a depression, I am not sure how the economists, how they identify employment of a depression, but I would just say that most of my district is beneath whatever the parameters in my district.

Ms. WATSON. These are depressed areas.

Mr. RUSH. Yes.

Ms. WATSON. In listening very closely to what you see as a remedy, I think it goes to the basis that the agency that was established to see that we had eligibility requirements that could be met by minority businesses is underfunded.

Mr. RUSH. Absolutely underfunded. And that is the foundation for the problem, that it is underfunded.

Ms. WATSON. So it really becomes a fiscal problem for us to see that we share with this agency a justifiable amount so that we can increase minority contract and put the people back to work. Is that a statement that would be verified by your bill?

Mr. RUSH. Madam Chairman, yes, it would be. It would be. And if we just want to look at, if we just extrapolate for one moment, if we invest in the beginning, at the outset, if we invest in minority businesses, invest in this agency, then the same—American taxpayer on the other end would mean 100 times greater, because if you invest in creating businesses, in creating jobs, and then your investment in the social program and the citizens.

That investment on the back end would be less if we invest in a robust minority business program in order to help create jobs. By definition, jobs is still the standard for being productive in this society. Jobs are still the creator of the American dream and of the American economy. The real stimulus program that I think we need now is to disseminate minority businesses so that minority businesses can do its rightful and natural function of creating jobs for the American people.

Ms. WATSON. Thank you.

I will now yield to Mr. Bilbray.

Mr. BILBRAY. Congressman, thank you for your kind words. Let me just say, as somebody who was born and raised in a working class neighborhood, one of the things that has frustrated me so often is, first of all, a lot of people come into our communities that are distressed and see the unemployment, see the redlining.

I still remember this one company, this one bank that I caught when I was mayor of a small town and said that the 7-Eleven being built in my community, built at half the revenue and be twice as expensive as the same 7-Eleven being built in another community. Now, I can understand half the revenue or reduced revenue because of our economic situation, but twice as expensive? So that tricky little game you get into.

So I have seen that and I am concerned that we approach, many times, what we think is the problem is a symptom of deeper prob-

lems, and we see things in isolation; we go in and say this unemployment is the problem, but in reality there is a bigger problem.

One thing that I really want us to concentrate on is that the minority community does not operate in the business community in isolation; it is part of a broader network. Wouldn't you agree that if you were breaking down the businesses into three categories, large, medium, and small, there are very few minority-owned businesses in the large category? Big business tends to be exclusive. Medium you have some, but not much.

But the overwhelming majority of minority-owned and disadvantaged is in the small category. And I think we have to understand that a lot of these barriers appear to be just race-based or social-economic, but, in reality, because of the way systems, especially in the Government, is operated, we favor the big guy so much that indirectly there is a discrimination that not only is based on the color of your skin but, more importantly, by the volume of your pocketbook And it happens that the minority and disadvantaged community tends to fall into that category, along with other groups.

Have you looked at the fact that one of the biggest problems we have with this program is we tend to put the weight on that middle ground? That if you want to qualify, you must qualify to be one of those medium sized businesses, the initial hit. But if you are one of the smaller guys, you are not big enough to compete for those contracts; you are not able to fulfill those requirements; and the system tends to say, we don't care, medium guy, if all of your subcontractors are disadvantaged, we want you to be disadvantaged. So you don't have the incubator process.

I mean, let's face it, the great majority of these non-minority businesses were not born big, were not born even medium; they grew from the small. But the incubator concept tends to be stifled right now when I look at Federal contracting.

In fact, one of the biggest problems we have, I think, with fraud in the system is that a lot of middle and big business are creating the fraud to get this advantage, where the true disadvantaged business people are not gaining access because they are too small to compete in the existing Federal program, they are not big enough to be able to play the game and, thus, they de facto are cut out not because of who they are, but because of the size they are. But the result is the same, exactly the same.

Mr. RUSH. Mr. Bilbray, let me just say this. It seems to me that the problem that you are addressing, first of all, small businesses employ the majority of the American people across the board. Firms that employ less than 500 people are the main employers of the American people; not major corporations, it is the small businesses. And what I think, I do think that there is a fallacy and there is a fault line with, Federal Government, because they do favor large corporations.

And I think that addresses why there is such a need for the MBDA, because we have to change the thinking pattern, the mindset of the Federal procurement community so that they will go out of their way, rather than discriminating against small businesses, that they will switch the paradigm and—that small businesses should be a premium, should be the priority for Federal procurement.

Now, it might be cumbersome in one extent, maybe in terms of the bureaucracy or paperwork, but in this age of computerization and technological innovation, I think that we are living in a new world, and I don't think the same competitiveness that existed 10, 20 years ago exists now in terms of how you manage having more contracts broken down, you know, smaller contracts, and thereby inviting more and more businesses.

Mr. BILBRAY. Let me kind of reinforce. One of the problems we have now is that if you have that middle business size, put a bid in, they do not get credit for the fact that all of their subcontractors, or a large percentage of the subcontractors, may be disadvantaged businesses.

So what happens is there is not the incentive to help incubate and grow the small into the medium to where you have the ability to compete in there. It is like we look at whoever is the bidder and we don't look at where their supply chain is. And you and I know, from the employment point of view, just from the workers in your district, if they are hired by a subcontractor who is doing the Government project, that is just as good a job as if they are hired by the guy who got the contract originally.

But we are not, right now, giving any credit to those middlemen, the guys who are getting the bid, of literally incorporating the small guy into it and making a special effort to go out and get those disadvantaged businesses into their proposal; and I really think that there is a real missing link to build this foundation.

This kind of economic prosperity doesn't happen overnight. It is not just a political and a Government thing, it is a cultural thing of people getting in the habit of giving people a chance to bid and compete, and rewarding them for taking the effort to go do that. Right now I run into situations of frustration where a lot of guys are telling me I don't even get credit if I go out and recruit this on a lot of these contracts, and I think that is one of the things we have to be frank and open about.

Just because it appears that we are playing a game by setting aside, the outcome doesn't reflect reality, and the outcome proves to us what we have been doing traditionally is not doing it right. And I think we should be willing to shake it up a little bit and try these new things of saying if you have a contractor who has done that outreach into the minority community and got subcontractors, he should get credit and be reflected in a benefit to him for going out and recruiting and incorporating and integrating those subcontractors into the process and empowering the disadvantaged businesses to start growing. And I think that is a critical component. I know it sounds like an abstract, but if we are going to create the jobs, you have to change the system.

Mr. RUSH. Mr. Bilbray, let's shake, rattle, and roll.

Ms. WATSON. I would like to introduce one of our colleagues, Judy Chu, of California, for sitting in with us this morning. You probably didn't hear the opening statement, but I know that you understand the subject matter. Would you like to make a comment?

Ms. CHU. I am just happy to be here to pursue the issue of improving our minority contracting opportunities, and I am glad to

hear the testimony, and I certainly support Congressmember Rush's efforts in doing so.

Ms. WATSON. Thank you so much for joining us this morning.

And thank you, Bobby Rush, for being consistent and staying on us until we had this hearing. We appreciate it so much.

Mr. RUSH. Thank you very much.

Ms. WATSON. This will conclude the testimony for Congressman Rush. Thank you again.

Mr. RUSH. Thank you so much.

Ms. WATSON. I would like to invite our second panel. But before you come up will staff bring the chairs back? We will call up the second panel that is composed of David Hinson, the Honorable Marie C. Johns, Mr. Jiyoung Park, Linda Oliver, and Brandon Neal.

[Pause.]

Ms. WATSON. It is the policy of the Committee on Oversight and Government Reform to swear in all witnesses before you testify, and I would like to ask you to please stand and raise your right hands.

[Witnesses sworn.]

Ms. WATSON. With that, you may be seated, and let the record reflect that the witnesses answered in the affirmative.

I will now introduce each one of you.

Mr. David Hinson is the Director of the Minority Business Development Agency at the Department of Commerce. Mr. Hinson oversees five regional offices and a network of 48 minority business centers that provide services to promote the growth and competitiveness of minority businesses. Prior to this position, Mr. Hinson was president and CEO of the Wealth Management Network, Inc., a multimillion dollar independent financial advisory boutique. He also managed a 10-State sales region as director of advisory services for Investnet Asset Management, a $70 billion financial advisory firm.

Ms. Marie Johns serves as the Deputy Administrator of the Small Business Administration. Prior to her appointment, Ms. Johns was the managing member of L&L Consulting, LLC, and she is also past president of Verizon in Washington, DC. At Verizon, Ms. Johns was responsible for 2,000 employees and over 800 customers, including many of the small businesses.

Ms. Jiyoung Park serves as the Associate Administrator for Small Business Utilization at the General Services Administration, where she oversees the agency's small business policies and programs. Previously, Ms. Park worked at Touchstone Consulting, where she managed communications strategy and program management efforts for the U.S. Agency for International Development and National Science Foundation and the Small Business Administration.

Ms. Linda Oliver is the Acting Director of the Office of Small Business Programs at the Department of Defense, where she implements DOD policies that encourage the Department to provide opportunities for small businesses to successfully compete for small business contracts.

And, finally, Mr. Brandon Neal is the Director of the Office of Small and Disadvantaged Business Utilization at the Department

of Transportation, where he advises the Secretary of Transportation on opportunities for small and disadvantaged businesses to participate in the Department's contracting process. Prior to this position, Mr. Neal worked as a financial director for African-American affairs with Obama for America, and he also worked for the Democratic Governors Association as deputy political director and later as director of extended affairs.

I ask that each one of the witnesses of the panel now give a brief summary of their testimony and keep their summary under 5 minutes in duration, and I know you can do that, because your complete written statement will be included in the hearing record. So I would like to start with Mr. Hinson. Please proceed.

**STATEMENTS OF DAVID HINSON, DIRECTOR, MINORITY BUSINESS DEVELOPMENT AGENCY, U.S. DEPARTMENT OF COMMERCE; MARIE C. JOHNS, DEPUTY ADMINISTRATOR, U.S. SMALL BUSINESS ADMINISTRATION; JIYOUNG PARK, ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS UTILIZATION, GENERAL SERVICES ADMINISTRATION; LINDA OLIVER, ACTING DIRECTOR, OFFICE OF SMALL BUSINESS PROGRAMS, U.S. DEPARTMENT OF DEFENSE; AND BRANDON NEAL, DIRECTOR, OFFICE OF SMALL AND DISADVANTAGED BUSINESS UTILIZATION, U.S. DEPARTMENT OF TRANSPORTATION**

**STATEMENT OF DAVID HINSON**

Mr. HINSON. Chairwoman Watson, Member Bilbray, and members of the subcommittee, thank you for inviting the Minority Business Development Agency to appear before this subcommittee. I request that my entire written statement, including attachments, be entered into the official hearing record.

For over 40 years, MBDA has been working aggressively to expand the economic footprint of minority business enterprises [MBEs]. At the time of the Agency's creation in 1969, there were approximately 322,000 MBEs that generated $10.6 billion in annual gross receipts. Today, according to the recently released numbers by the U.S. Census Bureau, the number of MBEs stands at 5.8 million, generating $1 trillion in gross receipts. However, while the recent numbers are encouraging, there is still work left to be done.

Discriminatory barriers continue to persist which impede the ability of MBEs to access the Federal marketplace on an equal footing with non-minority-owned and operated businesses. I am submitting for the record as Attachment A to my testimony a document entitled The Compelling Interest for Race and Gender Conscious Federal Contracting Programs, which details these barriers, as well as a number of disparity studies. MBDA is working to eliminate these barriers, acting as both an advocate and facilitator for minority-owned firms seeking to gain greater access to the marketplace, including, but not limited to, procurement opportunities with the Federal Government.

A great deal of work takes place in MBDA business centers located across the country and in Puerto Rico. The centers provide technical assistance to improve MBE competitiveness at securing both public and private contracts, in addition to promoting joint

ventures and teaming arrangements as we recognize some contracts are too large for one firm to compete for alone. In fiscal year 2009, MBDA helped generate $2.2 billion in contracts and helped create 3,858 new jobs. This exceeds the Agency's fiscal year 2009 goals of $900 million in contracts and 3,000 new jobs. We expect to surpass our 2009 performance in fiscal year 2010.

MBDA also works to match MBEs with contracting opportunities that fit each firm's profile and capabilities. Two of the more prominent methods are our business-to-business linkage form and the Phoenix-Opportunity Data base. MBDA hosts B2Bs throughout the year, matching MBEs with the public and private contracts ready to be let. During the B2B, MBEs have an opportunity to meet one-on-one with interested contract officers from all levels of the Government and the private sector to examine the possibility of doing business together. For example, at this year's National Minority Enterprise Development Week Conference, MBDA presented more than $30 billion in public and private sector forecasted contract opportunities.

The Phoenix-Opportunity Data base, which is linked to FedBizOpps, helps to connect MBEs with available contracting opportunities. Using this system, MBEs input their profiles into the system accessible on the MBDA Web site. Contracting officers throughout the Federal, State, and local government can use this system to upload notices of their Federal contracts into the MBDA Opportunity data base. The system then matches each opportunity with MBEs meeting the requirements of the solicitation.

The lack of access to capital has often inhibited the ability of MBEs to compete for Federal contracts. In January 2010, MBDA released a report titled Disparities in Capital Access Between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs. This report, which examines the issue of capital access, accompanies my testimony as Attachment B.

Capital, in the form of surety bonds, is required for Federal construction contracts. However, as credit markets tighten, obtaining bonding has become even more difficult. MBDA is working on a Surety Bonding Initiative to alleviate this problem and help MBEs secure the bonding needed to meet the requirements of Federal contracts.

On April 26th of this year, President Obama established the Interagency Task Force on Federal Contracting Opportunities for Small Businesses, of which MBDA was a member. The Task Force was charged with providing recommendations to the President to help ensure that small businesses, including minority-owned businesses, have fair access to Federal contracting dollars. These recommendations include addressing the issue of contract bundling, subcontract planning, and identifying ways to increase small business utilization in prime contracting. MBDA was honored to serve on this Task Force and work with our colleagues to implement the recommendations put forth.

So in conclusion, MBDA will continue to take an active role in eliminating barriers faced by MBEs in our Federal marketplace. MBDA is creating a Government Contracting Unit under our Office of Business Development. This Unit will be comprised of experts fo-

cusing on assisting minority-owned firms in accessing contracting opportunities. We anticipate having this Unit operational in the near future.

Also, the Agency is working closely with Secretary Locke in establishing a National Advisory Council on Minority Business Enterprise to advise the administration on issues pertaining to the growth in minority-owned firms, including access to Federal contracts.

MBEs are a critical part of this country's economic infrastructure, and it in Federal contracting that many will find avenues for growth. MBDA looks forward to working with Congress to help create more entry points into the Federal marketplace for MBEs. Thank you, and I look forward to your questions.

[The prepared statement of Mr. Hinson follows:]

18

U.S. DEPARTMENT OF COMMERCE
MBDA
MINORITY BUSINESS DEVELOPMENT AGENCY

**WRITTEN TESTIMONY OF**
**DAVID A. HINSON, NATIONAL DIRECTOR**
**MINORITY BUSINESS DEVELOPMENT AGENCY,**
**U.S. DEPARTMENT OF COMMERCE**

Before the U.S. House Committee on Oversight and Government Reform

Subcommittee on Government Management, Organization, and Procurement

September 22nd, 2010

Chairwoman Watson, Ranking Member Bilbray, and Members of the Subcommittee:

Thank you for inviting the Minority Business Development Agency (MBDA) to appear before the Subcommittee to discuss the important issues surrounding minority contracting opportunities in the federal marketplace. I request that my entire written statement, including the attachments, be entered into the official hearing record.

**I. Overview**

MBDA has been in existence for over forty years, originally established as the Office of Minority Business Enterprise by President Nixon on March 5, 1969, pursuant to Executive Order 11458. On October 13, 1971, President Nixon issued Executive Order 11625, as amended, which clarified the Agency's authority and expanded the scope of its operations. MBDA is the sole federal agency dedicated exclusively to promoting equal economic opportunities for the nation's minority business enterprises (MBEs) and accomplishes its mission through programs and activities designed to foster MBE growth and global competitiveness. Today, MBDA continues as the sole federal agency dedicated to fostering minority business growth and global competitiveness.

By establishing a federal agency dedicated exclusively to promoting equal economic opportunities for MBEs, President Nixon recognized the crucial impact of minority businesses on the nation's economy. In 1969, there were approximately 322,000 minority businesses generating $10.6 billion in annual gross receipts.[1] More recently, according to the preliminary findings of the *2007 Survey of Business Owners,* there were about 5.8 million minority-owned firms.[2] These firms employed approximately 5.9 million persons and generated approximately $1 trillion in total gross receipts for the national economy.[3]

It is this potential for continued growth that mandates a positive regulatory and political climate in which MBEs can flourish. Based on U.S. Census Bureau data, minorities represented approximately 35 percent of the total U.S. population in 2009.[4] It is estimated that by 2050 minorities will represent approximately 54 percent of the total U.S. population.[5] With those estimates, ensuring that minority-owned firms are given equal economic opportunities to participate in the domestic and global marketplaces is an imperative. I would also like to point out that if minority-owned firms were to able to

---

[1] U.S. Department of Commerce, U.S. Census Bureau, *Minority-Owned Businesses: 1969* (Washington, DC: US Government Printing Office, 1971).

[2] U.S. Department of Commerce, U.S. Census Bureau, 2007 Survey of Business Owners, Preliminary Estimates of Business Ownership by Gender, Ethnicity, Race and Veteran Status, 2010 (accessed July 20, 2010); available from http://www.census.gov/econ/sbo/.)

[3] Ibid

[4] U.S. Department of Commerce, U.S. Census Bureau, Table 3. Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States: April 1, 2000 to July 1, 2009 (NC-EST2009-03), 2010 (accessed June 23, 2010); available from www.census.gov.

[5] U.S. Department of Commerce, U.S. Census Bureau, *An Older and More Diverse Nation by Midcentury* (Press Release), 2008; available from www.census.gov

generate total gross receipts in relation to the adult minority population in 2007, which represented 13 percent that year, such firms would have enjoyed an estimated additional $2.4 trillion in annual gross receipts.[6] MBDA defines entrepreneurial parity as reaching proportionality between the adult minority population and business development measures such as numbers of firms, gross receipts and employees of Classifiable firms (excludes publicly held).

Moreover, MBEs have the potential to have a major impact in the global marketplace as they are twice as likely to generate sales through exports as non-minority firms.[7] More than 70 percent of the world's purchasing power and 95 percent of its population is beyond US borders.[8] With their ability to break down cultural and linguistic barriers, minority-owned firms can lead the way to tapping global markets and aid in reducing the U.S. trade deficit.

However, while the recent Census numbers show overall growth and expansion for minority firms, there is still work left to be done. The average gross receipts of minority-owned firms increased to just over $178,000 in 2007 from $167,000 in 2002, but still well below the gross receipts for non-minority-owned firms which had average gross receipts of $490,000 in 2007[9] and $439,000 in 2002.[10]

Furthermore, discriminatory barriers continue to persist, which impede the ability of MBEs to access the marketplace on fair and equal footing with non-minority-owned businesses; thus, preventing MBEs from realizing their full economic potential. I am submitting for the record, as Attachment A to my testimony, a document entitled *The Compelling Interest for Race- and Gender Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority and Women-Owned Businesses*, along with a disk that contains all of the disparity and academic studies referenced in that document. The *Compelling Interest* document was compiled by the Department of Justice with input from SBA, the Department of Commerce, the Department of Transportation, the Department of Defense, and other federal agencies, and was previously submitted to the Senate Small Business and Entrepreneurship Committee by SBA on June 2, 2010. The study and appendix

---

[6] U.S. Department of Commerce, Minority Business Development Agency (MBDA) analysis of data from the 2007 Survey of Business Owners and Population Estimates, both from the U.S. Census Bureau. (Accessed September 20, 2010; available from http://www.mbda.gov/sites/default/files/MinorityBusinessGrowthandGlobalReach.pdf)

[7] U.S. Department of Commerce, Minority Business Development Agency, *Characteristics of Minority Businesses and Entrepreneurs* (2008), available from http://www.mbda.gov/index.php?section_id=6&bucket_id=16#bucket_120

[8] U.S. Department of Commerce, MBDA, Characteristics of Minority Businesses and Entrepreneurs, An Analysis of the 2002 Survey of Business Owners (March 2008)

[9] U.S. Department of Commerce, Minority Business Development Agency (MBDA), *Minority-Owned Businesses Growing at Twice the National Average* (Press release), 2010, available from www.mbda.gov

[10] U.S. Department of Commerce, U.S. Census Bureau, 2002 Survey of Business Owners, 2007 (Accessed July 20, 2010); available from http://www.census.gov/econ/sbo/.)

reference 75 recent disparity studies from 33 states and regions detailing the local effects of discrimination on minority and female contractors. Nearly all of these disparity studies and reports have already been submitted to Congress over the last several years. The *Compelling Interest* document also refers to quite a few congressional hearings held over the past several years that explore the existing barriers to the ability of disadvantaged businesses to compete equally for federal contracts. It also reviewed nearly 40 academic articles investigating and detailing the various sources and effects of the discrimination. This document, which is a thorough discussion of some of the extensive body of evidence generated in the last decade which has already been placed before the Congress, clearly shows that discriminatory barriers continue to impede the ability of minority and women-owned businesses to compete with other firms on a fair and equal footing in government contracting markets. Indeed, significant discrimination, in arenas such as access to capital and employment, limits the formation of these businesses in the first instance.

Though MBDA is not a regulatory or enforcement agency, the Agency plays an active role in the federal marketplace. We are working to eliminate these barriers acting as both an advocate and facilitator for minority-owned firms seeking to gain greater access to the marketplace, including but not limited to procurement, grant and other opportunities with the Federal Government.

**II. <u>MBDA and the Federal Marketplace</u>**

A great deal of our work on behalf of MBEs takes place in the 46 MBDA minority business centers located across the country and in Puerto Rico. Each center provides MBEs with a wide range of business consulting services to assist in the growth and competitiveness of MBE firms. On the contracting front, our centers provide technical assistance to improve MBE competitiveness at securing both public and private contracts in addition to promoting joint ventures and teaming arrangements as we recognize some contracts are simply too large for one firm to compete for alone. The professional business consultants who staff MBDA centers work to keep MBEs abreast of state and federal contracting opportunities in the pipeline. We currently have two centers in the Los Angeles area that service a number of the Chairwoman's constituents. In calendar year 2009, these two centers assisted in the generation of over $116 million in contracts for MBEs and the creation of 292 new jobs. As a whole, in FY 2009, MBDA helped generate $2.2 billion in contracts and helped create 3,858 new jobs. MBDA's performance far and away exceeds The Agency's FY 2009 goals of $900 million in contracts and 3,000 new jobs created.

MBDA works to match MBEs with contracting opportunities that fit each firm's profile and capabilities. This is accomplished through a number of ways but two of the more prominent are our Business-to-Business (B2B) Linkage Forums and our online Phoenix-Opportunity Database. MBDA hosts B2Bs throughout the year and across the country aimed at matching MBEs with both public and private contracts ready to be let. During the B2Bs, MBEs have an opportunity to meet one-on-one with interested contract officers from all levels of government and the private sector across industry sectors to examine the possibility of doing business together. For example, at this year's National Minority Enterprise Development Week Conference held last month

here in Washington, DC, MBDA presented more than $30 billion in public and private sector forecasted contract opportunities. Our B2B sessions also seek to match MBEs with prime contractors holding federal contracts looking for potential subcontractors.

The online Phoenix-Opportunity Database, which is linked to FedBizOpps, helps to match MBEs registered with MBDA to available public and private sector contracting opportunities. Using this system, MBEs input their profiles into the system accessible on the MBDA website (www.mbda.gov). Contracting officers throughout the Federal, state, and local Government as well private sector procurement officers can use this system to upload notices of their contract opportunities into the MBDA Opportunity database. The system then matches each contract opportunity with MBEs meeting the requirements of the solicitation. After a match is made, the system generates an e-mail notification to each of the matched minority companies. This notice will provide the MBEs with all of the relevant information including: name and contact information for the contracting officer, a brief description of the project, and the open/close dates. Another e-mail containing a list of the matched MBEs is sent to the contracting officer. Presently, MBDA has over 77,000 registered users of the system with over 14,000 opportunity companies including private sector, state, and federal organizations.

MBDA also works with MBEs to secure critical financing needed to grow and perform on awarded contracts. The lack of access to capital has long plagued MBEs and often inhibited their ability to compete for federal contracts. In January of 2010, MBDA released a report, *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: the Troubling Reality of Capital Limitations Faced by MBEs*. This report accompanies my testimony as Attachment B. Some of the key findings of the report include:

1. Minority-owned firms are less likely to receive loans than non-minority owned firms regardless of firm size. According to an analysis of data from the Survey of Small Business Finances, for firms with gross receipts over $500,000, 52 percent of non-minority-owned firms received loans compared to 41 percent of minority-owned firms. [11]
2. When minority-owned firms do receive financing, it is for less money and at a higher interest rate than non-minority-owned firms regardless of the size of the firm. Minority-owned firms paid an average of 7.8 percent in interest rates for loans compared to 6.4 percent for non-minority-owned firms. Among firms with gross receipts under $500,000, minority-owned firms paid an average of 9.1 percent in interest rates compared to 6.9 percent for non-minority-owned firms. [12]
3. Minority-owned firms receive smaller equity investments than non-minority owned firms even when controlling for firm size, yet venture capital funds focused on investing in the minority business community are highly competitive. The average amount of new equity investments

[11] U.S. Department of Commerce, Minority Business Development Agency, *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs* (2010)
[12] Ibid

in minority-owned firms receiving equity is 43 percent of the average of new equity investments in non-minority-owned firms. [13]

Federal construction contracts are a major source of revenue for many construction firms -- minority and non-minority alike. Capital in the form of surety bonds is required for federal construction contracts. However as credit markets tighten and minority-owned firms continue to face the barriers outlined above, obtaining the necessary bonding has become even more difficult for most and impossible for some. If an MBE cannot secure the requisite bonding, they lose contracts otherwise awarded on merit. MBDA has taken an aggressive approach on this issue. Last year MBDA was able to help MBEs access approximately $800 million in working capital, equity investments, and bonding. This year, MBDA is working on a Surety Bonding Initiative with a goal of identifying over $100 million in private capital through a public/private partnership and to eventually grow that capacity to over $1 billion over time.

On April 26th of this year, President Obama issued a memorandum establishing the Interagency Task Force on Federal Contracting Opportunities for Small Businesses[14] which MBDA, along with my colleagues on this panel, is a part of. The Task Force is charged with providing proposals and recommendations to the President to help ensure that small businesses, including businesses owned by minorities, women socially and economically disadvantaged individuals and service-disabled veterans, have fair access to federal contracting dollars. These recommendations included addressing the issues of contract bundling, strengthening small business subcontracting plans, and identifying ways to increase small business utilization in prime contracting. MBDA was honored to serve on this task force and we will continue to work with our federal colleagues to implement the recommendations put forth.

**III. <u>ARRA-related Activities</u>**

On February 17, 2009, the American Recovery and Reinvestment Act of 2009, Public Law 111-5 (ARRA), was signed into law by President Obama. This bill provided $787 billion in spending and tax cuts to stimulate the economy. Though MBDA did not receive any ARRA funds, the Agency continues to play an active role in facilitating ARRA procurement and grant opportunities for MBEs.

President Obama, Vice President Biden, and Commerce Secretary Gary Locke have all taken an intense interest in ARRA contracting opportunities. The President and the Vice President tasked the Department of Commerce (DOC), along with the Small Business Administration (SBA) with leading the government's effort to ensure minority-owned and small businesses have equal opportunities to participate in ARRA funding both at the federal and state levels. For its part, MBDA used its network of 46 centers to guide MBEs into the arena. We continue to provide our usual range of services in addition to now conducting numerous networking and educational outreach events across the country to bring together MBEs and agencies that have received ARRA funds on all levels of government. MBDA centers have conducted and/or participated in over 115 events reaching approximately 28,000 people with a majority being

---

[13] Ibid
[14] *See* 75 FR 22499 (April 29, 2010).

minority businesses and minority business stakeholders. Recognizing that a great deal of ARRA funding has gone to projects on state and local levels, MBDA regional offices and local centers have been working diligently to build relationships with relevant contracting officials on those levels in every state.

The efforts of MBDA centers to increase minority participation have yielded significant results. I would like to share an ARRA success story from one of our centers located in South Carolina. Brix Stone, LLC, an African-American-owned development firm based in Columbia, SC, sought and received matchmaking assistance from our South Carolina minority business center. With this assistance, Brix Stone was able to successfully enter into a mentor-protégé agreement with the City of Columbia and ultimately received a contract award worth $10 million in ARRA funds via the Columbia Housing Authority. As a result of this award 30 new jobs were created.

To expand our outreach efforts in support of ARRA, last year MBDA redirected $900K of its FY 2009 appropriation to fund augmentation grants to seven minority business centers. These included our centers in Philadelphia, Detroit, New Orleans, Mesa, Bismarck, Raleigh-Durham, and San Jose. The grants were generally used to hire expert consultants to provide advocacy, partnership development, networking, and other services to minority-owned firms specifically on ARRA opportunities.

In an effort to address concerns voiced over the lack of transparency in the procurement process, MBDA developed a customized suite of technology products to track federal prime and sub- recipient contract and grant data with emphasis on ARRA transactions. This unprecedented proprietary system, titled the MBDA National Tracking System (NTS), is the first Federal system of its type. It allows MBDA to track government contracts and grants obtained by MBEs at Federal, state and local levels. The MBDA NTS heeds the President's call for greater transparency and efficiency throughout government and DOC leadership's call for greater innovation.

**IV. <u>Conclusion</u>**

Looking ahead, I can assure this Subcommittee that MBDA will continue to take an active role in eliminating discriminatory and other barriers faced by MBEs and in facilitating equal economic opportunities for MBEs in the domestic and global marketplaces, including but not limited to federal procurements. MBDA to this end is creating a Government Contracting Unit under its Office of Business Development. This new unit will be comprised of experts in government contracting specifically focused on assisting minority-owned firms access federal, state and local contracting opportunities. We anticipate having this unit fully operational in the very near future.

In addition, on August 10, 2010, MBDA launched the Global Construction Program for Minority Contractors (GCP), together with the Tutor-Perini Corporation, the Department of Commerce's International Trade Administration (ITA), the University of Southern California, Ralph Moore & Associates and Next Level Diversity Consulting LLC. This historic public-private partnership is designed to assist MBEs navigate the international marketplace as it relates to competing for construction contracts. Through the GCP, three classes of 50 participants each will receive training tailored

specifically to contracting on international federal projects, thereby positioning them to successfully compete for construction contracts, including an estimated $1 billion (or more) in contract opportunities from the Tutor-Perini Corporation over the next four years.

As I mentioned at the onset of my testimony, MBDA has a mission of fostering the growth and global competitiveness of the nation's MBEs. Unlike the SBA, we work with MBEs of all sizes and not just MBEs that are deemed "small" under the applicable SBA size standards. Our goal is help create a new generation of MBEs capable of doing $100 million in revenue per year. If this goal is obtained, more MBEs would be capable of seeking federal dollars not as subcontractors, as so many are now, but as primes. However, even if there is only a ten percent increase in both the number of MBEs and the average number of employees per firm, we will have assisted in the creation of one million new jobs.[15]

MBEs are a critical part of this country's economic infrastructure and it is in federal contracting dollars that many will find avenues for growth and continued existence and future growth. MBDA looks forward to working with Congress to help create more entry points into the federal marketplace for MBEs. I would like to again thank Chairwoman Watson, Ranking Member Bilbray, and the entire subcommittee for allowing MBDA to appear before you today and look forward to answering any questions you may have.

[15] Fairle, Robert, *Race and Entrepreneurial Success: Black-, Asian-, and White-Owned Businesses in the United States* (Cambridge, MA: MIT Press, 2008) at page 176.

**List of Attachments**

Attachment A: *The Compelling Interest for Race- and Gender Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority and Women-Owned Businesses*, along with a disk that contains all of the disparity and academic studies referenced in that document.

Attachment B: U.S. Department of Commerce, Minority Business Development Agency, *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs* (2010).

Ms. WATSON. Thank you so much, Mr. Hinson.

Ms. Johns, you may proceed.

**STATEMENT OF MARIE C. JOHNS**

Ms. JOHNS. Thank you, Chairwoman Watson, Ranking Member Bilbray, members of the subcommittee. I am honored to testify on this very important topic and I am honored to be in my role for a little over 2½ months now as the Deputy Administrator at the Small Business Administration.

Minority business is something that I care deeply about, and it goes back to my family roots. My grandfather was a pioneering small business person in my home State of Indiana, my father, uncles have been in small business ownership as well, so I have seen firsthand the hard work, the commitment that it takes to own a business, and how important business ownership is to minority communities. So I am eager to work with you all and this subcommittee to hear your questions and to discuss how we best support minority small businesses.

In these tough economic times, minority-owned small businesses have been especially hard hit. According to a study by the SBA's Office of Advocacy, on average, minority-owned firms have lower receipts and fewer employees, and are less likely to have access to capital than non-minority-owned firms. Minorities are 32 percent of the population, but make up 18 percent of business ownership.

Meanwhile, for every dollar earned by a white-owned firm, Pacific Islander-owned firms made about 59 cents; Hispanic, Native American, and Asian firms made about 56 cents; and African-American-owned businesses made 43 cents. And, finally, survival rates of minority firms are significantly lower than those of white firms.

Knowing this, it is clear that we must do all we can to support minority-owned businesses in a comprehensive way. Certainly, Federal procurement is a part of that, but also through increased access to capital and increased opportunities for technical assistance and counseling as well.

As you know, Congress sets the goal of awarding 23 percent of all Federal contracting dollars to small businesses. Congress also created goals for women-owned business, service disabled veteran-owned small business, businesses in HUBZones, and socially and economically disadvantaged businesses [SDBs], which includes many of our minority firms. These goals, especially the SDB goal, reflect the capacity of minority-owned small businesses and help the Government to ensure that these companies have the opportunity to compete for and to win Federal contracts.

We are proud that in fiscal year 2009, 7½ percent of contracts, or over $7 billion, went to SDBs. The 7½ percent exceeds the statutory goal of 5 percent. SDBs have also been successful in winning Recovery Act contracts. So far, nearly 12 percent of Recovery Act contracts, or $3.7 billion, has gone to SDBs.

Moreover, SBA has programs in place that expand businesses' capacity, including minority-owned businesses, so that they can compete for and win Government contracts, and chief among these are the 8(a) program. The 8(a) program is a 9-year business development program for socially and economically disadvantaged busi-

nesses, the majority of which are minority owned. Participants receive business development, technical assistance, and the chance to work alongside larger firms in a mentor-protege relationship.

The 8(a) program has helped thousands of businesses across the country. I would like to cite a couple of examples. In Jacksonville, Florida, A. Harold and Associates provides training, tech support, and project management for clients across the country. Owner, Andy Harold, created 24 new jobs after enrolling in the 8(a) program.

In Los Angeles, J&P Construction saw their sales increase tenfold since entering the 8(a) program. The company recently graduated from the program and has agreed to come back as a mentor for new 8(a) firms.

But, of course, despite the success of the 8(a) program, we have more work to do. Recently, our agency undertook the first ever comprehensive review of the 8(a) program, strengthening the rules to ensure that the benefits of the program flow to the businesses that need them, and we are very close to implementing these recommendations.

Furthermore, SBA has made strong, robust oversight a top priority. We are working to root out fraud, waste, and abuse in our certification program for the three-step process: improving certification, strengthening our monitoring and oversight, and increasing enforcement.

In addition, the President's Task Force on Government Contracting came back with a number of concrete actionable recommendations to address the challenges and barriers to success for small businesses seeking Federal contracts, and many of my colleagues on this morning's panel lent their expertise to that very important effort. I want to thank my colleagues, Director Hinson, Associate Administrator Park, Acting Director Oliver, and Director Neal, all of whom were involved in that very important effort.

It is clear that this commitment to small business contracting spans the entire Federal Government. The Task Force identified three main areas of focus: to develop clearer and more comprehensive policies, provide a better trained Federal contracting work force, and to improve and better leverage technology. And this fall the SBA will be announcing its Advisory Council on Underserved Communities. I am excited to be leading this effort and our purpose will be working to develop strategies to promote business growth and entrepreneurship in traditionally underserved areas.

Finally, minority contractors will be helped by resolving the issue of parity. A current court decision would give HUBZone businesses preferences above other set-aside programs, potentially redirecting millions of dollars away from 8(a) businesses.

In closing, let me assure you that everyone at SBA is aware of the need to support minority businesses. We are proud of the programs we have in place, but we must work diligently and continue to improve. And I am looking forward to working with this committee and with Congress as a whole in partnership to enhance the tools that we provide currently and to continue to develop new ones as we go forward. Thank you.

[The prepared statement of Ms. Johns follows:]

U.S. SMALL BUSINESS ADMINISTRATION

WASHINGTON, D.C. 20416

**Testimony of Marie C. Johns**
**Deputy Administrator**
**U.S. Small Business Administration**

**Before the**

**Subcommittee on Government Management, Organization, and Procurement**
**Oversight and Government Reform Committee**

***"Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses"***

**September 22, 2010**

Good morning.

Thank you, Chairwoman Watson, Ranking Member Bilbray, and the other members of this subcommittee. I'm honored to be testifying on this important topic.

Minority business ownership is something I am deeply passionate about. I grew up in a small business family. Years ago, my grandfather started a landscaping business in Indiana, and he helped my uncle start his own business. So I've seen firsthand what it takes to own a business, and how important business ownership is to minority communities.

I am eager to work with you and this committee, to hear your questions and discuss how we can best support minority-owned small businesses.

In these tough economic times, minority-owned small businesses have been especially hard hit. According to a study by SBA's Office of Advocacy, on average, minority-owned firms have lower receipts and fewer employees, and are less likely to have access to capital than non-minority-owned firms.[1] It is essential that we do all we can to support minority-owned small businesses in a comprehensive way, not just through federal procurement but through increased access to capital and more counseling options as well.

As you know, Congress set the goal of awarding 23 percent of all federal contracting dollars to small businesses. Congress also created goals for women owned businesses, service-disable veteran-owned small businesses, businesses in HUBZones, and socially and economically disadvantaged businesses, also known as SDBs, which include many of our minority firms.

---

[1] Office of Advocacy, U.S. Small Business Administration. *Minorities in Business: A Demographic Review of Minority Business Ownership*. April 10, 2007. http://www.sba.gov/advo/research/rs298tot.pdf

These goals—especially the SDB goal—reflect the capacity of minority-owned small businesses and help the government to ensure that these companies receive a fair share of federal contracting opportunities.

We are proud that in Fiscal Year 2009, 7.5 percent of contracts, or over 7 billion dollars, went to SDBs. The 7.5 percent exceeds the statutory goal of 5 percent. SDBs have also been successful in winning Recovery Act contracts. So far, nearly 12 percent of Recovery Act contracts, or 3.7 billion dollars, has gone to SDBs.

Moreover, SBA has programs in place that expand businesses' capacity—including minority-owned businesses—so they can compete for and win government contracts. Chief among these is 8(a). The 8(a) program is a 9-year business development program for socially and economically disadvantaged businesses, the majority of which are minority owned.

Participants receive business development—including technical assistance, and the chance to work alongside larger firms in a mentor-protégé relationship.

8(a) has helped thousands of businesses across the country. In Jacksonville, Florida, A. Harold and Associates provides training, tech support, and project management for clients across the country. Owner Andy Harold created 24 new jobs after enrolling in the 8(a) program.

Andy served 10 years as a Navy helicopter pilot. Afterwards, he started working for a company that did helicopter training for the Department of Defense using multimedia. In 2003, he broke out and started his own business. He's been growing ever since. In 2005, he got his first SBA loan and landed his first contract, and a year later he got a bigger contract through one of SBA's local matchmaking events.

In 2007, he entered SBA's 8(a) Business Development program and hired 24 new staff. He has since won a number of government contracts, including one to support the electrical kit for a simulator which trains our troops for when vehicles get flipped over on the battlefield. Andy has taken advantage of several SBA loans, including two Recovery Act loans which helped him create 10 new jobs.

In Los Angeles, J&P Construction saw their sales increase ten-fold since entering the 8(a) program. The company recently graduate from the program, and has agreed to come back and mentor new 8(a) businesses.

Owner Jeff Ploutz founded J&P Construction in 1995. In 1999, the company enrolled in the 8(a) program. Since then, J&P has been awarded over 100 contracts, worth over $36 million, from government agencies such as the Army Corps of Engineers, the Air Force, the Naval Air Weapons Station China Lake, and the Naval Air Weapons Station Lemoore.

The company proudly graduated from the 8(a) Program on Aug. 24, 2008, as a thriving local construction company that is well respected and sought after by agencies throughout California.

Because of their success in the program J&P Construction is eager to share their knowledge and experience with others. With that in mind, J&P Construction has agreed to mentor companies that are new in the 8(a) program to pass on the lessons learned and help these businesses grow and be successful.

Of course, despite the success of the 8(a) program, we still have more work to do.

In late 2009, the SBA proposed new regulations to strengthen the integrity of the program. The proposed changes are the result of the first ever comprehensive review of the program and cover a variety of areas, including:

- Joint Ventures—quantifying that 8(a) firms are required to perform a significant portion of the work to ensure that these companies are able to grow and build capacity
- Economic Disadvantage—providing more clarification on economic disadvantage as it relates to total assets, gross income, retirement accounts and a spouse of an 8(a) company owner in determining the owner's access to capital and credit
- Mentor-Protégé Program—requiring that assistance provided through the Mentor-Protégé relationship is directly tied to the protégé firm's business plan and not the interests of the mentor.
- Ownership and Control Requirements—providing flexibility in admitting individuals of immediate family members of current and former 8(a) participants
- Tribally-Owned Firms—seeking public comments on the best way to determine whether a tribe meets the criteria of being economically disadvantaged for the 8(a) program
- Excessive Withdrawals—amending regulations on what is considered excessive as a basis for termination or early graduation from the 8(a) program
- Business Size for Primary Industry—requiring that a firm's size status remain small for its primary industry code during its participation in the 8(a) program.

We are very close to moving forward with these recommendations and implementation will follow publication of the final rule.

Furthermore, SBA has made strong, robust oversight a top priority. We are working to root out fraud, waste, and abuse in our certification programs with a three step process: improving certification, strengthening monitoring and oversight, and increasing enforcement.

In addition, the President's Task Force on Government Contracting came back with a number of concrete, actionable recommendations to address the challenges and barriers to success for small businesses seeking federal contracts.

These recommendations fall into three categories:

- clearer, stronger policies at federal agencies, including better guidance on how to do small business set-asides and implement effective mentor-protégé programs;

- a better-trained federal workforce, with stronger certification and training requirements, coupled with meaningful "carrots and sticks" to help agencies reach their goals; and,

- more user-friendly tools and technologies, such as improving FedBizOpps to be a one-stop resource for small businesses looking for matchmaking events, subcontracting opportunities, agency contact information, and more.

This fall, SBA will be announcing its Advisory Council on Underserved Communities. The Council will work on strategies to promote business growth and entrepreneurship in traditionally underserved communities. I'm excited to be leading this.

Finally, minority contractors will be helped by resolving the issue of parity. A current court decision would give HUBZone businesses preference above other set-aside programs, potentially redirecting millions of dollars away from 8(a) businesses.

In closing, let me say that everyone at SBA is aware of the need to support minority-owned small businesses. We are proud of the programs we have in place, but we must work diligently and continue to improve. I'm looking forward to working with Congress and this committee to enhance the tools we have to reach minority-owned small businesses and get them the contracts, capital, and counseling they need.

## EXECUTIVE SUMMARY
## INTERAGENCY TASK FORCE ON FEDERAL CONTRACTING OPPORTUNITIES FOR SMALL BUSINESSES

*"[E]nsuring small businesses can thrive is about more than economic success. It's also about who we are as a people. It's about a nation where anybody who's got a good idea and a willingness to work hard can succeed. That's the central promise of America."*

*President Barack Obama*

Small businesses are leaders in innovation and drivers of the economy. Small businesses hold more patents than all of the nation's universities and largest corporations combined, and create two thirds of all private sector jobs, employing half of all working Americans.

The Federal government is the largest buyer in the world, spending over $500 billion each year. For the Federal government, contracting with small businesses is common sense. Small businesses get the revenue they need to create jobs and drive the economy forward, and federal agencies get the creativity, innovation, and technical expertise of small businesses to help accomplish their mission. When small businesses are excluded from federal contracts, the Federal government, American taxpayers and the nation's economy lose out.

Over 30 years ago, Congress set a goal of having a certain portion of all federal contracting dollars go to small businesses and established sub-goals for small businesses owned by women, socially and economically disadvantaged individuals, and service-disabled veterans of the Armed Forces, and for small businesses in Historically Underutilized Business Zones (HUBZones). The current government-wide goal for small businesses' share of contracting dollars is 23%. Every year since 2006, the Federal government has missed the 23% small business goal and all but one of the sub-goals; the 2009 shortfall was greater than $4 billion. Removing barriers to federal contracting and increasing access for small businesses will go a long way in closing this gap.

Over the past 18 months, the Federal government has taken important steps to increase opportunities for small businesses, from creating new online training for small businesses to issuing a proposed rule to create set-asides for women-owned small businesses in industries in which women are underrepresented. Last summer, the Department of Commerce and the Small Business Administration (SBA) co-led a government-wide effort that involved over 300 matchmaking and training events across the country to ensure American Recovery and Reinvestment Act (Recovery Act) contracts were awarded to a broad array of small businesses. With over 31% of Recovery Act contracting dollars going to small businesses, this initiative proved that, with committed leadership and the right tools, the government has the ability to meet – and exceed – the 23% small business contracting goal.

In keeping with this commitment to small businesses, the President established the Interagency Task Force on Federal Contracting Opportunities for Small Businesses to ensure small businesses can participate in the Nation's economic recovery, including small businesses owned by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans of our Armed Forces, as well as HUBZone small businesses. The Task Force – co-chaired by SBA, the Office of Management and Budget (OMB) and Commerce, and including twelve other federal agencies – created five working groups to address key barriers for small businesses in federal contracting. The working groups met, heard from key stakeholders, and identified three priority objectives:

***Stronger rules.*** Insufficient guidance and gaps in current policy hamper the use of tools that provide contracting opportunities for small businesses. The Task Force recommends actions to strengthen and update policies where they are weak or outdated and develop policies where they are lacking.

***A better equipped, more informed and more accountable acquisition workforce.*** A lack of knowledge and agency accountability inhibits the government's ability to meet and exceed small business procurement goals on an ongoing basis. The Task Force recommends increasing the knowledge base and efficiency level of the procurement workforce and providing appropriate incentives and accountability for agencies to meet small business goals.

***Improved outreach and better use of technology and data.*** The current data systems in the federal acquisition environment are cumbersome and not user friendly for many small businesses, especially for those who are new to the systems and trying to "get their foot in the door." The Task Force recommends a one-stop shop for easier access to procurement information, as well as greater focus on the accuracy of procurement data.

In the following report, the Task Force outlines the key recommendations and actions needed to meet these priority objectives. The Task Force will report to the President by December 30, 2010, on progress in the implementation of the recommendations in this report.

SBA, Commerce, OMB, and the other members of the Task Force are committed to increasing opportunities for small businesses. Small businesses, including businesses owned by women, socially and economically disadvantaged individuals, and service-disabled veterans of our Armed Forces, must be able to participate in the Nation's economic recovery. They must be able to compete effectively for federal contracts so our agencies, taxpayers, and the broader economy can reap the full benefit of their talents and services.

REPORT
INTERAGENCY TASK FORCE ON FEDERAL CONTRACTING OPPORTUNITIES FOR SMALL BUSINESSES

Small businesses are leaders in innovation and the drivers of the economy-- holding more patents than all of America's universities and largest corporations combined, creating two thirds of all private sector jobs and employing half of all working Americans.

The Federal government is the largest buyer in the world, spending over $500 billion each year. For the Federal government, contracting with small businesses is common sense. Small businesses get the revenue they need to create jobs and drive the economy forward, and federal agencies get the creativity, innovation, and technical expertise of small businesses to help accomplish their mission. When small businesses are excluded from federal contracts, agencies, small businesses, taxpayers and the broader economy lose out.

For more than half a century, it has been the policy of the Federal government to provide "maximum practicable opportunity" for small businesses to participate in federal contracts. To achieve this objective, Congress established an aspirational goal in 1978 for the percentage of annual prime contract spending that should be awarded to small businesses each year. Congress later set the government-wide goal at 23% and created a set of sub-goals to support the participation of special segments of the small business community: small disadvantaged businesses (5%), women-owned small businesses (5%), service-disabled-veteran-owned small businesses (3%), and small businesses in Historically Underutilized Business Zones (HUBZones) (3%). These goals help ensure that a diverse set of small businesses share in the jobs and opportunities created by federal contracting.

Since 2006, the Federal government has missed the 23% small business contracting goal and all but one of the sub-goals; the 2009 shortfall for the small business goal was more than $4 billion. This gap must be closed.

The barriers to entry for small businesses are numerous: weak policies and rules that limit the effectiveness of tools that are supposed to facilitate contracting opportunities; inadequate workforce training to help contracting officers, small business advocates, and program offices understand how to successfully use contracting tools; and a lack of coordination among and accessibility to agency training and outreach events designed to help small businesses navigate the contracting system. Action must be taken to remove these barriers and ensure small businesses get access to federal contracts.

A number of important steps have been taken or are underway to remove barriers and open more doors for small businesses in the federal marketplace.

- Later this year, the Small Business Administration (SBA) will implement a new **rule** on contracting with women-owned small businesses. For the first time, contracting officers will have a tool to set aside contracting opportunities for women-owned small businesses in

industries where women are under-represented. This is a critical step toward increasing opportunities for women-owned small businesses.

- This year SBA conducted the **first comprehensive review of regulations in ten years governing its 8(a) business development program for disadvantaged small businesses to ensure** the program's effectiveness and increase 8(a) firms' capacity to obtain contracts.

- A series of **new online training courses** have been rolled out (www.sba.gov/training) to walk small business owners through the steps involved in becoming a government contractor. These tools help small businesses navigate the process.

- SBA is conducting a **comprehensive review of its size standards** for small businesses – the first in 25 years – to ensure they accurately reflect the state of each industry.

- SBA is working actively to identify and **eliminate waste, fraud, and abuse** in its business programs through a strengthened certification, eligibility and enforcement process.

Additionally, last summer, through the American Recovery and Reinvestment Act (Recovery Act), SBA and Commerce co-led an effort that included over 300 outreach and matchmaking events across the country executed by various agencies to inform businesses of contracting opportunities under the Recovery Act. Today, over **31 % of federal Recovery Act contracting dollars have gone to small businesses** and as of September 3, 2010 we have hit or exceeded all of the sub-goals. This work has helped agencies to benefit from small business expertise and small businesses to grow their revenues and create jobs.

The Recovery Act demonstrates that – with committed leadership and the right tools – small businesses can participate in the federal marketplace. This success and focus from the top must be replicated.

This spring, to ensure his commitment to the Nation's small businesses is reflected across the government, the President established an Interagency Task Force on Federal Contracting Opportunities for Small Businesses, co-chaired by SBA, the Department of Commerce, and the Office of Management and Budget (OMB), to develop proposals and recommendations for ensuring that small businesses – including firms owned by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans of our Armed Forces – are given fair access to Federal government contracting opportunities. A copy of the President's April 26, 2010, Memorandum establishing the Task Force is set forth in the Appendix.

This Task Force, which included more than a dozen federal agencies (see section 2 of the President's Memorandum for a list of members), created working groups to identify ways to improve contracting authorities and strategies, workforce training and agency accountability, data quality and access to information through technology and outreach, training for small

businesses, and access to capital. Each working group focused on identifying actionable recommendations that would have maximum benefit for small businesses.

To help inform the development of its recommendations, the Task Force conducted a variety of outreach efforts, including a public meeting in Washington, D.C., on June 28, 2010, which was attended by more than 450 individuals (including representatives of small businesses and small business associations), the creation of a small business task force mailbox for written comments, and several focus group sessions. Through these efforts, interested parties were invited to offer their views on the challenges small businesses face in pursuing federal contracts, on best practices for overcoming these challenges and increasing small business participation in the federal marketplace.

Based on the working groups' analysis and comments collected from stakeholders at the public meeting in June, the Task Force has developed a number of recommendations to provide for clearer and more comprehensive small business contracting policies, a better trained acquisition workforce, and improved accessibility to federal procurement opportunities for small businesses. The Task Force recommends specific action in three key areas:

***Stronger regulations and guidance.*** Policy weaknesses, such as insufficient guidance on the use of Mentor-Protégé programs or the lack of guidance on set-asides for orders, are hampering the use of existing small business contracting authorities and the opportunities they are intended to provide for small businesses. Rules for reserving work for small businesses should be updated – with statutory and regulatory changes when needed to increase consideration of set-asides for the billions of dollars in work that is awarded through task and delivery orders that may be suitably performed by small businesses. Reviews of contract bundling – where an agency consolidates requirements that were previously provided or performed under separate smaller contracts into a single contract that is unlikely to be suitable for award to a small business – must be tightened to prevent unjustified bundling and to ensure appropriate mitigation strategies are used to identify alternative options for small businesses where bundling is necessary and justified. Subcontracting plan practices should be improved so that contracting officers can properly evaluate proposed small business participation, monitor performance and ensure prime contractors keep their promises to provide work to small business subcontractors. Mentor-Protégé programs should be promoted through a new government-wide framework to give small businesses the opportunity to develop under the wing of experienced large businesses.

***A better equipped and more informed acquisition workforce.*** The Federal government's ability to meet small business goals is weakened by insufficient understanding of small business programs coupled with the lack of agency accountability. Workforce training should be required for contracting officers, small business specialists, and program managers to strengthen agencies' ability to use contracting authorities in the most effective manner possible. "Carrots" and "sticks" should be used to instill a stronger sense of accountability for meeting goals. Best practices from different agencies should be shared and replicated across the government, facilitated by SBA.

***Improved outreach and better use of technology and data***. The current information and data systems in the federal acquisition environment are cumbersome and difficult to access for many small businesses, especially those that are new to the systems and trying to get their foot in the door. The functionality of the government's one-stop source for federal prime contract business opportunities, "FedBizOpps," should be enhanced to identify upcoming outreach events and to provide an online small business training directory. The same platform can also be used to provide easy access to information on subcontracting opportunities for small businesses and annual forecasts of every agency's projected prime contracting needs for the coming year. Finally, the usability and quality of data needs to be improved to support user needs for better business intelligence and to prevent data entry errors that hinder the integrity and accuracy of small business contracting information.

Additional discussion of the Task Force's recommendations is below. These recommendations are designed so that they may be accomplished, to the maximum extent practicable, through administrative and regulatory actions by the Executive Branch, with efforts beginning immediately and led by the organizations identified in connection with each stated action. The Task Force will report to the President by December 30, 2010 on progress in the implementation of the recommendations in this report.

The recommendations in this report are the first step. The Task Force will propose additional appropriate steps as it implements these recommendations and evaluates progress.[1] The Task Force is committed to increasing opportunities for small businesses in the federal marketplace so that our agencies and taxpayers can reap the full benefit of their talents and services.

[1] While the recommendations in this report focus on increasing the participation of small businesses in federal contracting, the Task Force noted that there may be opportunities to leverage the combined talents of small businesses and the nonprofit organizations of the AbilityOne Program that employ people who are blind or have other significant disabilities to create new opportunities for both communities. The Task Force will be exploring these ideas further in the coming months.

## SUMMARY OF RECOMMENDATIONS

**Develop clearer and more comprehensive small business contracting policies:**

- **Recommendation 1:** Update acquisition policies and regulations to provide clear guidance on small business set-asides and related tools.
- **Recommendation 2**: Issue guidance clarifying practices and strategies to prevent unjustified contract bundling and mitigate any negative effects of justified contract bundling on small businesses.
- **Recommendation 3:** Develop a government-wide framework for Mentor-Protégé programs and clarify rules for small business teaming.
- **Recommendation 4:** Strengthen the requirements for small business subcontracting plans and enhance the electronic subcontracting reporting system.
- **Recommendation 5**: Identify where focused efforts will likely have the most positive effect on increasing small business utilization in prime contracting.
- **Recommendation 6:** Clarify the relationship between policies that address the rebalancing of agencies' relationship with contractors and small business contracting policies, and evaluate the impact of in-sourcing on federal small business contractors.
- **Recommendation 7:** Conduct a full review of the SBA Surety Bond program, the financial products it offers, and its current funding to determine if it is meeting the current needs of small businesses.

**Provide for a better trained workforce and hold agencies accountable for meeting small business goals:**

- **Recommendation 8:** Strengthen the skills of the acquisition workforce by revising existing core certification, requiring training on small business contracting, procurement policies and regulations, and creating focused refresher materials for continuous learning.
- **Recommendation 9:** Use meaningful "carrots and sticks" to create a greater sense of agency accountability for reaching small business federal contracting goals.
- **Recommendation 10:** Facilitate the identification and rapid adoption of best practices across the agencies to maximize successful strategies.

**Leverage technology to enhance transparency, increase federal procurement accessibility for small businesses, and improve data quality:**

- **Recommendation 11:** Enhance FedBizOpps, the government-wide point of entry on business opportunities, to also serve as a one-stop resource for annual requirements forecasting agencies' prime contracting opportunities and for posting subcontracting opportunities, the outreach calendar of all federal agency matchmaking and training events, and as a directory of online agency small business resources.
- **Recommendation 12:** Improve the accessibility and usability of small business procurement data in the Federal Procurement Data System (FPDS).
- **Recommendation 13:** Improve data quality related to small business contracting through use of validation rules and improved systems integration.

## Suggested Priorities and Recommended Actions

**PRIORITY: DEVELOP CLEARER AND MORE COMPREHENSIVE SMALL BUSINESS CONTRACTING POLICIES**

Policy weaknesses, such as insufficient guidance on the use of Mentor-Protégé programs or the lack of guidance on set-asides for orders, are hampering the use of existing small business contracting authorities and reducing the opportunities they intended to provide for small businesses. Policies should be strengthened in a manner that both increases small business utilization and preserves processes that are efficient and achieve the best value for our taxpayers.

**Recommendation #1:** ***Update government-wide acquisition policies and regulations to provide clear guidance on when and how set-asides and related tools should be used to increase opportunities for small businesses.***

The Small Business Act and the Federal Acquisition Regulation (FAR) require agencies to reserve acquisitions for award to small businesses, or certain subsets of small businesses, if there are two or more responsible small businesses capable of performing the work at fair and reasonable prices. Set-asides are one of the most powerful tools agencies have for creating opportunities for small businesses – accounting for approximately half of the $97 billion in awards to small businesses in FY 2009. Under current policies, set-aside considerations are made prior to the award of a contract. Many of these awards are for "task and delivery order" contracts, where the vast majority of work is placed through orders made after contract award. These contracts have become increasingly popular over the past 15 years, as have the Federal Supply Schedule (Schedule) contracts managed by the General Services Administration (GSA), because all of these vehicles allow agencies to run streamlined competitions among multiple contractors and make awards simply and quickly to keep pace with mission demands. As a result, there has been a general reluctance among acquisition policy officials to advocate for regulatory changes that might require the mandatory application of set-asides to orders in the same manner that law and regulation currently require for contracts. Although set-aside requirements continue to apply to the initial award of task-and-delivery-order contracts, these contracts generally are not set aside (with a few exceptions noted below) because they typically are broad in scope, and small businesses often lack the capacity to perform all the work that might be required during the life of the contract.

The Government Accountability Office (GAO) issued a legal opinion in 2008 holding that rules calling for small business set-asides must, as a matter of law, be applied to orders. GAO's opinion, while not binding on the Executive Branch, is reportedly being followed by some agencies but not by others, and the ensuing legal uncertainty led to the introduction of legislation in the Senate (S. 2989) this past spring addressing the use of set-asides for orders.

Some task-and-delivery-order contracts, such as GSA's Small Business Alliant government-wide acquisition contract (GWAC), 8(a) STARS GWAC and VETS GWAC, and NIH's upcoming Chief Information Officer – Solutions and Partners 3 GWAC for small businesses, have been set aside for small businesses, and experience with those contracts proves that, with proper planning and outreach, it is possible to achieve both contract efficiency and strong small business participation. Additionally, GSA's recent award of its new Schedule blanket purchase agreements for discounted office supplies, where 13 of 15 awards were made to small businesses, including two SDVOSBs, suggests that set-asides are not the only tool that can facilitate small business participation for orders. In this case, strong small business participation was achieved because GSA treated socioeconomic status of the prospective providers as a primary evaluation factor. To date, however, there has been no attempt to create a comprehensive policy for orders placed under either general task-and-delivery-order contracts or Schedule contracts that rationalizes and appropriately balances the need for efficiency with the need to maximize opportunities for small businesses. Existing tools that might help direct additional work toward small businesses, such as the consideration of socio-economic status for Schedule orders and partial set asides for contracts, appear to be underutilized and misunderstood. Many public comments offered to the Task Force voiced frustration over the continued failure of policy officials to tackle these issues. Some commenters pointed out that even a small increase in task-and-delivery-order awards made to small businesses could help the government meet its small business goals.

Recommended actions:

- OMB's Office of Federal Procurement Policy (OFPP) should lead an effort, in close collaboration with SBA and GSA, as well as the Department of Defense (DoD) and other contracting agencies, to determine which steps are (or should be) permitted, which encouraged, and which required with respect to reserving individual orders for small businesses under task-and-delivery-order and Schedule contracts. The review should also take into account the effectiveness of existing tools, including partial contract set-asides and the consideration of socio-economic status in placing Schedule orders.

- In conducting the analysis, OFPP should reach out to interested stakeholders, including agency Chief Acquisition Officers (CAOs), Senior Procurement Executives (SPEs), and Small Business Directors; Offices of Small and Disadvantaged Business Utilization (OSDBU); Procurement Technical Assistance Centers; Congress; small and large businesses; and professional and trade associations.

- Where it is determined that statutory changes are warranted, OFPP should work with Congress and other stakeholders to support the development of appropriate legislation.

- When appropriate (taking into account possible statutory and regulatory changes), OFPP should issue guidance addressing the use of set-asides and related authorities for limiting consideration for task and delivery orders to small businesses. Guidance should also

address existing set-aside and related policies, as necessary. General guidance should be drafted jointly with SBA, and with GSA as to guidance affecting the Schedules.

- Where, in the absence of (or in advance of) statutory changes, amendments to the FAR will be helpful in providing clear guidance in this area, the Federal Acquisition Regulatory Council (FAR Council) should take actions to amend the FAR.

**Recommendation #2:** ***Issue guidance clarifying practices and strategies to prevent unjustified contract bundling and mitigate any negative effects of justified contract bundling on small businesses.***

Results of SBA's most recent Small Business Scorecard suggest that a number of agencies continue to face challenges in carrying out their responsibilities under statute and regulation to address contract bundling and that there would be benefit in reviewing agency policies and highlighting those that are the most effective. These challenges are not new. In 2007, the Acquisition Advisory Panel established by Congress to review the acquisition system concluded that steps should be taken to help agencies develop techniques for mitigating the negative effects of contract bundling on small businesses where bundling is justified. It noted that the lack of guidance "contributes to the workload pressures facing [the] acquisition workforce, undermining its ability to plan and award acquisitions efficiently." GAO agreed with the Panel's conclusion. The Panel's recommendation has not been acted on and should be implemented.

Recommended actions:

- Agencies subject to the Chief Financial Officers Act should provide copies to SBA of their internal bundling policies and procedures. SBA, in consultation with OFPP, should issue guidance identifying best agency practices for preventing unjustified bundling and mitigating the effects of justified contract bundling.

- SBA should issue a report for the FAR Council on the need for additional FAR coverage on contract bundling.

- The Federal Acquisition Institute (FAI) and the Defense Acquisition University (DAU) should incorporate identified best practices and strategies currently in use by agencies with respect to bundling into government-wide training materials.

**Recommendation #3:** ***Develop a government-wide framework for Mentor-Protégé programs and clarify rules for small business teaming.***

Mentor-Protégé programs offer important opportunities for small businesses to strengthen their capabilities with the developmental assistance of established large businesses. A number of federal agencies have developed models for using Mentor-Protégé programs, but this tool may be underused due to lack of government-wide guidance that addresses small business concerns when entering into these agreements. Similarly, teaming arrangements among small

businesses contractors can enhance those firms' ability to compete for larger contracting opportunities, but these arrangements are underutilized because of confusion regarding their legal effects (that is, whether a small business participating on a team retains its small business status).

Creating a government-wide framework for Mentor-Protégé programs and additional guidance on teaming arrangements could facilitate greater use of strategic partnerships and create more opportunities for small businesses.

Recommended actions:

- SBA should convene a panel of government agencies that are users of Mentor-Protégé programs to develop a government-wide program framework. This process should include the development of metrics to measure program effectiveness and incentives to form Mentor-Protégé relationships.

- SBA should clarify the application of affiliation rules so small and large businesses can more clearly understand how Mentor-Protégé and teaming relationships work and how these relationships can be successfully pursued without hurting businesses' "small" status.

**Recommendation #4:** ***Revise small business subcontracting plan requirements to increase small business subcontracting participation, and enhance the electronic subcontracting reporting system to improve federal agency monitoring of prime contractor achievements against their subcontracting plans.***

Subcontracting is an important avenue for small businesses to gain entry to the federal marketplace when they lack the capacity to compete at the prime contractor level and can also serve as a stepping stone to receiving work as a prime contractor. Subcontracting plans, where large business prime contractors explain how they will tap the talents of small businesses to help them in performing the contract, are the key tool agencies have to facilitate opportunities for small businesses as subcontractors. Prime contractors on any contract with an estimated contract value exceeding $550,000 ($1 million for construction) that has subcontract possibilities are required to submit a subcontracting plan to the government. The government monitors the prime's utilization of small businesses by reviewing this plan and reported achievements against the plan.

How effective subcontracting plans are in creating opportunities for small businesses depends on a wide range of factors, including:

(i) the quality of the information in the plan; for instance, whether information is sufficiently detailed and organized to understand how small businesses will be used and to facilitate monitoring of progress;

(ii) the manner in which the contract treats the plan; that is, whether the plan terms are described as goals only or as requirements that, if not met, affect the contractor's performance rating);

(iii) the ability of small businesses to negotiate effective business arrangements with prime contractors;

(iv) the timing of when the plan is submitted and evaluated; more specifically, whether the solicitation requires a plan to be provided by all offerors with initial submission of the proposal, after a competitive range is established, or only by the apparently successful offeror;

(v) the amount of emphasis placed during the source selection process on the plan, or on an offeror's past performance in meeting subcontracting plan goals or requirements (namely, whether it is a factor or subfactor, and whether past performance in meeting subcontracting plan goals is evaluated as part of, or separately from, other types of past performance);

(vi) the timeliness, accuracy, and completeness of contractors' reporting of subcontracting achievements in the Electronic Subcontracting Reporting System (eSRS); and

(vii) the quality of contracting officials' evaluation of progress against the subcontracting plan, including the diligence of agencies in assessing prime contractors' achievements against their plans and inputting these assessments into the Past Performance Information Retrieval System (PPIRS) for consideration by other contracting officials across the government.

Concerns have been raised regarding the strength of current policy, practice, or both on all of these fronts. The government's review of performance against the plans is further complicated by antiquated supporting technology that still has contractors submitting plans and reports to the contracting officer in paper format in some cases. Managing subcontracting plans for task and delivery order contracts also presents certain challenges, since specific work requirements are not known until orders are placed.

As is the case with set-asides, strengthening policies and practices requires appropriately balancing the need to increase opportunities for small businesses and the need to maintain efficient contracting practices. For instance, a requirement to provide plans with the initial submission of offers might allow for the quality of the plan to play a greater role in source selection, but it creates additional costs for offerors wishing to bid on new agency projects. Similarly, requiring offerors to identify names of subcontractors may make it easier to hold a contractor to its promise and prevent a bad faith "bait and switch," but requiring detailed disclosure of sources of supply may inappropriately constrain how prime contractors manage their subcontractors, and create new problems for prime contractors trying to line up the best subcontractors.

Recommended actions:

- The FAR Council and SBA should review the FAR's coverage and existing policy documents on subcontracting plans to determine where guidance needs to be improved. The review should give priority attention to guidance addressing the contents of subcontracting plans, the timing of their submission, approaches for evaluating plans and an offeror's past performance in meeting subcontracting plan goals, and the feasibility of reporting at the task and delivery order level. The review should also consider the benefits and drawbacks of requiring prime contractors to report a breakdown of small business participation at the subcontract level, by socioeconomic category, that includes an identification of the dollar value of each contract, the North American Industry Classification System (NAICS) code for each subcontract, the type of effort to be performed under each contract, and the total subcontract dollars as a percentage of the prime contract value.

- OFPP and agency compliance reviews of PPIRS submissions should expressly consider whether agency assessments of contractor performance provide clear, comprehensive, and constructive information on prime contractors' achievement of subcontracting plan goals (where plans are required) that is useful for making future contract award decisions.

- SBA, in consultation with the Integrated Acquisition Environment (the program management office run by GSA that supports the operation of government-wide acquisition information systems) should ensure the functionality of eSRS is improved to allow linking information in the eSRS with other government-wide acquisition systems, such as PPIRS.

- SBA should update existing policies, or issue new ones, as appropriate, addressing deadlines for submission and review of subcontracting reporting to better capture subcontracting at all tiers. The eSRS functionality should also be improved by including the capability for automatic notifications to support the new policies.

**Recommendation #5:** ***Perform analysis of spending to identify where targeted efforts will likely have the most positive effect on increasing small business utilization in prime contracting.***

DoD recently created an analytical tool to help its buying organizations perform a self-analysis of their small business contracting to compare their results to other organizations in the agency for similar requirements. This analysis serves two functions. First, it helps organizations that are experiencing less success to identify organizations that are achieving greater success so organizations with the most room for improvement can emulate the small business contracting practices of the best-in-class organizations. Second, it helps organizations identify small businesses that are currently doing business with the Department, which facilitates the use of set-asides.

Recommended actions:

- DoD should share its analytical tool with civilian agencies so that they can benchmark their record of awards to small businesses with that of DoD organizations purchasing similar products and services.

- Civilian agencies should work with DoD to tailor the tool for their own internal agency analyses in identifying the maximum practicable opportunity for small businesses within their own agencies.

**Recommendation #6: Clarify the relationship between policies that address the rebalancing of agencies' relationship with contractors and *small business contracting policies, and evaluate the impact of in-sourcing on federal small business contractors.***

Agencies have begun the process of rebalancing their work with contractors, and some "in-sourcing" has taken place as work has been shifted from contractors to federal employees. Small business contractors have voiced concerns that rebalancing efforts will not only limit new opportunities for small businesses but also take existing contracts away from them. Some small businesses have indicated that agencies are already bringing in-house work that had previously been performed by small businesses. While some work performed by small business contractors may need to be in-sourced if it is inherently governmental or is of a critical nature and the agency is at risk of losing control of its operations, the Task Force believes much of the work will continue to be performed by contractors, including small businesses. This belief was reinforced by the recent announcement by the Secretary of Defense that in-sourcing would not be used by the Department as a tool for saving money.

Recommended actions:

- OFPP and SBA should issue a memorandum directing CAOs, SPEs, the agency small business offices, and other appropriate agency officials to conduct impact analyses of in-sourcing. The analysis should be submitted to both OFPP and SBA, and the assessments should be updated annually.

- In finalizing its draft policy letter on work reserved for federal employees, OFPP should include a reminder that agencies are required to consider small business contractors in accordance with the "rule of two" when they determine that work will be performed by contractors. Agencies should be reminded of the need to set aside the work where at least two small businesses are available to perform the work at a fair market price. This reminder should help agencies to integrate small business priorities into their rebalancing efforts.

**Recommendation #7:** ***SBA should conduct a full review of the SBA Surety Bond Program, the financial products it offers, and its current funding levels to determine if the program is meeting the current needs of small businesses.***

All federal construction contracts valued at more than $100,000 require a surety bond in accordance with the Miller Act of 1935. Additionally, most state, county, and local government organizations, as well as many commercial operations, have adopted similar requirements. The SBA Surety Bond Program was authorized in 1971 and the program has been run with few modifications since then. In the last seven years, however, there has been a 43% decrease in the number of surety bond guarantees by the SBA.

Recommended actions:

- SBA should begin a complete evaluation of the Surety Bond program to reflect changes in the construction industry, and foster growth and support of small businesses

**PRIORITY: PROVIDE FOR A BETTER TRAINED WORKFORCE AND HOLD AGENCIES ACCOUNTABLE FOR MEETING SMALL BUSINESS GOALS**

By increasing the knowledge base and efficiency level of the procurement workforce involved in the acquisition process at all levels, as well as holding the agencies accountable for meeting small business goals, the Federal government can provide the tools and incentives federal employees need to meet these goals. The acquisition workforce must have a comprehensive understanding of small business programs and their importance, the skills to build small-business-friendly requirements, and the ability to use contracting authorities to generate maximum practicable small business participation. Agencies must be held accountable for their results. In addition, best practices should be shared and replicated to help agencies meet these goals.

**Recommendation #8:** ***Strengthen the skills of the acquisition workforce by (i) revising existing core certifications and requiring training on small business contracting and (ii) creating focused refresher materials for continuous learning.***

As agencies build the capacity and capability of their acquisition workforce, they must ensure that the workforce has up-to-date skills and knowledge to address the current challenges of small business contracting. In the past, workforce training on small business contracting has not been required. This has led to inconsistent application of contracting policies and lost opportunities for the small business community. Mandatory training – through core curricula for new personnel and periodic refreshers for experienced staff and managers – will help to ensure that the workforce is well prepared to give small businesses, including businesses owned by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans, as well as HUBZone small businesses, fair access to federal government contracting.

Recommended actions:

- FAI and DAU should collaborate to update the required core curriculum for the following personnel in the acquisition world to increase small business utilization:

  - For 1102 training, make mandatory training (including appropriate refresher training) on small business federal contracting execution (i.e., how to properly implement small business programs) in order to develop a functional understanding and working knowledge of necessary market analysis to ensure small business capability is thoroughly vetted in each and every acquisition. Include training on use of GSA's Schedules, which provides access to more than 14,000 small business contracts, and other multiple award programs to direct task orders to small business.

  - For small business specialists, mandate training (including refresher training) on small business contracting (e.g., how to do market research, work with SBA Procurement Center Representatives) in order to develop necessary competencies to foster industry innovation, technology development, and acquisition of quality products, services and solutions from small business providers. This should include training on use of GSA's Schedules.

  - For program managers and contracting officer technical representatives (COTRs), make mandatory training on small business federal contracting operations and execution to help program managers and COTRs fully understand how small businesses are vital to the total ownership cost of programs and systems that support the mission of their activity.

  - For Senior Executive Service/general officers and flag officers, make mandatory training that provides an overview of small business federal contracting to ensure that senior managers are aware of their responsibilities with respect to small business contracting.

- FAI and SBA should collaborate in the development of refresher training for acquisition professionals on small business programs and planning for and executing small business contracts.

**Recommendation #9:** ***Use "carrots and sticks" to create a greater sense of agency accountability for reaching small business federal contracting goals.***

Although each agency has negotiated individualized goals with SBA to support the overall 23% government-wide goal, agency leadership is not held accountable when these goals are not met. SBA's Small Business Procurement Scorecard shows progress, but also uneven results, across agencies. There needs to be clearer agency accountability for results. In addition to SBA's work with agency officials, there should be regular discussion between OFPP and the

CAOs and SPEs on the steps being taken to meet goals and ensure the acquisition workforce is effectively trained on small business programs and contracting authorities.

Recommended actions:

- There should be quarterly meetings of Cabinet-level officials to review agencies' progress toward meeting their small business goals and, where applicable with respect to agencies not making sufficient progress toward meeting their small business goals, to review and present plans for improving performance.

- Agencies should leverage existing or retired award programs to recognize agencies and federal employees who successfully promote small business contracting, along the lines of the:

    - Gold Star award at National Small Business Week, which recognizes exemplary performance of federal staff who manage aggressive goals for strategic initiatives;

    - Eisenhower Award for Excellence at National Small Business Week, which recognizes large prime contractors who have excelled in their utilization of small businesses as suppliers and subcontractors; and

    - Department of Navy Acquisition Excellence Awards, which are presented to individuals and teams who improve the DOD acquisition process.

    - Recognition should be given to agencies or individuals for achieving small business goals, such as the Navy Acquisition Excellence Award or the Small Business Advocate TEAM Award.

- SBA should implement a new small business contracting scorecard rating format that measures success at all levels so that agencies give greater attention to areas of underachievement.

- SBA should establish an interagency peer review process to identify best and worst practices.

**Recommendation #10:** ***Facilitate the identification and rapid adoption of successful practices, especially those that highlight collaborative efforts between agency small business directors and senior procurement executives.***

Many agencies have developed best practices for increasing opportunities for small businesses, but information often is not effectively communicated between agencies or even between functional offices within an agency, such as the OSDBU and the Office of the CAO. As a result, promising practices are not used consistently across all agencies.

Recommended actions:

- SBA should develop a website to share best practices. SBA should also organize a high-level event, in consultation with the Chief Acquisition Officers Council (CAOC), where agency OSDBUs present agency best practices for ensuring greater small business participation. SBA should catalog these practices, post them online in a readily accessible location, and encourage agencies to adopt them when appropriate.

**PRIORITY: LEVERAGE TECHNOLOGY TO ENHANCE TRANSPARENCY, INCREASE FEDERAL PROCUREMENT ACCESSIBILITY FOR SMALL BUSINESSES, AND IMPROVE DATA QUALITY**

The current data systems of the federal acquisition environment are cumbersome and inaccessible for many small businesses, especially those that are new to the systems and trying to "get their foot in the door." By ensuring that both procurement opportunities and agency procurement resources – such as training and outreach events – are more transparent and accessible, agencies can make it easier and less burdensome for small businesses to transact with the government and for federal agencies to find small businesses. More accurate systems and data collection also prevent data errors, helping the federal government account for meeting its goals.

**Recommendation #11:** ***Use FedBizOpps as a one-stop source for annual requirements forecasting, the posting of subcontracting opportunities, the outreach calendar of all federal agency matchmaking and training events, and a directory of online agency small business resources.***

The link between effective outreach and maximizing business opportunities for small businesses is clear. Yet, too often, small businesses are unaware of upcoming events, despite the fact that many agency small business directors and offices of small disadvantaged business utilization plan numerous matchmaking activities every year. Capabilities exist, through FedBizOpps, to help agencies publicize their matchmaking events and training opportunities. There is other key information that small business contractors seek out, including subcontracting opportunities and agencies' annual forecast of requirements, that could be made more accessible if provided through FedBizOpps.

Recommended actions:

- The IAE should enhance the functionality of FedBizOpps to support the submission of subcontracting opportunities and agency requirements forecast data in a user-friendly, transparent, and timely manner.

- SBA should manage the creation of a calendar of all federal government in-person and online training opportunities so that this information is easy to access for both experienced

and novice small businesses. OMB and SBA, in consultation with IAE, should require OSDBUs to put all outreach and training events on FedBizOpps.

**Recommendation #12:** ***Improve accessibility and usability of small business procurement data.***

While data on small business procurement currently exists, it is often challenging to navigate and time-consuming to use. In particular, FPDS is challenging to use for analyzing procurement data, generating business intelligence, identifying actual market opportunities for small business, and supporting executive-level reports. The newly established Small Business Contracting Dashboard that was developed as part of the Presidential memorandum is an important step in making data more meaningful, enhancing transparency and supporting agency accountability but more work remains to be done.

Recommended actions:

- SBA, in consultation with GSA, should continue to enhance the Small Business Contracting Dashboard and GSA, in consultation with SBA, should leverage USASpending.gov's modern user interface to increase small business data accessibility and transparency.

- The IAE should enhance the usability of FPDS for small business contracting information.

**Recommendation #13:** ***Improve data quality related to small business contracting through use of validation rules and improved systems integration.***

Through an annual procurement data validation process, agencies and the SBA have identified common errors that, if given appropriate attention, may be avoided. Errors or gaps in data entry can skew important analyses that are needed to evaluate where results are weak and where greater attention is required. In FY 2009, SBA identified potential anomalies in contracting data that totaled over $2 billion, some of which may be errors in coding but all of which needed to be reviewed by agencies for verification, reducing the amount of time contracting professionals have available to focus on increasing opportunities for small businesses.

Recommended actions:

- Current efforts by OMB and the CAOC related to the implementation of the President's January 21, 2009 Memorandum on Transparency and Open Government to improve the transparency and quality of federal spending data should include a comprehensive review of data quality related to small business contracting. The review should identify opportunities for integrating a more robust approach to the validation of procurement data and addressing common challenges identified through previous validation exercises.

- The CAOC should address common data quality challenges, such as incorrect industry coding, timely updating of business size status, and non-business entities being represented as small businesses.

**Appendix**

## Presidential Memorandum on the Interagency Task Force on Federal Contracting Opportunities for Small Businesses

April 26, 2010

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

SUBJECT: Establishing an Interagency Task Force on Federal Contracting Opportunities for Small Businesses

The Federal Government is the world's largest purchaser of goods and services, with purchases totaling over $500 billion per year. The American Recovery and Reinvestment Act of 2009 (Recovery Act) and other national investments are providing new opportunities for small businesses to compete for Federal contracts, and it is critical that these investments tap into the talents and skills of a broad cross-section of American business and industry. Small businesses must be able to participate in the Nation's economic recovery, including businesses owned by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans of our Armed Forces. These businesses should be able to compete and participate effectively in Federal contracts.

The Congress has established a number of statutory goals designed to help small businesses compete for Federal contracts. In addition to the goal of awarding at least 23 percent of all Federal prime contracting dollars to small businesses, the Congress also established Government-wide contracting goals for participation by small businesses that are located in Historically Underutilized Business Zones (at least 3 percent) or that are owned by women (at least 5 percent), socially and economically disadvantaged individuals (at least 5 percent), and service-disabled veterans (at least 3 percent). These aspirational goals help ensure that all Americans share in the jobs and opportunities created by Federal procurement.

In recent years, the Federal Government has not consistently reached its small business contracting goals. Although we have made some progress -- particularly with respect to Recovery Act contracts -- more work can and should be done. I am committed to ensuring that small businesses, including firms owned by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans, have fair access to Federal Government contracting. Indeed, where small businesses have the capacity to do more, we should strive to exceed the statutory goals. While Chief Acquisition Officers and Senior Procurement Executives have many priorities, small business contracting should always be a high priority in the procurement process.

Obtaining tangible results will require an honest and accurate accounting of our progress so that we can have transparency and accountability through Federal small business procurement data. Additionally, we must expand outreach strategies to alert small firms to Federal contracting opportunities.

In order to coordinate executive departments' and agencies' efforts towards ensuring that all small businesses have a fair chance to participate in Federal contracting opportunities, it is hereby ordered as follows:

Section 1. Establishment. There is established an Interagency Task Force on Federal Contracting Opportunities for Small Businesses (Task Force). The Secretary of Commerce (Secretary), the Director of the Office of Management and Budget (Director), and the Administrator of the Small Business Administration (Administrator) shall serve as Co-Chairs of the Task Force and shall direct its work.

Sec. 2. Membership. In addition to the Secretary, the Director, and the Administrator, the Task Force shall consist of the following members:

(i) the Secretary of the Treasury;
(ii) the Secretary of Defense;
(iii) the Attorney General;
(iv) the Secretary of Labor;
(v) the Secretary of Housing and Urban Development;
(vi) the Secretary of Transportation;
(vii) the Secretary of Veterans Affairs;
(viii) the Secretary of Homeland Security;
(ix) the Administrator of General Services;
(x) the Administrator of the National Aeronautics and Space Administration;
(xi) the Director of the Minority Business Development Agency;
(xii) the Director of the Office of Science and Technology Policy;
(xiii) the Director of the Domestic Policy Council;
(xiv) the Director of the National Economic Council;
(xv) the Chair of the Council of Economic Advisers; and
(xvi) the heads of such other executive departments, agencies, and offices as the President may, from time to time, designate.

A member of the Task Force may designate, to perform the Task Force functions of the member, one or more senior officials who are part of the member's department, agency, or office, and who are full-time officers or employees of the Federal Government.

Sec. 3. Functions. The Task Force shall provide to the President, not later than 120 days after the date of this memorandum, proposals and recommendations for:

(i) using innovative strategies, such as teaming, to increase opportunities for small business contractors and utilizing and expanding mentorship programs, such as the mentor-protégé program;

(ii) removing barriers to participation by small businesses in the Federal marketplace by unbundling large projects, improving training of Federal acquisition officials with respect

to strategies for increasing small business contracting opportunities, and utilizing new technologies to enhance the effectiveness and efficiency of Federal program managers, acquisition officials, and the Directors of Offices of Small Business Programs and Offices of Small and Disadvantaged Business Utilization, their managers, and procurement center representatives in identifying and providing access to these opportunities;

(iii) expanding outreach strategies to match small businesses, including firms located in Historically Underutilized Business Zones and firms owned and controlled by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans of our Armed Forces, with contracting and subcontracting opportunities; and

(iv) establishing policies, including revision or clarification of existing legislation, regulations, or policies, that are necessary or appropriate to effectuate the objectives of this memorandum.

Sec. 4. Using Technology to Improve Transparency and Accountability. Within 90 days of the date of this memorandum, the Assistant to the President and Chief Technology Officer and the Federal Chief Information Officer, in coordination with the Task Force, shall develop a website that illustrates the participation of small businesses, including those owned by women, minorities, socially and economically disadvantaged individuals, and service-disabled veterans of our Armed Forces, in Federal contracting. To foster greater accountability and transparency in, and allow oversight of, the Federal Government's progress, this website shall be designed to encourage improved collection, verification, and availability of Federal procurement data and provide accurate data on the Federal Government's progress in ensuring that all small businesses have a fair chance to participate in Federal contracting opportunities.

Sec. 5. Outreach. In developing its recommendations, the Task Force shall conduct outreach with representatives of small businesses and small business associations.

Sec. 6. General Provisions. (a) This memorandum shall be implemented consistent with applicable law and subject to the availability of any necessary appropriations.

(b) This memorandum does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(c) The heads of executive departments and agencies shall assist and provide information to the Task Force, consistent with applicable law, as may be necessary to carry out the functions of the Task Force. Each executive department and agency shall bear its own expenses of participating in the Task Force.

(d) The Director is hereby authorized and directed to publish this memorandum in the *Federal Register*.

BARACK OBAMA

Ms. WATSON. Thank you, Ms. Johns.
Ms. Park, you may proceed.

## STATEMENT OF JIYOUNG PARK

Ms. PARK. Good morning and thank you for the opportunity to appear before you. I am Jiyoung Park, Associate Administrator of the Office of Small Business Utilization with the U.S. General Services Administration.

Minority business ownership is something I feel strongly about. Several family members, including my father, have owned local small businesses. I have seen how business ownership and hard work can lead to economic independence and prosperity among minority communities and among their broader communities. I look forward to hearing your questions today and discussing how we all can better support minority business success in Federal contracting.

As Director Hinson referenced with the statistics, minority firms, without question, will continue to play a pivotal role in our economy, and we at GSA continue to support this ever-growing group of businesses, and we partner closely with the MBDA, SBA, and other agencies to do this.

The Honorable Ms. Johns mentioned small business and small disadvantaged business goals Government-wide. GSA consistently exceeds these goals for our agency. To date, in 2010, we have awarded nearly $1.9 billion to small businesses, which is 28.7 percent of the eligible contract spending. We have awarded $829 million to small disadvantaged businesses, which represents 12.7 percent of our contracting so far this year.

This achievement illustrates GSA's dedication to creating opportunities for minority businesses. More importantly, these numbers are a testament to the great achievement of minority businesses themselves.

In 2009, GSA received $5.85 billion through the American Recovery and Reinvestment Act to convert Federal buildings into high-performing green spaces and to green the Federal fleet. This portfolio includes many large capital construction projects that were not best suited for small businesses. Despite this challenge, we are committed to minority businesses at both the prime and subcontract level.

To date, GSA has awarded $452 million directly to minority firms of Recovery Act funds. One such recipient is Rios Associates, a Los Angeles-based Hispanic-owned firm who won $300,000 to develop sustainable landscapes for GSA buildings. OKE Thomas and Associates, an African-American-owned Missouri-based company, won $16 million for multiple GSA projects across the Midwest, ranging from carpet installation to roof upgrades using Energy Star materials. Finally, Epsalon System Solutions, an Asian-American firm in San Diego, won $350,000 to provide technical expertise for various GSA recovery projects. The list goes on.

Awards like these across the country are helping minority firms make payroll, grow their business, contribute to the greening of our Federal buildings, and create green jobs for the future.

The Recovery Act is only one part of GSA's overall portfolio. In a given year, nearly 17 percent of Federal contract dollars flow

through GSA. We are fully committed to stewarding these funds to maximize small and minority business opportunities. One of the best ways we do this is through GSA's Multiple Award Schedules Program. Currently, 19,000 scheduled contracts are in place, of which nearly 15,000 are held by small businesses; 2,300 are held by small disadvantaged businesses. This fiscal year, as of the end of August, small disadvantaged businesses have received $2.8 billion through the Schedules Program, or 7.3 percent of program sales totaling $40 billion.

Another way we level the playing field is GSA's Governmentwide Acquisition Contracts that has been set aside exclusively for participants in SBA's 8(a) program. This contract is called 8(a) STARS. Nearly 200 8(a) firms participate in GSA's STARS, and since 2004 these firms have received $2.7 billion in orders.

In addition to our contract vehicles, GSA provides a wealth of outreach and education to minority businesses. Last October, GSA launched a Mentor-Protege Program to help small and minority firms team subcontracts to other firms and compete on their own. To date, our Mentor-Protege Program has established 40 mentoring relationships, a third of which include small disadvantaged businesses. This program is just one of many resources that GSA has to help minority firms. We also host and participate in hundreds of outreach events across the country each year, including those listed by the SBA, MBDA and other Federal agencies. And we also work side-by-side with procurement teams to help create opportunities for minority businesses on from inside.

In closing, we at GSA have a strong record with minority businesses. We are committed to increasing minority firms' access to contract opportunities and to building their capacity to succeed, while at the same time bringing the most innovative ideas and best industry expertise to the Government.

I would be happy to answer any questions and provide any other information at the subcommittee's request. Thank you for your time.

[The prepared statement of Ms. Park follows:]

STATEMENT OF

JIYOUNG PARK

ASSOCIATE ADMINISTRATOR

OFFICE OF SMALL BUSINESS UTILIZATION

U.S. GENERAL SERVICES ADMINISTRATION

BEFORE THE

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

SUBCOMMITTEE ON GOVERNMENT MANAGEMENT, ORGANIZATION,

AND PROCUREMENT

U.S. HOUSE OF REPRESENTATIVES

SEPTEMBER 22, 2010

Good morning, and thank you for the opportunity to appear before you today to discuss doing business with the government and the U.S. General Services Administration's (GSA) record and goals for small and minority owned businesses. I am Jiyoung Park, Associate Administrator for the Office of Small Business Utilization at GSA.

As you know, small businesses are leaders in innovation and drivers of the economy. Small businesses create two thirds of all net new private sector jobs, employing half of all working Americans. According to the U.S. Census Bureau, the number of minority owned businesses increased by 46 percent between 2002 and 2007, which is more than twice the national rate for U.S. businesses.[i] Without question, during this period of economic revitalization, small and minority businesses will continue to play a pivotal role in supporting our country.

We at GSA continue to support this ever-growing group of businesses, and we partner closely with the U.S. Small Business Administration, Department of Commerce's Minority Business Development Agency, and others on these efforts. GSA recognizes the importance of small and minority owned businesses to our nation, as well as the benefit to the Federal Government of engaging in business with this sector. Our agency remains committed to helping minority businesses gain access to competitive contract opportunities that fulfill the needs of the Federal Government, create jobs for American workers, and promote economic growth.

The current procurement policy provides for encouraging small disadvantaged business participation in contract performance through joint ventures, teaming arrangements, and subcontracts through the use of credit under source selection evaluation factors. The current policy also provides for increased subcontracting opportunities through monetary incentives in targeted industries. GSA supports this policy, and it has helped us achieve significant success. Each year the federal government contracts out approximately $500 billion of business. The Small Business Act sets a goal of awarding 23 percent of those prime federal contract dollars to small firms and a goal of 5 percent to small disadvantaged businesses.

GSA fully supports federal contracting opportunities for small businesses. To date in FY 2010, the agency has awarded nearly $1.9 billion to small businesses, and over $829 million to small disadvantaged businesses. These numbers illustrate GSA's unwavering dedication to supporting opportunities for minority businesses. These numbers are also a testament to the great achievement of minority owned businesses.

In FY 2009, GSA directly awarded approximately $2 billion contract dollars to small businesses, and $793 million of that to small disadvantaged businesses. While $2 billion in awards did not fully meet GSA's FY 2009 goal negotiated with SBA at 35.7 percent, it represents a $100 million increase over the 1.9 billion awarded in FY 2008. While more remains to be done, $2 billion is the largest amount GSA has awarded to small businesses to date. GSA received $5.85 billion through the American Recovery and Reinvestment Act to convert federal buildings into high-performing green spaces, green the federal fleet, and renovate buildings, courthouses, and land ports of entry. This portfolio includes many large capital construction projects that were unavailable for small businesses, which presented a unique challenge in meeting our small business goals. Despite this challenge, we are committed to small businesses at both the prime and subcontract level.

Since the enactment of the Recovery Act, GSA has taken on an integral role in helping small businesses compete for our agency's Recovery Act projects. To date, $340 million in GSA Recovery Act dollars have been awarded to minority firms. M.E.R.I.T. from Newark, New Jersey is one such recipient of Recovery Act funding. The infusion of Recovery Act funds enabled M.E.R.I.T. to directly hire more workers and has also allowed the company to successfully subcontract, providing some of these subcontractors a chance to weather the tough economy.

Another significant GSA Recovery Act award was made to OKE Thomas and Associates Inc., a small African American owned, Missouri-based company. There, $16 million was awarded for multiple Recovery Act projects in the Midwest for work ranging from carpet installation to roof replacement with energy star rated materials. In another region, GSA awarded JBlanco Enterprises of Sheridan, Colorado, a $2.5 million contract to install cool roofing for the Denver Federal Center Building. The list goes on. Awards like these across the country respond to the discriminatory barriers still faced by minority owned firms, and help small minority owned firms make payroll, grow their business during difficult economic times, contribute to the greening of our federal buildings, and create green jobs for the future.

The Recovery Act is only a small part of GSA's overall portfolio. In a given year, nearly 17 percent of all Federal contract dollars flow through GSA contracts, and we are fully committed to continued stewardship of these funds to maximize small business opportunity. Our contracting programs level the playing field and enable small businesses to compete, while also bringing the best, innovative ideas to the government. One of our largest vehicles for supporting small business is the Multiple Award Schedules (MAS) Program. GSA's MAS program is the largest acquisition program within the federal government, with $47 billion in sales in FY 2009.

GSA MAS procurements represent nearly 10 percent of total federal contract spending. Excluding defense spending, the total is about 30 percent of federal contract spending. The MAS program is a significant opportunity for businesses and customer agencies given its widespread use and accessibility. Of the roughly 18,000 schedule contracts in place during FY 2009, nearly 14,000 were held by small businesses. Currently, there are 2,331 small disadvantaged businesses on GSA Schedules. There are 4,352 contracts held by minority owned business enterprises on GSA Schedules, 3,996 of which are also small business.

Another avenue for small business access to government spending is Government-wide Acquisition Contracts (GWAC). These streamlined contract vehicles allow agencies to procure comprehensive IT solutions from pre-qualified firms. In furthering its commitment to small disadvantaged businesses, GSA has set aside several GWACs exclusively for small businesses. Total GWAC sales to date for small businesses exceed $4.7 billion, which is a significant achievement. GSA's 8a STARS GWAC is set aside exclusively for small disadvantaged businesses participating in SBA's 8a business development program. Nearly 200 8a firms participate in 8a STARS. Since the contract's inception in June 2004, contract holders have received $2.7 billion in orders, which represents a significant amount of funds awarded to small disadvantaged businesses.

GSA is also placing greater emphasis on teaming, subcontracting, and mentoring programs. For example, the GSA Mentor-Protégé program, launched October 2009, helps small firms win more business and enhance their capabilities to perform successfully on government contracts. To date, the program has established more than 38 Mentor-Protégé relationships with one-third of these

partnerships between small disadvantaged businesses such as J. Roberts Inc., an Asian Pacific American owned firm, and JAB Innovative Solutions, a Hispanic American owned business.

Beyond these tailored programs, GSA has many resources available to help small businesses and provide them with useful information. Business activities are supported by program experts at GSA Headquarters, through OSBU centers in 11 regional offices, and by small business technical advisors in our procurement offices. Our small business website (www.gsa.gov/sbu) provides links to a variety of resources and small business publications.

---

[i] U.S. Census Bureau. Survey of Business Owners (SBO): Company Statistics Series: Preliminary Estimates of Business Ownership by Gender, Ethnicity, Race and Veteran Status: 2007. http://www.census.gov/econ/sbo/.

Ms. WATSON. Thank you, Ms. Park, for your testimony.
Ms. Oliver, you may proceed.

## STATEMENT OF LINDA OLIVER

Ms. OLIVER. Thank you, Chairwoman Watson, Ranking Member Bilbray, Mr. Connolly, Ms. Chu. It is nice to be here, but I have deadly boring testimony. It is all about numbers, so I will really summarize what the numbers tell us, and I will begin with a digression.

Last night I had a telephone call from somebody who in theory was calling me because he wanted to know something about small businesses. This was a man in Los Angeles. I found out, as I talked to him, that the real reason he was calling me was because he thought I should take this chance to mention publicly, from many constituents, as I understand it, how much they have appreciated Ambassador, as he called her, Ambassador Watson's work. So I pass that along to you.

Ms. WATSON. It wasn't my brother, was it? [Laughter.]

[Remarks made off mic.]

Ms. OLIVER. In developing testimony, we looked at the numbers in a general way and then in more specific ways, so it is a series of charts. The first chart tries to look at small disadvantaged businesses that do contracting with the Department of Defense. We looked at it over a 9-year period, and I am pleased to say that we have consistently, our contracting dollars that go to small disadvantaged businesses has consistently increased; and, in general, we have increased the percentages. In 2001 we were at 5.6 percent, which exceeds the goal, and in 2009 figures show that we are at 6.9 percent. So I am so happy to be talking about this area because this is an area where we are doing well.

We also looked in more detail at the numbers for the last 3 years, 2007, 2008, and 2009, and I am pleased to say again that whether we break it down by 8(a) companies or by the small disadvantaged businesses that are not 8(a) companies, in both cases the Department of Defense shows an upward trend in dollars contracted, in numbers of contracts with small disadvantaged businesses, both categories, and we are very pleased by that.

We have also been happy with our Recovery Act numbers. The Department of Defense received $7.4 billion under the Recovery Act, which actually is not very much for the Department of Defense.

Ms. WATSON. Let me just interrupt you for a moment.

Ms. OLIVER. Sure.

Ms. WATSON. The charts that Ms. Oliver is referring to, I understand, are in your statement on the table.

Ms. OLIVER. Yes, ma'am.

Ms. WATSON. Great. So that you can pick them up on your way out.

Ms. OLIVER. Yes.

Ms. WATSON. Thank you.

Ms. OLIVER. You bet.

Where Recovery Act is concerned, right now approximately half of all our Recovery Act dollars are going to small businesses and

34.9 percent of our ARRA dollars are going to small disadvantaged businesses.

Now, I am realistic enough to know that there are going to be some big purchases down the road that are planned, and those numbers will go down, but we are very pleased with where our numbers are.

Finally, we took a look at the source of things that the small businesses and small disadvantaged businesses with whom we contract, with what they purchase, because we think that might help us in our plans. But there are four main areas that small disadvantaged businesses contract with us: manufacturing; construction; professional, scientific, and technical services; and administration and support accounts for 89, almost 90 percent of our small disadvantaged business contracts.

Well, there is my quick summary. I have appreciated being able to come and tell you that Department of Defense is very happy with what we have done with small disadvantaged businesses, and through analysis we hope to continue on in this upward pattern.

[The prepared statement of Ms. Oliver follows:]

**TESTIMONY**

**of**

**Linda B. Oliver**

**Acting Director**

**Office of Small Business Programs**

**Office of the Under Secretary of Defense (Acquisition, Technology & Logistics)**

**U.S. Department of Defense**

**Before the**

**U.S. House of Representatives**

**Committee on Oversight and Government Reform Policy**

**Subcommittee on Government Management, Organization and Procurement**

**Hearing on**

**"Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses"**

**September 22, 2010**

HOLD UNTIL RELEASED BY THE COMMITTEE

Linda B. Oliver
Acting Director, Office of Small Business Programs
U.S. Department of Defense

Good morning Chairman Watson, Ranking Member Bilbray, Vice Ranking Member Schock, and Committee Members. I am Linda Oliver, Acting Director of the Office of Small Business Programs of the Department of Defense.

Thank you for the opportunity to appear before you today to discuss, on behalf of the Department of Defense, Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses. The Department of Defense (DoD) is committed to providing maximum practicable opportunities to all small businesses, including small disadvantaged businesses and 8(a) small business concerns that are in the U.S. Small Business Administration's (SBA) business development program. We consistently exceed the Government-wide 5 percent goal for small disadvantaged businesses, so I am particularly pleased to discuss our efforts.

I will start by bringing to your attention some of the existing data limitations we face when we look at current minority contracting opportunities and challenges within DoD. My testimony will however specifically summarize the Department's contracts with small disadvantaged businesses (SDBs) and 8(a) small business concerns over the last several years. I will then provide information about the DoD SDB and 8(a) accomplishments for contract awards made under the American Recovery and Reinvestment Act of 2009. Third, I will highlight some of the business characteristics of SDBs and 8(a) businesses we have observed from our review of contract award information obtained from the Federal Procurement Data System. Finally, I will conclude with some general comments on techniques we are developing to increase our contracting with SDBs and 8(a) concerns.

**What are some of the problems we have encountered when looking at current minority contracting opportunities and challenges within DoD?**

Your questions can be read to ask for more than just small business data, so I want to begin by clarifying the limits of the information we are providing. My statement will not address DoD contracting with other-than-small businesses. Federal agencies use the Federal Procurement Data System (FPDS) to report their procurement and contract award information, and SBA uses FPDS data to report on Federal agencies performance of their small business program achievements. Those reports are reasonably reliable. However, FPDS cannot produce a report with accurate information on other-than-small business concerns owned and operated by minorities.

One reason for not being able to make generalized conclusions about minority owned firms using FPDS data is that reports from FPDS are based on awarded contracts made to both publicly held and privately owned companies. Information on publicly held companies in FPDS does not include data on the diversity of their stockholder ownership or on the diversity of their management; both of these characteristics are critical

identifiers that determine whether a business is a minority business. Large privately owned business owners may not care to disclose ethnicity, as this information provides no competitive advantage to the company.

As a result, information obtained from FPDS shows that most of DoD's contracting is with firms that cannot be reliably categorized as minority or non-minority owned and operated. For example, we examined the top 100 DoD contractors and found that ethnic status is impossible to determine for most of these firms. Nearly 65 percent of DoD's contract dollars were with the top 100 companies. Large contractors account for nearly 80 percent of DoD contract dollars for FY 2009. We can't characterize these firms by their minority status from the data obtained from FPDS.

**What is the difference between an 8(a) small business concern and a small disadvantaged business (SDB)?**

My testimony will use two terms: 8(a) small business concern and small disadvantaged business. The terms are related but different from each other. An 8(a) small business is a subcategory of small disadvantaged business. The Small Business Administration certifies active participants in the SBA 8(a) business development program. Hence, all 8(a) small business concern are small disadvantaged businesses. However, at the same time, there are many small disadvantaged businesses that are not in the 8(a) small business development program.

At this time there are approximately 21,000 SDBs registered in the Central Contractor Registration. Approximately 8,000 of these businesses are certified by the Small Business Administration as being active in the 8(a) Business Development Program. In contrast, three out of five of all SDBs are not in the 8(a) program.

**How does the 8(a) program help DoD meet it's contracting needs?**

It has been more than a decade since DoD has been permitted to set aside contracts for small disadvantaged businesses or to award price evaluation preferences to SDBs. Thus, DoD relies on SBA's 8(a) Business Development Program as its primary contracting tool for encouraging DoD contract awards to small disadvantaged businesses.

Linda B. Oliver
Acting Director, Office of Small Business Programs
U.S. Department of Defense

How effective has it been for DoD? One way to view progress is to look at some of our numbers. Chart 1, presented below, shows that DoD is increasing its prime contracts with SDB and 8(a) small business concerns. Over the past nine fiscal years (FY), FY 2001 through FY 2009, DoD has increased its prime contract awards to small disadvantaged businesses from $7.5 billion to $21.7 billion as shown by the bar portion of the chart. The bars delineate a line moving to the right in an upward trend. The chart illustrates that DoD is improving and, in most instances, shows an annual increase in dollars awarded to small disadvantaged businesses for each year. We are proud of this progress, one that shows nearly a three-fold increase in awarded contract dollar over this time period.

From a different viewpoint, our percentage achievements have fluctuated over the same time period. Overall, however, our percentage has increased from 5.6 percent in 2001 to 6.9 percent in 2009 -- more than a 23 percent increase for this period. We are pleased by this positive trend, particularly the past three years where the total dollars are increasing and the percentage of awards for this group is also increasing.

Chart 1



Chart 2 below provides a more detailed perspective on our work over the last three years with small disadvantaged businesses. In FY 2007, $15.5B in total contract dollars was awarded to small disadvantaged businesses. This increased to $21.7B in FY 2009. This upward trend represents an overall increase of about 40 percent over the three year period. The chart indicates that DoD has awarded more contract dollars to 8(a) firms than to small disadvantaged businesses that are not in the 8(a) program.

Chart 2



Chart 3 below provides another perspective on our work with small disadvantaged businesses including 8(a) small business concerns. The chart provides a summary of the number of SDB contractors doing business with DoD.

In FY 2007 the number of small disadvantaged businesses, including 8(a) small business concerns, that received DoD contract dollars totaled 7,000 firms. As the chart below illustrates, the number of firms has increased and shows an overall upward trend, from 7,000 firms to 8,600 firms. This represents an overall increase of more than twenty two percent over this three year period. This chart indicates that DoD does business with more small disadvantaged businesses that are not in the 8(a) program than with those that are in the program.

Chart 3



Linda B. Oliver
Acting Director, Office of Small Business Programs
U.S. Department of Defense

Chart 4 provides another perspective on our work with small disadvantaged businesses, including 8(a) small business concerns. In FY 2007 a total of 35,100 contract awards were made to small disadvantaged businesses including 8(a) small business concerns. As the chart below illustrates, there were 45,600 DoD contract awards made to small disadvantaged businesses in FY 2009. This represents an overall increase of about 30 percent over this three year period. This chart indicates that DoD has awarded more contracts to small disadvantaged businesses than to 8(a) firms.

Chart 4



Table 1

| *DoD Contract ARRA $ Awarded as of 9-9-10* | *DoD ARRA SDB $* | *% of Tot DoD ARRA $ to SDB* | *8(a) Program $* | *SDB Not 8(a) $* |
|---|---|---|---|---|
| $4,838,052,996 | $1,687,883,232 | 34.9% | $1,276,382,626 | $411,500,606 |

**Has the American Recovery and Reinvestment Act of 2009 helped SBDs?**

DoD received $7.4B in Recovery Act funds. As of September 9, 2010 about $4.8B has been awarded to both large and small businesses in more than 4,000 contract actions. About $2.5B in Recovery Act awards has been for work performed by small businesses. Of this amount, more than $1.68B, over 34 percent, has been awarded to small disadvantaged businesses, as indicated in Table 1. Thus far, more than $1.2B of DoD Recovery Act work has been awarded to 8(a) small business concerns. In order to ensure small business interests are considered, my office actively participates in the Department's Recovery Act working group that meets weekly to assess our performance in meeting the requirements of the Act.

**What are some of the some of the business characteristics of small disadvantaged businesses?**

Data analysis has helped us understand better the characteristics of small disadvantaged businesses. Below are some of the facts we have discovered concerning products and services DoD purchases from small disadvantaged businesses within DoD's contracting program.

In FY 2009 there were $63B DoD contract dollars awarded to all small businesses, including small disadvantaged businesses. Of this total, approximately $21.7 B (see Chart 2), or about 34 percent, were dollars awarded to small disadvantaged businesses. SBA 8(a) small business concerns received 20.7 percent of all DoD small business contract dollars.

The Department of Defense contract awards to small disadvantaged businesses have tended to concentrate around a relatively small group of products and services classified under the North American Industry Classification System (NAICS). The four top categories are: construction; professional, scientific & technical services; administration & support; and manufacturing. These four categories account for nearly 89 percent of all small disadvantaged business awards that were made in FY 2009 as compared to 81.9 percent for all other small businesses.

In all but one of these categories DoD awards a higher percentage of contract dollars to small disadvantaged businesses than it does to all other small businesses. Specifically, DoD awarded 24 percent of contract dollars to small disadvantaged

businesses under the NAICS code for professional, scientific & technical services. In comparison, award of 28.9 percent of contract dollars was made to all other small businesses under this NAICS code. This suggests that there may be opportunities for small disadvantaged businesses, including 8(a) small businesses, under this NAICS code.

For awards made to small disadvantaged businesses, 39 percent of contract dollars was awarded in the category of construction. In contrast, for all other small businesses 11.7 percent of the dollars were awarded under this NAICS code. For awards made to small disadvantaged businesses in the administration and support NAICS category, 11 percent of contract dollars were awarded to small disadvantaged businesses. This compares to 4.3 percent of total DoD contract dollars that were awarded to all other small businesses.

We believe these facts imply good use of small disadvantaged businesses in the NAICS classes where DoD buys what these firms offer. We hope that further analysis will help us better understand the small disadvantaged businesses that want to do business with us so that we can continue to improve our contracting accomplishments.

**Conclusion**

The FPDS data does not provide accurate information on all minority-owned businesses, but it does yield lessons about small disadvantaged business in that small disadvantaged businesses are usually owned by minorities. The DoD has continued to increase its contract awards to small disadvantaged businesses since 2001. DoD has demonstrated that it can continue to increase opportunities for these businesses in the future. Small disadvantaged businesses are, and will continue to be, an important part of DoD's small business programs. I believe that we are gaining insights that will help us develop mechanisms that will, in turn, allow us to make even greater use of small disadvantaged businesses in our contracting programs.

Madam Chairman, I thank you and the members of the Subcommittee for your interest in our efforts. I would be pleased to address your questions.

Ms. WATSON. Thank you so much. I am sure there will be questions.

Mr. Connolly, I know that you are concerned about the DOD, so we will get to questions in just a few minutes.

You may proceed, Mr. Neal.

**STATEMENT OF BRANDON NEAL**

Mr. NEAL. Good morning, Chairwoman Watson and Ranking Member Bilbray, and members of the committee. Thank you for inviting the U.S. Department of Transportation to discuss our efforts to comply with Government-wide contracting requirements for minority-owned businesses. My name is Brandon Neal, and I am the Director of the Office of Small and Disadvantaged Business Utilization.

Under the leadership of Secretary Ray LaHood, DOT has been a strong advocate for ensuring the participation of small businesses and ensuring that opportunities created by our Nation's investments are shared by all Americans. DOT small business contracting opportunities are available through our direct Federal contracting program and through recipients of DOT financial assistance via the Disadvantaged Business Program [DBE].

In fiscal year 2009, DOT received an A scorecard rating from the U.S. Small Business Administration for meeting its direct contracting small business procurement goals. In fiscal year 2009, $752 million was awarded to small and disadvantaged businesses.

The DBE Program is designed as a vehicle to increase the participation of DBEs in State and local procurements through our Federal Highway Administration, our Federal Transit Administration, and our Federal Aviation Administration. These are the three DOT operating administrations involved in the DOT program.

The Department created a high level task force to take a look at the DBE program and develop a long- and short-term recommendation process to improve the administration of the DBE program. The task force is chaired by yours truly, and it is also comprised of the senior leadership of each operating administration. The Secretary and the Deputy Secretary have personally participated in many of the task force meetings.

Secretary LaHood sent a letter to each Governor and State DOT administration indicating the Department's commitment to work together to provide small and disadvantaged businesses with an opportunity to participate in transportation projects. In a May 2010 Notice of Proposed Rulemaking, we proposed several important improvements to the DBE program: one, accountability for State DOT recipients; two, adjusting the personal net worth threshold; and, three, improvements with post-award oversight. We anticipate a final issuing within the next few months of the rulemaking.

DOT quickly disbursed contracts funded through the Recovery Act and the projects are still continuing to provide contracting opportunities. Additionally, projects are now in the stage of providing subcontracting opportunities for small businesses. Our most recent data indicates we have awarded $24.9 billion in ARRA contracts, of which $2.08 billion have been awarded to DBEs.

Additionally, we implemented a Bonding Education Program in collaboration with The Surety Fidelity Association of American to

get small businesses bond ready. Becoming bondable is a major obstacle for many DBEs, and this pilot program aims to address the issue and help those businesses grow by becoming bond ready and to compete for larger contracts.

Some examples of our outreach include over 180 outreach activities across this country this past year. The participation in the White House Interagency Task Force on Federal contracting opportunities for small businesses; in March 2010, DOT hosted the inaugural Small Business Summit entitled The Road to Recovery, attended by more than 700 small business leaders from across the country. Plans are currently underway for the second summit in 2011.

Our short-term lending program continues to help small businesses gain access to financing. We have implemented a Pilot Entrepreneurial Training and Technical Assistance Women and Girls Program with Spelman College in Atlanta, Georgia. This program is a part of the broader effort led by the White House Council on Women and Girls. Last month, Secretary LaHood announced the award of $11.6 million in grants for minority- and women-owned businesses to provide Federal aid to State DOTs for DBE firms to improve their ability to compete for and fulfill Federal highway contracts.

As demonstrated in the testimony of the Department and other witnesses on this subject before the House Transportation and Infrastructure Committee, the Department of Justice's compelling interracial narrative and the Department's own experience, race-conscious programs by the DBE program continue to be needed to address discrimination and its continuing efforts in transportation contracting. DOT is continuously looking for ways to increase small and minority business contracting.

Thank you again for the opportunity to be here.

[The prepared statement of Mr. Neal follows:]

**STATEMENT OF**
**BRANDON NEAL**
**DIRECTOR, OFFICE OF SMALL AND DISADVANTAGED BUSINESS UTILIZATION**
**U.S. DEPARTMENT OF TRANSPORTATION**

**BEFORE THE**

**COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM**
**SUBCOMMITTEE FOR GOVERNMENT MANAGEMENT, ORGANIZATION, AND PROCUREMENT**

**U.S. HOUSE OF REPRESENTATIVES**

**September 22, 2010**

Good Morning Chairwoman Watson and members of the Committee.

Thank you for inviting the U.S. Department of Transportation (DOT) here today to discuss our efforts to comply with government-wide contracting requirements for minority owned business programs.

My name is Brandon Neal and I am the Director of the Office of Small and Disadvantaged Business Utilization (OSDBU).

DOT has been a strong advocate for ensuring the participation of small businesses, including small disadvantaged, women-owned, HubZone, veteran, and service-disabled veteran owned small businesses, in its procurement process at both the prime and subcontracting levels. Under the leadership of Secretary LaHood, our commitment is to ensure that opportunities created by our nation's investment are shared by all Americans. The objective is for each operating administration (OA) within the Department to work to provide small businesses a fair chance to participate in transportation projects.

DOT Small Business contracting opportunities are available through our direct federal contracting program and through recipients of DOT financial assistance via the Disadvantaged Business Enterprise (DBE) program. DOT has demonstrated its commitment to small and disadvantaged businesses by designing a successful program to increase the number of competitively awarded direct federal contracts to small businesses by maximizing opportunities and promoting use of small businesses in DOT contracts.

**Small Business Strategy – Direct Contracting**

Small businesses are the backbone of our economy, employing about half of all private sector employees, and paying for nearly 45% of the total U.S. private payroll. Cognizant of this reality,

DOT has implemented a successful small business program designed to ensure opportunities for small businesses to participate in DOT contracts and subcontracts.

In Fiscal Year 2009 DOT received an "A" scorecard rating from the U.S. Small Business Administration for meeting its direct contracting small business goal achievements, which is the highest rating an agency can receive. In Fiscal Year 2009 DOT spent $1.9 billion in direct contracting, of which $752 million (39 percent) went to small and disadvantaged, women owned, Historically Underutilized Business Zone (Hub Zone), and service disabled veteran-owned businesses.

The OSDBU program is supported at the highest level of the organization and reflected in the DOT strategic and performance plans. The Transportation Acquisition Manual and the Transportation Acquisition Regulations reinforce written policies and procedures for use by the OAs to implement small business contracting activities. Each OA has at least one small business specialist to assist small businesses seeking contracting opportunities with DOT.

**Small Business Strategy – Financial Assistance Programs**

The history of the DOT DBE program began with a 1980 DOT rule. The program has been specifically authorized by statute since 1983, and is intended to provide a level playing field for businesses owned and controlled by socially and economically disadvantaged individuals. In response to strong evidence of continued effects of discrimination against women and minority business owners in federal transportation contracting, Congress has enacted DBE or similar program requirements as part of every highway/transit authorization act since 1983, and similar requirements for airport programs were codified in 1987. Three major DOT operating administrations are involved in the DBE program. They are the Federal Highway Administration, the Federal Aviation Administration and the Federal Transit Administration.

The Department is committed to strong oversight of the DBE program. Our objectives are to foster equal opportunity in DOT-assisted contracts, improve the flexibility and efficiency of the DBE program, and reduce burdens on small businesses. To this end, the Department held a series of stakeholder meetings to bring together prime contractors, DBEs, and state and local government representatives. Additionally, the Department recognizes the need to address the continuing effects of discrimination in our programs, as identified, for example, by recipient's disparity studies and testimony before the House Transportation and Infrastructure Committee in March 2009. As is made clear in those studies and testimony, DBEs continue to face discrimination in business lending, exclusion by networks of prime contractors, and less favorable treatment by suppliers, among others problems. In response, the Department has implemented program improvements and will continue to seek guidance to help all participants better understand and carry out their responsibilities.

The Department created a high level Task Force to look at the DBE program and develop long and short term recommendations to improve the administration of the DBE program. The Task Force is chaired by me and is composed of the heads of the General Counsel's Office, Government Affairs, Office of Civil Rights, Federal Highway Administration, Federal Transit Administration, Federal Aviation Administration, Federal Railroad Administration, and their respective DBE program directors. The Secretary and Deputy Secretary have personally participated in many of the Task Force meetings.

Secretary LaHood sent a letter to each governor and state DOT administrator indicating the Department's commitment to work together to provide small and disadvantaged businesses an opportunity to participate in transportation projects. Secretary LaHood also emphasized the need to take existing equal opportunity programs and resources to create innovative strategies to provide opportunities for small and disadvantaged businesses. Additionally, FAA, FHWA, and FTA Administrators sent a similar letter to their recipients stressing the importance of setting and meeting goals for DBE participation that reflect the level of DBE participation that would be expected absent discrimination, and indicating that they will be closely monitoring states that do not meet goals.

In a May 2010 notice of proposed rulemaking (NPRM), we proposed several important improvements in the DBE program. Some of the main provisions of this proposed rule include:

1. Accountability for state DOT recipients with respect to good faith efforts to meet overall goals.
2. Modifying and updating certification requirements.
3. Adjusting the personal net worth (PNW) threshold for inflation.
4. Providing for expedited interstate certification.
5. Adding provisions to foster small business participation and
6. Improve post-award oversight.

The comment period for this rulemaking has closed, and we received over 160 comments. We anticipate issuing a final rule within the next few months.

**<u>Implementation of Recovery Act</u>**

DOT quickly disbursed contracts funded through the American Recovery and Reinvestment Act (ARRA). The projects include bridge and pavement improvements, safety/traffic management and other transportation infrastructure projects. These projects continue to provide contracting and subcontracting opportunities for small businesses.

Our current reporting data indicates FHWA funded $24.5 billion in ARRA funded contracts and $1.7 billion (7 percent) in commitments to DBEs. FAA reports $1.1 billion in ARRA obligations and $92 million (8.4 percent) committed to DBEs. FTA will be unveiling a new web-based DBE

reporting module to their Awards Management System. A sampling of data from FTA's largest 50 ARRA recipients indicates of $2.8 billion awarded in contracting opportunities, with over $380 million awarded to DBEs (13 percent).

One of the major goals for the DBE Task Force is to have consistency and transparency in our data reporting. Projected improvements in our reporting mechanism will enhance DBE data collection including the number of jobs created.

We recently implemented a Bonding Education Program in partnership with The Surety and Fidelity Association of America to get small businesses bond ready. Becoming bondable is a major obstacle for many disadvantaged businesses, and this pilot program aims to address the issue and help these businesses grow by becoming bond ready.

**Small Business Strategy – Increased Opportunities**

The OSDBU developed and implemented several strategies to increase opportunities for small businesses. These strategies include working with each OA, small business organizations, and the minority small business community across the country.

Some examples of our efforts and strategies in the past year were:

- We conducted over 170 outreach activities, including webinars, DOT/OSDBU Small Business Days, and participating in major events like the Hispanic National Veterans Conference sponsored by the US Department of Veterans Affairs, Congressional Black Caucus Legislative Conference and the Minority Business Enterprise Development Conference. We have also participated in more than 70 congressional and community based events to ensure information is disseminated at all levels.

- The OSDBU is participating in the White House Interagency Task Force on Federal Contracting Opportunities for small businesses. The task force's mission is to coordinate the efforts of Federal agencies to improve capital, and business development opportunities for small businesses. I served as co-chair, along with Ginger Lew of the White House National Economic Council, of a working group entitled "Enabling Small Business Contracting through Training, Outreach, Bonding, and Access to Capital.

- In March 2010 DOT hosted the inaugural Small Business Summit entitled, "The Road to Recovery." More than 700 business leaders and representatives from the small disadvantaged business community came together to discuss the demands and challenges presented by today's economy, opportunities under the Recovery Act, and ways to grow businesses in the future.

- We hosted major vendor outreach days with a focus on veteran owned small businesses and women owned small businesses and each attracting over 500 small businesses. These special vendor outreach events provided small businesses an opportunity to have one-on-one sessions with representatives from each of our operating administrations and to learn about DOT small business programs.

- Our Minority Business Resource Center loan guarantee program, formerly referred to as the Short Term Lending Program, continues to help small businesses gain access to the financing they need to participate in transportation contracts.

- We increased our Small Business Transportation Resource Center program to 11 centers across the country. These centers offer a comprehensive delivery system of business training, technical assistance, and dissemination of information targeted toward transportation related small business enterprises.

- We established a "Pilot Entrepreneurial Training and Technical Assistance Women and Girls Program," a partnership with Spelman College in Atlanta, GA to encourage girls to pursue careers in science, engineering, and technology and help women in the field to achieve their goals. As part of our overall efforts to introduce students to such careers, this program provided internships and mentoring for young women as well as entrepreneurial training for women owned small business owners. This program is part of a broader effort, led by the White House, to ensure that federal programs and policies take into account the distinct needs and concerns of women and girls.

- The Pilot Entrepreneurial Training and Technical Assistance internship program has been very successful, and we just announced the expansion of the program through our Small Business Transportation Resource Centers – each of our 11 centers will now offer an internship program for female colleges students based on the Spelman model, allowing young women from all across the country to pursue careers in transportation.

- The Federal Highway Administration in conjunction with Federal Transit Administration and the OSDBU office are conducting a series of community workshops across the country to bring together all stakeholders in the contract process, including prime and subcontractors, federal, state, and local transportation agencies, unions, trade associations, and faith-base and civic groups – to discuss opportunities for DBE, set goals and develop plans to meet these goals. Also, the Federal Aviation Administration has conducted three national conferences, and has partnered with major trade associations to conduct other workshops and conferences to provide stakeholders the tools they need to implement a robust DBE program.

- We developed an internal committee for women owned small businesses and a committee for service disabled veteran owned small businesses – each to promote, coordinate and monitor DOT procurement plans and programs towards continued achievement of our procurement goals.

- DOT leadership has met with the representatives from the Tri-Caucus/Transportation and Infrastructure Committee to discuss our efforts to ensure that small and disadvantaged businesses have equal opportunities to benefit from DOT programs.

- Last month Secretary LaHood announced the award of $11.6 million in grants for minority and women-owned businesses. The grants from the Federal Highway Administration's Disadvantaged Business Enterprise/Supportive Services program provide federal aid to state DOTs for DBE firms to improve their ability to compete for and fulfill federal highway contracts.

But more is needed to address the barriers that DBEs continue to face in the marketplace and to ensure that they receive fair access to federal contracting opportunities. As a result, DOT will robustly implement its DBE program and is continuously looking at ways to increase opportunities for small and disadvantaged business contracting. Thank you for the opportunity to appear before you today. I will be happy to answer any questions.

Congresswoman Diane E. Watson

Chairwoman

The Subcommittee on Management, Organization, and Procurement

2157 Rayburn House Office Building

Washington, DC 20515

Dear Congresswoman Watson:

It was a pleasure to testify at the hearing entitled, "Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses," on Wednesday, September 22, 2010.

As requested, enclosed you will find the Disadvantaged Business Enterprise (DBE) Program participation in contracts funded by ARRA as of September 2010.

As noted in my testimony, there are three Department of Transportation (DOT) operating administrations involved in the DBE program. They are the Federal Highway Administration, the Federal Aviation Administration and the Federal Transit Administration.

Again, thank you for the opportunity to share DOTs efforts to comply with government-wide contracting requirements for minority owned business programs. If you have any questions, please do not hesitate to contact me at 202-366-1930.

Sincerely,

Brandon Neal

Director

Office of Small and Disadvantaged Business Utilization

**American Recovery and Reinvestment Act (ARRA) Projects Map**




**American Recovery and Reinvestment Act (ARRA) Funds Map**



**Disadvantaged Business Enterprise (DBE Program Participation in contracts funded by ARRA)**

**September 2010**

| | Total ARRA Contracts | DBE Commitments | Percent |
|---|---|---|---|
| FAA | $1,100,000,000 | $96,713,455 | 8.8% |
| FHWA | $24,685,452,272 | $1,718,587,366 | 7.0% |
| FTA | $3,100,000,000 | $386,000,000 | 12.5% |
| Total ARRA | $28,885,452,272 | $2,201,300,821 | 7.6% |

Ms. WATSON. Thank you so much, Mr. Neal. I would like to start the questioning now, and I am going to go quickly so I can get to our ranking member, and then I will get to you, Mr. Connolly.

Mr. Hinson, given that the Minority Business Development Agency now assists minority businesses of all sizes with their efforts to secure financing and other public and private sector contracts, what has your agency discovered regarding the issues confronting minority-owned businesses?

Mr. HINSON. Thank you for that question. Certainly we have discovered, as was outlined in the testimony and in our reports, that minority firms suffer tremendously from a lack of access to capital. Our studies and our research has shown that they suffer from a lack of access to contracts and they suffer from access to new market opportunities. So those are the three areas where we found that minority-owned firms are, and continue to be, challenged.

Ms. WATSON. We are basing this hearing around H.R. 4343, and I think you heard the position. How would these programs that are proposed in that legislation affect the MBDA's current operations and what, if any, type of additional researches would the Agency require to implement these programs?

Mr. HINSON. Thank you. To achieve our current mission right now, as it stands and as we are focused, we have adequate resources. These resources would expand our capabilities to go beyond where we are now. For example, we operate 46 business development centers around the country. These types of resources would quite naturally allow us to gain a broader footprint to help more firms grow to size and scale. But in terms of our current operation, our resources are sufficient to maintain the mission that we have now.

Ms. WATSON. If there is another area that seems to be uniquely depressed, how would they go about getting one of the centers?

Mr. HINSON. Well, certainly it is in the purview of Congress to decide if they want to, a Congressperson or Congress in general to decide.

Ms. WATSON. Would we have to make that decision, or do you have the authority to make that decision?

Mr. HINSON. We do not have the authority to make that decision beyond what is within the context of our budget.

Ms. WATSON. That is what I am really getting to. Can you open a new center if such an area exists and applies to you? Or do you have to come back to Congress?

Mr. HINSON. We certainly have the ability, because the centers are public-private partnerships. So we go out and we actually bid these centers out. The centers we have are the number of cents that we can actually have in the marketplace given our resources. So, yes, it is within our power to expand that footprint, but, again, in that respect we are resource constrained.

Ms. WATSON. Let me give you a case in point. California could be three States. Central Valley is suffering, and these are the field workers and so on. Should they want to start a small business to enhance opportunities for jobs, other than picking our fruits and vegetables, would they come then to your center? And most of these are Hispanic workers and so on. Is your center authorized to start an opportunity there, in that area, if they applied?

Mr. HINSON. Yes.

Ms. WATSON. Within your budget.

Mr. HINSON. Well, again, we are within the context of our current resources. We have essentially maxed out on our capability to expand our center footprint.

Ms. WATSON. I see.

Mr. HINSON. What we are doing is we are continuing to expand job growth by focusing on larger minority-owned and operated firms. Congressman Bilbray had an interesting point earlier, when he was speaking with Congressman Rush, about the power of size and scale. We partner and we work very closely with SBA.

SBA has a tremendous number of programs that help firms start businesses of different sizes. Our target market is really geared toward, again, because of what we work with on the resource side, we are really geared toward providing services to those firms that $1 million or more in gross revenue. But at the same time we provide services to all minority firms of all sizes.

Ms. WATSON. Let me yield now to our ranking member.

Mr. BILBRAY. Thank you very much, Madam Chair.

Let me just say I appreciate the comment.

Ms. Oliver, I want to thank you for bringing up a comparison between the disadvantaged and the small. Some people may say, well, 50 percent may sound good, but when 60 percent of jobs are created by small, that looks 10 percent deficient. But in all fairness to you, I have to say I assume, though, that the 50 percent that go to the big guys, there are many subcontracts that are serving the small guys through the larger contracts, is that fair to say?

Ms. OLIVER. That is absolutely fair to say, and particularly with these funds, because many of them are construction, and construction is an area where there are virtually always lots of subcontracts. It is the way the industry operates.

Mr. BILBRAY. Right. I appreciate that.

Ms. Johns, your reference and you made something that we do I think too often and, in all fairness to you, it just happens to be that we go down, we talk about the disadvantaged numbers. One thing I learned, I did a lot of work in environmental health, and that single component models are very, very deficient, if not delusionist. You have to have multi-faceted models to always make sure you cover the big ones. And I think you were pointing out there fairly on that about the return that businesses get based on the community or the ethnic background of the owner.

Did you have with those data, too, the proportionality between the profit margin and the return that you get based on size and the inherent disadvantage of the little guy competing in the field?

Ms. JOHNS. I don't have any specific data about that for this morning. Ranking Member Bilbray, I would be happy to come back or provide a specific response to any question you may have.

What I would like to tell you, though, is that the SBA is undertaking a rigorous look at size standards. I have, even in my short time at the SBA, I have made it a strong priority to meet with minority business owners. In fact, I had roundtables with two sets of 8(a) business owners just last week, one with a national representation, the other was local; and the issue of size standards is something that comes up, and that is as companies grow to a certain

size and their inability, once they size out of, so to speak, the small business category, but yet not sufficiently large to compete with really large companies, we know that is an issue that we have to pay close attention to. So that study is underway to do just that.

Congressman Bilbray, if I may also just say a word about the notion of coverage and footprint and access to services to start small businesses. I appreciated Director Hinson's reference to the SBA because the agency does have a broad network throughout the country through our resource partners, the small business development centers, our affiliation with Score, our women business centers; that in a year's time we touched a little over 1 million individuals to provide counseling to them. So that is why partnership is so very important. MBDA has its area of expertise; the SBA is the place where a full complement of services particularly focus on small businesses that we strive to make available. And, again, we are looking at where we can improve our outreach and improve our——

Mr. BILBRAY. Ms. Johns, I appreciate that. I think one of the things we have to admit, in fact, I guess the example totally separate from this was the RTB back in the 1980's, where the big guys, everything was grouped together; contractors grew up so huge that there were only a few people that could put together capital to manage that. The American taxpayer was absolutely ripped off because you go out to bid where only two or three people could bid. But because it was easier for the bureaucracy to manage these huge packages, rather than breaking them up into competitive market-based structures, because just inherently it is easier to handle one contract rather than 10 or 100. But the taxpayer and the small guy got totally cut out of the system.

I want to make sure that we keep that in mind, because you can't isolate the disadvantaged business people from the impact of our policies on small businesses. De facto, it is always going to be the minority community that gets hit harder when the little guy gets hit, regardless. And I think the one thing that isn't talked about enough in polite company is the fact that just because it is a disadvantaged minority-owned business doesn't mean that people that do not fall into that ethnic crowd is not benefiting, because the employees aren't necessarily in one little group; the employees are very broad. And I don't think we talk enough about that, that a job is a job is a job, and that just because the boss happens to fall into one category doesn't mean the general community is not benefiting with real viable jobs.

My question, though, is when we get down to this issue of subcontractors, are we frank and open to the fact that, like you point out, they get credit for recruiting those subcontractors, but being much more aggressive on that? Is that fair to say?

Ms. JOHNS. May I comment on that?

Mr. BILBRAY. Yes.

Ms. JOHNS. What we have done at the SBA is, I believe it was referenced earlier, we have a scorecard that we utilize to track what Federal Government agencies are doing in the area of small business utilization, and just recently the whole area of subcontracting was strengthened and more focus is being put there because, as you cite, Congressman Bilbray, the notion of larger con-

tracts for longer terms, as the Government is looking to operate more efficiently, we have to make sure that even in that situation that the focus on small business opportunity is not lost.

Mr. BILBRAY. And competition in the long run is going to save us. I know I have burned up time, but the 900K really sticks out to me. There is 900K being spent on these centers, and my question to you is, to give you a chance to defend it, wouldn't that be better used going directly out to your target rather than creating this structure and this overhead of getting this directly out into the market and stimulate the private sector, rather than building this public sector infrastructure that is costing 900K?

Mr. HINSON. I am sorry, 900K, what are you referring to?

Mr. BILBRAY. I am talking about hiring the development of the business centers and hiring the experts, consultants.

Mr. HINSON. Right. The answer to that question, I would respectfully say, is no. Those business development centers create the conditions for minority-owned and operated firms to gain access to capital and access to contracts, the two key inputs if you want to grow a company. When you look at our operation, our ROI is over 100 times.

In other words, for every dollar of taxpayer money that flows into our agency, we create over $100 of economic output. I would argue, sir, that it is the exact reverse. You would want to expand the footprint so you can touch more firms, help these firms grow to size and scale. And I might add, anecdotally, that minority-owned firms are twice as likely to export as non-minority-owned firms. This sector screams for investment and for support. So I would argue to you that, from where we sit, the dollars that are committed to these centers are critical to providing the conditions under which these firms can grow.

Mr. BILBRAY. Madam Chair, just for the record, California does not constitute three States. My county of San Diego is larger than 20 States, and your county is larger than 40 States.

I yield back.

Ms. WATSON. Thank you for reminding us.

I would like now to yield to Mr. Connolly.

Mr. CONNOLLY. I thank the Chair. And before my time starts counting, on a point of personal privilege, if I may just say, this may be one of your last hearings to chair, Congresswoman Watson, and I just want to say personally I have really appreciated your friendship and the civility and grace and thoughtfulness with which you comport yourself and bring to every debate and every issue. It is going to be something sorely missed.

Ms. WATSON. Thank you.

Mr. CONNOLLY. Thank you for your service.

Let me start, if I may, as the Chair anticipated, Ms. Oliver, and, by the way, is there somebody from Pentagon Government Relations here with you?

Ms. OLIVER. I don't know.

Mr. CONNOLLY. OK, good. So I hope you take this back. You know I want to, first of all, thank you for your testimony and thanks for summarizing it and admitting a lot of it would have otherwise been boring. Thank you. [Laughter.]

A refreshing change. And none of this is meant personally, but I want, since you are here and you are from the Pentagon, as you know, Secretary Gates announced a pullback of 10 percent of all outside Pentagon contracts for 3 years. Ten percent a year for 3 years.

The Virginia delegation was recently briefed by Pentagon folks, and there was not a shred, not a scintilla of evidence to justify such an announcement. There was no analysis; there were no programs or priorities identified. It was just a number pulled out of a hat. And for this Member of Congress, and I think increasingly for colleagues on both sides of the aisle, that is unacceptable.

And one of the concerns I got—by the way, this subcommittee has asked the Pentagon to testify on September 29th. I hope Government Relations takes it back. If you want to duck it, some of us will call it out for precisely that. But the concern I got, Ms. Oliver, and I want you to have a chance to comment, when you set an arbitrary goal like that, and what that means is people in the bureaucracy have to scramble to meet it on a date certain. Ten percent, oh my God.

So what happens? Well, you are going to take the low hanging fruit. What is the easiest to pull back from outside contracting to meet that goal? And it ain't the big guys. The have big law firms; they can litigate, they can appeal. They know how to work the system, and there are lots of other big contracts at stake even the Pentagon may not want to upset.

I think the earliest victims of such an arbitrary 10 percent pullback will be small and minority-owned businesses. It will be businesses owned by minorities, women, and disabled veterans, especially. And I wonder, No. 1, has your office at all been involved in any of the discussions about this incredible decision when we think about the money and the number of contracts potentially affected? And have you done any analysis of the potential impact and how to guard against that negative impact on all of the wonderful statistics you rightfully and pridefully shared with us this morning?

Ms. OLIVER. I would be so happy if you could tell me how to find those statistics. Yes, we have been. The Department of Defense has been asking itself internally how will we become more efficient particularly without harming small businesses. We are aware of the problem and I personally would so welcome any insight you might be able to give about how to quantify it.

Mr. CONNOLLY. I want to be real clear about your testimony. Are you testifying here that you were consulted before the announcement of a 10 percent pullback, 10 percent a year for 3 years, and that the concern was expressed to you we want, of course, to make sure that we shield or protect or there is not some disproportionate negative impact on small and minority-owned businesses?

Ms. OLIVER. No, I am not testifying to that.

Mr. CONNOLLY. That is what I thought. Have you been invited to any discussions, moving forward to the future, to talk about the implementation of such a sweeping goal?

Ms. OLIVER. Yes, I have been.

Mr. CONNOLLY. Are you aware of the fact that the Pentagon has been invited by this subcommittee to come and explain that goal and how it will be implemented? I understand you are not the

spokesperson for the Pentagon but, unfortunately for you, you are here.

Ms. OLIVER. This happens all the time.

Mr. CONNOLLY. And even though we loved your testimony, we want to send you back with a message, because this is very serious business, and it doesn't just affect my district or my State; it is going to affect Mr. Bilbray's, it is going to affect Diane Watson's, it is going to affect Judy Chu's.

There are contractors all over the country, especially for the Pentagon, and especially I worry that one of the unintended consequences, it certainly is not an intended consequence, is the very people you get paid to try to help, and the very firms you get paid to try to integrate into the opportunities of Federal contracting, will be hurt the first and the most; and that is the message I would like you to take back to the Pentagon.

Thank you, Madam Chairman.

Ms. WATSON. Thank you so much for your concern, and we are planning to hold a private confidential hearing for you to raise those questions and get answers. We did not want to subpoena anyone from DOD at this hearing, but I think you can get the kind of information you need. We all represent constituencies that will be sorely affected, I mean, they are now.

So that is one of the reasons why we are having this hearing. And in order to save the jobs, particularly those small firms and minority firms, that are really impacted greatly in this current economy, we would just like to know what the thinking that went in. So we are going to have a meeting. We hope to get some direct answers.

With that, let me yield to Ms. Chu.

Ms. CHU. Thank you so much, Madam Chair.

I certainly embrace Congressmember Rush's bill, H.R. 4343, and certainly think that it is so important to improve the outreach to minority contractors for Federal contracts, and I am certainly alarmed that minority businesses make up 20 percent of all businesses, yet are lagging with regard to Federal contracts.

I would like to direct this question to Mr. Hinson. As the Chair of the Economic Development Task Force for the Congressional Asian Pacific Caucus, I have been contacted by several Asian Pacific Islander groups, the Asian Pacific Islander Small Business Program, the Pacific Asian Consortium and Employment, the Search to Involve Filipino-Americans in the Asian Business Association, as well as the Asian Pacific Revolving Loan Fund, and they are very, very anxious to participate in MBDA and to partake of the technical assistance that is inherent in it.

I was wondering what kind of outreach you would be doing to the API community, other than attending conferences or participating at roundtables? What kind of technical assistance is there to make these businesses actually succeed?

Mr. HINSON. Thank you for that question. The API community is a critical community in this country. In fact, the API community produces $500 billion of the $1 trillion in gross receipts that the entire minority business community generates. Certainly, this community is critical to MBDA, and we continue to provide outreach and support to this community.

We have found that, from an overall business standpoint, around 20 percent of our business activity is within API companies. Those companies and those individuals who are interested in participating have access to our centers just like any other company does; we continue to provide outreach to the various members of the community.

In fact, I would say that, at your prodding, which I very much appreciate, with our new Web site we actually have bilingual capability so that various members of the API community who don't have English as their first language have the ability to access the information that MBDA provides in the language of their choice. So we continue to outreach to this community; we are aggressive about it. It is important to the administration that this community continue to receive support and service, and we continue to outreach and support this community.

Ms. CHU. Well, I appreciate your translation of services on the Web site. In fact, I wanted to follow that up with a question about linguistically appropriate outreach. And I am concerned for the Hispanic community, as well as for the API community, where you do indeed have many high-end businesses where people may be primarily proficient in another language. So I am wondering what kind of incorporation in the grant program is there about linguistically appropriate services? I just want to make sure that those centers do indeed have the capability to address the linguistic needs of our communities.

Mr. HINSON. And again I thank you for that question. Some of our centers certainly do have people that work in those centers that speak multiple languages. Our centers are in high dense communities, where you have a lot of businesses, where you have a lot o f languages being spoken, and you know as well as anyone that there is no one language that represents the API community; there are quite a number of languages.

I won't sit here and say that on the ground we have the ability, we have the people that can actually speak each one of the individual languages. I can say that our experience has been, for the businesses that we serve, that they are very comfortable speaking English in their business transactions. I would tell you that many of them participate in our B2Bs.

In fact, we partnered with SBA and DOT, as I mentioned, for the B2B event at our MED Week Conference, and there were quite a number of API companies that took advantage of the access to the $300 billion of contract opportunities that we provided. So I understand your point and I appreciate that point, and we will continue to do as much as we can do to make sure we meet the language requirements of the community.

Ms. CHU. In fact, I did write a letter asking for a legal opinion on a linguistic and culturally appropriate services in the new round of Federal funding opportunities to operate in MBDA centers. Can you tell me what the status is of this legal opinion?

Mr. HINSON. I cannot tell you now. I will certainly get back to you with an answer to that question. I will tell you that, as I indicated earlier, that all the centers are public-private partnerships. There is open bidding. We are in the process of going out with the new FFO to open up the bidding for these centers, and anybody

who is interested in bidding, anybody from the API community who wants to bid, they have the right to bid, and they will be reviewed in competition with all the other bidders for those particular centers.

Ms. CHU. That is great. I just would hope that there would be some encouragement for those bidders, especially those who might have linguistically appropriate capabilities.

Mr. HINSON. Absolutely.

Ms. WATSON. Thank you so much.

To conclude this panel, I would like to go to Mr. Neal, and if you can answer very quickly. I going to put two questions in one. DOT has received a considerable number of funds, stimulus funds. How much of these dollars have gone to DBE firms? And do you believe that discrimination continues to be a problem in the transportation industry?

We are getting some feedback and there seems to be some contractors out there that are contacting us that they feel that they have been treated unfairly. So can you respond?

Mr. NEAL. Sure. Thank you, Madam Chairwoman. Under our Federal Highway Administration, $1.7 billion was committed to DBEs out of $24½ billion. Under our FTA, Federal Transit Administration, we had 13 percent go to DBEs and $2.3 billion funded, and $290 million was awarded to DBEs. And under our FAA, Federal Aviation Administration——

Ms. WATSON. Can I just stop you there?

Mr. NEAL. Sure.

Ms. WATSON. Would you give us those statistics in writing to our committee?

Mr. NEAL. Absolutely.

Ms. WATSON. I would like to circulate them so we can have proof that we are using these funds to serve the purpose.

Mr. NEAL. Absolutely. And under our Federal Aviation Administration, we had $1.1 billion in recovery money, and $92 million went to DBEs and 8.4 percent were committed overall to DBEs.

The Office of the Secretary, under the leadership of Secretary LaHood, has put together an Interagency Task Force solely focused on DBEs and accountability, and, of course, as I indicated in my remarks, that yours truly is the chair, and what we do is make sure that there is a lot of accountability and enforcement in making sure that the States who receive these moneys are now making sure that they are actually readily reaching out to DBEs and making sure that there is no form of discrimination. And through our Office of Civil Rights and through our Office of the General Counsel's Office, we have put together some extreme measures to make sure that there will be accountability for those contractors and for those companies who do not reach out to DBEs.

Ms. WATSON. If there are other questions that any Member might have, let's have them given to us, and we will submit them to you. We are really pushed for time now, so I want to thank this panel for your testimony. Everything you have presented to us has been recorded and your full statements are over there, and they will be part of the record.

So any Members that want those charts that we referred to, please take the materials that are on the table.

Thank you so much. We will adjourn this panel.

The third panel will be composed of Mr. Anthony Robinson, Mr. Fernando V. Galaviz, Donald O'Bannon, Mr. Zingeser, Michael Sumner.

[Pause.]

Ms. WATSON. I want to thank the panel for coming up quickly. Our time is growing short, so we are going to get started, and if the audience will quietly exit, those that are leaving, we can begin.

As you know, it is the policy of the Committee on Oversight and Government Reform to swear in all witnesses before they testify, so I would like to ask you to stand and raise your right hands.

[Witnesses sworn.]

Ms. WATSON. Let the record reflect that the witnesses answered in the affirmative.

Now, I will take a moment to introduce each panelist. Mr. Anthony Robinson is the president of the Minority Business Enterprise Legal Defense and Education Fund, where he advocates on legislative and regulatory issues on behalf of the minority business community. Previously, Mr. Robinson, was a partner in the law firm of Singleton, Dashiell, and Robinson in Baltimore, and he also served as a commissioner with the Maryland Inmate Grievance Commission.

Mr. Fernando V. Galaviz is the president and CEO of the CENTECH Group, Inc., and is here on behalf of the Mid-Tier Advocacy. The CENTECH Group, Inc., is a technology systems and solutions provider that has serviced Federal Government, civilians, and military agencies for more than 20 years. Mr. Galaviz also chairs the National Association of Small Business Federal Contractors, Inc., and previously he also worked as chief of industry trade and market development for the Minority Business Development Agency and as chief of the Contracting and Financial Systems Programs for the Office of the Secretary, U.S. Department of Transportation.

Mr. Don O'Bannon is vice president of the Business Diversity and Development Department at the Dallas-Fort Worth International Airport. Mr. O'Bannon is currently serving his second term as chairman of the Board of Airport Minority Advisory Council [AMAC], and previously Mr. O'Bannon was a partner at the Dallas law firm of Vile & Hamilton, has also managed his own legal consulting firm, O'Bannon & Associates, P.C.

Mr. Joel Zingeser is director of corporate development for Grunley Construction Co., Inc., and he leads the company's Strategic Planning, Business Development, and New Technology Programs, including sustainable design and construction. He has consulted with the World Bank and the U.S. Agency for International Development, and he is treasurer of the Washington Building Congress.

And Mr. Michael Sumner, doctor, is research manager for the Henderson Center at UC Berkeley Law School, where he focuses on evaluating the effects of equal opportunity programs on both public contracting and public employment. Mr. Sumner has examined the impact of California's anti-affirmative action, Proposition 209, and has also led the Henderson Center's work on best practices in equal opportunity programs. Prior to his work with the Henderson Center, Mr. Sumner worked at the Discrimination Research Center,

where he focused on language access rights to public institutions for speakers with limited English language skills.

All right, I ask that each one of the witnesses now give a brief summary, a brief summary of your testimony, if you will, and keep this as much under 5 minutes, if you can. Your complete, as I said before, written statement will be included in the hearing record.

Mr. Robinson, would you please proceed?

**STATEMENTS OF ANTHONY W. ROBINSON, PRESIDENT, MINORITY BUSINESS ENTERPRISE LEGAL DEFENSE AND EDUCATION FUND; FERNANDO V. GALAVIZ, PRESIDENT, THE CENTECH GROUP, ON BEHALF OF THE MID-TIER ADVOCACY; DON O'BANNON, CHAIRMAN, AIRPORT MINORITY ADVISORY COUNCIL; JOEL ZINGESER, FAIA, DIRECTOR OF CORPORATE DEVELOPMENT, GRUNLEY CONSTRUCTION CO., INC.; AND MICHAEL SUMNER, DISCRIMINATION RESEARCH CENTER, THELTON E. HENDERSON CENTER FOR SOCIAL JUSTICE, UC BERKELEY SCHOOL OF LAW**

## STATEMENT OF ANTHONY W. ROBINSON

Mr. ROBINSON. Thank you very much, Madam Chairwoman. I am, as you have noted, Anthony Robinson, with the Minority Business Legal Defense Fund. We are affectionately referred to as MBELDEF, and act as a legal advocate, founded by former Congressman Parren J. Mitchell in 1980, on behalf of the minority business community. We appreciate very much you holding this hearing. We think it is quite significant and appreciate your time and attention as it relates to this matter.

Madam Congressman, it has been noted by a number of previous witnesses that growth in minority enterprise in exact numbers, but what has also been acknowledged is the issue of capacity on behalf of these firms to operate at a level at which the new market has emerged in reference to that.

Discrimination remains a stark reality for minority businesses. In a recent survey that was conducted by an economic research firm, where they surveyed some 350 of the fastest growing minority-owned firms as it relates to the significance of discrimination in their industry, brought about the following results: 80 percent of the firms in communications and utilities, 46 percent in transportation, 57 percent in heavy construction, and 53 percent among general and specialty contractors considered discrimination a very significant, significant factor within their industry. And it impacts almost every aspect of their doing business, from business formation, access to contracts, access to credit and capital, to performance on the job.

Recently, Madam Chairwoman, MBELDEF, along with the National Association of Minority Contractors Philadelphia Chapter, and the National Black Chamber of Commerce, conducted field hearings in some eight cities across the country, and we interviewed over 65 witnesses. I would ask that we be provided the opportunity to present the testimonies of these 65 witnesses at some later point to supplement our testimony.

The consistent theme——

Ms. WATSON. Let me just say you may give them to us and, without objection, we will accept them and put them into the record.

Mr. ROBINSON. Thank you very much.

As I said, minority business programs are important relative to speaking to the disparities that have been pervasive as a result of discrimination, and there has been an enormous amount of research that has been done, much of it noted. I would like to reference the fact that many of the disparity studies that my colleague on this panel, Mr. O'Bannon, will be putting in the record will speak to much of the private sector discrimination. As it relates to private sector discrimination, I would like to state that there is no affected policy to deal with private sector discrimination now in place, and we would ask this Congress to take a look at that.

In addition, the disclusionary activities of the construction trade unions continue to have a pervasive impact on minority enterprise programs. And, of course, as you heard in reference to access to capital and access to bonding, there continues to be a persistent and pervasive problem.

What I would like to do with the balance of my time before the committee is just to relate several of the individual experiences of minority businesses in the marketplace on the issue of discrimination, and among them would be a Louisiana concrete contractor. And we have deliberately maintained the anonymity of these contractors because of concerns about reprisal in the marketplace as it relates to this issue, and it is a very real issue, Madam Chairwoman.

A Louisiana concrete contractor was rejected by six banks, despite the fact that he had worked for some of the largest real estate development firms in that region of the country on the issue of finance. He knew what banks were looking for and he knew many of the bankers personally. He had contract commitments from customers who were willing to go with him to the bank to verify their commitments.

Nevertheless, he was forced to diversify his ownership to include a white minority partner before any bank would approve the loan. The only difference in his presentation to the banks before and after the loan approval was the presence of his white equity partner. The critical variable was not the financial strength of his presentation, because he has a wealthy Black football player that was willing to act as a credit backer, but still the bank rejected his loan application. Only when the white credit backer was presented did the banks approve, so the issue had to be the credit backer's race.

His was an 8-year-old business with 45 employees, generating 25 percent annual growth during a recession, with $10 to $15 million in sales, and a $800 to $1 million in annual profits. He had three times the cash-flow needed to cover debt service on three new plants, but still he could not get a loan for a single new plant until he had the white equity backer. In spite of this creditworthiness, he faced the same challenges that a startup business would face. No matter how strong the business was, his secondary source for repayment, his loan application was disapproved by the banks.

In another instance, an African-American contractor in Richmond, Virginia faced disparate treatment in his competition for

construction, demolition, and disposal contracts. After his bid for a city demolition contract was determined to be the lowest, the contract was in fact split in half, resulting in a majority contractor receiving a portion of the contract as well. In other cases where he was the lowest bidder, the contract award was in fact split.

I have many other anecdotes, Madam Chairwoman. I see my time has elapsed. Again, we would like to submit the balance of the 65 testimonies into the record.

Thank you very much for this opportunity.

[The prepared statement of Mr. Robinson follows:]

MBELDEF
Minority Business Enterprise Legal Defense
and Education Fund, Inc.
www.mbeldef.org

Parren J. Mitchell
Founder and Chairman
Emeritus

Anthony W. Robinson
President
awrobinson@mbeldef.org

Testimony of Anthony W. Robinson, President
Minority Business Enterprise Legal Defense and Education Fund

Before the United States House of Representatives
Subcommittee on Management, Organization, and Procurement
Committee on Oversight and Government Reform

Washington, DC
September 22, 2010

Testimony of Anthony W. Robinson, President
Minority Business Enterprise Legal Defense and Education Fund

Before the United States House of Representatives
Subcommittee on Management, Organization, and Procurement
Committee on Oversight and Government Reform

Washington, DC
September 22, 2010

Good morning Madam Chairwoman and members of this subcommittee. My name is Anthony W. Robinson, and I am President of the Minority Business Enterprise Legal Defense and Education Fund (MBELDEF). Our organization was founded by the late Congressman Parren J. Mitchell, to act as a national advocate and legal representative of the minority enterprise community. We promote policies affecting the equitable and full participation of minority businesses in the national and international marketplace. We attempt to provide non-partisan opinions on matters affecting these enterprises.

We appreciate the subcommittee providing us this opportunity to represent the class interest of minority entrepreneurs who continue to rely on the federal marketplace as a primary source of opportunity.

## BACKGROUND

According to the most recent data published by the U.S. Census Bureau, minority-owned businesses now comprise approximately 21% of the 27 million U.S. businesses and they are growing very rapidly. Between 2002 and 2007, the percentage increase in the number of firms owned by Hispanic Americans was over three times that of whites; the percentage increase in firms owned by Black Americans was over four times that of whites; and the percentage increase among Asians owned firms was just under three times that of whites.[1]

As we project forward, this represents a rapidly changing business demographic profile. The advent of public policies encouraging minority participation and population changes are producing a growing parity in the number of businesses that are owned by minority and other historically underrepresented groups. However, because of pervasive discrimination there remains a tremendous disparity in the relative capacity and scale of minority-owned businesses in comparison to businesses owned by whites.

The global nature of the economy is forcing upon small and minority-owned businesses the need to increase scale and capacity to compete successfully or

[1] www.census.gov/econ/sbo.

merely survive. Globalization has moved major corporations to reduce the number of firms they use in their supply chain. In addition, there continues to be growing phenomena of government organizations bundling contracts.

Minority contractors who manage to overcome these obstacles are frequently confronted with racial discrimination in attempting to bid for, obtain, and perform construction contracts. In a recent survey by the economic research firm Euquant, they surveyed 350 of the fastest growing minority-owned firms relative to the significance of discrimination in their industry. The survey results found eighty percent (80%) of the firms in communication and utilities, forty-six percent (46%) in transportation; fifty-seven percent (57%) in heavy construction; and fifty-three percent (53%) among general and specialty contractors considered discrimination a very significant factor within their industry.[2]

The evidence of discrimination against minority contractors is stark and affects all aspects of market access, utilization and performance. Quantitative studies, as well as anecdotal reports, detail the considerable discrimination based on race and national origin that confronts minority contractors in all parts of the country and in virtually every industry. These discriminatory practices have been documented extensively in case law, regional disparity studies, and congressional hearings.

The discrimination is not limited to one particular minority group; instead disparity studies show conclusively that businesses owned by African-Americans, Hispanics/Latinos, Asians, Pacific Islanders, and Native Americans all confront discrimination in their efforts to form, grow and maintain businesses.

**SUMMARY OF FINDINGS**

In a collaborative effort between the Minority Business Enterprise Legal Defense and Education Fund (MBELDEF), the National Black Chamber of Commerce (NBCC) and the Philadelphia Chapter of the National Association of Minority Contractors (NAMC), we conducted field hearings in eight U.S. cities. The cities included Philadelphia, Chicago, St. Louis, New Orleans, Houston, Washington, DC, Portland and Richmond. Testimony provided by nearly sixty witnesses, including construction contractors and others directly involved in the implementation of minority inclusion programs, provides us with a clear and unimpeachable perspective on the nature of the discrimination they face. What the testimonies document are the operation of discriminatory systems that, independently are troubling enough, but in combination yield devastating outcomes

[2] T. Boston and Linje Boston (October 2007) "Increasing the Capacity of the Nation's Small Disadvantaged Businesses" Research Report prepared for the Congressional Black Caucus Foundation and entered into the Congressional Record as part of testimony before U.S. Senate Committee on Small Business and Entrepreneurship, September 11, 2008, 63 pp.

for the survivability of minority construction contractors and the creation of job opportunities for minorities in the construction industry.

Finance

Minority-owned construction firms face significant discrimination in the financial arena. They are less likely to receive loans than non-minority firms. Banks apply tighter lending standards for minority-owned construction firms than to their non-minority competitors. Creditworthy minority-owned construction firms are denied loans because they are minority-owned and, in some cases, have been forced to accept non-minority equity partners in order to qualify for loans. SBA and DOT loan programs and Federal Reserve Community Reinvestment Act are ineffective in increasing lending to minority-owned construction firms, fundamentally because they do not have a significant effect on bank lending procedures.

The testimonies of our witnesses have been buttressed by numerous studies that continue to document the racially discriminatory barriers minority firms encounter when pursuing debt and equity funding. A study by Ken Cavaluzzo analyzed credit applications, loan denials and interest rates paid across gender, race and ethnic characteristics of the small business owners. He gathered data on businesses that applied for credit and those that did not apply because they felt their application would have been turned down. He found large unexplained differences in denial rates between African American and white male owned companies that could only be attributed to discrimination. [3]

In a 2004 study conducted by Susan Coleman examined access to the capital for women and minority owned small firms and found that after controlling for differences in human capital characteristics of owners, minorities were significantly less likely to be approved for loan requests and they were also significantly less likely to apply for loans because they assumed they would be denied. [4] Karlyn Mitchell and Douglas Pearce (2004) found that African American and Hispanic firms are significantly less likely to receive bank loans than are white business owners. (cite?)

The inability of minority-owned construction firms to meet bonding requirements seriously constrains their participation. Approaches to risk management that have proven to be effective in dealing with this problem are not fully utilized. Insurance brokers lack incentives to serve the minority-owned construction firms, whose contracting opportunities are generally smaller in size.

---

[3] Ken Cavalluzzo & Linda Cavalluzzo & John Wolken, 1999. "Competition, small business financing, and discrimination: evidence from a new survey," Proceedings, Federal Reserve Bank of Chicago, issue Mar, pages 180-266.

[4] Availability of Financing to Small Firms Using the Survey of Small Business Finances, by Karlyn Mitchell and Douglas K. Pearce SBA Office of Advocacy, May 2005, Under contract number SBAHQ-03-Q-0016.

Enforcement of MBE Regulations

The certification of minority contractors is fraught with problems. Minority certification places minority-owned construction firms at a competitive disadvantage when competing for work as prime contractors, relegating them to subcontracting. Lack of enforcement discourages minority participation. Prime contractors use a variety of tactics to discourage minority participation, such as slow payment, unjust termination, forced reduction in bid price, forcing subcontractors to pay liquidated damages, requesting bids without intending to use the contractor, and refusing to assist minority-owned construction firms to obtain equipment, supplies and financing. When project owners fail to challenge these tactics and regulators fail to enforce the law, minority contractor discouragement is exacerbated.

Private Sector Participation

One of the reasons that government minority business programs are important is that the discrimination and disparities in the private sector are so pervasive. There has been an enormous amount of research documenting the fact that private sector discrimination, where minority business programs are not in place, is far greater than in the public sector where such programs do exist. I would direct the committee's attention to many of the disparity studies that my colleague, Mr. O'Bannon is putting in the record today for ample evidence of private sector discrimination. Another problem is that, unfortunately, existing public sector minority business programs are insufficiently effective in preparing minority construction firms to compete for work in the private sector. We must improve and strengthen these programs so that they do more to allow minority businesses to transfer their skills and experience from the public sector to the private sector. We may also need to consider new legislation to more effectively prohibit discrimination in the private sector. Without these improvements, minority-owned construction firms will continue to work almost exclusively in the public sector. .

Impact of Unions, PLAs and Exclusionary Agreements

It is clear that the construction trade labor unions have been, and remain, a serious obstacle to the participation of minority contractors and workers in the construction industry. They intimidate minority-owned construction firms to discourage utilization of minority construction workers, discourage workforce development in higher-paying skilled trades, send less qualified workers to minority-owned construction firms, and discriminate against minority-group workers in apprenticeship programs. The execution of project labor agreement was also cited as disadvantageous to minority owned construction companies and their desire to employ minority workers.

I would like to give you some specific examples of real business owners who have confronted discrimination. This represents a sampling of the testimonies we have collected. With the Chair's permission, we may supplement our testimony with additional examples at a later date. It is critical that the Committee understand how very difficult it is for these businesspersons to come forward and share their experiences. By coming forward, they are putting their businesses in jeopardy of being blackballed and frozen out of future business opportunities with larger companies that dominate their market or industry. I hope that you will all carefully consider the sort of courage and commitment to justice required to those kinds of risks. I will submit letters and emails providing details of these entrepreneurs' stories for the record. However in the interest of time, I will provide only a short synopsis anonymously of the difficulties they have experienced

**INDIVIDUAL TESTIMONIES**

- A Louisiana concrete contractor was rejected by six banks despite the fact that he worked for some of the largest real estate development companies in the country, and had been an officer of the city government with responsibility for putting finance deals together. He therefore knew what the banks were looking for and knew the bankers personally. He had contract commitments from customers who were willing to go with him to the bank to verify their commitments. Nevertheless, he was forced to diversify his ownership to include a white minority partner before any of the banks would approve a loan. The only difference in his presentation to the banks before and after loan approval was the presence of a white equity partner. The critical variable was not the financial strength of his presentation because he had a wealthy black football player that was willing to act as credit backer, but the banks still rejected the loan application. Only when the white credit backer was presented did the banks approve, so the issue had to be the credit backer's race.

  His is an 8-year-old business with 45 employees. He has generated 25% annual growth even during the recession with $10-15 million annual sales and $800,000 to $1 million in annual profits, which he used to retire his debt by 50% in the last two years. He has three times the cash flow needed to cover debt service on three new plants, but still can not get a loan for a single new plant unless he has a backer. In spite of his obvious creditworthiness, he is facing the same discrimination today that he faced as a start-up business. No matter how strong his business is, he must have a "secondary source" of repayment before the banks will lend to him, and he has documentation from the banks to prove it.

- An African-American contractor in Richmond, Virginia faced disparate treatment in his competition for construction, demolition, and disposal contracts. After his bid for a city demolition contract was determined to be the lowest, the contract was split in half – resulting in a majority contractor receiving a portion of the contract as well. In other cases where he was the lowest bidder and the contract award was split, majority contractors would receive larger shares of the work despite their higher bids. In another case where he had the lowest of four bids and another African-American contractor submitted the second lowest bid, the contract was subsequently awarded in part to all four.

- An African-American electrical contractor in Philadelphia, Pennsylvania was forced to join the International Brotherhood of Electrical Workers in order to continue to provide services to the Philadelphia School District under the terms of a union-only project labor agreement (PLA). The PLA provided that minority contractors who joined the union because of the PLA but were never unionized prior to the PLA, would be permitted to utilize their own work force of skilled and semi-skilled workers rather than workers provided by the union hiring hall. Six of the contractor's nine employees were signed as apprentices. The apprentices were told that apprenticeship classes would begin three or four months later. When the classes began, they learned that all the other participants in the apprenticeship program had been given the benefit of up to ten weeks pre-apprenticeship training, including mathematics courses. The minority apprentices had difficulty with the geometry, trigonometry and other subjects, having been out of school six to seven years. The union terminated all six apprentices, banning them from continuing to perform work that they had been successfully performing for years and denying the minority contractor the benefit of utilizing the workforce he had personally trained and should have been allowed to employ under the terms of the PLA. The contractor is now litigating this and other related issues with the IBEW in federal court.

- A leading second-generation New Orleans African-American general contractor has been in business for eighteen years, and has done business throughout the Gulf region and in more than a dozen countries. He is an 8A and HUB Zone program participant. Recently he paid cash for a 50,000 square foot strip mall and a 26-unit condominium complex worth $8 million. He has perfect credit and substantial deposits on account with Omni Bank, Chase and Capital One. He has done business with Chase and Capital One for years and they know him well. Yet even though he has perfect credit and has $8 million in real estate as collateral, when he sought a loan of $1.5 to $2 million and was not able to get a response for three months from these banks to complete the project renovations. He has over $20 million in bonding capacity and an 18-year track record, but still cannot

get a modest working capital loan, even from banks that have known him, and profited from his business, for years.

- Another African-American contractor encountered difficulties while working on a bridge project in Maryland. The Ironworkers Local said that they were informed by the business manager of the ironworkers in another jurisdiction that the contractor only hired minorities and told him that was not going to happen in Baltimore. The contractor explained that, while he planned to hire minorities on the project, he did not have a problem hiring non-minorities, some of whom he had already identified. He agreed to release the non-union minorities he had hired and hire his workers through the union hall. The union initially sent him a crew of four, two of which were minorities that were so obviously unqualified that they themselves wondered why the union had sent them. They were on probation (complete with ankle bracelets) and had to receive visits from their probation officer twice a day. Though they both carried union cards identifying them as journeymen, they did not know how to read blueprints and did not know how to tie steel. When the contractor complained to the union for sending unqualified workers he was told, "you asked for blacks and we sent you blacks." The contractor explained his dilemma to one of his non-minority workers, who told him that he knew of many minority ironworkers who could tie steel. When he contacted them he was asked why he had not contacted the black ironworkers, and was told that there are hundreds of black ironworkers were "sitting on the bench" waiting for a call to work. When they learned that an African-American had been awarded the contract, they felt that they would get an equitable opportunity to work but had never been called. The union refused to call minority ironworkers who were qualified.

- An African-American general contractor in Richmond, Virginia formed a joint venture with other African Americans in an effort to pool their resources, knowledge and experience. The group faced disparate treatment in the bidding process for the construction of 106 manufactured homes through HUD. They were selected as finalists and invited to compete in a defined, multi-step process. However, the local agency failed to follow its own steps in the process that had been outlined before awarding the contract to a majority firm with less experience. Through its bid protest, the group discovered that they had been assigned a "zero" on the financial component of their evaluation by the white committee members even though they "had four banks backing them" and "more money than everyone else [bidding] combined."

  In another example of disparate treatment, the group bid on, and won, a contract in Petersburg, Virginia for mixed use and income apartments. Subsequently, certain issues regarding parking and historical preservation were identified. Although the group identified efficient solutions, the city manager said he doubted their figures and that the contract would be

resubmitted for bidding. A majority contractor with strong political ties was ultimately awarded the project.

- Another African-American contractor in Richmond, Virginia successfully bid on the first large contract awarded to a minority firm by a local university. The university had a "dog and pony show" congratulating him. Once the project commenced, it became clear that drawings were incomplete. The contractor proposed the necessary solutions and price, but did not receive approval. An African-American from the university working supportively with the contractor was terminated. Ultimately the in-house renovations department took over the project. The contractor was advised by the campus diversity purchasing director to "just let it go." The contractor was not compensated for a large amount of the work performed before his removal.

Clearly racial discrimination remains a very serious problem in government contracting. We strongly urge this subcommittee to continue to investigate and document this discrimination so that we can ensure that the government is adequately addressing this very serious problem. Thank you for your attention.

**STATEMENT OF FERNANDO V. GALAVIZ**

Mr. GALAVIZ. Madam Chairwoman, members of the committee, we definitely appreciate the opportunity for us to share information and basically seek your support.

From the previous distinguished panel, I think it would be helpful, because if you listened, as I listened, as a businessman and as an advocate for the community, that panel basically more or less gave me the impression that everything is just great and fine. However, there was no mention about the many, many small minority businesses and small businesses that disappear from the Federal sector over the last 20 years. There is no mention of how many of those businesses, the only way to get out is to be acquired.

And in that process, for example, I would like for the panel to ask the previous members how many of the awards they claim has gone to small businesses. There has been a GAO study and an SBA study that shows that agencies are reporting awards that have gone to large companies as small business awards. Also, when small businesses get acquired, for example, the recent acquisition of a company that had almost $200 million worth of business that used to be a small business, a good portion of that portfolio was small business awards, and yet the big company now has the contracts but yet is being counted as small business.

Also, as it relates to Department of Defense, it would be important to us why is it that, Air Force contract, where originally we had a small business set-aside program, the Air Force eliminated the small business set-aside program. And why is it that many DOD, particularly the Army, allows for direct competition, they call it small business set-asides, but yet the small business community and the minority business community has to compete against the large companies?

Basically, also SBA representative talked about coming up with a new study on size standards. Madam Chairman, both Congress and the SBA have been studying size standards now for 30 years, and still we are in the same place where we were 30 years ago.

My written testimony that has been submitted to the committee has been reviewed by the Minority Roundtable organization, by Tony's organization, by the LAMA organization, the Latin American Management Association, and also, of course, by the organization that we represent here today, MTA.

The minority and small business community has made significant contributions to our Nation, both in the Federal agencies, through its employees, and to the community. However, I will focus my limited time to a specific issue that it is important that all of us focus on, and that is the inability for small business and minority businesses to really compete due to the faulty policy on size standards.

Basically, Madam Chairman, it comes to a very simple question. If you take, for example, a training company, the size standards of a training company is $7 million. For a facility management company, it is $25 million. Now, when a training company graduates from the $7 million size standard, how can a $7 million company compete against a $29 billion company? Take the five top integrators. Their other sales are $29 billion. Now, even if you multiple the size standards that are now in the books by four times, you

still have to ask how can a $28 million company, if you take the $7 million size standard on training and you multiple it by four, how can a $28 million company compete against a $29 billion organization?

The same thing on IT. The size standard for IT is $25 million. Multiple that times four, be generous. How can a $100 million company compete against a $29 billion firm?

Now, basically, the large organizations, Northrop Grumman is $33 billion. Really, what it comes down to, Madam Chairman, over the years, mid-sized firms, and the reality is, Madam Chairman, is the mid-sized firms are really not the classical small businesses that have grown over the size standard; but it has been organizations like Booz Allen; CACI, $3.1 billion; Wiley, $1 billion; Unisys, $4 billion. Those firms themselves, if you look at their last 10 years records of growth, most of the growth has been through acquisition. So if those firms had difficulty in competing, how in the devil can we expect for the small business community that has grown out of the size standard to be able to survive? It is impossible.

The one thing unfortunately, I must share with you, Madam Chairman, is that when I have had discussions with elected Members of the House and the Senate, and I ask them how does a small business, where do they pay for their business development and proposal development, quite frankly, it is sad for me over the years to find that those members do not know the answer.

In order for a Government contract, there is a big difference between dealing with the private sector and the Federal Government. A big difference. And the way that a company can grow is how much can you build into your budget. And the only way you can have an increased budget in order to be able to afford to be competitive, you have to have a higher level of sales.

But then if you become somewhat over the size standard, it really becomes impossible, and that is the reason you have so many casualties. So the basic solution—there is a solution, and that is to develop a tier effect of competition by the number of employees.

We appreciate the opportunity, Madam Chairman, to provide our testimony.

[The prepared statement of Mr. Galaviz follows:]

**Testimony on behalf of the Mid-Tier Advocacy/ Developing Second-Tier Small Business Association (MTA/DSTSBA), the Latin American Management Association (LAMA) and the National Federal Contractor's Associations (NaFCA)**

**Mr. Fernando Galaviz, CEO/President**

**THE CENTECH GROUP, INC.**

Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses

**For Questions Please Contact:**

| | | |
|---|---|---|
| Fernando V. Galaviz | Monique Poole | Aya Mueller |
| galavizf@centechgroup.com | poolem@centechgroup.com | muellera@centechgroup.com |
| (703) 626-5433 | (703) 970-6737 | (703) 970-6707 |

**Madam Chairwoman,** and members of the committee, I am honored to come before all of you today to represent Mid-Tier Advocacy/Developing Second-Tier Small Business Association (MTA/DSTSBA) and its strategic partners, the Minority Business Roundtable (MBRT), the Latin American Management Association (LAMA), Business Enterprise Legal Defense and Educational Fund (MBELDEF) and National Federal Contractor's Associations (NaFCA), to provide insight into what we refer to as "the twilight zone," the competitive quagmire in which many firms that have outgrown the NAICS revenue/employee ceilings (second-tier firms) find themselves due to being neither small enough nor large enough to successfully compete in the federal market place. These businesses are quite literally between a rock and a hard place and therefore some face the threat of going out of business altogether. This disparity is a critical issue that affects the very health and vitality of our national economy.

The DSTSBA directly and indirectly represents a community of small and developing second tier firms that provide employment for thousands of people across the United States and across multiple industries including, but not limited to, information technology, engineering, logistics, facilities management, operations and maintenance, international development, scientific research, resource management, construction and more in support of both the public and private sectors. As an organization of the country's top veteran-owned, service disabled, hub-zone certified, minority-owned and woman-owned businesses, we believe that most concerns are well represented as it pertains to small business.

In the last 40 years, the federal government has had a significant positive impact on the development of small businesses in our country. The Department of Commerce, through the office of Minority Business Development Agency, has contributed to the significant growth in our economy through its network of centers throughout the US; assistance with securing financing, and identifying and accessing opportunities. Important to note are also the contributions to expand the United States economic base with fundamental support to small business by the Small Business Administration (SBA) and its' numerous programs, particularly in the areas of federal procurement. Singularly, the 8(a) program has done more for the development of minority-owned firms than any other government-run program to date. These

programs have served to support minorities, entrepreneurism, and small businesses and have been a success story to date.

However, Madam Chairman and members of the committee, thousands of minority businesses have disappeared from the landscape of the federal marketplace over the last three decades. The policies that drive the management of size-standard criteria help the entry-level and emerging minority firms; however, the same policies that make it possible for start-up firms to succeed, also eventually stifle many of them after achieving some modest success in the federal marketplace and outgrowing their small-business status. As a consequence, a significant number of minority and small businesses are faced with the decision of either selling their companies at less than desirable terms to large corporations, or going out of business altogether. Minority and small business entrepreneurs, like most, prefer to grow their businesses in order to increase value for themselves and their families, as well as their employees.

**The Challenges Developing Second-Tier Firms Face Today**

Our testimony today will focus on 1) Restrictive Size Standards; 2) In-sourcing, a rising challenge; 3) Large businesses become small through acquisition; and 4) Infrastructure capacity. Of these challenges, we will emphasize Restrictive Size-Standards because it is the main roadblock for the Developing Second Tier Firm and it is the main goal of the Mid-Tier Advocacy group. We will make several recommendations as I summary of the briefing. Now I will start with a discussion of the current and, as we believe, inadequate standards used to define small-business by the National American Industry Classification System (NAICS[i]). We say "inadequate" because in most cases the NAICS codes define small business in the federal market place as a company or corporation that has less than a certain threshold in annual revenues over a three year average. For instance, a business that specializes in training, qualifies as small if it has a three-year average sales of $7M and in information technology if it sells fewer than $25M. The reality is that once any company surpasses this standard, it is considered *"other than small"*.

In practice, however, these are not really "large" companies; they simply no longer meet the traditional small business size-standards. Once this point is reached, any such business, even if it

only has $8M per year in sales in the training industry, has to directly compete with the top six federal government systems integrators Northrop Grumman, Lockheed Martin, SAIC, EDS-Hewlett Packard, and General Dynamics with average sales of $30B per year and 130,000 employees (see Tables 1 & 2 below). Developing second-tier firms cannot realistically be expected to compete with such corporations?

**Table 1**

| **GRAPHICAL VIEW OF SMALL BUSINESSES COMPETITION AGAINST LARGE BUSINESSES DAVID v GOLIATH** | | | | | |
|---|---|---|---|---|---|
| **LARGE SYSTEM INTEGRATORS** | | **SMALL SYSTEM INTEGRATORS** | | **LARGE SYSTEM INTEGRATORS** | **SMALL SYSTEM INTEGRATORS** |
| **Company Name** | **Annual Revenue in BILLIONS** | **NAICS Ceiling on Revenue in MILLIONS** | | **Number of EMPLOYEES** | **NAICS Ceiling on EMPLOYEES** |
| Northrop Grumman | $33.8 | $7 – 33.5M | | 120,000 | 500 - 1500 |
| Lockheed Martin | $45.189 | | | 136,000 | |
| General Dynamics | $31.981 | | | 91,200 | |
| EDS (not part of HP) | $22.1 | | | 136,000 | |
| CSC | $16.740 | | | 95,000 | |
| **Average** | **$29.962** | | | **130,040** | |

Madam Chairman, the above table clearly demonstrates how illogical, even ludicrous, the federal policy on size-standard is as it relates to the ability of minority entrepreneurs to protect and further develop their businesses. To make this point even more clearly, let us assume the above

sales standards were three times what they currently are: Instead of a $7M ceiling, the NAICS small-business restriction would now be $28M and instead of $25M, the restriction would be capped at $100M. The sales differential between a large corporation and a Developing Second Tier business would still be nearly $ 29.934B and $ 29.862B respectively – almost $30B. With such a stark difference, how is it possible that two such businesses, in all fairness can be put in competition with each other?

When companies like my own do compete against these giants, we have very little chance of success. I started my own business, THE CENTECH GROUP, in 1988 with the help of the 8(a) minority small business development program. As of last month, CENTECH successfully performed on over 4,200 contracts in the federal marketplace, and reached aggregate revenue of 1 billion dollars over 22-years. Our current annual revenue at CENTECH now stands at about $150M.

At face value, this performance may seem impressive, however, Madam Chairman and members of the committee, in the last 18 months, our company has had very little success in competing against the big corporations despite being graded as technically acceptable by the government. To be specific, in June 2009, we had 410 employees; today we have 280 employees. This is the direct result of having to compete with large corporations with thousands of employees and significant resources, giants compared to our humble size. In the last few months, we have lost three of our incumbent contracts on which we performed for over 10 years to very large corporations who can offer pricing which we simply cannot compete against. This experience of loss is shared by hundreds of other minority small businesses trying to compete in the U.S. federal marketplace.

The fact remains, that doing business in the federal market place is very different from doing business in the commercial sector. Businesses in the federal market place are limited by Government requirements on yearly submissions of G&A budgets to be approved by the Defense Contract Audit Agency. These budgets define the amount of money a business can utilize for its growth expenses. For example, if a business with a 10 percent G&A budget and sales of $1M will have a $100,000 G&A with which it must cover all of its corporate management costs,

including accounting and finance, HR, contracts administration, security risk management, quality assurance, internal logistics and business development (sales representatives and proposal development). To compare, a $25M firm with a 10 percent G&A budget will have $2.5M to cover the same functions. This, to an inexperienced business person might appear to be an abundant sum to operate such a firm. But consider the cost of qualified management personnel in the federal market place as reflected in the following annual base salaries:

| | |
|---|---|
| CFO | $175,000 |
| Director of Administration | $125,000 |
| Chief Technical Officer | $150,000 |
| Business Development Manager | $175,000 |
| Business Development Specialist | $120,000 |
| HR Director | $120,000 |
| Contracts Administrator | $135,000 |
| Quality Assurance Manager | $120,000 |
| **Total** | **$1,120,000** |

The above salaries are estimated at the lower end of the competitive range. To this, we must add fringe benefits and overhead costs:

| | |
|---|---|
| Benefits (35 percent) | $392,000 |
| Overhead (25 percent) | $378,000 |
| **Total** | **$1,890,000** |

According to this model, just the leadership costs for a $25M business amounts to $1.89B, leaving only about $600,000 of the $2.5M budget. This sum must pay for staff support in accounting and finance, HR and project operations support, business development and proposals and of course, the owner, or CEO, who is leading the organization.

Developing Second-Tier firms providing goods and services to the federal government experience many challenges, but today our testimony focuses the main ones: 1) Restrictive Size-Standard Policy; 2) Subcontracting 3) Large businesses become small through acquisition; and 4) In-sourcing, a rising challenge 5) Infrastructure capacity.

***Restrictive Size-Standard Policy: Unintended cap on small business development***

Developing Second-Tier firms lose **all** of the contracting incentives provided under the Small Business Programs. It is unfair and unreasonable to expect a Developing Second-Tier firm with sales ranging from $50 - $300 million to go into a "full and open" competition with government contractors whose sales range from $10 B to $171B. The NAICS revenue and employee definitions for small firms actually create a ceiling for small businesses. Most small businesses provide *services* with the most common NAICS ceiling set at $7M and "the highest annual receipts size-standard for any service industry is $35.5M.[ii]

In the fully competitive world, Developing Second-Tier firms have few bidding options--- full and open contracts where the probability of a win is very small; or they can align with small businesses and bid as a subcontractor; or they can form a joint venture with a small business(es). The subcontract strategy and the joint venture strategy both limit the growth potential of Developing Second-Tier firms.

Small businesses grow beyond the limits set by the NAICS codes-, are in fact punished for doing what any business aims to do and that is to grow. Once they become moderately successful in the federal market place, they are thrust into the unrestricted labor market without the infrastructure and capital to compete successfully against *significantly* larger businesses. They are therefore in the twilight zone, a competitive quagmire. Consider the viability of an $8M business competing against a $30B corporation. While such an occurrence would generally be considered illogical, it happens in the federal sector on a daily basis. As a positive, the unprecedented growth in the size and number of federal contracts restricted to small businesses is providing tremendous growth for small businesses, accelerating the time required to graduate from small business status and, unfortunately, as a negative, simultaneously accelerating the point at which small businesses are no longer able to effectively compete.

***Recommendations for Correcting Restrictive Size-Standards***

First, we recommend suspension of the current revenue standards for small business determination in favor of using only an employee size-standard as is already used, for instance, in the telecommunications and telephone support industry, where a business is still considered

small if it employs fewer than 1,500 people, regardless of its three-year average sales. In those industries where a size-standard has not been identified, we recommend using a size-standard of 1500 employees. Several economists have concluded that average revenue is an *inappropriate measurement of business size*. For example, many of the contracts awarded to small businesses are for provision of supplies, and value added reselling. These contracts provide only a small profit margin, but have the potential to rapidly increase the businesses revenue stream and thereby accelerate its graduation to the unrestricted or "full and open" category. Similarly, small businesses that serve as prime contractors on supply and value added resale contracts are credited with the total revenue expenditure for that contract. However, in reality the small business must partner with other small and large businesses to successfully compete on these types of contracts and must disperse a considerable amount of revenue to subcontractors. The amount of monies dispersed to subcontractors can be as much as 80% of the total contract value which only leaves 20% for the prime, but 100% of the revenue gets added to prime contractor revenues.

Second, we recommend a five year *pilot program* be designed and conducted in which Contracting Officers may elect to use the number of employees to determine small business status. This pilot should aim to provide an even playing field by building upon the concepts already in place. NAICS codes for Engineering, Logistics, SETA and telecommunications size standards designated small businesses by number of employees, ranging from 500-1500. It would be beneficial and helpful to establish a tier size according to the number of employees for small businesses. We propose the following tiered system:

| Number of Employees | Tier |
|---|---|
| 1-150 | Tier 1 |
| 151-250 | Tier 2 |
| 250-500 | Tier 3 |
| 500-1000 | Tier 4 |
| 1000-1500 | Tier 5 |
| 1500-2000 | Tier 6 |

The pilot program should be designed to ensure businesses performing under current socio-economic programs are not disadvantaged by the Tier system. Using a pilot program provides

the flexibility to make interim adjustments in response to changes in the business environment and to leverage lessons learned.

At least one federal agency has recognized the value of the Developing Second-Tier Business. They have small businesses that have been providing goods and services to their agency for a period of years. During that time, the small businesses have proven their capabilities and developed invaluable knowledge of the agencies' environment. When the small business contracts end and they have exceeded the NAICS small business standards, the proven small business contractors are no longer eligible to bid and must subcontract to less experienced small businesses. The second-tier firm has done everything they have been asked to do and often more than. Now they are penalized for their successful performance and support to the customer. The result is that the Developing Second-Tier Business loses at least 50% of its revenue and a large portion of its employees. The agency looses a valuable asset in the prior contractor, and the Developing Second Tier Business may no longer have sufficient revenue to sustain its infrastructure. This loss of infrastructure support can lead to business failure. This scenario occurs on a regular and continuous basis across the federal government.

Our third recommendation is to have different size standards developed for businesses operating in the public and private sectors. Of note, the Standard Industrial Classification (SIC) System (predecessor of NAICS) defined different size standards for performance in the private sector versus the public sector. This was changed to reduce the government's administrative burden of maintaining two classifications. The unintended consequences fell on the government contracting sector, which is dramatically different from the private sector. In a recent meeting with SBA, it was agreed that conceptually, the tiered size-standards approach would be a good step towards helping small businesses transition to full and open competition.

While discussing the tiered approach to small business definition, several challenges were identified. One challenge would be to ensure that procuring agencies give the first priority to small businesses in the 1st tier before inviting those in the 2nd or higher tier and that they do not bundle the contracts to favor higher tiered small businesses at the expense of those at the lower tiers. The DSTSBA agrees that small business concerns <u>should be protected from unfair competition</u>. Under this recommended approach the SBA will coordinate with the designated

federal department(s) who will perform the pilot. The department would be directed to consider other small business programs [8(a), HUBZone, SDVOSB, and traditional SB] *before* considering the enhanced small business set-aside, thus "protecting" smaller 1st tier firms and paving the way for this program to work on appropriate "medium size" contracts. Also, all 1st tier small businesses may "bid up" for 2nd tier set asides but 2nd tier businesses may not "bid down" for 1st tier set-asides.

**Subcontracting**

The dominance of large corporations is so overwhelming because they continue to absorb the minority businesses' share of the market place, which they achieve not only through outcompeting the smaller businesses but also by acquiring them. These corporations fail to be consistently responsible in fulfilling the spirit and the letter of the Federal Government's subcontracting laws, which are spelled out in public law 95-507, section 211.

To provide an example: a small company by the name of TYBRIN won a small business set-aside contract at Edwards Air Force Base in the Spring of 2009 worth $342M for a 12-year term. Before the end of the same year, TYBRIN was acquired by JACOBS, a large corporation, who now benefits from this small business set-aside contract for the remainder of its 11 year term. To the Air Force's credit, they are requiring TYBRIN to add a required Small Business subcontracting plan to the Edwards contract, are adjusting the current Award Fee plan to reflect the small business commitment, and fully expect to re-compete this effort at the 5-year point versus the current 11-year term. Additionally, the Air Force annually monitors a contractor's progress towards its small business commitment and reflects that progress in its annual Contractor Performance Assessment Reports. It seems that JACOBS as a good corporate citizen would not need the federal government to force it to comply with the spirit and the letter of public law 95-507, section 211.

In this particular situation, General Wendy Masiello's leadership was the driving force in creating an environment to assure that the minority and small-business community's interests are being served. However, this is not the rule: many major corporations own contracts which were

originally awarded under the small business set-aside program and agencies which awarded these contracts have not taken action to assure that the subcontracting provision of public law 95-597, section 211 is properly enforced.

Other examples: The L-3 Corporation acquired a USCG Training contract and Northrop Grumman acquired an IT support contract at the LA Air Force base. Neither company has any meaningful subcontracting plan to small business on either of these sizeable contracts.

We, as the minority and small business community, do support the federal government's subcontracting reform efforts by the House Bills that are now being considered:

> HR 4134 - Subcontracting Fairness Act – Rep. Lacy Clay and Rep. Yvette Clarke – Amends Federal Property and Administrative Service Act of 1949 to require that a prime contractors pre-award subcontract agreement, used for the purpose of bidding successfully of a federal contract will become a valid contract when the award is made.
>
> H.R. 4496 - Helping Small Business Compete Act – Rep Graves – contains provisions that Subcontracting plans subject to a good faith review under regulations to be promulgated, penalties will be applied to an errant prime contractor.
>
> H.R. 4929 - Expanding Opportunities for Main Street Act. Rep. Bobby Rush – Agency can withhold 5% of contract if contractor does not live up to subcontracting goals. Non use of a subcontractor included in the contracting plan must be justified. Agencies must have a phone line for Subcontractor complaints.
>
> H.R. 5019 - SB Bill of Rights - Rep Kirk – SBA must issue regulation requiring a good faith effort to follow subcontracting plan. Fines and other penalties shall be specified.

**In-sourcing – A Rising Challenge**

Several objectives have been associated with the government's ongoing efforts to convert contractor positions to government employee positions and to restrict the use of contractors for specific government support functions in the future. The identification of functions that are "inherently governmental" is one of the most often cited objectives and is defined in general terms as "an effort to reverse a previous policy of indiscriminately out-sourcing functions that are so intimately related to the public interest as to mandate performance by Government employees.[iii] While the DSTSBA agrees that there are critical functions that can and should only be performed by government employees, we believe that the underlying principle associated with those functions is the authority to make decisions. We are convinced that "inherently governmental" should be defined in terms of acceptance of the responsibility and exercise of the authority entrusted to government employees to do the "people's work" in the most efficient and effective manner. This definition is consistent with the definition of inherently governmental established in 1992:

> These functions include those activities that require either the exercise of discretion in applying Government authority or the making of value judgments in making decisions for the Government. Governmental functions normally fall into two categories: (1) the act of governing, i.e., the discretionary exercise of Government authority, and (2) monetary transactions and entitlements. (Policy letter 92-1: Subject: Inherently governmental functions, 1992)

*"Inherently governmental"* should not be defined by process but rather in terms of decision making and execution authority. To suggest that government officials can be inappropriately influenced by the data and information provided by contractors in the decision making process demeans the intellectual capacity of government decision makers and questions the integrity of a dedicated and experienced contractor work force. After all the arguments are put forward, when "inherently governmental" is reduced to a discussion of who provides the information needed to make informed decisions it takes on the appearance of protectionism for the unions and limits the government's access to talent, an unequalled employee experience base, and innovation. DSTSBA has two recommendations to address this issue: 1) recommends policies related to "inherently governmental" be based on the Policy Letter 92-1 definition given above; and 2)

require a "small business impact study" prior to any in-sourcing decision to determine the impact on existing small business contractors.

**Large Businesses become Small through Acquisition**

What has been described as "unfair competition" refers to the inadvertent entry of other than small businesses into the small business competitive area. In most instances, entry is achieved as a result of the acquisition of a small business. To correct this situation, some Contracting Offices now require annual - recertification. In some, perhaps isolated instances, recertification has resulted in the loss of work by small businesses that, as a result of innovation and initiative, have outgrown their small business status. This situation does not occur in the solicitation process, but after the contract is awarded. Therefore, the DSTSBA recommends **annual recertification.** We recommend that a small business should retain its small business status during the entire period of performance for any small business contract that is in effect. If the small business outgrows its small business status, the business must compete in the unrestricted category for all new work. Again, the change in **small vs. unrestricted** status may be as a result of growth or acquisition.

**Infrastructure Capacity Affected by "Graduation"**

Businesses need strong and stable infrastructure to grow. Infrastructure includes accounting systems, human resources systems, intellectual capital (especially in the executive levels) technology systems, strategic planning processes, and other industry specific standard business processes. The key word is stable, because as business size fluctuates, so does its infrastructure, and like a physical building, as the infrastructure weakens, so does the entire business, which may lead to an early death.

A study of the annual receipts of small firms shows there is a significant decline in businesses across all industries when the annual receipts go from $1- 5M to $5 – 10M. For example, in 2002, the Information Industry (NAICS 51) shows that in the first category ($1 – 5M) there were 13,263 firms, but in the second category ($5 – M), 10 the number firms declined to 2,572, which

represents an 80% drop.[iv] The Professional, scientific and technical services industry (NAICS 54) shows an 88% drop in firms.

Note: These figures are for ALL firms in an industry. Small government contractors represent a subset of these firms.

Source: U.S. SBA, Office of Advocacy, based on data provided by the U.S. Census Bureau.

We understand that this decline could be due to a number of things including the usual spasms associated with business growth and development, and that the Census data is for all businesses and not just federal government contractors. But, the drop is so significant as to lead one to believe there may be a relationship between the most common small business NAICS with a revenue ceiling of $7M and this drop in revenue. This data lends support to our contention that just as a firm reaches a level of stabilization in its revenues and infrastructure; it is no longer eligible for the support provided to other small businesses.

We recommend that this Subcommittee direct development of a study to determine the impact of graduation from current small business categories on small business infrastructure and revenues.

**Summary and Conclusion**

The federal government's small and minority business development programs and the esteemed members of the Subcommittee on Management, Organization, and Procurement, Committee on Oversight and Government Reform do an excellent job of supporting and overseeing the establishment and growth of small businesses. We believe that it is fair to say, however, that the record of viable small businesses after 8(a) and other small business program graduation is not nearly as good.

The federal government has invested millions in dollars in support of small business development. Therefore, it behooves the government to protect its investment by ensuring that businesses that have grown to the maturity phase are allowed to continue to grow and mature. We contend that the federal government has single-mindedly focused on the start-up and growth

phases of business development while ignoring the maturity phase. We also suggest that in this time of economic challenges, the government cannot afford to let any business decline which will ultimately lead to more unemployment.

Our testimony focuses on 1) Restrictive Size Standards; 2) In-sourcing, a rising challenge; 3) Large businesses become small through acquisition; and 4) Infrastructure capacity. Of these challenges, we have emphasized Restrictive Size Standards because it is the main roadblock for the Developing Second Tier Firm and it is the main goal of the Mid-Tier Advocacy group.

We recommend the following:

- Suspension of the current revenue standards for small business determination in favor of using only an employee size standard.
- A five year *pilot program* be designed and conducted in which Contracting Officers are encouraged to elect to use the number of employees to determine small business status. "Enhanced Small Business Opportunities"
- Develop different size standards for businesses operating in the public and private sectors.
- Policies related to "inherently governmental" be based on the Policy Letter 92-1 definition given above.
- Annual recertification of small businesses.
- Development of a study to determine the impact of graduation from current small business categories on small business infrastructure and revenues.
- Require a "small business impact study" prior to any in-sourcing decision to determine the impact on existing small business contractors.

Madam Chairman , and members of the committee we strongly urge this committee and the special task force that President Obama has formed to implement policy based on the recommendations that have been collectively developed and presented in this testimony today. We sincerely appreciate the opportunity to provide testimony before the Subcommittee today. We are prepared to answer questions and welcome your suggestions on any further actions that could result in policy changes to support small and matured small businesses.

End Notes

[i] U.S. Census Bureau, North American Industry Classification System. http://www.census.gov/eos/www/naics/

[ii] SBA, Summary of Size Standards.
http://www.sba.gov/contractingopportunities/officials/size/summaryofssi/index.html

[iii] Policy letter 92-1: Subject: Inherently governmental functions, 1992.

[iv] U.S. Small Business Administration. Employer Firms, Establishments, Employment, Annual Payroll, and Receipts y Receipts Size of Firm and Major Industry using NAICS, 2002. http://www.sba.gov/advo/research/us_rec_mi.pdf

**STATEMENT OF DON O'BANNON**

Mr. O'BANNON. Madam Chairwoman, members of the subcommittee, thank you for inviting me here today. My name is Don O'Bannon, and I am Chair of the Airport Minority Advisory Counsel [AMAC]. AMAC is the only national nonprofit organization dedicated to creating success for minorities and women in the airport industry. While AMAC's primary focus is on airport-related business, AMAC members work on contracts funded by many different Federal agencies.

AMAC is a strong advocate for Federal policies, like the DBE program, that address discrimination in Government contracting. As this subcommittee has heard and is well aware, racial and gender discrimination against minority and women business owners continues to be an ongoing problem.

Minority women business owners experience discrimination in all aspects of public contracting, but DBE type programs do more than address discrimination. The DBE program is a significant source of the entrepreneurship, employment, and economic growth of the minority and women-owned business community.

Minority and women-owned firms, when given a fair chance and a level playing field, are important engines of growth in our economy. Fortunately, various Federal, State, and local programs aimed at giving every entrepreneur a full and fair opportunity to succeed have begun to make some headway. Nevertheless, discrimination against minority and women-owned businesses continues to be persistent and pervasive.

The evidence is compelling that the discrimination remains a problem and that programs like the DBE program are vital to address that discrimination. Testimonial from AMAC members detail the discrimination they have had to endure. These personal stories make it clear how difficult it is to run a business while enduring discrimination. To make matters worse, business owners are often fearful about reporting the discrimination. For this reason, we will report AMAC's members' experience without using their names.

A female construction contractor reported aggressive sex discrimination. She has also repeatedly experienced harmful gender discrimination in supply pricing, bid shopping, and access to capital. One minority business expert has observed discrimination, including intimidation and retaliation against minority contractors; disproportionate punishment of minority contractors for minor infractions; and racially discriminatory remarks.

A female Hispanic business owner developed a new airport concessions business. A majority-owned leasing company launched a whisper campaign intended to undermine her success and the retail lease by falsely claiming that she was not dedicated to her business and, instead, was focusing on being a mommy.

An African-American business owner endured many instances of racial discrimination, including being charged 50 percent for certain supplies and being subject to racial slurs.

The story of an African-American airport executive illustrates just how resistant majority primes can be to change. This executive was working to help identify business owners for concessions opportunities at Memphis Airport, but the prime was simple not committed to participation. The prime claimed that he could not find any

qualified owners to open a barbecue restaurant at the airport in Memphis, TN. As our member said, I kid you not, this man looked at me in the face and told me he could not find a minority business that cooked barbecue in Memphis.

With our testimony today, AMAC is submitting 24 disparity studies. We ask that these studies be included in the record.

Madam Chair, may we offer these studies into the record?

Ms. WATSON. Yes. Without objection.

Mr. O'BANNON. Through both quantitative and qualitative evidence, statistically they demonstrate the existence of serious discrimination against women and minorities in many different industries across the Nation. Each of the disparity studies provides significant quantitative evidence of discrimination against minority and women-owned businesses in both the public and private sector.

In addition, the studies include numerous individual reports of discriminatory behavior similar to the examples I have given you from AMAC's membership. The accounts make it clear that minority and women entrepreneurs are subject to a broad range of discriminatory actions, including discrimination in lending and supply purchasing. They also reveal the use of racial slurs and other tactics aimed at intimidating minority and women-owned business owners.

Overall, these studies provide strong evidence of serious discrimination against minorities and women. They also demonstrate that there is a compelling and continuing need for the DBE program and similar programs across the Federal contracting front dealing with public funds. For these same reasons, AMAC strongly supports final enactment of the FAA reauthorization bill and the improvements to the DBE program it contains. These changes are precisely the policy changes needed to ensure that the aviation system here in America remains the best in the world.

Thank you.

[The prepared statement of Mr. O'Bannon follows:]

AMAC
AIRPORT MINORITY ADVISORY COUNCIL

**Statement of the**
**Airport Minority Advisory Council (AMAC)**
**Submitted to the**
**Subcommittee on Government Management, Organization and Procurement**
**U.S. House Committee on Oversight and Government Reform**
**September 22, 2010**

Madam Chairwoman, Mr. Ranking Member, and Members of the Subcommittee on Government Management, Organization and Procurement, thank you for your invitation to provide testimony today. My name is Don O'Bannon and I am proud to serve as the Chair of the Airport Minority Advisory Council (AMAC). AMAC is the only national, non-profit organization dedicated to creating success for minorities and women in the airport industry. AMAC represents thousands of individuals involved in federally funded and federally assisted contracting, ranging from minority and women business owners to government officials, airports, airport employees, and large majority owned corporations. While AMAC's primary focus is on airport-related business, our minority and women business owner members work in many different industries in many different contexts. Indeed, AMAC members work on contracts supported by many different federal agencies, not just the Department of Transportation. They also work in the private sector. I sincerely thank you for this opportunity to testify and for your consideration of AMAC's views.



Airport Minority Advisory Council | 2345 Crystal Drive, Suite 902 | Arlington, VA 22202 | (703) 414-2622 Phone | (703) 414-2686 Fax | www.amac-org.com website

I. Introduction

The federal government is a major player in almost every American industry and market and it is imperative that all American businesses have a fair chance at winning contracts funded with public money. Just to give an example of a sector with which I am most familiar, in 2009 the federal government appropriated almost 4.5 billion dollars for aviation through the Airport Improvement Program (AIP) and the American Recovery and Reinvestment Act (ARRA). Less than 10% of these contracting dollars were awarded to minority- and women-owned small and disadvantaged businesses. That is simply unacceptable. AMAC is devoted to the full inclusion and participation of minorities and women in business opportunities in airports and airport-related industries. In particular, AMAC is a strong advocate for federal policies like the airport Disadvantaged Business Enterprise and Airport Concessions Disadvantaged Business Enterprise programs (herein referred to as the "DBE program") that redress past discrimination and ongoing discrimination in government contracting. In addition, AMAC also seeks to raise awareness regarding the significant economic benefits that DBE firms contribute to airports, to the traveling public, and to the communities in which they do business. For example, an airport with which I am especially familiar is the Dallas/Fort Worth International Airport (DFW). DFW is committed to ensuring that local DBE firms have an equal opportunity to compete for contracts awarded by DFW Airport. Some of the prime concessionaires for DFW's new D terminal began as minority joint venture partners under the DBE program and these firms have subsequently been awarded several concession packages as prime contractors. Given the opportunity to compete because of the airport DBE program, these businesses flourished as a result of

their owners' hard work and business prowess. In the process, they contributed very significantly to the local economy by generating both jobs and tax revenues.

The importance of DBE efforts like the DFW program cannot be overstated. As this Subcommittee is aware, racial and gender discrimination against minority and women business owners continues to be an ongoing and a critical problem throughout the United States. Minority and women business owners experience discrimination in all aspects of contracting—in areas such as contract formation, bonding, insurance, credit, the purchase of supplies, and interactions with their business peers.

As a consequence, AMAC believes that there is a continuing need for robust minority business programs throughout the federal contracting system. Given AMAC's special focus on airports, at the end of my statement I respectfully highlight certain policies that AMAC believes should be adopted either as part of the final FAA Reauthorization or through regulations. In many cases, these are program changes that should be instituted across all federal programs intended to assist minority and women owned businesses.

## II. The Powerful Economic Benefits of the DBE Program

The minority- and women-owned firms that participate in the DBE programs provide substantial economic benefits to the communities in which they operate. In the airport context, these firms provide a variety of important products and services to the travelers and businesses that rely on airports. Moreover, the DBE program is a significant source of entrepreneurship, employment, and economic growth that can be

one of the important keys to jump-starting our economy and ensuring that our diverse citizenry benefits from the economic recovery.

The University of North Texas recently conducted a study of the economic impact of DBE concessions businesses at the Dallas/Fort Worth International Airport.[1] Between September 2006 and August 2008, the study found firms that participated in the Airport's Disadvantaged, Minority-, and Women-Owned Business Enterprise (DMWBE) Program produced more than $350 million in gross concession revenue and $280 million in contracting revenue. These businesses created over 14,000 job years of employment, increased labor income by more than $450 million, and generated an astonishing $1.2 billion in economic activity.[2] These are very significant and positive economic contributions and they should be recognized and celebrated.

III. Discrimination is Still a Problem for Women and Minority Owned Firms

As the experience in the Dallas/Fort Worth areas demonstrates, minority and women owned firms, *when given a fair chance and a level playing field,* can be important engines of growth in our economy. Unfortunately, discrimination, both current discrimination and the present day effects of past discrimination, make it extremely difficult for most minority and women owned firms to succeed to their full potential. Fortunately, various federal, state and local programs aimed at giving every entrepreneur a full and fair opportunity to succeed have begun to make headway. Nevertheless, discrimination against minority- and women-owned businesses continues to be pervasive.

[1] Terry L. Clower, Bernard L. Weinstein, Michael Seman, and Mehmet Adalar, Center for Economic Development and Research—University of North Texas, DFW International Airport's Disadvantaged, Minority- and Women-owned Business Enterprise Program: Detailed Findings and Updates (Feb. 2009).
[2] *Id.*

The evidence is abundant, compelling, and demonstrative of the vital role these programs play in the effort to address current and past discrimination against minority- and women-owned firms.

AMAC has collected testimonials from its members detailing some of the discrimination they have had to endure. These personal stories make clear how difficult it is to start-up and grow a business while also being subjected to race and gender discrimination. Our experience in collecting these accounts has also made another truth clear: business owners are very fearful about reporting the discrimination that they confront. They are concerned that if they come forward and tell their stories, they will be prevented from getting any business in the future. This puts many of them in a catch –22; either they simply put up with the discrimination and continue to get less business because of it, or they report the discrimination and risk getting no business at all when they are labeled as "trouble-makers." For this reason, we will report a few of their experiences here, but without using their names or other identifying information:

- A female contractor who works in construction in the East reported extremely aggressive sexual harassment and sex discrimination. She has repeatedly been the subject of sexual advances on the job and in one case was the subject of an attempted rape by a general contractor. The attack stopped only when she shot her assailant in the knee with a lawfully-permitted concealed weapon. She has also frequently been the victim of less violent but still harmful gender discrimination in supply-pricing, treatment by government officials, bid-shopping, and access to capital.

- A minority male business expert has observed many different types of discrimination including: efforts to intimidate and retaliate against minority contractors; holding minorities to higher standards than their white male counterparts; disparate treatment by inspectors and other government officials; disproportionate punishment of minority contractors for minor infractions; and racially discriminatory remarks. In addition, he has observed prime contractors refusing to conduct even minimal outreach and refusing to use minority contractors on any project that does not have explicit goals. Finally, he has witnessed outright program fraud including prime contractors reporting that minority contractors have been given work that has not actually been awarded and the fraudulent and unauthorized use of tax IDs belonging to minority companies.
- One Hispanic female business owner detailed the threats to her business caused by gender discrimination. This entrepreneur developed a new airport concessions business, but, just as her business was getting off the ground, she found herself the victim of various types of stereotyping and other efforts to undermine her success and reputation. They included false allegations spread by her leasing company that she was not sufficiently dedicated to running her business because, they alleged, she was planning to focus her efforts on being a "mommy." The larger, majority businesses used this whisper campaign to prevent her from expanding her business and to try to force her out of a valuable retail location at a "premiere" airport.



Airport Minority Advisory Council | 2345 Crystal Drive, Suite 902 | Arlington, VA 22202 | (703) 414-2622 Phone | (703) 414-2686 Fax | www.amac-org.com website

- An African American, male business owner in the Midwest recounted to us the many instances race discrimination he has endured, which include being: charged as much as 50% more for certain supplies critical to his business; excluded from informal business networks and clubs in his community where business leaders socialize; subjected to disparate treatment by banks, for instance being forced to use personal assets to secure business loans; and subjected to racial slurs. This owner feels strongly that programs like the DBE program are crucial to help minority business owners deal with the serious disadvantages imposed by racial discrimination.
- An African-American airport executive and member of AMAC, recounted a story that reveals just how resistant majority prime contractors are to opening up even the smallest opportunities to minorities and women. This executive was working with a prime concessionaire to identify diverse business owners to occupy restaurant and retail space at the airport in Memphis. The airport had given the prime lots of leads of minority- and women-owned businesses that were qualified and interested in the opportunities, but the prime was simply not interested in doing its part to contract these businesses and kept claiming that there simply were no qualified businesses to fill the slots. Eventually the situation reached a point of absurdity when the prime claimed that he could not find any qualified minority businesses owners to open a barbeque restaurant at the airport. As our member said: "I kid you not. This man looked me in the face and told me that he could not find minority businesses that cook barbeque! In Memphis! This is what we are dealing with."



Airport Minority Advisory Council | 2345 Crystal Drive, Suite 902 | Arlington, VA 22202 | (703) 414-2622 Phone | (703) 414-2686 Fax | www.amac-org.com website

With our testimony today, AMAC is submitting twenty-four disparity-type studies.[3] These studies, through detailed statistical and anecdotal evidence, demonstrate insidious discrimination against women and minorities in many different industries all across the nation. The twenty-four studies submitted represent a cross-section of our country—every region of the nation, including rural, urban, and suburban areas. Regardless of location, the studies confirm that discrimination continues to be directed at women and all minority groups, including but not limited to African-Americans, Hispanic Americans, Asian Americans, Subcontinent Asian Americans, and Native Americans. Further, the discrimination takes a variety of forms.

---

[3] *The State of Minority- and Woman-Owned Business Enterprise: Evidence from New York,* prepared for the New York State Department of Economic Development, NERA, April 29, 2010; *Colorado Department of Transportation Statewide Transportation Disparity Study,* D. Wilson Consulting Group, LLC, November 2009; *Measuring Business Opportunity: A Disparity Study of NCDOT's State and Federal Programs,* EuQuant, August 1, 2009; *Availability Analysis and Disparity Study for the Arizona Department of Transportation, Final Report,* MGT of America, March 16, 2009; *Race, Sex and Business Enterprise: Evidence from Memphis, Tennessee*, Prepared for the Memphis-Shelby County Airport Authority, NERA Economic Consulting, December 18, 2008; *Final Report: Alaska Disadvantaged Business Enterprise Study—Availability and Disparity*, D. Wilson Consulting Group, LLC, June 6, 2008; *Race, Sex, and Business Enterprise: Evidence from the City of Austin: Final Report Prepared for the City of Austin, Texas*, NERA Economic Consulting, May 15, 2008; *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport (BNA)*, Griffin and Strong, PC, September 19, 2007; *Disadvantaged Business Enterprise Availability Study*, prepared for the Maryland Department of Transportation, NERA, separate studies for: Maryland Aviation Administration, Maryland Transit Administration, and State Highway Administration, November 2, 2006; *Race, Sex and Business Enterprise, Evidence from the State of Washington*, NERA Economic Consulting, October 20, 2005; *Anecdotal Evidence of Race and Sex Disparities in the Washington State Department of Transportation's Contracting Market Place*, Colette Holt & Associates, July 2006; *Race, Sex and Business Enterprise: Evidence from Denver, CO*, NERA Economic Consulting, May 5, 2006; *Race, Sex and Business Enterprise: Evidence from the State of Maryland*, NERA Economic Consulting, March 8, 2006; *Race, Sex and Business Enterprise: Evidence from the State of Minnesota*, NERA Economic Consulting and Colette Holt and Associates, September 27, 2005; *State of New Jersey Disparity Study of Procurement of Professional Services, Other Services, Goods and Commodities*, MGT, June 13, 2005; *The City of Phoenix, Minority-Women-Owned and Small Business Enterprise Program Update Study: Final Report*, MGT of America, April 21, 2005; *Disadvantaged Business Enterprise Availability Study*, prepared for the Missouri Department of Transportation, NERA, November 26, 2004; *Disadvantaged Business Enterprise Availability Study*, prepared for the Illinois Department of Transportation, NERA, August 16, 2004; *North Carolina Department of Transportation Second* Generation Disparity Study: Final Report, MGT of America, Inc., March 30, 2004; *Disparity Study for the Commonwealth of Kentucky*, Griffin and Strong, P.C., March 2003; *Broward County Small Disadvantaged Business Enterprise (SDBE) Disparity Study*, MGT of America, Inc., April 3, 2001; and *The Utilization of Minority Business Enterprises by The State of Maryland*, NERA Economic Consulting, January 8, 2001.



Airport Minority Advisory Council | 2345 Crystal Drive, Suite 902 | Arlington, VA 22202 | (703) 414-2622 Phone | (703) 414-2686 Fax | www.amac-org.com website

Each of the disparity studies provides significant quantitative evidence of discrimination against minority- and women-owned businesses in diverse industries. I would like to cite just a few of the myriad of examples in order to demonstrate the gravity of this issue:

- Several studies have established widespread revenue differentials between firms owned by non-minority men and firms owned by African Americans, Hispanic Americans, Asian Americans, Native Americans, and women, even when controlling for relevant factors. One study describes the revenue disparities as "large, adverse, and statistically significant." For example, in one study for the state of New York, the researchers found that while African-Americans owned 6.65% of the firms in the market area, they received barely 1% of sales and receipts revenue. The same study also finds that firms owned by minorities and women are more likely to experience capital and credit discrimination.[4]
- Several studies indicate that there are statistically significant and large business formation disparities for minorities and women. For example, a study conducted in Memphis based on data collected by the Census Bureau, found that business formation rates for African-Americans was 43 percent lower in construction and related professional services than for non-minority males. In commodities and services it was 46 percent lower. And the discrimination is not restricted to African Americans. For instance, the firm formation rates in Memphis in construction and related services for other minority groups showed dramatic

[4] *The State of Minority- and Woman-Owned Business Enterprise: Evidence from New York,* at 5.

differentials when compared to firm formation rates by non-minority males. For example, for Hispanic Americans it was 51 percent lower. [5]

- Research has indicated that minority and female entrepreneurs earn substantially and significantly less from their efforts than similarly situated non-minority male entrepreneurs. One study concludes that "these disparities are a symptom of discrimination in commercial markets that directly and adversely affects DBEs." The study further notes that "if minorities and women cannot earn remuneration from their entrepreneurial efforts comparable to that of White males, growth rates will slow, business failure rates will increase, and … business formation rates will decrease. Combined, these phenomena result in lower DBE availability levels than observed in a race- and sex-neutral marketplace."[6]
- Several studies established widespread discrimination in the credit market. One study found that 60.5 percent of African Americans report being "always" denied loans, whereas only 7.3 percent of non-minority males report the same. Once loans are approved, minority- and women-business owners pay higher interest rates as well. According to the study, Hispanic Americans pay 20.9 percent interest on approved loans compared to 6.7 percent for non-minority males.[7]
- One study reported that 44 percent of M/WBEs surveyed had experienced at least one instance of disparate treatment in business dealings. It also found that reports of disparate treatment were substantially and statistically significantly higher for minorities and non-minority women than for non-minority males. Reports of

---

[5] *Race, Sex and Business Enterprise: Evidence from Memphis, Tennessee*, at 104.
[6] *Evidence from the State of Washington*, at 30.
[7] *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport (BNA)*, at 9-10.

disparate treatment were highest among African American and Native Americans with overall rates of 70 percent or more. [8]

Many of the studies also present extensive anecdotal evidence that provides direct insight into the sources and forms of discrimination. More importantly, this evidence humanizes the impact of discrimination on DBE owners—these are the actual accounts of individuals and families struggling to build their businesses and contribute to their communities. The accounts make clear that minority and women entrepreneurs are subject to a broad range of discriminatory actions including: discrimination in business lending and access to real bid opportunities; intentional actions to circumvent and disregard remedial disadvantaged business programs; "old boy networks" that work to exclude minority- and woman-owned companies from opportunities; use of racial slurs and other tactics aimed at humiliating and intimidating minority and women business owners. All of these accounts provide a window on just how much steeper the path to success is for minority- and women-owned businesses.

Overall, these studies provide strong evidence of serious discrimination against minorities and women. They also demonstrate that there is a compelling and continuing need for the airport contracting and concessions DBE programs and similar programs which apply in other industries to the expenditure of public funds. We urge Congress to continue to investigate and document the continuing impact of discrimination against businesses owned by minorities and women.

## IV. The Airport Disadvantaged Business Enterprise Program

[8] *The State of Minority- and Woman-Owned Business Enterprise: Evidence from New York,* at 359.

The airport DBE program is codified as part of the Airport Improvement Program (AIP). Specifically the airport DBE program consists of two sub-components—one pertaining to airport contracting (e.g., construction or professional services contracts), codified in Part 26 of Title 49 of the Code of Federal Regulations (CFR) and referred to as the DBE program, and one pertaining to airport concessions, codified in Part 23 of Title 49 of the CFR and referred to as the airport concessions DBE program (ACDBE). Again, both components are designed to remedy past and ongoing discrimination based on the race or gender of the business owner.

As part of the DBE program, all primary airports must develop and administer in good faith a narrowly-tailored DBE program with annual aspirational contracting and concession DBE goals. These goals must be based on the levels of participation that would be expected in the absence of discrimination and the airport must consider what portion of their goals they can meet through race-neutral means. In order to be certified as a DBE and participate in the program, a firm and its minority and women owners must meet requirements related to: (1) ownership and control; (2) personal net worth; and (3) firm size.

Except for certain Department of Transportation (DOT) rules that uniquely apply to airport concessions, the airport DBE program regulations also govern federal surface transportation programs such as those providing assistance to state and local transit authorities and state highway departments. DOT and the various modal administrations jointly implement the DBE program.[9] It is important to note that, the DBE program and its implementing regulations have been found by the courts to meet the strict scrutiny

[9] For instance in the case of the airport DBE program, DOT has primary responsibility for developing rules and guidelines for the national DBE program and for considering certification appeals. The FAA Office of Civil Rights has primary oversight responsibility for the program and for airport compliance.

constitutional standard applied to "race-conscious" programs. The facial constitutionality of the program has been upheld by every federal circuit court that has considered it.

V. Improvements to the Airport DBE Programs

I would like to take this opportunity to bring to your attention a few issues related to the DBE program. First, AMAC strongly supports final enactment of the FAA Reauthorization bill. We understand that there are still some remaining disagreements between the House and Senate. We respectfully request that these disagreements be worked out as quickly as possible in order to facilitate enactment of the bill this year. Both the House and Senate bills contain very important provisions related to the DBE program and in most cases the two bodies are in agreement on these provisions. AMAC is especially supportive of the provisions included in the House-passed FAA Reauthorization and we strongly urge you to pass a final FAA Reauthorization as soon as possible and to include the improvements to the DBE program as well as the proposed provision in the House bill to increase the ceiling on Passenger Facility Charges from $4.50 to $7.00. These changes are precisely the federal policy changes needed to ensure that the American aviation system remains the best in the world *and* to get our economy back on its feet creating jobs and opportunities for all of our citizens.

VII. Conclusion

Mr. Chairman, thank you for the opportunity to submit this statement to this esteemed panel and for your consideration of our views. AMAC greatly appreciates the Subcommittee's leadership against discrimination and in support of minority and women



Airport Minority Advisory Council | 2345 Crystal Drive, Suite 902 | Arlington, VA 22202 | (703) 414-2622 Phone | (703) 414-2686 Fax | www.amac-org.com website

owned companies. We look forward to working with the Subcommittee on these important issues.



Airport Minority Advisory Council | 2345 Crystal Drive, Suite 902 | Arlington, VA 22202 | (703) 414-2622 Phone | (703) 414-2686 Fax | www.amac-org.com website

**VanBuren, Valerie**

| | |
|---|---|
| **From:** | SCVDL@aol.com |
| **Sent:** | Thursday, October 07, 2010 5:23 PM |
| **To:** | VanBuren, Valerie |
| **Subject:** | list of disparity studies on disk submitted by Don O'Bannon of AMAC |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |
| **Attachments:** | Study list numbered.doc |

Hi Valerie:

Thanks for taking the time to reach out to me on this important matter. Attached is the list of studies on the disk. Please let me know if you have any additional questions and, if you don't mind, please let me know that you received this e-mail so that I know it went through successfully. Thanks so much.

Sarah

NOTICE: The information in this electronic mail transmission (along with any attachments) is intended solely for the specified recipient(s). The information in the e-mail and attachments is or may be privileged, confidential and exempt from disclosure under applicable law. If you are not a specifically intended recipient of this transmission or attachment, you are absolutely prohibited from reading, copying, printing, distributing or disclosing any of the information contained in it. If you have received this transmission in error, please immediately contact the person named above by reply e-mail and delete the original and all copies this transmission (including any attachments) without reading or saving it in any manner. Thank you for your assistance in this very important matter.

1. *The State of Minority- and Woman-Owned Business Enterprise: Evidence from New York,* prepared for the New York State Department of Economic Development, NERA, April 29, 2010;
2. *Colorado Department of Transportation Statewide Transportation Disparity Study,* D. Wilson Consulting Group, LLC, November 2009;
3. *Measuring Business Opportunity: A Disparity Study of NCDOT's State and Federal Programs,* EuQuant, August 1, 2009;
4. *Availability Analysis and Disparity Study for the Arizona Department of Transportation, Final Report,* MGT of America, March 16, 2009;
5. *Race, Sex and Business Enterprise: Evidence from Memphis, Tennessee*, Prepared for the Memphis-Shelby County Airport Authority, NERA Economic Consulting, December 18, 2008;
6. *Final Report: Alaska Disadvantaged Business Enterprise Study—Availability and Disparity*, D. Wilson Consulting Group, LLC, June 6, 2008;
7. *Race, Sex, and Business Enterprise: Evidence from the City of Austin: Final Report Prepared for the City of Austin, Texas*, NERA Economic Consulting, May 15, 2008;
8. *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport (BNA)*, Griffin and Strong, PC, September 19, 2007;
9. *Disadvantaged Business Enterprise Availability Study*, prepared for the Maryland Department of Transportation, NERA, Maryland Aviation Administration, November 2, 2006;
10. *Disadvantaged Business Enterprise Availability Study*, prepared for the Maryland Department of Transportation, NERA, Maryland Transit Administration, November 2, 2006;
11. *Disadvantaged Business Enterprise Availability Study*, prepared for the Maryland Department of Transportation, NERA, State Highway Administration, November 2, 2006;
12. *Race, Sex and Business Enterprise, Evidence from the State of Washington*, NERA Economic Consulting, October 20, 2005;
13. *Anecdotal Evidence of Race and Sex Disparities in the Washington State Department of Transportation's Contracting Market Place*, Colette Holt & Associates, July 2006;
14. *Race, Sex and Business Enterprise: Evidence from Denver, CO*, NERA Economic Consulting, May 5, 2006;
15. *Race, Sex and Business Enterprise: Evidence from the State of Maryland*, NERA Economic Consulting, March 8, 2006;
16. *Race, Sex and Business Enterprise: Evidence from the State of Minnesota*, NERA Economic Consulting and Colette Holt and Associates, September 27, 2005;
17. *State of New Jersey Disparity Study of Procurement of Professional Services, Other Services, Goods and Commodities*, MGT, June 13, 2005;
18. *The City of Phoenix, Minority-Women-Owned and Small Business Enterprise Program Update Study: Final Report*, MGT of America, April 21, 2005;
19. *Disadvantaged Business Enterprise Availability Study*, prepared for the Missouri Department of Transportation, NERA, November 26, 2004;
20. *Disadvantaged Business Enterprise Availability Study*, prepared for the Illinois Department of Transportation, NERA, August 16, 2004;
21. *North Carolina Department of Transportation Second* Generation Disparity Study: Final Report, MGT of America, Inc., March 30, 2004;
22. *Disparity Study for the Commonwealth of Kentucky*, Griffin and Strong, P.C., March 2003;
23. *Broward County Small Disadvantaged Business Enterprise (SDBE) Disparity Study*, MGT of America, Inc., April 3, 2001; and
24. *The Utilization of Minority Business Enterprises by The State of Maryland*, NERA Economic Consulting, January 8, 2001.

Ms. WATSON. Thank you.
Mr. Zingeser.

## STATEMENT OF JOEL ZINGESER

Mr. ZINGESER. Thank you, Madam Chairwoman and Ranking Member Bilbray. It is a pleasure to be here. My name is Joel Zingeser. I am with Grunley Construction of Rockville, Maryland. I come to you today on behalf of the Associated General Contractors of America.

AGC strongly supports full and open competition for the many contracts necessary to construct improvements to real property. AGC supports procurement reform to improve delivery of Federal construction services. Reform of the Federal procurement process should recognize construction's unique melding of industry sectors, while ensuring the Government is using the most cost-effective method for procurement.

AGC would like to discuss an issue of great concern to us that we believe, if addressed, would bring the greatest possible amount of transparency to Federal contracting, and specifically contracting with small and disadvantaged businesses nationwide.

Current SBA rules require small business set-asides and establish small business goals be met by large businesses to assure that significant portions of Federal procurement dollars flow to small business firms. But the rules for keeping track and measuring the flow of dollars to small businesses do not take into account the actual amounts that flow down to small businesses below the first tier level of subcontracting. As you already heard today from others, the nature of the construction industry and how it operates is through subcontractors and second- and third-tier subcontractors.

Within the construction industry, the bulk of the work is performed by subcontractors that specialize in specific expertise and, in turn, hire second- and third-tier firms to perform elements of the project. Under the current system, if an other than small business is included as a first-tier subcontractor, the prime contractor is not asked to report the flow of dollars that are going to small businesses hired below the first-tier subcontractor. This is because the contracting agency, those Federal agencies that are awarding the procurements, are not allowed to take credit for those dollars toward their goals.

Allowing prime contractors to report small business subcontracting at all tiers would demonstrate true participation of small businesses on Federal contracts and would show more accurately how significantly the construction industry supports and is in fact dependent upon small businesses.

In attempting to meet the various small business goals under the current system, prime contractors are often required to consider subcontractor choices for large projects that are beyond the capacity, especially bonding capacity, of small businesses. The present approach to keeping score puts pressure on small businesses to accept roles with larger firms operating under them in a way that is upside down, in an unnatural alignment.

If credit for small business participation were allowed to be counted toward the goals when the small businesses are performing in their logical and most comfortable roles, the true benefits of

small business to the construction industry will be measured, accounted for, and recognized for what they are, critical to the success of our industry. Moreover, such a system would allow small and emerging firms to grow in a natural manner that would force them not to become overextended, and ultimately this will make them more successful.

Changing the scoring system will let prime contractors and small businesses determine together the best arrangement of large and small subcontractors according to capabilities, capacity, and availability. The ability to solve the reporting problem is available today. The shift to the Electronic Subcontractor Reporting System [eSRS], by the Federal Government provides the opportunity to simply and accurately gather the small business data at all tiers and thus correct the problem.

The system has the capability to track and report small business subcontractors on multiple tiers, yet current rules do not encourage prime contractors and their subcontractors to account for total small business participation at all tiers. The Interagency Task Force on Federal Contracting Opportunities for Small Business recommends enhancing the Electronic Subcontractor Reporting System. Specifically, the Task Force recommends enhancing the eSRS to better capture subcontracting at all tiers.

AGC recommends Congress direct a change to the system by amending the Federal Acquisition Regulations [FAR], through legislation to allow all parties to report and receive credit for the dollars flowing to all small businesses on Federal contracts. We have attached suggested language for the committee's consideration.

I want to thank you for the opportunity to provide our views on working with the Federal market. We believe this market offers tremendous opportunities for both construction contractors and the Federal Government. AGC looks forward to continuing to work with the subcommittee on this critically important issue.

[The prepared statement of Mr. Zingeser follows:]

Statement of

Mr. Joel P. Zingeser of Grunley Construction Company, Inc.

on behalf of

The Associated General Contractors of America

to the

**Subcommittee on Government Management, Organization, and Procurement**

Committee on Oversight and Government Reform

U.S. House of Representatives

For a hearing on

**"Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Business"**

September 22, 2010

AGC of America
THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA
Quality People. Quality Projects.

***Building Your Quality of Life***

**The Associated General Contractors of America (AGC) is the largest and oldest national construction trade association in the United States. AGC represents more than 33,000 firms, including 7,000 of America's leading general contractors, and over 12,000 specialty-contracting firms. Over 13,000 service providers and suppliers are associated with AGC through a nationwide network of chapters. AGC contractors are engaged in the construction of the nation's commercial buildings, shopping centers, factories, warehouses, highways, bridges, tunnels, airports, waterworks facilities, waste treatment facilities, dams, water conservation projects, defense facilities, multi-family housing projects, site preparation/utilities installation for housing development, and more.**

**THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA**
2300 Wilson Boulevard, Suite 400 • Arlington, VA 22201 • Phone: (703) 548-3118 • FAX: (703) 548-3119

**Statement of Mr. Joel P. Zingeser**
**Grunley Construction Company, Inc., Rockville, Maryland**
**Subcommittee on Government Management, Organization, and Procurement**
**Committee on Oversight and Government Reform**
**United States House of Representatives**
**September 22, 2010**

My name is Joel Zingeser of Grunley Construction, where I lead the firm's strategic planning, business development, and sustainable design/construction efforts. For 55 years our firm has specialized in renovations, restorations, and modernizations of large-scale government and commercial buildings, including office, laboratory, and educational facilities. In addition we construct new facilities and additions to existing buildings for both public and private sector clients.

On behalf of the Associated General Contractors of America (AGC), we strongly support full and open competition for the many contracts necessary to construct improvements to real property. This includes competition among general contractors, specialty contractors, suppliers and service providers. Over the years, it has been established that such competition energizes and improves the construction industry to the benefit of the industry and the nation as a whole. As the Committee considers the changing Federal procurement landscape, AGC offers the following points for consideration.

**On The Issue**

AGC supports procurement reform to improve delivery of federal construction services. Reform of the federal procurement process should recognize construction's unique melding of industry sectors while ensuring the government is using the most cost-effective method of procurement.

AGC is working to foster a business climate that enhances opportunities for all businesses. Construction is an intensely competitive industry, and we believe that competition penalizes any firm that resorts to discrimination. To succeed, construction firms have to focus on price, quality and reliability. Our members recognize the benefits that the 8(a) program and the Disadvantage Business Enterprise (DBE) programs have to contractors who qualify for these programs. We also have growing concerns about the need for Federal decision-makers to address the challenges small businesses that do not qualify for any special preferences are facing in today's harsh economic conditions. We believe that current Federal rules need to be updated to generate more collaboration, mentoring and assistance no matter who is the business owner.

AGC would like to discuss issues surrounding an issue of great concern to us that we believe if addressed, will bring the greatest possible amount of transparency to the Federal contracting, and specifically contracting with small and disadvantaged businesses nationwide.

**Subcontracting Goal Achievement: The Key to Transparency**

Current SBA rules require small business set-asides and establish small business goals to be met by large businesses to assure that significant portions of federal procurement dollars flow to small business firms. But the rules for keeping track and measuring the flow of dollars to small

businesses do not take into account the actual amounts that flow down to small businesses below the first tier level of subcontracting. Within the construction industry, the bulk of the work is performed by subcontractors that specialize in a specific expertise and in turn hire second tier and third tier firms to perform elements of the project. Under the current system, if an other-than-small business is included as a first-tier subcontractor, the prime contractor is not asked to report the flow of dollars that are going to small businesses hired below the first tier subcontractor. This is because the contracting agency is not allowed to take credit for those dollars towards its goals. Allowing prime contractors to report small business subcontracting at all tiers would demonstrate true participation of small businesses on a federal contract and would show more accurately how the construction industry supports and is dependent upon small businesses.

In attempting to meet the various small business goals under the current system, prime contractors are often required to consider subcontractor choices for larger projects that are beyond the capacity (especially bonding capacity) of small businesses. The present approach to keeping score puts pressure on small businesses to accept lead roles with larger firms operating under them in a way that is "upside down" and an unnatural alignment. If credit for small business participation were allowed to be counted toward the goals when the small businesses are performing in their logical and most comfortable roles, the true benefits of small business to the construction industry will be measured, accounted for, and recognized for what they are – critical to the success of our industry. Moreover, such a system would allow small and emerging firms to grow in a natural manner that will not force them to become over extended and ultimately will make them more successful.

Changing the scoring system will let prime contractors and small businesses determine together the best arrangement of large and small subcontractors according to capabilities, capacity and availability. Accurately accounting for small business participation at all levels of the construction process helps federal agencies better meet set-aside goals established by the Small Business Act and helps prime contractors get credit for significant small business participation in government contracts.

The shift to Electronic Subcontractor Reporting System (eSRS) by the federal government provides the opportunity to simply and accurately gather the small business data at all tiers and thus correct this problem. The system has the capability to track and report small business subcontractors on multiple tiers, yet current rules do not encourage prime contractors and their subcontractors to account for total small business participation at all tiers. AGC recommends Congress direct a change to the system by amending the Federal Acquisition Regulation (FAR Part 52.219-9(l)) through legislation to allow all parties to report and receive credit for the dollars flowing to all small businesses on Federal contracts. We have attached suggested language for the Committee's consideration.

**Conclusion**

Thank you for the opportunity to provide our views on working with the Federal market. We believe this market offers tremendous opportunities for both construction contractors and the Federal government. AGC looks forward to continue working with the Subcommittee on these critically important issues.

## Small Business Participation

### Allow Prime Contractors to Include All Participating Subcontractors to Determine Goal Achievement

**Background:**

- Current Small Business Administration rules require set-asides for small business subcontractors, but prohibit prime contractors from truly accounting for the total amount of dollars flowing to small businesses. Under the current system, if an other-than-small business is included in first-tier subcontractors, a prime contractor is prevented from reporting further dollars going to small businesses. This happens regardless of whether small business subcontractors comprise other tiers or even the rest of the first tier.

**AGC Message:**

- **Demonstrate True Small Business Participation.** Allowing prime contractors to report small business subcontracting at all tiers would demonstrate true small business participation on a federal contract. Accurately accounting for small business participation helps federal agencies better meet set-aside goals established by the Small Business Act and helps prime contractors get credit for small business participation in government contracts.

- **Ensure Best Match of Contractor Capacity and Procurement Requirements.** The current system leaves prime contractors with inadequate subcontractor choices for larger projects that are beyond the capacity (especially bonding capacity) of small businesses. Changing the system lets prime contractors determine the best mix of large and small subcontractors according to capacity and availability.

- **Shift to Electronic Subcontractor Reporting System (ESRS) Provides A Potential Remedy.** The shift to ESRS by the federal government provides a unique opportunity to correct this problem. The system has the capability to track and report small business subcontractors on multiple tiers, yet current rules still prevent prime contractors from accounting for total small business participation at all tiers. Directing a change to the system through legislation, before the system becomes widespread, could potentially help all parties track the dollars flowing to small businesses. FAR 52.219-9(l) should be amended to allow subcontract award data reported by prime Contractors and subcontractors to be included at all lower tiers.

  **FAR 52.219-9(l):**
  The Contractor shall submit ISRs and SSRs using the web-based eSRS at http://www.esrs.gov. Purchases from a corporation, company, or subdivision that is an affiliate of the prime Contractor or subcontractor are not included in these reports. Subcontract award data reported by prime Contractors and subcontractors shall include ~~be limited to~~ awards made to ~~their immediate next tier~~ subcontractors at all lower tiers. ~~Credit cannot be taken for awards made to lower tier subcontractors unless the Contractor or subcontractor has been designated to receive a small business or small disadvantaged business credit from an ANC or Indian tribe.~~

Ms. WATSON. Thank you so much.
Mr. Sumner.

**STATEMENT OF MICHAEL SUMNER**

Mr. SUMNER. Chairwoman Watson, Ranking Member Bilbray, thank you for the opportunity to speak with you today regarding the challenges and opportunities for minority-owned businesses in contracting. My name is Michael Sumner, and I am the Research Manager at the Thelton E. Henderson Center for Social Justice at the University of California Berkeley School of Law.

The Henderson Center is a training and research center that produces scholarship on issues of race, sex, and poverty. My colleagues and I research equal opportunity programs in public contracting. In a series of reports, we looked at the California Department of Transportation [Caltrans], which operates a program for disadvantaged business enterprises [DBEs]. DBEs are small businesses that are majority owned and operated by people of color and women of any race or ethnicity.

In the mid-1990's, there was a successful effort to curtail equal opportunity programs in California, culminating in the passage of Proposition 209 in 1996. The DBE program was dismantled entirely for projects with only State funding, but continued for projects with Federal funding, as required by Federal law.

We examined over 20 years of Federal awards and found that awards to DBEs doubled between the mid-1980's and the mid-1990's, providing evidence for the success of the equal opportunity program. However, when equal opportunity programs were removed and scaled back, the percentage of awards to DBEs dropped by nearly 50 percent and continued to decline. In fact, rates have fallen from a high of 28 percent of awards going to DBEs in 1994 to only 2 percent of awards going to DBEs in 2008.

It is important to note that we were unable to analyze awards for projects that only receive State funding, as CalTrans ceased collecting data for State awards. However, in a report commissioned by CalTrans, it was found that disparity for State awards was two to three times higher than for Federal awards. Therefore, the federally required DBE program might have been instrumental in reducing the level of disparity by at least half.

We also collected anecdotal evidence via focus groups and interviews with DBE owners. Contractors said the DBE program helped them build relationships and encourage prime contractors to pick up the phone. However, after the DBE program ended, the phone stopped ringing. Contractors perceived being systematically excluded in part from the existence of an old boys network. When the anti-affirmative action, Proposition 209, was passed, it was perceived by DBE contractors as reinforcing a system of exclusion.

For example, one female contractor that participated in our study reported that the day after Proposition 209 passed, the senior project manager walked up to me and said, hey, Prop. 209 passed and we don't have to use you anymore. I didn't say anything to him at first, but the next day I told him that I wanted to talk to him about what he had said to me. I said, did it occur to you that I have been working here for a number of years and that I have always finished on time or early? And how many letters do you have

from my clients praising my cleanliness and professionalism? Well, he didn't care; he just looked at me and said, well, it's true, Prop. 209 passed and we don't have to use you anymore.

Additionally, contractors discussed the challenges in securing loans, bonding, and insurance. One contractor shared a story of being asked to provide collateral for a $200,000 loan. His attorney said that similarly situated white male clients were able to secure loans of that size without being asked for collateral.

In summary, our research found evidence that discrimination and disparity are still prevalent for minority and women-owned businesses; that equal opportunity programs can aid in leveling the playing field; removing or weakening equal opportunity programs can lead to dramatic reductions in the opportunity for minority and women-owned businesses to succeed; and the removal of equal opportunity programs can create a climate in which discrimination and disparity become more widespread.

In order to promote equal opportunity in contracting, we recommend that programs should be championed by key leaders and organizations to counter discriminatory and isolated social networks. The programs should include help with securing bonding, financing, and insurance. The programs should minimize the burdens on entrepreneurs applying for certification, while being stringent enough to weed out false fronts. The programs should promote prompt payment, unbundled contracts, and increased lead times, elements that are race and gender neutral. The programs should include a data collection and analysis mandate to ensure the utilization of best practices.

The research I mentioned today is available in more detail in our reports, which are freely available on our Web site and I have asked to be included in the record.

Thank you very much for the opportunity to be here today. I would be happy to answer any questions you may have.

[The prepared statement of Mr. Sumner follows:]

BerkeleyLaw
UNIVERSITY OF CALIFORNIA

Thelton E. Henderson
Center for Social Justice

Testimony of
Michael Sumner, PhD
Research Manager, Thelton E. Henderson Center for Social Justice,
Berkeley Law

before the U.S. House Oversight and Government Reform
Subcommittee on Government Management, Organization and
Procurement

"Minority Contracting: Opportunities and Challenges for Current and
Future Minority-Owned Businesses"

presented Wednesday, September 22, 2010

**Michael Sumner, PhD**
**Research Manager**
**Thelton E. Henderson Center for Social Justice, UC Berkeley School of Law**

Chairwoman Watson, Ranking Member Bilbray, and members of the Subcommittee, thank you for the opportunity to speak with you today regarding the challenges and opportunities for minority-owned businesses in contracting.

My name is Michael Sumner, and I hold a PhD in Social Psychology from New York University. Currently, I am the Research Manager at the Thelton E. Henderson Center for Social Justice at the University of California, Berkeley School of Law.

The Thelton E. Henderson Center for Social Justice (Henderson Center) at UC Berkeley School of Law is a training and research center that prepares the next generation of lawyers to represent underserved communities and produces innovative and accessible scholarship on issues of race, sex, and poverty. Established in 1999, the Henderson Center draws together law students, law faculty, and members of the bench and bar to transfer knowledge, exchange ideas, and meld the theory and practice of law.

My colleagues and I have researched the effects of equal opportunity programs on small businesses owned and operated by people of color and by women of all racial and ethnic groups. As a result of this research, we have published several reports and I have given presentations at conferences for equal opportunity professionals, to contractors, and at government hearings.

Regarding equal opportunity programs, our research found evidence that:

- Discrimination and disparity are still prevalent for minority- and women-owned businesses.
- Equal opportunity programs can aid in leveling the playing field.
- Removing or weakening equal opportunity programs can lead to dramatic reductions in the opportunity for minority- and women-owned businesses to succeed.
- The removal of equal opportunity programs can create a climate in which discrimination and disparity become more widespread.

**In summary, our research supports the idea that equal opportunity programs enable small businesses owned and operated by people of color and women of all races and ethnicities to more freely compete, and that ending these programs hinders the success of minority- and women-owned businesses. Equal opportunity programs should utilize best and emerging practices when being designed and implemented.**

The Henderson Center conducted research in California, where in the mid-1990s equal opportunity programs were scaled back or eliminated completely. California's experience is important, in part because its economy is responsible for 13 percent of the gross domestic product of the United States. Furthermore, the lessons learned in California can also serve as an example for the rest of the nation as we consider whether and how to implement equal opportunity programs currently and in the future.

The California Department of Transportation, or Caltrans, operates a Disadvantaged Business Enterprise (DBE) program. DBEs are small businesses that are majority-owned and operated by people of color or women of any race or ethnicity. Prior to the mid-1990s, the DBE program was used for all transportation construction awards. In the mid-1990s, there was a successful effort to curtail equal opportunity programs in California, beginning with an Executive Order in 1995 and culminating in the passage of Proposition 209 in 1996. For contracts awarded by Caltrans, the equal opportunity program was dismantled entirely for projects with state funding. However, the program still operated for contracts on projects with federal funding, as required by federal law.

We examined over 20 years of federal awards distributed by Caltrans to DBEs and to non-DBEs, and found that awards to DBEs doubled between the mid-1980s and the mid-1990s, providing evidence for the success of the equal opportunity program. However, as equal opportunity programs were removed and scaled back, federal awards to DBEs plunged. In 1996, the percentage of awards to DBEs dropped by nearly 50 percent and has continued to fall since then. In fact, rates have fallen from a high of 28 percent of awards going to DBEs in 1994 to only two percent of awards going to DBEs in 2008. As a point of reference, California's population is over 50 percent people of color and nearly 25 percent white women.

It is important to stress that this reduction in awards occurred for projects with federal funding, in which an equal opportunity program was still in place. Unfortunately, we were unable to analyze trends for state awards, where equal opportunity programs were completely eliminated, as Caltrans ceased collecting data for state awards. Without the rigorous collection and analysis of data each year, it is impossible to ascertain if significant disparity is still present or whether there are changes in the level of disparity.

In an Availability and Disparity study commissioned by Caltrans, BBC Research and Consulting collected data on both federal and state awards. The report included the level of disparity faced by minority- and women-owned businesses. The report found that for federal awards in California between 2002 and 2006, in which there was a federally required DBE program, the level of disparity faced by minority- and women-owned businesses was between 13 and 17 percent. For state awards, in which there was no DBE program, the level of disparity was 41 percent, which was two to three times higher. Therefore, the

federally required DBE program might have been instrumental in reducing the level of disparity by at least half.

Research from other states that have passed affirmative action bans shows similar trends to California. For example, a 2007 Insight Center for Community and Economic Development study "State Policies and Programs for Minority- and Women-Business Development" documented similar trends in Washington state, with increased awards to DBEs when equal opportunity programs were utilized and decreased awards after the anti-affirmative action Initiative 200 was passed in 1998.

We also collected anecdotal evidence via focus groups and interviews with DBE owners and operators who were certified in 1996 and stayed in business for at least 10 years. DBE contractors mentioned a number of barriers to their success that were eased by the DBE program. They mentioned an industry culture in which they perceived the operation of a "good old boy" network, one which systematically excluded people of color and women by keeping DBEs from gaining access to information about requests for bids and proposals and by ignoring quality bids from DBEs. DBE owners said the race- and gender-conscious DBE program opened doors for subcontracting opportunities by helping DBEs build relationships with prime contractors. In their words, it encouraged prime contractors to "pick up the phone." However, after the end to traditional affirmative action programs, DBE owners reported that the "phone stopped ringing."

When the anti-affirmative action Proposition 209 passed, it was perceived by DBE contractors as reinforcing a system of exclusion. Although billed as a way to create equal opportunity, they felt it never addressed the root causes of the discrimination and disparity they faced. Instead, it appeared to have had to a "chilling effect" on the climate of diversity in the state. For example, one female contractor that participated in our study reported that:

> "When Proposition 209 passed, I was working on $200,000 worth of projects. The day after Proposition 209 passed, the senior project manager walked up to me and said, 'Hey, Prop 209 passed, and we don't have to use you anymore.' I didn't say anything to him at first, but the next day, I told him that I wanted to talk to him about what he had said to me. I said, 'Did it occur to you that I've been working here for a number of years and that I have always finished on time or early...and how many letters do you have from clients praising my cleanliness and professionalism?' Well, he didn't care. He just looked at me and said, 'Well, it's true. Prop 209 passed, and we don't have to use you anymore.' The next year, my projects plummeted to $30,000. To this day, I have to call and remind clients that I'm in still in business"

Our research indicates that the discrimination faced by this woman was not uncommon. Many women in the male-dominated field of transportation construction confront a hostile working environment,

facing both physical and emotional intimidation on the job, such as being randomly quizzed to prove their knowledge of the industry. Women also reported receiving the "run around" when trying to file a grievance or discrimination complaint.

The contractors also had suggestions for how DBE programs could be improved. They stressed the importance that the components put into place are effective and utilize best practices. As one example, they observed that the DBE program only encouraged their participation at a subcontracting level, offering little help for reaching the prime contracting level, which is typically more lucrative and stable.

Additionally, contractors discussed the need for assistance in securing loans, bonding, and insurance. These elements are key for capacity building in the transportation construction industry, and are areas in which racial and gender discrimination are still present. As a result of both present day discrimination and the vestiges of historical discrimination, people of color and women who own businesses tend to be undercapitalized. For instance, one contractor shared a story of being asked to provide collateral for a $200,000 loan he was attempting to secure. His attorney said that similarly situated White male clients were able to secure loans of that size without being asked for collateral.

In summary, our research points to the need for robust equal opportunity programs which utilize best practices. It is important that federal programs maintain and appropriately strengthen equal opportunity programs when warranted so that minority- and women-owned businesses have a chance to demonstrate their abilities.

In order to promote equal opportunity in contracting for all small business owners, we recommend the following:

- The programs should be championed by leaders in key positions and should work in partnership with ethnic Chambers of Commerce, professional networks, and advocacy organizations to counter discriminatory and isolated social networks, including "good old boy" networks. The programs should include elements that help minority and women contractors gain access to key information, expand their networks, and identify mentors.

- The programs should include help with securing bonding, financing, and insurance, access to which minority and female business owners are more likely to be denied because of historic and present day discrimination.

- The programs should minimize the burdens on entrepreneurs applying for certification while being stringent enough to weed out "false fronts." By minimizing paperwork and creating

reciprocal certifications with other contracting agencies, certification does not need to be unduly burdensome.

- The programs should promote prompt payment, unbundled contracts, and increased lead time, elements that are race- and gender-neutral.

- The programs should include a data collection and analysis mandate. Trends should be studied over time rather than focusing on year-to-year trends to ensure the utilization of best practices.

The research I have mentioned today is available in more detail in our reports, "Free to Compete? Measuring the Impact of Proposition 209 on Minority Business Enterprises" and "A Vision Fulfilled? The Impact of Proposition 209 on Equal Opportunity for Women," which are freely available on our website, www.law.berkeley.edu/HendersonCenter.htm. I am also submitting copies of the reports with my testimony today and ask that they be made a part of the record.

Thank you very much for the opportunity to be here today. I am happy to answer any questions you may have.

Ms. WATSON. Thank you so much. I was there on the fateful day that affirmative action was eliminated in front of the Board of Regents. Seated next to me was the president of UCLA; on the other side Jessie Jackson and another Member of the Senate. Tears came down the face of the president and he left the university at that time.

The results of the passage of the bill to eliminate affirmative action resulted in not one Hispanic being admitted to the law school at UCLA, and only one African-American being admitted to Boalt Hall, and he chose not to go. So it has had a dire effect. Potentially very bright students who would have been able to come out and practice, started their own firms were just blackened with that one vote.

And I have other things I want to say, but I am going to yield now to Mr. Bilbray.

Mr. BILBRAY. Thank you. First, may I advise maybe you two want to get together and work this thing out. I think that the goals of the program and the results, we get frustrated with a lack of results, but I think that the Association of General Contractors were pointing out the issue that I have run into, and it is not just in the construction trades. The fact is it is across the board and is something we need to talk about and make sure that we should follow the money, as we say. That is what really counts.

I know it is tougher on the bureaucracy to do multi-tier evaluation assessment, but this is important enough. If it is really enough to have the program, then it is important enough to have the program operate appropriately and function the way its goals are, rather than just basically saying, look, we have done this, we have spent this money, and obviously we should pat ourselves on the back.

Let me just say one thing, and I want to say it again and again. The biggest problem with Washington is not that we try new things. The biggest problem with Washington is not that we try new things and make mistakes. But when we make mistakes, we are not willing to go back and take care of it. And we love to take the credit when we sign a bill, but we have an obligation, and it is one of the things I enjoy being in Oversight about, is go back and fine-tune it. Any businessman knows that, because there is a real incentive to do that.

Sadly, that incentive doesn't occur in Government, because if we go back and find problems, then we have to admit that our package wasn't perfect. But we should be proud to say, you are right, it wasn't perfect, but we care enough about it, this is our baby, and we ought to go back and, yeah, every once in a while we have to change the diapers for the bureaucracy and get this thing straightened, even if it is a messy process. But I think that we need to talk specifically about making sure that system of following the money reflects reality, not just some kind of easy accounting process.

Look, there were some discussions here. There are certain characteristics that each one of your industries have on this issue. Would you point out in your industry what makes it more or less difficult for small disadvantaged businesses to enter the contracting process specifically to your industries?

Mr. ROBINSON. I'm sorry, I didn't hear the question.

Mr. BILBRAY. The question is, every business has its pros and cons and whatever when it gets into it, but specifically from your industry's point of view, do you see the advantages or can you point out the advantages and disadvantages from your perception of your industry either gaining access or not being able to gain access into the Federal process?

Mr. ROBINSON. First of all, Mr. Bilbray, I don't represent any particular industry. The nature of my organization is to be an advocate on behalf of minority businesses in the courts and in the legislative bodies.

Mr. BILBRAY. And I appreciate that and I apologize. I was trying to get down to those specific industries and, Mr. Robinson, it obviously wouldn't be a question to you, but it would be to some of the other members.

Mr. GALAVIZ. If we take the information technology and engineering logistics and support contracting efforts in the Federal Government, we basically most contributed to minority business to enter into the Federal space has been over the last 30 years the 8(a) program. The 8(a) program has made a lot of significant contributions to startup the funds. The other is the small business set-aside program. And particularly during the Clinton administration, with the reform of the GWAC concepts, that also provided some added opportunities.

However, the downside is that when those firms finally start developing some modest capability, then they are cut down at the knees, because I said earlier in the testimony the one question that all of you——

Mr. BILBRAY. Success goes punished, basically, once you——

Mr. GALAVIZ. No, no.

Mr. BILBRAY [continuing]. You reach a certain level, a tier, and you start getting cutoff?

Mr. GALAVIZ. Well, that is one interpretation, but the other is, to ask a simple question, how can a $7 million firm compete against a $29 billion firm? Or how can a $100 million firm compete against a $29 billion firm, or even a $300 million firm? And that is one thing, in the community, where we are working with antiquated policies that basically put us in the economic ghetto, because the one thing that every time you look in the paper about XYZ Co. being acquired by a large corporation, and look at the history of what has happened to those companies, a lot of them finally give up because their balance sheet has become so deteriorated because they keep losing competition.

My firm alone, I have had years worth of successes. Now that I am in the so-called twilight zone market, first of all, I am not a mid-tier firm because I am not Booz Allen or I am not UniSys. Those are the guys are the mid-tier firm. I'm the small guy. Even though I outgrew the size standards, I am still a small guy. So what is going to happen, let's say, to most of us? Give us an accountability of what has happened, the Government has made an investment in developing these firms, particularly in operation support contracts.

Let's be honest. The private sector hasn't made an investment on developing the staff of those contracts, because you have the concept in the Federal Government that operation support contract

that when the new company picks up the same cases from the previous company, and the new company, regardless what was said in their proposal, because that is another thing the Congress has never looked at, and that is these companies get selected because of a competitive process, Lockheed Martin, IBM, anybody. And they say, well, the reason you won is because you had these strengths, because you are going to bring this added value.

But yet, Madam Chairman, the Government never puts that in the contract. They do not put that in the contract. So then what does the new site management for that company do? He is hired to manage the contract according to what the Government signed on to, and the Government neglects to put down all the goodies that were in the proposal.

Mr. BILBRAY. That is absolutely fabulous testimony on that. It really is a good point. The fact is it is a proposal. If this is what the decision was made on this standard, on these proposals, then it should be almost automatic to transfer that in.

And I know my time has expired, but from the AGC's point of view, let me kind of hit you with a counter on that. Do you have any reason why we would not take that proposal and basically say, here is your proposal, this is what you propose, this is what the bid was on; we are now going to include that in the contract that you sign? From the AGC's point of view, do you see a major problem with that?

Mr. ZINGESER. Generally speaking, I think any general contractor working with subcontractors is always looking at their proposal. In other words, we might write a scope of work of some sort, which is saying how we see the work that needs to be done. They come back in turn and either agree that is what they can and will do or come back with their scope and saying that they "got it all."

Mr. BILBRAY. What if, right off the top, the proposal is put out there, and this is one of those things, don't offer if you are not willing to deliver, and this is a very good point that we may want to be talking about, and that is the fact is when a proposal uses certain terminologies used in certain proposals, that terminology from the proposal is incorporated, at least referred to in reference right in the contract.

Mr. ZINGESER. Yes. That is an automatic.

Mr. GALAVIZ. Well, that is not quite so in the Federal sector.

Mr. BILBRAY. But that is what you are saying and I am saying, is if that was a goal that we were shooting for, you think that should be included in, sir. That is what I am talking about.

Mr. GALAVIZ. Well, yes. In other words, if you are going to say, the evaluation committees, if they are being ethical and morally correct, they made a decision to hire this other company because they can do a better job, then those things, and probably I can give you some very interesting examples, and have those submitted to the committee.

But the fact is that right now, we are going through a very dynamic, kind of stupid experience right now. Right now, because of the budget pressures, right now companies or agencies are just doing the following: as long as you pass the technical cut, then lowest price will prevail. So what really the Government now is doing is saying we really don't care about added value, we really don't

care about innovation, OK? Right now we just care for you to show that you are a reasonably good contractor, that you have not been arrested over the last month, and, therefore, as long as you have the lowest cost.

Now, what is happening? Now, how do these large companies get the lower cost? And what is happening today in the marketplace is what they are doing is they are using different call centers with different benefits package. So now the new employees are now basically having less benefits, less holiday. So guess what happens? Those folks are going to stay there as long as they can find another job.

We have gone through this cycle before in Government over the last 40 years, OK, and then find that people get wise. Right now we know of three contracts that have been awarded just in the last 90 days in which a third of the incumbent employees either have left or are looking for a job because the new bidder won the contract in a totally different environment. So what is the Government really doing? You are creating sophisticated body shops.

Mr. BILBRAY. Thank you very much.

And I appreciate the extended time. I think we have some opportunities here. I am sad to say that I don't have the opportunity to look forward to working with the Chairwoman. Hopefully, with the blessing of the voters, I will be around to work with whoever the democratic leadership chooses to work with me on this committee. But I think that there are some great opportunities here.

I just have to say one thing about the budget process. You think it is tough now? Believe me, it is going to get very, very ugly. I mean, the Congressman from Virginia talked about a 10 percent cut across for the Department of Defense for contracts. I think we are going to see some real tough times coming down the pike and, believe me, when all of us go back to the district they are really looking at us; and coming from this committee, we get a lot of scrutiny.

So I appreciate your testimony and, Madam Chair, I really appreciate the fact that you have jumped into this, and I know you have some questions.

Ms. WATSON. Thank you so much.

Let me quickly just go down the line of panelists. I would like to start with you, Mr. Robinson. You are in the business of providing the legal defense and so on. In your opinion, how do minority-owned firms tend to view the various types of Federal assistance provided to them? And are some programs perceived as being more or less effective in offering assistance?

Mr. ROBINSON. Madam Chairwoman, that is a very mixed bag. There are programs where the policies that are in place that Congress designed to develop companies, we have been talking a lot about capacity, and if you look at the statutes that Congress has passed as the goal of these programs to build competitively viable companies, and yet you look at how that policy is executed on the ground, it leaves a great deal to be desired.

And I am specifically talking about, for example, the Department of Transportation. I think one of the things that they have instituted relative to accountability between State recipients and the Federal Government, and how they are accountable for the imple-

mentation of the program, begins to move us in the right direction, but there is a huge distance between what Congress has intended, or the Federal Government has intended, and how that is actually executed on the ground. And I think that, if you would poll many companies, they would indicate that those services designed to develop them are wholly inadequate.

Ms. WATSON. Assuming that the Federal courts will continue to eliminate these exclusive programs, including price evaluation adjustments and quotas, such as inclusive programs like technical assistance and outreach, how could the inclusive programs be made more effective? You know, we recognize there are some problems with the execution of these provisions. How can we make them more effective?

Mr. ROBINSON. I would like to correct one observation, one point that you just made. There is no program that you can consider a quota. All of these programs are inclusive. The SDB program, which is questionable as to whether it is in fact operating right now, but all of the other programs eligibility is determined by socioeconomic criteria.

And if you read that socioeconomic criteria, in most of these programs you can participate. So there are no what I would call exclusive programs in the Federal sector; most of these programs have general socioeconomic criteria by which you can in fact engage.

The second part of your question as it relates, again, to the effectiveness of the program.

Ms. WATSON. Right.

Mr. ROBINSON. I think the importance there is accountability, because most of this money flows through State and local actors, and to the degree that the Federal Government provides accountability, and for those who do not provide that accountability and do not implement these programs according to Federal law, the Federal Government has an obligation to cut out those funds to those agencies.

Ms. WATSON. That is why we are the Oversight Committee, and we are looking at how we hold the entities out there accountable. That is an excellent point, and I am so pleased that Mr. Bilbray is our ranking member, because you heard him commit to helping to work through some of these issues that you are raising today. Thank you so very much.

Mr. Galaviz, what types of Government programs would help the mid-tier companies in obtaining financial or Government contracts, and what could be the downside of such assistance?

Mr. GALAVIZ. Madam Chairman, thank you for that question. First, the reality of the environment of size standards is really a major, major hurdle, because it just practically, practically, it is difficult to answer that question, how can a $7 or $25 million company compete with a $29 billion company. So what we basically are proposing, to design a pilot program that would provide a tier type of competition, which, by the way, we implemented this and I helped part of design 20, 25 years ago, when the Department of Commerce introduced the comments program.

And there have been several agencies that have used that tier effect, and right now we do have a couple of agencies looking at that, and the reason why they are looking at that, because there has been a significant number of investments made by the Federal

Government in the development of some of these firms, and some of these firms have performed very, very well particularly because they know that on these mission-critical programs that are quite sophisticated and accomplished in technology, they know that when something goes haywire they can get the CEO of that company, of that small business, to come down and take care of it right away. They know they are not going to get the chairman or the CEO of Northrop Grumman to even say hello.

But also, for example, another thing that has been important to us in support of this pilot program is the fact that the small business community, the one thing that has been very positive on the Federal level is that over the last 35 years the small business community and the minority business community have gained significant amounts of capability to give confidence, for example, to the Air Force, which is the most sophisticated range you find in the world, and, 5, 7 years ago, they decided to make that a small business set-aside, and they had a significant number of competition. A small business won the contract 5 years ago; they performed very well. And the other examples we can provide to the committee were the small business community has really demonstrated to be able to provide the services that are needed in complex, critical projects.

So what we propose is basically to have the ability of collaboration to stop the bleeding that is happening in the marketplace by having a program that either SBA gets their act together and the Department of Commerce gets their act together of coming up with a realistic size standard program or develop a pilot program to show that indeed it can be a win-win situation, because in the proposal that we have, it would protect small emerging businesses.

Now, one thing that we have to give credit to MBDA is that since President Nixon established the minorities agency, they have done tremendous excellent work throughout the country in small businesses; the small manufacturer, the barber shop, the little market. All that has created a lot of vitality of economic development.

However, it is important to say that in the history of MBDA, as far as working with Federal contractors and really supporting Federal contractors, that has not been their strength. And SBA still has what we call the ghetto economic mentality. We hope that the proposal that we are saying on this pilot program, that should be considered, Madam Chairman.

Ms. WATSON. Thank you so much. We have other questions we would like to ask, but, for the sake of time, we are going to send you a letter with these questions, and you can respond in writing to us.

Mr. GALAVIZ. Yes, ma'am.

Ms. WATSON. Mr. O'Bannon, you described a situation that we know all too well. Are you aware of any ongoing efforts by the Department of Transportation to ensure that airports are actively working to increase the contracting opportunities for minorities and women-owned businesses? What are they doing that you are aware of?

Mr. O'BANNON. AMAC has worked extensively with some of our sister organizations, COMTO, with Tony's group and other organizations, to work directly with the Federal Aviation Administration and DOT on rulemaking, and some of the rules that have been pro-

posed, such as the increase in personal net work for an adjustment for inflation are those types of efforts that will hopefully have a positive impact. In addition, there has been more of an emphasis on accountability, and there are some efforts being taken by the agencies in that regard in terms of increasing accountability.

It just seems to me that, fundamentally, the issue has to be a recognition that there is a problem by these agencies, and it just seems to me, and, again, I am not a statistician, so when I go down this road, please don't ask me about the statistics of all of this, but many of these A&D studies look at a lot of factors, and at the end of the day, when they control for size, when they control for education, when they control for experience in the given industry, at the end of the day, a lot of these studies, when they find discrimination, it is race or gender, which is the motivating force that establishes that discrimination still exists, despite size, despite income.

I hate to use an example, but when I was younger and I was driving through certain neighborhoods in North Texas, they didn't stop and ask me if I was in college, and they sure as heck, when I stop now, don't ask me if I am a lawyer or what the balance in my checkbook is. They stop me because I am African-American driving through a certain neighborhood after hours. And that is the reality that we have to keep in mind and continue to address. And I think fundamentally, as long as the agencies focus on that and then come up with specific policies to address that, then we can move forward. But until that happens we are not going to move forward.

Ms. WATSON. You used an example of asking about, is there anyone available who can set up a barbecue stand in the airport. That is just like saying there is no available sand on the Hawaii beaches, you know. Maybe we ought to establish this, this is what I did at the University of California when I went in to talk to the current president at that time, and there were several minorities, five of them, trying to get tenure, and he said they didn't do the kind of academic research; and I set up an example for him and he couldn't respond.

But where I went with it, I said, well, why don't I supply you with a list of credible academicians in this country that will meet the standard that you set, because I know, right off hand, 10 of them? I would not let that excuse rise. So maybe we ought to be developing lists of people who meet those standards. Think about it. You don't need to respond. But I think if they can't find qualified contractors to fill this requirement or this need, we ought to some available.

Mr. O'BANNON. Ms. Watson, I know we are in need of time, and I will be brief, but I just want to point out, again, I think the committee should keep in mind that if you analyze in sheer number, not size of contract, but sheer number of contracts, that a significant portion of those contracts are well within the capability of the majority of our minority and women-owned business community.

Ms. WATSON. Of course. And that is what I am saying. Maybe we better have, when we go in and raise these issues, a list of those that are qualified. Then they would have to tell us why they

don't meet the standards. And I think they are illusional, as you have referred.

Mr. Zingeser, how are other firms in the industry affected when minority-owned firms are unable to meet the bonding requirements for prime contractors and, instead, become subcontractors? You know, I have gone through this for decades, and I remember sitting on the school board in Los Angeles, the largest one in the State, really, the largest one in the country under one board, seven members, and there would be contracts, and minority contractors, of course, would come to me because I am the only one of color sitting there, and they would say they can't compete because the bonding was too high and they couldn't get bonded. And I said we are still in 2010, pointing up the same problem. Would you respond?

Mr. ZINGESER. Yes. It is a complex issue, but I will try and break it down into a couple of pieces.

Ms. WATSON. Please.

Mr. ZINGESER. First of all, in our industry, we have general contractors who are like systems integrators and putting all the pieces together, and then there are subcontractors, and those subcontractors on a large project, and by large I am talking about $100 million renovation of this building, they may, in turn, have large subcontracts, like the mechanical work might be $30 million. And then, in turn, their subcontractors look down at other smaller firms to do work that break down into the duct work or other parts of that trade.

So there is general contracting and then trade work. General contracting does require, generally, a higher bonding capacity than work at a lower tier. The issues related to subcontracting for any general contractor, and I am not speaking necessarily for AGC, but I will speak for myself and our company, and I think it is similar. We are looking at two things, capability and capacity. Capability is to do the job. If it is painting, if it is installation of some specific system. And then capacity is ability to know that they are going to show up, they have the workers and they have the financial capacity to be there.

There are programs for small businesses, whether they be minority businesses or not, such as the SBA 8(a) Mentor-Protege Program, which is an excellent program. We participate. We have a couple of proteges that we work with. It has been very successful from the mentor's point of view and I think from the protege's point of view. That process officially allows us to bond the work. We have the bonding capacity, where they may not. Their bonding capacity has grown because they have been more successful. We have been in this relationship for a few years now, so they are developing their bonding capacity. But because there is an entity that is blessed, we can bond that and we can help. We can help in that way.

The issue that I pointed to in my testimony is really two points. One is very, very, very simple; it is that we can get the right data. We have the ability to know where the dollars go, as Mr. Bilbray said. We can do that easily. And we, the contractors, will give you that information; all you need to do is ask us for it. The Electronic Reporting System enables us to ask our subs, and they their subs,

for this data. We can tell you how many dollars go to what types of entities.

Now, the second part of the problem, though, is by not scoring that information or allowing it to be accounted for, we are forcing the subcontractors, who both logically and from a business model point of view don't necessarily want to be general contractors or don't want to work at a higher level, they do what they do; we are forcing them into situations where they are taking risks that they may not be comfortable with or creating some situations that I think are now being looked at, which I referred to as being upside down. That is where a small business gets in bed with a large business because the large business can provide the bonding. Well, the surety companies are not looking favorably on that and I don't think the Government is looking favorably on that.

That is a business model that I suggest is not meeting the social economic goals of the program. I think it creates some businesses whose model is to operate in the scoring system, but not to hire employees to do work, to get out there, to increase productivity and contribute to the Nation as a whole. So if we simply do the right thing, which Mr. Bilbray, I think, suggested when we make a mistake perhaps we can correct it, if we properly account and let these businesses, whether they be minority or other specially characterized businesses, if we allow the businesses to operate at the level they want to operate at, the trade they provide, the service they provide, and we get the credit, everybody gets the credit, we will see what we are doing; they will grow, they will be more comfortable, they will do the things that the program is intended to do, not create some opportunity for other business models.

So I am, as you can tell, pretty passionate about this. I think we have the answers to some part of it. It is an incremental problem. We can't solve all of the history of our country through some of these things, but we can do some things that will make a better environment for these programs to succeed. That is what we are trying to suggest.

Ms. WATSON. I appreciate your testimony.

Finally, Mr. Sumner, in your testimony you cite the decrease in Federal contract awards given through CalTrans to disadvantaged business enterprises from 28 percent, that was 1994, to just 2 percent in 2008. How much of an impact has the Federal Government had in increasing contracting opportunities for minority-owned businesses?

Mr. SUMNER. Specifically from the Federal Government, the DBE program that was required, because it is a USDOT requirement if you receive Federal awards, I think was beneficial in the State of California because it continued some form of the DBE program. Although we weren't able to collect evidence on that ourselves, the CalTrans Availability and Disparity Study showed the level of disparity to be two to three times higher for State awards, which is where the program wasn't operating.

And, on top of that, some of the things that were part of the Federal program would be things like mentorship opportunities, technical assistance opportunities. That would have a spillover effect on State awards. So it is possible that without the Federal program the State program might have shown even more disparity. So the

Federal Government's DBE program has been a benefit, I think, in California.

Ms. WATSON. And given the influx of the American Recovery and Reinvestment Act funds to California, are you aware of an increase in opportunities for minority-owned businesses?

Mr. SUMNER. Obviously, there the potential of opportunity is there, since it was a large increase in construction dollars that were available. We haven't done any research on that nationally or in California. I know, anecdotally, that others have done research. I know that the Kirwan Institute has been tracking stimulus money by race and I believe by gender, but I would have to review what their findings were, and I could get back to you on that.

Ms. WATSON. I want to say to this panel we really appreciate your input. We are going to be back in touch with you to give us concrete suggestions as to how we can fix the programs that we put into place through legislation. Working with our ranking member, I think that we can take the bill that we have and add provisions to it that would have the outcomes that we intend for Federal funds to have.

When we put them into a program, there is an outcome that we expect, and this hearing this morning and now into the afternoon has been about how do we cover minority- and women-owned businesses, and I think that all of you are on the track to helping us design the kind of policies that will reach our goal and have the outcomes.

We are about fairness and justice. As you know, we are in an economic time that is very troublesome for most families, and certainly for those at the lower end of the socioeconomic scale. People of color, women, feel the brunt of it greater than other segments of our population. We need to address it. We can't create miracles, but we can identify the provisions that need to be applied and the oversight that we need to do to be sure we get the results we intend.

So thank you so much, panel members there, and we will be extending to you more questions that we would like to have answered. We would appreciate your getting right back to us within 10 days, if you can.

Thank you very much, and we will adjourn this panel.

[Whereupon, at 1 p.m., the subcommittee was adjourned.]

[The prepared statement of Hon. Gerald E. Connolly follows:]

Opening Statement of Congressman Gerald E. Connolly

"Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses"

September 22nd, 2010

Thank you, Chairwoman Watson for holding a hearing on minority contracting. Historically, the federal government's purchasing power has played an important role in fulfilling the objectives of the civil rights movement. Martin Luther King said, "The dignity of the individual will flourish when the decisions concerning his life are in his own hands, when he has the assurance that his income is stable and certain, and when he knows that he has the means to seek self-improvement." The federal government has helped fulfill King's vision of equality of opportunity by desegregating its own work force, starting with Roosevelt's New Deal, and by using its purchasing power to create entrepreneurial opportunities for those who have long been denied equal opportunity in the realm of education, health care, or housing.

Today, many federal agencies are doing their part to fulfill King's vision; in FY 2009 6.67% of federal contract expenditures went to 8(a) socially disadvantaged firms. Recovery Act dollars have been even more productive: 12.6% of ARRA contract dollars have flowed to socially disadvantaged businesses. While we must be vigilant to ensure that this program is not being undermined by pass-throughs to larger contractors, it is clear that 8(a) and other federal programs like it have helped equalize opportunity for groups that have been the victims of de jure and de facto discrimination. Unfortunately, an activist court has attempted to block these programs, despite persistent wage gaps between black and white Americans and men and women. While these wage gaps have declined dramatically since the federal government first attacked discrimination under the Roosevelt Administration, black full time median wages are 38% less than white full time median wages, while the median wages of full time female workers are still 19% less than full time male workers. While the female-male earnings ratio increased from 60% to 78% between 1960 and 2008, we still have a long way to go to achieve equal opportunity for female wage earners.

I look forward to learning about how we may defend federal minority contracting preferences against judicial assault. Following Rothe Development Corporation vs. Department of Defense, Congress will have to demonstrate a "strong basis in evidence" in order to use contracting preferences to remedy discrimination in the defense industry. This narrow view ignores the impact of pervasive impacts of racism, which include unequal educational and employment opportunities beyond direct discrimination in a particular industry.

If racism or sexism were anachronisms we would not have wage disparities today, so it is imperative that we continue to use federal spending as a tool to achieve that more perfect union envisioned by the founders. As Martin Luther King eloquently explained, we cannot achieve civil equality without addressing equality of economic opportunity.