# EXHIBIT A-10
# (part 1)

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# THE DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

(111–18)

## HEARING

BEFORE THE

## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

MARCH 26, 2009

Printed for the use of the
Committee on Transportation and Infrastructure

# THE DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

# THE DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

**(111–18)**

## HEARING

BEFORE THE

## COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

MARCH 26, 2009

Printed for the use of the
Committee on Transportation and Infrastructure

U.S. GOVERNMENT PRINTING OFFICE
48–413 PDF WASHINGTON : 2009

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

JAMES L. OBERSTAR, Minnesota, *Chairman*

NICK J. RAHALL, II, West Virginia, *Vice Chair*
PETER A. DEFAZIO, Oregon
JERRY F. COSTELLO, Illinois
ELEANOR HOLMES NORTON, District of Columbia
JERROLD NADLER, New York
CORRINE BROWN, Florida
BOB FILNER, California
EDDIE BERNICE JOHNSON, Texas
GENE TAYLOR, Mississippi
ELIJAH E. CUMMINGS, Maryland
ELLEN O. TAUSCHER, California
LEONARD L. BOSWELL, Iowa
TIM HOLDEN, Pennsylvania
BRIAN BAIRD, Washington
RICK LARSEN, Washington
MICHAEL E. CAPUANO, Massachusetts
TIMOTHY H. BISHOP, New York
MICHAEL H. MICHAUD, Maine
RUSS CARNAHAN, Missouri
GRACE F. NAPOLITANO, California
DANIEL LIPINSKI, Illinois
MAZIE K. HIRONO, Hawaii
JASON ALTMIRE, Pennsylvania
TIMOTHY J. WALZ, Minnesota
HEATH SHULER, North Carolina
MICHAEL A. ARCURI, New York
HARRY E. MITCHELL, Arizona
CHRISTOPHER P. CARNEY, Pennsylvania
JOHN J. HALL, New York
STEVE KAGEN, Wisconsin
STEVE COHEN, Tennessee
LAURA A. RICHARDSON, California
ALBIO SIRES, New Jersey
DONNA F. EDWARDS, Maryland
SOLOMON P. ORTIZ, Texas
PHIL HARE, Illinois
JOHN A. BOCCIERI, Ohio
MARK H. SCHAUER, Michigan
BETSY MARKEY, Colorado
PARKER GRIFFITH, Alabama
MICHAEL E. MCMAHON, New York
THOMAS S. P. PERRIELLO, Virginia
DINA TITUS, Nevada
HARRY TEAGUE, New Mexico

JOHN L. MICA, Florida
DON YOUNG, Alaska
THOMAS E. PETRI, Wisconsin
HOWARD COBLE, North Carolina
JOHN J. DUNCAN, JR., Tennessee
VERNON J. EHLERS, Michigan
FRANK A. LOBIONDO, New Jersey
JERRY MORAN, Kansas
GARY G. MILLER, California
HENRY E. BROWN, JR., South Carolina
TIMOTHY V. JOHNSON, Illinois
TODD RUSSELL PLATTS, Pennsylvania
SAM GRAVES, Missouri
BILL SHUSTER, Pennsylvania
JOHN BOOZMAN, Arkansas
SHELLEY MOORE CAPITO, West Virginia
JIM GERLACH, Pennsylvania
MARIO DIAZ-BALART, Florida
CHARLES W. DENT, Pennsylvania
CONNIE MACK, Florida
LYNN A WESTMORELAND, Georgia
JEAN SCHMIDT, Ohio
CANDICE S. MILLER, Michigan
MARY FALLIN, Oklahoma
VERN BUCHANAN, Florida
ROBERT E. LATTA, Ohio
BRETT GUTHRIE, Kentucky
ANH "JOSEPH" CAO, Louisiana
AARON SCHOCK, Illinois
PETE OLSON, Texas

# CONTENTS


| | Page |
|---|---|
| Summary of Subject Matter | v |

TESTIMONY

| | |
|---|---|
| Aranza, Gilbert, Chief Executive Officer, Star Concessions, Ltd. | 7 |
| Cloonen, Katherine M., President and Owner, JK Steel Erectors, Inc. | 7 |
| Clyburn, Hon. James E., a Representative in Congress from the State of South Carolina | 4 |
| Covington, Chuck, Chief Executive Officer, People's Transit | 7 |
| Cunningham, Julie A., President and Chief Executive Officer, Conference of Minority Transportation Officials | 38 |
| Hall, Amy, Member of DBE Task Force, Associated General Contractors of America, President, Ebony Construction Company | 38 |
| Kim, K. Dennis, President, EVS, Inc. | 7 |
| O'Bannon, Don T., Esq., Chairman, Airport Minority Advisory Council (AMAC), Vice President of Business Diversity Development, Dallas-Fort Worth International Airport | 38 |
| Payne, Joann, President, Women First National Legislative Committee | 38 |
| Szabat, Hon. Joel, Acting Assistant Secretary for Transportation Policy, U.S. Department of Transportation, accompanied by Robert C. Ashby, Deputy Assistant General Counsel for Regulation and Enforcement, U.S. Department of Transportation | 7 |
| Thompson, Anthony, President and CEO, Kwame Building Group, Inc. | 7 |
| Wainright, Dr. Jon S., Vice President, NERA Economic Consulting | 7 |
| White, Richard, Vice President of Properties and Business Development, Memphis-Shelby County Airport Authority, Chairman of the Business Diversity Committee, Airports Council International-North America, accompanied by Sara L. Hall, Vice President and General Counsel, Memphis-Shelby County Airport Authority | 38 |

PREPARED STATEMENTS SUBMITTED BY MEMBERS OF CONGRESS

| | |
|---|---|
| Brown, Hon. Corrine, of Florida | 63 |
| Clyburn, Hon. James, of South Carolina | 66 |
| Duncan, Hon. John J., of Tennessee | 71 |
| Johnson, Hon. Eddie Bernice, of Texas | 76 |
| Mitchell, Hon. Harry E., of Arizona | 197 |
| Norton, Hon. Eleanor Holmes, of the District of Columbia | 200 |
| Oberstar, Hon. James L., of Minnesota | 202 |

PREPARED STATEMENTS SUBMITTED BY WITNESSES

| | |
|---|---|
| Aranza, Gilbert | 206 |
| Cloonen, Katherine M. | 212 |
| Covington, Chuck | 216 |
| Cunningham, Julie A. | 222 |
| Hall, Amy | 228 |
| Kim, K. Dennis | 280 |
| O'Bannon, Don T. | 284 |
| Payne, Joann | 297 |
| Szabat, Hon. Joel | 306 |
| Thompson, Anthony | 319 |
| Wainright, Dr. Jon S. | 323 |
| White, Richard | 381 |

Page

## SUBMISSIONS FOR THE RECORD

Johnson, Hon. Eddie Bernice, a Representative in Congress from the State of Texas:

Sanchez, Thomas W., Stolz, Rich, and Ma, Jacinta S, "Moving to Equity: Addressing Inequitable Effects of Transportation Policies on Minorities," The Civil Rights Project at Harvard University: Cambridge, MA (2003) .... 80

Swanstrom, Todd, "The Road to Good Jobs: Patterns of Employment in the Construction Industry," Public Policy Research Center, University of Missouri, St. Louis (September 30, 2008) .... 148

Napolitano, Hon. Grace F., a Representative in Congress from the State of California, letter from Will Kempton, Director, California State Department of Transportation, to the transportation construction community .... 198

Payne, Joann, President, Women First National Legislative Committee, written statement of Beth Doria, Federation of Women Contractors .... 304

Szabat, Hon. Joel, Acting Assistant Secretary for Transportation Policy, U.S. Department of Transportation, responses to questions from Rep. Napolitano .... 315

Wainright, Dr. Jon S., Vice President, NERA Economic Consulting:

Responses to questions from the Committee .... 373

Index of additional materials submitted for the record .... 380

## ADDITIONS TO THE RECORD

Asian American Justice Center, Aimee Baldillo and Aarathi Deshmukh, written statement .... 392

Committee on Transportation and Infrastructure, index of all disparity studies submitted for the record by witnesses and others .... 398

U.S. Department of Transportation, index of materials submitted for the record .... 400

Women Construction Owners & Executives, USA, Theresa Kern, President, Deborah Wilder, Past President, written statement .... 401

# U.S. House of Representatives
## Committee on Transportation and Infrastructure
Washington, DC 20515

James L. Oberstar
Chairman

David Heymsfeld, Chief of Staff
Ward W. McCarragher, Chief Counsel

John L. Mica
Ranking Republican Member

James W. Coon II, Republican Chief of Staff

March 25, 2009

**SUMMARY OF SUBJECT MATTER**

**TO:** Members of the Committee on Transportation and Infrastructure

**FROM:** Committee on Transportation and Infrastructure Staff

**SUBJECT:** Hearing on "The Department of Transportation's Disadvantaged Business Enterprises Program"

### PURPOSE OF HEARING

On Thursday, March 26, 2009, at 11:00 a.m., in room 2167 Rayburn House Office Building, the Transportation and Infrastructure Committee will meet to receive testimony regarding the Department of Transportation's Disadvantaged Business Enterprises Program.

### BACKGROUND

The U.S. Department of Transportation's (DOT) Disadvantaged Business Enterprises (DBE) program was established through a series of legislative initiatives to remedy past and current discrimination against minority and women-owned businesses to ensure that they are provided equal opportunity to compete for DOT-assisted highways, transit and airport contracts.

First established by regulation in 1980 as a minority and women's business enterprise program, pursuant to Title VI of the "Civil Rights Act of 1964" and other nondiscrimination statutes applicable to DOT financial assistance programs, the DBE program was later statutorily authorized in 1983 by the "Surface Transportation Assistance Act of 1982" (P.L. 97-424), primarily to aid small businesses owned and controlled by socially and economically disadvantaged individuals in the highway and transit programs.[1]

In 1987, Congress passed the "Surface Transportation and Uniform Relocation Assistance Act of 1987" (P.L. 100-17), and the "Airport and Airway Safety and Capacity Expansion Act of

[1] DBE programs for women-owned businesses and the DOT's airport program continued under the original 1980 regulations. *See* 64 Fed. Reg. 5096 (Feb. 2, 1999).

1987" (P.L. 100-223), which expanded the statutory DBE program to include airports, airport concessions and women-owned businesses.[2] In 1991, Congress reauthorized the highway/transit DBE programs and, in 1992, amended the airport DBE program to include management contracts and suppliers of goods and services.[3] The DBE program for highways and transit has since been reauthorized in successive surface transportation statutes.[4]

## I. What is a DBE?

A firm (and its minority and women owners) seeking certification as a DBE must meet: (1) an ownership and control test, (2) a personal net worth test, and (3) a size standard.[5] For eligibility purposes, a DBE is defined as a small for-profit business where socially and economically disadvantaged individuals own at least 51 percent of the economic interests of the entity and also control and manage the business operations of the firm.[6] Minorities and women are presumed to be socially disadvantaged (although that presumption is rebuttable).[7] Others may qualify as socially disadvantaged on a case-by-case basis.[8]

To be regarded as economically disadvantaged, an individual must, among other things, have a personal net worth (PNW) that does not exceed $750,000, excluding the equity in the individual's primary residence and the value of their ownership interest in the firm seeking certification.[9] Individuals seeking an Airport Concessions Disadvantaged Business Enterprises (ACDBE) certification may exclude other assets that the individual can document are necessary to obtain financing or a franchise agreement for the initiation or expansion of his or her ACDBE firm (or have in fact been encumbered to support existing financing for the individual's ACDBE business), up to a maximum of $3 million.[10]

As to size, to be eligible as a DBE, a business must be an existing small business (as defined by the SBA) and must not have average annual gross receipts over the firm's previous three fiscal years, in excess of $22.41 million.[11]

---

[2] Note that the airport DBE program is codified in statute and does not have to be specifically reauthorized in the same manner as the surface transportation DBE program.
[3] *See* "The Intermodal Surface Transportation Efficiency Act of 1991" (P.L.102-240), and the "Airport and Airway Safety, Capacity, Noise Improvement, and Intermodal Transportation Act of 1992" (P.L. 102-581). For the airport concessions program, this statutory change permitted the value of contracts with, or of goods procured from, certified DBE firms to be counted toward DBE participation goals.
[4] *See* the "Transportation Equity Act for the 21st Century" (TEA-21) (P.L. 105-178), and the "Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users" (SAFETEA-LU) (P.L. 109-59).
[5] 49 C.F.R. §§ 26.61-26.73 (2008).
[6] 49 C.F.R. § 26.69 (2008).
[7] For purposes of the DBE program, ethnic minorities include: Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans or other minorities found to be disadvantaged by the Small Business Administration (SBA). 49 C.F.R. § 26.67 (2008).
[8] 49 C.F.R. § 26.67(d) (2008).
[9] 49 C.F.R. § 26.67(a)(2)(ii) (2008). The $750,000 number was originally set by the SBA in 1989 and then borrowed by DOT and applied to the surface transportation and airport contracting programs in 1999, and airport concessions in 2005.
[10] 49 C.F.R. § 23.3 (2008).
[11] *See* DOT Final Rule: Disadvantaged Business Enterprise Program; Inflationary Adjustment (signed March 24, 2009)(to be published in the Federal Register).

## II. How does the DBE program work?

Congress has established a national 10 percent aspirational participation goal for firms certified as DBEs with respect to surface transportation programs, airport federally-assisted contracting (i.e., procurement, construction, or professional services contracts), and airport concessions.[12]

DOT regulations require recipients of federal financial assistance (i.e., state and local transportation agencies and airport operators) that anticipate awarding prime contracts of more than $250,000 to establish an annual aspirational DBE participation goal that reflects what DBE participation would be in the absence of discrimination.[13] Recipients must base their goals on how to achieve a level playing field in their individual programs, regardless of the 10 percent national goal.[14] These goals must be based on demonstrable evidence of the availability of ready, willing, and able DBEs relative to the DOT-assisted contracts that will be let that fiscal year ("FY").[15] It is important to note that a recipient's goal is aspirational only; quotas and set-asides are generally not permitted.[16] In addition, DOT does not assess penalties for not meeting DBE goals as long as good faith efforts are made.[17]

Importantly, recipients are required to use race-neutral means (i.e., without application of any criteria that favor DBEs over non-DBEs) to meet as much of their overall goal as possible. Examples of race-neutral means include: providing assistance in overcoming issues such as the inability to obtain bonding or financing; unbundling large contracts to make them more accessible to small businesses; informational and communication programs on contracting procedures and specific contract opportunities; and other business support services.[18]

If a recipient is unable to meet its overall DBE participation goal through race-neutral means, then the recipient must establish contract goals (which are deemed race conscious) for DBE participation.[19] This means that the recipient has determined that without the use of race-conscious measures, the level playing field could not be achieved. An example of how DBE goals might be set:

> [S]uppose Recipient X establishes an 11 percent overall goal for Fiscal Year 2000. This is the amount of DBE participation X has determined it would have if the playing field were level. Recipient X projects that, using a combination of race-neutral means, it can achieve 5 percent DBE participation. Recipient X then sets contract goals on some of its contracts throughout the year to bring in an additional 6 percent DBE participation.[20]

---

[12] *See* §1101(b) of SAFETEA-LU; 49 U.S.C. §§ 47107(e), 47113 (2009).
[13] Federal Transit Administration (FTA) or Federal Aviation Administration (FAA) recipients who reasonably anticipate awarding $250,000 or less in prime contracts in any fiscal year are not required to develop overall DBE goals.
[14] *See* 64 Fed. Reg. 5107 (Feb. 2, 1999).
[15] DOT, in its regulations, details the type of evidence that can be used as a basis for setting goals, including: DBE Directories and Census Bureau Data, bidder's lists, disparity studies, goals used by another recipient in similar circumstances and other alternative methods. *See* 49 C.F.R. § 26.45 (2008).
[16] Note that DOT's regulations do allow "set-asides" only in "limited and extreme circumstances . . . when no other method could be reasonably expected to redress egregious instances of discrimination." 49 C.F.R. § 26.43 (2008). Neither set-asides nor quotas are permitted in the airport concessions program. 49 C.F.R. § 23.61 (2008).
[17] 49 C.F.R. §§ 26.41, 26.47 (2008).
[18] 49 C.F.R. § 26.51 (2008).
[19] *Id.* However, contract goals may only be used for those DOT-assisted contracts that have subcontracting possibilities.
[20] *See* 64 Fed. Reg. 5112.

In addition, recipients of DOT financial assistance are required to establish a Unified Certification Program (UCP).[21] The purpose of a UCP is to ensure that DBEs and applicants (including airport concessionaires) will have "one stop shopping" on certification matters with respect to every recipient in the state. If a business wants to be certified as a DBE, it must submit an application to the UCP for approval. A determination as to whether a firm meets the DBE criteria will be made through various means, including on-site visits, personal interviews, reviews of licenses, stock ownership, equipment, bonding capacity, work completed, resume of principal owners, financial capacity, and type of work preferred.[22] Once a DBE is certified through the UCP, that certification must be honored by all recipients of DOT funds within the state; as opposed to having the DBE apply separately to each recipient with which it wants to work.[23]

The DOT also has counting rules to ensure that recipients have a mechanism to verify that the work committed to a DBE at contract award is actually performed by the DBE, as well as to have appropriate mechanisms to ensure compliance with the program.[24] Each recipient must report to DOT semi-annually on DBE commitments and achievements for the previous 6 months and then the full year. If the actual achievements of a particular contractor's, or a recipient's, program, falls short of commitments, DOT views this as an indication that corrective action should be taken to improve program performance.[25] As noted above, DOT does not sanction recipients if they fall short of their overall DBE participation goal, unless the recipient has not administered its DBE program in good faith.[26]

## III. The Impact of Federal Case Law on DOT's DBE Program

In 1995, the U.S. Supreme Court's decision in *Adarand v. Pena (Adarand)*,[27] a contracting case dealing with the expenditure of DOT funds in the state of Colorado, set forth constitutional requirements for race and/or gender conscious contracting programs established by Congress and implemented by the DOT. The Court held that race-conscious programs were subject to a "strict scrutiny" standard of legal review. The Court stated that strict scrutiny involves a two-part analysis. First, to enact a race-conscious program, the government must have a "compelling governmental interest." Second, the Court stated that combating discrimination was a compelling interest, but race-conscious programs could only be used if they are "narrowly tailored."[28]

It should be noted that the 1995 *Adarand* decision did not specifically determine the constitutionality of any affirmative action or government DBE program (including the DOT's DBE

---

[21] 49 C.F.R. § 26.81 (2008). Recipients (i.e., state DOTs and airports and transit properties that receive funds directly from FAA or FTA) must commit in writing to participate.
[22] 49 C.F.R. § 26.83 (2008).
[23] States are required to annually survey and compile a list of small and socially and economically disadvantaged business concerns within the State, and submit this list to DOT.
[24] *See, generally*, 49 C.F.R. §§ 26.37, 26.55 (2008).
[25] *See* DOT Official Questions and Answers DBE Program Regulation (49 CFR 26) (Updated Feb. 19, 2009), http://osdbu.dot.gov/dbeprogram/dbeqna.cfm.
[26] 49 C.F.R. § 26.47 (2008).
[27] 515 U.S. 200 (1995).
[28] On remand following the Court's decision in *Adarand v. Pena*, the U.S. Court of Appeals for the Tenth Circuit noted that factors to be considered regarding whether the DOT DBE program is "narrowly tailored" include: (1) the availability of race-neutral alternative remedies; 2) limits on the duration of the [DBE] certification programs; (3) flexibility; (4) numerical proportionality; (5) the burden on third parties; and (6) over-or under-inclusiveness. *See Adarand Constructors v. Slater*, 228 F.3d at 1147, 1178 (10th Cir. 2000).

program at issue in the case).[29] In response to the Court's decision in *Adarand*, however, the Clinton Administration undertook a review of all federal programs using race or gender as a basis for decision making. In 1998, Congress reauthorized the DBE program for surface transportation programs in TEA-21. In 1999, the DOT finalized new rules for the DBE program designed to meet the requirements of strict scrutiny and, in 2005, new rules for the ACDBE program were issued.[30] Circuit courts that have considered the constitutionality of the DOT DBE program since the rules were re-written have upheld the program against facial challenges.[31]

Although not a case reviewing the DOT's DBE program, there has been a recent ruling by the United States Court of Appeals for the Federal Circuit in *Rothe Development Corp. v. Dept. of Defense* (*Rothe*) declaring the Department of Defense's (DOD) 1207 Program, which is one of the programs that the DOD uses to meet its SBA goals, unconstitutional because "Congress did not have before it, at the time of the 2006 reenactment of Section 1207, a 'strong basis in evidence' for the proposition that DOD was a passive participant in racial discrimination in relevant markets across the country and that therefore race-conscious measures were necessary."[32] The *Rothe* court's application of strict scrutiny in evaluating the DOD minority business program may have implications for other Federal agencies in the event of future litigation.

However, one court decision that impacted how the DOT DBE program is applied is *Western States Paving v. Washington State Department of Transportation*.[33] In this case, the United States Court of Appeals for the Ninth Circuit (9th Circuit) held that the federal DBE program was facially constitutional, but that the Washington State DOT DBE program was unconstitutional "as applied," because the Washington State DOT had not narrowly tailored the program by ensuring that it had sufficient statistical evidence to target its remedial measures. As a result of this decision, the DOT advised recipients located in the 9th Circuit to use all race-neutral goals, pending the completion of studies to assist in narrowly tailoring the use of race-conscious goals. This has negatively impacted DBE participation in those states.[34]

For example, the FAA has compiled statistics regarding the airport DBE program following the ruling in *Western States*, which demonstrate that DBE participation was generally lower when only race-neutral means were used.[35] FAA collected data from airports located in 9th Circuit States for which numbers were available in both 2004 (the last year before race-conscious measures were discontinued) and 2007 (the most recent year for which data have been compiled and only race-neutral means were used). Twenty eight of those airports had race-conscious components in their 2004 goals, but had no race-conscious components in their 2007 goals. Of these 28 airports, FAA found that 18 (64 percent) had DBE participation that was significantly lower in percentage terms, in 2007 than in 2004.

---

[29] The case was remanded back to the lower courts and the program was ultimately upheld as constitutional in 2000 by the 10th Circuit in *Adarand Constructors v. Slater*. *Id.* at fn. 28.
[30] *See* 64 Fed. Reg. 5096 (Feb. 2, 1999); 70 Fed. Reg. 14508 (Mar. 22, 2005).
[31] *See, e.g.*, *Sherbrooke Turf Inc. v. Minn. DOT.*, 345 F.3d 964 (8th Cir. 2003); and *Northern Contracting, Inc. v. State of Illinois*, 473 F.3d 715 (7th Cir. 2007). A facial challenge is a challenge that the law is unconstitutional on its face, as opposed to unconstitutional in its application.
[32] 545 F.3d 1023 (Fed. Cir. 2008).
[33] *W. States Paving Co., Inc. v. Wash. State DOT*, 407 F.3d 983 (9th Cir. 2005).
[34] Note that some of the recipients have completed the requisite studies and are once again using both race-neutral and race-conscious means to meet DBE aspirational program goals.
[35] *FAA response to Chairman Costello question for the record on the DBE program (March 17, 2009): Hearing on the FAA Reauthorization Act of 2009 before the H. Subcomm. on Aviation*, 111th Cong. (Feb. 11, 2009).

x

| Airport | DBE Achievements 2004 (%) | DBE Achievements 2007 (%) |
|---|---|---|
| Anchorage, AK | 6.9 | 0 |
| Kodiak, AK | 11.5 | 22.3 |
| Palmer, AK | 2.8 | 47.3 |
| Page, AZ | 20.2 | 0.8 |
| Ryan Airfield, AZ | 12.9 | 13.2 |
| Tucson, AZ | 7.0 | 0.8 |
| San Francisco, CA | 33.0 | 34.5 |
| Fresno, CA | 8.7 | 7.8 |
| Palm Springs, CA | 6.1 | 0.9 |
| Santa Barbara, CA | 2.1 | 0.5 |
| Contra Costa, CA | 3.6 | 5.4 |
| County of San Diego, CA | 6.9 | 4.6 |
| Ventura, CA | 10.5 | 40.6 |
| San Diego County Regional, CA | 11.3 | 4.6 |
| Honolulu, HI | 66 | 0 |
| State of Hawaii | 22 | 0 |
| Friedman Memorial, ID | 1.7 | 0 |
| Gooding, ID | 7.7 | 6.4 |
| Pocatello, ID | 9.9 | 15.8 |
| Lemhi County, ID | 44.2 | 1.9 |
| Bert Mooney, MT | 4.6 | 16.8 |
| Missoula, MT | 8.9 | 4.6 |
| Sanders County, MT | 4.1 | 4.8 |
| Sidney Richland, MT | 0.2 | 1.0 |
| Reno Stead, NV | 5.2 | 0 |
| State of Nevada | 10.1 | 8.9 |
| Klamath Falls, OR | 0.9 | 0.4 |
| Portland, OR | 27.9 | 2.0 |

Source: FAA, 2009.[36]

[36] According to the FAA, DBE achievements are expressed in percentages of FAA financial assistance used in contracting.

In addition, the Federal Highway Administration has compiled similar data, as shown below.

| State DOT | DBE Achievements 2004 (%) | DBE Achievements 2007 (%) |
|---|---|---|
| Alaska | 6.70 | 8.20 |
| Arizona | 9.6 | 3.77 |
| California[37] | 10.4 | 6.6 |
| Hawaii | 9.0 | 2.0 |
| Idaho[38] | 4.35 | 14.79 |
| Montana | 5.38 | 5.09 |
| Nevada[39] | 4 | 0.11 |
| Oregon | 12.80 | 10.60 |
| Washington | 9.7 | Contract goals were suspended for only one year (2005 – 2006). During that time, DBE participation was 3.6%. Upon completion of its study, goals were reinstated in 2007. |

Source: DOT, Federal Highway Administration, 2009.

This recent evidence illustrates the importance of, and the continuing need for, the DBE program to ensure that minority and women-owned businesses have an opportunity to bid on DOT-assisted contracts.

[37] The DOT states that according to the California DOT Disparity Study (which covered 2002 – 2006), the use of DBEs on federally-assisted contracts was 9 percent from 2002 – April 1, 2006 and dropped to 4.9 percent from May – December 2006.
[38] According to the DOT, the FY 2007 participation number is not based on DBE participation achieved through entirely race-neutral means. It includes multiyear contracts with pre-existing DBE contract goals. The DOT notes that according to the Idaho DOT Disparity Study, DBE participation reported at 7.3 percent for the period 2002 – January 2006; DBE participation reported at 4.9 percent for the period February 2006 – December 2006.
[39] The DOT states that according to the Nevada DOT Disparity Study, DBE participation reported at 4 percent for the period October 1999 – September 2005; DBE participation reported at 1.3 percent for the period October 2005 – 2006.

**WITNESSES**

**MEMBER PANEL**

**The Honorable James E. Clyburn**
House Majority Whip
U.S. House of Representatives

**PANEL I**

**The Honorable Joel Szabat**
Acting Assistant Secretary for Transportation Policy
U.S. Department of Transportation
*Accompanied by:*
**Mr. Robert C. Ashby**
Deputy Assistant General Counsel for Regulation and Enforcement
U.S. Department of Transportation

**Dr. Jon Wainwright**
Vice President
NERA Economic Consulting

**Mr. Chuck Covington**
Chief Executive Officer
People's Transit

**Ms. Katherine M. Cloonen**
President and Owner
JK Steel Erectors, Inc.

**Mr. K. Dennis Kim**
President
EVS, Inc.

**Mr. Gilbert Aranza**
Chief Executive Officer
Star Concessions, Ltd.

**Mr. Anthony Thompson**
President and CEO
Kwame Building Group, Inc.

**PANEL II**

**Don O'Bannon, Esquire**
Chairman, Airport Minority Advisory Council (AMAC)
Vice President of Business Diversity Development
Dallas-Fort Worth International Airport

**Mr. Richard White**
Vice President of Properties and Business Development
Memphis-Shelby County Airport Authority
Chairman of the Business Diversity Committee
Airports Council International-North America
*Accompanied by:*
**Ms. Sara L. Hall**
Vice President and Legal Counsel
Memphis-Shelby County Airport Authority

**Ms. Joann Payne**
President
Women First National Legislative Committee

**Ms. Julie Cunningham**
President and Chief Executive Officer
Conference of Minority Transportation Officials

**Ms. Amy Hall**
Member of DBE Task Force
Associated General Contractors of America
President - Ebony Construction Company

# HEARING ON THE DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM

**Thursday, March 26, 2009**

HOUSE OF REPRESENTATIVES
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE,
*Washington, DC.*

The Committee met, pursuant to call, at 11:00 a.m., in Room 2167, Rayburn House Office Building, the Honorable James Oberstar [Chairman of the Committee] presiding.

Mr. OBERSTAR. The Committee on Transportation and Infrastructure will come to order.

The purpose of today's hearing is a very serious and deeply felt need to establish a record on the need for continuation of the Disadvantaged Business Enterprise program. The DBE program was established by regulation in 1980, following the Civil Rights Act of 1964. It has been expanded and adjusted and adapted through a series of four highway and aviation reauthorization legislative initiatives, the purpose of which have been to correct past discrimination, current discrimination against minority, against women-owned businesses to ensure they have equal opportunity to compete for Federal funds in our highway, transit, and airport programs.

Major infrastructure investments as the ones we make in aviation and surface transportation program are important sources of revenue to local construction and engineering firms. But for very long, a very, very long time, disadvantaged and minority-owned businesses were not to win portions of those big contracts because of barriers to entry in the sector. They were unable to compete with larger firms who were bidding on these projects. And that is why there was need for the Minority Business Enterprise program.

In 1980, I said it was a regulatory initiative to establish such a program under the Civil Rights Act of 1964. In 1983, there was legislation enacted to establish a national 10 percent aspirational participation goal for firms certified as DBEs for surface transportation programs, for Federal aid to airports for procurement, for construction, for professional services contracts, and for airport concessionaires.

The regulations of DOT require beneficiaries of Federal aid—State and local transportation agencies and airport operators—to establish annual aspirational DBE participation goals that reflect their participation and reflect what participation would be in the absence of discrimination. And that is for prime contracts of more than $250,000.

Now, it is important to understand that technical term. The recipient's goal is aspirational only. Quotas and set-asides are not permitted.

Recipients are required to use race-neutral means to meet as much of their overall goal as possible: providing help for bonding, financing, unbundling large contracts to make them more accessible to small businesses, establishing informational programs on contracting procedures, programs to inform small business enterprises on specific contract opportunities.

But, if a recipient is unable to meet, if a large contractor or the agency contracting is unable to meet its overall DBE participation goal through race-neutral means, then that beneficiary, that agency must establish contract goals, which are deemed race conscious, for DBE participation. So that, in technical real-world terms, means that the recipient has determined that without the use of race-conscious measures, minority-and women-owned businesses would not have an adequate opportunity to participate in these contracts.

The DBE program has faced a number of legal and legislative challenges, but I am very satisfied and very pleased that, with the work that we have done in this Committee over a number of years, the program has withstood those challenges. In 1995, the U.S. Supreme Court ruled, in the Adarand v. Pena case, which everyone knows is the Adarand case, that a race-conscious programs were subject to a strict scrutiny standard of legal review. That gave us a lot of headaches in the TEA-21 legislation. And we have as our lead witness one of those who had the biggest headache, among others, Eleanor Holmes Norton of this Committee, Maxine Waters, who was of great counsel, Eddie Bernice Johnson, now Chair of our Water Resources Subcommittee. All of us counseled together and Mr. Clyburn, then a Member of the Committee, with his resonant voice, was able to bring everybody together. He doesn't need a gavel; he just needs to speak.

So that ruling required that all affirmative action programs be "narrowly tailored to serve a compelling governmental interest." That sent everybody scurrying. How do we narrowly tailor? What do we establish as a compelling government interest? The DOT tried to address that with new regulations to ensure non-discrimination, and every court since then that has reviewed DOT regulations has found them to be constitutional.

Now, our Committee has compiled volumes of evidence, actual and word-of-mouth, case-by-case, that discrimination continues to adversely affect minority-and women-owned businesses across the Country. And these data demonstrate that there is a significant difficulty remaining for small and disadvantaged businesses to compete. If we can expand access to Federal contracts, and have much greater, much more expansive Federal program that will go in the range of $450 billion to $500 billion over the next six years, then we are going to be doing something really significant for the minority community in this Country. Make them full partners in reducing congestion, improving mobility, and keeping America competitive. To keep America competitive, all have to be able to compete, and that is where this legislation comes in.

We on this Committee have supported the continuation of DBE in both Democratic majorities and Republican majorities, although it was a pretty tough negotiation and an intense conference between the House and Senate in 1998 that I want to say Mr. Clyburn played a very, very pivotal role. I am grateful for your contribution, Mr. Clyburn.

Mr. OBERSTAR. Mr. Petri?

Mr. PETRI. Thank you very much, Mr. Chairman, and thank you for calling today's hearing to review the Department of Transportation's Disadvantaged Business Enterprise, or DBE, program. It is important that we review the status of and the need for these programs on a regular basis.

It has been over 25 years since Congress created these programs, which were intended to increase participation in federally-assisted State and local contracts by small businesses owned and controlled by disadvantaged individuals. It is an admirable goal and I look forward to hearing from today's witnesses as to the progress that we have made toward its realization.

Three Department of Transportation administrations, including the FAA, oversee DBE programs. Allowing fair competition for airport construction projects and airport concession contracts is clearly important. It is a goal I support as long as it is determined that there is a compelling need for the program and as long as the program is conducted in a fair, transparent, and legal way.

I look forward to hearing from the Department of Transportation and the aviation and airport representatives on the status of the DBE programs in the aviation sector.

Given the current state of the economy and its particular impact on the airline and airport industry, I am interested in learning how the program is assisting small businesses to compete for newly funded airport improvement projects. Likewise, I look forward to learning more about how the airport concession program is working post-9/11 and during these very, very trying times.

Again, I would like to thank you, Mr. Chairman, for calling this hearing and our witnesses for taking the time to join us today, and particularly someone I admire a great deal, my friend, the Majority Whip from the State of South Carolina, Jim Clyburn, who is kicking things off for this hearing. Thank you.

Mr. OBERSTAR. Thank you very much, Mr. Petri.

I might add Mr. Mica is at a meeting, a roundtable discussion with handicapped persons in our Subcommittee hearing room. I just left that meeting a few moments ago, and he will join the hearing later on.

I would like to ask unanimous consent that Representative Sheila Jackson Lee, in due course, be allowed to sit on the dais, but not to ask questions or to make comments as the hearing proceeds. Without objection, so ordered.

Mr. Clyburn, please proceed.

I will ask other Members to withhold comments because we are going to have votes fairly soon, unless the Whip changes that schedule.

[Laughter.]

## STATEMENT OF HON. JAMES E. CLYBURN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF SOUTH CAROLINA

Mr. CLYBURN. Thank you very much, Mr. Chairman, Mr. Petri, other Members of the Committee. Thank you all so much for allowing me to be a part of this process here today.

I am very honored and pleased to appear before you today. As a former Member of this Committee, I know firsthand the significance of the many programs and various matters that fall within your jurisdiction. I am also aware and stand in awe of the tremendously positive impact this Committee's work has on our Country.

I want to discuss with you today one of those various matters that is of great importance and concern not only to me personally, but I believe to our Nation as a whole, and that is the issue of effectively confronting historical inequities occurring in our Nation's transportation industries.

The hearing today focuses on the Disadvantaged Business Enterprise, DBE, programs authorized by Congress and administered by the Department of Transportation. As the Committee is aware, the Department of Transportation DBE programs apply to airports and surface transportation. They have been enacted by Congress to address historic discrimination against minority-owned firms in transportation and to ensure that minority-and women-owned businesses have a fair opportunity to participate in contracting opportunities made possible by Federal financial assistance.

Mr. Chairman, the word discrimination is a tough term. It conjures up images of past times and past acts that many people would like to forget. Any discussion of it makes many people uncomfortable. In this regard, I am reminded of the debate that ensued when Attorney General Holder observed essentially the same point last month.

Mr. Chairman and Members of this Committee, although an uncomfortable discussion at times, it is absolutely essential that we, as Members of Congress and as citizens, be willing to talk about the continuing challenges that racial and gender discrimination and, for that matter, other forms of discrimination raises for public policy.

This Committee has demonstrated on a bipartisan basis its commitment to fairness and to tackling this issue, and for this reason I commend you for holding this hearing today.

Mr. Chairman, sometimes I hear pundits argue that there is no current need for the DOT DBE programs. They reason that times have changed and that America is much more enlightened than when the first statutory DBE program was enacted back in 1983 during the Reagan Administration. Critics and opponents often argue that the DBE programs are legally or constitutionally suspect.

However, despite such assertions, it is my strong belief that discrimination is still a problem, that DOT DBE programs remain necessary, and that the programs are constitutionally sound.

Mr. Chairman, it is true times for minority and women entrepreneurs have improved from what they were when the first DBE programs were enacted. Although I readily acknowledge and celebrate these improvements, I also know that it does not mean that discriminatory conduct has ended. Indeed, there are numerous aca-

demic and statistical studies demonstrating the lingering effects of past discrimination and that there are ongoing incidences of racial discrimination.

Equally compelling are the anecdotal stories that I hear from minority and women businesses in my congressional district and from around the Country. For the most part, these entrepreneurs have to find ways in which to persevere and to overcome. Some are successful and some are not.

I also urge the Committee to keep in mind that discrimination can be both direct and indirect. Either method is just as harmful and just as wrong. For example, beyond the denial of a contract, discriminatory practices can be evident in how a contract is structured. It is in the eligibility criteria for the work, in quotes for materials from suppliers, in the practices of prime contractors towards subcontractors, or in credit or bonding determinations.

Mr. Chairman and Members of the Committee, I speak to this issue from personal experiences. For more than 17 years, immediately before coming to this body, I supervised the investigations of thousands of these cases in my native State of South Carolina. I did so under four governors, to Democrats and two Republicans. Many of those cases had no merit. But, unfortunately, many of them did. The academic and statistical studies and stories of individual entrepreneurs are poignant and painful reminders to us as legislators that progress is not a reasonable justification, or legal or moral, to stop combating inequities and discrimination.

Although we should acknowledge and celebrate the fact that the policies that were first developed in this Committee have helped minority-and women-owned firms participate in the transportation industry, we should also understand that there is ongoing work required if the playing field is going to become truly level.

Earlier, I mentioned that the term discrimination makes a lot of people feel uneasy. Perhaps this is particularly understandable for airport owners, State DOT officials, transit agencies and the like whose leaders are committed to inclusion, who truly engage in good faith efforts for DBE participants, and who fully comply with Federal DBE participation goal requirements. To these leaders I tell you that your commitment is understood and appreciated, and your accomplishments are noted.

Further, I urge you to understand that congressional efforts redress continuing barriers to participation in no way diminishes your good work. To my way of thinking, it is quite the opposite. Your efforts represent a model of best practices that should be emulated.

Mr. Chairman, while addressing discrimination and working to ensure fairness is the right policy, this Committee should not overlook the clear economic case for inclusion and diversity. Our Nation suffers when those who are talented, who have new ideas, and who want to work hard are denied the opportunity to compete because of their ethnic background, race, or gender.

Mr. Chairman, before closing, I want to say a word about the constitutional soundness of the DOT DBE programs. I mentioned previously the DBE programs are intended to remedy discrimination in order to make it possible for all firms to have a fair chance to participate in the business opportunities arising from Federal

transportation spending. The DOT DBE statutes and regulations have been carefully crafted and narrowly tailored to meet the rigorous, strict scrutiny constitutional standards established by the United States Supreme Court in the Adarand decision in 1995. In fact, all of the full United States Circuit Courts of Appeal that have considered the constitutionality of the DOT DBE programs since Adarand and new regulations put in place after that decision have found that the program is constitutional. This conclusion has been affirmed by the 7th, 8th, 9th, and 10th Circuits.

Mr. Chairman, in closing, I want to share with you a very personal experience. A few days after being appointed to run the work training programs for Charleston County, South Carolina, I received a phone call from a Mrs. Rowena Tobias, someone I knew only by reputation and the society pages in the local newspapers. She invited me to her home on Charleston's South Battery, where the two of us spent the better part of an hour reflecting on Charleston's history. She shared with me the fact that Charleston was once the leading economic engine on the Country's East Coast. Whenever there were problems, she said, people would sit down to talk and work their way through them, except for one. She said to me on that day that Charleston lost its standing because whenever the issue of race came up, people would stop talking. She told me that we are not going to be able to work our way through the issues of race if we continue to stop talking whenever the subject came up. She asked me to promise her that I would never stop talking until we solve this very important problem.

Mr. Chairman, I commend you and this Committee for reviewing and discussing the DOT's DBE programs and the issues of discrimination and fairness, and I thank you for allowing me another opportunity to continue keeping the promise I made to Mrs. Rowena Tobias over 40 years ago. Thank you so much for allowing me to be here, and I will answer any questions you may have.

Mr. OBERSTAR. Mr. Whip, thank you very much for that very compelling, powerful, and moving statement.

Mr. CLYBURN. I want.

Mr. OBERSTAR. Is Ms. Tobias still——

Mr. CLYBURN. No, she is no longer with us, Mr. Chairman.

Mr. OBERSTAR. We will keep your promise to her. We will never stop talking——

Mr. CLYBURN. I appreciate it.

Mr. OBERSTAR.—about race——

Mr. CLYBURN. Thank you.

Mr. OBERSTAR.—about its effect. It may be a different color, but I remember as a kid going out looking for jobs when I was in high school, and you would go to the mining companies and they would say bohunks need not apply. It has the same effect. They can tell by your name, if not by your skin color.

Mr. CLYBURN. Absolutely.

Mr. OBERSTAR. Mr. Petri, do you have any comments?

Mr. PETRI. No.

Mr. OBERSTAR. I think we will thank you for your testimony and for your participation, and I will always remember in the markup the conference in 1998 on the TEA-21 legislation, when just having Jim Clyburn at the table, having him say his name and shake his

head was enough to confirm the House position on minority business enterprise issues in that legislation.

Mr. CLYBURN. Well, thank you, Mr. Chairman, for your kindness, and I thank Mr. Petri for his long friendship. He is one of the people that I really admire a whole lot, and I want him to know that the counsel he gave to me during those trying times will never be forgotten. Thank you.

Mr. OBERSTAR. There are a series of votes on the floor, the nine minutes remaining; 420 have not yet voted, so there is plenty of time. We will continue with the next panel and at least let them get started, and that will be beginning with Joel Szabat, Deputy Assistant Secretary for Transportation Policy, accompanied by Mr. Robert Ashby, Deputy Assistant General Counsel for Regulation and Enforcement; Dr. Jon Wainwright, Vice President for NERA Economic Consulting; Chuck Covington, Chief Executive Officer, People's Transit; Ms. Katherine Cloonen, President and Owner of JK Steel Erectors; K. Dennis Kim, President of EVS; Mr. Gilbert Aranza, Chief Executive Officer, Star Concessions; Mr. Anthony Thompson, President and CEO, Kwame Building Group, Incorporated.

We will begin Deputy Assistant Secretary Szabat.

It is probably Hungarian, Szabat.

Mr. SZABAT. Almost, sir. It is Polish.

Mr. OBERSTAR. Polish. Close, but not related. Hungarians are a different ethnic origin than Poles.

Mr. SZABAT. And nothing but respect for them, sir.

[Laughter.]

Mr. OBERSTAR. Well, they are neighbors to my ancestral land of Slovenia.

I read your testimony and read it twice last night, and I thank you for the thoroughness of the presentation, the excellent examples that you provided, and for the very substantive contribution it makes to the purpose of this hearing. Please proceed, summarize your statement.

After Mr. Szabat's presentation, we will recess for votes and reconvene immediately thereafter.

**TESTIMONY OF THE HONORABLE JOEL SZABAT, ACTING ASSISTANT SECRETARY FOR TRANSPORTATION POLICY, U.S. DEPARTMENT OF TRANSPORTATION, ACCOMPANIED BY ROBERT C. ASHBY, DEPUTY ASSISTANT GENERAL COUNSEL FOR REGULATION AND ENFORCEMENT, U.S. DEPARTMENT OF TRANSPORTATION; DR. JON S. WAINRIGHT, VICE PRESIDENT, NERA ECONOMIC CONSULTING; CHUCK COVINGTON, CHIEF EXECUTIVE OFFICER, PEOPLE'S TRANSIT; KATHERINE M. CLOONEN, PRESIDENT AND OWNER, JK STEEL ERECTORS, INC.; K. DENNIS KIM, PRESIDENT, EVS, INC.; GILBERT ARANZA, CHIEF EXECUTIVE OFFICER, STAR CONCESSIONS, LTD.; AND ANTHONY THOMPSON, PRESIDENT AND CEO, KWAME BUILDING GROUP, INC.**

Mr. SZABAT. Thank you, Mr. Chairman, Members, and thank you for inviting the U.S. Department of Transportation here today to review the status of our——

Mr. OBERSTAR. Turn that microphone closer to you.

Mr. SZABAT.—to review the status of our Disadvantaged Business Enterprise program.

I am Joel Szabat, the Deputy Assistant Secretary for Transportation Policy. Joining me today is Bob Ashby, our Deputy Assistant General Counsel for Regulation and the man, as much as anyone, sir, who is responsible for the detailed information that was provided in our written testimony.

The Department of Transportation has a proud record of reaching out to work with small and minority businesses. We send twice as much of our business to small businesses as a typical Federal agency. Over 40 percent of the Federal Aviation Administration's direct contracting dollars go to small businesses, and the rest of the Department finds small businesses suitable for over half of our contract work.

The DBE program is even more important to minority-owned firms in the transportation field, providing them with an equal opportunity to participate in over $30 billion worth of DOT-assisted highway, transit, and airport contracts each year. In fiscal year 2008, DBEs were awarded $3.3 billion, or 11 percent of DOT's total assisted contracting. Additionally, this year the Recovery Act entrusted $48.1 billion to the Department of Transportation. Over $35 billion of these monies will be provided through assisted contracts covered by the DBE program, creating another $3 billion to $4 billion in job-creating business opportunities for DBEs.

Transportation's DBE program works. As Chairman Oberstar and Congressman Clyburn have already noted, every Federal court that has examined our rule has agreed it is constitutional. The program is narrowly tailored to redress the continuing effects of discrimination. There are no quotas or set-asides. Goals are set based on evidence and no one is sanctioned or loses a business opportunity just for failing to hit a number.

There is powerful evidence of the continuing compelling need for the DBE program. Recipients can set race conscious goals for DBEs only when they conclude, based on the evidence, that racial neutral measures alone cannot create a nondiscriminatory market for DBEs. From 2004 to 2008, recipients found it necessary to use race conscious goals 81 percent of the time. Without this tool, they could not have properly addressed the effects of discrimination.

A 2005 Federal court decision drove this point home by demonstrating the debilitating effect of denying the use of race conscious goals. This decision barred jurisdictions on the West Coast from using race conscious measures until they had conducted disparity studies. Despite the use of race neutral measures by assisted contract recipients, DBE participation declined in 7 of the 9 affected States, 18 of 28 airport districts, and 7 of 9 transit authorities over the three year period.

Disparity studies are providing important statistical evidence of the presence and effects of discrimination in the marketplace. These studies paint an indelible picture of a nationwide problem not limited to any particular minority group or any region of the Country. Disparity studies also collect firsthand stories of how discrimination affects individuals trying to compete on an uneven playing field.

With your permission, the Department will submit summaries of statistical and anecdotal evidence in our additional material for the record.

Mr. OBERSTAR. Without objection, that information will be received and included in the record at this point, following your testimony.

Mr. SZABAT. Thank you, Mr. Chairman.

The anecdotal and survey information provided by disparity studies illustrates a continuing barrier to participation encountered by DBEs; that a lack of access to the informal network of communication and relationships that are crucial to success in the contracting business. Most of us depend on a network of trusted friends and colleagues for advice and recommendations. Unfortunately, in the world of contracting, as in elsewhere, those networks frequently are limited to people of the same race or gender. Possibly the most important function our program performs is to help correct this lack of access.

When there is a race conscious goal in a contract, primes must make good faith efforts to contact qualified DBE firms whose owners may not be part of their normal networks. This process creates business relationships that lead to opportunities for DBEs, and our data shows that this process has been successful where other good faith efforts have failed.

The information we have submitted to the Committee for the record demonstrates a clear, compelling, continuing, nationwide need for the DBE program. Within DOT, we are continually working to improve the program to meet this need.

Thank you, Mr. Chairman, Members. Mr. Ashby and I will be happy to respond to any questions you may have.

Mr. OBERSTAR. And we will come back to the rest of the panel. There are two minutes remaining on this vote. We will all have to leave for the House floor and reconvene as quickly as possible after the last vote.

The Committee will resume its sitting and the Chair can confidently announce there will be no more interruptions from the House floor. The last votes have occurred. Now we will proceed with the hearing and thank Secretary Szabat for his presentation.

Mr. Ashby, you are next. You are not speaking separately, Mr. Ashby?

Mr. ASHBY. No, sir. I am in the capacity of assisting with answering questions that you may have.

Mr. OBERSTAR. You are support services for——

Mr. ASHBY. Exactly, sir.

Mr. OBERSTAR. All right. Okay. Very good.

Dr. Wainwright.

Mr. WAINWRIGHT. Thank you, Mr. Chairman, Mr. Guthrie, other members of the Committee. Thank you for your invitation to appear here today. My name is Jon Wainwright. I am a Vice President with NERA Economic Consulting. I hold a doctorate in economics from the University of Texas at Austin.

With the Committee's permission, I would like to include my written testimony in the record as if read in full.

Since 1989, I have devoted my professional life to studying race and sex discrimination and its impact on business enterprise. I

have served as the project director or principal investigator for over 40 studies of business discrimination. I have authored a book on the subject and have provided expert testimony in Federal and State courts on these and related matters.

The primary bulwark against business discrimination has been the use of public sector purchasing power to promote fair and full access to government contracting opportunities for minority-and women-owned businesses, and to mitigate the impact of such discrimination in the private sector. The USDOT DBE program is a key example of such policies at the Federal level.

Because the DBE program is subject to the strictest standard of constitutional scrutiny, it is important that any DBE studies used to assess discrimination and to assess the presence of DBEs in the transportation sector are of high quality, independent and objective, academically rigorous, and incorporate as much relevant evidence as possible. It is also important that DBE studies be carried out by economic and statistical experts who can be qualified in Federal court to testify regarding their data, methods, and findings if called upon to do so.

In 1999, Congress reviewed and revised the DBE program's authorizing statute and implementing regulations. As already mentioned, every court that has considered the issue has found the DBE regulations to be constitutional on their face. Whether USDOT grant recipients can withstand an as-applied challenge, however, turns at least in part on whether they went to court prepared with a high quality DBE study and an expert to testify about it.

For example, when the DBE programs in Minnesota and Illinois were challenged, such studies played important roles in successfully defending the constitutionality of the programs applied by each agency. In contrast, when the program at Washington State was challenged, no study or expert was proffered at all. As a result, the 9th Circuit lacked the benefit of any guidance on the correct economic analysis of discrimination and made several serious errors as a result.

Although unrelated to the USDOT DBE program, a similar situation recently occurred in the Federal Circuit Court of Appeals in the Rothe case, concerning the DoD program for small disadvantaged businesses. Here again, the defendants proffered no study of their own, nor an expert to testify about such a study, and once again the court made several serious errors in its economic reasoning, concluding, for example, that factors such as firm size should be factored into study estimates of DBE availability.

Since 2000, I have directed 16 studies at NERA where one or more of the participating entities was a State Department of Transportation, transit authority, or airport. With the Committee's permission, I would like to provide copies of these studies for the record. The studies span the Country. Of the 75 Members in this Committee, 50 hail from States represented in the studies submitted. Despite their geographic diversity, the study findings show much more similarity than difference. DBEs throughout the Nation continue to face large disparities in almost every aspect of business activity that can be quantified.

It is fair to ask whether these disparities result primarily from discrimination or from other factors. Our DBE studies have put such questions to the test using the most recent available data. Our studies find that even when other nondiscriminatory attributes are held constant, the disparities between DBEs and non-DBEs tend to remain large, adverse, and statistically significant.

In addition to statistical evidence, we have conducted thousands of surveys and hundreds of in-person interviews with DBEs and non-DBEs alike, and the results are strikingly similar across the Country and across different industries. There is general agreement that without the use of affirmative remedies such as the DBE program, these firms would receive few opportunities on government contracts, as is the case on public contracts without goals, and especially in the private sector.

Our studies' findings strongly suggest a continuing need for the USDOT DBE program to help remedy the ill effects of business discrimination in the transportation sector. The economic consequences of that program are significant. It has improved economic opportunities for minorities and women in business, and thereby improved the overall competitiveness and efficiency of the American economy.

Thank you. I would be glad to answer any questions.

Mr. OBERSTAR. Thank you very much, Dr. Wainwright. Those are very compelling statistics and reports that you cited in your testimony. We will come back to that later. And the information you requested will be received for the hearing and perhaps, depending on the volume of the documentation, included in the hearing record at this point. If it is too voluminous, it will be included in the Committee files.

Mr. Covington.

Mr. COVINGTON. Good morning, Mr. Chairman.

Mr. OBERSTAR. Please put your microphone on, please.

Mr. COVINGTON. Good morning, Mr. Chairman and Members of the Committee. My name is Chuck Covington, and I am the President and CEO of People's Transit in Detroit, Michigan. My company provides vehicles and crews for ground transportation, including Detroit Metropolitan Airport.

Thank you for the chance to talk about the airport DBE program. Small and minority businesses are the backbone of this Country. Without the DBE program, big business would steam roll right over us. I believe that tendency is partially responsible for the economic trouble we face today. One thing is clear: small minority businesses are not the ones that have brought our Nation's financial system to the brink.

I have dealt with discrimination my entire life, and I still deal with it. Last year, one of my employees receive a quote on new tires. The supplier quoted us more than $613 for each tire. I called a white business associate and learned that he had only paid $400 per tire for the same tires, from the same supplier. My employee who obtained the original quote has what might be described as an ethnic sounding voice. So I used a white voice, called the tire supplier, and got the $400 price.

When asked why we had initially been given the higher price, nothing the supplier said justified the actions. A 50 percent mark-

up on one of the most basic supplies in my business puts me at a huge disadvantage. Today's business climate is tough, and it has been tough in Michigan for years. No business person can succeed if they are paying a race-based markup on supplies.

Some other examples are important. Even those of us who have accumulated wealth, for instance, equity in our homes, face more difficulty getting loans than similarly situated white entrepreneurs. Housing discrimination is real. Early in my career I responded to an ad for an apartment, but when I showed up, I was told that the apartment had been rented. I knew what was going on, but I had my white secretary call and inquire. She was told the unit was still available.

Housing discrimination matters, because, for many minority businesses, our homes represent our best source of collateral. Given Congress's investigations, you know that minorities pay higher mortgage rates. We also pay higher business loan rates, if we can get them. As long as housing and lending discrimination persists, minority business owners will be at a disadvantage.

Sadly, I have to deal with bigoted business people. Not long ago, I was sued by a white subcontractor. We resolved the case to my advantage, and later I heard that outside the courtroom the CEO that sued me had said that he never believed that N word and his Jew lawyer would take the case so far.

That slur says nothing against me, but it says a lot about the person that used it. One thing that it tells me is that I still have to work harder than the majority of business owners to succeed. Unfortunately, the good ol' boy network still exists. Breaking into that network is critical. I have seen situations in which unqualified majority firms were hired over me.

In a recent job involving shuttle services at a local mall, my bid was rejected and a non-minority firm was hired. I was brought in as a subcontractor and my drivers frequently had to manage the job and fill in when the prime's drivers did not show up. I was paid the same price that I had originally quoted the mall. I was more qualified; my price was fair; so why didn't I get the prime contract? I believe it has to do with the networks.

I serve in many public service and civic roles in my hometown, Van Buren Township, Belleville, Michigan. In these roles, I sometimes attend events at a local private club called the Eagles Club, one of the main places that business people in my area network. But the Eagles Club has an unwritten rule: African-Americans cannot be members. It sickens me that this club in my community would exclude me and my daughters because of our race. And this also impacts my business. If business people do business with those with whom they are comfortable, how am I supposed to succeed if I can't even join the club where they socialize?

The current DBE program helps enormously. Still, the program can be improved.

Thank you, Mr. Chairman, for the provisions already included in H.R. 915 to improve certification training and adjust the personal net worth cap for inflation. I believe that the DBE program should also be extended beyond AIP funds to include TSA and PFC funding. The discrimination that DBEs face is not limited by funding

source, and other efforts to end discrimination should not be limited either.

Thank you again for the opportunity to speak here today. I would be happy to take any questions you might have.

Thank you very much for that very powerful testimony. I appreciate your being here. We will return to that theme later.

Ms. Cloonen.

Ms. CLOONEN. Good morning. Thank you for inviting me to testify. My name is Katherine Cloonen. I am President and Owner of JK Steel Erectors, a small construction company. I started the company in 1991. We specialize in rebar and wire mesh installation in concrete and structural steel erection for transportation and other projects. The geographical area we cover is the rural area south and west of Chicago, Illinois.

JK Steel Erectors is certified as a Disadvantaged Business Enterprise with the Illinois Department of Transportation. I was certified by IDOT in November of 2000.

This testimony will be on three issues: one, the difference the DBE program has made; two, the discrimination I have faced; three, why the Disadvantaged Business Enterprise program needs to remain.

The difference the DBE program has made is dramatic. Since being certified, my sales have more than quadrupled. Before being certified, there was a lack of opportunity. Very few prime contractors used me. I was limited to a very small geographic radius and could not expand. I could not get my foot in the door. In many cases, smaller companies are not given a chance by the larger companies unless they are certified as a DBE.

Certification helps JK Steel and companies like mine increase in size. Once we are in the program, we are able to bid on larger jobs, get better bonding, get better loans, and purchase more equipment.

The certification has given JK Steel Erectors exposure. Being certified doesn't guarantee a job, but it does open doors. I still have to be the low bidder.

Discrimination has been, and still is, a factor for women and minorities in the construction business. I will illustrate a few examples. One company called and, instead of giving me an invitation to bid, the man asked if I wanted to make more money and he gave me an invitation to a meeting to sell health and beauty products for a pyramid company. I told him that if I had to sell his company's products in order to be a subcontractor for him, I would not do it. I have not done any business with that company since then.

Another instance of discrimination is that there are companies that will not do construction business with a female. I sent one of my male employees to negotiate a job and to be a project manager with such a company. When the owner understood that I had the day-to-day control, he never asked me again for another quote.

Often, I will get a call asking for the person in charge of estimating, and I say that I am that person, and then the caller hangs up. Once in a while the person says, well, I want the boss or the man in charge, and I say I am the boss, I am the man in charge; and I still hear a click on the other end of the phone. I was not taken seriously by contractors or union business agents.

Women are not afforded the networking opportunities that men are allowed, and without the DBE program many prime contractors just would not hire me.

The Disadvantaged Business Enterprise program needs to remain in the Department of Transportation. Even though I am now certified, I still have to prove myself on a day-to-day basis, and we are rated in several categories. It is not enough for the State of Illinois to say that I am qualified to do the work; I have to be low bidder for the steel and rebar on the project. We have to perform in a timely manner according to the IDOT specifications and turn in all the required documentation. I am responsible for several people's wages, benefits, and tax burdens.

Small businesses, including women-and minority-owned businesses, are the driving force in the United States economy. It is vital that, as the big companies merge, the smaller companies such as the DBE companies remain to help fuel the local communities. This is particularly true of areas away from the urban regions, where there is still a lack of true diversity.

If women and minorities were not a part of the DBE program, our companies would not get jobs just because some contractors feel that we are incapable of running a construction company on a day-to-day basis. Our businesses would take a backwards step to the struggles of where we were before we were certified. We are simply asking for the opportunity to bid and receive projects without bias.

I am grateful for the DBE program. Being certified with IDOT has given my company credibility. I am a director on the board of Associated General Contractors of Illinois. I serve on the Ironworkers Mid-America Pension Plan, and I am a trustee on the Ironworkers Local 444 Joint Apprenticeship Training Committee. These appointments would not have happened without the DBE program.

For these reasons, the DBE program should remain a part of the Department of Transportation. Thank you very much for your time and consideration.

Mr. OBERSTAR. Well, thank you for the courage to speak forthrightly about your experiences. We will come back to that testimony.

Mr. Kim.

Mr. KIM. Thank you, Mr. Chairman and Members of the Committee. My name is Dennis Kim. I am the President of EVS, Incorporated. EVS is an engineering company in the Twin Cities, Minnesota. As you know, Minnesota is Mr. Chairman's home State. I came to Minnesota in 1969 from South Korea. I attended the University of Minnesota when I arrived. Oftentimes, people ask me why do you still live in Minnesota when it is so cold. As you know, it can go down to 20 or 30 below zero. Usually, I answer that it is cold, we got frozen in Minnesota.

So I joined EVS when there were four people at the company, hoping some day I can become a successful business man. In 1982 I took over EVS. One of the ways to grow the business was to get involved in government contracting, so in 1984 I obtained a DBE certification. It was time-consuming, also a difficult process.

Currently, we have 22 employees, with an annual revenue of $2.5 million to $3 million. We are civil engineers land surveyors working on infrastructure projects.

I am proud of what I do as a small business person. In 1990, we designed four lake dams in Minnesota, which was a finalist for American Society Civil Engineers award for excellent engineering work. We also designed the decision driving course at Dakoma Technical College in the Twin Cities. The driving course is still being used to train police officers, firefighters, and commercial truck drivers. This project also received an outstanding award from another engineering group.

On a personal level, because I am from Korea, I eat Korean food. Some of you may know kimchi as supposed to be very good, healthy food, but it is also stinky. So people think it is really stinky because there is a lot of garlic in it. As you know, a lot of medical studies show garlic is good for our health. But, anyway, you know, people complain about the smell, so I have to mask the smell, so I have to brush and use mouthwash and drink milk, because I read somewhere drinking milk will mask stinky smell. Nobody has proved it yet, but I still try.

I want to talk about one instance which made me humiliated as a small business owner. In 1998, I first learned of a subcontracting opportunity with a white owned company. It was a highway design project with Rochester District of Minnesota Department of Transportation. The company was successful in winning the contract. The contract was to design several miles of highway. EVS was chosen as a subcontractor because we had contacted that company about this project. Also, there was a requirement of DBE requirement.

However, the project was delayed over a year because the scope of the project had been expanded after the contract was awarded, then there had been a number of issues with the project, including expanding the scope of work, delay of the work, and other engineering problems.

In 2003, I was summoned to a meeting in Rochester. When I walked in, there were three people in the room from the company and DOT. They were all while male Caucasians. I was told that I was at fault for the many problems with the project. Then they kicked me off the project, even with my protest. Later on, they hired another subcontractor owned by a Caucasian male. I felt that their reason for unfairly targeting me in this way is that I am Asian-American. They would not have done this to me if I were Caucasian. That is what I thought.

I did not complain to anyone about this because I was afraid of retaliation, and I did not want to be labeled as another minority contractor whining because I have enough comments about some people saying many DBEs complain without any good reason. Later on I learned we were blacklisted anyway because, when I tried to get the project, we were not successful.

I welcome the opportunity to do more work with the Minnesota DOT. In particular, I am excited about the stimulus package for infrastructure and reasonable energy projects. Since stimulus dollars have been available, I contacted the Minnesota DOT about the new opportunities. I noticed that they became a lot more friendlier, and

I hope this will continue. I really help that my story will motivate you to not only reauthorize the DBE program, but to improve it. Thank you.

Mr. OBERSTAR. Thank you very much for your testimony. Your comments about your English and the accent, had I been with you, I would have said to any of those folks, come and walk the streets of Iron Range communities in Minnesota when I was growing up. There you could hear accents of Slovenian, Croatian, Serbian, Italian, Finn, Norwegian, Swede. They all sounded different from British English.

Mr. KIM. Thank you, sir.

Mr. OBERSTAR. Mr. Aranza.

Please use your microphone.

Mr. ARANZA. Good afternoon, Mr. Chairman——

Mr. OBERSTAR. We want to hear every word you have to say.

Mr. ARANZA. Okay.—and Members of the Committee. My name is Gilbert Aranza, and I am the CEO of Star Concessions. Thank you for holding this hearings and inviting me to testify.

Star Concessions is a 100 percent minority-owned DBE operating food and beverage and retail concessions in airports, including DFW and Love Field. My company has excellent credentials, delivers top national brands and is highly qualified. Even so, we face race discrimination that makes it much harder to succeed. I have no doubt that, without programs like the FAA's ACDBE program, I would not have had any opportunities to succeed in the airport environment.

I don't believe the leaders of major companies are inherently bad people, but experience has taught me that many of these leaders do not see diversity as being good for the bottom line. Although these leaders advocate diversity, without the ACDBE program, I do not believe they would provide opportunities for minority-owned companies.

Our Nation has made progress against racial and ethnic discrimination. However, much remains to be done. Discrimination still negatively impacts minority businesses in many areas. Four of them are capital and financing, business networks, treatment by suppliers, and enduring stereotypes.

Discrimination in capital markets makes it incredibly difficult for minority entrepreneurs to obtain regular bank loans. For instance, I might be able to obtain 15 or 16 percent money, while a majority player has a greater chance of obtaining 7 or 8 percent money. I have been lucky with some banks, but 90 percent of my financing comes from lenders chartered by the Federal Government like the SBIC program to work with small and minority-owned businesses.

In terms of business networks, the good ol' boy network still prevails. Conventional wisdom says if we go to the right schools and join the right clubs, we will build good business networks. These business networks are essential to success, but minorities are often shut out.

I graduated from the University of Texas at Austin, one of the State's flagships schools, and from Harvard Law School. However, these degrees have not benefitted me in the same way that they have benefitted non-minority graduates. Nor have they insulated me from discrimination. As a minority, joining a professional club

in Dallas came at a price. Being a Member meant I had to tolerate discrimination in the form of racist jokes and having fellow Members mistake me for a waiter at various functions.

While airports and other public entities have laws enforcing equal opportunity, private businesses do not. Consequently, another problem faced by minority entrepreneurs is discrimination by vendors. I have worked with distributors who have been responsive to my needs. I have also had to deal with the opposite: distributors who ignored me completely. Price is also a problem. I had one supplier who said he was giving me mom and pop prices, prices that were ridiculously high. I believe that my race is one of the reasons for this treatment. I suspect that most of my suppliers still think, oh, he is just a minority. But now they have to think twice about acting on that attitude. Because of the DBE program, I had a chance to succeed and I have. Now, most suppliers who want access to the large customer market available in the airports where I work understand that I represent their best access to that market.

Still, I am certain that if the DBE program disappeared, many of these large majority-owned firms would stop doing business with minorities altogether. Enduring stereotypes may be one of the reasons for that. Recently, a distributor came into one of my stores and demanded to speak to the owner. Based on his rude and dismissive tone, I knew it hadn't even entered his mind that the Hispanic guy in front of him might be the owner.

I try to practice what I preach. I extend the benefits of the DBE program to others. For me, hiring and partnering with African-Americans is a priority. I don't have to do it; I am already 100 percent minority-owned. I do I because I believe it is the right thing to do. Fostering diversity and making money are not conflicting goals; it is good for business and good for society.

I am very supportive of the DBE program, the SBIC program, and other programs that assist minority business owners. If it weren't for those programs, I would not be where I am today. That said, there are ways that these programs could be improved. In the current economic climate, minority businesses need more and better access to credit and venture capital, and newer, smaller DBEs need proactive information and assistance from airport staff.

Thank you for the opportunity to speak to you today. I am happy to take any questions you might have.

Mr. OBERSTAR. Thank you very much for your testimony as well. We greatly appreciate your contribution.

Mr. Thompson.

Mr. THOMPSON. Thank you. My name is Anthony Thompson. I am the President and CEO of the Kwame Building Group. We are a local construction management company in St. Louis, Missouri, but we do have offices in Pittsburgh, Dallas, and now recently Seattle. My undergrad is an architectural engineering from the University of Kansas. I also have a degree in architecture for environmental design from the University of Kansas. I have an MBA in Finance and a Masters in Engineering from Washington University.

After working with the Corps of Engineers, Monsanto Chemical Company, and Anheuser-Busch, one of the largest brewers at one

time in the world, I decided to start my own business, and I was surprised at the challenges that I was faced with coming from the private sector with so much experience in construction management and the education to be successful in the business. I decided to start my own business and go through the exhaustive process of becoming certified and so forth. It was surprising to me that unless I was certified or unless I had gone through the rigorous process of being certified, none of the white or prime contractors really wanted to do business with us unless they had to, unless it was a requirement. So there was no opportunity for me to show my experience or what I was capable of without having that certification.

So after getting the certification, we began to win work. We were subcontractors to various firms throughout the Country, and the opportunity became very exciting for me because now I was able to employ other African-Americans, and women. I am proud to say that we currently have about 75 employees, of which 70 percent are minorities and women in senior and leadership positions. The average salary within our organization is $70,000 a year, and we give back to the community because also, like Mr. Aranza, we employ other minority vendors, we employ other minority and African-American suppliers and subcontractors.

We could easily say we don't need to do that because I am a 100 percent minority owned business, but I have an obligation to give back to the community. My mother has told me that none of us have made it until all of us have made it. I live by that, I run my business that way, and the opportunities are great. And the return on the investment that the DBE process has given us allows us to give back philanthropically in our community as well. We donate to various causes, mentoring programs, as well as scholarships. We have $600,000 worth of endowed scholarships for minority youth that we have established. We are trying to make that $1 million within the next four years.

The growth of our organization has been great, but doing business with minority firms and the DBE program should be a business imperative, not just a feel good sort of program. It does not cost more money to do business with minorities. It is more economical to do business with minorities and DBEs. For example, the east terminal for Southwest Airlines that was constructed in St. Louis was $15 million over budget when it was initially presented to start construction. They could not start the project because they did not have the funds. We were brought on to augment the existing staff to do value engineering and support estimates to get the cost down within the budget. We were able to find those $15 million worth of savings and, as a result of that, they hired us on to be the construction manager to oversee the entire construction of that project.

Our fee for the four years that we managed that project was $4 million, so that was a pretty good return on investment for a $15 million savings on a project of that magnitude. That led to us being a joint venture partner with two of the largest construction companies in the world on the $1.5 billion expansion at Lambert International Airport, of which we gained experience and were able to lead the team at that point. That led to us now recently being

prime contractor selected for some taxiway expansions and renovations at Lambert, as well as Seattle Airport.

So, as you can see, the growth and development I tried to create opportunities, I think you may have this book in front of you that lists several of our transportation-related projects throughout the Country that have been led by our organization, and there are a lot of minorities within our organization that would not have a chance to lead major projects had they not come to work for a Disadvantaged Business Enterprise.

So thank you very much, and I would be glad to answer any questions as we move forward.

Mr. OBERSTAR. Well, yours is certainly a wonderful success story. Great to have that contribution.

Let me ask Ms. Brown if she has some comments.

Ms. BROWN. I am ready, Mr. Chairman. First of all, let me just thank Mr. Chairman for holding this hearing and thank the participants for coming and giving their stories.

We just passed the largest stimulus bill, the recovery bill, billions of dollars, and it seems as though there is some push-back from some of the different agencies as far as minority participation, and particularly in the area of transportation, whether I am talking about the airport or transit. I want to know is there anything in the bill from the Department that would cause the push-back? Because, as you just heard, I feel that minority participation is crucial. When we passed that stimulus bill, I look at it like my grandmamma's sweet potato pie: I want my slice hot out of the oven. And I am sure that is what you want too. And we all contribute to that pie, and I want to hear from the Department on this issue.

Mr. SZABAT. Madam Congresswoman, I don't know that we will get our Recovery Act money hot out of the oven, but we do intend to move it very quickly. But of the $48 billion that was entrusted to the Department in Recovery Act monies, over $35 billion will be distributed as formula grants through Federal Highways, through the Federal Transit Administration, and through our Airport Grant and Aid program. All of those monies are—I say again, are—covered by the DBE program. We estimate that that will lead to, conservatively, at least $3 billion, probably closer to $4 billion in business opportunities for DBEs.

Ms. BROWN. To follow up, there was a bonding program because some minorities have problems. Can you tell me what is the status of the bonding program?

Mr. SZABAT. Yes, Madam Congresswoman. There is a $20 million program for bonding assistance for DBEs that was included in the Federal Highway portion of Transportation's Recovery Act. We are working with the Small Business Administration in order to craft an assistance program. If we use the money straight for bonding, we would be able to help fewer than 200 small businesses. So what we are looking at is to a program where we would actually cover the costs of small businesses that participate in the Small Business Administration's bonding program, in which case we could actually assist far more businesses with that $20 million.

As you might expect, working between two agencies with two different programs, there are some technical matters for us to work

through, but we are confident that we will have something set up within the next few months.

Ms. BROWN. And I guess I just want to follow up again because it seems like there have been some push-backs from some of the airports that received dollars prior to the stimulus. What would cause them to think that the program is not——

Mr. ASHBY. Madam Congresswoman, we had received some expressions of concern from recipients in various modes along the lines that because the stimulus funding was going to increase the amount of funding available for projects as much as it is, that somehow they might not be able to find sufficient DBE capacity in order to do the job. We weren't convinced by that. We put out guidance very early on after the passage of the legislation that said, I think very plainly, that not only do the DBE programs apply to this stimulus funding, but that we expected our recipients to do further outreach to use some of their underutilized DBE capacity, of which there is some, and to make sure that the promise of these stimulus funds extended to all businesses wanting to work with us, including DBEs.

Ms. BROWN. Thank you.

Mr. OBERSTAR. Ms. Johnson, our Chair of the Water Resources; Ms. Brown, Chair of our Rail Subcommittee, thank you.

Ms. Johnson?

Ms. JOHNSON. Thank you very much, Mr. Chairman. Let me commend you for having this hearing, and I would like to ask unanimous consent to place my opening remarks in the record.

Mr. OBERSTAR. Without objection, so ordered.

Ms. JOHNSON. From the Department of Transportation, I have read your testimony, and you cite some commonly known barriers to success for DBEs, such as the lack of bonding, in addition to a host of other issues. As you may know, largely due to the leadership of this Committee, the recently enacted American Recovery and Reinvestment Act provides $20 million for that bonding, and I have written to the Secretary inquiring as to how these funds would be allocated. You just finished giving some on that, but I would like to hear a little bit more in depth. And we will be having some local meetings in order to get this word out so that, in case it might be able to assist some of the DBEs.

You know, it has not been easy over the years. Back when I was in the State Senate, I had to write the Department and ask them to withhold money from Texas until they worked out something, and it took so long I forgot I had written that when Texas called and asked if I would release it. But very often these contracts are made very, very large purposefully, but they don't have to be. So do you do anything actively to get the information out to prime contractors?

Mr. SZABAT. Yes, Madam Congresswoman. To handle your questions in order, first, regarding the $20 million in assistance, the Department will commit to working with you and your staff as we develop criteria in conjunction with the Small Business Administration, to share that with you, with any other Member of the Committee who is interested, before we actually go out and make a public announcement of what we intend to do so that you are

aware of what we are trying to accomplish and how we intend to accomplish that.

In terms of getting the information out to prime contractors, remember, our program is essentially three distinct programs. The Federal Aviation Administration, the Federal Highway Administration, and Federal Transit Administration each run their own. They have a series of seminars, nowadays webinars that they use to get the words out. And I think many of the contractors here would indicate that Federal Register notices and the other ways that you normally use announcements to get information out to contractors is one of our more effective ways.

But, again, we would be happy to share with you information from each of our three modes and how they communicate their programs to the community.

Mr. ASHBY. And if I might add, with respect to the issue about unbundling larger contracts, that is something that we have always endorsed and supported in our regulations. It is specifically mentioned there. We also recognize, though, that unbundling is often something that has been easier to praise than implement, and for that reason, in some regulatory proposals that we anticipate publishing in hopefully the very near future, we are going to be seeking comment and suggestions on additional ways that we, as the Department of Transportation, can do more to encourage or push grant agencies to unbundle their contracts and divide them into smaller chunks that are more readily able to be performed by small businesses.

Ms. JOHNSON. Thank you. Now, I hear what you are saying and I can appreciate it very much. You know that these projects have to be started within a certain period of time, but you are going to move expeditiously to make sure that you on target with them having opportunity to participate?

Mr. ASHBY. That is certainly our objective.

Mr. OBERSTAR. If the gentlewoman would yield just a moment.

Ms. JOHNSON. Yes.

Mr. OBERSTAR. That is a very important point that you have raised, about the size of contracts. The reverse side of that coin is that when State DOTs want to achieve some other objective, they segment contracts into smaller pieces and award this piece and that piece at a time in order to avoid, as they have done in certain circumstances, avoid Davis-Bacon requirements. And we certainly don't want to see that kind of avoidance either. But breaking contracts down into more manageable pieces as part of an overall project so that there are elements that can be bid by minority enterprises is an important factor.

Are there regulations that deal with this or is there guidance, is there policy guidance for State DOTs as they undertake these projects?

Mr. ASHBY. Our existing regulations specifically talk about unbundling as one of the key race neutral efforts to help small businesses, including DBEs, realizing that I think everyone perceives there is more needing to be done in that area. As I said, we are in the process of proposing regulations and asking for comment on additional ways of encouraging unbundling by our grant recipients.

Mr. SZABAT. I will add to that, Mr. Chairman. There is, as the Congresswoman alluded to, there is an inherent tension with what we are trying to accomplish with the Recovery Act, to get the money out quickly to create jobs. We are aware of that. Depending on whether it is an airport, a transit or a highway project, we have between 120 and 180 days, the recipients do, to get half of their money obligated. In those cases, to be obvious and honest, our hope is to work with them to find projects that are ready to go, and if they have contracts that are ready to go, we will be less enthusiastic about pressing them to unbundle them if it means a delay in getting people to work. That is an honest answer.

Having said that, those contract opportunities are still covered by the goaling of DBE. So if there is in fact a tradeoff, the tradeoff is between the opportunity of having more prime contracts and increasing the subcontracting opportunities. We hope it doesn't come to that, but we do recognize that there is a tension there, and we are watching that very closely.

Ms. JOHNSON. I know my time has expired, but give me——

Mr. OBERSTAR. No, time has not expired. I took some of the time.

Ms. JOHNSON. Oh, thank you, Mr. Chairman.

Give me a frame of time that you have in mind to achieve this.

Mr. SZABAT. If I could ask you to expand the question, to achieve which goal, Madam Congresswoman?

Ms. JOHNSON. Going to Small Business Administration. You know, sometimes government works slowly, and I was just trying to determine how long you anticipated working that out so you can——

Mr. SZABAT. For the DBE granting, I would be surprised if it took us more than three months to have that out the door.

Ms. JOHNSON. By that time, those contracts will be out there, because if they don't get them started by then, they have to send the money back. So you are going to have to move faster than that to give us some opportunities.

Mr. SZABAT. Then we will do it faster than that.

Ms. JOHNSON. Okay. Could you keep in touch with me?

Mr. SZABAT. We will make it a point to.

Ms. JOHNSON. Thank you.

Mr. OBERSTAR. Following up on Ms. Johnson's questions, I first want to observe that, thus far in the recovery program, OMB has allocated to DOT $40 billion for highway and transit funding, and an additional amount to wastewater treatment. Thirty-three States have been approved for 800 projects, totaling $2.9 billion, which is 10 percent of the recovery funds. And I also note for the record that the Congressional Budget Office was wrong, Office of Management and Budget was wrong, Larry Summers was wrong. They said that they would send out only 2 percent. They were wrong, and I said so. And now you have proven them wrong and the States have proven them wrong. Eleven contracts in my own State of Minnesota have already been awarded for a net of 1,000 new jobs created, just as one example. Federal Transit Administration has awarded grants for 500 transit vehicles—trolleys, buses, vans, ferries, and bus shelters. Amtrak has sent $938 million in capital improvement grants out, contracts out, and for rehabilitation of 68

passenger cars for Amtrak at a value of $82 million on that contract; replacing a bill on the Niantic River for Amtrak.

This is evidence that the Department is really moving out, the States are moving out smartly and they are doing the things they need to do. The question is on the size of these contracts, those that I have seen are in the range from $500,000 to $10 million or $12 million. There are a couple that are in the range of $100 million. Do you have information on sort of the average size of contract that Mr. Thompson, as a prime contractor, would bid on or that Mr. Aranza, Mr. Kim would bid as a subcontractor or Ms. Cloonen?

Mr. SZABAT. Mr. Chairman, we don't have that information in yet, and that is because it has only been in the last two weeks that we have started collecting information that we have actually had outlays going out the doors for these contracts. That information is coming in. It is coming in very rapidly and we are in the process of setting up our systems to capture that. So we can easily pull together, within the next week or so, snapshots and crosscuts of that information, but it will probably be a month or more, probably two months, closer to two months before we actually have the systems up and running so that we are actually able, on a real time basis, to reflect that level of granularity in tracking contract data.

Ms. BROWN. Mr. Chairman?

Mr. OBERSTAR. Yes. The gentlewoman from Florida.

Ms. BROWN. On that point, could I raise another point? I think what we have had is eight years of not monitoring the departments, so I am very interested in the follow-up, making sure we are monitoring it and let the agencies that we are watching them. They have programs in place, they have minorities in place that they work with, and we want to make sure that they get part of those contracts. So I think it is the feedback. What you said, generally, for them to report back to us, to report back to us on the progress of the money going out, but also what kind of minority and female participation. See, those agencies then will keep that in mind as they award these programs. This is not anything new. We just want them to do their jobs. But we need to monitor what they are doing.

Mrs. NAPOLITANO. Would the gentleman yield?

Mr. OBERSTAR. The gentlewoman from Texas has the time.

Ms. JOHNSON. Yes, I will yield.

Mrs. NAPOLITANO. I will be very short. Thank you, madam, for yielding to me.

On the same point, Ms. Brown is correct, we have been dealing with this for many years, since I was in the State House. How do we know that this is being enforced? Is there anything that tells us that you audit some of these for unbundling? Is there something that can tell this Committee how effective that has been or not been, following up on Ms. Brown's question? Is there a follow-up to be able to indicate whether or not, even if you unbundle, many of those who are testing to be minorities are fraudulent minorities; and are you going after the fraud perpetrators and blacklisting them for a few years, at least, to allow the legitimate minorities to be able to be successful?

Mr. SZABAT. Yes, Congresswoman. Whenever you have a program like this, there are at least two enticements for fraudulent

behavior. One is, as you say, the people who will falsely represent themselves to be minorities, and the second one is that you will have prime contractors who will either establish fronts or will bring in a DBE firm and then discard it after they have won the contract. We look for both of those.

Now, given how many DBEs at any one time—there are 27,000 or so out there and other firms that are interested in applying—and how many contractors active at any one time, our single best source of information is other people, especially other contractors, filing complaints to indicate that they believe that there is fraudulent behavior. Every one of those complaints is investigated by our staff and civil rights offices within each of the modes or within the Office of the Secretary, and, separately, the Inspector General's Office has also conducted investigations.

Mr. ASHBY. If I may add, Congresswoman, our Inspector General's Office has made DBE fraud a primary emphasis area. They have had a great deal of success over the last five years or so. They have taken action. This resulted in something like 49 indictments, 43 convictions, millions of dollars in fines or forfeitures, and a lot of jail time. I personally had the privilege, a year and a half ago or so, of testifying in a DBE fraud case brought by our IG and U.S. Attorney folks in Miami which resulted in someone who had done a classic pay a DBE not to do the work scheme, five years in jail.

Mrs. NAPOLITANO. You say you do by complaint. Do you actually do any audits to be able to ferret out any of those?

Mr. ASHBY. There are audits by our operating administrations of DBE program performance in general. Our certification office in the civil rights office looks at phony certifications.

Ms. JOHNSON. Reclaiming my time.

Mrs. NAPOLITANO. I am sorry. Go ahead.

Mr. ASHBY. So there is a good deal of work that our people do both by themselves and to insist that our recipients look at what is happening in their own programs.

Ms. JOHNSON. But you indicated here in the testimony that there were some contractors that would make commitments long enough to get the contract, and then that commitment would disappear. Is that fraud?

Mr. ASHBY. It may not necessarily be fraud in the legal sense. It is certainly a sharp practice which is contrary to the provisions and intent of our program. In the forthcoming rulemaking actions, one of the things that we are seeking to do is to put into place provisions that would require written consent of the airport or the transit authority or the highway department before a prime contractor was able to drop a subcontractor, a DBE subcontractor that they had relied upon to get the contract. That was an issue that was brought up in our stakeholder meetings that we have been having over the last several months and one of considerable concern in the community that we are responding to.

Ms. JOHNSON. When you find something of this sort, do you refer to the Inspector General or how do you handle it?

Mr. SZABAT. It depends on the nature of the complaint. All fraud complaints goes to the Office of the Inspector General. If there are complaints about a rule being misinterpreted, about sloppy bookkeeping, about a State not following our standards, those things

are handled with our auditors and through our normal chain of command, working directly with the States, with the transit districts, or with the airport authorities.

Ms. JOHNSON. Could I make a request? Could you send me, about every couple months, a report of different findings that you have in this area? I am not asking you to tell me all of what you have done—I will find that out when I get the report—but just tell me about the various incidences that you have noticed.

Mr. SZABAT. We will make it a point to do so.

Ms. JOHNSON. Thank you very much.

Thank you, Mr. Chairman.

Mr. OBERSTAR. Now the Chair recognizes the gentleman from Louisiana, Mr. Cao.

Mr. CAO. Thank you very much, Mr. Cao.

I just wanted to follow up on the questions that have been presented. I want to know whether or not the DOT programs and operations could be strengthened by administrative sanctions.

Mr. ASHBY. As of now, the main sanction available with respect to our grantees, to the airports and highway departments and so forth, themselves, is simply that compliance is a condition of receiving financial assistance, and that is a pretty powerful incentive. In some of our other civil rights programs, for example, in our aviation disability program, there is the option of civil penalties, which must be granted legislatively. In addition, we have an existing tool of suspension and debarment that can be used not only for criminal activity on the part of contractors and other participants, but also for essentially unethical business practices, and that is a tool which I think can be used profitably to deal with folks whose conduct might not rise to the level of criminal conduct, but who are engaging in activities that undermine the program. Of course, with respect to firms that are certified improperly, we have the existing sanction of removing their certification so they can no longer participate.

Mr. CAO. Now, how does the DBE program assist minorities in attaining needed financing, and is there appropriate oversight of this process?

Mr. ASHBY. Again, the DBE program itself, in terms of our regulations, does not directly assist people in getting financing. We do talk about things like bonding, capital assistance programs as among the race neutral measures that our recipients are directed to take in order to get as much DBE participation as they can through race neutral means. Through the bonding initiative that we have discussed in the recovery package, through our Office of Small and Disadvantaged Business Utilization, which has a short-term lending program, and, of course, through cooperation with the programs of the Small Business Administration, there is that kind of assistance that is available to at least some DBEs. Our Federal Highway Administration also has a program which has been repeatedly authorized by this Committee and Congress to provide supportive services to DBEs.

Mr. CAO. Based on my experience with minority contractors from the 2nd Congressional District for New Orleans, a lot of the minority groups who want to be involved in the rebuilding process have the problem of meeting all the criteria required in order to qualify

for certain projects, so I see there might be a need to assist them in that area. Do you see that same problem in other areas of the United States besides the New Orleans area?

Mr. ASHBY. I think that the information we have suggests that there are a number of barriers that typically exist that help prevent DBEs from getting a fair opportunity of the jobs. The studies that Dr. Wainwright mentions identify in substantial detail the capital and bonding and prequalification and other barriers that may be more difficult for some minority companies to surmount than larger, well established non-minority companies. So I think one does see evidence of that kind of barrier across the board, and the studies that Dr. Wainwright and others have submitted for the record I think give ample evidence of that.

Mr. CAO. I don't have any further questions, Mr. Chairman. Thank you.

Mr. OBERSTAR. Thank you, Mr. Cao.

Mrs. Napolitano, gentlewoman from California.

Mrs. NAPOLITANO. Thank you, Mr. Chair, and I thank my two ladies for allowing me some time.

Mr. Szabat, I want to continue the dialog and the questioning in regard to the bundling issue and to the enforcement issue, the audit issue. Would you be able to provide this Committee the number of those fraudulent cases where you found convictions necessary as a percentage of the total number of complaints? In other words, are we going after them? Are you finding enough of those that discourage others from trying to attempt fraud in seeking contractors, or is it just too lucrative for them to worry about any penalties?

Mr. SZABAT. We will find that information and we will provide it to the Committee.

Mrs. NAPOLITANO. I guess, maybe, Mr. Chair, I am very concerned because I just spoke to Ms. Velazquez, Chair of the Small Business Committee, and she was indicating that, in Small Business, the hub zones have been found to be very fraudulent, to the fact that she is suspending the hub zones designation because, after the second round of audits and investigations, there were 17 left. Of those 17, 10 had ben found to be questionable. So that goes down to 7, and that is nationwide; and that is a sad story for our administration not be having a handle on. So that brings concern about what other agencies are not actually enforcing or going after those fraudulent cases and doing enough to where it means something to the public who is being left out.

Mr. SZABAT. Your point is well received.

Mrs. NAPOLITANO. Thank you. One of the other areas is how do the DBE regulations ensure that the race neutral methods are used as much as possible?

Mr. ASHBY. If I may answer, Congresswoman, we have a process by which when a recipient proposes its overall goal for everything it is doing during the given year, that level playing field for nondiscriminatory participation, they are required to show us—we always tell them show your work—they are required to show us what is the evidence they have for being able to make a particular amount of their goal through race neutral means and what are the race neutral means they are using, as well as what evidence they

have for needing to use race conscious means for the other portion of their goal; and our FTA, FHWA, FAA staff initially in the field and, where necessary, later in headquarters, review those submissions and can and have gone back to the States and said, wait a minute, your evidence may not support your conclusions, why are you making this assumption. So there is a fair amount of direct Federal oversight of those decisions.

Mrs. NAPOLITANO. Does this also include the other general race—what is the other term that they use?

Mr. ASHBY. Race conscious.

Mrs. NAPOLITANO. Race conscious, right.

Mr. ASHBY. Yes, that is true for both those aspects of the goal program.

Mrs. NAPOLITANO. I guess maybe I have a concern that because many minorities cannot apply for prime contracts because of their size and their ability to find the funding, so they become subcontractors. And if there is a way of being able to ace them out, if you will, of being able to be participants based on those reasonings, what can we do to be able to assure that the minorities are served well? And I am talking about all minorities.

Mr. ASHBY. Again, I think that our program has fairly clear criteria for the size of the businesses. We don't age people out in the same sense that the SBA program does, but we do have size criteria; and the success stories that we provided for the record talk about a number of cases in which DBE companies who started out as subcontractors have become more successful, the term that is used is graduated from the program, and become successful prime contractors in their jurisdiction. So that kind of thing can and does happen, and obviously one of the objectives of our program is to provide all the possible assistance so that——

Mr. SZABAT. And if I may follow up with Mr. Ashby's answer, Congresswoman, for us in the Department, sometimes it is important for us to remember that this program is one tool in the toolkit, it doesn't cover all of the needs. Both you, Congresswoman Johnson and Congressman Cao have talked about the importance of bonding and financing. This program makes no pretensions to do that. We have never had a significant bonding program of our own; we had a small one in the Department a few years ago. Until we have the $20 million with the Recovery Act, and that, in and of itself, is very small. Those sorts of assistance—the financing, the bonding guarantees—will primarily come through SBA or other agencies, Federal or otherwise.

Having said that, we think that this program is very meritorious for all of its other reasons. But we don't pretend that it meets all of the needs for all of the witnesses and all of the other companies that participate in the DBE program.

Mrs. NAPOLITANO. Okay, is there an issue because of the number of subprimes that you have a problem in being able to go through all of them and assert that they are legitimate or that they are worthy or that they will be able to be prospective contractors?

Mr. ASHBY. We have in the program a very significant certification element which goes through the bona fides of each firm applying to participate in significant detail, and that program is the first line of defense to make sure that the firms that participate are

genuinely eligible for this program. We also have oversight of those certification efforts by our operating administrations, and when there is a disagreement about whether someone should be certified, that often comes to our Office of Civil Rights for decision, and they do a very thorough job of looking at the record and seeing if the right decision——

Mrs. NAPOLITANO. Which goes back to my question of being able to audit and figure out whether they are legitimate or not.

Mr. SZABAT. And there is more that we can do in that area, Congresswoman, and more that we are doing. One of the challenges we have had is for many years, and up to this day in some areas, our program has been paper based. So we had 50 States, numerous airport authorities, transit districts, all of them certifying on their own, all of them turning this in to us in to three different modes—aviation, highways and transit. So when I tell you that there are 27,000 DBEs out there, I can't give you an exact number because we are not accounting for duplications, whether one of these companies is certified in more than one State or if they are certified both on the airport side as well as on the transit side, for example.

The Federal Aviation Administration has already moved to automated system, a system that is called DOORS, and we are in the planning phases to do that also with transit and with highways. When this information is automated, it will be much easier for us to automate because we will be able to make more real-time comparisons of the data as it comes up from the States, from the transit districts, and from the airport authorities.

Mrs. NAPOLITANO. Thank you.

Mr. Chair, I would like to ask you to receive into the record a letter from Caltrans in regard to some of the issues that have just been covered, and thank you very much for the time.

Mr. OBERSTAR. Without objection, the Caltrans letter from Director Will Kempton will be included in the record at this point. And we will work with the gentlewoman and USDOT on the specific issues raised in that letter.

Mr. Cohen, gentleman from Tennessee.

Mr. COHEN. Thank you, sir. I am pleased that I have guests that will be here testifying before the second panel. We are still on the first panel, are we not?

Mr. OBERSTAR. Yes, we are.

Mr. COHEN. So I am premature or you are premature, but I am ready and fired up and ready to go.

[Laughter.]

Mr. OBERSTAR. Well, thank you very much.

I appreciate most of the questions have been directed at our DOT witnesses, but I do want to come to a very important matter raised by Mr. Szabat's testimony and Ms. Cloonen, Mr. Aranza and other witnesses, and that is these informal networks. You described it very well as old boy networks. That really does exist, doesn't it? There is an exclusion. If you don't happen to be in the same golfing group or the hunting group. In Minnesota it would be ice fishing. You have all seen Grumpy Old Men. That really exists, people really do get pretty testy about their fish houses on the ice; and if you are not part of that group, it is sort of maybe we can't call it an invisible exclusion or discrimination, but it certainly is a discrimi-

nation. How can we address those matters outside of the—or perhaps within regulation or within the legal structure?

Do you have some ideas, Ms. Cloonen?

Ms. CLOONEN. Thank you. One of the ways that I am able to meet with more male-owned contractors is that I join associations that allow the women in. But I still don't go on the Canadian fishing outings. So I don't know, legally, other than offering or encouraging the associations to be open to female and minorities being a part of that, I am not really sure another way to do that legally.

Mr. OBERSTAR. But the DBE provisions give you access, is that right, Mr. Kim, Mr. Aranza, Mr. Thompson? Why don't you pick it up from there?

Mr. KIM. Thank you, Mr. Chairman. As Ms. Cloonen mentioned, sometimes it is tough to get access to these major consultants or contractors, but with the DBE program they are kind of forced to talk with you, so that is the first step. So when we have opportunity, we have to perform, we have to deliver what we promise; otherwise, we are going to be in trouble. But it takes more than that.

As you indicated, there are some groups out there, something you don't see always, but how do you get over with it? That is not easy, but one way I found out is partially successful, I try to participate in civic organizations and I serve as a board member for a number art music organizations, I serve in Rotary Committee. So by these community organizations I get to meet other people, expand my contacts. As you all know, it is all relationship driven. We need to build relationships with decision-makers. That is one way to get in, but it is always not that easy, so we have to work really hard.

Mr. OBERSTAR. Thank you. I was intrigued by your comment about food. It reminded me of the days when I worked in the summers in the iron ore mines and in the concrete block factory in my hometown of Chisholm, and we had Swedes, Norwegians, Finns, Serbs, Croatians, and the aromas were wonderful when they opened their lunch pails at lunchtime. Nobody complained. They all wanted to share their respected foods.

Mr. Aranza.

Mr. ARANZA. Yes, sir. Unfortunately, those networks exist, and I have found the only way to change it is to use political power, to go to my city council friends that are minority or to go to my Congress friends like Congresswoman Johnson and basically tell them what I believe is happening and try to change the makeup of the boards that govern airports, to put people like Don O'Bannon, who is here, to oversee that the good ol' boy network doesn't continue to permeate and control every piece of business that goes on, in my case, in the city of Dallas. So, without political power, I don't know how minorities or you could effectively change what happen despite our collective abilities to perform.

Mr. OBERSTAR. Mr. Thompson.

Mr. THOMPSON. Yes. That is really a key issue. I said a lot of great things about my organization, but I failed to mention all of the discriminatory experiences, because there are so many. We would be here all day if I talked about all the discrimination that I had to deal with on a day-to-day basis. It is real. One of the things we have to be concerned about also is, once you graduate

from the program, you are no longer protected, so to speak, by the DBE program. Then the real troubles begin, because now, if there is no incentive for the prime contractors to do business with you, they won't, and you go back to being destitute and looking for work, unless you can quickly move to the private sector, establish yourself as a competent professional firm that people will want to do business with, because it is the right thing to do but, more importantly, because it is economically feasible to do so.

But if it weren't for organizations, from a networking standpoint, like COMTO, the Conference of Minority Transportation Officials, that is where the relationships and the networking helps organizations like mine. Those conferences and a lot of the programs that they provide puts us with prime contractors and also puts us in line to be considered for priming. The gentleman, Mr. Aranza, mentioned Don O'Bannon of Dallas. There is an excellent program that he headed up down there, the GMax program, that we were able to be a part of. We partnered with a minority disadvantaged business and, through our professional management expertise and their local construction knowledge, we had a GMax prime contractor for about three years through that particular program. But it was all as a result of the DBE program.

Mr. OBERSTAR. Thank you.

Mr. Covington, do you have any observations on that subject? Please use your microphone.

Mr. COVINGTON. It is direct and it is indirect, as you have seen, and it also puts a subconscious cloud on a lot of minority and women. When you do participate in your community, when you give back to your community, like Mr. Kim and Mr. Aranza have, and yet you can go to places where they will hold a civic event or a fundraiser and you know that, by your race or your sex, you are not allowed to join, it dampens your enthusiasm a bit. And to know that we are adults, we have been through some of this, but when it falls down as far as your children, you know that your children aren't allowed to join these same organizations that house the same people that you see, that you have to work with daily to try to advance your business, it is a psychological disadvantage.

The DBE program does help, because all we are asking for is to get our time at bat, just our time to play. The DBE program does help there. It does help with airports as far as AIP funds. But we also think that, to help level the field, it needs to be expanded to TSA and PFC funds as well. That is another way that we can help attempt to level this playing field.

Mr. OBERSTAR. I would think that, under the construct of the PFC, when the language—which I wrote in 1990, that we said it is applicable to and eligible for anything that AIP is applied for, that the rules for AIP should apply to PFC. So if that is not the case, then before we bring this aviation reauthorization bill to the House floor in a manager's amendment, we will have to address that issue.

Mr. COVINGTON. We appreciate it, Mr. Chairman.

Mr. OBERSTAR. Thank you.

Mr. Cohen, before I go to you, I want to recognize the gentlewoman from the District of Columbia, our legal scholar who was partner in our wordsmith and legal craftswoman when we re-

sponded to the Adarand decision. I am grateful for your counsel, your guidance as we went through that difficult time. We had Mr. Clyburn here earlier and I recognized his contributions at that time. Thank you for being here, Ms. Norton.

Ms. NORTON. Well, thank you very much, Mr. Chairman. And despite the hearings going on, I certainly had to make it my business to be here. But I particularly want to thank you for making this a Full Committee hearing, indicating that this is a matter of great importance to the entire Committee. Before I came to Congress, you had already established yourself and the reputation of those who had worked under you for the priority you have always given to these issues, including, as my question shall indicate, something that you put in some prior bills.

Those before us understand that this hearing is being held not simply because the Members of this Committee feel strongly about the matter at hand. It is being held as part of our constitutional and legal obligation. Title VI of the 1964 Civil Rights Act bars the expenditure of funds that discriminate based on race, sex, and in a number of other ways, and that is taken from the 14th Amendment of the United States Constitution. So we are only carrying out our required duty, and these statutes simply implement the 14th Amendment and Title VI.

I have been very interested to here especially the questions on minority and women business enterprises. Because they have been so thoroughly explored, I would like to go to a section of the stimulus bill that is of equal importance to many of us, and I think this question is best addressed to the two Department of Transportation representatives, because they go both to policy and to enforcement.

This is a jobs bill. For the first time, the stimulus bill, at least, could allow minorities and women to get a foothold in the construction industry. In about 1980, the program that the Federal Government had set up in conjunction with management and labor that would have integrated the construction trades was abruptly dropped by the administration at hand. What that meant was that people had to find their way into these top paying construction jobs. That wasn't easy, although it should be said for the record that the construction trades have long left the discriminatory policies for which they had become so infamous.

But there has not been a training tract for people who weren't already a part of the industry or didn't already know how to get in the industry. In fact, before this economy collapsed, there were jobs shortages in the trades. Now, we are not going to put out this kind of money all at one time, say spend it all at one time for a long time, so my question goes to pre-apprentice and apprenticeship programs. I don't think we need to have a war between the journeymen and the minorities who look to see that all the jobs are going to people that look like everybody except me, especially since minorities and women have not had the same opportunity to become journeymen.

That is why, in the wisdom of the Chairman, we are carrying out something that he has had in the full transportation bill, at least in the transportation section, for at least the last two authorizations or reauthorizations for the transportation bill. These were sections that allowed a very large sum of money, when you imagine

how much money gets put out, this is the biggest blob of money to come out of the Congress. One half of one percent could have gone to training.

When the stimulus bill came, we did our homework and we found that only 17 States in either of—we don't even know if that is in any one authorization—and don't worry, you are going to provide us with that information. Only 17 States had taken advantage of it. We don't have any information on how the Department administered this or looked at this. Seventeen States out of 50 States, all of which hunger covered this money. But it was optional. So you would have had to care enough about who the jobs went to in order to take one half of one percent of this great big highway appropriation to use in this way.

So we did it differently this time. We said it is not optional. You will take—and we gave specific amounts of money. Too little, in my estimation, but they are specific amounts of money. In the highway section we say you will use up to $20 million, not you can take it. It is out of the money you get, but you will use that. And the other out of the section that comes under my own Subcommittee that has control of GSA, FEMA, etcetera, but especially GSA, it says $3 million. This is not optional money.

Now, I dare believe that the reason 17 States have failed to do it or not do it, based on their druthers, is because the Department took no leadership one way or the other. So forgive me if I ask what leadership have you taken since this money is now required to be used and spent in a bill which the President said is first and foremost for making jobs for the American people?

Mr. SZABAT. Thank you, Congresswoman. I will take that in two segments. The first is, of course, the $20 million that we have specifically for the bonding assistance and other training assistance.

Ms. NORTON. Just a moment. I am not sure the money is for bonding assistance. The $20 million, I think, is for—I know my $3 million is for jobs, sir.

Mr. OBERSTAR. There are two separate accounts. There is an account for training and then there is an account for surety bonds and assurance to cover the unique and special needs of minority business enterprises.

Ms. NORTON. Thank you, Mr. Chairman. Indeed, I am now informed it is $20 million each.

Mr. OBERSTAR. Twenty each, yes.

Ms. NORTON. Twenty million each for bonding. Nobody is saying out of that little bit of money take bonding and training. So would you inform this Committee what the Department has done this time to see that the States implement this money?

Mr. SZABAT. Well, and keeping in mind, as you have alluded to, $20 million is a very, very small sum of money in order to provide meaningful training assistance for these programs nationwide, the Federal Highway Administration has incorporated guidance to the States as to how they can use this money, and I would be delighted to share that information with you and with Members of the Committee as to what the guidance is and to how the guidance has been disseminated.

Ms. NORTON. Since the Chairman has put everybody on deadlines, could I ask that in 10 days you get to the Chairman of this Committee what that guidance is?

Mr. SZABAT. We will have it to you by close of business tomorrow, ma'am.

Ms. NORTON. Appreciate that, sir. And we would like this as well: we would like to know the nature of your outreach beyond guidance. Guidance says this is what to do, this is how you access it, these are what the rules are. Very important. But I would like to know, in addition, what the Department is doing, given how few States have taken advantage of this appropriation in the past. Therefore, these States, along with the Federal Government, are responsible for the fact that there are so few minority and female journeymen. And, by the way, whatever there are, we better make sure they get some work and we are in touch with the White House on beefing up the Office of Federal Contract Compliance and the EEOC. But what we know is that this was a section of the law which nobody paid any attention to, they just used their own money, their last dime on the last bit of highway with the same workforce, a workforce that is aging out, sir. Don't worry any more about the sons and the cousins being handed construction jobs; they don't want to do it. You know, they want to do low tech, if I may say so, because too few of them go on to the kinds of jobs we would like them to do because it would take a great deal of education. So they are sitting behind some machine while people are looking for people who can become journeymen.

So I want to know what kind of outreach to the States you are prepared to do to encourage the States to use this money, because I can assure you this Chairman is going to be keeping track of just what has happened to this money and how many people and what kinds of people have been trained under this money, especially since he was the author of it for two reauthorizations and the States just let the money lie there or, worse, used it for other purposes.

Mr. SZABAT. We will provide that information as well.

Ms. NORTON. Thank you, sir, also within 10 days.

Thank you very much, Mr. Chairman.

Mr. OBERSTAR. I thank the gentlewoman.

Mr. Cohen.

Ms. NORTON. Mr. Chairman, I have a statement which I would like——

Mr. OBERSTAR. Without objection, the statement will be included in the record.

Mr. COHEN. Thank you, Mr. Chairman. My questions are going to go toward the surety bond issue. I have had a lot of people in my community, minorities who have had trouble getting work because they can't make the bond, and bonds and other safeguards are there to protect the public on many occasions, but at the same time they make it impossible for new businesses, often minority businesses, to get business.

If Mr. Thompson shakes his head or anybody else has any thoughts, have there been creative ways to get around the bonding problem in communities or projects that you are familiar with?

Mr. THOMPSON. Sure, I would like to speak to that. First, I would like to say that the bonding is a really interesting phenomenon because it costs the project, in most cases, more money by even having the bonding in the first place. A lot of the prime contractors on the private sector work are not required to bond the private sector work. Therefore, they are storing up their bonding capacity so that when the large public projects come along, they have the capacity. I can assure you that if every major prime contractor had to bond every job that they performed, they would not have enough bonding capacity to do the public work.

But on the private work, they would require those that at least are seeking out minority assistance, they require the minority subs to bond the work that they are not bonding as a prime. So, therefore, the capacity that those minority contractors did have are no longer available when public sector projects come around.

So what I have suggested and has worked on some public projects is that, first of all, if you are a general contractor, if you are a minority and you are going after a prime contract, why should you bond the entire $10 million job if you are only self-performing five percent or if 80 to 90 percent of the work is subcontracted? If each of the subcontractors only bonded their portion of the work, and even the prime contractor, bond the work that you are self-performing. There is no value in layering all these bonds on these various projects.

So that is more from a general contractor standpoint. But from a subcontractor standpoint, depending on the role that he is performing, there are ways that they can bond their portion of the work or even phase the bonding so that, when they complete 40, 50 percent of the bond, release that bond so they can have that capacity for other projects. The problem is most of the sub or minority contractors are not able to go and secure additional work because it is tied up on one particular job until the project is entirely completed, and we all know through litigation and other issues that come up on a project, that one project could tie up his bonding capacity for two or three years and will prevent his ability to bid on additional work. That has been my experience.

Mr. COHEN. Is there a way around it? Is there some type of——

Mr. THOMPSON. Well, I think the way around it is, depending on the complexity of the job or the timing of the job, sometimes these projects, particular stimulus work, they are such fast turnaround projects, if there is a general contractor that has deep pockets and has the capacity to bond, why even require that the sub or minority contractor bond it at all? You are already protected by the general contractor. If the work has to be done in a short period of time, there is not a lot of time for anybody to get in trouble.

Mr. COHEN. Anybody else want to comment?

[No response.]

Mr. COHEN. I noticed in the testimonies Dr. Wainwright and I believe Mr. Aranza both hit on the point that minority firms are more likely to be denied credit than non-minority firms. Are there other factors like bonding requirements that might act as a defacto means of discrimination that work against minorities other than the credit and bonding? Mr. Aranza?

Mr. ARANZA. Well, in my business, I am in the airport concessions business, and we basically don't have anything that we can mortgage. We get concession rights and as much as the airports should be thanked for providing us that opportunity, it further makes it difficult for us to get financing. I have many friends in Dallas who are minority contractors that I try to use on every one of my projects, and bonding is the largest issue; and in some cases I am able to assist them, but primarily because my projects are all half a million or less and we get them done rather quickly, so we sort that out. But in a lot of cases for major construction projects on airports themselves, the bonding is the big deterrent to their ability to get a job.

Mr. COHEN. I think there would be problems. Mr. Covington, I was interested in hearing your statement about clubs that you go to where you can't be a member. Those clubs exist in my community as well, and you can't be a member based on your race, and often, also, your religion. And I have commented just recently I am a minority in my district. I represent a majority African-American district, and I have never felt more like a minority in my life than at the country club that wouldn't accept you or me. There I not only felt totally estranged and unwelcome, but I knew if I was in a situation, I was looking for votes and/or contributions. You would be looking for possibly contacts later on for jobs and/or for maybe loans from the banks, because that is where the bankers and the members of the board all reside, and they provide those loans and those jobs to the people they sit around with in the plaid shirts and the plaid pants at the country club that wouldn't have us as members. So I relate and that is going to take a long time, but much of it is systemic and it goes back to slavery and it goes through Jim Crow, and we need to end it.

Mr. COVINGTON. Absolutely, sir. It has been said that people do business with people they like. People get information from people that they feel comfortable with. And under the circumstances that you were talking about, it is impossible for us to gain the same access.

Mr. OBERSTAR. Thank you very much.

The Member of our Committee who was most responsible for the provisions in the stimulus package on bonding, Mr. Cummings, the issue was raised at a meeting of the Congressional Black and Hispanic Caucus, which I was participating, and Mr. Cummings made the contribution that the State of Maryland had a program to deal with this, and he provided me with that information. The Committee staff took that language, we crafted it into Federal legislative language for the stimulus program, and that $20 million is there because Mr. Cummings is the godfather of it.

I would like to recognize the gentleman at this time.

Mr. CUMMINGS. Mr. Chairman, thank you very much. I will be very brief. I know, folks, we have another panel. I just wanted to make one quick statement.

First of all, I want to thank you, Mr. Chairman, for making sure those provisions were included in that legislation.

Mr. Chairman, as you can see—and I have not heard all the testimony because I had three other hearings today, but, as you can see, bonding is a phenomenal impediment that prevents folks from

participating in these programs. Even in the Maryland program, when we created, through the Maryland Small Business Financing Authority, a way to guarantee the bonds, the bonding community still found ways to not bond, which is phenomenal, which is incredible. So I think that this is something that we are going to—I think that what we have done is a great start, Mr. Chairman, but I think we have to keep digging a little deeper so that we can make sure that we strike down all of these barriers.

You know, for the life of me, I can't figure out why it is that, in 2008, that we still have folks that bend over backwards not to allow people into these opportunities. But the fact is that they still exist. And I am very curious, with regard to my folks from Transportation, panelists, to see what you all present to Ms. Johnson, because I realize that $20 million is very limited, and I am just wondering if you all, in this new era of Obama, who, by the way, I supported a million percent, I think that if we are going to have a color-blind society, then we should have a color-blind society that goes to the point of eliminating this wall that blocks so many people from opportunity.

Let me just end on this, Mr. Chairman. I have now lived long enough and see enough to know that there are so many people that have given their blood, their sweat, their tears in the area of minority contracting; they have given their very, very best. They banged on doors, they have done it right, they have been honest, they have applied for this, they have responded to proposals. They have done it over. And over and over and over again they see and feel the wind from a door being shut in their faces over and over and over again, and they do get tired of going home to their children and their children asks them, mommy, how did you make out on that contract, and they get tired of saying I didn't get it.

But, you know, the most painful thing about it, Mr. Chairman, is that they go through all of that, denied opportunity over and over again, and then they die. They die. They die while banging on the door of opportunity that has been shut in their faces. And this bonding issue is one I think if we are able to accomplish nothing else but striking down this issue—and there are many more we need to deal with—then I think we will have accomplished a lot.

And, Mr. Chairman, I don't want you for one moment to take this in any way but to say that I think we have you as a partner in this fight because I know that you are very, very sensitive to these issues. And I also know something else about you: you don't like the idea of trying to break down a wall only to find out that somebody else is putting a wall up simultaneously. So some kind of way hopefully we can work with this Administration and our Congress to continue in the community, the contracting community—and I am not trying to say all contractors are like have been described, but the fact is that it is still a barrier, and I have seen it over and over again. I saw it as a lawyer going before what is called our Board of Investments in Baltimore, where people just could not get that bond; and these were qualified folks who did great work; were dependable.

But with that, Mr. Chairman, I see my time is running out and I thank you.

Mr. OBERSTAR. Thank you very much for your comments, for your observations, for your kind words. But with the experience we have had in the stimulus and on this bonding issue, I assure you, when we do the long-term transportation bill, this element will be a part of it. We will make it permanent law. With this experience in hand and with the testimony at today's hearing on the specifics of this issue, we establish an extraordinarily solid record, and to extend it also to the aviation law and to the wastewater treatment program, where we extended DBE provisions for the first time in the history of that program because it hadn't been authorized in the last 14 years. We moved it through the House in the last Congress; it didn't get through the Senate. We moved it through the House in this Congress, and we hope we get to conference with the Senate on it. We are making progress in all of these arenas and we are not going to stop.

Just one closing observation. Ms. Cloonen, you talked about your experience with the ironworkers and the building trades, and, if I recall rightly, you are now on their board of advisors for the ironworkers union, is that right?

Ms. CLOONEN. Yes, I sit on the Ironworkers Mid-America Pension Plan.

Mr. OBERSTAR. Oh, the pension plan, yes.

Ms. CLOONEN. But I also sit on the Ironworkers Local 444 Apprentice Program Committee.

Mr. OBERSTAR. Are the other building trades accepting not just you, but women, other minority enterprises?

Ms. CLOONEN. Not too many. I was the first female on the pension board and I was the first female on the apprentice board.

Mr. OBERSTAR. Well, the ironworkers and the other building trades are frequent participants at our hearings, and they are frequent supporters of our initiatives, vigorous supporters of our initiatives. I think we will have a little conversation with them about this matter.

[Laughter.]

Ms. CLOONEN. That is great. Thank you.

Mr. OBERSTAR. And if it isn't a successful one, I have a woodshed to which I will invite them.

I thank this panel for your candor, for your information. I want to thank the DOT for vigorously pursuing this issue and all of its ramifications, and for the specific examples, Mr. Szabat, in your testimony, which, of course, is included in full in the record. Thank you all very, very much for your presentation.

We will now receive the second panel: Don O'Bannon, Chairman of the Airport Minority Advisory Council; Mr. Richard White, the Memphis-Shelby County Airport Authority. And I will turn to Mr. Cohen for an introduction. Ms. Sara Hall, also the Memphis-Shelby County Airport Authority; Ms. Joann Payne, Women First National Legislative Committee; Ms. Julie Cunningham, President and CEO, Conference of Minority Transportation Officials; Ms. Amy Hall, member of the DBE Task Force of AGC and President of Ebony Construction Company.

Welcome.

**TESTIMONY OF DON T. O'BANNON, ESQUIRE, CHAIRMAN, AIRPORT MINORITY ADVISORY COUNCIL (AMAC), VICE PRESIDENT OF BUSINESS DIVERSITY DEVELOPMENT, DALLAS-FORT WORTH INTERNATIONAL AIRPORT; RICHARD WHITE, VICE PRESIDENT OF PROPERTIES AND BUSINESS DEVELOPMENT, MEMPHIS-SHELBY COUNTY AIRPORT AUTHORITY, CHAIRMAN OF THE BUSINESS DIVERSITY COMMITTEE, AIRPORTS COUNCIL INTERNATIONAL-NORTH AMERICA, ACCOMPANIED BY SARA L. HALL, VICE PRESIDENT AND GENERAL COUNSEL, MEMPHIS-SHELBY COUNTY AIRPORT AUTHORITY; JOANN PAYNE, PRESIDENT, WOMEN FIRST NATIONAL LEGISLATIVE COMMITTEE; JULIE A. CUNNINGHAM, PRESIDENT AND CHIEF EXECUTIVE OFFICER, CONFERENCE OF MINORITY TRANSPORTATION OFFICIALS; AND AMY HALL, MEMBER OF DBE TASK FORCE, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, PRESIDENT, EBONY CONSTRUCTION COMPANY**

Mr. OBERSTAR. Mr. O'Bannon, you are first on our list and you get yourself situated there, turn the microphone on. Welcome.

Mr. O'BANNON. Thank you, sir.

Mr. OBERSTAR. Glad to have you with us.

Mr. O'BANNON. It is a pleasure to be here. Good morning, Chairman Oberstar, Congresswoman Johnson, who is a proud Member of the Texas delegation, and other Members of the Committee. My name is Don O'Bannon. I am Chair of the Airport Minority Advisory Council and I am pleased to have the opportunity to appear before the Committee in support of the Federal Aviation Administration's Disadvantaged Business Enterprise program and the Airport Concessions Disadvantaged Business Enterprise program.

AMAC is the only national, nonprofit organization dedicated to fostering the full and fair participation of DBE businesses in airport contracting and concessions, and the inclusion of minorities and women in employment within the airport industry. As this Committee is aware, racial and gender discrimination, as heard from the panel before us, continues to present a serious problem in our Nation. As AMAC Chair, and with eight years of experience in the airport industry, I routinely see firsthand the impact of discrimination against DBE firms in all aspects of the airport industry, from contracting, construction, to concessions.

My testimony will detail the impact of discrimination on DBE contracting and concessions businesses, and will address policies that AMAC believes should be adopted as part of the FAA reauthorization.

Airport DBE contracting and concessions programs have started to address inequities faced by DBE firms, but there is compelling evidence demonstrating that there is ongoing need for these programs to address current discrimination faced by DBE firms. In testimony before and in statements submitted to Congress over the past six months, AMAC has submitted numerous disparity studies that through detailed, statistical, and anecdotal evidence demonstrate continuing discrimination against women and minorities in the aviation industry and the industry sectors with which airports and other transportation agencies conduct business. These studies represent every region of the Country, both urban and rural. These studies also demonstrate that discrimination faced by

women and minority groups—African-Americans, Hispanics, Asian, and Native Americans—comes in a variety of forms. Each of these studies provides significant quantitative evidence of discrimination against DBE firms in the industries that are related to airport contracting.

While statistical analysis presents quantitative evidence of discrimination, they do not tell the entire story. We can much better understand the seriousness of these statistics from stories that are told by the businesses themselves. Here are just three examples. A Hispanic contractor reported that a general contractor called him to express that he did not want any Mexicans on the job and that he had been called wetback, dumb Mexican, and my little Mexican friend. A white woman business owner reported that she encounters people who assumes that she is a front for male-owned businesses or that she is not qualified. Men she encounters on particular jobs have asked her what are you doing here. An African-American business man reported that people assume he does not understand relatively simple matters related to his work. On one occasion, as part of the bidding process for a concrete contract, an individual spoke to him very slowly to make sure that the African-American business man understood.

These studies provide strong statistical and anecdotal evidence of discrimination against minorities and women, and demonstrate that there is a continuing need for the airport contracting and concessions DBE program. As part of my testimony, with the permission of the Chair, I have submitted six additional studies and ask that they be included in the record.

Mr. CUMMINGS. [Presiding] Without objection, so ordered.

Mr. O'BANNON. Mr. Chairman, we would also like to thank you for addressing two issues related to the DBE program in H.R. 915. Although the airport DBE program is governed by a single set of Federal regulations, certifying officials often interpret and apply these rules differently. Section 135 of the bill would greatly ameliorate this problem by directing DOT to establish a mandatory certification training program and requiring those persons responsible for DBE eligibility and certification to complete the training.

Second, Section 137 of H.R. 915 addresses another aspect of DBE program eligibility, the personal net worth cap contained in DOT regulations. The personal net worth cap in the DBE program has not been adjusted for inflation since its inclusion in 1989. Section 137 directs the DOT to issue final regulations to initially adjust PNW for inflation that has occurred since 1989 and provides for yearly adjustment thereafter. AMAC believes this provision is an excellent addition to H.R. 915, as well as a matter of economic common sense and fairness.

Mr. Chairman, AMAC greatly appreciates the Committee's leadership on the important issue of diversity and inclusion in the airport industry. We thank you for the opportunity to provide testimony and for your consideration of our comments and views, and we look forward to working with this Committee in the future.

Mr. CUMMINGS. Thank you very much.

It is my understanding that Mr. Cohen will introduce our next witness. Is that correct, Mr. Cohen?

Mr. COHEN. Yes, sir.

Mr. CUMMINGS. I yield.

Mr. COHEN. Thank you, Mr. Chairman.

I am pleased today that we have two witnesses from my home city, Memphis, Tennessee, and the great airport that we have there, as witnesses here on the U.S. Department of Transportation's Disadvantaged Business Enterprise: Mr. Richard White, Vice President of Properties and Business Development at the Memphis-Shelby County Airport Authority; and Ms. Sara Hall, who is the Vice President and Legal Counsel and former legal counsel for the city of Memphis, but now for the city and County Airport Authority. I had the pleasure of being toured around the airport for specific aspects at one point, and I appreciate their courtesies.

The Memphis-Shelby County Airport Authority is one of the Nation's largest and leading airports, number one cargo airport in the Country, and it has demonstrated its dedication and inclusion of minority-owned and women-owned Disadvantaged Business Enterprises in contracting and procurement. And I don't know if it is for that reason or for the quality of the food that is served, but if you come to the Memphis Airport, you will smell the best ribs in all of America, in fact, all of the world permeating the concourses there, particularly Neely's has the smell that permeates and is just as good as the smell.

Five years ago, the Memphis-Shelby County Airport Authority led the way in compiling a study on whether discrimination existed for minorities and women. The 2008 Memphis study validated the importance of our affirmative action program and the continued prevalence of discrimination, which unfortunately exists in our business community. Minorities and women are still lacking equal opportunity to compete for Department of Transportation-assisted highways, HOT transit, and airport contracts, which the DBE program provides.

I am delighted to introduce these witnesses, to see them here in my other home city, Washington, and appreciate their sharing their information with the Members of the Committee, and I thank the Chairman for the opportunity to introduce these two fine Memphians.

Mr. CUMMINGS. Thank you very much, Mr. Cohen.

You are recognized, Mr. White.

Mr. WHITE. Chairman Cummings, Congressman Steve Cohen, Members of the House Transportation and Infrastructure Committee, thank you for allowing me to participate in this important hearing. My name is Richard White. I am the Vice President of Properties and Business Development at the Memphis-Shelby County Airport Authority. Today, I am testifying in my capacity as Chairman of the Airport Council International-North America's Committee on Business Diversity.

Airports are an integral part of their community. They not only provide economic development, but are a part of the community in which airport staff like me live, work, and raise our families. As such, insuring inclusion and eliminating discrimination is always our focus. We strive not only to meet the letter of the law, but to embrace the spirit of the law, as well as by ensuring that diversity of our community is evident in business and employment opportunities at our airport.

ACI-NA's Business Diversity committee plays a vital role in providing a forum to develop proactive outreach educational programs, best practices that allow fair participation for MWB businesses. Our committee produced a comprehensive white paper of airport DBE programs, and in 2007 we conducted a Disadvantaged Business Enterprise program survey to evaluate what was working and what was not. The survey found that finding certified DBEs continues to be a major barrier, and here is where the DBE program is important. In a recent meeting with a prime concessionaire at Memphis International Airport, I was told by that prime that they could not find a ACDBE in Memphis, Tennessee that could cook or provide barbeque for one of our restaurants in our airport.

The problem is if he couldn't find a certified minority to cook barbeque in Memphis, Tennessee, he just wasn't looking.

[Laughter.]

Mr. WHITE. But with the help of this program, we can help make those types of contacts.

Still, the certification process can be a barrier. We at ACI support the provisions of H.R. 915 that would require mandatory certification training. It is imperative that the certification process become more uniform so that DBEs with limited resources are able to get access to more opportunities. We have taken steps towards working more closely with DOT and FAA and other stakeholders to improve the certification process and make the program work better for everyone. In February of this year, ACI-NA joined the Airport Minority Council and the American Association of Airport Executives in sending a letter to DOT and FAA asking them to partner with us in order to take the next step forward in the UCP program.

The Memphis-Shelby County Airport Authority and sister airports have taken steps to ensure DBE participation in contracting. The Wayne County Airport Authority took extra steps to ensure good turnouts in their outreach sessions by providing free membership to their vendor list for all those that attended. Dallas-Fort Worth, in one four-month period, had 12 outreach events or meetings explaining the potential opportunities for retail food and beverage concessionaires in their new Terminal D.

Many airports have DBE programs for projects that are not funded with Federal money. The Metropolitan Washington Airport Authority runs an extensive local Disadvantaged Business Enterprise program focused on small business. In my airport, we have a business diversity development program for projects funded with general operating funds. The program is being revised based on results of the diversity study we just completed at the end of 2008.

My colleague, Sara Hall, is here with me today and will be happy to provide a brief overview of the disparity study conducted by Memphis-Shelby County Airport Authority and answer questions you might have.

Having an effective DBE program that opens the doors for participation for all people is always our focus. ACI-NA is committed to continuing this work to improve the program. Thank you for your time.

Mr. CUMMINGS. Thank you very much, Mr. White.

Ms. Hall?

Mr. COHEN. Mr. Chairman?

Mr. CUMMINGS. Yes.

Mr. COHEN. Before she makes her remarks, I just remembered Interstate Barbeque does a great job too, as well as Neely's, and I want to get myself out of trouble.

Mr. CUMMINGS. Very well.

Ms. Hall?

Ms. SARA HALL. Chair Cummings, and particularly my Congressman, Steve Cohen, who has long had a record of advocating for civil rights, my name is Sara Hall, and I am the Vice President and General Counsel for the Memphis-Shelby County Airport Authority. I did have the privilege of being the former city attorney and former HR director for the city of Memphis as well.

The Memphis-Shelby County Airport Authority has had a long history of inclusion of minority-owned, women-owned, and Disadvantaged Business Enterprises, M/W/DBEs, in contracting and procurement. Recently, we commissioned NERA to engage in a study to study the status of M/W/DBEs and the airport community and the Memphis metropolitan statistical area.

Despite progress, our study shows that discrimination still exists in the marketplace for minorities and women, particularly in the private sector, where these goals rarely exist. As a result, minorities and women continue to be under-represented and under-utilized both in MSCAA and non-MSCAA contracting, and in business ownership and in business earnings. For example, although 19.4 percent of all firms in the Memphis metropolitan areas are owned by blacks, less than 1 percent of sales and receipts go to these firms. The numbers for women are no better.

These results are not atypical. In talking with airports across the Country and looking at their disparity studies, I can tell you that the results are the same. Despite meaningful efforts by all the people you see here and our airport community, statistical and anecdotal evidence of discrimination still exists in airport contracting and in our communities. The conclusions of our study conducted by NERA are supported by over six years of contracting data, over 1,200 contracts and subcontracts, and over $900 million of work.

We applaud this Committee for examining this difficult issue. We encourage you to continue to look at disparities that exist in our communities, and we hope you will join us in our efforts to eliminate discrimination in our own backyards and across our Country. Thank you.

Mr. CUMMINGS. Thank you very much.

Ms. Payne.

Ms. PAYNE. Yes, sir. Before I start my testimony, if I may, sir——

Mr. CUMMINGS. You may want to turn your mic on. Is it on?

Ms. PAYNE. Thank you. Before I start my testimony, if I may, for the record submit two other testimonies. One is from the Federation of Women Contractors out of Illinois and the other is Women Construction Owners and Executives. They are part of Women First and they are nonprofit associations across the Country. If I may do so.

Mr. CUMMINGS. Without objection, we will make them a part of the record.

Ms. PAYNE. Thank you, sir. Also, that my full testimony also be part of the record, since I really cut this one down.

Mr. CUMMINGS. Without objection, so ordered.

Ms. PAYNE. Thank you, sir.

Mr. Chairman, thank you so much for the opportunity to be here today. I am President of Women First Legislative National Committee. Women First represents the interest of women-owned businesses certified in the Disadvantaged Business Enterprise program. Mr. Chairman, I wish with all my heart I could look you straight in the eye and say to you that this Committee does not need to authorize the DBE program. But, sadly, I cannot testify to that statement.

In 2001, Women First submitted an amicus brief to the Supreme Court in Adarand Construction v. Mineta. In the brief it said, "They have experienced firsthand the detrimental effect of discriminatory practices, which, to this day, continue to plague the construction industry. As a result of this discrimination, the ability of women owned businesses to compete for government contracts in the transportation related area has been severely hampered."

And in 2009 those words are still true.

In 2004, during the transportation authorization process, Senator Max Baucus, on behalf of Women First, submitted for the record 15 letters from women-owned businesses from different States who had continued to face discrimination in the highway construction industry. And in 2009 those words and those letters are still true today.

I am here to give voice to women DBEs who continue to face discrimination on a daily basis.

In surveying the DBEs across the Country regarding discrimination they have faced, I was not surprised by the anecdotal evidence of discrimination that was sent to me as these women-owned businesses continue to face a number of the same challenges they have been facing for years.

Said one DBE, when I applied for my first business line of credit, the bank loan officer actually said couldn't you get a man to cosign? Your husband perhaps?

Another DBE from Indiana told me that I own my own companies 100 percent, but I still face discrimination. Example: when a project's resident engineer won't speak to me on the job, but directs all his comments to the male standing to the left of me.

A women-owned DBE from Illinois wrote, my company is 23 years old and I have been in highway construction since 1971. Yet, I still deal with discrimination on a regular basis.

A DBE from Michigan wrote that she is still asked, after 25 years in business as a contractor, who runs the company? Who shall I call?

A DBE in Delaware wrote she had a disagreement with one of her prime contractors. The prime kept on calling her office, but always asked to talk to the male foreman rather than her. This went on for many, many, many months. The foreman kept telling the contractor he needed to talk to the boss. The contractor decided to take another approach: he called the DBE's home phone number and asked for her husband. Her husband had nothing to do with the contract or the company. The contractor said in the message

that they needed to sit down and talk about this to get it straightened out, and we don't have to involve your wife. When this failed to get a meeting, the contractor had no other choice but to meet with the boss, the woman who owns the company. The first thing he said to her, and I quote, "I am sorry this has taken so long, but I don't like dealing with women." Unbelievable.

In representing women-owned DBEs for about 23 years now, I have heard women discuss the problems they face in the construction industry many times with Members of Congress and with different administrations. These women, every day, have to face the assumption by others that their companies cannot do the work and they do not run their own businesses. Women-owned businesses still have problems obtaining loans and bonding, and after years in business they still have to explain that they are the boss to men on job sites who refuse to believe that women actually have the ability to be a boss.

If the DBE program were not to continue, I believe not just women and minority companies will be severely affected, but small majority-owned subcontracting businesses will be affected as well. The only small business program in the highway, airport, and transit industries will disappear. There will be no reason for subcontract work, even to majority firms. Thus, competition will be eliminated and prices will climb.

In conclusion, I had a member of the Women First Trustee Board tell me, when I asked why she still felt the burn of discrimination after years in business, she said to me that when she attends meetings, there are very few women, if any, around the table. She thinks, and I quote, "Well, it will be okay because I am at the table. I know these people; I work with these people. I make a pretty good living. So why do I still feel discrimination?" And then she realized why. She told me, and I quote, "It's because I'm not like them. I will never be like them. I'm different and they don't understand the importance of that."

I have thought about her statement so many times, and I believe this awareness should empower her and other women, because they contribute and make better an industry that is vital to our Country's daily life; and it is also why diversity is so important in the highway construction industry and in our Nation. Our diversity is what strengthens and bonds us together. We are a government for all the people, and all of our people deserve a chance to compete and contribute.

Recently,—and I am about finished, Mr. Chairman—a Minnesota-based DBE told a local radio station about the work that she and other women and minority-owned firms performed on par, equal to, any other contractor on the 35W bridge project, and this is what she said: I think we have been given a chance to show that a contractor can value the DBE experience. We can add value to the final product and to the taxpayers of Minnesota. And, Mr. Chairman, I think that pretty well says it all. Thank you.

Mr. OBERSTAR. [Presiding.] Thank you for raising that last example, Ms. Payne, because I am very much aware of that. At the outset of that bridge construction project, I made it very clear to the State DOT that they are going to adhere to the DBE program and they are going to culture and nourish and support, and Flatiron

Construction Company, to their great credit, made very vigorous outreach effort.

Ms. PAYNE. Outstanding. They did a great job, yes, sir.

Mr. OBERSTAR. But the need persists.

Ms. PAYNE. Yes, sir.

Mr. OBERSTAR. Ms. Cunningham.

Ms. CUNNINGHAM. Thank you, sir.

Mr. OBERSTAR. Please touch your microphone.

Ms. CUNNINGHAM. Mr. Chairman, I would like to thank you and Members of this Committee for this hearing, and I would also like to start out by thanking you for your long-term support of our organization, appearing at our policy forums over the years and really making sure that you understand what are the issues of our membership. Then I have to acknowledge Congressman Cummings, who is the official host and the godfather of our annual Transportation Braintrust, and has been so for, I believe, what is going to be 15 years. So I want to do that.

My name is Julie Cunningham, and I represent the Conference of Minority Transportation Officials. Our organization is celebrating 38 years of service as a voice for the transportation community, and today we are the only multi-modal association for minorities in all of the transportation industry. Because of the legacy of inequity in employment and business for minorities within the industry, our mission is as relevant today as ever: to level the playing field in transportation for individuals, businesses, and communities of color.

Our membership spans 29 cities and includes individuals, public transit agencies, airports, State DOTs, private businesses, academic institutions, and last, but certainly not least, small and Disadvantaged Business Enterprises. Several of our member firms are here today. You have heard from one from St. Louis who was on the first panel; Dallas, Mr. Al Brunson, Mr. Kevin Potter from St. Louis, and Mr. Prescott Sherrod from Virginia Beach.

As you know, COMTO has been at the forefront of this issue for quite some time. Our advocacy on behalf of DBEs has received national recognition. In 2006, the Department of Transportation awarded us the DBE Advocate of the Year. We have also partnered with the DOT and published the FTA's, the Federal Transit Administration's first CD on DBE methodology for Federal grantees. For the last two years we have conducted Title VI training workshops across the Country on behalf of the DOT, and the training components in these workshops includes information on DBE goal-setting, the certification process, and fraud detection.

In 2007, when the Wahlberg Amendment threatened to neutralize the DBE program, it was COMTO that made our voices heard here on the Hill and also in Chairman Olver's office, because it was an appropriations issue. Our chapters across the Country petitioned their congressional representatives and we met with Congressman Olver to ensure the voices of the DBE community were heard. We were effective and we thank Chairman Olver for his great support.

Mr. Chairman, as you have reminded our membership on more than one occasion, both you and the Majority Whip, the battle that was fought to include the DBE provision in TEA-21 in 1998 was

no less fierce than the battle is today. Majority Whip Clyburn outlined in his testimony here this morning that the program has stood up in court over and over again, and that testimony was supported by members on the first panel. So I don't want to spend a lot of time defending the fact that the program is in fact constitutional.

But what I want to do is talk to you a little bit about the concerns that my members have expressed. This week, I canvassed our membership and talked to a number of our DBE firms, a few transportation professionals who have responsibility for running State DBE programs, and I want to recognize Ms. Grimley-Johnson from Virginia DOT, one of our members, is here and is one of those people. I also visited with a senior partner from Booz Allen Hamilton, which is one of the Country's largest consulting firms and has one of the strongest mentor-protege programs in the Country. And each of these discussions resulted in the overlying theme from the members, so I just want to focus a little bit on what they said, really briefly.

The first thing that they said was that there needs to be more specific language in the RFPs issued by Federal grantees to ensure the integrity of good-faith efforts. Currently, there are no teeth in good faith and there is too much inconsistency from agency to agency. In the COMTO membership, our DBEs refer to good faith as drive-bys. In other words, primes will drive by and the drive-by could be faxing an organization like COMTO or making a phone call, and then they call it good faith and they say we couldn't find any.

Number two, we need a national uniform certification program. It is long overdue. As of 2008, all 50 States had established uniform certification programs. However, there is no national database or central repository for the vital data. The certification process is cumbersome and time-consuming and expensive for DBEs. And even though the DBE program is governed by a single set of Federal rules, the information requested by one certifying entity is far too often not the same information required by another.

Number three, there needs to be more aggressive and consistent compliance monitoring of the DBE program. And we heard the questions from Congresswoman Brown and Congresswoman Eleanor Holmes Norton, as well as Congresswoman Eddie Bernice Johnson, and they kept saying are we monitoring it. Well, there needs to be more monitoring, and COMTO recommends funding for the establishing, maintenance, and monitoring of a national DBE and ACDBE program to ensure and guarantee the success.

And, lastly, we believe that there should be the development of a national mentor-protegé program. We recommend the creation of outreach opportunities in collaboration with federally-funded transportation entities to connect the prime contractors with DBE firms around the Country.

During the transition process for President Barack Obama, I had the opportunity to serve on the transition team at the DOT Agency Review Group, and I saw firsthand that what this Nation is faced with is more about bricks and mortar and concrete and steel. It is about people and it is about jobs, and too often we forget that the golden nuggets of our industry are the people who participate in

the DBE program and the thousands upon thousands of people that they employ.

COMTO DBE firms touch the full spectrum of projects, offering everything from engineering services to advanced technologies to traffic engineering to professional services for legal, real estate, capital investments. They are suppliers that provide goods and services to the industry. They run the gamut from the very established businesses to the startups which are poised to partner in a mentor-protegé relationship. We have as members of our organization the only minority-owned manufacturer of heavy duty brakes and clutches for trucks, buses, trains, and power equipment. We have the only minority-owned railway engineering services firm. And we have one of the largest minority-owned firms whose primary business is to lay track.

So we must take into consideration that our reason for being here is not just a DBE issue; it is also a workforce issue. Small businesses hire, employ 70 percent of the workforce.

Congressman Cummings, as the Chairman of Government Oversight and Reform, you know that when we talk about cleaning up government, we must also talk about cleaning the program. We have to strengthen the program, not dismantle it, not eliminate it. Last week I was in St. Louis facilitating stakeholder meetings on behalf of the Missouri DOT for the new Mississippi River Bridge, a brand new bridge whose ground will be broken in the fall of this year. There were probably 150 people in attendance, most of them principals or employees of DBEs from both sides of the Mississippi River, the metropolitan St. Louis area and East St. Louis, which has an unemployment rate of 14.9 percent. They are the stakeholders wanting to contribute to the building of something new and exciting in their community, and a chance to play their part to help our economy recovery, wanting some of the business and some of the jobs of building that new bridge that will impact their community and make it more livable.

I will leave you with this. Recently, Secretary LaHood said, and I quote, "In a very short time, your cities will be humming with construction workers, engineers, maintenance crews, and many others. You will see roads repaved, interchanges improved, and bus and rail systems repaired, upgraded, and expanded." Well, I am very excited about the fact that the COMTO Board of Directors and I have a meeting with Secretary LaHood next week, and what we want to offer to him is that with that wonderful humming in the construction industry, we want to also hear the sweet chorus of our Nation's DBE firms, and also added to that the harmonies of all of their workforce—their engineers, their planners, their administrative workforce, their carpenters.

With that kind of chorus, with that kind of humming and melody all together, we can enhance our Nation's infrastructure, decrease discrimination, and harness the power of all our Nation's people and businesses to get our economy back on track. The members of COMTO stand ready to do our part. To dismantle or neutralize the existing DBE program will result in a very chilling effect not only minorities and women who have been demonstratively under-represented in federally-funded transportation contracts across the Country, but also a chilling effect against our very Nation.

Mr. Chairman, COMTO applauds the efforts of the T&I Committee to protect the DBE program and we support your efforts to advance inclusiveness in the industry. Thank you for the opportunity to testify.

Mr. OBERSTAR. Thank you for your splendid testimony. Really appreciate your comments and your remarks about my work in particular on this matter.

Ms. Hall, on behalf of AGC of America.

Ms. AMY HALL. Mr. Chairman and Members of the Committee, thank you for the opportunity to present testimony today on the U.S. Department of Transportation Disadvantaged Business Enterprise program. I am Amy Hall, President of Ebony Construction, located outside Toledo, Ohio, representing the Associated General Contractors of America.

Ebony is a second generation family-owned business that performs asphalt paving and milling, primarily as a subcontractor, in Ohio, Michigan, and Indiana. We are a certified DBE company. My comments today will focus on how the USDOT DBE program is administered by the Federal Highway Administration.

No industry as large, diverse, and fragmented as the construction industry is is entirely free of discrimination. While the vast majority of these men and women who work in our industry are good people, there are no doubt some bad seeds. AGC is working to foster a business climate that enhances opportunities for all businesses. The contracting community has concerns about the administration of the DBE program. Many program requirements are contradictory and/or ambiguous. In addition, there can be lack of uniformity in the ways each State handles these various requirements. These problems are real concerns for contractors because stepping over the line can lead to suspension, disbarment, and Federal prosecution. Any of these penalties can, at the very least, put a company out of business and have far graver consequences.

These concerns led the AGC to meet with then Federal Highway Administrator Mary Peters and then DOT Inspector General Ken Meade and other DOT representatives. The outcome of the meeting was the creation of an industry-government workgroup to: identify the contradictory and inconsistent program requirements; clarify the intent and the administration of these various requirements; and create guidance. This group met for over three years, and the end result was a document that we called the Tool Kit, which is initiated to help contractors comply with the program requirements. A copy of the Tool Kit is attached to my testimony.

AGC believes that the document is very helpful in clarifying for all parties involved how this program, the requirements and how they are intended to be implemented. However, despite all of our efforts, the DOT informed us that they could not endorse this document. Unfortunately, that renders this document useless, because contractors and DBEs must have the confidence in their decisions that they make related to program compliance are based on some official guidance from DOT.

AGC still believes there is a need for a document clarifying what contractors and DBEs can and cannot do in meeting the DBE program requirements. We believe there are real differences of opinion on how to administer the rules. Many of these issues also impede

DBEs from being successful in the program and cause uncertainty and potential traps for contractors and DBEs attempting to meet these requirements. An example of how the implementation of this program seems to undermine its intended purpose are the rules related to the expertise of the DBE owner. Once again, DBE owners are being held to a different standard than non-DBEs. As part of the commercially-useful function reviews, DBE subcontractors are being asked to go to the field and actually perform field tasks. Let's remember, running a successful contracting operation does not require the owner to be able to operate the machinery or perform any of the actual construction tasks. However, running a business requires an entirely different set of skills.

Another issue that was discussed as part of the Tool Kit is the type of assistance the general contractor is able to provide DBE subcontractors. It is industry standard practice to provide assistance to subcontractors with equipment, personnel, and material as the need exists. This assistance can be provided to the non-DBE subcontractor; however, if a prime contractor was to offer the same assistance to the DBE contractor, red flags are raised and both the contractor and the DBE could be subject to intense scrutiny or targeted for legal proceedings.

An example of the regulation that works against the DBE's success in the program is an issue that directly impacts my company. The regulations allow for the cost of material that is purchased by the DBE work for on the contract to count towards goal achievement. However, if the DBE purchases material from an entity associated with the prime, rather than a third party source, that portion of the contract is not counted. Often, the third party is not an option because the plans call for specific material production. Frequently, the prime contractor then becomes the only source for that material. Not allowing my purchase of asphalt from the prime undermines the ability of the prime to not only meet their goals, but negatively impacts my business.

Further meetings with the DOT resulted in the creation of the DBE Roundtable. Through this forum, issues can be raised and discussed in a public setting, resulting in guidance from DOT. AGC is hopeful that the Roundtable will continue. The Roundtable has addressed the use of joint checks, certification consistency, change orders, DBE capacity, and many more items. The issue I mentioned about material purchased from the prime has also been addressed, and we are awaiting OMB's response.

We believe the program rules need to be written in a way that allows for more collaboration, mentoring, and assistance. AGC has always encouraged the creation of mentor-protege programs that allow contractors to work with DBE firms in a collaborative fashion to ensure a mutually beneficial result.

Mr. Chairman and Members of the Committee, AGC has taken the approach that while the program is in place, we will work together to make it something that makes sense, does not impede the successful completion of the vitally needed transportation improvement projects, and does not create legal concerns for all participants. AGC is hopeful that the dialog that was started over the past years with DOT, the National Association of Minority Contractors, and the construction industry will continue.

Thank you to the Committee for having this hearing on the administration of the program, and I would be happy to answer any questions you may have.

Mr. OBERSTAR. Thank you, Ms. Hall. I want to thank AGC for their very active, assertive involvement in the DBE program and for the very significant contributions AGC has made. It is very much to their credit to have done it and have you as their very articulate witness.

Ms. AMY HALL. Thank you.

Mr. OBERSTAR. The sum of the testimony of these two panels is perhaps that three centuries of discrimination cannot be overcome in two decades, and that while there are successes, as noted in the DOT testimony and testimony of the various witnesses, there are still serious problems inherent in this program, and that those problems are reflective of the society in which we function. We can't change all of society, but we can sure change a good deal of it in this Committee and in the work that we do and the legislation that we move forward.

We have heard continuing theme about informal networks, about the ol' boy networks, about bonding requirements, about insurance needs. We have had this initial experience on funding to cover bonding needs of DBEs in the stimulus, and it is too early for any of the panelists to say they had an experience with it, but comment on that for me and then offer your thoughts about whether this would be a good precedent for us to include such language in the long-term six-year surface transportation authorization bill coming up.

Ms. Hall, it looks like you are ready to respond.

Ms. SARA HALL. Well, certainly, I think anything that we can do that helps highlight some of the hidden barriers to participation. One of the things that we have certainly found is that even if your contract compliance department or your airport is serious about making bonding and insurance requirements that are possible and encourage participation, you sometimes have a disconnect in the process; and unless there is education on all fronts through programs such as the one sponsored, you are not going to have real results.

What we have found is that you have to educate at every step of the way and make sure that there is not a step that is missed, because often, if that step is missed, then the barrier exists and you are simply not aware of it.

Mr. O'BANNON. Mr. Chair, there must be a commitment to be robust in our application and implementation of the program. That really is where the rubber meets the road. If you impose these requirements without thinking about their impact, then you are in fact creating artificial barriers to participation.

For example, you have a janitorial service contract, and as part of that solicitation you say we are requiring that you have five years worth of airport experience in doing janitorial work. Those are the types of artificial requirements and barriers in terms of criteria that really do prevent inclusion, and those are some of the things that you are going to have to focus on in terms of really implementing the program in such a way that that participation is both real and substantive.

Mr. OBERSTAR. Are you referring to an actual requirement in a proposal?

Mr. O'BANNON. Yes. I have seen those requirements.

Mr. OBERSTAR. How in heaven's name, tell me how experienced janitorial service at an airport differs from janitorial service.

Mr. O'BANNON. That is the issue on that particular contract that I had. But these are built in because sometimes the person drafting it is really drafting it from the perspective of what are we looking for. I mean, we are looking for people that frankly we don't have to supervise; we are looking for people who have been here for a while; we are looking for people who have the experience. And when you take that attitude in drafting these RFPs, you begin to exclude other potential providers from participating.

Mr. OBERSTAR. Earlier, Mrs. Napolitano, our Member from California, raised the issue with DOT whether they have an actual active review process where they are looking for those circumstances where there is this—she didn't use this term, but unseen, under-the-surface discrimination. What you are saying is maybe we need some structural—by that I mean institutional—review of contracts to see whether they are discriminatory in their requirements.

Mr. O'BANNON. Well, let me say this, Mr. Chair. The FAA Office of Civil Rights has done a great job with the resources that they have, but I can tell you from my personal experience they are understaffed. I mean, for the southwest region, we basically have one civil rights officer who is responsible for administering all of these programs across the board. She is the one who really is the day-to-day person who is responsible. But it is the DBE liaison officers at the individual agencies that are really responsible for implementing these programs, and if we are not aggressive, if we do not have experience, if we are not pushing this particular agenda, and if it is a stepchild of that agency, then we are not going to be successful.

Mr. OBERSTAR. We don't want stepchildren in the historic sense of that word. They are sort of unwanted, unappreciated, unloved. I have stepchildren and I love them, and that love is returned, I must say.

Section 136 of H.R. 915, the FAA Reauthorization Act, which has been reported from Committee—hasn't come to the House floor yet—provides: "This Section requires the Secretary to establish not later than one year after date of enactment a mandatory program to train airport owners and operators on how to properly certify whether small businesses and airport concessions qualify as small business concerns owned and operated by socio and economically disadvantaged individuals." It doesn't say anything about the Office of Civil Rights. It doesn't say anything about the staffing of that office. It doesn't say anything about the numbers of personnel. And now that you have raised that issue, this is something we can address before we bring this bill to the House floor. We can include such adjustment in a manager's amendment.

Mr. O'BANNON. Thank you.

Mr. OBERSTAR. Why is it difficult for disadvantaged, small, minority, women-owned enterprises to discuss, in whatever forum, the discrimination they are confronting? What are those barriers to raising the issue?

Yes, Ms. Cunningham.

Ms. CUNNINGHAM. Mr. Chairman, if I may, what our members tell us—and I heard this last week in St. Louis from hollers. When they raise the issue, then they lose the work or they don't get the next job. So there are penalties. So they go along to get along so that they can get the next contract.

Mr. OBERSTAR. So people are worried about sticking their neck out of the foxhole and getting it shot off?

Ms. CUNNINGHAM. Yes.

Mr. O'BANNON. That has been our experience as well. I mean, AMAC represents airport concessionaires and DBEs who do work in airport contracting, and even though they are willing to talk to us confidentially, their concern is they are going to be branded as firebrands or radical and simply people are not going to want to do business with them if they complain.

Mr. OBERSTAR. We have protection for whistleblowers, and a number of programs under the jurisdiction of this Committee. We just recently did something very significant for Coast Guard. We have it for aviation, for reporting of near misses, for reporting of failure maintenance oversight. Maybe we need something of that nature here, a whistleblower protection for minority enterprises.

Mr. Cummings. Godfather Cummings.

Mr. CUMMINGS. Oh, boy. Mr. Chairman, I want to pick up where you left off and tell you, Mr. Chairman, that one of the things that folks have a tendency to say when minority and women contractors raise issues, they have a tendency to say here they go again, meaning that a lot of times the legitimate complaints and concerns are dismissed, or they will say things like you are whining. That is a favorite word. But yet and still, people are not getting those opportunities. You can call it what you want, but the fact is that it doesn't take a rocket scientist to see the discrimination.

With regard to the whistleblowers, I think one of the things that happens is that while folk may have the protection, may get the protection of a whistleblower statute, folks don't necessarily want to go through the process, because although you have the protection, they feel that you are going to suffer no matter what in the meantime. And I think our witnesses probably would agree with that, I think. So we have got to be careful with even how we do that, and not assume that it is going to be the solution to all the problems.

But I want to come back to some of the things that you all have said, particularly you, Ms. Hall, and you, Mr. O'Bannon. In answer to one of the Chairman's questions, you all were talking about things that may be—and all of you, to a degree—impediments of reaching true participation with equity and parity with regard to minorities and women. Can you think of other things that you have not maybe mentioned yet today that we could, say, incorporate in a SAFETEA-LU bill or, as the Chairman has said, the aviation bill? I just think that this is a prime opportunity to get some of these things done right now. Like I said, we have a Chairman that is sensitive to these issues, and hopefully we have a Congress that is sensitive to them.

So I am just trying to make sure that we cover things that—I mean, if each one of you all maybe had something that you would

like to see in legislation, that is practical, that is,—and when I say practical, going back to what you said, Mr. O'Bannon, taking into consideration everything involved and truly thinking it out to the nth degree and saying, okay, this is going to, in the end, when all the dust settles, this has the most likelihood of helping this situation. And in your answer I am trying to get to what are those things that we can do hopefully to memorialize something that lasts beyond us. Because one of the most important things I think for us to do is, during our watch, to try to put things in place that will last beyond us. And, of course, you have to take into consideration the law as it is now and making sure that it fits within the law, because certainly the other thing is that, from a practical standpoint, if it doesn't fit within the law, then we have got the constitutional challenges.

So why don't we go right down the line? If you don't have a response, that is fine. But I think the Chairman is asking what can we do to try to—I don't want to make your trip in vein or your testimony in vein, so I want to make sure we are getting from you the very best that you have to offer as to what we might be able to do to help.

Mr. O'BANNON. Well, let me say this. First of all, AMAC, as an organization, would be more than happy to sit down and work with this Committee or with any Subcommittee in terms of coming up with specific recommendations. I am the guy in the weeds. I administer the DFW Airport DBE, ACDBE program, our MWBE program, so I am a weeds kind of guy, because, to me, it is these little decisions that have greatest impact in terms of are you able to be successful at the end of the day.

There are two or three areas that I would really ask this Committee to take a look at. One is we tried, at DFW, using an approach called subguard versus bonding. Subguard is an insurance program that replaces the bonding requirement. That approach can be successful if administered properly. And, again, the devil is in the detail. If you apply the same bonding standards for admission into the subguard insurance program, you have just traded one obstacle for another. But you can have a much looser set of criteria which still provides the protection for both the owner, the contractor, and the insurance company without some of the financial restrictions that go into the bonding requirement. So that is one approach that I think this Committee should take a look at.

A second approach that I think this Committee should take a look at is financing. The critical battle for many smaller minority- and women-owned businesses is that mobilization fee and the time that it takes in a public sector job to get paid. At DFW—and I will use my airport as an example—we have a situation where you work 30 days, you then have 30 days by statute to pay. That is 60 days. Assuming that you are a subcontractor, that prime contractor can pay you within 10 to 15 days from the date that they get paid. That is 75 days before you get your first check. You paid labor, material, and supplies. We must address the issue of providing adequate financing for mobilization.

Mr. CUMMINGS. And I want number three, but what you just said, in an economic time like we have right now, it is a death sentence to a small business, because most small businesses survive

based upon lines of credit. If you don't have a line of credit, under those circumstances, you are dead; you can't buy supplies, you can't pay employees, you can't pay rent. So you're dead.

Number three?

Mr. O'BANNON. Number three is we should look at the delivery methods, everything from—and by that—I don't want to disparage the people who work in my capacity, but some of us—you know, I am a lawyer by training, and what I had to do—and thank goodness our board supported this—was I went and I requested our board I need a construction expert. I need someone who has done construction so they can tell me how to speak constructiony to a construction person, because I found myself being—I would go in with the expectation of achieving a certain goal and simply get talked out of it because I simply didn't have the expertise to deal with it. So the staffing and the training of the DBE LEOs is critical. I mean, we must be able to critically, analytically assess the work, the scope of work. We must have experience in this area and enough training and background in order to impact the process. So it is the delivery of these services. If we do not have that training, we cannot be effective, and we either have to have the staffing that will bring that expertise to the forefront or the type of training that will make us more effective. You cannot take an HR person and say you are now the DBE LEO officer and expect that person to be successful.

Mr. CUMMINGS. Mr. White?

Mr. Chairman, I know I am running over. I just wanted to get these answers.

Mr. OBERSTAR. Please, just proceed. There are no other people clambering for the microphone right now.

Mr. WHITE. ACI's feeling is more of mandatory certification training where DOT and FAA really has a uniform process and where DBEs get certified as a DBE. That form they can use in Memphis, Tennessee, can go to Arkansas and do work, go to Mississippi and do work. I mean, in Memphis, Tennessee, we live right there in the region. You actually can do work in a four-State area. But without that certification and being seen as a real certification uniformly throughout the United States, that is a very difficult process.

Mr. CUMMINGS. Yes, ma'am.

Ms. SARA HALL. I would echo the two comments and just say that, certainly, anything that we can do on both sides of the equation, on the airport, the transportation, the DOT, FAA recipient side, and then also with the DMWBE to make the process easier is what we want to do. Uniform certification will do that; training will do that; as will the educational programs of AMAC and ACI, where they bring together the individuals and the airports who implement and carry out these regulations and really educate them about the hidden barriers and the well-meaning policies that, in effect, further discrimination and exclude people from the marketplace.

Mr. CUMMINGS. Ms. Payne?

Ms. PAYNE. Well, I ditto all of the above as far as the highway construction industry is concerned.

About 20 years ago, the prime contractor usually held the bonding. Today, the DBEs have got to get their own bonding, which is directly tied to the personal net worth issue. So the fact that we have addressed the personal net worth issue is extremely important.

Secondly, part of that personal net worth issue, today, to accumulate or to count personal net worth, retirement plans are part of it. That should be eliminated. It is very, very difficult if you have been in business or you are my age, say, for example, and you have been putting into a retirement plan, and you have now—well, maybe now not now, but in the past two or $300,000. Well, that was $300,000 that went immediately to your personal net worth, even though your business—it would be stupid to touch it, you can't touch it, so on and so forth. So eliminating the retirement plans as part of the personal net worth accumulation or accounting would be helpful tremendously to DBEs.

Also, I think in the highway construction industry people live and die by bank loans. You get a project, prime contractor, subcontractor, and you go to the bank to make sure you can do the work. Well, in this very bad economy, banks aren't loaning, and we have had a lot of women-owned businesses and minority-owned businesses actually go out of business because they couldn't get the loans necessary so they could do the work.

Mr. WHITE. Mr. Chairman, please excuse me. I need to go catch a flight, if I may.

Mr. OBERSTAR. You are excused, Mr. White. We don't want an airport person missing an aviation flight.

[Laughter.]

Ms. CUNNINGHAM. I would like to echo members of the panel, but I think high on our list of the COMTO membership is the need for a national uniform certification program. I sat with Al Brunson, who is sitting behind me, so if he will raise his hand so you all see him. He also sits as the advisor to the COMTO Board of Directors on small and disadvantaged business issues, so he is a member of our national board. But last night we had dinner and I was asking him all the places that he does business, and every place he does business he has to get—every State; he is in several States—he has to get certified, and these are all federally-funded projects either in transit or in highways. So from State to State to State he has to go get another certification. Well, he has been established for about nine years, but what about the firms that are starting up or have been in business less than three to five years? That is a very expensive and cumbersome process for them.

Mr. OBERSTAR. On that point, if the gentleman would yield. Are there significant differences State to State? Why does each—if you are doing this work under federally-funded out of the Highway Trust Fund, why does each State have to be so different?

Ms. CUNNINGHAM. Now, I can't——

Mr. OBERSTAR. Or are there real differences?

Ms. CUNNINGHAM. I can't give you the specifics, but I would gladly give him my seat. I can get you the information. I can get it to you by close of business tomorrow. But I will tell you that our small businesses complain about the fact that they have a mound

of paperwork like this for every certification, and maybe Ms. Hall can speak to that, I don't know.

Ms. AMY HALL. We have found that when we have applied for certifications in other States outside our home State, that this is true, and that happens, and I think it is probably because, at the end of the day, the onus of that particular DBE and their efficacy and their actual ability to perform work, that particular State feels the need to do the investigation and to do all the things that are supposed to be standard under the UCF. Not the UCF, but the UCP. I am sorry. So I would imagine that creates the silos in which each State works.

Mr. OBERSTAR. We could, I think, if the gentleman would continue to yield, we could provide guidance, direction to DOT to harmonize those requirements among the States. It is Federal funds, the same Federal Trust Fund dollars in the East Coast as on the West Coast and the northern border and the southern border. I don't understand why that is a problem.

Yes, Ms. Payne.

Ms. PAYNE. I was just going to say that I know it sounds like it is a really big problem, and it is. Please don't get me wrong. But in years past—actually, DOT does have a unification program, and the paperwork actually has been cut down by two-thirds, believe it or not, from the past. However, the States, their domain, because our program is so unique, where, like an SBA, certification is all paperwork. Our certification is onsite. So one State, even though their peer, the State beside them, has certified a company, they don't know anything about that company, necessarily, and they want to know, so they will come in and they will do an onsite presentation. They don't have to, but generally they do, and that is one of the problems. And that is the good thing about our program. I mean, it is really scrutinized and it is very difficult to get certified. But, on the other hand, it does hinder the uniform certification process.

Mr. OBERSTAR. Ms. Hall?

Ms. SARA HALL. Chairman Oberstar, I can tell you that in the last 12 months, I have attended both AMAC and ACI conferences where this very issue and this problem has been discussed, and in transportation our dollars come from the FAA, they are Federal dollars and they flow through to the airports in the various States. The States do have uniform certification agencies, but they are at the State level. So what happens, for example, in Memphis, Tennessee, is in 30 minutes we have a firm from Arkansas who wants to come over, they have to be certified in Tennessee, their Arkansas certification does not count. A firm 15 minutes away in Mississippi must be certified in Tennessee, and ACI and AMAC have gone on record writing both the FAA and TDOT to request a meeting, which they agreed to grant us, and we are looking forward to that, to sit down and discuss this issue and this problem.

And what we have heard is that while the rules are the same, as you know, the devil is in the details and they are all fact-specific. So each State may interpret a particular detail differently; may see an asset in a different way, especially when you are talking about joint assets; may view something differently; and literally the forms that are required are extensive. And when you are small,

it takes all your resources to get certified; you really can't get ready for your jobs.

Mr. O'BANNON. And under the existing regulations, it is optional for me to accept—I have the option, under the existing regulations, to accept certification from Virginia. Much of their hesitancy in doing that is concern about the integrity of their certification process.

Mr. CUMMINGS. Ms. Hall?

Ms. AMY HALL. Our position and our point of view is that we feel that two-way communication is vital to promoting the DBE program. We have created the Tool Kit, which we hope at some point will be endorsed by the DOT. The Roundtable was also created last year. It is a forum in which contractors, both majority and minority contractors, get together with the various DOT agencies, and we are able to sit down and discuss the rules and the regulations that are currently in place that have the potential to negatively impact both the contractor, as well as the DBE subcontractor. And one of the challenges that the DBE program has is to shift the consciousness from protecting the efficacy of the program from fraud to moving the program to what it is supposed to be, to build the capacity of the DBEs. And so many things have been created to prevent the fraud from happening; however, simultaneously, it negatively impacts the DBEs' ability to carry on industry standard practices and business practices that other subcontractors can do, but the DBEs cannot.

Mr. CUMMINGS. Thank you very much. I want to thank all of you for your testimony. I appreciate it. All of these suggestions are very, very helpful, and, as the Chairman has said, there is nothing like hearing people who are having to deal with something every day, every day, because you are the experts. So thank you very much.

And thank you, Mr. Chairman.

Mr. OBERSTAR. Yes, I concur in those comments. You are the experts. You are the practitioners on the front line.

Ms. Hall, you suggested that the DBE Tool Kit AGC developed be somehow incorporated in the Federal Highway Administration programming, is that the thrust of your——

Ms. AMY HALL. Yes. We have, for over the past three years, worked in conjunction with FHWA in creating this Tool Kit, and what it does is it breaks down the DBE program and puts in layman's terms the guidance and the how to interpret these rules both for the contractor, as well as the DBE contractor, because what happens or what we have found is, from State to State, each State interprets these rules differently. So in order to provide like one common language, so to speak, so everybody is understanding and working with the same rules, the Tool Kit was created.

Mr. OBERSTAR. It is a very intriguing idea, something we will have to evaluate further. Something of this nature takes on the character of law. We want to be very careful about how it is worded, how it is phrased, how it is practiced, and consequences that we haven't foreseen that might result from it. Have you talked to AASHTO about this Tool Kit——

Ms. AMY HALL. Yes.

Mr. OBERSTAR.—and considered having AASHTO included in their manual? Which is different from being a regulatory procedure.

Ms. AMY HALL. Right. We have. At the conception and the development of this Tool Kit, all the organizations have been abreast of what has been going on, yes.

Mr. OBERSTAR. Well, we have to evaluate that very intriguing suggestion, and we will work on that further.

Was it Mr. O'Bannon I think you said you are concerned about the integrity of the certification process. What do you mean by that, that it might differ from State to State? Is that what you are saying?

Mr. O'BANNON. The question always is how rigorous is that certification process, and you have heard some discussion about you have only a paper certification process in some jurisdictions; you submit your paperwork and then that basically is it. Other jurisdictions are much more concerned to make sure that there are onsite inspections. I mean, we have actually had experiences where you actually have gone onsite and the example I am using is the white female who was ostensibly the owner of this particular job was actually in a small clerical office in the back. Her husband was up front in a big office, and when you went on and did your onsite inspection, it really was apparent that the person running this company was the husband and not the wife. So those onsite inspections are valuable in determining and to make sure, to confirm that what is represented on paper is in fact what is going on.

So as the person who is responsible for working with these businesses, I want to make sure that the benefit of the program goes to those businesses that are supposed to be the beneficiaries. So I trust, because I know, the local certification process. I have more concern about other jurisdictions because I am not as familiar with what they are doing.

Mr. OBERSTAR. What you are really arguing for is a standardization of the certification process.

Mr. O'BANNON. Absolutely.

Mr. OBERSTAR. Which is interesting in another context at airports. The TSA accepts every State's driver's license as a verification of who that person is; it has their photo, it has their vitals, usually social security number and address, and so on. And TSA doesn't go behind that license to see whether every State has a good certification process for driver's licenses. But you are talking about something different here and we can craft language that will do this.

Mr. O'BANNON. I don't want my airport or my office written up because of fraud. I do not want that. So we have to be concerned about the integrity.

Mr. OBERSTAR. And it is clear that the civil rights offices, from previous testimony and from this panel's testimony, need more personnel.

Mr. O'BANNON. Absolutely.

Mr. OBERSTAR. They just don't have enough people. I think you said that earlier on your own.

Mr. O'BANNON. Yes.

Mr. OBERSTAR. Ms. Hall, you referenced a statistically significant wage disparities for all minority groups and white women. Is there a documentation for this?

Ms. SARA HALL. Excuse me, Chairman. Our disparity study is 318 pages. We have included it and submitted it to the Committee. We have also submitted a 20-page summary and then a shorter 2-page summary. We did use NERA. The study was quite extensive; it was six years of contracting data, over 1,200 contracts, sub-contracts; and over $900 million of contracts. And NERA looked at every aspect and it was reviewed by the airport in great detail, and the disparities were statistically significant and adverse in all minority groups.

Mr. OBERSTAR. Let me just ask our counsel, Ms. Soumbeniotis, do we have that in our file?

Ms. SOUMBENIOTIS. We do have that in our file.

Mr. OBERSTAR. Okay, we will make sure that that remains a part of the Committee file. We will make a reference to it in the Committee hearing. And if there is an abstract summary of some discreet length, we can include that at this point in the record.

I want to be very clear in this hearing to establish the successes of the Minority Business Enterprise program, the obstacles to its full success, and the challenges that remain so that in some future court case, which is most surely to arise,—I have learned my years of legislating—that a court looks at it and says oh, there was a very substantial record in support of this legislation, and that is what we want. That was one of the main purposes of this legislation, is to build that record in the course of this hearing.

I just want to sharpen your focus now in this question. What has been the impact of the MBE program in DOT, for all of its modes, in ensuring that women-owned, black-owned, Hispanic-owned enterprises have been able to enjoy success?

Mr. O'BANNON. DFW conducted an economic impact study that was done by the University of Texas, and for the period September 29, 2006 through August 30th, 2008, we looked at the MWBE concessionaires. Those DMWBE concessionaires produced more than $350 million in gross revenue, and DMWBE firms on contracting provided over $280 million in contracting services and procurement. That spending and concessions operated generated an astounding $1.2 billion in economic activity, creating 14,000 job years of employment and increasing labor income by more than $450 million.

There is a positive economic contribution to removing discrimination and allowing these firms to participate in these opportunities both from a job creation standpoint, as well as State and local taxes, because my recollection—I don't have the statistics in front of me, but my recollection was $60 million was paid in State and local taxes by DMWBE firms from the activities.

Mr. OBERSTAR. That is an important part. Not only doing this work, they are paying taxes as well.

Mr. O'BANNON. Absolutely.

Mr. OBERSTAR. Employing people. People are paying taxes; the businesses are paying taxes. But can you say that without the presence of the MBE language, that much of this would not have occurred?

Mr. O'BANNON. That is correct. You would have a bifurcation in society where a portion of my community and the business owners who live in my neighborhood would not be participating in these dollars, because when I go to the grocery store, I am seeing local contractors and subcontractors who live in my neighborhood, who have contracts at DFW, and they are benefitting that local community and our region because of this economic activity.

Mr. OBERSTAR. Thank you.

Ms. Hall?

Ms. SARA HALL. Chairman Oberstar, there are a number of statistics and findings in our study. I think a few that might sum it up relatively quickly are that although black firm owners account for 19.4 percent of all firm owners in the Memphis metropolitan statistical area, they account for less than 1 percent of sales and receipts. For women, the number is women-owned firms account for 26.6 percent of all firms in the Memphis metropolitan statistical area, but account for less than 2.5 percent of sales and receipts. So we know that there is disparity.

What we also know from our study is that our utilization of M/W/DBEs in our study period was approximately 17 percent, much higher than the 1 percent and the 2.5 percent numbers, while not apples-to-apples comparisons, but they give you a good idea of the progress.

What is perhaps, as you said, it has taken us a long time to get here, and it will take us a long time to remedy these effects. What we found in our study was that the current availability of MWBEs in the Memphis metropolitan statistical area was 28 percent. And, again, these are broad numbers. So what we want to do is make sure that, in the public sector, that there are goals, that we encourage participation and inclusion, and that we allow those goals to reach out into the greater community, because what the anecdotal evidence of our disparity study said—and you can read it in a pretty large section—we both surveyed both by telephone, by written survey, and by individual interviews and group interviews, M/W/DBEs and non-M/W/DBEs alike, and what we found from the M/W/DBEs is that, in many instances, they told us that but for goals on public contracts, that they would not be included, and that by the very firms that used them as subcontractors when there were goals, those firms did not call them to submit quotes on projects without goals.

So I think you see both the progress that we have made and the progress yet to be made, and those studies certainly illustrate that.

Mr. OBERSTAR. That is very precise on point. Thank you, exactly what I am looking for.

Ms. Payne.

Ms. PAYNE. Well, Mr. Chairman, first of all, Women First has calculated that DBEs, women and minorities, certified, create about 100,000 jobs annually. So that would be number one. Secondly, for women, in 1988, women were at 1.6 percent nationwide. We are now over 6 percent. So that is the positive. There has been a tremendous increase as far as women participation and the dollars that they have generated.

The negative part is that, in my testimony that I didn't verbally give, but submitted, I called 15 States and talked to their DBE co-

ordinator in every State. Out of those 15 States, 10 got me the information that I needed, and I asked two questions. Question number one was what was your DBE actual achievement goal for 2007 and 2008; and the second thing I asked was what was your 100 percent State funding achievement for DBEs. In every case other than one the DBE Federal program had a goal of between 7 and 12 percent. State was less than 2 percent in most cases, with one exception to the rule.

So that tells you, with the program in place, qualified women-owned businesses and minority-owned businesses can do the work. Here it is being used because it is required. In those areas that are not required, they don't use them, privately or actually public monies if it is a State 100 percent funding, and they don't have a program; and most States do not have a program.

Mr. OBERSTAR. Thank you.

Ms. Cunningham.

Ms. CUNNINGHAM. I don't have the supporting statistics because I was told other people were going to do that, and they have done that very well, but I would like to draw a contrasting analogy, and that is—and I will just use public transit, because COMTO started out as public transit professionals.

In that part of the industry, minorities fund 60 percent of the fares for public transit; African-Americans about 38 percent, Hispanics 18 percent, and then the next group is American Indian and Asian-American. So almost 60 percent of fares are provided by people of color. Add to that the tax base that they support. Then you go around the Country and look at who is sitting behind the steering wheels of the buses and who is operating the railcars. So the impact of minorities in public transportation is significant in just their everyday living. I mean, they have to use public transportation.

But when you look at the firms that are doing business or the folks that are CEOs of those agencies, it is horrendously low. In the employment part, of 1500 major public transit agencies around the Country, less than 40 are people of color. So even the people that are making the decisions about contracts do not look like—they are not women and they are not people of color.

So, that said, I certainly can get you statistics from some of our collaborative organizations—AASHTO, AAPTA. I do not have those statistics today, but I can get them. But the impact of women-and minority-owned businesses I would believe is just as substantial as our use of the systems and the roads.

Mr. OBERSTAR. Thank you.

Ms. Hall.

If you provide information, it need not be duplicative.

Ms. CUNNINGHAM. It need not be? Okay.

Ms. AMY HALL. The DBE program, independent of the inherent challenges and the nature that comes with that, has provided opportunities for myself, as well as other contractors, to participate in an arena in which had historically not seen such participation, and it has allowed people to create jobs and give their employees a quality of life, which they wouldn't have been able to do that prior to the DBE program. So independent of all the challenges we have, the good part of the program is that it gives access. It gives

access for people and for groups of people who primarily and traditionally and historically have not had access.

Mr. OBERSTAR. Those are the answers that we were looking for, the framing of the issue for which I scheduled this hearing, and very instructive. It reminds me of a Haitian expression: [indiscernible]. Behind the mountains are more mountains.

Behind the problem are more problems. And while the language that is in place that we have been discussing during this hearing, making a move toward resolving these problems, there are still some issues yet unresolved.

I am reminded of the first days of the Reagan Administration in 1981, when they were trying to dramatically change the scope and the nature of government, and, in effect, to repeal the great society issue of legislation of the Johnson era, the immediate post-civil rights legislative era. And one after another program David Stockman, Reagan's budget director, said REA has been a success, there is no longer a need for it; we recommend termination of this program. EDA, the Federal Economic Development Administration, has been a great success, there is no longer a need for it. And when one after another proclaimed victory and said we can now erase these programs from the book, without for a moment considering that there was no final victory; there was a job yet to be done and that we had really only made a start on attacking the problem.

We have made a start with the DBE program. We now have to continue it. We have to open wider that door and address these fundamental underlying problems that you have addressed today in this panel and the previous panel. I thank you for your testimony.

The Committee is adjourned.

[Whereupon, at 3:53 p.m., the Committee was adjourned.]

**Statement of Honorable Corrine Brown**
**Full Committee Hearing on Disability Business Enterprises**
**March 25, 2009**

I want to thank Chairman Oberstar for holding this important hearing on the Disadvantaged Business Enterprise Program. I could bring up hundreds of businesses in my district that are benefiting or could benefit from DBE programs.

There should be no question that these programs are critical to ensuring some small measure of fairness in distributing the billions of dollars provided by the federal government each year. In fact, I think we should be doing even more to ensure that minority and women owned businesses are getting their fair share, and I think the upcoming transportation reauthorization is a great place to start.

I often use my grandma's sweet potato pie as an example. We all work to provide the ingredients for the pie, and all that minority and women owned businesses are asking for is a small slice. Majority owned businesses get the rest of the pie, and yet they are still not satisfied.

Minority, women owned, and DBE businesses have to work even harder to get the financing, insurance, and bonding that is needed to run a company and get contracts. And even then they usually end up subcontracting for large prime contractors who send these businesses their scraps so they can fulfill state mandated minority participation goals.

Eight years of Bush Administration policies have destroyed many of the meager provision designed to protect Disadvantaged Business Enterprises, but I am hopeful that with the new Obama Administration we can begin to turn that trend around, and return some fairness and equality to a system that is currently unfair and unequal.

With that, I want to welcome today's panelists. I look forward to hearing how the DBE program has made a positive impact on their business and community, and how we can strengthen and build the program.

**Testimony of the Honorable James Clyburn (D-SC)**

**House Majority Whip**

**At the hearing on**

**U.S. Department of Transportation**

**Disadvantaged Business Enterprise Programs**

**March 26, 2009**

**Before the**

**Committee on Transportation and Infrastructure**

**U.S. House of Representatives**

Chairman Oberstar, Mr. Petri, and members of the Committee, I am honored and pleased to appear before you today. As a former member of this Committee, I know first-hand the significance of the many programs and various matters within your jurisdiction. I am also aware, and stand in awe, of the tremendously positive impact this Committee's work has on our country.

I want to discuss with you today one of those matters that is of great importance and concern not only to me personally, but I believe to our nation as a whole, and that is the issue of effectively confronting historical inequities in our nation's transportation industries. The hearing today is on the disadvantaged business enterprise (DBE) programs authorized by Congress and administered by the Department of Transportation (DOT). As the Committee is aware, the DOT DBE programs apply to airports and surface transportation. They have been enacted by Congress to address historic discrimination against minority-owned firms in transportation and to ensure that minority and women-owned firms have a fair opportunity to participate in contracting opportunities made possible by federal financial assistance.

Mr. Chairman the word "discrimination" is a tough term. It conjures up images of past times and past acts that many people would like to forget. Any discussion of the terms makes many people uncomfortable. In this regard, I am reminded of the debate that ensued when Attorney General Holder observed essentially the same point.

Mr. Chairman and Members of this Committee, although an uncomfortable discussion at times, it is absolutely essential that we—as Members of Congress—and as citizens are willing to talk about the continuing challenges that racial and gender discrimination (and, for that matter, other forms of discrimination) raise for public policy. This Committee has demonstrated on a bipartisan basis its commitment to fairness and to tackling this issue. For this reason I commend you for holding this hearing today.

Mr. Chairman, sometimes I hear pundits (well intentioned and some not so well intentioned) argue that there is no current need for the DOT DBE programs. They reason "that times have changed" and that America is much more enlightened than when the first statutory DBE program was enacted in 1983 during the Reagan Administration. Critics and opponents often argue that the DBE programs are legally or constitutionally suspect. However, despite