# EXHIBIT A-10
# (part 3)

**The Road to Good Jobs: Patterns of Employment in the Construction Industry**

The Transportation Equity Network (TEN) is a coalition of about 300 grassroots organizations committed to making transportation more responsive to poor people, minorities, the handicapped, and other disadvantaged groups. TEN's JOBS NOW campaign is designed to target the jobs from federal and state transportation projects to disadvantaged communities. One year ago, TEN published *The Road to Jobs*, an analysis of patterns of employment of blacks, Hispanics, and women in the construction industry in eighteen metropolitan areas. This report updates and expands last year's report.

Last year *The Road to Jobs* pointed to the great need for decent paying jobs for people who do not attend college. Construction jobs can fill that need. They pay well and offer on-the-job training. Moreover, the looming shortage of skilled construction workers presents an opportunity to employ women, minorities, and other disadvantaged groups without displacing current workers. Last year's report showed, however, that blacks and women are employed in the construction industry at rates far below their employment in the general workforce.

Pointing to evidence of continuing discrimination in the construction industry, *The Road to Jobs* proposed policies that would give excluded groups greater access to construction jobs. *The Road to Jobs* garnered considerable media attention, with articles appearing in a number of newspapers, including USA Today, Detroit Free Press, Albany Times Union, and St. Louis Post-Dispatch. News conferences on the report were held by grassroots members of the TEN coalition in a number of cities, including Detroit, Minneapolis, St. Louis, Albany, and Chicago. TEN's JOBS NOW! campaign has continued to win victories around the nation. The Missouri Department of Transportation (MoDOT) signed agreements with grassroots coalitions in Kansas City and St. Louis committing ½ of 1 percent of federal highway dollars on specific projects to local workforce development. Today, in St. Louis, 59 minorities, women, and low-income persons are employed on the I-64 project because of this agreement. The Michigan Department of Transportation committed to a 4-year, $15 million state policy that will direct transportation funds into local job training. The first class of 80 students just graduated. A TEN affiliate in Minnesota passed a statewide legislation committing the state Department of Transportation to spending the "maximum amount feasible" on local workforce development.

*The Road to Jobs* also found that Hispanic men have established a strong foothold in the construction industry. Generally, this is good news. But, unfortunately, Hispanic men tend to have construction jobs which are less well paid, less unionized, less skilled, and often more dangerous.[1] TEN concluded that it is not enough to open up the construction industry to previously excluded groups; we also must work to improve the quality of jobs in the construction industry. As a result, we have expanded the scope of this year's report to look at job quality as well as job inclusion. Accordingly, we have titled our follow up to last year's report *The Road to Good Jobs.*

**Introduction: The Need for Good Jobs**

There is a pressing need in the United States for more "good" jobs. A good job is one that pays enough to support a family, includes health and retirement benefits, has safe and supportive working conditions, and includes job ladders so that workers can advance as their skills advance. Although the proportion of jobs that pay poverty or near-poverty wages has actually declined, the proportion of good jobs, as defined above, has risen. Workers must now cope with a much more unstable job market. Increasingly, workers face longer periods of unemployment and a growing number of dead-end jobs with poor pay and benefits.

A few decades ago, workers used to spend most of their career with one company, often unionized, and enjoying high job security, a chance to work their way up job ladders, and solid benefits. Good jobs like this are increasingly a thing of the past. Job quality has deteriorated. Between 1983 and 2006 the amount of time a middle-aged worker could expect to spend with the same employer fell by more than one-third.[2] As a recent study put it: "Workers entering the labor force can expect to hold fewer steady jobs, to not often find themselves on a within-company upward career trajectory, and to receive less on-the-job training."[3] The tremendous growth of what one author calls "unjobs" is striking: temporary jobs and outsourcing are two of the fastest growing trends in the American labor market. The proportion of workers who get employer-provided health insurance fell from 69.0 percent in 1979 to 55.9 percent in 2004. During that same period the proportion workers provided pensions fell from 50.6 percent to 45.5 percent.[4] Companies are less committed to their workers than they were even a decade ago.

The problem is especially severe for minorities, women, and those with less than a college education. Between 1973 and 2005 the wages of those with a high school education or less fell significantly in inflation-adjusted dollars while those with college degrees or more enjoyed significant increases. In 2005, one-third of black employees and 25.5 percent of women workers made poverty-level wages, compared to "only" 15.2 percent of white male workers. Women, blacks, and Hispanics are less likely than white men to be provided with health insurance or a pension by their employer. In 2004, for example, only 39.7 percent of Hispanics had employer-provided health insurance coverage.[5]

**Good Jobs in the Construction Industry**

The construction industry offers a supply of good jobs that are increasingly rare in today's job market. Moreover, individuals without a college degree can get construction jobs that pay well, provide clear job ladders, and include health and pension benefits. One of the great advantages of a construction job is that you can "earn while you learn." Apprenticeship programs pay workers as they acquire the skills to move up the job ladder. For single mothers or others who cannot afford to stop working in order to get an education, this is very attractive.

The number of construction job openings is growing, presenting more opportunities for disadvantaged groups to obtain good jobs without displacing current workers. Programs to bring women and minorities into good construction jobs can succeed. As we will see, however, there are two problems with this

optimistic scenario: 1) evidence of continuing discrimination against blacks and women in the industry; 2) a falling proportion of good jobs in construction.

In 2006 the average wage in construction in the United States was $18.29, well above most jobs in the service sector.[6] One reason wages have remained relatively high is that construction is insulated from global competition. Contractors cannot build a new office building or highway in China and then ship it to Chicago. Although skilled construction workers have been hurt by competition from prefabricated components, such as cabinets and windows, it still is basically a labor-intensive industry that relies upon skilled workers to produce one-of-a-kind products adapted to individual sites.

Construction is also a growing industry. It is the only goods producing industry that has enjoyed steady job growth in recent years.[7] The federal government projects annual openings for 245,900 skilled construction workers each year from 2004-2014.[8] These openings are the result of job growth in the industry as well as openings due to retirements and job transfers. The Aspen Institute projects zero growth in the native labor supply in the next twenty years.[9] Realistically, the industry will have to reach out to immigrants, as well as previously excluded groups, such as women and minorities, to meet the demand for construction workers.

Construction is one of the few industries where workers with relatively little formal education can acquire the skills necessary to earn incomes that can support a middle-class lifestyle. The reason for this is that most construction skills are craft skills, learned on the job through formal and informal apprenticeship systems. Many building trades, however, do require basic math skills. Because of this on-the-job training system, construction is one of the few industries today where good jobs are filled by workers advancing up job ladders rather than by educated workers recruited from outside. In banking, schools, and hospitals between 82 and 92 percent of "good" jobs are filled by workers with at least some college; in construction, only 42 percent of "good" jobs go to college-educated workers. [10]

In the construction industry, the most successful job training programs are run by joint union-management apprenticeship committees.[11] Union apprenticeship programs are covered by collective bargaining agreements in each metropolitan area in which a few cents for every hour worked is put into a fund to pay for job training. Each apprenticeship program is run by one of the approximately fourteen building trades (carpenters, electricians, etc.) in each state or metropolitan area. The U.S. Department of Labor registers apprenticeship programs that meet twenty-two basic standards. Each apprenticeship program creates a job ladder from apprentice to journeyman, with hourly wages increasing year by year until the top journeyman status is achieved. The value of the training to an individual worker in the form of higher wages, greater safety, etc. has been estimated at between $40,000 and $150,000.[12]

While many jobs in construction fit the picture described above and are "good" jobs, the proportion of good jobs in construction is declining. After controlling for inflation, construction industry wages fell 17 percent between 1973 and 2006.[13] The percentage of construction workers covered by health insurance is below the national average and the U.S. construction industry has death rates well above those reported for other developed countries.[14] Despite the documented need for almost a quarter of a million new skilled construction workers each year, only about 40,000 workers enter construction apprentice

programs each year and fewer than that graduate each year.[15]

The causes of the deterioration of good jobs in construction are complex but probably the most important factor is the declining union presence. The unionization rate in construction in the U.S. fell from 50 percent in 1966 to only 14.2 percent in 2005.[16] The declining unionization rate has resulted in lower skill levels in construction and lower wages. Even the Business Roundtable, founded in 1972 to oppose construction unions, recognizes that underfunding of job training in construction by open-shop contractors is a serious problem.[17] An association of nonunion firms has been formed to provide training but the research shows that joint union-management apprenticeship programs enroll 70 percent of the apprentices, have higher completion rates, and produce more skilled journeymen.[18]

In short, the construction industry presents an opportunity for disadvantaged groups to gain access to good jobs, lifting up not just individuals but whole communities. This opening is threatened, however, by the declining presence of good jobs in the construction industry. We now turn to how these issues play out in the twenty-five largest metropolitan areas in the nation. Are women and minorities gaining access to construction jobs? Are good jobs in construction disappearing?

**Findings on Job Inclusion**

First, we examined the extent which minorities are employed in the construction industry. We assumed that minorities should be employed in construction jobs at about the same percentage as they are in the general workforce. The percentage difference between the proportion in the general workforce and the proportion in construction we call the "employment gap." A positive number indicates that employment in construction for group in question falls below their participation in the general workforce. A negative number indicates employment at a rate above their participation in the general workforce. (For details about our methodology, see the Appendix.)

**Figure 1: Gap Between Share of Total Workforce and Construction Workforce for Black, Non-Hispanic Workers 2006**




In every metropolitan area we studied, we found a positive employment gap for African Americans (Figure 1). Atlanta had the largest gap (18 percent), followed by Baltimore, Dallas, and Houston. The cities most open to employment by African Americans were Portland, San Diego, and Boston. Portland's employment gap, for example, was less than 1 percent. Overall, we estimate that 137,044 black workers are "missing" from the construction workforce in our twenty-five metropolitan areas. In other words, if blacks participated in construction at the same rate they participated in all industries, thousands of more blacks would be employed in construction.

**Figure 2: Gap Between Share of Total Workforce and Share of Construction Workforce - Hispanic Workers 2006**




The findings for Hispanics are dramatically different. In only three cities (Cleveland, Boston, and Pittsburgh) did Hispanics have a smaller percentage of the construction workforce than the general workforce and even in these cities the gap was tiny. In all the other cities Hispanics had a greater presence in construction than in the workforce generally. Dallas, Atlanta, and Washington, DC all had negative employment gaps of 40 percent or more, meaning that Hispanics were employed in construction at a much higher rate than the general workforce.

**Figure 3: Percent of Construction Workforce that is Female 2006**




The employment goal for women is more difficult to determine. Unlike minorities, many have questioned whether women should be expected to hold the same percentage of jobs in construction that they hold in the overall workforce. The construction industry has many physically demanding jobs, and some question whether women have the physical strength for some jobs or whether women are interested in construction jobs. In fact, construction has changed. In many parts of construction backbreaking labor has been replaced by machines. Women are clearly capable of operating construction machinery and doing most other forms of construction work as well. Recognizing the changing realities of the skilled trades, under the leadership of Secretary of Labor Ray Marshall, the Department of Labor established goals and timetables for the employment of women in construction. In 1980, the Department of Labor raised set the goal that one out of every four apprenticeships, most of which are in construction, should be held by women. We think 25 percent is a reasonable goal for employment in construction.

The exclusion of women from skilled construction jobs has deep historical roots. Skilled construction work has been viewed traditionally as "man's work." As late as 1968, out of 77,151 apprenticeships in construction nationwide, only 2 were held by women.[19] Since then women have made inroads into skilled construction jobs. As Figure 3 shows, however, none of the cities we studied came even close to realizing the 25 percent goal in 2006. The female percentage of the construction workforce varied from a high of 9 percent in Cincinnati to a low of 1 percent in Cleveland. We still have a long way to go.

**Findings on Job Quality**

At the same time that it is important to track the access of women and minorities to construction jobs, it is also important to see if those jobs are good jobs. It does little good to gain access to an industry if the pay is poor, the benefits are inadequate, working conditions are dangerous, and there are few opportunities for advancement. We begin by examining pay in the construction industry in our twenty-five metropolitan areas.

**Figure 4. Average Construction Wage 2004-2007**



As Figure 4 shows, wages in the construction industry vary tremendously from one metropolitan area to the next. The metropolitan areas with the highest wages are Chicago ($27.70), San Francisco ($26.91), and New York ($26.88). The lowest hourly wages are in Dallas ($15.65), Tampa Bay ($15.88), and Houston ($15.99). The average annual construction wage varies from a high of $57,610 in Chicago to a low of $32,540 in Dallas. In other words, whether calculated by the hour or by the year, a construction worker in Chicago makes on average 77 percent more than a construction worker in Dallas.

The difference in wages is huge but of course this comparison ignores the variation in the cost of living across different metropolitan areas. The Living Wage Calculator estimates the minimum pay rate at which an employee can meet basic needs and remain self-sufficient without government assistance.[20] The living wage is based on geographically-specific data on the cost of food, housing, child care, medical care, transportation, and other necessities. Estimates for state and federal income taxes and payroll taxes are also factored into the living wage calculation. These costs are adjusted to reflect the household structure (number and ages of adults and children, and gender of adults in the household). Because the wage is intended to reflect the lowest wage at which the employee can meet basic needs, the calculation of each component includes assumptions that reflect the most likely decisions of low-wage earners. For example, the food calculation assumes that all food will be prepared in the home, and the child care expenditures are based on the lowest costs possible for the selected geography.

**Figure 5. Ratio of Average Construction Wage and Living Wage: 2004-07**



As Figure 5 shows, when you control for the cost of living in different metropolitan areas all of the metro areas provide a living wage for one adult and one child, but some do much better than others. The rankings of metropolitan areas in terms of what the average construction wage can buy are very different. Now, the top metro area in the country is St. Louis, where the average construction wage is 1.78 times the living wage. St. Louis is followed by Chicago (1.69) and Seattle (1.56). The worst metropolitan areas for construction wages are Tampa Bay (1.02) Miami (1.03) and Washington, D.C. (1.05). The cost of living in these metropolitan areas means that a full-time construction wage is barely enough to support a single parent with one child. The main culprit in the case of Washington, DC, which has a fairly healthy construction wage, is the high cost of housing. Areas that were near the top on hourly wage, such as New York, Boston, and San Francisco, fall to the middle or bottom of the pack after the cost of living is taken into account.

**Figure 6. Construction Union Membeership Rate: 2004-07**



Why do some metropolitan areas have much higher construction wages, even after controlling for the cost of living? The main reason is the strength of the construction trade unions. Figure 6 shows that the presence of unions in construction varies tremendously across the country. St. Louis has the highest unionization rate at 41.9 percent, followed by Chicago (39.8 percent), and Minneapolis (31.9 percent). The lowest unionization rate is found in Dallas (1.6 percent), followed by Tampa Bay (2.5 percent), and Houston (4.0 percent).

**Figure 7. Scatter Plot: Construction Industry Union Memebership Rate and Construction Wage /Living Wage Ratio : 2004-07**




Figure 7 shows the relationship between union membership and the ratio of construction industry wages to the living wage. Each dot represents a metropolitan area and the line represents the best fit-correlation between the two variables. The upward slope of the line shows that as the union membership rates increase across metropolitan areas, the effective buying power of the average construction worker also increases. There is a strong relationship between union membership and construction wages. The R-Square statistic indicates that union membership "explains" over 83 percent of the wage variation. Not surprisingly, St. Louis construction workers, who have the highest unionization rate (41.9 percent), also have greatest buying power (78 percent higher than the living wage). On the other hand, Dallas construction workers, who have the lowest unionization rate (1.6 percent), have weak buying power from their wages (just 7 percent above the living wage).

We have not been able to obtain data on benefits and working conditions down to the metropolitan level. We do know, however, that, nationwide, 83 percent of unionized construction workers have employment-based health insurance compared to only 48 percent of nonunion construction workers. Similarly, 71 percent of union construction workers participate in retirement plans, compared to only 21 percent of nonunion workers.[21] Clearly, unionized construction workers enjoy both better wages and benefits compared than nonunion construction workers. Moreover, unions run, with contractors, the best apprenticeship training programs around the country.

We now turn to the profiles of the twenty-five largest metropolitan areas in the nation.

# NYC, New York

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Queens, NY | 7,737,049 | $26.88 | $7.15 | $19.24 |
| New York, NY | | | | |
| Bronx, NY | | | | |
| Kings, NY | | | | |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
NYC, NY 2006




Construction Workforce Distribution by Gender
NYC, NY 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
NYC, NY 2006




Unionization Rates for Construction
NYC, NY 2006



# Chicago, Illinois

**Metro Area Population, Construction Wage, Minimum and Living Wage**

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Cook, IL | 5,288,655 | $27.70 | $7.50 | $16.37 |

**Workforce by Race, Ethnicity, and Gender**







**Living Wage and Unionization Rates**






# Philadelphia, Pennsylvania

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Philadelphia ,PA | 1,448,394 | $23.48 | $7.15 | $17.11 |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Philadelphia, PA 2006




Construction Workforce Distribution by Gender
Philadelphia, PA 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Philadelphia, PA 2006




Unionization Rates for Construction
Philadelphia, PA 2006



# Dallas, Texas

| Metro Area Population, Construction Wage, Minimum and Living Wage | | | | |
|---|---|---|---|---|
| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
| Dallas, TX | 2,345,815 | $15.65 | $5.85 | $14.60 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Miami, Florida

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Miami-Dade, FL | 2,402,208 | $17.39 | $6.67 | $16.84 |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Miami, FL 2006




Construction Workforce Distribution by Gender
Miami, FL 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Miami, FL 2006




Unionization Rates for Construction
Miami, FL 2006



# Washington DC

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| District of Columbia, DC | 3,643,507 | $20.44 | $7.00 | $19.44 |
| Fairfax, VA | | | $5.85 | |
| Arlington, VA | | | | |
| Alexandria city, VA | | | | |
| Prince Georges, MD | | | $6.15 | |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Washington DC 2006




Construction Workforce Distribution by Gender
Washington DC 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Washington DC 2006




Unionization Rates for Construction
Washington DC 2006



# Houston, Texas

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Harris, TX | 3,886,207 | $15.99 | $5.85 | $14.21 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Detroit, Michigan

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Macomb, MI<br>Wayne, MI<br>Oakland, MI | 4,018,969 | $24.39 | $7.15 | $16.43 |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Detroit, MI 2006




Construction Workforce Distribution by Gender
Detroit, MI 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Detroit, MI 2006




Unionization Rates for Construction
Detroit, MI 2006



# Boston, Massachusetts

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Suffolk, MA | 687,610 | $26.64 | $7.50 | $21.63 |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Boston, MA 2006




Construction Workforce Distribution by Gender
Boston, MA 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Boston, MA 2006




Unionization Rates for Construction
Boston, MA 2006



# Atlanta, Georgia

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Fulton, GA | 3,120,040 | $17.26 | $5.85 | $15.40 |
| DeKalb, GA | | | | |
| Cobb, GA | | | | |
| Gwinnett,GA | | | | |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# San Francisco, California

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Contra Costa, CA | | | $7.50 | |
| San Francisco, CA | 3,225,786 | $26.91 | | $21.41 |
| Alameda, CA | | | | |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Riverside, California

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| San Bernardino, CA | 4,026,135 | $20.64 | $7.50 | $17.05 |
| Riverside, CA | | | | |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Riverside, CA 2006




Construction Workforce Distribution by Gender
Riverside, CA 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Riverside, CA 2006




Unionization Rates for Construction
Riverside, CA 2006



# Phoenix, Arizona

| Metro Area Population, Construction Wage, Minimum and Living Wage | | | | |
|---|---|---|---|---|
| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
| Maricopa, AZ | 3,768,123 | $17.05 | $6.75 | $15.77 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Seattle, Washington

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| King, WA | 1,826,732 | $24.26 | $7.93 | $15.60 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Minneapolis, Minnesota

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Dakota, MN | 2,330,314 | $25.71 | $6.15 | $17.19 |
| Hennepin, MN | | | | |
| Ramsey, MN | | | | |
| Anoka, MN | | | | |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# San Diego, California

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| San Diego, CA | 2,941,454 | $22.19 | $7.50 | $19.34 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# St. Louis, Missouri

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Madison, IL | 1,873,913 | $24.23 | $7.50 | $13.61 |
| St. Clair, IL | | | | |
| St. Louis City, MO | | | $6.50 | |
| St. Louis County, MO | | | | |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity St. Louis, MO 2006




Construction Workforce Distribution by Gender St. Louis, MO 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage St. Louis, MO 2006




Unionization Rates for Construction St. Louis, MO 2006



## Baltimore, Maryland

### Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Baltimore, MD | 1,418,750 | $19.70 | $6.15 | $17.40 |
| Baltimore city, MD | | | | |

### Workforce by Race, Ethnicity, and Gender







### Living Wage and Unionization Rates






# Pittsburgh, Pennsylvania

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Allegheny, PA | 1,589,851 | $20.66 | $7.15 | $14.90 |
| Westmoreland, PA | | | | |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Pittsburgh, PA 2006




Construction Workforce Distribution by Gender
Pittsburgh, PA 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Pittsburgh, PA 2006




Unionization Rates for Construction
Pittsburgh, PA 2006



# Tampa, Florida

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Hillsborough, FL | 1,157,738 | $15.88 | $6.67 | $15.62 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Denver, Colorado

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Denver, CO | 566,974 | $19.03 | $6.85 | $16.99 |

## Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity Denver, CO 2006




Construction Workforce Distribution by Gender Denver, CO 2006




## Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage Denver, CO 2006




Unionization Rates for Construction Denver, CO 2006



## Cleveland, Ohio

| Metro Area Population, Construction Wage, Minimum and Living Wage | | | | |
|---|---|---|---|---|
| **County/City** | **2006 Total Population ACS Estimates** | **2007 Average Construction Wage** | **Minimum Wage** | **Living Wage for Adult and a Child** |
| Cuyahoga, OH | 1,616,234 | $21.20 | $6.85 | $14.36 |
| Lorain, OH | | | | |

### Workforce by Race, Ethnicity, and Gender

Percentage of Total Workforce vs. Construction Workforce by Race and Ethnicity
Cleveland, OH 2006




Construction Workforce Distribution by Gender
Cleveland, OH 2006




### Living Wage and Unionization Rates

Living Wage for Adult and Child vs. Construction Wage
Cleveland, OH 2006




Unionization Rates for Construction
Cleveland, OH 2006



# Cincinnati, Ohio

## Metro Area Population, Construction Wage, Minimum and Living Wage

| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
|---|---|---|---|---|
| Hamilton, OH | 822,596 | $19.62 | $6.85 | $13.66 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






# Portland, Oregon

| Metro Area Population, Construction Wage, Minimum and Living Wage | | | | |
|---|---|---|---|---|
| County/City | 2006 Total Population ACS Estimates | 2007 Average Construction Wage | Minimum Wage | Living Wage for Adult and a Child |
| Washington ,OR<br>Multnomah, OR | 1,195,723 | $21.49 | $7.80 | $14.97 |

## Workforce by Race, Ethnicity, and Gender







## Living Wage and Unionization Rates






**Policy Recommendations**

Our nation's infrastructure is crumbling before our eyes. This provides us with a challenge and an opportunity -- the challenge to rebuild America to be strong and more economically competitive and the opportunity to put millions of people to work in the process. We must ensure that at all levels of government our national investment creates good jobs that benefit all members of the community, including women and minorities.

Two new trends give us cause for hope in the years ahead. Congress must consider a new transportation appropriations bill in 2009. If Congress is serious about addressing climate change as well as our decaying infrastructure, the transportation appropriations bill is the perfect place to begin this work. Creating a more diversified transportation system that encourages biking, walking, and greatly increased transit options will both help the climate and provide green jobs. In addition, the incorporation of "green" technologies, products, and practices will open up new and refashioned job opportunities in the construction field. Many of these opportunities will flow from innovative public policy which is focused on environmental sustainability, economic growth, and the equitable distribution of those economic benefits. For example, the wave of Green Buildings Codes in various cities across the country requires buildings to be constructed or retrofitted in line with nationally accepted energy efficiency standards. These regulations provide a stimulus to job creation in the fields of solar paneling, HVAC installation, carpentry, and other fields.

The demand for skilled construction labor is growing. In many regions of the country, the combination of an aging construction workforce and growing demand could lead to crippling labor shortages. Construction companies and unions need to recruit new workers and diversify their workforces if they are to meet future needs. The looming shortage of skilled labor in the construction industry is a crisis, but it is also an opportunity - an opportunity to give everyone a chance at achieving the American Dream. There will be plenty of jobs to go around, and a larger skilled construction workforce will grow all the more important as the United States attempts to address its infrastructure needs, including the repair of existing roads and bridges and responsible investment in new infrastructure.

*Federal Level*

1) **The federal government should increase investment in public transportation. Currently, only about 20 percent of federal transportation spending goes toward public transportation, which has been shown to generate more jobs and build the economy in a more substantial way than spending on highways.**

High gas prices are enough justification for increased investment in public transportation. Whether bus systems, rail systems, or inter-city freight and passenger trains, public transportation demand is rising as people escape congestion and the high cost of driving.

In addition to the benefits to people's pocketbooks, public transportation investments act as engines of economic revitalization and create good jobs. Analysis from the Transportation and Infrastructure Committee of the House of Representatives shows that for every dollar investment in transit, $6.21 is generated in economic activity. Also, a recent PIRG report showed that investment in transit produces nineteen percent more jobs than equivalent investments in road and bridge projects (see: http://www.uspirg.org/home/reports/report-archives/transportation/transportation2/a-better-way-to-go).

**2) Federal transportation law (23 USC 140) allows states to utilize up to ½ of 1% of Surface Transportation Program (federal highway) funds for workforce development. This provision should be made mandatory and extended to all federal transportation projects, including public transit.**

Until recently, only a few states have used the provision that allows ½ of 1 percent of federal highway funds to be utilized for targeted recruitment, training, pre-apprentice programs, and other workforce development initiatives. Recently, grassroots groups have won programs to reserve ½ of 1 percent of federal highway funds for job training programs in Michigan and Minnesota. Illinois is considering an even bigger investment, with work hours also reserved for low-income people, minorities and women through its capital bill, currently before the Illinois Legislature. Grassroots leaders have won community benefits agreements in Missouri as well, reserving ½ of 1 percent of the budget of highway projects for job training and contractor incentives.

The Safe, Accountable, Flexible and Efficient Transportation Equity Act (SAFETEA-LU), which became law in August of 2005, guarantees at least $244 billion in highway and transit spending over a five-year period, from 2005 through 2009. We recommend that the ½ of 1 percent provision be extended to all federal transportation projects, including public transit. If this provision were applied to all SAFETEA-LU spending, it would generate $1.22 billion for workforce development.

**3) SAFETEA-LU included a "Sense of Congress" (Section 1920) that called for state DOTs to "facilitate and encourage" collaboration to "leverage scarce training and community resources and to help ensure local participation in the building of transportation projects." Section 1920 should be made mandatory and extended to all large federal construction projects, including projects by the Department of Housing and Urban Development (HUD), the National Aeronautics and Space Administration (NASA), and the U.S. Corps of Engineers. Implementation of this provision would mean that 30 percent of the work hours on large federally funded construction projects would be reserved for low-income people, ex-offenders, women and minorities.**

4) **Federal transportation law should make repairing existing infrastructure a priority over building new highways that promote more urban sprawl. "Fix it first!" We should also ensure we create complete streets so that everyone can safely and conveniently use the roads, even if they don't have a car.**

The collapse of an interstate highway bridge in Minneapolis placed the issue of decaying infrastructure on the nation's agenda. The American Society of Civil Engineers Report Card for America's Infrastructure gave a grade of D to our roads and a grade of C to our bridges. The federal government should require that states first repair existing roads and bridges before building new roads and bridges. Research has shown that "fix it first" smart growth construction projects generate more jobs than new highways that fuel sprawl. (For evidence on this point, see: www.goodjobsfirst.org/pdf/backintown.pdf.) A complete streets policy would ensure that when the road is reconstructed or repaired, it provides safe access to all who use the road (pedestrians of all ages and abilities, bicyclists, transit riders, as well as auto and truck drivers). This would not only create good jobs, but also provide better access to those jobs for low-income workers who cannot afford a car.

5) **Unions are a very important part of the construction industry, helping to insure that workers are well-trained, adequately paid, and enjoy reasonable benefits. The Employee Free Choice Act has bi-partisan support and will protect the right to organize. We support it.**

Our research shows that metropolitan areas with higher rates of union membership in construction enjoy significantly higher real wages. Nationally, unionized construction workers are much more likely to have health insurance and retirement benefits. Just as important, unions have been shown to run, in conjunction with contractors, the best apprenticeship training programs. Unions benefit not just individual workers but the whole community. By increasing the productivity of construction workers, unions sustain a living wage and decent benefits for workers who can support their families and boost local businesses and the local tax base. According to a poll by Peter D. Hart Research Associates in December 2006, 60 million American workers would join a union if they could. Presently, labor law is tilted against unions. The Employee Free Choice Act would level the playing field so that American workers could make the choice themselves free of any coercion.

6) **The Green Job Act, passed as part of the 2007 energy bill, authorizes $125 million per year to create an Energy Efficiency and Renewable Energy Worker Training Program. The Green Jobs Act is an initial pilot program designed to identify needed**

**skills, develop training programs, and train workers for jobs in a range of green industries. It targets a broad range of populations for eligibility, but has a special focus on creating "green pathways out of poverty." Congress has not yet appropriated any funds for the Green Jobs Act. We support full funding.**

Jobs in the energy efficiency industry – which primarily focuses on weatherizing and retrofitting buildings – are for the most part familiar construction jobs. The Green Jobs Act creates training partnerships that require the participation of unions to support training that results in good jobs leading to economic self-sufficiency. A portion of the funds are directed to partnerships that train people under 200 percent of the poverty line. Although this is a small program, it is an important model to build on as the "green economy" grows dramatically.

**7) Invest in a green economic recovery that targets infrastructure, including building efficiency and mass transit. Pass a Clean Energy Corps to ensure that the work of rebuilding and retrofitting America is done by those who most need work.**

America is suffering through an economic recession, rising energy prices and energy insecurity, and job losses. All of these problems can and should be addressed simultaneously. A recent report from the Center for American Progress and the Political Economy Research Institute demonstrates that a targeted investment of $100 billion – roughly the amount the federal government returned to taxpayers as an economic stimulus earlier this year -- in greening America's infrastructure would create 2 million jobs, many of them in the construction industry. A number of organizations have proposed a Clean Energy Corps (CEC) as a vehicle for this kind infrastructure investment. The CEC would focus on retrofitting America's building stock and creating a skilled workforce which will be more racially diverse than today's. Concentrated in cities and struggling communities CEC would combat global warming, grow local and regional economies, and demonstrate the equity and employment promise of the clean energy economy.

***State/Local Level***

**1) State and local policies like Renewable Portfolio Standards, LEED building standards, Energy Efficiency Resource Standards, and Public Benefit Funds should be passed as a means to create large numbers of new construction jobs, while reducing greenhouse gas emissions and energy costs.**

There are a number of state and local policy tools to ensure the healthy development of energy efficiency and renewable energy markets. These are job creation policies, and far better economic development vehicles than tax giveaways to individual green businesses.

These kinds of job creation efforts can be paired with other policies to ensure that green jobs initiatives are smart and sustainable and pay off for workers and communities. Detailed policy recommendations can be found in the Greener Pathways report, available at: http://www.greenforall.org/resources/greener-pathways-jobs-and-workforce-development-in

**2) State Departments of Transportation (DOTs) should reserve 30% of the work hours on highway and transit projects for low-income people, ex-offenders, minorities and women. State DOTs should encourage the development of local task forces to publicize opportunities in construction and should work with community-based organizations to develop pre-apprenticeship programs to prepare under-represented groups for employment in the construction industry.**

The Missouri DOT (MoDOT) I-64 project in St. Louis is a model for increased construction work hours designated for the target populations. The project has pledged up to $2.5 million towards job training, including pre-apprenticeship programs, as well as contractor incentives for women, minority, and low-income persons, and has reserved 30% of the work hours on the project for these populations. (See http://www.thenewi64.org/new6_workforcedevelopment.jsp.)

**3) Local governments should pass ordinances requiring local workforce development on all large publicly funded construction projects.**

With the help of MORE2, a coalition of churches, Kansas City passed path-breaking legislation on April 26, 2007, which applies goals for hiring minorities and women to all construction firms doing business with the city. City governments around the country are exploring creative ways to insure that local residents benefit from construction in their communities.

**4) Community-based organizations (CBOs) should work to negotiate "Community Benefits Agreements" (CBAs) on large construction projects in their communities that include guarantees for employing local residents, including women, minorities, and low-income people.**

The Alameda Corridor project is a model of how community groups can negotiate a CBA that includes local workforce development. (See Lisa Ranghelli, Replicating Success: The Alameda Corridor Job Training & Employment Program, Center for Community Change, 2002; available at: http://www.communitychange.org/shared/publications/downloads/ACJC%20Replication%20Manual.pdf.)

## Metropolitan Area Profiles

**Metro area core counties included in the construction workforce analysis by race, ethnicity, and gender:**

New York City: Queens, New York, Bronx, and Kings

Los Angeles: Los Angeles County

Chicago: Cook County

Philadelphia: Philadelphia

Dallas: Dallas

Miami: Miami-Dade

Washington, D.C.: District of Columbia, Fairfax, Arlington, Alexandria City, Prince Georges

Houston: Harris

Detroit: Macomb, Wayne, and Oakland

Boston: Suffolk

Atlanta: Fulton, DeKalb, Cobb, and Gwinnett

San Francisco: Contra Costa, San Francisco, and Alameda

Riverside: San Bernadino and Riverside

Phoenix: Maricopa

Seattle: King

Minneapolis: Dakota, Hennepin, Ramsey, and Anoka

San Diego: San Diego County

St. Louis: Madison, St. Clair, St. Louis City, and St. Louis County

Baltimore: Baltimore County and Baltimore City

Pittsburgh: Allegheny and Westmoreland

Tampa: Hillsborough

Denver: Denver County

Cleveland: Cuyahoga and Lorain

Cincinnati: Hamilton

Portland: Washington and Multnomah

## Appendix: Data and Methodology

To examine patterns of employment in the construction industry we used data from the 2006 American Community Survey (ACS). Conducted by the U. S. Census Bureau, ACS conducts a rolling, random sample of housing unit addresses throughout the United States and Puerto Rico. Each year, about 1-in-40 addresses, or 2.5 percent of the nation's population, respond to the survey. The size of the sample permits reasonably accurate generalizations for communities of 65,000 or more. There are more than 60 questions on the American Community Survey. Responding to the survey is required by law. In 2010 the ACS will replace the long form in the decennial census.

For ACS data the residence of individual records can be allocated to a particular Public Use Microdata Area (PUMA). These areas contain about 100,000 people and, like other census geographies, are drawn to contain a more or less homogeneous population to the extent that that is possible for such a large population and area. ACS also includes information on the PUMA in which respondents work, allowing for place of work tabulations, which is what our analysis of discrimination in the construction industry is based upon.

To access the data we relied upon Steven Ruggles, Matthew Sobek, Trent Alexander, Catherine A. Fitch, Ronald Goeken, Integrated Public Use Microdata Series: Version 3.0 [Machine-readable database]. Minneapolis, MN: Minnesota Population Center [producer and distributor], 2004.

Aside from the PUMS and ACS data, additional geographic information was required for the project. In particular, GIS (Geographic Information System) shapefiles were necessary to identify which PUMAs should be used to represent each of the urban counties in our eighteen metropolitan areas. In generating data for the metro areas, core urban counties and urban cities (state of Virginia only) efforts were made to assure that the data represented only the geographic area covering the county – no more and no less. However, it is sometimes not the case that the PUMAs and counties have consistent boundaries, such that a county is made up of exactly one or more PUMAs. Thus, in cases where a PUMA intersected (or "straddled") the boundaries of a geographic unit for which data was desired, that PUMA had to be either included or excluded from the calculations. The decision of whether to include or exclude the PUMA depended on the number of "completely contained" PUMAs that fell within the geo-area in question: if the area already had at least two completely contained PUMAs – making accurate calculations for the area possible – then the straddling PUMA was left excluded while if the area had one or fewer completely contained PUMAs residing within it, then the straddling PUMA was included and any additional counties falling outside of the geo-area in question but inside the straddling PUMA were noted in the outputted data for the geo-area. Finally, for geo-areas composed of exactly one PUMA, only that one PUMA was used in making the necessary calculations.

Labor force calculations were based on the variable which reports, for individuals working in the county or counties under examination, whether or not they were in the labor force at the time of the survey, and if they were in the labor force, whether they were employed or unemployed. All calculations were restricted to those who were in the labor force and employed at the time of the survey. Individuals were identified

as being in the construction occupation based on the variable which gives for each individual reporting an occupation based on the six-digit SOC code starting with "47". We eliminated the less skilled and less well paid category of "helpers" (47-3000) and laborers (47-2961) from our analysis of construction jobs. Any individuals reporting an occupation of "unemployed" were also omitted from the occupational calculations, along with those reporting that they were "not in the labor force" or "unemployed" at the time of the survey.

To calculate the proportion of the total workforce or the construction industry that was of a particular race or ethnicity any respondent reporting Hispanic descent was coded into the Hispanic category, while all others were placed into either the non-Hispanic white, non-Hispanic black, or Other (also non-Hispanic) categories. The gender composition of the construction industry is the percentage of the workforce in the county who were females. Note that our analysis is based on the jobs located in the county, not on construction workers who happen to live in the county.

## Endnotes

[1] Paul M. Goodrum, "Hispanic and Non-Hispanic Wage Differentials: Implications for United States Construction Industry," *Journal of Construction Engineering and Management*, July/August, pp. 552-559; Paul M. Goodrum and Jiukun Dai, "Differences in Occupational Injuries, Illnesses, and Fatalities Among Hispanic and Non-Hispanic Construction Workers." *Journal of Construction Engineering and Management*, September 2005: 1021-1028.
[1] Peter Gosselin, *High Wire: The Precarious Financial Lives of American Families* (New York: Basic Books, 2008), p. 116.
[1] Chris Benner, Laura Leete, and Manuel Pastor, *Staircases or Treadmills: Labor Market Intermediaries and Economic Opportunity in a Changing Economy* (New York: Russell Sage, 2007), p. 4.
[1] Lawrence Mishel, Jared Bernstein, and Sylvia Allegretto,*The State of Working America 2006/2007* (Corrnell University Press, 2007), pp. 135 and 138.
[1] *Ibid.*
[1] Center to Protect Workers' Rights, *The Construction Chart Book: The U.S. Construction Industry and its Workers*, 4th ed. (Silver Springs, MD: Center to Protect Workers' Rights, Center for Constructoin Resarch and Training, December 2007).
[1] Jeff Grabelsky, "Construction of De-construction? The Road to Revival in the Building Trades," *New Labor Forum* 16 (2), 2007, pp. 49-60.
[1] Daniel Hecker, "Occupational Employment Projections to 2014," *Monthly Labor Review*, November, 2005, pp. 70-101.
[1] Aspen Institute, *Grow Faster Together or Grow Slowly Apart: How Will American Work in the 21st Century* (Aspen Institute, 2002); as cited in Robert Giloth, "Full Employment and Local Workforce Politics and Policies," in *Economic Development in American Cities*, edited by Michael I. J. Bennett and Robert Giloth (State University of New York Press, 2007), p. 2.
[1] Pablo A. Mitnick Matthew Zeidenberg, *From Bad to Good Jobs? An Analysis of the Prospects for Career Ladders in the Service Industries* (Center on Wisconsin Strategy, 2007). Mitnick and Zeidenberg define "good" jobs as jobs paying more than $12.60 an hour in 2000.
[1] Robert W. Glover, Donald W. Long, Carl T. Haas, and Christine Alemany, *Return-on-Investment (ROI) Analysis of Education and Training in the Construction Industry* (Center for Construction Industry Studies, 1999).
[1] Bruce Nissen, *Training for the Workforce of the Future: Advantages and Disadvantages of Using Registered Apprentices in Two County GOB Projects* (Research Institute on Social and Economic Policy, Florida International University, 2006).
[1] Center to Protect Workers Rights, *op. cit.*
[1] Center to Protect Workers Rights, *op. cit.*
[1] Cihan Bilginsoy, "The Hazards of Training: Attrition and Retention in Construction Industry Apprenticeship Programs," *Industrial and Labor Relations Review* 57 (1), 2003, pp. 54-67.
[1] David Weil, "The Contemporary Industrial Relations System in Construction: Analysis, Observations and Speculations," *Labor history* 46 (4), 2005, pp. 447-471; and Center to Protect Workers Rights, *op. cit.*
[1] Business Roundtable, *Confronting the Skilled Construction Workforce Shortage: A Blueprint for the Future* (Business Roundtable, 1997).
[1] Glover, et al, *op. cit.*
[1] Robert W. Glover, "Apprenticeships: A Route to the High-Paying Skilled Trades for Women? In *Job Training for Women: The Promise and Limits of Public Policies*, edited by Sharon L. Harlan & Ronnie Steinberg (Temple University Press, 1984), p. 277.
[1] See [illegible]; accessed September 18, 2008.
[1] Center to Protect Workers Rights, *op. cit.* Both figures refer to production workers, not supervisory employees.

Harry E. Mitchell

Statement of Rep. Harry Mitchell
House Transportation and Infrastructure Committee
3/26/09

--Thank you Mr. Chairman.

--Today we will examine the U.S. Department of Transportation's Disadvantaged Business Enterprises program (DBE).

--DBE was first established by regulation in 1980 as a minority and women's business enterprise program, and later statutorily authorized in 1983.

--As we prepare for reauthorization of SAFETEA-LU this year, it is important for us to examine DBE, and determine what changes, if any, may be necessary.

--I look forward to hearing for our witnesses.

STATE OF CALIFORNIA—BUSINESS, TRANSPORTATION AND HOUSING AGENCY ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF TRANSPORTATION**
DIRECTOR'S OFFICE
1120 N STREET
P.O. BOX 942873
SACRAMENTO, CA 94273-0001
PHONE (916) 654-5266
FAX (916) 654-6608
TTY 711

*Flex your power!*
*Be energy efficient!*

March 4, 2009

Dear Transportation Construction Community:

The California Department of Transportation (Caltrans) has just received conditional approval from the Federal Highway Administration (FHWA) to immediately implement its Federal Fiscal Year (FFY) 2009 Disadvantaged Business Enterprise (DBE) Goal and Methodology. The 2009 Goal and Methodology provides for a 6.75 percent race-conscious goal and a 6.75 percent race-neutral goal for an overall 13.5 percent program goal.

With the recent enactment of the American Recovery and Reinvestment Act (ARRA) of 2009 and the increase in transportation contracting opportunities it will bring, the urgency for Caltrans to implement contract goals has heightened. The conditional approval requires Caltrans to submit to FHWA the additional requested information to support its decision to make no upward adjustment to the FFY 2009 goal. The conditional approval also requires Caltrans to submit monthly status reports on its use of contract goals beginning March 31, 2009.

FHWA has indicated that failure to implement the overall goal and contract goals could result in the imposition of sanctions authorized by 23 Code of Federal Regulation (CFR) section 1.36. Those sanctions may include withholding federal funds, withholding approval of projects, or other action FHWA deems appropriate under the circumstances.

By March 30, 2009, the Division of Engineering Services and the Division of Procurement and Contracts will begin including an appropriate DBE race-conscious goal to include African American, Asian-Pacific American, Women, and Native American businesses, in the advertised contracts for federally funded projects. These four groups together will be referred to as Underutilized Disadvantaged Business Enterprises (UDBEs). The race-conscious goal established for each contract will be based on the subcontracting opportunities it provides and the availability of UDBEs. At this time, Hispanic American and Subcontinent Asian American businesses are not included in the race-conscious portion of the program. However, use of these businesses does count toward meeting the race-neutral portion of the goal and the overall goal. I encourage continued use of these groups at current levels in order to avoid the necessity of adjusting the goals as time goes on.

Implementation of the race-conscious component of the DBE program applies to Local Agencies as subrecipients. Caltrans will advise regional and local partners to begin implementing DBE race-conscious goals on federally funded projects within 90 days.

Caltrans will continue its commitment to the application of race-neutral measures as before. They include, but are not limited to, providing technical assistance, one-on-one counseling, training, and direct referral of DBEs to prime contractors through the California Construction Contracting Program and the memorandum of understanding with the California Community Colleges Chancellor's Office. More information can be found on the Web site at http://www.buildcalifornia.org.

Caltrans will also implement its Communication Plan to advise the DBE firms, community organizations, industry/trade associations, and California Legislators that Caltrans has conditional approval to implement the race-conscious component of the overall DBE goal. To broaden business communication and outreach, the Caltrans' Office of Business and Economic Opportunity will have information and the schedule of public forums on its Web site at http://www.dot.ca.gov/hq/bep. In addition, Caltrans staff will work with business groups such as the City-County-State-Federal Cooperative Committee, Caltrans Statewide Small Business Council, Associated General Contractors of California, Engineering and Utility Contractors Associations, Southern California Contractors Association, and American Council of Engineering Companies on the implementation of their program revision.

I thank you for your patience and understanding during the last year while Caltrans operated under race-neutral measures. If you have any questions regarding this announced change in the DBE program, please contact Robert Padilla, Disparity Study Project Manager, at (916) 324-0552, or by e-mail at robert_padilla@dot.ca.gov.

Sincerely,

Will Kempton

WILL KEMPTON
Director

c: Walter Waidelich, Division Administrator, Federal Highway Administration
Rick Land, Chief Engineer, California Department of Transportation
Robert Padilla, Disparity Study Project Manager, California Department of Transportation

ELEANOR HOLMES NORTON
DISTRICT OF COLUMBIA

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
SUBCOMMITTEES:
CHAIRWOMAN
ECONOMIC DEVELOPMENT, PUBLIC BUILDINGS, AND EMERGENCY MANAGEMENT
AVIATION
WATER RESOURCES AND ENVIRONMENT

**Congress of the United States**
**House of Representatives**
**Washington, D.C. 20515**

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM
SUBCOMMITTEES:
FEDERAL WORKFORCE, POSTAL SERVICE, AND DISTRICT OF COLUMBIA
* COVERS DISTRICT OF COLUMBIA ISSUES

COMMITTEE ON HOMELAND SECURITY
SUBCOMMITTEES:
TRANSPORTATION SECURITY, AND INVESTMENT PROTECTION
EMERGENCY COMMUNICATION, PREPAREDNESS, AND RESPONSE

**March 26, 2009**

**Congresswoman Eleanor Holmes Norton Statement at the Transportation and Infrastructure Committee Hearing "The Department of Transportation's Disadvantaged Business Enterprises Program"**

The Disadvantaged Business Program and Airport Concessions Disadvantaged Business Program are designed to remedy discrimination against minority and women owned businesses in airport related industries. The DBE and ACDBE programs are fair, effective and constitutional and above all, they are needed. We are all aware that despite enormous progress in the battle against discrimination, there is a great deal more that must be done to level the playing field for minority and women owned businesses.

The Congress receives enormous amounts of information about the ongoing problems of discrimination. Some of this information comes to us through formal channels like hearings and official reports, and some comes directly from our constituents. I looked through testimony submitted for the stimulus hearing on January 22, 2009 and the hearing on the FAA Reauthorization on February 11, 2009. I noticed that just during those two hearings we received twenty-one different studies from every region of this nation including: Alaska, Arizona, Colorado, Florida, Illinois, Kentucky, Maryland, Minnesota, Missouri, North Carolina, New Jersey, Tennessee, Texas, and Washington State. Each of these studies is a little bit different but each one contains detailed statistical and anecdotal evidence of discrimination against minority and women owned businesses in airport and transportation industries. These studies are also interesting in that they use different methodologies and approaches – and yet they each come to the same conclusion: discrimination is having a strong negative impact on minority and women owned businesses in every corner of this country. Together, these studies show that discrimination impacts women and every minority group including: African Americans, Hispanic Americans, Asian Americans and Native Americans. And finally these studies make clear that discrimination impacts minority and women owned businesses at many different points in the contracting process. It impacts credit, bonding and insurance. It impacts the contracting and bidding process itself. It impacts the working environment for minority and women owned businesses. In sum, discrimination is pervasive.

NATIONAL PRESS BUILDING
529 14TH STREET, N.W., SUITE 900
WASHINGTON, D.C. 20045
(202) 783-5065
(202) 783-5211 (FAX)

2136 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, D.C. 20515
(202) 225-8050
(202) 225-3002 (FAX)
(202) 225-1904 (TDD)
www.house.gov/norton

2041 MARTIN L. KING AVENUE, S.E
SUITE 300
WASHINGTON, D.C. 20020-5734
(202) 678-8900
(202) 678-8844 (FAX)

PRINTED ON RECYCLED PAPER

All of this evidence illustrates how needed the DBE and ACDBE programs are. As a constitutional lawyer, I will tell you that this voluminous record makes clear that there is a very strong basis in evidence for Congress to pursue efforts to remedy discrimination. I believe this evidence also makes clear that we need to strengthen and expand the DBE and ACDBE programs. For instance, we need to make sure that the personal net worth cap on DBE and ACDBE eligibility has not been so eroded by inflation so as to be counterproductive. We also need to ensure that there is uniform training for the officials who certify DBEs and ACDBEs so that the program is efficient, effective and focused on helping the minority and women owned businesses that we need to. Finally, I hope that my colleagues will join me in examining whether there are ways we can expand the application of this program beyond the AIP program. The DBE program works and has been found to be facially constitutional by every federal circuit court that has examined it since the Supreme Court's decision in Adarand. Let's build on that success, respond to the volumes of evidence of discrimination, and do everything we can to level the playing field.

**OPENING STATEMENT**
**THE HONORABLE JAMES L. OBERSTAR**
**FULL COMMITTEE HEARING ON**
**THE DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISES PROGRAM**

**MARCH 26, 2009**

Today, the Committee will evaluate the Department of Transportation's ("DOT") Disadvantaged Enterprises ("DBE") Program. The DBE program was established through a series of legislative initiatives to remedy past and current discrimination against minority and women-owned businesses to ensure that they are provided equal opportunity to compete for DOT-assisted highways, transit and airport contracts.

Major infrastructure investments such as those in aviation and surface provide substantial sources of revenue to local construction and engineering contractors. For too long, disadvantaged and minority-owned businesses were unable to secure portions of these large contracts due to high barriers to entry in the sector, and were unable to compete with larger firms bidding to participate in these projects. That is where the need for the DBE program came in.

In 1983, Congress established a national 10 percent aspirational participation goal for firms certified as DBEs with respect to surface transportation programs,

airport federally-assisted contracting (i.e., procurement, construction, or professional services contracts), and airport concessions.

DOT regulations require recipients of federal financial assistance --state and local transportation agencies and airport operators -- that anticipate awarding prime contracts of more than $250,000 to establish an annual aspirational DBE participation goal that reflects what DBE participation would be in the absence of discrimination. A recipient's goal is aspirational only; quotas and set-asides are generally not permitted.

Importantly, recipients are required to use race-neutral means to meet as much of their overall goal as possible, such as providing assistance in obtaining bonding or financing, unbundling large contracts to make them more accessible to small businesses, or conducting informational programs on contracting procedures and specific contract opportunities.

However, if a recipient is unable to meet its overall DBE participation goal through race-neutral means, then the recipient must establish contract goals (which are deemed race conscious) for DBE participation. This means that the recipient has determined that without the use of race-conscious measures, minority and women

business owners would not have an adequate opportunity to participate in DOT-assisted contracts.

The DBE program has faced a number of legal and legislative challenges, and I am proud to say that the program has been able to withstand those challenges. In 1995, the U.S. Supreme Court ruled, in *Adarand v. Peña* that race-conscious programs were subject to a "strict scrutiny" standard of legal review. The ruling required that all affirmative action programs be "narrowly tailored to serve a compelling governmental interest," that of addressing discrimination. In response to the Supreme Court's decision in *Adarand*, the DOT issued new regulations to ensure non-discrimination in the award and administration of DOT-assisted contracts, and to assist firms owned and controlled by minorities, women, and other socially and economically disadvantaged persons have the opportunity to grow and become self-sufficient. Since *Adarand*, every federal court that has reviewed the DOT's DBE program has found it to be constitutional.

The Committee has also received volumes of evidence, both empirical and anecdotal, about the discrimination that continues to impact minority and women business owners across this nation.

This data demonstrates that it is difficult for small and disadvantaged businesses to compete—discrimination impacts minority and women owned businesses at many points in the contracting process, including obtaining credit, bonding, and insurance. By expanding access to federal contracts, minority owned small businesses are provided the opportunity and the aid needed to overcome the large barriers to entry they face in entering the marketplace.

Over the past two decades, the Committee on Transportation and Infrastructure has supported the continuation of the DBE program in the reauthorization of its transportation programs and we must work to continue and strengthen these programs as we reauthorize both the aviation and surface transportation programs this session.

I thank each of the witnesses for taking the time to be with us today and I look forward to your testimony.

STAR CONCESSIONS

# The Statement of Gilbert Aranza
# CEO, Star Concessions, Ltd.

## At the hearing on:

## The Department of Transportation's Disadvantaged Business Enterprise Programs

**Thursday, March 26, 2009**
**11 o'clock am**

**Before the Committee on Transportation and Infrastructure of the United States House of Representatives**

**James L. Oberstar, Chairman**

Good Morning. My name is Gilbert Aranza, and I am the CEO of Star Concessions, a 100 percent, minority-owned, certified DBE based in Dallas, Texas. I would like to thank Chairman Oberstar, Ranking Member Mica, and the distinguished members of the Committee for providing this opportuntity to present testimony.

Star Concessions, Ltd. ("Star") is the umbrella for a group of companies that operate food, beverage, retail and convenience store/service station concessions in airports. Star operates facilities out of Dallas/Fort Worth International Airport (DFW) and Dallas Love Field Airport (Love Field).

I am very pleased to be here today and to have the opportunity to testify about the Federal Aviation Administration's (FAA) Airport Concessions Disadvantaged Business Enterprise (ACDBE) Program. I strongly believe that I would not have received many of the opportunities I have had without the help of this program and other federal and local minority business programs. The fact is, while we have made progress in this country against racial and ethnic discrimination, a great deal remains to be done. Discrimination against minority-owned companies is still very common and very damaging. Even though many large, majority-owned companies advocate diversity, I truly believe that they would not make room for minority-owned companies without programs like the ACDBE program.

After the City of Dallas moved to single member council districts in 1991, the new city council, which included more minorities, moved aggressively to increase the number of minority contractors doing business with the city at every level. In 1995, I won the food and beverage concession contract at Dallas Love Field Airport. My competitors were four rather large companies, one being the former food and beverage concessionaire the preceding 37 years. Certainly, it made a huge difference that my company had excellent credentials and the ability to deliver the national brands the city wanted; but even though we were highly qualified, I do not believe that I would have won the contract without the push to be inclusive from the City Council and the DBE program. Since then, there have been numerous incidents I could cite that have contributed to my belief; that if it weren't for the ACDBE and other federal programs, airports and majority-owned companies would not provide opportunities for minorities and minority-owned companies to participate in the program. I don't say this because I believe the leaders of major companies are bad people, but I know from first hand experience that many of these companies do not view diversity as something that is good for business and good for the bottom line.

It is important to realize that discrimination impacts minority businesses in many different ways. Four areas in which I think discrimination continues to have a particularly negative impact are: 1) minorities are often denied traditional sources of financing; 2) minorities are excluded from business associations and networks; 3) discrimination by suppliers and other private companies; and 4) enduring stereotypes and bias.

**Discrimination in Capital Markets and Financing**

I can tell you that a minority-owned business has incredible difficulty obtaining regular bank financing. I am in the food and beverage industry, which already makes getting financing

difficult. The problem is compounded by operating in an airport where you don't own the physical space and are subject to a system that does not easily negotiate with its tenants. The reality is that banks are not open to doing business with minorities. Some banks won't talk to minorities at all. Others have learned to be polite over the years, but, at the end of the day, they have no interest in financing minority-owned businesses.

If a minority-owned firm manages to get a loan, it is almost always at a higher rate. For instance, I might be able to get 15 or 16 percent money, where a majority player might be able to get 7 or 8 percent money. I've been lucky with some banks, but 90 percent of my financing comes from lenders that are chartered by the federal government to work with small businesses and, specifically, minority small businesses – like lenders chartered by the SBIC program.

When obtaining capital is harder, it takes longer to get started – even when you are as driven as I am. I had trouble with financing right from the start. When I came back to Dallas as a young lawyer and tried to borrow money, race was absolutely a factor in my not being able to obtain loans. I can tell you that my Anglo counterparts – who didn't go to the same caliber of schools I went to – had no trouble borrowing money. I played the game the way it was supposed to be played and went to the University of Texas at Austin and Harvard Law School. Everyone always says, "If you get a good education, it makes all the difference." And I agree, a good education is important – but it didn't prevent my race from making it difficult to obtain financing.

**Discrimination in Business Networks**

I wish I could report that the Good Ol' Boy Network no longer exists, but I am afraid that I run up against it all the time. Conventional wisdom in Texas is that students who go to one of the state's flagship schools, like the University of Texas or Texas A&M, and stay in Texas usually find a built-in network of people with whom they can do business. It is the equivalent of graduating with a diploma and an advantage. However, I went to the University of Texas at Austin (UT Austin), and it hasn't benefited me professionally in the same ways it has benefited many non-minority graduates.

Let me give you an example. I joined the Young President's Organization, which is a fairly exclusive club in Dallas. The membership is comprised of people who run companies with revenues of 10 to 20 million before the age of 40. I qualified for that group in 1993, and I had to go to a number of meetings and events in order to be admitted. The first two times I was there, I had to listen to a white male telling racist jokes. I almost refused to continue. As it turns out, the white male telling the jokes was the Chair of the DFW Airport Board. Fortunately, this was before I had submitted any proposals to DFW International Airport.

During the time I was seeking admission, I was the only brown person in the Young President's Organization. There were no Blacks. I can tell you that less than a third of the members would shake my hand. They just walked by and ignored me. They constantly tried to bait me by saying derogatory things about immigrants and bilingual education. I was surprised when I was finally admitted. There were times I wanted to quit, but I made myself stay because groups like the Young President's Organization are very important for developing business connections and

relationships. In the early days, at holiday parties, I was the only brown person there other than the wait staff. It's amazing to remember how many members asked me to get them drinks.

**Discrimination by Suppliers and Other Businesses**

One of the biggest problems that minority entrepreneurs have to deal with is discrimination by other businesses. While the airports and other public or semi-public entities have laws and regulations enforcing equal opportunity, private businesses do not. This leaves room for a lot of discrimination. In recent years, I have had an inside view of how things work in large majority-owned companies. For instance, I served on a diversity-oriented board for a major company. To his credit, the CEO told those of us on these boards, "I want you to make life difficult for our leadership because they don't understand the importance of diversity." I was on that board for eight years. I saw the inner workings of the company's leadership. In some ways it is hard to fault them because they were trying hard when so many others weren't, but, the fact is, they were mostly white and male. We made some progress. When we started, the minority component of senior leadership for the company was very small. It was better when I left, but that progress did not come easily. Whether it was hiring more minority suppliers or employees, there is still more that could have been done.

Supply pricing is another problem. When I opened a convenience store at DFW, the prices I was getting from one of my suppliers were outrageous. He tried to convince me that he was giving me his "mom and pop" pricing. I finally had a pretty honest conversation with him, the result of which was that he started giving me prices that made sense. Honestly, I wasn't sure if that was the way he dealt with minorities or if he was only that way with people he didn't think were experienced enough to challenge him on his pricing. Either way, the result was the same. As a result of discrimination, minority business owners are more likely to be less experienced and therefore they end up being charged higher prices.

Another example I can think of involved a beer distributor that served the Dallas area. All of the local distributorships are owned by Anglos. The owner of one distributor made it a point to come to me, welcome me and ask if there was anything he could do for me. That was terrific and that guy deserves lots of credit. Then there was the counter-example. Another distributor's salesman simply ignored me. Over the years, the difference in service between the two became more and more evident. Eventually, I phased out my use of beer from the non-responsive distributor. I took it off tap and removed all their signage. One day the man who owned the distributorship was flying through Love Field and noticed none of his beer or signage in my stores. He made his way to my office at Love Field and asked why I wasn't selling any of his beer. I told him it was because the representatives from his company weren't responsive and pretty much ignored me. The next thing I knew he was my best friend. I sell their beer now, but it is hard to forget how they initially treated me.

I have decided that I want to do business with the people who behave in a proper manner toward minorities. I am pretty confident that most of my suppliers deal with me and think, "Oh, he is just a minority," but, at this point, I think I am getting favorable pricing from most of them. It's not because they all of a sudden decided they like Hispanic or Black people. It's because they know I can hurt them by not selling their product. Do I think for a minute that these people

would otherwise go out of their way to do business with minorities? Absolutely not! But with me, they don't have a choice – in part because of the DBE program and in part because those of us who were given a fair shot under those programs have now succeeded in such a way that we have to be dealt with fairly. Yet, I have no doubt that if the DBE program disappeared, many of these large, majority-owned firms would stop doing business with minorities all together.

**Enduring Stereotypes and Bias**

Even though many people want to believe that we now live in a colorblind or "post-racial" society, we don't. Just recently, a distributor came into one of my stores and demanded to speak to the owner. He was rude and dismissive, and, based on his tone, I knew it hadn't even entered his mind that the Hispanic guy in front of him might be the owner. I told him, "You are talking to the owner," and I stopped doing business with that company.

It's important to understand that even past discrimination impacts today's minority business owners. If you are old enough to be a successful business owner today – assuming you didn't just inherit a successful business – then you were in college and professional school and getting your early work experience several decades ago. I suspect that even though I was fortunate enough to go to some very good schools, my early work experience was very different than the experiences of my white competitors.

The year I got my first job at a law firm, I had to interview with all 42 attorneys at the firm. I guarantee you that young, white lawyers did not have that same experience. One of the lawyers who started working for the same firm as me, who graduated the same year I did and was white, flat out told me that he believed I had taken his place at Harvard Law School. His implication was that I had somehow "stolen" his spot through affirmative action. He wasn't the only one. Another associate said his friend graduated at the top of his class at another law school and that I had taken his friend's space at Harvard. I'm the type of guy who usually just perseveres and pushes this stuff down, but I went back to those guys and gave them copies of my transcripts and my resume and said, "Here, see if you can beat me. Take this and look at it and tell me if you can compete with me."

There were other problems with that first law firm job. When I started there, the firm actually had clients who refused to work with me because I was Hispanic, but I have to give credit to the senior partner. He called me into his office and told me what the clients had said about me. Then he said that he told them they were either going to work with me or they could find another law firm. That is the type of leadership we need more of in business and professional environments. I was the first minority hired and the first minority to make partner at a major law firm in the city of Dallas.

**My Success Benefits Others**

To the extent that I have been successful, I have practiced what I have preached. Minority business owners do more to hire and mentor other minorities. I know I do. I have African American partners in most of my businesses at the airports. I don't have to do it. I am already 100 percent minority-owned. I do it because it makes good business sense and it's the right thing

to do. I am not sure that non-minorities in my position believe it is either the right thing or the smart thing to do.

My employees are 40% Hispanic, 30% Black, 30% Anglo, and many of them are female. I have a pretty diverse management team, and they come into contact with a lot of people who are Anglo, and I stress to everybody that we don't tolerate discrimination at any level in this organization. My success means that I can have a zero tolerance policy for discrimination. I teach my employees they do not have to put up with being mistreated. If I hear that an Anglo route man has disrespected one of my minority managers, I will terminate that relationship. I won't put up with it. They need to send me someone who will be respectful of all of my employees if they expect to continue doing business with me.

When I became a Pizza Hut franchisee in 1993, I got a call from the General Counsel of Pizza Hut. He wanted to see me because they were in a position where they would not have had any Hispanic franchisees in the U.S. So they engaged the U.S. Hispanic Chamber of Commerce, and my name was at the top of the list, primarily because of my Dallas area restaurants. The president of Pizza Hut toured all of my restaurants. He asked me how it was possible that I had so many Black, Hispanic, gay and female managers. I told him, "If I don't do it, no one else will." And I really believe that. So if you come to my organization today, I probably have more African American and Hispanic American general managers than any other businesses of comparable size or larger.

The fact is, fostering diversity and making money are not conflicting goals. It is good for business, but you have to believe it is important and you have to do the work. Anglo business owners just aren't getting the job done. I think that creating a level playing field that will allow more minority-owned businesses to succeed is a critical part of accomplishing that goal.

**Conclusion**

I am very supportive of the DBE program and other programs that assist minority business owners. If it were not for the DBE program and the SBIC program, there is no way that I would be where I am today.

That said, there are ways that these programs could be improved. In the current economic climate, minority businesses need more and better access to credit and venture capital. In addition, I believe that there are ways that airport staff could be more helpful in working with DBEs that are not big players or who don't have the expertise of large corporations. A little bit of help and advice could go a very long way. For instance, large companies know to pick the best locations in order to increase their chances of getting customers, but a minority business just starting out might not know how to do that and could not afford a consultant to help. I think the airport staff could help a lot with things like that.

I am grateful for the opportunity to share my experiences with you and for your support of these crucial programs. I would be happy to take any questions you might have.

# Testimony

## U. S. House of Representatives
## Committee on Transportation
## and Infrastructure

### The Department of Transportation's
### Disadvantaged Business Enterprise Programs

**March 26, 2009**

**Katherine M. Cloonen**
**President and Owner**
**JK Steel Erectors, Inc.**
**9184 W. Rt. 17**
**Bonfield, IL 60913**

**815-933-3739**

**JK Steel Erectors, Inc.**

KATHERINE M. CLOONEN
W.B.E. CERTIFIED
9184 W. Rte. 17 • Bonfield, IL 60913
PH (815) 933-3739 • FAX (815) 933-3708

The Honorable James Oberstar
U. S. House of Representatives
Chairman
Committee on Transportation and Infrastructure
Washington, D.C. 20515

I am the president and owner of JK Steel Erectors, Inc. I started the company in 1991 with funds I had saved to purchase a house. We specialize in rebar and wire mesh installation in concrete and structural steel erection for transportation, commercial, industrial, and public works projects. My employees are union ironworkers around the Joliet, Illinois area. I have six full time employees and up to thirty employees in the construction months. The geographical area we cover is the area south and west of Chicago, Illinois. Our mission is to provide quality work to the prime contractors with safety, efficiency and expediency.

JK Steel Erectors is certified as a Disadvantaged Business Enterprise with the Illinois Department of Transportation (IDOT) and the Women's Business Development Center of Chicago (WBDC). I was certified by IDOT in November, 2000, after being in business nine years.

This testimony will be on three issues:

1. The positive difference the D. B. E. program has made
2. The discrimination I have faced
3. Why the Disadvantaged Business Enterprise program needs to remain

**The difference the D. B. E. program has made** since being certified is that my sales increased dramatically. Prior to being certified with IDOT, JK Steel averaged sales just over one half million dollars annually. My sales after being certified with IDOT have averaged approximately two million dollars annually. My clients numbered about sixteen prior to being certified, and now, JK Steel has been a subcontractor for about thirty-five IDOT prime contractors due to the certification. Before being certified, there was a lack of opportunity. Very few prime contractors used me. I was limited to a very small geographical radius and could not expand. I could not get my foot in the door. Even when I sent a bid, they did not use me because I did not have the credibility. It was very tough to get prime contractors to believe that I actually was running a company of iron workers. The only contractors that would hire me were the ones that already knew me and my foremen. In many cases, smaller companies are not given a chance by the larger companies unless they are certified as a D. B. E.

Certification helps JK Steel, and companies like mine, increase in size. Once we are in the program, we have more opportunity to perform larger jobs, and we have a better ability to obtain loans, get bonding, and make larger equipment purchases.

The certification has given JK Steel Erectors exposure. Many prime contractors see our trucks on worksites and the JK Steel name on lists. This alone has solicited bid opportunities. Being certified does not guarantee a job, but it does open doors. I still have to be low bidder, but once I have had a chance to work for a company, they usually ask me to bid again because of the quality of workmanship.

**Discrimination** has been, and still is, a factor for women and minorities in the construction business. I will illustrate a few examples. One company called, and instead of giving me an invitation to bid, the man asked If I wanted to make more money and gave me an invitation to a meeting to sell health and beauty products for a pyramid company. I told him that if I had to sell this company's products in order to be a subcontractor for him, I would not do it. I have not done business with the company since then.

Another instance of discrimination is that there are companies that will not do construction business with a female. After having tried unsuccessfully to do business with a local contractor, I sent one of my male employees to negotiate the job and be project manager. When the owner understood that I had the day to day control, he never asked me for another quote.

Often I will get a call asking for the person in charge of estimating. Sometimes, when I answer that I am that person, the caller hangs up the phone. Occasionally the person says that he wants the boss or the man in charge. When I say that I am the boss and the man in charge, I still hear a "click" on the other end of the line.

When I first started business, in addition be being called "Honey," by the union business agents, I was not taken seriously when I called for iron workers from the hall. If they sent men, they sometimes sent the worst possible workers. It took years, and the IDOT certification, for the local union to understand that I was running the company.

Men can stop for a beer after work, play golf, or go fishing, all in private, to do their networking. A woman has to be very careful where she is seen, particularly with another man. Furthermore, it needs to be in a public place. Women are not afforded the networking opportunities that men are allowed. Of the female social entities with which I am involved, not ***one*** member is a general or prime contractor. This is not to say that all contractors discriminate against female contractors, however, without the D. B. E. program, many prime contractors just would not hire me.

**The Disadvantaged Business Enterprise program needs to remain in the department of transportation.** In order to get certified by IDOT, I had to prove all my capabilities, including showing them that I could tie rebar. Even though I am now certified, I have to prove myself on a job to job basis. I am only as good as my last job. On all IDOT projects, we are rated in several categories. It is not enough that the State of Illinois says I am qualified to do the work. I have to be low bidder for the steel and rebar on the project. We have to perform the work in a timely manner, according the prime contractor's schedule. We must do the work safely, with quality, in accordance with the IDOT specifications. Additionally, I am required to submit all of the certifications, all weekly and monthly equal employment opportunity reports, all other required documentations, and all of the correct invoices before I can begin to get paid. I am responsible for the quality of work of JK Steel Erectors, and I am responsible for several people's wages, benefits and tax burdens.

Small companies, such as mine, add workforce and quality of life to our communities. Small businesses, including women and minority owned businesses, are the driving force in the United States economy. In today's world of construction, companies are forced to merge into larger companies. It is vital that as the big companies merge, the smaller companies, such as the D. B. E. companies, remain to help fuel the

local communities. This is particularly true of areas away from the urban regions where there is still a lack of true diversity.

For a prime contractor to suggest that I am not qualified to run a steel company because I am female is absurd. The fact is this ideology still exists. If women and minorities were not a part of the D. B. E. program, our companies would not get jobs just because some contractors feel that we are incapable of running a construction company on a day to day basis. Our businesses would take a backward step to the struggles of where we were before we were certified. We are not asking for an entitlement. We are simply asking for the opportunity to bid and receive projects without bias.

I am grateful for the D. B. E. program. Being certified with IDOT has given my company credibility. I am a director on the board of Associated General Contractors of Illinois, I serve on the Iron Workers' Mid-America Pension Plan, and I am a trustee on the Iron Workers' Local 444 Joint Apprentice Training Committee of Joliet. I am chairman of the Kankakee Area Contractors iron worker negotiation committee. These appointments would not have happened without the D. B. E. program.

In conclusion, I have given testimony as to the difference the D. B. E. program has made. I have furnished examples of discriminatory practices, and I have provided reasons as to why the D. B. E. program should remain a part of the department of transportation.

Thank you very much for your time and consideration.

Sincerely,

Katherine M. Cloonen

Katherine M. Cloonen
President
JK Steel Erectors, Inc.

People's TRANSIT

# The Statement of Chuck Covington
# President and CEO of People's Transit

## Before the Committee on Transportation and Infrastructure Of the United States House of Representatives

**James L. Oberstar, Chairman**

**At the hearing on:**

**The Department of Transportation's Disadvantaged Business Enterprise Program**

**Thursday, March 26, 2009**
**11 O'Clock am**

Good morning Mr. Chairman and members of the Committee. My name is Chuck Covington and I am the President and CEO of People's Transit in Detroit, Michigan.

My company provides employee shuttles, campus shuttles and general ground transportation. My vehicles provide numerous high-tech amenities like public address systems, DVD players, and flat screen televisions that make them rolling conference rooms. We currently do work at the Detroit Metropolitan Wayne County Airport also known as DTW and for many private corporations in Michigan and other states. My company is certified as an MBE, DBE, SDB and an 8(a) firm.

I am here today to talk about why the continuation of the Airport Disadvantaged Business Enterprise (DBE) and Airport Concessions Disadvantaged Business Enterprise program is so important. The fact of the matter is, despite all the progress this nation has made on issues of race discrimination, there is still a lot of work left to do. Small and minority businesses are truly the backbone of this country. Without programs like the DBE program, big business would steamroll over us. And perhaps that is some of the behaviour that has landed out country in the economic trouble it is in today. It certainly hasn't been small and minority businesses that have brought our nation's financial system to the brink.

I have dealt with discrimination my whole life – and I still deal with it all the time. Sure, it is different these days. Most of the time I don't hear racial slurs anymore – but the discrimination is there all the same. In some ways, I think that I – and other business owners like me – start to simply ignore a lot of the discrimination we observe. If we responded to every slight and every biased person, we would never get any work done. So we ignore most of it.

Still, every so often something happens that you just can't ignore. One very recent example will help you understand what I mean. Early last year, in 2008, one of my employees came to me with a quote on new tires for part of my fleet – coincidentally this was for a part of the fleet that I use at the airport. Apparently, the tire supplier wanted to charge me more than $613 apiece for 16 new tires. Since I have been around the business a while, I suspected that price was too high. Just to check my instinct, I called a friend, a white business associate who works in the same field, and asked how much he paid for the same tires from the same vendor. My friend told me that he had only paid $400 per tire for the same tires for the same type of vehicles.

Now I had known the $613 price was high – but even I was surprised at how much more this supplier was charging me than he was charging my friend. My employee who obtained the original quote is African-American and had what might be described as an ethnic sounding voice. I put on a white voice and called the tire supplier. And sure enough, I got the $400 price. Once I got the new price, I inquired a bit more as to why my employee had been given such an inflated price. Let's just say that while the supplier said a lot of words – not one of them made sense or provided any justification for a 50% increase in the price of the tires.

It is important to understand what this sort of mark-up in supplies means to a small business owner like myself. A 50% mark up on one of the most basic supplies in my business puts me at an incredible competitive disadvantage. I know you all know that the business climate is tough out there. And believe me, it has been tough in Michigan for a long time now. NO businessperson, no matter how talented can succeed if they are paying a race-based mark-up on supplies. I know my competitors do not have to make so many extra calls to verify price before they buy tires – nor should I.

This is not an isolated incident and yet, I am not bitter or cynical. I think that to be an entrepreneur, you have to be an optimist. You have to be willing to accept five No's before you get one Yes. And yet I still wonder how many of the "No's" I have received were based on the color of my skin as opposed to the quality of my product.

Some other examples are important. The fact is that I am still asked to do more than some of my non-minority competitors to obtain business loans. Despite my success, and my reputation in this community, I, like many other minority business owners, am always required to give a personal guarantee for business loans and to put my personal assets at risk to finance business expansion. I do not believe that is always the case for my majority counterparts. And of course, as an African-American, I do not have a long history of family wealth.

It is also important to understand that even those of us who have accumulated some wealth, for instance in our homes, have had a harder time doing that than similarly situated white entrepreneurs. We all know that there is housing discrimination. I remember earlier in my career, looking for a new apartment. I called and learned that there were vacancies but when I showed up, I was told that all of the apartments had been rented. I knew what was going on, but just to confirm my suspicions, I had my white secretary call and inquire about the same apartments. She was told they were still available.

Why does housing discrimination matter to minority businesses? Especially housing discrimination that happened some years back? Because for many minority businesses today, our homes represent our best source of collateral for credit to develop and expand our businesses. Given Congress' investigation in to mortgage discrimination, you know that we minorities tend to pay higher mortgage rates. And of course, discrimination in business lending also exists. Many of the studies that have been submitted to this committee about discrimination against minority business detail the significant disparities in access to business loans. As long as housing and lending discrimination persist, it will negatively impact opportunities for minority business owners.

And despite the progress we have made as a nation, bigoted people still exist and some of them are in positions of power. Not so very long ago, I was involved in a court case. I had been awarded a multi-million dollar contract as a prime and had subcontracted out a portion of the work to a white firm. When the contract came up for renewal, I decided not to use that same subcontractor any more. That company sued me, I guess because

they thought that I should keep them as a subcontractor permanently regardless of whether I was happy with their work or whether the arrangement made good business sense. We resolved the case to our advantage and I later hired one of the majority firm's vice presidents away. That gentleman told me that during the course of the trial he had been in the hallway outside the courtroom and had heard the CEO of the majority company say that he never believed that, and I quote, "that nigger and his Jew lawyer" would take the case so far.

I want to be clear here: I don't lose sleep when an ignorant person calls me an ugly name. But when I do hear a racial slur, either spoken to me or behind my back, it tells me a lot about how steep my climb is in business. The slur says nothing important about me, but it tells me a lot about the person that used it. When a competitor or a prime contractors refers to me as a nigger – even behind my back – it gives me a window on just how stacked the deck is and how much harder I have to work than a majority business owner.

Another thing that stacks the deck is racial discrimination in business networks. Some people call these "Good Ol' Boy" networks. I like to call them the "comfortable networks." I know that breaking into these networks is essential for the success of my company. But it is a lot easier said than done.

I know that some people think that programs like the DBE program result in hiring "unqualified" minority firms. My experience has been very different. In fact, I have seen situations in the private sector, where no DBE program was in place and unqualified, or at least unprepared, majority firms were hired over me. For example when a Mall in our community needed a shuttle service to move retail employees from the shopping mall to outlying parking lots during the Christmas season, they hired a non-minority firm that was unable to fulfil their contractual obligations. My drivers frequently had to manage the prime contract and fill in gaps when the prime company's shuttle drivers did not show up. The non-minority business wound up subcontracting part of the work out to me at the same price that I had originally quoted the mall. In the end, I essentially performed the contract anyway and so I can't help but wonder whether the majority company that initially got the work did so because they were part of the "comfortable network." Clearly I was more qualified, my price was fair. In the end I had to clean up the problems the majority contractor caused. So why didn't I get the contract right from the beginning? I believe it has to do with networks.

Sometimes we minority companies get relegated to projects that have goals, or projects that are minority-focused in some way. Still, even in those cases, majority contractors sometimes still get the work. Recently, I submitted a bid for a contract to provide transportation for a minority business event. It was ultimately won by a non-minority firm. Later, the non-minority firm wound up leasing the vehicles from me and once again, it was at the same price I had originally bid. Now I highly doubt that this firm was doing the project for free which must mean they bid more than I had bid and still they won the contract. If the bidding process is entirely based on choosing the individual who submits the lowest bid and is best equipped to do the job, shouldn't the contract

have gone to me from the outset? I was clearly better equipped than the non-minority owned company that received the contract so if my bid was lower, why didn't I get the contract outright? I think the answer can be found in the "comfortable network."

One way that I have found to both serve my community and establish new business relationships is to serve in public service roles in my hometown, Van Buren Township, Belleville, MI, and with different civic organizations including: the Water and Sewer Commission; the Cable Commission; the Public Safety Committee; and the Local District Financing Authority. Although I no longer serve on the Planning Commission, I was once its Vice Chairman.

I understand that people do business with the people they like. But how do you get to know these people? The Eagles Club is one of the primary places that successful business people in my area network, and where the aforementioned civic organizations hold fundraisers. But it has an unwritten rule: African-Americans cannot be members. I have served on a number of boards and panels that hold functions at the Eagles Club, and I have attended many of them. But I can't be a member. I have served my community in both public and private positions and it sickens me that there is a club--in my community--that would exclude me and my daughters -- as members because of our race. But the fact that it impacts my ability to conduct business is reprehensible. If people do business with the people they are comfortable with, and if I am denied opportunities to sit down and get to know people--based on nothing more than my race--it automatically puts me and my business at a disadvantage.

People say they want minorities to succeed and to be competitive, but how can I be competitive if it costs me more to do business than an equally qualified, non-minority competitor? All of these things--the discrimination in lending, being banned from social clubs, being charged higher prices by vendors--they all add up to increase our chances of failing. And all of this makes it all the more important that we maintain the DBE program.

Still, it is important to know that just preserving the DBE program doesn't finish the job of levelling the playing field – there is more we can do. Along those lines, I hope that the Committee will consider making some needed improvements to the DBE programs. First of all, thank you, Mr. Chairman for the provisions already included in H.R. 915 that will help improve certification training and finally make long overdue adjustments for inflation in the Personal Net Worth Cap. These are vital changes and we appreciate your work to make sure they happen. I would also like to strongly urge the Committee to extend the DBE program to airport expenditures with both TSA funds and PFC funds. The discrimination that DBEs face is not limited to projects funded by AIP – it exists throughout our industry. For that reason, we should ensure that DBE-type requirements attach to TSA and PFC funds as well.

In closing, I want to thank you again for the opportunity you have given me to speak here today. Given the discrimination minority businesses face, even today, we need

opportunities that the DBE program provides. Without them, we would never have a chance and we, as a nation, would lose.

I would be happy to take any questions you might have.

March 26, 2009

COMTO Moving the Nation

**Testimony on the US DOT DBE Program**

by Julie A. Cunningham, President & CEO

Conference Of Minority Transportation Officials

Opening Remarks

Mr. Chairman and members of the Transportation & Infrastructure Committee, let me first say thank you for conducting hearings on this very critical issue.

It is an honor to be here today to represent the Conference Of Minority Transportation Officials (COMTO). Our organization is celebrating thirty-eight (38) years of service, as a voice for the transportation community and today we are the only multi-modal association for minorities in all of the transportation industry. Because of the legacy of inequity of employment and business for minorities within the industry, our mission - which is as relevant today as ever - remains constant – to level the playing field in transportation for individuals, businesses and communities of color.

Our ever-increasing membership spans thirty-nine (39) urban cities across the United States and includes individuals, public transit agencies, airports, state DOTs, private businesses, academic institutions, other not-for-profit organizations and last, but certainly not least, small and disadvantaged business enterprises on whose behalf I speak today. I am pleased that several of our member DBE firms and supporters have traveled from around the country to be with us today.

As you know, COMTO has been at the forefront of this issue for quite some time.

COMTO's advocacy on behalf of DBEs has received national recognition:

- We were awarded the Department of Transportation's DBE Advocate of the Year in 2006.
- We partnered with the DOT and published a CD on DBE methodology for federal grantees.
- For the last 2 years, we have conducted Title VI training workshops across the country on behalf of the DOT. The training components in these workshops includes information on DBE goal setting, the certification process and fraud detection, to name a few
- We also are a member of the DOT DBE Roundtable, which meets on a quarterly basis at the DOT HQ.

When the Wahlberg Amendment threatened the DBE program in 2007, it was COMTO that made our voices heard throughout the U.S. and here on Capital Hill to thwart what could

have resulted in a chilling effect on the DBE community. The amendment would have systematically denied access to competition for DBE firms. Our chapters across the country petitioned their congressional representatives, and we met with Congressman Olver to ensure the voices of the DBE community were heard. We were effective. We thank Chairman Olver for his great support.

As a voice for the industry, collaboration is a key part of our strategy. We partner with other national industry organizations and stakeholders including the Airport Minority Advisory Council, American Public Transit Association, American State Highway & Transportation Officials, Transportation Equity Network, and the Women's Transportation Seminar to ensure and advocate access and opportunities for the small and disadvantaged business enterprise.

Earlier this month in partnership with Patton Boggs law firm, COMTO hosted a very well received, Transportation Summit, to develop strategies and recommendations for the new administration to discuss strategies for a ready-to-go and sustainable workforce. It was an excellent session and our summit white paper will be available to you in the next few days.

Just as with employment in the transportation industry, we believe redressing past and ongoing discrimination, with regard to contracting and business opportunities for minority and women owned firms is still a critical issue, as well as for veteran and service-disabled veterans.

<u>Why DBE Program is Relevant Today?</u>

Congress enacted the DOT DBE program to address the problem of discrimination against businesses owned by minorities and women in federally-supported transportation contracting. Over the years, the program has helped provide opportunities to thousands of businesses. Unfortunately, despite advances, more than two decades later, discrimination is still a serious problem. Disparity and other studies have documented well the ongoing problems faced by DBEs, including the:

- use of antiquated "old boy networks,"
- exclusion of DBEs from business opportunities,
- discrimination in credit lending, bonding and insurance,
- attempts to induce DBEs to act fraudulently as "fronts;"
- and discriminatory application of procurement and contracting rules.

Mr. Chairman, as both you, Majority Whip Clyburn and other members of Congress have shared with the COMTO Membership during our annual Transportation Braintrust , the battle that was fought to include the DBE Provision in the TEA-21 legislation was no less fierce over 10 years ago, than it is today. In 1998, the program's inclusion was the topic of very strong debates in both the House & Senate - both had amendments on the floor to either dismantle or neutralize the DBE Program. In the House, the amendment failed by a vote of 194-225. The program goals remained intact and charged doing all of the following:

- remedy past and current discrimination against disadvantaged business enterprises

- ensure a "level playing field" in which DBEs can compete fairly for DOT-assisted contracts,
- improve the flexibility and efficiency of the DBE program, and
- reduce burdens on small businesses.

Most of the opponents of the DBE program in Congress claimed that the DBE Program was an unconstitutional, illegal and racist program compromised of set asides and quotas. Contrary to these comments, the DOT DBE Program has proven to be a constitutional and legal program compromised of flexible, aspirational goals.

The landmark case ***Adarand v. Mineta,*** finally ended when the US. Supreme Court concluded that the DBE program is constitutional as long as the strict scrutiny standard was achieved. There have been other federal cases as well, that have upheld the facial constitutionality of the DBE programs.

So, I don't believe I need to spend much time arguing that the program is still relevant and that the playing field is still not level; but I would rather take a few minutes to offer solutions and briefly outline necessary and crucial improvements to the existing program.

Problems With the Current DBE Program

Earlier this week, I held a teleconference with a number of our DBE members and talked with other stakeholders and transportation professionals who have (or had in the past) the responsibility for running state DBE programs. I also visited with a Senior Partner at Booz Allen Hamilton, a COMTO business member, strong DBE advocate and as you know, one of the country's largest consulting firms. The overlying theme of these discussions was consistent regarding necessary and crucial improvements to the existing program. There were six (6) reverberating issues:

1. Need more specific language in the RFPs (issued by federal grantees) to ensure the integrity of "good faith efforts." Currently there are no teeth in "good faith efforts" and there is far too much inconsistency from agency to agency. For COMTO and its members, challenges remain in the process of goal setting, the DBE certification process, DBE eligibility requirements, and the usefulness of the UCPs in terms of streamlining and opening up more potential opportunities for contracts in federally funded transportation projects across the country.

   **COMTO recommends** that the DBE program is supported with increased federally-funded vigilance, including education, training, outreach, compliance, and enforcement mechanisms, which would be steadfastly evident and achieved in more measurable ways.

2. Uniform Certification Program (UCP): The DOT DBE program was a catalyst for the establishment of Unified Certification Programs (UCP) in each state across the country. The UCP was designed to help facilitate and streamline certification of disadvantaged businesses through a 'one-stop shop' concept. As of 2008, all 50 states had established

UCPs. However, there is currently no national database or central repository for this vital data.

**COMTO recommends** that Congress exercise greater oversight regarding compliance with this program reform. Further, to enhance best practices and consistent results, **COMTO recommends** that Congress require greater reciprocity of DBE certifications nationally. Further we encourage DOT to collaborate even more closely with other federal agencies such as the Small Business Administration, Department Of Labor and the Department of Veterans Affairs.

3. Cumbersome and Time Consuming Certification Process: As noted above, while some progress has been made with regard to DBE program certification, additional efforts to streamline the process are needed to reduce unwarranted burdens on DBE firms or applicants, and on certification officials. The current DBE eligibility and certification process is often unnecessarily cumbersome and burdensome. Even though the DOT DBE program is governed by a single set of federal rules, the information requested by one certifying entity is, far too often, not the same information required by another (both as to content and form of the information).

   **COMTO recommends** that Congress, require by statute, that all certification officials undergo formal, structured training and be tested and accredited. In this way, Congress can promote the consistent and fair interpretation and application of program eligibility rules. **COMTO further recommends** the establishment of a technology-based, unified DBE certification process that is clearly standardized with compliance reviews, to ensure consistency throughout the participating entities and national outreach.

   Mr. Chairman, COMTO applauds the mandatory certification training provisions included in H.R. 915 the Federal Aviation Administration Reauthorization Act. We urge you to include similar provisions in the surface transportation programs as well.

4. Need for More Aggressive and Consistent Compliance Monitoring of the DBE Program: **COMTO recommends** that Congress mandate the General Accounting Office (GAO) to commission a report on the current status of the Department of Transportation DBE/ACDBE program and to provide the critical information necessary to understand its impact when implemented, according to its mission, as was completed in June of 2001. COMTO welcomes the opportunity to support this effort.

5. Ongoing Congressional Oversight**:** Regarding the ongoing problem of discrimination in the transportation industry, **COMTO recommends** that Congress reauthorize the DOT DBE programs (in those instances where reauthorization is required) and retain the minimum national aspirational 10% DBE/ACDBE participation goal. **COMTO further recommends** that the DBE participation goal be made applicable not only to federally-funded transportation projects, but also to all programs or projects authorized by SAFETEA-LU and the AIP program (including, for example, airport projects funded with federally-approved "passenger facility charges"). Additionally, **COMTO recommends** funding for the establishment, maintenance and monitoring of a national

DBE/ACDBE program to ensure its success. This inclusive initiative will require additional compliance requirements and there will be a need to allocate funding to perform the required tasks.

6. Development of a National Mentor-Protégé Program. **COMTO recommends** the creation of outreach opportunities in collaboration with federally-funded transportation entities to connect prime contractors with DBE firms across the country. **COMTO further recommends** the creation of a web-based DBE opportunity clearing house, where transportation agencies post potential opportunities for DBE firms. COMTO is taking the lead with this effort and will discuss further with Secretary LaHood when we meet for our initial strategy session on April 1st.

COMTO Disadvantaged Business Enterprises-The Golden Nuggets

During President Obama's transition,, I had the opportunity to serve in the transition process on the DOT Agency Review Team and saw first-hand that what this nation is faced with is about more than bricks and mortar, concrete and steel.

This issue is more than just contracts, constructions and costs; it is clearly about the future of our nation's workforce. This is about people.....this is about jobs. Too often we forget that the golden nuggets of our industry are the people who participate in the DBE program and the thousands upon thousands of others who work for the DBE firms. DBEs are the force that will spur the stimulus projects.

COMTO DBEs firms touch the full spectrum of projects, offering everything from engineering services to advanced technologies to traffic engineering; to professional services for legal, real estate and capital investments. They are suppliers that provide goods and services to the industry. They run the gamut from the very established business to the start-ups which are poised to partner in a mentor-protégé relationship. We have, as members, the only minority owned manufacturer of heavy-duty brakes and clutches for trucks, buses, trains and power equipment (based in Miami, FL); we have the only minority owned railway engineering services firm (based in Jacksonville, FL) and we have one of the largest minority owned firms whose primary business is to lay track.

So, we must take into consideration that our reason for being here is not just a DBE issue – this is also a workforce issue. As we all know, small businesses hire 70% of the workforce. DBEs are the engines of our economy in transportation, now more than ever before.

Last week, I was in St. Louis facilitating stakeholder meetings on behalf of the Missouri DOT for the new Mississippi River Bridge. Construction of the bridge is scheduled to begin in the fall. There were probably 150 people in attendance – most of them principals or employees of DBEs from both sides of the Mississippi River – St. Louis, MO and East St. Louis, IL, which has an unemployment rate of 14.9%.

Stakeholders......the people who live and work on both sides of the river – wanting to contribute to the building of something new and exciting in their community; wanting a fair

chance to play their part to help our economy recover; wanting some of the business and some of the jobs of building that bridge that will impact their community, wanting to employ their families and the people in their community.

In the St. Louis region, there is a group known as Gamaliel Foundation – which is a consortium of 400 faith based organizations. Members of Gamaliel are quick to tell you that President Barack Obama learned and perfected his community activism through Gamaliel. They have been at the forefront in both Missouri and Illinois advocating for a level playing field for DBEs, as well as for women, minorities and the economically disadvantaged looking to be employed in the heavy highway construction industry. DBEs employ the people in their community. If you want the community to take pride in ownership, let them take part in the building process. Let them contribute to their own livable community.

An effective DBE program makes it easy to support the economic recovery program. Recently Secretary LaHood said:

> *In a very short time, your cities will be humming with construction workers, engineers, maintenance crews and many others. You'll see roads repaved, interchanges improved and bus and rail systems repaired, upgraded and expanded.*

Well, I submit to you and the members of this committee, Mr. Chairman, that along with that melodious hum, needs to be the sweet chorus of our nation's DBE firms and then we can add the harmonies of a DBE firm's project manager, and the civil engineer, and the carpenter, and the administrative staff....

That's what will enhance the humming that Secretary LaHood referred to – the continued investment of human capital. With the kind of chorus I am describing, we can enhance our nation's infrastructure, decrease discrimination and harness the power of ALL our nation's people and businesses to get our economy back on track. The members of COMTO stand ready to do our part.

Conclusion

Collectively, we all – COMTO, our members, the Congress, both the private and public sector and our DBEs – have a tremendous responsibility to facilitate change in an industry that does not always benefit those from whom it benefits.

To dismantle or neutralize the existing DBE program will result in a very chilling effect against minorities and women who have been demonstratively under-represented in federally funded transportation contracts across this country.

In closing, allow me to share a quote from President Barack Obama:

> *Our economic dependence depended on individual initiative. It depended on a belief in the free market; but it has also depended on our sense of mutual regard for each other, the idea that everybody has a stake in the country, that we're all in it together and everybody's got a shot at opportunity.*

Mr. Chairman, COMTO applauds the efforts of the T&I Committee to protect the DBE program and we support your efforts to advance inclusiveness in transportation.

Thank you for the opportunity to testify here today. I would be happy to take any questions you might have.

AGC of America
THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA
Quality People. Quality Projects.

Testimony of

Amy Hall
Member of DBE Task Force
Associated General Contractors of America
President, Ebony Construction Co
Sylvania, Ohio

Presented to the

Committee on
Transportation and Infrastructure

on the topic of

US Department of Transportation's
Disadvantaged Business Enterprise Program

March 26, 2009

The Associated General Contractors of America (AGC) is the largest and oldest national construction trade association in the United States. AGC represents more than 33,000 firms, including 7,500 of America's leading general contractors, and over 12,500 specialty-contracting firms. More than 13,000 service providers and suppliers are associated with AGC through a nationwide network of chapters. Visit the AGC Web site at www.agc.org.

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA
2300 Wilson Boulevard, Suite 400 • Arlington, VA 22201 • Phone: (703) 548-3118 • FAX: (703) 837-5407

Mr. Chairman and Members of the Committee thank you for the opportunity to present testimony on the US Department of Transportation's (DOT) Disadvantaged Business Enterprise (DBE) program. I am Amy Hall, the President of Ebony Construction Company, located in Sylvania, Ohio, representing the Associated General Contractors of America. AGC is the oldest construction association in the country representing contractors that build all forms of infrastructure, including: highways, bridges, transit systems, railways, airport terminals and runways, water and wastewater treatment facilities, underground utilities, public buildings, multi-family housing, office buildings, military facilities, water resource projects, energy production and conservation, and the many other structures that are the backbone of the US economy and provide and ensure US Citizens' quality of life.

Ebony Construction Company is a second generation family owned business that operates in Ohio, Michigan and Indiana. Ebony is an asphalt paving and milling business. We work primarily as a subcontractor and mostly on publicly funded contracts. Ebony is a certified Disadvantaged Business Enterprise. My comments will focus on how the US DOT DBE program is administered by the Federal Highway Administration (FHWA) in the Federal-aid Highway Program, and by state DOTs.

Stepping back for just a moment, I'd like to briefly address the basic premises of the program, because both this program and its many state and local counterparts have been the subject of much litigation. Today, it is well beyond dispute that the DBE program is subject to "strict scrutiny" and will survive judicial review only if Congress has a "compelling interest" in continuing it.

No industry as large, diverse and fragmented as the construction industry is entirely free of discrimination. In 2005, this highly fragmented industry had 778,000 firms and 6.8 million paid employees. In the same year, ninety-two percent of construction firms had fewer than 20 employees; only one percent of construction firms had 100 or more employees; and the average construction firm had fewer than 9 employees. In 2007, construction spending totaled $1.14 trillion, or 8.2 percent of GDP. Among these thousands of firms and millions of employees conducting such a huge proportion of the nation's business, there are certainly some bad actors.

The vast majority of the men and women who work in the construction industry are good people. They provide both honest and critical services to the nation, and for their hard work, they accept modest compensation.[1] The construction industry is part of the larger society that it serves, and no doubt, it has many of the same problems, but it manifests discrimination no more than any other segment of our society. AGC is working to foster a business climate that enhances opportunities for all businesses.

Construction is an intensely competitive industry, and that competition penalizes any firm that resorts to discrimination. To succeed, construction firms have to focus on price, quality and reliability. Most public and many private owners continue to use the traditional design-bid-build system to deliver their construction projects. And most public owners remain subject to legal requirements for open competitive bidding. Such requirements typically include a publicly announced deadline for the submission of sealed bids, the public opening of such bids, and contract award to the lowest responsive and responsible bidder. Such a process precludes public

---

[1] Each year, the Construction Financial Management Association (CFMA) conducts a financial survey of the construction industry. According to that survey, construction firms' net earnings margins before income taxes averaged 2.7% in 2007 and 3.9% in 2008.

owners from engaging in unlawful discrimination. And the resulting pressure on prime contractors makes it necessary to select subcontractors based on experience, price and quality. The contracting community, the states and the agencies have concerns about the interpretation of many DBE program requirements. The DBE program has been evolving over the years with many changes. Practices that were encouraged by the Federal government and state governments are no longer acceptable. Many program requirements are contradictory or ambiguous when applied to real life scenarios. There is not uniformity in the way the states handle the program's various requirements. We in the business feel that there is a sincere interest in making the program work, but in many cases contractors and many government employees are not sure how to ensure compliance with elements of the program today. Some of this uncertainty may be due to the lack of compliance guidance and other problems reside in the implementing regulations.

The uncertainty felt in how to interpret elements of the rules poses a real concern for contractors. Not only did it lead to disputes in operations on the job site, but also because stepping over the line can lead to suspension, debarment and Federal prosecution. Any of these penalties can, at the very least, put a company out of business. AGC wanted to address the real concerns about the DBE program. There was a desire to come up with common language that could be applied in everyday life. As a result, AGC requested a meeting with then- Federal Highway Administrator Mary Peters, then-DOT Inspector General Ken Meade and other DOT representatives to discuss how to make the program work better. The result of the meeting was the creation of an industry-government work group to:

- Identify contradictory, inconsistent or ambiguous DBE program requirements.
- Clarify the intent and administration of these various requirements.
- Create guidance to communicate these clarifications.
- Determine the most expeditious method for getting these clarifications implemented.

AGC's goal was to find a way to create a template that could help the industry navigate this complex regulation. After this industry-government work group met for over three years, the end result was a document that we called a "toolkit" which is intended to help contractors comply with program requirements. A copy of the "toolkit" is attached to my testimony. AGC believes the document is very helpful in clarifying for all parties involved in this program how the requirements are intended to be implemented. We believe it is important information for contractors, DBE subcontractors, state DOT officials, and frankly for FHWA personnel as well.

However, after three years of meeting on what we all agreed were contradictory, inconsistent or ambiguous DBE program requirements and completing the "toolkit", DOT informed us that they could not endorse the document. Unfortunately that renders the document useless for contractors as a compliance document. Contractors and DBEs must have confidence that decisions they make related to program compliance are based on some official guidance from DOT. Simply saying that the issues are covered in the regulations does not fully explain how they should be applied in real world situations and we don't believe they really address contractors concerns.

AGC still believes there is the need for a document clarifying what contractors and DBEs can and cannot do in meeting the DBE program requirements. We believe there are real differences of opinion about how to administer rules on how to count participation, the best way to define "commercially useful function," and how general contractors can assist their DBE subcontractor to name a few priority areas. Many of these issues serve as impediments to DBEs being

successful in the program and cause uncertainty and potential traps for contractors attempting to meet program requirements.

We spent a lot of time talking about how to calculate goal compliance. As an example, in order to count a DBE contractor's participation on a project towards the contract goal, the DBE has to be deemed to be performing a "commercially useful function." However, the contractor who has to make a decision to hire the DBE is not permitted to make a determination about whether a particular DBE will in fact be performing a "commercially useful function." In the "toolkit" AGC and FHWA agreed to a series of questions that a prudent contractor could ask a DBE firm prior to signing a subcontract agreement. The questions are related to the DBEs experience, management of the job, work force, equipment ownership, potential subcontracting and other similar questions. The questions are not unlike questions asked of non-DBE subcontractors when they are being used for the first time. We felt that if the questions result in the contractor not believing that the DBE will perform a "commercially useful function" then the contractor should reject the subcontractor. DOT, however, says that a "commercially useful function" determination cannot be made by the contractor but rather by the government and this determination cannot be made upfront. This puts the contractor in a very untenable position when trying to make good faith efforts to meet contract goals.

Another example of how the implementation of this program seems to undermine its intended purpose is the rules related to the expertise level of the DBE owner. DBE owners are being held to a different standard than non-DBEs. They are disadvantaged by the program. As part of the Commercially Useful Function reviews, DBE subcontractors are being asked to go to the field and actually perform field tasks. Running a successful contracting operation does not require you to be able to operate the machinery or perform any of the actual construction tasks. While some contractors may start out their careers operating equipment, running the business requires an entirely different set of skills. Unfortunately the DBE regulations diminish the value of management expertise which is the key to business success. Non-DBEs are not expected to perform these specific construction tasks. This differentiation seems to undermine the ability of DBEs in becoming successful businesses.

Another issue that was discussed as part of the "toolkit" is the type of assistance the general contractor is able to provide to DBE and non-DBE subcontractors. The prime contractor is ultimately responsible for the successful completion of all aspects of the contract. Typically the owner is not concerned about who performs what part of the contract, only in the successful delivery of the completed product. To ensure success, the prime contractor will do what it takes to be sure that the subcontractor performs its contract efficiently, in a timely fashion and provides a final product of the highest quality. This may include assistance with equipment, personnel and material if problems arise in performing contract requirements. However, if the prime contractor was to offer the same assistance to the DBE subcontractor, suspicions are raised that the subcontractors is not serving a "commercially useful function" and the contractor and DBE could be subject to intense scrutiny or subject to legal proceedings.

An example of a regulatory provision that works against DBE success in the program is an issue that is of direct impact to my company. The regulations allow for the cost of material that is purchased by the DBE for work on the contract to count towards goal achievement. However, if the DBE purchases the material from the prime, rather than a third party source, that portion of the contract is not counted. Being in the paving business requires my company to have access to aggregate and liquid asphalt. In many parts of the country, there are very limited sources for

these products. In some instances the prime contractor is the only source, there is no third party source that can provide the needed material. Not allowing my purchase of asphalt from the prime undermines the ability of the prime to meet the contract goal and can hurt my business from growing. This is an issue that we have discussed with DOT and we are awaiting their proposed remedy.

Although DOT determined that it was unable to endorse the "toolkit" this did not end our efforts for program clarification. Further meetings with DOT resulted in the creation of a DBE Roundtable. Through this forum issues can be raised and discussed in a public setting resulting in guidance issued by DOT on specific issues. AGC is hopeful that the Roundtable and this process for clarifying issues can be continued. While this process is extremely helpful, there remains the need for an official guidance document to assist contractors, DBEs and state DOTs in understanding how issues will be resolved. We are starting to see some positive results of our persistence. As a result of the Roundtable discussions guidance was issued clarifying some of the assistance that is permissible, and we are glad that has been issued. The assistance discussed is often provided to non-DBE subcontractors and not allowing it for a DBE can be detrimental to their business success.

The Roundtable has also addressed other confusing and counterproductive regulatory provisions. In addition to what assistance primes can provide DBEs, we've also addressed "commercially useful function" determinations, the use of joint checks, DBE owner technical expertise, certification consistency and eligibility to count DBE participation, change orders, materials purchased from non-DBE suppliers, DBE capacity and more.

We believe the program rules need to be written in a way that allows more collaboration, mentoring and assistance. Assistance with bonding, equipment, estimating, and project management can prove helpful to developing businesses no matter who is the owner. AGC has always encouraged the creation of Mentor-Protégé programs that allow contractors to work with DBE firms in a collaborative fashion to ensure a mutually beneficial result. AGC believes that this concept should become a significant part of the program as we move forward.

Mr. Chairman and members of the Committee, AGC has taken the approach that while this program is in place we will try to work to make it something that makes sense, that does not impede the successful completion of vitally needed transportation improvement projects and does not create legal concerns for participants. AGC is hopeful that the dialogue that was started over the past several years with DOT, the DBE community and the construction industry will continue. Thank you to the committee for having this hearing on the administration of the program. I would be happy to answer any questions you may have.

# DISADVANTAGED BUSINESS ENTERPRISE (DBE) CONTRACTORS' TOOL KIT

ENDORSED BY:
ASSOCIATED GENERAL CONTRACTORS OF AMERICA
NATIONAL ASSOCIATION OF MINORITY CONTRACTORS
WOMEN 1ST

# DISADVANTAGED BUSINESS ENTERPRISE (DBE) TOOL KIT

## CONTENTS

SECTION PAGE

I. INTRODUCTION ..........

II. GETTING STARTED ..........

III. ELEMENTS OF A CONTRACTOR COMPLIANCE PROGRAM

- A. RESPONSIBILITIES
- B. DETERMINING AVAILABLE DBE'S
- C. GOOD FAITH EFFORTS (GFE)
- D. SPECIFIC PROJECT PARTICIPATION
  1. PRE-ESTIMATE ACTIONS
  2. DEVELOP A DBE PARTICIPATION PLAN
  3. GOOD FAITH EFFORTS
  4. IMPLEMENT YOUR DBE PARTICIPATION PLAN
  5. QUOTE DOCUMENTATION
  6. EXCLUSIVITY ARRANGEMENTS
  7. BID CLOSE OUT
  8. ADMINISTRATIVE RECONSIDERATION OF INADEQUATE GOOD FAITH EFFORTS
- E. BUILDING THE PROJECT
  1. EXECUTING DBE SUBCONTRACTS
  2. PAYMENT, MONITORING AND DOCUMENTATION PROCEDURES
  3. GENERAL COUNTING RULES
  4. COMMERCIALLY USEFUL FUNCTION ("CUF")
  5. MONITORING DBE "CUF"
  6. ASSISTANCE TO DBES
  7. CHANGE ORDERS AND DBE CONTRACT GOALS
  8. EMERGENCY PERFORMANCE OF DBE WORK
  9. TERMINATION OF DBE CONTRACTOR
  10. REPLACEMENT OF DBE
  11. FINAL DOCUMENTATION AND CERTIFICATION

IV. APPENDICES ..........

# I. INTRODUCTION

Since the late 1970's, federal, State and local governments have established programs designed to maximize opportunities for firms owned by minorities, women and disadvantaged individuals to compete for and perform contracts. The United States Department of Transportation ("USDOT") issued revised regulations in February 1999 regarding the participation by Disadvantaged Business Enterprises ("DBE") in USDOT financial assistance programs. After the USDOT issued new regulations in 1999, each State DOT revised its DBE program to implement the new regulations.

This Tool Kit is meant to be a practical guide in establishing a contractor's DBE compliance program as implemented by the states and local governments where they work. It has been prepared from the user's perspective and guidance shared in the tool kit is the result of direct experience in obtaining and utilizing DBEs in accordance with the DBE program requirements.

The Tool Kit is divided into three sections ranging from Getting Started to assessing one's performance in meeting its own program.

The GETTING STARTED Section provides information on the resources you will need to set up your DBE Compliance Program.

The ELEMENTS OF A CONTRACTOR COMPLIANCE PROGRAM Section offers suggestions on how to follow-up on your program to insure its running properly and remains updated.

The Tool Kit provides checklists that can serve as practical tools for contractors' day-to-day use in the management of their DBE compliance program. Your program should make use of Appendices or Attachments in the same manner as this Tool Kit. Include copies of all pertinent rules, regulation, and specifications.

Because this Tool Kit is intended as a general guide, it cannot address every situation a contractor may encounter. Each State DOT may interpret or implement the same federal DBE regulations differently. The information provided in this Tool Kit can and should be adapted to meet a contractor's particular circumstances. Several key points are emphasized in the Tool Kit:

- Know your State DOT officials responsible for administering the DBE programs in the DOT headquarters and in the project area district and understand their interpretation of the rules and regulations implementing those programs.

- This tool kit was created through Joint Cooperative efforts of the construction industry and government officials. This spirit of joint cooperation should be mirrored on the state and local level.