# EXHIBIT A-10
# (part 4)

- The local contractor chapter organizations should be involved with the DOT in the local goal setting committee.
- Reach out to DBEs and to DBE assistance organizations to determine the availability and capabilities of DBEs in your area.
- Make your best efforts to meet individual contract DBE goals and document those efforts in case your DBE participation falls short of the contract DBE goal.
- Be vigilant during contract performance.
- If you assist DBEs in any way, make sure your State DOT is aware and approves of the assistance.
- Identify a Company DBE coordinator and encourage your field supervisors to contact the DBE coordinator whenever a question arises or help is needed.

## II. GETTING STARTED

The following are some good first steps you can take to gain an understanding of your State and Federal DBE program requirements.

- Understand State and Federal Rules

  Obtain copies of, review and retain for reference:

  a. Federal Rules
  b. State Rules
  c. State DOT contract requirements
  d. State DBE Plan Program

  - Include copies of these documents with your plan.

  - Review how your State DOT counts DBE participation on various types of work including subcontracts involving installation of materials, material suppliers, truckers, joint ventures, etc.

  - Review your State DOT's rules on "commercially useful function" (CUF). Attach your State DOT DBE Special Provision as Appendix F to this Tool Kit for guidance on what constitutes a commercially useful function.

  - Review your State DOT's policy on meeting DBE goals when contract changes are made which affect the DBE's work.

- Program Officials: It is important and useful for you to know the FHWA and your State DOT DBE program officials. They can assist you in understanding what they require concerning the DBE program and how you can follow the requirements.

- Review your State DOT's rules on documenting good faith efforts towards meeting the goal. You should attach your State DOT DBE Special Provision as Appendix B to this Tool Kit for guidance concerning what constitutes adequate good faith efforts.

In the next Section ELEMENTS OF CONTRACTOR COMPLIANCE PROGRAM, you will learn about the specific items your program should address.

# III. ELEMENTS OF A CONTRACTOR COMPLIANCE PROGRAM

## A. RESPONSIBILITIES

- Identify and assign a responsible person or persons for:

1. Overall management of the Compliance Program.
2. Administrative responsibilities such as reporting.
3. Identifying certified and capable DBEs.
4. Preparation and submission of proposed project specific DBE participation.
5. Oversight of DBE Subcontractor work performance.

The DBE Compliance program should clearly describe the contractor's management approach toward complying with the DBE program requirements. It should identify the individual(s) in the organization who have the overall responsibility to carry out the program and who is designated the key individual(s) that everyone in the organization can approach to deal with issues supporting the contractor's compliance. In addition, in describing this management approach, it is imperative that everyone, including field specialists and foremen, understand the roles and responsibility of working together to see that this is done.

- Develop DBE procedures to follow, including:

a. Estimating and bidding procedures.

b. Procedures for negotiating and writing contracts.

c. Procedures for monitoring, inspecting and documenting a DBE's performance and progress.

**THIS TOOL KIT WILL AID YOU IN DEVELOPING SUCH PROCEDURES.**

## B. DETERMINING AVAILABLE DBE'S

- Your program should describe the process that you routinely use to identify, interview and assess available DBEs. Your State DOT requires DBEs to be certified at the time DBE commitments are submitted so it is imperative that you have an on-going process for identifying, soliciting

and evaluating the capabilities of DBEs that have the potential to bid on work the contractor maybe subcontracting out in response to an STA advertisement. This normal business practice can be the essential support behind a good faith effort determination on a project specific basis. This Tool Kit suggests a two-step process.

## STEP 1 – DBE IDENTIFICATION

- Your State DOT is required to participate in a Unified Certification Program ("UCP"). The UCP is required to make all certification decisions on behalf of all USDOT recipients in each State. Each UCP is required to maintain a unified DBE directory containing all firms certified by the UCP. The UCP is required to make the directory available on the internet, as well as in print. (See 49 CFR § 26.81.) A State's Unified Certification Program must certify DBE firms.

  Obtain a current DBE directory listing of certified firms. Your State DOT maintains and makes available to interested persons a directory identifying all firms eligible to participate as DBEs in your State DOT's program. Online directories are more up to date and a better source for obtaining information on certified DBE firms. The listing for each DBE firm will include its address, phone number and the types of work the firm has been certified to perform as a DBE. These directories are revised at least annually. Further, your State DOT will make updated information available on request.

  The UCP DBE Directory should be relied on as your primary source of firms to contact in preparation of your bid.

## Step 2 – DBE Solicitation

*Your State DOT requires that you not reject DBEs as being unqualified without sound reasons based on a thorough investigation of their capabilities. You need to determine whether interested DBEs are certified in the work they want to bid on. Meet with DBE firms. Assess their availability, willingness and ability to perform work. Develop ongoing dialogue and relationships with DBE firms.*

- As you would with any subcontractor, you should determine whether interested DBEs are capable to perform the work they are quoting consistent with the type of work they are certified to perform as a DBE.

- Use the form on page ___, DBE Interviews, to help determine whether the interested DBE is capable to perform the work it is quoting.

- A thorough investigation of a DBE's capabilities should include consideration of the following:

  a. The type and scope of work the DBE intends on quoting.

  b. The DBE's experience in performing the type of work it wishes to quote.

  c. The DBE's staff and its availability to perform on the project.

  d. The equipment the DBE has available to perform the work, or if the DBE does not own equipment, how it intends to obtain the necessary equipment.

  e. The DBE's current workload, including other contracts the DBE will be performing concurrently with this project.

  f. How the DBE plans to obtain the necessary materials, their creditworthiness and whether joint checks may be required.

  g. The DBE's intention to subcontract any of the work to a non-DBE.

  h. Information on the DBE's bonding capacity, including "Total Program" and "Largest Single Project."

  i. Your past experience working with the DBE may be considered.

  j. Ask for references from the DBE as to other prime contractors for which they have worked and check them out.

## Step 3 – INVESTIGATE DBE CAPABILITIES TO PERFORM THE WORK

*Now you need to determine whether interested DBEs are capable of performing the work they are interested in quoting. A DBE must perform a "commercially useful function," as defined by USDOT in 49 CFR § 26.55(c) and your State DOT DBE Special Provision. At some point the prime may be required to document that the DBE is performing a "commercially useful function."*

*In determining a DBE's capabilities to perform the work the following should be ascertained:*

a. Is the work to be performed the DBE's usual type of work?

b. Will the DBE estimate the work himself, receive all material and sub quotes and negotiate and write P.O.'s and subcontracts?

c. Is there a clean split between what you are performing and what the DBE will perform?

d. Will the DBE manage and supervise the work with its own managers and superintendents?

e. Will the DBE perform the work with its own forces?

f. Will the DBE be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, and installing (where applicable) and paying for the material itself?

g. What work, if any, does the DBE intend to subcontract and is that amount consistent with industry practice? Work that a DBE subcontracts to a non-DBE does not count towards the contract goal.

h. If the DBE is subcontracting an unusual amount or does not intend to perform at least 30% of the work with its own forces, your State DOT will presume the DBE is not performing a commercially useful function (49 CFR § 26.55(c)(3)). Some state rules may require subcontractors to perform more than 30% of the subcontract with its own forces.

i. A DBE does not perform a commercially useful function if its role is limited to a "pass-through" for purposes of obtaining DBE participation.

***Elements of a Contractor Compliance Program***

1. **Have you identified the person responsible for managing your DBE activities?**

2. **Are you familiar with the persons responsible for administering the DBE program for your State DOT?**

3. **Are you aware of the supportive services available to assist DBEs in your area?**

4. **Are you familiar with capable DBEs in your normal subcontract solicitation geographic area?**

5. **Are you seeking to understand any problems DBEs will have in bidding or successfully completing contracts with you?**

## C. GOOD FAITH EFFORTS

*You must make good faith efforts to meet the DBE contract goal, either by meeting the goal or by documenting adequate good faith efforts to meet the goal. You should make sincere and aggressive efforts to meet the DBE contract goal. If you do not meet the DBE contract goal, then you must document your adequate good faith efforts to meet the goal.*

- You should not be automatically denied the award of a contract for not meeting DBE contract goals. Your State DOT does not have a quota for DBEs on USDOT-assisted contracts.

- Attempting to obtain a contract on the basis of documented good faith efforts should be your last resort. In other words, you should make sincere, intensive and aggressive efforts to meet the DBE contract goal and should resort to a good faith efforts submission only if your efforts do not produce DBE participation meeting the contract goal. However, as detailed in Subsection E, on USDOT assisted contracts, you are not required to use a DBE if the DBE price is excessive or unreasonable when compared to a non-DBE quote or self performing the work. However, if you reject an excessive DBE quote you may be determined to have not made a good faith efforts submission.

- You should also not be required to use a DBE you believe does not have the capabilities to perform the work.

- If it is necessary for you to make a "good faith effort" submission, DOCUMENT every step taken to satisfy your State DOT's good faith effort requirements and meet the contract DBE goal.

- You must be able to demonstrate in writing that you complied with the good faith effort requirements. Keep in mind that if you do not meet the contract DBE goal, you will need to convince the State DOT that it is appropriate to award the contract to you on the basis of your documented good faith efforts. As a result, the efforts discussed in Subsection D below

must be documented in case it is necessary to make a good faith effort submission.

- You must thoroughly understand the listed examples or types of actions which your State DOT will consider as part of your good faith efforts to obtain DBE participation. Keep in mind also that your State DOT will likely not consider its list to be exclusive or exhaustive.

- The following is the list of the types of good faith efforts found in the 49 CFR § 26. These actions are considered as good faith efforts:

  a. Soliciting through all reasonable and available means (e.g. attendance at pre-bid meetings, advertising and/or written notices) the interest of all certified DBEs who have the capability to perform the work of the contract. The bidder must solicit this interest within sufficient time to allow the DBEs to respond to the solicitation. The bidder must determine with certainty if the DBEs are interested by taking appropriate steps to follow up initial solicitations.

  b. Selecting portions of the work to be performed by DBEs in order to increase the likelihood that the DBE goals will be achieved. This includes, where appropriate, breaking out contract work items into economically feasible units to facilitate DBE participation, even when the prime contractor might otherwise prefer to perform these work items with its own forces.

  c. Providing interested DBEs with adequate information about the plans, specifications, and requirements of the contract in a timely manner to assist them in responding to a solicitation.

  d. Negotiating in good faith with interested DBEs. It is the bidder's responsibility to make a portion of the work available to DBE subcontractors and suppliers and to select those portions of the work or material needs consistent with the available DBE subcontractors and suppliers, so as to facilitate DBE participation. Evidence of such negotiation includes the names, addresses, and telephone numbers of DBEs that were considered; a description of the information provided regarding the plans and specifications for the work selected for subcontracting; and evidence as to why additional agreements could not be reached for DBEs to perform the work.

  e. A bidder using good business judgment would consider a number of factors in negotiating with subcontractors, including DBE subcontractors, and would take a firm's price and capabilities as

well as contract goals into consideration. However, the fact that there may be some additional costs involved in finding and using DBEs is not in itself sufficient reason for a bidder's failure to meet the contract DBE goal, as long as such costs are reasonable. Also, the ability or desire of a prime contractor to perform the work of a contract with its own organization does not relieve the bidder of the responsibility to make good faith efforts. Prime contractors are not required to accept higher quotes from DBEs if the price difference is excessive or unreasonable, however, state DOT approval is necessary in determining "excessive price" for a good faith effort determination.

f. Not rejecting DBEs as being unqualified without sound reasons based on a thorough investigation of their capabilities. The contractor's standing within its industry, membership in specific groups, organizations, or associations and political or social affiliations (for example union vs. non-union employee status) are not legitimate causes for the rejection or non-solicitation of bids in the contractor's efforts to meet the project goal.

g. Making efforts to assist interested DBEs in obtaining bonding, lines of credit, or insurance as required by your State DOT or contractor. Such efforts would include introducing the DBE to professionals in these fields.

h. Making efforts to assist interested DBEs in obtaining necessary equipment, supplies, materials, or related assistance or services. (See section on assisting DBEs below).

i. Effectively using the services of available minority/women community organizations; minority/women contractors' groups; local, state, and Federal minority/women business assistance offices; and other organizations as allowed on a case-by-case basis to provide assistance in the recruitment and placement of DBEs.

## D. SPECIFIC PROJECT PARTICIPATION

### 1. PRE-ESTIMATE ACTIONS

*The Pre-Estimate involves specific actions that you should take prior to beginning an estimate for a specific project. These actions will help in achieving your State DOT's DBE contract goals, or help in making qualifying good faith efforts.*

- Review project specifications and provisions to see if there are any DBE program modifications specific to this project.

- Review the contract documents for the DBE goal on this project
- Review the online certified DBE directory for the list of certified DBEs

## 2. Develop a DBE Participation Plan

*The second step in estimating and bidding should be to develop a DBE Participation Plan. This plan will help you achieve the DBE contract goals, or will help you in documenting that you made adequate good faith efforts to meet the contract goals.*

- Formulate a project-specific DBE Participation Plan when you decide to bid a project requiring DBE participation. This plan should address the following:

  a. Review of the Project's Special Provision for DBE contract goals.

  b. Determine items which may be subcontracted and quantify based on estimated dollar amounts.

  c. Quantify "traditional" subcontracted items. Identify and quantify "new" potential subcontracting opportunities.

  d. When practical, divide large (scope or quantity) items into potential smaller subcontracting opportunities and quantify.

  e. If your State DOT permits DBE participation by second tier subcontracts look for second tier subcontracting opportunities and quantify.

  f. Quantify potential material supply contracting opportunities. Determine the allowable DBE participation for material supply, i.e. 100% for materials or supplies purchased from a DBE manufacturer, and 60% for materials or supplies purchased from a DBE regular dealer. See 49 CFR § 26.55(e), attached as Appendix A, for additional information. See also your State DOT DBE Special Provision, refer to Appendix B.

  g. Determine the likely total DBE participation from all of the above items and compare to your State DOT's DBE contract goals.

     1. If the likely participation well exceeds your State DOT's DBE contract goals, begin implementing your DBE Participation Plan.

2. If the likely participation does not well exceed the DBE contract goals, alternate or additional efforts are required:

   - Investigate the possibility of subcontracting to DBEs work you would traditionally self-perform.

   - DOCUMENT steps 1 – 6 and the reason(s) for the potential shortfall.

## 3. Good Faith Efforts

Closely monitor the DBE Participation Plan throughout the estimate stage to ensure your ability to submit your most competitive bid that is in full compliance with your State DOT's DBE contract goals and/or your State DOT good faith efforts requirements.

1. Identify Good Faith Effort requirements (See Section C above).

2. Determine if this Project Special Provision has any additional good faith efforts it expects you to make.

3. Generally, for each project, if you document each of the actions listed in your State DOT DBE Special Provision, you should satisfy the good faith efforts requirement.

## 4. Implement your DBE Participation Plan

*The next step is to implement your DBE Participation Plan. Even if obtaining the DBE participation is not a problem, the implementation of the DBE Participation Plan is a good approach to take for any bid. Implementing your plan provides a thorough and methodical approach to obtaining adequate DBE participation. This process, if documented, should demonstrate good faith efforts adequately.*

- You should begin implementing your DBE Participation Plan at the start of the estimating process

- Solicit from your list of certified/capable DBEs (See Section B above). Obtain a current DBE directory listing of certified firms from your State DOT. Review certified DBEs listed on the UCP web site. See Section B above.

- Should you anticipate that your list of certified/capable DBEs may be inadequate due to the specific nature of the project, you should consider:

  a. Consider expanding your search for DBEs to outside of your normal work discipline or geographic solicitation area.

  b. Contact your State DOT DBE supportive services or business assistance entity to obtain the names of additional DBE firms.

  c. Contacting available minority/women community organizations, contractor groups and State, federal and local minority/women assistance offices.

  d. Use minority/women community organizations, contractor groups and State, federal and local minority/women assistance offices to recruit additional DBEs.

- When soliciting interest from DBEs, notify them in a timely fashion to allow time to prepare proper quotes.

  a. The written notice should include:

     1. Your name, address, telephone number, fax number and email address.

     2. The project location and description and if you would be willing to make a site inspection with the DBE.

     3. A place where subcontractors can review bidding documents.

     4. Your representative to contact.

     5. Direction to contact you by email or fax to let you know whether they will be bidding.

     6. The date and time by which you must receive sub-bids or quotes and the location to which they must be delivered.

  b. Use email or fax, as appropriate.

  c. List items for which you are particularly interested in receiving quotes. If necessary to meet the goal, identify the items that could be broken down into smaller quantities.

d. Consider enclosing a checklist for the DBEs to check off the type(s) of work they are capable/certified to do and are interested in quoting.

- Follow up the initial solicitation of interest by contacting the DBEs to determine with certainty whether or not they are interested. If possible, document the reason for a "no quote".

- Provide interested DBEs with needed information about the plans, specifications, estimated quantities, schedule and the contract requirements.

- Negotiate in good faith with interested DBEs, not rejecting DBEs as unqualified without reasons based on a thorough investigation of their capabilities. Recognize that FHWA and your State DOT expects prime contractors to negotiate a reasonable price with higher quoting DBEs rather than simply reject the quote. You are not required to accept an excessive or unreasonable quote. If you are unable to reach an agreement with a DBE on a reasonable price, or if you reject a DBE's quote and that causes you to be unable to meet the DBE goal, you should be able to explain the reasons why an agreement was not reached. The federal regulations give an example of what constitutes negotiating in good faith with interested DBEs as follows:

  "A bidder using good business judgment would consider a number of factors in negotiating with subcontractors, including DBE subcontractors, and would take a firm's price and capabilities as well as contract goals into consideration. However, the fact that there may be some additional costs involved in finding and using DBEs is not in itself sufficient reason for a bidder's failure to meet the contract DBE goal, as long as such costs are reasonable. Also, the ability or desire of a prime contractor to perform the work of a contract with its own organization does not relieve the bidder of the responsibility to make good faith efforts. *Prime contractors are not, however, required to accept higher quotes from DBEs if the price difference is excessive or unreasonable*." 49 CFR 26, Appendix A, § IV-D(2).

- To determine what constitutes an excessive or unreasonable quote the prime should:
  - Compare proposal to bids submitted by other subcontractors.
  - Prepare your own internal estimate of the cost of performing the work.
  - Compare the bid to prices for similar work performed on other recent contracts.

- Remember, determining adequate GFE is an after the fact decision by the State DOT. If the reason you were unable to meet the goal is based primarily on the DBEs bid being excessive but your overall bid is substantially less than the next low bidder and/or the engineer's estimate, it might not be considered adequate.
- Direct interested DBEs to where they may obtain information about bonding, lines of credit or insurance required by the contract.
- Make efforts to assist interested DBEs in locating sources for obtaining necessary equipment, supplies, materials or related assistance or services.
- In making efforts to assist DBEs in these areas, the following might be helpful hints:

  - This effort is not expected to involve obtaining such items for the DBE. It is intended for you to provide information on and possible referrals to the DBE of sources with whom you may have had a long term working relationship.

  - This referral service and assistance may include directing the DBE to the source of such items you are currently negotiating with on a project specific basis.

## 5. QUOTE DOCUMENTATION

*Quote documentation concerns receiving and documenting a DBE's quote. If the DBE's quote is out-of-line with other quotes and/or your own estimate, you should contact the DBE to verify its quote is correct.*

- After determining that a DBE is certified and capable, be ready to receive its quote. Confirm the following:

  a. Company name, contact person and telephone number.

  b. Full scope of work being quoted.

  c. Addenda acknowledgment.

  d. DBE status and evidence of certification.

  e. Schedule requirements if possible.

  f. Any exclusions or special conditions of the quotation.

  g. Bond rate.

h. Quote price.

1. Occasionally you may receive quotes from DBEs with whom you have no prior experience. In addition to the information discussed in this Subsection, the following should be reviewed:

   a) Verify that the DBE is certified.

   b) Investigate the DBE's capabilities to perform the work (See section D step 3 above).

   c) Is the quote in-line with others received?

2. When receiving quotes from DBEs that are, under the particular facts and circumstances, substantially lower than other quotes and/or your own estimate, you should:

   a) Advise the DBE that its quote is substantially lower than others received and ask the DBE to double check its estimate. Do not reveal by how much the DBE's quote is low.

   b) Go over the scope of work.

   c) Check/compare quantities.

   d) Ask whether the DBE has received material quotes for the work to be performed.

   e) Ask about the DBE's schedule.

   f) Any adjustment in the quotation by the DBE should be accepted only after you are thoroughly satisfied the DBE's revised quote is legitimate and correct.

3. DO NOT SHOP THE DBE's QUOTE.

4. If a DBE quotes multiple items, find out from the DBE if the quote is good for each individual item or if the DBE will insist on being awarded all items it quotes. It may be possible to negotiate the use of the DBE quote for only those items for which the DBE's pricing is reasonable and not use the quote for those items where the DBE's pricing is unreasonable. DO NOT USE PIECES OR PARTS OF A

QUOTATION WITHOUT OBTAINING PERMISSION FROM THE DBE IN WRITING.

5. DO NOT accept a DBE quote from any entity other than the DBE contractor that proposes to perform the work!

6. DOCUMENT THE REASONS FOR ANY REJECTED QUOTATION.

7. Include in subcontract language the full details of the scope of work that is to be performed by the DBE for the price quoted. Details such as loading and unloading materials, storage of equipment and materials, supervision and inspection of work and all other details should be written into the subcontract.

## 6. Exclusivity Arrangements

*The federal regulations do not explicitly prohibit a DBE from having an exclusive relationship with a general contractor. Instead the regulations state that the DBE firm's relationships with prime contractors should be examined to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential DBE firm.*

An exclusivity arrangement involves the situation where a DBE agrees to perform work for only one entity. These arrangements may cause questions regarding the independence of the DBE and its eligibility to be certified. To be safe, prime contractors should avoid setting up an exclusivity arrangement with a DBE.

## 7. Bid Close-Out

*The process of bid close-out involves the use of a DBE summary sheet to know where you stand in the bid with respect to meeting the DBE contract goal. A sample DBE summary sheet is attached. Some State DOTs require specific DBE goal information to be submitted with the bid others do not. In either case, this process organizes your DBE quotations and makes the process more effective.*

- If it would be helpful, use a DBE Summary Sheet to determine where you stand in the bid and what it will take to meet the DBE goal. See the example form DBE Summary Sheet on page ___. Instructions for using the DBE Summary Sheet are on page __.

- If the low quote is not from a DBE subcontractor/supplier and you have not yet met your goal, search for reasonable DBE quotes based on

different mixture of bid item and quantities. The DBE Summary Sheet is set up to help you do this. You should obtain the DBEs permission to alter the item quantities on its quote or to select only portions of its quote. Remember, on USDOT assisted contracts, you are not required to use excessive or unreasonable quotes and may document good faith efforts in lieu of fully meeting the contract DBE goal.

- Your State DOT will have requirements of documents to be submitted either with the bid or after the bid. Usually those documents include some form of "DBE Commitment Agreement" for each DBE you intend to use to satisfy the contract DBE goal.

- The award of USDOT-assisted contracts for which a contract goal has been established requires all bidders/offerors to submit:

  a. the names and addresses of DBE firms that will participate in the contract;
  b. a description of the work that each DBE will perform;
  c. the dollar amount of the participation of each DBE firm participating;
  d. written documentation of the bidder/offeror's commitment to use a DBE subcontractor whose participation it submits to meet a contract goal;
  e. written confirmation from the DBE that it is participating in the contract as provided in the prime contractor's commitment; and
  f. if the contract goal is not met, evidence of good faith efforts.

- Copy all information submitted including your State DOT's DBE Listing page.

## 8. Administrative Reconsideration of Inadequate Good Faith Efforts

*You may have your bid administratively reconsidered if your bid is rejected due to inadequate good faith efforts. The administrative reconsideration must provide you with the features described below.*

- Under 49 CFR § 26.53 (d) your State DOT is required to have a procedure for reconsideration of good faith efforts by an official not involved in the initial determination that you did not make adequate good faith efforts to meet the DBE goal.

- If you desire to pursue administrative reconsideration of a rejected bid, then you should timely follow the reconsideration procedure in your State DOT DBE Special Provision.

## *ESTIMATING AND BIDDING CHECKLIST*

1. **Do you have your State DOT's current DBE directory or certification list?**

2. **Do you know what qualifies as good faith efforts for your State DOT? If so, what efforts are mandatory?**

3. **Do you know how your State DOT counts DBE participation for: (1) material supply; (2) trucking; (3) joint ventures; and (4) furnish and install subcontracts?**

5. **Have you developed a plan to identify and contact DBEs, including contacting your State DOT, State supportive services or business assistance office, minority contractor associations and any other DBE Assistance Organizations?**

6. **Have you followed-up your initial written contact with DBEs and documented your contacts?**

7. **Have you selected portions of work for DBEs that will likely increase their participation?**

8. **Have you negotiated in good faith with interested DBEs?**

9. **Have you determined that the DBEs you plan to use will be able to manage, supervise and perform their work?**

10. **Have you checked DBE quotes to see if the quotes are unreasonably low or unreasonably high?**

11. **Have you completed the items on the DBE Summary Sheet? (See pages 27 and 28.)**

**DBE INTERVIEWS**

| | |
|---|---|
| Company Name: | |
| Interview Date: | |
| Point of Contact: | |

| | |
|---|---|
| Annual Sales Last Year | |
| Credit Line with Vendors | |
| $ of Largest Job | |
| Desc work on Largest Job | |
| Preferred Work Type | |
| Turnkey Work? | |
| Avg # Employees | |
| # Field Supervisors | |
| Equipment | |
| Own or Lease | |
| Approx # Pcs | |
| Current # of Active Projects | |
| Geographical Preferences | |
| Familiar with your State DOT Bidding | |
| Familiar with your State DOT Construction | |
| Internet & Email | |
| Other | |
| Other | |

**DBE SUMMARY SHEET**

**CONTRACT DBE % GOAL: ____________________%**

**TOTAL DBE $ TO MEET THE GOAL: $________________**

| SUBCONTRACTOR | DESCRIPTION | DBE SUB QUOTES | ADD TO DBE | DBE TOTAL AMOUNT IN BID |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| PAGE TOTALS | | | | |

**INSTRUCTIONS FOR DBE SUMMARY SHEET**

a. Write in the contract DBE percentage goal.

b. Calculate the total dollar amount of DBE Participation that is needed to meet the contract DBE goals. This will change as your total bid amount changes.

c. List every DBE quote you receive.

1. Company Name.
2. Description of Work.
3. Quoted Price.

d. If the DBE submits the low quote:

1. Put quote amount into "DBE Total Amount In Bid" column.
2. Write a zero in the "Add to DBE" column.

e. If the DBE's quote is not the low quote:

1. Put a zero in the "DBE Total Amount In Bid" column.
2. Put the difference between the low bidder's quote and the DBE's quote in the "Add To DBE" column. This difference may be factored into estimating the total bid amount.

## E. BUILDING THE PROJECT

### 1. EXECUTING DBE SUBCONTRACTS

If they are not already aware:

- Call DBEs you intend to use as soon as possible after the bid opening and let them know you intend to use them.
- Advise DBEs which items you intend to subcontract to them.

#### *a. Subcontract Language*

- Include the following additional provisions in the subcontract. Review these provisions with the DBE. Advise the DBE you expect it to manage, supervise and perform the work in question with its own organization and resources.

  *Subcontractor agrees to perform a "commercially useful function" as defined in 49 CFR § 26.55, in connection with the work covered by this subcontract. In doing so, subcontractor agrees that it will be responsible for and will actually perform, manage and supervise the work covered by this subcontract and agrees that it will not sub-subcontract a significantly greater portion of the work than would be expected on the basis of normal industry practices. Subcontractor certifies that it has adequate resources to perform the work covered by this subcontract. The subcontractor agrees to prepare and submit all sub-tier subcontracts and material contracts to the contractor for approval. The contractor reserves the right to review and reject any and all sub-subcontracts, equipment leases and/or use of other contractor's personnel entered into between subcontractor and third parties that do not conform or comply with the provisions of this section, the terms of the prime contract or the requirements of the owner. Neither the approval of nor the failure on the part of the contractor to reject such arrangements shall relieve the subcontractor of any of its obligations under this agreement. In the event it is determined that the subcontractor fails to perform a "commercially useful function," due in whole to the actions of the subcontractor, the contractor shall have the right to terminate the subcontract, without penalty or liability, and contractor may recover from subcontractor any damages contractor may suffer as a result of subcontractor's failure to perform a "commercially useful function."*

- Make the DBE subcontract contingent on your State DOT's initial and continued approval of the commercially useful function to be performed by the subcontractor. As a result, insert the following provision in the subcontract:

*Under the provisions of the prime contract, the contractor is required to meet the specified DBE participation. Subcontractor acknowledges that the dollar amount of the subcontract is being used by contractor to meet the specified goal and warrants that it is a certified DBE under the owner's DBE- program. Subcontractor further agrees contractor shall have the right to terminate the subcontract for default pursuant to the provisions of this Agreement, without penalty or liability, if subcontractor is decertified as a DBE, and/or if for any reason the owner refuses to count any portion of the subcontract towards meeting the DBE goal due in whole to the actions of the subcontractor. Contractor shall be entitled to recover any damages from the subcontractor it may suffer as a result of subcontractor's decertification, including any increased costs attributable to obtaining a replacement DBE acceptable to the owner to complete the subcontract work.*

***b. Bond***

- Will the DBE provide a bond? If so, will it be for the entire project or will it be in stages?
- If a bond waiver becomes necessary and you approve, review your bond waiver form with the DBE, advising it that both the DBE and your State DOT must approve the bond waiver form. You should then obtain approval from your State DOT.

***c. Contract Execution***

- Make sure the DBE has copies of all pertinent documents.
- Complete the subcontract, with any necessary revisions or amendments.
- Submit the completed subcontract documents to the DBE for execution, and establish a date by which you expect to receive an executed subcontract back from the DBE.

### *d. Meeting DBE Goals Through Second or Multiple Tier Subcontracts*

*The prime contractor is ultimately responsible for the actions of its subcontractors and any DBE second or multiple tier subcontractors, such as truckers and suppliers.. You should therefore ensure that any subcontract between a subcontractor and DBE second tier subcontractor contains the provision below.*

- Keep in mind that you, as the prime contractor, are responsible for the actions of your subcontractor and the DBE second or multiple tier subcontractor.

***Make sure the subcontract includes the following provision and that the subcontractor meets its obligations:***

*Under the provisions of the prime contract, the contractor is required to meet the specified DBE participation. Subcontractor agrees, as part of its subcontract obligations, to provide $ ________________ of the DBE participation through a sub-tier contract between subcontractor and ________________________________________ (Name), of ________________________________________ (Address), who subcontractor has verified as a currently certified DBE, under the owner's DBE- program. Subcontractor agrees to comply with all applicable laws, regulations, prime contract documents, and this Agreement concerning DBE participation on the project.*

*Subcontractor agrees to fully cooperate with the contractor and owner in every respect to assure that the DBE goals are met and that the DBE, performs a commercially useful function. Failure to provide the required participation in compliance with the applicable laws, regulations, prime contract documents, and this Agreement shall constitute failure to comply with the provisions of this Agreement as provided under Section ___ of this Agreement.*

### *EXECUTING DBE CONTRACTS CHECKLIST*

1. **Have you made a post-bid contact with all the DBEs you included in your submission to your State DOT?**

2. **Do the DBEs understand their obligation to perform a commercially useful function?**

3. **Have you included the appropriate provisions in your subcontract requiring that the DBE remain certified and perform a commercially useful function?**

4. **Have you made any of your DBE participation by second or multiple tier subcontracts? If so, have you obligated your subcontractor to ensure that the sub-tier DBE performs a commercially useful function?**

## 2. PAYMENT, MONITORING AND DOCUMENTATION PROCEDURES

Some DBE subcontractors and DBE material suppliers cannot secure a bond at a competitive rate. If a DBE cannot secure a bond and the DBE agrees to the use of joint checks for material payments, submit the appropriate requests to your State DOT for written approval. Each DBE subcontract or DBE material contract may need to include the lien waiver form. When beginning a project, include an administration plan for proper documentation and payment procedures involving unbonded DBE subcontractors and suppliers as you would with any unbonded subcontractor or supplier.

To avoid claims by suppliers, second-tier subcontractors or laborers, a monitoring and documentation procedure should be established to verify that the following items are received from the unbonded subcontractor after each partial payment estimate and before the next payment is made:

- Require the DBE subcontractor to timely submit a copy of its certified payroll.

- Require the unbonded subcontractor/supplier to provide written verification that payment has been made to all material suppliers and

second tier subcontractors for work or services for which the unbonded subcontractor has received payment on the past pay estimate.

- Prior to the end of each partial payment period, the unbonded subcontractor should provide a certified affidavit of names of all persons or entities that provided labor, services and/or materials on behalf of the unbonded subcontractor.

- The unbonded subcontractor should provide proof of payment of union benefits and IRS payroll taxes shortly after the period ends.

- If the unbonded subcontractor fails to provide this information, you should seek to satisfy yourselves.

Under 49 CFR § 26.29, your State DOT is required to establish a prompt payment contract clause to require you, as the prime contractor, to pay subcontractors for satisfactory performance of their contracts no later than 30 days from receipt of each payment made to you. The state's prompt pay requirement may be more stringent than that required by the USDOT. The prime contractor should include in its subcontracts the same prompt pay clause requiring compliance with prompt pay requirements.

The USDOT DBE regulations require prime contractors to make prompt payments to all DBE and non-DBE firms that are performing work on the contract. Make sure to identify and comply with any prompt payment clause in the contract.

Prompt payment clauses may include a contract clause providing that the prime contractor will not be reimbursed for work performed by subcontractors unless and until the prime contractor ensures that the subcontractors are promptly paid for the work they have satisfactorily performed.

The USDOT DBE regulations also require the prompt and full return of retainage payments from you, as the prime contractor, to the subcontractor no later than 30 days after the subcontractor's work is satisfactorily completed and accepted by the state DOT.

## 3. GENERAL COUNTING RULES

*When a DBE participates in a contract, you may count only the value of the work actually performed by the DBE toward DBE goals. A DBE's participation is counted toward DBE goals only if the DBE is performing a "commercially useful function." [49 CFR § 26.55(c) and your State DOT DBE Special Provision] The FHWA has made clear that it is the prime contractor's primary responsibility to make sure DBEs are performing a commercially useful function.*

*There are five key areas for a commercially useful function. Those are management/supervision, labor, equipment, materials and performance of the work.*

- Count the entire amount of that portion of a contract that is performed by the DBE's own forces (49 CFR § 26.55 (a)). Do not count the amount a DBE subcontracts to a non-DBE firm. Include the cost of supplies and materials obtained by the DBE for the work of the contract, including supplies purchased or equipment leased by the DBE. DO NOT, however, count supplies or equipment the DBE purchases or leases from you or your affiliates (49 CFR § 26.55 (a) (1)). *Note: Even though the regulations refer to supplies or equipment purchased or leased from you or your affiliates, FHWA interprets this provision as including materials.*

- Count the entire amount of fees or commissions charged by a DBE for providing a bona fide service, such as professional, technical, consulting or managerial services, or for providing bonds or insurance specifically required for performance of a USDOT assisted contract, provided that the fee is reasonable and not excessive as compared with fees customarily charged for similar services (49 CFR § 26.55 (a) (2)).

- Does your State DOT DBE Special Provision permit a DBE subcontractor to enter into second tier subcontracts? If so, keep in mind that work subcontracted to a non-DBE does not count towards DBE goals.

***DBE Material Manufacturer/Regular Dealer/Broker***

*This section discusses expenditures with DBEs for materials or supplies and how those expenditures are counted toward DBE goals as long as the DBE assumes the actual and contractual responsibility for the provision of the materials. If materials or supplies are obtained from a DBE manufacturer, count 100% of the cost of the materials or supplies toward DBE goals. If the materials or supplies are purchased from a DBE regular dealer, count 60% of the cost of the materials or supplies toward DBE goals.*

The following is an example that can possibly show the difference under the requirements of the DBE program between a manufacturer, a regular dealer, and if there is a normal industry practice, a broker. The example is the furnishing of crushed aggregate meeting State DOTs specification for such items as Aggregate Base Course.

A DBE as its principal business and under its name produces on its premises crushed aggregate by taking natural rock and crushing, washing and screening such rock excavated on its premises into the size and gradation meeting certain State standard specifications. Under this set of circumstances, the DBE can be considered a manufacturer and the cost of the crushed aggregate produced can be credited 100% towards meeting the goal.

If, however, the same DBE obtains the same product from another source that performed that noted above, the DBE maybe considered a regular dealer of the product if it purchased this product in his/her name, he/she engages as its principal business in the purchase and sale of crushed aggregate to the general public, and owns and operates the necessary distribution equipment (since aggregate is considered a bulk item) to deliver the crushed aggregate. Under these circumstances, the DBE can be considered a regular dealer and 60% of the cost of the crushed aggregate purchased is credited towards the goal.

If the DBE firm doesn't meet all or any of the functions presented in defining a regular dealer in crushed aggregate but arranges or expedites transactions consistent with industry practice in the delivery of such materials, then the DBE (broker) services in the amounts of fees or commissions charged in the procurement and/or delivery of such materials can be credited towards the goal.

- If materials or supplies are obtained from a DBE manufacturer, count 100% of the cost of the materials or supplies toward DBE goals. For purposes of this paragraph, a manufacturer is a firm that operates or maintains a factory or establishment that produces, on the premises, the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications. See 49 CFR § 26.55(e)(i)&(ii) in Appendix A and your State DOT DBE Special Provision in Appendix B (you should attach a copy of your State DOT DBE Special Provision to Appendix B).

- If the materials or supplies are purchased from a DBE regular dealer, count 60 percent of the cost of the materials or supplies toward DBE goals. For purposes of this section, a regular dealer is a firm that owns, operates, or maintains a store, warehouse, or other establishment in which the materials, supplies, articles or equipment of the general character described by the specifications and required under the contract are bought, kept in stock, and regularly sold or leased to the public in the usual course of business. . . . Packagers, brokers, manufacturers' representatives, or other persons who arrange or expedite transactions are not regular dealers. See 49 CFR § 26.55(e)(iii)&(iv) in Appendix A and your State DOT DBE Special Provision in Appendix B.

- With respect to materials or supplies purchased from a DBE which is neither a manufacturer nor a regular dealer, count the entire amount of fees or commissions charged for assistance in the procurement of the materials and supplies, or fees or transportation charges for the delivery of materials or supplies required on a job site, toward DBE goals, provided you determine the fees to be reasonable and not excessive as compared with fees customarily allowed for similar services. See 49 CFR § 26.55(e)(2) in Appendix A and your State DOT DBE Special Provision in Appendix B.

***Trucking*** - Your State DOT will likely consider:

- DBE receives credit for the total value of the transportation services it provides on the contract using trucks it owns, insures, and operates using drivers it employs.

- DBE who leases trucks from another DBE receives credit for the total value of the transportation services the lessee DBE provides on the contract.

DBE who leases trucks from a non-DBE is entitled to credit for the total value of transportation services provided by non-DBE lessees not to exceed the value of transportation services provided by DBE-owned trucks on the contract.(Some states do not count the non-DBE leased trucks towards the DBE credit. Make sure to verify your state's rule on this.)

## 4. ESTABLISHING DBE PERFORMANCE OF A COMMERCIALLY USEFUL FUNCTION ("CUF")

To refresh yourself on what constitutes a CUF refer to Section B – Step 3.

You can be better assured that the DBE will perform a commercially useful function, if you do the following.

- ***DBE Plan for Performing Work***

If you have not already done so, determine how the DBE will perform the work including:

a. Supervision (both on-site and off site).

b. Equipment utilization.

c. Negotiation of cost, determination of quality and quantity, ordering, installation and payment for materials.

d. Manpower utilization schedule.

- ***Coordination of the Work***

a. You should provide the DBE with overall project schedule information and how their work is integrated.

b. The DBE should prepare their own schedule and submit to you for approval.

## 5. Monitoring DBE Performance of a Commercially Useful Function

It is important to understand what the FHWA and your State DOT considers important in determining whether a DBE has performed a commercially useful function.

To determine whether a DBE is performing a commercially useful function, your State DOT will evaluate the amount of work subcontracted, industry practices, whether the amount the firm is to be paid under the contract is commensurate with the work it is actually performing and the DBE credit claimed for its performance of the work, and other relevant factors.

The FHWA has made clear that your State DOTs should review the following five categories to determine whether the DBE is performing a commercially useful function:

- Management and Supervision
- Labor
- Equipment
- Materials and Supplies
- DBE Trucking

a. ***Management and Supervision*** – Your State DOT will likely consider:

- Scheduling work.
- Ordering equipment, materials and supplies.
- Preparing and submitting payrolls.
- Hiring and firing employees.
- Daily supervision and control of the work by a DBE's regularly employed superintendent.

***Management and Supervision "Red Flags"*** In a presentation on DBE fraud, the following red flags on management and supervision were identified:

- Mere Performance of Administrative Duties By DBE
- DBE Provides Little or No Supervision of Work
- DBE's Superintendent Is Not a Regular Employee
- Supervision Is Performed by Personnel Associated With the Prime Contractor or Any Other Firm or Business
- DBE Firm's Owner Is Not Aware of the Status of the Work or the Performance of the Business
- Inquiries by your State DOT or FHWA Are Answered by the Prime Contractor

b. ***Labor*** – Your State DOT will likely consider:

- Workforce must be under direct supervision of the DBE firm.
- Workforce should be normally employed by the DBE and not be normally employed by a non-DBE.
- DBE hires and fires employees.
- Workforce must actually be doing the work.

***Labor "Red Flags"*** In a presentation on DBE fraud, the following red flags on labor were identified:

- Movement of Employees Between Contractors
- Employee Paid by DBE and Prime
- Employee Working for Prime in Morning and DBE in Afternoon
- Employees Don't Know Who They Work For When Asked
- Superintendent Or Foreman Don't Work For DBE Firm

c. ***Equipment*** – Your State DOT will likely consider:

- The DBE owns or leases the equipment and has a written lease agreement.
- Only equipment that is specialized and on the project for other purposes may be utilized by the DBE with an operator who remains on the prime contractor's payroll. Approval from your State DOT must be obtained first.
- No credit towards the DBE goal is counted when the prime contractor leases equipment to the DBE.

***Equipment "Red Flags"*** In a presentation on DBE fraud, the following red flags on equipment were identified:

- Equipment Used by DBE Firm Belongs to the Prime Contractor or Another Contractor With No Formal Lease Agreement
- Equipment Signs and Markings Cover Another Owner's Identity, Usually Through the Use of Magnetic Signs
- A DBE Trucking Business Utilizes Trucks Owned by the Prime Contractor

d. ***Materials and Supplies installed by DBE Subcontractors*** - Your State DOT will likely consider:

- DBE subcontractors installing materials must negotiate the cost, determine quantity and quality, arrange delivery, install and pay for the materials and supplies it utilizes.
- Invoices must be sent to the DBE, <u>not</u> to the prime contractor.
- Payments by joint checks must be approved in advance by your State DOT.

***Materials "Red Flags"*** In a presentation on DBE fraud, the following red flags on materials were identified:

- Materials for the DBE Ordered, or Paid For, by the Prime Contractor
- Two Party Checks From Prime to DBE Subcontractor and Supplier or Manufacturer
- Materials or Supplies Necessary for the DBE Firm's Performance Are Delivered To, Billed to or Paid by Another Business
- A DBE Contractor Only Purchases Materials While Performing Little or No Work

***e. Trucking - Your State DOT will likely consider:***

- DBE must be responsible for the management and supervision of the entire trucking operation.
- DBE must itself own and operate at least one fully licensed, insured, and operational truck used on the contract.
- DBE receives credit for the total value of the transportation services it provides on the contract using trucks it owns, insures, and operates with drivers it employs.
- DBE who leases trucks from another DBE receives credit for the total value of the transportations services the lessee DBE provides on the contract
- DBE who leases trucks from a non-DBE is entitled to credit for the total value of transportation services provided by the non-DBE lessees not to exceed the value of transportation services provided by DBE-owned trucks

## 6. ASSISTANCE TO DBES

There may be instances that in an effort to help a DBE develop his capabilities that you want to assist a DBE in some manner such as renting him equipment, or renting him a foreman to help train his foreman, or assistance in estimating a project. In order for anything along these lines to be done they must be transparent to all interested parties. The best way of achieving this is to spell out these items in the subcontract agreement and ask your DOT for written approval. If you don't feel comfortable bringing it up to

your DOT it probably is advisable not to do it. DBEs that need various forms of assistance should be encouraged to work with the state supportive services program.

The special provisions of the subcontract or material contract should dictate what you are doing, what the subcontractor is doing and what, if any assistance you will give the DBE. The following items are usually examined by your State DOT to verify the DBE is performing a commercially useful function:

*a. Unloading and/or Hoisting Assistance*

- If the DBE subcontractor quoted its work excluding the unloading and hoisting of materials, then the contract provision should exclude it from the scope of work and the contract dollar amount should also exclude it. If the unloading and hoisting is to be done by the prime, this should be spelled out in the DBE's subcontract. If not specified in the subcontract, your State DOT should be advised in advance that you will be providing the unloading and hoisting services.

*b. Assistance with Equipment*

In general, the DBE subcontractor must provide the necessary equipment to perform its work. The equipment can be owned by the DBE or leased from outside sources. If leased, there should be a written lease agreement. In most cases:

- Do not loan or provide your equipment to the DBE subcontractor unless your State DOT is made aware and approves of it.

- In an emergency situation (such as where equipment malfunction or unavailability make negatively impact safety, material integrity, time factors, or other concerns) you may provide your equipment to a DBE subcontractor for a short duration but be expected not to receive credit towards the goal for the amount of equipment rental.

- If the fair rental value of the equipment temporarily provided to the DBE is to be deducted from DBE participation toward the goal.

*c. Assistance Ordering Materials and Supplies*

- Do not count toward DBE goals the cost of materials or supplies the DBE purchased from you or your affiliate.

- Do not deal directly with the material supplier on matters that are the DBE's responsibility. For example, do not schedule, order or arrange delivery of materials for the DBE.

- The more material-intensive the DBE subcontract is, the more likely FHWA or your State DOT will carefully scrutinize the DBE's handling of the material supply portion of the subcontract.

***d. Providing Early Payment or Cash Flow Assistance***

Most small subcontractors and suppliers, including DBEs, run tight operations from a capital and cash flow standpoint. A DBE may have problems making budget, paying creditors and/or making payroll. Depending on the circumstances, it may be necessary to provide some financial assistance that is not in-line with the payment provisions of the subcontract. Should that happen:

- Approval from your State DOT is necessary.

- Special procedures to follow must be set up and can be worked out without sacrificing the CUF or the independence of your DBE subcontractor.

***e. Mentor-Protégé Program***

Within the context of the DBE Mentor-Protégé program, a mentor is typically defined as an experienced contractor acting in a position of trust whereby the contractor provides guidance, counseling and training to a DBE Protégé needing assistance in successfully pursuing highway construction work. The DBE Protégé is a firm that needs a Mentor to develop or expand the Protégé's expertise and experience.

The Mentor-Protégé program may provide incentives to you and the DBE with the goal of assisting the DBE to successfully enter the free enterprise system. The further development of DBEs includes, but is not limited to, assisting them to move into non-traditional areas of work and/or compete in the marketplace outside the DBE program, via the provision of training and assistance from you.

Types of assistance you may provide to a protégé DBE include:

- Financial Counseling
- Management Advisement
- Capital Formation
- Technical Assistance
- Record Keeping

To participate in a Mentor-Protégé program, you must obtain your State DOT's approval. Your State DOT will provide you with details of its Mentor-Protégé program. The details should include descriptions of the types of assistance you may provide to your DBE Protégé, program requirements and parameters, and how your assistance may count toward contract goals.

Consistent with the USDOT Mentor-Protégé program guidelines, as found in 49 CFR § 26, *Appendix D*, which is attached as part of the Tool Kit's Appendix A, your State DOT's program will stipulate that :

1. Any mentor-protégé relationship shall be based on a written development plan, approved by your State DOT, which clearly sets forth the objectives of the parties and their respective roles, the duration of the arrangement and the services and resources to be provided by the mentor to the protégé. The formal mentor-protégé agreement may set a fee schedule to cover the direct and indirect cost for such services rendered by the mentor for specific training and assistance to the protégé through the life of the agreement. Services provided by the mentor may be reimbursable under the FTA, FHWA, and FAA programs.

2. To be eligible for reimbursement, the mentor's services provided and associated costs must be directly attributable and properly allowable to specific individual contracts. Your State DOT may establish a line item for the mentor to quote the portion of the fee schedule expected to be provided during the life of the contract. The amount claimed shall be verified by your State DOT and paid on an incremental basis representing the time the protégé is working on the contract. The total individual contract figures accumulated over the life of the agreement shall not exceed the amount stipulated in the original mentor/protégé agreement.

DBEs involved in a mentor-protégé agreement must be independent business entities which meet the requirements for certification as defined in subpart D of this part. A protégé firm must be certified before it begins participation in a mentor-protégé arrangement. If your State DOT chooses to recognize mentor/protégé agreements, it should establish formal general program guidelines.

These guidelines must be submitted to the operating administration for approval prior to your State DOT executing an individual contractor/ subcontractor mentor-protégé agreement.

The USDOT limits awarding DBE credit to a non-DBE mentor firm for using its own protégé firm for:

- more than one half of its goal on any contract let by your State DOT; and
- more than every other contract performed by the protégé firm.

However, some State DOTs have sought USDOT waivers of these limitations.

It is important that you look to your State DOT for guidance, requirements and details concerning its Mentor-Protégé program.

## 7. Change Orders and DBE Contract Goals

Change orders have a much different connotation and affect on the project if DOT bid the contract as a "unit price" or as a "lump sum" contract. For purposes of this tool kit the following considerations are directed towards "unit bid" contracts. A change order is a written order detailing changes to the specified work quantities or increase or modification in the contract due to such changes as additional work beyond the original contract. Some of the factors that might be considered in the application of the DBE program requirements to extra or additional work are: the nature and scope of the additional work, the degree of completion of the contract, the availability of DBEs to perform the additional work and the prime contractor's existing contractual commitments If your state DOT should broadly use change orders to cover formal modifications such as administrative changes for revisions to and clarification of contract requirements, changes in contract time, final quantity determinations, etc., such changes may not involve apply the DBE requirements from the original contract. Some of the examples on applying the DBE program requirements to contract changes are:

- If a change order involves items of work already included in a DBE's subcontract or the work is materially the same as the work included in the DBE's subcontract, the DBE is to have the opportunity to perform the work unless it is documented that the DBE is unable or unwilling to perform the work.

- Likewise, if a change order involves items of work already included in a non-DBE's subcontract or the work is materially the same as the work included in the non-DBE's subcontract, the non-DBE should be given the opportunity to perform the work.

- If the change order involves extra or additional work outside the scope of the original contract and involves items of work not covered in the original contract, the prime contractor is to exercise GFEs in taking all necessary and reasonable steps to meet the DBE program contract requirements.

## 8. Emergency Performance of DBE Work

A number of situations could necessitate the emergency performance of your DBE subcontractor's work. If you must use your equipment and personnel to perform part of the DBE subcontractor's work, in most cases you should follow these procedures:

- Notify your State DOT and inform it that the emergency work will be or was performed with your equipment and forces and that you will deduct an appropriate amount from the DBEs participation toward the goal.

- Document the work performed and itemize the total direct cost of equipment, labor, supplies, etc.

- Prepare a change order to reduce the DBE subcontractor's scope of work and contract dollar amount.

- Meet with the DBE subcontractor and develop procedures to eliminate the necessity for other emergency performance of work.

- Exercise good faith efforts to get additional DBE participation if there is a shortfall.

- The performance of work under these circumstances should not be routine but the exception to normal operations.

**Remember documentation must be accurate and complete so that the proper reduction is made to the DBE subcontractor's scope of work and dollar amount of contract. If possible get your State DOT's approval in advance. If that is not possible notify a representative of your State DOT that you plan to perform some of the DBE's work.**

## 9. Termination of DBE Contractor

Termination of a DBE subcontractor is not an easy process. Consider doing so only as a last resort.

- Make sure and comply with any provisions in your subcontract including any notice provisions.

- Inform your State DOT if you become concerned with a DBE subcontractor's lack of performance or declining performance.

- Use a "Show Cause" Notice Letter if necessary, sending copies to your State DOT and the DBE subcontractor's surety company.

- Document the DBE's efforts or lack of efforts to comply with the 5-Day "Show Cause" Notice Letter.

- Your State DOT DBE Special Provision likely requires that prior to terminating or removing a DBE subcontractor named in your DBE commitment, you must demonstrate to the satisfaction of your State DOT that the DBE was not able or willing to perform.

- You must obtain State DOT approval prior to any termination of a DBE.

## 10. REPLACEMENT OF DBE

Following the termination of, or refusal to perform by, a DBE subcontractor or supplier, it may be necessary to replace the contract DBE with one or more new DBEs.

- Under 49 CFR § 26.53(f)(2), your State DOT is required to have in its DBE Special Provision that when a DBE subcontractor is terminated, or fails to complete its work on the contract for any reason, you must make good faith efforts to find another DBE subcontractor to substitute for the original DBE. These good faith efforts shall be directed at finding another DBE to perform at least the same amount of work under the contract as the DBE that was terminated, *to the extent needed* to meet the DBE contract goal.

- Since you are only required to replace a DBE to the extent needed to meet the contract DBE goal, thoroughly project your final DBE contract participation. This projection will indicate whether you have requirements to replace part or all of the lost DBE contract volume.

- If you will not have sufficient DBE participation to meet the contract DBE goal, meet with your State DOT to discuss the matter. Your State DOT may insist that you seek DBE participation of other work or may only require that you make good faith efforts to find a DBE subcontractor or supplier to complete the work remaining from the terminated contract.

## 11. FINAL DOCUMENTATION AND CERTIFICATION

Likely, your State DOT DBE Special Provision requires a final contract report or documentation of your DBE participation and likely requires managers or corporate officials to sign and certify the final contract DBE participation report. This certification must be accurate to avoid being accused of a false claim or a false statement.

Make sure you:

- Perform a final audit of DBE participation.
- Check the final audit.
- Be conservative in the totals of DBE participation.

### *BUILDING THE WORK / REQUIREMENTS TO COUNT DBE PARTICIPATION TOWARDS THE DBE GOALS CHECKLIST*

**1. Have you established monitoring and documentation procedures for your unbonded subcontractors and suppliers?**

**2. Have you identified and complied with any prompt payment clause in the contract?**

**3. To ensure your DBEs perform a commercially useful function, have you:**

**a. Obtained a Work Plan?**

**b. Included DBEs in your weekly scheduling meetings?**

**c. Obtained a schedule from your DBE?**

**4. Are you monitoring your DBEs' performance to make sure they are performing, managing and supervising the work?**

**5. Regarding management and supervision, are your DBEs:**

**a. Scheduling, their work?**

**b. Negotiating the price, determining quantity and quality, arranging for delivery, installing and paying for materials they install?**

**c. Preparing and submitting payroll?**

**d. Hiring and firing their own employees?**

**e. Controlling the day-to-day work by their crews?**

6. **Regarding labor:**

   a. **Are crews under the direct supervision of the DBE foreman/superintendent?**

   b. **Are they normally employed by the DBE rather than being normally employed by a non-DBE?**

7. **Regarding equipment:**

   a. **Does the DBE own or does it have a written lease for the equipment?**

   b. **Is any equipment belonging to you or another non-DBE firm being utilized by the DBE? If so, is it a specialized piece of equipment that was on the job anyway, and has your State DOT given prior approval?**

8. **Regarding materials and supplies:**

   a. **Has the DBE negotiated the price?**

   b. **Has the DBE taken care of shop drawings?**

   c. **Has the DBE arranged for delivery and received the materials?**

   d. **Has the DBE installed the materials on this job?**

   e. **Has the DBE paid for the materials directly?**

   f. **Have you used joint checks to pay for materials? If so, did you obtain your State DOT approval first?**

# APPENDIX

## CONTENTS

| | TAB |
|---|---|
| USDOT REGULATIONS – PARTICIPATION BY DBEs IN USDOT FINANCIAL ASSISTANCE PROGRAMS (49 CFR § 26) | A |
| Your State DOT DBE Special Provision | B |
| USDOT GUIDANCE CONCERNING GOOD FAITH EFFORTS | C |
| Your State DOT GUIDANCE CONCERNING GOOD FAITH EFFORTS | D |
| USDOT GUIDANCE ON COMMERCIALLY USEFUL FUNCTION | E |
| Your State DOT GUIDANCE ON COMMERCIALLY USEFUL FUNCTION | F |

**Testimony of Dennis Kim**
**President, EVS, Inc.**

**before the**

**House Transportation and Infrastructure Committee**
***"The Department of Transportation's Disadvantaged Business Enterprise Programs"***

**March 26, 2009**

EVS, Inc.
10250 Valley View Road, Suite 123
Eden Prairie, MN 55344
Direct 952-646-0238
FAX 952-646-0290
Email: dkim@evs-eng.com

My name is Dennis Kim and I am the president of EVS, Inc., an engineering consulting company in Eden Prairie, Minnesota. I immigrated to the United States in 1969 from South Korea. I joined the company in 1980 and took over the ownership in 1982 and currently have more than 20 employees. The focus of my company is civil and environmental engineering.

For the first 10 years of my life in the United States, I continued my education at the University of Minnesota and worked as an engineer with the State of Nebraska. Despite all of this American education, Caucasian professionals who I see at work meetings regularly ask me where I learned to speak English and are surprised that I speak it as well as I do. I have heard many comments about my English. Then they ask me if I am a U.S. citizen. A number of Caucasian people also express surprise when I mention that my son is studying political science instead of engineering. It seems that it is expected that Asians are supposed to study only mathematics or engineering.

I joined EVS, a four-person engineering company in Minneapolis, Minnesota with the dream of becoming a successful businessman. In 1982, I took over the company when the founder moved out of town. One of the ways in which I decided to grow my company was to get involved in government contracting. I first made this decision in 1984, when I obtained Disadvantaged Business Enterprise ("DBE") certification. It was a time consuming and painstaking process to prepare all the required paperwork. It was also difficult to put together acceptable applications when help was not easily available at that time. The DOT told me they had limited capacity and could not do much to help me.

Despite these difficulties, I am very proud to say that I now have 22 employees. Last year we had $2.5 million in revenue. I have been able to grow my business from just 4 employees in 1982 to now having 22 employees. I am very proud of what I have accomplished. In 1990 my company was a finalist for the American Society of Civil Engineers award for exemplary engineering work. A decision driving course I designed for Dakota County Technical College in 1998 is still used today to train police officers, fire fighters, commercial truck drivers and other law enforcement officials. The special pavement on the driving course that I designed can simulate winter driving conditions. Being able to drive in very harsh winter conditions is a crucial skill for anyone living in Minnesota, and especially for law enforcement officials who need to quickly respond to emergencies. I'm honored that I was able to play a role in helping the community in this way.

During lunch meetings with potential project partners, Caucasian engineers and consultants tell me that they are sure that I eat stinky Korean food at home. I have tried explaining to them that Korean food tastes good and smells different because it is cooked with ingredients that are not used in American food. They tell me that it still stinks. Now, I make sure that I don't bring Korean food to work. If I have it at home and have to see any colleagues soon after that, I make sure to brush my teeth, use mouthwash and drink milk in order to mask the smell of the Korean food as much as I can. I drink milk because I heard that it hides strong breath odors. I think this is outrageous. To me, Korean food doesn't smell any stronger than hamburgers and French fries. I'm deeply offended that I have felt forced to hide eating my Korean food.

The examples about food that I just described are only one example of the discrimination people have shown towards me because of my race. However, I do recognize that the United States has made a lot of progress and I'm very grateful for that. But there is still a lot of work to be done.

In 1998, I first learned of a subcontracting opportunity with a large engineering company in Minnesota. This company was competing for a contract with the Minnesota Department of Transportation. Our share of the contract was more than $150,000 for 2 phases of the contract. I believe that the total contract amount for the large engineering company was more than one million dollars. EVS had been chosen by this company because we had approached them about this project and there was a requirement of DBE participation.

The project was delayed over a year because the scope of the project has been expanded greatly after the first contract was awarded. There had been a number of issues with the project including expanded scope of work, delay of the work and engineering problems. In the middle of the project, the DOT expanded the scope of the project. Figuring out how the large engineering company and my company were going to accommodate this expansion took significant time. Another reason for the delay was a change in the project management team at the large engineering company and at the DOT – the new people on the project management team had to take a lot of time to become familiar with the project. None of these problems were the fault of my company or me. In fact, during the period of delay, I frequently tried to reach the large engineering company to learn what was going on and I was repeatedly put off and was never given any real information.

Finally, more than a year later, the engineering company and the Minnesota DOT summoned me for a meeting to discuss the project. When I walked into the room, there were 3 people from the engineering company and DOT – all male Caucasians. It was quickly obvious to me that they had already discussed and decided the fate of the project, including my role as a subcontractor. I knew that they already had met earlier because they were on agreement on every issue related to EVS. They told me that the problem was entirely my fault and I was wholly responsible for it. They told me that they were kicking me off the project, and since the problem was my fault they would only pay me a fraction of the money I earned on the project thus far. I felt that their reason for unfairly targeting me in this way is that I am Asian American. Had I been Caucasian they would not have done this to me. They kicked me off the project and replaced me with a Caucasian subcontractor.

I did not complain to anyone about this because I was afraid of retaliation and being labeled as an Asian whiner. I regularly heard Caucasian engineers and contractors complain about DBEs who they thought were complaining for no reason.

When the engineering company and the DOT kicked me off the project, I did not realize then that I had been blacklisted. I came to know this later on when I tried to compete for other projects. The reason for my rejection was consistently that this large engineering company and the Minnesota DOT staff gave me a bad reference and recommended against working with me. Again, I really believe this was because I am Asian American. I was an easy target, as a minority, to be bad mouthed by this large white prime contractor. Since then, I have never been able to procure a DOT contract in the same district where this issue had occurred.

I would welcome the opportunity to do more work with the DOT – in particular I am excited to work on wind energy projects. It's the new frontier and my firm is poised to do really well in this area.

My experience with discrimination has demonstrated to me how important the DOT DBE program is. While in the situation I described, the project goals were clearly not sufficient incentive to keep the large engineering company from discriminating, I do believe that in many other cases the program works. Without it, qualified minority business owners like me would have even less of a chance at getting DOT contracts.

Recently, since federal stimulus dollars have become available, I have contacted the Minnesota DOT about new projects. I have noticed that they have become much more user-friendly and I hope this will continue.

Moving forward, I recommend that all federal and state agencies be more proactive in thinking about small businesses, including DBEs. Instead of always forcing small businesses to compete against large companies, there should be a more even playing field. This can be accomplished by unbundling larger contracts or even having particular contracts that are only open for bids from small businesses. Competition among peers is fair, and of course competition in general is always a good thing. Forcing us to always compete against the big guys means we will almost never get a prime contract. Small businesses want to be a player on their own, but we need experience in managing projects on our own and not always under someone else's umbrella.

This is important because in addition to having the right skills, business is heavily relationship-oriented. When small businesses are always a subcontractor, even on small projects, we don't have the opportunity to build relationships with the key decision makers. Interaction and relationship-building with the key decision makers will help small businesses become prime contractors and grow their business. When the pool of qualified prime contractors increases, the effect is that competition increases – and in business, that is always a good thing.

I really hope that my story will motivate you to not only reauthorize the DBE program but to improve it.

Thank you.

AMAC
AIRPORT MINORITY ADVISORY COUNCIL

# The Statement of Don T. O'Bannon, Esq. Chairman of the Airport Minority Advisory Council (AMAC)

**Before the Committee on Transportation and Infrastructure Of the United States House of Representatives**

**James L. Oberstar, Chairman**

**At the hearing on:**

**The Department of Transportation's Disadvantaged Business Enterprise Program**

**Thursday, March 26, 2009**
**11 O'Clock am**

**Statement of the**
**Airport Minority Advisory Council (AMAC)**
**for the Hearing on the Department of Transportation's Disadvantaged Business Enterprise Program**
**March 26, 2009**
**Before the U.S. House Committee on Transportation and Infrastructure.**

Mr. Chairman and Members of the Committee, my name is Don O'Bannon. I am the Chair of the Airport Minority Advisory Council ("AMAC"). I am submitting this statement on the Federal Aviation Administration's (FAA) Disadvantaged Business Enterprise (DBE) program and the Airport Concessions Disadvantaged Business Enterprise (ACDBE) Program. AMAC appreciates this opportunity and we thank you for your consideration of our views.

I. Introduction

AMAC is the only national, non-profit organization dedicated to fostering the full and fair participation of minority- and women-owned businesses in airport contracting and concessions, and the inclusion of minorities and women in employment within the airport industry. One of AMAC's most important objectives is to eliminate the discrimination minority- and women-owned businesses continue to face in the airport contracting and concessions businesses. We also aim to raise awareness regarding the important economic benefits these businesses bring to the airports and communities in which they operate. Combined with its affiliate (the AMAC Educational Scholarship Program), AMAC represents thousands of individuals across the airport industry spectrum—including minority and women business owners, corporations, airport operators, and government officials. Dallas/Fort Worth International Airport, where I work, is particularly proud of the growth of our local DBE concession entrepreneurs.

Many of the successful prime concessionaires for DFW's new terminal D started as minority joint venture partners under the DBE program and were awarded several concession packages. The DBE partners' growth and success is a direct result of not only their individual business acumen but also the ACDBE joint venture program at DFW airport.

As this Committee is aware, racial and gender discrimination continue to represent a serious problem in our nation. Unfortunately, in my role as AMAC Chairman and through my experience in the airport industry, I routinely see the impact of discrimination against minority- and women-owned businesses in all aspects of airport contracting and concessions programs. Minority and women business owners have faced discrimination in contracting, credit, bonding, insurance, the purchase of supplies, and in their daily interactions with colleagues. As a result, robust airport contracting and airport concessions disadvantaged business enterprise programs (collectively, "airport DBE programs") continue to play a critical role in the effort to remedy discrimination in these arenas. My testimony will detail the impact of discrimination on DBE contracting and concession businesses and will address certain governmental policies that AMAC believes should be adopted as part of the FAA Reauthorization.

## II. The Airport Disadvantaged Business Enterprise Program

The Airport Improvement Program includes codified small disadvantaged business programs to address airport contracting (49 CFR Part 26) and airport concessions (49 CFR Part 23).[1] With the exception of certain DOT rules that apply only

[1] DOT and FAA have joint responsibility for the airport DBE program. FAA's Office of Civil Rights has primary oversight responsibility for the program and for airport compliance. DOT has primary

to airport concessions, the airport DBE program regulations are synonymous to those that apply to federally-assisted surface transportation programs (e.g., the rules regarding goal setting or eligibility). The program is intended to ensure nondiscrimination in the award and administration of DOT-assisted contracts that address the needs of airports. It aims to remedy the long history of pervasive and continuing discrimination that studies show minorities and women still encounter in today's airport-related industries, and to ensure a level playing field on which they can compete for DOT-assisted contracts.

For these programs, Congress has established a national aspirational goal that 10% of FAA's federally assisted contracting (i.e., procurement, construction, or professional services contracts) is with firms certified as DBEs and that 10% of airport concessions are ACDBEs. Quotas are not permitted under the program and the goal is flexible, requiring only good faith efforts to comply. There are no penalties for failure to meet the 10% goal. All primary airports are required to develop and implement an FAA-approved DBE program plan with overall participation goals for their concessions and contracting. A firm (and its minority and women owners) seeking certification as a DBE must meet requirements with respect to (1) ownership and control, (2) personal net worth, and (3) size.

. The airport DBE programs were rewritten entirely in light of the Supreme Court's ruling in Adarand v. Pena[2] in order to ensure that the DBE program could meet strict constitutional scrutiny. The constitutionality of the DBE program has been upheld against facial challenges by every circuit court that has evaluated it.

---

responsibility for developing rules and guidelines for the national DBE program and for considering appeals from state or local certification decisions.

[2] 515 U.S. 200 (1995).

III. Economic Benefits of Minority-Owned Businesses in Airports

Mr. Chairman, the firms that participate in the airport DBE programs are a particularly meaningful source of economic activity in the airport and broader community. In addition to providing important products and services to airports and the traveling public, the airport DBE program promotes entrepreneurship, employment, and economic growth.

For example, the University of North Texas recently conducted a revealing and illustrative study of the Dallas/Ft. Worth International Airport's (DFW) Airport's Disadvantaged, Minority- and Women-Owned Business Enterprise (DMWBE) Program.[3] For the period of September 29, 2006 through August 30, 2008, the study found that DMWBE concessionaires produced more than $350 million in gross revenue and DMWBE firms provided over $280 million in contracting services and procurement.[4] Regionally, DMWBE spending and concession operations generated an astounding $1.2 billion in economic activity—creating over 14,000 job years of employment and increasing labor income by more than $450 million.[5] The positive economic contribution of airport DBE firms is an untold story that should be documented and celebrated.

IV. Discrimination Continues to be a Problem in the DBE Industry

While the airport DBE contracting and concessions programs have started to address inequalities faced by minority- and women-owned firms, discrimination continues in the airport industry. There is abundant and compelling evidence demonstrating that there is an ongoing and urgent need for these programs to address

[3] Terry L. Clower, Bernard L. Weinstein, Michael Seman, and Mehmet Adalar, Center for Economic Development and Research—University of North Texas, DFW International Airport's Disadvantaged, Minority- and Women-owned Business Enterprise Program: Detailed Findings and Updates (Feb. 2009).
[4] *Id.* at i-ii.
[5] *Id.*

current discrimination and the effects of past discrimination against minority- and women-owned firms.

In testimony before and statements submitted to Congress over the past six months,[6] AMAC has submitted twenty disparity studies.[7] Through detailed statistical and anecdotal evidence, these studies demonstrate the astounding pervasiveness of discrimination against women and minorities in the aviation industry, as well as every industry sector (e.g. professional services, heavy construction, etc.) with which airports

---

[6] *FAA Reauthorization: Hearing Before the Subcomm. on Aviation of the H. Comm. on Transportation and Infrastructure,* 111th Cong. (Feb. 2009) (statement of Gene Roth, Executive Director of the Airport Minority Advisory Council); *Infrastructure Investment: Ensuring an Effective Economic Recovery Package Before H. Comm. on Transportation and Infrastructure*, 111th Cong. (Jan. 2009) (statement of Gene Roth, Executive Director of the Airport Minority Advisory Council); *Hearing Before the Subcomm. on Information Policy, Census and National Archives of the H. Comm. on Oversight and Gov't Reform*, 110th Cong. (Sept. 2008) (statement of Anthony Brown, Chairman of the Government Affairs Committee, Airport Minority Advisory Council); and *Business Start Up Hurdles in Under-Served Communities: Hearing Before S. Comm. on Small Bus. and Entrepreneurship*, 110th Cong. (Sept. 2008) (statement of Don O'Bannon, Chairman, Airport Minority Advisory Council).

[7] *Race, Sex and Business Enterprise: Evidence from Memphis, Tennessee*, Prepared for the Memphis-Shelby County Airport Authority, NERA Economic Consulting, December 18, 2008; *Final Report: Alaska Disadvantaged Business Enterprise Study—Availability and Disparity*, D. Wilson Consulting Group, LLC, June 6, 2008; *Race, Sex, and Business Enterprise: Evidence from the City of Austin: Final Report Prepared for the City of Austin, Texas*, NERA Economic Consulting, May 15, 2008; *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport (BNA)*, Griffin and Strong, PC, September 19, 2007; *Disadvantaged Business Enterprise Availability Study*, prepared for the Maryland Department of Transportation, NERA, separate studies for: Maryland Aviation Administration, Maryland Transit Administration, and State Highway Administration, November 2, 2006; *Anecdotal Evidence of Race and Sex Disparities in the Washington State Department of Transportation's Contracting Market Place*, Colette Holt & Associates, July 2006; *Race, Sex and Business Enterprise: Evidence from Denver, CO*, NERA Economic Consulting, May 5, 2006; *Race, Sex and Business Enterprise: Evidence from the State of Maryland*, NERA Economic Consulting, March 8, 2006; *Race, Sex and Business Enterprise: Evidence from the State of Washington*, Prepared for Washington State Department of Transportation, NERA, October 20, 2005; *Race, Sex and Business Enterprise: Evidence from the State of Minnesota*, NERA Economic Consulting and Colette Holt and Associates, September 27, 2005; *State of New Jersey Disparity Study of Procurement of Professional Services, Other Services, Goods and Commodities*, MGT, June 13, 2005; *The City of Phoenix, Minority-Women-Owned and Small Business Enterprise Program Update Study*: Final Report, MGT of America, April 21, 2005; *Disadvantaged Business Enterprise Availability Study*, prepared for the Missouri Department of Transportation, NERA, November 26, 2004; *Disadvantaged Business Enterprise Availability Study*, prepared for the Illinois Department of Transportation, NERA, August 16, 2004; *North Carolina Department of Transportation Second* Generation Disparity Study: Final Report, MGT of America, Inc., March 30, 2004; *Disparity Study for the Commonwealth of Kentucky*, Griffin and Strong, P.C., March 2003; *Broward County Small Disadvantaged Business Enterprise (SDBE) Disparity Study*, MGT of America, Inc., April 3, 2001; *The Utilization of Minority Business Enterprises by The State of Maryland*, NERA Economic Consulting, January 8, 2001; and *Dallas /Fort Worth International Airport Board Disparity Study Final Report*, MGT of America, October 17, 2000.

and other transportation agencies conduct business. These twenty studies represent every region of the country, including both urban and rural areas. In addition, these studies demonstrate that the discrimination faced by women and minority groups, including but not limited to African-Americans, Hispanic Americans, Asian Americans, Subcontinent Asian Americans, and Native Americans comes in a variety of different forms. Each of the studies provides significant quantitative evidence of discrimination against minority- and women-owned businesses dealing in the industries that are integral to airport contracting. With my testimony today, I have provided six of these studies and I ask that they be included in the record.[8]

In order to demonstrate the seriousness of this issue to the Committee, I would like to cite just a few of the myriad of examples of discrimination contained in these studies:

- In a disparity study of the Metro Nashville Airport Authority, researchers found that all minority- and women-owned firms were significantly underutilized in the private construction sector, with disparity indices of 0.003 and 0.28, respectively. In addition, Native American and Asian American construction firms were not utilized at all, despite being available.[9]
- In a study conducted on the State of New Jersey's FY 2000-2004 procurement practices, researchers found that, DBE vendor utilization in the category of professional services, as measured in terms of unique vendors, increased from

[8] *Evidence from Denver, CO*; *Race, Sex and Business Enterprise: Evidence from the State of Maryland*; *The City of Phoenix, Minority- Women-Owned and Small Business Enterprise Program Update Study: Final Report*; *Broward County Small Disadvantaged Business Enterprise (SDBE) Disparity Study*; *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport*; and *Dallas /Fort Worth International Airport Board Disparity Study Final Report.*

[9] *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport (BNA)*, at 4-10.

0.62 percent during the pre-minority business program period to 1.10 percent in the period after the program was enacted. Researchers noted that "any shifts in underutilization can be characterized only within degrees of underutilization—more underutilized or less underutilized—but substantially underutilized in any case."[10]

- Studies have consistently found regression analysis demonstrates that minorities and women earn substantially and significantly less their white male counterparts. One disparity study noted that "such disparities are symptoms of discrimination in the labor force that, in addition to its direct effect on workers, reduce the future availability of DBEs by stifling opportunities for minorities and women to progress through precisely those internal labor markets and occupational hierarchies that are most likely to lead to entrepreneurial opportunities in the first place."[11]
- Research also indicates that there are statistically significant and large business formation disparities for minorities and women. A Minnesota study found that business formation for African-Americans is 53 percent to 63 percent lower than business formation for white males. The study further notes that "this suggests that minorities and women are substantially and significantly less likely to own their own businesses as the result of discrimination."[12]
- Studies have established widespread discrimination in the credit market. One study found that 40 percent of African Americans and 50 percent of Hispanic

[10] *State of New Jersey Disparity Study of Procurement of Professional Services, Other Services, Goods and Commodities*, at ii-xi.
[11] *Evidence from the State of Washington*, at 28.
[12] *Race, Sex and Business Enterprise: Evidence from the State of Minnesota*, at 35-37.

Americans were denied for loans, in comparison to 7.8 percent of non-minority males. In addition, once loans were approved, most minorities and women paid a higher interest rate than white males.[13]

- One study found that DBE participation dropped to virtually zero on federally-assisted contracts during a time when the program was enjoined. Researchers stated that "it appears that the mere fact of adopting a DBE program—whether or not goals are being set on any given contract—increases DBE participation."[14]

While statistical analyses present compelling evidence of discrimination, they do not tell the entire story. We can much better understand the seriousness of these statistics from stories that are told by the businesses themselves. Many of the studies also present extensive anecdotal evidence of discrimination, which gives life to the statistics and makes clear how discrimination actually works and how it specifically impacts minority and women owned businesses at every stage of the process. These anecdotes are the stories of individuals who struggle with discrimination as they seek to build their businesses, support their families, and contribute to our national economy. Here are just a few examples:

- A white woman business owner has experienced degrading treatment from contractors. In one instance, a contractor refused to pay her and gave her the impression that his refusal to pay was because of her gender.[15]
- An Alaska Native construction specialty contractor discussed specific experiences during a walk-through of a potential job site. He reported that the prime

---

[13] *Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport (BNA)*, at 9-10.
[14] *Race, Sex and Business Enterprise: Evidence from the State of Minnesota*, at 17-18.
[15] *Final Report: Alaska Disadvantaged Business Enterprise Study—Availability and Disparity*, at 8-26.

contractor regularly said "the reason you're here is because you're a minority," and explicitly stated his opinion that minority businesses were not qualified. He also reported that during a project, his company's equipment was regularly turned on during the night, causing the batteries to die and the project to be delayed. No non-minority contractors experienced this problem.[16]

- A Hispanic contractor reported that a general contractor called him to express that he "did not want any Mexicans on the job," and that he has been called "'Wetback', 'brown like s**t,' 'dumb Mexican,' 'little Mexican,' [and] 'my little Mexican friend.'" [17]
- A white woman business owner reported that she encounters people who assume that she is a "front" for a male-owned business, or that she is not qualified until she dispels the notions by demonstrating her expertise. Men she encounters on particular jobs have asked her, "What are you doing here?" [18]
- An African American business man reported that people assume that he does not understand relatively simple matters related to his work. At one time, he was bidding a concrete job and the individual he was interacting with spoke to him very slowly, explaining that he wanted to make sure the African American business man understood. He was under the impression that this lack of confidence in his ability to understand was because of his race.[19]

---

[16] *Final Report: Alaska Disadvantaged Business Enterprise Study—Availability and Disparity*, at 8-27 to 8-28.
[17] *City of Phoenix, Minority-, Women-Owned and Small Business Enterprise Program Update Study: Report*, at 6-26.
[18] *Final Report for Development and Revision of Small, Minority, and Women Business Enterprise Program, Nashville International Airport*, at 169-170.
[19] *Final Report for Development and Revision of Small, Minority, and Women Business Enterprise Program, Nashville International Airport*, at 171.

- An African American contractor said he has experienced prime contractors choosing to increase their workforce and equipment so that they can self-perform rather than hiring minority contractors.[20]
- A female engineer reported being dismissed as a serious professional. She has been asked by men in the transportation industry, "When are you going to stop taking this so seriously and get married?" and advised that she should behave as if she is gay if she wishes to work in the male-dominated field.[21]
- One minority contractor stated that he is treated unprofessionally by majority firms. At one presentation to a general contractor, the minority contractor was never offered a seat, and the general contractor joked and laughed about the fact that he believed he had a way of "getting around" the DBE ordinance and had already chosen another company to work with.[22]
- A minority contractor has experienced stigma associated with being a DBE and said that he encounters discrimination often. He has encountered the attitude that minorities are better-suited to be janitors or plumbers than architects. He perceives that his firm gets less credit than non-minority owned firms when projects are successful, and disproportionate criticism when projects are not successful.[23]

---

[20] *North Carolina Department of Transportation Second Generation Disparity Study: Final Report*, at 6-24.
[21] *Anecdotal Evidence of Race and Sex Disparities in the Washington State Department of Transportation's Contracting Market Place*, at 4.
[22] *Race, Sex, and the Business Enterprise: Evidence from the City of Austin: Final Report*, at 231.
[23] *Race, Sex, and the Business Enterprise: Evidence from the City of Memphis: Final Report*, at 261.

These studies provide a strong statistical and anecdotal record of evidence of pervasive discrimination against minorities and women and demonstrate that there is a continuing need for the airport contracting and concessions DBE programs. AMAC strongly urges Congress to continue to investigate and document the continuing impact of discrimination against minority- and women-owned businesses in airport-related industries.

V. Program Improvements and Contained in H.R. 915

Mr. Chairman, we would like to thank you for addressing two issues related to the DBE program in H.R. 915. First, many DBE firms are small, family-owned operations that spend considerable resources to complete the DBE certification program. Although the airport DBE program is governed by a single set of federal regulations, certifying officials often interpret and apply these rules differently. Section 135 of the bill would greatly ameliorate this problem by directing DOT to establish a mandatory certification training program and requiring those involved persons who are responsible for DBE eligibility and certification to complete the training.

Second, Section 137 of H.R. 915 contains a provision which is strongly supported by AMAC and which addresses another aspect of DBE program eligibility, the personal net worth (PNW) cap contained in DOT regulations.[24] Under the regulations, in order to be regarded as economically disadvantaged for the purposes of DBE certification, the minority or woman owner(s) of the firm must have a PNW that does not exceed $750,000. The PNW cap is based on a standard used in a Small Business Administration (SBA) federal contracting program and has not been adjusted for inflation since it was

[24] 49 C.F.R. Part 23.35; 49 C.F.R. Part 26.67.

first adopted two decades ago. The PNW formula also does not take into account the realities of operating an airport contracting or concession business, which is generally more expensive than a typical storefront operation. Section 137, directs DOT to issue final regulations to initially adjust the PNW for the inflation that has occurred since 1989 and then to adjust the PNW for inflation each year thereafter. AMAC believes this provision is an excellent addition to H.R. 915 as well as a matter of economic common sense and fairness.

I also want to stress that AIP is an important source of funding for airport capital projects, especially for smaller airports that are less able to access private capital markets. AMAC strongly urges reauthorization of the AIP program at a funding level that allows the program to encourage and support critical airport infrastructure needs. In addition, the multiple short-term extensions that have been enacted over the last 18 months drastically limit the ability to plan and execute important airport infrastructure programs. As such, AMAC would like to urge Congress to act quickly to enact H.R. 915.

VII. Conclusion

Mr. Chairman, AMAC greatly appreciates the House Transportation and Infrastructure Committee's leadership on the important issues of diversity and inclusion in the airport industry. We thank you for this opportunity to provide testimony before the esteemed panel and for your consideration of our comments and suggestions. We look forward to working with the Committee going forward.

**Testimony**
**Committee on Transportation and Infrastructure**
**United States House of Representatives**
**The Department of Transportation's**
**Disadvantaged Enterprise Program**
**March 26, 2009**

***Joann Payne, President,***
**Women First National Legislative Committee**
**227 MASSACHUSETTS AVENUE, NE**
**SUITE 202**
**WASHINGTON, DC 20002**
**202-452-9119**

WOMEN FIRST NATIONAL LEGISLATIVE COMMITTEE
227 MASSACHUSETTS AVENUE, NE
SUITE 202
WASHINGTON, DC 20002
202-452-9119

Chairman Oberstar, Congressman Mica, and Members of the Committee:
Thank you for the opportunity to appear here today. My name is Joann Payne and I am President of Women First National Legislative Committee. Women First National Legislative Committee is a nonpartisan, national grassroots advocacy group that aggressively promotes and protects the interests of women owned businesses certified in the United States Department of Transportation Disadvantaged Business Enterprise (DBE) Program.

**Introduction**

It has been seventeen years since I last testified before this Committee concerning the authorization of the Disadvantaged Business Enterprise (DBE) Program. I guess today should be headlined DBE the Sequel.

Mr. Chairman, I wish with all my heart I could look you straight in the eye and say to you that the Committee does not need to authorize the DBE Program but sadly I can not testify to that statement.

In 2001, Women First submitted an amicus brief to the Supreme Court in *Adarand Construction v. Mineta*. In the brief, it said, "they have experienced firsthand the detrimental effects of the discriminatory practices, which, to this day, continue to plague the construction industry. As a result of this discrimination, the ability of women owned businesses to compete for government contracts in the transportation related area has been severely hampered." [1]

And in 2009, those words are still true.

In 2004, during the Transportation Authorization process, Senator Max Baucus on behalf of Women First submitted for the record 15 letters from women-owned DBE firms from different states who had continued to face discrimination in the highway, airport and transit construction industry.

And in 2009, the words in those letters are still true today.

I am here to give voice to women-owned DBEs who continue to face discrimination on a daily basis.

---

[1] Brief of Women First National Legislative Committee, et al, *Amici Curiae* In Support of Affirmance of the Tenth Circuit Court of Appeals.

In surveying DBE's across the country regarding discrimination they have faced, I was not surprised by the anecdotal evidence of discrimination that was sent to me as these women owned businesses continue to face a number of the same challenges they have been facing for years.

Said one DBE, "When I applied for my first business line of credit the bank's loan officer actually said, 'Couldn't you get a man to co-sign? Your husband perhaps?' It took me a moment to register this flagrant disregard for about a half-dozen federal laws and banking regulations, and this guy's casual admission that unlawful discrimination is his bank's routine and pervasive policy. Calming myself, I pointed out that having my husband co-sign would make little sense, since he had no involvement with my company or the construction industry, not to mention that my own personal credit score was better than his. The bank officer said, 'Still, we'd be a lot more comfortable with a man's name on the application.'"

Another DBE from Indiana told me that "I own my companies 100% but I still face discrimination. Some of it is merely insulting and annoying, such as when a project's resident engineer won't speak to me on the job site but directs all his comments to the (male) foreman standing two feet to my left. Other things though affect my bottom line and are not so easily dismissed."

A women-owned DBE from Illinois wrote, "My Company is twenty-three years old and I have been in highway construction since 1971, yet I still deal with discrimination on a regular basis."

Another woman who has been in business for over twenty years was applying for certification in her state with a different city agency. The person reviewing the certification was in the DBE's office and the reviewer looked up at her and said that "all white women were fronts."

A DBE from Michigan wrote that she is still asked after 25 years in business as a contractor, 'Who runs the Company?' 'Who should I call?' Her response is, "I run my Company and proud of it."

A DBE in Delaware wrote she had a disagreement with one of her prime contractors. The Prime kept calling her office, but always asking to talk with the male foreman rather than her. This went on for several months. The foreman kept telling the contractor he needed to talk to the boss. The prime contractor decided to take a different approach so he called the DBE's home phone and left a message—for her husband.

Her husband had nothing to do with the project. The contractor said in the message, again, left for her husband, that they needed to sit down and talk about this to get it straightened out, and "we don't have to have your wife involved." When this failed to get a meeting, the prime contractor had no other choice but to meet with the boss, the woman who owns the company, to resolve the issue and the first thing he said to her was, 'I am sorry this has taken so long but I don't like dealing with women."

**Program Overview**

The DBE Program is a competitive small business program that is an innovative goal setting economic development program that produces results year after year.

The program:

- Creates jobs—approximately 100,000 jobs are created by DBE companies annually;
- Serves as an engine of growth for our nation's economy;
- Establishes a tax base from women and minority owned businesses;
- Promotes competition in an industry where there was very little for years;
- Levels the playing field by opening access;
- Promotes diversity

The DBE Program has proven to be an equal opportunity program, which benefits all Americans by promoting the development and competitiveness of America's small businesses. In fact, the DBE Program is the most successful small business contracting program for women. For example, the DBE Program has significantly increased the percentage of women owned construction firms. Women DBE participation has increased from 1.6% in 1986 to over 6% in 2008.

The DBE Program shows the government's commitment to its citizens on the notion that we all can, must and should contribute when given the chance.

**If the Program Does Not Continue**

In representing women-owned DBEs for twenty three years, I have heard women discuss the problems they face in the construction industry with Members of Congress and the Administration. These women, everyday, have to face the assumption by others that they can not do the work and run their businesses. Women owned businesses still have problems obtaining loans and bonding and after years in business they still have to explain that they are the boss to men on the jobs who refuse to believe that a woman can be the boss.

If the DBE Program were not to continue, I believe not just women and minority owned companies will be severely affected, but small majority owned sub-contracting businesses will be affected as well.

The only small business program in the highway, airport and transit industries will disappear. There would be no reason for sub-contract work even to majority firms thus competition would be eliminated and prices will climb.

The trend of the industry the last several years has been the prime contractors are doing more of the work in-house. For example, a women-owned DBE in Minnesota told me that in her state, because of a court ordered injunction, the Minnesota's DOT DBE Program was suspended for approximately two years.
Prior to this injunction, the Minnesota DBEs participation rate was 11% during the injunction period, participation dropped to 2%.
Much of the DBE work was absorbed by large prime contractors rather than going to specialty contractors. Most majority prime contractors returned to the same "good old boy" policy of exclusion.

In 1998, Congress again looked at the DBE Program specifically in states that had dismantled affirmative action programs and left it up to the marketplace to determine who would get contracts.

For example, less than one year after the state of Michigan dropped its state M/WBE program, the percentage of highway construction projects fell to zero even though DBE's participation in the federal program was at 13%. [2]

In Idaho, for state funded contracts, the rate of M/WBE's participation held steady in 2004 from 6.17% to 2005 at 6.29% to 2006 at 6.20% and when Idaho went to a race-gender neutral program, the M/WBE participation rate in 2007 dropped to 3.96%.[3]

In California, a state of great diversity which ranks amongst the ten largest economies in the world, the California Department of Transportation (Caltrans) discontinued setting DBE goals on federally-funded contracts on May 1, 2006. Their disparity analysis, written in 2007, compares utilization of minority- and women-owned firms for federal funded contracts when DBE contract goals are in place to what happened when the program was discontinued in 2006.

From 2002 through April 2006, total utilization of certified DBEs on federally funded contracts was 9.0 %. Since 1998, Caltrans has implemented only race- and gender-neutral measures on state-funded contracts. State funded contracts during this same time period was 6.7% for M/WBE companies.

After May 2006, when California discontinued setting DBE goals, certified DBE's participation in federally funded contracts was 4.9%, with WBEs participation at only .1%. Furthermore, the report went on to state that after May 2006, "Utilization of certified DBEs substantially decreased."[4]

---

[2] S1409, S1404 Statements by Senators Kerry and Baucus
[3] Idaho Department of Transportation
[4] Availability and Disparity Study California Department of Transportation, June 2007

It is very clear from the chart below that there is a great discrepancy between the participation of women and minority owned businesses in the federal DBE program and the state funded program. Most states do not have an affirmative action highway, transit, and airport contracting programs. Those states that do have contracting programs, they are usually for all small businesses and do not require specific goals on contracts.

Past history and present DBE participation percentages on state funded projects reflect what will happen if the DBE programs do not continue. I believe within two years the participation of women and minority owned businesses will drop nationally to approximately 2% based on past history and present reality.

**2007, 2008 Federal DBE Participation[5]**
**2007, 2008 State Funded M/WBE Participation[6]**

| *STATE* | *FEDERAL 2007* | *FEDERAL 2008* | *STATE 2007* | *STATE 2008* |
|---|---|---|---|---|
| ARKANSAS | 8.5% | 8.7% | 1.0% | 1.0% |
| CALIFORNIA* | 10% | | 3.0% | |
| FLORIDA** | 7.5% | | 9.4% | |
| IDAHO | 7.39% | | 3.96% | |
| MICHIGAN | 10.6% | | 2.0% | |
| MINNESOTA | 8.6% | | 2.0% | |
| NEVADA | 5.9% | | 2.0% | |
| NEW YORK*** | 3.0% | 10% | 3.0% | 3.0% |
| VIRGINIA | 10.2% | 9.8% | .297% | .25% |
| WASHINGTON | 12.3% | 13% | 3.6% | |

**CalTrans does not keep records, but estimated 3%*
***Florida has an outstanding Human Resources Department that grades its prime contractors by their DBE participation rates.*
****New York DOT had reporting problems in 2007 and feels that the 3% is a low estimate.*

[5] Federal DBE Participation rates provided by each state's Department of Transportation
[6] State DBE Participation rates provided by the state agency that oversees the DBE program.

**Conclusion**
I had a member of the Women First Board of Trustees tell me when asked why she still felt the burn of discrimination after years in business. She said to me that when she attends meetings there are very few women, if any, around the table.

She thinks, "Well it will be ok because I am at the table, I know these people, I've worked with them and I make a pretty good living—so why do I sill feel the subtle discrimination—and then I realized why."

She told me, "It's because I am not like them, I will never be like them, I am different and they don't understand the importance of that." I have thought about her statement a lot and I believe this awareness should empower her and other women owned businesses because they contribute and make better an industry that is vital to our country's daily life. And it also why diversity is so important in the highway industry and in our nation. Our diversity is what strengthens and binds us together. We are a government for all the people and all of our people deserve a chance to compete and to contribute.

Recently, in Minnesota, a Minneapolis-based DBE told a local radio station about work that she and other women and minority owned firms performed on par with any other contractor on the same project. "I think we've been given a chance to show that if a contractor can value the DBE's experience. . . We can add value to the final product and to the taxpayers of Minnesota." [7]

Mr. Chairman, I think that says it all.

[7] Minnesota Public Radio Interview with Susan Rani, Rani Engineering, December 8, 2008

5650 South Archer Avenue
Chicago, IL 60638

312-360-1122
Fax 312-360-0239

Federation of Women Contractors

WRITTEN TESTIMONY OF
BETH DORIA
FEDERATION OF WOMEN CONTRACTORS

HEARING ON
THE DEPARTMENT OF TRANSPORTATION'S
DISADVANTAGED BUSINESS ENTERPRISE PROGRAMS

BEFORE THE
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
UNITED STATES HOUSE OF REPRESENTATIVES

March 26, 2009

Introduction

Good afternoon, Chairman Oberstar and members of the Committee. My name is Beth Doria and I serve as Executive Director of the Federation of Women Contractors. Thank you for the opportunity to present written testimony in support of the need to continue the DBE program.

The Federation of Women Contractors (FWC) has been in existence since 1989, serving over 100 women-owned construction firms in Illinois. In addition, FWC serves in a leadership position for the Alliance of Minority and Female Contractor Associations, which aggregately serves over 1000 women- and minority-owned construction firms in the state.

A substantial number of these contractors are DBE certified and struggle, on a daily basis, to win contract awards. The biggest problems for DBE contractors are the personal net worth and gross revenues restrictions. These limits negatively impact a contractor's ability to access needed capital, secure lines of credit, and obtain required bonding. Additionally, in a trade where equipment purchases can easily exceed several million dollars each, obtaining equipment financing when you can only show a personal net worth of less than $750,000 is most often impossible. And, nationwide, these restrictions severely limit the available pool of qualified DBE contractors for state and federal procurement.

In addition to the barriers listed above, women in the trades meet massive resistance and various forms of pervasive discrimination. There remain persistent obstacles, largely related to the fears and prejudices of the men we work with:

- Refusal by general contractors to work with women and minority contractors
- Utilization of women and minority contractors only when goals demand they do so
- Deliberate withholding of payment to subcontractors
- Holding of retention way beyond terms of contract
- Unnecessary bonding requirements on contracts

And these obstacles are amplified for women of color.

Throughout the past several years in Illinois, various challenges to both the DBE and M/WBE programs have been brought forth[1]. In the course of defending those programs, both anecdotal and statistical evidence was presented supporting the disparate utilization of M/W/DBE's in the state and the continued widespread discriminatory practices by general contractors.

These same practices continue to exist today, partially because of the state's economic crisis and its failure to have adequate staff for compliance monitoring. Bid shopping, false listings of DBE subcontractors on projects, and loose monitoring of "good faith efforts", are all tactics utilized by majority contractors to circumvent the proper utilization of DBE contractors on projects. These practices are persistent and pervasive, and oftentimes blatant.

The existing DBE programs, although outdated, are often the only opportunity for qualified women- and minority-owned companies to participate on transportation-funded projects. Without the DBE program, there is no doubt there would be no participation by disadvantaged business enterprises on projects, at all. One need only look at recent statistics in states where M/WBE programs no longer exist to see the negative impact it has had on participation.

Additionally, the advantages of diverse participation in these programs far outweigh the negatives. Minorities and women generally hire other minorities and women and, therefore, sustain many disadvantaged communities by employing local workers. The social impact of restricting growth for these companies will likely become an additional statistic in the unemployment and Medicaid programs. Given the fact that the majority of economic growth occurs with small businesses, an appropriate business response would be to continue programs that sustain these employers.

On behalf of the entire DBE community in Illinois, I implore you to consider the widespread devastation eliminating the DBE program would have to the already-frail economic status of the country.

---

[1] Builders Association of Greater Chicago vs. City of Chicago, 96 C 1122; Northern Contracting, Inc. vs. State of Illinois, Illinois Dept. of Transportation, No. 05-3981, U. S. Court of Appeals for the Seventh Circuit

**STATEMENT OF JOEL SZABAT**
**DEPUTY ASSISTANT SECRETARY**
**FOR TRANSPORTATION POLICY**
**U.S DEPARTMENT OF TRANSPORTATION**

**BEFORE THE**

**COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE**
**U.S. HOUSE OF REPRESENTATIVES**
**MARCH 26, 2009**

***Disadvantaged Business Enterprise Program***

Chairman Oberstar, Ranking Member Mica, and Members of the Committee.

Thank you for inviting the U. S. Department of Transportation (DOT) here today to discuss our Disadvantaged Business Enterprise (DBE) program.

My name is Joel Szabat and I am the Deputy Assistant Secretary for Transportation Policy. With me today is Robert Ashby, the Deputy Assistant General Counsel for Regulation and Enforcement. Mr. Ashby has worked closely with our DBE program since its inception, and has been the primary drafter of the Department's regulations on the subject.

The DBE program, enacted in 1983 as part of the Surface Transportation Assistance Act (STAA) of 1982, was designed as a vehicle to increase the participation by small businesses owned and controlled by socially and economically disadvantaged individuals in federally assisted state and local contracts. Three major DOT operating administrations are involved in the DBE program: the Federal Highway Administration, the Federal Aviation Administration and the Federal Transit Administration.

An individual must be socially and economically disadvantaged to qualify his or her firm as a DBE. All *bona fide* African-American, Asian-American, Hispanic-American, Native-American and women-owned businesses are rebuttably presumed to be disadvantaged. Others may qualify on a case-by-case basis. The personal net worth of a DBE owner can not exceed $750,000, and the total gross receipts to a DBE can not exceed a $22.41 million annual average.

In Fiscal Year 2008, DOT distributed more than $40 billion in formula and other grant funds, which resulted in over $30 billion in contracting and subcontracting opportunities for small and disadvantaged businesses. DBEs were awarded $3.3 billion in contracts, representing over 11% of the total DOT assisted contracting.

The success of the DBE program is not measured solely in dollars or percentages. Across the country, DBEs are growing to the point of graduating from the program and, in many cases, becoming respected prime contractors.

For example:

- Myles Construction Company, after receiving assistance from the South Carolina DOT Business Development Center, advanced from subcontractor to prime contractor status, and recently was the low bidder on a project totaling $1.7 million dollars.
- In Illinois, Millennia Professional Services, a Hispanic-owned DBE engineering consulting firm, was founded and certified in 2004 by four partners working out of their basements. They started with two full-time employees and revenue of $76,000 in 2004, grew to 10 full-time employees, eight part-time employees, revenue of $1,408,000, and were awarded their first project as a prime consultant by 2007.

- In 2008, Millennia landed their second project as a prime consultant, employed nine full-time employees and 21 part-time employees, and had revenue of $2.0 million. They currently specialize in construction architecture.

We would like to provide for the record a selection of additional "success stories" that illustrate the benefits of the DBE program to individual firms and the innovate steps that many States are taking to help DBEs grow and prosper.

The DBE program in its present form has been an important part of DOT's financial assistance programs since 1999, and its antecedents reach back to 1980. Congress has enacted DBE or similar program requirements as part of every highway/transit authorization act since 1983, and similar requirements for airport programs were first codified in 1987. This is a program that has received bipartisan support from Administrations and Congresses controlled by both major parties.

In 1999, the Department issued a revised DBE regulation intended to meet the most stringent "strict scrutiny" constitutional requirements articulated for programs of this kind by the Supreme Court. Since then, every Federal court that has reviewed the DBE rule has found it to be constitutional. We would like to provide for the record a summary of those cases.

Why is the program constitutional? The courts speak of two requirements for the DBE program. First, there must be a compelling need for the program, such as the need to combat discrimination and its continuing effects. Second, the administration of the program must be narrowly tailored to address discrimination and its effects. The DBE regulation that the Department issued in 1999 focused on this second requirement.

In that rule, which continues, with minor modifications, to govern the program, we forbade the use of DBE set-asides and quotas. Only individuals who are genuinely socially and economically disadvantaged are eligible to participate, something we made clear by imposing a limit on the personal net worth of participants. Women or members of minority groups who are too wealthy do not get to participate, while individuals who are

not members of one of the designated groups can participate if they make an individual case that they are socially and economically disadvantaged.

We told state and local governments to use the best evidence available to estimate the DBE participation they could expect to obtain if there were a nondiscriminatory level playing field. This evidence-based estimate, and not some arbitrarily chosen number, must be the basis for each DOT recipient's annual program goal. We then told our recipients that they must achieve as much as possible of that annual goal through what we call "race-neutral" means, not involving the use of techniques that are based on the race or gender of business owners. Outreach, technical and bonding assistance, unbundling of contracts, and small business programs are among the race-neutral measures that we encourage recipients to use.

Only where a state or local government determines that it cannot achieve its "level playing field" goal solely through the use of race-neutral means does that government employ what we call "race-conscious" means, such as setting contract-specific goals for DBEs. Where there is a contract goal, we insisted that what matters in awarding a contract is that bidders make good faith efforts to use DBEs, which they can do either by meeting a goal or by documenting the efforts they made to meet the goal. We've made it very clear that nobody is required simply to "hit the number" in order to get a contract.

There is a great deal of flexibility in the DBE program. This flexibility allows recipients to implement their program without setting race conscious contract goals when not needed to ensure a discrimination-free market, and some recipients have all race-neutral programs. Where needed to narrowly tailor the program, the Department will grant waivers to recipients to permit them to focus their race-conscious goals only on groups for which there is evidence from a disparity study of underutilization. We have recently granted such waivers to California and Oregon. As provided in the DBE rule, recipients are not penalized for failing to meet their goals, though we use any shortfalls in evaluating program success and working with recipients to improve their programs.

Courts have noted these features of our regulation as reasons for finding that the DBE program meets the narrow tailoring requirement. But a narrowly tailored program passes constitutional muster only when there is a compelling need for having the program in the first place. That is where this Committee and the Congress as a whole come in. Congress is responsible for determining that there is a compelling need to continue the program.

During the 1998 consideration of a highway/transit reauthorization bill, Congress looked in detail at the need for the DBE program. Many members affirmed that discrimination against women and minorities persists, citing not only their own experience in their states and districts but evidence from sources like disparity studies. Members cited differences between the percentage of businesses that minorities or women own and the percentage of construction earnings that they receive. Members spoke of the differences between the loan amounts and terms received by white as compared to minority firms, and of the particularly difficult times minority and women-owned firms have in obtaining financing. Tellingly, members cited examples where minority and women-owned business

participation fell dramatically when goal-based programs were eliminated, or of situations in which, within a jurisdiction, DBE participation in Federal contracts was markedly more robust than the participation in state or locally-funded contracts that did not involve race- or gender-conscious programs. We would like to provide a copy of the 1998 debate for the record.

Those Congressional debates took place 11 years ago. What is the situation now? The Department believes strongly that, while substantial progress has been made, discrimination and its effects continue to exist today and to distort contracting opportunities for DBEs. While race-neutral programs have had heartening successes in some places, it is clear to us that there is a compelling need to continue to make race-conscious measures available, since use of this tool is often the only means of redressing the inequities we see in the transportation contracting marketplace.

One way we have of assessing the need for race-conscious measures is to look at the way that our recipients have structured their goals. Under our rules, recipients must meet as much of their overall goals as their evidence tells them they can through race-neutral measures. For meeting the remainder of their overall goal they have to rely on race-conscious measures. This means that if they could not use race-conscious measures, they would be unable to achieve levels of DBE participation consistent with a discrimination-free competitive environment. They would be unable to redress the effects of discrimination.

From 2004 – 2008, FHWA recipients and large FTA and FAA recipients of which we have current records have set overall annual goals in some 619 instances. In 81 percent of these cases, recipients have found it necessary to establish race-conscious goals.
This means that, eight out of ten times, our recipients, if denied the availability of race-conscious goals, would have left unremedied the effects of discrimination on small, disadvantaged business. Moreover, in 69 percent of these cases, the race-conscious component of the goal was needed to make up the majority of the entire overall goal. In the absence of race-conscious goals, the gap between a level playing field and the reality facing DBEs trying to find work with our recipients would have been significantly larger.

We would like to provide for the record a chart displaying the use of race-conscious goals by recipients in all three operating administration's programs, as well as the recipient-by-recipient data about DBE goals and achievements on which this chart is based.

As the result of a court decision (Western States Paving Co. v. United States and Washington State Department of Transportation, 407 F. 3d 983 ((9 th Cir., 2005)), we have had something of a laboratory experiment of the effect of denying race-conscious tools to recipients. This decision in effect prohibited jurisdictions in the 9th Federal Judicial Circuit from using race-conscious measures until they had conducted disparity studies. Meanwhile, recipients in the 9th Circuit had to use all race-neutral programs. When we observe notable decreases in the participation of DBEs coinciding with the sudden unavailability of race-conscious measures, we see the footprints of continuing discrimination.

We've looked at the DBE participation records of recipients in the 9th Circuit and we found the following: in the highway program, seven of the nine states' DBE participation declined between 2004 and 2007. Among airports, 18 of 28 experienced declines, as did seven of nine transit authorities. We would like to provide for the record charts displaying the information on which this calculation is based.

Not only has overall participation declined, but we have noted many cases in which recipients who were forced by the Western States decision to suspend the use of race-conscious have had difficulty in achieving DBE participation consistent with the nondiscriminatory level playing field they had estimated in setting their overall goals. For example, in 2007 and 2008, Arizona DOT set overall goals of 9.1 and 9.9 percent, and was able to achieve only 3.8 and 3.1 percent, respectively. California DOT set goals of 10.5, 10.5, and 13.5 percent in 2006, 2007, and 2008 and obtained only 8.2, 6.6., and 4.6 percent DBE participation in those respective years. Sound Transit goals were 15 and 13 percent in 2007 and 2008; its achievements were 8.6 and 6.8 percent in those years. Portland's airport set goals of 7.3 and 4 percent in 2007 and 2008, achieving only 2 and 1.1 percent DBE participation in those years. Our recipients' job is to ensure their Federally-assisted contracting programs provide nondiscriminatory access to business opportunities on a level playing field, as defined by their overall goals. Take away the ability to use race-conscious goals, and the recipients can't, in many cases, get that important job done

The effect of the loss of DBE contract goals is very evident to small disadvantaged businesses as they seek business day-to-day. DBEs describe a dramatic drop off in the opportunities to compete for business when race-conscious measures become unavailable. For example, when race-conscious goals were suspended in California following the Western States decision, a DBE contractor told State officials, since "there's no DBE participation goal, our phones have stopped ringing…we don't get calls any more." Another DBE contractor spoke of about a roughly 50% drop off in calls. A woman-owned construction business added that "where there are no goals, I can tell you that the fax machines stop…The next day I got no faxes, the phone didn't ring, asking for my bid. I used to get maybe 20 faxes a day…now I might get three a week."

A lot of the barriers that create the disadvantages that the DBE program is intended to remedy are well known: lack of access to capital, bonding, insurance, and other resources. Some examples include:

- An Idaho woman contractor commented that, despite good credit, it took her firm five years to get financing that a male acquaintance got after three months in business.

- A Texas minority contractor related being turned down for a $20,000 line of credit by a major bank even though he had a $20,000 CD to back up the loan.

- Several California contractors mentioned that prime contractors often imposed higher bonding or insurance requirements than the state required, blocking them from participation.

- One female contractor in California commented that "minorities and women have a much harder time getting capital, getting bonding, getting insurance…in bonding… women are still asked to have their husbands sign at the bank…"

- A minority contractor in Washington State told of the following situation he had encountered in trying to get financing:

  "My first commercial loan, I applied for a…line of credit, and I was turned down…And one of my white employees [said] 'Let me see your financial statements'…He walked down to same bank and walked into the same office and talked to the same loan officer and got a call three days later saying 'You've got the loan'…We walked into the bank…and the bank officer doesn't know who I am…and says to [the white employee] 'You're the kind of businessman we're looking for. I love your financials. We want to do business with you'…And then [my employee] says 'Let me introduce you to Mr. ___, who was here less than a week ago…' From then on, until I got much bigger, I never went into a bank without…a white employee."

As in the Washington State contractor's case, blatantly discriminatory attitudes sometimes play a role. In Idaho, for example, a female business owner related that a prime contractor would not give her specifications or allow her to bid on a private sector project because of her gender. A Hispanic contractor said it was not allowed to provide a proposal on a private contract because of ethnicity, the prime contractor explaining that it did not trust his work ethic. A Native American firm reported harassment of female construction workers that caused them to quit. Another female contractor said that "some contractors think we should not, as women, be on the job." She also mentioned that "comments and attitudes…wisecracks" often create a hostile workplace environment that affects her bidding, negotiating, and getting a job.

One of the most important barriers to participation encountered by minority and women-owned contractors is their lack of access to the informal networks of communication and relationship that are so important to success in the contracting business. In California, a female contractor said "There's still very much an old boy network …and if you're not an old boy, you're not in that network [and] there's a lot of information you don't get. [At the] golf course...information flows." An Asian DBE owner said prime contractors always use the same subcontractors and "don't see any reason of cultivating relationships [with and] providing jobs to new DBE firms ….." Another DBE firm owner commented that the "number one thing [that] puts DBEs at a disadvantage" is lack of access to decision makers, who "maybe … go out to drinks every once in a while…or see each other on the golf course." Non-DBEs, a trade association commented, do not trust DBE firms because they do not know them. Another trade association representative commented that "Lots of

things get done with back slapping and who knows who and if you're not in that group you might as well not come to the party."

Similarly, in Idaho, a DBE said that people get comfortable working with other people and they socialize outside of work on hunting trips, for example. An Idaho Hispanic contractor described the network there as "white guys that have been running around with the same white guys that have controlled the money in the valley for [many] years." In Illinois, a female contractor recounted going to the meeting of her local contractors' association; she was the only woman present out of over 200 attendees, and no one would talk to her.

In our experience in operating this program for nearly 30 years, possibly the most important function it performs is to address the lack of access by minority and women contractors to these crucial informal networks. Many prime contractors do not regularly socialize with African-American, Hispanic, Asian, female etc. contractors. But when there is a race-conscious goal on a contract, they are required to make good faith efforts that involve contacting DBE firms whose owners may not be part of their normal circle. This is a very beneficial way of introducing prime contractors to DBEs and, hopefully, beginning to create business relationships that will lead to opportunities for DBEs to get the work the need to succeed.

When we're examining evidence of the continuing compelling need for a race-conscious DBE program, one of the most important sources we have are disparity studies conducted around the country. These studies are very useful for providing detailed evidence of the ongoing presence of discrimination as well as the current effects of past discrimination. They examine, in a statistically sophisticated way, the differences between the availability and actual use of disadvantaged businesses and the degree to which these differences can be attributed to discriminatory distortions in the marketplace.

These studies paint an indelible picture of a nationwide problem, not limited to any particular minority group or any region of the country. While there are some differences among state and local jurisdictions, that picture is one of consistent underutilization of all the groups the DBE statutes and DOT's regulation presume to be disadvantaged. That is powerful evidence of discrimination. We would like to provide for the record a chart summarizing the underutilization findings of a significant number of disparity studies that have come to our attention, and we have in addition provided copies of these studies to the Committee.

Disparity studies also perform another important function, by collecting first-hand stories of how discrimination affects individual people trying to compete on an uneven playing field, some of which I have mentioned in this statement. These stories put an important human face on the abstractions and statistics that so often dominate the debate about race-conscious programs. We would like to provide for the record a summary of some of the real-world experience DBEs have had with discrimination and other barriers to participation in the marketplace that necessitate something like the DBE program.

In our experience, DBE companies are often reluctant to complain to us or to state or local governments about discriminatory treatment, for fear that rocking the boat will make it very difficult for them to get work. DBEs who participated in the disparity study process were often spoke of this fear of retaliation.. For example, an Austin, Texas contractor said that minorities and women who experienced discrimination "hesitate to use complaint procedures of public entities because they will get blackballed." Another experienced retaliation for bringing what he felt was a one-sided contract to Texas DOT's attention, in that it was never interviewed for another contract for which the firm was perfectly qualified.

There are complaints that cast light on potentially discriminatory situations in various jurisdictions. From 2005 to the present, the Department itself has received 34 complaints alleging discrimination against DBEs in the highway, airport, and transit programs.

For example, a DBE owner alleged that a large prime contractor only used the DBE firm to secure a contract and that the DBE's work never actually materialized. The Department's OIG investigated and found that the prime contractor had falsely represented that it met DBE requirements. In another case, a DBE alleged that a prime contractor committed to use a DBE just long enough to get a contract, and then quickly replaced the DBE with a non-DBE contractor. Other complaints have raised a variety of issues, such as improper goal-setting practices, exclusion of minority-owned bidders, harassment of DBE firms, failure of bidders on prime contracts to make good faith efforts to secure DBE participation. We would like to provide for the record a chart summarizing examples of both open and closed complaints that our agencies have received.

We believe that the information that is available, both the statistical evidence and the anecdotal stories, clearly indicate that there is a continuing need for our DBE programs to combat discrimination and the current impacts of past discrimination nation wide. The Department of Transportation has a compellingly necessary, quite successful, and narrow-tailored program to redress discrimination and its continuing effects in DOT-assisted contracting. We are continually working to improve it. We have held a series of large stakeholder meetings in the last several months, and have issued guidance and rulemaking documents inspired by the participants' comments. The stakeholders include representatives from the prime contracting, DBE, and state and local government communities. We would ask the Committee to take notice of statements on this subject that have been made by members of Congress or witnesses at hearings in recent years, and would like to provide for the record a list of links to statements and information that have been presented to Congress on this subject. We also would like to provide for the record a series of publications in the media that have discussed the persistence of discrimination and barriers to the success small disadvantaged business, as well as the effects of the termination of race-conscious goals on the opportunities of DBEs.

Recently, we have issued a final rule to adjust the small business size standards in the rule for inflation. We are also considering how to respond to concerns expressed in the stakeholder meetings about such issues as ways of streamlining the certification process for companies that wish to work in more than one State, and reducing the frequency of

recipients' overall goal submissions to the Department. We would like to provide for the record a copy of the final rule.

If the DBE program is to work well, it's crucial to ensure that its operations are transparent and honest. Our Office of Inspector General (OIG) has made rooting out DBE fraud one of its priorities, and its successes in obtaining civil settlements and criminal indictments and convictions is fair warning to those who would try to take improper advantage of the program. During the last 5 years (October 1, 2003 through September 30, 2008), OIG investigations of DBE fraud allegations have resulted in 49 indictments, 43 convictions, nearly $42 million in recoveries and fines, and 419 months of jail sentences. Through conferences, publications, and videos, OIG has also carried out an aggressive fraud awareness program. We would like to submit for the record some examples of the kinds of enforcement actions that have resulted from OIG investigations of DBE fraud.

DOT's other agencies are also working to ensure accountability and transparency in the DBE program. The Federal Transit Administration is engaged in a series of oversight visits to certifying agencies. the Federal Highway Administration and Federal Aviation Administration have stepped up operational oversight of the DBE program in their areas of responsibility. We intend to continue this important process of getting information to help us improve the program.

With significant additional transportation funding becoming available quickly because of the American Recovery and Reinvestment Act (ARRA), the Department has an unparalleled chance to make sure that DBEs have a nondiscriminatory opportunity to participate in the recovery from the current recession. Congress made clear that the DBE program applies to ARRA-funded projects, and the Department has issued guidance emphasizing this to our state and local partners. The DBE program will allow us to ensure that all American businesses benefit, without being held back by discrimination, from this opportunity.

Thank you again, and Mr. Ashby and I will be happy to respond to any questions you may have.

**U.S. House of Representatives**
**Committee on Transportation and Infrastructure**
**Washington, DC 20515**

James L. Oberstar
Chairman

David Heymsfeld, Chief of Staff
Ward W. McCarragher, Chief Counsel

John L. Mica
Ranking Republican Member

James W. Coon II, Republican Chief of Staff

March 31, 2009

The Honorable Joel Szabat
Acting Assistant Secretary for Transportation Policy
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Dear Acting Assistant Secretary Szabat:

On March 26, 2009, the Committee on Transportation and Infrastructure held a hearing on **The Department of Transportation's Disadvantaged Business Enterprise Programs.**

Attached are questions to answer for the record submitted by Rep. Grace F. Napolitano. I would appreciate receiving your written response to these questions within 14 days so that they may be made a part of the hearing record.

Sincerely,

Jim Oberstar

James L. Oberstar
Chairman

JLO:pk
Attachment

MARCH 26, 2009
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
HEARING ON
THE DEPARTMENT OF TRANSPORTATION'S
DISADVANTAGED BUSINESS ENTERPRISE PROGRAMS

QUESTIONS FOR THE RECORD FROM REP. GRACE F. NAPOLITANO TO:
THE HONORABLE JOEL SZABAT
ACTING ASSISTANT SECRETARY FOR TRANSPORTATION POLICY
U.S. DEPARTMENT OF TRANSPORTATION

Questions regarding California DBE Program Application

1. Caltrans has recently received interim approval from the Federal Highway Administration (FHWA) to proceed with a DBE program that does not include Hispanic and subcontinent Asian contractors in the race conscious program category. Why were Hispanic and subcontinent Asian contractors not included in the race conscious program category and do you feel this was a mistake?

2. Why was Caltrans only granted interim approval for their DBE program? What was lacking in their application? What must be done for Caltrans to complete their application with Hispanic and subcontinent Asian contractors included in the race conscious program category? How is the Department working with Caltrans to solve this problem?

**March 26, 2009**
**Committee on Transportation and Infrastructure**
**HEARING on**
**The Department of Transportation's**
**Disadvantaged Business Enterprise Programs**

**Questions for the Record from Rep. Grace F. Napolitano to:**
**The Honorable Joel Szabat**
**Acting Assistant Secretary for Transportation Policy**

**Questions regarding California DBE Program Application**

QUESTION 1. Caltrans has recently received interim approval from the Federal Highway Administration (FHWA) to proceed with a DBE program that does not include Hispanic and subcontinent Asian contractors in the race conscious program category. Why were Hispanic and subcontinent Asian contractors not included in the race conscious program category and do you feel this was a mistake?

RESPONSE: A recent federal court decision had the effect of requiring West Coast states to conduct disparity studies before resuming the use of race-conscious goals. A disparity study conducted by Caltrans revealed that while several groups presumed disadvantaged under the Department of Transportation's DBE program were underutilized, Hispanics and Subcontinent Asian Americans were not. Based on this evidence, Caltrans applied to the U.S. Department of Transportation for a waiver of a regulatory requirement that all DBEs be included in race-conscious goals. The waiver was also needed to ensure that Caltrans' implementation of its program was narrowly tailored to meet the standards set in the recent court case. The Department granted this request, since the evidence supported it, and Caltrans' race-conscious goals are not, therefore, required to include these two groups.

QUESTION 2. Why was Caltrans only granted interim approval for their DBE program? What was lacking in their application? What must be done for Caltrans to complete their application with Hispanic and subcontinent Asian contractors included in the race conscious program category? How is the Department working with Caltrans to solve the problem?

RESPONSE: Caltrans was granted conditional approval of the methodology used in establishing its overall goal in view of the need for the agency to begin promptly its use of race-conscious goals, particularly in light of projects being expedited with the use of American Recovery and Reinvestment Act funds. Caltrans had delayed its use of race-conscious goals for some

time after the Department of Transportation's decision to grant a program waiver based on the results of the study. The conditional nature of the approval was designed to emphasize to Caltrans the importance of responding in a timely manner to the request of the Federal Highway Administration (FHWA) for additional information to support the overall goal Caltrans had chosen. FHWA will convert the interim approval to a final approval when it completes its review of the additional information provided by Caltrans.

Under the program waiver, Caltrans will not include Hispanic and Subcontinent Asian American contractors in its race-conscious goals. If, in the future, evidence shows that the two groups are underutilized (i.e., that there are statistically significant disparities between availability and utilization) then Caltrans' race-conscious goals would once again include them.

KWAME
BUILDING GROUP, INC.

## DOT DBE Congressional Hearing Testimony

**By Anthony Thompson**

Kwame Building Group, Inc.
1204 Washington Avenue - Suite 200
St. Louis, MO 63103
(314) 754-5617

**Underutilized or Disadvantaged?**

Why is it that, despite a decade of record revenues and employment growth in the St. Louis construction industry, we see ongoing unrest over the lack of minority business participation in public construction projects? Why, after years of disadvantaged business enterprise (DBE) programs are so many minority-owned firms still struggling to survive or prosper? One reason is that racial and gender discrimination are still problems in our nation.

Despite this, the interest on the part of owners and community stakeholders seems sincere. Yet the largest public projects in the country continue to fall well below the goals set by their own boards.

Some minority-owned businesses thrive in America. Success varies widely across categories in the minority business community. The technology industry has offered great opportunities for David Steward of World Wide Technologies and Kelvin Westbrook of Millennium Digital two minority business owners whose exemplary firms rival any competitor. The Kwame Building Group has grown and survived multiple challenges and obstacles and still managed to become one of the most successful DBE firms in the construction industry working on multiple transit and transportation projects from Seattle to Pittsburgh and Dallas to St. Louis.