# EXHIBIT A-10
# (part 5)

But we can't assume that all minority or DBE firms are doing well just because a couple are successful. Each industry has its own unique challenges and I believe none is more challenging than the design and construction industry. With second and third generation transitions among white family business owners in full swing and a curious dynamic of "minority inclusion" efforts in place, the local construction industry is an anomaly in terms of minority business success.

Consider this. For a small minority- or woman-owned business to become certified to compete for what is typically a small portion of a construction contract; the owner must complete exhausting forms that expose his or her business and personal financial history, tax returns and financial statements to bureaucratic strangers. Certification requires many hours of work and much exposure, simply to validate ethnicity or gender. Given the threat of identify theft these days, most privately owned companies would bristle at that level of intrusion.

Then, after a considerable expenditure of time and money, the firm is *not* put on a list for prime or lead contract opportunities. Instead, they are usually only eligible to be a *subcontractor* on a prime contract typically held by a white-owned business. In some cases, the prime contractor is less qualified than the minority contractor, who they are soliciting for sub work simply to meet minority inclusion requirements. The white prime contractor does not complete a form or share any highly confidential and personal financial information to be considered for a major prime contract.

This is not the best way to promote greater minority participation. The very businesses these programs are designed to help are disadvantaged from the start by a system that requires them to spend more time, money and resources than their white colleagues, for lesser opportunities.

However, most minority-owned firms don't mind the effort it takes to become certified. In fact, most small businesses would not exist or prosper if not for these programs. And let me just say that none of us support companies that take advantage of these programs. Fronts and frauds are unacceptable and should be excluded from participation. Still, it is important to understand that most majority firms have huge advantages when utilizing a disadvantaged business enterprise.

Initiatives implemented to improve cash flow for DBE's assist cash flow for the majority firm as well. Therefore the DBE program is often as much an advantage to the majority firm as it is to the DBE firm.

So how do we fix this complicated dilemma? We need to keep our eye on the ball of working to address discrimination and facilitate the development of strong, viable and competitive minority and women owned businesses. And we need to limit administrative burdens on DBEs while simultaneously taking on fraud and abuse. This leads me to a potential solution. If you do what you have always done, you will get the results you have always gotten. The DBE program is not the problem, but I believe in can be implemented far more effectively to meet its real purpose. So let's try something different.

The Mentor/Protege Program at Busch Stadium is a shining example of success, one that is bound to become a national model. This program has provided meaningful, growth-building contracts to more than 60 local minority and woman-owned enterprises (M/WBE). Most importantly, the positive impact goes far beyond the initial contracts or any statistical goals. The program actually helps firms gain the skills they need to be successful and profitable in the long run.

So what has made this DBE program highly successful, while others have failed?

First, we have a solid commitment from the Cardinals, the private owner of the project, inspired by a similar commitment from Major League Baseball (MBA). To achieve the Cardinals' inclusion goal, every prime contractor had strong incentives not only to team with a minority or woman-owned firm certified through the DBE program but also to be actively ***involved*** in that firm's work throughout the project.

One-on-one mentor/protégé relationships were created, and written, monitored action plans were established to ensure that the M/WBE firms learned the rigors of working on a large project.

Secondly, we built in extensive oversight, follow-up and support from Hunt Construction in association with Kwame Building Group, the general contracting team on the stadium project. April Brown-Hendricks of my firm, Kwame Building Group, manages the program and provides training workshops and support for the M/WBE firms. The involvement from the top down has given the program real depth. MoDot liked it so much, they hired April to head a similar program on a local highway project and recently hired her directly for their department.

The goal was to leave the market stronger, to leave stronger minority subs capable of doing more work, and capable of doing it in a more efficient manner. We succeeded.

The key to this program's success is that it's neither voluntary nor a mandatory set-aside. The Mentor/Protégé program works because it combines both commitment and desire, and goes well beyond the cliché reasons to not do business with small minority or woman-owned firms. At Busch Stadium and MoDot, the owner is committed to inclusion, the prime contractors/mentors are enthusiastically involved and the protégés are receiving extensive training and support to help them grow and stay successful.

So next time you hear "there just aren't enough good minority-owned firms," try thinking outside the box for a moment. Instead of just setting goals that may or may not even be met, let's ask our public agencies to provide *real* opportunities – even prime contracts – to our most promising minority- and woman-owned businesses. Let's ensure that our young minority and woman entrepreneurs and workers are truly on level footing with their white male peers. Let's build an industry where we can share expertise and grow all of our businesses. After all, DBE firms want the same thing as majority firms, they are placed at a disadvantage by bureaucrats, thus the term disadvantaged has a stigma associated that sends the wrong message of inadequacy. The real term should be changed for good to "underutilized business enterprise" or UBE.

And we can do this by being FAIR! That is how we will build a better America.

NERA
Economic Consulting

**Testimony Concerning the Challenges Faced by Disadvantaged Business Enterprises in the Transportation Sector**

*Testimony of Dr. Jon S. Wainwright, Vice President, NERA Economic Consulting, 1006 E. 39th St., Austin, Texas 78751, (512) 371-8995*

Before the Committee on Transportation and Infrastructure

United States House of Representatives

March 26, 2009

Chairman Oberstar, Ranking Member Mica, and Members of the Committee:

Thank you for the invitation to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Currently, I am a Vice President with NERA Economic Consulting, in Chicago, Illinois and Austin, Texas.

NERA is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For nearly half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. With its main office in New York City, NERA serves clients from over 20 offices across North America, Europe, and Asia Pacific.

I would like to ask the Committee's permission to include my entire testimony in the record as if read in full and to supplement my testimony with additional material if needed.

## I. Introduction

For twenty years, I have devoted the greater part of my professional life to studying race and sex discrimination and its impact on business enterprise and entrepreneurship in the United States. During this time I have served as the project director and principal investigator for almost 30 studies of business discrimination against minorities and women undertaken since 2000 and prior to that time worked on perhaps a dozen more. I have authored a book on the subject and provided expert testimony in federal and state courts on these and other labor and business related matters on 13 occasions.

I was fortunate to have been mentored at the start of my career by two of the country's leading scholars in this field—Dr. Ray Marshall, Professor Emeritus at the Lyndon B. Johnson School of Public Affairs at The University of Texas at Austin and former United States Secretary of Labor, and Dr. Andrew Brimmer, former member of the Board of Governors of the Federal Reserve, former Assistant Secretary of Commerce, and Professor Emeritus at the University of Massachusetts, Amherst.

A key lesson I absorbed from these men was expressed by Professor Marshall in this way:

> "Institutionalized discrimination in business transactions is deeply rooted in the American economy. There can be no doubt that business discrimination inflicts serious damage on the society, polity, and economy. Governments have a responsibility to improve public understanding of the seriousness of this problem and to take positive steps to address it. These positive steps must include public education, specifically outlawing this form of discrimination, using governments' purchasing power to help those who are being discriminated against while rewarding those who do not discriminate, and developing race neutral programs to help all small businesses."[1]

If you accept that discrimination in business transactions has become institutionalized in the American economy, then it is difficult to argue with the logic of Dr. Marshall's conclusions.

During the last twenty years, the primary bulwark against business discrimination has been the policy of using public sector purchasing power to support the entrepreneurial endeavors of DBEs and other historically underutilized businesses and to promote fair and full access to government contracting and procurement opportunities as well as to mitigate the impact of business discrimination in the private sector. The Department of Transportation's Disadvantaged Business Enterprise (DBE) Program[2] is a key example of such policies at the federal level.

**II. Constitutional Challenges Facing the USDOT DBE Program**

The USDOT DBE Program, like other affirmative public contracting programs, is subject to the highest and strictest standards of constitutional scrutiny.[3] It is important, therefore, that the DBE studies used to assess the scope of business discrimination and the presence of DBEs in the markets of state DOTS, airports, and transit agencies are of high quality—

---

[1] Ray Marshall, "Minority and Female Business Development After *Croson*," Working Paper, 2000.

[2] 49 C.F.R. Part 26.

[3] *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); *Adarand v. Peña*, 515 U.S. 200 (1995) (*Adarand III*).

independent and objective, academically rigorous, and incorporating as much relevant evidentiary data as possible. It is equally important that these DBE studies are carried out by economic and statistical experts who can be qualified in federal court to testify regarding their data, methods, and findings.

In 1999, Congress reviewed and revised the DBE Program's authorizing statute and implementing regulations. To date, every court that has considered the issue has found the DBE regulations to be constitutional on their face.[4] Whether the DBE Program can withstand an "as applied challenge," however, appears to turn at least in part on whether the public sector defendant went to court prepared with a high quality DBE study and testifying expert.

For example, when the DBE programs at Minnesota DOT (*Sherbrooke*) and Illinois DOT (*Northern Contracting*) were challenged, good DBE studies and qualified experts played crucial roles in successfully defending the constitutionality of the DBE program as applied by each agency. In contrast, when the DBE program at Washington State DOT was challenged (*Western States*), no study or expert was proffered at all. As a result, the Ninth Circuit lacked the benefit of any guidance on the correct economic analysis of discrimination and made several serious errors as a result.[5] Although unrelated to the USDOT DBE Program, a similar situation recently occurred in the Federal Circuit Court of Appeals in the *Rothe* case concerning the Department of Defense Program for Small Disadvantaged Businesses.[6] Here again, the defendants proffered no study of their own nor an expert to testify about such a study and once again, the court made several serious errors in its economic reasoning, concluding, for example, that factors such as firm size should be factored into estimates of DBE availability.

**III. Findings and Conclusions from NERA's DBE Studies Completed Since 2000**

I would like to address the remainder of my remarks today to the state of DBEs as documented in 16 studies and related research I have directed at NERA in the last 10

---

[4] *See, e.g., Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147 (10th Cir. 2000), *cert. granted*, 532 U.S. 941, *then dismissed as improvidently granted*, 534 U.S. 103 (2001) ("*Adarand VII*"); *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation*, and *Gross Seed Co. v. Minnesota Department of Transportation*, 345 F.3d. 964 (8th Cir. 2003), *cert. denied*, 541 U.S. 1041 (2004); *Western States Paving Co., Inc. v. Washington Department of Transportation*, 407 F.3d 983 (9th Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006); *Northern Contracting, Inc. v. Illinois Department of Transportation*, 473 F.3d 715 (7th Cir. 2007) ("*Northern Contracting III*").

[5] For more on this, *see* Colette Holt and Jon Wainwright "*Western States Paving Company v. Washington State Department of Transportation*: Ninth Circuit Upholds Federal Disadvantaged Business Enterprise Program for Transportation Contracts But Strikes Down State's Implementation of Program Regulations," American Bar Association, Section of Antitrust Law, *The Transportation Antitrust Update*, No. 16 (Spring), 2007.

[6] *Rothe Development Corporation v. U.S. Department of Defense*, 545 F.3d 1023 (Fed. Cir. 2008) ("*Rothe VII*").

years, and the implications of these findings for the continuing need for the public sector to use its purchasing power to help remedy the ill effects of business discrimination.

Each of these studies includes one or more entities participating in the USDOT's DBE Program through a state department of transportation, a transit authority, or an airport. With the Committee's permission, I would be pleased to provide copies of all sixteen studies for entry into the record.[7]

It is important to acknowledge as well the enormous amount of relevant evidence that already appears in the Congressional record. A useful synopsis of this evidence was provided by the Tenth Circuit Court of Appeals in their decision in *Adarand Constructors*.[8] Additionally, the U.S. Senate Committee on Small Business and Entrepreneurship, for example, held hearings in May 2007 and September 2008 regarding closely related subject matter. The Subcommittee on Information Policy, Census, and National Archives of the U.S. House Committee on Oversight and Government Reform held a hearing in last September as well on how information policy affects competitive viability in minority contracting.

The DBE studies I have submitted for the record span a wide range of geographic locations—from Pennsylvania in the North, Texas and Tennessee in the South, Maryland in the East, Washington and Colorado in the West, to Illinois, Minnesota, and Missouri in the Midwest. Of the 75 members of this Committee, 50 hail from states represented in the studies we have submitted.

Despite the geographic diversity our studies represent, the findings from these studies show far more similarities than differences—minority-owned businesses and women-owned businesses throughout the nation continue to face large disparities in almost every aspect of business enterprise activity that can be quantified.

---

[7] Memphis International Airport, 2008; City of Austin, Texas (including Austin-Bergstrom International Airport), 2008; Illinois State Toll Highway Authority, 2006; Maryland Department of Transportation, State Highway Administration, 2006; Maryland Department of Transportation, Maryland Aviation Administration, 2006; Maryland Department of Transportation, Maryland Transit Administration, 2006; City and County of Denver (including Denver International Airport), 2006; St. Louis Regional Transit, 2005; Washington Department of Transportation, 2005; Minnesota Department of Transportation, 2005; Missouri Department of Transportation, 2004; Illinois Department of Transportation, 2004; Minnesota Department of Transportation, 2000; Southeastern Pennsylvania Transportation Authority, 2000a, 2000b; Chicago Metra, 2000. All but the two SEPTA studies were produced in collaboration with Colette Holt & Associates.

[8] *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166-1175 (10th Cir. 2000) (discussing evidence before Congress of business discrimination against minorities in the construction industry in enacting the Disadvantaged Business Enterprise Program for federal-aid transportation contracts, Pub.L. No. 100-17, 101 Stat. 132 (1987), Pub.L. No. 102-240, 105 Stat. 1914 (1991) and Pub.L. No. 105-178, 112 Stat. 107 (1998), and the implementing regulations at 49 CFR Part 26 (1999)).

**III.A. Data from the Survey of Business Owners**

One important source of data that we draw upon in our DBE studies is the Census Bureau's Survey of Business Owners (SBO), performed every five years. According to the most recent data available from the SBO, there are substantial disparities between the share of minorities in the general population and their share of the business population. Specifically:

- Although African Americans comprised 12.7 percent of the U.S. population, they accounted for only 5.3 percent of its businesses.
- Although Hispanics and Latinos comprised 13.4 percent of the population, they accounted for only 7.0 percent of the businesses.
- Although women comprised 50.9 percent of the population, they accounted for only 28.9 percent of the businesses.

Moreover, the minority and female share of business sales and receipts is far lower than their share of the business population.

- Although African Americans comprised 5.3 percent of all U.S. businesses, they earned only 1.0 percent of sales and receipts.
- Although Hispanics and Latinos comprised 7.0 percent of all businesses, they earned only 2.5 percent of sales and receipts.
- Although women comprised 28.9 percent of all businesses, they earned only 10.7 percent of sales and receipts.

Similar disparities are observed for other minority groups as well. Asians and Pacific Islanders comprised 5.0 percent of the business population yet earned only 3.8 percent of sales and receipts. Native Americans comprised 0.9 percent of all businesses but earned only 0.3 percent of sales and receipts.

These disparities between the size of the minority and female business populations and their share of sales and receipts are very large. They are also statistically significant, meaning they are unlikely to result from chance alone. While the exact proportions vary, large and statistically significant disparities are observed in all 50 states and the District of Columbia, for all minority groups—African-Americans, Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans—as well as for women. These disparities are found in the Construction sector as well as in the economy as a whole. This is documented below in Tables 1A through 2F. Similar findings from current and past SBO reports appear in most of NERA's DBE studies.

### III.B. Public Use Microdata Samples and Current Population Survey Data

It is fair to ask whether the disparities documented in the SBO data result primarily from discrimination, either past, present or both, or whether they result from other, potentially non-discriminatory, factors.[9]

Our DBE studies have put such questions to the test using the public use microdata samples (PUMS) from the two most recent decennial censuses, as well as microdata from the *Current Population Survey* (CPS) through 2006. The advantage of the PUMS and CPS data is that they allow us to compare these percentages while holding a wide variety of other, potentially non-discriminatory, factors constant, such as industry, geography, education, age, and labor market status.[10]

Like the SBO, the PUMS and CPS data sources show large and statistically significant disparities between the percentage of minorities and women who choose to form businesses and the percentage of comparable non-minority males who choose to form businesses. Such disparities are observed for the nation as a whole and throughout the states, and in the economy as a whole as well as across different industry sectors, including construction and construction-related professional services.

As shown below in Table 3A, our DBE studies have found that even when these other attributes are held constant using regression analysis, the disparities between African-Americans, Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans, and women business owners on the one hand and their non-minority male counterparts on the other, tend to remain large, adverse, and statistically significant. Out of the 49 cases included in Table 3A, 46 show disparities and 45 show large disparities.

Furthermore, even for those minorities and women who manage against the odds to form their own businesses, their entrepreneurial earnings tend to lag far behind their non-minority male counterparts. As shown below in Table 3B, minority and female business owner earnings in construction and construction-related professional services average almost 25 percent lower than their non-minority male counterparts, again even when other attributes are held constant. For African Americans, Native Americans, and non-minority women, the disparities are even larger.

In sum, the evidence gathered from PUMS and CPS data sources, as documented below and in our many DBE studies, strongly suggests that business discrimination is the principal explanation for the disparities in the SBO data.

---

[9] This was the subject of a book I authored, *Racial Discrimination and Minority Business Enterprise: Evidence from the 1990 Census*, New York and London: Garland Publishing, 2000. As all of the studies submitted for the record attest, similar results are observed using the 2000 decennial census data.

[10] We have also tested the hypothesis, with similar results, including additional factors such marital and family status, immigration status, ability to speak English, military service and veteran status, disability status, and asset levels.

### III.C. Data from the National Survey of Small Business Finances

One particular manifestation of business discrimination is denial of access to credit. One of the primary concerns voiced by minority and women entrepreneurs is disproportionate difficulty accessing commercial capital and credit. If such discrimination exists, not only would it hamper the ability of these entrepreneurs to succeed, it could also prevent them from starting their own businesses in the first place.

In our DBE studies we have used the *National Survey of Small Business Finances* (SSBF), a joint effort of the Federal Reserve Board and the Small Business Administration, to test for the existence of discrimination in the small business credit market during the 1993 to 2003 period. These surveys are based on a large representative sample of firms with fewer than 500 employees.[11]

The SSBF data provide qualitative and quantitative evidence consistent with the presence of discrimination against DBEs in the credit market for small businesses. Using the SSBF, we find that after controlling for a large number of financial and other characteristics of the firms, African-American-owned firms, Hispanic or Latino-owned firms, and to a lesser extent other minority-owned firms are substantially and statistically significantly more likely to be denied credit than are nonminority-owned firms. We find some evidence in the SSBF that women as well are discriminated against in the credit market. The principal findings from the SSBF are as follows:

- A larger proportion of minority-owned firms than nonminority-owned firms report that credit market conditions are a serious concern.
- A larger share of minority-owned firms than nonminority-owned firms believes that the availability of credit is the most important issue likely to confront them in the upcoming year.
- Minority-owned firms were more likely to report that they did not apply for a loan over the preceding three years because they feared the loan would be denied.
- *When minority-owned firms did apply for a loan their loan requests were substantially more likely to be denied than non-minorities, even when differences like firm size and credit history are accounted for.*
- *When minority-owned firms did receive a loan they were obligated to pay higher interest rates on the loans than was true of comparable nonminority-owned firms.*

[11] The 1993 and 1998 surveys deliberately oversampled minority-owned and women-owned firms but the 2003 survey unfortunately did not. The 2003 survey took other steps, however, to increase the likelihood that minority-owned and women-owned firms were captured in the sampling frame. For more details, see National Opinion Research Center, *The 2003 Survey of Small Business Finances: Methodology Report*, Chicago, NORC, p. 11.

- There is no evidence that discrimination in the market for credit is significantly different in different regions of the country, or in the construction industries than it is in the nation or the economy as a whole.

- There is no evidence that the level of discrimination in the market for credit has diminished between 1993 and 2003, the most recent year for which data are available.

The SSBF is designed to produce estimates for the U.S. as a whole and for multi-state census regions. As a check on the findings above, and in order to produce results for specific states and metropolitan areas, we have conducted our own surveys—closely following the SSBF survey instrument—to supplement to national SSBF.

NERA has conducted these state and local credit market surveys on nine occasions between 1999 and 2007. Geographic locations include the Chicago metropolitan area in 1999, the State of Maryland in 2000, the Jacksonville, Florida metropolitan area in 2002, the Baltimore-Washington, DC metropolitan area in 2003, the St. Louis metropolitan area in 2004, the Denver metropolitan area in 2005, the State of Maryland (again) in 2005, the State of Massachusetts in 2005, and the Memphis, TN-MS-AR metropolitan area in 2007. The Chicago, Jacksonville, Baltimore, St. Louis, and Denver surveys focused on construction and construction-related industries, while the two Maryland surveys, the Massachusetts surveys and the Memphis surveys included other goods and services as well.[12]

In Table 3C below, I have combined the results of these nine NERA surveys together in a consistent format and re-estimated the basic loan denial regression model on this larger file. These results are remarkably similar to results seen in the national SSBF. For example, loan denial probabilities for African-American-owned firms compared to nonminority male-owned firms are 29 percentage points higher—even when assets, liabilities, creditworthiness measures such as bankruptcies, judgments, and delinquencies, and other firm and owner characteristics are held constant.

In NERA's own surveys we found statistically significant loan denial disparities for Hispanic or Latino-owned firms and nonminority female-owned firms as well as for African-American-owned firms. Denial rates were 18-24 percentage points higher for Hispanic or Latino-owned firms and 5-9 percentage points higher for nonminority female-owned firms than for their nonminority male-owned counterparts. Significant loan denial disparities were also observed for Native American-owned firms in some cases (18-19 percentage points higher).

Finally, as shown in Table 3D, we modeled the rate of interest charged, conditional upon receiving loan approval, using NERA's nine-jurisdiction dataset. Once again, the results

[12] NERA's Chicago, Maryland I, and Jacksonville survey questionnaires followed the format of the 1993 SSBF while our Baltimore, St. Louis, Denver, Maryland II, Massachusetts, and Memphis surveys followed the format of the 1998 SSBF questionnaire.

are similar to what is observed in the national SSBF. African-Americans pay approximately 1.7 percentage points more, on average, for their business credit than do nonminority males, declining slightly to 1.5 percentage points when creditworthiness and other firm and owner controls are accounted for.

On the basis of the foregoing, I conclude that the evidence of credit discrimination from NERA's nine local credit market surveys conducted throughout the nation between 1999-2007 is entirely consistent with the results obtained using the national SSBF data from the 1993-2003 SSBF files.

### III.D. Qualitative/Anecdotal Evidence of Discrimination

In addition to the statistical evidence of business discrimination described above, the numerous studies we have conducted in recent years also found extensive qualitative or "anecdotal" evidence of discrimination against minorities and women, particularly in the key DBE Program sectors of construction and construction-related professional services. In conjunction with my long time colleague, attorney Colette Holt of Colette Holt & Associates in Chicago, we have conducted surveys and in person interviews with hundreds of DBEs and non-DBEs, and the results are strikingly similar across the country.

In general, minorities and women reported that they still encounter significant barriers to doing business in the public and private sector market places, as both prime contractors and subcontractors. They often suffer from stereotypes about a suspected lack of competence and are subject to higher performance standards than similar nonminority men. They also encounter discrimination in obtaining loans and surety bonds; receiving fair price quotes from suppliers; working with trade unions; obtaining public and private sector prime contracts and subcontracts; and being paid promptly.

Significantly, there is also general agreement among DBEs that without the use of affirmative remedies such as the USDOT DBE Program, minorities and women would receive few if any opportunities on government contracts, as is the case on public sector projects without DBE goals and as is especially the case on private sector projects. Our own research has documented time and again that prime contractors who use DBEs on projects with goals rarely use them—or even solicit them—in the absence of such goals.

Thus, the continued operation of federal, state, and local efforts to ensure equal access to the public contracting process is essential to the competitive viability of minority-owned and women-owned business enterprises.

## IV. Conclusion

It is fairly easy to specify in a general way the economic consequences of the USDOT DBE Program. It has improved economic opportunities for minorities and women in business and therefore improved the competitiveness and efficiency of the American

economy. It has also focused public attention on discrimination against minority and female businesses for reasons unrelated to their qualifications or performance.

The DBE Program and similar public sector programs, standing alone, will not solve the problem of business discrimination. The private sector, which is far larger in terms of economic activity and scope, must take on more responsibility for eliminating business discrimination as well. Some major corporations have begun to take important steps down this road by developing genuine supplier diversity initiatives, but these companies are still the exception rather than the rule.

I am optimistic that the statistical and anecdotal evidence will one day show that the DBE Program is no longer needed, because minority-owned and women-owned businesses will have achieved competitive parity with their nonminority male-owned counterparts. However, my own research and that of my colleagues demonstrates that this day has not yet arrived.

Thank you. I will be pleased to answer any questions.

NERA
Economic Consulting

**Table 1A. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, African American, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 9.26% | 0.62% | 2.96% | 0.46% | *0.07* | *0.16* |
| Alaska | 1.49% | 0.18% | 0.66% | 0.14% | *0.12* | *0.22* |
| Arizona | 1.66% | 0.16% | 0.66% | 0.13% | *0.10* | *0.19* |
| Arkansas | 4.28% | 0.27% | 1.38% | 0.18% | *0.06* | *0.13* |
| California | 3.88% | 0.35% | 1.48% | 0.26% | *0.09* | *0.18* |
| Colorado | 1.52% | 0.20% | 0.68% | 0.16% | *0.13* | *0.24* |
| Connecticut | 3.42% | 0.19% | 0.97% | 0.14% | *0.05* | *0.14* |
| Delaware | 6.70% | 0.18% | 1.97% | 0.11% | *0.03* | *0.06* |
| Dist. Columbia | 25.86% | 1.47% | 9.23% | 1.28% | *0.06* | *0.14* |
| Florida | 6.63% | 0.53% | 1.95% | 0.36% | *0.08* | *0.19* |
| Georgia | 13.41% | 0.77% | 3.88% | 0.55% | *0.06* | *0.14* |
| Hawaii | 0.82% | 0.12% | 0.31% | 0.10% | *0.15* | *0.33* |
| Idaho | 0.31% | 0.08% | 0.34% | 0.07% | *0.26* | *0.21* |
| Illinois | 7.17% | 0.43% | 1.73% | 0.35% | *0.06* | *0.20* |
| Indiana | 3.24% | 0.35% | 1.28% | 0.31% | *0.11* | *0.24* |
| Iowa | 0.68% | 0.11% | 0.35% | 0.10% | *0.16* | *0.29* |
| Kansas | 2.04% | 0.16% | 0.96% | 0.13% | *0.08* | *0.13* |
| Kentucky | 2.52% | 0.39% | 0.92% | 0.35% | *0.15* | *0.38* |
| Louisiana | 12.24% | 0.59% | 3.55% | 0.40% | *0.05* | *0.11* |
| Maine | 0.24% | 0.04% | 0.10% | 0.03% | *0.18* | *0.33* |
| Maryland | 15.65% | 1.25% | 4.23% | 0.92% | *0.08* | *0.22* |
| Massachusetts | 2.27% | 0.19% | 0.87% | 0.15% | *0.08* | *0.18* |
| Michigan | 6.03% | 0.54% | 1.68% | 0.47% | *0.09* | *0.28* |
| Minnesota | 1.77% | 0.15% | 0.46% | 0.12% | *0.08* | *0.27* |
| Mississippi | 13.33% | 0.94% | 4.39% | 0.59% | *0.07* | *0.13* |
| Missouri | 3.81% | 0.30% | 1.73% | 0.24% | *0.08* | *0.14* |
| Montana | 0.22% | 0.03% | n/a | n/a | *0.13* | |
| Nebraska | 1.44% | 0.10% | 0.62% | 0.09% | *0.07* | *0.14* |
| Nevada | 2.56% | 0.29% | 1.08% | 0.23% | *0.11* | *0.22* |
| New Hampshire | 0.37% | 0.07% | 0.23% | 0.06% | *0.19* | *0.26* |
| New Jersey | 5.12% | 0.38% | 1.86% | 0.31% | *0.07* | *0.16* |
| New Mexico | 1.13% | 0.29% | 0.50% | 0.27% | *0.26* | *0.53* |
| New York | 7.58% | 0.43% | 1.81% | 0.31% | *0.06* | *0.17* |
| North Carolina | 8.11% | 0.59% | 3.07% | 0.45% | *0.07* | *0.15* |
| North Dakota | 0.14% | 0.03% | n/a | n/a | *0.24* | |
| Ohio | 4.36% | 0.40% | 1.56% | 0.34% | *0.09* | *0.22* |
| Oklahoma | 2.55% | 0.23% | 0.96% | 0.18% | *0.09* | *0.19* |
| Oregon | 0.74% | 0.15% | 0.39% | 0.13% | *0.20* | *0.34* |
| Pennsylvania | 2.83% | 0.22% | 1.17% | 0.18% | *0.08* | *0.16* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 9.77% | 0.63% | 3.31% | 0.42% | *0.06* | *0.13* |
| South Dakota | 0.18% | 0.10% | 0.11% | 0.10% | *0.58* | *0.90* |
| Tennessee | 5.90% | 0.40% | 2.16% | 0.29% | *0.07* | *0.14* |
| Texas | 5.12% | 0.35% | 1.79% | 0.26% | *0.07* | *0.14* |
| Utah | 0.34% | 0.13% | 0.15% | 0.13% | *0.38* | *0.86* |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 0.29% | 0.05% | 0.15% | 0.05% | *0.18* | *0.33* |

**Table 1A. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, African American, All Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 7.77% | 0.67% | 3.39% | 0.55% | *0.09* | *0.16* |
| Washington | 1.49% | 0.23% | 0.84% | 0.21% | *0.16* | *0.25* |
| West Virginia | 1.30% | 0.11% | 0.39% | 0.08% | *0.08* | *0.22* |
| Wisconsin | 1.70% | 0.15% | 0.76% | 0.12% | *0.09* | *0.16* |
| Wyoming | 0.28% | 0.03% | 0.24% | 0.02% | *0.10* | *0.10* |

Notes: The disparity ratio is derived by dividing the percentage of sales by the corresponding percentage of firms. A disparity ratio of zero indicates complete disparity while a value of 1 indicates parity. Disparity ratios in italics are statistically significant at a 1-in-100 probability level. "n/a" indicates data was suppressed by Census for statistical reason and/or to protect confidentiality.

NERA
Economic Consulting

**Table 1B. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Hispanic or Latino, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.82% | 0.28% | 0.90% | 0.26% | *0.34* | *0.29* |
| Alaska | 2.00% | 0.37% | 1.85% | 0.34% | *0.19* | *0.18* |
| Arizona | 9.21% | 1.32% | 5.30% | 1.10% | *0.14* | *0.21* |
| Arkansas | 1.00% | 0.23% | 0.84% | 0.20% | *0.23* | *0.24* |
| California | 14.70% | 2.04% | 7.06% | 1.68% | *0.14* | *0.24* |
| Colorado | 5.17% | 1.33% | 3.48% | 1.21% | *0.26* | *0.35* |
| Connecticut | 3.12% | 0.33% | 1.70% | 0.28% | *0.11* | *0.16* |
| Delaware | 1.38% | 0.12% | 0.72% | 0.09% | *0.09* | *0.12* |
| Dist. Columbia | 4.60% | 0.51% | 3.18% | 0.48% | *0.11* | *0.15* |
| Florida | 17.33% | 3.80% | 11.09% | 3.27% | *0.22* | *0.29* |
| Georgia | 2.71% | 0.57% | 1.66% | 0.48% | *0.21* | *0.29* |
| Hawaii | 3.12% | 0.73% | 2.05% | 0.66% | *0.23* | *0.32* |
| Idaho | 2.28% | 0.48% | 1.82% | 0.41% | *0.21* | *0.23* |
| Illinois | 4.13% | 0.64% | 2.69% | 0.57% | *0.16* | *0.21* |
| Indiana | 1.26% | 0.16% | 0.81% | 0.14% | *0.13* | *0.17* |
| Iowa | 0.65% | 0.12% | 0.58% | 0.11% | *0.19* | *0.19* |
| Kansas | 1.90% | 0.29% | 1.47% | 0.25% | *0.15* | *0.17* |
| Kentucky | 0.70% | 0.27% | n/a | n/a | *0.39* | |
| Louisiana | 2.33% | 0.60% | 1.63% | 0.56% | *0.26* | *0.34* |
| Maine | 0.54% | 0.15% | 0.32% | 0.13% | *0.28* | *0.41* |
| Maryland | 3.46% | 0.64% | 2.00% | 0.54% | *0.19* | *0.27* |
| Massachusetts | 2.83% | 0.32% | 1.41% | 0.26% | *0.11* | *0.19* |
| Michigan | 1.34% | 0.40% | 0.90% | 0.39% | *0.30* | *0.43* |
| Minnesota | 0.90% | 0.10% | 0.57% | 0.08% | *0.11* | *0.14* |
| Mississippi | 0.71% | 0.15% | 0.56% | 0.13% | *0.21* | *0.22* |
| Missouri | 0.83% | 0.15% | 0.63% | 0.14% | *0.18* | *0.22* |
| Montana | 0.96% | 0.22% | n/a | n/a | *0.23* | |
| Nebraska | 1.35% | 0.31% | 0.94% | 0.29% | *0.23* | *0.31* |
| Nevada | 5.75% | 1.11% | 3.18% | 0.96% | *0.19* | *0.30* |
| New Hampshire | 0.73% | 0.21% | 0.65% | 0.18% | *0.28* | *0.28* |
| New Jersey | 7.03% | 0.85% | 3.78% | 0.73% | *0.12* | *0.19* |
| New Mexico | 21.73% | 5.40% | 15.08% | 4.83% | *0.25* | *0.32* |
| New York | 9.58% | 0.71% | 3.26% | 0.56% | *0.07* | *0.17* |
| North Carolina | 1.41% | 0.30% | 1.09% | 0.25% | *0.21* | *0.23* |
| North Dakota | 0.41% | 0.04% | 0.25% | 0.03% | *0.09* | *0.13* |
| Ohio | 0.87% | 0.14% | 0.67% | 0.13% | *0.16* | *0.19* |
| Oklahoma | 1.87% | 0.58% | 1.40% | 0.53% | *0.31* | *0.38* |
| Oregon | 2.12% | 0.56% | 1.56% | 0.52% | *0.26* | *0.34* |
| Pennsylvania | 1.26% | 0.18% | 0.72% | 0.15% | *0.14* | *0.21* |
| Rhode Island | 3.91% | 0.32% | 1.20% | 0.20% | *0.08* | *0.17* |
| South Carolina | 1.03% | 0.27% | 0.90% | 0.25% | *0.26* | *0.28* |
| South Dakota | 0.51% | 0.20% | 0.49% | 0.19% | *0.40* | *0.39* |
| Tennessee | 0.95% | 0.23% | 0.92% | 0.21% | *0.24* | *0.23* |
| Texas | 18.41% | 2.33% | 9.47% | 1.88% | *0.13* | *0.20* |
| Utah | 2.68% | 0.38% | 1.82% | 0.32% | *0.14* | *0.17* |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 0.62% | 0.10% | 0.35% | 0.08% | *0.15* | *0.22* |

**Table 1B. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Hispanic or Latino, All Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 3.59% | 0.62% | 1.79% | 0.53% | *0.17* | *0.30* |
| Washington | 2.20% | 0.34% | 1.74% | 0.30% | *0.16* | *0.18* |
| West Virginia | 0.57% | 0.22% | 0.81% | 0.20% | *0.38* | *0.25* |
| Wisconsin | 0.95% | 0.22% | 0.77% | 0.21% | *0.23* | *0.27* |
| Wyoming | 2.49% | 0.66% | 1.95% | 0.63% | *0.26* | *0.32* |

Notes: See Table 1A.

NERA
Economic Consulting

**Table 1C. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Asians, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 1.38% | 0.56% | 2.17% | 0.53% | *0.41* | *0.24* |
| Alaska | 3.07% | 0.91% | 4.05% | 0.82% | *0.30* | *0.20* |
| Arizona | 2.68% | 0.73% | 3.36% | 0.67% | *0.27* | *0.20* |
| Arkansas | 0.96% | 0.37% | 1.84% | 0.36% | *0.39* | *0.19* |
| California | 12.77% | 4.50% | 15.24% | 4.17% | *0.35* | *0.27* |
| Colorado | 2.35% | 0.64% | 2.94% | 0.58% | *0.27* | *0.20* |
| Connecticut | 2.38% | 0.48% | 3.24% | 0.41% | *0.20* | *0.13* |
| Delaware | 2.98% | 0.53% | 3.96% | 0.49% | *0.18* | *0.12* |
| Dist. Columbia | 5.11% | 0.94% | 10.11% | n/a | *0.18* | |
| Florida | 2.68% | 1.04% | 3.78% | 0.99% | *0.39* | *0.26* |
| Georgia | 3.99% | 1.08% | 5.97% | 1.00% | *0.27* | *0.17* |
| Hawaii | 45.28% | 18.88% | 43.92% | 17.73% | *0.42* | *0.40* |
| Idaho | 0.91% | 0.39% | 1.29% | 0.38% | *0.43* | *0.29* |
| Illinois | 4.64% | 1.27% | 5.43% | 1.19% | *0.27* | *0.22* |
| Indiana | 1.40% | 0.54% | 2.11% | 0.52% | *0.38* | *0.24* |
| Iowa | 0.76% | 0.20% | 1.12% | 0.18% | *0.26* | *0.16* |
| Kansas | 1.62% | 0.39% | 2.36% | 0.36% | *0.24* | *0.15* |
| Kentucky | 1.08% | 0.48% | 1.89% | 0.47% | *0.45* | 0.25 |
| Louisiana | 2.50% | 0.55% | 3.07% | 0.47% | *0.22* | *0.15* |
| Maine | 0.62% | 0.27% | 1.28% | 0.26% | *0.45* | *0.21* |
| Maryland | 5.90% | 1.89% | 7.44% | 1.76% | *0.32* | *0.24* |
| Massachusetts | 3.21% | 0.77% | 3.76% | 0.72% | *0.24* | *0.19* |
| Michigan | 2.09% | 0.64% | 2.80% | 0.60% | *0.31* | *0.21* |
| Minnesota | 1.73% | 0.38% | 1.61% | 0.35% | *0.22* | *0.22* |
| Mississippi | 1.56% | 0.87% | 2.34% | 0.79% | *0.56* | *0.34* |
| Missouri | 1.45% | 0.42% | 2.19% | 0.40% | *0.29* | *0.18* |
| Montana | 0.51% | 0.22% | 0.90% | 0.22% | *0.44* | 0.24 |
| Nebraska | 1.00% | 0.49% | 1.53% | 0.49% | *0.49* | *0.32* |
| Nevada | 5.23% | 1.35% | 5.37% | 1.17% | *0.26* | *0.22* |
| New Hampshire | 1.22% | 0.43% | 2.07% | 0.39% | *0.35* | *0.19* |
| New Jersey | 7.33% | 2.18% | 8.46% | 2.06% | *0.30* | *0.24* |
| New Mexico | 1.73% | 0.73% | 2.52% | 0.69% | *0.42* | *0.27* |
| New York | 8.50% | 1.76% | 8.40% | 1.58% | *0.21* | *0.19* |
| North Carolina | 2.13% | 0.58% | 2.84% | 0.54% | *0.27* | *0.19* |
| North Dakota | 0.49% | 0.25% | 0.97% | 0.25% | *0.52* | *0.26* |
| Ohio | 1.68% | 0.57% | 2.71% | 0.54% | *0.34* | *0.20* |
| Oklahoma | 1.57% | 0.47% | 2.28% | 0.42% | *0.30* | *0.18* |
| Oregon | 3.02% | 0.87% | 3.42% | 0.76% | *0.29* | *0.22* |
| Pennsylvania | 2.59% | 0.69% | 3.17% | 0.63% | *0.27* | *0.20* |
| Rhode Island | 1.75% | 0.49% | 1.78% | 0.44% | *0.28* | *0.25* |
| South Carolina | 1.51% | 0.81% | 2.47% | 0.79% | *0.54* | *0.32* |
| South Dakota | 0.43% | 0.15% | 0.46% | 0.14% | *0.34* | *0.31* |
| Tennessee | 1.59% | 0.50% | 2.86% | 0.47% | *0.31* | *0.16* |
| Texas | 4.49% | 1.14% | 5.99% | 1.04% | *0.25* | *0.17* |
| Utah | 1.46% | 0.48% | 1.81% | 0.45% | *0.33* | *0.25* |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 0.60% | 0.17% | 1.00% | n/a | *0.28* | |

**Table 1C. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Asians, All Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 5.75% | 1.38% | 6.05% | 1.27% | *0.24* | *0.21* |
| Washington | 5.75% | 1.59% | 6.01% | 1.46% | *0.28* | *0.24* |
| West Virginia | 1.09% | 0.51% | 2.12% | 0.50% | *0.47* | *0.23* |
| Wisconsin | 1.26% | 0.34% | 1.61% | 0.32% | *0.27* | *0.20* |
| Wyoming | 0.76% | 0.25% | 1.34% | 0.24% | *0.33* | *0.18* |

Notes: See Table 1A.

NERA
Economic Consulting

**Table 1D. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, American Indians and Alaska Natives, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.94% | 0.18% | 0.69% | 0.16% | *0.19* | *0.23* |
| Alaska | 8.29% | 6.02% | 4.76% | 6.07% | *0.73* | *1.28* |
| Arizona | 1.72% | 0.17% | 0.49% | 0.14% | *0.10* | *0.29* |
| Arkansas | 1.09% | 0.19% | 0.50% | 0.16% | *0.18* | *0.31* |
| California | 1.31% | 0.14% | 0.54% | 0.11% | *0.11* | *0.20* |
| Colorado | 0.85% | 0.14% | 0.50% | 0.11% | *0.16* | *0.23* |
| Connecticut | 0.40% | 0.04% | n/a | n/a | *0.09* | |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist. Columbia | 0.47% | 0.05% | 0.33% | 0.05% | *0.10* | *0.14* |
| Florida | 0.64% | 0.06% | 0.23% | 0.04% | *0.09* | *0.16* |
| Georgia | 0.66% | 0.08% | 0.42% | 0.06% | *0.12* | *0.15* |
| Hawaii | 0.90% | 0.15% | n/a | n/a | *0.17* | |
| Idaho | 0.94% | 0.28% | 0.54% | 0.26% | *0.30* | *0.48* |
| Illinois | 0.35% | 0.04% | 0.20% | 0.03% | *0.11* | *0.16* |
| Indiana | 0.45% | 0.05% | 0.27% | 0.05% | *0.12* | *0.17* |
| Iowa | 0.27% | 0.04% | n/a | n/a | *0.13* | |
| Kansas | 0.79% | 0.15% | 0.60% | 0.14% | *0.20* | *0.24* |
| Kentucky | 0.44% | 0.03% | 0.15% | 0.02% | *0.06* | *0.11* |
| Louisiana | 0.82% | 0.10% | 0.30% | 0.08% | *0.12* | *0.27* |
| Maine | 0.50% | 0.06% | 0.32% | 0.05% | *0.13* | *0.15* |
| Maryland | 0.81% | 0.11% | 0.35% | 0.09% | *0.13* | *0.24* |
| Massachusetts | 0.40% | 0.06% | 0.24% | 0.05% | *0.14* | *0.20* |
| Michigan | 0.73% | 0.09% | 0.40% | 0.08% | *0.12* | *0.19* |
| Minnesota | 0.62% | 0.07% | 0.43% | 0.06% | *0.11* | *0.15* |
| Mississippi | 0.36% | 0.05% | n/a | n/a | *0.12* | |
| Missouri | 0.75% | 0.08% | 0.39% | 0.06% | *0.10* | *0.14* |
| Montana | 1.98% | 0.48% | 1.26% | 0.43% | *0.24* | *0.34* |
| Nebraska | 0.29% | 0.03% | 0.11% | 0.03% | *0.11* | *0.25* |
| Nevada | 1.12% | 0.14% | 0.59% | 0.10% | *0.13* | *0.17* |
| New Hampshire | 0.42% | 0.06% | 0.29% | 0.05% | *0.15* | *0.17* |
| New Jersey | 0.37% | 0.03% | 0.18% | 0.02% | *0.09* | *0.14* |
| New Mexico | 4.99% | 0.52% | 1.14% | 0.45% | *0.11* | *0.39* |
| New York | 0.65% | 0.04% | 0.23% | 0.03% | *0.06* | *0.13* |
| North Carolina | 0.93% | 0.10% | 0.55% | 0.07% | *0.11* | *0.14* |
| North Dakota | 1.50% | 0.29% | 0.55% | 0.26% | *0.19* | *0.48* |
| Ohio | 0.38% | 0.05% | 0.20% | 0.05% | *0.14* | *0.23* |
| Oklahoma | 5.86% | 1.28% | 3.53% | 1.10% | *0.22* | *0.31* |
| Oregon | 1.02% | 0.14% | 0.53% | 0.10% | *0.13* | *0.20* |
| Pennsylvania | n/a | n/a | n/a | n/a | | |
| Rhode Island | 0.51% | 0.04% | 0.13% | 0.02% | *0.08* | *0.19* |
| South Carolina | 0.49% | 0.06% | 0.32% | 0.05% | *0.12* | *0.16* |
| South Dakota | 1.87% | 0.22% | 0.73% | 0.21% | *0.12* | *0.28* |
| Tennessee | 0.78% | 0.15% | 0.38% | 0.12% | *0.19* | *0.32* |
| Texas | 0.93% | 0.17% | 0.61% | 0.15% | *0.19* | *0.25* |
| Utah | 0.59% | 0.06% | 0.36% | 0.05% | *0.09* | *0.13* |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 0.41% | 0.11% | 0.18% | 0.10% | *0.27* | *0.54* |

**Table 1D. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, American Indians and Alaska Natives, All Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.50% | 0.08% | 0.36% | 0.07% | *0.17* | *0.19* |
| Washington | 1.23% | 0.22% | 0.72% | 0.19% | *0.18* | *0.27* |
| West Virginia | 0.36% | 0.04% | 0.30% | 0.03% | *0.11* | *0.09* |
| Wisconsin | 0.64% | 0.10% | 0.35% | 0.09% | *0.15* | *0.25* |
| Wyoming | 1.12% | 0.18% | 0.87% | 0.15% | *0.16* | *0.18* |

Notes: See Table 1A.

NERA
Economic Consulting

**Table 1E. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.03% | 0.00% | 0.01% | 0.00% | *0.06* | *0.24* |
| Alaska | 0.24% | 0.02% | 0.22% | n/a | *0.09* | |
| Arizona | 0.09% | 0.01% | 0.07% | 0.01% | *0.13* | *0.14* |
| Arkansas | 0.03% | 0.00% | n/a | n/a | *0.09* | |
| California | 0.24% | 0.04% | 0.15% | 0.03% | *0.18* | *0.22* |
| Colorado | 0.08% | 0.01% | 0.05% | 0.01% | *0.11* | *0.16* |
| Connecticut | 0.06% | 0.02% | n/a | n/a | *0.36* | |
| Delaware | 0.03% | n/a | n/a | n/a | | |
| Dist. Columbia | n/a | n/a | n/a | n/a | | |
| Florida | 0.10% | 0.01% | 0.04% | 0.00% | *0.07* | *0.13* |
| Georgia | 0.03% | 0.00% | 0.03% | 0.00% | *0.13* | *0.08* |
| Hawaii | 8.42% | 2.16% | 4.26% | 1.98% | *0.26* | *0.46* |
| Idaho | 0.08% | 0.01% | n/a | n/a | *0.15* | |
| Illinois | 0.07% | n/a | n/a | n/a | | |
| Indiana | 0.03% | 0.02% | n/a | n/a | *0.61* | |
| Iowa | 0.01% | 0.00% | 0.00% | n/a | *0.39* | |
| Kansas | 0.02% | 0.01% | n/a | n/a | *0.42* | |
| Kentucky | 0.02% | n/a | 0.00% | n/a | | |
| Louisiana | n/a | n/a | n/a | n/a | | |
| Maine | n/a | n/a | n/a | n/a | | |
| Maryland | 0.02% | n/a | 0.04% | 0.01% | | *0.24* |
| Massachusetts | n/a | n/a | n/a | n/a | | |
| Michigan | 0.03% | 0.00% | n/a | n/a | *0.17* | |
| Minnesota | n/a | n/a | n/a | n/a | | |
| Mississippi | 0.07% | 0.00% | n/a | n/a | *0.07* | |
| Missouri | 0.02% | 0.01% | n/a | n/a | *0.35* | |
| Montana | 0.04% | 0.00% | n/a | n/a | *0.12* | |
| Nebraska | 0.01% | n/a | 0.00% | 0.00% | | |
| Nevada | 0.18% | 0.04% | n/a | n/a | *0.20* | |
| New Hampshire | 0.01% | n/a | n/a | n/a | | |
| New Jersey | 0.06% | 0.00% | n/a | n/a | *0.07* | |
| New Mexico | 0.10% | 0.02% | n/a | n/a | *0.19* | |
| New York | 0.18% | 0.01% | 0.04% | n/a | *0.04* | |
| North Carolina | 0.03% | 0.00% | n/a | n/a | *0.07* | |
| North Dakota | 0.00% | n/a | 0.00% | 0.00% | | |
| Ohio | n/a | n/a | n/a | n/a | | |
| Oklahoma | 0.10% | 0.00% | 0.03% | 0.00% | *0.05* | *0.10* |
| Oregon | 0.12% | 0.02% | 0.08% | 0.02% | *0.18* | *0.21* |
| Pennsylvania | 0.03% | 0.00% | n/a | n/a | *0.13* | |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 0.01% | 0.00% | n/a | n/a | *0.29* | |
| South Dakota | 0.02% | n/a | 0.01% | n/a | | |
| Tennessee | n/a | n/a | n/a | n/a | | |
| Texas | 0.08% | 0.00% | n/a | n/a | *0.05* | |
| Utah | 0.22% | 0.10% | 0.18% | 0.10% | *0.47* | 0.58 |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | n/a | n/a | n/a | n/a | | |

NERA
Economic Consulting

**Table 1E. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, All Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.08% | 0.03% | 0.07% | n/a | *0.32* | |
| Washington | 0.16% | 0.05% | 0.09% | 0.05% | *0.33* | *0.55* |
| West Virginia | 0.01% | n/a | 0.00% | 0.00% | | |
| Wisconsin | 0.03% | 0.00% | 0.01% | 0.00% | *0.03* | *0.12* |
| Wyoming | 0.04% | 0.00% | 0.00% | 0.00% | *0.04* | |

Notes: See Table 1A. The Employer disparity ratio for Utah is statistically significant at a 1-in-10 probability level.

NERA
Economic Consulting

**Table 1F. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Women, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 26.43% | 4.29% | 15.77% | 3.87% | *0.16* | *0.25* |
| Alaska | 26.24% | 5.08% | 18.87% | 4.53% | *0.19* | *0.24* |
| Arizona | 28.79% | 4.83% | 16.60% | 4.26% | *0.17* | *0.26* |
| Arkansas | 23.74% | 3.85% | 14.92% | 3.50% | *0.16* | *0.23* |
| California | 29.93% | 4.92% | 17.18% | 4.25% | *0.16* | *0.25* |
| Colorado | 29.08% | 4.25% | 18.36% | 3.69% | *0.15* | *0.20* |
| Connecticut | 27.23% | 3.14% | 14.66% | 2.68% | *0.12* | *0.18* |
| Delaware | 24.14% | 1.74% | 14.86% | 1.45% | *0.07* | *0.10* |
| Dist. Columbia | 33.23% | 2.25% | 17.92% | n/a | *0.07* | |
| Florida | 28.41% | 5.70% | 18.09% | 5.01% | *0.20* | *0.28* |
| Georgia | 29.09% | 4.06% | 17.02% | 3.60% | *0.14* | *0.21* |
| Hawaii | 30.18% | 6.91% | 19.32% | 6.17% | *0.23* | *0.32* |
| Idaho | 23.71% | 4.42% | 13.72% | 3.96% | *0.19* | *0.29* |
| Illinois | 29.74% | 4.08% | 16.53% | 3.69% | *0.14* | *0.22* |
| Indiana | 27.39% | 3.41% | 14.77% | 3.07% | *0.12* | *0.21* |
| Iowa | 26.98% | 3.17% | 14.04% | 2.86% | *0.12* | *0.20* |
| Kansas | 27.18% | 3.02% | 15.78% | 2.68% | *0.11* | *0.17* |
| Kentucky | 25.66% | 3.33% | 15.01% | 2.95% | *0.13* | *0.20* |
| Louisiana | 26.43% | 3.76% | 15.54% | 3.36% | *0.14* | *0.22* |
| Maine | 24.01% | 4.40% | 14.88% | 3.83% | *0.18* | *0.26* |
| Maryland | 30.98% | 4.63% | 17.24% | 3.99% | *0.15* | *0.23* |
| Massachusetts | 28.73% | 3.57% | 15.88% | 3.07% | *0.12* | *0.19* |
| Michigan | 29.59% | 3.68% | 15.61% | 3.29% | *0.12* | *0.21* |
| Minnesota | 27.92% | 3.52% | 14.71% | 3.15% | *0.13* | *0.21* |
| Mississippi | 25.11% | 4.79% | 15.67% | 4.27% | *0.19* | *0.27* |
| Missouri | 27.41% | 4.14% | 16.69% | 3.80% | *0.15* | *0.23* |
| Montana | 24.42% | 4.79% | 16.41% | 4.16% | *0.20* | *0.25* |
| Nebraska | 26.61% | 4.16% | 14.95% | 3.91% | *0.16* | *0.26* |
| Nevada | 28.13% | 5.86% | 15.36% | 5.17% | *0.21* | *0.34* |
| New Hampshire | 24.74% | 4.99% | 15.80% | 4.56% | *0.20* | *0.29* |
| New Jersey | 26.13% | 4.19% | 15.46% | 3.79% | *0.16* | *0.24* |
| New Mexico | 30.91% | 5.44% | 18.54% | 4.81% | *0.18* | *0.26* |
| New York | 29.59% | 4.10% | 15.74% | 3.55% | *0.14* | *0.23* |
| North Carolina | 27.06% | 4.43% | 16.14% | 4.02% | *0.16* | *0.25* |
| North Dakota | 23.25% | 3.12% | 11.87% | 2.74% | *0.13* | *0.23* |
| Ohio | 28.12% | 3.61% | 15.11% | 3.23% | *0.13* | *0.21* |
| Oklahoma | 25.73% | 4.69% | 15.97% | 4.25% | *0.18* | *0.27* |
| Oregon | 29.49% | 4.21% | 16.30% | 3.66% | *0.14* | *0.22* |
| Pennsylvania | 25.98% | 4.09% | 15.28% | 3.76% | *0.16* | *0.25* |
| Rhode Island | 26.52% | 5.48% | 14.40% | 4.92% | *0.21* | *0.34* |
| South Carolina | 26.22% | 4.29% | 15.55% | 3.86% | *0.16* | *0.25* |
| South Dakota | 22.40% | 2.58% | 13.61% | 2.31% | *0.12* | *0.17* |
| Tennessee | 25.96% | 4.04% | 14.78% | 3.61% | *0.16* | *0.24* |
| Texas | 27.02% | 3.63% | 17.43% | 3.18% | *0.13* | *0.18* |
| Utah | 25.12% | 4.06% | 12.69% | 3.66% | *0.16* | *0.29* |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 26.26% | 3.64% | 13.41% | 3.00% | *0.14* | *0.22* |

**Table 1F. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Women, All Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 29.66% | 3.96% | 17.35% | 3.52% | *0.13* | *0.20* |
| Washington | 29.40% | 3.88% | 16.21% | 3.41% | *0.13* | *0.21* |
| West Virginia | 27.68% | 3.82% | 14.76% | 3.38% | *0.14* | *0.23* |
| Wisconsin | 26.49% | 4.03% | 14.99% | 3.75% | *0.15* | *0.25* |
| Wyoming | 24.38% | 3.37% | 15.63% | n/a | *0.14* | |

Notes: See Table 1A.

NERA
Economic Consulting

**Table 2A. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, African Americans, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 5.71% | 1.09% | 3.12% | 0.74% | *0.19* | *0.24* |
| Alaska | 0.44% | 0.13% | 0.23% | 0.11% | *0.30* | *0.46* |
| Arizona | 0.57% | 0.10% | 0.20% | 0.09% | *0.18* | 0.45 |
| Arkansas | 2.60% | 1.38% | n/a | n/a | 0.53 | |
| California | 2.10% | 0.47% | 1.05% | 0.40% | *0.22* | *0.38* |
| Colorado | 0.65% | 0.24% | n/a | n/a | *0.36* | |
| Connecticut | 2.13% | 0.39% | 0.97% | 0.28% | *0.18* | *0.28* |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist. Columbia | 34.90% | n/a | 17.16% | 7.05% | | *0.41* |
| Florida | 4.15% | 0.59% | 1.67% | 0.45% | *0.14* | *0.27* |
| Georgia | 6.19% | 1.68% | 2.96% | 1.42% | *0.27* | *0.48* |
| Hawaii | n/a | n/a | n/a | n/a | | |
| Idaho | n/a | n/a | n/a | n/a | | |
| Illinois | 2.79% | 0.80% | 0.94% | 0.74% | *0.29* | *0.79* |
| Indiana | 0.89% | 0.97% | 0.65% | 1.02% | *1.09* | *1.57* |
| Iowa | 0.22% | 0.15% | 0.13% | 0.14% | *0.68* | *1.04* |
| Kansas | 1.09% | 0.52% | 1.17% | 0.48% | *0.48* | *0.41* |
| Kentucky | n/a | n/a | n/a | n/a | | |
| Louisiana | 9.90% | 1.34% | 2.92% | 0.77% | *0.14* | *0.26* |
| Maine | 0.04% | n/a | 0.04% | n/a | | |
| Maryland | 7.12% | 2.05% | 2.69% | 1.82% | *0.29* | *0.68* |
| Massachusetts | 1.18% | 0.55% | 0.59% | 0.51% | *0.47* | *0.87* |
| Michigan | 1.64% | 1.33% | 0.85% | 1.32% | *0.81* | *1.55* |
| Minnesota | 0.73% | 0.18% | 0.11% | 0.15% | *0.25* | *1.40* |
| Mississippi | 10.47% | 2.14% | 5.65% | 0.98% | *0.20* | *0.17* |
| Missouri | 1.50% | 0.62% | 0.77% | 0.60% | *0.41* | *0.78* |
| Montana | n/a | n/a | n/a | n/a | | |
| Nebraska | 0.51% | n/a | 0.54% | n/a | | |
| Nevada | 1.18% | 0.37% | n/a | n/a | *0.31* | |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 2.42% | 0.58% | 1.31% | 0.47% | *0.24* | *0.36* |
| New Mexico | 0.60% | 0.16% | n/a | n/a | *0.27* | |
| New York | 4.86% | 0.77% | 1.52% | 0.67% | *0.16* | *0.44* |
| North Carolina | 4.22% | 0.87% | n/a | n/a | *0.21* | |
| North Dakota | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Ohio | 2.04% | 1.45% | 1.37% | 1.50% | *0.71* | *1.10* |
| Oklahoma | 1.41% | 0.32% | 0.26% | 0.16% | *0.23* | *0.61* |
| Oregon | 0.41% | 0.30% | 0.38% | 0.31% | *0.74* | *0.80* |
| Pennsylvania | 1.41% | 0.38% | 0.54% | 0.35% | *0.27* | *0.64* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 6.65% | 1.44% | 3.95% | 0.99% | *0.22* | *0.25* |
| South Dakota | n/a | n/a | n/a | n/a | | |
| Tennessee | 2.72% | 0.70% | 1.39% | 0.57% | *0.26* | *0.41* |
| Texas | 2.16% | 0.57% | 0.92% | 0.41% | *0.26* | *0.45* |
| Utah | 0.25% | 0.03% | 0.02% | n/a | *0.12* | |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | n/a | n/a | n/a | n/a | | |

**Table 2A. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, African Americans, Construction Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 4.10% | 1.05% | 2.71% | 0.88% | *0.26* | *0.33* |
| Washington | 0.55% | 0.28% | n/a | n/a | *0.52* | |
| West Virginia | 0.54% | 0.94% | 0.29% | 0.97% | *1.73* | *3.32* |
| Wisconsin | 0.54% | 0.40% | n/a | n/a | *0.75* | |
| Wyoming | 0.13% | n/a | n/a | n/a | | |

Notes: The disparity ratio is derived by dividing the percentage of sales by the corresponding percentage of firms. A disparity ratio of zero indicates complete disparity while a value of 1 indicates parity. Disparity ratios in italics are statistically significant at a 1-in-20 probability level or better. The Employer disparity ratio for Arizona and the All Firms disparity ratio for Arkansas are statistically significant at a 1-in-10 probability level.

NERA
Economic Consulting

**Table 2B. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Hispanic or Latino, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 1.23% | 0.44% | 1.32% | 0.28% | *0.36* | *0.21* |
| Alaska | 2.20% | 0.86% | 2.50% | 0.81% | *0.39* | *0.32* |
| Arizona | 11.66% | 2.73% | 6.97% | 2.47% | *0.23* | *0.35* |
| Arkansas | 1.50% | 0.76% | 0.44% | 0.66% | *0.51* | *1.48* |
| California | 15.38% | 4.30% | 8.25% | 3.71% | *0.28* | *0.45* |
| Colorado | 7.35% | 2.61% | 5.50% | 2.22% | *0.36* | *0.40* |
| Connecticut | 3.50% | 0.64% | 1.67% | 0.44% | *0.18* | *0.26* |
| Delaware | 1.16% | 0.58% | 0.25% | 0.36% | *0.50* | *1.45* |
| Dist. Columbia | 19.76% | n/a | 10.65% | n/a | n/a | |
| Florida | 17.44% | 5.15% | 8.25% | 3.90% | *0.30* | *0.47* |
| Georgia | 5.77% | 1.39% | 1.95% | 0.62% | *0.24* | *0.32* |
| Hawaii | 3.40% | 1.31% | 3.05% | n/a | *0.38* | |
| Idaho | 2.01% | 1.63% | 1.93% | 1.67% | *0.81* | *0.87* |
| Illinois | 4.52% | 1.52% | 2.24% | 1.38% | *0.34* | *0.61* |
| Indiana | 1.67% | 0.73% | 0.97% | 0.62% | *0.44* | *0.64* |
| Iowa | 0.73% | 0.29% | 0.46% | 0.18% | *0.39* | *0.40* |
| Kansas | 2.49% | 1.53% | n/a | n/a | *0.61* | |
| Kentucky | 0.79% | 0.43% | 0.41% | 0.32% | *0.55* | *0.77* |
| Louisiana | 3.23% | 1.84% | 0.82% | 1.70% | *0.57* | *2.07* |
| Maine | 0.31% | 0.33% | 0.28% | 0.37% | *1.04* | *1.34* |
| Maryland | 8.43% | 1.89% | 3.13% | 1.44% | *0.22* | *0.46* |
| Massachusetts | 2.05% | 0.75% | 1.15% | 0.67% | *0.37* | *0.58* |
| Michigan | 1.33% | 0.75% | 0.95% | 0.70% | *0.57* | 0.73 |
| Minnesota | 0.88% | 0.42% | 0.67% | 0.35% | *0.47* | *0.52* |
| Mississippi | 0.75% | 0.57% | 0.31% | 0.49% | *0.76* | *1.59* |
| Missouri | 0.72% | 0.43% | 0.68% | 0.41% | *0.59* | *0.60* |
| Montana | n/a | n/a | n/a | n/a | | |
| Nebraska | 1.35% | 0.33% | n/a | n/a | *0.24* | |
| Nevada | 7.05% | 2.70% | 3.93% | 2.64% | *0.38* | *0.67* |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 6.97% | 2.13% | 3.33% | 1.83% | *0.31* | *0.55* |
| New Mexico | 29.50% | 17.20% | 25.44% | 15.39% | *0.58* | *0.60* |
| New York | 7.59% | 1.72% | 2.74% | 1.48% | *0.23* | *0.54* |
| North Carolina | 2.26% | 1.11% | 1.32% | 0.72% | *0.49* | *0.55* |
| North Dakota | n/a | n/a | n/a | n/a | | |
| Ohio | 0.76% | 0.32% | 0.58% | 0.27% | *0.42* | *0.47* |
| Oklahoma | 2.27% | 1.03% | 1.49% | 0.82% | *0.46* | *0.55* |
| Oregon | 1.69% | 1.10% | 1.92% | 1.10% | *0.65* | *0.57* |
| Pennsylvania | 1.22% | 0.36% | 0.65% | 0.28% | *0.29* | *0.44* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 1.41% | 0.67% | 1.13% | 0.58% | *0.48* | *0.51* |
| South Dakota | n/a | n/a | n/a | n/a | | |
| Tennessee | 1.47% | 0.34% | 0.71% | 0.22% | *0.23* | *0.31* |
| Texas | 30.86% | 7.30% | 11.30% | 4.71% | *0.24* | *0.42* |
| Utah | 2.78% | 0.77% | 1.60% | 0.68% | *0.28* | *0.43* |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | n/a | n/a | n/a | n/a | | |

**Table 2B. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Hispanic or Latino, Construction Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 7.24% | 1.99% | 2.10% | 1.41% | *0.28* | *0.67* |
| Washington | 1.67% | 0.76% | 1.78% | 0.76% | *0.45* | *0.43* |
| West Virginia | 0.35% | 0.96% | 0.41% | 1.02% | *2.75* | *2.50* |
| Wisconsin | 0.70% | 0.37% | 0.58% | 0.35% | *0.53* | *0.61* |
| Wyoming | 1.23% | 0.44% | 1.32% | 0.28% | *0.36* | *0.21* |

Notes: See Table 2A. The Employer disparity ratio for Michigan is statistically significant at a 1-in-10 probability level.

**Table 2C. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Asians, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | | | | | | |
| Alaska | 1.73% | 0.43% | 0.67% | 0.32% | *0.25* | 0.48 |
| Arizona | 0.55% | 0.14% | n/a | n/a | *0.25* | |
| Arkansas | n/a | n/a | n/a | n/a | | |
| California | 4.77% | 1.55% | 3.57% | 1.30% | *0.32* | *0.36* |
| Colorado | 0.88% | 0.21% | 0.54% | 0.17% | *0.24* | *0.31* |
| Connecticut | 0.30% | 0.26% | 0.27% | 0.27% | *0.86* | *1.01* |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist. Columbia | 2.69% | n/a | 6.80% | n/a | | |
| Florida | 0.75% | 0.36% | 0.45% | 0.35% | *0.48* | *0.78* |
| Georgia | 0.69% | 0.40% | n/a | n/a | *0.58* | |
| Hawaii | 37.27% | 27.68% | 35.62% | 27.67% | *0.74* | *0.78* |
| Idaho | 0.31% | 0.16% | 0.24% | 0.14% | *0.51* | *0.58* |
| Illinois | 0.80% | 0.60% | 0.65% | 0.59% | *0.74* | *0.90* |
| Indiana | 0.35% | 0.08% | n/a | n/a | *0.23* | |
| Iowa | n/a | n/a | n/a | n/a | | |
| Kansas | 0.32% | 0.06% | n/a | n/a | *0.19* | |
| Kentucky | 0.17% | 0.27% | 0.20% | 0.29% | *1.62* | *1.50* |
| Louisiana | 0.63% | 0.21% | n/a | n/a | *0.34* | |
| Maine | n/a | n/a | n/a | n/a | | |
| Maryland | 4.14% | 1.28% | 1.49% | | *0.31* | |
| Massachusetts | 1.21% | 1.03% | 0.54% | 1.03% | *0.85* | *1.90* |
| Michigan | 0.34% | 0.25% | 0.26% | 0.24% | 0.72 | *0.95* |
| Minnesota | 0.47% | 0.44% | n/a | n/a | *0.92* | |
| Mississippi | n/a | n/a | n/a | n/a | | |
| Missouri | 0.23% | 0.29% | 0.23% | n/a | *1.22* | |
| Montana | 0.18% | 0.15% | n/a | n/a | *0.87* | |
| Nebraska | n/a | n/a | n/a | n/a | | |
| Nevada | 1.11% | 0.48% | 0.70% | 0.47% | *0.44* | *0.66* |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 1.33% | 0.77% | 0.89% | n/a | *0.58* | |
| New Mexico | n/a | n/a | n/a | n/a | | |
| New York | 4.12% | 1.15% | 1.93% | 1.03% | *0.28* | *0.53* |
| North Carolina | 0.53% | 0.34% | 0.40% | 0.31% | *0.65* | *0.76* |
| North Dakota | n/a | n/a | n/a | n/a | | |
| Ohio | 0.43% | 0.39% | n/a | n/a | *0.91* | |
| Oklahoma | 0.57% | 0.10% | n/a | n/a | *0.18* | |
| Oregon | 0.86% | 0.30% | 0.67% | 0.25% | *0.35* | *0.38* |
| Pennsylvania | 0.72% | 0.23% | 0.23% | 0.20% | *0.32* | *0.88* |
| Rhode Island | 0.38% | 0.25% | 0.06% | n/a | *0.67* | |
| South Carolina | n/a | n/a | n/a | n/a | | |
| South Dakota | n/a | n/a | n/a | n/a | | |
| Tennessee | 0.47% | 0.16% | 0.32% | 0.13% | *0.35* | *0.39* |
| Texas | 1.02% | 0.40% | 0.69% | 0.36% | *0.39* | *0.52* |
| Utah | 0.42% | 0.66% | n/a | n/a | *1.57* | |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | n/a | n/a | n/a | n/a | | |

**Table 2C. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Asians, Construction Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 3.14% | 0.86% | 1.28% | 0.58% | *0.27* | *0.45* |
| Washington | 2.10% | 1.09% | 1.72% | 1.06% | *0.52* | *0.62* |
| West Virginia | 0.15% | 0.15% | n/a | n/a | *0.96* | |
| Wisconsin | 0.21% | 0.06% | n/a | n/a | *0.26* | |
| Wyoming | 0.13% | n/a | n/a | n/a | | |

Notes: See Table 2A. The Employer disparity ratio for Alaska and the All Firms disparity ratio for Michigan are statistically significant at a 1-in-10 probability level.

NERA
Economic Consulting

**Table 2D. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Amer. Indians and Alaska Natives, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 1.30% | 0.56% | 1.31% | 0.53% | *0.43* | *0.40* |
| Alaska | 5.08% | 15.03% | 5.24% | 15.67% | *2.96* | *2.99* |
| Arizona | 2.05% | 0.56% | 0.80% | 0.51% | *0.27* | 0.64 |
| Arkansas | 1.81% | 1.53% | 1.19% | 1.51% | *0.84* | *1.26* |
| California | 2.15% | 0.70% | 1.27% | 0.62% | *0.33* | *0.49* |
| Colorado | 1.18% | 0.31% | 0.87% | 0.24% | *0.26* | *0.28* |
| Connecticut | 0.53% | 0.09% | n/a | n/a | *0.16* | |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist. Columbia | 0.75% | n/a | 0.00% | 0.00% | | |
| Florida | 1.00% | 0.17% | n/a | n/a | *0.17* | |
| Georgia | 1.03% | 0.17% | 0.26% | 0.03% | *0.16* | *0.12* |
| Hawaii | 0.54% | n/a | n/a | n/a | | |
| Idaho | 1.47% | 0.84% | n/a | n/a | *0.57* | |
| Illinois | 0.33% | 0.13% | 0.22% | 0.12% | *0.39* | *0.55* |
| Indiana | 0.20% | 0.23% | n/a | n/a | *1.16* | |
| Iowa | n/a | n/a | n/a | n/a | | |
| Kansas | 1.21% | 0.71% | 0.90% | 0.69% | *0.59* | *0.77* |
| Kentucky | n/a | n/a | n/a | n/a | | |
| Louisiana | 1.05% | 0.29% | n/a | n/a | *0.28* | |
| Maine | 0.81% | 0.18% | n/a | n/a | *0.22* | |
| Maryland | 2.07% | 0.32% | n/a | n/a | *0.15* | |
| Massachusetts | 0.67% | 0.07% | 0.29% | 0.05% | *0.11* | *0.18* |
| Michigan | 0.95% | 0.34% | 0.48% | 0.31% | *0.36* | *0.65* |
| Minnesota | 0.66% | 0.21% | 0.42% | 0.20% | *0.32* | *0.48* |
| Mississippi | 0.38% | 0.03% | n/a | n/a | *0.08* | |
| Missouri | 1.36% | 0.39% | n/a | n/a | *0.28* | |
| Montana | 2.30% | 1.91% | 1.81% | 1.99% | *0.83* | *1.10* |
| Nebraska | 0.33% | 0.29% | 0.20% | 0.28% | *0.86* | *1.36* |
| Nevada | 2.07% | 0.29% | 1.10% | 0.26% | *0.14* | *0.23* |
| New Hampshire | 0.79% | 0.38% | n/a | n/a | 0.47 | |
| New Jersey | 0.38% | n/a | 0.16% | n/a | | |
| New Mexico | n/a | n/a | n/a | n/a | | |
| New York | 0.96% | 0.19% | 0.38% | 0.14% | *0.20* | *0.37* |
| North Carolina | 1.34% | 0.48% | 0.95% | 0.38% | *0.36* | *0.40* |
| North Dakota | 1.93% | 1.02% | 1.68% | 1.00% | *0.53* | *0.60* |
| Ohio | 0.48% | 0.15% | n/a | n/a | *0.32* | |
| Oklahoma | 8.30% | 5.39% | 5.00% | 4.75% | *0.65* | *0.95* |
| Oregon | 1.36% | 0.64% | 1.03% | 0.60% | *0.47* | *0.58* |
| Pennsylvania | 0.37% | 0.08% | 0.23% | 0.07% | *0.21* | *0.28* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 0.58% | 0.17% | n/a | n/a | *0.29* | |
| South Dakota | 2.65% | 1.74% | 1.85% | 1.79% | *0.66* | *0.97* |
| Tennessee | 1.03% | 0.35% | n/a | n/a | *0.34* | |
| Texas | 1.09% | 0.57% | 0.91% | 0.54% | *0.53* | *0.60* |
| Utah | 0.92% | 0.22% | 0.48% | 0.18% | *0.23* | *0.37* |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 0.91% | 0.38% | 0.31% | 0.27% | *0.42* | *0.85* |

**Table 2D. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Amer. Indians and Alaska Natives, Construction Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.75% | 0.30% | 0.40% | 0.20% | *0.40* | *0.50* |
| Washington | 1.06% | 0.66% | 0.92% | 0.63% | 0.62 | *0.68* |
| West Virginia | 0.55% | 0.13% | 0.09% | 0.12% | *0.24* | *1.33* |
| Wisconsin | 0.57% | 0.32% | 0.31% | 0.31% | *0.55* | *1.00* |
| Wyoming | 1.82% | 0.84% | n/a | n/a | *0.46* | |

Notes: See Table 2A. The Employer disparity ratio for Arizona and the All Firms disparity ratio for New Hampshire and Washington are statistically significant at a 1-in-10 probability level.

NERA
Economic Consulting

**Table 2E. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Native Hawaiians and Pac. Islanders, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.00% | n/a | 0.01% | n/a | | |
| Alaska | n/a | n/a | n/a | n/a | | |
| Arizona | 0.14% | n/a | n/a | n/a | | |
| Arkansas | n/a | n/a | n/a | n/a | | |
| California | n/a | n/a | n/a | n/a | | |
| Colorado | 0.14% | 0.03% | 0.09% | n/a | *0.24* | |
| Connecticut | n/a | n/a | n/a | n/a | | |
| Delaware | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Dist. Columbia | 0.06% | n/a | 0.00% | 0.00% | | |
| Florida | n/a | n/a | n/a | n/a | | |
| Georgia | 0.03% | 0.03% | 0.07% | 0.03% | 0.89 | 0.44 |
| Hawaii | 12.87% | 4.66% | n/a | n/a | *0.36* | |
| Idaho | n/a | n/a | n/a | n/a | | |
| Illinois | n/a | n/a | n/a | n/a | | |
| Indiana | n/a | n/a | n/a | n/a | | |
| Iowa | 0.01% | n/a | n/a | n/a | | |
| Kansas | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Kentucky | 0.01% | n/a | n/a | n/a | | |
| Louisiana | 0.00% | n/a | 0.01% | n/a | | |
| Maine | 0.01% | n/a | 0.04% | n/a | | |
| Maryland | 0.01% | n/a | 0.01% | n/a | | |
| Massachusetts | n/a | n/a | n/a | n/a | | |
| Michigan | 0.00% | n/a | 0.01% | n/a | | |
| Minnesota | n/a | n/a | n/a | n/a | | |
| Mississippi | 0.02% | 0.02% | 0.02% | n/a | 0.74 | |
| Missouri | n/a | n/a | n/a | n/a | | |
| Montana | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Nebraska | 0.01% | n/a | 0.00% | 0.00% | | |
| Nevada | 0.06% | n/a | n/a | n/a | | |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 0.03% | n/a | 0.07% | n/a | | |
| New Mexico | 0.01% | n/a | 0.02% | n/a | | |
| New York | n/a | n/a | n/a | n/a | | |
| North Carolina | 0.01% | 0.00% | n/a | n/a | 0.47 | |
| North Dakota | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Ohio | n/a | n/a | n/a | n/a | | |
| Oklahoma | 0.50% | 0.06% | n/a | n/a | *0.11* | |
| Oregon | 0.08% | 0.09% | n/a | n/a | 1.05 | |
| Pennsylvania | n/a | n/a | n/a | n/a | | |
| Rhode Island | 0.02% | n/a | 0.00% | 0.00% | | |
| South Carolina | n/a | n/a | n/a | n/a | | |
| South Dakota | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Tennessee | 0.00% | n/a | 0.01% | n/a | | |
| Texas | n/a | n/a | n/a | n/a | | |
| Utah | 0.17% | 0.82% | n/a | n/a | *4.85* | |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 0.00% | 0.00% | 0.00% | 0.00% | | |

**Table 2E. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Native Hawaiians and Pac. Islanders, Construction Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.02% | n/a | 0.05% | n/a | | |
| Washington | 0.13% | n/a | 0.18% | n/a | | |
| West Virginia | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Wisconsin | n/a | n/a | n/a | n/a | | |
| Wyoming | 0.03% | n/a | 0.00% | 0.00% | | |

Notes: See Table 2A. The Employer disparity ratio for Georgia is statistically significant at a 1-in-10 probability level.

**Table 2F. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employers Firms, Women, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 7.45% | 3.97% | 6.96% | 3.75% | 0.53 | 0.54 |
| Alaska | 10.30% | 8.39% | n/a | n/a | 0.81 | |
| Arizona | 7.47% | 4.69% | 7.23% | 4.34% | 0.63 | 0.60 |
| Arkansas | 7.37% | 4.05% | 5.55% | 4.11% | 0.55 | 0.74 |
| California | 5.98% | 4.97% | 5.65% | 4.95% | 0.83 | 0.88 |
| Colorado | 7.85% | 3.99% | 7.32% | 3.89% | 0.51 | 0.53 |
| Connecticut | 6.85% | 5.69% | 7.03% | 5.68% | 0.83 | 0.81 |
| Delaware | 5.19% | 4.30% | 7.36% | n/a | 0.83 | |
| Dist. Columbia | 5.25% | n/a | 10.36% | n/a | | |
| Florida | 8.33% | 5.31% | 7.38% | 5.05% | 0.64 | 0.68 |
| Georgia | 6.96% | 3.76% | 6.49% | 3.53% | 0.54 | 0.54 |
| Hawaii | 8.03% | 3.62% | 5.93% | 3.56% | 0.45 | 0.60 |
| Idaho | 6.89% | 4.92% | 5.88% | 4.97% | 0.71 | 0.84 |
| Illinois | 8.92% | 7.87% | 10.83% | 8.12% | 0.88 | 0.75 |
| Indiana | 7.45% | 4.32% | 5.85% | 4.36% | 0.58 | 0.75 |
| Iowa | 6.74% | 4.59% | 4.60% | 4.60% | 0.68 | 1.00 |
| Kansas | 6.57% | 4.57% | n/a | n/a | 0.70 | |
| Kentucky | 7.62% | 5.30% | 6.75% | 5.29% | 0.70 | 0.78 |
| Louisiana | 7.06% | 5.64% | 7.89% | 5.66% | 0.80 | 0.72 |
| Maine | 6.12% | 5.45% | 5.47% | 5.32% | 0.89 | 0.97 |
| Maryland | 8.14% | 5.46% | 7.75% | 5.40% | 0.67 | 0.70 |
| Massachusetts | 6.44% | 4.00% | 6.31% | 3.98% | 0.62 | 0.63 |
| Michigan | 8.01% | 4.98% | 6.49% | 4.94% | 0.62 | 0.76 |
| Minnesota | 6.61% | 3.98% | 6.49% | 3.93% | 0.60 | 0.61 |
| Mississippi | 5.14% | 5.70% | 6.12% | 5.07% | 1.11 | 0.83 |
| Missouri | 8.21% | 5.50% | 8.05% | 5.57% | 0.67 | 0.69 |
| Montana | 7.09% | 5.34% | 7.35% | 5.49% | 0.75 | 0.75 |
| Nebraska | 4.55% | 3.13% | 4.22% | 3.21% | 0.69 | 0.76 |
| Nevada | 9.79% | 5.22% | 9.21% | 5.09% | 0.53 | 0.55 |
| New Hampshire | 3.38% | 4.64% | 3.35% | 5.22% | 1.37 | 1.56 |
| New Jersey | 7.37% | 7.55% | 7.76% | 7.78% | 1.02 | 1.00 |
| New Mexico | 10.34% | 6.92% | n/a | n/a | 0.67 | |
| New York | 8.11% | 6.65% | 8.51% | 6.71% | 0.82 | 0.79 |
| North Carolina | 8.05% | 5.30% | 7.64% | 5.24% | 0.66 | 0.69 |
| North Dakota | 4.80% | n/a | 5.56% | n/a | | |
| Ohio | 7.55% | 5.05% | 8.00% | 5.16% | 0.67 | 0.65 |
| Oklahoma | 7.37% | 5.40% | 6.61% | 5.69% | 0.73 | 0.86 |
| Oregon | 6.29% | 3.72% | 5.84% | 3.60% | 0.59 | 0.62 |
| Pennsylvania | 6.18% | 4.79% | 7.01% | 4.98% | 0.77 | 0.71 |
| Rhode Island | 6.96% | 10.55% | 7.80% | 11.20% | 1.52 | 1.44 |
| South Carolina | 6.66% | 5.45% | 5.55% | 5.50% | 0.82 | 0.99 |
| South Dakota | 6.48% | 4.21% | 3.90% | 4.26% | 0.65 | 1.09 |
| Tennessee | 8.30% | 3.99% | 6.40% | 3.69% | 0.48 | 0.58 |
| Texas | 7.22% | 5.15% | 9.19% | 5.18% | 0.71 | 0.56 |
| Utah | 6.66% | 3.61% | 5.06% | 3.59% | 0.54 | 0.71 |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Vermont | 6.20% | n/a | 2.67% | n/a | | |

**Table 2F. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employers Firms, Women, Construction Industries, 2002, cont'd**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 6.81% | 4.59% | 6.97% | 4.58% | *0.67* | *0.66* |
| Washington | 6.87% | 3.37% | 5.42% | 3.26% | *0.49* | *0.60* |
| West Virginia | 6.03% | 7.84% | 7.75% | 7.96% | *1.30* | *1.03* |
| Wisconsin | 6.52% | 5.63% | 5.49% | 5.87% | *0.86* | *1.07* |
| Wyoming | 7.77% | 6.60% | 9.07% | 6.69% | *0.85* | *0.74* |

Notes: See Table 2A. The Employer disparity ratio for Arkansas, Hawaii, and Nebraska and the All Firms disparity ratio for Idaho, Illinois, and Montana are statistically significant at a 1-in-10 probability level. "n/a" indicates data was suppressed by Census for statistical reason and/or to protect confidentiality.

NERA
Economic Consulting

**Table 3A. Actual and Potential Business Formation Rates, Construction and Construction-Related Industries**

| Race/Sex, Location, Transportation Mode | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Ratio |
|---|---|---|---|
| *Austin, TX MSA (Airport)* | (1) | (2) | (3) |
| African-American | 17.7 | 27.4 | 0.646 |
| Hispanic or Latino | 10.8 | 18.4 | 0.587 |
| Asian | 18.6 | 24.2 | 0.769 |
| Native American | 39.3 | 46.9 | 0.838 |
| Nonminority female | 11.7 | 24.2 | 0.483 |
| All minority and female | 11.5 | 20.1 | 0.572 |
| *Chicago, IL MSA (Highways)* | | | |
| African-American | 20.2 | 16.0 | n/a |
| Hispanic or Latino | 10.5 | 18.1 | 0.580 |
| Asian | 9.9 | 15.6 | 0.635 |
| Native American | 8.0 | 16.0 | 0.500 |
| Nonminority female | 11.0 | 19.5 | 0.564 |
| All minority and female | 12.1 | 20.8 | 0.582 |
| *Colorado (Airport)* | | | |
| African-American | 30.3 | 23.4 | n/a |
| Hispanic or Latino | 7.3 | 19.8 | 0.369 |
| Asian | 12.4 | 18.1 | 0.685 |
| Native American | 3.3 | 11.3 | 0.292 |
| Nonminority female | 12.5 | 21.0 | 0.595 |
| All minority and female | 10.3 | 18.9 | 0.545 |
| *Maryland (Highways, Transit, Airport)* | | | |
| African-American | 11.3 | 21.1 | 0.536 |
| Hispanic or Latino | 7.1 | 14.7 | 0.483 |
| Asian | 16.8 | 22.8 | 0.737 |
| Native American | 7.2 | 15.2 | 0.474 |
| Nonminority female | 9.5 | 18.0 | 0.528 |
| All minority and female | 10.0 | 18.6 | 0.538 |
| *Memphis, TN-MS-AR MSA (Airport)* | | | |
| African-American | 14.6 | 24.3 | 0.601 |
| Hispanic or Latino | 12.6 | 20.2 | 0.624 |
| Asian | 0.0 | 5.6 | 0.000 |
| Native American | 28.8 | 36.4 | 0.791 |
| Nonminority female | 21.9 | 30.5 | 0.718 |
| All minority and female | 15.8 | 24.4 | 0.648 |

**Table 3A. Actual and Potential Business Formation Rates, Construction and Construction-Related Industries, cont'd**

| Race/Sex, Location, Transportation Mode | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Ratio |
|---|---|---|---|
| *Missouri (Highways)* | (1) | (2) | (3) |
| African-American | 13.91 | 23.21 | 0.599 |
| Hispanic or Latino | 12.86 | 22.46 | 0.573 |
| Asian | 11.70 | 17.50 | 0.669 |
| Native American | 28.47 | 16.47 | n/a |
| Nonminority female | 19.21 | 22.91 | 0.838 |
| All minority and female | 18.13 | 24.00 | 0.755 |
| *Minnesota (Highways)* | | | |
| African-American | 4.6 | 14.3 | 0.322 |
| Hispanic or Latino | 11.5 | 19.1 | 0.602 |
| Asian | 16.1 | 21.8 | 0.739 |
| Native American | 6.5 | 14.5 | 0.448 |
| Nonminority female | 16.8 | 25.3 | 0.664 |
| All minority and female | 15.1 | 23.2 | 0.651 |
| *Philadelphia, PA MSA (Transit)* | | | |
| All minority and female | 13.2 | 18.1 | 0.729 |
| *Washington State (Highways)* | | | |
| African-American | 5.5 | 25.5 | 0.216 |
| Hispanic or Latino | 10.5 | 18.1 | 0.580 |
| Asian | 13.4 | 19.0 | 0.705 |
| Native American | 13.3 | 20.9 | 0.636 |
| Nonminority female | 14.5 | 18.7 | 0.775 |
| All minority and female | 14.4 | 20.7 | 0.696 |

Notes The figure in column (1) is the average self-employment rate weighted using PUMS population-based person weights. The figure in column (2) is derived by inflating the figure in column (1) according to the corresponding coefficient from the business formation regression analysis, which holds constant industry, geography, education, age, and labor market status. Column (3) is column (1) divided by column (2). "n/a" indicates no adverse disparity observed. If there is parity in the relevant marketplace, then the disparity ratio will equal 1.000 because the expected business formation rate (that is, the business formation rate that would be observed in a non-discriminatory marketplace) will be equivalent to the actual business formation rate. In cases where adverse disparities are present in the relevant marketplace, then the disparity ratio will be less than 1.000 because expected business formation rates will exceed current business formation rates.

Source: 2000: Five Percent PUMS.

NERA
Economic Consulting

**Table 3B. Actual and Potential Business Owner Earnings, Construction and Construction-Related Industries**

| Race/Sex, Location, Transportation Mode | Business Earnings Deficit (%) |
|---|---|
| *Austin, TX MSA (Airport)* | (1) |
| African-American | -33.8 |
| Hispanic or Latino | n/a |
| Asian | -6.9 |
| Native American | -35.3 |
| Nonminority female | -50.5 |
| *Chicago, IL MSA (Highways)* | |
| African-American | -29.2 |
| Hispanic or Latino | -14.7 |
| Asian | -5.7 |
| Native American | -36.8 |
| Nonminority female | -51.2 |
| *Colorado (Airport)* | |
| African-American | -29.0 |
| Hispanic or Latino | n/a |
| Asian | -5.7 |
| Native American | -36.8 |
| Nonminority female | -51.3 |
| *Maryland (Highways, Transit, Airport)* | |
| African-American | -27.9 |
| Hispanic or Latino | -18.8 |
| Asian | -3.8 |
| Native American | -38.0 |
| Nonminority female | -43.7 |
| *Memphis, TN-AR-MS MSA (Airport)* | |
| African-American | -30.1 |
| Hispanic or Latino | -19.0 |
| Asian | -4.1 |
| Native American | -38.4 |
| Nonminority female | -44.0 |
| *Missouri (Highways)* | |
| African-American | -17.5 |
| Hispanic or Latino | -12.3 |
| Asian | -1.6 |
| Native American | -14.9 |
| Nonminority female | -47.4 |
| *Minnesota (Highways)* | |
| African-American | -29.0 |
| Hispanic or Latino | -14.5 |
| Asian | -5.6 |
| Native American | -36.7 |

| Race/Sex, Location, Transportation Mode | Business Earnings Deficit (%) |
|---|---|
| Nonminority female | -51.3 |

**Table 3B. Actual and Potential Business Owner Earnings, Construction and Construction-Related Industries, cont'd**

| Race/Sex, Location, Transportation Mode | Business Earnings Deficit (%) |
|---|---|
| *Philadelphia, PA MSA (Transit)* | |
| All minority and female | -38.3 |
| *Washington State (Highways)* | (1) |
| African-American | -33.8 |
| Hispanic or Latino | -14.7 |
| Asian | -6.9 |
| Native American | -35.4 |
| Nonminority female | -50.5 |

Notes The figure in column (1) is the percentage by which minority or female business owner earnings are lower than comparable non-minority male earnings, based on results of the business owner earnings regression analysis, which holds constant industry, geography, education, age, and labor market status.

Source: Five Percent Decennial Census PUMS.

NERA
Economic Consulting

**Table 3C. Excess Loan Denial Rates–Nine Jurisdictions**

| Race/Sex | (1) | (2) |
|---|---|---|
| | *Most Recent Application (%)* | *Last Three Years (%)* |
| African-American | 28.9 | 29.3 |
| Hispanic or Latino | 17.8 | 24.4 |
| Asian and Pacific Islander | 4.2 | 0.3 |
| Native American | 8.7 | 18.8 |
| Nonminority female | 4.6 | 8.6 |

Source: NERA Credit Market Surveys, 1999-2007.

**Table 3D. Excess Cost of Credit–Nine Jurisdictions**

| Race/Sex | (1) | (2) |
|---|---|---|
| | *Most Recent Application (Int. Rate % Points)* | *Last Three Years (Int. Rate % Points)* |
| African-American | 1.683 | 1.491 |
| Hispanic or Latino | 0.820 | 0.895 |
| Asian and Pacific Islander | 1.221 | 0.789 |
| Native American | 1.241 | 1.008 |
| Nonminority female | 0.046 | 0.018 |

Source: NERA Credit Market Surveys, 1999-2007.

Spring 2007 Issue No. 16

SECTION OF ANTITRUST LAW

# THE TRANSPORTATION ANTITRUST UPDATE



Transportation Industry Committee • Section of Antitrust Law • American Bar Association

## IN THIS ISSUE:

**Volvo Trucks North America v. Reeder-Simco GMC: Robinson-Patman Act Verdict Reversed Because Plaintiff in Competitive Bidding for Special Order Trucks Did Not Show Actual Competition or Competitive Injury**
by Terri L. Bowman ..... 3

**Canadian National Railway Company v. Western Canadian Coal Corporation: The Start of Something New?**
by François Tougas ..... 7

**Western States Paving Company v. Washington State Department of Transportation: Ninth Circuit Upholds Federal Disadvantaged Business Enterprise Program for Transportation Contracts But Strikes Down State's Implementation of Program Regulations**
by Colette Holt and Jon Wainwright ..... 9

**U.S. Department of Transportation Rejects Antitrust Immunity for Northwest/KLM Addition to SkyTeam Alliance**
by James V. Dick ..... 15

**An Economic Analysis of How Antitrust-Immunized Alliances Have Affected Transatlantic Competition**
by James D. Reitzes and Dorothy Robyn ..... 18

**The Transportation Committee WEBSITE** is located at http://www.abanet.org/antitrust/committees/transportation/welcome.html. Our website includes pages with reports of recent developments, announcements of upcoming meetings, and useful links. Back issues of this newsletter are available as well. We invite you to visit the website and provide us with your feedback.

## *Note from the Chair*

In this issue of our newsletter, we lead off with an analysis of the Supreme Court's 2006 decision in *Volvo Trucks North America v. Reeder-Simco GMC*, which applied Robinson-Patman Act jurisprudence in the context of competitive bidding. Next, François Tougas comments on *Canadian National Railway Company v. Western Canadian Coal Corporation*, the first case in which a railway governed by the Canada Transportation Act has filed an application for judicial review of final offer arbitration. Colette Holt and Jon Wainwright write about the Ninth Circuit's decision in *Western States Paving Company v. Washington State Department of Transportation*, which upheld the federal Disadvantaged Business Enterprise Program for transportation contracts but struck down the State of Washington's implementation of program regulations. Our final two articles discuss the decision by the United States Department of Transportation ("DOT") to reject

# WESTERN STATES PAVING COMPANY v. WASHINGTON STATE DEPARTMENT OF TRANSPORTATION

## Ninth Circuit Upholds Federal Disadvantaged Business Enterprise Program for Transportation Contracts But Strikes Down State's Implementation of Program Regulations

Colette Holt* and Jon Wainwright**

In a challenge to the constitutionality of the Disadvantaged Business Enterprise ("DBE") Program for federally-assisted U.S. Department of Transportation ("USDOT") contracts,[1] the Ninth Circuit Court of Appeals held that the statute adopting the Program[2] and the federal implementing regulations[3] satisfied strict constitutional scrutiny on their face. At the same time, however, the court struck down the 2000 implementation of that Program by the Washington Department of Transportation ("WSDOT"), finding that it was not sufficiently narrowly tailored.

### Factual Background and Procedural History

The plaintiff, Western States Paving Co., Inc. ("Western States"), was a non-DBE asphalt and paving subcontractor. It alleged that it had submitted the lowest quotes on two WSDOT projects, but lost the subcontracts because the prime contractors chose to utilize DBEs to meet the subcontract goals pursuant to Part 26 of Chapter 49 of the Code of Federal Regulations. Western States filed suit to enjoin the operation of WSDOT's USDOT-approved federal fiscal year 2000 goal and for damages related to denial of the subcontracts. USDOT intervened to defend the constitutionality of the statute and implementing regulations.

The United States District Court for the Western District of Washington entered summary judgment for the federal and state defendants. It held that Congress had established a compelling interest in remedying nationwide discrimination against DBEs in the highway construction industry, and that the implementing regulations were facially constitutional. The district court further held that WSDOT met its legal obligations by complying with the federal regulations; WSDOT was not required to independently establish that its Program satisfied strict scrutiny.

On appeal, the United States Court of Appeals for the Ninth Circuit affirmed the district court's holding as to USDOT, agreeing that Congress met its constitutional burdens, but reversed and directed the entry of judgment as against the state defendants. The court found that WSDOT's DBE goal was not separately supported with controlled, statistical evidence of discrimination and therefore was not narrowly tailored to remedy discrimination in its marketplace.

* Colette Holt, an attorney, is the principal of Colette Holt & Associates, 541 West Arlington Place, Chicago, Illinois, 60614, 773-528-9072, holtlaw@ameritech.net.

** Jon Wainwright is a Vice President of NERA Economic Consulting, 1006 East 39th St., Austin, Texas, 78751, 512-371-8995, jon.wainwright@nera.com.

1 *Western States Paving Co., Inc. v. Washington State Dep't of Transp.*, 407 F.3d 983 (9th Cir. 2005).

2 Transportation Equity Act for the Twenty-First Century ("TEA-21"), Pub. L. No. 105-178, 112 Stat. 107 (1998).

3 49 C.F.R. pt. 26 (2007).

**Analysis**

***Federal Regulations Upheld as Facially Constitutional***

The Ninth Circuit held that the statute adopting the DBE Program and the implementing regulations met both prongs of strict scrutiny.[4] In harmony with every other court that has considered the question, the court held that Congress established its compelling interest in remedying discrimination in the highway construction industry through ample statistical and anecdotal evidence of discrimination. The evidence before Congress included:

- Disparities between the earnings of minority-owned firms and white-owned firms;
- Disparities between the loans received by black business owners compared to similar white business owners;
- The large decline in minorities' participation in the construction industry when affirmative action programs were struck down or abandoned; and
- Discrimination by prime contractors, trade unions, business networks, suppliers and sureties against minority contractors.

[4] The Program's inclusion of women in addition to racial and ethnic minorities in the definition of presumptively "socially disadvantaged individuals" required discussion of the standard of review applicable to sex-conscious measures. While gender-based classifications must be supported by an "exceedingly persuasive justification" and "substantially related to the achievement of that underlying objective, in this case the application of intermediate scrutiny of the inclusion of women in the DBE program would not change the outcome." 407 F.3d at 987 n.1, citing *United States v. Virginia*, 518 U.S. 515, 524 (1996).

The court concluded that:

> Although Congress did not possess evidence that minorities suffer discrimination in every State's public contracting market, Congress need not undertake such an onerous task when enacting legislation that is applicable on a nationwide basis. . . . Congress had a strong basis in evidence for concluding that in at least some parts of the country discrimination within the transportation contracting industry hinders minorities' ability to compete for federally funded contracts.[5]

The regulations also satisfied the narrow tailoring requirement. The maximum feasible portion of the recipient's DBE goal must be achieved through race-neutral means. The Program is flexible; there are no quotas and contractors' good faith efforts to meet goals are recognized. The statute is subject to periodic review and reauthorization, and grantees must tailor their goals to their specific marketplaces. The burden on non-DBEs is permissible and minimal: white males can qualify as DBEs if they can prove their social disadvantage, and the personal net worth limit ensures that "wealthy" minorities do not receive a windfall. "Overall," the court found, "[the statute] and its implementing regulations possess all the features of a narrowly tailored remedial program."[6]

[5] 407 F.3d at 992-93.

[6] *Id.* at 995.

***WSDOT's Implementation Struck Down as Insufficiently Narrowly Tailored***

Turning to the plaintiff's challenge to WSDOT's implementation of the Program, the Ninth Circuit first rejected the State's position that compliance with the federal regulations insulated it from strict scrutiny.[7] The court agreed with the analysis of the Eighth Circuit in *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation*,[8] which held that although a recipient need not have an independent compelling interest for its DBE Program, courts must nevertheless undertake an "as applied" inquiry into whether the State's Program is narrowly tailored to its marketplace. In upholding the Minnesota Department of Transportation's DBE goal-setting based upon its Availability Study, the Eighth Circuit stated, "[t]o the extent the federal government delegates this tailoring function, a State's implementation becomes critically relevant to a reviewing court's strict scrutiny."[9]

The Ninth Circuit was persuaded by USDOT's argument that race-conscious goals can be applied only in those localities where the effects of discrimination are present: "As the United States correctly observed in its brief and during oral argument, it cannot be said that TEA-21 is a narrowly tailored remedial measure unless its application is limited to those States in which the effects of discrimination are actually present."[10] The court required WSDOT to prove not only that discrimination had current effects in its market but also that such discrimination affected all of the presumptively socially disadvantaged groups included in the federal regulations.[11] "[E]ach of the principal minority groups benefited by Washington's DBE program . . . must have suffered discrimination within the State."[12]

The Ninth Circuit rejected WSDOT's goal-setting methodology, even though that methodology closely tracked the Sample Program[13] developed by USDOT. The State had chosen option one in 49 CFR § 26.45(c) to determine its step one base figure of DBE availability: dividing the number of certified DBEs by the total number of establishments in the Census Bureau's *County Business Patterns* database. In step two, the State had followed the USDOT's guidance and adjusted the base figure of 11.17% to 14%, based upon the average of the step one estimate averaged with the median (18%) of prior years' DBE participation,[14] without an explanation of how this figure reflected expected DBE availability in a race-neutral market. WSDOT was unable to make an adjustment for discriminatory barriers in obtaining bonding and financing or for the effects of past or present discrimination because it lacked statistical studies of such discrimination. WSDOT then projected that it would achieve the 14% goal through 9% DBE participation from race-neutral means, based upon its utilization on state-funded contracts

---

7 The plaintiff conceded that Washington's Program comports with the regulations.

8 345 F.3d 964, 970 (8th Cir. 2003), *cert. denied*, 124 S. Ct. 2158 (2004).

9 345 F.3d at 971.

10 407 F.3d at 998.

11 The opinion recognizes in the discussion of Congress' narrow tailoring that the federal regulations do not permit disaggregated goals by race, ethnicity and gender. *Id.* at 990.

12 407 F.3d at 999.

13 *See* http://osdbuweb.dot.gov/documents/pdf/dbe/SampleDB.pdf.

14 *See Tips for Goal Setting in the Disadvantaged Business Enterprise (DBE) Program*, available at http://osdbuweb.dot.gov/business/dbe/tips.cfm ("[C]alculate your median past participation percentage and use that figure to adjust your Step One Base Figure by taking the average of your median past participation figure and your Step One Base Figure.").

without goals, and 5% DBE participation from race-conscious subcontracting goals.

Lacking other statistical evidence of discrimination, the State could rely only upon the gap between its estimate of 14% and the 9% DBE participation of DBEs on contracts without affirmative action remedies. The Ninth Circuit, however, held that WSDOT's 14% figure reflected the effects of the DBE Program, and thus was not indicative of DBE utilization in a race-neutral market. "Indeed, even in States in which there has never been discrimination, the proportion of work that DBEs receive on contracts that lack affirmative action requirements will be lower than the share that they obtain on contracts that include such measures because minority preferences afford DBEs a competitive advantage."[15] According to the Ninth Circuit, the only figure upon which WSDOT could "plausibly rely to demonstrate discrimination is the disparity between the proportion of DBE firms in the state (11.17%) and the percentage of contracting funds awarded to DBEs on race-neutral contracts (9%)."[16] The court found that this "oversimplified statistical evidence" was "entitled to little weight, however, because it [did] not account for factors that may affect the relative capacity of DBEs to undertake contracting work."[17] According to the Ninth Circuit, the fact that DBEs may be smaller, less experienced and more expensive than non-DBEs may explain the difference. To the extent that this "small disparity has any probative value, it is insufficient, standing alone, to establish the existence of discrimination against DBEs."[18] What is necessary is statistical significance.

15 407 F.3d at 1000.

16 *Id.*

17 *Id.*

18 *Id.* at 1001.

The State did not rely upon any anecdotal evidence of discrimination in Washington's transportation marketplace in setting its goal. According to the Ninth Circuit, the affidavits required from applicants for DBE certification attesting that they have suffered discrimination established no more than general assertions of societal bias.[19] The court concluded that:

> The record is therefore devoid of any relevant evidence suggesting that minorities currently suffer – or have ever suffered – discrimination in the Washington transportation contracting industry. . . . The "exact connection" between means and ends that is a prerequisite to the use of racial classifications is demonstrably absent from Washington's DBE program.[20]

***Dissent***

While agreeing with the majority that Congress met its constitutional burden, the dissent took issue with the holding that WSDOT must independently establish discrimination in the State. "[O]nly when the state exceeds its federal authority is it susceptible to an as-applied constitutional challenge."[21] Since the majority relies heavily upon *Sherbrooke*, it should follow that court's inquiry into whether the state complied with the regulations not impose the additional requirement that the discrimination already found by Congress must also be proved to exist in Washington. A contractor who is concerned that certain minorities are receiving a "windfall" should challenge the certification of those firms, "not file a federal lawsuit."[22]

19 *Id.* at 1002.

20 *Id.*

21 *Id.* at 1004.

22 *Id.* at 1005.

**Implications**

With *Western States*, the Ninth Circuit is the eighth court to find the DBE Program to be constitutional on its face. In view of the unanimous rejection of the argument that the DBE program *per se* fails strict scrutiny, and the Ninth Circuit's imposition of the requirement that recipients identify discrimination in their local markets, it is likely that the focus of anti-affirmative action efforts will shift to grantees' (often *pro forma*) adoption of annual goals.

It is unclear how much evidence of discrimination in a recipient's jurisdiction is necessary. The Ninth Circuit somewhat collapsed the requirement of "strong evidence" of discrimination to establish a compelling interest with the requirement that the remedy be narrowly tailored to that evidence. Although the federal implementing regulations explicitly disavow the need for grantees to conduct disparity studies, the Ninth Circuit demanded evidence closely resembling a disparity study.

Perhaps this merely illustrates that when a party presents no evidence and no expert testimony the court then lacks guidance on the correct economic and legal analysis of discrimination. As a result, the Ninth Circuit made several serious errors:

- Contrary to the Ninth Circuit's assertion that a state is "required" to adjust its base figure of DBE availability to account for the effects of discrimination, the federal implementing regulations mandate only *consideration* of such an adjustment.[23]
- Factors affecting the competitiveness of DBEs, such as firm revenues, length of time in operation, and bonding capacity, are infected by discrimination. It has long been established that proper statistical analysis should not control for the variables affected by the behavior sought to be isolated. As recognized by the Tenth Circuit Court of Appeals in holding that Denver's local Minority and Women Business Enterprise program met strict scrutiny, DBEs may be smaller, newer and otherwise less competitive because of the very discrimination sought to be remedied by the adoption of the Program. It is simply wrong to use the outcomes of discrimination as the measure of a race-neutral market.[24]
- The disparity between the estimated 11.17% DBE availability and the actual 9% utilization of DBEs on contracts without goals is not "small." On the contrary, a disparity of .8 would be considered "large" pursuant to, for example, the Equal Employment Opportunity Commission's four-fifths rule.[25]

What WSDOT lacked was the type of expert statistical evidence that the Minnesota Department of Transportation ("MNDOT") presented in support of the Program upheld in

---

23 407 F.3d at 989; *cf.* 49 CFR §226.45(d)(3) (2007) ("If you *attempt* to make an adjustment to your base figure to account for the continuing effects of past discrimination (often called the "but for" factor) or the effects of an ongoing DBE program, the adjustment must be based on demonstrable evidence that is directly and logically related the effect for which the adjustment is sought.") (emphasis added).

24 *See, e.g., Concrete Works of Colo., Inc. v. City & County of Denver*, 321 F.3d 950, 981, 983 (10th Cir. 2003), *cert. denied*, 124 S. Ct. 556 (2003) ("M/WBE construction firms are generally smaller and less experienced *because* of discrimination.... Additionally, we do not read *Croson* to require disparity studies that measure whether construction firms are able to perform a *particular contract*.") (emphasis in the original).

25 29 C.F.R. § 1607.4(d) (2007).

*Sherbrooke*.[26] The MNDOT Availability Study provided a comprehensive, market-wide estimate of DBE availability weighted by the geographic and product markets in which MNDOT did business.[27] This addresses the court's concern that DBEs may not be located where WSDOT's prime contractors awarded subcontracts. The study further provided a detailed step 2 analysis of statistical disparities in DBEs' formation and earnings relative to similarly situated non-DBEs and summarized the anecdotal evidence extant in that jurisdiction. Thus, the *Sherbrooke* court had ample evidence of DBEs' availability to perform on MNDOT contracts and subcontracts as well as evidence of the discriminatory barriers those firms faced in pursuing those contracts and subcontracts.

There is also the interesting question of the correct response when a recipient determines that not all the enumerated groups have suffered discrimination in its market. Must the recipient petition USDOT for a waiver of the prohibition against separate goals for racial and ethnic minorities and white women? Or will such a finding prohibit the operation of race-conscious goals for any group, given the regulations' prohibition against separate goals? The Ninth Circuit has voiced "concerns about the haphazard inclusion of minority groups in affirmative action programs ostensibly designed to remedy the effects of discrimination. . . . The overly inclusive designation of benefited minority groups was a 'red flag' that the legislation is not narrowly tailored."[28] The court's concern about the application of TEA-21's "laundry list" of racial and ethnic minorities to particular markets suggests that serious consideration must be given to a waiver petition to permit the use of disaggregated subcontracting goals to remedy identified discrimination in a particular jurisdiction.

At a minimum, *Western States* counsels that the USDOT Sample Plan must be significantly customized to withstand strict scrutiny. It is not enough to plug the step one availability estimate into a formula without consideration of the effects of discrimination on the analysis. While the opinion affirms that the step two adjustment is the appropriate point at which to undertake this inquiry, a conceptually rigorous model must be applied. That does not mean that an adjustment is always warranted or supportable, but there must be evidence of and discussion of discrimination in the goal-setting submission. The court's analysis also casts doubt on the value of using the recipient's past levels of DBE utilization as a measure of the availability of DBEs "but for" discrimination. In any event, any adjustment undertaken must be statistically valid. It must be a quantifiable representation of the qualitative judgment whether the ongoing effects of past or current discrimination continue to impede DBEs' full and fair access to the recipient's market.

In sum, recipients can no longer assume that compliance with USDOT's guidance or USDOT's approval of their goal-setting methodology provides a safe harbor. It would be prudent to draft future submissions to ensure that they are based upon defensible statistical and anecdotal evidence that narrowly tailors the goals to their jurisdictions. If WSDOT had presented a *Sherbrooke*-type study and proffered expert testimony in support of its analysis, the Ninth Circuit may very well have upheld the Program.

---

26 To its credit, WSDOT had already commissioned such a study, which formed the basis for its FFY 2006 DBE goal submission.

27 The authors were counsel and principal investigator, respectively, on the MNDOT Study.

28 407 F.3d at 998.

**U.S. House of Representatives**
**Committee on Transportation and Infrastructure**
**Washington, DC 20515**

James L. Oberstar
Chairman

David Heymsfeld, Chief of Staff
Ward W. McCarragher, Chief Counsel

John L. Mica
Ranking Republican Member

James W. Coon II, Republican Chief of Staff

April 21, 2009

Dr. Jon Wainwright
Vice President
NERA Economic Consulting
1006 East 39th Street
Austin, Texas 78751

Dear Dr. Wainwright:

On March 26, 2009, the Committee on Transportation and Infrastructure held a hearing on **The Department of Transportation's Disadvantaged Business Enterprise Programs.**

Attached are questions to answer for the record. I would appreciate receiving your written response to these questions within 14 days so that they may be made a part of the hearing record.

Sincerely,

James L. Oberstar
Chairman

JLO:pk
Attachment

MARCH 26, 2009
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
HEARING ON
THE DEPARTMENT OF TRANSPORTATION'S
DISADVANTAGED BUSINESS ENTERPRISE PROGRAMS

QUESTIONS FOR THE RECORD
DR. JON WAINWRIGHT
VICE PRESIDENT
NERA ECONOMIC CONSULTING

Some people have argued that the statistical evidence in disparity studies should be adjusted for something they call "capacity." By this they often seem to mean that disparity study statistics should be adjusted for the size of firms or size of contracts firms have completed in the past. Based upon your experience as an expert in the field of economics, do you agree?

**Question:** Some people have argued that the statistical evidence in disparity studies should be adjusted for something they call "capacity." By this they often seem to mean that disparity study statistics should be adjusted for the size of firms or size of contracts firms have completed in the past. Based upon your experience as an expert in the field of economics, do you agree?

**Answer:** No.

The main problem with the argument that statistical evidence in disparity studies should be adjusted for so-called "capacity" measures is that such an approach prevents accurate measurement of the existence of discrimination. Many, if not all, "capacity" indicators are themselves impacted by discrimination. Therefore, it is not good social science to limit availability measures by factors such as firm age, revenues, or numbers of employees. Moreover, disparity studies already adjust for more appropriate measures related to "capacity" such as geographic market and industry code.

The reality is that large, adverse statistical disparities between minority-owned or women-owned businesses and non-minority male-owned businesses have been documented in numerous research studies and reports since *Croson*.[1] Business outcomes, however, can be influenced by multiple factors, and it is important that disparity studies examine the likelihood of whether discrimination is an important contributing factor to observed disparities.

One traditional way that the linkage between statistical disparities and discrimination has been established is to consider the size of the observed disparities. That is, the larger the disparity, the less likely it becomes that non-discriminatory factors can account for the entire difference. Another traditional way that the linkage between statistical disparities and discrimination has been established is through the introduction of qualitative, or "anecdotal," evidence. If the thrust of such qualitative evidence is consistent with the statistical disparities observed, the case for the linkage is strengthened.

Some critics of DBE and MWBE programs and some courts have criticized the evidentiary value of disparity statistics, claiming that the availability measure in the disparity statistic does not factor in "capacity" or, stated another way, claiming that availability statistics may include firms that are not "qualified, willing, and able" to perform the work. For several reasons, such criticisms are unwarranted and unscientific.

First, terms such as "capacity," "qualifications," and "ability" are not well defined in any statistical sense. Does "capacity" mean revenue level, employment size, or bonding limits? Does "qualified" or "able" mean possession of a business license, certain amounts of training, or types of work experience? Also, does the meaning of such terms differ from industry to industry, state to state, or through time?

Second, it is important to understand that when measuring the existence of discrimination, the statistical method used should not improperly limit the availability measure by incorporating

[1] Enchautegui, *et al.* 1996.

factors that are themselves impacted by discrimination such as, firm age, revenues, bonding limits, or numbers of employees.

In understanding this problem, it is helpful to consider an extreme example where discrimination has prevented the emergence of any minority-owned firms. Suppose that racial discrimination was ingrained in a state's highway construction market. As a result, few minority construction employees are given the opportunity to gain managerial experience in the business; minorities who do end up starting construction firms are denied the opportunity to work as subcontractors for non-minority prime contractors; and non-minority prime contractors place pressure on unions not to work with minority firms and on bonding companies and banks to prevent minority-owned construction firms from securing bonding and capital. In this example, discrimination has essentially prevented the emergence of a minority highway construction industry with "capacity." Those minority firms that exist at all will be smaller and have lower revenues and employees than firms that are not subject to the same discrimination.

In this situation, excluding firms from an availability measure based on their "capacity" in a discriminatory market would preclude a government agency from doing anything to rectify the continuing support of a clearly discriminatory system with public dollars. There is no recognition that discrimination has prevented the emergence of "qualified, willing and able" minority firms. Without such firms, there can be no statistical disparity.

Therefore, focusing on the "capacity" of businesses in terms of employment, revenue, bonding limits, number of trucks, and so forth is simply wrong as a matter of economics because it can obscure the existence of discrimination. A truly "effective" discriminatory system would lead to a finding of no "capacity," and under the "capacity" approach, a finding of no discrimination. Consider, for example, using revenue as the measure of qualifications. Revenues simply measure the value of contracts that firms are receiving. If minority-owned and women-owned businesses are subject to marketplace discrimination, their revenues will be smaller than nonminority male-owned businesses because they will be less successful at obtaining work. Using revenues as a measure of DBE availability in contracting is like using pay as a measure of qualifications in an equal-pay case. Revenue, like pay, measures the extent to which a firm has succeeded in the marketplace—it does not measure the ability to succeed and should not be used in such a manner.

Of course, the government is not so helpless in the face of the current effects of discrimination, and governments have quite rightly responded to the existence of discrimination by instituting programs like the DBE program enacted by Congress and administered by the Department of Transportation. Interestingly, the existence of these types of programs in the public sector even while such programs are relatively rare in the private sector, has resulted in a situation where minority firms may more available for public sector work than for private sector work, despite the relatively greater bureaucratic barriers to entry (*e.g.*, certification requirements, reporting requirements, etc.) precisely because of the efforts to remedy discrimination in the public sector.

Third, in dynamic business environments, and especially in the construction sector, such "qualifications" or "capacity" can be obtained relatively easily. It is well known that small construction companies can expand rapidly as needs arise by hiring workers and renting

equipment. Many general contractors subcontract the majority of a project. Subcontracting is one important source of this elasticity, as has been noted by several academic studies. Bourdon and Levitt, for example, in their study of construction labor markets, observed that:

> "One of the unique aspects of the construction industry is the prevalence of subcontracting. Construction projects are undertaken by a multitude of firms assembled for brief periods of time on a site then disbanded. General contractors can undertake projects of considerable scale without large amounts of direct labor or fixed capital; subcontractors can start with one or two employees and bid only on particularly highly specialized contracts."[2]

Thus, the "capacity" and "qualifications" of firms in the construction sector are highly elastic. Firms grow quickly when demand increases and shrink quickly when demand decreases.

Academic studies have also found that, absent discrimination, entry into the construction industry is not difficult. Bourdon and Levitt attribute this to subcontracting opportunities.[3] Eccles observes that entry is easy based on the large number of small firms and that capital requirements for fixed assets are small.[4] Gould, who followed the careers of six construction contractors, also demonstrates ease of entry.[5] He further notes that there is movement between small and large firms not only via subcontracting but also by experienced staff at larger firms leaving to form smaller new firms. Similar kinds of elasticity exist as well in many industries beyond construction.

Fourth, even where "capacity"-type factors have been controlled for in statistical analyses, results consistent with business discrimination are still typically observed. For example, many jurisdictions have demonstrated that large and statistically significant differences in commercial loan denial rates between minority and non-minority firms were evident even when detailed balance sheet and creditworthiness measures were held constant.[6] Similarly, economists using the decennial census data have demonstrated that statistically significant disparities in business formation and business owner earnings between minorities and non-minorities remain even after controlling for a host of additional factors including educational achievement, labor market experience, marital status, geographic mobility, number of workers in the family, number of children, immigrant status, disability status, veteran status, interest and dividend income, labor market attachment, industry, geographic location, and local labor market variables such as the unemployment rate, population growth rate, government employment rate, or per capita income.[7]

---

[2] Bourdon and Levitt, 1980.

[3] *Ibid.*

[4] Eccles, 1981.

[5] Gould, 1980.

[6] Such evidence appears, for example, in each of the NERA disparity studies submitted to the Committee for the record.

[7] Wainwright, 2000.

Noted labor economist and former U.S. Secretary of Labor Ray Marshall, in partnership with former Federal Reserve Board Governor Andrew Brimmer, conducted one of the first post-*Croson* disparity studies, for the City of Atlanta in 1990. Drawing on that experience, Marshall summarizes well the arguments against using the outcomes of discrimination to measure "capacity"[8]

> The problem of establishing statistical proof of whether or not minority contractors are "qualified, willing and able" is particularly challenging. *Croson* provides limited guidance on this question.... Unfortunately, this lack of guidance has made it possible for courts and opponents of [DBE and MWBE] programs to argue that the failure to produce perfect statistical evidence—*i.e.*, timely and highly specific, and methodologies that control for everything except discrimination—invalidates these programs despite the fact that the most reliable statistics and the most appropriate methodologies confirm the persistence of discrimination. Our evidence for Atlanta suggests that even highly qualified black contractors are disadvantaged relative to similarly situated white contractors.... Once contractors are able to obtain contracts, they usually are able to expand their capacity.
>
> In a dynamic business environment, it would be difficult to argue, as some critics have, that qualifications are determined mainly by size.... Moreover, as the Tenth Circuit Court of Appeals observed in *Adarand VII*, there is no credible evidence that minority contractors who have been hired under [DBE or MWBE] programs have lacked adequate qualifications.
>
> Nevertheless, analyses of available data for business owners that enable personal characteristics and other factors to be controlled for [generate results that remain] compatible with racial exclusion. There therefore is no credible evidence that the large disparities in the utilization of minority contractors can be explained by the lack of qualifications or the unwillingness to contract. Indeed, strong historical, anecdotal and survey evidence ... demonstrates that minority contractors are more willing than white males to contract with governmental entities, even though they recognize that public contracting is less desirable than the mainstream private sector, where their opportunities are greatly restricted.

To summarize, there are several reasons why I do not agree that the statistical analysis in disparity studies should adjust for "capacity." These reasons include that the term "capacity" has been ill-defined; that small firms, particularly in the construction industry, are highly elastic with regard to ability to perform; and that many disparity studies have shown that even when "capacity" and "qualifications" type factors are held constant in statistical analyses, evidence of disparate impact against DBE and MWBE firms tends to persist. However, the most important reason I disagree with the use of "capacity" to limit measures of availability and other measures of disparity is that most, if not all, identifiable indicators of capacity are themselves impacted by discrimination.

---

[8] Marshall, 2002.

## References

Bourdon, Clinton C. and Raymond E. Levitt. 1980. *Union and open-shop construction, compensation, work practices, and labor markets.* Lexington Books: Lexington, Massachusetts.

Eccles, Robert G. 1981. "Bureaucratic versus Craft Administration: The Relationship of Market Structure to the Construction Firm." *Administrative Science Quarterly*. Vol. 26.

Enchautegui, Maria E., Michael Fix, Pamela Loprest, Sarah von der Lippe, Douglas Wissoker. 1996. *Do minority-owned businesses get a fair share of government contracts?* Washington, DC.: The Urban Institute.

Gould, Frederick Elliot. 1980. "Investigation in Construction Entrepreneurship," Masters Thesis, MIT, May.

Marshall, Ray. 2002. "The economics of discrimination as applied to business development," in Horowitz, Irving Louis, ed., *Eli Ginzberg: The Economist as a Public Intellectual*. New Brunswick, NJ: Transaction Publishers, 67-106.

Wainwright, Jon S. 2000. *Racial discrimination and minority business enterprise, evidence from the 1990 Census*, Studies in Entrepreneurship Series. Edited by S. Bruchey. New York, Garland Publishing.

**Index of Additional Items Submitted for the Record by Dr. Jon S. Wainwright for the Committee on Transportation and Infrastructure hearing on the Department of Transportation's Disadvantaged Business Enterprises Program, held on March 26, 2009**

(The full text of the following materials are held on file at the Committee editorial office)

- Marshall, Ray, "Minority and Female Business Development after *Croson*," Discussion Paper (June 29, 2000).
- Northern Contracting, Inc. v. the State of Illinois, Report of Defendant's Expert, Dr. Jon S. Wainwright (September 1, 2004).

AIRPORTS COUNCIL INTERNATIONAL

**Testimony of Richard White,**
**Vice President of Properties and Business Development,**
**Memphis-Shelby County Airport Authority**
**Chairman of the Business Diversity Committee, Airports Council International-North America**

**before the**

**House Transportation and Infrastructure Committee**

**"The Department of Transportation's Disadvantaged Business Enterprise Programs"**

**March 26, 2009**

Airports Council International-North America
1175 K Street, NW, Suite 500
Washington, DC 20006
202-293-8500

Chairman Oberstar, Ranking Member Mica, and members of the House Transportation and Infrastructure Committee, thank you for allowing me to participate in this important hearing. My name is Richard White, and I am Vice President of Properties and Business Development at the Memphis-Shelby County Airport Authority (MSCAA). Today I am testifying in my capacity as the Chairman of Airports Council International-North America's (ACI-NA's) Committee on Business Diversity. ACI-NA's 366 member airports enplane more than 95 percent of the domestic and virtually all of the international airline passenger and cargo traffic in North America. Nearly 400 aviation-related businesses who provide goods and services to airports are also members of ACI-NA.

DBE Overview

Nearly thirty years ago, in order to remedy past discrimination, the Department of Transportation established a minority-and women-owned business enterprise program for highway, airport, and transit programs. In 1987, Congress and the Reagan Administration explicitly applied the Disadvantaged Business Enterprise (DBE) program to airport contractors (Part 26) and concessionaries (Part 23).

Under the statutory requirements, any airport that receives federal funding is required to maintain a DBE program. As noted above, the contractors' program covers projects funded through the Airport Improvement Program (AIP). The Airport Concessionaire Disadvantaged Business Enterprise (ACDBE) covers businesses located at the airport that sell consumer goods and services, and those businesses associated with airport concessions, including advertising and management contractors.

There are also regulations governing rental-car concessions. Each airport must establish DBE goals for the rental-car concessions operating on that airport property. There has been some discussion of a national goal program for rental care companies. If national goals are established, the rental-car companies would be responsible to the FAA, and not the airports, for establishing and meeting the DBE concession goals. Furthermore, these goals would be monitored by the FAA, not the airports.

Last year, the FAA held informal discussions to examine the viability of establishing "national" goals for DBE participation in airport rental-care concessions. They have not, to date, issued a notice of proposed rulemaking on this proposal.

In addition, as part of the DBE oversight process, the FAA Civil Rights Office reviews the Part 26 DBE goal-setting methodology submitted by approximately 850 airports each year to ensure compliance with DOT's DBE regulations. They also review the Part 23 goal-setting methodology submitted by approximately 350 primary airports every 3 years on a staggered basis.

Just as Congressional and regulatory reviews, along with court decisions, bring about changes in the system, airports find themselves constantly reviewing, revising and seeking new ways to improve the program. DBE programs are not static - they can't afford to be. As our airports and communities grow and change, so too must the DBE program in order to address the needs of the community.

Airports are an integral part of their community – they not only provide an economic gateway for business and goods to move in and out of the community but remember, we live, work and raise our families in these same communities. As such, ensuring inclusion is an ongoing concern, not only in our long term project planning, but in the day-to-day work of the airport. We strive to not only meet the letter of the law, but to embrace the 'spirit' of the law, as well. We learn from experience what works and what does not; as we welcome and educate new employers to the area; and as times and circumstances change, the program and the steps we take to make it work do as well.

<u>Role of ACI-NA Business Diversity Committee</u>

This is where ACI-NA's Business Diversity Committee plays a vital role. The Committee provides us with a forum to develop proactive outreach and educational programs, and to share information on best practices that allow maximum participation of MWDBE Businesses. It also provides us with access to technical experts from the FAA, the legal community and the financial community who help educate us on the program and the impact of regulatory, legislative and legal changes, as well as what we, as airports, need to do to address these changes.

The Business Diversity Committee also works regularly with ACI-NA's Legal, Commercial, Insurance and Finance Committees on a range of issues, including diversity studies and how to find the best consultants; how to respond to changes brought about by court decisions; and insurance and bonding issues that impact both airports and DBEs. Next month, we are scheduled to meet to discuss joint ventures and the best ways to foster them.

We also produced a comprehensive white paper providing an orientation on Airport DBE programs for our members outlining the program, its origins, and examples of successful implementation strategies.

In 2007, we conducted a Disadvantaged Business Enterprise Program Survey, where we asked our members to rank the top five practices that help make their DBE programs successful, as well as the five biggest obstacles that challenged their program's success. This is yet another example of the work of the ACI-NA Business Diversity Committee to provide ACI-NA airports with information and guidance on ways to improve their programs.

I would like to share the results of that survey with you. It found the best practices to be, in order of importance:

1) having contract goals;
2) airport management or governing board support;
3) using direct contracts, joint ventures or subleases;
4) aggressive outreach and marketing, and
5) working with prime contractors to identify DBEs.

The five greatest obstacles indentified in the survey, again ranked in order of importance, were

1) finding certified DBEs;
2) potential DBEs do not apply for certification;
3) prime contractors unwillingness to go beyond contract requirements;
4) indentifying DBEs who have airport experience, and
5) hesitancy of airport prime contractors to look at new ways to increase participation.

The Importance of Developing a Unified Certification Program

Finding certified DBEs has been, and continues to be, a major barrier. Airports across the country worked with their states to create strong, state Unified Certification Programs (UCPs). The UCPs provide 'one-stop shopping' for certification as a DBE, and that certification is then recognized

and accepted throughout the state. It is a good program and helpful in identifying potential DBEs.

Despite the availability of this 'one stop' certification process, however, we have found it necessary to continue vigorous outreach efforts in our communities to inform and educate companies and to urge them to apply. In February of this year, ACI-NA joined the Airport Minority Council (AMAC) and the American Association of Airport Executives (AAAE) in sending a letter to DOT and FAA asking them to partner with us in order to take the next step forward on the UCP program - the development of uniform certification forms and uniform training. We strongly believe this needs to happen if we are to ensure that DBE/ACDBEs with limited resources have opportunities for contracts in more than one state, as well as to ensure that they receive consistent answers to their questions regarding the program regulations.

The letter is based on our collective experience as we have found that states are modifying the USDOT prescribed certification application as well as the Small Business Administration's (SBA's) Personal Net Worth (PNW) forms. We have encountered issues with the information gathered during on-site visits which can differ from state to state, as well as finding that DBEs/ACDBEs are receiving different answers to the same questions concerning certification. The DOT and the FAA have reached out to us, and we are in the process of scheduling a meeting to discuss the issue.

You can imagine how frustrating it is for a small firm, new to the DBE process, based near the border of the neighboring state (or two) having to fill out separate certification applications, answer different questions or receive different and possibly conflicting answers to the same questions, depending on which state program they consult for guidance. It doesn't make sense, and it is a deterrent to companies seeking and obtaining certification.

The creation and publication of appropriate protocols for ensuring compliance, including information about what DBE/ACDBEs can do if they believe that a certifying entity is not following the national forms or standards during the certification process, is a necessary step to ensure the program continues to work as it was designed. We also recommended that a training program be developed to ensure consistency. And we commend this Committee for including a provision in HR 915 that establishes a mandatory certification training program.

Airports and DBEs

MSCAA and our sister airports across the country have taken many steps to ensure DBE participation in contracting. I would like to provide some practical examples of the steps the airport community has taken and continues to take to make the program work. I think it will give this committee a better understanding of how the program can work, as well as restating our commitment to running successful programs.

In order to ensure a strong pool of DBE companies, many airports hold outreach events in their communities to provide information about the program as well as to explain the UCP process. The Wayne County Airport Authority, which governs the Detroit Airport, took extra steps to ensure good turnouts at their outreach sessions by providing a special incentive. They offered free membership to their vendor's list for all those who attended. Membership in the Michigan Intergovernmental Trade Network (MITN) ensures notification of specific bidding opportunities via facsimile or electronic mail. This is one of the reasons why the Authority, in 2006, was able to surpass its DBE goal of 20% - in fact they ended up at 32% - and this translated to revenues of over $65.9 million for DBE firms.

At Dallas-Fort Worth (DFW), for the four-month period covering April to July of 2004, the Airport held twelve outreach events or meetings explaining the potential opportunities for retail and food and beverage concessionaires in their new Terminal D. Because of this aggressive outreach effort, the Airport was able to far exceed its participation goals.

DFW also has a Small Contractors Development Training Workshop, an eight week course, designed to provide technical training for minority and women owned businesses. The curriculum includes workshops on a variety of topics including business development, financial management, insurance and bonding.

At MSCAA, like many other airports, we hold pre-bid conferences to provide information and guidance on upcoming contracts. It's an opportunity to ask questions and meet potential business partners for both prime and subcontractors.

Mentor Protégé programs also work well for helping DBEs. As the name implies, the purpose is to link up companies with limited or no experience

with those with more experience. The joint effort not only further develops DBEs, but can also assist them in moving into non-traditional areas of work and/or compete in the marketplace outside the DBE program.

DFW Airport instituted a mentor protégé program in its marketing department. Alpha Business, one of the early members, is a small African-American female-owned public relations and advertising firm. They participated in the program for three years and are now a joint venture partner on DFW's business-to-business and business-to-consumer contract with Moroch, an international, full-service agency specializing in integrated marketing.

In 2000, six of the seven DBE architecture firms in the Indianapolis area created an umbrella entity called ARCHonsortium. This pooling of experience and skills allowed them to bid and win the contract for the design of the $100 million parking garage and ground transportation center at the new midfield terminal at the Indianapolis Airport. It also earned them a 10% role in a joint venture that was created for the new terminal building and concourse. By joining together firms increase their capacity and capabilities as well as becoming more cost competitive.

San Francisco International Airport underwent a $22 million redevelopment of its concession program, known as the San Francisco Marketplace, earlier this decade. At an informational meeting on the project, about three hundred people were present – half of whom represented minority or women-owned firms, and close to 20 ended up participating in the project. When the Marketplace opened it featured 45 new concessions of which 80% were locally-owned. A majority of the DBEs in the Marketplace when it opened were under direct leases as owners/operators. SFO has reported that there are several features that make its DBE program unique and effective. These include:

- Principal Concession Concept – whereby Prime concessionaires subleased to small DBE's and provided training and management assistance to help DBE's get started in Airport operations. As a result – many DBE's were awarded concessions without the help of a prime contractor;

- Airport Concession Loan Program – Financial assistance was provided to DBEs for capital improvements to their airport locations in the new redevelopment;

- Airport Surety Bond Program – The Airport assisted DBE's with obtaining performance bonds on concession operations; and

- DBE guidelines were established to ensure the DBE's are owners/operators for their shops.

At Las Vegas' McCarran International Airport, they point to the success of Ayala's Inc. This DBE started with one shop at the airport and now has eight operations there and at Denver International Airport. At MSCAA, I like to point to Lenny's Sub Shop, which started with one single store, and now has the highest grossing shop on a per square foot basis at the Airport.

Many airports also have DBE programs for projects that are not funded with federal money, including those funded with the receipts of the Passenger Facility Charge (PFC) user fee. One example is right here in Congress' own backyard. The Metropolitan Washington Airport Authority (MWAA) runs an extensive Local Disadvantaged Business Enterprise (LDBE) program. The program, which is focused on small businesses located within a 100 mile range of the District of Columbia's zero mile marker, has a clearly defined Business Diversity Policy. That policy is to "aggressively seek the participation of small, disadvantaged, minority and women-owned businesses in its contracting opportunities through all lawful means."

To ensure that the program is vibrant and busy, MWAA uses a number of tools, including undertaking extensive outreach. They host Annual Business Opportunity Seminars; participate in regional procurement fairs and small business conferences; provide advanced notifications/forecasts of upcoming opportunities to small minatory and women-owned business enterprise firms; newsletters, and email alerts.

Another important step they have taken to ensure participation is to relax bonding and insurance requirements for contracts valued at $100,000 or below, thereby clearing a financial hurdle many DBEs face.

At MSCAA, we also have a Business Diversity Development Program for projects done with nonfederal money. The program is being revised, based on the results of the diversity study completed at the end of last year. The study found that work remains to be done in our region in order to achieve our goal of a truly level playing field, and it provides a number of recommendations for

change that we are putting into place. My colleague Sara Hart, Vice President and General Counsel for MSCAA is here with me today, and will be happy to provide a brief overview of the study and answer any questions you may have. I mentioned earlier.

The examples I have provided are only a small sample of what airports are doing to ensure a level playing field, help erase the artificial barriers to participation DBEs face, and to encourage and promote the program. I am sure members of this Committee, in talking with their own airports, will learn of additional, innovative ideas being used to enhance and encourage the participation of DBEs at airports.

One of my colleagues likes to say that having a good DBE program is a always a work in progress. ACI-NA stands committed to work with this Committee and this Congress to continue this important work.

Thank you.

*MEMPHIS-SHELBY COUNTY AIRPORT AUTHORITY*

*OFFICE: MEMPHIS INTERNATIONAL AIRPORT*
*2491 WINCHESTER RD., SUITE 113*
*MEMPHIS, TENNESSEE 38116-3856*
*OFFICE: 901-922-8000 / FAX 901-922-8099*
*INTERNET WEB PAGE ADDRESS http://www.mscaa.com*

**Condensed Executive Summary**
**Memphis-Shelby County Airport Authority**
**2008 Disparity Study Conducted by NERA Economic Consulting**

**To:** House Transportation and Infrastructure Committee
"The Department of Transportation's Disadvantaged Business Enterprise Programs"
**From:** Sara L. Hall, Vice-President and General Counsel
Memphis-Shelby County Airport Authority
**Date:** March 26, 2009
**Re:** Executive Summary of the 2008 Memphis Disparity Study

The Memphis Shelby County Airport Authority ("MSCAA") has a long record of commitment to including minority-owned, women-owned, and disadvantaged business enterprises (M/W/DBEs) in contracting and procurement. In 2004, MSCAA contracted with NERA Economic Consulting, an international firm of economists providing disparity studies to governments and corporations, to prepare a new disparity study for MSCAA ("2008 Memphis Study"). For this study, NERA considered whether discrimination existed for the following federally defined and identified groups: Blacks; Hispanics; Asians, which includes the sub-continent of India; Native Americans; and women.

The 2008 Memphis Study results demonstrate that MSCAA provides significant opportunities for M/W/DBEs in the Memphis area but that the demand for and utilization of M/W/DBEs still shows discrimination in the marketplace, particularly the private sector, where contracting and procurement activities are rarely subject to M/W/DBE requirements. As a result, minorities and women continue to be under-represented and under-utilized in the Memphis study area in MSCAA and non-MSCAA contracting as well as in business ownership and earnings. The 2008 Memphis Study validated the progress that has been made through MSCAA's affirmative action programs and verified the continued existence of discrimination against women and minorities in the marketplace.

The 2008 Memphis Study conducted by NERA was comprehensive and in-depth. Six years of MSCAA prime contract and subcontract records were analyzed. In all, the study database of MSCAA spending included 399 prime contracts and 848 associated subcontracts with a total overall dollar value of $426.4 million, and $486.0 million in Concessions revenues. Revenue data was analyzed from MSCAA prime contractors; M/W/DBE and non-M/W/DBE subcontractors; sub-consultants; suppliers; and airport concessionaires. The entire 318 page 2008 Memphis Study is contained in the Committee's record. The Executive Summary is on study pages one through nineteen and attached for your review.

When statistical data, gathered and confirmed by NERA, was used to compare the availability of D/M/DBEs in the Memphis metropolitan statistical area ("MSA") to their utilization in MSCAA contracts, statistically significant disparities were evident for all minority groups.

Table C1, Overall Disparity Results- Construction, A&E, Services and Commodities, details these disparities by minority group and procurement category on page twelve of the attached Executive Summary with the overall totals as follows:

**Table C1 Excerpt. Overall Disparity Results-Procurement**

| Procurement Category | M/W/DBE Utilization | M/W/DBE Availability | Disparity Ratio |
|---|---|---|---|
| All Procurement | 17.07 | 33.76 | 50.6 |
| Construction | 18.69 | 27.99 | 66.8 |
| Architecture &Engineering | 13.88 | 34.32 | 40.5 |
| Services | 15.58 | 45.31 | 34.4 |
| Commodities | 6.53 | 32.31 | 20.2 |

Note: The Disparity Ratio represents utilization over availability.

The 2008 Memphis Study data demonstrated large, adverse and statistically significant wage disparities for all minority groups and for white women. Likewise, large, adverse and statistically significant business owner earnings disparities were observed. For example, although 19.4 percent of all firms in the Memphis MSA are owned by blacks, they earn less than one percent (.84%) of all sales and receipts. Study data also confirmed acutely large disparities for other minority groups and women in the Memphis MSA.

The interview evidence portion of the 2008 Memphis Study included a large-scale mail survey of both M/W/DBEs and non-M/W/DBEs, seven group sessions totaling 50 M/W/DBE and 31 non-M/W/DBE business owners, and one-on-one interviews with 81 business owners. The results of the surveys and interviews supported the 2008 Memphis Study's extensive statistical data and represented compelling evidence of the continued existence of discrimination in the marketplace. Even when compared to firms of like size and owner characteristics, M/W/DBEs in MSCAA markets were found to suffer discrimination in large numbers and statistically significantly greater frequency than non-M/W/DBEs.

In both survey and interview responses, the 2008 Memphis Study indicates that M/W/DBEs continue to suffer discriminatory barriers to MSCAA and other public and private contracts, including perceptions of M/W/DBE incompetence, being subject to higher performance standards, discrimination in loan and bond access, and paying higher prices for supplies. The survey results also revealed that M/W/DBE firms that have been hired in the past by non-M/W/DBE prime contractors to work on public contracts with M/W/DBE goals are rarely hired or even solicited to work on projects without goals.

The 2008 Memphis Study data demonstrates greater utilization of D/M/WBEs in Memphis airport contracts than that of the Memphis marketplace in general. Despite our best efforts, the 2008 Memphis Study demonstrates significant evidence of disparity in MSCAA contracting and procurement and Airport Concession activity, despite the presence of the DBE, BDD and ACDBE Programs.

Written Testimony of:

Aimee Baldillo & Aarathi Deshmukh
Asian American Justice Center
1140 Connecticut Avenue NW, Suite 1200
Washington, D.C. 20036
Phone: 202.296.2300
Email: abaldillo@advancingequality.org/adeshmukh@advancingequality.org

**Submitted for the Committee on Transportation and Infrastructure Hearing conducted on March 26, 2009 regarding "The Department of Transportation's Disadvantaged Business Enterprise Programs"**

April 9, 2009

The Honorable James L. Oberstar, Chairman
The Honorable John L. Mica, Ranking Member
U.S. House of Representatives Committee on Transportation and Infrastructure
2165 Rayburn House Office Building
Washington, DC 20515
Phone: (202) 225-4472
Fax: (202) 226-1270

**I. ORGANIZATIONAL BACKGROUND**

Founded in 1991, the Asian American Justice Center ("AAJC") works to advance the human and civil rights of Asian Americans through advocacy, public policy, public education and litigation. AAJC is one of the nation's leading experts on issues of importance to the Asian American community, including equal opportunity, anti-Asian violence prevention/race relations, census, immigrant rights, immigration, language access, television diversity and voting rights. AAJC works with its affiliates, the Asian American Institute in Chicago, the Asian Law Caucus in San Francisco and the Asian Pacific American Legal Center in Los Angeles to enact a sweeping range of programs on critical national issues that enrich, enhance and serve our communities all across the country.

AAJC has a long history of dealing with the adverse impact of United States laws, policies, regulations, and procedures on minority contractors and small businesses, having published a report in 1997 on the plight of Asian American businesses in public contracting,[1] filed an amicus curiae brief in *Adarand Constructors, Inc. v. Mineta,*[2] partnered with community organizations to reinstate Asian Americans as a presumptive minority group in the city of Chicago's women and minority public contracting program and the recent release of a handbook and follow-up report on the disparate treatment of Asian Americans in public contracting.[3] In addition, AAJC recently launched the Asian American Contractor Empowerment Project ("AACEP"), a project which seeks to build alliances with Asian American business associations and other advocates of small and disadvantaged businesses in order to strengthen and preserve Asian American participation in government business and contracting programs.

[1] Asian Pacific Americans and Public Contracting: A Report by the National Asian Pacific American Legal Consortium (1997), available at http://65.36.162.215/files/minority_business_programs.pdf.
[2] 534 U.S. 103 (2001).
[3] *Equal Access: Unlocking Government Doors for Asian American Businesses*, Asian American Justice Center, ISBN 1-932526-11-0 (2008)

**II. SUPPORT OF THE U.S. DEPARTMENT OF TRANSPORTATION'S DISADVANTAGED BUSINESS ENTERPRISE PROGRAM**

AAJC supports the U.S. Department of Transportation's ("DOT") Disadvantaged Business Enterprise ("DBE") program which was the subject of the Committee on Transportation and Infrastructure's hearing on Thursday, March 26, 2009.

Disparity studies and anecdotal evidence make it clear that Asian Americans have unequal access to government contracting opportunities. Asian American business owners cannot fairly compete for DOT contracts without the DBE program, as the discrimination they face is simply too formidable. Disadvantaged, minority and women business enterprise procurement programs are the most effective method for giving Asian American businesses a fair opportunity to put their considerable talents and abilities to work. Without disadvantaged, minority and women business enterprise procurement programs, equal access to business opportunities created through federal funding, including the new stimulus package dollars, cannot be realized.

**III. EVIDENCE OF DISCRIMINATION AGAINST ASIAN AMERICAN BUSINESSES**

Asian American business owners, similar to other minorities, have faced a long history of racial and national origin discrimination.

**A. <u>Asian Americans Continue to Face Both Intentional and Institutional Discrimination:</u>**

- Asian Americans are still excluded from the "old boys' networks" that provide access to lucrative government contracting opportunities. This includes, but is not limited to, exclusion from networking events where contracting deals are often made.
- Asian Americans continue to suffer from the damage caused by the model minority myth – a stereotype that assumes all Asian Americans are wealthy and educated, and therefore are not subject to discrimination.
- Asian Americans in the workplace are disproportionately complimented on their English-speaking skills and asked whether they are U.S. citizens – inherently implying that Asian Americans are not "true" Americans.
- Asian Americans in the workplace are often perceived to be less vocal than their Caucasian colleagues and are assumed to lack leadership skills, and therefore do not reach a company's highest ranks – making it impossible to ever break the glass ceiling.
- On average, Asian American firms receive only 72 cents for every dollar in revenues received by white firms, and the respective figure for payroll is only 66 cents for every dollar. In other words, Asian American firms are typically smaller than non-Hispanic white firms

**B. Testimonials of Discrimination from Asian American Contractors who have Attempted to Procure Contracts from the DOT Highlight the Necessity of the DBE Program:**

- Asian American contractor and DBE registrant Dennis Kim, who testified at the U.S. Department of Transportation's hearing on March 26 and has submitted full testimony under separate cover, was discriminated against, because of his race, by the Minnesota DOT and one of its large, Caucasian-owned prime contractors. These two entities along with other Caucasian colleagues regularly insult Mr. Kim's Korean food, comment on his English speaking skills and ask him if he is a U.S. citizen. Given this, it is not surprising but is still entirely unacceptable that the Minnesota DOT and its large, Caucasian-owned prime contractor blacklisted Mr. Kim, preventing him from procuring any more DOT contracts in that particular district.[5]

- An Asian American contractor from the western United States, also a DBE registrant, requested anonymity in describing the discrimination he faces from his state's DOT, as he fears that revealing his identity will spark retaliation from the DOT and its Caucasian-owned prime contractors. He has told AAJC the following[6]:
    - His state's DOT hoards projects so it can complete them on its own and charge the federal government higher prices – even though a DBE would charge a much lower price:
        - For example, if a project is worth $1M or more, the DOT will do the entire project itself and will not put any DBE goals on such a project
        - Further, a private consultant could do the same projects for 15% less – resulting in a 7% savings for the federal government
    - The DOT does not even consider him a DBE because he is Asian American and he is an engineer. This is well-known among Asian American business owners in that community. Further, the DOT does not notify Asian American DBEs of contracting opportunities; only non-Asian American construction companies are informed.

---

[4] *Equal Access: Unlocking Government Doors for Asian American Businesses*, Asian American Justice Center, ISBN 1-932526-11-0 (2008).
[5] Testimony of Mr. K. Dennis Kim, submitted electronically to pam.keller@mail.house.gov (March 24, 2009).
[6] In preparation of this testimony, AAJC contacted Asian American DBEs in multiple regions across the U.S. to determine if they had faced discrimination in doing business with the DOT.

  - The DOT has a large amount of airport design work, but the related contracts are only given to Caucasian-owned companies;
  - The DOT only contacts him if they are desperate to complete a project on time and need his help as a last resort;
  - He feels that there is no point in even sharing his story because the discrimination by his state's DOT is so rampant and deeply imbedded. He has resigned himself to always facing discrimination.

- An Asian American DBE contractor who is certified in two contiguous states also requests anonymity because of fear of retaliation from the DOT and its large prime contractors[7]:

  - This contractor explained they tried to bid on an airport expansion project in the last couple of years. They found out there was no reciprocity between the contiguous states. The contractor immediately started the application process for obtaining DBE certification in the other state. Timing was of the essence.

  - Among the laundry list of documentation that this Asian American contractor was asked to produce was the original and/or certified birth certificates of their father and his parents, all born in the early twentieth century. The Asian American contractor did everything as asked but could not obtain these records within the deadline. In their own words, the Asian American contractor explained,

> "In 1902, there were only two racial categories for birth certificates: Black or White. It was an advantage at that time to [choose the category of] White. [My father's] mother's birth certificate reads her DOB and her father's birthplace of Japan. *It was obvious he was a descendent of Japanese heritage.* It took a lot of time to gather the documentation. The goal of the consulting agency is to turn an application around in 30 days. That is almost impossible when you will never be able to acquire the documentation they want, coupled with the convenient unavailability of the consulting agent.
>
> *It was painfully obvious to me that my skin was not the right color* to get that approval so we declined to bid on the job and I filed the months of

[7] Id.

documentation away for a future battle." (emphasis added)

**IV. CONCLUSION**

Constitutional guarantees and anti-discrimination laws on their own have not achieved true equality of opportunity for all Americans. Discrimination still persists within our society and our social institutions. Equal opportunity programs over the past thirty years have helped to lower some of the discriminatory barriers confronting women, Asian Americans, and other minorities. To eradicate those barriers completely, we need to continue those programs and implement new ones where needed. Such programs have been proven effective against both intentionally and unintentionally discriminatory practices.

**Index Of Reports Submitted for the Record of the Committee on Transportation and Infrastructure Hearing on the Department of Transportation's Disadvantaged Business Enterprise Program, held on March 26, 2009**

(The full text of the following reports are held on file at the Committee editorial office)

- "Alaska Disadvantaged Business Enterprise Study: Availability and Disparity," prepared by D. Wilson Consulting Group, LLC for the Alaska Department of Transportation and Public Facilities (June 6, 2008).
- "The City of Phoenix Minority-, Women-Owned, and Small Business Enterprise Program Update Study," prepared by MGT of America, Inc., in association with Fields & Brown, Attorneys at Law (April 21, 2005).
- "Availability and Disparity Study," prepared by CRA International for the California Department of Transportation (June 29, 2007).
- "Race, Sex, and Business Enterprise: Evidence from Denver, Colorado," prepared by NERA Economic Consulting for the City and County of Denver, Colorado (May 5, 2006).
- "The City of Bridgeport Disparity Study Regarding Minority Participation in Contracting," prepared by Mason Tillman Associates, Ltd. For the City of Bridgeport, Connecticut (August 2005).
- "Broward County Small Disadvantaged Business Enterprise Disparity Study," prepared by MGT of America, Inc. for Broward County Board of County Commissioners (April 3, 2001).
- "Georgia Department of Transportation Disparity Study," prepared by Boston Research Group, Inc., in association with Holland and Knight, LLP and Alexander At'Ta Associates, Inc. (March 2005).
- "A Study to Determine DBE Availability and Analyze Disparity in the Transportation Contracting Industry in Idaho," (December 14, 2007).
- "Kansas Department of Transportation Availability and Goal Setting Study," prepared by MGT of America, Inc. for Harold Benoit, Chief, Office of Engineering Support (March 27, 2003).
- "Race, Sex, and Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area," prepared by NERA Economic Consulting for the Illinois State Toll Highway Authority (June 20, 2006).
- "Race, Sex, and Business Enterprise: Evidence from the State of Maryland," prepared by NERA Economic Consulting for the Maryland Department of Transportation (March 8, 2006).
- "Race, Sex, and Business Enterprise: Evidence from the State of Minnesota," prepared by NERA Economic Consulting and Colette Holt & Associates for the Minnesota Department of Transportation (September 27, 2005).
- "Disadvantaged Business Enterprise Availability Study," prepared by NERA Economic Consulting and Colette Holt & Associates for the Missouri Department of Transportation (November 26, 2004).
- "State of New Jersey Construction Services Disparity Study 2000-2002," prepared by Mason Tillman Associates, Ltd. For the Disparity Study Commission (October 2005).
- "City of New York Disparity Study," prepared by Mason Tillman Associates for the City of New York (January 2005).
- "Availability and Disparity Study," prepared for the Nevada Department of Transportation.

- "North Carolina Department of Transportation Second Generation Disparity Study," prepared by MGT of America for Andrea L. Harris, President, North Carolina Institute of Minority Economic Development (March 30, 2004).
- "A Second-Generation Disparity Study for the City of Dayton, Ohio," prepared by MGT of America for the City of Dayton, Ohio (August 8, 2008).
- "The State of Oregon Department of Transportation Disparity and Availability Study," prepared by MGT of America for the State of Oregon, Department of Transportation (October 31, 2007).
- "Disadvantaged Business Enterprise Availability Study: Purchasing," prepared by NERA, Inc. for the Southeastern Pennsylvania Transportation Authority (March 13, 2000).
- "Race, Sex, and Business Enterprise: Evidence from Memphis, Tennessee," prepared by NERA Economic Consulting for the Memphis-Shelby County Airport Authority (December 18, 2008).
- "Dallas/Fort Worth International Airport Board Disparity Study," prepared by MGT of America for the Dallas/Fort Worth International Airport Board (October 17, 2000).
- "A Procurement Disparity Study of the Commonwealth of Virginia," prepared by MGT of America for Edward L. Hamm, Jr., Director, Department of Minority Business Enterprise (January 12, 2004).
- "Race, Sex, and Business Enterprise: Evidence from the State of Washington," prepared by NERA Economic Consulting for the Washington State Department of Transportation (October 20, 2005).

**Index of Additional Materials Submitted for the Record by the U.S. Department of Transportation for the Committee on Transportation and Infrastructure hearing on the Department of Transportation's Disadvantaged Business Enterprise Program, held on March 26, 2009**

(The full text of the following materials are held on file at the Committee editorial office)

- DBE Success Stories
- Summaries of court decisions upholding constitutionality of U.S. Department of Transportation DBE rules
- Congressional Record history of 1998 debates on reauthorization of DBE program
- Summary chart of race-neutral and race-conscious goals in DOT DBE Program
- FHWA recipient-by-recipient record of DBE goals and achievements
- FAA recipient-by-recipient records of DBE goals and achievements
- FTA recipient-by-recipient records of DBE goals and achievements
- Charts comparing FHWA, FTA, and FAA DBE participation among 9th Circuit recipients in 2004 and 2007
- List of disparity and availability studies provided for the record
- Chart showing groups found underutilized in disparity studies
- Summary of anecdotal evidence from disparity studies
- Chart with examples of DBE complaints received by DOT
- DOT final rule on size standard adjustments
- Compilation of publications concerning barriers to participation by small disadvantaged businesses
- Examples of Office on Inspector General investigations of DBE fraud
- List of links to other testimony on related subjects

# Written Testimony on The Department of Transportation's Disadvantaged Business Enterprise Programs

### Hearing: Thursday, March 26, 2009

Women Construction Owners & Executives, USA (WCOE) is a national association representing women owners and executives in the construction industry. We thank you for the opportunity to submit this testimony on the issue of the Disadvantaged Business Enterprise Program within the U.S. Department of Transportation. Women business owners continue to face additional barriers of socio-economic stereotyping, which inhibit their ability to obtain capital, contracts, bonding, and access to market opportunities. This is especially true in nontraditional fields, such as construction. WCOE is celebrating our 25th anniversary this year as we continue to advocate for laws and regulations that help all small businesses, particularly those that will create a level playing field for women business owners.

Twenty- two years ago, we testified before a Congressional Subcommittee on the issue of DBE goals and the discrimination and disparity that existed in the federal procurement arena with women owned companies. While there has been some improvement, I am disappointed to say that many things have stayed the same.

Only two weeks ago in Houston, Texas, one of our members had an informal conversation with a local judge who, when he learned she ran a construction company, reminisced about the day when "women used to be happy staying at home and raising a family". Clearly this attitude still pervades in society where women are not perceived as legitimate business owners or working for anything other than "pin money".

This last week a number of our members met with the US Department of Commerce. During the presentation, one of the speakers told us we should "take this information back to our CEOs to see if we would be interested in doing more government business". We ARE the CEOs and presidents of our respective companies. While we are certain this was not intentionally meant as a discriminatory statement, it only further demonstrates that stereotypes and assumptions about women business owners in the construction industry still create challenges for women businesses seeking to obtain work.

Most of our members would be considered small businesses with gross receipts between $3-$25 million per year. Yet, we also have members who are both subcontractors and general contractors and perform work from $35 million-$100 million per year. ALL of our women will tell you that barriers still exists, that bid opportunities are not equally available and women owned business must actually be better than their male counterparts to get the work.

One of the true barriers to the growth of women owned businesses is the DOT DBE program's self imposed cap on net worth. An individual cannot exceed a net worth of more than $750,000 or it will no longer qualify as a DBE. However, the value of the owner's pension plan counts toward that net worth value. There are many other unsound business assumption included in the net worth calculations.

In construction, we must be able to bond projects. Our bonding capability is based on our net worth. If you restrict us to a net worth of $750,000, you restrict us to never growing beyond a certain size. When the SBA considers a prime contractor to be "small" with gross receipts of $33 million per year, there is no way a DBE with a net worth of only $750,000 can even compete with these other small businesses, let alone a "large" business. The DBE program is a program designed to keep DBE businesses small.

Several of our members have been removed from the DBE program because their

personal net worth exceeds $750,000. Originally the thought by Congress was that when a business exited this program, they should be able to compete on an equal footing with other contractors. However, several of our members have been told by general contractors, with whom they have done construction work for years, there will be no more bid opportunities because these members are no longer DBEs. These are the same women whose companies were qualified and performed quality work for these general contractors last year. However, now the general contractors do not call with bid opportunities and the women business itself is not large enough to compete as either a larger subcontractor or as a prime contractor. These types of comments from general contractors continue to emphasize the inherent discrimination and stereotyping of women businesses owners in the construction industry.

WCOE recommends that you consider not only maintaining the current DBE goals, but eliminate the continual barriers imposed by the program so that DBE contractors can actually grow their companies to a size of self sufficiency. This can be done by increasing the personal net worth cap to $3 million and index that number annually going forward. The value of retirement accounts should not be counted toward an individual's net worth and the DOT should revisit other components and assumptions in calculating net worth. DBEs must be allowed to engage in sound business practices to grow their businesses.

One of the other clear problems with the DBE program is where disparity studies have been completed by various businesses and subsequently disqualified. With no standards or guidelines for what should be considered in a disparity study, too many companies perform disparity studies, only to have them later disqualified. National guidelines and standards need to be created for disparity studies. These guidelines should be set by the Transportation Research Board of the National Academy of Sciences and provide clear guidance to recipients to ensure that disparity/availability studies are consistent between recipients.

Women Construction Owners and Executives, USA knows that DBE goals are critical to creating equal opportunity in bidding on construction projects and in creating a level playing field upon which women and minorities can compete. WCOE has never supported quotas, but strongly supports a strong goals program which include the disqualification of prime contractors who do not engage in a genuine good faith effort to solicit bids from DBEs in a timely manner.

Again, we thank you for the opportunity to provide this testimony. Should you have any additional questions that we can answer for you, please do not hesitate to contract us.

Theresa Kern,
WCOE USA president
Owner: MA Steel, Chicago, IL

Deborah Wilder
WCOE USA past president
Legislative Committee Chair
Owner: Contractor Compliance & Monitoring Inc.
San Mateo CA

○