# EXHIBIT A-11

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# HOW INFORMATION POLICY AFFECTS THE COMPETITIVE VIABILITY OF SMALL AND DISADVANTAGED BUSINESS IN FEDERAL CONTRACTING

## HEARING

BEFORE THE

SUBCOMMITTEE ON INFORMATION POLICY, CENSUS, AND NATIONAL ARCHIVES

OF THE

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

SEPTEMBER 24, 2008

**Serial No. 110–147**

Printed for the use of the Committee on Oversight and Government Reform

Available via the World Wide Web: http://www.gpoaccess.gov/congress/index.html
http://www.oversight.house.gov

U.S. GOVERNMENT PRINTING OFFICE

48–659 PDF WASHINGTON : 2009

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

HENRY A. WAXMAN, California, *Chairman*

EDOLPHUS TOWNS, New York
PAUL E. KANJORSKI, Pennsylvania
CAROLYN B. MALONEY, New York
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
DANNY K. DAVIS, Illinois
JOHN F. TIERNEY, Massachusetts
WM. LACY CLAY, Missouri
DIANE E. WATSON, California
STEPHEN F. LYNCH, Massachusetts
BRIAN HIGGINS, New York
JOHN A. YARMUTH, Kentucky
BRUCE L. BRALEY, Iowa
ELEANOR HOLMES NORTON, District of Columbia
BETTY MCCOLLUM, Minnesota
JIM COOPER, Tennessee
CHRIS VAN HOLLEN, Maryland
PAUL W. HODES, New Hampshire
CHRISTOPHER S. MURPHY, Connecticut
JOHN P. SARBANES, Maryland
PETER WELCH, Vermont
JACKIE SPEIER, California

TOM DAVIS, Virginia
DAN BURTON, Indiana
CHRISTOPHER SHAYS, Connecticut
JOHN M. MCHUGH, New York
JOHN L. MICA, Florida
MARK E. SOUDER, Indiana
TODD RUSSELL PLATTS, Pennsylvania
CHRIS CANNON, Utah
JOHN J. DUNCAN, JR., Tennessee
MICHAEL R. TURNER, Ohio
DARRELL E. ISSA, California
KENNY MARCHANT, Texas
LYNN A. WESTMORELAND, Georgia
PATRICK T. MCHENRY, North Carolina
VIRGINIA FOXX, North Carolina
BRIAN P. BILBRAY, California
BILL SALI, Idaho
JIM JORDAN, Ohio

PHIL BARNETT, *Staff Director*
EARLEY GREEN, *Chief Clerk*
LAWRENCE HALLORAN, *Minority Staff Director*

SUBCOMMITTEE ON INFORMATION POLICY, CENSUS, AND NATIONAL ARCHIVES

WM. LACY CLAY, Missouri, *Chairman*

PAUL E. KANJORSKI, Pennsylvania
CAROLYN B. MALONEY, New York
JOHN A. YARMUTH, Kentucky
PAUL W. HODES, New Hampshire

MICHAEL R. TURNER, Ohio
CHRIS CANNON, Utah
BILL SALI, Idaho

TONY HAYWOOD, *Staff Director*

# CONTENTS


| | Page |
|---|---|
| Hearing held on September 24, 2008 | 1 |
| Statement of: | |
| Boston, Thomas, Ph.D., economist, Georgia Tech University; Jon Wainwright, Ph.D., National Economic Research Associates; Anthony Brown, senior association, MGT of America; Anthony Robinson, president, Minority Business Enterprise Legal Defense and Education Fund Inc.; and Earl Peek, president, Diamond Ventures, LLC | 10 |
| Boston, Thomas | 10 |
| Brown, Anthony | 55 |
| Peek, Earl | 70 |
| Robinson, Anthony | 62 |
| Wainwright, Jon | 19 |
| Letters, statements, etc., submitted for the record by: | |
| Boston, Thomas, Ph.D., economist, Georgia Tech University, prepared statement of | 12 |
| Brown, Anthony, senior association, MGT of America, prepared statement of | 57 |
| Clay, Hon. Wm. Lacy, a Representative in Congress from the State of Missouri, prepared statement of | 3 |
| Peek, Earl, president, Diamond Ventures, LLC, prepared statement of | 72 |
| Robinson, Anthony, president, Minority Business Enterprise Legal Defense and Education Fund Inc., prepared statement of | 64 |
| Wainwright, Jon, Ph.D., National Economic Research Associates, prepared statement of | 21 |

# HOW INFORMATION POLICY AFFECTS THE COMPETITIVE VIABILITY OF SMALL AND DISADVANTAGED BUSINESS IN FEDERAL CONTRACTING

**WEDNESDAY, SEPTEMBER 24, 2008**

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON INFORMATION POLICY, CENSUS, AND NATIONAL ARCHIVES,
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 2 p.m. in room 2154, Rayburn House Office Building, Hon. Wm. Lacy Clay (chairman of the subcommittee) presiding.

Present: Representatives Clay, Yarmuth, and Turner.

Staff present: Darryl Piggee, staff director/counsel; Jean Gosa, clerk; Alissa Bonner and Michelle Mitchell, professional staff members; Charisma Williams, staff assistant; Leneal Scott, full committee information systems manager; Charles Phillips, minority senior counsel; and Emile Monette, minority professional staff member.

Mr. CLAY. The Information Policy, Census, and National Archives Subcommittee will come to order.

Welcome to today's hearing entitled, "How Information Policy Affects the Competitive Viability of Small and Disadvantaged Businesses in Federal Contracting."

Without objection, the Chair and ranking member will have 5 minutes to make opening statements, followed by opening statements not to exceed 3 minutes by any other Member who seeks recognition. Without objection, Members and witnesses may have 5 legislative days to submit a written statement or extraneous materials for the record.

I will begin with the opening statement. It has long been the policy of the Federal Government to assist minority and other socially and economically disadvantaged small businesses to become fully competitive and viable businesses. The objective has largely been pursued through the Federal procurement process by allocating Federal assistance and contracts to foster disadvantaged business development.

Federal assistance has taken a variety of forms, including targeting procurement contracts and subcontracts for disadvantaged or minority firms, management and technical assistance grants, educational and training support, and surety bonding process.

There has been a large body of evidence concerning discrimination. Court cases, legislative hearings, quantitative studies and an-

ecdotal reports detail the considerable discrimination based on race and national origin that confronts minority contractors in all parts of the country and in virtually every industry.

The discrimination is not limited to one particular minority group; instead, evidence shows businesses owned by African Americans, Latinos, Asian, Pacific Islanders, and Native Americans all must overcome discriminatory practices in order to grow and prosper.

This subcommittee will look at some of the information, data, and assumptions dealing with the subject of minority contracting and Federal programs and how they deal with discrimination against minority business. We will look at disparities in the marketplace and help determine if those disparities are the result of discrimination.

This hearing is the first in a series of hearings that will hear testimony regarding recent data, studies, and other evidence of discrimination against minority businesses, including the abuse of the subcontractor status of minority businesses. The courts will look closely to see that Congress, while exercising its rights and duties to enact broad discrimination remedy, tailors this legislation in this area within the confines of relevant court decisions.

The courts must be convinced that Congress has strong evidence of actual discrimination to fashion a constitutionally sufficient remedy. We can assist by making sure this information is current and relevant to present conditions.

[The prepared statement of Hon. Wm. Lacy Clay follows:]

***Wm. Lacy Clay, Chairman***
*Information Policy, Census, and National Archives Subcommittee*
*Oversight and Government Reform Committee*
*Wednesday, September 24, 2008*
*2154 Rayburn HOB*
*2:00 p.m.*

***"How Information Policy Affects the Competitive Viability Of Small and Disadvantaged Businesses in Federal Contracting"***

It has long been the policy of the Federal Government to assist minority and other "socially and economically disadvantaged" small businesses to become fully competitive and viable businesses. The objective has largely been pursued through the federal procurement process by allocating federal assistance and contracts to foster disadvantaged business development. Federal assistance has taken a variety of forms, including targeting procurement

contracts and subcontracts for disadvantaged or minority firms, management and technical assistance grants, educational and training support, and surety bonding process.

There has been a large body of evidence concerning discrimination. Court cases, legislative hearings, quantitative studies and anecdotal reports detail the considerable discrimination based on race and national origin that confronts minority contractors in all parts of the country and in virtually every industry. The discrimination is not limited to one particular minority group, instead,

evidence shows businesses owned by African-Americans, Latinos, Asians, Pacific Islanders and Native Americans all must overcome discriminatory practices in order to grow and prosper.

This subcommittee will look at some of the information, data and assumptions dealing with the subject of minority contracting and federal programs and how they deal with discrimination against minority businesses. We will look at disparities in the marketplace and help determine if those disparities are the result of discrimination. This hearing is the first in

a series of hearings that will hear testimony regarding recent data, studies and other evidence of discrimination against minority businesses, including the abuse of the subcontractor status of minority businesses. The courts will look closely to see that Congress, while exercising its rights and duties to enact broad discrimination remedies, tailors its legislation in this area within the confines of relevant court decisions. The courts must be convinced that Congress has strong evidence of actual discrimination to fashion a constitutionally sufficient remedy. We can assist by making

sure this information is current and relevant to present conditions.

Mr. CLAY. I now yield to the distinguished ranking minority member, Mr. Turner of Ohio.

Mr. Turner, you are recognized for an opening statement.

Mr. TURNER. Thank you, Mr. Chairman. I appreciate you for holding a hearing on this issue.

Maintaining a high-performing, robust, small, disadvantaged business contractor base is an important goal of our Federal policy and our public policy. We meet today to discuss the challenges facing minority-owned small businesses when they compete for Federal contracts. This is a complex issue which plays out at the intersection of procurement policy and business judgment.

The attendant goal is that small businesses compete on a level playing field with other contractors, while at the same time ensuring that they have an active competitive market available to the Government so that we can get the best value for the American taxpayer.

Federal Government spends over $400 billion annually on contracts. Federal Government currently has a goal of awarding 23 percent of its prime contracts to small businesses, and 5 percent of its prime and subcontracts for small, disadvantaged businesses.

According to the Small Business Administration, which administers the small, disadvantaged business program, in fiscal year 2005 the Federal Government awarded nearly $21 billion in contracts to these firms, representing 6.55 percent of the total expenditure for that year. In 2006 the Government awarded contracts valued at nearly $23 billion to small, disadvantaged businesses, representing 6.75 percent of the total amount spent for that year.

Clearly, the data supporting these numbers is critical. I am interested in reading the testimony from today's witnesses about how Federal information policy affects competitive viability for minority-owned businesses, how we can get an accurate picture of the marketplace, and how we can improve opportunities for this important segment of business owners.

Thank you, Mr. Chairman.

Mr. CLAY. Thank you so much, Mr. Turner, and thank you for joining us.

If there are no additional opening statements, the subcommittee will now receive testimony from the witnesses before us today.

Our first witness is Dr. Thomas Boston, economist, professor of economics at Georgia Tech and principal of the EuQuant Consulting Firm. He has done extensive research on small and disadvantaged businesses, including work for the Congressional Black Caucus Foundation and the U.S. Congressional Small Business Committee to revise Federal regulations regarding small, disadvantaged business.

Welcome to the committee, Doctor.

Mr. BOSTON. Thank you very much, Mr. Chairman.

Mr. CLAY. Let me finish introducing everybody, and then we will let you start it off.

Our second witness is Dr. Jon Wainwright, vice president of National Economic Research Associates. Dr. Wainwright specializes in labor, economics, statistics, and industrial organizations. He has executive experience in analyzing the effects of discrimination on minorities, women, and persons over 40. Dr. Wainwright has testi-

fied as an expert witness in Federal and State courts on these issues and has authored a book and numerous research reports on these subjects.

Welcome, Dr. Wainwright.

Next we will hear from Mr. Anthony Brown, senior associate of MGT of America, a national management consulting firm specializing in assisting public sector entities, the completion of disparity studies, complex statistical and social research projects that evaluate evidence related to minority- and women-owned firms. Disparity studies help determine whether or not race or gender bias exists in Government and private contracting.

Thank you for being here, Mr. Brown.

Our next witness will be Mr. Anthony Robinson, president of the Minority Business Enterprise Legal Defense and Education Fund Inc., an organization founded by the late Parren J. Mitchell, a former Member of the U.S. House of Representatives from Maryland.

As president of MBELDEF, Mr. Robinson and the organization have actively participated in the passage and preservation of major MBE legislation. Mr. Robinson, through MBELDEF's National Lawyers Panel, has participated as a litigant or amicus on occasions before congressional committees regarding issues of importance to the MBE community.

Thank you, sir, for being here.

Our final witness, Mr. Earl Peek, president of Diamond Ventures. Mr. Peek, a CPA, has an extensive background in public accounting, commercial lending, and as an entrepreneur, having run his own business for 8 years. He crafted minority finance programs in the city of Atlanta and assisted many for technical assistance organizations and business plan review models, deal flow summaries, underwriting write-up techniques, and more.

Thank you also for being here. We could probably use your expertise on Wall Street today.

Thank you all for appearing before the subcommittee today.

It is the policy of the committee to swear in all witnesses before they testify. Would you please all stand and raise your right hands.

[Witnesses sworn.]

Mr. CLAY. Thank you. Let the record reflect that the witnesses answered in the affirmative.

I ask that each of the witnesses now give a brief summary of their testimony. Please limit your summary to 5 minutes. Your complete written statement will be included in the hearing record.

Dr. Boston, you may begin.

**STATEMENTS OF THOMAS BOSTON, PH.D., ECONOMIST, GEORGIA TECH UNIVERSITY; JON WAINWRIGHT, PH.D., NATIONAL ECONOMIC RESEARCH ASSOCIATES; ANTHONY BROWN, SENIOR ASSOCIATION, MGT OF AMERICA; ANTHONY ROBINSON, PRESIDENT, MINORITY BUSINESS ENTERPRISE LEGAL DEFENSE AND EDUCATION FUND INC.; AND EARL PEEK, PRESIDENT, DIAMOND VENTURES, LLC**

### STATEMENT OF THOMAS BOSTON

Mr. BOSTON. Thank you, Mr. Chairman. Mr. Chairman, Congressman Turner, and distinguished members of the Information Policy Subcommittee, I thank you for allowing me to testify on this important topic.

As you noted, Mr. Chairman, I am a professor of economics at Georgia Tech, where I have taught since 1985. I am also the owner of a consulting company, EuQuant, that specializes in economic and statistical research. One of my primary areas of research is minority business development.

Recently I was asked by the Congressional Black Caucus Foundation to examine the policies of the small, disadvantaged business program administered by the Small Business Administration. Our primary objective was to determine whether or not the $750,000 ceiling established for the personal net worth of participating business owners had adversely affected the ability of SDBs to increase their capacity.

As you know, the Federal Government established the SDB program to mitigate the effects of decades of discrimination against firms owned by minority and disadvantaged business owners. In 1998 the personal net worth ceiling was established to restrict the program's eligibility to only disadvantaged minorities and other business owners who claimed disadvantaged status.

Our study found the following: The ability of small firms to secure bonding or gain access to capital is tied closely to the owner's personal net worth; therefore, by capping personal net worth, the SDB program has constrained the ability of firms to secure bonding and finance, and therefore to perform large contracts.

Our study found that there is a 40 percent relationship between changes in SDB revenue and changes in their owners' personal net worth; therefore, when personal net worth is constrained, the revenue capacity of SDBs is also constrained.

We also found that if SDBs did not have to operate under the current personal net worth ceiling and if they were treated the same as our non-minority-owned firms, their current annual revenue would be higher by almost $1 million. The personal net worth ceiling has not been adjusted for inflation since 1998, which means its real inflation-adjusted value in 2007 was $550,000, and today it would be even much lower.

Furthermore, the current ceiling was not based on any empirical study but was simply a policy decision. That decision did not even take into consideration the fact that different industries require different levels of capitalization, so today SDBs in manufacturing or heavy construction have the same ceiling as do SDBs in printing.

Mr. Chairman, our study recommended new industry-specific ceilings that we believe meet the legal test of strict scrutiny. In construction, we recommend a ceiling of $979,000; in manufacturing, $1,043,000; and in professional and scientific services, $1,026,000. We also recommend that the ceiling be adjusted annually for inflation and that businesses be allowed a 2-year transition period to remain in the SDB program once their owner's net assets have reached the personal net worth ceiling.

Finally, Mr. Chairman and committee members, we believe ultimately the personal net worth ceiling should be replaced with more industry-specific and business development criteria. We are currently researching a business development index that incorporates numerous company and industry variables into a single metric that can be used to determine SDB program eligibility. For the record, we have provided the executive summary of the study we conducted for the Congressional Black Caucus Foundation and will gladly provide copies of the current research once it is completed.

Thank you very much.

[The prepared statement of Mr. Boston follows:]

EUQUANT

100 Galleria Parkway SE Suite1440
Atlanta, GA 303339-5959
T: 678-424-5615
EuQuant.com

September 24, 2008

The Honorable William Lacy Clay, Chairman
Information Policy, Census, and National Archives Subcommittee
2157 Rayburn House Office Building
Washington, DC 20515-6143

RE: Testimony of Thomas D. Boston, Professor of Economics, Georgia Tech and CEO of EuQuant

Mr. Chairman and distinguished members of the Information Policy Subcommittee, thank you for allowing me to testify on this important topic. I am a professor of Economics at Georgia Tech where I have worked since 1985. I am also the owner of a consulting company (EuQuant) that specializes in economic and statistical research. One of my primary areas of research is minority business development.

Minority-owned businesses comprise approximately 18% of all US businesses and their numbers are increasing at a rate that is more than four times that of non-minority-owned companies. But there remains a tremendous disparity in the capacity of minority-owned firms in comparison to that of businesses owned by whites.

Recently, I was asked by the Congressional Black Caucus Foundation to examine the policies of the Small Disadvantaged Business program (SDB) administered by US SBA. A primary objective was to determine whether or not the $750,000 ceiling established for the personal net worth of participating business owners had adversely affected the ability of SDBs to increase their capacity.

As you know, the federal government established the SDB program to mitigate the effects of decades of discrimination against firms owned by minority and disadvantaged business owners. In 1998, the PNW ceiling was established to restrict program eligibility to disadvantaged minorities and other business owners who claimed disadvantaged social and economic status.

In conducting our investigation we examined over 47,000 small businesses that were registered with the federal government. This included about 28,000 non-minority-owned firms and 19,000 minority-owned firms. This also included about 7,000 firms that were active in the SDB program and 3,000 firms that formerly participated in the program.

Our study found the following:

The ability of small firms to secure bonding or gain access to capital is tied closely to the owner's personal net worth. Therefore, by capping personal net worth the SDB program has constrained the ability of firms to secure bonding and finance and therefore to perform large contracts.

Our study found that there is a 40% relationship between changes in SDB revenue and changes in their owners' personal net worth. Therefore, when personal net worth is constrained, the revenue capacity of SDBs is also constrained.

We also found that if SDBs did not have to operate under the current PNW ceiling and if they were treated the same as are non-minority owned firms, their current annual revenue would be higher by almost $1 million.

The personal net worth ceiling has not been adjusted for inflation since 1998, which means its real inflation-adjusted value in 2007 was $558,070.

Furthermore, the current ceiling was not based on any empirical study, but was simply a policy decision. That decision did not even take into consideration the fact that different industries require different levels of capitalization. So today, SDBs in manufacturing or heavy construction have the same ceiling as do SDBs in printing.

Mr. Chairman, our study recommended new industry specific ceilings that we believe meet the legal test of strict scrutiny. In construction we recommend a ceiling of $979,000; in manufacturing, $1,043,000; and in professional and scientific services, $1,026,000.

We also recommend that the ceiling be adjusted annually for inflation and that businesses be allowed a two year transition period to remain in the SDB program once their owner's net assets have reached the PNW ceiling.

Finally Mr. Chairman and committee members, we believe ultimately that the PNW ceiling should be replaced with more industry specific and business development criteria. We are currently researching a Business Development Index that incorporates numerous company and industry variables into a single metric that can be used to determine SDB Program eligibility.

For the record, we have provided the Executive Summary of the study we conducted for the Congressional Black Caucus Foundation and we will gladly provide copies of the current research once it is completed.

Thank you.

Thomas D. Boston,
Professor of Economics, Georgia Tech
CEO, EuQuant

# Increasing the Capacity of the Nation's Small and Disadvantaged Businesses (SDBs)

**October 16, 2007**

**Submitted to:** **The Congressional Black Caucus Foundation**

**Prepared by:** **EuQuant**
(Formerly Boston Research Group, Inc.)

EUQUANT

FINAL REPORT

## Executive Summary

EuQuant (formerly Boston Research Group) was commissioned by the Congressional Black Caucus Foundation to conduct a comprehensive study of the Small Disadvantaged Business (SDB) Program run by the U.S. Small Business Administration. The report seeks to increase the national and global competitiveness of SDBs by offering recommendations that are designed to increase their capacity and success in federal procurement and in corporate supply chain relations. The primary recommendation is that the $750,000 personal net worth ceiling of the SDB program should be adjusted so that participants can build greater capacity. By building greater capacity, SDBs are able to operate more successfully in the public and private sectors. Their greater success adds significant value to overall economic output and generates jobs, income, and wealth in the general economy and especially in underserved communities.

### Background and Purpose

- The government's Small Disadvantaged Business (SDB) Program was established to help mitigate the effects of discrimination on the performance of businesses owned by minorities and other socially and economically disadvantaged individuals.

- This comprehensive report assesses the impact of the SDB Program on minority-owned businesses and examines the contribution of SDBs to national output and employment.

- A major section of the report is devoted to exploring how the SDB Program's $750,000 personal net worth (PNW) ceiling affects SDBs.

- After determining that the PNW ceiling is too low and that it adversely affects the operation of SDBs, new program changes are proposed.

- The recommendations are designed to increase the capacity of SDBs so they will become more competitive in federal procurement and in corporate supply chains.[1]

- The results are based on an examination of 47,254 Small Business Concerns (SBCs)[2] listed with the government's Central Contractor Registration (CCR) in 2006.

### What the Reader can Expect

The report has thirteen sections. These sections describe the current status of minority-owned businesses, document the critical importance of government contracting to minority business viability, and examine the plight of more than 10,000 minority-owned SBCs that are listed in the CCR but have never participated in the SDB program. The report considers how the U.S. Supreme Court Adarand Decision has changed the SDB Program. It measures the impact of the SDB Program on minority business performance and analyzes how the $750,000 PNW ceiling has affected SDB capacity. Finally, it estimates the influence of the SDB Program on national output and employment and it analyzes where minority and non-minority-owned firms are located in relation to the most distressed areas of central cities.

---

[1] As used in this report, capacity is synonymous with the three-year average revenue of a firm.

[2] A Small Business Concern (SBC) means any for-profit business that meets the industry and employment size standards as determined by the Office of Small Business Standards of the Small Business Administration (See Federal Acquisition Regulation FAR 19.101, at: http://acquisition.gov/far/current/html/FARTOCP19.html). This report does not examine SBCs that register with CCR as Women-owned Small Business Concerns, Veteran-owned or Disabled Veteran-owned Small Business Concerns.

**Findings**[3]

In 2006, the SDB Program had an economic impact of $5.5 billion on U.S. final demand and created over 124,000 jobs.

Minority-owned small businesses also contributed to the economic development of distressed central cities. In 2006, 31% of minority-owned businesses listed in CCR were located in high poverty areas of central cities as compared to 24% of non-minority-owned companies.[4]

In some central cities a very high percentage of minority-owned businesses were located in high poverty areas: In Baltimore (69%), Philadelphia (60%), Detroit (50%) and Boston (48%).

Despite the significant contribution that minority-owned businesses make to the U.S. economy, they still encounter large disparities in private sector business transactions. Consequently, they depend more heavily upon government contracting because access to government contracts is usually more equal than is access to private sector opportunities. While minority-owned businesses comprised 18% of all U.S. small businesses, they made up 35% of the 47,254 small businesses listed in CCR in 2006.

Between 2004 and 2006 the SDB program had a significant effect on the performance of SDB certified firms. The average revenue of SDBs was $2.8 million greater than the average revenue of identical firms that did not participate in the SDB Program.

SDBs experienced an annual disparity in revenue of $0.9 million in comparison to non-minority-owned small-business concerns with similar characteristics.

There were 10,513 minority-owned small businesses listed in CCR in 2006 that had never been SDB certified. These firms experienced the greatest disparities of all small businesses that sought federal government contracting.

[3] The study used regression analysis and decomposition analysis extensively to explain the differences in performance between minority-owned firms that never entered the SDB Program (10,513), active SDBs (6,758) and other small business concerns that were not minority-owned in 2006 (27,087). A multivariate propensity score matching procedure was used to measure performance differences between firms with identical characteristics that were SDBs and non-SDBs.

[4] High poverty areas are defined as census tracts where poverty was 20% or greater in 2000.

The $750,000 personal net worth (PNW) ceiling of the SDB Program has not been adjusted for inflation in nine years. Therefore, the current real value of the ceiling is $558,070. Yet innovations in corporate supply chains and the increasing use of contract bundling in government procurement require SDBs to have greater capacity.

The capacity of SDBs and the personal net worth of their owners is closely related. When capacity increases by 10%, PNW increases by 4%. Therefore, if the PNW ceiling is too low, it is impossible for SDBs to reach their optimum capacity. In a marketplace free of discrimination we estimated that the average capacity of SDBs would be $4.1 million. The current PNW ceiling prevents SDBs from achieving this average capacity.

A PNW ceiling that is set too low causes other economic hardships. For example, in February of 2007 seventeen firms were graduated out of the Georgia Department of Transportation Disadvantaged Business Enterprise Program when an audit revealed that their PNW surpassed the $750,000 ceiling. We interviewed the owners of these firms and tracked their monthly financial performance. The owners felt that they were being penalized for being successful and they complained that very few corporations solicited or engaged their services after they were de-certified. They also stated that the low PNW ceiling had not allowed them to build sufficient bonding capacity to compete successfully as prime contractors. During the first five months of 2007, their average monthly revenue decreased by 45% in comparison to 2005 and 2006.

Many large businesses are incorrectly registered in CCR as small businesses. In a recent Congressional hearing, SBA Inspector General Eric Thorson stated that, "The number 1 management challenge facing the SBA is that large firms are receiving small business contracts and federal agencies are receiving credit for these awards."[5] This report identified 442 companies registered as small businesses that exceeded the small-business size standard for their industry. In 2006, the average revenue of these 442 companies ($172 million) was forty-four times larger than the average revenue of legitimate small business concerns.

[5] Chapman, Lloyd. 2006. "SBA Reauthorization Lacks Provisions to stop Fraud and Abuse." American Small Business League, July 20, 2006:
Accessed at: http://www.asbl.com/showmedia.php?id=275

**Recommendations**

**1) Increase the PNW ceiling for construction industries to $979,000, for manufacturing industries to $1,043,000 and for professional and scientific service and IT services industries to $1,026,000. The PNW ceilings should be adjusted annually for inflation. In addition SDBs that exceed the PNW ceiling should be given a two year transition period during which they remain eligible to participate in the SDB Program.**

Rationale for this recommendation
First, the current PNW ceiling has not been adjusted for inflation since it was established in 1998. If adjusted, the current PNW would be $977,560. Second, the SDB Program was established to help mitigate the effects of discrimination. But it is very difficult for SDBs to achieve the capacity they would be expected to have in a non-discriminatory market because the PNW ceiling is too low and capacity and PNW are closely related. Third, the PNW regulation assumes that "one size fits all." Therefore, only one PNW ceiling has been set for all industries. This contrasts with small business size standards that are set for each industry. The single PNW ceiling does not take into consideration the level of capitalization required by different industries.[6] Finally, when SDBs are "graduated" from the program unexpectedly because of the PNW ceiling, they face significant short-run decreases in revenue. For example recent data from the Georgia DOT indicated that when minority-owned firms were "graduated" from the DBE program because of an audit of PNW, their monthly revenue decreased by 45% during the first six months following their exit.

**2) The SBA should establish race-neutral monitoring procedures for small minority-owned firms that are not SDB certified.**

Rationale for the recommendation
First, it is important to know whether minority-owned firms have fair access to corporate supply chains and government procurement in the absence of SDB mandates. Results of this study indicate that they do not. For example the 10,513 minority-owned small businesses listed in CCR that were not SDB certified in 2006 experienced the largest disparities in government procurement awards and supply chain utilization among all CCR firms. Second, it is important to know why so many minority-owned businesses are not SDB certified. Some owners have indicated that the costs and paperwork involved in certification are deterrents while others maintain that the benefits of the program have been greatly reduced over time. A revision should be made to Standard Form 295 (Summary Subcontract Report) by including a category to record the utilization of minority firms that are not SDBs. Additionally, improvements should be made to the way that corporations and government agencies report subcontracting data.

**3) Reauthorize all preferential procurement benefits of SDB status including Price Evaluation Adjustment (designed to assist SDBs as prime contractors), Subcontracting Evaluation Factors and Monetary Subcontracting Incentives (designed to increase SDB subcontracting opportunities).**

Rationale for the recommendation
First, SDBs add significant value to national output and employment. In 2006 SDBs added $5.5 billion to U.S. final demand and created 124,000 jobs that would not have existed without the program. Second SDBs, in comparison to non-SDBs, add significantly to economic opportunity in high poverty areas of central cities. Therefore by reinstating SDB procurement incentives, the goals of the HUBZone Program will be reinforced.[7] Third,

[6] The research team was unable to determine why the initial PNW ceiling for the SDB program was set at $750,000 and we did not have access to PNW data for non-SDBs. Therefore, we could not determine the industry specific PNW for all small businesses; but only for SDBs. As a result, we had to use the current PNW ceiling as our starting point for making an adjustment.

[7] If enacted, H.R. 1873, Sec. 214 would provide financial support to conduct of a study on the "feasibility and desirability" of providing financial incentives to contractors for meeting subcontracting utilization goals. PEAs allowed SDBs to receive a price benefit of up to 10% in specified industries. They expired in 2004. The HUBZone Empowerment Contracting

SDBs still face significant inequality in business transactions. For example, SDBs experienced an annual disparity in revenue of $0.9 million in comparison to non-minority-owned small-business concerns with similar characteristics. Finally, the procurement benefits are a major incentive for participating in the SDB Program.

**4) Existing regulations that penalize large businesses for self-certifying as small business concerns (SBCs) should be enforced more vigorously and new penalties should be established. Additionally, the SBA Inspector General should audit the CCR annually to identify and penalize firms that are inappropriately self-certified as SBCs.[8]**

Rationale for the recommendation

Inaccurate self-certification has been cited as a growing problem that is adversely affecting small business opportunity. This report identified 442 companies, that exceeded the small-business size standard for their industry, registered as small businesses. The average revenue of these firms was $172 million, which was forty-four times larger than the average revenue of legitimate small business concerns.

**5) Additional studies are needed to further illuminate factors that may enhance the competitiveness of SDBs. These additional studies should examine:**

- What happens to firms following their exit from the SDB Program;
- Ways of improving the global competitiveness of SDBs;
- The extent to which government procurement dollars are shifting from SDBs to other CCR groups;
- The relationship of PNW and firm capacity for non-minority-owned firms;
- The impact of the PNW ceiling on the ability to secure bonding, financing and supply chain opportunities; and, monitor the performance of minority-owned firms that are not-SDB certified.

Program is part of the Small Business Reauthorization Act of 1997. It is designed to stimulate economic development and create jobs in hard-pressed urban and rural communities. Contracting preferences are given to small businesses that are located in a HUBZone and that hire employees who live in a HUBZone.

[8] House of Representative Bill H.R. 1873: "Small Business Fairness in Contracting Act" passed the House on May 10, 2007 and has been sent to the Senate for consideration. Sec. 301-303 of the bill contains language specifying penalties for large businesses that fraudulently certify as small business concerns.

Mr. CLAY. Thank you, Dr. Boston. I appreciate that.

We will now go to Dr. Wainwright. You may proceed with your opening statement.

**STATEMENT OF JON WAINWRIGHT**

Mr. WAINWRIGHT. Thank you, Chairman Clay, Ranking Member Turner, members of the committee. Thank you for the invitation to appear here today.

My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Currently I am a vice president with NERA Economic Consulting in Chicago, IL, and Austin, TX.

Since 1989, I have devoted the greater part of my professional life to studying race and sex discrimination and its impact on business enterprise. Since 2000 I served as the project director and principal investigator for 28 studies of business discrimination, and, as Chairman Clay pointed out, I have provided expert testimony in Federal and State court on these and related matters.

I have provided to counsel a CD-ROM containing eight of these studies, including one from the chairman's home town in St. Louis, as supplementary material to my testimony today.

The primary bulwark against business discrimination has been the use of public sector purchasing power to promote fair and full access to Government contracting and procurement opportunities for minority- and women-owned businesses. Section 8(a) and 8(b) at the SBA, the DB program at U.S. DOT, and the SDB program are key examples of such policies at the Federal level. Today I would like to address the current state of MBEs as documented in several key Federal data bases and the implications for the continuing need for the public sector to use its purchasing power to help remedy the ill effects of business discrimination.

In my written testimony I also offer some suggested modifications to key Federal data bases that would enhance the ability of social scientists and policymakers to meet the strict scrutiny standard.

The first data base is the 2002 Survey of Business Owners [SBO]. Nationally, large disparities are observed in the SBO between the minority share of the business population and their share of business sales and receipts. African Americans comprise 12.7 percent of the population, but they were only 5.3 percent of U.S. businesses, and earned only 1 percent of business receipts.

Hispanics and Latinos comprise 13.4 percent of the population, but were only 7 percent of all businesses and earned only 2.5 percent of business receipts.

Women comprise 51 percent of the population, but they counted for only 28.9 percent of the businesses and earned only 10.7 percent of business receipts.

Asians and Pacific Islanders comprise 5 percent of the businesses, yet earn only 3.8 percent of the receipts.

Native Americans comprise 0.9 percent of the businesses, but earn only 0.3 percent of the receipts.

These disparities are adverse, very large. They are also statistically significant, meaning they are unlikely to have resulted from chance, alone. Let me repeat that: these disparities are adverse, very large, and statistically significant.

While the exact proportions vary, large, adverse, and statistically significant disparities are observed in all 50 States and the District of Columbia for all minority groups as well as for women. This is documented at tables 1A through F and 2A through F in my written testimony.

It is a fair question to ask whether these large, adverse, and statistically significant disparities result primarily from discrimination or whether they result primarily from other non-discriminatory factors. The evidence from these next data sources suggest they result primarily from discrimination. We have tested this hypothesis using the 2000 and 1990 Decennial Census microdata, and presently conducting similar tests using the American Community Survey microdata.

Even when holding these other factors constant using regression analysis, the business disparities I have outlined remain adverse, large, and statistically significant. Let me repeat that: even when comparisons are made between similarly situated business owners, the disparities facing minorities and women tend to remain adverse, large, and statistically significant. We observed similar results in States and metropolitan areas throughout the country.

Lack of access to capital is the most frequently cited obstacle among MWBEs. Credit market discrimination can obviously have an important effect on the likelihood that these firms will succeed.

On the Survey of Small Business Finances, we have used that to document disparities in loan denial rates even when balance sheets and creditworthiness statistics are held constant across business owners. I have submitted for the record a 60-page report that accompanied my Senate testimony a couple of weeks ago on this particular issue.

Finally, in addition to statistical evidence, we have conducted thousands of surveys and hundreds of in-person interviews with MBEs and non-MBEs alike, and the results are strikingly similar across the country and across different industries. In general, MBEs report that they still encounter significant barriers to doing business in the public and the private sector, both as prime contractors and subcontractors. There is also general agreement that without the use of affirmative remedies, MWBE firms receive few, if any, opportunities on Government contracts, as is the case on projects without goals; thus, the continued operation of programs such as 8(a), 8(d), DBE, and SDB was deemed essential to MWBEs' survival.

Thank you. I will be glad to take any questions.

[The prepared statement of Mr. Wainwright follows:]

NERA
Economic Consulting

*Testimony*

*Of*

***Dr. Jon S. Wainwright***

*Vice President*

***NERA Economic Consulting***

***Information Policy, Census, and National Archives Subcommittee***

***Oversight and Government Reform Committee***

***Thursday, September 24, 2008***

***2154 Rayburn HOB***

***2:00 p.m.***

***"How Information Policy Affects the Competitive Viability in Minority Contracting"***

Chairman Clay, Ranking Member Turner, and Members of the Subcommittee:

Thank you for the invitation to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Currently, I am a Vice President with NERA Economic Consulting, in Chicago, Illinois and Austin, Texas.

NERA is an international firm of economists who understand how markets work. We provide economic analysis and advice to corporations, governments, law firms, regulatory agencies, trade associations, and international agencies. Our global team of more than 600 professionals operates in over 20 offices across North America, Europe, and Asia Pacific. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. Founded in 1961 as National Economic Research Associates, our more than 45 years of experience creating strategies, studies, reports, expert testimony, and policy recommendations reflects our specialization in industrial and financial economics. Because of our commitment to deliver unbiased findings, we are widely recognized for our independence. Our clients come to us expecting integrity and the unvarnished truth.

## Introduction

For almost twenty years, I have devoted the greater part of my professional life to studying race and sex discrimination and its impact on business enterprise and entrepreneurship in the United States.

I have served as the project director and principal investigator for 28 studies of business discrimination against minorities and women completed since 2000 and prior to that time worked on perhaps a dozen more. I have authored a book on the subject and provided expert testimony in federal and state courts on these and other labor and business related matters on 13 occasions. With your permission, I would be pleased to submit copies of eight of NERA's recently completed business discrimination studies for entry into the record.[1]

I was fortunate to have been mentored at the start of my career by two of the country's leading scholars in this field—Dr. Ray Marshall, Professor Emeritus at the Lyndon B. Johnson School of Public Affairs at The University of Texas at Austin and former United States Secretary of Labor, and Dr. Andrew Brimmer, former member of the Board of Governors of the Federal Reserve, former Assistant Secretary of Commerce, and Professor Emeritus at the University of Massachusetts, Amherst.

A key lesson I absorbed from these men was expressed by Professor Marshall in this way:

> "Institutionalized discrimination in business transactions is deeply rooted in the American economy. There can be no doubt that business discrimination inflicts serious damage on the society, polity, and economy. Governments have a responsibility to improve public understanding of the seriousness of this problem and to take positive steps to address it. These positive steps must include public education, specifically outlawing this form of discrimination, using governments' purchasing power to help

---

[1] *Disadvantaged Business Enterprise Availability Study*, prepared for the Missouri Department of Transportation, November 2004.; *Race, Sex, and Business Enterprise: Evidence from the St. Louis Metropolitan Statistical Area*, prepared for the Bi-State Development Agency (Metro), March 2005.; *Race, Sex, and Business Enterprise: Evidence from Denver, Colorado*, prepared for the City and County of Denver, May 2006.; *Race, Sex, and Business Enterprise: Evidence from the State of Maryland*, prepared for the Maryland Department of Transportation, March 2006.; *Race, Sex, and Business Enterprise: Evidence from the State of Minnesota*, prepared for the Minnesota Department of Transportation, September 2005.; *Race, Sex, and Business Enterprise: Evidence from the Commonwealth of Massachusetts, Vol. I*, prepared for the Massachusetts Housing Finance Agency, November 2006.; *Race, Sex, and Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area*, prepared for the Illinois State Toll Highway Authority, June 2006.; *Race, Sex, and Business Enterprise: Evidence from the City of Austin*, prepared for the City of Austin, Texas, May 2008. All eight studies by NERA Economic Consulting in collaboration with Colette Holt & Associates.

> those who are being discriminated against while rewarding those who do not discriminate, and developing race neutral programs to help all small businesses."[2]

If you accept that discrimination in business transactions is indeed deeply rooted in the American economy, then it is difficult to argue with the logic of Dr. Marshall's conclusions.

During the last twenty years, the primary bulwark against business discrimination has been the policy of using public sector purchasing power to support the entrepreneurial endeavors of minority-owned and women-owned business enterprises (M/WBEs) and to promote fair and full access to government contracting and procurement opportunities. Programs such as 8(a) and 8(d) at the Small Business Administration, the Disadvantaged Business Enterprise (DBE) Program at the Department of Transportation, and the Small Disadvantaged Business (SDB) Program at the Defense Department are key examples of such policies at the federal level.

I would like to address myself today to the current state of M/WBEs across the United States as documented in several key federal databases, and implications for the continuing need for the public sector to use its purchasing power to help remedy the ill effects of business discrimination.

I will also offer some suggested modifications to key federal statistical data collection programs that would enhance the ability of social scientists and public policy makers to meet the strict scrutiny standard that the Supreme Court applies to such programs.

Before continuing, it is important to acknowledge the enormous amount of relevant evidence that already appears in the Congressional record. A useful synopsis of this evidence was provided by the Tenth Circuit Court of Appeals in their 2000 decision in *Adarand Constructors*.[3]

The disparities between minorities and Whites are much greater in business than they are in other economic activities, even though these other disparities remain considerable. The gap is particularly wide with respect to income and wealth. African-Americans, for example, comprise approximately 13 percent of the general population, but only 12 percent of the civilian labor force, and only 11 percent of total employment. Further,

---

[2] Ray Marshall, "Minority and Female Business Development After *Croson*," Working Paper, 2000.

[3] *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166-1175 (10th Cir. 2000) (discussing evidence before Congress of business discrimination against minorities in the construction industry in enacting the Disadvantaged Business Enterprise Program for federal-aid transportation contracts, Pub.L. No. 100-17, 101 Stat. 132 (1987), Pub.L. No. 102-240, 105 Stat. 1914 (1991) and Pub.L. No. 105-178, 112 Stat. 107 (1998), and the implementing regulations at 49 CFR Part 26 (1999)).

African-Americans earned only 7 percent of total money income, owned only 5 percent of the nation's businesses, and made only 1 percent of business sales.[4]

At NERA, we create many original and custom data sets in our research studies of M/WBEs. Today I would like to focus on statistics from several key data sources produced within the federal government, that we utilize regularly in our research. These are the *Survey of Business Owners* (SBO), produced by the Census Bureau; the *Public Use Microdata Samples from the Decennial Census* (DCPUMS), also produced by the Census Bureau; the *Current Population Survey* (CPS), produced jointly by the Census Bureau and the Bureau of Labor Statistics (BLS); and the *Survey of Small Business Finances* (SSBF) produced by the Federal Reserve and the SBA. Along with the Census Bureau's *American Community Survey Public Use Microdata Samples* (ACPUMS), these are the key publicly available data sources that are currently able to shed light on the state of M/WBEs.

## Survey of Business Owners (SBO)

The most recent SBO data from 2002 counted just under 22.5 million privately held business enterprises in the United States. Those firms, in total, made $8.78 trillion in sales and receipts, or almost $391,000 per firm on average.

Large disparities are observed in the SBO between the share of minorities in the general population and their share of the business population.

- Although African Americans comprised 12.7 percent of the U.S. population in 2002, they accounted for only 5.3 percent of its businesses.
- Although Hispanics and Latinos comprised 13.4 percent of the population, they accounted for only 7.0 percent of the businesses.
- Although women comprised 50.9 percent of the population, they accounted for only 28.9 percent of the businesses.

Moreover, the minority and female share of business sales and receipts is far lower than their share of the business population.

- Although African Americans comprised 5.3 percent of all U.S. businesses in 2002, they earned only 1.0 percent of sales and receipts.
- Although Hispanics and Latinos comprised 7.0 percent of all businesses, they earned only 2.5 percent of sales and receipts.

---

[4] Bureau of the Census, *Statistical Abstract of the United States: 2008*, various tables, and *Survey of Business Owners: 2002*. A similar pattern is evident for Native Americans, Hispanics and Latinos, and Asians and Pacific Islanders.

- Although women comprised 28.9 percent of all businesses, they earned only 10.7 percent of sales and receipts.

Similar disparities are observed for other minority groups in the SBO. Asians and Pacific Islanders comprised 5.0 percent of the business population yet earned only 3.8 percent of sales and receipts. Native Americans comprised 0.9 percent of all businesses but earned only 0.3 percent of sales and receipts.

These disparities between the size of the minority and female business populations and their share of sales and receipts are very large. They are also statistically significant, meaning they are unlikely to result from chance alone.

While the exact proportions vary, large and statistically significant disparities are observed in all 50 states and the District of Columbia, for all minority groups—African-Americans, Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans—as well as for women. This is documented below in Tables 1A through 1F.

When the results for the construction sector are isolated, again, the specific proportions vary but the overall trend is one of large and statistically significant disparities. This is documented in Tables 2A through 2F.

Similar outcomes have been observed in the previous versions of this survey as well.

## Decennial Census Public Use Microdata Samples (DCPUMS), American Community Survey Public Use Microdata Samples (ACPUMS), and Current Population Survey (CPS)

It is a fair question to ask whether these disparities result primarily from discrimination, either past, present or both, or whether they result primarily from other, potentially non-discriminatory, factors.[5] The evidence strongly suggests they primarily result from discrimination.

I have tested this hypothesis empirically using the DCPUMS from the 2000 census and 1990 decennial censuses. I am currently preparing to conduct similar tests using the ACPUMS microdata for 2000-2007. Like the SBO, these data sources can be used to document large and statistically significant disparities between the proportion of business owners who are minorities or women and their share of business owner earnings, in the nation as a whole, and throughout the states, and in the economy as a whole as well as across different industry sectors.

[5] This was the subject of my book, *Racial Discrimination and Minority Business Enterprise: Evidence from the 1990 Census*, New York and London: Garland Publishing, 2000. Similar findings are observed using the 2000 decennial census data. See, *e.g* "NERA Economic Consulting, "Race, Sex, and Business Enterprise: Evidence from the State of Maryland (Final Report)," 8 March 2006, 107-145.

The advantage of the DCPUMS and the ACPUMS is that they allow us to compare these percentages while holding a wide variety of other, potentially non-discriminatory, factors constant, such as industry, geography, education, age, and labor market status, among other factors.[6] Even when all these factors are held constant, using regression analysis, the disparities between minority business owners (African-Americans, Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans) and women business owners on the one hand and their non-minority male counterparts on the other tend to remain large and statistically significant.

The ACPUMS has only recently achieved nationwide coverage. Prior to this, in the interim between issues of the DCPUMS, we have used data from the CPS, which is published on an annual basis. The CPS is the official source of government statistics on employment and unemployment and has been conducted monthly for over 40 years. The data structure of the CPS is similar to the decennial census, so it is possible to conduct similar types of disparity analyses to those just described. The CPS results also tend to show large and statistically significant disparities facing minority and women business owners, even when a large variety of potentially non-discriminatory factors is held constant.[7]

## Survey of Small Business Finances (SSBF)

One significant factor leading to the disadvantaged status of minority and women businesses is lack of access to capital and credit. This is among the most frequently cited obstacles to success among M/WBEs, particularly African-Americans and Hispanics and Latinos.[8] It is also reported more frequently by women business owners than by men. Discrimination in the credit market against such businesses can obviously have an important effect on the likelihood that they will succeed. Indeed, discrimination in the credit market could even prevent such businesses from opening in the first place.

We are fortunate to have data that allows us to test for evidence of discrimination in the small business credit market in recent years. The SSBF is conducted jointly by the U.S. Small Business Administration and the Board of Governors of the Federal Reserve System. It has been conducted every 5 years since 1988 and is drawn from a representative sample of firms with fewer than 500 employees. The 1993 and 1998 surveys deliberately oversampled minority-owned and women-owned firms but the 2003 survey, unfortunately, did not.[9]

---

[6] We have also tested the hypothesis, with similar results, including additional factors such marital and family status, immigration status, ability to speak English, military service, disability status, and asset levels.

[7] See, *e.g.*, NERA Economic Consulting, *op cit.*, 107-145.

[8] See, *e.g.*, U.S. Chamber of Commerce (2005), "Access to capital, what funding sources work for you?," U.S. Chamber of Commerce, Washington, DC, 55.

[9] The 2003 survey took other steps, however, to increase the likelihood that minority-owned and women-owned firms were captured in the sampling frame. For more details, see NORC (2005), p. 11.

The beauty of the SSBF data is that, in addition to the race and sex of the business owners, it contains complete balance sheet and credit history information for each business that was interviewed. This is the same information that would be available to a loan officer when making a determination of whether or not to grant credit. With this data, we can use regression analysis to test for race and sex disparities in access to commercial credit while holding constant all of the relevant balance sheet and credit history information.

The SSBF data provide qualitative and quantitative evidence consistent with the presence of discrimination against minorities in the credit market for small businesses. For example, I find that African-American-owned firms are much more likely to report being seriously concerned with credit market problems and to report being less likely to apply for credit because they fear their loan application will be denied. Moreover, after controlling for a large number of financial and other characteristics of the firms, I find that African-American-owned firms, Hispanic-owned firms, and to a lesser extent other minority-owned firms are substantially and statistically significantly more likely to be denied credit than are White-owned firms. I find some evidence that women are discriminated against in this market as well. The principal results are as follows:

- Minority-owned firms were more likely to report that they did not apply for a loan over the preceding three years because they feared the loan would be denied.
- When minority-owned firms did apply for a loan their loan requests were substantially more likely to be denied than non-minorities, even when differences like firm size and credit history are accounted for.
- When minority-owned firms *did* receive a loan they were obligated to pay higher interest rates on the loans than was true of comparable White-owned firms.
- A larger proportion of minority-owned firms than White-owned firms report that credit market conditions are a serious concern.
- A larger share of minority-owned firms than White-owned firms believes that the availability of credit is the most important issue likely to confront them in the upcoming year.
- There is no evidence that discrimination in the market for credit is significantly different in different regions of the country, or in the construction industries than it is in the nation or the economy as a whole.
- There is no evidence that the level of discrimination in the market for credit has diminished between 1993 and 2003.

The analysis of credit market discrimination against minority and women business owners using SSBF data was the subject of a 60 page report about which I testified to the

Senate Committee on Small Business and Entrepreneurship earlier this month. A copy of that report is included in the package of supplementary materials I have provided.

## Anecdotal/Qualitative Evidence of Discrimination

In addition to the statistical evidence of discrimination, the numerous studies we have conducted in recent years found extensive anecdotal evidence of discrimination against minorities and women in the key sectors of construction and construction-related professional services. In conjunction with my long time colleague, attorney Colette Holt of Colette Holt & Associates in Chicago, we have conducted surveys and in person interviews with hundreds of M/WBEs and majority-male owned firms, and the results are strikingly similar across the country.

In general, minorities and women reported that they still encounter significant barriers to doing business in the public and private sector market places, as both prime contractors and subcontractors. They often suffer from stereotypes about their suspected lack of competence and are subject to higher performance standards than similar White men. They also encounter discrimination in obtaining loans and surety bonds; receiving price quotes from suppliers; working with trade unions; obtaining public and private sector prime contracts and subcontracts; and being paid promptly. Finally, there was general agreement that without the use of affirmative remedies such as subcontracting goals, minorities and women would receive few if any opportunities on government contracts, as is the case on non-goals projects. Prime contractors who use M/WBEs on goals projects rarely use them—or even solicit them—in the absence of goals. Thus, the continued operation of federal, state, and local efforts to ensure equal access to the public contracting process is essential to the competitive viability of minority-owned and women-owned business enterprises.

## Suggested Refinements to Federal Data Collection Programs Related to M/WBEs

Useful as they are, the key federal databases used to study M/WBE issues that I have just discussed are limited in several important respects. Below is a list of suggested refinements to the federal databases that would enhance the ability of researchers such as myself and policy makers such as yourselves to draw defensible inferences about MWBEs.

<u>Public Use Microdata Samples of the Decennial Census, American Community Survey, and the Current Population Survey</u>

- provide more industry detail for construction (NAICS 23) (*i.e.* differentiate general building contractors, general heavy construction contractors, and special trades contractors, which are all currently lumped together).

- more industry detail for professional, scientific, and technical services (NAICS 541) (differentiate lawyers, architects & engineers, accountants, advertisers, and others, which are all currently lumped together).

- show legal form of organization for self-employed persons in the class of worker field (sole proprietorship, partnership, C corporation, S-corporation or LLC).

Survey of Business Owners

- substantially increase sample size so that more detailed combinations of geographic location and industry attachment can be analyzed; this would be of enormous benefit to state and local governments operating or considering M/WBE programs.

- substantially increase the sample size so that 3- and 4- digit NAICS results can be had for all or most metropolitan areas.

- reduce the time lag between when the survey is conducted and when the results are released to the public; currently it is in excess of 4 years.

Survey of Small Business Finances

- restore the over-sampling of minorities and women that was present in the 1993 and 1998 surveys but dropped for the 2003 survey. Increase resources to account for the alleged negative impact of this over-sampling on response rates.

- substantially increase overall sample size so that more results for different race groups can be analyzed, in particular Native Americans and Asians.

- substantially increase overall sample size so that, *e.g.*, the influence of venture capital/Small Business Investment Companies on minority and women businesses can be studied.

- conduct research designed to identify, and then include, one or more variables that are correlated with a firm's decision to apply for a loan, but is independent of the financial institution's decision to approve or deny the request. This would allow for "Heckman corrected" analyses that could account for self-selection issues in the loan application process.

- add a longitudinal component so that commercial loans to small businesses could be tracked from origination through repayment or default.

Business Establishment List of the Bureau of Labor Statistics
Standard Statistical Establishment List of the Bureau of the Census

- implement identification of establishment ownership by race and sex in these basic Census and BLS lists of business establishments.

Small Business Size Standards

- more transparency needed in how size standards are actually determined.

- why are manufacturing and mining industries mostly sized in terms of employees while other industries are mostly sized in terms of annual revenues?

- geographic differentiation needed - we often hear complaints that a set of standards that works in Chicago or Los Angeles doesn't work so well in Tampa or Dayton.

- more frequent updates needed for firms sized by annual revenues, in times of significant price inflation.

## Conclusion

It is fairly easy to specify in a general way the economic consequences of public sector M/WBE contracting programs. They have improved economic opportunities for minorities and women in business and therefore improved the competitiveness and efficiency of the American economy. They have also focused public attention on discrimination against minority and female businesses for reasons unrelated to their qualifications or performance.

These public sector programs, standing alone, will not solve the problem of business discrimination. The private sector, which is far larger in terms of economic activity and scope, must take on more responsibility for eliminating business discrimination as well. Some major corporations have begun to take important steps down this road by developing genuine supplier diversity initiatives, but these companies are still the exception rather than the rule.

I am optimistic that the statistical and anecdotal evidence will one day show that such M/WBE contracting programs are no longer needed, because minority-owned and women-owned businesses will have achieved competitive parity with their majority-owned counterparts. However, my own research and that of my colleagues demonstrates that this day has not yet arrived.

Thank you. I will be pleased to answer any questions.

NERA
Economic Consulting

**Table 1A. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, African Americans, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 9.26% | 0.62% | 2.96% | 0.46% | *0.07* | *0.16* |
| Alaska | 1.49% | 0.18% | 0.66% | 0.14% | *0.12* | *0.22* |
| Arizona | 1.66% | 0.16% | 0.66% | 0.13% | *0.10* | *0.19* |
| Arkansas | 4.28% | 0.27% | 1.38% | 0.18% | *0.06* | *0.13* |
| California | 3.88% | 0.35% | 1.48% | 0.26% | *0.09* | *0.18* |
| Colorado | 1.52% | 0.20% | 0.68% | 0.16% | *0.13* | *0.24* |
| Connecticut | 3.42% | 0.19% | 0.97% | 0.14% | *0.05* | *0.14* |
| Delaware | 6.70% | 0.18% | 1.97% | 0.11% | *0.03* | *0.06* |
| Dist of Columbia | 25.86% | 1.47% | 9.23% | 1.28% | *0.06* | *0.14* |
| Florida | 6.63% | 0.53% | 1.95% | 0.36% | *0.08* | *0.19* |
| Georgia | 13.41% | 0.77% | 3.88% | 0.55% | *0.06* | *0.14* |
| Hawaii | 0.82% | 0.12% | 0.31% | 0.10% | *0.15* | *0.33* |
| Idaho | 0.31% | 0.08% | 0.34% | 0.07% | *0.26* | *0.21* |
| Illinois | 7.17% | 0.43% | 1.73% | 0.35% | *0.06* | *0.20* |
| Indiana | 3.24% | 0.35% | 1.28% | 0.31% | *0.11* | *0.24* |
| Iowa | 0.68% | 0.11% | 0.35% | 0.10% | *0.16* | *0.29* |
| Kansas | 2.04% | 0.16% | 0.96% | 0.13% | *0.08* | *0.13* |
| Kentucky | 2.52% | 0.39% | 0.92% | 0.35% | *0.15* | *0.38* |
| Louisiana | 12.24% | 0.59% | 3.55% | 0.40% | *0.05* | *0.11* |
| Maine | 0.24% | 0.04% | 0.10% | 0.03% | *0.18* | *0.33* |
| Maryland | 15.65% | 1.25% | 4.23% | 0.92% | *0.08* | *0.22* |
| Massachusetts | 2.27% | 0.19% | 0.87% | 0.15% | *0.08* | *0.18* |
| Michigan | 6.03% | 0.54% | 1.68% | 0.47% | *0.09* | *0.28* |
| Minnesota | 1.77% | 0.15% | 0.46% | 0.12% | *0.08* | *0.27* |
| Mississippi | 13.33% | 0.94% | 4.39% | 0.59% | *0.07* | *0.13* |
| Missouri | 3.81% | 0.30% | 1.73% | 0.24% | *0.08* | *0.14* |
| Montana | 0.22% | 0.03% | n/a | n/a | *0.13* | |
| Nebraska | 1.44% | 0.10% | 0.62% | 0.09% | *0.07* | *0.14* |
| Nevada | 2.56% | 0.29% | 1.08% | 0.23% | *0.11* | *0.22* |
| New Hampshire | 0.37% | 0.07% | 0.23% | 0.06% | *0.19* | *0.26* |
| New Jersey | 5.12% | 0.38% | 1.86% | 0.31% | *0.07* | *0.16* |
| New Mexico | 1.13% | 0.29% | 0.50% | 0.27% | *0.26* | *0.53* |
| New York | 7.58% | 0.43% | 1.81% | 0.31% | *0.06* | *0.17* |
| North Carolina | 8.11% | 0.59% | 3.07% | 0.45% | *0.07* | *0.15* |
| North Dakota | 0.14% | 0.03% | n/a | n/a | *0.24* | |
| Ohio | 4.36% | 0.40% | 1.56% | 0.34% | *0.09* | *0.22* |
| Oklahoma | 2.55% | 0.23% | 0.96% | 0.18% | *0.09* | *0.19* |
| Oregon | 0.74% | 0.15% | 0.39% | 0.13% | *0.20* | *0.34* |
| Pennsylvania | 2.83% | 0.22% | 1.17% | 0.18% | *0.08* | *0.16* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 9.77% | 0.63% | 3.31% | 0.42% | *0.06* | *0.13* |
| South Dakota | 0.18% | 0.10% | 0.11% | 0.10% | *0.58* | *0.90* |
| Tennessee | 5.90% | 0.40% | 2.16% | 0.29% | *0.07* | *0.14* |
| Texas | 5.12% | 0.35% | 1.79% | 0.26% | *0.07* | *0.14* |
| Utah | 0.34% | 0.13% | 0.15% | 0.13% | *0.38* | *0.86* |
| Vermont | 0.29% | 0.05% | 0.15% | 0.05% | *0.18* | *0.33* |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 7.77% | 0.67% | 3.39% | 0.55% | *0 09* | *0 16* |
| Washington | 1.49% | 0.23% | 0.84% | 0.21% | *0 16* | *0.25* |
| West Virginia | 1.30% | 0.11% | 0.39% | 0.08% | *0.08* | *0.22* |
| Wisconsin | 1.70% | 0.15% | 0.76% | 0.12% | *0.09* | *0.16* |
| Wyoming | 0.28% | 0.03% | 0.24% | 0.02% | *0.10* | *0.10* |

Notes: The disparity ratio is derived by dividing the percentage of sales by the corresponding percentage of firms. A disparity ratio of zero indicates complete disparity while a value of 1 indicates parity. Disparity ratios in italics are statistically significant at a 1-in-100 probability level.

NERA
Economic Consulting

**Table 1B. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Hispanics and Latinos, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.82% | 0.28% | 0.90% | 0.26% | *0.34* | *0.29* |
| Alaska | 2.00% | 0.37% | 1.85% | 0.34% | *0.19* | *0.18* |
| Arizona | 9.21% | 1.32% | 5.30% | 1.10% | *0.14* | *0.21* |
| Arkansas | 1.00% | 0.23% | 0.84% | 0.20% | *0.23* | *0.24* |
| California | 14.70% | 2.04% | 7.06% | 1.68% | *0.14* | *0.24* |
| Colorado | 5.17% | 1.33% | 3.48% | 1.21% | *0.26* | *0.35* |
| Connecticut | 3.12% | 0.33% | 1.70% | 0.28% | *0.11* | *0.16* |
| Delaware | 1.38% | 0.12% | 0.72% | 0.09% | *0.09* | *0.12* |
| Dist of Columbia | 4.60% | 0.51% | 3.18% | 0.48% | *0.11* | *0.15* |
| Florida | 17.33% | 3.80% | 11.09% | 3.27% | *0.22* | *0.29* |
| Georgia | 2.71% | 0.57% | 1.66% | 0.48% | *0.21* | *0.29* |
| Hawaii | 3.12% | 0.73% | 2.05% | 0.66% | *0.23* | *0.32* |
| Idaho | 2.28% | 0.48% | 1.82% | 0.41% | *0.21* | *0.23* |
| Illinois | 4.13% | 0.64% | 2.69% | 0.57% | *0.16* | *0.21* |
| Indiana | 1.26% | 0.16% | 0.81% | 0.14% | *0.13* | *0.17* |
| Iowa | 0.65% | 0.12% | 0.58% | 0.11% | *0.19* | *0.19* |
| Kansas | 1.90% | 0.29% | 1.47% | 0.25% | *0.15* | *0.17* |
| Kentucky | 0.70% | 0.27% | n/a | n/a | *0.39* | |
| Louisiana | 2.33% | 0.60% | 1.63% | 0.56% | *0.26* | *0.34* |
| Maine | 0.54% | 0.15% | 0.32% | 0.13% | *0.28* | *0.41* |
| Maryland | 3.46% | 0.64% | 2.00% | 0.54% | *0.19* | *0.27* |
| Massachusetts | 2.83% | 0.32% | 1.41% | 0.26% | *0.11* | *0.19* |
| Michigan | 1.34% | 0.40% | 0.90% | 0.39% | *0.30* | *0.43* |
| Minnesota | 0.90% | 0.10% | 0.57% | 0.08% | *0.11* | *0.14* |
| Mississippi | 0.71% | 0.15% | 0.56% | 0.13% | *0.21* | *0.22* |
| Missouri | 0.83% | 0.15% | 0.63% | 0.14% | *0.18* | *0.22* |
| Montana | 0.96% | 0.22% | n/a | n/a | *0.23* | |
| Nebraska | 1.35% | 0.31% | 0.94% | 0.29% | *0.23* | *0.31* |
| Nevada | 5.75% | 1.11% | 3.18% | 0.96% | *0.19* | *0.30* |
| New Hampshire | 0.73% | 0.21% | 0.65% | 0.18% | *0.28* | *0.28* |
| New Jersey | 7.03% | 0.85% | 3.78% | 0.73% | *0.12* | *0.19* |
| New Mexico | 21.73% | 5.40% | 15.08% | 4.83% | *0.25* | *0.32* |
| New York | 9.58% | 0.71% | 3.26% | 0.56% | *0.07* | *0.17* |
| North Carolina | 1.41% | 0.30% | 1.09% | 0.25% | *0.21* | *0.23* |
| North Dakota | 0.41% | 0.04% | 0.25% | 0.03% | *0.09* | *0.13* |
| Ohio | 0.87% | 0.14% | 0.67% | 0.13% | *0.16* | *0.19* |
| Oklahoma | 1.87% | 0.58% | 1.40% | 0.53% | *0.31* | *0.38* |
| Oregon | 2.12% | 0.56% | 1.56% | 0.52% | *0.26* | *0.34* |
| Pennsylvania | 1.26% | 0.18% | 0.72% | 0.15% | *0.14* | *0.21* |
| Rhode Island | 3.91% | 0.32% | 1.20% | 0.20% | *0.08* | *0.17* |
| South Carolina | 1.03% | 0.27% | 0.90% | 0.25% | *0.26* | *0.28* |
| South Dakota | 0.51% | 0.20% | 0.49% | 0.19% | *0.40* | *0.39* |
| Tennessee | 0.95% | 0.23% | 0.92% | 0.21% | *0.24* | *0.23* |
| Texas | 18.41% | 2.33% | 9.47% | 1.88% | *0.13* | *0.20* |
| Utah | 2.68% | 0.38% | 1.82% | 0.32% | *0.14* | *0.17* |
| Vermont | 0.62% | 0.10% | 0.35% | 0.08% | *0.15* | *0.22* |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 3.59% | 0.62% | 1.79% | 0.53% | *0.17* | *0.30* |
| Washington | 2.20% | 0.34% | 1.74% | 0.30% | *0.16* | *0.18* |
| West Virginia | 0.57% | 0.22% | 0.81% | 0.20% | *0.38* | *0.25* |
| Wisconsin | 0.95% | 0.22% | 0.77% | 0.21% | *0.23* | *0.27* |
| Wyoming | 2.49% | 0.66% | 1.95% | 0.63% | *0.26* | *0.32* |

Notes: See Table 1A.

**Table 1C. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Asians, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 1.38% | 0.56% | 2.17% | 0.53% | 0.41 | 0.24 |
| Alaska | 3.07% | 0.91% | 4.05% | 0.82% | 0.30 | 0.20 |
| Arizona | 2.68% | 0.73% | 3.36% | 0.67% | 0.27 | 0.20 |
| Arkansas | 0.96% | 0.37% | 1.84% | 0.36% | 0.39 | 0.19 |
| California | 12.77% | 4.50% | 15.24% | 4.17% | 0.35 | 0.27 |
| Colorado | 2.35% | 0.64% | 2.94% | 0.58% | 0.27 | 0.20 |
| Connecticut | 2.38% | 0.48% | 3.24% | 0.41% | 0 20 | 0.13 |
| Delaware | 2.98% | 0.53% | 3.96% | 0.49% | 0 18 | 0.12 |
| Dist of Columbia | 5.11% | 0.94% | 10.11% | n/a | 0 18 | |
| Florida | 2.68% | 1.04% | 3.78% | 0.99% | 0 39 | 0.26 |
| Georgia | 3.99% | 1.08% | 5.97% | 1.00% | 0.27 | 0.17 |
| Hawaii | 45.28% | 18.88% | 43.92% | 17.73% | 0.42 | 0.40 |
| Idaho | 0.91% | 0.39% | 1.29% | 0.38% | 0.43 | 0.29 |
| Illinois | 4.64% | 1.27% | 5.43% | 1.19% | 0.27 | 0.22 |
| Indiana | 1.40% | 0.54% | 2.11% | 0.52% | 0.38 | 0.24 |
| Iowa | 0.76% | 0.20% | 1.12% | 0.18% | 0.26 | 0.16 |
| Kansas | 1.62% | 0.39% | 2.36% | 0.36% | 0.24 | 0.15 |
| Kentucky | 1.08% | 0.48% | 1.89% | 0.47% | 0.45 | 0.25 |
| Louisiana | 2.50% | 0.55% | 3.07% | 0.47% | 0.22 | 0.15 |
| Maine | 0.62% | 0.27% | 1.28% | 0.26% | 0 45 | 0.21 |
| Maryland | 5.90% | 1.89% | 7.44% | 1.76% | 0 32 | 0.24 |
| Massachusetts | 3.21% | 0.77% | 3.76% | 0.72% | 0 24 | 0.19 |
| Michigan | 2.09% | 0.64% | 2.80% | 0.60% | 0.31 | 0 21 |
| Minnesota | 1.73% | 0.38% | 1.61% | 0.35% | 0.22 | 0.22 |
| Mississippi | 1.56% | 0.87% | 2.34% | 0.79% | 0.56 | 0.34 |
| Missouri | 1.45% | 0.42% | 2.19% | 0.40% | 0.29 | 0.18 |
| Montana | 0.51% | 0.22% | 0.90% | 0.22% | 0.44 | 0.24 |
| Nebraska | 1.00% | 0.49% | 1.53% | 0.49% | 0 49 | 0 32 |
| Nevada | 5.23% | 1.35% | 5.37% | 1.17% | 0.26 | 0.22 |
| New Hampshire | 1.22% | 0.43% | 2.07% | 0.39% | 0.35 | 0.19 |
| New Jersey | 7.33% | 2.18% | 8.46% | 2.06% | 0.30 | 0.24 |
| New Mexico | 1.73% | 0.73% | 2.52% | 0.69% | 0.42 | 0.27 |
| New York | 8.50% | 1.76% | 8.40% | 1.58% | 0.21 | 0.19 |
| North Carolina | 2.13% | 0.58% | 2.84% | 0.54% | 0.27 | 0.19 |
| North Dakota | 0.49% | 0.25% | 0.97% | 0.25% | 0.52 | 0.26 |
| Ohio | 1.68% | 0.57% | 2.71% | 0.54% | 0.34 | 0.20 |
| Oklahoma | 1.57% | 0.47% | 2.28% | 0.42% | 0 30 | 0.18 |
| Oregon | 3.02% | 0.87% | 3.42% | 0.76% | 0.29 | 0.22 |
| Pennsylvania | 2.59% | 0.69% | 3.17% | 0.63% | 0.27 | 0.20 |
| Rhode Island | 1.75% | 0.49% | 1.78% | 0.44% | 0.28 | 0.25 |
| South Carolina | 1.51% | 0.81% | 2.47% | 0.79% | 0.54 | 0.32 |
| South Dakota | 0.43% | 0.15% | 0.46% | 0.14% | 0.34 | 0.31 |
| Tennessee | 1.59% | 0.50% | 2.86% | 0.47% | 0 31 | 0.16 |
| Texas | 4.49% | 1.14% | 5.99% | 1.04% | 0.25 | 0.17 |
| Utah | 1.46% | 0.48% | 1.81% | 0.45% | 0.33 | 0.25 |
| Vermont | 0.60% | 0.17% | 1.00% | n/a | 0.28 | |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 5.75% | 1.38% | 6.05% | 1.27% | *0.24* | *0.21* |
| Washington | 5.75% | 1.59% | 6.01% | 1.46% | *0.28* | *0.24* |
| West Virginia | 1.09% | 0.51% | 2.12% | 0.50% | *0.47* | *0.23* |
| Wisconsin | 1.26% | 0.34% | 1.61% | 0.32% | *0.27* | *0.20* |
| Wyoming | 0.76% | 0.25% | 1.34% | 0.24% | *0.33* | *0.18* |

Notes: See Table 1A.

NERA
Economic Consulting

**Table 1D. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, American Indians and Alaska Natives, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.94% | 0.18% | 0.69% | 0.16% | *0.19* | *0.23* |
| Alaska | 8.29% | 6.02% | 4.76% | 6.07% | *0.73* | *1.28* |
| Arizona | 1.72% | 0.17% | 0.49% | 0.14% | *0.10* | *0.29* |
| Arkansas | 1.09% | 0.19% | 0.50% | 0.16% | *0.18* | *0.31* |
| California | 1.31% | 0.14% | 0.54% | 0.11% | *0.11* | *0.20* |
| Colorado | 0.85% | 0.14% | 0.50% | 0.11% | *0.16* | *0.23* |
| Connecticut | 0.40% | 0.04% | n/a | n/a | *0.09* | |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist of Columbia | 0.47% | 0.05% | 0.33% | 0.05% | *0.10* | *0.14* |
| Florida | 0.64% | 0.06% | 0.23% | 0.04% | *0.09* | *0.16* |
| Georgia | 0.66% | 0.08% | 0.42% | 0.06% | *0.12* | *0.15* |
| Hawaii | 0.90% | 0.15% | n/a | n/a | *0.17* | |
| Idaho | 0.94% | 0.28% | 0.54% | 0.26% | *0.30* | *0.48* |
| Illinois | 0.35% | 0.04% | 0.20% | 0.03% | *0.11* | *0.16* |
| Indiana | 0.45% | 0.05% | 0.27% | 0.05% | *0.12* | *0.17* |
| Iowa | 0.27% | 0.04% | n/a | n/a | *0.13* | |
| Kansas | 0.79% | 0.15% | 0.60% | 0.14% | *0.20* | *0.24* |
| Kentucky | 0.44% | 0.03% | 0.15% | 0.02% | *0.06* | *0.11* |
| Louisiana | 0.82% | 0.10% | 0.30% | 0.08% | *0.12* | *0.27* |
| Maine | 0.50% | 0.06% | 0.32% | 0.05% | *0.13* | *0.15* |
| Maryland | 0.81% | 0.11% | 0.35% | 0.09% | *0.13* | *0.24* |
| Massachusetts | 0.40% | 0.06% | 0.24% | 0.05% | *0.14* | *0.20* |
| Michigan | 0.73% | 0.09% | 0.40% | 0.08% | *0.12* | *0.19* |
| Minnesota | 0.62% | 0.07% | 0.43% | 0.06% | *0.11* | *0.15* |
| Mississippi | 0.36% | 0.05% | n/a | n/a | *0.12* | |
| Missouri | 0.75% | 0.08% | 0.39% | 0.06% | *0.10* | *0.14* |
| Montana | 1.98% | 0.48% | 1.26% | 0.43% | *0.24* | *0.34* |
| Nebraska | 0.29% | 0.03% | 0.11% | 0.03% | *0.11* | *0.25* |
| Nevada | 1.12% | 0.14% | 0.59% | 0.10% | *0.13* | *0.17* |
| New Hampshire | 0.42% | 0.06% | 0.29% | 0.05% | *0.15* | *0.17* |
| New Jersey | 0.37% | 0.03% | 0.18% | 0.02% | *0.09* | *0.14* |
| New Mexico | 4.99% | 0.52% | 1.14% | 0.45% | *0.11* | *0.39* |
| New York | 0.65% | 0.04% | 0.23% | 0.03% | *0.06* | *0.13* |
| North Carolina | 0.93% | 0.10% | 0.55% | 0.07% | *0.11* | *0.14* |
| North Dakota | 1.50% | 0.29% | 0.55% | 0.26% | *0.19* | *0.48* |
| Ohio | 0.38% | 0.05% | 0.20% | 0.05% | *0.14* | *0.23* |
| Oklahoma | 5.86% | 1.28% | 3.53% | 1.10% | *0.22* | *0.31* |
| Oregon | 1.02% | 0.14% | 0.53% | 0.10% | *0.13* | *0.20* |
| Pennsylvania | n/a | n/a | n/a | n/a | | |
| Rhode Island | 0.51% | 0.04% | 0.13% | 0.02% | *0.08* | *0.19* |
| South Carolina | 0.49% | 0.06% | 0.32% | 0.05% | *0.12* | *0.16* |
| South Dakota | 1.87% | 0.22% | 0.73% | 0.21% | *0.12* | *0.28* |
| Tennessee | 0.78% | 0.15% | 0.38% | 0.12% | *0.19* | *0.32* |
| Texas | 0.93% | 0.17% | 0.61% | 0.15% | *0.19* | *0.25* |
| Utah | 0.59% | 0.06% | 0.36% | 0.05% | *0.09* | *0.13* |
| Vermont | 0.41% | 0.11% | 0.18% | 0.10% | *0.27* | *0.54* |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.50% | 0.08% | 0.36% | 0.07% | *0.17* | *0.19* |
| Washington | 1.23% | 0.22% | 0.72% | 0.19% | *0.18* | *0.27* |
| West Virginia | 0.36% | 0.04% | 0.30% | 0.03% | *0.11* | *0.09* |
| Wisconsin | 0.64% | 0.10% | 0.35% | 0.09% | *0.15* | *0.25* |
| Wyoming | 1.12% | 0.18% | 0.87% | 0.15% | *0.16* | *0.18* |

Notes: See Table 1A.

**Table 1E. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.03% | 0.00% | 0.01% | 0.00% | *0.06* | *0.24* |
| Alaska | 0.24% | 0.02% | 0.22% | n/a | *0.09* | |
| Arizona | 0.09% | 0.01% | 0.07% | 0.01% | *0.13* | *0.14* |
| Arkansas | 0.03% | 0.00% | n/a | n/a | *0.09* | |
| California | 0.24% | 0.04% | 0.15% | 0.03% | *0.18* | *0.22* |
| Colorado | 0.08% | 0.01% | 0.05% | 0.01% | *0.11* | *0.16* |
| Connecticut | 0.06% | 0.02% | n/a | n/a | *0.36* | |
| Delaware | 0.03% | n/a | n/a | n/a | | |
| Dist of Columbia | n/a | n/a | n/a | n/a | | |
| Florida | 0.10% | 0.01% | 0.04% | 0.00% | *0.07* | *0.13* |
| Georgia | 0.03% | 0.00% | 0.03% | 0.00% | *0.13* | *0.08* |
| Hawaii | 8.42% | 2.16% | 4.26% | 1.98% | *0.26* | *0.46* |
| Idaho | 0.08% | 0.01% | n/a | n/a | *0.15* | |
| Illinois | 0.07% | n/a | n/a | n/a | | |
| Indiana | 0.03% | 0.02% | n/a | n/a | *0.61* | |
| Iowa | 0.01% | 0.00% | 0.00% | n/a | *0.39* | |
| Kansas | 0.02% | 0.01% | n/a | n/a | *0.42* | |
| Kentucky | 0.02% | n/a | 0.00% | n/a | | |
| Louisiana | n/a | n/a | n/a | n/a | | |
| Maine | n/a | n/a | n/a | n/a | | |
| Maryland | 0.02% | n/a | 0.04% | 0.01% | | *0.24* |
| Massachusetts | n/a | n/a | n/a | n/a | | |
| Michigan | 0.03% | 0.00% | n/a | n/a | *0.17* | |
| Minnesota | n/a | n/a | n/a | n/a | | |
| Mississippi | 0.07% | 0.00% | n/a | n/a | *0.07* | |
| Missouri | 0.02% | 0.01% | n/a | n/a | *0.35* | |
| Montana | 0.04% | 0.00% | n/a | n/a | *0.12* | |
| Nebraska | 0.01% | n/a | 0.00% | 0.00% | | |
| Nevada | 0.18% | 0.04% | n/a | n/a | *0.20* | |
| New Hampshire | 0.01% | n/a | n/a | n/a | | |
| New Jersey | 0.06% | 0.00% | n/a | n/a | *0.07* | |
| New Mexico | 0.10% | 0.02% | n/a | n/a | *0.19* | |
| New York | 0.18% | 0.01% | 0.04% | n/a | *0.04* | |
| North Carolina | 0.03% | 0.00% | n/a | n/a | *0.07* | |
| North Dakota | 0.00% | n/a | 0.00% | 0.00% | | |
| Ohio | n/a | n/a | n/a | n/a | | |
| Oklahoma | 0.10% | 0.00% | 0.03% | 0.00% | *0.05* | *0.10* |
| Oregon | 0.12% | 0.02% | 0.08% | 0.02% | *0.18* | *0.21* |
| Pennsylvania | 0.03% | 0.00% | n/a | n/a | *0.13* | |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 0.01% | 0.00% | n/a | n/a | *0.29* | |
| South Dakota | 0.02% | n/a | 0.01% | n/a | | |
| Tennessee | n/a | n/a | n/a | n/a | | |
| Texas | 0.08% | 0.00% | n/a | n/a | *0.05* | |
| Utah | 0.22% | 0.10% | 0.18% | 0.10% | *0.47* | 0.58 |
| Vermont | n/a | n/a | n/a | n/a | | |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.08% | 0.03% | 0.07% | n/a | *0.32* | |
| Washington | 0.16% | 0.05% | 0.09% | 0.05% | *0.33* | *0.55* |
| West Virginia | 0.01% | n/a | 0.00% | 0.00% | | |
| Wisconsin | 0.03% | 0.00% | 0.01% | 0.00% | *0.03* | *0.12* |
| Wyoming | 0.04% | 0.00% | 0.00% | 0.00% | *0.04* | |

Notes: See Table 1A. The Employer disparity ratio for Utah is statistically significant at a 1-in-10 probability level.

**Table 1F. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Women, All Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 26.43% | 4.29% | 15.77% | 3.87% | 0.16 | 0.25 |
| Alaska | 26.24% | 5.08% | 18.87% | 4.53% | 0.19 | 0.24 |
| Arizona | 28.79% | 4.83% | 16.60% | 4.26% | 0.17 | 0.26 |
| Arkansas | 23.74% | 3.85% | 14.92% | 3.50% | 0.16 | 0.23 |
| California | 29.93% | 4.92% | 17.18% | 4.25% | 0.16 | 0.25 |
| Colorado | 29.08% | 4.25% | 18.36% | 3.69% | 0.15 | 0.20 |
| Connecticut | 27.23% | 3.14% | 14.66% | 2.68% | 0.12 | 0.18 |
| Delaware | 24.14% | 1.74% | 14.86% | 1.45% | 0.07 | 0.10 |
| Dist of Columbia | 33.23% | 2.25% | 17.92% | n/a | 0.07 | |
| Florida | 28.41% | 5.70% | 18.09% | 5.01% | 0.20 | 0.28 |
| Georgia | 29.09% | 4.06% | 17.02% | 3.60% | 0.14 | 0.21 |
| Hawaii | 30.18% | 6.91% | 19.32% | 6.17% | 0.23 | 0.32 |
| Idaho | 23.71% | 4.42% | 13.72% | 3.96% | 0.19 | 0.29 |
| Illinois | 29.74% | 4.08% | 16.53% | 3.69% | 0.14 | 0.22 |
| Indiana | 27.39% | 3.41% | 14.77% | 3.07% | 0.12 | 0.21 |
| Iowa | 26.98% | 3.17% | 14.04% | 2.86% | 0.12 | 0.20 |
| Kansas | 27.18% | 3.02% | 15.78% | 2.68% | 0.11 | 0.17 |
| Kentucky | 25.66% | 3.33% | 15.01% | 2.95% | 0.13 | 0.20 |
| Louisiana | 26.43% | 3.76% | 15.54% | 3.36% | 0.14 | 0.22 |
| Maine | 24.01% | 4.40% | 14.88% | 3.83% | 0.18 | 0.26 |
| Maryland | 30.98% | 4.63% | 17.24% | 3.99% | 0.15 | 0.23 |
| Massachusetts | 28.73% | 3.57% | 15.88% | 3.07% | 0.12 | 0.19 |
| Michigan | 29.59% | 3.68% | 15.61% | 3.29% | 0.12 | 0.21 |
| Minnesota | 27.92% | 3.52% | 14.71% | 3.15% | 0.13 | 0.21 |
| Mississippi | 25.11% | 4.79% | 15.67% | 4.27% | 0.19 | 0.27 |
| Missouri | 27.41% | 4.14% | 16.69% | 3.80% | 0.15 | 0.23 |
| Montana | 24.42% | 4.79% | 16.41% | 4.16% | 0.20 | 0.25 |
| Nebraska | 26.61% | 4.16% | 14.95% | 3.91% | 0.16 | 0.26 |
| Nevada | 28.13% | 5.86% | 15.36% | 5.17% | 0.21 | 0.34 |
| New Hampshire | 24.74% | 4.99% | 15.80% | 4.56% | 0.20 | 0.29 |
| New Jersey | 26.13% | 4.19% | 15.46% | 3.79% | 0.16 | 0.24 |
| New Mexico | 30.91% | 5.44% | 18.54% | 4.81% | 0.18 | 0.26 |
| New York | 29.59% | 4.10% | 15.74% | 3.55% | 0.14 | 0.23 |
| North Carolina | 27.06% | 4.43% | 16.14% | 4.02% | 0.16 | 0.25 |
| North Dakota | 23.25% | 3.12% | 11.87% | 2.74% | 0.13 | 0.23 |
| Ohio | 28.12% | 3.61% | 15.11% | 3.23% | 0.13 | 0.21 |
| Oklahoma | 25.73% | 4.69% | 15.97% | 4.25% | 0.18 | 0.27 |
| Oregon | 29.49% | 4.21% | 16.30% | 3.66% | 0.14 | 0.22 |
| Pennsylvania | 25.98% | 4.09% | 15.28% | 3.76% | 0.16 | 0.25 |
| Rhode Island | 26.52% | 5.48% | 14.40% | 4.92% | 0.21 | 0.34 |
| South Carolina | 26.22% | 4.29% | 15.55% | 3.86% | 0.16 | 0.25 |
| South Dakota | 22.40% | 2.58% | 13.61% | 2.31% | 0.12 | 0.17 |
| Tennessee | 25.96% | 4.04% | 14.78% | 3.61% | 0.16 | 0.24 |
| Texas | 27.02% | 3.63% | 17.43% | 3.18% | 0.13 | 0.18 |
| Utah | 25.12% | 4.06% | 12.69% | 3.66% | 0.16 | 0.29 |
| Vermont | 26.26% | 3.64% | 13.41% | 3.00% | 0.14 | 0.22 |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 29.66% | 3.96% | 17.35% | 3.52% | *0.13* | *0.20* |
| Washington | 29.40% | 3.88% | 16.21% | 3.41% | *0.13* | *0.21* |
| West Virginia | 27.68% | 3.82% | 14.76% | 3.38% | *0.14* | *0.23* |
| Wisconsin | 26.49% | 4.03% | 14.99% | 3.75% | *0 15* | *0 25* |
| Wyoming | 24.38% | 3.37% | 15.63% | n/a | *0.14* | |

Notes: See Table 1A..

**Table 2A. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, African Americans, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 5.71% | 1.09% | 3.12% | 0.74% | *0.19* | *0.24* |
| Alaska | 0.44% | 0.13% | 0.23% | 0.11% | *0.30* | *0.46* |
| Arizona | 0.57% | 0.10% | 0.20% | 0.09% | *0.18* | 0.45 |
| Arkansas | 2.60% | 1.38% | n/a | n/a | 0.53 | |
| California | 2.10% | 0.47% | 1.05% | 0.40% | *0.22* | *0.38* |
| Colorado | 0.65% | 0.24% | n/a | n/a | *0.36* | |
| Connecticut | 2.13% | 0.39% | 0.97% | 0.28% | *0.18* | *0.28* |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist of Columbia | 34.90% | n/a | 17.16% | 7.05% | | *0.41* |
| Florida | 4.15% | 0.59% | 1.67% | 0.45% | *0.14* | *0.27* |
| Georgia | 6.19% | 1.68% | 2.96% | 1.42% | *0.27* | *0.48* |
| Hawaii | n/a | n/a | n/a | n/a | | |
| Idaho | n/a | n/a | n/a | n/a | | |
| Illinois | 2.79% | 0.80% | 0.94% | 0.74% | *0.29* | *0.79* |
| Indiana | 0.89% | 0.97% | 0.65% | 1.02% | *1.09* | *1.57* |
| Iowa | 0.22% | 0.15% | 0.13% | 0.14% | *0.68* | *1.04* |
| Kansas | 1.09% | 0.52% | 1.17% | 0.48% | *0.48* | *0.41* |
| Kentucky | n/a | n/a | n/a | n/a | | |
| Louisiana | 9.90% | 1.34% | 2.92% | 0.77% | *0.14* | *0.26* |
| Maine | 0.04% | n/a | 0.04% | n/a | | |
| Maryland | 7.12% | 2.05% | 2.69% | 1.82% | *0.29* | *0.68* |
| Massachusetts | 1.18% | 0.55% | 0.59% | 0.51% | *0.47* | *0.87* |
| Michigan | 1.64% | 1.33% | 0.85% | 1.32% | *0.81* | *1.55* |
| Minnesota | 0.73% | 0.18% | 0.11% | 0.15% | *0.25* | *1.40* |
| Mississippi | 10.47% | 2.14% | 5.65% | 0.98% | *0.20* | *0.17* |
| Missouri | 1.50% | 0.62% | 0.77% | 0.60% | *0.41* | *0.78* |
| Montana | n/a | n/a | n/a | n/a | | |
| Nebraska | 0.51% | n/a | 0.54% | n/a | | |
| Nevada | 1.18% | 0.37% | n/a | n/a | *0.31* | |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 2.42% | 0.58% | 1.31% | 0.47% | *0.24* | *0.36* |
| New Mexico | 0.60% | 0.16% | n/a | n/a | *0.27* | |
| New York | 4.86% | 0.77% | 1.52% | 0.67% | *0.16* | *0.44* |
| North Carolina | 4.22% | 0.87% | n/a | n/a | *0.21* | |
| North Dakota | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Ohio | 2.04% | 1.45% | 1.37% | 1.50% | *0.71* | *1.10* |
| Oklahoma | 1.41% | 0.32% | 0.26% | 0.16% | *0.23* | *0.61* |
| Oregon | 0.41% | 0.30% | 0.38% | 0.31% | *0.74* | *0.80* |
| Pennsylvania | 1.41% | 0.38% | 0.54% | 0.35% | *0.27* | *0.64* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 6.65% | 1.44% | 3.95% | 0.99% | *0.22* | *0.25* |
| South Dakota | n/a | n/a | n/a | n/a | | |
| Tennessee | 2.72% | 0.70% | 1.39% | 0.57% | *0.26* | *0.41* |
| Texas | 2.16% | 0.57% | 0.92% | 0.41% | *0.26* | *0.45* |
| Utah | 0.25% | 0.03% | 0.02% | n/a | *0.12* | |
| Vermont | n/a | n/a | n/a | n/a | | |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 4.10% | 1.05% | 2.71% | 0.88% | *0.26* | *0.33* |
| Washington | 0.55% | 0.28% | n/a | n/a | *0.52* | |
| West Virginia | 0.54% | 0.94% | 0.29% | 0.97% | *1.73* | *3 32* |
| Wisconsin | 0.54% | 0.40% | n/a | n/a | *0.75* | |
| Wyoming | 0.13% | n/a | n/a | n/a | | |

Notes: The disparity ratio is derived by dividing the percentage of sales by the corresponding percentage of firms. A disparity ratio of zero indicates complete disparity while a value of 1 indicates parity. Disparity ratios in italics are statistically significant at a 1-in-20 probability level or better. The Employer disparity ratio for Arizona and the All Firms disparity ratio for Arkansas are statistically significant at a 1-in-10 probability level.

NERA
Economic Consulting

**Table 2B. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Hispanics and Latinos, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 1.23% | 0.44% | 1.32% | 0.28% | *0.36* | *0.21* |
| Alaska | 2.20% | 0.86% | 2.50% | 0.81% | *0.39* | *0.32* |
| Arizona | 11.66% | 2.73% | 6.97% | 2.47% | *0.23* | *0.35* |
| Arkansas | 1.50% | 0.76% | 0.44% | 0.66% | *0.51* | *1.48* |
| California | 15.38% | 4.30% | 8.25% | 3.71% | *0.28* | *0.45* |
| Colorado | 7.35% | 2.61% | 5.50% | 2.22% | *0.36* | *0.40* |
| Connecticut | 3.50% | 0.64% | 1.67% | 0.44% | *0.18* | *0.26* |
| Delaware | 1.16% | 0.58% | 0.25% | 0.36% | *0.50* | *1.45* |
| Dist of Columbia | 19.76% | n/a | 10.65% | n/a | n/a | |
| Florida | 17.44% | 5.15% | 8.25% | 3.90% | *0.30* | *0.47* |
| Georgia | 5.77% | 1.39% | 1.95% | 0.62% | *0.24* | *0.32* |
| Hawaii | 3.40% | 1.31% | 3.05% | n/a | *0.38* | |
| Idaho | 2.01% | 1.63% | 1.93% | 1.67% | *0.81* | *0.87* |
| Illinois | 4.52% | 1.52% | 2.24% | 1.38% | *0.34* | *0.61* |
| Indiana | 1.67% | 0.73% | 0.97% | 0.62% | *0.44* | *0.64* |
| Iowa | 0.73% | 0.29% | 0.46% | 0.18% | *0.39* | *0.40* |
| Kansas | 2.49% | 1.53% | n/a | n/a | *0.61* | |
| Kentucky | 0.79% | 0.43% | 0.41% | 0.32% | *0.55* | *0.77* |
| Louisiana | 3.23% | 1.84% | 0.82% | 1.70% | *0.57* | *2.07* |
| Maine | 0.31% | 0.33% | 0.28% | 0.37% | *1.04* | *1.34* |
| Maryland | 8.43% | 1.89% | 3.13% | 1.44% | *0.22* | *0.46* |
| Massachusetts | 2.05% | 0.75% | 1.15% | 0.67% | *0.37* | *0.58* |
| Michigan | 1.33% | 0.75% | 0.95% | 0.70% | *0.57* | 0.73 |
| Minnesota | 0.88% | 0.42% | 0.67% | 0.35% | *0.47* | *0.52* |
| Mississippi | 0.75% | 0.57% | 0.31% | 0.49% | *0.76* | *1.59* |
| Missouri | 0.72% | 0.43% | 0.68% | 0.41% | *0.59* | *0.60* |
| Montana | n/a | n/a | n/a | n/a | | |
| Nebraska | 1.35% | 0.33% | n/a | n/a | *0.24* | |
| Nevada | 7.05% | 2.70% | 3.93% | 2.64% | *0.38* | *0.67* |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 6.97% | 2.13% | 3.33% | 1.83% | *0.31* | *0.55* |
| New Mexico | 29.50% | 17.20% | 25.44% | 15.39% | *0.58* | *0.60* |
| New York | 7.59% | 1.72% | 2.74% | 1.48% | *0.23* | *0.54* |
| North Carolina | 2.26% | 1.11% | 1.32% | 0.72% | *0.49* | *0.55* |
| North Dakota | n/a | n/a | n/a | n/a | | |
| Ohio | 0.76% | 0.32% | 0.58% | 0.27% | *0.42* | *0.47* |
| Oklahoma | 2.27% | 1.03% | 1.49% | 0.82% | *0.46* | *0.55* |
| Oregon | 1.69% | 1.10% | 1.92% | 1.10% | *0.65* | *0.57* |
| Pennsylvania | 1.22% | 0.36% | 0.65% | 0.28% | *0.29* | *0.44* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 1.41% | 0.67% | 1.13% | 0.58% | *0.48* | *0.51* |
| South Dakota | n/a | n/a | n/a | n/a | | |
| Tennessee | 1.47% | 0.34% | 0.71% | 0.22% | *0.23* | *0.31* |
| Texas | 30.86% | 7.30% | 11.30% | 4.71% | *0.24* | *0.42* |
| Utah | 2.78% | 0.77% | 1.60% | 0.68% | *0.28* | *0.43* |
| Vermont | n/a | n/a | n/a | n/a | | |

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 7.24% | 1.99% | 2.10% | 1.41% | *0.28* | *0.67* |
| Washington | 1.67% | 0.76% | 1.78% | 0.76% | *0.45* | *0.43* |
| West Virginia | 0.35% | 0.96% | 0.41% | 1.02% | *2.75* | *2.50* |
| Wisconsin | 0.70% | 0.37% | 0.58% | 0.35% | *0.53* | *0.61* |
| Wyoming | 1.23% | 0.44% | 1.32% | 0.28% | *0.36* | *0.21* |

Notes: See Table 2A. The Employer disparity ratio for Michigan is statistically significant at a 1-in-10 probability level.

**Table 2C. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Asians, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | | | | | | |
| Alaska | 1.73% | 0.43% | 0.67% | 0.32% | *0.25* | 0.48 |
| Arizona | 0.55% | 0.14% | n/a | n/a | *0.25* | |
| Arkansas | n/a | n/a | n/a | n/a | | |
| California | 4.77% | 1.55% | 3.57% | 1.30% | *0.32* | *0.36* |
| Colorado | 0.88% | 0.21% | 0.54% | 0.17% | *0.24* | *0.31* |
| Connecticut | 0.30% | 0.26% | 0.27% | 0.27% | *0.86* | *1.01* |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist of Columbia | 2.69% | n/a | 6.80% | n/a | | |
| Florida | 0.75% | 0.36% | 0.45% | 0.35% | *0.48* | *0.78* |
| Georgia | 0.69% | 0.40% | n/a | n/a | *0.58* | |
| Hawaii | 37.27% | 27.68% | 35.62% | 27.67% | *0 74* | *0.78* |
| Idaho | 0.31% | 0.16% | 0.24% | 0.14% | *0.51* | *0.58* |
| Illinois | 0.80% | 0.60% | 0.65% | 0.59% | *0.74* | *0.90* |
| Indiana | 0.35% | 0.08% | n/a | n/a | *0.23* | |
| Iowa | n/a | n/a | n/a | n/a | | |
| Kansas | 0.32% | 0.06% | n/a | n/a | *0.19* | |
| Kentucky | 0.17% | 0.27% | 0.20% | 0.29% | *1.62* | *1.50* |
| Louisiana | 0.63% | 0.21% | n/a | n/a | *0.34* | |
| Maine | n/a | n/a | n/a | n/a | | |
| Maryland | 4.14% | 1.28% | 1.49% | | *0 31* | |
| Massachusetts | 1.21% | 1.03% | 0.54% | 1.03% | *0 85* | *1.90* |
| Michigan | 0.34% | 0.25% | 0.26% | 0.24% | 0.72 | *0.95* |
| Minnesota | 0.47% | 0.44% | n/a | n/a | *0.92* | |
| Mississippi | n/a | n/a | n/a | n/a | | |
| Missouri | 0.23% | 0.29% | 0.23% | n/a | *1.22* | |
| Montana | 0.18% | 0.15% | n/a | n/a | *0.87* | |
| Nebraska | n/a | n/a | n/a | n/a | | |
| Nevada | 1.11% | 0.48% | 0.70% | 0.47% | *0.44* | *0.66* |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 1.33% | 0.77% | 0.89% | n/a | *0.58* | |
| New Mexico | n/a | n/a | n/a | n/a | | |
| New York | 4.12% | 1.15% | 1.93% | 1.03% | *0.28* | *0.53* |
| North Carolina | 0.53% | 0.34% | 0.40% | 0.31% | *0.65* | *0.76* |
| North Dakota | n/a | n/a | n/a | n/a | | |
| Ohio | 0.43% | 0.39% | n/a | n/a | *0.91* | |
| Oklahoma | 0.57% | 0.10% | n/a | n/a | *0.18* | |
| Oregon | 0.86% | 0.30% | 0.67% | 0.25% | *0.35* | *0.38* |
| Pennsylvania | 0.72% | 0.23% | 0.23% | 0.20% | *0.32* | *0.88* |
| Rhode Island | 0.38% | 0.25% | 0.06% | n/a | *0.67* | |
| South Carolina | n/a | n/a | n/a | n/a | | |
| South Dakota | n/a | n/a | n/a | n/a | | |
| Tennessee | 0.47% | 0.16% | 0.32% | 0.13% | *0 35* | *0.39* |
| Texas | 1.02% | 0.40% | 0.69% | 0.36% | *0.39* | *0.52* |
| Utah | 0.42% | 0.66% | n/a | n/a | *1.57* | |
| Vermont | n/a | n/a | n/a | n/a | | |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 3.14% | 0.86% | 1.28% | 0.58% | *0.27* | *0.45* |
| Washington | 2.10% | 1.09% | 1.72% | 1.06% | *0 52* | *0 62* |
| West Virginia | 0.15% | 0.15% | n/a | n/a | *0 96* | |
| Wisconsin | 0.21% | 0.06% | n/a | n/a | *0.26* | |
| Wyoming | 0.13% | n/a | n/a | n/a | | |

Notes: See Table 2A. The Employer disparity ratio for Alaska and the All Firms disparity ratio for Michigan are statistically significant at a 1-in-10 probability level.

NERA
Economic Consulting

**Table 2D. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Amer. Indians and Alaska Natives, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 1.30% | 0.56% | 1.31% | 0.53% | *0.43* | *0.40* |
| Alaska | 5.08% | 15.03% | 5.24% | 15.67% | *2.96* | *2.99* |
| Arizona | 2.05% | 0.56% | 0.80% | 0.51% | *0.27* | 0.64 |
| Arkansas | 1.81% | 1.53% | 1.19% | 1.51% | *0.84* | *1.26* |
| California | 2.15% | 0.70% | 1.27% | 0.62% | *0 33* | *0.49* |
| Colorado | 1.18% | 0.31% | 0.87% | 0.24% | *0 26* | *0.28* |
| Connecticut | 0.53% | 0.09% | n/a | n/a | *0.16* | |
| Delaware | n/a | n/a | n/a | n/a | | |
| Dist of Columbia | 0.75% | n/a | 0.00% | 0.00% | | |
| Florida | 1.00% | 0.17% | n/a | n/a | *0.17* | |
| Georgia | 1.03% | 0.17% | 0.26% | 0.03% | *0.16* | *0.12* |
| Hawaii | 0.54% | n/a | n/a | n/a | | |
| Idaho | 1.47% | 0.84% | n/a | n/a | *0.57* | |
| Illinois | 0.33% | 0.13% | 0.22% | 0.12% | *0.39* | *0.55* |
| Indiana | 0.20% | 0.23% | n/a | n/a | *1.16* | |
| Iowa | n/a | n/a | n/a | n/a | | |
| Kansas | 1.21% | 0.71% | 0.90% | 0.69% | *0.59* | *0.77* |
| Kentucky | n/a | n/a | n/a | n/a | | |
| Louisiana | 1.05% | 0.29% | n/a | n/a | *0.28* | |
| Maine | 0.81% | 0.18% | n/a | n/a | *0 22* | |
| Maryland | 2.07% | 0.32% | n/a | n/a | *0 15* | |
| Massachusetts | 0.67% | 0.07% | 0.29% | 0.05% | *0.11* | *0.18* |
| Michigan | 0.95% | 0.34% | 0.48% | 0.31% | *0.36* | *0.65* |
| Minnesota | 0.66% | 0.21% | 0.42% | 0.20% | *0.32* | *0.48* |
| Mississippi | 0.38% | 0.03% | n/a | n/a | *0 08* | |
| Missouri | 1.36% | 0.39% | n/a | n/a | *0 28* | |
| Montana | 2.30% | 1.91% | 1.81% | 1.99% | *0.83* | *1.10* |
| Nebraska | 0.33% | 0.29% | 0.20% | 0.28% | *0.86* | *1 36* |
| Nevada | 2.07% | 0.29% | 1.10% | 0.26% | *0.14* | *0 23* |
| New Hampshire | 0.79% | 0.38% | n/a | n/a | 0.47 | |
| New Jersey | 0.38% | n/a | 0.16% | n/a | | |
| New Mexico | n/a | n/a | n/a | n/a | | |
| New York | 0.96% | 0.19% | 0.38% | 0.14% | *0.20* | *0.37* |
| North Carolina | 1.34% | 0.48% | 0.95% | 0.38% | *0.36* | *0.40* |
| North Dakota | 1.93% | 1.02% | 1.68% | 1.00% | *0.53* | *0.60* |
| Ohio | 0.48% | 0.15% | n/a | n/a | *0.32* | |
| Oklahoma | 8.30% | 5.39% | 5.00% | 4.75% | *0.65* | *0.95* |
| Oregon | 1.36% | 0.64% | 1.03% | 0.60% | *0.47* | *0.58* |
| Pennsylvania | 0.37% | 0.08% | 0.23% | 0.07% | *0.21* | *0 28* |
| Rhode Island | n/a | n/a | n/a | n/a | | |
| South Carolina | 0.58% | 0.17% | n/a | n/a | *0.29* | |
| South Dakota | 2.65% | 1.74% | 1.85% | 1.79% | *0.66* | *0.97* |
| Tennessee | 1.03% | 0.35% | n/a | n/a | *0.34* | |
| Texas | 1.09% | 0.57% | 0.91% | 0.54% | *0.53* | *0.60* |
| Utah | 0.92% | 0.22% | 0.48% | 0.18% | *0.23* | *0.37* |
| Vermont | 0.91% | 0.38% | 0.31% | 0.27% | *0.42* | *0.85* |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.75% | 0.30% | 0.40% | 0.20% | *0.40* | *0.50* |
| Washington | 1.06% | 0.66% | 0.92% | 0.63% | 0.62 | *0.68* |
| West Virginia | 0.55% | 0.13% | 0.09% | 0.12% | *0.24* | *1.33* |
| Wisconsin | 0.57% | 0.32% | 0.31% | 0.31% | *0.55* | *1.00* |
| Wyoming | 1.82% | 0.84% | n/a | n/a | *0.46* | |

Notes: See Table 2A. The Employer disparity ratio for Arizona and the All Firms disparity ratio for New Hampshire and Washington are statistically significant at a 1-in-10 probability level.

**Table 2E. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employer Firms, Native Hawaiians and Pac. Islanders, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 0.00% | n/a | 0.01% | n/a | | |
| Alaska | n/a | n/a | n/a | n/a | | |
| Arizona | 0.14% | n/a | n/a | n/a | | |
| Arkansas | n/a | n/a | n/a | n/a | | |
| California | n/a | n/a | n/a | n/a | | |
| Colorado | 0.14% | 0.03% | 0.09% | n/a | *0.24* | |
| Connecticut | n/a | n/a | n/a | n/a | | |
| Delaware | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Dist of Columbia | 0.06% | n/a | 0.00% | 0.00% | | |
| Florida | n/a | n/a | n/a | n/a | | |
| Georgia | 0.03% | 0.03% | 0.07% | 0.03% | 0.89 | 0.44 |
| Hawaii | 12.87% | 4.66% | n/a | n/a | *0.36* | |
| Idaho | n/a | n/a | n/a | n/a | | |
| Illinois | n/a | n/a | n/a | n/a | | |
| Indiana | n/a | n/a | n/a | n/a | | |
| Iowa | 0.01% | n/a | n/a | n/a | | |
| Kansas | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Kentucky | 0.01% | n/a | n/a | n/a | | |
| Louisiana | 0.00% | n/a | 0.01% | n/a | | |
| Maine | 0.01% | n/a | 0.04% | n/a | | |
| Maryland | 0.01% | n/a | 0.01% | n/a | | |
| Massachusetts | n/a | n/a | n/a | n/a | | |
| Michigan | 0.00% | n/a | 0.01% | n/a | | |
| Minnesota | n/a | n/a | n/a | n/a | | |
| Mississippi | 0.02% | 0.02% | 0.02% | n/a | 0.74 | |
| Missouri | n/a | n/a | n/a | n/a | | |
| Montana | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Nebraska | 0.01% | n/a | 0.00% | 0.00% | | |
| Nevada | 0.06% | n/a | n/a | n/a | | |
| New Hampshire | n/a | n/a | n/a | n/a | | |
| New Jersey | 0.03% | n/a | 0.07% | n/a | | |
| New Mexico | 0.01% | n/a | 0.02% | n/a | | |
| New York | n/a | n/a | n/a | n/a | | |
| North Carolina | 0.01% | 0.00% | n/a | n/a | 0.47 | |
| North Dakota | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Ohio | n/a | n/a | n/a | n/a | | |
| Oklahoma | 0.50% | 0.06% | n/a | n/a | *0.11* | |
| Oregon | 0.08% | 0.09% | n/a | n/a | 1.05 | |
| Pennsylvania | n/a | n/a | n/a | n/a | | |
| Rhode Island | 0.02% | n/a | 0.00% | 0.00% | | |
| South Carolina | n/a | n/a | n/a | n/a | | |
| South Dakota | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Tennessee | 0.00% | n/a | 0.01% | n/a | | |
| Texas | n/a | n/a | n/a | n/a | | |
| Utah | 0.17% | 0.82% | n/a | n/a | *4.85* | |
| Vermont | 0.00% | 0.00% | 0.00% | 0.00% | | |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 0.02% | n/a | 0.05% | n/a | | |
| Washington | 0.13% | n/a | 0.18% | n/a | | |
| West Virginia | 0.00% | 0.00% | 0.00% | 0.00% | | |
| Wisconsin | n/a | n/a | n/a | n/a | | |
| Wyoming | 0.03% | n/a | 0.00% | 0.00% | | |

Notes: See Table 2A. The Employer disparity ratio for Georgia is statistically significant at a 1-in-10 probability level.

**Table 2F. Percentage of Firms and Sales and Corresponding Disparity Ratios, All Firms and Employers Firms, Women, Construction Industries, 2002**

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Alabama | 7.45% | 3.97% | 6.96% | 3.75% | 0.53 | 0.54 |
| Alaska | 10.30% | 8.39% | n/a | n/a | 0.81 | |
| Arizona | 7.47% | 4.69% | 7.23% | 4.34% | 0 63 | 0.60 |
| Arkansas | 7.37% | 4.05% | 5.55% | 4.11% | 0 55 | 0.74 |
| California | 5.98% | 4.97% | 5.65% | 4.95% | 0.83 | 0.88 |
| Colorado | 7.85% | 3.99% | 7.32% | 3.89% | 0.51 | 0.53 |
| Connecticut | 6.85% | 5.69% | 7.03% | 5.68% | 0.83 | 0.81 |
| Delaware | 5.19% | 4.30% | 7.36% | n/a | 0.83 | |
| Dist of Columbia | 5.25% | n/a | 10.36% | n/a | | |
| Florida | 8.33% | 5.31% | 7.38% | 5.05% | 0.64 | 0.68 |
| Georgia | 6.96% | 3.76% | 6.49% | 3.53% | 0.54 | 0.54 |
| Hawaii | 8.03% | 3.62% | 5.93% | 3.56% | 0.45 | 0.60 |
| Idaho | 6.89% | 4.92% | 5.88% | 4.97% | 0.71 | 0.84 |
| Illinois | 8.92% | 7.87% | 10.83% | 8.12% | 0.88 | 0.75 |
| Indiana | 7.45% | 4.32% | 5.85% | 4.36% | 0.58 | 0 75 |
| Iowa | 6.74% | 4.59% | 4.60% | 4.60% | 0.68 | 1.00 |
| Kansas | 6.57% | 4.57% | n/a | n/a | 0.70 | |
| Kentucky | 7.62% | 5.30% | 6.75% | 5.29% | 0.70 | 0.78 |
| Louisiana | 7.06% | 5.64% | 7.89% | 5.66% | 0.80 | 0.72 |
| Maine | 6.12% | 5.45% | 5.47% | 5.32% | 0.89 | 0 97 |
| Maryland | 8.14% | 5.46% | 7.75% | 5.40% | 0.67 | 0.70 |
| Massachusetts | 6.44% | 4.00% | 6.31% | 3.98% | 0.62 | 0.63 |
| Michigan | 8.01% | 4.98% | 6.49% | 4.94% | 0.62 | 0 76 |
| Minnesota | 6.61% | 3.98% | 6.49% | 3.93% | 0.60 | 0.61 |
| Mississippi | 5.14% | 5.70% | 6.12% | 5.07% | 1.11 | 0.83 |
| Missouri | 8.21% | 5.50% | 8.05% | 5.57% | 0.67 | 0.69 |
| Montana | 7.09% | 5.34% | 7.35% | 5.49% | 0.75 | 0 75 |
| Nebraska | 4.55% | 3.13% | 4.22% | 3.21% | 0.69 | 0.76 |
| Nevada | 9.79% | 5.22% | 9.21% | 5.09% | 0.53 | 0.55 |
| New Hampshire | 3.38% | 4.64% | 3.35% | 5.22% | 1.37 | 1.56 |
| New Jersey | 7.37% | 7.55% | 7.76% | 7.78% | 1.02 | 1.00 |
| New Mexico | 10.34% | 6.92% | n/a | n/a | 0.67 | |
| New York | 8.11% | 6.65% | 8.51% | 6.71% | 0.82 | 0.79 |
| North Carolina | 8.05% | 5.30% | 7.64% | 5.24% | 0.66 | 0.69 |
| North Dakota | 4.80% | n/a | 5.56% | n/a | | |
| Ohio | 7.55% | 5.05% | 8.00% | 5.16% | 0 67 | 0.65 |
| Oklahoma | 7.37% | 5.40% | 6.61% | 5.69% | 0.73 | 0.86 |
| Oregon | 6.29% | 3.72% | 5.84% | 3.60% | 0.59 | 0.62 |
| Pennsylvania | 6.18% | 4.79% | 7.01% | 4.98% | 0.77 | 0.71 |
| Rhode Island | 6.96% | 10.55% | 7.80% | 11.20% | 1 52 | 1.44 |
| South Carolina | 6.66% | 5.45% | 5.55% | 5.50% | 0.82 | 0.99 |
| South Dakota | 6.48% | 4.21% | 3.90% | 4.26% | 0.65 | 1.09 |
| Tennessee | 8.30% | 3.99% | 6.40% | 3.69% | 0.48 | 0.58 |
| Texas | 7.22% | 5.15% | 9.19% | 5.18% | 0.71 | 0.56 |
| Utah | 6.66% | 3.61% | 5.06% | 3.59% | 0 54 | 0.71 |
| Vermont | 6.20% | n/a | 2.67% | n/a | | |

NERA
Economic Consulting

| State | Percentage of All Firms | Percentage of All Sales | Percentage of All Employers | Percentage of All Employer Sales | Disparity Ratio-All Firms | Disparity Ratio Employers |
|---|---|---|---|---|---|---|
| Virginia | 6.81% | 4.59% | 6.97% | 4.58% | *0.67* | *0.66* |
| Washington | 6.87% | 3.37% | 5.42% | 3.26% | *0.49* | *0.60* |
| West Virginia | 6.03% | 7.84% | 7.75% | 7.96% | *1 30* | *1.03* |
| Wisconsin | 6.52% | 5.63% | 5.49% | 5.87% | *0.86* | *1.07* |
| Wyoming | 7.77% | 6.60% | 9.07% | 6.69% | *0.85* | *0.74* |

Notes: See Table 2A.. The Employer disparity ratio for Arkansas, Hawaii, and Nebraska and the All Firms disparity ratio for Idaho, Illinois, and Montana are statistically significant at a 1-in-10 probability level.

Mr. CLAY. Thank you so much, Dr. Wainwright.

Our next witness will be Mr. Brown.

Mr. Brown, you may proceed.

**STATEMENT OF ANTHONY BROWN**

Mr. BROWN. Thank you, Chairman Clay and members of the subcommittee. My name is Anthony Brown, and I am Chair of the Government Affairs Committee of the Airport Minority Advisory Council [AMAC]. AMAC is the only national nonprofit trade association dedicated to promoting the full participation of minority- and women-owned and disadvantaged businesses in airport contracting.

I am also a senior associate partner at MGT of America, a public sector consulting firm specializing in high-quality research, including disparity studies. I was also previously a vice president at the Memphis Shelby County Airport Authority.

I thank you for your invitation to speak to the committee today on behalf of AMAC.

Recently the EEOC settled an outrageous hostile environment lawsuit against a fuel supplier operating at a large Texas airport. The plaintiffs in the case asserted that they were subjected to racial slurs, threats of violence, and disparate treatment in promotions and disciplinary action. While this case was not about business owners, it does demonstrate the persistence of racism in the aviation-related marketplace. Airport executives work hard to level the playing field for minority- and women-owned businesses. Business assistance programs and contract goals help, but it is never easy. Many times, even where there are contract goals, prime contractors say we just can't meet the contract goal. Sadly, the truth often is that they don't know where to find minority- and women-owned businesses or they haven't tried.

This requires airport staff to step in and help majority firms move beyond their established networks to give previously excluded businesses the opportunity to prove themselves. But I can tell you, changing long-established patterns of business behavior which exclude the participation of minority- and women-owned businesses is hard. The mentality of exclusion can exist in contractors and public contracting officials, alike, and it works like a one-two punch, eliminating minority- and women-owned firms.

Programs like the disadvantaged business enterprise program are crucial because they help us to ensure that airports across the country provide opportunities to all qualified businesses, not just those who have always gotten work in the past.

At MGT of America I oversee the completion of disparity studies. I can tell you, based upon the many disparity studies that have been conducted across the country, that discrimination is still a serious problem.

I have with me today six examples of many recent airport-related disparity studies. I would like to ask that they be included in the record. These are just a small fraction of the studies that have been completed, but they demonstrate the statistical evidence of ongoing under-utilization of minority- and women-owned businesses is overwhelming.

But don't just take my word for it. Listen to the stories of the men and women who struggle every day to overcome discrimination. One African American businessman in the midwest has repeatedly run up against the Old Boys' Network. He has been the subject of racial slurs, discriminatory attitude, and recently found that he was being charged 50 percent more for the tires on his buses than majority-owned firms. When this business owner disguised his voice and called the same distributor, he was given a lower price.

A Hispanic construction worker subcontractor on the east coast was recently told by a majority prime contractor that they would use him on the job, and that they then shopped his price and bid to a much larger majority contractor and removed him from the contract. With 25 years of industry experience, he felt very strongly that there was significant racial bias against his Hispanic-owned business.

A white woman business owner has experienced patronizing, bullying, and discriminatory attitudes from the men she deals with in other companies, and even among airport staff. She told us that she has been referred to—excuse the expression—as a bitch behind her back, and she explains that she often sends a male employee to make the business pitch because it is more likely to result in the winning bid than in other cases.

Another African American member based in the southeast attempted to obtain venture capital from a fund specifically established for under-served communities. Even in that context, this business owner was asked to meet extraordinary conditions that would not normally have been required of a majority-owned business. Because of this, the denial of the venture capital happened and the deal failed.

In closing, discrimination against minority and women contractors in America is abundant and devastating. At best it translates into higher cost and foreclosed opportunities, and at worst it results in failed businesses.

All of this makes it imperative that we maintain important programs like the DBE and ACDB programs. We hope that in the future the Congress will strengthen both programs.

I would like to again thank the committee for this opportunity and would again ask the committee to again support the continued affect of these programs.

[The prepared statement of Mr. Brown follows:]

AMAC

Airport Minority Advisory Council | 2345 Crystal Drive | Suite 902 | Arlington, VA | 22202 | 703.414.2622 Main | 703.414.2686 Fax | http://www.amac-org.com

**The Testimony of Anthony W. Brown**

**Chairman of the Government Affairs Committee**
**of the**
**Airport Minority Advisory Council (AMAC)**

**before the**

**Information Policy, Census and National Archives**
**Subcommittee of the U.S. House of Representatives**
**Committee on Oversight and Government Reform**

**Wm. Lacy Clay**
**Chairman**

**September 24, 2008**
**2:00pm**
**2154 Rayburn House Office Building**

Good afternoon, Chairman Clay and members of the Subcommittee. My name is Anthony Brown. I am a Board Member of the Airport Minority Advisory Council (AMAC), and I also serve as Chairperson of AMAC's Government Affairs Committee. AMAC is the nation's only national, non-profit trade association dedicated to promoting the full participation of minority-owned, women-owned and disadvantaged business enterprises (M/W/DBEs) in airport contracting. I am also a Senior Associate Partner in the state and local government division of MGT of America. MGT is a public sector consulting firm that specializes in providing high quality services, including disparity studies, to state and local government. And finally, before I joined MGT I was previously Vice President for Business Diversity Development and Government Affairs at the Memphis-Shelby County Airport Authority. I thank you for your invitation to speak to the Committee today on behalf of AMAC and its nationwide membership.

In all of the jobs I mentioned, I regularly witnessed the impact of discrimination. Let's be clear, the aviation business world can be a tough one for minorities and women. Just to provide context, recently there was a lawsuit filed by the EEOC involving outrageous hostile environment claims against a fuel supplier that operates at a very large Texas airport. The plaintiffs in the case asserted that they were subjected to racial slurs, threats of violence and disparate treatment in promotions and disciplinary actions. Use of the N-word was common in speech and in graffiti. And there were displays of nooses and racially offensive cartoons. There was even graffiti detailing a "Nigger Hit List" posted on a bathroom wall and one white supervisor reportedly stated "I am going to get all of you niggers fired."

These things happened in a facility on the airport grounds. The case was settled for almost two million dollars, and was the largest race and national origin employment discrimination case resolved by the Dallas District Office of the EEOC. When announcing the settlement, one of the supervising attorneys working on the case made clear that the case was especially repulsive because the management of Allied Aviation acquiesced in the discrimination against the African-American and Hispanic employees.[1] While these were not actions taken against minority business owners, they do demonstrate the persistence of racism in the aviation-related marketplace and the environment in which some minority and women-owned entrepreneurs must work.

I know that we have a big job to do to address discrimination. I know how hard airport executives work to level the playing field through programs to assist minority and women owned businesses. Business assistance programs and contract goals help, but it is never easy. Unfortunately, even when airports conscientiously work to set goals on contracts based on solid statistical evidence of the relative availability and utilization of minority and women owned firms, prime contractors still regularly come back and say "we just can't meet the goal." Sadly, the truth often is that the prime contractors either don't know where to find minority and women business owners – or they just haven't tried. Once airport staff step in to help make connections, the prime contractors are always able to meet the goal. In my nearly ten years as an airport

[1] *EEOC v. Allied Aviation Services, Inc.*, complaint, US District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:05-CV-1379-L, filed July 6, 2006; EEOC Press Release, March 11, 2008, *Allied Aviation to Pay Almost $2Million for Harassment of Black and Hispanic Workers,* at http://www.eeoc.gov/press/3-11-08.html.

executive, I had very few situations in which minority and women owned firms were simply unavailable, and those cases usually related to something like the purchase of advanced avionics. In nearly every case we were able to link prime contractors with qualified minority or women owned businesses. More important than meeting any goal, however, is the fact that, through this process, new business alliances were established.

This is the essence of leveling the playing field: helping majority firms move beyond their established networks to give previously excluded businesses the opportunity to prove themselves. But I can tell you, it doesn't happen by accident and it doesn't happen without help. Changing long-established patterns of business behavior which excludes the participation of minority and women owned business is hard. The well entrenched psyche of exclusion (which operates with no sense of conscious or excuse), and can exist in contractors and internal airport department heads and purchasing agents alike, works as a one-two punch and can result in a knock-out for minority and women owned firms in the aviation field. This "old boy network" didn't develop overnight – and opening up that network to new firms won't happen overnight either. The Disadvantaged Business Enterprise (DBE) and Airport Concessions Disadvantaged Business Enterprise (ACDBE) programs help us ensure that airports across this country provide business opportunities to all qualified businesses – to the full community, not just the segment which has always gotten the work in the past due to systemic exclusion.

In my work with MGT of America, one of the things that I do is to oversee the completion of disparity studies. These complex statistical and social research projects evaluate the evidence related to minority and women owned firms and attempt to determine whether or not racial or gender bias is present. I can tell you, based upon the many disparity studies that have been completed across the country, that discrimination is still a serious problem. While the results of each study are different, when we examine them together a clear picture emerges: discrimination against business owners of every racial minority group is still a problem in every region of the country. I have with me today six examples of the many recent airport-related studies that have been conducted by MGT and other disparity study research firms. I would like to ask that these be included in the record. These studies come from all across our nation -- Denver, Colorado; the State of Maryland; Phoenix, Arizona; Broward County, Florida; Nashville, Tennessee and Dallas, Texas[2] -- they all present compelling evidence of discrimination in the public and private sectors. It is important to note that these are just a small fraction of the studies in which discrimination has been found that have been conducted by airports and many other public entities such as state departments of transportation, jointly funded studies which include state administrative departments and state-wide university systems, and city and county governments

[2] Dallas /Fort Worth International Airport Board Disparity Study Final Report, MGT of America, October 17, 2000. Final Report: Broward County Small Disadvantaged Business Enterprise (SDBE) Disparity Study, MGT of America, Inc., April 3, 2001; The City of Phoenix, Minority-, Women-Owned and Small Business Enterprise Program Update Study: Final Report, MGT of America, April 21, 2005; Race, Sex and Business Enterprise: Evidence from the State of Maryland, NERA Economic Consulting, March 8, 2006; Race, Sex and Business Enterprise: Evidence from Denver, CO, NERA Economic Consulting, May 5, 2006; and Final Report for Development and Revision of Small, Minority and Women Business Enterprise Program, Nashville International Airport, (BNA), Griffin and Strong, PC, September 19, 2007.

including local transit agencies. To say that the statistical evidence of the ongoing underutilization of minority and women owned businesses is overwhelming is not hyperbole.

But don't just take my word for it. It is important to hear the stories of the men and women who struggle each and every day to overcome discrimination as they seek to build their businesses, support their families and contribute to our national economy. Many businesses fear retaliation and have requested that we use their stories anonymously.

- An African American business man in the travel and transportation industry in the Midwest has run up against the old boys' network his whole life. He has been the subject of racial slurs, discriminatory attitudes and recently found that he was being charged almost 50% more for tires for his buses than a majority firm owner in the same industry. When this business owner disguised his voice and called the same distributor that had previously given him the higher price he was given the lower price.

- A Hispanic construction subcontractor working on the East coast was recently told by a large majority owned prime contractor that they would use him on a job to fulfill a contract goal. After that, they "shopped" his bid to a much larger majority subcontractor and removed him from the contract. With 25 years of experience in the industry, this business owner feels strongly that there is significant racial animus against Hispanic owned companies.

- A white woman business owner has experienced patronizing, bullying and discriminatory attitudes from the men she deals with in other companies and even among airport staff. She told us that she has been referred to behind her back as a "bitch" and "the necessary evil." She also explained that she sometimes sends male employees to make the company's pitch because she feels it is more likely to result in a winning bid in some cases.

- Another African-American AMAC member, based in the Southeast with many years of experience in airport concessions, attempted to obtain venture capital from a fund specifically established for underserved communities. Even in that context this business owner was asked to meet extraordinary conditions that would not have been required of majority owned businesses. This was true despite the business owner's own sterling business, educational and financial qualifications. Because of the denial of venture capital, the deal, which would have involved five franchises with a Fortune 100 company, ultimately fell through.

Simply put, this discrimination causes real and lasting harm to minority and women entrepreneurs, who, unlike many of their competitors are often first generation business owners. In case after case all across this country the experience clearly shows that this type of inexcusable bias, for them, translates at best into higher costs and foreclosed opportunities, and at worst, failed businesses. It's like the addition of a race-based tax that makes them have to work twice as hard while making half the profit.

In closing, discrimination against minority and women contractors in America is abundant and devastating. All of this makes it imperative that we maintain and expand important programs like the DBE and ACDBE programs. We expect that this week the Congress will finalize a new extension of the FAA programs to which the DBE and ACDBE programs attach. We also hope that in the months ahead, Congress will consider ways to strengthen these programs by making certification training more uniform, providing for national certification reciprocity, and adjusting the personal net worth cap for inflation – just to name a few of AMAC's legislative priorities.

Given this subcommittee's jurisdiction, and my work with disparity studies at MGT, I would also like to add a plea that you do whatever you can to strengthen the Census Bureau's data collection on minority and women owned businesses. We need this committee to provide more resources and direction for more and better data collection. The current census of business owners is always notoriously late – in fact, the data is usually several years old before it is even released. Moreover, the database simply doesn't provide us with enough detailed data at the state and local level, or enough information about business owners themselves. This has meant that those of us conducting disparity studies are forced to build our own datasets (or buy them from private sector companies) at additional cost to our clients. Disparity studies are critically important to helping airports and other public entities assess the effectiveness of their minority and women business programs and determining what types of policy responses are needed. Your help in improving the timeliness and detail of the publicly available federal data could lower the costs of studies and make it possible for more public entities, even smaller ones like non-hub and general aviation airports, to conduct disparity studies. This in turn will make it easier for all of us who are working to level the playing field.

Thank you for the opportunity to appear here today. I look forward to answering any questions you might have.

Mr. YARMUTH [presiding]. Thank you, Mr. Brown.

Without objection, the reports that you referenced will be included in the record.

Mr. Robinson.

**STATEMENT OF ANTHONY ROBINSON**

Mr. ROBINSON. Thank you, Mr. Chairman and Mr. Turner, ranking member of the committee. My name is Anthony Robinson. I represent the Minority Business Enterprise Legal Defense and Educational Fund. MBELDEF, as we affectionately refer to it, has been in the business of advocacy on behalf of minority businesses for about 27 years. At least 20 of those years have been spent dealing with the issues of discrimination in the marketplace and how to overcome those discriminatory barriers in order to assure the full and fair opportunity to minority enterprises.

I am going to be rather short, because most of the panelists have already covered many of the areas that I would have, except to say that I would like to suggest to the panel that there is a definite pattern in discriminatory practices as it relates to ongoing discrimination in the marketplace. Mr. Brown just touched on one of the first ones, and that is the Good Old Boys' Network, which effectively restricts the opportunities of minority contractors at various points in the bidding and contracting process.

The other that I would like to cite, which represents an ongoing pattern of discriminatory practices, would be unequal access to bonding. Minority contractors also face discrimination in obtaining bonding, which is often a prerequisite to participating in public sector construction contracts.

State and local studies, as well as extensive anecdotal evidence presented at congressional hearings, have documented the fact that minority enterprises are significantly less able to secure bonding on equal terms with their white-owned counterparts.

The other thing Mr. Brown also spoke to relative to a specific anecdote but also represents a pattern and practice, and that is that of bid shopping. It has been the construction industry particularly has been and remains a closed network, with prime contractors maintaining longstanding relationships with subcontractors with whom they prefer to work.

One of the very interesting things about the bid shopping process and maintaining preferences is that often we find the pattern that when you have minority enterprise programs or policies in place, that will incentivize, in some instances, at least, majority firms to utilize and subcontract to minority firms. However, when it comes to those projects that those policies and mandates do not exist, that they will not utilize those same firms on those primarily private sector contracting opportunities.

The other pattern and practice is in price discrimination by suppliers—again, cited by Mr. Brown in his anecdote—where minority firms are frequently required to pay more for supplies than their white counterparts.

And then finally unfair denial of the opportunity to bid. It is common for minority contractors to bid on private sector jobs; however, as I have already stated, only to be told when it comes to private sector jobs that those opportunities do not exist.

With that I am going to close and take any questions that you might have.

[The prepared statement of Mr. Robinson follows:]

**Testimony of Anthony W. Robinson, President**
**Minority Business Enterprise Legal Defense and Educational Fund**

**Information Policy, Census & National Archives Subcommittee**
**Oversight and Government Reform Committee**
**Wednesday, September 24, 2008**
**2154 Rayburn HOB**
**2:00 p.m.**

***"How Information Policy Affects the Competitive Viability of Small and Disadvantaged Businesses in Federal Contracting"***

Good afternoon Mr. Chairman, Ranking Member Turner and Members of this Subcommittee. My name is Anthony W. Robinson, President of the Minority Business Enterprise Legal Defense and Education Fund (MBELDEF). Our organization was founded by the late Congressman Parren J. Mitchell, to act as a national advocate and legal representative of the minority enterprise community. We promote policies affecting the equitable and full participation of minority businesses in the national and international marketplace. We attempt to provide non partisan opinions on matters affecting these enterprises.

We appreciate the committee providing us this opportunity to represent the class interest of minority entrepreneurs who continue to rely on the federal marketplace as a primary source of opportunity.

## ***Background***

The evidence of discrimination against minority contractors is stark. Quantitative studies, as well as anecdotal reports, detail the considerable discrimination based on race and national origin that confronts minority contractors in all parts of the country and in virtually every industry. The discrimination is not limited to one particular minority group; instead disparity studies show conclusively that businesses owned by African-Americans, Hispanics/Latinos, Asians, Pacific Islanders, and Native Americans all confront discrimination in their efforts to form, grow and maintain businesses.

Congress has long been cognizant of the prevalence of discrimination in public and private contracting, and has taken strong steps to address the problem through the enactment and reauthorization of numerous programs to level the playing field in federal contracting for minority contractors. Over the past decade, however, organizations dedicated to ending minority contracting programs (and other forms of affirmative action) have repeatedly challenged the constitutionality of these programs in court. Although these constitutional challenges have been largely unsuccessful, they underscore the need for a clear Congressional record with respect to federal programs that seek to assist minority businesses. In considering the constitutionality of any federal program that seeks to correct discrimination against particular minority groups courts apply what is known as strict constitutional scrutiny, as required by the Supreme Court's 1995 decision in Adarand Constructors v. Pena. This is the most rigorous standard of constitutional review. As part of that process, courts normally look to see what evidence of discrimination Congress has considered in enacting and maintaining the federal minority contracting programs.

***Entry-Level Discrimination***

Evidence before Congress, detailed in dozens of congressional hearings and reports, independent academic studies, and a voluminous Justice Department survey published in the Federal Register as *The Compelling Interest for Affirmative Action in Federal Procurement*, 61 Fed. Reg. 26,050-26,063 (1996), revealed two fundamental barriers confronting minority entrepreneurs seeking to establish and build successful contracting businesses. First, minorities have faced a long and well-documented history of discriminatory exclusion from trade unions on the basis of race, which has prevented minorities from developing the technical skills and experience necessary to launch a successful business. *Id.* at 26,054. The exclusionary tactics employed by unions have included discriminatory selection criteria, discriminatory application of admissions requirements, and imposition of conditions (such as requiring new members to be related to an existing member) that effectively barred minorities from employment opportunities in the skilled trades. *Id.* at 26,055. The overwhelming evidence of racial discrimination by unions has led this Court to observe that "judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice." *United Steelworkers of*

*America v. Weber*, 443 U.S. 193, 198 n.1 (1979).[1] A recent study conducted by a Yale University economist concluded that a history of "blocked access to the skilled trades is the most important explanation of the low numbers of minority and women construction contractors today." *The Compelling Interest*, 61 Fed. Reg. at 26,056 (citing Jaynes Associates, *Minority and Women's Participation in the New Haven Construction Industry: A Report to the City of New Haven* 34 (1989)).

The second principal barrier to the formation and development of minority businesses is the discriminatory denial of access to capital, a subject Congress has explored in depth through numerous hearings over the past ten years. *Id.* at 26,057 & n.86 (citing hearings). Academic studies confirm the mountain of anecdotal evidence presented at these hearings documenting the discriminatory treatment minority entrepreneurs have received when applying for loans and credit. For example, a study comparing white-owned businesses with black-owned businesses with the same amount of equity capital found that white-owned businesses typically received loan amounts three times larger than those received by their black-owned counterparts. *Id.* at 26,058 (citing Bates, *Commercial Bank Financing of White and Black Owned Small Business Start-ups*, Quarterly Review of Economics and Business, Vol. 31, No. 1, at 79 (1991)). In the construction industry, the disparity was even more pronounced: white-owned firms received *50 times* as many loan dollars as black-owned firms with the same equity. *Id.* (citing Grown & Bates, *Commercial Bank Lending Practices and the Development of Black-Owned Construction Companies*, Journal of Urban Affairs, Vol. 14, No. 1, at 34 (1992)).

Studies also show that, among firms with the same borrowing credentials, minority-owned firms are approximately 20% less likely to obtain venture-capital financing than comparable non-minority-owned firms, and 15% less likely to receive business loans. *Id.* A 1996 study in the Denver, Colorado, area, from which this case arises, found that African-Americans were three times more likely than whites to be rejected for business loans, and Hispanics were 1.5 times more likely than whites to be rejected for such loans. *Id.* (citing Colorado Center for Community Development, University of Colorado at Denver, *Survey of Small Business Lending in Denver* at v (1996)). Statistically significant disparities remained even after the authors of the study controlled for factors that might legitimately affect lending decisions, such as size, firm age, creditworthiness, and net worth. *Id.* This compelling body of evidence largely explains why the availability of

---

[1] *See* Herbert Hill, *Race and Ethnicity in Organized Labor: The Historical Sources of Resistance to Affirmative Action*, Univ. of Wisconsin-Madison Journal of Intergroup Relations, Vol. XII, No. 4, pp. 21-27 (1984) (describing tactics used by unions to exclude black workers, including establishment of state licensing boards controlled by union representatives that discriminatorily denied licenses to black craftsmen).

minority-owned contractors has been artificially depressed by marketplace discrimination.[2]

***Ongoing Marketplace Discrimination Confronting Established Minority Contractors***

Minority contractors who manage to overcome these obstacles to obtaining the skills and financing necessary to start their own businesses are frequently confronted with discrimination in attempting to bid for, obtain, and perform construction contracts. This ongoing discrimination adversely affects market access and utilization of minority contractors and seriously undermines the ability of minority contractors to compete on an equal basis for contracts. These discriminatory practices have been documented extensively in case law, regional disparity studies, and congressional hearings. *See The Compelling Interest*, 61 Fed. Reg. at 26,059 nn.100-01. Discussed below are a few examples of the forms such discrimination takes in markets throughout the country.

***"Good-Old-Boy" Networks:*** Racial discrimination restricts the opportunities of minority contractors at various points in the bidding and contracting process. For example, much of the information about upcoming job opportunities is spread through informal "old-boy networks" that have deliberately excluded minorities, placing minority-owned businesses at a distinct competitive disadvantage. *The Compelling Interest*, 61 Fed. Reg. at 26,059-26,060 (citing National Economic Research Associates, *Availability and Utilization of Minority and Women Owned Business Enterprises at the Massachusetts Water Resources Authority* 74 (1990) (finding that exclusion from established networks makes it more costly for minorities to compete with non-minority-owned firms)).

***Unequal Access to Bonding:*** Minority contractors also face racial discrimination in obtaining bonding, which is often a prerequisite to participating in public-sector construction contracts. State and local studies, as well as extensive anecdotal evidence presented at congressional hearings, have documented the fact that "minority businesses [are] significantly less able to secure bonding on equal terms with white-owned firms with the same experience and credentials." *Id.* at 26,060 & nn.117-20. Such discrimination can seriously undercut the ability of minority contractors to compete with non-minority-owned firms. Even a one or two percent differential in the bonding premiums charged to minority contractors can increase costs substantially and result in the difference between a winning and losing bid.

[2] Thus, any attempt at measuring the degree and pervasiveness of marketplace discrimination through a gross comparison of current availability to current utilization necessarily underestimates the true magnitude of disparities caused by such discrimination.

***Bid Shopping:*** The construction industry has been and remains "a closed network, with prime contractors maintaining long-standing relationships with subcontractors with whom they prefer to work." *Id.* at 26,058. This system allows prime contractors to discriminate against minority subcontractors by simply refusing to accept low bids submitted by minority-owned firms, or by "shopping" a low bid submitted by a minority-owned firm to non-minority subcontractors willing to beat the bid. *Id.* at 26,059. Such bid shopping is generally considered unethical in the construction industry, but its use is not uncommon when a prime contractor seeks to replace a low-bidding minority contractor with a favored non-minority contractor. In the numerous disparity studies that have been undertaken by state and local governments over the past decade, there are virtually no documented instances in which minority subcontractors were the beneficiaries of bid shopping.

***Price Discrimination by Suppliers:*** Minority contractors are frequently unable to obtain the same prices and discounts that suppliers offer to non-minority contractors, thereby raising the costs incurred (and thus the bids submitted) by minority contractors. *The Compelling Interest*, 61 Fed. Reg. at 26,061. Indeed, one regional study found, in an incident illustrative of many others, that a white and minority contractor who had formed a joint venture were given such disparate quotes from the *same* supplier for the *same* project that the price differential would have added 40% to the final contract price had the minority contractor's price been used. *Id.* at 26,061 & n.125 (citing BBC Research and Consulting, *Regional Disparity Study: City of Las Vegas* IX-20 (1992)).

***Unfair Denial of Opportunity to Bid:*** It is also common for minority subcontractors to bid on private-sector jobs only to be told by a non-minority contractor that no bids from minority-owned firms were needed because no requirements for DBE participation applied to those contracts. To the extent that minority contractors derive a disproportionate share of their contract dollars from the highly competitive and low profit margin public-works arena, it undoubtedly reflects the daunting obstacles posed by such forms of marketplace discrimination on private construction contracts that remain beyond the reach of government affirmative-action programs.[3]

In addition to the direct evidence of racial discrimination discussed above, the legislative record before Congress contained a wealth of disparity studies conducted after this Court's decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989). The Justice Department commissioned an analysis of 39 such studies from localities across the country, which revealed

---

[3] *See Concrete Works of Colorado, Inc. v. City and County of Denver*, 86 F. Supp. 2d 1042, 1074 (D. Colo. 2000) (noting testimony of minority and women contractors in the Denver area who were unable to obtain work on private construction projects due to negative stereotypes held by white male contractors). The city's appeal in the *Concrete Works* case has been held in abeyance by the Tenth Circuit pending the Court's decision in this case.

that, on average, minority-owned businesses received only 59 cents for every dollar these firms would be expected to receive based on the number of qualified and available firms. *The Compelling Interest*, 61 Fed. Reg. at 26,061-26,062. Even in the area of construction subcontracting, which had the smallest disparity by industry sector; minority-owned firms received only 87 cents for every dollar they would be expected to receive. *Id.* at 26,062. Perhaps more significant were the studies documenting the effect on minority participation in public-sector contracting in those localities that abruptly ended their affirmative-action programs in the wake of *Corson*. In Philadelphia, for example, contract awards to minority- and women-owned businesses plummeted by 97% after the city discontinued its program in 1990; in Hillsborough County, Florida, awards to minority-owned businesses fell by 99%; and in Tampa, Florida, contract awards to black-owned businesses also dropped by 99%. *Id.* at 26,062 & nn.131-33. These figures graphically illustrate the extent to which minority-owned contractors remain effectively frozen out of public-sector contracting markets absent affirmative remedial measures designed to counteract the racially discriminatory forces otherwise at play.

Mr. YARMUTH. Thank you, Mr. Robinson.
Mr. Peek, welcome.

## STATEMENT OF EARL PEEK

Mr. PEEK. Good afternoon, Mr. Chairman and members of the Information Policy, Census, and National Archives Subcommittee. My name is Earl Peek, and I have 22 years of experience as a CPA, a commercial lender, economic development lender, and also a vice president with a minority bank as well as a majority bank. Much of my experience covers the entire capital risk continuum, including the formation of a venture capital firm under the auspices of the Small Business Administration, the Small Business Investment Company Program that I will talk about later.

I have counseled thousands of entrepreneurs. I have done hundreds of loans and financed businesses from every part of the alphabet. More than 60 percent of minority- and women-owned businesses, I have seen daily the obstacles to fulfilling the contracts that many of my panelists and colleagues have studied. I have watched many of them have many issues fulfilling joint ventures and enter into various relationships.

Seven years ago I formed the management team that was a majority/minority form to apply for a venture capital license to be licensed by the SBA, in part because we saw many of these issues in lending. The team that we formed had over 100 years of experience, had deployed collectively over $1 billion of capital, had done over 1,000 financings, and created or saved over 30,000 jobs. The team consisted of MBAs, CPAs such as myself, licensed professionals, and even those who teach entrepreneurship and write national magazine articles. SBA told us that we were unqualified and they denied our license.

We sued the SBA. We are now in the closing moments of litigation with the SBA in the Federal courts for a denial of our rights, but by suing we found out firsthand a look behind the curtain of how the SBA operates the venture capital program, which is the bedrock of capital that many of these panelists cite the businesses endure.

We saw that SBA has only approved one black firm, one minority firm in the last 10 years. They testified to this. This is sworn testimony. We studied over 115 licensees in the program and found that 0.0057 percent are minorities and women. Just so that you all know, every venture capital firm has between three to five members, of which only they found I think between three and five out of several hundred were minority owned or of some type of minority descent.

So I stand here today to talk to you about a report that was presented by Dr. Timothy Bates. It will be submitted as a part of the record. Dr. Tim Bates has studied SBA for the better part of since the early 1970's. He submitted a 107-page report, somewhat on Diamond but more generally on the program returns of the deployment of capital through this program that deploys more than $5 billion a year to venture capital firms in loans and things of that sort to small businesses. Dr. Bates concluded that SBA continues to use its exclusionary criteria, evaluation, and methodologies to deny minority- and women-owned businesses and management

teams focused on SBA and SBIC capital resources and/or assistance.

It is not just the SBA. The Wall Street Journal just conducted a study with the National Venture Capital Association and the SBA is like the private market. Venture capital deployment of capital is largely a white dominated profession, 97 to 99 percent. These are studies that are also going to be submitted as a part of the record today.

I have personally witnessed SBA officials, from political appointees to Civil Service members, who testified under oath that they do not keep records of race of the applicants, they cannot tell you which SBIC licensees deploys capitals to a or any minority- and women-owned business. They cannot tell Congress when and under what criteria the SBICs have reported investments to low- to moderate-income areas.

Further, the program analysts have testified that they have no training in this area or no experience in this area. They have no sensitivity. I found this somewhat appalling to see that they even said that they do not believe this is a goal of the SBA to make capital more broadly available to minorities or women.

SBA has unreliable records that will not withstand any type of public inspection or report to you as a body. And they do not keep records of the applicants or the inquiries to the program or the final disposition of anybody applied, whether denied, or what happened to them. SBA does not evenly score the applicants to the program.

These are not empty statements that I make, but these are actual documents that the lawyers who instituted the action against SBA have found and that SBA has reported and that SBA has said under sworn oath in depositions as part of the litigation process.

Capital is the bedrock of small business growth, and I hope that, as I conclude this, that one thing that I found appalling, that we will qualify to be a new market venture capital firm program, which has sunset by Congress, but we found out that SBA withheld a letter for 7 years showing that we were eligible and qualified. Not only us, but a firm out of New York, women and minority capital partners.

I urge this body to look at these efforts. Also, I can offer solutions as a part of this testimony to remedy this action, not only for my firm but for many across America and many businesses that they have studied to deal with these issues.

Thank you.

[The prepared statement of Mr. Peek follows:]

***Testimony***
***Of***
***C. Earl Peek***
***President***
***Diamond Ventures***

***Information Policy, Census, and National Archives Subcommittee***
***Oversight and Government Reform Committee***
***Thursday, September 24, 2008***
***2154 Rayburn HOB***
***10:00 a.m.***

***"How Information Policy Affects the Competitive Viability of Small and Disadvantaged Business in Federal Contracting"***

1701 Pennsylvania Avenue, Suite 300 Washington, DC 20006
Phone (877) 342-8227 Fax (202) 580-6559 www.DiamondVenturesLLC.com

Good morning Mr. Chairman, Ranking Member Turner and Members of the Information Policy, Census, and National Archives Subcommittee, Oversight and Government Reform Committee. My name is C. Earl Peek. During my 22 year career, which started out as a CPA and evolved into my current role as President of a venture capital company, I have served as a Commercial Lender with an SBA Community Development Corporation, Senior Manager and Lender with an economic development firm and as Vice-President for a minority owned bank and a major regional bank. I have had the privilege of working with thousands of entrepreneurs. I have financed hundreds of successful businesses after I carefully executed extensive evaluations of those businesses' financial viability and management capacities. As a result of my experience and expertise, I have counseled hundreds of minority and women-owned businesses across this nation, and became all too familiar with the overwhelming need for venture capital for these businesses.

Without a doubt, access to capital is the most critical issue for minority and women-owned businesses. Surprisingly, the SBA is the primary culprit of discriminatory and restrictive practices that prevent minority and women-owned business from accessing or receiving patient capital (i.e. venture capital). Prominent researcher, Dr. Timothy Bates, a well respected and longstanding researcher of Minority businesses since the 1970s, and Dr. William Bradford, have provided numerous reports that outline the practices which prevent minority and women-owned businesses access to venture capital.[i] Studies from 2006, 2007 and particularly from 2008, revealed documented truths about the detrimental effects of discriminatory practices.

However, Dr. Bates' findings also demonstrated that investments in minority and women-owned businesses were profitable; and when compared to the market returns of investments in non-minority owned businesses, market returns of comparable minority and women-owned businesses were just as successful as the non-minority owned businesses. Even though Dr. Bates' studies should encourage the SBA to explore expanding minority and women-owned businesses' participation in programs like the Small Business Investment Company program ("SBIC"), the SBA continues to use exclusionary evaluation criteria and methodologies that further deny minority and women-owned businesses access to SBIC capital resources or assistance. In fact, minority and women-owned businesses have proven to be more than qualified and capable to participate in programs like the SBA's SBIC because of their tenacity to prevail regardless of the restrictive and discriminatory practices. The reality is that venture capital opportunities are readily accessible for **only** non-minority owned businesses.

I speak passionately about this issue because I am the President of one of "those" minority owned businesses. My company, Diamond Ventures, LLC, along with other minority companies, has sought to obtain a New Markets Venture Capital ("NMVC") license and a SBIC License to become a provider of capital to underserved groups, such as minorities and women-owned businesses. However, my firm has been engaged in litigation against the SBA for the past 7 years, due to the SBA's denial of our applications based on discriminatory practices and unfair exclusionary qualifications screening procedures. Today, as an advocate for minority and women-owned businesses and as a follower of Dr. Bates' research, I have the privilege to provide specific examples of the exclusionary and discriminatory practices plaguing the minority and women-owned business constituency. For instance:

1. In a February 16, 2006 letter from the Honorable Senator John F. Kerry to the SBA's former Administrator, the Honorable Hector V. Barreto, Senator Kerry noted that:

    a. "There has been a consistent and significant decline in the number of Small Business Investment Company (SBIC) financings to minority and women-owned firms, according to statistics compiled by the [SBA's] Investment Division."[ii]

    b. "According to a study conducted by the Ewing Marion Kauffman Foundation, less than 1% of the $250 billion in venture capital dollars nationwide is made available to meet the needs of the country's 4.4 million minority business owners…and [although] women own approximately 40% of all businesses in the U.S., they receive less than 5% of all venture capital investment."[iii]

    c. Between fiscal years 2000 and 2004, an already low participation rate for minority owned business in SBIC financings fell 50%; from 20.4% to as low as 10.6% with the largest disbursement of financing dollars even lower at 5.2% in 2004.[iv]

    d. During the same time frame, women-owned businesses represented a drop in participation from 5.9% of all SBIC financings in 2000 to 3.0%, with even lower participation at 2.6% in 2002. Disbursement of financing dollars to women-owned firms has only gotten as high as 2.2% in 2004.[v]

2. Pursuant to a Dr. Bates' April 2008, 107-page report with references to prior reports conducted by Dr. William Bradford, the Kauffman Foundation, the Minority Business Development Agency, the Milken Institute, the Minority Business Enterprise Legal Defense and Education Fund, and the Dow Jones/Wall Street Journal reveals that:

    a. …[O]f over 250 applicants screened by SBA during the 2000 – 2004 period. [Dr. Bates'] review entailed comparing the traits of the applicants licensed by SBA to dispense capital in the SBIC program versus the applicants that were not licensed. This exercise highlighted the specific criteria employed by SBA as it sorted through, evaluated, and ultimately accepted or rejected SBIC applicants. To a striking degree, this evaluation process was conducted by SBA in a manner that makes it extraordinarily difficult for African Americans specifically, and minorities generally, to qualify"[vi]

    b. "[The Minority and women-owned businesses] market segment is… underserved and attractive returns should be available to funds choosing to specialize in financing this client group."[vii]

    c. The evaluation criteria utilized by SBA in this case were highly appropriate if the objective of the Agency is to minimize minority presence in the SBIC industry, but largely inappropriate if the objective is to identify applicants most likely to operate successfully under SBA parameters as debenture licensees.[viii]

d. Commercial banking and local economic development lending were types of careers that were readily accessible to African Americans and other minorities; investment banking and mainstream venture capital investing were rarely available, a fact clearly testified to by the survey data summarized in table ten and discussed above. For the SBA to establish such experience [investment banking and venture capital] as a de facto criterion for qualifying for a SBIC license would have the effect of discouraging minority involvement in the SBIC program.[ix]

e. African American total representation in the SBIC universe consisted of two funds owned by one firm. This is the predictable consequence of requiring work experience largely unavailable to African Americans as a condition for approving applicants for SBIC charters.[x]

3. Deposed statements from the SBA's high ranking/decision making civil servant employees bring to light the reality of a distinct and prevalent biased culture against the inclusion of minority and women-owned businesses. Listen further to what four key SBA staffers said despite the concerns of Senator Kerry's requests for "change" as it related to the treatment/review of minority and women-owned applicants…I quote:

a. "…venture capital should be available to a wider geographical area…I agree that [venture capital] should be more broadly available to minority-owned businesses, to women-owned businesses, and firms located in rural areas and inner-cities."[xi]

b. "There was no special training for analyst who reviewed applications."[xii]

c. "It is my belief that making venture capital more broadly available to minorities is not a specific goal of the SBIC program."[xiii]

d. "[I] did not have the opinion that economic development corporations (and organizations such as civil rights organizations, business development organizations, and ethnic membership organizations) are quality sources of deal flow."[xiv]

e. "I did not receive any formal training prior to reviewing the [Diamond] application."[xv]

f. "I did not really consider Diamond's public policy goal of investing in and lending to minorities, women, inner-city, and LMI areas even though it was stated in the application."[xvi]

g. "I think I felt he (C. Earl Peek) had a sense of entitlement about being in the program."[xvii]

I understand that today you are principally concerned with the experiences of entrepreneurs, primarily minority and women-owned businesses that have applied for, pursued, sought, or had obstacles to grow and succeed. The culprit is SBA in not making venture capital available for this group. I have witnessed firsthand the dire need for this kind of capital for minority, women-owned businesses, and businesses located in the inner-city/underserved areas. Past Congressional inquiries accurately outlined findings that the SBA provided significantly less money, less opportunities, and fewer prospects for growth for minority and women-owned businesses as compared to predominantly Caucasian male owned businesses. Sadly, the SBA continues this trend.

**SBA even withheld an internal approval showing that Diamond and Women and Minority Partners, LP of New York Qualified and Eligible** for seven years (See Judge Alan Kay ruling in May 2008).

Mr. Chairman and Members of the Committee, I have been a direct participant in and witness of testimony made under oath by SBA employees and past political appointees that do not deem investments in and lending to minorities and women a goal of the SBIC program. These officials have testified that they do not deem it appropriate to consider it a viable strategy or good public policy to invest in or lend in low-moderate-income areas. This is in contrast to Congressional testimony by past Administrator Preston, and others, that 25% of the SBA's funds is and should be directed to assist low-moderate-income (LMI) and/or underserved areas. As noted by my testimony citing numerous reliable sources, the SBA has not deployed sufficient capital to minority and women-owned businesses that serve underserved and low-moderate income areas.

I strongly urge the Members of this committee to consider today's testimonies and to take aggressive action to correct the SBA's history of discriminatory practices that pose a grave obstacle to small businesses. I urge this committee to establish and guarantee implementation of inclusive procedures that will enable minority and women-owned businesses to access the necessary capital to achieve the American Dream, not just for them, but for the underserved and low-moderate income areas they serve. Please review Senate Bill 2920 for comprehensive inclusion of management teams and experiences earned by minority persons, accountability for deployment of capital, penalties for failure to comply and related changes that impact capital for minorities.

It is time to change the way America and the SBA conduct business and deploy public funds that have been entrusted for the purpose of making capital available for all Americans.

I thank you kindly, and submit my testimony together with the documents referenced herein.

---

[i] **Expert Witness Report: Diamond Ventures, LLC,v. Steven Preston, Administrator U.S. Small Business Administration,** Submitted by Timothy Bates, April 30, 2008 (hereafter referred to as "Expert Report")

[ii] February 16, 2006 letter from the Honorable John F. Kerry to the SBA's former Administrator, the honorable Hector V. Barreto, pg. 1, paragraph, 1.

[iii] February 16, 2006 letter from the Honorable John F. Kerry to the SBA's former Administrator, the honorable Hector V. Barreto, pg. 1, paragraph, 2.

[iv] February 16, 2006 letter from the Honorable John F. Kerry to the SBA's former Administrator, the honorable Hector V. Barreto, pg. 1, paragraph, 3.

[v] February 16, 2006 letter from the Honorable John F. Kerry to the SBA's former Administrator, the honorable Hector V. Barreto, pg. 1, paragraph, 1

[vi] Dr. Timothy Bates, Expert Report, May 2008, page 8

[vii] Dr. Timothy February 16, 2006 letter from the Honorable John F. Kerry to the SBA's former Administrator, the honorable Hector V. Barreto, pg. 1, paragraph, 1Bates, Expert Report, May 2008, page 30

[viii] Dr. Timothy Bates, Expert Report, May 2008, page 8

[ix]Dr. Timothy Bates, Expert Report, May 2008, page 47

[x] Dr. Timothy Bates, Expert Report, May 2008, page 47

[xi] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Jeffrey Pierson, Associate Administrator, pg. 46, line 14 and pg. 47, line 4.

[xii] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Margaret "Terri" Dennin, pg. 20, line 21.

[xiii] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Stephen Knott, Program Analyst, Day 1, pg. 49, line 22 and pg. 50, line 1.

[xiv] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Jeffrey Pierson, Associate Administrator, pg. 263, line 14.

[xv] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Stephen Knott, Program Analyst, Day 2, pg. 33, line 6.

[xvi] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Stephen Knott, Program Analyst, Day 2, pg. 293 , line 13.

[xvii] Diamond Ventures, LLC v. Jovita Carranza, U.S. District Court for the District of Columbia, CA03-1449(GK), sworn deposition of Karen Ellis, Program Analyst, pg. 184, line 14.

1701 Pennsylvania Avenue, Suite 300 Washington, DC 20006
Phone (877) 342-8227 Fax (202) 580-6559 www.DiamondVenturesLLC com

Mr. YARMUTH. Thank you very much, Mr. Peek.

Well, first of all, let me say without objection the reports that you referenced will be included in the record.

Mr. PEEK. Thank you.

Mr. YARMUTH. So now, since you have offered to give us some recommendations, why don't you proceed to do that?

Mr. PEEK. I have seen five recommendations not only that I understood from my experiences, but also Dr. Bates corroborated in his studies. He is an esteemed economist I am sure Dr. Boston and many others know of.

The first would be transparency. Treasury with the new market tax credit program has a program where you can apply online. They have a panel of independent reviewers and then they look at the scoring and make sure it is uniform before they approve people to dispense tax credits.

SBA is a very subjective process by people that are untrained, and they need to look at that program as a model for the SBIC program.

Second would be in the area of management qualifications. Dr. Bates found that typical in minority- and women-owned firms we gained our experience in economic development lending, banking, and financing, and we are not necessarily members of venture capital firms, and we can't say that we have worked 5 years together in the firm, which is the standard that SBA has. So we need to expand the definition of what is considered qualified management to dispense capital to minority- and women-owned businesses.

Third there needs to be reporting and accountability. During this process we never were able to find out the race of the applicants to get financing, neither can we find the race of the people who dispense it, so we never know if there is sensitivity to this area or to the broader geography.

Fourth, there has to be some penalty for noncompliance. Right now there is a bill in the Senate that sets forth to increase the leverage, the amount of dollars that a person can get if they are a licensed SBIC. What if they don't invest the money? What if they don't make it more broadly available? There should be some penalties for that.

Last, there needs to be some diversity. There needs to be diversity amongst the management team. All of the decisionmakings at SBA do not look like America, and they don't necessarily have to be majority/minority. They just have to look like the citizens of America who pay the taxes.

Mr. YARMUTH. Thank you very much for that.

This hearing is very timely for me, because I just met back in my District a few weeks ago with a gentleman, a minority business owner who was talking about the personnel net worth ceiling and the impact it was having on him, so I am very interested in the testimony related to that.

Dr. Boston, could you tell me what positive impact these PNCs— I shouldn't say PNC. I don't want to confuse it with the bank—but the net worth ceilings have, or are there any?

Mr. BOSTON. The only positive aspect of the personal net worth is the fact that it is designed from a legal standpoint to ensure that businesses that truly have some history or relationship to dis-

advantaged status are eligible for the program. But the way in which that is implemented actually works adversely to the businesses actually being successful in the program, simply because, as I mentioned during the testimony, personal net worth is tied, particularly for small business owners, to their ability to secure bonding, to raise capital, to perform as prime contractors.

As a result, when they graduate from the program and are no longer eligible and they go out into the market—we did a case study of 17 firms. We found that those firms' revenue on average dropped by about 45 percent, and it was because, again, the constraints that were imposed on them while they were participating in the program.

Mr. YARMUTH. Let's take the other side of this, because the gentleman I was speaking with, my constituent, was saying he can get a lot of jobs at a certain level, but there really is no incentive for him to do a great job because it doesn't allow him, because of these artificial constraints, he has no ability to do larger jobs and jobs for which he thinks he has assembled a pretty good resume. Is that something you are also finding?

Mr. BOSTON. Absolutely, Congressman. We are finding it from both sides of the equation, both from the standpoint of minority and disadvantaged businesses as well as corporations, major corporations. For example, GSK and a number of other corporations came and were supportive of the research because what they were finding, in fact, was that the businesses that they had mentored and grown, once they were able to get into their value chain at a significant level, their owners reached the personal net worth ceiling and then they were no longer eligible to participate in the program.

So it has a detrimental affect on the ability of corporations that are prime Government contractors to participate in the program and grow firms. It also has adverse consequences on minority-owned firms that are in the program.

Mr. YARMUTH. So it is really just not a ceiling on the person's net worth; it is also, in effect, in some cases, anyway, a ceiling on their potential?

Mr. BOSTON. Absolutely, because we found there is a very close relationship between the firm's revenue and the owner's personal net worth. We found that is about a 40 percent relationship, so that when you cap personal net worth you are also explicitly capping firm revenue.

Mr. YARMUTH. Thank you very much.

Mr. Chairman, I think my time is up. I will yield back.

Mr. CLAY [presiding]. Thank you so much.

Let me ask Dr. Wainwright, whenever this subcommittee asks the Census Bureau for information regarding contracts broken down by race, the response is that the Commerce Department does not track this information because it is not required to do so. However, you cite a lot of data collected by the Department in your testimony. How can the Commerce Department and other Government agencies provide Federal procurement data by agencies in the manner in which it is provided in the surveys noted in your testimony? Can you clear that up for us?

Mr. WAINWRIGHT. Yes, Mr. Chairman. The data in my testimony isn't tied directly to specific Federal Government contracts. It is really Census data on self-employed business owners for which we do track race and sex, and it is a special program, the Survey of Business Owners, at the Census Bureau, which is conducted every 5 years as part of the economic censuses that specifically seeks to track minority- and women-owned businesses.

However, my day job is doing disparity studies, and every State and local government that runs a race-conscious affirmative action program has to track not only who the prime contractors are by their race and sex but who the subcontractors are, and it is hard to believe that the Commerce Department does not have that data or that someone in the Federal Government doesn't have that data; otherwise, it would be impossible to compile the type of statistics that Representative Turner cited in his opening statement about how much Federal money is going each year to SDBs. So if they are not tracking that data, they certainly can and they certainly should.

Mr. CLAY. Thank you for that response.

Dr. Peek, I had a question for you. There have been concerns about SBA's lack of implementation and restrictive proposed rules of the women's contracting program that was the subject of litigation. How would our actions and reforms to SBICs help this program?

Mr. PEEK. By instituting reforms in the SBIC program in terms of the management diversity of the people who dispense the capital and the qualifications for the people who can actually invest in women- and minority-owned firms, when that contractor rule is adjusted and the contracts that are created with the ceilings that will be lifted here with the capital will equal more businesses, more job creation, and things of that sort.

I think that the efforts here would go right to helping the women have the capital availability when that rule is enacted and the rules are fully adopted by Congress.

Mr. CLAY. Would you say that the lack of women's contracting programs and investment in minorities and women is a result of the lack of diversity at SBA and in managers SBA approves to manage these programs?

Mr. PEEK. Absolutely.

Mr. CLAY. OK. In your testimony you note that Dr. Bates concluded that SBA continues to use exclusionary criteria, evaluation, and methodologies to deny minority- and women-owned businesses access to capital. Can you speak a little about the criteria in Dr. Bates' findings?

Mr. PEEK. Yes. SBA deputy administrators sent out information that says that in order for a firm to be considered eligible they have to have two members that have worked in a venture capital firm together for at least 5 years and they would have had to perform what they call upper quartile of returns in the venture capital industry. That is a nice benchmark to have, but not many minorities and women have venture capital firms in the first place, so you will have to have that experience to go in.

So in that way it has a discriminatory effect and excludes people who have experience in banking and economic development and fi-

nance, which Dr. Bates has shown that these people have gone and raised money from pension funds and other places and had compatible returns to the S&P and the stock market, so those standards need to be moved away or they need to be more accommodating of experiences that are more common to minorities and women today.

Mr. CLAY. Thank you for that response.

Mr. Robinson, what recourse does a business person have when confronting the types of discrimination you have described?

Mr. ROBINSON. Very few, if not non-existent, recourse. We had the slim hope that the 1866 Civil Rights Act would be a vehicle to redress discriminatory conduct, but the recent Supreme Court decision in the case of *Dominoi* v. *McDonald* pretty much eviscerated that as being a viable option. As a result, it is only in the viability of these affirmative programs that we are talking about here does it hold out any real hope for opportunity for these companies. They are not getting it in the private sector to a great degree, and so these programs remain a bedrock for that opportunity to take place.

So strengthening these programs represents the most viable option that exists, and that is why, again, I want to commend you, Mr. Chairman, that these hearings are so critically important in strengthening the viability, the base that these programs need to operate from in order for them to remain constitutionally viable.

Mr. CLAY. So once Congress has a record of the performance of the programs now, it should be incumbent upon Congress to go back and revise the law in order——

Mr. ROBINSON. At least revise the appropriate predicate for the laws that exist, because the court, in its determination of what is narrowly tailored programs look at how recent the data is before the Congress in determining as to whether or not that data is stale, represents an appropriate predicate that can be relied on that discrimination in the marketplace remains.

Mr. CLAY. Thank you for that response.

Mr. Yarmuth, do you want a second round?

Mr. YARMUTH. I would like to followup with Dr. Boston on the ceilings. Can you conceive of any alternative method of achieving whatever required positive benefit you think that the PNC provides that might be a little bit more conducive to providing greater opportunity for minority contractors?

Mr. BOSTON. Yes, Congressman. The purpose of the personal net worth again was to make sure that businesses that have experienced discriminatory treatment in the past are those businesses that have eligibility for the program. The program, however, is also designed or established to be a program that assists and promotes business development, and the personal net worth ceiling actually prevents that, so you have a law that is actually working against the intent of the program.

What needs to happen are a number of things. One is that there needs to be some consideration of the industry requirements for different businesses—manufacturing, construction, or what have you. Again, there needs to be consideration of where the business is in terms of its own development relative to the industry. So there are a number of criteria, both internal to the business as well as its

relationship to the industry—bonding requirements and other kinds of things, capital requirements. Those things are important.

What we are currently working on is a way in which we can develop a multi-dimensional index that bundles all of these criteria together, and with that multi-dimensional criteria then you are a better position to determine what companies and what state of development in that company should it be or should it not be eligible, as opposed to using a single criteria, personal net worth, that has, particularly as a company grows, very little relationship to the business dynamics within the company.

Mr. YARMUTH. Having been in business myself, I agree with you totally on that one.

Mr. Brown, you mentioned in your testimony a mentality of exclusion. Could you elaborate on that and tell us how it actually plays out in real life?

Mr. BROWN. Yes, Congressman. The mentality of exclusion basically is a mentality that says minority- and women-owned businesses don't belong at the table. It basically says the status quo is fine, businesses are operating, the work that is doing the Federal contracts is coming forth, it is being done, the performance is good. And it says we don't have a problem.

The fact that no contracts are going to minority- and women-owned businesses is not a problem, and that is the mentality that is there. And it is there not only on the prime contractors and large contractors, it is also there many times on the staff, who have been at cities, airports, others, for a number of years. They have become accustomed to those with whom they deal and they don't see a problem in what is going on.

In fact, I have often witnessed the fact that many of them feel that if a minority- and women-owned business gets the contract, then we done them a favor, whereas they don't look at the fact that there are millions of dollars of contracts that go on every year, and they feel that those majority businesses have earned the right to be at the table, but they feel that if a minority- and women-owned business gets the contract then we have done them a favor.

Mr. YARMUTH. Looking at all of the disparity studies with which you are familiar, do you see this as forming some kind of pattern that is geographic, or is this something that is broad based across the country?

Mr. BROWN. Our company, MGT, does disparity studies all across this country from the west coast to the east coast and the south. The under-utilization of minority- and women-owned businesses and the under-utilization of all segments of that community is seen. It is not geographical in nature. It is across the Nation.

Mr. YARMUTH. I have nothing else, Mr. Chairman.

Mr. CLAY. Thank you, Mr. Yarmuth.

Let me continue along that line of questioning, Mr. Brown. We have heard a lot about discrimination today, but some would say that the statistical disparities are actually caused by the fact that minority firms are smaller, have less capacity, and are less qualified. How would you respond?

Mr. BROWN. Chairman Clay, I think the evidence is pretty clear that it is not due to the ability of minority- and women-owned businesses. It is not due to their interest in contracting. Oftentimes,

the size of the business and the fact that it is small is caused by the discrimination in the particular community or the segment in which that business seeks to operate.

In other words, the discrimination has had a true and adverse affect upon the ability of that business to grow and to be able to handle larger contracts.

I can say in the many offices that I have held in airports, it has been very frustrating when you have contracts that are of a particular size and you will come in contact with very qualified, very capable minority business owners who have been limited in their abilities and their business's ability to grow, not due to their vision, not due to their hard work, not due to their ability, but simply due to the fact that no one will give them the opportunity to do the work because of what their racial or ethnic background is or their sex.

Mr. CLAY. You know, you give us pretty good examples that are very compelling, but isn't it possible that those business owners are simply assuming that the problems they are facing are caused by discrimination and couldn't the real problem be something else?

Mr. BROWN. One of the things we do when performing a disparity study, we control for certain factors in that disparity study. We control for factors that are economic in nature or others in nature and are not related to race. Once we control for those factors, we are also able to determine and exclude those factors.

I will tell you that disparity studies from one end of the country to the other control for those factors and find that it is not, again, the size of the business, it is not, again, so many other factors that are normal business factors. Leading to the exclusion of those factors, coupled with the indication of the anecdotal evidence that we gather and the experiences that we gather, it is overwhelming that it can't be simply because of some other factor other than the racial implications that are found.

Mr. CLAY. That is pretty compelling. Thank you for that response.

Dr. Boston, what happens to minority firms that are government contractors but not in the SDB program or have graduated from the SDB program? How well do they do after graduation?

Mr. BOSTON. Mr. Chairman, there are a number of things happening. In the study, we examined the records of 47,000 firms that are registered with the Federal Government in the Central Contractor Registry, and among those firms there were 10,000 minority-owned firms that had never become a part of the SDB program. There was another 4,000 firms that had graduated from the program, and we wanted to look at both of those, in addition to the firms that were in the program.

What we found was that 10,000 that had never been in the SDB program, they encountered significant disparities. Because we had so much information, we could match these firms up equally with non-minority Government contractors in terms of their years of existence, the industry that they operated in, their bonding capacity, and so on and so forth. What we found is that these firms were operating at a significant disadvantage in terms of revenue when they pursued both Government contracts as well as private sector

contracts. There was a significant revenue disparity that they encountered that could only be attributed to discrimination.

On the other side of the spectrum, for firms that had graduated out of the program, we found that there are also problems that they encounter. For example, we looked at the records, a case study of 17 firms that participated in the SDB program, and we followed these firms' revenue 2 years before on a monthly basis and then 6 months after they left the program. What we found is that the revenue of those firms after they left the program decreased by 45 percent, and when we interviewed the owners they mentioned a number of things.

One, they mentioned that firms that used them when they were certified no longer use them. They didn't even get the opportunity to bid any more. They indicated that they had not been able to get the bonding capacity when they were in the program that would allow them to be successful as prime contractors. And they indicated that they had been graduated out of a program into an industry, in many cases, that was very concentrated, and as a result they were unable to be successful because of the capital requirements.

So there were a number of barriers, both discriminatory and industry-related barriers that they encountered.

Mr. CLAY. Industry-related as institutional, lack of access to credit?

Mr. BOSTON. Exactly.

Mr. CLAY. Things like that.

Mr. BOSTON. Exactly, meaning access to bonding, access to capital, those kinds of things. And, for example, when firms had graduated out of a program into industries that are concentrated and they have not had the capacity, because of the personal net worth ceiling, to build bonding and gain access to bonding or capital, then it makes it that much more difficult for them.

Mr. CLAY. If the personal net worth ceiling were eliminated, what would you recommend as an alternative criteria?

Mr. BOSTON. I would recommend, Mr. Chairman, something that we call a business development index. This is an index, again, that would look at the characteristics of the business, itself, where that business is in terms of its startup and its growth and its development, and the characteristics of the industry that the business operates within, and then use those as a criteria so that you could standardize this criteria, and along this standardized criteria then you could select a threshold above which then businesses are no longer eligible, which makes much more sense because then you are talking about the characteristics that it takes in order to operate successfully in an industry, as opposed to just simply artificial criteria of personal net worth.

Mr. CLAY. And that is how you came up with your new recommendations as far as dollar amounts with a trigger for inflation, and per industry? Is that how you——

Mr. BOSTON. Maybe, the recommendation is operating within the constraints that we have. In other words, we wanted to take the existing $750,000 and make an adjustment to that, but we also realized that ultimately that is not the solution. There is a problem, because even when you adjust that and it goes up, it is not suffi-

cient in order to give those firms access to bonding and capital. But we did adjust it by adjusting it for inflation, by adjusting it for the amount of capital that is required in different industries, and also by adjusting it by the amount of revenue that these businesses would be able to achieve if they were treated equally as non-minority-owned firms.

Mr. CLAY. So, in other words, it is time for a new model for Government to adhere to?

Mr. BOSTON. Yes, Mr. Chairman.

Mr. CLAY. Thank you for that response.

Dr. Wainwright, you state that the Supreme Court used information on business discrimination against minorities presented to Congress. Can you tell us how the court used this information in the *Adiron* case?

Mr. WAINWRIGHT. Being an economist rather than a lawyer, I am not sure that is my bailiwick, but the tenth circuit went to great pains to pull together everything that had been put into the Congressional Record up until the Adiron case and along with the Justice Department brief at that time, so a real good way to get caught up on the older evidence in the record is to reference that decision. Certainly the Supreme Court looked at that to underscore Congress' special role in eradicating discrimination nationwide.

As Mr. Yarmuth pointed out, this is a nationwide problem, but it shows up in every single region of the United States. In the tables in my written testimony you will see broken down specific disparity ratios for all 50 States and the District of Columbia for Blacks, Hispanics, Asians, Native Americans, and women, and it is amazing how pervasive they are.

Mr. CLAY. Mr. Robinson, can you tell us how the court used the information derived here in Congress on the Adiron case?

Mr. ROBINSON. Well, the court essentially looks at, and the paradigm that the court has created for looking at this evidence is to take the empirical data that these three gentlemen to my right developed in their econometric models, statistical, the regressional analysis, those kinds of things, and then they say that is informed by the anecdotal evidence, like what Mr. Peek has presented and what others have been presented here today in written testimony, talk about the anecdotal experiences of minorities and women as they operate their businesses in the marketplace, and that those anecdotal experiences inform the statistical disparities that are found.

It is from that the court draws its conclusion about whether or not there is discrimination in the marketplace. It looks for Congress to document that, as it uses race-conscious remedies, affirmative remedies, to address this discrimination.

It is in that context that the Congress has the duty to act and to provide the appropriate remedies, but that data must be kept current. That information must be kept current before the Congress moves on these issues.

Mr. CLAY. Are there any relevant cases coming in the next term of the Supreme Court that they may hear?

Mr. ROBINSON. Not that we are aware of in this term coming up.

Mr. CLAY. Let's give them a little more time.

Mr. ROBINSON. Yes.

Mr. YARMUTH. I just want to ask one other question. We talked about the personal net worth ceiling as a structural problem. We talked about the general mentality of exclusion. Are there any other structural problems that you have seen in the program that we might want to look at?

Mr. BOSTON. Yes, Congressman Yarmuth. We examined, based on all these records that we had. We also identified close to 500 firms that were registered as small business concerns, but their revenue indicated that they were not. They had, on average, revenues that were well over $200 million.

Now, there are provisions in the regulations that allow for transition periods, in some cases, when small businesses are bought out, but it appeared, by what we looked at, that this could not be the case for the large majority of these firms.

So there are large firms that are registering as small business concerns, and one of the things that we recommend is that there be an annual audit of those programs and of the participation of businesses, and that audit ought to identify and enforce regulations on the book to make sure that your firms aren't fraudulently registering as small business concerns, that process is eliminated.

One other factor is that the incentives to participate in the program, there were, for example, price incentives and bid incentives to use subcontractors in the program. Most of those incentives have been eliminated, or at least they sunset and they were not put back into place legislatively, except for the Department of Defense. So there is very little incentive now for minority firms or disadvantaged firms to even become certified, because that is a process in itself, because the end result is that there are not very many incentives left in the program that they can actually take advantage of, so that is a problem.

And then, finally, the other problem has to do with this 10,000 minority-owned firms that have never become SDB certified. There needs to be a study to determine why those firms are not and why they are encountering so much disparity, because one of the things that the court mandates is that, in addition to studying the effects of the program, one also has to study what would happen but for the existence of the program. In other words, what happens if businesses don't have access to a program. Here we have 10,000 businesses and we found significant disparities in their revenue, both from the Government and the private sector, absent their participation in the program, so that needs to be studied and those business's experience needs to be tracked.

Mr. ROBINSON. Can I add to that, please?

Mr. YARMUTH. Yes, sir.

Mr. ROBINSON. Mr. Congressman, it was announced I think in the past week that the SBA plans to no longer certify SDBs. This could pose a huge problem for reasons that Dr. Boston has indicated, because there is a real problem with the viability of the numbers, the data. When the agencies represent that they have met their goals that they established with the SBA on an annual basis, I suggest to you that there are real problems with those numbers. You find double counting, in addition to the kind of fraud that Dr. Boston has indicated where companies are literally mis-

representing their status—their status as either small businesses, minority businesses, or 8(a) companies, etc.

So this issue of the viability, the integrity of the data is something that we would really encourage this committee to begin to examine in a much more thorough fashion. Oversight is just so, so critical around this issue, and this committee specifically on the integrity of the data.

As it relates to structural issues, you know, discrimination in the private sector remains a problem. There are two ways that I think that the Congress can begin to address that issue, and the first is to look at this whole issue of subcontracting and the viability of the subcontracting programs that exist with Federal agencies, and the subcontractor reporting and how that is done, and the integrity of that data that is reported to agencies relative to subcontracting.

How the subcontracting program works, normally the horse is already out of the barn before minority firms are even engaged by major prime contractors, and we have to find a way to make them an integral part of the process on the front end so that their involvement with that prime becomes a material part of the contract, itself, with the Government.

In addition to that, we would encourage the Congress to consider a policy that we have been working with at State and local levels of government, and that is a commercial nondiscrimination policy which basically requires on the front end an affirmative showing that you have not engaged in discrimination in your other activities before becoming eligible for work that the Federal Government would provide.

Mr. YARMUTH. Thank you, Mr. Chairman.

Mr. CLAY. Thank you.

Let me ask a panel-wide question, and anyone can volunteer. We will start with Mr. Peek.

Is there data collected in the Small Business Owners Survey or any of the other business surveys conducted by the Census Bureau that might serve as models for collecting information for Federal Government contracts to minority contractors? Do you know of any examples?

Mr. PEEK. I cannot think of any now. I am not abreast to all the data that is collected on the census. But I would certainly defer to the economist in that area.

Mr. CLAY. OK.

Mr. WAINWRIGHT. None of the existing Census Bureau programs are contract based like that, but ostensibly all of this Federal contracting is a matter of public record. The subcontractors are a matter of public record. I don't know that there is anything stopping Congress from mandating that reports be issued on a regular basis at the contract level so that data can be subject. That is what we call microdata. Rather than aggregating it all together and saying so many billions of dollars are spent during a quarter and so many millions are spent with SDBs, actually put out there contract-by-contract what those contracts are for, what codes they fill in, what the status of the prime contractor was, who the first-tier subs were, and make that data available for analysis and scrutiny and shed some light on that contracting process. I think that would be very, very useful information to have, but it is not out there right now.

Mr. CLAY. And it gets at the problem.

Mr. BOSTON. Mr. Chairman, there is a way in which it can be done. There are some current gaps. But if you use the Central Contractor Register, which is for Federal Government procurement, that has a list of every firm that pursues or does business with the Federal Government, both as a subcontractor and a prime contractor, so they are registered there. We just simply use, for example, small businesses, and that was close to—excluding non-minority businesses, for example, businesses owned by white women and others, there were close to 50,000 records there.

So on the characteristics of the businesses, the information is actually maintained in the Central Contractor Register.

On the other hand, there is also the Federal procurement data system that gives information on contract awards. Both of these data sets are very rich. What is missing from the Federal procurement data is information on subcontracting activity. That is really where the big gap is. If we collect information, the Government begins to collect information on subcontracting activity combined with these other data sets, then that is a rich amount of information that we can begin to analyze in a great deal of detail, the kind of discriminatory patterns that we see, and document that to determine what is due to discrimination and what is not and the way in which firms are or are not treated equally based on race, gender, and other kinds of criteria.

Mr. CLAY. Thank you for that response.

Last question, and it is panel-wide and anyone can provide examples if you have them—are any of you familiar with the problem of abuse of subcontractor status of minority businesses in Federal contracting?

Mr. ROBINSON. Yes.

Mr. CLAY. Mr. Robinson, we will start with you.

Mr. ROBINSON. Yes. In fact, we have one of the firms here today in the audience. But one of the big problems that you run into—and I cited some of it in my testimony—is the whole issue of bid shopping with subcontractors, the bait and switch. You use a minority firm subcontracting firm to win a contract, and once receiving that contract they no longer use that firm, or they use the firm only minimally, certainly not within the scope of work as it had been originally represented.

So the bid shopping is driving the minority firms' prices down to the point where they can't be competitive. They can't even be profitable in the work they are doing.

So you have bait and switch, you have bid shopping, and things of that nature. Just getting the information out to the firms in a timely manner so that they can, in fact, bid for subcontracting opportunities, there is a host. I cite some of those in my full written testimony of those kinds of abuses that happen with subcontractors.

Mr. CLAY. So there should be penalty for the bait and switch?

Mr. ROBINSON. Say that again?

Mr. CLAY. There should be penalty for bid shopping and bait and switch?

Mr. ROBINSON. No question about it.

Mr. CLAY. By the general contractor.

Mr. ROBINSON. Yes.

Mr. CLAY. OK. Thank you.

Mr. BROWN. I would also like to mention, Chairman Clay, that there is another practice that is also somewhat rampant, and that is, once the minority- or women-owned business begins performance of the contract, there is often a practice of nit-picking at the performance level of contractor to the extent that, in other words, the minority- and women-owned contractor is giving the subcontract, but there is an understanding that there are going to be problems on the contract, and then, through performance issues, they are going to exclude them and then replace them.

Many times, unless you have an administrator of a DB program at a locality and airport that has oversight, then maybe that department head, coupled with that contractor, prime contractor, will then exclude even after the contract award the performance of the contract by the minority- or women-owned business. You will often find many of them have stories and complaints of their work be perfect, but yet the problem is being found and being excluded after the fact of the contract.

So it is not even a guarantee after the award of a contract that there is not issues that come up, and that is an area that I have seen time and again.

The other aspect that I have also seen is we have talked about bonding requirements and we have talked about insurance requirements. You can have a project with, let's say, at an airport a $40 million project. Then you look at how the bonding and insurance requirements are set on that project by that entity. In other words, if that entity has a $30 million bond requirement for a $40 million project, it doesn't make sense, but if that is the requirement then it is normally going to exclude a large number of minority- and women-owned businesses. For example, a bond on a project like that may be reasonable at $5 million. There might be companies in that range that can afford that type of bonding and get that type of bonding in the community, but you have to look at where those are also being set.

Another practice I have also, in fact, personally had the issue of dealing with is when you talk about payment of minority contractors. It is so important because minority- and women-owned businesses don't have the types of financial reserves that many majority businesses have, so what they need is prompt payment. There will also be late payment, and there will also be retainage held against that minority-owned business.

So when you talk about the payment aspects that come along under the program, those are vital to having minority businesses that can continue to work on projects.

Mr. CLAY. And so you recommend the payment schedule be locked in for subcontractors?

Mr. BROWN. The payments should be locked in, they should be stronger regulations in regard to prompt payment.

I will tell you personally I had a situation where I had a minority-owned business that was family owned called me and said we haven't been paid. I checked on the project. Everybody had been paid on the project but them, so I ordered—which is allowable

under my authority—that no more payments be made to that prime contractor.

I received a call from the prime contractor 2 days later that said, I hear you are holding my money. I said, yes, sir, I am holding my money. He said, well, I want you to release my money. I said, well, I want you to tell me why you haven't paid these subcontractors. He actually came from Texas where he was located, and we sat down and met and he paid those subcontractors and then he received his payment. But unless you have that type of oversight and are willing to do that type of thing, then minority- and women-owned businesses face a tremendous hurdle.

Mr. CLAY. Thank you for that.

Mr. WAINWRIGHT. I might add as, appropro of the pilot mitigation issue, there is a lot more effort goes into tracking awards and commitments at Federal agencies as well as State and local agencies that are working these programs then into payments. What happens, there can be a lot of difference between the original award amount and the final payment amount, and a lot of the data you see reported is that front-end effort. Agencies are—I won't say unwilling, but oftentimes unable due to staff restrictions to track those contracts all the way through to payment.

Another issue in particular with subcontractors is change orders. Sometimes construction projects ultimately have more money in the change orders than were in the original contract award. Goals are almost never applied to the change orders or tracked through the change orders, thus, of course, diluting all of these wonderful percentages that we think we are getting by reporting awards up front.

Mr. CLAY. Thank you for that testimony.

Mr. BOSTON. Mr. Chairman, just a very quick comment about something I am really passionate about. I think this will go a long way to preserving minority business opportunity. There needs to be, for lack of a better word, a commission to standardize the method and approach of doing disparity studies. The reason I say this is because what happens now, the Supreme Court has said these programs have to meet strict scrutiny and be narrowly tailored.

The problem is that the interpretation of that varies by judges all over the country, so that if one, for example, is hostile to the notion of affirmative action, then that program, there can always be come deficiency found. So if that process is standardized, then we know whether the existence of a program meets the standard or it doesn't meet the standard, whether there is sufficient evidence or there is not sufficient evidence.

It would also save local jurisdictions, Federal and State, hundreds of thousands of dollars in terms of commissioning studies.

Mr. CLAY. Sure. Thank you for that.

Mr. Peek, go ahead. Just finish us off.

Mr. PEEK. Just one comment. As I hear these issues, I sell money daily—not like Wall Street though. But I constantly run into quick pay issues and hear we need money to mobilize on a contract and we need money to pay our payroll because they are holding, and all these issues, and, Mr. Chairman, I really congratulate you and thank you passionately for taking on this issue, because all these

bottle up, but at some point it comes back to capital and it comes back to access to capital.

I don't know what the remedy will be to where the government provides credits or capital in this continuum of process for contracting opportunity, but hopefully we can build some solutions in here. I would be more than happy to submit some after the hearing into the record that will deal with the fact that there has to be the capital there for these guys, when they have the opportunity, and we remedy these other issues.

I know that those people who get the capital have to be committed to tying this into it. It can't be a return on investment. The return on investment is job creations and expanding the tax base and creating an opportunity. Those have to be built into this whole process.

Mr. CLAY. Thank you for those closing comments. I am sure that will be a subject of subsequent hearings.

This is a first in a series of hearings in order to build an adequate record so that we can go back and revise current law, to update it, and to make the program actually work.

Again, let me thank the entire panel of witnesses for your testimony today, for your knowledge, for your expertise in this area that is so vital to the economic growth of this country. I appreciate each and every one of you for your commitment to this issue of minority business development throughout this country.

Before we adjourn, I want to restate that you do have up to 5 legislative days in which to revise and extend your remarks.

The Chair will ask unanimous consent that the written testimony of Mr. Jack Thomas, assistant director of certification and compliance for the city of St. Louis, Lambert-St. Louis International Airport, be inserted in the record. The testimony will be inserted.

That will conclude this hearing. Hearing adjourned. Thank you.

[Whereupon, at 3:30 p.m., the subcommittee was adjourned.]

[Additional information submitted for the hearing record follows:]

The following documents are part of the official hearing record of this Subcommittee hearing. In the interest of government cost efficiency, these documents are available upon request from the Information Policy, Census and National Archives Subcommittee.

They are also available at the Subcommittee's website: http://informationpolicy.oversight.house.gov/

***Dr. Jon S. Wainwright***
***Supplemental for the Record***
***(9)***
***Go to: www.nera.com for download***

NERA
Economic Consulting

National Economic Research Associates, Inc.
1006 E. 39th St
Austin, TX 78751
512 371 8995 Fax 512 371 8996
www.nera.com

# Race, Sex, and Business Enterprise: Evidence from the St. Louis Metropolitan Statistical Area, 1979-2004

**Prepared for the Bi-State Development Agency, Doing Business As Metro**

**by**

**NERA Economic Consulting**

**March 14, 2005**

QuickTime™ and a
TIFF (Uncompressed) decompressor
are needed to see this picture

NERA
Economic Consulting

National Economic Research Associates, Inc
875 North Michigan Avenue
Chicago, IL 60611
312 573 2800 Fax 312 573 2810
www nera com

# DISADVANTAGED BUSINESS ENTERPRISE AVAILABILITY STUDY

**Prepared for the Missouri Department of Transportation**

**by**

**NERA Economic Consulting**
**(Jon Wainwright, Ph.D., Project Director)**

**Colette Holt & Associates**

**November 26, 2004**

QuickTime™ and a
TIFF (Uncompressed) decompressor
are needed to see this picture

NERA
Economic Consulting

National Economic Research Associates, Inc
1006 East 39th St
Austin, TX 78751
512 371 8995 Fax 512 371 8996
www.nera.com

# RACE, SEX AND BUSINESS ENTERPRISE: EVIDENCE FROM THE STATE OF MINNESOTA

**Prepared for the Minnesota Department of Transportation**

**by**

**NERA Economic Consulting**
**and**

**Colette Holt & Associates**

**FINAL REPORT—September 27, 2005**

MMC Marsh & McLennan Companies

NERA
Economic Consulting

# Discrimination Facing Small Minority-Owned and Women-Owned Businesses in Commercial Credit Markets

Testimony of Jon S. Wainwright, Ph.D., Vice President, NERA Economic Consulting

Before the Committee on Small Business and Entrepreneurship

United States Senate

September 11, 2008

Chairman Kerry, Ranking Member Snowe, and Members of the Committee:

Thank you for the opportunity to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Currently, I am a Vice President with National Economic Research Associates, also known as NERA Economic Consulting, in Chicago, Illinois and Austin, Texas.

NERA is an international firm of economists who understand how markets work. We provide economic analysis and advice to corporations, governments, law firms, regulatory agencies, trade associations, and international agencies. Our global team of more than 600 professionals operates in over 20 offices across North America, Europe, and Asia Pacific. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. Founded in 1961 as National Economic Research Associates, our more than 45 years of experience creating strategies, studies, reports, expert testimony, and policy recommendations reflects our specialization in industrial and financial economics. Because of our commitment to deliver unbiased findings, we are widely recognized for our independence. Our clients come to us expecting integrity and the unvarnished truth.

I would like to ask the Committee's permission to include my entire testimony in the record as if read in full and to supplement my testimony with additional material if needed.

May 5, 2006

# Race, Sex, and Business Enterprise: Evidence from Denver, Colorado

Prepared for the City and County of Denver, Colorado

NERA
Economic Consulting

MMC Marsh & McLennan Companies

June 20, 2006

# Race, Sex, and Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area

Prepared for the Illinois State Toll Highway Authority

NERA
Economic Consulting

MMC Marsh & McLennan Companies

November 30, 2006

# Race, Sex, and Business Enterprise: Evidence from the Commonwealth of Massachusetts: Volume I

Prepared for the Massachusetts Housing Finance Agency

NERA
Economic Consulting

MMC Marsh & McLennan Companies

March 8, 2006

# Race, Sex, and Business Enterprise: Evidence from the State of Maryland (Final Report)

Prepared for the Maryland Department of Transportation

NERA
Economic Consulting

MMC Marsh & McLennan Companies

May 15, 2008

# Race, Sex, and Business Enterprise: Evidence from the City of Austin

Final Report Prepared for the City of Austin, Texas

NERA
Economic Consulting

***Mr. Anthony Brown***
***Supplemental for the Record***
***(5)***
***Go to: www.nera.com for download***

***Final Report: Nashville International Airport***
***Contact: Rodney@gspclaw.com***

March 8, 2006

# Race, Sex, and Business Enterprise: Evidence from the State of Maryland (Final Report)

Prepared for the Maryland Department of Transportation

NERA
Economic Consulting

MMC Marsh & McLennan Companies

# THE CITY OF PHOENIX MINORITY-, WOMEN-OWNED, AND SMALL BUSINESS ENTERPRISE PROGRAM UPDATE STUDY

## *Final Report*


**SUBMITTED BY:**

**MGT OF AMERICA, INC.**
**2123 CENTRE POINTE BOULEVARD**
**TALLAHASSEE, FLORIDA 32308**

***IN ASSOCIATION WITH:***
***FIELDS & BROWN, ATTORNEYS AT LAW***


**APRIL 21, 2005**

# FINAL REPORT
# BROWARD COUNTY
# SMALL DISADVANTAGED BUSINESS ENTERPRISE (SDBE) DISPARITY STUDY

**SUBMITTED TO:**

BROWARD COUNTY
BOARD OF COUNTY COMMISSIONERS
115 SOUTH ANDREWS AVENUE
FORT LAUDERDALE, FLORIDA 33301

**SUBMITTED BY:**

MGT OF AMERICA, INC.
2123 CENTRE POINTE BOULEVARD
TALLAHASSEE, FLORIDA 32308

**APRIL 3, 2001**

# DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD DISPARITY STUDY

## *FINAL REPORT*

**PREPARED FOR:**

**DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD**
**3200 EAST AIRFIELD DRIVE**
**DFW AIRPORT, TEXAS 75261**

**PREPARED BY:**

**MGT OF AMERICA, INC.**
**2123 CENTRE POINTE BOULEVARD**
**TALLAHASSEE, FLORIDA 32308**

**October 17, 2000**

# Final Report

## For Development and Revision of Small, Minority & Women Business Enterprise Program

Nashville International Airport (BNA)

Submitted to:
Metropolitan Nashville Airport Authority

Submitted September 19, 2007 by:

Griffin & Strong, P.C.

404.584.9777
404.584.9730 fax
rodney@gspclaw.com
235 Peachtree St. Suite 400 Atlanta, GA 30303