# EXHIBIT A-12

S. HRG. 110–211

# MINORITY ENTREPRENEURSHIP: ASSESSING THE EFFECTIVENESS OF SBA'S PROGRAMS FOR THE MINORITY BUSINESS COMMUNITY

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP UNITED STATES SENATE

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

MAY 22, 2007

Printed for the use of the Committee on Small Business and Entrepreneurship

Available via the World Wide Web: http://www.access.gpo.gov/congress.senate

U.S. GOVERNMENT PRINTING OFFICE

37–636 PDF WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

JOHN F. KERRY, Massachusetts, *Chairman*

CARL LEVIN, Michigan
TOM HARKIN, Iowa
JOSEPH I. LIEBERMAN, Connecticut
MARY LANDRIEU, Louisiana
MARIA CANTWELL, Washington
EVAN BAYH, Indiana
MARK PRYOR, Arkansas
BENJAMIN L. CARDIN, Maryland
JON TESTER, Montana

OLYMPIA J. SNOWE, Maine,
CHRISTOPHER S. BOND, Missouri
NORMAN COLEMAN, Minnesota
DAVID VITTER, Louisiana
ELIZABETH DOLE, North Carolina
JOHN THUNE, South Dakota
BOB CORKER, Tennessee
MICHAEL B. ENZI, Wyoming
JOHNNY ISAKSON, Georgia

NAOMI BAUM, *Democratic Staff Director*
WALLACE HSUEH, *Republican Staff Director*

# C O N T E N T S

Page

OPENING STATEMENTS


Kerry, the Honorable John F., Chairman, Committee on Small Business and Entrepreneurship .......... 1
Snowe, the Honorable Olympia J., a United States Senator from Maine .......... 3
Cardin, the Honorable Benjamin L., a United States Senator from Maryland .. 5
Tester, the Honorable Jon, a United States Senator from Montana .......... 5


TESTIMONY


Jenkins, Calvin, Deputy Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration, Washington, DC .......... 6
Wainwright, Dr. Jon, vice president, National Economic Research Associates, Inc., Austin, Texas .......... 26
Robinson, Anthony W., president, Minority Business Enterprise Legal Defense and Educational Fund, Largo, Maryland .......... 35
Miera, Bill M., chief executive officer, Fiore Industries, Inc., Albuquerque, New Mexico .......... 60
Galaviz, Fernando, chairman, Small Business Association for Technology, Alexandria, Virginia .......... 73


ALPHABETICAL LISTING AND APPENDIX MATERIAL SUBMITTED


Cardin, the Honorable Benjamin L.
- Opening statement .......... 5

Galaviz, Fernando
- Testimony .......... 73
- Prepared statement .......... 75

Jenkins, Calvin ..........
- Testimony .......... 6
- Prepared statement .......... 9
- Response to post-hearing questions from:
  - Senator Kerry .......... 100
  - Senator Snowe .......... 105
  - Senator Lieberman .......... 108

Kerry, the Honorable John F.
- Opening statement .......... 1
- Post-hearing questions posed to Calvin Jenkins and subsequent responses .......... 100

Lieberman, the Honorable Joseph I.
- Post-hearing questions posed to Calvin Jenkins and subsequent responses .......... 108

Miera, Bill M.
- Testimony .......... 60
- Prepared statement .......... 62

Robinson, Anthony W.
- Testimony .......... 35
- Prepared statement with attached letters of complaint .......... 37

Snowe, the Honorable Olympia J. ..........
- Opening statement .......... 3
- Post-hearing questions posed to Calvin Jenkins and subsequent responses .......... 105

Page

Tester, the Honorable Jon
Opening statement ..... 5
Wainwright, Dr. Jon
Testimony ..... 26
Prepared statement ..... 28
Supplementary material may be accessed on the Committee's Web site at *http://sbc.senate.gov/20070522.cfm*
Disadvantaged Business Enterprise Availability Study for Missouri
Race, Sex, and Business Enterprise: Evidence from Denver, Colorado
Race, Sex, and Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area
Race, Sex, and Business Enterprise: Evidence from the State of Maryland
Race, Sex, and Business Enterprise: Evidence from the Commonwealth of Massachusetts
Race, Sex, and Business Enterprise: Evidence from the State of Minnesota
Race, Sex, and Business Enterprise: Evidence from the State of Washington

COMMENTS FOR THE RECORD

Zamora, Peter, regional counsel, Mexican American Legal Defense and Educational Fund (MALDEF), Washington, DC ..... 112

# MINORITY ENTREPRENEURSHIP: ASSESSING THE EFFECTIVENESS OF SBA'S PROGRAMS FOR THE MINORITY BUSINESS COMMUNITY

**TUESDAY, MAY 22, 2007**

UNITED STATES SENATE,
COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP,
*Washington, DC.*

The Committee met, pursuant to notice, at 10 a.m., in room SR–428A, Russell Senate Office Building, the Honorable John F. Kerry (Chairman of the Committee) presiding.

Present: Senators Kerry, Cardin, Tester, and Snowe.

## OPENING STATEMENT OF THE HONORABLE JOHN F. KERRY, CHAIRMAN, SENATE COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP, AND A UNITED STATES SENATOR FROM MASSACHUSETTS

Chairman KERRY. This hearing of the Small Business Committee will commence. I appreciate everybody taking the time to come here today.

I have called this hearing to give the Committee an opportunity to take a look at a critical area of business development and growth in our Nation, one that has proven to be a challenge, but nevertheless has provided a very significant base of growth, and importantly, a significant door-opener of opportunity for segments of our country that have often had to struggle to be able to get that opportunity.

As we all know, one of our Nation's greatest assets is our diversity, but we have to fight to make sure that that diversity is given appropriate opportunity to share in all of the opportunities of our country, and the strength of that diversity is really one of the things that allows us to be the most competitive Nation in terms of the marketplace.

The number of businesses in our minority communities continues to grow and that adds to our competitive advantage. Over the last 10 years, minority business enterprises accounted for over 50 percent of the 2 million new businesses started in the United States, and there are now more than 4 million minority-owned companies in the United States with annual sales totaling about $694 billion. These businesses cross the entire industrial base, from financial services and health care to construction and transportation.

But, and there is an important but, while the numbers of minority-owned businesses hold promise for the future, and obviously

that growth is important, it is clear that much more needs to be done to encourage and strengthen the minority business community and to guarantee the opportunities within it. The potential for small business growth and entrepreneurship has simply not been fully tapped and barriers continue to exist for many minority business owners.

SBA's Office of Advocacy has analyzed the most recent business census data from 2002, noting that although minorities make up 32 percent of our population, minorities own only 18 percent of small businesses. The Minority Business Development Agency looking at the same census data notes that the number of minority-owned firms has grown by 35 percent over the 5-year period that was surveyed, but the average gross receipts for those firms dropped by 16 percent. In fact, the average gross receipts of minority firms was $162,000, which was considerably lower than the $448,000 average gross receipts of non-minority firms.

Clearly, we still have a ways to go before we can say that there is parity between majority-owned and minority-owned firms. We also must ensure that we are doing as much as possible to open the doors to Federal contracting for minority-owned businesses.

The aforementioned disparities are why we need Federal contracting programs like 8(a) and its business counseling counterpart, 7(j). These programs to help minority and disadvantaged firms access Federal contracts are needed to help these firms break into the Federal market. We also need more lending and investment opportunities through the SBA, and quite frankly, we need to find innovative ways to create access to capital in the commercial market.

The question today is whether SBA's contracting and access to capital programs are meeting the needs of those that they were created to help. One of the keys to small business growth is access to capital, an area where minority firms also still lag behind. When we look at SBA lending, the share of loan dollars to minorities is largely stagnant. And more interestingly, minorities who have obtained SBA loans have seen their average loan size shrink by more than those to non-minorities.

For example, over the past 7 years, the share of loan dollars to African Americans in the 7(a) lending program, which is SBA's largest small business lending program, only increased from 3 to 4 percent, yet African American firms constitute 5 percent of all of the minority firms. This gap is important to address, because as the SBA's Office of Advocacy study found, higher percentages of black-owned businesses use loans from the Government or guaranteed by the Government. Therefore, SBA can and should be doing more.

Changing demographics make it all the more urgent that we address the challenge of minority entrepreneurship. We can't afford to leave any segment of our society behind. According to U.S. census projections, between 1995 and 2050, we are going to add 131 million new citizens to our country and 90 percent of that growth is going to come from the minority population.

To address the substantial gap in small business ownership and the minority community, I have introduced the Minority Entrepreneurship Development Act of 2007, co-sponsored by Senators Cardin, Landrieu and Clinton, and this bill would give grants to

historically Black colleges and universities, Hispanic-serving institutions, and tribal colleges to help train the entrepreneurs of the future. This bill was adopted last year in Committee as part of S. 3778, the bipartisan reauthorization bill and I hope we can help to open the door to entrepreneurship to minority communities by passing it this year.

We also need to do more to expand access to capital in the minority community. Small business can't grow unless they have access to working capital and loans to purchase land or equipment, and I am concerned that the very programs that were created to reach the underserved, especially minority communities, such as the 7(a) and 504 lending programs, are not being sufficiently accessed by these communities. That is why we included a provision in the lending bill that we marked up last week to create an Office of Minority Business Development in the SBA.

We also adopted this provision last year, and I think Senator Snowe and I believe very strongly that if we have offices at SBA dedicated to women, veterans, Native Americans, and faith-based community initiatives, we should have an office that focuses on minority business development, and that will increase contracting, counseling, and capital to firms owned by minorities.

As the country changes, and it is obvious that it will based on demographics that I just mentioned, it is really important that we make sure that we fulfill the promise embodied in our laws with respect to opening the doors of opportunity. You don't do that by just passing the law, you do it by guaranteeing its implementation. It is more and more important that we at the Federal level show we really value the contributions that citizens make from every segment of our society to the marketplace of our country, and we are determined to do that as effectively as we can.

I am delighted to be joined by our Ranking Member, Senator Snowe. Thank you.

**OPENING STATEMENT OF THE HONORABLE OLYMPIA J. SNOWE, A UNITED STATES SENATOR FROM MAINE**

Senator SNOWE. Thank you, Chairman Kerry, for calling this timely hearing on the subject of minority entrepreneurship. Just last week, the U.S. Census Bureau announced that over 100 million people, or one in three U.S. residents, are classified as an ethnic or racial minority. According to a study released last month by the SBA Office of Advocacy, minorities own approximately 18 percent of the 23 million firms in America. Additionally, there are now over four million minority-owned businesses across the country, accounting for over $591 billion in revenues.

As former Chair of this committee and now ranking member, I have championed an aggressive contracting agenda that promotes entrepreneurship and opportunities for minority-owned and women-owned small businesses, as well as for businesses located in Historically Underutilized Business Zones. In the coming weeks, I plan to work very closely with you, Chairman Kerry, to develop a bipartisan small business contracting package that will address ways to promote small business utilization of key SBA entrepreneurship programs, including the 8(a) and HUB Zone programs.

This morning we will be hearing from SBA and a panel of expert witnesses about ways we can improve SBA's vital minority entrepreneurship programs and services to SBA to make sure that these laws are fully consistent with the intent and obligations under the law in fulfilling our responsibilities within these programs.

The SBA is responsible for administering and implementing programs to ensure that minority-owned small businesses achieve economic self-sufficiency and realize their tremendous potential. The SBA's minority entrepreneurship programs, especially the Small Disadvantaged Business and the 8(a) Business Development Program for Small Disadvantaged Businesses have provided real economic opportunities to minority communities across America. Unquestionably, we have achieved some real progress, but we can do better.

Unfortunately, the effectiveness of these programs have been repeatedly called into question. Four recent reports of the SBA Inspector General found that the SBA, number one, does not track compliance with 8(a) regulations; second, the SBA improperly maintains an 8(a) data base; third, the SBA improperly supervises mentor-protégé arrangements between 8(a) firms and large businesses; and fourth, the SBA fails to ensure that 8(a) contracts go to more than a handful of participating firms.

These conclusions are echoed by the Government Accountability Office, which found that over the last 2 years, the 8(a) program has been vulnerable to fronting and fraud by large business concerns and that subcontracting opportunities for small disadvantaged businesses were not properly enforced on Hurricane Katrina reconstruction projects in the Gulf Coast. It is my sincere hope that the SBA will explain to us this morning the specific corrective remedies the agency has taken to rectify these problems.

In conclusion, I again look forward to working with Chairman Kerry on this issue and developing a bipartisan contracting package that builds on what was included in last year's SBA reauthorization package. But more importantly, we must make sure that these programs are working as intended and as developed under the law to make sure that those who should be benefiting from these programs actually are. Also, we must ensure that we can extend these programs and to reach out into the disadvantaged communities and to make sure that the minorities are benefiting from the intent and purpose of these programs that are so worthwhile.

I am disturbed by the many reports that have been developed that have indicated some serious fundamental problems that have yet to be addressed, so I am hoping that we are going to hear this morning from Mr. Calvin Jenkins of the Small Business Administration as to how the agency is responding to many of the issues that have been raised by the SBA's Inspector General.

Thank you, Chairman Kerry.

Chairman KERRY. Thank you very much, Senator Snowe. Thanks for your previous work on this and we look forward to working with you on it.

Senator Cardin.

## OPENING STATEMENT OF THE HONORABLE BENJAMIN L. CARDIN, A UNITED STATES SENATOR FROM MARYLAND

Senator CARDIN. Mr. Chairman, first, thank you for holding this hearing. I concur with both your statement and Senator Snowe's statement.

The dilemma we face is that while the largest number of new small businesses are in the minority communities, we are not providing the type of assistance needed so these companies can grow to their full potential. As you have laid out, we need to find out how we can be more aggressive in dealing with that disparity.

It is particularly important in Maryland. Prince George's County has the fourth-largest number of African American firms in the country and I have heard from my small business minority owners about the problems they have faced basically in getting capital. You hear about health care, number one, but after health care, it is access to capital and it is access to Government procurement.

I am interested in how we can improve the 8(a) program so that minority businesses get the technical assistance they need to be able to obtain the type of opportunities through the procurement process. I was disappointed in the President's budget that cut a lot of the funding for these programs, and I hope that we will be able to do much better as we consider the budgets that go through the Congress.

In the loan programs, the microloan programs are particularly valuable to small businesses, minority businesses. They get a larger share of the microloans, which just shows you a small amount of money can make a huge difference. But when we look at the 7(a) program and the 504, the number of minority businesses participating in these programs are not what I think they should be.

So I really do thank you for holding these hearings so that we can figure out how we can provide the type of help and assistance to minority small businesses that will allow them to continue to grow, helping America as far as our economic growth is concerned, and living up to the American dream of providing opportunities for all of our citizens.

Chairman KERRY. Thank you very much, Senator Cardin. That is a very important point you underscore about the microlending. First is the 7(a), and the other distinction we may follow up on later.

Senator Tester.

## OPENING STATEMENT OF THE HONORABLE JON TESTER, A UNITED STATES SENATOR FROM MONTANA

Senator TESTER. Thank you, Mr. Chairman and Ranking Member Snowe. I appreciate also the fact that you are holding this hearing.

In Montana, we have a large minority base called Native Americans. We have unemployment at 85 percent and, quite frankly, the role that the SBA can play and hopefully will be playing in the economic development through small businesses in our Indian Country is critically important.

I look forward to Mr. Jenkins' testimony and I will have some questions for him after he is done.

Chairman KERRY. Terrific. Thank you, Senator.

Mr. Jenkins, if we could invite you to the table, the SBA's Deputy Associate Administrator for Government Contracting and Business Development. We are delighted to have you here with us today.

If I could just mention, we are a little under the gun in that we have an 11:30 a.m. conflict, or I do, anyway. I don't want anybody to be shortchanged, so I want to make sure we get to cover the waterfront here as well as possible.

Mr. Jenkins, if you can summarize in the 5 minutes we normally give our witnesses; your full testimony will be placed in the record as if read in full. Thanks.

**STATEMENT OF CALVIN JENKINS, DEPUTY ASSOCIATE ADMINISTRATOR FOR GOVERNMENT CONTRACTING AND BUSINESS DEVELOPMENT, U.S. SMALL BUSINESS ADMINISTRATION, WASHINGTON, DC**

Mr. JENKINS. Chairman Kerry and Ranking Member Snowe and other distinguished Members of this Committee, I thank you for the opportunity to testify regarding minority entrepreneurship and the effectiveness of SBA's programs. I am Calvin Jenkins, Deputy Associate Administrator for the Office of Government Contracts and Business Development. I appreciate the opportunity to testify today on behalf of Administrator Preston regarding the operations and successes of SBA's activities associated with minority businesses, as well as to briefly discuss our continued efforts to enhance and ensure a continued accessibility of our product and services to entrepreneurs in our Nation's most underserved markets.

Minority-owned small businesses have a dramatic impact on the U.S. economy, creating jobs and driving economic growth. According to SBA's Office of Advocacy, in 2002, minorities owned 4.1 million firms that generated $694 billion in revenues and employed 4.8 million workers. Of the 23 million non-farm firms, 6.8 percent were owned by Hispanic Americans, 5.2 percent by African Americans, 4.8 percent by Asian Americans, 0.9 percent by American Indians or Alaskan Natives, and 0.14 percent by Native Hawaiians or other Pacific Islanders.

Entrepreneurs, including minority entrepreneurs, face a number of challenges as they pursue their dreams and begin to create and expand their businesses. These challenges include access to capital, the cost of health insurance, the need for training and technical assistance, access to Federal contracts, and regulatory burdens. SBA has focused on addressing the challenges of minority business, in particular, minority-owned small businesses and entrepreneurs.

There are many areas of the country that have significantly higher unemployment and lower income levels than the Nation's averages. Federally defined economically distressed markets, which are typically based in inner city and rural areas, include Low/Moderate Income, Historic Underutilized Business Zones, Enterprise Community, Empowerment Zones, and New Market Tax Credit Zones. Higher levels of business formation and growth in these areas can promote job creation, business ownership, and economic vitality where they are most needed. In many cases, SBA's financial, technical, and contracting programs are especially well-designed to meet the needs of small businesses in these "place-based" commu-

nities, as well as in "people-based" communities on which it is also focused.

In short, one of our principal jobs at the SBA is all about increasing access to the tools that we presently have available to the people and communities that need them most. SBA made great strides in addressing the needs of minority and entrepreneurs and small businesses. I am pleased to share with you the results of our efforts in increasing access for the underserved communities.

The number of minority loans approved by the SBA has increased from 12,010 in fiscal year 2001 to 34,627 in fiscal year 2006, and loan dollars have increased from less than $3.5 billion in fiscal year 2001 to more than $6.7 billion in fiscal year 2006. The number of loans to women approved by the SBA has increased from 9,986 in fiscal year 2001 to 23,454 in fiscal year 2006. Loan dollars have also increased from $2 billion in fiscal year 2001 to more than $3.4 billion in 2006.

Through April 30 of 2007, the end of the first 7 months of the Federal Government's fiscal year, SBA has approved 20,186 loans for $3.7 billion for minorities, and 13,723 loans for $2 billion for women.

During the period from 2001 through 2006, the number of minority-owned small businesses that have received commercial credit through SBA's 7(a) and 504 programs has almost tripled and has increased from less than 25 percent total loans approved to 32.3 percent of total loans approved. In an effort to expand support for microborrowers, the SBA has piloted the Community Express Program. This 7(a) pilot was designed specifically to reach underserved markets and provide both financial assistance and technical assistance. The latter is provided through leveraging the skills of the agency's counseling and training partners.

Equity in Government contracting—the mission of our Office of Government Contracting and Business Development is to increase small business access to procurement opportunities utilizing various educational, training, consultant forums. The office is also responsible for increasing public awareness of SBA's Government Contracting and Small Business Preference Programs through targeted market outreach initiatives in underserved markets and public-private partnership.

For example, SBA continues to provide access for small and disadvantaged businesses to be able to compete in Federal marketplaces. The Office of Government Contracts and Business Development works to create an environment for maximum participation by small, disadvantaged, and HUB Zone businesses in Federal Government contract awards and large prime subcontracts.

Each year, our Government spends billions of dollars purchasing goods and services from private firms. Congress has established a governmentwide small business goal of 23 percent for small businesses, 5 percent for small disadvantaged businesses, and 3 percent for HUBZone small businesses. SBA negotiates goals annually with each Federal agency on an individual basis. The Federal achievement toward the SDB goal for fiscal year 2005 was $21.7 billion, or 6.92 percent which exceeded the 5 percent statutory goal.

In terms of expected performance for fiscal year 2007 and 2008, we believe that we have set the bar very high. Some of our more

ambitious goals include the following. A fiscal year 2008 budget targeting a total of $85 billion in prime Federal contract dollars to be awarded to small businesses. SBA will focus on expanding bonding opportunities for more small business, especially minority-owned businesses and businesses located in underserved communities.

The goal for fiscal year 2007 is a total of 5,200 bid and final bond guarantees. The final bond guarantee will result in $566 million in contract revenues and the creation of over 4,800 jobs, of which $226 million in contract revenues and 1,950 new jobs will benefit contractors facing special competitive opportunity gaps.

SBA has requested for its fiscal year 2008 budget an additional $500,000 to examine how to best serve the 8(a), HUBZone, and Small Disadvantaged Business communities, as well as women and veterans. The agency recognizes a need for improvement in these areas and is evaluating how best to make these improvements.

SBA will also support small business facing special competitive opportunity gaps by expanding bonding opportunities——

Chairman KERRY. Mr. Jenkins, I am sorry. I hate to interrupt you. I apologize for doing that, but I did ask you to summarize. You are now going through your entire written testimony, which is going to be part of the record. We are already at 4 minutes over the alloted time. I want to be fair, but if you can summarize, it would help us so we can ask some questions and get at it.

Mr. JENKINS. OK. I will just summarize by saying I know that the Committee will agree with the Administration that there is still a great deal of work to be done in creating opportunities for minorities and entrepreneurs in America. The President, Administrator Preston, and the SBA are committed to continue to forge ahead to achieve the goals that we have set for ourselves to not only leave a lasting legacy of accomplishments behind, but more importantly, to make the dream of thousands of aspiring entrepreneurs a reality.

I will be happy to answer questions the Committee may have.

[The prepared statement of Mr. Jenkins follows:]

**Testimony of**

**Calvin Jenkins**

**Deputy Associate Administrator for Government Contracting and Business Development**

**Before the**

**Small Business and Entrepreneurship Committee**

**United States Senate**

---

**Hearing on Minority Business Development**

**May 22, 2007**

***Minority Entrepreneurship: Assessing the Effectiveness of SBA's Programs for the Minority Business Community.***

Chairman Kerry, Ranking Member Snowe and other distinguished Members of this Committee, I thank you for the opportunity to testify regarding minority entrepreneurship and the effectiveness of SBA's programs.

I am Calvin Jenkins, Deputy Associate Administrator for Government Contracting and Business Development. I appreciate the opportunity to testify today on behalf of Administrator Preston, regarding the operations and successes of SBA's activities associated with minority business development as well as briefly discuss our continued efforts to enhance and ensure the continued accessibility of our products and services to entrepreneurs in our Nation's most underserved markets.

Minority-owned small businesses have a dramatic impact on the US economy, creating jobs and driving economic growth. According to SBA's Office of Advocacy, in 2002, minorities owned 4.1 million firms that generated $694.1 billion in revenues and employed 4.8 million workers. Of the 23 million non-farm firms, 6.8 percent were owned by Hispanic Americans, 5.2 percent by African Americans, 4.8 percent by Asian Americans, .9 percent by American Indians or Alaskan Natives, and .14 percent by Native Hawaiian or other Pacific Islanders.

Entrepreneurs, including minority entrepreneurs, face a number of challenges as they pursue their dreams and begin to create and expand their businesses. These challenges include: access to capital, the cost of health insurance, the need for training and technical assistance, access to Federal contracts, and regulatory burdens. SBA is focused on addressing the challenges of small businesses, and in particular, minority-owned small businesses and entrepreneurs.

There are many areas of the country that have significantly higher unemployment and lower income levels than the Nation's averages. Federally-defined economically distressed markets, which are typically based in inner-city and rural areas, include: Low/Moderate Income, Historically Underutilized Business (HUBZones), Enterprise Community/Empowerment Zones, and New Market Tax Credit Zones.

Higher levels of business formation and growth in these areas can promote job creation, business ownership, and economic vitality where they are most needed. In many cases, SBA's financial, technical, and contracting assistance programs are especially well-designed to meet the needs of small businesses in these "place-based" communities, as well as in "people-based" communities on which it also focuses (e.g., minority, female, and veteran entrepreneurs). In short, one of our principal jobs at SBA is all about increasing access to the tools that we presently have available to the people and communities that need them most.

**Making Progress**

SBA has made great strides in addressing the needs of minority entrepreneurs and small businesses. I am pleased to share with you the results of our efforts at increasing access for the underserved communities. Briefly---

- The number of minority loans approved by the SBA has increased from 12,010 in FY 2001 to 34,627 in FY 2006, and loan dollars have increased from less than $3.5 billion in FY 2001 to more than $6.7 billion in FY 2006.

- The number of loans to women approved by the SBA has increased from 9,986 in FY 2001 to 23,454 in FY 2006, and loan dollars have increased from $2 billion in FY 2001 to more than $3.4 billion in FY 2006.

- Through April 30, 2007, the end of the first seven months of the Federal Government's fiscal year, SBA has approved 20,186 loans for $3.7 billion for minorities and 13,723 loans for $2 billion for women.

- During the period from 2001 through 2006, the number of minority-owned small businesses that have received commercial credit through SBA's 7(a) and 504 programs has almost tripled, and has increased from less than 25 percent of total loans approved to 32.3 percent of total loans approved.

- In an effort to expand support for micro-borrowers, the SBA has piloted the Community Express program. This 7(a) pilot was designed specifically to reach underserved markets and provides both financial assistance and technical assistance. The latter is provided through leveraging the skills of the Agency's counseling and training partners —Small Business Development Centers, SCORE, and Women's Business Centers.

**Equity in Government Contracting**

The mission of our Office of Government Contracting and Business Development (GCBD) is to increase small business access to procurement opportunities utilizing various educational, training and counseling forums. The office is also responsible for increasing public awareness of SBA's government contracting and small business preference programs through targeted marketing and outreach initiatives in underserved markets and public-private partnerships.

For example, SBA is continuing to provide access for small and disadvantaged businesses to be able to compete in the Federal Marketplace. GCBD works to create an environment for maximum participation by small, disadvantaged, and HUBZone businesses in Federal government contract awards and large prime subcontract awards. Each year, our government spends billions of dollars purchasing goods and services from private firms. Congress has established a government-wide small business goal of 23% for small businesses, 5% for Small Disadvantaged Businesses, and 3% for HUBZone small businesses. SBA negotiates the goals annually with each Federal agency on an individual basis. The Federal achievement toward the SDB goal for FY 2005 was $21.7 billion or 6.92%.

In terms of expected performance for FY 2007 and FY 2008 we believe that we have set the bar very high. Some of our more ambitious goals include the following:

- FY 2008 Budget: Targeting a total of $85 billion in prime federal contracting dollars to be awarded to small businesses in FY 2008.

- SBA will focus on expanding bonding opportunities for more small businesses, especially minority owned businesses and businesses located in underserved communities.

- FY 2007: The goal for FY 2007 is a total of 5,200 bid and final bond guarantees. The final bond guarantees will result in $566 million in contract revenue and the creation of 4,880 jobs of which $226 million in contract revenue and 1,950 new jobs will benefit contractors facing special competitive opportunity gaps.

- SBA has requested for its FY 2008 Budget an additional $500,000 to examine how to best serve the 8(a), HUBZone and small disadvantaged business communities as well as women and veterans. The Agency recognizes the need for improvement in these areas and is evaluating how best to make these improvements.

- SBA will also support small businesses facing special competitive opportunity gaps by expanding bonding opportunities for contractors in underserved markets. OSG's Marketing Plan includes strategies specifically designed to help more of these small businesses. OSG will work closely with other SBA offices and programs, such as the Office of Government Contracting, 8(a) program, HUBZone program, and the Office of Women's Business Ownership to focus on specific groups.

## The 8(a) Program – Helping the Disadvantaged to Compete

The 8(a) Program is a business development program created to help small disadvantaged businesses compete in the marketplace. It is also designed to assist such companies in gaining access to Federal and private procurement markets.

The focus of the program is to provide business development support, such as mentoring, procurement assistance, business counseling, training, financial assistance, surety bonding and other management and technical assistance. The goal, however, is to prepare small disadvantaged firms for procurement and other business opportunities so that they can be competitive in the public and private marketplace. In FY 2005, 8(a) program participants received Federal contracts totaling $10.5 billion.

## HUBZone

The HUBZone Program stimulates economic development and creates jobs in urban and rural communities by providing Federal contracting preferences to small businesses. These preferences go to small businesses that obtain HUBZone (Historically Underutilized Business Zone) certification, in part, by employing staff who live in a HUBZone. The company must also maintain a "principal office" in one of these specially designated areas. The program resulted from provisions contained in the Small Business Reauthorization Act of 1997.

In FY 2007 and FY 2008 SBA field staff will complete 680 HUBZone reviews. This review of the HUBZone program portfolio is important to maintain strict internal controls on the program and its participants. To uphold the intent of this program it is important to ensure that participants continue to meet the eligibility criteria. The staff in the district offices is charged with many responsibilities. Recognizing the need to balance its resources and responsibilities, the Agency is committed to making the performance and accountability process a meaningful one by setting realistic yet challenging goals. In FY 2005, HUBZone firms received Federal contracts totaling $6.1 billion.

## Native Americans

Finally, let me also briefly mention our efforts to assist the underserved Native American market. SBA is targeting marketing, outreach and training to Native Americans to enhance their business opportunities. During FY 2007, the Office on Native American Affairs (ONAA), tribal leaders and decision makers will continue to embark upon existing initiatives to complete the web-based "Self Assessment Tool". This web-based tool will be available to all members of the Tribal community, directing tribes into areas of likely success and away from pursuit of initiatives ill-suited to the tribal Nation. Outreach will continue to promote tribal and entrepreneurial 8(a) certification, government contracting, and business development through training and technical assistance.

**Work Still to Do**

I know the committee will agree with the Administration that there is still a great deal of work to do in creating opportunities for minority entrepreneurship in America. The President, Administrator Preston and the SBA are committed to continuing to forge ahead to achieve the goals that we have set for ourselves to not only leave a lasting legacy of accomplishment behind but more importantly to make the dreams of thousands of aspiring entrepreneurs a reality.

This concludes my testimony. I look forward to answering any questions you and the members of the committee may have.

Chairman KERRY. Thank you, Mr. Jenkins. I appreciate that.

In the beginning of your testimony, you listed—first of all, we are all glad to see the growth in certain sectors, as I acknowledged in my opening comments. The issue is not whether there is growth or not. As Senator Cardin said, one of the fastest-growing areas is small business entrepreneurs. The question is, are the programs working as effectively as they ought to be and are we opening up contracting to the degree that we ought to be, so that we are really maximizing this opportunity?

There is a huge wealth disparity in America. The average wealth of an African American family in the United States is about $6,100. The average of a white family is about $67,000. So it is a big, big gap.

And while we see people starting up, as Senator Cardin also mentioned, there is the disparity. They get a lot of microloans, so they are getting small amounts of money, but they are not getting the 7(a) or 8(a) at the level they ought to be, and the technical assistance particularly, which a lot of people feel is the key to the SBA.

Can you sort of address that for us? Maybe I will simplify the question with that predicate by saying you mentioned challenges that still remain—the access to capital, the cost of health insurance, the need for training and technical assistance, access to Federal contracts. These are problems that almost anybody faces. Is there something that you believe also is particular to the minority community beyond those issues?

Mr. JENKINS. Well, I think a lot of what small businesses face in general is what minorities face, especially when you look at it in terms of Federal procurements. For example, 10, 15 years ago, there was a very visible relationship with the contracting officer and, let us say, a small business or minority business. Today, the system has been replaced by automation and so there is less interaction, personal interaction. So I think knowing the systems, knowing how to do business with the Federal Government, I think it is important that we get that information to minority businesses as well as small businesses in general and I think they can——

Chairman KERRY. So there is a knowledge deficit that you think is—an experience deficit——

Mr. JENKINS. Yes.

Chairman KERRY [continuing]. That you have got to make up, particularly with respect to minority businesses.

Mr. JENKINS. Yes. I believe it is key that the SBA makes its programs aware, that the minority community is aware of the programs and that they take full advantage of these programs.

Chairman KERRY. Is it fair to say that that is the reason that the 8(a) program exists, because there are challenges that are actually based on race that still exist for minority business owners?

Mr. JENKINS. Yes, there are, and the 8(a) program, as you are aware, is a business development program, and our key piece there is to provide business development assistance. As part of that, contracts are available, but the key there is to make sure that they are aware of the program and how to best leverage the program.

Chairman KERRY. Now, with respect to that leverage, let me address that for a moment. One of the major concerns that we hear

from 8(a) participants is the lack of contracts that come from the program. We all understand that being in the 8(a) program doesn't mean that you have an automatic flow of contracts, et cetera, but many participants are sitting in the program for 3 to 4 years before they get a contract, and by the time they actually begin to see some benefit, boom, they are out of the program.

Of the 10,000 or so 8(a) firms that are part of the program, can you share with us how many actually get contracts per year?

Mr. JENKINS. Well, roughly, it takes a firm who is entering the 8(a) program about 16 months to 2 years before they receive some kind of contract assistance. The key with the 8(a) program is different from the Small Disadvantaged Business Program in that there is a potential for success requirement so that it requires firms to be in business for at least 2 years so that they have a sense of how to create revenues for their business.

What we try to do through our district offices is to help the firm, one, develop a good business plan, and then, two, market the agencies that actually purchase the product and services that they look to provide. And so that becomes the key, not a shotgun approach, but more a very targeted approach so that they are not wasting their resources and their energy trying to reach out to too many agencies, versus being very specific to those that offer the product and services they offer.

Chairman KERRY. That said as an approach, do you know how many actually get contracts, how many firms get work out of the program each year?

Mr. JENKINS. I don't have the actual number. I do know that in fiscal year 2005, the 8(a) program did about $10.5 billion——

Chairman KERRY. Could you check for us?

Mr. JENKINS. Sure.

Chairman KERRY. Could you make that one of the things on a punch list here to get to the Committee for the record, so we could determine that?

Mr. JENKINS. Sure.

Chairman KERRY. What are you doing specifically to help program participants get the most out of their contracting preference, because 8(a) gives you a contracting preference.

Mr. JENKINS. That is correct.

Chairman KERRY. What is happening to guarantee that that preference is, in fact, beneficial to minority business owners?

Mr. JENKINS. Well, one of the keys is when a firm enters the 8(a) program, they are assigned to a district office in their geographic area. They are also assigned a specialist that works with the firm, that works with them in developing their business plan, but also that works with the Federal agencies that procure the product or services the firms offer.

We also leverage our Procurement Center representatives. As they look at procurements that are coming down that may be available to firms that are small business or firms in the 8(a) program, they coordinate with the various district offices to ensure that those opportunities are made aware and firms are identified to go after those requirements.

Chairman KERRY. One of the keys is the Technical Assistance Program which is really important to a lot of startup early compa-

nies. There is a specific line item called the 7(j), which you are familiar with, which is in the Minority Business Development Program. This is specifically for technical assistance, but your agency removed that line item. Elsewhere in the budget, it says that $1.5 million is to be used to fund that. But the lack of a line item is important because there is no guarantee that any money is being spent on technical assistance and there is no transparency. What are we to make of that?

Mr. JENKINS. Well, Administrator Preston has made it very clear that he is supporting providing the necessary levels of business development assistance to the firms that are in the 8(a) program——

Chairman KERRY. Why not fund the 7(j)? I mean, just last week, we were informed that the money that at one time came out of the 7(j) program to support training is now gone.

Mr. JENKINS. No, I don't believe that is correct. We currently are supporting with the funding that we have in fiscal year 2007, as well as what we received in 2006 went toward——

Chairman KERRY. Would you check on that? I may be incorrect, but I just would like to get this for the record. If you would check what the 7(j) money was used for or is used for and perhaps provide the Committee with a detailed explanation of what it went for last year and what it is slated to be used for this year, because my understanding is it is not going to technical assistance.

Mr. JENKINS. Well, that falls directly under my office. Last year, what we did, we hired third-party technical assistance providers and we provided literally thousands of 8(a) firms in the program training around the country to various district offices. Our plan is to continue that effort in fiscal year 2007, as well.

Chairman KERRY. So you will third-party contract?

Mr. JENKINS. That is exactly right. We leverage—one of the things in providing technical assistance is, one, use the 7(j) funds we were given to provide third-party assistance, folks who have expertise in providing this assistance. We also leverage our resource partners, such as our SBDCs. We are currently working very closely with our SBDCs to develop some products that we think will be very helpful to the 8(a) firms, and then look at other resources, as well, within the agency. But in fiscal year 2006 and fiscal year 2007, we used 7(j) funds specifically for providing that third-party assistance.

Chairman KERRY. I appreciate that.

Now I'd like to discuss the net worth limitations associated with the 8(a) program. There is the $250,000 limitation for entering and then you can't exceed $750,000 in net worth or you're removed from the program. Those haven't been updated in more than a decade, and one of the things we hear is that maybe that is squeezing some people out who need the assistance to get in, and that it is early in pushing people out. Could you react to that?

Mr. JENKINS. Sure. We believe that those levels currently that are set are appropriate. It is the net worth of the individual, not the net worth of a business. There has been a lot of confusion as to whether or not it is the business net worth. This is the individual and the statute, the Small Business Act, allows for two exclusions, the equity in one's home, as well as the investment in one's business. So when you look at even the $250,000 net worth,

it probably accounts for close to 95 percent of all Americans. When we look at the average net worth of someone that enters the 8(a) program, it is probably somewhere in the $60,000, $70,000 range when you make those two exclusions. The same thing is with the $750,000 net worth. Again, those two exclusions take place and it is just the individual net worth.

Chairman KERRY. Is that a determination that has been made recently? I mean, has there been some analysis within SBA to actually conclude what you just said to us, or—I mean, over 10 years, values have changed significantly in the country.

Mr. JENKINS. Mm-hmm.

Chairman KERRY. You don't think it is appropriate after a 10-year shift in property values, asset values, income values, wages, all these different kinds of things, that that threshold might not need some kind of indexing or updating, because it seems to squeeze downwards rather than be expansive, which is what you would want to be. Two-hundred-fifty-thousand dollars 10 years ago, I don't know what the value is today, but it certainly is different by some significant component over 10 years, perhaps even as much as doubled. Who knows.

Mr. JENKINS. Yes. No, there have not been any recent analyses that SBA has conducted on that, but the only thing that I can, once again, say is that it excludes the equity in one's home and excludes the investment in the business, and so the $250,000—and what we see, again, is the average individual that comes into the 8(a) program is well below the $250,000. So it would sort of argue against a need to increase it when the average is coming well below that.

Chairman KERRY. Thank you very much, Mr. Jenkins.

Senator Snowe.

Could I just mention something? I have been following the clock here, trying to keep my time, but it keeps repeating itself. Could we just do a total time on it? That would be helpful. Thanks.

Senator SNOWE. Thank you, Mr. Chairman.

Mr. Jenkins, I appreciate the statistics that you have given in terms of how much progress has been made with respect to these programs, but your testimony really didn't address many of the fundamental concerns that have been raised in a series of Inspector General reports since 2004, the most recent from March of 2006. The testimony from the second panel this morning will raise a number of issues that have been a concern of this Committee and obviously a concern of those who will be testifying.

For example, Mr. Robinson is going to talk about substantial examples of abuses and exploitation of small minority-owned businesses. I mean, it is a concern. He cites a number of individuals who, at great risk, come forward to tell their story. Now, have these individual cases come to your attention and what is the SBA doing about them?

Mr. JENKINS. Well, first of all, I believe that Administrator Preston is very concerned to ensure that we have adequate levels of oversight of the 8(a) program. Certainly the 8(a) program is a program that if we are not—if we don't have the proper levels, then it could create some problems where the benefits are not going to those who they are intended for.

One of the things that we have done under Administrator Preston is we are conducting some studies, top-to-bottom review, for example. We are currently reviewing the mentor-protégé program. We have an outside contractor that is working with us to evaluate that program.

We are looking at one of the keys when someone talked about making sure that more firms receive contracts in the program. We have a provision in our regulations called the Competitive Business Mix which require firms to wean themselves off of 8(a) contracts when they get into the transitional year. We are looking at that to make sure that we are properly—have oversight over that, as well as the joint venture provisions in the program.

So there are about three or four areas that we are working on that we believe do address some of the concerns that are in the IG and GAO reports.

Senator SNOWE. Have you had any examples of abuses? Have minority-owned businesses come to your attention, such as the ones that have been cited in Mr. Robinson's testimony?

Mr. JENKINS. Yes. I mean, we are aware of certain abuses and we are looking at ways to, one, improve our regulations, and two, improve our overall oversight.

Senator SNOWE. I guess my question is what aggressive oversight is the SBA providing with respect to these programs? I mean, that is the bottom line because many of these issues have been raised repeatedly. With respect to contract bundling, many of those issues have not disappeared. Many of these contracts that have been bundled have gone forward without the SBA's review. So there is no aggressive effort on the part of SBA to examine some of these major flaws with respect to programs that are supposed to help minorities throughout the country. So what do you do, for example, when there is such a case of exploitation and abuse? What kind of action does SBA take?

Mr. JENKINS. Well, first of all, we look to ensure that our regulation—one, are our regulations adequate in terms of preventing the problem or do we have an issue with the abuse, with something that is more—that would be referred to our Office of Inspector General? But the key is to ensure that we have adequate regulations, that our staff is adequately trained. A lot of the program is actually monitored and administered in our district offices and we conduct routine training with our staff to ensure that they are catching any possible abuse and that the firms are getting the benefits.

Senator SNOWE. Can you please enumerate for the Committee what specific changes have been made to the 8(a) program and the Small Business Disadvantaged Program that respond directly to the issues raised by the Inspector General?

Mr. JENKINS. We have not issued any new regulations. We are currently in the process of developing new regulations that we believe will go directly to some of the issues that are raised in both the——

Senator SNOWE. When do we expect that to be completed, I mean, because these reports came out in 2004, 2005, and now the most recent was 2006. So when do we expect this process to be completed?

Mr. JENKINS. We hope during this fiscal year.

Senator SNOWE. During this fiscal year?

Mr. JENKINS. This fiscal year, that we will have some draft regulations that will go through the process.

Senator SNOWE. And what changes do you hope to accomplish?

Mr. JENKINS. Well, I think the——

Senator SNOWE. Because these issues were raised with Administrator Preston early on——

Mr. JENKINS. Sure.

Senator SNOWE [continuing]. Back in February during a hearing. So at what point do we expect to have those changes, and which specifically can we expect?

Mr. JENKINS. I think one of the things that we are concentrating on is our oversight of the program, to ensure that we have adequate oversight of the programs, that we have procedures that address any of the potential issues that have come up, that they have very clear guidance for both the firms that are in the program as well as for our staff that is administering the program.

Senator SNOWE. Are you aware of a number of companies, large companies, that are not complying with their subcontracting goals, I mean, they are basically a front? They draw small businesses in. We will hear that in subsequent testimony, that they draw small businesses in, but yet when it comes time to issue those subcontracts, small business participation is far below what they originally indicated and promised.

Mr. JENKINS. Yes. That has been an issue for Federal procurement for a number of years, when a small business takes time, effort, and resources to make a proposal to a large firm to get on a team and after the large firm has received the contract, there have been instances where the small businesses were pushed off the team. We are certainly very concerned about that.

We have worked very closely with the procuring agencies that really have the authority to enforce whether or not there is good faith effort. The law talks about good faith effort on the part of the large business prime and the only one that has the authority to enforce that is the contracting officer at the agency. So where we are notified by small businesses, we bring that to the contracting officer's attention and we try to increase our oversight of that large business prime through our subcontracting program.

Senator SNOWE. I think that enforcement and heavy penalties might help them to exercise a good faith effort, because that clearly hasn't been demonstrated in a number of instances and it continues to be a persistent problem. Thank you, Mr. Jenkins. Thank you, Mr. Chairman.

Chairman KERRY. Thank you, Senator Snowe, an important line of questioning. Senator Snowe doesn't need any assistance in defending what she is asking, but I might comment that you didn't answer her question specifically about what she could expect when and what is being specifically implemented on the 8(a).

Mr. JENKINS. Well, at this point, as I mentioned——

Chairman KERRY. When could we expect those changes?

Mr. JENKINS. Well, because of the process, the clearance process that any proposed regulations will go in, it will be very difficult for me to give a specific date. Our plan is to have regulations in place

by the end of the fiscal year. Earlier this year, and I believe late last year——

Chairman KERRY. Why does it take so long? Why does this drag on? I mean, as the Senator said, the Inspector General reported on a lot of this stuff last year. It just seems like nobody is really moving this with any sense of priority.

Mr. JENKINS. Well, we—in the public notice, we identified areas that we were going to address in the Advance Notice of Rulemaking. That was made available to the public earlier this year as well as late last year. There are specific areas that we are working on. We are currently reviewing that internally, but——

Chairman KERRY. Do you have a plan as to when the promulgation will take place? Is there a plan? Is there a business plan here or a date?

Mr. JENKINS. There are dates, but understanding the process, once regulations are released by an agency, then they do go to Office of Management and Budget——

Chairman KERRY. Sure. There are timeframes for all that.

Mr. JENKINS. Exactly. Our plan is to get those regulations cleared through SBA and over to OMB well before the end of this fiscal year.

Chairman KERRY. Senator Cardin.

Senator CARDIN. Thank you very much, Mr. Chairman.

Mr. Jenkins, thank you for your testimony. But I am going to tell you, I am disappointed that we are not getting more specifics as to the topic of our hearing, and that is helping minority small businesses. I am somewhat surprised that there isn't a greater acknowledgement of the problems that are out there with the current programs and the challenges of the budget support to your agency.

We are trying to work together to help minority businesses and it would be helpful if we had more specific direction from SBA as we try to improve the programs. It just points out, Mr. Chairman, the need for the special office within SBA to deal with minority businesses so that we have a focus on this issue.

The one area—well, there is more than one, but the one area that you are specific about in your testimony, you say that for the fiscal year 2008 budget you are targeting a total of $85 billion in prime Federal contracting dollars to be awarded to small business.

Mr. JENKINS. That is correct.

Senator CARDIN. How much of that will it be a goal to award to minority small businesses?

Mr. JENKINS. Well, currently, the rules talk—the statute requires a 5-percent goal and what the SBA will do is continue to negotiate that with the various agencies. Over the past 5 years, that goal has been exceeded, from anywhere from 6 percent to as much as 7 percent.

Senator CARDIN. Do you think that is a reasonable percentage, considering that Senator Snowe pointed out one-third of our population is now minority and approximately 50 percent of the new small businesses are minority? Is that what you think is the right goal for this country?

Mr. JENKINS. This is the statutory goal——

Senator CARDIN. I understand the statutory goal. I am asking your view. You are on the front lines. You are dealing with the businesses. Is that the right goal for this country?

Mr. JENKINS. I can't answer that, Senator. The only thing I could——

Senator CARDIN. Who could answer it in the agency as to what needs are out there? You are the one who we rely upon to give us the information. I think it is not. I think we should be doing better than that. But it would be nice if we had your experienced view on that as to what we should be shooting for. Do you have a specific number as to—these are prime contracts we are talking about?

Mr. JENKINS. These are prime contracts, prime contracts to small businesses.

Senator CARDIN. I must tell you, I get complaints all the time from small minority businesses in my State about the difficulty in getting prime contracts.

Mr. JENKINS. In terms of the specific goals, certainly there is always room for improvement in terms of—and that is one of the things the SBA does. We negotiate individually with each of the Federal agencies. Some agencies will give us a higher goal and we will achieve higher than the 5 percent. Others will be at the 5 percent.

Senator CARDIN. Well, let me go to the 7(a) and the 504 loan programs. The information that we have is that from fiscal year 2001 to fiscal year 2006, the share of loan dollars to African Americans has risen only 1 percent, from 3 percent to 4 percent. For Hispanics, the share of the dollars have risen from 6 percent to 8 percent. Are you satisfied with those numbers?

Mr. JENKINS. No. I don't think Administrator Preston is satisfied and he——

Senator CARDIN. What are you doing to increase those numbers?

Mr. JENKINS. We are currently working with our Office of Capital Assistance to look at ways of increasing the program, looking at the specific programs we have. I mentioned the Community Express Program has been very successful in reaching these underserved communities?

Senator CARDIN. Are you going to have specific recommendations for how we can get those numbers up?

Mr. JENKINS. I believe the agency is looking at ways of how to get these numbers up, yes.

Senator CARDIN. And do you have any thoughts as to what that number should be? Should it be—what percentage should be going to minority businesses?

Mr. JENKINS. No, I cannot commit to a number.

Senator CARDIN. I didn't think so. And last, Mr. Chairman, I know my time is running out, on the 8(a) program, you talk in your testimony about the importance of the program for mentoring, procurement assistance, business counseling, training, financial assistance, technical assistance, and yet the budgets have been reduced in those areas. Does that mean that we are spending too much money on technical assistance within 8(a)?

Mr. JENKINS. No. I believe we have the opportunity to leverage all of SBA's resources——

Senator CARDIN. Are you satisfied with the level of service presently being provided for technical assistance?

Mr. JENKINS. No, and we are looking at ways to increase the technical assistance to all the firms that are in the program.

Senator CARDIN. Well, I hope so, because I must tell you, that is another area that I get tremendous concern from the minority small businesses in my community, that SBA is not doing enough to help these firms in moving forward with procurement opportunities. I understand we have a desire for success. They must be successful, be able to succeed on their own—but in order to get there, they need help and that is your responsibility.

Mr. JENKINS. That is correct.

Senator CARDIN. And I would have hoped that you would have been a little bit more specific and forthcoming about what we can do to improve the 8(a) program, because we get complaints. I agree with the Chairman. The income levels are of concern to businesses in my community. They haven't been changed in many years. I would just hope we could work together to try to improve these programs so these percentages are more in keeping with the population of this country and with the new business starts in this country.

Thank you, Mr. Chairman.

Chairman KERRY. Thank you, Senator Cardin.

Senator Tester.

Senator TESTER. Thank you, Mr. Chairman, and I want to thank you, Mr. Jenkins, for your testimony.

I want to switch a little bit to Native Americans. I am looking at some charts here that show that the 7(a) loans, about 1 percent go to Native Americans, and evidently the 504 is so small it doesn't register on the chart. The question I guess I have for a start is how do the requests equate with the amount given? In other words, when you are getting loan requests from Native American minorities, how do those requests stack up with the amount loaned?

Mr. JENKINS. I don't have the number. Basically what happens is, as you are aware, the SBA guarantees loans. So the first contact is through our marketing effort through the district offices and then on channeling the businesses through the various banks in which SBA has a relationship with.

Senator TESTER. OK. So you have no way to monitor that——

Mr. JENKINS. No.

Senator TESTER [continuing]. That ability? So do you have the ability to monitor success, then, of the loans that are guaranteed?

Mr. JENKINS. Yes. We have the Loan Monitoring System at SBA in which we look at the performance of all of the loans within the 7(a)——

Senator TESTER. Can you tell me how the minority loans stack up against the other loans, and specifically could you tell me how the Native American loans, from a success rate standpoint, stack up?

Mr. JENKINS. I don't have that with me, but I am sure we can get that——

Senator TESTER. I would like to get that from you.

Is there anything you are doing in Indian Country to let people know what is out there as far as program availability and help educate them on how to access those programs that SBA offers?

Mr. JENKINS. Yes. That is really the foundation of our district offices to make sure constituents in their particular geographic areas are aware of all of the SBA's programs to leverage any of our resource partners that may be there to also get the word out.

Senator TESTER. Is there a special effort being made to let people know, because, I mean, the amount of money that is being lent is almost, truthfully, almost nonexistent in areas of our State where under the best conditions there is 50 percent unemployment, and it rises up over three-quarters unemployment almost as a rule.

Mr. JENKINS. Sure.

Senator TESTER. So is there any instruction given to those district offices to get out there and explain to the folks who are the entrepreneurs, the minority entrepreneurs, what is available?

Mr. JENKINS. Yes, there is. Administrator Preston has an initiative to ensure that we reach the underserved markets, that we increase lending to all of the communities within the underserved market. And so, once again, leveraging our resource partners, because sometimes a firm may not get the loan and we need to know that in order to provide some business assistance to them.

Senator TESTER. I would ask a similar question as to what was previously asked as to if you think we are making an adequate amount of loans in Indian Country throughout the United States, but I know your answer would be no, and it should be if it is not. I think that there needs to be a concerted effort on the part of SBA across the board, particularly in Indian Country, to educate folks.

I want to touch a little bit on banking, if I have got a minute. You guys guarantee these loans to the banks. Is there any oversight done to the banks, I mean, as far as if they are working the system?

Mr. JENKINS. Yes. We have a very stringent oversight. We look at, as part of the Loan Monitoring System, not only do we look at the individual loans themselves, but we also look at the performance of the individual banks.

Senator TESTER. As far as the percentage that is paid and the percentage that you are guaranteeing?

Mr. JENKINS. Oh, yes. Yes.

Senator TESTER. OK. The dollars that are lent—and there are several figures here—I don't know if they are individual or cumulative, but $6.7 billion in fiscal year 2006 to minorities is what I have from your testimony. Those dollars, are they all for startup, or do you know that, or are some of them for continuing, and what percentage each way, and do you have the ability to know that?

Mr. JENKINS. Sure. I don't have the breakdown, but they are the total. They cover startups all the way to more mature businesses.

Senator TESTER. Just in closing real quick, and thank you, Mr. Chairman, Mr. Jenkins, I do appreciate your testimony. I hope that the SBA sees some sort of urgency—I do—as far as education and letting people know. There is a reason why there isn't the kind of investment in Indian Country that there ought to be, and we need to determine what that is so that we can move forward. I mean,

there are people with good ideas all over and I would hope that you would make it a priority.

Mr. JENKINS. Sure.

Senator TESTER. Thank you. Thanks, Mr. Chairman.

Chairman KERRY. Thank you, Senator Tester.

Mr. Jenkins, can you stay for the testimony of the folks following?

Mr. JENKINS. Sure.

Chairman KERRY. I think it would be important for you to hear what they have to say. Too often, we have panels arranged that way and I am going to try to see if we can change that as we go forward.

But I think you can tell from the Members of the Committee, Mr. Jenkins, there is a real anxiety here on the committee about the implementation of this program. You just look at this chart up here and you see the distribution and it is very, very disturbing when you measure it, particularly—look at the microloans. You have got 22 percent. Look at what is going to African Americans in terms of microloans versus the larger loans of either the 7(a) or the 504. The 504 is, what, 2 percent. I mean, it is just crazy on its face. It is almost insulting and it is unacceptable.

I am going to, I think, ask Senator Snowe if she would join with me and with other Members of the Committee in writing a very specific letter to the Chairman asking for a more detailed and precise set of expectations of what we can look for as we go forward here, because we all hear this. We go out, anywhere we go in the country, we talk to people, the people that we are supposed to be helping, that this program has been set up to serve, and this isn't to serve us. This isn't to help the folks who are in the program administering it. This is for the people out there who need it.

It does a disservice to everybody if there isn't a kind of energy, a lift, a push to try to say, hey, let us do better. Let us expand this. That reverberates throughout the community. People feel it and they know it when they see that kind of activity. But it just frankly seems like nothing is happening.

And when you look at the lending level differential there, you know, they are up, but they are smaller. The technical assistance is less. It is just not accomplishing what it ought to be, and you yourself have acknowledged there is a race-based need for this because there are problems out there.

So we ask you to think about that. We are going to leave the record open for a couple weeks to submit some questions in writing from colleagues and staff at the end of this. And I am glad you can stay because I want you to hear what our next panel has to say. Thank you.

I would invite the next panel, if they would, to come forward, Dr. Jon Wainwright, vice president of National Economic Research Associates; Mr. Tony Robinson, president of the Minority Business Enterprise Legal Defense and Education Fund; Bill Miera, the CEO of Fiore Industries; and finally, Mr. Fernando Galaviz, chairman of the Small Business Association for Technology. Thank you all for taking time to be here.

Again, if I could ask each of you to summarize your testimonies in the 5 minutes, and we will proceed. Why don't you lead off, Dr. Wainwright.

**STATEMENT OF JON WAINWRIGHT, VICE PRESIDENT, NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC., AUSTIN, TEXAS**

Dr. WAINWRIGHT. Thank you, Chairman Kerry, Ranking Member Snowe, Members of the Committee. Thank you for allowing me to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin and currently am a vice president with NERA Economic Consulting. I would like to ask the Committee's permission to supplement my testimony with additional written materials, if needed.

Chairman KERRY. Without objection, so done.

[The supplementary material referred to by Dr. Wainwright may be accessed on the Committee's Web site at *http://sbc.senate.gov/20070522.cfm.*]

Dr. WAINWRIGHT. For almost 20 years, I have devoted the greater part of my professional life to studying race and sex discrimination and its impact on business enterprise in the United States. Since 2000, I have served as the policy director and principal investigator for 22 studies of business discrimination. I have authored a book on the subject and have provided expert testimony in Federal and State courts on these matters.

The primary bulwark against business discrimination in the United States has been the use of public sector purchasing power to support the endeavors of Minority-Owned Business Enterprises, or MBEs, and to promote fair and full access to Government contracting opportunities. Programs such as 8(a) and 8(d) and 7(a) of the SBA and the DBE program of the U.S. DOT are key examples of such policies at the Federal level.

I would like to address myself today to the current state of MBEs in the United States and discuss statistics from some key publicly available data sources. The first is the 2002 Survey of Business Owners. We have already heard some statistics from that today. Large disparities are observed in this survey between minority share of the business population and the corresponding share of business sales and receipts.

For example, although African Americans comprised 5.3 percent of all U.S. businesses in 2002, they earned only 1 percent of sales and receipts. Hispanics and Latinos, 7 percent of the businesses, but only 2.5 percent of receipts. Asians and Pacific Islanders, 5 percent of businesses, but only 3.8 percent of receipts. Native Americans, 0.9 percent of businesses, but only 0.3 percent of receipts. As you mentioned, Chairman Kerry, 18 percent, roughly, minority business share in the United States, but only 7.5 percent, roughly, of the sales and receipts for the business population.

Not only are these disparities very large, they are also statistically significant, meaning they are unlikely to have arisen due to chance. Similar results are observed in all 50 States and the District of Columbia and in all major industry sectors.

Now, it is a fair question to ask whether these disparities arise primarily from discrimination or whether they are due to other po-

tentially non-discriminatory factors. The evidence strongly suggests they result from discrimination. I have tested this hypothesis using microdata from the 2000 and the 1990 Decennial Censuses. The advantage of Census data is that it allows us to compare business owners while holding a variety of other potentially non-discriminatory factors constant. Even when this is done, however, disparities facing MBEs remain large and statistically significant.

Lack of access to capital and credit is among the most frequently cited obstacles to success among MBEs. Discrimination in the credit market can obviously have an important effect on the likelihood of success in business. The Survey of Small Business Finances Data allows us to test for business discrimination in credit markets. These data contain complete balance sheet and credit history information for each business interviewed, the same information that would be available to a loan officer in deciding whether or not to grant credit. These data show that minority-owned firms are substantially and statistically significantly more likely to be denied credit than are white-owned firms with similar balance sheets and similar credit histories. We also find that when minority-owned firms do receive loans, they are obligated to pay higher interest rates than comparable white-owned firms.

In addition to statistical evidence, we have conducted thousands of surveys and hundreds of personal interviews with MBEs and non-MBEs alike. The results are strikingly similar across the country. In general, minorities report that they still encounter significant barriers to doing business in the public and private sector marketplaces as both prime contractors and subcontractors, including stereotypical attitudes about their qualifications, double standards in performance, bonding and credit discrimination, and supplier price discrimination.

There is also general agreement among MBEs that without the use of affirmative remedies such as subcontracting goals, these firms would receive few, if any, opportunities on Government contracts, as is the case on projects without such goals. Thus, the continued operation and effective operation of programs such as 8(a), 8(d), and 7(a) were deemed essential to MBE survival.

In conclusion, it is fairly easy to specify in a general way the economic consequences of these programs. They have improved economic opportunities for minorities and women in business and, therefore, improved the competitiveness and efficiency of the American economy. I am optimistic that the statistical and anecdotal evidence will one day show that programs such as 8(a), 8(d), and 7(a) are no longer necessary because MBEs have achieved parity, competitive parity, with their majority-owned counterparts. However, my own research shows that this day has not yet arrived.

Thank you, and I will be pleased to answer any questions.

[The prepared statement of Dr. Wainwright follows:]

NERA
Economic Consulting

**Testimony Concerning the Current State of Minority-Owned and Women-Owned Business Enterprises in the United States**

*Testimony of Jon S. Wainwright, Ph.D., Vice President, NERA Economic Consulting*

Before the Committee on Small Business and Entrepreneurship

United States Senate

May 22, 2007

Chairman Kerry, Ranking Member Snowe, and Members of the Committee:

Thank you for the opportunity to appear here today. My name is Jon Wainwright. I hold a Ph.D. in economics from the University of Texas at Austin. Currently, I am a Vice President with National Economic Research Associates, also known as NERA Economic Consulting, in Chicago, Illinois and Austin, Texas.[1]

I would like to ask the Committee's permission to supplement my testimony with additional written materials if needed.

Introduction

For almost twenty years, I have devoted the greater part of my professional life to studying race and sex discrimination and its impact on business enterprise and entrepreneurship in the United States.

I have served as the project director and principal investigator for 22 studies of business discrimination against minorities and women completed since 2000 and prior to that time on perhaps a dozen more.[2] I have authored a book on the subject and have provided expert testimony in federal and state courts on these and other labor and business related matters on 12 occasions.

I was fortunate to have been tutored at the start of my career by two of the country's leading scholars in this field—Dr. Ray Marshall, Professor Emeritus at the Lyndon B.

[1] NERA is an international firm of economists who understand how markets work. We provide economic analysis and advice to corporations, governments, law firms, regulatory agencies, trade associations, and international agencies. Our global team of more than 600 professionals operates in over 20 offices around the globe. Because of our commitment to deliver unbiased findings, we are widely recognized for our independence. Our clients come to us expecting integrity; they understand this sometimes calls for them to listen to unexpected or even unwelcome news. NERA's founding principles remain its guiding principles today: focus, independence, defensibility and clarity.

[2] Our recently completed disparity study for the City and County of Denver is available on the World Wide Web at the following address: http://www.milehigh.com/business/do-business/CEI. I will include the Executive Summary of this report in an appendix to my testimony along with several other executive summaries and reports I have authored or co-authored. I also intend to include the complete text of our recently completed disparity study for the State of Maryland, which is cited at several key points in my testimony.

Johnson School of Public Affairs at The University of Texas at Austin and former United States Secretary of Labor, and Dr. Andrew Brimmer, former member of the Board of Governors of the Federal Reserve, former Assistant Secretary of Commerce, and Professor Emeritus at the University of Massachusetts, Amherst.

A key lesson I absorbed from these men was expressed by Professor Marshall in this way:

> "Institutionalized discrimination in business transactions is deeply rooted in the American economy. There can be no doubt that business discrimination inflicts serious damage on the society, polity, and economy. Governments have a responsibility to improve public understanding of the seriousness of this problem and to take positive steps to address it. These positive steps must include public education, specifically outlawing this form of discrimination, using governments' purchasing power to help those who are being discriminated against while rewarding those who do not discriminate, and developing race neutral programs to help all small businesses."[3]

If you accept that discrimination in business transactions is indeed deeply rooted in the American economy, then it is difficult to argue with the logic of Dr. Marshall's conclusions.

During the last twenty years, the primary bulwark against business discrimination has been the policy of using public sector purchasing power to support the entrepreneurial endeavors of minority-owned and women-owned business enterprises (M/WBEs) and to promote fair and full access to government contracting and procurement opportunities. Programs such as 8(a) and 8(d) at the Small Business Administration, the Disadvantaged Business Enterprise (DBE) Program at the Department of Transportation, and the Small Disadvantaged Business (SDB) Program at the Defense Department are key examples of such policies at the federal level.

I would like to address myself today to the current state of M/WBEs in the United States, and the continuing need for affirmative public sector programs such as those of the SBA, the USDOT, and the USDOD. Before continuing, however, it is important to recognize the enormous amount of relevant evidence that already appears in the Congressional record. A useful synopsis of this evidence was provided by the Tenth Circuit Court of Appeals in their 2000 decision in *Adarand Constructors*.[4]

---

[3] Ray Marshall, "Minority and Female Business Development After *Croson*," Working Paper, 2000.

[4] *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1167-1175 (10th Cir. 2000) (discussing evidence before Congress of discrimination against minorities in the construction industry in enacting the Disadvantaged Business Enterprise Program for federal-aid transportation contracts, Pub.L. No. 100-17,

The disparities between minorities and Whites are much greater in business than they are in other economic activities, even though these other disparities remain considerable. The gap is particularly wide with respect to income and wealth. Currently, for example, African-Americans represent roughly 13 percent of the U.S. population, 12 percent of the civilian labor force, and 11 percent of total employment. However, African-Americans received only 7 percent of total money income, owned only 5 percent of the nation's businesses, and made only 1 percent of business sales.[5]

We create many original and custom data sets in our research studies of M/WBEs. Your time is valuable and my time before you is limited, however, so I wish to briefly focus today on statistics from three or four important data sources, all produced within the federal government, that we utilize regularly in our research. These are the *Survey of Business Owners* (SBO) and the *Public Use Microdata Sample* (PUMS) from the decennial census, both produced by the Census Bureau, the *Current Population Surveys* (CPS), produced jointly by the Census Bureau and the Bureau of Labor Statistics, and the *Survey of Small Business Finances* (SSBF) produced by the Federal Reserve Board and the SBA. These are the key publicly available data sources that are able to shed light on the state of M/WBEs.

Survey of Business Owners

The most recent SBO data from 2002 counted just under 22.5 million privately held business enterprises in the United States. Those firms, in total, made $8.78 trillion in sales and receipts, or almost $391,000 per firm on average.

Large disparities are observed in the SBO between the share of minorities in the general population and their share of the business population.

- Although African Americans comprised 12.7 percent of the U.S. population in 2002, they accounted for only 5.3 percent of its businesses.
- Although Hispanics and Latinos comprised 13.4 percent of the population, they accounted for only 7.0 percent of the businesses.
- Although women comprised 50.9 percent of the population, they accounted for only 28.9 percent of the businesses.

More troubling still, there are large disparities between the minority and female share of the business population and their share of business sales and receipts.

---

101 Stat. 132 (1987), Pub.L. No. 102-240, 105 Stat. 1914 (1991) and Pub.L. No. 105-178, 112 Stat. 107 (1998), and the implementing regulations at 49 CFR Part 26 (1999)).

[5] Bureau of the Census, *Statistical Abstract of the United States: 2006*, various tables, and *Survey of Business Owners: 2002*. Similar patterns are evident for Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans as well.

- Although African Americans comprised 5.3 percent of all U.S. businesses in 2002, they earned only 1.0 percent of sales and receipts.
- Although Hispanics and Latinos comprised 7.0 percent of all businesses, they earned only 2.5 percent of sales and receipts.
- Although women comprised 28.9 percent of all businesses, they earned only 10.7 percent of sales and receipts.

Similar disparities are observed for other minority groups in the SBO. Asians and Pacific Islanders comprised 5.0 percent of the business population yet earned only 3.8 percent of sales and receipts. Native Americans comprised 0.9 percent of all businesses but earned only 0.3 percent of sales and receipts.

These disparities between the size of the minority and female business populations and their share of sales and receipts are very large. They are also statistically significant, meaning they are unlikely to have arisen by chance.

While the exact proportions vary, large and statistically significant disparities are observed in all 50 states and the District of Columbia, for all minority groups—African-Americans, Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans—as well as for women. When the results are disaggregated by industry sector, again, the specific proportions vary but the overall trend is one of large and statistically significant disparities. Similar outcomes have been observed in all prior versions of this survey, dating back to 1972.

Decennial Census Public Use Microdata Sample and Current Population Survey Data

It is a fair question to ask whether such disparities result primarily from discrimination, either past, present or both, or whether they arise primarily due to other, potentially non-discriminatory, factors.[6] The evidence strongly suggests they arise primarily as a result of discrimination.

I have tested this hypothesis empirically using microdata from the 2000 decennial census, and earlier from the 1990 census. Like the SBO, these data sources document large and statistically significant disparities between the proportion of business owners who are minorities or women and their share of business owner earnings, in the nation as a whole, and throughout the states, and in the economy as a whole as well as across different industry sectors.

The advantage of the PUMS is that it allows us to compare these percentages while holding a wide variety of other, potentially non-discriminatory, factors constant,

[6] This was the subject of my book, *Racial Discrimination and Minority Business Enterprise: Evidence from the 1990 Census*, New York and London: Garland Publishing, 2000. Similar findings are observed using the 2000 decennial census data. See, *e.g.* "NERA Economic Consulting, "Race, Sex, and Business Enterprise: Evidence from the State of Maryland (Final Report)," 8 March 2006, 107-145.

including industry, geography, education, age, and labor market status, among other factors.[7] Even when all these factors are held constant, using a statistical technique known as regression analysis, the disparities facing minority business owners (African-Americans, Hispanics and Latinos, Asians and Pacific Islanders, and Native Americans) and women business owners remain large and statistically significant.

The disadvantage of PUMS is that it is only produced once every ten years. In the interim, data from the CPS are available annually through 2006. The CPS is the source of official government statistics on employment and unemployment and has been conducted monthly for over 40 years. The data structure of the CPS is similar to the decennial census, so it is possible to conduct similar types of disparity analyses to those I have just described. When this is done, the results again show large and statistically significant disparities facing minority and women business owners, even when a large variety of potentially non-discriminatory factors is held constant.[8]

Survey of Small Business Finances

Lack of access to capital and credit is among the most frequently cited obstacles to success among M/WBEs, particularly African-Americans and Hispanics and Latinos.[9] It is also reported more frequently by women business owners than by men. Discrimination in the credit market against such businesses can obviously have an important effect on the likelihood that they will succeed. Indeed, discrimination in the credit market could even prevent such businesses from opening in the first place.

We are fortunate to have data that allows us to test for evidence of discrimination in the small business credit market in recent years. The SSBF data are based on a large representative sample of firms with fewer than 500 employees and are administered by the Federal Reserve Board and the SBA. We have analyzed data from the three most recent releases of this survey in 1993, 1998, and 2003.

The beauty of the SSBF data is that, in addition to the race and sex of the business owners, it contains complete balance sheet and credit history information for each business that was interviewed. This is the same information that would be available to a loan officer when making a determination of whether or not to grant credit. With this data, we can use regression analysis to test for race and sex disparities in access to commercial credit while holding constant all of the relevant balance sheet and credit history information.

These data provide qualitative and quantitative evidence consistent with the presence of discrimination against minorities in the credit market for small businesses. After

---

[7] We have also tested the hypothesis, with similar results, including additional factors such marital and family status, immigration status, ability to speak English, military service, disability status, and asset levels.

[8] See, *e.g.*, NERA Economic Consulting, *op. cit.*, 107-145.

[9] See, *e.g.*, U.S. Chamber of Commerce (2005), "Access to capital, what funding sources work for you?," U.S. Chamber of Commerce, Washington, DC, 55.

controlling for a large number of balance sheet, credit history, and other characteristics, we find that African American-owned firms and other minority-owned firms are substantially and statistically significantly more likely to be denied credit than are White-owned firms. We also find some evidence that women are discriminated against in this market as well. The principal results are as follows:

- Minority-owned firms were more likely to report that they did not apply for a loan over the preceding three years because they feared the loan would be denied.
- When minority-owned firms did apply for a loan their loan requests were substantially more likely to be denied than non-minorities, even when balance sheets and credit history differences were accounted for.
- When minority-owned firms did receive a loan they were obligated to pay higher interest rates on the loans than was true of comparable White-owned firms.
- Far more minority-owned firms report that credit market conditions are a serious concern than do White-owned firms.
- A greater share of minority-owned firms believes that the availability of credit is the most important issue likely to confront their firms in the upcoming year.
- There is no evidence that discrimination in the market for credit is significantly different in different regions of the US, or in certain industries versus the economy as a whole.
- There is no evidence that the level of discrimination in the market for credit has diminished during the 1990s or the 2000s.[10]

Anecdotal Evidence of Discrimination

In addition to the statistical evidence of discrimination, the numerous studies we have conducted in recent years found extensive anecdotal evidence of discrimination against minorities and women in the key sectors of construction and construction-related professional services. In conjunction with my long time colleague, attorney Colette Holt of Colette Holt & Associates in Chicago, we have conducted surveys of and in person interviews with hundreds of M/WBEs and majority-male owned firms, and the results are strikingly similar across the country.

In general, minorities and women reported that they still encounter significant barriers to doing business in the public and private sector market places, as both prime contractors and subcontractors. They often suffer from stereotypes about their suspected lack of competence and are subject to higher performance standards than similar White men.

---

[10] See, *e.g.*, NERA Economic Consulting, *op. cit.*, 147-200. See also, NERA Economic Consulting, "Race, Sex, and Business Enterprise: Evidence from Austin, Texas," forthcoming 2007, which includes results from the 2003 SSBF.

They also encounter discrimination in obtaining loans and surety bonds; receiving price quotes from suppliers; working with trade unions; obtaining public and private sector prime contracts and subcontracts, and being paid promptly. Finally, there was general agreement that without the use of affirmative remedies such as subcontracting goals, minorities and women would receive few if any opportunities on government contracts, as is the case on non-goals projects. Prime contractors who solicit M/WBEs on goals projects rarely do so in the absence of goals. Thus, the continued operation of programs such as the SBA 8(a) and 8(d) programs was deemed essential to M/WBEs' survival.

Conclusion

It is fairly easy to specify in a general way the economic consequences of such programs. They have improved economic opportunities for minorities and women in business and therefore improved the competitiveness and efficiency of the American economy. They have also focused public attention on discrimination against minority and female businesses for reasons unrelated to qualifications or performance.

These public sector programs, standing alone, will not solve the problem of business discrimination. The private sector, which is far larger in terms of economic activity and scope, must take on more responsibility for eliminating business discrimination as well. Some major corporations have begun to take important steps down this road by developing genuine supplier diversity initiatives, but these companies are the exception rather than the rule.

I am optimistic that the statistical and anecdotal evidence will one day show that programs such as 8(a) and 8(d) are no longer necessary, because minority-owned and women-owned businesses have achieved competitive parity with their majority-owned counterparts. However, my own research and that of my colleagues demonstrates that this day has not yet arrived.

Thank you. I will be pleased to answer any questions.

Chairman KERRY. Thank you very much, Dr. Wainwright. We appreciate it very much.

Mr. Robinson.

**STATEMENT OF ANTHONY W. ROBINSON, PRESIDENT, MINORITY BUSINESS ENTERPRISE LEGAL DEFENSE AND EDUCATIONAL FUND, LARGO, MARYLAND**

Mr. ROBINSON. Good morning, Mr. Chairman, Senator Snowe, Senator Cardin, and Senator Tester. Thank you for the opportunity to come before you today. My name is Anthony Robinson and I am president of the Minority Business Enterprise Legal——

Chairman KERRY. Your voice carries well, but why don't you just pull the microphone over so that the record can handle it. There you go.

Mr. ROBINSON. My name is Anthony Robinson. I am with the Minority Business Enterprise Legal Defense and Educational Fund, affectionately referred to as MBELDEF. MBELDEF was founded in 1980 by former Congressman Parren J. Mitchell as a national advocate for the minority business community. We work with businesses in every sector of the economy and every corner of the country. We appreciate the Committee for providing us this opportunity.

Since the Federal Government's first efforts to level the contracting playing field in the 1970s, there has been substantial progress for minority businesses. The growth of MBEs has been dramatic. In fact, in some measure, MBEs have outpaced the growth among all firms. However, minority firms continue to account for a disproportionately smaller share of overall business than do non-minority firms, and they make less money.

As the Chairman has already noted, minority groups represent 32 percent of the population, but only 18 percent of the Nation's businesses. But it is even more important to note that minority businesses receive only 6 percent of total business receipts and employ only 3 percent of the Nation's civilian labor force.

The plight of the minority entrepreneur is brought into stark relief when he is faced with having to survive without minority contracting programs like the 8(a) and the SDB Programs. After the Supreme Court decisions in *Croson* v. *city of Richmond* in 1989 and *Adarand* v. *Pena* in 1995, many State and local governments eliminated programs designed to provide opportunities to MBEs. In the wake of these decisions to curtail and eliminate programs, studies have shown that minority firms have fared markedly worse where there are no goal programs in place.

What are the reasons for these disparities in contracting? Why are minority firms at such a disadvantage in our economy? One study concluded that the gap that exists has not in any way been caused by a lack of effort on the part of the minority entrepreneur. The same study went on to note that discriminatory conditions that previously existed and continue to exist were deep and pervasive and have not been fully reversed.

I am here to relate the experiences of real business owners who have confronted discrimination. I hope the Committee will seek to understand how very difficult it is for these business people to come forward and share their stories. By coming forward, they are putting their businesses in jeopardy of being frozen out of future

business opportunities with larger companies that dominate their market or industry. In the interest of time, I can only provide a short synopsis of the difficulties they have experienced. I would ask further permission to submit a number of supporting documents for the record after this hearing.

Chairman KERRY. We would welcome that.

Mr. ROBINSON. Thank you. The first example is of Mr. Maurice Coates, an African American mechanical contractor who solicited a quote for HVAC equipment from his supplier and then relied on that quote. The supplier, a majority company, mistakenly faxed to Mr. Coates a lower quote supplied to Coates' majority competitor. When Mr. Coates called the supplier and asked for the same price quote provided his competitor, the supplier replied that they reserved the right to provide better pricing to their better customers.

Mr. John McDonald, an African American expert in institutional real estate, had a contract with Domino's Pizza to acquire and build several stores. After being the only African American to attend a Domino's convention, he received a call asking him to agree to unreasonable amendments to his contract with Domino's. When he refused, the Domino's representative told him, "I don't like doing business with you people anyway," and threatened to ruin his business, which they did.

Mr. Soo San Choi, an Asian American nuclear chemist, was the victim of an attempt by a majority company to use him as a straw man in order to obtain an 8(a) contract. Over the course of the ploy, the 5-foot-tall, 82-year-old Mr. Choi was subjected to intimidation, coercion, and ultimately financial ruin.

The C. Earl Peek, who is with us at this hearing, is a young African American entrepreneur and exactly the type of young businessman who should be leading the growth of minority businesses. Instead, Mr. Peek is embroiled in a race discrimination lawsuit against SBA where between 2000 and 2004, 95 percent of SSBIC's investment dollars went to white-owned and managed firms. The SBA's own IG found that Mr. Peek's firm was subjected to ill treatment and bias.

Mr. Fernando Galaviz, who sits with me on this panel, an Hispanic business owner, teamed with an Asian-owned company, both with excellent performance evaluations as subcontractors to Northrop-Grumman. As a result, Centech, Mr. Galaviz's firm, experienced, assisted Northrop-Grumman in winning the contract. As a result, the prime awarded 52 of 130 slots to Centech for their contribution in obtaining the award. After the first year on a 5-year contract, the prime removed both minority firms. A similar experience with a Mr. Paul Curtis in Southern Florida.

I see my time has ended. I end by saying these few examples are only the tip of the iceberg. Many, many more firms experienced similar discrimination, and many others hoped that I would tell their stories here today despite the risks to their businesses. I just don't have the time to tell them all. We must work together to ensure these businesses and others like them get the support that they need.

Thank you for this opportunity, and I will be happy to entertain any questions that you have.

[The prepared statement of Mr. Robinson follows:]

**Testimony of Anthony W. Robinson, President**
**Minority Business Legal Defense and Educational Fund**
**Before the United States Senate Committee on Small Business And Entrepreneurship**
**Washington, DC May 22, 2007**

Good morning Mr. Chairman and members of the Committee on Small Business and Entrepreneurship. My name is Anthony W. Robinson and I'm president of the Minority Business Legal Defense and Educational Fund, affectionately referred to as MBELDEF. MBELDEF was founded and established in 1980 by former Maryland Congressman Parren J. Mitchell to act as a national advocate and legal representative for the minority business community. The organization has monitored barriers to minority business formation and development. We serve as a national advocate and legal representative for minority business enterprises (MBEs) by promoting policies affecting equitable and full participation of minority enterprises in the mainstream marketplace. We work with businesses in every sector of the American economy and we work with businesses in every corner of the country. We seek to advocate on behalf of firm owners from all disadvantaged minority groups. We attempt to provide non-partisan opinions on matters affecting minority firms and small businesses in general. We appreciate the committee providing us this opportunity to come before you to represent the tens of thousands minority and small entrepreneurs who continue to rely on the federal marketplace as their primary source of opportunity.

Since the federal government's first efforts to level the playing field on behalf of the minority business community in the 1970's there has been substantial progress. I should note that assisting minority businesses has always been a bi-partisan effort. In fact in the 1970's President Nixon was instrumental in promoting equal opportunity for minority businesses. And Assistant Secretary of Labor Arthur Fletcher worked closely with Senator Ed Brookes and Congressman Mitchell to pass the earliest minority business legislation. Minority firms have grown quantitatively and qualitatively. According to a recent study prepared by James H. Lowry & Assoc. sponsored by the Kauffman foundation the growth among MBEs has been dramatic in actual number of employees and revenues. In fact, in some measure their growth has outpaced the growth among all firms.[1] However, historically (and it remains a fact today) minority firms account for a disproportionately smaller share of overall business opportunities in many industry segments than do non-minority firms. According to the Milkin Institute, minority groups represent 26.1% of the population, but own only 11.6% of the nation's businesses.[2] Minority businesses receive only 6% of total business gross receipts[3] and employ only 3% of the nation's civilian labor

[1] The Boston Consulting Group, " The Agenda for Minority Business Development", p.4 (June,2005)
[2] Michael Harrington and Glenn Yago, "Mainstreaming Minority Business: Financing Domestic Emerging Markets," Milkin Institute, p.5. (1999) citing SBA Office of Advocacy, 1992 Economic Census
[3] Minority Business Development Agency, "The New Realities for Minority Business", p. 3 (1999), quoting data provided at the 1997 NMSDC annual convention .

force.[4] Perhaps more startling is the fact that in "19 industries with the largest representation of minority subcontractors, only 3.5% of supply dollars are estimated to have gone to minority businesses."[5]

The plight of the minority entrepreneur is brought into stark relief when he is faced with having to survive in the marketplace without the various minority contracting programs mandated by federal state and local laws in jurisdictions across the nation. An analysis performed by the Urban Institute compared jurisdictions where race-conscious programs were in place with those without such programs. Disparity was markedly greater in jurisdictions where there were no goals program in place.[6] Moreover, it is clear that ending or curtailing minority contracting programs causes real and immediate harm. This was confirmed in another study conducted by the former chair of the Dartmouth College Department of Economics D. G. Blanchflower and economist and disparity study expert, Jon Wainwright.[7]

After the Supreme Court decision in Croson v. City Of Richmond (1989) and Adarand Constructors v. Pena (1995), many state and local governments eliminated programs designed to provide opportunities to MBEs. Blanchflower Wainwright found that "Although Federal highway construction aid dollars increased from $14.7 billion in 1998 to $24.3 billion in 2002, and although *overall* disadvantaged business goals remained virtually constant during this time, the proportion of federal aid dollars actually awarded to such businesses declined almost 30% between 1998 and 2002."[8]

A recent study in the state of California analyzing the impact of proposition 209, which outlawed affirmative action, observed, " during the nine years before passage of proposition 209, the percentage of awards to MBEs was 16.0 percent. However that percentage significantly fell by more than half, to 7.9 percent for the nine years after [it's] passage. Of particular interest was FY 2002. This year had the highest amount of money awarded by CALTRANS, yet it was the year that MBEs received the lowest proportion of awards.[9] (Discrimination Research Center, "Free to Compete? Measuring the Impact of Proposition 209 on Minority Business Enterprises", 2006).

What are the reasons for these disparities especially in the absence of a policy mandate? The Lowry study cited several reasons after concluding, "The gap that exists has not in any way been caused by a lack of effort on the part of minority entrepreneurs." The first reason cited by the Lowry study was that "discriminatory conditions that previously existed were deep and pervasive and have not been fully reversed." [10]

---

[4] Ibid. quoting "estimate derived from 1992 and 1997 statistics quoted by Office of Advocacy, U.S. Small Business Administration, from data provided by U.S. Department of Commerce, Bureau of the Census.
[5] Ibid, quoting the Center for Advanced Purchasing Studies (1997).
[6] Enchautagui, et. al., "Do Minority-Owned Businesses Get a Fair Share of Government Contracts," Urban Institute, pp. 22-24, 1997.
[7] Blanchflower, D.G., & Wainwright, J., National Bureau of Economic Research (NBER) Working Paper, *An Analysis of the Impact of Affirmative Action Programs on Self-Employment in the Construction Industry*. Cambridge, MA: (2005, November).
[8] *Ibid.*
[9] Discrimination Research Center, "Free to Compete? Measuring the Impact of Proposition 209 on Minority Business Enterprises," 2006.
[10] Boston Consulting Group, " The Agenda for Minority Business Development", (June,2005).

I would like to give you some examples of real business owners who have confronted discrimination. It is critical that the Committee understand how very difficult it is for these businesspersons to come forward and share their experiences. By coming forward they are putting their businesses in jeopardy of being blackballed and frozen out of future business opportunities with larger companies that dominate their market or industry. I hope that you will all carefully consider the sort of courage and commitment to justice required to take those kinds of risks. I will submit letters and e-mails providing details of these entrepreneurs' stories for the record, but in the interest of time I will provide only a short synopsis of the difficulties they have experienced. And Mr. Chairman, I would like to ask permission to submit a number of supporting documents to for the record after the hearing.

- **Maurice E. Coates, Jr.** An African-American mechanical contractor has experienced disparate treatment relative to the cost of materials from suppliers. Mr. Coates solicited a quote for HVAC equipment from his supplier which he then submitted with his bid. The supplier, a majority company, mistakenly faxed to Mr. Coates a lower quote supplied to his majority competitor. When Mr. Coates called the supplier asking for the same price quote provided his competitor they replied that they reserved the right to provide better pricing to their better customers. With all else being equal relative to labor Mr. Coates can never be competitive if materials cost are not the same.

- **John McDonald** is an African-American expert in the world of institutional real estate acquisition. He had a contract with Domino's Pizza to acquire and build several stores. After being the only African-American to attend a Domino's convention where his work was actually featured, he received a call asking him to agree to unreasonable and unheard of amendments to his contract with Domino's. When he refused the Domino's representative told him "I don't like doing business with you people anyway" and threatened to ruin his business. In the end the ensuing litigation bankrupted Mr. McDonald. He took his case all the way to the Supreme Court where the Court ruled against Mr. McDonald saying that only his corporation, not Mr. McDonald personally, had the right to sue for race discrimination in this instance. He never received a decision on the merits of his discrimination claim.

- **Soo San Choi, Choi Enterprises, Inc.** An Asian-American nuclear chemist and most recently for the past twenty years a general contractor. Mr. Choi intended to use Fay Corp., a majority owned specialty contractor, as a subcontractor on an Army Corp of Engineer's project – Charleroi Locks and Dam in Western Pennsylvania. The majority company desired to use Mr. Choi as a straw man for the SBA 8(a) contract and then become the de facto prime contractor. The minority firm complained to SBA and the Corp to no avail. Mr. Choi would receive $125,000 on a contract valued in excess of $12 million. Through various machinations and smaller majority owned smaller contractors which had worked with Fay in the past, the 5 foot 110 pound 82 year old Choi was coerced and threatened with financial ruin to complete the contract with Fay and his cohorts. Fay became the indemnifier on Choi's surety bond and attempted to include previously purchased materials to manipulate contract costs and assigned Fay employees to Choi's payroll. Mr. Choi has yet to recover financially and his physical health remains dire.

- **C. Earl Peek, Managing Partner of Diamond Ventures, LLC** is a young African-American entrepreneur. He is exactly the type of young businessman who should be leading the growth of minority businesses. Instead, Mr. Peek is embroiled in a race discrimination suit against the Small Business Administration. According to Mr. Peek, the SBA and the Small Business Investment Company have consistently discriminated against him (and others) on the basis of race. Indeed statistics show that 95% of SBIC's investment dollars went to white owned and managed firms between 2000 and 2004 as the result of an old boy network that is tolerated by SBA and SBIC. The SBA Inspector General identified several instances of bias and ill treatment of Mr. Peeks firm Diamond Ventures. Moreover Mr. Peek has also confronted instances of racial bias in attempting to obtain capital from private sources – including instances in which his minority management team was rejected while white teams with similar qualifications obtained investments.

- **John Layman, JRL Enterprises, Inc.** is a minority contractor who has experienced a common problem among minority businesses. It relates to corporations falsifying the dollar amounts reported to the federal government and others on the amount of work performed by MBE/DBE firms. The prime contractor, Mr. Layman's customer, claimed that he had performed $3.3 million on a project that he had actually performed less than $900,000. Mr. Layman learned that this occurs often because most transit authorities do not verify figures related to work actually performed by MBE/DBE firms. The customer later retaliated against Mr. Layman for reporting the exaggeration by excluding his firm on a major contract that had initially included his firm on the original proposal.

- **Charles Baker, President, MCB Lighting & Electrical, Inc**. An 8(a) and Service Disabled Veteran Firm has been acknowledged as a leader by the Department of Defense (DOD)in saving the tax payer money and a Federal Energy & Water Management Award. As the retired Chief of Facilities and ex-electrical Superintendent of Andrews Air Force Base responsible for all maintenance and electrical systems, he waited 2 years after he retired in accordance with ethical rules. Mr. Baker went through the formal processes including the OSDBU Offices. He had a local squadron commander take him to the contracting commander's office to vouch for his work using alternate procurement methods because local contracting office refused to give him a capability briefing for over 4 years despite multiple requests. After the last request he received feedback that the request had been sent to a former subordinate (electrical foreman) who had stated his company was "not qualified". This individual knew nothing of his capability or company experiences. He did know his race and the race of the incumbent, who was white, working illegally on an 8(a) contract. Additionally, the same individual directed his personnel not to order electrical products from his company even though they have delivered critical items timely in the past and white vendors have caused the organization money due to waiting for deliveries.

- **Fernando Galaviz, Centech Group, Inc.,** This Hispanic owned company teamed with an Asian owned company, both with excellent performance evaluations supporting the Air Force Base in Los Angeles California as subcontractors to Northrop-Grumman Corp. Centech's best business practices project management strategies were a major contributor to Northrop Grumman winning the contract. As a result the prime awarded 48 of the

approximately 130 slots to Centech for their contribution in obtaining the award. After the first performance period (nine months) on a five year contract and for no credible reason the prime removed minority owned firms. Appeals to senior executives have gone unheeded.

- **Paul Curtis,** Curtoom Companies, Inc., a veteran-owned minority (M/WBE) business located in South Florida, entered into agreement with HUD developer Auburn Development, Inc. (Developer) to perform as a team member on a HUD assisted public housing project in Delray Beach, Florida. The RFP called for Proposers team to act as a Partner to the Delray Beach Housing Authority (Authority), in the public housing project. The RFP required the Proposers to identify M/WBE participant firms and their percent of involvement. The Developer failed to provide the details of the M/WBE involvement, as required in the advertisement, but did identify Curtoom, as M/WBE participant. After bids were received, the M/WBE requirements became a matter of controversy. The Authority decided to rescind the M/WBE plan, included in the advertised RFP. The Developer later stated that it would not utilize the services of the M/WBE firm it had identified in its proposal, Curtoom. The RFP required proposed changes to key participants be submitted to the Authority, for approval in advance, with justification. According to the M/WBE firm's officials, DBHA officials informed them, "…any part of the RFP was subject to negotiation, including but not limited to, the M/WBE participation requirement." The Authority awarded the contract to the developer by the Authority in March 2007.

Mr. Chairman, members of the Committee, these examples are only the tip of the iceberg. And for every one of these minority entrepreneurs who is willing to come forward to tell their story, there are many, many more that cannot for fear of losing their business and being unable to support their families. We must work together to ensure that these businesses and other like them get the support they need. Thank you.

May 20, 2007

Mr. Anthony W. Robinson
President
Minority Business Enterprise Legal Defense and Education Fund
1100 Mercantile Lane
Suite 115-A
Largo, MD 20774

Dear Mr. Robinson:

I am an 8A and SDV owned electrical company. My example happened about two years ago. As the retired Chief of Facilities and ex-electrical Superintendent of Andrews AFB responsible for all maintenance and electrical systems, I waited 2 years after I retired to prevent the appearance of ethics violations on everyone's part. I went through the formal process of going to the OSDBU's office. I even had a local squadron commander take me to the contracting commander's office to vouch for the great work I did in his squadron using alternate procurement methods because local contracting refused to give me a capability briefing for over 4 years. I asked multiple times, and the last time the request for a meeting to perform a capability briefing went to the program office. The feedback I got from the inside was an individual that worked for me (Electrical Foreman), who stated my company was not qualified without reviewing anything. This individual has never seen any capability statement of mine nor does he know anything about my company. He only knew I was black and that he wanted the white incumbent back doing the work illegally because the large white company was performing all the work on an 8A sole source contract.

This individual also directed his personnel not to order electrical products from my company even though we had delivered critical items on time and correct in the past. He would spend more money and wait for products instead of buying them from our company. I have more but his is a start.

Thank you very much for a minute of life's most valued commodity; your time! Our customers mean everything to us.

Mr. Charles M Baker Retired AF (SMSgt sel)
MCB Lighting & Electrical
President
8A/Service Disabled Veteran/Maryland MBE & DBE

3540 Chaneyville Rd
Owings MD 20736
240-372-7923 Office
301-812-2878 Fax
202-812-1378 Cell

May 21, 2007

Mr. Anthony W. Robinson
President
Minority Business Enterprise Legal Defense and Education Fund
1100 Mercantile Lane
Suite 115-A
Largo, MD 20774

Re: Discrimination in Contracting

Dear Mr. Robinson:

I am a certified DWBE electrical contractor who, as a woman, has faced key areas of difficulty in working with general contractors:

1. There is an unwillingness to use minorities and women on jobs where there is no M/WBE goal. There are a significant number of minority/women small business contractors who have the capability and proven experience to perform on many jobs, but are only sent bid invitations when the job has participation requirements. This seems to be especially true with the larger general contractors. They will talk a great game of inclusion but favor their long term buddies. Most importantly, minority and women contractors are completely forgotten when it comes to the more lucrative negotiated work. There are also some subcontractor companies that no longer qualify for DM/WBE certification in our area who still have certification but have the correct political connections through monetary campaign contributions; and those are the subcontractors that also get the negotiated work.

2. Shopping of M/WBE bids to majority subs happens so general contractors can *choose* which subs they use on the job. Bid shopping happens all the time. The only way to prevent it is to require the general contractor to provide all subcontractors' names and contract amounts at time of bid – not after bid submission. Sometimes, general contractors and owners use a contract loophole to circumvent participation, i.e., adding in a clause about subcontractor financial stability or stringent requirements, such as requiring certified financial audits to be provided with a bid - something that most small contractors cannot afford to provide with a bid.

3. MBEs experience difficulty breaking into old-boy networks of general contractors. Because of the monetary and time consumption of the construction business for small businesses, many small minority and women subcontractors do not have the social connections, money, or time to effectively network in the old boy system. For instance, I currently run 11 electricians and there are only two of us in the office that handle all the bidding, project management, and accounting/human resources. I am very active as an executive board member on the Kansas City Chapter of the National Electrical Contractors Association, which is of great benefit to my operations. I work 60-70 hours per week and often go without a paycheck. This leaves little time for networking and no money to attend social functions where I can rub elbows with the old boy network or contribute to election campaigns.

4. Prompt payment is an issue in the survival of small disadvantaged minority and women subcontractors. While Kansas and Missouri have prompt pay acts, there are numerous loopholes that general contractors can use to delay or prevent payment to subcontractors. This significantly hurts the disadvantaged minority subcontractor who has to wait 90 days for payment on a pay application, and 6-9 months for payment of retainage. In our very competitive bid market, the typical profit margin is in the 8-

12% range. Your employees, suppliers, union, and governments demand prompt payment either weekly or monthly. It financially kills us to borrow money to pay them because delayed application payments to subcontractors quickly devour profits and erode operating capital. Waiting 6 to 9 months for retainage significantly hampers our ability to fund additional work. Oftentimes, the M/WBE subcontractor owners themselves go without taking paychecks while the general contractor holds their money. These monetary issues can quickly fail the M/WBE subcontactor.

Thank you for your time and I wish you much success in your testimony

Sincerely,

Rita J Baslock
President
Max Electric, Inc.
705 Blue Ridge Ext.
Grandview, MO 64030
816-965-7555
Fax 816-965-7557

May 22, 2007

Mr. Anthony W. Robinson
President
Minority Business Enterprise Legal Defense and Education Fund
1100 Mercantile Lane
Suite 115-A
Largo, MD 20774

Dear Mr. Robinson:

I am the owner, President, and CEO of a small electrical firm contracting in the Greater Kansas City Metropolitan Area. We have being in business for over 10 years. During this time, we have built an excellent reputation as a competent contractor. We have performed work for large corporations, such as Ford, GM, Owens Corning, Alstom Power, Omaha Power Public District, Nebraska Power Public District, Kansas City Power & Light, Kansas City Board of Public Utilities, and others.

Last year we had a chance to participate in a bid for an electrical maintenance contract for Kansas City Power & Light (KCP&L). We participated in the mandatory pre-bid meeting and later on, submitted our bid proposal. Due to the tight rate spread amongst the bidders, it took KCP&L a long time to decide which firm should receive the contract. In the bid-evaluation process, KCP&L held meetings with almost all the bidders. Supposedly, in these meetings each bidder had a chance to explain and clarify their proposal.

The reason I stated "almost" is that we were excluded from these meetings. Now, almost a year since that occurrence, I was informed that someone at KCP&L was directed to invite us to those meetings. That person never contacted us, but informed his/her superiors that they had done so. Moreover, the person maliciously reported to their superiors that we never responded to their contacts, and demonstrated no interest in participating in any negotiations. Of course, by reporting such a lie to their superiors, the person not only precluded us from the opportunity to clarify our proposal, but killed any chance of consideration of our firm, as KCP&L decision-makers would not want to do business with a company that was "uninterested" in negotiating with them.

The maintenance contract I am relating is a very important one for any electrical contractor in the Greater Kansas City Area. It is a two-year contract, with an option for 3 yearly extensions. The yearly volume is approximately $1.5 million. As you can see, we have been drastically prejudiced by the discriminatory action of one or more KCP&L's employees.

Sincerely,

Nilson Goez, Ph.D.
Infinite Energy Construction, Inc. dba PROGRESS ELECTRIC

May 21, 2007

Mr. Anthony W. Robinson
President
Minority Business Enterprise Legal Defense and Education Fund
1100 Mercantile Lane
Suite 115-A
Largo, MD 20774

Re: Past problems as an MBE (Black American)

Dear Mr. Robinson:

I am the Founder/President of an Environmental Consulting firm that has been in business since 1992. One of the major problems that we face is the overall inability to have access to decision makers as we are unable to gain access to their many formal and informal networking activities. It is extremely difficult to survive when there are no decision makers that look like you.

Additionally, with respect to government work, the bundling of work into large contracts has certainly eroded our ability to gain work as the overall requirements are just too huge. We have a constant task of having to re-prove ourselves on every job although we have built an excellent reputation. When people don't want to see you with work, it gets even harder.

Presently, I am in the process of writing a book that will discuss the many hardships I have had to face.

Thanks and good luck

Bobby E. Henderson
President - Anlab Environmental - **SINCE 1992**
(816) 756-2214
http://www.anlabenv.com/

May 18, 2007

Mr. Anthony W. Robinson
President
Minority Business Enterprise Legal Defense and Education Fund
1100 Mercantile Lane
Suite 115-A
Largo, MD 20774

Dear Mr. Robinson:

My name is John Laymon from JRL Enterprises, Inc. in Pittsburgh, Pennsylvania. I received your contact information from my local NMSDC representative requesting information on problems faced by MBE/DBE firms. I am dealing with a problem that affects me and all MBE's. It relates to corporations falsifying the dollar amounts reported to the Federal Government and others on the amount of work actually performed by MBE/DBE firms. I am involved in a lawsuit in Federal Court that I filed against my customer for claiming that I performed over $3,300,000 on a project that I actually performed less than $900,000. After meetings between my lawyer and their lawyer, it was confirmed that they falsified the amount reported to their Transportation Authority client who reported these figures to the Federal Government because Federal dollars were used to help fund the project.

A Federal Judge "Dismissed The Case Without Prejudice" which allows us to do discovery on the Transit Authority to determine how the project was funded by the Federal Government. The problem is that we have already proven that they falsified their reported figures but they may be able to escape penalties due to legal loopholes related to how the project was funded.

This is not an isolated case. I learned that this occurs often because most transit authorities do not verify figures related to work actually performed by MBE/DBE firms. Needless to say, my customer has retaliated against me by excluding me in a major contract after they stated that I was initially included in their proposal but excluded later. This explains the problem in general. There are several other underlying problems that I experienced in dealing with this situation and Federal Investigators that I did not mention because I wanted to make you aware of the most important problem.

Thanks,

John Laymon
JRL Enterprises, Inc.
3 Gateway Center, Suite 1580
Pittsburgh, Pa. 15222

Work Phone (412) 471-9315
Cell Phone (412) 916-3606
email jrl1987@aol.com

May 22, 2007

Anthony W. Robinson, President
Minority Business Enterprise
Legal Defense and Education Fund
115-A Mercantile Lane
Largo, MD 20774

Anthony:

Attached are two documents for use in your testimony before the Senate Committee on Small Business and Entrepreneurship.

I hereby transmit and authorize these items, including this letter, for use as you see fit during your testimony before the U.S. Senate on May 22, 2007. The first document is a three page factual recital of statistical evidence consistent with racial discrimination in the SBIC program. The second document is a longer letter detailing discriminatory and abusive practices I and other similarly situated firms have encountered in dealing with private investors, SBA and the managers of the SBIC program.

Highlights of the two documents include:

◊ A summary of SBIC statistics showing that the SBA and SBIC finance blacks less than 5% of the time and minority owned firms in total less than 20% of the time, and they allocate over 95% of the annual SBIC dollars to white firms.

◊ Evidence from studies by Dr. Timothy Bates, Dr. William Bradford and the Kauffman Foundation that documents that minority venture firms perform above the parameters of the SBIC program.

◊ Descriptions of my own personal experiences with race discrimination in private venture capital markets.

◊ Evidence we have collected in the course of our litigation against the SBA (Diamond Ventures, LLC V SBA – Case # 03-1449) that shows that by the SBA's own disclosure to Diamond pursuant to litigation that there are likely a maximum of two black managers in an SBIC with a possible majority equity interest. This is two managers out of possibly 2,000 (the average management team has four members). SBA has approved more than 500 teams in the last 10 years.

◊ None of the accomplished black venture fund managers who have invested in firms such as BET and Radio One and similarly successful ventures have "regular" SBIC licenses. Most of them have even stated that they are not interested in the program due to past discrimination, ill treatment, and the callousness of SBA officials.

◊ The SBA Inspector General found several instances of bias and ill treatment towards Diamond in an audit of Diamonds SBIC application (Inspector General Report #3-17, April 2003).

◊ SBA program managers' comments on Diamond's application, obtained in discovery, characterized the strategy of investing in black, minority, and underserved communities as "weak", "gibberish", and "a flawed strategy".

◊ Diamond's interest in investing in Low-Moderate-Income areas, permissible by SBIC regulations, was characterized by program managers as "not within the parameters of the SBIC program."

◊ The SBA and SBIC program managers have essentially created an old boy network by inconsistently applying management qualification criteria, altering management qualifications approval criteria to meet their exclusionary aims, effectively designating a few law firms and individuals to assist in the processing of SBIC applications in order to grant approval to firms with political connections to former Administrators, program managers, and politically-favored firms virtually all of which are white, male owned firms.

◊ Discussion of Diamonds attempt to ascertain facts about all SBA approved teams by examining the SBIC applications called Management Assessment Questionnaires (MAQs)

By the grace and mercy of God, I have been able to endure this grueling process. It's my hope that God will bless this Congressional oversight hearing to effect changes so that other black and minority applicants have a level playing field.

There is quite a bit of data in the official testimony and accompanying letter. I hope this will be of great use to you and guidance to the Congress in addressing the disparities of access to capital for all U.S. citizens.

Sincerely,

C. Earl Peek
Managing Partner

Diamond Ventures, LLC
1536 Marona Street, NE
Atlanta, Georgia 30307
(404) 978-2202-Phone/Fax
www.diamondventuresllc.com
info@diamondventuresllc.com

DV

May 22, 2007

Anthony W. Robinson, President
Minority Business Enterprise
Legal Defense and Education Fund
115-A Mercantile Lane
Largo, MD 20774

REF: Senate Hearings, Small Business Committee
United States Small Business Administration

Anthony:

This letter outlines my personal experiences with racial discrimination in seeking venture capital in the private venture capital markets and under the provisions of the Small Business Administration's Small Business Investment Company (SBIC) program.

This is a tale of institutional racism and discrimination both overtly and in pretext that has systematically excluded blacks and other minorities from capital formation which then leads to the demise of minority communities, the decline of minority wealth creation, and a lack of capital to allow minority firms to compete in the private sector.

I begin with a personal note. Six months ago, I nearly died. I have worked within my faith to understand why God spared me and gave me new life and spirit. I have come to believe that perhaps I am still alive today so that I can do my part, however small, to help reform the process by which the SBA and SBIC deal with small minority entrepreneurs and minorities applying for SBIC licenses to provide capital to them. In this role, I have become the first, and to this date, the only black person to challenge the SBIC program in the courts (See Diamond Ventures, LLC V Hector Barretto-Case Number 03-1449). My hope is that I can ensure that no other firms are treated with the callous disregard and unfairness that my firm has been treated. I hope that my work in this context and in every context will continue to serve the glory of God and the life and love that He has given me.

**Race Discrimination In Private Sector Venture Capital**
I first learned of discrimination in venture capital at the age of 26, when my former employer the Atlanta Economic Development Corporation (AEDC), chaired by Mayor Maynard Jackson and then Ambassador Andrew Young, sought to capitalize Renaissance Capital Corporation (RCC) in 1986. The RCC was founded to provide venture capital to disadvantaged minority firms. AEDC was a quasi-public-private nonprofit entity established to promote Atlanta area economic development.

When I look back, this was to be my first in a long line of experiences with racial bias in efforts to make venture capital available to assist qualified minority businesses.

Despite the fact that Atlanta was the home of Coca-Cola, SunTrust, Georgia Power, Georgia Pacific, and numerous industry and corporate leaders, AEDC could not muster more than a token investment in RCC. Capitalized at what I recall was less than $2 million, AEDC was the largest investor in RCC with well over $1 million. That means that few if any of the large corporations in Atlanta demonstrated a willingness to provide venture capital to minority firms. Of course, at the same time they were providing significant venture capital and business opportunity to white firms.

In 2000, I became one of those minority firms searching for capital. In that role, I have confronted racial discrimination both in the private sector and the public sector. While I have been interested in obtaining an SBIC license, my first goal was simply to establish a venture firm that could provide capital to serve minority communities and improve minority business development. In this pursuit I have approached many private sector investors including individuals, banks, insurance companies and other corporations. While many times, these investors dealt with me fairly, the few that did not made me realize how difficult it is for minority firms to raise venture capital.

The types of discriminatory actions I have personally observed have usually involved investors providing capital to management groups that had the same or similar qualifications as my team but were white. When my team approached these same investors, we sometimes did not even get a return phone call. The fact is that the good old boy network is just as active in venture capital as it is in other sectors of our economy.

I note that even Bob Johnson, arguably the wealthiest black person alive, has problems raising capital. He notes in the June issue of Black Enterprise, that pension funds employ "white companies with white consultants" who essentially only select white firms to invest in. Even Bob Johnson, with investment professionals from the world's largest venture capital fund-the Carlyle Group-cannot raise capital. Something is very wrong with the system for capital management by and deployment to minorities.

**Race Discrimination at the SBA and the SBIC – Background**
The problems at the SBA and the SBIC are serious and they are pervasive. The rest of this letter will outline my personal experiences related to these programs and the things I have heard from others who have interacted with these programs in one way or another.

I have spoken to a number of former managers of MESBIC's who led the current generation into the formation of non-SBA charted venture funds. Time after time, I hear bitterness, categorical dismissal of SBA and its SBIC programs, reflections that conclude that race, racism, and discrimination have led to the demise of the MESBIC industry and that SBA has a scant few minority managed venture firms as licensed SBIC's.

Despite the minority managers moving on to manage non-SBA funds and achieving great market success, I'm shocked that they still harbor emotional scars and deep wounds about SBA and its consistent ill-will towards black and minority managers seeking to perform and to be treated equally to their white counterparts.

Sadly, the experience of these past MESBIC managers is reflected in the situation we see today with respect to the SBIC: to date, SBA disclosed in our litigation that it only has maybe two black managers, and those funds are not independent of major investment banks such as JP Morgan. SBA could not ascertain that the managers had ownership in the funds.

This status quo has also been the subject of academic observation and commentary. Three esteemed academicians, Dr. Timothy Bates, Dr. William Bradford, and Dr. Julia Sass Rubin, have long espoused the viability of minority venture capital firms. They have performed studies under the aegis of the Kauffman Foundation, a prominent advocate of wealth creation and capital formation in the black community and minority communities nationwide. Their 2003 and 2006 reports clearly show the viability of these emerging markets and the sensibility for our nation's welfare to capitalize minority venture firms and investing in minority businesses.

Sadly, they have a critical commentary of SBA. They find that SBA is not receptive to minority managed funds. They found that SBA does not conduct outreach to minority managed venture funds and their networks. Moreover, in their surveys of the most eligible firms, they note that the minority fund managers essentially want nothing to do with SBA.

Dr. Bates was awarded a grant from SBA to study minority managed venture funds in 1994. His role was to ascertain their viability. Dr. Bates wrote a report on SBA's systemic mistreatment of black fund managers, the categorical cuddling of the "regular SBIC" program (whites), while destroying numerous attempts to allow the minority firms to become established and flourish.

The report, entitled "Is SBA A Racist Institution", gave a long and storied history of changing administrators, program managers, political objectives and a remarkable track record effectively of choking (or seeking to choke) MESBICs and black managers out of existence.

Ironically, many of these managers, some with 30+ years of experience, have gone on to establish non-SBA chartered funds and have had great investment successes with endeavors such as BET and Radio One. Clearly, these managers had viable strategies – but SBA just couldn't see it. I personally have talked with many seasoned and experienced fund managers who have deep scars resulting from the discriminatory treatment the received at the hands of the SBA.

**Race Discrimination at the SBA– The Experience of Diamond Ventures, LLC**
Litigation is difficult and I for one would rather be a businessman than a party to a lawsuit. Still, I will say that our discovery in litigation has provided a very enlightening window on the workings of the SBA and the SBIC program in general and with respect to my firm, Diamond Ventures, LLC. Diamond has obtained the so-called "scoring" of its Management Assessment Questionnaire (MAQ) which is the first start in the application process to be licensed by the SBA.

The program analyst with SBA made handwritten comments on Diamond's MAQ questioning the viability of investing in minority businesses, women owned firms, inner-city areas, underserved communities, and in the southeast. An SBA program analyst wrote comments in the section of our MAQ regarding our strategy for outreach to minority communities as "Weak". SBA called our sources of deal flow from community development corporations, black business associations, civil rights associations, black CPA firms, and in one instance a future approved SBIC organization as being "Not quality sources of deal flow".

SBA called our sources of deal flow from development authorities charged with revitalizing underserved communities as "not top tier". We considered this direct bias because at the same time SBA approved a firm with a similar objective and geographic region as Diamond – but with white management. Moreover, SBA has approved a number of non-black firms with a tie into or who were supported by economic development initiatives of a municipality or developmental institutions.

SBA called components of our application, which are standard in the venture capital industry, "a bunch of gibberish". Our strategy of investing in underserved areas was a "flawed strategy". Even though SBA has a specific SBIC Debentures License program and a LMI (Low-Moderate-Income) program in its regulations, the program analyst wrote on Diamond's MAQ that LMI considerations are "irrelevant to the SBIC program".

The abnormal treatment and categorical dismissal of our 70 years of combined experience, advanced degrees, and investment returns that exceeded SBIC program historical performance led us to complain to the Inspector General of SBA. The IG made a report of the SBIC program in general and then turned to our application which is report #3-17 (April 2003).The report documented instances of SBA using outdated standards, applying regulations that were not codified properly by SBA, applying standards of review differently to Diamond Ventures versus other teams, and imposing requirements on Diamond that did not exist when other firms were reviewed.

Ironically, even while we were being so unfairly criticized by the SBA analysts, we were being courted by some private investors and firms. In the venture capital process and fundraising process, people in the industry share information and seek to help one another. In this regard, we had high success at raising funds or getting established firms to seriously consider us. We were approached by one SBIC to consider a merger. Another firm was open in assisting us to file our MAQ. Both firms gave us a copy of their MAQ.

It was earthshaking to see the MAQ's of these firms. Items SBA found as reasons to deny Diamond a right to file for a license were apparently "waived" or not considered for approved white firms.

The government, above all, has an obligation to provide a level playing field. Per a retired SBA official who formed the current SBA Investment Committee that approves SBIC applicants to file for a license, 40 SBIC's or in self liquidation, 100 SBIC's are in receivership, and SBA has $2 Billion in leverage lost or potentially going to be lost. These are the types of firms SBA is approving.

Our issue was that of the three firms approved or licensed to operate a SBIC, Diamond has examined their MAQ's or management teams. All firms had similar management teams, comparable investment performance, and industry skill levels as compared to Diamond. One firm, based in Atlanta, where Diamond was formed, had a management team with 2/3rds of their team EXACTLY like Diamond's team in years of experience, transactions, and experience level. Another firm-based in Atlanta- added a partner late in the application process and was approved (unlike how Diamond was treated when it added a partner during the MAQ review). SBA had major issues with our adjustment to our management team and cited our "management team as unstable" despite approving white firms in similar circumstances.

One of the keys to success to be able to operate a successful SBIC is the ability to raise capital in the private sector. I had great success at finding potential investors and obtaining strong indications of interest and commitments contingent commitments from investors. Because our entire fund formation model was built on being approved into the SBIC program and the high interest at licensing a firm in the Southeast, we had a commitment from a Savings and Loan based in Atlanta that was bought by a major bank.

The major bank considered increasing its commitment by more than 5 times contingent upon SBA approval. I had meetings and strong forms of interest and in many cases was involved in due diligence with other banks, investment banks, insurance companies, high net worth individuals, state and local governments, and the like.

All of the parties committed, seriously considered, or made contingent their commitment (verbally or otherwise) if SBA would approve the firm. We had better receptivity from the private sector than SBA. However, without the SBA approval, we were effectively shut out from the capital formation for an SBIC. Ultimately, more than $10 million-more than enough to start an SBIC-was lost.

As difficult as it was to see so much potential capital lost, the treatment of our investment team even more demoralizing. Members of our management team had advanced degrees, had proven track records, had made over 1,000 financings, and had made over 100 investments. We had more than 70 years of experience combined. We had deployed and leveraged over $1 Billion in capital. This was 10 times what we were entitled to from SBA.

SBA's own best practices outlined in 1994, set forth that management teams like ours were the "model structure" for an SBIC team. Yet, we were not approved. White teams with similar qualifications were.

SBA had great issues with our experience in financing firms based on our economic development financing and lending experience. However, SBA has sponsored and approved a number of professionals to operate an SBIC with economic development experience. Our research provided by our experts informed us that Ron Bew, an SBA official who issued explanations on our first denial letter, has appeared before you discussing the positive impact and viability of economic development firms on the SBIC program and the SBIC capital raising process.

Factually, SBA approved a team headed by a person who was a state director of economic development with no apparent experience in finance at the level outlined by Diamond. Notably, the Office of Comptroller Currency (OCC) permits SBICs to receive investment from banks and have the investment qualified under the Community Reinvestment Act – and economic development initiatives law. Moreover, SBA has a long track record of approving SBICs sponsored by economic development corporations, has SBIC's with economic development corporations and board members, has approved SBIC managers from economic development firms and backgrounds, and has SBICs spurred by economic development activities.

Thus, the SBA's most strongly worded objection is contradicted by their own documented history of approvals and Congressional testimony. But of course, all of these other firms were headed by all-white management teams.

**SBA Defiance of the Federal Courts**
Diamond and SBA have agreed since the inception of the case four years ago that the MAQ's are discoverable to get to the truth of the racial composition and qualifications of management teams and other pertinent matters relevant to Diamonds discrimination claim. Both parties submitted protective orders to the Courts due to the sensitive nature of the financial documents. The Appellate Court set forth the use of a protective order and procedures for review of the MAQs proposed by SBA in July 2006.

SBA has not turned these documents over since the Appellate Court prescribed that we use their proposed procedures to review the documents. As late as March of this year, SBA sought not to turn over the documents in discovery. The District Court denied their request.

The US Attorney sent a letter to our counsel two weeks ago admitting that we have asked for the documents "dozens of times", yet SBA and the US Attorney refuse to submit them to Diamond-after Appellate Court rulings prescribing that we use their proposed protective order.

I'm left wandering why when the Courts and parties agree on the procedure proposed by SBA to review these documents, SBA continuously does not comply. I'm not a lawyer, but the SBAs refusal to comply with court procedures, orders, and rulings makes me ask- what's there to hide?

**Conclusion**
Sadly, I've concluded that SBA is a racist institution based on first hand experience. Never have I seen such obstinance to truth. SBA has no measurable interest in outreach to blacks or minorities. It has no program in place to credibly establish a relationship with the black community and as a result, SBA has no credibility in the black venture capital community. SBA also has had no significant capital deployment to blacks and minorities for at least 10 years.

Even with all of these experiences, I believe the SBIC program is worth saving. In theory, if not in operation it is a good program. I believe that it can be fixed but frankly, from the black and minority community perspective it needs a complete overhaul. My seven year experience illustrates the institutional bias, systemic exclusion, and the lack of deployment of capital will only be addressed through serious reform, oversight, and changing the management of the program.

It is my greatest hope that this letter will spur change and reform of the agency management and culture starting with stricter oversight and reporting to Congress and more objective and consistent evaluation and outreach criteria. Thank you for making sure our voices are heard in the halls of Congress. We need your help so desperately.

Most Sincerely, I am

C. Earl Peek
Managing Partner

Literature Review and Compilation of Statistics Related to
Disparities in SBA and the Small Business Investment Company Program and
Access to Capital and Approved Management Teams to Dispense Capital
By C. Earl Peek
Managing Partner, Diamond Ventures, LLC
May 22, 2007

SBA has failed to manage the SBIC program successfully to encourage blacks and other minorities and women to apply or receive capital or licenses to manage SBICs to dispense capital. The resulting access to capital has been shut out from these groups. SBA statistics bear out the issue. The lack of women and minority managers in the program with a lending and investment philosophy focused on blacks, other minorities, women, inner-city, and Low-Moderate Income situated firms results in a lack of capital, growth, and qualified management teams to participate in the economic expansion and prosperity of the nation.

The Kauffman Foundation funded a report published in 2003 authored by Dr. Timothy Bates and Dr. William Bradford entitled Minorities in Venture Capital. The report analyzed data generally from over 50 funds and provided statistical investment information from 24 venture capital funds making 117 minority-oriented investments. The authors found that Minority enterprise venture capital investing is very profitable. The Median rate of return, a key measure of venture firms, was 19.5%. Comparatively, SBIC debenture firms have a 25 year history of an under 10% return on investment.

The Minority Business Insider publication article in 2006, citing from SBA public reports, denote that black, other minority, and women-owned firms receive less SBIC financing as compared to other firms per transaction and that these firms receive less than 5% of all SBIC dollars (as a group). Blacks received 6/10ths of 1% in 2003. The report yielded the following:

| **Small Business Investment Company Investments** | | | | |
|---|---|---|---|---|
| **Minority-Owned Businesses / Women-Owned Businesses** | | | | |
| **Fiscal Year** | **% of Total # of Financings White's v. All Minorities** | **% $ Share-SBIC $'s White's v. All Minorities** | **% Total of Financings White's v. All Minorities** | **% Total of All SBIC $'s White's v. All Minorities** |
| '00 | 80.6% versus 19.4% | 95.9% versus 4.1% | 94.1% versus 5.9% | 98.1% versus 1.9% |
| '01 | 89.1% versus 10.9% | 96.7% versus 3.3% | 96% versus 4% | 98.6% versus 1.4% |
| '02 | 89.8% versus 10.2% | 95.7% versus 4.3% | 95.6% versus 4.4% | 99.2% Versus 0.8% |
| '03 | 86.1% versus 13.9% | 95.7% versus 4.3% | 96.9% versus 3.1% | 98.2% versus 1.8% |
| '04 | 80.4% versus 19.6% | 94.8% versus 5.2% | 96.9% versus 3.1% | 98.2% versus 1.8% |

Literature Review and Compilation of Statistics Related to
Disparities in SBA and the Small Business Investment Company Program and
Access to Capital and Approved Management Teams to Dispense Capital
By C. Earl Peek
Managing Partner, Diamond Ventures, LLC
May 22, 2007

It doesn't take a rocket scientist to see that SBA overwhelmingly finances and permits the SBICs it licenses to allocate nearly all of the program dollars and leverage from Congress to White men and groups controlled overwhelmingly by White men. SBA an its current group of licensees finance blacks, other minorities, and women less than 6% of the time, allocates less dollars per transaction consistently more than 90% of the time, and overall allocates funding to these groups at less than 5% annually. Ironclad lack of access to capital.

According to a study conducted by the Ewing Marion Kauffman Foundation, less than 1 percent of the $250 billion in venture capital dollars nationwide is made available to meet the needs of the country's 4.4 million minority business owners. Women-owned businesses are also severely under-represented in access to venture capital dollars. Although women own approximately 40 percent of all businesses in the U SA., they receive less than 5 percent of all venture capital investment-and even less from SBA.

SBA, under request for disclosure pursuant to litigation (Diamond Ventures, LLC V SBA-03-1449), provided two venture firms with African-Americans in management who may have ownership of an equity interest in a licensed SBIC. If in fact this is true, SBA could not ascertain if those persons owned a majority interest in the firm. SBA did not provide documentation of any women, Hispanics, Asian Americans, and Native-Americans with a majority ownership interest. SBA's website showed over 400 licensed and active SBICs in July 2006. More than 500 firms have been licensed or approved to file a license in the past 10 years. SBA and SBIC's annually dispense $4-5 billion annually.

The Inspector General produced a report in 1994 entitled "SBIC Best Practices", where SBA selected 9 firms it believed embodied the most successfully managed SBICs. That report noted: **"Financially successful SBICs are headed by managers and officers who are well qualified in terms of their work experience and academic backgrounds.** The top managers have many years of experience in venture capital or related fields, including investment banking and corporate finance, and, along with most other senior officers, have advanced degrees in relevant fields. Three out of four officers in the nine SBICs we visited had graduate degrees, over 80 percent of which were Masters Degrees in Business Administration senior managers in the SBICs we surveyed solidly praised the SBIC managers for their integrity, professionalism, and intuitive business sense. Two of the exemplary firms were headed by CPAs and engaged in investing and lending using debt instruments."

Diamond Ventures, LLC, per its 2001 application, was owned primarily by African Americans and an East Indian. One member of the firm was of Jewish heritage. The Managing Partner is an African American man with a CPA. All of the members of Diamond's team had attended graduate schools in business, law, and engineering with three members having earned MBAs, one member with a PhD, one member previously with an extensive background in investment banking with the requisite securities licenses, and the team in total had a track record of lending to 1,000 firms, had deployed over $1 Billion in capital in a 20 year period, and had made over 100 investments with returns in excess of 20%. Diamond has been in the application and litigation process for discrimination and bias in the SBIC program for 7 years.

Literature Review and Compilation of Statistics Related to
Disparities in SBA and the Small Business Investment Company Program and
Access to Capital and Approved Management Teams to Dispense Capital
By C. Earl Peek
Managing Partner, Diamond Ventures, LLC
May 22, 2007

Dr. Timothy Bates, Dr. William Bradford, and Dr. Julia Sass Rubin produced a 2006 report entitled "The Viability of the Minority-Oriented Venture Capital Industry Under Alternative Financing Arrangements". That report concluded that "The SBA is too unstable an agency for promoting the minority venture capital industry". The SBIC program provides for a 2:1 match of funds raised by a licensed SBIC-66% of its funding. Minority oriented venture capital funds obtained less than 30% of its capital from SBA and governmental sources, per the referenced report.

Finally, The SBA annually has provided reports on its website entitled, the "Demographics of SBIC Program-Financed Small Businesses", the "Weighted Realized Internal Rate of Return ("IRR") - Debenture Type Regular SBIC's", "Financing to Small Businesses and Percent of Dollars Disbursed", "All Licensees Investments in Low Moderate Income Zones", the "SBA Inspector General Report # 3-17 (April 2003), the "SBA Performance Measure and Indicators", the "SBA Budget Request and Performance Plan", the "SBIC Audit Report 3-33", and other statistical reports.

These reports, and others, document the impact of SBAs selective use and application of the SBIC qualification standards and criteria s to be licensed as an SBIC, the use of outdated regulations and policy, the practice of evaluating management teams unevenly, the adverse impact of SBIC activities on minorities and women, the uneven scoring criteria, the uneven distribution of licensed firms in the country, the results of licensed firm's that do not invest in or lend to minority and women-owned firms, the SBA failing to license firms that invest in or lend to low-moderate-income communities, the SBA permitting SBICs to invest and lend less per transaction and overall number of financings to minority and women-owned firms, and the licensing of firms white management teams versus new teams managed or owned by blacks, minorities and women with a focus on investing ad lending to those markets.

"Is The U.S. SBA A Racist Institution," a report prepared by Dr. Timothy Bates-SBIC Grant 94-001-01", and SBAs selection of New Market Venture Capital firms, show a history of bias against minority and women owned firms and investment and lending philosophies to those groups.

The Investment Division of SBA and the licensing practices and SBIC program administration result in miniscule access to capital for blacks, minorities and women nationally.

Chairman KERRY. Mr. Robinson, thank you, and as I said, your full testimony is placed in the record. Obviously, during the questions and answers, we look forward to any other examples that you would like to put before the Committee. We thank you for it. It is very important testimony and we understand how some of those folks are reluctant to come forward, so it makes it very difficult.

Mr. Miera.

**STATEMENT OF BILL M. MIERA, CHIEF EXECUTIVE OFFICER, FIORE INDUSTRIES, INC., ALBUQUERQUE, NEW MEXICO**

Mr. MIERA. Chairman Kerry, Ranking Member Snowe, and Members of the Committee, thank you for the opportunity to speak before you today on the importance of preserving and strengthening small and disadvantaged businesses. My name is Bill Miera and I own a technology company in New Mexico. I serve on the board of the U.S. Hispanic Chamber of Commerce Board of Directors, where I chair the Federal Procurement Committee. I also serve on the board of the New Mexico 8(a) and Minority Business Association, the largest 8(a) association in the Nation, where I chair the High-Tech Committee. In addition, I serve on the board of the Professional Aerospace Contractors Association, where I serve as the small business representative. I also serve on the Greater Albuquerque Chamber of Commerce and I was on the board on the Rio Grande Minority Purchasing Council, among others.

Seventeen years ago, I started Fiore Industries, a graduate 8(a) company specializing in high-technology products and services for the Federal Government. While we have enjoyed success over the years, we are probably about one-third the size we would be if not for several obstacles.

One major obstacle we faced was contract bundling. We previously won two consecutive contracts as a prime with the Air Force Research Laboratory for Directed Energy Systems Development. Based on our performance, the contract grew to $2.5 million per year. Unfortunately, high-level decisionmakers within the agency decided to bundle our contract. In order for us to continue on the project, we were forced to team with another prime, a large business, and we had to be the subcontractor. Our team won the contract, but the new large prime eliminated our subcontract by adding a surcharge of nearly 40 percent to our work.

This is one of the problems with bundling. Primes bring you in, but rarely intend to give you work. In this case, all they really wanted was to eliminate my company as a competitor with no repercussions. Half of our work was contracted out to other contractors who were non-competitors to the prime and about half was taken in-house by the prime. The contract cost taxpayers $475,000 a year in increased expenses in order to save approximately $50,000 in administrative costs. This is a false economy that also fails to account for decreases in performance by the prime due to the only competitor being eliminated and decreases in innovation. Most patents, as you know, come from small businesses, not large.

Another obstacle we encountered was reduction in support from our local SBA office. We received outstanding help and support from the SBA when we started. Nevertheless, budget cuts and personnel transfers to Washington have decimated the number of staff

at the local office, resulting in a drastic reduction of support the local office provides to the small business community.

This is not limited to New Mexico alone. A fellow Hispanic business owner and board member at the U.S. SEC, Mr. Massey Villareal, was told by his local Business Opportunity Specialist in Texas after he received his 8(a) certification that, “After you receive your certification, don’t call me because I am too busy to help you.” This is not the type of encouragement that SDBs expect from the SBA.

Currently, my company needs infrastructure upgrades. I hesitate approaching the SBA for help in the form of loan guarantees because the local office does not have sufficient staff. While the current office has dedicated workers, they do not have sufficient resources to accomplish their mission.

For these reasons, I believe it is critical that SBA funding be adequately restored and sufficient personnel be assigned to the field offices. To a new entrepreneur who hasn’t learned the system, there was just absolutely nothing like a real person to talk to in a local SBA office.

Another obstacle for SDBs is the failure of Federal agencies to meet their small business contracting goals and a lack of increase in the total small business goal of 23 percent. Additionally, new small business categories only redistribute dollars from one deserving group of small businesses to another. This has resulted in much fewer 8(a) contracts available for competition.

On the positive side, Fiore is an example of why the 8(a) program is so critical. Eight years ago, we won a $12 million competitive 8(a) contract with the Department of Energy. Our performance gave us the qualification to bid on similar contracts with the national laboratories. More importantly, it gave us the resources to create our own laboratory. This allowed us to win a full and open competition with the Department of Justice to develop a new technology for stopping vehicles in high-speed chases using smart pulse-shaped microwaves. Absent our new laboratory, we would not have won the contract nor developed this unique technology.

If I could quickly, with my remaining time, I disagree respectfully with the SBA on previous testimony and I want to quickly turn to just a small part of my written testimony, especially around the net worth issue. I want to point out that in 1988, the average price for a gallon of gasoline was 91 cents. Now it is more than $3. The price of an average home was $91,000. Today, it is $251,000. A typical truck for a contractor is a Ford F–150. In 1988, it was $13,000 and today it runs $30,000.

In addition, the limit on staying in the program means that the strong ties that personal wealth has to business loans, that we are not allowing the businesses to grow fast enough.

Mr. Chairman, I thank you and Ranking Member Snowe for inviting me to testify and I look forward to any questions. Thank you.

[The prepared statement of Mr. Miera follows with attachments:]

UNITED STATES HISPANIC CHAMBER OF COMMERCE

Senate Committee on Small Business and Entrepreneurship Testimony
Testimony by Mr. Bill M. Miera
May 22, 2007

Chairman Kerry, Ranking Member Snowe and members of the committee, thank you for the opportunity to speak before you today on the importance of preserving and strengthening small and disadvantaged businesses.

My name is Bill Miera and I own a technology company in New Mexico. I serve on the board of the United States Hispanic Chamber of Commerce where I chair the Federal Procurement Committee. I also serve on the board of the New Mexico 8(a) and Minority Business Association, the largest 8(a) organization in the nation, where I chair the High Tech Committee.

In addition, I serve on the board of the Professional Aerospace Contractors Association as their small business representative. I also serve on the board of the Greater Albuquerque Chamber of Commerce, and I was on the board of the Rio Grande Minority Purchasing Council among others.

Seventeen years ago I started Fiore Industries – a graduate 8(a) company- specializing in high technology products and services for the federal government. While we have enjoyed success over the years we are probably about 1/3 the size we would be if not for several obstacles.

One major obstacle we faced was contract bundling. We previously won two consecutive contracts as a prime with the Air Force Research Laboratory for Directed Energy Systems development and based on our performance the contract grew to $2.5 million per year. Unfortunately, high-level decision makers within the agency decided to bundle our contract.

In order for us to continue on the project, we were forced to team with another prime (a large business) and we had to be the subcontractor. Our team won the contract but the

new large prime eliminated our contract by adding a surcharge of nearly 40 percent on our work.

This is one of the problems with bundling. Primes bring you in but never intend to give you the work. In this case, all they really wanted was to eliminate my company as a competitor with few repercussions.

Half our work was contracted out to other contractors (who were non-competitors to the prime) and about half was taken in-house by the prime. The contract cost taxpayers $450,000 a year in increased expenses in order to save approximately $50,000 in administrative costs. This is a false economy that also fails to account for decreases in performance by the prime due to the only competitor being eliminated and decreases in innovation (most patents come from small business not large).

Another obstacle we encountered was a reduction in support from our local SBA office. We received outstanding help and support from the SBA when we started. Nevertheless, budget cuts and personnel transfers to Washington have decimated the number of staff at the local office resulting in a drastic reduction of support the local office provides to the small business community.

This is not limited to New Mexico alone. A fellow Hispanic business owner and board member at the USHCC, Mr. Massey Villareal, was told by his local Business Opportunity Specialist in Texas after he received his 8(a) certification that, "after you receive your certification don't call me because I am too busy to help you." This is not the type of encouragement that SDBs expect from the SBA.

Currently my company needs infrastructure upgrades. I hesitate approaching the SBA for help in the form of loan guarantees because the local office does not have sufficient staff. While the current office has dedicated workers they do not have sufficient resources to accomplish their mission.

For these reasons, I believe it is critical that SBA funding be adequately restored and sufficient personnel be reassigned to the field offices. To a new entrepreneur that hasn't learned the "system" there is absolutely nothing like a real person to talk to in a local SBA office.

Another obstacle for SDBs is the failure of federal agencies to meet their small business contracting goals. Additionally, new 8 (a) and small business categories only redistribute dollars from one deserving group of small businesses to another. This has resulted in much fewer 8(a) contracts available for competition.

On the positive side, Fiore is an example of why the 8(a) program is so critical. 8 years ago we won a $12 million dollar competitive 8(a) contract with the Department of Energy. Our performance gave us the qualification to bid on similar contracts with the National Laboratories.

More importantly, it gave us the resources to create our own laboratory. This allowed us to win a full and open competition with the Department of Justice to develop a new technology for stopping vehicles in high speed chases using smart pulse shaped microwaves. Absent our new laboratory we would not have won the contract nor developed this unique technology.

Beyond my personal anecdotes, I believe this hearing is an auspicious time to raise a range of issues relating to the future of the Federal government's Minority Business programs and the future of the SBA, the flagship agency that is charged with promoting the growth and development of small and minority businesses. There can be no doubt that the SBA and its programs are just as important to small businesses as they were when the SBA was created in 1953. Unfortunately, many challenges still remain.

Federal Minority Business Programs such as the 8(a) prime contracting program and the SDB subcontracting program have been in existence for over 30 years. Before these programs were first initiated, there were no MBE programs. There were no MBE goals. There were no measurable accomplishments. The Federal government, and the Federal government's prime contractors, had dismal track records of doing business with minority firms.

Today, over thirty years later, the landscape has changed dramatically. The programs initiated over 30 years ago are succeeding. Every Federal agency and every Federal contractor has a minority business program in place today. There are goals and objectives for the use of MBEs. There are measurable accomplishments that are reported on a regular basis. The last year the 8(a) program saw legislative attention was in 1988.

While everything is far from perfect, those of you in Congress who craft these programs can take great pride and satisfaction that progress is being made. It is a testament to our great nation that programs of this nature can be created to foster fair and equitable treatment of the Nation's minorities.

At this juncture, in the context of the Adarand Supreme Court Decision, and in the context of the enormous budgetary and personnel cutbacks that SBA has undergone over the past several years, it is appropriate to take a new look at these programs and the underpinnings for them and ask ourselves what is their future.

As I mentioned before, my company is in New Mexico and I do business with the Department of Defense laboratories and with several other Federal agencies and military installations. I can categorically tell you that, were it not for the MBE programs that we are discussing today, my company would not have experienced the success we have achieved in recent years. The SBA helped me in the early days of my company. The SDB program had given me access to opportunities for subcontracting with many Federal prime contractors.

As I also mentioned at the outset, I am a member of the New Mexico 8(a) and Minority Business Association. The association is one of the most active associations of its kind in

the country. Through the association, we have fought many battles that have given our companies better access to contract opportunities with Federal agencies and Federal prime contractors.

One of the reasons why Hispanic business organizations formed was to address the discrimination that still exists today in federal procurement. We have come together because many subtle and sometimes inadvertent acts of discrimination still today prevent small and minority firms full access to the world of federal procurement.

There are certain programs, like the 8(a) and the SDB programs, that clearly fall within the framework contemplated in the Adarand Supreme Court decision. These are narrowly tailored programs that seek to address the historic patterns of discrimination. Let us keep in mind that the Supreme Court did not reject race-based preferences altogether. The Court held that they could be used in limited ways if they were narrowly constructed.

Our collective sense is that although these procurement preference programs will not be needed forever, they are certainly needed for the foreseeable future. In that regard, we agree with Justice Sandra Day O'Connor that the evidence of discrimination continues to support the use of these programs. While our laws may be intended to be blind on race and color, the simple fact is that people are the ones that execute those laws, and people are not color blind.

These programs can be dismantled when we are certain that the gains we have experienced over the past 30 years will not collapse if the programs are suspended. At the present time, I can assure you that there would be significant back-sliding if these programs were dismantled prematurely.

This is amply demonstrated by the back-sliding in state and local programs that occurred when MBE programs were suspended as a result of the Adarand Supreme Court case and other related cases. There are numerous examples of this back-sliding that we believe can be provided to the committee by the Minority Business Enterprise Legal Defense and Education Fund.

One of the first issues needing the attention of this Committee is the fact that there has been substantial back-sliding in Federal contracting with MBE and 8(a) firms in recent years.

As you can see by the attached charts, there has been a substantial percentage reduction in Federal contracting with MBEs over the past several fiscal years - this includes 8(a) firms that are part of the MBE universe. During this period, contracting with MBEs dropped from 28% of Federal small business contracting to 21%. During that same period, the percentage small business goals of the Federal government remained static.

As newer programs have been added, the Federal goal of 23% has remained unchanged. If we add up all the procurement goals for the various socio-economic programs (SDVBs,

HUBZone, 8(a), WOB, etc.), it adds up to almost the entire 23% goal. Traditional small businesses are almost totally displaced by the various socio-economic programs. That is the primary reason why we so wholeheartedly endorse the proposal for increasing the Federal small business goal to 30%.

Furthermore, in its efforts to achieve savings in government spending and efficiencies of operation, in recent years, there have been significant budgetary cutbacks at the SBA. Those budgetary cutbacks have predictably resulted in substantial personnel reductions. We can clearly see that these budgetary and personnel cutbacks have hurt the program operations of the agency in numerous ways.

Little or No BOS Support - To begin with, the companies in the 8(a) portfolio, for example, no longer get the individualized attention that they need for success in the program. The Business Opportunity Specialists have been assigned other duties and no longer concentrate on providing business development support to 8(a) firms.

No Loan Support at the Local Level - In a similar manner, many personnel in the loan programs were sent to the Central SBA office (or assigned other duties). They are no longer available for consultation at the local level with small businesses that need support in financing their businesses. This was one of SBA's key functions and now it is gone. This has resulted in the SBA loan programs being farther removed from the user community. Thus, companies like mine, for example, have no one at SBA to consult with for loans for facilities development. Therefore, SBA is in danger of becoming irrelevant at the local level.

Reductions in PCRs - The Procurement Center Representatives are one of the most essential positions at the SBA. The reason is that they are the first line of defense for the small business community at the many military and civilian buying activities across the country. With substantial reductions in PCRs in recent years, we no longer have their effective advocacy in the Federal procuring officers around the nation as procurement decisions are being made that affect small and minority businesses. One of the results is many more bundled contracts because there is no PCRs present to defend the interests of small businesses.

Reverse the Personnel Cuts - The bottom line is that many of the SBA personnel cuts that were made in recent years need to be reversed. We need to have personnel at the local SBA offices that can work with local businesses in using the SBA loans programs. We need to have local BOS' whose role it is to assist us with the development of our 8(a) companies. We need an increase in PCRs so that the interests of small and minority businesses are taken into consideration as procurement decisions are being made at hundreds of buying activities around the country.

Loan Programs - I would like to address the SBA's loan programs. When SBA underwent a restructuring a couple of years ago, all of the SBA's employees with lending knowledge were centralized. This has for the most part taken smaller lenders, particularly in rural areas, out of the program. There is no one at SBA in the local offices

to walk these banks through the SBA lending process. Because of this, and the fact that the loans have become more expensive for borrowers to make, the vast majority of loans are made by national banks – putting SBA loans out of reach for thousands of small businesses throughout the country.

Now, I would like to come back to an item I discussed earlier in my testimony but remains the most serious threat to small and minority business participation in Federal procurement – contract bundling. With the significant Federal procurement reforms that have taken place over the past decade, small contracts that could be performed - or that had historically been performed - by small businesses have been routinely swept up into large bundled contracts, out of the reach of small businesses. Because these bundled contracts remain in place for many years, these contracts remain beyond the reach of small businesses for long periods of time.

It is generally known that small business contract actions in the past few years has dropped as a result of the bundling that has taken place across all Federal agencies. The trend in Federal procurement over that past decade has been toward larger and larger contracts. A plethora of multi-year contract vehicles have sprung into use at the Federal agencies. These multi-year contracts are so large that small businesses cannot bid on them.

The recent efforts by the present Administration to control bundling, while well intentioned, have not worked. I am not aware of a single large contract that has been unbundled as a result of the Administration's anti-bundling policies.

Something definitive needs to be done to control bundling before all Federal business ends in the laps of large corporations. Federal agencies, for example, must be required to provide more justification for their bundling decisions. Too often, their bundling decisions are made for reasons of administrative convenience, with no justification in terms of cost savings or enhanced efficiencies.

In addition, it has been amply demonstrated in recent years that SBA is virtually powerless to impact the bundling decisions of the Federal agencies. For SBA to ask the agency that made the bundling decision to reverse its bundling decision is simply unrealistic. It doesn't work.

There needs to be a third party involved in those bundling decision. The most logical third party is the Office of Federal Procurement Policy at OMB. This is not a new proposal. It is simply a more realistic mechanism for dealing with bundling decisions by the Federal agencies that my not have been thought through carefully enough and result in devastating consequences for small businesses.

While all Federal contractors face the bundling issue across the Federal procurement landscape, 8(a) contractors are faced with a serious bundling problem within the 8(a) program itself. The unlimited sole-source authority given to the billion-dollar ANCs has created a huge bundling mechanism right in the middle of the 8(a) program.

ANCs, which are large, multi-billion-dollar corporations, are routinely awarded large sole-source 8(a) contracts that bundle up many requirements that could be performed (or were previously performed) by local small and minority businesses. In New Mexico, for example, many large contracts from the DOE laboratories and military installations have been bundled and awarded to ANCs, thereby depriving many local 8(a) firms to opportunity to perform these requirements.

This process reached a peak when DOE decided to bundle $300,000,000 in requirements from three DOE laboratories into a single sole-source 8(a) contract award to an ANC. The 8(a) community in New Mexico was very upset when it found out about this prospective bundled ANC 8(a) contract. The adverse political fall-out of this proposed DOE bundled ANC 8(a) procurement resulted in the suspension of this procurement action.

The unlimited sole-source authority of the ANCs is seriously distorting to the 8(a) program. Either the ANCs need their own separate program, or their sole-source authority needs to be brought down to the level of all other 8(a) program participants so that there is a level playing field in the 8(a) program. Having multi-billion dollar ANC corporations in the 8(a) program is similar to having several Lockheed Martins in the 8(a) program.

As you know, the Price Evaluation Adjustment (PEA) is an important tool that gives SDBs a slight price advantage in open competitions for Federal prime contracts. Unfortunately, an amendment sponsored by Senator Santorum required DOD to suspend the use of the PEA when DOD met its annual 5% SDB goal.

While this makes sense in a general way, there are many DOD installations and buying activities that, individually, don't meet the 5% SDB goal. In addition, many DOD installations are meeting their SDB goals by awarding low-tech contracts for janitorial services, landscaping, contracting services, and the like.

Therefore, we recommend the DOD be required to use the PEA for purposes of meeting the 5% SDB goal at **all** DOD installations and buying activities. And, we recommend that DOD also be required to use the PEA to facilitate the participation of SDBs in more technical areas of contracting, such as telecommunications, electronics, precision manufacturing, Information Technology, and the like. The SDB price adjustment meets the constitutionality test as it is narrowly constructed and historical discrimination has not as of yet been repaired.

The importance of PEA was recently acknowledged by the House of Representatives by including report language in the Defense Authorization Act for FY08 that encouraged the agency to expand use of this important tool in SDB contracting.

However, the 8(a) program remains as the single most important tool in bringing SDBs into Federal prime contracting. The 8(a) program has not been modernized in two

decades and it has not been updated to incorporate the faster ways that agencies are buying goods and services. It is time to overhaul and improve the 8(a) program. Below are some of the areas that need attention.

Net Worth for Program Entry - The net worth issue needs to be addressed. The net worth ceiling of $250,000 for entry into the 8(a) program is too low. This artificially low net worth ceiling lets only the weakest SDBs into the 8(a) program. This has the effect of limiting entry only to the weakest firms into the 8(a) program.

This policy was too restrictive when it was first adopted 20 years ago. After 20 years, it is even more restrictive in that it has not kept up with COL increases. The personal net worth limitation for entry into the 8(a) program needs to be lifted substantially. We support $750,000 as the net worth limitation for entry into the 8(a) program. In addition, since the capital requirements vary so dramatically from industry to industry, we recommend that SBA conduct a study and establish net worth thresholds for all major industries (in no case less than $750,000).

Net Worth for Continued Participation - The net worth restriction of $750,000 during 8(a) and SDB programs tenure is wrong-headed policy. The underlying purpose of net worth criteria is to determine economic disadvantage for purposes of qualifying for entry into the 8(a) and SDB programs. Economic disadvantage should not be a continuing criterion for program participation. On the contrary, the net worth of the program participants should grow as much as possible so that they can develop strong banking relationships to help them finance their businesses. For several years in the life of a business, the owner and the business are financially joined – meaning that the access to capital that the business is able to obtain is based on the financial strength of the owner, represented by his or her net worth. This is particularly limiting for companies in capital intensive industries. We are also operating on standards that are indeed out of date. In 1988, the average price for a gallon of gas was 91 cents – now it is more than three dollars. The price of an average home was $91,000, today it is $$251,700. A typical truck for a contractor is a Ford F150. In 1988 it was $13,000 and today it runs $30,000. Therefore, there should be no net worth restrictions during program tenure.

Sole-Source Ceilings - The 8(a) sole-source ceilings of $3.5 and $5.5 million for services and manufacturing respectively is seriously out of date. Over the past 20 years, the nature of Federal contacting has completely changed. The size of contracts has increased dramatically. The use of multi-year contracting vehicles by the Federal agencies has become the norm. IT has replaced manufacturing as the most significant area of Federal prime contracting. It is time for substantial upward adjustments to the 8(a) sole-source ceilings.

Ideally, the sole source ceilings should be based on the nature of each industry. The sole-source ceiling for small janitorial contracts, for example, would logically be substantially less than the sole-source ceiling for large systems integration contracts. The ceiling for the IT industry, for example, should be quite high, perhaps as high as $100 million. The reason is that IT systems integration contracts are routinely very large.

Therefore, we recommend that SBA be charged with developing sole-source ceilings by major industries. Until such time as SBA is able to establish such ceilings, we recommend that the sole-source ceiling be $25 million for high-tech, manufacturing, IT, telecommunications, facilities and base management, and environmental remediation.

In 1994, Congress enacted the Federal Acquisition Streamlining Act (FASA) and the Federal Acquisition Reform Act (FARA). FASA and FARA changed the way that the government buys, giving agencies significant flexibility to acquire goods and services in a much more expedited manner. Because no corresponding changes were made to the 8(a) program, it now seems to be a slower process – particularly for competitively awarded 8(a) contracts.

As the Committee looks at reauthorizing the SBA's programs this year, the U.S. Hispanic Chamber of Commerce urges you to modernize the 8(a) program and make the SBA's loan programs more affordable to small firms. We encourage you to include in any Senate-passed legislation the provisions contained in H.R. 4474, the "Minority-Owned Venture Empowerment Act" otherwise known as the MOVE Act and introduced by Congressman John Barrow last year in the House. This legislation makes substantial, comprehensive, and long overdue changes to the 8(a) program.

Thank you Senator Kerry for the opportunity to present these views to you and to the members of the Committee. I am happy to answer any questions you may have about my testimony.

CHART #1




CHART #2




Note: Small Business share of total federal procurement: 22.26%

CHART #3

## Small Business Goal Programs
as a Percentage
of the Total Small Business Procurement Pie (FY 2005)




Note: Small Business share of total federal procurement: 21.57%

Source: Federal Procurement Data System

Chairman KERRY. Thank you very much, Mr. Miera. Very helpful testimony.

Mr. Galaviz, thank you, sir, for being here.

**STATEMENT OF FERNANDO GALAVIZ, CHAIRMAN, SMALL BUSINESS ASSOCIATION FOR TECHNOLOGY, ALEXANDRIA, VIRGINIA**

Mr. GALAVIZ. Thank you, sir. Chairman Kerry and Ranking Member Snowe and Members of the Committee, it is important—I would like to focus my testimony, opening testimony on solutions.

It is important that we all keep in mind that Federal program managers are responsible, and you make them responsible, to assure that they have qualified companies to perform the work. The marketplace has changed dramatically in the last 30 years within the minority and the small business community, where there is significant competition, and therefore program managers at the Federal Government level have a wide range of options on firms to select.

The challenges of a startup firm, you are talking about the 8(a) program, you are talking about the disadvantaged program, these are developing programs, and you asked the question, how can a firm build a capability in order to be responsible in meeting the requirements of the Federal client? And also keep in mind there is a myth that even though you have in the legislation that there is an 8(a) sole source program, that really is not true because for the most part, on all 8(a) contracts under $3 million that can be awarded sole source legally, what happens is there is competition because you are competing with a wide range of firms to present your credentials. So seldom really is the 8(a) program given a sole source contract.

Now, how these firms develop capability, particularly, for example, that really you keep talking about disadvantaged goals or minority goals, but in reality, there is no disadvantaged direct contracting because that was eliminated because of the Adarand decision. So the only thing you have left really is the 8(a) program on direct contracting and you have the small business program.

So what really is left to develop capability is the subcontracting program, and everyone in this room knows that that program is basically, unfortunately, a farce or a lie. All of us, regardless of what your religion believes or what your moral, we are all participants, Federal Government people, elected officials, small business community, we all participate in a big lie and know that the subcontracting program, it is not a true program.

So therefore what we recommend is that we eliminate the so-called need for corporations to have subcontracting plans because really they are not enforceable. Major corporations have shared many times that they don't care about how much you penalize them, because even if you penalize them on a piece of work, even if they don't get their profits, they are happy just to get the G&A and overhead that comes from that work that maybe should go to a small business.

So what we recommend is that we totally overhaul the program to be market-driven, to be market-driven where on contracts over $2 million, instead of companies having to submit subcontracting

plans, they submit a plan for subcontracting strategy which is evaluated as part of the proposal. And the major corporations, when they select a company to be a partner, will provide them a subcontracting team agreement right away that is only executable at the time of the contract award if the major corporation wins the contract.

That way, there is a legal linkage right at the beginning, because right now what they do is they sign team agreements and team agreements are useless. And keep in mind that small business cannot get into legal battles with major corporations. They cannot get involved because politically, they cannot get involved because you would be blackballed. Plus, corporations have bigger pockets.

So what we recommend, Mr. Chairman and Committee, is for there to be a look at how we can streamline the subcontracting program to be really market-driven and eliminate the taxpayer having to pay for all this monitoring, which is useless. And with all due respect to our friends at SBA, whenever we come—SBA 20 years ago did try to bring the private sector in to show them to be cooperative. It might be more legislation if they don't pay attention.

As far as bundling, OK, the Air Force put a program on to allow a group of small firms to come in an informal joint venture in order to bid on large jobs. The program was in place. It was a proactive program. Then SBA comes around and tells the Air Force, no, we agree in principle, but because you didn't sign the Memorandum of Understanding, that program, you cannot use it. So I recommend that if you look at the Air Force's informal joint venture program and institute it and get SBA to work with all Federal agencies to institutionalize that program across the Federal sector, I think you will see an improvement on the bundling issue.

[The prepared statement of Mr. Galaviz follows:]

CONGRESSIONAL TESYIMONY

UNITED STATES SENATE

COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

MAY 22, 2007

# MINORITY ENTREPRENEURSHIP: ASSESSING THE EFFECTIVENESS OF SBA'S PROGRAMS FOR THE MINORITY BUSINESS COMMUNITY

Testimony of:
Fernando V. Galaviz
Chairman

Small Business Association for Technology
1940 Duke Street, Suite 200
Alexandria, VA 22314

Contact:
E david.cintron@sbat.org
T (703) 946-8099
F (703) 525-2349

Good morning Chairman Kerry, Ranking Minority Member Snowe, and distinguished members of the Committee, I am pleased to appear before you today to discuss minority entrepreneurship in federal contracting and the usefulness of existing Small Business Administration (SBA) regulations.

On behalf of the minority-owned small business community, we appreciate the opportunity to discuss today's issues to find fundamental solutions to the various problems facing the Small disadvantaged business (SDB) community.

I am Fernando V. Galaviz, the chairman of the Small Business Association for Technology (SBAT); founder of the National Federation of 8(a) Companies; co-founder of the Asian Pacific American Chamber of Commerce; founding member of the Latin American Manufacturing Association; and president and CEO of THE CENTECH GROUP, Inc. (CENTECH).

I am here to report that the current status of SBA programs is ineffective and is making insignificant progress to increase small business federal contracting opportunities. Even though, there is considerable evidence that minority-owned small businesses significantly contribute to the nation's economic productivity creating innovation and providing more jobs.

Considering these realities I will focus on two main topics related to federal contracting that have become deterrents and caused limitations for the development of minority-owned small businesses: Contract bundling and subcontracting regulations.

CONTRACT BUNDLING

There have been attempts by federal agencies to encourage large business corporations that have been awarded bundled contracts to provide subcontracting opportunities to minority businesses. However, the large majority of government subcontracting programs have not provided subcontracting opportunities to small disadvantaged businesses because large corporations do not fully comply with these subcontracting regulations.

In most cases, contract bundling as a business practice is a cost effective and efficient process of managing the important work that government agencies must perform. On the other hand, the current practice of contract bundling in the federal procurement process has contributed to the loss of market share for many minority-owned small disadvantaged businesses.

According to the Small Business Act, "bundling of contract requirements" is the consolidation of two or more procurement requirements for goods or services previously Provided or performed under separate smaller contracts into a solicitation for a single contract that is likely to be unsuitable for award to a small business concern due to: (1) the diversity, size, or specialized nature of the elements of the performance specified; or (2) the aggregate dollar value of the anticipated award; (3) the geographical dispersion of the contract performance sites; or (4) any combination of the preceding three factors.

Over the past five years, total government contracting has increased by 60 percent, while the number of small business contracts has decreased by 55 percent. Actually, the federal

government spent over $417 billion in Fiscal Year 2006. However, of the total prime contract obligations solicited by the federal government in FY 06 only 4 percent were obtained by SDBs and 7 percent by minority-owned businesses in contrast to 88 percent obtained by large businesses.[1]

Subsequently, the federal marketplace continues to expand and contract bundling is vital to the viability and business growth of small government contractors, but data reporting by agency procurement officials is unreliable and inconsistent. In FY 06, only 43 contracts over $5 million were reported as bundled, or consolidated and these 43 contracts accounted for $5.7 billion.[2]

In May 2005, the Office of Inspector General (OIG) of the Small Business Administration (SBA) completed an audit survey of the contract bundling process to determine whether SBA is properly receiving and reviewing all bundled contracts. The audit report stated that (1) SBA did not review the majority of bundled contracts reported by procurement agencies, and (2) the Office of Government Contracting was not in compliance with various requirements concerning contract bundling.

SBA reviewed 28 possible contract bundlings for the period FY 2001 through FY 2004, but OIG identified 220 possible bundlings, or eight times the number of possible bundlings that SBA reviewed. In particular, 87% of the reported potential bundlings (with a value of at least $384 million) identified in the survey were not reviewed by SBA, though procuring activities must provide, and SBA must review proposed bundled acquisitions.[3]

As a result, SBA's ability to protect the interests of small disadvantaged businesses was hindered. One hundred ninety-two contracts identified by procuring agencies as bundled were awarded without SBA's review, with a minimum of $384 million of potential lost revenue to eligible small businesses.[4]

Moreover, unnecessary bundling displaces entrepreneurial contractors and discourages competition. It also undermines a congressionally mandated goal that at least 23 percent of the nearly $200 billion spent each year by the federal government on goods and services go to small businesses.

The Small Business Act, Title 13 of the CFR and the Federal Acquisition Regulation (FAR) require procuring agencies to notify SBA of all proposed contracts that would be considered bundled.

---

[1] INPUT company generated government market information for CENETCH, May 2007.
[2] Statistics generated using Federal Procurement Data System,-Next Generation (FPDS-NG), May 18, 2007, that contains detailed information on contract actions over $25,000 and summary data on procurements of less than $25,000. The system is intended to identify who bought what, from whom, for how much, when, and where.
[3] SBA OIG, *Audit of the Contract Bundling Process*, Audit Report No. 5-20, p. 4, May 20, 2005.
[4] Since SBA does not have a database with the actual number of bundlings, OIG cited the number of bundled contracts identified, but were not reviewed by SBA. According to the FAR § 7.104, the minimum contract dollar amount for a bundling is typically $2 million dollars. If one $2 million contract was lost to small business on each of the 192 bundled contracts SBA did not review, $384 million in Federal contracts would have been lost for small business.

Title 13 CFR§125.2(b) (1) also states that "PCRs are responsible for reviewing all acquisitions not set-aside for small businesses to determine whether a set-aside is appropriate and to identify alternative strategies to maximize the participation of small businesses in procurement."

Additionally, according to a report prepared for SBA's Office of Advocacy, for every 100 bundled contracts, 106 individual contracts are no longer available to small businesses. Likewise, for every $100 awarded on a bundled contract there is a $33 decrease in small business awards.[5]

In March 2002, as part of the Small Business Agenda, the President called upon OMB to prepare a strategy for unbundling Federal contracts. One of the strategies in the October 2002 OMB Report, "*Contract Bundling- Strategy for Increasing Federal Contracting Opportunities for Small Business,*" states that SBA should "Identify best practices for maximizing small business opportunities."

The recommendation within the strategy states that: In cooperation with department and agency procurement executives and Office of Small and Disadvantaged Business Utilization (OSDBU) directors, SBA will collect and disseminate these examples and incorporate them in appropriate training courses and materials.

To my knowledge, SBA has not finalized nor distributed a best practices guide, even though several years have passed since issuance of the OMB report. This failure is also stated in the Government Accountability Office's (GAOs) May 2004 report "*Contract Management: Impact of Strategy to mitigate Effects of Contract Bundling on Small Business is Uncertain,*" that SBA had not complied with the OMB recommendation. GAO recommended "that SBA will disseminate best practices to maximize small business contracting opportunities, as required..."

Pursuant to Standard Operating Procedure (SOP) 60 02 06, "*Responsibilities of the PCR*": You [PCR] will interface with all of the contracting activities assigned to you and establish a written operating plan. The plan should include the following...A description of the items/services purchased by the contracting activity; Procedures for review of purchase requisitions, solicitations (including electronic solicitation systems), and subcontracting plans...[6]

I concur and recommend that the Associate Deputy Administrator for Government Contracting and Business Development implement current operating plans in accordance with Standard Operating Procedure SOP 60 02 and establish procedures with each of the 23 major procurement agencies' Offices of Small and Disadvantaged Business Utilization (OSDBU).

I further recommend establishing a process to hold procuring agencies accountable for unreported bundlings, (e.g., options cannot be exercised on bundled contracts not reported to SBA). Furthermore, I urge SBA management to disseminate a best practices guide to maximize small business contracting opportunities as required by OMB.

---

[5] *The Impact of Contract Bundling on Small Businesses FY 1992 – FY 1999* (Eagle Eye Publishers for the U.S. Small Business Administration, Office of Advocacy, September 2000).
[6] This Standard Operating Procedure (SOP) under SBA was updated in October 2004

These recommendations and procedures should identify what constitutes possible bundling, when and where proposed procurements must be referred to SBA for review, and consequences for procuring agencies that do not notify SBA of proposed acquisitions involving contract bundling.

Certainly, regulatory changes, especially those related to oversight, have the potential to promote greater small business opportunities. For example, the regulations now require agencies' Office of Small and Disadvantaged Business Utilization (OSDBU), an agency's advocate for small business, to conduct annual assessments of (1) the extent to which small businesses receive a fair share of federal procurements, (2) the adequacy of contract bundling documentation and justifications, and (3) the adequacy of actions taken to mitigate the effects on small businesses of necessary and justified contract bundling.

However, the regulations do not establish metrics to measure the extent to which contract bundling is occurring, or the extent to which bundling impacts small business contracting opportunities. Consequently, it will be difficult to gauge agency efforts to identify and eliminate contracts that are unnecessarily bundled and, thereby, increase small business federal contracting opportunities. This weakness is not new; past data on bundling and the effects of consolidating requirements on small businesses have been limited and unreliable.[7]

SUBCONTRACTING

The federal government subcontracting regulations consist of essential programs that contribute to the building of capabilities and resources to minority-owned small businesses. To restate, small disadvantaged businesses are a critical part of productivity, growth, and innovation to the economic base of the United States.

Historically, small businesses in the United States have received a share of federal procurement dollars not quite commensurate with their relative importance in the U.S. economy. While 99.7 percent of all employer firms are small, they receive about 23 percent of direct federal procurement dollars and almost 40 percent of subcontracting dollars. While subcontracting has been a part of the federal procurement framework, it has not received the same focus and attention as the prime contracting program.[8]

The federal government promotes small business procurement opportunities at both the prime and subcontracting levels; and with the enactment of Public Law 95-507, this legislation was extended to include small socially and economically disadvantaged small businesses as well. Public Law 95-507 was enacted in 1978. Specifically, Section 211 which established subcontracting has not been effective to date.

Provisions within the subcontracting authority of Public Law 95-507 that allows major corporations to subcontract to small and small disadvantaged businesses for contracts that are

---

[7] *Small Businesses: Limited Information Available on Contract Bundling's Extent and Effects*, GAO/GGD-00-82 (Washington, D.C.: Mar. 31, 2000).

[8] SBA Advocacy, *The Government's Role in Aiding Small Business Federal Subcontracting Programs in the United States*, September 2006.

over $500,000 or over $1 million for construction contracts. It is unfortunate that I report to you today that over the last 2 decades, there has been a consistent practice of major corporations not complying with the commitments outlined in their subcontracting plans which adversely impacts the market share for minority, small and small disadvantaged businesses.

Furthermore, it is unfortunate that I report that Federal government contracting officers have not been consistent in enforcing the subcontracting plans of major corporations even though Congress approved liquidated damages as remedy to penalize large corporations for failing to comply with subcontracting regulations. Although there have been thousands cases where large business corporations have not complied with subcontracting plans, we, can count on one hand when the liquid damages remedy has been enforced.

There are inconsistencies in the regulations that could affect small business procurement. Both the Small Business Act and the FAR state that acquisitions exceeding $2,500 but not greater than $100,000 are "reserved exclusively for small business concerns" with one exception: The Small Business Act exception reads, "Unless the contracting officer *is unable to obtain* offers from two or more small business concerns." The FAR exception reads: "unless the contracting officer determines there is not a reasonable expectation of obtaining offers from two or more responsible small business concerns."[9]

This difference can be interpreted to mean that, according to the Small Business Act, the contracting officer must at least attempt to award the contract as a set-aside. If two or more competitive offers are not received, then the award does not have to be reserved for a small business.

The FAR on the other hand allows the contracting officer to avoid the set-aside based solely on the "reasonable expectation" that two or more competitive offers from small business concerns will not be received. The SBA's exception offers small businesses greater protection. Therefore, SBA should ensure that the language in the Small Business Act is implemented in the FAR.

Recent studies by the Government Accountability Office, SBA's Office of Inspector General, and SBA's Office of Advocacy have found that agencies are counting awards made to large firms towards their small business procurement goals. Another problem with the MAS Program is that GSA classifies firms as small for the contract even though the firms may not be small for all of the contract's goods or services.

As a result, agencies may obtain small business credit for using a firm classified as small even if the firm is not small for all of the procured goods or services. This is contrary to SBA regulations, which require that a contractor meet the size standard for each product or service for which it submits an offer (13 CFR § 121.407).[10]

---

[9] SBA OIG, *SBA Small Business Procurement wards are not Always Going to Small Businesses,* Report No. 5-14, February 24, 2005.
[10] SBA OIG, *New Management Challenge: Large Businesses Receive Small Business Awards,* Report No. 5-15, February 24, 2005.

As you may recall, due to the Supreme Court's 1995 decision in *Adarand Contractor, Inc. v. Pena (Adarand),* the Federal Government Direct Contracting Program for small disadvantaged businesses was reduced. The Supreme Court held that federal programs using racial and ethnic bases in decision making must serve a compelling government interest and be narrowly tailored to meet that interest.[11] Under this standard, federal agencies must seriously consider race-neutral alternatives to race-conscious procurement programs.

Ten years after the *Adarand* decision, in September 2005, the U.S. Commission on Civil Rights issued a report finding that federal agencies still largely fail to comply with the rule in *Adarand.*[12] consider race-neutral alternatives as the Constitution requires. This report measured federal agencies' compliance with this constitutional requirement. The Commission reviewed relevant aspects of seven agencies' procurement programs: the Departments of Defense, Transportation, Education, Energy, Housing and Urban Development, and State, and the Small Business Administration. Significantly, the agencies under review neither provide clear recourse for contractors who are the victim of discrimination nor guidelines for enforcement.

Specifically, the Commission found that these agencies do not seriously consider race neutral alternatives before implementing race-conscious federal procurement programs. In addition, that such consideration is required by the strict scrutiny standard under *Adarand* and other Supreme Court decisions. Although the Commission identified some race-neutral programming efforts, agencies do not engage in the activities that constitute serious consideration, such as program evaluation, outcomes measurement, empirical research and data collection, and periodic review. Significantly,

Among recommendations, the Commission urged the Department of Justice to offer clear and specific guidance on the government wide obligation to consider race-neutral alternatives. The Commission also asked the White House to assemble a task force to determine what data are required to measure the effectiveness of race-neutral alternatives. Finally, the Commission asked Congress to enact legislation expressly prohibiting race discrimination in federal contracting and establishing effective remedies and enforcement procedures.

With all due respect to committee members, has Congress enacted any legislation to remedy the bias in federal procurement agencies and eliminate race discrimination in federal contracting? After more than a decade of this milestone Supreme Court decision in *Adarand* , there have been no effective steps taken by the agencies under review, and these agencies still do not provide clear recourse for contractors who are the victim of discrimination nor guidelines for enforcement.

Therefore to increase chances of subcontracting with government contractors and become more viable, the minority-owned small business community is left with SBA's 8(a) Business Development Program, Mentor-Protégé Program, and SDB certification rules that are poorly monitored, implemented, and evaluated by SBA officials.

---

[11] Adarand Constructors, Inc. v. Peña, 515 U.S. 200 (1995) (hereafter cited as *Adarand*).
[12] U.S. Commission on Civil Rights, Federal Procurement After Adarand, (September 2005).

Using the 8(a) program as an example, subcontracting opportunities are extremely important to the development and support of minority small disadvantaged businesses. The 8(a) program, as a part of its graduation strategy, requires a small business concern to have a business mix that includes non-8(a) sales. Most small business firms in the early stages of their development do not have adequate resources to compete for direct contracts in the Federal marketplace in open competition. Therefore, assuring major corporations comply is critical to provide business opportunities to minority, small and disadvantaged businesses.

Case in point, CENTECH was awarded a major Air Force contract that included the proactive small business-friendly informal joint venture provision of the AF policy on small business contracting. In order to proactively assist minority and small businesses, the U.S. Air Force (USAF) developed a concept through which minority and small businesses could organize in an informal joint venture concept in order to meet the 50% work share requirements in order to demonstrate capabilities and be competitive for major bundled contracting opportunities. Years after the implementation of this proactive small business user-friendly contract bundling business strategy, the Small Business Administration (SBA) indicated that the Air Force did not have the authority to implement this very useful and effective initiative.

However, after CENTECH was awarded the contract, the Air Force, as referenced above, was forced to rescind its policy under pressure from the GAO and SBA. The SBA did not take any action to remedy the negative impact on small businesses that had followed the rejection of the Air Force's policy citing the absence of enabling legislation permitting it to do so.

Presently, this process is costing small and minority owned small businesses a significant amount of business primarily as a result of 1) the lack of agreement between the USAF and the SBA on the informal joint venture concept, and 2) jurisdictional disputes between the GAO and the SBA concerning who has the authority to decide whether a small business bidder complies with work share allocation requirements applicable to SB set aside contract opportunities.

Therefore, we recommend that the SBA should adopt and implement this proactive small business-friendly contract bundling business strategy so that SDBs can compete for major bundled procurements, and also we recommend that that Congress act to clarify that the SBA is the sole arbiter to determine whether or not a small business bidder complies with limitations on subcontracting provisions and other laws and regulations relating to small business.

At this time, Mr. Chairman, we are pleased to inform you that we have an innovative solution that we recommend that gets strongly implemented into law. We have learned in life that difficult problems and challenging circumstances can indeed be resolved by using common sense and simplicity.

Therefore, we are proposing that there is no need for the federal government and the taxpayer to be paying a significant amount of money to have federal managers going across the country determining whether large business corporations are complying with their subcontracting plans. We recommend the elimination of subcontracting plans.

Instead, with respect to prime contract awards over $2 million the federal government should require in the Request for Proposal's (RFPs) that large business acquisition bidders do the following:

1) Identify the subcontractor;
2) Identify the subcontractor's specific scope work to be performed;
3) Identify the specific dollar amount that will be awarded to the Subcontractor in the subcontract agreement;
4) Mandate that the prime and subcontractor execute a subcontract agreement prior to the proposal submission;
5) Mandate that a copy of the fully executed subcontract agreement executed between the prime and subcontractor be included in the bidder's proposal submission.

The subcontract agreement would only be in effect if the bidder is awarded the prime contract. Since there is no privity of contract between the government and the subcontractor, there would be no need for government intervention if the prime contractor breaches the subcontract agreement because the subcontractor would have a means to enforce the subcontract agreement through the legal system.

It is the current practice for prime contractors to enter into teaming agreements where the major corporation as a prime contractor indicates a percentage of work to be performed and a certain dollar amount that will be awarded. Subsequent to contract award, prime contractors enter into subcontract agreements with subcontractors but in most instances subcontractors are offered less work share and less dollars in the subcontract agreement as what was indicated in the teaming agreement.

For example, under the present system, the major prime contractor can be awarded a $200 million contract on the basis that the prime contractor will be subcontracting 20% ($40 million) of the award to minority, small and disadvantaged business. However, in actuality, subsequent to contract award, the prime contractor may only award the small business subcontractors $8 million worth of business, leaving the remaining $32 million dollars to be awarded in the future. Currently, the Federal government is not fully aware whether large business corporations are complying with their subcontracting plans. Would you buy a home without looking at the master bedroom or kitchen? It's no different with Federal government contracting.

It is for this reason that we believe our recommendation for subcontracting compliance is viable and will benefit minority, small and disadvantaged business subcontractors. This strategy will be market driven because in order to be competitive, prime contractors will be need to select the best qualified subcontractors. This strategy will also afford the Federal government contracting agency the opportunity to fully evaluate all vendors at all tier levels performing on the contract.

Thank you for the chance to work in partnership with the committee to identify best practices and solutions for maximizing small business federal procurement opportunities, and undertake the effort to stop the hemorrhaging and languishing of minority-owned firms that continue to lose ground on the government contracting playing field.

Chairman KERRY. Thank you, Mr. Galaviz.

Let me just say to all of you, your testimony has been really important and very, very informative. Mr. Jenkins, I am glad you were able to stay here and listen to this because I think it is like night and day, to be honest with you. I mean, there are just two different worlds here that we are hearing about.

I need to go over for that 11:30 a.m. meeting that I mentioned. Senator Cardin is going to Chair in my absence. I am going to get back here. I want to follow up and I didn't want to shortchange anybody here. So I appreciate your indulgence in letting me do that.

But I really do want to follow up on a number of things that have been said. I think it is very important testimony. It is a very important challenge to this Committee. It is an important challenge to the SBA, because clearly the bundling/subcontracting is not working and it is ripping off a lot of companies. I mean, it is just an unfair practice. So we need to dig into it. I know my colleagues will do that in my absence. I will try not to be repetitive when I get back, but I thank you for your indulgence and I will come back. Senator Cardin, thanks for chairing in my absence.

Senator Snowe, do you want to take over?

Senator SNOWE. Thank you, Mr. Chairman.

Thank you all very much for your testimony. I think it has been very useful to hone in on some of the key flaws and weaknesses with the existing programs and also for your recommendations on what we can do to act upon some of these failures. Regrettably, these flaws and weaknesses have been ongoing for so long and repeatedly and that has had an impact on the minority community. The question is now where do we start to address some of these issues, and certainly through the Small Business Administration or through the Congress or totally revamping these programs.

I think, Mr. Miera, you mentioned several things that were certainly very disturbing, examples of why these programs are simply not working to their potential and ultimately affecting the potential of the minority community. We have heard these examples across the board in many forms. But you mentioned that the Government is actually back-sliding on Federal contracting with Minority Business Enterprises and 8(a) firms. So obviously we are moving in the wrong direction.

You also recommend that the Office of Federal Procurement Policy oversee the implementation and the compliance with these programs rather than the Small Business Administration. Can you comment on that, because I think that is an interesting point. I would like to know why you think SBA might not be up to it. I mean, the SBA obviously hasn't demonstrated its oversight capability thus far, so I understand your skepticism, but could you expound further on that?

Mr. MIERA. One of the reasons that I think it is critical is that even if the SBA steps up and really advocates strongly, for instance, in the case of unbundling a contract or something like that, the problem is that they have to go to the agency itself and that is their limit of who they can go to. So once they go to the agency, if the agency has no interest and there is no repercussions to them, there is no reason for them to reverse their decision. And so it has

to be outside of an agency, and I think that is the logical place, so that if the SBA doesn't have any success there, that once they can go somewhere else, there is a larger club that they can wield. I mean, obviously, there has been a lot of back-sliding, and if there is no motivation, if there is no repercussion, then it is just not going to happen.

Senator SNOWE. Well, it is interesting to your point that even the GAO has indicated that the SBA has never raised the issue of the threat of penalties——

Mr. MIERA. Right.

Senator SNOWE [continuing]. You know, the penalty provisions that now exist under the law. I am not so sure that the SBA has ever exercised those penalties for large contractors who use small businesses as fronts. Does anybody know of any examples with respect to SBA and how they have addressed these issues?

Mr. MIERA. I don't personally, but one thing that I will tell you is that I worked about 9 years in a very large business and I can tell you that it is the problem with subcontracting. While there are good people in those companies that will do the right thing, in general, large businesses and large entities are driven by—a large business is driven by the stockholders and there is absolutely no motivation if it doesn't hit the bottom line. And if there are no repercussions, if there are no penalties, there will be no action. I can guarantee that. I have seen that and that is one of the big problems.

Senator SNOWE. Mr. Galaviz, do you have any examples of where the SBA has aggressively enforced or pursued some of these issues to enforce compliance?

Mr. GALAVIZ. About 20 years ago, it did make an effort to have a couple—trade associations to work with SBA and to encourage them. That did not quite work, and then there was liquidation damages added a few years later. If you look at the whole history of what has happened in the last 10 years, I don't think there are more than three or four times in the whole Federal Government where liquidation damages have been used.

Madam Chair, the sad part about it that really—there is in the legislation now the authority for contracting officers to make major corporations accountable, but the fact is that the management of the agencies, and that happens whether it is Democratic or Republican, the leadership, they are not forceful enough to have their contracting officers to manage the element of the subcontracting requirements.

As far as the other side of the story is that contract personnel, they say they have so many things to deal with in managing and executing a contract that this is just another thing that they have to deal with and is not a priority to them.

The SBA itself in the last decade has not really been effective, and when we have gone and talked to them, we get a lot of bureaucratic responses and nobody really wants to take on the effort. The suggestion that I have made to the Committee is a suggestion I have been making now for 6 years to different people, and it is really a simple solution. It is so simple that it is too complicated because they feel, you know, it cannot be that simple, but it is a simple solution that we propose.

Senator SNOWE. Mr. Robinson.

Mr. ROBINSON. I am unaware of any situation in which SBA has vigorously enforced relative to subcontracting and bundling. One of the things I think the Committee needs to take into consideration were the changes that happened in procurement with FARA and FASA. When those streamlining reforms came into the procurement process, a lot of the socio-economic issues that were normally key to how a contracting officer operated were eliminated.

And so the regulatory constraints, if you will, that a contracting officer had to take into consideration relative to subcontracting, 8(a), those kinds of things, with FARA and FASA, they were totally eliminated and thus that took the restraints off of contracting officers, the sensitivity, if you will, at a minimum, off of contracting officers. So I think the Committee needs to look at that issue if you are going to look at this from a systemic standpoint and how you bring more enforcement into that process.

Senator SNOWE. Do you think SBA is capable of enforcing compliance?

Mr. ROBINSON. No. Institutionally, no. Even where they have institutional power, let us say with the 8(a) program, I mean, technically with the 8(a) program under 95–507, SBA is the prime contractor. But they have delegated much of that responsibility away and at least instances that I am aware of—we just had a situation with an 8(a) contractor, F&L Construction Company here in the District, and appeals to SBA to address that issue, the complaints that this company was having—exemplary performance at Walter Reed Hospital, and yet the appeals to SBA to come in and carry out their role, their institutional role, went unheard.

Senator SNOWE. So this company went to SBA——

Mr. ROBINSON. Yes.

Senator SNOWE [continuing]. And there was no response?

Mr. ROBINSON. There was——

Senator SNOWE. Was this recent?

Mr. ROBINSON. This is recent, yes. This has been within the last year.

Senator SNOWE. OK.

Mr. ROBINSON. It was within the last year.

Senator SNOWE. At Walter Reed——

Mr. ROBINSON. At Walter Reed Hospital, that is correct.

Senator SNOWE. Have you heard of anybody getting any response from SBA on these particular questions, and certainly the egregious examples of discrimination that you raised in your testimony, have you ever heard of an instance where SBA has responded appropriately?

Mr. ROBINSON. Not appropriately, no. I gave the case of Mr. Soo Choi up in Pittsburgh. That was an 8(a) contract. The prime contractor just literally took the contract and acted as a prime, and this was an 8(a) contract, once again. And his appeals to SBA, to the Corps of Engineers, went unheeded.

Senator SNOWE. Well, it is clear they have to do something fundamentally different. I think that is undeniable.

Mr. Wainwright, you have obviously indicated in your testimony statistics that buttress and reinforce the disparities and the discrimination that continue to exist with these 8(a) programs and is

illustrated by these graphs. How would you recommend from what you know on how we should proceed? I mean, the real question is whether or not you can change the culture in an agency to do what it is required to do. We have systematically had these reports. We are dealing with contract bundling and fronting by large companies fronting. The examples are replete, unfortunately.

Dr. WAINWRIGHT. Certainly, changing the culture is important. I think that takes top-down leadership. I just would add a slightly different take on some of this from a completely different perspective. Just to be fair to SBA and the other State and local governments around the country that are trying to enforce and protect these affirmative remedies, you have to keep in mind the legal landscape in the last 20 years for such remedies has become quite perilous ever since the Croson decision. It has really chilled out a lot of State and local governments, who are many of my clients.

From the moment they enforce, take a contract away from a low bidder for not meeting the subcontracting goals, not meeting the good faith efforts, they are slapped with a lawsuit that threatens to take the entire program away. So consequently, you see oftentimes very tepid approaches to enforcement in the interest of keeping the program from going away entirely.

So some of the—to be fair to the public sector entities, they are in a real bind as far as having had a lot of the teeth taken out of their ability to aggressively enforce things. Does that excuse some of the stories we have heard here today? Absolutely not, but I just wanted to put that in as a recommendation, or as an observation.

Senator Cardin, you mentioned earlier, what should the goal be, when you were questioning Deputy Administrator Jenkins. Certainly not 5 percent. We heard in the statistics 18 percent of the businesses in the country are minority-owned. That doesn't even include women. Now, I believe the SDB designation does include women—I could be wrong about that—but a 5-percent goal is clearly, at best, locking in the status quo ante from discrimination in this country. So the goal certainly could go higher and I think that would go a long way toward helping these communities.

Obviously, a high goal in an environment where the agencies can't even get the 5 percent goal right is still problematic. So I think there are many, many things that have to happen simultaneously in order to really, as you said, Senator Snowe, allow these programs to live up to their potential. But certainly they are very, very important programs.

The other thing to keep in mind is that there are hardly any programs like this in the private sector. While some major corporations have developed really good supplier diversity programs, I think those still remain the exception rather than the rule, and we have to keep in mind that the private sector represents 90 percent of the activity in this country. So for the burden to be on the public sector to do all this by themselves is difficult and somewhat reminiscent of the boy with his finger in the dike trying to keep this problem from bursting forth.

Senator SNOWE. Thank you and thank you all for your very illuminating testimony.

Thank you, Mr. Chairman.

Senator CARDIN. [Presiding.] Thank you, Senator Snowe.

I want to join in thanking you all for being here. We hear the numbers, the statistics. You put a face onto it. You give us some of the specific examples, which I know are difficult to come by because of the concern that business people have about being able to continue with their businesses and retribution. But I very much appreciate the way that all of you have added to the record here because I think it is going to be helpful in our work.

I want to go back to procurement for one moment with the subs and primes. Of course, it would be a lot easier if we had higher numbers of prime contractors. Then we wouldn't have to worry about whether there is a sincere effort to deal with the sub issue.

I had a meeting with small business people in my community about compliance with these requirements and they brought up the budget issues, not just the budget issues in SBA, but the budget issues in agencies, that a lot of the agencies don't have the technical capacity to do what is required under law or to, in fact, carry out a good faith effort to make sure that these goals are met and that efforts are made to be more inclusive.

I am just interested in your observations, whether we have an attitude issue among various Federal agencies that is reflective in some of the examples, Mr. Robinson, that you cited, or whether this is just a fact that people are busy. Agencies are busy. They don't have enough resources to handle their work, so they look for an easy way out and don't do what they should be doing as far as making sure our laws are not only complied with in number, but in spirit. Who wants to take a jab?

Mr. GALAVIZ. Our experience has been that it all depends on the leadership. If a cabinet secretary, let us say, like at the Department of Transportation demonstrates that it is important to the secretary for them to do business with minority firms, 8(a) and small businesses, and they are consistent with our policy statements, then you see it that all of a sudden the whole system works. Where there is no leadership on top, they just move on. NASA is a good example of where they really worked the program. So it depends who is the coach and who is the leader.

Mr. MIERA. My experience has been primarily with DOD, and while there is no question that there is a requirement for some contract bundling, there just are issues that can't be dealt with any other way.

My experience has been that there is an attitude problem, and what I have seen in the past is that some contracting officers and, in fact, the technical program managers, just to take the burden off of their plate, have just bundled contracts when it wasn't really necessary, that they just didn't want to have as much work as they used to have.

And the problem is that, as I said before, unless people's behavior in this area is really forced to change and until there is an institution that is built and that will maintain itself, unless people are forced to change, they will go back to what they feel comfortable doing and these folks have not supported minority business programs. They feel that it has been shoved down their throat and if there is any opportunity to eliminate those kind of activities, they are going to do it.

And I have seen them use bundling as an excuse. Oh, we just don't have the money to pay for additional contracting officers. As I showed in my example, it is a false economy. I mean, the government has ended up actually paying more money to eliminate a couple of contracting officers.

Senator CARDIN. Mr. Robinson.

Mr. ROBINSON. I think it is an attitude problem, yes. I think it is also a personnel problem in that you have fewer people in the procurement process. Somebody made mention of PCRs, and we have seen just a dramatic decline in the number of PCRs that are involved in the process. And so long as, from a systemic standpoint, so long as you have the problems that were created by FARA and FASA, you know, bundling is going to be here and the only way to ameliorate that is to create a set-aside for small businesses and minority businesses that becomes an institutional part of the procurement process. But with the advent of FARA and FASA, you know, systemically, you are going to have a problem with bundling. Bundling is going to be a mainstay in the procurement process.

Senator CARDIN. Dr. Wainwright.

Dr. WAINWRIGHT. I would just say a lot of my experience has been at the State and local level. We just completed a study for the State of Maryland last year where we worked with all the major State agencies and I expect a lot of the things that we have observed at the State and local level are true in the Federal level as well. As has been mentioned, people are spread thin. Certainly, the people that are responsible for implementing compliance with minority business programs are often, at the State and local level, one-person shops with way too much on their plate to effectively do their jobs.

The other thing we have noticed, and I suspect this is true in the Federal agencies, as well, is the people that are responsible for implementing and ensuring compliance with the SDB goal programs hierarchically within the organization don't have authority over the contract administrators. They are at a lower level where their observations and recommendations really carry no weight with the people who are administering the contracts and the major procurements.

So they are set up in the organizational framework without the necessary tools they need to effectively, even if they don't have the attitude problems, if they are sincerely dedicated to doing their jobs and seeing these programs work, they can't really trump a veto by a contract administrator.

Mr. GALAVIZ. If you take the Air Force, to use an example, the Air Force in the last 10 years has taken a significant number of programs that are worth, on a particular direct contract, a $100 million award at Colorado Springs, the C–4 contract, that went small business set-aside. The Vandenberg Range, which is the most sophisticated range in the world, after being for many years run by major corporations, the Air Force moved that to the small business community, and that was a $474 million award. The Nextance contract, which is a contract vehicle which is used internationally by the Air Force and other DOD, they created a segment of small business which half of the small businesses were minority firms.

So there is, for example, with the Air Force a role model that this Committee can use, and the SBA—I have gone, I have even gone to the White House to have included in some Presidential speeches what the Air Force has been doing and no one ever used it. Even SBA, in order to get credit for their own programs, even though they did not do the work for the Air Force, they should use that as an example.

So it is a situation of leadership and attitude, and what the Air Force has shown, and so has the Department of Energy, that the small business community, including minority communities, there is enough capability for them to deal with this large bundling contracts. And also, it is good business for the taxpayer, quite frankly, for there to be this bundling contracts.

So the real answer, instead of fighting the system, is for the leadership of this Committee to propose that, let us say that 20 percent of the bundling contracts should be set aside for small businesses. And I can assure you, Mr. Chairman, there is enough capability in this United States of the small business community to be able to be competitive. It has been demonstrated by the Air Force many times and also by other DOD agencies.

Senator CARDIN. Well, I agree with the thrust that leadership is the principal driving force. If an agency head wants to make it work, not only will it work, but the people that work in the agency will know that that has got to be done. There is never enough money in a budget to do everything an agency wants to do, and they make their own priority judgments, but also, I think, budget support is important. So we need to make sure the agencies have adequate budgets.

Let me just move on to the area of finance and deal with the 7(a) program and the 504 program. Those numbers are just not acceptable. What changes are needed in the programs in order to make it easier for minority small businesses to participate in the major funding programs?

Mr. ROBINSON. One of the principal things that can be done, of course, is opening up the distribution chain so that minorities are more involved in the chain that actually interfaces with minority businesses. As noted in the peak example, you have very few minority firms in the SSBIC Program, which is your venture capital program. And so opening that up so that you have more minority firms, we have some very capable firms that operate in the venture capital community, yet they find it extremely difficult to be involved in the SSBIC Program of SBA. So getting more minorities involved in what I call the distribution chain for access to capital would go a long way to opening up more opportunities—more finance for minority firms.

Senator CARDIN. If you have other suggestions in regards to how we can improve this program, please let us know. This Committee is very interested in trying to improve the SBA laws as relate to minority opportunities. I know in talking with the Chairman, his legislation that he has introduced plus other efforts are being made to strengthen the tools that are available, understanding, of course, that we need to work on leadership and attitude as part of what we are doing, not only in the governmental sector, but in the pri-

vate sector, as well, in order to make better progress on expanding opportunity in America.

Dr. Wainwright.

Dr. WAINWRIGHT. I would just circle back, since it is almost apropos to your comment, to the net worth issue. I don't know if that binds in the 7(a) program or not. I believe it probably does. We did—you know, the $750,000 figure, nobody seems to really know where that came from. Senator Kerry suggested it was at least 10 years old. We have some anecdotal evidence it is more like 30 years old, that it was pulled out in the 1970s when some of these programs were initially put forward.

We did some simple inflation indexing, assuming that it was only 10 years old, and it puts the number, and certainly Administrator Jenkins is right that the threshold does not include equity in your business or in your primary residence, but regardless, that $750,000 number, even if it were 10 years old, ought to be around $1 million. And quite frankly, it is probably a lot older than that and, consequently, the indexing—I don't know what a gallon of milk was in 1970, but it was probably quite a bit—or a gallon of gas was probably 30 cents a gallon, or 35 cents a gallon.

So that would go a long way, I think, toward enhancing fairness in the program while maintaining the purpose of the net worth cap in the first place which is to make sure that the benefits of the program are going to the firms that really need them.

Mr. ROBINSON. In that regard, we did some adjusting for inflation on that number and the number is more like $1.3 million, I think, if it is 10 years old. If it is 30 years old, then that number is much greater than that.

We have identified this issue of access to capital as a fundamental impediment to building capacity. As you have noted in your statistics, the number of minority firms has grown exponentially. It has been the fact that the firms lack capacity, and in operating in a global market, you need capacity in order to operate that, and we have found this issue of personal net worth to be one of several impediments to building capacity in firms.

The number—I recall the hearing very vividly where the $750,000 number came into play and that was about 1989, which was soon after the Wedtech scandal had hit the 8(a) program and there was all this concern about minority millionaires being involved in the program. And I recall specifically, I think it was Senator Nunn at the time who was Chairman of the Small Business Committee, and the issue was, why $750,000? There is no adjustment for industry or anything of that nature. And the answer was, it was less than a million.

Mr. GALAVIZ. If I may give, because I am the oldest person in this room—[off microphone]—the concept was that basically this was just a business—and it was also the concept that—let us focus on the firms that need developing, the younger firms, because the whole concept was that it does not count the value of your home, OK. It does not count the value of your business. So the idea was to make those businesses stronger, because a lot of firms after being in the 8(a) program do not continue being in business. They fail. Let us force these entrepreneurs to put their resources into their business. So if they want to take advantage of these Federal

programs, let them then commit that they can have the $5 million home that they want, OK, but instead of buying that $50,000 car, let us put it into the business, and that was the basic concept.

Senator CARDIN. Well, clearly we can do better under these programs. The fact that there has been no adjustment in law for over 10 years is certainly something we need to look at, because the pool of applicants are smaller than otherwise, which would give you a broader pool if we change that. It gives you the opportunity to bring in more minority businesses. So it is something we need to clearly consider.

Let me again, on behalf of our Committee, thank each of you for your testimony here today. As the Chairman indicated, the record will stay open and additional questions may be asked. Again, thank you all.

I have one more question to ask, I have been told, because Senator Kerry is on his way back, so that gives me a chance to ask one more question on these issues.

Let me go to technical assistance, which is an area that I hear about frequently, on ways in which the SBA has not been as effective. For a company to be able to deal with the procurement issues, they need help in dealing with Government procurement. I understand the rules of Section 8(a) that require a company to have shown some degree of strength. Are you satisfied with the current services being provided by SBA, the budget support for helping minority businesses prepare for Government procurement work?

Mr. MIERA. Well, I can answer that as a small business owner and the answer is absolutely not. I mean, it was in part of my testimony, but it has been devastating to most, especially young, new starting businesses the lack of resources in the local SBA office, I mean, and the technical support that they receive when they are there. It is just critical for a brand new company, somebody that is just getting started and doesn't really understand Washington or how to get contracts, to be able to walk into the office and have somebody there that is not only going to give them the technical assistance, but also you were asking about the loan assistance. There needs to be somebody there.

And while I understand the temptation in an agency when their budgets are being cut to increase efficiencies by moving people to Washington, it just doesn't help the people that need the help. They need to be out in the field. It is critical.

Senator CARDIN. Does anyone else wish to comment?

Mr. GALAVIZ. Mr. Chairman, one of the things that SBA did a few years ago that helped a lot, and that is to have firms that apply for the 8(a) program to go through a seminar ahead of time, before they would turn in the application, and I don't know whether that is happening now. But that was a very important help to the firms because it gave a reality check to the firms. Do you really want to get into this business? Do you realize there is a big difference between dealing with the Federal Government and dealing with the private sector and that it takes a significant amount of more resources to do business in the Federal sector?

The basic concept and reality is that technical assistance is best given by the private sector, people who are in business that know about business, OK. And with all due respect to a lot of folks at

SBA, they are very fine, committed people, but none of them have run a business. None of them have ever been responsible in making a business be profitable.

So basically when you talk about this technical assistance, as long as the SBA management and this Committee realizes that the development of the firms in the first 4 years of being in business, it is important there is significant assistance to them regarding what it takes in order to succeed, because a major failure that we find is that people also have an attitude sometimes when they enter into the 8(a) program as if the Government or SBA is going to put their contracts on their lap.

And what we now tell our members in our association, think of SBA only as a person to certify you in the 8(a) program and think of the 8(a) program only as another contract vehicle, but do not any longer expect for the SBA to give you the technical assistance, and for sure do not expect for SBA to really go and find contracts for you.

Back 20 or 30 years ago, SBA did a much better job of working with agencies in making sure that there were 8(a) contract opportunities. Today, if the Administrator of SBA spent more time at home talking to cabinet officers and asking the cabinet officers to definitely have 8(a) contract awards instead of politicking all over the country, that would make a big difference, because we have learned in the past that when a cabinet officer—it doesn't matter what kind of administration it is, but when they know that the SBA's leadership is dealing on a personal basis with a cabinet officer, then things do happen in that agency.

Senator CARDIN. Thank you very much.

Thank you, Mr. Chairman.

Chairman KERRY. [Presiding.] Thank you, Senator Cardin. Thanks a lot for carrying on here. I really appreciate that enormously. I gather you have covered quite a bit of territory and I appreciate that very, very much. Thank you for doing so.

Can I just follow up? Mr. Galaviz, what you just said is very important because under the Clinton administration, I think Erskine Bowles and others, they sat at the cabinet table, but this Administration specifically chose to downgrade the SBA, not just in budgeting, but in its presence, and I think that has had an impact. I think that when people know that nobody is there sort of pushing and there is no advocacy and there is no flag, it is not on the agenda.

Mr. GALAVIZ. Mr. Chairman, regardless of what administration, no question as an individual, in my view of being involved in this thing for 40 years, there is no question that Mr. Bowles, Administrator Bowles, was to me the most effective administrator in the history of the Small Business Administration, and because why? He was a bottom-line businessman. He worked on problems in a very simple and very honest way and he also did his homework. I wish we could find more—with all due respect to the present Administrator——

Chairman KERRY. Yes.

Mr. GALAVIZ. [continuing]. I wish we could find more Mr. Bowles.

Chairman KERRY. Well, I appreciate your saying that. Personally, let me just say that I think that Administrator Preston has

worked effectively with the Committee. I think he has started out in an earnest way to try to grapple with some problems that he has inherited and I still am hopeful that he is going to step up on some of these things. And I think that he has a lot to get a handle on in a short period of time, but we are anxious to work with him and hopefully he can change a lot of this as quickly as possible.

Some of it is tough because OMB and the Administration are squeezing on the budget. I am confident he asked for more than he got, and he has to struggle to some degree with what he has. But administratively, notwithstanding the budget constraints, a lot could be done and you all have articulated that.

I don't want to go over areas that already been discussed. I have a pretty good summary here of some of the things you have been asked, but let me just ask you quickly, and if this was asked, just tell me and we will stay with the record. But on the subcontracting, Mr. Miera, how do we best get at that? I mean, this is something we have heard for a long time. In some cases, primes will use people to get the contract and then they dump them afterwards and different things happen. That is sort of what you have described. You get squeezed out or they eliminate competition. What is the most effective way for us to deal with this—is there something statutorily we can do or is this simply a matter of administrative oversight and enforcement?

Mr. MIERA. Well, I think it is both. I think the SBA has to come on stronger on enforcing the subcontracting plans. There is no question they need to do a better job at that. But also, one of the things that I have seen in non-Federal entities, if you will, is that until a behavior becomes institutionalized, it has to have some kind of motivation, and what I have seen in other institutions is that they have awarded contracts where part of the award fee was dependent on how well they executed their subcontracting plan. That is absolutely the only thing that I have ever seen work.

There are other ideas that have been tried, for instance it comes into play when you are giving an award and it is taken into account in the evaluation and maybe in past performance. Those things are so far apart from the direct bottom line that an organization looks at, that they do not work. But the annual or semi-annual award fee, when there is actually an effect on the bottom line to the company, that is all I have ever seen work. So there has to be some teeth put into the executing on the subcontracting plans or, in my opinion, it just never happens.

And I think that should be across the board. It is not just with the large prime contractors. We need to be careful as more contracts are bundled, they end up being larger contracts even with small businesses, because while there has been an increase in the number of dollars that have gone to minority businesses, if you look at the actual number of contracts, and, the number of businesses, that has not done as well. So we want to make sure——

Chairman KERRY. Because of the bundling?

Mr. MIERA. Exactly. So you get a couple of small businesses——

Chairman KERRY. What is the fundamental reason they are bundling? Are they bundling to avoid the administrative overhead of doing more of the contracts? Are they bundling because it is a sim-

pler way of getting the money out the door? Or is it a way to take care of people that you want to take care of?

Mr. MIERA. Absolutely all of the above. What I have seen is that there is a real requirement. There is no way around it. There have been lots of cuts in the administrative ranks and there are not enough contracting officers and there are some efficiencies, not all, but there are some efficiencies to bundling.

But what I have also seen is that contracting officers and program managers have used it as an excuse. They never supported minority business programs. They never supported the 8(a) program. And if there is any method that they can use to not have to go to contractors like that, they will use it.

So I have seen it just as an excuse, where they say, oh, well, we don't have enough contracting officers. But as I showed in my example, it is false economy. In actually, many times where there are subcontracting requirements, it has cost the Government and the taxpayers more money to bundle a contract where there is subcontracting involved than if they would have just hired another contracting officer to administer the contract.

Mr. GALAVIZ. Mr. Chairman, with all due respect, think of you building a home and deciding not to have a general contractor, and for the electrician to do this and the plumber to do that. Basically, the fact is that it makes sense many times to bundle in order for that Government official to have one point of contact, one point of accountability, and then have the work be done.

So I think it is realistic to say that bundling is here to stay. Bundling is not going to go away. And it is difficult to manage. Even President Bush's Executive order that he put in 2 years after he took office, although it was a good faith effort, but that Executive order is not working.

The fact is that while you were away, we stated that several agencies have demonstrated, like the Air Force, where there is significant capability in the small business community and the minority community to handle major contracts. As I stated, the Air Force has demonstrated on providing direct awards, competitive awards of $800 million or $474 million. The civilian agencies like the Department of Energy have set aside an important contract that was awarded to a small business on a competitive basis that was almost a half-a-billion-dollar contract. And there was a lot of competition for those contracts.

So basically, bundling is here to stay and the best solution is to have a set-aside to say, of all the bundling contracts, 20 or 25 percent will be set-aside on a competitive basis for the small business community, and then if you let SBA and the Air Force complete their negotiations to have the informal joint venture so that a lot of small business can gather to meet the 51 percent, the 50 percent rule as a prime contractor for small business set-asides, then between that and having the set-asides for bundling, that will be really the long-term solution, the only solution.

On the subcontracting, with all due respect, it is best to get the Government out of monitoring. Get SBA out of the subcontracting business. But have this Committee—have the leadership of this Committee to design a program that is private-sector-driven and where it gets the parties, the subcontractor and the prime con-

tractor, in the legal subcontractor arrangement and that that arrangement is submitted with that proposal so the Government can evaluate.

Today, Mr. Chairman, if a major prime wants a $200-million contract and they say in their subcontracting plan that they are going to give 20 percent, that is $40 million. But what really happens is when the contract starts, only $8 million is really distributed within the subcontract to small business. The other $32 million is later on to be determined who is going to do the work over the 5 or 10 years of the contract.

So what happens is a good portion of that $32 million never gets to the subcontractors. It goes to the prime because that means more money to their pockets, which really means that the evaluators of that proposal, the Federal evaluators, only were able to get to know at the beginning what 80 percent of the work was going to be done by what companies. Now, would anyone in this room buy a house without looking at the master bedroom and the kitchen? And the way the thing works, that is exactly what we are doing. We let this corporation submit their plans. They don't award the contracts at the beginning, when the contract starts, and no one knows who later on—small business will not get the subcontract contracts.

Chairman KERRY. Well, we are going to take a look at that.

Dr. WAINWRIGHT. Mr. Chairman——

Chairman KERRY. Yes, sir.

Dr. WAINWRIGHT. I would just add, I think I agree with both these gentlemen in that you have to tie the subcontracting plan to the profits of the contractor, not just their ability to get the award, but once—because, you know, once the award is won, they can blow off the subcontractor——

Chairman KERRY. And then the game gets played and the money gets distributed and there is no back-up on that. Is there not sufficient oversight or follow-up on that now? No?

Dr. WAINWRIGHT. [Shaking head.]

Chairman KERRY. OK. Well, we have to take a look at that. Obviously, it is not working right and that is a very good point of accountability, so we ought to be taking a look at that.

One quick question before we wrap up here. On the venture capital dollars, SBA's shrinking venture capital dollars, I wrote the Administrator last year and he wrote back to say they were making a lot of effort to reverse those things with aggressive outreach efforts and that a number of minority-led firms are in the process of applying for SSBIC licenses. That was a year ago. Do we have a sense of how we are doing on that in your judgment, any of you? Mr. Robinson?

Mr. ROBINSON. At best I can tell, very poorly. I don't see anything that I am aware of that would suggest that the SBA has moved forward aggressively to include more minorities as Special Small Business Investment Companies. So I have seen no real movement on that.

Chairman KERRY. Mr. Miera

Mr. MIERA. What I have seen in my experience is that the few folks that are left in the field are barely keeping their heads above water, much less putting anything new in line.

Chairman KERRY. Well, let me wrap up by saying to everybody, Senator Snowe knows these issues as well as anybody in the Congress and I have been on this Committee for a fair amount of time or I wouldn't be sitting in this Chair. I have never seen the SBA at loggerheads with the community it is supposed to serve to as great a degree as it is today, and it is baffling to a lot of us on this Committee on both sides of the aisle. It is very frustrating.

And I hope, Mr. Jenkins, you kind of go back there, and I think it is time for us to think about when we get the Administrator back. I have been trying to give him a fair amount of time to kind of get a handle on things and be able to get his feet under him over there, but we have to figure out how we are going to turn this relationship around, because we are hearing from too many of the clients in the community that it is not working for them correctly.

And we always expect a wrinkle here or there and there are always things that you can adjust a little and there are tweaks and so forth, but this is bigger than tweaking and adjusting. This is some sort of fundamental breakdown, and part of it goes to the budget issue which we have been screaming about here also on a bipartisan basis for a couple of years.

This notion, you know, Hector Barreto used to come in here and say, well, we are doing more with less. I mean, that was great rhetoric, but it just isn't happening. There is less happening with less and it is not happening as well as it used to be.

So it baffles me, because the SBA has the ability to have its own budget paid many times over by the companies that expand the tax base of this country. And when you look at it, you can take some of the icons of the effort over the years, ranging from the FedExes to the Intels to the Callaway Golfs and run down a long list of them. But you can take less prominent ones and find a sufficient return to the Federal Treasury to have paid this budget many times over. So, I mean, this nickel-and-diming just doesn't make sense. I don't know whose ideological juices are getting pumped by it, but it is really counterproductive.

So on that note, folks, we are going to try to pursue this, and I will spend some time with the Ranking Member, and we will talk together about how we can do this in a bipartisan and thoughtful way.

We appreciate your testimony here very much. Thank you all.

We stand adjourned.

[Whereupon, at 12:17 p.m., the Committee was adjourned.]

# APPENDIX MATERIAL SUBMITTED

QUESTIONS FROM SENATOR KERRY TO CALVIN JENKINS

SMALL BUSINESS ADMINISTRATION

**Leveraging Contracts for 8(a) Firms. One of the major concerns that I hear from 8(a) participants is the lack of contracts that come from the program. I understand that being in the 8(a) program does not guarantee anything, but many participants are sitting in the program 3-4 years before they get a contract. By the time they actually begin to see any benefit they're out of the program.**

**Response:** It is important to note that the intent of the 8(a) Program is that it focus on business development and not on "Contracts." In accordance with Title 13 CFR Part 124.1, SBA, through various forms of assistance, (e.g., management, technical, financial and procurement) assists eligible small disadvantaged business concerns compete in the American economy. SBA continues to work with 8(a) Program participants, SBA's resource partners and Federal agencies to address firm's "business development" needs and ensure that the firm's are receiving material benefits and that they are meeting the goals and objectives outlined in their business plans.

- **Of the ten thousand or so 8(a) firms that are a part of the program, how many actually get contracts per year? I am not asking for number of contract actions. I am asking how many firms get work out of the program each year.**

  **Response:** Currently, there are 9,442 firms certified for participation in SBA's 8(a) Business Development Program. Thus far in FY07, 2,324 8(a) firms (24.6%) have received contracts.

- **What is your agency doing to help program participants get the most out of the contracting preference that the 8(a) program provides?**

  **Response:** SBA is committed to improving the 8(a) Business Development (BD) Program and has committed several resources that are aimed at refocusing the Program to emphasize "business development." On September 30, 2006, SBA engaged a contractor to conduct a review/assessment of the business processing functions of the 8(a) BD Program (i.e., those processes related to initial certification, continuing eligibility, management and technical assistance, legislative and regulatory requirements) and design a plan consisting of both short and long term methodologies for re-engineering and improving those functions.

  Specifically, this process improvement plan will:

  a.) Identify and define each program element and the requirement(s) related to the delivery of the 8(a) BD Program;
  b.) Identify significant issues and problems that exist;
  c.) Identify key issues in the 8(a) BD Program and processes and systems that need to be updated and
  d.) Review/assess programmatic requirements to ensure relevance and consistency with legislative and regulatory compliance.

  Secondly, in an effort to foster a closer working relationship with Federal agencies and ensure greater oversight as it relates to 8(a) contract awards, SBA's Office of Business

Development revised the language in the Partnership Agreements (between SBA and the procuring agencies) to clarify roles and responsibilities. The revised Partnership Agreements specifically require the procuring agencies to monitor an 8(a) firm's compliance with contract performance. In February 2007, the Office of Business Development began conducting training for the procuring agencies with regard to the rules and regulations governing the 8(a) Program and the revised language in the Partnership Agreements. This training is intended to ensure that contracting officers and technical representatives are adequately advised of their responsibilities concerning 8(a) contract compliance and to increase contract opportunities for 8(a) Program participants.

**Transparency in Funding the 7(j) Minority Business Development Program. In this year's SBA budget submission, your agency again removed the line item for the 7(j) technical assistance program. Elsewhere in the SBA's budget it states that $1.5 million will be used to fund the 7(j) program. The lack of a line item for the 7(j) program is important because there is a lack of transparency in the funding for training 8(a) participants. There is no guarantee that any money is spent on that technical assistance program. In fact, just last week my office was informed that money that at one time came out of the 7(j) program to help support training programs for minority entrepreneurs is now gone.**

- **What is the 7(j) money used for? Can you provide the Committee with a detailed explanation of what the money was used for last year and what it's slated to be used for this year?**

  **Response:** Section 7(j) of the Small Business Act authorizes the U. S. Small Business Administration (SBA) to provide financial assistance to public or private organizations for projects designed to provide technical or management assistance to eligible individuals or enterprises.

  Through the 7(j) Management and Technical Assistance Program, the SBA contracted with a contractor to provide 25 specialized training sessions across the nation. The sessions provided a "real world" understanding of the crucial role that decision making, sound hiring practices and the art of deal making can play in a firm's success or failure. The training targeted those 8(a) program participants in the Transitional Stage and was designed to assist them as they prepare to exit the 8(a) Program and transition into the competitive marketplace. A contractor also provided an online seminar consisting of a presentation that will help business owners recognize critical indicators of business success and craft an action plan. Another contractor provided two workshops in 21 locations nationwide to the 7(j) eligible audience. The workshops were entitled CEO and Cost and Pricing for Government Contractors. The one-day "Cost and Pricing Workshop for Government Contractors" covered critical topics such as understanding how to develop acceptable and profitable indirect rates; developing a DCAA acceptable accounting system; and understanding FAR Part 31 on allowable and unallowable costs and minimizing exposure to fines, penalties, and interest. This two-day workshop touched on issues and strategies to help 8(a) firms maximize their participation in the 8(a) Business Development Program. The workshop also discussed strategies that would facilitate a smooth transition out of the 8(a) Business Development Program. Funding requested for the 7(j) program in FY 2008 will focus on similar activities.

**<u>HUBZones.</u> In your written testimony, you mentioned the role that HUBZones play in helping urban and rural areas gain access to federal contracting. As you know, the HUBZone program is 'place-based' as opposed to 'people-based' like 8(a). HUBZones can be effective at bringing contracting opportunities to areas that are underutilized, but I am concerned they can not be a substitute for programs that seek to overcome racial discrimination in government contracting.**

- **How effective are placed-based contracting programs at helping populations discriminated against because of their race?**

**Response:** The HUBZone Program, as a place based, race neutral program, has been effective in providing contracting opportunities in underutilized urban, rural and reservation communities. Data obtained from the Federal Procurement Data System – Next Generation (FPDS-NG) indicates that 1.94% of total Federal contract dollars, approximately, $6.18 Billion were awarded to HUBZone firms in FY 2005. Although this amount is well below the statutory goal of 3% of total Federal prime contract dollars be awarded to HUBZone firms, this amount is significant. It is also noteworthy that 38% of HUBZone firms are minority-owned. We do not track HUBZone contract dollar awards by race, ethnicity or gender. Our expectation and belief is that because of the demographics of HUBZone communities, many of the beneficiaries are minority-owned business concerns and minority residents.

**<u>Community Express Loans.</u> In your testimony, Mr. Jenkins, there is mention of the support for micro-borrowers through the SBA's 7(a) Community Express Program. It says this program was designed to meet under-served markets with financial and technical assistance.**

- **This program sounds like the microloan program. How do they differ?**

**Response:** The CommunityExpress and the Microloan programs are in many ways similar, as both target underserved communities and both provide smaller size loans and technical assistance. However, there are several significant differences between the CommunityExpress program and the Microloan program.

Under the CommunityExpress program, which is part of SBA's 7(a) loan program and thus takes advantage of SBA's existing lending procedures and infrastructure and its relationships with thousands of lenders nationally, SBA guarantees loans (75/85 percent) that are made by participating commercial lenders to eligible small businesses. The Agency requires lenders to arrange and when necessary pay for appropriate technical assistance, which is often provided by SBA's technical assistance resource partners. As a result, SBA effectively and efficiently reaches a large number of microbusinesses through this program. Also, SBA restricts the interest rates applicable to the borrowers under the program, which can result in interest rates of as much as a few hundred basis points less than the rates applicable to borrowers under the Microloan program. In addition, loans under this program can be revolving loans, which particularly accommodate small, start-up businesses.

Under the Microloan program, SBA makes loans to intermediary lenders, predominantly non-profit organizations, which in turn make loans of $35,000 or less to small businesses; however, these loans cannot be lines of credit or revolving loans and SBA does not guarantee them. Also, each Microloan intermediary must generally provide technical assistance to its microborrowers and receives grants from SBA for that purpose. As a result, under the Microloan program, SBA must process, service, and administer each loan to an intermediary as well as process and administer each

intermediary's request for grant funds to deliver technical assistance. Additionally, Microloan intermediaries must establish and maintain a loan loss reserve fund and a microloan revolving fund, each of which must be overseen and administered by the Agency.

As a result, the SBA's Microloan program is administratively more complex and costly to administer than other SBA loan programs, including the CommunityExpress program. In addition, the Microloan technical assistance grants are virtually identical to the assistance provided through SBA's Entrepreneurial Development programs. It is for these reasons that SBA has proposed in its 2008 Budget request to simplify the Microloan program by moving the loan program to a zero-subsidy basis and having microlenders utilize SBA's Entrepreneurial Development programs for technical assistance.

- **What is the interest rate on these Community Express loans?**

  **Response:** The interest rates range from 4.5 percent to 6.5 percent over the Prime rate, depending on the size of the loan.

- **Is it true that the fee on these loans is $500?**

  **Response:** SBA does not impose any fees on these lenders other than its standard 7(a) guaranty and servicing fees. However, the SBA does allow lenders to charge borrowers under the program the same fees that they would charge for their conventional non-SBA loans, provided the fees are reasonable and for services provided. These fees are no different than those charged by microlenders. Also, lenders must not charge for technical assistance.

- **What about the construction of these loans makes them address the needs of "under-served markets"?**

  **Response:** CommunityExpress loans are very small loans, with the average less than $30,000, as well as lines of credit loans and revolving loans. Additionally, they predominately comprise start-up and fledgling small businesses. Furthermore, technical assistance is required to be made available to borrowers under the program.

<u>Disparity in Average Loan Size.</u> **SBA has made a push for the last several years to reduce the average size of loans.**

- **Why is it important for the SBA to make smaller loans? Is there an assumption, or data to back up, that smaller loans go to needier borrowers?**

  **Response:** By the mid 1990's, the average size of a 7(a) guaranteed loan was around $250,000. SBA was criticized for not having a program that encouraged lenders to make truly "small" loans to start-up businesses and those businesses which needed a relatively small amount of money. Business owners complained that the only financing available for businesses that needed under $50,000 was high cost personal credit cards. SBA addressed this concern by developing the SBAExpress program which was designed to reduce the cost of obtaining an SBA guaranty on a small loan and streamline the process. In 2002, changes were made to the Express program to permit more lenders to access it. SBA did not make an assumption that the borrowers in the Express program were "needier". SBA responded to the market demand that there were not enough lenders interested in making small loans. The program has been very successful. The number of SBA Express loans increased from 17,495 in FY2002 to 66,294 in FY2006.

- **Does SBA think it's a problem that not only the share of loan dollars to most minorities has been stagnant, but also that the average loan size has dropped more than the Agency's non-minority average loan? For example, from FY2001 to FY2006, the average loan size for African American-owned firms dropped from $181,000 to $84,525. That's a 53-percent drop in the size of a loan. By contrast, the average loan to non-minorities has dropped only 19 percent, around $213,000.**

  **Response:** Lending to minority-owned businesses increased from 13,484 loans in 2002 to 31, 958 loans in 2006 or 137%. Total SBA lending increased from 51,666 to 97,290 or 88%. Thus the growth rate in minority lending was substantially higher than lending in general. This significant growth is the result of SBA's outreach efforts to the minority business community and to the lenders that are serving these communities. The drop in the average size loan to African American businesses is the result of the significant number of African Americans that are starting businesses. In general, start-up businesses do not need as much money as established businesses. Almost 45% of loans to African American owned businesses went to start up companies. This compares to a 33% rate of loans to start ups for the portfolio in general.

- **We need to understand the implications of this trend. You used to work in the Office of Financial Assistance.**

  1. **What do these drastically smaller loans to African Americans mean to that community looking for capital?**

     **Response:** The drop in the average size loan to African American businesses is the result of the significant number of African Americans that are starting businesses. In general, start-up businesses do not need as much money as established businesses. Almost 45% of loans to African American owned businesses went to start up companies. This compares to a 33% rate of loans to start ups for the portfolio in general. The bottom line is that African American businesses are using SBA guaranteed loans more than ever before.

  2. **Does it mean that the numbers are up because of $5,000 Community Express Loans?**

     **Response:** Community Express has been very successful in providing loan guarantees to minority business owners. However, in addition to the increase in the number of loans, the dollar volume of loans to minority business owners has increased from $3.7 billion in 2002 to almost $5 billion in 2006, or an increase of over 35%.

**QUESTIONS FROM SENATOR SNOWE TO CALVIN JENKINS, SMALL BUSINESS ADMINISTRATION:**

**1. Mr. Jenkins, since Fiscal Year 2003, the U.S. Postal Service abandoned the practice of establishing small disadvantaged business (SDB) goals. After I introduced legislation in early 2006 to reinstate SDB goals in Postal contracting, the U.S, Postal Service wrote me a letter promising to reinstate Federal contracting goals for small, minority-owned, and women-owned businesses. According to the Postal Service, it procurement system and the small business goals will be "consistent with the Small Business Administration standards." Further, the Postal Service wrote that they have made contact with SBA officials, and that it will give "full consideration to SBA guidance."**

**(A) What specific goals for small and disadvantaged businesses was the SBA able to negotiate with the Postal Service? Will the Postal Service goal achievements be reported in the Federal Procurement Data System on the same terms as other agencies' small business achievements? Did the Postal Service agree with SBA's guidance?**

**Response:** The Postal Service is not subject to the Federal Acquisition Regulation (FAR). Accordingly, it is not included in the Agency's socioeconomic procurement preference program goaling process. To date, the Agency has not provided guidance to the Service on its contracting programs. However, the Agency will contact the Service this summer to offer assistance in furtherance of opportunities for small businesses.

**(B) The Postal Service was criticized in a series of reports by the GAO and the Postal Inspector General for allowing large businesses to improperly claim small disadvantaged status. What guidance, if any, has the SBA provided to the Postal Service concerning fraud and fronting its small and minority contracting? Is there currently a process for the SBA to review small and disadvantaged business size and status challenges concerning Postal contracts and subcontracts?**

**Response**: The Agency's regulations provide a very specific process for adjudicating protests, with separate procedures for size status and disadvantaged status. However, we have no record of having adjudicated any protests in connection with requirements of the Postal Service. We are consulting with the Agency's Office of General Counsel to determine jurisdiction.

**2. Mr. Jenkins, as you know, the Small Business Act requires large businesses to establish subcontracting plans on large contracts. Under current SBA regulations, the compliance standard for subcontracting plans is a showing of "good faith effort." Small and disadvantaged businesses have often complained that they suffer from "bait-and-switch" fraud by large contractors, which happens when subcontractors named in winning bids are dropped from projects. There is a concern that the SBA has not done enough to guard against this type of fraud.**

**(A) What actions will the SBA take to establish clear, legally binding, and enforceable standards of "good faith" compliance with subcontracting plans, especially with regard to the "bait-and-switch" fraud?**

**Response:** The SBA has clear, legally binding, and enforceable standards of "good faith" compliance with subcontracting plans set forth in 13 CFR 125.3, which was substantially rewritten and strengthened in 2004. While these regulations do not specifically address the "bait-and-switch issue," they do define what is meant by the term "good faith" and outline the procedures by which the Agency conducts compliance reviews to ensure that contractors adhere to the terms and conditions of their subcontracting plans. The Agency also published new Standard Operating Procedures for the subcontracting program in 2006. Further, SBA is working with the FAR Council on changes to the FAR that will require all contractors to report their achievements in the Electronic Subcontracting Reporting System (eSRS).

**(B) The Small Business Act authorizes imposition of damages for non-compliance with subcontracting plans and the use of subcontracting compliance in past performance evaluation of large contractors bidding on Federal projects. Please detail for the Committee how often these authorities have been used, and please describe what can be done to improve their effectiveness.**

**Response:** The provision for liquidated damages is not used very often. As a practical matter, this remedy puts the burden on the Government to prove that a contractor failed to make a good faith effort to meet the goals in its subcontracting plan, which is often difficult to prove. Moreover, if a contractor is providing a satisfactory product or service on time and within budget, it is unlikely that a contracting officer would want to impose liquidated damages because the contractor failed to meet one or more goals in its subcontracting plan.

However, it has been SBA's experience that most contractors want to comply with the terms of their contract and will work with the Government constructively to achieve the goals. The Agency is more interested in expanding the applicability of the second provision that you mention, use of subcontracting compliance in past performance evaluation of large contractors bidding on Federal projects. This could be very effective in demonstrating to contractors that they will have a better chance of winning Federal contracts in the future if they meet their subcontracting goals on current contracts. Currently there are some impediments to collecting past performance data on subcontracting. Implementation of eSRS will assist us in overcoming some of these barriers, especially as it becomes fully deployed within the Department of Defense.

Questions from Senator Tester for Calvin Jenkins, Small Business Administration

1. **Regarding 7(a) loans, about one percent goes to American Indians, and the Indian portion of the 504 program is so small that it doesn't even register on the chart Mr. Jenkins supplied. How do the requests for loans from American Indians equate with the amount loaned. In other words, when SBA gets loan requests from American Indians, how do those requests compare with the amount loaned?**

   **Response:** SBA does not receive loan requests directly from small business applicants. The loan request is delivered to the participating lender. The lender makes a determination on loan eligibility. SBA does not collect data on the original loan request to the participating lender.

   It should be noted that Sovereignty, Trust land issues, a lack of uniform commercial codes and a belief that Tribal Courts do not provide an equitable venue for dispute resolution can make lenders reluctant to serve Native Americans living within the boundaries of a reservation.

2. **Based on the Loan Monitoring System, how does the success of American Indian loans compare to other minority and non-minority loans?**

   **Response**: SBA does not maintain minority and ethnic data in the Loan and Lender Monitoring System (L/LMS). L/LMS contains business credit score information.

3. **Of the $6.7 billion that was loaned to minorities in FY 06, what is the breakdown of dollars that went to start-up businesses compared to continuing operations?**

   **Response:** In FY 2006, 31.5% of the loans to minority owned businesses went to start up operations.

Senator Joseph I. Lieberman
Questions Submitted for Small Business Committee Hearing on 5/22/2007

Questions for Deputy Administrator Jenkins:

1. **One complaint I have routinely is that, due to budget cuts, several SBA field offices have either cut their staff or had them transferred to Washington, and this has greatly reduced the level of service these offices can provide to small business owners in their community. Could you tell me about some of the efforts SBA is undertaking to address these complaints and to restore the quality of service provided by the field offices?**

   **Response:** Under Administrator Preston's tenure, he has listened to the field employees' concerns and worked with the leadership of the Agency to develop rapid response plans in the areas of staffing, training, and resources.

   Staffing

   A significant, fundamental step SBA has taken to addressed concerns about staffing practices which heretofore were perceived as arbitrary and unresponsive to the field's needs has been the development of a staffing model. SBA has worked hard to develop a fair and transparent staffing mechanism for the field. The staffing model will serve as a tool to ensure that district offices have the right staffing level to meet each office's respective workload. The model is based on objective factors including district market size, 8(a) workload, and number of branch offices. This model will allow field managers to make predictable and transparent hiring decisions. Every employee will be informed of the staffing model, the underlying methodology, and the implementation strategy.

   Training

   Training of our employees is a critical to providing quality service to the small business community. In the fourth quarter of FY07 SBA will offer five training tracks for field employees. Each employee will have an individual training plan and take specific and appropriate courses to their job function. The five training initiatives are:

   **Training Initiative One: Mission Critical Occupations Skills Gap Narrowing Mandatory Training:**

   Field employees have completed a skills gap assessment survey and are currently utilizing online courses to address individual skills gaps identified through survey. The date for completion has been extended to September 30.

   **Training Initiative Two: SBA University**

   SBA University is an initiative to provide SBA employees with training in the specific skill areas related to their primary roles and responsibilities. Dates of the training are: July 30 – August 3: August 6 – 10; and August 20 – 24. Field employees have provided their preferred dates and training confirmations will begin this week.

**Training Initiative Three: Disaster Surge Training**

To meet the commitments made to Congress in the Disaster Response Plan (DRP), training is required to help ensure that SBA has the "surge" capacity to ramp up to meet the demands of a level 3 or level 4 disaster scenario as outlined in the DRP and must be completed before the end of the current hurricane season. The Disaster Office has scheduled three-day training sessions for 190 field staff the weeks of July 9th, July 16th, and July 23rd at their centers in Buffalo, NY; Dallas-Fort Worth, TX; and Sacramento, CA.

**Training Initiative Four: BRP/COOP Training Exercise**

There will be a one-day table-top BRP/COOP training exercise held in Sacramento, California, on July 9. The BRP/COOP representative from the regional and district offices in Regions 9 and 10 will be participating in this training exercise.

**Training Initiative Five: Senior Management Training Conference**
A senior management training conference is tentatively scheduled for September and will include approximately the same group that attended the senior management meeting in Atlanta.

Resources

In response to the field offices' request for resources, SBA was able to fully fund each district offices for travel and outreach efforts. Additionally, SBA strategically realigned resources to provide district offices additional travel funds to enable broader delivery of SBA's program and services.

Each office prepared an annual operating plan that linked staffing, work load, and office equipment requests. As a result, SBA anticipates providing district offices with the requested office equipment.

2. **Given the rise in complaints about SBA, and the fact that federal funding for SBA has declined in real dollars since fiscal year 2001 do you think you have sufficient resources as an agency to complete your mission? What kind of sacrifices has SBA had to make because of the cuts to your operating budget?**

   **Response:** Yes, we believe SBA's FY 2007 appropriation and our FY 2008 request are sufficient to complete our mission. With the FY 2007 enacted funding level, SBA is in the process of hiring over 100 people to fill important positions across the Agency. In 2001, SBA began a drive to deliver more value to the Nation's small businesses while lowering costs to the taxpayer. By restructuring key Agency operations and reengineering its largest loan program, SBA has achieved record program growth of 56 percent in the loan portfolio, while reducing its total cost by 31 percent since 2001 through increased operational efficiencies and core program requirements. The most important factor to this cost savings has been the 7(a) loan program's operation at zero subsidy. Like most Federal agencies, SBA has continued to identify opportunities for eliminating unnecessary operating expenses in recent years. We are working hard to reengineer many of our business processes to become more customer friendly, modernize our business practices, and take advantage of technology. Through its ongoing restructuring and business process reengineering, SBA has improved and will continue to improve the effectiveness of the taxpayers' dollars supporting small business development.

3. **There have been a number of complaints that the SBA has been unwilling to investigate claims of minority business owners that they have either been discriminated against or taken advantage of by larger corporations under a contract-bundling scheme. How many investigations has the SBA conducted? Are there any specific examples you can think of in the last year where the SBA has found that a minority entrepreneur was in fact taken advantage of and was able to provide a remedy? Are there any other mechanisms that you think Congress could authorize to make it easier for the SBA to investigate these claims?**

   **Response:** We have not been made aware of any claims by minority business owners that they have either been discriminated against, or taken advantage of by larger corporations under a contract-bundling scheme. Therefore, we have not conducted any investigations. Accordingly, we cannot provide examples in which we found that a minority entrepreneur was taken advantage of, or imposition of relevant remedies. Please note that through our internet-based contract bundling report, all bundling complaints are referred to the Office of Government Contracting Area Offices for investigation by the cognizant procurement center representative (PCR).

   However, it is important to remember that business arrangements between prime contractors and subcontractors are usually agreed to by contract. Under such contracts, each party is accorded associated rights and responsibilities. If a small business subcontractor believes that a prime contractor is not complying with the terms of the small business subcontracting plan under a Federal contract the contractor can and should file with a complaint with the Federal contracting officer.

4. **I have heard numerous complaints that the certification process for the 8(a) loan program is needlessly difficult for firms. Can you tell me what progress SBA has made in eliminating inefficiencies in the process and making it easier for eligible firms to apply for certification?**

   **Response:** Small businesses that are having difficulty obtaining certification and are in need of guidance to complete the 8(a) application can obtain assistance through the SBA-funded Small Business Development Centers (SBDCs). The SBDCs – a nationwide network – work in concert with SBA's local district offices and often conduct 8(a) application workshops. The SBDCs can provide counseling and assist the applicant in completing the 8(a) application. In addition, SBA's Women's Business Centers can provide assistance to applicants seeking 8(a) certification. Also, SBA's staff in each of its field offices can provide assistance to potential applicants. For a listing of SBA field offices as well as SBDCs and WBCs, please visit: **www.sba.gov**.

## COMMENTS FOR THE RECORD

MALDEF

Mexican American Legal Defense and Educational Fund

**Written Testimony of Peter Zamora,**
**Washington, D.C. Regional Counsel**

**U.S. Senate Committee on Small Business and Entrepreneurship**
**Minority Entrepreneurship: Assessing the Effectiveness of**
**SBA's Programs for the Minority Business Community**
**May 22, 2007**

For over 40 years, the federal government has targeted federal contracts to foster business development among disadvantaged groups.[1] In 1978, Congress authorized the Minority Small Business and Capital Ownership Development Program under Section 8(a) of the Small Business Act to assist disadvantaged and minority small business owners in becoming fully viable in a context of unlawful discrimination.[2] Congress approved Section 8(a) because minorities are disproportionately underrepresented in small business due to the persistent effects of past discrimination and ongoing prohibited discrimination.[3]

Congressional authority to enact Section 8(a) is rooted in a positive grant of remedial legislative power under Section 5 of the Fourteenth Amendment to the U.S. Constitution. Courts have generally required that Congress enact remedial legislation under the Fourteenth Amendment only when there is a compelling state interest and Congress has reviewed a record of prohibited discrimination that underlies a "congruent and proportional" remedy.[4] Section 8(a) is constitutionally sound because it satisfies a compelling state interest, Congress has reviewed a significant record of discrimination that underlies the need for the program, and it is a "proportional and congruent" remedy against prohibited discrimination.

In assessing the effectiveness of SBA's programs for the minority business community, the Senate Committee on Small Business and Entrepreneurship has reviewed sufficient evidence of disparities and discrimination to demonstrate that Section 8(a) addresses a compelling state interest. [5] In addition to evidence regarding specific

---

[1] Feder, Jody. *Minority Contracting and Affirmative Action for Disadvantaged Small Businesses: Legal Issues.* 1-2 (2007).
[2] *Id.* at 2-4.
[3] See *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community*, Senate Comm. on Small Business and Entrepreneurship (2007) (statement by Anthony W. Robinson, President of the Minority Business Legal Defense and Educational Fund); see also, *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community,* Senate Comm. on Small Business and Entrepreneurship (2007) (statement by John S. Wainwright, Ph.D., Vice President of NERA Economic Consulting).
[4] See *Boerne v. Flores*, 521 U.S. 507, 508 (1997).
[5] See *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989).

incidents of discrimination against minority small business owners, the Committee has been presented with statistical disparities between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged, which the Supreme Court has indicated may justify an "inference of discriminatory exclusion."[6]

The Supreme Court has held that in order to satisfy the "congruent and proportional" standard for remedial legislation, the Congressional Record supporting the legislation must include 1) specific evidence relevant to the remedial legislation and 2) a clear nexus between the discrimination and the specified harm to a group.[7] Here, the Committee has reviewed specific evidence that shows that discriminatory business practices have caused harms to minority businesses and that these practices have caused the specific harms that Section 8(a) remedies.

The Congressional Record developed by the Senate Committee on Small Business and Entrepreneurship contains statistical evidence of inequalities for minority businesses in the United States, specific evidence of discrimination against minorities in contract bundling, and other evidence of discrimination against minorities in small business. The Congressional Record does not need to contain a finding of discrimination in every state in order to justify a national remedy.[8] The Supreme Court does not require that the Congressional Record contain a finding for every minority racial group in order to justify a remedy for all disadvantaged minority groups.[9]

## I. STATISTICAL EVIDENCE OF INEQUALITY IN THE CONGRESSIONAL RECORD

Congress has reviewed statistical evidence that shows that businesses owned by racial and ethnic minorities are not on an equal playing field in the market.[10] Disparities between minorities and whites are much greater in business than they are in other economic activities, even though these disparities remain considerable.[11] Lack of access to capital and credit is among the most frequently cited obstacles to success among minority and women business owners, particularly African-Americans and Latinos.[12]

---

[6] *Id.* at 503.
[7] *Boerne*, 521 U.S. 507 at 507-09.
[8] *Oregon v. Mitchell*, 400 U.S. 112 (1970).
[9] *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1329 (Fed. Cir. 2001).
[10] *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community*, Senate Comm. on Small Business and Entrepreneurship (2007) (statement by John S. Wainwright, Ph.D., Vice President of NERA Economic Consulting).
[11] *Id.*
[12] *Id.*

## II. EVIDENCE OF DISCRIMINATION AGAINST MINORITIES IN CONTRACT BUNDLING

The Committee has reviewed evidence of prohibited discrimination against minority small businesses in the practice of contract bundling.[13] One example of discriminatory practices in contract bundling is that of Fernando Galaviz, a Hispanic American and owner of Centech Group, Inc.[14] Centech Group teamed with an Asian American owned company, and both companies have excellent past performance evaluations as subcontractors.[15] However, after a performance period with Northrop-Grumman Corp., the Hispanic and Asian American minority owned firm was removed from the contract for no credible reason.[16] The Committee heard evidence that the minority-owned small business lost the contract because of discriminatory motives.

Similarly, John Layman, a minority contractor for JRL Enterprises has experienced a lack of the ability to obtain contracts, a hardship common to minority business owners.[17] In one instance, the prime contractor, Mr. Layman's customer, fraudulently overstated the amount of work performed.[18] Mr. Layman bore the brunt of the penalty for this exaggeration when his firm was later excluded from a major contract.[19] This discrimination has greatly limited Mr. Layman's ability to operate a viable small business.

## III. ADDITIONAL EVIDENCE OF DISCRIMINATION AGAINST MINORITY-OWNED SMALL BUSINESSES

The Congressional Record includes extensive evidence of discrimination against minorities and women in construction and construction-related professional services.[20] For example, John McDonald, an African-American expert in real estate acquisition, worked under contract with Domino's Pizza to acquire and build several stores.[21] However, after being the only African-American to attend a Domino's convention, he

---

[13] *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community*, Senate Comm. on Small Business and Entrepreneurship (2007) (statement by Bill Miera, Hispanic small business owner in New Mexico); *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community*, Senate Comm. on Small Business and Entrepreneurship (2007) (statement by Fernando V. Galaviz, Small Business Association in Technology).
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community*, Senate Comm. on Small Business and Entrepreneurship (2007) (statement by Anthony W. Robinson, President of the Minority Business Legal Defense and Educational Fund).
[18] *Id.*
[19] *Id.*
[20] *Hearing on Minority Entrepreneurship: Assessing the Effectiveness of the Small Business Association's Programs for the Minority Business Community*, Senate Comm. on Small Business and Entrepreneurship (2007) (statement by Anthony W. Robinson, President of the Minority Business Legal Defense and Educational Fund).
[21] *Id.*

received a call asking him to agree to unreasonable and nonstandard amendments to his contract, which Mr. McDonald refused.[22] The Domino's representative made it clear that he was discriminating against Mr. McDonald based on race when he stated "I don't like doing business with you people anyway" and then threatened to destroy Mr. McDonald's business. [23]

Similarly, the small business owned by Mr. Charles Baker, a racial minority and President of MCB Lighting & Electrical, Inc., did not receive a contract, and Mr. Baker was told that he was "not qualified" despite his extensive experience.[24] The individual providing the feedback knew Mr. Baker's race but nothing else about his capability or company experiences.[25] As such, the Committee is presented with strong evidence that Mr. Baker was excluded from the contract, which was awarded to a non-minority, because of his race. [26]

## IV. CONCLUSION

The Senate Committee on Small Business and Entrepreneurship has created a record of prohibited discrimination sufficient to enact remedial legislation under Section 5 of the Fourteenth Amendment to the Constitution. The Congressional Record contains sufficient evidence of discrimination to satisfy the *Boerne* standard for "congruence and proportionality."

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*