# EXHIBIT A-13
# (part 1)

104

# PROPOSED REFORM OF THE 8(A) PROGRAM THROUGH H.R. 3994, THE ENTREPRENEUR DEVELOPMENT PROGRAM ACT OF 1996

Y 4. SM 1: 104-92

Proposed Reform of the 8(A) Program...

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FOURTH CONGRESS

SECOND SESSION

WASHINGTON, DC, SEPTEMBER 18, 1996

Printed for the use of the Committee on Small Business

**Serial No. 104–92**

SUPERINTENDENT OF DOCUMENTS
DEPOSITORY

MAR 19 1997

BOSTON PUBLIC LIBRARY
GOVERNMENT DOCUMENTS DEPARTMENT

U.S. GOVERNMENT PRINTING OFFICE

27–291 CC WASHINGTON : 1996

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-054088-7

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# PROPOSED REFORM OF THE 8(A) PROGRAM THROUGH H.R. 3994, THE ENTREPRENEUR DEVELOPMENT PROGRAM ACT OF 1996

Y 4. SM 1: 104-92

Proposed Reform of the 8(A) Program...

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS HOUSE OF REPRESENTATIVES

ONE HUNDRED FOURTH CONGRESS

SECOND SESSION

WASHINGTON, DC, SEPTEMBER 18, 1996

Printed for the use of the Committee on Small Business

**Serial No. 104–92**

SUPERINTENDENT OF DOCUMENTS
DEPOSITORY

MAR 19 1997

BOSTON PUBLIC LIBRARY

U.S. GOVERNMENT PRINTING OFFICE

27-291 CC WASHINGTON : 1996

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-054088-7

COMMITTEE ON SMALL BUSINESS

JAN MEYERS, Kansas, *Chair*

JOEL HEFLEY, Colorado
WILLIAM H. ZELIFF, JR., New Hampshire
JAMES M. TALENT, Missouri
DONALD A. MANZULLO, Illinois
PETER G. TORKILDSEN, Massachusetts
ROSCOE G. BARTLETT, Maryland
LINDA SMITH, Washington
FRANK A. LoBIONDO, New Jersey
ZACH WAMP, Tennessee
SUE W. KELLY, New York
DICK CHRYSLER, Michigan
JAMES B. LONGLEY, JR., Maine
WALTER B. JONES, JR., North Carolina
MATT SALMON, Arizona
VAN HILLEARY, Tennessee
MARK E. SOUDER, Indiana
SAM BROWNBACK, Kansas
STEVEN J. CHABOT, Ohio
SUE MYRICK, North Carolina
JACK METCALF, Washington
STEVEN C. LATOURETTE, Ohio

JOHN J. LAFALCE, New York
IKE SKELTON, Missouri
NORMAN SISISKY, Virginia
FLOYD H. FLAKE, New York
GLENN POSHARD, Illinois
EVA M. CLAYTON, North Carolina
MARTIN T. MEEHAN, Massachusetts
NYDIA M. VELÁZQUEZ, New York
CLEO FIELDS, Louisiana
DOUGLAS "PETE" PETERSON, Florida
KEN BENTSEN, Texas
WILLIAM P. LUTHER, Minnesota
JOHN ELIAS BALDACCI, Maine
JESSE JACKSON, JR., Illinois
JUANITA MILLENDER-MCDONALD, California
EARL BLUMENAUER, Oregon
XAVIER BECERRA, California
JAMES E. CLYBURN, South Carolina
ELEANOR HOLMES NORTON, District of Columbia
MAXINE WATERS, California

JENIFER LOON, *Staff Director*
JEANNE M. ROSLANOWICK, *Minority Staff Director*

# CONTENTS

| | Page |
|---|---|
| Hearing held on September 18, 1996 | 1 |

## WITNESSES

### WEDNESDAY, SEPTEMBER 18, 1996

| | |
|---|---|
| Banerjee, Tapan, founder and President, TapanAm and Associates | 54 |
| England-Joseph, Judy, Director of Housing and Community Development Issues, General Accounting Office, Washington, DC | 9 |
| Farinha, Steven, President, Farinha, Inc. | 57 |
| Ford, Brenda, President, Ford & Associates, Silver Spring, Maryland | 44 |
| La Noue, George R., Director, Policy Sciences, University of Maryland-Baltimore County, Policy Sciences Graduate Program, Baltimore, Maryland | 48 |
| Lader, Philip, Hon., Administrator, U.S. Small Business Administration, Washington, DC, accompanied by Calvin Jenkins, Associate Administrator for Minority Enterprise Development; John Spotila, General Counsel; and Hugh Wright, Assistant District Director for Minority Enterprise Development, Washington District Office | 6 |
| Offord, Jim, Retired Contract Specialist, Silver Spring, Maryland | 46 |
| Rosen, Jeffrey, Associate Professor, George Washington University School of Law and Legal Affairs Editor, The New Republic, Washington, DC | 52 |
| Stewart-Veal, Shirley A., President and Founder, SAS, General Construction Contractor, Herndon, VA | 43 |

## APPENDIX

| | |
|---|---|
| Opening statements: | |
| Clayton, Hon. Eva | 73 |
| Fields, Hon. Cleo | 78 |
| Flake, Hon. Floyd H. | 80 |
| LaFalce, Hon. John J | 83 |
| Meyers, Hon. Jan | 87 |
| Millender-McDonald, Hon. Juanita | 94 |
| Poshard, Hon. Glenn | 96 |
| Velázquez, Hon. Nydia | 98 |
| Prepared statements: | |
| Banerjee, Tapan | 105 |
| England-Joseph, Judy | 108 |
| Farinha, Steven | 128 |
| Ford, Brenda | 132 |
| La Noue, George R. | 137 |
| Lader Philip | 178 |
| Offord, Jim | 201 |
| Rosen, Jeffrey | 204 |
| Stewart-Veal, Shirley A. | 216 |
| Additional material: | |
| Questions to Mr. Lader from Chair Meyers | 218 |
| Answers to questions from Mr. Lader | 220 |

# PROPOSED REFORM OF THE 8(A) PROGRAM THROUGH H.R. 3994, THE ENTREPRENEUR DEVELOPMENT PROGRAM ACT OF 1996

---

**WEDNESDAY, SEPTEMBER 18, 1996**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON SMALL BUSINESS,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:05 a.m., in room 2359, Rayburn House Office Building, Hon. Jan Meyers (Chair of the Committee) presiding.

Chair MEYERS. The meeting will come to order. This morning's meeting is about the 8(a) set-aside program in the Small Business Administration. I am going to try to limit my opening remarks to about 5 minutes, and I hope Mr. LaFalce can do the same. We are going to try to get right into the program here, because there are a lot of you in attendance and we have a lot of witnesses to be heard from.

The Small Business Administration is a small but mighty Agency. It is a half-a-billion-dollar Agency, a little over that. In most of the Agencies in this Government, one program will spend $6 or $8 billion, and here we have this little Agency expending about half a billion dollars for small business.

Since I have been Chair of the Committee, we have really tried to emphasize the programs that I believe, and I think many of the Committee members believe, are of tremendous importance to all small business; the loan programs, the advocacy program, and the SBDC Programs. Now, here we have a program that is of dubious value that is losing us $1.5 billion a year. Let me document that a little bit. Both the part about dubious value and the part about $1.5 billion a year.

The 8(a) Program has failed as a bootstrap program to help fledgling minority businesses and has become a rich-get-richer program for contractors inside the DC beltway. The GAO reported that less than 4 percent of 8(a) firms emerged from the program as "competitive businesses." Many see the program as an end in itself.

As of September 1995, the SBA has never "graduated" an 8(a) firm because it had met the goals and objectives set forth in its business plan. The top 50 firms, 1 percent of the participants, most of which are located in and around Washington, DC, received 25 percent of the contracts, $1.1 billion in fiscal year 1994. Over half the firms certified in 8(a) in fiscal year 1994 never got a single contract.

One can be a millionaire and still be in the 8(a) Program as the equity in your house and in your business does not count toward the $750,000 allowable limit on personal wealth.

Furthermore, the SBA Inspector General's Office found that SBA miscalculates net worth and often does not consider the spouse's wealth.

The 8(a) Program is riddled with fraud and abuse even after three congressional attempts to reform it. In 1978, 1980, and in 1988, Congress adopted measures to clarify 8(a)'s intent and to reform SBA's administration of the program, emphasizing business development and not contracts.

Today, the same problems exist. Firms leave the program without achieving self-sufficiency, most of the program's benefits accrue to those who least need assistance, and poor management of the program by SBA continues.

The 8(a) Program is no longer necessary. Prior to the adoption of the Federal Acquisition Streamlining Act (FASA), 8(a) was the only government-wide procurement set-aside program for minorities. A few Agencies had specific Federal procurement set-aside programs for minority-owned small businesses to help meet the government-wide minority contracting goal of 5 percent.

The largest was DOD's 1207 Program, which allowed DOD procurement officers to use set-asides and bid preferences to meet their 5 percent goal.

In 1994, Congress passed FASA, which took those set-asides and bid preferences used in the 1207 Program government-wide. So, essentially, I see 8(a) now as a duplicative program.

The 8(a) Program wastes money through its reliance on sole-source contracting. In 1994, less than 9 percent of 8(a) contracts were competitively bid among 8(a) participants. Agencies have found ways around the requirement that all contracts over $3 million must be competed among 8(a) firms.

Competition, we know from testimony before this Committee and from government studies, saves an estimated 25 percent on Government contracts. That is, if a contract is bid, you are probably going to save 25 percent at a minimum, maybe more, but certainly 25 percent.

At the program's current level of about $6 billion in contracts a year, approximately $1.5 billion could be saved simply by going to competitive bidding.

The GAO found that 8(a) contracts for commercially available computer hardware were on the average 18 percent more costly than those contracts awarded through competitive bidding.

Finally, the personnel alone just to administer this program costs between $20 and $30 million a year.

I appreciate all of your being here. I know how strongly some of you feel about this. But I think it is time that we talk about doing something to this program that will really resolve some of these problems.

Let me say to my colleagues, I did not come to Congress to eliminate programs or to protect programs embraced by special interests. But when a program fails to show ability to achieve its goal over the course of 18 years, I know that Congress has the responsibility to act. It is for that reason that I introduced H.R. 3994, the

Entrepreneur Development Program Act of 1996, which would sunset the 8(a) Program's predominantly sole-source contracting arm, while retaining and broadening access to its established counseling and business planning outreach elements.

This approach would end, once and for all, the contracting shenanigans that the SBA and the participating Agencies have engaged in to "game" the system and funnel billions of dollars to beltway insiders. It also would focus valuable business development assistance to the struggling bottom tier of small businesses whose proprietors aspire to success rather than conspire to hide it.

I appreciate your being here. At this point I yield to Mr. LaFalce.

[Chair Meyers' statement may be found in the appendix.]

Mr. LAFALCE. Thank you very much, Madam Chairman. I have an opening statement. I ask unanimous consent to put it in the record.

Chairman MEYERS. Without objection.

[Mr. LaFalce's statement may be found in the appendix.]

Mr. LAFALCE. I also have a letter from a former member of the Small Business Committee and now the President of the NAACP, Mr. Mfume, and I would ask unanimous consent to put his letter in the record.

Chairman MEYERS. Without objection.

[The information may be found in the appendix.]

Mr. LAFALCE. Madam Chairman, because of the seriousness with which we take this hearing, I requested that the leadership fill the vacancies that exist on the Small Business Committee for the duration of this Congress. So, I would like to welcome, not everyone is present, but in any event, we have four new members of the Small Business Committee on our side of the aisle, Representatives Maxine Waters, Eleanor Holmes Norton, Jim Clyburn, and Xavier Becerra. I would welcome them to the Small Business Committee and whatever deliberations we will be having this year.

Having said that, let me make a few statements, Madam Chairman. Of course it is always appropriate to have a congressional hearing on a governmental program. But one has to look at the context of the hearing to determine whether or not it is appropriate or inappropriate in those circumstances. The 8(a) Program was one of the affirmative action efforts that at the beginning of this Congress the leadership of your party, and both sides of the aisle, Speaker Gingrich and then Senate Majority Leader Robert Dole, had under review a consideration for repeal.

As a matter of fact, at the beginning of this Congress, Senator Dole requested an examination of the Library of Congress of all possible affirmative action programs. It appeared for quite a period of time that a wholesale onslaught was going to be made against them.

Subsequent to that, we saw reports in the paper, and I am thinking of a few months or so ago, well, they are not going to proceed now, given the political context, except with the 8(a) Program. They will move to repeal the 8(a) Program.

You introduced a bill just before we recessed. I have forgotten whether it was the last day or July or the first or second day of August of this year, and then about 1 or 2 weeks ago, we heard word that there would be a hearing and a markup of your bill the

next day, approximately a week and a half or so before Congress was scheduled to adjourn.

I tell you, this was not received very well at all by the membership on our side. I don't know if it is still your intent to go ahead with the markup of your bill or not.

I think it is important to reiterate certain facts. The 8(a) Program was created in response to a tragic reality of American life, and that is the inability of some individuals to participate in our economy simply because of who they are.

I do not believe that programs like 8(a) have outlived their usefulness, because discriminatory treatment of certain Americans is not a thing of the past. It is small comfort to argue, as some do, that discrimination today is only subtle or unconscious or generational or situational. The fact remains that discrimination exists, both with respect to opportunity and with respect to effect.

It affects the individuals with whom one associates, the businesses one patronizes, perceptions of who can do the job, and the ability to access capital on a fair and equitable basis. In other words, all the aspects of doing business.

The 8(a) Program seeks to give firms a chance to rise above discriminatory barriers, with the hope that given this opportunity to develop, they will become competitive, viable firms in the open marketplace.

Historically, there was some confusion as to whether the 8(a) Program was simply a business set-aside program or whether it was, in fact, a business development program. We settled that issue in the 1988 legislation. We clearly said it is a business development program and should be viewed as such and implemented as such, et cetera.

Implementation has not always been what many of us would desire, and perhaps further improvements need to be made, both in the implementation and in the law. But improvements, not de facto repeal.

We clearly said, too, when it comes to certain dollar amounts, these contracts should be competitively bid, that competition is of the essence of business development. We clearly said legislatively that 8(a) contractors should be weaned off of the contracts, too, as they proceed through the program, and we put a time certain on their duration within it. Before you could stay in the program almost endlessly, and we said in the 8(a) legislation from beginning to end, 9 years is it. You must either graduate successfully or you flunk at the end of that period of time.

Now, so-called evidence is endlessly trotted out to show how flawed this program is. Often cited is the view that too many contracts go to firms in too few geographic locations. Well, I certainly think that merits examination.

The 1988 legislation mandated by law there should be the maximum possible geographic distribution of these contracts whenever possible, but there are certain contracts that are national in nature as opposed to local in nature. No other Federal program is criticized because of where private sector firms choose to locate.

We have buzz words such as Silicone Valley, Route 128. They have come into the English language based on the tendency of firms to collocate for whatever business rationale drives them.

Other examples include the concentration of financial services in New York and North Carolina, textiles and carpets in the Carolinas. I could go on and on.

Harvard Business School Professor Michael Porter has coined the term "clustering" for this tendency of like firms to collocate. He believes it enhances competition.

We also within this Congress were faced with the specter of Adarand, and the administration has done a thorough review of every affirmative action program to see if it complies with the structures of Adarand.

In their judgment, and I think the judgment of almost every legal scholar that I am aware of, there could be some exceptions, I suppose, but if any affirmative action program is able to stand up to the constraints of Adarand, it is the 8(a) Program. In large part I believe because it is a business development program, competitively bid, et cetera, except for your small business contracts.

Are there abuses? To be sure, in every program. This Committee briefly preliminarily examined one abuse that arose in your great State of Kansas, Madam Chairman. It involved a Kansas 8(a) firm called EDP, which received a $30 million contract for food processing. During my chairmanship, our Committee referred this matter to the Department of Justice, the FBI, the SBA's Inspector General, for follow-up regarding the possible illegal benefit from this contract that accrued to several people, including individuals with extremely close ties to former Senator Robert Dole.

Indeed, what apparently set this contract award in motion for EDP was a phone call from former Senator Dole to the then Administrator of the SBA. President Bush's administration did not act on the information we referred, and the matter largely dropped out of the public eye recently. However, a key player in this drama has dropped his previous wall of silence and may now be willing to testify before the Committee as part of this hearing on the 8(a) Program.

We certainly expect the Chair would work with us to develop the necessary information to answer the previously unanswered questions.

Madam Chairman, with that, I will conclude my remarks.

Chairman MEYERS. Thank you, Mr. LaFalce. I am going to quote, if I may, a couple of lines that you said on the floor in 1988. This was after your last thorough investigation of this event, and you said "one preliminary but important point must be made: The initial reason why this case received so much national attention is because several of the individuals associated with this contract also have had close personal and working relationships with Senator Robert Dole of Kansas. In that regard, I want it understood," still quoting you, "that based upon all of the materials the Committee has reviewed and interviews with numerous individuals, I have found nothing that suggests Bob Dole was personally involved in any questionable event or occurrence."

I think it is really important to say that, because I think starting off this hearing with that kind of innuendo is wrong.

Mr. LAFALCE. Madam Chairman?

Chair MEYERS. I recognize Mr. Phillip Lader.

Mr. LAFALCE. Madam Chairman, since you have commented on that report and not on the memo that I sent out the day after that report with new information that came from the Chief of Staff to the then Administrator of the SBA, which prompted me to forward the information to the Department of Justice and the FBI, I think I should at least be able to make reference to that, Madam Chairman.

Chair MEYERS. We can certainly do that at a later time. I recognize at this point——

Mr. LAFALCE. Madam Chairman. Madam Chairman.

Chair MEYERS. You had your opportunity, Mr. LaFalce.

Mr. LAFALCE. You reputed my opening statement.

Chair MEYERS. I certainly did.

Mr. LAFALCE. With the findings I made on day one, but then because of those findings, we received a phone call that would have contradicted that interpretation, contradicted that information, and you omit reference to that, despite the fact that I sent a memo to everyone advising them of the new information.

I ask unanimous consent, Madam Chairman, to put in my memorandum dated subsequent to my statement in the Congressional Record, dated February 3, 1988, that was given out to the public at large, an addendum to the preliminary investigation on EDP Enterprises.

Chair MEYERS. We can certainly enter it into the record, Mr. LaFalce. I think your statement on the floor stands.

Mr. POSHARD. Madam Chair, may I ask unanimous consent in the interest of time that any Members who have opening statements may submit those for the record?

Chair MEYERS. Thank you. We will do that without objection.

[The statements may be found in the appendix.]

Chair MEYERS. I recognize Mr. Lader.

## TESTIMONY OF HON. PHILIP LADER, ADMINISTRATOR, U.S. SMALL BUSINESS ADMINISTRATION, WASHINGTON, DC; ACCOMPANIED BY CALVIN JENKINS, ASSOCIATE ADMINISTRATOR FOR MINORITY ENTERPRISE DEVELOPMENT, JOHN SPOTILA, GENERAL COUNSEL, AND HUGH WRIGHT, ASSISTANT DISTRICT DIRECTOR FOR MINORITY ENTERPRISE DEVELOPMENT, WASHINGTON DISTRICT OFFICE

Mr. LADER. Thank you for the opportunity to be with you today, Madam Chairman. I am accompanied by Calvin Jenkins, to my left, the Associate Administrator for Minority Enterprise Development, John Spotila, the SBA's General Counsel and our Agency's lead liaison with the Justice Department regarding this program, and Hugh Wright, the SBA's Washington District Office's Assistant District Director for Minority Enterprise Development.

Let me also introduce Ronald Hobson, SBA's newly appointed Associate Deputy Administrator for Government Contracting and Minority Enterprise Development, who joins us from Signet Bank.

Madam Chairman, the Clinton administration is committed to the Dole goal of expanding opportunity for all Americans to participate in our free enterprise system and in Federal procurement. The President has strongly stated his commitment to mend, not end, Federal affirmative action programs.

To achieve this goal, SBA has sought to strengthen and improve the 8(a) Program as a business development program, designed to help eligible small businesses which are socially and economically disadvantaged as defined by statute reach self-sufficiency and competitive viability.

This was the program's intent when it was established in the Nixon administration, business development, not a handout, not a giveaway. Nearly 3 years ago today my predecessor asserted before you SBA's intent to improve the 8(a) Program, and I am pleased to tell you that significant improvements have been made.

A new comprehensive management information system is in place, talked about for 10 years. Annual reviews of program participants have been done. We have reduced the application processing time. We have refocused the 7(a) and technical assistance through expansion of technical education.

We have reduced the paperwork burden by eliminating quarterly financing reporting, and accelerated the termination of ineligible firms. Moreover, the Justice Department is proposing other changes to this program.

There are some particularly interesting points I should mention as a prefatory note. Currently, 8(a) firms directly employ more than $157,000 people. More than 80 percent of all 8(a) firms are located outside the Washington, DC area, and these firms receive about 75 percent of the 8(a) contract awards. There is another frequent though inaccurate criticism of the program.

The average net worth of program entrants is $60,000, exclusive of residence and ownership in the business. I would ask that my written testimony be admitted and therein you will find a variety of success stories from the program. But given these success stories, the question can be asked, as to whether the program's purpose has been fulfilled.

The most recent data shows that minority-owned businesses comprise 8.8 percent of the total business population, while minorities comprise 26 percent of the general population.

The participation of minority-owned firms in Federal procurement remains even smaller: The aggregate minority-owned business participation in Federal contracting amounted to only $11.2 billion, representing 5.5 percent of total procurement in 1995. Total contract dollars awarded through the 8(a) Program represented approximately $6.4 billion, or 3.1 percent of Federal contracting, about half of all the minority business participation in Federal procurement.

In other words, had 8(a) contracting opportunities not been available, minority-owned businesses might have received 2.4 percent of Federal procurement dollars. You can understand what I mean therefore when we say that as a Nation, we still have a long way to go in opening small business opportunities for all Americans: But this dramatic need should not excuse the 8(a) Program from improvement.

As I mentioned previously, SBA has meaningfully addressed concerns placed by this Committee in other reports. Our efforts have not been perfect. The work is not yet done, but we can demonstrate that the 8(a) Program is being mended, often in a very profound

way that is consistent both with the program's objectives and the best interests of American taxpayers.

There are certain specifications about these reforms I want to share with you. Eighty-four percent of all portfolio firms were reviewed last year as compared to only 57 percent the previous year, and we expect all to be reviewed this year. A newly implemented management information system is now a reality. To increase the number of contracts available for competition, the indefinite delivery-indefinite quantity, ID–IQ, contract loophole has been closed.

Our processing, which averaged 203 days, today is 90 days, and nonsole-source contracts are increasing at a faster pace than all minority contracts. Amongst those exiting the program from 1992 to 1995, 52 percent, Madam Chairman, reported that they were now independently operational as viable businesses.

As to H.R. 3994, the Clinton administration strongly opposes this bill, because it would eliminate the 8(a) contracting program and the 7(j) business development training. Countless disadvantaged small business owners would be hurt. The economic potential of a critical segment of America's population would have a significantly less chance of being realized.

SBA would recommend that the President veto any legislation that passes the Congress which is not consistent with this policy of mending, not ending affirmative action. The bill does not refer to any data, analyses or other evidence to demonstrate that the problems which led Presidents Nixon and Reagan to establish and then renew the 8(a) Program have now been overcome.

Under H.R. 3994, the businesses eligible for the substitute services are the smallest businesses, and these very small firms are currently eligible for all of SBA's other programs.

As to the sole-source issue, let me put this in perspective. Two large businesses, each received a single sole-source contract last year that was approximately equal to the total value of all 85 contract awards put together. Last year, 8(a) firms received about $2.5 billion in new sole-source awards. There was about $2 billion additional of renewal activity. That is $4.5 billion. But by comparison, there were $63 billion of sole-source awards throughout the Government.

There is also a misunderstanding about the question of competition. Let me again emphasize that total 8(a) contract dollars of approximately $6.4 billion represented only 3.1 percent of the total Federal contracts. Only half of the 8(a) Program participants, as you said, actually received one contract. Self-marketing and negotiation of reasonable prices were required in every instance, and all receiving contracts were required to perform successfully in the provision of goods and services.

The SBA, I will conclude, believes that the 8(a) Program is necessary, but it does not condone any past abuses that may have occurred. We have acted to correct them, and all of the aforementioned reforms and the upcoming Justice Department proposals demonstrate our administration's commitment. We recommend that the forthcoming Justice Department proposals be given a chance to work.

We need to continue to improve this program. But while such great disparities continue in the levels of Federal procurement, the program, I respectfully submit, should not be eliminated.

[Mr. Lader's statement may be found in the appendix.]

Chair MEYERS. Thank you, Mr. Lader. I would like to state that Mr. Spotila and Mr. Jenkins accompanied Mr. Lader today, and at this time I would recognize Ms. Judy England-Joseph, Director of Housing and Community Development Issues of the General Accounting Office.

**TESTIMONY OF JUDY ENGLAND-JOSEPH, DIRECTOR OF HOUSING AND COMMUNITY DEVELOPMENT ISSUES, GENERAL ACCOUNTING OFFICE, WASHINGTON, DC**

Ms. ENGLAND-JOSEPH. Thank you. Thank you, Madam Chair and Members. I would like to summarize my remarks and submit the full statement for the record. I am here today to discuss the Small Business Administration's 8(a) Minority Business Development Program. Our reports and testimony over the years have chronicled the difficulties that SBA has had in implementing many of the changes to the 8(a) Program mandated by the Congress in the Business Opportunity Development Reform Act of 1988 and subsequent amendments.

My testimony today focuses on SBA's progress in implementing several changes that are of special interest to the Committee and that are designed to make the 8(a) Program an effective business development program.

These are requiring that 8(a) contracts with a large dollar value be awarded competitively, distributing 8(a) contracts so that a larger number of firms receive them, ensuring that firms rely less on 8(a) contracts by increasing their business that does not come simply through the 8(a) Program, and finally, graduating firms from the program that demonstrate that they can survive without 8(a) contracts.

My statement is based primarily on information that we obtained from SBA through fiscal year 1995, the latest fiscal year for which complete data were available. Most of this data came directly from SBA's automated system. Because of the limited time that was available to prepare for this hearing, we were not able to independently verify the accuracy of this data.

In summary, while the dollar amount of 8(a) contracts awarded competitively during fiscal year 1995 increased over fiscal year 1994, the percentage of contract dollars awarded competitively remained at about 19 percent. It is important to note, however, that as of August 1995, SBA regulations now require Agencies to consider the full value of the contract, when determining whether an ID–IQ contract should be competed. So, we may see a change in the number of contracts competed in fiscal year 1996.

The concentration of 8(a) Program contract dollars in a relatively few number of firms that occurred in prior years also continued in fiscal year 1995, with less than 1 percent of the firms receiving about 25 percent of all contract dollars. This concentration limits the developmental opportunities available to other disadvantaged firms.

In 1995, DOD and VA agreed with SBA to give special emphasis to 8(a) firms that had never received contracts. SBA does not have data on this activity to date, but, again, we may see some changes in the concentration of business activity in 1996 as a result of the decisions of DOD and VA.

During fiscal year 1995, a larger percentage of the firms in their final program year achieved the required level of non8(a) business than we reported to you in April 1995 — 58 percent compared to 37 percent.

In 1995, 28 percent of the firms in the fifth through the ninth or final year of the program did not meet the minimum requirements for non8(a) business.

Actions considered by SBA, but not implemented could have significantly affected this issue and should those actions be implemented into the future, it is quite possible that we might see an increase in the number of firms that can meet the minimum level of non-8(a) activity.

Finally, during fiscal year 1995, three firms, among some 6,000 firms, were graduated from the program because SBA determined that the firms had met their developmental goals and were able to compete in the marketplace without further 8(a) assistance. According to SBA, these were the first graduations in the program's history.

It is important to add that 160 firms were terminated for various reasons, including the failure to comply with program requirements, or they were no longer in business, and an additional 250 firms left the program because either their program terms had expired or they simply chose to leave the program.

In May 1995, SBA established requirements for its field staff to evaluate the financial condition of 8(a) firms and to determine whether firms were ready to graduate from the program. An evaluation done by SBA in February 1996 of the annual reviews completed by field staff highlighted some serious weaknesses of the staff.

Financial analysis was very poor and the staff did not fully understand the concepts of economic disadvantage, financial conditions of the firms, and access to capital. In addition, comparisons of the financial condition of 8(a) firms to non-8(a) firms in similar business lines was limited.

While SBA plans some training later this year, the issue of staff skills and abilities is a critical one that could undermine many of the efforts that SBA is pursuing in its efforts to improve program management.

In closing, while the 8(a) Program has not yet achieved key changes mandated by the Congress, SBA has taken actions during the past year that indicate steps in the right direction.

Two areas, however, are of continuing concern to GAO. Those are the need to collect data to better measure the overall impact of the 8(a) Program, and the need to improve the skills and abilities of SBA staff who are responsible for assessing the financial condition and competitiveness of the 8(a) firms.

That concludes my remarks, Madam Chairman, and I would be happy to answer any questions or comments other Members may have.

[Ms. England-Joseph's statement may be found in the appendix.]

Chair MEYERS. Thank you very much, Ms. England-Joseph.

Our next witness is Mr. Hugh Wright. Mr. Wright, as I understand it, you are going to respond to questions rather than giving testimony; is that correct?

Mr. WRIGHT. That is correct.

Chair MEYERS. All right. Then we are ready at this time to have questions from our Members. We will be limited as to time, so we will use the lights. I will start by asking a very short question.

Is there any reason why we could not bid among minority firms those who desire 8(a) contracts?

Mr. LADER. In the interest of time, let me ask Mr. Jenkins, who manages the program, to respond. I might have a postscript.

Mr. JENKINS. As Administrator Lader mentioned earlier, in fact there is competition within the 8(a) Program. Sole-source contracting that takes place within the 8(a) Program is, in fact, itself competition. There is informal competition going on every single procurement.

Chair MEYERS. I don't know that informal competition is the same as a bid, Mr. Jenkins. I hear this over and over and over again, that we have informal competition. That is not a bid for a program.

Mr. JENKINS. Exactly right. The competition does not meet the same requirement of the Federal acquisition regulation, but, in fact, that competition that goes on is much more difficult than the competition that takes place as outlined by the Federal acquisition regulation.

These first must show proof to a contracting officer that they have fair and reasonable prices and that the product and services meet or exceed any that are offered by anyone else outside of the program.

Mr. LADER. Postscript, Madam Chairman. The same point that could be raised as you did in your opening statement as a criticism of the program I think is partially responsive. Only half of the some 6,000 first admitted to the program last year received any contracts. That demonstrates that within the program itself there is a competition for who gets contract awards.

I recognize the distinction you are raising between a bid and this type of informal competition, but I do want to emphasize, as Mr. Jenkins did, that there is competition and a reasonable price is required for the contract to be awarded.

Chair MEYERS. I think women also have about 2 percent, maybe less than that, of Federal contracts, and yet they are specifically barred from participating in the 8(a) Program. I would like you to comment on that.

Mr. JENKINS. Women are not barred from the program. I think it is very important to make it clear.

Chair MEYERS. But, Mr. Jenkins, of the thousands that have been involved since the program began 18 years ago, I think there have been 16 Caucasian women, and they had to go to court to get a contract, and there have been some 400 minority women.

Now, that sounds like a bar to me.

Mr. JENKINS. Well, I think it is important to realize, to actually review the statute, the statute indicates that the program is open to all Americans.

Chair MEYERS. I have trouble with the statute, yes.

Mr. JENKINS. But it is open to those that can demonstrate that they are socially and economically disadvantaged. Everyone that enters the program, no matter if they are part of the presumed group or not, must have demonstrated economic disadvantage. The test for social disadvantage is that which one has to show, long-standing of discrimination, there are no bars.

Chair MEYERS. Except that a minority is automatically considered socially disadvantaged, and no one else is. If you are other than a minority, you have to go to court to get certified. So, actually there is a bar to participation.

Now, the bar to minority women I think is just because, I don't know whether it is just the "old boy" network. I don't know whether that is changing really, but the number of minority women involved, based on or compared to the number overall, is very small.

Mr. LADER. A quick point. You correctly state what may be a policy difference regarding eligibility for entrance in the program. But you are very well aware of the SBA's strong efforts on behalf of women in our cornerstone 7(a) Program, as you know, with more than $7 billion of Government guaranteed loans last year. We had an 86 percent increase of loans to women-owned businesses.

Chair MEYERS. I think you have done a good job in that, Mr. Lader. It is just that there are no sole-source set-asides for women, and that is the point that I was making.

Mr. LADER. I am advised there are today more than 1,000 of the 6,000 firms in the program that are women-owned.

Chair MEYERS. That is a change, but how many have had contracts? At the time that I looked, in the entire history of the program, only 400 minority women had had a contract.

Mr. LADER. Though I am not at liberty to go into what the Justice Department may be proposing, I expect that you will see in the Justice Department proposals some changes that will facilitate women's entry into the 8(a) Program.

Chair MEYERS. That would be welcome news, but I would think the main problem with 8(a) is the fact that it defies *Adarand* and it is sole-sourced. So, including women might just exacerbate the program.

I recognize Mr. LaFalce.

Mr. LAFALCE. Thank you very much. Pursuant to the provisions of Rule XI 2(j)1, in connection with the hearing on proposed reform of the 8(a) Program through H.R. 3994, we, the undersigned, a majority of the Minority party members of the Small Business Committee, request that you designate a day for the Minority to call witnesses to testify with respect to that matter. I would like to transmit to you this letter signed by a majority of the Minority Members.

Chair MEYERS. Thank you. I appreciate this. I do think that we offered the opportunity for Minority Members to present witnesses, and I also think that Mr. Lader has done a very good job of stating your position.

Out of two witnesses on the first panel, one of them certainly has been stating your position in this, Mr. LaFalce.

Mr. LAFALCE. There is absolutely no question that under the rules we are entitled to our own separate day of hearings. That is point Number 1. Point Number 2, we submitted about a half dozen witnesses. We were confined to two witnesses. We were also not given the names of the witnesses you wished to propose. We were also told that our witnesses would have to be on a panel called panel 4, et cetera.

In any event, aside from the unfair treatment you have given the Minority with respect to this hearing, the absolute legal right we have under House Rules to our own separate days of hearings has been transmitted to you.

Chair MEYERS. We can discuss this another time, Mr. LaFalce. I will certainly take it under consideration. However, we received no names from you for witnesses, none.

Mr. LAFALCE. I think it is not necessary for me to comment on that, Madam Chairman.

Let me go on.

Chair MEYERS. I think we are resolving this conflict, but we received no names from you. I am sorry, Mr. LaFalce.

Let's proceed with the hearing. We will take this under consideration.

Ms. VELÁZQUEZ. Madam Chairman, I would like to refresh your memory. I personally sent a letter to you with a recommendation of four witnesses for this hearing.

Chair MEYERS. I received nothing from Mr. LaFalce, and I am not aware of your communication.

Ms. VELÁZQUEZ. I am a member of this Committee.

Chair MEYERS. Let us proceed, Mr. LaFalce.

Mr. BECERRA. Madam Chairman, parliamentary inquiry. I believe the Ranking Member has stated under the rules that the Minority is entitled to a hearing once a majority of the Minority Members requests one. I understand that the Chairwoman said that she would take that under consideration.

I would like to know if under the rules, this is something that can be ruled on at this stage since the request has been made?

Chair MEYERS. I have no objection to having another hearing. However, I will say that this is the third hearing we have had on 8(a) in the 104th Congress, and it is not like it is a brand new subject or that I have avoided it or tried to avoid your witnesses.

The only question that I have is in the remaining week that we are here, if we can schedule a hearing, we will do it. That is why I said I would take it under advisement. I have no objection to having further hearings.

Mr. BECERRA. Further parliamentary inquiry. Perhaps the Parliamentarian can advise us. I don't have a copy of the rules for the Committee before me, but I would like to know exactly what those rules state with regard to this particular request. Can it be ruled on at a later point in time or is it up to the discretion of the Chair to determine if a hearing will be held? Or is it a requirement that is mandatory once a hearing has been requested by a majority of the Minority Members?

Chair MEYERS. I have stated that I have no objection to having another hearing. I will attempt to do so. I do not know whether such a thing is possible in the remaining week.

Mr. BECERRA. Let me further my parliamentary inquiry. It appears that the Chairwoman is saying that perhaps because of time we may be constrained in hosting another hearing. What I would like to know is: Do the rules require us to hold another hearing, given that the request has been made by a majority of the Minority Members?

Chair MEYERS. Let us resolve this at a later time and go on with the questioning, because we have so many witnesses to be heard, we will resolve this before we adjourn this morning.

Mr. BECERRA. I hate to continue to intercede, but——

Chair MEYERS. The gentleman is out of order. I have said before 12 o'clock we will resolve this.

Mr. BECERRA. That is fine.

Mr. FIELDS. Parliamentary inquiry, Madam Chairman.

Chair MEYERS. You are recognized for a parliamentary inquiry only, because we have a lot of witnesses this morning.

Mr. FIELDS. I understand. I am interested in hearing them. But I would like to know what does the rule provide, and I am sure we have counsel here who could read the rule.

Chair MEYERS. That is what I am going to determine. I would like to move forward at this time.

Mr. FIELDS. I understand. But parliamentary inquiry, I wanted to know as a member of this Committee, if I am operating under the rulings I want to know what they are.

Chair MEYERS. You will be operating under the rules, I think, when we determine what we can do and whether we can set a hearing date right at this time.

Mr. FIELDS. I understand that, Madam Chairman. I don't want to be rude, but if we have counsel here with a rule book, then I see nothing at all wrong with the counsel reading the rule to the Members.

Chair MEYERS. I am saying, Mr. Fields, let us move forward. We are getting the rule book and we will see and a determination will be made very shortly.

Mr. FIELDS. If the gentlewoman is saying we are going to wait until the rule book arrives, I would agree with that.

Chair MEYERS. No, we are not. We are going to move forward. I would like to have the Committee give some attention to the additional witnesses that are with us. We will move forward and resolve this as quickly as possible.

Questions, Mr. LaFalce.

Mr. LAFALCE. Thank you. Reference has been made to 8(a) contracts in the State of Kansas. I will tell you what I am interested in and what refreshed my recollection. A short while ago, perhaps a month, I was watching television, and a Nightline program was on, and the Nightline program happened to deal with a number of issues arising out of the State of Kansas, and some individuals were on that program, their names were mentioned, David Owen and Jim Palmer, and it refreshed my recollection that we had made an investigation of a 8(a) contract that was awarded to Mr. Palmer, a former Assistant of Senator Dole's, and we also discovered at that

time, too, that Mr. Owens, who recently got out of jail and has begun talking more now than he would in 1988——

Chair MEYERS. He was jailed on an unrelated charge.

Mr. LAFALCE. Yes, absolutely, but had been a recipient of a consulting contract from EDP, the 8(a) contract or, for approximately $170,000.

It was also revealed on this Nightline Program that Jim Palmer, who had never received an 8(a) contract before he got an almost $30 million award, was the individual who bought the real estate that was in the blind trust of Mrs. Dole. It was just an unusual convergence of circumstances, that this former assistant, who got this almost $30 million contract and gave Mr. Owen a consultantship of approximately $170,000, was then the one who bought this real estate.

I refreshed my recollection by looking through the file and found out that the information I had received subsequent to the preliminary investigation was replete with information which made me send this information to the Attorney General's office, to the FBI, saying it lcoks as if criminal activity took place here.

Now, that is not to say who was involved in this criminal activity. I certainly saw nothing that implicated Senator Dole in criminal activity, and said so. It certainly seemed as if criminal activity was involved. The Assistant Attorney General in charge of the Criminal Division, I rediscovered in looking over the file, was one William Weld, now Governor of the great State of Massachusetts. There was no follow-up on that.

Well, all these circumstances lead me to believe that this is something that should be looked at. Here we have a 8(a) contract or totally unqualified, no prior experience. It is a $30 million award. David Owen gets a consultant fee of about $170,000——

Chair MEYERS. You are proving my point, Mr. LaFalce.

Mr. LAFALCE. What is that point?

Chair MEYERS. The point is that this program is riddled with fraud and abuse.

Mr. LAFALCE. This is one we should investigate then, Madam Chairman.

Chair MEYERS. It is certainly one, and I will not defend EDP or John Palmer or Dave Owen, any of them. This was investigated by the Committee in 1988, investigated by the Inspector General at the same time, investigated by the FBI at the same time, and investigated by a Democrat Special Prosecutor appointed by the Attorney General of Kansas. No impropriety was found on Senator Dole's part, a fact that Mr. LaFalce made clear at the time, as did his staff investigator.

Are we to assume that all of these individuals, including the Minority staff, are either incompetent or corrupt? Mr. Owen, at the least, bent if not broke campaign finance laws and abused his status as the adviser to Elizabeth Dole's blind trust. Senator Dole was disgusted and betrayed by this, and now Owen is spreading his baseless charges to cover up his own problems.

He stole Mrs. Dole's money and tried to steal Bob Dole's good name. To mention this man is an appalling act, and I should think the Ranking Member would recall his own words of February 1988.

Mr. LAFALCE. There was new information, Madam Chairman, and I put out the new information. We also have new information regarding Mr. Palmer's purchase of the real estate that was in the blind trust. This is more than mere coincidence. I think it is deserving of a careful, impartial pursuit by the gentlewoman from Kansas.

Chair MEYERS. Your time is gone. May I recognize the gentleman from Maryland.

Mr. BARTLETT. Thank you very much, Madam Chairman. I am sorry I was late for the hearing. I was delayed because I went to a news conference, Feed the Children, Reverend Larry Jones.

While there, I was thinking of this hearing and noting the analogy between Feed the Children and what we are talking about here today. This Feed the Children Program is one that finds most of its recipients to be minorities, but the program does not discriminate. The program does not focus on a specific type of person. It focuses on need. I think that that should be the goal of any program, such as the one we are talking about today.

It should be a program that focuses on need, and I think that is where our Chairman would like to take us.

I have in front of me some statements relative to the 8(a) Program, and I just asked staff if the information I had could possibly be correct. In the history of the 8(a) Program, according to SBA, and this was verified, I understand, by GAO, that only 3 of over 6,000 participants have become self-sufficient and graduated from the program?

I was assured that that was correct. That is in 1995.

Mr. LADER. If it is appropriate, I will be pleased to respond.

Chair MEYERS. I will recognize Mr. Lader and then Ms. Joseph.

Mr. LADER. Congressman Bartlett, the factor of three may be accurate, but what you must recognize is that is not the determination of self-sufficiency or commercial viability. Firms leave the program for a variety of reasons throughout the 9-year spectrum. Many of them become commercially viable and leave. Many of them find that the benefits of the program were not what they expected to it to be. Many have not received contracts, since we said only half actually in the competition that goes on receives contracts. So, you are equating the number 3 as the formal graduation at the end of 9 years with commercial viability.

I would submit to you, sir, that is not an accurate representation.

Mr. BARTLETT. What are these three then? You admit there are three in a category. What are the three?

Mr. LADER. I can't tell you the names.

Mr. BARTLETT. I want to know not what specific companies. I want to know the characteristics of these three.

Mr. LADER. They would, the same characteristics, sir, as many of the firms that left the program earlier than the 9-year period or have chosen not to participate. Those are firms which have established a good mix between Government contracting and commercial businesses.

Those businesses which have developed the sufficient entrepreneurial, managerial skills that they are now satisfied to be outside the program, those are the criteria by which we would gauge business success, and that applies to a variety of firms, and you

should not limit it only to those that have formally graduated as such.

Chair MEYERS. If the gentleman would yield for a moment, I do think, however, that of the programs that exit or graduate, that only about half of them are still viable firms after a 3- or 4-year period.

Mr. LADER. Madam Chairman, you recognize, though, we are enjoying in the last several years a greater percentage of success of small businesses. That percentage may not be that different from the number of small businesses which generally succeed in the overall context.

Chair MEYERS. But considering that we have carried them along for 9 years and counseled with them, it seems to me that the figure should be going up, and it is going down.

We had 64 who were independently operational after a 4-year review in 1986, and now it is 52 percent.

Mr. LADER. Actually, the percentage of firms which are becoming commercially viable has been increasing. What we have to point out in this context, though, is that as we measure the viability of the firms, we have not been carrying them along. They have been admitted to the program to compete for contracts. They have counseling, but can have counseling outside the program through the small business development centers and other programs you champion. So, I don't think that is a valid comparison.

Chair MEYERS. Mrs. England-Joseph?

Ms. ENGLAND-JOSEPH. I want to be sure that we all understand what the three actually means and also what graduation means and what termination or exit really means.

When your staff spoke to you about the three, it is true that only three have graduated from that program. According to SBA, that means those three firms, throughout the time that they were involved in the program, had gotten to the point where SBA determined that the 8(a) and non-8(a) contracts the firms had received enabled the firms to leave the program and compete in the regular marketplace.

I would not agree with the word that only three left that were self-sustaining or successful in some way, because I think we have to really understand that there is very little data on which to understand success of firms that depart from the program.

One of the issues that we have raised with SBA is that the term "exited" or "departed" or "terminated", those terms are used as fairly broad terms to define a number of different situations when a firm departs. It can be because the firm no longer exists. It can be because the firm does not comply with or meet the requirements of the program.

Mr. LADER. Or successfully merged with another.

Ms. ENGLAND-JOSEPH. It can mean that the firm has more than felt they can compete successfully in the marketplace and no longer need 8(a) assistance and would like to go out on their own. That can be a choice at any time, or SBA can look at the data and determine that that firm is already competitive and does not need 8(a) support and should graduate from the program. So, it can be either voluntary or SBA can, in fact, move the firm out. So, there are a number of reasons why firms leave.

It is very difficult, given the data that are available today, to be able to point to empirical evidence. There is a lot of anecdotal evidence out there in terms of stories of success, but very little in terms of empirical evidence to show how many of the firms that in some way participated in the program, whether they were in for 1 year, 5 years, or the entire 9 years, whether there is a cause-effect relationship between the assistance they received in business development and technical assistance, and 8(a) contracts, whether that cause-effect relationship demonstrates when they depart, in whatever way, they are, in fact, successful in the marketplace.

I realize that is an evaluation issue in terms of data, but it is an important question when anyone is talking about what is going on in this program and why for several years now we have been saying that until we have that type of data, it is very difficult to be able to point to a great deal of success. But I also don't want to imply that it also suggests there has been no success at all.

Chair MEYERS. Thank you.

Mr. BARTLETT. I know the red light is on, but I have had a lot of help in consuming these 5 minutes. If I might ask just one additional exit question, it is my understanding — let me ask this as a question: Who established the guidelines for determining graduation? If that was SBA, then isn't it true that if your child in school had this level of achievement, ½ of 1 percent success rate, that you would understand an F-minus on the report card?

Ms. ENGLAND-JOSEPH. SBA did define what graduation means.

Mr. BARTLETT. By their own rules the program has been a monumental failure.

Ms. ENGLAND-JOSEPH. No, sir, at least I don't want to speak for SBA, but in my opinion, the data you are quoting is not accurate enough on which to base the issue of success. That is the difficulty I think everyone has on both sides. The data are just not there to overwhelmingly suggest one way or the other about this program.

Chair MEYERS. I believe that this 4-year survey, after exiting indicates that 52 percent were independently operational, and 45 percent had totally ceased operation.

Ms. ENGLAND-JOSEPH. Yes, ma'am. But for several years we have testified that we have concerns about that exit study, that annual study. The IG has issued reports regarding that study. It was and has been the only data available to date to determine what might be happening. But we have seen that it is extremely difficult to follow firms once they depart from the program.

Many firms are absorbed by others, many firms don't leave addresses, it is very hard to find them. So, when you use those statistics, it is very difficult to know whether you have an accurate base on which to make those percentages. It may be that those percentages are based on the respondents, but those respondents may be a much narrower part of the population than the whole. So, it could be quite misleading.

Chair MEYERS. Mr. Poshard?

Mr. POSHARD. Thank you, Madam Chairman. I would direct my questions to Administrator Lader. One of the concerns that I have is performance.

What data do we have to show how well 8(a) contractors perform compared to non8(a) contractors?

Mr. LADER. Let me ask Mr. Jenkins to respond as Program Manager.

Mr. JENKINS. The data we rely on is basically feedback from procurement Agencies that report the performance of firms, as well as our own district offices. We are required to maintain responsibility over a firm in terms of working with the Agencies in contract administration. When compared, 8(a) firms to non-8(a) firms, we notice that the percentage, the delinquency rate or termination rate, is literally less than 1 percent.

8(a) firms, when given the opportunity, perform as well or better in a lot of cases than the general population out there.

Mr. POSHARD. So we don't have any evidence in general, and sometimes I hear this as a concern expressed to me. We don't have any evidence to suggest that people are getting less qualitative production or work as a result of 8(a) contractors doing the job?

Mr. JENKINS. We get very few. Literally, when contracting officers select a firm to perform, they are valuing that firm on their technical capability. Technical capability, when you look at the Government procurement process, becomes a more key element.

Price sort of becomes secondary in nature. The question is can you get a quality product. Certainly, you can get a low price product. But then if the firm fails, you have to go back out and reprocure, and that drives the cost up. So, technical capability is key, and we have seen 8(a) firms that are performing outstanding.

Mr. POSHARD. For my concern at least, the performance is at the heart of what we are all about here. Other folks may be concerned about how we distribute the Federal dollars and the work and so on. I want to make sure that we are getting the biggest bang for our buck. You are telling me we are doing that, at least on an equal basis, and sometimes much better, than the non8(a) contractors.

Second question, Mr. Administrator: What about the sole-source contracts? I have some concerns about that. I hear people say those end up being costly; that there is not a competitive nature to them, and that flies in the face of what we ought to be about.

Can you respond to that question of sole-source contracts?

Mr. LADER. I will ask Mr. Jenkins in a moment, but I will return to the same ground I went over with the Chair, and that is, while there is not a bid, there is the element of competition. You have got 6,000 firms competing for various jobs. In most cases there are a variety of firms seeking that particular contract. They have to demonstrate through their own marketing ability why they are the most competent to get that award.

Then when they get it, they have to determine that the price is fair and reasonable, and then they have to perform. So, there are levels of competition, though the Chair is correct, there is not the bid element to it. That is a matter of public policy.

Mr. POSHARD. But is the construct for this procedure with respect to 8(a) any different than what we do in awarding sole-source contracts in other parts of the Government?

Mr. LADER. No. What I pointed out earlier is just either of the two largest sole-source contracts in the Federal Government, just one contract is larger than all the 8(a) contracts put together. In fact, of the next five after the top two, any one of them would be

as big as half of all the 8(a) contracts put together. So, it is not a sole source that is a procedure simply for one particular group.

I should mention relating to your prior question to Mr. Jenkins, we actually have realized a lower contract default rate on the 8(a) contracts than on Government contractors generally, which is a very good index of performance.

Mr. POSHARD. I know my time is running out, but one final question: Who has the responsibility or is there a responsibility within SBA to make sure that the business plans of the 8(a) contractors are current, they are kept up? This is a big deal for us when we are trying to get EDA or any Agency to help a small business or a municipality and so on.

Everybody has got to have the business plan. Everyone has to have that up-to-date in order, all relevant information.

Are we doing that with 8(a) contractors?

Mr. LADER. I will ask Mr. Jenkins to respond. Let me mention an illustration of how we are taking this pending issue very seriously. A number of years ago there was little review of the individual business plans. Three years ago we did an annual review of I believe it was 57 percent of all the participating firms. This year we are at 84 percent, this past year.

I expect this year, because we have set it as a goal for the performance review of every SBA district director, we will have 100 percent review of those business plans. So, we are making significant improvement.

Why don't you explain how that is accomplished.

Mr. JENKINS. Yes. As Administrator Lader mentioned, we have a goal now in every single one of our district directors. The business plan evaluation is the responsibility of our district offices. Our headquarter's responsibility is to monitor the district office's compliance.

As the data is now indicating, we have completed 84 percent of annual reviews last year, and we plan to do 100 percent this year in terms of reviewing firms as it relates to their business plan. If firms are not providing us with the data to conduct that review, we are moving aggressively to remove them from the program and our data supports that.

Mr. LADER. That is part of the reason, Madam Chairman, that in the last 2 years, there have been removed from this program more firms than in the entire prior history of the program back to 1968. We are aggressively monitoring this.

Mr. POSHARD. Thank you, Madam Chairman.

Chair MEYERS. Ms. England-Joseph, would you like to respond to that?

Ms. ENGLAND-JOSEPH. The only comment I would like to make is related to the study that you all conducted in February 1996 in looking at the annual reviews that the field staff had performed. I think when we talk about how many business plans have been reviewed, going from 1 percent to a much higher percentage sounds really good, but I think we have to think about the quality of that review.

To me, that is the more serious issue, how well can we review these plans and provide assistance to these firms so they can improve their business planning. I do credit SBA for doing the study,

because I think it gives them a lot of information now on what they need to do in terms of skills of the staff.

You may have missed this in my opening statement, but they did identify some serious weaknesses in their staffs' abilities. Financial analysis was very poor, and their understanding of the concepts of economic disadvantage, financial conditions of the firm, and access to capital, as well as their comparison of 8(a) firms' condition to non-8(a) firms in similar lines of business, were limited.

Those factors are critical to reviewing a business plan as well as determining whether those businesses are really ready or not to depart from the program and to graduate. So, I would highlight that as an issue that I think remains on the table.

Mr. LADER. She is exactly right on that point. It was a shortcoming of our evaluation. For that reason we began this year financial training of the individuals who are reviewing these business plans. We have just had a class of 60 finish that training. We have a national training program of all the individuals around the country who are involved in business plan review. That is something we plan to continue to be doing. It was a shortcoming.

Mr. POSHARD. Thank you. Thank you, Madam Chairman.

Chair MEYERS. Ms. Kelly.

Mrs. KELLY. Thank you very much. I want to say that I have some concerns about the 8(a) Program. One of the concerns I have has to do with the fact that the geographic spread within which these 8(a) participants, the contracts were awarded, was so very narrow, I think Congressman Flake would agree with me, we could certainly use some of those in New York.

As I understand it, Washington, DC got 25 percent of the contracts. Over half of them, the people who graduated from this program never got a single contract. I am pleading for New York, but I am also pleading for a wider geographic spread.

Chair MEYERS. If the gentlewoman would yield, they have 50 percent of the dollars right within the beltway. It might be 25 percent of the contracts, but it is 50 percent of the dollars.

Mrs. KELLY. I think that it is important that if we are going to have such a program as this, that it be something that is evenly spread across the United States.

I also wanted to know why the administration has been arguing that the 8(a) Program needs to be reformed when you had 4 years to get it reformed. Why hasn't this happened before?

Mr. LADER. If I might respond to each of those points, Mrs. Kelly, on the first point, the dollar amount for Washington area firms is about 35 percent, not 50 percent. It is still a very great concentration. But you have to recognize that this is firms that may be performing work well beyond, it may be right in your district, but if the firm is headquartered around the beltway, that it would be included in that number.

Mrs. KELLY. Do you have figures on that?

Mr. LADER. I don't have the specific number.

Ms. KELLY. I would like to see figures on that.

Mr. LADER. We will provide whatever information we have on that.

Chair MEYERS. I would like to know what year those figures are from also. I think according to the most recent year, a greater per-

centage is within the beltway. That is something we can check later. But this is my understanding.

Mr. LADER. Let us provide you with that. Congresswoman, let me point out to you, the reforms to which we refer are not beginning today and didn't begin last year. We have aggressively throughout these last 3½ years been addressing this.

The illustrations I give, 3 years ago the average length of time to process an application to enter the program was 208 days. Today it is 90 days. We have been talking for 10 years around the Agency, I am told, about the need to have a management information system. It is now finally in place, though it took several years to get that in place.

So, on each of these matters, there is improvement that has been made, but we are suggesting that continued improvement certainly is necessary, and the GAO report highlights the areas where we concur the most attention needs to be addressed.

Mrs. KELLY. Are you also suggesting that perhaps some of these firms ought to go out and reach into the marketplace as a part of the program under competitive bidding? Because when they leave the program, they are going to be in a competitive bidding situation. It seems to me that if you are going to shore up a budding business, that they should be in a marketplace situation before they leave the program where you can help them do that, understand what it is to put a bid together and get it out and stand up. I don't see anything, I haven't heard anything, in the hearings, that indicates that. Is that part of your program?

Mr. LADER. It very much is, to try to prepare businesses for that competitive mix. But there is an error in your basic premise there, if I might respectfully point that out. When you say they will go out and face competition, even in procurement circles, some $63 billion of the $200 billion of Government contracts are sole-sourced.

Mr. LAFALCE. I didn't hear that, Mr. Lader. What did you say?

Mr. LADER. I stated that $63 billion of the $200 billion of Government contracts are sole-sourced.

Mr. LAFALCE. You are kidding me.

Mr. LADER. Would I do that to you, sir? That is why I point out, Congresswoman, that just either one of the two largest contracts that were awarded by the Federal Government, just the individual contracts are more than all the contracts under the 8(a) Program put together.

Similarly, Madam Chairman, I want to point out that those firms going into the commercial marketplace are not going to be in bidding situations. They are going to have to market themselves against other providers of goods and services, and they are currently doing that in the 8(a) Program, because there is no handout or giveaway. Once you get in the program, it doesn't mean you automatically get a contract. You have to compete with other firms to win those awards.

Mrs. KELLY. Thank you.

Chair MEYERS. Ms. Velázquez.

Ms. VELÁZQUEZ. Thank you, Madam Chairman. Ms. England-Joseph, do you know, and I know this is not regarding your study, but just out of curiosity, do you know how many big corporations have graduated from corporate welfare?

Ms. ENGLAND-JOSEPH. No, ma'am.

Ms. VELÁZQUEZ. I thought not. Regarding your finding on over concentration of 8(a) awarded of contracts to a few firms, where are these firms located?

Ms. ENGLAND-JOSEPH. Could you repeat the question again?

Ms. VELÁZQUEZ. Regarding over concentration of 8(a) awarded contracts, where are these firms located?

Ms. ENGLAND-JOSEPH. The concentration issue that we were making was just in the firms themselves, not where they were geographically located. We were not making a point about geographic location. I can get that data for you, but I don't have it right here to be able to give you at the moment.

Ms. VELÁZQUEZ. What about the claim they have been over concentrated here inside the beltway. Do you have any data?

Ms. ENGLAND-JOSEPH. Several years ago in response to the 1988 amendments, we were asked to do a study on a number of issues as a result of those amendments, and we looked at geographic concentration, and there was geographic concentration in and around the Washington, DC metropolitan area. But we have not done any work since then to try to follow up and look at that, partly because most of the discussion and hearings tended to focus much more on the concern with the concentration in large firms.

I think many seemed to understand in previous hearings that more and more firms are moving all over the country, and they may have an office here, but they are actually physically located in other parts of the country. So, geographic location on its own may not be a clear indication of what is happening out there.

Ms. VELÁZQUEZ. Did you interview any successful 8(a) firms?

Ms. ENGLAND-JOSEPH. As a part of the follow-up we did in the last 4 weeks? No, ma'am.

Ms. VELÁZQUEZ. In order to present a more complete and accurate review of the effectiveness of the program, wouldn't it have been valuable for you to talk to those firms?

Ms. ENGLAND-JOSEPH. If we had been asked to evaluate the overall effectiveness of the program, we would have attempted to do that. That was not what we were asked by Congress to do. We were simply asked to follow up on and update information that for the last several years has been requested of us. But you are exactly right, if we were going to do a broad-based review on effectiveness, one of the things we would need to understand is what makes a firm successful and what makes a firm perhaps not so successful. That was not the objective of our work.

Ms. VELÁZQUEZ. Maybe we should request another study that will deal with those issues.

Ms. ENGLAND-JOSEPH. We work for the Congress.

Ms. VELÁZQUEZ. Mr. Lader, concentration of contracts in one area has been a concern with 8(a) and Federal procurement in general. What is SBA doing to provide a more equitable distribution of 8(a) contracts?

Mr. LADER. Two observations: First, as Mr. LaFalce pointed out with his examples of 128 or Silicon Valley and Professor Porter's reference to clustering, it is not atypical for businesses engaged in certain industries to be located close to each other, and it is par-

ticularly a phenomenon-for businesses to be close to the procurement Agencies.

In other words, individuals, even the very small business person, will typically try to locate that business person to be closest to the customer to be responsive. If the customer is a Washington-based Government Agency, it is not all together surprising, then, that many of the firms are located nearby.

That being said, we recognize the continued need, Congresswoman, to make sure this is spread across the whole country. For that reason, through our small business development centers, through our district offices, through our outreach efforts, we are trying to help all small businesses around the country be better prepared to participate in Federal procurement, not just those firms that are engaged in the 8(a) Program.

Ms. VELÁZQUEZ. Mr. Lader, if you don't have this answer, maybe Ms. Joseph will help. Compared to all Federal contracts, what percentage does 8(a) represent?

Ms. ENGLAND-JOSEPH. I think you had it in your opening statement.

Mr. LADER. It represents 3.1 percent.

Ms. VELÁZQUEZ. What would be the impact on small disadvantaged businesses if this bill were to become law?

Mr. LADER. If you were to remove that 3.1 percent, the total minority business participation in Federal procurement would be 2.4 percent. In other words, the largest procuring Agencies, the largest source of procurement in the world, worth some $200 billion, only 2.4 percent would go to minority businesses without this program, if you were to assume that there were no other changes.

Ms. VELÁZQUEZ. Thank you, Madam Chairman.

Chair MEYERS. Mr. Fields.

Mr. FIELDS. Thank you, Madam Chairwoman. Before I get into my questioning, I would like to elaborate just a few minutes on the rule of the House. I requested through a parliamentary inquiry——

Chair MEYERS. I beg your pardon, we have had a response. We contacted the House Parliamentarian. He has been consulted on the request of the Minority to have a day for the Minority to call witnesses in the hearing on this topic. The Parliamentarian says the Chair may take this under consideration and must provide reasonable notice of my decision.

I have stated to you that I have no objection to having a hearing if it is something that we can work out. Therefore, I certainly will abide by the rule of the House Parliamentarian.

Mr. FIELDS. I thank the Chairwoman. But let me make one thing emphatically clear. The Chairwoman does not have the right under the rules to deny the Minority a hearing, and that is why I want to make it very clear. I certainly do not want the Chair to operate under some type of rules that are not the Rules of the House.

Rule XI 2(j)1 states in no uncertain terms whenever any hearing is conducted by any Committee, upon any measure or matter, the Minority party members on the Committee shall, not may, not should, not maybe, but shall be entitled upon request to the Chair by a majority of the Minority Members to call witnesses by the end of that hearing.

So, I just want to make it emphatically clear. That is why I wanted a parliamentary inquiry, because I wanted the gentlewoman to know she does not have the right to deny the Minority the opportunity to bring witnesses before this Committee.

My question is to Mr. Lader. Thank you, sir, for being here today. Procurement outside of the 8(a) Program as relates to minority businesses, did I understand you to say that is about 2.4 percent of individuals who participated, small businesses that participate in Government procurement——

Mr. LADER. Minority-owned.

Mr. FIELDS. Through the 8(a) Program it is 2.4 percent; is that correct?

Mr. LADER. That is correct.

Mr. FIELDS. In the Government Procurement Program, it is about 3 percent?

Mr. LADER. Yes.

Mr. FIELDS. So you have a total of about 5.4 percent?

Mr. LADER. Yes.

Mr. FIELDS. Total minority participation in the Government procurement program, about 5.4 percent.

Mr. LADER. 5.5 percent.

Mr. FIELDS. Less than 6 percent. With this legislation, without any substitute, we could reasonably assume that we lose 3 percent; is that not correct?

Mr. LADER. That is correct.

Mr. FIELDS. So the total Government, you are not suggesting if we pass this piece of legislation, that the total Government procurement to small businesses could be a mere 2.4 percent?

Mr. LADER. It could be. That is the point.

Chair MEYERS. Excuse me, not to small businesses.

Mr. FIELDS. To minorities.

Mr. LADER. The Chair would perhaps argue, if I might take your brief for a moment, that some of the provisions in this bill would help increase that amount of minority participation, to which I would respond virtually all the services that are provided in this bill are services already provided by the SBA in its other programs. So, if we were to have the elimination of the program, we would do everything we could as an Agency through our other programs to help increase minority participation in procurement, but are entirely correct to say that there is nothing to suggest that that 3.-some percent would perhaps disappear.

Mr. FIELDS. I want to finally talk about the competitiveness within the applicants who are 8(a) certified, because there has been a lot of talk about these are nonbid contracts.

Can you explain to us the type of competition that takes place within the 8(a) Program in terms of those individuals who qualify to compete for contracts? Because you stated that though there are about 6,000 or so businesses, only half of them actually benefit from the 8(a) Program because of the competition.

Mr. LADER. That is correct. I will address one part in brief and then ask Mr. Jenkins. The part I want to refer to is what I have mentioned several times already, and that is that the individual firms must get out there and market themselves. They must, just as you do in the commercial marketplace, demonstrate that they

have what it takes to provide the goods and services. Then when convincing the procuring agent, they have to have a determination that the price is fair and reasonable.

There is a prior question of competition. That is to get into the program. Let me ask Mr. Jenkins to address how we determine who gets in the program.

Mr. FIELDS. I am out of time. Let me close by saying does discrimination still exist in Government procurement today?

Mr. LADER. The program manager directly responsible can give you the best insight.

Mr. JENKINS. Can you repeat that part of it?

Mr. FIELDS. Does discrimination exist today in Government procurement or minorities, women, Hispanics, blacks, disadvantaged whites, when they try to obtain Government procurement? Today in general or is there no discrimination in the procurement cycle sector of the Government?

Mr. JENKINS. Well, one of the things we certainly like to point out with the proposed bill is that there is no data or any analysis which would indicate that the elements of discrimination or the basis for setting up the 8(a) Program has been overcome. So, we have no analysis to say that these problems have been resolved.

Mr. FIELDS. So the answer, what I want to know is, is there still a problem? Is there discrimination within the procurement area of the Government?

Mr. JENKINS. I think the disparity between the numbers dictates that, and the answer would be, yes.

Chair MEYERS. Ms. Norton.

Ms. NORTON. Thank you, Madam Chairman. As a preliminary matter, may I note that the rule about at least 1 day of hearings says, "the minority party Members on the Committee shall be entitled, upon request to the Chairman by a majority of Members before completion of the hearing, to call witnesses selected by the minority to testify." I think it was important that the Ranking Member, Mr. LaFalce, raised the point, and that the point be clarified. I don't think there is any way to read this rule except that it gives no discretion and was meant to give no discretion whatsoever to the Chair, whoever she might be.

Chair MEYERS. Ms. Norton, I think that Mr. LaFalce will agree that if we have not agreed on anything else, I have tried to be as open as possible about allowing witnesses from the Minority. I certainly think that I have been at least as open as Mr. LaFalce was.

Ms. NORTON. I hope this is not being taken from my time.

Chair MEYERS. We received no names this morning.

Ms. NORTON. I have a number of questions, and I just want to be sure this is not taken from my time. I simply wanted to, because this matter says it has to be raised before the completion of the hearing, to indicate that taking a matter under advisement about which you have no discretion is not the appropriate response. It seems to me you have to have a hearing, the rule is clear, and you have not said there is going to be a hearing.

I just read it to you. I don't want to make an issue of it because I have questions for these witnesses, if you don't mind.

There has been some discussion here about what would be indications of success, and I can understand the concern there, and I

am looking for objective indications of success, and perhaps I draw from Ms. England-Joseph's testimony and would like her response as well as Mr. Lader's response, because she reports a fairly dramatic figure, that a larger percentage, and I am reading from page 2 of her testimony, a larger percentage of the firms in their final program year achieve the required level of 8(a) business than we reported in April 1985. Eighty-five percent, compared with 37 percent. That is a figure that needs elucidation if we are looking for indications of success.

Also in a response it was indicated in passing that 8(a) firms had a lower default rate than other firms. I would like to ask Ms. England-Joseph how she would evaluate these two standards as an indication of success? Lower default rate and more non-8(a) business than 8(a) business.

Ms. ENGLAND-JOSEPH. With regard to the business mix and the 8(a) versus non-8(a) business activity, I do see that as a measure of success in the program in the sense that in 1988 amendments, it was quite clear, in my opinion, that the Congress was looking for a movement toward firms that were in the program to become much more a part of the real marketplace.

To the extent that they could compete and get access to non-8(a) business was a good indication of that activity and that ability to compete in a non-8(a) environment. So, yes, I see that as an indication of success or an indication of what might be happening in the program.

Two issues, one is that it is right now at 58 percent. It has moved up by 21 percent from the previous fiscal year. But there is still more that needs to be done for those firms. I recognize that that is largely what SBA is attempting to do and really paying attention to these business plans and trying to understand how to provide better guidance and advice to these firms that are moving toward more of a non-8(a) activity.

The difficulty sometimes with that data is not really knowing whether any of that activity in the non-8(a) area is due specifically because of the 8(a) Program. Now, I don't want to——

Ms. NORTON. What do you mean, due specifically to the 8(a)? It is non-8(a) business.

Ms. ENGLAND-JOSEPH. One of the things we have spoken to SBA about is the need for better information about the firms as they are certified. I think the more we know about the conditions and characteristics and the qualities of the firms as they enter the program, it may give SBA a clear indication of whether certain types of characteristics may actually bode well for an individual firm, and that if those characteristics are not apparent at the beginning of the program, then there may need to be other activities that would have to be applied or provided to those firms in order to bring them up and equally as successful as they run through the program.

So, knowledge at the beginning of the program, in my opinion, gives you not only a baseline but an opportunity to make a linkage between where firms were at the beginning and where they are at the end of the program.

Ms. NORTON. The numbers increased. How do you account for the rather dramatic percentage increase in non-8(a) business of firms during the 2 years you compared?

Ms. ENGLAND-JOSEPH. It could very easily be that the firms are quite qualified to compete and able to compete in the non-8(a) environment. So, there is no question that separate from the program, these data would indicate that these firms are getting a much stronger foothold in the normal marketplace.

Ms. NORTON. Another hypothesis might be that in a competitive environment where you belong to a disadvantaged group, the fact that you have gotten an 8(a) contract gives you more credibility to go out and get other 8(a) business and thus helps you to graduate from the program.

Ms. ENGLAND-JOSEPH. Absolutely. I am not suggesting that is not true. It is just that we don't have real good cause and effect data in order to suggest what could happen in the program that benefits the recipients of these activities and what needs to be enhanced perhaps or changed in order to improve the success of firms as they are proceeding through the program.

It simply is a program management issue, in my opinion, that is critical, and the data would be the way in which to understand what changes in the program are warranted.

The other concern that I have, when I was mentioning certification, is that I have some concern that we simply talk about the 6,002 firms that have been certified. We don't know how many of those firms really intend to participate in the 8(a) Program. We do know that firms want that certification because it provides them access to State contracts, to other Federal contracts that are non-8(a).

I think that would be really important for SBA to know, so that the base on which we are trying to determine how many firms are receiving 8(a) contracts ought to be a base largely driven by the firms that want to be in the program versus simply wanting to be certified. So, again, there are several things I think we have talked about with SBA that move toward the direction of better understanding what the success of the program might be, and no one indicator, I think, is sufficient.

Chair MEYERS. The Chair recognizes Mr. Clyburn.

Mr. CLYBURN. Thank you, Madam Chairman.

Madam Chair, if I may, I would like to roll two questions into one for Ms. England-Joseph. They have to do with the graduation versus what I would call successful terminations.

Now, I understand that there have been only three graduations, but a number of terminations. I would like to know whether or not any effort had been made in order to find out whether or not any of those terminations from the program were what I would like to call from the old manpower development and training days, successful terminations, rather than failures.

Then, whether or not there have been any follow-up interviews, I think, with you said 48 percent of the companies no longer in the program or are no longer in existence, or 48 percent of the ones that came into the program and have left are no longer in existence, I think I heard that somewhere.

I would like to know whether any effort has been made on the part of the GAO or SBA or anybody to find out, first of all, whether or not to the extent those terminations were successful, and second,

to find out from the 48 percent why is it that you are no longer in business?

Did you revert back to your status before you came into the 8(a) Program, did you find yourselves being subjected to the same kind of social pressures and realities that you experienced before you received the protection of 8(a)? I would like to know whether or not anything was done to find those two things out.

Ms. ENGLAND-JOSEPH. Yes, sir. The term "graduation," the definition of graduation, the criteria, are all driven by SBA, and we simply reported to you the data as SBA reported it to us. In terms of successful termination versus terminations because the businesses were not complying with program requirements, the data we received was aggregate, and it is not easily or readily available on what basis these firms were terminated. It is an excellent point. It is an issue we have as well, because I think the more that SBA and you all understand on what basis firms depart from the program, the better you would be in a position to assess the program itself.

Now, in terms of follow-up interviews, you must be referring to the annual review that is done by SBA, and it is not done by GAO, so that 48 percent would be something that SBA could speak to. But we do know from our look at those annual reviews and also speaking to and reviewing the IG reports, is that it is very difficult at a minimum to collect that information, and I would be surprised if SBA was able to understand beyond the 48 percent what really has happened in terms of those firms.

It is another issue that I think is really worth pursuing. However, I do know it is extremely difficult to find these firms. We have done other work for the Congress where it is extremely difficult to follow up on small business firms as well as minority and socially disadvantaged firms. Once they are off the radar screen, it is very difficult to find them.

Mr. LADER. Congressman, first, when you refer to successful terminations, I think if you look at the commercial mix percentage rising, that is one very good index of more of the people leaving are successful in terms of being commercially viable.

Second, this management information system, the computer model we have finally put together after a decade of work, is going to be very helpful to ensure we get more data like this and keep track of the data. Though you are very correct, it is oftentimes difficult to track down the firms after they have left the program or gone out of business.

You should know that last year, 550 firms completed 9 years successfully. They did not graduate by our definition, but at the end of 9 years, 550 left and were commercially viable and successful. Two hundred firms were terminated in an unsuccessful sense. So, that is a good balance that we can see.

Mr. CLYBURN. That is the number I am looking for. That is the first time I have heard that number today. I think that is very, very important, 500 versus the 200. Thank you very much.

Chair MEYERS. Mr. Flake.

Mr. FLAKE. Madam Chair, thank you very much. Let me begin by just making sure we clarify one point, and I am going to ask both Ms. Joseph and you, Mr. Lader, if you will agree or disagree

with this statement; that 8(a), as opposed to what has been stated here, in fact, passes constitutional muster. It passed the test. The language of *Adarand v. Peña,* in fact, says that 8(a) serves a compelling Government interest and is narrowly tailored to serve that interest, and therefore is constitutional. Am I correct or am I incorrect?

Mr. LADER. You are correct. Let me ask our general counsel, who has been working with the Justice Department, to respond directly.

Mr. SPOTILA. Congressman, as you know, the Department of Justice and the SBA have been working jointly in several cases that have raised these issues. We have made the argument thus far we think successfully that 8(a) does comply fully with the standards set down by the Supreme Court in the Adarand decision; that it is constitutional, a business development program designed to help disadvantaged firms. We are certainly continuing to work along those lines. We think that the program is narrowly tailored and does meet the compelling Governmental need.

Mr. FLAKE. Ms. England-Joseph?

Ms. ENGLAND-JOSEPH. Our general counsel has not taken or officially spoken to the issue of whether the 8(a) Program meets the constitutional language, but that is also not to suggest that it does not. We just have not been asked to nor have we made a statement regarding that issue.

Mr. FLAKE. Mr. Lader, your statements indicate that the aggregate total of contracts to minorities under the 8(a) Program comes to about 5.5 percent. That means that 94.5 percent of the contracts that are being let by the Federal Government are not going to minorities, nor is the 63 percent of Federal contracts that are sole sourced. Who are they going to?

Mr. LADER. One must remember that when you talk about the largest single procurements, oftentimes they are to shipbuilders, to aviation industry businesses and the like, and so we are talking about very large single purchases. That excuses the numbers. But that gives you a sense of the whole range of goods and services that are represented in that sole source.

I don't mean to point out just those two industries, but those are certainly some of the largest contracts.

Mr. FLAKE. It does indicate if your primary sole source contracts are going into shipbuilding, aviation and areas in which traditionally minorities are not involved, that this 5.5 percent aggregate in fact is left for contracts in other categories, e.g., maintenance and other smaller suppliers; am I correct?

Mr. LADER. I would say it is a very diverse crowd. None of us should sell ourselves short. The 8(a) contracts go for high-tech, software development, light manufacturing, as well as maintenance or other sorts of work. So, it is the full range of goods and services that are represented in the 8(a) universe.

Mr. FLAKE. Is it correct to say that this 94.5 percent of contracts is primarily reflective of white males?

Mr. LADER. Though I have not seen the specific statistics, I think that is a reasonable assumption.

Mr. FLAKE. So one cannot argue that the "old boy" network is operative in 8(a), but in fact if there is an "old boy" network, it is in this 94.5 percent category.

Chair MEYERS. If the gentleman could yield, could I make just a comment here? Noncompetitive contract awards other than those made pursuant to Section 8(a) must meet at least one of the statutory exceptions to the full and open competition standard mandated by the Competition in Contracting Act (CICA), and requires the contracting officer to follow a detailed justification and approval process, gaining permission from a higher level Agency official, depending on the value of the proposed noncompetitive contract award.

Now, at the request of then Chairman of the Committee Mitchell, 8(a) contracts were explicitly exempted from CICA's competition requirements and the requirements of its justification and approval process. 8(a) completely stands alone in this regard.

Mr. FLAKE. I would like to reclaim my time and ask unanimous consent for an extra minute for the time you took. Thank you very much.

Even under the statement of the Chairlady, the reality is that the number of minority contract awards would be reduced if it were not for the fact that there is an 8(a) Program. Am I correct or am I incorrect?

Mr. LADER. You are correct, and I would refer you to the Federal Register of May 23, 1996, in which the Justice Department has said that they have found that minorities continue to face impediments to participation in Government procurement. Your conclusion is totally consistent with the Justice Department findings.

Mr. FLAKE. Could it be also a fact that the high percentage of contract awards to 8(a) firms located within this geographical area has as much to do with the reality that many 8(a) firms do not have the resources to travel to where the primary procurement contracts are being awarded, namely right here in the District of Columbia, as opposed to being let in South Carolina, North Carolina, New York, or somewhere else?

So, that the actual cost of competing for contracts in the 8(a) Program is prohibitive for some of the minority contractors who would otherwise be applying to get some of these contracts. Would that be a correct assumption?

Mr. LADER. It is a reasonable assumption, certainly, sir.

Mr. FLAKE. Reasonable is generally pretty correct. Thank you very much, Madam Chairman.

Chair MEYERS. I would like to call next on Mr. Jackson. I would like to make a comment, however, or let me put this in the form of a question: Would you say that small business faces impediments in competing for Federal contracts? Not just minority small business, but all small businesses face tremendous competition and difficulties in competing for Federal contracts?

Mr. LADER. That is true, Madam Chair, and that is part of what your Committee and our Agency has been so focused on.

Chair MEYERS. And I think you will recall that I fought alongside Ms. Collins twice this year on the floor to bring about more full and open competition in contracting and to end sole-sourcing, not for minorities, but for everybody.

Ms. WATERS. That is not in the bill.

Chair MEYERS. No, it is not.

Ms. WATERS. Put something in here on sole-sourcing.

Chair MEYERS. I am stating that full and open competition is something that I feel very, very strongly about. Not just for minorities, but across the board.

Mr. FLAKE. Would the gentlewoman yield?

Chair MEYERS. Yes.

Mr. FLAKE. I think we have to be very clear that all small businesses do, in fact, face impediments. The particular focus of this program, however, that says that one impediment that is not faced by the average nonminority small business is that, when a black face walks in to confront a procurer he or she has to deal with the reality that there is almost an automatic rejection mode that is put into play, even before there is a discussion of what that particular minority business is seeking.

I sit here as a business person. I can tell you about going to 30 or even 40 banks, and those banks rejecting before they even understand what the application is about or for, based simply on the fact that the person happens to be African-American. It doesn't matter whether you have an MBA, Doctorate or anything else. That is the question that we have to deal with, and we don't want to deal with, because the bottom line is that there is yet a major discrimination in America.

Chairman MEYERS. Mr. Jackson.

Mr. LAFALCE. Would Mr. Jackson yield for 30 seconds? I want to point out when you make reference to another bill in which you aligned yourself with Mrs. Collins, and which virtually every member of this Committee was on the same side, that is apples. This is oranges. You cannot rationally make a comparison between those two.

Mr. FLAKE. It is lemons.

Mr. LAFALCE. I agree with Mr. Flake, it is lemons, not oranges.

Mr. JACKSON. Reclaiming my time, Madam Chairman, I am glad that you took the time in your opening statement to express your concern for the plight of women entrepreneurs. I hope this means you will not reintroduce language that you authored which would have meant the early termination of the Women's Demonstration Grant Program.

Perhaps now you will join me and our Ranking Member, Mr. LaFalce, in permanently extending the authorization of this program which has spread nonprofit women business centers across the Nation.

Let me just begin by saying briefly that I am an ardent believer in this program, the 8(a) Program. It has enabled minority entrepreneurs to withstand the discrimination and, quite frankly, as Mr. Flake has indicated, the racism that they often face in Government contracting. The reality is racism and discrimination persists in the free enterprise system and qualified businesses, and I am talking about qualified businesses, cannot get a contract.

I want to center some questions around that concern. Anyone is capable of answering them. The reality is that many of these businesses were in business before they applied for the 8(a) Program. Is that correct?

Mr. LADER. Yes, sir.