# EXHIBIT A-13
# (part 2)

Mr. JACKSON. Once they get in the 8(a) Program, they are really provided an incubation from the racism and discrimination that presently exists in Federal contracting; is that correct?

Mr. LADER. That is correct.

Mr. JACKSON. I believe it was the lady from the GAO who indicated after they leave the 8(a) Program, 50 percent or thereabouts of these businesses do not survive; is that correct?

Ms. ENGLAND-JOSEPH. No, I did not say that. I believe someone else referred to the SBA study. That is not a GAO study. We are familiar with it, but you may want to have SBA describe how that study was done.

Mr. JACKSON. Is that because many of those businesses, once they are out of the 8(a) Program, continue to face the discrimination that the 8(a) Program provided them with in terms of incubation?

Mr. LADER. Mr. Jenkins?

Mr. JENKINS. We do not have empirical data to support that, but we have heard certainly anecdotal information from these firms that, in fact, this is part of the reason why either they have gone out of business or continue to struggle.

Mr. JACKSON. Let me address these questions to the GAO and let's see if we can arrive at some of that empirical data. Is it a fact that over 90 percent of Federal contracting dollars go to companies owned by white men, even though the SBA 8(a) Program has doubled the contracting awards for socially and economically disadvantaged entrepreneurs?

Ms. ENGLAND-JOSEPH. It is true that the statistics that were quoted by the administrator, 5.5 percent of the activity is directed at or the beneficiaries are minority-owned businesses. Yes, if you were to take that from 100 percent, the 94.5 which Congressman Flake referred to, would mean all other groups that are not in the category of minority-owned or socially and economically disadvantaged.

Mr. JACKSON. These statistics are coming from the Department of Justice. Isn't it a fact when comparing entrepreneurs with identical borrowing characteristics, the average white borrower in the construction business receives over 50 times the loan equity cap as the average African-American small business owner?

Ms. ENGLAND-JOSEPH. Are you asking me to confirm the Justice Department statistics?

Mr. JACKSON. I certainly am, if you can.

Ms. ENGLAND-JOSEPH. I can't confirm them, but those are probably the best available data right now. I can't point to anything else that would contradict that.

Mr. JACKSON. Your acknowledgment that that is the best data is certainly a step in the direction that I am heading.

Among applicants with the exact same credentials, wealth, work and borrowing credentials, minority applicants for venture capital are 20 percent more likely to be rejected than a white applicant.

Let me just read one other fact from the Justice Department. When firms of equal experience level are compared, nonminority firms are nearly twice as likely as minority firms to obtain bonding for their services, three times as likely to obtain bonding for over

$1 million, and, on average, are charged lower rates for the same bonding coverage prices.

Madam Chair, I want to close by making one brief remark. The 8(a) Program is not a handout. It is really a helping hand for those businesses that continue to face discrimination and racism in Federal contracting. The best use of our Committee's time today would be to look at those businesses who continue to face that discrimination so that we can improve this program and make it possible for everyone to have an equal opportunity to participate in the free enterprise system.

Thank you, Madam Chairman, for this time.

Chair MEYERS. Mr. Becerra.

Mr. BECERRA. Ms. Joseph, let me ask you a couple of questions. I noticed in your testimony you mentioned some things that seem troubling when you look at them in a first light. About 18 to 19 percent, I believe you said, of SBA contract dollars went out through competitive bidding within the 8(a) Program; is that correct?

Ms. ENGLAND-JOSEPH. About 19 percent, right.

Mr. BECERRA. About 19 percent. Do you happen to know what percentage of the Federal contract dollars in total go out through a competitive bidding process?

Ms. ENGLAND-JOSEPH. I believe the Administrator made the comment in his opening remarks. I cannot remember off the top of my head what the number was. Do you remember the statistic you quoted?

Mr. JENKINS. Approximately $63 billion that is sole source. There is another $30 billion awarded to other organizations not classified as a business entity.

Mr. BECERRA. So we are looking at something in the order of $90 to $100 billion of about $200 billion total in Federal contract dollars that are awarded without competitive bidding?

Mr. JENKINS. That is correct.

Mr. BECERRA. These are competitive.

These are actually Federal contract dollars going out to firms that could be the size of an Exxon.

Mr. JENKINS. Yes.

Mr. BECERRA. There is no requirement for competition for an Exxon or for an IBM or any of the particular companies that are seeking those sole-source contracts totaling somewhere between $90 to $100 billion?

Ms. ENGLAND-JOSEPH. Under Federal procurement requirements, there is a threshold in which competition must occur, and that threshold is lower than the threshold in the 8(a) Program. The 8(a) Program requires that for manufacturing contracts, the threshold is $5 million and for all other contracts, it is $3 million. So, the threshold for sole-source noncompetitive is different in the 8(a) Program and higher than it is for the rest of the Federal procurement activity. But that is not to suggest that that would in and of itself explain why there is so much sole source going on. There are other issues associated with the sole source question.

Mr. BECERRA. We do have a problem if you want to consider sole-sourcing a problem. We have an overall problem in the contracting

system when you have close to $100 billion worth of contracts that go out sole source.

Chair MEYERS. Mr. Becerra, if you would yield, that was the very point I was making a little while ago, is that I vigorously oppose all sole-sourcing. Maybe there are some extreme cases, but I vigorously oppose all.

Mr. BECERRA. I understand that, Madam Chairman. I think the concern that a number of us have with H.R. 3994 is that if sole source contracts is a concern the Chairwoman has, then the bill should address the entire concern, not just go after one particular program, the 8(a) Program.

Let me move on——

Chair MEYERS. Let me say I have gone after all of them.

Mr. BECERRA. If I may move on, I have a question for anyone from the SBA, Administrator Lader or anyone else. I wanted to make sure we are clear on 8(a) eligibility, and I will ask some really quick questions.

First, are Caucasian women eligible to participate in the 8(a) Program?

Mr. JENKINS. Individually, a Caucasian woman has to demonstrate on an individual basis——

Mr. BECERRA. If you meet the criteria?

Mr. JENKINS. One would be eligible.

Mr. BECERRA. If they meet the criteria, which anyone would have to meet, do Caucasian men qualify to participate in the 8(a) Program?

Mr. JENKINS. That is correct.

Chair MEYERS. Mr. Becerra, they do have to go to court to prove they are socially disadvantaged and only 16 Caucasian women have been allowed in the program.

Mr. LAFALCE. I wonder if it would not be appropriate at this time to call on Mr. Spotila. No one is arguing that the bill is perfect. We are concerned about what your bill would bring about in its repeal. We have some proposals for exchange that have been promulgated in the Federal Register. The comment period has received about 1,000 responses, and Mr. Spotila, perhaps you could elucidate some of the changes that would address these issues in particular.

Mr. BECERRA. So long as he is not doing that on my time.

Mr. SPOTILA. I would be happy to. I will try to be as brief as I can.

First of all, let me respond to your question. Individuals, even Caucasian men and women, are eligible for the program if they establish they meet the social and economic disadvantage test. One point in the Department of Justice proposal which went out for comment, and as Mr. LaFalce indicated, has already generated more than 1,000 comments.

One proposal they have made, which we think would expand an opportunity for more individuals to participate in this program, is the proposal that the evidentiary standard that one must meet in order to establish social disadvantage be reduced from the prior standard of clear and convincing evidence, which to lawyers is a high standard, to one of a more likely than not standard. We think that that will make it easier for individuals, including Caucasian

women, to establish that they also suffer disadvantage, social disadvantage because of their membership in the group of namely the category of white women, and to some degree that is perhaps speculative, but we think is a logical assumption.

It is certainly our effort to try to be more responsive to the needs of disadvantaged Americans around the country.

Mr. BECERRA. I thank you for that response. Madam Chairman, if you would indulge me for a couple of minutes to reclaim some of my time. The only reason I asked these questions is to make it clear that we would want anyone eligible, whether you are a minority or a woman or a minority woman, to be able to participate in the 8(a) Program. Just as we would want anyone who is socially and economically disadvantaged, whether female or male, to participate in the program.

It is unfortunate there have been instances where some people have had to sue to try to obtain their rights under the program. However, I would say there has been a history over the decades of people who have had to sue to try to get their rights under Federal programs whom happened for the most part to be minorities. It is an unfortunate fact that in this country people have to assert their rights, whether they are white, black, brown, Asian, or whatever else. I think everyone is hopeful that what we see out of the SBA is a productive 8(a) Program.

Chairman MEYERS. May I recognize Mr. Bentsen after your response.

Mr. SPOTILA. If I can add briefly, I think it is significant, certainly President Clinton asked us at the SBA to do all that we could to make certain that we made this program one that offered an opportunity for all those who were disadvantaged. I think there has been, I have been at the SBA for 3 years, and I think there has been a serious effort to try to meet that request on the part of the President. We are continuing to try to do that.

Mr. BECERRA. Some of my time was consumed with things collateral to my questions.

Chair MEYERS. However, your light has been red for some time. We have several other questioners. Maybe we will get back to you.

Mr. BECERRA. If I could ask one brief question of Ms. England-Joseph. I ask unanimous consent for an additional minute. I don't think it will take a minute.

Chair MEYERS. Ask your question, be brief, and the answer will be brief.

Mr. BECERRA. The question, Ms. England-Joseph, is: You pointed out that there are some problems that GAO believes should be addressed in the 8(a) program, and SBA has said it would like to try to address them. Have things gotten better from where they were, say, 1, 5, or 10 years ago? Can you make any qualifications as to whether the 8(a) Program has improved or not under SBA?

Ms. ENGLAND-JOSEPH. I think if you look back to when we first started maintaining some statistics on this, which was back in 1991 for the 1992 reporting period, and we have seen some movement, in some cases it has not been dramatic in the areas we were monitoring, but in fact it certainly has not gone down dramatically. It has either stayed stable or moved up.

The places I think where I have been most concerned in the past would have been in the business mix area. As we all said this morning, it appears as though that is moving up. I think that is indicative of the efforts going on, both within the SBA and the recognition perhaps because of all the attention the program has been given where firms recognize they need to be more active and self-marketing to be competitive.

So, I would definitely say over the last 5 years we have seen some change. The other place I would make a comment is in the last year, I think several things that I noted in my statement happened. The decision by SBA to change its regulations regarding ID–IQ contracts to require that the total estimated amount of the contract be used as the basis for determining whether or not a contract should be competed was a very, very good decision.

I think it is something that many of the Members on both sides were concerned about for several years. So, we don't see the result of that yet, so I think we will have to wait until 1996 or 1997 data to know what impact that should have.

Mr. LAFALCE. That should have a dramatic impact.

Ms. ENGLAND-JOSEPH. It should on the face of it. There are a lot of things outside of SBA's control and the procurement system really does have some incentives that are quite different than what you all may have intended in designing the 8(a) Program. So, it remains to be seen what other actions an Agency might do to kind of get around that whole issue of competition.

Chair MEYERS. Mr. Bentsen.

Mr. BENTSEN. Thank you, Madam Chairman. Let me unrelated to this thank Mr. Lader for help with some of the prequalification contracts, minority and women's pre-qual, we have gotten for the Houston area. I appreciate your help and your office's help for that.

Let me say while there is no question the 8(a) Program is not perfect, there are few Government programs that are. I think there are some problems and I have some questions about it. But I would say, Madam Chairman, this is the most crowded Committee hearing I have been to in this Committee in my short time on it, and I would caution all Members to tread lightly as we move through this field, because I am concerned that we have some who are more interested in a political goal than a philosophical or policy goal.

I would hate to see the country divided, whether it is over set-aside programs or affirmative action, for some political gain that would take us another 30 years to correct. Those of us from the South have been through that before, and we don't want to go back there. So, I would hope that we would be very careful in doing that.

Having said that, I also would add we have a lot of Members of this Committee who like to talk about coming from the real world before they were here. I also came from the real world, as I think most Members did.

Nonetheless, I was in the investment banking field before I came here, and the investment banking field is not a very integrated field. There is no question about that. There were, I have to say, there were definite successes in using set-aside programs. There were some that were not. But we saw in our experience where firms that did not have relationships with institutional purchasers of securities, once they were made parts of selling groups, once

they were made parts of underwriting groups, did gain that contact and were able to then market on their own.

So, these things can work. Not always, but that is true with just about everything in life.

Having said that, let me ask both the GAO and the SBA, I do have concerns about disbursement of contracts, and that has been a problem in my area as well, and I have looked at the data. Increasing the competition, that must help disbursement, if you move toward more competition. Is SBA moving in that direction?

Mr. JENKINS. Well, certainly when we closed the ID–IQ loophole, we hope that contracting officers will now realize a lot more competition in the program itself. One of the things that SBA has also done in terms of disbursements of contracts, we have changed our regulations to allow firms located in any part of the country to now bid outside of their district offices, whereas in the past firms were limited to only those buying Agencies within their particular district.

Now, we have not had a full year to see the impact of that, but we certainly would hope that that showed that firms now have better opportunities.

Ms. ENGLAND-JOSEPH. I guess I take a different approach. If you are talking about concentration of SBA contracting dollars in a few firms, one of the areas that I know SBA has been looking at and has considered but has not implemented, are options or actions that SBA can take when firms participating in the program are not trying to get non8(a) activity, or when huge concentrations, in terms of dollars, occur in a few firms and those firms obviously seemed pretty skilled and effective in competing in the non8(a) environment.

Mr. BENTSEN. I am about to lose my time, so I don't want to cut you off, but your review of SBA's data, it is one or the other, would indicate though that there has been — and this is another question — there has been a marked increase in non8(a) contract activity of 8(a) firms; is that correct?

Ms. ENGLAND-JOSEPH. Right. There has been an increase.

Mr. BENTSEN. In some cases a 100 percent increase in the 8th and 9th year? Not 100 percent, but it goes from 37 percent to 58 percent, which is a substantial increase.

Ms. ENGLAND-JOSEPH. For firms in the ninth or last year of program. My point is SBA is trying to decide how to deal with some of the problems I think they see within the program and come up with a couple of options. One was if they saw a firm that was receiving a number of 8(a) contracts and could in fact effectively compete in the non-8(a) environment, they have considered eliminating all those new 8(a) contracts to those firms when they are not meeting their business mix or have considered in fact placing a dollar limit on the value of the total 8(a) activity again to these firms that are not meeting that mix, which is another incentive perhaps in order to encourage those firms that are not meeting the mix to move in that direction.

It ends up allowing more dollars to be available perhaps in the 8(a) Program to firms that do not get access and that might both address the distribution from a geographic perspective as well as concentration.

Mr. BENTSEN. With the Chair's indulgence, and this may be a question to the Chair as well as the Administrator, but H.R. 3994, the bill that the Chair has introduced, if I understand this bill, it would do away with the set-aside program, if that is what we want to call it, and in lieu of that, it would emphasize both the loan and equity portions of the current SBA program for firms which qualified.

First, is that within the existing guaranteed loan authority and equity financing authority, or is that outside? If it is outside, what is the — is there a cost savings associated with that compared to what might be estimated the cost associated with the 8(a) contracting? Are we talking apples and oranges here? Are we going to add more subsidy costs to the taxpayer by going down this route?

Chair MEYERS. We are very short on time. A quick answer, and we will break to go vote. I think we are down to about 6 minutes.

Mr. LADER. As we read the bill, Mr. Bentsen, everything provided as a substitute for the elimination of the 8(a) Program is already being provided in SBA's existing programs. I remind you that last year we did $11.5 billion of financing for small businesses apart from the 8(a) Program, and the 8(a) Program consumes only 3 percent of our staff and 5 percent of our budget. So, in the context of everything happening for small business, what this bill is providing is already being done.

Mr. BENTSEN. This would not be additional lending or equity authority.

Chair MEYERS. We are going to have to go vote. The vote is on the Aviation Disaster Family Assistance Act. We have only two more questioners for this panel. I would ask the Committee to return as quickly as they can and we will move on.

[Recess.]

Chair MEYERS. The Committee will resume. Let me announce when we take the next witness page, we will combine and hear first from Dr. George La Noue and Jeffrey Rosen, and they will be at the table with Ms. Shirley Stewart, Brenda Ford, and Jim Offord. That will be the next panel.

I will recognize Ms. Clayton.

Ms. CLAYTON. Thank you, Madam Chairman. I hope my entrance was not counted against my time. I want to thank the panel that has been here for some time and to say that obviously the legislation that in my judgment we are about to consider is misguided and unnecessary. I would differ profoundly with the Chairlady, who thinks that the way to correct this is to end it.

H.R. 3994 would indeed end 8(a) Programs as we know them, or perhaps in the future.

I am not one who thinks that 8(a) has been a perfect program, but I think it has been a tool that has been effective. Anyone who is serious about providing opportunity for those who are considered to be disadvantaged cannot perceive that tools do not need to be perfected so they can withstand assaults and criticisms as this bill is doing, or potential constitutional challenges in the courts. I think the issue of the constitutionality, I think, has been properly addressed, but let me just reaffirm one reason why this program is unique.

It is considered to be a developmental program. Is that correct?

Mr. LADER. That is correct.

Ms. CLAYTON. Obviously, when we consider something to be developmental in its nature, we have a different mix of business individuals. That is why the classification. So, you should not necessarily have the same standards, though I think, indeed, good business procurement standards are essential in any business arrangement, whether it is for disadvantaged, minorities, women or whatever.

In the final analysis, to be a good, competent business person, those attitudes must be there. There are certain assumptions on here and there is a presumptive assumption. I think one was that one has the assumptive right to sue and find out if indeed a white male or white female is there. But I want to just share with you as someone who is experienced, I too, all people come from the real word, but I too have come from a business background, and at one time I was an applicant for an 8(a). I am living proof that the presumptive assumption worked to deny me that opportunity.

Of course, I read the criteria. I am not sure how they came to that conclusion, but nevertheless I know it is not automatic in simply because you are a minority or a woman. It certainly didn't happen in my case. I don't think I am unique in that particular experience of having to utilize 8(a).

My understanding is there are some 6,000 8(a) certified persons now?

Mr. LADER. Firms.

Ms. CLAYTON. Only half, only half of them have contracts. Can you tell us what the total dollars of the 8(a) contracts are now?

Mr. JENKINS. In this fiscal year it is roughly $3.3 billion as of August 30.

Ms. CLAYTON. Could you tell me what the, and this probably is for Mr. Lader, what is the total dollar amount of non-8(a) contracts for minority firms, do you know?

Mr. LADER. The percentage, the total percentage is 5.5 percent.

Ms. CLAYTON. Which includes 8(a).

Mr. LADER. Which is 3.1 percent.

Ms. CLAYTON. If I did the math?

Mr. LADER. It is 2.4 percent of those which are minority, of the total amount, that are not 8(a).

Ms. CLAYTON. I got the percentages. I had started to interject when my colleague, Mr. Flake, was giving 5.1 to 8(a). 5.1 is the total amount that minorities participate in; is that correct?

Mr. LADER. Yes. The dollar amount would be $11.2 billion of total minority, and of the 8(a) would be $6.4 billion, which leaves $4.8 billion as the balance.

Ms. CLAYTON. So, the total amount of dollars coming to minorities is $11.2 billion?

Mr. LADER. That is right.

Ms. CLAYTON. For 8(a) currently it is $6.4 billion?

Mr. LADER. That is right.

Ms. CLAYTON. The balance would be the non-8(a).

Mr. LADER. $4.8 billion.

Ms. CLAYTON. If this bill were to pass as written, we would eliminate that $6.4 billion for minorities, meaning all minorities, those who qualify under eligibility. Again, the presumption is that a

white female is also eligible and a white male could have that presumptive authority, too. So, that would be eliminated for those disadvantaged communities; is that correct?

Mr. LADER. That is correct.

Ms. CLAYTON. That would only leave $4.2 billion. I think the point should be made where a great effort to clarify and erase the abuse and make corrections, we are really talking about not minuscule, but a small percentage of the total procurement. Not that any one dollar should be misspent, and there has been abuse until 8(a), we should acknowledge that.

Also we should acknowledge there has been some correction. Although I think Ms. England-Joseph, she acknowledged there has been some progress, although not to her satisfaction, but it is moving in the right direction. So, some of those things that have been acknowledged — I don't think you gave me my full 5 minutes unless that clock is off.

Could I ask unanimous consent to have the clock——

Chair MEYERS. You had the full 5 minutes. I don't want to rush you.

Ms. CLAYTON. You don't want to rush me, but you don't want me to talk. How does that work, Madam Chairman?

I acknowledge your desire to move it on. This panel has been here for a long time. Let me make this point: We ought to find ways to address the abuses and the errors and make sure we have a strong program for minorities and others, not necessarily to eliminate the opportunity for minorities and not to eliminate $6.4 billion. That is not the way to make equal opportunity and fair play for entrepreneurs who want to make a contribution.

Chair MEYERS. Ms. Waters.

Ms. WATERS. Thank you very much, Madam Chairman. I am a little bit annoyed I have to be here on a special assignment to this Committee to protect this very, very, very minuscule amount of participation of minorities in this program. I am really annoyed, and I must say this, because at the same time that we are here trying to protect 3.1 percent, Jack Kemp is out on the campaign trail talking about economic empowerment and green power and going into minority communities up in Harlem and South Central Los Angeles talking about it is not about affirmative action, it is about economic empowerment and how he supports the idea that minorities should be earning money and having opportunities to Government procurement.

I also resent the hypocrisy of the Republican convention that spotlighted these little 54 African-Americans who were there talking about the big tent that has been created to attract minorities, because the Republican Party is better for opportunities.

That is flying in the face of this kind of Republican-led legislation. I really am annoyed with it. But I am here, and you can't take my time. Don't take my time. I am here because I have to be here to try to protect this little bit of participation that we have.

Let me note that SBA has been around since 1953, and 8(a) has only been around since, what, 1968, and so I would like to know, prior to 8(a), in the first 18 years of this program, prior to 8(a) let's say, prior to 8(a), what percentage of percentage was thereby minorities?

Mr. JENKINS. I don't think we have that data available.

Ms. WATERS. Could you speculate about it? Why did you have to have 8(a)?

Mr. JENKINS. I think it was clear in the Congress' mind there was a need to increase minority participation.

Ms. WATERS. So even with SBA that was organized to create opportunities for small businesses, still that did not get to minority businesses, and you had to do something even more by the creation of something like 8(a) to get at the discrimination that still took place in Government. Can we reasonably conclude that?

Mr. LADER. Ms. Waters, that was the finding of the Nixon administration when this program was created, and then in the Reagan administration when it was examined further, it was found the reasons for creating the program were still in existence. For that reason, the legislation in the Reagan administration reaffirmed the 8(a) Program.

Ms. WATERS. Am I to understand that whites are basically 100 percent of the sole-sourcing, and I am going to ask for an investigation on that.

Chair MEYERS. I really must ask you to yield and I will yield you an extra 30 seconds.

Ms. WATERS. I yield to the Chairwoman.

Chair MEYERS. The top 100 Federal contractors are publicly held corporations except for some employee-owned firms and universities. These corporations are publicly held by their stock owners who are not necessarily white males. They are women, minorities, white males, labor unions, retirement funds, and so forth.

Ms. WATERS. All right. I am going to ask for a review and investigation of the 63 percent sole-sourcing to find out and to document who is getting the dollars. Let me just say this, because I know something about sole-sourcing. It is not simply in the areas that have been described here today. There are a lot of sole-sourcing that is going on that extends the opportunity. You get in, you get the contract, you build into it an opportunity for that person who is holding that contract to continue to get it, even after that contracting period closes down, because you build it in the beginning of the contracting opportunity. So, we are going to look at this. We are going to investigate this to find out who is holding it. But let me just ask this: Do whites have an opportunity to participate in other SBA programs outside of 8(a)?

Mr. LADER. Certainly.

Ms. WATERS. Certainly. Do they have an opportunity to participate in other procurement opportunities that are not overseen by SBA, and certainly are not in 8(a)?

Mr. LADER. Certainly.

Ms. WATERS. So, again, and I think this is the point to be made, that we are talking about almost 95 percent of all procurement opportunities in Government, including SBA and others, including 8(a), are opportunities that whites basically have and maintain control and get the contracts in those arenas. Is that correct?

Mr. LADER. Well, I think as the Chair points out, much of that would be under the definition of publicly held companies or other entities, where it would be hard to allocate.

Ms. WATERS. You don't know that. We are kind of speculating now, and I appreciate what you are saying, but I want to tell you for all of the companies who have sole-sourcing, whether it is in the public arena or not, I bet you, without even looking at it, that the boards of directors are all white, and mostly white male at that. But we are going to find out, because I know the Chairlady is going to help me look at this because of her concern about sole-sourcing.

Finally, let me ask you, let me say this. I just looked at the application. The reason I asked somebody to bring me this application is I received numerous calls long before I got here, when I was in the State legislature, for assistance with getting through this application process, just to get to be an 8(a) contractor. I know you have streamlined this process since the first time I started getting involved with it almost 10 years ago.

However, those people who get into this program are no fly by-night business people. These are substantial business persons, even though they have not been able to get the capital, they have been red-lined. They have not had access to business opportunities. When you fill this out, you certainly are someone who has started a business for the most part. 8(a)'s are not startup businesses. They don't startup and say I am going to fill out an 8(a) so I can get some business.

They have been out there batting their heads against a brick wall, trying to get capital, trying to do everything. It takes a lot to get through this process.

Would you agree that 8(a) contractors are substantial business persons, may have low capital, may not have access to capital, may not have the reserves, but they are certainly credible business people to get in this program?

Mr. LADER. They are certainly credible business people or they would not be admitted, and they demonstrate a potential for considerable growth.

Chair MEYERS. At this point, I would thank the panel very much for being here and would ask our subsequent three panels to come to the table. That means we will put five in front of us here and one at the end. You have two witnesses. We will put one at the end — maybe we can squeeze the five in.

We will start with Ms. Shirley Stewart. I would ask the witness to get as close to the microphone as you can. They are voice-activated, and thank you.

## TESTIMONY OF SHIRLEY A. STEWART-VEAL SHIRLEY A. STEWART, PRESIDENT AND FOUNDER, SAS, GENERAL CONSTRUCTION CONTRACTOR, HERNDON, VA

Ms. STEWART-VEAL. First and foremost, I would like to thank you for inviting me to testify at this hearing. I would like to share with you my experience since being approved in the 8(a) contracting program in October 1992.

I am a small business who seemed to be relegated to small contracts that have barely afforded me a living, let alone in helping to build my business. I had hoped that the 8(a) Program and set-asides would permit me to do larger contracts that would allow me to make sufficient profit and capitalize my company. I would like the Small Business Administration to help me acquire at least one

contract so we can demonstrate our skills and capabilities to assure the Government Agencies that we are a serious and dependable company.

During my first year, the Small Business Administration calculated that I could safely complete 8(a) contracts up to $100,000. The second year, they calculated $200,000. However, despite their increasing confidence in my ability to handle larger contracts, they did not help me to secure a single contract. As a result, I spent a great deal of my time satisfying their administrative requirements for no return.

Prior to being approved in the 8(a) Program, I had been competitively bidding and was awarded a Federal contract with the General Service Administration for $20,000 since being in the 8(a) Program. I have been awarded several contracts, non8(a), ranging from $2,500 to $10,000.

With the Small Business Administration having approved me at the $100,000 support level, I had hoped that they would have helped me to get these types of contracts with Agencies like General Service Administration. However, since my approval with the Small Business Administration, I have been self-marketing and requesting search letters be sent out to various Federal Agencies for larger contracts.

The Small Business Administration, again, has done nothing to help me.

So, I am still excluded, even with General Service Administration. The 8(a) contracting program would be good if it was implemented. My views on the proposed legislation and the effects of H.R. 3994 are that I still — excuse me, is that it still does not help me, because I have utilized all of the counseling programs that have been made available to me for the development of becoming a successful entrepreneur. However, it seems to me the real issues here are not whether the program will work for me, but why the program officers at the Small Business Administration and also the contracting officers seem determined not to help me.

Thank you very much.

Chair MEYERS. Thank you very much.

[Ms. Stewart Veal's statement may be found in the appendix.]

Chair MEYERS. Our next witness is Ms. Brenda Ford. She is President of Ford and Associates, Silver Spring, Maryland.

## TESTIMONY OF BRENDA FORD, PRESIDENT, FORD & ASSOCIATES, SILVER SPRING, MARYLAND

Ms. FORD. Thank you, Madam Chairman. My name is Brenda Ford. I am President and owner of a small firm known as Ford and Associates. My firm specializes in interior landscaping. I have been in business for 15 years. I would like to say that I used to believe in the myth that 8(a) and SBA was there to help all small business owners with contract financing, obtaining contracts in their specialized area, as well as any other problems as far as setting up a workable business plan. I was wrong.

Ninety-eight percent of the services that I have just stated has not happened for my company, in the 15 years I have been in business. I am here today to testify about just how unfair, mismanaged,

unethical and corrupt the SBA is toward African-American business owners.

The type of stories that are usually swept under the rug and ignored by directors and appointed Secretaries of the Agencies. I will tell you, first of all, how my firm was denied fair and equal contract opportunities or the opportunity to become 8(a) certified 15 years ago.

As strange as it may seem, by the same SBA representative who most recently denied my firm a contract on a Government project, regardless of the fact that my firm had a proven track record and work performance and was $200 less than the other firm. I will tell you a story of unfair treatment by the Small Business Administration and how they ignore violations of Federal laws and regulations.

Public Law 95–507 is never enforced in this particular case. The cozy relationship between the SBA representatives, the contracting officers, and the facilities services managers, most managers that I have come in contact with in my 15 years give me the impression they are above the law. After all, management has nothing to fear in wrongdoing.

I have documented case after case of wrongdoing by SBA, facilities services managers, and contracting officers. After 15 years, the outcome was always the same: The contract was awarded to the larger firm. Even after such matters were brought to the attention of the Department directors or appointed Secretaries, the managers were ignored by whoever the correspondence was forwarded to and nothing was ever resolved.

In many cases, even Freedom of Information requests, which would give written documentation of biased treatment of African-American firms, has been prolonged or denied.

I do not see the Small Business Administration as being a friend of the African-American community, of businessmen and women. The few who have received assistance or contracts from SBA are few and far between.

I cannot see an Agency being in existence if they are not productive or if they are not doing their jobs to truly help socially disadvantaged and African-American-owned firms. If this were a private industry, would this be allowed?

SBA management has received case after case which involves mismanagement which I brought to their attention, and as I stated before, nothing was enforced. I have even been forced to request letters for the right to sue for financial harm done to my firm. Even my elected official was given the runaround by these Federal Agencies.

I wish to recommend that the Committee seriously consider setting up a task force of private business owners county-by-county and give this task force the ability to bring concerns of the socially disadvantaged business owners to the Committee with recommendations of how Federal funds should be spent with these Federal Agencies, as well as investigate problems brought to their attention by small business owners and expedite requests for information regarding the Freedom of Information Act where there are signs that the small business is facing serious hardship due to actions taken against the Agency by a small business owner.

I give a recommendation that management involved in biased treatment be placed on leave without pay until the matter is resolved. I give a recommendation of suspension of Federal funds for nonprofit groups and private firms who receive Federal money if it is discovered that unethical, deliberate misconduct, denial of fair and equal contracting opportunities has occurred, and management has refused to correct the situation or resolve the problem in a timely manner.

If the African-American community is to survive and provide employment for those within our community, we need to work with individuals of character and who are committed to the well-being of all small business minority owners in the metropolitan area. That character and commitment does not exist with the SBA, and has not for a long time. Instead, we have been given directors who like to talk the talk, but have little intention of walking the walk. Their track record speaks for itself.

Smoke and mirrors just will not do the trick this time. As I overheard one Federal manager say to another, promise them anything, but give them nothing. That is what SBA has been doing for a long time.

I keep hearing the term "racism and discrimination." Well, isn't that against the law? I wonder why these managers who are doing all of this discriminating and are such racist are not dismissed from the Federal Government? After all, wouldn't it resolve part of the problem of fair and equal contracting opportunities?

Ladies and gentlemen, I thank you for allowing me to speak before you today regarding some of the problems faced by African-American business owners. That concludes my testimony.

Chair MEYERS. Thank you, Ms. Ford.

[Ms. Ford's statement may be found in the appendix.]

Chair MEYERS. Mr. Jim Offord.

## TESTIMONY OF JIM OFFORD, RETIRED CONTRACT SPECIALIST, SILVER SPRING, MARYLAND

Mr. OFFORD. First, I want to thank you for allowing me to come to support the testimony of the two ladies who are on both sides of me. I consider that a privilege.

My name is Jim Offord. I am retired from the Federal Government. When I was employed by the Government, my position was a Contract Specialist assigned the special task of 8(a) representative of then HEW, Office of Human Development Services. In this capacity, it was my job to be an advocate for the minority set-aside to firms designated as minorities under the 8(a) Program.

Mr. LAFALCE. Could I just ask one question? What year, when he said HEW?

Mr. OFFORD. I retired in 1978.

Mr. LAFALCE. I see.

Mr. OFFORD. So I have been retired for a while. What I did was after I retired, I started my own consulting firm, consulting to firms who were trying to get or had contracts with the Government, because they needed that kind of help, the ones who had contracts.

Even though I had the supposed authority to select any procurement for minority set-aside, I found it very discouraging to over-

come the built-in prejudices of the program managers and some of my bosses.

As an example, when I would inform program managers within my Department that I had decided to set aside a particular requirement for the 8(a) firm, management would come up with excuse after excuse as to why a minority 8(a) firm could not possibly perform the requirement or the task.

Although these 8(a) firms had been certified by the Small Business Administration, in some cases program managers would withdraw their requirements. In some cases, if my boss found that the contract was over $25,000, that manager would try to convince me that the requirement was too large for a minority firm. When, in fact, small contracts are harder to perform since the fixed costs are the same as larger contracts. Therefore, this would make the profit margin smaller and the risk to perform harder.

It seems as though the mind set is that minority-owned firms should not be allowed to make larger profits. Even after contracts were awarded, some Government contract managers would try to make the contract harder to perform by changing specifications without a contract modification to compensate for the increased work effort.

This was done with veiled threats that if the minority contractor reported the increased work to the contracting officer, it would jeopardize any future contracts.

Another way to avoid minority contracting was to keep modifying a contract with a minority white firm, using a unique specification that only the majority vendor possessed, which was not necessarily needed to the requirement of the end product. Management used this unethical method to eliminate the bidding process, thus eliminating fair and equal contracting opportunities for minority-owned firms who were not able to bid competitively.

These are some of the kinds of things that happened while I was contracting specialist.

I feel that the SBA has done very little to protect the interests of minority-owned firms who were 8(a) certified and then did even less to prevent management from denying fair and equal contracting opportunities to minority-owned firms who were able to bid competitively.

Enforcement of all small business laws and regulation was not done because management had no incentive for allowing fair treatment to minority-owned firms. I recommend that, you heard this before, so we talked about this together, I recommend that the community task force be set up and given oversight of the 8(a) Program somehow. I don't know what the details would be. This special task force would be allowed to function as a subset of the Small Business Administration.

If the 8(a) Program is eliminated, though, those who have applied and never received contracts should be given maybe some kind of special exemption to be able to bid on contracts on a set-aside basis, and I will explain that if somebody asks a question. At this time, the system is very mismanaged. Thank you.

Chair MEYERS. Thank you very much.

[Mr. Offord's statement may be found in the appendix.]

Dr. George La Noue.

Ms. MILLENDER-MCDONALD. May I ask a quick question for clarification?

It appears to me the three of you, somewhere all of you in your presentation are suggesting that you do not want to end 8(a) Programs, you just want to mend them. That is what I am hearing in your presentations. So, you are not here to eliminate this program, but to help to improve upon it.

Mr. OFFORD. Absolutely. For me, absolutely.

Ms. FORD. Since I have been out there getting contracts on my own for 15 years, ending it would not affect me in any way, shape or form.

Ms. MILLENDER-MCDONALD. You are not suggesting that we end it, just to improve upon it. Am I correct in your presentation?

Ms. FORD. I would definitely say end it, simply because with a system as broken as badly as this one is, sometimes you have to start from scratch in order to correct the situation.

Ms. MILLENDER-MCDONALD. It doesn't appear to me you have any foundation from which you gather that statement.

Chair MEYERS. I think that is clarification. Let's go on. You will have your opportunity later to question, Ms. McDonald. I don't mean to rush anybody. We have had these people wait so long.

Dr. La Noue.

**TESTIMONY OF GEORGE R. LA NOUE, DIRECTOR, POLICY SCIENCES, UNIVERSITY OF MARYLAND-BALTIMORE COUNTY, POLICY SCIENCES GRADUATE PROGRAM, BALTIMORE, MARYLAND**

Dr. LA NOUE. Thank you, Madam Chair. Good afternoon. My name is George La Noue. I am Professor of Political Science, Director of the Policy Sciences Graduate Program, and Director of the Project on Civil Rights and Public Contracts at the University of Maryland, Baltimore. I have served as trial expert for the plaintiffs in challenges to racial preferences in contracting programs in Columbus, Ohio, and Philadelphia, Pennsylvania, and Federal courts have just recently within the last month struck down those programs on the grounds that they did not have appropriate factual predicates and violated the equal protection clause.

Currently, I am serving as expert witness for the plaintiffs in the case, *McCrossan v. Cook,* in New Mexico, which is a challenge to the contract set-asides by the Department of Defense.

In addition, I am working for a number of State and local Governments which are attempting to create the appropriate factual predicates for minority business programs. So, I am working for both plaintiffs and courts and local Governments in trying to find a path in this very complex area of what would be a constitutional minority business program.

I am here today principally because a colleague, John Sullivan and I, have written a history the SBA programs' use of the concept of presumptive eligibility, and it is that concept that I want to focus my testimony on. With the Committee's permission, I would like to put that article in the record, rather than going over it in any detail at all.

Chair MEYERS. Without objection.

Dr. LA NOUE. Presumptive eligibility is the key to the concept of the 8(a) Program. I think it is important to understand that less than 1 percent of all the minority businesses in the country are part of the 8(a) Program, and once those firms are certified by 8(a), they have a competitive advantage, not just vis-a-vis white-owned firms, but against other minority-owned firms.

Mr. LAFALCE. Doctor, just for clarification, 1 percent of what?

Dr. LA NOUE. Of all of the minority businesses in the country, are members of the 8(a) Program. Presumptive eligibilities is the concept around which participation in the 8(a) Program is built. While there is a requirement of economic disadvantage as well, the rules are exceedingly permissive.

In construction, for example, the firm size limitations make 98 percent of the construction businesses in the country eligible. Businesses with annual revenues of $100 million are in the 8(a) Program. We have talked about the ownership requirements, but because they exclude the worth of one's residence and one's business and because it is not clear how one's spouse's assets are included, the fact is that if you can be in this program with assets so defined of $750,000, the reality is all but the people who are really considered wealthy in this country can meet the economic standard. Therefore, the real screen in the 8(a) Program is not economic disadvantage, but social disadvantage. For that screen, presumptive eligibility is the key.

Presumptive eligibility involves a very large presumption indeed. Put simply, it assumes that American business owners can be classified into two groups on the basis of their race and ethnicity by the Federal Government. Owners in the first group are presumed to be socially disadvantaged and entitled to benefits.

Owners in the second group are presumed to be socially advantaged and excluded from these benefits. In practice, presumptive eligibility for the 8(a) Program means that two business owners with identical economic status, have gone to the same schools, live in the same community with the same business histories, would be treated by SBA very differently because of their race or ethnicity.

For the business owner who is in the presumptively eligibility group and meets the economic criteria, admission to the 8(a) Program and its access to billions of dollars of contracts annually will be a major competitive advantage. For the business owner in the nonpresumptively eligible groups, admission to the 8(a) Programs requires proving by clear and convincing evidence that he or she has suffered "chronic racial or ethnic prejudice or cultural bias".

In practice, this is a major barrier guarded by a very unsympathetic SBA bureaucracy. According to the documents given to us by SBA as a part of the *McCrossan* case, in fiscal year 1994, of the 5,628 8(a) firms, 9 of them were owned by white women, 9 of them were owned by disabled persons, and 8 of them were owned by white males. So, this is by no means a race-neutral program; it is very clearly a race-conscious program.

Which are the presumptively eligible groups? In my testimony on page 5, I indicate the list. I don't want to embarrass anybody, but I suggest that if you look at that list, a number of us in this room would not recognize and not be able to locate where some of these countries are. The Federated States of Micronesia, Tuvalu,

Kiribati, the Maldives Islands. Anybody who can claim ancestry from those areas can be considered presumptively socially disadvantage in this country.

While the history of discrimination against some of these groups is well-known, the SBA list is not an exhaustive list of groups that has suffered discrimination in the United States or have other forms of social disadvantage. Many of the groups on the SBA list are relatively recent arrivals to the United States and there is little, if any, evidence of any systematic bias against them. Nevertheless, a business owner who can claim membership in any of these groups is legally considered socially disadvantaged.

It is not certain that the SBA now knows or can reconstruct how some of the groups in the presumptively eligible list actually got there. In a deposition from the *McCrossan* case, the SBA official who the Government identified as knowledgeable about the origins of presumptive eligibility, conceded it would be sheer speculation about the criteria used in the past by that Agency.

The article that Mr. Sullivan and I have written based on the Freedom of Information Act documents goes through the whole history of which groups have been included and which groups have not been. In the eighties, the SBA turned down Hasidic Jews, women, service-disabled veterans and Iranian Americans, admitted Indians, Tongans, Sri Lankans and Indonesians to presumptively eligible status.

Historical records show some very active lobbying, the intervention of some prominent Members of Congress and the Carter White House. What it does not show is any principled base of decision-making or any use of any objective data to determine which groups should be on the presumptively eligible list and which should be excluded.

Some of the groups included are at the socioeconomic bottom of our society, while others, measured by education, income, and business formation rates are at the top. Facts about individual group characteristics were apparently irrelevant to the SBA's decision.

Now, as you all know, the constitutional law in this area has changed dramatically. After the Supreme Court's decision in the city of *Richmond v. Croson* and *Adarand v. Pena,* any use of racial classifications must be based on factual identification of discrimination against the group favored.

As the Supreme Court declared in *Adarand,* all racial classifications imposed by whatever Federal, State or local Government actor, must be analyzed by the reviewing court under strict scrutiny.

In other words, such classifications are constitutional only if they are narrowly tailored measures that further a compelling Government interest.

Now, the record, I think, will show that the concept of presumptive eligibility has been based on both illegitimate notions of racial stereotyping and racial politics, and *Croson* makes it very clear that that is not an appropriate basis.

Presumptive eligibility in the 8(a) Program is not intended as a remedy for any pattern or practice of discrimination in Federal contracting. No such record exists despite, of course, in any Government as large as this one there have been occasions of that. But

the records of any pattern or practice of discrimination by Federal procurement officers against anyone or all of these groups does not exist.

Nor since 8(a) contracts potentially cover everything the Government buys, are the racial classifications in the 8(a) Program intended to remedy discrimination in any particular industry.

If 8(a) is based on any theory at all, then presumptive eligibility was intended to compensate for societal discrimination. But that has been an invalid justification for the use of racial classifications since the *Wygant v. Jackson* decision in 1986.

Until last summer's *Adarand* decision, Federal minority business programs have been shielded from judicial scrutiny and consequently there are few relevant precedents. But in the only time an appellant court has examined presumptive eligibility, the concept fared poorly.

In 1991, in *Milwaukee County Pavers v. Fielder*, Judge Richard Posner, writing for the Seventh Circuit said in discussing presumptively eligible, this means that the State is conferring a significant benefit, access to the presumption of social and economic disadvantage that is the key to valuable entitlement, on the grounds that *Croson* forbids a State to use without establishing that the purpose is to rectify discrimination.

The State can, if it wants, redistribute wealth in favor of the disadvantaged, but it cannot get out from under *Crosan* by pronouncing entire racial and ethnic groups to be disadvantaged.

The whole point of *Crosan* is the disadvantaged diversity or other grounds for favoring minorities will not justify governmental racial discrimination, and then he added other than by the Federal Government. This was a pre-*Adarand* decision. Only a purpose of remedying discrimination against minorities will do, and the courts have now told us that that kind of discrimination has to be specifically defined.

Since that case, the Judiciary has become much more critical of the use of racial classifications in a variety of settings and has specifically expanded strict scrutiny to Federal programs. In *Adarand*, racial classifications were called odious, pernicious, and constitutionally suspect.

Presumptively eligible in the post-*Crosan-Adarand* legal world is an anachronism which is not based on anything like the factual predicates courts are now requiring for minority business programs on the State and local level. Courts have made it clear that rights belong to individuals, not groups.

Congress should move now to replace this obsolete concept of presumptive eligibility with a program that targets aspiring entrepreneurs from disadvantaged backgrounds of any race. That should be done before the courts eliminate the concept of presumptively eligible in the 8(a) Program as it is now configured.

Thank you.

[Dr. La Noue's statement may be found in the appendix.]

Chair MEYERS. Thank you very much, Dr. La Noue. The Chair recognizes Jeffrey Rosen.

**TESTIMONY OF JEFFREY ROSEN, ASSOCIATE PROFESSOR, GEORGE WASHINGTON UNIVERSITY SCHOOL OF LAW AND LEGAL AFFAIRS EDITOR, THE NEW REPUBLIC, WASHINGTON, DC**

Mr. ROSEN. Thank you, Madam Chair. My name is Jeffrey Rosen. I am the Legal Affairs Editor of the New Republic Magazine, where I write about constitutional issues. I am also an associate professor at the George Washington University Law School, where in the spring I will be teaching constitutional law.

I am honored by your invitation to testify about the constitutionality of the 8(a) Program in light of the Supreme Court's *Adarand* decision.

Let me begin by sounding a few notes of caution. There are important disagreements among members of the *Adarand* court that would make confident predictions about judicial performance irresponsible.

Discerning Justice O'Connor's mind, for example, is never easy, least of all for Justice O'Connor herself. I also respect the administration's effort to refine the 8(a) Program in light of the *Adarand* decision. This is a difficult task, and I think the administration has undertaken it in good faith.

Finally, the broad categories of Federal set-asides are mandated by Congress, and unless Congress repeals the set-aside laws, the President, of course, is constitutionally required to enforce them.

Nevertheless, as a constitutional matter, I am not convinced that the administration's proposed reforms, for all their good intentions, can resolve the tensions between the 8(a) Program and the *Adarand* decision.

Here is the nub of the constitutional difficulty. Recent decisions, for better or worse, suggest that courts will only accept affirmative action programs in Federal procurement if there is concrete evidence of discrimination against each of the relevant minority groups in each of the industries and regions with which the Federal Government does business. But the administration does not propose to collect this evidence with the precision that courts are likely to require.

In its proposal to reform affirmative action, issued last May, the Justice Department properly notes that courts have identified six factors in an attempt to define the elusive term that the courts have called the "narrow tailoring prong of strict scrutiny."

These factors include whether race is relied upon as the sole factor in eligibility, or whether it is used as one of many factors; whether any numerical target is reasonably related to the number of qualified minorities in the applicable pool; and the extent of the burden imposed on nonbeneficiaries of the program.

To its credit, the administration has frankly conceded that these constitutional tests call into question at least one Federal procurement program, the so-called rule of two, under which contracting officers can limit biddings on particular contracts to minority firms only.

Remember how the rule of two operated in practice. The State of New Mexico, for example, is about 50 percent Hispanic American, and yet the Department of Defense, in its effort to satisfy national goals set by the Small Business Administration, set aside

virtually all of its road building contracts at the White Sands military base, which is the largest military base in the country, for minority-owned construction firms.

Now, it is easy for us to recognize the rule of two as the antithesis of narrow tailoring. Race is the sole factor in eligibility. Numerical targets, which amount to 100 percent set-asides, have no relation to the availability of qualified minorities. Finally, the burden on the excluded nonminorities which is complete exclusion, couldn't be more dramatic.

Faced with likely defeat in court, the Clinton administration announced in October 1995 that it would repeal the rule of two. But the administration then announced that the Department of Defense would continue to set aside the same contracts for the same minority firms under a panoply of different Federal programs, most notably the 8(a) Program, which it continues to defend.

Now, in many respects, I want to suggest today, the 8(a) Program, which the administration defends, is hard to distinguish from the rule of two, which the administration repealed. Both programs insulate certain racial groups from competitive consideration with other racial groups, using race as the decisive factor rather than as a plus factor in assigning public benefits, and thus violating a distinction that Justice O'Connor herself has found crucial.

Both programs are employed to meet Federal goals that often have little connection to discrimination suffered by the particular minority groups in particular regions of the country. Because the Federal Government makes no attempt in establishing its annual goals to account for the availability of minority firms in a particular industry or geographic location, the only way for Agencies to meet their goals is to concentrate minority contracting in certain fields, such as construction, where minority firms actually exist.

Tacitly acknowledging that the 8(a) Program in its current form will be hard pressed to survive close judicial scrutiny, the Justice Department proposes to reform it. The administration proposes to set limits, which it calls "benchmarks" for each industry with which the Federal Government does business. According to the proposals, "Each industry benchmark limitation will represent the level of minority contracting that one would reasonably expect to find in a market absent discrimination or its effects."

The administration proposes to use census data to determine the capacity of firms operating in each market that are owned by qualified and available minorities, and then it proposes to adjust this figure upward to reflect "the estimated effect of race in suppressing minority business activity."

But the figure that the administration seeks is metaphysical, not empirical, and no State has convincingly calculated it. In Texas, for example, the State tried to suggest that low percentages of self-employed minorities and high percentages of discrimination lawsuits might indicate that minority business formation had been suppressed by discrimination. But the General Services Administration refused to accept the claim, conceding that business formation may be affected by cultural factors that have little to do with discrimination.

The most obvious weakness of the administration's proposal is its refusal to reexamine the Achilles heel of the 8(a) Program, its reli-

ance on a list of groups who are presumed to be socially and economically disadvantaged.

To satisfy standards that Justice O'Connor articulated in the *Croson* case, the administration would have to undertake a arduous empirical task indeed. It would have to look for discrimination against each group or subgroup included in the current set-aside program for each service that the Federal Government purchases in every State in the Nation.

But in its May 23 proposals, the Justice Department has decided not to do this, and in practice, of course, as Dr. La Noue has testified, it is difficult to produce evidence of systematic discrimination against many of the groups on the list with that degree of precision.

Recent court decisions have made the administration's task more daunting still. On July 21st, the U.S. Court of Appeals for the Third Circuit in the *Contractor's Association of Eastern Pennsylvania v. The city of Philadelphia,* struck down the city's contracting goals for African-American-owned businesses. Judge Stapleton, writing for the court, distinguished between three separate kinds of discrimination: Discrimination by prime contractors against subcontractors; discrimination by contractors associations against prospective members; and discrimination by the city against prime contractors.

Chair MEYERS. Mr. Rosen, if there is anything that you could submit for the record and summarize your testimony, I hate to crowd you into 5 minutes, but it is about the only way we can get through this. We have had another vote called, and I would like to hear from Mr. Banerjee before we take the vote. So, if you could conclude in the next few seconds, I would appreciate it.

Mr. ROSEN. I would be pleased to conclude, and I will submit the rest of my testimony.

I do want to end on the note of caution with which I began. As Members of Congress deciding whether or not to repeal the 8(a) Program, you have no obligation to engage in the mystical enterprise of reading judicial tea leaves. Instead, you surely have the right and responsibility to make an independent constitutional judgment about whether or not you believe that affirmative action in Federal procurement as it is currently administered to be consistent with the requirements of the Equal Protection Clause. If you find yourself more convinced by the arguments of the *Adarand* dissenters, which are powerful arguments, and consistent with judicial restraint, then your constitutional fears may be assuaged.

Thank you.

[Mr. Rosen's statement may be found in the appendix.]

Chairman MEYERS. Thank you very much, Mr. Rosen.

Mr. Banerjee is from my district and we are very pleased to have you here. I didn't know until this morning that you were going to be here. I am sorry if we made you miss your airplane. Mr. Banerjee.

## TESTIMONY OF TAPAN BANERJEE, FOUNDER AND PRESIDENT, TAPANAM AND ASSOCIATES

Mr. BANERJEE. Thank you for recognizing me. Again, my name is Tapan Banerjee. I am the founder and President of TapanAm

Associates. We are located in the Kansas City area. I have about 25 years experience as a licensed professional engineer. I really appreciate the opportunity to testify before Small Business Committee today on behalf of my company and express my strong support for the SBA Program, 8(a) Program.

I would like to talk about my business area within the 8(a) Program, which is architectural and engineering design, and which is different from the construction business. I would like to talk about our successes in this program.

We have been in business for 13½ years, and we are a design firm. We started with offering structural and civil engineering services for 6 years before we had the opportunity to join the 8(a) Program in 1989. Since then we have grown considerably offering multidiscipline architectural engineering services. Before the 8(a) Program we had six people, now we have about 32 people in-house.

I just wanted to mention that the remarks which I am going to make, some of them are my own and some are from others who voiced their opinions in my district. I would like to go over those, too, as we go along.

For anyone who is involved in altering or terminating the 8(a) Program, it is important to understand the basic premise that, still today, there is not an equal playing field. There have been many improvements, as there still must be, but it is simply not reality to think that every minority entrepreneur has the same opportunities to succeed in the business world as their nonminority counterparts.

As I mentioned, our architectural and engineering business is a very competitive business. It follows the Brooks bill, and that is what the Federal Agencies follow, which stipulates that the selection is based on qualification. So, the first thing that comes to mind when we wanted to get into the Federal Agency business is without the Federal project experience, how can we build our qualification portfolio to compete for the Federal contract?

In my experience, I found I was an outsider in the "good old boy" network, which is still prevailing in my area, and we did not receive the opportunities to get any substantial projects to grow until we got into the 8(a) Program.

I would like also to mention how my firm got into the transition. We were fortunate to receive considerable exposure and experience on Federal architectural engineering design projects working as a consultant to large firms who had to meet a contractual goal up to 5 percent for SDB firms. This transitional experience into Federal design projects and the 6 years prior business experience before we joined the program helped us to take the full advantage of the 8(a) business development program.

Since then, which is after 1989, we have successfully provided design services to Federal Agencies as the prime consultant. We have since received several commendations for the quality of our work and have received various awards from the SBA.

I would like to mention that 8(a), in our experience is essentially an opportunistic program for business development. The following few comments will clarify some of the misconceptions that people have and people have expressed when I have talked to them about the program.

The 8(a) Program is not a handout. The program only introduces us as a viable business enterprise to Federal Agencies and like any other business scenario, we still have to market our services, convince the Agencies that we could do the work well to give us the first job.

Again, 8(a) is based on competitive Brooks bill selection process. Federal Agencies evaluate qualifications of at least three firms before a final selection is made. There is no sole source in our arch-engineer 8(a) procurement process. For example, we recently won a design contract from a Federal Agency. We had to compete with 50 other firms to win one of the two contracts awarded to 8(a) firms on a nationwide competition.

Again, the 8(a) Program does not help minority firms to receive repeat business. SBA is there to introduce us and help us financially. That is where it ends. Agency's project managers do not invite back firms because they are in the 8(a) Program. It is up to the 8(a) firms to win repeat business with quality and efficient professional service.

Eight(a) has given us the opportunity to stabilize our business, which was up and down for about 5 or 6 years doing small projects, and helped to create a track record as the prime design consultant to clients. Presently, 65 percent of our contracts are non8(a), and we have 2 years left in our program.

Like any other business, we feel we have earned recognition from our Federal Agency clients. What we think the 8(a) Program has done to us is to give us the opportunity to develop our business and given us the confidence to win projects with other clients.

Chair MEYERS. I am going to have to ask you to conclude, not because the light is red. I would give you another 30 seconds, but we have about 5 minutes left to get over to the floor for a vote. The vote is the last vote of the day, and it is final passage of the Transportation Appropriations Act. We will resume when we come back.

We will recess for a few minutes and be back as quickly as possible.

[Recess.]

Chair MEYERS. You may have 30 seconds, Mr. Banerjee. The light was red when we left. I didn't want to cut you off without giving you an opportunity to conclude.

Mr. BANERJEE. All right. As I was saying, we are not afraid of graduating, because SBA's role was to introduce us to the Federal clients but we developed relationships with them. Therefore, we still will have those clients when we graduate and still go out and compete in the open market to win other clients.

Also, I wanted to tell very quickly that firms like us also create jobs for minorities. The percentage of minorities employed by large firms are not even close in comparison to minority firms. We have about 40 percent minorities and we also have 20 percent women. In all, we create jobs for all Americans as a small business.

I just want to let you know, if you think financial management of minority business is easy, please think about this: We had to wait 10 years in business before we got our first line of credit. Without a line of credit, you cannot manage payroll, hire people, and have the capital that we need to grow.

I just wanted to mention that I am really amazed that you are spending all this time and energy for just 3 percent of the work for minorities in the marketplace. That just really is something to think about when I go back and talk to the people what I saw in Washington, all this energy and the money being spent, and you are our representative, and you are fighting against only 3 percent. But I oppose H.R. 3994, the Entrepreneur Development Program, because it takes the drastic step of repealing this program which has proven to work.

The bill offers managerial and other technical guidance to small businesses through a modified 7(j) Program. This proposal would be of little value.

Chair MEYERS. Mr. Banerjee, I am afraid we are going to have to move on. I appreciate so much your coming in today. I know the percentage is very small. What I am speaking for is an end to sole-sourcing and a program that is compatible with *Adarand* and some of the other court decisions. I am not one of those that has voted against civil rights programs. I have voted for everything that has been in front of me. I also am not against outreach and assistance for people, but $6 billion worth of sole-sourced contracts, when you say it that way, it sounds like more.

Mr. BANERJEE. In the A/E business we do not have sole-source programs. We are always competing per qualification based selection (QBS). I do not know much about other areas of the 8(a) business. I just want to comment——

[Mr. Bannerjee's statement may be found in the appendix.]

Chair MEYERS. May I recognize Mr. Steve Farinha. You are President of Farinha, Incorporated, and where are you from?

## TESTIMONY OF STEVEN FARINHA, PRESIDENT, FARINHA, INC.

Mr. FARINHA. Thank you, Chairwoman Meyers, members of the Small Business Committee for the opportunity to submit testimony today in the 8(a) Program. My name is Steve Farinha. I am the President of Farinha, Inc., d.b.a. Paragon Construction.

To answer your question, we are in Auburn, California, on the West Coast, and I have always been a registered Republican. Today, I would like to testify about my company and the significant contributions that the SBA 8(a) Program has made to our success. I believe my company is a model example of what the 8(a) Program was intended to promote.

Let me give you a little background about myself. I was raised in a community of farming and agriculture, so I learned at a very young age if I wanted something I needed to work. While in school, I fell in love with the building industry and decided when I grew up I wanted, that is what I wanted to do.

So, in 1983, I founded Paragon Construction with a pick-up truck, a dog and $500. I had a dream I wanted to construct buildings. Then came an eye-opener. In the construction industry, it takes capital and surety credit to operate a commercial construction company. Without those two key ingredients, you cannot succeed.

Every time in my life I have encountered an obstacle, I have somehow attempted to make something positive out of the situation. So, I went to my parents and told them that I needed some

assistance. They mortgaged their house to help me out. But this was, in itself, was not enough for the bonding companies.

So, my bonding line was very small and with it I was not able to build a company due to lack of capital and surety credit. At the time, we had an annual volume of about $400,000 by 1988.

In 1988, I approached SBA for assistance and learned about the 8(a) Program. I was certified in May of 1989 and received my first contract in 1991. It took us 2 years to get our first contract. But from then until now we have grown to a staff of over 1,700 employees with over three offices.

Our current volume is approximately $17 million. People always want to know what our business mix is of 8(a) versus non8(a). I heard a lot of that today. I am happy to say our 8(a) sales account for approximately 35 percent of our annual volume, and 65 percent of our annual volume is non8(a), as you would call it competitive, and some of the 35 percent is also competitive. So, it is not just 35 percent of sole source.

Some of our current customers are the Air Force, Navy, Army, Coast Guard, General Services Administration, Veterans Administration, Social Security Administration, and National Guard. We have received numerous letters of commendation from our customers. You have a couple that we submitted today on that.

We believe that if someone will give us one opportunity to let us demonstrate that we can perform a quality project at a fair and reasonable price, we can keep that customer and develop a long-lasting relationship, as we have demonstrated. We have won numerous awards in the past few years as well, one being recognized as the 8(a) regional contractor of the year.

Also, we are active in our local community, participating in events such as career day for kids and local civic groups. I cannot stress enough how essentially the 8(a) Program has been for my success. The 8(a) Program, plus hard work, always equals success.

One of the key aspects of the 8(a) Program is that it provides diversity within Government contracting which in turn maximizes competition and ultimately provides the Government with higher quality goods and services at competitive prices.

H.R. 3994 kills the 8(a) Program. This bill does not attempt to reform the 8(a) Program. It simply repeals SBA's contracting authority. The 8(a) Program enables socially and economically disadvantaged persons to compete for Federal contracts.

Absent real contracts for minority firms to enter, to contract and perform, participation in development assistance programs becomes merely an academic exercise, befitting neither the small business nor the Federal Government.

H.R. 3994 provides no substitute for the 8(a) Program. The bill offers managerial and technical guidance to small businesses. This is already provided by SBA. H.R. 3994 provides no comprehensive substitute for the most important component of the 8(a) Program, the opportunity to compete for a project.

The program is a foot up, not a handout for small business. 8(a) is a business development program designed to help small firms become sufficient and competitively viable. In order to become an 8(a) firm, businesses must demonstrate a potential for success, and that

is why 8(a) has been a time-worn success. It creates jobs and promotes economic growth.

[Mr. Farinha's statement may be found in the appendix.]

Chair MEYERS. Thank you. Thank you very much. I would like to ask a few questions to start out here. Ms. Stewart, you have been in the 8(a) Program for quite a few years. Do you have evidence in the form of recommendations or commendations on your company's work from non-8(a) work that you have performed? What kind of evidence have you taken to the SBA that you could perform this work?

I might ask also, have they given any recommendations to you about non 8(a) contracts that you might bid on?

Ms. STEWART-VEAL. Your first question is, yes, I do have recommendations from various Government Agencies, Federal Government Agencies. They are recommendations of contracting officers that are satisfied and also state that work was completed on time, in a timely fashion. They would highly recommend my company to continue to do other contracts for the Federal Government.

Chair MEYERS. All right. How many years have you been attempting to get an 8(a) contract? Are you certified into the 8(a) Program?

Ms. STEWART-VEAL. Yes, I am. I have been attempting for the last 4 years.

Chair MEYERS. For 4 years?

Ms. MILLENDER-MCDONALD. Madam Chairman, may I follow up on a question? You indicated in your presentation that you have been awarded several contracts, not that of 8(a) contracts. One being from $2,500 to $10,000, and one being $20,000. Yet, it is my understanding in looking back on information that I have received, you have been offered a contract through the 8(a) Program that you refused.

Why did you refuse that and why do you then feel justifiable in saying that this——

Chair MEYERS. This is not coming out of my time, Ms. McDonald.

Ms. MILLENDER-MCDONALD. I understand that, Madam Chairman. Thank you so much.

Ms. STEWART-VEAL. I am glad you asked me that question. First, for the record, I didn't get a clear introduction of my qualifications and credibility. First of all, I am a master electrical contractor. So, when I was certified in this program in 1992, I was certified as a 1731 code, which is electrical contractor.

To answer your question, that particular solicitation or project from General Services Administration in which they requested my company to negotiate a contract with them for 8(a). That particular contract had nothing — I am sorry, was where they wanted me to go out and find a general contractor, and I would work with the general contractor for this particular project.

At that time, I was up against the wall. I didn't know what to do. So, I decided to terminate that particular offer.

Chair MEYERS. I will reclaim my time and say that I don't know where you got your information, Ms. Millender-McDonald.

Ms. MILLENDER-MCDONALD. I got it from my staff who did the research work.

Chair MEYERS. I would like to ask Dr. La Noue and Mr. Rosen a question. I know that it is difficult to speculate what the court is going to do, but in your opinion, is there any way that the 8(a) Program is compatible with the recent court decisions with *Adarand* and the other recent court decisions?

Dr. LA NOUE. In my view, the program has a clear racial classification. It is not targeted toward remedying any specific discrimination, and Congress has not established a compelling basis to remedy any discrimination by any aspect of Government procurement. So, lacking that foundation, it would seem to me unlikely that it would survive. But I don't make my living predicting what judges are going to do, and you can make arguments on the other side.

Chair MEYERS. Mr. Rosen, you wrote recently regarding the administration's benchmark proposal. Now, as I understand it, the Government under this proposal would attempt to establish the amount of discrimination that has affected certain groups and then apply these findings to establish levels of expected performance for these groups.

Do you believe such an effort would meet strict scrutiny? It sounds to me unworkable.

Mr. ROSEN. I think it is difficult to imagine actually how the figure would be arrived at. Recently, Madam Chairman I was reading the proofs of a new book by Christopher Edley, who, of course, served as the President's Coordinator of the Affirmative Action Task Force, an extremely provocative book.

Even Professor Edley concedes the difficulty of discerning this number. He talks about the analytical difficulty of figuring out how many entrepreneurs there would have been but for discrimination. He says, "economic attempts to answer the question have raised since the 1989 *Croson* decision from abysmal to crude, and it will be a steep, uphill climb to get much better.

"If you think personal wealth has something to do with becoming a successful entrepreneur, then you have the problem of very little census data to make useful comparisons. If you want to further control in each industrial subsector for education, age, various sorts of professional experience — which ones — the mind boggles."

I think this is a candid acknowledgment of just how difficult it would be to arrive at the figure, even if one set out to do it. I think that would make it more difficult to persuade a court.

Chair MEYERS. Well, I have more questions, but I may submit them for the record. I will yield at this time to Mr. LaFalce.

Mr. LAFALCE. Thank you. I think it is always, to put it mildly, a bit difficult to divine what the Supreme Court will do. Assuming you know who the Members of the Supreme Court are going to be at the time that the issue in controversy goes before them. That is to put it mildly.

First of all, Ms. Veal and Ms. Ford, if I were to summarize your remarks, I would say your chief concerns are based upon the fact that you did not obtain 8(a) contracts, and had you obtained 8(a) contracts, you would probably not have been as concerned about the program. But for some reason, unbeknownst to me right now, some reason, SBA did not award 8(a) contracts to you. Perhaps if

there were more 8(a) contracts to go around, they would have been able to.

Perhaps if you really didn't have competition in the noncompetitive program with other 8(a) contractors for a sole source, you would have got them.

With respect to Professors Rosen and La Noue, can we accept as a given that approximately 50 percent of the 8(a) contractors are blacks, approximately? Can we stipulate to that?

Dr. LA NOUE. I think that is correct, yes.

Mr. LAFALCE. Fine. Do you have any difficulty whatsoever in establishing presumptive eligibility for blacks? Do you think that there would be a constitutional difficulty with that? If we found, for whatever reason, that there had been, first, a history of discrimination against blacks within the United States, and, second, if we could find pursuant to the new rules being promulgated by the SBA in the Federal Register that the number of black contractors in given areas and given industries, Federal contracts, are not commensurate with what they ought to be in the absence of specific discrimination?

Dr. LA NOUE. Congressman, every person in this room knows that there has been an evil history of discrimination against African-Americans. We can get over that hurdle, yes. But the test the court is using is much more precise than that. The next question would have to be, is there any evidence of contemporary discrimination by the Federal procurement system against African-American entrepreneurs.

Mr. LAFALCE. I am not sure if that is the exact test that you articulated. What about the tested vision by the new or proposed Federal regs looking at the percentage of contractors in a given area that are getting contracts as opposed to the percentage of contractors of a minority persuasion available in a given area and a given industry? This is the effort that is being made by the Justice Department and the SBA to make absolutely sure that the 8(a) Program can withstand the structures of *Adarand*. It is a good faith effort. What do you think of it?

Dr. LA NOUE. Congressman, the tests articulated in *Croson* are comparing qualified, willing and able minority businesses.

Mr. LAFALCE. This is a different case than the *Adarand* case.

Dr. LA NOUE. I understand that. But I believe when one is doing an analysis of the factual predicate, that the *Crosan* concepts will be the concepts that will be applied.

Mr. LAFALCE. *Croson* was quite reliant, as I recall, on the lack of any finding by the local municipal legislative body, as opposed to the findings of fact by the Federal legislative body. There is a bit of a difference there, is there not? No findings of fact by a local legislative body, and findings of fact by a Federal legislative body.

Dr. LA NOUE. Congressman, there were findings by the Richmond City Council as there were findings by the Philadelphia City Council and by the Columbus City Council. The findings were not appropriate. They were not adequate.

If I could go back to the question——

Mr. LAFALCE. What standard of review did the court use with respect to the local legislative findings and what standard of review

would the Federal judiciary use with respect to findings of the Federal legislative body?

Dr. LA NOUE. I think *Adarand* says the findings are the same, strict scrutiny.

Mr. LAFALCE. All right, I can certainly accept strict scrutiny. But what quality of evidence? Is later deference to be given to the findings of the Federal legislative body under the Constitution with regard to strict scrutiny than the findings of a local legislative body? What would your answer to that argument be, and Mr. Rosen, what would your answer be?

Dr. LA NOUE. It seems to me that the deference that ought to be given turns on the quality of the evidence that is produced.

Mr. LAFALCE. Who determines the equality of the evidence? The legislative body or the court?

Dr. LA NOUE. I believe the courts will review it.

Mr. LAFALCE. De novo?

Dr. LA NOUE. I think they are certainly going to ask whether the Congress has made certain types of findings.

Mr. LAFALCE. If Congress had made findings, would the court examine those findings de novo, or would they ask simply whether or not there was substantial evidence or some quantum of evidence on which they would have to defer to the findings of the Federal legislative body? Mr. Rosen?

Mr. ROSEN. Congressman, I think you put your finger on, of course, the crucial question. It would be silly to pretend we know how this will turn out. We have four justices, the dissenters of the *Adarand* court, who say that the deference that Congress is entitled to receive under Section V should make a difference. And, of course, Justice O'Connor also talked about deference.

Analytically though, it is hard for me to imagine exactly what form the deference would take. If strict scrutiny really means strict scrutiny and not intermediate scrutiny, then presumably societal discrimination would not be enough. You would still need to define the discrimination precisely, and that is the why the Philadelphia decision is so interesting, because, it examined discrimination against African-American contractors, distinguishing with remarkable precision — and I am not endorsing this, I am just describing it — distinguishing between discrimination against prime contractors, against subcontractors, by Government officials against prime contractors, and by the contractors' association against their members.

It is conceivable, it seems to me, that even under Section 5 deference, Justice O'Connor, who as you suggest, really will be the only one who can answer this question for us, might go through the motions of deference, and still conclude that the discrimination had not been defined precisely enough to satisfy her. But you will have to ask her that.

Mr. LAFALCE. Your advice earlier was to proceed legislatively as we would divine constitutionally.

Mr. ROSEN. No, Congressman, I have made no legislative recommendation at all. I tried to describe the law as I best understood it.

Mr. LAFALCE. Toward the end you gave some counsel to the legislature.

Mr. ROSEN. I was trying to endorse the line of questioning you are suggesting, which is if you disagree with the constitutional analysis of the majority, and Congress is certainly entitled to believe that it deserves more deference, then your doubts will be less severe than if you were merely applying *Adarand* as the law.

Mr. LAFALCE. Justice O'Connor did agree with the four in the minority that deference should be given to the findings of the legislative body? Did she not?

Mr. ROSEN. The language is unclear. Of course, she did overrule Metro Broadcasting. To the degree it is relied on, deference is an argument for intermediate scrutiny. So, I don't think that her wishes can be discerned with crystal clarity right now.

Mr. LAFALCE. There are decided differences between Metropolitan Broadcasting and the instant situation, are there not?

Mr. ROSEN. There are, of course. Metro Broadcasting had to do with diversity in the broadcasting industry. This has to do with contracting. The crucial question of whether congressional deference means the courts are less suspicious is not clear from the *Adarand* opinion.

Mr. LAFALCE. Thank you.

Chair MEYERS. I am going to go to Mrs. Millender-McDonald next, because she missed her opportunity to question on the first go around.

Ms. MILLENDER-MCDONALD. Thank you, Madam Chair. I did pose a question to Ms. Stewart initially. What she suggested were contracts that she could very well expand her business, contracts that were from $2,500 to $10,000, and yet you refused to accept an 8(a) contract in the amount of $20,000.

In your presentation you suggested you had not even been given the award of a contract. So, you answered that question. The next one is to Ms. Ford.

Ms. Ford, your assertions that the 8(a) Program is corrupt, unethical, wrongdoings, what do you base that on?

Ms. FORD. I base that on the fact that I applied for 8(a) certification as a socially disadvantaged woman-owned firm. I was informed that I did not possess technical and managerial skills. The area that I was specializing in was grass-cutting, grounds maintenance, walking behind a lawn mower, and holding a weeder. That was the explanation given to me.

The same person who was involved in that decisionmaking 15 years later now working with the SBA, with the Veterans Administration, denied me fair and equal contracting opportunities. It appears that the same person felt the same way, even though it was a competitive bid, my company's bid was $200 less than the white-owned firm. I was still denied fair and equal contracting opportunities. Both times SBA was fully aware of the situation.

Ms. MILLENDER-MCDONALD. Thank you.

Chair MEYERS. Thank you. I am going to allow two Minority Members to question, and then I am going to take a quick question in between, because I am the only one that is here. I would like to ask Mr. Rosen a question and Dr. La Noue. It has seemed to me that when the administration did away with the Rule of Two, that he really did absolutely nothing because he didn't take away the bid preference.

In other words, what he said was everybody can bid, but we are going to keep the bid preference there. So, that if you go through the expense and the hard work of bidding, you are still going to run, and you happen to be Caucasian, you are still going to run up against the problem that somebody can have a bid that is 10 or 15 percent higher than yours and still get the bid.

I think doing away with the Rule of Two was really kind of a semantic change and not a real change. I would like to have you comment on that.

Mr. ROSEN. Well, again, I do believe the administration is acting in good faith. I respect their efforts to try to refine these programs. I think what you have pointed to, Madam Chairman, is the rather elusive distinctions between the various preferences the administration has reviewed. In affirmative action task force report, there is an interesting graph about ranges of preferences, from what are considered hard preferences, actual set-asides, to softer preferences, like bid preferences, and the softest of all, things like bonding help and reduction of lending requirements and so forth.

In practice though, as you suggest, it is often hard to see the difference between a hard set-aside and an intermediate bid preference because in practice it can be decisive, the 10 percent preference will determine who gets the bid. That is why I agree with you that it is analytically difficult to distinguish the programs the administration has retained from the ones it has repealed.

Chair MEYERS. In one of the laws where we supposedly were reforming the 8(a) Program, the Conference Committee specifically mentioned assistance to poor Appalachian whites. Over the years, this Committee has regularly discussed the discrimination faced by women. Yet there has not been any difference in articulation by the SBA of the discrimination suffered by these individuals opposed to members of the presumptive group.

I think people could tolerate this program better if it were based on economic disadvantage. But just to say, well, this group is obviously economically disadvantaged, but we are not going to consider them, but this group we will consider, even though they might be millionaires, because they are minority, and that is the tremendous weakness of this program.

Mr. LAFALCE. Madam Chairman, the law was changed about two decades ago to go from the disjunctive "or" to the conjunctive "and". It must be socially and economically disadvantaged. It cannot be simply the one.

Chair MEYERS. I understand. That is the weakness of the law and the weakness of the program. It should be based on an economic need if it is based at all. It ought to be based on an economic need, but not to say that a poor white person from Appalachia who graduated from high school is ineligible, whereas a minority with a $1 million who graduated from Harvard is eligible. There is something wrong with that.

Mr. LAFALCE. But that is not the law. It is just not the law.

Chair MEYERS. It is socially and economically disadvantaged, and those who are minorities are automatically considered socially disadvantaged. Everybody else has to go to court, and I think there have been 16 Caucasian women, and I think maybe 1 or 2 Caucasian men.

Mr. Clyburn, you are next.

Mr. CLYBURN. I really want to ask a question, but I don't want to lose all of my time. I find it rather interesting that we seem not to understand that there is a cause and effect in all of this. If we can't reach the conclusion that you ought to come into the program only if you are socially disadvantaged, those things that lead to the status of socially disadvantaged ought to be taken into account.

I don't know anybody who knows the history of this country, and I happen to be a founder of a small business, a business which still continues as I serve in this Congress, and, hopefully, my daughter will keep it open until the people decide I should no longer be here. I know something about a small business. I know something about how to start a small business. I also know something about what you are up against when you are not considered socially disadvantaged by income, but by complex.

I don't know how we can sit here and pretend that doesn't happen in this country. We have a member of this panel, Iva Clayton, who did not get 8(a) certification because she was not considered to be socially disadvantaged. But you are all about the same complex. So, I don't think that makes the program unethical and corrupt.

I would like to ask two questions. Ms. Ford, I would like to know from you, would you say that people who go around burning churches or people who make the whole society racist, if this one guy that you know that went from one Agency to another applying his own problems to the findings of the Agency, you think that makes a program corrupt, because you got one bad guy in it?

Ms. FORD. I have been in contact with more than one bad guy regarding problems with the SBA program. My Congressman's office also tried to straighten out or resolve the situation, regarding denial of fair and equal contracting opportunities. Even his legislative aides were given quite a runaround.

Mr. CLYBURN. Who is your Congressman?

Ms. FORD. Congressman Wynn. He is here today.

Mr. WYNN. Can I respond?

Mr. CLYBURN. As long as you don't take it out of my time.

Chair MEYERS. Let's complete Mr. Clyburn's question.

Mr. CLYBURN. I want to ask Dr. La Noue a question. That is why I brought Mr. Wynn with me.

Sandra Day O'Connor in her writings in *Adarand* revisited a statement made by Thurgood Marshall, I believe, in Fuller Love. Don't hold me to where it was. It may have been Bakke, but I think it was Fuller Love, when Mr. Marshall said that he considered strict scrutiny to be fatal.

Now, Ms. O'Connor says strict scrutiny in theory is not fatal in fact.

Dr. La Noue, do you agree with that?

Dr. LA NOUE. Yes. In amplifying her answer, she used as an illustration the *Paradise* case where the Alabama State police force had a history of systematic discrimination against African-Americans and refused judicial orders to do anything about it.

Mr. CLYBURN. If you recall, they did something about it. When they did, they started terminating one for every one they hired.

Dr. LA NOUE. The court had to finally use racial preferences to end that system. But I don't think that *Paradise* provides a very good basis for a Federal contracting program, because there isn't anything comparable to the history in Federal procurement of the behavior of the Alabama State police force.

Mr. CLYBURN. I beg to differ with you. I come from South Carolina. First to secede and last to come back in, where the Confederate battle flag, or at least the Navy Jack continues to fly on top of the State House. That makes a statement for me. It makes a statement to my children. It also says to all of us that such shenanigans as we saw in *Paradise* still continue, and it continues in the contract world as well.

I can cite you case after case where these things continue to happen, where people are given contracts only to be evaluated 3 months down the road or 6 months down the road. With all kinds of accusations and trumped-up charges, are then terminated. That is the same kind of mentality that led to *Paradise,* and it exists today in the contracting world. I beg to differ with you.

If you believe, as she does, that strict scrutiny in theory is not fatal in fact, then I don't understand why you can say to us today that there is no way that you can demonstrate that discrimination will, in fact, take place or does, in fact, take place in contracting.

Dr. LA NOUE. Congressman, I didn't say that you couldn't demonstrate it. It is my reading of the records that it hasn't been demonstrated. I think perhaps the Congress really ought to do that. It ought to identify particular Agencies, particular procurement officers, particular contracts where it feels discrimination at the Federal level has taken place.

Mr. CLYBURN. Will you agree that is exactly what the Justice Department is attempting to do now? Isn't that what we are trying to do as we work our way through some way to fashion an administrative response to *Adarand?* Don't you think that we are getting out in front of the horse here by short-circuiting that with these hearings we are having today, these recommendations we are entertaining?

If you believe we ought to be doing that, and you agree that the Justice Department is, in fact, undertaking that, what are we doing here today?

Dr. LA NOUE. I am not privy to all the Justice Department is doing. I do know the documents the Justice Department is introducing in the cases that are challenging racial preferences in Federal contracting. They are not producing that kind of evidence. If it is in process, we are about to see it in 3 weeks or 6 months; that is one thing. But so far there has not been any of that kind of evidence produced in these cases.

Mr. CLYBURN. Madam Chair, I think he testified earlier this morning that they received at least 1,000 responses to the attempts to try to build a response to *Adarand.*

Are you privy to those 1,000 responses?

Dr. LA NOUE. No, Congressman, I haven't seen them.

Mr. CLYBURN. I would suggest maybe you ought to become familiar with it, because that is what we are doing if more than 1,000 people have responded, and we are attempting to try to fashion a fair and proper response to — this affirmative action business has

a long history in this country. The first one was called for — that was an affirmative action program, and we have now come up to the third affirmative action program in this country, and every time we attempt to do something to correct the current affairs of past discrimination, we get all of these——

Chair MEYERS. We are going to have to terminate. Thank you very much.

Mr. Wynn, I am going to give you a minute or two to respond since your name was mentioned.

Mr. WYNN. Thank you, Madam Chair. I do want to make a statement with regard to Ms. Ford.

You have probably about 200 firms in my State, and the fact is, not all of them get contracts, and I work to try to get contracts. But the fact of the matter is, there is a competitive element and some do not get contracts. As a result of that competitive element, the overwhelming number of 8(a) contractors in my district are fully supportive of this; absolutely no question.

With respect to Ms. Ford's case, she did run into a bad situation, and we are going to try to correct that. There is certainly room for improvement, but I see no evidence because we had individual administrators who did carry out their functions properly.

So, I just wanted to indicate that for the record. We will continue to work with Ms. Ford as long as the program exists, and I hope it continues to exist, because as my colleague, Mr. Clyburn, has pointed out, there is a history of racial discrimination that is abundantly clear, that for some reason it seems the courts are trying to deny it.

We now have proof it was sanctioned by the U.S. Government notwithstanding the equal retention clause of the Constitution allowed for segregation, legalized segregation within the States, and that to me is a very ample credit to what we are trying to do with the 8(a) Program.

Chair MEYERS. A quick comment. We have talked to a number of 8(a) participants with similar complaints to Ms. Ford and Ms. Stewart Veal who decided that there may be some potential retribution for breaking ranks with the minority community's support of 8(a).

Now, I don't know how accurate that is or not. I just know that we contacted a lot of people and heard it over and over, and, consequently, when these people agreed to come and testify, not saying they were going to support the bill or anything but yes, that there were problems with 8(a), we did not reveal their names until this morning because of some concern that we felt about some pressures that would be being brought. So, that is all I am going to say about that.

Ms. WATERS. That is pretty serious. What do you think is going to happen?

Chair MEYERS. As I say, I don't want to — what is done is done, but I think they fear that they would not get 8(a) contracts, that they would forever destroy their possibility of getting an 8(a) contract by even mentioning there were problems in the program. Number two, they feared some retribution against their businesses generally.

Ms. WATERS. By whom?

Chair MEYERS. I don't know.

Ms. WATERS. Well, I am sure that now that they are here testifying, you are going to help them.

Chair MEYERS. I beg your pardon?

Ms. WATERS. I really do believe that if you really think that, you ought to assist them. You, as Chairlady of this Committee, ought to step forward and really help them out.

Chair MEYERS. All right.

Ms. Velázquez.

Ms. VELÁZQUEZ. Madam Chair, I really resent statements and comments that are made here about those who fear not coming forward because they fear retribution. You brought here three witnesses again to criticize the program, and yet we have to fight to get two witnesses that are supportive of this program. I am sure that there are hundreds and hundreds who have participated in the 8(a) Program that are willing to come forward and testify as to the good things that this program has done for them.

Also, I have a preoccupation, and that is the lack of participation from your side. It seems they agree with us that this hearing has no sense in terms of, we cannot finish or repeal this program, that we should mend it but not end it. I think that the lack of participation from your side is a signal that they disagree with you on this issue.

I would like to ask Mr. Banerjee: Could you please elaborate on the barriers you found when you first started your company and try to compete for contracts.

Mr. BANERJEE. I started the business like any other person, just start a business and see what I could do, and soon I found out that all I could get was smaller projects because I am an outsider from the old boy network and we struggled for 6 years doing little projects with very little backlog of work to make us hire people of qualifications and had litle chance to grow.

So, there was no future, not at that stage, being small, with little money. The 8(a) Program offered me a prime contract, and we were successful on the first one. We gained confidence which led to other successful ventures.

Ms. VELÁZQUEZ. How competitive do you expect to be after you graduate from this program?

Mr. BANERJEE. As I mentioned, most of the 8(a) firms who have been successful with the 8(a) Program have acquired, through their success, clients which happen to be Federal Agencies.

In our case, we also work outside the 8(a) Program and have acquired other clients. So, when we graduate, we are not afraid to go back to those Agencies who know us very well to compete for projects, because, if I may mention this, that we have earned our reputation, we were told by a client when they called for reference that TapanAm is one of the top five structural engineering firms they use. There was no mention anywhere that TapanAm is a minority firm and is in the 8(a) Program.

In other words, the 8(a) Program provides opportunities to qualify and do a job as capable as anybody else, and, when they graduate, they are just another firm.

Ms. VELÁZQUEZ. The legislation we have before us will repeal the 8(a) Program and the SBA's contract authority, and will replace it

with technical and managerial assistance. How helpful do you think that will be for you?

Mr. BANERJEE. For me, absolutely nothing. We have already matured ourselves. We have full-time accountant. We have learned from large firms, mentor firms, how to manage our business. So, as far as that is concerned, that is not going to be any help.

Ms. VELÁZQUEZ. Mr. Farinha, were you in business before you received the 8(a) contract?

Mr. FARINHA. Yes. We started business in 1983, and we got into the program in 1989. It took us 2 years to get our first 8(a) contract.

Ms. VELÁZQUEZ. Do you believe that Agencies review your market and work plans as strictly as they would those of nonminority firms?

Mr. FARINHA. Yes, I have a couple of good examples of that that happened with us that didn't happen at the time. One was the Air Force, where we went and we marketed our firm as an 8(a) firm. The contract officer had a job assigned for us. It was a small fence projects. It was about an $86,000 fence project. We went out and performed the project in 6 weeks.

What we weren't aware of until months afterwards was, at the same time they ran a test on us because they thought our price was going to be too expensive. They put the same project, one identical to it, out to bid, hard bid, sealed bid. That project did come in $3,000 less initially. The difference was, the project took 4½ months to finish whereas ours took 6 weeks and there was $8,000 of change orders.

So, the net effect was, our price, the negotiated price, initially was lower than the finished product, and we did it in less than half the time.

It happened on another project also at the Veterans' Administration. We went in with the price. It was a rush job because they had to open up a hospital wing. We did the project, and it was also 7 weeks. The second phase of it came up, and we thought we were going to do it. The project architect stated he felt he could get a better price putting it out on the street, full and open competition. They did that, in fact. They put it out full and open competition. That project took 5 months to complete whereas ours took 7 weeks. The net result was, it was $15,000 more than our final contract.

So, in both instances the contracting officers came back to us and said, "We wish we would have trusted you and did this whole thing, but we had to check for ourselves, and fact the price was fair and reasonable and we are getting quality work."

Chair MEYERS. I think our last questioner of the day is Mrs. Holmes Norton. Then we will adjourn this hearing.

Ms. NORTON. Thank you very much, Madam Chairwoman.

Dr. La Noue, just for the record, you made so much of how various microminority groups got on the list, and I have no defense to make of that and I have no knowledge of that. But I think all of us would take notice of the fact that racial discrimination in this country has been a matter of color, and therefore it is quite conceivable that somebody who comes from someplace else and arrived in the country yesterday could experience the same kind of discrimination that I and my own family have experienced who have

been here for many generations. That simply is for your future reference.

As to the constitutional arguments that both of you have made, as a lawyer who continues as a tenured professor at Georgetown University Law Center, I can only say to you — and this is nothing you had to do with — that I am always edified by constitutional arguments when I hear both sides. It is very hard to evaluate the constitutional position when I hear only one side. I want to hear the other side even when I disagree with the other side.

I don't know how to evaluate what you said except to say that this is a body that historically and traditionally pays no attention to whether a matter is constitutional or not, because it is a separate branch of Government. We go ahead and do what we have to do, and the courts will do what they have to do. That certainly was the case for years in this body.

I can tell you, growing up in the segregated city of Washington, DC, that when people raised the notion that racial discrimination enforced by this body was unconstitutional, nobody gave them the time of day. It took the Supreme Court to tell this body anything about that kind of discrimination, and I think the Supreme Court will get around to it in this case as well.

On the matter of presumptive eligibility, let me ask you both whether you believe it is correct to assume that two groups, blacks and Hispanics, have, and continue to, experience discrimination as a group?

Dr. LA NOUE. Discrimination by whom? That is, who is committing the discrimination, Government procurement officers?

Ms. NORTON. You are free — by anybody in America as a group.

Dr. LA NOUE. Well, Ms. Norton, I think——

Ms. NORTON. I didn't ask you to rephrase my question; I asked you to answer my question. I put it to you again. Is it correct to assume that people who are black and Hispanic, as a group, will tend to encounter discrimination, as a group, more than, for example, people who are white, as a group?

Dr. LA NOUE. If you are referring to societal discrimination, that is an assumption I would make. Whether that is true when they confront Government procurement officers——

Ms. NORTON. I am going on to the next question. Here we have a presumptive eligibility for a program. The testimony this morning was as to qualifications to get a contract that was a matter of individual eligibility and individual merit. That is to say, you get into the ball game based on the presumption that you have just indicated was not an unfair presumption to make about the group, but when it comes to the contract that was the unrebutted testimony this morning, people are, in fact, judged on an individual basis.

Dr. LA NOUE. The circle of competition is dramatically reduced, because only this handful of contractors, even among minorities, let alone everybody else, is considered, because the 8(a) Program is so small.

Ms. NORTON. Are you both aware that the majority of SBA set-asides go to whites?

Dr. LA NOUE. You will have to tell me more about that.

Ms. NORTON. I just told you the facts.

Chair MEYERS. I beg your pardon?

Ms. NORTON. Of the various set-asides across the Government, the majority of those go to whites and not to blacks.

Dr. LA NOUE. They just go to small businesses.

Ms. NORTON. Yes, small business set-asides, overwhelming majority.

Dr. LA NOUE. In those contracts there are no racial preferences.

Chair MEYERS. They are——

Ms. NORTON. Madam Chairman, is this my time or not? I asked the witness, and he can respond, as I understand the rules of this Committee.

Can you eliminate racial discrimination in a program designed to eliminate racial discrimination where the greater majority of those in the program are white?

Dr. LA NOUE. I guess the question is, could the program be redesigned to focus on persons with certain objective economic and social disadvantages, of which the number would probably be disproportionately but not exclusively——

Ms. NORTON. That was not my question. My question is if, in fact, there is a problem that has been identified in the society, that some people — let's assume blacks and Hispanics — have experienced specific discrimination, discrimination specifically addressed to them based on their race and ethnic origin, is it possible to fulfill the congressional intent to eliminate the specific discrimination for them if they are operating in a program where the majority of those in the program are white? That is my question.

I do not wish my questions rephrased; I wish them responded to.

Chair MEYERS. I wouldn't begin to know how to respond to that though.

Ms. NORTON. I didn't ask you that question, Madam Chairman; I asked the expert.

You are here as an expert. That is my question. What is your answer?

Dr. LA NOUE. The program, of course, includes more than blacks and Hispanics; it includes——

Ms. NORTON. What program?

Dr. LA NOUE. The 8(a) Program. It includes a substantial and growing number of Asian Americans.

Ms. NORTON. If you feel more comfortable answering my question, by adding other groups, then add them, but please answer my question.

Dr. LA NOUE. Well, forgive me, but it seems to me that this is not a program that was aimed at addressing the kinds of discrimination that Government programs can address. The Court has told us that societal discrimination is not a permissive basis for Government use of racial classifications.

Ms. NORTON. You are saying there has been discrimination by the U.S. Government against blacks and Hispanics and other people of color in procurements and that the only discrimination there has been has been discrimination in the society at large, otherwise known as societal discrimination?

Dr. LA NOUE. I don't know, and I don't think the Government has made the case yet.

Ms. NORTON. Thank you very much.

Chair MEYERS. Thank you all very much for being here.

This was a contentious and difficult hearing. I appreciate your participation just tremendously. I remain totally unconvinced, but I will keep listening to absolutely everybody. We are adjourned.

Mr. LAFALCE. Madam Chairwoman, what date do we have our hearing?

Chair MEYERS. That is what I said we will have — we had two representatives from you this morning——

Mr. LAFALCE. That is not my question. My question is, what date?

Chair MEYERS. I don't know. I have said to you I will take this under advisement. I have no idea what the floor schedule is going to be next week. I am complying with the guidelines of the House Parliamentarian, and I just can't tell you any more than that. We are adjourned.

[Whereupon, at 2:49 p.m., the Committee was adjourned, subject to the call of the Chair.]