# EXHIBIT A-13
# (part 3)

# APPENDIX

**Statement of Congresswoman Eva Clayton**
**Before the United States House of Representatives**
**Committee on Small Business**
**Hearing on H.R. 3994, "The Entrepreneur Development Act"**

**Wednesday, September 18, 1996**

Madame Chairwoman, today the Small Business Committee stands convened to hear testimony on the merits of H.R. 3994, "The Entrepreneur Development Act of 1996." As introduced, this bill will dramatically change the purpose and intent of the 8(a) program.

First, the bill would repeal the statutory authority for the 8(a) program; thereby, removing the contracting authority under which federal agencies award contracts to 8(a) participants. In its place the bill would establish an Entrepreneur Development Program that would enhance the 7(j) technical assistance component of the 8(a) program, without providing for a contracting mechanism.

Second, H.R. 3994 broadens the criteria under which applicants may enter the redesigned program. The bill does this by creating a new category of emerging small businesses -- which is defined as those firms that are owned by economically disadvantaged individuals or eligible groups and do not exceed 25 percent of the size standard for their respective industries -- and by eliminating the presumption of social disadvantage based upon racial or ethnic classification.

Proponents of H.R. 3994 argue that the provisions included in this bill will correct the most egregious and contemptible abuses of the 8(a) program, while retaining and broadening access to the program's established counseling and business planning outreach elements -- on a race-neutral basis. They argue that the 8(a) program, as presently conformed is replete with waste, fraud, and bureaucratic incompetence and has failed as a minority business development program.

To buttress this claim they argue that of the more than 6,000 firms currently participating in the 8(a) program, only 1% of these firms, the majority of which are located in the Washington, D.C. Metropolitan area, receive 25 percent of

the contracts awarded. In addition, they argue that the SBA has never "graduated" an 8(a) firm and that firms rarely if ever emerge from the program as "competitive businesses."

Underlying these systemic arguments against the 8(a) program, is a fundamental believe that the program is primarily a racial quota program designed to benefit specific racial groups at the expense of others. The program in its present form, therefore, is as the Chairwoman has said, "fatally flawed" and badly in need of "reform."

Combined with other so-called "reforms," proponents of H.R. 3994 maintain that this bill will construct a program which enables minority small business owners to participate more fully in the federal procurement process and diminish bureaucratic mismanagement, while not relying upon racial quotas or permitting a very few firms to be awarded a disproportionate number of contracts.

Sounds good doesn't it?

I admit, that were the abuses in the 8(a) program as onerous as some have made them appear, the bureaucratic ineptness so profound, or the bill so praiseworthy, I too would be before the Committee today extolling the virtues of H.R. 3994 and calling for the repeal of the 8(a) program.

However, Madame Chairwoman, thankfully, the abuses are not so onerous, the bureaucratic ineptness so profound, nor the bill so praiseworthy that I feel compelled to support this bill.

In fact, Madame Chairwoman, I feel just the opposite. I am offended and outraged by the continued mis-characterization of the 8(a) program as a corrupt and "fatally-flawed" program. I am appalled at the arrogance with which some have disparaged and sullied the reputations of honest businessmen and women. I am shocked at the ease with which some have fabricated or manipulated data to support their erroneous claims.

Rather than being a "fatally-flawed" program, as the Chairwoman has suggested, I believe that the 8(a) program remains a vitally important program. Yes, there is some abuse associated with the program. Yes, there is a measure of bureaucratic mismanagement that needs to be weeded out. Nevertheless, despite these minor problems, I deeply believe that the program is working. It

is working by increasing minority and women owned small business participation in the $203 Billion dollar federal procurement process. It is working by developing minority and women owned small businesses capable of thriving in a competitive environment. And, it is working by providing tens of thousands of people with well paid jobs.

Further, this belief is not simply based upon my intuition or a personal hunch, it is supported by impartial data. According to the Small Business Administration, in 1986 all small disadvantaged firms (including 8(a) participants) received $5 billion, or 2.7 percent of the $185 billion in total Federal contract dollars. By 1995, with a reemphasis on 8(a) and Department of Defense SDB contracting, such firms received $11.2 billion, representing 5.5 percent of Federal contract dollars of $202.3 billion. Without the 8(a) Program's award of $6.4 billion in FY 1995, total Federal contract dollars awarded to small disadvantaged firms would have aggregated $4.8 billion, representing only 2.4 percent of total Federal contract dollars. Moreover, at present there are over 6,000 firms participating in the 8(a) program -- 80 percent of which are located outside the Washington, D.C. area -- employing more than 157,000 people and paying approximately $100 million dollars in taxes.

Clearly, then, if one were to examine the 8(a) program on economic impact alone, the program will be seen as necessary to ensuring minority and women owned small businesses participation in the federal procurement process.

Upon what then do opponents base their claims that the 8(a) program is so profoundly flawed as to prohibit reform? As suggested earlier, opponents of the program base their opinion primarily upon three arguments. First, they maintain that the program is simply a racial quota system, awarding contracts on a sole-source basis without competition. Second, they argue that a few large firms located in the Washington, D.C. area are disproportionately awarded the majority of 8(a) contracts. Third they argue that few if any companies graduate from the program and are capable of thriving in a competitive environment.

Let me take a moment to address each of these issues. The first claim that the 8(a) program is a racial program is a misleading assertion. True, the program does award the majority of its contracts on a sole-source basis. However, sole-source as applied to the 8(a) program is not identical to sole-source in the regular procurement process. 8(a) firms must self-market their capabilities to Federal customers in order to have the opportunity to have the opportunity to

negotiate a sole source contract, competing against hundreds of other 8(a) firms. Competition in the 8(a) program, therefore is real and stringent. Indeed, 19 to 20 percent of 8(a) contracts were awarded on a straight-up competitive basis, whereas last year two large defense contractors were awarded sole source contracts -- in the true meaning of the word sole source -- in an amount greater than the sum of all the contracts awarded in the 8(a) program. In addition, participation in the 8(a) program is not limited to racial or ethnic minorities. Individuals who are not members of designated ethnic or racial groups may also participate in the 8(a) program if they can demonstrate that they are "socially disadvantaged."

The second claim made by opponents of the 8(a) program is that 1 percent of 8(a) participants, who are largely located in the Washington, D.C. area, received 25 percent of the contracts. While this is true, what critics fail to mention is that the federal government, quite simply, awards contracts where work needs to be performed. Therefore, given the concentration of federal agencies in the Washington, D.C. area, it is not surprising that their exists a disparity between the number of contracts awarded in the Washington area and the rest of the country. Moreover, the SBA has recognized this disparity and has taken administrative steps to correct it.

The final argument made by opponents of the program is that the SBA has rarely if ever graduated companies from the 8(a) program. While this claim does have an ounce of validity, it is far from accurate. Between October 1, 1992 and September 30, 1995 1,242 firms completed or exited the 8(a) program. Of these, 646 firms -- over 50 percent -- continued as thriving businesses.

Behind this statistical evidence is literally hundreds of businesses that graduated from the 8(a) program and continued to grow and expand. One such company is Shaw's Food Service, a North Carolina based catering company owned by my constituent Larry Shaw. Larry Shaw entered into the 8(a) program in 1974 and received his first contract two years later. In the early 1980's Shaw left the 8(a) program and continue to diversify his clientele and grow his business. Today, Shaw Foods Services is a multi-million dollar company employing close to 700 employees that has contracts with Howard University, North Carolina A&T, and R.J. Reynolds Tobacco company. For his success, Mr. Shaw credits the 8(a) program. He says that his company "benefitted from it [8(a)] right away. We were able to build an infrastructure, gain experience and establish a track record."

Accordingly, the criticisms leveled against the 8(a) program, if analyzed impartially and unbiasedly, have little if any basis. If anything, Madame Chairwoman, they point to the need for continued oversight and refinement of the program -- a process that the SBA has already begun. Even the GAO, in its testimony will testify that the SBA has instituted several administrative mechanisms that have increased the efficacy of the program and has eliminated much of the previous bureaucratic mismanagement.

H.R. 3994, however, does not reform or improve the 8(a) program. It guts it, leaving in its place a program which already exists in law and which increases the paperwork burden on small business owners. Reconstituted as the "Entrepreneur Development Program," this program is nothing more than an expanded 7(j) technical assistance program without the contracting authority of 8(a).

Madame Chairwoman, I submit that the changes included in H.R. 3994 are bad for minority and women owned small businesses. It is shortsighted, and it is harsh. I urge my colleagues to oppose this unnecessary and redundant bill.

**Statement**
**Congressman Cleo Fields**
**September 18, 1996**
**HR 3994, The Entrepreneur Development Reform Act of 1996**

Madame Chair:

It concerns me greatly that we are even having this hearing on HR 3994, the Entrepreneur Development Act of 1996 which proposes to amend the Small Business Act by repealing the 8(a) Contracting program. I agree that the 8(a) program needs adjusting, which the Administration and the Justice Department are currently doing, but by no means should the program be terminated.

In my state of Louisiana, there are 96 participating firms in the 8(a) program and they employ over 2,800 people. Furthermore, they generated more than ninety-one and a quarter million dollars in FY 1995. This type of economic stimulus is crucial in a state as impoverished as Louisiana. Socially and Economically disadvantaged businesses would not have the opportunity to contribute so generously to the economy if not for the 8(a) program. Before it was implemented, only 3% of minority businesses were given contracting consideration.

What must be kept in perspective is that contracts are not given to select firms, rather, successful 8(a) firms have to pass technical evaluations, devise marketing strategies and submit detailed proposals to demonstrate their competence. The 8(a) program is necessary to assist small businesses overcome the effects of discrimination which would otherwise make them susceptible to failure.

This crucial component of the SBAs effort to assist small businesses become and remain self-sufficient should be closely examined -- to improve it not to destroy it -- especially in light of the many successes it has reaped.

*Opening Statement of Floyd H. Flake*
*House Committee on Small Business*
*September 18, 1996*

GOOD MORNING LADIES AND GENTLEMEN OF THE COMMITTEE, AND TO THOSE PRESENTLY IN THE COMMITTEE ROOM. I AM HAPPY TO SEE SO MANY OF YOU IN THE AUDIENCE AS I THINK IT IS A CLEAR INDICATOR OF HOW MUCH INTEREST WE ALL HAVE IN THE PROGRAM BEING ADDRESSED TODAY. THE SMALL BUSINESS ADMINISTRATION'S 8(a) PROGRAM HAS INDEED AFFECTED MANY OF OUR LIVES, THOSE OF FRIENDS, FAMILY, EMPLOYERS, AND COLLEAGUES.

I WOULD NOT BE HAPPY WITH MYSELF MADAM CHAIRMAN IF I DID NOT MAKE IT UTTERLY CLEAR THAT I AM EXTREMELY CONCERNED WITH THE STRATEGY YOU'VE CHOSEN TO EMPLOY TODAY. THIS MAY BE AN UNDERSTATEMENT. FOR A PROGRAM THAT SIMULTANEOUSLY ADDRESSES TWO OF THE POSSIBLY MOST IMPORTANT ISSUES OUR COUNTRY FACES TODAY; RACE AND BUSINESS DEVELOPMENT, THE CASUAL AND CARELESS DISREGARD BEING SHOWN IS NOT ONLY DISPROPORTIONATE; IT IS OFFENSIVE.

I BELIEVE YOU HAVE CHOSEN TO TAKE THE "BABY WITH THE

BATHWATER" APPROACH HERE TODAY, MADAM CHAIRMAN. I AM SURE YOUR STAFF HAS BEEN SUCCESSFUL IN LOCATING SOME FORMER 8(a) COMPANY OWNERS, DISGRUNTLED FOR WHATEVER REASON. THEIR CONCERNS MAY BE VALID. BUT ANECDOTAL EVIDENCE OF SYMPTOMS HAS RARELY BEEN GOOD SCIENTIFIC CAUSE FOR DIAGNOSING A DISEASE, AND HAS CERTAINLY NEVER HELPED FIND A CURE.

AND THERE IS A DISEASE, MADAME CHAIRMAN, OF WHICH I AM NOT SURE YOU ARE AWARE. IT IS A DISEASE THAT IS AFFECTING CERTAIN MEMBERS OF OUR POPULATION WITH MORE DEVASTATION THAN OTHERS. I WILL NOT BE COY, MADAME CHAIRMAN. THE PEOPLE MOST NEGATIVELY AFFECTED ARE MINORITIES, AND THAT DISEASE IS JOBLESSNESS. THE RATE AT WHICH JOB AVAILABILITY IS DISAPPEARING IN BOTH OUR CITIES AND OUR RURAL COMMUNITIES IS APPALLING. VAST BLOCKS HAVE BEEN ABANDONED WHERE ONCE THRIVING BUSINESSES STOOD.

**AND I CANNOT BELIEVE WE AS A BODY HAVE THE AUDACITY TO SIT HERE TODAY AND USE OUR POWERFUL SEATS IN CONGRESS TO ELIMINATE A PROGRAM THAT CAN LIST JOB AND**

**WEALTH CREATION AMONG MINORITY COMMMUNITIES AS ONE OF ITS ACCOMPLISHMENTS.**

I BELIEVE THIS HEARING STEMS FROM A PROFOUND MISUNDERSTANDING OF BOTH THE PROGRAM AND OF THE PROBLEM THE PROGRAM IS SEEKING TO ADDRESS. THE 8(a) PROGRAM IS NOT A GIVEAWAY. IT DOES NOT ELIMINATE COMPETITION AMONG FIRMS. IT IS NOT EVEN THE MOST GENEROUS OF SOLE SOURCE CONTRACT PROGRAMS. AND IT CERTAINLY, IN NO LIGHT, COULD IT BE CHARACTERIZED AS A MEAL OF LOBSTERS DINNERS, AS THE CHAIRWOMAN HAS CLAIMED. WE **SHOULD** BE HERE TODAY PROPOSING SENSIBLE, POLICY-DRIVEN IMPROVEMENTS TO A PROGRAM THAT HAS BEEN LARGELY SUCCESSFUL IN EVERY WAY. THIS BILL, COLLEAGUES, GUESTS, AND MADAME CHAIRMAN, DOES NOT EVEN COME CLOSE.

**Opening Statement**
**Honorable John J. LaFalce**
**Committee on Small Business**
**September 18, 1996**

**Hearing on H.R. 3994**

Madame Chairman, forgive me if I dispense today with the customary opening words of thanks for the convening of a hearing.

I am deeply disturbed by your decision to hold today's hearing on the Minority Small Business and Capital Ownership and Development Program -- commonly known as the 8(a) program -- both procedurally and substantively.

The 8(a) program is important to and supported by many small business advocates, small business owners, and a sizable percentage of the members -- perhaps even the majority -- of this committee. It and its predecessors have been the cornerstone of several Republican and Democratic administrations' efforts to bring disadvantaged small businesses into the economic mainstream.

Procedurally, to hold a hearing on your widely-opposed bill to kill this program at the 11th hour in the 104th Congress is an approach to public policy making that can only lead to ill-considered results.

Substantively, let me assure you that, Committee Democrats, and perhaps some of our Republican colleagues, are ready to defend the obvious merits of this program in what I hope will be the last battle of this kind this year. The defenders of the less fortunate and the working class have already earned their pay during this Congress by resisting as committee after committee sought to dismantle programs that attempt to inject some fairness and dignity into the process whereby we distribute wealth and resources.

I am never one too proud to accept reinforcements for fighting the good fight. Let me, therefore, take a moment to officially welcome the newest members of the Small Business Committee on the Democratic side: Representatives Maxine Waters, Eleanor Holmes Norton, Jim Clyburn, and Xavier Becerra. I look forward to working with all of you and I encourage your active participation during today's hearing.

The 8(a) program was created in response to a tragic reality of American life: the inability of some individuals to participate in our economy because of who they are. Programs like 8(a) have not outlived their usefulness because

discriminatory treatment of certain Americans is not a thing of the past. It is small comfort to argue, as some do, that discrimination today is "only" subtle, or unconscious, or generational, or situational. The fact remains that discrimination exists. It affects the individuals with whom one associates, the businesses one patronizes, perceptions of who can do the job, and the ability to access capital on a fair and equitable basis. In other words, all of the aspects of doing business. The 8(a) program merely seeks to give firms a chance to rise above discriminatory barriers with the hope that, given this opportunity to develop, they will become competitive, viable firms in the open market.

8(a) firms are guaranteed nothing. They have to market themselves and provide their goods and services at a fair and reasonable price. They are required to compete among themselves for contracts above certain amounts. If their eligibility ends before they finish the full nine years in the program, they are terminated.

So-called "evidence" is endlessly trotted out to show how flawed this program is. Often-cited one is the view that too many contracts go to firms in too few geographic locations. Certainly the issue of geographic concentration merits examination. But I don't know of any other federal program that is criticized because of where private sector firms choose to locate. Indeed, buzz-words such as Silicon Valley and Route 128 have come into the English language based on the tendency of firms to co-locate for whatever business rationale drives them. Other examples include the concentration of financial services in North Carolina and New York, textiles and carpets in the Carolinas. I could go on and on. Indeed, Harvard Business School Professor Michael Porter has coined the term "clustering" for this tendency of like firms to co-locate, and he has documented that firms do so to go where the expertise is. More important and interesting for our purposes, however, is the fact that Professor Porter has found that this close proximity among firms is a factor in <u>enhancing competition</u>. Let us not be sidetracked by spurious problems.

That being said, I will not sit here today and pretend that there is no room for improvement in the 8(a) program. In 1988, I sponsored reform legislation that became law which underscored the business development nature of the program. In fact, it is precisely the fact that 8(a) is a business development program that ensures that it passes scrutiny under <u>Adarand</u>. Among other things, we established a maximum program time of 9 years, we introduced competition among program participants for larger contracts, and we created the business mix requirement wherein the percentage of 8(a) firms' reliance on 8(a) contracts must decline over time. I know that the current and former SBA Administrators have

made great strides in reforming the program, making it more business-like and bringing it into line with the program envisioned in the statute. The fact that the program has not always received this kind of attention from SBA officials in the past accounts in some measure for the program's problems, but legitimate beneficiaries of 8(a) assistance should not be punished for that.

I repeat, legitimate beneficiaries. As in any program, there are people who will come up with scams to profit unfairly from the 8(a) program. As you may know, for example, in 1988, this committee investigated a Kansas 8(a) firm called EDP, which received a $30 million contract for food processing. During my chairmanship, this Committee referred the matter to the Department of Justice, the FBI, and the SBA's Inspector General for follow-up regarding the possibly illegal benefit from this contract that accrued to several people, including individuals with very close ties to former Senator Robert Dole. Indeed, what apparently set this contract award in motion for EDP was a phone call from former Senator Dole to the then-administrator of the SBA. President Bush's administration did not act on the information we referred and the matter largely dropped out of the public eye. Recently, however, a key player in this drama has dropped his previous wall of silence and may now be willing to testify before the Committee as part of this hearing on the 8(a) program. I certainly expect that the Chair will work with us to develop the necessary information and answer the previously unanswered questions.

In regard to the timing of today's hearing, we all know that the Administration is in the midst of reviewing affirmative action in federal procurement programs to ensure that they comply with last year's Supreme Court decision in Adarand Constructors, Inc. v. Pena. An extensive proposed rule was published in the Federal Register in May by the Department of Justice, a public comment period followed, and the Department is now reviewing these comments prior to issuing a final rule. Why not wait to see the results of this reform process before taking drastic legislative action? Given that this reform process is on-going, today's hearing is not only ill-advised but meaningless in terms of any serious evaluation of the 8(a) program. No criticism leveled today is relevant, as the program we are examining is changing even as we speak.

In addition, the Committee has a number of programs under its jurisdiction which do require 11th hour attention. We should be using this time to work in a bipartisan manner on them rather than dividing into two opposing camps for a hearing on a controversial bill that has no chance of becoming law. In the handful of remaining legislative days, we still have to mark-up and present to the House the Small Business Investment Company bill and work with the Senate to finalize

the legislation reauthorizing key SBA lending and guarantee programs. I have to tell you, Madame Chairman, that your insistence on today's hearing can not but have a dampening effect on any spirit of compromise and cooperation among members on this side of the aisle, who you have to know would be upset by this hearing and the attack on this program.

At this point, I would like to submit into the record a letter from former Congressman Mfume, now President of the N.A.A.C.P., and previously a highly respected Memberm of this Committee, in opposition to this legislation.

Now, to proceed with today's business. I welcome all of the witnesses and I hope that their comments are constructive. One need not be especially gifted to find fault with something, but it usually takes the best and brightest to make something work better.

In closing, however, I would be remiss if I did not note my dismay about the imbalanced roster of witnesses the majority has structured.

As recently as yesterday afternoon, the majority still had not given us a list of witnesses nor even confirmed the number. We were only told that there would be up to 5 private sector witnesses speaking against the program and that we could invite 2 private sector witnesses. We had requested that our witnesses at least be placed on the appropriate panel and given a reasonable opportunity to present their views. We were assured that would be the case. This morning we find that they are now the last witnesses in a very long hearing. The reason no information was given on the Democratic witnesses was that our request for the names of the Republican witnesses was denied. Such discourtesy among Members on this Committee is unprecedented.

Therefore, Madame Chair, I am submitting to you a letter from the majority of the Democratic Members requesting, as is our right, a full day of Democratic hearings on this important issue.

**STATEMENT of**

***CONGRESSWOMAN JAN MEYERS, CHAIR***

**hearing before**

***the COMMITTEE on SMALL BUSINESS***

***U.S. House of Representatives***

**"Reform of the SBA's 8(a) Program Through H.R. 3994, the 'Entrepreneur Development Program Act of 1996.'"**

***September 18, 1996***

Today, for the third time during the 104th Congress, the Committee on Small Business has convened to review the impact of the Small Business Administration's Minority Enterprise Development Program which we commonly refer to as the 8(a) Program.

It is well known that I have long held grave concerns about this program, not only from the standpoint that it fails to provide the kind and quality of development assistance to disadvantaged small business that Congress intended, but also from the standpoint that its failing performance comes at a tremendous cost to the taxpayers.

This morning, for the first time in my memory, we will hear from small business owners who exemplify the kind of individual Congress really intended to benefit from 8(a), but whose stories are filled with disappointment, discouragement and personal loss. It has not been easy for these brave individuals to come forward and some of them have been intimidated and threatened with reprisal and blacklisting. I want to personally commend and thank each one of them for helping this Committee break ground today and truly get to the bottom of the problems plaguing this program. We also will hear from officials of the Small Business Administration and the General Accounting Office as well as independent experts and scholars who will speak to the program's performance and its Constitutionality.

Congress intended that 8(a) would utilize federal procurement to promote development of small businesses owned by socially and economically-disadvantaged individuals, and its enacting legislation put in motion a contract-letting mechanism within the Small Business Administration (SBA) through which federal agency purchases now worth about $6 billion are sublet, for the most part, uncompetitively as set-asides.

Under the shelter of the 8(a) umbrella, the reasoning went, eligible companies would have an opportunity to get on their feet, gain practical business experience, and at the end of a maximum of nine years, spread their wings in the competitive marketplace.

In practice, however, opportunity has been minimal for most of the 6,000 or so firms certified, who have found that a select few companies, though financially able, remain in 8(a) long after achieving a success level of which most struggling entrepreneurs

only dream. One prime example was recently found in the program history of a Washington-area computer hardware supplier, which last year tapped the 8(a) Program for a $97 million contract. Not surprisingly, this whopping order came in the last two years of the company's statutorily-allowed participation in 8(a), yet its own officers predict that it probably will take up to five years to complete the contract. As a columnist in the *Washington Times* wrote just last week, this company's owner is surely as disadvantaged as most people aspire to be.

This example offers yet another chapter in a growing volume of horror stories in which inside the beltway firms use 8(a) as a fast track to lucrative, multi-million-dollar contracts that no truly small nor disadvantaged business could handle. I refer here to three high-profile case studies of 8(a) abuse, which some of our more senior members will recall - I-Net and Tamsco, and of course, the nationally-publicized example of Wedtech.

By contrast, many firms who do win certification after lengthy battles with the SBA find the 8(a) well bone dry and never get a contract.

Congress has attempted to clean up the longstanding problems with this program through three major legislative overhauls in 1978, 1980 and the most substantial in 1988. Each time we have directed the SBA to increase oversight of this program to ensure that the program's benefits are distributed fairly and to guard against fraud and abuse. Nonetheless, more than a dozen studies by independent investigators, including the General Accounting Office and the National Academy of Public Administration, have

given the program poor and, in many cases, failing grades. General findings of these studies have concluded that 8(a)'s success in helping disadvantaged firms to become self-sufficient and competitive was minimal. More specifically, they found that only a fraction of 8(a) contracts awarded were bid competitively, that less than four percent of 8(a) firms emerge from the program as competitive businesses; that the top-50 firms doing business through 8(a) represent only one percent of the firms certified, and yet in one year that small group took a huge piece - in fact one quarter of the 8(a) business and finally that the SBA has allowed firms that clearly do not meet the program's guidelines as socially and economically disadvantaged.

At my request, the General Accounting Office has conducted another review of 8(a) and will bring an update of program performance in these critical areas, which I have just outlined.

This morning, we also will examine another very critical piece in this puzzle, which is the SBA's ability to manage this program. This Committee has spent hundreds of hours looking into 8(a) and attempting to get to the heart of the problems in this program. Repeatedly, the SBA has been either unable or unwilling to provide reasonable and timely answers to basic questions of managerial activity and program performance. Another telling example lies in the agency's failure to provide Congress an annual report of the 8(a) Program's performance, which is required by law on April 30. This year, that report was delivered to Congress 80 days late and finally arrived here only after I issued a press release highlighting the agency's failure to comply with the law.

This lapse of sound management has done little to improve the 8(a) Program's standing with Congress. More importantly, though, it suggests that we do not have a steady hand on the wheel of a $6 billion vessel - and that, in my view, is unacceptable.

Now, let me say to my colleagues that I did not come to Congress to eliminate programs or to protect programs embraced by special interests. But when a program fails to show ability to achieve its goals over the course of 18 years, I know that Congress has a responsibility to act. It is for that reason that I introduced H.R. 3994, the "Entrepreneur Development Program Act of 1996," which would sunset the 8(a) Program's predominantly sole-source contracting arm, while retaining and broadening access to its established counseling and business planning outreach elements. This approach would end, once and for all, the contracting shenanigans that the SBA and the participating agencies have engaged in to game the system and funnel billions of dollars to beltway insiders. It also would focus valuable business development assistance to the struggling, bottom tier of small businesses whose proprietors aspire to success rather than conspire to hide it.

Before we turn to the ranking member and our witnesses, I also want to address an issue which I am sure my critics will raise in short order: that is, that my proposal to repeal contracting under 8(a) will hurt women. Let's be clear: the 8(a) Program does not now and has never provided that women are presumed eligible for certification. Indeed, I should know, since in 1992, under the Democratically-controlled Congress, I introduced legislation to make all women eligible. I was defeated then because the same small group

of individuals who are defending the program in its current form today did not want to give one inch to a potential new group of eligibles. Furthermore, I am acutely aware of the enormous strides women have made in business and particularly small business, over the past 20 years. And I take pride in the fact that I have been a part of their advancement. But let me make it clear, women do not owe their advancement to the 8(a) Program. They owe it principally to their own hard work, determination and federal policies that have offered opportunity open to all women - not just those whose ethnic origin qualify them as eligible.

Finally, let me say that over the course of the past few months, I have personally met with representatives of some of the leading 8(a) companies. We have had frank discussions and I will reiterate publicly that, despite what my critics will say here today, I do not begrudge any of the contractors their success - and I do not offer my legislation as any sort of retribution. I offer it because there are too many of their peers who are equally qualified and deserving but who cannot get a foot in the door of this program.

Let me also make it clear that in my heart I do believe the intent originally behind 8(a) was very worthy. But after long deliberation, I have concluded that the program is fatally-flawed. The SBA cannot manage it and I doubt seriously whether the faculty of the Wharton School and the CEOs of the top 10 corporations in America could either.

As I reviewed the first legislative reform of 8(a), which Congress passed in 1978, I was struck by the words offered by Senator Sam Nunn as the other body prepared to move that bill. "If a firm can never succeed on its own without 8(a) contracts," the

Senator said, " it not only would be a cruel hoax on the firm itself, but it would also be a waste of valuable resources which could be applied to other business which eventually could be successful."

He added: "We must not allow the 8(a) program to simply be a rich-get-richer, poor-get-poorer program."

The facts speak for themselves. It is clear that, just as the Senator warned, a cruel hoax indeed has been perpetrated against far too many of those the 8(a) Program was intended to aid.

At this point, I recognize the Ranking Minority Member, Mr. LaFalce, for an opening statement.

***Statement of Congresswoman Millender-McDonald In Opposition to the "Entrepreneur Development Program Act of 1996"***

---

Madam Chairwoman,

**I have grave concerns about the negative impact that the "Entrepreneur Development Program Act of 1996" will have on the 17 businesses in my Congressional District who have qualified to participate in the Small Business Administration's (SBA's) 8(a) program, THEY have conducted their businesses according to the rules and now they face elimination of the 8(a) program, at time when the need for the program continues to exist. It is not possible to argue that these businesses operate in an environment devoid of the very discrimination that brought about the 8(a) program. The Congress created the 8(a) program with the presumption that certain disadvantaged groups (including African Americans, Asian Americans, Hispanic Americans and Native Americans) are "socially disadvantaged." Recent statistics indicate that this presumption remains true. Disadvantaged business owners receive approximately six percent of total federal contract dollars whereas disadvantaged individuals, as defined by the Small Business Act, constitute over 25 percent of the Nation's population. There is still a need for the 8(a) program, and we have a long way to go before we can begin to consider a gradual phase out of this important program.**

**The "Entrepreneur Development Program Act of 1996" is shamefully lacking in business development assistance which is the hallmark of the 8(a) program. The 8(a) program is one of the few government programs which meet the requirements of the Supreme Court's opinion in the Adarand case, which is the law of this land.**

**In all 8(a) awards, the contracting officer certifies that the contract prices charged by the 8(a) firms are "fair and reasonable." Through a negotiation between the contracting officer and the 8(a) firm, a "fair and reasonable" price is assured, as the contracting officer is under no requirement to give the firm the contract in the absence of this condition being satisfied.**

As a new Member of this House of Representatives, I want to make clear that I am working to make sure that the taxpayers get value for the dollars that they send to the federal government. Eliminating the 8(a) program will cost the taxpayers more, and put hardworking Americans, like my constituents, out of work. Current 8(a) firms directly employ more than 157,000 people. The multiplier effect of these 157,000 jobs results in considerable additional employment through subcontractors and suppliers to 8(a) contractors. If there are problems with the 8(a) program; let's mend it, not end it.

The SBA is doing its part to improve the 8(a) program, having removed 371 ineligible firms from the program since 1994. An additional 200 firms have been reviewed and are proposed to be removed in the remainder of FY96.

In working cooperatively with the Office of the Inspector General, the SBA eliminated loopholes (indefinite delivery, indefinite quantity contacts) that allowed abuse of the program by non-competitive award of contracts in excess of competitive thresholds.

Consistent with the business development focus of the 8(a) program, the SBA has increased the level of competitive bidding within the program. The dollar value of competitive awards has increased threefold over the last three years.

The "Entrepreneur Development Program Act of 1996" does not address the needs of the American people. As much as I would like to walk into this hearing with an open mind, I cannot. This is a bad bill, and it must be defeated.

**OPENING STATEMENT**

**for**

**Congressman Glenn Poshard**

**19th Congressional District**

**of Illinois**

**Small Business Committee Hearing**

**H.R. 3994**

**September 18, 1996**

Madame Chairman, thank you for convening this committee hearing today on the "Entrepreneur Development Program Act of 1996". I believe this is a successful program and I am somewhat puzzled why we would want to eliminate it, and would like to take a moment to speak in opposition to H.R. 3994, and ask some questions after my statement.

The 8(a) program was implemented by President Johnson with the initial purpose of aiding distressed urban areas and creating more jobs. This program has proven to be successful and by all indications this trend will continue.

In my district alone there are ~~three~~ four prime examples of successful 8(a) participants;

* B&M Construction Inc., which has seen a two million dollar increase in sales,

*Spates Construction Co., which in sales alone, has grown 1.5 million dollars,

*Fossie Brothers Inc. and R&E Midwest Sales Co. both have increased in sales by $100,000 in just a few months.

Granted, these are just a few examples of 8(a) participants, but it goes without saying that eliminating the 8(a) program would be detrimental to the growth of small business.

Before closing my statement I would like to address the panel with some concerns.

1. Why would you eliminate a program that has proven successful and helped so many economically-disadvantaged people become private entrepreneurs?

2. How much money did the 8(a) program receive in new sole-source awards as opposed to non-8(a) firms last year?

Madame Chairman, I urge my colleagues to consider the success of the 8(a) program and oppose H.R. 3994. I thank you for your time.

NYDIA M. VELAZQUEZ
12TH DISTRICT, NEW YORK

COMMITTEE ON BANKING AND
FINANCIAL SERVICES
SUBCOMMITTEE ON HOUSING AND
COMMUNITY OPPORTUNITY
SUBCOMMITTEE ON GENERAL OVERSIGHT
AND INVESTIGATION

COMMITTEE ON SMALL BUSINESS
SUBCOMMITTEE ON REGULATION AND
PAPERWORK REDUCTION

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515–3212**

132 CANNON BUILDING
WASHINGTON, DC 20515
(202) 225-2361

DISTRICT OFFICES

815 BROADWAY
BROOKLYN, NY 11206
(718) 599-3658

173 AVENUE B
NEW YORK, NY 10009
(212) 673-3997

50-07 108TH STREET
2ND FLOOR
QUEENS, NY 11368
(718) 699-2602

**STATEMENT SUBMITTED FOR THE RECORD**
**BY**
**CONGRESSWOMAN NYDIA M. VELAZQUEZ (D-NY)**

**HEARING ON H.R. 3994,**
***THE ENTREPRENEUR DEVELOPMENT PROGRAM ACT OF 1996***

**HOUSE SMALL BUSINESS COMMITTEE**
**SEPTEMBER 18, 1996**

Thank you, Madam Chair, for holding this hearing and providing this opportunity to discuss and explore H.R. 3994 and its impact on the Section 8(a) Minority Small Business and Capital Ownership Development Program. This program has been essential in our fight against the discrimination that socially and economically disadvantaged persons face across this country.

As the 104th Congress winds down, the Republicans have once again targeted minorities and women for attack. While only representing 3.1% of total federal contracts, 8(a) is a valuable program to level the playing field for socially and economically disadvantaged businesses.

When the program was created pursuant to President Nixon's executive order in the early 1970s, the reasons to create the program were clear. Historically, minorities and women struggled to compete for federal contracts due to discrimination. Thus, Congress presumed that, in light of these groups' histories, the ability of members of these socially and economically disadvantaged groups to compete in the marketplace had been impaired.

Unfortunately, recent SBA statistics indicate that this presumption remains true. For example, disadvantaged business owners receive approximately 6% of total federal contract dollars while disadvantaged individuals, as defined by the Small Business Act, constitute over 25% of the country's population. Any minority or woman-owned business will tell you that the barriers still exist and that the 8(a) program is essential to at

least get the foot in the door of federal contracting.

Section 8(a) is a business development program designed to help eligible small businesses reach a point of self-sufficiency and competitive viability. To participate in the program, such firms must demonstrate a potential for success and must be owned (at least 51%) and operated by American citizens who are both socially and economically disadvantaged. All applicants must show they are "economically disadvantaged" in order to qualify for the program. The SBA makes no presumption of economic disadvantage when reviewing 8(a) applications.

H.R. 3994 would hurt, not help, America's minority and women-owned small businesses. The bill makes no attempt to reform 8(a): it outright repeals the program and provides no substitute program. The heart of the program has been SBA's contracting authority. Without this program, thousands of minority-owned firms simply would not have access to federal contracting opportunities.

To replace this minority business development program, H.R. 3994 provides for a modified Section 7(j) program that presently provides small businesses with managerial and technical assistance. This proposal is a pale alternative for a program that helps introduce businesses to federal agencies and that provides minorities and women with real opportunities to compete for federal contracts. Furthermore, H.R. 3994 fails to recognize the unique challenges and barriers that minority-owned businesses face, resulting in many firms having no access at all to federal contracts.

Minority and women-owned firms need opportunities not consulting. The core element of the 8(a) program distinguishing it from other business development programs is the contracting authority held by the SBA. It is through the actual hands-on performance of contract work by which companies develop the most beneficial experience. Absent real contracts for minority firms to enter and perform, participation in development assistance programs becomes merely an academic exercise benefitting neither the small business nor the federal government.

This legislation is just one more example of unfair and unjust attacks against minority businesses. A summary of H.R. 3994 distributed by the Chair was biased against the program and contained various questionable assertions about the program. Just last week, a freelance writer published

an article in the Washington Times newspaper that portrayed the program as ineffective and unfair. The article criticized one particular 8(a) company, the Digicon Corporation. Digicon was so disturbed by the assertions made about the corporation and its participation in the 8(a) program that it wrote to me to refute the damaging article. I am submitting the Digicon letter, dated September 16, 1996, into the record to give this company an opportunity to respond.

8(a) has been a key instrument in assisting minority and women-owned businesses to compete for and perform federal contracts. A total of 6,018 firms participated in the program in Fiscal Year 1995. The firms were from all fifty states, the District of Columbia, Puerto Rico, the Virgin Islands, and Guam. These firms employed 157,019 employees in Fiscal Year 1995. These jobs, in turn, have had considerable positive multiplier effects by creating additional jobs and generating more economic activity throughout the United States. In 1995, 8(a) firms received $5.8 billion in federal procurement awards, had total combined revenues (including non-8(a) work) of more than $9.5 billion, and paid more than $100 million in federal income taxes.

Contrary to allegations by opponents of the 8(a) program, hundreds of minority-owned firms have successfully completed the requirements of the 8(a) Program. These firms have continued on their own to compete strongly in the marketplace without relying on 8(a) contracts and have favorable 8(a)/non-8(a) business mixes to demonstrate this. The impressive business mix, performance, and client base of Farinha, Inc. dba Paragon Construction and TapanAm Associates, Inc., both testifying today, attest to the value and effectiveness of the 8(a) program.

The 8(a) program has been attacked as an inside-the-beltway special interest program benefiting a few firms. However, the fact is that more than 80% of all 8(a) firms are located outside the Washington, D.C. area. These small businesses receive about 75% of all 8(a) contract awards.

Still, SBA has responded to these concerns. Last year, the agency refocused the 8(a) program emphasis on those firms that have never received an 8(a) contract. SBA executed a memorandum of understanding with the U.S. Department of Defense (DoD) to increase DoD contracts with such firms, and it is negotiating similar agreements with other federal

agencies. SBA also issued a new regulation to eliminate the distinction between local and national buys. This change will allow more 8(a) firms that are located outside of the Washington, D.C. to self-market in the capital area.

SBA has effectively addressed many concerns raised in the past about the effectiveness of the 8(a) program. For example, in 1995, SBA cut the average processing time for initial applications to 90 days from an average of 208 days the last three years. SBA has increased the number of annual portfolio reviews of 8(a) firms. In Fiscal Year 1994, 57% of all 8(a) firms were reviewed by SBA. In Fiscal Year 1995, the figure was 84%. It is expected that all firms will have been reviewed by the end of the current fiscal year. Finally, SBA has drastically increased the number of terminations of ineligible firms. Since Fiscal Year 1993, SBA removed 449 ineligible firms from the Program, more than it had processed in all prior years cumulatively.

The fact that the 8(a) program has enjoyed bipartisan support from President Nixon to President Clinton is testament to the recognition of the value and success of this program to meet its legislative objectives. I am opposed to H.R. 3994 because it simply ignores the need for the 8(a) program and does not make a real attempt to respond to questions about the operation of the program. If we need to reform the 8(a) program, let us do so. But, let us proceed deliberately and seriously. The adverse effects on minorities and women are too far-reaching to proceed so hastily under H.R. 3994. Elimination of the program is unacceptable.

Thank you.

DIGICON

September 16, 1996

Congresswoman Nydia Velazquez
United States Congress
House Committee Member on Small Business

Re: Article written by freelance writer, Joel Mowbray, dated September 12, 1996, Washington Times

The Honorable Nydia Velazquez:

We at DIGICON Corporation read the above captioned article (copy enclosed) and are concerned with the false impression an uninformed reader may have with the contents of this article. First, Mr. Mowbray admits he is using only one source for gathering his facts regarding DIGICON, and the source is an "anonymous" employee of DIGICON. It is of concern to us that he would not merely pick up the telephone to verify his erroneous facts.

It is true that DIGICON started its business ten years ago, however, its success has not been totally dependent upon "luck of their CEO being born in the right country," and DIGICON's ability to "wiggle into the 8(a)" program under the Small Business Administration. It is true the 8(a) program was established to enable certain qualified minority disadvantaged companies to be in a position to be awarded contracts that they would not probably be awarded without their 8(a) status. However, the actual award by the customer would not happen but for the fact the company must in fact be technically qualified to perform the specific project.

Thus, DIGICON's success has been due to its technical competency to perform the task required in a specific contract; its ability to perform on each of its contracts; the government agencies have been satisfied with DIGICON's performance; and the government agencies are desirous to use DIGICON again due to its past performance. The personnel of DIGICON have worked hard to achieve their respective success by being recognized as one of the finest system solution information companies in the United States. This success has not been dependent on the 8(a) program, but the hard work of over 500 employees of the company.

Second, the article lacks factual content, and is an apparent attempt to libel DIGICON, as follows:

1. DIGICON revenue for the fiscal year ended 1996 is approximately one half of the 100 million dollar

figure stated in the article.

2. The $97.3 million contract stated in the article was not a "graduation gift," as indicated in the article. DIGICON was negotiating this contract for more than one year before the actual award date. Further, 12 other companies were awarded the same contract, thus it was not specifically targeted to DIGICON.

The other 12 companies are:

| | |
|---|---|
| DIEZ (DMSI) | ISS (SEI) |
| FC Business | Signal |
| GMR | Software Surgery |
| GMSI | Soza |
| Haynes | Sumaria |
| IDP | UTI |

Furthermore, the contract is not an award of $97.3 million, but represents the ceiling of an Indefinite Delivery/Indefinite Quantity (IDIQ), contract. There is no guarantee of even a single dollar being realized by this contract. Each of the 13 awarded 8(a) companies must market this contract within government agencies and convince agencies to award tasks for the companies to perform. If the companies do not market effectively, they will not realize a single dollar of revenue from this contract. This form of IDIQ contract is rapidly gaining favor among Government agencies as part of procurement reform, and many contracts of this type have been issued in the past year to other non 8(a) Government contracting companies.

3. Stating the fact that sole source contracts are overpriced is an outrageously inaccurate comment. More than 40 billion dollars of government contracts a year are sole sourced. Sole source contracts are awarded for specific reasons, and before a sole source contract is awarded, the government agency must satisfy strict regulations to satisfy the rules.

4. Substantial amount of DIGICON's revenue is based upon competitive bid contracts, therefore, the 8(a)program did in fact prepare DIGICON to compete in the free market.

5. Not one contract awarded to DIGICON was a result of being "politically well-connected," but were a result of DIGICON being technically competent.

Third, while all government programs should be reviewed, the 8(a) program has been successful for preparing many companies to compete in the free market. Twenty-five years ago when the 8(a) program was initiated, there were few minority owned companies. The companies that did exist were in the low tech industries, such as security firms, maintenance firms, and garbage collection firms. Through the 8(a) program, companies like DIGICON were able to emerge in the high tech industry, and most important, were prepared to compete with non 8(a) companies. We believe DIGICON is what is right about the program, and so do many of our peers. DIGICON has received many awards from Inc. Magazine as well as being in the High Tech Fast 50 in the Washington area for the last 4 years. Further, DIGICON has achieved the Carnegie Mellon Software Engineering Institute SEI Level II certification for excellence in software development, such level has been achieved by less than 15% of all software companies in the world.

We at DIGICON understand that our admission to the 8(a) program was an opportunity not a guarantee. Of the 5500 firms in the program, only about half receive contracts each year. This is hardly a "give away". As in the commercial sector, the 80/20 rule is in effect. 80% of the revenue goes to 20% of the firms. Again, this percentage mirrors the real world, where only the committed, capable and industrious firms are rewarded with success. We do not apologize for our success. It was hard won. But as we look behind us to those disadvantaged firms who would like a similar chance at success, we urge the Congress and the American people to see the equity and fairness in providing a "a leg up" not a "hand out".

Respectfully submitted,

John J. Wu
President

**8(a) Program Hearing Before Business Committee**

**September 18, 1996**

My name is Tapan Banerjee and I am the President of TapanAm Associates, Inc. I have over 25 years experience as a licensed professional engineer. I appreciate the opportunity to testify before the Small Business Committee today on behalf of TapanAm Associates, Inc. and express my strong support for the SBA 8(a) program.

TapanAm is a 13.5 year old design firm. The firm offered Structural and Civil Engineering services for 6 years before joining the 8(a) program in 1989. Since then the firm has grown to provide multi-discipline Architectural/Engineering services. Before 8(a) the staff numbered 6. Presently, we have 32 in-house personnel.

For anyone who is involved in altering or terminating the 8(a) program, it is important to understand the basic premise that, still today there is not an equal playing field. There have been many improvements, as there still must be, but it is simply not reality to think that every minority entrepreneur has the same opportunities to succeed in the business world as their non-minority counterparts.

Federal agencies select Arch./Eng. firms following the Brooks Bill, which stipulates that the selection be based on Qualification (QBS). It's the age old dilemma - **"without the Federal project experience, how can we build our qualification portfolio to compete for the federal contract?"** The 'good-old-boy' network still exists and the minority-owned business (considered as outsiders), are not always allowed to ride the opportunity train.

TapanAm was fortunate to receive considerable exposure and experience on Federal Arch/Eng. design projects working as consultant to large firms who had to meet a contractual goal of up to 5% for SDB firms. This transition into Federal design projects and the six years prior business experience helped us to take the full advantage of the 8(a)

business development program. Since late 1989 we have successfully provided design services to Federal agencies as the Prime consultant. We have since received several commendations for the quality of our work and have received various awards from the SBA.

8(a) is essentially an opportunistic program for business development. The following will help to clarify some misconceptions about the program:

- 8(a) program is not a "HAND OUT" to minorities. - The program only introduces the firms to the Federal agencies. Like any other business scenario, we had to directly market our services and convince the agencies that we were capable of doing a good job.
- 8(a) is based on competitive Brooks Bill selection process. - Federal agencies evaluate qualifications of at least 3 firms before a final selection is made. *Example: TapanAm had to compete with nearly 50 other firms to win one of the 2 contracts awarded to 8(a) firms on a nationwide competition.*
- 8(a) program does not help minority firms to receive repeat contracts. - Agencies' project managers **do not** call back firms because they are in the 8(a) program. It is up to the 8((a) firms to win repeat business with quality and efficient professional service.

The 8(a) program has given us the opportunity to stabilize our design business and helped develop a track record as Prime Design Consultant to clients. Presently, 65% of our contracts are non 8(a). We have 2 years left in the program. Like any other business, we feel we have earned recognition with our federal agency clients and we are not afraid to compete for contracts in the open market place.

TapanAm has created jobs for 32 families. 40% of the employees are minorities; 20% are women and over 40% are non-minorities. Most of all, TapanAm has created jobs for all Americans. Thanks to the 8(a) program firms like TapanAm are gradually making their mark as good American Small Businesses throughout the country.

If you think financial management of minority business is easy, please think about this - **we had to wait for 10 years before a friendly bank could offer us a line of credit.**

In the current affirmative action debate some believe that the field has been so over-leveled that minorities now enjoy preferential treatment and non-minorities are now discriminated against. This point of view is somewhat understandable. A non-minority contractor sees a government job advertised that he would like to bid on, discovers that it is set-aside for 8(a) and feels shutout, and to top it off, the 8(a) concern often doesn't have to compete for it. Sounds like welfare to him. From the other prospective, that of the minority contractor, he feels shutout exactly like that, but 100% of the time ... without 8(a), that is. What is critically important is that these views be kept in perspective! Contract awards to minorities are approximately 2-5% of ALL FEDERAL PROCUREMENT. Therefore, non-minorities are only left out of an extremely small portion and no one in the affirmative action debate seems to want to talk about the other 95%. If with the 8(a) Program, minority owned businesses only receive 2-5% of the procurement, then apparently they will receive NONE without it!

I oppose H.R. 3994, The Entrepreneur Development Program Act of 1996, because it takes the drastic step of repealing this program which has proven to work! The bill offers managerial and other technical guidance to small businesses through a modified 7(j) program. However, this proposal would be of little value to the small business community. This assistance exists already and it is not what minority-owned firms want or need. They need contracts to get experience, develop federal agency clients, and create jobs all over the country.

In conclusion, when President Nixon created this program it was because of the disparity between minority and non-minority businesses among Federal contracts. SBA 8(a), quite simply, provided me with an opportunity to compete for federal contracts. To give back to the program, I have opened doors for fellow minority small business in my industry. I am afraid that the death of this program would be a step back on the road to equality this society is striving to achieve.

United States General Accounting Office

**GAO**

Testimony

Before the Committee on Small Business, House of Representatives

For Release on Delivery
Expected at
10 a.m. EDT
Wednesday
September 18, 1996

# SMALL BUSINESS

# Status of SBA's 8(a) Minority Business Development Program

Statement of Judy A. England-Joseph, Director, Housing and Community Development Issues, Resources, Community, and Economic Development Division

Madam Chair and Members of the Committee:

We are pleased to be here today to discuss the Small Business Administration's (SBA) 8(a) minority business development program. This program provides federal contracts to small businesses that are owned and controlled by socially and economically disadvantaged individuals to help these firms develop into viable, competitive businesses. Firms in the program are eligible to receive financial, management, and technical assistance from SBA to aid their development.

Our reports and testimonies over the years have chronicled the difficulties that SBA has had in implementing many of the changes to the 8(a) program mandated by the Congress in the Business Opportunity Development Reform Act of 1988 and subsequent amendments.[1] Our testimony today focuses on SBA's progress in implementing several changes that are of special interest to the Committee and that are designed to make the 8(a) program an effective business development program. These are (1) requiring that 8(a) contracts with a large dollar value be awarded competitively, (2) distributing 8(a) contracts so that a larger number of firms receive them, (3) ensuring that firms rely less on 8(a) contracts--by increasing their business that does not come through the 8(a) program--as they move through the 9-year program period, and (4) "graduating" from the program firms that have demonstrated that they can survive without 8(a) contracts. As requested, we will also provide information on SBA's denials of firms seeking to enter the program, and discuss SBA's efforts to provide management and technical assistance to firms in the 8(a) program.

---

[1]See Small Business: Problems in Restructuring SBA's Minority Business Development Program (GAO/RCED-92-68, Jan. 31, 1992); Small Business: Problems Continue With SBA's Minority Business Development Program (GAO/RCED-93-145, Sept. 17,1993); Small Business: SBA Cannot Assess the Success of Its Minority Business Development Program (GAO/T-RCED-94-278, July 27, 1994); and Small Business: Status of SBA's 8(a) Minority Business Development Program (GAO/T-RCED-95-122, Mar. 6, 1995; GAO/T-RCED-95-149, Apr. 4, 1995).

Our statement today is based primarily on information that we obtained from SBA through fiscal year 1995, the latest year for which complete data were available. Most of this data came directly from SBA's automated systems. We did not independently verify the accuracy of this data.

In summary: some progress has been made, but SBA has not yet achieved key changes mandated by the Congress. Specifically,

- While the dollar amount of 8(a) contracts awarded competitively during fiscal year 1995 increased over fiscal year 1994, the percentage of contract dollars awarded competitively remained at about 19 percent.

- The concentration of 8(a) program contract dollars in a relatively few firms that occurred in prior years continued in fiscal year 1995, with less than 1 percent of the firms receiving about 25 percent of all contract dollars. This concentration limits the developmental opportunities available to other disadvantaged firms.

- During fiscal year 1995, a larger percentage of the firms in their final program year achieved the required level of non-8(a) business than we reported in April 1995–58 percent compared with 37 percent.

- During fiscal year 1995, 3 firms (among some 6,000 firms in the program) were graduated from the program because SBA determined that the firms had met their development goals and were able to compete in the marketplace without further 8(a) assistance.

BACKGROUND

The 8(a) program, administered by SBA's Office of Minority Enterprise Development, is one of the federal government's primary vehicles for developing small businesses that are owned by minorities and other socially and economically disadvantaged individuals. Firms that enter the program are eligible to receive contracts that federal agencies designate as 8(a) contracts without competition from firms outside the program. During fiscal year 1995, 6,002 firms participated in the 8(a) program. SBA data show that during fiscal year 1995, 6,625 new contracts and 25,199 contract modifications, totaling about $5.82 billion were awarded to 8(a) firms.

To be eligible for the 8(a) program, a firm must be a small business that is at least 51-percent owned and controlled by one or more socially and economically disadvantaged persons. A business is small if it meets the SBA standard for size established for its particular industry. Members of certain ethnic groups, such as black and hispanic Americans, are presumed to be socially disadvantaged. To be economically disadvantaged as well, socially disadvantaged individuals cannot have personal net worth (excluding equity in a personal residence and ownership in the firms) exceeding $250,000. In addition, the firm must be an eligible business and possess a reasonable prospect for success in the private sector. Firms can participate in the 8(a) program for a maximum of 9 years.

The Business Opportunity Development Reform Act of 1988 marked the third major effort by the Congress to improve SBA's administration of the 8(a) program and to emphasize its business development aspects. The legislation affirmed that the measure of success for the 8(a) program would be the number of firms that leave the program without being unreasonably reliant on 8(a) contracts and that are able to compete on an equal basis in the mainstream of the American economy. Over the years, reports by GAO, SBA's Inspector General, and others have identified continuing problems with SBA's administration of the program and/or with the

program's ability to develop firms that could successfully compete in the marketplace after leaving the program.

PERCENTAGE OF COMPETITIVELY AWARDED 8(a) CONTRACT DOLLARS WAS ABOUT THE SAME

To help develop firms and better prepare them to compete in the commercial marketplace after they leave the program, the act requires that 8(a) program contracts be awarded competitively to 8(a) firms when the total contract price, including the estimated value of contract options, exceeds $5 million for manufacturing contracts or $3 million for all other contracts.

Of the approximately $3.13 billion in new 8(a) contracts awarded in fiscal year 1995, about $610 million, or 19.5 percent of the total dollar amount, was awarded competitively. In comparison, in fiscal year 1994, about $380 million, or 18.5 percent of the $2.06 billion in new 8(a) contracts, was awarded competitively. Between fiscal years 1991 and 1995, the total dollar value of new 8(a) contract awards increased by about 96 percent, while the value of contracts awarded competitively increased by about 190 percent. Appendix I shows the number and the dollar value of 8(a) contracts awarded competitively in fiscal years 1991 through 1995.

SBA's June 1995 revisions to the 8(a) program regulations closed a major loophole involving the competitive award of indefinite delivery, indefinite quantity (IDIQ) contracts. IDIQ contracts are used when an agency does not know the precise quantity of supplies or services to be provided under a contract. As the agency identifies a specific need for goods or services, it modifies the IDIQ contract to reflect the actual costs associated with providing that quantity of goods or services, up to the maximum amount specified in the contract.

Before the June 1995 revisions, SBA's 8(a) program regulations required that an agency, when determining whether an IDIQ contract should be offered on a competitive or noncompetitive (sole-source) basis, consider only the guaranteed minimum value of the contract rather than the estimated total contract amount. According to SBA, IDIQ contracts were often improperly used simply to avoid the need for competition, and wide differences often occurred between the guaranteed minimum values of IDIQ contracts and the amount eventually spent by agencies under the contracts. To avoid this problem, the June 1995 regulations require that for all 8(a) program contracts SBA accepts after August 7, 1995, including IDIQ contracts, the procuring agency must consider the total estimated value of the contract, including the value of contract options, when determining whether the contract should be awarded competitively.

## CONTRACT DOLLARS CONTINUED TO BE CONCENTRATED IN A SMALL PERCENTAGE OF FIRMS

The concentration of 8(a) contract dollars among relatively few firms is a long-standing condition that continued in fiscal year 1995. SBA data show that in fiscal year 1995, 50 firms--less than 1 percent of the 6,002 total firms in the 8(a) program during the fiscal year--received about $1.46 billion, or about 25 percent of the $5.82 billion in total 8(a) contracts awarded. In fiscal year 1994, 50 firms--about 1 percent of the 5,155 firms then in the program--also received about 25 percent of the $4.37 billion in total 8(a) contract dollars awarded during the fiscal year. Twelve firms that were among the top 50 in fiscal year 1995 were also among the top 50 firms in the previous year. Furthermore, 22 firms that were among the top 50 in fiscal year 1994 were also among the top 50 firms in fiscal year 1993. Appendix II contains a table that shows the range of total contracts dollars awarded to the top 50 firms for fiscal years 1992 through 1995.

While 8(a) contract dollars continue to be concentrated in a relatively few firms, many economically disadvantaged firms do not receive any 8(a) program contracts. SBA data show that of the 6,002 firms in the program during fiscal year 1995, 3,267 firms, about 54 percent, did not receive any program contracts during the fiscal year. In comparison, in fiscal year 1994, 56 percent of the 8(a) firms did not receive any program contracts.

As we testified in April 1995[2], a key reason for the continuing concentration of contract dollars among a relatively few firms is the conflicting objectives confronting procuring officials, according to SBA officials. In SBA's view, the primary objective of procuring officials is to accomplish their agency's mission at a reasonable cost; for these officials, the 8(a) program's business development objectives are secondary. At the same time, the agency's procurement goals for the 8(a) program are stated in terms of the dollar value of contracts awarded. According to SBA, the easiest way for agencies to meet these goals is to award a few large contracts to a few firms, preferably firms with which the agencies have had experience and whose capabilities are known.

In addition, according to SBA the concentration of firms receiving 8(a) contracts is no different than the concentration among firms that occurs in the normal course of federal procurement. However, while this may be true for federal procurement overall, the Congress in amending the 8(a) program in 1988 sought to increase the number of competitive small businesses owned and controlled by socially and economically disadvantaged individuals through the fair and equitable distribution of federal contracting opportunities.

---

[2]Small Business: Status of SBA's 8(a) Minority Business Development Program (GAO/T-RCED-95-149, Apr. 4, 1995).

In 1995, SBA made several efforts to increase the award of 8(a) contracts to firms that had never received contracts. SBA required its district offices to develop action plans to increase the number of 8(a) contract opportunities offered to a greater percentage of 8(a) firms. These action plans were to include specific initiatives for marketing the program to federal procurement offices in their jurisdictions. In addition, the Departments of Defense and Veterans Affairs agreed to give special emphasis to 8(a) firms that had never received contracts. Although SBA has not assessed the impact of these activities on increasing contract awards, SBA officials believe that these steps have helped in getting 8(a) contracts to firms that had never received them.

At the same time, in the view of SBA officials, the fact that some firms do not receive any 8(a) contracts may not be a problem because not all firms enter the program to receive 8(a) contracts. Rather, some firms, according to SBA officials, seek 8(a) certification in order to qualify as disadvantaged firms for other federal programs, such as the highway construction program funded by the Department of Transportation, or state and city programs that set aside contracts for disadvantaged firms.

## LARGER PERCENTAGE OF FIRMS MET TARGET LEVELS OF NON-8(a) BUSINESS

To increase the program's emphasis on business development and the viability of firms leaving the program, the act directed SBA to establish target levels of non-8(a) business for firms during their last 5 years in the program. The non-8(a) target levels increase during each of the 5 years, from a minimum of 15 percent of a firm's total contract dollars during its fifth year to a minimum of 55 percent in the firm's ninth or final program year. SBA field offices, as part of their annual reviews of firms, are responsible for determining whether firms achieve these target levels.

In April 1995, we testified that SBA data showed that while 72 percent of the firms in their fifth year that had 8(a) sales met or exceeded the minimum 15-percent non-8(a) target established for the fifth year, only 37 percent of the firms in their ninth or final program year that had 8(a) sales met or exceeded the minimum 55-percent target established for that year. The data also showed that of the 1,038 firms in the fifth through the ninth year of their program term that 8(a) sales, 37 percent did not meet the minimum targets.

SBA data for fiscal year 1995 showed that of the 8(a) firms in their fifth year that had 8(a) sales during the fiscal year, about 85 percent met or exceeded the minimum non-8(a) business target of 15 percent established for that year. In comparison, of the 8(a) firms in their ninth or final program year that had 8(a) sales during the fiscal year, 58 percent met or exceeded the minimum non-8(a) business target of 55 percent established for that year. Appendix III shows the extent to which firms met their target levels for fiscal year 1995.

In a September 1995 report, SBA's Inspector General (IG) discussed SBA's problems in enforcing the business-mix requirements. According to the IG, over one-third of the 8(a) firms in the last 5 years of their program term did not meet the business-mix requirements, yet they accounted for about $1.4 billion (63 percent) of total 8(a) contract revenues of all firms subject to the requirements. The IG noted that SBA's regulations identify a range of remedial actions that the agency can take to improve firms' compliance with the requirements, including reducing or eliminating sole-source 8(a) contract awards, and that SBA personnel have the discretion of selecting which remedial actions to impose. The IG found, however, that SBA personnel often took minimal or no action when firms did not meet the requirements, and firms continued to obtain 8(a) contracts even though they were not complying with the regulations to develop non-8(a) business.

To address this problem, the IG recommended that SBA limit the dollar value of new 8(a) contracts awarded to firms that do not meet their non-8(a) business target levels. SBA concurred with this recommendation and in March 1996 stated that it was exploring two options--eliminating all new 8(a) contracts to firms that do not meet their non-8(a) business levels, or placing a limit on the dollar value of 8(a) contracts awarded to such firms. In September 1996, an SBA official told us that the agency could not propose regulations implementing such restrictions until the Department of Justice finalizes its regulations regarding federal affirmative action programs.

The IG's September 1995 report also concluded that SBA could not measure the success of the 8(a) program as defined by the Congress, namely the number of firms that leave the program without being unreasonably reliant[3] on 8(a) contracts and that are able to compete on an equal basis in the mainstream of the American economy. The IG reported that SBA's procedures did not provide for compiling and reporting data on the (1) number of companies that met their business-mix requirements while in the program and (2) companies that remained in business after they no longer had 8(a) revenues. As a result, the IG concluded that neither SBA nor the Congress could determine whether the 8(a) program was accomplishing its intended purpose or whether any changes to the program were needed.

To address these problems, the IG recommended that SBA annually compile data on the numbers of firms that leave the 8(a) program that are unreasonably reliant on 8(a) contracts and those that are not. The IG also recommended that SBA (1) track former 8(a) firms after they have completed all 8(a) contracts to determine whether they are still in business and (2) annually determine how many of the firms that are still in business were unreasonably reliant on 8(a) contracts when they left the

---

[3]SBA has interpreted the language "not unreasonably reliant" to mean 8(a) firms that have met the appropriate non-8(a) business target.

program. With regard to this recommendation, the IG noted that responses to a questionnaire it sent to former 8(a) firms that had been out of the program for approximately 1.5 to 5.5 years showed that many firms still had substantial revenues from carryover 8(a)contracts. For example, 23 percent of the respondents reported that more than 50 percent of their total revenues were from 8(a) contracts.

In March 1996, SBA stated that it would begin to annually compile data on the number of firms leaving the 8(a) program that met or did not meet the business-mix requirements and, as a result, were or were not unreasonably reliant on 8(a) program contracts. SBA also stated that it was currently tracking 8(a) graduates to determine their current status and levels of revenues. Finally, SBA announced that it was developing a more thorough survey to track graduates and was considering using external data sources, such as Dun and Bradstreet, for this information. As of September 1996, SBA had not developed this survey. According to an SBA official, work on this project has been delayed by several factors, including the furloughs of SBA staff and the turnover of a top SBA official.

FEW FIRMS GRADUATE FROM PROGRAM

SBA's regulations provide that any firm that (1) substantially achieves its business development goals and objectives before completing its program term and (2) has demonstrated the ability to compete in the marketplace without 8(a) program assistance may be graduated from the 8(a) program. According to the regulations, factors SBA is to consider in deciding whether to graduate a firm include the firm's sales, net worth, working capital, overall profitability, access to credit and capital, and management capacity and capability. SBA may also consider whether the firm's business and financial profile compares positively with the profiles of non-8(a) firms in the same area or a similar line of business. A determination of whether a firm should be graduated is a part of SBA's annual review of each firm. A firm has the

option to appeal SBA's determination that it graduate from the 8(a) program. After graduating, a firm is no longer eligible to receive 8(a) contracts.

According to SBA data, during fiscal year 1995, SBA graduated three firms from the program–the first graduations in the program's history, according to SBA officials. The data also show that during fiscal year 1995, SBA terminated another 160 firms from the program for various reasons, including failure to comply with program requirements, and 250 more firms left the program because their program terms had expired during the fiscal year. According to SBA officials, SBA usually does not require that a firm graduate because of anticipated appeals and the difficulty in enforcing the graduation requirement, especially if the firm disagrees with SBA's decision.

SBA's IG has identified companies that should have been, but were not, graduated from the 8(a) program. For example, the IG reported in September 1994 that its examination of 50 of the larger 8(a) firms found that most of these firms were larger and more profitable than firms not in the program. Specifically, the IG's review showed that 32 of the 50 8(a) firms exceeded their respective industries' averages for the following five performance factors: business assets, revenues, gross profits, working capital, and net worth. The IG concluded that allowing such firms to continue in the program deprived other truly economically disadvantaged firms of 8(a) assistance and understated the 8(a) program's overall success because firms that had demonstrated success were not graduated.

In May 1995, as a result of the IG's review, SBA established requirements for its field staff to (1) compare annually five financial performance factors of 8(a) firms with the industry averages for companies in the same line of business and (2) consider graduation from the program for any 8(a) firm that meets or exceeds three of averages. However, a February 1996 evaluation by SBA of annual reviews conducted by SBA field staff of 8(a) firms raises questions about the ability of the field staff to

conduct such analysis. SBA noted that the staff's financial analysis is very poor, staff members do not fully understand the concepts of economic disadvantage, financial condition of the firm, and access to capital, and the annual reviews contained few comparisons of the condition of 8(a) firms with similar businesses. To address this problem, SBA recommended that field staff receive training in financial analysis and guidance on the concept of continuing economic disadvantage. As of September 1996, SBA planned to provide this training during a national meeting planned for October or November 1996.

APPLICATIONS PROCESSED AND
MANAGEMENT AND TECHNICAL ASSISTANCE
PROVIDED IN FISCAL YEAR 1995

I would now like to provide some overall statistics regarding SBA's disposition of applications made to the 8(a) program during fiscal year 1995, and the amount of management and technical assistance provided during the year.

Applications Processed

SBA data show that during fiscal year 1995, SBA processed 1,306 8(a) program applications. SBA approved 696 of the applications and initially denied the remaining 610. Among the reasons cited for denying the 610 applications were the following:

- The firm lacked potential for success (367 applications).

- The socially and economically disadvantaged individual did not own or control the firm (364 applications).

- The individual who owned and controlled the firm was not socially or economically disadvantaged (263 applications).

- The firm was a type of business that is not eligible to participate in the program (78 applications).

Of the 610 applications that SBA initially denied, 323 were reconsidered and 189 were subsequently approved, bringing to 885 the total number of applications approved during fiscal year 1995. In comparison, SBA ultimately approved 1,107 of the 1,536 applications it processed in fiscal year 1994, and 540 of the 819 applications it processed in fiscal year 1993.

Management and Technical Assistance

As small businesses, 8(a) firms are eligible to receive management and technical assistance from various sources to aid their development. SBA's primary source of such assistance has been its 7(j) program. Authorized by section 7(j) of the Small Business Act, as amended, the 7(j) program provides seminars and individual assistance to 8(a) firms. The 8(a) firms are also eligible to receive assistance from SBA's Executive Education Program, which is designed to provide the owners/managers of 8(a) firms with executive development training at a university. SBA may also provide 7(j) assistance to socially and economically disadvantaged individuals whose firms are not in the 8(a) program, firms located in areas of high unemployment, and firms owned by low-income individuals.

In fiscal year 1995, SBA spent about $7.6 million for 7(j) assistance to 4,604 individuals. This figure included individuals from 1,785 8(a) firms that received an aggregate of 9,452 days of assistance, and 190 firms that received executive training under SBA's Executive Education Program.

In fiscal year 1996, SBA changed the focus of the 7(j) program to provide only executive-level training. The individual assistance and seminar training previously provided will be provided by SBA's Small Business Development Centers and Service Corps of Retired Executives.

-----

This concludes my prepared statement. I would be glad to respond to any questions that you or the Members of the Committee may have.

8(a) CONTRACTS AND DOLLARS AWARDED COMPETITIVELY FOR FISCAL YEARS 1991 THROUGH 1995

(Dollars in billions)

| 8(a) contracts–dollars and percent | Fiscal year 1991 | Fiscal year 1992 | Fiscal year 1993 | Fiscal year 1994 | Fiscal year 1995 |
|---|---|---|---|---|---|
| Number of new contacts awarded | 4,576 | 4,693 | 5,481 | 5,990 | 6,625 |
| Number of new contracts awarded competitively | 86 | 139 | 202 | 174 | 283 |
| Percent of new contracts awarded competitively | 1.88 | 2.96 | 3.69 | 2.89 | 4.27 |
| Dollar amount of new contracts awarded | $1.60 | $1.70 | $2.21 | $2.06 | $3.13 |
| Dollar amount of new contracts awarded competitively | $0.21 | $0.34 | $0.34 | $0.38 | $0.61 |
| Percent of new contract dollars awarded competitively | 13.13 | 20.00 | 15.38 | 18.45 | 19.49 |

Source: SBA.

RANGE OF TOTAL 8(a) CONTRACT DOLLARS AWARDED TO TOP 50 8(A) FIRMS FOR FISCAL YEARS 1992 THROUGH 1995

(dollars in millions)

| 8(a) contracts–dollars and percent | Fiscal year 1992 | Fiscal year 1993 | Fiscal year 1994 | Fiscal year 1995 |
|---|---|---|---|---|
| Total 8(a) contract dollars awarded to top 8(a) firm | $91.6 | $71.2 | $57.2 | $97.1 |
| Total 8(a) contract dollars awarded to fiftieth 8(a) firm | $13.2 | $14.2 | $12.0 | $16.9 |
| Total 8(a) contract dollars awarded during fiscal year | $4,167.9 | $4,333.4 | $4,370.0 | $5,820.7 |
| Total 8(a) contract dollars awarded to top 50 firms | $1,227.7 | $1,075.1 | $1,083.0 | $1,461.4 |
| Percent of total 8(a) contract dollars awarded to top 50 firms | 29.5 | 24.8 | 24.8 | 25.1 |

Source: SBA.

ANALYSIS OF 8(A) FIRMS' COMPLIANCE WITH THEIR NON-8 (a) BUSINESS REQUIREMENTS FOR FISCAL YEAR 1995

| Program year | Required level of non-8(a) business (percent of total revenues) | Total number of firms with 8(a) sales | Number of firms with 8(a) sales that met or exceeded levels | Percent of firms with 8(a) sales that met or exceeded levels | Number of firms with 8(a) sales that did not meet levels | Percent of firms with 8(a) sales that did not meet levels |
|---|---|---|---|---|---|---|
| 5 | 15-25 | 266 | 227 | 85 | 39 | 15 |
| 6 | 25-35 | 319 | 239 | 75 | 80 | 25 |
| 7 | 35-45 | 189 | 140 | 74 | 49 | 26 |
| 8 | 45-55 | 148 | 87 | 59 | 61 | 41 |
| 9 | 55-75 | 198 | 114 | 58 | 84 | 42 |
| Total | | 1,120 | 807 | 72 | 313 | 28 |

Source: SBA

**Ordering Information**

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20877

Orders may also be placed by calling (202) 512-6000 or by using FAX number (301) 258-4066.

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

Testimony by Steven Farinha, President of Farinha Inc.
before the House Small Business Committee
Hearing on H.R.3994
September 18, 1996

Thank you Chairwoman Meyers and members of the Small Business Committee for the opportunity to submit testimony today on the Small Business Administration's 8a program. My name is Steven Farinha. I am the President of Farinha Inc. d.b.a. Paragon Construction located in Auburn Ca. and I have always been a registered Republican.

Today I would like to testify about my company and the significant contributions that the SBA 8a program has made to our success. I believe my company is a model example of what the 8a program was intended to promote.

Let me give you a little background about myself. I was raised in a community of farming and agriculture. So, I learned at a very young age that if I wanted something, I needed to work. While in school I fell in love with the building industry, and decided that when I grew up that's what I wanted to do.

In 1983 I founded Paragon Construction, with a pick up truck, a dog and $500.00. I had a dream that I wanted to construct buildings. Then came a eye opener, in the construction industry it takes capital and surety credit to operate a commercial construction company, and without those two key ingredients you can not succeed. Every time in my life that I have encountered an obstacle, I

somehow have attempted to make something positive out of the situation. So, I went to my parents and told them that I needed some assistance. They mortgaged there house to help me out, but this in itself was not enough for the bonding companies. So my bonding line was very small and with it I was not able to build the company due to lack of capital and surety credit. We had a annual volume of contracting business of about 400,000.00.

Then in 1988 I approached SBA for assistance and learned about the 8a program. I was certified in May of 1989 and received my first contract in 1991. It took us two years to get our first contract and from then until now we have grown to a staff of 100 employees with three offices. Our current volume is approximately 17 million dollars.

People always want to know what our business mix is of 8a versus non 8a contracts. Well, I am happy to say that our 8a sales our approx. 35% and our non 8a sales account for the other 65% of our volume. Some of our current customers are the Air Force, Navy, Army, Coast Guard, General Services Administration, Veterans Administrations, Social Security Administration, and National Guard. We have received numerous letters of commendation from our customers. We believe that if some one will give us one opportunity to let us demonstrate that we perform a quality project for a fair and reasonable price, we can keep that customer and develop a long lasting relationship. We have won

numerous awards in the past few years as well. One was being recognized as a MBDA Regional minority contractor of the year. Also we are active in our local community participating in events such as Career day for kids, and with local civic groups.

I cannot stress enough how essential the 8(a) program has been for my success. The 8(a) program plus hard work always equals success. One of the key aspects of the 8(a) program is that it provides diversity within government contracting which in turn maximizes competition and ultimately provides the government with higher quality goods and services at competitive prices.

H.R. 3994 kills the 8(a) program. This bill does not attempt to reform the 8(a) program. It simply repeals SBA's contracting authority. The 8(a) program enables socially and economically disadvantaged persons to compete for federal contracts. Absent real contracts for minority firms to enter the market and perform, participation in development assistance programs becomes merely an academic exercise benefitting neither the small businesses nor the federal government.

H.R. 3994 provides no substitute for the 8(a) program. The bill offers managerial and other technical guidance to small business, already provided by SBA. H.R. 3994 provides no comprehensive substitute for the most important component of the 8(a) program, the opportunity to compete for a contract.

This program is a foot up not a hand out for small businesses. 8(a) is a business development program designed to help small firms become self-sufficient and competitively viable. In order to become an 8(a) firm, businesses must demonstrate a potential for success and that's why 8(a) has been a time worn success. It creates jobs and promotes economic growth. Thank you

**TESTIMONY OF:**

**BRENDA B. FORD**

**BEFORE**

**The House Committee On Small Business**

**September 18, 1996**

My name is Brenda Ford. I am president and owner of a small firm known as Ford & Associates. My firm specializes in interiorscaping.

I have been in business for fifteen years and would like to say that I used to believe the myth that the Small Business Administration was there to help all small business owners with contract financing, obtaining contracts, 8(a) certification as well as setting up a workable business plan. I was wrong!

Ninety-eight percent of the services I stated have not happened for my firm in the fifteen years that I have been in business.

I am here today to testify about just how unfair, mismanaged, unethical and corrupt the SBA is towards African-American business owners. You know, the type of stories which are usually swept under the rug and ignored by directors or appointed secretaries of these agencies.

I will tell you, first of all, how my firm was denied fair and equal contracting opportunity to become 8(a) certified fifteen years ago and, as strange as it may seem, how the same SBA representative most recently denied my firm contract awards on a government project - regardless of the fact that my firm has a proven track record in work performance and that my bid was $200 less than the other business owner.

I will tell you a story of just how unfair the SBA is and how they ignored violations of

federal laws and regulations. Public Law 95-507 is not enforced at all. I will tell you the story of the cozy relationship between the SBA representatives, the contracting officers and the facility service managers. Most managers that I have come in contract with give me the impression they are above the law. After all, management has nothing to fear from wrong doings.

I have documented cases of wrong doing by SBA representatives, facility services managers and contracting officers and for fifteen years the outcome has been the same. The contract was always awarded to larger firms. Even after such matters were brought to the attention of department directors and appointed secretaries, these matters were ignored by whomever the correspondence was forwarded to and nothing was resolved. In many cases, even the Freedom of Information request, which would give written documentation of biased treatment of African-American firms, has been prolonged or denied.

I do not see the Small Business Administration as being a friend to the African-American community of businessmen and women. Those who have received any type of real assistance is few and far in between. I cannot see an agency being in existence if they are not productive, or if they are not doing their jobs to truly help small, socially-disadvantaged and African-American business owners. If this were private industry, would this be allowed? Because of SBA's mismanagement of case after case that I brought to their attention, I was not able to resolve anything.

I haven been forced to request letters for the right to sue for financial harm done to may firm. Even my Congressman's office was given the runaround by federal agencies.

I wish to recommend that this Committee seriously consider setting up a task force of private business owners, county by county, and giving that task force the authority to:

- Bring concerns of socially-disadvantaged business owners to the Committee with recommendations of how federal funds should be spent with federal agencies, as well investigate problems brought to their attention by small business owners.

- Expedite requested information under the Freedom of Information Act when there are signs that the small firm is facing financial hardship as a result of actions taken by the federal agency against the small business owner.

I also recommend that:

- Federal management involved in biased treatment or denial of fair and equal contracting opportunities be placed on leave without pay until the matter is resolved.

- Federal funds to nonprofit groups and private firms who receive federal money be suspended if it is discovered that unethical, deliberate misconduct and denial of fair and equal contracting opportunities have occurred and management refuses to correct the situation or resolve the problem in a timely manner.

If the African-American business community is to survive and provide employment for those within our community, we need to work with individuals of character who are committed to the well being of all minority small business owners. That character and commitment has not existed within the SBA for a long time. Instead we have been given directors who can talk the talk but have little intention of walking the walk! Their track record speaks for itself. Smoke and mirrors just won't do the trick this time. As I overheard one federal employee say to another: "Promise them anything, but given them nothing!" And that is what the SBA has been doing for years.

Madam chairman, I keep hearing the terms racism and discrimination. Isn't that against

the law? I wonder why those managers who are racist and discriminators are not dismissed from the federal government? After all, wouldn't that resolve a large part of the problem of fair and equal contract opportunities?

Ladies and gentlemen, I thank you all for allowing me to speak before you regarding some of the problems faced by African-American business owners today.

That concludes my testimony.

Testimony

by

George R. La Noue
Professor of Political Science -UMBC
Director, Policy Sciences Graduate Program
Director, Project on Civil Rights and Public Contracts
University of Maryland Graduate School, Baltimore

Hearings
Committee on Small Busines
U. S. House of Representatives
104th Congress

September 18, 1996

The Concept of Presumptive Eligibility in the 8(a) Program

After *Croson* and *Adarand*

I. Introduction

My name is George R. La Noue. I am the Director of the Policy Sciences Graduate Program and the Director of the Project on Civil Rights and Public Contracts of the University of Maryland Graduate School, Baltimore (UMBC). The Project is the largest publicly accessible database of materials on minority business enterprise (MBE) programs in the country, encompassing more than 50,000 pages of published and unpublished court cases, disparity studies, and research articles.

I have served as trial expert for plaintiffs in challenges to racial preferences in contracting programs in Columbus, Ohio, *AGC v Columbus*, 1996 WL 492336 (S. D. Ohio) and Philadelphia, Pennsylvania (*Contractors Association of Eastern Pennsylvania v. City of Philadelphia*, 893 F. Supp. 419 (E. D. Pa.1995) and 1996 WL 426804 (3rd Circuit Pa.) These cases, the first in this area of the law to be decided after full discovery and trial, resulted in the striking down of the MBE program by federal courts on the grounds that the factual predicates underlying the programs were incomplete and flawed. Currently, I am serving as expert witness for the plaintiffs in the case *McCrossan v. Cook* in New Mexico, which is a challenge to a contract set-aside by the Department of Defense. In addition, I have served as a consultant to the state of Texas, the city of Albuquerque, a consortium of governments in Oregon and currently with the city of West Palm Beach in Florida and a consortium of governments in the Nashville, Tennessee area in connection with the development of their disparity studies and MBE programs. In short, I have worked with both governments and

plaintiffs in the attempt to find a constitutional path in the complex area of minority business programs.

II. The concept of presumptive eligibility

What I want to discuss with you today is the concept of determining social disadvantage in the 8(a) program by granting that presumption to members of certain racial and ethnic groups. There are many other issues in the 8(a) program, including bureaucratic mismanagement, the failure to graduate firms, and the concentration of benefits on a small number of participants. But I assume these issues are familiar to you or will be discussed by others. I want to focus on the presumptive eligibility issue which is the most constitutionally suspect part of the program and the issue on which I have done research.

Presumptive eligibility is the concept around which participation in the 8(a) program is built. While there is a requirement of economic disadvantage as well, the rules are exceedingly permissive. In construction, for example, the firm size limitations make 98% of the construction businesses in the country eligible. Businesses with annual revenues of $100,000,000 are in the 8(a) program. Similarly, the personal income limitations of $250,000 (not counting the worth of the owner's residence or business) and $750,000 once you are in the program mean that everyone but the wealthy are eligible. Therefore the real screen in the 8(a) program is not economic disadvantage, but social disadvantage. For that screen, presumptive eligibility is the key.

Presumptive eligibility involves a very large presumption indeed. Put simply, it assumes that American business owners can be classified into two groups on the basis of

their race and ethnicity by the federal government. Owners in the first group are presumed to be socially disadvantaged and entitled to benefits. Owners in the second group are presumed to be socially advantaged and excluded from these benefits. In practice, presumptive eligibility for the 8(a) program means that two business owners with identical economic status, who have gone to the same schools, live in the same communities, and have the same business histories would be treated by the SBA very differently.

For the business owner who is in a presumptively eligible group and meets the economic criteria, admission to the 8(a) program and its access to billions of dollars of contracts annually will be a major competitive advantage. For the business owner in the non-presumptively eligible groups, admission to the 8(a) program requires proving by clear and convincing evidence that he or she has suffered "chronic racial or ethnic prejudice or cultural bias." This is a major barrier guarded by a very unsympathetic SBA bureaucracy. Of the 5,628 8(a) firms in fy 1994, only one-half of one percent of the owners are not in the presumptively eligible groups (9 women, 9 disabled, and 8 white males)(source: SBA answer to interrogatory in *McCrossan v. Cook*). Even, in the case of the O'Donnell Construction company which proved to the Court of Appeals for the District of Columbia that as a white male-owned company it had been discriminated against by the district's MBE program, (*O'Donnell v. District of Columbia*, 963 F.2d 420, D.C. D.C. 1992, now Justice Ginsburg concurring), the SBA refused to concede the firm had suffered from racial prejudice. O'Donnell finally received 8(a) status when an administrative law judge overturned the SBA administrators.

### III. Presumptively Eligible Groups

Which are the presumptively eligible groups? Any person who can show ancestry or identify with the following groups is presumptively eligible under 8(a) rules:

Black American, Hispanic American, Native American (American Indian, Eskimo, Aleut or Native Hawaiian, Asian Pacific American (An individual with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China, Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, The Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Hong Kong, Fiji, Tonga, Kiribati, Tuvalu, or Nauru, Subcontinent Asian American (An individual with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal).

While a history of discrimination against some of these groups is well known, the SBA list is certainly not the exhaustive list of groups which have suffered discrimination in the United States or have other forms of social disadvantage. Many of the groups on the SBA list are relatively recent arrivals to the United States and there is little, if any, evidence of any systematic bias directed against them. Nevertheless, a business owner who can claim membership in any of these groups is legally considered socially disadvantaged.

### IV. Historical Origins of Presumptive Eligibility

It is not certain the SBA actually now knows or can reconstruct how some of the groups on its presumptively eligible list actually got there. In a deposition for the *McCrossan* case, the SBA official who the government identified as knowledgeable about the origins of

presumptive eligibility conceded it would be sheer speculation about the criteria used in the past by his agency.

SBA was created in 1953 to "aid, counsel, assist, and protect, insofar as is possible, the interest of small-business concerns in order to preserve free competitive enterprise."(15 U.S.C. 631(a) (1971)) The agency entered into procurement contracts with other federal agencies and then subcontracted with small businesses which supplied the services or materials. For the first fifteen years of its existence, the SBA focused on assisting all small businesses, regardless of the race or ethnicity of the owner.

SBA policy changed after the 1967 publication of the Kerner Commission Report examining the urban riots of the preceding year.(U.S. Code Congressional and Administrative News, 3843) The Commission concluded that "special encouragement" was needed to guide blacks into the economic mainstream. Consequently, the agency decided administratively to construe its Section 8(a) authority to establish set-asides for small businesses owned by "socially or economically disadvantaged" individuals.

For the first few years, this term remained undefined, but in 1973 SBA published in the *Federal Register* a list of five groups "presumed" to be socially or economically disadvantaged: "blacks, American Indians, Spanish-Americans, Asian-Americans, and Puerto Ricans." (13 C.F.R. 124.8-(c) (1973)) There were no hearings or formal findings and the announcement did not explain why SBA had gone beyond the "special encouragement" of blacks recommended by the Kerner Commission to grant affirmative action status to other groups. Nor was there any explanation as to why these particular groups had been included.

The following year, 1978, Congress passed P.L. 95-507, the Small Business Investment Act, providing a statutory basis to what had been for a decade a purely administratively-based 8(a) program and generating a three track system for participation in set-asides. In the first track were small businesses owned by groups (blacks, Hispanics, and Native Americans) considered presumptively "socially and economically disadvantaged." P.L. 95-507 defined socially disadvantaged individuals "as those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." "Economically disadvantaged individuals" were "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired ... as compared to others in the same business area who are not socially disadvantaged." Presumptive eligibility has meant in practice that an owner merely had to prove group membership and that the program's economic standards were met. In the middle track were businesses owned by members of groups who could petition SBA for presumptive eligibility. In the third track, individual owners were required to qualify on their own according to far more extensive and rigorous requirements than those for group eligibility.

Groups petitioning for 8(a) minority status were evaluated by SBA on several measures. Petitioners had to make an "adequate showing" that the group had suffered racial, ethnic, or cultural bias by demonstrating:

(1) The group has suffered the effects of prejudice, bias, or discriminatory practices;

(2) Such conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in P. L. 95-507, and

> (3) Such conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to all small business owners. (13 C.F.R. 124.105 (d) (2) (i-iii))

The motivation for a group seeking inclusion was readily apparent. Contract awards under 8(a) have totaled as much as $5.8 billion in the last fiscal year. Perhaps even more enticing was the fact that the 8(a) program became the most copied model for affirmative action programs around the country. SBA selection of a group influenced acceptance into other major federal affirmative action programs, hundreds of state and local programs, and even private sector programs, such as those voluntarily established by corporations and universities.

It was the clear Congressional intent that SBA not confine 8(a) benefits solely to the groups P.L. 95-507 had listed. The House Committee report accompanying the new law stated "[t]here is sufficient discretion . . . to allow SBA to designate any other additional minority group or persons it believes should be afforded the presumption of social and economic disadvantage." (H.R. Rep. No. 949, 95th Cong. 2d Sess. 1978) The final Conference Committee report specifically referred to a "poor Appalachian white person" as an example of cultural bias that might justify inclusion. (Legislative History, P.L. 95-507, p. 3882) Congress had neither the political will nor the information to draw clear-cut lines of inclusion/exclusion, so that task was delegated to the administrative agency.

SBA also understood the breadth of its mandate. After the legislation, it issued Policy and Procedural Release #2017 in 1980 which said:

> <u>MEANING OF SOCIALLY OR ECONOMICALLY DISADVANTAGED</u>
>
> Except to recommend the elimination of any suggestion that only members of minority groups are eligible for assistance under this program and to specify that the

program is to aid all who are hampered in achieving full citizenship in our economic system by virtue of their social or economic disadvantages, Congress has not fully defined the words "socially or economically disadvantaged." This lack of precise legislative definition suggests that a precise definition is inappropriate, and that flexibility is warranted.

In determining whether the owners of small business concerns are "disadvantaged," consideration may be given to the following:

(a) low income;

(b) unfavorable location such as urban ghettos or depressed rural areas and areas of high unemployment or under-employment;

(c) limited education;

(d) physical or other special handicap;

(e) inability to compete effectively in the marketplace because of prevailing or past restrictive practices; and

(f) Vietnam era service in the Armed Forces, (August 5, 1964 to May 7, 1975), or such other factors as contribute to a disadvantaged condition in the ordinary (dictionary) meaning of that word: lacking in basic resources or conditions necessary to achieve an equal position in society. (Revised May 1, 1980)

A test of SBA's authority came almost immediately. When P.L. 95-507 became law in 1978 the list of presumptively eligible minority groups did not include Asian-Americans. (Parren Mitchell, the principle policy-maker for MBE programs said the omission of Asian-Americans was "inadvertent." Native Americans were not included until added in the Conference Committee report.) Within a year, after an intense lobbying effort by Asian-American interest groups, SBA administratively reinstated them. No formal process was involved, but SBA recognized a new group, "Asian Pacific Americans," consisting of United States citizens from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the U.S.

Trust Territory of the Pacific, the Northern Marinas, Laos, Cambodia, and Taiwan. Persons from these countries as well as blacks, Hispanics, and Native Americans, then, were the racial and ethnic groups considered presumptively eligible for the 8(a) program when the formal petition process began.

After that a series of groups petitioned for the coveted presumptively eligible status between 1980 and 1989. John Sullivan and I have done research on this issue and published it in 1994 in the *Journal of Policy History*. The article is reproduced in Appendix A and I will only touch on some highlights here.

Our access to this historical record came through two Freedom of Information Act requests and documents in the Carter Presidential library. The SBA shipped us more than 400 pages of rather chaotic records. Nevertheless, it has been possible to reconstruct SBA's decision-making.

During the Eighties, the SBA turned down Hasidic Jews, women, service disabled veterans, and Iranians and admitted Asian Indians, Tongans, Sri Lankans, and Indonesians to presumptively eligible status. The historical record shows some very active lobbying, the intervention of prominent members of Congress, and the Carter White House. What it does not show is any principled base of decision-making or any use of any objective data to determine which groups should be on the presumptively eligible list and which should be excluded. Some groups included on the list are at the socio-economic bottom of our society, while others, measured by income, education and business formation rates are at the top. Facts about individual group characteristics were apparently irrelevant to the SBA's decision.

in the 8(a) program intended to remedy discrimination in any particular industry. If it based on any theory at all, presumptive eligibility was intended to compensate for societal discrimination. But that has been an invalid justification for the use of a racial classification since the *Wygant v. Jackson* decision in 1986 which made the distinction between:

> "societal discrimination" which is an inadequate basis for race conscious classifications and the type of identified discrimination that can support and define the scope of race-based relief. (*Croson* at 497.)

Until last summer's *Adarand* decision, federal minority business programs have been shielded from judicial scrutiny and there are few relevant precedents. But in the only time an appellate court has examined presumptive eligibility, the concept fared poorly. In 1991 in *Milwaukee County Pavers Assoc. v. Fielder*, Judge Richard Posner writing for the Seventh Circuit stated:

> To trigger the presumption of disadvantage in the Wisconsin state programs, a subcontractor need only establish that 51 percent of its owners fall into one of four racial-ethnic groups (black, Hispanic, Asian, American Indian) or is a woman. Anyone who is not a member of one of these groups must prove that he is socially and economically disadvantaged in fact. The presumption can be rebutted, but given the difficulty of establishing whether a particular individual is socially and economically disadvantaged the availability of the presumption is likely to be decisive. This means that the state is conferring a significant benefit --access to a presumption of social and economic disadvantage that is the key to valuable entitlement -- on grounds that Croson forbids a state to use without establishing that the purpose is to rectify discrimination. The state can if it wants redistribute wealth in favor of the disadvantaged, but it cannot get out from under Croson by pronouncing entire racial and ethnic groups to be disadvantaged. The whole point of Croson is that disadvantage, diversity, or other grounds for favoring minorities will not justify governmental racial discrimination other than by the federal government; only a purpose of remedying discrimination against minorities will do so. (922 F.2d 418, 422 (7th Cir. 1991).

Since that case, the judiciary has become much more critical of the use of racial classifications in a variety of settings and has specifically expanded strict scrutiny to federal

programs. In *Adarand*, racial classifications were called "odious," "pernicious" and constitutionally suspect.

Presumptive eligibility in the post-*Croson-Adarand* world is an anachronism which is not based on anything like the factual predicate courts now require for minority business programs. The courts have made it clear that rights belong to individuals, not groups. Congress should move now to replace this obsolete concept with a program that targets aspiring entrepreneurs from disadvantaged backgrounds of any race. That should be done before the courts eliminate the 8(a) program as it is now configured.

GEORGE R. LaNOUE
JOHN C. SULLIVAN, ESQ.

# Presumptions for Preferences: The Small Business Administration's Decisions on Groups Entitled to Affirmative Action

Almost all affirmative-action plans cover women and minorities. Who are affirmative action's sanctioned minorities? According to the U.S. Bureau of the Census, there are at least 630 ethnic groups large enough to be counted. Indeed it is doubtful if there are any countries in the world that have not contributed at least one citizen to the United States. Language defines culture and status for many people, but no one knows how many tongues are spoken in America. Students in New York City School District 24 alone converse in some 83 different languages.[1] For some persons, religion is the core of their identity. The Yearbook of American Churches lists 250 different religious groups. Finally, many Americans are most invested in their vocations or avocations and each of those activities is a minority of the total.

So who is an affirmative-action minority? Justice Lewis Powell commented in the famous case *University of California Regents v. Bakke* that:

> During the dormancy of the Equal Protection Clause, the United States had become a Nation of minorities. Each had to struggle—and to some extent struggles still—to overcome the prejudices not of a monolithic majority, but of a "majority" composed of various minority groups of whom it was said—perhaps unfairly in many cases—that a shared characteristic was a willingness to disadvantage other groups. As the nation filled with the stock of many lands, the reach of the Clause was gradually extended to all ethnic groups seeking protection from official discrimination.[2]

Nevertheless, in affirmative-action terms, minorities have become almost universally defined as blacks, Hispanics, Asians, and Pacific Island-

JOURNAL OF POLICY HISTORY, Vol. 6, No. 4, 1994.
Copyright © 1994 The Pennsylvania State University Press, University Park, PA.

ers, Native Americans, Eskimos, and Aleuts. But why? The Supreme Court keeps challenging governments for an answer, without a definitive response.[3]

The affirmative-action groups do not possess a common history in the manner or timing of immigration to the United States. They do not possess a common socioeconomic status. Since most Hispanics identify themselves as white, affirmative-action groups are not all "people of color." Yet almost always, the particular groups listed above are the ones covered by affirmative-action plans, and that coverage can yield tremendous benefits.

Affirmative action is the name given to a cluster of policies developed in the Sixties to create greater equaity in American society and to remedy the effects of past discrimination. In its early form it was seen as temporary intervention into the processes of various competitions to ensure that all individuals were treated fairly regardless of factors such as race, ethnicity, religion, or sex. Gradually the focus of affirmative action shifted from process to outcome and from individuals to groups. Modern affirmative-action efforts concentrate on achieving proportional representation, principally in the areas of education, employment, and public contracts, for what are deemed protected groups. Today activities to redistribute educational and economic benefits under the affirmative-action rubric are firmly in place and have spread to virtually every large American government agency, private corporation, and nonprofit institution.

One of the major reasons for the logical difficulty in defining affirmative-action groups is that these programs originally focused on overcoming problems particular to blacks.[4] Other groups were added later through various political initiatives. Once added, they have labored mightily to remain in the favored category, but the reasons they were included in the first place have remained obscure. Not even the two recent definitive histories—Hugh Davis Graham's *The Civil Rights Era* (1990) and Herman Belz's *Equality Transformed: A Quarter Century of Affirmative Action* (1991)—answer this question in their almost nine hundred pages.[5] Neither Congress nor the executive branch has wanted to debate the issue publicly.[6] So the decisions were frequently delegated to mid-level bureaucrats in scores of federal agencies where records about their decisions have been largely lost or buried.

Only occasionally does an explanation find its way into print. Herbert Hammerman, the chief of the U.S. Equal Employment Opportunity Commission (EEOC) reports' unit in the period when many of the first decisions about affirmative-action policy were made, wrote a letter to

*The Public Interest* in 1988 recounting his recollections of the process.[7] According to Hammerman, the earliest federal list of "minority groups" appeared in Standard Form 40, which was used solely for statistical reporting purposes in employment prior to the Civil Rights Act of 1964. The designated groups were blacks, Hispanics (earlier called Spanish-surnamed Americans), Asians, and American Indians, and these categories were replicated in successive EEOC and Office of Federal Contract Compliance Programs (OFCCP) forms with little new consideration. In 1967, Hammerman urged removing Asians and American Indians from the reporting forms because there was no statistical evidence of discrimination against Asians and because American Indians living on reservations were not covered by the Civil Rights Act's Title VII. Hammerman recalls, "No one disagreed, not even the [EEOC] chairman [who explained, however that he was unwilling to take the political heat that the removal would generate]."[8]

When affirmative-action concepts changed and the racial and ethnic categories used for reporting were transformed into requirements for proportional representation in the workforce and other areas, there was still virtually no debate about which groups should be included. The concept of who was a minority was passed from program to program with very little reconsideration.

One federal agency, the Small Business Administration (SBA), however, developed a formal process for determining which ethnic groups were eligible for affirmative-action preferences in obtaining government contracts. Because the SBA process established administrative procedures, it was possible through a Freedom of Information Act (FOIA) request to document for the first time the rationales used by a federal agency in determining which groups should receive affirmative-action preferences.

There were several motivations for a group seeking SBA eligibility. Contract awards under 8(a) have totaled as much as $3.5 billion in a single fiscal year. Perhaps even more enticing was the fact that the 8(a) program became the most copied model for affirmative-action programs around the country. SBA selection of a group influenced acceptance into other major federal affirmative-action programs, hundreds of state and local programs, and even private-sector programs, such as those voluntarily established by corporations and universities.[9] Understanding the SBA's policy is a key to discerning the rationality and fairness of the inclusion or exclusion of groups in thousands of affirmative-action programs across the country.

## The Small Business Administration Develops Section 8(a)

The Small Business Administration (SBA) was created in 1953 as an independent agency that would "aid, counsel, assist, and protect, insofar as is possible, the interest of small-business concerns in order to preserve free competitive enterprise."[10] The agency entered into procurement contracts with other federal agencies and then subcontracted with small businesses, which supplied the services or materials. For the first fifteen years of its existence, the SBA focused on assisting all small businesses, regardless of the race or ethnicity of the owner.

SBA policy changed after the 1967 publication of the Kerner Commission Report examining the urban riots of the preceding year.[11] The commission concluded that "special encouragement" was needed to guide blacks into the economic mainstream. Consequently, the agency decided administratively to construe its Section 8(a) authority to establish set-asides for small businesses owned by "socially or economically disadvantaged" individuals.

For the first few years, this term remained undefined, but in 1973 the SBA published in the *Federal Register* a list of five groups "presumed" to be socially or economically disadvantaged: "blacks, American Indians, Spanish-Americans, Asian-Americans, and Puerto Ricans."[12] There were no hearings or formal findings and the announcement did not explain why the SBA had gone beyond the "special encouragement" of blacks recommended by the Kerner Commission to grant affirmative-action status to other groups. Nor was there any explanation as to why these particular groups had been included.

The 8(a) program grew rapidly, increasing from $9 million in 1969 to $208 million four years later. An even larger set-aside for designated minority groups occurred in 1977, when Representative Parren Mitchell (D-Md.) offered a floor amendment to Public Law 95-28, the Public Works Employment Act (PWEA). Mitchell's amendment set aside 10 percent of $4 billion for businesses owned by "Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."[13]

The following year, 1978, Congress passed P.L. 95-507, the Small Business Investment Act, providing a statutory basis to what had been for a decade a purely administratively based 8(a) program and generating a three-track system for participation in set-asides. In the first track were small businesses owned by persons belonging to groups (blacks, Hispanics, and Native Americans) considered presumptively "socially and economically disadvantaged." P.L. 95-507 defined socially disadvantaged individuals "as those who have been subjected to a racial or ethnic

prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." "Economically disadvantaged individuals" were "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired . . . as compared to others in the same business area who are not socially disadvantaged." Presumptive eligibility has meant in practice that an owner merely had to prove group membership and that the program's economic standards were met.[14] In the middle track were businesses owned by members of groups who could petition the SBA for presumptive eligibility. In the third track, individual owners were required to qualify on their own as socially or economically disadvantaged persons according to far more extensive and rigorous requirements than those for group eligibility.

Groups in the middle track petitioning for 8(a) minority status were evaluated by the SBA on several measures. Petitioners had to make an "adequate showing" that the group had suffered racial, ethnic, or cultural bias by demonstrating:

1. The group has suffered the effects of prejudice, bias, or discriminatory practices;
2. Such conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in Pub. L. 95-507;
3. Such conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to all small business owners.[15]

It was the clear congressional intent that the SBA not confine 8(a) benefits solely to the groups P.L. 95-507 had listed. The House Committee report accompanying the new law stated, "There is sufficient discretion . . . to allow SBA to designate any other additional minority group or persons it believes should be afforded the presumption of social and economic disadvantage."[16] The final Conference Committee report specifically referred to a "poor Appalachian white person" as an example of cultural bias that might justify inclusion.[17] Congress had neither the political will nor the information to draw clear-cut lines of inclusion/exclusion, so that task was delegated to the administrative agency.

The SBA also understood the breadth of its mandate. After the legislation, it issued Policy and Procedural Release #2017 in 1980, which said: