# EXHIBIT A-13
# (part 4)

Meaning of Socially or Economically Disadvantaged

Except to recommend the elimination of any suggestion that only members of minority groups are eligible for assistance under this program and to specify that the program is to aid all who are hampered in achieving full citizenship in our economic system by virtue of their social or economic disadvantages, Congress has not fully defined the words "socially or economically disadvantaged." This lack of precise legislative definition suggests that a precise definition is inappropriate, and that flexibility is warranted.

In determining whether the owners of small business concerns are "disadvantaged," consideration may be given to the following:

(a) low income;
(b) unfavorable location such as urban ghettos or depressed rural areas and areas of high unemployment or under-employment;
(c) limited education;
(d) physical or other special handicap;
(e) inability to compete effectively in the marketplace because of prevailing or past restrictive practices; and
(f) Vietnam era service in the Armed Forces (August 5, 1964, to May 7, 1975), or such other factors as contribute to a disadvantaged condition in the ordinary (dictionary) meaning of that word: lacking in basic resources or conditions necessary to achieve an equal position in society.[18]

A test of the SBA's authority came almost immediately. When P.L. 95-507 became law in 1978, the list of presumptively eligible minority groups did not include Asian-Americans.[19] Within a year, after an intense lobbying effort by Asian-American interest groups, the SBA administratively reinstated them. No formal process was involved, but the SBA recognized a new group, "Asian Pacific Americans," consisting of United States citizens from Japan, China, the Phillipines, Vietnam, Korea, Samoa, Guam, the U.S. Trust Territory of the Pacific, the Northern Marianas, Laos, Cambodia, and Taiwan. Persons from those countries as well as blacks, Hispanics, and Native Americans, then, were the racial and ethnic groups considered presumptively eligible for the 8(a) program when the formal petition process began.

Since 1979, eight groups have petitioned the agency for presumptive eligibility in the 8(a) program. SBA records include the petitions of these groups, some public comments, and agency responses, but the materials released are not complete. They reveal the arguments petitioners raised, although some specific names have been deleted. The materials also de-

scribe the agency's official reasons for its decisions. Because FOIA permits exemptions for attorney-client privileges and deliberative process materials, some SBA documents have been heavily edited. Therefore, it is not always possible to discern the internal debate, if any, within the agency about the petitions. Nevertheless, the more than 425 pages of FOIA materials are worthy of analysis because they provide the most definitive history of the decisions of any government agency regarding the inclusion or exclusion of groups for affirmative-action purposes.

## Group Decisions Regarding Presumptive Eligibility

This section discusses each of the eight petitions, in chronological order by date of filing and the SBA's response. Table A summarizes the petitions and their outcomes.

### Hasidic Jews

Fourteen months after P.L. 95-507 was passed, the first petition asking for inclusion in the 8(a) presumptively eligible track was filed on behalf of Hasidic Jews by the Opportunity Development Association (ODA), a private commercial organization from Brooklyn. There was considerable precedent for the request. In March 1974, the Office of Minority Business Development of the Department of Commerce had construed Executive Order 11625 to include Hasidic Jews and made ODA eligible to receive funds to provide Hasidic businessmen with management and technical assistance. Furthermore, the SBA had declared Hasidics socially and economically disadvantaged and made them eligible to receive financial aid from the Minority Enterprise Small Business Investment Company (MESBIC) program, and Hasidic firms had been a part of the old 8(a) program.

But Hasidics, like Asians, were not on the presumptively eligible list in P.L. 95-507 when it was passed. Consequently, the Washington law firm of Hughes, Hubbard, and Reid coordinated a seventy-three-page petition backed up by eighty-six letters of support, including those by Senators Jacob Javits, Abraham Ribicoff, and Charles Mathias, as well as several prominent congressmen. The Hasidic petition drew an equally energetic response. When the SBA asked in the *Federal Register* for comments, it received 151 letters, many from leaders in the black community opposing inclusion of the Hasidic Jews.

The petition combined a thorough analysis of the legal background of

**Table A.** SBA responses to petitions for presumptive group eligibility in the 8(a) program

| Group | Petitioners | Date of Original Petition | Date of Official Decision | Outcome | Decision Rationale |
|---|---|---|---|---|---|
| Hasidic Jews | Opportunity Development Association | 12/27/79 | 4/19/80 | Rejected | First Amendment concerns |
| Asian Indians | National Association of Americans of Asian Indian Descent | 6/30/81 | 2/26/82 | Accepted | Comparable to Asian-Pacific group |
| Women | National Association of Women Federal Contractors | 12/24/81 | 5/11/82 | Rejected | Not a traditional minority |
| Tongans | Tongan business leaders | 11/3/86 | — | Accepted | August 31, 1989, expansion of Asian Pacifics class |
| Service-Disabled Veterans | Service-Disabled Veterans | 8/10/87 | 12/16/87 | Rejected | Vets are handicapped, not minorities |
| Sri Lankans | Business person (name deleted) | 10/20/87 | 2/24/88 | Accepted | Subcontinent Asian Americans |
| Iranians | National Association for Iranian Americans | 8/17/87 | 1/6/89 | Rejected | Not long-term-bias victims |
| Indonesians | Business person (name deleted) | 7/24/88 | 3/24/89 | Accepted | Asian Pacifics |

MBE programs, including a description of the prejudices against Hasidics causing their disadvantages. According to the document:

> Their appearance is distinctive, their language is strange, their religious observances are resented, and their education and upbringing cause impediments in the business world. The discrimination and disadvantage resulting from these ethnic, cultural and religious characteristics are compounded by the persistence of anti-Semitism which has contributed to pockets of Jewish poverty and which victimizes Hasidics with special force. Finally, the submission explains the disabling trauma of the Holocaust on Hasidics who survived it and on subsequent generations of these survivors.[20]

The result, according to the petition, was that "Hasidics are a highly distinct and separate group of Jews" with a high concentration among the 15 percent of New York's Jewish population that was poor.[21] Still, the economic deprivation data were not very convincing because the Census collected no data on the 100,000 to 150,000 Hasidics scattered across the country. Further, the New York census tracts in which the Hasidics largely resided also contained high concentrations of blacks and other groups.

The more problematic issue was not the existence of discrimination or poverty, but whether Hasidics were statutorily or constitutionally eligible for 8(a) set-asides. The petition termed Congressman Mitchell's amendment to the Public Works Employment Act of 1977 "a highly aberrational action [because] Congress adopted a restrictive race-based definition for minority enterprises."[22] It noted that the final legislative compromise on which P.L. 95-507 was based was much broader than the PWEA. Indeed, nowhere in P.L. 95-507's legislative history was there any evidence that Congress intended to exclude any previously eligible group. Certainly, the reference to a "poor Appalachian white person" seemed expansive.[23] The petition saved its most vigorous language to combat "the suggestion that since religion was a voluntary identification," unlike race or ethnicity, that religious discrimination was of lesser consequence than racial discrimination. Concluding that there was not "a scintilla of evidence that Congress intended religious belief to be a disqualifying condition for federal assistance,"[24] the petition did not otherwise discuss the First Amendment issue.

The negative responses to the Hasidic Jew's petition were triggered by "Dear Friend" letters from Congressman Parren Mitchell, chair of the Congressional Black Caucus and chairman of the House Subcommittee

on Housing, Minority Enterprise, and Economic Development, to various black businesses and politicians. The congressman's letters made two points: (a) inclusion of Hasidic Jews would "dilute further the small percentage of existing resources earmarked for Blacks and other minorities," and (b) since "Hasidic Jews are a religious group . . . the approval of this application would appear to violate the First Amendment of the U.S. Constitution."[25]

Most of the critical letters the SBA received followed Mitchell's lead, but some evinced a clear hostility to Jews in general. The owners of a San Francisco black-owned firm wrote: "Their claim to be socially disadvantaged is inadequate on the basis that they do not form an actual ethnic group who have been historically discriminated against solely on the basis of race. In fact they could easily avoid any discrimination they might face by simply changing their names, or by not telling anyone who they are. . . . Jews of all sects including Hasidic's are a group among the wealthiest in this Country."[26] The partner of a Seattle minority design firm wrote: "Jews control a significant portion of the wealth of this country and the world, so the test of economically deprived cannot be met. If conditions of deprivation existed, the Jews would not control the significant portion of the wealth they now control."[27]

The debate soon spilled over into the Carter White House. In a memo to Stu Eizenstat, assistant to the President for Domestic Affairs and Policy, staff reported on the controversy, which was described as a "no-win situation."[28] Edward Norton, SBA general counsel, had decided the language of P.L. 95-507 made it "clear that the 8(a) program is not exclusively a racially preferential program." Furthermore, Norton concluded after a thorough review of the legislative history that "there does not appear to be a defensible legal justification for rejecting the Hasidic application," and that if such a rejection occurred litigation would result. Norton warned:

> In the event of litigation, the eligibility requirements for the 8(a) program will be strictly scrutinized by courts which might have sharply differing attitudes from SBA as to which groups should be considered socially disadvantaged. From SBA's standpoint, it is far preferable that it make those judgments.
>
> Litigation might also endanger affirmative action efforts in general. Thus far, the courts have given administrative agencies some leeway to make findings of discrimination and to take appropriate steps to remedy that discrimination. If SBA abstains from making such findings in a case where they appear to be clearly warranted, if

> not actually compelled by statute, a court might narrow substantially the authority administrative bodies now have to impose exclusively racial preferences as remedies for discrimination.[29]

Norton then proposed that the Hasidic Jews be accepted, but on such narrow grounds that other groups could not take advantage of the precedent. This would be done by defining them as an ethnic group with a strange appearance, language problems, and unusual customs. This finding, he concluded, "could be massively documented, both with anecdotal and statistical data. This would help to distinguish the Hasidim from other groups which may not be analytically distinguishable but which could not amass the same degree of evidence as can be done in this case."[30]

This arrangement appealed to the White House staff, but they noted that Parren Mitchell was opposed and that there was "significant underlying hostility to inclusion of persons of other racial minorities and Hispanics in section 8(a) programs among black contractors." Therefore the staff suggested inclusion of the Hasidim, but making it clear that the congressional language was the culprit, not the administration, and trying to convince Parren Mitchell that the Hasidim were so small that they would have a "miniscule impact . . . on other 8(a) competitors."[31]

The strategy did not work. Mitchell remained adamant and so the SBA decided that Hasidic Jews were a religious, not an ethnic, group. In its formal reply to the petition, SBA concluded that "the evidence of prejudice and discrimination experienced by the Hasidics is overwhelming and essentially unrefuted."[32] The reply detailed discrimination against the Hasidics in employment, finding customers, and in financing businesses, all of which constituted the classic complaints of minority businesses, regardless of race or ethnic group. The agency also considered the comments hostile to the inclusion of Hasidic Jews, but concluded, "Broad-base allegations about the economic power of American-Jews have no probative value."[33] Nevertheless, the SBA stated its unwillingness to grant "disadvantaged" status to a group it now defined as religious. Any other decision would represent "an abuse of discretion for SBA, absent express Congressional direction, to render a decision that might establish an impermissible religious classification."[34]

The controversy over Hasidic Jews reached the pages of the Washington and New York newspapers and was politically uncomfortable for the agency, so the process of reviewing petitions was revised dramatically. At that time (1980) there were only four groups automatically enjoying disadvantaged status: blacks, Hispanics, Native Americans (which included

Indians, Eskimos, and Aleuts), and the SBA-added Asian-Pacific Americans. In its interim rule, the agency explained: blacks had suffered "enslavement and subsequent disfranchisement" and Indians had endured "near extermination." There was no discussion as to why Hispanics and Asian Americans were entitled to 8(a) inclusion. Other groups seeking presumptive eligibility would have to follow new guidelines. A group's application would need to show "a number" of incidents not only demonstrating societal discrimination but linking these experiences to business discrimination. While there was "no limit" to the type of evidence that could be presented, the most persuasive evidence would be details of discrimination in education, employment, and business.[35]

### Asian Indians

The first petition prepared under the new guidelines was submitted on 30 June 1981 by Jan Pillai, a professor at Temple University School of Law, on behalf of NAAAID, the National Association of Americans of Asian Indian Descent. The petition claimed "no ethnic community in this nation struggles so hard as the Asian Indians to overcome the social and economic disadvantages stemming from their culture, religion, and ethnic origin,"[36] but its focus was on a statistical comparison of the status of businesses owned by Asian Indians to other groups, particularly other Asian groups. Various tables based on census data were constructed. Although they showed that Asian Indian-owned businesses were small in number and in gross receipts, they did not demonstrate relative disadvantage. For example, the petition showed that Asian Indians owned .07 percent of the nation's businesses and received .05 percent of the total receipts,[37] but the census recorded that they were only .02 percent of the population. Among minority businesses, Asian Indian–owned businesses were 1.27 percent of the total but received 1.39 percent of the receipts.[38]

None of these statistics is very meaningful, however, without an understanding of relative population sizes and immigration patterns, which the petition did not discuss. Due to restriction on immigration from the Indian subcontinent, Asian Indians were among the newest of all immigrant groups to the United States and had arrived much later than the other larger Asian groups: Japanese, Chinese, Filipinos, and to some extent Koreans. In 1946, for example, there were only 1,500 Asian Indians in the United States.[39] The timing of the immigration obviously affects the age and size of businesses that a group owns, but it may not affect the relative wealth of a group. By 1990, Asian Indians had grown to

815,447 and were relatively one of the best-educated and most prosperous groups in the country. In 1980, the percentage of college graduates and managers or professionals among Asian Indians was 52 percent and 49 percent, respectively, while for all Americans it was 16 percent and 23 percent. The median family income of Asian Indians was 20 percent higher than the typical American family.[40] None of these statistics was mentioned by Professor Pillai and there is no indication the SBA ever sought them from the census.

The Asian Indian petition was rejected by the SBA on 24 September 1981 in a response less than one-tenth the length of its reply to the Hasidics. The agency declared that Professor Pillai failed to make a prima facie showing on six of the seven standards:

1. The ability of NAAAID to adequately advocate the interests of Asian Indian Americans;
2. The traits of members of the group and a showing that such traits are sufficiently common as well as a showing that the group is sufficiently discrete;
3. Evidence of long-term prejudice and discrimination in American society suffered by an overwhelming majority of Asian Indian Americans;
4. Evidence of past and present effects of discriminatory practices or similar invidious circumstances on Asian Indian Americans over which they have no control;
5. Evidence that such conditions [as per (3) and (4) above] have resulted and continue to result in substantial economic deprivation for an overwhelming majority of Asian Indian Americans;
6. Evidence that such conditions have produced and continue to produce substantial impediments in the business world for an overwhelming majority of Asian Indian Americans.[41]

The following year Professor Pillai tried again, submitting another petition, this time ninety-six pages long. The introduction was devoted to the SBA equivalent of the legal issue of standing: establishing that NAAAID was a proper advocate for the Asian Indians. The petition then addressed the issue of identifiability, an underlying theme to several of the deficiencies cited in the SBA's response. The petition termed color—"In America, skin color is a central element of identifiability"[42]—the primary characteristic setting off Asian Indians as a discrete minority.

On 26 February 1982, Professor Pillai was given the good news in a three-paragraph letter: "It has been determined that the petition is ade-

quately documented and makes a prima facie showing as to each of the standards set forth in the Rules and Regulations."[43]

In May, a notice in the *Federal Register* invited comments on the proposed inclusion of Asian Indians. The Asian Indian community was quick to respond. The SBA received 1,875 comments, representing 2,433 signatures. All but nine comments were favorable. The positive comments were summed up by the SBA as having "bolstered the facts and figures cited in the original petition."[44] Several of the negative comments reflected fear that inclusion of Asian Indians would dilute the program's benefits for other minorities. In August 1982, the agency published another notice in the *Federal Register*, which formally granted 8(a) inclusion to Asian Indians and granted presumptive minority eligibility to those from Pakistan and Bangladesh, even though no one from those countries had petitioned SBA.[45] The agency ruled that "Asian Indian Americans" would include these other countries as well, despite NAAAID's statement in its petition that "Pakistanis are essentially a religious group."[46] Seven years later the name of this group was changed to "Subcontinent Asian-Americans" and it was expanded to include those from Sri Lanka, Bhutan, and Nepal.

## Women

On the day before Christmas 1981, Bosco and Curry, a Washington, D.C., law firm, submitted a petition to the SBA on behalf of the National Association of Women Federal Contractors. Like other applicants, the women contractors stressed that P.L. 95-507 was "*not limited to*" (emphasis in original) the minority groups named in the legislation, but they also had a strong case for their particular petition. They quoted the House Small Business Committee's Subcommittee on Minority Enterprise and General Oversight on P.L. 95-507, which said that "women, as a class of individuals, have been and continue to be excluded from equitable participation in our economy as business owners. This lack of access to our business system is the direct and indirect result of sex *discrimination*," and then concluded that "the government should utilize its vast purchasing power to assist female-owned businesses as well as small and minority businesses."[47] Furthermore, President Carter, in signing P.L. 95-507, commented that although the new law would principally benefit ethnic minorities, "others also face disadvantages to their entrepreneurial efforts. More must be done to assist women business owners into the economic mainstream."[48] Consequently, women-owned business enterprises (WBEs) were included in many set-asides and goal programs such as those of the Department of

Energy, the Department of Transportation, and the Federal Deposit Insurance Corporation, as well as programs operated by many state and local governments.

In the 8(a) program, however, there was a major disparity between male- (96 percent) and female-owned (4 percent—almost all minority women) firms participating.[49] Consequently, the petition urged that SBA "correct a long history of improper administration of the business development program by your predecessors."

On 11 May 1982, the SBA issued a single-page denial of the women's petition "based upon our findings that presumptive group 'social disadvantage' is primarily intended for the traditional 'minority' groups and should not be extended to the broader class of 'women.' "[50] The SBA offered to ease the rules on individual admission for women, but the National Association of Women Federal Contractors declined to cooperate and wrote, "Rather, we will direct our attention to bring substantial political and, if necessary, legal attention to this matter."[51] In 1988, their effort bore fruit when Congress passed the Women's Business Ownership Act. It required the SBA to administer procurement preferences for women-owned businesses in federal contracts parallel to, but apart form, the 8(a) program.

## Tongans

The Tonga Islands are located in the South Pacific approximately 1,700 miles north of New Zealand. Almost all Tongan-Americans have immigrated to the United States recently, as the result of Mormon missionary activity.[52] The Tongans petitioned the SBA on 3 November 1986, and because nearly twelve thousand Tongans lived in Utah, their petition was accompanied by a letter from Utah Republican Senator Jake Garn, who asked for every "fair consideration."[53]

The Tongans' brief petition made several points. First, they "did not enjoy benefits afforded to several other select minority groups," including their Pacific island neighbors of Samoa, Guam, the U.S. Trust Territory of the Pacific Islands, and the Northern Mariana Islands, previously accepted as presumptively eligible by the SBA in 1979. The petition also mentioned that Tongans were of Polynesian ethnic origin and that the main reason for their social disadvantage was "our general lack of command of the English language" because many Tongan immigrants were older and had difficulty learning English.[54]

Five months later the Tongans' petition was denied because the group had not provided evidence that (a) the number of potential 8(a) appli-

cants "is sufficiently substantial to warrant determination of minority group status" or that (b) Tongans have suffered long-term prejudice in American society. Finally, the agency noted that the designation of Tongans as "Polynesian Americans" was not persuasive since that was not one of the specified groups presumed disadvantaged.[55]

Despite the many deficiencies of the Tongan petition, and the fact that the Tongans did not follow the agency's suggestion of reapplying with more complete documentation, the group eventually gained the 8(a) status it desire. In 1989, the SBA added nine tiny Pacific locales to its list of covered Asian-Pacific American ethnic groups; one of them was Tonga.[56]

### Disabled Veterans

On 10 August 1987, John K. Lopez, chairman of the Service-Disabled Veterans Institute, wrote a letter to George Bush, then Vice President and a former naval officer. Lopez began his letter by cataloging some of the groups entitled to various procurement preferences in the federal governments: "ethnic minorities, women, labor surplus areas, *even incarcerated prisoners* (emphasis in original) . . . groups for which membership is primarily a circumstance of birth or geography." Awarding 8(a) inclusion to some of these groups but not disabled veterans, he concluded, "is an incomprehensible act of discrimination."[57]

The SBA did not agree. The agency replied to Lopez by ruling that his petition was deficient in four areas. First, he did not establish that veterans suffered the effects of discriminatory practices over which they had no control. The agency acknowledged there were sufficient data detailing the socioeconomic hardships endured by handicapped veterans, but the SBA pointed to the correlation between unemployment and the severity of the disability to show that the disability itself, not prejudice against disabled veterans, caused high unemployment among disabled veterans.

The second alleged deficiency of the petition was its failure to establish that prejudice inflicted on disabled veterans has been "chronic" and "long-standing." The petition limited itself to prejudice against veterans in the past two decades, allowing the SBA to declare that "there is no evidence, however, that the 'prejudice' discussed in the petition predates the Vietnam era."[58] The third weakness was the lack of distinction between disabled veterans and civilian handicapped individuals.[59] The agency stated, "In our opinion, the prejudices complained of are no different from those of civilian handicapped individuals." Therefore, the SBA

argued, the appropriate protection for prejudices against handicapped veterans attempting to start small businesses was not 8(a) but the Rehabilitation Act.[60]

The SBA also argued against the veterans' interpretation of legislative intent. The veterans had cited P.L. 93-237, mandating the SBA to give "special consideration to veterans." Their application also included a 1972 government press release in which the Veterans Administration and the SBA apparently agreed that "under the same program that previously has applied only to minorities and other disadvantaged persons, veterans are now eligible for Federal contracts (under section 8[a] of the Small Business Act)."[61] But the SBA declared special consideration did not necessitate "*mandatory* eligibility" (emphasis in original), nor did it create a presumptive social disadvantage. According to the agency, the phrase "special consideration" did nothing more than "provide added emphasis where eligibility already existed."[62] Since the issue was eligibility, this tautological interpretation rendered the words "special consideration" a nullity because there was no need for the benefit to be added once eligibility has already been achieved.

The SBA's legislative intent focus was on P.L. 95-507, which designated certain groups as socially disadvantaged. Handicapped veterans were not one of those groups, leading the SBA to declare: "Since Congress knew that Vietnam era veterans participated in the predecessor of the 8(a) program and did not include veterans as a socially disadvantaged group in Pulic Law 95-507, we can only conclude that Congress did not intend for veterans to be so designated."[63] Such a conclusion seems unjustified. Prior to the application of the disable veterans, the SBA expanded its list of presumptively eligible groups to include persons from eighteen Asian countries, none of which was specifically designated in P.L. 95-507.

## Sri Lankans

In October 1987, the SBA received a letter from a business owner whose origins were in Sri Lanka, formerly Ceylon. Two years earlier, the owner had applied for 8(a) status and was told he did not belong to a group designated as "socially disadvantaged." Because the SBA had previously determined that persons from India, Pakistan, and Bangladesh were eligible and because, as the owner pointed out, standard reference volumes referred to Sri Lanka as part of the Indian subcontinent, the owner asked for reconsideration. Four months later the SBA General Counsel wrote a memorandum stating:

> Sri Lankans possess identifiable physical characteristics, cultural and religious practices, ideological development, and historical origins in common with Asian Indians. Because Sri Lankans identify themselves with the same discrete minority group to which Asian Indians belong, and because American society identifies Sri Lankans as belonging to that same group, Sri Lankans should be considered members of the "Subcontinent Asian Americans" designated minority group.[64]

There is a logic in this response, but neither the procedural nor the substantive standards that the SBA required in other petitions were followed here. There was no showing that the owner represented other Sri Lankans or that Sri Lankans were a large enough group to merit special designation. There was no requirement that any statistics be supplied about the economic status of Sri Lankans in the United States, and no opportunity for public comment. In the eyes of the SBA, the proximity of geography, culture, and "physical characteristics" to Asian Indians was enough for 8(a) eligibility.

### Iranians

The opening paragraph of the 1987 petition on behalf of the National Association for Iranian Americans characterized 8(a) designation as "extremely important . . . since it would no longer require each and every Iranian American to undergo the almost impossible task of individually proving their social and economic disadvantages."[65] An estimated five hundred thousand to one million Iranians were thought to be in the United States.[66]

According to the petition, persecution of Iranians in this country reached its highest level in 1979–80. Much of the blame for this hostile public attitude was placed on Presidents Carter and Reagan; the latter, it was claimed, invariably described Iranians as "barbarians."[67] As proof, the petition quoted a *U.S. News and World Report* article, which stated: "Iranian American establishments have been set ablaze. Iranians have been assaulted, verbally abused, and forced from jobs and schools in the fiercest outbreak of prejudice against an ethnic minority since the anti-Japanese frenzy in the early days of World War II."[68]

Economic census data were used to conclude that the average household income of Iranians was "only somewhat above the poverty level, [which] places Iranians 38th among the 42 foreign born groups in the census."[69] But the key to the Iranian strategy was to compare themselves

to Asian Indians. According to the petition, Asian Indians enjoyed a median income 225 percent higher than that of Iranians, a differential caused, it was claimed, by the recognition by the SBA of Asian Indians as an 8(a) minority group.

But the Iranians also realized that the SBA decisions were not really based on group economic status, so the petition tried its best to establish a cultural and racial affinity with Asian Indians. The petition pointed out that the official Iranian language was Farsi,"which is rooted in Sanskrit which is the root of all 15 languages spoken in India." Language had never been a key to inclusion, however, so the petition devoted a major effort to race and color. It insisted that

> the majority of Iranians are of the Indo-European race. Descendants of other races, such as Turks and Mongolians, have also over the course of history made Iran their home. Nevertheless, their number is small and they are concentrated mainly in small towns along the national borders. Mainly due to the Indo-European race, the majority of Iranians have dark complexions which make them easily identifiable. Due to the color of their skin, Iranians are commonly mistaken for Hispanics or Indians (two groups who have already received recognition by the SBA as socially disadvantaged minority groups). It is important to note that, in terms of complexion, the only noticeable difference between an Iranian and an Indian, Pakistani, or Bangladeshi is that the skin color for the latter group is somewhat darker. It is therefore very easy to mistake one member of the above listed group for another. This, in fact, happens frequently even among the members themselves.[70]

On 23 November 1987, Wilfredo Gonzalez, SBA associate administrator for Minority Small Business and Capital Ownership Development, responded negatively to the Iranians, rejecting them in part due to a lack of evidence detailing long-term prejudice. The petition's examples dating from the beginning of the 1979 hostage crisis were thought not sufficiently long-standing. The response also focused on the Iranians racial claim:

> Do you seek disadvantaged status only for individuals of the Indo-European race or for all individuals who can trace their lineage to Iran?
>
> Moreover, in describing the group, the petition identifies the official language and principal religion of Iran and states that Iran has

> the same language as Afghanistan and principally the same religion as is prevalent in Iraq. Why should the SBA consider a petition for Iranian Americans and not, for example, for Iraqi Americans?[71]

On the surface, the agency's response seems strange. The petition was not seeking disadvantaged status for all members of the Indo-European race. The narrow interests of the National Association of Iranian Americans were obvious. Clearly, the Iranians were not urging preferred status for Iraqis when the two nations were then engaged in a bitter and bloody war. Furthermore, the SBA had not previously used this kind of domino argument—if we accept one group, we will have to accept others—in dealing with other Asian groups. But that was precisely the fear. The Indo-European linguistic and racial group (formerly called Aryan), according to anthropologists, stretches from Western Europe to the Indian subcontinent.[72] Having never applied consistent standards for determining economic or social deprivation, had the SBA accepted a group on the basis of their Indo-European affinity with other included groups the door would have been opened, at least, for other peoples from the Middle East or Asia Minor,[73] as it used to be called, and maybe for Europeans as well.

In February 1988, Sidley and Austin, the Washington, D.C., law firm that had prepared the initial petition, responded to the SBA's rejection with a long letter detailing evidence of discrimination against Iranians prior to 1979 and included synopses of three federal court cases, two from the Woodrow Wilson presidential era and one from 1972. The letter also supplied the agency-requested clarity about the exact group seeking 8(a) inclusion by explaining in a footnote that Turks and Mongolians were merely "temporary conquerors ultimately absorbed into the dominant Indo-European race."[74]

At first it seemed the revised petition had made some impact. On 28 July 1988, David Kohler, the SBA's associate general counsel, determined that the Iranians had made enough of a case that he recommended publishing a notice of their pending disadvantaged recognition in the *Federal Register* for public comment, usually the crucial first step in agency approval. Six months later he changed his mind, he said, after further examination of the SBA's regulations.[75]

On 6 January 1989 the Iranians were told their petition was again rejected. Four reasons were listed. The agency said the revised petition failed to show long-term discrimination against Iranians because the cases cited involved Syrians, not Iranians. Second, a satisfactory link between the census data on income to prejudice and bias was not created. "There are a number of possible explanations for the economic disparity between

Iranians and other groups," the reply claimed, although the SBA provided no such explanations.[76] Third, the agency felt that Iranians were "too narrow" as a group. The agency insisted that "SBA has never admitted individuals with origins limited to one country as a group whose members may be considered socially disadvantaged. Groups that are designated to be socially disadvantaged for purposes of the 8(a) program are defined more by cultural affinity than by country of origin."[77] While it is true that the Tongans, Indonesians, and Sri Lankans were admitted as part of geographic clusters and not as isolated nations, this was really a matter of bureaucratic convenience rather than careful ethnographic analysis. Was there a common "cultural affinity" within the Asian Pacific group between Chinese and Samoans admitted in 1979? Or between Cambodians and Japanese? Finally, the agency argued that the discrimination against the Iranians was merely "politically motivated" and as such was not the type of prejudice or bias for which the 8(a) program was established to remedy. "This approach was necessary," the agency claimed, because "political moods change over time and a group that is being politically ostracized today may be fully accepted tomorrow."[78]

### Indonesians

During the period the agency was considering the Iranians, the SBA received a letter from an Indonesian-born American citizen who owned a small business in California.[79] She recounted how, although she had office experience in Indonesia, language and cultural barriers forced her to begin her economic journey by cleaning houses in the United States. She soon became a dishwasher and then a waitress until, improving her English, she could begin her own business. It was a tale that could be told by many immigrants.

In the early part of 1988, her business received MBE certification by several local agencies and she applied to the SBA for 8(a) certification. The SBA, however, turned her down because Indonesian-Americans were not named as "members of [a] designated group." Failing as an individual applicant, despite her rather heroic personal odyssey, she, not surprisingly, decided to petition for group 8(a) eligibility for all Indonesian-Americans. A country of nearly 200 million inhabitants, Indonesia has furnished a relatively small number of immigrants to the United States. She conceded that there were only about twenty thousand Indonesians in the United States and asserted there were no statistics about their collective status. Actually, however, there were such Census data showing that, although one of seven Indonesians was below the poverty level, on average members

of the group were better educated, had better jobs, and were more prosperous than other Americans.[80]

Nevertheless, she insisted, following the linguistic cues in SBA documents, that Indonesians were like the other Asian Pacifics in America who had been previously included and:

> My color is yellow like other Indonesian Americans I know. . . . Asian Pacific Americans have suffered the chronic effects of discriminatory practices for a very long time, over which they have no control, and, Indonesian Americans, most definitely included have suffered economic deprivation. This has impacted all the Indonesian Americans I know in a most negative way. Good jobs are scarce regardless of talent. Language and color are a barrier to both employment and a good education. Indonesian-Americans have no business history.[81]

The petition also included a map of Southeastern Asia with Indonesia doubly underlined so the SBA would be certain to know where the country was located.

On 24 March 1989, the SBA general counsel informed the petitioner of her success. The SBA had decided to publish for public comment a proposal to add Indonesians to the already included Asian-Pacific American cluster. The record shows only one such comment received—that from another Indonesian-American businesswoman who had also previously been rejected as an individual for 8(a) certification. Needless to say, she was enthusiastic about prospective group inclusion. The SBA later added Indonesians as a group to its presumptively "eligible list."

## Patterns in Presumptive Eligibility

The SBA's response to the eight petitions for presumptive eligibility in its 8(a) program provides the only systematic documentation thus far available of federal decisions about group eligibility for affirmative-action preferences. However, as noted earlier, these papers do not reveal all the internal policies of the agency or the external pressures placed on the agency. If the communications were not made in writing or if the agency has deleted them from the FOIA request, the record is incomplete.[82] Still the documents constitute the formal administrative history of these decisions. As such they are an appropriate basis for evaluating the logic and fairness of the decisions.

Examining this record, it is difficult to discern any consistent application of the agency's published procedural or substantive standards. While determining the relative social disadvantages of groups may be necessarily subjective, the relative economic disadvantage of groups is quantifiable and the data were often available from census records. The SBA never used the data and never analyzed them when petitioners introduced them, but instead employed a hodgepodge of rationales that appear largely to be pretexts for its decisions. The putative requirement that there be evidence of "long-term" prejudice and discrimination in American society, used to exclude Iranians, was not applied to other new immigrant groups such as Asian Indians or the Asian Pacific Islanders. Similarly, the application of the standard that groups not be too narrow and represent only an individual nation, which was used against the Iranians, is inconsistent with the fact that when the SBA expanded eligibility throughout much of Asia, the agency did so by particular countries: Burma, Japan, etc. It informed the Tongans in 1987 that they were too small to "warrant an SBA determination of minority group status" but admitted them in 1989 along with people from the Marshall Islands and Micronesia.[83] The SBA turned down women because it did not wish to extend beyond "8(a) traditional minority groups," although women were participants in other federal programs and evidence of cultural discrimination against women in business was substantial. In 1988, Congress effectively overturned that decision by forcing women into the rest of SBA's portfolio, but women are still not eligible for 8(a) set-asides. The agency rejected disabled veterans, although disability and veteran status are common in other affirmative-action programs. Although Hasidic Jews were already eligible for other Department of Commerce and SBA programs, and the existence of discrimination against them was clear, they were excluded from 8(a) participation ostensibly on constitutional grounds. This is a complex area of law that can be argued either way, but the SBA ruled without citing any statute or court case.

On the other hand, when the agency did expand eligibility, as it did in 1979, when persons from twelve Asian countries were brought in, or, in 1982, when the persons from the Indian subcontinent were included, it did so without any independent examiniation of the actual social or economic status of those groups in America. Had the SBA done so, it would have discovered that Asian Americans are the best educated and most prosperous of all the nation's larger racial groups and, as a relatively new immigrant group, have made great strides in developing businesses.[84] But the agency seemed to accept the argument made to the SBA by the Asian American Commission of Washington State in a 1979 letter:

> Asian/Pacific Americans, Blacks, Hispanics, and Native Americans all share a well-documented, common history of racism, discrimination and exclusion. That we are people of color serves as the common denominator for such treatment even today. This should be the foundation for qualifying as a "socially and economically disadvantaged" minority group.[85]

The Asian Indians' petition repeated this theme in its assertion that, "in America, skin color is a central element of identifiability . . . the primary characteristics setting off Asian Indians as a discrete minority."[86]

A skin-color hypothesis would explain why the agency accepted persons from every nonwhite Asian country but rejected Iranians, and, for that matter, why it did not add Afghanis when it added Nepal and Bhutan in 1989. It would also explain why the petitions of the Hasidic Jews, women, and disabled veterans were rejected.

The SBA's decision to draw a "people of color" line around its 8(a) program was not consistent with its understanding of any formal congressional mandate, as evidenced by its formal Policy and Procedural Release No. 2017, quoted earlier.[87] But, informally, the agency was pressured by Parren Mitchell, who until 1987 chaired the House Subcommittee controlling the SBA's future, and by the groups already in the program not to "dilute the resources earmarked for blacks and other minorities."

To draw the "people of color" line, as SBA appears to have done in 8(a), is to ignore the reality that in the world of small businesses race and ethnicity are not very good surrogates for size or success. In 1982, 64 percent of all businesses owned by white males had net receipts of less than $25,000, compared to 69 percent for Hispanics, 70 percent for blacks, and 65 percent for other minorities (mostly Asian). Similarly 81 percent of all businesses owned by white males had no paid employees compared to 84 percent Hispanic, 87 percent black, and 81 percent other minorities.[88]

In 1989, the Supreme Court ruled in *City of Richmond v. Croson* that state and local MBE programs must provide specific evidence of discrimination about each racial and ethnic group eligible for business preferences.[89] Consequently, jurisdictions all over the country are reexamining their own programs and sometimes eliminating groups for which no discrimination can be shown. But the Supreme Court ruled in *Fullilove v. Klutznick (1981)* that Congress, and by extension, the federal agencies, had broad authority to grant business preferences to various racial and ethnic groups without judicial supervision. Despite repeated congressional admonitions that 8(a) beneficiaries should not be defined strictly on racial

grounds, 99 percent of all 8(a) benefits go to businesses owned by members of the "people of color" groups that SBA has designated as presumptively "socially and economically disadvantaged."[90] The SBA's reliance on the "people of color" ideology has led it to a position inconsistent with both the historical record and the contemporary evidence of discrimination in America. It has included groups (Tongans and Sir Lankans) for whom there was no history of discrimination because they were barely present in the country until recently, while excluding groups that have faced discrimination since the founding of the Republic (Jews and women). By refusing to apply an empirical test of contemporary socioeconomic status, the agency was left with no principled basis on which to include Asian Indians and exclude Iranians, both recent immigrant groups. Because of broader patterns of immigration that the SBA has not considered, Asian and Hispanic American businesses are growing much faster and receive more 8(a) benefits than black Americans,[91] so the original motivation for the program is being eroded.

The SBA has compounded the problems caused by its earlier decisions by taking the position that the agency does not have the authority to review rejections of petitions. Eight years after the Hasidics were rejected, they reapplied but were told agency rules did not permit reconsideration.[92] Nor will the agency reexamine whether a group made eligible because it was socially and economically disadvantaged at one time should remain in that category indefinitely.[93] In the 8(a) program, once a group is in, apparently it is always in. Unless Congress acts, once the SBA finally rules a group out, it is indefinitely out.

*University of Maryland*
*Graduate School, Baltimore*

## Notes

1. Laurel Shaper Walters, "Immigrants Flood New York City Schools," *Christian Science Monitor*, 18 May 1992, 1.
2. 438 U.S. 265, 292 (1978).
3. See, for example, Justice Douglas in *DeFunis v. Odegaard*, 416 U.S. 312, 337–40 (1974), Justice Powell in *Bakke* at 309 (1978), Justices Stewart and Stevens commenting separately in *Fullilove v. Klutznick*, 448 U.S. 448, 530, 535–36 (1980), Justice O'Connor in *City of Richmond v. Croson*, 486 U.S. 469, 506 (1989).
4. See, for example, Richard N. Goodwin's chapter, "Beyond Civil Rights," in *Remembering America* (Boston, 1988), when discussing the preparation of Lyndon Johnson's Harvard Commencement address, where the rationale for affirmative action was first set out (342–49).

5. Hugh Davis Graham (New York, 1990) and Herman Belz (New Brunswick, 1991). Graham does discuss the Nixon administration's specific inclusion of Cuban-Americans in the Spanish-surnamed group. Cuban-Americans tended to be relatively conservative, affluent, and Republican (328).

6. The issue of which groups to include in federal minority business programs is mentioned only in passing in the standard histories of federal MBE programs. George Lee Hopkins, "Contracting with the Disadvantaged Sec 8(a) and the Small Business Administration," *Public Contract Law Journal* 7:2 (August 1975): 169–217. Parren J. Mitchell, "Federal Affirmative Action for MBE's: A Historical Analysis," *National Bar Association Law Journal* 9 (1981–82): 1–22. Jess H. Drabkin, "Minority Enterprise Development and the Small Business Administration's Section 8(a) Program: Constitutional Basis and Regulatory Implementation," *Brooklyn Law Review* 49 (1983): 433–77. The most definitive study of federal MBE programs mentions the specific SBA exclusion of Hasidic Jews but otherwise does not comment on the group inclusion/exclusion issue. Daniel A. Levinson, "A Study of Preferential Treatment: Evolution of Minority Business Enterprises Assistant Program," *George Washington Law Review* 49 (1980): 1–99.

7. Herbert Hammerman, "'Affirmative-Action Stalemate': A Second Perspective," *The Public Interest* (Fall 1988): 130–34.

8. Ibid., 131

9. That is one of the reasons that local minority business programs included the same list of eligible groups as those identified by the SBA. This imitation of the SBA list has begun to cause trouble. In *City of Richmond v. Croson*, the Supreme Court criticized the city for granting set-aside preferences to "Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons" without any evidence of past discrimination against those groups or even any indication that Richmond had an Eskimo or Aleut citizen. At 506.

10. 15 U.S.C. 631(a) (1971).

11. U.S. Code Congressional and Administrative News, 3843.

12 13 C.F.R. 124.8–(c) (1973).

13. 42 U.S.C. 6705 (f)(2). In June 1980, the Supreme Court upheld the validity of these set-asides in *Fullilove*.

14. Owners are supposed to have a net worth of less than $250,000.

15. 13 C.F.R. 124.105(d)(2)(i–iii).

16 H.R. Rep. No. 949, 95th Cong. 2d sess., 1978, reprinted in Legislative History of the Small Business Act and Small Business Investment Act of 1958, Amendment, vol. 1, Committee Print at 56.

17. Legislative History, P.L. 95–507, 3882

18. Revised 1 May 1980.

19. Parren Mitchell, the principal policymaker for MBE programs, said the omission of Asian-Americans was "inadvertent." Native Americans were not included until added in the Conference Committee report.

20. "Application of Opportunity Development Association and others for Designation of Hasidic Jews as a Socially and Economically Disadvantaged Group Pursuant to 13 C.F.R. Sec. 124.1–1(3)(iii)," 27 December 1979, 4–5.

21. Ibid., 43.

22. Ibid., 10.

23. Ibid., 20.

24. Ibid., 28.

25. Letter, 22 February 1980.

26. Letter from Frederick E. Jordan to William Clement, associate administrator, Minority Small Business and Capital Ownership Program, 3 March 1980, 1.

27. Letter from Carlos A. Young to William Clement, 3 March 1980, 1.

28. Memo from Harry Schwartz and Bob Malson to Stu Eizenstat, "Application of Hasidic Jews for Designation as a Socially Disadvantaged Group Entitled to Minority

Procurement Set-Aside and Minority Subcontractor Benefits," 21 February 1980, 2. These White House papers come from the Carter Library, and I am indebted to Hugh D. Graham, Holland N. McTyeire Professor of History, Vanderbilt University, for unearthing them.

29. Memo from Edward W. Norton to Harry K. Schwartz, "Hasidic Application for Designation as a Socially Disadvantaged Group," 4.

30. Ibid., 8.

31. Schwartz-Malson memo (see note 28).

32. SBA Decision, 8 April 1980, 6.

33. SBA Decision, 8 April 1980, 12.

34. Ibid., 25. There had been no such First Amendment concerns six years earlier, when the Hasidic Jews received minority status from the Office of Minority Business Development in the Department of Commerce. This inconsistency within the federal government cannot be logically reconciled.

35. 45 FR 79415 (1 December 1980).

36. "Petition of National Association of Americans of Asian Indian Descent (NAAAID) for Inclusion of Asian Indians as a Majority Group Eligible for Participation in SBA's Section 8(a) Program in Parity with Asian Pacific Americans and Other Recognized Minorities," 30 June 1981, 9.

37. Ibid., 56-57.

38. Ibid., 6.

39. Ronald Takaki, *Strangers from a Different Shore: A History of Asian Americans* (Boston, 1989), 420.

40. "Civil Rights Issues Facing Asian Americans in the 1990's," U.S. Civil Rights Commission, Washington D.C., February 1992, 12–13.

41. Letter from Michael Cardenas to K. G. Jan Pillai, Esquire, 24 September 1981.

42. Asian Indian Petition, 33.

43. Letter from Robert L. Wright Jr., associate administrator for Minority Small Business to Jan Pillai, 26 February 1982.

44. SBA memorandum by Robert Wright, 19 July 1982.

45. SBA Notice by Robert Wright and James C. Saunders, 16 August 1982.

46. Asian Indian Petition, 40.

47. Letter from attorney Joseph A. Bosco to Michael Cardenas, 24 December 1981, 6.

48. Office of the White House Press Secretary, 25 October 1978.

49. Letter from Joseph Bosco to Michael Cardenas, 24 December 1981, 8.

50. Letter of 11 May 1982 from James C. Saunders to Joseph A. Bosco. This is consistent with the position the SBA was taking in denying the application of individual women-owned businesses for 8(a) status. For example, on 30 May 1980, Margaret Shaffer of Paradigm, Inc., received the following denial letter from William A. Clement Jr., associate administrator for Minority Small Businesses: "Sexual discrimination is not included as one of the elements which may lead to determination of social disadvantage, and neither does the Small Business Administration equate sexual discrimination to cultural bias."

51. Letter from Karen Olsen to Herberto Herrera, Deputy Administrator, 23 February 1983.

52. The history of Mormons' missionary activity to the Tongans is recounted in R. Lanier Britsch, *Unto the Islands of the Sea* (Salt Lake City, 1986).

53. Letter from Senator Jake Garn to Wilfredo Gonzalez, associate administrator, Minority Small Business and Capital Ownership Development, 3 November 1986.

54. Letter from an unknown author to Wilfredo Gonzalez, 3 November 1986.

55. Response from Gonzalez to unknown petitioner, 23 April 1987.

56. Actually, in March 1989, three years after the Tongan petition, when the SBA added eight places to the Asian Pacific group, Tonga was not one of them. In August of that year the explanation for Tongan exclusion was revealed in the *Federal Register* (54 FR 34696). The SBA admitted "that it inadvertently omitted" Tonga from its listing of coun-

tries whose people are regarded as Asian Pacific American. The agency's cavalier treatment of the Tongans was also inflicted on the Laotians in 1989, when they were inadvertently dropped from the same group and then later restored.

57. Letter from John Lopez to George Bush. According to the *Statistical Abstract of the United States*, in 1988 there were 2,199,000 veterans receiving compensation for injuries sustained in the service (10 August 1987).

58. Letter from Wilfredo S. Gonzalez to John Lopez, 16 December 1987, 2.

59. Ibid.

60. 29 U.S.C. 793–94.

61. SBA 1 August 1972, 72–56 Press Release, 3.

62. 16 December 1987 response, 3.

63. Ibid.

64. Memorandum from Robert Bluebber, general counsel to Francisco Marrero, 24 February 1988, 4.

65. "Petition for Designation of Iranian Americans as a Socially Disadvantaged Minority Group (Pursuant to Public Law 95-507 and 13 C.P.A. 124.105) Before the Small Business Administration," 1. For example, Iranian petition, "A favorable petition by the SBA will ipso facto allow Iranian Americans to become eligible to participate in other Federal, state, and local programs" (9).

66. This represents an unverifiable estimate because the general census does not maintain statistics on Iranians as a discrete ethnic group.

67. Ibid., 28–29.

68. 10 December 1979, 35.

69. Ibid, 33.

70. Ibid, 19.

71. Letter from Wilfredo Gonzales to Gary Gasper, attorney, Sidley & Austin, 23 November 1987, 2.

72. Felix M. Keesing, *Cultural Anthropology* (New York, 1966), 372, and Roger Pearson, *Anthropological Glossary* (Malabar, Fla., 1985), 126–27.

73. Later the agency asked if the logic of the Iranian petition would not lead to minority status for Syrians as well. Letter from Joseph O. Montes, associate administrator, Minority Small Business and Capital Ownership Development, to Gary J. Gasper, 6 January 1989, 2.

74. Letter from Gary Gasper to Wilfredo Gonzalez, 31 January 1988, 8.

75. Memorandum from David A. Kohler to Francisco Marrero, director, Office of 8(a) Program Eligibility, 31 January 1988.

76. Letter from Joseph O. Montes to Gary J. Gasper, 6 January 1989, 3.

77. Ibid., 3–4. The rejection letter carries this point to a bizarre conclusion. It chastises the Iranians for comparing themselves to Vietnamese Americans and for arguing that since the Vietnamese were included that the Iranians should be. The letter states that "Vietnamese Americans have not been designated as a minority group by SBA. SBA's regulations have designated Asian Pacific Americans, of which Vietnamese Americans are a small part, as socially disadvantaged group. . . . Thus any comparison between Iranian Americans and Vietnamese Americans for the purpose of supporting a petition by Iranian Americans is misplaced." Actually the Iranians never made comparisons with the Vietnamese, who were the poorest of the Asian group, but compared themselves with Asian Indians, who were the wealthiest. If the unpublished census data on which the Iranians relied are accurate, the median household income for them in 1979 was less than that for any other group in the Asian Pacific cluster. The SBA's argument, in addition to being factually incorrect, seems to suggest that it is better to determine economic and social disadvantage by large geographic areas than by smaller groups that do have distinctive cultures and histories of discrimination. The only thing people in the far-flung Asian Pacific category really have in common is that they are nonwhite.

78. Ibid., 5.

79. Letter from unknown person to Larry Parkinson, 25 July 1988.
80. "Civil Rights Issues Facing Asian Americans in the 1990s" (see note 40).
81. Ibid., 3.
82. Much of the section detailing examples of discrimination against Iranians was deleted by the SBA when it responded to the FOIA request. The agency made similar deletions in the sections of anti-Semitism and the Holocaust in the Hasidic Jewish petition. It is not clear what rationale under FOIA law the SBA used to make these deletions from the petitions it received. We have been successful in acquiring some deleted material by finding followup petitions with the SBA or contacting those who filed the original petition.
83. Letter from Wilfredo Gonzalez to unknown recipient, 23 April 1987, 2.
84. The most comprehensive assessment of the relative status of Asian-Americans can be found in "Civil Rights Issues Facing Americans in the 1990's" (see note 40). While this report documents some evidence of continuing discrimination against Asian Americans, it also shows that on average they are better educated, more likely to be managers or professionals, have less unemployment and a higher median income than the American population in general (11–12).
Timothy Bates, after conducting a careful economic analysis of minority businesses, concluded: "From a policy standpoint, an essential factor stands out. Self-employed Asians are not a disadvantaged group: their eligibility for government minority business set-asides and preferential procurement programs, financial assistance, subsidized technical assistance, and so forth is completely inappropriate. Their status as a "disadvantaged minority group" is history and it is time to adjust public policy to reflect this new reality." "The Changing Nature of Minority Business: A Comparative Analysis of Asian, Non-Minority, and Black-Owned Business," *Review of Black Political Economy* 18 (Fall 1989): 26.
There are some major differences among Asian groups in business participation. Japanese, Chinese, and Koreans are substantially above the national average, while Filipinos are much lower. Frank A. Fratoe and Ronald L. Meeks, "Business Participation Rates of the 50 Largest U.S. Ancestry Groups: Preliminary Report," (Washington, D.C., 1985).
85. Diane Wong, executive director, Commission on Asian American Affairs, letter to Lester Fettig, administrator, Office of Federal Procurement Policy, 16 April 1979.
86. Asian Indian Petition, 33.
87. Procedures Relating to Eligibility Determinations of Disadvantaged Businesses: "In determining whether small business concerns are socially or economically disadvantaged, reliance should not be placed upon a single factor, but on a composite of such factors as the social or economic background of the principal owners, controlling individuals and managers of the concern, along with the general pattern of their life, opportunities and education which have prevented them from obtaining financial or other assistance available to the average entrepreneur in the economic mainstream. Such persons may often include, but are not limited to Negroes, Indians, Eskimos, Aleuts, and persons of Mexican, Puerto Rican, Cuban, Filipino, or Oriental extraction."
88. Bureau of the Census, 1982 Characteristics of Business Owners, Table 3B, p. 12, and Table 4C, p. 22.
89. *Croson*, at 506.
90. Office of Minority Small Business and Capital Ownership Development, 10 April 1992.
91. In FY 91, blacks received 41 percent of the SBA contract dollars, but Asians received 18 percent and Hispanics 30 percent. Letter from Janelle Booker, Program Liaison, Office of Minority Small Business and Capital Ownership Development, 10 April 1992.
92. Letter from Francisco Marrero, director, Office of Program Eligibility, to Rabbi Zvi Kesterbaum, executive director, ODA, illegible date.
93. Telephone interview, Amy Mertz, attorney for the SBA, 23 April 1992.

U.S. SMALL BUSINESS ADMINISTRATION
WASHINGTON, D.C. 20416

PHILIP LADER
ADMINISTRATOR
U.S. SMALL BUSINESS ADMINISTRATION

BEFORE THE
UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON SMALL BUSINESS

September 18, 1996

Madam Chairman and Members of the Committee, thank you for this opportunity to appear before you today to discuss your proposed legislation, H.R. 3994, and the U.S. Small Business Administration's (SBA's) Minority Small Business and Capital Ownership Development (MSB&COD) Program, which I will also refer to as the Minority Enterprise Development (MED) Program, or 8(a) Program. I am Philip Lader, Administrator of the SBA, and am accompanied by Calvin Jenkins, Associate Administrator for Minority Enterprise Development, John Spotila.the SBA's General Counsel and our Agency's lead liaison with the Justice Department regarding this program, and Hugh Wright, the SBA's Washington District Office's Assistant District Director for Minority Enterprise Development.

Permit me to take this opportunity to introduce Ronald Hobson, SBA's newly appointed Associate Deputy Administrator for Government Contracting and Minority Enterprise Development. I look forward to working with Mr. Hobson, who joins us from Signet Bank. He brings fresh analytical insights and approaches to the highly interrelated matters of finance, government contracting, and business development.

The Clinton Administration is committed to the goal of expanding opportunity for all Americans to participate in our free enterprise system and in Federal procurement. The President has strongly stated his commitment to "mend, not end" Federal affirmative action programs. To achieve this goal, SBA has sought

to strengthen and improve the 8(a) Program as a business development program designed to help eligible small business firms which are socially and economically disadvantaged reach self-sufficiency and competitive viability. This was its intent when it was established in the Nixon Administration, and business development has been reemphasized as its focus today. Business development - not a "hand out" or "giveaway" - is the substance of the 8(a) program.

Furthermore, the Justice Department proposed reforms to affirmative action in federal procurement programs which are a critical component of the President's commitment to "mend, not end" affirmative action, will also help to improve the effectiveness of the 8(a) program and buttress its constitutionality.

It should be noted that nearly three years ago today, on September 22, 1993, my predecessor, former Administrator Erskine Bowles, asserted before you the SBA's intent to improve the 8(a) Program in terms of the quality of its business development assistance, oversight of program participants, SBA's work with other government agencies, and our internal management. I am pleased to tell you that significant improvements have been made:

- Improved management, monitoring, and control through a new, comprehensive management information system;
- Intensified monitoring of each firm's accomplishment of business development goals and compliance with competitive business targets by more comprehensive annual reviews of program participants;

- Reduced time that eligible firms must wait to receive program benefits by accelerating application processing time from an average of 208 days then to 90 days now, and re-engineering our application review process;
- Realigned organizational structure to integrate more fully the agency's government contracting initiatives into its program to assist disadvantaged firms;
- Re-focused 7(j) management and technical assistance to provide comprehensive assistance to 8(a) program participants through expansion of an executive education program;
- Reduced administrative paperwork burden on program participants by eliminating quarterly financial reporting requirements; and
- Improved program integrity by accelerating termination of ineligible firms. (To illustrate, more businesses have been removed from the program in the past two years than in the entire previous history of the program.)

Moreover, the U.S. Department of Justice is proposing other changes to the program.

Successes

Madam Chairman, before I address your specific issue, let me relate four of the MED program's successes. They demonstrate that the 8(a) program has produced many thriving companies which have created jobs and contributed to the nation's economic growth.

Integrated Systems Analysts, Inc. (ISA) of Arlington, VA, an engineering computer service firm established by C. Michael Gooden in 1980, was admitted to the 8(a) Program in 1982 and completed program participation in 1987, four years less than the currently allowable nine-year term. The company leveraged this access to Federal procurement to expand its annual revenues by a factor of ten

and increased its number of employees from less than ten to more than four hundred.

ISA, having exited the program nearly a decade ago, is an excellent example of successful transition from the sheltered environment of the 8(a) Program to the intensely competitive commercial and government marketplaces. In the past ten years, the firm's accomplishments have often been recognized: It has been included among Inc. Magazine's "500 Fastest Growing Companies" and Black Enterprise Magazine's "Top 100 Black Owned Businesses," and received the KPMG/Peat Marwick High Tech Entrepreneur Award and the Arthur Young/Venture Entrepreneur Award.

Dynacs Engineering Company, Inc., a current 8(a) participant founded by Ramendra P. Singh, entered the program in October 1989, and has been recognized by the National Aeronautics and Space Administration (NASA), the Boeing Company, the Governor of Florida, and the SBA for its commitment to excellence. Located in Clearwater, Florida, the business also has offices in Houston, Albuquerque, Pasadena, and Renton, Washington. Dynacs, engaged in engineering and scientific research, development and services, has developed complex technological innovations for NASA and is currently developing software to work with digital ink and paint used in commercial applications. Since 1993, sales have

almost tripled, and the company now employs 250 people nationwide. Dynacs' success reflects the support it received through the 8(a) program.

Lord and Company, Inc., of Manassas, Virginia, another business now in the 8(a) portfolio, was accepted in March 1991. It is a professional service firm, headed by Juan G. Cabrera, that specializes in the design, development, installation and start-up of microprocessor-based instrumentation, controls and monitoring systems. Certified as an Energy Savings Performance Contractor by the U.S. Department of the Army, it has more than 50 full-time and 16 part-time employees in five cities throughout the country. From 1993 to 1995, Lord and Company's revenues increased by more than 200 percent. It is now designing and implementing an important environmental control system for the Smithsonian Institution to protect the museums' collections.

Acorn Services, Inc., a current 8(a) participant based in Florham Park, New Jersey, entered the program in January 1993 and has succeeded in the very competitive food service management industry. Deborah Proctor, the business' president, contends that the "8(a) Program allowed my firm the opportunity ... to show people that we can deliver the agreed- upon services at the agreed-upon price in a timely and extremely professional manner, ... that corporate size, and owner's race and gender should not deter decision-makers from awarding contracts."

The company's 220 employees have performed ably on many contracts during the past three years, and Acorn's sales have grown by more than five hundred percent. Although fewer than half the program participants actually win contracts, Ms. Proctor's firm was awarded the first competitive 8(a) contract that it bid, an award from the U.S. Coast Guard. The 8(a) Program provided Acorn vital market access which once achieved, permitted the firm to demonstrate its competitiveness and ability to perform.

There are many more 8(a) success stories from all parts of the country. More than 6,000 small firms located across the United States are developing their competitive skills in the 8(a) program. Thousands of other firms have completed their nine-year term and have graduated from the program. Current 8(a) firms directly employ more than 157,000 people. Their multiplier effect results in considerable additional employment through subcontractors and suppliers. More than 80 percent of all 8(a) firms are located outside the Washington D.C., area. These firms receive about 75 percent of all 8(a) contract awards.

And, to address another frequent though inaccurate criticism of the program, it should be noted that the average net worth of program entrants is $60,000, exclusive of residence and ownership interest in the business, well below the $250,000 statutory maximum.

Real business development is being achieved through this program, measurable business-by-business in communities throughout our nation and in the human terms of aspirations and accomplishment, economic growth and new jobs.

Given these "success stories", the question can be asked whether the program's purpose has been fulfilled. The 8(a) program has kindled the entrepreneurial spirit among many who would otherwise lack access to business opportunity. It has helped reduce the barriers faced by socially and economically disadvantaged groups and has encouraged many individuals to go into business who otherwise might not have.

Based on the most recent data available from the Department of Commerce's Census Bureau, minority-owned businesses comprise 8.8% of the total business population, while minorities comprise 26.3% of the general population. This disparity, even greater in the Federal marketplace, is profound and argues powerfully for the continued need for 8(a) authority as a business development tool.

Contracting by minorities still represents a very small portion of total Federal procurement. In 1992, minority-owned businesses received only 2.9% ($5.7 billion) of the $200 billion of total Federal procurement, a figure which certainly is not representative of the country's minority population or business ownership.

This circumstance is consistent with Congress' finding in 1988 when it enacted PL. 100-656, determining that the need for the 8(a) program was just as valid then as it was at its inception in 1968.

SBA believes there is evidence that the 8(a) Program has indeed fostered business ownership by socially and economically disadvantaged persons, as intended by Congress. In 1995, 8(a) firms received $5.8 billion in Federal procurement awards. They had total combined revenues (including non-8(a) work) of more than $9.5 billion and paid more than $100 million in federal income taxes.

Yet the participation of minority-owned firms in Federal procurement remains comparatively small. Data from the General Services Administration's (GSA's) government-wide information from the Federal Procurement Data System indicates that aggregate minority-owned business participation in total Federal contracting amounted to only $11.2 billion, representing 5.5% of total procurement of $202 billion in Fiscal Year 1995. Total contract dollars awarded through the 8(a) Program represented approximately $6.4 billion, or 3.1% of Federal contracting dollar and 57% of the total minority participation.

Had 8(a) contracting opportunities not been available, minority-owned businesses might have received only $4.8 billion, which equates to 2.4% of total

Federal procurement dollars. Aside from the growth in 8(a) procurement from 1992 to 1995, minority business participation in the Federal marketplace increased only 0.7% over that period of time. You can understand what I mean, therefore, when I say we, as a nation, "still have a long way to go" in opening small business opportunities for all Americans.

**Minority Enterprise Development Program Accomplishments**

But this dramatic need should not excuse the 8(a) program from improvement. As I mentioned previously, SBA has meaningfully addressed concerns raised by past General Accounting Office (GAO) and Inspector General (IG) reports. First, SBA's inability to develop an effective, accurate management information system had been cited as a deficiency over the years that prevented the Agency from properly managing and evaluating the MED Program. Second, the Agency's failure to conduct comprehensive annual reviews of all portfolio firms to determine continuing program eligibility had been cited. Third, SBA's regulations permitting the abuse of competitive thresholds in award of indefinite delivery, indefinite quantity (IDIQ) contracts had been criticized. Fourth, SBA's previous failure to process program applications in a timely manner had been properly criticized. Fifth, SBA's failure to terminate firms which are no longer eligible had often been noted in past third-party reviews.

In the Clinton Administration, those of us charged with the privilege of managing this Agency have taken these criticisms very seriously and have, I believe, successfully addressed each of these shortcomings of the 8(a) program. Not only have significant management and streamlining improvements been made, but we have refocused the entire 8(a) and 7(j) programs to business development. Our minority economic development efforts have not been perfect; the work is not yet done; but we can demonstrate that 8(a) is being "mended," often in a very profound way that is consistent with both the program's objectives and the best interests of the American taxpayers.

**Management Information Systems**

A continuing criticism of SBA by GAO and the IG was SBA's failure to develop and implement an automated information system that would allow the agency to collect and evaluate information. In August 1994, SBA adopted a plan to complete automation of the MED program. Pursuant to this plan, in the fall of 1995, the agency implemented the Servicing and Contracts System/Minority Enterprise Development Central Office Repository (SACS/MEDCOR).

The system now used in Headquarters and all field offices is a comprehensive tool that enables SBA to monitor what kind of assistance is provided to whom, contracts awarded, business development progress, compliance

with statutory and regulatory requirements, and program performance. SBA is thereby able to measure program effectiveness and identify program vulnerabilities before they become problems.

During the past two months we have begun to use the information system to monitor district office compliance with statutorily mandated requirements to conduct business plan reviews. In FY 1997 we are committed to continue to monitor compliance on a quarterly basis.

**Annual Portfolio Reviews**

Annual reviews of the business plan for each program participant is essential: identifying market, management, and financial weaknesses, and recommending effective business development strategies. The failure to conduct annual business plan reviews was a serious program flaw.

Last year, for the first time in the 8(a) program's history, all SBA districts were assigned a goal to complete an annual review for every company in their portfolios. This goal was a critical component of each SBA District Director's performance review. As a result, 84% of all portfolio firms were reviewed during FY 1995, as compared to 57% in FY 1994, and it is expected that reviews will have been completed for all 8(a) firms this year.

Monitoring portfolio performance on a quarterly basis will now be possible because of the newly-implemented management information system. In FY 1997, to make the annual review process more efficient and the resulting data more accurate, we shall automate the review form and procedure, thereby simplifying our field staff's annual business plan reviews and improving their quality and consistency.

#### Indefinite Delivery, Indefinite Quantity Contracts

To increase the number of contracts available for competition, the "indefinite delivery, indefinite quantity" (IDIQ) contract "loophole" has been closed. Previously, IDIQ contracts with a minimum guarantee (not estimated) value below the competitive threshold were offered to SBA on a sole source basis. SBA relied on the minimum value guarantee in accepting these requirements into the 8(a) program. Subsequently, many of these contracts were allowed to grow, through issuance of task orders by contracting officers of agencies other than SBA, to amounts far in excess of the competitive threshold. As a result, SBA found that the estimates of contract quantities by contracting offices were unreliable. To remedy this problem, on June 7, 1995, SBA published regulations that used the total estimated value of the contract as the basis for determining if the contract should be let as an 8(a) competitive award, thus creating more opportunities for competition.

While SBA feels that these steps will assist in providing better distribution of 8(a) contracts, it does not believe they will guarantee equitable distribution of all 8(a) contracts, because it is up to each participant to market and seek out contract opportunities. The 8(a) program can only provide assistance necessary for participating firms to become competitive; it does not guarantee the award of contracts or economic viability. It does, however, in collaboration with other Federal agencies, offer management and technical assistance, as well as access to capital that will assist a company in its efforts to grow.

### Application Processing

During FY 1996, the SBA made a concerted effort -- and successful -- to meet the 90-day statutory time frame for processing 8(a) applications. In the last three years, the average processing time has been reduced from 208 to 90 days. This reform is important because the more rapidly we process eligible firms into the 8(a) program, the sooner they can benefit from its business development assistance.

During FY 1997, applications will continue to be processed in this timely manner. Recent streamlining measures closed two duty stations and consolidated processing into three adequately staffed duty stations, and revised processing procedures to eliminate duplicative reviews. We are now actively investigating the feasibility of fully electronic filing and processing of applications for program

certification, as well as other process re-engineering to expedite application processing.

### Termination of Ineligible Firms

We have taken to heart the President's injunction to "mend" this program. To maintain program integrity, and pursue realistic business development objectives with limited resources and limited contracting opportunities, it is essential that companies be screened for continuing eligibility and any determined to be ineligible be expeditiously removed from the program. Since the beginning of FY 1993, SBA has terminated 449 firms from the program for reasons of non-compliance. In this Administration, the SBA has processed more termination actions than in all prior years of this program cumulatively.

### 7(j) Business Development Assistance

To strengthen the business development potential of 8(a) participants, MED has expanded 7(j) Business Development Assistance, its executive development program targeted to the needs of 8(a) program participants as they transition from sheltered competition to open competition in Federal and commercial markets. Chief Executive Officers of 8(a) firms were invited to participate in SBA-sponsored Executive Education programs at Dartmouth College and Clark/Atlanta University, hosting 140 and 50 executives respectively. Based on excellent evaluations by

these program participants, new executive education programs have been funded by SBA at Howard and Loyola Universities.

### Competitive Viability of 8(a) Firms

The percentage of firms still independently operating after leaving the program has improved since the enactment of Public Law 100-656 in 1988. Each year, pursuant to the law, SBA surveys firms exiting the program during the immediately preceding three years to determine their operational status. Notwithstanding slight yearly fluctuations, the overall trend is positive. Among firms exiting the program from 1988 to 1991, 48.5% reported that they were still independently in business. Among those exiting during the 1992 to 1995 period, 52% reported that they were independently operational.

The SBA is intensifying its efforts to assist disadvantaged businesses attain full competitive viability. The computerized management information system, annual review of business plans, district office goals for annual reviews, and continuing education will especially contribute to achieving this objective.

### Impact of Previous Legislative Overhauls

Allow me now to respond to your question concerning the impact of previous legislative overhauls to improve management of the program.

In an attempt to correct alleged abuses that existed in the original program established by an Executive Order under President Nixon, Congress enacted Public Law 95-507 in 1978. Congress therein determined that the power to award Federal contracts could be an effective tool for development of business ownership among groups that own and control little productive capital. The law sought to shift the program's focus to business development and required small business owners participating in the program to be at least 51% owned and controlled by socially and economically disadvantaged individuals. The law also clarified that the primary beneficiaries of the program should be minorities, but it permitted non-minorities to establish eligibility.

PL. 95-507 created the SBA position of Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD) to administer the 8(a) and 7(j) management and technical assistance programs. To rectify inconsistent determinations of eligibility for the 8(a) program by the field offices, PL. 95-507 established specific eligibility criteria and required that all determinations be made by this individual.

P.L. 95-507 also served to expand the 8(a) Program. Yet even with P.L. 95-507, the program failed to develop a sufficiently viable number of disadvantaged firms that could successfully compete without continued government contract assistance. Consequently, Congress passed PL. 96-481 in October 1980, requiring SBA to negotiate program participation terms with fixed graduation dates for each program participant. Under this statute, a firm's participation in the program was

limited to an original term of up to five years, with a possible extension of two years. PL. 96-481 placed needed limitations on the maximum time a business could participate; but firms, to their detriment in terms of attainment of competitive viability, still relied too heavily on 8(a) contract support.

On November 15, 1988, President Reagan signed into law the "Business Opportunity Development Reform Act of 1988," PL. 100-656. This law provided for, among other things, competition for contracts among 8(a) program participants for procurement above certain contract dollar thresholds; a nine-year fixed participation term; a requirement for attainment of non-8(a) revenue at certain levels during program years five through nine; a direct loan program for 8(a) firms; and exemption from the Miller Act requirements for bonding and the Walsh-Healy Act requirements for status as a manufacturer or regular dealer. On the procedural side, the law also established a division of program certification and eligibility to process applications within 90 days; and required approval of business plans after certification but prior to award of any 8(a) contracts.

With PL. 100-656, Congress and President Reagan reaffirmed that the 8(a) program was a primary tool for improving opportunities in the Federal procurement process for small business concerns owned and controlled by socially and economically disadvantaged individuals and bringing such concerns into the nation's economic mainstream.

As previously stated, the percentage of firms still operating after leaving the program has improved following passage of PL. 100-656. The opportunities for competition among 8(a) firms have encouraged development of capacities and skills needed for competition without 8(a) support, and the required non - 8(a) revenue has fostered more aggressive self-marketing efforts.

Today, nearly 5,800 small businesses participate in this program, although fewer than half actually win contracts. Contrary to rhetorical claims, contracts are not "given" to select firms. In all cases, successful 8(a) firms pass technical evaluations to demonstrate their competence. These businesses are then required to self-market their capabilities to Federal customers in order to have the opportunity to negotiate a sole source contract. Should a firm successfully market itself, it is then required to submit a detailed proposal and negotiate a price for the contract.

In all 8(a) awards, the contracting officer certifies that the contract prices charged by the 8(a) firms a "fair and reasonable" price is assured, as the contracting officer is under no requirement to give the firm the contract in the absence of this condition being satisfied. All businesses awarded contracts must perform competitively in the provision of goods and services.

**Evaluation of H.R. 3994**

H.R. 3994 proposes to offer in place of 8(a) and 7(j) a training program which requires a potentially expensive and paperwork-intensive certification

process so that companies can receive the same benefits SBA currently offers all small business customers who meet the pertinent size standards. The Clinton Administration strongly opposes this bill because it would eliminate the 8(a) contracting program and the 7(j) business development training currently offered. Countless disadvantaged small business owners would be hurt, and the economic potential of a critical segment of America's population would have significantly less chance of being realized. SBA would recommend that the President veto any legislation that passes the Congress which is not consistent with his policy of mending, not ending, affirmative action.

Without offering anything meaningful to replace the 8(a) program, the proposed legislation would eliminate a business development program that has created and maintained jobs, strengthened the national, state and local economies, and increased the nation's tax base. The bill does not refer to data, analyses or other evidence to demonstrate that the problems which led Presidents Nixon and Reagan to establish and renew 8(a) contracting authority have now been overcome. It ignores, or repudiates, the fact that the 8(a) program, when combined with other business development tools provided or leveraged by the SBA for all small businesses, is a well-established mechanism that has resulted in success stories that have life- and community-changing consequences.

Under H.R. 3994, the businesses eligible for this program are the very smallest businesses: those that are less than 25% of the numerical size standard for their Standard Industrial Code (SIC code). These very small firms are currently

eligible for all of SBA's other programs without going through a certification process. The specific forms of assistance the bill proposes to offer these businesses are (1) business plan development assistance, (2) management and technical assistance, (3) financial assistance, (4) equity assistance, and (5) surety bond guarantees. Each of these forms of assistance is available now either directly through the SBA's offices or, more likely, through one of our private sector resource partners.

Let me put in perspective the total value of 8(a) contract awards during 1995. Two large business companies -- one in aerospace, the other in shipbuilding -- each received a sole source contract award that was approximately equal to the total value of all 8(a) contract awards for that year. Let me repeat the obvious in another way. The total amount of 1995 sole source contracts under the 8(a) program for all certified businesses owned by socially and economically disadvantaged individuals in the United States was approximately equal to just one sole source contract to each of the top two Federal contractors.

Additional statistics underscore the relative scale of sole source contracts for 8(a) businesses. During 1995, six firms each received one individual sole source contract award that was valued at approximately $1.5 billion. That is, each of these firms received a single contract that was roughly equal to half the size of new 8(a) contract awards for FY 1995. Last year, 8(a) firms received about $2.5 billion in new sole-source awards. Additions and modifications to existing sole source contracts represented about $2 billion in additional activity. Non-8(a) firms,

in comparison, received more then $63 billion in sole source awards.

Let me again emphasize that total 8(a) contract dollars of approximately $6.4 billion awarded during 1995 represented only 3.1 percent of total Federal contract awards. Only half of 8(a) program participants actually won contracts. Self-marketing and negotiation of reasonable prices were required in all instances. All were required to perform successfully in their provision of goods and services.

The SBA believes that the 8(a) program is necessary. But it does not condone any past abuses that have occurred. We have acted to correct them, and we are endeavoring to prevent abuses today and in the future. All of the aforementioned reforms and the upcoming Department of Justice proposals demonstrate this Administration's commitment.

The SBA recognizes that more must be done not only to "mend" this program, but to ensure equitable access to the benefits of the 8(a) program: to provide more opportunities to more Americans. We believe that the U.S. Department of Justice's proposal to reform affirmative action programs in Federal procurement in light of the Supreme Court's Adarand decision will further enhance the effective delivery of 8(a) program benefits by more accurately targeting contracting opportunities. We recommend that the forthcoming Justice Department proposals be given a chance to work.

During the past twenty-five years, SBA's use of its 8(a) contracting

authority has done much to assist socially and economically disadvantaged entrepreneurs. The 8(a) program has spurred creation of minority-owned businesses in all industrial sectors and unleashed entrepreneurial potential. It has fostered formation of capital and increased access to credit in the minority business community. The program also has provided vital employment opportunities for economically and socially disadvantaged employees.

We need to continue to improve this program. But while such great disparities continue in the levels of Federal procurement, the program should not be eliminated.

**Testimony of**
**James Offord**

**before**

**the House Committee on Small Business**
**Washington, D.C.**
**September 18, 1996**

**Hearing on Proposed Reform of the 8(a) Program through**
**H.R. 3994 - the "Entrepreneur Development Program Act of 1996"**

My name is James Offord and I am retired from the Federal Government. I was employed by the former Department of Health, Education and Welfare (HEW). My job title was Contract Specialist and I was assigned the special task of being the 8(a) representative of HEW's Office of Human Development Services. In this capacity, it was my job to be the advocate for minority set-a-sides to firms designated as minority under the 8(a) Program.

Even though I had the "supposed" authority to select any procurement for minority set-a-side, I found it very discouraging to overcome the built-in prejudice of program managers and some of their supervisors.

As an example, when I informed program managers within my Department that I had decided to set-a-side a particular requirement for an 8(a) firm, management would come up with excuses as to why the minority 8(a) firm could not possibly perform the requirement or task. These 8(a) firms had been certified by the Small Business Administration (SBA). In some cases, the program manager would withdraw the requirement. In other cases, if the program manager found that the contract was over $25,000, that manager would try to convince me that the requirement was too large for

a minority-owned firm. When in part, small contracts are harder to perform, since the fixed course are the same as for a larger contract. Therefore, the profit margin is smaller and the risk to perform is difficult. It seems as though the mind set is that minority-owned firms should not be allowed to make larger profits. Even after contracts were awarded, some government contract managers would try to make the contract difficult to perform by changing specifications without a contract modification to compensate for increased work efforts.

This was done with veiled threats that if the minority contractor reported the increased work to the contracting officer, it would jeopardize any future contracts. Another way to avoid minority contractors was to keep modifying a contract with a non-minority firm using a unique specification that only the current non-minority firm possessed, which was not necessarily needed to the requirement of the end product. Management used this unethical method to eliminate the bidding process thereby eliminating fair and equal contracting opportunities for minority-owned firms who were able to bid competitively. These are some of the kinds of things that happened while I was a contracting specialist.

**Summary**

I believe that the SBA has done very little to protect the interest of minority-owned firms who were 8(a) certified and did even less to prevent management from denying fair and equal contracting opportunities to minority-owned firms who were able

to bid competitively. Enforcement of small business laws and regulations was not done because management had no intention of allowing fair treatment of minority-owned firms.

## Recommendation

I recommend that a community task force be set up and given oversight of SBA and the 8(a) Program. This special task force could be allowed to function as an SBA counterpart while there is complete reorganization of the SBA. Or, if the 8(a) Program is eliminated, those who have never received contracts should be given a special exemption for contracts for a 2-year period of time. At this time, the system is so mismanaged and corrupt, the entire system may have to be shut down and started over again.

Testimony

by

Jeffrey Rosen

Legal Affairs Editor,

The New Republic

Associate Professor,

George Washington University Law School

House Committee on Small Business

September 18, 1996

My name is Jeffrey Rosen. I am the legal affairs editor of The New Republic, where I write about the Supreme Court and constitutional issues. I am also an associate professor at the George Washington University Law School, where I will soon be teaching constitutional law. I'm honored by your invitation to testify about the constitutionality of the 8(a) contracting program in light of the Supreme Court's decision in Adarand v. Pena.

I would like to begin on a note of caution. There are important disagreements among members of the Adarand Court -- most notably about the scope and significance of the deference that Congress should receive under its power to enforce Section 5 of the Fourteenth Amendment -- and these disagreements mean that confident predictions about the future would be irresponsible. Divining Justice O'Connor's wishes is never easy, least of all for Justice O'Connor herself. In the wake of Adarand, furthermore, I respect the Clinton administration's efforts to refine the 8(a) program, in the hopes of resolving constitutional difficulties. The broad categories of federal set-asides are mandated by Congress, after all; and unless Congress repeals the set-aside laws,

the President is constitutionally required to enforce them. Nevertheless, as a constitutional matter, I am not convinced that the administration's proposed reforms, for all their good intentions, can resolve the tensions between the 8(a) program and the Adarand decision.

Here is the nub of the constitutionality difficulty: Recent decisions suggest that the courts will only accept affirmative action programs in federal procurement if there is concrete evidence of discrimination against each of the relevant minority groups in each of the industries and regions with which the federal government does business. But the administration doesn't propose to collect this evidence with the precision that the courts are likely to require.

In its proposals to reform affirmative action last May, the Justice Department notes that courts have identified six factors in an attempt to define what is called the narrow tailoring prong of strict scrutiny:

(1) Whether the government considered race-neutral alternatives and determined that they would prove insufficient before resorting to race-conscious action; (2) the scope of the affirmative action program, and whether it is flexible; (3) whether

race is relied upon as the sole factor in eligibility, or whether it is used as one factor in the eligibility determination; (4) whether any numerical target is reasonably related to the number of qualified minorities in the applicable pool; (5) whether the duration of the program is limited and whether it is subject to periodic review; and (6) the extent of the burden imposed on nonbeneficiaries of the program.

The administration, to its credit, has frankly conceded that these constitutional tests call into question at least one federal procurement program, the so-called "rule of two," under which contracting officers can limit bidding on particular contracts to minority firms only. Remember how the "Rule of Two" operated in practice. The State of New Mexico is about 50 percent Hispanic American, and yet the Department of Defense, in its effort to satisfy national "goals" set by the Small Business Administration, set aside virtually <u>all</u> of its road-building contracts at the White Sands military base, the largest military base in the country, for minority-owned construction firms.

It is easy to recognize the Rule of Two as the antithesis of narrow tailoring: race is the sole factor in eligibility; numerical targets, which

amount to 100% set asides, have no relation to the availability of qualified minorities; and the burden on the excluded non-minorities -- complete exclusion -- couldn't be more extreme. Faced with likely defeat in court, the Clinton administration announced in October, 1995, that it would repeal the rule-of-two. But the administration then announced that the Department of Defense would continue to set-aside the same contracts for the same minority firms under a panoply of different federal programs, most notably the 8(a) program, whose constitutionality it continues to defend.

In many respects, the 8(a) set-asides, which the administration defends, are analytically indistinguishable from the "rule of two" set-asides, which the administration repealed. Both programs insulate certain racial groups from "competitive consideration" with other racial groups, using race as the decisive factor rather than as a plus factor in assigning public benefits, thus violating a distinction that Justice O'Connor has found crucial. And both programs are employed to meet federal "goals" that often have no connection to discrimination suffered by particular minority groups in particular regions of the country. Because the federal government makes no attempt, in establishing its annual "goals," to account for the

availability of minority firms in a particular industry or geographic location, the only way for agencies to meet their goals is to concentrate their minority contracting in certain fields, such as construction, where minority-owned firms actually exist.

Tacitly acknowledging that the 8(a) program, in its current form, can't survive close judicial scrutiny, the Justice Department proposes to reform it. The administration proposes to set limits, or "benchmarks," for each industry with which the federal government does business. According to the proposals, "Each industry benchmark limitation will represent the level of minority contracting that one would reasonably expect to find in a market absent discrimination or its effects." The administration proposes to use census data to determine the capacity of firms operating in each market that are owned by available and qualified minorities. This figure would then be adjusted upward to reflected "the estimated effect of race in suppressing minority business activity."

But the figure that the administration seeks is metaphysical, not empirical, and no state has convincingly calculated it. In Texas, for example, the state tried to suggest that low percentages of self-employed minorities, and high percentages of

discrimination lawsuits filed, might indicate that minority business formation had been suppressed by discrimination. But the General Services Administration refused to accept the claim, conceding that business formation may be affected by cultural factors or personal choices that have nothing to do with discrimination.

The most obvious weakness of the administration's proposal is its refusal to reexamine the Achilles heel of the 8(a) program: its reliance on a list of groups that are presumed to be socially and economically disadvantaged, even though neither Congress nor the Small Business administration has ever examined any evidence of discrimination against many of the groups on the list. To satisfy the standards that Justice O'Connor articulated in the Croson case, the administration would have to undertake an arduous empirical task indeed: looking for evidence of discrimination against each group or sub-group included in the current set-aside program for each service that the federal government purchases in every state in the nation. But the Justice Department has decided not to do this. "Members of designated minority groups seeking to participate in SDB and 8(d) programs will continue to fall within statutorily mandated presumptions of

social and economic disadvantage," says the Justice Department report.

In practice there simply isn't evidence of systematic discrimination against many of the groups on the federal list. In the 1980s, for example, the Small Business Administration decided, without examining any empirical evidence of discrimination, to add many recent immigrant groups to the list, such as Asian Indians, Tongans and Indonesians. Even if the courts decides to accept post-hoc evidence of discrimination -- and this question remains open -- it would be difficult to prove that each of these groups has been in the country long enough to have been victims of historical discrimination, or to be suffering from its current effects.

Recent court decisions have made the administration's task more daunting still. On July 31, the U.S. Court of Appeals for the Third Circuit, in Contractor's Association of Eastern Pennsylvania v. City of Philadelphia, struck down the City's contracting goals for American owned businesses. Judge Stapleton, writing for the Court, distinguished between three separate kinds of discrimination: discrimination by prime contractors against subcontractors; discrimination by contractors associations against prospective members; and discrimination by the City against

prime contractors. There may have been evidence of discrimination in the award of prime contracts, said the court; but it declined to answer that question definitively because Philadelphia had created a 15% set aside for subcontractors. And this, the court held, is not a narrowly tailored remedy for discrimination in the award of prime contracts.

The Philadelphia decision bodes ill for the administration's effort to save the 8(a) program, which is administered, after all, not by prime contractors, or contractors associations, but by the federal government itself. So the only discrimination for which the 8(a) program could confidently be said to provide a narrowly tailored remedy is discrimination by government employees in the award of government contracts. But no one has ever attempted to produce evidence that government officers have been, since the adoption of the 8(a) program at least, discriminating against minority owned prime contractors.

The administration proposes an empirical project of great complexity and expense; but to satisfy the Adarand standards, the project would have to be far more elaborate still. It would have to look for evidence of discrimination in the manufacturing and sale of each industry and each region in which the federal government does business. But all sorts of

questions remain. Would discrimination in manufacturing and sale of computers justify a bid preference in manufacturing and sale of paper? Does discrimination in South Carolina justify a bid preference in Massachuetts?

And what about the administration's bold suggestion that most markets are national rather than regional? Doesn't this vary, in fact, from industry to industry? There is a national market for cars, perhaps, but surely not for roof repairs. Instead of examining minority firms' ability to perform "a particular service," to use O'Connor's words, the administration plans to lump a host of services, from roof-building to road-making, into the amorphous category of "construction," and create state-by-state "construction industry" goals. But the most recent court decisions make clear that evidence of discrimination against African American janitors can't be invoked to justify preferences for Hispanic guardrail makers.

Ultimately, the administration's proposals may be doomed in court by a simple fact: thanks, in part, to the success of the 8(a) program, minority business enterprises today seem to be (in the legally relevant sense) over represented, rather than underrepresented, in many aspects of federal procurement. In 1994, 25 percent of all federal

dollars awarded to small business went to minority small businesses, although minorities own 9 percent of businesses in the country. The administration tries to skirt this number by emphasizing, in its proposals, that minority businesses receive "less than 4 percent of all business receipts," but this is the wrong comparison. Most procurement dollars go not to small businesses but to huge Fortune 500 companies, such as Lockheed and Exxon, that have no ethnic corporate identity but are owned by shareholders of all races.

I'd like to close on the note of caution with which I began. As members of Congress deciding whether or not to repeal the 8(a) program, you have no obligation to engage in the mystical enterprise of reading judicial tea leaves. Instead, you surely have the right and the responsibility to make an independent constitutional judgment about whether or not you believe affirmative action in federal procurement, as it is currently administered, to be consistent with the requirements of the Equal Protection Clause. If you find yourself more convinced by the arguments of the four Adarand dissenters -- and these are powerful arguments, consistent with principles of judicial restraint -- then your constitutional concerns, of course, will

be less acute than if you are persuaded by the arguments of the Adarand majority.

SAS.
General Construction Contractor
1601 Society Court
Herndon, Virginia 20172-1969

September 17,1996

Congress of the United States
House of Representatives
Committee on Small Business
2361 Rayburn House Office Building
Washington, DC 20515

Dear Madam Chair

First and foremost I would like to thank you for inviting me to testify at the hearing. I would like to share with you my experience since being approved in the 8(a) contracting program in October of 1992.

I am a small business, who seems to be relegated to small contracts, that has barely afforded me a living, let alone in building my business. I had hope that the 8(a) program and set-a-sides would permit me to do larger contracts that would allow me to make sufficient profit and capitalize my company. I would like the Small Business Administration to help me acquire, at least, one contract so we can demonstrate our skills and capabilities to assure government agencies that we are a serious and dependable.

During my first year the Small Business Administration calculated that I could safely complete 8(a) contracts up to hundred thousand, the second year they calculated two hundred thousand. However, despite their increasing confidence in my ability to handle larger contracts they did not help me to secure a single contract. As a result, I spent a great deal of time satisfying their administrative requirements for no return.

Prior to being approved in the 8(a) program I had been competitively bidding and was awarded a federal contract with General Services Administration for twenty thousand dollars. Since being in the 8(a) program, I have been awarded several contracts non 8(a) ranging from twenty five hundred to ten thousand dollars. With the Small Business Administration having approved me at hundred thousand support level, I had hope that they would had help me to get these types of contracts with agencies like General Services Administration.

However since my approval with the Small Business Administration I been self marketing and requesting search letters be sent out to various federal agencies for larger contracts. The Small Business Administration again have done nothing to help me. So I am still excluded even with General Services Administration.

The 8(a) contracting program would be good if implemented. My views on the proposed

legislation and the effects H.R. 3994 are that it still does not help me because I have utilized all of the counseling programs that have been made available to me for the development of becoming a sucessful entrepreneur , however it seems to me the real issues here is not whether the program will work for me , why the program officers at the Small Business Administration seems determine not to help me .

Sincerely,

Shirley A. Stewart Veal

Shirley A. Stewart Veal, President

JAN MEYERS, KANSAS
CHAIR

JOHN J. LAFALCE, NEW YORK

# Congress of the United States

House of Representatives
104th Congress
Committee on Small Business
2361 Rayburn House Office Building
Washington, DC 20515-0315

October 10, 1996

The Honorable Philip Lader
Administrator
Small Business Administration
409 3rd Street, SW
Washington, D.C. 20024

Dear Administrator Lader:

Thank you for your participation and testimony in the Committee's September 18, 1996, hearing examining the 8(a) Program and "The Entrepreneur Development Program Act of 1996," (H.R. 3994). I am grateful for your continuing interest in the program's performance.

As we complete the Committee's review of the 8(a) Program for the 104th Congress, I would appreciate an official response to the following questions:

*1)* What percentage of firms in each SIC two-digit category are encompassed in SBA's current definition of a small business?

*2)* What percentage of the adult members of each presumptively-eligible group are excluded by the SBA's $250,000 and $750,000 definition of economic disadvantage?

Your timely response to this request will be personally appreciated and most helpful in completing the Committee's work for this session.

If you have questions about this request, please contact Craig Orfield of the Committee staff at 225-5821. Thank you for your assistance.

Sincerely,

Jan Meyers

Jan Meyers
Chair

U.S. SMALL BUSINESS ADMINISTRATION
WASHINGTON, D.C. 20416

Honorable Jan Meyers
Chairman
House Committee on Small Business
2361 Rayburn Building
Washington, D.C. 20515

Dear Chairman Meyers:

I am pleased to respond to the questions raised in your letter of October 10, 1996 to Administrator Phil Lader, as part of the Committee's review of the 8(a) program during the 104th Congress.

**Question 1. What percentage of firms in each SIC two-digit category are encompassed in SBA's current definition of a small business?**

To remain active in the 8(a) program, each firm must be "small" per the U.S. Small Business Administration's size standard for its SIC Code. If a program participant is found to be other than small, it is removed from program participation via graduation or termination, as appropriate. Attached you will find a chart detailing the percentage of 8(a) firms in each SIC two-digit category encompassed by SBA's definition of a small business, as of October 31, 1996.

**Question 2. What percentage of the adult members of presumptively-eligible group are excluded by the SBA's $250,000 and $750,000 definition of economic disadvantage?**

The U.S. Small Business Administration maintains a data base that includes net worth information regarding only the principles of: (1) applicant firms, and (2) firms certified for program participation. It does not maintain general net worth data regarding the general population, nor members of groups presumed to be socially disadvantaged. Such information may be available, however, from the Bureau of the Census, or the Internal Revenue Service.

If you or your staff have further questions; or require clarification of these responses, do not hesitate in contacting me at 202-205-6412.

Sincerely,

Calvin Jenkins
Associate Administrator for
Minority Enterprise Development

Enclosure

Percentage of 8(a) Firms in Each 2-Digit SIC Code Category

| 2-Digit SIC Code | Number of Firms | Percent of Portfolio |
|---|---|---|
| 00 | 4 | 0.07 |
| 01 | 0 | 0.00 |
| 02 | 0 | 0.00 |
| 03 | 0 | 0.00 |
| 04 | 0 | 0.00 |
| 05 | 0 | 0.00 |
| 06 | 0 | 0.00 |
| 07 | 67 | 1.18 |
| 08 | 44 | 0.77 |
| 09 | 0 | 0.00 |
| 10 | 0 | 0.00 |
| 11 | 0 | 0.00 |
| 12 | 0 | 0.00 |
| 13 | 3 | 0.05 |
| 14 | 0 | 0.00 |
| 15 | 590 | 10.39 |
| 16 | 212 | 3.73 |
| 17 | 637 | 11.22 |
| 18 | 0 | 0.00 |
| 19 | 1 | 0.02 |
| 20 | 13 | 0.23 |
| 21 | 0 | 0.00 |
| 22 | 2 | 0.04 |
| 23 | 28 | 0.49 |
| 24 | 6 | 0.11 |
| 25 | 7 | 0.12 |
| 26 | 11 | 0.19 |
| 27 | 34 | 0.60 |
| 28 | 25 | 0.44 |
| 29 | 3 | 0.05 |
| 30 | 10 | 0.18 |
| 31 | 1 | 0.02 |
| 32 | 2 | 0.04 |
| 33 | 4 | 0.07 |
| 34 | 83 | 1.46 |
| 35 | 102 | 1.80 |
| 36 | 76 | 1.34 |
| 37 | 47 | 0.83 |
| 38 | 22 | 0.39 |
| 39 | 12 | 0.21 |
| 40 | 0 | 0.00 |
| 41 | 5 | 0.09 |
| 42 | 58 | 1.02 |
| 43 | 0 | 0.00 |
| 44 | 1 | 0.02 |
| 45 | 13 | 0.23 |
| 46 | 0 | 0.00 |
| 47 | 39 | 0.69 |
| 48 | 52 | 0.92 |
| 49 | 25 | 0.44 |

BOSTON PUBLIC LIBRARY
3 9999 06350 088 6



.ercentage of 8(a) Firms in Each 2-Digit
SIC Code Category

| 2-Digit SIC Code | Number of Firms | Percent of Portfolio |
|---|---|---|
| 50 | 261 | 4.60 |
| 51 | 88 | 1.55 |
| 52 | 6 | 0.11 |
| 53 | 2 | 0.04 |
| 54 | 0 | 0.00 |
| 55 | 3 | 0.05 |
| 56 | 2 | 0.04 |
| 57 | 18 | 0.32 |
| 58 | 31 | 0.55 |
| 59 | 6 | 0.11 |
| 60 | 0 | 0.00 |
| 61 | 1 | 0.02 |
| 62 | 1 | 0.02 |
| 63 | 3 | 0.05 |
| 64 | 7 | 0.12 |
| 65 | 30 | 0.53 |
| 66 | 0 | 0.00 |
| 67 | 0 | 0.00 |
| 70 | 2 | 0.04 |
| 71 | 0 | 0.00 |
| 72 | 20 | 0.35 |
| 73 | 1375 | 24.22 |
| 74 | 1 | 0.02 |
| 75 | 7 | 0.12 |
| 76 | 34 | 0.60 |
| 77 | 0 | 0.00 |
| 78 | 25 | 0.44 |
| 79 | 2 | 0.04 |
| 80 | 16 | 0.28 |
| 81 | 8 | 0.14 |
| 82 | 21 | 0.37 |
| 83 | 18 | 0.32 |
| 84 | 0 | 0.00 |
| 85 | 0 | 0.00 |
| 86 | 0 | 0.00 |
| 87 | 1411 | 24.85 |
| 88 | 1 | 0.02 |
| 89 | 37 | 0.65 |
| 92 | 0 | 0.00 |
| 93 | 0 | 0.00 |
| 94 | 0 | 0.00 |
| 95 | 2 | 0.04 |
| 96 | 0 | 0.00 |
| 97 | 0 | 0.00 |
| 98 | 0 | 0.00 |
| 99 | 0 | 0.00 |
| Total | 5678 | 100.00 |

ISBN 0-16-054088-7
90000
9 780160 540882