# EXHIBIT A-14

[Federal Register Volume 61, Number 101 (Thursday, May 23, 1996)]
[Notices]
[Pages 26042-26063]
From the Federal Register Online via the Government Publishing Office [www.gpo.gov]
[FR Doc No: 96-13123]

[[Page 26041]]

---

Part VI

Department of Justice

---

Federal Procurement; Proposed Reforms to Affirmative Action; Notice

Federal Register / Vol. 61, No. 101 / Thursday, May 23, 1996 / Notices

[[Page 26042]]

DEPARTMENT OF JUSTICE

Proposed Reforms to Affirmative Action in Federal Procurement

AGENCY: Department of Justice.

ACTION: Public notice and invitation for reactions and views.

-----------------------------------------------------------------------

SUMMARY: The proposal set forth herein to reform affirmative action in federal procurement has been designed to ensure compliance with the constitutional standards established by the Supreme Court in Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995). The proposed structure, which has been developed by the Justice Department, will form a model for amending the affirmative action provisions of the Federal Acquisition Regulation and the Defense Federal Acquisition Regulation Supplement.

DATES: Comment Date: Reactions and views on the proposed model must be submitted in writing to the address below by July 22, 1996.

ADDRESSES: Interested parties should submit written comments to Mark Gross, Office of the Assistant Attorney General for Civil Rights, P.O.

Box 65808, Washington, D.C. 20035-5808, telefax (202) 307-2839.

FOR FURTHER INFORMATION CONTACT: Mark Gross, Office of the Assistant Attorney General for Civil Rights, P.O. Box 65808, Washington, D.C. 20035-5808, telefax (202) 307-2839.

Introduction

In Adarand, the Supreme Court extended strict judicial scrutiny to federal affirmative action programs that use racial or ethnic criteria as a basis for decisionmaking. In procurement, this means that any use of race in the decision to award a contract is subject to strict scrutiny. Under strict scrutiny, any federal programs that make race a basis for contract decisionmaking must be narrowly tailored to serve a compelling government interest.

Through its initial authorization of the use of section 8(a) of the Small Business Act to expand opportunities for minority-owned firms and through reenactments of this and other programs designed to assist such businesses, Congress has repeatedly made the judgment that race-conscious federal procurement programs are needed to remedy the effects of discrimination that have raised artificial barriers to the formation, development and utilization of businesses owned by minorities and other socially disadvantaged individuals. In repeated legislative enactments, Congress has, among other measures, established goals and granted authority to promote the participation of Small Disadvantaged Businesses (SDBs) in procurement for the Department of Defense, NASA and the Coast Guard. It also enacted the Surface Transportation Assistance Act of 1982, the Surface Transportation and Uniform Relocation Assistance Act of 1987 and the Intermodal Surface Transportation Efficiency Act of 1991, each of which successively authorized a goal for participation by Disadvantaged Business Enterprises. Congress also included similar provisions in the Airport and Airway Improvement Act of 1982 with respect to procurement regarding airport development and concessions. Under Section 15(g) of the Small Business Act, 15 U.S.C. 644(g), Congress has established goals for SDB participation in agency procurement. Finally, in 1994, Congress enacted the Federal Acquisition Streamlining Act (FASA), which extended generally to federal agencies authority to conduct various race-conscious procurement activities. The purpose of this measure was to facilitate the achievement of goals for SDB participation established for agencies pursuant to Section 15(g) of the Small Business Act.

Based upon these congressional actions, the legislative history supporting them, and the evidence available to Congress, this congressional judgment is credible and constitutionally defensible. Indeed, the survey of currently available evidence conducted by the Justice Department since the Adarand decision, including the review of numerous specific studies of discrimination conducted by state and local governments throughout the nation, leads to the conclusion that, in the absence of affirmative remedial efforts, federal contracting would unquestionably reflect the continuing impact of discrimination that has persisted over an extended period. For purposes of these proposed reforms, therefore, the Justice Department takes as a constitutionally justified premise that affirmative action in federal procurement is necessary, and that the federal government has a compelling interest to act on that basis in the award of federal contracts.[1]

---------------------------------------------------------------------------

\1\ Set forth as an appendix to this notice is a preliminary survey of evidence establishing the compelling interest for affirmative action in federal procurement.

---------------------------------------------------------------------------

Subject to certain statutory limitations (that are discussed below), Congress has largely left to the executive agencies the

determination of how to achieve the remedial goals that it has established. The Court in Adarand made clear that, even when there is a constitutionally sustainable compelling interest supporting the use of race in decisionmaking, any such programs must be narrowly tailored to meet that interest. We have focused, therefore, on ensuring that the means of serving the congressionally mandated interest in this area are narrowly tailored to meet that objective. This task must be taken very seriously. Adarand made clear that Congress has the authority to use race-conscious decisionmaking to remedy the effects of past and present discrimination but emphasized that such decisionmaking must be done carefully. This Administration is committed to ensuring that discriminatory barriers to the opportunity of minority-owned firms are eliminated and the maximum opportunities possible under the law are maintained. Our focus, therefore, has been on creating a structure for race-conscious procurement that will meet the congressionally determined objective in a manner that will survive constitutional scrutiny.

In giving content to the narrow tailoring prong of strict scrutiny, courts have identified six principal factors: (1) Whether the government considered race neutral alternatives and determined that they would prove insufficient before resorting to race-conscious action; (2) the scope of the program and whether it is flexible; (3) whether race is relied upon as the sole factor in eligibility, or whether it is used as one factor in the eligibility determination; (4) whether any numerical target is reasonably related to the number of qualified minorities in the applicable pool; (5) whether the duration of the program is limited and whether it is subject to periodic review; and (6) the extent of the burden imposed on nonbeneficiaries of the program. Not all of these factors are relevant in every circumstance and courts generally consider a strong showing with respect to most of the factors to be sufficient. This proposal, however, responds to all six factors.

The Department of Defense (DoD), which conducts a substantial majority of the federal government's procurement, was the focus of initial post-Adarand compliance actions by the federal government. In particular, DoD, acting pursuant to authority granted by 10 U.S.C. Sec. 2323,[2] had developed through

[[Page 26043]]

regulation a practice known as the ``rule of two.'' Pursuant to the rule of two, whenever a contract officer could identify two or more SDBs that were qualified to bid on a project at a price within 10% of fair market price, the officer was required to set the contract aside for bidding exclusively by SDBs. Under section 2323, firms owned by individuals from designated racial minority groups are presumed to be SDBs.[3] Others may enter the program by establishing that they are socially and economically disadvantaged. After consultation with the Department of Justice, DoD suspended use of the rule of two in October 1995.

---------------------------------------------------------------------------

\2\ Section 2323 establishes a five percent goal for DoD contracting with small disadvantaged businesses (``SDBs'') and authorizes DoD to ``enter into contracts using less than full and open competitive procedures * * * and partial set asides for [SDBs].'' Section 2323 states that the cost of using such measures may not exceed fair market price by more than ten percent. It authorizes the Secretary of Defense to adjust the applicable percentage ``for any industry category if available information clearly indicates that nondisadvantaged small business concerns in such industry category are generally being denied a reasonable opportunity to compete for contracts because of the use of that percentage in the application of this paragraph.''

\3\ 10 U.S.C. 2323 incorporates by explicit reference the language of section 8(d) of the Small Business Act, which states that members of designated racial or ethnic groups are presumed to be socially and economically disadvantaged. Participants in the 8(a) program are also presumed to be SDBs.

---------------------------------------------------------------------------

Congress in 1994 extended the affirmative action authority granted DoD by section 2323 to all agencies of the federal government through enactment of the Federal Acquisition Streamlining Act (FASA), Public Law No. 103-355, sec. 7102, 108 Stat. 3243, 15 U.S.C. 644 note.[4] Because of Adarand and the effort to review federal affirmative action programs in light of that decision, regulations to implement the affirmative action authority granted by FASA have been delayed. See 60 Fed. Reg. 448258, 48259 (Sept. 18, 1995). This proposal provides the basis for those regulations.

---------------------------------------------------------------------------

\4\ FASA states that in order to achieve goals for SDB participation in procurement negotiated with the Small Business Administration, an ``agency may enter into contracts using--(A) less than full and open competition by restricting the competition for such awards to small business concerns owned and controlled by socially and economically disadvantaged individuals described in subsection (d)(3)(C) of section 8 of the Small Business Act (15 U.S.C. 637); and (B) a price evaluation preference not in excess of 10 percent when evaluating an offer received from such a small business concern as the result of an unrestricted solicitation.''

---

The proposed structure will necessarily affect a wide range of measures that promote minority participation in government contracting through race-conscious means. Taking DoD as an example, approximately one-sixth of contracting with minority-owned firms in 1994 resulted from use of the rule of two. The majority of dollars to minority firms was awarded by DoD through other means: direct competitive awards, the Small Business Administration's (SBA) section 8(a) program, subcontracting pursuant to section 8(d) of the Small Business Act, and a price credit applied pursuant to section 2323. With the exception of direct competitive awards (which do not take race into account), activities pursuant to all of these methods will be affected by the proposed reforms.[5]

---

\5\ This proposal addresses only affirmative action in the federal government's own direct procurement. It does not address affirmative action in procurement and contracting that is undertaken by states and localities pursuant to programs in which such entities receive funds from federal agencies (e.g., the Disadvantaged Business Enterprise program that the Department of Transportation administers pursuant to the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, section 1003(b), 105 Stat. 1919-1922, and the Airport and Airway Improvement Act of 1982, 49 U.S.C. 47101, et seq.).

---

The 8(a) program merits special mention at the outset. This program serves a purpose that is distinct from that served by general SDB programs. The 8(a) program is designed to assist the development of businesses owned by socially and economically disadvantaged individuals. To this end, the program is targeted toward concerns that are more disadvantaged economically than other SDBs (e.g. the standard for economic disadvantage for entry into 8(a) is an owner's net worth of $250,000 compared to $750,000 for SDB programs). Participants in the program are required to establish business development plans and are eligible for technical, financial, and practical assistance, and may compete in a sheltered market for a limited time before graduating from the program. Each of these aspects of the program is designed to assist the business in developing the technical and practical experience necessary to become viable without assistance. By contrast, the general SDB program is a procurement program, designed to assist the government in finding firms capable of providing needed services, while, at the same time, helping to address the traditional exclusion of minority-owned firms from contracting opportunities.

The operation of the 8(a) program will become subject to the overall limitations in the measures described below. In addition, the SBA is working to strengthen safeguards against fraud and to ensure that the 8(a) program serves its purpose of assisting the development of businesses owned by individuals who are socially and economically disadvantaged.

Because the proposed reforms are broad and cover a number of different subjects related to affirmative action in federal procurement, the Justice Department is seeking comments on each of the aspects of the proposal. Comments will be taken into account in the formulation of revised procurement regulations.

Overview of Structure

The SDB reform outlined herein involves five major topics: (1) Certification and eligibility; (2) benchmark limitations; (3) mechanisms for increasing minority opportunity; (4) the interaction of benchmark limitations and mechanisms; and (5) outreach and technical assistance. The proposed structure incorporates these elements into a system that furthers the President's commitment to ensuring equal opportunity in contracting, responds to the courts' narrow tailoring requirements, and is faithful to statutory authority.

I. Eligibility and Certification

At present, while a concern must have its eligibility certified by the SBA to participate in the 8(a) program, there is no similar certification requirement for participation in SDB programs. Under current practice, firms simply check a box to identify themselves as SDB's when bidding for federal contracts or 8(d) subcontracts. Reform of this certification process is needed to assure that programs meet constitutional and statutory objectives. While the basic elements of eligibility under these programs are statutorily determined, agencies have discretion to impose significant additional controls and to establish mechanisms to assure that the statutory criteria are in fact met.

The SBA will continue as the sole agency with authority to certify firms for the 8(a) program. The following discussion, therefore, concerns only certification of SDB's that are not participants in the 8(a) program.

Each bid that an SDB submits to an agency, or to a prime contractor seeking to fulfill 8(d) subcontracting obligations, will have to be accompanied by a form certifying that the concern qualifies as a small disadvantaged business under eligibility standards that will be published by the SBA. The standards and certification form will allow 8(a) participants to qualify automatically for SDB programs. Others will be required to establish their eligibility by submitting required statements and documentation.

When a concern has been certified by an agency as eligible for SDB programs, its name will be entered into a central on-line register to be maintained by SBA. That certification will be valid for a period of up to three years during which time registered firms will have only to complete a portion of the form confirming the continued validity of that certification to participate in SDB

[[Page 26044]]

programs at any agency. A full application will have to be submitted to an agency every three years to maintain eligibility.

A. Social and Economic Disadvantage

Members of designated minority groups seeking to participate in SDB and 8(d) programs will continue to fall within the statutorily mandated presumption of social and economic disadvantage.[6] This presumption is rebuttable as to both forms of disadvantage. The form will ask the applicant to identify the group identification triggering a presumption of social and economic disadvantage.[7] In addition, the form will enumerate the objective criteria constituting economic disadvantage according to SBA standards and advise the applicant that the presumption of such disadvantage is rebuttable and any challenge to the individual's SDB status will be resolved on the basis of these criteria. Challenges would be processed through existing SBA challenge mechanisms.

---

\6\ Both FASA and 10 U.S.C. 2323 incorporate by explicit

reference the definition of social and economic disadvantage contained in section 8(d) of the Small Business Act. Pursuant to section 8(d), members of designated groups are presumed to be both socially and economically disadvantaged; those presumptions are rebuttable. By contrast, for the 8(a) program, members of identified groups are rebuttably presumed to be socially disadvantaged, but must establish that they are economically disadvantaged.

\7\ Members of minority groups do not have to participate in the SDB program in order to bid on federal contracts.

---------------------------------------------------------------------------

Individuals who do not fall within the statutory presumption will be required to establish social and economic disadvantage by answering a series of questions demonstrating such disadvantage. Questions regarding social disadvantage will be included in the standard certification form. Pursuant to current practice, individuals who do not fall within a presumption must prove their social disadvantage by clear and convincing evidence. That standard will be changed to permit proof by a preponderance of the evidence.

The SBA currently has criteria for evaluating social disadvantage. SBA will conduct training seminars designed to instruct personnel from other agencies on the procedures for making eligibility determinations. Individuals who do not fall within the statutory presumption will also be required to demonstrate that they are economically disadvantaged according to the criteria established by SBA.

Agencies will have discretion to decide which official within the agency will have authority to determine whether ``non-presumed'' individuals are socially and economically disadvantaged.[8] In most instances, the contracting officer should not have final authority to make the determination; the procedure must, however, facilitate quick decisions so that the procurement process will not be delayed and applicants will have a fair opportunity to compete. An agency may wish to assign this responsibility to its Office of Small and Disadvantaged Business Utilization. The SBA will answer inquiries regarding eligibility determinations and the procuring agency will retain the ability to refer applications to the SBA for final eligibility determinations through the protest procedures now in place. In the alternative, an agency may enter into an agreement with SBA to have SBA make all determinations, including the initial determination of eligibility.

---------------------------------------------------------------------------

\8\ The form that such individuals are to complete will ask whether they previously have applied for SDB certification and been rejected or accepted. A rejected firm will not be permitted to re-apply for certification for one year after rejection, unless it can show changed circumstances.

---------------------------------------------------------------------------

B. Ownership and Control

In addition to submitting the form described above, every applicant will be required to submit with each bid a certification that the business is owned and controlled by the designated socially and economically disadvantaged individuals as those terms are defined by the SBA's standards for ownership and control at 13 C.F.R. 124.103 and 124.104.[9] Such a certification must come from an SBA approved organization, a list of which will be maintained by the SBA. In order to be approved by the SBA to certify ownership and control, (1) the entity must certify ownership and control according to the standards established by the SBA for the 8(a) program (13 C.F.R. 124.103 and 124.104); (2) the entity's certifications must have been accepted by a state or local government or a major private contractor; and (3) the entity must not have been disqualified by any government authority from making certifications within the past five years. Such entities may include private organizations, the SBA (i.e. through the 8(a) program), entities that provide certifications for participation in the Department of Transportation's disadvantaged business enterprise (``DBE'') program, or states or localities, so long as the certification addresses the standards for ownership and control promulgated by the SBA.

---------------------------------------------------------------------------

\9\ The standard certification form will accommodate one eligibility criterion peculiar to the DoD's SDB program under 10 U.S.C. 2323--that the majority of earnings must directly accrue to the socially and economically disadvantaged individuals that own and control the concern. The standard certification form will accommodate this criterion by including a DoD-specific section requiring the concern to attest that the majority of the firm's earnings do flow in this manner.

---------------------------------------------------------------------------

This procedure is intended to take advantage of the extensive network of certifying entities already in existence. At present, firms may have to obtain several different certifications as they pursue a mix of private and public contracts. While it is clear that a control mechanism is needed to protect against fraud, it makes little sense to create a new federal bureaucracy to perform work that is already being done and to erect another hurdle that an SDB must clear before qualifying for a federal contract. The limited resources of the federal government and of SDBs make creation of such a bureaucracy counterproductive.

To police the quality of certifications, SBA will conduct periodic audits of certifying organizations. Any entity may submit information to the SBA in an effort to persuade the agency to initiate such an audit.

As a means of ensuring that the identified socially and economically disadvantaged individuals retain ownership and control of a firm, a certification of ownership and control will be valid for a maximum of three years from the date it was issued. Certified firms will be required to recertify their eligibility by submitting a full application, including an updated certification of ownership and control, every three years.

C. Challenges

Where an SDB is the apparent successful offeror on a contract, the name of that firm and of the entity that certified its ownership and control will be a matter of public record. SBA regulations currently allow any concern that submitted an offer to protest the eligibility of an SDB that receives a contract through an SDB program. The procuring agency or SBA may also protest the eligibility of an SDB. Individuals or organizations that did not submit a bid for the contract in question may submit information to the procuring agency in an effort to convince the agency to initiate a protest.[10] The SBA's Division of Program Certification and Eligibility will process any protest that contains

[[Page 26045]]

specific factual allegations that the concern is not eligible for the program.

---------------------------------------------------------------------------

\10\ The protests contemplated in the discussion here relate only to certification and eligibility. The discussion does not relate to protests to other features of the proposed reforms that might be raised through existing bid protest procedures or through actions under the Administrative Procedure Act.

---

Grounds for an eligibility protest may include, but are not limited to, evidence that:

The owners of the firm are not in fact socially or economically disadvantaged;

The firm is not owned and controlled by the individuals who meet the definition of social and economic disadvantage;

The disadvantaged firm has acted, or is acting, as a front company by failing to complete required percentages of the work contracted to the concern.[11]

---

\11\ The basis for such a challenge would be 48 C.F.R. 19.508, which requires completion of a minimum percentage of contract activities by the firm awarded a contract through a small business set aside or the 8(a) program. A clause must be inserted in such contracts that limits the amount of work that can be subcontracted. 48 C.F.R. 52.219-14. These requirements will be expanded to include contracts awarded through the reformed SDB program as well.

---

Upon receiving a protest supported by specific factual information, the SBA will make an eligibility determination by examining documentation from the SDB including, for example, personal and business financial statements, business records, ownership certifications, and other information deemed necessary to permit a determination as to the eligibility of the firm. Current regulations require the SBA to make a determination concerning the eligibility of the firm within 15 days of the filing of the challenge or notify the contracting officer of any delay.

D. Enforcement

Finally, there must be a concerted effort to enforce the law against individuals who present fraudulent information to the government. The existence of a meaningful threat of prosecution for falsely claiming SDB status, or for fraudulently using an SDB as a front in order to obtain contracts, will do much to ensure that the program benefits those for whom it is designed. To this end, there will be an enhanced effort by SBA and the Department of Justice to identify and pursue individuals fraudulently misrepresenting information in order to obtain contracts through an SDB program. Any individual may forward specific factual information suggesting such a misrepresentation to the procuring agency contracting officer or the agency's inspector general. Similarly, the Inspector General of SBA will refer evidence of misrepresentation that emerges through the challenge procedure or otherwise to the Department of Justice. In its enforcement, the Department of Justice will ensure that it pursues to the extent permitted by law all of the parties responsible for fraudulent or sham transactions.

Penalties for misrepresentations in this area were increased by the Business Opportunity Development and Reform Act of 1988 and include:

(1) A fine of up to $500,000, imprisonment of up to 10 years, or both;

(2) Suspension and debarment from Federal contracting (48 C.F.R. pt. 9.4);

(3) Ineligibility to participate in any program or activity conducted under the authority of the Small Business Act or the Small Business Investment Act of 1958 for a period of up to three years; and

(4) Administrative remedies prescribed by the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. 3801-3812).

Knowing and willful fraudulent statements or representations may subject an individual to criminal penalties, including imprisonment for up to five years, pursuant to 18 U.S.C. 1001. In addition, knowing misrepresentations to obtain payment from the federal government may violate the False Claims Act, 31 U.S.C. 3729, and subject the claimant to civil penalties and treble damages.

II. Benchmark Limits

Although Congress has made the judgment that affirmative race-conscious measures are needed in federal contracting, the use of race must be narrowly tailored. The federal government operates under a general statutory mandate to achieve the ``maximum practical opportunity'' for SDB participation and that overall mandate is translated into specific agency-by-agency goals. Some specific programs operate under statutorily prescribed goals.[12] To the extent that race-conscious measures (going beyond outreach and technical assistance) are utilized to obtain these objectives, limitations must be established to comply with narrow tailoring requirements.

---

\12\ See, e.g., 10 U.S.C. 2323 (5% goal for DoD contracting with SDBs); Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, 105 Stat. 1914 (10% goal for highway construction projects carried out directly by the Department of Transportation).

---

To this end, the proposal relies on development of a set of specific guidelines to limit, where appropriate, the use of race-conscious measures in specific areas of federal procurement. The limits, or ``benchmarks'', will be set for each industry for the entire government. The Department of Commerce, in consultation with the General Services Administration (GSA) and SBA, will establish appropriate benchmark limitation figures for each industry and report them to the Office of Federal Procurement Policy (OFPP), which will publish and disseminate the final benchmark figures. Each industry benchmark limitation will represent the level of minority contracting that one would reasonably expect to find in a market absent discrimination or its effects. Benchmark limitations will provide the basis for comparison with actual minority participation in procurement in that industry (and, where appropriate, in a region).

In establishing the benchmark limitations, the first step is to define whether industries operate according to regional or national markets. In general, industries will be defined according to two-digit Standard Industrial Classification (SIC) codes. Based on the evidence, it appears that most federal contracting is conducted on a national basis. We also start from the view, reflected in a variety of federal policies, that federal contracting should encourage the development of national markets wherever feasible. Where data indicate, however, that an industry operates regionally, the benchmark limitations will be established by region.

After identifying the markets, the system will then measure, using primarily census data, the capacity of firms operating in each market that are owned by minorities. In estimating capacity, a number of factors will be examined. Most significant, of course, will be the

number of minority SDBs available and qualified to perform government contracts.[13] In general, it appears appropriate to look at the industry in question and identify the smallest firm that has won a government contract in that industry in the last three years. Firms that are significantly smaller would be presumed to be unqualified to perform government contracts in that industry. While keeping in mind that capacity is not fixed, it will also be important to look at measures such as the number of employees and amount of revenues.

---------------------------------------------------------------------------

\13\ For these purposes, the calculation of the number of minority-owned firms will not include corporations owned by federally-recognized Native American tribes and Alaskan Native villages. Bidding credits for such corporations are not subject to the Adarand strict scrutiny standard.

---------------------------------------------------------------------------

In addition to calculating the capacity of existing minority firms, the proposed system will examine evidence, if any, demonstrating that minority business formation and operation in a specific industry has been suppressed by

[[Page 26046]]

discrimination. This evidence may include direct evidence of discrimination in the private and public sectors in such areas as obtaining credit, surety guarantees and licenses. It may also include evidence of discrimination in pricing and contract awards. In addition, the evidence may include the results of regression analysis techniques similar to those used in state studies of discrimination in procurement. That form of analysis holds constant a variety of variables that might affect business formation so that the effect of race can be isolated.

The combination of existing minority capacity and, where applicable, the estimated effect of race in suppressing minority business activity in the industry will form the benchmark limitation. Although there is no absolutely precise way to calculate the impact of discrimination in various markets, the benchmark limitations represent a reasonable effort to establish guidelines to limit the use of race-conscious measures and to meet the requirement that such measures be narrowly tailored to accomplish the compelling interest that Congress has identified in this area.

Benchmark limitations will be adjusted every five years, as new data regarding minority firms are made available by the Census Bureau. Generally, census regions will be used in defining the scope of regional markets.

III. Mechanisms for Increasing Minority Opportunity

Under the reformed structure, the federal government will generally have authority, subject to the limitations discussed in the next section, to use several race-conscious contracting mechanisms: SBA's 8(a) program; a bidding credit for SDB prime contractors; and an evaluation credit for non-minority prime contractors that use SDBs in subcontracting. In addition, at all times, agencies must engage in a variety of outreach and technical assistance activities designed to enhance contracting opportunities for SDBs (but that are not subject to strict scrutiny). Those efforts will be expanded as described more fully below.

The 8(a) program will continue to provide for sole source contracting and sheltered competition for 8(a) firms. However, the program will be monitored; and where the benchmark limitations described more fully below warrant adjustments to the SDB program, corresponding adjustments will be made to the 8(a) program to ensure that its operation is subject to those limitations.

A second available race-conscious measure will be a bidding credit in prime contracting for SDBs. Statutory authority for the use of such a credit exists for DoD in 10 U.S.C. 2323 and for the remainder of the government in FASA. Each statute permits use of such a credit so long as the final price does not exceed a fair market price by more than 10%.

The use of the term ``credit'' is not meant to restrict utilization by agencies of this mechanism to contracts where price is the primary factor in selecting the successful bidder. Where the successful bidder is selected based on other factors--such as the ability to produce a contract that provides the ``best value'' to the agency--agencies may build the value of increasing the participation of SDB contractors into the evaluation of offers. For some contracts, a numerical credit may be appropriate; in others, some form of nonnumerical assignment may make more sense to the agency. This proposal does not restrict such options. However, regardless how it operates, any bidding credit will be subject to the overall limitations on race-conscious mechanisms described herein.

Pursuant to 10 U.S.C. 2323 and FASA, agencies will also be permitted to use, as a third race-conscious mechanism, an evaluation credit with respect to the utilization by nonminority prime contractors of SDBs as subcontractors. Such goals would be set by the agency for each prime contract based on the availability of minority firms to perform the work. The award of evaluation credits for prime contractors that use SDBs as subcontractors will supplement the existing statutory SDB subcontracting requirements in Section 8(d) of the Small Business Act.[14] In order to certify their eligibility as SDBs, subcontractors will submit the same certification form to the prime contractor that is described in the certification section of this proposal.

---------------------------------------------------------------------------

\14\ For certain types of procurement, Section 8(d) requires agencies to negotiate an SDB subcontracting plan with the successful bidder for the prime contract. The statute provides that each such plan shall include percentage goals for the utilization of SDB subcontractors.

---------------------------------------------------------------------------

Such an evaluation credit can take a number of different forms, depending on the circumstances of a solicitation.[15] For example, where it is practical for bidders to secure enforceable commitments from SDB subcontractors prior to the submission of bids, agencies should establish an SDB subcontracting goal for the contract, and award an evaluation credit to bidders who demonstrate that they have entered into such commitments as a means of achieving the goal. Where that is not practical, agencies can award an evaluation credit to a bidder that specifically identifies in a subcontracting plan those SDB subcontractors that it intends to use to achieve the agency's SDB subcontracting goal.[16] Agencies may also award an evaluation credit based on demonstrable evidence of a bidder's past performance in using SDB subcontractors. Agencies may also grant bonus awards to prime contractors to encourage the use of SDB subcontractors.[17] This proposal is not intended to limit agencies in developing or using additional mechanisms to increase SDB subcontracting, but any such

mechanism will be subject to the limitations on race-conscious mechanisms described herein.

---------------------------------------------------------------------------

\15\ As was the case with respect to the use of the term ``credit'' in connection with bids from SDBs as prime contractors, the use of that term here in connection with SDB subcontracting is not intended to restrict the utilization of this mechanism to the evaluation of prime contract bids for which price is the primary factor in selecting the successful bidder.

\16\ In either case, a successful prime contractor should notify the contracting officer of any substitution of a non-SDB subcontractor for an SDB firm with which the prime contractor had entered into enforceable commitments or that had been specifically identified in the prime contractor's subcontracting plan.

\17\ See e.g., Department of Transportation Incentive Subcontracting Program for Small and Small Disadvantaged Business Concerns, 48 C.F.R. 52 219-10.

---------------------------------------------------------------------------

In applying these bidding and evaluation credits, race will simply be one factor that is considered in the decision to award a contract--in contrast to programs in which race is the sole factor.

IV. Interaction of Benchmark Limits and Mechanisms

In determining how benchmark limitations will be used to measure the appropriateness of various forms of race-conscious contracting, the objective has been to develop a system that can operate with a sufficient degree of clarity, consistency and simplicity over the range of federal agencies and contracting activities. Where the use of all available tools, including direct competition and race-neutral outreach and recruitment efforts, results in minority participation below the benchmark, race-based mechanisms will remain available. Their scope, however, will vary and be recalculated depending on the extent of the disparity between capacity and participation. Where participation exceeds the benchmark, and can be expected to continue to do

[[Page 26047]]

so with reduced race-conscious efforts, adjustments will be made.

At the close of each fiscal year, the Department of Commerce will review data collected by its GSA's Federal Procurement Data Center for the three preceding fiscal years to determine the percentage of contracting dollars that has been awarded to minority-owned SDBs in each two-digit SIC code. Commerce will analyze minority SDB participation for all transactions that exceed $25,000. This review will include minority-owned SDBs participating through direct contracting (including full and open competition), the 8(a) program, and SDB prime and subcontracting programs.[18] Data regarding minority participation will be reviewed annually, but will include the past three fiscal years of experience. Examining experience over three year stretches should produce a more accurate picture of minority participation, given short-term fluctuations and the fact that the process of bidding and awarding a contract may span more than a single fiscal year.

---------------------------------------------------------------------------

\18\ In order to measure accurately SDB subcontracting participation, it will be necessary to have information regarding SDB subcontracting participation by two-digit SIC code. At the same time, however, it is important to minimize the amount of new record-keeping and reporting that these reforms may require. Prime contractors such as commercial vendors that report SDB participation through company-wide annual subcontracting plans will continue to be able to use this reporting method, with some modification that serves to facilitate SIC code reporting. Under one approach, prime contractors could require all subcontractors to identify their primary SIC code and then track, as most primes do now, the amount of dollars that flows to each subcontractor.

---------------------------------------------------------------------------

Commerce will analyze the data and, after consultation with SBA, report to OFPP regarding which mechanisms should be available in each industry and the size of the credits that can be applied. OFPP will publish and disseminate the mechanisms that can be used by the agencies in the upcoming year.

Pursuant to 15 U.S.C. 644(g), each agency now negotiates goals for SDB participation with SBA for each year. Commerce would inform SBA and agencies of the appropriate benchmark limits for the industries in which the agency contracts and of the mechanisms available.

Where Commerce determines that participation by SDB's in government contracting in an industry is below the relevant benchmark limitation, it may report to OFPP that agencies should be authorized to grant credit to SDB bidders and to prime contractors for SDB subcontracting. Commerce will set a percentage cap of up to ten percent on the amount the credit can allow the price of a contract to deviate from the fair market price. That percentage will represent the maximum credit that each agency may use in the evaluation of bids from SDBs and prime contractors who commit to subcontracting with SDBs. The size of the credit will depend, in part, on the extent of the disparity between the benchmark limitations and minority SDB participation in federal procurement and industry. It also will depend on an assessment of pricing practices within particular industries to indicate the effect of credits within that industry. Commerce's determinations would be published and disseminated by OFPP.

Where the bidding and evaluation credits have been used in an industry and the percentage of dollars awarded to SDBs in that industry exceeds the benchmark limit, Commerce, in consultation with SBA, must estimate the effect of curtailing the use of race-conscious contracting mechanisms and report to OFPP. If Commerce determines that the minority participation rate would fall substantially below the benchmark limit in the absence of race-conscious measures,[19] it need not require agencies to stop using such measures, but may, as described below, require agencies to adjust their use.

---------------------------------------------------------------------------

\19\ More than three ``standard deviations'' will generally be viewed as ``substantial'' for these purposes. Under applicable Supreme Court decisions, a disparity in the range of two or three standard deviations is strong evidence of a prima facie case of discrimination in the employment context. A standard deviation is a measure of the departure from the level of activity that one would expect in the absence of discrimination.

---------------------------------------------------------------------------

Agencies will report the number of contracts that were awarded using a bidding or evaluation credit as well as the amount of those credits. These figures will allow an estimate of the effect on SDB participation of adjusting or removing the credit. In the absence of that objective measure, Commerce will have to estimate and report to

OFPP how much minority contracting resulted from the application of these race-conscious measures. One indication may be the success of minorities in winning contracts through direct competition in which race is not used in the decision to award a contract. It may also be useful to examine comparable experience in private industries operating without affirmative action programs.

Even when agencies are not required to terminate bidding and evaluation credits, they may be required to adjust their size in order to ensure that the credits do not lead to the award of a disproportionately large numbers of contracts to SDBs. Statutory authority for this adjustment exists in both FASA and section 2323. Because the size of credits will affect industries differently, it is impossible to prescribe a set of specific rules to govern adjustments. Responsibility will rest with Commerce to analyze the impact of credits by industry category and make adjustments where appropriate, which would then be published and disseminated by OFPP.

In addition, in some circumstances, an agency may use less than the authorized bidding or evaluation credit where necessary to ensure that use of the credits by a specific agency does not unfairly limit the opportunities of non-SDB contractors seeking contracts from that agency. While the size of the maximum credits will be determined on an industry-wide basis and apply across all agencies, it remains important to maintain flexibility at the agency level to ensure against any undue concentrations of SDB contracting and unnecessary use of race-conscious credits. Thus, for example, where an agency has been particularly successful in reaching out to SDB contractors, it may find its use of the full credits unnecessary to achieve its goals, in which event it could, subject to approval by Commerce, depart downward from the authorized credits. The exercise of this discretion will be particularly important to avoid geographic concentrations of SDB contracting that unduly limit opportunities for non-SDBs.

When Commerce concludes that the use of race-conscious measures is not justified in a particular industry (or region), the use of the bidding credit and the evaluation credit will cease. Suspending the use of race-conscious means will not affect the continued use of race-neutral contracting measures. The limits imposed by the benchmarks also would not affect the applicability of statutorily mandated goals, but would limit the extent to which race-conscious means could be used to achieve those goals. For example, DoD would retain its five percent overall statutory goal and would continue to exhort prime contractors to achieve goals for subcontracting with SDB's. Prime contractors, however, would no longer receive credit in evaluation of their bids for signing up or identifying SDB subcontractors. Likewise, outreach and technical assistance efforts would continue and minority bidders on prime contracts would continue to seek and win competitive awards; but there would no longer be any bidding credit for minority firms.

It should be emphasized that the benchmarks are not a limit on the level

[[Page 26048]]

of minority contracting in any industry that may be achieved without the use of race-conscious measures. Conversely, there is, of course, no assurance that minority participation in particular industries will reach the benchmark limitations through the available race conscious measures. Minority participation will depend on the availability of qualified minority firms that successfully win contracts through open competition, subcontracting, the 8(a) program or through the application of price or evaluation credits. The system described herein is a good faith effort to remedy the effect of discrimination, but it is not a guarantee of any particular result.

The affirmative action structure described herein does not utilize the statutory authorization under FASA to allow federal agencies (or in the case of DoD its direct authorization under 10 U.S.C. 2323) to set contracts aside for bidding exclusively by SDBs. If federal agencies use race-conscious measures in the manner outlined above, together with concerted race-neutral efforts at outreach and technical assistance as described below, we believe the use of this additional statutory authority should be unnecessary. Following the initial two-year period of the reformed system's operation (and at regular intervals thereafter), however, Commerce, SBA and DoD will evaluate the operation of the system and determine whether this statutory power to authorize set-asides should be invoked. In making that determination, those agencies will take into account whether persistent and substantial underutilization of minority firms in particular industries or in government contracting as a whole is the result of the effects of past or present discriminatory barriers that are not being overcome by this system.

Such periodic reviews should also consider whether, based on experience, further limitation of the use of race-conscious measures is appropriate beyond those outlined herein. In that regard, it should be noted that the reformed structure is inherently and progressively self-limiting in the use of race-conscious measures. As barriers to minority contracting are removed and the use of race-neutral means of ensuring opportunity succeeds, operation of the reformed structure will automatically reduce, and eventually should eliminate, the use of race in decisionmaking. In addition, the statutory authority upon which the use of bidding and evaluation credits is based expires at the end of fiscal year 2000. Congress will determine whether that authority should be extended. See 10 U.S.C. 2323; FASA, Sec. 7102.

Section 8(a) Program

Contracts obtained by minority firms through the 8(a) program will count toward the calculation whether minority participation has reached or exceeded the benchmark in any industry.[20] The Administrator of SBA will be under an obligation to monitor the use of the 8(a) program in relation to the benchmark limits. Thus, where Commerce advises that the use of race-conscious measures must be curtailed in a specific industry on the basis of the benchmarks, the Administrator would take appropriate action to limit the use of the program through one or more of the following techniques: (1) Limiting entry into the program in that industry; (2) accelerating graduation for firms that do not need the full period of sheltered competition to satisfy the goals of the program; and (3) limiting the number of 8(a) contracts awarded in particular industries or geographic areas.

---------------------------------------------------------------------------

\20\ As with calculation of the benchmark limitations, see n. 13, supra, corporations owned by federally-recognized Native American tribes and Alaskan Native villages will not be included in this calculation.

---------------------------------------------------------------------------

These same techniques should be used by the Administrator in carrying out existing authority to ensure that 8(a) contracting is not concentrated unduly in certain regions. Even where a market is defined as national in scope, and 8(a) is being used within applicable national benchmark limits, efforts should be made to guard against excessive use of 8(a) contracting in a limited region.

As noted earlier, the 8(a) program is distinct from the general SDB program in that it is animated by its own distinct purpose--to assist socially and economically disadvantaged individuals to overcome barriers that have suppressed business formation and development.

Consistent with its unique nature, the 8(a) program has features that already reflect some of the factors that make up the narrow tailoring requirement. Unlike other SDB's, individuals seeking admission to the 8(a) program must establish economic disadvantage without the benefit of any presumption. The Small Business Act defines economically disadvantaged individuals as ``those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged.'' Furthermore, SBA employs objective criteria to measure whether an individual is economically disadvantaged. In this sense, the statute and regulations are targeted toward victims of discrimination; the SBA is proposing to clarify the regulations implementing the program to emphasize this fact. In addition, individuals are admitted to the 8(a) program for a limited period--nine years--and their performance is reviewed throughout. An individual may be required to leave the program prior to the nine year graduation period if the review reveals that the individual is no longer economically disadvantaged or the firm meets other graduation criteria determined by the SBA.

SBA has under consideration additional program changes designed to ensure that the 8(a) program focuses on its central mission of assisting businesses to develop and concentrates it resources on its intended beneficiaries. These changes would further ensure that the 8(a) program is narrowly tailored to serve the compelling interest for which it was enacted by Congress.

V. Outreach and Technical Assistance

At present, agencies undertake a variety of activities designed to make minority firms aware of contracting opportunities and to help them take advantage of those opportunities. As a general proposition, these activities are not subject to strict scrutiny. The structure outlined above for the use of race-conscious measures assumes that agencies will continue such outreach and technical assistance efforts at all times, so that race-conscious measures will be used only to the minimum extent necessary to achieve legitimate objectives. Our review indicates that, while there are a variety of good programs of this nature operated by various federal agencies, there is a lack of consistency and sustained energy and direction to these efforts.

SBA operates several assistance programs that are targeted toward minority firms, but are also available to qualifying nonminority firms. Notably, pursuant to section 7(j) of the Small Business Act, SBA provides financial assistance to public and private organizations to provide technical and management assistance to qualifying individuals. 13 CFR 124.403, 404. SBA also operates a program to provide assistance to socially and economically disadvantaged businesses in preparing loan applications and obtaining pre-qualification from SBA for loans. See 13 CFR 120. SBA also operates a surety bond program pursuant to which it provides up to a 90% guarantee for bonds required of small contractors.

[[Page 26049]]

The Department of Commerce, through the Minority Business Development Administration, sponsors several programs to provide information, training and research that are targeted toward minority-owned businesses. These programs include Minority Business Development Centers around the country to provide hands on assistance to minority businesses.

DoD has operated since 1990 the Mentor-Protege Pilot Program, which provides incentive for DoD prime contractors to furnish SDB's with technical assistance. See 10 U.S.C. 2301. Mentor firms provide a variety of assistance, including progress payments, advance subcontract payments, loans, providing technical and management assistance and awards of subcontracts on a noncompetitive basis to the protege. DoD reimburses the mentor firm for its expenses. The award of subcontracts under this program is subject to strict scrutiny, but other portions of the program are not.

The following are among the efforts that should be actively pursued:

1. A race-neutral version of the mentor-protege program (that does not guarantee the award of subcontracts on a non-competitive basis) should be encouraged at all agencies.

2. DoD has proposed--and other agencies should follow DoD's lead--eliminating the impact of surety costs from bids. Because SDB's generally incur higher bond costs, this race-neutral change would assist SDB's and address one of the most frequently cited barriers to minority success in contracting. In this regard, agencies should also examine the use of irrevocable letters of credit in lieu of surety bonds.

3. Where agencies use mailing lists, a minimum goal should be set for inclusion of SDB's on agency mailing lists of bidders.

4. The function of the Procurement Automated Source System (PASS), currently maintained by SBA, should be continued. The system provides contracting officers with a continuously updated list of SDB firms, classified by interest and region.

5. A uniform system for publishing agency procurement forecasts on SBA Online should be established. In addition, SBA should develop a systematic means for publishing upcoming subcontracting opportunities.

6. Agencies should target outreach and technical assistance efforts, including mentor-protege initiatives, toward industries in which SDB participation traditionally has been low. Agencies should continue to pursue strategies in which minority-owned firms are encouraged to become part of joint ventures or form strategic alliances with non-minority enterprises.

7. The SBA should enhance its technical assistance initiatives to enhance the ability of SDBs to use the tools of electronic commerce.

8. Pursuant to Executive Order 12876, which directs agencies to seek to enter into contracts with Historically Black Colleges and Universities, agencies should attempt to increase participation by such institutions in research and development contracts as means of assisting the development of business relationships between the institutions and SDB's.

9. Each agency should review its contracting practices and its solicitations to identify and eliminate any practices that disproportionately affect opportunities for SDBs and do not serve a valid and substantial procurement purpose.

The foregoing is merely a partial list of possible measures. What is required--both as a matter of policy and constitutional necessity--is a systematic and continuing government-wide focus on encouraging minority participation through outreach and technical assistance. It is proposed in contracting, therefore, that agencies should report annually to the President on their outreach and technical assistance practices. These reports should present the actual practices and experiences of federal agencies and include recommendations as to approaches that can and should be adopted more broadly. The maximum use of such race-neutral efforts will reduce to a minimum the use of race-conscious measures under the benchmark limits described above.

Conclusion

The structure outlined above has been crafted with regard for each

of the six factors that courts have identified as relevant in determining whether race-based decisionmaking is narrowly tailored to meet an identified compelling interest. While courts have identified these six factors as relevant in determining whether a measure is narrowly tailored, they have not required that race-conscious enactments satisfy each element or satisfy any particular element to any specific degree. The structure proposed herein for SDB procurement, however, measures up favorably with respect to each of the six factors.

The proposal requires that agencies at all times use race-neutral alternatives to the maximum extent possible. An annual review mechanism is established to ensure maximum use of such race-neutral efforts. Only where those efforts are insufficient to overcome the effects of past and present discrimination can race-conscious efforts be invoked.

The system is flexible in that race will be relied on only when annual analysis of actual experience in procurement indicates that minority contracting falls below levels that would be anticipated absent discrimination. Moreover, the extent of any credit awarded will be adjusted annually to ensure that it is closely matched to the need for a race-based remedial effort in a particular industry.

Race will not be relied upon as the sole factor in SDB procurement decisions. The use of credits (instead of set-asides) ensures that all firms have an opportunity to compete and that in order to obtain federal contracts minority firms will have to demonstrate that they are qualified to perform the work.[21]

---------------------------------------------------------------------------

\21\ The SBA's 8(a) program contains a variety of elements that help to target the program on firms in need of special assistance, including a requirement that applicants affirmatively demonstrate economic disadvantage. Furthermore, the program is not limited to minority-owned firms. These features of the program ensure that race is not the sole factor in determining entry into the program.

---------------------------------------------------------------------------

Application of the benchmark limits ensures that any reliance on race is closely tied to the best available analysis of the relative capacity of minority firms to perform the work in question--or what their capacity would be in the absence of discrimination.

The duration of the program is inherently limited. As minority firms are more successful in obtaining federal contracts, reliance on race-based mechanisms will decrease automatically. When the effects of discrimination have been eliminated, as demonstrated by minority success in obtaining procurement contracts, reliance on race will terminate automatically. The system as a whole will be reexamined by the executive branch at the end of two years and at regular intervals thereafter. In addition, the principal enactments that this proposal implements, FASA and the Department of Defense Authorization Act, expire at the end of the fiscal year 2000. Congress will have to examine the functioning of this system and make a determination whether to extend the authority to continue its operation.

Finally, the proposal avoids any undue burden on nonbeneficiaries of the program. As a practical matter, the overwhelming percentage of federal procurement money will continue to flow, as it does now, to nonminority businesses. Furthermore,

[[Page 26050]]

implementation of the benchmark limitations will ensure that race-based decisionmaking cannot result in concentrations of minority contracting in particular industries or regions and will thereby limit the impact on nonminorities.

The structure of affirmative action in contracting set forth herein will not be simple to implement and will undoubtedly be improved through further refinement. Agencies will have to make judgments and observe limitations in the use of race-conscious measures, and make concentrated race-neutral efforts that are not required under current practice. The Supreme Court, however, has changed the rules governing federal affirmative action. This model responds to principles developed by the Supreme Court and lower courts in applying strict scrutiny to race-based decisionmaking. The challenge for the federal government is to satisfy, within these newly-applicable constitutional limitations, the compelling interest in remedying the effects of discrimination that Congress has identified.

Michael C. Small,
Deputy Associate Attorney General.

Appendix--The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey

Under the Supreme Court's ruling last year in Adarand Constructors, Inc. v. Pena, 115 S. Ct. 2097 (1995), strict scrutiny applies to federal affirmative action programs that provide for the use of racial or ethnic criteria as factors in procurement decisions in order to benefit members of minority groups. Such programs satisfy strict scrutiny if they serve a ``compelling interest,'' and are ``narrowly tailored'' to the achievement of that interest. Strict scrutiny is the most exacting standard of constitutional review. It is the same standard that courts apply when reviewing laws that discriminate against minority groups. The Supreme Court in Adarand did not decide whether a compelling interest is served by the procurement program at issue in the case (or by any other federal affirmative action program), and remanded the case to the lower courts, which had not applied strict scrutiny.[1] Nevertheless, a strong majority of the Court--led by Justice O'Connor, who wrote the majority opinion--admonished that even under strict scrutiny, affirmative action by the federal government is constitutional in appropriate circumstances.[2] Without spelling out in precise terms what those circumstances are, the Court stated that the government has a compelling interest in remedying ``[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country.'' 115 S. Ct. at 2117.

---------------------------------------------------------------------------

\1\ Adarand involved a constitutional challenge to a Department of Transportation (``DOT'') program that compensates prime contractors if they hire subcontractors certified as small businesses controlled by ``socially and economically disadvantaged'' individuals. The legislation on which the DOT program is based, the Small Business Act, establishes a government-wide goal for participation of such concerns at ``not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.'' 15 U.S.C. Sec. 644(g)(1). The Act further provides that members of designated racial and ethnic minority groups are presumed to be socially and economically disadvantaged. Id. Sec. 637(a)(5)(6), Sec. 637(d)(2),(3). In Adarand, the Supreme Court stated that the presumption constitutes race-conscious action, thereby triggering application of strict scrutiny. 115 S. Ct. at 2105.

\2\ Adarand, 115 S. Ct. at 2117. The Court emphasized that point in order to ``dispel the notion that strict scrutiny is `strict in theory, but fatal in fact.''' Id. Seven of the nine justices of the

Court embraced the principle that it is possible for affirmative action by the federal government to meet strict scrutiny. This group included: (i) Justice O'Connor and two other justices in the majority, Chief Justice Rehnquist and Justice Kennedy; and (ii) the four dissenting justices (Stevens, Souter, Ginsburg, and Breyer). Only Justices Scalia and Thomas, both of whom concurred in the result in the case, advocated a position that approaches a near blanket constitutional ban on affirmative action.

---------------------------------------------------------------------------

At bottom, after Adarand, the compelling interest test centers on the nature and weight of evidence of discrimination that the government needs to marshal in order to justify race-conscious remedial action. It is clear that the mere fact that there has been generalized, historical societal discrimination in the country against minorities is an insufficient predicate for race-conscious remedial measures; the discrimination to be remedied must be identified more concretely. The federal government would have a compelling interest in taking remedial action in its procurement activities, however, if it can show with some degree of specificity just how ``the persistence of both the practice and the lingering effects of racial discrimination''--to use Justice O'Connor's phrase in Adarand--has diminished contracting opportunities for members of racial and ethnic minority groups.[3]

---------------------------------------------------------------------------

\3\ Adarand did not alter the principle that the government may take race-conscious remedial action in the absence of a formal judicial or administrative determination that there has been discrimination against individual members of minorities groups (or minorities as a class). The test is whether the government has a ``strong basis in evidence'' for the conclusion that such action is warranted. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 500 (1989). Adarand also did not alter the principle that the beneficiaries of race-conscious remedial measures need not be limited to those individuals who themselves demonstrate that they have suffered some identified discrimination. See Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 482 (1986); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277-78 (1986) (plurality opinion); id. at 287 (O'Connor, J., concurring).

---------------------------------------------------------------------------

In coordinating the review of federal affirmative action programs that the President directed agencies to undertake in light of Adarand, the Justice Department has collected evidence that bears on that inquiry. The evidence is still being evaluated, and further information remains to be collected. As set forth below, that evidence indicates that racially discriminatory barriers hamper the ability of minority-owned businesses to compete with other firms on an equal footing in our nation's contracting markets. In short, there is today a compelling interest to take remedial action in federal procurement.[4]

---------------------------------------------------------------------------

\4\ The term ``federal procurement'' refers to goods and services that the federal government purchases directly for its own use. This is to be distinguished from programs in which the federal government provides funds to state and local governments for use in their procurement activities. As part of those programs, Congress has authorized recipients of federal funds to take remedial action in procurement. Those programs are not the focus of this memorandum. However, much of the evidence discussed herein that supports the use of remedial measures in the federal government's own procurement also supports the use of congressionally-authorized remedial measures in state and local procurement.

---------------------------------------------------------------------------

The purpose of this memorandum is to summarize the evidence that has been assembled to date on the compelling interest question. Part I of the memorandum provides an overview of the long legislative record that underpins the acts of Congress that authorize affirmative action measures in procurement--a record that is entitled to substantial deference from the courts, given Congress' express constitutional power to identify and redress, on a nationwide basis, racial discrimination and its effects. The remaining sections of the memorandum survey information from various sources: (1) Congressional hearings and reports that bear on the problems that discrimination poses for minority opportunity in our society, but that are not strictly related to specific legislation authorizing affirmative action in government procurement; (2) recent studies from around the country that document the effects of racial discrimination on the procurement opportunities of minority-owned businesses at the state and local level; and (3) works by social scientists, economists, and other academic researchers on the manner in which the various forms of discrimination act together to restrict business

[[Page 26051]]

opportunities for members of racial and ethnic minority groups.[5]

---------------------------------------------------------------------------

\5\ It is well-established that the factual predicate for a particular affirmative action measure is not confined to the four corners of the legislative record of the measure. See, e.g., Concrete Works v. City and County of Denver, 36 F.3d 1513, 1520-22 (10th Cir. 1994), cert. denied, 115 S. Ct. 1315 (1995); Contractors Ass'n v. City of Philadelphia, 6 F.3d 990, 1004 (3d Cir. 1993); Coral Constr. Co. v. King County, 941 F.2d 910, 920 (9th Cir. 1991), cert. denied, 502 U.S. 1033 (1992).

---------------------------------------------------------------------------

All told, the evidence that the Justice Department has collected to date is powerful and persuasive. It shows that the discriminatory barriers facing minority-owned businesses are not vague and amorphous manifestations of historical societal discrimination. Rather, they are real and concrete, and reflect ongoing patterns and practices of exclusion, as well as the tangible, lingering effects of prior discriminatory conduct.[6]

---------------------------------------------------------------------------

\6\ Congress has also adopted affirmative action measures in federal procurement, as well as in programs that fund the procurement activities of state and local governments, that are intended to assist women-owned businesses. At present, such measures are subject to intermediate scrutiny, not the Adarand strict scrutiny standard. Therefore, they have not been the focus of the post-Adarand review that the Justice Department is coordinating. However, some of the evidence collected by the Justice Department bears on the constitutional justification for affirmative action programs for women in government procurement. See, e.g., Interagency Committee on Women's Business Enterprise, Expanding Business Opportunities for Women (1996); National Foundation for Women Business Owners and Dunn & Bradstreet Information Services, Women-

Owned Businesses: A Report on the Progress and Achievement of Women-Owned Enterprises--Breaking the Boundaries (1995); Problems Facing Minority and Women-Owned Small Businesses in Procuring U.S. Government Contracts: Hearing Before the Subcomm. on Commerce, Consumer and Monetary Affairs of the House Comm. on Government Operations, 103d Cong., 2d Sess. (1994).

---------------------------------------------------------------------------

It is important to emphasize that, even though the government has a compelling interest in taking race-conscious remedial measures in its procurement, their use must be limited. Under the requirements of the ``narrow tailoring'' prong of strict scrutiny, the federal government may only employ such measures to the extent necessary to serve the compelling interest in remedying the impact of discrimination on minority contracting opportunity. The Justice Department's proposed reforms to affirmative action in federal procurement (to which this memorandum is attached) are intended to target race-conscious remedial measures to markets in which the evidence indicates that discrimination continues to impede the participation of minority firms in contracting. Thus, the proposal seeks to ensure that affirmative action in federal procurement operates in a flexible, fair, limited, and careful manner, and hence will satisfy the requirements of narrow tailoring.

I. Survey of the Legislative Record

In evaluating the evidentiary predicate for affirmative action in federal procurement, it is highly significant that the measures have been authorized by Congress, which has the unique and express constitutional power to pass laws to ensure the fulfillment of the guarantees of racial equality in the Thirteenth and Fourteenth Amendments.[7] These explicit constitutional commands vest Congress with the authority to remedy discrimination by private actors, as well as state and local governments.[8] Congress may also exercise its constitutionally grounded spending and commerce powers to ensure that discrimination in our nation is not inadvertently perpetuated through government procurement practices.[9] In exercising its remedial authority, Congress need not target only deliberate acts of discrimination. It may also strive to eliminate the effects of discrimination that continue to impair opportunity for minorities, even in the absence of ongoing, intentional acts of discrimination.[10] Furthermore, in combatting discrimination and its effects, Congress has the latitude to develop national remedies for national problems. Congress need not make findings of discrimination with the same degree of precision as do state or local governments. Nor is it obligated to make findings of discrimination in every industry or region that may be affected by a remedial measure.[11]

---------------------------------------------------------------------------

\7\ See Croson, 488 U.S. at 488 (plurality opinion); Fullilove v. Klutznick, 448 U.S. 448, 483 (1980) (plurality opinion); id. at 500 (Powell, J., concurring); see also Adarand, 115 S. Ct. at 2114; Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 563 (1990); id. at 605-06 (O'Connor, J., dissenting); cf. Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, 1125 (1996) (reaffirming that broad grant of remedial power under Section 5 of the Fourteenth Amendment enables Congress to override state sovereign immunity).

\8\ See Croson, 488 U.S. at 490 (plurality opinion); Fullilove, 448 U.S. at 476-78 (plurality opinion); id. at 500 (Powell, J., concurring); Runyon v. McCrary, 427 U.S. 160, 179 (1976); see also Adarand, 115 S. Ct. at 2126 (Stevens, J., dissenting); Metro Broadcasting, 497 U.S. at 605 (O'Connor, J., dissenting).

\9\ See Croson, 488 U.S at 492 (plurality opinion) (``It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice.''); see also Metro Broadcasting, 497 U.S. at 563-64; Fullilove, 448 U.S at 473-76 (plurality opinion).

\10\ See Adarand, 115 S. Ct. at 2117 (Congress may adopt affirmative action to remedy ``both the practice and the lingering effects of discrimination''). Accord id. at 2133 (Souter, J., dissenting) (government may act to redress effects of discrimination ``that would otherwise persist and skew the operation of public systems even in the absence of current intent to practice any discrimination'').

\11\ Croson, 488 U.S. at 490, 504; Fullilove, 448 U.S. at 502-03 (Powell, J., concurring).

---------------------------------------------------------------------------

Congress has repeatedly examined the problems that racial discrimination poses for minority-owned businesses. A complete discussion of the entire record of Congress in this area is beyond the scope of this memorandum.[12] The

[[Page 26052]]

theme that emanates from this record is unequivocal: Congress has adopted race-conscious remedial measures in procurement directly in response to its findings that ``widespread discrimination, especially in access to financial credit, has been an impediment to the ability of minority-owned business to have an equal chance at developing in our economy.'' [13] Furthermore, Congress has recognized that expanding opportunities for minority-owned businesses in government procurement helps to bring into mainstream public contracting networks firms that otherwise would be excluded as a result of discriminatory barriers. In light of Congress' expansive remedial charter, it is a fundamental principle that courts must accord a significant degree of deference to those findings and the attendant judgment of the Congress that remedial measures in government procurement are warranted.[14]

---------------------------------------------------------------------------

\12\ Congressional hearings on the subject from 1980 to the present include the following: The Small Business Administration's 8(a) Minority Business Development Program: Hearing Before the Senate Comm. on Small Business, 104th Cong., 1st Sess. (1995); Discrimination in Surety Bonding: Hearing Before the Subcomm. on Minority Enterprise, Finance and Urban Development of the House Comm. on Small Business, 103d Cong., 1st Sess. (1993); Department of Defense: Federal Programs to Promote Minority Business Development: Hearing Before the Subcomm. on Minority Enterprise, Finance and Urban Development of the House Comm. on Small Business, 103d Cong., 1st Sess. (1993); SBA's Minority Business Development Program: Hearing Before the House Comm. on Small Business, 103d Cong., 1st Sess. (1993); Problems Facing Minority and Women-Owned Small Businesses in Procuring U.S. Government Contracts: Hearing Before the Subcomm. on Commerce, Consumer and Monetary Affairs of the House Comm. on Government Operations, 103d Cong., 1st Sess. (1993); Fiscal Economic and Social Crises Confronting American Cities: Hearings Before the Senate Comm. on Banking, Housing and Urban Affairs, 102d Cong., 2d Sess. (1992); Small Disadvantaged Business Issues: Hearing

Before the Investigations Subcomm. of the House Comm. on Armed Services, 102d Cong., 1st Sess. (1991); Federal Minority Business Programs: Hearing Before the House Comm. on Small Business, 102d Cong., 1st Sess. (1991); To Amend the Civil Rights Act of 1964: Permitting Minority Set-Asides: Hearing Before the Senate Comm. on Governmental Affairs, 101st Cong., 2d Sess. (1990); City of Richmond v. J.A. Croson: Impact and Response: Hearing Before the Subcomm. on Urban and Minority-Owned Business Development of the Senate Comm. of Small Business, 101st Cong., 2d Sess. (1990); Minority Business Set-Aside Programs: Hearing Before the House Comm. on the Judiciary, 101st Cong., 1st Sess. (1990); Minority Construction Contracting: Hearing Before the Subcomm. on SBA, the General Economy and Minority Enterprise Development of the House Comm. on Small Business, 101st Cong., 1st Sess. (1989); Surety Bonds and Minority Contractors: Hearing Before the Subcomm. on Commerce, Consumer Protection and Competitiveness of the House Comm. on Energy and Commerce, 100th Cong., 2d Sess. (1988); Twenty Years after the Kerner Commission: The Need for a New Civil Rights Agenda: Hearing Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 100th Cong., 2d Sess. (1988); Disadvantaged Business Set-Asides in Transportation Construction Projects: Hearings Before the Subcomm. on Procurement, Innovation and Minority Enterprise Development of the House Comm. on Small Business, 100th Cong., 2d Sess. (1988); Barriers to Full Minority Participation in Federally Funded Highway Projects: Hearings Before a Subcomm. of the House Comm. on Government Operations, 100th Cong., 2d Sess. (1988); The Small Business Competitiveness Demonstration Program Act of 1988: Hearings on S. 1559 Before the Senate Comm. on Small Business, 100th Cong., 2d Sess. (1988); Small Business Problems: Hearings Before the House Comm. on Small Business, 100th Cong., 1st Sess. (1987); Minority Business Development Act: Hearing Before the Subcomm. on Procurement, Innovation and Minority Enterprise Development of the House Comm. on Small Business, 100th Cong., 1st Sess. (1987); A Bill to Reform the Capital Ownership Development Program: Hearings on H.R. 1807 Before the Subcomm. on Procurement, Innovation and Minority Enterprise Development of the House Comm. on Small Business, 100th Cong., 1st Sess. (1987); To Present and Examine the Result of a Survey of the Graduates of the Small Business Administration Section 8(a) Minority Business Development Program: Hearings Before the Senate Comm. on Small Business, 100th Cong., 1st Sess. (1987); Minority Enterprise and General Small Business Problems: Hearings Before the Subcomm. on SBA and SBIC Authority, Minority Enterprise and General Small Business Problems of the Senate Comm. on Small Business, 99th Cong., 2d Sess. (1986); The State of Hispanic Small Business in America: Hearings Before the Subcomm. on SBA and SBIC Authority, Minority Enterprise and General Small Business Problems of the House Comm. on Small Business, 99th Cong., 1st Sess. (1985); Federal Contracting Opportunities for Minority and Women-Owned Businesses: An Examination of the 8(d) Subcontracting Program: Hearings Before the Senate Comm. on Small Business, 98th Cong., 1st Sess. (1983); Minority Business and Its Contribution to the United States Economy: Hearing Before the Senate Comm. on Small Business, 97th Cong., 2d Sess. (1982); Small Business and the Federal Procurement System: Hearings Before the Subcomm. on General Oversight of the House Comm. on Small Business, 97th Cong., 1st Sess. (1981); Small and Minority Business in the Decade of the 1980's (Part 1): Hearings Before the House Comm. on Small Business, 97th Cong., 1st Sess. (1981); Small Business and the Federal Procurement System: Hearings Before the Subcomm. on General Oversight of the House Comm. on Small Business, 97th Cong., 1st Sess. (1981); To Amend the Small Business Act to Extend the Current SBA 8(a) Pilot Program: Hearings on H.R. 5612 Before the Senate Select Comm. on Small Business, 96th Cong., 2d Sess. (1980).

\13\ Affirmative Action Review: Report to the President 55 (1995).

\14\ See Croson, 488 U.S. at 488-90 (plurality opinion); Fullilove, 448 U.S. at 472-73 (plurality opinion); id. at 508-10 (Powell, J., concurring); see also Metro Broadcasting, 497 U.S. at 563; id. at 605-07 (O'Connor, J., dissenting). This principle was not disturbed by the Supreme Court's ruling in Adarand; thus, it continues to have force, even under strict scrutiny. See Adarand, 115 S. Ct. at 2114; id. at 2126 (Stevens, J., dissenting); id. at 2133 (Souter, J., dissenting).

---

The relevant congressional findings encompass a broad range of problems confronting minority-owned businesses. They include ``deficiencies in working capital, inability to meet bonding requirements, disabilities caused by an inadequate `track record,' lack of awareness of bidding opportunities, unfamiliarity with bidding procedures, pre-selection before the formal advertising process, and the exercise of discretion by government procurement officers to disfavor minority businesses.'' [15]

---

\15\ Fullilove, 448 U.S. at 467 (plurality opinion).

---

For example, in a report that led to the legislation that created what has become known as the ``8(a)'' program at the Small Business Administration,[16] and that established goals for participation in procurement at each federal agency by firms owned and controlled by socially and economically disadvantaged individuals (SDB's),[17] a congressional committee found that the difficulties facing minority-owned businesses were ``not the result of random chance.'' Rather, the committee stated, ``past discriminatory systems have resulted in present economic inequities.'' [18] In connection with the same legislation, another committee concluded that a pattern of discrimination ``continues to deprive racial and ethnic minorities * * * of the opportunity to participate fully in the free enterprise system.'' [19] Eventually, when it adopted the 8(a) legislation, Congress found that minorities ``have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control,'' and that ``it is in the national interest to expeditiously ameliorate'' the effects of this discrimination through increased opportunities for minorities in government procurement.[20]

---

\16\ That program targets federal procurement opportunities for small firms owned and controlled by individuals who are socially and economically disadvantaged. See 15 U.S.C. Sec. 637(a). Members of certain minority groups are presumed to be socially disadvantaged. 13 C.F.R. Pt. 124.

\17\ 15 U.S.C. Sec. 644(g).

\18\ H.R. Rep. No. 468, 94th Cong., 1st Sess. 2 (1975).

\19\ S. Rep. No. 1070, 95th Cong., 2d Sess. 14 (1978). See also H.R. Rep. No. 949, 95th Cong., 2d Sess. 8 (1978).

\20\ Pub. L. No. 95-507, Sec. 201, 92 Stat. 1757, 1760 (1978). See 124 Cong. Rec. 35,204 (1978) (statement of Sen. Weicker)

(commenting on the introduction of the conference report on the 8(a) legislation and observing that the report recognizes the existence of a ``pattern of social and economic discrimination that continues to deprive racial and ethnic minorities of the opportunity to participate fully in the free enterprise system''). In the same year it passed the 8(a) legislation, Congress considered an additional bill that sought to target federal assistance to minority-owned firms. In introducing that measure, Senator Dole remarked that ``minority businessmen can compete equally when given equal opportunity. One of the most important steps this country can take to insure equal opportunity for its hispanic, black and other minority citizens is to involve them in the mainstream of our free enterprise system.'' 124 Cong. Rec. 7681 (1978).

---------------------------------------------------------------------------

When revamping the 8(a) program in the late 1980s, Congress again found that ``discrimination and the present effects of past discrimination'' continued to hinder minority business development. Congress concluded that the program required bolstering so that it would better ``redress the effects of discrimination on entrepreneurial endeavors.'' [21]

---------------------------------------------------------------------------

\21\ H.R. Rep. No. 460, 100th Cong., 1st Sess. 16, 18 (1987). See 133 Cong. Rec. 37,814 (1987) (statement of Sen. Bumpers) (discussing proposed revisions to 8(a) program and commenting that minorities ``continue to face discrimination in access to credit and markets''); id. at 33,320 (statement of Rep. Conte) (discussing proposed revisions to 8(a) program and commenting that effects of discrimination continued to be felt, and that 8(a) amendments were needed to ``create a workable mechanism to finally redress past discriminatory practices''). See generally S. Rep. No. 394, 100th Cong., 2d Sess. (1988); The Small Business Competitiveness Demonstration Program Act of 1988: Hearings on S. 1559 Before the Senate Comm. on Small Business, 100th Cong., 2d Sess. (1988); Small Business Problems: Hearings Before the House Comm. on Small Business, 100th Cong., 1st Sess. (1987); Minority Business Development Act: Hearing Before the Subcomm. on Procurement, Innovation and Minority Enterprise Development of the House Comm. on Small Business, 100th Cong., 1st Sess. (1987); A Bill to Reform the Capital Ownership Development Program: Hearings on H.R. 1807 Before the Subcomm. on Procurement, Innovation and Minority Enterprise Development of the House Comm. on Small Business, 100th Cong., 1st Sess. (1987); To Present and Examine the Result of a Survey of the Graduates of the Small Business Administration Section 8(a) Minority Business Development Program: Hearings Before the Senate Small Business Comm., 100th Cong., 1st Sess. (1987); Minority Enterprise and General Small Business Problems: Hearings Before the Subcomm. on SBA and SBIC Authority, Minority Enterprise and General Small Business Problems of the Senate Comm. on Small Business, 99th Cong., 2d Sess. (1986); The State of Hispanic Small Business in America: Hearings Before the Subcomm. on SBA and SBIC Authority, Minority Enterprise and General Small Business Problems of the House Comm. on Small Business, 99th Cong., 1st Sess. (1985).

---------------------------------------------------------------------------

In the same vein are congressional findings that underpin legislation that sets agency-specific goals for participation by disadvantaged businesses--including minority-owned firms--in procurement and grant programs administered by those agencies. For instance, in recommending the continued use of such goals as part of programs through which the Department of Transportation provides funds to state and local governments for use in highway and



transit projects, a congressional committee observed that it had considered extensive testimony and evidence, and determined that this action was ``necessary to remedy the discrimination faced by socially and economically disadvantaged persons attempting to compete in the highway industry and mass transit construction industry.'' [22]

---------------------------------------------------------------------------

\22\ S. Rep. No. 4, 100th Cong., 1st Sess. 11 (1987). The DoT goals were initially established in the Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, Sec. 105(f), 96 Stat. 2097 (1982). They were continued in the Surface Transportation and Uniform Relocation Assistance Act of 1987 (``STURAA''), Pub. L. No. 100-17, Sec. 106(c)(1), 101 Stat. 132, 145 (1987). Congress held further hearings on the subject after passage of STURAA. See Minority Construction Contracting: Hearing Before the Subcomm. on SBA, the General Economy and Minority Enterprise Development of the House Comm. on Small Business, 101st Cong., 1st Sess. (1989); Disadvantaged Business Set-Asides in Transportation Construction Projects: Hearings Before the Subcomm. on Procurement, Innovation and Minority Enterprise Development of the House Comm. on Small Business, 100th Cong., 2d Sess. (1988); Barriers to Full Minority Participation in Federally Funded Highway Construction Projects: Hearing Before a Subcomm. of the House Comm. on Government Operations, 100th Cong., 2d Sess. (1988). Congress subsequently reauthorized the goals in the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, Sec. 1003(b), 105 Stat. 1914, 1919 (1991). See 137 Cong. Rec. S7571 (June 12, 1991) (statement of Sen. Simpson) (expressing support for continuation of disadvantaged business program at Transportation Department).

Congress has established comparable initiatives to encourage disadvantaged business participation in grant programs administered by the Environmental Protection Agency (EPA). For example, recipients of grants awarded by EPA under the Clean Air Act are required to set disadvantaged business goals. See 42 U.S.C. Sec. 7601 note; see also 42 U.S.C. Sec. 4370d (establishing an SDB goal for recipients of EPA funds used in support of certain environmental-related projects); H.R. Rep. No. 226, 102 Cong., 1st Sess. 48 (1991).

---------------------------------------------------------------------------

Congress has also established goals for SDB participation in procurement at the Defense Department, and authorized that agency to use specific forms of remedial measures to achieve the goals.[23] The Defense Department program too is predicated on findings that opportunities for minority-owned businesses had been impaired.[24] More fundamentally, in establishing the program, Congress recognized that fostering contracting opportunities for minority-owned businesses at the Defense Department is crucial, because that agency alone typically accounts for more than two-thirds of the federal government's procurement activities. Therefore, affirmative action efforts at the Defense Department enable minority-owned businesses to demonstrate their capabilities to contracting officers at that important procuring agency and to the vast number of nonminority firms that provide goods and services to the Pentagon. In turn, minority-owned businesses can begin to break into the contracting networks from which they typically

have been excluded.[25]

---------------------------------------------------------------------------

\23\ 10 U.S.C. Sec. 2323.
\24\ See H.R. Rep. No. 332, 99th Cong., 1st Sess. 139-40 (1985) (if disadvantaged firms had been able to ``participate in the `early' development of major Defense systems, they would have had an opportunity to gain the expertise required to bid on such contracts''); see also H.R. Rep. No. 450, 99th Cong., 1st Sess. 179 (1985); 131 Cong. Rec. 17,445-17,448 (1985); H.R. Rep. No. 1086, 98th Cong., 2d Sess. 100-01 (1984).
\25\ See 131 Cong. Rec. 17,447 (1985) (statement of Rep. Conyers) (affirmative action needed to break down ``buddy-buddy contracting'' at the Defense Department, ``which has the largest procurement program in the Federal Government''); id. (statement of Rep. Schroeder) (an ``old boy's club'' in Defense Department contracting excludes many minorities from business opportunities); see also Department of Defense: Federal Programs to Promote Minority Business Development: Hearing Before the Subcomm. on Minority Enterprise, Finance and Urban Development of the House Comm. on Small Business, 103d Cong., 1st Sess. 49 (1993) (statement of Rep. Roybal-Allard) (``Old attitudes and old habits die hard * * *. Defense contracting has, traditionally, been a closed shop. Only a select few need apply. Since the passage of the minority contracting opportunity law, some progress has been made.''); H.R. Rep. No. 1086, 98th Cong., 2d Sess. 100-101 (1984) (low level of participation by disadvantaged firms in Defense Department contracting indicated a need to expand procurement opportunities at that agency for such firms).

---------------------------------------------------------------------------

Opportunities for minority-owned businesses to participate in Defense Department procurement increased following the introduction of the affirmative action program there in the late 1980s. However, the effects of discrimination were still felt in federal procurement generally. Based on information it obtained through a 1993 hearing, a congressional committee reported the following year that this ``lack of opportunity results primarily from discriminatory or economic conditions,'' and that ``improving access to government contracts and procurement offers a significant opportunity for business development in many industry sectors.'' [26] In the Federal Acquisition Streamlining Act of 1994, Congress saw fit to make available to all agencies the remedial tools that previously had been granted to the Defense Department, in order to ``improv[e] access to contracting opportunities for * * * minority-owned small businesses.'' [27]

---------------------------------------------------------------------------

\26\ H.R. Rep. No. 870, 103d Cong., 2nd Sess. 5 (1994).
\27\ 140 Cong. Rec. H9242 (Sept. 20, 1994) (statement of Rep. Dellums).

---------------------------------------------------------------------------

Through its recurring assessments of the implications of discrimination against minority-businesses, Congress has concluded that, standing alone, legislation that simply proscribes racial discrimination is an inadequate remedy. Congress also has attempted to redress the problems facing minority businesses through race-neutral assistance to all small businesses.[28] Congress has determined, however, that those remedies, by themselves, are ``ineffectual in eradicating the effects of past discrimination,'' [29] and that race-conscious measures are a necessary supplement to race-neutral ones.[30] Finally, based on its understanding of what happens at the state and local level when use of affirmative action is severely curtailed or suspended outright, Congress has concluded that minority participation in government procurement tends to fall dramatically in the absence of at least some kind of remedial measures, the result of which is to perpetuate the discriminatory barriers that have kept minorities out of the mainstream of public contracting.[31]

---------------------------------------------------------------------------

\28\ Beginning with the Small Business Act of 1953, Congress has authorized numerous programs to ``aid, counsel, assist, and protect * * * the interests of small-business concerns'' and ``insure that a fair proportion of the total purchases and contracts for supplies and services for the government be placed with small-business enterprises.'' Pub. L. No. 163, Sec. 202, 67 Stat. 232 (1953). After recognizing in the 1960s the specific problems facing minority owned businesses, Congress attempted to address them through race-neutral measures. For example, in 1971, Congress amended the Small Business Investment Act to create a surety bond guarantee program to assist small businesses that have trouble obtaining traditional bonding. In 1972, Congress created a new class of small business investment companies to provide debt and equity capital to small businesses owned by socially and economically disadvantaged individuals. And over the years, Congress has continuously reviewed and strengthened programs to assist all small businesses through the Small Business Act. See e.g. Pub. L. No. 93-386, 88 Stat. 742 (1974); Pub. L. No. 94-305, 90 Stat. 663 (1976); Pub. L. No. 95-89, 91 Stat. 553 (1977).
\29\ Croson, 488 U.S. at 550 (Marshall, J., dissenting). Accord Fullilove, 448 U.S. at 467 (plurality opinion); id. at 511 (Powell, J., concurring); see also City of Richmond v. J.A. Croson: Impact and Response: Hearing Before the Subcomm. on Urban and Minority-Owned Business Development of the Senate Comm. on Small Business, 101st Cong., 2d Sess. 48 (1990) (statement of Ray Marshall); H.R. Rep. No. 468, 94th Cong., 1st Sess. 32 (1975).
\30\ It bears emphasizing that race-neutral programs for small businesses are important and necessary components of an overall congressional strategy to enhance opportunity for small businesses owned by minorities. For example, Congress has authorized contracting set asides for small businesses generally--minority and nonminority alike--as well as a host of bonding, lending, and technical assistance programs that are open to all small businesses. See 15 U.S.C. Sec. 631 et seq.
\31\ The Meaning and Significance for Minority Businesses of the Supreme Court Decision in the City of Richmond v. J.A. Croson Co.: Hearing Before the Legislation and National Security Subcomm. of the House Comm. on Government Operations, 101st Cong., 2d Sess. 57, 62-90 (1990); City of Richmond v. J.A. Croson: Impact and Response: Hearing Before the Subcomm. on Urban and Minority-Owned Business Development of the Senate Comm. on Small Business, 101st Cong., 2d Sess. 39-44 (1990) (statement of Andrew Brimmer).

---------------------------------------------------------------------------

[[Page 26054]]

The foregoing is just a sampling from the legislative record of congressionally-authorized affirmative action in government procurement. The remainder of the memorandum surveys evidence from other sources regarding the impact of discrimination on the ability of

minority-owned businesses to compete equally in contracting markets. This evidence confirms Congress' determination that race-conscious remedial action is needed to correct that problem.

II. Discriminatory Barriers to Minority Contracting Opportunities

Developing a business that can successfully compete for government contracts depends on many factors. To begin with, technical or professional experience, which is typically attained through employment and trade union opportunities, is an important prerequisite to establishing any business. Second, obtaining financing is necessary to the formation of most businesses. The inability to secure the twin building blocks of experience and financing may prevent a business from ever getting off the ground. Some individuals overcome these initial obstacles and are able to form businesses. However, they subsequently may be shut out from important contracting and supplier networks, which can hinder their ability to compete effectively for contract opportunities. And further barriers may be encountered when a business tries to secure bonding and purchase supplies for projects--critical requirements for many major government contracts.

While almost all new or small businesses find it difficult to overcome these barriers and become successful, these problems are substantially greater for minority-owned businesses. Empirical studies and reports issued by congressional committees, executive branch commissions, academic researchers, and state and local governments document the widespread and systematic impact of discrimination on the ability of minorities to carry out each of the steps that are required for participation in government contracting. This evidence of discrimination can be grouped into two categories:

(i) evidence showing that discrimination works to preclude minorities from obtaining the experience and capital needed to form and develop a business, which encompasses discrimination by trade unions and employers and discrimination by lenders;

(ii) evidence showing that discriminatory barriers deprive existing minority firms of full and fair contracting opportunities, which encompasses discrimination by private sector customers and prime contractors, discrimination by business networks, and discrimination by suppliers and bonding providers.

The following provides an overview of both categories of evidence.

A. Effects of Discrimination on the Formation and Development of Minority Businesses

A primary objective of affirmative action in procurement is to encourage and support the formation and development of minority-owned firms as a remedy to the ``racism and other barriers to the free enterprise system that have placed a heavier burden on the development and maturity of minority businesses.'' [32] That these efforts are necessary is evident from the recent findings by the U.S. Commission on Minority Business Development, appointed by President Bush. The Commission amassed a large amount of evidence demonstrating the marginal position that minority-owned businesses hold in our society:

---------------------------------------------------------------------------

\32\ Small and Minority Business in the Decade of the 1980's (Part 1): Hearings Before the House Comm. on Small Business, 97th Cong., 1st Sess. 4 (1981). See also H.R. Rep. No. 870, 103d Cong., 2d Sess. 5 (1994).

---------------------------------------------------------------------------

Minorities make up more than 20 percent of the population; yet, minority-owned businesses are only 9 percent of all U.S. businesses and receive less than 4 percent of all business receipts.[33]

---------------------------------------------------------------------------

\33\ United States Commission on Minority Business Development, Final Report 2-6 (1992). These statistics are based on 1987 census data, the most recent full data available regarding the status of minority-owned businesses. Preliminary reports from 1992 census data reveal that the status of minority firms has not significantly improved. For instance, African Americans are 12 percent of the population but, in 1992, owned only 3.6% of all businesses (up from 3.1% in 1987) and received just 1 percent of all U.S. business receipts (which is the same level as in 1987).

---------------------------------------------------------------------------

Minority firms have, on average, gross receipts that are only 34% of that of nonminority firms.[34]

---------------------------------------------------------------------------

\34\ Id. at 3.

---------------------------------------------------------------------------

The average payroll for minority firms with employees is less than half that of nonminority firms with employees.[35]

---------------------------------------------------------------------------

\35\ Id. at 4.

---------------------------------------------------------------------------

President Bush's Commission undertook an extensive analysis of the barriers that face minority-owned business formation and development. It concluded that ``minorities are not underrepresented in business because of choice or chance. Discrimination and benign neglect is the reason why our economy has been denied access to this vital resource.'' 36 Further evidence of the effect of discrimination on minority business development is revealed in recent studies showing that minorities are significantly less likely than whites to form their own business--even after controlling for income level, wealth, education level, work experience, age and marital status.[37] These findings strongly indicate that minorities ``face barriers to business entry that nonminorities do not face.'' [38]

---------------------------------------------------------------------------

\36\ Id. at 60.

\37\ See Division of Minority and Women's Business Development, Opportunity Denied: A Study of Racial and Sexual Discrimination Related to Government Contracting in New York State, Appendix D, 53-75 (1992) (finding that minorities in New York were 20% less likely to enter self-employment than similarly situated whites); Timothy Bates, Self-employment Entry Across Industry Groups, Journal of Business Venturing, Vol. 10, at 143-56 (1995).

\38\ Timothy Bates, Self-employment Entry Across Industry Groups, Journal of Business Venturing, Vol. 10, 149 (1995).

---------------------------------------------------------------------------

Since the inception of federal affirmative action initiatives in procurement, policy makers have recognized that there are two principal barriers to the formation and development of minority-owned businesses:

limited technical experience and limited financial resources. President Nixon's Advisory Council on Minority Business Enterprise identified these barriers in 1973 when it reported that ``a characteristic lack of financial and managerial resources has impaired any willingness to undertake enterprise and its inherent risk.'' [39] Two decades later, a congressional committee found that minorities continue to have ``fewer opportunities to develop business skills and attitudes, to obtain necessary resources, and to gain experience, which is necessary for the success of small businesses in a competitive environment.'' [40] Discrimination in two sectors of the national economy accounts, at least in part, for the diminished opportunity: discrimination by trade unions and employers, which has prevented minorities from garnering crucial technical skills; and discrimination by lenders, which has prevented minorities from garnering needed capital.

---------------------------------------------------------------------------

\39\ Samuel Doctors & Anne Huff, Minority Enterprise and the President's Council 4-6 (1973) (quoted in Tuchfarber et al., City of Cincinnati: Croson Study 150 (1992)).

\40\ H.R. Rep. No. 870, 103d Cong., 2d Sess. 5 (1994).

---------------------------------------------------------------------------

1. Discrimination by Trade Unions and Employers

President Nixon's Advisory Council on Minority Business Enterprise determined that ``the lack of opportunity to participate in managerial technical training has severely restricted the supply of [minority] entrepreneurs,

[[Page 26055]]

managers and technicians.'' [41] A history of discrimination by unions and employers helps to explain this unfortunate phenomenon.

---------------------------------------------------------------------------

\41\ Samuel Doctors & Anne Huff, Minority Enterprise and the President's Council 4-6 (1973) (quoted in Tuchfarber et al., City of Cincinnati: Croson Study 150 (1992)).

---------------------------------------------------------------------------

Prior to the civil rights accomplishments of the 1960s, labor unions and employers were virtually free to practice overt racial discrimination. Minorities were segregated into menial, low wage positions, leaving no minority managers or white collar workers in most sectors of our economy. Trade unions, which controlled training and job placement in many skilled trades, commonly barred minorities from membership. As a result, ``whole industries and categories of employment were, in effect, all-white, all-male.'' [42] These practices left minorities unable to gain the experience needed to operate all but the smallest businesses, primarily consisting of small ``mom and pop'' stores with no employees, minimal revenue, located in segregated neighborhoods, and serving an exclusively minority clientele.[43]

---------------------------------------------------------------------------

\42\ Affirmative Action Review: Report to the President 7 (1995).

\43\ See, e.g., Joseph Pierce, Negro Business and Business Education (1947); Andrew Brimmer, The Economic Potential of Black Capitalism, Public Policy Vol. 19, No. 2, at 289-308 (1971); Kent Gilbreath, Red Capitalism: An Analysis of the Navajo Economy (1973).

---------------------------------------------------------------------------

Discrimination by unions has been recognized as a major factor in preventing minorities from obtaining employment opportunities in the skilled trades. Title VII of the Civil Rights Act of 1964 (prohibiting employment discrimination) was passed, in part, in response to Congress's desire to halt ``the persistent problems of racial and religious discrimination or segregation * * * by labor unions and professional, business, and trade associations.'' [44] Even after Title VII went on the books, however, unions precluded minorities from membership through a host of discriminatory policies, including the use of ``tests and admissions criteria which [have] no relation to on-the-job skills and which [have] a differential impact'' on minorities; [45] discriminating in the application of admission criteria; [46] and imposing admission conditions, such as requiring that new members have a family relationship with an existing member, that locked minorities out of membership opportunities.[47] As a result, unions remained virtually all-white for some time after the enactment of Title VII:

---------------------------------------------------------------------------

\44\ S. Rep. No. 872, 88th Cong., 1st Sess. 1 (1964). See, e.g., Brimmer & Marshall, Public Policy and Promotion of Minority Economic Development: City of Atlanta and Fulton County, Georgia, Pt. VII, 11-17 (1990) (in 1963, minorities were prohibited from joining Atlanta unions representing plumbers, electricians, steel workers and bricklayers); TEM Associates, Minority/Women Business Study: Revised Final Report, Phase I, Volume I 3-13 (``In 1963, not one of the 1,000 persons in apprenticeship training in Dade County was Black, and the Miami Sheet Metal Workers local, like most other trade unions, was all white.'').

\45\ United States v. Iron Workers Local 86, 443 F.2d 544, 548 (9th Cir.) cert. denied, 404 U.S. 984 (1971). See also Hameed v. International Ass'n of Bridge, Structural & Ornamental Iron Workers, 637 F.2d 506 (8th Cir. 1980) (selection criteria, including aptitude test, and the requirement of a high school diploma as a condition of eligibility were discriminatory).

\46\ United States v. Iron Workers Local 86, 443 F.2d 544, 548 (9th Cir.) (differential application and admissions requirements between whites and blacks; spurious reasons given for rejections of blacks), cert. denied, 404 U.S. 984 (1971); Sims v. Sheet Metal Workers Int'l Ass'n, 489 F.2d 1023 (6th Cir. 1973) (union waived requirements for white applicants).

\47\ United States v. United Bhd. of Carpenters and Joiners of America, 457 F.2d 210, 215 (7th Cir.) cert. denied, 409 U.S. 851 (1972) (family relation requirement excluded minorities from Carpenters trade); United States v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, 438 F.2d 679, 683 (7th Cir.) (requiring family relationships between new and existing members ``effectively precluded non-white membership'') cert. denied, 404 U.S. 830 (1971); Asbestos Workers, Local 53 v. Vogler, 407 F.2d 1047 (5th Cir. 1969) (rule restricting membership to sons or close relatives of current members perpetuated the effect of past exclusion of minorities).

---------------------------------------------------------------------------

In 1965, the President's Commission on Equal Opportunity found that out of 3,969 persons selected for skilled trade union apprenticeships in 30 southern cities, only 26 were black.[48]

---------------------------------------------------------------------------

\48\ Jaynes Associates, Minority and Women's Participation in the New Haven Construction Industry: A Report to the City of New Haven 24 (1989) (citing findings of President's Commission on Equal Opportunity).

---------------------------------------------------------------------------

In 1967, blacks made up less than 1 percent of the nation's mechanical union members (i.e. sheet metal workers, boilermakers, plumbers, electricians, ironworkers and elevator constructors).[49]

---------------------------------------------------------------------------

\49\ Steve Askin & Edmund Newton, Blood, Sweat and Steel, Black Enterprise, Vol. 14, at 42 (1984).

---------------------------------------------------------------------------

In 1969, only 1.6 percent of Philadelphia construction union members were minorities.[50]

---------------------------------------------------------------------------

\50\ Department of Labor Memorandum from Arthur Fletcher to All Agency Heads (1969) (cited in Affirmative Action Review: Report to the President 11 (1995)) (introducing the ``Philadelphia Plan'' requiring the use of affirmative action goals and timetables in construction, Secretary Fletcher noted that ``equal employment opportunity in these trades in the Philadelphia area is still far from a reality. * * * We find, therefore, that special measures are required to provide equal opportunity in these seven trades'').

---------------------------------------------------------------------------

Even when minorities were admitted to unions, discriminatory hiring practices and seniority systems often were used to foreclose job opportunities to them.[51] These actions were the subject of numerous civil rights suits, leading the Supreme Court to declare in 1979 that ``judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice.'' [52] Well into the 1980s, courts, committees of Congress, and administrative agencies continued to identify the ``inability of many minority workers to obtain jobs'' through unions because of ``slavish adherence to traditional preference practices [and] also from overt discrimination.'' [53]

---------------------------------------------------------------------------

\51\ See Pennsylvania v. Operating Eng'rs, Local 542, 469 F. Supp. 329, 339 (E.D. Pa. 1978) (unions held liable for racial discrimination in employee referral procedures and practices); Waldinger & Bailey, The Continuing Significance of Race: Racial Conflict and Racial Discrimination in Construction, Politics and Society, Vol. 19, No. 3, at 299 (1991) (``Despite rules and formal procedures, informal relationships still dominate the union sector's employment processes.''); Edmund Newton, Steel, The Union Fiefdom, Black Enterprise, Vol. 14, at 46 (1984) (discrimination in operation of hiring halls ``operated as impenetrable barriers'' to minority job seekers). See generally Barbara Lindeman Schlei & Paul Grossman, Employment Discrimination Law 619-28 (1983).

\52\ United Steelworkers of Am. v. Weber, 443 U.S. 193, 198 n. 1 (1979).

\53\ Taylor v. United States Dept. of Labor, 552 F. Supp. 728, 734 (E.D. Pa. 1982). See Minority Business Participation in Department of Transportation Projects: Hearing Before a Subcomm. of the House Comm. on Government Operations, 99th Cong., 1st Sess. 201 (1985) (testimony of James Haughton) (minority contractors continue to ``suffer[] heavily because they have been victims to that discrimination as practiced by the unions''); Division of Minority and Women's Business Development, Opportunity Denied!: A Study of Racial and Sexual Discrimination Related to Government Contracting in New York State 41 (1992) (``At least seven reports were issued by federal, state and city commissions and agencies between 1963 and 1982 documenting the pattern of racial exclusion from New York's skilled trade unions by constitution and by-law provisions, member sponsorships rules, subjective interview tests and other techniques, as well as the complicity of construction contractors and the acquiescence of government agencies in those practices.'').

---------------------------------------------------------------------------

The discriminatory conduct that was the subject of the Supreme Court's decision in Local 28, Sheet Metal Workers v. EEOC,[54] is illustrative of the pattern of racial exclusion by trade unions and its consequences for minorities. The union local operated an apprenticeship training program designed to teach sheet metal skills. Apprentices enrolled in the program received class-room training, as well as on-the-job work experience. As the Supreme Court described it, successful completion of the program was the principal means of attaining union membership. But by excluding minorities from the apprenticeship program through ``pervasive and egregious discrimination,'' [55] the local effectively excluded minorities from the

[[Page 26056]]

union for decades. Such exclusion continued notwithstanding the passage of Title VII and a series of administrative and judicial findings in the 60s and 70s that the local had engaged in blatant discrimination in shutting minorities out of the program. Indeed, even into the 80s, the local persisted in violating court orders to open up the program to minorities.[56]

---------------------------------------------------------------------------

\54\ 478 U.S. 421 (1986)

\55\ Id. at 476.

\56\ Id. at 433-34.

---------------------------------------------------------------------------

More recently, a Yale University economist prepared a report documenting the history of discrimination by New Haven unions that ``confirms the nationwide pattern of discrimination.'' [57] Prior to the passage of the Civil Rights Act of 1964, New Haven's unions prohibited minority membership, and minority workers were almost completely segregated into jobs that whites would not take because they required working under conditions of extreme heat or discomfort.[58] After passage of the Civil Rights Act, minorities were prevented from entering unions by a rule requiring that at least three current members sponsor the application of any new member.[59] Although the policy was race-neutral on its face, ``it was almost impossible to find three members who would nominate a minority [and] stand up for him in a closed meeting when other members would undoubtedly attack the candidate and his sponsors.'' [60] This and other discriminatory policies prevented all but five African Americans from joining the

1,216 white members of the highest paid skilled trade unions in 1967, and throughout the mid-70s, unions and apprenticeship programs remained virtually all-white.[61] The report concluded that the history of ``blocked access to the skilled trades is the most important explanation of the low numbers of minority and women construction contractors today.'' [62]

---------------------------------------------------------------------------

\57\ Jaynes Associates, Minority and Women's Participation in the New Haven Construction Industry: A Report to the City of New Haven 25-26 (1989).
\58\ Id. at 26-27.
\59\ Id. at 28.
\60\ Id. at 28.
\61\ Id. at 33; New Haven Board of Aldermen, Minority and Women Business Participation in the New Haven Construction Industry: Committee Report 7 (1990).
\62\ Jaynes Associates, Minority and Women's Participation in the New Haven Construction Industry: A Report to the City of New Haven 34 (1989). Comparable conclusions about the impact of trade union discrimination have been reached in studies from other jurisdictions around the country. See, e.g., D.J. Miller & Associates, et al., The Disparity Study for Memphis Shelby County Intergovernmental Consortium 11-46 (Oct. 1994) (``In Memphis, trade unions have historically discriminated against African Americans.''); Report of the Blue Ribbon Panel to the Honorable Richard M. Daley, Mayor of the City of Chicago 43 (March 1990) (``The Task Force specifically notes the exclusion of minorities and women from the building trades.''); National Economic Research Associates, et al., Availability and Utilization of Minority and Women-Owned Business Enterprises at the Massachusetts Water Resources Authority 72 (Nov. 1990) (``A number of M/WBE owners complain that problems caused by unions are exacerbated by state bidding requirements that make it difficult or impossible for non-union firms to bid.''); Coopers & Lybrand, et al., State of Maryland Minority Business Utilization Study 9 (Feb. 1990) (discussing discriminatory union practices).

---------------------------------------------------------------------------

There is no doubt that trade unions have put much of the discriminatory past behind them, and they now provide an important source of opportunity for minorities. Some barriers to full opportunity remain, however.[63]

---------------------------------------------------------------------------

\63\ See BPA Economics, et al., MBE/WBE Disparity Study of the City of San Jose I-34 (1990) (``When trying to join unions, minorities may face testing and experience requirements that are waived in the case of relatives of current union members.''); Waldinger & Bailey, The Continuing Significance of Race: Racial Conflict and Racial Discrimination in Construction, Politics and Society, Vol. 19, No. 3, at 296-97 (1991) (``In 1987, blacks averaged less than 80 percent of parity for all skilled trades with even lower levels of representation in the most highly paid crafts like electricians and plumbers.''); The Meaning and Significance for Minority Businesses of the Supreme Court Decision in the City of Richmond v. J.A. Croson Co.: Hearing Before the Legislation and National Security Subcomm. of the Comm. on Government Operations, 101st Cong., 2d Sess. 111-15 (1990).

---------------------------------------------------------------------------

A parallel history of discriminatory treatment by employers has prevented minorities from rising into the private sector management positions that are most likely to lead to self-employment. In 1972, Congress found that only 3.5 percent of minorities held managerial positions compared to 11.4 percent of white employees.[64] Congress attributed this underrepresentation to continued discriminatory conduct by ``employers, labor organizations, employment agencies and joint labor-management committees.'' [65] Evidence derived from caselaw and academic studies shows a variety of discriminatory employment practices, including promoting white employees over more qualified minority employees; [66] relying on word-of-mouth recruiting practices that exclude minorities from vacancy announcements; [67] and creating promotion systems that lock minorities into inferior positions.[68]

---------------------------------------------------------------------------

\64\ H.R. Rep. No. 238, 92d Cong., 2d Sess. 3 (1972).
\65\ Id. at 7.
\66\ See, e.g., Winbush v. Iowa, 69 FEP Cases 1348 (8th Cir. 1995) (evidence was ``overwhelming'' that employer had engaged in disparate treatment with respect to promotion of black employees); (United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973) (99 percent white management structure caused, in part, by promoting lesser qualified white employees over more qualified minorities).
\67\ See, e.g., EEOC v. Detroit Edison Co., 515 F.2d 301, 313 (6th Cir. 1975), vacated and remanded on other grounds, 431 U.S. 951 (1977) (finding discrimination in ``the practice of relying on referrals by a predominantly white work force''); Long v. Sapp, 502 F.2d 34, 41 (5th Cir. 1974) (word-of-mouth recruitment serves to perpetuate all-white work force); Thomas v. Washington County Sch. Bd., 915 F.2d 922 (4th Cir. 1990). See also Univ. of Mass., Barriers to the Employment and Work-Place Advancement of Latinos: A Report to the Glass Ceiling Commission 52 (Aug. 1994) (word-of-mouth recruiting methods that rely on social networks are a significant ``exclusionary barrier'' to employment opportunities for minorities); Roosevelt Thomas, et al., The Impact of Recruitment, Selection, Promotion and Compensation Policies and Practices on the Glass Ceiling, submitted to U.S. Department of Labor Glass Ceiling Commission, 14 (April 1994) (noting that ``recruitment practices primarily consist[ing] of word-of-mouth and employee referral networking * * * promote the filling of vacancies almost exclusively from within. If the environment is already homogenous, which many are, it maintains this same `home-grown' environment''); Gertrude Ezorsky, Racism and Justice: The Case for Affirmative Action 14-18 (1991); U.S. Commission on Civil Rights, Affirmative Action in the 1980s: Dismantling the Process of Discrimination 8 (1981); Barbara Lindeman Schlei & Paul Grossman, Employment Discrimination Law 571 (1983).
\68\ See, e.g., Paxton v. Union National Bank, 688 F.2d 552, 565-566 (8th Cir. 1982), cert. denied, 460 U.S. 1083 (1983); Sears v. Bennett, 645 F.2d 1365 (10th Cir. 1981) (system requiring that porters, all of whom were black, forfeit seniority when changing jobs designed to prevent promotion of black employees), cert. denied, 456 U.S. 964 (1982); Terrell v. U.S. Pipe and Foundry Co., 644 F.2d 1112 (5th Cir. 1981) (seniority system created for clearly discriminatory purposes), vacated on other grounds, 456 U.S. 955 (1982). See also Ella Bell & Stella Nkomo, Barriers to Workplace

Advancement Experienced by African Americans 3 (1994) (``African Americans * * * are functionally segregated into jobs less likely to be on the path to the top levels of management.'').

---------------------------------------------------------------------------

A study published earlier this year surveyed a broad range of current labor market evidence and concluded that employment discrimination is ``not a thing of the past.'' [69] Rather, race still matters when it comes to determining access to the best employment opportunities.[70] Progress has been made, of course. Yet, ``more than three decades after the passage of the Civil Rights Act, segregation by race and sex continues to be the rule rather than the exception in the American workplace, and discrimination still reduces the pay and prospects of workers who are not white or male.'' 71 The exclusionary conduct frequently is not deliberate, and the people on top--who are mostly white and male--often believe that they are behaving fairly. But old habits die hard: reliance on outmoded stereotypes and group reputations, and the persistence of ``invisible biases'' work to perpetuate a system that creates disadvantages in employment for minorities today.[72]

---------------------------------------------------------------------------

\69\ Barbara Bergmann, In Defense of Affirmative Action 32-33 (1996).
\70\ Id. at 33.
\71\ Id. at 62.
\72\ Id. at 63-82.

---------------------------------------------------------------------------

The results of recent ``testing'' studies--in which equally matched

[[Page 26057]]

minorities and nonminorities seek the same job--are but one source of evidence supporting this conclusion. These studies show, for instance, that white males receive 50 percent more job offers than minorities with the same characteristics applying for the same jobs.[73] As Justice Ginsburg described them, the testing studies make it abundantly clear that ``[j]ob applicants with identical resumes, qualifications, and interview styles still experience different receptions, depending on their race.'' [74]

---------------------------------------------------------------------------

\73\ Cross et al., Employer Hiring Practices: Differential Treatment of Hispanic and Anglo Job Seekers (1990); Turner et al., Opportunities Denied, Opportunities Diminished: Discrimination in Hiring (1991).
\74\ Adarand, 115 S. Ct. at 2135 (Ginsburg, J., dissenting).

---------------------------------------------------------------------------

Even when minorities are hired today, a ``glass ceiling'' tends to keep them in lower-level positions. This problem was recognized by Senator Dole who, in 1991, introduced the Glass Ceiling Act on the basis of evidence ``confirming * * * the existence of invisible, artificial barriers blocking women and minorities from advancing up the corporate ladder to management and executive level positions.'' [75] That Act created the Federal Glass Ceiling Commission, which subsequently completed an extensive study of the opportunities available to minorities and women in private sector employment, and concluded that ``at the highest levels of business, there is indeed a barrier only rarely penetrated by women or persons of color.'' [76] Evidence released by the Commission paints the following picture:

---------------------------------------------------------------------------

\75\ Federal Glass Ceiling Commission, Good for Business: Making Full Use of the Nation's Human Capital iii (1995) (citing 1991 statement by Senator Dole regarding 1991 Department of Labor Report on the Glass Ceiling Initiative).
\76\ Id. at iii.

---------------------------------------------------------------------------

97 percent of the senior level managers in the nation's largest companies are white.[77]

---------------------------------------------------------------------------

\77\ Id. at 9.

---------------------------------------------------------------------------

Black and Hispanic men are half as likely as white men to be managers or professionals.[78]

---------------------------------------------------------------------------

\78\ Id. at iv-vi.

---------------------------------------------------------------------------

In the private sector, most minority managers and professionals are tracked into areas of the company--personnel, communications, affirmative action, public relations--that are not likely to lead to advancement to the highest levels of experience.[79]

---------------------------------------------------------------------------

\79\ Id. at 15-16.

---------------------------------------------------------------------------

Because private sector opportunities are so limited, most minority professionals and managers work in the public sector.[80]

---------------------------------------------------------------------------

\80\ Id. at 13.

In light of the evidence that it considered, the Commission concluded that, ``in the private sector, equally qualified and similarly situated citizens are being denied equal access to advancement on the basis of gender, race, or ethnicity.''