# EXHIBIT A-15
# (part 1)

104

S. HRG. 104–135

# THE SMALL BUSINESS ADMINISTRATION'S 8(a) MINORITY BUSINESS DEVELOPMENT PROGRAM

Y 4. SM 1/2: S. HRG. 104-135

The Small Business Administration's...

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS
## UNITED STATES SENATE

ONE HUNDRED FOURTH CONGRESS

FIRST SESSION

APRIL 4, 1995

DEPOSITORY

OCT 11 1995

BOSTON PUBLIC LIBRARY

Printed for the use of the Committee on Small Business

U.S. GOVERNMENT PRINTING OFFICE

92–035 WASHINGTON : 1995

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-047558-9

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

S. HRG. 104-135

# THE SMALL BUSINESS ADMINISTRATION'S 8(a) MINORITY BUSINESS DEVELOPMENT PROGRAM

4. SM 1/2: S. HRG. 104-135

Small Business Administration's...

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS
## UNITED STATES SENATE

ONE HUNDRED FOURTH CONGRESS

FIRST SESSION

APRIL 4, 1995

DEPOSITORY

OCT 11 1995

BOSTON PUBLIC LIBRARY
GOVERNMENT DOCUMENTS DEPARTMENT

Printed for the use of the Committee on Small Business

U.S. GOVERNMENT PRINTING OFFICE
92-035 WASHINGTON : 1995

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-047558-9

## COMMITTEE ON SMALL BUSINESS

CHRISTOPHER S. BOND, Missouri, *Chairman*

LARRY PRESSLER, South Dakota
CONRAD BURNS, Montana
PAUL COVERDELL, Georgia
DIRK KEMPTHORNE, Idaho
ROBERT F. BENNETT, Utah
KAY BAILEY HUTCHISON, Texas
JOHN WARNER, Virginia
WILLIAM H. FRIST, Tennessee
OLYMPIA J. SNOWE, Maine

DALE BUMPERS, Arkansas
SAM NUNN, Georgia
CARL LEVIN, Michigan
TOM HARKIN, Iowa
JOHN F. KERRY, Massachusetts
JOSEPH I. LIEBERMAN, Connecticut
PAUL D. WELLSTONE, Minnesota
HOWELL HEFLIN, Alabama
FRANK R. LAUTENBERG, New Jersey

LOUIS TAYLOR, *Staff Director and Chief Counsel*
JOHN W. BALL III, *Democratic Staff Director*

# CONTENTS

## OPENING STATEMENTS


| | Page |
|---|---|
| Bond, The Honorable Christopher S., Chairman, Committee on Small Business, and a United States Senator from Missouri | 1 |
| Bumpers, The Honorable Dale, Ranking Minority Member, and a United States Senator from Arkansas | 13 |
| Burns, The Honorable Conrad, a United States Senator from Montana | 49 |
| Lautenberg, The Honorable Frank R., a United States Senator from New Jersey | 38 |
| Wellstone, The Honorable Paul D., a United States Senator from Minnesota | 8 |


## WITNESS TESTIMONY


| | |
|---|---|
| Lader, The Honorable Philip, administrator, U.S. Small Business Administration, accompanied by Cassandra Pulley, Deputy Administrator | 14 |
| England-Joseph, Judy A., director, Housing and Community Development Issues, Resources, Community, and Economic Development Division, U.S. General Accounting Office | 50 |
| Longuemare, R. Noel, principal deputy under secretary, Defense for Acquisitions and Technology, Department of Defense, accompanied by Dan Gill, Director, Small and Disadvantaged Business Office | 68 |
| Sims, Steven, vice president, National Minority Suppliers Development Council, Washington, DC | 95 |
| Graham, James B., founder, FaxLand Corporation, Falls Church, Virginia | 104 |
| Garza, Santos F., chairman of the board and chief executive officer, Counter Technology, Inc., Bethesda, Maryland | 110 |
| O'Donnell, Arnold J., member, Associated General Contractors of America, and vice president, O'Donnell Construction Company, Washington, DC | 119 |
| Smith, Joshua I., former chairman, U.S. Commission on Minority Business Development, and chairman and chief executive officer, Maxima Corporation, Lanham, Maryland | 151 |
| Archuleta, Nancy E., counsel, Council of Minority and Women Owned Businesses, chairman, Latin American Management Association, and chairman and chief executive officer, Mevatec Corporation, Huntsville, Alabama | 163 |
| Galaviz, Fernando, vice chairman, National Federation of 8(a) Companies, Arlington, Virginia | 175 |
| Homer, Peter, Jr., co-founder and member, National Indian Business Association, and director, Strategic Business Development Systems Integration & Research, Inc., Arlington, Virginia | 196 |


## ALPHABETICAL LISTING AND APPENDIX MATERIAL SUBMITTED


| | |
|---|---|
| Archuleta, Nancy E.: | |
| Testimony | 163 |
| Prepared statement | 165 |
| Bond, The Honorable Christopher S.: Opening statement | 1 |
| Bumpers, The Honorable Dale: Prepared statement | 13 |
| Burns, The Honorable Conrad: Prepared statement | 49 |
| England-Joseph, Judy: | |
| Testimony | 50 |
| Prepared statement and attachments | 53 |
| Responses to post-hearing questions from Senator Pressler | 224 |
| Galaviz, Fernando: | |
| Testimony | 175 |
| Prepared statement | 177 |

| | Page |
|---|---|
| Garza, Santos F.: | |
| Testimony | 110 |
| Prepared statement | 112 |
| Graham, James B.: | |
| Testimony | 104 |
| Prepared statement | 107 |
| Homer, Peter, Jr.: | |
| Testimony | 196 |
| Prepared statement | 198 |
| Responses to post-hearing questions from Senator Pressler | 228 |
| Lader, The Honorable Philip: | |
| Testimony | 14 |
| Prepared statement and attachments | 17 |
| Responses to post-hearing questions from Senator Pressler | 217 |
| Lautenberg, The Honorable Frank R.: | |
| Opening statement | 38 |
| Prepared statement | 39 |
| Longuemare, R. Noel: | |
| Testimony | 68 |
| Prepared statement and attachments | 71 |
| Responses to post-hearing questions from Senator Pressler | 225 |
| O'Donnell, Arnold J.: | |
| Testimony | 119 |
| Prepared statement and attachments | 122 |
| Responses to post-hearing questions from Senator Pressler | 226 |
| Pressler, The Honorable Larry: | |
| Prepared statement | 216 |
| Post-hearing questions posed to the Honorable Philip Lader and subsequent responses | 217 |
| Post-hearing questions posed to Judy A. England-Joseph and subsequent responses | 224 |
| Post-hearing questions posed to R. Noel Longuemare and subsequent responses | 225 |
| Post-hearing questions posed to Arnold J. O'Donnell and subsequent responses | 226 |
| Post-hearing questions posed to Peter Homer and subsequent responses | 228 |
| Sims, Steven: | |
| Testimony | 95 |
| Prepared statement | 98 |
| Smith, Joshua I.: | |
| Testimony | 151 |
| Prepared statement and attachment | 154 |
| Wellstone, The Honorable Paul D.: | |
| Constituent letters for the record | 3 |
| Opening statement | 8 |
| Prepared statement | 10 |


## COMMENTS FOR THE RECORD


| | |
|---|---|
| Basile, Juliana, contracting officer, Fleet and Industrial Supply Center, letter | 235 |
| Carradine, Samuel A., Jr., executive director, National Association of Minority Contractors, statement | 240 |
| Laverdure, president, National Indian Business Association, statement | 248 |
| Robinson, John F., president and chief executive officer, National Minority Business Council, Inc.; and Raymond Daugherty, Jr., chairman, board of directors, EB Enterprise Group, Inc., joint letter | 251 |

# THE SMALL BUSINESS ADMINISTRATION'S 8(a) MINORITY BUSINESS DEVELOPMENT PROGRAM

**TUESDAY, APRIL 4, 1995**

UNITED STATES SENATE,
COMMITTEE ON SMALL BUSINESS,
*Washington, DC.*

The committee met, pursuant to notice, at 10:05 a.m., in room SH–216, Hart Senate Office Building, Hon. Christopher S. Bond (chairman of the committee) presiding.

Present: Senators Bond, Warner, Burns, Hutchison, Frist, Bumpers, Nunn, Lautenberg, Lieberman, and Wellstone.

## OPENING STATEMENT OF THE HONORABLE CHRISTOPHER S. BOND, CHAIRMAN, SENATE COMMITTEE ON SMALL BUSINESS, AND A UNITED STATES SENATOR FROM THE STATE OF MISSOURI

Chairman BOND. The U.S. Senate Committee on Small Business is called to order. Good morning and thank you for attending today's hearing. Since we anticipated a somewhat larger audience than normal for today's hearing, we are meeting here rather than in our smaller hearing room in the Russell Office Building. We are delighted to see so many people with interest in these issues.

Let me say for the record as we begin that we have tried to develop a broad list of witnesses representing a wide diversity of views. For those of you who have not been asked to testify, we would say that you are most welcome to submit written comments supporting, opposing, commenting on the views of all or any of the witnesses, and your written comments will be most welcome. We do not intend to have any vocal expressions made at or during the testimony of the witnesses today.

We are holding a hearing on the SBA's 8(a) Minority Business Development Program and we are going to begin with testimony from the Small Business Administration. Then we will hear from the Department of Defense, the General Accounting Office, and witnesses from the private sector regarding Federal policies governing small disadvantaged businesses and the successes and problems associated with the 8(a) program.

Section 8(a) of the Small Business Act has a long history dating to the origins of the act in 1953. Until 1967, section 8(a) authorized the Small Business Administration to let Federal procurement contracts to small business. It was during the 1967–69 timeframe that section 8(a) was administratively rewritten to direct Federal pro-

curement contracts to minority-owned small businesses. In 1978, with the adoption of Public Law 95–507, the 8(a) Minority Business Program was transformed from an administrative program to a statutory program.

Today SBA's 8(a) program has grown significantly. In fiscal year 1994 there were over 5,100 companies in the program, and nearly $4.4 billion in Federal procurement contracts were awarded to 8(a) firms. In order to be awarded an 8(a) contract, a small firm must be certified by SBA to be socially and economically disadvantaged. Firms are presumed to be socially disadvantaged if they are owned by African-Americans, Hispanic-Americans, Native Americans, and Asian-Americans. Economic disadvantage is determined in part by the personal net worth of the owners. For example, in order to be eligible an individual's net worth cannot exceed $250,000 excluding ownership interest in the firm and equity in their primary residence.

Since I became chairman of this committee, I have maintained that each and every SBA program must be scrutinized closely to weed out what has not worked and to identify what is working and worth keeping and improving. The 8(a) program is no exception. At today's hearing we are going to look at the 8(a) program to address, among others, the following questions: No. 1, what were the original purposes of the 8(a) program? Is that program fulfilling its purposes?

Two, should the Federal Government presume that all members of certain racial and ethnic groups are socially disadvantaged?

Three, are there other ways to expand opportunities for all Americans without providing preferences for individuals because they belong to certain groups?

We have 11 witnesses today to hear from. The Administrator will present an overview and we will allot him 10 minutes. But I would ask all other witnesses to keep their oral presentations to five minutes. Your full written statements will be accepted for the record and shared with all committee members.

With each panel I am going to ask the members of this committee to constrain themselves to 5 minutes for questions and answers. As we move along it may be that we have more time, but I want to make sure that everyone who has come to testify today has an opportunity to present their testimony sometime during the daylight hours.

Since our ranking minority member is going to be joining us later, I am now going to turn for an opening statement to the distinguished senator from Minnesota, Senator Wellstone.

Senator WELLSTONE. Thank you, Mr. Chairman. Let me first of all ask for unanimous consent, Mr. Chairman, to include some letters from Minnesota in the record along with my opening statement.

Chairman BOND. Without objection, they will be accepted for inclusion in the record.

[The letters follow:]

**Columbia Precision Machine Corp.**

1608 East Cliff Road Burnsville, Minnesota 55337

Phone (612) 890-1003

March 30, 1995

Sen. Paul D. Wellstone
United States Senate
Washington DC 205102303

RE: US Small Business Administration 8(a) program

Dear Senator Wellstone:

I am writing in response to proposed changes and/or dismantling of the US SBA 8(a) program. The 8(a) program which sets-aside federal procurement requirements has a mixed review of value and worth in this contractor's mind.

On paper and in theory the 8(a) program is a win/win proposition: Minority contractors able to negotiate directly with a government procurement agency, much like Prime Contractors, in arriving at a fair and equitable price for an item or services deemed necessary for that agency. It has the upfront economic advantage of keeping costs down by limiting the burden of multiple bids, the receipt of those bids, and the shuffling of paper to find an award winner. In my experience and the input from my minority business colleagues, the government generally receives a more than fair and equitable price for its requirements through this program.

The reality of the program is less than the simple and efficient picture painted above. The problem exists in the under-utilization of some very dynamic and innovative minority business enterprises. This lack of use is directly related to a pervasive attitude in the US government contracting offices that the program is cumbersome and not in their daily realm of letting contracts. Responses I have received from contracting officers range from "We don't do 8(a)" (although mandated) to "It's too much trouble." Those responses highlight the problem. A program that is not designed correctly will continue to be less than it can be.

The 8(a) program, which should be an economic program to enhance the viability and longevity of minority business, has really become a political plum for a handful of the 4,800 8(a) contractors in the United States. Political handholding has allowed some minority businesses to obtain astronomical awards while the vast majority of 8(a) contractors have received little or no support.

This lack of utilization not only impacts the minority business organization but also the community in which the business is located. Many minority business owners, like myself, strive to give back to community. In this age of government program cuts, sometimes the only recourse to those cuts is voluntary donations of either time or money to continue these programs. The success and viability of local minority businesses can fill these voids. Many of us are more than willing to be involved but involvement does require money and resources. The 8(a) program can be an integral vehicle in the continuation of those programs.

As for my view of changes in the program that would give it more value I believe that a cap on the amount of contract awards is the first step in rehabilitating the 8(a) program. It's hard to imagine one minority company needs 20-100 million dollar contract awards. If there is another minority firm in that line of business, contracting officers should either look at a joint venture or a strong subcontract plan to another minority business organization or even a majority company. We all need to work together to strengthen our country and whatever methods to make a stronger procurement.

I also believe that bidding among "like" 8(a) contractors can offer "best price" contracting.

Another important point is to simplify the government buying process. The FAR is a dizzying maze of bureaucratic language. Learn from private contractors. Keep it simple and to the point.

The paperwork burden to be certified and to remain certified is a confusing project. There is a more simple and to the point method of certifying minority contractors for the 8(a) program.

We need help, understanding and, most importantly, people in position at the various government buying entities who care about this program performing equitably as it was designed and meant to function. We also need a fully staffed SBA 8(a) office to help our organizations weave the maze of bureaucratic intricacies that now constitute the reality of entry into government contracting through the 8(a) program.

Sincerely,

Gilbert L. Baldwin
President
Columbia Precision Machine Corp.

GLB/ay

I. C. E. S. Ltd.
5354 PARKDALE DRIVE, SUITE 103, ST. LOUIS PARK, MN 55416 • 612/542-0028 FAX 542-0030

30 March 1995

Paul David Wellstone
United States Senate
Washington, DC 20510-2303

Dear Senator Wellstone:

I am the President/CEO of a nine year old growing minority owned System Integration firm based in St. Louis Park, MN and I strongly contest the attempt to eliminate the 8(a) program.

As an African American entrepreneur in a high tech business, I face daily the challenges of having to be better than my European American counterparts. Why? Because of the lack of credibility and distrust created by the media, banks, buyers and by the good old boy competitors themselves.

Over the years I have become accustomed to not starting on an even playing field and this has never been a major concern. However, being routinely denied access to the plum by people steadfast to the idea that minority owned businesses provided poor quality, are unreliable and are always under financed, made this challenge almost overwhelming .

For two years our company grappled to penetrate the lucrative markets. We made minimum strides only because a few of our customers were doing business with the government and had in place some form of (Quota ) or Affirmative Action Program. I've watched several large firms win major contracts and call me to ask for the people to do the job. My customers would pay twice the amount to these firms because of their names.

During my second year in the survival mode I applied for the 8(a) status. It took my staff close to 400 man hours to complete this application and it was rejected because all of my SIC codes were saturated by the Beltway Folks. Note I was the only one from MN applying..

On the second try we were approved. We installed one of the first computers in Minnesota to run a MRI machine for the Minneapolis VA Hospital. Our second 8(a) project required the acquisition and sale of computers to the US Forestry Service using year end funds. We provided these systems at hundreds of dollars below GSA prices.

You must understand that before any of these projects were allowed to pass our way we had to complete a full business plan, evaluate our financial capabilities and accept council from the SBA 8(a) business development specialist and contract negotiator. This training provided some basics that gave me the foundation to continue pursuing my business goals.

Recently my company received an award from the Minority Business Network and AT&T as one of the Top Ten Minority firms in the country.

We have captured close to twenty eight million in Commercial, DOD and non-DOD contracts in the last nine months. We are working in seven states including Washington DC and will be providing employment for over fifty people by year end.

Yes, the 8(a) program is making the difference because it gives my company the opportunity to grow when no one else would. It gives us the edge that, when properly honed, allows us to develop a legacy for the future.

**What concerns me is that the 8(a) program captures less than one per cent of the revenue paid to Majority owned firms.** History tells me that the most of these same firms got their start through contracting with the U.S. Government (or have we forgotten!)

We have all heard the stories of parents with no money, immigrating from somewhere and starting with an apple cart. **Who gave them the apples and the cart?** My mom ironed shirts for 30 years for eighty five cents a dozen, and sent three of us to college. I was paralyzed from the waist down and started this company with an unemployment check that I had to pay back. My daughter graduates from **Harvard Law School in June 1995.** You tell me Senator, is the 8(a) program worth spending all this time to eliminate, or is it just a sacrificial lamb to satisfy the lobbyist of some major government contractors? Or is it a ploy to satisfy the tactfully misinformed paranoiac public. " Are the Minorities really taking over the world"

When you look at your children and say **"there lies our country's future"**. You should think about the Small Business 8(a) program and say **my children might be working for these guys,** so I better consider all of the options! This country began with small business and its future will depend on small business. If you eliminate the embryo and the means for the embryo to be nourished, there will be no future. It's as simple as that.

**Now how would I change the 8(a) program?**

**First** I would open it up to everyone small enough to meet the start up requirements. This would **eliminate the racial issue** (backlash) that some folks use as an excuse to claim reverse discrimination.

Minorities, women, disabled and other disadvantaged people have been competing against each other for the crumbs, for a long time. The 8(a) program keeps them focused just on the small picture, thereby giving the big guys less competition at the top. This concept may open the door to have culturally diverse people work together to get a larger piece of the pie. Wouldn't that make the big guys nervous.

**Second,** I would strongly consider **eliminating the title 8(a)** and simple name it **The Small Business Development Program. 8(a) has taken on somewhat of a negative connotation now that the big** boys **know what it means. It becomes a discriminatory label.**

**Third,** I would make it mandatory that every new 8(a) firm be assigned two senior mentors one in the 8(a) program and the other a Prime government contractor in their areas of expertise.

**Forth,** I would **Raise the Quota for Small Business Participation**, on government contracts. **Low goals produce** low results.

**Fifth,** I would drop the revenue ceiling down for small businesses based on revenue.

**Sixth,** I would work out some way to provide project financing for government contracts as well as expediting payments.

**Seventh,** I would stream line (Gore Line) the SBA by first evaluating their current process, eliminate the bottle necks and automate the system I would make this plan happen **within five years.** How? By asking Small and Large business to work together for this common goal and **make the Small Business the prime.** How do I know it will work. **I'm doing it now!** References upon request.

Paul, thank you for asking.

Sincerely Yours,

Albert J. Coleman
President/CEO

**OPENING STATEMENT OF THE HONORABLE PAUL D. WELLSTONE, A UNITED STATES SENATOR FROM MINNESOTA**

Senator WELLSTONE. Mr. Chairman, I will be very brief because we have many panelists. Mr. Lader, Ms. Pulley, I thank you for being here today.

Mr. Chairman, I think that there is an idea that binds and ties all of us together that are here. That idea is the importance of successful minority businesses in our communities. I think all of us are committed to self-reliant, self-sufficient communities, keeping capital within our communities, and I think that is a goal that we all share. There are tens of thousands of success stories. I wish we had time to hear about all those success stories. I think it is extremely important that we emphasize that.

By the same token, I think it is also true, Mr. Chairman, that anybody who wants to take a hard and honest look at our country will come to the understanding that we do not yet have a level playing field. We do not yet have a level playing field. I think that the value of this program—and all programs deserve reexamination and it is important that we have a full discussion—is that it is about promoting opportunity. I think we have to understand that whether it be an African-American or Southeast Asian or Native American or Hispanic small business, it is not just the importance of those businesses and communities of color, but that is a plus for the whole Nation when we promote that kind of entrepreneurship within our communities.

Mr. Chairman, we do not have enough 8(a) contracts in Minnesota for any of our 8(a) companies to be dependent on them. If I had any criticism of this program, and I have raised this before, it is in the allocation of funds. But I do want to conclude my opening statement by reading from a letter from Mr. Albert Coleman, president and CEO of ICES Ltd. in St. Louis Park. He is an African-American who started his system integration firm with an unemployment check 9 years ago. Today he employs about 50 people.

Under the 8(a) program Mr. Coleman's company, according to this letter, began by installing a computer to run an MRI machine in the Minneapolis VA hospital, and has provided computer systems to the Forestry Service at significantly below GSA prices. The company began as a commercial firm before becoming certified in the 8(a) program in 1989, but has used the 8(a) program since then to rebuild its sales and to build its capacity. It has succeeded. ICES recently received an award from the Minority Business Network and was named by AT&T as 1 of the top 10 minority firms in the country.

Mr. Coleman writes—and I conclude my opening statement this way—yes, the 8(a) program is making the difference because it gives my company the opportunity to grow when no one else would. It gives us the edge that when properly honed allows us to develop a legacy for the future.

I would point out, Mr. Chairman, that Mr. Coleman proudly describes in his letter how his mother, who ironed shirts for 30 years, put three children through college, and how his own daughter now is expected to graduate this year from Harvard Law School. I think this is exactly the kind of legacy that we hope for from the Federal

small business program and I think that is the goal we want to achieve.

With that, I conclude my opening statement.

[The prepared statement of Senator Wellstone follows:]

**OPENING STATEMENT OF SENATOR PAUL D. WELLSTONE**
**COMMITTEE ON SMALL BUSINESS**
**APRIL 4, 1995**

Mr Chairman Thank you for this opportunity to discuss a program whose goals I believe we all support. I welcome Administrator Lader, and thank him for his appearance today. I also welcome Ms Pulley and the rest of our witnesses

I think we all know that members of our minority communities who strive to develop the skills and the values of enterprise and ingenuity within their communities face a struggle In many ways minority entrepreneurs face even more than the usual, familiar obstacles facing other small business men and women in America The playing field is still not really level for many minority-owned and minority-run businesses

There are thousands of success stories In fact, with the Committee's permission, I would like to submit for the record some materials from Minnesota concerning minority businesses which received their crucial start, or important assistance, from SBA's 8(a) program Several of these firms have achieved success as commercial firms in the private marketplace, in addition to receiving government contracts through 8(a)

Still, I believe it remains in the economic interest not just of our minority communities, but of the whole country, that we continue to promote and assist the development of successful minority businesses It is in the interest not only of certain communities, but of the whole country, that those who face extra disadvantages in starting and operating a successful business, receive the chance to do so

The 8(a) program has had its problems This Committee discussed reforming it in hearings held last year Senator Kerry and the SBA each have presented important ideas for reform. But we also know that past reforms have been incompletely implemented We need to determine the most effective ways of achieving the goals of this program It is our responsibility to determine whether and how well our programs work, and what to do about it if they do not work well enough Therefore, I look forward to today's testimony

In Minnesota, the 8(a) program seems to have done a good deal of what Congress intended the program to do. And I note that support for minority-business development historically has been a bipartisan effort. In Minnesota, the 8(a) program has enhanced the sales of minority-owned and minority-run firms so that they have been able to build their capacity and their capabilities. A number of the firms appear to have become more successful and viable commercial firms in the private market as a result of their participation in the 8(a) program. That is how the program is supposed to work.

Frankly, Minnesota firms generally do not receive enough federal contracts to become overly "dependent" on the 8(a) program. And while we might be pleased by that absence of dependence, the relative lack of contracts points out what I believe to be one of the serious weaknesses of the program -- its geographical bias. I am sure that other members share my concern about the heavy concentration of the benefits from this program among a small number of firms. I understand that this phenomenon is a reflection of broader procurement trends, not only in 8(a). But I am convinced that there are qualified firms making outstanding efforts, who are nonetheless excluded.

Mr. Chairman, I will close by quoting briefly from a letter I received from Albert Coleman, President and CEO of I.C.E.S company in St. Louis Park, Minnesota. The company began as a commercial firm before receiving its 8(a) certification in 1989, but has used the 8(a) program since then to build its sales and to build its capacity. It has succeeded. I.C.E.S. now employs about 50 people and recently received an award from the Minority Business Network: it was named by AT&T as one of the Top Ten Minority Firms in the country.

Mr. Coleman writes: "Yes, the 8(a) program is making the difference because it gives my company the opportunity to grow when no one else would. It gives us the edge that, when properly honed, allows us to develop a legacy for the future.

I note, Mr. Chairman, that Mr. Coleman's letter proudly describes how his mother, who he says ironed shirts for 30 years, put three children through college. Now Mr. Coleman's own daughter is expected to graduate from Law School this year. I think that is the kind of legacy we hope for from federal small-business programs.

Chairman BOND. Thank you very much, Senator Wellstone. Now it is my pleasure to call on our ranking minority member, former chairman of the committee and my neighbor to the south. My consolation to you on coming in second, but second beats the heck out of all but one other.

Senator WELLSTONE. Would my colleagues just yield for one second?

Chairman BOND. I do not know. If you want to try to talk about the Big 10, I would not——

Senator WELLSTONE. No, I will not do that. I will not talk about the game last night. Mr. Chairman, I just wanted to apologize to Mr. Lader and Ms. Pulley. I actually have reserved time on the floor and I have to leave in about 5 minutes. I will try to come back after floor debate and I just want to let you know, and others know, that it is not lack of interest when I leave. Thank you.

Chairman BOND. Senator Bumpers.

Senator BUMPERS. Mr. Chairman, since I was late getting here I will save the committee the time and just ask unanimous consent that my statement be inserted in the record.

Chairman BOND. Without objection, it will be accepted. Thank you.

[The prepared statement of Senator Bumpers follows:]

**OPENING STATEMENT OF SENATOR DALE BUMPERS**
**Committee on Small Business**
**April 4, 1995**

I would first like to commend and thank the Chairman and today's witnesses for convening this hearing to examine the SBA Minority Small Business and Capital Ownership Development program, known by all as the 8(a) program. I hope that today's hearing represents a continuation of the Committee's work on this program in the last Congress which was led chiefly by Senator Kerry. As members know, Senator John Kerry chaired two hearings and introduced a bill to make several important reforms in the 8(a) program, and this bill passed the Senate just before adjournment. Unhappily, the House did not act on the Kerry bill.

Obviously, there are those who see political gain in attacking programs which benefit minorities, and there are certainly some people who believe they have lost opportunities because of the gains which have been made by African Americans, Hispanic Americans, Native Americans and others. Without addressing any specific case, we should start from the premise that we are a better country and a better people overall when disadvantaged people have been helped to overcome their disadvantages. This country and my state have a history of racial discrimination which has not been forgotten.

Programs like 8(a) make up a large and complex legal framework which was intended to rectify a century or more of legal wrongdoing by giving people opportunities to better themselves and give a better life to their offspring. There is nothing wrong with the purposes of these programs, and we should not be hesitant to defend those purposes from the political attacks which have become today's political currency.

Having said that, the 8(a) program has had more than its share of problems. I was chairman of this Committee in 1988 when we labored for many months to craft a comprehensive reform of the program in light of the horrendous Wedtech scandal. Our efforts were only partially successful. There remain, in my view, too many sole-source contracts and too few competitive awards within the program. The waiting list for program certification is still far too long. Perhaps worst of all, the top 8(a) companies continue to receive a huge percentage of contract awards, while half of all firms received no contracts last year. There are, I am sure, still front companies operating despite stringent efforts to root them out. GAO and others have catalogued the problems and abuses within the program regularly for as long as I have served on this Committee.

I am not, however, prepared at this point to throw the 8(a) program overboard. Perhaps the case can be made that the program is irreparable or has outlived its usefulness. But that case has not yet been made, in my view, and the burden is on the opponents to convince me if either of these is true. Moreover, I believe the motives of some political critics in today's environment are inherently suspect. I know that today's witnesses are not politically motivated, and they will give us the benefit of their experiences and learning, and I thank them for taking time to be with us today.

Chairman BOND. All right, with that we would like to welcome our good friend, Phil Lader, Administrator of the Small Business Administration and his deputy, Ms. Pulley. Mr. Lader.

## STATEMENT OF THE HONORABLE PHILIP LADER, ADMINISTRATOR, SMALL BUSINESS ADMINISTRATION, ACCOMPANIED BY CASSANDRA PULLEY, DEPUTY ADMINISTRATOR

Mr. LADER. Mr. Chairman, Senator Bumpers, Senator Wellstone, members of your staff, thank you for the opportunity to appear before you and your colleagues today to address this subject. Let me ask that my written testimony be entered in the record.

Chairman BOND. Without objection, it will be accepted in full.

Mr. LADER. Thank you very much, sir.

Let me begin by putting the discussion of 8(a) in a broader perspective with these three points. First, the United States is the world's largest single buyer of goods and services—some $160 billion. Secondly, as you refer to this chart, I think you will note that the yellow bar represents the total amount of Federal Government procurement. The orange represents the small business portion of that, which, as you can see, with no restrictions, no certification, the small business set-asides come to about 24 percent. So as Federal procurement has decreased in recent years, a rather steady percentage of small business participation means that there is a larger small business share in Federal procurement.

If we look, however, to the blue bars, that represents small disadvantaged business awards in our procurement system; you see how relatively small that is. And if you look at the red, which my vision hardly permits me to see, that is the percentage of women-owned businesses participating in Federal procurement. The specific numbers, as you are well aware, indicate that the total amount of minority-owned business' participation in Federal procurement was 5.8 percent in that last year. In the 8(a) program, the number is only 2.7 percent of total Government procurement.

The third point in the way of perspective is the overall SBA context. The 8(a) program consumes only 3 percent of our operating budget in the operation of the agency. Consequently, when the President announced last week—and I look forward to discussions in further hearings with you on our reinvention Government efforts at SBA—we took four steps to allow us to reduce our overall SBA budget by 32 percent; some $1.2 billion of taxpayer savings will be accomplished over the next 5 years through reducing the Federal subsidy of our guaranteed loan program, consolidating our field operations, centralizing loan processing, and moving various back office operations from our headquarters to the field.

But today's focus is the 8(a) program. I put all that as the background in which we focus on the history. Mr. Chairman, you identified the major landmarks in the history of this program. Before SBA was even created, Congress recognized the need for Government contracting opportunities for small businesses. In fact, during World War II, Congress ensured that small businesses would actively contribute to the war production effort. In 1953, as you pointed out, President Eisenhower, in calling for the creation of the SBA, authorized it to contract with Federal agencies and sub-

contract with small businesses. But that authority was not used for some 15 years.

In 1967, President Johnson, as a result of the Kerner Commission report, sought to use this mechanism to alleviate chronic unemployment of disadvantaged individuals in distressed urban areas. Then in 1969, under President Nixon, there was this transition to assisting and to fostering the establishment and growth of successful firms owned by disadvantaged persons.

You pointed to the 1978 legislation which shifted the emphasis to business development. Now I want to identify the three codified purposes of that action of the Congress. It was first to foster business ownership of socially and economically disadvantaged individuals. Second, to promote the competitive viability of such firms by providing contract, financial, management, and technical assistance to them. And third, to expand the Federal procurement program relating to these businesses.

Then in 1988, President Reagan signed various reforms of this program into law. By that legislation Congress set annual procurement goals Government-wide at 20 percent for small business, and 5 percent for disadvantaged. And in 1994, a similar goal, 5 percent was established for women-owned businesses.

In June of last year under this administration, a minority enterprise development set of reforms was proposed, the so-called MED Program. The status of the program at this moment is that the number of certified firms has grown from 2,000 in 1980 to more than 5,400 certified firms today, and the survival rate after graduation has increased.

But you asked in your questions, what has been our experience? What have been the achievements under this administration? In sum, by making this program, as well as virtually all of the SBA programs, more user friendly, we have sought to have an increase, and there has been a doubling of the number of certification requests under the 8(a) program. There has been a chronic backlog, as you know, of the certification process. That has been cleaned up over the past year.

Firms have been terminated under the 8(a) program. There has been criticism of too much concentration of these firms geographically and in terms of the small number of the firms. We have proposed and initiated various reforms in that regard which we will be discussing today. And we have proposed a more comprehensive plan through our resource partners, the many SCORE volunteers, the retired executives, and the small business development centers, to provide training, access to capital, as well as what this 8(a) program provides. All of these recommendations suggest the continued commitment that we have to 8(a) to positive change.

You asked, have the purposes of the program been fulfilled? The program, obviously, has been in response to a historic pattern of exclusion, or underrepresentation in business generally, and certainly as you can see from this chart, in Federal procurement. But today, 8(a) is a simplified method for procurement as well as a limited term business development tool. The small disadvantaged business program allows other firms to compete and gives Government agencies other vehicles for procurement.

It must be recognized that 8(a) firms perform well. The average net worth, I point out, of entrants to this program, exclusive as you point out, of equity in their personal residence and the 8(a) business is $54,000. Black Enterprise magazine, in identifying the 100 top African-American-owned businesses, found that 32 of them were or are participants in the 8(a) program. Hispanic Magazine, in identifying the top 100 Hispanic-owned firms found similarly that 17 were or are participants in this program.

The percentage of graduates who are still operating shows the progress. In 1992, only 50 percent of the graduates continued operations. Last year, more than 61 percent continued operations. So, I say to you and to your colleagues, let us go back in the analysis of 8(a) to what was the legislative purpose: the fostering of minority ownership of businesses and growing the middle class; 8(a) today is not a Government handout, not a giveaway, but it is a means by which qualified businesses have produced goods and services that have met or exceeded the market standards and agency needs.

Mr. Chairman, there is a broader question, and that is currently under review by the President and the Supreme Court. I know this committee will understand that it would be inappropriate for me to anticipate their conclusions, but it is national policy today to use Federal acquisition, in part, to support economically and socially disadvantaged individuals in the ownership of their own businesses. President Clinton is committed to expanding the opportunity for all Americans to participate in our free enterprise system.

I would like to point out quickly that 8(a) is only part of SBA's solution of this broader question. The progress that has been made in our 7(a) Guaranteed Loan Program demonstrated that in 1991 only about 15 percent of those loans and 16 percent of the dollars went to minorities; last year, the rate increased to 19 percent. In the LowDoc Program, which was established for loans under $100,000, about 17 percent of those loans have been made to minorities. Our one-stop capital shops will be helping to address this problem. Our surety bonds program has gone from 18 percent to minorities in 1991, to 24 percent in 1994. Of our total Microloans made this past year, about a third have gone to minorities.

Thus, you can see that the efforts being made by the SBA and this administration are broader than just 8(a). But I hope that our discussion of 8(a) may be in the context of this overall effort. I hope this has provided some perspective, and Ms. Pulley, who has been a principal partner to my predecessor and to me and who has the most direct experience in working in this program, looks forward to responding to your questions.

[The prepared statement and attachments of Mr. Lader follow:]

STATEMENT OF
PHILIP LADER
ADMINISTRATOR
OF THE U.S. SMALL BUSINESS ADMINISTRATION
BEFORE THE
UNITED STATES SENATE
COMMITTEE ON SMALL BUSINESS

April 4, 1995

Mr. Chairman and Members of the Committee, thank you for this opportunity to appear before you today to discuss the U.S. Small Business Administration's (SBA) Minority Enterprise Development Program (MED). I am accompanied by Cassandra M. Pulley, Deputy Administrator of the SBA.

As you are aware, President Clinton has directed a review of the Federal government's programs relating to affirmative action. That review is proceeding but is not yet completed. The Administration's objective is to determine what works and what does not work today. SBA is participating in this review.

Let me begin by emphasizing a fundamental point. This Administration is committed to the goal of expanding the opportunity for all Americans to participate in our free enterprise system and in Federal procurement opportunities. When the Administration's review is complete, we will present the recommendations concerning SBA's programs to this committee.

## SUCCESSES

Mr. Chairman, before I get into the heart of my testimony, let me take a moment to address some of the successes of the Minority Small Business & Capital Ownership Development (MSB&COD) program, also referred to as the Minority Enterprise Development (MED) or "8(a)" program. Despite its problems, the 8(a) Program has produced many thriving companies that have created jobs and contributed to America's economic growth and development.

Beltran's Security & Investigation Agency, Inc. (Beltran's) started in 1974 as a patrol operation, but as this market changed, phased into professional security guard services. In 1985, SBA approved a $48,000 7(a) guaranteed loan for the firm, providing needed financial resources, and certified Beltran's for 8(a) Program participation, thereby improving its marketing opportunities. Since that time, the firm has received eleven 8(a) contracts totaling $13,944,969. Firm employment has risen from 35 to 210 employees, and annual sales have grown from $302,000 to $3.5 million.

Paramount Contracting Company (Paramount) is a general contractor based in Morrow, Georgia, with broad experience in heavy commercial and government construction. The company's construction activities include site development, water and waste water systems, road and building construction, flood control, low level wind shear alert systems and radio communication link towers.

The company was organized in 1978 with five employees, in 1983 received a $175,000 SBA guaranteed loan, and in 1987, was certified for 8(a) Program participation. Approximately 50 workers are now employed, and sales have grown from $700,000 to more than $4 million. Bonding capacity is up to $10 million per project. Forty percent of Paramount's work force is minority, and minority subcontractors are utilized on most projects. Paramount received an outstanding performance rating from the U.S. Corps of Engineers in Savannah and has been commended by other government and non-government agencies for its performance, quality of work, and organizational capabilities.

Of the top 100 African-American-owned businesses (Black Enterprise Magazine, June 1994), 32 are or were in the 8(a) Program. Of the top 100 Hispanic-owned businesses (Hispanic Business Magazine, June 1994), 17 are or were in the 8(a) Program. Over the past three years, the 8(a) Program has supported well over 100,000 jobs.

The percentage of firms still operating after leaving the program has also improved since implementation of "competitive business mix requirements" in 1989. The Small Business Act, as amended by Public Law 100-656, requires SBA to include in its annual report to Congress a compilation and evaluation of those business concerns that have exited the 8(a) Program during the immediately preceding three fiscal years. The percentage of firms that have exited the program and are operational has risen from 50.3% in 1992 to 61.4% in 1994.

## HISTORICAL PERSPECTIVE ON THE 8(A) PROGRAM

The origin of the 8(a) Program can be found in Public Law 77-603, enacted June 11, 1942, which created the Smaller War Plants Corporation. This corporation had broad authority to contract with the United States to furnish goods and services to the government and to arrange for the performance of these contracts by subcontracting to small businesses or others.

The Defense Production Act amendments of 1951, Public Law 82-96, created the independent Small Defense Plants Administration with authority to enter into contracts with the United States and to arrange for performance by subcontracting to small businesses or others.

The 8(a) authority under Public Laws 77-603 and 82-96 was not used, but the concept was inherent in the establishment of SBA. The Small Business Act of 1953 authorized SBA to enter into contracts with Federal agencies and to subcontract the work to small businesses. However, for 15 years SBA did not use the section 8(a) authority.

The 8(a) Program, as we know it today, has evolved over the years from an employment/economic development program, to a contracting program, to an open-ended business development program, and today, to a limited-term business development "opportunity" program. As problems have been identified, Congress passed laws intended to improve the functioning of the program.

The 8(a) Program was started as a result of an Executive Order issued by President Johnson in response to the 1967 Report of the Commission on Civil Disorders, commonly called the Kerner Commission. In 1967, President Johnson ordered that the section 8(a) authority be used to direct contracts to businesses locating plants in distressed urban areas to create jobs. After rioting in the inner cities that year, section 8(a) authority was used for the first time in support of the Test Cities Program in 12 urban locations. Sole-source Federal contracts were provided to induce businesses to locate in areas of high unemployment. This effort was short-lived. The effort to promote more employment in inner cities was turned over to the National Alliance for Business JOBS Program in 1968.

In 1969 in the Nixon Administration, SBA redesigned the program to provide Federal contract support for small firms owned by socially or economically disadvantaged individuals. This use of the Section 8(a) authority was accomplished through SBA administrative regulations. The 8(a) Program grew to include, from 1970 to 1980, approximately 2000 firms. Throughout this period the program was subject to abuse and fraud, particularly because of "front" companies.

In an attempt to correct the abuses and provide the program with statutory authority, Congress enacted Public Law 95-507 in 1978. The law provided a number of measures to shift the program's focus to business development and required program participants to be at least 51% owned and controlled by socially and economically disadvantaged individuals. Congress also determined that the power to award Federal contracts could be an effective tool for development of business ownership among groups that own and control little productive capital. The legislation was therefore designed to foster business ownership and development by individuals in groups that own and control little productive capital and to promote the viability of businesses run by such persons by providing contract, financial, technical and management assistance. The law clarified the intent that the primary beneficiaries of the program would be minorities but also allowed non-minorities to establish eligibility.

The position of Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB&COD) was created by Congress to administer the 8(a) contract and 7(j) management and technical assistance programs. As a result of the inconsistent determinations of eligibility by the field offices, P.L. 95-507 provided specific eligibility criteria and required that all determinations be made by the AA/MSB&COD.

P.L. 95-507 also served to expand the 8(a) Program. There was a great increase in the 8(a) portfolio and number and dollar amount of 8(a) contracts as SBA and Federal agencies responded to the mandate of the new legislation. Unfortunately, even with P.L. 95-507 the program failed to develop viable, competitive firms that graduated from such government assistance. Congress consequently passed P.L. 96-481 in October 1980, requiring SBA to negotiate participation terms and definite graduation dates with each program participant.

Through regulations to implement P.L. 96-481, SBA established the fixed program participation term (FPPT) which limited a firm's participation in the program to an original term of up to 5 years with a possible extension of 2 years. Full implementation of these regulations took place on April 21, 1982.

On November 15, 1988, President Reagan signed into law the "Business Opportunity Development Reform Act of 1988," P.L. 100-656. This law provided for, among other things, competition in the 8(a) Program above certain contract dollar thresholds; a nine-year participation term; attainment of non-8(a) revenue at certain levels during program years 5 through 9; an 8(a) loan program to replace payment of business development expense; establishment of a division of program certification and eligibility to process applications within 90 days; Miller Act surety bond exemptions; Walsh-Healey Act exemptions; approval of business plans after certification but prior to award of any 8(a) contracts; a transition management plan during the first year of the transitional stage; submission of an annual report on the program to Congress; and a career-reserved AA/MSB&COD.

With P.L. 100-656, Congress and President Reagan reaffirmed that the 8(a) Program was a primary tool for improving opportunities in the Federal procurement process for small business concerns owned and controlled by socially and economically disadvantaged individuals and bringing such concerns into the nation's economic mainstream. Yet Congress also found that, while some business success could be demonstrated as a result of the program, the enduring principal objectives of the program had not been fully achieved.

Since its first 8(a) contract award in 1969, the 8(a) Program has awarded approximately 95,000 contracts valued at approximately $48 billion. At present, there are approximately 5,400 certified 8(a) firms. During FY 1994, 8(a) Program participants received approximately 5,990 contracts. The total of all contract actions,

including contracts and modifications, was valued at approximately $4.34 billion which represents only 2.7% of total procurement dollars awarded. The 8(a) Program is not a government "handout" or "giveaway," but is a means by which qualified businesses have produced goods and services which have met or exceeded market standards and agencies' needs.

## SOCIAL AND ECONOMIC DISADVANTAGE

To participate in the 8(a) Program today, a business must be at least 51% unconditionally owned, controlled and operated by an individual or individuals who are determined by the SBA to be socially and economically disadvantaged. As defined in Public Law 95-507, the Small Business Act [Section 8(a)(5)], socially disadvantaged persons are those who have been subject to racial or ethnic prejudice or cultural bias because they have been identified as members of certain groups without regard to their individual qualities. The Small Business Act [Section 2(f)(1)(c)] states that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian Tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities. This, however, does not preclude other Americans, who may have also suffered from social disadvantage because of racial or ethnic prejudice or cultural bias, from applying to the program.

Individuals who are not members of the designated groups may also apply for 8(a) certification. The Small Business Act [Section 8(a)(6)] defines economically disadvantaged individuals as "socially disadvantaged" individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities, the SBA shall consider, but not limited to, the assets and net worth of such socially disadvantaged individuals.

Whenever SBA computes the personal net worth for 8(a) Program eligibility, the Small Business Act [Section 8(a)(6)(e)] directs SBA to exclude the value of investments that disadvantaged owners have in their concerns and the equity in their primary personal residences except that any portion of such equity that is attributable to unduly excessive withdrawals from the concern shall be taken into account. Unduly excessive withdrawals are not defined in statute, but the Act [Section 8(a)(6)(c)] does require SBA to initiate termination proceedings or require the owner to reinvest the "unduly excessive withdrawals" in the firm when SBA determines that unduly excessive withdrawals have been made that are detrimental to achieving the firm's business development objectives.

Through the regulatory process SBA has established individual personal net worth thresholds for program entry, and participation during the developmental (first 4 years) and the transitional (last 5 years) stages. At program entry an individual

whose personal net worth (excluding the equity in the personal residence and the business) exceeds $250,000 will not be considered economically disadvantaged. In the developmental and transitional stages this threshold is set at $500,000 and $750,000 respectively.

**MINORITY ENTERPRISE DEVELOPMENT**

Much of the criticism of the 8(a) Program in the past has focused mostly on internal processes and procedures at SBA such as the lengthy application process, lack of program data and delays in contract awards. In this Administration, SBA has acknowledged these problems and addressed each one in a MED reform proposal, placing a greater emphasis on providing assistance to the participants and making it easier for procuring agencies to utilize the 8(a) process. This has been the underlying approach and philosophy for all of the changes and proposals, especially eliminating unnecessary requirements or processes and improving assistance that is provided to program participants.

Historically, Mr. Chairman, the efforts of the SBA to assist the minority business community, unlike its efforts to assist other small businesses, have focused almost exclusively on providing access to and assistance with government contracting.

The first step in improving the 8(a) Program was included in the Agency's overall reorganization. The Offices of Government Contracting and Minority Enterprise Development were placed under a separate Associate Deputy Administrator. This was done to take advantage of the capabilities and resources of the Office of Government Contracting in marketing and identifying contract opportunities for the 8(a) Program. The Agency has also downsized the central and regional office staffs and redirected those resources to the district offices to better serve our customers.

MED today represents a comprehensive approach to improve both the process operation of the 8(a) and, more importantly, to work toward providing more contact opportunities while also expanding Agency business assistance and training to a much broader base of eligible firms. MED is an effort to expand the program's mission to include the provision of comprehensive technical, business and procurement training. In our analysis of the portfolios of SBA programs, the Agency discovered that minority owned businesses as well as women-owned businesses were under-represented in almost all of the other programs and services of the Agency. SBA has broaden the outreach in its loan programs to provide greater access to credit for minority small businesses. One of our Office of Government Contracting's major priorities is to identify procurement opportunities for program participants. In cooperation with our Office of Small Business Development Centers the Agency is evaluating proposals to provide a structured counseling and training program for start-up and developing small disadvantaged businesses.

The administration of the program has been further streamlined with the elimination of MED Program responsibility at the Regional Office level in October 1994. This change moved many program responsibilities to the local district office, which empowered local officials and reduced the need for coordination, clearance and approval of specific actions at the regional level.

The Agency also believes that the contracting process could be substantially streamlined if the Congress granted SBA the authority to allow Federal procuring agencies to make direct awards of 8(a) contracts after SBA has determined that the firm is eligible for the award. This would free up our contracting personnel to provide assistance in marketing, bid and proposal preparation and negotiations rather than reviewing contract documents that have already been reviewed and executed by the procuring agency.

MED has developed a pilot program to test a simplified application and certification process. Under the proposal, application information will be verified prior to the newly certified firm receiving its first contract opportunity or at the annual review, whichever comes first. The application form for sole proprietorships is three pages, and can be reviewed in much less time than is now required for review. This will allow SBA to streamline its application process, reduce paperwork, and significantly decrease processing time. The Agency also believes that the application process could be further streamlined if the Congress would amend the Small Business Act to allow the Associate Administrator to delegate determinations of program eligibility to District Directors. The 8(a) Program has served as a valuable tool in providing the disadvantaged owners of small businesses access to the Federal procurement market; however, it has not fully met its business development objectives.

**EXPANDING 8(A) CONTRACT OPPORTUNITIES**

The General Accounting Office (GAO) and SBA Office of the Inspector General (IG) criticized the 8(a) Program because a few companies receive the majority of 8(a) contracts. The Agency agrees with their findings; however, factors beyond the control of SBA play a significant role in the distribution of 8(a) contracts.

It is important to realize that, in overall Federal contracting, a small percentage of firms also receive the majority of the Federal procurement dollars. For example, in FY 1993, 200 firms (representing the largest suppliers of Federal goods and services) received approximately 65 percent of all contract dollars for contracts awarded over $25,000 ($117 billion out of $180 billion). The concentration of contracts within the 8(a) Program is not unique, but is actually a reflection of the overall Federal marketplace.

8(a) firms are not different from other small businesses -- some will be more successful than others. Clearly, some 8(a) participants are more aggressive in marketing their firms than others, some have identified and developed a unique market niche, some provide outstanding customer service and contract performance, and some have the entrepreneurial spirit and tenacity that is necessary for effective market development and growth. Further, under the law, procuring agencies can nominate specific 8(a) firms for specific requirements. The Agency believes these factors make a difference and often determine what firm will get a contract award.

The determination of which firms receive 8(a) contracts, to a large degree, is determined by such factors as the firm's proximity to Federal agencies, capabilities of the firm, access to credit and capital, effective marketing, and the level of support received from each Federal agency. The current goaling process, which focuses only on total contract dollar awards, provides very little incentive for procuring agencies to utilize a larger number of firms or to consider identifying contract opportunities in different industries. Dollar goals can be met by awarding a few large 8(a) contracts to a few firms.

The Agency has taken several steps to broaden the distribution of 8(a) sole-source contracts. In February I issued a memorandum to all district directors directing each district to develop, in cooperation with our Office of Government Contracting staff, a strategic plan to increase the number of contract opportunities for a greater percentage of its portfolio. These plans will include initiatives to market the program to Federal procuring agencies and training of program participants.

SBA is working in other ways to increase the number of participants who actually receive contracts. SBA's Office of Government Contracting continues to take an active role in marketing and promoting the 8(a) Program. One of the major priorities of the Agency's Procurement Center Representatives is to work with SBA district offices and the 8(a) portfolio to identify additional contracting opportunities. The SBA has executed a Memorandum of Understanding (MOU) with the Department of Defense (DOD) to increase DOD awards to small disadvantaged businesses by five percent, with emphasis on the utilization of firms in the 8(a) portfolio. A key feature of this initiative is a commitment by DOD to give special attention to firms that have never received an 8(a) contract. SBA is negotiating with other Federal agencies and expect to execute similar MOUs or other agreements with those agencies.

Additional measures have been proposed by SBA to address this issue. These changes which were published for comment in the aforementioned proposed regulations would eliminate the definitions for local buy (except construction) and national buy 8(a) offerings. A local buy item is a service or product purchased to meet the specific needs of one user in one location. The Small Business Act [Section 8(a)(11)] requires that, to the maximum extent practicable, construction subcontracts awarded under section 8(a) shall be awarded within the county or state where the

work is to be performed. Currently, contracts classified as "local buys" can only be performed by firms located within the district office where the work is to be performed. The new rule will allow firms to market to the Federal government without geographical restrictions. Additionally, the Indefinite Delivery/Indefinite Quantity (IDIQ) contract "loophole" will be closed in the 8(a) Program to increase the number of contracts available for competition. The current regulation allows IDIQ contracts with a minimum value (not estimated value) below the competitive threshold to be offered on a sole-source basis. Many of these contracts are allowed to grow (through the issuance of task orders) to amounts greatly in excess of the competitive threshold. The new 8(a) regulation will establish the estimated value of the contract as the standard for competitive threshold evaluation, creating more opportunities for competition.

While these steps will likely assist in providing better distribution of 8(a) contracts, SBA does not believe this will guarantee equitable distribution of all 8(a) contracts. The 8(a) Program is self-marketed. This means that each participant must market and seek out contract opportunities. While the 8(a) Program provides opportunity and assistance necessary for participating firms to become competitive, it does not guarantee contracts or success. It does, however, in collaboration with other Federal agencies, offer management, technical assistance, and access to capital that will assist a company in its efforts to grow.

SBA also agrees with the comments provided to the U.S. House of Representatives by Mr. Ralph Thomas, NASA's Associate Administrator for Small and Disadvantaged Business Utilization, in his testimony before the House Small Business Committee on March 6, 1995, as summarized below.

> Presently, there is too much emphasis on the SBA's 8(a) Program as either the only vehicle or the primary vehicle to obtain the full integration of small disadvantaged businesses into the Federal procurement system. The 8(a) Program was designed to be a part of the solution -- not the entire solution. Within the same law that created the 8(a) Program, a number of other initiatives were authorized for the effective utilization of small disadvantaged businesses. Many of these initiatives have not been fully utilized by Federal agencies.
>
> For example, Section 211 of Public Law 95-507 added Section 8(d) to the Small Business Act to require that prime contractors with Federal contracts that exceed $1 million for the construction of any public facility or $500 thousand in the case of all other contracts establish percentage goals for the utilization of SDBs as subcontractors whenever subcontracting opportunities are present.

In FY 1993 small businesses overall received about $63 billion (out of about $180 billion) in Federal contract dollars. About one-third of that amount was from subcontracting. SDBs, on the other hand, received a little over $13 billion in Federal contract dollars but only one-sixth of that was through subcontracting.

In 1988 the General Accounting Office (GAO) conducted a mail survey of Federal contracting officers responsible for 8(a) contracts. The GAO survey report was positive with respect to the performance of 8(a) firms. Contracting officers reported that all or most of the delivery dates were met on over 75 percent of the 8(a) contracts and that for around 90 percent of the contracts the products or services delivered met or exceeded quality specifications.

GAO also found that the performance of 8(a) firms compared favorably with the performance of non-8(a) firms. The good performance of 8(a) firms continues today. For example, during fiscal years 1990 through 1994, 25,147 8(a) contracts were awarded. During this same period there were only 77 8(a) contracts terminated for default. This is a default rate of less than one-third of one percent. In summary, 8(a) firms have proven that, given the opportunity, they perform as well as, if not better than, non-8(a) firms.

## ADMINISTRATIVE IMPROVEMENTS

Historically, SBA has not met the 90-day statutory timeframe for processing 8(a) applications. However, in the last 11 months, SBA has made significant headway. SBA anticipates that by the end of the fiscal year our team will be processing consistently below the 90-day statutory requirement. While reducing processing time, SBA has also processed twice as many applications.

To assist in monitoring the 8(a) application process, SBA placed its Certification Tracking System (CTS) in full operation in November of 1993. It has become a valuable management tool which has helped to improve accountability.

Over the past eleven months SBA has moved aggressively to terminate those firms not in compliance with program regulations. All cases that have been referred to us by the Office of the Inspector General have been handled aggressively.

Historically, the SBA has been criticized for its failure to properly plan, develop, and implement an automated information system that allows the agency to collect, assess, and evaluate information regarding MED's programmatic performance. The Agency is building an information system that will monitor assistance provided, contract support, and firm development, and to measure program performance and accomplishment. Last summer, Deputy Administrator Pulley testified before the

Senate Small Business Committee that the Agency would complete our information system by the end of FY 1995. That commitment will be met.

**GOVERNMENT-WIDE SDB PROGRAM COMPARED TO SBA'S 8(a) PROGRAM**

Many interested in the MED program question whether the Government-Wide Small Disadvantaged Business (SDB) Set-Aside Program obviates the need for the 8(a) Program. This question is best addressed in terms of the stated purpose of both programs. 8(a) is a developmental program that addresses the historical lack of access to markets by firms owned by disadvantaged individuals. This program provides a logical, systematic approach to market access and enterprise growth over a nine-year term. Development is tracked through a business plan which is submitted by the firm upon entry into the Program and annually reviewed by SBA to determine progress and the need for developmental support. The award of Federal sole-source contracts through the 8(a) Program (although a very important component) is only one element in the overall formula used to encourage the development of 8(a) firms. SBA employs several other resources to support 8(a) firms including specialized training opportunities, professional consultant assistance through the 7(j) Program, and the opportunity to participate in high level executive development training.

The MED proposal recognizes that competition in the 8(a) Program would be duplicative of the government-wide SDB Set-Aside Program and has recommended that the 8(a) Program be used exclusively as a sole-source (non-competitive) program. This recognition responds to the fact that a number of disadvantaged owned firms have no prior Federal procurement experience and 8(a) would allow those firms the opportunity to gain this experience.

The SDB Set-Aside Program is intended to increase the amount of Federal contract dollars awarded to SDBs. This Program is a restrictive competitive procurement program. It does not include sole-source contracting or any developmental features. Companies that are involved in this program are considered to have the experience and capability to bid and perform on Federal contracts. This program represents a logical next step for 8(a) firms in terms of business opportunity, but should not be viewed as a substitute for the 8(a) Program.

The 8(a) Program provides a long-term commitment (through several modes of assistance) to the development of specific emerging firms, while the set-aside program has a singular focus -- opportunity for the participation of experienced SDBs within a restricted market.

**NEED FOR THE 8(A) PROGRAM**

As I mentioned earlier, only 2.7% of total procurement dollars were awarded to 8(a) firms in FY 1993. Adding the contracts awarded to small disadvantaged firms

through the SDB Set-Aside Program the total grows to only 5.8%. Based on the most recent data available from the Department of Commerce's Census Bureau, minority-owned businesses comprise only 8.8% of the total business population, while they comprise 26.3% of the general population.

The 8(a) Program serves to increase the participation of socially and economically disadvantaged individuals, particularly minority individuals, in our Federal procurement system. However, targeting Federal procurement is not unique to minority-owned businesses.

For example, to ensure that domestic products had an advantage over foreign markets in winning Federal contracts, Congress enacted the Buy American Act in 1933 which requires that domestic products receive six to twelve percentage preference points in certain procurements. This was done, in large part, to preserve the domestic mobilization base.

To ensure that a fair proportion of Federal contracts would go to small businesses, Congress created small business set-asides which require that certain contracts be set-aside for competition among small businesses only.

The original intent of Sections 8(a) and 8(d) of the Small Business Act, simply put, is to assist in developing small businesses owned, managed, and controlled by persons who have been determined to be socially and economically disadvantaged. The primary assistance vehicle is the award of sole-source and competitive Federal contracts to certified firms under the Section 8(a) authority. Section 8(d) focuses on ensuring that small disadvantaged businesses receive a fair share of subcontracts from large Federal prime contractors. 8(d) requires percentage goals and subcontracting plans for utilization of small disadvantaged businesses, from offerers or bidders on Federal contracts in excess of $1,000,000 for construction contracts or in excess of $500,000 for all other contracts.

In passing P.L. 95-507 in 1978, Congress codified the 10-year efforts of SBA to use the Section 8(a) authority to assist in developing small disadvantaged businesses. Congress made specific findings to support the need for the 8(a) Program based on the economic plight, and the discriminatory treatment, of members of designated minority groups.

At this juncture in the history of the 8(a) and other minority small business assistance programs, the question asked can be whether the purposes of the programs have been fulfilled. The mere existence of the 8(a) Program has increased the business ownership aspirations of members of designated minority groups. Knowing that the 8(a) Program is available to soften the impact of social and economic disadvantage has caused some minority individuals to go into business when they might not have otherwise. This is particularly true for certain types of businesses that

minorities have traditionally not pursued. The 8(a) Program also provides private sector jobs in high wage industries. Professional services, construction, and manufacturing industries pay higher than average wages to those workers producing goods and services purchased by the Federal government.

Congress found in 1988, when enacting P.L. 100-656, that the need for the 8(a) Program was just as valid then as it was at its inception. SBA believes there is evidence that the 8(a) Program has indeed fostered business ownership by socially and economically disadvantaged persons, as intended by Congress. But the participation of minority-owned firms in federal procurement still is comparatively small. The President's review, consequently, is studying alternatives for the program's future direction.

**CONCLUSION**

Over the past twenty-five years, SBA's use of its 8(a) contracting authority, not withstanding its problems, has done much to assist socially and economically disadvantaged entrepreneurs. The 8(a) Program has spurred creation of minority-owned businesses in all industrial sectors and unleashed innovative entrepreneurial potential. It has fostered formation of capital and increased access to credit in the minority business community. The program also has provided diverse employment opportunities for economically and socially disadvantaged employees.

This concludes my testimony. I will be happy to answer any questions you may have.

92-035 0 - 95 - 2

ADVOCACY & CONTRACT OPPORTUNITIES

# SBA Government Contracting

## Prime Contracts

| | FY90 | FY91 | FY92 | FY93 | FY94* |
|---|---|---|---|---|---|
| Total Awards | 177.8 | 190 | 180.3 | 179.4 | 160.1 |
| Small Business Awards | 36 | 43.2 | 41.3 | 42.2 | 36.7 |
| Small Disadvantaged Business Awards | 5.5 | 7.8 | 8.7 | 10.5 | 6.1 |
| Women Owned Business Awards | 2.3 | 2.8 | 2.8 | 3.2 | 1.9 |




*estimate

## Status of 8(a) Processing

**FY 93-95 APPLICATIONS COMPLETED**

**With Average Processing Time (APT) in Days - At Year End**




| | FY 93 | FY 94 | FY 95 PROJ |
|---|---|---|---|
| Applications | 819 | 1,536 | 1,644 |
| Days - - - - - | 207 | 136 | 89 |

*Increase in number of applications processed FY 93 to FY 94 - 88%*
*Decrease in number of processing days FY 93 to FY 95 - Year to Date 93 days*

## NUMBER OF 8(A) PROGRAM PARTICIPANTS




| Fiscal Years | FY 90 | FY 91 | FY 92 | FY 93 | FY 94 | FY 95 |
|---|---|---|---|---|---|---|
| | 3,673 | 3,925 | 4,509 | 4,848 | 5,613 | 5,356* |

* Note: Decline from FY 1994 to FY 1995 program participation reflects termination of 302 firms from the 8(a) program.

# 8(a) Alumni




| Reporting Year | FY 91 | FY 92 | FY 93 |
|---|---|---|---|
| Number | 507 | 565 | 710 |
| Full Operational | 246 | 301 | 395 |
| Curtailed | 9 | 24 | 41 |
| Acquired | 12 | 5 | 22 |
| Ceased | 240 | 235 | 252 |

*Each reporting year includes data on firms exiting the program over the prior three fiscal years (e.g., FY 1991 includes firms exiting the program during fiscal years 1989 thru 1991).*

## 8(a) Contract Actions vs Total Federal Contract Actions by SIC Code FY 1993




| | Agriculture | Mining | Construction | Manufacturing | Transportation | Wholesale trade | Retail trade | Finance | Services | Public Admin. | Non-Classifiable |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8(a) Actions | 556 | 16 | 8,213 | 2,238 | 838 | 762 | 637 | 7 | 12,738 | 0 | 0 |
| Federal Proc. Actions | 3,471 | 580 | 64,180 | 150,306 | 28,927 | 14,534 | 2,134 | 12,943 | 161,995 | 1,594 | 3,948 |
| Percent 8(a) Actions | 16.0 | 2.8 | 12.8 | 1.5 | 2.9 | 5.1 | 29.9 | 0.0 | 7.9 | 0.0 | 0.0 |

# FEDERAL CONTRACT AWARDS OVER $25,000

## Fiscal Year 1993




**Total Awards $178,765,055,000**

# FEDERAL CONTRACTS OVER $25,000

## by Competitive and Sole Source Awards
## Fiscal Year 1993



# MINORITY ENTERPRISE DEVEOPMENT



Chairman BOND. Thank you very much, Mr. Lader. Before beginning the questions let me welcome two more of our members who have joined us to see if they have any opening statements. Mr. Frist.

Senator FRIST. I do not at this time, Mr. Chairman. Thank you.

Chairman BOND. Mr. Lautenberg.

Senator LAUTENBERG. Thanks very much, Mr. Chairman. I do commend you for holding this hearing. I ask consent that the full statement that I have prepared be included in the record and I would just make a couple of short remarks.

Chairman BOND. Without objection, it will be accepted. Thank you.

**OPENING STATEMENT OF THE HONORABLE FRANK R. LAUTENBERG, A UNITED STATES SENATOR FROM NEW JERSEY**

Senator LAUTENBERG. This is a program that has, I think, a great deal of merit. Its mission is one that we would like to see accomplished—which is—to increase the number of entrepreneurs in the minority community, so that they might be able to have a chance to live the American dream and to participate fully in our economic affairs.

So, Mr. Chairman, I think it is fair to say that this hearing is about whether or not this program should be continued with some vigor and some support or whether or not we are going to let it languish on the vine. I hope that the former is the truth, and I look forward to the continuing information developed from this hearing. Thank you very much.

[The prepared statement of Senator Lautenberg follows:]

**OPENING STATEMENT OF SENATOR FRANK R. LAUTENBERG**
**COMMITTEE ON SMALL BUSINESS**
**APRIL 4, 1995**

I thank the Chairman for holding this hearing. Today we examine the SBA's 8(a) program. It has recently come under increased scrutiny due to the Majority Leader's speech calling for its termination. I think it's fair to say this hearing is not about whether the federal government should affirmatively assist small businesses. Rather, this is a hearing about whether the federal government should provide special assistance to minority-owned small businesses.

There are problems with the 8(a) program. We have known that for years and Congress has repeatedly tried to remedy the problems.

Last year the Senate unanimously passed legislation that sought to prevent further abuses and to increase the opportunities of firms in the program. That bill, sponsored by Senator Kerry, was cosponsored by many members of this committee -- members of both parties. We should not throw out a program which received such large bipartisan support just a few months earlier. We should, however, enact the reforms.

I believe there is a continuing need to create programs like 8(a) to help minority-owned ventures.

The facts are beyond dispute: for a variety of reasons, minority-owned small businesses have a harder time competing for contracts and securing capital than do other similarly situated enterprises. That reality, in my view, justifies a federal response.

The 8(a) program is designed to help small disadvantaged firms, for a relatively limited period of time, get the experience, contracts, and reputation which will allow them to compete on an equal basis with other firms.

This program awards a small percentage of procurement contracts to qualified and competent firms participating in the 8(a) program.

For many companies, the contracts received through their participation in 8(a) provide them with the necessary capital to build up an inventory, hire additional employees, and invest in better equipment -- all of which permits them to become more competitive.

Support for the concept behind the 8(a) program, however, is not the same as support for the way the program operates. There are problems in the 8(a) program. Let me list just a few:

* Too few firms get too much of the money;

* Most of these firms seem to be located within the Beltway;

* Many of the firms in the program become too reliant upon federal contracts, especially sole-source contracts, and do not take advantage of the program to become more competitive;

* Some agencies seem to be thwarting Congressional intent by ignoring the thresholds over which contracts must be awarded competitively;

* Successful firms that can compete in the open market are allowed to remain in the program until their term expires; and

* Anti-fraud provisions in the program are not strong enough.

Those concerns motivated Senator Kerry and many of us on this committee to support legislation designed to prevent abuses and increase the opportunities for more firms to participate in the program.

But now, instead of fixing the program, some want to abolish it. I disagree. While the 8(a) program has problems, if we agree with the principles upon which it is based, then we have a duty to fix it. We can do that if we use last year's reform proposal, S. 2478, as a starting point.

In fact, if our witnesses today are familiar with that bill, I would ask them to indicate in their statements whether they believe it would adequately respond to the most commonly identified problems in the 8(a) program.

Let me make one final point. The issue of affirmative action is controversial.

Claims of "reverse discrimination" raise profound questions about government policy and public morality. The concept that we may owe something to those who have suffered from historic, if not current, discrimination is complicated. But we should not approach them from the perspective of partisan politics. There is too much at risk here for that.

And I am sure, Mr. Chairman, that this committee and this Congress will accept the responsibility of looking at these questions calmly and rationally rather than simply trying to fuel the fires of passion and hatred which this issue can ignite.

Chairman BOND. Thank you very much, Senator Lautenberg.

Mr. Lader, we have the 8(a) program. Let's begin with a hypothetical. What if the program no longer had authority to set aside contracts for certified 8(a) programs. Just as a hypothetical, could you describe the minority business development activities that the agency would continue to perform? What can you do in addition to this program to assist the minority or disadvantaged businesses?

Mr. LADER. Senator, let me respond in two ways and then ask Cassandra Pulley to add further thoughts on this. First, in terms of the overall programs we have underway, the cornerstone of our Government-guaranteed effort is the 7(a) program, as you are aware. As I mentioned in my opening statement, we have made significant progress in education and in our district offices in the field to make sure that minorities, socially and economically disadvantaged persons who own businesses, have opportunities to have access to the 7(a) programs.

In the Microloan program, about a third of the current portfolio of those loans has been extended and is available to, and been taken advantage by in the best sense of that, such firms. You can see that in the counseling that is done by our retired executives in locations all over the country in the SCORE Program and the 900 small business development centers providing technical training assistance. All of those programs are available in addition to the 8(a) program.

But my second point is this, before turning to Ms. Pulley. I do not have a crystal ball as to what would happen if there were not an 8(a) program, but I can read history. When I look back to 1965 when there was some tampering with the small business set-aside program and by 1969 there was an 18 or 20 percent decrease in small business participation. That was just tampering with the small business set-aside program. There was this decrease in the small business participation in overall Government contracting.

That is why, notwithstanding all of the other efforts that we have within the agency, we are concerned as to what happens with 8(a) and its impact on minority participation in Government contracting.

Let me ask Ms. Pulley to respond as well.

Chairman BOND. Ms. Pulley.

Ms. PULLEY. Mr. Chairman, as the administrator said, we have undertaken a major effort to include minority-owned businesses in all of the agency's programs, which unfortunately, has not been the case in the past. Primarily minority firms were participating in the 8(a) program which is just contracting and not in the additional loan and business and educational programs that the agency offers. Without 8(a), certainly that commitment would continue, but it would be a significant drop and a significant loss to the minority business community without the access to Government contracting and the procurement opportunities.

Chairman BOND. Mr. Lader, I often hear comments about the net worth ceiling. As I understand the current rules, if your net worth is not greater than $250,000, excluding the value of your business and residence, you are economically disadvantaged. Did you say that the average net worth of new entrants in the 8(a) program was $53,000?

Mr. LADER. $54,000.

Chairman BOND. Do you have an idea what percentage of our population in the United States has a net worth that exceeds this ceiling? In other words, if you took out their residence and their primary business investment, what percentage of the population in the United States would exceed that ceiling?

Mr. LADER. I do not have the specific percentage of that. Let us get that for you.

[In response, Mr. Lader submitted the following:]

Information abstracted from the Federal Reserve Board Consumer Finance Survey (1992) indicates that 19.4% of the families that own businesses in the United States exceed the entry level ceiling ($250,000, excluding primary residence and business equity) for participation in the 8(a) Program as defined by SBA regulations. In terms of continuing 8(a) Program eligibility criteria ($750,000 with the aforementioned exclusions) 8.4% of families owning businesses in the United States would exceed the net worth ceiling as defined by SBA. It should be noted that the Federal Reserve data is based upon family net worth, while the SBA definition refers to individual net worth.

Chairman BOND. It might be interesting to find that out. Could you describe briefly how the 7(j) program works and how many grants are normally awarded annually?

Mr. LADER. Let me address that and ask Ms. Pulley to. But as a prefatory note, let me refer back to your prior question, if I may, Mr. Chairman, because the concern about this net worth requirement and why there is equity in the residence and the business is excluded. I just want to add quickly, as most Americans homes are typically mortgaged. So the value of the home is not a fair way to be added to the net worth in that sense. In addition to that, homeownership is a great American tradition and we do not want to discourage participants in this program from home ownership.

Similarly, because many of these companies, virtually all of them are privately held, and as those of you who have held and brought businesses public well understand, it is very difficult to ascertain the market value of a business in the private market, particularly when it is very small. Consequently, what would be the value of the entrepreneur's ownership in his own business would be very difficult at best.

[An explanation as mentioned in the conference report, Public Law 100–656, follows:]

AN EXCERPT FROM THE LEGISLATIVE HISTORY OF THE BUSINESS DEVELOPMENT REFORM ACT (P.L. 100–656)

The conferees are aware that the Administration has already taken steps to establish a threshold of net personal worth for the purpose of program admission. However, the conferees are concerned that the threshold established by the Administration includes the value of an applicant's business assets and primary personal residence in such individual's personal net worth.

Because of rapidly escalating real estate values and the wide disparity of real estate prices around the country, the conferees believe that the inclusion of the value of a primary personal residence in calculations of net worth may lead to inequitable treatment of homeowners in some areas. With regard to business assets, the conferees believe that the value of such assets are more properly considered in the context of the firm's ability to compete, and not as an element of personal net worth.

For this reason, the conference amendment requires that the Administration exclude the value of business assets and individual equity in a primary personal residence from calculations of personal net worth. At the same time, the conferees direct the Administration to take appropriate steps to ensure that these exclusions are not subject to abuse. Although the value of business assets and primary personal residence are not to be considered as an element of personal net worth, the conferees

anticipate that the Administration will consider whether such business assets and residence give an individual access to capital or loans such that he or she should not be considered to be impaired in his or her ability to compete.

Mr. LADER. Coming to your 7(j) question. About 65 percent of the 7(j) funds are directed toward 8(a) firms. In other words, more than half of the funds available for minority economic business training and development, of which there has been some very interesting new programs developed in the past year, are devoted to 8(a).

But let me ask Ms. Pulley to respond as well.

Ms. PULLEY. In terms of how the program has been administered in the past, Mr. Chairman, basically we have polled each of our district directors and asked them to review the business and technical assistance needs of the 8(a) companies in their districts. Then, we allocated from the central headquarters pool of funds to each district director based on the percentage. We then subcontracted with individual providers of business and technical assistance, whether it was in helping prepare a business plan, or accounting, marketing assistance—in that way.

As part of our Reinvention II efforts, we are changing the way we manage the 7(j) program. What we will do is combine those funds with the SBDC funds and the funds available in the Office of Women's Business Ownership under the Demonstration Program and allocate those to each district director. We believe that what that will do is enable us to manage the funds more efficiently, reduce the administrative overhead in Washington and eliminate the duplication in administering those programs as well as allow for efficiencies in terms of service delivery. Perhaps the SBDCs can provide some of the individual counseling that the 7(j) program does right now. So those are the changes we have proposed in reinvention.

Chairman BOND. Thank you very much, Ms. Pulley.

Now I turn to our ranking member, Senator Bumpers.

Senator BUMPERS. Thank you, Mr. Chairman.

Mr. Lader, you are familiar with the Kerry bill that passed the Senate last year?

Mr. LADER. Yes, Senator.

Senator BUMPERS. What is your present view of that bill?

Mr. LADER. To the extent that any of those reforms can be done administratively we have been taking action to move in that direction. We are supportive of that bill, and we believe that having a more comprehensive approach, including training and dealing with the local versus national buy questions and some of the other technical provisions of that legislation, would be effective.

Senator BUMPERS. As I understand the bill it also provided that SBA, which is now the sort of prime contractor and the 8(a) contractors are essentially subcontractors, SBA is simply an intermediary between the Federal agency and the 8(a) contractor. As I understood the Kerry bill, it would remove the SBA from that function and 8(a) contractors would go directly to the agencies. Do you find any fault with that?

Mr. LADER. Ms. Pulley and I have been deeply engaged in this discussion. I personally support that view. Let her address our common belief on that.

Senator BUMPERS. Ms. Pulley?

Ms. PULLEY. Senator Bumpers, we are very much supportive of that notion. We did, as you are aware, a number of brainstorming sessions around the country last year reviewing the 8(a) program as part of our comprehensive plan to restructure the program. One of the things we heard consistently all over the country from both procuring agencies and from 8(a) companies, was that there was no real value added from SBA being a part of the process.

In addition, from my perspective as the chief operating officer of the agency, it is an inefficient use of our resources. Certainly to the extent that newer 8(a) firms might need assistance in the negotiation process, we could make available our contracting offices to assist. In terms of the contract being assigned to SBA and then being subcontracted out, we see no real value.

The other problem with it is that it has been part of the misconception among many in the 8(a) community and outside of the community that SBA has contracts to award. So instead of people coming into the program fully understanding that it is a self-marketing program and that, essentially, the contracts a company gets are the contracts it self-markets, there is a perception that once you are certified for 8(a) participation, the agency has contracts to give. So, in general, I think it would be a much, much more efficient system if contracting agencies directly contracted with the suppliers.

Senator BUMPERS. It is sort of the old 1207 program that the Defense Department used, is it not? Doesn't the Defense Department contract directly with 8(a) firms?

Ms. PULLEY. Yes.

Senator BUMPERS. And so far as I know, that program has worked reasonably well for the Defense Department. Has it not?

Ms. PULLEY. Yes.

Senator BUMPERS. As a matter of fact now, and one of the questions, Mr. Lader, that I was going to ask is that since the section 1207 program from DOD is going sort of Government-wide, where does that leave the 8(a) programs, insofar as SBA is concerned? I mean, if we are going to go Government-wide with what is basically the old 1207 program, that essentially means minority business contracting is going to be direct, does it not?

Ms. PULLEY. Actually, Senator Bumpers, the 1207 program, as I understand it, is the Defense Department's small disadvantaged business program which is in addition to the 8(a) program.

Senator BUMPERS. But do they not overlap?

Ms. PULLEY. Actually, they are different programs.

Senator BUMPERS. I understand that.

Mr. LADER. Let me interrupt, if I might, in terms of the distinction, and Cassandra certainly will embellish this. The 8(a) program is a means by which this comprehensive approach can be taken for businesses of certain ownership to ensure that they can, not only have access to, but essentially grow as businesses, have the training, the technical assistance, and the like.

The small disadvantaged business program includes typically more mature businesses of a similar profile, but not necessarily those which are getting the more comprehensive Government assistance. Excuse my interrupting, Cassandra.

Ms. PULLEY. I think, Senator Bumpers, that the Government-wide 1207 program will benefit the procuring agencies as much as the 8(a) firms, because it will provide an additional tool for them to reach the 5-percent goal for contracting with small and disadvantaged businesses.

The 8(a) program is a program of great value to procuring agencies, in terms of a simplified, shortened contracting process. So I do believe that the programs go hand-in-hand.

Senator BUMPERS. They self-certify under the 1207 program, do they not?

Ms. PULLEY. Yes, sir.

Senator BUMPERS. Thank you, Mr. Chairman.

Chairman BOND. Thank you very much, Senator Bumpers. Senator Frist.

Senator FRIST. Thank you, Mr. Chairman.

Mr. Lader, in your testimony you stated that SBA's program provides a logical, systematic approach to market access and enterprise growth over a 9-year term. Can you give me some sort of feel for the average firm? How long is the average firm in there, in the program, over these 9 years?

Ms. PULLEY. That is a bit difficult to answer because the term of the program has changed. The fixed participation term has changed over time. Because it is a 9-year term, and both the 9-year period and the revision came in 1988, it is very difficult because prior to that time it was a 5-year participation with an option for a 2-year extension.

I will take a winger and say that probably about 7 or 8 years is probably average, but it is very difficult to judge because you are looking at a 25-year period and there have been several different revisions on the term of the program.

Senator FRIST. Is there an average or some very short term and some would be in there for a very, very long term? Is there any shape to the curve, or is it hard to know?

Ms. PULLEY. I would imagine that the top of the bell would be at about 7 or 8 years. With some companies, again, when you look at the total number of firms certified in the program, you also have to factor in those companies that are in the program that never get any contracts; those companies that go out of business while they are in the program—those companies that grow beyond the small business size standards and are no longer eligible for participation. There are any number of factors that weigh into that, and it is very difficult.

Mr. LADER. And Senator, let us emphasize, as you and your colleagues understand from your own personal and families' business experiences, this curve is not that greatly different from traditional business experience in terms of the maturation of a business, the fall out of some and the period of time it takes for them to really earn their stripes.

Senator FRIST. Second, in your testimony you have said, I think it was on page 12, the agency also believes that the contracting process could be streamlined substantially if Congress granted the authority to allow Federal procuring agencies to make direct awards of 8(a) contracts. And you go to say this would free up contracting personnel.

How much would that help? How much of a problem is that? Would that be significant streamlining?

Mr. LADER. I will give you this example in terms of our agency: 3 percent of our budget is consumed by the administration of this program. It is a relatively small amount, but every amount is a further taxpayer savings. About 10 percent of the SBA personnel is devoted to the administration of this program. And so, while we have just proposed a significant reinvention, saving about 32 percent of our budget, this 10-percent commitment of our personnel is the minimum necessary, as we see it, for the administration of this program.

Ms. PULLEY. Senator, I think the efficiencies are not only within the agency, but also within the Government. And I think that is the significant improvement. I think it is very cumbersome for many procuring agencies to contract with the SBA. Every time you add another person into the loop, it almost always lengthens the time required, so I think it would be.

But it would also free up people we now use to process paper to work more with the companies in terms of business development and marketing themselves to the procuring agencies.

Senator FRIST. Good. Thank you, Mr. Chairman.

Chairman BOND. Thank you very much, Senator Frist. Senator Lautenberg.

Senator LAUTENBERG. Thank you, Mr. Chairman.

Mr. Lader, I noticed in your prepared testimony that a fairly significant number of the top 100 African-American and Hispanic owned firms are or were in the 8(a) program. That is a statistic you should be proud of. But it seems to me that if any of those firms still participate in the program, we ought to look fairly closely at that. Do you know whether those in that top group there are currently participants in the 8(a) program?

Mr. LADER. Yes, there are. I do not know that specific number.

Ms. PULLEY. I do not know the specific number, but there are a few. But again, I think it is important to look at the size of the top 100 African-American or Hispanic-American owned firms. That number is in terms of gross revenues. The 100th company is not necessarily that large, and they almost all fall still within the definition of a small business.

Mr. LADER. Senator, two further points, if I might offer. If one looks at the 10 American companies which earn the largest share of Government procurement, you will see that there is great concentration of procurement dollars in a relatively small percentage of overall firms. Any of these 100, as Cassandra has indicated, on the African-American businesses are dwarfed in comparison with those businesses.

The second point is, although there are firms currently participating in the 8(a) program listed in that, that is a sign of the success. We do not want to penalize businesses which are successful in creating jobs, in earning revenues, for participating in this program.

Senator LAUTENBERG. By the same token, however, we would like to see as many minority owned firms participating as can be. Is there not some crowding out, if we take the most successful firms—and I do not know what the relative relationship is between

let us say the top 100 of non-minority versus minority. I am sure it is significantly different.

But we ought to, as much as possible, be including as many of the minority owned businesses as possible. And how do the others survive? Are there no successful businesses beyond that 100? How do they survive if they are not participating in these programs?

Mr. LADER. Two specific responses. We certainly agree with that premise, in terms of the participation of more than those 100 firms. And for that reason, the Department of Defense is undertaking an initiative which we support and applaud, and have worked with them, to try to ensure that as they look to other procurement, they look to 8(a) firms that have not participated thus far, have not received contracts. That is my second point.

Of the 5,400 currently certified firms, only about half of them actually have been getting contracts. And so, this is a self-marketed program. Our job is not to guarantee work, Government contracts to these firms, but it is to allow them to have this extra threshold. Consequently, the effort by the Department of Defense, and we hope increasingly Government-wide, to look to other 8(a) firms who can participate in contracts will be very useful to broaden that participation.

Senator LAUTENBERG. I would encourage that. We read and we see reports about front companies. Everyone knows about this problem. I wonder if you or Ms. Pulley can tell us, how prevalent is this problem? It seems to be endemic to the whole program, but I am not sure that that is the case. What do you think about that?

Mr. LADER. Let us both respond. If I can, as a prefatory note, mention that part of the reason for the paperwork that we have—and we have been trying in this administration to streamline the paperwork as much as possible at SBA—quite frankly is to get into the backgrounds of these firms, find out who are the controlling parties, and locate the capital that has been presented.

And consequently, it is that delicate equation of, on the one hand, requiring too much information and burdening the person seeking certification versus making sure that the legitimate statutory purposes are being addressed. Let me ask Cassandra to give you some more anecdotal response.

Ms. PULLEY. Senator, one of the proposals that we made when we reviewed the MED program last year was to delegate certification to our district offices. And one of the reasons we did that was because we wanted to put certification closer to where the companies are located. Right now certification is based almost exclusively on reviewing paper. We do not know the companies that we review, and I think that is one of the reasons that such a large percentage of the certified companies are not getting business—they are not necessarily ready to go after Government contracts.

What we would like to do is to, one, develop a more comprehensive training program so that the agency has an opportunity to work with these companies from the time they first indicate an interest in getting into Government contracting. By the time they are ready for certification, we will know who owns that company and who runs that company, and we will know it because the people in our district offices will be working very closely with them.

The second point I wanted to make in terms of that, is one of the reasons again, we want to delegate the contract award back to the procuring agency is that again our people—those people right now who are involved in signing the papers on the contract—will have a better opportunity to work with a Government agency.

And what we were proposing to do, in delegating contracting authority to the procuring agencies, was not just giving them goals in terms of the numbers of contract dollars which is what they have right now, but also goals in terms of both the number of contracts and the number of contractors, which will further assist us in spreading the 8(a) program around to more companies, which, I think, is a very valid concern.

Senator LAUTENBERG. If I might, Mr. Chairman, just one thing to follow up here, and that is do you believe that this is a significant problem or is it, in your judgment—you know, you have people out in the field, you hear from them and so forth—is this a problem that is a relatively small one? As you see it.

Ms. PULLEY. I think it is a relatively small one, and I think that is what the 1988 legislation did. It was designed primarily to address the issue of fronts, and that is why the process of certification right now is so very extensive.

Senator LAUTENBERG. Without evidence to the contrary, I can tell you what I hear is that it is a serious problem and one that I think has to be further investigated and I hope you have the resources and the capacity to do that, because I would like to hear further about it.

Chairman BOND. Thank you very much, Senator Lautenberg. We will have further questions for the record and perhaps the witnesses can answer that for the record. We will turn to Senator Burns now.

[The prepared statement of Senator Burns follows:]

**OPENING STATEMENT OF SENATOR CONRAD BURNS**
**Committee on Small Business**
**April 4, 1995**

Thank you, Mr. Chairman, for holding this hearing. I only have a few brief comments.

I will be interested to hear the testimony of those present today, for there are numerous 8(a) firms operating in Montana.

I know the 8(a) program has had some difficulties in the past. Thus, I am interested in looking closely at the current program and in hearing more about what the Small Business Administration hopes to accomplish with this program in the future.

I applaud recent efforts to reinvent and downsize the federal government. I also strongly believe that it is time to look at every government program. No program should escape scrutiny for any reason, and that includes the 8(a) program.

For that reason, I look forward to the witnesses giving their views and concerns about the 8(a) Minority Business Development Program. Today this program should be subjected to scrutiny in the same manner as every other government program.

Senator BURNS. I have just one question, I think, and maybe a follow up. How many SBA dollars do we have committed right now to 8(a) Programs that we are liable for, either through guarantee or direct loans?

Ms. PULLEY. None. Do you mean how much of our operating budget is it? $23 million. That is administrative, salary and expense money.

Senator BURNS. How many dollars, how many loans do we have out there? I am sorry, 7(a).

Mr. LADER. The current 7(a) portfolio is about $23 billion of Government guaranteed loans, and the average Government guarantee is 78 percent in that portfolio. But that is a separate program, as you are aware, from the 8(a) program.

8(a) participants are eligible to get 7(a) loans, but there is no direct correlation between those numbers.

Ms. PULLEY. Actually, Senator Burns, there are very few 8(a) companies in the 7(a) program, because 8(a) firms need accounts receivable financing. Our 7(a) program is essentially a term loan program. So, it is not necessarily an appropriate match of financing.

Senator BURNS. Thank you.

Chairman BOND. Thank you very much, Senator Burns. Actually, if my colleagues have no objection, we will reserve further questions for the distinguished witnesses from the SBA for written submission. We have the good fortune of being able to work with Mr. Lader on a day to day basis, and we will move on to the other panels, some of whom are not quite as accessible.

I want to express my sincere thanks, Phil, to you and Cassandra, for your help today on this program. Thanks for the information. We will keep the record open for you to respond to any additional questions.

Our second panel is a Government panel, Ms. Judy England-Joseph, Director of the Housing and Community Development Issues, Resources, Community, and Economic Development Division of the General Accounting Office; and Mr. R. Noel Longuemare, Principal Deputy Under Secretary of Defense for Acquisitions and Technology in the Department of Defense.

There is nothing like having long enough titles so that the witnesses can be seated while we are reading the titles. We thank you very much for joining us today. Ms. England-Joseph, would you begin?

## STATEMENT OF JUDY A. ENGLAND-JOSEPH, DIRECTOR, HOUSING AND COMMUNITY DEVELOPMENT ISSUES, RESOURCES, COMMUNITY, AND ECONOMIC DEVELOPMENT DIVISION, U.S. GENERAL ACCOUNTING OFFICE

Ms. ENGLAND-JOSEPH. Thank you, sir.

We are pleased to be here today to discuss the Small Business Administration's 8(a) Business Development Program. As you recall, Mr. Chairman, our testimonies over the years have discussed the difficulties that SBA has had in implementing many of the changes mandated by the Business Opportunity Development Reform Act of 1988 and subsequent amendments.

Our testimony today is based on the work we did in 1992 and 1993, updated to reflect recent activities. We will focus on SBA's progress in implementing key changes that are designed to make the 8(a) program an effective business development program.

In summary, Mr. Chairman, the 8(a) program undoubtedly has helped some firms to successfully compete in the commercial marketplace. Our testimony today focuses on several of the program's weaknesses that are preventing some firms from obtaining experience essential to their development.

Although the total dollar value of new contracts awarded competitively grew during fiscal year 1994, Federal procuring agencies limit firms' opportunities for competition under the 8(a) program. The concentration of contract dollars in a few firms continued in 1994, limiting the developmental opportunities available to many firms. And, while SBA has approved business plans for most firms, it has not given that same attention to annually reviewing these plans to ensure that they accurately reflect the firms' development goals and contract needs.

Moreover, many firms nearing the end of their program terms are still dependent on 8(a) contracts. These firms will thus leave the program without an adequate base of non-8(a) work, raising doubts about the firms viability in the commercial marketplace.

The 8(a) program is one of the Government's primary vehicles for developing small businesses that are owned by minorities and other socially and economically disadvantaged individuals. As of January 1995, 5,293 firms were in the 8(a) program. In fiscal year 1994, about $4.37 billion in contracts were awarded to 8(a) firms. Firms participate in the program for a maximum of 9 years.

In updating our previous work, we found that competitively awarded 8(a) contracts have increased. New contracts that were awarded competitively during fiscal year 1994 totaled about $383 million. This amount represented about 18.5 percent of the $2 billion in new 8(a) contract dollars awarded during fiscal year 1994, and an 11-percent increase over the contract dollars that were awarded competitively in the prior fiscal year.

We also found that contract dollars are still concentrated in a small percentage of firms. In fiscal year 1994, 50 firms, or about 1 percent of the firms in the program, received 25 percent of the dollars. Further, as 8(a) contract dollars continue to be concentrated in a few firms, many firms do not receive any 8(a) contracts. According to SBA, about 56 percent did not receive any program contracts during the fiscal year.

A key reason, according to SBA officials, for the continuing concentration of contract dollars among relatively few firms is the conflicting objectives confronting procuring officials. The primary objective of agency officials, in SBA's view, is accomplishing their agency's mission at a reasonable cost, and the business development objectives of the 8(a) program are secondary.

Moreover, agency procurement goals for the 8(a) program are stated in terms of dollar values of contracts awarded. According to SBA, the easiest way for agencies to meet their goals is to award a few large contracts to a few firms, preferably firms with which the agency has had experience and knows their capabilities.

In preparing for this hearing, we also found that business plans are not annually reviewed. Business plans help to develop firms by setting forth, among other things, development goals and objectives and future contract activity, both in the 8(a) and non-8(a) area.

Data provided by SBA field offices shows that about 85 percent of the firms have new business plans that have been approved, but only about 57 percent of those firms' plans had been reviewed annually.

And finally, we found that success in meeting 8(a) and non-8(a) business mix levels is very limited. To increase this program's emphasis on firms' development and viability, there is a requirement that there be both an 8(a) and a non-8(a) contract activity level. What we found, based on data SBA provided to us in February 1995, was that 63 percent of the firms in the fifth through the ninth year of the program met or exceeded the minimum non-8(a) business levels while 37 percent did not meet the minimum levels.

Furthermore, for those firms in their final year that did not meet their non-8(a) business levels, their non-8(a) business comprised, on the average, only about 34 percent of their contract dollars. If you look at the top 50 firms, for example, very few of them are meeting their required non-8(a) business mix. Only nine of those firms met their minimum non-8(a) business levels.

In closing, Mr. Chairman, while SBA continues to make progress in improving the 8(a) program, continuing weaknesses with certain aspects of the program deny opportunities for certain small businesses to obtain business development experience. Over the past years, SBA has paid considerable attention to ensuring that firms have new or revised business plans, but they are not conducting annual reviews of these plans on a regular basis. Also, we continue to have concern about the extent to which firms are achieving the requirement mix of 8(a) and non-8(a) contracts. For firms leaving the 8(a) program still are heavily dependent on the program for their livelihood, as in the case with many of the firms nearing the end of their program term, survival outside the program will be even more challenging.

That ends my prepared remarks, Mr. Chairman. I would be happy to answer any questions you might have.

[The prepared statement and attachments of Ms. England-Joseph follow:]

Statement of Judy England-Joseph, Director
Housing and Community Development Issues,
Resources, Community, and Economic Development Division
U.S. General Accounting Office

We are pleased to be here today to discuss the Small Business Administration's (SBA) 8(a) business development program. This program provides federal contracts to small businesses that are owned and controlled by socially and economically disadvantaged individuals to help these firms develop their business skills and become viable businesses. Firms in the program are eligible to receive financial, technical, and management assistance from SBA to aid their development.

As you may recall, Mr. Chairman, our testimonies over the years have discussed the difficulties that SBA has had in implementing many of the changes mandated by the Business Opportunity Development Reform Act of 1988 and subsequent amendments. Our testimony today is based on the work we did in 1992 and 1993, updated to reflect recent activities.[1] We will focus on SBA's progress in implementing key changes that are designed to make the 8(a) program an effective business development program. These are (1) requiring the competitive award of large-dollar-value contracts, (2) distributing contracts so that a larger number of firms receive them, (3) improving business planning by firms, and (4) requiring firms to achieve a certain mix of 8(a) and non-8(a) contract dollars as they progress toward the end of their program terms. As requested, we will also discuss the Department of Defense's (DOD) small disadvantaged business program.[2] This program served as a model for a similar program established for

---

[1]See Small Business: Problems in Restructuring SBA's Minority Business Development Program (GAO/RCED-92-68, Jan. 31, 1992); Small Business: Problems Continue With SBA's Minority Business Development Program (GAO/RCED-93-145, Sept. 17,1993); and Small Business: SBA Cannot Assess the Success of Its Minority Business Development Program (GAO/T-RCED-94-278, July 27, 1994).

[2]See Minority Contracting: DOD's Reporting Does Not Address Legislative Goals (GAO/NSIAD-93-167, July 27, 1993) and DOD Minority Contracting (GAO/NSIAD-94-117R, February 18, 1994).

other federal agencies in last year's procurement reform legislation.

In summary, Mr. Chairman, the 8(a) program undoubtedly has helped some firms to successfully compete in the commercial marketplace. Our testimony today focuses on several of the program's weaknesses that are preventing some firms from obtaining experiences essential to their development. Although the total dollar value of new contracts awarded competitively grew during fiscal year 1994, federal procuring agencies limit firms' opportunities for competition under the 8(a) program. The concentration of contract dollars in a few firms continued in 1994, limiting the developmental opportunities available to many firms. And, while SBA has approved business plans for most firms, it has not given the same attention to annually reviewing these plans to ensure that they accurately reflect the firms' development goals and contract needs. Moreover, many firms nearing the end of their program terms are still dependent on 8(a) contracts. These firms will thus leave the program without an adequate base of non-8(a) work, raising doubts about the firms' probability of success in the commercial marketplace.

## BACKGROUND

The 8(a) program, administered by SBA's Office of Minority Enterprise Development, is one of the federal government's primary vehicles for developing small businesses that are owned by minorities and other socially and economically disadvantaged individuals. As of January 1995, 5,293 firms were in the 8(a) program. In fiscal year 1994, 6,012 new contracts and 19,790 contract modifications, together totaling about $4.37 billion, were awarded to 8(a) firms. Firms can participate in the 8(a) program for a maximum of 9 years.

The 1988 legislation marked the third major effort by the Congress to improve SBA's administration of the 8(a) program and to emphasize its business development aspects. Over the years, reports by GAO, SBA's Inspector General, and others have shown continuing problems with SBA's administration of the program and/or with the program's ability to develop firms that could compete in the commercial marketplace after leaving the program. A problem often cited in these reports was that a large percentage of the total number of contracts was being awarded to very few 8(a) firms. These reports made numerous recommendations for improving the 8(a) program.

COMPETITIVELY AWARDED 8(a) CONTRACTS HAVE INCREASED

To help develop firms and better prepare them to compete in the commercial marketplace after they leave the program, the act requires that 8(a) program contracts be awarded competitively when the total contract price, including the estimated value of contract options, exceeds $5 million for manufacturing contracts or $3 million for all other contracts.

New contracts that were awarded competitively during fiscal year 1994 totaled about $383 million. This amount represented about 18.5 percent of the $2.06 billion in new 8(a) contracts that were awarded during fiscal year 1994 and an 11 percent increase over the contract dollars that were awarded competitively in the prior fiscal year. While the total dollar value of new 8(a) contracts awarded in fiscal years 1991 through 1994 increased by about 29 percent, the total contract dollars that were awarded competitively increased about 81 percent. Most of this increase occurred in fiscal year 1992, with only a modest increase in competitive awards since then. Appendix I contains a table that shows the number and the total 8(a) contract dollars that have been awarded competitively since fiscal year 1991.

Despite the increase in total contract dollars that are awarded competitively under the 8(a) program, federal procuring agencies have limited firms' opportunities for competition under the 8(a) program. Our February 1994 report[3] on contracting practices at the Department of Energy (DOE) revealed several examples where a procuring agency kept price estimates for 8(a) program contracts artificially low and structured contracts so that their estimated prices were below the competition thresholds specified in the act.

-- In one case, a program office limited the length of an 8(a) support services contract and required the contractor to provide less-skilled personnel than originally planned, to ensure that the contract did not exceed the $3 million threshold for competition. At the conclusion of that contract, the office made another noncompetitive 8(a) award to the same contractor for approximately $2.9 million, to continue the support for another 12 months.

-- In another case, a program office prepared price estimates for both 3- and 5-year 8(a) support services contracts. The estimate for the 3-year contract was $2.95 million and for the 5-year contract was $5.42 million. The office, citing the immediate need for a contractor's services, made a noncompetitive 8(a) award for 3 years. At the conclusion of that contract, the office awarded another noncompetitive 3-year 8(a) contract to the same contractor for the same services, priced at less than $3 million.

---

[3]Energy Management: DOE Can Improve Distribution of Dollars Awarded Under SBA's 8(a) Program (GAO/RCED-94-28, Feb. 23, 1994).

Our work also showed that before the 8(a) competition thresholds took effect in October 1989, almost 40 percent of the support services procurements that the DOE offered to the 8(a) program carried price estimates above the $3 million competition threshold. However, after the thresholds took effect, none of the support service procurements that the Department offered to the 8(a) program were estimated to exceed the $3 million competition threshold. In addition, over 60 percent of the procurements that the Department offered after the competition thresholds took effect had estimates between $2.5 million and $3 million, with half of those having estimated prices between $2.9 million and $3 million.

By avoiding the competition thresholds, agencies can direct sole-source contracts to firms with which they are familiar. SBA officials told us that agencies' procuring officials find the 8(a) program attractive because it allows them to develop a relationship with a firm and continue to make sole-source awards to that firm. It should be noted that the law generally requires SBA to award a sole-source contract to the 8(a) firm recommended by the procuring agency.

<u>CONTRACTS DOLLARS ARE STILL CONCENTRATED IN A SMALL PERCENTAGE OF FIRMS</u>

A long-standing concern has been the concentration of 8(a) contracts dollars among relatively few firms. In fiscal year 1994, 50 firms, or about 1 percent of the 5,155 firms in the program, received about 25 percent of the $4.37 billion in total 8(a) contract dollars awarded during the fiscal year. In addition, 22 firms that were among the top 50 firms in fiscal year 1993 were also among the top 50 firms in fiscal year 1994.

As 8(a) contract dollars continue to be concentrated in a few firms, many firms do not receive any 8(a) program contracts. According to SBA, of the 5,155 firms in the program at the end of

fiscal year 1994, 2,885 firms, or about 56 percent, did not receive any program contracts during the fiscal year. In the prior 3 fiscal years, 53 percent of the firms did not receive any program contracts.

A key reason, according to SBA officials, for the continuing concentration of contract dollars among relatively few firms is the conflicting objectives confronting procuring officials. The primary objective of agency procuring officials, in SBA's view, is accomplishing their agency's mission at a reasonable cost, and the business development objectives of the 8(a) program are secondary. Moreover, agency procurement goals for the 8(a) program are stated in terms of the dollar value of contracts awarded. According to SBA, the easiest way for agencies to meet this goal is to award a few large contracts to a few firms, preferably firms with which the agencies have had experience and know their capabilities.

Nonetheless, some efforts have been made to increase the award of 8(a) contracts to firms that have never received contracts. SBA is requiring that during 1995 each of its district offices develop specific initiatives for marketing the program to federal procurement offices in their jurisdictions in order to increase contracting opportunities for more firms. In addition, DOD has agreed to give special emphasis to firms in the 8(a) portfolio that have never received contracts. Similarly, the Department of Veterans Affairs has agreed to a goal that each of its 172 medical facilities will award a contract to an 8(a) firm that has never received a contract.

## BUSINESS PLANS ARE NOT ANNUALLY REVIEWED

Business plans help to develop firms by setting forth, among other things, the firm's business development goals and objectives, estimates of its future 8(a) and non-8(a) contract activity, and

specific steps for ensuring profitable business operations after the firm completes its term in the program. The 1988 act requires SBA to annually review each business plan with the firm and modify the plan, as needed, to ensure that the firm's business development goals are realistic and to help the firm achieve them. During its annual business plan review, each firm is required to provide SBA with a forecast of the amount of 8(a) and non-8(a) contract dollars it will seek over its next 2 program years.

In July 1994, we testified that about 80 percent of the firms in the program had new or revised business plans approved by SBA. However, SBA could not tell us whether these plans were being annually reviewed or were being modified because it did not routinely collect these data from the field offices. However, SBA officials told us at that time that there is a need for this information and that SBA planned to direct its field offices to provide it.

Data provided by SBA field offices as of September 30, 1994, show that 4,393 firms, or about 85 percent of the firms in the program at the end of fiscal year 1994, had new or revised business plans approved by SBA. However, at the same time, the data also show that SBA field offices are not conducting annual reviews of these business plans. Of the 4,393 firms with approved business plans, 2,516 firms, or about 57 percent, had annual reviews conducted of their business plans during fiscal year 1994. To emphasize the importance of and need for annual reviews of business plans, SBA has made the annual review of each firm's business plan one of the three performance goals for its field offices in fiscal year 1995.

SUCCESS IN MEETING 8(a) AND NON-8(a) BUSINESS MIX LEVELS IS LIMITED

To increase the program's emphasis on business development and the viability of firms leaving the program, the act directed SBA to establish levels of contract dollars that firms in the last 5 years of their program terms must achieve from non-8(a) sources. The non-8(a) business mix levels that SBA has established increase during each of the 5 years, ranging from a minimum of 15 percent of a firm's total contract dollars during its fifth year to a minimum of 55 percent of the total contract dollars in the firm's ninth or final year. SBA field offices, as part of their annual reviews of firms, are responsible for determining whether firms achieve their non-8(a) business levels. In July 1994, we reported that SBA could not provide us with information on the extent to which 8(a) firms were meeting the non-8(a) business levels because SBA headquarters did not routinely collect this information from its field offices.

In February 1995, SBA provided us with data that show that of 1,038 firms in the fifth through the ninth year of their program term, 63 percent of the firms met or exceeded the minimum non-8(a) business levels while 37 percent did not meet the minimum non-8(a) contract levels. However, these data also show that firms who have been in the 8(a) program longer are doing a poorer job of meeting minimum levels of non-8(a) business activities than newer firms. While 72 percent of the firms in their fifth year met or exceeded the minimum non-8(a) business level established for that year, only 37 percent of the firms in their eighth program year, and 37 percent of those in their ninth or final program year met or exceeded the minimum levels established for each of those two years. Furthermore, for those firms in their final year that did not meet their non-8(a) business levels, their non-8(a) business, on average, comprised only 34 percent of their total contract dollars.

In addition, firms that receive most of the 8(a) contract dollars often do not meet their non-8(a) business levels. SBA data show that 40 firms in the 8(a) program at the end of fiscal year 1994 each received 8(a) contracts totaling more than $10 million during the year. Only nine of those firms met their minimum non-8(a) business levels. The other 31 firms only achieved an average of about 40 percent of their minimum non-8(a) business. Three firms, including one with only 1 year remaining in the 8(a) program, reported no non-8(a) business during fiscal year 1994. As a whole, the 40 firms achieved less than two-thirds of the minimum non-8(a) business levels. The 31 firms that failed to achieve the minimum levels of non-8(a) business were required, on average, to have non-8(a) business equal to only about one-third of their total contract dollars. Some firms had total non-8(a) contracts as low as 15 percent of their total revenues. SBA recognizes the importance of remedial actions when firms are not achieving their non-8(a) business levels and has made this one of its district offices' performance goals for fiscal year 1995.

Appendix II contains a table showing the extent to which firms met their non-8(a) business levels for each program year.

DOD'S PROGRAM FOR SMALL DISADVANTAGED BUSINESSES

In addition to SBA's 8(a) program, DOD has a preference program for small disadvantaged businesses commonly referred to as the 1207 program.[4] This program (1) allows DOD to set aside contracts for competition among small disadvantaged businesses and (2) allows contracting officers, in evaluating other competitively offered prices, to provide price preferences to small disadvantaged businesses by increasing other offers by 10 percent.

---

[4]The program was created by section 1207 of Public Law 99-961, the Fiscal Year 1987 National Defense Authorization Act.