# EXHIBIT A-15
# (part 2)

DOD's 1207 program is of particular interest because last year's procurement legislation authorized a program for civilian agencies modeled after DOD's program. As in DOD's program, civilian agencies will be allowed to limit competition on some contracts to small disadvantaged businesses and to use price preferences in others.

Eligibility requirements for DOD's 1207 program are similar but not identical to those of the 8(a) program. As in the 8(a) program, participation is limited to concerns owned and controlled by socially and economically disadvantaged individuals. However, the 1207 program uses a less restrictive definition of economic disadvantage.[5] Moreover, while the 8(a) program requires SBA to certify firms' eligibility for the program, the DOD program relies on self-certification.

In fiscal year 1994, DOD awarded $6.1 billion in prime contracts to small disadvantaged businesses. About 18 percent of these contract dollars were awarded through the 1207 set-aside, and about 6 percent were awarded using price preferences (or as modifications to such contracts). Close to half of the contracts awarded to small disadvantaged businesses were awarded through the 8(a) program, while 31 percent were awarded outside the 1207 and 8(a) programs. According to DOD officials, the heavy reliance on the 8(a) program is the result of the priority given to 8(a) under DOD procurement regulations. These regulations provide that contracts should initially be considered for the 8(a) program, then for the 1207 set-aside program, next for the small business set-side, and finally to all businesses through full and open

---

[5]Under the regulations applying to DOD's program, economically disadvantaged individuals are those individuals with a net worth of not more than $750,000 (excluding equity in the business and in a primary residence). Currently, the 8(a) program sets the net worth limits at $250,000 for individuals owning and controlling firms entering the program, which increases to $750,000 as the firm progresses through the program.

competition. DOD officials also indicated that contracting officials prefer the 8(a) program because it allows them to select a contractor they are familiar with. Appendix III shows the contract dollars awarded to small disadvantaged businesses under each program.

While concentration under the set-aside portion of the 1207 program is similar to that of the 8(a) program, contract dollars awarded through price preference are significantly more concentrated. Under the set-aside program, 1 percent of the firms, or 10 firms, received 15 percent of contract dollars in fiscal year 1993. For DOD awards under the 8(a) program, 1 percent of the firms, or 16 firms, accounted for 17 percent of the contract dollars. However, under the price preference, 1 percent of firms, or 13 firms, received 91 percent of the contract dollars. The high concentration is primarily the result of the award of large petroleum contracts. For all awards to small disadvantaged businesses, 1 percent of the firms, or 41 firms, received 24 percent of the total contract dollars.

CONCLUSION

While SBA continues to make progress in improving the 8(a) program, continuing weaknesses with certain aspects of the program deny opportunities for some small businesses to obtain the experiences needed to develop into successful competitive enterprises. Over the past 5 years, there has been virtually no improvement in the dispersion of program contracts among 8(a) firms, with the result that contract dollars remain concentrated in a small number of firms. While the 8(a) program is intended to facilitate the entry of firms into government procurement and aid their development, the concentration of contract dollars among a few firms denies or limits development opportunities for many other firms.

Over the past several years, SBA has paid considerable attention to ensuring that firms have new or revised business plans, but it has not given the same attention to annually reviewing these plans to ensure that they accurately reflect the firms' business development goals and 8(a) and non-8(a) contract needs. In addition, when such annual reviews have occurred, SBA has not focused sufficient attention on the actions needed to improve firms' development of their non-8(a) program.

Mr. Chairman, SBA's limited success in ensuring that 8(a) firms have an adequate base of non-8(a) contracts that they can rely on as they near the end of their program term is perhaps the most significant issue facing SBA. The transition from the 8(a) program to the commercial market can be difficult even in those cases where the firm has developed a solid base of contracts outside the 8(a) program. However, for firms leaving the 8(a) program still heavily dependent on the program for their livelihood, as is the case with many firms nearing completion of their program term, survival outside the program will be even more challenging.

- - - - -

This concludes our prepared statement. We would be glad to respond to any questions that you or Members of the Committee may have.

INCREASE IN COMPETITIVE 8(a) CONTRACTS AND DOLLARS SINCE 1991

Dollars in billions

| 8(a) contracts | Fiscal Year 1991 | Fiscal Year 1992 | Fiscal Year 1993 | Fiscal year 1994 |
|---|---|---|---|---|
| Number of new contracts | 4,576 | 4,693 | 5,481 | 5,990 |
| Number of new contracts awarded competitively | 86 | 139 | 202 | 174 |
| Percent of new contracts awarded competitively | 1.88 | 2.96 | 3.69 | 2.89 |
| New contract dollars awarded | $1.60 | $1.70 | $2.21 | $2.06 |
| New contract dollars awarded competitively | $0.21 | $0.34 | $0.34 | $0.38 |
| Percent of new contract dollars awarded competitively | 13.13 | 20.00 | 15.38 | 18.45 |

Source: SBA

ANALYSIS OF 8(A) FIRMS' COMPLIANCE WITH THEIR NON-8 (A) BUSINESS LEVELS

| Program Year | Non-8(a) business mix level (percent of total revenues) | Total number of firms | Number of firms that met or exceeded levels | Percent of firms that met or exceeded levels | Number of firms that did not meet levels | Percent of firms that did not meet levels |
|---|---|---|---|---|---|---|
| 5 | 15-25 | 345 | 249 | 72 | 96 | 28 |
| 6 | 25-35 | 375 | 260 | 69 | 115 | 31 |
| 7 | 35-45 | 161 | 92 | 57 | 69 | 43 |
| 8 | 45-55 | 138 | 51 | 37 | 87 | 63 |
| 9 | 55-75 | 19 | 7 | 37 | 12 | 63 |
| Total | | 1,038 | 659 | 63 | 379 | 37 |

Source: SBA.

DOD CONTRACTS AWARDED TO SMALL DISADVANTAGED BUSINESSES (SDB)

Dollars in millions

| Program | FY 1992 | | FY 1993 | | FY 1994 | |
|---|---|---|---|---|---|---|
| | (in millions) | (percent) | (in millions) | (percent) | (in millions) | (percent) |
| SDB set-aside | $ 796 | 15 | $1,002 | 16 | $1,089 | 18 |
| SDB price preference | 264 | 5 | 515 | 8 | 356 | 6 |
| 8 (a)[a] | 2,566 | 49 | 2,773 | 45 | 2,754 | 45 |
| Other awards to SDBs[b] | 1,569 | 30 | 1,893 | 31 | 1,915 | 31 |
| TOTAL | $5,195 | 100 | $6,183 | 100 | $6,114 | 100 |

[a]May include awards to 8(a) firms made outside the 8(a) program.

[b]Includes awards to SDBs made outside of the 8(a)/SDB program.

Source: DOD

Chairman BOND. Thank you, Ms. England-Joseph.
Mr. Longuemare.

**STATEMENT OF R. NOEL LONGUEMARE, PRINCIPAL DEPUTY UNDER SECRETARY OF DEFENSE FOR ACQUISITIONS AND TECHNOLOGY, U.S. DEPARTMENT OF DEFENSE, ACCOMPANIED BY DAN GILL, DIRECTOR, SMALL AND DISADVANTAGED BUSINESS OFFICE**

Mr. LONGUEMARE. Thank you, Mr. Chairman. I have been joined this morning by Mr. Dan Gill, who is the director of our Small and Disadvantaged Business Office for the Department of Defense.

I certainly want to thank you for the opportunity to testify this morning. I intend to address in summary form the answers to the questions that you submitted to us in advance, but I would also request that the full statement that I have provided be made part of the record.

Chairman BOND. Without objection, it will be accepted for the record in full.

Mr. LONGUEMARE. Before addressing the questions, I would like to very briefly comment on the successes we have had in the Department of Defense with this program. We have a very dedicated and aggressive program in this area, and it actually does play a vital role in supporting the needs of our department.

Since the inception of the Federal Government's policy to support minority business enterprises in 1969, the DOD's Small and Disadvantaged Business Office (SDB) has levied awards that started at $9 million back in 1969 and we have now grown to in excess of $8.4 billion, which is quite a significant increase.

We would like to show you three quick charts here, because I think there is a message that is best told with them. If you examine the first chart, this plots the total contracts that we have awarded as a function of time since 1985. You can see that there has been a decreasing trend there of about 25 percent over that period of time.

The next chart shows the prime contracts that we have issued and this shows small businesses at the top. You can see that it stayed approximately level at about $25 billion or so. In light of the decreasing total contracts, this means we have had additional contracts in the small business area.

However, most significantly, if you look at the bottom, you will also note that the small and disadvantaged business contracts have had a monotonically increasing trend. We are up to 5 percent now, so that we have had a significant increase in this area, despite the fact that our total contracts have been down significantly.

The final chart shows you the same story for subcontracting, in which we also have achieved a 5-percent goal for the subcontracts for the first time this year. We have also had a major 2-to-1 increase in the number of contracts for the women-owned small businesses. So taken in toto, we feel very good about that track record.

As Mr. Lader indicated, we have also signed a Memorandum of Understanding with the Small Business Administration to address the increase in the number of awards that the DOD will make to the small and disadvantaged businesses. We are going to make a specific point of trying to increase the scope of the program to in-

clude more of the businesses in this area, and we think this is an important part of this mission.

I would like to hasten to point out that although these statistics are very impressive, the SDB's have played a very significant role in contributing to the defense mission of our country. Back in Desert Storm, we were critically dependent in several cases on firms that provided, for example, components for the Patriot missile, water trailers, camouflage netting, and things of that nature of cite a few. In my formal testimony, I have provided a number of other examples.

Mr. Chairman, I would now like to briefly answer some of the questions that you provided us. The first was: "What were the original purposes of the 8(a) program?" We believe that the purposes of the 8(a) program, as stated in Public Law 95–507 are to, one, foster business ownership by individuals who are both socially and economically disadvantaged, both of those together; two, to promote the competitive viability of such firms by providing such available contract, financial, technical and management assistance as may be necessary; and finally, three, to clarify and expand the program for the procurement by the United States of goods and services from small business concerns owned by socially and economically disadvantaged individuals. So that is our view of the program.

Question 2 was: "Have these purposes been fulfilled?" Our role in the 8(a) program is limited to providing contracts to assist the Small Business Administration in the development of 8(a) firms. However, we also do provide assistance to the SBA in the areas of helping to determine the qualifications to perform the contract and we also administer these contracts as a help to them. The fact that we provide this $2.8 billion in contracts to 8(a) firms in 1994 would suggest that there is a reasonable measure of success that we have achieved under this program.

Question 3: "Should the Federal Government presume that members of certain racial and ethnic groups are socially disadvantaged?" Mr. Chairman, as you are aware, this particular question relates to the areas that are currently under review by the President and the Supreme Court and I can only comment that it is national policy to use the DOD acquisition process to support economic and business development programs that are aimed at the socially disadvantaged.

We believe, however, that the only practical way to administer such a program is to accept by presumption the validity of the socially disadvantaged classification as presented on a contract by contract basis.

Question 4: "Are there other ways to expand opportunity for all Americans without providing preferences for individuals because they belong to certain groups?" Again, Mr. Chairman, this question goes to the very heart of the broad issues on affirmative action that are currently under review by the President. It would be presumptuous of me to try to determine what the President might decide once this review is completed.

But I would say that what we are about as a society is to use a variety of Government programs to advance all Americans. These programs range from the small disadvantaged business legislation

to student loans to FHA loans. Generally race is not the main or even a major criterion in crafting these programs, and enters only in specific circumstances.

Our goal in the Department of Defense is to engender a vibrant small business environment that contributes to our national defense, as well as to our national economic well-being. Our experience suggests that if the socially disadvantaged standard is either deleted or significantly broadened, that the program will be so substantially changed as to eliminate the very reason for Section 8(a) of the Small Business Act of 1983.

I have two brief additional comments on some informal questions that we received.

Do we feel that section 2323 could be modified to replace the 8(a) program? Section 2323 and section 8(a) serve very different purposes. Section 8(a) provides for sole source awards to permit SDB's to develop competitive skills. Section 2323 on the other hand, allows for a price advantage where SDB's submit offers in full and open competition. If we are to meet our small and disadvantaged business goals set for us, we believe that it is essential that we have both programs.

And finally, what do we think the impact on the country would be if the 8(a) program was discontinued? Again, from a DOD perspective, the goods and the services that we procure from 8(a) firms are needed to fulfill defense requirements so that the $6.1 billion we now spend in this area would still go into the economy. However, the social implications throughout the Nation and in many of the inner-cities would be quite significant and I certainly am not in a position to access the economic impact of that.

It is clear, however, that we would be unable to meet our 5-percent SDB goals without the 8(a) program.

Mr. Chairman, this ends my formal testimony and I would be pleased to answer any questions you might have.

[The prepared statement and attachments of Mr. Longuemare follow:]

STATEMENT OF R. NOEL LONGUEMARE, PRINCIPAL DEPUTY UNDER SECRETARY OF DEFENSE (ACQUISITION AND TECHNOLOGY) U.S. DEPARTMENT OF DEFENSE

Good morning Mr. Chairman and members of the Committee. I want to thank you for this opportunity to testify about the Department's views on the Small Disadvantaged Business 8(a) Program. As requested, my testimony this morning will address in summary form the substantive areas raised in the four questions contained in your letter of invitation. However, I do ask that my complete statement be made a part of the hearing record.

Before addressing the questions, I want to share with you some of the successes of the Department of Defense (DoD) in support of the programs for small businesses(SB), small disadvantaged businesses (SDB), and women-owned small businesses(WOSB).

DoD has a very aggressive and dedicated small business, SDB, and WOSB program. We recognize that these companies play a vital role in our nation's security and contribute significantly to our Defense industrial base. Our support of this program is evidenced by the fact that of the $112 billion in prime contracts awarded by DoD in FY 1994, $24.8 billion or 22.1% went to small business, exceeding our assigned goal of 19.7%. This outstanding performance represents the highest small business achievement rate in the last 40 years. SDBs were awarded $6.1 billion or 24.6% of the overall $24.8 billion in small business awards. WOSB were awarded $1.9 billion, the highest amount awarded to that sector of the small business community since the beginning of the emphasis on

this program. I believe it is obvious that we are taking these responsibilities seriously.

Since the inception of the Federal Government's policy to assist minority business enterprises in 1969, the Defense Department's Small and Disadvantaged Business Utilization program has grown from the award of just $9 MILLION in prime contracts and subcontracts in FY 1969, to some $8.4 BILLION in FY 1994. When one considers the total amount spent by the Defense Department for major systems such as airplanes, ships, tanks, and missiles where it is unlikely that any Small Business could be the prime contractor, we believe we have an excellent record in awards to such firms. As you can see from the charts we have included with this statement, DoD performance has continued to improve in this program area. Our most recent success in this program is even more impressive because it comes at a time when our prime contract and subcontract dollars are declining (CHARTS 1,2,& 3).

I am pleased to announce that FY 1994 marks the third time that DoD has surpassed the five percent goal for awards to SDBs established by Title 10, U.S.C.ß 2323. Chart 1 shows the total contract dollars awarded by DoD from 1985 through 1994, while chart 2 details our SDB procurement data from FY 1969 through FY 1994. As a result of a General Accounting Office (GAO) review and the GAO interpretation of Title 10, U.S.C.ß 2323, the DoD performance against the five percent

goal is measured by combining the total amount awarded for contracts and subcontracts with SDBs as the numerator, and total DoD awards as the denominator. This requires DoD to add the $6.1 billion in SDB prime contract awards to the $2.3 billion our major prime contractors subcontracted to SDBs, for a total DoD accomplishment of $8.4 billion. The $8.4 billion divided by the total DoD awards of $112 billion results in an accomplishment rate of 7.5 percent (CHART 4). A breakdown of these awards by ethnic group is also attached. (CHART 5).

Because of our historical emphasis to provide expanded opportunities for SDBs, historically Black colleges and universities (HBCUs) and minority institutions (MIs), DoD allocates three separate goals to the Military Departments and Defense Agencies. They are a five percent SDB prime contracting goal, a five percent SDB subcontracting goal and a five percent goal for awards to HBCU and MI. All goals are assigned to the Military Departments and Defense Agencies by the Deputy Secretary of Defense or the Under Secretary of Defense (Acquisition and Technology). We are extremely pleased to report that for the first time in the history of the SDB program, DoD achieved a rate of five percent against both the prime contracting and subcontracting goals during FY 1994.

It is important to point out that SDBs have played a significant role in contributing to the defense mission. Current participants in the 8(a) program and graduated 8(a) firms were critical in our success during Desert Storm providing, for example, components for the Patriot missile, water trailers, and camouflage netting, to cite but a few.

Some other examples of 8(a) firms that have contributed significantly to the Defense mission are:

1) AMA Technologies, Inc., a woman-owned 8(a) firm located in Alexandria, VA, performed a contract for the development and implementation of an automated management information system to support the post production plan for the F-15 aircraft. AMA has delivered all software ahead of contract schedule, and the quality and functionality of this software has exceeded expectations. The system developed by AMA has given DoD the capability to track some $1 billion in F-15 production tooling, or roughly 200,000 tools and subassemblies. This capability permits us to make sound decisions on what can be used or what can be disposed of. Prior to this system, there was no real handle on tracking this tooling because it was not stock listed. With the inventory modules now in place, we can better manage our spares and repair parts during the life cycle of the F-15. The program manager and AMA demonstrated this system to the Navy and the Grumman Corporation. Both were so impressed, they are looking to pursue this system for the F-14 aircraft

and other systems the Navy manages.

2) Galactic Technologies, Inc. (GTI), an 8(a) contractor, was recently recognized in the San Antonio Business Journal as the highest growth engineering firm in the local area during 1994. This firm has had several successful contracts with local military bases. An example involves a software contract it was awarded by Kelly AFB. The project was completed in half the time allotted and at one half the cost. In addition, GTI returned the savings to the Air Force.

3) LAU Technologies, a woman-owned 8(a)firm located in Acton, Massachusetts, is manufacturing electronic triggers for the Abrams Tank and distribution circuitry for the Abrams and the Bradley Fighting Vehicle. In 1991, LAU Technology received a Contractor's Excellence Award from the Army's Armaments, Munitions and Chemical Command for its participation in support of Desert Storm, reducing lead-time for the circuit boards for the Bradley Fighting Vehicles from 275 to 45 days.

4) As another example, I would like to read to you an excerpt from a letter that was received by the Director for Small and Disadvantaged Business Utilization, Department of the Army, from an SDB that he assisted. It reads: "...your support and dedication to this effort have clearly contributed

to a win, win situation.... The U.S. Army wins in a savings to the Government of $4,796,155 or nearly 50% of the estimated contract value to the OEM...contributes nearly $5 million to its small disadvantaged business goals ...20 (of the company's) families living in a labor surplus area maintain their primary source of income...(the company) maintains its manufacturing viability for the next two years."

DoD's achievement of the five percent prime contracting goal for SDBs is attributable directly to our strong support of the Small Business Administration's (SBA) Section 8(a) Business Development Program, the primary source of DoD awards to the SDB community.

Statistics reflect 8(a) growth as provided in Charts 6, 7 & 8. Please note that while 8(a) awards have continued to increase, direct awards to all SDBs also increased. This is attributable primarily to the success of present and graduated 8(a) firms in the competitive marketplace. We believe that the 8(a) awards to these firms have provided a foundation for this success.

I am also pleased to advise this Committee that the DoD recently executed a Memorandum of Understanding with the SBA to increase DoD awards to SDB firms, with particular

emphasis on the utilization of firms in SBA's 8(a) portfolio. A key feature of this initiative is our commitment to give special attention to firms that have never received an 8(a) contract. In this way, we are working to increase the total number of 8(a) firms receiving DoD contracts.

Now I would like to address the four specific questions that were included in your letter of invitation.

Questions-1 - What were the original purposes of the 8(a) program?

Answer 1 - It is our understanding that the authority in Section 8(a) of the Small Business Act (8(a) Program) has existed since 1953. Initially, Section 8(a) was a vehicle for targeting contracts toward all small firms. Prior to 1967 the authority was rarely used. However, in 1967 the authority was activated to encourage business ownership and to alleviate chronic unemployment of disadvantaged individuals in the ghetto. In addition to the 8(a) program, a DoD program of preference awards to labor surplus area (LSA) concerns was also used to alleviate unemployment.

In 1969, there was a transition in the 8(a) program to apply special emphasis on establishing, growing and developing successful firms owned by disadvantaged persons,

in lieu of primarily assisting the hard-core unemployed. The program was broadened to include non-competitive direct contracts for disadvantaged businesses, though these contracts were not restricted to minority owned firms.

In 1978, as a result of Public Law 95-507 (the most comprehensive statute yet enacted dealing with minority businesses), the 8(a) program emphasis remained on business development, but the target was focused more narrowly on businesses owned by individuals who are both socially and economical disadvantaged.

We believe the purposes of the 8(a) program, as stated in Public Law 95-507, are to:

1) Foster business ownership by individuals who are both socially and economically disadvantaged;

2) Promote the competitive viability of such firms by providing such available contract, financial, technical and management assistance as may be necessary; and

3) Clarify and expand the program for the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals.

Question 2 - Have these purposes been fulfilled?

Answer 2 - DoD's role in the 8(a) Program is limited to providing contracts to assist the SBA in the development of 8(a) firms. However, we also assist SBA by evaluating the firms' qualifications to perform the contract, and we administer the contracts. SBA is responsible for developing criteria for success and for reviewing each firm in the 8(a) portfolio to determine whether it has been successful. The fact that DoD provided $2.8 billion in contracts to 8(a) firms in FY 1994 and has contributed significantly to the growth in program dollars over the years suggests a reasonable measure of success relative to the business development objectives of the 8(a) program.

Question 3 - Should the Federal government presume that members of certain racial and ethnic groups, are socially disadvantaged?

Answer 3 - Mr. Chairman, as you are aware, this question relates directly to the areas currently under review by the President and the Supreme Court. I can only comment that currently it is national policy to use the DoD acquisition process to support economic and business development programs aimed at the socially disadvantaged. The only practical way to administer such a program is to accept, by presumption, the validity of the social disadvantaged classification as presented on a contract-by-contract basis. This view is presented based on two premises: (1) that each individual company has either been certified by an

appropriate administrative agency or has certified their own status subject to penalty of law, and (2) that it is neither practical nor economical to verify the certification of an individual firm in each instance where an offer is submitted on a government solicitation. Establishing an additional certification process for the very large number of contracts awarded by DoD would be extremely difficult to manage, particularly where the same firms are submitting bids to several DoD buying offices. For the DoD to individually certify would be duplicative and very costly.

Question 4 - Are there other ways to expand opportunity for all Americans, without providing preferences for individuals because they belong to certain groups?

Answer 4 - Mr. Chairman, this question also goes to the heart of the broad issues on affirmative action that are currently under review by the President. It would be presumptuous of me to guess the results of that review, or assume what the President might decide once the review is completed.

However, what we are about as a society is using a variety of government programs to advance all Americans. These programs range from the Small Disadvantaged Business legislation to Student Loans and FHA loans. Generally, race is not the main, nor even a major criterion in crafting these programs, and enters only in specific circumstances. Our goal

in the DoD is to engender a vibrant small business environment contributing to our national defense as well as our national economic well-being. Our experience suggests that if the socially disadvantaged standard is either deleted or significantly broadened, the program will be so substantially changed as to eliminate the very reason for section 8(a) of the Small Business Act of 1953.

Mr. Chairman, this ends my prepared testimony. Again, thank you for providing me an opportunity to speak to this Committee about the DoD Small Business Program. I would be pleased to answer any questions you may have.

## Department of Defense
## Total Contract Awards
(Section 1207 Program Begins)*




Chart 1

# DoD Small/Small Disadvantaged Business Prime Contract Awards




* - Section 1207 Program Begins

| Awards to All Firms ($=Billions) | 139.6 | 136.5 | 135.3 | 130.8 | 120.0 | 123.8 | 125.9 | 117.2 | 116.0 | 112.0 |
|---|---|---|---|---|---|---|---|---|---|---|

Chart 2

## Department of Defense Subcontracting Awards




Chart 3

# DoD Section 2323 Goal Accomplishment
## Prime & Subcontract Performance



## DoD CONTRACT AWARDS TO SDBs BY ETHNIC GROUP
## FISCAL YEAR 1994 (AWARDS OVER $25,000)
(Dollars in Millions)

| Dept./ Agency | Asian Indian American | Asian Pacific American | Black American | Hispanic American | Native American | Other Certif. | No Repr. | Not Coded | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| ARMY | $187 | $250 | $573 | $509 | $150 | $70 | $120 | $0 | $1,859 |
| NAVY | $99 | $305 | $572 | $301 | $120 | $90 | $136 | $0 | $1,623 |
| AIR FORCE | $131 | $197 | $396 | $428 | $171 | $49 | $79 | $4 | $1,455 |
| DLA* | $18 | $44 | $179 | $110 | $131 | $2 | $20 | $0 | $505 |
| ODA** | $37 | $33 | $121 | $53 | $9 | $10 | $4 | $0 | $267 |
| DoD | $471 | $829 | $1,842 | $1,402 | $581 | $220 | $360 | $4 | $5,709 |

## PERCENTAGE OF DoD CONTRACT AWARDS TO SDBs BY ETHNIC GROUP
## FISCAL YEAR 1994 (AWARDS OVER $25,000)

| Dept./ Agency | Asian Indian American | Asian Pacific American | Black American | Hispanic American | Native American | Other Certif. | No Repr. | Not Coded | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| ARMY | 3.3% | 4.4% | 10.0% | 8.9% | 2.6% | 1.2% | 2.1% | 0.0% | 32.6% |
| NAVY | 1.7% | 5.3% | 10.0% | 5.3% | 2.1% | 1.6% | 2.4% | 0.0% | 28.4% |
| AIR FORCE | 2.3% | 3.4% | 6.9% | 7.5% | 3.0% | 0.9% | 1.4% | 0.0% | 25.5% |
| DLA* | 0.3% | 0.8% | 3.1% | 1.9% | 2.3% | 0.0% | 0.4% | 0.0% | 8.8% |
| ODA** | 0.7% | 0.6% | 2.1% | 0.9% | 0.2% | 0.2% | 0.0% | 0.0% | 4.7% |
| DoD | 8.3% | 14.5% | 32.3% | 24.5% 0.0% | 10.2% | 3.9% | 6.3% | 0.0% | 100.0% |

* = Defense Logistics Agency
** = Other Defense Agencies

CHART 5

# Department of Defense

## Small Disadvantaged Business Program History

(Dollars in Millions)

| Fiscal Year | DoD Total | 8(a) | Direct | SDB Pref. | SDB Set-Aside | Total SDB | % of Total |
|---|---|---|---|---|---|---|---|
| 1985 | $139,587 | $1,780 | $1,119 | | | $2,899 | 2.1% |
| 1986 | $136,497 | $1,941 | $1,181 | | | $3,122 | 2.3% |
| 1987 | $135,340 | $2,169 | $1,148 | | | $3,317 | 2.5% |
| 1988 | $130,815 | $2,163 | $1,189 | $134 | $145 | $3,631 | 2.8% |
| 1989 | $120,003 | $1,987 | $1,137 | $576 | $298 | $3,998 | 3.3% |
| 1990 | $123,821 | $2,081 | $1,357 | $304 | $408 | $4,150 | 3.4% |
| 1991 | $125,878 | $2,135 | $1,455 | $181 | $652 | $4,423 | 3.5% |
| 1992 | $117,151 | $2,566 | $1,569 | $264 | $796 | $5,195 | 4.4% |
| 1993 | $116,007 | $2,773 | $1,893 | $515 | $1,002 | $6,183 | 5.3% |
| 1994 | $112,013 | $2,754 | $1,915 | $356 | $1,089 | $6,114 | 5.5% |

SDB = Small disadvantaged business
Direct = Competitive awards to SDBs
Pref. = Evaluation Preference Program Awards

CHART 6

# Department of Defense

## Analysis of 8(a) Contract Actions Over $25,000
(Dollars in Millions)

| Fiscal Year | Total 8(a) Awards | Non-Competitive Dollar Awards | Non-Competitive % of Total | Competitive Dollar Awards | Competitive % of Total |
|---|---|---|---|---|---|
| 1989 | $1,953 | $1,953 | 100.0% | $0 | 0.0% |
| 1990 | $2,029 | $1,944 | 95.8% | $85 | 4.2% |
| 1991 | $2,079 | $1,832 | 88.1% | $247 | 11.9% |
| 1992 | $2,501 | $2,183 | 87.3% | $318 | 12.7% |
| 1993 | $2,692 | $2,186 | 81.2% | $506 | 18.8% |
| 1994 | $2,666 | $2,087 | 78.3% | $580 | 21.7% |



CHART 7

# Department of Defense

## Analysis of 8(a) Contract Actions Over $25,000

| Fiscal Year | Total 8(a) Contract Actions | Non-Competitive Contract Actions | Non-Competitive % of Total | Competitive Contract Actions | Competitive % of Total |
|---|---|---|---|---|---|
| 1989 | 6,516 | 6,516 | 100.0% | 0 | 0.0% |
| 1990 | 7,959 | 7,742 | 97.3% | 217 | 2.7% |
| 1991 | 9,055 | 8,264 | 91.3% | 791 | 8.7% |
| 1992 | 9,587 | 8,609 | 89.8% | 978 | 10.2% |
| 1993 | 10,755 | 9,182 | 85.4% | 1,573 | 14.6% |
| 1994 | 12,073 | 9,861 | 81.7% | 2,212 | 18.3% |

CHART 8

Chairman BOND. Thank you very much, Mr. Longuemare.

Do you agree with Ms. England-Joseph, that there is a high concentration of 8(a) contracts being made with a small number of 8(a) firms?

Mr. LONGUEMARE. Yes, sir. That is, in fact, the whole reason why we instituted this memorandum of understanding with the agency. In order to try to attack that problem directly, by using the 8(a) authority that we have, we can go in and provide sole source awards to additional firms that meet the required qualifications. So we are working out some processes right now, as to how to implement this, but it is our intent to broaden this base in order to achieve the objective of having more firms participate.

Chairman BOND. One of the comments focused on geographic concentration, as well. Are you going to look at the geographic as well as the individual firm concentration?

Mr. LONGUEMARE. Yes, it is our intent to look at this whole program in cooperation with the SBA. We have not worked out all the details of that, but we will work very closely with them in trying to achieve that objective.

Chairman BOND. When will we see the results of your action?

Mr. LONGUEMARE. I believe you will start seeing some results this calendar year, by the end of this fiscal year.

Chairman BOND. We would like to see the results.

Mr. LONGUEMARE. There probably will be more following that.

Chairman BOND. Thank you.

Ms. England-Joseph, you previously stated in testimony that no firms had graduated from the 8(a) program. I thought that there had been numerous graduates from the 8(a) program. Could you explain what you mean when you say that no firms have graduated from the 8(a) program?

Ms. ENGLAND-JOSEPH. Yes, sir. That is probably a term that is widely used to describe any firm that has left the 8(a) program, but in fact, according to SBA officials, no firms have ever officially graduated from the program. I think we have to go back to the 1988 law and actions taken by SBA to implement that law to describe what graduation really meant by SBA; that is, for a firm to successfully meet its business plan, its development objectives and goals prior to the completion of its program term, and to be able to then successfully compete in the marketplace once it leaves the SBA program.

There have been a number of firms that have left the program for any number of reasons. They met or exceeded their eligibility in terms of their equity in their home and their net worth. They may not have participated as actively as SBA would like to see and were encouraged to leave the program. They may have left because of abuses in the program or they no longer were qualified or eligible. Some firms left because they simply felt that they could compete in the private marketplace without any more SBA assistance. So there are a lot of reasons. But the term graduated, as I have used it, is the way in which SBA actually defines it. In reality, no firm has successfully graduated from it, having met the requirements of the program and the requirements of their plan.

Chairman BOND. What information do you have available on the success of firms once they leave the 8(a) program, even though they may not "graduate" in your terminology?

Ms. ENGLAND-JOSEPH. There is very little data—comprehensive data—that is available on that. Much of it is anecdotal. Only two pieces of data exist out there. One is the annual review that is done by SBA as a part of their annual report to Congress. They send out a questionnaire to firms that have left the program trying to ascertain what success they have had since leaving the program.

From a methodological standpoint, it would not be consistent with the way in which perhaps we would want a survey to be done, because you really do not get the kind of information that would allow you to determine whether in fact this firm is financially viable and will be successful. And, you also do not know how many firms are not responding and whey they are not responding. So, the data that you have seen which says 55 percent of the firms are healthy and 33 percent no longer exist is probably the only data available, but it is not necessarily the best information on which to base policy.

The other data was a 1988 study done by the Senate committee staff.

Chairman BOND. At the end of this hearing we may want to discuss with you what further studies may be done.

Turning to the net worth for 8(a) eligibility, there is a proposal in your written statement about increasing the eligibility to $750,000 or three-quarters of a million dollars while a firm is in the program. Have your studies indicated that SBA actually verifies whether firms continue to meet the eligibility criteria? Do you have a feel for how this eligibility requirement stacks up with the population at large?

Ms. ENGLAND-JOSEPH. I do not know how it stacks up with the population at large; $250,000 to get into the program and $750,000 by the time you finish the program is a fairly large amount of money in terms of net worth.

SBA is required to annually review a firm's eligibility. As you heard, with Cassandra Pulley on the earlier panel, they do have a very concerted effort to review during the certification process. At the very beginning, when they certify a firm as 8(a) eligible, they have spent time trying to understand whether that firm, in fact, is or is not a front, and whether in fact it meets its eligibility requirements. They have done a better job in the last couple of years than they had done in previous years.

But once a firm is in the program, that annual review is critical as to whether that eligibility continues or whether they have exceeded that eligibility requirement. As I stated in my testimony, only about 57 percent of those firms are annually reviewed. So there is a big question mark as to whether these firms continue to be eligible.

Chairman BOND. If contract set-asides were no longer part of the 8(a) program, what is your evaluation of other programs available to encourage minority small business development?

Ms. ENGLAND-JOSEPH. There are other programs out there that provide assistance. The 7(j) program within SBA is clearly targeted and linked to the 8(a) program, to provide managerial and tech-

nical assistance. The Minority Business Development Administration in Commerce has 100 centers around the country that can also provide assistance to minority firms.

Then there are other programs, like SCORE, that was referred to earlier, that are available to a broader range of firms than just the socially and economically disadvantaged, but it also can target to that population. Finally, the Small Business Development Centers around the country can also provide technical assistance.

Chairman BOND. Thank you very much, Ms. England-Joseph. Senator Frist.

Senator FRIST. Thank you, Mr. Chairman.

Ms. England-Joseph, in your testimony you stated that DOD regulations provide that "contracts should initially be considered for the 8(a) program, then for the 1207 Set-Aside Program, next for the small business set-aside, and finally to all businesses through full and open competition."

In reading this, it looks like we have got several different programs with regulations designed to accomplish similar goals, at least in part. Are these programs duplicating one another in any way?

Ms. ENGLAND-JOSEPH. First of all, that is sort of a hierarchy of decisionmaking, so you go from a smaller population to a larger, to a larger, to a larger. So it is not quite the same. To some extent, it is duplicative if you look at the 8(a) program as being more a procurement program than a development program. I think there are conflicting goals within the 8(a) program because they are intending to try to do both.

From the procurement side, very clearly the 8(a) is somewhat duplicative of other programs like the Small and Disadvantaged Business Program at DOD, but it is the development side, the management business development side, that is missing from that component.

Senator FRIST. Any comment on that, Mr. Longuemare?

Mr. LONGUEMARE. We do believe that the 8(a) program, and the 2323 are complimentary. They have different purposes. The 8(a) program, of course, has thresholds of $3 million or services and $5 million for manufacturing, below which we are allowed to award sole source contracts to firms that met the criteria. We find that to be a very important capability to exercise in trying to carry through this mandate.

The 2323, on the other hand, provides for a 10-percent premium—we are allowed to award a contract with a 10-percent differential to those firms that have qualified to allow them an advantage in this marketplace in order to try to get them up to speed. So we see these two as very complimentary and not duplicative.

Senator FRIST. Thank you, Mr. Chairman.

Chairman BOND. Thank you, Senator Frist. We are delighted to be joined by the distinguished Senator from Connecticut, Senator Lieberman.

Senator LIEBERMAN. Thank you, Mr. Chairman. I appreciate your holding this hearing and it has given me the opportunity to start to begin to remember, if not to learn in the first place, about the 8(a) program.

My question builds somewhat on what Senator Frist has said, in some ways just to set down some simple foundations here. Obviously, there is some focus, some interest in this hearing beyond a review of the 8(a) program, in terms of the overall review that Congress is embarked on, the administration has embarked on, of so-called affirmative action programs. It is important to remember as we do that that affirmative action covers a very wide range of programs.

I always find it hard when people say I am for affirmative action or I am against affirmative action; it expresses itself in many different ways.

Let me just ask if there is any way to get some clarity about whether in pursuit of the goals of aiding disadvantaged individuals and the companies that we had, that we are actually spending more money than we would otherwise spend to procure the goods or services that the Government needs?

Mr. LONGUEMARE. Senator Lieberman, I think that question, of course, does indicate that there is a certain startup cost associated with providing this help. We have an office in the department, of which Mr. Gill is the head, whose purpose is to administer this program and try to do what is necessary there. So clearly there are some additional costs.

On the other hand, I would hasten to point out that the total economic benefit is certainly not something I could assess, but in terms of the contribution that these companies have been able to make to our defense effort, first of all, we only start with companies that are qualified. We do not bring people in that are not able to do the job.

Senator LIEBERMAN. Let me stop you there, because I think that is very important. Just indicate, if you would, how you determine qualifications here, how you determine if the company is qualified?

Mr. LONGUEMARE. We basically rely on the SBA to provide the necessary qualification process, and it is our presumption that either the companies self-certify themselves as being qualified under penalty of law, or that they have been certified by an appropriate process. So our approach to that is by presumption.

Senator LIEBERMAN. I understand and at some point—I regret that I missed the SBA witness, Mr. Lader, earlier—but the 8(a) program is not simply based on the status of being socially disadvantaged. It is based on some determination of qualification as well?

Mr. LONGUEMARE. Senator, I would like to invite Mr. Gill to give you a more indepth answer to this.

Senator LIEBERMAN. Please.

Mr. GILL. Senator Lieberman, good morning.

In implementing section 2323, we had to recognize the authorities that the Congress gave to us in awarding the contracts. Generally, all contracts awarded by the department are awarded at fair market prices. So when we set up the priorities of awarding the contracts, with the 8(a) being the first priority, recognizing our responsibility to assist the SBA, we made a determination that all contracts—as our regulation says—are awarded at fair market prices. So generally we pay no premiums on 8(a) contracts.

92-035 0 - 95 - 4

On section 1207 or 2323, we were given a special authority to pay a premium of up to 10 percent. So what we did, we used that authority also to use less than full and open competition to have SDB set-asides. SDB set-asides are authorized up to 10 percent above fair market price.

The next tool that we use is the premium, the 10-percent preference in full and open competition. We felt that in full and open competition, since the SDB's had to compete with the major corporations and the world at large, to attain the goal we had to use that leverage. So we did authorize contracting officers to pay up to 10 percent.

Now we do not always pay 10 percent. We pay whatever it takes to award the contract to the SDB if the price is within 10 percent of the low bid. Also, we have reports to show that we have paid a minimum in premiums and those premiums have been limited to one primary industry, and that is the fuel oil industry. That addresses the cost issue.

On the other end is the qualification to do the work. We did not reduce our standards for awarding contracts. There are 13 elements of qualifications that are done by our contract administration offices, and these qualifications or elements are done on all companies, major corporations, small 8(a)s and SDB firms. So the qualification standards are the same in terms of financial stability, technical capability to do the work, skills of the employees, the management program, and ability to meet our delivery requirements. They are all the same for all these programs, sir.

Senator LIEBERMAN. Thank you for your answer. My time is up, and I thank you, Mr. Chairman.

Chairman BOND. Thank you very much, Senator Lieberman. As I indicated, we will keep the record open for additional questions and comments, and we appreciate very much the helpful information provided by this panel. Since you are nearby we will look forward to following up with you with any additional questions.

Our third panel will include the following: Mr. Steven Sims, vice president of the National Minority Suppliers Council of Washington, DC; Mr. James B. Graham, founder of FaxLand Corp. of Falls Church, VA; Ms. Santos F. Garza, chairman of the board and chief executive officer of Counter Technology, Inc., in Bethesda, MD; and Mr. Arnold J. O'Donnell, member of the Association of General Contractors and vice president of O'Donnell Construction Co. in Washington, DC.

Thank you very much for joining us today, and we will begin the testimony with Mr. Sims.

As I indicated to all of you, again because of the number of people on the panel, we would appreciate keeping your opening statements to 5 minutes, but be assured that your full written statements and any matters that you feel were not adequately addressed will be most gratefully received in written form for the record.

**STATEMENT OF STEVEN SIMS, VICE PRESIDENT, NATIONAL MINORITY SUPPLIERS DEVELOPMENT COUNCIL, WASHINGTON, D.C.**

Mr. SIMS. Good morning, Mr. Chairman, and members of the committee. My name is Steven Sims. I am the vice president of the National Minority Supplier Development Council. Our organization is 23 years old and we are considered corporate America's Minority Business Development Program.

We represent some 3,500 corporate members, including most of the Fortune 1000. We include some 15,000 certified minority businesses, those being black, Hispanic, Asian, and Native American, and some 44 affiliated councils across the country and in many States represented by committee members. We provide a wide array of services including certification of minority businesses.

I want to go back to a question that Senator Lautenberg raised. We do believe that front companies are a significant threat and are a significant issue. I have challenged SBA's past program and DOD utilization of that program at 35 percent of the past system are front companies. Since they do not monitor, they cannot dispute my allegations.

We have found a significant increase in front companies trying to penetrate our certification process. We also provide a Capital Contracts Loan Program of up to $500,000, 1 point above prime, to certified minority vendors working with our national corporate members. We have a national data base of between 15,000 and 16,000 certified minority businesses.

We have just recently opened the first of its kind minority business information center out of New York. We provide seminars and workshops for corporations and MBE's that are committed to minority business development, and opportunities both formally and informally for corporations and MBE's to contact and contract one with the other.

We also have a strong belief that public policy does drive private sector practices. With that understanding, NMSDC created a Government relations office about 5 years ago, because we believed that there was a need to work with some of the Federal agencies, most notably SBA, MBDA, the OSDBU offices, to work with them and support their efforts in minority business development.

I am going to bounce around to cover several items very quickly. In terms of SBA's past and present, we thought there was a real problem in terms of leadership formerly at SBA. The fact that in my 6 years in Washington, up until the time Erskine Bowles came in, there was no one with a strong business background operating SBA. I think from my testimony, within 24 hours of being nominated for the position, Erskine Bowles was in our office in New York asking us how is SBA doing? What changes were necessary?

We also felt that in the past there had been an unwillingness to listen to the customer, small business, minority businesses. It made no sense to have hearings and talk about what do you think? How are we doing? And then do not respond to the information being shared with the agency.

We also believe that there has been a lack of contract diversification. I think GAO reported on the fact that 50 to 60 percent of graduates went out of business within three years of graduation or

moving on from the program. We believe very strongly that there needs to be a balanced portfolio if the 8(a) firms participating are to survive.

Also, then the identification and replication of best practices. If your competitors are doing a good job, sometimes you might ask what are they doing different and attempt to incorporate some of those best practices in order to maintain your own market share. We think that SBA and other agencies that are involved with minority business development need to do those same things. And in the past they have not.

SBA now, the 8(a) Program, starting with the new leadership team that Erskine Bowles brought on board, Cassandra Pulley and Bob Neal, have worked closely with us. They have reached out to the minority business community and the corporate community to ask what are the problems, what are the issues?

Several recommendations that we made that I would like to respond to. First, the issue of certification. SBA, through their 8(a) program, is talking about following the NMSDC model of taking certification locally where the business is known, doing a site visit and making that mandatory as part of certification so you know who you are dealing with. Again, diversifying the portfolio so that there are private sector contracts as well as public sector contracts that are supporting the development of that business.

The loan programs, the notion of reducing some of the paperwork to make it easier for minority businesses to secure loans. I think Low Doc was one example where it went from 28 pages to one page.

Improvement in the local operations of the SBDCs and their support, that we are still talking to SBA in terms of how we can improve our working relationship to and with some of those SBDCs in order to compliment and not necessarily supplement the operations of the SBDCs versus our local councils around the country.

We also suggested recommendations in terms of improving the 8(a) program, I think which resulted in the development of the MED program. We think that still needs some fine tuning, but is well on its way.

I think one of the things—in fact, I talked to Bob Neil earlier this morning, in terms of this issue of best practices. There is an opportunity for the public sector to learn from the private sector and vice versa. I do not think that is done enough across Government. I especially do not think in the 8(a) program. But we are seeing some progress. There have been some discussions with the Big Three automakers and SBA around the second tier program, which has been initiated by the Big Three automakers. And we are having ongoing discussions around issues of certification.

Again, I want to close with, because my remarks are in for the record, that public sector policy drivers private sector practices. I would not like to see the 8(a) program eliminated. I would like to see it strengthened. I would like to see some of the issues mentioned in the testimony that I have read and heard, in terms of strengthening of programs, holding it more accountable. But I certainly do not think it would be in the interest of minority business to have the program eliminated.

Thank you.

[The prepared statement of Mr. Sims follows:]

**Testimony of Steven Sims, Vice President**
**National Minority Supplier Development Council**
**before the Senate Committee on Small Business**
**United States Senate**

**April 4, 1995**

Mr. Chairman and Members of the Committee:

My name is Steven Sims. I am the Vice President of the National Minority Supplier Development Council (NMSDC).

Our organization is 23 years old and includes:

- forty-four affiliated councils across the country (in many of the states represented by you committee members)
- 3,500 corporate members, including most of the Fortune 1000;
- and more than 15,000 certified minority businesses -- Black, Hispanic, Asian and Native American

Our organization was founded by corporations -- with financial assistance from the Department of Commerce -- to provide increased procurement and business opportunities for minority businesses of all sizes.

The following are programs and services provided by the NMSDC network:

- certification of minority business enterprises after screening, interviews, site visits, and capability studies;
- access to MBYSIS, a national computerized database of nearly 15,000 certified minority suppliers;
- referrals to corporate buyers of minority suppliers capable of providing quality goods and services at competitive prices, and in a timely fashion;
- support in developing, expanding or promoting corporate purchasing programs;
- provision of contract financing loans of up to $500,000 to certified minority businesses which have contracts with NMSDC national and regional corporate members, through the business consortium fund;
- operation of a government relations office to provide government decision makers with information on minority business issues and to respond to legislative and regulatory proposals and changes which affect minority business development;
- dissemination, through mailings and newsletters, of vital statistics and information pertinent to the changing picture of purchasing;
- educational seminars, training and technical assistance for buyers and suppliers to assist in personal and professional growth;
- business opportunity/trade fairs which allow minority entrepreneurs to present themselves to many prospective buyers in a short time;

- networking opportunities, organized by purchasing categories, at which vendors speak directly to appropriate purchasing agents;
- corporate and vendor directories, and other publications;
- NMSDC Conference -- the nation's benchmark forum on minority business development
- awards and special recognition for outstanding corporate programs in support of minority business development, as well as for excellent minority businesses, and other citations.

I want to thank Senator Bond for the invitation to provide the perspectives and findings of NMSDC during your deliberations on the Small Business Administration and its 8(a) program, an issue of critical importance to minority businesses and the American economy as a whole.

My time is short. I ask that my written testimony be accepted for the record. I will summarize and highlight our major concerns.

As you look at the re-structuring and/or elimination of the 8(a) program at SBA, I want to share some observations and recommendations, and ask that you consider the impact of your decisions on the minority business community.

According to the Bureau of the Census, there are 1.5 million minority businesses in America, and this is one of the fastest growing and most dynamic business segments.

More than 25% of America's citizens are members of minority groups -- that is, Black, Hispanic, Asian and Native American. Minority citizens pay taxes.

Minority businesses account for only nine percent of all U.S. businesses, and four percent of gross receipts. Purchases from minority businesses represent only one to two percent of total corporate purchases. America's major corporations are working with us to bring those numbers up.

In 1972, when NMSDC was founded, our corporate members reported approximately 86 million dollars in purchases of goods and services from minority businesses. In 1993, our corporate members reported 24.7 billion dollars. These procurement successes were accomplished not by lowering purchasing standards, but by sourcing qualified firms and giving them business on a competitive basis -- business which would have been placed somewhere anyway.

Minority suppliers are also minority employers. They hire an extremely high proportion of minorities. Indeed, the benefits to the country's minority community that pass directly through MBEs appear to come from hiring minorities as well as purchasing from other minority-owned businesses, when they can.

Small Business Administration data shows that more than 70 percent of job creation by small businesses occurs after four years of operation. According to the Bureau of Labor Statistics, from 1990 to 2005, the labor force is expected to grow by 26 million people (of these, 27.8

percent will be Hispanic, 15.8 percent will be Black and 10.1 percent will be Asian). Many of NMSDC's certified businesses are well-positioned to contribute both to job growth and to the overall economic health of minority communities and the country as a whole.

With that background on NMSDC, let's talk about the 8(a) program.

SBA - 8(A) THEN

I understand that this committee is interested in a review and consideration of the Small Business Administration's 8(a) program. It is, in my opinion, a program that has merit but until recently did not propose or conduct its operation/activities in the best interest of minority businesses. Some of the reasons for this lack of success include:

* Leadership

  With not disrespect intended, the leadership of SBA traditionally appears to have been known as a safe haven for defeated politicians and supportive allies of whichever administration was in office. The concept of strong and proactive leadership, establishment of measured program goals and objectives and sanctions based on outcomes appears to have been avoided. Those folks deeply entrenched in this particular bureaucracy did not really believe they had to respond to the SBA leadership unless they chose to with no anticipation of paying for their insubordination. In one case in particular, the rumor that a battle waged between the SBA administrator and the head of the 8(a) program, resulted in business being halted while staff watched, chose up sides, and service to firms in the program became a tangential concern. In the end only the firms lost, you can not operate a strong effective program without strong effective leadership.

* Unwillingness to Listen to the Customer

  As a business focused entity, the Small Business Administration in general and the 8(a) program leadership never really listened to its customer about the problems minority businesses had with the program. How can you avoid good business practices -- asking your customers what they think and how am I doing in serving those needs, -- and expect success. Issues of capital and financing are serious problems; concerns about certification of legitimate 8(a) firms is a problem, and real opportunities to compete for contracts are a never ending reality. You can not and should not compound these problems by ignoring the needs, observations and experiences of your customer and expect success. You can't ask how am I doing? . and then ignore the answer. It sends the wrong message to your customer, to your employees and to the people paying for the program . . . the taxpayer.

* Lack of Contract Diversification

  The 8(a) program did not develop a program to encourage the diversification of contracting opportunities between the public sector and the private sector until 1993.

With a failure rate of approximately 60% of 8(a) graduated firms within a three year period of completion of the program, it was obvious a problem existed. For years, there were no real efforts to identify and solve this problem.

* Identification and Replication of Best Practices

  The ability to review, assess, evaluate, and implement best practices of competitors and allies has been lacking within the 8(a) program. Identification of what are the benchmarks in the area of minority business development; who is establishing the benchmarks, how is the bar raised, how is it reflected and can it be replicated in the 8(a) program, seems to be rarely asked questions with never considered responses.

I think you have a clearer picture of what I perceived to be the problems with the SBA 8(a) program. If you notice, for the most part, I have stayed away from the direct program issues and focus on managerial and organizational concerns. That is because in my experience and opinion, you must deal with those concerns before you can realistically expect to improve the product or service offered by your company or business. These issues determine your potential for success and chances for failure.

SBA - 8(A) NOW

As the government relations representative for NMSDC, I believe and have stated publicly that just when SBA and 8(a) are on the right track their existence is threatened. The changes being recommended, by the SBA are both realistic and relevant. They may be too late to save the program . . . and I hope that is not the case.

Let's review the changes in SBA over the last two years. It is impossible to talk about SBA and its Minority Enterprise Development (MED) program becoming a relevant and viable tool of minority business without mentioning Eskire Bowles and the leadership team he put in place. Within 24 hours of his nomination for the administrator's position, he was in our headquarters office in New York asking about our assessment of SBA and the 8(a) program; he asked about our operational procedures and business strategies; and he asked for our assistance. He reached out to numerous other minority business organizations and asked for a blunt critique of the 8(a) program specifically and SBA generally. His experience in running a business, making payroll, sales and marketing and challenging competitors gave him a realistic view of what minority business might need. It also allowed him to integrate the evaluations/reviews he received on the 8(a) program with his own experience as a business person. I don't intend to make this a testimonial to Mr. Bowles, or to Cassandra Pulley or Robert Neal, but I will say; with my, our, experience of assisting in revitalizing and recreating the NMSDC, that this leadership team brought about the real opportunity for change with the 8(a) program. Let's review specifics and the recommendations of NMSDC:

* NMSDC recommended improved certification process by reducing time necessary and process

  SBA response: Proposed to strengthen field offices and have certification done

locally with final approval being done in Washington Site visits also being made required activity by local SBDC office.

* NMSDC recommended diversify portfolios of 8(a) firms with stronger emphasis on private sector marketing.
SBA response: Proposed to increase private sector marketing efforts. There still needs to be more of a push in this area but they are moving in the right direction. This should be a mandated activity unless national security or specific market products limit the product or service to the government.

* NMSDC recommended increase and improve loan programs.
SBA response Reduced paperwork for Low Doc loan program from 28 pages to one page. Approved NMSDC acquisition of a MBESBIC after many delays and much hoop jumping. This program compliments our $19 million capital contract loan program.

* NMSDC recommended improvement in the operation of the local Small Business Development Center offices and their support of minority businesses.
SBA response: Some conversations about how they may better serve minority businesses requesting assistance. No firm action taken to date.

* NMSDC recommended more specialized assistance and assessment of what 8(a) firms needed and programs based on real rather than perceived needs.
SBA response: Creation of the well thought out Minority Enterprise Development (MED) program which is a three-prong approach to supporting and assisting minority businesses. It is a great start toward assisting minority businesses without creating a dependent relationship.

These observations are not to say everything is fine with SBA and the 8(a) program. There are still internal battles, personnel concerns, and developmental activities which can affect the programs success, which greatly concern us. There is a need for stronger outreach to MBE and business groups and assessment of private sector practices (second-tier purchasing and certification) which might better strengthen their efforts.

I can say that I am impressed with the leadership of SBA, the new willingness to listen and consider new ideas and desire to replicate activities and ideas when possible. The administration has come a long way but still has a journey in front of it. NMSDC would like to see them continue to add to the progress made and stands ready to work with this committee and the SBA in that effort. Thank you and I would be glad to answer any questions you might have for me.

P.S. While I have the attention of the Committee, I would like to add the following, non-related recommendations for your review and consideration.

There are still many barriers to the full participation of minority businesses in the American economy. While the National Minority Supplier Development Council acknowledges many

government initiatives at the local, state and Federal level, much more remains to be done to assure access to information, fairness and openness in the government procurement process.

NMSDC recommends:

1) Standardization of terms and definitions of eligibility

Currently, each agency and department has its own definition of minority, small disadvantaged, historically underutilized, etc.

2) Federal government-wide program on small and disadvantaged business

The initiatives at DOD, NASA, and so forth could also be replicated in other non-defense departments and agencies.

3) Abolish "Self Certification"

"Front" companies compete unfairly with legitimate minority businesses, when credentials are not checked to determine that businesses are 51% owned and operated by minorities.

4) Enforcement of regulations impacting the Offices of Small Disadvantaged Business Utilization (OSDBUs) as described in Public Law 95-507.

In many cases, the OSDBU director reports to the Procurement of Contacts office which they are required to monitor. According to the regulations, the OSDBU director would report directly to the secretary.

5) Codification of the OSDBU's operations, which would allow for objective monitoring and evaluation of efforts.

The OSDBU's directors group is itself developing performance measures in order to provide structure and accountability equal to their responsibilities.

6) Developing a credible, effective mechanism for providing access to working capital for minority businesses

Half of the minority business owners who have been turned down for credit by commercial banks believe that racism was one reason for the bank's decision. The Community Reinvestment Act (CRA) is not working in regard to minority business loans.

I would be happy to respond to any questions on these issues at your convenience.

Chairman BOND. Thank you very much, Mr. Sims.
Mr. Graham.

**STATEMENT OF JAMES B. GRAHAM, FOUNDER, FAXLAND CORP., FALLS CHURCH, VIRGINIA**

Mr. GRAHAM. Mr. Chairman, distinguished members, thank you very much for inviting me to testify before the committee. My name is James B. Graham, and I am president of FaxLand Corp., which I founded 7 years ago. I recently sold the company, and therefore it is important for me to note that the views I will present today are mine alone and in no way should be attributed to the company or its new owners.

My background includes an undergraduate degree in finance, a graduate degree in marketing and 10 years of employment with a Fortune 1000 company. I have been directly or tangentially involved in marketing to the Federal Government since 1980. I am here this morning to share with you my firsthand experience with the 8(a) program and particularly its negative impact on our employees and my business.

I believe the obstacles that the program presents to me are illustrative of the obstacles faced by the vast majority of small businesses on a daily basis. Hopefully, my real world input will help the committee in its efforts to make the agency more effective.

My proudest business achievement is the creation of more than 55 jobs over the last five years. When we were recognized by Inc. magazine as the 111th fastest growing private company in the United States, I was asked by several journalists what the greatest challenge had been in growing my company into a multi-million dollar concern. The answer was obvious: finding qualified, dedicated, hard-working people. It is my conclusion that these characteristics have absolutely nothing to do with ancestry.

My best estimate is that 32 of the 55 employees, roughly 60 percent, would have qualified for the 8(a) program had they started the business. But instead, they were discriminated against because our business did not have that status while direct competitors did.

In preparing for today, I reflected on the unwritten practices that guided the managers and me in finding new hires. The only bias I could uncover was a tacit preference for the unbridled enthusiasm that some of the newest immigrants hold for the free market system. It is clear with many of our new countrymen that their parents have taught them how fortunate they are to have a shot at the American Dream.

Although our business was not reliant on Federal contracts, we found participation in the Government market complementary to our core sales effort. We had dedicated Government sales representatives and, of course, my support staff spent a proportionate amount of time servicing contracts that we had won.

My most important message to the committee today is that the 8(a) program penalizes disproportionately the very same ethnic groups it is designed to help. Employees who themselves would have qualified for special contract set-asides had they owned the businesses lost commissions, pay, and benefits because they happened to work for my company. This occurred not because we had inferior products or services, but simply because of my heritage.

For example, last fall a marketing representative spent weeks working on an agency's communications department requirements, showing them how certain features of a particular fax machine would streamline field communications and save the Government operating funds. After testing, the communications department submitted the purchase request to procurement. Needing to fulfill a buying quota, the agency paid more for the same machine from a California-based 8(a) and my employees lost out.

This is one of numerous cases where the practice of set-asides had measurable negative consequences on our employees. I think less obvious are the unspoken games that major Government contractors play to take advantage of the program through what is euphemistically termed "teaming."

During Desert Storm the secure fax communications requirements at DOD escalated suddenly. Although my company had installed secured units, the scale was different and I pursued a direct relationship with the largest manufacturer of such products. I remember very clearly their sales manager saying "Jim, get with the game. Why should I run uphill selling with your company when I can run downhill with our 8(a) partner."

He went on to explain that they had a special relationship with the 8(a) firm designed specifically for agencies that need to spend set-aside dollars. The conversation was replete with the term pass-through and left the clear understanding that there was no place in this side of the industry for my Federal sales team.

The premise that small businesses need Federal help to compete in the free market is false. It stems apparently from the belief that big business has some insurmountable advantage based on economic resources, when in fact the opposite is true. Our small business thrived on competing with the giants because the burden of bureaucracy inflated their cost of doing business. Tinkering with the self-correcting genius of the free market is counterproductive.

In reviewing the SBA's annual report for this morning, I cannot find a clear and complete explanation of the 8(a) program or its goals and objectives. In fact, for such a high profile element of the agency, it is conspicuously absent from the performance agreement set forth inside the cover. Perhaps establishing such a mission statement should be the first step, for without an understanding of the Government's aim, it is impossible to explain to all the—by definition—socially and economically disadvantaged employees who do not work for 8(a)'s why they are being penalized.

There is no question that the program has rewarded financially a handful of owners. Washington Technology Newspaper publishes an annual list of the fastest growing technology companies in the area. While we have had the good fortune to appear on this list 4 of the last 5 years, 8(a) firms account for over 60 percent of the award recipients.

Has the success of these disadvantaged individuals somehow trickled down to other ethnically or socially disadvantaged people? Is the goal to reward individuals, groups or communities? Is there any evidence that this program has worked better than the free market? These are the issues that I recommend your committee examine when considering the future of the program.

In closing, I hope that the committee is guided by the premise that the free market system works extremely efficiently. I have been challenged and rewarded by it. When you are in doubt about the benefit of a given program or proposed legislation, please remember that most of the problems in America today stem from the interference with the free market and the lack of trust in the underlying strength of the individual citizen.

This concludes my prepared remarks. Thank you again for the opportunity. I will be happy to answer any questions you might have.

[The prepared statement of Mr. Graham follows:]

**Statement by James B. Graham**

Mr. Chairman and distinguished Members; thank you very much for inviting me to testify today before the committee. My name is James B. Graham and I am President of FaxLand Corporation, which I founded seven years ago. I recently sold the company; and therefore, it is important for me to note that the views I will present today are mine alone and in no way should be attributed to the company or its new owners.

My background includes an undergraduate degree in finance, a graduate degree in marketing and ten years of employment with a Fortune 1000 company. I have been directly or tangentially involved in marketing to the federal government since 1980. I am here this afternoon to share with you my firsthand experience with the 8(a) Program and particularly its negative impact on our employees and my business. I believe the obstacles that the program presents to me are illustrative of the obstacles faced by the vast majority of small businesses on a daily basis. Hopefully, my real-world input will help the committee in its effort to make the agency more effective.

My proudest business achievement is the creation of more than 55 jobs over the last five years. When we were recognized by *Inc. Magazine* as the 111th fastest growing private company in the United States, I was asked by several journalists what the greatest challenge had been in growing the company into a multi-million dollar concern. The answer was obvious: "finding qualified, dedicated people willing to work hard". It is my conclusion that these characteristics have nothing to do with ancestry.

My best estimate is that 32 of the 55 employees (60%) would have qualified for the 8(a) program had they started the business. But instead, they were discriminated against because our business did not have that status while direct competitors did. In preparing for today, I reflected on the unwritten practices that guided the mangers and me in finding new hires. The only bias I could uncover was a tacit preference for the unbridled enthusiasm that some of the newest immigrants hold for the free market system. It is clear with many of our new countrymen that their parents have taught them how fortunate they are to have a shot at the American Dream.

Although our business was not reliant on federal contracts, we found participation in the government market complementary to our core sales effort. We had dedicated government sales representative and, of course, the support staff spent a proportionate amount of time servicing contracts that we won. My most important message for the committee today is that the 8(a) Program penalizes disproportionately the very same ethnic groups it is designed to help. Employees who themselves would have qualified for special contract set-asides had they owned the business lost commissions, pay and benefits because they happened to work for my

company. This occurred not because we had inferior products or services - but simply because of my heritage.

For example, last fall a marketing representative spent weeks working with an agency's communications department showing them how certain features of a particular facsimile machine would streamline field communications and save the government operating funds. After testing, the communications department submitted the purchase request to procurement. Needing to fulfill a buying quota, the agency paid more for the same machine from a California-based 8(a) and my employees lost out. This is one of numerous cases where the practice of set-asides had measurable negative consequences on our employees. Less obvious are the unspoken games that major government contractors play to take advantage of the program through what is euphemistically termed "teaming".

During Desert Storm the secure fax communications requirements at DOD escalated suddenly. Although my company had installed secured units, the scale was different and I pursued a direct relationship with the largest manufacturer of such products. I remember very clearly their sales manager saying, "Jim, get with the game. Why should I run up hill selling with your company, when I can run downhill with our 8(a) partner." He went on to explain that he had a "special" relationship with an 8(a) firm designed specifically for agencies that need to spend set-aside dollars. The conversation was replete with the term "pass through" and left the clear understanding that there was no place in this side of our industry for my federal sales team.

The premise that small businesses need federal help to compete in the free market is false. It stems apparently from the belief that big business has some insurmountable advantage based on economic resources, when in fact the opposite is true. Our small business thrived on competing with the giants; because the burden of bureaucracy inflated their cost of doing business. Tinkering with the self-correcting genius of the free market is counterproductive.

In reviewing the SBA's Annual Report, I can not find a clear and complete explanation of the 8(a) Program or its goals and objectives. In fact for such a high profile element of the agency, it is conspicuously absent from the Performance Agreement set forth inside the cover. Perhaps, establishing such a mission statement should be the first step. For without an understanding of the government's aim, it is impossible to explain to all the (by definition) socially and economically disadvantaged employees who do not work for 8(a)'s why they are being penalized. There is no question that the program has rewarded financially a handful of owners. *Washington Technology Newspaper* publishes an annual list of the fastest growing technology companies in the area. While we have had the good fortune to appear on this list four of the last five years, 8(a) firms account for over 60 percent of the

award recipients. Has the success of these "disadvantaged" individuals somehow trickled down to other ethnically or socially disadvantaged people? Is the goal to reward individuals, groups or communities? Is there evidence that this program works better than the free market? These are the issues that I recommend your committee examine when considering the future of the program.

In closing, I hope that the committee is guided by the premise that the free market system works extremely efficiently. I have been challenged and rewarded by it. When you are in doubt about the benefit of a given program or proposed legislation, please remember that most of our problems in America today stem from interference with the free market and a lack of trust in the underlying strength of the individual citizen.

This concludes my prepared remarks. Thank you again for the opportunity to appear before you; I will be happy to answer any question you might have.

Chairman BOND. Thank you, Mr. Graham.
Ms. Garza.

**STATEMENT OF SANTOS F. GARZA, CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER, COUNTER TECHNOLOGY, INC., BETHESDA, MARYLAND**

Ms. GARZA. Good morning, Mr. Chairman, and committee members. My name is Santos Garza. I am the chairman of the board and chief executive officer of Counter Technology.

Chairman BOND. Ms. Garza, could you pull that microphone a little closer? I am having a little trouble hearing you.

Ms. GARZA. My children never complain that I cannot be heard.

Chairman BOND. Actually, my son has trouble hearing me, but it is because he does not listen, so there is a difference.

Ms. GARZA. I am cochairman of the Economic Development Committee for the U.S. Senate Republican Task Force on Hispanic Affairs. I have been involved in identifying those issues that impact the economic development of Hispanic business, and I have met with Senator Dole and shared and offered my recommendations regarding these issues.

CTI has been in the 8(a) program since 1990. Today we have over 375 employees; 69 percent of those employees are minorities and 57 percent of my management staff are minorities and women. We are a high technology firm providing security systems and programs design and engineering to Federal agencies, corporations and major aviation industry clients.

I present a dichotomy in that although I am a product of programs such as affirmative action and minority economic development, I feel very strongly that one succeeds through hard work and commitment. In 1976, I began my public safety and security career as the only minority female sworn officer in the history of the Aurora, IL, Police Department, hired through the city's Affirmative Action Program. I finished No. 2 on the entrance exams out of over 500 applicants, and I graduated first in my class. I served for 11 years before leaving to start my own business. That opportunity prepared me for the position I hold today.

The skills I developed as an officer, along with the support of my staff, have enabled us to successfully utilize the 8(a) program. Not everyone who enters the business world as an entrepreneur will succeed. Similarly, not every company that enters the 8(a) program will succeed. However, along with a plan on how to get CTI into the program, we developed a plan on how to get CTI out of the program successfully.

The SBA had already provided vital assistance to our firm in almost every aspect on how to do business. The 8(a) program has provided us the opportunity to gain further experience in other fundamental areas, such as the development of strategic marketing plans and project and budget management. In addition to quarterly financial reviews, our annual review submissions are monitored very closely by the SBA.

CTI's core service is in the aviation industry. We recently won a coveted contract for the design of a security system for the new airport being built in Austin, TX, the only new airport going up in

the Nation. The competition was full and open, and our competitors included major, multi-billion dollars firms.

CTI's selection over several major national firms is confirmation that the 8(a) Program does work. Three years ago, bidding on this contract would not have been an option for us. However, its impact in terms of CTI's credibility and standing in the industry has literally put us on the map.

CTI's continued success in the program does not mean that we do not mean that we do not recognize the program's weaknesses. For example, there is a potential and tendency to grow too quickly. With the guidance of SBA staff we have learned to manage our growth and today we will go after only those requirements that allow us to enhance the capability that is transferable into commercial or non-8(a) contracts.

One obstacle we had to initially overcome was convincing user agencies that we were qualified to perform on requirements that involved technical and professional disciplines. There is often a proclivity for the agencies to designate labor-intensive contracts to the 8(a) program, reserving the more technical contracts for more qualified firms.

Administrator Goldin recently testified that NASA has increased its use of qualified small minority contractors in highly technical areas in a concerted effort to broaden competition. The effect has been increased competition outside of the 8(a) program, higher quality goods and services, and reduced cost for the agency.

What is frequently misunderstood is that the 8(a) program does not give companies contracts. What the program does offer is the opportunity to develop those skills necessary to compete in a full and open environment and to gain experience necessary but not always available to small minority firms.

During our program participation, the SBA has fostered competence, placed requirements for competitive bidding, and set limits. The SBA continues to provide us with technical assistance, support, and management advice. Our experience in competitive bidding in a more sheltered environment has prepared us to more fully withstand the rigors of a fully open bidding environment.

As our revenues have grown we have become no longer eligible to bid on certain requirements. There has been much discussion, Mr. Chairman, about having reached a level playing field. If this is true and programs designed to ensure this are no longer needed, than 50 percent of police departments would be female and minorities would be representative of the minority populations in those communities.

My experience has been that similar conditions exist in our small business community. If the purpose of the 8(a) program is to foster a level playing field for small minority businesses, we are not quite there yet, despite our advances. The program was conceived for the promotion of diversity and opportunities and ultimately, in the national self-good. Honest conversation and examination without references to these issues is crucial to your decisions, and I thank the committee for the opportunity to participate in this effort.

[The prepared statement of Ms. Garza follows:]

Counter Technology Inc.

**SENATE COMMITTEE ON SMALL BUSINESS**

**TESTIMONY OF SANTOS F. GARZA**

**Delivered on April 4, 1995**

Mr. Chairman and Distinguished Committee Members. Good morning. Thank you, Senator Bond, for the opportunity to give testimony today on the Small Business Administration's 8(a) program.

My name is Santos (San) F. Garza. I am the Chairman of the Board and Chief Executive Officer of Counter Technology, Inc. (CTI), located in Bethesda, Maryland. CTI has been an 8(a) program participant since April, 1990. As Co-chairman of the Economic Development Committee for the U.S. Senate Republican Conference Task Force on Hispanic Affairs, I have been involved in identifying those issues that impact the economic development of Hispanic businesses. On a more personal basis, I have met with Senator Dole and offered my recommendations concerning these issues.

CTI was incorporated in October, 1986, and has grown from four (4) employees to over three hundred seventy-five (375) employees today. In addition to the corporate headquarters in Bethesda, Maryland, CTI now has satellite offices in Chicago, Austin, Dallas, and Covina, CA, from which CTI manages its employees deployed in twenty-five (25) States and the Commonwealth of Puerto Rico.

CTI provides security systems design and engineering, systems integration, security programs development and management, investigations and telecommunications for Federal agencies, such as the Departments of Transportation, Treasury, Energy, Commerce,

4733 Bethesda Avenue, Suite 200, Bethesda, MD 20814, (301) 907-0127

Agriculture, NASA and the U.S. Holocaust Memorial Museum. Additionally, CTI provides technical security management services to major aviation clients such as USAir, Northwest Airlines, Chicago's O'Hare and Midway Airports, the New Austin (TX) Airport Project, Philadelphia International Airport and Baltimore-Washington International Airport.

My family roots lie in the Rio Grande Valley of Texas. Although I was born in Illinois, the transient environment in which I spent my early years as the child of migrant workers in the South and Midwest, gave me a unique insight into the plight of Hispanic Americans.

The fact that I am present here today testifying before this committee is a contradiction of sorts. I present a dichotomy in that although I am a product of programs such as affirmative action and economic development, I feel very strongly that one succeeds by pulling oneself up by the bootstraps and that success comes from hard work and commitment.

In 1976 I began my public safety and security career as the first and only minority female sworn officer in the history of the Aurora, Illinois Police Department, hired through the city's affirmative action program. I finished number two on the entrance exams out of over five hundred applicants, and graduated number one from my Illinois State Police Academy basic training class. I went on to serve for eleven years before leaving to start my own business. The fact that I was still the only minority female sworn officer on that department when I left convinced me that had it not been for the affirmative action program, I would have been denied that opportunity. That opportunity prepared me for the position I have now as Chief Executive Officer and majority stockholder of CTI. As a street officer I developed and honed my communication skills; I learned how to lead and motivate people to do what I

needed them to do; I learned how to take command of a situation and maintain control. Most importantly, I learned how to make decisions, good decisions. These skills, along with the support of my dedicated and committed staff, have enabled us to successfully utilize the SBA's economic development program - the 8(a) program.

I would like to give you a brief overview of CTI's experience with the 8(a) program, the lessons learned and my observations.

Not everyone who enters the business world as an entrepeneur will succeed. Similarly, not every company that enters the 8(a) program will succeed. However, along with a plan on how to get CTI into the 8(a) program, we developed a plan on how to get CTI out successfully. The Small Business Administration had already provided vital assistance to our firm in almost every aspect on how to do business. The 8(a) program has provided us the opportunity to gain further experience in other fundamental areas such as the development of strategic marketing plans and project and budget management.

CTI's core service is in the aviation industry, specifically those areas related to security technology. Our competition includes major multi-billion dollar, multi-national corporations. The 8(a) program has enabled us to compete successfully against these firms. We recently bid on a contract for the design of the security system and development of the security program for the new airport being built in Austin, Texas. The fact that it is the only new airport under construction in the nation made this a coveted contract. The FAA, who must approve all design and implementation, was also watching the outcome carefully. The competition was full and open and in addition to technical capability, the bidders were evaluated on experience and performance in managing large projects, several years in duration. CTI's selection over several major firms is confirmation that the 8(a) program works. As recently as three

years ago, bidding on this contract would not have been an option for us. The significance of this contract is not monetary, indeed, it is one of the smallest contracts in CTI's contract base. However, its impact in terms of CTI's credibility and standing in the industry has literally put us on the map.

CTI's continued success in the program does not mean that we do not recognize the program's weaknesses. For example, there is a potential and tendency to grow too quickly, however, even major corporations have suffered from rapid growth as evidenced by today's climate of corporate down-sizing. With the guidance of SBA staff, we have learned to manage our growth. We have developed our own yardstick by which we measure whether we will chase a contract. Today we will only go after those requirements that offer us an opportunity to enhance or further develop a capability that is "translatable" into commercial or non-8(a) contracts and this strategy has worked well for us. In our proposal to the City of Austin we included vital experience gained on two 8(a) contracts.

One of the most difficult obstacles we had to overcome upon entering the program was convincing the user agencies that we were qualified to perform on requirements that involved technical and professional disciplines. Because of our involvement in security, we were offered numerous contracts to provide guard services. There is often a proclivity for the agencies to designate labor intensive contracts to the 8(a) program, reserving the more technical contracts for more "qualified" firms. Administrator Goldin recently testified that NASA has increased its use of qualified small minority contractors in highly technical areas, in a concerted effort to broaden competition. The effect has been increased competition outside of the 8(a) program, higher quality goods and services and reduced costs for the Agency.

The program has its stigmas. During my years as a police officer

I discovered something interesting. Unlike my fellow male officers, I found I had to prove myself every day. I had to make extra effort to do an exceptional job, take extra steps to ensure quality work. I find myself in a similar situation as a small and minority contractor. We have to work harder, be more diligent, monitor more closely because there is a pre and misconception that because we are in the program we must not be quite as good. Just as the extra effort made me a better cop, the extra steps have made CTI an exceptional and quality firm, but more importantly, our clients have benefited. We have received numerous commendations for the quality of our work, most recently, an Excellence Award from the Department of the Treasury, and the 8(a) Contractor of the Year Award for Technical Services from the Department of Education.

What is frequently misunderstood by many, including minority businesses, is that the 8(a) program does not give companies contracts. If anything, CTI has had to work harder to obtain the types of contracts that are preparing us for "life after 8(a)". What the program does offer is the opportunity to develop those skills necessary to compete in a full and open environment and gain experience so necessary but not always possible for a small firm.

An article which appeared in the March 27, 1995 issue of Business Week stated that "with solid technical assistance, set-aside programs can work." It goes on to address "how to make minority preferences work", citing, 1) fostering competence, 2) requirements for competitive bidding and 3) setting limits. Our 8(a) program experience has included all three. First, during our developmental stage, the SBA provided, and continues to provide, CTI technical assistance, support and management advice.

Secondly, we find that the program fosters competition. One of our first Federal contracts and by far our largest at the time, was competed among eligible 8(a) firms. Even though CTI was the

smallest firm to bid on that contract we were the successful bidder. Our experience in competitive bidding in a more sheltered environment has prepared us to more fully withstand the rigors of a fully open bidding environment. Although CTI was the only minority owned firm that submitted a bid as the prime contractor for the Austin airport contract, our competition included giants Unisys, Stone and Webster Engineering and the Bechtel Corporation. The program is structured so that during the transitional phase CTI is required to obtain a proportionate share of contracts outside of the program. Our 8(a) and non-8(a) generated revenues are monitored quarterly and an annual review is conducted to assess our growth, marketing strategies, and revised business and financial plans.

Thirdly, there are set limitations on the types of contracts that we can obtain through the program. As we have grown and our revenues have exceeded certain size limitations, we are no longer eligible to bid on certain requirements.

There has been much discussion about a level playing field. If I may use the analogy once more of my experience in police work, police and fire departments have long represented the transition zone between blue collar and white collar groups, therefore considered solid middle America. If indeed we now have a level playing field and those programs designed to ensure this are no longer needed, then 50% of these departments would be female, and minorities would be representative of the minority populations in those communities. My experience has been that similar conditions exist in our small business community. If the purpose of the 8(a) program is to foster a level playing field for small minority businesses, then I submit that even though we have made significant advances, we are not there yet.

A comprehensive review and assessment of the 8(a) program to

redetermine the purpose of its existence would surely further identify areas of weakness as well as strengths in the program. It is my understanding that the program was conceived for the promotion of diversity and opportunities, and ultimately the national self good. Honest conversation and examination without references to wedge issues is crucial to your decisions. I thank the Committee for the opportunity to participate.

Chairman BOND. Thank you very much, Ms. Garza.
Mr. O'Donnell.

**STATEMENT OF ARNOLD J. O'DONNELL, MEMBER, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, VICE PRESIDENT, O'DONNELL CONSTRUCTION CO., WASHINGTON, D.C.**

Mr. O'DONNELL. Mr. Chairman and members of the committee, my name is Arnold O'Donnell. My brother, John, and I are the co-owners of O'Donnell Construction Co., a small firm headquartered in northeast Washington, DC. My firm specializes in the construction and repair of streets, sidewalks, and underground utilities. At its peak, my company employed 25 people. Today it has 10 employees.

I am here today as a spokesman not only for myself, but also the 33,000 firms that make up the Associated General Contractors of America. On behalf of AGC and its members, let me thank you for the opportunity to testify on the 8(a) program.

For a long time, I doubted that this day would ever come. I doubted that Congress would ever pause to reflect on the larger, often moral issues, that the program raises. As I waited for this day, I began to fear that the next generation would grow cynical and disinterested in civil rights. As I waited for Congress to pause and reflect, I began to question whether many of our children would come to believe that civil rights are something in which they have no stake, something akin to property rights, belonging to others but not to them or to their children.

I now urge you to reflect on what it would mean to acquiesce to the demands that set-aside programs become a large and permanent feature of Federal procurement. The last generation forged an immensely powerful consensus that civil rights are personal rights guaranteed to each individual without regard to race, gender or ethnic origin. What would further acquiescence to Government preference programs do to that consensus?

Several years ago I challenged a set-aside program that the District of Columbia had implemented. During the course of that litigation I learned that the Nation's Capital had set aside well over half of its road and highway work for a period of 5 years. Eventually, the U.S. Court of Appeals for the District Circuit agreed that I was a victim of unlawful racial discrimination. As members of the D.C. Circuit, Supreme Court Justice Ruth Ginsburg and White House Council Abner Mikva agreed with Judge Randolph that I was entitled to a court order that would end the city's program.

With their decision in hand, I then applied to the 8(a) program. After all, few if any of the firms in the program have anything approaching the same evidence that racial discrimination has limited their business opportunities. I expected a quick decision that I would be eligible for 8(a) contracts, but I was rebuffed.

I was denied admission to the program on the grounds that I had failed to provide enough evidence of my eligibility. When I appealed that decision I was told that the SBA's administrative law judge had retired and that, as a result, there was no one to hear my appeal. The entire matter is now in bureaucratic limbo.

On behalf of AGC, I can tell you that thousands of other construction contractors have come to know the same frustration. They

have come to know the set-aside programs are littered with euphemism for the bottom line that they are deemed to be expendable.

The first attachment to my written statement is a letter from Air Force Col. Stephen Bull to the Honorable Jim McCrery. The letter confirms that Barksdale Air Force Base set aside 100 percent of its construction contracts in fiscal year 1994. The letter adds that the Air Force had found this proper and not disproportionate in its impact on the construction industry.

The 8(a) program is one of the bigger causes of the construction industry's frustration. Barksdale did not use the 8(a) program to set aside these contracts, but the same or another base in any given year could easily do so and the impact on small non-minority firms in the surrounding areas would be exactly the same.

Notwithstanding the many times in which it refers to social and economic disadvantage, the 8(a) program is based on rigid, racial classifications. The program makes a conclusive and unrebuttable presumption that all minorities are socially disadvantaged. The program then abandons any real notion of economic disadvantage and reserves the bulk of its benefits for the affluent members of the nation's minority groups.

In strictly economic terms, the 8(a) program is a subsidy for the upper middle class, particularly in the Washington area. A number of 8(a) contractors are, in fact, millionaires. After subtracting their equity in their homes and businesses, the 722 individuals who entered the 8(a) program in fiscal year 1993 had an average net worth of $135,000.

I would like to mention one thing briefly. Mrs. England-Joseph mentioned 50 of the top 8(a) firms got 25 percent—200 8(a) firms got 54 percent of all 8(a) contract dollars in fiscal year 1993. I mean 200 individuals got more than half of all the money.

The 1990 census found that 5.4 million Hispanics were living in poverty. I found that 8.4 million Blacks were living in poverty. It found that 19 million Whites were living in poverty. In these austere times, when Federal, State, and local budgets are all being cut, it is difficult to understand why the Federal Government should continue to subsidize a select group of affluent citizens.

Some of the program supporters will contend that 8(a) contractors make at least a greater effort to employ minorities. The data belies the claim. The second attachment to my testimony is an Associated Press report on the results of its own study of where the 8(a) program dollars are going. The study found that the lion's share of the dollars are going to firms whose headquarters were located in primarily white, well-to-do neighborhoods. The Associated Press found that the average minority contracting company is located in an area where 68 percent of the residents are white, half of the household earn $37,415 or more, and only 1 person in 7 is poor.

According to the attached article, the SBA's deputy administrator has actually conceded that the 8(a) program is not designed for economic development in black inner-city neighborhoods.

As I stated earlier, the 8(a) program is based on rigid racial classifications. The program does not merely add race to a mix of factors that collectively effect the award of Federal contracts, it makes race the dominant and controlling factor in the award of billions of

dollars of Federal work. Once a contracting officer sets a contract aside, non-minority firms are completely excluded from any and all consideration.

I hear the phrase, "the level playing field." We do not have a level playing field. For the past 5 years, my brother and I are not even allowed to enter the stadium. We are not complaining about field conditions.

The 8(a) program is one of the extreme forms of affirmative action and not one of these close cases in which race has become a plus factor used only to break a tie.

In closing, I urge the committee to review not only the 8(a) program, but also all of the other set-aside programs that have crept into the Federal system. The programs are many, and their collective impact is tremendous.

The Federal Aid Highway Program sets aside approximately $2 billion each year. The 8(a) program sets aside more than $4 billion. The 1207 program sets aside another $1 billion. If the civilian agencies maintain the Defense Department's ratio of 8(a) to other set-asides, the new program that Congress included in the Federal Acquisition and Streamlining Act will set aside another $2 billion.

Thank you again for the opportunity to testify. I hope that my testimony has been helpful. For myself and ACG, I respectfully request the committee to include the full text of my written statement and the attachments thereto in the record of this hearing.

[The prepared statement and attachments of Mr. O'Donnell follow:]

# Arnold J. O'Donnell
# On Behalf of
# The Associated General Contractors of America

Mr. Chairman and members of the Small Business Committee, my name is Arnold O'Donnell. My brother and I are the co-owners of the O'Donnell Construction Company, a small firm headquartered in Northeast Washington, D.C. My firm specializes in the construction and repair of streets, sidewalks and underground utilities. At its peak, my company employed 25 people. Today, my company has 10 employees.

I am here today as a spokesman for not only myself but also the 33,000 firms that make up the Associated General Contractors of America (AGC). These firms engage in the construction of highways, bridges, tunnels, airports, water conservation projects and waste treatment facilities. They also engage in the construction of office and other buildings, factories, warehouses and shopping centers. Among their projects are defense and other federal facilities.

On behalf of AGC and its members, let me thank you for the opportunity to testify on the 8(a) program. For a long time, I doubted that this day would come. I doubted that Congress would ever pause to reflect on the larger, often moral issues that the program raises. Congress has held many oversight hearings on the program's implementation. In fact, this Committee held a hearing just last summer. The Inspector General of the Small Business Administration (SBA) delivered typical testimony. He addressed the large number of contracts that the program concentrates in the hands of a few firms, the wealth of many of the program participants, the great number of contracts that the program sole sources, and the brokering that the program tolerates.[1]

Congress has heard similar testimony on many occasions. Congress has not, however, made much effort to put the program into any larger context. It has not made any serious effort

---

[1] Statement of James F. Hoobler, Inspector General, U.S. Small Business Administration, before the U.S. Senate Committee on Small Business, July 27, 1994 (hereinafter "Hoobler Statement").

to square the program with the nation's commitment to civil rights. It is an unpleasant truth that the 8(a) program threatens the civil rights consensus that past generations fought so hard to create. It is an unpleasant truth that the bulk of the program's benefits accrue to an affluent few.

As I waited for this day, I began to fear that our children would grow cynical and disinterested in civil rights. As I waited for Congress to pause and reflect, I began to question whether many of our children would come to believe that civil rights are something in which they have no stake, something akin to property rights, belonging to others, but not to them, or to their children.

I was myself a victim of discrimination, and much of my fear grew out of my own experience. The pain of racial discrimination became real for me because the government had imposed special preference programs.

But having been a victim of discrimination, and having experienced the pain, I now urge you to reflect on what it would mean to acquiesce to the demands for more of the same. The last generation forged an immensely powerful consensus that civil rights are personal rights, guaranteed to each individual, without regard to race, gender or ethnic origin. What would further acquiescence to government preferences programs do to that consensus?

It was seven years ago that I began writing to the federal and local officials who were routinely denying me the opportunity to bid for the smaller contracts that my company could perform. I wrote to Congress. I wrote to the Secretary of Transportation. I wrote to the city government. Letters went back and forth. To absolutely no avail.

Out of utter frustration, I took a drastic step. As have many minorities, I asked the federal courts for relief. During the course of that litigation, I learned that the nation's capital had set

aside well over half of its road and highway work for a period of five years.[2] Eventually, the U.S. Court of the Appeals for the D.C. Circuit agreed that I was a victim of unlawful racial discrimination in the award of public contracts in the District of Columbia. As members of the D.C. Circuit, Supreme Court Justice Ruth Ginsburg and White House Counsel Abner Mikva agreed that I was entitled to a court order that would end the city's program.

With their decision in hand, I then applied to the 8(a) program. After all, few if any of the firms in the program have anything approaching the same evidence that racial discrimination has limited their business opportunities. I expected a quick decision that I would be eligible for 8(a) contracts. But once again, I was rebuffed. I was denied admission to the program on the grounds that I had failed to provide enough evidence of my eligibility. When I appealed that decision, I was told that the SBA's administrative law judge had retired, and that, as a result, there was no one to hear my appeal. The entire matter is now in a bureaucratic limbo.

On behalf of AGC, I can tell you that thousands of other construction contractors have come to know the same frustration. They have come to know that set-aside programs are littered with euphemisms for the bottom line that they are deemed expendable. The first attachment to my written statement is a letter from Air Force Colonel Stephen Bull to the Honorable Jim McCrery. The letter confirms that Barksdale Air Force Base set aside 100% of its construction contracts in FY 1994. The letter adds that the Air Force has found this "proper" and "not disproportionate" in its impact on the construction industry.

The 8(a) program is one of the bigger causes of the construction industry frustration. Barksdale did not use the 8(a) program to set aside these contracts, but the same or another base, in any given year, could easily do so, and the impact on the small non-minority firms in the

---

[2] I learned that the city had set aside 98% of the locally funded road and highway construction, over the same period. This had a particularly severe impact on my company, because it could not perform the large contracts that tended to have federal funding.

surrounding area would be exactly the same.[3] Notwithstanding the many times in which it refers to "social and economic disadvantage," the 8(a) program is based on rigid racial classifications. The program makes a conclusive and unrebuttable presumption that all minorities are "socially disadvantaged." The program then abandons any real notion of "economic disadvantage," and serves the bulk of its benefits for the affluent members of the nation's minority groups. In strictly economic terms, the 8(a) program is a subsidy for the upper middle class, particularly in the Washington area.[4]

It is true that section 8(a) of the Small Business Act[5] is racially neutral. Section 8(a) makes no reference to any racial classification, and its legislative history reveals that Congress made a conscious and deliberate decision to make the program's benefits available to all Americans, on an equal basis, without regard to race or ethnic origin.[6] Nevertheless, the Small

[3] Eleven percent of the $4.32 billion that the 8(a) program set aside in FY 1993 was for work performed in just two of the twenty-seven SIC codes that make up the construction industry. Minorities in Business Insider, October 5, 1994, at 6-7.

[4] Twenty-five percent of the firms in the 8(a) program in FY 1993 were in the Mid-Atlantic region. Id., at 7. One-thousand-fifty-five of these firms, or or 22%, were in Washington, D.C., Maryland or Virginia. Id.

[5] 15 U.S.C. §637(a).

[6] From the time of its enactment in 1953 at least until 1968, when the President directed the SBA to develop a new program for socially or economically disadvantaged persons, section 8(a) was universally understood to be racially neutral. In 1970, in response to the President's directive, but well before Congress amended the statute, the SBA limited the program to such persons. 35 Fed. Reg. 17833 (1970). The agency also defined such persons to include Black Americans, American Indians, Spanish Americans, Oriental Americans, Eskimos and Aleuts. 13 C.F.R. §124.8-1(c) (1971).

It was not until 1978 that Congress amended section 8(a). Long after the fact, Public Law 95-507 authorized the Executive Branch to limit the 8(a) program to "socially and economically disadvantaged small business concerns." That legislation did not, however, authorize the 8(a) program to presume that minorities are either socially or economically disadvantaged. To the contrary, the legislative history reveals that Congress made a conscious decision to require the 8(a) program to be racially neutral. The House proposed to insert presumptions into sections 8(a)

Business Administration (SBA) has long and consistently presumed that racial minorities are socially disadvantaged, within the meaning and for the purposes of the 8(a) program.[7] Moreover, the SBA has made that presumption conclusive and unrebuttable, in both form and substance. One regulation implies that the SBA will apply the presumption only "[i]n the absence of evidence to the contrary."[8] But elsewhere, the SBA has retained the the unfettered discretion to disregard any such evidence.[9]

In the implementing regulations, one will find elaborate procedures for contracting officers and a limited number of others to challenge an individual's claim that he or she is socially disadvantaged.[10] A close reading of this material will, however, reveal that the SBA has authorized no one to protest an 8(a) set-aside.[11] The agency has authorized contracting officers and a limited number of others to protest section 1207 set-asides and bid preferences,[12] and the implementation of the 8(d) program, and "other federal procurement programs," but the relevant regulation expressly excludes the 8(a) program.[13]

---

and (d). Initially, the Senate rejected both. In conference, the Senate agreed to the House proposal to insert a presumption into section 8(d). In turn, the House agreed to delete the presumption that it had proposed to insert into section 8(a). See Conf. Rept. No. 95-1714, reprinted in 1978 U.S. Code. Cong. & Adm. News 3881-3882.

[7] See 13 C.F.R. §124.105(b).

[8] Id.

[9] See 13 C.F.R. 124.609(f).

[10] See 13 C.F.R. Part 124, Subpart B.

[11] See 13 C.F.R. §124.603.

[12] See 10 U.S.C. §2323.

[13] 13 C.F.R. §124.603(c).

In addition, the SBA has retained the discretion to reject any protest against any firm that it has admitted to the 8(a) program -- in reliance on the very presumption that the protest would question. The agency has retained the discretion "summarily" to determine that any 8(a) firm is "socially disadvantaged" without conducting any investigation or hearing of any kind.[14]

At the same time, the SBA has made it extremely difficult for non-minorities to enter the 8(a) program. The definition of social disadvantage is vague and subjective, and in the absence of any presumption, the "clear and convincing" evidence that will satisfy the SBA is equally uncertain.[15] Racial discrimination prevented me from bidding on hundreds of public contracts in the Washington area, but apparently, that does not mean that I have been "subjected to racial or ethnic prejudice or cultural bias."[16] My evidence of discrimination was strong enough to satisfy the U.S. Court of Appeals for the D.C. Circuit, but it is not enough, today, to satisfy the SBA.

The far from surprising result is that more than 99% of the 8(a) contractors are racial minorities.[17] Forty-eight percent of the 8(a) contractors are Black, 26% are Hispanic, 19% are Asian, between 6% and 7% percent are Native American, and less than 1% are non-minority.[18]

The SBA has also written any serious notion of "economic disadvantage" out of the 8(a) program. The SBA has defined economic disadvantage so broadly that even millionaires can

---

[14] 13 C.F.R. 124.609(f). The regulation does require the SBA to determine that it has completed an annual review of the firm within the previous 12 month period, and it does require the 8(a) firm to file an affidavit, but once again, it does not require any kind of independent investigation, or any hearing of any kind.

[15] <u>See</u> 13 C.F.R. §124.105(c).

[16] <u>See</u> 13 C.F.R. §124.105(a).

[17] Minorities in Business Insider, October 5, 1994, at 8. <u>Accord</u>, Associated Press, April 11, 1994.

[18] <u>Id</u>. <u>Accord</u>, Associated Press, April 11, 1994.

qualify for the program.[19] It has placed certain limits on the net worth of those eligible for the program but excluded their equity in their homes, and their equity in their businesses, from its estimate of their net worth.[20] Thus, if I had a million dollars in equity in my home, and twice that equity in my business, but no other assets, the SBA would find that my net worth is zero.

If I were a minority, and had $200,000 in other assets, the SBA would still let me into the program, because its limit on other assets, for anyone seeking to enter the program, is $250,000.[21] The SBA would permit me to remain an 8(a) contractor so long my other assets did not exceed $500,000.[22] For my last five years in the program, the agency would allow my other assets -- in addition to my home and business -- to climb to $750,000.[23]

Once again, the results are far from surprising. A number of 8(a) contractors are, in fact, millionaires.[24] After subtracting their equity in their homes and businesses, the 722 individuals who entered the 8(a) program in FY 1993 had an average net worth of $135,000.[25]

Adding insult to this injury is the frequently reported fact that a majority of the 8(a) contracts wind up in the hands of a few firms. A computer run of 8(a) companies with active

---

[19] Hoobler Statement, supra, n.1, at 8.

[20] See 13 C.F.R. §124.106 (a)(2)(i)(B). The SBA also excludes a spouse's one-half interest in all community property. Hoobler Statement, supra, n. 1, at 6

[21] See 13 C.F.R. §124.106(a)(2)(i).

[22] See 13 C.F.R. §124.111(a)(2)(i).

[23] See 13 C.F.R. §124.111(a)(2)(ii).

[24] See note 18, supra

[25] Associated Press, April 11, 1994.

contracts as of July 8, 1994, revealed that 200 companies had 54% of the work.[26] Their contracts totalled over $14 billion, meaning that each one had an average of $70 million in 8(a) work.[27]

The 1990 census found that 5.4 million Hispanics were living below the poverty. It found that 8.4 million Blacks were living below the poverty line. And it found that 19 million Whites were living below the poverty line. In these austere times, when federal, state and local budgets are all being cut, it is difficult to understand why the federal government should continue to subsidize a select group of affluent citizens.

Some of the program's supporters will contend that 8(a) contractors make at least a greater effort to employ minorities. In my personal experience, including several years in which I worked for a minority contractor, there is no significant difference in the number or percentage of minorities working for minority and non-minority firms. Every construction company tries to employ the best people it can find. Construction is a labor intensive industry, and the quality of a contractor's workforce can make all the difference in the world.

In any event, the data belies the claim. The second attachment to my testimony is an Associated Press report on the results of its own study of where the 8(a) program's dollars are going. The study found that "the lion's share" of the dollars are going "to firms whose headquarters were located in primarily white, well-to-do neighborhoods." The Associated Press found that "the average minority-contracting company is located in an area where 68 percent of the residents are white, half the households earn $37,415 or more, and only one person in seven is poor." According to the attached article, the SBA's Deputy Administrator has actually

---

[26] Hoobler Statement, supra, n. 1, at 4.

[27] Id. One-hundred-sixteen firms received 50% of the work in FY 1991; 151 firms received 50% of the work in FY 1992; and 175 firms received 50% of the work in FY 1993. Id. at 5.

conceded that the 8(a) program "is not . . . designed for economic development in black inner-city neighborhoods."

As I stated earlier, the 8(a) program is based on rigid racial classifications. The program does not merely add race to a mix of factors that collectively affect the award of federal contracts. It makes race the dominant and controlling factor in the award of billions of dollars of federal work. Once a contracting officer sets a contract aside, non-minority firms are completely excluded from any and all consideration. The third attachment to my written statement is an example of how the process works. It is a notice that the National Naval Medical Center had decided to set aside a sewer line replacement contract for an 8(a) contractor. As are the vast majority of 8(a) contracts, this one was sole sourced.[25] Thus, the military installation permitted only one contractor to bid for the work. All non-minority firms were completely shut out. The 8(a) program is one of the extreme forms of affirmative action, and not one of those close cases in which race has become a "plus factor" used only to break a tie.

In closing, I urge the committee to review not only the 8(a) program but also all of the other set-aside programs that have crept into the federal system. The programs are many and their collective impact is tremendous. Since 1987, the 1207 program has authorized the Defense Department to set aside contracts entirely on its own initiative, without going through the SBA or its 8(a) program. Last year, when it passed the Federal Acquisition and Streamlining Act, Congress extended the 1207 program to NASA and the Coast Guard. Congress also authorized a parallel program for all of the civilian agencies.

---

[25] The 8(a) program normally requires certified contractors to compete, among themselves, for any manufacturing contract expected to exceed $5 million, and for any other contract expected to exceed $3 million. See 13 C.F.R. §124.311. Nevertheless, from January of 1989 to July of 1994, the program actually required competition for only 1.9% of the 8(a) contracts, accounting for only 9% of the 8(a) program dollars. Hoobler Statement, supra, n. 1, at 11. During this period, the program sole sourced a total of $16.6 billion in federal work. Id.

The new program for the civilian agencies has yet to take effect but it is bearing down on me and thousands of other small businesses, and as Congress and the President debate the merits of racial preferences, the rest of us can only wonder whether Washington has even summoned the courage to keep the situation from getting worse. This program authorizes the civilian agencies to use not only set-asides but also bid preferences (up to 10%) to reach the "maximum practicable" level of "small disadvantaged business" participation in their procurement. Unless Congress and the President take decisive action, a huge new set-aside program will soon take effect.

And as have the 8(a) and 1207 programs, the new program will take its greatest toll on small non-minority firms. It is a fact of economic life that set-asides run down hill. The federal agencies cannot set aside their larger contracts because "small disadvantaged" businesses cannot perform those contracts. To make the numbers come out right, the agencies must and do set aside an excessive number of the smaller contracts on which small non-minority firms must also depend. It is not surprising that all of the construction contracts that Barksdale Air force Base set aside last year were contracts for less than $2 million. Nor would have it helped for the installation to put out a $20 million contract for open competition. The aggregate numbers would have changed, and in truth, Washington's perception of the situation would have also changed. The fact remains that small non-minority firms are incapable of performing such a large contract, and the set-aside program's impact on those firms would have been exactly the same.

Without taking the time necessary to discuss all of the federal programs, I would also urge the Committee to examine the "disadvantaged" business enterprise program for federal-aid highway construction. This program puts a $2 billion burden on one discrete segment of just one industry. For more than a deciade, it has imposed a severe hardship on the small non-minority contractors in the highway construction industry.

Until it identifies and assesses all of these programs. Congress cannot begin to appreciate their collective impact on non-minorities. As I noted. the federal-aid highway work sets aside approximately $2 billion each year. The 8(a) program sets aside more than $4 billion. The 1207 program sets aside another $1 billion. If the civilian agencies maintain the Defense Department's ratio of 8(a) to other set-asides. the new program that Congress enacted just last year could well set aside another $2 billion. The new bid preference for minority contractors could bias the competition for millions of dollars in additional work.

As it proceeds. Congress will also find it cannot take a piecemeal approach. These set-aside programs overlap and duplicate each other. It would do little if any good to revise or repeal the 8(a) program but permit the 1207 program or the new program for the civilian agencies to go forward. The latter would simply expand. and the total amount of work being set aside would be little changed.

Thank you again for the opportunity to testify. I hope that my testimony has been helpful. For myself and AGC. I respectfully request the committee to include the full text of my written statement. and the attachments thereto. in the record of this hearing.

# First Attachment

DEPARTMENT OF THE AIR FORCE
WASHINGTON DC 20330-1000

JAN 09 1995

OFFICE OF THE SECRETARY

January 3, 1995

SAF/LLP
1160 Air Force Pentagon
Washington, DC 20330-1160

The Honorable Jim McCrery
United States Representative
6425 Youree Drive
Suite 350
Shreveport, Louisiana 71105

Dear Mr. McCrery

This is in response to your letter of November 25, 1994, to Brigadier General David Young, Commander of the 2nd Bomb Wing at Barksdale Air Force Base (AFB), Louisiana, concerning the percentage of construction contracts set-aside for small disadvantaged businesses (SDBs) at Barksdale AFB during Fiscal Year (FY) 1994.

Although the Small Business Competitiveness Demonstration Program of 1988 deleted a large portion of the small business set-aside requirements (15 U.S.C. 644 note), agencies still must comply with 8(a) and small disadvantaged business (SDB) set-aside requirements. Title 10, United States Code, Section 2323 sets forth a percentage goal for Department of Defense (DoD) contracts with SDBs and other categories of contractors. The statute directs the Secretary of Defense to prescribe regulations providing procedures to meet these goals. Under DoD Federal Acquisition Regulation Supplement (DFARS) 219.502-1-70, the Contracting Officer "shall" set-aside acquisitions for SDB concerns when the requisite conditions are met.

Policy states that an acquisition will be set-aside for SDBs if the Contracting Officer has a reasonable expectation that two or more SDBs will submit bids and otherwise meet all requirements of the solicitation. In each case where a solicitation is to be set-aside, the Director of Business Programs determines whether or not a set-aside is appropriate. The Shreveport/Bossier City area happens to have numerous small disadvantaged contractors who are capable of performing projects for Barksdale AFB. Of the ten contracts awarded in FY 1994, Barksdale AFB received less than two bids only one time. In most cases, they received as many as five or six bids. The data shows that there are enough SDB concerns

bidding on projects at Barksdale AFB to justify the set-asides. Although 100 percent of Barksdale AFB's construction contracts that were awarded during FY 1994 were set-aside for SDBs, only 75 percent of the base's solicitations were set-aside. All of the projects that were open to large and small businesses either had bid opening dates in FY 1995 or were canceled prior to opening of bids.

Headquarters Air Combat Command (HQ ACC) has reviewed the bases's set-aside procedures and concurs that they are proper and that the base's set-aside rate is not disproportionate. Comparing bases is sometimes difficult because of the numerous factors that contribute to these figures such as the number of SDB contractors in the area, their willingness to bid on projects on DoD installations, and the aggressiveness of the Director of Business Programs in informing SDBs of the contracting opportunities. The complexity and magnitude of projects at each base can greatly affect the number of small disadvantaged businesses that bid on projects. Installations that advertise simple, small dollar construction projects will typically set-aside a greater percentage than bases with more complex, large dollar projects. We believe this was the case at Barksdale AFB in FY 1994 since all of their projects were relatively small and of a non-complex nature.

In summary, we believe Barksdale AFB's actions have been in accordance with public law and current policies and that the set-aside rate was consistent with the rest of the command. For your information, we have enclosed a list of all the solicitations for construction at Barksdale AFB and the outcome of each.

We appreciate your interest in this matter and trust the information provided is useful.

Sincerely

STEPHEN D. BULL, III
Colonel, USAF
Chief, Programs and Legislation
Division
Office of Legislative Liaison

Attachment

BARKSDALE AFB FY 94 CONSTRUCTION INFORMATION

SOLICITATIONS ISSUED IN FY 94 - NOT AWARDED:

| | | | | |
|---|---|---|---|---|
| 94-B0020 | Repair Switching Station | $974 K | Unrestricted | FY 95 Award |
| 94-B0007 | Construct TFH Maint Fac. | $422 K | SDB S/A Canx, Bids too high Reissued in FY 95 (Unrestricted) | |
| 94-R0001 | Replace Wherry Housing | $16 Mil | Unrestricted | Canx, Offers unacceptable Being Reissued |

SOLICITATIONS ISSUED IN FY 93 - CANCELLED IN FY 94:

| | | | | |
|---|---|---|---|---|
| 93-R0021 | Repair DRMO Road | $40.6 K | 8(a) S/A | Canx Oct 93 |
| 93-B0025 | Paint JP4 Fuel Tanks | $35.2 K | SDB S/A | Canx Oct 93 |
| 93-B0026 | Repair Twining Drive | $256 K | SDB S/A | Canx Oct 93 |
| 93-B0027 | Airfield Paint/Removal | $105.1 K | SDB S/A | Canx Nov 93 |
| 93-B0028 | Rpr N Taxiway Shoulders | $436 K | SDB S/A | Canx Nov 93 |
| | (This solicitation was reissued in FY 94 SDB S/A) | | | |
| 93-B0029 | Repair Supply Roof | $425 K | SDB S/A | Canx Oct 93 |
| 93-B0032 | Demolish Pumphouse 9 | $216 K | SDB S/A | Canx Oct 93 |
| 93-B0033 | Demolish Metal Dorms | $1.2 Mil | SDB S/A | Canx Oct 93 |
| 93-B0038 | Lights/Fans, Base Supply | $40 K | SDB S/A | Canx Oct 93 |

CONTRACTS AWARDED IN FY 94: (All were SDB Set-Aside)

| | | |
|---|---|---|
| 94-C0009 | WSA Entry Control Point | $97 K |
| 94-C0010 | Alt/Rep Bldg 7213 | $483.8 K |
| 94-C0011 | Alt Capehart MFH, Ph I | $1.6 Mil |
| 94-C0014 | 25 Ton A/C, Hospital | $48.5 K |
| 94-C0025 | Repair Sanitary Sewers | $635K |
| 94-C0027 | BURS, Base Supply | $214.6 K |
| 94-C0028 | North Taxiway Shoulders | $396.9 K |
| 94-C0029 | Construct New Weld Shop | $505 K |
| 94-C0032 | Repair Commissary Roof | $608.5 K |
| 94-C0034 | Repair Airfield Lighting | $717 K |

BARKSDALE AFB FY 94 CONSTRUCTION INFORMATION

| | NUMBER | DOLLARS |
|---|---|---|
| CONTRACT AWARDS IN FY 94: | 10 | $5,328,880 |
| CONTRACT AWARDS FROM SDB S/A: | 10 | $5,328,880 |
| Percentage: | 100% | 100% |

The following applies to ALL solicitations in FY 94:

| | | |
|---|---|---|
| SOLICITATIONS ISSUED IN FY 94: | 8 | $19,968,099 |
| SOLICITATIONS SET-ASIDE FOR SDB: | 6 | $2,994,099 |
| Percentage: | 75% | 14% |

The following applies to solicitations estimated under $2 Mil only:

| | | |
|---|---|---|
| SOLICITATIONS ISSUED IN FY 94: | 7 | $3,968,099 |
| SOLICITATIONS SET-ASIDE FOR SDB: | 6 | $2,994,099 |
| Percentage: | 85% | 75% |

NOTE: The above figures were prepared by removing only 94-R0001 ($16.0 Mil)