# EXHIBIT A-15
# (part 3)

# Second Attachment

03253277 0006
Minority Contract Program Mostly Benefits Companies in White Areas
BY: TIM BOVEE
DATELINE: WASHINGTON PRIORITY: Rush WORD COUNT: 1273
THE ASSOCIATED PRESS DATE: April 11, 1994 07:07 EDT

The government's flagship program for minority entrepreneurs awarded $19 billion in contracts over the last six years, with the lion's share going to firms whose headquarters were located in primarily white, well-to-do neighborhoods.

An Associated Press computer analysis of ''minority set aside'' contracts handled by the Small Business Administration found that just 22 percent of the project dollars went to companies located in minority areas.

And those companies that qualified for the program while remaining in minority areas on average got fewer contracts and dollars than those in white areas, the analysis showed.

The SBA's 8(a) program directs federal contracts to minority-owned companies for work ranging from computer processing to construction or custodial services. SBA has told Congress that one effect of these contracts has been to boost job opportunities in less prosperous city neighborhoods.

Yet to be more competitive, some business owners said they moved out of minority communities to get closer to their federal customers.

''I was (located) so far away from government installations, the SBA was reluctant to give me jobs,'' said Samuel Hayes, who moved his construction company out of Benton Harbor, a city in southwestern Michigan where nine people in 10 are black.

Now his company, Rah Development, does business from Northville, Mich., in an area of the Detroit suburbs where half the households make more than $167,374 and nine people in 10 are white.

The program's supporters say its goal is to foster minority businesses, not community development. And like any business, they say, minority companies need to locate near their customers. In the 1990s, that often means the suburbs.
''It's a business decision, not a social decision as to the location,'' said Cassandra Pulley, SBA deputy administrator. ''It is not a program that is designed for economic development in black inner-city neighborhoods.''

The analysis of 8(a) contracts showed the average minority-contracting company is located in an area where 68 percent of the residents are white, half the households earn $37,415 or more, and only one person in seven is poor.

In contrast, most black Americans live in neighborhoods where

minority residents are the majority and where half the households earn less than $24,550.

''A lot of truly small minority businesses which really would be the backbone of the minority community cannot ge: a quarter from the SBA,'' said attorney H.T. Smith, organizer o: a recently ended black tourism boycott in Miami.

When it comes to investing in minority communities, Smith believes, ''as far as the government and the business community are concerned, that's just throwing money away.''
There is no requirement that participants stay in minority neighborhoods or that they be poor. In fact, entrepreneurs can qualify with a net worth up to $250,000, excluding their home and business assets.

When SBA goes to Congress for funding, it presents the program as a business incubator that benefits impoverished minority communities.

''8(a) firms provided employment for over 102,000 men and women during fiscal 1992,'' the agency said in its most recent report to Congress. ''Many of these jobs are in the inner city and in areas of high unemployment.''

The AP analysis, however, suggests otherwise.

The study analyzed the contractors' location by the ZIP code of their headquarters, using racial, ethnic and income information from the 1990 census. AP reviewed almost 25,000 contracts covering $17.5 billion of the $19 billion awarded under the program from 1988 to 1993.
About $1.5 billion was not analyzed because there was no matching census information for the companies' ZIP codes.

Contracts spanned the country, ranging in value from 12 cents to $96.2 million.

It was not possible to determine from the database where the companies did the contract work, and the SBA said it did not track the background of employees who worked on the 8(a) contracts.

Companies owned by blacks or Hispanics make up three-quarters of the program': participants. However, the review found:

Only 9 percent of the 8(a) contract dollars went to businesses in black-majority neighborhoods.

4 percent went to Hispanic-majority neighborhoods.

9 percent went to neighborhoods with majority Asian, American Indian or mixed-minority populations.

7 percent of contract dollars went to neighborhoods with

minority populations from 40 percentto 50 percent.

The largest bloc of 8(a) dollars 37 percent went to companies in neighborhoods with fewer than 20 percent minorities. And three-fourths went to neighborhoods where the typical household income was more than $30,000.

Some contractors who remained in poor minority communities say they did so out of a sense of responsibility.

During the time she was in the SBA program, Florence Hicks Alexander kept the headquarters of her management consulting company in a mostly black neighborhood in Washington and located most of her 350 offices in minority neighborhoods across the country.

''We are very proud of what we did and how we did it,'' she said. ''I myself am a product of the ghetto. ... I felt it was my responsibility to give back.''

Such businesses, however, get fewer and smaller contracts, the AP review found.
Businesses in primarily minority areas averaged seven contracts worth $589,594 each, compared to nine contracts worth $748,661 each for those in white communities.

Some see the program, a product of the civil rights movement, as mirroring a growing divide in minority communities between rich and poor, skilled and unskilled.

''You have a two-tier system that's becoming more discernible in the black community itself,'' said Elijah Anderson, sociology professor at the University of Pennsylvania. ''The people who have the skills and education are being siphoned off by the corporate world. Those people are not starting inner-city businesses.''

Weldon Latham, of the National Association of Minority Business, defends the 8(a) program, saying critics wrongly view it as a ''paternalistic'' welfare initiative instead of a tool to help minorities break into the economic mainstream.

Participants say the decision on how many minorities they hire often depends on where the work is done.
''If I got a job in upper Appalachia, I'm going up there and hire me some white folks,'' said James L. Harrell, an Alabama construction company owner and president of the 4,500-member National Association of Minority Contractors.

Some say there are other ways their companies help minority communities.

Singobee Builders Inc. in Loretto, Minn., is located in a 99-percent white neighborhood and has only five minorities among its 25 workers, but it subcontracts much of its work with minority

firms, according to its chief officer, Gae Veit.

''The more successful minority businesses become, they automatically reach out to the minority business community,'' said Ms. Veit, who is an American Indian.

But the Rev. Michael Pfleger, a Roman Catholic priest on Chicago's largely black South Side, is skeptical. ''I look at the community I live in here, no businesses are opening up. You can't get jobs. I've only seen a continual spiral downwards,'' he said.
SECTION HEADING: Finance;
Copyright 1994 the Associated Press. -- All Rights Reserved

# Third Attachment

DEPARTMENT OF THE NAVY
CHESAPEAKE DIVISION
NAVAL FACILITIES ENGINEERING COMMAND
BUILDING 212 WASHINGTON NAVY YARD
WASHINGTON, D.C. 20374-2121

IN REPLY REFER TO:

23 March 1992

TO ALL CONCERNED:

Subj: N62477-89-R-0154 - SEWER LINE REPLACEMENT AT THE NATIONAL NAVAL MEDICAL CENTER, BETHESDA, MD

Initially project N62477-89-R-0154 was advertised in the Commerce Business Daily (CBD) as an unrestricted project. As a result of a recommendation from our Small Business Representative and an endorsement from the Small Business Administration (SBA), this project has been set aside as an 8(a) Negotiated Procurement.

Only the bidder listed below is permitted to bid on this project; however, if you are interested in subcontracting for any portion of this project, you may contact the bidder at the address listed below:

GOLDEN EAGLE CONSTRUCTION CO., INC.
3219 12th Street, N.E.
Washington, DC 20017

***(CORRECTED ADDRESS)***

Thanks for your interest in this project, and we hope you will participate in future projects that will be forthcoming.

Sandra K. Soderstrom

SANDRA K. SODERSTROM
CONTRACTING OFFICER

Chairman BOND. Without objection, it will be included. Thank you very much.

Mr. Sims, your organization has been very effective in helping small minority companies prosper without Government interference, and we have heard testimony about the difficulties of 8(a) firms once they leave the program. How would you address this failure rate, or the disappointing results of the 8(a) firms that leave the 8(a) program?

Mr. SIMS. Again, I think it starts with the leadership. If the mission of the 8(a) program was to provide opportunities for minority firms or socially and economically disadvantaged firms to enter and compete in the mainstream, then the designers of the program in terms of looking at how to best do that failed.

As I mentioned to you, I have been reaching out and have been meeting with folks at SBA in the 8(a) program to look at maybe developing working relationships with some of us who are involved primarily in the private sector, to mandate that the 8(a) firms diversify their programs and work with us to not only develop a process for that to happen but also to track how they are doing in terms of diversifying.

I think again, Judy from GAO had mentioned that there had not been an annual review of the business plans. As part of our recertification process, we mandate that every firm, every MBE in our data base has to submit updated information so that we can track from year to year how well or how poorly the program is doing, who it is working with, and what progress it is making.

So I do think that there is a process by which not only can we track how the 8(a) firm is doing, but we can also—and I would suggest a notion of looking at the contracts that go to some of these firms mentioned by my two fellow panelists. We are designing a program internally to track how much business MBE's are doing with each other, because in the private sector it does not make sense to go out to corporations and say you discriminate, you should be doing more contracting with minority firms, if we are not willing to also do business with minority firms.

So we have begun a process to look at how that money trickles down. How does it stay in the community? How many times is it turned over? And how many other MBE's benefit from the prosperity of some of the larger MBE firms?

Chairman BOND. Thank you, Mr. Sims.

Mr. Graham, you have heard the test that Ms. Garza suggested about seeing that there was a level playing field. You expressed your strong belief in the efficacy of the free market system. Are there any thoughts that you might have, or you could offer us, on how we can assist minorities in the development of economically viable businesses? What would you recommend?

Mr. GRAHAM. I guess my comments in summary, Senator, were that the discrimination that takes place is at the employee level. While the owners are being rewarded, there does not seem to be any effort in the program to see if that rewarding of the owners who are qualified as disadvantaged are, in fact, passing through those earnings to their employees.

My problem, quite simply, was that I had employees who would qualify as disadvantaged under the program who would come to me

and say I lost this commission payment, I lost this bonus. Why cannot we have the same kind of benefits that this other 8(a) firm can have? And therefore, our business was not on a level playing field.

Chairman BOND. Ms. Garza, let me ask you a question and you can also respond to that. You talked about how you would not have been successful without the help of the 8(a) program. With your experience prior to joining the 8(a) program, was that different from what it would have been for a non-minority firm seeking to provide security services? And what kind of commitment allowed you to make your business succeed without 8(a)—would be necessary for your business to succeed without 8(a) assistance?

Ms. GARZA. Mr. Chairman, let me clarify that. I did not mean to imply that we would not have been successful without the 8(a) program. I feel that CTI, prior to receiving 8(a) certification, was a successful firm. At that point, we had approximately 8 or 10 employees. That was 8 to 10 employees that I was providing employment for, and to me that is successful.

We would not be where we are today, I would not be providing employment to 375 individuals; 69 percent of those individuals, as I stated, are minorities and 50 percent of all my management is filled by minorities and females. I think that is a tremendous success rate, and I feel that the program has enabled us to do that.

In addition, the work that we are doing in our core service industry, which is the aviation industry, we are pitted against some very, very formidable companies. TRW is out there, Ogden-Allied, Bechtel, Stone & Webster, Unisys to name a few. We have been able to bid successfully against these firms.

We would not have been able to do that 3 years ago. There is just no way that I had the monies, the resources for the bidding and the proposal competition involved in those kinds of contracts.

Chairman BOND. Thank you very much, Ms. Garza. I will have to submit the rest of my questions for the record, and we will turn now to Senator Lieberman.

Senator LIEBERMAN. Thank you, Mr. Chairman. I thank the four of you. You have been an outstanding panel and you really put into stark relief some of the issues that we have got to deal with, both in 8(a) and affirmative action programs generally.

The picture that Mr. Graham and Mr. O'Donnell paint, and I take the liberty of trying to bring it together, one of the pictures they paint is of a program, the 8(a) program, that is basically benefiting a relatively small number of people at the top who, though they may be in generally socially or economically disadvantaged groups, themselves are not.

It is not, to paraphrase Mr. Graham's contention, trickling down. At least certainly not in the case of his employees. Some of his employees, quite clearly, being socially or economically disadvantaged and being additionally disadvantaged by his inability to compete for some of these 8(a) programs.

Mr. Sims or Ms. Garza, how would you respond to that, which is essentially that at one level there is no trickle down going on here?

Mr. SIMS. There has never been a—well, my response would be that the assumption is that everybody should compete equitably. I agree that the playing field has not been level, but is has not been

level for years. Our studies, and the MBE's that we work with around the country, when they do well they hire more minorities except in those situations where the industry has been such that they have had to hire some white sales staffs in order to even get in the door.

I mean, if you want to look at some research, Prof. Mark Dollinger of Indiana University, a self-described Reagan Republican, did a study after years of arm twisting that showed that there are barriers to contracting opportunities even between minority and majority suppliers that have nothing to do with product, nothing to do with cost. It is—I identify with you, we have some commonality.

Senator LIEBERMAN. Let me interrupt, and I apologize because I have limited time.

Are there any studies through the 8(a) program to indicate whether there is trickle-down? That is to say are there any national studies that you can provide to the committee that show the percentage of the workers of the MBE companies that are in the socially or economically disadvantaged groups themselves?

Mr. SIMS. No, but we can provide that. Since our data is computerized, we can do a run showing how many employees all of our 16,000 MBE's have and what the racial makeup of those employees are.

Senator LIEBERMAN. Let me ask, and these are sensitive and difficult questions but we have to ask them directly, and you are all very eloquent. I am therefore going to ask you again, Mr. Sims, to answer the question that Mr. O'Donnell's testimony poses, which is a very real question, which is—well, I am going to use his words. Forget the level playing field. Why can't he and his brother and their company even get into the stadium to play? That is the question that we are being asked over and over again, as we deal today with affirmative action.

Mr. SIMS. And it is a question that we have asked for hundreds of years and the Federal Government, in its wisdom, designed these programs to provide us entree'. It does not say that once we get into the stadium the field is level. It does not say that if you are going to run a 100-yard dash that I might not have a ball and chain, somebody else might be disabled, somebody else might be blind. But we have also had the problem of not even having access, and that this is one of those programs that at least provides an opportunity to compete and get in the arena also.

The playing field has never been level. We have never been a meritocracy. There have always been benefits, whether it is education, whether it is employment, et cetera. But this is a small token effort to adjust and provide opportunities for those that have been historically underutilized.

Mr. O'DONNELL. Could I respond to that, since you used my words?

Senator LIEBERMAN. Yes, go right ahead. I wanted to give you time.

Mr. O'DONNELL. There are quite a few things you have to realize. One, my company and the type of work we do is almost always owned by some Government agency, so we are greatly impacted by these programs.

Two, we are not talking about equal opportunity. Most of the work that we do is competitively bid. It is rip and read. The bid is due at 2 o'clock, you open the envelope and whoever has the low number gets it. This is not a subjective judgment. It does not matter what color the person is or their gender or the religion or anything else. When you go into the bid room, you drop the envelope off and somebody else rips it open.

We are not allowed to submit an envelope. It is just as simple as that. And if the program that was passed last year and the regulations were published on January 6 go into effect, my company is out of business.

You know, you have to recognize, Mr. Sims, society has changed. The attitudes of the people in the procurement offices, and in the country as a whole, are not what they were 30 and 40 years ago. They have changed dramatically. What we need to focus our efforts on is not establishing programs to shut out myself, Mr. Graham, and thousands and thousands of other people who want to do business with the Federal Government, State government, local government. What we should concentrate on is people who still discriminate and get rid of it. These programs do nothing to do that.

You are talking about percentages. My company used to be about 80 percent minority. Now it is 70, but that is only because I include my brother and I. If you take my brother and I out, it is 90 percent minority. We do not discriminate and we do not want to do business with people that do discriminate.

But these programs, they are a windfall to the companies that do not need them. I have worked for 8(a) firms for years, and it was like shooting fish in a barrel.

The other thing, you asked about, do these programs cost money? They cost a fortune. You are talking about billions and billions of dollars every single year. If they do not cost money, you do not need the program. If a minority owned firm is going to submit the low bid, why do you even need to have a program? The 8(a) allows Government to pay a lot more money.

Now on some of the contracts I negotiated, we got 50 to 100 percent profit on the jobs. It was easy. The companies were well-funded, well run, and it was just a windfall.

Mr. SIMS. But you have 97 percent of the field and you argue—Ataran said that he lost 70 percent of the contracts he went after. He decided to challenge one because it was given to a minority firm that resulted in it. You control 90 percent of the field. We ask for 5 or 3 percent and we have trouble getting our foot in the door.

Senator LIEBERMAN. I thank you both.

Mr. O'DONNELL. That is a real distortion. When you——

Ms. GARZA. I would like some equal time here.

Chairman BOND. This is the kind of discussion that I hope that we are going to be able to continue through written comments. We want to come back to it. We have another panel today. I will give Ms. Garza 1 minute, because she sat quietly through that interesting discussion. Ms. Garza.

Ms. GARZA. I would like to just comment on one of his comments on that it was like shooting fish in a barrel. There is no question that there may be abuses in the system. Being in the program, I recognize some of those. When the program is used and utilized in

the spirit in which it was intended, believe me, at my firm it is not like that at all. Our growth is very controlled. We are looking at those contracts that will help us succeed in an open environment. We only take those contracts that will give us capability that we can transfer into that environment. We are not in the program to grow for the sake of growing.

Chairman BOND. Thank you, Ms. Garza.

We have been joined by two more of our distinguished committee members and I would like to turn now for questions to the distinguished senior Senator from Virginia, Senator Warner.

Senator WARNER. I thank you, Mr. Chairman. Again, I and other members of the committee wish to commend you in the manner in which you are moving forward on a very broad front on this committee. It is a pleasure working with you.

Now I am in my 17th year here, and you have to go back and draw on all of the thousands of people who come through your offices during that period of time and distill in your mind the impression that is left with you. It is twofold, and this panel has very carefully described it here today. First, 8(a) conceptually was laid down to do a specific set of goals, and those goals need to be achieved. Therefore, where I am at the moment is that I do not want to kill the 8(a) program. I want to help make it work like it was intended to be.

Then, of course, I have heard any number of persons come in and describe the abuses which each of you discussed here today. So I would start off with these questions and if we could have brief answers. Congress put in place the framework of laws, regulations were promulgated, and I can remember when a former U.S. Senator under Ronald Reagan was the head of the SBA; a good friend of mine. So it is not political that the Republicans did this or the Democrats did this. It is just a constant flow of stories coming out.

So the question is, is SBA oriented to allow these abuses to continue? They have got to be aware of them. Or does the framework of laws allow them to perpetuate? In other words, why hasn't a good strong administrator gotten in there and said, we are going to stop this. We are going to go back to square one and figure out what this agency was designed to do and do it. It looks like Ms. Garza is ready to go on that. Just about 30 seconds, so I can get everybody.

Ms. GARZA. One of my observations have been that many of the abuses in the 8(a) program may not necessarily be from the SBA side. There are weaknesses in the Federal procurement process and those are transferred into the 8(a) program. So many of these so-called abuses——

Senator WARNER. Then the SBA Administrator should have been down here and saying, Congress, we want to tighten this up. Mr. Graham, what is your view?

Mr. GRAHAM. Senator, I think part of the problem is that I have had procurement people in the Government say to me, Jim, why don't you go get an 8(a) company to work with. We like working with the 8(a) program because it is easy, and procurement in the Federal Government has become increasingly difficult for the Government workers that have to handle that. So that is at least part of the reason.

Senator WARNER. All right, that is clear. Mr. O'Donnell.

Mr. O'DONNELL. I think it is fundamentally unreasonable to put race as a prime criteria as to who can do business with a Government organization, and I think it just gets worse following that premise. In contracts in general without 8(a) or any of these other programs there are abuses, but they are compounded by tenfold when you start taking away low bid and quality work as a criteria.

Senator WARNER. All right. Mr. Sims.

Mr. SIMS. On that I agree with my panelist here. I am against race-based and that is why 8(a) was created so that it was not all whites that had a chance to benefit. I think once you had a businessperson come in and head up SBA and begin to ask business questions and begin to reach out to some of us that have been working in the business community you got a better designed program. Still flaws, still some work to be done, but it is headed in the right direction.

Senator WARNER. Let me start with you on a second question and we will go the other way. Is 9 years too long, and should we begin to put some caps in here?

Mr. SIMS. It depends on what happens in the 9-year period. If there is more focus on diversifying the portfolio, if there is a stronger, solid certification program, or a Governmentwide certification program, if there are some teeth put in and greater accountability to measure the growth, then 9 years might be too long.

Senator WARNER. All right, Mr. O'Donnell.

Mr. O'DONNELL. I think 9 years is a little too long; probably 5 to 7. But the main thing is the annual volume. People should not be allowed to get $200 million a year in 8(a) work. It should be like $5 million.

Senator WARNER. Caps? You would cut down the number of years and put in some caps.

Mr. O'DONNELL. Regardless of the industry. Small business should be several million dollars a year.

Mr. GRAHAM. Senator, I think the program might take notice of some of the State contracts that are being let today. For instance, the State of Virginia which we hold part of the contract has a requirement for local employee participation in various regions of the State. One of the things I hear from the panel is that we are rewarding individuals and the request is, is that trickling down? If that is the goal of the program, is it getting down to the employees? One way of doing that is where several States in this area have required that certain percentages of the employees be locally employed.

Senator WARNER. All right. Ms. Garza?

Ms. GARZA. Senator, in my experience there are limitations set. I have experienced those——

Senator WARNER. Let us talk about the number of years now. Do you think we could back off nine?

Ms. GARZA. Not necessarily. I think it all depends on the progress of the company, and I think that is why the annual reviews that have been discussed here today are so important. I know that my reviews elicit a lot of comments from the business opportunity specialist that handles my firm.

Senator WARNER. How about caps?

Ms. GARZA. I had started to talk about that before. There are certain size limitations, and I have experienced those. When you hit those limitations you are no longer eligible to bid on those contracts. I know that. Your whole program is designed so that in your annual submissions to the SBA you yourself project how far or how fast you are going to grow. That has to be approved by them and then they hold you to those.

Senator WARNER. I thank you, Mr. Chairman. I thank the panel.

Chairman BOND. Thank you very much, Senator Warner. We appreciate your comments and certainly appreciate your service on this committee. You ask very good questions and we are honored to have senior members of the Senate who are taking an active part in this. I know you have many other responsibilities.

We also are very pleased to have another member who has been active for a long time on this committee and has a great deal of experience in the Defense Department side of the work. I know he has many other hearings going on. We are very pleased that Senator Nunn could join us today.

Senator NUNN. Thank you, Mr. Chairman. I appreciate your having these hearings and I appreciate our witnesses being here. This is a tough problem.

My first question to anyone on the panel—I would make an open invitation—when I read the definition the SBA is now using of what economic disadvantage is, it is anyone whose net worth does not exceed $250,000. As I read this, that excludes the value of investments that disadvantaged owners have in their concerns and the equity in their primary residence. If I am correct on that, that gets the net worth up to a very high level it seems to me.

Is the economic disadvantage portion of this—forgetting the social part of it for a moment—a proper definition or is it too broad? It seems to me if you forgot the social part of it and just said economic was the criteria that that would include probably 90 percent of most Americans.

Mr. O'DONNELL. One quick thing is the definition of economic includes social. We have been determined to be economically disadvantaged by the 8(a) certification except for the fact that we are not socially disadvantaged. That is the Federal Government's definition of economically disadvantaged, you must first be a socially disadvantaged individual.

But I agree with you, I think your net worth should just be what a bank looks at. What you can do now, if your net worth is $2 million and you have a $300,000 house, buy a bigger house and you qualify for the program.

Senator NUNN. What would be the appropriate—again, forgetting the social side for a moment, does anybody what to venture, if this is not the appropriate definition of economic—if it is, I would like to hear someone defend it. If it is not, what would be the appropriate definition of economically disadvantaged in America today?

Mr. GRAHAM. Senator, I will certainly comment on that. I know that by that criteria I would have been judged economically disadvantaged when I started my business. I think there is a tendency to lose touch with what small business is all about. I think the vast majority of people that have the entrepreneurial spirit and go out and start their own companies are economically disadvantaged by

those criteria. I think you would discover that the net worth of the average fellow or young lady that wants to go out and start a company is minute compared to those numbers.

Senator NUNN. It seems to me that if you exclude what people have invested in their business—now I may not be reading this right but that is what they have in a house, it is almost unlimited. I do not get it. I do understand how the economic disadvantage can be this broad because you could have $1 million invested in your own business. You could have $5 million invested in your business.

Mr. O'DONNELL. Some of these companies have tens of millions of dollars invested in their businesses and they are still in the program.

Senator NUNN. In that case, economic disadvantage is a meaningless term, is it not, the way it is being applied?

Mr. O'DONNELL. The way it is applied by the Small Business Administration. Last year in testimony, I believe before this committee by Inspector General Hoobler, he suggested that one firm that had been in the program that had received $440 million in 8(a) contracts, it might be appropriate to review that person's economic disadvantage. Another individual in Virginia who had withdrawn $6 million from his firm over a two-year period, the inspector general suggested that it might be appropriate to review his economic disadvantage also.

Senator NUNN. The whole debate has been focused on race so far, but it seems to me that the question of economics is just as important here if we are going to make some sense out of this program. Mr. Sims.

Mr. SIMS. I also think, though, that there are some considerations that have to be given, given the kind of business someone is going into. If I am a businessperson and I am competing with a large, well-financed competitor, the fact that I have some money in the bank should not be an embarrassment to me. Now I do not know if we need to look at and tighten up the economic disadvantaged criteria. But certainly, I do not think having a few dollars in the bank or being able to have a nice home precludes you or should preclude you from being considered eligible or provided an opportunity to compete in this arena.

Senator NUNN. I remember when we made social and economic, and I can assure you that the intent back then was not to have this broad a definition, not by at least a number of people who were involved in this. Ms. Garza.

Ms. GARZA. Senator, when I went into the 8(a) program I did not even realize what the definition for economically disadvantaged was. But let me tell you my background. My parents were migrant workers. I had to struggle and fight to get into the Aurora Police Department when I finally was hired through the Affirmative Action Program. I am a single parent to two sons, and I took my pension, sold my house, took whatever little savings I had and I started this business. I was not worth $55,000 when I started this business and I probably am not even worth that now because everything that I make goes back into my firm. I think that the majority of the 8(a) firms participating in this program are in the same position that I am in.

Senator NUNN. I think that falls within the intent of the economic disadvantage. What I am concerned about though is somebody that may have $250,000, $500,000, $1 million in their own business net equity and also a house worth $500,000 to $1 million. They are in the upper bracket of American people by far. They are way above the average level of net worth in this country.

Ms. GARZA. Senator, I feel that the enforcement——

Senator NUNN. I think that is way too far. That is going way too far, forgetting the race part all together for the purpose of this question. I do not think that is the intent of this program. Excuse me.

Ms. GARZA. I agree with it, it is not. I think the enforcement section if indeed—because I know that when this program was started the enforcement was not part of SBA's mandate. But if the enforcement section needs to be reviewed and revised and reassessed, then perhaps that is one of the alternatives that we have.

Mr. O'DONNELL. There is no opportunity to challenge the economic status of a firm that is certified as 8(a). In the Department of Transportation's DBE program which is before the Supreme Court right now, I went to the hearing and I sat there and listened to the Solicitor General tell the Justices about all the checks and balances in that program; how DBEs could be challenged.

Well, I challenged the economic status of eight individuals in 1989. That challenge has yet to be resolved. It is laying at the office of the Secretary of Transportation along with three other issues I have laying up there for several years. These are unreasonable programs administered by unreasonable people.

Chairman BOND. Thank you very much, Mr. O'Donnell. My sincere thanks to the panel for giving us a lovely and lively and exciting discussion. We do invite followup comments and questions from the panel. We will keep the record open for other members of the committee who read the record and have questions to submit the questions.

As I have indicated previously, those who are here as members of the audience who have written comments who wish to provide their views on what has been said here today, your comments and criticisms will be most welcome. My sincere thanks to panel number three.

We will now turn to panel number four: Mr. Joshua Smith, former chairman, U.S. Commission on Minority Business Development, and chairman and chief executive officer of MAXIMA Corp. of Lanham, MD; Mrs. Nancy Archuleta, counsel on the Council on Minority and Women-Owned Businesses, chairman of the Latin American Management Association, and chairman and chief executive officer of Mevatec Corp., Huntsville, AL; Mr. Fernando Galaviz, vice chairman, the National Federation of 8(a) Companies in Arlington, VA; and Mr. Pete Homer, Jr., cofounder and member of the National Indian Business Association and director, strategic business development for Systems Integration & Research of Arlington, VA.

Mr. Smith.

**STATEMENT OF JOSHUA I. SMITH, FORMER CHAIRMAN, U.S. COMMISSION ON MINORITY BUSINESS DEVELOPMENT, AND CHAIRMAN AND CHIEF EXECUTIVE OFFICER, MAXIMA CORP., LANHAM, MARYLAND**

Mr. SMITH. Thank you, Mr. Chairman. I appreciate the opportunity to appear before you. My name is Joshua Smith, I am chairman and chief executive officer of the MAXIMA Corp. I have had this opportunity to appear on two previous occasions before this committee as chairman of the U.S. Commission on Minority Business so I appreciate what you are doing here.

Let me get right to the heart of the matter because I think the previous discussion is very enlightening and it reflects some of my views from three years of having chaired the Commission, and we were in 42 States, 100 cities, 500 witnesses and actually appeared before a quarter of a million people, so we have some ideas. And by the way, many of the recommendations of SBA were first recommended by the Commission so we feel we have contributed.

I think the heart of this discussion, particularly the last panel is, how do you measure success? What is a success in the 8(a) program? Is it a company that continues to survive in post-8(a)? Is it a company that achieves success as a profitable enterprise? Is it a company that properly follows the myriad of rules and regulations while in the 8(a) program? Is it a company that provides jobs for minorities and disadvantaged persons and unemployed persons? Is it a company that locates its business in the plush suburbs of industrial parks or one based in the hood—the neighborhood, excuse me.

Is it a company that is able to obtain capital via equity or debt to meet its needs? Is it a company that performs well and is able to successfully sell its business? Is it a company that is able to attract members for its board of directors to help guide it? What is a success?

I think the heart of the discussion in the last panel and what we encountered is germane to this whole discussion. What is economic success? What is social success?

The truth is, we do not know what a success is, so how can we evaluate it? Can we offer experience? I think we can offer opinions, we can express views, we can debate it. But until we have some standards, until we have some measures, it is impossible to determine whether the program has or has not been successful.

We were in the 8(a) program, MAXIMA Corp., for 6 out of 17 years. The 6 years in the program were both great, and to some extent, horrible. But the main thing is that we got an experience, but we also felt tied to a rubber band because we never really got outside the rules and regulations.

I think that the single most important problem the 8(a) program faces and that you face as this committee, and minority business programs in general, have to do with socioeconomic programs. But in reality, socioeconomic programs are neither social nor economic. Therefore, the measures of success are totally lacking.

We have encountered some interesting nomenclature. For example, referring to a firm as a disadvantaged business. That sounds innocent enough until you go to your loan officer out in Podunk who does not understand what the Federal rules are and you are

trying for a loan as a disadvantaged business and this loan officer is trying to perform successful loans that increase his or her performance, and therefore, can grow up through the chain. You do not tell your boss in a loan portfolio that we should back a disadvantaged business because banks are in business to make money from the success of its clients.

Disadvantaged is a negative, if not lethal, term. In a socioeconomic context that sounds innocent. In a business context, it is not. So we came up with the term historically underutilized business so we could be constructive and positive in terms of how we present ourselves to the outside world.

We look at set-asides and we have a different measure for 8(a) set-asides. But set-asides in truth are as old as the Federal procurement system. As a matter of fact, set-asides is the way the Federal procurement system achieves its goals. What about labor surplus set-asides? What about tobacco subsidies? What about farm subsidies? What about the United States acting in terms of national need, whether it is war, whether it is emergency? What about the tens of billions of dollars that go to universities for research time and time again and they are completely dependent? What about the small business set-asides?

The problem with the 8(a) is it is a hybrid system. It is neither fish nor fowl, so we do not know really what to do with it. We can discuss it. We can get angry. We can get happy. But we have not achieved a measure, and until we do we will not be able to resolve this issue.

I have some recommendations I would like to quickly present. One is, create successful business programs with specific social benefits and mandates. In other words, what about a company providing a return on investment to this country in areas where there is a need, such as employment in certain depressed areas? So a company that creates jobs and hires minorities and others should have some kind of benefit. A job still is the greatest social program that ever existed.

What about a company that locates its business in that neighborhood? That is adding value to this country. What about those that participate as mentors and role models to other companies and to other individuals? That is adding value to the country. What about economic development designated in areas for neighborhood revitalization?

So there are ways that we can target performance, entrance, and even evaluation through the social benefits side. But as long as it is socioeconomic, it is difficult, if not impossible, to have a success.

No. 2, I believe we need to have one agency that would administer the program. We recommended that it be put in Commerce, but to be honest with you, that is a question mark because we are not sure where Commerce is on that issue. But it should be in one agency and Commerce appears to be the likely one.

We need to manage the program with business people employing business principles and business knowledge. We found time and time again, the people who were administering, who were advising, and who were offering assistance to 8(a) companies did not know business. Therefore, when you rely on someone who is not business

savvy for life and death information and you have got to meet a payroll, that is a very critical issue.

We have got to establish value added requirements, particularly from participating firms, and we have got to establish measures that exist in the financial and business community. For example, profitability, the niche and services, and value of services, ability to raise capital, no penalty for selling. That is actually a success. And ownership and control through a board of directors.

So these are just a few of the things that emanate from what we found out to be the problem. The problem is, we do not know what we have. We have not made any progress. We have great intentions but we have zero measures. And if you have zero measures, you have no ability to evaluate.

Thank you.

[The prepared statement and attachment of Mr. Smith follow:]

STATEMENT OF JOSHUA I. SMITH
FOUNDER, CHAIRMAN AND CHIEF EXECUTIVE OFFICER

THE MAXIMA CORPORATION

GOOD MORNING CHAIRMAN BOND AND MEMBERS OF THE COMMITTEE, I WOULD LIKE TO BEGIN MY TESTIMONY THIS MORNING BY SUGGESTING THAT WHILE THERE ARE MANY LEVELS OF REVIEW CURRENTLY UNDERWAY IN AN ATTEMPT TO ASSESS ALL TYPES OF AFFIRMATIVE ACTION PROGRAMS, IT IS MY HOPE THAT THE REVIEWERS NOT LOSE SIGHT OF THE FACT THAT THE TOTAL REMOVAL OF ANY ECONOMIC DEVELOPMENT PROGRAM WHICH BENEFITS MINORITY COMMUNITIES WILL LEAVE A VOID IN THOSE COMMUNITIES. WE MUST UNDERSTAND THAT MINORITY BUSINESSES ARE VITAL TO THE AMERICAN ECONOMY BECAUSE MINORITY BUSINESS PEOPLE LOCATE THEIR BUSINESSES WITHIN THEIR NEIGHBORHOODS, REVITALIZE COMMUNITIES, CREATE JOBS AND TRAIN OTHER MINORITIES, AND SERVE AS ROLE MODELS. THE PROPER UTILIZATION OF THIS SEGMENT OF THE U.S. ECONOMY WILL CREATE A SITUATION WHERE ECONOMIC SOLUTIONS CAN ADDRESS SOCIAL NEEDS. I AM A FIRM BELIEVER THAT CIVIL RIGHTS WITHOUT ECONOMIC STRENGTH IS A BORROWED EVENT. IT CAN BE TAKEN AWAY AT ANY TIME, BECAUSE YOU DON'T OWN IT.

AS AN ENTREPRENEUR AND A REPUBLICAN, I AM CERTAINLY IN FAVOR OF REDUCING GOVERNMENT BUREAUCRACY AND RED TAPE; HOWEVER, YOU DO NOT THROW THE BABY OUT WITH THE BATH WATER WHEN ALL IT MAY NEED IS A CHANGE OF ITS DIAPER.

I HAVE BEEN ASKED TO COMMENT ON THE U.S. SMALL BUSINESS ADMINISTRATION'S 8(A) PROGRAM, IN WHICH MY FIRM, THE MAXIMA CORPORATION, PARTICIPATED FOR ABOUT FIVE YEARS. MAXIMA'S EXPERIENCE IN THE PROGRAM WAS OVERALL BENEFICIAL, ALTHOUGH NOT IDEAL, AND WE ARE HONORED TO BE RECOGNIZED AS A "SUCCESSFUL" GRADUATE OF THE PROGRAM. WE LEARNED MUCH FROM THE 8(A) PROGRAM, AND WE BELIEVE THAT THE PROGRAM LEARNED MUCH FROM US. LADIES AND GENTLEMEN,

BELIEVE ME WHEN I SAY THAT ANY FIRM WHICH SURVIVES THE RIGORS OF PARTICIPATING IN THE 8(A) PROGRAM AND REMAINS IN BUSINESS FOR A SIGNIFICANT PERIOD AFTERWARDS DOES SO IN SPITE OF THE PROGRAM, AND NOT BECAUSE OF IT.

AS I HAVE STATED BEFORE, THE 8(A) PROGRAM NEEDS STRUCTURAL CHANGES TO MAKE IT STRONGER. EVEN THOUGH THE PROGRAM NOW ACCOUNTS FOR OVER 40 PERCENT OF ALL PROCUREMENT DOLLARS RECEIVED BY SMALL MINORITY FIRMS, WHICH REPRESENTS WELL IN EXCESS OF $4 BILLION, IT ONLY REPRESENTS A LITTLE MORE THAN 5,000 FIRMS OUT OF THE TOTAL 1,200,000 MINORITY-OWNED FIRMS IN THE UNITED STATES.

I HAVE APPEARED BEFORE THIS AUGUST BODY ON TWO PREVIOUS OCCASIONS TO DISCUSS THE 8(A) PROGRAM AS THE CHAIRMAN OF THE U.S. COMMISSION ON MINORITY BUSINESS DEVELOPMENT. THE COMMISSION, ESTABLISHED UNDER PUBLIC LAW 100-656 WAS ESTABLISHED DURING THE PRESIDENCY OF RONALD REAGAN, AND FULFILLED ITS MANDATE UNDER THE AEGIS OF ANOTHER REPUBLICAN PRESIDENT, GEORGE BUSH. IT WAS MANDATED TO OFFER TO THE PRESIDENT AND THE CONGRESS WAYS TO IMPROVE THE 8(A) PROGRAM. THOSE RECOMMENDATIONS WERE BASED UPON TESTIMONY RECEIVED BY THE COMMISSION AT ITS 18 HEARINGS AND TOWN MEETINGS. (A COPY OF THE RECOMMENDATIONS SPECIFIC TO THE SBA IS ATTACHED TO THIS TESTIMONY.) I AM CERTAIN THAT CHAIRMAN BOND AND MANY OF YOU ARE FAMILIAR WITH THE COMMISSION'S FINAL REPORT. FOR THOSE OF YOU WHO ARE NOT, THE REPORT REPRESENTED THE CULMINATION OF OUR ACTIVITIES WHICH COVERED 42 STATES AND 100 CITIES, FROM ANCHORAGE, ALASKA TO MIAMI, FROM BOSTON TO LOS ANGELES, AND FROM TALEQUAH, OKLAHOMA TO KANSAS CITY - WE GATHERED TESTIMONY FROM

OVER 500 WITNESSES AND APPEARED BEFORE AUDIENCES TOTALLING OVER 250,000 PEOPLE.

THE MEMBERS OF THE COMMISSION ARE PROUD OF THE WORK WE COMPLETED, AND OUR FINAL REPORT WAS HERALDED BY SOME AS THE MOST COMPREHENSIVE EFFORT OF ITS TYPE EVER UNDERTAKEN IN SUPPORT OF MINORITY BUSINESS DEVELOPMENT.

I SUBMIT TO YOU THAT I HAVE HAD MANY DISCUSSIONS WITH BOTH THE FORMER SBA ADMINISTRATOR (ERSKINE BOWLES) AND THE PRESENT ASSOCIATE ADMINISTRATOR OF THE SBA (CASSANDRA PULLEY) REGARDING THE RECOMMENDATIONS MADE IN THE FINAL REPORT. I AM PLEASED TO SAY THAT ALTHOUGH THE MAJORITY OF THE COMMISSION'S RECOMMENDATIONS WERE INITIALLY VIEWED WITH SKEPTICISM BY THE SBA, EVENTUALLY THOSE RECOMMENDATIONS WERE ACCEPTED BY THE AGENCY. CURRENTLY, MANY ARE TAKING THE FORM OF PROPOSED LEGISLATION OR HAVE ALREADY BEEN ENACTED AS POLICY OR REGULATORY CHANGES.

AS A GRADUATE OF THE 8(A) PROGRAM, MY FIRM, MAXIMA, IS VIEWED AS A SUCCESSFUL EXAMPLE OF A FEDERAL PROGRAM WHICH HAS BEEN MUCH MALIGNED FROM BOTH WITHIN AND WITHOUT. 8(A) IS VIEWED AS EVERYTHING FROM A "GIVE-AWAY" PROGRAM TO ONE WHICH SERVES NO OTHER PURPOSE THAN TO CREATE A FEW MINORITY MILLIONAIRES AT THE TAX PAYER'S EXPENSE. THE TRUTH OF THE MATTER IS THAT THE 8(A) PROGRAM DOES PROVIDE ACCESS TO BUSINESS OPPORTUNITIES WITH THE FEDERAL GOVERNMENT, BUT IT DOES NOT FULFILL ITS MISSION OF CREATING MINORITY BUSINESSES WHICH ARE ECONOMICALLY VIABLE IN THE OPENLY COMPETITIVE ARENA .

ONE OF THE MAJOR REASONS IT FAILS TO FULFILL ITS MISSION IS BECAUSE IT WAS DESIGNED AS A SOCIOECONOMIC PROGRAM, BUT IT IS NEITHER SOCIAL NOR ECONOMIC. IN TERMS OF AN ECONOMIC PROGRAM, HOW CAN THE PROGRAM BE AN ECONOMIC ONE IF THERE ARE NO MEASURES OF SUCCESS. WITHOUT MEASURES OF SUCCESS IT IS IMPOSSIBLE TO DETERMINE WHETHER A FIRM HAS SUCCEEDED OR NOT.

FOR EXAMPLE, 8(A) PARTICIPANTS ARE NOT MEASURED BY NORMAL BUSINESS STANDARDS. LET US BEGIN BY ADDRESSING THE INITIAL ISSUE OF NOMENCLATURE - A MAJOR PROBLEM WHEN DEALING WITH FIRMS WHICH ARE OWNED BY A MINORITY PERSON, BECAUSE FEDERAL PROGRAMS INSIST THAT YOU REFER TO YOUR BUSINESS AS DISADVANTAGED, WHICH IS A LETHAL TERM IN THE BUSINESS WORLD WHEN IT COMES TO EQUITY OR INVESTMENT. I CONTEND THAT AN INDIVIDUAL MAY BE DISADVANTAGED, BUT A BUSINESS SHOULD NOT CALL ITSELF DISADVANTAGED UNLESS IT TRULY IS. MY EXAMPLES OF DISADVANTAGED BUSINESSES ARE EASTERN AIRLINES, AND DREXEL BURNHAM – THESE FIRMS ARE OUT OF BUSINESS AND ARE TRULY DISADVANTAGED.

NORMALLY, A FIRM IS JUDGED TO BE SUCCESSFUL BY ITS PROFITABILITY OR LACK OF SAME. HOWEVER, IT IS NOT A REQUIREMENT FOR AN 8(A) FIRM TO BE PROFITABLE. THE PARTICIPANTS ARE MEASURED BY REVENUES, BY SALES VOLUME, BY NUMBER OF EMPLOYEES. BUT, THE SBA DOES NOT MEASURE THE GOVERNMENT'S RETURN ON ITS INVESTMENT, SO HOW CAN PROFITABILITY OR VALUE TO STAKEHOLDERS BE DETERMINED, AND THEREBY THE SUCCESS OF THE FIRM?

FURTHER, THE 8(A) FIRM IS SUBJECTED TO DIFFERENT STANDARDS REGARDING CONTROL THAN FIRMS IN THE GREATER FINANCIAL WORLD. FOR

EXAMPLE, AN 8(A) FIRM'S BOARD OF DIRECTORS MUST CONTAIN THE PROPER NUMBER OF SOCIO-ECONOMICALLY DISADVANTAGED MEMBERS IN ORDER TO CONTINUE TO QUALIFY FOR THE PROGRAM. WHEN ASSESSING AN 8(A) FIRMS OWNERSHIP AND CONTROL, THE SBA INSISTS THAT THE MEMBERS OF THAT FIRM'S BOARD OF DIRECTORS, WHO COLLECTIVELY REPRESENT THE TOTAL NUMBER OF VOTING SHARES FOR EXECUTIVE DECISION MAKING PURPOSES, MUST ALSO BE SOCIO-ECONOMICALLY DISADVANTAGED THEMSELVES OR IT IS POSSIBLE FOR NON-DISADVANTAGED INDIVIDUALS TO CONTROL A FIRM. THIS IS NOTWITHSTANDING THE FACT THAT THE PRINCIPAL OWNER OF AN 8(A) FIRM MUST CONTROL 51% OF THE STOCK FOR THAT FIRM TO CONTINUE TO QUALIFY. IN THE FINANCIAL WORLD, WHOEVER OWNS THE MAJORITY OF THE FIRM'S STOCK CONTROLS THE CORPORATION, IT DOES NOT MATTER THE SOCIAL OR ECONOMIC STATUS OF OTHER MEMBERS OF THE BOARD.

IN THE REGULAR BUSINESS WORLD, IF AN ENTREPRENEUR DECIDES TO SELL HIS OR HER FIRM, IT IS RULED A SUCCESSFUL TRANSACTION. IF AN 8(A) FIRM DECIDES TO SELL, IT CAUSES GREAT PAIN TO SBA.

THERE IS NO MISTAKING THAT WE STILL NEED A FEDERAL PROCUREMENT PROGRAM LIKE THE 8(A) PROGRAM. ALTHOUGH IT IS CERTAINLY IMPERFECT, WITH THE PROPER RESTRUCTURING AND FOCUS, IT COULD RETURN TO ITS INITIAL MISSION OF PROMOTING ENTREPRENEURSHIP BY PROVIDING OR FACILITATING ACCESS TO CAPITAL BY THOSE FIRMS IN TARGETED AREAS OF THE ECONOMY MOST IN NEED OF STIMULATION TO EITHER AVOID ECONOMIC CONCENTRATION OR TO PROMOTE OTHER LEGITIMATE POLICY GOALS NECESSARY TO MAINTAIN AND STRENGTHEN THE OVERALL ECONOMY OF THE NATION.

IN CLOSING, I WOULD LIKE TO SUGGEST THAT THE COMMITTEE CONSIDER THE FOLLOWING IN ITS DELIBERATIONS REGARDING MINORITY BUSINESS DEVELOPMENT PROGRAMS. THESE CRITERIA WERE DETERMINED BY THE TESTIMONY RECEIVED FROM THE BUSINESS COMMUNITY DURING THE DELIBERATIONS OF THE COMMISSION ON MINORITY BUSINESS DEVELOPMENT. THE SUCCESS OF MINORITY BUSINESS PROGRAMS SHOULD BE MEASURED BY THE DEGREE TO WHICH THE SPECIFIC PROGRAM HAS OR WILL:

1 *CONTRIBUTE TO THE EXPANSION OF ECONOMIC GROWTH AND INDUSTRIAL CAPABILITY, WHILE PROVIDING THE CONCOMITANT BENEFITS OF INCREASING JOBS AND THE AVAILABLE TAX BASE;*

2 *INCREASE THE MARKET SHARE FOR MINORITY OWNED BUSINESS, MEASURED IN TERMS OF A PERCENT OF TOTAL GROSS RECEIPTS IN THAT MARKET, BY SHIFTING CONTROL OVER, OR INCREASING ACCESS TO, THE FACTORS OF PRODUCTION;*

3 *MOVE MINORITY OWNED BUSINESSES INTO BUSINESS AREAS WHERE THEY HAVE BEEN HISTORICALLY UNDERUTILIZED OR THAT PRESENT PARTICULARLY DIFFICULT ENTRANCE BARRIERS;*

4 *DEMONSTRATE SOME INDICATION THAT THE ASSISTANCE PROVIDED CAN PRODUCE, WITHIN A REASONABLE PERIOD OF TIME, SELF-SUSTAINING MINORITY OWNED BUSINESS FIRMS, CAPABLE OF REMAINING IN BUSINESS WITHOUT THE CONTINUOUS NEED FOR REMEDIAL ASSISTANCE;*

5 *NOT HAVE A SUBSTANTIAL NEGATIVE IMPACT ON NON-MINORITY-OWNED SMALL BUSINESS;*

6 *ATTRACT SOME RESOURCES FROM THE PRIVATE SECTOR AND/OR STATE OR LOCAL GOVERNMENTS; AND*

7 *PRODUCE A REASONABLE COST-TO-BENEFITS RATIO AS COMPARED TO OTHER AVAILABLE ALTERNATIVES."*

ABOVE ALL, WHAT IS CERTAINLY NEEDED IS A CENTRALIZED FOCAL POINT WITHIN THE FEDERAL GOVERNMENT FOR THE DEVELOPMENT AND COORDINATION OF ALL MINORITY BUSINESS DEVELOPMENT PROGRAMS --WITH THE PROVISION THAT THOSE PERSONNEL RESPONSIBLE FOR MANAGING IT ARE FULLY QUALIFIED AND EDUCATED IN THE PRINCIPALS OF BUSINESS . THIS, ABOVE ALL ELSE IS WHAT IS TRULY IMPORTANT TO THE EFFECTIVE FUNCTIONING OF ANY GOVERNMENT PROGRAM, AND WHAT HAS BEEN SORELY LACKING IN THE REPERTOIRE OF MANY INDIVIDUALS ASSIGNED TO ASSIST MINORITIES IN BUSINESS.

THANK YOU FOR THE OPPORTUNITY TO APPEAR BEFORE THE COMMITTEE TODAY, AND WOULD BE HAPPY TO ANSWER ANY QUESTIONS YOU MAY HAVE.

ATTACHMENT

Final Report - CMBD
Recommendations - Structural Changes to the 8(a) Program

The Commission recommends:

The elimination of the traditional 8(a) contract agreement and that agencies be given the authority to contract directly with 8(a) certified firms, thereby terminating the role of SBA as a conduit, or surrogate prime contractor to the buying agency.

That most authorities stated in the Small Business Act regarding the 8(a) Program be removed from the SBA and vested in another, new administration, created by statute within the Department of Commerce, that will have the development of historically UNDERUTILIZED businesses as its sole mission.

That the new administration within the Department of Commerce be called the Administration for the Development of Historically UNDERUTILIZED Businesses, headed by an Undersecretary, who reports directly to the Secretary and is subject to confirmation by the Senate. This new agency should be the recipient of the transfer of all authority under Sections 8(a) (contract support); 7(j)(management assistance); and 7(a) (20) (direct and guaranteed loans for 8(a) concerns.))

That a management information system be established by the proposed Administration for the Development of UNDERUTILIZED Businesses that makes information on Federal contracts available nationwide. (The system should conform to seven specific requirements explained in the Final Report.)

That measures of economic disadvantage be "industry specific." Therefore, determination of whether a business is disadvantaged will take into account the capital, asses base, and sales figures needed to become competitive in that particular business area.

That the proposed Administration for the Development of Historically UNDERUTILIZED Businesses direct more of its concern on potential abuses and less on artificially derived maximum net worth.

That 8(a) contracts be selected for competition regardless of the dollar amount of the contract and that competitions be limited to firms in the last three (3) years of the program.

That 8(a) program participation terms be approved on the basis of four-digit SIC codes. Terms should vary from as low as seven years to a maximum of 14 years, depending upon

the industry in which the firm is engaged.

The creation of an automated centralized vendor certification process that designates qualifying firms as HUBs. Various SBA offices that certify firms for the 8(a) program should be given this added responsibility along with adequate resources to accomplish this mission. (The Centralized Certification System should comply with six specific criteria, which are spelled out in the Final Report.)

That each SBA district office be allocated a share of loan authority that can be reserved for small business deemed to be a "local priority." (Instead of the central office in Washington, D.C. making all final decisions about loans.

That Congress and the Administration redirect the SBA Business Loan Programs to achieve their original purposes. (Protect the interests of small business concerns to ensure that a fair proportion of Government's total purchases go to small businesses.)

That the Division of Program Certification and Eligibility remain as the only organizational element within SBA related specifically to the 8(a) Program.

That the job of processing 8(a) applications be taken away from SBA Central Office and decentralized. (Processing should take place at the organizational level closest to the place of business of the applicant.) If any SBA personnel are displaced by this reorganization, they should be assigned to other offices to assist with the processing of applications at that level (district or regional.)

That the selection of eligible firms be limited to small businesses attempting to enter, maintain, or expand a presence in economically concentrated industries.

That business plan review and approval become an integral part of the 8(a) process.

Chairman BOND. Thank you very much, Mr. Smith. Thank you for sharing your experiences with us. As I said, we will try to cover more of these things in questions and would invite further comments from the panelists. But unfortunately we are running up against a time deadline so we need to move right along.

Mrs. Archuleta.

**STATEMENT OF NANCY E. ARCHULETA, COUNSEL, COUNCIL OF MINORITY AND WOMEN OWNED BUSINESSES, CHAIRMAN, LATIN AMERICAN MANAGEMENT ASSOCIATION, AND CHAIRMAN AND CHIEF EXECUTIVE OFFICER, MEVATEC CORP., HUNTSVILLE, ALABAMA**

Ms. ARCHULETA. Thank you, sir. It is good to see you again. The Council of Minority and Women Owned Businesses—I will refer to it as the Council from here on out—is pleased to submit this written statement regarding the Small Business Administration's 8(a) Minority Small Business Program.

Chairman BOND. That will be accepted and we thank you.

Ms. ARCHULETA. The Council is comprised of 16 trade associations. The Council was formed in early 1993 in order for the trade associations representing minority businesses from across the country to share their collective knowledge and to present a unified position for streamlining the SBA's 8(a) program, and for increasing minority business participation in the Federal sector. We are proud of the progress made by the Council in developing a unified position, of our efforts to present this position to Congress, and to the SBA.

Changes in the section 8(a) program and the Federal procurement process are urgently needed and we are encouraged by today's hearings. I will add, however, that the Council is extremely concerned that these hearings still relate to the 20 percent of the Federal procurement effort. We are pitted small business against 8(a) company, and we are still very concerned that perhaps a bigger answer to this whole thing is that there should be more of a total Federal procurement dollar to all small businesses, therefore eliminating the need for us to fight between 24 percent to a mere 2.7 percent of the dollars that 8(a) companies get. I would like that to be noted.

Chairman BOND. We will note that.

Ms. ARCHULETA. The Small Business Acts and small disadvantaged business goal in section 8(d) presumption were designed by Congress to eliminate the present effects of past discrimination and to foster the development of businesses owned by socially and economically disadvantaged individuals.

However, the term "socially disadvantaged individuals" does not exclude any individual from qualifying. Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. To use the old cliché, a white male from Appalachia could qualify depending on the area where those cultural biases may have existed.

The term "economically disadvantaged individuals" is defined as follows, economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free en-

terprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged.

These purposes have not been fulfilled. Quoting from Senator Robert Dole's remarks to the Congress on March 15, 1995, "Unfortunately, America is not the color-blind society we would all like it to be. Discrimination continues to be an undeniable part of American life." He also stated that, "Discrimination is illegal. Those who discriminate ought to be punished, and those individual victims of illegal discrimination have every right to receive the remedial relief they deserve."

Further, in a study that cost over $1 million, the State of Texas disparity study, it was found that widespread marketplace discrimination against women and minorities, particularly African-Americans and Hispanics, does exist. The question of presumption, that members of certain racial and ethnic groups are socially disadvantaged, is not whether the Federal Government should make the presumption but that the Federal Government should recognize that the presumption exists. As an example, in the aforementioned study it was found that historically underutilized businesses received a smaller share of State procurement between fiscal year 1989 and fiscal year 1993 than would be expected given their availability to do business in the State.

Based on consistent survey findings across race, sex, and industry groups from survey and anecdotal evidence there is anecdotal evidence of discrimination that makes it harder for businesses owned by minorities and women to prosper. That disparity study was made a part of my testimony by the way.

Certainly there are ways to expand opportunity for all Americans and we believe that FASA has become to address exactly that. However, the Council does not believe that past and current discrimination have been overlooked and that some form or preference is still needed. Therefore, we proposed that legislation be introduced providing a comprehensive method for streamlining the 8(a) program and creating additional opportunities for small and minority-owned business.

Key elements of such legislation should consider the following recommendation: removal of unnecessary regulatory provisions and reduction in paperwork including the removal of the limitations on SIC codes. The elimination of SBA's policy of using business support levels as a basis for denying 8(a) contracts. The removal of the restriction of marketing national and local buy contracts. That would certainly address the concentration issue.

The removal of SBA as a party in the section 8(a) contracting process. The reduction in the reporting requirements for 8(a) firms. Elimination of levels of review for 8(a) applications.

We strongly recommend an implementation of prime contractor 8(a) programs. Increasing the Governmentwide small business goal from 20 percent to 40 percent, and the SDB goal from 5 percent to 10 percent; SDB here used to include women. Streamlining the acquisition process. I have entered some very, very definite remarks in that area there, sir.

Thank you very much.

[The prepared statement of Ms. Archuleta follows:]

WRITTEN STATEMENT OF

THE COUNCIL OF MINORITY AND WOMEN OWNED BUSINESSES

PRESENTED BY
NANCY E. ARCHULETA
CHAIRMAN AND CHIEF EXECUTIVE OFFICER, MEVATEC Corporation
CHAIRMAN, LATIN AMERICAN MANAGEMENT ASSOCIATION

The Council of Minority and Women Owned Businesses (Council) is pleased to submit this written statement regarding the Small Business Administration's 8(a) Minority Small Business Program.

The Council is comprised of sixteen trade associations, including the Asian-American Business Roundtable, Black Presidents Roundtable Association, Greater Los Angeles African American Chamber of Commerce, Institute for the National Business Council, Inc., Laguna Pueblo Indian Reservation, Latin American Management Association, Latin Business Association of Los Angeles, Minority Business Association of Northern Virginia, Minority Business Enterprise Legal Defense and Education Fund, National Association of Minority Businesses, Native American Businesses, National Indian Business Association, New Mexico 8(a) Association, Region X 8(a) Association, San Antonio 8(a) Association, and the United States Hispanic Chamber of Commerce.

The Council was formed in early 1993 in order for the trade associations representing minority businesses to share their collective knowledge and to present a unified position for streamlining the Small Business Administration's Section 8(a) Program and for increasing minority business participation in the Federal sector. We are proud of the progress made by the Council in developing a unified position of our efforts to present this position to the Congress and the SBA. Changes in the Section 8(a) program and the Federal procurement process are urgently needed and we are encouraged by today's hearings.

The Small Business Act's small and disadvantaged business goal and the section 8(d) "presumption" were designed by Congress to eliminate the present effects of past discrimination and to foster the development of businesses owned by socially and economically disadvantaged individuals. However, the term "socially disadvantaged individuals" does not exclude any individuals from qualifying:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities.
>
> The term "economically disadvantaged individuals" is defined as follows: Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged.

These purposes have not been fulfilled. Quoting from Senator Robert Dole's remarks to the Congress on 15 March 1995,

> "Unfortunately, America is not the color-blind society we would all like it to be. Discrimination continues to be an undeniable part of American life." He also stated that, "Discrimination is illegal. Those who discriminate ought to be punished. And those individual victims of illegal discrimination have every right to receive the remedial relief they deserve."

Further, in a study that cost over a million dollars, State of Texas Disparity Study, it was found that widespread marketplace discrimination against minorities and women, particularly African Americans and Hispanics does exist.

The question of presumption that members of certain racial and ethnic groups are socially disadvantaged is not whether the federal government should make the presumption, but that the federal government should recognize that the presumption exists. As an example, in the aforementioned study it was found that

> "*HUBs received a smaller share of State procurements between FY 89 and FY93 than would be expected given their availability to do business in the State.
>
> *Minorities and women earned far less from their businesses in 1990 than would be expected given their qualifications. Moreover, minorities are less likely to own or operate a business than non-minorities with similar qualifications in 1990.
>
> Generally, each of these statistical analyses showed that businesses owned by African Americans and Hispanics fared the worst, that businesses owned by white women fared the best (although still worse than white men), and, in most cases, that businesses owned by Asians and Native Americans fell between these two extremes.
>
> Based on consistent survey findings across race, sex and industry groups from survey and anecdotal evidence, there is anecdotal evidence of discrimination that makes it harder for businesses owned by minorities and women to prosper."

Certainly there are ways to expand opportunity for all Americans and we believe that FASA has begun to address exactly that. However, the Council does not believe that past and current discrimination can be overlooked and that some form of preference is still needed.

Therefore, we propose that legislation be introduced providing a comprehensive method for streamlining the Section 8(a) program and creating additional opportunities for small and minority-owned businesses. Key elements of such legislation should consider the following recommendations.

**A. REMOVAL OF UNNECESSARY REGULATORY PROVISIONS AND REDUCTION IN PAPERWORK**

There currently exist artificial restrictions on a Section(a) firm's ability to do business and a need exists to eliminate unnecessary paperwork requirements associated with the program. We strongly support enactment of the following proposals:

**1. The removal of the limitations on SIC codes.**

Currently, a firm is not permitted to seek Section 8(a) contracting opportunities as designated under a particular SIC code, unless SBA has pre-approved that firm for that business. For example, if an 8(a) firm wishes to add an additional line of business, it must submit a written request to the SBA in the form of an application, demonstrating that the firm has the capacity and capabilities to perform under the requested SIC codes and that the SIC codes are a logical business progression for the firm. The required documentation in support of such a request includes resumes, copies of contracts, and other burdensome and redundant evidence.

Eliminating this process removes the unduly burdensome regulatory requirement of submitting extensive paperwork to the SBA by allowing the 8(a) firm itself to select, within reason, the SIC codes under which it is capable of performing. This should also bring the Section 8(a) program in line with Federal contracting realities by allowing contracting officers to determine whether, in fact, a prospective 8(a) awardee is capable of performing under the SIC code designated for the procurement. At the same time, the SBA should maintain its authority to challenge a contracting officer's decision not to set aside a particular requirement for a firm. If the participant meets the size criteria for that SIC code, then the participant can bid on that procurement. Currently, the participant must request and justify in writing a SIC code addition to its portfolio, and the SBA must review approve/reject the participant under each SIC code. The SBA, however, is largely comprised of "business-type" personnel who are probably not technically qualified to determine if a particular participant has the technical capability and resources under each and every SIC code it applies for. In addition, the government may need to consider an additional "Certification & Representation" for the participant which states the participant meets the relevant SIC code criteria for the particular procurement. Currently, there is no such certification.

**2. The elimination of SBA's policy of using business support levels as a basis for denying 8(a) contracts.**

The concept of using program "support levels" as a ceiling on 8(a) revenues was created by the SBA and not mandated by Congress in Public Law 100-646. Currently, the SBA annually establishes an 8(a) support level for each firm which, generally, the firm may not exceed. Under current regulations, even contracts which have been self-marked for which an 8(a) firm

has been selected after an 8(a) competition may be disapproved for that firm if award is inconsistent with the firm's approved 8(a) support level. The current regulatory requirement unnecessarily limit a Section 8(a) firm's ability to obtain 8(a) contracts and to grow in the marketplace by placing artificial restrictions on the firm based on what SBA may perceive as a firm's ability to grow. Further, the provision is unnecessary given the requirement that 8(a) firms must achieve certain percentages of their sales outside the 8(a) program. Given this requirement, it is unnecessary to further restrict a firm's ability to increase its 8(a) business base.

**3. The removal of the restriction on marketing national and local buy contracts.**

The Council supports the elimination of unnecessary regulatory limitations on self-marketing by Section 8(a)firms, including those relating to national and local buy procurements. Section 8(a) firms, like all other Federal government contractors, should be permitted to compete on a national level at all times. This should also help address the issue of concentration of 8(a) contracts within local areas.

**4. The removal of SBA as a party in the Section 8(a) contracting process.**

This should decrease administrative expense of the Government and increase attractiveness of the procurement process by providing a two-party contracting process. (A carefully structured "Certification & Representation" section with stiff, enforceable penalties for false certification should streamline this contracting process.) If the tripartite 8(a) contracting agreement is removed it eliminates SBA serving as the prime contractor on 8(a) contracts, with the 8(a) firm as the subcontractor. Currently, SBA is required to review and execute all 8(a) contracts, options, modifications, and extensions. This tripartite arrangement was created when the 8(a) program was first established to provide agencies with additional assurances that 8(a) contracts would be performed.

Elimination of this regulation will motivate 8(a) contractors to initiate internal business management procedures which will effectively serve to better position them for exiting the program. However, the Council believes that SBA should still be involved in the contracting process in limited circumstances, i.e., to offer assistance if an 8(a) firm and the procuring agency are unable to reach agreement regarding the terms and conditions of award or for the resolution of disputes arising from the performance of a contract. In addition, if requested by the Section 8(a) firm, SBA should assist in contract negotiations.

Finally, the SBA should retain responsibility for issuing search letters on behalf of 8(a) participants and for requesting that procurements be set-aside for the 8(a) program. Use of SBA's limited resources for these tasks, rather than for the administrative tasks of executing

contracts, options and modifications, is more beneficial to program participants and provides substantial cost savings.

**5. The reduction in the reporting requirements for 8(a) firms.**

The current reporting requirements for 8(a) firms also place a costly burden on the SBA. Presently, 8(a) firms are required to submit semi-annual reports regarding their use of consultants, agents and other representatives, including the amount of fees paid. The Council recommends that all filings be done on an annual basis. This provision is consistent with the current goal of the Federal government to reduce unnecessary paperwork and to conserve Federal resources in the government contracting arena.

**6. Elimination of Levels of Review for 8(a) Applications.**

In addition to the aforementioned elimination of unnecessary regulatory and paperwork requirements, the Council supports a single level of review of 8(a) applications. Currently, 8(a) applications are reviewed at the district, regional and central office levels. Recommendations to do the certification either at the Central Office or at the District Office have been submitted. Either approach would streamline the 8(a) application process, thus ensuring timely and more efficient review of 8(a) applications and the elimination of unnecessary duplication. The Council prefers that the certification process remain at the SBA Central Office to ensure uniform determinations on certification. In the early 1980's, SBA Regional Offices approved applications for 8(a) certification. Often, this resulted in similarly situated firms being accepted in one region or denied certification in another region. Therefore the Council recommends that certification decisions be made at the Central level, with input from the District Offices, if necessary.

**B. Implementation of Prime Contractor 8(a) Program.**

This action would expand 8(a) contracting authority to ANY prime contractor. A prime contractor would be allowed to issue 8(a) sole source and 8(a) competed contracts to assist the prime in meeting its small, SDB, and Women-Owned Business goals. One of the FAR exceptions to "full and open competition" is exceptions as "Authorized or Required by Statue (FAR6.302-5). If the 8(a) program can be expanded to allow 8(a) subcontracts (from prime contractors, then FAR regulations are already in place to handle this exception to full and open competition. It broadens the possibilities for 8(a)s, it helps prime contractors meet their required SMALL BUSINESS, SDB and Women-Owned goals and it makes it easier for primes to meet their "consent" requirements. Further it would be an excellent way for a transitional 8(a) to mentor developing 8(a)s into the process and it could allow for transitioning 8(a) primes to be a follow-on subcontractor, thus insuring better continuity for services for the government. It's a win for the transitioning 8(a), the developing 8(a), and the government because it enhances the successful exiting from the 8(a) program.

**C. Increasing the government-wide Small business goal from 20% to 40%, and the SDB goal from 5% to 10%.**

Government-wide Small Business goals have been set at 20% and SDB goals at 5% respectively, and traditionally that is all that has ever been met and in most cases has not been met. Agencies should also be encouraged to exceed the recommended goals and, in fact, the Council believes that this committee should state clearly that the ultimate objective is to increase small business and SDB participation well beyond the final stated goal. Without a clarification, agencies barely meet the stated goals and the final result is the pitting of small businesses against SDB's for a very small percentage of the total federal procurement pie.

**D. Streamlining the Acquisition Process.**

Public Law 100-656 mandated that all procurements reserved for the 8(a) program with award amounts above thresholds of $3 million for services and $5 million for manufacturing be competed. By injecting competition into the 8(a) program, Congress intended to increase the ability of 8(a) firms to become competitive, particularly after exiting the 8(a) program. This provision, plus the requirement of Public Law 100-656 that a progressively increasing amount of revenues be obtained by 8(a) firms outside of the program, were intended to limit undue reliance on 8(a) sole-source awards.

Unfortunately, the implementation of this requirement by SBA and procuring agencies has had an unintended negative impact on minority-owned small businesses. Contrary to the intentions of Congress, the competitions required by Public Law 100-656 have not been "expedited or efficient." As a result, these competitions have been extremely time-consuming and expensive for both the Federal government and Section 8(a) firms. This, in turn has severely limited the growth potential of firms in the 8(a) program as well as the number of sizable procurements that procuring agencies are willing to set-aside for the program.

The solution to this problem is multi-fold. First, as set forth above, civilian agencies and prime contractors should be permitted to establish their own 8(a) competitions. This concept will create additional pools for 8a) companies to develop competitive proposals and increase their ability and viability to win competitive awards.

Secondly, the creation of a streamlined bidding process which objective is to decrease administrative expense of Government and increase attractiveness of 8(a)procurements to federal and civilian agencies and prime contractors because of the two-party contracts (SBA is no longer involved), and incorporates an initial agency screening via the creation of a data base to which qualified firms have submitted resumes and experience summaries to agencies; files would be annually updated. These firms would be required to submit required certifications and representations on an annual basis so that when a contracting opportunity arises, the agency screens the data base and selects a specified number of qualified firms. This definitely

encourages competition among the various firms thereby creating diverse opportunities. For example, if a procuring entity chooses to compete a contract among eligible firms, it may consider a bidding process that includes the following:

1. Invitations for bids would be encouraged, and in some cases required
2. Increase use of cost plus, award fee, fixed-price and time and materials contracts (control contract costs)
3. Encourage use of minimum requirements which are clearly stated in the solicitation
4. Require page limitations for solicitations
5. Eliminate burdensome requirements (similar to Simplified Acquisition Procedures used in contracts under $100,000)
6. Offerer's certify that Certifications on file in agency data base are accurate and current
7. Page limitations for proposals (experience information is already on file in agency data base)
8. One round of written discussions, with time limits
9. Once determined that a firm is technically qualified, cost can be negotiated including one round of BAFO, with time limits.

This process assures that the government has achieved best value contracting.

It is important to eliminate 8(a) competition in the 8(a) process in order to free scarce resources of the Section 8(a) firms. Currently, Section 8(a) firms competing in 8(a) competitions are required to expend significant time, effort and bid and proposal dollars to the preparation and submission of an 8(a) competitive proposal. These resources can be better utilized for other competitions which will assist the Section 8(a) firms in meeting their competitive business mix requirements and preparing them for successful exit from the program.

Procuring agencies would utilize their individual set-aside programs for more formal competitions among small, small disadvantaged and women- owned businesses. Actually, the Council would recommend that a similar streamlined procurement process be initiated for the aforementioned businesses.

The Council believes that this proposal is consistent with streamlining the overall procurement process, as well as the Section 8(a) program and should be included in any legislation to be enacted.

**E. Transitioning 8(a) Program Graduates**

Public Law 100-656 fell short of addressing the primary concern of the 1987 Senate Small Business Committee survey of 8(a) graduates-their serious concern over 8(a) firms that failed after graduation. As mentioned previously, the current 8(a) program fails to address the critical issues of development of strong business management infrastructures, competition outside of the 8(a) program (current 8(a) competition is not the answer), and broader more enhanced opportunities outside of the 8(a) program which result in direct competition with firms struggling to obtain a portion of the small 20% of the pie. Under this scenario, the number of firms allowed into the program will never make a difference, because the current structure only creates more competitors for the same (decreasing) portion of the available dollars.

To make matters worse, under the current program, 8(a) firms eventually lose their existing 8(a) business base after graduation because 8(a) contracts tend to be recycled back into the 8(a) program. In today's economy it would be extremely difficult for even a large and prospering business to lose annually up to 35% of its existing business base. For small exiting 8(a) firms, the loss of existing business base can mean the difference between a successful transition and failure.

In addition, because of the way the government does business (they want certain persons, without regard to the firm and its needs) employees generally stay with the company that wins the contract. This creates a void which attacks the core competency and core capability of an 8(a) firm and reduces its ability to compete in other areas.

Due to the many aforementioned inadequacies of the program, firms are placed in jeopardy. The Council wishes to affirm that these comments are not intended to mean that the program does not work, because in fact without it many minority firms would not be allowed access to these opportunities. However, we wholeheartedly agree that changes in the overall system must be implemented in order for it to succeed and thereby assure the success of its participants without jeopardizing the success of other small businesses.

**F. Increased Access to Credit and Capital**

An issue which is of critical importance to all small and minority small businesses is access to credit and capital. We believe a Section 8(a) firm's ability to access credit and capital is directly related to its ability to survive. Currently, the Section 8(a) program imposes unduly harsh restrictions on a Section 8(a) firm in its attempts to raise capital and access credit. These requirements must be relaxed to facilitate 8(a) firms in raising equity or working capital to operate their businesses. Current restrictions on firms must be reviewed to provide firms the ability to raise capital in ways similar to non 8(a) firms. In order for 8(a)

firms to be successful after exiting the program, they must be allowed to function like mainstream businesses.

**G. Bundling of 8(a) Contractor Capabilities**

Contract bundling has become an issue not only for 8(a) firms but for small businesses in general. The Council endorses a proposal that would allow 8(a) program participants to team with other program participants, small concerns, or large businesses for purposes of competing for bundled procurements. A provision that would allow this to occur would provide 8(a) firms more contracting opportunities and should relax the affiliation and control requirements of the SBA regulations which ordinarily would prohibit such teaming relationships.

In addition, a provision is needed that would limit large business participation in the subcontracting team to no more than 40% of participation of the anticipated total value of the contract. Although we recognize that this is a high percentage for large business, we also recognize that the government has not accepted that our constituent firms can perform on these kinds of contracts.

**H. Competitive Business Mix Requirements**

As mentioned in this testimony, this element of the law is vital to the success of an exited 8(a) firm. However, under current provisions, 8(a) competitive awards are not counted in the competitive mix requirements for 8(a) firms. This provision is costly both to the government and to the firm. Section 8(a) competitions are costly and time-consuming and, although competition is limited to program participants, the competition is as sever (possibly more so) as outside of the program.

The Council strongly recommends that the aforementioned recommendations for streamlining the acquisition process be considered as a way to (i) release bid and proposal dollars for non 8(a) procurements (ii) encourage 8(a) firms to compete in other areas (iii) release valuable bid and proposal and profit dollars for competition and technology development outside of the program.

**I. Other Key Provisions**

The Council also supports these additional key provisions that would prove instrumental in developing the 8(a) firms:

a. Buy-Indian Act: would waive the Buy Indian Act requirements for 8(a) contracts awarded to Native American owned 8(a) firms;

b. Require contracting officers to respond within 15 days to an 8(a) firm's requests regarding administration of contracts;

c. Require agencies to make available alternative means of dispute resolution to handle contracting officers' failure to make prompt payments or to respond to contract administration questions;

d. Allow current competitive 8(a) award to exited 8(a) firm if eligible on date specified for receipt of offers and if firm had a timely submitted offer, including price;

e. Allow sole-source award to a an exited firm which was eligible on the date specified by the agency contracting officer for the submission of an offer, including price;

f. Encourage mentor protégé arrangements between exiting, exited and emerging 8(a) firms.

**J. Conclusion**

In closing, the Council wholeheartedly agrees that changes to the Section 8(a) program are urgently needed. We urge the Committee to consider that there are many benefits to assisting minority owned business including: developing business persons that have long term commitments to economic growth; encourage diversity, innovation and competitiveness in the industrial base; provide upward mobility and career development for women and minorities (minority firms employ more minorities than the eight largest U.S. firms); developing role models for other women and minorities to follow; provides access to capital with may not otherwise be available; and, assure the creation of access to business development opportunities that are not otherwise available.

Chairman BOND. We will receive those for the record and thank you very much for your constructive comments.

Mr. Fernando Galaviz.

**STATEMENT OF FERNANDO GALAVIZ, VICE CHAIRMAN, NATIONAL FEDERATION OF 8(a) COMPANIES, ARLINGTON, VIRGINIA**

Mr. GALAVIZ. Mr. Chairman, my name is Fernando Galaviz, vice chairman of the National Federation of 8(a) Companies. We dearly appreciate the opportunity to testify before you and we request that our written statement be part of the record.

Chairman BOND. Your full written statement will be made a part of the record.

Mr. GALAVIZ. Mr. Chairman, first I personally want to thank this Congress and other congresses for providing for me and my family the opportunity to be able to develop a business. Also, I would like to thank some individuals, particularly Josh Smith who helped me start my business with my first contract, who helped me qualify for a sophisticated computer contract and also who provided some financing. Also Gordon Yamata, Dick Otero, and Elizabeth Penn. These are owners of companies that have helped me.

Also, I would like to acknowledge the fact that we have made a dramatic difference in trying to be viable with the help of Senator Nunn's mentor protege program. I want to thank the Senator for the support of that program.

Over the weekend an article appeared in the Los Angeles Times. If I were not familiar with the 8(a) Program and if I had not been an activist over the last 25 years, just be reading this article I would say, cancel the program. This article and other articles and other information, including the information you got today from the GAO, which a lot of it was incorrect, is what is creating for us a problem.

We know that right now we are in a friendly body here. But we know in the overall Senate and the overall Congress there are a lot of discussions being done on affirmative action. And we need your help to teach us how can we really clear the record as to what are the real facts.

This article and other articles do not address the fact that the so-called sole source concept in Government is the way it is doing business. In fiscal year 1993 the Federal Government spent $182 billion in Federal procurement, $55 billion went sole source to large corporations and nonprofit organizations; $7 billion went sole source to small businesses. Only $3.5 billion went to the 8(a) Program and $900 million was won 8(a) competitive.

Now also there is this perception in this body and other places that everything is sole source. The fact is, gentlemen, that when an agency puts out a requirement, they announce in the CBD or the small business office calls a group of 8(a) firms. Then that list might be 20 firms; they select seven. Then out of the seven they make us come in and make formal presentations. We have to spend money on those presentations. We have to get the right technical people. We have to do a professional job.

The perception that we get all our business sole source is totally erroneous. Our federation from some homework we have done

claims that only 10 percent of the 8(a) awards really come to us sole source.

The GAO today said to you, there is no such progress of graduation. That is incorrect. There are several ways you graduate out of the program. Either by the completion of the nine-year term or by going over your size standard. So if you are a computer company and you have only been five years in the program and you have gone over that three-year average, you are no longer small, then you can no longer qualify for 8(a) awards even though you are still 5 years into the program.

The net worth is a catch-22. Business expects you to be reasonably viable in order to—the CAA when they come in and check you out and audit you before you get a contract award, they expect you to be financially viable. They do not care that you are an 8(a) firm. There is no special provisions of the DCA regulations, the fact that you are an 8(a) firm. So if you do not meet the financial criteria, they might classify you as nonviable.

The 8(a) Program, there is confusion between the DOD program 1207 and the 8(a) Program. I was part of the people that worked to get the 1207 into law and the bottom line, the hidden agenda there was that we wanted to get SBA out of dealing with the three-party contracting effort. That was the real answer. Plus, the fact that at that time the Reagan administration was supportive. The Reagan administration is the one that started MED week and other initiatives. And so did the Bush administration provide support.

Basically, for the time that is allowed to me, there are other points I hope that will be picked up in the question and answer. But the one thing I would like just to second here. The question is whether or not these programs are needed. Please remember in the 1940's, 1950's, and 1960's when there was a lot of expenditure in Federal dollars and today's largest companies became viable because of those dollars that World War II provided, 1940's, 1950's, and 1960's we minorities were not allowed in.

Today, should the program continue? If I take you to any trade show throughout this country, whether it is a computer trade show, electronics trade show, sporting goods, any trade show, you are going to find that there are very few minorities. You are going to find that the people that are working those trade shows are mostly the executives, the salesmen. In the big, expensive trade shows you are going to find they are mostly white males, maybe a few white females, and once in a while a person of color. This is today in 1995.

Thank you, Mr. Chairman.

[The prepared statement of Mr. Galaviz follows:]

N8aF COMPANIES The National Federation of 8(a) Companies
4200 Wilson Boulevard ▪ Suite 700 ▪ Arlington, VA 22203
Telephone: (703) 525-5818 ▪ FAX: (703) 812-8692

TESTIMONY FROM THE NATIONAL FEDERATION OF 8(A) COMPANIES TO THE SENATE COMMITTEE ON SMALL BUSINESS FOR THE SENATE HEARING ON APRIL 4, 1995. TESTIMONY PRESENTED BY MR. FERNANDO GALAVIZ, VICE CHAIRMAN OF THE NATIONAL FEDERATION OF 8(A) COMPANIES.

Good afternoon Mr. Chairman Bond and distinguished members of the Senate Committee on Small Business—I am Fernando Galaviz, Vice Chairman of the National Federation of 8(a) Companies. The 8(a) Federation appreciates the opportunity to provide testimony on SBA's 8(a) and 8(d) Program.

The 8(a) Federation is a non-profit organization in good standing with a 12-member National Board and over 200 associate members nationwide.

We respectfully submit our written testimony to be included in the record of this hearing. The purpose of our testimony is to provide the background history of the original goals and objectives of the 8(a) and 8(d) program; discuss if these goals and objectives have been met; address the questions and concerns that have been raised in recent years on the design of the 8(a) and 8(d) program; and discuss the effectiveness of the Small Business Administration (SBA) in the management of these two programs. Included in our testimony are specific recommendations that we hope this committee will consider as deliberations on the 8(a) and 8(d) program are finalized.

Our testimony includes 18 recommendations that will streamline the resources that are presently being used, which we are confident will result in improved support for the development of minority owned enterprises and save the Federal government and tax payers over $65M.

It is important to acknowledge that the initial key objectives in the creation of the 8(a) and 8(d) program were to increase the number of small minority owned firms that support requirements in the Federal government and to increase the capital access of the minority community so that it may become a full participant in the mainstream of the American business community.

Support for minority business enterprises was initiated by the Nixon administration. The most crucial problem the Nixon administration attempted to address was the under-utilization of the minority business community by the Federal government and by the major corporations that support Federal government requirements. It is my understanding that President Nixon strongly felt that it was critical to bring the white and black communities together through a Black Enterprise program which

is now known as the Minority Business Enterprise (MBE). President Nixon recognized that the most effective way to achieve the building of peace in the civil unrest of the 1960's, which would go beyond the civil rights and affirmative action legislation, would be through much needed economic development initiatives that would give economic empowerment to the minority community—and sections 8(a) and 8(d) of the Small Business Act over a period of time were determined to be the best means to achieve economic empowerment and development in the minority business community.

Over the last twenty five years, the 8(a) program has made significant contributions to the American economy. After its inception, the number of minority owned companies has increased creating healthy competition in the Federal government contracting business. Federal government Managers now have a wider range of competitive choices, which in the last 10 years have clearly resulted in the 8(a) firms providing lower cost services and products to the Federal Government, this is reinforced by empirical observation and economic theory that the larger the supply of firms, the lower the prices get. The creation of the 8(a) program has proven to be a sound policy decision with clear and proven results in comparison with the distorted market choices of the 1970s.

The first 10 years of the 8(a) program were quite challenging for Federal government procurement and program managers. In the 1970's the concept of successful minority owned firms was questionable, and with reason, because there had been a history of "unsuccessful" and unprofitable minority owned businesses. These "unsuccessful" experiences were caused by the grim realities of the time. The minority business community had to be developed almost from scratch because it was the general practice at that time to purposely exclude minorities from business opportunities and sources of capital and lending. Prior to the Federal government's focused involvement in the development of minority owned business, the mainstream market place which included the Federal government, provided very little opportunities for minority owned businesses, and in fact, for many decades, prior to the 1970's minority owned firms were not encouraged or welcome to participate in the Federal government market place.

**Has the 25 Years of the 8(a) Program**
**Created an "Even Playing Field" for Minority Entrepreneurs?**

If anyone believes that in 1995 the playing field for minority owned businesses is not as uneven as it was four decades ago, or that 25 years of the 8(a) program has catapulted minority owned firms into the mainstream market, then Mr. Chairman and distinguished members of the committee, I recommend to go to any part of this country, to any of the national industry trade shows, and whether it is the AFCEA show, telecommunications, housewares show, hardware show, electronics show, COMDEX computer show, or any other national industry trade show, in fields of agriculture, medicine, science, and many others, and you will find that without exception, the participation of minority firms in the endless rows of industry or corporate exhibits is minimal or nonexistent. And, as importantly, you will find as you walk from exhibit to exhibit, whether it be large or medium-size mainstream companies, the representatives waiting to receive you are for the most part white males,

and now and then white females. This is a reflection of the realities we face in the marketplace. You may ask yourself why the state of affairs is the way it is, and this in 1995 can speak louder to you than all the statistics that the government or critics of "set-asides" for minority owned firms can provide. "A picture is worth a thousand words," and the real picture that should not be ignored is that the state of economic development minority firms need to achieve is the "consistent ability" to acquire and retain the resources necessary to be part of mainstream industry economic marketplace.

In the retail business, the three most critical elements for success are Location, Location, Location. What are the three most important elements for a minority owned company doing business in the Federal government or in the private sector to achieve success? The three most important words for minority entrepreneurs are Access, Access, Access, to capital, market and the "Old Boy's Network."

The greatest challenge to the minority business community is how to develop and manage business growth. In order to appreciate and understand the challenges that minorities have faced, it is necessary to take into consideration that most minority entrepreneurs have no family background of business experience, and for at least six decades into this century, minorities have had very little exposure to business very few successful role models to emulate. In general, non-minority mainstream business owners have ready access to "traditional sources of lending," an educated work force, generation after generation of professionals and experienced business individuals within the family structure, and fairly good access to markets by building upon generations of large and established relationships commonly known as the "Old Boys Network." Minority business owners, on the other hand, face great challenges finding traditional sources of lending.

It has been proven again and again through different independent studies that a minority person has a higher probability of being turned down for a loan than a non-minority person. It is also a fact that minorities have higher high school and college drop out rates than non-minorities—this has led to a scarcity of qualified and educated minorities in the sophisticated and technical labor market.

In real and concrete terms, very few minority business owners have broken the glass ceiling, and would have never, as a community, made the modest progress that has been made to date without the Federal government's support.

The 8(a) Program helps minority business owners to vie for entry into the business minor leagues' locker room, and, now that the minority business community is on the playing field (beyond the great progress Jackie Robinson made), minority businesses are considered as a "threat" to the welfare of this nation by those who carry the perception that these firms have reached "equality." Without the 8(a) program, minority firms would have a much higher failure rate, not because they are not good

entrepreneurs and managers, but because there is very limited access to capital and technology, and we have not been easily accepted as a community into the "Old Boys Network."

In 1995, a higher level of concern and attention has been given to set-asides. Therefore, Mr. Chairman, will Congress and the public show an interest in looking into the large and real benefactors of large sole source Federal set-aside awards to large corporations and large non profit organizations? After all, they receive over 40% of the contract awards on a sole source basis, compared to 2% of set-aside 8(a) awards, of which 35% of the 2% are 8(a) competitive awards?

Regarding the total number and dollar value of Federal government contracts awarded to 8(a) firms throughout the life of the 8(a) program, it is important to note that recent figures produced by the SBA have revealed a consistent pattern that 98% of Federal contract awards are made to non-minority and non-8(a) firms. This means that minority firms in the 8(a) Program have only been able to achieve, at most, a 2% market share penetration of total Federal contracting expenditures. One would have expected that after all these years of federally supported minority programs such as the 8(a) program, we would be celebrating a much greater success than this. And yet, can it be that even this modest 2% achieved over a 25-year period poses such a "threat" to our society that elected officials in the 104th Congress are debating its destruction? Is the notion that the minority business community will gain more than 2% of the market share so frightening that the 104th Congress may abolish or drastically reduce the programs which support the economic empowerment of the minority business community? Does the 104th Congress want to leave a legacy of "stumping" the progress that has been made to date? Will the 104th Congress show as much concern and intensity because 40% of contracts that are awarded on a sole source basis are given to major corporations and large non-profit organizations?

We highlight this one fact as a sample Mr. Chairman, so that as the 104th Congress reviews and evaluates the merits, problems, and challenges of the 8(a) program, that under your leadership as Chairman of the Senate Small Business Committee you will lead us in developing business solutions to improve the 8(a) program. These initiatives need to make good business sense instead of the past initiatives designed to restructure the 8(a) program which were driven more by political considerations rather than what makes good business sense in the development of minority owned firms in the United States.

Before we proceed, it is important for those who may not be familiar with the way Federal agencies operate, to point out that, for many years, it has been the practice of the Federal government to award a significant number of large sole-source contracts to large corporations and large non-profit organizations. The award of these sole-source contracts can be classified as set-asides for large organizations. Prior to the Competition and Contract Act of 1984, almost 60% of all contract awards were set-aside, on a sole source basis, to large corporations and non-profit organizations. After the Competition and Contract Reform Act of 1984 came into effect, the sole source awards to large corporations and non-profit has decreased to just over 40%. Throughout the life of the 8(a)

program, during any given year, the amount of contract awards to 8(a) firms has not exceeded 2% of all contract awards. Since the Business Opportunity Development Reform Act of 1988 came into effect, which required competition between 8(a) companies on contracts over $3 M for Services and $5M for Manufacturing, 35% of 8(a) awards have been awarded on a competitive basis. This means that approximately 1.6% of all Federal sole source contract awards have been made to 8(a) firms while over 40% of all sole source contracts have been awarded to large corporations and non-profit organizations.

Mr. Chairman, it is our intent in presenting this information to encourage you to look at the whole picture and not just focus on set-aside programs that have been proven to support the economic development of minority firms.

## SECTION 8 (d) SUBCONTRACTING PLAN / ITS PURPOSE / DO WE STILL NEED IT?

In 1995, major corporations, in complying with section 8(d) of the Small Business Act, seek out, identify, and work with minority firms throughout the country. The force behind their interest to include minority owned firms lies on contractual requirements designed by the Federal government through section 8(d) of the Small Business Act. Unfortunately, there are too many cases in which many of these large corporations only meet the minimum contractual requirements to subcontract to minority firms. The relationship between 8(a) firms and major corporations is critical to the 8(a) program because SBA regulations require 8(a) firms to diversify their revenue base to include non-8(a) competitive awards.

The 8(d) provision of the Small Business Act requires large prime contractors who have been awarded Federal contracts valued at $500,000 or greater for services, or $1,000,000 or greater for construction, to submit a subcontracting plan for small and small disadvantaged businesses. This plan is submitted by the large prime contractor after it has succeeded in winning the contract, and in some cases, after contract award. The performance by large prime contractors to meet the letter and the spirit of the law in the 1980's was very disappointing. In the late 1980's, agencies such as the Air Force and NASA started initiatives to make large prime contractors fully comply with section 8(d).

Agencies need to require large bidders to detail their subcontracting strategy in their initial proposal. In addition, evaluators should award additional points to those large primes with the best subcontracting strategy.

In the 1980's, Congress recognized the need to incorporate additional penalties through contract liquidation damages if the subcontracting plans were not implemented. Large prime contractors initially showed poor faith in complying with section 8(d), but have improved their compliance only after the Federal government stepped in to require compliance. There is no real concern, however, if a prime contractor does not meet its subcontracting plan.

With this in mind, Mr. Chairman, if the 104th Congress decides to eliminate section 8(d), awards to small disadvantaged businesses from large primes will diminish and perhaps decrease to a negligible level. The participation of minority owned firms supporting major prime contractors will be seriously affected.

History provides us with interesting and valuable hindsight. There is a great national hero, a great Republican, who will go down in history as one of the most accomplished men of our times. This man is Dwight D. Eisenhower, who started the Small Business Administration. It was another Republican, President Nixon, who had a clear vision that beyond civil rights and beyond affirmative action, the most significant element of bringing reasonable civil peace to our country and to address the national interest was to bring blacks and whites together. It is said that President Nixon privately used a phrase, "green power"— not black, brown, white, or yellow, but "green power" to mean that economic empowerment of minorities would bring the white and black communities closer to a productive, civil relationship. President Nixon was very wise in understanding that it was not to our Nation's national interest to continue civil unrest by the burning WATTS and other cities. Using Republican principles, he recognized that capitalistic initiatives supported by the Federal government would merge the interest of the white and black communities by providing economic development opportunities.

In our country today, due to Section 8(d) of the Small Business Act and its subcontracting provisions, the positive impact of President Nixon's vision is clearly evident. White males, mostly representing large corporations, sit down with all races to conduct business and to make a profit. But even in the case of inter-racial business dealings, it is important to be realistic by acknowledging that the only reason that non-minority and minority businesses are sharing the Federal government "business pie" is because the Federal government has mandated it. And if the Federal government had not mandated major corporations and others to share a piece of the market share, albeit a very modest piece, then large corporations would not be doing so yesterday, today, or tomorrow.

Chairman Bond and distinguished members of the committee, if the Federal government does not require large and medium size corporations to subcontract, specifically to small disadvantaged businesses, what makes anyone think that those corporations are going to share the "Federal government Business Pie" with minority firms?

It is very interesting to note that large corporations are quite aggressive in encouraging 8(a) firms to share a piece of the 8(a) contracting pie with them, and that the large companies usually want 49% of the share. This common practice has as its source the high standards that are imposed on 8(a) competitive awards. These standards are similar to those used in mainstream industry to measure well established and financially stable businesses rather than developing and merging minority owned businesses. These standards are a sharp contradiction to SBA's position that the 8(a) program is a development program, not a contracting program. Therefore, in order to compete successfully, the 8(a) has no choice but to share it's piece of the pie with large corporations.

The case in point in modern times is with NASA. For several years, large corporations that traditionally support NASA missions have been telling NASA management that there is no possible way that minority firms can perform on sophisticated engineering work which requires a significant degree of proven experience or mission expertise that NASA requires. They argued that it was impossible to find qualified minority owned firms. These large companies told NASA management that NASA management and staff were unrealistic for recommending initiatives that promoted expanded use of small minority firms. Thanks to the commitment, courage, and persistence of the management of NASA, supported by Republican Presidents Reagan and Bush, that these large companies got the message. In the late 1980s, NASA management and the Executive Branch sent the following message to long term major NASA prime contractors: "If you think it's too difficult to work with minority firms than you better not bid NASA jobs."

Through the efforts of Presidents Ronald Reagan and George Bush, the industry knew that there would be full support for the development of minority owned firms at NASA. The result was, Mr. Chairman, that the same large corporations that had been convinced that it was impossible to increase the use of minority firms at NASA, were now "falling all over themselves" to successfully and profitably bring minority business partners into their teams to support their competitive bids. — Now isn't that remarkable? So Mr. Chairman and distinguished members, everything starts from the top: It has to be the vision of you and the members of this Committee and other members of Congress to look each other "eyeball to eyeball" and ask yourselves for the national interest, is 2% of the Federal procurement market share that minority firms have achieved through Federal sponsored programs too much? Do we want to take away from the minority community the very modest progress that it has made? Do we want to stunt the modest growth of the capabilities that minority enterprises have developed to date, which has provided a greater number of competitive and qualified Federal government suppliers?

No one ever said life is fair. This is true for just about everything in life, however, the reality of the unfairness of life becomes much more tangible when you are an 8(a) company or a minority business. We have all heard about large companies being caught conducting illegal activities. . . and indictments come, fines come, officers, management and personnel from major corporations go to jail, and there are even some notices of temporary debarment. Yet the following week these large corporations are given task order contracts with the same agencies that initiated the legal proceedings and the convicted large corporations continue to do business with the rest of the Federal government. Now, lets see what happens to a small minority firm or 8(a) firm whose legal problems do not even go as far as an indictment, but only an investigation, or the firm is indicted for a lesser sin than the large corporation's. . . as a consequence, the minority firm is destroyed forever—no one said that it would be fair.

No one said it would be fair, for example, with minority subcontracting provisions under section 8(d) of the Small Business Act. We know that there are many people in this audience who own minority firms and who would tell the committee such true stories as this: A major corporation calls on a

small minority firm to give it an opportunity to find, as an example, ADA Programmers, or other specific technical professionals who possess a unique skill set, and the minority firm is pleased to fill the requirement knowing that it is going to be a tough assignment because it requires very unique capabilities. The minority business expends resources, time, and money recruiting for the major corporation because it wants to meet the challenge and successfully earn the work. Then, the minority firm discovers that the large corporation that originally gave it the requirement had already advertised and recruited on its own for the source requirement, and has filled most of its own requirement. Why do large corporations ask minority owned businesses to conduct the search and spend their limited resources to do useless digging with no hope of coming up with a bone? Why is it that minority firms are given the most difficult challenges? Do large corporations do it so they can say that they gave the minority owned community an opportunity, but it couldn't deliver?

The most important quality of a salesman is that he or she be a good listener—that he or she listen to what the customer needs, and what the customer wants. In all practical terms, Mr. Chairman, you and your colleagues on the committee, and other members of the Congress are our customers, and we have to listen to what it is that you want if we want to do business with you. We understand the importance of the "Golden Rule," that is, that he who has the gold makes the rules. Over the last four weekends, on all the weekend network talk shows—from Meet the Press, to This Week With David Brinkley, to Face the Nation, and, of course, Nightline—the members of the 104th Congress have been conveying on all these network television shows the message that, basically, as far as education, jobs, and economic development, the minority community is now empowered; that through whatever means it has reached the market share to satisfy "those minorities," that enough is enough and it is now good political time to be a fair and colorless society. If this is the case, why does the minority community have only 2% of the Federal government contract pie after trying for 25 years to get a reasonable market share? Is 2% a reasonable market share? We don't think so, nor would any reasonable and fair minded person.

The National Federation of 8(a) Companies is prepared to address the challenges of the changing political realities that the last congressional elections have put into the fore front of the national debate on set- asides, affirmative action, and the widely publicized court cases challenging minority business development support programs. These series of political driven events have augmented widespread national discussion of the need for a narrow definition of social and economic disadvantaged status.

The following are recommendations that the National Federation of 8(a) Companies is proposing to the 104th Congress. Mr. Chairman and distinguished members of the committee, we believe that these recommendations are balanced to ensure that, in the interest of the Federal government, large corporations, small businesses who are non-minority, and the taxpayers' interests are taken into consideration. These recommendations will streamline the support services and reduce the cost to the Federal government and the taxpayer by approximately over $65M.

## RECOMMENDATIONS TO THE 104TH CONGRESS FROM THE NATIONAL FEDERATION OF 8(a) COMPANIES

1. Streamline and Lower Cost of Administration of the 8(a) Program

We estimate that these recommendations will reduce by 40% the SBA staff presently required in the administration of the 8(a) program.

The following are activities that should be eliminated from SBA's responsibilities:

A. Involvement of SBA in the "third party" contracting process.
B. Assignment of SIC codes to 8(a) program participants.
C. The SBA Program support planning process.
D. The local/national buy concept.
E. Providing technical assistance through the 7(j) program.

SBA should manage the portfolio for each 8(a) participant to ensure participants are in good standing regarding the qualifying criteria in order to remain in the 8(a) program.

2. Streamline Resources That Provide Technical, Marketing, and Management Assistance On A Cost Sharing Basis. This Will Eliminate Duplication Of Services And Savings To The Tax Payer

8(a) firms who need management and technical assistance should use established sources such as the Department of Commerce (DOC), Minority Business Development Agency (MBDA), Business Development Centers, Marketing and Technical Support Services. MBDA provides these services on a cost sharing basis. SBA can be removed from this support effort.

3. Consolidate Duplication Of Field Support Services Which Will Result In Better Services At Half The Cost, Resulting In Savings To The Taxpayer

Streamline Federal government outreach support services through consolidation of field offices. At present SBA, MBDA, DOD, GSA, DOT, and other Federal agencies have outreach support services in most major cities. In many cases, these programs are a duplicated effort.

4. Reduction of Taxpayers' Contributions to Federal Government Activities in Support of Minority/Small Disadvantaged Business Trade Shows and Minority Seminars

Since the early 1970's there has been a considerable effort by federal government agencies and by major prime contractors to participate in the wide range of minority business development events, such as seminars, minority industry trade shows, trade fairs. These activities over a period of time have assisted many minority entrepreneurs and minority firms in becoming acquainted with a wide range of federal agencies and federal programs. Besides the activities by federal agencies, Congress members have sponsored their own federal procurement conferences which normally are sponsored in each State and District by members of Congress.

The funding to provide support to all these minority business development events is provided by the Federal Government, or more specifically, the taxpayer, and includes the travel, lodging, per diem for federal officials and for officials of prime contractors to participate. It also includes the costs of materials, exhibit space, freight of exhibit displays, communications cost, registration fees and other incidentals. The Federation recommends that a pilot program be approved that will require coordination among all federal agencies, the private sector, and Congress in order to be assured of an effective use of limited resources. In many instances, there has been a great duplication of effort of these conferences, for example, take southern California where one month there is a Congressional Procurement Conference in, say, Orange County, three weeks later another Congressman holds a similar conference just 40 miles away in Los Angeles, and the following month a federal agency holds its conference, and a minority trade association using federally-sponsored dollars holds a trade show. All these activities may be occurring within a period of six weeks, in less than a 100 mile radius.

We recommend that Congress require for the development a pilot program basis for their to be only be two major conferences for the year in each major metropolitan area in which all parties will participate in the same federal event. The Federation believes that it is not only a matter of considerable cost savings, but also that the quality of the managers sent by the federal government and major contractors to attend the events would be much higher did they not have to spread out so thin among so many events. In the present state of affairs, it is often not the most qualified federal and corporate representatives who attend, but whoever is expendable.

5. Significantly Cut The Cost of the Development and Management of Subcontracting Plans In Order To Comply With Section 8(d) By Streamlining The Subcontracting Plan Requirements

We strongly recommend that the 1974 requirements established under PL 95-507 be changed in order to eliminate the development of subcontracting plans and reporting requirements

which put a burden on prime contractors and cost the taxpayer a significant amount of dollars. Since 1974 there has been consistent concern in the small disadvantaged community about the low level of compliance by prime contractors in meeting the letter and spirit of PL 95-507.

The 8(a) Federation recommends that on contracts valued over $3M, all federal agencies should include in the RFP solicitation a requirement for bidders to include in their proposal the proposed contract work distribution by tasks, to specify which tasks will be performed by the prime contractor and which will be performed by the small and small disadvantaged businesses. The agency will be required to develop an RFP evaluation criteria which will award greater evaluation points to the bidders that have the best and most complete subcontracting strategy.

The benefits of this measure would include:

a) The federal government would benefit by knowing "up front" how the prime contractor will perform on the contract prior to contract award. In the present system, the Federal government does not receive the details of the subcontracting plan, which details the specifics on how and with whom the prime will perform the work and its actual implementation after contract award.

b) The federal government will benefit by eliminating the cost of monitoring contractors on their subcontracting plans. By including small and small disadvantaged businesses in the formal bid, the formal contractual teaming arrangement between the parties is a very effective self-monitoring mechanism, given that the parties involved have a contractual relationship.

c) The prime contractors will benefit by not having to develop the subcontracting plan. This measure will also eliminate the need for primes to file status reports on an on-going basis. This would eliminate a lot of paperwork and save the taxpayer a considerable amount of money.

d) The prime contractors will benefit by having the small and small disadvantaged businesses contribute to the marketing, data collection of market conditions and intelligence, and in proposal development efforts. At present, since the prime submits the subcontracting plan, subcontracting firms are not identified while the proposal is being developed by the prime.

e) The small and small disadvantaged firms will benefit by working and contributing to the prime contractor's efforts to develop the proposal and by having the appropriate time to prepare for its performance in the contract in the event the team wins.

6. 8(a) Program Training of Potential Participants

The SBA should focus its efforts and resources in the management of the 8(a) Program to effectively train potential entrepreneurs who are considering being federal government contractors and participating in the 8(a) Program.

7. 8(a) Program Certification Process

For the SBA to certify the participants who successfully complete the SBA training course; who have clearly demonstrated the practical elements necessary to succeed as a Federal government contractor to ensure that they meet the qualifying criteria to participate in the program. To ensure that SBA certifies those business owners who clearly understand that it is their responsibility to market their own business.

8. 8(a) Program Participant Business Owner Solely Responsible For Developing New Business

For SBA and Congress to make it clear to 8(a) participants that only they, the minority entrepreneurs, are responsible for developing their businesses. The 8(a) and 8(d) program will provide development assistance to make it a little easier to develop management and technical expertise through the limited participation period of nine years of receiving sole source awards. It is critical that 8(a) Program participants have a clear understanding that neither the SBA nor the Federal government are responsible for their contract awards.

9. Revision Of Qualifying Criteria For Economic Disadvantaged Status for 8(a) Program Participation

**Narrow Qualification Criteria for Economic Disadvantaged Status:**

Members of the Federation and the minority business community realize that the dynamics of the present state of the political environment require for all of us to be prudent and realistic by addressing the following question:

What is the best, most reasonable, and most common sense method to modify and enhance the legislative and regulatory language of the 8(a) Program to focus limited federal resources to assist the development of the minority entrepreneurs who are the most disadvantaged and who need the most assistance?

Mr. Chairman and distinguished members of the Committee, the time has come to reconsider the redefinition of the term "disadvantaged," because this is not an affirmative action hearing, this is a hearing about business, and as such, we should limit addressing the overall issues of affirmative action, or the issues of social disadvantage, and we should discuss the issue of defining guidelines

for economic disadvantage status.

At present, in order to determine economic disadvantage, the formula that is used has loopholes which can and has contributed to abuse and misinterpretation. We propose a streamlined and very straight-forward approach. It is very important to remind critics that the 8(a) Program is not a welfare program. If this were the case then all the major corporations, such as Grumman, and large non-profit organizations, such as MITRE, would all be considered to be on welfare for the last 55 years because they have all received sole source contracts. The following, Mr. Chairman, are initiatives that you and your colleagues should consider.

A. To qualify for the 8(a) Program, the net worth of the applicant and his or her immediate family, including spouse and relatives living in the same household, may not exceed $650,000 for all combined assets and equity in the home, but excluding the business. The business may not exceed the Small Business Administration's small business size standard for its primary SIC code.

B. To continue in the 8(a) Program, the net worth of the applicant and his or her immediate family, including spouse and relatives living in the same household, may not exceed $1.5 million, and the business must remain within the Small Business Administration's small business size standard for each contract it bids on.

C. To qualify as a Small Disadvantaged Business (SDB), the same restrictions as in A, above, apply. SBA will become involved in the annual SDB certification process to stop the present widespread abuse of SDB self-certification.

10. <u>Competitive 8(a) Bids Are as Costly and as Risky as Open Competition Bids</u>

The Reform Act of 1988 introduced the element of formal open competition in accordance with the Federal Acquisition Regulations (FAR), with in 8(a) firms. The Reform Act of 1988 has resulted in a double-edged sword—on one hand it has created a healthy competitive environment, on the other hand it has made it considerably more difficult for developing firms to build up their management and technical infrastructure in a reasonable time frame in order to achieve being able to succeed in a competitive environment. Prior to the 1988 Reform Act, an 8(a) firm could position itself to be awarded sole source contract awards larger then $3M for services or $5M for manufacturing. Such awards made it possible for 8(a) firms to have greater financial resources in their General Administration (G&A) and Overhead (OH) budgets in order to be able to afford competent marketing and sales, proposal development, graphics and technical support personnel.

The Federation strongly recommends expanding the definition of competitive contracts within the 8(a) Program's competitive business mix to include 8(a) competitive contract awards for

92-035 0 - 95 - 7

the purpose of meeting the SBA's present definition of non-8(a) Business Mix Requirements. The definition should be changed to sole source awards versus competitive awards which include 8(a) competitive awards.

The Federation board recommends that 8(a) company owners who have developed their businesses beyond 30% of their primary SIC code's size standard seriously consider implementing, on a voluntary basis, a Mentor-Protégé Program within their company to ensure that they set an example for other firms. Mr. Chairman, 18 months ago in my company, The CENTECH Group, Inc., we formalized a program in which any employee, regardless of race, sex, age, creed, color, national origin, or disability, after serving in good standing at the CENTECH Group for a period of five years, can qualify for mentoring by The CENTECH Group in the start-up of his or her own business. The CENTECH Group will assist the employee and protege firm in the business start-up process for 18 months. After the 18-month mentoring period, mentor firm and protégé firm will sever the business relationship. The reason for a total separation between the firms is to make it clear that The CENTECH Group has not established this volunteer mentor program for the purpose of developing and continuing a legacy for itself in the 8(a) Program. At this point, we have two employees who have applied for the program—Emma Vento, whose vision it is to start a recruiting firm, and Steve De Veranez, who intends to start a computer services firm. The CENTECH Group does not take any equity position in the new business.

It is reasonable to respond to the question, "Why do we have this entrepreneurship program at The CENTECH Group?" The reason is because at The CENTECH Group, we understand that even though the company is using its own capital and resources, we acknowledge that we are using a publicly-supported Program that is important to this Nation—and this is our way of paying back for the privilege that we have enjoyed as an 8(a) firm, and the assistance we have received to develop The CENTECH Group.

11. <u>8(a) Graduate Program Participants To Assist Siblings And Spouses</u>

Sons, daughters and spouses of 8(a) Program participants (including current and graduated participants) whose mother, father and spouses combined net worth is greater than $2.5 million will not be eligible for 8(a) certification. The Federation believes that if an 8(a) program participant has had very successful results in the 8(a) program, it is necessary that the experience be transferred to their own family given that the family has had a role model and has accumulated considerable financial resources. We believe that today abuses are committed when successful 8(a) business owners establish family members such as their wives or sons/daughters as another 8(a) company.

12. Promote The Support Of 8(a) Firms To Do Business In Economic Depressed Areas

An 8(a) firm that meets the following three criteria for at least four consecutive years during its Program participation will be allowed to extend its 8(a) participation for an additional two years (beyond the nine years), provided the firm stays within its primary SIC code's small business size standard:

a) Owner lives in an economically depressed area,
b) Corporate headquarters office is located in an economically depressed community,
c) 30% of the business's project and corporate management staff are minorities.

13. 8(a) Firms To Contribute To The Education Of Minority Students

8(a) firms that exceed $10 million in gross annual sales in two consecutive years will be required to provide financial educational assistance, such as NAACP, Urban League, LULAC, IMAGE, etc. etc. to a minority student through a national civil and economic non-profit minority organization by providing scholarships.

14. Not all 8(a) Program Participants Are The Same - Some Need More Time To Successfully Mature

Increase years of 8(a) Program participation to 11 years for 8(a) firms that have not achieved three-year average sales equaling at least 50% of their primary SIC code size standard dollar threshold by the end of their seventh year in the Program.

There is general agreement with the fact that minority and non-minority businesses experience different degrees of success and development. 8(a) firms and disadvantaged businesses are not all the same, and it is unrealistic to have a "cookie cutter mentality." The Federation proposes that the focus should be: "How do we make sure that more firms reach their graduation date in a stronger business position?" Therefore, we support that the legislation permit those 8(a) firms that have not achieved average sales equaling at least 50% of their size standard dollar thresholds in their Primary SIC code by the end of their seventh year of participation in the 8(a) Program be granted an additional two years of Program participation, beyond the standard nine years for a total of 11 years of Program participation.

As an example, the size standard for a computer services firms to be considered a small business, the firm must not exceed $18M in sales over a three year average. We are proposing that if an 8(a) computer services firms at the end of the seven years has not achieved a three year average of $9.0M, the firm be eligible to participate in the 8(a) program for a total of eleven years.

15. Develop By Reasonable Industry and Viable Business Guidelines

Develop a clear and precise definition to determine when a small business is "reasonably viable." In order to determine which business needs the most assistance it would be necessary to develop by industry viable business guidelines.

Mr. Chairman and distinguished members of the Committee, it is necessary and critical that each and every member of this committee be able to answer a very important question: "How do I, as a legislator, know when a given business in a given industry is reasonably viable?" And, what does it really take to make a small business successful?

Is the critical information necessary to answer this question available to you, Mr. Chairman, and your distinguished colleagues on the Committee. A clear definition is essential, if members of the Committee and Congress are to address where the federal government should focus its resources in order to assist those 8(a) firms that need the most assistance.

The reality today is the same as it has been since the beginning of federal programs that support the development of minority-owned businesses: The most critical business program decisions have been political in nature, instead of using reasonable and practical business sense. We strongly hope that you accept our invitation to have the opportunity in a working group setting to develop a framework program structure that is a win, win situation for all involved.

16. Participation By Small Minority Firms in Sole Source Awards to Large Corporations and Non-Profit Organizations

Study and recommend an approach for 8(a) firms to share access to the sole source or limited competition contracts which are currently being awarded to large corporations and large non-profit organizations.

17. 8(d) Program Subcontracting Eligibility Monitoring

Deterring companies from falsely self-certifying as SDBs by improving SBA's administration of the Government-wide "status" protest system and encouraging the use of available administrative as well as criminal remedies for those individuals or firms found to be engaged in a pattern of misrepresentation.

Firms which are required to comply with subcontracting provisions will ensure that all notifications provided to SDBs regarding contracting opportunities will clearly establish the qualifications criteria for the work to be performed by the SDB for each specific requirement

in accordance with the Small Business Act provisions which determine size standards for each contract or major task order to be performed. At the time of proposal submission, the prime contractor will require SDB bidders to certify that for the majority of the work category to be performed the SDB firm is within the SBA size standard threshold.

The prime contractor's solicitation will clearly identify the type of work to be performed, and will identify which SBA size standard classification the SDB firm must comply with in order to qualify, and in order for the prime contractor to legally qualify the award toward SDB contract goals.

We strongly support addressing the issue of self-certification of SDBs. However, the Federation agrees that the provisions proposed under the Business Development Act of 1994 by Senator Kerry of Massachusetts lack the force to fully eliminate misrepresentation.

Federation members have experienced inconsistencies in the subcontracting arrangements of major primes with SDBs. Some major primes proudly publish press releases after winning a contract which list their claimed SDB partners who have already exceeded their small business status. It often happens that these SDBs had long ago exceeded SDB size standard thresholds for the work which the primes have selected the firms to perform.

The position that certain primes have taken is that present regulations allow self-certification, and unless formal complaints are brought up, they will not remedy their inconsistencies. The primes' unlawful practice of taking credit for their SDB contract goals with firms that are no longer small is widespread. What is important for the Senate Small Business Committee to realize is that 98% of the time when a prime "invites" SDB firms to compete the prime selects the firms whom it invites for competitive consideration. It is not an open bidding process, nor is it a level playing field—the decision of who may to compete is made by the primes, unlike Government contracting opportunities which are openly advertised, and in which participants meet a certain size and revenue criteria in order to qualify as a small business and be considered, and no firm competing is at a major disadvantage in terms of size standard.

It is difficult and sometimes impossible for firms to bring up this issue during the bid process because of a fear of being marginalized or simply not considered in future bidding opportunities with that prime. The underlying politics with this issue may be described as follows—if a SDB complains either formally or informally about an unfair competition (the inclusion of large minority firms competing with truly small minority firms), that SDB is considered by the prime as "persona non grata." SDBs need protection from the Federal Government with regards to this issue.

18. <u>8(a) Manufacturing Enterprises Require Greater Level Of Effort To Develop As Viable Enterprises</u>

Most 8(a) firms are in the service business which do not require as much capital assets as a manufacturing business. The 8(a) program has had many success examples in the service or distribution business but not in the manufacturing industry. It takes a greater level of development to position a minority business as a viable business concern.

In order to increase the number of viable minority manufacturing enterprises it is necessary for the Federal Government to assist and encourage the realistic increase in the development of minority-owned manufacturing enterprises by allowing Program Participants, who, by the end of the first quarter of their eighth (8) year in the 8(a) Program can demonstrate that during the previous two (2) years they operated a manufacturing facility, and who have not achieved at least 50% of their size standard SIC Code for manufacturing, to be granted a three (3) year extension in the Program beyond the standard nine (9) years for a total of twelve (12) years of Program participation. The three (3) year extension shall apply only to manufacturing-type SIC Codes.

It is a fact that building a strong business foundation for a viable manufacturing firm requires more time, and more capital and operating investment than it does to develop a winning services firm. A start-up manufacturing firm must have the resources and support to strategically position itself in business.

Most Frequently Asked Questions About The 8(a) Program

1. Does the average citizen know that 8(a) firms risk their own capital?

It is critical for the taxpayer to know that the government does not provide any money to start-up and operate an 8(a) business. It is true that in the late sixties and early seventies, the 8(a) Program did provide a very limited number of grants because there were very few minority firms of any consequence in the engineering, manufacturing, computer support services, or sophisticated sciences fields. The few minority firms that existed in the sixties were in janitorial, guard services, courier services, and the like low-tech fields. The fact is that it is the minority business person that takes all the financial risks in the 8(a) program and the Taxpayer does not subsidize the minority business.

2. "Why do 20% of the 8(a) firms get 80% of the business?

The statistics are similar and consistent with large corporations. It comes down to the fact that the 8(a) firms or large corporations who position themselves to capture a greater share of the market and demonstrate their effectiveness will naturally capture a greater share of the market. The 8(a) firms do self marketing, very seldom does the SBA or Federal agency automatically provide the contract a opportunity to an 8(a) firm. Most participants in the program do not come from an hands on Federal Government contracting business experience. The average profile of a new 8(a) applicant is that he or she has been employed by a Federal, State, or Local government or by a large corporation that does business with the Federal Government and has an minimal two year exposure of establishing and getting a new business off the ground just before they are certified into the 8(a) program. The National Federation of 8(a) Companies has experienced that 40% of owners whose firm has been in the 8(a) program after three years have not received a contract and do not have full understanding or knowledge of what it takes to be a successful Federal Government Contractor. We believe that the training 3 phase program as developed and proposed by former Administrator Bowles should make a drastic difference in assuring that no minority owner gets certified until he or she demonstrates full understanding on what they are getting into. The minority business owner has to take full responsibility to assure that she or he does not enter into a business field which they are not reasonably prepared for. It is very unrealistic and unfair to continually blame the Federal Government and the SBA when individuals who by their own choice select to risk entering into the area of starting and operating successfully a business in the federal government marketplace.

Chairman Bond and members of the Senate Committee on Small Business, on behalf of the Federation I want to thank you for giving us the opportunity to present our views.

Chairman BOND. Thank you very much, Mr. Galaviz. As I indicated, the full statements will be accepted in the record and we look forward to receiving those.

Now we turn to Mr. Peter Homer. Welcome, Mr. Homer.

**STATEMENT OF PETER HOMER, JR., COFOUNDER AND MEMBER, NATIONAL INDIAN BUSINESS ASSOCIATION, AND DIRECTOR, STRATEGIC BUSINESS DEVELOPMENT SYSTEMS INTEGRATION & RESEARCH, INC., ARLINGTON, VIRGINIA**

Mr. HOMER. Thank you, Chairman Bond, and members of the Senate Small Business Committee for the opportunity to submit testimony today on the SBA's 8(a) Program. My name is Pete Homer and I am testifying today on behalf of the National Indian Business Association, NIBA, a national association established in 1992 to provide Native American business development through education, communication, and advocacy.

NIBA represents over 25,000 American Indian and Alaskan Native-owned companies nationwide. Approximately 220 of the total 308 8(a) Native American, Alaskan Native companies are members of NIBA. The 8(a) companies that I am talking about are considered in Indian country very viable companies and very successful companies.

My recommendations today on behalf of NIBA have the concurrence of the National Congress of American Indians and the Council on Minority and Women-Owned Businesses.

In addition to my role with NIBA, I am currently the director of business development for Systems Integration & Research, Inc., a 100-percent Native American-owned section 8(a) engineering firm. My experience also includes 2½ years of service for the Small Business Administration where I worked as the Director of the Office of Native American Affairs. In total, I have worked the past 26 years to advance opportunities for American Indians at the local, State, and Federal levels.

Today I would like to take the opportunity to offer several positive recommendations for improvement of the 8(a) Program. No. 1, tribally owned firms should be presumed economically disadvantaged for purposes of entry into the 8(a) Program as is currently the case for Alaskan Native village corporations. The use of the presumption would expedite the 8(a) application process for Indian-owned firms and reduce the resources that are being expended by the SBA to review these applications.

No. 2, the Small Business Act should be amended to state that 8(a) contract awards to American Indian firms will satisfy the Buy Indian Act. The Buy Indian Act, which involves lengthy competition among Indian firms has a burdensome waiver requirement. This discourages agencies from pursuing 8(a) awards to American Indian firms.

No. 3, the current 9-year 8(a) term should commence when an 8(a) firm gets its first contract. This will ensure that 8(a) firms have meaningful participation in the program, thereby helping them to succeed after graduation.

No. 4, the three nature contracts or the tripartite nature of 8(a) contracts should be eliminated. The SBA's authority should be, with limited exceptions, delegated to the procuring agencies. This

will streamline the 8(a) contract process by eliminating SBA's review and approval of contracts, options, modifications, and extensions, thereby creating an additional incentive for procuring agencies to use the 8(a) program.

No. 5, SBA's approval of the SIC codes to be contained in the 8(a) firm's business plan should be eliminated. The 8(a) firm rather than SBA should determine which industries should be part of their business plan. This would reduce unnecessary SBA oversight, eliminate burdensome paperwork, and encourage growth by 8(a) firms into new industries.

No. 6, the 8(a) program's support level approval requirements should be eliminated. This requirement limits an 8(a) firm's marketing ability and places an artificial restriction on the amount of 8(a) support a firm may receive during each year. Because 8(a) firms are already required to achieve certain percentages of their sales outside of the 8(a) program, the support level requirement is a duplication and unnecessary.

No. 7, unnecessary regulatory limitations on self-marketing by 8(a) firms including those relating to national and local buy procurements should be eliminated. 8(a) firms, like all Federal contractors, should be permitted to compete on a national level at all times.

No. 8, current semiannual reporting requirements for 8(a) firms are unnecessary and should be reduced.

No. 9, 8(a) applications should be subject to a single review by the SBA central office. This would streamline the 8(a) application process and eliminate unnecessary levels of review.

I have previously submitted for the committee's consideration my written testimony which more fully explains the above issues. I am available to answer the questions that you may have regarding these issues and I thank you again for the opportunity to appear before the committee and present these views.

[The prepared statement of Mr. Homer follows:]

**TESTIMONY OF**
**THE NATIONAL INDIAN BUSINESS ASSOCIATION**
**BEFORE THE**
**SENATE COMMITTEE ON SMALL BUSINESS**

**April 4, 1995**

Thank you, Chairman Bond and members of the Senate Small Business Committee for the opportunity to submit testimony today on the Small Business Administration's Section 8(a) Program.

My name is Peter Homer and I am testifying today on behalf of the National Indian Business Association ("NIBA"), a national association established in 1992 to promote Native American business development through education, communication and advocacy. NIBA represents over 25,000 American Indian-owned companies nationwide. My recommendations today on behalf of NIBA have the concurrence of the National Congress of American Indians.

NIBA is also a member of the Coalition of Minority Business Associations, which has been recently reconstituted as the Council on Minority and Women-Owned Businesses ("Council"). The Council, originally comprised of twelve minority associations, is growing to include many women's groups and Regional 8(a) associations throughout the country.

In addition to my role with NIBA, I am also involved in the private sector. Currently, I am the Director of Business Development for Systems Integration and Research, Inc., a 100% Native American-owned Section 8(a) engineering firm.

My experience also includes 2½ years of service for the SBA, where I worked as the Director of the Office of Native American Affairs. In total, I have worked for the past 26 years to advance opportunities for American Indians at the local, state and federal levels.

Today, I would like to take the opportunity to offer a few positive recommendations for improvement of the 8(a) Program. However, before addressing these recommendations, I would first like to state that, based on my experience both with the SBA and as a member of minority business community, I believe that the 8(a) Program is an invaluable tool for minority-owned businesses that are attempting to gain a footing in the mainstream of America's business economy. The 8(a) Program offers unique assistance which allows disadvantaged businesses to gain the experience and infrastructure necessary to survive in today's economy.

The 8(a) Program is especially beneficial because of its emphasis on business development. The Program is structured so that firms do not become unduly reliant on 8(a) contracts. On average 8(a) contracts account for only 25% to 30% of an 8(a) firm's total sales. As a result, many Native American and other minority-owned businesses have benefitted from the Program and are now prospering members of the nation's business community.

In addition, the American public as a whole benefits greatly from the Program. The cost of the 8(a) Program to the American public is approximately $20 million. In contrast, successful

8(a) firms provide the American public with over twice that amount in federal, state and local tax revenues. Moreover, the 8(a) Program develops needed role models for women and minorities.

Notwithstanding the tremendous value of the 8(a) Program, there are still certain areas that can be improved. Therefore, on behalf of NIBA, I would like to offer the following positive recommendations.

As you may know, NIBA strongly supported S. 2478, a bill that was passed by the Senate last year. S. 2478, which was introduced by Senators Kerry and Pressler, would have revised certain aspects of the 8(a) Program.

Specifically, we strongly support a presumption that tribally-owned firms are "economically disadvantaged". Currently, in order to qualify for admission into the 8(a) Program, a tribally-owned firm must submit extensive documentation to the SBA to prove that the tribe itself is economically disadvantaged. Such evidence includes: the number of tribal members; the per capita income of the tribal members; the present tribal unemployment rate; the percentage of the local Indian population below the poverty level; and other burdensome documentation.

On March 18, 1994, the SBA amended its regulations to eliminate the requirement that firms owned by Alaska Native Corporations prove that their Alaska Native village corporations are economically disadvantaged for purposes of 8(a) eligibility.

Likewise, tribally-owned firms should not have to prove that their tribes are economically disadvantaged. There is ample evidence to support the conclusion that most Native American tribes are economically depressed and require business development opportunities. For this reason, NIBA strongly recommends elimination of the requirement that tribally-owned and Native Hawaiian firms prove that their tribes are economically disadvantaged to gain entry into the 8(a) Program.

The elimination of this requirement would not only streamline the 8(a) review process, but it would also reduce considerably the time and energy that is being expended by the SBA to review the tribe's economic disadvantage status, as well as the tremendous volume of documentation that is required to be submitted.

Second, we recommend that the Small Business Act be amended to recognize 8(a) contract awards to American Indian firms as being in compliance with the Buy Indian Act. This provision is critical for several reasons. The Buy Indian Act is a Congressional mandate pertaining to the Departments of Interior and Health and Human Services. It is recognized by the Bureau of Indian Affairs ("BIA") and the Indian Health Service ("IHS"), and more recently, by other Federal agencies through interagency agreements. In an attempt to assist Indian people to become self-sufficient, the Buy Indian Act was designed to preferentially utilize goods and services provided by Indian-owned firms. All contracts are awarded under the Buy Indian Act

through open competition among Indian-owned firms, with the competitions often lasting more than a full year. This protracted procurement process is burdensome (both in terms of time and money) on the Federal government as well as the Indian-owned firms.

Additionally, a waiver of the Buy-Indian Act's stringent competition requirements involves an excessive amount of unnecessary paperwork. It is not surprising, therefore, that, due to the difficulty in obtaining such waivers, BIA and IHS are reluctant to pursue 8(a) sole-source contracts. Unfortunately, this drawn-out waiver process prevents an abundance of 8(a) contracts from being awarded to Indian-owned firms. In addition, based on my experience, when the waiver process has been used, it has been used to avoid contracting with Indian-owned firms in favor of contracting with non-Indian companies.

To address these problems, BIA and IHS should be allowed to award contracts through the 8(a) Program to Indian-owned firms. This would streamline the acquisition process by eliminating unnecessary and protracted "waiver" requirements. Also, this would eliminate the disincentive that the "waiver" requirement currently creates for BIA and IHS to use the 8(a) Program. Finally, this change would satisfy the spirit and intent of the Buy Indian Act.

Our next recommendation relates to a firm's participation term in the 8(a) Program. As you know, the 8(a) Program is designed to promote a firm's business development by assisting

them in obtaining Federal contracts. In 1988, Congress determined that firms should be able to perform a sufficient number of Federal contacts in nine years so as to gain the necessary infrastructure to compete in the open marketplace. However, Congress did not anticipate that, in reality, it often takes an 8(a) firm three to five years to obtain its first Federal contract, thereby leaving such firms with only several years of meaningful participation in the Program. Even if these firms are successful in obtaining contracts during their remaining four or five years in the Program, this is often an insufficient period of time in the Program for firms to fully develop. Indeed, many Program participants go out of business shortly following Program graduation precisely for this reason.

Therefore, we recommend that the current nine year term in the Program be revised to commence when a firm obtains its first 8(a) contract. This will ensure that 8(a) firms have meaningful participation in the Program, thereby helping them to succeed after graduation.

In addition to the foregoing, we are recommending a number of improvements that will streamline the 8(a) Program by removing unnecessary restrictions and burdensome paperwork requirements. These recommendations, which are designed to increase the efficiencies for 8(a) firms, the SBA and procuring agencies, are reviewed below.