# EXHIBIT A-15
# (part 4)

A. Elimination of "Tripartite" 8(a) Contracts

First, we recommend the elimination of the "tripartite" nature of 8(a) contracts, under which the SBA is included as a contracting party. Currently, the SBA serves as the prime contractor on all 8(a) contracts, and the 8(a) firm serves as the SBA's subcontractor. This framework requires the SBA to review, approve and execute all 8(a) contracts, options, modifications, and extensions. This tripartite arrangement was created when the 8(a) Program was first established in order to provide agencies with additional assurances that 8(a) contracts would be performed. However, the Program has progressed to the point that this arrangement is not only unnecessary, but it is burdensome and time-consuming for all involved.

The SBA should not be a party to 8(a) contracts. Rather, its authority should be delegated to the procuring agencies. Elimination of the "tripartite" nature of the 8(a) contract will streamline the 8(a) acquisition process, thereby creating an additional incentive for procuring agencies to use the 8(a) Program. Furthermore, unnecessary paperwork within the SBA will be reduced, thereby freeing up agency resources for business development activities.

Although the "tripartite" 8(a) contract should be discontinued, the SBA should still be involved in the contracting process in certain circumstances: (1) to offer assistance if an 8(a) firm and the procuring agency are unable to reach agreement regarding the terms and conditions of award; (2) to resolve

disputes arising from the performance of 8(a) contracts; and (3) to assist in contract negotiations, if requested by the 8(a) firm. In addition, the SBA should retain responsibility for issuing "search letters" on behalf of 8(a) firms and for requesting that procurements be set-aside for the 8(a) Program. Use of the SBA's limited resources for the above tasks, rather than for the administrative tasks of executing contracts, options and modifications, will reduce the SBA's expense in administering the 8(a) Program, and eliminate unnecessary delay and paperwork in the 8(a) contracting process.

B. Removal of Limitations on SIC Codes

The 8(a) firm, rather than SBA, should determine which industries, as designated by Standard Industrial Classification ("SIC") codes, should be part of its business plan. This would streamline the Federal procurement process by limiting SBA's role in an 8(a) firm's determination of which contracting opportunities it should pursue.

Currently, an 8(a) firm is not permitted to seek 8(a) contracting opportunities designated under a particular SIC code, unless the SBA has pre-approved that firm for that type of business. For example, if an 8(a) firm wishes to add an additional line of business, it must submit a written request to the SBA in the form of an application, demonstrating that the firm has the capacity and capabilities to perform under the applicable SIC code, and that the SIC code is a logical business

progression for the firm. The documentation required to support such a request includes resumes, copies of contracts, and other burdensome and redundant evidence.

Allowing 8(a) firms to determine, within reason, the SIC codes under which they are capable of performing will eliminate the burdensome regulatory requirement of submitting extensive paperwork to the SBA. This would also bring the 8(a) Program in line with Federal contracting realities by allowing contracting officers to determine whether, in fact, a prospective 8(a) awardee is capable of performing under the SIC code designated for the procurement.

C. Elimination of SBA's Policy of Using 8(a) Support Levels as a Basis for Denying 8(a) Contracts

The concept of using 8(a) Program "support levels" as a ceiling on 8(a) revenues was created by the SBA, and not mandated by Congress in Public Law 100-656. We recommend that this restriction be eliminated.

Currently, the SBA annually establishes an 8(a) support level for each 8(a) firm. Generally, the 8(a) firm may not exceed this level of 8(a) contracts. Under current regulations, even contracts that have been self-marketed, or for which an 8(a) firm has been selected after an 8(a) competition, may be disapproved if award is inconsistent with the firm's approved 8(a) support level.

The current regulatory requirement unnecessarily limits an 8(a) firm's ability to obtain 8(a) contracts and to grow in the marketplace by imposing artificial restrictions based on what the SBA may perceive as a firm's ability to grow. Further, the provision is unnecessary given the current requirement that 8(a) firms achieve certain percentages of their sales outside the 8(a) Program. In light of this requirement, a firm's ability to increase its 8(a) business base should not be subject to further restrictions.

D. Removal of Restrictions on National and Local Buys

NIBA also recommends elimination of the unnecessary regulatory limitations on self-marketing by 8(a) firms, including those relating to national and local buy procurements. Section 8(a) firms, like all other Federal government contractors, should be permitted to compete on a national level at all times.

E. Reduction in Reporting Requirements for 8(a) Firms

We also strongly recommend a reduction in current reporting requirements for 8(a) firms. Presently, 8(a) firms are required to submit semi-annual reports regarding their use of consultants, agents and other representatives, including the amount of fees paid to such persons. Such filings should only be required on an annual basis. This is consistent with the current goal of the Federal government to reduce unnecessary paperwork and to conserve Federal resources in the government contracting arena.

F. Elimination of Levels of Review of 8(a) Applications

Finally, in addition to the elimination of unnecessary regulatory and paperwork requirements, we further recommend a single level of review for 8(a) applications. Currently, 8(a) applications are reviewed at the SBA Regional and Central Office levels. We recommend a single review at the SBA's Central Office. This would streamline the 8(a) application process, thus ensuring timely and more efficient review of 8(a) applications and the elimination of unnecessary duplication.

In closing, I would like to reiterate that the 8(a) Program is an extremely necessary and valuable program. We believe that adoption of our recommendations will make the Program more efficient with the Federal Government and more meaningful for minority-owned businesses.

NIBA would be pleased to work with this Committee to enact positive legislation that would improve the 8(a) program, assist in transitioning 8(a) graduates to the open marketplace, and increase Federal contracting opportunities for minority-owned businesses.

Thank you again for the opportunity to present our views to the Committee.

Chairman BOND. Thank you very much, Mr. Homer. My thanks to all the members of the panel. As I indicated, we will be reviewing the entire written statements and we will keep the record open for other questions.

I would like to address just a few questions to this panel. Mr. Smith, you refer to promoting entrepreneurship by providing access to capital to firms in targeted areas. Now one of the real problems I have had as I have talked with leaders in the inner cities in my State of Missouri who complain to me that they have all the job training money needed and what they really need is jobs. That we are continuing to look for a way to get jobs into the 'hood, the neighborhood and into areas of rural poverty. How would you structure such a program? Would that be an 8(a) requirement or how would you——

Mr. SMITH. Senator, I think the first thing that the Federal Government has failed miserably on is to get a value added. As has been clearly indicated from the testimony 8(a) companies do the same thing other Federal contractors do. So there is no question about service to the country. There is no gift. There is no welfare system. None of that exists in the 8(a) program. But I believe there is a perception that is very strong as to what is happening. One of the ways you alter that is for there to be incentive by people of the same ilk in communities serving not only as role model but literally providing jobs in those communities.

Now everybody gets a benefit from that. You can also mesh or marry the job training with the jobs. What we need is a social benefit trailing a business success. But it has all gotten jumbled together and you do not know which one is which, and you see angry white men saying that because of the 8(a) companies I am being denied. But if the country is getting a value added, a return on investment by way of providing opportunities others clearly cannot do, then we have a contribution that the program makes in addition to the service that it provides the country.

We have some ideas on it. Be glad to talk to you about it. But I believe we have got to recognize that we have got to target social benefit programs, but we need the business successes first.

Chairman BOND. That is a very interesting idea. We do look forward to following up with you. In the early 1980s we were successful in adopting enterprise zone legislation in Missouri, which only partially met that need. We still do not have the jobs that we need and I would like to have your further thoughts on how we could build on that.

Mr. SMITH. I would be glad to work with you, sir.

Chairman BOND. Ms. Archuleta, you had some very good recommendations but I do not recall you saying anything about the management and technical assistance role of either the SBA or the SBDC's. How important is the technical assistance provided by the SBA or any of its agencies? Do you see that as an important function for encouraging and assisting minority and women-owned businesses?

Ms. ARCHULETA. That is a very good question, sir, because I believe that, as was testified earlier by a previous panelist, the burden of proof is on the entrepreneurs themselves. We need to be able to know what questions to ask and know where to seek that advice

and be well informed. No, not in every case does SBA have all of the answers. I have not to this date ever participated in any of the programs provided by an MBDC. However, I did have access to an SBDC that was very helpful in helping us get some market research done. I was assisted extensively by the Service Corps of Retired Executives. They helped me build some of my original business plans. This was pre-8(a). I knew that they were there and they came in to help me.

So there are programs that help. I believe part of the problem has been the public relations associated with it. I do not think most businesses know what is available to them. We get so wrapped around the flagpole trying to worry how we are going to meet payroll that we do not always look at those things in the long term. So it is really an education process that has to take place.

Chairman BOND. Mr. Galaviz, in your prepared testimony you referred to, and I think you mentioned briefly, abuses where successful 8(a) business owners set up family members in another 8(a) company. Can you explain how this is done and how SBA certifies these individuals as economically disadvantaged? What are we dealing with here?

Mr. GALAVIZ. The National Federation since 1984 has focused our efforts to help the people in the community who need the most help. We have always taken the posture that there should be a tightening up of many of the potential abuses such as the issue of net worth and other issues. As it relates to the issue you just brought up, we are concerned that there is allowed—for example, I have seven children. If I feel that my business is growing and eventually doing well and I am able to achieve a reasonable net worth, I feel that then I should be responsible to help my children if they want to become Government contractors. That I should then, since I have already gained the experience, I already have a role model, and I already have the financial support, then it should not be the Government through the 8(a) program that should help my children develop into being a Government contractor.

The issue one has to also look at, the difference between becoming a Government contractor and being 8(a) certified. There is that reality that many people certify to the 8(a) program because they want to just be in the 8(a) program and take advantage of what they perceive, some easy benefits to come. Later they find out when they get certified that the SBA is not going to help you to get business; you have to go and get the business. SBA is not going to help you to meet the payroll; you have to meet the payroll.

So basically the concern has been right now that, we can provide this information privately, of specific situations where successful 8(a) entrepreneurs positioned their siblings or their spouses go open up into the 8(a) program and continue the legacy.

Chairman BOND. My staff and I would welcome any suggestions or discussion you have on that issue. We will not disclose that information or seek to embarrass anyone with it. Thank you.

Mr. Homer, you have talked about the difficulties of a number of the regulations and burdens and restrictions put on by the SBA. Do you find that there is a valuable role for the SBA in providing technical advice? Has this been helpful to the Native Americans, and the Indians and Native Alaskans that you represent? Have

they utilized any of the technical assistance or SBDC or minority development assistance?

Mr. HOMER. No, SBA has not. It's been nonexistent, because of the isolation of the Indian reservations and the Alaskan Native villages. They more or less get technical assistance on their own by reading business types of journals and things like that.

Chairman BOND. Is this a need? Is this an area that there——

Mr. HOMER. Yes, very much a need because the simple fact is that Indian tribal governments only have 17 tribal governments that are in the 8(a) Program and all 17 are successful. The need is there for more to be involved in the program to create jobs on Indian reservations. Outreach is probably the most important technical assistance that SBA can provide to tribes. The processes of SBA are numerous processes that are very cumbersome, but important for tribes to know.

SBA provides technical assistance by providing funding to 500 colleges, junior colleges, and universities throughout the country. NBA recommends the funding of 22 American Indian colleges to provide SBA technical assistance to Native American communities.

Chairman BOND. If you heard Mr. Smith's suggestion about not only targeting the minority business firms but those that deliver a social advantage, I would assume that certainly geographically most of your members would fit in with that philosophy. Would you agree that your organization, your businesses would meet the test that Mr. Smith suggests?

Mr. HOMER. Yes.

Chairman BOND. Let me ask Ms. Archuleta and Mr. Galaviz just to comment briefly. What about saying that not only do you have to be a minority business owner, 8(a) qualified, socially disadvantaged, economically—and I think we are going to have some lengthy discussions among members of the committee on the economic levels. But what if there were a further requirement that your activities, your employment also had to be in areas where there would be greater social benefits derived from the program?

Ms. ARCHULETA. I believe that it is a step that needs to be certainly considered. There are some limitations however. Given the fact that the Department of Defense has the largest portion of the Federal procurement dollars and most of our firms do a lot of business with DOD, you are really limited to where DOD is located. If they are not located in some of those targeted areas that does present a problem.

One of the advantages or one of the things that we have done, and my company is an example and I have seen it done in others, is that because of the growth of our company we have been able to expand into some of those targeted areas. I got the highest concentration of my contracts in Huntsville, AL, because that is where NASA and DOD are located. But we have gone in and targeted placing pockets of business in other areas even back in New Mexico where I was originally from. So we have really had a distribution of the profits and we have reinvested those profits in those targeted areas, so I think it will have to be looked at and some conversation has to occur.

But, Senator Bond, I would like to address the issue of economic disadvantaged and that issue that Senator Nunn brought up. One

of the reasons that we have to be very careful how that gets played out is because of the ability to access credit. When I go to the bank, they take out the mortgage on my home and they take out the net value of my business before they will consider whether I have that access to credit, even signing on business loans. I still have to personally guarantee those. So they have to look at all of that.

So it is not just an issue that you are creating millionaires. What you are trying to do is create individuals that have the ability to have access to credit so that when they exit the program they can still be successful. If we are not careful and the cuts become too draconian or you begin to look at that situation from a draconian point of view, you will limit the individual's ability to access credit and therefore be a viable business thereafter. It is a very fine balance that has to be followed.

Second, the whole issue of the creation of millionaires. I heard an earlier panel say something about he had heard of a contractor that got a $260 million contract. I recently was awarded a $50 million contract which I won in a small business competitive arena. I would not have been prepared to do that, just as Ms. Garza was not, had it not been for 8(a) and the ability to grow my business there.

However, I certainly did not put $50 million into my pocket. My net profits on that are going to be minimal. I am very proud to say a lot of that will go back to Uncle Sam in the form of corporate taxes. And most of the balance of that will go back into reinvesting, back into areas that may be targeted pools. Thank you.

Chairman BOND. Mr. Galaviz.

Mr. GALAVIZ. Mr. Chairman, I would like to answer that in two ways, personally and on behalf of the Federation. On a personal basis—and normally I do not like to promote my company whenever I am doing work for the Federation, but if I may at this time because I have to put my money where my mouth is.

Due to the fact that we were able to participate in Senator Nunn's mentor protege program and the assistance we got through Congress through being a participant in the 8(a) program, we have instituted in our company a program where any employee, regardless of color, race, or creed, after being employed with the company more than 5 years and if they want to start their own business, we will formally help them in transition to that business, whether it is to open up a McDonald's franchise or a competing company like ours. We are the only company that we know in the Nation that has such a formal program.

Second, we let our employees develop their own bonus program because we want to share the wealth—if you may call it wealth, the short margins that we get—with our employees by them creating the kind of initiatives that are going to help our customers.

Third, we have started a program to support scholarships for minority students.

On behalf of the Federation, the Federation in their submission they have made to the committee, we recommend that indeed if a minority 8(a) firm lives in an economically depressed area and has their business there and at least 30 percent of their staff is minorities, then that firm should have some extra—we recommend, as

long as they are still small they should have 2 more years participation in the program.

That is my answer, sir.

Chairman BOND. I would like to thank this panel for all of your comments. Unfortunately, I have a time deadline. I was supposed to be someplace at 1 o'clock. I will continue the perception that Senators are always late when I arrive. But I very much appreciate receiving both the written testimony and the oral testimony and our discussions today.

You have heard, I think, some of the questions from the panel, the things that are of concern: the economic size of the firm going in, the targeting, the length of time, and other aspects. As you reflect on these, and I address to the audience as well, any further comments or views that you would like to express will be gratefully received by the committee. We thank all of you for the attendance today and for giving us an awful lot to work on.

Thank you, the meeting stands adjourned.

[Whereupon, at 1:06 p.m., the committee was adjourned.]

# APPENDIX MATERIAL SUBMITTED

**PREPARED STATEMENT OF SENATOR LARRY PRESSLER**
**COMMITTEE ON SMALL BUSINESS**
**APRIL 4, 1995**

I thank the Chairman for calling this important hearing on the Small Business Administration's section 8(a) program.

Few would question the goal of the 8(a) program. Part of the SBA's mission is to work with undercapitalized and inexperienced entrepreneurs. Likewise, it is important for small businesses to have an opportunity to compete for government contracts.

Unfortunately, instances of waste, fraud, and abuse have brought the integrity of the 8(a) program into serious question. Documented accounts of bloated contracts, front companies, and bureaucratic mismanagement have brought the usefulness of preferential contracting into question. The American citizenry--including small business owners from my home state of South Dakota--has spoken on this issue. Many think race-based preferential contracting has failed to achieve its objective. Fittingly, all three branches of the Federal government have responded in one form or another to these concerns.

As my colleagues will recall from the activity of this Committee late last Congress, the 8(a) program is of great interest to all involved in the world of small business. Last year, my good friend and colleague, the Senator from Massachusetts, Senator Kerry, took the lead on this issue by introducing S. 2478, the Business Development Opportunity Act of 1994. Though I felt this bill could have gone farther to encourage competition, S. 2478 was a step in the right direction for the 8(a) program and, therefore, worthy of cosponsorship.

The 8(a) program has had its share of success stories. We will hear from some of them today. Likewise, we will hear from critics of this program. I commend the Chairman for bringing together such a balanced slate of witnesses and look forward to hearing their testimony.

THE HONORABLE PHILIP LADER, ADMINISTRATOR
U.S. SMALL BUSINESS ADMINISTRATION

Responses to post-hearing questions posed by Senator Pressler
Hearing on the Small Business Administration's 8(a) Minority
Business Development Program
April 4, 1995

1. **American Indian business owners from my home state of South Dakota have told me they do not think the SBA's 8(a) program has worked well for them in the past. These important entrepreneurs cite lack of cultural understanding and remoteness as the culprits. What is the status of the office of the Assistant Administrator of Native American Affairs? What sort of outreach is this office making as it relates to the 8(a) program?**

RESPONSE:

The Office of Native American Affairs (ONAA) has developed partnerships with other Federal agencies and continues to work closely with SBA District Offices to reach out to Native American communities. Activities currently underway include:

- In March 1995, the SBA selected Montana, South Dakota and North Dakota as participants in the minority Pre-qualification Pilot Loan Program. This Program is specifically directed at reservation communities and is designed to alleviate difficulties for Indian people needing a business loan. The intent of this Program is to pre-qualify individuals, or Tribal Organizations, for an SBA guaranteed loan for new or expanding business ventures "prior to" their first meeting with a financial lender. This program will encourage Indian businesses to establish relations and a credit history with financial lenders, assist in the development of reservation based businesses, and foster creation of a private sector Indian business economy. Currently, the SBA Montana, North Dakota and South Dakota District Offices are conducting reservation workshops to explain this and other SBA program opportunities.

- SBA continues to monitor and fund the Oregon Native American Business Entrepreneurial Network (ONABEN). ONABEN is a Pilot Program for the SBA, a permanent entity for the Oregon Tribes. ONABEN is a not-for-profit corporation chartered by the Confederated Tribes of Grand Ronde, Klamath, Siletz and Warm Springs. The ONABEN mission is to create reservation based, Indian Business Development Centers and provide Tribal members with: business development classes; counseling; academic credit from Northwest Indian College (NWIC) and; to support the SBA, BIA, RDA loan programs. ONABEN has had an outstanding impact in these reservation communities, affecting both Indian and non-Indian people, and has succeeded in creating an Indian business private sector and an expanded

economic base for Indian Tribes throughout Oregon. To expand and support business development opportunities for Indian people the SBA will provide (3) three high-technology mini Business Information Centers to ONABEN in June 1995. These Centers will be located on the Grande Ronde, Warm Springs and Klamath reservations. In addition, the SBA has teamed with the Bureau of Indian Affairs to establish reservation based Indian Business Development Centers in South Dakota, North Dakota, Montana, and Wyoming. This effort will allow SBA 8(a) participants the opportunity to access business development resources closer to home.

- The SBA is working with, and closely monitoring the Defense Acquisition Regulatory Council (DARC), in the re-drafting of Federal Acquisition Regulation (FAR) Part 26, which implements the Indian Incentive Program (IIP). The IIP, initially created by a 1987 amendment to the Indian Financing Act, promises Federal prime contractors a flat monetary five percent subcontract "bonus" to utilize Indian businesses. The legislative intent of the Act is to provide Federal prime contractors with an incentive to reach into Indian Country and utilize Indian businesses located in reservation communities. Since 1987, the Department of Defense (DOD) appropriations has provided $8.0 million, drawn pro-rata, out of Title III procurement accounts to pay these incentives. Unfortunately, the current interim rule published in the FAR in 1988 virtually did away with the IIP. SBA, however, has been working with DOD to develop a new rule. We hope to announce the publication of a new regulation by July 1995. It is the SBA's position, that the IIP if implemented correctly through regulation, will provide substantial business and economic support for reservation based businesses participating in Federal procurements.

- In February 1995, the SBA created a separate Native American Goal category and negotiated Native American lending goals with 28 SBA District Offices servicing the Indian communities across the United States. This new goal category is designed to increase participation by SBA District Offices in assisting Native American businesses in accessing capital markets.

- The Office of Native American Affairs has developed an aggressive marketing strategy directed at both the Federal and private sector business community. Specifically, the SBA continues to encourage large Federal prime contractors to enter into Mentor/Protege agreements with Indian businesses and Tribal organizations, meets with commercial firms to outline the business and monetary opportunities of locating subsidiaries in reservation communities, as well as the benefits of team and contracting with individual Indian businesses and Tribal organizations.

- In Fiscal Year 1995 which began October 1, 1994, the SBA has made 48 micro-loans to the Native American community in the amount of $5,147,270, and 132 SBA 7(a) guaranteed loans totaling $22,531,782. On October 22, 1994, P.L. 103-403 amended the Small Business Act to allow Tribal Governments and non-profit Tribal Organizations to be eligible to lend under SBA's micro-loan program.

- The SBA has proposed a legislative amendment to the Small Business Act to eliminate the requirement for Tribes to prove they are economically disadvantaged prior to acceptance into the SBA Minority Enterprise Development 8(a) program.

- The SBA sponsored two Native American conferences in May 1995: the Third Annual Cultural Tourism Conference for the Alliance of Tribal Tourism on the Lower Brule reservation in South Dakota May 5-7; and the native American Economic Development Conference at KwaTazNuk Resort in Polson, Montana May 18-19. The Montana conference included special presentations by NASA, DOE, and Battelle Labs on the subject of technology transfer and business opportunities for Native Americans.

- As of May 1, 1995, the SBA has 363 Native American firms in its Minority Enterprise Development 8(a) program, and to date has processed 1672 contract actions totalling $837,583,884.22.

2. **Last year your agency testified that business development programs and public-private partnerships would be developed to supplement the business assistance portion of the 8(a) program. If this already has been done, could you please explain how well such partnerships are working?**

**RESPONSE:**

The Office of Minority Enterprise Development, in cooperation with Small Business Development Centers, has devised a plan to train and increase the viability of minority small businesses. Each pilot project has unique qualities and the target audiences vary. However, the principal goal is to develop the skills and organizational structures required to enhance the performance of small businesses in the marketplace. Six pilot sites have been selected around the nation for participation in this initiative. The targeted cities for these pilots include Helena, MT; Boston, MA; Miami, FL; Washington, D.C; San Diego, CA; and Houston, TX.

The University of Houston Small Business Development Center (UHSBDC) has targeted approximately 119 8(a) firms within the Houston District Office portfolio. The primary component of the UHSBDC project will be the use of the

renowned Premier FastTrac program to assist participating firms in developing and improving business plans. Selected participant firms will also have the opportunity to attend up to 40 hours of small business training. Topics addressed in the many training series range from marketing to product development. The objective of the third component is the provision of one-on-one counseling. Selected participants will be able to choose from three consultant pools. Consultants will assist the business owner in solving problems specific to the individual business.

The Montana and San Diego projects both contain public awareness campaigns to reach the minority small business community. These projects will target the Native, African and Hispanic American communities. News releases, public service announcements, paid advertisements, and targeted mailings will be used to apprise the minority business community of the many technical assistance resources available to them for the improvement of their business skills and expansion of their companies. These programs will also have a strong emphasis on loan packaging for business expansion.

The San Diego project will develop an Expansion Training Program for minority business owners. Participants will attend 40 hours of specialized training to provide them with the knowledge required to successfully seek, qualify for and obtain financing. The Montana project will utilize the Premier FastTrac program and counseling services. Participants will be referred to one of the following resources: Native American Technical Assistance Officer, Department of Commerce Regional Development Officer, SCORE counselor, Minority Business Development Center Officer, or other private or public resources.

The Howard University (HUSBDC) and University of Massachusetts (UMSBDC) Small Business Development Centers pilot projects also include intensive public awareness campaigns. The UMSBDC project will offer seminars which assist participants in completing a business plan. Seminars will also be conducted for participants with existing business plans. These seminars provide participants with the skills to conduct an in-depth analysis of potential commercial and government market segments, management structure and financing. HUSBDC will print a resource guide listing available management and technical assistance resources in the area and conduct a study to determine the impact of such programs.

3. **Many within the small business community feel race-based preferential contracting should be terminated. Do you think the 8(a) program ought to drop the "socially" from the "socially and economically disadvantaged" qualification?**

**RESPONSE:**

Historically, the Congress has supported the concept of increasing the level of business ownership by socially disadvantaged individuals so that they would have a better opportunity to materially share in the competitive free enterprise system. In 1978 Congress enacted Public Law 95-507 which specifically required 8(a) program participants to be at least 51% owned and controlled by socially and economically disadvantaged individuals. The Congress designed the legislation to foster business ownership and development by individuals in groups that own and control little productive capital and to promote the viability of businesses run by such persons by providing contract, financial, technical and management assistance. Congress also determined that the power to award Federal contracts can be an effective tool for development of business ownership among groups that own and control little productive capital.

The Administration is currently reviewing affirmative action and contract preference programs in the Federal government, including the 8(a) program. The outcome of this review will determine the future course of the 8(a) program.

4. **Does the Administration have any legislative plans to improve the effectiveness of the 8(a) program pursuant to the recommendations of the General Accounting Office?**

**RESPONSE:**

We have taken aggressive steps to effectively address each of these problems. In an effort to change the longstanding issue of contract concentration we have negotiated a Memorandum of Understanding (MOU) with the Department of Defense that will give special attention to firms that have never received an 8(a) contract. In this way, we are working to increase the number of participants who actually receive contracts. We are negotiating with other federal agencies to execute similar MOUs or other agreements.

Also, new program regulations that were published in the Federal Register on June 7, 1995, include two features that will assist greater contract distribution among 8(a) firms. The first is the elimination of the concept of local (except construction) and national market segmentation. This change will allow 8(a) firms to market to the Federal government without geographical restrictions. The second

92-035 0 - 95 - 8

regulatory change addresses the methodology for determining when Indefinite Delivery/Indefinite Quantity contracts must be competed. This revision will establish the estimated value of the contract as the standard for competitive threshold evaluation, creating more opportunities for competition among more 8(a) firms.

The Administrator has also issued a memorandum to all district directors to develop a strategic marketing plan to increase the number of contract opportunities for a greater percentage of their 8(a) portfolios. Also, all district offices are required to conduct annual reviews of all 8(a) firms. This requirement has been made a part of each district director's performance plan for this year. The districts are also required to report the progress of their accomplishment of this requirement. SBA Headquarters will monitor compliance to assure that this goal is achieved.

Firm compliance with 8(a) and non-8(a) contracting targets is a requirement that has also been included in the aforementioned district director performance plans. The previously mentioned proposed regulation will provide clear, consistent guidance to our district offices. Compliance with this requirement will be tracked by SBA Headquarters.

The 8(a) program's new management information system has been completed and will be in place and functioning at all district locations within the next two months.

5. **It has been suggested that private franchising be encouraged as a substitute for Federal assistance. Franchises may offer a better support network and access to capital than the SBA. I tend to agree that the private sector often provides services more efficiently than the government. Why could not the franchising concept be used to spur entrepreneurial growth in lieu of government involvement?"**

**RESPONSE**:

There is no doubt that franchising offers ample opportunity for individuals with sufficient resources to own and operate profitable enterprises. It is also generally true that franchisors, normally large corporate entities, provide support to their franchisees in many functional areas, e.g., purchasing, advertising/promotion, accounting services, etc. Another advantage of franchising is that normally the product or service is known and accepted in the marketplace. In addition to automobile retail franchises, which capitalize on manufacturer brand identification and loyalty, there are other examples such as McDonald's, Midas Muffler, Jiffy Lube and Pizza Hut.

There are, however, other factors associated with franchising which present drawbacks or limitations that make franchising unattractive to the typical user of SBA's programs. Normally, to obtain a franchise requires a large front end investment. The more successful franchises require the largest cash outlay. Franchisors also maintain extensive control over the operation of the franchisee so that there is virtually no room for the type of innovation, expansion and diversification that typifies entrepreneurial management. Franchises normally are limited to providing goods and services at the retail level. SBA's programs address entrepreneurial interests which go beyond retailing. The 8(a) program for example, which is the Federal government's most successful program in developing the capabilities of minority and women entrepreneurs, provides financial, management and technical assistance to manufacturers, suppliers of goods and services, construction companies and a broad range of high technology firms. In fact there are few, if any, participants in this program that could accurately be classified as retailers.

It is our opinion that while franchising does play a role in growing the economy, this approach, as any other, has limitations and consequently does not provide the whole answer. SBA programs and services play an important complementary role in providing access that is not available through other approaches to socially and economically disadvantaged individuals who are interested in starting and growing their own businesses.

JUDY A. ENGLAND-JOSEPH, DIRECTOR
HOUSING AND COMMUNITY DEVELOPMENT ISSUES, RESOURCES, COMMUNITY, AND ECONOMIC DEVELOPMENT DIVISION
UNITED STATES GENERAL ACCOUNTING OFFICE

Responses to post-hearing questions posed by Senator Pressler
Hearing on the Small Business Administration's 8(a) Minority Business Development Program
April 4, 1995

Q: Have either the GAO or the Department of Defense compared the cost of sole-source versus competitively awarded contracts?

A: GAO has not performed any analysis comparing the cost of awarding contracts on a sole-source versus competitive basis, and we are not aware of any such study performed by others. However, we have examined how various factors, such as contract size and type, affect the length of time agencies require to award contracts. Our March 1995 report Information Technology: A Statistical Study of Acquisition Times (GAO/AIMD-95-65, March 13, 1995) showed that, among other things, sole source contracts were awarded faster, and that the difference in contract-award time between the two methods increased dramatically as the contract value increased. For example, sole source contracts with values of less than $250,000 took 18 percent less time to award than comparably priced full and open competition contracts. Sole source contracts for $25 million and above took 58 percent less time to award than competitive contracts of similar value.

Q: Is there any evidence from SBA initiatives that the concentration of awards will change in the near future?

A: We have no evidence at this time that SBA's efforts will change the concentration of 8(a) program contracts in the near future. As noted in my testimony, the efforts that SBA has underway to increase contracting opportunities to a greater number of 8(a) firms include requiring its district office to better market the 8(a) program to federal procurement offices, as well as agreements from the Departments of Defense and Veteran Affairs that they will award contracts to 8(a) firms that have never received contracts. However, how successful these and SBA's other efforts will be, and how soon results may be expected, depends a great deal on the commitment of SBA's and the other agencies' staff to these initiatives.

R. NOEL LONGUEMARE, PRINCIPAL DEPUTY UNDER SECRETARY OF DEFENSE FOR ACQUISITIONS AND TECHNOLOGY
DEPARTMENT OF DEFENSE

Responses to questions posed by Senator Pressler
Hearing on the Small Business Administration's 8(a) Minority Business Development Program
April 4, 1995

Q Have either the GAO or the Department of Defense compared the cost of sole-source versus competitively awarded contracts?

A I know of no recent studies done by either GAO or DoD that compares the cost of sole-source versus competitively awarded contracts. However, it is obvious that competitively awarded contracts almost always cost less than sole-source, and there is no rational argument to support a different conclusion.

# O'Donnell Construction Co.

2209 CHANNING STREET, N E
WASHINGTON, DC 20018-2127
(202) 529-7227 FAX (202) 529-3350

United States Senate
Committee on Small Business
Washington, D.C. 20510-6350

April 26, 1995

Attention: Karen Ponzurick

Re: U.S. Small Business Administration
8(a) Minority Business Development Program

Dear Ms. Ponzurick,

Listed below are my responses to Senator Pressler's questions from the April 4, 1995, hearing on the SBA's 8(a) program.

1. Changing the 8(a)'s race-based preferences to economically-based preferences would at least correct the the constitutional deficiency of the current program; however, the waste, fraud, corruption and incompetence of this bureaucratic nightmare would continue. In our free market, capitalist country, the U.S. government should be the leading example of open and free competition. The low bid system is not perfect and it requires watchdogs, but there is no better system in the world for awarding publicly funded contracts. Gender, race, religion and economic circumstance should not determine which persons are allowed to do business with the federal government. I say this in spite of the fact that the SBA has conceded that my brother and I are economically disadvantaged except for the SBA's definition that only socially disadvantaged individuals can be determined to be economically disadvantaged.

2. The 8(a) program does one of four things to fledgling firms depending on the circumstance of the certified company:

a. Wastes the company's precious resourses at a critical stage because most certified firms never receive a contract.

b. Gives false hope to marginal firms that the SBA is actually going to help the company succeed. More than 90% of ALL small businesses fail within five years. There is no reason to expect 8(a) firms to do better.

c. Allows companies that should not be in business to survive or actually prosper. This group includes firms that are not competive in open competition, but survive because the SBA allows much higher prices than the real world; fronts, brokers and criminals who have learned to manipulate the SBA to a degree that can not be achieved under the scrutiny of open competition.

d. Bestows a windfall of almost unimaginable proportions on a few companies that are owned by individuals who happen to be members of the preferred groups and who operated companies that would succeed with or without the SBA. About 200 such firms received more than $2.3 billion just from the SBA in FY94.

3. Privatizing a fundamentally flawed government program offers no benefit to American society. Surely, there are more pressing needs for U.S. tax dollars than to perpetuate a program that does little good and a great deal of harm.

Sincerely,

Arnold J. O'Donnell
Vice President

# NATIONAL INDIAN BUSINESS ASSOCIATION

Honorable Senator Pressler
United States Senate
Committee on Small Business

May 2, 1995

Dear Senator Pressler:

On behalf of the National Indian Business Association ("NIBA"), I am pleased to respond to your letter of April 24, 1995, requesting additional information about our position on matters raised at the April 4, 1995, hearing on the Small Business Administration's 8(a) Minority Business Development Program. Our responses are as follows:

1. Should the criteria for eligibility for the 8(a) program be changed from a race-based preference to an economically-based preference?

NIBA believes that the current standard of eligibility based on an individual proving that he or she is both socially and economically disadvantaged is appropriate and should be maintained. Under the current eligibility criteria, "socially disadvantaged" does not equate to an automatic preference based on race. Nor is race the determining factor in an applicant's establishing that he or she is "socially disadvantaged."

The Small Business Act's definition of "socially disadvantaged" individual does not grant a "preference" to members of any particular racial or ethnic group. Rather, any person who can make the requisite showing that he/she has been subjected to bias may qualify as "socially disadvantaged." Thus a poor Appalachian white person who has never had the opportunity for quality education or the ability to expand his/her cultural horizons, may similarly be found "socially disadvantaged." Any individual may qualify as "socially disadvantaged" if they provide the requisite showings. As such, there is no "race-based preference" for 8(a) eligibility.

For example, even though Native-Americans are considered socially disadvantaged, this classification is based on social conditions, not race per se. NIBA represents over 24,000 Indian-owned businesses, which, given the size of Indian Country and the population, is relatively small. Moreover, Indian unemployment

and poverty levels continue to be disproportionately high. Today more than 30 % of the American Indian population lives in poverty as contrasted to only 13 % of the total population. Given the present socio-economic conditions, NIBA is committed to the creation of as many economic opportunities for American Indians as possible, both on and off reservations and for both tribal and individual businesses. To ensure maximum opportunities for the growth of both tribally and individually owned Indian businesses, we would recommend that SBA consider how SBDC or loan programs can target and promote tribal business development and how SBA's business development/procurement programs can better serve the entire Indian community.

Accordingly, while there are reasonable arguments on both sides of this issue, NIBA's position is that the present criteria which encompasses both socially and economically disadvantaged status should not be changed.

Moreover, as you know, a case presently before the U.S. Supreme Court, Adarand Construction, Inc. v Frederico Pena, will likely affect whether the Small Business Administration may continue to use social disadvantaged status as a criteria for entry into the 8(a) program. Should the Supreme Court determine that it is unconstitutional, than a significant amount of additional analysis and consideration should go into changing eligibility to only "economically disadvantaged." We believe, however, that until the Supreme Court rules on this issue, changing the criteria to exclusively "economically disadvantaged" is premature.

2. Whether the 8(a) program has been of assistance to Native Americans?

Ten years ago, tribal interaction with the SBA was minimal, and there were virtually no Indian-owned businesses participating in the 8(a) program.

Today however, this has changed dramatically, and SBA programs are increasingly recognized as important tools in the development of tribal economies and the expansion of Indian business opportunities. Indeed, a number of Indian-owned businesses are ranked in the top businesses under the 8(a) program. These businesses include Laguna Pueblo Industries, Turtle Mountain, Piquniq, Amerind, First Computer Concepts and Cherokee Nation Industries.

Moreover, in the State of South Dakota, there are several American Indian 8(a) firms. In 1993 and part of 94 SBA loans to American Indians in South Dakota ranked near the top of the list of among the 13 states with significant American Indian populations. The opportunities created by participation in the 8(a) program are desperately needed in Indian Country. However, as you note, the primary barrier to full Indian participation in the program is the geographical remoteness of most reservations combined with the absence of a good tribal outreach effort at SBA's field office levels. Consequently, tribal business owners do not have access to the business development management counselling, and other services available through the SBA Small Business Development Centers or the technical assistance provided by the SBA 7J program.

Accordingly, we offer a few recommendations that we believe will make the 8(a) program even more beneficial to American Indians. One way that the SBA could improve services to reservation based businesses especially in South Dakota is to coordinate through and work with the tribally controlled community colleges located on reservations throughout Indian Country. SBA should also increase the level of understanding among its staff members about the unique nature of the tribal business climate. Equally important, SBA should take steps to improve communications with the Indian business community.

3. The 8(a) competitive/non-competitive mix requirements do not prepare 8(a) firms for gradutation and creates a controlled environment that actually stymies the development of fledgling firms.

As I noted in my testomony, NIBA does not believe that the SBA 8(a) program stymies the development of program participants. Rather, we believe that the program is structured so that firms do not become unduly reliant on 8(a) contracts. Competitive business mix requirements require firms perform a significant percentage of contracts that are non-8(a) contracts before graduation. This ensures that program participants are prepared for the "wilderness" of the competitive business world.

In addition, we believe that the "environment" of the 8(a) Program actually helps participants to develop the infrastructure that enables them to be competitively viable after graduation.

However, certain artificial restrictions imposed by the Program, such as the restrictions of 8(a) firms merging, or becoming acquired with non-8(a) firms, do tend to inhibit, rather than promote.

In addition, NIBA believes that two SBA policies in particular tent to stymie the full development of American Indian 8(a) firms before they graduate. The first problem, relates to a firms participation term in the 8(a) program and the second is the national and local buy policy.

As you know, the 8(a) program is designed to promote a firm's business development by assisting them in obtaining federal contracts. In 1988 congress determined that firms should be able to perform a sufficiant number of federal contracts in nine years so as to gain the necessary infrastructure to compete in the open marketplace. However, congress did not anticipate that, in reality, it often takes and American Indian firm three to five years to obtain its first federal contract, thereby leaving such firms with only several years of meaningful participation in the 8(a) program. Even if these firms are successful in obtaining contracts during their remaining four years in the program, this is often an insufficient period of time in the program for firms to fully develop. Indeed, many program participants go out of business shortly following program graduation precisely for this reason.

Therefore, NIBA recommends that the current nine year term in the program be revised to commence when a firm obtains its first 8(a) contract. This will ensure that 8(a) firms have meaningful participation in the program, thereby helping them to succeed after graduation.

Secondly, NIBA also recommends elimination of the uneccessary regulatory limitations on self-marketing by 8(a) firms, including those relating to national and local buy procurements. Section 8(a) firms, like all other federal governments agencies and private sector contractors, should be permitted to compete on a national level at all times.

Finally, NIBA believes that a number of the recommendations in the bill you sponsored with Senator Kerry last year would also tend to make the 8(a) environment more like that confronting businesses upon graduation. For example, reducing the reporting requirements would enhance the likelihood of that a firm will be

able to compete in the open marketplace upon graduation. As presently structured the reporting requirements impose undue administrative burdens on participants and divert limited resources from normal business operations. Abolishing many of the reporting requirements would enable firms to focus more on the development of their infrastructure, thus enabling them greater success rates upon graduation.

4. Encourage private franchising as a substitute for SBA/ federal assistance.

Although this is an interesting concept there are significant reasons why private franchising cannot replace SBA/federal assistance, particular on reservations. The fact that Tribes have trust land status, sovereign immunity, and jurisdiction on American Indian reservations will present substantial obstacles, especially with regards to bank loans and private business development on an Indian reservation. The doctrine of sovereign immunity presents a problem because it means that Tribes cannot be sued, and without a "sue or be sued" provision in the financial or business arrangement, private franchising, banks, leasing and business development financiers are relcutant to make investments or loans on reservations.

The other main obstacle involves jurisdiction. Contractual disputes involving tribal enterprises or individual Indian businesses on reservations are most often handled by tribal courts and private businesses and bank leanders often feel they will receive less than fair treatment in these settings.

Finally, should they win a dispute, lenders often feel that enforced collection efforts by tribal governments will be less than aggressive.

In closing let me say that NIBA's goal is to enhance the self determination and self-sufficiency of American Indian businesses and economies by offering them opportunities to succeed and secure a productive way to live. Our goal is to give American Indians economic independence.

The United States congress and SBA, by helping to create a strong network of American-Indian-owned and managed small businesses, are in a unique position to help reduce joblessness among Indian

populations. NIBA is convinced that SBA's 8(a) program is the most effective way to promote self-determination for American Indian businesses, by development of small businesses, owned and operated by American Indians.

I would like to close by thanking you for the opportunity to testify and to address the additional issues. Please feel free to contact tha National Indian Business Association if we can be of any further assistance to you on this or any other matter. If I can be of further assistance, you may contact me at (703) 418-6888.

Sincerely

Pete Homer
Legislative Affairs Committee
National Indian Business
Association

# COMMENTS FOR THE RECORD

April 13, 1995

The Honorable Christopher S. Bond
Chairman, Senate Committee on Small Business
United States Senate
428A Russell Building
Washington, DC 20510

Dear Chairman Bond,

Please let me start by saying the comments and suggestions provided are made strictly on behalf of myself and in no way represent any official position for the United States, Department of Defense, the Department of Navy, the Naval Supply Systems Command or the Fleet and Industrial Supply Center, Pearl Harbor, Hawaii.

I am a Contracting Officer currently employed with the Fleet and Industrial Supply Center, Pearl Harbor, Hawaii. It is my responsibility to enforce the small business goals for the Government in all my contracts.

In this capacity, I have twelve years of experience with the small business programs. I would very much like to take this opportunity while the Senate Committee on Small Business is looking at the implementation of the Small Business Administration's (SBA) 8(a) program, to share my views with the Committee.

First, my opinion on the intent of the program.

It is a wonderful way for a small business person to learn the in's and out's of government contracting which can be very difficult to understand.

For contractor's who are not necessarily good managers, this program can provide a path to build those skills.

It encourages the parties do some considerable thinking about matching the skills necessary to perform with contractors who have a strong chance of performing successfully.

Second, my opinion on the program's actual implementation.

1. We pay a higher price to the 8(a) contractors for supplies and services while the contractor performs as a middle man. Without the element of competition, the contractors do not operate under the concept of proposing a fair and reasonable price when they first submit an offer. We pay a hidden cost by virtue of the fact another Government agency is the Prime Contractor and intercedes on behalf of the 8(a) contractor. We pay more because many of these firms don't demonstrate an over zealous desire to learn if they know someone (SBA) is the fall back support.

The reality in the field is the Government is supporting a program whereby we ask a contractor to procure things (like computer hardware) that the contracting offices can do (but our system takes too long for most customers) even if we are assured to get competitive prices. The Government ends up paying a mark-up for the 8(a) contractor's service. This factor makes justifying the 8(a) contractor's price as "fair and reasonable" very difficult.

SUGGESTION:
I am wishfully hoping the implementation of the Federal Acquisition Streamlining Act of 1994 might make the Government procurement system seem more attractive to end users by becoming more responsive to their needs. In this situation, I would welcome the 8(a) contractor's service as a supporting role

to the system, not a way around it.

2. The contractor has little incentive to keep costs down. Therefore, we find they are not always encouraged to think of ingenious ways to perform tasks and functions in any way that would be more efficient.

In the solicitation phase, the Government generates an estimate of what labor and material we think will be necessary to perform the work. But at the negotiation phase, The Government is put in the position of having to "disprove" the manhours needed that the contractor proposes. This isn't the unusual part, it works like this on unrestricted competitive procurements as well. What concerns me is in the contract performance period, when the contractor is operating under a fixed price contract, the contractor might and probably does find ways to cut costs - but no savings are passed back to the Government. This wouldn't bother me quite so much if the contractor had won the contract in a competitive environment. The theory being, competition will force the offerors to develop a price that is streamlined right from the beginning. But the 8(a) contractor was under no such pressure. He received a strong advantage whereby he did not have to compete. And as such, it isn't really true that in performance of the contract he is assuming all the risk. The risk factor is the key in a firm fixed priced contract. With SBA's support the contractor is pampered. Allowing them to be removed from the competition process puts the Government in a costly and vulnerable position.

SUGGESTION:
Let the 8(a) contractors compete with other contractors, even other 8(a)'s and of course Small Disadvantaged Businesses (SDBs). Perhaps using the same approach used in the SDB program of giving a percentage preference to 8(a)'s would be enough? Depending on which program is considered more disadvantaged the percentage could be more or less than the 10% used in the SDB program.

3. There is an increased amount of post-award administration that is needed for contracts done with 8(a) firms than is experienced with other contracts for similar services that were awarded using full and open competition.

Having SBA in the tri-party process means the contractor doesn't get a true impression of the role he plays as the service provider. Having the mediator is non-productive with respect to modifications and proposed changes. The SBA representative cannot know the business of the contractor the way he/she does. I believe this three party system actually robs the contractor of the valuable learning experience.

SUGGESTION:
Change the SBA's role to be that of an advocate, advisor, or champion only. Let the contractor's owner/negotiator be the responsible official to enter into and sign the contract with the Government. The contractor will realize he/she is actually at stake for his/her word and they will be learning how the process works which will help them to successfully graduate from the program with the confidence and skills they will need to compete in the larger (full and open) competitive arena.

4. The Government activities have come to know the 8(a) program as the alternative to having to write a Justification and Approval (J&A) as outlined in FAR PART 6. At times, the main reason they want to limit competition is to get the procurement done by the fastest means available. The end users are willing to settle for a contractor with less experience, who is 8(a) and hope they will partner with the quality business firm the customer really wants.

Since using a J&A means having to pick whether the action is urgent or sole source. The end user knows that if they can justify using the urgent reason, then they can have their contract in place faster. But they know that just because they have one known responsible offeror, they will still have to wait a long time for the award to be completed. Therefore, they go looking for 8(a) contractors to circumvent the long lead times it takes to make a competitive award. This takes me back to the first problem, we pay more for the privilege of saving procurement lead time.

I have no suggested solution to this problem. I am hoping the change to the acquisition regulations that will result from the Federal Acquisition Streamlining Act of 1994 will address long lead times and shorten the regular acquisition process, thereby leaving the 8(a) alternative as just that - as a valuable alternative, not an overly abused "short-cut".

5. As functions that are done by 8(a) contractor are vacated when the 8(a) graduates from the program, the contracting office is left with the pool of contractor's SBA has to step in and attempt to perform the function. This is a real problem in my community. The 8(a) contractors take a long time to figure out the process of not only contracting but the particulars of the requirement. We see no evidence in the field that SBA actively seeks out other potential contractor to take over fields vacated by graduating 8(a)s. Many times we get offered replacement contractor who are in totally different fields unrelated to the task being left vacant. I do not feel it is an acceptable answer for a contractor to tell me "I've never done that before, but I can". There is no assurance that the Government is getting a quality replacement. I would rather compete the requirement using full and open competition. If a contractor is "playing" at contracting and doesn't currently perform the same or similar duties elsewhere, why would we consider giving this contractor a protected status to gain work with us that he doesn't already perform and perform satisfactorily? Some areas of the country do not lend themselves to having a multitude of contractors who perform in certain areas. The contractors need to be shown potential work areas and motivated to get themselves ready to step into that field PRIOR to the time the incumbent graduates.

<u>SUGGESTION</u>:
Allow a senior 8(a) contractor to work closely with a newly entered 8(a) contractor IN THE SAME FIELD to partner together in some capacity to be able to offer the Government Contracting Officer a reliable future source to continue using the 8(a) program. OR give the Contracting Officer a way out by permitting the requirement to be an unrestricted full and open competition (something which is now prohibited).

6. Along the lines of number 5. The idea of a mentor program <u>amongst the 8(a)'s</u> would be another valuable creation. I understand SBA already has some type of mentor program whereby a Large Business teams with an 8(a). This happens as a by product of the fact the 8(a)'s get preferred status and many large business seek the 8(a) firms to gain contracts. I suggest the 8(a) who is in his/her final year and approaching graduating should be teamed with a newer participant to teach the newer 8(a) <u>about the 8(a) program</u>. As an optimist, I believe the 8(a) contractor ought to want to give something back to the program. Realizing this may not be enough to encourage them to participate, they might need some motivating in this area. I don't know what that could be, but the general idea is for the graduating contractor to impart his/her lessons learned and return the favor for the privilege of benefiting from the program.

7. The time the contractors are in the program, and permitted to stagnate, is extremely long. If there is no demonstrated ability to achieve success at the five year mark, the contractor should be subject to removal from the program.

<u>SUGGESTION</u>:
Shorten the over all length of the program to 6 or 7 years, and institute more stringent requirements to show evidence of achievement.

8. Along the line of number 7. make the 8(a)'s seek to participate in regular large contracting procurements in the open market environment. Many 8(a) contractors will track the Commerce Business Daily for potential procurements they think might be good for them and seek SBA's assistance to get it set aside as an 8(a) procurement. When the reply from the Contracting Officer is negative, the contractor is included on the Bidder's/Solicitation Mailing List. It becomes increasingly aggravating when the 8(a) contractor makes no attempt to offer in the full and open competitive process. This implies a lack of diligence (in my opinion) in trying to stay gainfully employed. It also

implies, if they can't have their cake and eat it too, they just quit. These contractors should either be persuaded to really get with the program or be eliminated from having the protected status.

SUGGESTION:
Institute an incentive to make the contractors participate in non 8(a) set-aside procurements. One way to do this would be to bench mark the process by which an unemployed person has to demonstrate they have actively been seeking employment. The 8(a) contractor could show his SBA champion a copy of a proposal the contractor has submitted in response to some solicitation that he did on his own. Perhaps requiring at least one submittal every six months. Some ideas of what would constitute demonstrated evidence might be a copy of the bid/proposal abstract with his proposal on it; or get the Contracting Officer or Bid Officer to sign a copy of his proposal or a letter. These could be taken back to the SBA representative. Even if his offer or bid didn't "win", this would give the contractor some good experience, some good questions to bring to SBA to get focused help and give the contractor a feel for what it will be like when he leaves the program.

9. Allow SBA and the rest of the Government to work with (i.e., support with time and money and resources and assistance) those contractor's who routinely demonstrate a cooperative attitude, a willingness to learn and mature in the program. We need to "work with the workers" and purge the contractors who just hang in the program to say they are "8(a)".

I don't have a suggestion on how this purge would take place. I would render an opinion that there are specialists within SBA who would have a plan on how this might be done.

10. There are many contractors in the program who render supplies and services that very few or almost no Government agencies need or procure. The cost to administer this program must certainly preclude leaving in contractors who add no value to the program. Many contractors just don't want to hear that the majority of the Government doesn't buy what they are offering.

SUGGESTION:
Make the prospective 8(a) applicants submit (for example) ten Government invoices from contracts or purchases they supplied, to an appropriated funded activity, with their application to demonstrate to themselves and the SBA champion that there is a bonafide need for the supplies or services. To do other wise is a waste of the SBA's resources entertaining contractors who merely beef up the program figures but offer nothing of value.

11. My community is very small and I work closely with the SBA and the Chamber of Commerce to provide training to the small businesses of Hawaii. These conferences and seminars have been conducted for at least seven years. This state wide focus provides many different aspects of contracting with the Federal Government and has proven very successful. But to my knowledge, I have never heard of any class offered or conducted by SBA strictly for prospective 8(a)s in the community to teach them what the program is and is not, what the program offers, and what it can do and is targeted to do.

SUGGESTION:
This could easily be done to include: how to write a proposal/bid and the concept of the fair and reasonable determination, for starters. This would be a valuable tool to teach the contractors and demonstrate to the Government Contracting Officers that SBA is taking an active role in finding, training, offering and graduating quality vendors.

12. My last request. The appeal process is time consuming and cumbersome. In cases where the Government tries to pursue an 8(a) contractor's proposal, if the contractor's price cannot be determined to be fair and reasonable, it would be nice if the Contracting Officer could decide to reverse the 8(a) set aside. My office spends hundreds of hours every year debating over a contractor's capability. This time is not productive and adds nothing of value to the decision. SBA, even with the best 8(a) contractor, cannot guarantee the

contractor's price or workmanship. Sometimes the only alternative is to cancel the procurement and then the customer ends up "the loser".

SUGGESTION:
Please consider giving the Government Contracting Officer the final decision on when to go 8(a) or cut it off and eliminate the SBA appeal.

Of course the comments and suggestions presented here are all subject to discussion. I do not make any claim to be an expert on the 8(a) program. I am only a participant and these are my views "from the bottom". I, in no way wish to slight the hard working employees of the SBA, whom from my experience, just want to do the right thing and help a small business owner to be successful.

I urge you to do more than simply recommend to SBA to "manage the program better". It should not be an accepted answer from SBA to simply say "we promise to manage the program better". It is my opinion some real and tangible objectives and suggestions should be made to make the program more effective.

You are taking a positive step to evaluate a government assistance program that needs some serious revamping. Please take the time to make the necessary changes that will allow us, the contracting community, greater flexibility in whether or not to use this program. Please make the contractors put in a little more effort at demonstrating they can learn the process and can do the job. This will be the best way Contracting Officers can be assured we are spending the taxpayer's money as wisely as possible and that the taxpayers are able to reap the long term benefit of our collective investment.

Thank you for this opportunity.

Sincerely,

Juliana Basile

Juliana Basile
Contracting Officer

STATEMENT BY SAMUEL A. CARRADINE, JR.
EXECUTIVE DIRECTOR
NATIONAL ASSOCIATION OF MINORITY CONTRACTORS

Staff Attorney: J. Cobbie de Graft

1. Introduction

The National Association of Minority Contractors (NAMC) is a non-profit trade association that was established in 1969 to address the needs and concerns of minority contractors. While membership is open to people of all races and ethnic backgrounds, the organization's agenda focuses on construction industry concerns common to African Americans, Asian Americans, Hispanics, and Native Americans. The organization has a membership of 3,500 businesses, and represents the interests of more than 60,000 minority contractors nationwide.

NAMC's agenda for minority contractors includes educational and training programs, legal and legislative advocacy, business networking, and technical assistance for business development. Many of NAMC's members have participated in, or had experiences under, the Small Business Administration (SBA) Minority Enterprise Development Program (more commonly referred to as the 8(a) Program). We offer this statement on behalf of such businesses under the 8(a) Program hearing which was conducted by the Senate Committee on Small Business on April 4, 1995. We hope our comments will contribute meaningfully to the Committee's assessment of the 8(a) Program's utility and efficiency as an Affirmative Action tool in the 1990s.

Recognizing that many of the questions posed under the 8(a) Program have already been addressed in-depth by the panel of witnesses under the Senate hearing, we wish only to add a few key points as highlights on the broader dialogue:

- First, we emphasize that the there are still more good points than bad about the 8(a) Program. Changes should focus on increased efforts to carry out key improvements rather than outright elimination. We believe that continuous monitoring by an independent oversight board would assist in tightening the 8(a) Program's performance, as well as in preventing and/or quickly correcting future problems.

- Second, we suggest that 8(a) improvements might include emphasizing non-Program competitive contracting as a matching requirement on continued sole-source awards to Program participants. Such matching requirements would nurture 8(a) companies toward increased competitive capability on the open market. They would also deflect the perception of unfairness associated by critics with the net worth thresholds governing Program eligibility under the Small Business Act's "economically disadvantaged" provisions.

- Third, we suggest that the 1994 changes expanding the Department of Defense (DOD) "Section 1207" Program to civilian agencies under a new Small Disadvantaged Business (SDB) Program should by no means serve as a reason to terminate the 8(a) Program, but rather as an opportunity to better its performance as a minority business development tool. A stronger 8(a) Program would compliment the SDB Program by providing workable, well-defined, business building services targeted to assist emergent minority business owners for whom technical support and sole source opportunities provide solid developmental encouragement.

The remainder of this statement is devoted to expanding on each of the above three suggestions.

2. <u>Using an Oversight Board to Monitor the 8(a) Program</u>

Congress originally mandated the 8(a) Program in 1968 as a means of assisting minority business-owners in gaining access to opportunities in the mainstream American economy. Today, about half of all federal dollars going to minority businesses get channeled through the 8(a) Program. Despite current criticism of the Program, NAMC believes proper credit is due for the very real achievements of a critical number of 8(a) participants and graduates over the years.

It is currently estimated that about one-third of the top-one hundred African-American businesses, and one-fifth of the top one-hundred Hispanic-owned businesses, are current or former participants of the 8(a) Program. We believe the question of how and why these businesses have fared well should be at the heart of the 8(a) review process. We also believe that the 8(a) Program has strong merits that contribute meaningfully to Affirmative Action, and that these merits should be enhanced while at the same time eradicating the negative aspects of the Program.

NAMC directed close attention to the Congressional hearings in September, 1994, which brought to the forefront many of the issues that have caused some to declare the 8(a) Program a failure. Reflected in those hearings were the erstwhile findings of the General Accounting Office (GAO), the Commission on Minority Business Development, and the SBA Inspector General, all of which cited very specific problems needing attention. Among these problems were the slow processing of Program entry applications, the relative inequity in the distribution of contract opportunities among Program participants, and claims that an inordinately high number of graduating 8(a) participants are unable to compete in the open market after years of supposedly being nurtured for such competition under the

Program's business development initiatives.

The SBA responded to these and other criticisms by embarking on a process to improve its internal management of the 8(a) Program. And it seems to have made clear progress over the past several months. On March 2, Mr. Robert Neal, SBA Associate Deputy Administrator for Government Contracting and Minority Enterprise Development, testified before the House Committee on Small Business that key changes effected under the 8(a) Program last year have already resulted in marked improvements in 1995. Mr. Neal particularly stressed internal management changes which have helped reduce the backlog in 8(a) Program applications, and the new effort to increase contract awards to first-time 8(a) Program recipients.

In light of the above and other ongoing changes, NAMC believes that current indications point to strong efforts within the SBA to improve the management of the 8(a) Program. We also believe that these efforts are sincere, and are beginning to yield measurable results. There is unquestionably a continuing need among emerging minority businesses for strong mechanisms providing meaningful opportunities for business growth. An outright elimination of the 8(a) Program therefore makes little sense given the clear investments toward appropriate reform already underway. *Instead of elimination, NAMC supports a continued 8(a) Program with improved oversight mechanisms, preferably through the use of an independent board or panel.*

An independent oversight board comprising federal and private sector representatives would be an excellent means of monitoring the 8(a) Program to ensure proper functioning as well as reduced potential for abuse. Such a board, properly structured, would function as a mechanism to counter-check, but not unduly interfere with, the SBA on issues regarding the 8(a) Program's efficiency and fairness. An oversight board would also be valuable as a means for providing specific and comprehensive feedback on the SBA's efforts to correct current or impending 8(a) Program shortcomings.

NAMC will not attempt to address details regarding the composition or structure of the proposed board in this statement because we believe the options are numerous and should be developed through continued and purposeful dialogue. We merely suggest here that such oversight boards are not unusual, and have been known to work well under other circumstances for programs or entities needing reform. We believe this idea at least deserves serious consideration in Congress, and propose specifically that a Congressional mandate would ensure sufficient authority in an oversight board to bring clearer focus to the process of fulfilling the original purpose of 8(a) Program. We offer our assistance in developing this idea further through the Senate Committee on Small Business.

3. Instituting a "Matching Requirement" for Competitive Contracting under the 8(a) Program

One of the now-predominant arguments against the 8(a) Program is that it fosters inequities in the distribution of contracting opportunities, not only among 8(a) companies, but also between 8(a) companies and non-8(a), white owners of small businesses. The criticisms are borne out by the facts, at least on the issue of internal Program inequities. In 1994, for example, one percent of all 8(a) firms received 25 percent of the $4.4 billion in contracts awarded. The complaints regarding inequities between 8(a) Program participants and white small business owners, while not necessarily supported statistically, are reflected by the anecdotes of what many now describe as the "angry white male."

The trends suggesting these inequities are disturbing, considering that the aim of the 8(a) Program is not to enrich a few, but to provide increased business development opportunities for as many "socially and economically disadvantaged" business owners as possible. *NAMC believes that requiring 8(a) participants to balance their sole-source contract portfolios with matching dollars from competitively awarded contracts would help, not only to deflect the perceived inequities, but also to bring Program objectives within the original Congressional intent of assisting disadvantaged businesses in accessing the mainstream American economy.*

Our suggestion of requiring matching competitive contract dollars to balance 8(a) sole-source awards stems from the observation that the current Program structure may indeed carry internal inconsistencies that feed perceived inequities. The Small Business Act provision establishing a rebuttable presumption that most racial and ethnic minorities are socially and economically disadvantaged inevitably runs into problems when juxtaposed against the simultaneous provision allowing for 8(a) Program applicants to have an entry-level net worth threshold of $250,000 (excluding home equity and business investment). Understanding the dichotomy helps to correct it.

The 8(a) Program's entry-level net worth threshold makes good sense as a business practice issue because business entities by nature require capital infusion for growth. Deterring businesses-owners from building their net worth would virtually assure their failure. But, to critics whose first impulse is to cast an emotionally-charged comparison to the relatively lower net worth of the average white citizen, such an argument tends to hold little ground. The truth is that such critics are upset not only by the 8(a) entry net worth threshold, but also by 8(a) Program participants being permitted to increase their net worth to $750,000 (within

defined limitations) virtually without having to compete for contracts.

Critics' further perceptions of inequity are generated when a select few in the 8(a) Program are permitted millions of dollars in sole source portfolio increases while many are unable to land even a single 8(a) contract. To make matters worse, the net worth rules have a loophole (or loopholes) that technically allow contractors who receive a windfall to further enrich themselves by passing on benefits without restriction to immediate family members to the detriment of others in the Program. A few 8(a) contractors therefore take over the Program by establishing mini-dynasties tied directly sole source opportunities.

NAMC believes that the proposed competitive contract matching requirement would work to correct such unfair sole sourcing, and deflect net worth criticisms, by allowing each 8(a) company to progress on its own merits in healthy stages with a portfolio that appropriately balances sole-source awards with competitive awards. For each new "level" of sole-source contracting, an 8(a) company would be required to secure matching competitive awards before moving on to the next level allowing for more sole-source awards. The bottom line is that companies doing well in 8(a), SDB, small business, or even open market subcontracting competitions would be rewarded with the opportunity for further business growth through sole-source awards.

Companies failing to demonstrative competitive capability would not be bumped off the Program, but would be held at lower sole-source dollar levels while being given the opportunity to improve business efficiency for competitive capability. They would be discouraged from excessive reliance on growth through sole source contracting and encouraged to seek opportunities for competition. The results of a strong push for competition would increase the likelihood of an 8(a) company being ready to graduate, either after nine years of being in the Program, or after reaching a reasonable net worth meriting graduation.

We will not endeavor to lay out specific details of the competitive matching approach here because we believe the rules could be structured successfully in a number of different ways, and deserve to be fully explored through dialogue and planning. While one simple approach, for example, might be to tie competitive matching requirements to the stages of a business-owner's net worth growth in steady increments of $200,000, a better alternative might be to set matching requirements on an industry-by-industry schedule categorized according to SIC codes. The latter approach would be more difficult to attain, but certainly seems better in light of there being varying capital infusion requirements from one industry to the next. As another example, matching requirements could be based on either on a simple ratio (e.g. a 1:1 match between sole-source and competitive

contract awards) or on a more complex ratio tied more closely to industry-by-industry planning or business risk considerations.

NAMC acknowledges the SBA's argument that the less successful 8(a) companies remain that way due to their failure to self-market, and proposes that requiring greater competition as part of the net worth building process would help ensure a wider spread of contracting opportunities. We are also aware of a number of proposals, including those submitted by the National Federation of 8(a) Companies, which would aim to tighten the 8(a) net worth rules and open up options for competition among 8(a) participants, and do not think our proposal in any way deterring such efforts.

In short, we believe competitive matching requirements would not take away, but would complement, many of the other good proposals currently on the table for 8(a) reform. Allowing 8(a) Companies to contract directly with Agencies rather than through the SBA, for example, would provide solid channels of opportunity for fulfilling proposed matching requirements. Again, closing loopholes in the net worth rules that allow 8(a) participants to siphon Program benefits to their relatives would help in structuring tighter rules on competitive contracting matching requirements. We welcome the opportunity to further discuss our ideas on competitive contract matching with members and staff of the Senate Committee on Small Business.

4. Comparing the 8(a) Program with the New, Government-wide Small Disadvantaged Business (SDB) Program

NAMC supports the widening of the DOD Section 1207 Program to the civilian agencies under the Federal Acquisition Streamlining Act of 1994 (FASA). We do not believe, however, that proposed new SDB rules under FASA would appropriately compensate for the clear losses that would be sustained by minority businesses if the 8(a) Program were outrightly repealed. We believe that there are fundamental foundational differences between the 8(a) and the SDB Programs which should not be played down, but should be emphasized as a means of getting the best possible results out of both.

At its base, the 8(a) Program differs from the SDB Program in its focus on business development rather than straightforward contract letting. It acts as a launching pad for very small but highly promising businesses seeking opportunities for growth through federal contracting. The very nature of the 8(a) Program fosters the building of institutional know-how regarding the unique problems of minority contractors in a way that could not be easily replicated under the SDB Program. NAMC submits, therefore, that eliminating the 8(a) Program

would only create pressure for new programmatic facilities, whether within the OFCPP, the OFPP, the MBDA, the SBA, or some other body, for providing minority technical and business development support. It make little sense to do away with the 8(a) Program only to have to reinvent the wheel in some other form.

The strengths of the SDB Program, on the other hand, lie in its utility as a tool for streamlining managed competition among historically under-utilized businesses. The SDB Program in essence creates a tier allowing for federal contracting competition by minority and women-owned businesses traditionally lacking such opportunities under the small business set-aside. There is a flexibility in the SDB contracting process that is absent in the 8(a) Program, and that could probably never be properly achieved otherwise. This is why the SDB Program should exist side-by-side with the 8(a) Program.

As a aside on this issue, NAMC has learned of a proposal to roll-over the 8(a) Program's business and technical services into the SBA 7(j) Program, and we would like to comment that we believe this approach to be impractical. The 7(j) Program would literally have to carve out a sub-program to achieve the same level of success in its minority outreach and business development capabilities as the 8(a) Program. NAMC does not by any means advocate segregated programs for technical assistance to small businesses and businesses owned by socially and economically disadvantaged individuals, but we believe that the same logic meriting the need for an SDB Program on contracting drives the need for separate yet complimentary activities between the 7(j) and 8(a) Programs.

The 8(a) Program's strengths as a one-stop center for technical support and business opportunity among socially and economically disadvantaged individuals currently remains unparalleled in the federal marketplace, and would most likely be undermined if forced under the 7(j) Program. In short, it seems pointless to eliminate the 8(a) Program when many of the lessons it has taught, particularly in the areas of minority business outreach, certification, and contract letting, will only have to be relearned or reapplied under a new regulatory regime.

*NAMC therefore supports continued implementation of the 8(a) Program side by side with the SDB Program under circumstances allowing for the sharing of information and business development tools.* We particularly believe that enhancing the business development component of the 8(a) Program while leaving the bulk of the competitive contracting functions to the SDB Program, would enhance the value of the 8(a) Program. As a corollary, we support the strong emphasis on competition under the SDB Program, and advocate counting SDB competitive awards under the competitive matching requirements proposed earlier (Section 3, above) for adoption under the 8(a) Program.

5. Conclusion

NAMC believes that the SBA 8(a) Program has served, and should continue to serve, as an important Affirmative Action tool assisting minority-owned businesses in accessing greater opportunities in the American economy. The Program has not only made a tangible difference in minority business development, but serves as an important channel of hope for many seeking the opportunity to make a difference with their businesses. Eliminating the 8(a) Program would not only be devastating to minority business development, but would send a strong negative message to many minorities regarding the federal government's commitment to bettering the economic well-being of historically underutilized businesses.

Three key factors that NAMC believes would improve the 8(a) Program are: (1) setting up an independent board or panel to oversee questions of fairness and efficiency; (2) implementing a competitive matching requirement as a key basis for increasing sole-source awards to 8(a) Program participants; and (3) enhancing the business development functions of the 8(a) Program while allowing the SDB Program under FASA to develop as a competitive contract letting tool for small disadvantaged businesses.

We thank Chairman Kit Bond and others on the Senate Committee on Small Business for the opportunity of a hearing on the 8(a) Program, and also for the opportunity to submit this written statement. We also welcome an invitation from the Committee to further discuss our ideas under the dialogue on 8(a) reform.

####

WRITTEN STATEMENT OF

RON LAVERDURE

PRESIDENT

OF THE NATIONAL INDIAN BUSINESS ASSOCIATION

ALBUQUERQUE, NEW MEXICO

Chairman Bond and Members of the Committee, thank you for the opportunity to present written testimony for your hearing on the Small Business Administration's 8(a) Minority Business Development Program. The actual hearing was conducted on April 4, 1995, with the record remaining open until April 18, 1995, to receive additional written testimony.

The National Indian Business Association (NIBA), represents over 24,000 Indian-owned businesses across the United States. Established in 1992, our national headquarters is located in Albuquerque, New Mexico. NIBA's central role is to promote the successful development and growth of American Indian-owned businesses.

I am an enrolled member of the Turtle Mountain Band of Chippewa Indians. In addition, I am Chief Executive Officer and General Manager of Uniband, Inc., a computer service firm owned and operated by the Turtle Mountain Band of Chippewa Indians in North Dakota. I also serve as President of the National Indian Business Association.

NIBA strongly believes that the Small Business Administration's 8(a) Minority Business Development Program has been of assistance to Native American and other minority businesses. Consequently, we believe that the program should be retained. So much is mentioned today with regard to a "Contract With America". We, as Native American people, made our "Contract With America" many years ago through treaties. We contracted to give our land in exchange for health, education and other opportunities. The treaties were contracts not welfare. We ask only that they be honored and that business development programs such as the SBA 8(a) opportunities be continued.

NIBA is concerned that Congressional focus on the SBA 8(a) Minority Business Development Program is misplaced. Most reports on federal procurement contracting show that approximately 93% of federal contracting dollars are awarded to large, white-owned businesses. The remaining 7% of federal contracting dollars are awarded as follows: 5% to minority businesses and 2% to women-owned businesses. For all the imperfections that can exist in any program, why should we loose track of this central fact? If the federal government spends $200 billion a year on the purchase of goods and services, the major Congressional focus should be on the $186 billion awarded annually to large majority companies not the $14 billion awarded to minority and women-owned businesses.

The 8(a) program is not perfect. NIBA believes that any government program should be reviewed to insure that taxpayer dollars are being used properly and wisely. The SBA 8(a) program is no exception. The 8(a) program should be made to work better but it should not be eliminated or placed in other agencies, such as the Department of Commerce, which are not created or based on public law, which do not have experience on the issues, or do not have the broad scope of minority business assistance programs as does the Small Business Administration.

One of the recurring themes mentioned by opponents of the 8(a) program and 8(a) participants is that the program is full of "front" companies; ie, companies that use a minority to qualify but which are controlled by non-minorities. NIBA believes that "front" companies exist but certainly not in the numbers intimated. We have seen no factual basis for the concerns articulated at the hearing--only anecdotal stories. NIBA recommends that enforcement of the law against "front" companies rather than the denial of business opportunities for minority businesses is the best way to address this perceived problem. We believe that public policy should not be made or based on anecdotal information. The Congress has more important issues to address and the public will be better served by addressing issues of more pressing national concern.

We further recommend that the Congress not become involved in the effort to make "affirmative action" programs a "wedge" issue for political purposes. There is a certain amount of anxiety in the country over jobs, saleable skills, the future of our children, and the future of our country. We in the Native American community live with these concerns every day. However, it is a time for us all to come together not divide along ethnic groups. Minorities know that for many years there have been forms of "negative action" in this country. Both political parties, in the past, have risen above "negative action" and have advocated government programs for minorities. Affirmative action programs such as the 8(a) program are not handouts, it is not welfare. It is a business development program. It is an opportunity for people who did not come from money or social position to participate in the American dream.

NIBA is watching the developments in California concerning an anti-affirmative action proposal which may be placed on the November, 1996 ballot. We understand that a candidate for president, who is on the "wrong" side of the affirmative action issue (for California purposes), could loose 20% of the electoral votes and, therefore, the presidency. NIBA is also watching and waiting for the U.S. Supreme Court decision in Adarand v. Pena. Nevertheless, we suggest that the Congress rise above petty politics and rise to the occasion. Do not deny to minorities the opportunities possessed by most of the majority from birth.

BOSTON PUBLIC LIBRARY
3 9999 06350 098 5



With regard to the Small Business Administration and the SBA's 8(a) Minority Business Development Program, NIBA recommends the following actions:

1. Keep the SBA and the 8(a)program.

2. Eliminate needless duplication of programs on a factual basis not on anecdotal information.

3. Remove the SBA from the contracting process so that qualified 8(a) companies contract directly with the federal agency which needs the requested goods or services not through the SBA.

4. Review the level of concentration of federal contracts to some 8(a) businesses so that all qualified 8(a) companies receive a meaningful opportunity to participate in the program.

5. The current 9-year 8(a) program term should not begin for a participating company until the company receives its first government contract.

As stated on the Witness List for the committee hearing of April 4, 1995, Mr. Pete Homer,Jr., Co-Founder and Member of NIBA, testified at the hearing. NIBA respectfully requests that you and the other committee members give strong consideration to Mr. Homer's specific recommendations not enumerated above.

This concludes NIBA's written testimony. We thank you again for the opportunity to participate in this matter of such vital importance to Native Americans and Native American businesses.

The National Indian Business Association
Ron Laverdure, President
Wayne Chattin, Executive Director
2820 Central S.E., Suite D-2
Albuquerque, N.M. 87106
(505) 256-0589

James L. Thorne
Washington Counsel
Alexander, Aponte & Marks, LLP
(202) 835-1555

NMBC
NATIONAL MINORITY BUSINESS COUNCIL, INC.
235 East 42nd Street, New York, NY 10017 • (212) 573-2385

March 6, 1995

Honorable Dale Bumpurs
Senator
Chairman, Committee on Small Business
United States Senate
SD-229 Dirksen Senate Office Building
Washington, DC 20510-0401

Dear Senator Bumpurs:

We are writing to urge you to stand firm on preserving affirmative action programs. These programs provide the crucial leverage to allow minority business owners to get into the economy, create new jobs and establish their professional credentials. If there is fat in government, let's eliminate it. However, we cannot sacrifice programs that have demonstrated their effectiveness.

Affirmative Action gives women and minority-owned business owners the means of conquering decades of old prejudice, allowing them to enter the market place on a level playing field. We need to strengthen and enhance those programs because a reduction in affirmative action programs will have a particularly negative impact on the ability to create jobs within the minority community. We know affirmative action programs do not sustain a business -- but they do provide the boost needed to enter the marketplace. If these cuts happen, one out of every 20 women and minority-owned businesses would have to close their doors -- primarily impacting new companies in their first year or two of operation.

We realize the ability of the minority business executive to function in our global economy is not going to rise or fall based on affirmative action. However, the NMBC believes the minority business community is an important part of the economy and will assume a larger role in the marketplace as we move toward the next century. In the interest of fairness, morality and common sense as we seek to create a larger job based in the minority community, you need to know affirmative action is working for all of us.

We look forward to meeting with you in the coming months. Please feel free to contact our national headquarters at (212)573-2385 if you would like to schedule a meeting with the NMBC Board of Directors or if you have any questions.

With warmest regards,

John F. Robinson
John F. Robinson
President and CEO

Raymond Daughtry Jr.
EB Enterprise Group, Inc.
Chairman, Board of Directors

cc: NMBC Board of Directors

ISBN 0-16-047558-9
90000
9 780160 475580